## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Southern District of West Virginia |
|---|---|
| Name (under which you were convicted):  John Moss, III | Docket or Case No.: CR-82-F-221  2:09-1406 |
| Place of Confinement: Mount Olive Correctional Complex | Prisoner No.: 13734 |

| Petitioner (include the name under which you were convicted) | | Respondent (authorized person having custody of Petitioner) |
|---|---|---|
| John Moss, III | v. | David Ballard, Warden |
| The Attorney General of the State of West Virginia;  Darrell V. McGraw, Jr. | | |

**FILED**

DEC 15 2009

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: <u>Thirteenth Judicial Circuit; Kanawha County; Charleston, WV</u>

   (b) Criminal docket or case number (if you know): <u>CR-82-F-221</u>

2. (a) Date of the judgment of conviction (if you know): <u>24 April, 1990 (Second Trial) - 26 April, 1984 (First)</u>

   (b) Date of sentencing: <u>24 April, 1990</u>

3. (a) Length of sentencing: <u>Three consecutive life without possibility of parole</u>

4. In this case, were you convicted on more than one count or of more than one crime? **X** Yes ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case: <u>Three counts of first degree murder</u>

6. (a) What was your plea? (Check one)

   (1)  Not guilty  **X**       (3)  Nolo contendere (no contest)  ☐

   (2)  Guilty  ☐              (4)  Insanity plea  ☐

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?  <u>N/A</u>

_____
_____
_____
_____

(c) If you went to trial, what kind of trial did you have?  (Check one)

Jury **X**          Judge Only ☐

7.     Did you testify at a pretrial hearing, trial, or a post-trial hearing?

Yes **X**          No ☐

8.     Did you appeal from the judgment of conviction?

Yes **X**          No ☐

9.     If you did appeal, answer the following:

(a) Name of court:   West Virginia Supreme Court of Appeals

(b) Docket or case number (if you know):   17063 (First appeal) 910166 (Second appeal)

(c) Result:   Reversed and remanded for new trial on the first one;  Refused to review the second

(d) Date of result (if you know):   19 December, 1988 (First appeal);  12 March, 1991 (Second appeal)

(e) Citation to the case (if you know):   (Pleas see attached additional page 3a)

(f) Grounds raised:   (Please see attached additional pages 3a-3b)

_____
_____
_____
_____
_____
_____

(g) Did you seek further review by a higher state court?        Yes ☐          No **X**

If yes, answer the following:

(1) Name of court:   N/A

(2) Docket or case number (if you know):   N/A

(3) Result:   N/A

_____

(4) Date of result (if you know):   N/A

(5) Citation to the case (if you know):   N/A

(6) Grounds raised   N/A

_____
_____

Attached Additional Page 3(a)

**Answer to question 9(e)** – Citation to the case:

*State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988) (First appeal);
*State v. Moss*, unreported (1991) (Second appeal).

**Answer to question 9(f)** – Grounds raised:  (*First appeal*)

A.     THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED INTO EVIDENCE Mr. MOSS' CONFESSIONS TO THE REGGETTZ MURDERS.

　　　　1.     The Confessions Were Obtained Through Exploitation Of Custody Obtained Through A Statutorily Defective Transfer Pursuant To The Interstate Agreement On Detainers.

　　　　2.     The Confessions Were Obtained As The Result Of The Police's Intentional Failure To Comply With The Juvenile Prompt Present Statute, *W.Va. Code*, 49-5-8(d)

　　　　3.     The Confessions Were Obtained Through Coerced Waiver Of Constitutional Rights.

B.     THE DEFENDANT WAS DENIED A FAIR TRIAL BY THE STATE'S INTRODUCTION INTO THE TRIAL OF THE RESULTS OF POLYGRAPH EXAMINATIONS GIVEN TO WITNESS PAUL REGGETTZ.

C.     THE DEFENDANT WAS DENIED A FAIR TRIAL BY THE REFUSAL OF THE TRIAL COURT TO POLL THE JURY AS TO POSSIBLE PREJUDICE CAUSED BY PUBLIC RADIO BROADCAST DURING WHICH THE PROSECUTOR EXPRESSED HIS PERSONAL OPINION OF THE GUILT OF Mr. MOSS.

D.     IMPROPER CLOSING ARGUMENT BY THE PROSECUTOR, UNCORRECTED BY THE TRIAL COURT, DENIED THE DEFENDANT A FAIR TRIAL.

　　　　　　1.   Appeals To The Passions And Prejudices Of The Jury.

　　　　　　2.   Expressions Of Personal Opinion And Beliefs.

　　　　　　3.   Misstatement Of The Evidence.

　　　　　　4.   Argument Concerning Consequences Of Jury Verdict.

　　　　　　5.   Elevated Standard Of Fairness And Impartiality.

　　　　　　6.   Contemporaneous Objection Requirement.

　　　　　　7.   Responsibility Of Trial Court.

Attached Additional Page 3(b)

**Answer to question 9(f)** – **Grounds raised:**  (Second appeal.)  (Counsel's submitted petition.)

A.     THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO GRANT DEFENDANT'S MOTION FOR A MISTRIAL DUE TO THE PROSECUTRIX'S PREJUDICIAL AND INFLAMMATORY STATEMENT DURING HER CLOSING ARGUMENT.

B.     THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO RENDER INADMISSIBLE THE TWO CONFESSIONS OF THE JUVENILE DEFENDANT, MR. MOSS, JR., [sic] WHICH WERE OBTAINED AS A RESULT OF UNJUSTIFIED DELAY AND WERE OBTAINED PRIOR TO PRESENTMENT TO A NEUTRAL JUDICIAL OFFICER.

C(1)   THE TRIAL COURT ERRED IN RULING THAT THE STATE HAD MET THE BURDEN OF PROOF IMPOSED UPON IT TO ESTABLISH THAT THE ELECTROPHORESIS MULTI-SYSTEM TECHNIQUE ENJOYS GENERAL ACCEPTANCE IN THE SCIENTIFIC COMMUNITY.

C(2)   THE TRIAL COURT ERRED IN RULING THAT THE STATE HAD ESTABLISHED A PROPER FOUNDATION FOR THE INTRODUCTION OF ELECTROPHORESIS MULTI-SYSTEM BLOOD STAIN TEST RESULTS, THEREBY RENDERING THESE RESULTS INADMISSIBLE AS A MATTER OF LAW.

(Supplemental *pro se* petition.)

1.     THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED PETITIONER'S CONFESSIONS OF THE REGGETTZ MURDERS INTO EVIDENCE.

2.     IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION DENIED THE PETITIONER A FAIR TRIAL.

3.     THE IMPROPER ADMISSION OF SEROLOGY TEST RESULTS DENIED THE PETITIONER A FAIR TRIAL.

4.     PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AND EQUAL PROTECTION OF THE LAW.

(h) Did you file a petition for certiorari in the United States Supreme Court?    Yes ☐    No **X**

    If yes, answer the following:

    (1) Docket or case number (if you know):  __N/A__

    (2) Result:  __N/A__

    (3) Date of result (f you know):  __N/A__

    (4) Citation to the case (if you know):  __N/A__

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

    Yes **X**   No ☐

11.    If your answer to Question 10 was "Yes," give the following information:

    (a)    (1) Name of court:  __Thirteenth Judicial Circuit; Kanawha County Circuit Court__

        (2) Docket or case number (if you know):  __94-MISC-663    (Special Zain Habeas Petition)__

        (3) Date of filing (if you know):  __August 18, 1994__

        (4) Nature of the proceeding:  __Application for state post-conviction relief__

        (5) Grounds raised:  __(Please see attached additional page 4a)__

        (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

        Yes **X**   No ☐

        (7) Result:  __Denied and Dismissed__

        (8) Date of result (if you know):  __Final Order denying habeas relief entered 30 January, 2003__

    (b) If you filed any second petition, application, or motion, give the same information:

        (1) Name of court:  __Thirteenth Judicial Circuit; Kanawha County Circuit Court__

        (2) Docket or case number (if you know):  __05-MISC-298__

        (3) Date of filing (if you know):  __2 July, 2005__

        (4) Nature of the proceeding:  __Application for state post-conviction relief__

Additional Attached Page 4(a)

**Answer to question 11(a)(5) – Grounds raised:** (Counsel's petition for writ of habeas corpus; and Counsel's submitted *Petitioner's Motion For Relief On The Two Remaining Issues Raised In The Habeas Corpus Petition.*)

[P]etitioner's incarceration Is Illegal And In Violation Of His Constitutional Rights Under The Fifth, Sixth, Eighth And Fourteenth Amendments To The United States Constitution And Article III, Sections 1, 5, 10, and 14 Of The West Virginia Constitution, Based Upon The Following, To-Wit:

1.  The Admission Of Testimony And Test Results Performed By Trooper Fred Salem Zain, Whose Credentials, Credibility, And Test Results Have All Been Found By The West Virginia Supreme Court Of Appeals To Be Inherently Unreliable And A Violation Of A Criminal Defendant's Constitutional Rights.

2.  The Presentation By The State Of Incorrect, False, Misleading, Overstated, And Unscientific Evidence.

3.  The Admission Of The Alleged Confessions Given By Petitioner, Which Resulted From A Violation Of His Constitutional Rights. Although The Issues Regarding The Confessions Have Been Extensively Litigated In Many Hearings, Petitioner Reserves The Right To Develop New Information And New Arguments With Regard To The Alleged Confessions That Were Previously Unavailable.

(Counsel's supplemental habeas corpus brief.)

The State Failed To Preserve Evidence And The Results Of Testing Of Evidence.

(5) Grounds raised:  (Please see attached additional pages 5a-5c)

_____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

　　　Yes ☐　No **X**

(7) Result:  Summarily denied and dismissed

(8) Date of result (if you know):  Final Order denying habeas relief entered February 7, 2006

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:  Thirteenth Judicial Circuit; Kanawha County Circuit Court

(2) Docket or case number (if you know):  06-MISC-245

(3) Date of filing (if you know):  22 June, 2006

(4) Nature of the proceeding:  Application for state post-conviction relief

(5) Grounds raised:  (Please see attached additional pages 5a-5c)

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

　　　Yes ☐　No **X**

(7) Result:  Summarily denied and dismissed

(8) Date of result (if you know):  October 16, 2006

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

Additional Attached Page 5(a)

**Answer to question 11(b)(5)** – **Grounds raised:** (*Pro se* petition)

a.  THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR IN RULING THAT THE FIRST TWO CONFESSIONS WERE ADMISSIBLE UNDER THE "LAW OF THE CASE DOCTRINE."

b.  THE FACTUAL DETERMINATION BY THE WEST VIRGINIA SUPREME COURT OF APPEALS THAT NO PROMPT PRESENTMENT OBJECTIONS WERE ENTERED ON THE FIRST TWO ALLEGED CONFESSIONS IS CLEARLY ERRONEOUS AND WORKS A MANIFEST INJUSTICE.

c.  PETITIONER WAS DEPRIVED OF THE SIXTH AMENDMENT'S GUARANTEE OF THE EFFECTIVE ASSISTANCE OF COUNSEL:

   (1).  Counsel Failed To Bring To The Trial And Appellant Court's Attention The Fact That The Two October 28, 1980, Confessions Were The Subject Of An Extensive Motion And Memorandum, Hearing, And Testimony And Was, In Fact, Objected To By Counsel Prior To The First Trial, Based On, *Inter Alia*, *W.Va. Code § 49-5-8(d)*.

   (2)  If Trial Counsel, At The First Trial, Failed To Object To The West Virginia Authorities' Failure To Promptly Present The Juvenile Defendant To A Neutral Judicial Officer Prior To Taking Petitioner's Alleged Confessions.

d.  PETITIONER DID NOT RECEIVE A FULL AND FAIR HEARING ON HIS MOTION AND MEMORANDUM TO SUPPRESS SAMPLES OF BLOOD, CONFESSION, AND OTHER PHYSICAL EVIDENCE SEIZED DUE TO THE IMPROPER TACTICS OF FRED S. ZAIN AND THE WEST VIRGINIA STATE POLICE TROOPERS AND CRIME LABORATORY.

e.  PETITIONER'S SIXTH AMENDMENT RIGHT TO A FAIR AND IMPARTIAL JURY WAS CONTRAVENED WHEN THE STATE KNEW, OR SHOULD HAVE KNOWN, OF THE FALSE OR MISLEADING TESTIMONY AND EVIDENCE PRESENTED BY A STATE WITNESS.

f.  THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED PETITIONER'S BLOOD SAMPLES, CONFESSIONS AND ALL EVIDENCE INCIDENT THERETO INTO EVIDENCE, WHEN THE SAMPLES OF BLOOD WERE OBTAINED IN VIOLATION OF FEDERAL AND STATE CONSTITUTIONAL RIGHTS.

g.  IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION DENIED THE PETITIONER A FAIR TRIAL.

**Answer to question 11(c)(5)** – **Grounds raised:** (*Pro se* petition)

BLOOD TEST RESULTS AND REPORTS OF OFFERED SEROLOGY EVIDENCE WERE FALSIFIED OR WERE SUBSTANTIALLY INCORRECT.

INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

Additional Attached Page 5(b)

In addition to the above filed petitions, Petitioner also filed, on or about 31 July, 2007, his *pro se Petition Under W.Va. Code § 53-4A-1 For A Writ Of Habeas Corpus*, under the original jurisdiction of the West Virginia Supreme Court of Appeals.  That petition raised the following grounds:

a.   THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR IN RULING THAT THE FIRST TWO CONFESSIONS WERE ADMISSIBLE UNDER THE "LAW OF THE CASE DOCTRINE."

b.   THE FACTUAL DETERMINATION BY THE WEST VIRGINIA SUPREME COURT OF APPEALS THAT NO PROMPT PRESENTMENT OBJECTIONS WERE ENTERED ON THE FIRST TWO ALLEGED CONFESSIONS IS CLEARLY ERRONEOUS AND WORKS A MANIFEST INJUSTICE.

c.   PETITIONER WAS DEPRIVED OF THE SIXTH AMENDMENT'S GUARANTEE OF THE EFFECTIVE ASSISTANCE OF COUNSEL:

   (1).   Counsel Failed To Bring To The Trial And Appellant Court's Attention The Fact That The Two October 28, 1980, Confessions Were The Subject Of An Extensive Motion And Memorandum, Hearing, And Testimony And Was, In Fact, Objected To By Counsel Prior To The First Trial, Based On, *Inter Alia*, *W.Va. Code § 49-5-8(d)*.

   (2)   If Trial Counsel, At The First Trial, Failed To Object To The West Virginia Authorities' Failure To Promptly Present The Juvenile Defendant To A Neutral Judicial Officer Prior To Taking Petitioner's Alleged Confessions.

d.   PETITIONER DID NOT RECEIVE A FULL AND FAIR HEARING ON HIS MOTION AND MEMORANDUM TO SUPPRESS SAMPLES OF BLOOD, CONFESSION, AND OTHER PHYSICAL EVIDENCE SEIZED DUE TO THE IMPROPER TACTICS OF FRED S. ZAIN AND THE WEST VIRGINIA STATE POLICE TROOPERS AND CRIME LABORATORY.

e.   PETITIONER'S SIXTH AMENDMENT RIGHT TO A FAIR AND IMPARTIAL JURY WAS CONTRAVENED WHEN THE STATE KNEW, OR SHOULD HAVE KNOWN, OF THE FALSE OR MISLEADING TESTIMONY AND EVIDENCE PRESENTED BY A STATE WITNESS.

f.   THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED PETITIONER'S BLOOD SAMPLES, CONFESSIONS AND ALL EVIDENCE INCIDENT THERETO INTO EVIDENCE, WHEN THE SAMPLES OF BLOOD WERE OBTAINED IN VIOLATION OF FEDERAL AND STATE CONSTITUTIONAL RIGHTS.

g.   IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION DENIED THE PETITIONER A FAIR TRIAL.

Additional Attached Page 5(c)

h.      BLOOD TEST RESULTS AND REPORTS OF OFFERED SEROLOGY EVIDENCE
        WERE FALSIFIED OR WERE SUBSTANTIALLY INCORRECT.

        The West Virginia Supreme Court of Appeals refused to issue a writ, by Order entered
on or about 13 September, 2007.

        Petitioner then filed, on or about 28 September, 2007, his *pro se* application for state
post-conviction relief, raising the following ground:

a.      PETITONER RECEIVED THE INEFFECTIVE ASSISTANCE OF COUNSEL AS
        GUARANTEED BY THE CONSTITUTIONS OF WEST VIRGINIA AND THE
        UNITED STATES.

        The circuit court summarily denied and dismissed the petition by Order entered on or
about 30 March, 2009.  A Rule 59(e) Motion was timely filed on or about April 13, 2009.  The
court denied the motion by Order entered on or about April 20, 2009.

        A petition, appealing the circuit court's summary denial and dismissal, was filed in the
circuit court on or about July 29, 2009.  The West Virginia Supreme Court of Appeals refused
to review the petition by Order entered on or about November 30, 2009.

(1)  First petition:        Yes  X      No ☐

(1)  Second petition:    Yes  X      No ☐

(1)  Third petition:        Yes  X      No ☐

(e)  If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____N/A_____

_____

12.     For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION:  To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:   (Please see attached additional pages 6a-6b)**_____

_____

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

  (Please see attached additional pages 6a-6b)_____

_____

_____

_____

_____

_____

_____

_____

(b)  If you did not exhaust your state remedies on Ground One, explain why:  _N/A_____

_____

_____

_____

(c)  **Direct Appeal of Ground One:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?        Yes  X   No ☐

(2)  If you did not raise this issue in your direct appeal, explain why:  _N/A_____

_____

_____

(d)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes  X   No ☐

(2)  If your answer to Question (d)(1) is "Yes," state:

Attached Additional Page 6(a)

**GROUND ONE**

THE LOWER COURT'S RULING THAT PETITIONER'S CONFESSIONS WERE VOLUNTARY IS CLEARLY AGAINST THE WEIGHT OF THE EVIDENCE PRESENTED AND AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ANNOUNCED BY THE UNITED STATES SUPREME COURT.

**Supporting facts:** (Because the facts throughout Petitioner's claims are so interwoven and connected, Petitioner incorporates herein, by reference thereto, the facts as set forth in his contentions 2-10, respectively.)

1.    On 28 October, 1980, ostensibly while being transported to West Virginia by members of the West Virginia Department of Public Safety to answer an unconnected malicious wounding charge, although the two troopers were the chief investigating authorities in the Reggettz murders, a confession was beaten and/or coerced out of the young, eighteen-year-old, defendant.

2.    Petitioner was yanked out of the Ohio State Reformatory without a chance to resist being transported to West Virginia by having his counsel file a habeas due to violations of the Interstate Agreement on Detainers.

3.    Petitioner was then placed in the troopers' car by having both hands cuffed to the passenger's side front head rest.

4.    After stopping for fuel, the trio were underway on some lonely Ohio highway when Trooper Smith crawled over the front seat and started punching Petitioner in the midsection asking him about the Reggettz murders.

5.    Petitioner told the troopers he would be glad to talk to them with the presence of his attorney and requested that he be allowed to contact attorney Jim Williams. Trooper Smith, however, told Petitioner he did not need an attorney. Trooper Smith intermittently continued beating Petitioner until they arrived at a Parkersburg, West Virginia State Police Detachment at around 6:30 p.m.

6.    Once there, the troopers removed Petitioner from the vehicle. Trooper Smith then hit Petitioner in the groin and told him they were there to take a taped confession.

7.    For over five hours Petitioner was held at the state police detachment and coached about what he would confess to on tape concerning the Reggettz murders. When Petitioner did not get it right, Trooper Williams would send Trooper Smith in and he would slap Petitioner around until he got it correct.

Attached Additional Page 6(b)

8.  Finally, at approximately 9:22 p.m., Petitioner signed a second waiver of rights form and a tape recorded "confession" was conducted by Troopers Williams and Preston.

9.  The West Virginia Supreme Court (hereinafter "WVSCA"), however, found that Petitioner never requested the presence of an attorney and that the troopers adequately refuted his claims that unlawful coercion was involved in obtaining Petitioner's confessions, *State v. Moss*, 180 W.Va. 363, 373 376 S.E.2d 569, 579 (1988), and, therefore, under a totality of the circumstances, Petitioner's confessions were voluntary.

10.  The WVSCA made that determination even though it was admitted by Trooper Smith that Petitioner was handcuffed to the front seat head rest, and that he (Smith) crawled over the seat to sit beside Petitioner and that he (Smith) asked Petitioner why he thought they took his blood. Petitioner took that to mean they took his blood in order to frame him for the Reggettz murders.

11.  From a totality of the circumstances, Petitioner's free will was overborne by the two burly troopers, both on the deserted, lonely highway, and later at the Parkersburg State Police detachment.

Type of motion or petition:  Application for state post-conviction relief

Name and location of the court where the motion or petition was filed:  Thirteenth Judicial Circuit; Kanawha

County Circuit Court; Charleston, WV

Docket or case number (if you know):  05-MISC-298

Date of the court's decision:  February 7, 2006

Result (attach a copy of the court's opinion or order, if available):  Summarily denied and dismissed

(Copy of denial order attached hereto as Appendix A.)

(3) Did you receive a hearing on your motion or petition?    Yes ☐  No **X**

(4) Did you appeal from the denial of your motion or petition?    Yes **X**  No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  Yes **X**  No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:  West Virginia Supreme Court of Appeals

Docket or case number (if you know):  061721

Date of the court's decision:  December 6, 2006

Result (attach a copy of the court's opinion or order, if available):  Refused to review

(Copy of Court's Order refusing to review attached hereto as Appendix B.)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

N/A

(e) **Other Remedies**: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have
used to exhaust your state remedies on Ground One:  N/A

**GROUND TWO**:  (Please see attached additional pages 7a-7d)

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(Please see attached additional pages 7a-7d)

Attached Additional Page 7(a)

**GROUND TWO**

PETITIONER'S DUE PROCESS RIGHTS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WERE VIOLATED AND THE LOWER COURT'S RULING WAS CONTRARY TO AND/OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ANNOUNCED BY THE UNITED STATES SUPREME COURT AND/OR AN UNREASONABLE DETERMINATION OF THE FACTS OF THE CASE.

(a).    The confessions were obtained through exploitation of custody obtained through a statutorily defective transfer pursuant to the Interstate Agreement on Detainers.

(b).    The confessions were obtained as the result of the Police's intentional failure to comply with the juvenile prompt presentment statute, W.Va. Code 49-5-8(d).

(c).    The confessions were obtained through coerced waivers of Petitioner's constitutional rights.

(d)     The West Virginia Supreme Court Of Appeals Erroneously Ruled That No Objections Were Entered At Petitioner's First Trial On Two Of Petitioner's Three Confessions.

(e)     The Second Trial Court Ruled That The Two Confessions In Question Were Admissible Under The "Law Of The Case Doctrine."

(f).    The Lower Court Admitted Petitioner's Confessions To The Reggettz Murders Into Evidence At Trial.

**Supporting Facts:** (Because the facts throughout Petitioner's claims are so interwoven and connected, Petitioner incorporates herein, by reference thereto, the facts as set forth in his contentions 1 and 3-10, respectively.)

1.      The admissibility of the three confessions obtained from Petitioner by the state troopers between October 28 - 30, 1980, is an issue which the WVSCA reviewed in *State v. Moss,* 376 S.E.2d 569 (1988).

2.      In *Moss, supra,* the WVSCA held that the third confession, the one on October 30, 1980, should not have been admitted into evidence because it was obtained in violation of the prompt presentment provisions of *W.Va. Code,* § 49-5-8(d), and the court's ruling in *State v. Ellsworth J.R.,* 331 S.E.2d 503 (1985).

Attached Additional Page 7(b)

3.      With regard to the two confessions obtained from Petitioner on October 28, 1980, at the Parkersburg State Police Detachment, the court's ruling was deemed inapplicable because a timely prompt presentment objection had not been made.

4.      However in the second trial, a prompt presentment objection was specifically and timely raised as to the two confessions. (Tr. pg. 19-21).

5.      The trial court, however, interpreted the *Moss* decision as requiring a finding that the two statements in issue admissible evidence. (Tr. pg. 19). The court ruled that "the taking of the statement did not violate either specific language or the principles embodied in the juvenile statute requiring an immediate presentment. (Tr. pg. 20).

6.      In *State v. Moss,* the Court found that the facts clearly established that the Petitioner had not been presented to a referee, circuit court judge, or magistrate, even after he had given three confessions to the murders. *Id.* at 376 S.E.2d at 508.

7.      The stop in Parkersburg was solely a calculated tactic of delay to allow the intimidation of a frightened juvenile who was overwhelmed by the circumstances involving the accusation of being accused of committing a serious crime.

8.      The integrity of the state troopers is immediately under scrutiny when such abuses take place.

9.      Trooper Smith, one of the troopers traveling with Petitioner, provided the following statement describing the applicable facts:

        It was then said to the effect, that we needed to get it straightened out but that something of the importance needed to be discussed some other than the back seat of a car in which we were riding. Going on to say it needed to be discussed in a place where you could sit down, have a cup of coffee and could look each other in the eye.

10.     The facts clearly indicate that Petitioner was never taken in front of a magistrate; that the confession was obtained not as a result of the troopers' decision to stop in Parkersburg or not as a result of Petitioner's offering of a confession; and that the primary purpose of the delay was to obtain a confession; and not that the delay was for the recording of said confession which had already been offered.

Attached Additional Page 7(c)

11.  Trooper Smith's statement clearly indicates that there was no clear or specific understanding between Petitioner and the troopers that he was prepared to discuss the Reggettz murders at that moment while traveling or any other time. The nod of his head described by Trooper Smith is certainly not tantamount to an expression of the desire to offer a confession.  The entire conversation was conceived by and prompted by the trooper, not by the Petitioner:

> . . . I said something to the effect of, now John, we both know what I am talking about and it is important we get it straightened out. He did not acknowledge that he did know what we were talking about.  After expressing a couple of more times to John that it was extremely important that the matter needed to be straightened out, it was told to John or asked of him something of the effect of, John why do you think we got that sample of blood. After mentioning the blood, John was again told something to the effect of, now John, we both know what I'm talking about, he agreed shaking his head yes.

12.  Therefore, because Petitioner's prompt presentments were timely raised at the second trial, the confessions should have been excluded from evidence.  Based upon the particular set of facts in the instant case, Petitioner should be entitled to a new trial.

13.  Prior to Petitioner's first trial, counsel filed a motion to suppress two of the alleged confessions of Petitioner, as well as the results of blood tests.  The court held two *in camera* suppression hearings.

14.  One was held prior to the first trial, and one was held after individual *voir dire* of the jury had begun.  At the conclusion of the September, 1983, hearing, the trial court set a briefing schedule as well as a date of October 12, 1983, at 9:00 a.m. to render a ruling from the bench on the admissibility of the two 10/28/80 "confessions."  It is not clear to Petitioner, due to the passage of time, whether any hearing was held on that date and Petitioner has been unable to obtain a transcript of the court's ruling or any entered Order.

15.  Counsel filed his *Memorandum In Support Of Motion To Suppress*, on or about 3 October, 1983.  A bench ruling that the two confessions would be admissible was issued in a December 29, 1983, 2-page letter type document.

16.  The defense was not informed of the state's intention of introducing Petitioner's third confession, so that confession was not a subject of the motion, September, 1983, hearing, memorandum or ruling.  Counsel also filed a motion *in limine* on the two confessions.

Attached Additional Page 7(d)

17. Though not dispositive of the reversal by the WVSCA of Petitioner's first trial, the court nonetheless considered Petitioner's issue on direct appeal that the three confessions were improperly admitted at trial due to, they felt, "[b]ecause the admissibility of the...three confessions..[would] again be of concern on remand..." See State v. Moss, 180 W.Va. 363, 369, 376 S.E.2d 569, 575 (1988).

18. The court ruled that, unlike the first two confessions, the third confession is inadmissible due to the lack of prompt presentment to a neutral judicial officer. State v. Moss, 376 S.E.2d at 576. The court ruled that had prompt presentment objections been preserved on the first two confessions, as in the third confession, they, too, would have been inadmissible. Id. at 581. Appellate counsel failed to file a petition on rehearing to call the court's attention to their mistake.

19. Prior to Petitioner's second trial, counsel filed a motion to suppress the two remaining confessions based on authorities' failure to promptly present Petitioner to a neutral judicial officer, and subsequently objected to the second trial court's adverse ruling. The second trial court cursorily ruled that the WVSCA, in State v. Moss, had held the two confessions to be admissible, and that ruling was, therefore, "law of the case" on remand; and if that were not the case, the foray or diversion from the direct route from Ohio to Charleston would not violate the juvenile prompt presentment statute or the WVSCA mandate in Ellsworth, J.R. (State v. Ellsworth, J.R., 331 S.E.2d 503 (W.Va. 1985).

20. The two confessions were quite probably the decisive factor for the jury to convict Petitioner as the remaining evidence were easily dispelled as not being strong enough to convince impartial minds, beyond a reasonable doubt, of Petitioner's guilt. Neither the WVSCA or Kanawha County Circuit Court followed the state's own procedural and decisional law in allowing the two confessions before the jury.

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why:  N/A

_____

_____

_____

(c) **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?   Yes **X**  No ☐

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why:  Petitioner attempted to raise this issue in

_pro se_ Supplemental Petition For Appeal

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

    Yes **X**  No ☐

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition:  Application for state post-conviction relief

    Name and location of the court where the motion or petition was filed:  Thirteenth Judicial Circuit; Kanawha

    County Circuit Court; Charleston, WV

    Docket or case number (if you know):  05-MISC-298

    Date of the court's decision:  February 7, 2006

    Result (attach a copy of the court's opinion or order, if available):  Summarily denied and dismissed

    (Appendix A.)

_____

    (3) Did you receive a hearing on your motion or petition?    Yes ☐  No **X**

    (4) Did you appeal from the denial of your motion or petition?    Yes **X**  No ☐

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes **X**  No ☐

    (6) If your answer to Question (d)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:  West Virginia Supreme Court of Appeals

_____

    Docket or case number (if you know):  061721

Date of the court's decision:  December 6, 2006

Result (attach a copy of the court's opinion or order, if available):  Refused to review

   (Appendix B.)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

   N/A

(e) **Other Remedies**:  Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two:  N/A

**GROUND THREE**:  (Please see attached additional pages 9a-9b)

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

   (Please see attached additional pages 9a-9b)

(b) If you did not exhaust your state remedies on Ground Three, explain why:  N/A

(c) **Direct Appeal of Ground Three**:

   (1) If you appealed from the judgment of conviction, did you raise this issue?      Yes ☐   No **X**

   (2) If you did not raise this issue in your direct appeal, explain why:  Information revealing this issue withheld by the state and was not discovered until during state application for post-conviction relief. Under West Virginia procedure, this issue is not proper for direct appeal.

(d) **Post-Conviction Proceedings**:

Attached Additional Page 9(a)

**GROUND THREE**

PETITIONER DID NOT RECEIVE A FULL AND FAIR HEARING ON HIS MOTION AND MEMORANDUM TO SUPPRESS SAMPLES OF BLOOD, CONFESSION, AND OTHER PHYSICAL EVIDENCE SEIZED DUE TO THE IMPROPER TACTICS OF FRED S. ZAIN AND THE WEST VIRGINIA STATE POLICE TROOPERS AND CRIME LABORATORY, AND PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED. THE LOWER COURTS' RULINGS WERE CONTRARY TO AND/OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ANNOUNCED BY THE UNITED STATES SUPREME COURT, OR AN UNREASONABLE DETERMINATION OF THE FACTS AS SET FORTH IN THE RECORD.

**Supporting Facts:** (Because the facts of Petitioner's claims are so interwoven and connected, Petitioner incorporates herein, by reference thereto, the facts as set forth in his contentions 1-2 and 4-10, respectively.)

1.     The two samples of blood obtained from Petitioner were derived from him on two separate trips by West Virginia State Police troopers to Ohio where Petitioner was being held.

2.     On the first occasion, 30 January, 1980, the troopers did not have a court order, warrant, or permission from Petitioner's counsel or parents. On the second occasion, 28 April, 1980, however, an Ohio court order was obtained by West Virginia authorities to extract a blood sample.

3.     On neither occasion was counsel present with Petitioner, even though the assistant prosecuting attorney for Kanawha County, West Virginia, was present at the second, forced, extraction.

4.     It was only after the first blood sample was obtained that Petitioner became a serious focal point in the homicides of the Reggettz family.

5.     It was alleged by West Virginia authorities that the cloth containing the first sample was returned to Petitioner. However, Petitioner unequivocally avers the cloth, or all of it, was not returned but was taken to Fred S. Zain on 30 January, 1980, by Zain's fellow troopers, Williams and Smith. That fact has never been disputed by the government.

6.     It was only after Zain had a known sample of Petitioner's blood, with which he falsely reported had been gathered at the crime scene, that Petitioner became a serious focal point in the investigation of Petitioner's involvement in the murders of the Reggettz family.

Attached Additional Page 9(b)

7.    The fact Zain had a known sample of Petitioner's blood is borne out by the copy of a January, 1980, lab table listing blood groupings from fourteen (14) individuals, including Petitioner.  Contrary to testimony, a known sample of Petitioner's blood was in Zain's possession in January, 1980.

8.    The illegally obtained blood sample, forcefully extracted from the then 17-year-old, and constitutionally prohibited questioning of the young defendant, who had, subsequently, just turned 18, provided West Virginia authorities with the probable cause to obtain an Ohio court order to obtain another, ostensibly, legal blood sample from Petitioner, for the probable cause to transport Petitioner from Ohio to West Virginia, and to issue search warrants of Petitioner's parents' home and automobile. It is also what the two troopers who beat a confession from Petitioner used to inform him that they were pinning the murders of the Reggettz family on him.

9.    The trial court held two *in camera* suppression hearings on counsel's motion to suppress Petitioner's blood test results, confessions, and all physical evidence seized from Petitioner's parents' home and automobile, which were also the subject of counsel's motions *in limine.*

10.   One hearing was held prior to trial and one was held after individual *voir dire* of the jury had commenced.

11.   Counsel had filed motions for particulars (discovery) requesting the state turn over all reports, statements, test results, etc., that was in the possession of the state.

12.   The state responded that it had provided defense counsel with all the requested material.

13.   However, the blood grouping table was not divulged by the state until Petitioner's habeas corpus counsel, Lonnie C. Simmons, discovered it during Petitioner's first special Zain habeas proceeding.

14.   Trial counsel was precluded from fully and fairly litigating Petitioner's Fourth Amendment issues prior to or during trial because of the state's nondisclosure of, *inter alia*, the blood grouping table.

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes **X**   No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   Application for state post-conviction relief

Name and location of the court where the motion or petition was filed:   Thirteenth Judicial Circuit;  Kanawha County Circuit Court; Charleston, WV

Docket or case number (if you know):   05-MISC-298

Date of the court's decision:   February 7, 2006

Result (attach a copy of the court's opinion or order, if available):   Summarily denied and dismissed (Appendix A.)

(3)  Did you receive a hearing on your motion or petition?                        Yes ☐   No **X**

(4)  Did you appeal from the denial of your motion or petition?              Yes **X**   No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   Yes **X**   No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:   West Virginia Supreme Court of Appeals

Docket or case number (if you know):   061721

Date of the court's decision:   December 6, 2006

Result (attach a copy of the court's opinion or order, if available):   Refused to review (Appendix B.)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

  N/A

(e)  **Other Remedies**: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:   N/A

**GROUND FOUR**:   (Please see attached additional pages 10a-10jj.)

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Attached Additional Page 10(a)

## GROUND FOUR

PETITIONER'S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL AND IMPARTIAL JURY WAS CONTRAVENED WHEN THE STATE KNEW, OR SHOULD HAVE KNOWN, OF THE FALSE OR MISLEADING TESTIMONY AND EVIDENCE PRESENTED BY A STATE WITNESS, AND THE LOWER COURTS' RULINGS WERE CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ANNOUNCED BY THE UNITED STATES SUPREME COURT, AND/OR WAS AN UNREASONABLE DETERMINATION OF THE FACTS AS SET FORTH IN THE RECORD.

**Supporting Facts:** (Because the facts throughout Petitioner's claims are so interwoven and connected, Petitioner incorporates herein, by reference thereto, the facts as set forth in his contentions 1-3 and 5-10, respectively.)

## GROUND FIVE

THE ADMISSION OF PETITIONER'S BLOOD SAMPLES, CONFESSIONS AND ALL EVIDENCE INCIDENT THERETO VIOLATED PETITIONER'S RIGHT TO A FAIR TRIAL WHEN THE SAMPLES OF BLOOD WERE OBTAINED IN VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, AND THE RULINGS OF THE LOWER COURTS ARE CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ANNOUNCED BY THE UNITED STATES SUPREME COURT, AND/OR AN UNREASONABLE DETERMINATION OF THE FACTS AS SET FORTH IN THE RECORD.

**Supporting facts:** (Because the facts throughout Petitioner's claims are so interwoven and connected, Petitioner incorporates herein, by reference thereto, the facts as set forth in his contentions 1-4 and 6-10, respectively.)

Attached Additional Page 10(b)

**GROUND SIX**

IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION DENIED
PETITIONER HIS FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR
TRIAL AND DUE PROCESS OF LAW, THE LOWER COURTS' RULINGS
ARE CONTRARY TO OR AN UNREASONABLE DETERMINATION OF
CLEARLY ESTABLISHED FEDERAL LAW AS ANNOUNCED BY THE
UNITED STATES SUPREME COURT, AND/OR AN UNREASONABLE
DETERMINATION OF THE FACTS AS SET FORTH IN THE RECORD.

**Supporting Facts:** (Because the facts throughout Petitioner's claims are so interwoven and
connected, Petitioner incorporates herein, by reference thereto, the facts as set forth in his
contentions 1-5 and 7-10, respectively.)

1.     The trial of this case came down to the simple matter of which confessor the jury
       would choose to believe.

2.     Both had unsuccessfully attacked their confessions as being unconstitutionally
       coerced.

3.     Paul Reggettz testified for the state.  He told the jury of the pressures and tactics the
       police employed in illegally extracting his confession. The jury saw him testify, they
       heard his version of the story.

4.     The petitioner, on the other hand, invoked his constitutional right not to testify.  The
       jury had his confession to consider.

5.     The significance of this fact was not lost on the prosecution in its summation.
       Repeated references were made in relation to Mr. Reggettz such as:

              [Y]ou saw him on the stand.  He told you.... (Tr. 1322); Paul told
              you... .You heard him say it. (Tr. 1323); Paul Reggettz told you [about
              the interrogation]; He told you how they fired questions at him; You
              heard what Paul said [about] the interrogation. (Tr. 1324); Paul told
              you that he just couldn't take it [the interrogation]/ (Tr. 1326). You saw
              Paul Reggettz on the stand. He told you... (Tr. 1330); And how Paul
              Reggettz says -- he's able to testify and he can say... (Tr. 1386).

              References were also made with regard to the petitioner:

              John Moss told you about those gifts... (Tr. 1327); [Y]ou heard the
              defendant on the stand... (tr. 1332); And then John testified he gave it
              to another lady... He told you... (Tr. 1335).

Attached Additional Page 10(c)

6.     Contrary to the state's argument, however, Petitioner did not testify. He was never on the stand before the jury. He told the jury nothing. The jury was aware of that fact and they were made even more aware of it by the state's improper implication that Petitioner's confession was akin to him having taken the stand, and that he had testified.

7.     The prosecutor deliberately made comments that drew attention to the jury, special facts known only to the prosecutor that they, the jury, were not privy to; it attacked opposing counsel's strategy and/or presentation of Petitioner's case; and was a comment on Petitioner's, or his witness' credibility.

> I want you to ask defense counsel -- again, ask them to explain how Paul Reggettz's confession changes any of the evidence against John Moss. See if they can explain it.  (Tr. 1331).

> Did you notice...they didn't talk about blood?  Did you notice that there is no explanation... " (Tr. 1370).

> He didn't necessarily tell the whole story.  (Tr. 1376).

> Why did he kill [her].  He doesn't say... ."  (Tr. 1377).

8.     Taken as a whole, the state's remarks in closing amounted to improper comments on the failure of petitioner to testify and infused the entire trial process with so a fundamental unfairness as to deprive petitioner the guarantees of a fair trial.

9.     The state also made the following statement:

> He knew Vanessa Reggettz was there by herself with her two children, didn't he? He knew that her husband worked at night. He didn't necessarily tell the whole story. Perhaps Vanessa Reggettz's panties are on the bed -- not on her body.  Why her sanitary napkin was on the floor -- a homemade sanitary napkin, not store bought one, something has no pins to secure it, no tape to secure it no belt to secure it. It was secured in place by her underwear, but her underwear is off her body and her sanitary napkin is on the floor.

> He did leave out a struggle in the front bedroom and left out taking off her underwear. (Tr. 1376 & 1377.)

10.     At the conclusion of the State's argument, Petitioner's counsel asked to approach the bench.  The court, *sua sponte,* said, "I know you are going to raise an objection. [I]s it something that you think you want a curative instruction on or is it instructional? (Tr. 1391).  Petitioner's counsel replied, "I don't know." (Tr. 1391).  The court continued: "The reason I ask is this, if you don't think it's something that can be

Attached Additional Page 10(d)

taken care of by a curative instruction..." (Tr. 1391.) You've made a timely request to object. I take it you object to the inference drawn from the panties and such?" (Tr. 1392.) Petitioner's counsel replied, "[Y]es." (Tr. 1391.)

11. Petitioner's counsel moved for a motion for mistrial. (Tr. 1395.) The court stated: "I overruled the motion for mistrial, and I will deny the request for a curative instruction." (Tr. 1396.)

12. There was absolutely no factual basis for the state to make an argument that the Petitioner had sex with the victim. The litany of the sanitary napkin and it's particulars were deliberately designed only to inflame the jury, and was most certainly highly prejudicial to the Petitioner at his trial.

## GROUND SEVEN

PETITIONER'S GUARANTEE TO EQUAL PROTECTION AND THE DUE PROCESS OF LAW WERE VIOLATED WHEN THE LOWER COURTS FAILED TO PROVIDE HIM WITH THE APPOINTMENT OF COUNSEL AND A FULL HABEAS CORPUS EVIDENTIARY HEARING, INASMUCH, THE CIRCUIT COURT FAILED TO ABIDE BY THE WEST VIRGINIA SUPREME COURT'S MANDATE, AND THE WEST VIRGINIA SUPREME COURT ON APPEAL FAILED TO HONOR ITS OWN MANDATE, THEREBY THE LOWER COURT'S RULING IS CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ANNOUNCED BY THE UNITED STATES SUPREME COURT, OR AN UNREASONABLE DETERMINATION OF THE FACTS AS SET FORTH IN THE RECORD.

**Supporting facts:** (Because the facts of Petitioner's claims are so interwoven and connected, Petitioner incorporates herein, by reference thereto, the facts as set forth in his contentions 1-6 and 8-10, respectively.)

1. On June 16, 2006, the West Virginia Supreme Court of Appeals filed its opinion styled: *IN THE MATTER OF: RENEWED INVESTIGATION OF THE STATE POLICE CRIME LABORATORY, SEROLOGY DIVISION,* 2006 W.VA. LEXIS 512006, W.VA. LEXIS 51, NO. 32885. The Supreme Court enunciated the following directive:

A prisoner against whom a West Virginia State Police Crime Laboratory serologist other than Fred Zain offered evidence and who challenges his or her conviction based on serology evidence is to be granted a full habeas corpus hearing on the issue of the serology evidence. The prisoner is to be represented by counsel unless he or she knowingly and intelligently waives

(Attached Additional Page 10(e)

that right.  The circuit court is to review the serology evidence presented by the prisoner with painstaking scrutiny. At the close of the evidence, the circuit court is to draft a comprehensive order which includes detailed findings as to the truth or falsity of the serology evidence and if the evidence is found to be false, whether the prisoner has shown the necessity of a new trial based on the five factors set forth in the syllabus of *State v. Frazier,* 162 W.Va. 935, 253 S.E.2d 534 (1979).  Syllabus Point 4.

A prisoner who was convicted between 1979 and 1999 and against whom a serologist, other than Fred Zain, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence despite the fact that the prisoner brought a prior habeas corpus challenge to the same serology evidence, and the challenge was finally adjudicated.  Syllabus Point 6.

2.      In announcing these new syllabus points, the WVSCA adopted the report of findings submitted by the Honorable Thomas A. Bedell, Special Judge, but with modifications thereto.  Those modifications included the additional finding that, though insufficient evidence exists to rule Zain's assistant serologists engaged in misconduct, **errors** did occur in the proceedings below.  Justice Maynard opined:

"[B]ecause of the frequent and recurring errors identified in the work of Zain's assistant serologists we deem it necessary to enact a special habeas corpus procedure . . . to be utilized by those prisoners against whom serologists, other than Zain, offered evidence."

3.      On or about June 21, 2006, Petitioner filed his Special Habeas Corpus with the Kanawha County Circuit Court pursuant to the WVSCA mandate, alleging that serologists other than Fred Zain offered evidence at his 1990 trial that was falsified and/or substantially incorrect.

4.      On October 16, 2006, the Honorable Judge Louis H. Bloom, entered an Order summarily denying Petitioner's Writ of Habeas Corpus, in direct contravention of the Supreme Court's Mandate that counsel be appointed and a full hearing be held in the matter.

5.      On or about January 31, 2007, Petitioner filed his *pro se* petition with the WVSCA appealing the circuit court's Order summarily dismissing Petitioner's petition.

6.      On or about June 9, 2007, the WVSCA refused said appeal, in direct violation of their express mandate in their previous ruling, and not in accordance with the State of West Virginia constitutional directive as contained in Article VIII, Section § 4, which states:

Attached Additional Page 10(f)

A writ of error, supersedeas or appeal shall be allowed by the supreme court of appeals, or justice thereof, only upon a petition assigning error in the judgment or proceedings of a court and then only after the court, or justice thereof, shall have considered the record and is satisfied that there is probably error in the record, or that it presents a point proper for the consideration of the court.

## GROUND EIGHT

PETITIONER'S INCARCERATION IS ILLEGAL AND IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTIONS RESPECTIVELY, AND THE LOWER COURTS' RULING IS CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ANNOUNCED BY THE UNITED STATES SUPREME COURT, OR AN UNREASONABLE DETERMINATION OF THE FACTS AS SET FORTH IN THE RECORD.

1.    The admission of testimony and test results performed by Trooper Fred Salem Zain, whose credentials, credibility, and test results have all been found by the West Virginia Supreme Court of Appeals to be inherently unreliable and a violation of a criminal defendant's constitutional rights. (*See PETITION FOR WRIT OF HABEAS CORPUS*, (Civil Action No. 94-MISC-663, pg. 45).

2.    The presentation by the State of incorrect, false, misleading, overstated, and unscientific evidence.  (*See PETITION FOR WRIT OF HABEAS CORPUS*, (Civil Action No. 94-MISC-663, pg. 45).

3.    The admission of the alleged confessions given by the Petitioner, which resulted from the violation of his constitutional rights. Although the issues regarding the confessions have been extensively litigated in many hearings, petitioner reserves the right to develop new information and new arguments with regards to the alleged confessions that were previously unavailable. (*See PETITION FOR WRIT OF HABEAS CORPUS*, (Civil Action No. 94-MISC-663, pg. 45).

4.    The West Virginia Supreme Court in the Laboratory Decision erred in applying the harmless error test for nonconstitutional errors, rather than the harmless error test for constitutional errors. (*See PETITIONER'S SUPPLEMENTAL BRIEF ON ISSUES RAISED IN HABEAS CORPUS PETITION*, pg. 3).

5.    The State failed to preserve the evidence and the results of the testing for review by Petitioner.  (*See PETITIONER'S SUPPLEMENTAL BRIEF ON ISSUES RAISED IN HABEAS CORPUS PETITION*, pg. 10).

Attached Additional Page 10(g)

This ground and the five sub contentions have been denied by the Circuit Court of Kanawha County, West Virginia, and appealed to the West Virginia Supreme Court of Appeals. (*See PETITIONER'S APPEAL BRIEF,* (No. 31646). On or about July 1, 2004, the West Virginia Supreme Court filed a written opinion; *Moss v. Trent,* 603 S.E.2d 656, affirming the lower court's denial of habeas corpus relief.

**Supporting facts:** (Because the facts of Petitioner's claims are so interwoven and connected, Petitioner incorporates herein, by reference thereto, the facts as set forth in his contentions 1-7 and 9-10, respectively.)

A.

Reggettz's Transcripts Are Factually And Legally Relevant In Petitioner's Case. Petitioner Incorporates Them Herein.

1.      Most of all the transcripts from the hearings held in connection with the case styled *State v. Paul Reggettz, III,* Criminal Action No. CR-80-F-121, have now been transcribed.

2.      In light of the detailed confessions given by Paul Reggettz, III, and the subsequent indictments in Texas and West Virginia against Trooper Fred Salem Zain, Petitioner and his counsel believed it was essential that virtually all of the hearings held in the *Reggettz* case be transcribed so that the various representations made by the State and others regarding the Reggettz confessions and the findings by Zain could be noted, as they are paramount in Petitioner's case.

3.      After most of the court reporter tapes were located, they were sent to the original court reporters for transcribing.

4.      The Clerk's office had the transcripts of the hearings held on January 2, May 5, June 11, 18, 19, and 23, 1980, in the Reggettz case, some of which were cited in Petitioner's Petition.

Attached Additional Page 10(h)

B.

Reggettz Confesses To The Murders Of His Family.

5.    The evidence in this case consists largely of conflicting confessions from two different people–Reggettz, and Petitioner.

6.    In Petitioner's State Habeas Corpus Petition, as in these proceedings, the relevant facts in the proceedings against Reggettz and Petitioner are necessary and will be noted.

7.    On December 13, 1979, Reggettz, testified that he returned from work to his home in St. Albans, West Virginia, and found that his wife, Vanessa Reggettz, his son, Paul Eric Reggettz, and his daughter, Bernadette Lynn Reggettz, were dead.

8.    On the same day and the next day, Reggettz confessed to killing his wife, son, and daughter.

9.    On December 14, 1979, Reggettz returned to his house, accompanied by law enforcement officers, including Mike Roark, Kanawha County Prosecutor, and, through words and actions, demonstrated how he killed his wife, son, and daughter.

10.   Based upon his detailed confessions, Reggettz was arrested for these three murders and incarcerated in the Kanawha County Jail.

C.

State Requests Blood Sample From Reggettz.

11.   Shortly after his arrest, the State sought to obtain a blood sample from Reggettz.

12.   On December 20, 1979, a hearing was held in which the State made various representations regarding known blood types of the three victims, and the blood types obtained from the unknown blood samples found in the Reggettz home.

13.   Upon the filing of Petitioner's Petition for Writ of Habeas Corpus and the subsequent state proceedings, counsel for the Petitioner was unable to locate the court reporter tape generated from said hearing, therefore, it was not available for review for possible utilization in Petitioner's habeas corpus proceedings in his State habeas corpus proceedings or in the instant proceedings.

14.   On December 31, 1979, counsel for Reggettz filed a motion opposing the request by the State to obtain a blood sample from Reggettz.

## Attached Additional Page 10(i)

15. According to the memorandum filed on behalf Reggettz, the basis for the State's request was that, "The State had offered testimony of seven (7) blood smears from the defendant's home and that the State is able to say conclusively that those smears were not of the blood type of the three (3) victims."

16. In an Order dated January 2, 1980, the Court required Reggettz to provide the State with a blood sample.

17. On January 7, 1980, Reggettz was bound over to the grand jury.

### D.

### Blood Samples Obtained Illegally From Petitioner.

18. On January 30, 1980, Troopers Michael Don Smith and Terry Williams traveled to the Juvenile Detention Center in Cleveland, Ohio, to meet the Petitioner and to obtain a blood sample from him.

19. Trooper Smith testified at Petitioner's second juvenile hearing that he gave Petitioner a sharp metal pin which petitioner used to prick his own finger. Petitioner bled on a piece of cloth, which the trooper took with him.

20. At the time Trooper Smith obtained this blood sample from Petitioner, he was not represented by counsel and was a juvenile.

21. After Trooper Smith's actions were brought to the attention of the Cuyahoga Court of Common Pleas, the court determined that this blood sample had been obtained illegally and ordered the sample to be destroyed or returned to Petitioner.

22. On April 22, 1980, after obtaining a court's Order, Troopers Terry Williams and Smith again traveled to Cleveland, Ohio to obtain another blood sample from Petitioner. A Kanawha County assistant prosecuting attorney accompanied them.

Attached Additional Page 10(j)

E.

Reggettz Indicted For Murdering His Family.

23. On April 24, 1980, during the January, 1980, term of the grand jury, Reggettz was indicted for three counts of murder, based upon the testimony of Trooper Terry Williams and Sergeant Robert C. Murphy.

24. Petitioner's name is included in the indictment, but the grand jury did not officially indict him on any charges.

25. On May 5, 1980, Reggettz was arraigned on the indictment and a trial date was set for June 23, 1980.

F.

State Conducts Serological Testing.

26. During the course of the investigation, the State obtained known blood samples from various individuals, including Paul Reggettz, III, Petitioner, the three victims, and several other persons.

27. In searching the Reggettz home, the State (Trooper Fred Zain) also obtained several allegedly unknown blood samples from various items therein.

28. After obtaining these alleged blood samples, the State performed testing on them to compare the blood types determined from the known blood samples with the blood types obtained from the unknown blood samples.

29. In a report dated June 10, 1980, and signed by Sgt. Robert C. Murphy, the serological typing performed on these known and alleged unknown blood samples was documented.

30. Based upon the foregoing typings, the report concludes that the blood stains "identified on items #1 - 6, #8, #13 from the scene, on the nightgown of Vanessa Reggettz, and on the doll were consistent with the groupings of Vanessa Reggettz's blood and with the groupings of Paul Eric Reggettz's blood."

31. The blood stains found on items #9 and #16 were also found to be consistent with the groupings of Vanessa Reggettz's blood and Paul Eric Reggettz's blood.

Attached Additional Page 10(k)

32.     The report further concluded: "groupings of the human blood stains identified on items #7, #11, #12, #14 and #15 from the scene, on the Christmas package and wrapping paper, on the flashlight, and on the clothing of Bernadette Reggettz were consistent with the groupings of blood of [Petitioner's] and were not consistent with the groupings of the other blood specimens submitted."

33.     Based upon the testing, Trooper Zain testified that the combination of the blood types found on Item #15, the change purse, eliminated 99.9% of the population, meaning that one person in one thousand would have those seven blood types, and that Petitioner was included in the population with that particular combination of seven blood types.


G.

Reggettz Confessions Found By The Court To Be Voluntary And Admissible.

34.     October 20 and 21, 1980, a suppression hearing was held on the voluntariness and admissibility of the confessions given by Reggettz.

35.     The state filed a brief in opposition to the motion to suppress and concluded:

"In summary, it is the State's contention that Paul Reggettz, III, gave a voluntary and informed consent to waive his rights to remain silent and his right to counsel, and ultimately confessed to Trooper H. F. Woodyard on December 14, 1980. It is submitted that the record in this case is devoid of any evidence to support defendant's theory that the confession was the result of physical force, threats, psychological coercion, or some other fraud, deceit or trickery. Rather, it is submitted that during the time he was being questioned Paul Reggettz' various and sundry constitutional rights were assiduously protected, and he was treated in an orderly fashion. To hold otherwise, would give credence to the defendant's obviously self-serving testimony and to completely disregard the testimony of several members of the West Virginia Department of Public Safety and the Prosecuting Attorney of Kanawha County. Defendant's contention that his confession was involuntary and unintelligently given flies in the face of reason, considering the detailed nature of the confession and considering that the crime itself was reenacted by the accused." (MEMORANDUM OF LAW ON BEHALF OF THE STATE OF WEST VIRGINIA IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS AT 8-9).

Attached Additional Page 10(I)

36.     On October 28, 1980, the Court agreed with the State's arguments and made extensive findings of fact and conclusions of law on the record, holding the confessions were voluntary and admissible.

37.     Specifically, the Court held:

> "Thus, a reading of the cases submitted for the Court's consideration and a totality of the facts surrounding this matter, leaves the Court to conclude in fact and in law that the defendant Reggettz was of normal intelligence and that the State has proven its case by a preponderance of the evidence that it was made voluntary.
>
> There was testimony from the number of State's witnesses that Reggettz was alert and that he did not ask to go to sleep when asked if he was tired. He was given food and drink and cigarettes and he was permitted to go outside unaccompanied, although Reggettz disputes that.
>
> "Given a totality of the circumstances of this case, which involved three counts of murder in the first degree, the Court finds that the confession was made knowingly, intelligently, voluntarily, and that the State, by a preponderance of the evidence, has sustained its burden of proof." (*REGGETTZ* OCTOBER 28, 1980, Tr. 35-36).

### H.

#### Petitioner Allegedly Confesses To Three Murders.

38.     On October 28, 1980, the same day the Court found the confessions given by Reggettz to have been given voluntarily and in accordance with his constitutional rights, Petitioner, who was then eighteen years old, allegedly confessed to killing Vanessa Reggettz, Paul Eric Reggettz, and Bernadette Lynn Reggettz. (SECOND TRIAL, Tr. 505-78).

39.     In the suppression hearing held before the first trial, Petitioner testified that he confessed to these crimes only after being subjected to repeated physical abuse by Trooper Smith, who crawled into the back seat beside petitioner while both of Petitioner's hands were handcuffed to the headrest. (FIRST TRIAL PRETRIAL SUPPRESSION HEARING, Tr. 303-05).

40.     Trooper Williams and Trooper Smith confirmed the fact that Petitioner was handcuffed to the front seat head rest and that Trooper Smith did crawl into the back seat with Petitioner to begin the questioning. (SECOND TRIAL, Tr. 509, 937).

Attached Additional Page 10(m)

41.    Even though Troopers Williams and Smith denied the beating allegations, both admitted that Petitioner's "willingness" to discuss the Reggettz murders was triggered when Trooper Smith said to the Petitioner, "Why do you think we got your blood?" (SECOND TRIAL, Tr. 511-14,, 944-45).

42.    The alleged confessions were obtained from Petitioner after they arrived at the Parkersburg, West Virginia, State Police barracks.

43.    Based upon these alleged confessions, Petitioner was arrested for these three murders and incarcerated in the Kanawha County Jail.

44.    Subsequent to Petitioner's arrest, Reggettz was released from jail.

I

Fred Zain's Serological Testing And Testimony Critical To The State's Case.

45.    Although the State presented some additional circumstantial evidence in an effort to bolster or corroborate the alleged confessions given by Petitioner, it cannot be disputed that the most significant evidence presented at both trials was the testimony of Zain, who is the former head of the Serology Division of the West Virginia Department of Public Safety.

46.    Petitioner anticipated that the State may attempt to deny Zain was involved in the testing in his case. The following discussion notes the various transcripts in which Zain either admits, under oath, conducting the testing, or in which the State attributes the blood testing to Zain.

47.    Petitioner avers that the importance of Zain's testimony and blood typing results were paramount in the State obtaining a conviction in his case, and it is necessary to note his testimony was emphasized numerous times throughout both trials.

48.    In the first trial, the state opined to the jury in its opening statement what some of the evidence would be:

"On April 22, 1980, police officers, state police officers and a member of the prosecutor's office, acting on a tip, went to Ohio to obtain a blood specimen from a young man that they found out lived within two to three hundred yards of the Reggettz house during the time of these murder. And that young man was John Moss, Jr."

Attached Additional Page 10(n)

"A blood specimen was obtained. It was analyzed, and that blood specimen, you will hear, matched the blood characteristics of John Moss, Jr.
"The technician will tell that the blood is found -- three in every ten thousand people have that kind of blood. They will tell you they no longer break down blood the way you and I may be familiar with it, the old A-B-O. They can break down into nine separate factors now, each one independent of the others. But they must tell you about that." (FIRST TRIAL, TR. 2236).

49.   In the first trial, Petitioner's counsel raised a question about who performed the serological testing. Zain or Murphy:

"The defendant, John Moss, moves the Court to prohibit Sergeant Zain from testifying as serologist in this case on the basis of discovery that the defendant discussed and was given blood analysis reports from the State of West Virginia. Those blood analysis reports reflected that a Sergeant Murphy did the analysis.

"In a subsequent suppression hearing a Sergeant Murphy testified under oath that he was the one that did those analyses of the blood. Relying on discovery, relying on what the State afforded the defendant, and relying on the evidence in the suppression hearing, the defendant interviewed Sergeant Murphy, and now is advised that Sergeant Zain did the analyses. We object on that basis." (FIRST TRIAL, Tr. 3450-51).

50.   Actually in the suppression hearing held before the first trial, Murphy testified that all of the blood tests were completed by April 26, 1980, and that he testified before the grand jury which indicted Reggettz. (First Trial Pretrial Suppression Hearing, Tr. 255-56).

51.   Murphy was never asked whether he performed all of the tests by himself or whether Zain had any involvement in the testing process.

52.   Furthermore, Murphy did not testify before the jury in either the first or second trials, leaving Zain to provide the jury with all of the evidence regarding the blood typing.

53.   The state opposed the objection and explained:

"Sergeant Zain took scrapings, and he will testify that he did the analyses, as did Murphy. I have seen Zain's notes. He does have a lot of notes. I don't know if he has them with him here, but he has them. In any event, what he did do he can testify he did. I think he can testify." (FIRST TRIAL, Tr. 3451).

54.   Thus, the State represented to the Court that it had actually reviewed laboratory notes generated by Trooper Zain during the testing process and that these notes helped establish the fact Trooper Zain did some of the serological testing.

55.   Based on these representations and arguments, the trial court overruled the objection and permitted Trooper Zain to testify. (FIRST TRIAL Tr. 3452).

Attached Additional Page 10(o)

56.     In the first trial, Trooper Zain testified how he obtained various blood samples from the scene and further stated:

Q.      Did you do testing on all these various items?

A.      Yes, sir, I did.

Q.      Do you have any charts here with you today to explain what testing procedures you used and what results you had?

A.      I have some charts to show the results of the tests which were performed on the majority of the items which I had received and which were submitted at a later time for display purposes." (FIRST TRIAL, Tr. 3465).

57.     In the State's closing argument in the first trial, some emphasis is placed on the blood evidence obtained by Trooper Zain:

"April 22, 1980, the investigation went on, continued. They went and obtained John Moss' blood. They had no idea what kind of blood John Moss had at the time. They had went and got a sample of it. They obtained the results. You heard testimony that right here (indicating) is John Moss' blood type. When compared with the blood found at the scene, there is a remarkable fact: The blood was the same, was consistent, no differences. One difference, and it throws it out. There was no difference.

"And what else did we learn from that blood from testimony? We learned that that the blood is found in the population of North America in three persons in every ten thousand, three people. We know that half of that are women." (FIRST TRIAL, Tr. 4086-87).

58.     Later in the closing argument, the State emphasized the blood evidence:

"What is the evidence that indicates beyond a reasonable doubt that John Moss is the killer of Vanessa, Paul Eric and Bernadette? What is the probability of being able to select out of ten thousand people, when only three of them have that type of blood, being able to randomly select one of those three people, as if we had a jar of jelly beans, 10,000 jelly beans, 9,997 of them are white jelly beans and 3 of them are red jelly beans. Now, would it be fairly easy to reach in with your eyes open and pull out one of the red jelly beans. But you don't know what type of blood is in a person until you draw it. So put on a blindfold on that individual and now what is the probability of reaching in there and pulling out a red jelly bean? What is the probability?

Attached Additional Page 10(p)

"John's blood matched. I submit to you that it matched because John Moss' blood was in the house on December 13, 1979. And I submit to you it was in there because he was in there, because he did exactly what he told you he did in the taped confession. They got his blood. And then you take a person, as improbable as it is that you would pick that jelly bean or that person out, and then he confesses and his confession is accurate. What is the probability of that?" (FIRST TRIAL, Tr. 4100-01).

59.     In the State's final closing argument, the blood is again emphasized:

"And then there is the blood. Mr. McKittrick says that Trooper Zain said that three in ten thousand is not very rare. What he got him to say was that they had found that the rarest of blood is one in one hundred million. You all go count. Do you think three in ten thousand is rare? He said the rarest is one in one hundred million.

"Do you think that electrophoresis light that the chemist was talking about, did that lie about John Moss' blood? No." (FIRST TRIAL, Tr. 4207).

60.     In the second trial, the State's reliance on the blood testing conducted by Trooper Zain was even greater than in the first trial.

61.     In the State's opening statement in the second trial, the jury was told at length about the testimony anticipated from Trooper Zain:

"Now, the case begins to unravel soon after that, because at the scene that day on December 13th, when the Troopers showed up and the Lab people showed up, the photographer showed up, a person from the Serology Lab, a person who is a forensic serologist, showed up along with a fingerprint man. The serologist, a man by the name of Fred Zain, the chief forensic serologist for the State -- he'll tell you that there was a lot of blood at the scene.

"Vanessa Reggettz had an injury. We all know how a head injury is. For example, Fred Zain will tell you that he took his samples of blood from every stain in that house. He will tell you he took these samples from the house, then he went back to the lab where he analyzed them. Of course, in the meantime, he had the known blood samples of the victim, the mother. He got a known blood sample of Paul Reggettz shortly thereafter.

"He will tell you that when he took the samples, he analyzed them in the lab. He found samples of blood taken from all of these people that I've just listed, that did not match any member of the Reggettz family. The blood didn't belong to Vanessa, from the head wound. It didn't belong to Paul Eric.  It didn't belong to Bernadette. And it didn't belong to Paul Reggettz.

Attached Additional Page 10(q)

"So the Police continued their investigation.  On April 22, 1980, they traveled to Cleveland, Ohio, to take a blood sample from a young man.  During the course of their investigation, at the time of the murders, this man was living with the grandfather, some one hundred to two hundred yards straight down the road from the Reggettz home.  And shortly after the murders, after about a week, that young man returned to Cleveland.  That young man, ladies and gentlemen, is sitting right there (Indicating), John Moss, the defendant.  His blood was taken that day in April and brought back to Fred Zain, the serologist, and his blood was found to match the blood found in the house."

"Now, we all know about the blood work.  Everyone has an ABO type:  either O, A, or AB, or B.  Trooper Zain – or Lieutenant Zain will tell you that the blood work at the time, was broken down scientifically and forensically, and can be broken down to a number of samples, to nine genetic markers or enzymes, all independent of each other, which is important.  Some of the blood samples that were taken from the house were taken from the curtains on the back door, from Bernadette's pajama top, from Christmas wrapping paper, I believe the Christmas package.  And those blood samples were able to be broken down by Fred Zain into nine genetic markers.  And one at time -- that blood exactly matched John Moss' -- the genetic markers, those nine genetic markers, in the sample of the blood."

"And Fred Zain will further tell you that the combination of those nine genetic markers found in the defendant's known blood and on those exhibits, the exhibits I just listed, occur in three of every ten thousand people, point zero three percent of the population in this State.  Three in every ten thousand.  Fred Zain will further tell you that some of the other samples, the other ones I listed, for lack of sufficient sample or whatever reason, he was able to break it down into seven of the nine genetic markers.  And again, he'll tell you that those seven genetic markers found on those exhibits matched right down the line to defendant's known blood."

"Fred Zain will tell you that combination of those seven genetic markers occurs in one of every thousand, twenty-one percent."  (SECOND TRIAL, Tr. 406-09).

62.   In an *in camera* hearing held prior to Zain's testimony, the State raised a question about who was responsible for doing the testing in this case, to which the following was stated:

Q.   I see Sergeant Murphy's signature on this report, dated June 10, 1980. Is it your testimony that you performed these analyses, too?

A.   Yes, sir, Sergeant Murphy, at the time, was in charge of a section, and we both countersigned reports. And I processed all the evidence that was submitted to me at the serology section at the time.  The reports were either issued by himself or myself after conferring as to what should be issued in the report.

Q.   But is it your testimony that you performed the analysis?

## Attached Additional Page 10(r)

       A.      Yes, that's correct." (SECOND TRIAL, Tr. 1049-50.)

63.    During the same hearing Zain reiterated that he performed the testing in the case:

       Q.      Mr. Zain, you testified that you actually did the analysis that was presented here in this particular case; is that correct?

       A.      Yes, sir, that is correct.

       Q.      So, how long after these scrapings were obtained was the analysis performed?

       A.      Within the next day or so.

       Q.      So, in fact that the report is dated in June, that doesn't indicate that's how long it was before the actual analysis were done is that correct?

       A.      That's correct." (SECOND TRIAL, Tr. 1053).

64.    One of the unique features about this case is that not only did Zain perform the testing, but he also obtained the unknown blood samples from the scene of the crime himself. (SECOND TRIAL, Tr. 1074).

65.    In the closing argument of the second trial, the State emphasized the significance of the testing performed by Zain:

"We know that Paul Reggettz's confession is not true. How do we know that? We know that from the evidence. The blood found on the Christmas presents and wrapping-paper is not Paul Reggettz's blood. Remember what Trooper Zain said yesterday? He said an inconsistent marker excludes people one hundred percent. The blood found at the scene wasn't Vanessa's. It was consistent with the defendant's. It can't be Paul's. A hundred percent." (SECOND TRIAL, Tr. 1326).

66.    Throughout the State's initial closing argument in the second trial, numerous references are made to the serological testing performed by Zain.

67.    Following the closing argument by Petitioner's counsel, the State once again focused on the significance of Zain's serological analysis. (SECOND TRIAL. Tr. 1370).

68.    In the deposition Zain gave in Texas on May 24, 1993, he reconfirmed the fact that he was the person who did the testing in the case and, in fact, stated that during the testing process, he had excluded at least 27 other suspects:

Attached Additional Page 10(s)

"[W]hen you talk about blood cases, I will tell you one that would mean more to you-all than anything else and that's in Paul Reggettz'. There we went through 27 suspects, I believe it was, to try to match up not only by ABO typing but enzyme typing and we went through 27 exoneration's, for example."

Q.     Were you the analyst that identified the blood in the Reggettz investigation that did not fit the theory of the case that the investigating officers were working on at the time?

A.     I did the protein enzyme work as well as Sergeant Murphy also who ran samples in the case, which is a matter of documentation.

Q.     And that ultimately led to the conviction of Mr. Moss (spelled phonetically) on that case?

A.     That's correct." (May 24, 1993 Deposition, Tr. 47).

69.     Based upon the foregoing extensive record, Petitioner has conclusively shown that at least some of the serological testing in this case was conducted by Zain, with Murphy also performing some of the tests. Therefore, the State cannot deny this fact.

J.

Trooper Zain Committed Perjury By Lying About His Qualifications.

70.     For the purposes of this Petition, as established by the West Virginia Supreme Court and as discussed below, this Court should consider that any testimony or testing by Zain is invalid, unreliable, inadmissible, and false.

71.     Even though all of his testimony and testing, under this analysis, is presumptively invalid, unreliable, inadmissible, and false, Petitioner respectfully submits that parts of Zain's testimony are, in fact, false and the statistical conclusions presented based upon the blood typing results are overstated.

72.     During his tenure as the head of the serology laboratory for the West Virginia Department of Public Safety, Zain routinely lied under oath about his credentials.

73.     In an *in camera* hearing held in the second trial, Zain testified as follows:

Q.     And what training had you received at that time in performing -- to perform such analysis?

A.     My formal education was a degree in biology, with a minor in chemistry.

Attached Additional Page 10(t)

I also received an Associate Degree in Police Sciences, and specialized training at the FBI academy at Quantico, Virginia, relating to the specific field of forensic science, and more particularly, serology, or tests and methods utilized in the identification of blood and body fluids.

Both basic and advanced courses were obtained by me from the FBI Academy and other specialized training sessions that I attended, as well as scientific organizations which I belong to, such as the Southern Association of Forensic Scientists, and other peer groups." (SECOND TRIAL, Tr. 1050).

74.     Virtually the same testimony about his credentials was presented to the jury shortly thereafter. (SECOND TRIAL, Tr. 1066-67).

75.     Zain was indicted for perjury on July 22, 1994, for giving approximately the same answer in the case styled *State v. Walker*, Felony No. 91-F-62.

76.     It was discovered during the special investigation headed by Special Judge James O. Holiday, Zain never obtained a minor in Chemistry, which was not even offered at the time by the college he attended.

77.     Furthermore, as for Zain's FBI training, he either flunked or failed to complete at least two FBI training sessions he attended.

78.     Moreover, if Zain's history of fabricating evidence, as discovered through the special investigation, had been known at the time of Petitioner's first trial, his testimony and test results would have been given little or no weight by the jury and may have been found too unreliable to be admitted into evidence.


K.

Trooper Zain Overstated The Statistics In Connection With The Blood Typing.

79.     In addition to Zain's perjured testimony and a history of fabricating evidence, as he often did, he overstated the statistical conclusions that could be legitimately drawn from the blood typing performed.

80.     The scientific analysis in this part of the Petition is based, in part, upon the scientific criticism of Zain in the written reports of Dr. Edward Blake, Professor Alec Jeffreys, Dr. George Sensabaugh, Dr. David Bing, Dr. Henry Erlich, and Dr. Robert Sahler.

Attached Additional Page 10(u)

81. In the accepted view of most reputable forensic scientists, Zain overstated the population frequency statistics in comparing the unknown blood samples with Petitioner's known blood samples.

82. It is important to note that for each blood type found, a properly trained forensic scientist is able to refer to sources which provide what percentage of the population have that particular blood type.

83. Where multiple blood types are found from one sample, these population frequency statistics for each type are multiplied together, resulting in a smaller statistical percentage with each blood type.

84. Thus, one of the goals of any forensic scientist is to identify as many blood types as possible in order to obtain a more probative population frequency percentage.

85. In other words, where blood types obtained from unknown blood samples from the crime scene are found to be similar to the blood types obtained from an accused blood sample, the smaller the percentage of the population with the same combination of blood types, the greater the likelihood that two different blood samples came from the same person.

86. Forensic science has developed rules to ensure these blood type statistics are not overstated or misstated.

87. Whenever blood is discovered at a crime scene, forensic scientists have to be concerned about whether it is possible that the blood of the victim was mixed with the blood of the assailant.

88. If in fact, there is a mixture of blood of the victim with the blood of the assailant, ordinary serological testing is unable to make a determination as to the source of the blood tested.

89. A basic tenet of forensic biology is that in a situation where the evidence establishes that a victim and an assailant or other person possibly bled at the crime scene, only those blood types obtained from an unknown blood sample that are foreign to the known blood types of any known possible donors of the blood may be included in the population frequency statistics calculated from the unknown blood sample.

90. The rule concerning the possibility of a mixture of types is particularly true in sexual assault cases, where the swabs taken from the victim often contain a mixture of bodily fluids from the victim and the assailant.

Attached Additional Page 10(v)

91.   The rule recognized by forensic scientists to account for this mixture in a sexual assault case is stated as follows:

"In forensic specimens such as vaginal swabs, which are known to contain a mixture of both semen and vaginal fluid, one should only make use of those markers present in the forensic stain but <u>absent</u> from the victim in any biostatistical estimation of the frequency of individuals in the population who could have contributed the semen."--Professor Alec Jeffrreys, November 9, 1990 report in *State v. Glen Dale Woodall*."

"Semen stain evidence in sexual assault cases must be presumed to contain a mixture of semen and fluids from the victim unless there is microscopic or chemical evidence as suggested in either reports or the testimony; hence the presumption of mixture applies. Accordingly, the only meaningful genetic typings on the evidence samples are those that show a type foreign to the victim."–Dr. George Sensabaugh, December 9, 1990 Report in State v. Glen Dale Woodall."

"I agree with Dr. Blake's criticism of the statistical interpretation given for the conventional serological genetic marker testing in this case. Since the sperm and epithelial cells were not separated from each other, only those genetic markers found in the semen stain and absent the victims' reference sample can be used to estimate the probability of the random match."–Henry Erlich, December 21, 1990 Report in *State v. Glen Dale Woodall*."

92.   Albeit the possibility of this mixture rule clearly applies in sexual assault cases, the underlying principle applies where multiple blood samples are discovered at a crime scene.

93.   A forensic scientist, in calculating the percentage of the population having the particular blood type obtained from an unknown blood sample found at a crime scene, can only include those blood types that are different from any of the known blood types of persons who are known possible donors of blood in that particular location.

94.   Furthermore, if the known blood types of the victim are not excluded from the blood types obtained from the unknown blood sample, then the resulting probability statistic is overstated and is misleading because the impression given to the jury is that the unknown blood sample came from one person when, in fact, there may be a mixture of blood within that sample.

95.   The only scientifically acceptable method of addressing this problem is to exclude any blood types which cannot be excluded from the victim's blood types.

Attached Additional Page 10(w)

96.    In the present case, at a minimum, it cannot be disputed that Vanessa Reggettz is a known possible donor of blood in the Reggettz home, since she was stabbed with a pair of scissors.

97.    Arguably, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III, are additional known possible donors of the blood in the Reggettz home because they lived there and may have deposited blood in the home at some point.

98.    However, for purposes of this Petition, Vanessa Reggettz will be treated as a known possible donor of the blood in the Reggettz home.

99.    According to the June 10, 1980 report Vanessa Reggettz has the following blood types: **ABO O,** PGM 2+1-, **AK,** 1, EAP B, EsD 1, **ADA 1, GLO 1 2,** Hp 1, and Gc 2-1.

100.   According to the June 10, 1980 report **ABO O, AK** 1, **ADA 1, GLO 1 2** blood types were obtained from several of the blood samples.

101.   Thus, in analyzing the unknown blood samples obtained from the crime scene, a forensic scientist would not be able to include the ABO, AK, ADA, and GLO I blood types because Vanessa Reggettz has the same blood types as the types determined from the unknown samples using these particular tests.

102.   If the known blood types of Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III, are included as known possible donors of blood in the Reggettz home, then, in addition to the blood types listed above, the EAP and Hp blood types would also be eliminated.

103.   Moreover, several additional blood types may also have to be eliminated where it is impossible to distinguish the blood types of Vanessa Reggettz from the blood types obtained from the unknown blood samples.

104.   For example, according to the June 10, 1980, report, Vanessa Reggettz has EsD type 1 and several of the unknown blood samples have EsD type 2-1.

105.   Any unknown blood sample with EsD 2-1 could possibly result from a mixture of blood with EsD type 2.

106.   Therefore, the EsD type cannot be included in the statistical conclusions drawn from the types obtained from the unknown sample or, at least, a forensic scientist would have to recognize this additional possibility.

Attached Additional Page 10(x)

107.   However, in reaching this statistical conclusion regarding the unknown blood types found, Zain committed the error of including blood types that either matched or could not be excluded from being deposited by Vanessa Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III.

108.   Even though the June 10, 1980 report does not clearly state how Zain's statistics were calculated, it is apparent from his testimony that he did include blood types that either matched or could not be excluded from the known blood types of Vanessa Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III.

109.   The inclusion of these additional blood types gave the unknown blood typing much greater statistical significance than it merited if the proper and accepted procedure had been followed.

L.

The Reliability Of Any Evidence Obtained By Trooper Zain Is Questionable.

110.   One unique feature about this case is the fact that all of the critical unknown blood samples were obtained by Zain.

111.   In the report issued by Special Judge Holiday, which is quoted in *Matter of West Virginia State Police Crime laboratory*, 190 W.Va. at ___, 438 S.E.2d at 503, the following litany of false evidence presented by Zain under oath is noted:

"The acts of misconduct on the part of Zain included (1) overstating of the strength of evidence of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested: (5) reporting inconclusive tests as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with he victim; (11) reporting scientifically impossible or improbable results."

Attached Additional Page 10(y)

112.  The possibility that Zain fabricated what types were obtained from the unknown blood samples by simply matching them to the Petitioner's known blood types is not too far fetched and, in fact, would be consistent with Zain's well demonstrated history.

113.  Thus, in light of the overwhelming evidence of Zain's perjury, his overstatement of the blood type results, and his history of fabricating evidence, Petitioner avers that this §2254 petition should not be based upon any evidence obtained by Zain.

114.  Based upon the foregoing factual basis, Petitioner should be granted a new trial where a jury is asked to decide Petitioner's guilt or innocence without the false, misleading and overstated testimony of evidence as presented by Fred S. Zain.

**M.**

The Depositions Of Robert Murphy And Dr. David Bing In Regard To Trooper Zain's Word.

115.  All of the laboratory documentation that could be found by the State has been produced. However, the State was not able to locate any photographs of any of the testing performed, the autorods and notes from the testing performed by Zain, and the original raw laboratory notes.  The grand jury transcripts resulting in the indictment of the Petitioner was produced, pursuant to the Order from the Court, but the grand jury transcript resulting in the indictment of Reggettz was never found.

116.  An independent expert, Dr. David Bing, has reviewed Zain's testimony and the underlying documentation, and the person who assisted Zain in the testing, Robert Murphy, (Murphy) was deposed. The deposition of Murphy was taken on May 17, 1995.  Murphy is the person who issued the report dated June 10, 1980, summarizing the blood typing tests performed in Petitioner's case. Murphy acted as a serologist for the West Virginia Department of Public Safety approximately from 1974 to 1982.  (Murphy Dep. at 6). Once Zain was hired, Murphy supervised him in the serology laboratory. (Murphy Dep. at 6).

117.  Murphy testified that it was unusual for a serologist to go to the scene of a crime to collect evidence samples, as Zain did in Petitioner's case. In fact, he could only recall one case when he (Murphy) was ordered to obtain evidence samples at a scene of a crime. (Murphy Dep. at 11).

Attached Additional Page 10(z)

118.    As of December, 1979, the State Police Laboratory had no written protocols on laboratory procedure, the collection of evidence, or any of their testing procedures. (Murphy Dep. at 13.) He also explained at the time, the laboratory did not have any quality control or any quality assurance program. (Murphy Dep. at 14.)

119.    With regard to the testing conducted in Petitioner's case, Murphy explained:

        A.      To the best of my recollection, I was involved in most of the testing.

        Q.      Okay.

        A.      I don't know that I saw–that I did everything, but I did see all of the results.

        Q.      Who else would have been involved in the testing?

        A.      Fred Zain. (Murphy Dep. at 17.)

120.    In his deposition, Murphy reviewed the laboratory documents produced, marked "Murphy" on documents written by him and "Not Murphy" on documents written by some other person in the laboratory. As a general rule, if the writing was Murphy's handwriting, he performed those tests. These documents were attached as a group exhibit to Murphy's deposition.

121.    Of particular interest in the documentation is one sheet, marked with Bates Number 000013, which records the results of tests performed on most items obtained by Zain. The back of this sheet has the initials "FSZ" and Petitioner respectfully submits that Zain is the person who recorded this information, which indicates he is the person who performed these particular tests. Thus, the most critical testing in this case was performed by Zain.

122.    The deposition of Dr. David H. Bing was taken on June 5, 1995. Dr. Bing reviewed all of the trial testimony of Fred Zain from the first trial and second trials, all of the laboratory documentation produced by the State, the autopsy report, and the ZAIN PETITION FOR WRIT OF HABEAS CORPUS filed by Petitioner. Dr. Bing initially noted that the lack of photographs recording the results of electrophoretic typing made it impossible for him to evaluate the accuracy of results reported. (Dr. Bing Dep. at 12-13).

123.    Due to the lack of preserving the test results, for purposes of his analysis, Dr. Bing had to assume the typings were correct. (Dr. Bing Dep. at 13).

Attached Additional Page 10(aa)

124.  Dr. Bing explained the importance of written protocol in the laboratory and quality control, quality assurance program. (Dr. Bing Dep. at 18-19). In explaining why he believed the data generated in this case was meaningless, Dr. Bing stated:

"Well, by that I mean that the -- there is so much data on these stains that weren't analyzed, it would seem to me there should be some extensive notes backing that material up. So that in that -- context of not being able to look at the backup data, other than the summaries, it becomes, you know almost impossible for me to either agree or disagree with the final outcome of the results. And that's what I mean by when I say it's meaningless. I can't agree, I can't disagree. All I can say is what was reported." (Dr. Bing Dep. at 21-22).

125.  After commenting on the lack of any written protocols, quality controls, original laboratory notes and photographs of the testing performed, Dr. Bing went through a series of general scientific principles applicable to the serological testing performed in Petitioner's case. The purpose of this analysis was to demonstrate the flaws in the conclusions reached based upon the data and the overstating of the significance of this testing at trial.

126.  First, he noted that it is important to obtain the known blood types of all potential donors of blood at the scene of the crime. In this case, the potential donors of blood were Vanessa Dale Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III. (Dr. Bing Dep. at 22-23).

127.  Second, at a crime scene, where the origin of all evidentiary stains is unknown, it cannot be assumed that the stains originated from a single source. (Dr. Bing Dep. at 24). Third, only those types obtained from the evidence that are different from any of the types obtained from known possible donors provides relevant and meaningful information to the forensic scientist. Dr. Bing gave the following hypothetical to illustrate this general principle:

"Think of it another way. Suppose that the distinguishing factor of a blood stain was something that you actually visualize. Suppose that you could look at this blood stain and you could say inequitably, 'I know that that blood stain came from somebody who has brown hair.' Brown hair is a genetic marker. In some ways it's very similar to, say, a blood type antigen because there is a certain -- The color or the reason it's brown is due to certain genetic marker. In some ways it's very similar to, say, a blood type antigen because there is a certain -- The color or the reason it's brown is due to certain genetic markers that result in color. So you say I know -- It doesn't make any difference how I know it. I know this blood stain is from somebody who has brown hair. Now, you get your list of possible donors to that and you -- and they all have brown hair. You can't say that any one person is more likely than the other to be a donor to that blood stain."

"Now let's say if we can do a little more. Let's say, 'Well I can-- 'I know that the person who contributed to this blood stain has brown hair and is left-handed.' So you now look at your candidates, and you look at them and you say, 'Well, three of them are left handed and say two are right-handed.' Well, the two who are right-handed are automatically eliminated, but you still can't distinguish between the other three because left-handedness and brown hair color are the same in all of them."

"So that if you have a series of markers and they're identical in all people that are being tested, then you can't really use that to try to distinguish the source of a given blood stain. You can only look to the differences, not to the similarities, because the question that is being asked here, the scientific question that is being asked is who could possibly be a biological donor to this blood stain."

"And, secondly, I don't know whether there's a single person or from a bunch of people. As I stated in my affidavit, it is a single source sample or many people are sources of the sample. So you have to look to the differences between individuals who you test rather than their similarities." (Dr. Bing Dep. at 25-26).

128. Third, as a general rule, where a type from a known possible donor of a blood stain matches a type from the blood discovered, it is not appropriate to include that type in calculating the frequency that the blood was deposited by a particular suspect. Dr. Bing illustrated this general principle as follows:

"Let's take another genetic typing you can sort of visualize. Let's suppose that the blood sample that you know came from somebody who has brown hair, is left-handed, and is an albino, has no pigment color in their skin at all. Albinism is a very rare occurrence in the human population. It's very rare indeed. Now, at this point, the fact that you now have three individuals who are left-handed and have brown hair, but one of them is albino. You say that's a very rare event. It could only have been that person."

"So you can use that to reason backwards and say, 'Alright, albinism is a very rare event, so I know this blood stain came from an albino.' That could only have occurred in one out of a very few number of people who have this inherited genetic trait."

"That is separate from the question of saying, 'how often is the combination of brown hair, left–handism and albinism found in the general population?' That's a separate question. That's how often do I find these together in the general population. You can make that estimate as well. But that's the general question about population. That is not a question about the sample."

The only thing that distinguishes that sample is what is different about that sample is in the known individuals that you're testing. So you got a -- Those two things have to be separate."

## Attached Additional Page 10(cc)

And that's what I mean by this, that you can't take a combination of factors that are found in the general population and relate it to a specific sample. All you can say is that if these are present and I now have data to show they are indeed present, this is how often I would expect to find that combination of markers in the general population, providing they are behaving and acting independent of each other, because that's the other issue in terms of being able to do that, they have to be behaving independently. They have to be what we say scientifically, they sort independently." (Dr. Bing Dep. at 28-29).

129.  Finally, Dr. Bing noted that serological typing is unable to determine when a particular evidentiary stain was deposited. (Dr. Bing Dep. at 37). Thus, from a scientific point of view, there is no objective basis for a scientist to conclude that a particular stain actually resulted from the criminal episode or may have been deposited at some earlier time.

130.  The remainder of Dr. Bing's deposition applies these general principles to the facts. He concludes that the blood type of significance are PGM, Gc, and EsD. The remaining types obtained from the blood stains found at the crime scene do not provide significant information because the remaining types obtained from the evidence were identical to the types obtained from at least one or more possible donors. (Dr. Bing Dep. at 3). Dr. Bing further testified that he agreed with the scientific analysis of the evidence set out in the Petition.

### N.

The West Virginia Supreme Court Of Appeals Adopts The Standard Of Review Announced By The Special Judge.

131.  Special Judge Holiday concluded in his report, that was adopted and quoted by the West Virginia Supreme Court in the case, *In The Matter of Investigation of State Police Crime Laboratory,* 190 W.Va. at ___, 438 S.E.2d at 506:

"It is believed that, as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding."

132.  The WVSCA adopted and applied that standard of review to all cases in which Zain testified or had any involvement with the testing process.

133.  In Petitioner's case, all of the blood testing results testified to be Zain and all of his testimony was deemed invalid, unreliable, inadmissible and false.

134.  The State noted repeatedly throughout both trials that the deciding factor was the testimony of Zain.

Attached Additional Page 10(dd)

**GROUND NINE**

PETITIONER WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM THROUGH THE SIXTH AMD FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND THE COURT'S RULINGS BELOW WERE CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED LAW AS ANNOUNCED BY THE UNITED STATES SUPREME COURT AND/OR AN UNREASONABLE DETERMINATION OF THE FACTS AS SET FORTH IN THE RECORD.

A.  Counsel failed to bring to the trial and appellate court's attention the fact that the two October 28, 1980, confessions were the subject of an extensive Motion and Memorandum, Hearing, and testimony and was, in fact, objected to by counsel prior to the first trial, based on, inter alia, W.Va. Code § 49-5-8(d).

B.  If trial counsel, at the first trial, failed to object to the West Virginia authorities' failure to promptly present the juvenile defendant to a neutral Judicial Officer prior to taking Petitioner's alleged confessions.

C.  Trial counsel failed to conduct adequate investigation into the facts and law of the case prior to Petitioner's second trial.

D.  Appellate counsel failed to conduct adequate investigation and research prior to perfecting and filing a petition for appeal from Petitioner's second trial.

**Supporting Facts:** (Because the facts of Petitioner's claims are so interwoven and connected, Petitioner incorporates herein, by reference thereto, the facts as set forth in his contentions 1-8 and 10.)

1.  In a September 19, 20, 21 & 22, 1983, Suppression hearing, Petitioner extensively testified on, *inter alia*, the West Virginia Troopers' failure to take him before a neutral judicial officer. One of the main focuses of that hearing was the two "confessions" of 28 October, 1980. The state failed to divulge their intention to use, and the existence of, the third "confession" until the first day of *jury voir dire*. At the conclusion of the September, 1983, hearing, the trial court set a briefing schedule as well as a date of October 12, 1983, at 9:00 a.m. to render a ruling from the bench on the admissibility of the two 10/28/80 "confessions." It was not clear, due to the passage of time, whether any hearing was held on that date and Petitioner has been unable to obtain a transcript of the court's ruling or entered Order. It is undisputed, however, that the first two "confessions" were used at trial.

Attached Additional Page 10(ee)

2.     Additionally, once the state, on the eve of trial, informed trial counsel of the existence and its intention of using the third "confession" of 30 October, 1980, trial counsel objected to it but the trial court allowed it, also. The WVSCA, of course, later stated the third "confession" should have been excluded. The court implied that had objections been made to the first two "confessions," those, like the third, should also have been excluded.

3.     Petitioner's counsel at his second trial were ineffective for, *inter alia*, failing to bring the court's attention to, or otherwise asserting and failing to enter into the record, Petitioner's *MOTION TO SUPPRESS SAMPLES OF BLOOD, CONFESSION, AND OTHER PHYSICAL EVIDENCE SEIZED FROM JOHN MOSS BY EMPLOYEES OF THE STATE OF WEST VIRGINIA, AND MEMORANDUM IN SUPPORT THEREOF*, as well as the transcript of the suppression hearing held on 19, 20, 21 & 22 September, 1983. Those documents conclusively demonstrate that counsel at the first trial did indeed object to the failure of the state authorities to promptly present Petitioner to a neutral judicial officer in violation of W.Va. Code § 49-5-8(d) and the holdings, made retroactive to Petitioner's case on the third confession, in *State v. Ellsworth J.R.*, 175 W.Va. 64, 331 S.E.2d 503 (1985), and that the factual determination to the contrary by the WVSCA, i.e., that "[A] prompt presentment objection was preserved before the trial court only with respect to the third "confession,"" is clearly erroneous. The results of the second trial court's ruling, therefore, would certainly have been different and the two confessions of 28 October, 1980, would have been excluded, as well as the evidence resulting therefrom. Coupled with Reggettz's confession, without the three confessions and the "poisoned" evidence resulting therefrom, the results of Petitioner's trial would have been an acquittal.  Indeed, a trial probably would not have occurred, because the state would have had no evidence to present.

Attached Additional Page 10(ff)

4.    Petitioner's second trial attorneys failed to bring the trial court's attention to the fact that objections were entered on the first two confessions, or to formulate arguments against the court's erroneous "law of the case doctrine" ruling.  Counsel also failed to object to the court's determination of the facts and conclusions that the foray to the Parkersburg State Police Detachment did not violate the West Virginia's prompt presentment rule.  In furtherance of that ineffectiveness, appellate counsel failed to inform the supreme court of its serious erroneous determination of the facts. Appellate counsel also failed to include other, stronger, meritorious issues in their petition for appeal when they actually prepared the petition prior to the second trial itself, but, most tellingly, prior to the second trial court's "law of the case" ruling. The petition on appeal did not respond to the trial court's two-part ruling on the admissibility of Petitioner's confessions because it was already written when that decision issued.

5.    Petitioner asserts the illegally obtained blood was either smeared on objects removed from the crime scene or simply falsely stated as being found on the items, thus providing authorities with allegedly conclusive evidence Petitioner was in the Reggettz home the night of the murders.

6.    Authorities testified that only after April, 1980, when the so called legal blood sample was removed from Petitioner did they discover the unknown blood samples matched Petitioner.

7.    The taking of a so called legal blood sample from Petitioner was contrived inasmuch as the investigating authorities already knew they would link the sample they had in January, 1980, and which are claimed to have been unknown blood samples taken from the crime scene by the infamous Fred S. Zain, to the sample from Petitioner taken in April, 1980.

8.    The manufactured evidence was the fortuitous catalyst investigators used to acquire the other material evidence presented at trial to convict Petitioner, including his "confession."

9.    It was the same two state troopers who calculatingly induced Petitioner into relinquishing a sample of his blood in January, 1980, who, in October, 1980, as they were beating a confession from him, as much as told Petitioner they used that illegally obtained sample to "frame" him for the murders. (Second Trial Tr. p. 511-14, 944-45.)

# Attached Additional Page 10(gg)

10.     The illegally obtained blood sample was used to implicate Petitioner in the murders.

11.     The Kanawha County Circuit Court and the WVSCA found that Petitioner's confessions were largely consistent with the physical evidence, citing a camera identified by Paul Reggettz as belonging to him, and silverware Reggettz alleged he had purchased.  Due to ineffective assistance of trial counsel at the second trial, the jury, as well as both courts as stated above, were all denied evidence which would provide a basis that Paul Reggettz's identification of these items were false and completely self-serving and were offered to draw attention away from his own (admissible) confession and culpability in the murders of his family.

## The Silverware

12.     Paul Reggettz identified a set of silverware at trial as being the silverware he purchased as a Christmas gift for his wife in 1979 at the local K-Mart store.  Police obtained the silverware presented at trial from the mother of one of Petitioner's friends, Mrs. Arbutus Johnson Pomeroy.  Petitioner had given the silverware to Mrs. Pomeroy as a Christmas gift.

13.     In the first trial of this case, (1984) defense called the K-Mart merchandising and ordering manager as a witness, Ms. Edith Lilly.  Ms. Lilly testified that K-Mart has never sold the brand of silverware that Paul Reggettz identified as being the item he purchased for his wife at K-Mart.  Defense counsel at Petitioner's second trial did not call Ms. Lilly as a witness despite requests to call her.  As a result, Petitioner was deprived of putting crucial information before the jury, the Kanawha County Circuit Court and the WVSCA in determining the weight of evidence to be afforded in Paul Reggettz's testimony of purchasing the flatware at K-Mart.  Based upon Reggettz's testimony of purchasing silverware at K-Mart, alleged to be missing from his home after the murder of his family, the silverware relied upon at trial could not be the property allegedly stolen from the Reggettz home.  Absent the false, misleading and/or substantially incorrect evidence and testimony offered by employees of the West Virginia State Police and Crime Laboratory, Serology Division, the absolute testimony by Ms. Lilly was such as would create reasonable doubt.

Attached Additional Page 10(hh)

**The Camera**

14.      Additionally, the Kanawha County Circuit Court and/or WVSCA rulings that evidence of the silverware was, absent the false, misleading and/or substantially incorrect evidence and testimony by members of the West Virginia State Police and Crime Laboratory, Serology Division, were strong enough to sustain a conviction, would certainly not have been the same, if not for the deficient performance of trial counsel.

15.      Originally, no camera was alleged to have been missing from the Reggettz home. Once again the only evidence offered that a camera obtained from Petitioner's father's car was taken from the Reggettz home was self-serving identification by Paul Reggettz. The state offered no corroborating evidence that Paul Reggettz owned a camera, such as demonstrating that Reggettz owned film that would fit this model of camera, or a picture alleged to have been taken with the camera. The Reggettz family had been residents of Kanawha County for some time, yet no witness alleging to have ever seen any member of the Reggettz family with a camera of any kind was called to corroborate Paul Reggettz's story of a missing camera.

16.      On the other hand, both Petitioner's parents (John and Marzee Moss) were called as witnesses in the first trial in 1984. Both witnesses substantiated the fact Petitioner owned a camera like the one identified by Paul Reggettz as being his camera. It was further established that both Petitioner and his sister had owned cameras and that Petitioner had his camera during the summer of 1979 prior to the December 1979 murders of the Reggettz family. Petitioner's mother passed away prior to the second trial and Petitioner's father was not called by trial counsel to testify at the second trial even though Petitioner requested the same.

17.      The Kanawha County Circuit Court and/or WVSCA rulings that evidence of the silverware was, absent the false, misleading and/or substantially incorrect evidence and testimony by members of the West Virginia State Police and Crime Laboratory, Serology Division, were strong enough to sustain a conviction, if not for the deficient performance of trial counsel, would certainly not have been the same.

Attached Additional Page 10(ii)

### Reliability Of Petitioner's Confessions

18. The Kanawha County Circuit Court and the WVSCA has ruled that Petitioner's confessions were reliable, citing consistencies to crime scene evidence, motive and other identified factors. However, when the confession of Paul Reggettz is compared to the crime scene evidence and forensic evidence that couldn't be known to persons who only viewed the scene after the fact, Reggettz's confession is the only credible account of the murders consistent to unseen forensic evidence.

19. When Petitioner's confessions are compared to all the physical and admissible forensic evidence, it becomes clear that his confessions were consistent to having been told, for over 5 hours, what to say by the investigating officers who had viewed the crime scene, but who could not have known the underlying forensic evidence.

20. The deficient performance by the second trial counsel in failing to put on witnesses whose testimony dispels the self-serving testimony of Paul Reggettz concerning the alleged items removed from the Reggettz home during the murders of his family, or, at the least, creates a reasonable doubt as the veracity of Reggettz's testimony concerning the same, prejudiced Petitioner three-fold. First, the jurors at the second trial did not hear the compelling testimony of the omitted witnesses testifying from the stand; the Kanawha County Circuit Court was not afforded the opportunity to consider the testimony in its decision to deny Petitioner relief in all his habeas corpus petitions, and, third, the WVSCA didn't have the benefit of the witness's testimony in considering all of Petitioner's appeals of all the circuit court's denials of his petitions for writ of habeas corpus. If any one of the above-named entities had had the available testimony to consider, the results of these proceedings certainly would be different.

21. Trial counsel's failure to investigate these facts and law of the case constituted ineffectiveness of counsel at trial.

22. Appellate counsels' failure to investigate these facts as well as the law in regard to this case constituted ineffectiveness of counsel at the appellate level.

Attached Additional Page 10(jj)

### GROUND TEN

PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED BY THE STATE'S WITHHOLDING OF EXCULPATORY AND/OR IMPEACHMENT EVIDENCE AND THE LOWER COURTS' RULINGS WERE CONTRARY TO AND/OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS ANNOUNCED BY THE UNITED STATES SUPREME COURT, AND/OR AN UNREASONABLE DETERMINATION OF THE FACTS AS SET FORTH IN THE RECORD.

**Supporting Facts:**       (Because the facts of Petitioner's claims are so interwoven and connected, Petitioner incorporates herein, by reference thereto, the facts as set forth in his contentions 1-9.)

  (Please see attached additional pages 10a-10jj for the supporting facts for grounds 4 thru 10, all of which have been exhausted at the state level.)

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why:  N/A

_____

_____

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?      Yes ☐   No **X**

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why:  This issue was not known due to the improper tactics of state officials until years after the trial and direct review.

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes **X**   No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   Application for state post-conviction relief

Name and location of the court where the motion or petition was filed:  Thirteenth Judicial Circuit;  Kanawha County Circuit Court;  W.Va. Supreme Court of Appeals;  Charleston, WV

Docket or case number (if you know):  05-MISC-298 & 06-MISC-245 & 07-MISC-403 & 072486

Date of the court's decision: February 7, 2006 & October 16, 2006 & September 13, 2007 & April 20, 2009

Result (attach a copy of the court's opinion or order, if available):  All petitions summarily denied and dismissed.  (Copies of Orders attached hereto as Appendices A-H)

_____

(3) Did you receive a hearing on your motion or petition?                Yes ☐   No **X**

(4) Did you appeal from the denial of your motion or petition?           Yes **X**   No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   Yes **X**   No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:  West Virginia Supreme Court of Appeals

Docket or case number (if you know):  061721 & 070678 & 091215

Date of the court's decision:  December 6, 2006 & July 9, 2007 & November 30, 2009

Result (attach a copy of the court's opinion or order, if available):  All petitions were refused   (Appendixes A-H)

(7)  If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise the issue:

N/A

(e)      **Other Remedies**:  Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:  N/A

13.     Please answer these additional questions about the petition you are filing:

(a)     Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?  **X** Yes  ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:  N/A

(b)     Is there any ground in this petition that has not been presented in some state or federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

All grounds in this petition have been presented to the state court(s).

14.     Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?  **X** Yes  ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinion or order, if available.  United States Supreme Court; Washington, D.C.;  Petition for writ of certiorari from the decision of the West Virginia Supreme Court of Appeals denying collateral appeal in Kanawha County Civil Case No. 94-MISC-663  (Please see Attached Additional Page 13a).

_____

_____

_____

_____

15.     Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?     Yes ☐     No **X**

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.  N/A _____

_____

_____

16.     Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:  (Don't recall.) _____

_____

(b) At arraignment and plea:  (Don't recall.) _____

_____

(c) At trial:  (First Trial) Parrish McKittrick; 45 Second Ave., St. Albans, WV 25177 – (Second Trial) Nelson R. Bickley; 823 Charleston National Plaza, Charleston, WV 25301 (Please see Att. 13b.)

(d) At sentencing:  (Same as at both trials.) _____

_____

(e) On appeal:  (First Trial) Franklin D. Cleckley – P.O. Box 4, Morgantown, WV 26505 – Frank W. Helvey, Jr.; 1001 E. Village Dr.,  (Please see Attached Additional Page 13b.)

(f) In any post-conviction proceeding:  Lonnie C. Simmons _____

_____

(g) On appeal from any ruling against you in a post-conviction proceeding:  Lonnie C. Simmons _____

_____

_____

Attached Additional Page 13(a)

**Answer to No. 14: (cont.)**

United States No. 04-7625;  Refused 24 January, 2005.

## QUESTION PRESENTED

Was Petitioner's Due Process and Equal Protection guarantees abridged by the West Virginia courts' refusal to apply prior decisions in Petitioner's case, when all other prisoners filing a state created prophylactic rule petition for post-conviction relief was given benefit of the rulings?

## REASONS TO GRANT CERTIORARI AND SUPPORTING DISCUSSIONS

a.    The West Virginia Trial And Appellate Courts Failed To Apply The Correct Legal Analysis In Petitioner's Case To Which All Other Similarly Situated Prisoners Received.

   1.    The West Virginia Courts Erred In Ruling That Zain I Not Only Was Inapplicable To Petitioner's Case, But Would Not Have Provided The Basis For Habeas Corpus Relief Even If It Did Apply, Where Trooper Zain: (1) Personally Went To The Scene Of The Crime; (2) Personally Looked For And Gathered Physical Evidence At The Crime Scene; (3) Personally Performed The Critical Testing Of The Evidentiary Items That He Had Observed And Gathered; (4) Is The Only Serologist To Testify In Both Of Petitioner's Trials; (5) Presented The Key Evidence Allowing The Jury To Decide Which Of The Two Confessions To Believe; And (6) Had More Personal Involvement In This Case Than Any Other Habeas Corpus Action Filed Pursuant To Zain I.

   2.    The West Virginia Court Erred In Holding That Any Scientific Problems With Trooper Zain's Testimony Constituted Harmless Error Beyond A Reasonable Doubt, Where Both Experts Agreed That No One Could Vouch For The Accuracy Of The Work Performed By Trooper Zain In This Case. Petitioner's Expert Specifically Identified Numerous Errors By Trooper Zain And Concluded That Trooper Zain's Results In This Case Were "Meaningless," And Many Of The Errors Identified Were Consistent With The Errors Found By The ASCLD Experts In Zain I.

   3.    The West Virginia Court Erred, In Light Of The Totality Of The Circumstances, Which Now Includes The Fact That Trooper Zain Had A History Of Faking Data And In Light Of The Conflicting Confessions Given By Reggettz, In Concluding That Petitioner's Alleged Confessions Were Voluntary And Admissible.

Attached Additional Page 13(b)

**Answer to No. 16(c) (cont.):**

Timothy Huffman; 1600 Laidley Tower, Charleston, WV 25301 – Kathy Beckett;  600 United Center, Charleston, WV 25301.

**Answer to No. 16(e):**

South Charleston, WV 25309 (Second Appeal)(Same as trial attorneys.

17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are

   challenging:     Yes ☐   No **X**

   (a)  If so, give name and location of court that imposed the other sentence you will serve in the future:   **N/A**
   _____

   (b)  Give the date the other sentence was imposed:   **N/A**

   (c)  Give the length of the other sentence:   **N/A**

   (d)  Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the

        future?     Yes ☐   No ☐

18.   TIMELINESS OF PETITION:  If your judgment of conviction became final over one year ago, you must explain why

      the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

   My conviction became final prior to the enactment of the AEDPA.  I had a properly filed application
   for state post-conviction relief pending on the date of the enactment, April 26, 1996.  That action
   became final on or about September 9, 2004, the date the WVSCA entered its final mandate Order
   refusing Petitioner's motion for rehearing.  Petitioner then filed his *pro se* application for state
   post-conviction relief on or about July 2, 2005.  Petitioner has had a properly filed application for
   state post-conviction relief pending in the state courts until on or about November 30, 2009, when
   the West Virginia Supreme Court of Appeals refused to review Petitioner's denial of his state
   application for post-conviction relief.

* The Antiterrorism and Effective Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:  That Petitioner's convictions and sentences be vacated and that his case be remanded back to the state courts for retrial.

or any other relief to which petitioner may be entitled.

N/A
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on   December 14, 2009   (month, date, year).

Executed (signed) on   December 11, 2009   (date).

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.
N/A

Appendix A

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED

**JOHN MOSS, III**                    2006 FEB -7  AM 11: 20

      Petitioner,                    CATHY S. GATSON, CLERK
KANAWHA CO. CIRCUIT COURT

v.                                                   Civil Action No. 05-MISC-298

Judge Louis H. Bloom

**THOMAS MCBRIDE, Warden,**
**Mount Olive Correctional Complex,**

      Respondent.

<u>**FINAL ORDER DENYING HABEAS RELIEF**</u>

Pending before the Court is the *"Petition Under W.Va. Code §53-4A-1 for Writ of Habeas Corpus"* (hereinafter "Petition"), filed by the self-represented petitioner John Moss, III (hereinafter "Mr. Moss"). Mr. Moss's Petition relates to his conviction of three counts of first degree murder in April of 1990. Mr. Moss filed a direct appeal of his conviction to the Supreme Court of Appeals of West Virginia and such appeal was refused in 1991. Mr. Moss filed a prior habeas petition in 1994, but that petition was denied by this Court, after a full review of the grounds raised therein, and the Supreme Court of Appeals of West Virginia affirmed that denial.

After full consideration of Mr. Moss's current habeas Petition, his prior habeas petition, the files relating to his underlying trial, applicable law, and based on the following findings and conclusions, the Court is of the opinion that the Petition must be **SUMMARILY REFUSED** and **DISMISSED**.

<b>FINDINGS OF FACT</b>

1.    The Supreme Court of Appeals previously summarized the facts of this case in *In Interest of Moss*, 170 W.Va. 543, 295 S.E.2d 33 (W. Va. 1982):

In December of 1979, a woman and her two children were found dead in their St. Albans home. Soon afterward, the deceased woman's husband became a suspect in the triple murder. He is alleged to have confessed to the crime and was subsequently indicted by the Kanawha County Grand Jury. The husband was held in custody for approximately eleven months awaiting trial, during which time his alleged confession was ruled admissible into evidence as voluntarily given. Trial was set for November 12, 1980.

The record indicates that the appellant was also a suspect in the murders and that his name was recited in the indictment of the accused husband. In January 1980, the investigating authorities traveled to Cleveland, Ohio, to obtain a blood sample from the appellant, who at the time was housed in a juvenile detention center on an unrelated charge, and to question him about the murders. The appellant denied committing the murders. A blood sample was taken, when, at the authorities' request, the appellant pricked his finger and dribbled blood on a cloth provided for this purpose.

At the time of this interrogation, the appellant was seventeen years of age. The blood sample was taken without a court order, and without the knowledge or consent of the appellant's parents. The authorities were aware that the appellant was a juvenile. They made no effort to contact the appellant's Ohio lawyer. The appellant was advised of his rights prior to questioning, but did not sign a waiver of rights form.

When the appellant's counsel learned of the blood sample taken by the West Virginia authorities, he objected, and an Ohio court ordered that the cloth on which the blood sample was deposited be returned to the appellant. This apparently was done. Subsequently, in April 1980, the investigating authorities again traveled to Cleveland to obtain a blood sample from the appellant, pursuant to an order issued by an Ohio court. A doctor performed the sampling. Analysis of the blood sample strengthened the investigating authorities' suspicions concerning the appellant's involvement in the murders.

On September 26, 1980, the State filed a detainer against the appellant . . . based on a malicious wounding charge, unrelated to the homicides[.]  On October 28, 1980, while being transported to West Virginia by members of the Department of Public Safety to answer the malicious wounding charge, the appellant confessed to having committed the homicides in Kanawha County. The appellant subsequently made a tape recorded confession after signing a waiver of his *Miranda* rights.

On November 2, 1980, a second detainer was filed by the State against the appellant based on a charge of three counts of murder in the first degree. On December 18, 1980, the appellant was again transported from [Ohio] to the Kanawha County Jail. A preliminary hearing was set [and] the juvenile referee made a finding of probable cause and referred the appellant to the juvenile jurisdiction of the Circuit Court of Kanawha County.

On January 20, 1981, the State filed a motion to have the appellant transferred to the criminal jurisdiction of the circuit court and tried as an adult[.] At the conclusion of the hearing the court issued from the bench its decision that the appellant be transferred to the criminal jurisdiction of the court, and indicated that further proceedings would be stayed until counsel had an opportunity to file an appeal.

*In Interest of Moss*, 170 W.Va. at 544-548, 295 S.E.2d at 35-37.

2

2.    Mr. Moss appealed the trial court's decision to transfer him to the adult jurisdiction of the Court and the Supreme Court reversed and remanded the matter.  See *In the Interest of Moss*, 170 W.Va. 543, 295 S.E.2d 33.

3.    After conducting a second transfer hearing, the circuit court entered another order on September 28, 1982, granting the motion to transfer Mr. Moss to the Court's adult jurisdiction.  The Supreme Court refused to hear Mr. Moss's appeal from the second transfer order.

4.    A grand jury later returned an indictment, charging Mr. Moss with three counts of first degree murder.

5.    Mr. Moss was tried, convicted, and sentenced for the three counts of first degree murder in 1984, but that conviction was reversed by the Supreme Court of Appeals of West Virginia by its decision in *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988).

6.    The Supreme Court's decision to overturn Mr. Moss's conviction was based on the Court's finding of multiple trial court errors.  First, the Supreme Court held that the trial court erred when it refused Mr. Moss's motion to poll each juror, outside the presence of others, about each juror's exposure to prejudicial comments made by the prosecuting attorney.  Second, the Supreme Court held that the trial court erred when it failed to intervene for the purposes of limiting and correcting fundamentally improper remarks made by the prosecuting attorney during closing.  Third, the Supreme Court held that the trial court erred when it allowed the admission of evidence regarding the results of a polygraph test taken by the victims' husband and father.  *Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988).

3

7.   In the 1988 decision, the Supreme Court also made the following statements regarding the three confessions that were admitted at the trial:

> We conclude that the first two confessions given by [Mr. Moss] are admissible, while the last confession is inadmissible due to the lack of prompt presentment to a neutral judicial officer.
>
> *Moss*, 180 W.Va. 363, 369, 376 S.E.2d 569, 575.

8.   Mr. Moss's second trial was held in 1990.  He was convicted again of three counts of first degree murder.  Mr. Moss appealed that conviction to the Supreme Court of Appeals of West Virginia, but such appeal was refused on March 12, 1991.

*The Prior Habeas Petition*

9.   Mr. Moss's prior habeas petition was filed in August of 1994 and resulted in this Court's consideration of numerous motions, legal memoranda, oral argument, and evidentiary exhibits.  The grounds raised in that habeas matter were the following:

(1)   The admission of Trooper Fred Zain's testimony and test results violated Mr. Moss's Constitutional rights;

(2)   The State presented incorrect, false, misleading, overstated, and unscientific evidence; and

(3)   The admission of Mr. Moss's confessions violated his Constitutional rights.

10.   In September of 1998, Judge MacQueen entered a Memorandum Order which concluded that Mr. Moss was not entitled to a new trial on the basis of Trooper Zain's testimony and testing.  Specifically, Judge MacQueen held that based on the fact that the scientific conclusions were confirmed as valid, Trooper Zain's testimony was not false, inaccurate, or invalid.  Further, Judge MacQueen held that even if the serological evidence is completely disregarded, there remains sufficient evidence to sustain the conviction.

4

11.   Mr. Moss filed a motion to alter or amend Judge MacQueen's judgment and in October of 1998, Judge MacQueen held a hearing on Mr. Moss's motion. Apparently Judge MacQueen denied that motion from the bench, but a written order was never entered.

12.   In June of 2001, and after Judge MacQueen retired, this Court held a status conference in this matter, wherein the parties were granted additional time to submit evidence and argument.

13.   In February of 2002, this Court entered an Order which denied relief, based on this Court's conclusion that Trooper Zain's testing and testimony did not result in any prejudice. However, the habeas matter was reinstated to the Court's docket in March of 2002 so that the other issues that Mr. Moss raised in the habeas petition could be addressed, on their merits. After another hearing, the Court entered a Final Order in January of 2003, which denied all claims raised in that habeas proceeding.

14.   The January 2003 final order made the following findings and conclusions:

> "[e]ven if the serological evidence were excluded, there would still be sufficient evidence in the record to support Moss's conviction and that the introduction of Zain-related evidence and testimony at Moss's trial did not prejudice the jury."

> \* . \* . \*

> "As both parties acknowledged, the issue of the voluntariness of Moss's confession has been thoroughly litigated[.] Moss failed to present any new evidence on the voluntariness of his confession. Rather, he seems to argue that the fact that Mr. Reggettz had, at one point, given a confession somehow invalidates Moss's own confession. The existence of the Reggettz confession does not have the devastating effect that Moss desires because the Reggettz confession does not impugn the voluntariness of Moss's confession. At most, it provided fodder for defense theories at trial. The question before the Court is whether Moss was able to establish that his confession was constitutionally flawed. He was not. Therefore, the admission of his confession at trial does not provide a predicate for issuance of the requested writ".

5

15.   Mr. Moss filed an appeal from this Court's January 2003 order denying his habeas petition and the Supreme Court of Appeals of West Virginia affirmed this Court's decision after finding no merit in Mr. Moss's assignments of error. *Moss v. Trent*, 216 W.Va. 192, 603 S.E.2d 656 (W. Va. 2004).

## The Current Habeas Petition

16.   Mr. Moss filed the present Petition for Writ of Habeas Corpus in July of 2005. The petition is based on the following averments of error:

(1)   The trial court abused its discretion and committed reversible error in ruling that the first two confessions were admissible under the "law of the case doctrine";

(2)   The factual determination by the West Virginia Supreme Court of Appeals that no prompt presentment objections were entered on the first two alleged confessions is clearly erroneous and works a manifest injustice;

(3)   The petitioner was deprived of the Sixth Amendment's guarantee of the effective assistance of counsel;

(4)   The petitioner did not receive a full and fair hearing on his motion and memorandum to suppress samples of blood, confession, and other physical evidence seized due the improper tactics of Fred S. Zain and the West Virginia State Police Troopers and Crime Laboratory;

(5)   The Petitioner's Sixth Amendment right to a fair and impartial jury was contravened when the State knew or should have known of the false and misleading testimony and evidence presented by Fred Zain;

(6)   The trial court abused its discretion and committed reversible error when it admitted petitioner's blood samples, confessions, and all evidence incident thereto into evidence, when the samples of blood were obtained in violation of Federal and State Constitutional rights; and

(7)   The prosecution made improper close arguments that denied the petitioner a fair trial.

17.   The Court finds as fact that the first ground raised by Mr. Moss relates to the trial court's admission of his confessions, which has been throughly litigated and previously considered, on the merits of such claim, by this Court and the Supreme Court, on at least two occasions.

18. The Court finds as fact that the second ground raised in Mr. Moss's Petition relates to findings or conclusions made by the Supreme Court of Appeals of West Virginia, which are not subject to review by this Court.

19. The Court finds as fact that the third ground raised in Mr. Moss's Petition is based on the following two averments: (1) Mr. Moss's trial counsel failed to bring the trial court's attention to the fact that two of the confessions were the subject of an extensive motion and memorandum; and (2) Mr. Moss's trial counsel failed to object to the admission of his confessions based on the failure to promptly present Mr. Moss to a neutral judicial officer. The Court finds that these grounds relate to the admissibility of Mr. Moss's confessions, which has been previously raised, considered and denied, on the merits, by the Supreme Court of Appeals and this Court in Mr. Moss's prior habeas petition and appeal.

20. The Court finds as fact that the fourth and fifth grounds that are raised in the current Petition relate to the alleged, improper tactics of State Trooper Fred Zain regarding his collection and testing of evidence. The Court finds as fact that this issue has been previously raised, considered, and denied, on the merits, by the Supreme Court of Appeals and this Court.

21. The Court finds as fact that the sixth ground raises issues regarding blood samples and confessions that were obtained from Mr. Moss while he was in custody. To the extent that Mr. Moss argues that his confessions were obtained in violation of his Constitutional rights, the Court finds as fact that such issue was previously raised, considered, and denied by this Court and the Supreme Court of Appeals of West Virginia. To the extent

7

that Mr. Moss's sixth ground for relief relates to the admissibility of his blood sample, the Court finds that such ground does not appear to have been raised in the prior appeals or habeas matters.

22.     Mr. Moss alleges that two samples of blood were obtained from him while he was in Ohio.  He claims that the blood was extracted and seized in violation of his Fourth Amendment rights.  The Court finds as fact that the first blood sample was allegedly taken in January of 1980, without a court order, and was subsequently determined, by an Ohio Court, to be in violation of Mr. Moss's Constitutional rights.  The Ohio Court ordered that sample returned to Mr. Moss.  The second sample, which was allegedly obtained in April of 1980, was pursuant to an Ohio Court Order.  Mr. Moss claims that the order was granted, even though no probable cause existed at that time.

23.     Trooper Michael Smith testified at a suppression hearing prior to the first trial that in April of 1980, he had the following evidence that led him to believe that Mr. Moss may have committed the murders:  (1) A newspaper article from Ohio indicating that Mr. Moss was suspected of attempted murder by strangulation, in Ohio; (2) The fact that Mr. Moss lived in close proximity to the victims' home; (3) The fact that Mr. Moss was suspected of being involved in a crime at a Moose Club that was close to the victims' home; (4) Information from a "friend" of Mr. Moss who claims that Mr. Moss stated, prior to the murders, that he wanted to burglarize the victims' home.  (Transcript, September 19, 1983).

24.     Trooper Terry Williams testified at the second trial that the blood sample obtained in April of 1980 was taken by a doctor.  (Trial Transcript, p. 505).

8

25.     In the 2004 decision which upheld this Court's denial of Mr. Moss's prior habeas petition, the Supreme Court repeated Judge MacQueen's finding that the Troopers "discovered genetic markers in blood samples from the [victims'] residence that excluded [the other suspect] and would ultimately incriminate [Mr. Moss], long before a sample of Moss's blood was obtained and analyzed." *Moss v. Trent*, 216 W.Va. 192, 194, 603 S.E.2d 656, 658.

26.     The seventh and final ground raised in Mr. Moss's Petition relates to certain comments made by an Assistant Prosecutor during closing statement. Specifically, Mr. Moss believes the following comments were improper and unduly prejudicial:

> "He didn't necessarily tell the whole story. Perhaps that's why Vanessa Reggettz's panties are on the bed – not on her body. Why her sanitary napkin was on the floor – a homemade sanitary napkin, not a store-bought one, something that has no pins to secure it, no tape to secure it, no belt to secure it. It was secured in place by her underwear, but her underwear is off of her body and her sanitary napkin is on the floor.

> He did leave out a struggle in the front bedroom, and he left out taking off her underwear. But what he did tell you in his confession, that is corroborated.

> *Trial Transcript*, pp. 1376-1377.

27.     Mr. Moss claims that the State implicitly stated that Mr. Moss, an African-American man, had sex with the victim, a Caucasian woman, during her menstrual cycle. Mr. Moss avers that there was no direct evidence of sexual relations and that such statement unduly prejudiced him.

28.     The victim's husband, Mr. Reggettz, testified at the trial that his wife was menstruating at the time of her death and that she used homemade sanitary napkins. (Trial Transcript, pp. 730-731). The Chief Medical Examiner for the State of West Virginia testified that Ms.

Reggettz was wearing a nightgown, but no other clothing at the time he examined the body. (Trial Transcript, pp. 829-830).

29. The prosecutorial misconduct ground was raised in Mr. Moss's direct appeal which was refused by the Supreme Court of Appeals of West Virginia.

## STATEMENT OF THE LAW

1. According to the *Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia*, circuit courts are required to conduct an initial evaluation of habeas petitions before requiring an answer from the respondent. *Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia, Rule 4 (hereinafter "Habeas Rules").*

2. After conducting this initial evaluation, the circuit court can either summarily dismiss the petition or order the respondent to file an answer. *Habeas Rules, Rule 4.*

3. The court may refuse the petition if it is satisfied that the petitioner is entitled to no relief, after the Court reviews the petition, the documentary evidence attached thereto, the record of the underlying conviction, and the records of any previous attacks on the conviction or sentence. *W. Va. Code* § 53-4A-3(a).

4. The Supreme Court of Appeals of West Virginia (hereinafter "Supreme Court") has recognized that this conclusion can be made without a hearing and without the appointment of counsel. *Mugnano v. Painter*, 212 W.Va. 831, 833, 575 S.E.2d 590, 592 (W. Va. 2002) (per curiam)(citing Syl. pt. 1, *Perdue v. Coiner*, 156 W.Va. 467, 194 S.E.2d 657 (W. Va. 1973)).

5. Contentions in habeas petitions that have been previously and finally adjudicated, after a decision on the merits and an opportunity for an appeal, need not be considered unless the

10

prior decision was clearly wrong. See *W.Va. Code*, § 53-4A-1.

6. When any contentions and grounds could have been advanced by the petition at trial, on direct appeal, or in a proceeding or proceedings on a prior habeas petition, but were not advanced, there shall be a rebuttal presumption that the petitioner intelligently and knowingly failed to advance such contention or contentions and grounds. See *W.Va Code*, § 53-4A-1(c).

7. Finally, this Court evaluates habeas petitions with an awareness that "[a] habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Syl. pt. 4, *State ex rel. McMannis v. Mohn*, 254 S.E.2d 805, 806 (W. Va. 1979).

## CONCLUSIONS OF LAW

1. The Court concludes that Mr. Moss's first ground for relief must be **SUMMARILY DENIED** and **DISMISSED** as it relates to the admissibility of his confessions, which was previously raised, considered, and denied, on the merits, by this Court and the Supreme Court of Appeals of West Virginia.

2. The Court concludes that Mr. Moss's second ground for relief must be **SUMMARILY DENIED** and **DISMISSED** as it asks this Court to review certain determinations made by the Supreme Court of Appeals of West Virginia. This Court does not have appellate review powers over the Supreme Court of Appeals.

3. The Court concludes that Mr. Moss's third ground for relief must be **SUMMARILY DENIED** and **DISMISSED** as it relates to the admissibility of his confessions, which

11

was previously raised, considered, and denied, on the merits, by this Court and the Supreme Court of Appeals of West Virginia.

4.   The Court concludes that Mr. Moss's fourth and fifth grounds for relief must be **SUMMARILY DENIED** and **DISMISSED** as they relate to Trooper Fred Zain's evidence gathering, testing, and testimony, which was previously raised, considered, and denied, on the merits.

5.   The Court concludes that Mr. Moss's sixth ground for relief must be **SUMMARILY DENIED** and **DISMISSED** as it fails to provide this Court with probable cause that Mr. Moss may be entitled to relief.  While the United States Supreme Court has determined that compulsory blood testing implicates Fourth Amendment issues, the question is whether the "intrusion" is justified and reasonable.  See *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826 (1966).  In *Schmerber*, the Court found that extraction of blood samples in a hospital environment, and according to accepted medical practice, was reasonable. *Schmerber*, 384 U.S. 757, 771, 86 S.Ct. 1826, 1836.

6.   The Court concludes that based on the testimony provided at the earlier suppression hearing, law enforcement officers completed an affidavit which included a substantial basis for determining that probable cause existed in April of 1980.  Further, the Court concludes that the withdraw of the blood sample in April of 1980, where law enforcement officers submitted an affidavit to a neutral and detached judicial officer, who granted them permission to withdraw the blood, and where sample was obtained by medical personnel, was reasonable and Constitutional. *Id.*

12

7.      Mr. Moss's seventh and final ground for relief relates to the prosecutor's statements during closing arguments about the adult victim's panties and sanitary napkin. The Court concludes that this ground must be **SUMMARILY DENIED** and **DISMISSED** as Mr. Moss has failed to provide this Court with probable cause to believe that he may be entitled to relief. The trial transcript reveals that there was testimony at trial about Ms. Reggettz's use of homemade sanitary napkins and the fact that she was not wearing underwear when her body was found. Specifically, the Court concludes that the prosecutor's comments were not unduly prejudicial and did not infect the trial with unfairness resulting in a denial of due process. See *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.E.2d 431 (1974).

Accordingly, the Court does hereby **SUMMARILY DENY** and **DISMISS** all grounds that were raised in Mr. Moss's Petition. The Court notes Mr. Moss's objection(s) to the entry of this Order. The Clerk is **DIRECTED** to send a certified copy of this Order to Mr. Moss, who is believed to be incarcerated at Mount Olive Correctional Complex, which has a mailing address of One Mountainside Way, Mt. Olive, West Virginia, 25185.

There being nothing further, the Court **DIRECTS** the clerk to **REMOVE** this action from the Court's docket.

**ENTER: This ___7th___ day of February, 2006.**

Judge Louis H. Bloom

2/7/06

Date:
Certified copies sent to:
____ counsel of record
____ parties ②      Jm, III / PA
____ other _____
        (please indicate)

____ certified/1st class mail
____ fax
____ hand delivery
____ interdepartmental
____ other directives accomplished

Deputy Circuit Clerk

13

STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT.
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS 7th
DAY OF February, 2006
Cathy S. Gatson, CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA

IN THE SUPREME COURT OF APPEALS

IN VACATION

State of West Virginia ex rel. John Moss, III,
Petitioner Below, Petitioner

vs.)  No.  061721

Thomas L. McBride, Warden, Mount Olive
Correctional Complex, Respondent Below,
Respondent

      On a former day, to-wit, June 22, 2006, came the petitioner, John Moss, III, pro se, and presented to the Court his petition praying for an appeal from a judgment of the Circuit Court of Kanawha County, rendered on the 7th day of February, 2006, with the record accompanying the petition.

      Upon consideration whereof, the Court is of opinion to and doth hereby refuse said petition for appeal.

      DONE IN VACATION of the Supreme Court of Appeals, this 6th  day of December, 2006.

                Honorable Robin Jean Davis,  Chief Justice

                Honorable Larry V. Starcher

                Honorable Elliott E. Maynard

                Honorable Joseph P. Albright,

                Honorable Brent D. Benjamin

      Received the foregoing order this 6th day of December, 2006, and entered the same in Order Book No. 158.

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III**

       **Petitioner,**

**v.**
                            **Civil Action No. 06-MISC-245**
                            **Judge Louis H. Bloom**

**THOMAS MCBRIDE, Warden,**
**Mount Olive Correctional Complex,**

       **Respondent.**

## FINAL ORDER DENYING HABEAS RELIEF

Pending before the Court is the *"Petition Under W.Va. Code §53-4A-1 for Writ of Habeas Corpus"* (hereinafter "Petition"), filed by the self-represented petitioner John Moss, III (hereinafter "Mr. Moss"). Mr. Moss's Petition relates to his conviction of three counts of first degree murder in April of 1990. Mr. Moss filed a direct appeal of his conviction to the Supreme Court of Appeals of West Virginia and such appeal was refused in 1991. Mr. Moss filed his first habeas petition in 1994, that petition was denied by this Court, after a full review of the grounds raised therein, and the Supreme Court of Appeals of West Virginia affirmed that denial. Mr. Moss filed a second habeas petition in 2005, that petition was denied by this Court, after full consideration of the grounds raised therein, and an appeal of that decision is currently before the Supreme Court of Appeals of West Virginia. Mr. Moss's current habeas Petition is brought pursuant to the decision of the Supreme Court of Appeals of West Virginia, *In the Matter of: Renewed Investigation of the State Police Crime Laboratory, Serology Division*, 2006 WL 1686169, W.Va., June 16, 2006.

After full consideration of Mr. Moss's current habeas Petition, his two previous habeas petitions, the files relating to his underlying trial, applicable law, and based on the following

findings and conclusions, the Court is of the opinion that the Petition must be **SUMMARILY**

**REFUSED** and **DISMISSED**.

## FINDINGS OF FACT

1.  The Supreme Court of Appeals previously summarized the facts of this case in *In Interest of Moss*, 170 W.Va. 543, 295 S.E.2d 33 (W. Va. 1982):

> In December of 1979, a woman and her two children were found dead in their St. Albans home. Soon afterward, the deceased woman's husband became a suspect in the triple murder. He is alleged to have confessed to the crime and was subsequently indicted by the Kanawha County Grand Jury. The husband was held in custody for approximately eleven months awaiting trial, during which time his alleged confession was ruled admissible into evidence as voluntarily given. Trial was set for November 12, 1980.

> The record indicates that the appellant was also a suspect in the murders and that his name was recited in the indictment of the accused husband. In January 1980, the investigating authorities traveled to Cleveland, Ohio, to obtain a blood sample from the appellant, who at the time was housed in a juvenile detention center on an unrelated charge, and to question him about the murders. The appellant denied committing the murders. A blood sample was taken, when, at the authorities' request, the appellant pricked his finger and dribbled blood on a cloth provided for this purpose.

> At the time of this interrogation, the appellant was seventeen years of age. The blood sample was taken without a court order, and without the knowledge or consent of the appellant's parents. The authorities were aware that the appellant was a juvenile. They made no effort to contact the appellant's Ohio lawyer. The appellant was advised of his rights prior to questioning, but did not sign a waiver of rights form.

> When the appellant's counsel learned of the blood sample taken by the West Virginia authorities, he objected, and an Ohio court ordered that the cloth on which the blood sample was deposited be returned to the appellant. This apparently was done. Subsequently, in April 1980, the investigating authorities again traveled to Cleveland to obtain a blood sample from the appellant, pursuant to an order issued by an Ohio court. A doctor performed the sampling. Analysis of the blood sample strengthened the investigating authorities' suspicions concerning the appellant's involvement in the murders.

> On September 26, 1980, the State filed a detainer against the appellant . . . based on a malicious wounding charge, unrelated to the homicides[.]  On October 28, 1980, while being transported to West Virginia by members of the Department of Public Safety to answer the malicious wounding charge, the appellant confessed to having committed the homicides in Kanawha County. The appellant subsequently made a tape recorded confession after signing a waiver of his *Miranda* rights.

> On November 2, 1980, a second detainer was filed by the State against the appellant based on a charge of three counts of murder in the first degree. On December 18, 1980, the appellant was again transported from [Ohio] to the Kanawha County Jail. A preliminary hearing was set [and] the juvenile referee made a finding of probable cause and referred the appellant to the juvenile jurisdiction of the Circuit Court of Kanawha County.

Appendix C

On January 20, 1981, the State filed a motion to have the appellant transferred to the criminal jurisdiction of the circuit court and tried as an adult[.] At the conclusion of the hearing the court issued from the bench its decision that the appellant be transferred to the criminal jurisdiction of the court, and indicated that further proceedings would be stayed until counsel had an opportunity to file an appeal.

*In Interest of Moss*, 170 W.Va. at 544-548, 295 S.E.2d at 35-37.

2.     Mr. Moss appealed the trial court's decision to transfer him to the adult jurisdiction of the Court and the Supreme Court reversed and remanded the matter.   See *In the Interest of Moss*, 170 W.Va. 543, 295 S.E.2d 33.

3.     After conducting a second transfer hearing, the circuit court entered another order on September 28, 1982, granting the motion to transfer Mr. Moss to the Court's adult jurisdiction.  The Supreme Court refused to hear Mr. Moss's appeal from the second transfer order.

4.     A grand jury later returned an indictment, charging Mr. Moss with three counts of first degree murder.

5.     Mr. Moss was tried, convicted, and sentenced for the three counts of first degree murder in 1984, but that conviction was reversed by the Supreme Court of Appeals of West Virginia by its decision in *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988).

6.     The Supreme Court's decision to overturn Mr. Moss's conviction was based on the Court's finding of multiple trial court errors.  First, the Supreme Court held that the trial court erred when it refused Mr. Moss's motion to poll each juror, outside the presence of others, about each juror's exposure to prejudicial comments made by the prosecuting attorney.  Second, the Supreme Court held that the trial court erred when it failed to intervene for the purposes of limiting and correcting fundamentally improper remarks made by the prosecuting attorney during closing.  Third, the Supreme Court held that the

3

trial court erred when it allowed the admission of evidence regarding the results of a

polygraph test taken by the victims' husband and father. *Moss,* 180 W.Va. 363, 376

S.E.2d 569 (1988).

7.    In the 1988 decision, the Supreme Court also made the following statements regarding

the three confessions that were admitted at the trial:

> We conclude that the first two confessions given by [Mr. Moss] are admissible,
> while the last confession is inadmissible due to the lack of prompt presentment to
> a neutral judicial officer.
>                            *Moss,* 180 W.Va. 363, 369, 376 S.E.2d 569, 575.

8.    Mr. Moss's second trial was held in 1990.  He was convicted again of three counts of first

degree murder.  Mr. Moss appealed that conviction to the Supreme Court of Appeals of

West Virginia, but such appeal was refused on March 12, 1991.

*1994 Habeas Petition*

9.    Mr. Moss's first habeas petition was filed in August of 1994 and resulted in this Court's

consideration of numerous motions, legal memoranda, oral argument, and evidentiary

exhibits.  The grounds raised in that habeas matter were the following:

(1)    The admission of Trooper Fred Zain's testimony and test results violated
       Mr. Moss's Constitutional rights;

(2)    The State presented incorrect, false, misleading, overstated, and
       unscientific evidence; and

(3)    The admission of Mr. Moss's confessions violated his Constitutional
       rights.

10.   In September of 1998, Judge MacQueen entered a Memorandum Order which concluded

that Mr. Moss was not entitled to a new trial on the basis of Trooper Zain's testimony and

testing.  Specifically, Judge MacQueen held that based on the fact that the scientific

4

Appendix C

conclusions were confirmed as valid, Trooper Zain's testimony was not false, inaccurate, or invalid.  Further, Judge MacQueen held that even if the serological evidence is completely disregarded, there remains sufficient evidence to sustain the conviction.

11.  Mr. Moss filed a motion to alter or amend Judge MacQueen's judgment and in October of 1998, Judge MacQueen held a hearing on Mr. Moss's motion.  Apparently Judge MacQueen denied that motion from the bench, but a written order was never entered.

12.  In June of 2001, and after Judge MacQueen retired, this Court held a status conference in this matter, wherein the parties were granted additional time to submit evidence and argument.

13.  In February of 2002, this Court entered an Amended Order which denied relief, based on this Court's conclusion that Trooper Zain's testing and testimony did not result in any prejudice.  In coming to that conclusion, the Court noted from the earlier Memorandum Order that there remains sufficient evidence to sustain the conviction.  The Court specifically noted that, Mr. Moss's own confession is a key piece of evidence that stands independently of any Zain-related evidence.  "Further, the Court found that the confession is corroborated in a number of significant ways, which the Court has described as 'indices of reliability.'  In focusing on Zane, Moss ignores the power of his own well-corroborated confession."  However, the habeas matter was reinstated to the Court's docket in March of 2002 so that the other issues that Mr. Moss raised in the habeas petition could be addressed, on their merits.  After another hearing, the Court entered a Final Order in January of 2003, which denied all claims raised in that habeas proceeding.

14.  The January 2003 final order made the following findings and conclusions:

"[e]ven if the serological evidence were excluded, there would still be sufficient evidence in the record to support Moss's conviction and that the introduction of Zain-related evidence and testimony at Moss's trial did not prejudice the jury."

\* . \* . \*

"As the Court has noted in its earlier orders, Moss's confession was well-corroborated and consistent with details of the crime scene. Therefore, even if the Court were to adopt all of Moss's arguments as to the flaws in the State's scientific evidence, Moss still would not be entitled to the requested writ."

"As both parties acknowledged, the issue of the voluntariness of Moss's confession has been thoroughly litigated[.] Moss failed to present any new evidence on the voluntariness of his confession. Rather, he seems to argue that the fact that Mr. Reggettz had, at one point, given a confession somehow invalidates Moss's own confession. The existence of the Reggettz confession does not have the devastating effect that Moss desires because the Reggettz confession does not impugn the voluntariness of Moss's confession. At most, it provided fodder for defense theories at trial. The question before the Court is whether Moss was able to establish that his confession was constitutionally flawed. He was not. Therefore, the admission of his confession at trial does not provide a predicate for issuance of the requested writ."

15.    Mr. Moss filed an appeal from this Court's January 2003 order denying his habeas petition and the Supreme Court of Appeals of West Virginia affirmed this Court's decision after finding no merit in Mr. Moss's assignments of error. *Moss v. Trent*, 216 W.Va. 192, 603 S.E.2d 656 (W. Va. 2004).

*2005 Habeas Petition*

16.    Mr. Moss filed his second Petition for Writ of Habeas Corpus in July of 2005. The petition is based on the following averments of error:

(1)    The trial court abused its discretion and committed reversible error in ruling that the first two confessions were admissible under the "law of the case doctrine";

(2)    The factual determination by the West Virginia Supreme Court of Appeals that no prompt presentment objections were entered on the first two alleged confessions is clearly erroneous and works a manifest injustice;

(3)    The petitioner was deprived of the Sixth Amendment's guarantee of the effective assistance of counsel;

6

STATE OF WEST VIRGINIA
IN THE SUPREME COURT OF APPEALS
IN VACATION

John Moss, III, Petitioner Below, Petitioner

vs.)  No.  070678

Thomas McBride, Warden, Mount Olive
Correctional Complex, Respondent Below,
Respondent

On a former day, to-wit, March 5, 2007, came the petitioner, John Moss, III, pro

se, and presented to the Court his petition praying for an appeal from a judgment of the

Circuit Court of Kanawha County, rendered on the 16th day of October, 2006, with the

record accompanying the petition.

Upon consideration whereof, the Court is of opinion to and doth hereby refuse

said petition for appeal.  Justice Albright would grant.

DONE IN VACATION of the Supreme Court of Appeals, this 9th day of July,

2007.

Honorable Robin Jean Davis,  Chief Justice

Honorable Larry V. Starcher

Honorable Elliott E. Maynard

Honorable Joseph P. Albright,

Honorable Brent D. Benjamin

Received the foregoing order this 9th day of July, 2007, and entered the same in

Order Book No. 159.

A True Copy

Attest: _____

Clerk, Supreme Court of Appeals

Appendix E

STATE OF WEST VIRGINIA

At a Regular Term of the Supreme Court of Appeals continued and held at Charleston, Kanawha County, on the 13th of September, 2007, the following order was made and entered:

State of West Virginia ex rel. John Moss, III,
Petitioner

vs.)  No.  072486

Thomas McBride, II, Warden, Respondent

On a former day, to-wit, July 31, 2007, came the petitioner, John Moss, III, pro se, and presented to the Court his petition praying for a writ of habeas corpus ad subjiciendum to be directed to the respondent, Thomas McBride, II, Warden, commanding him to appear before this Court and show cause, if any he can, why he detains and restrains said petitioner of and from his liberty.

Upon consideration whereof, the Court is of opinion that a rule should not be awarded, and the writ prayed for by the petitioner is hereby refused.

A True Copy

Attest: _____
Clerk, Supreme Court of Appeals

Appendix F

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED

2009 MAR 30  PM 12: 08

STATE OF WEST VIRGINIA
EX REL., JOHN MOSS, III,

      Petitioner,

*lt*

CATHY S. GATSON, CLERK
KANAWHA CO. CIRCUIT COURT

vs.

    Case No. 07-MISC-403
    Judge Jennifer F. Bailey

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.

## FINAL ORDER SUMMARILY DISMISSING
## POST-CONVICTION HABEAS CORPUS PETITION

    The above-named petitioner has filed in this Court a *Pro Se* Petition for post-conviction habeas corpus relief. The petitioner has also filed with the Court a motion to amend his original petition and assert eight additional assignments of error.  In accord with the requirements of Rule 4(c) of the Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia, this Court examined the Petition. The Court has also examined the records of prior habeas corpus proceedings initiated by the petitioner.

    After a full consideration of the petitioner's current habeas petition, his three previous habeas petitions, files relating to his underlying trial, and all pertinent legal authorities, the Court is of the opinion that the currently pending petition should be **SUMMARILY REFUSED** and **DISMISSED**. The Court also **DENIES** the petitioner's motion to amend his original petition.

1

Appendix  F

## FINDINGS OF FACT

1.      The West Virginia Supreme Court of Appeals previously summarized the facts of this

case in *In Interest of Moss*, 295 S.E.2d 33 (W.Va. 1982):

> In December of 1979, a woman and her two children were found dead in their St. Albans home. Soon afterward, the deceased woman's husband became a suspect in the triple murder. He is alleged to have confessed to the crime and was subsequently indicted by the Kanawha County Grand Jury. The husband was held in custody for approximately eleven months awaiting trial, during which time his alleged confession was ruled admissible into evidence as voluntarily given. Trial was set for November 12, 1980.

> The record indicates that the appellant was also a suspect in the murders and that his name was recited in the indictment of the accused husband. In January 1980, the investigating authorities traveled to Cleveland, Ohio, to obtain a blood sample from the appellant, who at the time was housed in a juvenile detention center on an unrelated charge, and to question him about the murders. The appellant denied committing the murders. A blood sample was taken, when, at the authorities' request, the appellant pricked his finger and dribbled blood on a cloth provided for this purpose.

> At the time of this interrogation, the appellant was seventeen years of age. The blood sample was taken without a court order, and without the knowledge or consent of the appellant's parents. The authorities were aware that the appellant was a juvenile. They made no effort to contact the appellant's Ohio lawyer. The appellant was advised of his rights prior to questioning, but did not sign a waiver of rights form.

> When the appellant's counsel learned of the blood sample taken by the West Virginia authorities, he objected, and an Ohio court ordered that the cloth on which the blood sample was deposited be returned to the appellant. This apparently was done. Subsequently, in April 1980, the investigating authorities again traveled to Cleveland to obtain a blood sample from the appellant, pursuant to an order issued by an Ohio court. A doctor performed the sampling. Analysis of the blood sample strengthened the investigating authorities' suspicions concerning the appellant's involvement in the murders.

> On September 26, 1980, the State filed a detainer against the appellant...based on a malicious wounding charge, unrelated to the homicides. The appellant at this time was serving a term of four to twenty-five years at the Ohio State Reformatory on charges of rape and attempted murder. On October 28, 1980, while being transported to West Virginia by members of the Department of Public Safety to answer the malicious wounding charge, the appellant confessed to

2

having committed the homicides in Kanawha County. The appellant subsequently made a tape recorded confession after signing a waiver of his *Miranda* rights.

On November 2, 1980, a second detainer was filed by the State against the appellant based on a charge of three counts of murder in the first degree. On December 19, 1980, the appellant was again transported from the Ohio State Reformatory to the Kanawha County Jail. A preliminary hearing was set for December 24, 1980, but as a result of motions for continuance made by the defense, the hearing was not held until January 12, 1981. After the presentation of evidence, which included a replay of the appellant's taped confession, the juvenile referee made a finding of probable cause and referred the appellant to the juvenile jurisdiction of the Circuit Court of Kanawha County.

On January 20, 1981, the State filed a motion to have the appellant transferred to the criminal jurisdiction of the circuit court and tried as an adult. The transfer hearing was set for January 28, 1981. Defense counsel's motion for a continuance to allow for psychological and psychiatric testing and evaluation of the appellant was granted. Following subsequent motions for continuance on the part of defense counsel, the transfer hearing was held on June 29, 1981.

*In Interest of Moss*, 295 S.E.2d 33 at 35-37 (W.Va. 1982).

2.   Moss appealed the trial court's decision to transfer him to adult jurisdiction of the Court and the Supreme Court reversed and remanded the matter. *Id.*

3.   After conducting a second transfer hearing, the Circuit Court entered another order on September 28, 1982, granting the motion to transfer Moss to the Court's adult jurisdiction. Moss appealed the decision and the Supreme Court refused to hear his appeal.

4.   A Kanawha County grand jury later returned an indictment, charging Moss with three counts of first degree murder. *See Kanawha County Action No. 82-F-221.*

5.   Moss was tried, convicted, and sentenced for the three counts of first degree murder in 1984.

6.    The initial conviction of Moss was overturned by the West Virginia Supreme Court of
Appeals based upon numerous trial court errors. *See State v. Moss*, 376 S.E.2d 569
(W.Va. 1988). Specifically, the Supreme Court held that the trial court erred when it
refused Moss' motion to poll each juror, outside the presence of others, about exposure to
prejudicial comments made by the prosecuting attorney. In addition, the Supreme Court
found that the trial court erred when it failed to intervene for the purposes of limiting and
correcting fundamentally improper remarks made by the prosecuting attorney during
closing. Lastly, the Supreme Court held that the trial court erred when it allowed the
admission of evidence regarding the results of a polygraph test taken by the victim's
husband and father. *Id.*

7.    Moss' second trial was held in 1990. He was again convicted of three counts of first
degree murder.

8.    Following the second conviction, Moss appealed to the West Virginia Supreme Court of
Appeals. His appeal was refused on March 12, 1991.

### *First Habeas Petition -1994*

9.    Moss filed his first habeas petition in August of 1994. *See Kanawha County Action No.
94-MISC-633.* The case was assigned to the Honorable Judge MacQueen who considered
numerous motions, legal memoranda, oral arguments, and evidentiary exhibits.

10.   Moss asserted three grounds in the petition and made the following allegations:

(1) The admission of Trooper Fred Zain's testimony and test results violated his
constitutional rights;

4

(2) The State presented incorrect, false, misleading, overstated, and unscientific evidence; and

(3) The admission of his confessions violated his constitutional rights.

11.    On September 10, 1998, Judge MacQueen entered a Memorandum Order which concluded that Moss was not entitled to a new trial on the basis of Trooper Zain's testimony and testing. Specifically, Judge MacQueen held that based on the fact that the scientific conclusions were confirmed as valid, Trooper Zain's testimony was not false, inaccurate, or invalid. Further, Judge MacQueen held that even if the serological evidence is completely disregarded, there remains sufficient evidence to sustain the conviction.

12.    Moss then filed a motion requesting that Judge MacQueen alter or amend his judgment. Judge MacQueen held a hearing on said motion in October 1998 and denied the motion from the bench. No written order was entered memorializing the ruling from the October 1998 hearing.

13.    Due to Judge MacQueen's retirement, the Honorable Judge Louis Bloom became the presiding judge in the habeas matter. After assuming Judge MacQueen's docket, Judge Bloom conducted a status conference on this matter in June of 2001. At that time, the parties were granted additional time to submit evidence and arguments.

14.    On February 15, 2002, Judge Bloom entered an order denying Moss' habeas petition. Specifically, Judge Bloom concluded that Trooper Zain's testing and testimony did not result in any prejudice. In reaching that conclusion, the Court noted from the earlier Memorandum Order that there remains sufficient evidence to sustain to conviction. The

Court specifically noted that Moss' own confession is a key piece of evidence that stands independently of any Zain-related evidence. The Court further found that Moss' confession is corroborated in a number of reliable ways.

15.   In March 2002, the habeas petition was reinstated onto Judge Bloom's docket so that the other issues raised by Moss' petition could be addressed on their merits.

16.   After another hearing was conducted, the Judge Bloom entered a final order on January 30, 2003 denying all claims raised by Moss in his habeas petition. Specifically, Judge Bloom found that even if serological evidence were excluded, there would still be sufficient evidence to support Moss' conviction and that the introduction of Zain-related evidence and testimony at Moss' trial did not prejudice the jury. As to the confession, the Court held that Moss' confession was well-corroborated and consistent with details of the crime scene.

17.   Moss then appealed the decision to the West Virginia Supreme Court of Appeals, where the denial was affirmed. *See Moss v. Trent*, 603 S.E.2d 656 (W.Va. 2004).

### *Second Habeas Petition - 2005*

18.   Moss filed his second Petition for Writ of Habeas Corpus on July 7, 2005. *See Kanawha County Action No. 05-MISC-298.* Moss made the following assignments of errors in his petition:

> (1) The trial court abused its discretion and committed reversible error in ruling that the first two confessions were admissible under the "law of the case doctrine;"

> (2) The factual determination by the West Virginia Supreme Court of Appeals that no prompt presentment objections were entered on the first two alleged confessions is clearly erroneous and works a manifest injustice;

(3) The petitioner was deprived of his Sixth Amendment's guarantee to effective assistance of counsel;

(4) The petitioner did not receive a full and fair hearing on his motion and memorandum to suppress samples of blood, confession, and other physical evidence seized due to the improper tactics of Fred S. Zain and the West Virginia State Troopers and Crime Laboratory;

(5) The petitioner's Sixth Amendment right to a fair and impartial jury was contravened when the State knew or should have known of the false and misleading testimony and evidence presented by Fred Zain;

(6) The trial court abused its discretion and committed reversible error when it admitted petitioner's blood samples, confessions, and all evidence incident thereto into evidence, when the samples of blood were obtained in violation of Federal and State Constitutional rights; and

(7) The prosecution made improper closing arguments that denied the petitioner a fair trial.

19.     Judge Bloom denied Moss' petition, after a full consideration of all seven grounds raised

        therein. Moss then appealed to the Supreme Court, where the petition for appeal was

        refused.

20.     As to Moss' allegation of ineffective assistance of counsel, the Court found that all

        claims related to the admissibility of confessions, which had been previously raised,

        considered, and denied, on the merits, by the Supreme Court of Appeals and the trial

        court in Moss' prior habeas petition and appeal.

                              ***Third Habeas Petition - 2006***

21.     Moss filed his third habeas petition on June 22, 2006. *See Kanawha County Action No.*

        *06-MISC-245.*  Moss made the following assignments of error in his petition:

                (1) Blood test results and reports of offered serology evidence were falsified or
                were substantially incorrect.

                (2) Ineffective assistance of trial counsel in failing to conduct an adequate
                investigation.

7

22.   The Court found that the two grounds raised in the petition related to the alleged improper tactics of the West Virginia State Police Crime Laboratory Serology Division in preparing blood test results and reports.

23.   Judge Bloom summarily denied and dismissed the petition on the grounds that the allegations were previously raised, considered, and denied on the merits by the West Virginia Supreme Court of Appeals.

24.   As to the ineffective assistance of counsel claim, the Court found the issue to be moot because there remained sufficient evidence to sustain the conviction.

25.   Moss appealed the decision to the Supreme Court and said appeal was refused.

### Fourth and Current Habeas Petition

26.   Moss filed the petition currently pending before this Court on September 28, 2007. The petition is based upon the following assertion:

> (1) The petitioner received ineffective assistance of counsel as guaranteed by the Constitutions of West Virginia and the United States.

27.   The Court finds as fact that the assertion tendered by Moss in his current petition relates to physical evidence and the reliability of his confession. Specifically, Moss asserts that his counsel failed to present testimony regarding silverware and a camera allegedly stolen from the victim's home. Moss asserts that if such testimony had been provided and his counsel had not acted deficiently, there would not be evidence sufficient to sustain his conviction. Moss further questions the reliability of his confession and his attorneys presentment of testimony in relation thereto.

28.   The Court find that the issue of ineffective assistance of counsel has been alleged by Moss in two of his prior habeas petitions. In his second petition, the Court ultimately

8

found the admissibility of confessions had been previously raised, considered, and denied on the merits by both the Supreme Court of Appeals and the Circuit Court of Kanawha County. In his third habeas petition, the Court ultimately held that the issue was moot because there remained sufficient evidence on the record to sustain the conviction.

29.     On January 9, 2008, Moss filed a "Motion for Leave from the Court to Amend Habeas Petition." In said motion, Moss sought to add the following assertions to his habeas petition:

> (1)  The trial court abused its discretion and committed reversible error in ruling that the first two confessions were admissible under the "law of the case doctrine;"

> (2)  The factual determination by the West Virginia Supreme Court of Appeals that no prompt presentment objections were entered on the first two alleged confessions is clearly erroneous and works a manifest injustice;

> (3)  Petitioner was deprived of the Sixth Amendment's guarantee to effective assistance of counsel;

> (4)  Petitioner did not receive a full and fair hearing on his motion and memorandum to suppress samples of blood, confession, and other physical evidence seized due to the improper tactics of Fred S. Zain and the West Virginia State Police Troopers and Crime Laboratory;

> (5)  Petitioner's Sixth Amendment right to a fair and impartial jury was contravened when the state knew, or should have known, of the false or misleading testimony and evidence presented by a state witness;

> (6)  The trial court abused its discretion and committed reversible error when it admitted petitioner's blood samples, confessions, and all evidence incident thereto into evidence, when the samples of blood were obtained in violation of federal and state constitutional rights;

> (7)  Improper closing arguments by the prosecution denied the petitioner a fair trial; and

> (8)  Blood test results and reports of offered serology evidence were falsified or were substantially incorrect.

9

## STATEMENT OF LAW

1.  Rule 10 of the Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia provides that the "West Virginia Rules of Civil Procedure, to the extent they are not inconsistent with these rules, may be applied, when appropriate, to petitions filed in West Virginia circuit courts under these rules." Habeas Rules, Rule 10.

2.  Meanwhile, Rule 15 of the West Virginia Rules of Civil Procedure provides that leave to amend should be freely given when justice so requires. W.Va. R. Civ. P. 15.

3.  According to the Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia, circuit courts are required to conduct an initial evaluation of habeas petitions before requiring an answer from the respondent. Habeas Rules, Rule 4.

4.  After conducting this initial evaluation, the circuit court can either summarily dismiss the petition or order the respondent to file an answer. *Id.*

5.  The Court may refuse the petition if it is satisfied that the petitioner is entitled to no relief, after the Court reviews the petition, the documentary evidence attached thereto, the record of the underlying conviction, and the records of any previous attacks on the conviction or sentence. W.Va. Code §53-4A-3(a).

6.  A claim for relief in post-conviction habeas corpus can only be based on contentions not previously and finally adjudicated. W.Va. Code §53-4A-1(a).

7.  The West Virginia Supreme Court of Appeals has held that the decision to summarily dismiss can be reached without a hearing and without the appointment of counsel. *Mugnano v. Painter*, 575 S.E.2d 590, 592 (W.Va. 2002) (per curium) (citing Syl. pt. 1, *Perdue v. Coiner*, 194 S.E.2d 657 (W.Va. 1973).

10

8.   If the circuit court summarily dismisses all or part of the claims asserted in the petition, it is required to enter a specific dismissal order. The West Virginia Supreme Court of Appeals has held that "[t]he court's summary dismissal order shall contain specific findings of fact and conclusions of law as to the manner in which each ground raised in the petition has been previously and finally adjudicated and/or waived." Syl. Pt. 5, *Mathena v. Haines*, 633 S.E.2d 771 (W.Va. 2006).

9.   West Virginia statutory law provides that contentions in habeas petitions that have been previously and finally adjudicated, after a decision on the merits and opportunity for appeal, need not be considered unless the prior decision was clearly wrong. W.Va. Code §53-4A-1.

10.  When any contentions or grounds could have been raised by petition at trial, on direct appeal, or in a proceeding or proceedings in a prior habeas petition, but were not advanced, there shall be a presumption that the petitioner intelligently and knowingly failed to advance such contention or contentions and grounds. W.Va. Code §53-4A-1(c).

11.  The Court evaluates habeas petitions with the awareness that "[a] habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Syl. pt. 4, *State ex rel. McMannis v. Mohn*, 254 S.E.2d 805, 806 (W.Va. 1979).

## CONCLUSIONS OF LAW

As a preliminary issue, the Court finds that justice does not require that the petitioner be allowed to amend his currently pending habeas petition to include assertions that have been addressed in previous habeas petitions. The first seven proposed amendments to the petition were addressed in Civil Action No. 05-MISC-298, while the eighth proposed amendment was

11

Appendix F

addressed in Civil Action No. 06-MISC-245. Therefore, the Court **DENIES** the petitioner's Motion to Amend and declines to consider the eight amended assertions.

As to the original petition filed, the Court notes that the petitioner has filed numerous appeals to the West Virginia Supreme Court of Appeals and three habeas petitions in the Circuit Court of Kanawha County. In two of the habeas petitions filed in Kanawha County, Moss indicated that he was deprived of his Sixth Amendment right to effective assistance of counsel. In one case, Judge Bloom denied Moss' petition on the ground that the issue had been previously raised, considered, and denied. In another denial, Judge Bloom ordered that the issue was moot because there remained sufficient evidence to sustain the conviction.

In accord with the prior holdings of this circuit, the Court concludes that Moss' claim for ineffective assistance of counsel must be **SUMMARILY DENIED** and **DISMISSED** because the issue of effective assistance of counsel has been previously and finally adjudicated. Additionally, any claims of deficient counsel were waived by the petitioner because such claims should have been advanced on direct appeal or in prior habeas proceedings.

The Court further concludes that Moss' claim regarding the reliability of his confession must be **SUMMARILY DENIED** and **DISMISSED** because the admissibility of his confession has been previously raised, considered, and denied on the merits by both the West Virginia Supreme Court of Appeals and the Circuit Court of Kanawha County.

## DECISION

For the reasons set forth above, the Court does hereby **SUMMARILY DENY** and **DISMISS** all grounds that were raised in Moss' Petition for Writ of Habeas Corpus. The Court further **DENIES** the petitioner's motion to amend his original petition.

12

Appendix  F

This is a final order and the Court notes the objection and exception of the petitioner to this ruling.

There being nothing additional pending before this Court, the Court further **ORDERS** that this matter be **DISMISSED** and **STRICKEN** from the docket of this Court.

The Circuit Clerk shall distribute certified copies of this Order to all counsel of record and self-represented parties.

Entered this ____30th____ day of _____March_____, 2009.

_____
JENNIFER F. BAILEY, JUDGE
Thirteenth Judicial Circuit

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF THE CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT.
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS __31__
DAY OF __March 2009__
__Cathy S Gatson__ CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

Appendix  G

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED

2009 APR 20  PM 3: 38

CATHY S. GATSON-CLERK
KANAWHA COUNTY CIRCUIT CT

STATE EX REL JOHN MOSS, III,

         Petitioner,

v.

                                  Civil Action Number: 07-MISC-403
                                  Judge Jennifer F. Bailey

DAVID BALLARD, Warden
of Mount Olive Correctional Complex,

         Respondent.

## ORDER DENYING PETITIONER'S MOTION
## TO AMEND FINAL JUDGMENT

    The Court has had under consideration the petitioner's Motion to Alter or Amend Final Judgment. On March 30, 2009, this Court entered an order summarily dismissing the petitioner's Petition for Post-Conviction Habeas Corpus Relief.

    The Court finds, after consideration of the facts and circumstances, that the previously entered final order is proper.  Accordingly, the petitioner's Motion to Alter or Amend Final Judgment is hereby **ORDERED DENIED**.

    The Court does hereby **FURTHER ORDER** that a certified copy of this Order be sent to all parties or counsel of record.

    Enter this Order the _20th_ day of ____April____, 2009.

                                _____
                                  JENNIFER D. BAILEY, Judge
                                  Thirteenth Judicial Circuit

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF THE CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS 23
DAY OF April, 2009
Cathy S Gatson , CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**Appendix  H**

STATE OF WEST VIRGINIA

At the Supreme Court of Appeals continued and held at Charleston, Kanawha County, on the 30th of November, 2009, the following order was made and entered **in vacation**:

State of West Virginia ex rel. John Moss, III, Petitioner
Below, Petitioner

vs.) No.  091215

David Ballard, Warden, Mount Olive Correctional Complex,
Respondent Below, Respondent

On a former day, to-wit, August 6, 2009, came the petitioner, John Moss, III, pro se, and presented to the Court his petition praying for an appeal from a judgment of the Circuit Court of Kanawha County, rendered on April 20, 2009, with the record accompanying the petition.

Upon consideration whereof, the Court is of opinion to and doth hereby refuse said petition for appeal.

A True Copy

Attest: _____

Clerk, Supreme Court of Appeals