# MOSS v. BALLARD
## CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 1

376 S.E.2d 569, 180 W.Va. 363, State v. Moss, (W.Va. 1988)                          Page 1

**\*569**  376 S.E.2d 569

180 W.Va. 363

Supreme Court of Appeals of
West Virginia.

**STATE of West Virginia**
v.
**John MOSS, Jr.**

No. 17063.
Dec. 19, 1988.

Defendant was convicted in the Circuit Court, Kanawha County, Hey, J., of first-degree murder. Defendant appealed. The Supreme Court of Appeals, McGraw, J., held that: (1) trial court's failure to poll each juror about prosecutor's statement during radio broadcast and its failure to correct prosecutor's improper closing argument were reversible error; (2) admission of results of polygraph test supporting innocence of victim's husband required reversal; and (3) transfer of lawfully incarcerated defendant to West Virginia without pretransfer hearing did not violate Fourth Amendment and did not require application of exclusionary rule to defendant's inculpatory statements to West Virginia authorities.

Reversed and remanded.

West Headnotes

[1] Criminal Law ☞868

110 ----
110XX Trial
110XX(J) Issues Relating to Jury Trial
110k868 Objections and Disposition Thereof.

Trial court was required to poll each juror alone about that juror's exposure to prosecutor's comment asserting his belief in defendant's guilt during radio broadcast; defendant had made motion for polling. Code, 62-3-7.

[2] Criminal Law ☞868

110 ----
110XX Trial
110XX(J) Issues Relating to Jury Trial
110k868 Objections and Disposition Thereof.

[See headnote text below]

[2] Criminal Law ☞1174(1)

110 ----
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1174 Conduct and Deliberations of Jury
110k1174(1) In General.

Trial judge committed reversible error in murder prosecution by refusing to grant defendant's motion to poll each juror about prosecutor's comment asserting his belief in defendant's guilt during radio broadcast. Code, 62-3-7.

[3] Criminal Law ☞2139

110 ----
110XXXI Counsel
110XXXI(F) Arguments and Statements by Counsel
110k2139 Expression of Opinion as to Guilt of Accused.

(Formerly 110k720.5, 110k7201/2)

Prohibition against prosecutor asserting personal opinion as to guilt or innocence of accused is applicable in and out of courtroom. Code of Prof.Resp., DR 7-106(C)(4); Code, 62-3-7.

[4] Criminal Law ☞868

110 ----
110XX Trial
110XX(J) Issues Relating to Jury Trial
110k868 Objections and Disposition Thereof.

[See headnote text below]

[4] Criminal Law ☞1174(1)

110 ----
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1174 Conduct and Deliberations of Jury
110k1174(1) In General.

Where publicity has been disseminated which raises serious question of possible prejudice and either party has made motion to poll jurors about exposure to publicity, trial court's refusal to undertake questioning constitutes reversible error:

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

376 S.E.2d 569, 180 W.Va. 363, State v. Moss, (W.Va. 1988)                    **Page 2**

Code, 62-3-7.

[5] Criminal Law ⊚⟹868

    110 ----
      110XX Trial
      110XX(J) Issues Relating to Jury Trial
      110k868 Objections and Disposition Thereof.

Actual prejudice was not required before defendant was entitled to poll of jury about exposure to prosecutor's allegedly prejudicial remarks during recess. Code, 62-3-7.

[6] Criminal Law ⊚⟹2200

    110 ----
      110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
      110k2191 Action of Court in Response to Comments or Conduct
      110k2200 Comments on Evidence or Witnesses.

      (Formerly 110k730(8))

[See headnote text below]

[6] Criminal Law ⊚⟹2207

    110 ----
      110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
      110k2191 Action of Court in Response to Comments or Conduct
      110k2207 Appeals to Sympathy or Prejudice.

      (Formerly 110k730(14))

Trial court in prosecution for first-degree murder was required to intervene and correct prosecutor's closing argument which expressed personal opinion as to credibility of State's witnesses, characterized defendant as "psychopath" with "diseased criminal mind," implored jury to return verdicts of guilty without recommendation of mercy so that defendant would "never be released to slaughter women and children," misstated crucial evidentiary matters, and referred to polygraph by victim's husband as supporting his innocence. Code of Prof.Resp., DR 7-106(C)(4).

[7] Criminal Law ⊚⟹2098(5)

    110 ----
      110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
      110k2093 Comments on Evidence or Witnesses
      110k2098 Credibility and Character of Witnesses; Bolstering
      110k2098(5) Credibility of Other Witnesses.

      (Formerly 110k720(5))

[See headnote text below]

[7] Criminal Law ⊚⟹2117

    110 ----
      110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
      110k2102 Inferences from and Effect of Evidence
      110k2117 Homicide and Assault with Intent to Kill.

      (Formerly 110k720(9))

[See headnote text below]

[7] Criminal Law ⊚⟹2148

    110 ----
      110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
      110k2145 Appeals to Sympathy or Prejudice
      110k2148 Comments Regarding Character of Victim.

      (Formerly 110k723(1))

[See headnote text below]

[7] Criminal Law ⊚⟹2200

    110 ----
      110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
      110k2191 Action of Court in Response to Comments or Conduct

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

110k2200 Comments on Evidence or Witnesses.

(Formerly 110k730(8))

[See headnote text below]

[7] Criminal Law ☞2207

110 ----
110XXXI Counsel
110XXXI(F) Arguments and Statements by Counsel
110k2191 Action of Court in Response to Comments or Conduct
110k2207 Appeals to Sympathy or Prejudice.

(Formerly 110k730(14))

Trial court in prosecution for first-degree murder committed plain and reversible error by failing to intervene in prosecutor's closing argument which expressed personal opinion as to credibility of State's witnesses, characterized defendant as "psychopath" with "diseased criminal mind," implored jurors to return verdict of guilty without recommendation of mercy so that defendant could "never be released to slaughter women and children," misstated crucial evidentiary matters, and referred to polygraph by victim's husband as supporting his innocence. Code of Prof.Resp., DR 7-106(C)(4).

[8] Criminal Law ☞1980

110 ----
110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)1 In General
110k1980 In General.

(Formerly 110k700(1))

Prosecutor's duty to remain fair and impartial is especially important where very nature of crime charged, such as first-degree murder, has tendency to predispose jury against defendant.

[9] Criminal Law ☞2192

110 ----
110XXXI Counsel
110XXXI(F) Arguments and Statements by

Counsel
110k2191 Action of Court in Response to Comments or Conduct
110k2192 In General.

(Formerly 110k730(1))

Trial court has duty to independently protect accused's right to fair trial free from improper remarks by prosecuting attorney.

[10] Criminal Law ☞388.5(1)

110 ----
110XVII Evidence
110XVII(I) Competency in General
110k388 Experiments and Tests;  Scientific and Survey Evidence
110k388.5 Lie Detector or Polygraph Tests and Procedures
110k388.5(1) In General.

Results of polygraph test by victim's husband were inadmissible in prosecution of defendant for first-degree murder.

[11] Criminal Law ☞1169.5(4)

110 ----
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1169 Admission of Evidence
110k1169.5 Curing Error by Withdrawal, Striking Out, or Instructions to Jury
110k1169.5(4) Immaterial or Incompetent Evidence in General.

Trial court's instruction  **\*569**  not to consider results of polygraph test showing innocence of victim's husband was insufficient to cure erroneous admission in prosecution of defendant for first-degree murder.

[12] Criminal Law ☞388.5(1)

110 ----
110XVII Evidence
110XVII(I) Competency in General
110k388 Experiments and Tests;  Scientific and Survey Evidence
110k388.5 Lie Detector or Polygraph Tests and Procedures
110k388.5(1) In General.

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

[See headnote text below]

[12] Criminal Law ☞1169.1(7)

  110 ----
   110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
     110k1169 Admission of Evidence
      110k1169.1 In General
       110k1169.1(7) Immaterial or Incompetent
       Evidence in General.

  Admission of results of polygraph test showing innocence of victim's husband was reversible error in prosecution of defendant for first-degree murder.

[13] Criminal Law ☞412(4)

  110 ----
   110XVII Evidence
    110XVII(M) Declarations
     110k411 Declarations by Accused
      110k412 In General
       110k412(4) Circumstances Affecting
       Admissibility in General.

[See headnote text below]

[13] Extradition and Detainers ☞14(1)

  166 ----
   166I Extradition
    166I(A) International
    166k8 Proceedings for Extradition to Foreign
    Country
     166k14 Examination and Determination
      166k14(1) In General.

  Transfer of lawfully incarcerated defendant to West Virginia without pretransfer hearing did not violate Fourth Amendment and did not require application of exclusionary rule to defendant's inculpatory statements to West Virginia authorities. Ohio R.C. §§ 2963.09, 2963.30-2963.45; Code, 62-14-1 to 62-14-7, 62-14-1, Art. IV; U.S.C.A. Const.Amend. 4.

[14] Extradition and Detainers ☞19

  166 ----
   166I Extradition
    166I(A) International
    166k19 Rights and Liabilities of Accused
    After Extradition.

  Prisoner who has been denied pretransfer hearing is not entitled to have convictions overturned after notice and fair trial in demanding state. Ohio R.C. §§ 2963.01-2963.29, 2963.30-2963.45; Code, 5-1-7 to 5-1-13, 49-1-4(1), 62-14-1 to 62-14-7, 62-14-1, Art. IV.

[15] Criminal Law ☞531(3)

  110 ----
   110XVII Evidence
    110XVII(T) Confessions
    110k531 Preliminary Evidence as to
    Voluntary Character
     110k531(3) Weight and Sufficiency of
     Evidence.

  Evidence established knowing and intelligent waiver of 18-year-old defendant's *Miranda* rights and voluntariness of confessions; nothing indicated defective intelligence; police gave *Miranda* warnings prior to each discussion; and defendant signed two written waivers of rights, and did not request attorney. U.S.C.A. Const.Amends. 5, 14.

[16] Criminal Law ☞412.1(1)

  110 ----
   110XVII Evidence
    110XVII(M) Declarations
    110k411 Declarations by Accused
     110k412.1 Voluntary Character of Statement
      110k412.1(1) In General.

    (Formerly 110k1(1))

  Voluntariness of statements by defendant over age of 16 was to be tested by totality of circumstances. U.S.C.A. Const.Amends. 5, 14.

[17] Criminal Law ☞1178

  110 ----
   110XXIV Review
    110XXIV(R) Error Waived in Appellate Court
    110k1178 In General.

  Alleged violation of Sixth Amendment right to counsel could be deemed waived where it was not raised in appellate brief. U.S.C.A. Const.Amend. 6.

[18] Criminal Law ☞412.2(5)

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

110 ----
  110XVII Evidence
    110XVII(M) Declarations
      110k411 Declarations by Accused
        110k412.2 Right to Counsel; Caution
          110k412.2(5) Failure to Request Counsel;
          Waiver.

Defendant who made knowing and intelligent waiver of *Miranda* rights and never asserted right to counsel also waived Sixth Amendment right to counsel. U.S.C.A. Const.Amend. 6.

[19] Criminal Law ☞527

  110 ----
    110XVII Evidence
      110XVII(T) Confessions
        110k527 Children.

Noncompliance with requirement promptly to present juvenile before judicial officer results in inadmissibility of confession, if violation occurred for primary purpose of obtaining confession from juvenile, and noncompliance may operate to exclude confessions even where *Miranda* rights have been given and waived. Code, 49-5-8(d).

[20] Courts ☞100(1)

  106 ----
    106II  Establishment,  Organization,  and
    Procedure
      106II(H) Effect of Reversal or Overruling
        106k100 In General
          106k100(1) In General;  Retroactive or
          Prospective Operation.

Supreme Court of Appeals' decision requiring exclusion of confession if juvenile is not promptly taken before neutral judicial officer was not retroactively applicable to confessions for which no objection was preserved before trial court, but was retroactively applicable to confession for which objection was preserved before trial court. Code, 49-5-8(d).

[21] Extradition and Detainers ☞56

  166 ----
    166II Detainers
      166k56 Review of Proceedings;  Contesting
      Detainer or Request.

Statute requiring juvenile to be taken immediately before neutral judicial officer upon being taken into custody applies to persons in custody pursuant to interstate detainer. Code, 49-5-8(d).

**\*571 [180 W.Va. 365]**
Syllabus by the Court

1. "It is improper for a prosecutor in this State to '[a]ssert his personal opinion ... as to the guilt or innocence of the accused....'  ABA Code DR7-106(C)(4) *in part*."  Syl.Pt. 3, *State v. Critzer,* 167 W.Va. 655, 280 S.E.2d 288 (1981).

2. "If it is determined that publicity disseminated by the media during trial raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material."  Syl.Pt. 5, *State v. Williams,* 172 W.Va. 295, 305 S.E.2d 251 (1983).

3. "The prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case.  In keeping with this position, he is required to avoid the role of a partisan, eager to convict, and must deal fairly with the accused as well as the other participants in the trial.  It is the prosecutor's duty to set a tone of fairness and impartiality, and while he may and should vigorously pursue the State's case, in so doing he must not abandon the quasi-judicial role with which he is cloaked under the law."  Syl.Pt. 3, *State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710 (1977).

4. A prisoner incarcerated in a jurisdiction that has adopted the Uniform Criminal Extradition Act is entitled to a hearing before being transferred to another jurisdiction pursuant to Article IV of the Interstate Agreement on Detainers.

5. "Once a fugitive has been brought within the jurisdiction of West Virginia as the demanding state, the propriety of the extradition proceedings which occurred in the asylum state may not be challenged.  The extradition proceedings may be challenged only in the asylum state."  Syl.Pt. 4, *State v. Flint,* 171 W.Va. 676, 301 S.E.2d 765 (1983).

6. "The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

voluntary before such may be admitted into the evidence of a criminal case." Syl.Pt. 5, *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975).

7. "A statement freely and voluntarily made by an accused while in custody or deprived of his freedom by the authorities and subjected to questioning is admissible in evidence against him if it clearly appears that such statement was freely and voluntarily made after the accused had been advised of his constitutional right to remain silent and that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney and if he can not afford an attorney one will be appointed for him, and that, after he has been so advised, he knowingly and intelligently waives such rights." Syl.Pt. 7, *State v. Plantz,* 155 W.Va. 24, 180 S.E.2d 614 (1971).

**\*572 [180 W.Va. 366]** 8. "A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syl.Pt. 3, *State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146 (1978).

9. "Under W.Va.Code, § 49-5-8(d), when a juvenile is taken into custody, he must immediately be taken before a referee, circuit judge, or magistrate. If there is a failure to do so, any confession obtained as a result of the delay will be invalid where it appears that the primary purpose of the delay was to obtain a confession from the juvenile." Syl.Pt. 3, *State v. Ellsworth J.R.,* 175 W.Va. 54, 331 S.E.2d 503 (1985).

10. The exclusionary rule established in Syllabus Point 3 of *State v. Ellsworth J.R.,* 175 W.Va. 64, 331 S.E.2d 503 (1985), is not to be applied retroactively to a confession which was obtained prior to the date of that decision where no prompt presentment objection was made at trial.

Frank W. Helvey, Jr., Public Legal Services, for appellant.

Silas B. Taylor, Deputy Atty. Gen., for appellee.

McGRAW, Justice:

The appellant, John Moss, Jr., was convicted by a jury in the Circuit Court of Kanawha County on April 30, 1984, of three counts of first degree murder, without recommendation of mercy, and

was sentenced to three consecutive life without mercy sentences. The horrifying facts of this case are substantially set forth in *In the Interest of John Moss, Jr.,* 170 W.Va. 543, 295 S.E.2d 33 (1982), wherein the appellant challenged the circuit court's initial order transferring the appellant from the circuit court's juvenile jurisdiction to its adult jurisdiction. Due to error in the initial transfer proceeding, this Court reversed the circuit court's transfer order and remanded the matter for further proceedings.

After conducting a second transfer hearing, the circuit court entered another order on September 28, 1982, granting the prosecution's motion that the appellant be transferred from juvenile to adult jurisdiction. (FN1) The grand jury later returned an indictment charging the appellant with three counts of murder in the first degree, and he was tried, convicted, and sentenced as an adult. He now seeks reversal of his convictions based on numerous assignments of error. Those assignments are detailed below, where we conclude that the appellant is entitled to a new trial.

I.

The trial court erred when it refused the appellant's motion to poll each juror, out of the presence of the others, about each juror's exposure to prejudicial comments made by the prosecuting attorney, which were broadcast by a local radio station on a day that the trial was in recess. The trial court erred when it failed to intervene for the purpose of limiting and correcting fundamentally improper remarks made by the prosecuting attorney during closing, the cumulative effect of which was to deny the appellant his right to a fair trial. The trial court also erred when it allowed admission of evidence regarding the results of a polygraph test taken by a prior suspect to the murders, the husband of the deceased woman and father of the two deceased children. Each of these errors requires reversal of the appellant's convictions.

A. Prosecutor's Prejudicial Comments Disseminated During Trial

[1] On April 16, 1984, several weeks into the appellant's lengthy trial, the appellant moved for a mistrial based on statements made by the prosecuting attorney during a radio interview broadcast on a day that the court was in recess. The prosecutor's statements included the remark:

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

"No doubt in my mind that he in fact is the murderer of Vanessa Reggettz and her two children." Contemporaneously with his motion for a mistrial, the appellant moved **\*573** [180 W.Va. 367] that the trial court poll the jurors about their exposure to the prosecutor's prejudicial remark. The judge denied both of the appellant's motions, stating that he had confidence that the jurors had complied with his admonition to avoid radio, newspaper, and television accounts of the case while the court was in recess.

[2][3] We agree with the appellant that the trial judge committed reversible error when he refused to poll the jurors. In Syllabus Point 3 of *State v. Critzer,* 167 W.Va. 655, 280 S.E.2d 288 (1981), this Court made it clear that "[i]t is improper for a prosecutor in this State to '[a]ssert his personal opinion ... as to the guilt or innocence of the accused....' ABA Code DR7-106(C)(4) *in part.* " This rule is applicable in and out of the courtroom. Standard 8-1.1(a) of the American Bar Association Standards for Criminal Justidce (2d ed. 1980) limits extrajudicial statements by attorneys, specifically providing that: "A lawyer shall not release or authorize the release of information or *opinion* for dissemination by any means of public communication if such dissemination would pose a clear and present danger to the fairness of the trial." (emphasis added). Here, possible prejudice resulted from the prosecuting attorney's extrajudicial statement expressing his personal opinion as to the appellant's guilt.

[4] By refusing to poll the jurors the trial court left unanswered the critical question of whether any or all of the jurors were exposed to this inherently prejudicial statement. In Syllabus Point 5 of *State v. Williams,* 172 W.Va. 295, 305 S.E.2d 251 (1983), this Court held that: "If it is determined that publicity disseminated by the media during trial raises serious questions of possible prejudice, the court may on its own motion or*shall* on motion of either party question each juror, out of the presence of the others, about his exposure to that material." (emphasis added). *See also* Syl.Pt. 2, *State v. Nixon,* 178 W.Va. 338, 359 S.E.2d 566 (1987). Thus, where publicity has been disseminated which raises a serious question of possible prejudice and either party has made a motion to poll the jurors about their exposure to the publicity, a trial court's refusal to undertake such questioning constitutes reversible error.

[5] In the case now before us, timely motions were made for a mistrial and to poll the jurors concerning their exposure to the prosecuting attorney's extrajudicial statement. Although corrective measures, such as giving a cautionary instruction, may have justified not declaring a mistrial even if it were determined that the jurors had been exposed to the radio interview, the trial court abused its discretion in refusing to poll the jurors to determine whether a "manifest necessity" existed to discharge the jury and to declare a mistrial. *See* W.Va.Code § 62-3-7 (1984 Replacement Vol.). (FN2)

B. Prosecutor's Prejudicial Closing Argument

[6][7][8][9] The trial court also committed reversible error when it failed to intervene for the purpose of limiting and correcting improper remarks made by the prosecuting attorney during closing. Although "[t]his Court recognizes that wide latitude must be given to all counsel in connection with final argument," *State v. Myers,* 159 W.Va. 353, 361, 222 S.E.2d 300, 306 (1976), prosecuting attorneys and trial courts must be mindful of and adhere to the instructive holdings by this Court regarding the bounds of permissible argument. In Syllabus Point 3 of *State v. Boyd,* 160 W.Va. **\*574** [180 W.Va. 368] 234, 233 S.E.2d 710 (1977) To view preceding link please click here , we emphasized the quasi-judicial role of the prosecuting attorney:

The prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case. In keeping with this position, he is required to avoid the role of a partisan, eager to convict, and must deal fairly with the accused as well as the other participants in the trial. It is the prosecutor's duty to set a tone of fairness and impartiality, and while he may and should vigorously pursue the State's case, in so doing he must not abandon the quasi-judicial role with which he is cloaked under the law.

The prosecutor's duty to remain fair and impartial is especially important where the very nature of the crime charged, in this instance murder in the first degree, has a tendency to predispose the jury against the defendant. *Id.* 160 W.Va. at 243, 233 S.E.2d at 717. Likewise, the trial court has a duty to independently protect the accused's right to a fair trial free from improper remarks by the prosecuting attorney:

We do not say that every improper remark is a proper basis for a mistrial. However, we do not think that an improper remark should be lightly treated by a trial court. If the remark has the potential of prejudicing the defendant, a mistrial should be seriously considered by the court, and at the very least, the court, in the exercise of its discretion, should do everything reasonably possible to obliterate any such prejudicial influence.

*Myers,* 159 W.Va. at 362, 222 S.E.2d at 306; *see also* American Bar Association Standards for Criminal Justice § 3-5.8(e) (2d ed. 1980) ("It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds.").

In the present case, the appellant's counsel did not object to the prosecutor's closing statement until after the prosecutor had concluded his remarks. Moreover, when he did object, appellant's counsel did not object to all of the prosecutor's improper remarks. After carefully reviewing the record in this case, however, we need not decide whether the appellant complied with the contemporaneous objection requirement, since we conclude that the prosecutor's statements were egregious enough to cause this Court to invoke the plain error doctrine. Syl.Pt. 4, *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975); W.Va.R.Crim.P. 52(b); *cf. United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *State v. Grubbs,* 178 W.Va. 811, 364 S.E.2d 824 (1987). We find that the prosecuting attorney overstepped the permissible bounds of adversary zeal, and that the trial court erred by not intervening in order to limit and correct the prosecutor's fundamentally improper remarks. The prosecutor expressed his personal opinion as to the credibility of the State's witnesses. Code of Professional Responsibility DR 7-106(C)(4). He characterized the appellant as a "psychopath" with a "diseased criminal mind." Syl.Pt. 3, *State v. Brown,* 104 W.Va. 93, 138 S.E. 664 (1927). He appealed to the passions and prejudices of the jury by imploring that they return verdicts of first degree murder without recommendation of mercy so that the appellant would "never be released to slaughter women and children of Kanawha County." *Critzer,* 167 W.Va. at 661, 280 S.E.2d at 292. He misstated crucial evidentiary matters. (FN3) And he referred the jury to the fact that the deceased woman's husband took a polygraph, arguing to the jury "that is one

reason we know he didn't do it."

We conclude that manifest injustice resulted from the prosecutor's remarks insofar as their cumulative effect denied the appellant his fundamental right to a fair trial and constituted plain error. *See* Syl.Pt. 2, *State v. Hatala,* 176 W.Va. 435, 345 S.E.2d 310 (1986).

C. Admission of Husband's Polygraph Test Results

[10] In Syllabus Point 2 of *State v. Frazier,* 162 W.Va. 602, 252 S.E.2d 39 [180 W.Va. 369] (1979) To view preceding link please click here , this Court ruled that "[p]olygraph **\*575** test results are not admissible in evidence in a criminal trial in this State." Although the trial judge instructed the jury that polygraph test results are not admissible in evidence in a criminal trial, he still allowed error to be committed in this regard on two occasions during the appellant's trial.

As previously noted, the deceased woman's husband became a suspect in the murders soon after they were committed. After he was taken into custody by the police, the same police officers who later interrogated the appellant extracted a confession from the husband, and he was indicted by the grand jury. While the husband was in custody awaiting trial, the same trial judge who presided over the appellant's subsequent trial ruled that the husband's alleged confession was admissible as "voluntarily" given. *In the Interest of John Moss , Jr.,* 170 W.Va. at 546, 295 S.E.2d at 36. The indictment against the husband was dismissed after he passed one of two polygraph tests administered by the police.

The police officer who administered the polygraph tests was called as one of the State's witnesses at the appellant's trial. The prosecuting attorney elicited the officer's testimony that, after administering the second polygraph test to the husband, he believed the husband was "being truthful" and that the prosecution "got the wrong man" when it brought charges against the husband. Moreover, over the appellant's continuing objection, the prosecuting attorney elicited testimony from the attorney who had represented the husband to the effect that, pursuant to an agreement between the prosecuting attorney's office and the husband, the husband voluntarily submitted to the polygraph examinations and was thereafter released from jail and the indictment against him was dismissed.

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

[11][12] We find that the introduction of the husband's polygraph test results in this instance was so prejudicial that the trial court's instruction not to consider such evidence was insufficient to cure the error, *cf. State v. Acord,* 175 W.Va. 611, 614, 336 S.E.2d 741, 744 (1985). Here, the trial court committed reversible error by allowing the State, through the introduction of the husband's polygraph test results, to prejudicially vouch for the husband's innocence. We again emphasize that trial courts must strictly adhere to the mandate of Syllabus Point 2 of *State v. Frazier* to not allow polygraph test results to be admitted into evidence in a criminal case. (FN4)

### II.

Because the admissibility of the appellant's three confessions to the triple murders will again be of concern on remand, we now turn our attention to his argument that those confessions should not have been admitted into evidence. The appellant assails the confessions as being inadmissible for three reasons: (1) the appellant was transferred from Ohio to West Virginia pursuant to the Interstate Agreement on Detainers (Detainer Agreement) (FN5) without a pretransfer hearing or the benefit of counsel; (2) the investigating officers illegally coerced the appellant into waiving his constitutional rights and into making the inculpatory statements; and (3) the investigating officers failed to immediately take the appellant before a referee, circuit judge, or magistrate, in contravention of West Virginia's juvenile prompt presentment requirement. Each of these contentions is examined separately below, where we conclude that the first two confessions given by the appellant are admissible, while the last confession is inadmissible due to the lack of [180 W.Va. 370] prompt presentment to a neutral judicial officer.

**\*576** A. Pretransfer Hearing

On September 26, 1980, while the appellant was serving a term of four to twenty-five years at the Ohio State Reformatory for felony convictions in Ohio, the Kanawha County prosecutor's office lodged a detainer and sought custody of the appellant, pursuant to Article IV of the Detainer Agreement. (FN6) The purpose of the detainer was to obtain a determination by the Circuit Court of Kanawha County of whether the appellant was a delinquent child within the provisions of West Virginia Code § 49-1-4(1) (1986 Replacement

Vol.). The delinquency petition and detainer were based on a malicious wounding charge, unrelated to the instant homicides, pending against the appellant in Kanawha County. On October 28, 1980, two officers from the West Virginia Department of Public Safety travelled to Ohio, took the appellant into custody, and returned with him to West Virginia. The appellant was not granted a pretransfer hearing. The appellant subsequently made three inculpatory statements regarding the murders to the West Virginia authorities. One of the statements was tape recorded. All three were admitted into evidence at trial.

[13] In *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), the United States Supreme Court held that a prisoner incarcerated in a jurisdiction that has adopted the Uniform Criminal Extradition Act (Extradition Act) (FN7) is entitled to a hearing before being transferred to another jurisdiction pursuant to Article IV of the Detainer Agreement. (FN8) Before trial, the appellant moved to suppress the inculpatory statements, arguing *inter alia* that the denial of a pretransfer hearing rendered his detention unlawful, and that the inculpatory statements he gave while unlawfully detained should be excluded from evidence. The trial court rejected this argument and denied the appellant's motion to suppress. In support of this same position on appeal, the appellant argues by analogy that his transfer under the Detainer Agreement without a pretransfer hearing should be equated with an illegal arrest under the Fourth Amendment, thereby vitiating his confessions. Citing Syllabus Point 2 of *State v. Stanley,* 168 W.Va. 294, 284 S.E.2d 367 (1981) and *Wong Sun v. United States,* 371 U.S. 471, 478-88, 83 S.Ct. 407, 412-418, 9 L.Ed.2d 441 (1963), the appellant contends that his detention by West Virginia authorities without a pretransfer hearing is sufficiently analogous to an illegal arrest to cause application of the exclusionary rule. We disagree.

[14] While a prisoner denied a pretransfer hearing is entitled to seek habeas relief in the asylum state in order to prevent his transfer without a hearing, *Cavallaro v. Wyrick,* 701 F.2d 1273 (8th Cir.1983), *cert. denied,* 462 U.S. 1135, 103 S.Ct. 3120, 77 L.Ed.2d 1372 (1983), a prisoner who has been denied a pretransfer hearing is not [180 W.Va. 371] entitled to have his convictions overturned after notice and a fair trial in the demanding state. *Shack v. Attorney General of* **\*577** *the State of Pennsylvania,* 776 F.2d 1170, 1172-74 (3rd

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

Cir.1985) To view preceding link please click here ,*cert. denied*, 475 U.S. 1030, 106 S.Ct. 1234, 89 L.Ed.2d 342 (1986); *see Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). In Syllabus Point 4 of *State v. Flint*, 171 W.Va. 676, 301 S.E.2d 765 (1983), where a defendant sought dismissal of the murder charge against him because he had been extradited to West Virginia without benefit of counsel, this Court held that "[o]nce a fugitive has been brought within the jurisdiction of West Virginia as the demanding state, the propriety of the extradition proceedings which occurred in the asylum state may not be challenged. The extradition proceedings may be challenged only in the asylum state." Thus, the general rule denies collateral attacks upon convictions imposed after notice and a fair trial.

The appellant attempts to distinguish between challenging the detainer proceeding itself and challenging the admissibility of evidence obtained after the appellant's transfer without a pretransfer hearing. His argument is founded on the allegation that he was illegally detained. As we have said in prior cases, however, "[w]e are unable to perceive a Fourth Amendment violation where the defendant is already in lawful custody on another unrelated charge." *Grubbs*, 178 W.Va. 811, 814-15 n. 8, 364 S.E.2d 824, 828 n. 8 (citing *State v. Clawson*, 165 W.Va. 588, 600-04, 270 S.E.2d 659, 668-69 (1980)). When the detainer was lodged against the appellant, he was in lawful custody in the Ohio State Reformatory on unrelated Ohio convictions. Thus, his transfer to West Virginia without a pretransfer hearing did not violate his rights under the Fourth Amendment, (FN9) even though it did deny him the opportunity to test the legality of the detainer lodged against him. (FN10)

B. Voluntariness of *Miranda* Waivers and Confessions

[15] The appellant claims that the statements he made while in custody in West Virginia were involuntary under the totality of the circumstances, which he contends included unlawful coercion and prolonged interrogation in an unduly restrictive custodial setting, and that these statements should have been excluded from the evidence at trial. In accordance with the mandatory duty to determine voluntariness set out in Syllabus Point 1 of *State v. Fortner*, 150 W.Va. 571, 148 S.E.2d 669 (1966), *overruled in part, State ex rel. White v. Mohn*, 168

W.Va. 211, 283 S.E.2d 914 (1981), the trial court held *in camera* suppression hearings to consider evidence of the voluntariness of the appellant's waiver of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and of the resulting confessions. (FN11) After considering the testimony *578 [180 W.Va. 372] at the suppression hearings, the trial court admitted the appellant's inculpatory statements into evidence. We find no error in the trial court's voluntariness determination.

[16] Because the appellant was over the age of sixteen years of age when his extrajudicial statements were made to the police, the voluntariness of those statements are tested by the totality of the circumstances under which they were taken. Syl.Pt. 1 and Syl.Pt. 2, *Matter of Mark E.P.*, 175 W.Va. 83, 331 S.E.2d 813 (1985); *see* W.Va.Code § 49-5-1(d). (FN12) "The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case." Syl.Pt. 5, *State v. Starr*, 158 W.Va. 905, 216 S.E.2d 242 (1975). In Syllabus Point 7 of *State v. Plantz*, 155 W.Va. 24, 180 S.E.2d 614 (1971), we emphasized that the prosecution must also demonstrate that the accused has knowingly and intelligently relinquished his *Miranda* rights:

A statement freely and voluntarily made by an accused while in custody or deprived of his freedom by the authorities and subjected to questioning is admissible in evidence against him if it clearly appears that such statement was freely and voluntarily made after the accused had been advised of his constitutional right to remain silent and that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney and if he can not afford an attorney one will be appointed for him, and that, after he has been so advised, he knowingly and intelligently waives such rights.

*See also Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981); *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

In support of his contention that he did not voluntarily waive his rights, the appellant cites *State v. Mollohan*, 166 W.Va. 60, 272 S.E.2d 454 (1980)

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

376 S.E.2d 569, 180 W.Va. 363, State v. Moss, (W.Va. 1988)                                  **Page 11**

. The totality of the circumstances in the present case, however, are distinguishable from the circumstances of *Mollohan*. The *Mollohan* confession was taken in its entirety solely within the confines of a patrol car, during a two-day journey from New Hampshire to West Virginia. In *Mollohan*, the accused had a defective level of intelligence and was deeply religious, characteristics which the investigating officers played upon in securing a waiver and confession from the accused. We concluded from the totality of these circumstances that the waiver in *Mollohan* was coerced. *Id.* 166 W.Va. at 64, 272 S.E.2d at 457. The totality of the circumstances in the present case lead us to a different conclusion.

The two officers who took the appellant into custody at the Ohio State Reformatory on October 28, 1980, testified at the pretrial suppression hearing. Trooper Smith testified that on the return trip to Kanawha County, prior to discussing the appellant's involvement in any crimes committed in West Virginia, he advised the appellant of his constitutional rights by reading the standard *Miranda* warnings, and that the appellant acknowledged that he understood his rights. Trooper Smith testified that he then inquired as to whether the appellant would agree to talk about the "serious" crime in West Virginia. The appellant at first suggested that he did not know anything about the crime, but after being asked by Trooper Smith, "Why do you think we took your blood?", the appellant indicated his willingness to talk. (FN13) Trooper *579 [180 W.Va. 373] Smith testified that he then told the appellant that they should wait until they arrived at the state police detachment in Parkersburg before discussing the matter. Trooper Williams corroborated Trooper Smith's testimony that the appellant was advised of and indicated that he understood his rights prior to the discussion in the police car.

Both troopers testified that the appellant at no time requested a lawyer or conditioned his willingness to talk on the presence of a lawyer, and that the appellant voluntarily signed two separate *Miranda* waiver forms at the Parkersburg state police detachment. The *Miranda* warnings printed on the first form was read to the appellant by Trooper Williams beginning at 6:50 p.m. The appellant affixed his signature to the form in the presence of both troopers at 6:57 p.m. (FN14) A question and answer interrogation, lasting about two hours, followed, during which the appellant confessed to

the murders. At 9:22 p.m. the appellant signed another waiver of rights form in the presence of Trooper Williams and another officer from the Parkersburg detachment. Subsequent to the signing of this waiver of his rights, the appellant made a tape recorded confession, which lasted until about 11:00 p.m.

The appellant was then transported to Kanawha County, where he remained until October 30, 1980, when he was returned to the Ohio State Reformatory by two other members of the Department of Public Safety, Troopers Woodyard and Allen. At a second *in camera* suppression hearing Trooper Allen testified that during the return trip he advised the appellant of his *Miranda* rights; that the appellant indicated he understood those rights; and that the appellant indicated his willingness to talk about the murders without the presence of an attorney. Trooper Woodyard testified that he overheard the exchange between the appellant and Trooper Allen, and vouched for the accuracy of Trooper Allen's testimony. The troopers testified that they questioned the appellant about the murders for about forty-five minutes to an hour, and that the appellant's inculpatory responses included the statement that he wore gloves while at the scene of the murders. The trial court thereupon ruled that a third oral confession had been voluntarily made by the appellant during the return trip to Ohio after a knowing and intelligent waiver of the appellant's constitutional rights.

Upon consideration of the relevant testimony adduced at the suppression hearings, we conclude that, under the totality of the circumstances, there was sufficient evidence to support the trial court's determination that the three confessions now in question were voluntarily made after knowing and intelligent waivers by the appellant of his constitutional rights. The appellant was eighteen years of age when he waived his rights and gave the confessions, and there is no evidence that he had a defective level of intelligence. The evidence also shows that the appellant was given *Miranda* warnings prior to each discussion with the police, and that he signed two written waivers of his rights at the Parkersburg detachment. The officers involved testified that he never requested the presence of an attorney, and they adequately refuted his claims that unlawful coercion was involved in obtaining the confessions. (FN15)

*580 [180 W.Va. 374] [17][18] Based on all of

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

376 S.E.2d 569, 180 W.Va. 363, State v. Moss, (W.Va. 1988)                    **Page 12**

the foregoing, we find that there was a sufficient showing of voluntariness to support the trial court's rulings. It is well established that "[a] trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syl.Pt. 3, *State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978). (FN16)

C. Prompt Presentment

The final issue which we address concerns the appellant's contention on appeal that all three of his confessions should be ruled inadmissible because his rights under West Virginia Code § 49-5-8(d) (1986 Replacement Vol.) were violated. This statute directs that a juvenile be taken immediately before a neutral judicial officer upon being taken into custody. (FN17) In Syllabus Point 3 of *State v. Ellsworth J.R.*, 175 W.Va. 64, 331 S.E.2d 503 (1985), we addressed the consequences of noncompliance with the provisions of Code § 49-5-8(d):

> Under W.Va.Code, 49-5-8(d), when a juvenile is taken into custody, he must immediately be taken before a referee, circuit judge, or magistrate. If there is a failure to do so, any confession obtained as a result of the delay will be invalid where it appears that the primary purpose of the delay was to obtain a confession from the juvenile.

[19] In reaching this decision, we concluded that the juvenile prompt presentment requirement is more stringent than the provision requiring the initial presentment of an adult before a magistrate under West Virginia Code§ 62-1-5 (1984 Replacement Vol.); *see* W.Va.R.Crim.P. 5(a). Unlike a violation of the adult prompt presentment requirement, which is analyzed for admissibility as part of the totality of the circumstances making a confession involuntary and hence inadmissible, Syl.Pt. 6, *State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1982), *as amended*, Syl.Pt. 1, *State v. Guthrie*, 173 W.Va. 292, 315 S.E.2d 397 (1984), noncompliance with the juvenile prompt presentment requirement results in inadmissibility if the violation occurred for the primary purpose of obtaining a confession from the juvenile, *Ellsworth J.R.*, 175 W.Va. at ----, 331 S.E.2d at 508, and may operate to exclude confessions even where *Miranda* rights have [180 W.Va. 375] been given and waived. *Guthrie*, 173W.Va. **\*581.** at ----, 315 S.E.2d at 399. To view preceding link please

click here    Thus, compliance with the juvenile prompt presentment requirement is examined separately from the determination of voluntariness.

[20][21] Like the rule stated in Syllabus Point 6 of *Persinger*, however, the exclusionary rule established in Syllabus Point 3 of *Ellsworth J.R.* "is not to be applied retroactively to a confession which was obtained prior to the date of that decision *where no prompt presentment objection was made at trial.* " Syl.Pt. 4, *in part*, *State v. Hickman*, 175 W.Va. 709, 338 S.E.2d 188 (1985) (emphasis added); *see also* Syl.Pt. 3, *State v. Gangwer*, 168 W.Va. 190, 283 S.E.2d 839 (1981). (FN18) In the present case, it is uncontroverted that the appellant was not presented to a referee, circuit judge, or magistrate, even after he had given three confessions to the murders. (FN19) The three confessions were obtained prior to our holding in *Ellsworth J.R.*, however, and our review of the record reveals that a prompt presentment objection was preserved before the trial court only with respect to the third confession. Since the issue was not preserved on the first two confessions, the decision in *Ellsworth J.R.* will not be applied retroactively to exclude those confessions, but will only be applied retroactively to exclude the third confession obtained from the appellant on October 30, 1980. (FN20) Accordingly, the appellant's third confession is hereby declared invalid and inadmissible. (FN21)

III.

For the reasons given above, the appellant's convictions are hereby reversed, and this case is remanded for a new trial consistent with this opinion.

REVERSED AND REMANDED.

(FN1.) In February of 1983 this Court refused to hear the appellant's appeal from the second transfer order and denied the appellant's prayer for a writ of prohibition.

(FN2.) The State wrongly argues that a showing of actual prejudice is required before a defendant is entitled to a poll of the jury. We considered and rejected this practice in *Williams*, noting that "in many instances it would be impossible for a defendant to show actual juror exposure without a direct inquiry of the jurors themselves...." *State v. Williams*, 172 W.Va. at 305 n. 5, 305 S.E.2d at

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

261 n. 5. Rather, "[m]odern reasoning indicates that the trial court is obligated to conduct an inquiry if there is any *possibility* of prejudice." *State v. Williams*, 160 W.Va. 19, 24, 230 S.E.2d 742, 746 (1976) (emphasis in original); *cf. State v. Hobbs*, 168 W.Va. 13, 282 S.E.2d 258 (1981) (probable prejudice did not exist since publicity was not inherently prejudicial).

(FN3.) For example, the prosecutor stated that the appellant had given five confessions, although the evidence reveals that three confessions were actually given and introduced at trial.

(FN4.) Our review of the record does not convince us that the appellant should be precluded from complaining of error in the admission of the polygraph test results by the "invited error" rule stated by this Court in Syllabus Point 2 of *State v. Bowman*, 155 W.Va. 562, 184 S.E.2d 314 (1971).

(FN5.) The Detainer Agreement is a compact among 48 states, the District of Columbia and the United States, which provides procedures allowing a jurisdiction to temporarily obtain for trial a prisoner who is incarcerated in another jurisdiction. The Detainer Agreement is codified in Ohio, Ohio Rev.Code Ann. §§ 2963.30 to 2963.45 (Page's 1987), and in West Virginia, W.Va.Code §§ 62-14-1 to 62-14-7 (1984 Replacement Vol.).

(FN6.) An involuntary transfer under Article IV is initiated when the prosecuting attorney in the state seeking temporary custody sends a written request to the asylum state to have the prisoner made available for prosecution of the charges pending against him.

(FN7.) The Extradition Act, which has been adopted in 48 states, Puerto Rico, and the Virgin Islands, provides procedures to transfer from one state to another persons against whom criminal charges are pending. While the Detainer Agreement applies only to persons incarcerated, the Extradition Act applies to persons at liberty as well as to persons incarcerated. The Extradition Act is codified in Ohio, Ohio Rev.Code Ann. §§ 2963.01 to 2963.29 (Page's 1987), and in West Virginia, W.Va.Code § 5-1-7 to 5-1-13 (1987 Replacement Vol.).

**\*581** (FN8.) A person transferred pursuant to the Extradition Act is explicitly granted a right to a

pretransfer "hearing." *Cuyler v. Adams*, 449 U.S. 433, 443, 101 S.Ct. 703, 709, 66 L.Ed.2d 641 (1981). Although the Detainer Agreement does not explicitly provide a pretransfer hearing right, *Id.* at 443, 101 S.Ct. at 709, the United States Supreme Court held in *Cuyler* that, as a matter of federal law, the Detainer Agreement and the Extradition Act must be construed together, *Id.* at 445-450, 101 S.Ct. at 710-713, and that a prisoner transferred pursuant to Article IV of the Detainer Agreement is entitled to the pretransfer hearing guaranteed to prisoners under the Extradition Act. *Id.*; see Ohio Rev.Code Ann.§ 2963.09.

(FN9.) We note that there are sanctions other than the exclusionary rule for violation of the pretransfer hearing requirement. A prisoner who has been denied a pretransfer hearing has a claim for relief under 42 U.S.C. § 1983 (1982). *Cuyler*, 449 U.S. at 450, 101 S.Ct. at 712-713.

(FN10.) In this regard, however, we find it significant that the appellant has not raised at trial or on appeal a challenge to any of the factors which would have been scrutinized had the appellant been taken before a judge in Ohio and given the opportunity to test the legality of the detainer. *See Michigan v. Doran*, 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978); Syl.Pt. 1, *State ex rel. Gonzales v. Wilt*, 163 W.Va. 270, 256 S.E.2d 15, 17 (1979) (citing Syl.Pt. 2, *State ex rel. Mitchell v. Allen*, 155 W.Va. 530, 185 S.E.2d 355 (1971)).

(FN11.) The trial court held two *in camera* suppression hearings. One was held prior to trial to consider the admissibility of two oral confessions, one of which was tape recorded, given by the appellant on October 28, 1980, the day that he was returned to the custody of the West Virginia authorities. After individual *voir dire* of the jury had commenced, another supression hearing was held to consider the admissibility of a third oral confession given by the appellant on October 30, 1980, the day that he was transported back to Ohio to await the filing of a second detainer based on the first degree murder charges. The admissibility of this confession was not determined at the first suppression hearing because the prosecuting attorney then handling the case was not made aware of its existence until after *voir dire* had started. Over the appellant's denial that he had made such a statement, the trial court ruled in favor of the admissibility of the appellant's

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

October 30, 1980, oral confession.

(FN12.) The factors important to determining the voluntariness of a juvenile's confession under the totality of the circumstances are discussed in *State v. Laws,* 162 W.Va. 359, 363, 251 S.E.2d 769, 772 (1978); *see also Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

(FN13.) In April of 1980 the investigating authorities had obtained a blood sample from the appellant, pursuant to an order by an Ohio court. *In the Interest of John Moss, Jr.,* 170W.Va. at 546, 295 S.E.2d at 36. This one factor does not convince us to conclude that the waivers and confessions in the present case were coerced, given the preponderance of the evidence to the contrary. *Cf. State v. Mollohan,* 166 W.Va. 60, 64, 272 S.E.2d 454, 457 (1980); *State v. Randle,* 179 W.Va. 242, 244, 366 S.E.2d 750, 752 (1988); Syl.Pt. 6, *State v. Worley,* 179 W.Va. 403, 369 S.E.2d 706 (1988).

(FN14.) The waiver of rights forms signed by the appellant indicated that he did not desire the presence of a lawyer prior to talking with the troopers. The waivers also indicated that the appellant was not acting under pressure or coercion.

(FN15.) Contrary to his contention on appeal, the first two confessions were not elicited in a police car. The evidence instead shows that after the appellant indicated his willingness to talk about the murders, the troopers delayed questioning until the group arrived at the state police detachment in Parkersburg. Although the third confession was taken while the appellant was in a patrol car, the appellant's challenge to the admissibility of this confession was not that it resulted from unlawful coercion, but that he had in fact never made such a confession. In the alternative, he attacked the admissibility of this confession on the basis of noncompliance with West Virginia's juvenile prompt presentment law. *See infra* text accompanying notes 17-21.

**\*581**  (FN16.) In his petition for appeal, the appellant argued that his Sixth Amendment right to counsel had attached because his name appeared in the indictment returned on April 29, 1980, against the deceased woman's husband. The assignment of error on this point was not argued in the appellant's brief on appeal and may be deemed by this Court to be waived. "Assignments of error that are not argued in the brief on appeal may be deemed by this Court to be waived." Syl.Pt. 6, *Addair v. Bryant,* 168 W.Va. 306, 284 S.E.2d 374 (1981). Assuming *arguendo* that the appellant's Sixth Amendment right to counsel had attached on the murder charges before he was taken into custody by the West Virginia troopers, we are aware that the United States Supreme Court held during its most recent term that a knowing and intelligent *Miranda* waiver will also waive the Sixth Amendment right to counsel after it has attached. *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (U.S.1988). Thus, even if the appellant's Sixth Amendment right to counsel had attached prior to his custodial interrogation, the weight of the evidence shows that the appellant's waiver of his rights, including his Sixth Amendment right to counsel, was knowing and intelligent, without an assertion by him of his right to counsel. The holding in *Patterson* does not change the rule that, where an accused has requested the assistance of counsel, a subsequent waiver of his Sixth Amendment right to counsel for purposes of a police-initiated interrogation would be invalid. *Id.* at 293 n. 5, 108 S.Ct. at 2395-2396 n. 5 (citing *Michigan v. Jackson,* 475 U.S. 625, 631-35, 106 S.Ct. 1404, 1408-1410, 89 L.Ed.2d 631 (1986)); *see also* Syl.Pt. 1, *State v. Barrow,* 178 W.Va. 406, 359 S.E.2d 844 (1987); *State v. Crouch,* 178 W.Va. 221, 358 S.E.2d 782 (1987).

(FN17.) West Virginia Code § 49-5-8(d) (1986 Replacement Vol.) provides, in relevant part, that:

A child in custody must immediately be taken before a referee or judge of the circuit court and in no event shall a delay exceed the next succeeding judicial day: Provided, That if there be no judge or referee then available in the county, then such child shall be taken immediately before any magistrate in the county for the sole purpose of holding a detention hearing. The judge, referee or magistrate shall inform the child of his right to remain silent, that any statement may be used against him and of his right to counsel, and no interrogation shall be made without the presence of a parent or counsel.

(FN18.) We pointed out in *State v. Hickman,* 175 W.Va. 709, 338 S.E.2d 188 (1985), that our decision in *Persinger* "was not fashioned as a constitutional mandate that affected the heart of the

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

truthfinding function." *Hickman,* 175 W.Va. at-720, 338 S.E.2d at 198. The same is true of the exclusionary rule announced by our decision in *Ellsworth J.R.* for violation of the juvenile prompt presentment requirement.

(FN19.) The record does disclose that, after a second detainer was lodged against the appellant on the murder charges, he was returned to West Virginia on December 18, 1980. He was subsequently presented to a magistrate at a preliminary hearing held on January 12, 1981. *In the Interest of John Moss, Jr.,* 170 W.Va. at ----, 295 S.E.2d at 37.

(FN20.) We reject the State's contention that the provisions of Code§ 49-5-8(d) should not apply to persons in custody pursuant to an interstate detainer. As we said in Syllabus Point 2 of *State v. Guthrie,* 173 W.Va. 290, 315 S.E.2d 397 (1984): "West Virginia officers may not avoid our state rules about prompt presentment of arrestees and admissibility of confessions when they cross our borders to apprehend a fugitive suspect."

(FN21.) Because we are reversing the appellant's convictions on other grounds, we need not decide whether the admission of this testimony, in violation of the prompt presentment requirement, was harmless error, irrespective of the propriety of its admission. *See* Syl.Pt. 2, *State v. Atkins,* 163 W.Va. 502, 261 S.E.2d 55 (1979).

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

# MOSS v. BALLARD
# CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 2

```
                                                            Action Log
        Case number : 82-F-221
              STATE OF WV                    vs. JOHN R MOSS, III

Line    Date                        Action / Results
   1  09/30/82 INDICT RET
   2  10/07/82 O; PROCEEDINGS ON 82-F-221 STAYED PENDING FINAL ACT BY WVSCA
   3  01/07/83 O: F TRANS OF HRG HELD 10/1/82
   4  01/07/83 O: F D MOT TO DISM INDICT
   5  02/23/83 O: TD SET 2/24/83; CERT CPY OF O TO BE SERVED ON MCKITTRICK &
   6  02/23/83 VAUGHAN
   7  02/23/83 CPY OF O W/RET (2)
   8  02/24/83 O: CT GRT D MOT TO CONT; TD SET 6/14/83
   9  02/28/83 O: REC FROM WVSCA DTD 2/24/83 PET FOR WRIT OF PROH DENIED
  10  03/03/83 O: F D REQ & MOT FOR INSP & DISC
  11  03/18/83 O: CT GRT D MOT FOR EXT OF TIME OF NO MORE THAN 3 WRKNG DYS TO
  12  03/18/83 F PRETRIAL MOT BEYOND DATE OF 3/18/83 & ST TO HAVE LIKE # OF
  13  03/18/83 WRKNG DYS TO F RESP
  14  03/29/83 ISS SUBP & 1 CPY FOR DEFENSE, RET 6/14/83
  15  03/23/83 F D MOT (27)
  16  04/01/83 O: F ST PRETRIAL MO (2)
  17  04/18/83 O: F D MOT (2)
  18  05/18/83 O: CT GR D MOT TO CONT TIL 10/17/83
 C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt  A=Add  I=Image       _
```

```
     Case number : 82-F-221                        Action Log
        STATE OF WV                        vs. JOHN R MOSS, III

Line    Date                        Action / Results
  19 05/20/83 O: CT GRT D MOT TO CONT TO 10/17/83
  20 05/20/83 O: F D ANS (2)
  21 05/20/83 O: F D MOT FOR GJ MINUTES
  22 09/13/83 F TRANS OF PROCEEDINGS HELD 8/15/83
  23 09/19/83 ISS SUBP & 1 CPY FOR DEFENSE RET FORTHWITH
  24 09/19/83 ISS SUBP & 1 CPY FOR DEFENSE RET FORTHWITH
  25 09/19/83 ISS SUBP & 1 CPY FOR D, RET FORTHWITH
  26 10/03/83 F D MEMO IN SUPP OF D MOT TO SUPPRESS SAMPLES OF BL, CONFESSION
  27 10/03/83 & OTHER PHYSICAL EVID SEIZED FROM JOHN MOSS BY EMPLOYEES OF ST
  28 12/30/83 F ST MEMO IN OPPOS TO D MOT TO SUPPRESS/CPY OF CT RULING TO CNSL
  29 01/05/84 O: CT GR MOT TO CONT; TD SET 2/21/84
  30 01/18/84 F TRANS
  31 01/25/84 ISS SUBP & 12 BLANK COPIES FOR D, NO RET DTE
  32 01/19/84 O: KCS TO TRANSP D FROM KCJ TO DPS TO VIEW EXH FOR TRIAL
  33 02/01/84 ISS SUBP & 25 CPYS FOR ST, RET 2/21/84
  34 02/08/84 ISS SUBP & 2 CPYS FOR ST, RET 2/21/84
  35 02/06/84 O: F NOT OF ST OF D INTENT TO USE HEARSAY EVID WHICH IS AGNST
  36 02/06/84 PENAL INTEREST OF EXTRA JUDICIAL DECLARANT
 C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image
```

```
          Case number : 82-F-221                              Action Log
                 STATE OF WV
                                              vs. JOHN R MOSS, III
Line    Date                        Action / Results
  37  02/09/84 ISS SUBP & 18 CPYS FOR ST, RET 2/21/84
  38  02/08/84 O: GRT D MOT FOR CERT TO SEC ATTEND OF OUT-OF-STATE WITN
  39  02/08/84 O: CERT TO SEC OUT-OF-ST WITN; FOR PERIOD OF (1) DY BETWEEN THE
  40  02/08/84 DATES OF 2/21/84 & (6) WKS THEREAFTER
  41  02/14/84 D SUPP LIST OF WITNESSES F
  42  02/22/84 D SUPP LIST OF WITNESSES F; SUBP FOR D W/RET; SUBP FOR D W/RET
  43  02/21/84 O: F ST MOT (O SEALED BY CT); STMTS O SEALED BY CT
  44  03/05/84 ISS SUBP & 10 CPYS BLAND FOR D
  45  03/12/84 O: CERT OF JUDGE HEY REQ ST FOR ATTEND OF OUT-OF-ST WITNESS,
  46  03/12/84 CARLTON MOSS, RET 4/2/84; CERT OF JUDGE HEY ATT; ATTESTATION OF
  47  03/12/84 PHYLLIS RUTLEDGE ATT; ST'S PET ATT
  48  03/12/84 O: CERT OF JUDGE HEY REQ FOR OUT-OF-ST WITNESS, MARZEE MOSS, RET
  49  03/12/84 4/2/84, CERT OF JUDGE HEY ATT; ATTESTATION OF CIR CLERK ATT; ST
  50  03/12/84 PET ATT
  51  03/22/84 ISS SUBP & 1 CPY FOR ST RET 3/24/84
  52  04/03/84 O: ALLOW TO MARZEE MOSS IN AMT OF $60.00
  53  04/03/84 O: ALLOW TO JOHN MOSS, JR. IN AMT OF $145.60
  54  04/04/84 O: ALLOW TO WM. JOHNSON IN AMT OF $90.50
 C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image      _
```

Case number : 82-F-221                                    Action Log
         STATE OF WV                          vs. JOHN R MOSS, III

Line    Date                         Action / Results
  55  04/04/84  O: ALLOW TO ARBUTUS JOHNSON IN AMT OF $109.93
  56  04/10/84  SUBP & 1 CPY ISS FOR ST, RET 4/10/84
  57  04/12/84  F TRANS OF TESTIMONY OF JOHN MOSS TAKEN 3/19/84
  58  04/13/84  ISS SUBP & 2 CPY FOR D RET 4/16/84
  59  04/19/84  O: ALLOW TO KRT IN AMT OF $120.00 FOR JURY VIEW
  60  04/26/84  O: ALLOW TO NATL TRAVEL SERV IN AMT OF $910.00 FOR TRAVEL EXP
  61  04/06/84  ISS SUBP & 1 CPY FOR ST RET 4/6/84
  62  04/17/84  ISS SUBP & 1 CPY FOR ST RET 4/17/84
  63  04/30/84  O: CT I: PENIT LIFE W/O MERCY W./CRED OF 1230 DYS, SENT TO BE
  64  04/30/84  SERVED CONSEC TO SENT IMPOSED IN ST OF OHIO; CT II: LIFE W/O
  65  04/30/84  MERCY, SENT TO BE SERVED CONSEC TO SENT IMPOSED IN ST OF OHIO &
  66  04/30/84  CONSEC TO SENT IMPOSED THIS DATE IN CT I: CT III: PENIT LIFE W/O
  67  04/30/84  MERCY W/CRED OF 1230 DYS, SENT TO BE SERVED CONSEC TO SENT IMP
  68  04/30/84  IN ST OF OHIO & CONSEC TO SENT IMP IN CT I & CT II
  69  04/30/84  F CERT COMMIT
  70  05/30/84  O: ALLOW TO HOLIDAY INN IN AMT OF $440.96
  71  05/30/84  O: ALLOW TO HOLIDAY INN IN AMT OF $275.24
  72  06/22/84  O: F D NOT OF INTENT TO APPEAL
 C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image

```
          Case number : 82-F-221                        Action Log
              STATE OF WV                    vs. JOHN R MOSS, III

Line    Date                        Action / Results
  73 08/30/84 O: F AFD & APPT CHARLES COVERT AS C OF R FOR APPEAL
  74 09/24/84 O: F & GRT CNSL RELIEF FOR PURP OF APPEAL
  75 10/02/84 O: CT RELIEVES CHARLES COVERT & APPT WAYNE SINCLAIR AS C OF R
  76 10/17/84 O: CT APPT DAVID STUART AS CO-CNSL W/WAYNE SINCLAIR
  77 11/02/84 O: F CNSL MOT & BRIEF; MOT TO BE RELIEVED GRT
  78 11/14/84 O: APPR ATTY ALLOW IN AMT OF $63.50 TO CHARLES COVERT
  79 12/21/84 O: PET GRT EXT OF (4) MOT TO F PET FOR WRIT OF ERROR
  80 01/22/85 O: CT RELIEVES DAVID STUART & APPT WM. HIGHLAND AS C OF R
  81 03/29/85 O: CT REP TO FURNISH PA W/CPY OF TRANS OF TRIAL
  82 05/07/85 O: REC FROM WVSCA DTD 4/30/85; TIME TO MAKE APPLIC FOR APPEAL
  83 05/07/85 EXT TO 8/30/85
  84 06/10/85 TRANS OF JT, 18 VOLUMES, F; ALSO, CPYS FOR CLERK'S F
  85 09/06/85 REC FROM WVSCA DTD 8/30/85, APPEAL RECEIVED
  86 09/06/85 CPY OF LTR FROM CLERK WVSCA TO D CNSL DTD 8/30/85-F
  87 02/27/86 O: REC FROM WVSCA DTD 2/11/86 APPEAL GRT
  88 03/05/86 O: CT APPT FRANK HELVEY C OF R FOR D, WM. HIGHLAND RESIGNED
  89 02/02/89 O FROM WVSCA SETTING ASIDE JDGMT OF CIR CT ON 4/30/84 & REMAND
  90 02/02/89 BACK FOR NEW TRIAL
 C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image      _
```

```
          Case number : 82-F-221                              Action Log
                   STATE OF WV                     vs. JOHN R MOSS, III
Line     Date                        Action / Results
   91  02/06/89 O: WRIT OF HAB CORP AD PROSEQ BE ISSUED, DIR TO JOHN MASSEY
   92  02/06/89 FOR THE BODY OF JOHN MOSS, RET 2/14/89, 9 AM/CAN
   93  02/07/89 F MOT FOR WRIT OF HAB CORP AD PROSEQ, F WRIT OF HAB CORP AD
   94  02/07/89 PROSEQ ISSUED THIS DATE
   95  02/22/89 O: CT APPTS CHRIS BUTCH AS C OF R FOR APPEAL/CAS
   96  02/24/89 O: KCS TO TRANSP D TO FUNERAL OF GRANDFATHER ON 2/27/89/CAN
   97  02/28/89 F CNSL, CHRIS BUTCH MOT TO W/D; F CNSL NISAR KALWAR MOT TO W/D
   98  03/07/89 F CNSL, DAVID LAMBERT MOT TO W/D AS CNSL
   99  03/07/89 O: CT RELIEVES DAVID LAMBERT & APPTS KATHY BECKETT CO-CNSL W/
  100  03/07/89 NELSON BICKLEY
  101  04/11/89 O: MOT FOR FURLOUGH F & DENIED W/COS/CAN
  102  06/13/89 F D PRO SE MOT TO DISMISS THE INDICTMENT, EXH A ATTACH
  103  09/05/89 D & CNSL MOT FOR LEAVE TO W/D AS CNSL DENIED; MATTER CONT TO
  104  09/05/89 12/11/89; F D PRO SE MOT FOR NEW CNSL
  105  09/11/89 NOT OF HRG (9/19/89) ON ATT MOT FOR RECONSIDERATION FOR RELIEF
  106  09/11/89 AS CNSL W/COS
  107  09/06/89 F RCPT FROM WVSCA FOR EXH'S RECEIVED BACK
  108  10/31/89 O: CT APPTS JOHN FOWLER AS CO-CNSL/CAN
C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image        _
```

Case number : 82-F-221                              Action Log
STATE OF WV                        vs. JOHN R MOSS, III

```
Line   Date                        Action / Results
 109  11/28/89 D MOT TO CONT TD W/D; CT TAKES D MOT FOR MEDICAL EXAM UNDER
 110  11/28/89 ADVISEMENT; D MOT FOR BD DENIED; ST MOT TO CONT TD GRT; TD SET
 111  11/28/89 3/5/90-NEED O/CAN
 112  12/06/89 NOT OF HRG (12/13/89); MOT TO COMPEL BL SAMPLES & MOT TO REL
 113  12/06/89 EXH'S W/COS
 114  12/13/89 O: CT DENIES MOT FOR BAIL & TD SET 3/5/90/CAN
 115  12/13/89 O: CT GRT ST MOT FOR BL SAMPLES OF D/CAN
 116  12/13/89 O: CT GRT MOT TO RELEASE EXH'S/CAN
 117  12/14/89 LIST OF EXH'S RELEASED TO TROOPER TERRY WILLIAMS ON 12/14/89
 118  01/19/90 D MOTIONS (10) W/COS
 119  02/20/90 NOT OF MOT (HRG 2/26/90); D MOT TO SUPPRESS EVID W/COS
 120  03/15/90 F ST'S ANS (10) W/COS; ST'S MOT & REQ (3) W/COS
 121  03/19/90 SUPPR HRG HELD; ARGUM OF CNSL; TO SUBMIT BRIEFS
 122  03/26/90 D MEMO OF LAW IN SUPP OF D MOT TO SUPPRESS EVID W/COS
 123  03/29/90 D REPLY MEMO; ST'S REPLY MEMO IN OPPOS TO D MOT TO SUPPRESS
 124  03/29/90 ST ANS TO D MOT FOR DISCLOSURE, DISC, INSPEC & PROD OF STMT OF
 125  03/29/90 WITN; ST SUPP ANS TO D MOT FOR LIST OF WITN W/COS
 126  04/04/90 ST'S ANS TO MOT FOR DISCL; ANS TO REQ FOR LIST OF WITN W/COS
```
C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image        _

Case number : 82-F-221                                    Action Log
STATE OF WV                              vs. JOHN R MOSS, III

Line   Date                        Action / Results
127  04/05/90  O: F & GRT ST'S PET FOR JUDGES CERTIF TO SECURE AN OUT-OF-ST
128  04/05/90  WITN/HEY
129  04/05/90  O: CERTIF TO JUDGE OF CIR CT REQ STATE FOR ATTEND OF OUT-OF-ST
130  04/05/90  WITN/HEY
131  04/05/90  O: CERTIF ISSUED TO JUDGE OF COMMON PLEAS OF CUYAHOGA CO., OHIO
132  04/05/90  TO COMPEL ATTEND OF CARLTON MOSS FOR WITN ON 4/23/90/HEY
133  04/05/90  CERTIF OF AUTHENTICITY BY JUDGE HEY & CATHY GATSON ATT
134  04/06/90  HRG HELD; STATUS CONF SET 4/12/90
135  04/09/90  ISD SUBP (17) FOR D ATTY TO SERVE RET DTD 4/16/90
136  04/11/90  F ST SUPP ANS
137  04/12/90  F NOT OF THE ST OF WV'S INT TO USE STATEMENT OF CARLTON J. MOSS
138  04/16/90  D ANS TO ST MOT FOR LIST OF WITNESSES; NOT OF ALIBI DEFENSE
139  04/16/90  ST SUPPL ANS TO D WITNESS LIST W/COS
140  04/23/90  *TRANS OF PROCEED HELD 3/3/89; TRANS OF PROCEED HELD 9/5/89
141  04/26/90  JV FORM - GLTY ALL CTS; EVID LOG; D MOT IN LIM
142  04/30/90  ST'S MEMO IN OPPOS TO D MOT TO SUPPRESS W/COS
143  04/24/90  O: GRT MOT TO CONT; TD SET 9/5/89/CAN
144  04/24/90  O: DENYING MOT TO WD & TD CONT TO 12/11/89/CAN
C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image      _

```
       Case number : 82-F-221                        Action Log
            STATE OF WV              vs. JOHN R MOSS, III
Line    Date                         Action / Results
 145  05/04/90  O: PYNG KRT AMT OF $150.00 FOR JURY VIEW TRANSPORTATION/MAC
 146  05/10/90  NO ACTION THIS DT; CONT TO 5/14/90, 5 PM
 147  05/11/90  PENT LIFE W/O MERCY-NEED O/MAC
 148  05/14/90  D NOT OF INTENT TO APPEAL; MOT FOR NEW TRIAL W/COS
 149  05/23/90  O APPT TIMOTHY HUFFMAN AS CO-CNSL FOR APPEAL/MAC
 150  05/23/90  O: ALLOW IN AMT OF $278.64 TO HOLIDAY INN, CHAS HOUSE/MAC
 151  05/23/90  O: ALLOW IN AMT OF $1160.00 TO NATL TRAVEL SERVICE/MAC
 152  06/01/90  O: JV - GUILTY OF ALL COUNTS/MAC
 153  06/01/90  O: PENT - LIFE W/O MERCY W/CRED OF 3,435 DAYS/MAC
 154  06/01/90  PENT & CERTIFIED COMMITMENTS
 155  07/17/90  O PYNG CT REP $3,957.25/MAC
 156  07/18/90  TRIAL TRANSCRIPTS
 157  08/16/90  F D'S REQ FOR CPY OF MOTION FILED 6/13/89
 158  08/23/90  *O: GRT ADV APPR FOR INVEST FEES TO EXCEED STAT LIMIT/MAC
 159  08/24/90  *O GRT ADV APPR FOR INVESTIG FEES TO EXCEED STAT LIMIT/MAC
 160  09/20/90  *O: PYNG BEXAR CTY MED EXAMINER AMT OF $150.00/MAC (S/9/19/90)
 161  11/29/90  *O: PYNT CT REP, CONNIE COOKE $1,079.25 FOR TRANS/MAC
 162  01/14/91  *D DESIG OF REC FOR AP, PET FOR APPEAL
C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image      _
```

```
FUNCTION: SEQ INQUIRY                                    CASE SCREEN 4
      Case number : 82-F-221                          Action Log
         STATE OF WV                          vs. JOHN R MOSS, III

Line    Date                      Action / Results
 163 01/23/91 HAND DELIVERED TO WVSCA
 164 01/30/91 *O FROM SCA EXT TIME TO F AP TO 3/1/91
 165 01/31/91 *LTR TO C OF R FOM ANCIL RAMEY
 166 03/22/91 *O FROM SCA REFUSING PET FOR AP
 167 10/21/92 *O APPR PYMT OF APPT ATTY FEES TO T. HUFFMAN IN AMT OF $3263.00
 168 10/21/92 /MAC (S/10/20/92)
 169 01/08/93 ¢LTR FROM D REQ CPY OF TRANS OF SUPP HRG (TO JUDGE MAC FOR O)
 170 01/13/93 ¢F CPY OF CIR CLK'S LET TO D
 171 02/03/93 >TRANS OF SUPP HRG SENT TO D
 172 02/03/93 *O: CT REP TO PREPARE TRANS OF SUPPRESSION HRG & SEND CPY TO D
 173 02/03/93 //MAC; LTR TO CLK FR D
 174 02/03/93 *TRANS OF HRG HELD 4/13/90
 175 02/02/94 *O: CT REP TO TRANSCRIBE HRG HELD 3/19/90/MAC
 176 02/03/94 *TRANS OF SUPPR HRG HELD 3/19/90
 177 06/23/03 + RCPT FR WVSCA REC'D FILE ON APPEAL THIS DATE
 178 06/02/05 *LTR TO CLK FR D REQ COPIES; LTR TO D FR CLK W/COPIES ATT
 179 06/03/05 TSC C/M TO D WITH COPIES REQUESTED
 180 06/07/05 + RMR AS TO JOHN MOSS, III (SIGNED BY KEITH KIRK)
C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image    _
```

```
FUNCTION    SEQ INQUIRY                                              CASE SCREEN 4
     Case number : 82-F-221                           Action Log
            STATE OF WV                      vs. JOHN R MOSS, III
Line    Date                        Action / Results
  181 08/08/05 *LTR FR D DTD 6/12/05; LTR TO D FR CLK DTD 8/8/05 W/REQ DOC ATT
  182 03/27/06 *LTR FR D DTD 3/23/06; LTR TO D FR CLK DTD 3/27/06 A/ATT
  183 04/20/06 *LTR TO CLK FR D; LTR TO D FR CLK
  184 04/27/06 *LTR TO D FR CLK W/REQ COPIES ATT MAILED BY CM
  185 05/01/06 *RMR AS TO D
  186 02/27/07 *O FR SCA REFUISING MOT FOR EXT OF TIME TO F AP
  187 03/02/07 + CPY OF RCPT FR WVSCA - REC'D ORIG RECORD
  188 12/15/08 TSC LTR DTD 11/24/08 FROM DEF, REQ COPIES FROM FILE
  189 01/05/09 TSC LTR TO DEF




         C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image    _
```

Case 2:09-cv-06406 Document 8-1 Filed 02/09/10 Page 29 of 119 PageID #: 187
Case Number: 82-F-221     Total # Counts:     Count Shown #:     1

              Counsel              Jury Trial: Y    Exhibits Filed: _
                                                    Public Access : Y

                                        File         Who            Date
     Court Appointed:  Y        Checked Out:  _____      _____
                                             _____      _____
                                   Judgment
Plea:        Plea Bargain:   Final Order: 06/01/90
   Plea Agreement:

Verdict: G   MUR1           Verdict Date: 04/26/90     Decision Type: J
Sentencing Order: PENT - LIFE W/O MERCY W/CREDIT OF 3,435 DAYS


                            Post Judgement
Motion to Set Aside Date: _____     Appeal Filed: 01/14/91
                Status: _               Date Bond Posted: _____
Purge Date: _____  Stat Close: 06/01/90  Bond Amount: _____  Type: __

   <Ent>=Cont N=Notes M=Menu C=Chg 1-4=Scr F=Fwd B=Back D=DefAt W=WP O=Other    _

**MOSS v. BALLARD
CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 3**

March 21, 1991

FILED
91 MAR 22 AM 9: 27

State of West Virginia, Plaintiff
Below, Respondent

v.   910166

John Moss, Jr., a/k/a John Moss, II,
Defendant Below, Petitioner

Received of Ancil G. Ramey, Clerk of the Supreme Court of Appeals of
West Virginia, a copy of Court's Order and original record in the
above-styled case.

Dated at _____Charleston_____, West Virginia, this __25__
day of _____March_____, 19 _91_.

_____
Clerk, Circuit Court

STATE OF WEST VIRGINIA

At a Regular Term of the Supreme Court of Appeals
continued and held at Charleston, Kanawha County, on the 12th
day of March, 1991, the following order was made and entered:


State of West Virginia, Plaintiff
Below, Respondent

vs.)   No. 910166

John Moss, Jr., a/k/a John Moss, II,
Defendant Below, Petitioner

On a former day, to-wit, January 23, 1991, came
the petitioner, John Moss, Jr., a/k/a John Moss, II, by Bickley,
Jacobs & Barkus, and Nelson R. Bickley; Jackson & Kelly, and
Timothy Huffman; and Robinson & McElwee, and Kathy G. Beckett,
his attorneys, and presented to the Court his petition praying
for an appeal from a judgment of the Circuit Court of Kanawha
County, rendered on the 14th day of May, 1990, with the record
therein accompanying the petition.  Thereafter, on the 1st day
of March, 1991, came the petitioner, pro se, and presented to
the Court a supplement to his petition for appeal.

Upon consideration whereof, the Court is of
opinion to and doth hereby refuse said petition for appeal.
Chief Justice Miller and Justice McHugh would grant.


A True Copy

Attest: _____
Clerk, Supreme Court of Appeals

# FILE COPY

## 910166

### IN THE SUPREME COURT OF APPEALS
### THE STATE OF WEST VIRGINIA

JOHN MOSS, JR.,
a/k/a John Moss, III

    Petitioner

vs.

STATE OF WEST VIRGINIA

    Respondent

Appeal No. _____

---

## PETITION FOR APPEAL

---

NELSON R. BICKLEY
Counsel for Petitioner
BICKLEY, JACOBS & BARKUS
623 Charleston National Plaza
Charleston, WV  25301

TIMOTHY HUFFMAN
Counsel for Petitioner
JACKSON & KELLY
1600 Laidley Tower
Charleston, WV  25301

KATHY G. BECKETT
Counsel for Petitioner
ROBINSON & MCELWEE
600 United Center
Charleston, WV  25301

DATE:  January 14, 1991



# TABLE OF CONTENTS

TABLE OF AUTHORITIES

I.      JURISDICTION..................................................4.

II.     STATEMENT OF THE CASE.........................................4.

III.    STATEMENT OF THE FACTS.......................................5.

IV.     ASSIGNMENTS OF ERROR

ISSUE A.    The trial court committed reversible error when it failed
            to grant defendant's motion for a mistrial due to the
            prosecutrix's prejudicial and inflammatory statement
            during her closing argument............................10.

ISSUE B.    The trial court committed reversible error when it failed
            to render inadmissable the two confessions of the
            juvenile defendant, John Moss, Jr., which were obtained
            as a result of unjustified delay and were obtained prior
            to presentment to a neutral judicial officer..........14.

ISSUE C.    1.    The trial court erred in ruling that the State had
                  met the burden of proof imposed upon it to
                  establish that the electrophoresis multi-system
                  technique enjoys general acceptance in the
                  scientific community............................20.

            2.    The trial court erred in ruling that the State had
                  established a proper foundation for the
                  introduction of electrophoresis multi-system blood
                  stain test results, thereby rendering these results
                  inadmissable as a matter of law.................28.

IV.     CONCLUSION..................................................31.

### TABLE OF AUTHORITIES
#### CASES

State v. Woodall, 385 S.E.2d 253 (W.Va. 1989).........20, 21, 22.

State v. Koss, 176 S.E.2d 569 (W.Va. 1988)................14, 15.

State v. Armstrong, 369 S.E.2d 870 (W.Va. 1988)...........20, 28.

State v. Ellsworth J.R., 331 S.E.2d 503 (W.Va. 1985).......14-19.

State v. Franklin, 327 S.E.2d 659 (W.Va. 1985)............28, 29.

State v. Critzer, 280 S.E.2d 288 (W.Va. 981)................13.

State v. Clawson, 165 W.Va. 588, 270 S.E.2d 659 (1980)....20, 22, 28, 29.

State v. Boyd, 233 S.E.2d 710 (W.Va. 1977)..................12.

State v. Dyer, 160 W. Va. 166, 233 S.E.2d 309 (1977)..........28.

State v. Hood, 155 W. Va. 337, 184 S.E.2d 334 (1971)......28, 29.

United States v. Weatherless, 734 F.2d 179 (4th Cir., 1984)...11.

Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).......21, 27.

United States v. Leon, 534 F.2d 667 (6th Cir., 1976).........12.

Berger v. United States, 55 S.Ct. 629, 259 U.S. 78 (1935).....13.

People v. Seda, 139 Misc.2d 834, 529 N.Y.S.2d 931 (Sup. 1988).23, 24, 26.

People v. Lewis, 160 Mich. App. 20, 408 N.W.2d 94 (1987)......23.

People v. Holbrook, 154 Mich. App. 508, 397 N.W.2d 832 (1986).23.

People v. Brown, 40 Cal.3d 512, 230 CalRptr. 834, 726 F.2d 516, rev'd on other grounds subnom, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1986)...............................20, 22, 23, 26, 28.

People v. Young, 425 Mich. 470, 391 N.W.2d 270 (1986).....22, 23, 25, 26....................................................

People v. Marbold, 124 Ill. App.3d 363, 464 N.E.2d 734 (1984)..................................................23, 26.

People v. Gonzales, 415 Mich. 615, 329 N.W.2d 743 (1982)......22.

2

People v. Barbara, 400 Mich. 352, 255 N.W.2d 171 (1977).......26.

Lewis v. State, 285 Md. 705, 404 A.2d 1073 (1979)............17.


                              STATUTES


W.Va. Code 49-5-6(d)(1982)..................................14.


                              SERVICES


F. Cleckley, Handbook on Evidence for West Virginia Lawyers,
6.11(C)(2)(2d ed. 1986)..................................22, 26.

Jonakait, Will Blood Tell? Genetic Markers in Criminal Cases, 31
Emory L.J. 833, 912 (1982)..................................23.

Sweet & Elvins, Studies by Crossed Electroimmunodiffusion on the
Individuality and Sexual Origin of Blood Stains, 29 J. Forensic
Science 498 (1976)..........................................24.

Grunbaum, Potential and Limitations of Forensic Blood Analysis,
Handbook for Forensic Individualization of Human Blood and Blood
Stains......................................................24.

Juricek, The Misapplication of Genetic Analysis in Forensic Science
............................................................24.
Denault Takimoto Kwan Crim and Pallos, Deductibility of Selected
Genetic Markers in Dried Blood on Aging, 25 J. Forensic Science 479
(1980)......................................................24.

Sensabaugh, Genetic Markers in Semen III: Alteration of
Phosphoglucomutase Isoenzyme Patterns in Semen Contaminated with
Saliva, 25 J. Forensic Science 470 (1980)...................24.

Kind, An Investigation into the Possible Sources of Adventitious
ABH Substances in Blood Stain Grouping, 16 J. Forensic Science
Society 151 (1976).........................................24.

Perlera, Problems Involved in the Grouping of Saliva, Semen and
Other Body Fluids, 16 J. Forensic Science Society 151
(1976).....................................................24.

Jenkins, The Problem of the Acquired B Antigen Forensic Serology,
12 J. Forensic Science Society 597 (1972)..................26.

Grunbaum et al. Distribution of Gene Frequencies and Discrimination Probabilities for Twenty-Two Blood Genetic Systems in Four Racial Groups, 25 J. Forensic Sciences 428 (1980)..................25.

Grunbaum et al, Frequency, Distribution and Discrimination Probability of Twelve Protein Genetic Variance in Human Blood as Functions of Race, Sex, and Age, 23 J. Forensic Sciences 577 (1978)...........................................25.

## JURISDICTION

This case is before this Honorable Court upon the Petition for Appeal of John Moss, Jr. a/k/a John Moss, III's conviction in the Circuit Court of Kanawha County for Murder in the First Degree as contained in Counts 1,2, and 3 of Indictment No. CR 82-F-221. The sentencing order was entered on May 14, 1990.

This case was remanded by this Honorable Court in December, 1988 as a result of a finding that the prosection had conducted itself in an improper manner and that the West Virginia juvenile prompt presentment statute had been violated.

This appeal of that new trial ordered by this Honorable Court is based on the following grounds: that the State erroneously made reference to an unsupported allegation of rape; erroneously submitted into evidence confessions illegally obtained from the juvenile, John Moss, Jr.; and erroneously relied upon incompetent blood sample analysis to prove the appellant's presence at the scene of the crime.

## STATEMENT OF THE CASE

On November 3, 1980, juvenile petitions were issued charging John Moss, Jr. a/k/a John Moss, III with the murders of Vanessa Reggettz and her two children. A detainer was filed by the State against John Moss based on the charge of three counts of murder.

On August 13, 1981, the State presented its case against John Moss to the grand jury, which returned an indictment charging the petitioner with three counts of murder in the first degree. On April 30, 1984, John Moss was convicted by a jury in the Circuit Court of Kanawha County of the three counts set forth in the indictment.

In December, 1988, the Petitioner appealed his convictions based on numerous assignments of error including: misconduct by the prosecutor, and violation of the West Virginia juvenile prompt presentment statute (W.Va. Code, §49-5-8(d)). As a result of these errors, this Honorable Court ruled that John Moss, Jr. was entitled to a new trial.

A new trial was conducted in April, 1989. The jury returned a verdict of guilty of three counts of murder in the first degree. John Moss, Jr. was sentenced to life in prison without mercy.

## STATEMENT OF FACTS

In December of 1979 Vanessa Reggettz and her two children, Bernadette and Paul Eric were found dead in their St. Albans home. The husband and father of the family, Paul Reggettz, confessed to the crime and was subsequently indicted by the Kanawha County Grand Jury. Mr. Reggettz was held in custody for approximately eleven (11) months awaiting trial.

On January 30, 1980, West Virginia Troopers Michael Smith and Terry Williams traveled to Cleveland, Ohio, to obtain a blood

4

sample from John Moss, Jr., who was seventeen years of age. A blood sample was taken, at which time the Reggetts murders were discussed by John Moss and the troopers. This blood sample was taken without a Court Order, without the consent of John's parents or John's attorney at that time. When John Moss' attorney in Ohio learned of this unauthorized seizure of John's blood by the West Virginia Troopers Williams and Smith, he obtained an Ohio Court Order which required that the blood sample be returned.

Subsequently in April, 1980, Troopers Williams and Smith returned to Cleveland to obtain a blood sample from John Moss. (Tr. pg. 505). Examination of the blood obtained indicated that John Moss' blood and the blood from the scene of the Reggetts homicide were consistent in that both samples contained similar blood enzymes. Upon this event, a Court Order from Ohio had been obtained which resulted in a legal collection of a blood sample from John. On September 26, 1980, that State filed a Detainer against John Moss based on a malicious wounding charge, unrelated to the Reggetts homicides. The following month, October 28, 1980, the same troopers Terry Williams and Michael Don Smith went to Mansfield, Ohio to bring John Moss back to West Virginia pursuant to the malicious wounding detainer. (Tr. pg. 506).

On the afternoon of October 28, 1980, Troopers Williams and Smith took John Moss into custody and left Mansfield, Ohio with their ultimate destination being Charleston, West Virginia. During the trip, one stop was made at the Parkersburg State Police Detachment. (Tr. pg. 513). It was stated by Trooper Smith in his

7

written statement that the reason for the stop at Parkersburg was to discuss some crimes in West Virginia where everyone could "sit down face to face and talk to each other." Exhibit A, (Tr. pg. 413). According to Trooper Smith there was no discussion of the Baggetts homicides prior to the stop in Parkersburg. Exhibit A.

John Moss signed a Waiver of Rights at 6:57 p.m. on October 28, 1980 after which he gave an oral confession in the presence of Troopers Williams, Smith and Sergeant R. L. Presson of the Parkersburg State Police Detachment. Exhibit B. After that confession was completed it was determined by the officers, who were present, that a taped confession would be desirable. (Tr. pg. 544). John Moss signed another Waiver of Rights form at 9:28 p.m. for the purpose of taking the taped confession. Exhibit C. According to the testimony of Trooper Williams, the tape recorder was stopped four (4) times during the recording of the confession. (Tr. pg. 575). During each time the recorder was stopped, Trooper Williams left John to go outside the room to discuss with Trooper Smith and Sergeant Presson the development of the confession and to solicit for other issues which needed to raised with John. Ultimately, the tape was finished between 10:00 p.m. and 10:30 p.m. Exhibit D. The total time taken to obtain the twenty-seven (27) minute taped confession was one to one and one-half hours.

John Moss was relayed by West Virginia State Troopers to Charleston, West Virginia. He was held in the Kanawha County Jail from October 28 until October 30, 1980. John Moss was never taken

before a Circuit Court Judge or referee for prompt presentment. On October 30, 1980 John Moss was transported back to Ohio.

A second detainer was filed by the State against John Moss, on November 2, 1980, based on a charge of three (3) Counts of Murder in The First Degree. Approximately one year later, on August 13, 1981, the State presented its case against the appellant to the Grand Jury, which returned an indictment charging the appellant with three (3) Counts of Murder in The First Degree. Exhibit John Moss was tried and was convicted in March of 1984. In 1988, John Moss sought reversal of his convictions based on numerous assignments of error. Those errors included misconduct by the Prosecutor, and violation of West Virginia Code §49-5-8(d), the juvenile prompt presentment statute. As a result of these assignments of error this Honorable Court ruled that John Moss, Jr. was entitled to a new trial.

Subsequently, in April 1990 John Moss was tried and convicted a second time. This Petition for Appeal is from that verdict.

9

## ASSIGNMENTS OF ERROR

The appellant, John Moss, argues the following assignments of error in this Petition for Appeal:

A.  The trial court committed reversible error when it failed to grant defendant's motion for a mistrial due to the prosecutrix's prejudicial and inflammatory statement during her closing argument.

B.  The trial court committed reversible error when it failed to render inadmissable the two confessions of the juvenile defendant, John Moss, Jr., which were obtained as a result of unjustified delay and were obtained prior to presentment to a neutral judicial officer.

C.  1.  The trial court erred in ruling that the State had met the burden of proof imposed upon it to establish that the electrophoresis multi-system technique enjoys general acceptance in the scientific community.

    2.  The trial court erred in ruling that the State had established a proper foundation for the introduction of electrophoresis multi-system blood stain test results, thereby rendering these results inadmissable as a matter of law.

## ARGUMENTS

1. THE TRIAL COURT COMMITTED REVERSIBLE ERROR
   WHEN IT FAILED TO GRANT DEFENDANT'S MOTION FOR
   A MISTRIAL DUE TO THE PROSECUTRIX'S
   PREJUDICIAL AND INFLAMMATORY STATEMENT DURING
   CLOSING ARGUMENTS.

The prosecutrix, Neva Lusk, gave the State's rebuttal argument
to the jury. She said, inter alia, the following statements:

> "He knew Vanessa Reggettz was there by herself
> with her two children, didn't he? He knew
> that her husband worked at night. He didn't
> necessarily tell the whole story. Perhaps
> that's why Vanessa Reggettz's panties are on
> the bed -- not on her body. Why her sanitary
> napkin was on the floor -- a homemade sanitary
> napkin, not a store bought one, something has
> no pins to secure it, no tape to secure it, no
> belt to secure it. It was secured in place by
> her underwear, but her underwear is off her
> body and her sanitary napkin is on the floor.
> (Emphasis added.)

> "He did leave out a struggle in the front
> bedroom and he left out taking off her
> underwear." (Emphasis added.) (Tr. pg. 1376
> and 1377).

At the conclusion of her argument, defendant's counsel
requested to approach the bench. The Court, sua sponte, said "I
know you are going to raise an objection. Number One, is it
something that you think you want a curative instruction on or is
it instructional." (Tr. pg. 1391).

Defendant's counsel replied "I don't know." (Tr. pg. 1391).

11

The Court continued: "The reason I ask is this, if you don't think it's something that can be taken care of by a curative instruction. . . ."

You made the timely request to object. I take it you object to the inference drawn from the panties and such? (Tr. pg. 1392). Defendant's counsel replied "yes." (Tr. pg. 1392).

Defendant's counsel "moved for a motion for mistrial." (Tr. pg. 1395).

The Court stated "I overruled the motion for mistrial, and I will deny the request for a curative instruction." (Tr. pg. 1386).

"To justify the granting of a mistrial or new trial, the misconduct must be so egregious as to render ineffectual the type of curative measure employed "United States v. Weatherless, 734 F.2d 179, 182 (4th Cir., 1984). The Court immediately recognized the egregious nature of the prosecutrix's inflammatory remarks, and knew that curative instruction would not nullify the prejudicial inferences to the defendant. He, therefore, should have granted the mistrial.

There was absolutely no basis for the State to make an argument that the defendant had sex with the victim, Vanessa Reggettr. No evidence was put forth during the course of the trial that remotely indicated that sex played any part in the crime.

The following language was prescribed by this Honorable Court regarding prosecutorial conduct, "The crime of which this defendant is accused is so revolting that it is difficult for the average jury to give the one accused the benefit of a reasonable doubt. Its very nature should have prompted the prosecuting attorney to

exercise the highest degree of decorum in the conduct of the trial." State v. Boyd, 233 S.E.2d, 710, 717.  (W.Va. 1977). Instead of exercising discretion, the prosecutrix in the case at hand very graphically and deliberately drew this gross picture of a sanitary napkin: "Why her sanitary napkin was on the floor -- a homemade sanitary napkin, not a store bought one, something that has no pins to secure it, no tape to secure it, no belt to secure it. It was secured by her underwear. . ." (Tr. pg. 1176). What possible relevance does the fact that the victim's sanitary napkin is homemade, has no pins, no tape, and no belt to secure it?  None. I submit that such conduct is not in consonance with the expectation that the prosecution will exercise the highest degree of decorum in the conduct of a trial. The only possible inference that one can make from the aforementioned argument is that she was conscious of the fact that she was talking to a white jury panel, the majority of whom were women, about a black defendant. And in this instance, it would have been equally as damning if it had been a white defendant, but the propensity to relate this gross sex act to a black man is greater.  Additionally, the litany of the sanitary napkin and its particulars were deliberately designed to inflame the jury.  "The impact of prosecutor's remarks is to be determined by considering the tendency of such remarks to mislead the jury whether the remarks are isolated or extensive, whether the remarks were deliberate or accidental, and the strength of the case against the accused." United States v. Leon, 534 F.2d 667, 679 (4th Cir., 1976).  The remarks made by the State were deliberate

13

and without basis in fact.  "A prosecuting attorney has a duty not to make statements concerning facts not in evidence or not inferable from the evidence."  State v. Critzer, 280 S.E.2d 288 (W.Va. 1981).

The United States Supreme Court sets forth the following guidance to prosecutors: "[S]he may prosecute with earnestness and vigor -- indeed [s]he should do so.  But while [s]he may strike hard blows, [s]he is not a liberty to strike foul ones.  It is as much her duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about one."  Berger v. United States, 55 S.Ct. 629, 633 (1923).

The prosecutrix waited until rebuttal argument to make the aforementioned sex allegations knowing that defendant's counsel would be unable to mitigate the prejudicial harm her inflammatory remarks would make.  As has been noted, curative instruction would not be able to erase the mental image of the defendant, a black man, having sex with the victim, Vanessa Baggetts, an attractive white woman, during her menstrual period; a taboo that most people find revolting and reprehensible.  Only a new trial could cure the misconduct of the prosecutrix.  Consequently, the defendant is entitled to a new trial.

2.  **THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO RENDER INADMISSIBLE THE TWO CONFESSIONS OF THE JUVENILE DEFENDANT, JOHN MOSS, WHICH WERE OBTAINED AS THE RESULT OF UNJUSTIFIED DELAY AND WERE OBTAINED PRIOR TO PRESENTMENT TO A NEUTRAL JUDICIAL OFFICER.**

The admissibility of the confessions obtained from John Moss during the dates October 28 - 30, 1980 is an issue which the Court had been requested to review in a previous appeal filed by John Moss in 1988. When this matter was considered by this Honorable Court in State v. Moss, 376 S.E.2d 569 (W.Va. 1985), the issue of the admissibility of three confessions made by the Petitioner was specifically considered. As a result, the confession which was given by Petitioner on October 30, 1980, was ruled to be inadmissible since it was obtained in violation of the prompt presentment provisions of W.Va. Code, §49-5-8(d) and the Court's ruling in State v. Ellsworth J.R., 331 S.E.2d 503 (W.Va. 1985).

With regard to the two remaining confessions which were obtained on October 28, 1980, the exclusionary rule established in Ellsworth J.R. was not applied because there was no prompt presentment objection made to those two confessions, at the previous trial. However, a prompt presentment objection was specifically raised prior to the beginning of the Petitioner's second trial thus requiring the application of the Ellsworth J.R. exclusionary rule. (Tr. pg. 19 - 21).

Circuit Court Judge Andrew MacQueen interpreted the State v. Moss decision as rendering the two statements at issue admissible. (Tr. pg. 19). Judge MacQueen ruled that "the taking of the

19

statement does not violate either specific language or the principles embodied in the juvenile statute requiring an immediate presentment." (Tr. pg. 20).

In *State v. Moss* it was stated that the facts of John Moss' confessions occurring on October 28 - 30, 1986 indicated that "it is uncontroverted that the appellant was not presented to a referee, circuit judge, or magistrate, even after he had given three confessions to the murders." *Moss*, 376 S.E.2d at 581. The *Ellsworth* case dictates that "noncompliance with the juvenile prompt presentment requirement results in inadmissibility if the violation occurred for the primary purpose of obtaining a confession from the juvenile." *Ellsworth*, 331 S.E.2d at 508.

The stop in Parkersburg was initiated by the officers to obtain a confession. To allow the intimidation of children through the tactic of delay is unconstitutional. The juvenile prompt presentment statute exists for the purpose of assuring that children who are frightened and overwhelmed by the circumstances involving the accusation of committing a serious crime are taken before a neutral party who can explain the types of options that are available to that child. A child is to be afforded the same rights as are available to adults and in order to do so, he must be told what those rights are and be made aware that exercising those rights is perfectly legal, acceptable to the police officers around him, and actually recommended for his own defense.

The integrity of the enforcement officers is immediately under scrutiny when such abuses take place. In addition to assuring that

16

the rights of juveniles are protected, the prompt presentment statutory provision assures that information that is obtained by enforcement officers is not clouded by later denouncements of the juvenile confessor that the statements made were the result of intimidation or force. The audience of a neutral party could have proven to be an invaluable witness who would now be available to address the issue as to whether the confessor was aware of his rights and knew that he could at any time choose to waive those rights or continue to maintain his innocence.   Of particular interest is not only the fact that John Moss, aged 17, was not taken to a neutral judicial officer after allegedly confessing to murder, but the fact that he was never taken to a magistrate. Since the officers were able to obtain such detailed confessions r' peatedly, it stands to reason that they should have had an opportunity to obtain one of those confessions after John Moss was taken to a magistrate. The State has never been able to offer an explanation as to what obstacle presented itself that prohibited these experienced State Police officers from following the law.

When applying the Ellsworth rule to the situation presented in the instant case, it is obvious that the Respondent would be required to exclude the two confessions obtained on October 28, 1980.   The Court in Ellsworth bases its interpretation of the prompt presentment statute on two principles.   Initially, the Ellsworth court looked to the language of the statute which provides that a juvenile must be presented before a neutral judicial officer. The Court interpreted that proviso as being

17

> designed to ensure that if a juvenile referee
> or judge is not available, a child in custody
> must be **immediately** brought before a
> magistrate. In placing this construction on
> the statute, we have restricted the import of
> the proceeding language that indicates a delay
> may no 'exceed the next succeeding judicial
> day'. (emphasis added)
>
> We do so because we do not believe that
> this language was intended to sanction <u>any</u>
> <u>delay</u> in taking a juvenile directly to a
> judicial officer. Rather, this clause relates
> to how long a detention hearing may lawfully
> be delayed while a child is held in custody.
> (emphasis added) <u>Ellsworth</u>, 331 S.E2d at 507.

The <u>Ellsworth</u> Court continued its reasoning by stating that,
"It is obvious that advising the juvenile as to his constitutional
rights can be done immediately upon the appearance of the child."
<u>Id</u>. The interpretation of the juvenile prompt presentment statute
therefore dictates that John Moss should have been taken before a
neutral judicial officer immediately. This interpretation does not
even allow the "next judicial day" time frame.

The second principle the Court addresses is the issue of delay
when traveling to appear before a judicial officer. The facts of
the <u>Ellsworth</u> case indicate that Ellsworth, J.R. confessed to the
murder in question while riding in the police car which presumably
was traveling to the offices of the neutral judicial officer. The
police stopped en route in order to reduce to writing the oral
confession offered in the car. Delay as a result of the need to
reduce to writing the oral confession is "designed to insure that
what the defendant desires to relate is accurately recorded."
<u>Ellsworth</u>, 331 S.E.2d at 509 citing <u>Lewis v. State</u>, 404 A.2d 1073,

18

1080 (1979).  The Court in _Ellsworth_ assumes that the stop to record a statement was for the purpose of recording a confession already given and that had the defendant not volunteered to confess he would have been promptly presented.

In order to arrive at the prompt presentment exception recognized in _Ellsworth_, the Court posed three questions:  (1) Was the juvenile taken before a magistrate?  (2) Was the confession obtained as a result of delay? and (3) Was the primary purpose of the delay to obtain a confession?  When these questions are applied to the facts surrounding the confessions of John Moss, it is clear that he was not taken before a magistrate; that the confession was obtained as a result of the officers' decision to stop in Parkersburg not as a result of the Petitioner's offering of a confession; and that the primary purpose of the delay was to obtain a confession.  Trooper Smith, one of the officers traveling with the Petitioner, provided the following statement describing the applicable facts:

> It was then said to the effect, that we needed to get it straightened out but that something of that importance needed to be discussed some place other than the back seat of the car in which we were riding.  Going on to say it needed to be discussed in a place where you could sit down, have a cup of coffee and could look each other in the face.  Exhibit A.

It must be noted, however, that the delay was not delay for the purpose of recording a confession which had already been offered, as was the situation in the _Ellsworth_ case which resulted in an exception to the prompt presentment provision.  The statement of Trooper Smith indicates that there was no clear or specific

understanding between the Petitioner and the troopers that he was prepared to discuss the Reggetts murders at that moment while traveling or at any other time. The nod of his head as described by Trooper Smith is not tantamount to an expression of the desire to offer a confession. The entire conversation is one conceived by and prompted by the officer not by John Moss.

> . . . I said something to the effect of, now John, we both know what I am talking about and it is important we get it straightened out. He did not at that time acknowledge that he did know what we were talking about. After expressing a couple of more times to John that is was extremely important that the matter needed to be straightened out, it was told to John or asked of him something to the effect of, John why do you think we got a sample of your blood. After mentioning the blood, John was again told something to the effect of, now John, we both know what I am talking about, he agreed shaking his head yes. Exhibit A.

The delay in the case at hand does not qualify as an exemption to the prompt presentment statutory requirement because John Moss had not confessed nor suggested that he wished to confess prior to the stop in Parkersburg. The Court in Ellsworth had ruled that since the purpose for the delay in presenting the juvenile to a judicial officer was to accurately record the accused's statement, the confession was admissible.

Consequently, it is the Petitioner's position that once the prompt presentment objection was raised, before trial, the Respondent is required to consider the same under the exclusionary rule of Ellsworth. The Petitioner further submits that with the absence of any factual dispute as to the purpose of the delay in

20

Parkersburg, there is only one ruling that can be made on the admissibility of those two confessions. This Honorable Court must remand this case back to the Circuit Court and order a new trial.

<blockquote>
3    a.    THE STATE FAILED TO MEET THE BURDEN OF PROOF IMPOSED UPON IT TO ESTABLISH THAT THE ELECTROPHORESIS' MULTI-SYSTEM TECHNIQUE ENJOYS GENERAL ACCEPTANCE IN THE SCIENTIFIC COMMUNITY.
</blockquote>

The admissibility of test results derived from the electrophoresis multi-system technique presents a case of first impression in the State of West Virginia.

In State v. Woodall, 385 S.E.2d 253 (W.Va. 1989), this Honorable Court recognized the Frye rule as the litmus test for admissibility of novel scientific technique. See also, State v. Armstrong, 369 S.E.2d 870 (W.Va. 1988); State v. Clawson, 165 W. Va. 588, 270 S.E.2d 659 (1980). The Frye rule sets forth the principle that scientific tests are admissible only upon a showing that the tests are generally accepted by scientists in the field. In an often quoted passage, the Frye court stated:

> Electrophoresis is a physical method which, through the use of an electric current, separates biologically significant genetic markers found in all blood groups. "A test sample is placed on a gel medium in an ionized buffer solution. When an electric current is run through the solution, the sample separates and migrates on the medium into characteristic patterns. These are then fixed, dyed and read visually by the analyst." People v. Brown, 40 Cal.3d 512, 529, 230 Cal.Rptr. 834, 726 P.2d 516, 523, rev'd on other grounds Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 834 (1986).

> Just when a scientific principle or discovery
> crosses the line between experimental and
> demonstrable stages is difficult to define.
> Somewhere in this twilight zone, the
> evidential force of the principle must be
> recognized, and while the courts will go a
> long way in admitting expert testimony,
> deduced from a well-recognized scientific
> principle or discovery, the thing from which
> the deduction is made must be sufficiently
> established to have gained general acceptance
> in the particular field in which it belongs.
> Frye v. United States, 293 F. 1013 (D.C. Cir.
> 1923).

Under W.Va. Rules of Evidence, Rule 702, expert testimony is admissible when it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Although Rule 702 would appear to undermine the Frye standard, this Honorable Court explained in Woodall that Rule 702 is modified by W.Va. R.Evid., Rules 401 and 403 (1985), which exclude "irrelevant, prejudicial, confusing, or misleading evidence." Woodall, 385 S.E.2d at 259. The West Virginia Court reasoned that the policies underlying the Frye rule are preserved when Rules 702, 401 and 403 are read in pari delicto. Id. Realizing the dangers of unreliable scientific techniques, and the necessary safeguards imposed by the Frye standard, the Woodall Court stated:

> Certainly, a test clothed with all the
> trappings of science, but which is not
> scientifically accepted, is more misleading or
> prejudicial than is probative. Pseudo-science
> is more dangerous than no science at all.
> Therefore, at the end of the day, we are all
> brought back to the Frye rule with regard to
> tests that are not generally accepted and the
> burden of proof that the test is reliable
> remains on the proponent. Id. at 259-60.

32

In Clawson, 270 S.E.2d at 676,this Honorable Court held
that the party introducing and relying upon scientific evidence
must demonstrate that the principle and its results are
scientifically accepted and reliable for the purpose for which it
is used.  See also, Woodall, 385 S.E.2d at 253.  Cleckley has
written that a showing of general acceptance in the scientific
community is a "condition precedent" to admission.  F. Cleckley
Handbook on Evidence for West Virginia Lawyers, § 6.11(C)(2) (2d
ed. 1986).

As this issue presents a case of first impression in the
State of West Virginia, guidance may be gleaned from the courts of
other states who have considered the question.

In People v. Young., 425 Mich. 470, 391 N.W.2d 270 (1986),
the Michigan Supreme Court dealt squarely with the issue presented
in this appeal; that is, whether the results of serological
electrophoresis have achieved general acceptance in the scientific
community.  Like West Virginia, the Michigan Supreme Court has
adopted the Frye rule.  The Young Court explained that the Frye
rule recognizes that jurors are "scarcely prepared to evaluate
complicated, scientific testimony concerning the theory and
operation of the devices in the face of a difference of scientific
opinion as to their accuracy." Id. at 274 (citing People v.
Gonzalez, 415 Mich. 615, 623, 329 N.W.2d 743 (1962)).  The Young
Court held that the State failed to establish that the results of
serological electrophoresis had achieved general acceptance in the
scientific community.  See also, People v. Brown, 40 Cal.3d 512

23

(1986), People v. Lewis, 160 Mich. App. 20, 408 N.W.2d 94 (1987); People v. Holbrook, 154 Mich. App. 508, 397 N.W.2d 832 (1986); People v. Harbold, 124 Ill. App.3d 363, 464 N.E.2d 734 (1984); People v. Seda, 139 Misc.2d 834, 529 N.Y.S.2d 931 (Sup. 1988). In so holding, the Young Court specifically discussed three areas of disagreement in the scientific community regarding the validity of the electrophoresis multi-system method. These areas concern the length of time genetic markers can be accurately read in dried blood, the reliability of the thin-gel multi-system analysis, and the effects of crime-scene contaminants. People v. Young, 425 Mich. 470, 391 N.W.2d at 272.

In People v. Brown, the California Supreme Court also noted the inherent problems in the electrophoresis multi-system method, including "substantial" chemical and electrical variations, the potential for "spurious or false positive" test results, and the effect of crime-scene contaminants which were not yet fully understood by the scientific community.

In People v. Harbold, 124 Ill. App.3d 363, 464 N.E.2d at 746, the court discussed the growing controversy over the reliability of electrophoresis blood stain testing results. The Harbold court emphasized the newness of this technique and its fairly recent application in forensic science. The Harbold court cited one scholar who concluded:

> The forensic test for the detection of genetic markers in blood have not been proven to be reliable and should not be admitted into criminal trials. Jonakait, Will Blood Tell?

24

Genetic Marker Criminal Cases, 31 Emory L.J.
833, 912 (1982).

Jonakait does not stand alone in criticizing the reliability
of electrophoresis multi-system blood stain testing results.  See
also, Sweet & Elvins, Studies by Crossed Electroimmodiffusion on
the Individuality and Sexual Origin of Blood Stains, 21 J.
Forensic Science 498, 505 (1976); Grunbaum, "Potential and
Limitations of Forensic Blood Analysis," Handbook for Forensic
Individualization of Human Blood and Blood Stains; Juricek, The
Misapplication of Genetic Analysis in Forensic Science, 29 J.
Forensic Science 8 (1984).  There is also controversy among the
experts to the effect of crime-scene contaminants and aging blood
stains in the electrophoretic process.  Denault Takimoto Kwan Crim
& Pallos, Deductibility of Selected Genetic Markers in Dried Blood
on Aging, 25 J. Forensic Science 479, 496 (1980);  Sensabaugh,
Genetic Markers in Semen III: Alteration of Phosphoglucomutase
Isoenzyme Patterns in Semen Contaminated with Saliva, 25 J.
Forensic Science 47), 476-77 (1980); Kind, An Investigation into
the Possible Sources of Adventitious ABH Substances in Blood Stain
Grouping, 16 J. Forensic Science Society 155, 160 (1976); Perlera,
Problems Involved in the Grouping of Saliva, Semen and Other Body
Fluids, 16 J. Forensic Science Society 151, 152 (1976); Jenkins,
The Problem of the Acquired B. Antigen forensic Serology, 12 J.
Forensic Science Society, 597, 600, 602 (1972).

In People v. Soda, the court held that the electrophoretic
multi-system blood testing method was inadmissible as a matter of

25

law.  The Seda court recognized the heated scientific debate over the validity of the multi-system technique.  The court's holding was significantly swayed by the expert testimony of Dr. Benjamin Grunbaum[1], a recognized leader in the development of electrophoresis testing in the field of forensic identification.

In People v. Young, the State attempted to meet the Frye general acceptance standard via expert testimony of law enforcement forensic serologist.  The State's experts personally attested to the reliability and validity of electrophoresis blood testing and asserted that crime-scene contaminants did not undermine the reliability of the testing procedure.  The Young court responded:

> This is, however, the type of self-verification considered inconclusive in the scientific community.
>
> *  *  *
>
> Reliability remains in dispute and unresolved because of the questions unanswered.  The questions are not likely to answered and the reliability of electrophoresis of evidentiary blood stains until independently conducted validation studies on the thin-gel multi-system analysis are undertaken and comprehensive control tests evaluating the

---

[1] Dr. Grunbaum holds a PHD degree in biochemistry and a Master's degree in criminology with a specialty in forensic identification.  Dr. Grunbaum has thirty years of experience as a research biochemist, specializing in analytical biochemistry and microanalysis.  Dr. Grunbaum has authored the most-cited studies on the distribution of enzyme and antigen phenotypes in the population.  See Grunbaum et al. Distribution of Gene Frequencies and Discrimination Probabilities for Twenty-Two Human Blood Genetic Systems in Four Racial Groups, 25 J. Forensic Science 428 (1980); Grunbaum et al., Frequency, Distribution and Discrimination Probability of Twelve Protein Genetic Variance in Human Blood as Functions of Race, Sex, and Age, 23 J. Forensic Science 577 (1978).

> effects of different contaminants are run, and
> the results have been subjected to the
> scrutiny of the scientific community.  Id. at
> 272.

Cleckley has asserted that, in a Frye jurisdiction, general acceptance is not satisfied when a witness "personally vouches for the theory of scientific validity."  F. Cleckley Handbook on Evidence for the West Virginia Lawyers, § 6.11(C)(2) (2d ed. 1986).  The Young Court was concerned that the State had attempted to meet the general acceptance test on the basis of the expert testimony of police forensic serologist.  Recognizing the inherent bias in this approach, the Young Court required an acknowledgement of the value of the scientific technique by "disinterested and impartial" experts whose livelihood was not intimately connected with the new technique.  People v. Young, 319 N.W.2d at 274, 276. (Citing People v. Barbers, 400 Mich. 352, 368-69, 255 N.W.2d 171 (1977)).  In People v. Brown, the California Supreme Court stated that a witness is impartial when he is "so personally invested in establishing the technique's acceptance that he might not be objective about disagreements within the relevant scientific community."  Brown, 40 Cal.3d at 523.  Other courts that have addressed this issue have opined that use of a technique in crime labs alone cannot justify admission in the face of a bona fide scientific dispute.  See People v. Harbold, 464 N.E.2d at 747.  See also, Young, Brown, Soda.

The defendant would respectfully submit that there is a "bona fide" dispute in the relevant scientific community concerning the

27

reliability of electrophoresis multi-system blood stain testing results. Several leading commentators have identified inherent flaws in the multi-system technique. Several courts have recognized the ongoing debate and have excluded electrophoresis multi-system test results in criminal trials under the Frye general acceptance standard.

The only evidence the State has introduced in this regard is the testimony of Fred Zain, a former West Virginia police forensic serologist, who personally attested to the validity and general acceptance of the electrophoresis multi-system technique at trial. (Tr. pg. 1056). Several courts and legal commentators have disapproved of this "self-verification" technique because it completely undermines the general policies underlying the Frye rule. Clearly, the State failed to sustain the burden of proof imposed upon it to establish that the electrophoretic multi-system method is reliable and generally accepted in the relevant scientific community. Inasmuch as West Virginia adheres to the Frye rule, the defendant would respectfully submit that the trial court erred as a matter of law in allowing the electrophoretic evidence to pass before the jury, therefore a new trial must be granted.

25

**b.      THE STATE FAILED TO ESTABLISH A PROPER
          FOUNDATION FOR THE INTRODUCTION OF
          ELECTROPHORESIS MULTI-SYSTEM BLOOD STAIN TEST
          RESULTS, THEREBY RENDERING THESE RESULTS
          INADMISSIBLE AS A MATTER OF LAW.**

This Honorable Court has long held that a proper foundation
must be established before scientific evidence will be admitted.
State v. Franklin, 327 S.E.2d 449 (W.Va. 1985); State v. Clawson,
270 S.E.2d 659 (W.Va. 1980); State v. Dyer, 233 S.E.2d 309 (W.Va.
1977); State v. Hood, 184 S.E.2d 334 (W.Va. 1971). In addition to
a finding that the scientific principle upon which the evidence is
based enjoys general acceptance in the scientific community, the
Hood Court required a showing that the person interpreting the
test results was properly qualified, that the testing device was
in proper working order, and that the test was properly conducted.
Hood, 327 S.E.2d at 337. See also, Franklin, 327 S.E.2d at 454,
Clawson, 270 S.E.2d at 677; Dyer, 233 S.E.2d at 310.

In Armstrong, 369 S.E.2d at 877, this Honorable Court stated
that expert testimony is admissible where the expert possesses the
"requisite skill and experience and demonstrates the accuracy and
reliability" of a scientific technique so that his testimony
provides a "valuable aid" to the trier of fact. This standard
implicitly requires that the expert be well versed in the
scientific discipline and mindful of disagreements within the
relevant scientific community.

In People v. Brown, 40 Cal.3d at 525, the California Supreme
Court recognized that state's expert were "competent and well-

29

credentialed forensic technicians," but that their identification
with law enforcement and career interests in upholding the
validity of electrophoresis testing rendered them unqualified to
state the view of the relevant community of "impartial
scientists."

The defendant does not per se question the qualifications of
Mr. Zain, the State's expert witness. However, Mr. Zain's
identification with law enforcement and career interest in
upholding the validity of these tests as the present director of a
private crime lab directly impeach his qualifications as an expert
witness in this case. Indeed, Mr. Zain recognized no disagreement
in the scientific community regarding electrophoresis multi-system
blood stain testing. (Tr. pg. 1055-56). Mr. Zain also attacked
the character and veracity of Dr. Benjamin Grunbaum, a recognized
leader in the development of electrophoresis testing, who happens
to disagree with MR. Zain's assertions. (Tr. pg. 1061-1062). Mr.
Zain's demonstrated hostility and unwillingness to address
relevant disputes in the scientific community undermine his
ability to provide a "valuable aid" to the jury and rendered him
unqualified to testify in this trial.

In addition to establishing the expert's qualifications, a
proper foundation requires a showing that the test was property
conducted and that the testing device was in good working order.
See generally, Franklin, 327 S.E.2d 659 (W.Va. 1985); Clawson, 270
S.E.2d 659 (W.Va. 1980); Hood, 184 S.E.2d 334 (W.Va. 1971).

30

The only evidence the State offered in this regard was the testimony of Mr. Zain.  Indeed, Mr. Zain testified that no records were maintained to insure that proper working condition of the electrophoresis testing device. (Tr. pg. 1058).  He simply stated that, "[i]t either works or it doesn't work."  (Tr. pg. 1058).  Mr. Zain also testified that "internal and external quality control standards were used in all testing.  (Tr. pg. 1055).  He further testified that, "[t]he scientific method was followed completely," (Tr. pg. 1057) although he never described the exact methodology utilized in the case at bar.  Mr. Zain conceded that he did not actually sign the report from which he based his testimony and that there was no way to actually review the test results "[o]ther than the report itself."  (Tr. pp. 1049, 1057).

In essence, the defendant was completely deprived of his right to rebut Mr. Zain's testimony and the report upon which it was based.  Put simply, Mr. Zain could have lied about the test result and there is not one thing the defendant could have done about it.  The defendant respectfully asserts that Mr. Zain's "self-verification" of the proper methodology employed in the good working condition of the electrophoresis device is hardly sufficient to establish the prerequisite foundation for the admissibility of scientific evidence.

Even if this Honorable Court were to conclude that the electrophoretic multi-system has gained general acceptance in the relevant scientific community, the defendant would respectfully submit that the State failed to lay a proper foundation for Mr.

31

Zain's testimony and the report upon which it was based. This Honorable Court has consistently held that a proper foundation requires that a showing that the testing device was in proper working order, that the person interpreting the test was qualified, and that the test was properly conducted. The only evidence the State put forth in this regard was the "self-verification" testimony of Mr. Zain. The ramifications of this practice are clear. If expert witnesses are permitted to verify the validity of test methodology and attest to the proper working condition of the testing device, through their own testimony, without more, the policies requiring a proper foundation for scientific evidence will be completely undermined. In the absence of control standards and machine maintenance records, the defendant was completely helpless to rebut Mr. Zain's testimony and the report upon which it was based. Therefore, this Honorable Court is requested to grant a new trial.

## CONCLUSION

The Petitioner submits that the errors assigned as sufficient to constitute reversible error either singularly or cumulatively.

32

JOHN MOSS, JR.
By Counsel

NELSON R. BICKLEY
Counsel for Petitioner
BICKLEY, JACOBS & BARKUS
873 Charleston National Plaza
Charleston, WV 25301

TIMOTHY HUFFMAN
Counsel for Petitioner
JACKSON & KELLY
1600 Laidley Tower
Charleston, WV 25301

KATHY A. BECKETT
Counsel for Petitioner
ROBINSON & MCELWEE
600 United Center
Charleston, WV 25301

33

EXHIBIT A

After saying this to John, I said something to the effect of, Now John, we both know what is going on. Why not try to get it straightened out. He did say to that he would. Also that he did know what we were talking about. After expressing a couple more times to John that it was extremely important that the matter needed to be straightened out, it was told to John or asked of him something to the effect of, John why do you think we got a sample of your blood. After mentioning the blood, John was again told something to the effect of, now John, we both know what I am talking about, he agreed shaking his head yes. It was then said to the effect, that we needed to get it straightened out but that something of that importance needed to be discussed some place other than the back seat of the car in which we were riding. Going on to say it needed to be discussed in a place where you could sit down, have a cup of coffee and could look each other in the face. After stating this, John agreed and said he was willing to discuss the matter. It was then agreed that until we had a better place than the back seat of the car, discussions would be about things other than crimes.

Upon arrival at the Parkersburg Detachment, John was allowed to use the restroom, get a drink of water, given coffee and ordered a coke and sandwich. Before starting any further discussions concerning any crimes, John was again advised of his Rights. This time, this was done on a DPS Form Number 79.

In starting this discussion of crimes or crime at the Parkersburg Detachment, it was started that by saying something to the effect of, John, we have already agreed about the importance of this other matter and to the fact that it did need to be resolved. After that John again agreed by shaking his head. It was asked of John if this happened because he got scared and he said it did. John was asked to tell about what happened and his answer was it just happened. Then I said to John something to the effect, well what happened John tell us about what happened. John's answer was, I don't remember.

After John saying it just happened, but he could not remember what happened, it was explained to John to the effect of the following:

That he needed to try and remember what happened, because it was extremely important to know how and why this had happened. Sure we can understand it is probably hard to talk about, but you must remember that this can not be resolved without your help. In order for you to help, you tell us exactly what happened as well as you can remember. You and I know you remember what happened, right?

Again, John was asked to tell what had happened, but he said he was having trouble remembering. He was then asked, do you remember what scared you; he answered, I just got scared. He was then asked if he remembered where he was when he first remembered being scared. He answered, on the tracks. He was then asked, on the railroad tracks and he answered, yes. Asked John if this was before or after it happened and he answered, after. Asked him to the effect didn't you get scared before and he answered, yes. Then asked him where it was when he first remembers being scared before it happened, he answered at the

EXHIBIT B

<u>YOUR RIGHTS</u>    Parkersburg State

Place   Police Department

Date    10-28-50

Time    6.50 p.m. CST

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

<u>WAIVER OF RIGHTS</u>

I have had this statement of my rights read to me and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed: _John Moon II_

Witness: _Tpr. T. Wilson_   6.57 p.m.

Witness: _Tpr. M. D. Smith II  2005_

Time: _____

EXHIBIT C

U. P. S. Form #79

<u>YOUR RIGHTS</u>

Place _Buckingham STATE Police Detachment_

Date _October 25, 1981_

Time _9 22 PM EST_

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

<u>WAIVER OF RIGHTS</u>

I have had this statement of my rights read to me and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed: _____

Witness: _____ 10/15 9:25 PM

Witness: _____ 9:25 ~

Time: _____

EXHIBIT D

VOLUME 19 OF 18

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA

vs.                                    CR-82-F-221

FILED
In Kanawha County Court
Clerk's Office

JUN 1 1985

JOHN ROSS, JR.,
also known as
John Ross, III

BEFORE:   HONORABLE JOHN HEY, Judge,
          and a Jury,

APPEARANCES

    FOR THE STATE:  James C. Stucky, Prosecuting Attorney,
and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha
County.

    FOR THE DEFENDANT:  The Defendant, John Ross, Jr., also
known as John Ross, III, in person, and by Parrish McKittrick,
his counsel.

                                    Patty Lou Frame
                                    Official Reporter

Terry Williams - Cross                                    6006

        Q    So it took you between an hour and an hour and a half
to get a twenty-seven minute tape.  Is that what you are telling
the ladies and gentlemen of this jury?

        A    I said between 10:15 and 10:30.

        Q    That is not what your testimony was before.  Which
testimony do you want them to believe, the one today, or the one
here in this transcript where you said it would have been as
late as 11:00?

        A    I'm saying between 10:15 and 10:30.

        Q    Now you are saying between 10:15 and 10:30?

        A    Yes.

        Q    What is the definition of physical evidence?

        A    It is evidence, real evidence that you have against
someone.

        Q    Real evidence that you have against somebody?

        A    Yes.

        Q    Physical evidence would be, if it was relevant,
something like this knife handle that I am holding in my hand,
is that correct?

        A    Yes.

        Q    As of January 12, 1981, did you have any physical
evidence that indicated to you that John Shaw was a suspect in
the murder cases?

        A    Yes.

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA.

I, Cathy S. Gatson, Clerk of the Circuit Court of Kanawha County, certify that papers has been filed to guarantee the expenses of preparing and indexing the record; fees for filing the petition and certifying copies of orders; cost of transmission and return of the record; and, costs of the making of the transcript, in case an appeal be allowed in STATE OF WEST VIRGINIA v. JOHN ROSS, JR., aka JOHN ROSS, III, Criminal Action No. 82-F-771.

I, further certify that a petition to the Supreme Court of Appeals of West Virginia has been filed in my office, a duplicate remaining thereto on file.

Given under my hand and the seal of said Court, this ___11___ day of ___January___, 19 91.

_____
Clerk of the Circuit Court of
Kanawha County, West Virginia

# FILE COPY

Case No. #10166

IN THE

S U P R E M E   C O U R T   O F   A P P E A L S

OF

W E S T   V I R G I N I A

At Charleston

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

JOHN MOSS, III,
Defendant Below, Petitioner.

Underlying Proceeding Number
82-F-231
Kanawha County Circuit Court

SUPPLEMENTAL PETITION FOR APPEAL

Prepared By:

Robert D. Margard
Inmate Paralegal
WV Penitentiary
818 Jefferson Avenue
Moundsville, WV 26041



## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . iii

SUPPLEMENTAL PETITION FOR APPEAL . . . . . . . . . . . . . . . . 1

I.    INTRODUCTORY STATEMENT . . . . . . . . . . . . . . . . . . 1

II.   KIND OF PROCEEDING & NATURE OF RULING BELOW . . . . 2

III.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . 2

      A.  Case History . . . . . . . . . . . . . . . . . . . . . . . 2

      B.  New Trial . . . . . . . . . . . . . . . . . . . . . . . . 5

           i    Admission Of Evidence Ruling . . . . . . . . . . 5

           ii   The State's Case & Argument To The Jury . . 6

IV.   ASSIGNMENTS OF ERROR . . . . . . . . . . . . . . . . . . . 7

      1   THE TRIAL COURT COMMITTED REVERSIBLE ERROR
          WHEN IT ADMITTED PETITIONER'S CONFESSIONS OF
          THE REGGETTZ MURDERS INTO EVIDENCE . . . . . . . . 7

      2   IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION
          DENIED THE PETITIONER A FAIR TRIAL . . . . . . . . . 13

      3   THE IMPROPER ADMISSION OF SEROLOGY TEST
          RESULTS DENIED THE PETITIONER A FAIR TRIAL . . . 16

      4   PETITIONER WAS DEPRIVED OF EFFECTIVE
          ASSISTANCE OF COUNSEL AND EQUAL PROTECTION OF
          THE LAW . . . . . . . . . . . . . . . . . . . . . . . . 16

      5   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 7

VI.   CONCLUSION & RELIEF . . . . . . . . . . . . . . . . . . . . 17

Critique Of Petition For Appeal . . . . . . . . . . . . . . . . TAB 1

Motion To Suppress . . . . . . . . . . . . . . . . . . . . . . . TAB 2

Memorandum Of Law In Support . . . . . . . . . . . . . . . . . TAB 3

Reply Memorandum . . . . . . . . . . . . . . . . . . . . . . . . TAB 4

Letter To Appellate Lawyer . . . . . . . . . . . . . . . . . . TAB 5

Response From Lawyer . . . . . . . . . . . . . . . . . . . . . . TAB 6

Trial Court Ruling On Suppression Motion . . . . . . . . . . TAB 7

# TABLE OF CASES

Page

Arizona v. California,
    460 U.S. 605, 618,
      103 S.Ct. 1382,
      75 L.Ed.2d 318, 333 (1983) (dictim) . . . . . . . . .  8

Baumer v. United States,
    685 F.2d 1318, 1320 (11th Cir. 1982) . . . . . . . .  9

Booth v. United States,
    154 F. 836, 837 (2d Cir. 1907). . . . . . . . . . .  10

Cichos v. State,
    246 Ind. 680,
      208 N.E.2d 685 . . . . . . . . . . . . . . . .  12

Darwin v. Connecticut,
    391 U.S. 346,
      20 L.Ed.2d 630,
      88 S.Ct. 1488 (1968) . . . . . . . . . . . . .  12

E.E.O.C. v. International Longshoremen's Association,
    623 F.2d 1054, 1058 (5th Cir. 1980) . . . . . . . .  9

Gertz v. Robert Welch, Inc.,
    680 F.2d 527, 537 . . . . . . . . . . . . . . . .  9

Gore v. Bingaman,
    20 Cal.2d 118, 122-23,
      124 P.2d 17, 20 (1942) . . . . . . . . . . . . .  9

In the Interest of John Moss, Jr.,
    295 S.E.2d 33 . . . . . . . . . . . . . . . . . .  2

Messenger v. Anderson,
    225 U.S. 436, 444,
      32 S.Ct. 739,
      56 L.Ed. 1152, (1912) (Holmes, J.) . . . . . . .  8

Naples v. United States,
    359 F.2d 276 (C.A.D.C. 1966) . . . . . . . . . .  10

People v. Corbo,
    17 A.D.2d 351,
      234 N.Y.S.2d 662 . . . . . . . . . . . . . . .  12

People v. Medina,
    6 Cal.3d 484, 491,
      99 Cal.Rptr. 630,
      492 P.2d 686 (1972) . . . . . . . . . . . . . .  9

People v. Modesto,
    427 P.2d 788 (Cal. 1967)  . . . . . . . . . .   10

People v. Stoughton,
    185 Mich.App. 219,
    460 N.W.2d 591 (8/22/90)  . . . . . . . . . .   16

Quern v. Jordan,
    440 U.S. 332, 347 n.18,
    99 S.Ct. 1139, 1148 n.18,
    59 L.Ed.2d 358 (1979)  . . . . . . . . . .   9

Southern Railway Co. v. Clift,
    260 U.S. 316, 319,
    43 S.Ct. 126, 127,
    67 L.Ed. 283 (1922)  . . . . . . . . . . .   9

State v. Adjmi,
    170 So.2d 340 (Fla.App.)  . . . . . . . . . .   12

State v. Darwin,
    155 Conn. 124, 142,
    230 A.2d 573, 582  . . . . . . . . . .   11

State v. Darwin,
    161 Conn. 413,
    288 A.2d 422 (1971)  . . . . . . . . .   11, 12, 13

State v. Ellsworth, J.R.,
    331 S.E.2d 503 (W.Va. 1985)  . . . . . . .   4, 6, 11

State v. Humphrey,
    351 S.E.2d 613 (W.Va. 1986  . . . . . . . .   13

State v. Moss,
    376 S.E.2d 569 (W.Va. 1988)  . . . . . . .   2, 10

State v. Noe,
    230 S.E.2d 826 (W.Va. 1976)  . . . . . . . .   15

State v. Nuckolls,
    273 S.E.2d (W.Va. 1980)  . . . . . . . . . .   15

State v. Starcher,
    282 S.E.2d 877 (W.Va. 1981)  . . . . . . . .   15

United States v. Coward,
    669 F.2d 180 (4th Cir. 1982)  . . . . . . . .   11

United States v. Paroutian,
    319 F.2d 661 (2d Cir. 1963),
    cert. denied, 375 U.S. 981,
    84 S.Ct. 494, 11 L.Ed.2d 426 (1964)  . . . . . . . . .   10

United States v. Romano,
    241 F.Supp. 653 (D.Me.) . . . . . . . . . . . . .    10, 13

United State v. Watson,
    146 F.Supp. 258 (D.D.C.)  . . . . . . . . . . . .    13

White v. Murtha,
    377 F.2d 428, 431-32 (5th Cir. 1967)  . . . . . . . .    9

IN THE

SUPREME COURT OF APPEALS

OF

WEST VIRGINIA

At Charleston

STATE OF WEST VIRGINIA,

          Plaintiff Below,
          Respondent,

                                      Underlying Proceeding Number
                                          62-F-231
V.                                      Kanawha County Circuit Court

JOHN MOSS, III,

          Defendant Below,
          Petitioner.

## SUPPLEMENTAL PETITION FOR APPEAL

I.

### INTRODUCTORY STATEMENT

Pursuant to this Court's 24 January 1991 Order,[1] the petitioner, John Moss, III, hereby presents his pro-se[2] supplemental petition for appeal wherein he asserts a basic denial

---

[1] The Order had the effect of granting the petitioner a 30 day extension of time within which to file a supplemental petition for appeal.

[2] Petitioner, unskilled in the procedural intricacies of the law, has had to rely upon the assistance of a fellow inmate layman in this matter; this non-lawyer writer has had only 30 days to fully research the entire case and properly this petition; consequently, there remains a presumption that even this supplemental assistance is substandard and constitutionally ineffective.

of equal protection of the law by virtue of ineffective assistance[1] of court-appointed appellate counsel; and, inter alia, reversible error below through the improper application of the "Law Of The Case" doctrine as the primary basis for admitting into evidence at retrial "a unlawfully obtained inculpatory statements.

## II.

### KIND OF PROCEEDING & NATURE OF RULING BELOW

Petitioner was convicted on three counts of first degree murder by a petit jury in the Circuit Court of Kanawha County on 26 April 1990. On 14 May 1990 the trial court sentenced him to the rest of his life in prison without possibility of parole. This appeal follows.

## III.

### STATEMENT OF FACTS

#### A   Case History

This Court reversed petitioner's first conviction on 19 December 1988. That opinion is reported as State v. Moss, 376 S E 2d 569 (W.Va. 1988) ("Moss II"[a]):

[1] attached hereto and incorporated herewith is a critique of the petition for appeal as prepared by appellate counsel. (See, TAB 1).

[a] The case was previously before the Court on appeal from a juvenile jurisdiction transfer order as In the Interest of John Moss, Jr., 295 S.E.2d 33 ("Moss I").

In *Moss II* this Court held that each of the following errors were sufficient alone to require reversal:  (1) the refusal of a motion to poll each juror about exposure to prejudicial comments of the prosecuting attorney, broadcast by radio on a day the trial was in recess; (2) the failure of the trial court to intervene for the purpose of limiting and correcting fundamentally improper remarks made by the prosecuting attorney during closing; and (3) admission of evidence regarding the negative results of a polygraph test taken by a prior suspect to the murders — the husband and father of the deceased victims.

Aside from these three reversible errors (supra), the petitioner (then appellant) alleged further that three pre-arraignment confessions were inadmissible for three separate reasons:  (1) that he was illegally transferred from Ohio to West Virginia contrary to the Interstate Agreement on Detainers Act ("IAD"); (2) that the investigating officers illegally coerced him into waiving his constitutional rights and into making the inculpatory statements; and (3) that the investigating officers failed to immediately take him before a referee, circuit judge, or magistrate, in contravention of West Virginia's juvenile prompt presentment requirement.

In the *Moss II* opinion, though unnecessary to the decision itself, this Court went on to consider the remaining issues[1]

---

[1] This gratuitous consideration by the Court of the remaining issues after already determining the need for a new trial based on unrelated issues gives rise

(continued ..)

- 3 -

"[b]ecause the admissibility of the . . . three confessions . . . [would] again be of concern on remand. . . ."

After a somewha. detailed discussion regarding the possible merits of the appellant's confession contentions, the Moss II Court decided that only one[6] of the three confessions would be inadmissible at retrial because the investigating officers failed to promptly present the appellant before a judicial officer as required by W Va. Code, 49 5-8(d) (1986 Replacement Vol.). In making this decision, the Court rejected the appellant's argument that a violation of the IAD was akin to an illegal arrest, or that the first two confessions were involuntary as a result of unlawful coercion and prolonged interrogation in an unduly restrictive custodial setting. Regarding the prompt presentment contention, the Court held that the issue was preserved below by proper contemporaneous objection only with regard to the third confession; therefore, the ruling in State v. Ellsworth, J.R., 331 S.E.2d 503 (W Va 1985), would not be applied retroactively to exclude the remaining two confessions to which no prompt presentment objection was made[7]

[5] continued:

to the question of what might have occurred if the appellant had not briefed any confession-related issues on appeal in the first place.

[6] This confession, the only one to which a prompt presentment objection was preserved, was the subject of a second suppression hearing at the first trial because the prosecution was not made aware of it until after the first suppression hearing and the beginning of trial.

[7] The significance of this inference is obvious; neither party had this far emstioned the fact that no objection was made on prompt presentment grounds at the first suppression hearing; the Court. was specfc, raised the procedural
(continued...)

-4-

## B.  New Trial

### 1.  Admission Of Evidence Ruling

On 19 February 1990 the petitioner, through counsel, filed with the circuit court his motion to suppress[6] the two confessions left intact by Moss II.  Presumably, a suppression hearing[7] was held on or about 26 February 1990.  Despite specific prompt presentment objections, the motion to suppress was denied[8] by the trial court on 16 April 1990, the first day of the retrial.

The basis of the trial court's suppression motion denial was: (i) that this Court in Moss II had held the two confessions to be admissible, and this ruling was, therefore, "law of the case" on

. . . . continued default defense for the State and declared the confessions admissible for a lack of objection.

[6] TABS 2, 3 & 4 include, respectively, the Defendant's Motion To Suppress; Defendant's Memorandum Of Law In Support; and, Defendant's Reply Memorandum.

[7] This writer is informed by the petitioner that such a hearing was held; however, no transcripts of any such hearing seem to exist.  By letter of 28 January 1991 to one of the petitioner's attorneys, in an attempt to procure these records (TAB 5), the petitioner was informed that he had already received all records in her possession (TAB 6), but he did not receive the suppression hearing transcripts.  Obviously, as will appear more fully hereinafter, the attorney who was responsible for writing the confession argument portion of the petitioner's appeal petition (Kathy Beckett) did not use the transcripts of the suppression hearing for this writing assignment; this portion of the appeal petition was written prior to the petitioner's trial; much of the entire argument was copied verbatim from the pretrial Memorandum Of Law In Support (TAB 3) of the Motion To Suppress and the Defendant's Reply Memorandum (TAB 4).  It is no small wonder then, that it did not contain any mention of the "Law Of The Case" ruling because it was already written by the time the trial court made it's decision in this regard.

[8] The full text of the court's order is attached hereto as TAB 7.

-5-

remand; and (2) "[i]f that were not the case, . . . the foray or diversion from the direct route from Ohio to Charleston," under the facts of the case, would not violate the juvenile prompt presentment statute or this Court's mandate in *Ellsworth, J.R., supra.*

### ii.   The State's Case & Argument
### To The Jury

At trial, the State's case consisted primarily of the two confessions of the petitioner, and forensic serology test results which indicated that the killer's blood, found at the scene of the crime, was consistent only with that of the petitioner and two or three other unidentified individuals in St. Albans, West Virginia. (Tr. 1334-35).

The State exploited the fact that, although Paul Reggettz had also confessed to the crimes, he was present to deny the veracity of these confessions (e.g., Tr. 1322, 1324, 1330-31, 1386), while the petitioner did not personally contest the veracity of his confessions before the jury,[11] as he chose not to take the stand and testify in his own behalf.

The petitioner was convicted of three counts of felony murder;

_____

[11] At least three times in its closing argument, in an obvious ploy to draw attention to this fact, the State misstated or intimated that the petitioner had testified before the jury.  (Tr. 1327, 1332, 1355).

-6-

ostensibly, the underlying felony was burglary.[11]

## IV.

## ASSIGNMENTS OF ERROR

1.  THE TRIAL COURT COMMITTED REVERSIBLE ERROR
    WHEN IT ADMITTED PETITIONER'S CONFESSIONS OF
    THE REGGETTZ MURDERS INTO EVIDENCE.

2.  IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION
    DENIED THE PETITIONER A FAIR TRIAL.

3.  THE    IMPROPER    ADMISSION    OF    SEROLOGY    TEST
    RESULTS DENIED THE PETITIONER A FAIR TRIAL.

4.  PETITIONER    WAS    DEPRIVED    OF    EFFECTIVE
    ASSISTANCE OF COUNSEL AND EQUAL PROTECTION OF
    THE LAW.

## V.

## ARGUMENT

1.  THE TRIAL COURT COMMITTED REVERSIBLE ERROR
    WHEN IT ADMITTED PETITIONER'S CONFESSIONS OF
    THE REGGETTZ MURDERS INTO EVIDENCE.

The opinion of this Court in *Ross II* clearly implied that, had
objections been made, the first two confessions, like the third,
would also have been inadmissible under the prompt presentment
exclusionary rule because it was uncontested that the petitioner
had not been taken before a magistrate even after giving all three

---

[11] Though no instruction was offered on this theory, nor evidence adduced,
the State in closing rebuttal inferred an alternate felony murder theory; that
of sexual assault. (Tr. 1376-77).

confessions.  The second part of the trial court's order dealing with the "foray or diversion" of the police in stopping at the Parkersburg detachment, therefore, is logically incongruous with this Court's *Ross II* opinion.  This being the case, there is only one argument which this petitioner need assert on appeal:  the first part of the trial court's order, holding the confessions admissible under the law of the case doctrine, was reversible error.

In West Virginia, at least in the context *sub judice*, the law of the case doctrine has never before been expounded by this Court; but other courts have explained it thus:

In the absence of statute the phrase "law of the case" merely expresses the practice of courts generally to refuse to reopen what has been decided; it is not a limit to their power. Messenger v. Anderson, 225 U.S. 436, 444, 56 L.Ed. 1152, 32 S.Ct. 739 (1912) (Holmes, J.) Unlike the more precise requirements of *res judicata* and *collateral estoppel*, law of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318, 333 (1983) (dictum). Observations, commentary, or mere dicta touching upon issues not formally before the Court do not constitute binding determinations, and are not, therefore, law of the case. See, e.g., Quern v. Jordan, 440 U.S. 332, 347 n.18, 99 S.Ct. 1139, 1148

n.18, 59 L.Ed.2d 358 (1979). Gertz v. Robert Welch, Inc., 680 F.2d 527, 533. The doctrine is a self-imposed prudential limitation of the courts' power. 1B Moore's Federal Practice 0.404[10] at 573 (2d ed. 1980) It is not an immutable rule, but rather a way to foreclose continued appeals for reconsideration of prior rulings of law   Southern Railway Co. v. Clift, 260 U.S. 316, 319, 43 S.Ct. 126, 127, 67 L.Ed. 283 (1922).

There are three general exceptions to the law of the case doctrine  It should not be applied when:  [1] the evidence on a subsequent trial is substantially different, [2] controlling authority has since made a contrary decision of the law applicable to such issues, or [3] the decision was clearly erroneous and would work a manifest injustice   Bauer v  United States, 685 F.2d 1318, 1320 (11th Cir  1982);   E.E.O.C. v. International Longshoremen's Association, 623 F.2d 1054, 1058 (5th Cir. 1980); White v  Murtha, 377 F.2d 428, 431-32 (5th Cir  1967)

Most importantly, the law of the case rule should not be applied to any issues which were not necessary to the decision on the first appeal.  People v. Medina, 6 Cal.3d 484, 491, 99 Cal.Rptr. 630, 492 P.2d 686 (1972)  And above all, the rule should never be made the instrument of injustice   Gore v. Bingaman, 20 Cal.2d 118, 122-23, 124 P.2d 17, 20 (1942).

This Court considered the confession issues in Ross II "[b]ecause the admissibility of the . . . three confessions . . .

[would] again be of concern on remand. . . . State v. Moss, 376
S.E.2d 569, 575. The holding, therefore, was not necessary to the
decision itself; the Court had already decided that "[e]ach of [the
first three] errors require[d] reversal." Id. at 572. Had this
Court foregone consideration of the confession issues altogether,
the conviction of the petitioner would have still been reversed,
and all his rights reinstated. See United States v. Watson, 145
F Supp. 156, 159 (D.C. 1956) (After a conviction is reversed and a
case is remanded for a new trial, all of the rights a defendant
originally had are reinstated and he is not precluded from filing
a motion to suppress evidence prior to his retrial. Nor is he
precluded from urging in support thereof legal grounds not
previously raised.) Cf. United State v. Romano, 241 F.Supp 933
(S.D.Me. 1965); United States v Paroutian, 319 F.2d 661 (2d Cir
1963), cert. denied, 375 U.S. 981, 84 S.Ct. 494, 11 L Ed.2d 426
(1964), Booth v. United States, 154 F. 836, 837 (2d Cir. 1907).


Assuming arguendo, however, that the law of the case was
applicable to this court's former determination regarding the
admissibility of the petitioner's confessions, still there would be
exceptions to its application. For example, if the evidence upon
remand was substantially different, or if an intervening decision
had altered the applicable rule of law, it is clear that the law of
the case would not govern. See Naples v United States, 359 F.2d
276 (D A D C 1966), People v Modesto, 427 P 2d 788 (Cal. 1967).
The petitioner's case is undoubtedly exceptional. Not only was the

-18-

evidence different[13] on remand, but the intervening decision of State v. Ellsworth, J.R., 331 S.E.2d 503 (W.Va. 1985), had altered the applicable rule of law.[14] Moreover, insofar as the decision of this Court in Moss II would foreclose the petitioner from objecting anew, that decision was clearly erroneous and would work a manifest injustice.

In United States v. Coward, 669 F.2d 180 (4th Cir. 1982), the defendant's first conviction had been overturned; he was retried and once again convicted. At his first trial, evidence was "erroneously" suppressed by the trial court, but the Government did not appeal on this ground. At the second trial, this same evidence was introduced after a new suppression hearing where the Government was permitted to clarify the error of the first suppression hearing. On appeal, the Fourth Circuit stated that "[r]emand of the case for a new trial effectively cleansed the slate; the District Court properly corrected as many errors of the first trial as was possible." Id. at 184. (Emphasis added).

Likewise, in State v. Darwin, 161 Conn. 413, 288 A.2d 422 (1971), the defendant had been convicted and appealed to the Connecticut Supreme Court. That court affirmed, holding that "[the] claims [concerning attacks on the validity of the search

---

[13] Different in the sense that it was not objected to in an appropriate fashion initially, but was properly brought to the court's attention on remand.

[14] Although petitioner's first trial attorney did object to the failure of the police to promptly present the petitioner before a magistrate with regard to the third confession, he cited the McNabb-Mallory rule for his authority.

warrant] now come too late.  The [trial] court was never asked to rule on the claims, and under settled Connecticut practice they cannot now be considered."  State v. Darwin, 155 Conn. 124, 142, 230 A.2d 573, 582.  Darwin petitioned the United States Supreme Court for certiorari, and the case was reversed on the unrelated issue of the voluntariness of Darwin's confession, Darwin v. Connecticut, 391 U.S. 346, 20 L.Ed.2d 630, 88 S.Ct. 1488 (1968). At his second trial, Darwin filed a motion to suppress certain evidence obtained as a result of an insufficient search warrant; this issue formed the basis for his second appeal.  Conceding the validity of this claim, the State argued three reasons against it. "(1) that by not attacking it before or during the first trial the defect was waived, (2) that the defendant had no standing to challenge the search of his wife's car and (3) that by reversing on the ground of an inadmissible confession, and by not mentioning the search warrant, the validity of which the defendant had raised before it, the United States Supreme Court implied . . . the warrant was valid.  Rejecting the State's argument altogether, the Connecticut Supreme Court reversed, holding that:

> The first trial ended in a verdict of guilty and a judgment was rendered.  That judgment was appealed, first to this court and then to the United States Supreme Court.  The end result was a reversal and the ordering of a new trial.  The purpose of a new trial is to have an error-free trial.  The trial is "new" in every sense.  It is as if no trial had ever taken place.  Darwin, supra, citing State v. Adjmi, 170 So.2d 340 (Fla.App.); Cichos v. State, 246 Ind. 680, 208 N.E.2d 685; People v. Corbo, 17 A.D.2d 351, 234 N.Y.S.2d 662.  An invalid search, therefore, which was not contested on the first trial may be contested

-12-

by a motion to suppress prior to the second trial. United States v. Romano, 241 F.Supp. 933 (D.Me.); United State v. Wetson, 146 F.Supp. 258 (D.D.C.). By the same token, evidence which was not objected to at the first trial may be contested at the second. It would not be compatible with the theory of a new trial to tie the hands of counsel so that any errors waived in the first trial are forever waived. Thus, the defendant did have a right to raise the issue of a defective search warrant; that right had not been waived. Id. 288 A.2d 425. (Emphasis added).

The law of the case doctrine was designed to stop the needless repetition of meritless arguments already fairly adjudicated; it was not intended to be used as an instrument of injustice to blindly preclude consideration of legitimate issues never before decided.[5] The petitioner's first argument was never fairly considered by this Court because of a procedural default. "... [T]rial error not raised in the trial court will not be addressed on appeal." See State v. Humphrey, 351 S.E.2d 613 (W.Va. 1986). Petitioner was granted a "new" trial. This cleansed the slate of "all" errors at his first trial, including those made by his first attorney. He was given new lawyers, and they objected in a timely fashion with sufficient specificity. His convictions should be reversed and his confessions thrown out as they were obtained in violation of the prompt presentment requirement.

[5] This is not a case where the same facts which were previously decided not to warrant a positive outcome are again sought to be considered without a substantial change in the evidence; the obvious futility the law of the case was designed to avert.

2.   IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION
     DENIED THE PETITIONER A FAIR TRIAL.

When all was said and done, the trial of this case came down to the simple matter of which confessor the jury was willing to believe.  Both the petitioner and Paul Reggettz had initially confessed to the murders.  Both had unsuccessfully attacked their confessions as being unlawfully coerced.  Paul Reggettz testified for the State.  He told the jury of the pressures and tactics the police used to illegally extract his confession.  The jury saw him testify; they heard his version of the story.  The petitioner, on the other hand, chose not to testify.  The jury had only his confession to go by.  The significance of this fact was not lost on the prosecution in its summation.  Repeated references were made in relation to Mr. Reggettz such as:

> [Y]ou saw him on the stand.  He told you. . .
> (Tr. 1322); Paul told you    .   You heard him
> say it  (Tr. 1323); Paul Reggettz told you
> [about the interrogation]; He told you how
> they fired questions at him; You heard what
> Paul said [about the interrogation].   (Tr.
> 1324); Paul told you that he just couldn't
> take it (the interrogation).  (Tr. 1326); You
> saw Paul Reggettz on the stand.  He told you.
> .  (Tr. 1330); And now Paul Reggettz says --
> he's able to testify and he can say . . . Tr.
> 1386).

Likewise, references were also made with regard to the petitioner:

> John Moss told you. . . (Tr. 1330); you heard
> the defendant on the stand. . . (Tr. 1333);
> And then John testified that he. . .  That's
> what he told you (Tr. 1335).

But the petitioner did not testify; he was never on the stand before the jury; he told the jury nothing.  The jury was aware of that fact, and they were made even more aware of it by the State's improper remarks that the petitioner had took the stand, that he had testified.  This ploy was designed with one purpose in mind: to draw attention to the failure of the petitioner to testify; the failure of the petitioner to deny his confession; his failure to assert his innocence and be subject to self-incrimination.

> I want you to ask defense counsel -- again, ask them to explain how Paul Ruggetti's confession changes any of the evidence against John Moss.  See if they can explain it.  (Tr. 1371)
>
> Did you notice    they didn't talk about the blood?  Did you notice that there is no explanation  .  (Tr  1370)
>
> He didn't necessarily tell the whole story. (Tr  1376).
>
> Why did he kill (her)?  He doesn't say .   (Tr  1377)

Taken as a whole, these remarks by the State in closing amounted to improper comments on the failure of the petitioner to testify.  State v. Starcher, 262 S E.2d 677 (W.Va. 1981); State v. Nuckolls, 273 S.E.2d (W Va. 1980); State v. Boyd, 230 S.E.2d 828 (W Va. 1976)  The fact that no objections were made is evidence that the petitioner's attorneys were ineffective at trial as on appeal. But these remarks were sufficiently egregious to cross the plain error threshold regardless of trial counsel's lacking

performance, and counsel's ineptitude should not be used to the detriment of his client. The State's closing comments regarding the petitioner's failure to testify amount to reversible error.

3    THE IMPROPER ADMISSION OF SEROLOGY TEST RESULTS DENIED THE PETITIONER A FAIR TRIAL.

Two months after the petitioner's second trial, in August of 1990, the Michigan Court of Appeals ruled that the Wraxall thin gel multilayered method of serological electrophoresis (the method used in the petitioner's trial) had not achieved general acceptance for reliability in the scientific community. People v. Stoughton, 185 Mich App. 219, 460 N.W.2d 591 (8/22/90). This was apparently the test which the State claimed could exclude all but 3 people in St. Albans as the killer -- the petitioner and 2 or 3 others. The use of this test at the petitioner's second trial was reversible error.

4    PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AND EQUAL PROTECTION OF THE LAW

This writer is well aware of his literary limitations and overall inefficiencies with regard to knowledge of the law and ability to expound it; the petitioner should not have to resort to such inferior assistance -- he is entitled to more. He is entitled to effective assistance by reasonably qualified, competent counsel.

This petition itself exemplifies the degree of disservice done by appellate counsel's inattention to the arguable issues of this

case; but nothing could be more convincing than proof the petition was written prior to the trial court's "law of the case" ruling. A quick comparison of the confession argument of the petition (TAB 1[34] RED) to the arguments made before trial (TABS 3 & 4 RED), conclusively proves that this portion of the petition was actually written before trial, as it is mainly reprinted from pretrial (pre-denial) papers. It did not respond to the first part of the trial court's two-part ruling on the admissibility of the petitioner's confessions because it was already written when that decision issued. This is flagrant ineffectiveness. The petitioner is entitled, at the very least, to appointment of new counsel and reinstatement of his right to appeal these convictions.

VI

CONCLUSION & RELIEF

The petitioner's federal and state constitutional rights to due process, a fair trial, and effective assistance of counsel have all been abridged by the actions and omissions above; he should be granted a "new," error-free trial, as if no trial had ever taken place.

Respectfully submitted.

John Moss, III
Petitioner, pro-se

[34] Compare A thru J red in TAB 1 to A thru J red in TABS 3 & 4.

**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 4**

Case 2:09-cv-01406-cc Document 8-1  Filed 02/09/10  Page 96 of 119 PageID #: 254
     Case Number : 94-146SC-003              Action Log
          JOHN MOSS, III                vs. GEORGE TRENT
Line    Date                    Action / Results
    1 08/18/94 *PET FOR WR HAB CORP W/COS; COV LET; PET MOT FOR ALL DOC'S
    2 08/18/94 RELATING TO TESTING PERFORMED IN THIS CASE OR IN CONNECTION W/
    3 08/18/94 PAUL REGGETTZ, III W/COS; PET MOT TO EXCEED STAT LIMIT W/COS
    4 08/18/94 *PET MOT FOR GJ TRANS W/COS; SIMMONS FOR P
    5 09/15/94 *O: PET MOT FOR DOC'S GRT/MAC
    6 09/15/94 *O: PET CNSL ALLOW TO INCUR EXP IN EXCESS OF STAT LIMIT/MAC
    7 09/15/94 # NOT OF HRG W/COS
    8 10/17/94 # O: GRT PETITIONER'S MOT FOR GRAND JURY TRANS/MAC (S 10/14/94)
    9 10/24/94 # LET FR MARY KERSHNER TO JUDGE MACQUEEN DTD 10/24/94 W/ATTACH
   10 10/24/94 # COPY OF TRANS FROM GRAND JURY PROCEEDINGS HELD ON 9/17/82
   11 11/22/94 # COPY OF LET FR MARY KERSHNER TO LONNIE SIMMONS DTD 11/22/94
   12 11/22/94 # SEROLOGICAL RECORDS FROM WV STATE POLICE
   13 04/13/95 # NOT OF HRG W/COS; PETITIONER'S MOT FOR PROD W/COS
   14 05/01/95 # NOT OF DEPO W/COS
   15 05/01/95 # LET FR LONNIE SIMMONS TO MARY BETH KERSHNER DTD 4/28/95
   16 05/02/95 # O: PETITIONER'S MOT FOR PROD OF RECORDS GRT/MAC
   17 05/03/95 # COS AS TO AMD NOT OF DEPO
   18 05/03/95 # SUBP & 1 CPY FOR P BY LONNIE SIMMONS, ATTY; NO CHG
  C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image

              JOHN MOSS, III                   vs. GEORGE TRENT

Line    Date                         Action / Results
  19  05/12/95 # DEPO SUBP W/RET (5/11/95 PER) AS TO ROBERT MURPHY
  20  07/07/95 AFFDVT,AFFDVT W/COS
  21  08/14/95 # PETITIONER'S SUPP BRIEF W/COS & W/EXH
  22  08/22/95 .O: PUBLIC DEF SERV ISSUE CK PYABLE TO GARRETT REPT SERV IN AMT
  23  08/22/95 $196 W/INVOICE-MAC S8/17/95
  24  08/22/95 .O: PUBLIC DEF SERV ISSUE CK PYABLE TO GARRETT REPT SERV IN AMT
  25  08/22/95 $226.25 W/INVOICE-MAC S8/17/95
  26  09/12/95 # NOT OF HRG W/COS
  27  09/13/95 *O: PET TO BE TRANSP TO CT ON 9/19/95/MAC (S/9/12)
  28  09/13/95 *ND; 9/12/95; CCM L. SIMMONS & M. KERSHNER BY J RITZ
  29  09/14/95 # ANS OF RESPONDENT W/COS
  30  10/23/95 *O: PD OFFICE TO ISSUE CK TO GARRETT REPORTING SERVICES IN AMT
  31  10/23/95 OF $422.25/MAC
  32  12/08/95 *O: PD OFFICE TO ISSUE CK TO CBR LAB IN AMT OF $6,812.17/MAC
  33  12/13/95 # ND; CCM; 12/13/95; 12/8/95; L. SIMMONS; BY CE
  34  12/13/95 # ND; CCD; 12/13/95; 12/8/95; M. KERSNER; BY CE
  35  12/14/95 *O: TO PAY DIR EXP IN AMT OF $2,362.17/MAC (S/12/13)
  36  12/14/95 *ND; 12/13/95; CC L. SIMMONS BY SE
  C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image       _

Line    Date                        Action / Results
  37  06/05/96 # LET FR MARY BETH KERSHNER TO JUDGE MACQUEEN DTD 6/4/96
  38  06/14/96 # NOT OF STATUS CONF W/COS
  39  06/24/96 # PETITIONER'S MOT FOR PROD W/COS
  40  06/24/96 # AMD NOT OF STATUS CONF & NOT OF HRG W/COS
  41  07/23/96 *O: APPROVING PYMT OF DIRECT EXP TO LESA R. SMITH IN AMOUNT OF
  42           $1402.84/MAC
  43  09/17/96 # MEMO IN OPPOS TO PET FOR WRIT OF HABEAS CORPUS W/COS
  44  09/27/96 # SUPP ARGUMENT IN OPPOS TO PET W/COS
  45  10/02/96 # PETITIONER'S RESP TO MEMO IN OPPOS TO PET FOR WRIT OF
  46  10/02/96 # HABEAS CORPUS W/COS
  47  01/07/97 ## NOT OF STATUS CONF W/COS
  48  01/10/97 @LET FR CNSL TO JUDGE; BLACK NOTEBOOK OF EXHIBITS
  49  01/10/97 @P'S RESP TO MEMO IN OPPOSTION TO PETITION FOR WRIT OF HC
  50  02/03/97 # COPY OF PETITIONER'S SUPP BRIEF W/EXH & COS
  51  05/29/98 # PETITIONER'S MOT FOR ACCESS TO FRED ZAIN SPECIAL GRAND JURY
  52  05/29/98 # TRANS & REPORT W/COS
  53  09/10/98 *O: REQ FOR NEW TR DENIED/MAC
  54  09/10/98 >ND; 9/10/98; CC L. SIMMONS, M.KERSHNER, BY GS
  C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image     _

Case 2:09-cv-01406-ID-WC   Document 8-1   Filed 02/09/10   Page 99 of 119   PageID #: 257
         JOHN MOSS, III                    vs. GEORGE TRENT
Line    Date                    Action / Results
   55 09/21/98 # NOT OF HRG W/COS
   56 09/21/98 # PETITIONER'S MOT TO ALTER OR AMD O & TO RECONSID W/COS
   57 10/21/98 <O: PET TO BE TRANSPORTED FR MT OLIVE/STUCKY FOR MAC/STUCKY
   58 10/26/98 >ND; 10/21/98; CC CPT.LONG, L.SIMMONS, SCRJ, APA, MT.OL, BY JT
   59 11/06/98 # NOT OF CHANGE OF ADDRESS W/COS
   60 11/27/98 # PETITIONER'S SUPP TO RULE 59 MOT W/COS
   61 01/12/99 <O: PUB DEF'S OFFICE TO ISS A CK IN THE AMT OF $881.00 TO
   62          SEROLOGICAL RESEARCH/MAC
   63 02/24/99 NOT OF STAUS CONF W/COS
   64 07/15/99 # PETITIONER'S SUPP TO MOT TO ALTER OR AMD O & TO RECONSID
   65 07/15/99 # W/EXH & COS
   66 12/02/99 # COV LET; MOT FOR LEAVE TO F; PETITIONER'S ADDTL SUPP TO
   67 12/02/99 # RULE 59 MOT TO ALTER OR AMD O, TO CORRECT FACTUAL & LEGAL
   68 12/02/99 # ERRORS & TO RECONSID LEGAL CONCLUSIONS W/EXH'S & COS
   69 05/18/00 # NOT W/COS
   70 06/13/00 # NOT OF STATUS CONF W/COS
   71 10/13/00 # NOT OF HRG; PETITIONER'S MOT FOR ENTRY OF O & CONCLUSIONS OF
   72 10/13/00 # LAW W/COS
 C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image

          Case 3:09-cv-94408-DocBB6ent 8-1  Filed 02/09/10  Page 100 of 119 PageID #: 258
                JOHN MOSS, III                      vs. GEORGE TRENT

Line    Date                      Action / Results
  73  10/17/00 # NOT OF HRG W/COS;
  74  07/02/01 $CASE INFO SHEET; MOT FOR STAT CONF TRANS; MOT FOR PAUP
  75  07/06/01 # COV LET; PET FOR WRIT OF MAND W/EXH & COS
  76  07/09/01 *MOT TO PROCEED IN FORMA PAUPERIS & AFD
  77  08/02/01 # NOT OF HRG W/COS
  78  08/22/01 <O: PET TO BE TRANSPORTED TO HRG SET 8/23/01/BLOOM
  79  08/22/01 # ND; CCM; 8/22/01; 8/22/01; L. SIMMONS; BY MS
  80           # ND; FAXED; 8/22/01; 8/22/01; MT. OLIVE; BY MS
  81           # ND; CCD; 8/22/01; 8/22/01; PROS. ATTY; BY MS
  82  08/31/01 # APPELLATE TRANS REQ
  83  08/31/01 # TRANS FOR STATE CONF HELD ON 7/7/00 BEFORE JUDGE MACQUEEN
  84  08/31/01 # TRANS OF RECONSID OF LEGAL CONCLUSIONS HELD ON 12/1/00 BEFORE
  85           # JUDGE MACQUEEN
  86  10/01/01 # PETITIONER'S MOT FOR APPT OF CO-CNSL; MOT FOR STATUS CONF
  87           # HRG TRANSCRIPTS; MOT TO PROCEED IN FORMA PAUPERIS W/COS;
  88  10/01/01 # LET FR JUDGE BLOOM TO LONNIE SIMMONS DTD 10/1/01
  89  10/09/01 # PETITIONER'S 2ND MOT FOR ENTRY OF O W/ATTACH & COS
  90  10/25/01 # NOT OF HRG W/COS
 C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image      _

                  JOHN MOSS, III                    vs.  GEORGE TRENT

Line    Date                          Action / Results
  91  02/15/02 *O: AMD MEMO O DENYING HAB RELIEF/BLOOM; ND
  92  02/25/02 # PETITIONER'S MOT TO ALTER OR AMD JUDG W/COS
  93  03/21/02 # PETITIONER'S MOT TO HAVE PRESENT COUNSEL APPT FOR APPEAL
  94           # W/COS; PAUPER'S AFD
  95  03/28/02 ORDER MAILED;3/28/02 BY MAB
  96  03/28/02 *O: PET TO F BRIEF BY 4/15/02; HRG 5/24/02; PET TO APPT CNSL
  97           DENIED; MOT TO ALTER JGMT DENIED/BLOOM
  98  04/15/02 # PETITIONER'S MOT FOR RELIEF W/COS;
  99  07/01/02 *TRANS OF PROCEEDINGS HELD 6/10/02
 100  07/03/02 ORDER MAILED;7/3/02 BY MAB
 101  07/01/02 + O: APPROVING PYMT FOR CONNIE COOKE, REPORTER (7/1/02 BLOOM)
 102  08/05/02 # NOT OF CHANGE OF ADDRESS W/COS
 103  11/18/02 # NOT OF HRG W/COS
 104  11/21/02 ORDER MAILED;11/21/02 BY MAB
 105  11/21/02 *O: BRIEFING SCHEDULE/BLOOM
 106  12/02/02 # MEMO OF RESPONDENT IN OPPOS TO PETITIONER'S MOT FOR HABEAS
 107           # CORPUS RELIEF W/COS
 108  12/12/02 # PETITIONER'S REPLY BRIEF TO MEMO IN OPPOS TO MOT FOR
C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image

CASE SCREEN 4

FUNCTION                                          Action Log
    Case number : 94-MISC-663
         JOHN MOSS, III                    vs. GEORGE TRENT

Line   Date                  Action / Results
 109          # HABEAS CORPUS W/ATTACH & COS
 110  01/13/03  ORDER MAILED;1/13/03 BY MAB
 111  01/13/03  *O: TRANSPORT O/BLOOM
 112  01/30/03  ORDER MAILED;1/30/03 BY MAB
 113  01/30/03  *FO DENYING PET FOR HABEAS/BLOOM
 114  02/13/03  *P RENEWED MOT TO HAV CNSL APPT FOR AP W/COS
 115  02/19/03  # TRANS OF HRG HELD ON 1/17/03 BEFORE JUDGE BLOOM
 116  03/03/03  ORDER MAILED;3/3/03 BY MAB
 117  03/03/03  # O: APPT LONNIE SIMMONS AS CNSL FOR P/BLO
 118  05/30/03  PET FOR APP TO WVSCA W/COS; DOCKETING STMT W/COS; DESIGN OF
 119           RECORD W/COS; CT. APPT. ATTY  CLS
 120  06/23/03  CB/LTR TO RORY PERRY FR CLERK DTD 6/20/03
 121  06/23/03  CB/LTR FR STATE SUPREME CT TO CLK DTD 6/23/03; ACK RECEIPT OF
 122           FILE
 123  07/17/03  # LET FR RORY PERRY TO LONNIE SIMMONS DTD 7/16/03
 124  07/22/03  # PETITIONER'S MOT W/COS
 125  07/23/23  ORDER MAILED;7/23/03 BY MAB
 126  07/23/03  <O: SCHED HRG 8/8/03 @ 10:30AM & TRANSPORTATION O/BLOOM
C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#  PgUp PgDn P=Prt A=Add I=Image

FUNCTION Case 2:09-cv-01406   Document 8-1   Filed 02/09/10   Page 103 of 119 PageID #: 261

FUNCTION: CASE INQUIRY                                    Action Log
    Case number : 94-MISC-663
        JOHN MOSS, III                        vs. GEORGE TRENT
Line    Date                    Action / Results
 127  08/11/03  ORDER MAILED;8/11/02 BY MAB
 128  08/11/03  <O: TRANS  TO BE PART OF RECORD/BLOOM
 129  08/15/03  # RECEIPT FROM WVSCA
 130  12/11/03  <O FR WVSCA GRTING APPEAL
 131  12/11/03  # LET FR DAWN WARFIELD TO CLK DTD 12/10/03
 132  07/07/04  # OPINION FROM WVSCA
 133  09/10/04  <O FR WVSCA DENING PET FOR REHRG
 134  09/14/04  <O FR WVSCA REFUSING APPEAL
 135  10/07/04  <O FR WVSCA AFFIRMING DEC OF COURT
 136  03/02/07  # RECEIPT FROM WVSCA
 137  07/23/07  <O FR WVSCA REFUSING PET


C=Chg  D=Del  1-4=Scr  M=Menu  T=Chg Line#   PgUp PgDn P=Prt A=Add I=Image

```
FUNCTION _                                              CIVIL CASE SCREEN 2
          Plaintiff's Attorney(s)          Case Number: 91 02BC 6462


                                    Jury Trial: Y
                                    Exhibits Filed: _
           Defendant's Attorney(s)  Public Access (Y/N): _


                                         File      Who        Date
                                    Checked Out: _____  _____
                                                 _____  _____
Final Order Date: 09/15/94  Stat Close:  09/15/94  _____  _____
Judgement Order: PET GRANTED                       _____
                 9/10/98 - O: REQ FOR NEW TR DENIED/MAC
                 2/15/02 - O: AMD O DENYING HAB RELIEF/BLO
                                    Judgement
Favor: _     Costs: _____   Decision Type: S    Date: _____
Judgment Amount: _____    Dismissal Type: ____  Date: _____
                                    Post Judgment
Motion to Set Aside: _____       Date Bond Posted: _____
Status:              _              Bond Amount:   _____     Type: __
Appeal Filed:        _____       Writ Type:        ___
                                    Purge Date:      _____
  <Ent>=cont  N=Notes  M=Menu  C=Chg  P=PlaAt  D=DefAt  F9=Add Rct       _
```

# MOSS v. BALLARD
# CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 5

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III

v.

Civil Action No. 94-MISC-663
Judge Louis H. Bloom

GEORGE TRENT, Warden of the
West Virginia Penitentiary

## FINAL ORDER DENYING HABEAS RELIEF

On the 17th day of January 2003, came the petitioner, John Moss, III ("Moss") in person

and by his counsel, Lonnie Simmons, Esquire, and came also the State of West Virginia, by

counsel, Assistant Prosecuting Attorney Mary Beth Kershner, for a hearing on the outstanding

issues raised by Moss in his petition for a writ of habeas corpus *ad subjiciendum*. Specifically,

Moss argued 1) that his conviction was defective because the scientific evidence introduced by

the State was so flawed that he was deprived of his constitutional right to a fair trial, and 2) that

his confession was involuntary and should not have been admitted at trial.

Upon mature reflection, after reviewing the file, reading the legal memoranda submitted

by the parties, hearing the argument of counsel, and reviewing the pertinent law, the Court

concludes that neither of the remaining two issues provide a predicate for issuance of a petition

for a writ of habeas corpus *ad subjiciendum*. For the reasons discussed more fully below, the

writ will be denied.

### DISCUSSION

#### Scientific Evidence

This Court has previously concluded that, even if the serological evidence were excluded,

there would still be sufficient evidence in the record to support Moss's conviction and that the introduction of Zain-related evidence and testimony at Moss's trial did not prejudice the jury. The analysis that led to these conclusions was conducted in accordance with the test set forth in Syl. pt. 3, *In the Matter of an Investigation of West Virginia State Police Crime Laboratory, Serology Division*, 438 S.E.2d 501, 502 (W. Va. 1993), for determining whether the introduction of "improper evidence of a nonconstitutional nature" constitutes harmless error.

Moss now argues that the Court should utilize the test for whether an error of constitutional dimensions can be considered harmless. "Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syl. pt. 14, *State v. Salmons*, 509 S.E.2d 842, 847 (W. Va. 1998)(citing Syl. pt. 5, *State ex rel. Grob v. Blair*, 214 S.E.2d 330 (1975)). The Court need not determine whether the admission of the serological testimony and evidence was an error of constitutional magnitude because, even if it were, it would still be harmless beyond a reasonable doubt. As the Court has noted in its earlier orders, Moss's confession was well-corroborated and consistent with details of the crime scene. Therefore, even if the Court were to adopt all of Moss's arguments as to the flaws in the State's scientific evidence, Moss still would not be entitled to the requested writ.

### Confession

As both parties acknowledged, the issue of the voluntariness of Moss's confession has been thoroughly litigated. Nonetheless, Moss wanted to reserve "the right to develop new information and new arguments with regard to the alleged confessions that were previously unavailable."

Moss failed to present any new evidence on the voluntariness of his confession. Rather,

2

he seems to argue that the fact that Mr. Reggettz had, at one point, given a confession somehow invalidates Moss's own confession. The existence of the Reggettz confession does not have the devastating effect that Moss desires because the Reggettz confession does not impugn the voluntariness of Moss's confession. At most, it provided fodder for defense theories at trial.

The question before the Court is whether Moss was able to establish that his confession was constitutionally flawed. He was not. Therefore, the admission of his confession at trial does not provide a predicate for issuance of the requested writ.

RULING

Accordingly, the Court does hereby **ORDER** that the petition for a writ of habeas corpus *ad subjiciendum* is **DENIED**. This action is hereby **DISMISSED** and **STRICKEN** from the docket of this Court.

The objection of the petitioner, John Moss, III, to entry of this Order is noted and preserved.

The Clerk of this Court is hereby directed to forward an attested copy of this Order to each counsel of record.

ENTERED this 30th day of January 2003.

Judge Louis H. Bloom

3

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

       Petitioner,

vs.

                                  Civil Action No. 94–MISC-663

GEORGE TRENT, Warden, West
Virginia State Penitentiary;

       Respondent.

### MEMORANDUM ORDER

In 1993, it was discovered that Fred S. Zain, a former serologist employed at the West Virginia State Police Crime Laboratory, may have falsified test results and testimony in criminal cases and that his activities may have resulted in wrongful convictions of one or more defendants. Following the extraordinary proceeding of appointing a special judge to preside over a thorough and detailed inquiry into the conduct of Zain, the Supreme Court of Appeals found that the evidence demonstrated a long history of willful false testimony that may have tainted the convictions of numerous criminal defendants across the State. As a remedy, the Court adopted the prophylactic rule that:

> . . . [A]ny testimonial or documentary evidence offered by Zain at any time in any criminal prosecution shall be deemed invalid, unreliable and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding.

*Matter of the W. Va. State Police Crime Lab.*, 190 W. Va. 321, 326, 438 S.E.2d 501, 506 (1993). The Court further stated that a reviewing court, in deciding whether habeas corpus relief should be granted, should determine whether the evidence, independent of the forensic evidence of Zain, was sufficient to support the verdict. Id.

The petitioner, John Moss, was convicted of three counts of first degree murder on April 24, 1990, in the Circuit Court of Kanawha County.[1] He has filed this habeas corpus proceeding

---

[1] These convictions were the result of a second trial. The petitioner had been previously tried and convicted of the same offenses but that conviction had been overturned by the Supreme

1

to challenge his conviction on numerous grounds, including the fact that the conviction resulted, at least in part, from the activities and testimony of Fred S. Zain. Since it will be unnecessary to reach any of the other grounds asserted in the petition if the petitioner is correct in his assertion concerning Zain, this issue is being addressed preliminary to and independent of any other issues.

On the morning of December 13, 1979, Paul Reggettz returned from work to his home in St. Albans and found his wife, Vanessa, and their two children, Paul Eric and Bernadette, brutally slain. After lengthy interrogation in State Police custody, Reggettz confessed to the killings.[2] Based on the confession, Reggettz was charged with three counts of murder.

At the time of the investigation of the Reggettz murders, Trooper Fred Zain had been employed by the State Police Laboratory for about three years and was supervised by another serologist, Trooper Robert Murphy. On December 13, 1979, the day the bodies were discovered, Zain was dispatched to the Reggettz home where he took several samples of the many blood stains and spatters at the scene for serological testing.

Early in the investigation and before Paul Reggettz was indicted, results of blood testing revealed that blood found at the murder scene did not match Reggettz or any of the victims. This revelation, which caused some consternation within the State Police because it favored Reggettz's innocence, prompted officers to look for other suspects or an explanation for the presence of the alien blood. In this connection, blood samples were obtained from several other persons, including policemen who had been present at the Reggettz home, for comparison with the unknown blood. During this same time period, law enforcement officials apparently obtained some information that identified the petitioner as a possible suspect. Acting on this information, two state troopers traveled to Cleveland, Ohio, where Moss was being detained on unrelated

---

Court in *State v. Moss*, 180 W. Va. 363, 376 S.E.2d 569 (1988) on grounds that are unrelated to the issue presented in this opinion. The Supreme Court refused an appeal of the second conviction on March 12, 1991.

[2] Reggettz testified at a suppression hearing related to murder charges against him and during the petitioner's trial that he worked nights for United Parcel Service, that he had slept very little on December 12, and that he had been graphically threatened and beaten by his interrogators before giving a confession. He had been in the company or custody of police for more than sixteen hours when he made the incriminating statement.

2

charges of juvenile delinquency, and, in the opinion of an Ohio judge, unlawfully took a blood sample from Moss. A short time later, armed with a search warrant, the same officers returned to Cleveland and obtained a second blood sample from the petitioner and returned it to the State Police Crime Laboratory for analysis. Serological testing revealed the known specimen from Moss to be consistent with the unknown samples collected at the murder scene.

Based on the results of the analysis of the petitioner's blood, the petitioner was taken into custody in the State of Ohio and transported to West Virginia. En route, the petitioner gave officers a detailed confession which was consistent with the physical evidence in significant respects. The blood test results, together with the petitioner's incriminating statements, prompted the State to dismiss charges against Paul Reggettz and to initiate delinquency proceedings against the petitioner. Subsequently, Moss was transferred to adult status and the transfer was allowed to stand by the Supreme Court. A grand jury returned an indictment against Moss, charging him with three counts of murder. As noted above, Moss was convicted and sentenced to the penitentiary for the rest of his life without the possibility of parole.

While the record in this proceeding does not contain sufficient detail to identify exactly which of the State Police serologists preformed the testing of all of the specific blood samples,[3] it is clear that both Zain and Murphy conducted analyses of some of the blood and Zain testified concerning the results at trial. These unique circumstances complicate reaching an unequivocal conclusion about the practical implications of *Matter of W. Va. State Police Crime Lab, supra* [given the shorthand reference *Zain I* by the Supreme Court], largely because in a supplemental opinion, the Court concluded that, ". . . serology reports prepared by employees of the Serology

---

[3] The record is deficient in detail in several particulars, none of which are attributable to any lack of care or diligence on the part of counsel for the petitioner. For example, there were no clearly defined protocols in place at the State Police Crime Laboratory at the time the serological testing was performed on the evidence in the petitioner's case. Neither meticulous documentation nor graphic reproductions of the test procedures were made contemporaneously with the testing. Much of the evidence was simply discarded after the testing was completed. Fred Zain was not available to testify because of pending criminal charges related to his false testimony, and Robert Murphy's recollection was understandably incomplete after the passage of some fifteen years.

3

Division of the State Police Crime Laboratory, other than Trooper Zain, are not subject to the invalidation and other strictures contained in *Zain I*." *Matter of W. Va. State Police Crime Lab.*, 191 W. Va. 244, 445 S.E.2d 165 (1994). [*Zain II*].

Having adopted the conclusion that Trooper Zain, ". . . intentionally and systematically gave inaccurate, invalid, or false testimony or reports in criminal prosecutions," the Supreme Court implemented the extraordinary blanket rule that requires the complete exclusion of Zain testimony when reviewing the sufficiency of the evidence in any habeas corpus proceeding involving a conviction based in whole or in part on evidence presented by Fred Zain. This wholesale expedient was deemed to be necessary in light of the pervasive misconduct identified in the Court's investigation. Essentially, the Court eliminated the usual requirement that each individual habeas corpus petitioner establish a particular factual or legal basis for relief. The question presented here is whether this prophylactic rule is appropriate to the facts of this case.

In addition to the fact that Trooper Robert Murphy performed much of the laboratory testing and prepared the forensic report for the Department, other facts distinguish this case from the prototypical Zain case envisioned by the Court in *Zain I and II*. Perhaps the most striking aspect of the record is the fact that Zain and Murphy had discovered genetic markers in blood samples from the Reggettz residence that excluded Paul Reggettz and would ultimately incriminate John Moss, long before a sample of Moss's blood was obtained and analyzed. This stands in stark contrast with the image of Zain developed in other cases, as an expert witness who was willing to adjust his opinions to fit the theories developed by other investigators. In addition, Zain was not the chief serologist, but was subordinate to and supervised by Murphy. Under these particular circumstances, it is inappropriate to resolve the petitioner's claims by the application of an arbitrary rule.

The petitioner offered the expert opinion of Dr. David H. Bing, a nationally recognized authority in the fields of molecular biology, forensic DNA testing and immunology, to support his challenge to the evidentiary sufficiency of the testimony of Fred Zain. Dr. Bing was unable to conduct independent testing of the blood evidence, apparently because samples were consumed in the original testing, were discarded or were treated in a manner that prevents contemporary

4

DNA analysis.[4] In addition, Dr. Bing was unable to determine the accuracy of the specific serology performed by Murphy and Zain because neither the original electrophoretic gels nor photographs of them were available. Dr. Bing generally criticized the absence of detailed documentation of test procedures and the lack of a well defined protocol at the State Police Crime Laboratory when the tests were performed. He further stated that, where blood is deposited at a crime scene by persons in addition to the suspect, it is misleading to calculate frequencies of occurrence using all of the markers in a sample which may have been of mixed origin.

The forensic evidence presented against the petitioner at his trial consisted of two essential conclusions. First, blood stains sampled at the scene contained genetic markers that were not donated by any of the victims or by Paul Reggettz, but matched the known blood sample from John Moss. Second, the combination of markers in the samples from the scene that matched the petitioner's blood occurred in one-tenth of one percent (.1%) and three-hundredths of one percent (.03%) of the general population. Dr. Bing did not take direct issue with either of these conclusions.[5] Rather, he testified essentially that, if a given stain or sample from a crime scene may be a mixture from two or more donors with some common markers, only those markers that are unique to the suspect should be used in determining the frequency of those markers in the population. Significantly, when asked to summarize the importance of a limited factor calculation, the following exchange occurred:

---

[4] Subsequent to the submission of this issue, the parties have agreed to submit the blood evidence that remains to an independent laboratory for analysis, evidently in an attempt to ascertain if newer technology may yield some results.

[5] For example, concerning the frequency calculations, Dr. Bing stated:
"They are an accurate calculation. I don't disagree with the 0.03%. My tables are a little different than the ones they us [sic], so it's probably -- I came up with something like 0.05%. That certainly is close enough." *Bing Depo.*, p. 33.
"I would use it in saying how often I would expect to find this type in combination with all the others in the general population. That's a valid calculation." *Bing Depo.*, p. 34.
"There's nothing wrong with doing that. All that says is that I would -- when you did that calculation, that would say, 'This combination of factors would be expected to be found in a certain portion of the population,' in this particular case using the number that was calculated in this case, 0.03% of the population would have that combination of factors. There's nothing wrong with that." *Bing Depo.*, p. 40.

5

Q [Mr Simmons]: And just so I also make it clear, are you saying that the calculation method, that you have discussed here is what would have been appropriate, is it what would have been mandatory, or how would you describe the additional calculation that you've been talking to where you focused on the differences in each sample?

A [Dr. Bing]: *There isn't anything really mandatory in doing this.* It really is based on understanding how genetic systems work and coupling that with the experience of the forensic scientist who appreciates the nature of the samples that are being studied.

*     *     *

A stain collected off a disorganized scene, that are frequently what happens in a forensic situation, at that point all we can do is test what is there and say, "This is what I found. Here's a" -- If all of these were -- all of these markers would be expected to be found in a certain combination, these are the markers that distinguish this stain from -- and make this person as a possible donor of that stain.

*     *     *

. . . [O]ne might say that, for example, on the stain on the kitchen door Mr. Moss couldn't be excluded in the PGM, the Gc, and the Esterase D systems. That just says where -- what distinguishes that sample from all the others.

And then if you want to know what this combination is, then you could go and say a combination of 1+ -- PGM 1+, EsD 2-1, and Gc 1 is a certain number, and the combination of type O blood, PGM 1+, EsD, ADA 1,2 for GLO I, 2-1 for Haptoglobin, and Gc 1, *that's found in three percent -- or .03% of the population.*

And at that particular point the scientist has done their job, presented you with the best possible data that you can use, and at that point the decision is up to those people involved in the process who actually have to make the next decision in relationship to what this -- how this data is going to be used in the case being tried. (Emphasis added.)

It can hardly be said that Dr. Bing characterized Murphy and Zain's scientific conclusions and Zain's testimony as false, inaccurate or invalid. To the contrary, based on the information available to him, he confirmed the scientific validity of the conclusions. At best, it seems that Dr. Bing suggested that Zain should have explained to the jury that only a limited number of genetic

6

markers distinguished the petitioner's blood from that of the victims. From the evidence presented at trial, the jury could not have failed to appreciate this fact.

Based on the record as it has been developed, this court is of the opinion: (1) That the prophylactic rule announced in *Zain I and II* should not operate to nullify the serology evidence offered during the petitioner's trial; and (2) That in the absence of specific evidence that the blood test results were falsified or were substantially incorrect, there is no basis to set aside the verdicts against the petitioner.

It is important to note that even if the serological evidence is completely disregarded, there remains sufficient evidence to sustain the conviction. The petitioner gave statements in which he confessed to the killings and provided detail that gave particular credence to the confession. Lawyers and judges alike know that a confession is a profoundly convincing piece of evidence and that it is uncommon for any defendant who has confessed to avoid conviction.[6] However, in the trial of the present case, the confession and the evidence derived from it provided particular indices of reliability beyond the fact of a confession alone. For example, petitioner's confession was largely consistent with the physical evidence. He said that he went to the Reggettz residence to steal money and that he had taken a camera and what he recalled were dishes. He told investigators that he had taken the camera to his parents home in Cleveland, Ohio, and that he had given the dishes to a Ms. Arbutus Johnson. A camera was obtained from the petitioner's father's car and was subsequently identified by Paul Reggettz during the trial. Ms. Johnson said that Moss had given her a set of silverware as a Christmas gift sometime during December, 1979. Ms. Johnson also stated that Moss was scratched when she saw him. Significantly, before he returned to his home in Cleveland, the petitioner lived with his grandfather at his grandfather's home which

---

[6] In his Response to the State's Memorandum in Opposition to the Petition for a writ of habeas corpus, the petitioner asserts that "a conviction cannot be sustained based upon an uncorroborated confession." This assertion is not entirely correct. It is true that the corpus delicti cannot be established by a confession without independent corroboration. *State v. Mason*, 162 W. Va. 297, 249 S.E.2d 793 (1978); *State v. Blackwell*, 102 W. Va. 421, 135 S.E. 393 (1926). Of course, the corpus delicti was proved, without contradiction, by evidence entirely separate from the petitioner's incriminating statements. There is no rule of law that prevents the identity of the perpetrator to be proved by a confession exclusively.

7

was immediately behind the Reggettz residence. The State has identified other, similar portions of the petitioner's confession which reinforced its reliability.

As was noted earlier, to the extent that opening statements and closing arguments reflect the degree to which the State relied on various components of the evidence, it is plain that it considered both the confession and the serological evidence to be equally important. Nevertheless, the appropriate inquiry is whether the evidence, exclusive of the serological evidence, was sufficient to "convince impartial minds of the defendants guilt beyond a reasonable doubt." Here, the petitioner's incriminating statements, the statement's harmony with the physical evidence and related corroboration were certainly sufficiently persuasive to convince twelve reasonable persons his guilt beyond a reasonable doubt.

For the reasons articulated above, it is hereby ORDERED that the request of the petitioner for a new trial, based on the fact that Fred S. Zain conducted forensic serology and gave testimony in the trial that resulted in his conviction, is denied.

The objection and exception of the petitioner is hereby preserved.

ENTER: _____ 9/10/98 _____
                    Date

                          Circuit Judge

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA  SS
I CATHY S. GATSON CLERK OF CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT.
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS_____

DAY OF _____ 19 _____
_____, CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

8

FILE COPY

DO NOT REMOVE
FROM FILE

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

                    Petitioner,

v.                                           Civil Action No. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

                    Respondent.



FILED

JUL 16 2003

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**PETITIONER'S DESIGNATION OF THE
RECORD FOR APPEAL**

Petitioner John Moss, III, respectfully designates the following to be included in the record for appeal:

1.     All pleadings, with exhibits, affidavits, or other documents, in Civil Action No. 94-MISC-663.

2.     All orders in Civil Action No. 94-MISC-663.

3.     All hearing transcripts in Civil Action No. 94-MISC-663.

4.     All pleadings, with exhibits and affidavits, or other documents, in the case styled *State v. Paul Reggettz, III*, Criminal Action No. CR-80-F-121.

5.     All orders in the case styled *State v. Paul Reggettz, III*, Criminal Action No. CR-80-F-121.

6.     All hearing transcripts in the case styled *State v. Paul Reggettz, III*, Criminal Action No. CR-80-F-121.

7.     All pleadings, with exhibits and affidavits, or other documents, in the case styled *State v. John Moss, III*, 82-F-122.

8.     All orders in the case styled *State v. John Moss, III*, 82-F-122.

9.    All hearing and trial transcripts, including the transcripts of both trials, in the

case styled *State v. John Moss, III*, 82-F-122.

**JOHN MOSS, III**, Petitioner,

--By Counsel--

Lonnie C. Simmons (W.Va. Bar No. 3406)
**DITRAPANO, BARRETT & DIPIERO, P.L.L.C.**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **PETITIONER'S DESIGNATION OF THE RECORD FOR APPEAL** was hand-delivered to counsel of record on the 30th day of May, 2003, addressed as follows:

Michelle Drummond
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg
111 Court Street
Charleston, West Virginia 25301
(304) 357-0300

Lonnie C. Simmons (W. Va. Bar No. 3406)