# MOSS v. BALLARD
# CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 6

STATE OF WEST VIRGINIA

At a Regular Term of the Supreme Court of Appeals continued and held at Charleston, Kanawha County, on the 4th of December, 2003, the following order was made and entered:

John Moss, III, Petitioner Below,
Appellant

vs.) No. 31646

George Trent, Warden of the West
Virginia State Penitentiary, Respondent
Below, Appellee

On a former day, to-wit, July 16, 2003, came the petitioner, John Moss, III, by Lonnie C. Simmons, DiTrapano, Barrett & DiPiero, his attorney, and presented to the Court his petition praying for an appeal from a judgment of the Circuit Court of Kanawha County, rendered on the 30th day of January, 2003, with the record accompanying the petition.

Upon consideration whereof, the Court is of opinion to and doth hereby grant said petition for appeal. Justice Davis would refuse.

It is hereby ordered that the above-captioned proceeding be heard, submitted and determined upon the original record, briefs of counsel and oral argument, if requested by the parties.

It is further ordered that the appellant file an original and nine copies of a brief within thirty days of receipt of this order; the appellee to file a like number of briefs within thirty days of receipt of the appellant's brief, with any reply brief deemed necessary to be filed within fifteen days of receipt of appellee's brief.

12/8/03 - Kanira Dummond, Lonnie Simmons
Clm - Kanawha City Circuit Clerk

**Certified Article Number**

7106 4575 1294 1284 1908

**SENDERS RECORD**

A True Copy

Attest: _____

Clerk, Supreme Court of Appeals

STATE OF WEST VIRGINIA

At a Regular Term of the Supreme Court of Appeals continued and held at Charleston, Kanawha County, on the 29th of January, 2004, the following order was made and entered:

John Moss, III, Petitioner Below,
Appellant

vs.) No. 31646

George Trent, Warden of the West
Virginia State Penitntiary, Respondent
Below, Appellee

On a former day, to-wit, January 28, 2004, came the appellee, the State of West Virginia, by Dawn E. Warfield, Deputy Attorney General, and presented to the Court its motion in writing for an extension of time within which to file its brief of the appellee in the above-captioned proceeding for the reasons stated therein, which being seen and inspected by the Court is hereby granted.

It is ordered that the time within which to file an appellee's brief in the above-captioned proceeding be, and it hereby is, extended until the 30th day of March, 2004.

A True Copy

Attest: _____
Clerk, Supreme Court of Appeals

2/2/04 - Ronnie Simmons, Dawn Wayfield

STATE OF WEST VIRGINIA

At a Regular Term of the Supreme Court of Appeals continued and held at Charleston, Kanawha County, on the 2nd day of September 2004, the following order was made and entered:

John Moss, III, Petitioner Below, Appellant

vs.)  No. 31646

George Trent, Warden of the West Virginia
State Penitentiary, Respondent Below, Appellee

The Court, having maturely considered the petition for rehearing filed by the petitioner, John Moss, III, by DiTrapano, Barrett & DiPiero, P.L.L.C., and Lonnie C. Simmons, his attorney, is of the opinion to and doth hereby refuse said petition for rehearing.

A True Copy

Attest: _____
              Clerk, Supreme Court of Appeals

STATE OF WEST VIRGINIA

At a Regular Term of the Supreme Court of Appeals continued and held at Charleston, Kanawha County, on the 9th day of September 2004, the following order was made and entered:

John Moss, III, Petitioner Below, Appellant

vs.) No. 31646

George Trent, Warden of the West Virginia
State Penitentiary, Respondent Below, Appellee

The Court, having maturely considered the record and the oral argument and the briefs of counsel thereon, is of the opinion for reasons stated in writing and filed with the record that there is no error in the ruling of the Circuit Court of Kanawha County, rendered on the 30th day of January, 2003. It is therefore considered and ordered by the Court that said ruling be, and it hereby is, affirmed; all of which is ordered to be certified to the Circuit Court of Kanawha County.

The syllabus of points adjudicated, prefixed to the written opinion aforesaid prepared Per Curiam, was concurred in by Chief Justice Maynard and Justices Davis, Starcher, McGraw and Albright.

A True Copy

Attest: _____
Clerk, Supreme Court of Appeals

94-msc-663

# WEST VIRGINIA SUPREME COURT OF APPEALS

To:     Kanawha County Circuit Clerk

Date:   September 14, 2004

Re:     Moss v. Trent
        No. 31646

Received of Rory L. Perry II, Clerk, Supreme Court of Appeals of West Virginia,

a copy of the **mandate and record** in the above-styled action.

Dated at _Charleston_____, West Virginia, this _7th____ day

of _October_____, 2004.

_Cathy S. Daton /mB_
Circuit Clerk

RETURN TO:

SUPREME COURT OF APPEALS OF WV
STATE CAPITOL COMPLEX
BLDG. 1, ROOM E-317
CHARLESTON, WV 25305
ATTENTION: MEGAN BERRY

# WEST VIRGINIA SUPREME COURT OF APPEALS

To:              Dawn Warfield

Date:            December 9, 2003

Style:           **John Moss, III**

                 vs.) No. 31646

                 **George Trent, Warden**

        Received of Rory L. Perry, II, Clerk of the Supreme Court of

Appeals of West Virginia, a copy of the Court's Order and Petition in the

above-styled case. Dated at *Charleston* , West

Virginia, this *9th* day of *December* , 2003.

                                *Dawn E Warfield*
                                Dawn Warfield

> RETURN TO WV SUPREME COURT OF APPEALS, STATE CAPITOL COMPLEX,
> BLDG. 1, RM. E-317, CHARLESTON, WV 25305
> ATTN: ANGIE WILKINSON

031408
31646

BEFORE THE SUPREME COURT OF APPEALS

**FILE COPY**

OF WEST VIRGINIA

No._____

**DO NOT REMOVE**
**FROM FILE**

**JOHN MOSS, III,**

Petitioner,

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

Respondent.

*FROM THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA*

**PETITION FOR APPEAL**



FILED

JUL 1 6 2003

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Lonnie C. Simmons (W.Va. I.D. No. 3406)
**DITRAPANO, BARRETT & DIPIERO, P.L.L.C.**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

*Counsel for Petitioner John Moss, III*

## TABLE OF CONTENTS

I.    Kind of proceeding and nature of ruling below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.    Since two different people–Paul Reggettz, III, and Petitioner–
            allegedly confessed to committing the same three murders,
            one or both confessions must be false . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II    Statement of facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    Chronology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    Trooper Zain's extensive involvement in this case . . . . . . . . . . . . . . . . . . . . . . . 10

III.  Issues presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      A.    Whether the trial court erred in ruling that *Zain I* not only was
            inapplicable to Petitioner's case, but would not have provided the
            basis for habeas corpus relief even if it did apply, where Trooper
            Zain: (1). personally went to the scene of the crime; (2). personally
            looked for and gathered physical evidence at the crime scene;
            (3).personally performed the critical testing of the evidentiary items
            that he had observed and gathered; (4) is the only serologist to testify
            in both of Petitioner's trials; (5) presented the key evidence allowing
            the jury to decide which of the two confessions to believe; and (6).
            had more personal involvement in this case than any other habeas
            corpus action filed pursuant to *Zain I?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      B.    Whether the trial court erred in holding that any scientific problems
            with Trooper Zain's testimony constituted harmless error beyond a
            reasonable doubt, where both experts agreed that no one could vouch
            for the accuracy of the work performed by Trooper Zain in this case,
            Petitioner's expert specifically identified numerous errors by Trooper
            Zain and concluded that Trooper Zain's results in this case were
            "meaningless," and many of the errors identified were consistent with
            the errors found by the ASCLD experts in *Zain I?* . . . . . . . . . . . . . . . . . . . . . 15

      C.    Whether the trial court erred, in light of the totality of the
            circumstances, which now includes the fact that Trooper Zain had a
            history of faking data and in light of the conflicting confession
            initially given by Mr. Reggettz, in concluding that Petitioner's alleged
            confessions were voluntary and admissible? . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

IV    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     A.    The trial court erred in ruling that *Zain I* not only was inapplicable to Petitioner's case, but would not have provided the basis for habeas corpus relief even if it did apply, because Trooper Zain: (1). personally went to the scene of the crime; (2). personally looked for and gathered physical evidence at the crime scene; (3) personally performed the critical testing of the evidentiary items that he had observed and gathered; (4) is the only serologist to testify in both of Petitioner's trials; (5) presented the key evidence allowing the jury to decide which of the two confessions to believe; and (6). had more personal involvement in this case than any other habeas corpus action filed pursuant to *Zain I* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     B.    The trial court erred in holding that any scientific problems with Trooper Zain's testimony constituted harmless error beyond a reasonable doubt, because both experts agreed that no one could vouch for the accuracy of the work performed by Trooper Zain in this case, Petitioner's expert specifically identified numerous errors by Trooper Zain and concluded that Trooper Zain's results in this case were "meaningless," and many of the errors identified were consistent with the errors found by the ASCLD experts in *Zain I* . . . . . . . . . . . . . . . . . . . . . 27

     C.    The trial court erred, in light of the totality of the circumstances, which now includes the fact that Trooper Zain had a history of faking data and in light of the conflicting confession initially given by Mr. Reggettz, in concluding that Petitioner's alleged confessions were voluntary and admissible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

V.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## TABLE OF AUTHORITIES

*West Virginia*

*In the Interest of John Moss, Jr.,*
  170 W.Va. 543, 295 S.E.2d 33 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9

*Matter of Investigation of the West Virginia*
*State Police Crime Laboratory, Serology Division,*
  190 W.Va. 321, 438 S.E.2d 501 (1993) . . . . . . . . . . 1, 2, 3-5, 16-17, 19, 21-22, 24-25, 27

*Matter of West Virginia State*
*Police Crime Laboratory,*
  191 W.Va. 244, 445 S.E.2d 165 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 21, 22

*Maxey v. Bordenkircher,*
  175 W.Va. 49, 330 S.E.2d 859 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State ex rel. Grob v. Blair,*
  158 W.Va. 647, 214 S.E.2d 330 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State v. Atkins,*
  163 W.Va. 502, 261 S.E.2d 55 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Barrow,*
  178 W.Va. 406, 359 S.E.2d 844 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State v. Goff,*
  169 W.Va. 778, 289 S.E.2d 473 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*State v. Moss,*
  180 W.Va. 363, 376 S.E.2d 569 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 9, 36

*State v. Thomas,*
  187 W.Va. 686, 421 S.E.2d 227 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Other jurisdictions*

*Chapman v. California,*
  386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Giglio v. United States*,
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) .............................. 18

*Miller v. Pate*,
 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) ................................ 18

*Napue v. Illinois*,
 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ........................... 18

*People v. Cornille*,
 95 Ill.2d 497, 69 Ill.Dec. 945, 448 N.E.2d 857 (1983) ......................... 26

*United States v. Hasting*,
 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) ........................... 17

### Miscellaneous

Richard A. Leo & Richard J. Ofshe, *Criminal Law: The Consequences
of False Confessions: Deprivations of Liberty and
Miscarriages of Justice in the Age of Psychological Interrogation*,
 88 J.Crim.L.&Criminology 429 (1998) ...................................... 36

Richard J. Ofshe & Richard A. Leo, *The Decision to Confess
Falsely: Rational Choice and Irrational Action*,
 74 Denv.U.L.Rev. 979 (1997) .............................................. 36

BEFORE THE SUPREME COURT OF APPEALS

OF WEST VIRGINIA

No._____

**JOHN MOSS, III,**

        Petitioner,

v.

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

        Respondent.

---

*FROM THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA*

---

### PETITION FOR APPEAL

> *"It is believed that, as a matter of law, any testimonial or documentary evidence offered by [Fred Salem ]Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding."*
>
> \*        \*        \*
>
> *The matters brought before this Court by Judge Holliday are shocking and represent egregious violations of the right of a defendant to a fair trial. They stain our judicial system and mock the ideal of justice under law.[1]*

### I.

### Kind of proceeding and nature of ruling below

#### A.

#### Introduction

---

[1] *Matter of Investigation of the West Virginia State Police Crime Laboratory, Serology Division,* 190 W.Va. 321, 326, 328, 438 S.E.2d 501, 506, 508 (1993). This initial decision involving the West Virginia State Police Crime Laboratory will be referred to as *Zain I.* The next laboratory decision, *Matter of West Virginia State Police Crime Laboratory*, 191 W.Va. 244, 445 S.E.2d 165 (1994), will be referred to as *Zain II.*

The devastating impact Trooper Fred Zain has had on the criminal justice system in West Virginia continues to be felt by those who were the victims of his deceit. This appeal represents what may be the only remaining Zain habeas corpus proceeding still being litigated. Petitioner respectfully submits that as a result of the "stain" left by Trooper Zain in the present case and his repeated mockery of the criminal justice system, justice requires that this case be heard.

B.

<em>Since two different people–Paul Reggettz, III, and Petitioner–<br>allegedly confessed to committing the same three murders,<br>one or both confessions must be false</em>

On **December 13, 1979,** Paul Reggettz, III, confessed that he murdered his twenty-six year old wife, Vanessa Reggettz, his seven year old son, Paul Eric Reggettz, and his four year old daughter, Bernadette Lynn Reggettz. (SECOND TRIAL, Tr. 599-611, 619, 684-90, 699-712).[2] On **December 14, 1979,** Mr. Reggettz returned to his house, accompanied by law enforcement officers, and, through words and actions, demonstrated how he killed his wife, his son, and his daughter.

On **October 28, 1980,** the same day the Honorable Judge John Hey found Mr. Reggettz's confessions to have been given voluntarily and in accordance with his constitutional rights, Petitioner John Moss, III, who was then only seventeen years old, also allegedly confessed to killing three members of the Reggettz family. (SECOND TRIAL, Tr. 505-78).

Who provided the critical "scientific" analysis of the physical evidence to assist the jury in deciding which of these two separate and conflicting confessions to believe? **TROOPER FRED SALEM ZAIN.** Once again, this Court is faced with the daunting task of deciding whether

---

[2]The record in this appeal includes transcripts from the first and second trials involving Petitioner John Moss, III, and transcripts from hearings involving Paul Reggettz, III, who originally confessed to the crimes and was charged with these murders. In referring to these transcripts, Petitioner will use either FIRST TRIAL or SECOND TRIAL or REGGETTZ.

2

a convicted criminal should be condemned to spend the rest of his life in prison, based upon evidence presented by Trooper Zain, whose testing and testimony was found by this Court consistently to be false, misleading, and scientifically invalid. Since the investigation conducted by Special Judge James O. Holliday revealed that in **every case examined, where there was sufficient evidence to review, the ASCLD experts found that Trooper Zain had committed one or more identified acts of misconduct,**[3] no court, no lawyer, and no jury should ever give any weight whatsoever to anything Trooper Zain said or did .[4]

On **April 30, 1984,** Petitioner was convicted of these three murders and sentenced to life without mercy. In *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988), this Court reversed Petitioner's convictions and remanded for a new trial.

---

[3]In *Zain I*, 190 W.Va. at 323, 438 S.E.2d at 503, this Court quoted the following summary of Trooper Zain's repeated acts of misconduct:

> "The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results."

[4]For some unknown reason, Petitioner's case was not included in this special investigation. Petitioner respectfully submits that had his case been included, many of the criticisms made by the ASCLD experts in reviewing the other cases similarly applied to the work Trooper Zain did in Petitioner's case. In this habeas corpus proceeding, Petitioner developed a record, based upon the review and testimony of nationally renowned forensic scientist Dr. David Bing, on the numerous problems with Trooper Zain's analysis in this case. *See* Part IV(B) of this **PETITION.**

On **April 24, 1990**, after hearing the confessions allegedly given by Mr. Reggettz and

Petitioner, and after hearing the testimony of Trooper Zain, a jury in the Circuit Court of Kanawha

County convicted Petitioner of three counts of first degree murder, without a recommendation of

mercy. Petitioner appealed this second conviction to this Court, which refused to grant the petition

on a 3 to 2 vote on **March 12, 1991**.

On **November 10, 1993**, in an unprecedented decision that serves as a model for how

the criminal justice system should address fraudulent expert testimony, this Court issued *Zain I*.

*Zain I* acknowledged the repeated fraud committed by Trooper Zain and provided habeas corpus

relief for those inmates who were victimized by his false testimony.[5]

On **August 18, 1994**, Petitioner filed his petition for a writ of habeas corpus, alleging

that his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United

States Constitution and Article III, Sections 1, 5, 10, and 14 of the West Virginia Constitution, were

violated, based upon the following grounds:

> 1.   The admission of testimony and test results performed by
> Trooper Fred Salem Zain, whose credentials, credibility, and test
> results have all been found by this Court to be inherently unreliable
> and a violation of a criminal defendant's constitutional rights.
>
> 2.   The presentation by the State of incorrect, false, misleading,
> overstated, and unscientific evidence.

---

[5]*Zain II* essentially cleared the other laboratory workers of any wrongdoing and held that
there should be no presumption of fraudulent testimony with respect to testing by persons in the State
Laboratory other then Trooper Zain. However, *Zain II* was reopened by this Court in an
administrative order issued **June 10, 1999**. Based upon some findings made in a federal habeas
corpus action involving Wilbert Thomas, this Court concluded that some of the findings in that case
"have cast a renewed shadow of doubt on the State Police Laboratory Serology Division. Whether
there was a practice of reporting a result for a test that was not performed and whether the newly-
raised questions represent another systematic procedural deficiency at the Serology Division is
unknown." This second investigation, headed once again by Special Judge Holliday, is still ongoing.

3. The admission of the alleged confessions given by Petitioner, which resulted from a violation of his constitutional rights.

In the present case, Trooper Zain personally went to the scene of the crime (an extremely unusual thing for a serologist to do), Trooper Zain personally looked for physical evidence at the crime scene, Trooper Zain personally gathered physical evidence at the crime scene, Trooper Zain personally performed the critical testing of these evidentiary items that he had observed and gathered, Trooper Zain is **the only serologist** to testify in both of Petitioner's trials, and Trooper Zain's testing and testimony was the key evidence allowing the jury to decide which of the two confessions to believe. In fact, Trooper Zain's involvement in this case **is more extensive than his involvement in any other habeas corpus action filed pursuant to *Zain I*.** However, despite these indisputable facts, on **September 10, 1998,** the Honorable Judge A. Andrew MacQueen issued a surprising and unpersuasive order stating that the holding in *Zain I* somehow did not apply to Petitioner, and, even if it did apply, relief would not be appropriate.[6]

On **September 21, 1998,** as a result of several factual and legal errors included in the order, Petitioner filed **PETITIONER'S MOTION TO ALTER OR AMEND ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS.**[7] At the **October 27, 1998** hearing on this motion, Judge MacQueen agreed that

---

[6]In Respondent's **MEMORANDUM IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS,** at page 7, even Respondent conceded the applicability of *Zain I* by noting, "The West Virginia Supreme Court of Appeals has required the habeas corpus review in all cases in which Fred Zain, formerly of the West Virginia Police Serology Laboratory, testified and/or performed serological testing....There is no argument here that Petitioner is not entitled to such review."

[7]In the **September 10, 1998** order, the trial court noted, "Since it will be unnecessary to reach any of the other grounds asserted in the petition if the petitioner is correct in his assertion concerning Zain, this issue is being addressed preliminary to and independent of any other issues." Thus, this ruling was interlocutory because the other two grounds raised had not been briefed or ruled upon by the trial court.

he had not addressed both parts of the analysis required under *Zain I*. However, Judge MacQueen never ruled on this motion prior to leaving office.

Upon his election to the Circuit Court of Kanawha County, Judge Louis H. Bloom was assigned the present case. On **February 15, 2002**, Judge Bloom issued an order denying Petitioner's pending motion. After requiring Petitioner to develop a record on the remaining two issues and permitting Respondent to add an expert witness about four years after the factual record had been closed, on **January 30, 2003**, Judge Bloom issued a final order, rejecting the remaining two issues raised in Petitioner's habeas corpus action.

## II.

### Statement of facts

#### A.

#### Chronology

The extensive chronology in Petitioner's case, as well as the proceedings involving Mr. Reggettz, are set out in great detail in Petitioner's initial **PETITION FOR WRIT OF HABEAS CORPUS**. Furthermore, in *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988), and *In the Interest of John Moss, Jr.*, 170 W.Va. 543, 295 S.E.2d 33 (1982), this Court previously has summarized the facts relevant to the horrible crimes that resulted in the senseless and tragic deaths of three members of the Reggettz family.

The essential chronology of events is as follows:

1.  **December 13, 1979**--Paul Reggettz, III, returned home and found his family, Vanessa Reggettz (26 years old), his wife, Paul Eric Reggettz (7 years old). his son, and Bernadette Lynn Reggettz (4 years old), his daughter, dead. (SECOND TRIAL, Tr. 397). After several hours of questioning, Mr. Reggettz confessed, in detail, that he had murdered his family. (SECOND TRIAL, Tr. 599-611, 619, 684-90, 699-712). At Petitioner's second trial, Mr. Reggettz admitted that he had said that he wished his wife were dead and further admitted saying that he "wished he (Paul Eric Reggettz) had never

6

been born." (SECOND TRIAL, Tr. 742). Mr. Reggettz also acknowledged that he belonged to a motorcycle gang called The Sons of Satan and that on one occasion, he and his fellow gang member unsuccessfully tried to "conjure up Satan." (SECOND TRIAL, Tr. 728, 740). Finally, Mr. Reggettz testified that after seeing his wife dead, he stated, "I felt free." (SECOND TRIAL, Tr. 744, 764-65).

2. **December 13, 1979**--As found by the trial court, on this date, "Zain was dispatched to the Reggettz home where he took several samples of the many blood stains and spatters at the scene for serological testing." (September 10, 1998 order, at 2). By that time, Trooper Zain had been employed at the State Police Laboratory "for about three years and was supervised by another serologist, Trooper Robert Murphy." (September 10, 1998 order, at 2).

3. **December 14, 1979**--Mr. Reggettz returned to the scene of the crime, with law enforcement officers, and demonstrated how he had plunged the scissors in his wife's chest. Mr. Reggettz went over to where she had been tied up to the door and said he got the scissors and kind of bent down and pushed them in her chest. Mr. Reggettz testified that in his confession, he told the police that he drowned his son, because he liked swimming, and he hanged his daughter with the electrical cord draped over a door, because she liked swinging. (SECOND TRIAL, Tr. 611, 758).

4. **January 30, 1980**--Trooper Michael Don Smith went to the Juvenile Detention Center in Cleveland, Ohio, to meet with Petitioner and to obtain a blood sample. Trooper Smith asked Petitioner to prick his finger and bleed on to a cloth, which Trooper Smith kept. (SECOND TRIAL, Tr. 912; SECOND JUVENILE TRANSFER HEARING, Tr. 195-96).[8]

5. **April 22, 1980**--Trooper Williams went to Cleveland, Ohio, pursuant to a search warrant, to obtain a legal blood sample from Petitioner. (SECOND TRIAL, Tr. 505). Later that same day, Trooper Zain received Petitioner's blood sample from Trooper Williams. (SECOND TRIAL, Tr. 1110).

---

[8]It is not clear in any of the records or transcripts what happened to this blood sample that was obtained illegally. As this Court noted in *In Interest of Moss*, 170 W.Va. at 545, 295 S.E.2d at 36, "When the appellant's counsel learned of the blood sample taken by the West Virginia authorities, he objected, and an Ohio court ordered that the cloth on which the blood sample was deposited be returned to the appellant. **This apparently was done.**" (Emphasis added).

Petitioner denies that this illegally obtained blood sample was ever returned to him or his counsel. Furthermore, although he has been unable to develop concrete evidence to support this allegation, Petitioner suspects that this blood sample was used to identify Petitioner's blood types. In light of this Court's finding that Trooper Zain had an extensive history of fraud, this suspicion is well founded.

6.  **April 24, 1980**--Mr. Reggettz, who was jailed soon after he confessed to the murders, was indicted by a grand jury in Kanawha County for these murders. (SUPPRESSION HEARING PRIOR TO FIRST TRIAL, Tr. 168). Petitioner's name is also included in this indictment, but the grand jury did not indict him on any charges.

7.  **June 10, 1980**--Date of report containing results of blood types obtained from the three victims, Mr. Reggettz, Petitioner, and various blood stains found at the crime scene.[9] According to Trooper Robert Murphy, who then was the head of the West Virginia State Police laboratory, he only conducted the testing of nine potential suspects, including control samples from the victims, and four other items, including clothing from Bernadette Reggettz.[10] **ALL** of the remaining items, including all other items from the crime scene, were tested by Trooper Zain.

8.  **October 24, 1980**--State files **Memorandum Of Law On Behalf Of The State Of West Virginia In Opposition To Defendant's Motion To Suppress** in Mr. Reggettz's case. In the Motion, the State asserts, "In the early morning hours of December 14, 1979, Paul Reggettz contradicted his earlier denials and confessed, <u>in detail,</u> Trooper Woodyard that he had, in fact, committed the murders. This was done in the presence of Trooper Woodyard alone. It should be noted that before such confession Reggettz had executed two (2) Waiver of Rights forms, which had been admitted into evidence, and which Trooper Woodyard testified were apparently understood by, and read to, Reggettz. Subsequently Reggettz returned to his home and again explained <u>in detail</u> that he had committed the murders and the manner and sequence of his actions. This confession was given in the presence of Troopers Woodyard, McGowan and Williams, and James E. Roark, Prosecuting Attorney for Kanawha County." (State's Brief, p. 2). "Defendant's contention that his confession was involuntarily and unintelligently given flies in the face of reason, considering the detailed nature of the confession and in considering that the crime itself was re-enacted by the accused." (State's Brief, p. 9).

---

[9]Attached to this **PETITION** are three tables summarizing the blood typings conducted in this case.

[10]In his deposition, Trooper Murphy was able to identify which laboratory notes were in his writing, meaning that he had performed the testing, and which notes were in the handwriting of someone else. (Murphy Dep., at 34). The critical laboratory note, containing the results of testing performed on evidentiary samples obtained from the crime scene, were acknowledged by Trooper Murphy as not being in his writing and at the top of the sheet are the initials "FSZ." (Murphy Dep., at 35-36). Attached to Trooper Murphy's deposition are the only notes or reports relating to the testing conducted in this investigation by the State Laboratory that could be located. These documents have a Bates stamp number at the bottom of each page.

9. **October 28, 1980**--After considering the briefs, testimony, and arguments, Judge John Hey found that Mr. Reggettz's confessions were admissible and concluded, "Given a totality of the circumstances of this case, which involved three counts of murder in the first degree, the Court finds that the confession was made knowingly, intelligently, voluntarily, and that the State, by a preponderance of the evidence, has sustained its burden of proof."[11] (REGGETTZ OCTOBER 28, 1980, Tr. 35-36).

10. **October 28, 1980**--Troopers Williams and Smith went to Mansfield, Ohio to bring Petitioner back to Charleston. (SECOND TRIAL, Tr. 506). As noted by this Court in *In the Interest of Moss*, 170 W.Va. at 546, 295 S.E.2d at 36-37, the purpose of this trip was to return Petitioner to West Virginia to answer an unrelated malicious wounding charge. During this trip, Petitioner allegedly confessed to these murders. (SECOND TRIAL, Tr. 505-78). In the suppression hearing held before the first trial, Petitioner testified that he confessed to these crimes only after being subjected to repeated physical abuse by Trooper Smith, who crawled into the back seat beside Petitioner while both of Petitioner's hands were handcuffed to the headrest. (FIRST TRIAL PRETRIAL SUPPRESSION HEARING, Tr. 303-05). Trooper Williams and Trooper Smith confirmed the fact that Petitioner was handcuffed to the front seat head rest and that Trooper Smith did crawl into the back seat with Petitioner to begin the questioning. (SECOND TRIAL, Tr. 509, 937). Even though Trooper Williams and Trooper Smith denied the beating allegations, both admitted that Petitioner's "willingness" to discuss the Reggettz murders was triggered when Trooper Smith said to Petitioner, "'Why do you think we got your blood?'"[12] (SECOND TRIAL, Tr. 511-14, 944-45). It is not clear, from this statement, if Trooper Smith was referring to the illegally obtained blood sample or the subsequent legally obtained sample. However, since Trooper Smith is the officer who obtained the illegal sample, while Trooper Williams obtained the subsequent legal sample, Petitioner had a legitimate basis for believing that Trooper Smith was referring to the illegal sample. Based upon this alleged confession, Petitioner was arrested and jailed.

11. **November 12, 1980**--Judge John Hey entered an order reducing bail for Mr. Reggettz to a $75,000 personal recognizance bond.

12. **February 27, 1981**--Judge John Hey entered an order granting the State's motion to *nolle prosequi* the charges against Mr. Reggettz.

---

[11]In *In Interest of Moss*, 170 W.Va. at 545, 295 S.E.2d at 36, this Court noted that Mr. Reggettz "was held in custody for approximately eleven months awaiting trial, during which time his alleged confession was ruled admissible into evidence as voluntarily given."

[12]These essential facts were noted by this Court in *State v. Moss*, 180 W.Va. at 372-73, 376 S.E.2d at 578-79.

9

13.   **April 30, 1984**--Petitioner was convicted by a jury in the Circuit Court of
      Kanawha County of three counts of first degree murder, without a
      recommendation of mercy.

14.   **December 19, 1988**--In *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569
      (1988), this Court reversed Petitioner's convictions and remanded for a new
      trial.

15.   **April 24, 1990**--A jury in the Circuit Court of Kanawha County convicted
      Petitioner of three counts of first degree murder, without a recommendation
      of mercy.

*B.*

*Trooper Zain's extensive involvement in this case*

For purposes of this appeal, it is important for the Court to understand the significant

role Trooper Zain played in this case. Although the State presented some additional circumstantial

evidence in an effort to bolster or corroborate the alleged confessions given by Petitioner, it cannot

be disputed that the most significant evidence presented at both trials was the testimony of Trooper

Zain. His testimony with respect to the testing of any physical evidence found was of particular

importance in this case, where the jury had to decide whether to believe the confessions given by Mr.

Reggettz or by Petitioner. Since at least one of these two conflicting confessions necessarily had to

be false, the State needed other evidence to prove guilt beyond a reasonable doubt.

The importance of Trooper Zain's testimony and the blood typing results to the State's

case was emphasized numerous times throughout both trials.[13] In the second trial, the State's reliance

on the blood testing conducted by Trooper Zain was even greater than in the first trial. In the State's

---

[13]Extensive citations to the first trial transcript, where the State emphasized its reliance on
Trooper Zain's testing and testimony, are noted in Petitioners **PETITION FOR WRIT OF
HABEAS CORPUS.**

10

opening statement in the second trial, the jury was told at length about the testimony anticipated from

Trooper Zain:

> Now, we all know about some bloodwork. Everyone has an
> ABO type; either O, A, or AB, or B. **Trooper Zain -- or Lieutenant
> Zain** will tell you that the bloodwork at the time, was broken down
> scientifically and forensically, and can be broken down to a number
> of samples, to nine genetic markers or enzymes, all independent of
> each other, which is important. Some of the blood samples that were
> taken from the house were taken from the curtains on the back door,
> from Bernadette's pajama top, from Christmas wrapping paper, I
> believe the Christmas package. **And those blood samples were able
> to be broken down by Fred Zain into those nine genetic markers.**
> And one at a time -- that blood exactly matched John Moss's -- the
> genetic markers, those nine genetic markers, in the sample of blood.
>
> **And Fred Zain will further tell you that the combination
> of those nine genetic markers found in the defendant's known
> blood and on those exhibits, the exhibits that I just listed, occur
> in three of every ten thousand people, point zero three percent of
> the population in this State. Three in every ten thousand. Fred
> Zain will further tell you that some of the other samples, the
> other ones I listed, for lack of sufficient sample or whatever
> reason, he was able to break it down into seven of the nine genetic
> markers. And again, he'll tell you that those seven genetic
> markers found on those exhibits matched right down the line to
> the defendant's known blood.**
>
> **Fred Zain will tell you that combination of those seven
> genetic markers occurs in one of every thousand, twenty-one
> percent.** (Emphasis added)(SECOND TRIAL, Tr. 407-09).

In an *in camera* hearing held prior to Trooper Zain's testimony, the State raised a

question about who was responsible for doing the testing in this case, to which the following was

stated:

> Q    I see a Sergeant Murphy's signature on this report,
> dated June 10th of 1980. Is it your testimony that you performed
> these analyses, too?

A      Yes, sir. Sergeant Murphy, at the time, was in charge of a section, and we both countersigned reports. And I processed all of the evidence that was submitted to me at the serology section at the time.

The reports were either issued by himself or myself after conferring as to what should be issued in a report.

**Q      But it is your testimony that you performed the analysis?**

**A      Yes, that's correct.** (Emphasis added). (SECOND TRIAL, Tr. 1049-50).

During this same hearing, Trooper Zain reiterated the fact that he had performed the

testing in this case:

**Q      Mr. Zain, you testified that you actually did the analysis that was presented here in this particular case; is that correct?**

**A      Yes, sir, that is correct.**

Q      So, how long after these scrapings were obtained was the analysis performed?

A      Within the next day or so.

Q      So, the fact that the report is dated in June, that doesn't indicate that's how long it was before the actual analyses were done; is that correct?

A      That's correct.      (Emphasis added).      (SECOND TRIAL, Tr. 1053).[14]

_____

[14]In the deposition conducted by former Kanawha County Prosecuting Attorney William Forbes of Trooper Zain in Texas on May 24, 1993, Trooper Zain reconfirmed the fact that he was the person who did the testing in this case and, in fact, stated that during the testing process, he had excluded at least 27 other suspects:

[W]hen you talk about blood cases, I will tell you one that would mean more to you-all than anything else and that's in Paul Reggetz'. There we went through 27 suspects, I believe it was, to try to match

One of the unique features about this case is that not only did Trooper Zain perform the testing, but he also obtained the unknown blood samples from the scene of the crime himself. (SECOND TRIAL, Tr. 1074). Trooper Murphy acknowledged that it was not common for a serologist to go to the scene of the crime and that in his experience, he had been ordered to inspect a crime scene only on one occasion. (Murphy Dep., at 11).

In the closing argument of the second trial, the State emphasized the significance of the testing performed by Trooper Zain:

> "We know that Paul Reggettz's confession is not true. How do we know that? We know that from the evidence. **The blood found on the Christmas presents and wrapping paper is not Paul Reggettz's blood. Remember what Trooper Zain said yesterday? He said one inconsistent marker excludes people one hundred percent. The blood found at the scene wasn't Vanessa's. It was consistent with the defendant's.** It can't be Paul's. A hundred percent." (Emphasis added)(SECOND TRIAL, Tr. 1326).

During his employment in the serology laboratory for the West Virginia Department of Public Safety, Trooper Zain routinely lied under oath about his credentials. For example, in an *in camera* hearing held in the second trial, Trooper Zain testified as follows:

---------------

up not only by A.B.O. typing but enzyme typing and we went through 27 exonerations, for example.

Q. Were you the analyst that identified the blood in the Reggetz investigation that did not fit the theory of the case that the investigating officers were working on at the time?

A. I did the protein enzyme work as well as Sergeant Murphy who also ran samples in the case, which is a matter of documentation.

Q. And that ultimately led to the conviction of Mr. Moss (spelled phonetically) on that case?

A. That's correct. (May 24, 1993 Deposition, Tr. 47).

13

"Q    And what training had you received at that time in performing
-- to perform such analysis?

"A    My formal education was a degree in biology, with a minor in
chemistry.

"I also received an Associate Degree in Police Sciences, and
specialized training at the FBI academy at Quantico, Virginia, relating
to the specific field of forensic science, and more particularly,
serology, or tests and methods utilized in the identification of blood
and body fluids.

"Both basic and advanced courses were obtained by me from the
FBI Academy and other specialized training sessions that I had
attended, as well as scientific organizations which I belong to, such
as the Southern Association of Forensic Scientists, and other peer
groups." (SECOND TRIAL, Tr. 1050).

Virtually the same testimony about his credentials was presented to the jury shortly thereafter.
(SECOND TRIAL, Tr. 1066-67).

Trooper Zain was indicted for perjury on July 22, 1994, for giving approximately the
same answer in the case styled *State v. Paul Walker*, Felony No. 91-F-62.[15]  As was discovered
during the investigation headed by Special Judge Holliday, Trooper Zain never obtained a minor in
chemistry, which was not even offered at that time by the college he attended.  Furthermore, as for
Trooper Zain's FBI training, he either flunked or failed to complete at least two FBI training sessions
he attended.  Moreover, if Trooper Zain's history of fabricating evidence, as discovered during the
special investigation, had been known at the time of Petitioner's first trial, his testimony and test
results would have been given little or no weight by the jury and may have been found too unreliable
to be admitted into evidence.

_____

[15]Ultimately, despite at least two separate attempts, Trooper Zain was never convicted of any
crimes.

14

In this habeas corpus proceeding, new facts were developed through the depositions of Trooper Robert Murphy and Dr. David H. Bing, Scientific Director of the Center for Blood Research laboratories in Boston, Massachusetts. Once the trial court permitted Respondent to reopen the record, the deposition of Captain Ted Smith, presently the laboratory director of the West Virginia State Police Crime Laboratory, was taken. In addition to these depositions, previously untranscribed hearings in the case against Mr. Reggettz have been added to the record of this case. Additional facts developed during this habeas corpus action will be discussed in connection with some of the arguments.

## III.

### Issues presented

#### A.

*Whether the trial court erred in ruling that <u>Zain I</u> not only was inapplicable to Petitioner's case, but would not have provided the basis for habeas corpus relief even if it did apply, where Trooper Zain: (1) personally went to the scene of the crime; (2) personally looked for and gathered physical evidence at the crime scene; (3) personally performed the critical testing of the evidentiary items that he had observed and gathered; (4) is the only serologist to testify in both of Petitioner's trials; (5) presented the key evidence allowing the jury to decide which of the two confessions to believe; and (6) had more personal involvement in this case than any other habeas corpus action filed pursuant to <u>Zain I</u>?*

#### B.

*Whether the trial court erred in holding that any scientific problems with Trooper Zain's testimony constituted harmless error beyond a reasonable doubt, where both experts agreed that no one could vouch for the accuracy of the work performed by Trooper Zain in this case, Petitioner's expert specifically identified numerous errors by Trooper Zain and concluded that Trooper Zain's results in this case were "meaningless," and many of the errors identified were consistent with the errors found by the ASCLD experts in <u>Zain I</u>?*

15

C.

*Whether the trial court erred, in light of the totality of the circumstances, which now includes the fact that Trooper Zain had a history of faking data and in light of the conflicting confessions given by Mr. Reggettz, in concluding that Petitioner's alleged confessions were voluntary and admissible?*

## IV.

### Argument

### A.

*The trial court erred in ruling that* Zain I *not only was inapplicable to Petitioner's case, but would not have provided the basis for habeas corpus relief even if it did apply, because Trooper Zain: (1). personally went to the scene of the crime; (2). personally looked for and gathered physical evidence at the crime scene; (3).personally performed the critical testing of the evidentiary items that he had observed and gathered; (4) is the only serologist to testify in both of Petitioner's trials; (5) presented the key evidence allowing the jury to decide which of the two confessions to believe; and (6). had more personal involvement in this case than any other habeas corpus action filed pursuant to* Zain I

In *Zain I*, 190 W.Va. at 326, 438 S.E.2d at 506, this Court accepted Special Judge Holliday's recommendation that in light of the "overwhelming evidence" of Trooper Zain's misconduct, "'as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding." To carry out this procedure, this Court held in Syllabus Points 2 and 3 of *Zain I*:

16

2. Although it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict.[16]

3. "Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury." Syllabus Point 2, *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980).

The main holdings in *Zain I* were based upon several decisions by the United States Supreme Court addressing the question of whether the presentation of false evidence was a violation of the Due Process Clause under the United States Constitution. In these cases, the United States Supreme Court held that the presentation of false evidence against a defendant in a criminal case is

---

[16]Syllabus Point 2 of *Zain I* clearly states that a conviction based upon false evidence is a **constitutional** violation. The harmless error standard for constitutional violations is set out in Syllabus Point 5 of *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975):

"Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt."

*See also* Syllabus Point 3, *State v. Barrow*, 178 W.Va. 406, 359 S.E.2d 844 (1987); Syllabus Point 1, *Maxey v. Bordenkircher*, 175 W.Va. 49, 330 S.E.2d 859 (1985); *United States v. Hasting*, 461 U.S. 499, 510-11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96,107 (1983); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In the briefing below, Petitioner argued that this Court should have applied the harmless error beyond a reasonable doubt standard in *Zain I*. However, as a practical matter, if *Zain I* is applied to Petitioner, he should prevail under either the constitutional or nonconstitutional harmless error standards.

17

a violation of the Due Process Clause of the United States Constitution and the State must be held responsible for such false evidence, even if the falsity was unknown. *Napue v Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972);*Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). Thus, this Court's *Zain I* decision was firmly grounded upon federal and state due process principles.

In applying this two-part test to this case, Petitioner first argued that if Trooper Zain's evidence were removed from the case, the remaining evidence was insufficient to sustain his conviction. Without Trooper Zain's evidence, the jury would be presented with Mr. Reggettz's confessions, and evidence corroborating his admissions, as well as Petitioner's alleged confessions, and evidence allegedly corroborating his statements. The existence of Mr. Reggettz's confessions and the evidence corroborating his statements create a substantial reasonable doubt that the State would have to overcome before prevailing against Petitioner.

If a conviction against Petitioner could be sustained based upon his alleged confessions and other corroborative facts, then the same could be said regarding Mr. Reggettz. There were more corroborative facts supporting Mr. Reggettz's confessions, particularly in light of the fact that he reenacted the murders and was the initial person on the scene. Where the evidence is sufficient to sustain a conviction against two different people, both of whom confessed to being the sole person responsible for the crime, Petitioner respectfully submits that absent compelling physical or other evidence directly linking one of the confessors to the crime, neither person can be convicted because the other person's confession and corroborative evidence renders it impossible for the remaining evidence to be sufficient "to convince impartial minds of the defendant's guilt beyond a reasonable doubt." This assertion is particularly true where, as in the present case, trial courts

18

analyzing the totality of the circumstances of the two different confessions have held they were intelligently and voluntarily given.

If it is assumed, as found by the respective trial courts involved, that both confessions were given intelligently and voluntarily by Mr. Reggettz and Petitioner, then what basis did the jury have to reject the confessions given by Mr. Reggettz? Clearly, when weighing the evidence against Mr. Reggettz and Petitioner, the deciding evidence was the testimony of Trooper Zain. Trooper Zain's testimony appeared to be scientifically reliable and based upon objective physical evidence found at the crime scene. Since, according to Trooper Zain, some of the unknown blood found could not have been deposited by Mr. Reggettz, and some of the stains were consistent with Petitioner's blood types, the testing, if valid, incriminated Petitioner and exonerated Mr. Reggettz. Thus, no matter how hard Respondent tries to rely upon tangential facts to support the conviction, clearly the evidence in the record is insufficient to convince impartial minds of Petitioner's guilt beyond a reasonable doubt, without Trooper Zain's testing and testimony.

Alternatively, Petitioner argued that he clearly should prevail under the second step of the *Zain I* analysis because he merely has to prove that Trooper Zain's testing and testimony "had any prejudicial effect on the jury." Any juror having any reasonable doubts about Petitioner's guilt, based upon the detailed confessions given by Mr. Reggettz, must have been quite impressed with Trooper Zain's ability to make the physical evidence point the finger of guilt toward Petitioner. Since most people would like to believe that physical evidence does not lie, Trooper Zain's testimony must have been very persuasive. Of course, what the jurors did not know at that time was Trooper Zain's history of making up data, falsifying records, lying or exaggerating about his credentials, overstating statistical frequencies, and waiving his "magic wand," all designed to make a suspect appear to be guilty allegedly based upon an analysis of the physical evidence.

19

The impact of Trooper Zain's testimony on the jury must be analyzed within the context of the trial. When Trooper Zain entered the court room, he had the aura of a person entrusted by law enforcement to perform this very specialized task. He wanted the jury to believe him and rely on his expert opinions, so he detailed his education and work history. He summarized the number of times other courts throughout the state had acknowledged that he was an expert in his field. He was cloaked with the label "expert witness" by the trial court, which found him to be qualified, based upon his testimony. (SECOND TRIAL, Tr. 1072). He rattled off terms of art common in his field of expertise, but foreign to most if not all jurors. Particularly in an area as complex as serological testing, jurors are at the mercy of the expert witness and must accept the expert opinions stated as true because most jurors lack the educational background to analyze critically and scientifically the opinions presented.

Placed in this context, how could the jury not have been prejudiced by hearing Trooper Zain testify that the seven types obtained from the unknown blood samples found on Item No. 15 (the change purse), Item No. 11 (the utensil drawer), Item No. 14 (the door between the master bedroom and the front door), Item No. 12 (the pillow case from the bedroom beside the bath), and the flashlight, eliminated 99.9 % of the population, meaning that **one person in one thousand** would have those seven bloodtypes, and that Petitioner was included in the population with that particular combination of seven blood types? (SECOND TRIAL, Tr. 1120). How could the jury not have been prejudiced by hearing Trooper Zain testify that the nine types obtained from the unknown blood samples found on Item No. 7 (the curtain on the kitchen door), the Christmas wrapping paper, and the clothing of Bernadette Reggettz eliminated 99.97 % of the population, meaning that **three persons in ten thousand** would have those nine blood types, and that Petitioner was included in the population with that particular combination of nine blood types? (SECOND TRIAL, Tr. 1122-25).

20

Regardless of any assertions made by Respondent to the contrary, the obvious answer to both rhetorical questions is that it is impossible for any person to suggest that the jury was not prejudiced by Trooper Zain's testimony.

Although the trial court acknowledged the procedure **required** by this Court in *Zain I*, the trial court nevertheless decided not to allow Petitioner to have the benefit of this Court's ruling. Thus, Petitioner is the only inmate, to the best of counsel's knowledge, whose conviction rested in large part on the testing and testimony of Trooper Zain, but who was denied the procedure followed by all of the other inmates who filed *Zain I* habeas corpus petitions.

In concluding that the *Zain I* procedure was inapplicable, the trial court noted that "Trooper Robert Murphy performed much of the laboratory testing and prepared the forensic report for the Department" in this case, "Zain and Murphy had discovered genetic markers in blood samples from the Reggettz residence that excluded Paul Reggettz and would ultimately incriminate John Moss, long before a sample of Moss's blood was obtained and analyzed," and "Zain was not the chief serologist, but was subordinate to and supervised by Murphy." (September 10, 1998 order, at 4).

The review by Trooper Murphy was of some significance to the trial court because this Court held, in *Zain II*, that based upon the evidence known at that time, there was no particular need to presume that the testing performed by the other employees in the laboratory was invalid.[17]

---

[17]In Syllabus Point 3 of *Zain II*, this Court held:

> Serology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Fred S. Zain, are not subject to the invalidation and other strictures contained in *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 190 W.Va. 321, 438 S.E.2d 501 (1993).

21

Of course, now that this Court has reopened *Zain II*, and a special investigation is still being conducted, this part of the trial court's ruling is weakened.

      After making these observations, the trial court held:

> Based on the record as it has been developed, this court is of the opinion: (1) That the prophylactic rule announced in *Zain I and II* should not operate to nullify the serology evidence offered during the petitioner's trial; and (2) That in the absence of specific evidence that the blood test results were falsified or were substantially incorrect, there is no basis to set aside the verdicts against the petitioner. (September 10, 1998, at 7).

Thus, through this unique and unprecedented ruling, which flies in the face of this Court's explicit holdings, the trial court denied Petitioner the benefit of *Zain I*. To make matters worse, the trial court created a new requirement, that Petitioner had an obligation to prove that Trooper Zain's tests were falsified or substantially incorrect, when Special Judge Holliday already had concluded, and this Court had accepted, that the evidence of Trooper Zain's pervasive misconduct was so overwhelming that "'as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding." *Zain I*, 190 W.Va. at 326, 438 S.E.2d at 506.

      Petitioner respectfully submits that the trial court's ruling is factually and legally incorrect. Factually, Trooper Murphy admitted that when Trooper Zain performed the testing in this case, "I would primarily look at the final result, not necessarily see every single step." (Murphy Dep., at 50). In light of Trooper Zain's proven track record of committing a wide variety of fraudulent acts in connection with his serological testing, all of which went unnoticed by his fellow employees in the laboratory, the fact that Trooper Murphy may have reviewed the end result of some testing performed or glanced at the raw laboratory notes in this case is of little comfort. Trooper

22

Murphy also noted that it was unusual for a serologist to go to the crime scene and gather evidence, and that he was not aware that Trooper Zain had any training in the collection of evidence. (Murphy Dep., at 11-12).

The fact that Trooper Zain obtained most, if not all, of the blood samples from the crime scene himself distinguishes this case. Thus, Trooper Zain's extensive involvement in this case not only raises serious questions regarding the reliability of any of his test results, but also creates reasonable doubts regarding **the integrity of the evidence itself**.

The fact that Trooper Murphy testified to reviewing Trooper Zain's work does not mean that Trooper Zain did not commit fraud or one of the eleven or more acts of misconduct found by Special Judge Holliday. Throughout his employment with the Department of Public Safety, Trooper Zain's work was reviewed by others in the serology laboratory, and yet he continued to falsify data consistently in case after case. When Trooper Zain's work was analyzed by qualified experts, in connection with the investigation headed by Special Judge Holliday, these experts found that Trooper Zain had falsified data or otherwise acted contrary to well established scientific principles **IN EVERY CASE EXAMINED WHERE THERE WAS SUFFICIENT DATA FOR REVIEW, WITHOUT ANY EXCEPTIONS!!!** With this well documented condemnation of Trooper Zain and the fraud he committed on courts throughout West Virginia and elsewhere, it is unimaginable that any person at this time would even suggest that this Court or any other court should place any reliance whatsoever in anything Trooper Zain ever did in a laboratory.

The trial court placed considerable emphasis on the assertion that if Trooper Zain had acted consistent with his track record, he would have falsified data to implicate Mr. Reggettz, rather than Petitioner. This argument suggests that since Trooper Zain did not falsify his test results to incriminate Mr. Reggettz, then this Court should accept Trooper Zain's analysis in this one case as

23

being fully reliable and accurate. This argument not only is absurd on its face because it accepts the fact that Trooper Zain has a history of falsifying data to incriminate a suspect, but ignores all of the scientific deficiencies, flaws, and misstatements noted by Dr. Bing in his analysis of the serological testing.[18]

The problem with any case involving Trooper Zain is that it is virtually impossible to know when he was making things up or when he conducted testing in accordance with well accepted scientific principles. For that reason, Special Judge Holliday and this Court decided that the trial courts in this State had to assume that Trooper's Zain's testing and testimony were false, particularly since Trooper Zain and the laboratory did not keep the raw data sheets in this case and the test results were not otherwise preserved through photographs.

The trial court's ruling rewards Trooper Zain not only for being skilled at presenting fraudulent "scientific" evidence, but also for destroying the underlying data, documentation, and test results that a competent forensic scientist might be able to review to challenge his findings. The same concerns that led this Court to adopt the rule requiring the preservation of scientific test results, such as the serological testing performed in the present case, in Syllabus Point 4 of *State v. Thomas*, 187 W.Va. 686, 421 S.E.2d 227 (1992), are applicable here.

The laboratory notes reviewed by Trooper Murphy in his deposition demonstrate that the critical evidence, being the blood found on certain items at the crime scene, was in Trooper Zain's handwriting, which was an indication that Trooper Zain performed that work. Once again, Trooper Zain's direct involvement in the manipulation of this critical evidence is the very reason why this Court adopted the prophylactic rule in *Zain I* in the first place.

_____

[18]*See* Part IV(B) of this **PETITION**.

24

Legally, the trial court's holding that Petitioner is not entitled to follow the same habeas corpus procedure available to any other inmate where Trooper Zain was involved is refuted by this Court's explicit holding in *Zain I*. *Zain I* created, as a matter of law, a legal presumption that all of Trooper Zain's testing and testimony was false.

The two-part analysis adopted by this Court in *Zain I* was based upon longstanding law with respect to how a court should analyze the admission of improper evidence of a nonconstitutional nature. This analysis was first stated in Syllabus Point 2 of *State v. Atkins*, 163 W.Va. 502, 514-15, 261 S.E.2d 55, 62-63 (1979), which provided the following guidance on how a court should determine whether the defendant had been prejudiced by the admission of improper evidence of a nonconstitutional nature:

> While our cases state the test as whether the error had prejudicial impact on the jury, the difficulty is in applying the test. **The more tangential the error to the ultimate issue of guilt, the less likely its prejudicial impact.**
>
> In any inquiry into the prejudicial impact of the error, we will be guided by whether the record reveals that the error was repeated or singled out for special emphasis in the State's argument. We will scrutinize the record to determine if the error became the subject of a special instruction to the jury, or produced a question from the jury. **Also of importance is the overall quality of the State's proof. While on appellate review under *Starkey*, the State is entitled to have its case viewed in the most favorable light, this is because the jury's verdict of guilty is taken to have resolved factual conflicts in favor of the State in recognition of the jury's role in evaluating the credibility of witnesses. If the case contains a number of substantial key factual conflicts or is basically a circumstantial evidence case, or is one that is largely dependent on the testimony of a co-participant for conviction, there is an increased probability that the error will be deemed prejudicial.**
>
> Further, if the error is related to critical testimony of the defendant, the more likely that it will be deemed prejudicial. *Cf. People v. Mayrant*, 43 N.Y.2d 236, 401 N.Y.S.2d 165, 372 N.E.2d 1 (1977); *People v. Dickman*, 42 N.Y.2d 294, 397 N.Y.S.2d 754, 366

N.E.2d 843 (1977)(holding prior conviction evidence not harmless in context of New York balancing test for admissibility of prior convictions). A further consideration is the cumulative effect of the error in the context of the entire trial. We have recognized that there may be error which, standing alone, is not sufficient to require a reversal, but that when cumulated with other marginal error, the combined effect may be sufficient to warrant a reversal. *Cf. e.g.,* *State v. Wilson,* ___ W.Va. ___, 202 S.E.2d 828 (1974)(constitutional and nonconstitutional errors combined). (Emphasis added).

Petitioner respectfully submits that by any objective measure, Petitioner clearly and indisputably was prejudiced by Trooper Zain's testimony. Trooper Zain's testimony was not merely "tangential" evidence, but rather was the key evidence implicating Petitioner in a case where the jury was faced with conflicting confessions given by two different people. Without Trooper Zain's testimony, the jury had virtually no evidence upon which to decide whether or not to believe the confession given by Mr. Reggettz or by Petitioner.

In *People v. Cornille,* 95 Ill.2d 497, 69 Ill.Dec. 945, 448 N.E.2d 857 (1983), a case cited by this Court in *Zain I,* the Illinois Supreme Court was presented with a situation where an arson expert lied about his education and other credentials. The facts in *Cornille* are remarkably similar to the present facts in that by the time the defendant in *Cornille* had filed his habeas corpus action, the alleged arson expert had already been indicted for perjury for lying about his education and credentials. The Illinois Supreme Court held that there was a reasonable likelihood that the jury's decision may have been affected by this expert's false testimony, which made him appear to be more credible. Consequently, the defendant in *Cornille* was granted a new trial on this basis alone.

Petitioner respectfully submits that a similar holding is required in the present case, where there can be no doubt that even without the presumption of falsity in Trooper Zain's testimony and blood typing, there is a reasonable likelihood that the jury's decision was affected by Trooper

26

Zain's false testimony concerning his education and credentials. Moreover, in light of the revelations made about Trooper Zain and his proclivity to fabricate evidence in an effort to obtain a conviction, a jury would have the right to disregard anything he said.

Petitioner respectfully submits that the trial court erred in holding that *Zain I* was inapplicable to the present case. Furthermore, Petitioner respectfully submits that an application of *Zain I* requires this Court to conclude that Petitioner's convictions must be set aside, because Petitioner clearly was prejudiced by Trooper Zain's testimony, and this case should be remanded for a new trial. Without tainting the trial with Trooper Zain's unreliable and fraudulent testing and testimony, a jury should be permitted to consider the confession and other evidence presented against Mr. Reggettz, the confession, if admissible, and the other evidence presented against Petitioner, and to decide which person is guilty of these three murders. Allowing Petitioner's conviction to stand, based upon Trooper Zain's evidence, cannot be permitted in our system of justice.

                                        *B.*

> *The trial court erred in holding that any scientific problems with Trooper Zain's testimony constituted harmless error beyond a reasonable doubt, because both experts agreed that no one could vouch for the accuracy of the work performed by Trooper Zain in this case, Petitioner's expert specifically identified numerous errors by Trooper Zain and concluded that Trooper Zain's results in this case were "meaningless," and many of the errors identified were consistent with the errors found by the ASCLD experts in* Zain I

The second issue raised in the habeas corpus petition was that even without the presumption that Trooper Zain's testing and testimony were false and fraudulent, the analysis by Dr. Bing demonstrated that Trooper Zain's results were invalid and meaningless. Furthermore, Dr. Bing went into great detail noting the various acts of misconduct or scientific deficiencies in this case that also were found by the ASCLD experts when they reviewed Trooper Zain's work in other cases.

                                        27

In the January 30, 2003 order, the trial court chose not to address the specific scientific issues raised, and, in fact, held that "even if the Court were to adopt all of Moss's arguments as to the flaws in the State's scientific evidence, Moss still would not be entitled to the requested writ." Petitioner respectfully submits that this conclusion indicates a fundamental misunderstanding of the significance of Dr. Bing's testimony, much of which was corroborated by Captain Ted Smith and by the ASCLD experts.

The only items Dr. Bing could analyze were the report and the laboratory notes found. In his deposition, Trooper Murphy was unable to identify whether the handwritten documents attached to his deposition were the raw data sheets or compilation sheets. (Murphy Dep. at 32). A raw data sheet would be a document where test results initially are recorded as soon as a test has been completed. Often, raw data sheets included data from multiple cases. A compilation sheet would be a summarization of the test results recorded on the raw data sheets.

This distinction between a raw data sheet and a compilation sheet has profound implications. For example, the document attached to Trooper Murphy's deposition and marked with Bates No. 10 was identified by Trooper Murphy as being in his handwriting. This document records findings from all of the known blood samples tested, which are included in Table I attached to this **PETITION**. At the top left of this sheet, Trooper Murphy wrote "JAN," which Trooper Murphy acknowledged probably was an abbreviation for January. (Trooper Murphy Dep., at 32).

If this document were the raw data sheet, as opposed to a later compilation sheet, it would support Petitioner's theory, asserted in his habeas corpus petition, that the blood sample illegally obtained from Petitioner on January 30, 1980, when he was being held in a juvenile facility in Ohio, had been provided to the West Virginia State Police crime laboratory. This document lists

28

all of the known samples tested by Trooper Murphy, including Petitioner's blood sample. Thus, the

State Laboratory's own documentation provides support for Petitioner's assertion on this issue.

After reviewing all of the available materials, Dr. Bing explained why he believed

the data generated in this case was **meaningless**:

> Well, by that I mean that the -- there is so much data on these
> stains that weren't analyzed, it would seem to me there should be
> some extensive notes backing that material up. **So that in that -- in
> the context of not being able to look at the backup data, other
> than the summaries, it becomes, you know, almost impossible for
> me to either agree or disagree with the final outcome of the
> results. And that's what I mean by when I say it's meaningless.
> I can't agree, I can't disagree. All I can say is what was
> reported.**" (Emphasis added). (Dr. Bing Dep., at 21-22).

Dr. Bing first commented on the lack of any written protocols, quality control, quality

assurance programs, original laboratory notes and photographs of the testing performed, echoing

many of the same criticisms made by the ASCLD experts. (Dr. Bing Dep., at 12-22). Dr. Bing then

went through a series of general scientific principles applicable to the serological testing performed

in this case. The purpose of this analysis was to demonstrate the flaws in the conclusions reached

based upon the data and the overstating of the significance of this testing at trial.

First, he noted that it is important to obtain the known blood types of all potential

donors of blood at the scene of the crime. In this case, the potential donors of blood were Vanessa

Dale Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III. (Dr. Bing Dep., at

22-23). Second, at a crime scene, where the origin of all evidentiary stains is unknown, it cannot be

assumed that the stains originated from a single source. (Dr. Bing Dep., at 24). Third, only those

types obtained from the evidence that are different from any of the types obtained from known

possible donors provides relevant and meaningful information to the forensic scientist. (Dr. Bing

29

Dep., at 25-26). Fourth, as a general rule, where a type from a known possible donor of a blood stain matches a type from the blood discovered, it is not appropriate to include that type in calculating the frequency that the blood was deposited by a particular suspect. (Dr. Bing Dep., at 28-29).

Finally, Dr. Bing noted that serological typing is unable to determine when a particular evidentiary stain was deposited. (Dr. Bing Dep., at 37). Thus, from a scientific point of view, there is no objective basis for a scientist to conclude that a particular stain actually resulted from the criminal episode or may have been deposited at some time earlier.

The remainder of Dr. Bing's deposition applies these general principles to the facts. He concludes that the only blood types of significance are PGM, Gc, and EsD. The remaining types obtained from the blood stains found at the crime scene do not provide significant information because the remaining types obtained from the evidence were identical to the types obtained from at least one or more of the known possible donors. (Dr. Bing Dep., at 38). Dr. Bing further testified that he agreed with the scientific analysis of the evidence set out in the habeas corpus petition. (Dr. Bing Dep., at 39).

In addition to Dr. Bing's testimony, the August 6, 1993 report issued by ASCLD demonstrates that certain parts of Trooper Zain's evidence were false, misleading, exaggerated, and scientifically unsound. The ASCLD experts examined a number of cases analyzed in the State Police Crime Laboratory from 1986 through 1989. While the cases examined occurred after the initial testing performed in this case, there is no evidence and no reason to believe that any of the practices found by the ASCLD experts to be deficient or just plain wrong were any different earlier. Thus, based upon this report, the Court may conclude that at the time the testing was performed in the State Police Crime Laboratory in this case, there was no quality assurance program, no procedures manual, and no use of controls or standards.

30

Of particular importance to this Court's consideration is the failure of Trooper Zain to use any controls or standards in the testing he performed in this case. Petitioner can demonstrate that Trooper Zain failed to use controls or standards in this case by referring the Court to the laboratory documents provided. The ASCLD criticism was that any time blood or other evidence is found on some object, a sample from the unstained areas of that object, sometimes referred to as the substrate, should be taken "to ensure that the material itself (substrate) was not rendering a false positive interference. The use of such controls is imperative." ASCLD report at 5. In reviewing Trooper Zain's documentation, there is no reference to any substrate samples being tested on any of the items where blood allegedly was found. Thus, Petitioner has demonstrated that Trooper Zain's testing in this particular case was in fact performed consistent with ASCLD's criticism of the State Police Crime Laboratory.

In reviewing the ASCLD report, the Court should note that with respect to several of the cases reviewed, there was a severe lack of documentation and preservation of the test results, as in the present case, rendering it impossible for these experts to complete their analysis. The problem with overstating the statistical matches found with several of the cases examined was repeated in the present case. For example, in the ASCLD report, in connection with the examination of the data from the Robert Wallace case, the experts noted that Trooper Zain had included a marker in calculating the percentage of the population who might be the semen donor that matched the victim's known marker. By committing that error, Trooper Zain was able to testify that only 6.8% of the population would have the same markers as those found from the evidence, when, in fact, the number should have been 28%. This same error of exaggerating the statistical significance of the data was committed by Trooper Zain in this case. Petitioner respectfully refers the Court to the extensive analysis of the typings included in his original petition.

31

In its conclusion, the ASCLD experts stated:

> Irregularities were found in most of the cases reviewed in this investigation, and, therefore, believed to have been the result of systematic practice rather than an occasional inadvertent error. The majority of the irregularities were in the incompleteness of records or appeared to affect the weight given to a genetic match of evidence samples to possible donors.

There is no question that if the ASCLD experts had reviewed the data in this case, as did Dr. Bing, they similarly would have concluded that the data was "meaningless" due to the lack of documentation and the overstatement of the statistics generated. Furthermore, as noted in the ASCLD report and earlier in this **PETITION**, Trooper Zain repeatedly and consistently lied about his credentials.

In briefing this issue below, Respondent used the following preposterous heading: "The testing of Fred Zain at Petitioner's trial was correct and reliable." Even Respondent's own expert, Captain Ted Smith, the present director of the West Virginia State Police's serology laboratory, would not support that statement. Since Captain Smith's testimony corroborated many of the scientific criticisms made by Dr. Bing, Petitioner will quote several portions of his deposition testimony.

Captain Smith made it clear that he was not vouching for the accuracy of Troper Zain's testing or testimony in this case:

> As we sit here today, are you vouching for the accuracy of the testing performed by Fred Zain in this case?
>
> A  Well, I'm not exactly sure what testing Fred Zain may or may not have done in this particular case. But, no, I'm not vouching for the accuracy of his testing. (Captain Smith Dep., at 27).

32

Captain Smith further admitted that he was not able to review the raw data notes or any photographs of the testing performed because those items are not available. In fact, Captain Smith stated, "I'm just taking the data at face value." (Captain Smith Dep., at 28). The lack of these materials rendered it impossible for Captain Smith, or any other expert, to review and evaluate the accuracy of Trooper Zain's testing. As Captain Smith noted, "I have no idea about how the data was created or how it was generated, just simply what it looks like now and how it's being reported now." (Captain Smith Dep., at 56).

Captain Smith was asked several questions about his testimony given during the Special Investigation into Trooper Zain's work in the West Virginia State Police Laboratory, which testimony was cited by Special Judge Holliday in several of his findings of fact. Captain Smith agreed that he had discovered "'evidence that Zain had falsely reported results on worksheets that could not be supported by data on the laboratory notes, including falsely reporting that testing had been performed on multiple items when only a few had been tested and falsely reporting that multiple genetic markers had been identified when only a few had been identified.'" (Captain Smith Dep., at 29).

Captain Smith also confirmed Special Judge Holliday's finding that, "'As with the ASCLD investigation, Smith discovered improprieties in every case he reviewed in which Zain had been involved.'" (Captain Smith Dep., at 30). When asked if Trooper Zain **had not committed** any improprieties in the testing performed in the present case, would this case be the one exception to the rule, Captain Smith candidly responded:

> In terms of the cases that were reviewed, yes. There are other cases,
> earlier cases, that did not appear to show improprieties that weren't
> a part of the ASCLD investigation and a part of the rule. But as a part

33

of that, yes, that would be a correct statement. (Captain Smith Dep., at 30-31).

Thus, if this Court were to find Trooper Zain's testing and testimony in this case to be correct and reliable, this case would be the first and only case, following the Special Investigation, where Trooper Zain's testing was found to be free of any improprieties. In light of the findings made by the ASCLD investigators as well as by Captain Smith, it truly would be remarkable if Trooper Zain did not commit any improprieties in this case. Since there are no raw data notes or photographs of his testing to review in this case, based on his history, the probabilities are overwhelming that Trooper Zain committed various scientific improprieties in this case.

In response to whether he felt confident enough in the data reported in this case to testify in a trial, Captain Smith stated that it depends upon who did the testing:

> The Supreme Court has indicated that if Fred did it, I can't testify to it, basically, because it's unreliable. So, no, I wouldn't go testify to it if you told me that Fred did it.
>
> Now, on face value, no, I don't see anything that suggests any problems with the data. It fits the pattern that I would expect. If I were doing an audit, it fits the pattern that I would expect.
>
> **But no. If you tell me that Fred did all of these types and all of these testings, then, no, I would not go into court and I would not testify to it, simply because of the Supreme Court's ruling in that regard.** They've decided that I can't do that, and so I salute and execute. I don't do that. That's just the bottom line. (Emphasis added). (Captain Smith Dep., at 64-65).

The main difference between the opinions expressed by Dr. Bing and Captain Smith is that Dr. Bing detailed several principles used in interpreting forensic data while Captain Smith agreed with some of those principles, but disagreed with others. Both experts agree that in light of his history of fabricating test results, Trooper Zain's testing and testimony is highly suspect. Some

34

of the differences in the opinions expressed by these two experts were more trivial than substantive. Dr. Bing's approach is more cautious, particularly in light of the extensive proven history of Trooper Zain committing multiple improprieties while he worked in the West Virginia State Police Laboratory.

Based upon the data examined, Dr. Bing refused to assume any facts that were not documented. For example, both Dr. Bing and Captain Smith devote some time to a discussion of the blood stain found on the Christmas wrapping paper. Dr. Bing did not assume that there was a single drop of blood found, as opposed to a blood smear, because the documentation did not support that conclusion. Even Captain Smith agreed with Dr. Bing that if the blood were smeared, "that would raise the possibility that you could have more than one source present." (Captain Smith Dep., at 45). Thus, as Dr. Bing noted, since there is no way of knowing whether or not this blood stain came from only one person, forensic science principles require the person reporting the results to focus only on the types found that are different than the known types of the possible contributors in the house.

Based upon the foregoing "overwhelming evidence," including the testimony of Dr. Bing and Captain Smith, who is the expert witness chosen by Respondent, there is no question that Trooper Zain's testing and testimony in this simply is not credible or consistent with accepted scientific principles. In light of these facts, it was error for the trial court to suggest that any errors committed by Trooper Zain somehow are harmless.

35

C.

*The trial court erred, in light of the totality of the circumstances, which now includes the fact that Trooper Zain had a history of faking data and in light of the conflicting confession initially given by Mr. Reggettz, in concluding that Petitioner's alleged confessions were voluntary and admissible*

In *State v. Moss*, this Court held that the initial two confessions allegedly given by Petitioner were admissible, but the third confession was invalid and inadmissible, based upon a prompt presentment violation. When the admissibility of these two confessions was addressed by the trial court at the beginning of the second trial, the trial court held that they were admissible for two reasons. First, in light of this Court's decision in *State v. Moss*, the admissibility of these confessions was the law of the case. Second, there was no prompt presentment violation in connection with these two confessions. (SECOND TRIAL, Tr. 19-21).

Obviously, the issue of whether Petitioner's confessions were obtained in violation of his constitutional rights has been litigated fairly extensively. However, this Court now has the benefit of all available transcripts developed in the *Reggettz* case. These transcripts demonstrate that a trial court had found the confession given by Mr. Reggettz to be voluntarily and intelligently given, in accordance with his constitutional rights. Thus, this Court is presented with two confessions from two separate individuals where the trial courts involved held that both confessions were constitutionally valid. Clearly, one or both of these confessions has to be false.[19]

_____

[19]It has been well documented that for a variety of reasons, people have confessed to crimes that either never were committed or were committed by someone else. *See generally* Richard A. Leo & Richard J. Ofshe, *Criminal Law: The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J.Crim.L.&Criminology 429 (1998); Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 Denv.U.L.Rev. 979 (1997).

Confessions are evaluated based upon the totality of the circumstances. *See, e.g.,* *State v. Goff,* 169 W.Va. 778, 289 S.E.2d 473 (1982). Petitioner respectfully submits that the additional facts developed in this habeas corpus action alter the totality of the circumstances to the point where the admissibility of Petitioner's confessions should be revisited and found to be inadmissible.

In viewing the conflicting confessions allegedly made by Mr. Reggettz and Petitioner, the Court should note that Mr. Reggettz is the first person to confess to these horrible murders and is the first person to arrive at the crime scene. Some of the officers who obtained the confession from Mr. Reggettz also were involved in obtaining the confession from Petitioner. Trooper Murphy noted in his deposition that the investigating officers were so convinced by Mr. Reggettz's confession that when they were confronted with Trooper Zain's false, misleading, exaggerated, and scientifically unsound test results, they asserted that Mr. Reggettz must have planted some blood evidence in his house. (Murphy Dep., 25-27).

The trial court in the present case suggested that despite the contrary ruling by Judge Hey, the confessions from Mr. Reggettz were coerced. (September 10, 1998 Order, at footnote 2). If it is true that Mr. Reggettz was coerced into confessing, then it is just as likely that Petitioner's confessions also were coerced, particularly where some of the same law enforcement officers involved in obtaining confessions from Mr. Reggettz were involved in interrogating Petitioner. Furthermore, the fact that a police officer admittedly obtained an illegal blood sample from Petitioner prior to him giving any confessions is an indication that following the rules and respecting Petitioner's constitutional rights was not a top priority.

37

In light of this more fully developed record, particularly the evidence regarding Trooper Zain's wrongdoings and the transcripts for the proceedings against Mr. Reggettz, which had not been available to any court prior to this habeas corpus action, the totality of the circumstances has changed dramatically with respect to the confessions' issue. Fundamentally, the trial court in the various orders issued consistently failed to address the legal significance of the fact that two different people had confessed to committing the same crime. While Petitioner recognizes that his confessions have been scrutinized by this Court before, at this time, the confessions must be viewed in light of the new information developed with respect to Trooper Zain. When viewed in the context o f the record developed in this case, Petitioner's confessions were obtained in violation of his federal and state constitutional rights. Consequently, at his new trial, these confessions should be inadmissible.

## V.

## Conclusion

Obviously, anyone familiar with the tragic facts of this case, where three people, including two children, were senselessly murdered, would want to make sure that the right person was convicted of these crimes. However, as long as the most critical evidence presented to the jury was the testimony of Trooper Zain, no one could ever conclude that any reasonable form of justice was reached in this case.

For the foregoing reasons, Petitioner John Moss, III, respectfully asks this Court to grant this **PETITION FOR APPEAL**, to schedule this case on the argument docket, to reverse the final order of the Circuit Court of Kanawha County, to reverse Petitioner's conviction of three counts

38

of first degree murder, and to remand this case for a new trial that excludes any testing performed

by Trooper Fred Zain.

**JOHN MOSS, III**, Petitioner,

--By Counsel--

Lonnie C. Simmons (W.Va. I.D. No. 3406)
**DITRAPANO, BARRETT & DIPIERO, P.L.L.C.**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **PETITION FOR APPEAL** was hand-delivered to counsel of record on the 30th day of May, 2003, addressed as follows:

Michelle Drummond
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg
111 Court Street
Charleston, West Virginia 25301
(304) 357-0300

Lonnie C. Simmons (W.Va. I.D. No. 3406)

40

*TABLE I\**
**KNOWN BLOOD SAMPLES**

| PERSON | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|---|---|---|---|---|---|---|---|---|---|
| Vanessa Reggettz | O | 2+1- | 1 | B | 1 | 1 | 2 | 1 | 2-1 |
| Bernadette Reggettz | O | 2+2+ | 1 | B | 1 | 1 | 2 | 2-1 | 2-1 |
| Paul Eric Reggettz | O | 2+1- | 1 | B | 1 | 1 | 2 | 2-1 | 2-1 |
| Paul Reggettz III | O | 2+2- | 1 | BA | 1 | 1 | 2 | 2 | 2-1 |
| John Moss, III | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |

*The shared blood attributes between Petitioner's known blood types and the blood types of the Reggettz family are highlighted in Table I to emphasize the similarities and differences in the known blood types.

41

*TABLE I\**

## KNOWN BLOOD SAMPLES (CONTINUED)

| PERSON | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|---|---|---|---|---|---|---|---|---|---|
| Jack C. Neal, Jr. | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Roger L. Province | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| William J. Monk | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Ross E. Gillespie | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Marvin D. Smith | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Richard A. Rollins | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Joseph Morehouse | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Nathaniel Brown | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Thomas F. White | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |

*Petitioner has been unable to find any explanation as to why the blood of Jack C. Neal, Jr., Roger L. Province, William J. Monk, Ross E. Gillespie, Marvin D. Smith, Richard A. Rollins, Joseph Morehouse, Nathaniel Brown, and Thomas F. White was tested.

42

*TABLE II\**
**UNKNOWN BLOOD SAMPLES**

| ITEM | ABO | PGM | AK | EAP | EsD | ADA | GLO 1 | Hp | Gc |
|---|---|---|---|---|---|---|---|---|---|
| 1. Knife pieces | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 2. Room next to bath | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 3. Front bedroom carpet | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 4. Bedspread front bedroom | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 5. Pillow case front bedroom | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 6. Electrical cord | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 7. Kitchen door curtain | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |
| 8. Sheet kitchen floor | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 9. Back door handle | O | 2-1 | ? | ? | ? | ? | ? | ? | ? |
| 10. Kitchen sink | ? | ? | ? | ? | ? | ? | ? | ? | ? |
| 11. Utensil drawer | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 12. Pillow case bedroom beside bath | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 13. Door between bedroom and living room | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 14. Door between bedroom and front door | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 15. Change purse | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 16. Medium t-shirt | O | 2-1 | ? | ? | 1 | ? | ? | ? | ? |
| 17. Jockey shorts | ? | ? | ? | ? | ? | ? | ? | ? | ? |
| 18. Vanessa Reggettz's nightgown | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 19. Doll | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |

        \*The blood types obtained from the unknown blood samples that are identical to the known blood types obtained from Vanessa Reggettz, Paul Eric Reggettz, Bernadette Reggettz, or Paul Reggettz, III, are highlighted in Table II.

*TABLE II*

## UNKNOWN BLOOD SAMPLES (CONTINUED)

| ITEM | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|---|---|---|---|---|---|---|---|---|---|
| Table knife | ? | ? | ? | ? | 1 | ? | ? | ? | ? |
| Christmas wrapping paper | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |
| Flashlight | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| Clothing of Bernadette Reggettz | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |

**FILE COPY**

**SUPREME COURT OF APPEALS OF WEST VIRGINIA**

**DOCKETING STATEMENT**

**DO NOT REMOVE FROM FILE**

Style:  **John Moss, III**

Type of Action
**Civil**

v.

**GEORGE TRENT, Warden of the West Virginia State Penitentiary,**

**Respondent.**

Circuit:       **13th Judicial Circuit**

County:       **Kanawha**

Judge:        **Louis H. Bloom**

Circuit Number:   **94-MISC-663**

FILED
JUL 16 2003
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

A.    Timeliness of Appeal

1.  Date of entry of judgment or order appealed from: **January 30, 2003.**
2.  Filing date of any post-judgment motion filed by any party pursuant to R. Civ. P. 50(b), 52(b), or 59: **N/A**
3.  Date of entry of order deciding post-judgment motion: **N/A.**
4.  Date of filing of petition for appeal: **May 30, 2003.**
5.  Date of entry of order extending appeal period: **N/A**
6.  Time extended to: **N/A**

B.    Finality of Order or Judgment

1.  Is the order or judgment appealed from a final decision on the merits as to all issues and parties?       **Yes**
2.  If no, was the order or judgment entered pursuant to R. Civ. P. 54(b)? **N/A.**
3.  Has the defendant been convicted?   **Yes.**
4.  Has a sentence been imposed?   **Yes.**
5.  Is the defendant incarcerated?   **Yes.**

C.      *Has this case previously been appealed?*          **No.***

        ***This particular case, involving the appeal of the denial of habeas corpus relief arising
from Petitioner's second trial, has not been previously appealed.  However, Petitioner's appeal
from his second trial was denied by this Court on March 12, 1991, and this Court has published
two previous decisions involving Petitioner: In the Interest of John Moss, Jr.,170 W.Va. 543, 295
S.E.2d 33 (1982), and State v. Moss, 180 W.Va. 363, 376 S.E.2d 569 (1988).***

        *If yes, give the case name, docket number, and disposition of each prior appeal on a separate
sheet.*

D.      *Are there any related cases currently pending in the Supreme Court of Appeals or Circuit
Court?*          **No.**

        *If yes, cite the case and the manner in which it is related on a separate sheet.*

E.      *State*
*the nature of the suit, the relief sought, and the outcome below.  [Attach an additional sheet, if
necessary]*

        ***Petitioner was convicted of three counts of first degree murder and was sentenced to life
without mercy.  This habeas corpus action was filed, pursuant to this Court's decision in Matter
of Investigation of the West Virginia State Police Crime Laboratory, Serology Division, 190
W.Va. 321, 326, 328, 438 S.E.2d 501, 506, 508 (1993), some times referred to as Zain I.  The
critical witness against Petitioner was Trooper Fred Zain, whose testing and testimony was
essential for the jury to determine whether to believe the confessions given by Paul Reggettz, III,
or by Petitioner.  The trial court did not apply Zain I to Petitioner, held that even if Zain I did
apply, Petitioner was not prejudiced by Trooper Zain's testimony, and denied relief on the
remaining two issues raised.***

F.      *Issues to be raised on appeal.  [Attach an additional sheet, if necessary].*

                                    ***A.***

                ***Whether the trial court erred in ruling that Zain I not only was
                inapplicable to Petitioner's case, but would not have provided the
                basis for habeas corpus relief even if it did apply, where Trooper
                Zain: (1). personally went to the scene of the crime; (2). personally
                looked for and gathered physical evidence at the crime scene;
                (3).personally performed the critical testing of the evidentiary items
                that he had observed and gathered; (4) is the only serologist to
                testify in both of Petitioner's trials; (5) presented the key evidence
                allowing the jury to decide which of the two confessions to believe;
                and (6). had more personal involvement in this case than any other
                habeas corpus action filed pursuant to Zain I?***

**B.**

*Whether the trial court erred in holding that any scientific problems with Trooper Zain's testimony constituted harmless error beyond a reasonable doubt, where both experts agreed that no one could vouch for the accuracy of the work performed by Trooper Zain in this case, Petitioner's expert specifically identified numerous errors by Trooper Zain and concluded that Trooper Zain's results in this case were "meaningless," and many of the errors identified were consistent with the errors found by the ASCLD experts in* <u>Zain I</u>?

**C.**

*Whether the trial court erred, in light of the totality of the circumstances, which now includes the fact that Trooper Zain had a history of faking data and in light of the conflicting confessions given by Mr. Reggettz, in concluding that Petitioner's alleged confessions were voluntary and admissible?*

G.    *Do you wish to make an oral presentation of the petition?*    **Yes.**

H.    *Has the entire or only portions of the record been designated?* **Entire.**

I.    *If the appeal is granted, do you desire reproduction of the record or that the case be heard on the original record?*        **Original record.**

J.    *List each adverse party to the appeal. Attach additional sheets if necessary. If no attorney, give address and telephone number of the adverse party.*

    *1.*    *Adverse party:* **George Trent**

        *Attorney(s):*    **Michelle Drummond**
        *Firm:*    **Kanawha County Prosecuting Attorney's Office**
        *Address:*    **111 Court Street**
                **Charleston, WV 25301**
        *Telephone:*    **(304) 357-0300**

K.    *Petitioner(s) name:*    **John Moss, III.**

    *If incarcerated, give institutional address:* **Mount Olive Correctional Complex**
    *Address:*        **Mount Olive, WV**
    *Telephone:*

L.    *Attorney or pro se litigant filing Docketing Statement.*

    *Will you be handling the appeal? (In criminal cases, counsel below will handle the appeal unless relieved by the court).* **Yes.**

| | |
|---|---|
| *Name:* | ***Lonnie C. Simmons (W.Va. Bar No. 3406)*** |
| *Address:* | ***DITRAPANO, BARRETT & DIPIERO, PLLC*** |
| | ***604 Virginia Street, East*** |
| | ***Charleston, West Virginia 25301*** |
| *Telephone:* | ***(304) 342-0133.*** |

*If this is a joint statement by multiple petitioners, add the names and addresses of the other petitioners and counsel joining in this Docketing Statement on an additional sheet, accompanied by a certification that all petitioners concur in this filing.*

*Signature*

*Date: **May 30, 2003***

*ATTACH:*

1.   *ADDITIONAL PAGES, IF ANY, CONTAINING EXTENDED ANSWERS TO QUESTIONS ON THIS FORM.*

2.   *A COPY OF THE ORDER OR JUDGMENT FROM WHICH THE APPEAL IS TAKEN.*

3.   *A CERTIFICATE OF SERVICE. "*

*A True Copy*

_____
*Clerk, Supreme Court of Appeals*

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, counsel for Petitioner John Moss, III, do hereby certify that

a true copy of the attached **DOCKETING STATEMENT** was hand-delivered to counsel of record,

this 30th day of May, 2003, addressed as follows:

Michelle Drummond
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg
111 Court Street
Charleston, West Virginia 25301
(304) 357-0300

Lonnie C. Simmons (W.Va. Bar No. 3406)

DO NOT REMOVE
FILE COPY

BEFORE THE SUPREME COURT OF APPEALS

OF WEST VIRGINIA

No.31646

**JOHN MOSS, III,**

                  Petitioner,

v.

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

                  Respondent.



FILED
DEC 3 0 2003
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

---

*FROM THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA*

---

### PETITIONER'S APPEAL BRIEF

Lonnie C. Simmons (W.Va. I.D. No. 3406)
**DITRAPANO, BARRETT & DIPIERO, P.L.L.C.**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

*Counsel for Petitioner John Moss, III*

## TABLE OF CONTENTS

I.   Kind of proceeding and nature of ruling below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   Since two different people–Paul Reggettz, III, and Petitioner–
        allegedly confessed to committing the same three murders,
        one or both confessions must be false . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   Statement of facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.   Chronology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.   Trooper Zain's extensive involvement in this case . . . . . . . . . . . . . . . . . . . . . . 10

III.   Issues presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.   Whether the trial court erred in ruling that *Zain I* not only was
        inapplicable to Petitioner's case, but would not have provided the
        basis for habeas corpus relief even if it did apply, where Trooper
        Zain: (1). personally went to the scene of the crime; (2). personally
        looked for and gathered physical evidence at the crime scene;
        (3).personally performed the critical testing of the evidentiary items
        that he had observed and gathered; (4). is the only serologist to testify
        in both of Petitioner's trials; (5). presented the key evidence allowing
        the jury to decide which of the two confessions to believe; and (6).
        had more personal involvement in this case than any other habeas
        corpus action filed pursuant to *Zain I*? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.   Whether the trial court erred in holding that any scientific problems
        with Trooper Zain's testimony constituted harmless error beyond a
        reasonable doubt, where both experts agreed that no one could vouch
        for the accuracy of the work performed by Trooper Zain in this case,
        Petitioner's expert specifically identified numerous errors by Trooper
        Zain and concluded that Trooper Zain's results in this case were
        "meaningless," and many of the errors identified were consistent with
        the errors found by the ASCLD experts in *Zain I*? . . . . . . . . . . . . . . . . . . . . . . 15

    C.   Whether the trial court erred, in light of the totality of the
        circumstances, which now includes the fact that Trooper Zain had a
        history of faking data and in light of the conflicting confession
        initially given by Mr. Reggettz, in concluding that Petitioner's alleged
        confessions were voluntary and admissible? . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.   The trial court erred in ruling that *Zain I* not only was inapplicable to Petitioner's case, but would not have provided the basis for habeas corpus relief even if it did apply, because Trooper Zain: (1). personally went to the scene of the crime; (2). personally looked for and gathered physical evidence at the crime scene; (3).personally performed the critical testing of the evidentiary items that he had observed and gathered; (4). is the only serologist to testify in both of Petitioner's trials; (5). presented the key evidence allowing the jury to decide which of the two confessions to believe; and (6). had more personal involvement in this case than any other habeas corpus action filed pursuant to *Zain I* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.   The trial court erred in holding that any scientific problems with Trooper Zain's testimony constituted harmless error beyond a reasonable doubt, because both experts agreed that no one could vouch for the accuracy of the work performed by Trooper Zain in this case, Petitioner's expert specifically identified numerous errors by Trooper Zain and concluded that Trooper Zain's results in this case were "meaningless," and many of the errors identified were consistent with the errors found by the ASCLD experts in *Zain I* . . . . . . . . . . . . . . . . . . . 27

    C.   The trial court erred, in light of the totality of the circumstances, which now includes the fact that Trooper Zain had a history of faking data and in light of the conflicting confession initially given by Mr. Reggettz, in concluding that Petitioner's alleged confessions were voluntary and admissible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

V.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

*West Virginia*

*In the Interest of John Moss, Jr.,*
170 W.Va. 543, 295 S.E.2d 33 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9

*Matter of Investigation of the West Virginia*
*State Police Crime Laboratory, Serology Division,*
190 W.Va. 321, 438 S.E.2d 501 (1993) . . . . . . . . . . 1, 2, 3-5, 16-17, 19, 21-22, 24-25, 27

*Matter of West Virginia State*
*Police Crime Laboratory,*
191 W.Va. 244, 445 S.E.2d 165 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 21, 22

*Maxey v. Bordenkircher,*
175 W.Va. 49, 330 S.E.2d 859 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State ex rel. Grob v. Blair,*
158 W.Va. 647, 214 S.E.2d 330 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State v. Atkins,*
163 W.Va. 502, 261 S.E.2d 55 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Barrow,*
178 W.Va. 406, 359 S.E.2d 844 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State v. Goff,*
169 W.Va. 778, 289 S.E.2d 473 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*State v. Moss,*
180 W.Va. 363, 376 S.E.2d 569 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 9, 36

*State v. Thomas,*
187 W.Va. 686, 421 S.E.2d 227 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Other jurisdictions*

*Chapman v. California,*
386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Giglio v. United States,*
    405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Miller v. Pate,*
    386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Napue v. Illinois,*
    360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Cornille,*
    95 Ill.2d 497, 69 Ill.Dec. 945, 448 N.E.2d 857 (1983) . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Hasting,*
    461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 17

## Miscellaneous

Richard A. Leo & Richard J. Ofshe, *Criminal Law: The Consequences
of False Confessions: Deprivations of Liberty and
Miscarriages of Justice in the Age of Psychological Interrogation,*
    88 J.Crim.L.&Criminology 429 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Richard J. Ofshe & Richard A. Leo, *The Decision to Confess
Falsely: Rational Choice and Irrational Action,*
    74 Denv.U.L.Rev. 979 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

iv

BEFORE THE SUPREME COURT OF APPEALS

OF WEST VIRGINIA

No. 31646

**JOHN MOSS, III,**

Petitioner,

v.

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

Respondent.

*FROM THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA*

### PETITIONER'S APPEAL BRIEF

> *"It is believed that, as a matter of law, any testimonial or documentary evidence offered by [Fred Salem ]Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding."*
>
>        \*        \*        \*
>
> *The matters brought before this Court by Judge Holliday are shocking and represent egregious violations of the right of a defendant to a fair trial. They stain our judicial system and mock the ideal of justice under law.[1]*

### I.

### Kind of proceeding and nature of ruling below

*A.*

*Introduction*

---

[1]*Matter of Investigation of the West Virginia State Police Crime Laboratory, Serology Division,* 190 W.Va. 321, 326, 328, 438 S.E.2d 501, 506, 508 (1993). This initial decision involving the West Virginia State Police Crime Laboratory will be referred to as *Zain I.* The next laboratory decision, *Matter of West Virginia State Police Crime Laboratory,* 191 W.Va. 244, 445 S.E.2d 165 (1994), will be referred to as *Zain II.*

The devastating impact Trooper Fred Zain has had on the criminal justice system in West Virginia continues to be felt by those who were the victims of his deceit. This appeal represents what may be the only remaining Zain habeas corpus proceeding still being litigated. Petitioner respectfully submits that as a result of the "stain" left by Trooper Zain in the present case and his repeated mockery of the criminal justice system, justice requires that this case be heard.

*B.*

*Since two different people–Paul Reggettz, III, and Petitioner–*
*allegedly confessed to committing the same three murders,*
*one or both confessions must be false*

On **December 13, 1979,** Paul Reggettz, III, confessed that he murdered his twenty-six year old wife, Vanessa Reggettz, his seven year old son, Paul Eric Reggettz, and his four year old daughter, Bernadette Lynn Reggettz. (SECOND TRIAL, Tr. 599-611, 619, 684-90, 699-712).[2] On **December 14, 1979,** Mr. Reggettz returned to his house, accompanied by law enforcement officers, and, through words and actions, demonstrated how he killed his wife, his son, and his daughter.

On **October 28, 1980,** the same day the Honorable Judge John Hey found Mr. Reggettz's confessions to have been given voluntarily and in accordance with his constitutional rights, Petitioner John Moss, III, who was then only seventeen years old, also allegedly confessed to killing three members of the Reggettz family. (SECOND TRIAL, Tr. 505-78).

Who provided the critical "scientific" analysis of the physical evidence to assist the jury in deciding which of these two separate and conflicting confessions to believe? **TROOPER FRED SALEM ZAIN.** Once again, this Court is faced with the daunting task of deciding whether

---

[2]The record in this appeal includes transcripts from the first and second trials involving Petitioner John Moss, III, and transcripts from hearings involving Paul Reggettz, III, who originally confessed to the crimes and was charged with these murders. In referring to these transcripts, Petitioner will use either FIRST TRIAL or SECOND TRIAL or REGGETTZ.

2

a convicted criminal should be condemned to spend the rest of his life in prison, based upon evidence presented by Trooper Zain, whose testing and testimony was found by this Court consistently to be false, misleading, and scientifically invalid. Since the investigation conducted by Special Judge James O. Holliday revealed that in **every case examined, where there was sufficient evidence to review, the ASCLD experts found that Trooper Zain had committed one or more identified acts of misconduct,**[3] no court, no lawyer, and no jury should ever give any weight whatsoever to anything Trooper Zain said or did .[4]

On **April 30, 1984**, Petitioner was convicted of these three murders and sentenced to life without mercy. In *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988), this Court reversed Petitioner's convictions and remanded for a new trial.

---

[3]In *Zain I*, 190 W.Va. at 323, 438 S.E.2d at 503, this Court quoted the following summary of Trooper Zain's repeated acts of misconduct:

> "The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results."

[4]For some unknown reason, Petitioner's case was not included in this special investigation. Petitioner respectfully submits that had his case been included, many of the criticisms made by the ASCLD experts in reviewing the other cases similarly applied to the work Trooper Zain did in Petitioner's case. In this habeas corpus proceeding, Petitioner developed a record, based upon the review and testimony of nationally renowned forensic scientist Dr. David Bing, on the numerous problems with Trooper Zain's analysis in this case. *See* Part IV(B) of this **BRIEF**.

3

On **April 24, 1990**, after hearing the confessions allegedly given by Mr. Reggettz and Petitioner, and after hearing the testimony of Trooper Zain, a jury in the Circuit Court of Kanawha County convicted Petitioner of three counts of first degree murder, without a recommendation of mercy. Petitioner appealed this second conviction to this Court, which refused to grant the petition on a 3 to 2 vote on **March 12, 1991**.

On **November 10, 1993**, in an unprecedented decision that serves as a model for how the criminal justice system should address fraudulent expert testimony, this Court issued *Zain I.* *Zain I* acknowledged the repeated fraud committed by Trooper Zain and provided habeas corpus relief for those inmates who were victimized by his false testimony.[5]

On **August 18, 1994**, Petitioner filed his petition for a writ of habeas corpus, alleging that his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10, and 14 of the West Virginia Constitution, were violated, based upon the following grounds:

> 1. The admission of testimony and test results performed by Trooper Fred Salem Zain, whose credentials, credibility, and test results have all been found by this Court to be inherently unreliable and a violation of a criminal defendant's constitutional rights.
>
> 2. The presentation by the State of incorrect, false, misleading, overstated, and unscientific evidence.

---

[5]*Zain II* essentially cleared the other laboratory workers of any wrongdoing and held that there should be no presumption of fraudulent testimony with respect to testing by persons in the State Laboratory other then Trooper Zain. However, *Zain II* was reopened by this Court in an administrative order issued **June 10, 1999**. Based upon some findings made in a federal habeas corpus action involving Wilbert Thomas, this Court concluded that some of the findings in that case "have cast a renewed shadow of doubt on the State Police Laboratory Serology Division. Whether there was a practice of reporting a result for a test that was not performed and whether the newly-raised questions represent another systematic procedural deficiency at the Serology Division is unknown." This second investigation, headed once again by Special Judge Holliday, is still ongoing.

4

3.    The admission of the alleged confessions given by Petitioner, which resulted from a violation of his constitutional rights.

In the present case, Trooper Zain personally went to the scene of the crime (an extremely unusual thing for a serologist to do), Trooper Zain personally looked for physical evidence at the crime scene, Trooper Zain personally gathered physical evidence at the crime scene, Trooper Zain personally performed the critical testing of these evidentiary items that he had observed and gathered, Trooper Zain is **the only serologist** to testify in both of Petitioner's trials, and Trooper Zain's testing and testimony was the key evidence allowing the jury to decide which of the two confessions to believe. In fact, Trooper Zain's involvement in this case **is more extensive than his involvement in any other habeas corpus action filed pursuant to *Zain I*.** However, despite these indisputable facts, on **September 10, 1998**, the Honorable Judge A. Andrew MacQueen issued a surprising and unpersuasive order stating that the holding in *Zain I* somehow did not apply to Petitioner, and, even if it did apply, relief would not be appropriate.[6]

On **September 21, 1998**, as a result of several factual and legal errors included in the order, Petitioner filed **PETITIONER'S MOTION TO ALTER OR AMEND ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS.**[7] At the **October 27, 1998** hearing on this motion, Judge MacQueen agreed that

---

[6] In Respondent's **MEMORANDUM IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS**, at page 7, even Respondent conceded the applicability of *Zain I* by noting, "The West Virginia Supreme Court of Appeals has required the habeas corpus review in all cases in which Fred Zain, formerly of the West Virginia Police Serology Laboratory, testified and/or performed serological testing....There is no argument here that Petitioner is not entitled to such review."

[7] In the **September 10, 1998** order, the trial court noted, "Since it will be unnecessary to reach any of the other grounds asserted in the petition if the petitioner is correct in his assertion concerning Zain, this issue is being addressed preliminary to and independent of any other issues." Thus, this ruling was interlocutory because the other two grounds raised had not been briefed or ruled upon by the trial court.

he had not addressed both parts of the analysis required under *Zain I*. However, Judge MacQueen never ruled on this motion prior to leaving office.

Upon his election to the Circuit Court of Kanawha County, Judge Louis H. Bloom was assigned the present case. On **February 15, 2002**, Judge Bloom issued an order denying Petitioner's pending motion. After requiring Petitioner to develop a record on the remaining two issues and permitting Respondent to add an expert witness about four years after the factual record had been closed, on **January 30, 2003**, Judge Bloom issued a final order, rejecting the remaining two issues raised in Petitioner's habeas corpus action.

## II.

### Statement of facts

#### A.

##### *Chronology*

The extensive chronology in Petitioner's case, as well as the proceedings involving Mr. Reggettz, are set out in great detail in Petitioner's initial **PETITION FOR WRIT OF HABEAS CORPUS**. Furthermore, in *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988), and *In the Interest of John Moss, Jr.*, 170 W.Va. 543, 295 S.E.2d 33 (1982), this Court previously has summarized the facts relevant to the horrible crimes that resulted in the senseless and tragic deaths of three members of the Reggettz family.

The essential chronology of events is as follows:

1.  **December 13, 1979**–Paul Reggettz, III, returned home and found his family, Vanessa Reggettz (26 years old), his wife, Paul Eric Reggettz (7 years old), his son, and Bernadette Lynn Reggettz (4 years old), his daughter, dead. (SECOND TRIAL, Tr. 397). After several hours of questioning, Mr. Reggettz confessed, in detail, that he had murdered his family. (SECOND TRIAL, Tr. 599-611, 619, 684-90, 699-712). At Petitioner's second trial, Mr. Reggettz admitted that he had said that he wished his wife were dead and further admitted saying that he "wished he (Paul Eric Reggettz) had never

been born." (SECOND TRIAL, Tr. 742). Mr. Reggettz also acknowledged that he belonged to a motorcycle gang called The Sons of Satan and that on one occasion, he and his fellow gang member unsuccessfully tried to "conjure up Satan." (SECOND TRIAL, Tr. 728, 740). Finally, Mr. Reggettz testified that after seeing his wife dead, he stated, "I felt free." (SECOND TRIAL, Tr. 744, 764-65).

2. **December 13, 1979**--As found by the trial court, on this date, "Zain was dispatched to the Reggettz home where he took several samples of the many blood stains and spatters at the scene for serological testing." (September 10, 1998 order, at 2). By that time, Trooper Zain had been employed at the State Police Laboratory "for about three years and was supervised by another serologist, Trooper Robert Murphy." (September 10, 1998 order, at 2).

3. **December 14, 1979**--Mr. Reggettz returned to the scene of the crime, with law enforcement officers, and demonstrated how he had plunged the scissors in his wife's chest. Mr. Reggettz went over to where she had been tied up to the door and said he got the scissors and kind of bent down and pushed them in her chest. Mr. Reggettz testified that in his confession, he told the police that he drowned his son, because he liked swimming, and he hanged his daughter with the electrical cord draped over a door, because she liked swinging. (SECOND TRIAL, Tr. 611, 758).

4. **January 30, 1980**--Trooper Michael Don Smith went to the Juvenile Detention Center in Cleveland, Ohio, to meet with Petitioner and to obtain a blood sample. Trooper Smith asked Petitioner to prick his finger and bleed on to a cloth, which Trooper Smith kept. (SECOND TRIAL, Tr. 912; SECOND JUVENILE TRANSFER HEARING, Tr. 195-96).[8]

5. **April 22, 1980**--Trooper Williams went to Cleveland, Ohio, pursuant to a search warrant, to obtain a legal blood sample from Petitioner. (SECOND TRIAL, Tr. 505). Later that same day, Trooper Zain received Petitioner's blood sample from Trooper Williams. (SECOND TRIAL, Tr. 1110).

---

[8]It is not clear in any of the records or transcripts what happened to this blood sample that was obtained illegally. As this Court noted in *In Interest of Moss*, 170 W.Va. at 545, 295 S.E.2d at 36, "When the appellant's counsel learned of the blood sample taken by the West Virginia authorities, he objected, and an Ohio court ordered that the cloth on which the blood sample was deposited be returned to the appellant. **This apparently was done**." (Emphasis added). Petitioner denies that this illegally obtained blood sample was ever returned to him or his counsel. Furthermore, although he has been unable to develop concrete evidence to support this allegation, Petitioner suspects that this blood sample was used to identify Petitioner's blood types. In light of this Court's finding that Trooper Zain had an extensive history of fraud, this suspicion is well founded.

6.   **April 24, 1980**--Mr. Reggettz, who was jailed soon after he confessed to the murders, was indicted by a grand jury in Kanawha County for these murders. (SUPPRESSION HEARING PRIOR TO FIRST TRIAL, Tr. 168). Petitioner's name is also included in this indictment, but the grand jury did not indict him on any charges.

7.   **June 10, 1980**--Date of report containing results of blood types obtained from the three victims, Mr. Reggettz, Petitioner, and various blood stains found at the crime scene.[9] According to Trooper Robert Murphy, who then was the head of the West Virginia State Police laboratory, he only conducted the testing of nine potential suspects, including control samples from the victims, and four other items, including clothing from Bernadette Reggettz.[10] **ALL** of the remaining items, including all other items from the crime scene, were tested by Trooper Zain.

8.   **October 24, 1980**--State files **Memorandum Of Law On Behalf Of The State Of West Virginia In Opposition To Defendant's Motion To Suppress** in Mr. Reggettz's case. In the Motion, the State asserts, "In the early morning hours of December 14, 1979, Paul Reggettz contradicted his earlier denials and confessed, in detail, Trooper Woodyard that he had, in fact, committed the murders. This was done in the presence of Trooper Woodyard alone. It should be noted that before such confession Reggettz had executed two (2) Waiver of Rights forms, which had been admitted into evidence, and which Trooper Woodyard testified were apparently understood by, and read to, Reggettz. Subsequently Reggettz returned to his home and again explained in detail that he had committed the murders and the manner and sequence of his actions. This confession was given in the presence of Troopers Woodyard, McGowan and Williams, and James E. Roark, Prosecuting Attorney for Kanawha County."   (State's Brief, p. 2). "Defendant's contention that his confession was involuntarily and unintelligently given flies in the face of reason, considering the detailed nature of the confession and in considering that the crime itself was re-enacted by the accused." (State's Brief, p. 9).

----

[9]Attached to this **BRIEF** are three tables summarizing the blood typings conducted in this case.

[10]In his deposition, Trooper Murphy was able to identify which laboratory notes were in his writing, meaning that he had performed the testing, and which notes were in the handwriting of someone else. (Murphy Dep., at 34). The critical laboratory note, containing the results of testing performed on evidentiary samples obtained from the crime scene, were acknowledged by Trooper Murphy as not being in his writing and at the top of the sheet are the initials "FSZ." (Murphy Dep., at 35-36). Attached to Trooper Murphy's deposition are the only notes or reports relating to the testing conducted in this investigation by the State Laboratory that could be located. These documents have a Bates stamp number at the bottom of each page.

9.  **October 28, 1980**--After considering the briefs, testimony, and arguments, Judge John Hey found that Mr. Reggettz's confessions were admissible and concluded, "Given a totality of the circumstances of this case, which involved three counts of murder in the first degree, the Court finds that the confession was made knowingly, intelligently, voluntarily, and that the State, by a preponderance of the evidence, has sustained its burden of proof."[11] (REGGETTZ OCTOBER 28, 1980, Tr. 35-36).

10. **October 28, 1980**--Troopers Williams and Smith went to Mansfield, Ohio to bring Petitioner back to Charleston. (SECOND TRIAL, Tr. 506). As noted by this Court in *In the Interest of Moss*, 170 W.Va. at 546, 295 S.E.2d at 36-37, the purpose of this trip was to return Petitioner to West Virginia to answer an unrelated malicious wounding charge. During this trip, Petitioner allegedly confessed to these murders. (SECOND TRIAL, Tr. 505-78). In the suppression hearing held before the first trial, Petitioner testified that he confessed to these crimes only after being subjected to repeated physical abuse by Trooper Smith, who crawled into the back seat beside Petitioner while both of Petitioner's hands were handcuffed to the headrest. (FIRST TRIAL PRETRIAL SUPPRESSION HEARING, Tr. 303-05). Trooper Williams and Trooper Smith confirmed the fact that Petitioner was handcuffed to the front seat head rest and that Trooper Smith did crawl into the back seat with Petitioner to begin the questioning. (SECOND TRIAL, Tr. 509, 937). Even though Trooper Williams and Trooper Smith denied the beating allegations, both admitted that Petitioner's "willingness" to discuss the Reggettz murders was triggered when Trooper Smith said to Petitioner, "'Why do you think we got your blood?'"[12] (SECOND TRIAL, Tr. 511-14, 944-45). It is not clear, from this statement, if Trooper Smith was referring to the illegally obtained blood sample or the subsequent legally obtained sample. However, since Trooper Smith is the officer who obtained the illegal sample, while Trooper Williams obtained the subsequent legal sample, Petitioner had a legitimate basis for believing that Trooper Smith was referring to the illegal sample. Based upon this alleged confession, Petitioner was arrested and jailed.

11. **November 12, 1980**--Judge John Hey entered an order reducing bail for Mr. Reggettz to a $75,000 personal recognizance bond.

12. **February 27, 1981**--Judge John Hey entered an order granting the State's motion to *nolle prosequi* the charges against Mr. Reggettz.

---

[11]In *In Interest of Moss*, 170 W.Va. at 545, 295 S.E.2d at 36, this Court noted that Mr. Reggettz "was held in custody for approximately eleven months awaiting trial, during which time his alleged confession was ruled admissible into evidence as voluntarily given."

[12]These essential facts were noted by this Court in *State v. Moss*, 180 W.Va. at 372-73, 376 S.E.2d at 578-79.

13. **April 30, 1984**--Petitioner was convicted by a jury in the Circuit Court of Kanawha County of three counts of first degree murder, without a recommendation of mercy.

14. **December 19, 1988**--In *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988), this Court reversed Petitioner's convictions and remanded for a new trial.

15. **April 24, 1990**--A jury in the Circuit Court of Kanawha County convicted Petitioner of three counts of first degree murder, without a recommendation of mercy.

*B.*

*Trooper Zain's extensive involvement in this case*

For purposes of this appeal, it is important for the Court to understand the significant role Trooper Zain played in this case. Although the State presented some additional circumstantial evidence in an effort to bolster or corroborate the alleged confessions given by Petitioner, it cannot be disputed that the most significant evidence presented at both trials was the testimony of Trooper Zain. His testimony with respect to the testing of any physical evidence found was of particular importance in this case, where the jury had to decide whether to believe the confessions given by Mr. Reggettz or by Petitioner. Since at least one of these two conflicting confessions necessarily had to be false, the State needed other evidence to prove guilt beyond a reasonable doubt.

The importance of Trooper Zain's testimony and the blood typing results to the State's case was emphasized numerous times throughout both trials.[13] In the second trial, the State's reliance on the blood testing conducted by Trooper Zain was even greater than in the first trial. In the State's

---

[13]Extensive citations to the first trial transcript, where the State emphasized its reliance on Trooper Zain's testing and testimony, are noted in Petitioners **PETITION FOR WRIT OF HABEAS CORPUS**.

10

opening statement in the second trial, the jury was told at length about the testimony anticipated from

Trooper Zain:

> Now, we all know about some bloodwork. Everyone has an ABO type; either O, A, or AB, or B. **Trooper Zain – or Lieutenant Zain** will tell you that the bloodwork at the time, was broken down scientifically and forensically, and can be broken down to a number of samples, to nine genetic markers or enzymes, all independent of each other, which is important. Some of the blood samples that were taken from the house were taken from the curtains on the back door, from Bernadette's pajama top, from Christmas wrapping paper, I believe the Christmas package. **And those blood samples were able to be broken down by Fred Zain into those nine genetic markers.** And one at a time -- that blood exactly matched John Moss's -- the genetic markers, those nine genetic markers, in the sample of blood.

> **And Fred Zain will further tell you that the combination of those nine genetic markers found in the defendant's known blood and on those exhibits, the exhibits that I just listed, occur in three of every ten thousand people, point zero three percent of the population in this State. Three in every ten thousand. Fred Zain will further tell you that some of the other samples, the other ones I listed, for lack of sufficient sample or whatever reason, he was able to break it down into seven of the nine genetic markers. And again, he'll tell you that those seven genetic markers found on those exhibits matched right down the line to the defendant's known blood.**

> **Fred Zain will tell you that combination of those seven genetic markers occurs in one of every thousand, twenty-one percent.** (Emphasis added)(SECOND TRIAL, Tr. 407-09).

In an *in camera* hearing held prior to Trooper Zain's testimony, the State raised a

question about who was responsible for doing the testing in this case, to which the following was

stated:

> Q    I see a Sergeant Murphy's signature on this report, dated June 10th of 1980. Is it your testimony that you performed these analyses, too?

A    Yes, sir. Sergeant Murphy, at the time, was in charge of a section, and we both countersigned reports. And I processed all of the evidence that was submitted to me at the serology section at the time.

The reports were either issued by himself or myself after conferring as to what should be issued in a report.

Q    **But it is your testimony that you performed the analysis?**

A    **Yes, that's correct.** (Emphasis added). (SECOND TRIAL, Tr. 1049-50).

During this same hearing, Trooper Zain reiterated the fact that he had performed the testing in this case:

Q    **Mr. Zain, you testified that you actually did the analysis that was presented here in this particular case; is that correct?**

A    **Yes, sir, that is correct.**

Q    So, how long after these scrapings were obtained was the analysis performed?

A    Within the next day or so.

Q    So, the fact that the report is dated in June, that doesn't indicate that's how long it was before the actual analyses were done; is that correct?

A    That's correct.    (Emphasis added).    (SECOND TRIAL, Tr. 1053).[14]

_____

[14]In the deposition conducted by former Kanawha County Prosecuting Attorney William Forbes of Trooper Zain in Texas on May 24, 1993, Trooper Zain reconfirmed the fact that he was the person who did the testing in this case and, in fact, stated that during the testing process, he had excluded at least 27 other suspects:

[W]hen you talk about blood cases, I will tell you one that would mean more to you-all than anything else and that's in Paul Reggetz'. There we went through 27 suspects, I believe it was, to try to match

12

One of the unique features about this case is that not only did Trooper Zain perform the testing, but he also obtained the unknown blood samples from the scene of the crime himself. (SECOND TRIAL, Tr. 1074).  Trooper Murphy acknowledged that it was not common for a serologist to go to the scene of the crime and that in his experience, he had been ordered to inspect a crime scene only on one occasion.  (Murphy Dep., at 11).

In the closing argument of the second trial, the State emphasized the significance of the testing performed by Trooper Zain:

> "We know that Paul Reggettz's confession is not true.  How do we know that?  We know that from the evidence.  **The blood found on the Christmas presents and wrapping paper is not Paul Reggettz's blood.  Remember what Trooper Zain said yesterday?  He said one inconsistent marker excludes people one hundred percent.  The blood found at the scene wasn't Vanessa's.  It was consistent with the defendant's.**  It can't be Paul's.  A hundred percent."  (Emphasis added)(SECOND TRIAL, Tr. 1326).

During his employment in the serology laboratory for the West Virginia Department of Public Safety, Trooper Zain routinely lied under oath about his credentials.  For example, in an *in camera* hearing held in the second trial, Trooper Zain testified as follows:

---

> up not only by A.B.O. typing but enzyme typing and we went through 27 exonerations, for example.
>
> Q. Were you the analyst that identified the blood in the Reggetz investigation that did not fit the theory of the case that the investigating officers were working on at the time?
>
> A. I did the protein enzyme work as well as Sergeant Murphy who also ran samples in the case, which is a matter of documentation.
>
> Q. And that ultimately led to the conviction of Mr. Moss (spelled phonetically) on that case?
>
> A. That's correct.  (May 24, 1993 Deposition, Tr. 47).

"Q    And what training had you received at that time in performing -- to perform such analysis?

"A    My formal education was a degree in biology, with a minor in chemistry.

"I also received an Associate Degree in Police Sciences, and specialized training at the FBI academy at Quantico, Virginia, relating to the specific field of forensic science, and more particularly, serology, or tests and methods utilized in the identification of blood and body fluids.

"Both basic and advanced courses were obtained by me from the FBI Academy and other specialized training sessions that I had attended, as well as scientific organizations which I belong to, such as the Southern Association of Forensic Scientists, and other peer groups." (SECOND TRIAL, Tr. 1050).

Virtually the same testimony about his credentials was presented to the jury shortly thereafter. (SECOND TRIAL, Tr. 1066-67).

Trooper Zain was indicted for perjury on July 22, 1994, for giving approximately the same answer in the case styled *State v. Paul Walker*, Felony No. 91-F-62.[15] As was discovered during the investigation headed by Special Judge Holliday, Trooper Zain never obtained a minor in chemistry, which was not even offered at that time by the college he attended. Furthermore, as for Trooper Zain's FBI training, he either flunked or failed to complete at least two FBI training sessions he attended. Moreover, if Trooper Zain's history of fabricating evidence, as discovered during the special investigation, had been known at the time of Petitioner's first trial, his testimony and test results would have been given little or no weight by the jury and may have been found too unreliable to be admitted into evidence.

_____

[15]Ultimately, despite at least two separate attempts, Trooper Zain was never convicted of any crimes.

14

In this habeas corpus proceeding, new facts were developed through the depositions of Trooper Robert Murphy and Dr. David H. Bing, Scientific Director of the Center for Blood Research laboratories in Boston, Massachusetts. Once the trial court permitted Respondent to reopen the record, the deposition of Captain Ted Smith, presently the laboratory director of the West Virginia State Police Crime Laboratory, was taken. In addition to these depositions, previously untranscribed hearings in the case against Mr. Reggettz have been added to the record of this case. Additional facts developed during this habeas corpus action will be discussed in connection with some of the arguments.

### III.

### Issues presented

#### A.

*Whether the trial court erred in ruling that* <u>Zain I</u> *not only was inapplicable to Petitioner's case, but would not have provided the basis for habeas corpus relief even if it did apply, where Trooper Zain: (1). personally went to the scene of the crime; (2). personally looked for and gathered physical evidence at the crime scene; (3).personally performed the critical testing of the evidentiary items that he had observed and gathered; (4). is the only serologist to testify in both of Petitioner's trials; (5). presented the key evidence allowing the jury to decide which of the two confessions to believe; and (6). had more personal involvement in this case than any other habeas corpus action filed pursuant to* <u>Zain I</u>*?*

#### B.

*Whether the trial court erred in holding that any scientific problems with Trooper Zain's testimony constituted harmless error beyond a reasonable doubt, where both experts agreed that no one could vouch for the accuracy of the work performed by Trooper Zain in this case, Petitioner's expert specifically identified numerous errors by Trooper Zain and concluded that Trooper Zain's results in this case were "meaningless," and many of the errors identified were consistent with the errors found by the ASCLD experts in* <u>Zain I</u>*?*

15

C.

*Whether the trial court erred, in light of the totality of the circumstances, which now includes the fact that Trooper Zain had a history of faking data and in light of the conflicting confessions given by Mr. Reggettz, in concluding that Petitioner's alleged confessions were voluntary and admissible?*

## IV.

### Argument

#### A.

*The trial court erred in ruling that Zain I not only was inapplicable to Petitioner's case, but would not have provided the basis for habeas corpus relief even if it did apply, because Trooper Zain: (1). personally went to the scene of the crime; (2). personally looked for and gathered physical evidence at the crime scene; (3).personally performed the critical testing of the evidentiary items that he had observed and gathered; (4). is the only serologist to testify in both of Petitioner's trials; (5). presented the key evidence allowing the jury to decide which of the two confessions to believe; and (6). had more personal involvement in this case than any other habeas corpus action filed pursuant to Zain I*

In *Zain I*, 190 W.Va. at 326, 438 S.E.2d at 506, this Court accepted Special Judge Holliday's recommendation that in light of the "overwhelming evidence" of Trooper Zain's misconduct, "'as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding." To carry out this procedure, this Court held in Syllabus Points 2 and 3 of *Zain I*:

16

2.  Although it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict.[16]

3.  "Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury." Syllabus Point 2, *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980).

The main holdings in *Zain I* were based upon several decisions by the United States

Supreme Court addressing the question of whether the presentation of false evidence was a violation

of the Due Process Clause under the United States Constitution.  In these cases, the United States

Supreme Court held that the presentation of false evidence against a defendant in a criminal case is

---

[16]Syllabus Point 2 of *Zain I* clearly states that a conviction based upon false evidence is a **constitutional** violation.  The harmless error standard for constitutional violations is set out in Syllabus Point 5 of *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975):

"Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt."

*See also* Syllabus Point 3, *State v. Barrow*, 178 W.Va. 406, 359 S.E.2d 844 (1987); Syllabus Point 1, *Maxey v. Bordenkircher*, 175 W.Va. 49, 330 S.E.2d 859 (1985); *United States v. Hasting*, 461 U.S. 499, 510-11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96,107 (1983); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In the briefing below, Petitioner argued that this Court should have applied the harmless error beyond a reasonable doubt standard in *Zain I*. However, as a practical matter, if *Zain I* is applied to Petitioner, he should prevail under either the constitutional or nonconstitutional harmless error standards.

a violation of the Due Process Clause of the United States Constitution and the State must be held responsible for such false evidence, even if the falsity was unknown. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972);*Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). Thus, this Court's *Zain I* decision was firmly grounded upon federal and state due process principles.

In applying this two-part test to this case, Petitioner first argued that if Trooper Zain's evidence were removed from the case, the remaining evidence was insufficient to sustain his conviction. Without Trooper Zain's evidence, the jury would be presented with Mr. Reggettz's confessions, and evidence corroborating his admissions, as well as Petitioner's alleged confessions, and evidence allegedly corroborating his statements. The existence of Mr. Reggettz's confessions and the evidence corroborating his statements create a substantial reasonable doubt that the State would have to overcome before prevailing against Petitioner.

If a conviction against Petitioner could be sustained based upon his alleged confessions and other corroborative facts, then the same could be said regarding Mr. Reggettz. There were more corroborative facts supporting Mr. Reggettz's confessions, particularly in light of the fact that he reenacted the murders and was the initial person on the scene. Where the evidence is sufficient to sustain a conviction against two different people, both of whom confessed to being the sole person responsible for the crime, Petitioner respectfully submits that absent compelling physical or other evidence directly linking one of the confessors to the crime, neither person can be convicted because the other person's confession and corroborative evidence renders it impossible for the remaining evidence to be sufficient "to convince impartial minds of the defendant's guilt beyond a reasonable doubt." This assertion is particularly true where, as in the present case, trial courts

18

analyzing the totality of the circumstances of the two different confessions have held they were intelligently and voluntarily given.

If it is assumed, as found by the respective trial courts involved, that both confessions were given intelligently and voluntarily by Mr. Reggettz and Petitioner, then what basis did the jury have to reject the confessions given by Mr. Reggettz? Clearly, when weighing the evidence against Mr. Reggettz and Petitioner, the deciding evidence was the testimony of Trooper Zain. Trooper Zain's testimony appeared to be scientifically reliable and based upon objective physical evidence found at the crime scene. Since, according to Trooper Zain, some of the unknown blood found could not have been deposited by Mr. Reggettz, and some of the stains were consistent with Petitioner's blood types, the testing, if valid, incriminated Petitioner and exonerated Mr. Reggettz. Thus, no matter how hard Respondent tries to rely upon tangential facts to support the conviction, clearly the evidence in the record is insufficient to convince impartial minds of Petitioner's guilt beyond a reasonable doubt, without Trooper Zain's testing and testimony.

Alternatively, Petitioner argued that he clearly should prevail under the second step of the *Zain I* analysis because he merely has to prove that Trooper Zain's testing and testimony "had any prejudicial effect on the jury." Any juror having any reasonable doubts about Petitioner's guilt, based upon the detailed confessions given by Mr. Reggettz, must have been quite impressed with Trooper Zain's ability to make the physical evidence point the finger of guilt toward Petitioner. Since most people would like to believe that physical evidence does not lie, Trooper Zain's testimony must have been very persuasive. Of course, what the jurors did not know at that time was Trooper Zain's history of making up data, falsifying records, lying or exaggerating about his credentials, overstating statistical frequencies, and waiving his "magic wand," all designed to make a suspect appear to be guilty allegedly based upon an analysis of the physical evidence.

19

The impact of Trooper Zain's testimony on the jury must be analyzed within the context of the trial. When Trooper Zain entered the court room, he had the aura of a person entrusted by law enforcement to perform this very specialized task. He wanted the jury to believe him and rely on his expert opinions, so he detailed his education and work history. He summarized the number of times other courts throughout the state had acknowledged that he was an expert in his field. He was cloaked with the label "expert witness" by the trial court, which found him to be qualified, based upon his testimony. (SECOND TRIAL, Tr. 1072). He rattled off terms of art common in his field of expertise, but foreign to most if not all jurors. Particularly in an area as complex as serological testing, jurors are at the mercy of the expert witness and must accept the expert opinions stated as true because most jurors lack the educational background to analyze critically and scientifically the opinions presented.

Placed in this context, how could the jury not have been prejudiced by hearing Trooper Zain testify that the seven types obtained from the unknown blood samples found on Item No. 15 (the change purse), Item No. 11 (the utensil drawer), Item No. 14 (the door between the master bedroom and the front door), Item No. 12 (the pillow case from the bedroom beside the bath), and the flashlight, eliminated 99.9 % of the population, meaning that **one person in one thousand** would have those seven bloodtypes, and that Petitioner was included in the population with that particular combination of seven blood types? (SECOND TRIAL, Tr. 1120). How could the jury not have been prejudiced by hearing Trooper Zain testify that the nine types obtained from the unknown blood samples found on Item No. 7 (the curtain on the kitchen door), the Christmas wrapping paper, and the clothing of Bernadette Reggettz eliminated 99.97 % of the population, meaning that **three persons in ten thousand** would have those nine blood types, and that Petitioner was included in the population with that particular combination of nine blood types? (SECOND TRIAL, Tr. 1122-25).

Regardless of any assertions made by Respondent to the contrary, the obvious answer to both rhetorical questions is that it is impossible for any person to suggest that the jury was not prejudiced by Trooper Zain's testimony.

Although the trial court acknowledged the procedure **required** by this Court in *Zain I*, the trial court nevertheless decided not to allow Petitioner to have the benefit of this Court's ruling. Thus, Petitioner is the only inmate, to the best of counsel's knowledge, whose conviction rested in large part on the testing and testimony of Trooper Zain, but who was denied the procedure followed by all of the other inmates who filed *Zain I* habeas corpus petitions.

In concluding that the *Zain I* procedure was inapplicable, the trial court noted that "Trooper Robert Murphy performed much of the laboratory testing and prepared the forensic report for the Department" in this case, "Zain and Murphy had discovered genetic markers in blood samples from the Reggettz residence that excluded Paul Reggettz and would ultimately incriminate John Moss, long before a sample of Moss's blood was obtained and analyzed," and "Zain was not the chief serologist, but was subordinate to and supervised by Murphy." (September 10, 1998 order, at 4).

The review by Trooper Murphy was of some significance to the trial court because this Court held, in *Zain II*, that based upon the evidence known at that time, there was no particular need to presume that the testing performed by the other employees in the laboratory was invalid.[17]

---

[17]In Syllabus Point 3 of *Zain II*, this Court held:

> Serology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Fred S. Zain, are not subject to the invalidation and other strictures contained in *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 190 W.Va. 321, 438 S.E.2d 501 (1993).

21

Of course, now that this Court has reopened *Zain II*, and a special investigation is still being conducted, this part of the trial court's ruling is weakened.

After making these observations, the trial court held:

> Based on the record as it has been developed, this court is of the opinion: (1) That the prophylactic rule announced in *Zain I and II* should not operate to nullify the serology evidence offered during the petitioner's trial; and (2) That in the absence of specific evidence that the blood test results were falsified or were substantially incorrect, there is no basis to set aside the verdicts against the petitioner. (September 10, 1998, at 7).

Thus, through this unique and unprecedented ruling, which flies in the face of this Court's explicit holdings, the trial court denied Petitioner the benefit of *Zain I*. To make matters worse, the trial court created a new requirement, that Petitioner had an obligation to prove that Trooper Zain's tests were falsified or substantially incorrect, when Special Judge Holliday already had concluded, and this Court had accepted, that the evidence of Trooper Zain's pervasive misconduct was so overwhelming that "'as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding." *Zain I*, 190 W.Va. at 326, 438 S.E.2d at 506.

Petitioner respectfully submits that the trial court's ruling is factually and legally incorrect. Factually, Trooper Murphy admitted that when Trooper Zain performed the testing in this case, "I would primarily look at the final result, not necessarily see every single step." (Murphy Dep., at 50). In light of Trooper Zain's proven track record of committing a wide variety of fraudulent acts in connection with his serological testing, all of which went unnoticed by his fellow employees in the laboratory, the fact that Trooper Murphy may have reviewed the end result of some testing performed or glanced at the raw laboratory notes in this case is of little comfort. Trooper

22

Murphy also noted that it was unusual for a serologist to go to the crime scene and gather evidence, and that he was not aware that Trooper Zain had any training in the collection of evidence. (Murphy Dep., at 11-12).

The fact that Trooper Zain obtained most, if not all, of the blood samples from the crime scene himself distinguishes this case. Thus, Trooper Zain's extensive involvement in this case not only raises serious questions regarding the reliability of any of his test results, but also creates reasonable doubts regarding **the integrity of the evidence itself**.

The fact that Trooper Murphy testified to reviewing Trooper Zain's work does not mean that Trooper Zain did not commit fraud or one of the eleven or more acts of misconduct found by Special Judge Holliday. Throughout his employment with the Department of Public Safety, Trooper Zain's work was reviewed by others in the serology laboratory, and yet he continued to falsify data consistently in case after case. When Trooper Zain's work was analyzed by qualified experts, in connection with the investigation headed by Special Judge Holliday, these experts found that Trooper Zain had falsified data or otherwise acted contrary to well established scientific principles **IN EVERY CASE EXAMINED WHERE THERE WAS SUFFICIENT DATA FOR REVIEW, WITHOUT ANY EXCEPTIONS!!!** With this well documented condemnation of Trooper Zain and the fraud he committed on courts throughout West Virginia and elsewhere, it is unimaginable that any person at this time would even suggest that this Court or any other court should place any reliance whatsoever in anything Trooper Zain ever did in a laboratory.

The trial court placed considerable emphasis on the assertion that if Trooper Zain had acted consistent with his track record, he would have falsified data to implicate Mr. Reggettz, rather than Petitioner. This argument suggests that since Trooper Zain did not falsify his test results to incriminate Mr. Reggettz, then this Court should accept Trooper Zain's analysis in this one case as

23

being fully reliable and accurate. This argument not only is absurd on its face because it accepts the fact that Trooper Zain has a history of falsifying data to incriminate a suspect, but ignores all of the scientific deficiencies, flaws, and misstatements noted by Dr. Bing in his analysis of the serological testing.[18]

The problem with any case involving Trooper Zain is that it is virtually impossible to know when he was making things up or when he conducted testing in accordance with well accepted scientific principles. For that reason, Special Judge Holliday and this Court decided that the trial courts in this State had to assume that Trooper's Zain's testing and testimony were false, particularly since Trooper Zain and the laboratory did not keep the raw data sheets in this case and the test results were not otherwise preserved through photographs.

The trial court's ruling rewards Trooper Zain not only for being skilled at presenting fraudulent "scientific" evidence, but also for destroying the underlying data, documentation, and test results that a competent forensic scientist might be able to review to challenge his findings. The same concerns that led this Court to adopt the rule requiring the preservation of scientific test results, such as the serological testing performed in the present case, in Syllabus Point 4 of *State v. Thomas*, 187 W.Va. 686, 421 S.E.2d 227 (1992), are applicable here.

The laboratory notes reviewed by Trooper Murphy in his deposition demonstrate that the critical evidence, being the blood found on certain items at the crime scene, was in Trooper Zain's handwriting, which was an indication that Trooper Zain performed that work. Once again, Trooper Zain's direct involvement in the manipulation of this critical evidence is the very reason why this Court adopted the prophylactic rule in *Zain I* in the first place.

---

[18]*See* Part IV(B) of this **BRIEF**.

24

Legally, the trial court's holding that Petitioner is not entitled to follow the same habeas corpus procedure available to any other inmate where Trooper Zain was involved is refuted by this Court's explicit holding in *Zain I*. *Zain I* created, as a matter of law, a legal presumption that all of Trooper Zain's testing and testimony was false.

The two-part analysis adopted by this Court in *Zain I* was based upon longstanding law with respect to how a court should analyze the admission of improper evidence of a nonconstitutional nature. This analysis was first stated in Syllabus Point 2 of *State v. Atkins*, 163 W.Va. 502, 514-15, 261 S.E.2d 55, 62-63 (1979), which provided the following guidance on how a court should determine whether the defendant had been prejudiced by the admission of improper evidence of a nonconstitutional nature:

> While our cases state the test as whether the error had prejudicial impact on the jury, the difficulty is in applying the test. **The more tangential the error to the ultimate issue of guilt, the less likely its prejudicial impact.**
>
> In any inquiry into the prejudicial impact of the error, we will be guided by whether the record reveals that the error was repeated or singled out for special emphasis in the State's argument. We will scrutinize the record to determine if the error became the subject of a special instruction to the jury, or produced a question from the jury. **Also of importance is the overall quality of the State's proof. While on appellate review under *Starkey*, the State is entitled to have its case viewed in the most favorable light, this is because the jury's verdict of guilty is taken to have resolved factual conflicts in favor of the State in recognition of the jury's role in evaluating the credibility of witnesses. If the case contains a number of substantial key factual conflicts or is basically a circumstantial evidence case, or is one that is largely dependent on the testimony of a co-participant for conviction, there is an increased probability that the error will be deemed prejudicial.**
>
> Further, if the error is related to critical testimony of the defendant, the more likely that it will be deemed prejudicial. *Cf. People v. Mayrant*, 43 N.Y.2d 236, 401 N.Y.S.2d 165, 372 N.E.2d 1 (1977); *People v. Dickman*, 42 N.Y.2d 294, 397 N.Y.S.2d 754, 366

25

N.E.2d 843 (1977)(holding prior conviction evidence not harmless in context of New York balancing test for admissibility of prior convictions). A further consideration is the cumulative effect of the error in the context of the entire trial. We have recognized that there may be error which, standing alone, is not sufficient to require a reversal, but that when cumulated with other marginal error, the combined effect may be sufficient to warrant a reversal. *Cf. e.g., State v. Wilson*, ___ W.Va. ___, 202 S.E.2d 828 (1974)(constitutional and nonconstitutional errors combined). (Emphasis added).

Petitioner respectfully submits that by any objective measure, Petitioner clearly and indisputably was prejudiced by Trooper Zain's testimony. Trooper Zain's testimony was not merely "tangential" evidence, but rather was the key evidence implicating Petitioner in a case where the jury was faced with conflicting confessions given by two different people. Without Trooper Zain's testimony, the jury had virtually no evidence upon which to decide whether or not to believe the confession given by Mr. Reggettz or by Petitioner.

In *People v. Cornille*, 95 Ill.2d 497, 69 Ill.Dec. 945, 448 N.E.2d 857 (1983), a case cited by this Court in *Zain I*, the Illinois Supreme Court was presented with a situation where an arson expert lied about his education and other credentials. The facts in *Cornille* are remarkably similar to the present facts in that by the time the defendant in *Cornille* had filed his habeas corpus action, the alleged arson expert had already been indicted for perjury for lying about his education and credentials. The Illinois Supreme Court held that there was a reasonable likelihood that the jury's decision may have been affected by this expert's false testimony, which made him appear to be more credible. Consequently, the defendant in *Cornille* was granted a new trial on this basis alone.

Petitioner respectfully submits that a similar holding is required in the present case, where there can be no doubt that even without the presumption of falsity in Trooper Zain's testimony and blood typing, there is a reasonable likelihood that the jury's decision was affected by Trooper

26

Zain's false testimony concerning his education and credentials. Moreover, in light of the revelations made about Trooper Zain and his proclivity to fabricate evidence in an effort to obtain a conviction, a jury would have the right to disregard anything he said.

Petitioner respectfully submits that the trial court erred in holding that *Zain I* was inapplicable to the present case. Furthermore, Petitioner respectfully submits that an application of *Zain I* requires this Court to conclude that Petitioner's convictions must be set aside, because Petitioner clearly was prejudiced by Trooper Zain's testimony, and this case should be remanded for a new trial. Without tainting the trial with Trooper Zain's unreliable and fraudulent testing and testimony, a jury should be permitted to consider the confession and other evidence presented against Mr. Reggettz, the confession, if admissible, and the other evidence presented against Petitioner, and to decide which person is guilty of these three murders. Allowing Petitioner's conviction to stand, based upon Trooper Zain's evidence, cannot be permitted in our system of justice.

*B.*

> *The trial court erred in holding that any scientific problems with Trooper Zain's testimony constituted harmless error beyond a reasonable doubt, because both experts agreed that no one could vouch for the accuracy of the work performed by Trooper Zain in this case, Petitioner's expert specifically identified numerous errors by Trooper Zain and concluded that Trooper Zain's results in this case were "meaningless," and many of the errors identified were consistent with the errors found by the ASCLD experts in* <u>Zain I</u>

The second issue raised in the habeas corpus petition was that even without the presumption that Trooper Zain's testing and testimony were false and fraudulent, the analysis by Dr. Bing demonstrated that Trooper Zain's results were invalid and meaningless. Furthermore, Dr. Bing went into great detail noting the various acts of misconduct or scientific deficiencies in this case that also were found by the ASCLD experts when they reviewed Trooper Zain's work in other cases.

27

In the January 30, 2003 order, the trial court chose not to address the specific scientific issues raised, and, in fact, held that "even if the Court were to adopt all of Moss's arguments as to the flaws in the State's scientific evidence, Moss still would not be entitled to the requested writ." Petitioner respectfully submits that this conclusion indicates a fundamental misunderstanding of the significance of Dr. Bing's testimony, much of which was corroborated by Captain Ted Smith and by the ASCLD experts.

The only items Dr. Bing could analyze were the report and the laboratory notes found. In his deposition, Trooper Murphy was unable to identify whether the handwritten documents attached to his deposition were the raw data sheets or compilation sheets. (Murphy Dep. at 32). A raw data sheet would be a document where test results initially are recorded as soon as a test has been completed. Often, raw data sheets included data from multiple cases. A compilation sheet would be a summarization of the test results recorded on the raw data sheets.

This distinction between a raw data sheet and a compilation sheet has profound implications. For example, the document attached to Trooper Murphy's deposition and marked with Bates No. 10 was identified by Trooper Murphy as being in his handwriting. This document records findings from all of the known blood samples tested, which are included in Table I attached to this **BRIEF**. At the top left of this sheet, Trooper Murphy wrote "JAN," which Trooper Murphy acknowledged probably was an abbreviation for January. (Trooper Murphy Dep., at 32).

If this document were the raw data sheet, as opposed to a later compilation sheet, it would support Petitioner's theory, asserted in his habeas corpus petition, that the blood sample illegally obtained from Petitioner on January 30, 1980, when he was being held in a juvenile facility in Ohio, had been provided to the West Virginia State Police crime laboratory. This document lists

28

all of the known samples tested by Trooper Murphy, including Petitioner's blood sample. Thus, the

State Laboratory's own documentation provides support for Petitioner's assertion on this issue.

After reviewing all of the available materials, Dr. Bing explained why he believed

the data generated in this case was **meaningless**:

> Well, by that I mean that the -- there is so much data on these
> stains that weren't analyzed, it would seem to me there should be
> some extensive notes backing that material up. **So that in that -- in
> the context of not being able to look at the backup data, other
> than the summaries, it becomes, you know, almost impossible for
> me to either agree or disagree with the final outcome of the
> results. And that's what I mean by when I say it's meaningless.
> I can't agree, I can't disagree. All I can say is what was
> reported."** (Emphasis added). (Dr. Bing Dep., at 21-22).

Dr. Bing first commented on the lack of any written protocols, quality control, quality

assurance programs, original laboratory notes and photographs of the testing performed, echoing

many of the same criticisms made by the ASCLD experts. (Dr. Bing Dep., at 12-22). Dr. Bing then

went through a series of general scientific principles applicable to the serological testing performed

in this case. The purpose of this analysis was to demonstrate the flaws in the conclusions reached

based upon the data and the overstating of the significance of this testing at trial.

First, he noted that it is important to obtain the known blood types of all potential

donors of blood at the scene of the crime. In this case, the potential donors of blood were Vanessa

Dale Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III. (Dr. Bing Dep., at

22-23). Second, at a crime scene, where the origin of all evidentiary stains is unknown, it cannot be

assumed that the stains originated from a single source. (Dr. Bing Dep., at 24). Third, only those

types obtained from the evidence that are different from any of the types obtained from known

possible donors provides relevant and meaningful information to the forensic scientist. (Dr. Bing

29

Dep., at 25-26). Fourth, as a general rule, where a type from a known possible donor of a blood stain matches a type from the blood discovered, it is not appropriate to include that type in calculating the frequency that the blood was deposited by a particular suspect. (Dr. Bing Dep., at 28-29).

Finally, Dr. Bing noted that serological typing is unable to determine when a particular evidentiary stain was deposited. (Dr. Bing Dep., at 37). Thus, from a scientific point of view, there is no objective basis for a scientist to conclude that a particular stain actually resulted from the criminal episode or may have been deposited at some time earlier.

The remainder of Dr. Bing's deposition applies these general principles to the facts. He concludes that the only blood types of significance are PGM, Gc, and EsD. The remaining types obtained from the blood stains found at the crime scene do not provide significant information because the remaining types obtained from the evidence were identical to the types obtained from at least one or more of the known possible donors. (Dr. Bing Dep., at 38). Dr. Bing further testified that he agreed with the scientific analysis of the evidence set out in the habeas corpus petition. (Dr. Bing Dep., at 39).

In addition to Dr. Bing's testimony, the August 6, 1993 report issued by ASCLD demonstrates that certain parts of Trooper Zain's evidence were false, misleading, exaggerated, and scientifically unsound. The ASCLD experts examined a number of cases analyzed in the State Police Crime Laboratory from 1986 through 1989. While the cases examined occurred after the initial testing performed in this case, there is no evidence and no reason to believe that any of the practices found by the ASCLD experts to be deficient or just plain wrong were any different earlier. Thus, based upon this report, the Court may conclude that at the time the testing was performed in the State Police Crime Laboratory in this case, there was no quality assurance program, no procedures manual, and no use of controls or standards.

30

Of particular importance to this Court's consideration is the failure of Trooper Zain to use any controls or standards in the testing he performed in this case. Petitioner can demonstrate that Trooper Zain failed to use controls or standards in this case by referring the Court to the laboratory documents provided. The ASCLD criticism was that any time blood or other evidence is found on some object, a sample from the unstained areas of that object, sometimes referred to as the substrate, should be taken "to ensure that the material itself (substrate) was not rendering a false positive interference. The use of such controls is imperative." ASCLD report at 5. In reviewing Trooper Zain's documentation, there is no reference to any substrate samples being tested on any of the items where blood allegedly was found. Thus, Petitioner has demonstrated that Trooper Zain's testing in this particular case was in fact performed consistent with ASCLD's criticism of the State Police Crime Laboratory.

In reviewing the ASCLD report, the Court should note that with respect to several of the cases reviewed, there was a severe lack of documentation and preservation of the test results, as in the present case, rendering it impossible for these experts to complete their analysis. The problem with overstating the statistical matches found with several of the cases examined was repeated in the present case. For example, in the ASCLD report, in connection with the examination of the data from the Robert Wallace case, the experts noted that Trooper Zain had included a marker in calculating the percentage of the population who might be the semen donor that matched the victim's known marker. By committing that error, Trooper Zain was able to testify that only 6.8% of the population would have the same markers as those found from the evidence, when, in fact, the number should have been 28%. This same error of exaggerating the statistical significance of the data was committed by Trooper Zain in this case. Petitioner respectfully refers the Court to the extensive analysis of the typings included in his original petition.

31

In its conclusion, the ASCLD experts stated:

> Irregularities were found in most of the cases reviewed in this
> investigation, and, therefore, believed to have been the result of
> systematic practice rather than an occasional inadvertent error. The
> majority of the irregularities were in the incompleteness of records or
> appeared to affect the weight given to a genetic match of evidence
> samples to possible donors.

There is no question that if the ASCLD experts had reviewed the data in this case,

as did Dr. Bing, they similarly would have concluded that the data was "meaningless" due to the lack

of documentation and the overstatement of the statistics generated. Furthermore, as noted in the

ASCLD report and earlier in this **BRIEF**, Trooper Zain repeatedly and consistently lied about his

credentials.

In briefing this issue below, Respondent used the following preposterous heading:

"The testing of Fred Zain at Petitioner's trial was correct and reliable." Even Respondent's own

expert, Captain Ted Smith, the present director of the West Virginia State Police's serology

laboratory, would not support that statement. Since Captain Smith's testimony corroborated many

of the scientific criticisms made by Dr. Bing, Petitioner will quote several portions of his deposition

testimony.

Captain Smith made it clear that he was not vouching for the accuracy of Troper

Zain's testing or testimony in this case:

> As we sit here today, are you vouching for the accuracy of the testing
> performed by Fred Zain in this case?
>
> A       Well, I'm not exactly sure what testing Fred Zain may or may
>         not have done in this particular case. But, no, I'm not
>         vouching for the accuracy of his testing. (Captain Smith
>         Dep., at 27).

Captain Smith further admitted that he was not able to review the raw data notes or any photographs of the testing performed because those items are not available. In fact, Captain Smith stated, "I'm just taking the data at face value." (Captain Smith Dep., at 28). The lack of these materials rendered it impossible for Captain Smith, or any other expert, to review and evaluate the accuracy of Trooper Zain's testing. As Captain Smith noted, "I have no idea about how the data was created or how it was generated, just simply what it looks like now and how it's being reported now." (Captain Smith Dep., at 56).

Captain Smith was asked several questions about his testimony given during the Special Investigation into Trooper Zain's work in the West Virginia State Police Laboratory, which testimony was cited by Special Judge Holliday in several of his findings of fact. Captain Smith agreed that he had discovered "'evidence that Zain had falsely reported results on worksheets that could not be supported by data on the laboratory notes, including falsely reporting that testing had been performed on multiple items when only a few had been tested and falsely reporting that multiple genetic markers had been identified when only a few had been identified.'" (Captain Smith Dep., at 29).

Captain Smith also confirmed Special Judge Holliday's finding that, "'As with the ASCLD investigation, Smith discovered improprieties in every case he reviewed in which Zain had been involved.'" (Captain Smith Dep., at 30). When asked if Trooper Zain **had not committed** any improprieties in the testing performed in the present case, would this case be the one exception to the rule, Captain Smith candidly responded:

> In terms of the cases that were reviewed, yes. There are other cases, earlier cases, that did not appear to show improprieties that weren't a part of the ASCLD investigation and a part of the rule. But as a part

33

of that, yes, that would be a correct statement. (Captain Smith Dep., at 30-31).

Thus, if this Court were to find Trooper Zain's testing and testimony in this case to be correct and reliable, this case would be the first and only case, following the Special Investigation, where Trooper Zain's testing was found to be free of any improprieties. In light of the findings made by the ASCLD investigators as well as by Captain Smith, it truly would be remarkable if Trooper Zain did not commit any improprieties in this case. Since there are no raw data notes or photographs of his testing to review in this case, based on his history, the probabilities are overwhelming that Trooper Zain committed various scientific improprieties in this case.

In response to whether he felt confident enough in the data reported in this case to testify in a trial, Captain Smith stated that it depends upon who did the testing:

> The Supreme Court has indicated that if Fred did it, I can't testify to it, basically, because it's unreliable. So, no, I wouldn't go testify to it if you told me that Fred did it.
>
> Now, on face value, no, I don't see anything that suggests any problems with the data. It fits the pattern that I would expect. If I were doing an audit, it fits the pattern that I would expect.
>
> **But no. If you tell me that Fred did all of these types and all of these testings, then, no, I would not go into court and I would not testify to it, simply because of the Supreme Court's ruling in that regard.** They've decided that I can't do that, and so I salute and execute. I don't do that. That's just the bottom line. (Emphasis added). (Captain Smith Dep., at 64-65).

The main difference between the opinions expressed by Dr. Bing and Captain Smith is that Dr. Bing detailed several principles used in interpreting forensic data while Captain Smith agreed with some of those principles, but disagreed with others. Both experts agree that in light of his history of fabricating test results, Trooper Zain's testing and testimony is highly suspect. Some

34

of the differences in the opinions expressed by these two experts were more trivial than substantive. Dr. Bing's approach is more cautious, particularly in light of the extensive proven history of Trooper Zain committing multiple improprieties while he worked in the West Virginia State Police Laboratory.

Based upon the data examined, Dr. Bing refused to assume any facts that were not documented. For example, both Dr. Bing and Captain Smith devote some time to a discussion of the blood stain found on the Christmas wrapping paper. Dr. Bing did not assume that there was a single drop of blood found, as opposed to a blood smear, because the documentation did not support that conclusion. Even Captain Smith agreed with Dr. Bing that if the blood were smeared, "that would raise the possibility that you could have more than one source present." (Captain Smith Dep., at 45). Thus, as Dr. Bing noted, since there is no way of knowing whether or not this blood stain came from only one person, forensic science principles require the person reporting the results to focus only on the types found that are different than the known types of the possible contributors in the house.

Based upon the foregoing "overwhelming evidence," including the testimony of Dr. Bing and Captain Smith, who is the expert witness chosen by Respondent, there is no question that Trooper Zain's testing and testimony in this simply is not credible or consistent with accepted scientific principles. In light of these facts, it was error for the trial court to suggest that any errors committed by Trooper Zain somehow are harmless.

35

*C.*

> *The trial court erred, in light of the totality of the circumstances, which now includes the fact that Trooper Zain had a history of faking data and in light of the conflicting confession initially given by Mr. Reggettz, in concluding that Petitioner's alleged confessions were voluntary and admissible*

In *State v. Moss*, this Court held that the initial two confessions allegedly given by Petitioner were admissible, but the third confession was invalid and inadmissible, based upon a prompt presentment violation. When the admissibility of these two confessions was addressed by the trial court at the beginning of the second trial, the trial court held that they were admissible for two reasons. First, in light of this Court's decision in *State v. Moss*, the admissibility of these confessions was the law of the case. Second, there was no prompt presentment violation in connection with these two confessions. (SECOND TRIAL, Tr. 19-21).

Obviously, the issue of whether Petitioner's confessions were obtained in violation of his constitutional rights has been litigated fairly extensively. However, this Court now has the benefit of all available transcripts developed in the *Reggettz* case. These transcripts demonstrate that a trial court had found the confession given by Mr. Reggettz to be voluntarily and intelligently given, in accordance with his constitutional rights. Thus, this Court is presented with two confessions from two separate individuals where the trial courts involved held that both confessions were constitutionally valid. Clearly, one or both of these confessions has to be false.[19]

---

[19]It has been well documented that for a variety of reasons, people have confessed to crimes that either never were committed or were committed by someone else. *See generally* Richard A. Leo & Richard J. Ofshe, *Criminal Law: The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J.Crim.L.&Criminology 429 (1998); Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 Denv.U.L.Rev. 979 (1997).

Confessions are evaluated based upon the totality of the circumstances. *See, e.g.,*
*State v. Goff*, 169 W.Va. 778, 289 S.E.2d 473 (1982). Petitioner respectfully submits that the
additional facts developed in this habeas corpus action alter the totality of the circumstances to the
point where the admissibility of Petitioner's confessions should be revisited and found to be
inadmissible.

In viewing the conflicting confessions allegedly made by Mr. Reggettz and Petitioner,
the Court should note that Mr. Reggettz is the first person to confess to these horrible murders and
is the first person to arrive at the crime scene. Some of the officers who obtained the confession
from Mr. Reggettz also were involved in obtaining the confession from Petitioner. Trooper Murphy
noted in his deposition that the investigating officers were so convinced by Mr. Reggettz's
confession that when they were confronted with Trooper Zain's false, misleading, exaggerated, and
scientifically unsound test results, they asserted that Mr. Reggettz must have planted some blood
evidence in his house. (Murphy Dep., 25-27).

The trial court in the present case suggested that despite the contrary ruling by Judge
Hey, the confessions from Mr. Reggettz were coerced. (September 10, 1998 Order, at footnote 2).
If it is true that Mr. Reggettz was coerced into confessing, then it is just as likely that Petitioner's
confessions also were coerced, particularly where some of the same law enforcement officers
involved in obtaining confessions from Mr. Reggettz were involved in interrogating Petitioner.
Furthermore, the fact that a police officer admittedly obtained an illegal blood sample from
Petitioner prior to him giving any confessions is an indication that following the rules and respecting
Petitioner's constitutional rights was not a top priority.

37

In light of this more fully developed record, particularly the evidence regarding Trooper Zain's wrongdoings and the transcripts for the proceedings against Mr. Reggettz, which had not been available to any court prior to this habeas corpus action, the totality of the circumstances has changed dramatically with respect to the confessions' issue. Fundamentally, the trial court in the various orders issued consistently failed to address the legal significance of the fact that two different people had confessed to committing the same crime. While Petitioner recognizes that his confessions have been scrutinized by this Court before, at this time, the confessions must be viewed in light of the new information developed with respect to Trooper Zain. When viewed in the context o f the record developed in this case, Petitioner's confessions were obtained in violation of his federal and state constitutional rights. Consequently, at his new trial, these confessions should be inadmissible.

## V.

## Conclusion

Obviously, anyone familiar with the tragic facts of this case, where three people, including two children, were senselessly murdered, would want to make sure that the right person was convicted of these crimes. However, as long as the most critical evidence presented to the jury was the testimony of Trooper Zain, no one could ever conclude that any reasonable form of justice was reached in this case.

For the foregoing reasons, Petitioner John Moss, III, respectfully asks this Court to schedule this case on the argument docket, to reverse the final order of the Circuit Court of

Kanawha County, to reverse Petitioner's conviction of three counts of first degree murder, and to remand this case for a new trial that excludes any testing performed by Trooper Fred Zain.

**JOHN MOSS, III**, Petitioner,

--By Counsel--

Lonnie C. Simmons (W.Va. I.D. No. 3406)
**DITRAPANO, BARRETT & DIPIERO, P.L.L.C.**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

39

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **PETITIONER'S APPEAL BRIEF** was mailed to counsel of record on the 30th day of December, 2003, addressed as follows:

> Michelle Drummond
> Assistant Prosecuting Attorney
> 550 Eagan Street
> Charleston, West Virginia 25301
> (304) 357-0300
>
> Dawn E. Warfield
> Deputy Attorney General
> Office of the Attorney General
> Room 26-E, State Capitol
> Charleston, West Virginia 25305
> (304) 558-2021

Lonnie C. Simmons (W.Va. I.D. No. 3406)

40

*TABLE I\**
### KNOWN BLOOD SAMPLES

| PERSON | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|---|---|---|---|---|---|---|---|---|---|
| Vanessa Reggettz | O | 2+1- | 1 | B | 1 | 1 | 2 | 1 | 2-1 |
| Bernadette Reggettz | O | 2+2+ | 1 | B | 1 | 1 | 2 | 2-1 | 2-1 |
| Paul Eric Reggettz | O | 2+1- | 1 | B | 1 | 1 | 2 | 2-1 | 2-1 |
| Paul Reggettz III | O | 2+2- | 1 | BA | 1 | 1 | 2 | 2 | 2-1 |
| John Moss, III | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |

*The shared blood attributes between Petitioner's known blood types and the blood types of the Reggettz family are highlighted in Table I to emphasize the similarities and differences in the known blood types.

41

*TABLE I\**

## KNOWN BLOOD SAMPLES (CONTINUED)

| PERSON | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|--------|-----|-----|----|----|-----|-----|-------|----|----|
| Jack C. Neal, Jr. | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Roger L. Province | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| William J. Monk | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Ross E. Gillespie | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Marvin D. Smith | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Richard A. Rollins | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Joseph Morehouse | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Nathaniel Brown | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Thomas F. White | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |

\*Petitioner has been unable to find any explanation as to why the blood of Jack C. Neal, Jr., Roger L. Province, William J. Monk, Ross E. Gillespie, Marvin D. Smith, Richard A. Rollins, Joseph Morehouse, Nathaniel Brown, and Thomas F. White was tested.

*TABLE II\**
UNKNOWN BLOOD SAMPLES

| ITEM | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|---|---|---|---|---|---|---|---|---|---|
| 1. Knife pieces | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 2. Room next to bath | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 3. Front bedroom carpet | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 4. Bedspread front bedroom | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 5. Pillow case front bedroom | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 6. Electrical cord | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 7. Kitchen door curtain | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |
| 8. Sheet kitchen floor | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 9. Back door handle | O | 2-1 | ? | ? | ? | ? | ? | ? | ? |
| 10. Kitchen sink | ? | ? | ? | ? | ? | ? | ? | ? | ? |
| 11. Utensil drawer | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 12. Pillow case bedroom beside bath | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 13. Door between bedroom and living room | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 14. Door between bedroom and front door | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 15. Change purse | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 16. Medium t-shirt | O | 2-1 | ? | ? | 1 | ? | ? | ? | ? |
| 17. Jockey shorts | ? | ? | ? | ? | ? | ? | ? | ? | ? |
| 18. Vanessa Reggettz's nightgown | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 19. Doll | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |

\*The blood types obtained from the unknown blood samples that are identical to the known blood types obtained from Vanessa Reggettz, Paul Eric Reggettz, Bernadette Reggettz, or Paul Reggettz, III, are highlighted in Table II.

*TABLE II*

**UNKNOWN BLOOD SAMPLES (CONTINUED)**

| ITEM | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|---|---|---|---|---|---|---|---|---|---|
| Table knife | ? | ? | ? | ? | *1* | ? | ? | ? | ? |
| Christmas wrapping paper | *O* | 1+*1*- | *1* | *BA* | *2-1* | *1* | *2* | *2-1* | 1 |
| Flashlight | *O* | 1 | *1* | *BA* | *2-1* | *1* | *2* | ? | ? |
| Clothing of Bernadette Reggettz | *O* | 1+*1*- | *1* | *BA* | *2-1* | *1* | *2* | *2-1* | 1 |

NO. 31646

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA



JOHN MOSS, III,

      *Appellant,*

*v.*

GEORGE TRENT, WARDEN,

      *Appellee.*

---

**APPELLEE'S MOTION FOR ENLARGEMENT OF TIME**

---

    Pursuant to W. Va. R. App. P. 16(b), the State of West Virginia, Appellee, respectfully requests this Court to grant it an additional sixty (60) days within which to file its brief in this matter, currently due January 30, 2004. In support of its motion, Appellee states:

    1.    The Appellate Division of the Attorney General's Office is currently engaged in representing the State of West Virginia in a number of cases before this Court and the United States federal courts;

    2.    The record in this matter is massive due to the number of years this case has been in litigation, and has not been reproduced;

    3.    The Appellate Division was not previously involved with this case, and has yet to receive or review any of the records relevant to this proceeding;

4.      Because of deadlines in several criminal appeals, federal habeas cases and other unanticipated obligations, the undersigned counsel, as well as the other attorneys in the Appellate Division, have been unable to devote the attention to this case that its full and fair resolution requires;

5.      Without an extension of time within which to file its brief in this matter, the Appellee will not be able to properly address the issues the Appellant raises so as to allow this Court to make a full, fair and just ruling; and

6.      This case has not yet been docketed for oral argument, so Appellant will not be prejudiced by the granting of this enlargement of time.

WHEREFORE, for the reasons stated above, Appellee prays that this Court will grant its motion, and allow it an additional sixty (60) days, or until March 30, 2004, within which to file its brief in this case.

Respectfully submitted,

State of West Virginia,
*Appellee,*

by Counsel,

DARRELL V. McGRAW, JR.
ATTORNEY GENERAL


*Dawn E Warfield*

DAWN E. WARFIELD
DEPUTY ATTORNEY GENERAL
State Bar ID No. 3927
State Capitol, Room E-26
Charleston, West Virginia 25305
(304) 558-2021

2

## CERTIFICATE OF SERVICE

I, Dawn E. Warfield, Deputy Attorney General for the State of West Virginia, do hereby certify

that a true and exact copy of the foregoing Appellee's Motion for Enlargement of Time was served on

counsel for Appellant by depositing the same postage prepaid in the United States Mail, this 28th day of

January, 2004, addressed as follows:

> Lonnie Simmons, Esq.
> DiTrapano, Barrett & Dipiero, PLLC
> 604 Virginia Street, East
> Charleston, West Virginia 25301

*Dawn E Warfield*

DAWN E. WARFIELD

DO NOT REMOVE
FILE COPY

FILE COPY

BEFORE THE SUPREME COURT OF APPEALS

OF WEST VIRGINIA

No. 31646

JOHN MOSS, III,

          Petitioner,

v.

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

          Respondent.



FILED

APR 2 8 2004

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

---

*FROM THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA*

---

**PETITIONER'S REPLY BRIEF**

Lonnie C. Simmons (W.Va. I.D. No. 3406)
**DITRAPANO, BARRETT & DIPIERO, P.L.L.C.**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

*Counsel for Petitioner John Moss, III*

BEFORE THE SUPREME COURT OF APPEALS

OF WEST VIRGINIA

No. 31646

**JOHN MOSS, III,**

Petitioner,

v.

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

Respondent.

---

*FROM THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA*

---

**PETITIONER'S REPLY BRIEF**

In his very well written and detailed brief, Respondent George Trent does not challenge the fundamental issue raised by Petitioner John Moss, III, namely, that discredited State Trooper Fred Zain provided false testimony in Petitioner's trial. Respondent quite candidly states, "There is no question that discredited former State Police Serologist Fred Salem Zain was involved in the testing and analysis of evidence in Appellant's case and that he lied about his credentials at the Appellant's trial." (Respondent's brief at 17). Later in his brief, Respondent agrees with Petitioner that "This Court has required the habeas corpus review in all cases in which Fred Zain, formerly a serologist at the West Virginia State Police Serology Laboratory, testified and/or

performed serological testing. *(See Zain I)*.  There is no argument that Appellant is not entitled to such review." (Respondent's brief at 19).

Despite these comments, where Petitioner and Respondent appear to be in agreement, Respondent goes on to state, "However, in this case, unlike the classic Zain case, there are profound independent indicia of reliability of Zain's testing and pivotal evidence was tested by and reported by State Police Serologist Robert Murphy." (Respondent's brief at 17).  Respondent also asserts that "The circuit court's finding that there were indicia of reliability attached to the serological evidence in this case which are not normally present in the typical 'Zain' case and, accordingly, the case was not subject to the *Zain I* analysis was not clearly erroneous." (Respondent's brief at 28).  Thus, one of the initial decisions to be made by this Court is whether the prophylactic rule recognized in *Matter of Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 190 W.Va. 321, 438 S.E.2d 501 (1993), (*Zain I*), to provide habeas corpus relief, should be applied to Petitioner's case.

To determine whether Petitioner should receive the benefit of this Court's holding in *Zain I*, the Court need look no further than the standard accepted by this Court, adopted from the holding reached by Special Judge James O. Holliday: "'It is believed that, as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding.'" *Zain I*, 190 W.Va. at 326, 438 S.E.2d at 506.  This general rule was designed to be applied to one of the most serious challenges to the validity of forensic evidence ever addressed by any appellate court.  This rule necessarily was written in a very broad

2

fashion because Trooper Zain's penchant for lying and creating false evidence was so wide spread that it would be impossible to narrow down which cases required habeas corpus relief.

No where in *Zain I* does this Court suggest that Trooper Zain's demonstrated history of fabricating test results and lying about his credentials somehow should be overlooked because such test results may have been reviewed by someone else in the laboratory or because at least some of the testing may have been performed by another serologist. If Trooper Zain falsified a result, how is that fraudulent result made more accurate by having another person look at the electrophoretic gel? Where there is no question that Trooper Zain performed the vast majority of the testing of evidence obtained a the crime scene, how does the possibility that one particular blood stain was analyzed by Robert Murphy validate Trooper Zain's results? Clearly, the rule adopted by this Court in *Zain I* was never intended to be so easily avoided. Stated simply, under *Zain I*, if Trooper Zain testified or tested any of the evidence, the habeas corpus review established in Syllabus Points 2 and 3 is mandatory.

In the present case, the need for this *Zain I* analysis is even greater than in most cases. As noted in Petitioner's appeal brief, and not disputed by Respondent, Trooper Zain's personal involvement in the retrieval and analysis of the evidence in this case is far greater than any other Trooper Zain case ever presented to this Court. Trooper Zain personally went to the scene of the crime, Trooper Zain personally obtained evidence from the Reggettz house, Trooper Zain personally analyzed the bulk of the evidence obtained at the crime scene, and Trooper Zain was the only serologist to testify at Petitioner's second trial. Petitioner respectfully submits that there is no legitimate factual, legal, or logical basis for the trial court's conclusion that Petitioner was not entitled to the review mandated by *Zain I*. The fact that the trial court alternatively did go through

3

the *Zain I* analysis is some indication that even the trial court had some concerns about its own holding.

Respondent asserts that the trial court was not clearly erroneous in concluding that the State's presentation of Trooper Zain's testing and testimony was not prejudicial. In the present case, Trooper Zain's testing and testimony was a critical part of the State's case. Even Respondent admits that "the serology evidence was no doubt compelling" and concludes that "The addition of the serology evidence served only to remove all doubt from the issue, a burden that the state need not carry to convict." (Respondent's brief at 37-38). However, Respondent asserts that Petitioner's alleged confessions, as well as the evidence cited by the State to corroborate portions of that confession, are sufficient to sustain the conviction. Respondent goes so far as to assert that "there is no reasonable likelihood" that the jury would have acquitted Petitioner had it received only the evidence of his alleged confessions and the alleged corroborating evidence.

Petitioner relied upon this Court's holding in *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), to demonstrate that this prejudicial standard has been met in the present case. *Atkins* holds that where improper evidence of a nonconstitutional nature was admitted, the more tangential the error to the ultimate issue of guilt, the less likely its prejudicial impact. Similarly, where the case contains substantial factual conflicts, the greater the likelihood that such improper evidence is prejudicial. As applied to the present case, what greater factual conflict could there be in a criminal case where two separate people confess to committing the same crime?

To assist the Court in its analysis, Petitioner has attached to this brief the portion of the suppression hearing held in *State v. Paul Reggettz, III*, CR-79-F-121, in which State Trooper Howard F. Woodyard testified to the very detailed confession given by Mr. Reggettz. In his brief,

4

o

Respondent appears to be suggesting that this confession was given involuntarily, despite the judicial finding made by the Honorable Judge John Hey, that this confession was voluntarily and intelligently given. For whatever reason, Respondent is willing to accept the testimony of Mr. Reggettz with respect to the actions of the police that prompted him to confess, but chooses not to believe the testimony of Petitioner, who, as a seventeen year old boy seated in the back of the cruiser, with his hands handcuffed to the neck rest, was beaten repeatedly in the stomach before allegedly confessing. (FIRST TRIAL PRETRIAL SUPPRESSION HEARING, Tr. 303-05).

Petitioner respectfully submits that in light of these conflicting confessions, it simply is unreasonable for anyone to conclude that Trooper Zain's testing and testimony in Petitioner's trial was not prejudicial. Trooper Zain played a pivotal role in Petitioner's conviction and in no way could his involvement in this case be characterized as tangential. His evidence went to the heart of the case because Trooper Zain provided significant evidence to assist the jury in deciding which confession to believe.

Finally, Respondent makes of point of emphasizing throughout his brief that Robert Murphy may have been the serologist who performed the testing on the blood found on Bernadette Reggettz's pajamas. Apparently, the assumption made by Respondent is that since this Court gave the other serologists a clean bill of health in *Matter of West Virginia State Police Crime Laboratory*, 191 W.Va. 244, 445 S.E.2d 165 (1994), (*Zain II*), any work performed by Mr. Murphy necessarily must be accurate. As noted in Petitioner's appeal brief, since *Zain II* was reopened by this Court and the special investigation of the other serologists is ongoing, the validity of this Court's initial conclusions reached in *Zain II* may be adjusted, depending upon the outcome of that investigation.

5

Petitioner acknowledges that in the deposition of Mr. Murphy, he marked the various laboratory documents as either "Murphy," for those documents in his handwriting, or "Not Murphy," for those documents in some other person's handwriting.  Based upon Mr. Murphy's testimony, Petitioner concedes that the test results obtained from the blood obtained from the pajamas is in the handwriting of Mr. Murphy.

Whether or not Mr. Murphy actually is the serologist who performed that testing is debatable.  In his deposition, Mr. Murphy explained:

> Q Would this sheet in your handwriting indicate that you had performed all of those tests or does that not indicate that?
>
> A Not necessarily.
>
> Q Okay.
>
> A But, as I stated earlier, I would have seen the results.
>
> (Murphy Dep. at 31-31).

Another problem with the assumption that Mr. Murphy performed the testing on the pajamas is that the *Zain I* special investigation found numerous instances where the testing was conducted by someone other than Trooper Zain, but Trooper Zain would note findings on the raw data sheets where no result was present.  Specifically, in the appendix to *Zain I*, 190 W.Va. at 331, 438 S.E.2d at 511, Special Judge Holliday found:

> Moreland and Midkiff testified that Zain became their supervisor in 1979 or in the early 1980s.  **They testified that during their employment, particularly in the later years, they observed Zain recording on his worksheet results from enzyme test plates which appeared to them and to other employees, including State Police Officer Blake, Zain's supervisor, to be blank.  Midkiff estimated that she had observed at least 100 instances of such conduct, stating such occurrences became routine over the years and were known in the other divisions of the State Police lab.** She

6

> could not, however, remember the identity of any specific case in
> which this occurred. Midkiff also testified that it appeared to her that
> the results found by Zain in such cases appeared to be consistent with
> results from tests of known samples from the suspect or the victim,
> thereby inculpating the suspect. (Emphasis added).

Therefore, if in fact Mr. Murphy had performed the test on the pajamas, but Trooper Zain noted

results on the raw data sheet, then the compilation sheet in Mr. Murphy's handwriting merely would

reflect the results noted by Trooper Zain.

Of course, the jury was never told that anyone other than Trooper Zain performed all

of the testing. In the *in camera* hearing held prior to Trooper Zain's testimony, he testified that he

performed all of the testing and analysis in this case. (SECOND TRIAL, Tr. 1049-50). During this

same hearing, Trooper Zain reiterated the fact that he had performed the testing in this case:

> **Q      Mr. Zain, you testified that you actually did the
> analysis that was presented here in this particular case; is that
> correct?**
>
> **A      Yes, sir, that is correct.**
>
> Q      So, how long after these scrapings were obtained was
> the analysis performed?
>
> A      Within the next day or so.
>
> Q      So, the fact that the report is dated in June, that doesn't
> indicate that's how long it was before the actual analyses were done;
> is that correct?
>
> A      That's correct.   (Emphasis added).  (SECOND

TRIAL, Tr. 1053).

When he testified before the jury, Trooper Zain gave every indication that he was the

only person who performed any of the testing. (SECOND TRIAL, Tr. 1065-1138). Robert Murphy

7

did not testify in either trial and Petitioner has been unable to find where his name was even mentioned to the jury. Had Petitioner's trial counsel known that someone other than Trooper Zain performed some of the testing, they may have insisted upon calling Mr. Murphy to discover what specific testing he had conducted and to impeach Trooper Zain for claiming to have performed all of the testing.

However, for the sake of Respondent's argument, even if this Court assumes that Mr. Murphy is the serologist who performed the analysis of the blood found on Bernadette's pajamas, the result sought by Respondent would still be incorrect. *Zain I* required the trial court first to determine whether Trooper Zain performed any testing or provided any testimony. Having established that fact in the present case, the next step was to decide whether there was sufficient evidence to convict Petitioner, excluding all of Trooper Zain's testing and testimony. Once that step was met, the trial court had to analyze whether the inclusion of this improper evidence from Trooper Zain was prejudicial to Petitioner. It is this critical part of the analysis, discussed above, where the trial court clearly erred.

Furthermore, through the analysis provided by Dr. David Bing, the statistical significance of all results obtained from the evidence, including from the stain on the pajamas, was overstated. As Dr. Bing explained, only those types obtained from the evidence that are different from any of the types obtained from known possible donors provides relevant and meaningful information to the forensic scientist and, where a type from a known possible donor of a blood stain matches a type from the blood discovered, it is not appropriate to include that type in calculating the frequency that the blood was deposited by a particular suspect. (Dr. Bing Dep., at 25-26, 28-29). Thus, when interpreted properly, the statistical information that should have been provided to the jury, based upon this testing, would have been greatly reduced.

8

Respondent suggests that Mr. Murphy's testing of blood stains found on these pajamas somehow overcomes all of the admitted lies Trooper Zain presented to the jury with respect to his credentials as well as whatever other fabrications he may have committed in this case. As noted in Petitioner's appeal brief, one of the problems in these Trooper Zain habeas corpus cases is that due to the lack of documentation available, it is virtually impossible to prove scientifically whether or not Trooper Zain fabricated the test results in this case. However, in light of Trooper Zain's proven history of repeated wrongdoing, how can any system of justice, in good conscience, allow Petitioner's conviction to stand on the possibility that one item of evidence may have been tested by someone other than Trooper Zain, despite Trooper Zain's testimony to the contrary?

This case represents Petitioner's last best hope of obtaining relief from his convictions on three counts of first degree murder. Although Petitioner has had two separate criminal trials, as a result of Trooper Zain's involvement, Petitioner has never received the fair trial mandated in our criminal justice system.

Petitioner now has spent more days in prison than he has been alive. All Petitioner asks of this Court is to be afforded the same habeas corpus relief as every other prisoner who was victimized by Trooper Zain and who sought relief under this Court's holdings in *Zain I*.

In a new trial, a jury should be permitted to consider the conflicting confession evidence, in the event Petitioner's confessions are found to be admissible, as well as all other evidence corroborating the confessions given by Mr. Reggettz and Petitioner, without being influenced in any way by the testing or testimony of Trooper Zain. Petitioner respectfully submits

9

that for this Court's monumental decision in *Zain I* to have any real meaning, Petitioner's

convictions must be set aside and Petitioner must be granted a new trial.

**JOHN MOSS, III**, Petitioner,

--By Counsel--

Lonnie C. Simmons (W.Va. I.D. No. 3406)
**DITRAPANO, BARRETT & DIPIERO, P.L.L.C.**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

10

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **PETITIONER'S REPLY BRIEF** was mailed to counsel of record on the 28th day of April, 2004, addressed as follows:

> Darrell V. McGraw, Jr.
> Attorney General
> Jon R. Blevins
> Assistant Attorney General
> Office of the Attorney General
> Room 26-E, State Capitol
> Charleston, West Virginia 25305
> (304) 558-2021

Lonnie C. Simmons (W.Va. I.D. No. 3406)

11

## CONFESSION OF PAUL REGGETTZ, III,
## TO MURDERING HIS WIFE, HIS SON, AND HIS DAUGHTER

*When asked about the murder of his wife, Paul Reggettz, III, explained:*

*He went back into the bedroom and saw his wife's body on the floor and he again became afraid that she would regain consciousness and start fighting with him, so he went to the bathroom where he found a pair of scissors that he used to trim his mustache and he forced the scissors into his wife's chest.*

*When asked why he drowned his son, Paul Reggettz, III, explained:*

*[H]e said because he knew the child liked to swim and as a matter of fact, when he returned to the bathroom after his nap, I asked him if he saw the child and he said, "Yes", and I said, "What did he look like?" He said, "It looked as though he was swimming in the bathtub."*

*When asked why he hanged his daughter with a cord swinging over a door, Paul Reggettz, III, explained:*

*He said he knew she liked to swing, so he put her up there where she could*

*When asked how he felt knowing that his entire family was dead, Paul Reggettz, III, explained:*

*Yes, at one point I asked him, "Paul, how did you feel about leaving for work and knowing that your wife and both children were dead in the house?" He said the only thing he felt was relief; that he felt free and I asked him what he meant by feeling free, and he said he felt that he no longer had any responsibilities and felt as though a great weight had been lifted off of him.*

The following is the very detailed confession given by Paul Reggettz, III, as summarized by State Trooper Howard F. Woodyard during the suppression hearing held on October 20, 1980, in *State v. Paul Reggettz, III,* CR-79-F-121. The record in the present habeas corpus case is so large, including the transcripts of various hearings held in *Reggettz,* Petitioner believed that providing the Court with easy access to the confession given by Mr. Reggettz would be beneficial.

Based upon the evidence presented in this suppression hearing, which included testimony from State

Trooper M. D. Smith, State Trooper Terry Williams, State Trooper Stephen McGowan, and

Kanawha County Prosecuting Attorney James E. Roark, the Honorable Judge John Hey concluded

that Mr. Reggettz' confessions were given intelligently and voluntarily:

> A.  He [Paul Reggettz, III] stated that he and his wife and children
> were having supper at around 7:30 on the evening of December and
> that during supper, the children had started acting up and had been
> making considerable noise and would not eat their food.  He said that
> after supper, he was trying to watch television and that the kids
> continued to be quite noisy and he said that his wife was not
> controlling them properly, so he asked her to make them quiten down
> and she was unable to do this, so at some point he told her to put the
> children to bed and he told me then that the children started getting
> out of bed and continued playing and **he said at this point that his
> wife started to whip the children and he thought she was abusing
> them and he asked her to stop.  At that time, he and she got
> involved in an argument and he stated that as the argument
> continued and gradually got a little worse, they were following
> each other throughout the house arguing with each other and
> shoving each other and at some point, Mrs. Reggettz told Paul she
> was going to get a gun which was kept in the front bedroom of
> the house.  Paul followed her into the bedroom.  She took a gun
> from where it was hidden and he was afraid that she would try
> to hurt him with it, so he struggled with her over the gun and
> during the struggle, he took the gun away from her and started
> swinging the gun.** He told me that he could not actually remember
> striking his wife with the gun, but he felt the gun strike something,
> possibly the wall or perhaps his wife.  He was not clear exactly as to
> what he remembered.
>
> Q.  Did he demonstrate this?
>
> A.  Yes, he made a swinging motion back and forth across his chest
> a couple of times.
>
> Q.  What did he tell you then?
>
> A.  **He said that he remembered his wife falling to the floor of the
> bedroom and that he was afraid that she would regain
> consciousness and start fighting with him again, so he picked her
> up into his arms and carried her to the second bedroom, dropped**

her on the floor near the door and secured an extension cord from the television room, which sits adjacent to the second bedroom.

Q. Did he demonstrate that to you?

A. He demonstrated reaching around the side of the doorway and getting the cord and he said that he attempted to tie her up with the cord and he said that he intended to tie her to the door of the bedroom, but that he had some problems with the cord getting it through the hole where the doorknob had been.

Q. Did he tell you where he tied her up on her person?

A. I don't remember him saying whether or not he tied her hands, but he placed the cord around her neck and was intending to secure her by her neck to the door.

Q. What did he tell you then?

A. He was not able to properly secure it and during our conversation, I asked him what the children were doing at this time and he said that the children were screaming and that he had a severe headache and felt that his head was pounding and if he didn't stop the noise, his head would explode. He said the children were moving about in the bedroom around their mother and he yelled at the boy and told him to be quiet and at this time, the boy ran and he said as the boy ran behind him, he reached out his arm and got the boy and threw him face-down on the floor. He said he got the boy down on the floor by placing his right knee on the boy's buttocks and he pulled another electrical cord from a radio that was at or near the foot of the bed on the floor and he grabbed the cord, placed it around his son's neck and pulled it straight back and then he tied the child's hands with the electrical cord and after securing the child's hands, he picked him up and carried him into the bathroom and placed him face-down in a partially filled bathtub of water.

Q. Did he recite to you what, if anything, the child said to him?

A. Yes, I asked him if the boy had said anything and he said the only thing he could remember was, "Don't Daddy. Don't Daddy."

Q. What did he tell you next?

A. He said that after placing the child in the bathtub, he returned to the second bedroom, where his wife's body was located and **he observed his little girl bent over her mother on the floor and he said that he then walked over to the child, picked the child up with one arm and carried her into the first bedroom, where he got another extension cord while holding the child and secured the child with the cord in some manner,** which I was never really able to understand.

Q. Did he tell you where the extension cord came from?

A. He stated he was not sure exactly where it came from, but he thought it was from the vacuum cleaner in the room.

Q. What did he do next?

A. He said that after securing the child with the cord that he put the child on the door of the bedroom and I asked him how he did this and he stated that he put the cord over the door and closed the door and allowed the child's body to hang against the door.

Q. Did he tell you what he did next?

A. He went back into the bedroom and saw his wife's body on the floor and he again became afraid that she would regain consciousness and start fighting with him, so he went to the bathroom where he found a pair of scissors that he used to trim his mustache and he forced the scissors into his wife's chest.

Q. What did he do next?

A. He told me that he was very tired, so he thought he remembered lying down on the bed for a while. He thought he went to sleep for a while and after waking up, he went to the bathroom, used the bathroom, and went into the kitchen and had a cup of coffee. He sat down and watched television and prepared to go to work. He said that prior to going to work, he remembered that the gun he had used to strike his wife–he picked up pieces of the gun and remembered that he had a .22 caliber rifle in the house and he took both of those guns and placed them in his car, which was parked in front of the residence, some several feet from the house. He returned to the house, got his stuff ready for work, and then prior to leaving for work, he pulled a sheet down that separated the television room from the kitchen and that he placed some stainless steel ware on the sheet as it lay on the floor and I asked him why he did that and he said he

knew that it would appear that someone had broken into the house and attempted to steal something and he said that after doing that, he left the house through the rear door and went to work. He said he left the house at thirteen minutes until 2:00 and worked until 11:30 the following day.

Q. Did you have further discussion with him at this point?

A. Yes, we continued with it and I asked him what he did when he left work and he stated that he returned to his residence through the back door, observed the condition of the house and he said that he then saw his wife on the floor. He got scared again. He knew he had to call the police. He said it frightened him that he knew that he had to call the police because he felt they would suspect him, so he went to the front door and as he was going out, he observed his little girl hanging on the door, so before he left, he took here body down from the door and placed it on the bed and he went out the front door and ran down to the A & W restaurant and went inside intending to tell someone to call the police and he got frightened again and he said he went back outside of the restaurant but he knew he had to do it and he went back in and placed a dollar bill down on the counter and told one of the clerks to call the police, "Someone has killed my wife." He ran out of the restaurant and back to his residence, where, after re-entering the residence, he removed the boy's body from the bathtub, placed it on the bed, and removed the cord from the child's body.

Q. Did he ever tell you what, if any feelings, he had after he committed these acts?

A. Yes, at one point I asked him, "Paul, how did you feel about leaving for work and knowing that your wife and both children were dead in the house?' **He said the only thing he felt was relief; that he felt free and I asked him what he meant by feeling free, and he said he felt that he no longer had any responsibilities and felt as though a great weight had been lifted off of him.**

Q. Did he ever offer any explanation to you at that point as to why he placed his son in the bathtub and why he hung his daughter on the door?

A. Yes, sir, during the course of our conversation, I asked **him why he placed the child in the bathtub and he said because he knew the child liked to swim** and as a matter of fact, when he returned to the bathroom after his nap, I asked him if he saw the child and he said, "Yes", and I said, "What did he look like?" He said, "It looked as though he was swimming in the bathtub."

Q. And about the daughter.

A. **He said he knew she liked to swing, so he put her up there where she could.** (*State v. Paul Reggettz, III*, CR-80-F-121, Suppression hearing October 20, 1980, pp. 37-44).

At about 8:15 a.m., on December 14, 1979, Mr. Reggettz returned to his home to demonstrate physically to the police officers and to the prosecutor how he had murdered his family:

A. We went inside the house. I asked for Paul to explain or to demonstrate certain things that he had done in different rooms of the house and he went through those things.

Q. On the occasion of this visit to the Reggettz house, did Mr. Reggettz tell you and demonstrate to you what had taken place there?

A. Yes, sir, I asked him to start at the beginning to show me what he had done and in which rooms he did them and how he had done them.

Q. Did he go through and reconstruct the events for you?

A. Yes.

Q. What did he tell you.

A. He talked about arguing with his wife; about them following each other through the house and arguing, and during that pat of the conversation, we walked through the house, at which time he was telling us where the argument occurred, and then we reentered the first bedroom, where he said he followed her when she got the gun, and during this time, she took the gun and he got it from her. **I asked him to demonstrate what he had done after he took the gun from his wife and he made a swinging motion with his arm, back and forth, back and forth across his chest, and stated that he remembered hitting something, but that he would not remember hitting his wife, only that he remembered hitting something and that his wife was lying on the floor.** I asked him what he did then and he indicated that he lifted her up and I asked him to please show me how he did that, so he knelt down on the floor, indicated that he was picking something up in his arms, in a cradling position, and carried this imaginary object into the second bedroom where he bent over slightly and allowed his arms to drop and he indicated that he dropped some object to the floor. **Then he pointed out the door where he had tried to secure his wife and he said that he had had some problem with the cord and he had not secured it the way he**

intended to secure it and then he showed–I asked him what he had done when the child started to run past him and he held his right arm out in a blocking motion and indicated that he grabbed the child and forced the child down on the floor and placed his right leg over the child's buttocks and held him on the floor. After that, he indicated that he reached around the corner of the bed on the floor with his left hand, grabbed an imaginary cord and started securing the child in that position and then demonstrated to me that he picked the child up, carried the child into the bathroom, and placed him face-down in water that remained in the bathtub.

Then I asked him what had actually happened with the little girl and he said that he had walked past her, grabbed her with his right arm, carried her to the front bedroom, forced her down on the floor, and at this point, he had not demonstrated what he had done there. I asked him how he had secured the child on the door and he stated that he just placed the cord over the door and shut the door, holding the cord in place. After that, I asked him where he had gotten the scissors and he said he walked into the bathroom and got them from the medicine cabinet or whatever was above the sink in the bathroom, and he had taken those back to the bedroom and I asked him to demonstrate how he placed the scissors in his wife's chest and he knelt down, indicated that he held the scissors in both hands and forced the scissors into her chest.

Q. Did Mr. Reggettz indicate to you that any further–what further action he had taken with respect to the body of his daughter?

A. Yes, he had not gone through the motions, but at some point, I believe Mr. Roark or one of the troopers who were present, asked him when he had taken the little girl down from the door and he stated that he had taken here down before he went to work and I asked him, I said, "Paul, that is not exactly what you told me." He said, "Well, as I remember it now, I remember I didn't want to leave her hanging there before I went to work."

Q. In the second statement when you were back at the house and Mr. Reggettz, you testified that Mr. Reggettz sort of recreated the scene for you, did he tell you about anything that his daughter said in reference to Mr. Reggettz?

A. Yes, he said that after he placed the boy in the bathtub and returned to his wife's body, I asked him what the little girl was doing and he said that she was bending over her mother's body and I said, "What was she doing?" He said she was pushing on

the mother's body and I said, "Was she saying anything?" He said, "Yes, she was saying something like `Mommy, wake up. Mommy, get up.'" (*State v. Paul Reggettz, III*, CR-80-F-121, Suppression hearing October 20, 1980, pp. 48-52); (Emphasis added).

FILE COPY

BEFORE THE SUPREME COURT OF APPEALS

OF WEST VIRGINIA

DO NOT REMOVE
FROM FILE

No. 31646

JOHN MOSS, III,

Petitioner,

v.

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

Respondent.



FILED

AUG – 2 2004

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*FROM THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA*

**PETITION FOR REHEARING**

Lonnie C. Simmons (W.Va. I.D. No. 3406)
**DITRAPANO, BARRETT & DIPIERO, P.L.L.C.**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

*Counsel for Petitioner John Moss, III*

BEFORE THE SUPREME COURT OF APPEALS

OF WEST VIRGINIA

No. 31646

**JOHN MOSS, III,**

Petitioner,

v.

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

Respondent.

---

*FROM THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA*

---

**PETITION FOR REHEARING**

*TO THE HONORABLE JUSTICES OF THE*

*WEST VIRGINIA SUPREME COURT OF APPEALS:*

In *Matter of Investigation of the West Virginia State Police Crime Laboratory,
Serology Division,* 190 W.Va. 321, 328, 438 S.E.2d 501 (1993) , hereinafter referred to as *Zain I,*
this Court boldly and courageously told Fred Zain that, unlike Texas, the criminal justice system in
West Virginia would not tolerate his extensive and repeated history of lying under oath, fooling
juries and this Court with false scientific evidence, and assisting in the conviction of several provably
innocent men. In stark contrast to the *Zain I* decision, in *Moss v. Trent,* issued on July 1, 2004, this
Court embraced Fred Zain's lies and false scientific data, **ignored Respondent's admission that
Zain lied in Petitioner John Moss's trial,** and held that John Moss is not entitled to the same due
process as every other inmate where Fred Zain was the star witness. This result is dumbfounding.

Consequently, in an effort to ensure that this Court applies its holdings to all victims of Zain's deceit, Petitioner John Moss, III, respectfully files this **PETITION FOR REHEARING**, pursuant to Rule 24 of the Rules of Appellate Procedure, seeking the withdrawal of the opinion and justice.

The law and the policy behind this Court's decision in *Zain I* is clear–where a State witness lies under oath, the due process rights of the criminal defendant under the United States and West Virginia Constitutions are violated. The analysis established by this Court also is very clear-- in light of the "overwhelming evidence" of Zain's misconduct, "`as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding." *Zain I*, 190 W.Va. at 326, 438 S.E.2d at 506.

Despite the fact that **Zain is the person who gathered the critical blood samples from the crime scene himself, Zain was the only serologist to testify in either of John's trials and <u>Zain testified that he alone performed all of the testing</u>,** this Court held that the standard established in *Zain I* is inapplicable to John's case. Embarrassingly, this Court actually regurgitates the argument by the Respondent that since Zain usually incriminated suspects with lies and false scientific results, the fact that Zain exonerated Paul Reggettz, III, somehow suggests that Zain may have performed the tests accurately in this case. (Slip op. at 5). Does this Court really mean to say that because Zain has such an extensive history of lying and fabricating evidence, the fact that he came up with evidence in this case that allegedly excluded Mr. Reggettz somehow causes this Court to accept the validity of the results?

The Court further accepted the trial court's conclusion regarding the extensive analysis of Zain's work conducted by Dr. David Bing, who was extremely critical of the data, as it

2

existed. Counsel for John made every effort to correct the misstatement made by the trial court and provided specific citations to Dr. Bing's testimony, but this correction was never made. By citing this incorrect conclusion, the Court appears to be accepting the validity of the Zain's test results, when the only evidence in the record, including the testimony of Respondent's late-named expert Captain Ted Smith, clearly does not endorse the validity or acceptability of Zain's work in this case.

The opinion suggests that this case is different because some of the testing was performed by Robert Murphy, who would have been Zain's superior at the time. Ignoring for the moment **the undisputed fact that Zain testified, under oath in John's trial, that he performed all of the testing,** and the fact that it would be easier for Zain to fake data when he performed the tests himself, that distinction is without any merit. If the Court would review the results of the special investigation conducted in *Zain I*, the Court would find case after case where testing was performed **by Zain and by other serologists** in the laboratory. The serological testing performed in the State Police Laboratory usually involved a collaboration between Zain and the other serologists, and Zain would be the expert witness at trial. Thus, if the distinction made by the Court were valid, then virtually all of the cases included in the special investigation and at least one of the cases involving DNA exonerations (Glen Dale Woodall) would not receive the benefit of the standard established in *Zain I* because in those cases, some of the testing was performed by other serologists as well.

The Court also comments on the testing allegedly performed by Mr. Murphy on the blood found on the young girl's pajamas and concludes that his test results distinguishes this case from the ordinary *Zain I* habeas corpus action. Of course, this comment ignores Mr. Murphy's own testimony that merely because a laboratory document was in his handwriting did not necessarily mean that he had performed that testing. (Murphy Dep. at 31-32).

3

As noted in the briefs, it is important for this Court to appreciate the distinction between raw laboratory notes, which were not discovered in this case, and compilation sheets, which are based upon the raw laboratory notes. If a raw laboratory note is in the handwriting of a particular serologist, then one may conclude that the testing was performed by that serologist. However, a compilation sheet either could be written by the serologist who performed the testing or someone else. At a minimum, since Zain testified under oath that he performed all of the testing in this case and Mr. Murphy cannot testify with any certainty that he performed the testing on the pajamas, a jury issue would be presented with respect to this particular testing.

The conclusion by this Court that John does not get the benefit of the *Zain I* standard is baffling and quite disturbing. When the *Zain I* decision first was released and John's family came to present counsel over ten years ago to discuss representation, it was obvious that John was entitled to relief under *Zain I*. In the ensuing ten years that it took to obtain a ruling from this Court, nothing has changed in the applicable law to alter this legal outcome.

The other major flaw in the decision is the failure to apply the *Zain I* standard correctly. The Court established a two-part analysis. First, the trial court was supposed to examine all of the evidence, excluding Zain's testing and testimony, to determine whether the remaining evidence was sufficient to sustain John's conviction. Once that determination was made, the trial court was supposed to determine whether Zain's testimony was prejudicial.

This Court, as did the trial court, ignored this second step. The Court cites John's alleged confession, overstates the evidence allegedly corroborating such confession, ignores the conflicting confession given by Mr. Reggettz, ignores the evidence corroborating the confession given by Mr. Reggettz, and somehow concludes that Zain's testing and testimony were not prejudicial. The problem with this faulty analysis is that all of this alleged evidence of John's guilt

4

is only relevant to the first part of the *Zain I* standard. In other words, the trial court and this Court, under step one, should have examined all of the alleged other evidence of John's guilt, excluding Zain's testing and testimony, in deciding whether the evidence was sufficient to sustain the convictions without Zain's involvement.

The question of whether Zain's testing and testimony was prejudicial is not a question of what evidence was presented allegedly to prove John's guilt, but rather focuses on what role Zain's involvement played in this case. The analysis that the trial court and this Court should have made was first stated in *State v. Atkins*, 163 W.Va. 502, 514-15, 261 S.E.2d 55, 62-63 (1979), which provided the following guidance on how a court should determine whether the defendant had been prejudiced by the admission of improper evidence of a nonconstitutional nature:

> While our cases state the test as whether the error had prejudicial impact on the jury, the difficulty is in applying the test. **The more tangential the error to the ultimate issue of guilt, the less likely its prejudicial impact.**
>
> In any inquiry into the prejudicial impact of the error, we will be guided by whether the record reveals that the error was repeated or singled out for special emphasis in the State's argument. We will scrutinize the record to determine if the error became the subject of a special instruction to the jury, or produced a question from the jury. **Also of importance is the overall quality of the State's proof. While on appellate review under *Starkey*, the State is entitled to have its case viewed in the most favorable light, this is because the jury's verdict of guilty is taken to have resolved factual conflicts in favor of the State in recognition of the jury's role in evaluating the credibility of witnesses. If the case contains a number of substantial key factual conflicts or is basically a circumstantial evidence case, or is one that is largely dependent on the testimony of a co-participant for conviction, there is an increased probability that the error will be deemed prejudicial.**
>
> Further, if the error is related to critical testimony of the defendant, the more likely that it will be deemed prejudicial. *Cf. People v. Mayrant*, 43 N.Y.2d 236, 401 N.Y.S.2d 165, 372 N.E.2d 1 (1977); *People v. Dickman*, 42 N.Y.2d 294, 397 N.Y.S.2d 754, 366

5

> N.E.2d 843 (1977)(holding prior conviction evidence not harmless in context of New York balancing test for admissibility of prior convictions). A further consideration is the cumulative effect of the error in the context of the entire trial. We have recognized that there may be error which, standing alone, is not sufficient to require a reversal, but that when cumulated with other marginal error, the combined effect may be sufficient to warrant a reversal. *Cf. e.g.,* *State v. Wilson,* ___ W.Va. ___, 202 S.E.2d 828 (1974)(constitutional and nonconstitutional errors combined). (Emphasis added).

Under *Atkins*, Zain's testing and testimony clearly was not "tangential" to the issue of guilt, but rather was the key piece of evidence distinguishing between the confessions given by Paul Reggettz, III, and John. The competing and conflicting confessions presented to the jury constitutes a "substantial key factual conflict," which increases the probability that Zain's testing and testimony was prejudicial. What could be more persuasive to the jury in deciding which of the two confessions to believe than scientific evidence supposedly showing that blood was found in the house had characteristics similar to John? Clearly, *Atkins* is designed to weed out those cases where the inadmissible evidence being subjected to this harmless error standard played a minimal or unimportant role in the case. Just as clearly, *Atkins* requires the conclusion that Zain's testing and testimony in this case was prejudicial.

The scientific evidence developed in the record pointing out the similarities between the problems discovered in the *Zain I* special investigation and the testing performed in this case virtually was unrebutted in the record below and ignored by this Court. The theory for raising this related issue was that since John's case had not been analyzed by the ASCLD experts, it made sense to have the data reviewed in this habeas corpus proceeding. Dr. Bing's criticisms of Zain's work in this case mirrored many of the criticisms found by the ASCLD experts, which were accepted by this Court. Captain Smith merely disagreed with the more conservative analysis of the data offered by Dr. Bing, but otherwise did not corroborate any of Zain' test results because, as he explained, he

believes this Court's ruling in *Zain I* precludes him from supporting any of Zain's work. The Court at least should have reviewed this scientific evidence in the decision and explained how all of the similarities between the ASCLD criticisms and Dr. Bing's findings in this case somehow can be ignored.

Finally, the challenges to John's alleged confessions obviously have been before this Court on two prior occasions. However, the confessions were never examined with the complete record presented in this habeas corpus action, where several transcripts from the various Reggettz hearings were included. The trial courts examining both confessions in the context of suppression hearings concluded that the confessions by Mr. Reggettz and John were given voluntarily and in accordance with their constitutional rights. Did both of these people voluntarily and intelligently confess to these horrible crimes, or did the police use unconstitutionally impermissible tactics in obtaining one or both confessions? Thus, the questions surrounding the validity of the confessions allegedly given by John necessarily are intertwined with the confession given by Mr. Reggettz.

In the final analysis, this Court has failed to apply *Zain I* to John, despite the fact that of all the post-*Zain I* cases, Zain had more involvement in John's case than any other. It is very discouraging for this Court, which recognized Zain's fraudulent history, to now accept Zain's work in a case where the Respondent admits that Zain lied in John's trial.

John, who was a seventeen year old boy at the time of the crime, has been condemned to spend the rest of his life in prison, without any possibility of parole. Meanwhile, Mr. Reggettz, who is the first person to confess to these crimes and who reenacted the murders for the police in graphic detail, is a free man. The only fair resolution of this case, for any person who believes in the jury system, is to reverse John's convictions, and permit the jury to decide John's guilt or innocence, based upon both confessions and the evidence corroborating the confessions. Only then will John

7

have received the fair trial to which he is entitled under the United States and West Virginia Constitutions.

Why has this Court denied John Moss the same due process rights afforded to every other inmate whose conviction was tainted by Zain's invalid, unreliable, and inadmissible evidence? Under *Zain I*, clearly John is entitled to be afforded the same procedures provided to all of the other victims of Zain's lies. Now, it is up to this Court, through this rehearing process, to recognize the due process rights denied to John, to withdraw the opinion issued on July 1, 2004, to reverse John's convictions, and to remand for a new trial.

JOHN MOSS, III, Petitioner,

--By Counsel--


Lonnie C. Simmons (W.Va. I.D. No. 3406)
DITRAPANO, BARRETT & DIPIERO, P.L.L.C.
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

8

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **PETITION FOR REHEARING** was mailed to counsel of record on the 2nd day of August, 2004, addressed as follows:

> Darrell V. McGraw, Jr.
> Attorney General
> Jon R. Blevins
> Assistant Attorney General
> Office of the Attorney General
> Room 26-E, State Capitol
> Charleston, West Virginia 25305
> (304) 558-2021

Lonnie C. Simmons (W.Va. I.D. No. 3406)

9

DO NOT REMOVE
FILE COPY

FILE COPY

BEFORE THE SUPREME COURT OF APPEALS

OF WEST VIRGINIA

No. 31646



FILED

SEP 1 20[...]

RORY L. PERRY II, CLE
SUPREME COURT OF APP[...]
OF WEST VIRGINIA

JOHN MOSS, III,

       Petitioner,

v.

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

       Respondent.

---

FROM THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

---

PETITION FOR SUPPLEMENTAL REHEARING PRO-SE PETITION

John Moss, III # 13734
Mount Olive Correctional Complex
1 Mountainside Way
Mt. Olive, WV 25185

Pro-se

BEFORE THE SUPREME COURT OF APPEALS

OF WEST VIRGINIA

No. 31646

JOHN MOSS, III,

       Petitioner,

v.

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

       Respondent.

---

FROM THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

---

PETITION FOR SUPPLEMENTAL REHEARING PREO—SE PETITION

TO THE HONORABLE JUSTICES OF THE

WEST VIRGINIA SUPREME COURT OF-APPEALS: -

In **Matter of Investigation of the West Virginia State Police Crime
Laboratory, Serology Division**, 190 W.Va. 321, 328, 438 S.E.2d 501 (1993),
hereinafter referred to as **Zain I**, this Court boldly and courageously told
Fred Zain that, unlike Texas, the criminal justice system in West Virginia
would not tolerate his extensive and repeated history of lying under oath,
fooling juries and this Court with false scientific evidence, and assisting in

1

the conviction of several provably innocent men. In stark contrast to the **Zain I** decision, in **Moss v. Trent**, issued on July 1, 2004, this Court embraced Fred Zain's lies and false scientific data, **ignored Respondent's admission that Zain lied in Petitioner John Moss's trial,** and held that John Moss is not entitled to the same due process as every other inmate where Fred Zain was the star witness. This result is dumbfounded. Consequently, in an effort to ensure that this Court applies its holdings to all victims of Zain's deceit, Petitioner John Moss, III, respectfully files this PETITION FOR SUPPLEMENTAL REHEARING PRO-SE PETITION, pursuant to Rule 24 of the Rules of Appellate Procedure, seeking the withdrawal of the 1988 opinion and mandate.

The erroneous opinion issued by the West Virginia Supreme Court in **State v. Moss, Jr.,** 180 W. Va. 363, 376 S.E.2d 569 (1988) clearly implied that, had an objection been made, with the [f]irst two confessions, like the [t]hird, they would also have been inadmissible under the prompt presentment exclusionary rule because it was uncontested that the Petitioner had not been taken before a magistrate even after giving all three confessions. The application of this analysis " law of the case" became binding on all subsequent trial proceedings which was reflected in the trial court"s order dealing with the "foray or diversion" of the police in stopping at the Parkersburg detachment, therefore, is logically incongruous with this Court's **Moss II** opinion. Law of the case is just that however, it does not and cannot limit the power of a court to reconsider an earlier ruling. The ultimate responsibility of the Courts, at all levels, is to reach the correct judgment under law.

Though that obligation may be tempered at times by concerns of finality and judicial economy, nowhere is it greater and more unflagging than in the context of subject matter jurisdiction issues, which calls into question the very legitimacy of a court's adjudicatory authority.

2

These questions are of such overriding import that the United States Supreme Court has, in other contexts, carved out special exceptions for them to the general rules of procedure. So, for example, a party can challenge subject matter jurisdiction for the first time on appeal even though, in most contexts, issues not raised below are considered waived. See, e.g., **Wisconsin Dept. of Corrections v. Schacht**, 524 U.S. 381, 389, 141 L.Ed.2d 364, 118 S.Ct. 2047 (1998)(" No party can waive the [subject matter jurisdiction] defect or consent to jurisdiction.". Thus, the Supreme Court itself has decided that the value of correctioness in the subject matter jurisdiction context overrides at least some of the procedural bars in place to protect the values of finality and judicial economy. See 18B Wright, Miller & Cooper, Federal Pracice and Procedure § 4478 (2d ed. 2002)(Even after the first final judgment, the nature of some issues may encourage reconsideration; the most obvious illustration is provided by the rule that federal subject-matter jurisdiction remains open until there is no more opportunity to continue the proceeding by appeal.").

The force of law-of-the-case doctrine is affected by the nature of the first ruling and by the nature of the issues involved. If the ruling is avowedly tentative or the issues especcially important, it may be said that law-of the-case principles do not apply."). See 18B Wright, Miller & Cooper, Federal Practice and Procedure § 4478.5.

This being the case, there is only one argument which this Petitioner need assert on appeal: the first part of the trial court's order, holding the confessions admissible under the law of the case doctrine, was reversible error. In West Virginia, at least in the context <u>sub judice</u>, the law of the case doctrine has never before been expounded by this Court; but other courts have explained it thus:

> In the absence of statute the phrase "law of the

3

case" merely expresses the practice of courts generally to refuse to reopen what has been decided; it is not a limit to their power. <u>Messenger v. Anderson</u>, 225 U.S. 436, 444, 56 L.ED. 1152, 32 S.Ct. 739 (1912) (Holmes, J.). Unlike the more precise requirements of <u>res judicata</u> and <u>collateral estoppel</u>, law of the case is an amorpous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. see <u>Christianson v. Colt Indus. Operating Corp.</u>, 486 U.S. 800, 815-16, 100 L.Ed.2d 811, 108 S.Ct. 2166 (1988); <u>Arizona v. California</u>, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318, 333 (1983) (dictum). Observations, commentary, or mere dicta touching upon issues not formally before the Court do not constitute binding determinations, and are not, therefore, law of the case. <u>See</u>, <u>e.g.</u>, <u>Quern v. Jordan</u>, 440 U.S. 332, 347 n.18, 99 S.Ct. 1139, 1148 n.18, 59 L.Ed.2d 358 (1979). <u>Gertz v. Robert Welch, Inc.</u>, 680 F.2d 527, 533. The doctrine is a self-imposed prudential limitation of the court's power. 1B Moore's Federal Practice 0.404[10] at 573 (2d ed. 1980). It is not an immutable rule, but rather a way to foreclose continued appeals for reconsideration of prior rulings of law. <u>Southern Railway Co. v. Clift</u>, 260 U.S. 316, 319, 43 S.Ct. 126, 127, 67 L.Ed. 283 (1922).

There are three general exceptions to the law of the case doctrine. It should not be applied when: [1] the evidence on a subsequent trial is substantially different, [2] controlling authority has since made a contrary decision of the law applicable to such issues, or [3] the decision was clearly erroneous and would work a manifest injustice. <u>Sejman v. Warner-Lambert Co.</u>, 885 F.2d 66, 69 (4th Cir. 1988); <u>E.E.O.C. v. International Longshoremen's Association</u>, 623 F.2d 1054, 1058 (5th Cir. 1980).

Most importantly, the law of the case rule should not be applied to any issues which were <u>not necessary to the decision</u> on the first appeal. <u>People v. medina</u>, 6 Cal.3d 484, 491, 99 Cal.Rptr. 630, 492 P.2d 686 (1972). And above all, the rule should never be made the instrument of injustice. <u>Gore v. Bingaman</u>, 20 Cal.2d 118, 122-23, 124 P.2d 17, 20 (1942).

4

This Court considered the confession issues in Moss II "[b]ecause the admissibility of the ... three confessions ... [would] again be of concern on remand...." State v. Moss, 376 S.E.2d 569, 575. The holding, therefore, was not necessary to the decision itself; the Court had already decided that "[e]ach of [the first three] errors require[d] reversal." Id. at 572. Had this Court foregone consideration of the confession issues altogether, the conviction of the Petitioner would have still been reversed, and all his rights reinstated. See United States v. Watson, 146 F.Supp 258, 259 (D.C. 1956) (After a conviction is reversed and a case is remanded for a new trial, all of the rights a defendant originally had are reinstated and he is not precluded from filing a motion to suppress evidence prior to his retrial. Nor is he precluded from urging in support thereof legal grounds not previously raised.). Cf. United States v. Romano, 241 F.Supp 933 (S.D.Me. 1965); United States v. Paroutian, 319 F.2d 661 (2d Cir. 1963), cert. denied, 375 U.S. 981, 84 S.Ct. 494, 11 L.Ed.2d 426 (1964); Booth v. United States, 154 F. 836, 837 (2d Cir. 1907).

Assuming arguendo, however, that the law of the case was applicable to this Court's former determination regarding the admissibility of the petitioner's confession regarding the admissibility of the petitioner's confessions, still there would be exceptions to its application. For example, if the evidence upon remand was substantially different, or if an intervening decision had altered the applicable rule of law, it is clear that the law of the case would not govern. See Naples v. United States, 359 F.2d 276 (C.A.D.C. 1966); People v. Modesto, 427 P.2d 788 (Cal. 1967). The Petitioner's case is undoubtedly exceptional. Not only was the evidence different on remand, but the intervening decision of State v. Ellsworth, J.R., 331 S.E.2d 503 (W.Va. 1985), had altered the applicable rule of law.

5

Moreover, insofar as the decision of this Court in <u>Moss II</u> would foreclose the Petitioner from objecting anew, that decision was clearly erroneous and work a manifest injust.

In <u>United States v. Coward</u>, 669 F.2d 180 (4th Cir. 1982), the defendant's first conviction had been overruled; he was retried and once again convicted. At his first trial, evidence was "erroneously" suppressed by the trial court, but the Government did not appeal on this ground. At the second trial, this same evidence was introduced after a new suppression hearing where the Government was permitted to clarify the error of the first suppression hearing. On appeal, the Fourth Circuit stated that "[r]emand of the case for a new trial effectively <u>cleansed the slate</u>; the District Court properly corrected as many errors of the first trial as was possible." <u>Id.</u> at 184. (Emphasis added).

Likewise, in <u>State v. Darwin</u>, 161 Conn. 413, 288 A.2d 422 (1971), the defendant had been convicted and appealed to the Connecticut Supreme Court. That court affirmed, holding that "[t]he ... claims [concerning attacks on the validity of the search warrant] now come too late. The [trial] court was never asked to rule on the claims, and under settled Connecticut practice they cannot now be considered." <u>State v. Darwin</u>, 155 Conn. 124, 142, 230 A.2d 573, 582. <u>Darwin</u> petitioned the United States Supreme Court for certiorari, and case was reversed on the unrelated issue of the voluntariness of <u>Darwin's</u> confession, <u>Darwin v. Connecticut</u>, 391 U.S. 346, 20 L.Ed.2d 630, 88 S.Ct. 1488 (1968). At his second trial, <u>Darwin</u> filed a motion to suppress certain evidence obtained as a result of an insufficient search warrant; this issue formed the basis for his second appeal. Conceding the validity of this claim, the State argued three reasons against it, "(1) that by not attacking it before or during the first trial the defect was waived, (2) that the defendant

6

had no standing to challenge the search of his wife's car and (3) that by reversing on the ground of an inadmissible confession, and by not mentioning the search warrant, the validity of which the defendant had raised before it, the United States Supreme Court implied ... the warrant was valid. Rejecting the State's argument altogether, the Connecticut Supreme Court reversed, holding that:

> The first trial ended in a verdict of guilty and a judgement was rendered. That judgement was appealed, first to this court and then to the United States Supreme Court. The end result was a reversal and the ordering of a new trial. The purpose of a new trial is to have an error-free trial. The trial is "new" in every sense. It is as if no trial had ever taken place. Darwin, supra, citing State v. Adjimi, 170 So. 2d 340 (Fla.App.); Cichos v. State, 246 Ind. 680, 208 N.E.2d 685; People v. Corbo, 17 A.D.2d 351, 234 N.Y.S.2d 662. An invalid search, therefore, which was not contested on the first trial may be contested by a motion to suppress prior to the second trial. United States v. Romano, 241 F. Supp. 933 (D.Me.); United States v. Watson, 146 F.Supp. 258 (D.D.C.). By the same token, evidence which was not objected to at the first trial may be contested at the second. It would not be compatible with the theory of a new trial to tie the hands of counsel so that any errors waived in the first trial are forever waived. Thus, the defendant did have a right to raise the issue of a defective search warrant; that right had not been waived. Id. 288 A.2d 425. (Emphasis added).

The law of the case doctrine was designed to stop the needless repetition of meritless arguments already fairly adjudicated; it was not intended to be used as an instrument of injustice to blindly preclude consideration of legitimate issues never before decided. The Petitioner's first argument was never fairly considered by this Court because of a procedural default. "* * * [t]rial error not raised in the trial court will not be addressed on appeal." See State v. Humphrey, 351 S.E.2d 613 (W.Va. 1986). Petitioner was granted a "new" trial. This cleansed the slate of "all" errors at his first trial, including those made by his first attorney.

7

He was given new lawyers, and they objected in a timely fashion with sufficient specificity. His convictions should be reversed and his confessions thrown out as they were obtained in violation of the prompt presentment requirement.

8

## CERTIFICATE OF SERVICE

I, John Moss, III, do hereby certify that a copy of the foregoing **PETITION FOR SUPPLEMENTAL HEARING PRO-SE PETITION** was mailed to counsel of the record on the 19 day of August, 2004, addressed as follows:

        Darrell V. McGraw, Jr.
        Attorney General
        Jon R. Blevins
        Assistant Attorney General
        Office of the Attorney General
        Room 26-E, State Capitol
        Charleston, West Virginia 25305
        (304) 558-2021

*John Moss, III # 13734*

John Moss, III, # 13734
Mount Olive Correctional Complex
1 Mountainside Way
Mt. Olive, WV 25185

Pro-se

9

# MOSS v. BALLARD
# CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 7

*656 603 S.E.2d 656

216 W.Va. 192

Supreme Court of Appeals of West Virginia.

**John MOSS, III, Petitioner Below, Appellant**
**v.**
**George TRENT, Warden of the West**
**Virginia State Penitentiary, Respondent**
**Below, Appellee.**

No. 31646.
Submitted June 8, 2004.

Decided July 1, 2004.

**Background:** Petitioner sought writ of habeas corpus following appellate affirmance of conviction for first-degree murder, 180 W.Va. 363, 376 S.E.2d 569. The Circuit Court, Kanawha County, Louis H. Bloom, J., denied petition. Petitioner appealed.

**Holdings:** The Supreme Court of Appeals held that:

(1) any error in use of testimony of serologist who was subsequently discovered to have given willful false testimony in other prosecutions was not prejudicial, in light of defendant's independently corroborated confession, and

(2) events that took place outside presence of defendant's confession were irrelevant to determination of voluntariness of confession.

Affirmed.

West Headnotes

[1] Habeas Corpus ☞846

197 ----
197III Jurisdiction, Proceedings, and Relief
197III(D) Review
197III(D)2 Scope and Standards of Review
197k846 Clear Error.

Findings of fact made by a trial court in a post-conviction habeas corpus proceeding will not be set aside or reversed on appeal unless such findings are clearly wrong.

[2] Criminal Law ☞1139

110 ----
110XXIV Review
110XXIV(L) Scope of Review in General
110XXIV(L)13 Review De Novo
110k1139 In General.

[See headnote text below]

[2] Criminal Law ☞1147

110 ----
110XXIV Review
110XXIV(N) Discretion of Lower Court
110k1147 In General.

[See headnote text below]

[2] Criminal Law ☞1158.1

110 ----
110XXIV Review
110XXIV(O) Questions of Fact and Findings
110k1158.1 In General.

(Formerly 110k1158(1))

In reviewing challenges to the findings and conclusions of the circuit court, appellate court reviews the final order and the ultimate disposition under an abuse of discretion standard, and reviews the circuit court's underlying factual findings under a clearly erroneous standard; questions of law are subject to a de novo review.

[3] Criminal Law ☞1169.1(1)

110 ----
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1169 Admission of Evidence
110k1169.1 In General
110k1169.1(1) Evidence in General.

Where improper evidence of a non-constitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless;

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

603 S.E.2d 656, 216 W.Va. 192, Moss v. Trent, (W.Va. 2004)                                                    **Page 2**

(3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

[4] Criminal Law ☞1169.9

  110 ----
   110XXIV Review
   110XXIV(Q) Harmless and Reversible Error
   110k1169 Admission of Evidence
   110k1169.9 Opinion Evidence.

 Any error in murder prosecution in use of testimony of serologist who was subsequently discovered to have given willful false testimony in prosecutions involving serology evidence was not prejudicial; serologist who engaged in malfeasance was subject to supervision by another serologist at time of defendant's trial, defendant had confessed to offense, a second suspect who also confessed to committing offense repudiated his earlier confession, medical examiner's testimony suggested veracity of defendant's confession rather than that of second suspect, and defendant's confession was corroborated by testimony of individuals other than serologist.

[5] Criminal Law ☞531(2)

  110 ----
   110XVII Evidence
   110XVII(T) Confessions
   110k531 Preliminary Evidence as to Voluntary Character
   110k531(2) Admissibility of Evidence.

 Evidence that a second suspect confessed to offense of which defendant was accused was irrelevant to issue of voluntariness of defendant's confession.

[6] Criminal Law ☞531(2)

  110 ----
   110XVII Evidence
   110XVII(T) Confessions
   110k531 Preliminary Evidence as to Voluntary Character
   110k531(2) Admissibility of Evidence.

 Events that took place outside the presence of defendant's confession, such as any malfeasance committed by witnesses at trial, had no bearing on

the determination of the voluntariness of confession.

*Syllabus by the Court*

 1. "Findings of fact made by a trial court in a post-conviction habeas corpus proceeding will not be set aside or reversed on appeal by this Court unless such findings are **\*657** [216 W.Va. 193] clearly wrong." Syl. Pt. 1, *State ex rel. Postelwaite v. Bechtold,* 158 W.Va. 479, 212 S.E.2d 69 (1975).

 2. "Although it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict." Syl. Pt. 2, *In Re Investigation of the W.Va. State Police Crime Lab. Serology Div.,* 190 W.Va. 321, 438 S.E.2d 501 (1993).

 3. " 'Where improper evidence of a non-constitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.' Syllabus Point 2, *State v. Atkins,* 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980)." Syl. Pt. 3, *In Re Investigation of the W.Va. State Police Crime Lab.,* 190 W.Va. 321, 438 S.E.2d 501 (1993).

 Lonnie C. Simmons, DiTrapano, Barrett & DiPiero, PLLC, Charleston, for the Appellant.

 Darrell V. McGraw, Attorney General, Jon R. Blevins, Assistant Attorney General, Charleston, for the Appellee.

 PER CURIAM.

 John Moss III appeals the January 30, 2003, order of the Circuit Court of Kanawha County, denying his petition for a writ of habeas corpus in connection with his April 24, 1990, conviction for three counts of first degree murder. As the basis

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

for his appeal, Appellant argues that the lower court wrongly concluded that this Court's ruling in *Zain* I (FN1) did not afford him habeas corpus relief. Upon our full review of this matter, we reach the same conclusion that the circuit court did with regard to the unavailability of relief based on this Court's ruling in *Zain* I. Having found no error with regard to the trial court's rulings, we affirm.

## I. Factual and Procedural Background

The facts concerning the underlying conviction for three counts of murder were set forth in *In Re Moss,* 170 W.Va. 543, 295 S.E.2d 33 (1982). The murders for which Appellant was convicted occurred in December 1979. (FN2) Following an initial conviction for these murders in 1984, this Court set aside those convictions due to the trial court's failure to poll the jurors regarding their exposure to certain prejudicial remarks concerning Appellant's guilt that the prosecutor made during a radio interview broadcast. *See State v. Moss,* 180 W.Va. 363, 376 S.E.2d 569 (1988). Upon the conclusion of the second trial for these murders, Appellant was convicted on April 24, 1990. By order entered on March 12, 1991, this Court refused Appellant's appeal from the 1990 conviction. Following the issuance of *Zain* I, Appellant filed a habeas corpus petition in the Circuit Court of Kanawha County through which he requested a new trial due to the allegedly prejudicial testimony given by Trooper Fred Zain, former serologist for the West Virginia State Police Crime Laboratory.

The Honorable Andrew MacQueen, by decision entered on September 10, 1998, ruled that Appellant was not entitled to relief under *Zain* I because Mr. Zain was not the chief serologist at this time and his work was being supervised; Appellant's confession provided sufficient evidence upon which to base his conviction; and specific details pertinent to that confession were corroborated by the location of physical evidence. Despite these rulings, Judge MacQueen later determined that it was necessary to consider whether **\*658** [216 W.Va. 194] Mr. Zain's testimony had a prejudicial effect on the jury. Upon consideration of this issue by the Honorable Louis Bloom, (FN3) the trial court refused the habeas petition, ruling that the introduction of "Zain-related evidence and testimony at Moss's trial did not prejudice the jury" and that Appellant had not introduced any new evidence on the issue of the

voluntariness of his confession. Appellant seeks a reversal of the ruling denying his entitlement to habeas corpus relief.

## II. Standard of Review

[1][2] In syllabus point one of *State ex rel. Postelwaite v. Bechtold,* 158 W.Va. 479, 212 S.E.2d 69 (1975), we held that "[f]indings of fact made by a trial court in a post-conviction habeas corpus proceeding will not be set aside or reversed on appeal by this Court unless such findings are clearly wrong." Generally applicable is our standard for conducting review of circuit court decisions, as restated in *Phillips v. Fox,* 193 W.Va. 657, 458 S.E.2d 327 (1995):

In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

*Id.* at 661, 458 S.E.2d at 331 (citing *Burnside v. Burnside,* 194 W.Va. 263, 460 S.E.2d 264 (1995)).

With these standards in mind, we proceed to review the trial court's rulings on the issue of habeas corpus relief to determine if any error was committed.

## III. Discussion

In arguing that he is entitled to relief, Appellant refers to Judge MacQueen's September 10, 1998, ruling, and contends that the lower court initially determined that *Zain* I was inapplicable. Critically, however, Judge MacQueen never found the rulings of *Zain* I to be inapposite. To the contrary, Judge MacQueen structured his analysis based on the report prepared by Judge Holliday that was adopted by this Court and attached to *Zain* I. In that report, Judge Holliday identified the following three-pronged step for conducting review of cases where Mr. Zain's involvement was suspected:

The circuit court could then appoint counsel to represent the [habeas corpus] petitioner to ascertain (1) whether Zain was involved in the petitioner's prosecution; (2) whether Zain rendered an inculpatory report or offered inculpatory

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

603 S.E.2d 656, 216 W.Va. 192, Moss v. Trent, (W.Va. 2004)                                      **Page 4**

testimony; and (3) whether, excluding the serological evidence, the other evidence adduced at trial would have been sufficient to sustain a conviction beyond a reasonable doubt.

190 W.Va. at 340, 438 S.E.2d at 520.

In conducting his review of Appellant's habeas corpus claims, Judge MacQueen initially recognized the unique posture that this case presented Compared to the prototypical criminal case involving allegations of Mr. Zain's malfeasance, Appellant's case is distinguishable for several reasons, as Judge MacQueen observed. First, unlike the multitude of "Zain cases," this was an early case in which Mr. Zain was not yet the supervisor (FN4) of the State Police Crime Laboratory and, consequently, his work was being supervised by another serologist, Trooper Robert Murphy. With regard to the blood test reports relied upon in this case, Judge MacQueen found that "it is clear that both Zain and Murphy conducted analyses of some of the blood." Another significant distinction with regard to this case was "the fact that Zain and Murphy had discovered genetic markers in blood samples from the Reggettz' [victims'] residence that excluded Paul Reggettz [original suspect] and would ultimately incriminate John Moss, long before a sample of Moss's blood was obtained and analyzed." (FN5) *659 [216 W.Va. 195] Finally, with regard to the forensic evidence under scrutiny, the expert witness employed by Appellant, Dr. David H. Bing, "did not take direct issue with either of the[ ] conclusions" presented against Appellant at trial based on this evidence. As Judge MacQueen explained,

The forensic evidence presented against the petitioner [Appellant] at trial consisted of two essential conclusions. First, blood stains sampled at the scene contained genetic markers that were not donated by any of the victims or by Paul Reggettz, but matched the known blood sample from John Moss. Second, the combination of markers in the samples from the scene that matched the petitioner's blood occurred in one-tenth of one percent (.1%) and three-hundredths of one percent (.03%) of the general population.

After relating portions of Dr. Bing's testimony, Judge MacQueen concluded:

It can hardly be said that Dr. Bing characterized

Murphy and Zain's scientific conclusions and Zain's testimony as false, inaccurate or invalid. To the contrary, based on the information available to him, he confirmed the scientific validity of the conclusions. At best, it seems that Dr. Bing suggested that Zain should have explained to the jury that only a limited number of genetic markers distinguished the petitioner's blood from that of the victims. From the evidence presented at trial, the jury could not have failed to appreciate this fact.

Upon consideration of these distinguishing factors and the record as developed, Judge MacQueen concluded that the rule (FN6) announced in *Zain* I and II (FN7) "should not operate to nullify the serology evidence offered during the petitioner's trial" and "[t]hat in the absence of specific evidence that the blood test results were falsified or were substantially incorrect, there is no basis to set aside the verdicts against the petitioner." After making this ruling, the trial court proceeded to the third-prong of the analysis suggested by Judge Holliday to consider whether "even if the serological evidence is completely disregarded, there remains sufficient evidence to sustain the conviction." Following his summary of the evidence presented at trial against Appellant, (FN8) Judge MacQueen ruled that "petitioner's incriminating statements, the statement's harmony with the physical evidence and related corroboration were certainly sufficiently persuasive to convince twelve reasonable persons [of] his guilt beyond a reasonable doubt."

*660 [3] [216 W.Va. 196] Notwithstanding Judge MacQueen's denial of relief to Appellant in September 1998, his counsel ultimately convinced the trial court to examine the additional issue of whether the introduction of Mr. Zain's testimony had a prejudicial effect on the jury under this Court's holdings in syllabus points two and three of *Zain* I. In syllabus point two, we held that "[a]lthough it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict." 190 W.Va. at 322, 438 S.E.2d at 502. Upon a demonstration of false evidence used to sustain a conviction, we reasoned: "The only inquiry that remains is to analyze the other evidence in the case under the *Atkins* rule (FN9) to determine if there is sufficient evidence to uphold the conviction." *Id.* at 326, 438 S.E.2d at 506 (footnote added). Accordingly, in syllabus point three of *Zain* I we restated the test for

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

evidentiary error:

" 'Where improper evidence of a non-constitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.' Syllabus Point 2, *State v. Atkins,* 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980)."

190 W.Va. at 322, 438 S.E.2d at 502.

[4] The crux of Appellant's appeal is that the trial court, in applying the *Atkins* test, wrongly concluded that Mr. Zain's testimony did not have a prejudicial effect on the jury. Emphasizing the personal and extensive involvement of Mr. Zain in his prosecution, Appellant states that Mr. Zain collected blood samples at the scene; performed testing on critical pieces of evidence; testified in both of Appellant's trials; and presented key evidence that enabled the jury to decide which of two confessions to believe. (FN10) Downplaying the significance of Mr. Murphy's involvement in the case, Appellant argues that Mr. Zain's testimony was the key testimony based upon which the jury made its decision regarding which of the two confessions was credible.

In response to these arguments, the State identifies a number of inaccurate statements made by Appellant. As opposed to the scenario described by Appellant with Mr. Zain improperly and overzealously going to the Reggettz' home to collect blood samples, Mr. Zain only went to the scene of the crimes to collect those samples upon being called by Trooper Williams for that express purpose. Moreover, at least one critical piece of evidence--the pajama top of Bernadette Reggettz-- was collected by Trooper Williams and submitted for testing at a later date in time. The testing on this top, which Dr. Bing testified to as constituting a complete match with the blood typing of Appellant, (FN11) was performed by Trooper Murphy. Mr. Zain's only involvement with this critical piece of

evidence was his reading of the report with the blood typing results to the jury.

While Appellant strenuously argues that absent the testimony of Mr. Zain the jury had no basis from which to choose between the two confessions, the State explains why this contention is specious. In making his argument, Appellant chose to ignore various items of evidentiary significance that the jury *661 [216 W.Va. 197] was presented with that may have affected their decision regarding the truthfulness of the two confessions. Mr. Reggettz testified at trial and explained the circumstances surrounding the giving of his confession (FN12) AND FULLY REPUDIATED that confession. dr. irving sopher, the chiEf Medical Examiner, testified both to specific marks on the victims' bodies and the contents of their stomachs with regard to the time of their last meal. The details of Dr. Sopher's testimony suggested the veracity of Appellant's confession, as opposed to that given by Mr. Reggettz.

Perhaps the most convincing corroborative evidence that the jury heard on the issue of confessions, however, was testimony describing the recovery of various items taken from the Reggettz' home. (FN13) During his confession, Appellant related that he had taken a camera and what he described as "some dishes" from the Reggettz' home. He further indicated that he had given the camera to his father and the dishes to a Ms. Arbutus Pomeroy, his best friend's mother. The camera that was taken from the Reggettz' home was discovered in Appellant's father's car in Cleveland, Ohio, and Ms. Arbutus Pomeroy testified that Appellant had given her silverware, which was identified as having been taken from the Reggettz' home, as a Christmas present, shortly after the time when the murders occurred.

Setting aside the Zain evidence, the confession given by Appellant was powerfully incriminating evidence, as Judge Bloom recognized in ruling on the habeas corpus petition:

Moss's own confession is a key piece of evidence that stands independently of any Zain-related evidence. Further, the confession is corroborated in a number of significant ways, which the Court has described as "indices of reliability." In focusing on Zain, Moss ignores the power of his own well-corroborated confession.

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

The State convincingly argues that there was sufficient testimony offered through individuals other than Mr. Zain from which the jury could have based its decision to believe Appellant's confession. Given the abundance of evidence that the jury was presented with that supported Appellant's confession to having committed the subject murders, (FN14) we simply cannot accept Appellant's argument that Mr. Zain's testimony was *per se* prejudicial. Accordingly, we find no error with the trial court's conclusion that the introduction of testimony or evidence by Mr. Zain did not have a prejudicial effect on the jury. *See* Syl. Pt. 2, *Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979).

[5][6] Although Appellant sought to raise, according to the State for the fourth time, the issue of the voluntariness of his confession, the trial court found that he "failed to present any new evidence on the voluntariness of his confession." The trial court further opined:

[H]e seems to argue that the fact that Mr. Reggettz had, at one point, given a confession somehow invalidates Moss's own confession. The existence of the Reggettz confession does not have the devastating effect that Moss desires because the Reggettz confession does not impugn the voluntariness of Moss's confession. At most, *662. [216 W.Va. 198] it provided fodder for defense theories at trial.

As the State correctly posits, events that took place outside the presence of Appellant's confession (i.e. any malfeasance committed by Mr. Zain) have no bearing on the determination of the voluntariness of that confession. *See State v. Hager*, 204 W.Va. 28, 38, 511 S.E.2d 139, 149 (1998) (citing *Moran v. Burbine*, 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

Having closely examined the arguments presented against the record of this case, we find no merit in the assignments of error raised by Appellant. (FN15) Accordingly, the order of the Circuit Court of Kanawha County is hereby affirmed.

Affirmed.

(FN1.) *In Re Investigation of the W.Va. State Police Crime Lab.*, 190 W.Va. 321, 438 S.E.2d 501 (1993).

(FN2.) The victims were twenty-six-year-old

Vanessa Reggettz, her four-year-old daughter Bernadette, and her seven-year-old son, Paul Eric.

(FN3.) Due to the retirement of Judge MacQueen, this case was reassigned to Judge Bloom.

(FN4.) At the time the reports pertinent to this case were prepared, Mr. Zain had been employed by the State Police Laboratory for about three years.

(FN5.) As the State comments, this stands in stark contrast to the paradigmatic Zain scenarios where he would manufacture evidence to assist in securing a conviction of the initial suspect. At the time the blood analysis reports at issue were prepared in this case, Mr. Reggettz, and *not* Appellant, was the prime suspect for the murders under investigation.

(FN6.) What Judge MacQueen refers to is this Court's conclusion that any evidence offered by Mr. Zain in any criminal prosecution "should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial" in a subsequent habeas corpus proceeding. 190 W.Va. at 326, 438 S.E.2d at 506.

(FN7.) *See* Syl. Pt. 3, in part, *In re W.Va. State Police Crime Lab.*, 191 W.Va. 224, 445 S.E.2d 165 (1994) (holding that "[s]erology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Fred S. Zain, are not subject to the invalidation and other strictures contained in" *Zain* I). As Appellant notes, however, by administrative order entered on June 10, 1999, there currently is an investigation being performed to determine whether the work of any other employees of the State Police Crime Lab should be similarly viewed as presumptively invalid, unreliable, and inadmissible.

(FN8.) That summary included the following:

The petitioner gave statements in which he confessed to the killings and provided detail that gave particular credence to the confession.... [T]he confession and the evidence derived from it provided particular indices of reliability beyond the fact of a confession alone. For example, petitioner's confession was largely consistent with the physical evidence. He said that he went to the Reggettz residence to steal money and that he had taken a camera and what he recalled were dishes.

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.

603 S.E.2d 656, 216 W.Va. 192, Moss v. Trent, (W.Va. 2004)                    Page 7

He told investigators that he had taken the camera to his parents [sic] home in Cleveland, Ohio, and that he had given the dishes to a Ms. Arbutus Johnson.   A camera was obtained from the petitioner's father's car and was subsequently identified by Paul Reggettz during the trial. Ms. Johnson said that Moss had given her a set of silverware as a Christmas gift sometime during December, 1979. Ms. Johnson also stated that Moss was scratched when she saw him. Significantly, before he returned to his home in Cleveland, the petitioner lived with his grandfather at his grandfather's home which was immediately behind the Reggettz residence.   The State has identified other, similar portions of the petitioner's confession which reinforced its reliability.

(FN9.) See Syl. Pt. 2, State v. Atkins, 163 W.Va. 502, 261 S.E.2d 55 (1979).

(FN10.) The two confessions of which the jury was presented with evidence were those of Mr. Reggettz and Appellant.

(FN11.) During his deposition, Dr. Bing testified as follows: "[T]here is one result here where there is a complete match between Mr. Moss and a stain found at the crime scene.  That's item seven, the kitchen door curtain.  And that's also the case reported on the clothing of Bernadette Reggettz ... and the Christmas wrapping paper...."

*662_  (FN12.) He had been questioned repeatedly by as many as three or four troopers at a time over the course of almost fourteen hours before he confessed to the crimes.  Among the explanatory

testimony that the jury heard regarding the circumstances surrounding the giving of this confession was the testimony of Trooper Woodyard, who answered "yes" to the State's question of "isn't it true that when he [Mr. Reggettz] made his first inculpatory statement, he said, 'If I tell you what you want, then you won't let them hurt me?'"

(FN13.) See supra note 8.

(FN14.) Additional evidence that the jury heard included the fact that Vanessa Reggettz' autopsy revealed scalp lacerations that were consistent with being struck by the butt of a gun, which was found beside her body.   In his confession, Appellant stated he had struggled with Vanessa for a gun, and then struck her with the butt of the gun.  He also revealed in his confession his knowledge of the broken condition of the gun.   In addition, Appellant stated that Vanessa's face was "bumpy," which was inconsistent with her facial appearance on photographs shown to Appellant when he was being questioned, but was consistent with her appearance at the time of her death.   Appellant also admitted to having struggled with Vanessa for a knife, and a knife was found beside her body.

(FN15.) Given this Court's conclusion that the trial court did not error in finding that Mr. Zain's testimony did not have a prejudicial effect on the jury based on the presence of sufficient independent evidence regarding Appellant's guilt, we do not discuss the purported invalidity of Mr. Zain's testimony.

© 2009 Thomson Reuters. No claim to original U.S. Govt. works.