**MOSS v. BALLARD
CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 20
(TRIAL TRANSCRIPT, pp. 1 - 150)**

```
1      IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2

3

4      STATE OF WEST VIRGINIA

5

6      vs.                                    Action No. 82-F-221

7

8      JOHN MOSS, JR., aka JOHN MOSS, III

9

10

11            BEFORE:  Hon. A. Andrew MacQueen, Judge

12

13                         Day 1

14

15

16                       APPEARANCES

17

18            For the State:  Neva Lusk and Stephen Revercomb,

19     Assistant Prosecuting Attorneys for Kanawha County.

20            For the Defendant:  The Defendant, in person, and

21     by Nelson R. Bickley, Kathy Beckett and Timothy Huffman,

22     his counsel.

23

24

25
```

Connie Cooke
Official Reporter

FILED

JAN 23 1990

2

1                     WITNESSES FOR THE PLAINTIFF

2

3                                            D      X     RD    RX

4      1)   Trooper Terry Williams          425    590   612   619

5      2)   Scott Leasure                   625    630

6      3)   John Fulks                      631

7      4)   Joe Dean Jarrell                635    640

8      5)   William D. Estep                643

9      6)   Lt. Clarence Ralph Lane         650    654

10     7)   Paul Reggettz                   661    735   762   764

11     8)   Trooper Robert R. Custer        767    779   781

12     9)   Sgt. R. L. Presson              782    796   798

13    10)   Irvin R. Sopher, M.D.           799    864   865

14    11)   Paul Fortson                    870

15    12)   Arbutus Johnson Pomeroy         896    903   905

16    13)   Michael D. Smith (In Camera)    907    913

17    14)   John Moss (In Camera)           917    919   914

18    15)   Michael Don Smith               931    978

19    16)   Charles E. Pettry, Jr.          997   1004   1009

20    17)   Lt. David H. Shumate           1021   1045

21    18)   Fred S. Zain                   1048   1053

22                              and        1065   1125  1135  1137

23

24

3

1                     WITNESSES FOR DEFENDANT

2

3                                        D      X     RD    RX

4

5     1)  Alexander Fortson             1164   1173

6     2)  Willie James Moss             1179  1187  1191  1192

7     3)  John Moss, Jr.                1193

8     4)  John C. Wideman               1202   1204

9     5)  Trooper Howard Woodyard       1208  1222  1233  1234

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

| | | | Admitted | Received | Obj. |
|---|---|---|---|---|---|
| 1 | | EXHIBITS | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | 1) | Photo | 1403 | 1403 | N |
| 6 | 2) | Not offered | | | — |
| 7 | 3) | Photo | '' | '' | N |
| 8 | 4) | Photo | '' | '' | N |
| 9 | 5) | Photo | '' | '' | N |
| 10 | 6) | Photo | '' | '' | N |
| 11 | 7) | Not offered | | | — |
| 12 | 8) | Photo | '' | '' | N |
| 13 | 9) | Photo | '' | '' | N |
| 14 | 10) | Photo | '' | '' | N |
| 15 | 11) | Not offered | | | — |
| 16 | 12) | Photo | '' | '' | N |
| 17 | 13) | Not offered | | | — |
| 18 | 14) | Not offered | | | — |
| 19 | 15) | Photo | '' | '' | N |
| 20 | 16) | Photo | '' | '' | N |
| 21 | 17) | Photo | '' | '' | N |
| 22 | 18) | Not offered | | | — |
| 23 | 19) | Not offered | | | — |
| 24 | 20) | Photo | '' | | Y |

5

EXHIBITS (Continued)

| | | | | | |
|---|---|---|---|---|---|
| 1 | 21) | Photo | '' | '' | N |
| 2 | 22) | Photo | '' | '' | N |
| 3 | 23) | Not offered | | | — |
| 4 | 24) | Photo | '' | '' | N |
| 5 | 25) | Not offered | | | — |
| 6 | 26) | Photo | '' | | Y |
| 7 | 27) | Photo | '' | '' | N |
| 8 | 28) | Not offered | | | — |
| 9 | 29) | Photo | '' | | Y |
| 10 | 30) | Not offered | | | — |
| 11 | 31) | Not offered | | | — |
| 12 | 32) | Photo | '' | | Y |
| 13 | 33) | Not offered | | | — |
| 14 | 34) | Photo | '' | | Y |
| 15 | 35) | Photo | '' | | Y |
| 16 | 36) | Not offered | | | — |
| 17 | 37) | Not offered | | | — |
| 18 | 38) | Photo | '' | '' | N |
| 19 | 39) | Not offered | | | — |
| 20 | 40) | Photo | '' | | Y |
| 21 | 41) | Photo | '' | '' | N |
| 22 | 42) | Not offered | | | — |

6

1                           EXHIBITS (Continued)

2

3      43)  Not offered                                            —

4      44)  Not offered                                            —

5      45)  Photo                              "                    Y

6      46)  Photo                              "            "       N

7      47)  Photo                              "            "       N

8      48)  Photo                              "            "       N

9      49)  Photo                              "            "       N

10     50)  Photo                              "            "       N

11     51)  Photo                              "            "       N

12     52)  Photo                              "            "       N

13     53)  Not offered                                            —

14     54)  Photo                              "            "       N

15     55)  Photo                              "            "       N

16     56)  Photo                              "            "       N

17     57)  Photo                              "            "       N

18     58)  Photo                              "            "       N

19     59)  Photo                              "            "       N

20     60)  Not offered                                            —

21     61)  Not offered                                            —

22     62)  Not offered                                            —

23     63)  Photo                              "            "       N

24     64)  Photo                              "            "       N

7

1                              EXHIBITS (Continued)

2

3        65)   Photo                    ''              ''          N

4        66)   Photo                    ''              ''          N

5        67)   Photo                    ''              ''          N

6        68)   Not offered                                          —

7        69)   Photo                    ''              ''          N

8        70)   Not offered                                          —

9        71)   Photo                    ''                          Y

10       72)   Not offered                                          —

11       73)   Photo                    ''                          Y

12       74)   Photo                    ''                          Y

13       75)   Not offered                                          —

14       76)   Not offered                                          —

15       77)   Not offered                                          —

16       78)   Not offered                                          —

17       79)   Photo                    ''              ''          N

18       80)   Not offered                                          —

19       81)   Photo                    ''              ''          N

20       82)   Photo                    ''              ''          N

21       83)   Not offered                                          —

22       84)   Photo                    ''              ''          N

23       85)   Photo                    ''              ''          N

24       86)   Photo                    ''              ''          N

8

| 1 | | | EXHIBITS (Continued) | | | |
|---|---|---|---|---|---|---|
| 2 | | | | | | |
| 3 | 87) | Photo | | " | " | N |
| 4 | 88) | Photo | | " | " | N |
| 5 | 89) | Photo | | " | " | N |
| 6 | 90) | Not offered | | | | – |
| 7 | 91) | I.D. Card | | " | " | N |
| 8 | 92) | Waiver of Rts. | | " | " | N |
| 9 | 93) | Waiver of Rts. | | " | " | N |
| 10 | 94) | Not offered | | | | – |
| 11 | 95) | Not offered | | | | – |
| 12 | 96) | Not offered | | | | – |
| 13 | 97) | Not offered | | | | – |
| 14 | 98) | Time Card – UPS | | " | " | N |
| 15 | 99) | Dishes | | " | " | N |
| 16 | 100) | Flatware | | " | " | N |
| 17 | 101) | Knife Handle | | " | " | N |
| 18 | 102) | Camera – From Car | | " | " | N |
| 19 | 103) | Pistol Grips | | " | " | N |
| 20 | 104) | Bullet & Powder Residue | | " | " | N |
| 21 | 105) | Vacuum Cleaner & Cord | | " | " | N |
| 22 | 106) | Lantern | | " | " | N |
| 23 | 107) | Christmas Gift – Dish | | " | " | N |
| 24 | 108) | Knife Blade Pieces | | " | " | N |

9

1          EXHIBITS (Continued)

2

3      109)  Back Door Curtain                    ..          ..       N

4      110-A)  Cord (Cut for Removal)             ..          ..       N

5      110-B)  Cord (Remainder 110-A)             ..          ..       N

6      111)  Brown Cord                           ..          ..       N

7      112)  Brown Cord                           ..          ..       N

8      113)  White Cord                           ..          ..       N

9      114)  Christmas Wrap Paper                 ..          ..       N

10     115)  Change Purse                         ..          ..       N

11     116)  Not offered                                               –

12     116-A)  Girl PJ Top                        ..          ..       N

13     117)  Camera from House (3)                ..          ..       N

14     118)  Camera from House (2)                ..          ..       N

15     119)  Camera from House (3)                ..          ..       N

16     120-A)  Original Tape                      ..          ..       N

17     120-B)  Duplicate                          ..                   Y

18     121)  Gloveprint - Knife                   ..                   Y

19     122)  Gloveprint - Scissors                ..                   Y

20     123)  Gloveprint - Bedroom Door            ..                   Y

21     124)  Gloveprint - Hanky Box               ..                   Y

22     125)  Gloveprint - Wrap Paper              ..                   Y

23     126)  Gloveprint - Flatware                ..                   Y

24     127)  Clock Radio                          ..          ..       N

10

1                        EXHIBITS (Continued)

2

3     128)   Not offered                                            —

4     129)   Not offered                                            —

5     130)   Not offered                                            —

6     131)   Not offered                                            —

7     132)   Not offered                                            —

8     133)   Not offered                                            —

9     134)   Bloodwork Chart                      "          "     N

10    135)   Sample - Christmas Package           "          "     N

11    136)    "   - Utensil Drawer                "          "     N

12    137)    "   - Backdoor Curtain              "          "     N

13    138)    "   - Door Between Front/Back       "          "     N

14    139)    "   - Pillowcase, Back B.Rm.        "          "     N

15    140)    "   - Wrapping Paper                "          "     N

16    141)    "   - Clothing of Girl             "          "     N

17    142)    "   - Moss Known Blood             "          "     N

18    143)    "   - Vanessa Known Blood          "          "     N

19    144)    "   - Bernadette  "      "         "          "     N

20    145)    "   - Paul Reggettz " "            "          "     N

21    146)    "   - Paul Eric   "      "         "          "     N

22    147)   Chart                               "          "     N

23    148)   Not offered                                            —

24    149)   Not offered                                            —

| | | | | |
|---|---|---|---|---|
| 1 | | EXHIBITS (Continued) | | 11 |
| 2 | | | | |
| 3 | 150) | Not offered | | |
| 4 | 151) | Not offered | | — |
| 5 | 152) | Not offered | | — |
| 6 | 153) | Not offered | | — |
| 7 | 154) | Not offered | | — |
| 8 | 155) | Vanessa's Nightgown | " " | — |
| 9 | 156) | Paul Eric's PJ's | " " | N |
| 10 | 156-A) | Not offered | " " | N |
| 11 | 156-B) | Not offered | | — |
| 12 | 157) | Handkerchief Box | " " | — |
| 13 | 158) | Scissors | " " | N |
| 14 | 159) | Photo | " " | N |
| 15 | 160) | Not offered | " | Y |
| 16 | 161) | Not offered | | — |
| 17 | 162) | Photo | " " | — |
| 18 | 163) | Photo | " " | N |
| 19 | 164) | Photo | " " | N |
| 20 | 165) | Photo | " " | N |
| 21 | 166) | Photo | " " | N |
| 22 | 167) | Rights Form - Reggettz | " " | N |
| 23 | | | " " | N |
| 24 | 1-Def.) | Picture of Moss at 17 | " | Y |

12

1

2      BE IT REMEMBERED, that on Monday, the 16th day of

3 April, 1990, during the January 1990 Term of said Court,

4 in proceedings in the matter of the STATE OF WEST

5 VIRGINIA versus JOHN MOSS, JR., aka JOHN MOSS, III,

6 Action No. 82-F-221, as stated in the caption hereto, the

7 following transpired:

8

9      THE COURT:  Before we get started, let's just

10 take up a couple of very quick matters.

11      I have told the Sheriff's Department that I am

12 going to trust their judgment about security in this

13 case.   Mr. Moss, they will not require you to be

14 handcuffed or manacled during the course of this trial,

15 and that will be the rule which prevails throughout the

16 trial.  So long as they are not required to do that, the

17 only thing that would cause them to be required to put

18 you in handcuffs would be because you misbehaved.   And

19 I don't expect you to do that.

20      As the trial progresses, I am going to ask the

21 Sheriff's Department to do everything they can to not

22 indicate to the jury that the defendant is in custody.

23 There, again, their ability to do that will depend

24 largely upon you and your cooperation with them.   When

1    the jury files in, and during the course of this trial,

2    I want you to remain in your seat, unless you are called

3    upon by either me or by the attorneys to go somewhere.

4    It is my practice to have the defendant accompany his

5    attorneys to the bench here, if we are having a bench

6    conference of any kind, so that you can hear and

7    understand the proceedings. Other than that, I don't

8    expect you to move around the Courtroom at all. You will

9    also wait until the jury is excused and we are confident

10    that there are no jurors wandering around before you

11    leave the Courtroom. You will be escorted by the

12    Deputies at the appropriate times.

13         Okay. Now, what I am going to do -- we have

14    forty-nine jurors, and I am going to bring the entire

15    forty-nine in, and then I am going to pull off thirty and

16    will send the remainder up to Judge Canady. We will

17    start with that thirty ourselves doing the voir dire

18    examination. If it becomes necessary to use additional

19    jurors -- Judge Canady is only going to use six out of

20    -- six or seven out of the nineteen and that will give

21    us another twelve prospective jurors to pick from.

22         What I'm going to do is, I am going to have the

23    Clerk draw, in order, thirty names. The first fourteen

24    of those jurors will be seated at the jury box. The

14

1    remaining ten will be seated in chairs back there.  That

2    will provide us with a jury from which we can select

3    twelve jurors and two alternates.

4         I´ll have the Clerk call, after those twenty-

5    four, an additional six names.  Those names, in order,

6    will be drawn up in the event that any of the initial

7    twenty-four jurors are disqualified.  After I have called

8    those thirty names, I´ll then excuse the remaining

9    nineteen jurors to go to Judge Canady.

10        Jimmy, is he ready to start right now?

11        MR. THAXTON:  Pretty close.

12        THE COURT:  I´ll excuse them to go on to Judge

13   Canady´s Courtroom, and we´ll get on with the program

14   here.

15        Do you all have any motions, other than the ones

16   that we have already discussed, that need to be discussed

17   this morning?

18        MS. LUSK:  I don´t think so, Judge.  We have just

19   a few questions for you to look at.

20        THE COURT:  Do you want me to ask these

21   questions, Nelson?

22        MR. BICKLEY:  Yes.

23        THE COURT:  In individual voir dire?

24        MR. BICKLEY:  Yes.

1         THE COURT:  Do you want me to ask the question

2    about, "Are any of you members of any clubs or

3    associations that ---

4         MR. BICKLEY:  Yes, I do.

5         THE COURT:  -- like the Ku Klux Klan or anything

6    -- a White Supremacist group?"

7         MR. BICKLEY:  Yes.

8         THE COURT:  Fine.

9         MS. LUSK:  Judge, we haven´t seen their

10    individual voir dire questions.  Perhaps I could look at

11    the Court´s copy when you are done with it.

12         THE COURT:  Sure.

13         MS. LUSK:  Now, for our questions, your Honor, we

14    were thinking that probably you were going to ask most

15    of the questions that we have to ask.

16         THE COURT:  I do that if you´d like.

17         MS. LUSK:  No, I mean in your regular voir dire.

18         THE COURT:  Yes, I will do that.  That´s true.

19    Do you want to ask your own questions?

20         MR. BICKLEY:  I would like to ask a couple of the

21    questions, for obvious reasons.

22         THE COURT:  Fine.

23         MS. LUSK:  Judge, I don´t know how you want to

24    handle the individual voir dire, but we would really like

1   to ask at least Question No. 3 ourselves.

2          THE COURT:  Do you want to ask them all?

3          MS. LUSK:  Well, I'd probably rather.

4          MR. BICKLEY:  Which ones?

5          THE COURT:   I usually let counsel ask these

6   (Indicating).  All I want to do is -- and I trust your

7   judgment about this, but the more we can get away or done

8   here, the more quickly we can do it and the cleaner we

9   can do it.   You all know the kind of questions,

10  particularly, the defense knows the kind of questions

11  that you'd like to have asked.  So -- and you want all

12  of the raised questions asked?

13         MR. BICKLEY:  Individually.

14         THE COURT:  Fine.

15         MR. BICKLEY:  I thought the Court would ask them.

16  Are you going to ask them in individual about publicity?

17         THE COURT:  On publicity?

18         MR. BICKLEY:  Yes.

19         THE COURT:   Right.   But if you've got some

20  general questions that you want to ask -- either side

21  -- we can do that.

22         Okay.  Are we ready to get started?

23         MR. BICKLEY:  We're ready.

24         MS. LUSK:  Yes, your Honor.

17

1    THE COURT:  Oh, I need the witness lists, I'm

2  sorry.

3    MR. BICKLEY:  I took the Court's list and filed

4  it, your Honor, our witness list that I gave to you.  I

5  gave you my copy.

6    THE COURT:  You gave me your copy?

7    MR. BICKLEY:  Here, I'll give you my copy.  I

8  took it down and filed it this morning, the original.

9  So, it may not be in the file yet.

10    THE COURT:  They brought me a bunch of stuff this

11  morning.

12    MR. BICKLEY:  I just found it this morning.  Let

13  me borrow yours for just a second.

14    MR. REVERCOMB:  Your Honor, ours should be in the

15  Court file, too.  Here's our copy; I can get it back

16  later.

17    Your Honor, I've filed various witness lists, but

18  this is the latest.

19    THE COURT:  Is it in here, in the file?

20    MR. REVERCOMB:  It should be.  If it isn't, I'll

21  go down and get it.

22    THE COURT:  Would you?

23    MR. REVERCOMB:  Okay.

24    MS. LUSK:  Judge, he's going to go get our

1   answers while you are looking at that.

2           THE COURT:  Fine.

3           MS. LUSK:  Judge, are you going to ask them if

4   they've ever been the victims of a crime?

5           THE COURT:  I'm going to.

6           Did  you  get  everything  squared  away  on

7   Massenberg?

8           MR. BICKLEY:  Yes, your Honor.  I gave him all of

9   the confession of both parties, both Reggettz and Mr.

10  Moss, and he refused to comment until -- on both of them,

11  I have to give him some additional stuff this evening on

12  recantation, the effect of what was a basis for recanting

13  on both of them.   Then, I asked him to let me know as

14  soon as possible.   I'll give them to him as soon as

15  possible when we get out this evening.   I'll take them

16  up there to him, after I Xerox them, and he's to let me

17  know within a day or so whether or not he can testify.

18  And I will tell Neva and them so they can get some kind

19  of rebuttal.

20          THE COURT:  Okay.  If you all are ready, we'll go

21  ahead and roll out thirty names.

22

23          WHEREUPON, the names of thirty jurors were rolled

24  out for voir dire.

1

2        THE COURT:  Okay.  Do we need to do anything else

3  before we bring the jurors in?

4        MR. BICKLEY:  When will you spread on the record

5  your ruling?

6        THE COURT:  Well, let's do that right now.

7        Previously, I have told the attorneys in this

8  case my ruling on the question of suppression of the two

9  statements, about which I heard argument a couple of

10  weeks ago.  I have ruled that those statements are

11  admissible, and there are two reasons why that -- why I

12  want to articulate the two bases that I am going to

13  articulate for that ruling.

14        The first is, having read the decision on appeal

15  of this case, I am satisfied that the Supreme Court of

16  Appeals in that case held those two statement admissible,

17  and I believe that they specifically considered, while

18  not on its face very completely, the question of the

19  immediate taking of the defendant before a Magistrate or

20  Referee, because that's -- because the Court said that.

21  So, I believe that the admissibility of those statements

22  is law of the case by the Supreme Court of Appeals.  If

23  that were not the case, I would, nonetheless, authorize

24  the admission of these two statements, because I believe

20

1  that the foray or diversion from the direct route from

2  Ohio to Charleston, West Virginia -- the taking of the

3  statement does not violate either specific language or

4  the principles embodied in the juvenile statute requiring

5  an immediate presentment.   And for the life of me, I

6  can't remember the other case.

7       MR. REVERCOMB:  Ellsworth?

8       THE COURT:  Ellsworth.  It's particularly noted

9  in Ellsworth that the defendant in that case, while that

10 statement was held admissible, the defendant or

11 respondent was not taken immediately, but in fact was

12 taken to a Police Station later to give a statement.

13      Law Enforcement Officers are entitled to -- so

14 long as they follow the rules -- take statements.  It's

15 an efficient and effective way to solve crimes.

16 Although, in this case, it raises some question with

17 respect to the infallibility of that taking, but it's a

18 legitimate technique to take a statement, so long as the

19 statements are verified and are taken under

20 constitutional and permissible conditions.

21      The officers in this case -- we're not talking

22 specifically about this case, but we're talking about

23 this by implication -- another criminal offense.  And it

24 was suggested to him that they wanted to talk to him

21

1    about something else and he said that he was going to

2    talk to them.    And they made the circumstances

3    comfortable for him.  I don't find that a violation of

4    the statute, and I will admit the statements.

5           MR. BICKLEY:  Will you note our exceptions, your

6    Honor?

7           THE COURT:  Your exceptions are taken.

8           Okay.  Why don't you bring the jurors in now.

9           THE CLERK:  Fine.

10          THE COURT:   Mr. Moss, when did you attend St.

11   Albans High School?

12          THE DEFENDANT:  I think it was in --- right after

13   summer break in '77, I believe.

14          THE COURT:  Just one year?

15          MR. MOSS:  No, I was there about a year and a

16   half or two years.

17          THE COURT:  So you would have been there from '77

18   to '79?

19          THE DEFENDANT:  Yes.

20          THE COURT:  At St. Albans High School?

21          THE DEFENDANT:  Yes.

22          THE COURT:   What about McKinley or the other

23   Junior High Schools?

24          THE DEFENDANT:  No, just St. Albans High School.

22

1          THE COURT:   Is Kathy Beckett going to join you

2     all?

3          MR. BICKLEY:   She had to go to Atlanta; but, yes,

4     she will be here.

5          THE COURT:   I´ll identify her for the jury.

6          MR. BICKLEY:   Please do.

7

8          WHEREUPON, the entire panel of jurors was sworn,

9     upon their oaths, and selection was continued.

10

11         THE COURT:   The Clerk will call your names, and

12    if you will, the first juror called will take seat No.

13    1, which is the far seat on the back row, and you´ll fill

14    the jury box, then begin filling the front row of seats

15    out there.   Then, after that, we´ll decide what we´re

16    going to do with the remaining jurors.

17

18         WHEREUPON, thirty jurors were called forward for

19    panel voir dire.

20

21         THE COURT:   The remaining jurors just remain

22    where you are.   You may have to change your seats later.

23         We´re going to start by very briefly telling you

24    what this case is about, and then I´m going to ask you

23

1    some questions.  Then, I´m going to allow counsel -- the

2    Assistant Prosecutors and defense counsel -- to ask you

3    some questions.

4         Again, we´re going to have to ask you a couple of

5    questions individually; that is, we´re going to take up

6    residence in our Jury Deliberation Room and we call

7    jurors one-at-a-time back and very briefly ask you a

8    couple of questions.  The purpose for doing that is to

9    make sure that every juror feels very comfortable

10   answering some questions privately, which might not be

11   so simply answered publicly.

12        I may be wrong about that; but we´re just going

13   to try to make this process as comfortable as we can, but

14   also as quick as possible.

15        This case is a criminal proceeding.  It is

16   captioned the State of West Virginia versus John Moss,

17   Jr.  Mr. Moss is indicted -- or has been indicted by the

18   Grand Jury of this County and charged with three counts

19   of first degree murder.

20        In fact -- and let me explain to everyone, if you

21   haven´t participated in a criminal trial before, the fact

22   that Mr. Moss has been indicted is no evidence whatsoever

23   of his guilt or innocence.  The indictment, as you will

24   hear later, is nothing more than a charge that has been

24

1    brought against him -- against Mr. Moss.

2         Mr. Moss has pleaded not guilty, and it will be

3    the responsibility of this jury to determine whether the

4    Prosecuting Attorneys can prove beyond a reasonable doubt

5    any of the charges against Mr. Moss.  Mr. Moss is charged

6    with the murder of three persons:  Paul Eric Reggettz,

7    Bernadette  Reggettz,  and  Vanessa  Reggettz.   The

8    indictment alleges that that occurred during the month

9    of December of 1979, and I believe that the State will

10   attempt to prove that that occurred on the 13th of

11   December, 1989.

12        MR. REVERCOMB:  1979, your Honor.

13        THE COURT:  I´m sorry, ´79, thank you.

14        It  is  alleged  that  this  occurred  at  1727

15   Chesapeake Avenue.  It is my understanding that that is

16   a St. Albans address, and is in fact down near Route 60

17   in the area that´s between South Charleston and the city

18   limits of St. Albans, beyond Chef Wong´s restaurant down

19   in that direction.

20        Now, the attorneys who are going to participate

21   in this trial for the State are Ms. Neva Lusk and Mr.

22   Stephen Revercomb.  And for the defense, Mr. Nelson

23   Bickley, Mr. Tim Huffman, and later in the course of the

24   trial, Ms. Kathy Beckett will join Mr. Bickley and Mr.

25

1   Huffman.  The questions that I'm going to ask you, and
2   I hope that I can make it as simple and easy to
3   understand as possible -- if you have an answer to a
4   question, simply raise your hand and I'll acknowledge
5   each of you, one-by-one, as you have an answer to my
6   question.  If you don't understand, tell me that also.
7           First, let me ask you if any of you are related
8   by blood or by marriage to Paul Eric Reggettz, Bernadette
9   Reggettz, Vanessa Reggettz, or John Moss?
10          Are any of you acquainted, or were you acquainted
11   with any of those persons?
12          Yes, ma'am.
13          JUROR TWELVE:  I know Paul.
14          THE COURT:  Would you step up here for just a
15   moment, please?
16
17          WHEREUPON, a bench conference was held.
18
19          Are you Mrs. Hanshaw?
20          JUROR TWELVE:  Yes.
21          THE COURT:  You know Mr. Reggettz?
22          JUROR TWELVE:  He worked with my husband.
23          THE COURT:  He did?
24          JUROR TWELVE:  I didn't know it before, but

26

1    afterwards.

2           THE   COURT:   You  didn´t  know  him  before  this

3    happened?

4           JUROR TWELVE:   No.

5           THE COURT:  Have you ever met him?

6           JUROR TWELVE:   Yes.

7           THE   COURT:   Has  he  ever  been  a  guest  in  your

8    home?

9           JUROR TWELVE:   He´s been a guest in my house.

10          THE COURT:   Would that make it difficult for you

11   to remain a juror in this case?

12          JUROR TWELVE:   I don´t think so.

13          THE   COURT:   Do  you  know  when  you  met  Mr.

14   Reggettz?

15          JUROR TWELVE:   Well,  he  went  to  work  at  the

16   Bowling Alley and then worked for my husband.

17          THE COURT:   When did you know that his wife and

18   children had been killed?

19          JUROR TWELVE:   I worked right across the street

20   from where it happened, at Valley Clinic Hospital.

21          THE COURT:  Do you remember when it happened?

22          JUROR TWELVE:   Not really.   Not a day or anything

23   like that.

24          THE COURT:   Okay.  Do you remember anything about

27

1    the case?

2           JUROR TWELVE:  Not too much.

3           THE COURT:  What do you remember?

4           JUROR TWELVE:  Mostly about the kids.

5           THE COURT:  What do you remember about them?

6           JUROR TWELVE:  Well, about one of them hanging in

7    the bathroom, or something like that.

8           THE COURT:  Did your husband ever talk to you

9    about it?

10          JUROR TWELVE:  No.

11          THE COURT:  Mr. Reggettz -- I think the evidence

12   will be in this case that he made at least one confession

13   that he killed his wife and children.

14          JUROR TWELVE:  Yes, he said he did.

15          THE COURT:  Did he tell you and your husband why

16   he did that?

17          JUROR TWELVE:  Yes.  He said he was beat.

18          THE COURT:  Ms. Hanshaw, I think you know more

19   about this case than I can allow you to sit.  A juror

20   should come in here without any knowledge about a case,

21   so I am going to excuse you.  I'm going to ask you to do

22   this -- it's extremely important.

23          This case is going to take about two weeks to

24   try, and during that period of time you may be summoned

28

1   back to sit as a juror in some other case. Whatever you

2   do, do not discuss this case with anybody, whether a

3   juror or not, until you know that a verdict has been

4   reached in this case.

5           JUROR TWELVE:  Right.

6           THE COURT:  Okay.  I'm going to excuse you and

7   you can go on home.

8           JUROR TWELVE:  I can go on home?

9           THE COURT:  Yes.

10

11          WHEREUPON, Ms. Arvada Hanshaw was excused from

12  serving on this case.

13

14          THE COURT:  Mrs. Christ, would you come on up

15  here and take seat number eleven, please.

16          Okay.  Now, is anyone else acquainted with any of

17  the persons whom I have named?

18          JURORS:  No response.

19          THE COURT:  I have identified the lawyers for

20  your.  Are any of you now or have you in the past been

21  represented by any of these attorneys?

22          JURORS:  No response.

23          THE COURT:  Are any of you social acquaintances

24  or business associates of any of these attorneys?

1        JURORS:  No response.

2        THE COURT:  I've got pretty substantial list of

3   witnesses; and incidentally, our estimate is that this

4   case is going to take about two weeks -- perhaps a day

5   or two beyond two weeks to try.  Everybody is concerned

6   about not letting the trial go too long.

7        The list of witnesses that I will read is

8   possible witnesses.  I think it is safe to say that not

9   every one of these witnesses will be called, but it is

10  entirely possible that a large number of these witnesses

11  will be called.

12       Trooper Terry Williams, of the Department of

13  Public Safety;

14       Trooper Michael Don Smith; and incidentally, I'll

15  try to keep from reading names twice;

16       Robert L. Presson;

17       Clarence Ralph Lane;

18       William Johnson;

19       Arbutus Johnson Pomeroy;

20       Sgt. R. R. Customer, of the Department of Public

21  Safety;

22       Lt. David H. Shumate, of the Department of Public

23  Safety;

24       Dr. Irvin M. Sopher;

1         UNIDENTIFIED JUROR FROM AUDIENCE:  (Raises hand)

2         THE COURT:  Okay, how are you acquainted with Dr.

3  Sopher?

4         UNIDENTIFIED JUROR:  I´m a firefighter from South

5  Charleston, and where I work, I´ve been in contact with

6  him.

7         THE COURT:  Why don´t you come on up for just a

8  second.

9

10        WHEREUPON, a bench conference was held, and the

11  following transpired:

12

13        UNIDENTIFIED JUROR:  Judge, my name is Edward

14  Miller.  I also have an auto repair shop and I do his

15  automotive repairs.

16        THE COURT:  Does he bring his car in a lot?

17        JUROR MILLER:  It´s mostly mechanical work.

18        THE COURT:  How long have you known Dr. Sopher?

19        JUROR MILLER:  Probably two to three years.

20        THE COURT:  How many times do you suppose in that

21  period of time that he´s ever come into your shop?

22        JUROR MILLER:  Three or four.

23        THE COURT:  Okay.  Now, did you get to know him

24  by him coming into your shop or through your firefighting

31

1    job?

2         JUROR MILLER:  Through the shop.

3         THE COURT:  Okay.  Have you ever been involved in

4    a fire that Dr. Sopher has been involved with -- that he

5    examined the body or something that nature?

6         JUROR MILLER:  In my firefighting capacity, I

7    have dealt with him in drownings.

8         THE COURT:  Did he examine the bodies in that

9    instance?

10        JUROR MILLER:  I have been in there for

11   autopsies, yes.

12        THE COURT:  You were actually in the Medical

13   Examiner's room when he was doing it?

14        JUROR MILLER:  Yes.

15        THE COURT:  Okay.  Would the fact that you know

16   Dr. Sopher cause you to believe him any more than any

17   other witness?

18        JUROR MILLER:  No, not in any way.

19        THE COURT:  Let me just ask you the reverse.

20   Would the fact that you know him cause you to disbelieve

21   him?

22        JUROR MILLER:  No.

23        THE COURT:  Do you think that you could be fair,

24   notwithstanding the fact that you know Dr. Sopher, and

32

1    that you would take his evidence just as that of any

2    other witness?

3              JUROR MILLER:  Yes.

4              MR. REVERCOMB:  Do you believe that you likewise

5    could be fair to the State?

6              JUROR MILLER:  Yes.

7              MR. BICKLEY:  Do you believe that you could be

8    fair and impartial to the defendant?

9              JUROR MILLER:  Yes.

10             THE COURT:  Okay.  You may take your seat.

11             JUROR McLAUGHLIN:  Your Honor, I'm acquainted

12   with Mr. Custer and Mr. Williams.

13

14             WHEREUPON, Mr. Carl McLaughlin approached the

15   bench, where the following transpired:

16

17             THE COURT:  You're Mr. McLaughlin?

18             JUROR McLAUGHLIN:  Yes.

19             THE COURT:  You're not related to Carl

20   McLaughlin, the Juvenile Probation Officer; are you?

21             JUROR McLAUGHLIN:  No, but I wish he wasn't from

22   around here.

23             THE COURT:  You do?  Why?

24             JUROR McLAUGHLIN:  Because, I get calls at 3:00

33

1    o'clock in the morning telling me that their kids are not

2    going to be in school the next day.

3           THE COURT:  Is that right?

4           JUROR McLAUGHLIN:  Yeah.

5           THE COURT:  I'll tell him that he needs to get

6    his phone number straight with some people.

7           Now, you say you know Williams and Custer, both?

8           JUROR McLAUGHLIN:  Yes.

9           THE COURT:  Tell me how you know them.

10          JUROR McLAUGHLIN:  Terry Williams and I have

11   played basketball together for the last five or ten

12   years, off and on.  It's not an all-the-time thing, just

13   by chance.  And I grew up about a block and a half from

14   the Custers.

15          THE COURT:  I don't know how old Trooper Custer

16   is.  Is he older or younger than you?

17          JUROR McLAUGHLIN:  He's older.  I think maybe two

18   or three years, something like that.

19          THE COURT:  Did you all go to the same school

20   together, but different classes?

21          JUROR McLAUGHLIN:  He may have been the year in

22   front of my class.  When I went to Junior High, he went

23   to  High  School.    When  I  went  to  High  School,  he

24   graduated.

34

1          THE COURT:  Did you and Trooper Williams play on

2     the same team?

3          JUROR McLAUGHLIN:  Yes.

4          THE COURT:  Is it just a pickup league?

5          JUROR McLAUGHLIN:  It's mostly just pickup.

6          THE COURT:  Do you ever talk to him about his

7     work?

8          JUROR McLAUGHLIN:  No.

9          THE COURT:  Has he ever mentioned this case to

10    you?

11         JUROR McLAUGHLIN:  No.

12         THE COURT:  It doesn't ring a bell to you at all?

13         JUROR McLAUGHLIN:  No, sir.

14         THE COURT:  His testimony, like the testimony of

15    all witnesses, is going to have to be evaluated by the

16    jury, and you will have to decide whether his testimony,

17    as well as anyone else's testimony, is credible.

18         Do you believe that you can take his evidence

19    just as that of a stranger?

20         JUROR McLAUGHLIN:  Yes, I do.

21         THE COURT:  Do you think that just because you

22    know him that you might be inclined to believe him more

23    or believe him less than anybody else?

24         JUROR McLAUGHLIN:  No, sir.

35

1          THE COURT:  Now, tell me about Custer.

2          JUROR McLAUGHLIN:    It really wasn't a close

3     relationship or anything.   I just knew that he lived

4     right around the corner.

5          THE COURT:  Okay.  Has he ever been in your home?

6          JUROR McLAUGHLIN:  No, sir.

7          THE COURT:  Have you ever been in his?

8          JUROR McLAUGHLIN:  No, sir.

9          THE COURT:  Again, let me ask you if you can be

10    fair with both the State and the defendant, and weigh his

11    testimony just as you would somebody's whom you didn't

12    know?

13         JUROR McLAUGHLIN:  Yes, sir, I think so.

14         THE COURT:  Okay.  you may take your seat.

15

16         WHEREUPON, Juror McLaughlin returned to his seat.

17

18         THE COURT:  Okay.  Do any of these names ring a

19    bell so far?  I think I was down to Terry Wayne Kirby;

20         Calton Moss;

21         R. E. O'Dell;

22         John Fulks, F-u-l-k-s;

23         Scott Leasure, L-e-a-s-u-r-e;

24         Trooper Rinehart, I can't remember his first

36

1    name.

2              MR. REVERCOMB:  I don't know.

3              THE   COURT:    He's  with  the  West  Virginia

4    Department of Public Safety;

5              Trooper Egnor.

6              JUROR McLAUGHLIN:  I know Trooper Rinehart.

7              THE COURT:  Come on back up.

8

9              WHEREUPON, a bench conference was held with Carl

10   McLaughlin, where the following transpired:

11

12             JUROR McLAUGHLIN:  Judge, there is two or three

13   of the Rineharts that I grew up with.  There was Brad,

14   that's a City Policeman, and one of his brothers is a

15   State Policeman; I'm not sure which one it is.

16             THE COURT:  Do you know them personally?

17             JUROR McLAUGHLIN:  Not personally; but I know

18   them.

19             THE COURT:  Okay.  Would the fact that you know

20   them cause you to believe or disbelieve them?

21             JUROR McLAUGHLIN:  No.

22             THE COURT:  Okay.  Let me ask you this:  We've

23   all got about a tenth of the way through here.  Do you

24   know other law enforcement officers?

1        JUROR McLAUGHLIN:   I think that you´ve hit just

2    about every one of them.

3        THE COURT:  Do you think that you could treat all

4    of these people fairly?

5        JUROR McLAUGHLIN:   Yes.

6        THE COURT:   One of the questions that I´ve asked

7    before is, do you still play basketball?

8        JUROR McLAUGHLIN:   Yes.

9        THE COURT:   What if you were to participate in

10   the jury in this case and Trooper Williams´ testimony

11   would be pretty poor or important to the case?  Are you

12   going to be able to walk out of here and play basketball

13   with him?   Would you be comfortable doing that, even

14   though you might not have believed what he says?

15       JUROR McLAUGHLIN:   Yes.

16       THE COURT:   Even if you didn´t believe him, or

17   disbelieve him, you could treat his evidence just like

18   that of anyone else?

19       JUROR McLAUGHLIN:   Yes.

20       MR. BICKLEY:  Are you a volunteer policeman?

21       JUROR McLAUGHLIN:   No.

22       MR. BICKLEY:  Do you do security work?

23       JUROR McLAUGHLIN:   No.

24       THE COURT:   Okay.  Thank you.  You may take your

38

1    seat.

2            WHEREUPON, Juror McLaughlin returned to his seat.

3

4            THE COURT:  The next witness is R. C. Murphy;

5            Trooper L. C. Inman;

6            Lt. R. F. Langley.

7            JUROR HUFFMAN:  I knew him through work before

8    retirement.

9            THE COURT:  You want to come on up, please?

10

11           WHEREUPON, Juror David Huffman approached the

12   bench, where the following transpired:

13

14           THE COURT:  Are you Mr. Huffman?

15           JUROR HUFFMAN:  Yes.

16           THE COURT:  Tell me how you knew him?

17           JUROR HUFFMAN:   Through our work at Virginia

18   Welding Supply.  He stopped a few times at my spot.

19           THE COURT:  When did you first know him?

20           JUROR HUFFMAN:  It's just been a couple of years

21   ago, right around the time of his retirement.

22           THE COURT:  I take it, he's still retired:

23           MR. REVERCOMB:  As far as we know.

24           THE COURT:  Did you ever talk to him about his

39

1    police work?

2             JUROR HUFFMAN:  No.  See, I was a police officer

3    in Ohio.

4             MR. BICKLEY:  You were a police officer in Ohio?

5             JUROR HUFFMAN:  Yes.

6             THE COURT:  Where?

7             JUROR HUFFMAN:  In Belleville, Ohio.

8             THE COURT:  Where is Belleville?

9             JUROR HUFFMAN:  It's out of Columbus, about sixty

10   miles.

11            THE   COURT:   You  were  a  municipal  or  city

12   policeman?

13            JUROR HUFFMAN:  Yes.

14            THE COURT:  How many police officers were there?

15            JUROR HUFFMAN:  There were two full-time, and one

16   auxiliary.

17            THE COURT:  Were you a full-time officer?

18            JUROR HUFFMAN:  No, I was a part-time.  I was a

19   Special Deputy Sheriff.

20            THE COURT:  You were a Special Deputy Sheriff?

21            JUROR HUFFMAN:  Yes, for the County.

22            THE COURT:  Which county?

23            JUROR HUFFMAN:  Richland County.

24            THE COURT:  For how long?

40

1      JUROR HUFFMAN:  Six years.

2      THE COURT:  When you were an auxiliary policeman,

3  were you also employed otherwise, at the same time?

4      JUROR HUFFMAN:  Right.  I was a part-time police

5  officer with the auxiliary, and a Special Deputy Sheriff

6  as a full-time job.

7      THE COURT:  In the course of your police work,

8  did you ever have occasion to investigate criminal

9  activity -- breakings and enterings, burglaries, and

10  robberies, that sort of thing?

11      JUROR HUFFMAN:  Several.

12      THE COURT:  How about killings?  Did you do any

13  investigative work like that?

14      JUROR HUFFMAN:  Yes.  I worked homicide.

15      THE COURT:  A person shot himself?

16      JUROR HUFFMAN:  He shot himself and his wife.

17      THE COURT:  When was that?

18      JUROR HUFFMAN:  Right before I resigned in '81.

19      THE COURT:  About how big is Belleville?

20      JUROR HUFFMAN:  I think it had about ten thousand

21  people, and I resigned and moved back here.

22      THE COURT:  Okay.  Both sides of this case are

23  entitled to a fair trial, and you can imagine that the

24  plaintiff is going to be uncomfortable with a police

41

1    officer.  Any defendant would be uncomfortable having a

2    police officer on the jury.  Do you think that you can

3    be fair in this case?

4         JUROR HUFFMAN:  Yes.

5         THE  COURT:   Can  you  evaluate  this  evidence

6    carefully and know that the Prosecuting Attorney has the

7    burden of proof in this case?

8         JUROR HUFFMAN:  Sure.

9         THE COURT:  You think that you can do that?

10        JUROR HUFFMAN:  Yes.

11        THE COURT:  And you have no hesitation?

12        JUROR HUFFMAN:  No, that's the past.

13        THE COURT:  Do you have any questions.

14        MR. BICKLEY:  Where is Belleville, Ohio?

15        JUROR HUFFMAN:  It's right out of Columbus.

16        MR. BICKLEY:  Your Honor, I'd like to excuse him

17   for cause.

18        MR. REVERCOMB:  I think we ought to take this up.

19        THE COURT:  Okay, Mr. Huffman, you can take your

20   seat.

21

22        WHEREUPON, Juror David Huffman returned to his

23   seat.

24

42

1          THE COURT:  Let me suggest something.  After we

2    finish, I'll let them sit down so that you can make the

3    changes out of their presence, because I don't want to

4    send them out knowing who did it.

5          MR. BICKLEY:  Okay.

6          THE COURT:  I think that we ought to let him off.

7    I don't think there's any question about that; do you?

8          MR. REVERCOMB:    I don't know about the man's

9    connections.

10         MR. BICKLEY:  I am concerned.  That's why I asked

11   him how far away is Belleville.

12         THE COURT:  I understand your concerns.  I didn't

13   want  him  saying  it  was  close  to  there,  and  then

14   challenging him for cause.

15         Okay.   Mr. Huffman, I'm going to excuse you.

16   Thank you.  You may go on home.

17         JUROR HUFFMAN:  Thanks.

18

19         THE  COURT:    Michele  Williamson,  please  come

20   forward, and take seat number nine.  Ms. Williamson, did

21   you hear all of the questions, the witness list, and so

22   forth?

23         JUROR MICHELE WILLIAMSON:  Yes.

24         THE COURT:  Did you know any of those persons?

43

1          JUROR WILLIAMSON:  No, sir.

2          THE   COURT:   Trooper  D. L.  Williams,  of  the

3     Department of Public Safety;

4          Sgt. J. R.  Smith, of the Department of Public

5     Safety;

6

7          JUROR STERN:  He goes to our church.

8          THE COURT:  You want to step up here, please?

9

10         WHEREUPON, Elizabeth Stern approached the bench,

11    where the following transpired:

12

13         JUROR STERN:  I'm sorry about this.

14         THE   COURT:   That's  all  right.   Where  is  your

15    church?

16         JUROR STERN:  Cross Lanes Bible Church.

17         THE   COURT:   How  long  have  you  attended  that

18    church?

19         JUROR STERN:  Since 1974.

20         THE COURT: Now, how long, to your knowledge, has

21    he attended?   About as long as you have?

22         JUROR STERN:  No, I don't think so.  I'm more

23    familiar with his wife than I am him.  I know who he is,

24    but that's about all.

44

1    THE COURT:  How do you know his wife?

2    JUROR STERN:  We were picked in church to lead a

3  young people´s group for a while.  And she´s been in my

4  Sunday School Class.

5    THE COURT:  Have you ever socialized with the

6  Smith´s, away from the church?

7    JUROR STERN:  No.

8    THE COURT: Now, have you ever discussed subjects

9  at work with Mrs. Smith?

10    JUROR STERN:  Once.

11    THE COURT:  When was that?

12    JUROR STERN:  I don´t know.  I had a wreck and

13  she told me who to go to, and to mention his name, and

14  I did.  And they fined me more.

15    THE COURT:  Let me ask you this.  You´re going to

16  have to evaluate the believability of all of the

17  witnesses in this case, and the believability is the same

18  of all of these witness who come into Court.

19    Would the fact that you go to church with Mr.

20  Smith and the fact that he attends your church cause you

21  to believe him more than you would someone whom you did

22  not know?

23    JUROR STERN:  I don´t think so.

24    THE COURT:  You hesitated.  Was that because you

45

1   have some misgivings?

2           JUROR STERN:  No, I just want to give my honest

3   answer.

4           THE COURT:  That's exactly what I need, too.

5           I think that's all.

6           MS. LUSK:  Ma'am, the fact that you might have

7   been fined more for knowing him ---

8           JUROR STERN:  That doesn't bother me.  I deserved

9   it.

10          MS. LUSK:  And you're not mad at him about that;

11  are you?

12          JUROR STERN:  My brakes failed, so it was my

13  fault, and it wasn't that big of a fine.  It didn't have

14  anything to do with him.

15          MS. LUSK:  You're not mad at him over that; are

16  you?

17          JUROR STERN:  I was never mad at him.  I thought

18  it was funny.

19          MR. BICKLEY:  I have no questions.

20          THE COURT:  You may take your seat.

21

22          WHEREUPON, Elizabeth Stern returned to her seat.

23

24          THE COURT:  The next witness is Trooper G. L.

46

1    Clark;

2           Trooper L. L. Farley;

3           Trooper D. R. Searls;

4           Steve McGowan;

5           Corporal  Cook,  of  the  Department  of  Public

6    Safety.

7           UNIDENTIFIED JUROR FROM THE AUDIENCE:   Judge, I'm

8    very familiar with the last four or five that you named,

9    on a social basis.

10          THE COURT:   You want to come on up?

11

12          WHEREUPON,  Juror  Edward  Miller  approached  the

13   bench, where the following transpired:

14

15          JUROR MILLER:   Instead of raising my hand each

16   time, I thought I'd let you name several of them.   But

17   I am familiar with several of them on a social basis.

18          THE COURT:   Now, on a social basis, just how do

19   you mean that?

20          JUROR MILLER:   Boating together.

21          THE COURT:   Boating?

22          JUROR MILLER:   Yes.

23          THE COURT:   Okay.  Did any of these fellows ever

24   talk to you about this case?

47

1       JUROR MILLER:  No.

2       THE COURT:  Do you know anything about it?

3       JUROR MILLER:  I've never talked to anyone about

4    this case.

5       THE COURT:  Again, you're going to have to weigh

6    the credibility of these witnesses.  You're going to have

7    to determine, based on some rules that I will give you,

8    whether they are telling the truth and whether the fact

9    that you know these people would make you believe them

10   more or less than you would someone you didn't know?

11      JUROR MILLER:  No.

12      THE COURT:  Are you sure?

13      JUROR MILLER:  I'm sure.

14      THE COURT:  Now, do you expect to see these guys

15   when you are out this summer boating again?

16      JUROR MILLER:  Oh, yes.

17      THE COURT:  Are you going to be able to maybe

18   disbelieve them and then go out and look them in the eye?

19      JUROR MILLER:  Yes.

20      THE COURT:  You think that you can do that?

21      JUROR MILLER:  Yes.

22      THE COURT:  That is, if the evidence warrants?

23      JUROR MILLER:  Yes.

24      THE COURT:  Just out of curiosity, do you know

48

1    Smith?

2             JUROR MILLER:  No.

3             THE COURT:  Clark?

4             JUROR MILLER:  Yes.

5             THE COURT:  Farley?

6             JUROR MILLER:  Yes.

7             THE COURT:  Searls?

8             JUROR MILLER:  Yes.

9             THE COURT:  McGowan?

10            JUROR MILLER:  Yes.

11            THE COURT:  He is the lawyer, right?

12            MS. LUSK:  Yes.

13            THE COURT:  And Cook?

14            JUROR MILLER:  Yes.

15            THE COURT:  Do you know which Cook this is, by

16    the way?

17            MS. LUSK:  Yes, it's the one that is retired; not

18    Don.

19            THE COURT:  How about Trooper C. R. Martin?

20            JUROR MILLER:  No.

21            THE COURT:  Trooper R. L. Seacrist?

22            JUROR MILLER:  I'm fairly close to Seacrist.

23            THE COURT:  You are?

24            JUROR MILLER:  Yes.

49

1        THE COURT:   When you say fairly close, what do

2   you mean?

3        JUROR MILLER:   We have spent several evenings

4   together at each other's house.   There could be problems

5   there.

6        THE COURT:   Okay.   I'm going to let you go, then.

7        JUROR MILLER:   All right, thank you.

8        THE COURT:   You can go on home.

9        MR. REVERCOMB:   Judge, several of these people

10  whose names you called aren't going to be called.   I

11  don't think we're going to call those people, Seacrist

12  and ---

13        THE COURT:   Just go take your seat a second, but

14  don't leave yet.

15        JUROR MILLER:   All right.   If anyone seems like

16  there would be a conflict, then I'll let you know.

17        THE COURT:   Fine.

18

19        WHEREUPON, Edward Miller returned to his seat.

20

21        MR. REVERCOMB:   Your Honor, the State doesn't

22  intend to call Seacrist as a witness.   We don't call

23  Corporal G. L. Clark.

24        MR. BICKLEY:   I want to challenge him for cause

50

1   anyway.

2       THE COURT:  I´m not feeling too comfortable with

3   him maybe knowing these people anyway -- a couple here

4   and a couple there.

5       MR. REVERCOMB:  I understand.

6       MS.  LUSK:   Should  we  come  up  with  a  more

7   realistic list?

8       THE COURT:  Mr. Miller, I´m going to excuse you

9   for the rest of the day.

10      Mr. Boyd, would  you  please  take  seat  number

11  sixteen, please?

12

13      WHEREUPON, Mr. William Boyd came forward and took

14  seat number sixteen.

15

16      WHEREUPON, a bench  conference  was  held,  out  of

17  the hearing of the jury.

18

19      MS.  LUSK:   Judge, we´re not going to call Mark

20  McMillan, either.

21      THE COURT:   Let´s just go down through here and

22  mark them off.  What about Martin?

23      MS. LUSK:  No.

24      THE  COURT:   You´re  not  going  to  call  him  for

51

1     sure?

2             MS. LUSK:   Right.

3             THE COURT:   Seacrist?

4             MS. LUSK:   No.

5             THE COURT:   What did Detective McMillan have to

6     do with the case?

7             MS. LUSK:   He investigated the malicious wounding

8     in May of '79.   He didn't have anything to do with this

9     case.

10            THE COURT:   Presson?

11            MS. LUSK:   Presson will be called.

12            THE COURT:   Miller?

13            MS. LUSK:   Miller won't be, right.

14            THE COURT:   Arthur Moss?

15            MS. LUSK:   That's a maybe.

16            THE COURT:   Will Moss?

17            MS. LUSK:   They are going to call him.

18            MR. BICKLEY:   We are going to call him.

19            THE COURT:   Dennis Vaughn?

20            MS. LUSK:   No.

21            THE COURT:   Robert Bottom?

22            MS. LUSK:   No.

23            THE COURT:   Donald Ferris?

24            MR. REVERCOMB:   No.

52

| | |
|---|---|
| 1 | THE COURT:  Detective Minton? |
| 2 | MS. LUSK:  No. |
| 3 | THE COURT:  Dr. Kepler? |
| 4 | MS. LUSK:  No.  He's from Cleveland. |
| 5 | THE COURT:  Norma Buckland? |
| 6 | MS. LUSK:  She may be called. |
| 7 | THE COURT:  Pettry? |
| 8 | MS. LUSK:  Yes. |
| 9 | THE COURT:  Richard Greene? |
| 10 | MS. LUSK:  Yes. |
| 11 | THE COURT:  William Jeffrey Monk? |
| 12 | MS. LUSK:  Maybe. |
| 13 | THE COURT:  Now, Bickley's list. |
| 14 | Joey Jarrell? |
| 15 | MS. LUSK:  Leave all three of those off. |
| 16 | THE COURT:  Alexander Fortson? |
| 17 | MS. LUSK:  Yes. |
| 18 | THE COURT:  Paul Fortson? |
| 19 | MS. LUSK:  Yes. |
| 20 | THE COURT:  Russell Clark? |
| 21 | MS. LUSK:  Yes. |
| 22 | THE COURT:  Alex Swiggart? |
| 23 | MS. LUSK:  Yes. |
| 24 | THE COURT:  Sergeant Fulks? |

53

1       MS. LUSK:  No.  He's just the photographer.

2       MR. BICKLEY:  On ours, we're not calling Karen

3   Glass.  We subpoenaed Roark, but he hasn't answered.

4   He's been subpoenaed, but I don't know if he's coming or

5   not.  But leave him on in case he shows.

6       THE COURT:  I'll leave him on.

7       I think I said Sergeant R. L. Presson, with the

8   Department of Public Safety;

9       Arthur Moss;

10      Will Moss;

11      Nora Buckland;

12      Charles Pettry;

13      Richard M. Greene;

14      William Jeffery Monk;

15      Paul Fortson;

16      UNIDENTIFIED JUROR FROM THE AUDIENCE:  I know

17  both of those.

18      THE COURT:  Why don't you join us for a second?

19

20      WHEREUPON, Curtiss Hairston approached the bench,

21  where the following transpired:

22

23      THE COURT:  You're Curtiss Hairston?

24      JUROR HAIRSTON:  Yes.

54

1          THE COURT:  How do you know these two fellows:

2          JUROR HAIRSTON:  I played softball with both of

3    them.   Plus, we go to West Virginia's home games

4    together.

5          THE COURT:  You mean that you drive up together?

6          JUROR HAIRSTON:  Yes.

7          THE COURT:  How long have you known them?

8          JUROR HAIRSTON:  At least thirteen years, or

9    better.  Ever since I started working at Carbide.

10          THE COURT:  Is that right?

11          JUROR HAIRSTON:  Yes.

12          THE COURT:  How did you happen to meet these two

13    fellows?

14          JUROR HAIRSTON:  Through softball, really.  And

15    I knew a couple of them in high school.

16          THE COURT:  Do you have a league?

17          JUROR HAIRSTON:  Yes, it's a Carbide league.

18          THE COURT:  Were they on the same team, or on

19    different teams?

20          JUROR HAIRSTON:  The same team; we play at the

21    same time.

22          THE COURT:  Oh, do you still play?

23          JUROR HAIRSTON:  No, I don't play anymore.

24          THE COURT:  I take it, from this softball, you

1    got to know them quite well and went to West Virginia

2    football games with them?

3             JUROR HAIRSTON:  Uh-huh.

4             THE COURT:  Did you go to all of the home games

5    with them last year?

6             JUROR HAIRSTON:  All but one.

7             THE COURT:  Which one did you miss?

8             JUROR HAIRSTON:  I can't remember.  I had to work

9    that weekend.

10            THE COURT:  You're going to have to weigh the

11   testimony of these witnesses, all of these witnesses, to

12   determine if their testimony is believable.

13   Now, if you know somebody, and know them well, you might

14   have formed some opinion of whether what they say is

15   trustworthy.  Do you think you might believe these

16   witnesses or disbelieve them because you know them?

17            JUROR HAIRSTON:  I know them all pretty well, but

18   I couldn't really answer that.

19            THE COURT:  Do you think that you might find

20   their testimony more believable?

21            JUROR HAIRSTON:  Yes, probably.

22            MS. LUSK:  Judge, I don't know if it's necessary

23   for the Court to make any further inquiry, but this crime

24   occurred on Fortson's property.  They live next door.

56

1    So I don't know if it's necessary to make any further

2    inquiry.  But if you think they're not complete, maybe

3    we could have some further inquiry about conversations

4    about this case.

5            THE COURT:  Have you ever heard anything about

6    this case?

7            JUROR HAIRSTON:  Not just besides what I read in

8    the newspaper when it happened.

9            THE COURT:  Could you tell me what you read in

10   the newspaper?

11           JUROR HAIRSTON:  I read everything about the

12   case.  I read it every day.

13           THE COURT:  Just because you always read the

14   newspaper?

15           JUROR HAIRSTON:  Yes.

16           THE COURT:  What do you remember?

17           JUROR HAIRSTON:  I remember that they charged the

18   husband with the crime, and then they later found him not

19   guilty.  That's about it.

20           THE COURT:  Do you remember reading or hearing

21   anything about Mr. Moss?

22           JUROR HAIRSTON:  No.

23           THE COURT:  Nothing at all?

24           JUROR HAIRSTON:  No.  But there is a Moss that

1    was in the jury upstairs, and I know him, but I don't

2    know if he is any kin to this man or not.

3              THE COURT:  He's a cousin of this fellow.

4              JUROR HAIRSTON:  I worked with another Moss, too.

5              THE COURT:  What is his name?

6              JUROR HAIRSTON:  I don't know his first name.  He

7    works at the Tech Center and I work at South Charleston.

8    But he tailgates and parties with us, too.

9              THE COURT:  Do you have any questions?

10             MR. BICKLEY:  No.

11             THE COURT: Mr. Hairston, you may take your seat.

12

13             WHEREUPON, Curtiss Hairston returned to his seat.

14

15             THE COURT:  Okay.  I'll let him go if either of

16   you want me to.

17             MR. BICKLEY:  I don't have any objection.

18             MR. REVERCOMB:  I'd like to know if he's talked

19   to Kevin Moss about this case.

20             THE COURT:  Okay.

21             Mr. Hairston, would you come on back up for just

22   one second.  I'm sorry.

23

24             WHEREUPON, Curtiss Hairston approached the bench,

58

1    where the following transpired:

2         THE COURT:  One of the things that I need to ask

3    you is this:  One of the jurors is named Kevin Moss.

4    Have you talked about this case with him?

5         JUROR HAIRSTON:  No.

6         THE COURT:  Did he mention anything at all?

7         JUROR HAIRSTON:  No.

8         MR. REVERCOMB:  Have you ever been in the Fortson

9    household?

10        JUROR HAIRSTON:  Yes, once.

11        MR. REVERCOMB:  So, you know the Fortson family,

12   the brothers and the mother?

13        JUROR HAIRSTON:  Yes.

14        THE COURT:  Mr. Bickley?

15        MR. BICKLEY:  I don´t have any questions.

16        THE COURT:  Okay.  You may take your seat.

17

18        WHEREUPON, Curtiss Hairston returned to his seat.

19

20        THE COURT:  Okay?

21        MR. REVERCOMB:  Your Honor, we have a challenge

22   for cause.

23        THE COURT:  The Fortson´s are your witnesses?

24        MR. REVERCOMB:  They are both witnesses.

                                                                59

1          THE COURT:  Mr. Hairston, I'll let you go, sir.

2     It's okay for you to go back to work or wherever you'd

3     like.

4          THE COURT:  Mrs. Samples, would you move up to

5     Mr. Hairston's seat, please?

6

7          WHEREUPON,  Beverly  Samples  took  seat  number

8     twenty-two, and the following transpired:

9

10         THE COURT:  Oh, I'm sorry.

11         JUROR PATRICK COOKE:  I know the Fortson's.  A

12    couple of them played ball with my brother.

13         THE COURT:  In a Carbide softball league?

14         JUROR COOKE:  No.  It was Little League.

15         THE COURT:  How long ago has that been?

16         JUROR COOKE:  Twenty-two or twenty-three years

17    ago.

18         THE COURT:  Did you know the Fortson's separately

19    from the fact that your brother played ball with them?

20         JUROR COOKE:  No.

21

22         THE COURT:  Okay.  The next witness is Joe Dean

23    Jarrell;

24              William Estep;

60

1          Wesley King;

2          Russell Clark;

3          Alex Swiggart;

4          Belinda Gregg;

5

6          UNIDENTIFIED JUROR FROM THE AUDIENCE:   She is a

7    social acquaintance from a couple of years ago.   She is

8    the sister of the victim.

9          THE COURT:   The sister of Vanessa Reggettz?

10         UNIDENTIFIED JUROR:   Yes.

11         THE COURT:   Why don't you come on up here for

12   just a second.

13

14         WHEREUPON, Evelyn Whidby approached the bench,

15   where the following transpired:

16

17         THE COURT:   You're Evelyn Whidby?

18         JUROR WHIDBY:   Yes.

19         THE COURT:   Now, you say you know Belinda Gregg?

20         JUROR WHIDBY:   Not well.

21         THE COURT:   Well, tell me how you know her?

22         JUROR WHIDBY:   I picked her up to take her to

23   church sometimes.

24         THE COURT:   When was that?

1          JUROR WHIDBY:  It would have been about twenty

2     years ago.

3          THE COURT:  When was the last time you had any

4     contact with Ms. Gregg?

5          JUROR WHIDBY:  About that time.

6          THE COURT:  She is Mrs. Reggettz' sister?

7          JUROR WHIDBY: Yes, as far as I know.  I knew her

8     name was Belinda, and a friend of mine told me that she

9     was her sister.

10          THE COURT:  When did you find that out?

11          JUROR WHIDBY:  Well, I've know it, but I've

12     talked to a lady Saturday after a wedding about the case

13     being in the paper.  I asked her again, and she said,

14     "Yes, that's her sister."

15          THE COURT:  What did you read in the paper on

16     Saturday?

17          JUROR WHIDBY:  About the retrial.  But I am from

18     St. Albans.

19          THE COURT:  Do you remember reading about this

20     case when it first occurred?

21          JUROR WHIDBY:  Yes.

22          THE COURT:  What do you remember reading about

23     it?

24          JUROR WHIDBY:  I remember reading about her

1    husband being charged first, but then later John Moss

2    was.

3            THE COURT:   What do you remember reading about

4    Mr. Moss?

5            JUROR WHIDBY:   Just that he was convicted.

6            THE COURT:   Do you remember when this occurred?

7            JUROR WHIDBY:   No.

8            THE COURT:   Now, do you know why we are trying

9    this case again?

10           JUROR WHIDBY:   No.   I really didn´t understand

11   why.

12           THE COURT:   Have you discussed this case with any

13   of your fellow jurors?

14           JUROR WHIDBY:   No.   I just knew that it was going

15   to be today.   I don´t know any of the details.

16           THE COURT:   Now, would the fact that you know and

17   have read some things about this case, and the fact that

18   you know that Mr. Moss has previously been convicted --

19   would that cause you to in any way believe that he might

20   be guilty?

21           JUROR WHIDBY:   Well, I´d rather not serve, if I

22   didn´t have to.

23           THE COURT:   Why is that?

24           JUROR WHIDBY:   Well, it´s just my own personal

1    feelings.

2         THE COURT:   You´d be uncomfortable sitting as a

3    juror in this case?

4         JUROR WHIDBY:   Yes, sir.

5         THE COURT:   You said that you lived in St.

6    Albans.   Did you live close to the Reggettz house?

7         JUROR WHIDBY:   I lived in Virginia Heights, out

8    of the city limits.

9         THE COURT:   The other way?

10        JUROR WHIDBY:   Yes.

11        THE COURT:   Do you have any questions?

12        MS. LUSK:   When you say that you are

13   uncomfortable ---

14        JUROR WHIDBY:   I remember some of the details

15   being in the paper, about the violence.   I would just be

16   uncomfortable with this.

17        MS. LUSK:   I´m not suggesting that the details

18   aren´t violent -- they are.   But, do you think, though,

19   that that would make you feel more uncomfortable than it

20   would make anybody else?   It´s definitely going to make

21   people uncomfortable.

22        JUROR WHIDBY:   Well, I don´t know about their

23   feelings.   I just know about mine.

24        MR. REVERCOMB:   Do you feel that that would make

64

1    you unable to sit fairly and impartially?

2         JUROR WHIDBY:  Yes.  I'd just rather not serve on

3    this.

4         MR. BICKLEY:  That speaks for itself, your Honor.

5         THE COURT:  Okay.  We'll excuse you.

6         During the course of this trial, we expect quite

7    a bit of evidence to come in.  Please don't discuss this

8    with any of the other jurors who have been selected to

9    sit in this case.

10        JUROR WHIDBY:  Okay.

11

12        WHEREUPON, Evelyn Whidby was excused from the

13   jury panel in this case.

14

15        UNIDENTIFIED JUROR FROM THE AUDIENCE:  Your Honor

16   ---

17        THE COURT:  Come on up.

18

19        WHEREUPON, Brenda Allen approached the bench,

20   where the following transpired:

21

22        THE COURT:  Okay?

23        JUROR ALLEN:  Judge, I'm not sure, but I think

24   Arthur Moss used to be a policeman?

1          MR. REVERCOMB:  Yes.

2          JUROR ALLEN:  I know him.  We're not acquainted,

3     but I've seen him and waved at him, things like that.

4     And I know a couple of his brothers, Eugene Moss and --

5     wait a minute, I'll think of the other one -- I can't

6     think of his other brother's name right now -- oh, it's

7     Billy Moss.   Billy is what we called him.

8          I know them through my husband.

9          THE COURT:   Have you talked with any of those

10    people about this case?

11         JUROR ALLEN:   No.   They don't talk about each

12    other.   I didn't even know that he was a brother.

13         THE COURT:   Would the fact that you know them

14    cause you any difficulty in evaluating the credibility

15    of anyone in this case?

16         JUROR ALLEN:   No, because I don't know them that

17    well.   I just speak to them.

18         THE COURT:   Your husband knows them better than

19    you do?

20         JUROR ALLEN:   He knows Eugene.

21         THE COURT:   This case is going to take two weeks

22    to try, and your husband is obviously going to know what

23    you are doing.   Can you avoid discussing this case with

24    him during that time?

66

1          JUROR ALLEN:  Yes.

2          THE COURT:  You won't let him talk to you about

3      it?

4          JUROR ALLEN:  No, we don't talk like that.  No.

5          MS. LUSK:  I think Billy is Will.  Will is on the

6      list.

7          THE COURT:  Right.

8          JUROR ALLEN:  You mean, that's the brother?

9          MR. REVERCOMB:  Yeah.

10         JUROR ALLEN:  He lives down on Route 35, down

11     toward Winfield?

12         MR. REVERCOMB:  Yes.

13         MS. LUSK:  There may be a Will Moss who is a

14     witness, and he may be Billy's father.  He probably is

15     Billy's father.

16         MR. BICKLEY:  Yes.

17         Could you serve, even though you know those

18     people, and could you be a fair and impartial juror?

19         JUROR ALLEN:  Yes.

20         MR. BICKLEY:  I think she's fine.

21         THE COURT:  Fine.  You may take your seat.

22

23         WHEREUPON, Brenda Allen returned to her seat in

24     the jury panel.

67

1

2          THE COURT:   The next witness is Bonnie Hull;

3          Faith Moss;

4          John Wideman;

5          Sergeant J. R. Smith;

6          Alex Fortson;

7          Mike Roark, Mike is the former Prosecuting

8     Attorney and Mayor of Charleston;

9          Dr. Charbonniez;

10         UNIDENTIFIED JUROR FROM THE AUDIENCE:   Judge, I

11    know Dr. Charbonniez.

12         THE COURT:   You want to come on up?

13

14         WHEREUPON, William Boyd approached the bench,

15    where the following transpired:

16

17         THE COURT:   Okay.

18         JUROR BOYD:   After my retirement, I worked for

19    Rehabilitative Services, and I'm acquainted with Dr.

20    Charbonniez.   We're sailing buddies; we go sailing

21    together.

22         THE COURT:   Where do you sail?

23         JUROR BOYD:   Summersville, Beech Fork, Red

24    Mountain Lake ---

68

1          THE COURT:  Is he a good sailor?

2          JUROR BOYD:  Yes.  He's a good athlete, period.

3          THE COURT:  Would the fact that you know him

4     cause you to give his testimony more weight and

5     credibility than you would otherwise ---

6          JUROR BOYD:  I don't think so.

7          THE COURT:  You think that you could judge his

8     testimony objectively?

9          JUROR BOYD:  Yes.

10         THE COURT:  What is going to happen if you go out

11    of here after finding that his testimony might be

12    contrary; are you going to be able to look him in the eye

13    and ---

14         JUROR BOYD:  Yes, sir, I will.

15         THE COURT:  Do you have any questions?

16         MS. LUSK:  No.

17         MR. BICKLEY:  None.

18         THE COURT:  Thank you.  You may take your seat.

19

20         WHEREUPON, William Boyd returned to his seat in

21    the jury panel.

22

23         THE COURT:  Reese Otts;

24         Trooper Howard Woodyard;

69

1          Dr. Jerome Massenburg;

2          Edith Lilly;

3          Roger Lyon; and

4          Loren Tobia.

5          Okay.  You all have been in your seats for a

6  while now.  If you will do me a favor -- we are going to

7  take a ten minute recess.  When you come back, please

8  come back into the room and take the same seats that you

9  old now.

10         Also, I´m going to ask you now, and I´ll try to

11  remember to repeat it every time, but if I don´t, the

12  rule will apply, even though I didn´t say it.  Please,

13  under no circumstances, should you discuss this case

14  among yourselves or with any other jurors who are not a

15  part of this case, or with any other persons not a part

16  of the jury, under any circumstances.  It is imperative

17  that the evidence which comes to you and the information

18  which comes to you as a juror in this case, come to you

19  only in this Courtroom.

20         So, with that, I´ll excuse you for ten minutes.

21  If you´ll just reassemble back in the jury room in about

22  ten minutes, then we´ll pick back up.

23

24         WHEREUPON, the Court stood in a recess in the

70

1    hearing of this case.

2            (Back on the Record)

3

4            THE COURT:  Okay.  Now, let me ask if any of you

5    are acquainted with Lynn Moreland?

6            How many of you are from St. Albans?

7            UNIDENTIFIED  JURORS  FROM  AUDIENCE:    (Raised

8    hands)

9            THE  COURT:    Of  those  of  you  who  are  from  St.

10   Albans, do any of you have children at St. Albans High

11   School?

12           UNIDENTIFIED JUROR FROM AUDIENCE:  I have a son

13   there.

14           THE COURT:  What grade is he in?

15           UNIDENTIFIED JUROR:  He's in the twelfth.

16           THE COURT:  Are any of you now, or have any of

17   you in the past, been police officers or any kind of law

18   enforcement officers?

19           Do any of you have immediate family members, and

20   by immediate family I mean your mother, father, children,

21   brothers, sisters, husbands or wives ---

22           JUROR JACQUELINE HILL:    My  brother  is  on  the

23   Charleston Police Department.

24           THE COURT:  What is his name?

1          JUROR HILL:  Casey James.

2          THE COURT:  He's been on the Police Department

3     for how long?

4          JUROR HILL:  About twenty-seven years.

5          THE COURT:  Do you think that the fact that your

6     brother is a policeman will affect your judgment in this

7     case in any way?

8          JUROR HILL:  No.

9          THE COURT:  Does anyone else have immediate

10    family who is a police officer?

11         JURORS:  (No Response)

12         THE COURT:  Do any of you have any close friends,

13    and by close friends, I mean people with whom you

14    regularly socialize and the like, who are police

15    officers?

16         UNIDENTIFIED JUROR FROM THE AUDIENCE:  I know a

17    lady who I used to work with, a Trooper Deitz.  She used

18    to work with me and my wife.

19         THE COURT:  Is she still a police officer?

20         UNIDENTIFIED JUROR:  She is a State Trooper.

21         THE COURT:  How long have you known her?

22         UNIDENTIFIED JUROR:  About ten or twelve years,

23    I think.

24         THE COURT:  Has she ever been a guest in your

72

1    home?

2              UNIDENTIFIED JUROR:  No.

3              THE COURT:   Would that in any way affect your

4    judgment in this case?

5              UNIDENTIFIED JUROR:  No.

6              THE COURT:   In what capacity -- where was she

7    stationed?

8              UNIDENTIFIED JUROR:  She was at South Charleston.

9              THE COURT:  At the CIB?

10             UNIDENTIFIED JUROR:  Yes.

11             THE COURT:  Okay.

12             JUROR COOKE:   Your Honor, there is a Sergeant

13   Sparks who is my neighbor in South Charleston.

14             THE COURT:  Is he a City Police Officer?

15             JUROR COOKE:  Yes.

16             THE COURT:  What is his name?

17             JUROR COOKE:  Bobby.

18             THE COURT:  How close are you?

19             JUROR COOKE:  He lives about four houses away.

20             THE COURT:   How long have you all lived close

21   together there?

22             JUROR COOKE:   I'm 32, so it would be about

23   thirty-two years.

24             He's moved over to another part of town now, but

73

1    we used to live close together.

2         THE COURT:  Have any of you, yourselves, ever

3    been the victim of a crime?

4         JUROR HILL:   I've been  --  I've  had  two

5    burglaries.

6         THE COURT:  At your home?

7         JUROR HILL:  Yes.

8         THE COURT:  Casey ought to park on your doorstep.

9         JUROR HILL:  I know.

10        THE COURT:  When did that take place?

11        JUROR HILL:  Approximately five years ago.

12        THE COURT:  Were they close in time?

13        JUROR HILL:  They were within three months of

14   each other.

15        THE COURT:  Were the persons who are alleged to

16   have committed those crimes ever apprehended?

17        JUROR HILL:  No.

18        THE COURT:  So, there was no trial?  You never

19   went to Court?

20        JUROR HILL:  No.

21        THE COURT:  Anyone else?

22        UNIDENTIFIED  JUROR:   On  three  different

23   occasions, I had the hubcaps stolen from my car.

24        THE COURT:  In front of your house?

74

1          UNIDENTIFIED JUROR:  Yes.

2          THE COURT:  Did they catch the people who did it?

3          UNIDENTIFIED JUROR:  No.  They just took one at

4     a time.

5          THE COURT:  Maybe it was the same fellow and he

6     just kept losing one.

7          UNIDENTIFIED JUROR:  I have a Volkswagen Camper

8     and you just jerk them and they come off.

9          THE COURT:  Okay.

10         JUROR MARTHA BRADY:  I had a burglary in 1980.

11         THE COURT:  At your home?

12         JUROR BRADY:  We weren´t living there at the

13    time.  They broke in and stole some stuff.

14         THE COURT:  Were the persons caught?

15         JUROR BRADY:  No.

16         THE COURT:  Anyone else?

17         Do any of you have immediate family members who

18    have been the victim of some sort of crime?

19         JUROR ROSIE EATON:  My daughter -- down on Sixth

20    Avenue a few years ago, somebody broke into her house,

21    but they didn´t catch them or anything like that.

22         JUROR JACQUELINE HILL:  My son was arrested

23    approximately two and a half years ago for assault and

24    battery, but there was no Court involvement.

75

1      JUROR HELEN CHRIST:  Someone broke into my son's

2   house about twelve years ago.

3      THE COURT:  Were the persons caught?

4      JUROR CHRIST:  No.

5      THE COURT:  Where is his house?

6      JUROR CHRIST:  Chesterfield Avenue in Kanawha

7   City.

8      UNIDENTIFIED JUROR FROM THE AUDIENCE:  My sister-

9   in-law and brother -- somebody broke into their house and

10  broke up some things, but they were never caught.

11     UNIDENTIFIED JUROR FROM THE AUDIENCE:  My

12  daughter's house was burglarized about five years ago.

13     THE COURT:  Did they catch the burglar or

14  burglars?

15     UNIDENTIFIED JUROR:  No, your Honor.

16     THE COURT:  Have any of you read about this case?

17  Have you seen or heard anything about it in the media,

18  on television or radio, that sort of thing?

19     JUROR JACQUELINE HILL:  I read the first part.

20     THE COURT:  I'm not going to ask you what.  I

21  just want to get your names.

22     Juror Seven, Juror One, Juror Fourteen, Juror

23  Haynes, Linda Haynes; Juror Jacqueline Hill; and Steven

24  Pryor; and Mrs. Samples, Beverly Samples; and Mrs. Allen.

1          Let me ask this:  Has anyone discussed this case

2     with you?

3          JURORS:  (No Response)

4          THE COURT:  If we can keep to our schedule, we'll

5     be finished on Friday, a week from this coming Friday,

6     with two full weeks of trial time.  Is there anyone here

7     who is going to be put to an insurmountable hardship by

8     participating in a jury trial that would last that long?

9          JUROR ROSIE EATON:  Your Honor, my mother is past

10    89, and she is not completely an invalid, but my nephew

11    would have to stay there too, and that would be hard for

12    him to do.  I do most of the cooking and those sorts of

13    things.

14         THE COURT:  Let me have counsel up here for just

15    a moment.

16

17         WHEREUPON, a bench conference was held, where the

18    following transpired:

19

20         THE COURT:  Mrs. Eaton, do you take care of your

21    mother most of the time?

22         JUROR EATON:  Most of the time.  I stay at night

23    with her.  I bathe her and do most of the cooking and

24    things like that.

77

1        THE COURT:  Does she live in your home?

2        JUROR EATON:  I live in her home.

3        THE COURT:  How old is she?

4        JUROR EATON:  She's past 89.  She walks on a

5    walker.

6        THE COURT:  I take it that you'd like to be

7    excused to take care of her?

8        JUROR EATON:  Yes, sir.

9        THE COURT:  Okay, why don't you have a seat and

10   I'll let you know in just a minute.

11       JUROR EATON:  Thank you.

12

13       WHEREUPON, Juror Rosie Eaton returned to her seat

14   in the jury panel.

15

16       THE COURT:  What do you want to do?

17       MR. BICKLEY:  I think she'd be under a lot of

18   pressure and wouldn't be able to keep her mind on this

19   man.  It's apparent she takes care of her mother and does

20   all of the cooking.

21       THE COURT:  I'm just thinking about the decency

22   that you manifest from time to time.

23       MR. BICKLEY:  I try to show my sensitive side

24   from time to time.

78

1          THE COURT:  What do you think?

2          MS. LUSK:  Well, Judge, my question -- she said

3     she takes care of her in the evenings and does the

4     cooking.  She doesn't indicate that she does anything for

5     her during the day, so she would have time to hear the

6     case.

7          THE COURT:  Anyone else?

8          Yes, ma'am.  You want to come on up?

9

10         WHEREUPON, Ruth Belcher approached the bench,

11    where the following transpired:

12

13         THE COURT:  Okay, Ms. Belcher.

14         JUROR BELCHER:  I was just wondering what the

15    schedule was because I have a class at West Virginia

16    State College in the evenings from 5:30 to 7:00 o'clock.

17         THE COURT:  Every evening?

18         JUROR BELCHER:  Well, two evenings at 5:30, and

19    the other two evenings at 7:00 o'clock.

20         THE COURT:  Which evenings do you have -- well,

21    I think we'll be able to get you out of here by 5:00 on

22    those evenings, but we won't go after that when you've

23    got class.

24

79

1        WHEREUPON, Ruth Belcher returned to her seat in

2    the jury panel.

3

4        WHEREUPON, Mr. Richard Kenney approached the

5    bench where the following transpired:

6

7        THE COURT:  All right, Mr. Kenney?

8        JUROR KENNEY:  I have Wednesday, Thursday, and

9    Friday.  On Wednesday, I've got to go to Charleston

10   General Hospital.  They're going to take blood, and then

11   on Thursday, I've got a small operation as an outpatient.

12       THE COURT:  When is that?

13       JUROR KENNEY:  On Thursday morning.

14       THE COURT:  Okay.

15       JUROR KENNEY:  And then on Friday, they're going

16   to put hearing aids in.

17       THE COURT:  When is that set up?

18       JUROR KENNEY:  On Friday?  I have no idea when on

19   Friday.  They just set me for Friday morning.

20       THE COURT:  Okay.  Thank you.

21       MR. BICKLEY:  I think we ought to excuse him.

22       THE COURT:  Yeah, let's let him go.

23

24       WHEREUPON, Mr. Richard Kenney was excused from

80

1     the jury panel.

2          THE COURT:   Is there anybody else?

3

4          WHEREUPON, Mr. Steven Pryor approached the bench,

5     where the following transpired:

6

7          THE COURT:   Yes?

8          JUROR PRYOR:   I'm having a hard time.   I work

9     every day and I'm having a hard time paying all of the

10    bills that I've got to pay.

11         THE COURT:   Where do you work?

12         JUROR PRYOR:   Arby's Roast Beef, down on Virginia

13    Street.

14         THE COURT:   They don't pay you when you're not

15    there; do they?

16         JUROR PRYOR:   No, sir, they don't.

17         THE COURT:   What do you do for Arby's?

18         JUROR PRYOR:   Sir, I'm a cook.

19         THE COURT:   I'll tell you what -- that's a shame.

20    How much jury duty have you done so far?

21         JUROR PRYOR:   I was here all last week and today.

22         THE COURT:   Okay.   Why don't you go ahead and

23    have a seat.

24

81

1          WHEREUPON, Mr. Steven Pryor returned to his seat

2     in the jury panel.

3

4          THE COURT:  Under ordinary circumstances, I'd let

5     him go.

6          MR. REVERCOMB:  Your Honor, if you don't let him

7     go, he's going to be upset about his bills.

8          THE COURT:  What do you think?

9          MR. BICKLEY:  It sort of takes your breath away;

10    doesn't it?   I think he was probably going, anyway.

11    They just don't want to use their preemptory challenge

12    for him.

13         THE COURT:  I hate like Hell to let him go.

14         MS. LUSK:  He's making minimum wage, and he's

15    having that much trouble -- he probably ought to be

16    released from the whole panel.  He's coming in here every

17    week, and not even making minimum wage.

18         THE COURT:  He's making fifteen bucks a day.

19         MS. LUSK:  If that's all he's got ---

20         THE COURT:  I'm going to let him go.

21         Is there anybody else in the back?

22         Yes, sir, you want to come on up?

23

24         WHEREUPON, Mr. William Burroughs approached the

82

1   bench, where the following transpired:

2          THE COURT:  Yes, sir?

3          JUROR BURROUGHS:  Sir, I need, rather badly, to

4   get off to do a painting job at my house.  I have a man

5   scheduled to start out with me on Friday, and I don't

6   want to lose him.

7          THE COURT:  You say, by helping you do you mean

8   that you'll be doing the painting and he'll be painting

9   with you?

10         JUROR BURROUGHS:  I'll be painting with him.  I

11  hate to drag this out for a long time.  We're painting

12  six rooms.

13         THE COURT:  Okay.

14         MS. LUSK:  How long do you anticipate this job

15  would last?

16         JUROR BURROUGHS:  Four or five, probably five

17  days I would think.  I hope it's not too much longer than

18  that.

19         THE COURT:  Five days for all of the painting;

20  you mean?

21         JUROR BURROUGHS:  Yes, sir.

22         THE COURT:  You may go ahead and take your seat.

23

24         WHEREUPON, Mr. William Burroughs returned to his

83

1   seat in the jury panel.

2       THE COURT:  Do you want to pull his name and let

3   him go?

4       MR. BICKLEY:  I think so, yes.

5       MR. REVERCOMB:  Your Honor, he's already shown

6   his decency once.

7       MR. BICKLEY:  Yeah.

8       THE COURT:  I might as well give it a try.

9       Mr. Kenney, Mr. Pryor, and Mr. Orr, I'm going to

10  let you all go.  You all may be excused to go on home.

11  If you're called to come back for jury duty, you'll come

12  back with the next call.

13      Mr. Burroughs, would you come up please, and take

14  the vacant seat in the jury box?

15      All right, members of the jury, we are going to

16  take our lunch recess now.  If you all would please

17  report back at about five minutes after one, we'll get

18  started at about that time.

19

20      WHEREUPON, counsel for the State, the Defendant,

21  and other Court personnel retired to the Jury Room, to

22  conduct individual voir dire.

23

24      THE COURT:  Sally, will you bring in Mr. David

84

1     Smith, please?

2          THE CLERK:  Yes, sir.

3

4          WHEREUPON, Mr. David Smith entered the Jury Room

5     for individual voir dire.

6

7          THE COURT:  Mr. Smith, will you have a seat,

8     please?  I want to ask you just a couple of very basic

9     questions.

10         I think that you indicated, that you put your

11    hand up when I asked if you have heard anything?

12         JUROR DAVID SMITH:  I heard about it when it

13    happened.  It was on the TV and in the papers.

14         THE COURT:  Where do you live?

15         JUROR SMITH:  In Mink Shoals, at Dutch Road.

16         THE COURT:  Can you tell me what you remember

17    about it?

18         JUROR SMITH:  I just remember him being charged

19    with it and let out; then later, somebody else was

20    charged with it.

21         THE COURT:  Who being charged with it?

22         JUROR SMITH:  Mr. Moss.

23         THE COURT:  Okay.  Do you remember what happened?

24         JUROR SMITH:  Do you mean, why Mr. Reggettz was

85

1   charged with it?

2          THE COURT:  No, do you remember what was supposed

3   to have happened to the people involved?

4          JUROR SMITH:  Oh, no, I don´t know any of the

5   details.

6          THE COURT:  Did you know anybody involved?

7          JUROR SMITH:  No, I didn´t.

8          THE COURT:  Now, would any of the things that

9   you´ve heard cause you to have any preconceived notions

10  about whether Mr. Moss is guilty or not?

11         JUROR SMITH:  No, I don´t remember that much

12  about it, but I do remember hearing about it.

13         THE COURT:  My experience has been that the

14  jurors are going to know about twenty times more than the

15  press reports anyway, because they just pop in, take a

16  quick shot, and hear enough to get something written

17  about it.  The jurors are the ones who are going hear all

18  of the evidence.

19         I´m confident that whatever you might have heard

20  or read in the press isn´t going to be actually what you

21  will hear, if you are selected as a juror in this case.

22         Do you feel that you can approach this case with

23  an open mind?

24         JUROR SMITH:  Yes, sir.

86

1        THE COURT:  Now, let me ask you, have you -- in
2   this case, the State, I am confident, is going to ask for
3   the toughest punishment possible under the laws of the
4   State of West Virginia.

5        Any person convicted of first degree murder could
6   be found guilty with a finding of either mercy or no
7   mercy.  If a person is convicted of first degree murder
8   without mercy, that means that he would spend the rest
9   of his life in the penitentiary, without parole.  But a
10  person who is convicted with mercy is going to have to
11  spend at least ten years, with a possibility of parole
12  after that.

13       Do you believe that if the evidence warrants it,
14  that you could return either of those verdicts?

15       JUROR SMITH:  Yes.

16       THE COURT:  Now, the other side of that obviously
17  is that if a person is not guilty of committing the
18  offense, then he should not spend the first day in the
19  penitentiary.  Do you believe that if the evidence in
20  this case fails to demonstrate that Mr. Moss is guilty
21  beyond a reasonable doubt that you could find a verdict
22  of not guilty?

23       JUROR SMITH:  Yes.

24       THE COURT:   Are you employed now?

87

1          JUROR SMITH:  Yes.

2          THE COURT:  Where do you work?

3          JUROR SMITH:  I drive for the KRT.

4          THE COURT:  Okay.  How long have you been with

5     them?

6          JUROR SMITH:  Eight or ten years.

7          THE COURT:  I ask you if -- you don´t have any

8     immediate family members who have ever been the victim

9     of a crime; have you?

10         JUROR SMITH:  No, I don´t.

11         THE COURT:  Do you believe that if a victim is

12    white and the suspect is black, that the suspect is

13    automatically guilty?

14         JUROR SMITH:  No.

15         THE COURT:  Have you associated with black

16    persons at school or at your workplace?

17         JUROR SMITH:  Yes.

18         THE COURT:  Do you belong to any group or

19    organization which systematically excludes any persons

20    because of their race?

21         JUROR SMITH:  No.

22         THE COURT:  Have you ever lived in St. Albans?

23         JUROR SMITH:  No, I haven´t.

24         THE COURT:  Would you tend to give the testimony

1    of a Police Officer more weight or credibility, or would

2    you find that a Police Officer´s testimony is more

3    believable than anyone else?

4         JUROR SMITH:  Well, it would depend.

5         THE COURT:  On what?

6         JUROR SMITH:  Well, I wouldn´t necessarily -- I

7    wouldn´t necessarily believe one over somebody else; no.

8         THE COURT:  Do you know of a juror, Kevin Moss?

9         JUROR SMITH:  No.

10        THE COURT:  Have you discussed this case with

11   anybody else or has anybody discussed it with you?

12        JUROR SMITH:  No.

13        THE COURT:  There will be circumstantial evidence

14   in this case; we´re relatively sure.  And circumstantial

15   evidence -- if somebody comes into this building and you

16   can´t see outside, but somebody comes in with an umbrella

17   and a raincoat with water dripping off of it, you can

18   reasonably infer that it was raining outside, without

19   seeing it.  That´s circumstantial evidence as opposed to

20   direct evidence in which you just look outside and see

21   it raining.

22        I´ll instruct this jury that they can find a

23   verdict based upon circumstantial evidence, as well as

24   other evidence, so long as the circumstantial evidence

89

1    excludes any reasonable hypothesis consistent with the

2    innocence of the defendant.

3        Do you believe that you could follow that

4    instruction?

5        JUROR SMITH:  Yes, I believe I could.

6        MR. BICKLEY:  Mr. Smith, do you understand that

7    the defense -- we do not have to prove Mr. Moss's

8    innocence, but the State must prove that he is guilty

9    beyond a reasonable doubt?

10        JUROR SMITH:  Yes, sir.

11        MR. BICKLEY:  You do understand that?

12        JUROR SMITH:  Yes, sir.

13        MR. BICKLEY:  Do you understand that if Mr. Moss

14    never takes the stand, there is no presumption of his

15    guilt?

16        JUROR SMITH:  That is right.

17        MR. BICKLEY:  And on circumstantial evidence, do

18    you understand that while it might be raining, if you

19    were in a room with that witness, someone could have

20    thrown water on that person; that that's a possibility,

21    if you couldn't see outside that it was raining?

22        JUROR SMITH:  Yes, sir.

23        MR. BICKLEY:  I have no further questions.

24        MS. LUSK:  I might ask Mr. Smith if he

90

1    understands that the State doesn't have to prove its case

2    beyond all doubt, but just beyond a reasonable doubt?

3         JUROR SMITH:  Yes, ma'am.

4         MS.  LUSK:   Would  you  hold  us  to  any  stiffer

5    burden than that?

6         JUROR SMITH:  Beyond a reasonable doubt?  Would

7    I hold you to any more than that?

8         MR. REVERCOMB:  To a higher burden of proof?

9         JUROR SMITH:  No.

10        MR.  BICKLEY:   Would  you  be  able  to  understand

11   that  the  Court,  more  than  likely,  will  give  you  an

12   instruction that mere suspicion is not guilt?  Would you

13   be able to understand that?

14        JUROR SMITH:  Yes, sir.

15        MR. BICKLEY:  Or that inference is not guilt?

16        JUROR SMITH:  Yes, sir.

17        MR. BICKLEY:  I have nothing further.

18        MR. REVERCOMB:  I have just one question.

19        Do  you  understand  --  getting  back  to  Judge

20   MacQueen's example on circumstantial evidence -- do you

21   understand  that  the  reasonable  inference  in  that

22   hypothetical circumstance, is that it is raining outside

23   and not that he walked through a carwash?

24        JUROR SMITH:  Yes, sir.

91

1          THE COURT:  Okay, thank you.  You can go on back.

2      We're  going  to  be  another  half  hour  or  forty-five

3      minutes, so you can have a cup of coffee.

4          Please don't discuss the questions with any of

5      your fellow jurors.

6          JUROR SMITH:  Yes, sir.

7          THE COURT:  Thank you, sir.

8

9          WHEREUPON, Juror David Smith returned to the Jury

10     Lounge.

11

12         THE COURT:  Okay, are there any objections to Mr.

13     Smith?

14         MR. BICKLEY:  I might do him on preemptory.  I

15     don't have enough for cause.

16         MR. REVERCOMB:  Should we ask these people if

17     they've ever been charged with a crime?

18         THE COURT:  Yes.

19         Sally,  would  you  bring  back  Patrick  Cooke,

20     please?

21         THE CLERK:  Yes.

22

23         WHEREUPON, Patrick Cooke was brought to the Jury

24     Room for individual voir dire.

92

1

2          THE COURT:   Come on back, Mr. Cooke.   How are

3     you?

4          JUROR COOKE:   Fine.

5          THE COURT:   We'll make sure to try to make this

6     brief.

7          JUROR COOKE:   Fine.

8          THE COURT:   Where do you live?

9          JUROR COOKE:   8718 Holly Street, St. Albans.

10         THE COURT:   I think you told me that you grew up

11    in St. Albans?

12         JUROR COOKE:   Yes.

13         THE COURT:   Have you ever heard about this case

14    before?

15         JUROR COOKE:   No, sir.   Well, I heard about it

16    when it first happened, but I don't remember anything

17    about it.

18         THE COURT:   Just tell me what you remember or

19    what you have heard -- very briefly.

20         JUROR COOKE:   I just heard that there was a

21    couple of murders, and that was basically it.   I don't

22    remember how it was done or whereabouts it was done.

23         THE COURT:   Okay.   Do you remember the

24    defendant's name in connection with this incidence in any

93

1    way?

2            JUROR COOKE:  Mr. Moss?

3            THE COURT:  Yes.

4            JUROR COOKE:  I just remember the name; but,

5    that's it.

6            THE COURT:  Do you remember anything about Mr.

7    Reggettz?

8            JUROR COOKE:  No.

9            THE COURT:  Where do you think you remember

10   seeing things about this; from newspaper or television,

11   or what?

12           JUROR COOKE:  Television.

13           THE COURT:  Okay.  Did you go to St. Albans High

14   School?

15           JUROR COOKE:  Yes.

16           THE COURT:  When did you graduate from St.

17   Albans?

18           JUROR COOKE:  I graduated from St. Albans in

19   1977.

20           THE COURT:  In the spring of 1977?

21           JUROR COOKE:  Yes.

22           THE COURT:  (To Mr. Moss)  Did you start in the

23   fall of '77?

24           THE DEFENDANT:  It was right after the summer

94

1    break.

2           THE COURT:  Okay.  You don´t remember seeing Mr.

3    Moss at St. Albans High School; do you?

4           JUROR COOKE:  No, sir.

5           THE COURT:  Would any of the publicity that you

6    are aware of interfere with your ability to decide this

7    case?  Not on the publicity, but on the evidence that

8    you hear here in this Court?

9           JUROR COOKE:  No, sir.

10          THE COURT:  You wouldn´t have any trouble

11   deciding this case, based just on the evidence?

12          JUROR COOKE:  No, sir.

13          THE COURT:  Because you know and I know that the

14   Press people stop in here for ten or fifteen minutes, and

15   then do a story.  They are not going to see a fraction

16   of what you will see as a juror.

17          Okay.  When you went to St. Albans High School,

18   were there any black students there?

19          JUROR COOKE:  Oh, yes.

20          THE COURT:  And did you play any sports there?

21          JUROR COOKE:  No, sir.

22          THE COURT:  I don´t know whether or not you told

23   me, Mr. Cooke, but have you or any member of your family

24   ever been a victim of a crime?

95

1        JUROR COOKE:   I have a brother who, a couple of

2    years ago, was charged with dealing cocaine.

3        THE COURT:   Here in Charleston; in this area?

4        JUROR COOKE:   In the St. Albans area.

5        THE COURT:   What law enforcement officers charged

6    him?

7        JUROR COOKE:   I have no idea.

8        THE COURT:   What became of that?

9        JUROR COOKE:   He had to do time for it.   He was

10   sentenced to eighteen months, and he did something like

11   nine or ten months.

12       THE COURT:   In Federal Court?

13       JUROR COOKE:   Yes.

14       THE COURT:   Where is he now?

15       JUROR COOKE:   He's at home.   He got married since

16   then, and they're living down at Sun Valley Road.

17       THE COURT:   Do you believe that if a victim is

18   white and that the defendant who is charged with the

19   offense is black, that the black man is more likely than

20   not to have committed the crime?

21       JUROR COOKE:   No, sir.

22       THE COURT:   Do you belong to any group or

23   organization that excludes any persons because of their

24   race?

1          JUROR COOKE:  No, sir.

2          THE COURT:   Do you have any philosophical or

3    religious views -- the jury in this case is going to have

4    to decide, not only -- or in addition, the jury that

5    hears this case -- one of the questions that will be

6    submitted to you is, if the jury finds the defendant

7    guilty, the jury will have to decide the nature of the

8    punishment.

9          A verdict of first degree murder, without a

10   recommendation of mercy, would mean that Mr. Moss would

11   go to the penitentiary for the rest of his natural life,

12   without any hope of parole.  Do you have any religious

13   or philosophic or personal reasons why you could not

14   return such a verdict?

15         JUROR COOKE:  No, sir.

16         THE    COURT:     The   other   side   of   that,

17   notwithstanding the fact that this is a very, very

18   serious charge, that they have got to prove his guilt

19   beyond a reasonable doubt.

20         JUROR COOKE:  True.

21         THE COURT:  If the State cannot do that, would

22   you have any trouble in finding the defendant not guilty?

23         JUROR COOKE:  No, sir.

24         THE COURT:  Some of the evidence in this case is

97

1    going to be circumstantial evidence, and one of the

2    examples of circumstantial evidence is if a man ran out

3    of an alleyway with a gun, right after you heard a

4    gunshot, and you found somebody lying there, you might

5    assume that the man who ran out with the gun was the

6    person who did it.  That is circumstantial evidence.  You

7    didn´t actually see him pull the trigger ---

8          JUROR COOKE:  Right.

9          THE   COURT:    --  but  you  saw  what  happened

10   afterwards.

11         Now,  the  State  can  rely  on  circumstantial

12   evidence.   But  in  order  to  rely  on  circumstantial

13   evidence, the State has got to prove the guilt to the

14   exclusion of every possibility of his innocence.

15         Do you understand that?

16         JUROR COOKE:  Yes, sir.

17         THE COURT:  Could you follow an instruction about

18   the evidence to that effect?

19         JUROR COOKE:  Yes, sir.

20         THE COURT:  Would you tend to believe a Police

21   Officer more than you might believe any other witness?

22         JUROR COOKE:  No, sir.

23         THE COURT:  Okay.  Mr. Bickley?

24         MR. BICKLEY:  Mr. Cooke, do you understand that

98

1    the defense does not have to prove Mr. Moss innocent?

2        JUROR COOKE:  Yes, sir.

3        MR. BICKLEY:  But that the State must prove him

4    guilty beyond a reasonable doubt; do you understand that?

5        JUROR COOKE:  Yes, sir.

6        MR. BICKLEY:  If there is the mere suspicion that

7    he might be guilty, you would still vote for not guilty;

8    do you understand that?

9        JUROR COOKE:  Yes.

10        MR. BICKLEY:  And if there is just a strong

11    inference that he might be guilty, you would have to vote

12    for not guilty.

13        Do you understand that?

14        JUROR COOKE:  Yes, sir.

15        MR. BICKLEY:  It has to be beyond a reasonable

16    doubt.

17        JUROR COOKE:  Right.

18        MR. BICKLEY:  Do you understand all of that?

19        JUROR COOKE:  Yes, sir.

20        MR. BICKLEY:  That's all of the questions that I

21    have.

22        MR. REVERCOMB:  As Mr. Bickley just said, do you

23    understand that Mr. Moss is presumed to be innocent?

24        JUROR COOKE:  Right.

99

1        MR. REVERCOMB:  Judge MacQueen asked you about

2    circumstantial evidence.  I believe he stated that you

3    don't have to exclude every possibility of his guilt.

4    Actually, it's every reasonable hypothesis of his guilt.

5        Our burden of proof is beyond a reasonable doubt,

6    and not beyond all doubt or beyond all possible doubt.

7    Would you hold us to a higher burden than beyond a

8    reasonable doubt?

9        JUROR COOKE:  No, sir.

10       MR. REVERCOMB:  You say your brother was arrested

11   and sent to prison for selling cocaine?

12       JUROR COOKE:  Yes, sir.

13       MR. REVERCOMB:  Do you think that he was treated

14   fairly by the Police?

15       JUROR COOKE:  Yes, sir.

16       MR. REVERCOMB:  And I think Judge MacQueen asked

17   you if you would tend to believe a Police Officer's

18   testimony more than you would believe anyone else's

19   testimony, and I believe your answer was no.

20       JUROR COOKE:  Right.

21       MR. REVERCOMB:  Well, the other side of that is,

22   would you tend not to believe or place credence in a

23   Police Officer?

24       JUROR COOKE:  No, sir.

1          MR. REVERCOMB:  So, you would treat that like

2     every other witness?

3          JUROR COOKE:  Yes, just like any other witness.

4          MR. BICKLEY:  I have one other question.

5          Do you understand -- I just want to raise you

6     level of consciousness -- do you believe that Mr. Moss,

7     throughout the entire trial, until the jury goes into the

8     Jury Room, is presumed to be innocent?

9          JUROR COOKE:  Yes, sir.

10          MR. BICKLEY:  You do understand that?

11          JUROR COOKE:  Yes, sir, I do.

12          MR. BICKLEY:  And do you understand that if

13     required, the Court will instruct you to keep an open

14     mind until you go into the Jury Room?

15          JUROR COOKE:  Yes, sir.

16          MR. BICKLEY:  Thank you.

17          MS. LUSK:  Just one other area, Judge.

18          Did you know when you came in this morning that

19     this was the type of case that you might be sitting on?

20          JUROR COOKE:  No, ma´am.

21          MS. LUSK:  You hadn´t heard that this case was

22     ready to start, or anything like that?

23          JUROR COOKE:  No.

24          MS. LUSK:  You hadn´t heard any discussion about

101

1    it in the Jury Lounge?

2              JUROR COOKE:  No, ma'am.

3              MR. REVERCOMB:  I've got one last question.

4         I think you've answered so far that you don't

5    really know too much about it; what happened.  But if

6    something comes up during the trial that would suddenly

7    jog your memory, and you say, "I remember something more

8    now," could you put that out of your mind and base your

9    decision based on what you hear from the witness stand?

10             JUROR COOKE:  Yes, sir.

11             THE COURT:  Okay.  Thank you, Mr. Cooke.  You can

12   go on back to the Jury Lounge and have a cup of coffee.

13   It's going to be a little while before we get back to

14   you.

15             Please don't discuss the questions or your

16   answers with any of the other jurors.

17             JUROR COOKE:  All right.

18             THE COURT:  Thank you.

19

20             WHEREUPON, Patrick Cooke returned to the Jury

21   Lounge.

22

23             THE COURT:  Okay.  Any motions for cause?

24             MR. BICKLEY:  None.

102

1       MS. LUSK:   No.

2       Are you just going to ask the ones stated in the

3     case, or are you going to ask them all?   I hate to draw

4     attention to the fact that there is a relationship there,

5     because if somebody likes Kevin, then we have to ask them

6     if they liked him, and could they find Mr. Moss guilty

7     knowing that they are going to be serving as a juror with

8     him later?

9       THE COURT:   I´ll ask about that.

10      Sally, bring back Ms. Eaton.

11

12      WHEREUPON, Rosie Eaton was brought to the Jury

13    Room for individual voir dire.

14

15      THE COURT:   Hi, Mrs. Eaton.   We´re still

16    considering your request to be excused because of your

17    mother.   The only reason that I haven´t let you go is

18    because we want to make sure that we have got enough

19    people to be able to hear this case.

20      Let me ask you first, have you heard anything

21    about this case?   Have you heard it being discussed

22    anywhere?

23      JUROR EATON:   No, I wasn´t living here at the

24    time.

103

1          THE COURT:  You weren't -- okay.  Have you heard

2     anybody talk about it among the jurors -- talking about

3     the case?

4          JUROR EATON:  No.

5          THE COURT:  Did you know that this case was

6     specifically going to come up today?  Did anybody tell

7     you that?

8          JUROR EATON:  No, sir.

9          THE COURT:  Where did you live?

10         JUROR EATON:  I was in Cleveland at that time.

11         THE COURT:  How long had you been a resident in

12    Cleveland?

13         JUROR EATON:  I had been up there around ten

14    years.  We went up there in '73.

15         THE COURT:  From West Virginia?

16         JUROR EATON:  Yes.  My husband was working up

17    there.  I came back in 1984.

18         THE COURT:  I stayed up there for about ten

19    years.  My dad was transferred up there.

20         Do you have any -- well, let me ask you this.  Do

21    either you or your husband belong to any clubs or

22    organizations or associations who don't let certain

23    people in because of their race?

24         JUROR EATON:  We don't belong to any

104

1    organizations or anything like that.

2         THE COURT:   Do you believe that a person who

3    commits a crime is more likely to be a black person than

4    a white person?

5         JUROR EATON:   No, sir.

6         THE COURT:   You won't allow Mr. Moss's race in

7    any way to hinder your thinking about this case; will

8    you?

9         JUROR EATON:   No, sir.

10        THE COURT:   The State is going to ask this jury

11   to return a verdict that would result in the defendant

12   spending   the   rest   of   his   natural   life   in   the

13   penitentiary.  Do you have any philosophical or religious

14   reasons or bases that would prevent you from returning

15   such a verdict?

16        JUROR EATON:   I don't think that I have.

17        THE COURT:   On the other side of that coin,

18   obviously, is that if the defendant is found to be not

19   guilty -- if the State can't prove that the defendant is

20   guilty beyond a reasonable doubt, would you have any

21   hesitation about returning a nonguilty verdict?

22        JUROR EATON:   No, sir.

23        THE COURT:   The State may rely in part on

24   circumstantial evidence.   For example, if you heard a

105

1    gunshot and saw a man run out of an alleyway carrying a

2    gun that was smoking, and you walked over and saw a man

3    lying there with a bullet wound in him, that would be

4    circumstantial evidence that that person shot the other

5    person.  And even though you didn't see the shooting, you

6    could draw the deduction from the evidence that that man

7    may have done it.

8         Now, there is nothing the matter with

9    circumstantial evidence.  The law allows a person to be

10   convicted because of circumstantial evidence; but in

11   order to prove circumstantial evidence, the State has to

12   prove his guilt to the exclusion of all other theories

13   of his innocence.

14        Do you think you can follow that instruction?

15        JUROR EATON:  I would try to, to the best of my

16   ability.

17        THE COURT:  Where do you live now?

18        JUROR EATON:  I live at 309 Buckhannon Street, on

19   the West Side, with my mother.

20        THE COURT:  Have you ever lived in St. Albans?

21        JUROR EATON:  No, sir.

22        THE COURT:  Do you have any relatives who do?

23        JUROR EATON:  No, sir.

24        THE COURT:  Would you believe a Police Officer

106

1    more than you would somebody else, just because he was

2    a Police Officer?

3         JUROR EATON:  Well, you'd like to think a Police

4    Officer would uphold the law of the land.  You'd like to

5    believe that.

6         THE COURT:  Well, if a Police Officer gets on the

7    witness stand and testifies, can you measure his

8    evidence, just like you would anybody else's?

9         JUROR EATON:  I would try to.  By the evidence,

10   I would hear him.

11        THE COURT:  Do you believe you could do that?

12        JUROR EATON:  Well, I don't know.  I would try to

13   the best of my ability.

14        THE COURT:  Have you sat on a jury yet?

15        JUROR EATON:  I was on it, but it was a mistrial.

16        THE COURT:  Have any members of your family ever

17   been convicted of a crime?

18        JUROR EATON:  I'm not sure.  Like I say, I can't

19   remember of any.

20        THE COURT:  But no one that immediately sticks

21   out in your mind?

22        JUROR EATON:  Yes.  I can't remember all of the

23   details, but I have a brother that was killed.  I don't

24   remember all of the details.  It was years and years ago.

107

1   I believe it was proved in Court, and I believe that it

2   was proven that the gun went off accidentally.  They were

3   both just a young couple -- got married.

4        THE COURT:  So, did your mother think that his

5   wife killed him?

6        JUROR EATON:   Yes.   They were just a young

7   couple.

8        THE COURT:  How long ago has that been?

9        JUROR EATON:  It´s been a long time ago.

10       THE COURT:  And she was tried?

11       JUROR EATON:  Yes.

12       THE COURT:  And found innocent?

13       JUROR EATON:  As far as I know.  I believe that

14   it  was  proven  in  Court  that  the  gun  went  off

15   accidentally, but my mother never believed it.

16       THE  COURT:   You said that you have something

17   else?

18       JUROR EATON:  I have an uncle -- he was drinking

19   and killed another person.

20       THE COURT:  How did he kill him?

21       JUROR EATON:  With a gun.

22       THE COURT:  Was he tried and convicted?

23       JUROR  EATON:   It  never  came  to  a  trial  or

24   anything like that, I don´t think.  Because of his age

108

1    and illness, he was released.

2           THE COURT:  How long ago has that been?

3           JUROR EATON:  That´s been since I´ve been back,

4    or right before I came back.

5           THE COURT:  Were you particularly close to this

6    uncle?

7           JUROR EATON:  He stayed with my mother quite a

8    bit.

9           THE COURT:  Now, do you know where he was living

10   when this happened?

11          JUROR EATON:  No, I don´t.  I just don´t

12   remember.

13          THE COURT:  Was it in Kanawha County?

14          JUROR EATON:  It must have been.  I really don´t

15   remember.

16          THE COURT:  What was his name?

17          JUROR EATON:  Manuel Barnette.

18          THE COURT:  That´s all I have.

19          MR. BICKLEY:  Mrs. Eaton, I just have a few

20   questions.  Do you understand about the defense -- the

21   fact that we don´t have to prove Mr. Moss´s innocence,

22   but that the State must prove him guilty beyond a doubt.

23          Do you understand that?

24          JUROR EATON:  Yes.

1        MR. BICKLEY:  In other words, after the State's

2    case, when they finish, if you do not believe that they

3    have proved their case, you would have to go and vote not

4    guilty in the Jury Room?

5        JUROR EATON:  Yes.

6        MR. BICKLEY:  Or after the case is finished and

7    you were suspicious that he might be guilty, but not

8    beyond a reasonable doubt, you would also have to vote

9    not guilty.

10       Do you understand that?

11       'JUROR EATON:  Yes.

12       MR. BICKLEY:  Could you do that?

13       JUROR EATON:  Yes.

14       MR. BICKLEY:  Could you do that if you were

15    suspicious, and the other eleven people were convinced

16    that he was guilty -- could you hold out?

17       JUROR EATON:  I don't know.  I would try.  I

18    really can't say.

19       MR. BICKLEY:  Not just to be stubborn, but do you

20    think that you could stand by your convictions if you

21    really felt that the State had not proved its case?

22       JUROR EATON:  Well, like I say -- I would try to,

23    because I want to do what is right.  And after hearing

24    all of the evidence, I would try to do what is right.

110

1      MR. BICKLEY: Okay. Now, do you understand that
2   as it stands now, and until you go into the Jury Room to
3   discuss and deliberate the case, that Mr. Moss remains
4   under the inference of innocence?

5      Do you understand that?

6      JUROR EATON: Yes.

7      MR. BICKLEY: I have no further questions.

8      MS. LUSK: Ma´am, in the same vein, would you be
9   able to listen openly to your fellow jurors if the vote
10  was eleven to one, and you were the one, would you listen
11  to what they have to say, and consider that?

12     JUROR EATON: I suppose I would consider all
13  things through listening.

14     MS. LUSK: Mr. Bickley told you that the State´s
15  burden in this case, as it is in every criminal case, is
16  to prove the defendant guilty beyond a reasonable doubt.
17  Our burden is not to prove him guilty beyond all doubt.

18     Could you uphold the law and follow the
19  reasonable doubt law, as opposed to without any doubt?

20     JUROR EATON: I would try my best to uphold the
21  laws as I could. I would listen to the evidence, and try
22  to do to the best of my ability.

23     MR. REVERCOMB: May we have a moment, your Honor?

24     THE COURT: Yes.

111

1        MR. REVERCOMB:  We have nothing further.

2        MR. HUFFMAN:  Mrs. Eaton, you indicated that you

3    are a christian, and my question to you would be, if a

4    person were to testify in this trial that they are a born

5    again christian, would that fact, in and of itself, cause

6    you to believe that witness more than somebody who

7    didn't?

8        JUROR EATON:  We are to speak the truth, and I

9    would want to believe that they would.  I would speak the

10   truth and hope that they would because they were a

11   christian.

12       MR. HUFFMAN:  Would you trust them more because

13   they are a christian?

14       JUROR EATON:  Yes, I would.

15       MR. HUFFMAN:  I don't have any other questions.

16       MR. REVERCOMB:   Judge MacQueen, when talking

17   about circumstantial evidence, asked you a question and

18   gave you an example about a certain situation, and asked

19   if you understood that the State, in proving those

20   circumstances, they have to disprove every other theory

21   consistent with his innocence.   I think the law is

22   probably all other reasonable theories of his innocence.

23       Do you understand what I'm saying?  It goes back

24   to our burden of proof beyond a reasonable doubt -- not

112

1    beyond all possible doubt, or possible theories of

2    innocence.

3           Do you understand what I'm trying to ask you?

4           JUROR EATON:  I guess so.

5           MR. REVERCOMB:  Could you go along with that?

6           JUROR EATON:   Well, maybe I don't really

7    understand what you're saying.  I'm trying to grasp it.

8           MR. REVERCOMB:  It's my fault.  I didn't express

9    it very clearly.

10          There will be circumstantial evidence in this

11   trial, and Judge MacQueen, I believe, has instructed you

12   on the question about circumstantial evidence, asked you

13   if you understand the fact that these circumstantial

14   facts have to be joined together to prove to the

15   exclusion of all other theories consistent with the

16   defendant's innocence, and I don't think that's true.

17   I think that there are reasonable theories that could be

18   reasonably true or consistent with his innocence -- not

19   all possible theories.

20          JUROR EATON:  Now I am confused.

21          MR. REVERCOMB:  I'll just drop this question.

22          MR. BICKLEY:  I have no further questions.

23          THE COURT:  Thank you.  You may go back with the

24   other jurors now.  You might relax for about forty-five

113

1    minutes.

2            WHEREUPON, Rosie Eaton returned to the Jury Room.

3

4            MR. BICKLEY:  I strike her for cause.

5            MR. HUFFMAN:  She is a born again christian.

6            MS. LUSK:  Well, Moss said he was too.

7            MR. BICKLEY:  This is not a suppression hearing.

8    He didn't testify in the last trial.

9            MR. REVERCOMB:  He testified before that he was

10   a born again christian.  He may want to take the stand.

11           MR. BICKLEY:  He may or may not take the stand.

12   But we know what she thinks about Reggettz.

13           MS. LUSK:  We don't have any way of protecting

14   what he is going to put on, but the last time, part of

15   their voluntariness argument was that John was carrying

16   around his Bible in his back pocket, when the Troopers

17   took it out and threw it across the car.  So, there is

18   certainly evidence that Mr. Moss is a christian as well.

19   It's got a date in that Bible that was introduced the

20   last time about the date of his dedication being February

21   7, 1980, or something like that.  It's well worn ---

22           MR. REVERCOMB:  It's been put into evidence, your

23   Honor.

24           MR. HUFFMAN:  The question was whether she would

114

1    believe a born again christian who testified.  Mr. Moss

2    didn't testify the last time.  We know that Mr. Reggettz

3    is going to testify that he is a born again christian.

4    He has been over at the jail holding services.

5         THE COURT:  I'm going to excuse her, but don't

6    tell her that he is excused right now.  I'll send a

7    message back later.

8         MR. REVERCOMB:  I think maybe the circumstantial

9    evidence question is causing more concern than it should.

10        THE  COURT:   One  of  the  problems  about  that

11   question is, I'm trying to find some words other than

12   reasonable hypothesis consistent with the innocence of

13   the defendant.  I've got it in a charge somewhere that

14   makes more sense.

15        MR. REVERCOMB:  I just confused her further.

16        MS. LUSK:  In that cautionary instruction, you're

17   only entitled to a cautionary instruction if it is only

18   circumstantial.

19        THE  COURT:   That's  not  right.   I'll  get  the

20   charge out if you want to take a look at it.  It says

21   that anytime there is circumstantial evidence, in whole

22   or in part, that they have to believe that the guilt is

23   proved beyond a reasonable hypothesis.

24        MR.  REVERCOMB:   It  still  says  a  reasonable

115

1   hypothesis.

2           THE COURT:  I'll ultimately end up instructing on

3   it.

4           MR.   REVERCOMB:    You   might   say   there   is

5   circumstantial evidence, and then give an example.   And

6   then ask if they know what circumstantial evidence is.

7           THE COURT:  Do you like that better than -- do

8   you like the gunshot example?  It didn't get you to ask

9   some questions afterward?

10          MR. BICKLEY:  That's right.

11          THE COURT:  Okay.  Bring back Elizabeth Stern.

12

13          WHEREUPON, Elizabeth Stern was brought into the

14  Jury Room for individual voir dire.

15

16          THE COURT:  Hi, Ms. Stern.  Come on in and have

17  a seat.

18          Have you heard anything about this case?

19          JUROR STERN:  No, sir.

20          THE COURT:  Nothing?

21          JUROR STERN:  No.

22          THE COURT:  Do you remember reading anything in

23  the newspaper?

24          JUROR STERN:  In 1979 -- I don't take the paper.

1    I barely watch the TV.  In 1979, I had a lot of personal

2    problems of my own, and my eyes were kind of focused on

3    myself.  I've never even heard of these people.

4         THE COURT:  If, during the course of this trial,

5    you hear something that sort of rings a bell, could you

6    put whatever your recollections you might have out of

7    your mind, and make your decision based only on what you

8    hear in the Courtroom?

9         JUROR STERN:  Yes.

10        THE COURT:  Did you know that you would be

11   starting a murder trial today before you were called?

12        JUROR STERN:  No, sir.

13        THE COURT:  So, you haven't talked to any jurors

14   about this case, other than here in the last half hour?

15        JUROR STERN:  No.

16        THE COURT:  Have you worked or attended school

17   with black persons?

18        JUROR STERN:  No.  By the time I graduated from

19   high school -- now wait, let me think -- West Virginia

20   State College was desegregated the year after I left high

21   school, but I don't remember any blacks being in my

22   school.

23        THE COURT:  Where did you go to high school?

24        JUROR STERN:  I graduated from St. Albans in

117

1    1954.

2          THE COURT:  Do you have children who went to high

3    school at St. Albans?

4          JUROR STERN:  My children -- no.  We live at

5    Cross Lanes and my daughter went to Cross Lanes Christian

6    School.

7          THE COURT:  Are you now, or have you in the past,

8    ever belonged to any clubs or groups that organizations

9    that  systematically  excluded  black  persons  from

10   membership because of their race?

11         JUROR STERN:  I belong to Beta Sigma Phi, and as

12   soon as I realized what was going on, I dropped out of

13   it.

14         THE COURT:  What is Beta Sigma Phi?

15         JUROR STERN:  It´s a sorority or organization for

16   women who work.  It´s young people out of college that -

17   - it´s supposed to be similar to one of the college

18   sororities, I think.  I didn´t go to college, so I don´t

19   know.  I belonged for two years, and then it came up, to

20   vote on whether we should allow blacks in.  They said no,

21   so I said forget it.  That´s ridiculous.

22         THE COURT:  I feel relatively sure that the State

23   is going to ask the jury to return a verdict of guilty

24   in the first degree on the charges, and ask that the jury

118

1    recommend that there be no finding of mercy.

2         Now, if a person is convicted of first degree

3    murder, with no finding of mercy by the jury, a person

4    would spend the rest of his natural life in the

5    penitentiary. Do you have any religious or philosophical

6    or personal reasons that would prevent you from returning

7    such a verdict if you feel that it was warranted?

8         JUROR STERN:  No, sir.

9         THE COURT:  The other side of that coin is that

10   the State has got to prove this defendant guilty beyond

11   a reasonable doubt, and if the State fails to do that,

12   if the State fails to find the defendant guilty beyond

13   a reasonable doubt, would you have any fears at all about

14   returning a verdict of not guilty?

15        JUROR STERN:  No.

16        THE COURT:  None whatsoever?

17        JUROR STERN:  No.  I mean, I've been on two

18   different trials in this Court period.  One of them was

19   a shoplifting, and we didn't feel that it was a clear cut

20   case, and the person was voted unanimously not guilty.

21   And I felt confident -- I felt okay about that.

22        MR. BICKLEY:  Mrs. Stern, is that correct?

23        JUROR STERN:  Yes.

24        MR. BICKLEY:  You've been on juries, so you've

119

1    heard this before.  But do you understand that the

2    defendant in this shoplifting does not have to prove

3    himself innocent, but the State must prove him guilty?

4          JUROR STERN:  Right.

5          MR. BICKLEY:  And you can appreciate Mr. Moss as

6    he stands up and -- until you go into the Jury

7    Deliberation Room, that he is innocent?

8          JUROR STERN:  Yes.

9          MR. BICKLEY:  Until the jury vote is unanimous?

10         JUROR STERN:  Yes.

11         MR. BICKLEY:  Do you further understand that even

12   if you might be suspicious that he might be guilty, that

13   is not enough; that it has to be beyond a reasonable

14   doubt?

15         And if you were suspicious, you would have to

16   return a vote of not guilty.  Do you understand that?

17         JUROR STERN:  Yes.

18         MR. BICKLEY:  I have no further questions.

19         Tim, do you have any?

20         MR. HUFFMAN:  Ms. Stern, you indicated before

21   that you attend the Cross Lanes Bible Church, and knew

22   Trooper Smith; is that correct?

23         JUROR STERN:  Yes.

24         MR. HUFFMAN:  Because you attend church with him,

120

1   when he is testifying would you believe his testimony

2   more just because you go to church with him?

3          JUROR STERN:    Like I've already told Judge

4   MacQueen, no.

5          MR. HUFFMAN:  If a person were to testify in this

6   case and profess to being a christian, would you tend to

7   believe his testimony more than someone who does not

8   profess to being a christian?

9          JUROR STERN:  They lie just as much as anybody

10  else.   I'm sorry, but I know some that have.

11         MS. LUSK:  Mr. Bickley was asking you about the

12  burden that the State is required to prove.   The State

13  is required to prove his guilt beyond a reasonable doubt,

14  but do you understand that the State is not required to

15  prove it beyond all doubt?  The burden is just beyond a

16  reasonable doubt.

17         JUROR STERN:  Oh, yeah.

18         MR. REVERCOMB:  Mr. Huffman asked you if someone

19  professed to be a born again christian, would you tend

20  to believe their testimony more -- and you said some of

21  them lie as much as anyone else.

22  And having that experience, would you tend to believe

23  someone less if they got on the stand?

24         JUROR STERN:    No.   I think it depends on the

121

1    individual situation.

2           THE COURT:  Thank you, ma´am.  You can go on back

3    and join the other jurors now.  It´s going to be a while,

4    so you can get a cup of coffee.  We´ll call you back

5    later.

6

7           WHEREUPON, Elizabeth Stern returned to the Jury

8    Lounge.

9

10          THE COURT:  We´ve got eleven more.

11          MR. BICKLEY:  She´s okay with me.

12          THE COURT:  Okay.  Sally, bring back Carol Hay.

13

14          WHEREUPON, Carol Hay was brought to the Jury Room

15    for individual voir dire.

16

17          THE COURT:  Come right up here, if you would,

18    Mrs. Hay.  I´m just going to ask you a couple of

19    questions.

20          Have you heard anything about this case?

21          JUROR HAY:  I was trying to remember if I have or

22    not, but I can´t.

23          THE COURT:  Where do you live?

24          JUROR HAY:  Out Sissonville Road, out on Route

122

1    21.

2              THE COURT:  I think the evidence is going to be,

3    and I don't think anybody is going to dispute it, that

4    the father, Mr. Paul Reggettz, was originally charged

5    with the death of his wife and two children.

6              Do you remember anything about that?

7              JUROR HAY:  He was a coal miner; wasn't he?

8              MR. REVERCOMB:  He drove for UPS.

9              THE COURT:  Anyway, he came home and found his

10   wife and two children murdered.

11             JUROR HAY:  I believe that rings a bell.

12             THE COURT:  Let me tell you why I ask ---

13             JUROR HAY:  But didn't they decide that he didn't

14   do it?

15             THE COURT:  I think the evidence in this case

16   will be that he was released from custody.

17             JUROR HAY:  I'm trying to think if I have heard

18   about it.  I'm almost sure I have, but it's been so long

19   ago.

20             THE COURT:  It happened right before Christmas?

21             JUROR HAY:  I don't know.

22             THE COURT:  Okay.  One thing that is really a

23   most important thing -- regardless, even if you remember

24   this trial, in the middle of this trial you might say,

123

1    "Oh, I remember what happened," can you put that out of

2    your mind and base your decision on this case solely on

3    the evidence that comes to you here in the Courtroom?

4            JUROR HAY:  I think so.

5            THE COURT:  Well, then ---

6            JUROR HAY:  I don't remember enough.  If I do

7    remember it, it is just like something that might have

8    come over the radio.  I don't remember enough to -- at

9    least I can't place it in my mind.

10           THE COURT:  The newspaper people will come in

11   here throughout the course of this trial, and I think I

12   probably am going to instruct you not to read any

13   newspaper articles and that sort of thing about the

14   trial.  Just save the articles until you are finished.

15           I think that you'll find that they come in for

16   just about ten or fifteen minutes just to check out

17   what's going on and then go write a story about it.  But

18   the jury is going to know what's going on much more than

19   the newspapers do.

20           Okay.  Did you know that this particular trial

21   was starting?  Did you know that before you came in this

22   morning?

23           JUROR HAY:  No.

24           THE COURT:  So, no other jurors have ever talked

124

1      to you about this?

2                THE JUROR HAY:  No.

3                THE COURT:  Where did you go to high school?

4                JUROR HAY:  I went to Walton.  Do you know where

5      Walton is?

6                THE COURT:  Yes.

7                JUROR  HAY:   I  finished  at  night  school  at

8      Charleston High.

9                THE  COURT:   Have  you  ever  gone  to  school  with

10     persons who are black?

11               JUROR HAY:  No, I haven´t.

12               THE  COURT:   Have  you  ever  worked  with  black

13     people?

14               JUROR HAY:  Yes, I have.

15               THE COURT:  Where have you ever worked with them?

16               JUROR  HAY:   I  worked  at  Charleston  General

17     Hospital  for  a  long  time  as  a  nurse;  probably  twenty

18     years.

19               THE COURT:  You say at General?

20               JUROR HAY:  Yes, as a practical nurse.

21               THE COURT:  Are you employed now?

22               JUROR  HAY:   I  quit  a  year  ago.   My  husband

23     retired, so I did too.

24               THE COURT:  Have you ever belonged to any groups

125

1    or  organizations  that  automatically  exclude  persons

2    because of their race?

3              JUROR HAY:  No.

4              THE COURT:  Have you ever -- or have any members

5    of your immediate family ever been convicted of a crime?

6              JUROR HAY:  Yes, sir.

7              THE COURT:  Who was it?

8              JUROR HAY:  I have a brother that was -- he was

9    killed in prison.

10             THE COURT:  He was?

11             JUROR HAY:  Yes, he was.

12             THE COURT:  Who was he?

13             JUROR HAY:  David Painter.  You may remember him.

14             THE  COURT:  I  don't  remember.   When  did  that

15   happen?

16             JUROR HAY:  Golly, he's been dead a long time --

17   ten years.   It might ring a bell -- like, he knew that

18   he was going to die in the prison.

19             THE COURT:  In prison?

20             JUROR HAY:   In prison.   It was when Governor

21   Moore was in.

22             THE COURT:  The first time?

23             JUROR HAY:  Probably the first time.  He knew he

24   was going to die.  It was all in the paper.  And he tried

126

1     to get help.

2          THE COURT:   What did he go to prison for?

3          JUROR HAY:   He killed a person also.

4          THE  COURT:   He  was  tried  in  Kanawha  County;

5     wasn't he?

6          JUROR HAY:   Yes.

7          THE COURT:   Do you know who prosecuted that case?

8          JUROR HAY:   No.

9          THE COURT:   Do you know who was the Prosecutor at

10    the time?

11         JUROR HAY:   All  I  could  think  about  was  my

12    brother.

13         THE  COURT:   Would that experience cause you to

14    have any hostility or bad feelings about the Prosecutor's

15    office?

16         JUROR HAY:   Not about the Prosecutor.  It would

17    make me think a lot, but not about that.  The only thing

18    it would make me think about was people -- you know, he

19    was killed in prison.

20         THE COURT:   By another inmate?

21         JUROR HAY:   By another inmate.  It was hard.

22         THE COURT:   Yes, I know.  How old was he?

23         JUROR HAY:   He was young -- in his 20's, 28

24    maybe.  It's been a long time.

1    THE COURT:  Do you think that you could see the

2    evidence in this case objectively and listen fairly to

3    both sides of the case?

4    JUROR HAY:  Well, I think I'm a fair person.

5    THE COURT:  What sentence did your brother

6    receive?

7    JUROR HAY:  I think it was only two to five.  He

8    was in a -- I want to call it "a joint", you know, he was

9    in a bad place.  And I think it was like self-defense,

10   too.

11   THE COURT:  Well, in this case, I feel relatively

12   sure that the Prosecutors are going to ask you to return

13   a verdict of guilty of first degree murder on all of the

14   charges.  They are going to ask you as a juror not to

15   recommend mercy.

16   Now, if this jury should do that -- if they

17   should find the defendant guilty of any of the charges

18   of first degree murder and not recommend mercy, that

19   means that he will go to the penitentiary for the rest

20   of his natural life.

21   If the evidence warrants it, could you return

22   such a verdict?

23   JUROR HAY:  I think I could.

24   THE COURT:  The other side of that coin is that

128

1    before    the    defendant    could    be    found    guilty,    the

2    Prosecutors  have  to  prove  that  he  is  guilty  beyond  a

3    reasonable doubt.

4          Now, if they fail to do that, do you believe that

5    you would have any difficulty finding the defendant not

6    guilty?

7          JUROR HAY:  Beyond a reasonable doubt?

8          THE COURT:  If they don´t prove him guilty beyond

9    a  reasonable  doubt,  do  you  think  you  would  have  any

10   difficulty in finding him not guilty?

11         JUROR HAY:  I don´t think so.

12         MR. BICKLEY:  Ms. Hay, you understand that at the

13   present time, Mr. Moss remains innocent, until you enter

14   this Jury Room to deliberate?

15         JUROR HAY:  Yes.

16         MR. BICKLEY:  And you understand -- you have been

17   on  a  panel  before  --  you  have  had  a  trial  with  this

18   panel?

19         JUROR HAY:  Pardon me?

20         MR. BICKLEY:  Have you served as a juror on other

21   trials?

22         JUROR HAY:  I´ve never been on one.  This is the

23   first time.

24         MR. BICKLEY:  Well, the Court will probably give

1    some instructions similar to this, that mere suspicion

2    that he might be guilty is not enough to convict him.

3    It must be beyond a reasonable doubt.

4         And if you had a mere suspicion to suspect, but

5    nothing more, there is not enough evidence to prove to

6    you beyond a reasonable doubt, could you hold out against

7    these other eleven people that may be thinking they did?

8         JUROR HAY:  Yes.  I'm strong in my feelings about

9    anything.

10        MR. BICKLEY:  I'd like to ask, do you know who

11   killed your brother?

12        JUROR HAY:  Let me see.  I can't think.  It's on

13   the records.  You all can look it up.

14        MR. BICKLEY:  Do you know if he was black or

15   white?

16        JUROR HAY:  He wasn't black.

17        MS. LUSK:  Do you know if that man was convicted

18   of the murder of your brother?

19        JUROR HAY:  Yes.  See, it happened in prison, and

20   I think he got more time out of it.  I'm pretty sure that

21   he did.

22        MS. LUSK:  Now, when the Judge was asking you

23   about that, you hesitated for just a minute.  You said

24   that you didn't think you would hold that against the

1   Prosecutor, but I guess there was somebody that you are

2   holding it against?

3         JUROR HAY:  Well, my brother was guilty.  He was

4   guilty, you know, of what he did.

5         MS. LUSK:  Uh-huh.

6         JUROR HAY:  And he had to serve time for it.  I

7   hate it that he was killed in prison.

8         MS. LUSK:  Would the fact that your brother was

9   killed in prison -- would that make it even more

10  difficult?

11        JUROR HAY:  It would make it more difficult to

12  decide something, you mean?  A person's fate?

13        MS. LUSK:  Uh-huh.

14        JUROR HAY:  It might.

15        MS. LUSK:  Or make it even more difficult to find

16  somebody guilty?

17        JUROR HAY:  Well, put yourself in that position.

18        MS. LUSK:  Well, that's why we're asking.  We're

19  not trying to pry or make you uncomfortable.

20        We're trying to see what your thoughts are.

21        JUROR HAY:  It would make you think, "Gosh,

22  what's going on?"  I know it's all over the place,

23  anyway.  But I have a brother that was killed there.  It

24  would have to make you think.

1      But my judgment -- is that what you're asking?

2   I feel that I have good judgment.  But you all would just

3   have to decide on that -- whether you want me to serve

4   or not.

5      MS. LUSK:  I was just wondering if you could do

6   it if you thought the circumstances would justify -- if

7   you could find a verdict that would justify this man

8   spending the rest of his life there?

9      JUROR HAY:  It's a hard decision to start with,

10  so it would be a little bit harder for me probably than

11  it would be for the rest of them who had never had

12  anybody in prison before.

13     I feel I have good judgment, and I feel that I

14  understand everything about my brother -- what happened.

15     But you all will just have to decide, but I just

16  wanted to tell you that.

17     MS. LUSK:  We appreciate your honesty and your

18  candor about it.

19     That's all I have.

20     MR. HUFFMAN:  Ms. Hay, during the course of this

21  trial, if you were to hear medical evidence which you

22  -- upon listening to which you thought was contrary to

23  your training as a nurse, would you be able to render a

24  verdict based upon the evidence, or if you felt that it

132

1    was contrary to what you knew, given your past work

2    history?

3            JUROR HAY:  Like my nursing?

4            MR. HUFFMAN:  Yes.

5            JUROR HAY:  I'd have to have the circumstances to

6    know.  You know, I've been a nurse for years.

7            MR. HUFFMAN:  Let me ask you another question.

8            In the course of this trial, if a witness were to

9    profess on the stand that he is a born again christian,

10   would you give that testimony more weight than you would

11   someone else who did not make such a profession of faith?

12           JUROR HAY:  That he is a born again christian?

13           MR. HUFFMAN:  Would it cause you to believe his

14   testimony more than someone else?

15           JUROR HAY:  I'm a christian also.

16           MR. HUFFMAN:  Would that fact cause you believe

17   his testimony more so than someone else?

18           JUROR HAY:  Well, I'd have to think about it.  It

19   would have to have some effect.  You just have to go on

20   the evidence, also.

21           MR. HUFFMAN:  I have no further questions.

22           MR. REVERCOMB:  I have one last question.

23           Do you understand that the burden of proof which

24   is on the State is to prove the defendant guilty beyond

133

1    a reasonable doubt.  Our burden of proof is not any

2    higher than that, not beyond all doubt or all

3    possibility, but beyond a reasonable doubt.

4         Would you hold the State to a higher burden of

5    proof than that?

6         JUROR HAY:  Beyond a reasonable doubt?

7         MR. REVERCOMB:  Yes.

8         JUROR HAY:  No, I don't think so.

9         THE COURT:  Thank you, Ms. Hay.  You can go on

10   back to the Jury Lounge, and then we'll get back to you.

11

12        WHEREUPON, Carol Hay returned to the Jury Lounge.

13

14        THE COURT:  You don't know anything about this

15   guy, Painter; do you?

16        MR. REVERCOMB:  I remember him being in jail and

17   saying that he was going to be killed, and everything.

18        THE CLERK:  I remember it vaguely.

19        MR. REVERCOMB:  It was in the '70s.  Do you want

20   me to check downstairs?

21        THE COURT:  Okay.

22        Sally, bring back Sherry Grubb, please.

23

24        WHEREUPON, Ms. Sherry Grubb was brought to the

1    Jury Room for individual voir dire.

2         THE COURT:  Hello, Ms. Grubb, how are you today?

3         JUROR GRUBB:  Fine.

4         THE COURT:  Where do you live?

5         JUROR GRUBB:  Scott Depot.

6         THE COURT:  Do you remember anything about this

7    case?

8         JUROR GRUBB:  Nothing.

9         THE COURT:  Not a thing?

10        JUROR GRUBB:  Nothing.

11        THE COURT:  In the time that you have been here

12   as a juror, have you ever heard anybody discuss this

13   case?

14        JUROR GRUBB:  No, sir.

15        THE COURT:  Did you know before you came into the

16   Courtroom that this case was scheduled?

17        JUROR GRUBB:  No, sir.

18        THE COURT:  Have you talked to any jurors, other

19   than just casual conversation, about what time they were

20   supposed to be back here and what this case was all

21   about?

22        JUROR GRUBB:  No, sir.

23        THE COURT:  Now, where did you attend school?

24        JUROR GRUBB:  Stonewall Jackson.

135

1          THE COURT:   When you attended Stonewall, was it

2    racially mixed there?

3          JUROR GRUBB:   Yes.

4          THE COURT:   Have you ever belonged to a club or

5    a group or organization that systematically excluded

6    black people from membership?

7          JUROR GRUBB:   No, sir.

8          THE COURT:   Do you think that it is more likely

9    that a person would commit a crime if he is black?

10         JUROR GRUBB:   No, sir.

11         THE COURT:   Have you ever had an immediate family

12   member who was convicted of a crime?

13         JUROR GRUBB:   Yes.

14         THE COURT:   Who was that?

15         JUROR GRUBB:   My son.

16         THE COURT:   How old was he?

17         JUROR GRUBB:   23.

18         THE COURT:   How old was he when he was convicted?

19         JUROR GRUBB:   21.

20         THE COURT:   Where was it?

21         JUROR GRUBB:   In Ohio.

22         THE COURT:   What was he charged with?

23         JUROR GRUBB:   I'm not sure about the charge.   I

24   just know that he is placed on probation right now.

136

1          THE COURT:  Do you remember what he was charged

2     with?

3          JUROR GRUBB:  I think it was nighttime burglary;

4     but I'm not sure.

5          THE COURT:  Do you know who handled his case?

6          JUROR GRUBB:  Judge Hey.

7          THE COURT:  What was his name?

8          JUROR GRUBB:  John Grubb.

9          THE COURT:  He's on probation now?

10          JUROR GRUBB:  Yes.

11          THE COURT:  How is he doing?

12          JUROR GRUBB:  Great.

13          THE COURT:  Do you know who the Prosecutor was;

14     who prosecuted the case?

15          JUROR GRUBB:  No, I don't.

16          THE COURT:  It didn't go to trial?

17          JUROR GRUBB:  No.

18          THE COURT:  Did he plead guilty under a Plea

19     Agreement?

20          JUROR GRUBB:  Yes.  It was reduced to a

21     misdemeanor.

22          THE COURT:  Okay.  Now, does that fact cause you

23     to harbor any resentment toward the Probation office --

24     or I mean, the Prosecutor's office?

137

1      JUROR GRUBB:  Absolutely not.

2      THE COURT:  Could you decide this case separately

3  and completely apart from any other feelings that you

4  might have?

5      JUROR GRUBB:  Yes.

6      THE COURT:  Now, this is a case which is called

7  a capital case.  And unless I am surprised, I would guess

8  that the Prosecutor, at the close of the evidence in this

9  case, is going to ask the jury to find Mr. Moss guilty

10  of murder in the first degree, and not recommend mercy.

11      And if this jury were to return a verdict of

12  guilty without a recommendation of mercy, that means that

13  Mr. Moss would go the penitentiary of this State for the

14  rest of his natural life, with no chance of parole.

15      Do you have any religious, philosophical or

16  personal reasons that would prevent you from returning

17  such a verdict?

18      JUROR GRUBB:  No, sir.

19      THE COURT:  The other side of the coin is,

20  obviously, that Mr. Moss pleaded not guilty.  He is

21  presumed to be innocent.  The Prosecutor has to prove his

22  guilt beyond a reasonable doubt.

23      Now, if the Prosecutor can't prove Mr. Moss

24  guilty beyond a reasonable doubt, would you have any

138

1    hesitation about finding him not guilty?

2         JUROR GRUBB:  No, sir.

3         MR. BICKLEY:  Ms. Grubb, I want you to know that

4    I find it surprising that you have a son 23.

5         JUROR GRUBB:  Thank you.

6         MR. BICKLEY:  You understand -- how long --

7    you've been on the panel for quite a while; haven't you?

8         JUROR GRUBB:  Yes.

9         MR. BICKLEY:  Have you ever served on a case?

10        JUROR GRUBB:  One shoplifting case.

11        MR. BICKLEY:  Then you apparently aware that the

12   defendant Moss, here, is considered to be innocent until

13   you go into the Jury Room to deliberate?

14        JUROR GRUBB:  Yes.

15        MR. BICKLEY:  You understand that?

16        JUROR GRUBB:  Yes.

17        MR. BICKLEY:  You must work hard to consider

18   this?

19        JUROR GRUBB:  Yes.

20        MR. BICKLEY:  You must also understand that you

21   must find him guilty beyond a reasonable doubt, and that

22   if you were just suspicious that he might be guilty; that

23   is not sufficient to convict him?

24        JUROR GRUBB:  Correct.

139

1      MR. BICKLEY:  Do you understand that?

2      JUROR GRUBB:  Yes.

3      MR. BICKLEY:  Ms. Grubb, let's assume that this

4   is a situation where you are just suspicious, but the

5   other eleven people are certain of it beyond a reasonable

6   doubt.   Do you feel that if that was really your

7   conviction that the State had not proved it case that you

8   could hold out?

9      JUROR GRUBB:  Yes.

10      MR. BICKLEY:  Okay.  I have no further questions.

11      MS. LUSK:  Would you also listen to your fellow

12   jurors' opinions and consider what they have to say?

13      JUROR GRUBB:  Yes.  I would take all of the

14   evidence into consideration, yes.

15      MS. LUSK:   And in your deliberations -- Mr.

16   Bickley has examined -- well, if there were eleven people

17   who felt one way and you felt the other way, would you

18   listen to their reasons for feeling the way they did?

19      JUROR GRUBB:  Yes, ma'am, I would.

20      MS. LUSK:  Now, Mr. Bickley has indicated to you

21   that the State's burden of proof goes beyond a reasonable

22   doubt.  That's always our burden in a criminal case.

23      It's not our burden to prove the case beyond all

24   doubt.  Do you understand that?

140

1   JUROR GRUBB:  Yes, ma´am.

2   MS. LUSK:  Can you accept that?

3   JUROR GRUBB:  Yes.

4   MR. REVERCOMB:  Do you feel that your son was

5   treated fairly?

6   JUROR GRUBB:  Yes, I do.

7   MR. HUFFMAN:  Ms. Grubb, if one of the witnesses,

8   during the course of the testimony in this case, among

9   other things, were to testify that he is a born again

10  christian, would that fact in itself cause you to give

11  more weight to his testimony than you would otherwise?

12  JUROR GRUBB:  No.

13  THE COURT:  Thank you.  You can go have a cup of

14  coffee, if you´d like, and relax.  But please don´t

15  discuss anything that we´ve asked or what you´ve said to

16  any of the other jurors.

17  JUROR GRUBB:  All right.

18

19  WHEREUPON, Sherry Grubb returned to the Jury

20  Lounge.

21

22  THE COURT:  Are there any objections?

23  MR. BICKLEY:  I have no objections.

24  MR. REVERCOMB:  When I was running the Grand

1    Jury, that was my case.                                    141

2              THE   COURT:    Sally,   would   you   bring   back

3    Jacqueline Hill, please?

4

5              WHEREUPON, Jacqueline Hill was brought into the

6    Jury Room for individual voir dire.

7

8              THE COURT:  Would you come on back, please?  I

9    just want to ask you some questions.

10             Incidentally, I represented Casey one time.  He

11   and some other policemen had a case.  He is a nice guy.

12             JUROR HILL:  Thank you.

13             THE COURT:  Let me ask you.  I think you said you

14   may have heard something about this case?

15             JUROR HILL:  When the trial was initially -- but

16   since I've been initially impaneled or come to jury duty

17   -- I've been reading in the newspaper and hearing on the

18   news, things like that.

19             THE COURT:  What do you remember?

20             JUROR HILL:  The first trial, he was found

21   guilty.  But I think three people are supposed to have

22   been killed, or something like that.

23             THE COURT:  Do you remember anything about how

24   that happened?

142

1        JUROR HILL:  No.

2        THE COURT:  Do you remember anything about the

3   husband being charged?

4        JUROR HILL:  No.

5        THE COURT:  Casey didn't have any contact with

6   this case; did he?

7        JUROR HILL:  No, not that I know of.

8        THE COURT:  You've certainly not discussed it

9   with him; have you?

10       JUROR HILL:  No.

11       THE COURT:  Do you know why we're having another

12   trial now?

13       JUROR HILL:  I'm not quite sure.

14       THE COURT:  Without regard to what you might have

15   heard or read about this case, can you decide this case

16   from scratch just as though you might not have heard

17   anything about it?

18       JUROR HILL:  I believe I could, sir.

19       THE COURT:  It would be your responsibility to

20   judge this case on the evidence, not based on news

21   reports or any other information.

22       JUROR HILL:  Right.

23       THE COURT:  When you came in this morning, did

24   you know that this case was starting?

143

1          JUROR HILL:  No, sir.

2          THE COURT:  Have you talked to any other jurors

3    about this case?

4          JUROR HILL:  No.

5          THE COURT:  Have any members of your immediate

6    family ever been convicted of a crime?

7          JUROR HILL:  Not convicted.  Like I said, my son

8    was charged with assault and battery, but it was thrown

9    out of Court.

10         THE COURT:  Now, at the end of the evidence in

11   this case, the Prosecutor is going to ask you to return

12   a verdict of guilty without a recommendation of mercy.

13   If that verdict is returned and this defendant is found

14   guilty  of  murder  in  the  first  degree  without  a

15   recommendation of mercy, he will go the penitentiary for

16   the rest of his natural life, with no hope of parole.

17         Do  you  have  any  philosophical,  religious  or

18   personal reasons that you couldn't return such a verdict?

19         JUROR HILL:  No, sir.

20         THE COURT:  Mr. Moss has pleaded not guilty.  He

21   doesn't  have  to  prove  that  he  is  not  guilty.   The

22   Prosecutor has to prove that he is guilty, and they have

23   to prove that he is guilty beyond a reasonable doubt.

24   And if they put on a bunch of evidence and fail to prove

144

1    that he is guilty, would you have any trouble at all
2    returning a verdict of not guilty?
3         JUROR HILL:  No, sir.
4         MR.  BICKLEY:   Ms.  Hill,  have  you  had  the
5    opportunity to serve on a trial since you've been on this
6    panel?
7         JUROR HILL:  No, sir.
8         MR. BICKLEY:  You've just been coming up here and
9    going back every day, I take it?
10        JUROR HILL:   I've been scratched twice, and one
11   case was settled out of Court.
12        MR. BICKLEY:  You understand, I believe, that Mr.
13   Moss remains innocent throughout the entire trial, until
14   you go into this Jury Room to deliberate?
15        JUROR HILL:  Yes, sir.
16        MR. BICKLEY:  Do you further understand that if
17   you were just suspicious that he might be guilty, that
18   is not enough to convict him; that you would be obligated
19   to vote not guilty just on the basis of that suspicion
20   that he is not guilty ---
21        JUROR HILL:  Yes.
22        MR. BICKLEY:  -- if the State has not proved its
23   case beyond a reasonable doubt?
24        JUROR HILL:  Yes, sir.

145

1           MR. BICKLEY:  That's all I have.  Thank you.

2           MS. LUSK:  Ms. Hill, how did the charges against

3    your son come to be dropped?  Do you know that?

4           JUROR HILL:   The Police Officer that had him

5    arrested -- the girl he was supposed to have been

6    assaulting, she didn't have him arrested.   The Police

7    Officer had him arrested.

8           When he went to Court that morning, the Police

9    Officer didn't show up.

10          MS.  LUSK:   The  Prosecuting  Attorney's  office

11   didn't have anything to do with that; did they?

12          JUROR HILL:  No.

13          MS. LUSK:  Do you have any -- well, never mind.

14          Mr.  Bickley  was  asking  you  about,  do  you

15   understand that the State's burden is to prove his guilt

16   beyond  a  reasonable  doubt;  it's  not  our  burden  in  a

17   criminal case to prove the charges beyond all doubt?

18          JUROR HILL:  Yes.

19          MS. LUSK:  Do you understand, though, that the

20   State's  burden  is  not  to  prove  his  guilt  beyond  all

21   doubt?

22          JUROR HILL:  Yes.

23          MS. LUSK:  It's beyond a reasonable doubt; do you

24   understand that?

1          JUROR HILL:  Would you repeat the question again?

2          MS. LUSK:   The State's burden is to prove the

3     case beyond a reasonable doubt.  We are not required to

4     prove the case beyond all doubt; just beyond a reasonable

5     doubt.

6          JUROR HILL:  Well, I'd be able to reach a verdict

7     by that.

8          MS. LUSK:   You wouldn't hold us to a stiffer

9     standard than the law requires?

10         JUROR HILL:  No.

11         MR. HUFFMAN:  Ms. Hill, if one of the witnesses

12    in this case were to profess to be a christian, would you

13    give his testimony greater weight than you would anyone

14    else's simply because of that fact?

15         JUROR HILL:  No, sir.

16         THE COURT:  That's all.  Thank you, you can go on

17    back now and finish your Coke.

18         Oh, by the way, don't discuss these questions or

19    your answers with any of the other jurors.

20

21         WHEREUPON, Jacqueline Hill returned to the Jury

22    Lounge.

23

24         THE COURT:  She's probably not quite old enough

147

1     to have gone to school with all blacks, but I'll bet she

2     started out ---

3              MR. BICKLEY:  At Garnet.

4              THE COURT:  Yeah.  Is there any objection to her?

5              MR. BICKLEY:  No, not me.

6              MS. LUSK:  No.

7              THE COURT:  Okay, Sally.  Bring back Mrs. Brady.

8

9              WHEREUPON, Martha Brady was brought to the Jury

10    Room for individual voir dire.

11

12             THE COURT:  Mrs. Brady, come on back.  I just

13    want to ask you a couple of questions.

14             Where do you live?

15             JUROR BRADY:  Nitro.

16             THE COURT:  Close enough to have heard anything

17    about this case?

18             JUROR BRADY:  No.  I didn't even live in this

19    area then.

20             THE COURT:  Oh, you didn't?

21             JUROR BRADY:  No.

22             THE COURT:  Did you know that this trial was

23    starting when you came in this morning?

24             JUROR BRADY:  No.

148

1          THE COURT:  Did you know what you were in for?

2          JUROR BRADY:  No, sir.

3          THE COURT:  Have you heard any of the other

4     jurors talk about the case?

5          JUROR BRADY:  No.

6          THE COURT:  Where did you attend high school?

7          JUROR BRADY:  I graduated from Woodrow Wilson in

8     Beckley.

9          THE COURT:  At the time you went to high school,

10    was your high school integrated?

11         JUROR BRADY:  They were just starting.

12         THE COURT:  Have you worked with black persons?

13         JUROR BRADY:  Yes.

14         THE COURT:  Do you belong to any clubs or

15    organizations that systematically exclude persons because

16    of their race?

17         JUROR BRADY:  No.

18         THE COURT:  Do you think that it is more likely

19    that a black person would commit a crime than someone

20    else?

21         JUROR BRADY:  No.

22         THE COURT:  Have any of your family members ever

23    been convicted of a crime?

24         JUROR BRADY:  No.

149

1        THE COURT:  Now, in this case, the Prosecutor is

2   going to ask the jury to return a verdict for first

3   degree murder with no recommendation of mercy.  If the

4   jury does that, that means that the defendant will have

5   to go to the penitentiary for the rest of his natural

6   life, without hope of parole.

7        If the evidence in this case warrants it, can you

8   return such a verdict?

9        JUROR BRADY:  If it warrants it.

10        THE COURT:  Now, the other side of that coin,

11   quite obviously is, if the defendant, who has pleaded not

12   guilty, and is presumed by the law to be not guilty --

13   if the Prosecutor fails -- if the Prosecutors fail to

14   prove their case beyond a reasonable doubt, would you

15   have any difficulty in returning a not guilty verdict?

16        JUROR BRADY:  No.

17        MR. BICKLEY:  Ms. Brady, how long have you been

18   on the panel?

19        JUROR BRADY:  This term.

20        MR. BICKLEY:  Have you had any cases to serve on?

21        JUROR BRADY:  I've had two.

22        MR. BICKLEY:  What kind of cases were they?

23        JUROR BRADY:  I'd say one was a criminal case,

24   and one was a civil case.

1          MR. BICKLEY:  One was shoplifting?

2          JUROR BRADY:  No.

3          MR. BICKLEY:  Which case was yours; what were the

4     circumstances?

5          JUROR BRADY:  Gosh, I´ve forgot now.  There was

6     one of them in the first couple of weeks.  I don´t

7     remember what it was.

8          MR. BICKLEY:  That´s okay.  Do you, of course,

9     understand that the defendant, Mr. Moss, here, is

10    innocent until you go into the Jury Room and deliberate?

11         Do you understand that?

12         JUROR BRADY:  That´s right.

13         MR. BICKLEY:  And do you further understand --

14    and I suppose in a criminal trial, whether he takes the

15    stand or if he elects not to take the stand, that there

16    is no inference of guilt?

17         JUROR BRADY:  That´s right.

18         MR. BICKLEY:  Now, do you know that Mr. Moss

19    doesn´t have to prove anything to prove himself innocent.

20    The State is obligated to prove him guilty beyond a

21    reasonable doubt?

22         JUROR BRADY:  Right.

23         MR. BICKLEY:  And what I want you to understand

24    is, if you are merely suspicious or have a strong