**MOSS v. BALLARD
CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 20
(CONTINUATION, pp. 301 - 450)**

301

1    about the time that schools were not integrated; right?

2        JUROR WAYNE:  I don't know.  I went to school in

3    Chicago, Illinois.  So, the schools were already

4    integrated.

5        THE COURT:  Where have you worked in your life?

6        JUROR WAYNE:  I was an accountant here in

7    Charleston for about twenty-seven years.  I worked in the

8    National Bank of Commerce building.

9        THE COURT:  In your work, did you come into

10   contact with black people?

11       JUROR WAYNE:  Very little.

12       THE COURT:  Who did you work for?

13       JUROR WAYNE:  I worked for H&R Block one year,

14   and that was mostly when I did come in contact with them.

15       THE COURT:  I just asked for an extension

16   yesterday.

17       JUROR WAYNE:  You should have had it done.

18       THE COURT:  I found out that I owe a lot more

19   money than I could pay.

20       Have you ever been a member, or are you presently

21   a member, of any club or organization or social group

22   that excludes persons from membership because of their

23   race?

24       JUROR WAYNE:  No, sir.

302

1       THE COURT:  Have you any family members who have
2   ever been convicted of a crime, other than traffic
3   violations and such?

4       JUROR WAYNE:  No, sir, not that I know of.

5       THE COURT:  Now, in this case, the Prosecuting
6   Attorney, at the close of all of the evidence, is going
7   to ask the trial jurors in this case to return a verdict
8   of guilty of first degree murder.  They are also going
9   to ask this jury not to recommend mercy.

10      If the jury brings back one or more verdicts of
11  guilty of first degree murder without mercy, that means
12  that Mr. Moss will go to the penitentiary for the rest
13  of his natural life without any hope of parole at all.

14      If the evidence warrants it, could you return
15  such a verdict?

16      JUROR WAYNE:  Yes, sir, I could.

17      THE COURT:  Now, obviously, there are two sides
18  to that process.  Right now, Mr. Moss is, in the eyes of
19  the law, innocent, because the law presumes him to be not
20  guilty and he has pleaded not guilty.

21      If the Prosecutors put on their case and it shows
22  that there were some horrible things done, but
23  nevertheless they failed to prove that Mr. Moss is the
24  person who did it, failed to prove it beyond a reasonable

1    doubt, would you have any difficulty at all in returning

2    a not guilty verdict?

3            JUROR WAYNE:  No, sir.

4            THE COURT:  Mr. Bickley?

5            MR. BICKLEY:  Mr. Wayne, you do understand, sir,

6    that Mr. Moss, as he sits here, enjoys the presumption

7    of innocence throughout the entire trial?

8            JUROR WAYNE:  Right.

9            MR. BICKLEY:  That's until the jury goes into the

10   Jury Room to deliberate.

11           JUROR WAYNE:  Right.

12           MR. BICKLEY:  And do you understand that Mr. Moss

13   has  absolutely  no  responsibility  to  prove  himself

14   innocent; but the State has the burden of proving him

15   guilty beyond a reasonable doubt?

16           JUROR WAYNE:  Yes, sir.

17           MR. BICKLEY:  Do you understand that?

18           JUROR WAYNE:  Yes, sir.

19           MR. BICKLEY:  As a matter of fact, the mere fact

20   that he may or may not take the stand in his own defense

21   is no inference of guilt?

22           JUROR WAYNE:  Right.

23           MR. BICKLEY:  Do you further understand, sir,

24   that you may, at the end of the trial, when you are

304

1    cogitating all of the evidence in your mind, come to the

2    conclusion that there is a strong suspicion that he might

3    be guilty; that if you come to that conclusion that's a

4    strong suspicion, that's not enough, that you would have

5    to find him not guilty.

6            Are you aware of that?

7            JUROR WAYNE:  Yes, sir.

8            MR. BICKLEY:  Now, let me ask you -- Mr. Wayne,

9    let's say, at the end of the trial, you're searching in

10   your heart of hearts, and you have arrived at the

11   conclusion that there may be a suspicion, not a mere but

12   maybe a strong suspicion that he might be guilty, but the

13   State has not proven it's case beyond a reasonable doubt.

14   And you go into the Jury Room to deliberate and discuss

15   the case, but you are convinced in your heart of hearts

16   -- and there was a strong suspicion that he was guilty,

17   and the other eleven are convinced that he is guilty --

18   could you, after deliberating and listening to their

19   rationale, if you still are convinced that they did not

20   prove their case, could you stand firm in your

21   convictions?

22           JUROR WAYNE:  Yes, sir, I could.

23           MR. BICKLEY:  Thank you very much, sir.

24           MR. REVERCOMB:  Mr. Wayne, taking the situation

305

1    in the Jury Room, deliberating -- and eleven of your

2    fellow jurors are convinced beyond a reasonable doubt

3    that the defendant is guilty, and you are not, at that

4    point, would you be able to listen to their reasons and

5    discuss it in a fair way?

6            JUROR WAYNE:  Yes, sir.

7            MR. REVERCOMB:  And try to come to a verdict, if

8    you could?

9            JUROR WAYNE:  Yes, sir.

10           MR. REVERCOMB:  Also, he talks about suspicion

11   and all of that.  And he is presumed to be innocent, but

12   you must understand that the State's burden in every case

13   is beyond a reasonable doubt.   That's our burden of

14   proof.   We have to prove that the defendant is guilty

15   beyond a reasonable doubt.  We don't have to prove that

16   he is guilty beyond all doubt or beyond all possible

17   doubt.

18           Would you hold the State to a higher burden than

19   beyond a reasonable doubt?

20           JUROR WAYNE:  No, sir.

21           MR. REVERCOMB:  Okay.

22           MR. BICKLEY:  One other thought.  There may be

23   some testimony from some witnesses who will state that

24   they are born again christians.   Would you give more

1    credibility to their statement than anyone else?

2        JUROR WAYNE:  No, sir.

3        MR. BICKLEY:  What about if a uniformed officer

4    was to testify, or out of uniform?  Would you give a

5    Police Officer more credibility than you would any other

6    person?

7        JUROR WAYNE:  Probably, yes, sir.

8        MR. BICKLEY:  You think that he would tell the

9    truth more often than not?

10       JUROR WAYNE:  Probably, yes.

11       MR. BICKLEY:  Thank you.

12       MR. REVERCOMB:  Could you follow the instructions

13    of the law that the Judge told you -- that you are to

14    weigh each witnesses testimony as to the demeanor and how

15    they came across equally?

16       JUROR WAYNE:  Yes, sir.

17       MR. REVERCOMB:  And you could follow those

18    instructions if the Judge were to give them?

19       JUROR WAYNE:  Yes, sir.

20       MR. REVERCOMB:  I have nothing further.

21       MR. BICKLEY:  I have no further questions.

22       THE COURT:  Thank you, Mr. Wayne.  Would you like

23    to go back and join the rest of the jury?  You will have

24    plenty of time to have a cup of coffee, if you'd like.

307

1          JUROR WAYNE:  Good luck with your taxes.

2          THE COURT:  Thanks.

3

4          WHEREUPON, Kenna Wayne returned to the Jury

5     Lounge.

6

7          MR. REVERCOMB:  He testified, your Honor, that he

8     could follow instructions of law.

9          MR. BICKLEY:  We strike for cause.  We've got

10    more Police Officers testifying than anybody else, your

11    Honor.

12         THE COURT:  I'm going to excuse him.  I

13    understand -- if he hadn't been so cotton-pickin' sure

14    about it, I may have thought about it.  But he didn't

15    have any trouble at all answering that question --

16    without a millisecond delay.  Otherwise, I thought he was

17    going to be a pretty good juror.

18

19         WHEREUPON, Kenna Wayne was excused from the jury

20    panel for this case.

21

22         WHEREUPON, Terrie Janney was brought to the Jury

23    Room for individual voir dire.

24

308

1          THE COURT:  Hello, Ms. Janney.  You want to come

2     on back.

3          JUROR JANNEY:  Hi.

4          THE COURT:  How are you this morning?

5          JUROR JANNEY:  Fine.

6          THE COURT:  Let me ask you, have you heard

7     anything about this case?

8          JUROR JANNEY:  No.

9          THE COURT:  Did you know beforehand, before

10    yesterday, that this trial was starting?

11         JUROR JANNEY:  No.

12         THE COURT:  Have any of the other jurors talked

13    to you about this trial in any way, other than just from

14    having to wait around?

15         JUROR JANNEY:  No, sir.

16         THE COURT:  Where did you attend school?

17         JUROR JANNEY:  High school?

18         THE COURT:  Yes.

19         JUROR JANNEY:  George Washington.

20         THE COURT:  When did you graduate from George

21    Washington?

22         JUROR JANNEY:  In '76.

23         THE COURT:  Are you employed now?

24         JUROR JANNEY:  Yes.

309

1          THE COURT:  Where?

2          JUROR JANNEY:  Stone & Thomas.

3          THE COURT:  Do you know my wife?

4          JUROR JANNEY:  What is your wife's name?

5          THE COURT:  Susan MacQueen.

6          JUROR JANNEY:  No.

7          THE COURT:  In your work, I take it then, you

8     work with black people?

9          JUROR JANNEY:  Yes, I do.

10         THE COURT:  Do you belong to any clubs or

11    organizations that exclude blacks or other persons

12    because of their race?

13         JUROR JANNEY:  No, sir.

14         THE COURT:  Do you have any members of your

15    immediate family who have ever been convicted of a crime?

16         JUROR JANNEY:  No, sir.

17         THE COURT:  Now, in this case the Prosecuting

18    Attorney's office, at the close of all of the evidence,

19    they are going to ask the jurors, each member of the jury

20    to return a verdict finding the defendant guilty of first

21    degree murder without mercy.

22         Now, what that would mean if that verdict came

23    back is that Mr. Moss would go to the penitentiary.  He

24    would spend the rest of his natural life there without

310

1    ever having the opportunity for parole or release.   And
2    if the evidence warrants it, could you return such a
3    verdict?
4        JUROR JANNEY:  Yes, sir.
5        THE COURT:   Now, obviously, that is a story with
6    two sides.   Mr. Moss has pleaded not guilty, and in the
7    eyes of the law, he is, in fact, not guilty; not until
8    the Prosecuting Attorney has proven him guilty beyond a
9    reasonable doubt.
10       If they put on evidence of some pretty nasty
11   events, unpleasant things, but you don't believe that
12   they have proved the defendant guilty beyond a reasonable
13   doubt, do you believe that you could find a verdict of
14   not guilty?
15       JUROR JANNEY:  Yes, sir.
16       THE COURT:  Mr. Bickley?
17       MR. BICKLEY:   Ms. Janney, did I pronounce that
18   right?
19       JUROR JANNEY:  Yes.
20       MR. BICKLEY:   If a born again christian were to
21   testify, would you give them more credibility than the
22   testimony of anybody else?
23       JUROR JANNEY:  No, sir.
24       MR. BICKLEY:  If a uniformed Police Officer were

1    to testify, would you give him more credibility than

2    anybody else?

3            JUROR JANNEY:  No, sir.

4            MR. BICKLEY:  Ms. Janney, you recognize that the

5    presumption of innocence goes with Mr. Moss throughout

6    the entire trial; that is, up until the jury walks into

7    the Jury Deliberation Room to deliberate?

8            JUROR JANNEY:  Yes, sir.

9            MR. BICKLEY:  Do you further understand that Mr.

10   Moss does not have to do anything at all to prove his

11   innocence, but that the State must prove his guilt beyond

12   a reasonable doubt?

13           JUROR JANNEY:  Yes, sir.

14           MR. BICKLEY:  Now, do you further understand that

15   after all of the evidence is in, and you have searched

16   your heart of hearts, and you walk into the Jury Room you

17   may believe that -- you may have even come to the

18   conclusion that there is a suspicion that he might be

19   guilty -- but that is not enough.

20           And if you felt that way, you could vote not

21   guilty?

22           JUROR JANNEY:  Yes.

23           MR. BICKLEY:  Do you understand that?

24           JUROR JANNEY:  Yes, sir.

1          MR. BICKLEY:  Let's take that scenario just one

2     step further.  This is the hard part.

3          You are convinced in your mind, and you have

4     listened to everyone else in the Jury Room, and in your

5     heart of hearts you are convinced -- not beyond a

6     reasonable doubt -- but you are convinced that the State

7     has not proved it case beyond a reasonable doubt, but you

8     merely might be suspicious.  And if the other eleven

9     jurors are saying that he is guilty, could you stand

10    against them?

11         JUROR JANNEY:  Yes, I could.

12         MS. LUSK:  If you were in that situation that Mr.

13    Bickley has described and there were eleven people on the

14    jury who thought that the defendant was guilty, do you

15    think that you would listen to them and listen to their

16    views and their reasons that they thought that he was

17    guilty?

18         JUROR JANNEY:  Yes, ma'am.

19         MS. LUSK:  Would you take their view into

20    consideration and listen to them and try to reach a

21    verdict?

22         JUROR JANNEY:  Yes, ma'am.

23         MS. LUSK:  Now, Mr. Bickley asked you a couple of

24    questions about Police Officers and born again

313

1    christians.  Is there any reason in your mind that you
2    would believe those people less than any other people?
3         Juror JANNEY:  No.
4         MS. LUSK:  Would you have any reason not to
5    believe a Police Officer?
6         JUROR JANNEY:  No.
7         MS. LUSK:  He also indicated to you that the
8    State's burden in this case, as it is in every criminal
9    case, is to prove this defendant guilty beyond a
10   reasonable doubt.  It is not our burden to prove him
11   guilty beyond all doubt or beyond any doubt.  And you
12   think you could abide by that law and not hold the State
13   to a stricter burden than the law requires?
14        JUROR JANNEY:  Yes.
15        MS. LUSK:  Thank you.
16        MR. BICKLEY:  No further questions.
17        THE COURT:  Good.  You can go back and join the
18   other jurors and we'll get back to you in just a couple
19   of minutes.
20
21        WHEREUPON, Terrie Janney returned to the Jury
22   Lounge.
23
24        MR. REVERCOMB:  Judge, I know it's a little late

314

1    to bring this up, but I have a problem with the way

2    Nelson is arguing some of this.  He is arguing the law

3    and they haven't been instructed on the law yet.  And

4    that's not really probative.  He's talking about

5    suspicion and strong suspicion and that's not enough.

6    You're going to instruct them on all of that at the end

7    of the case.  I'm just not sure it's proper for him to

8    do that -- even though it's a little late for me to be

9    objecting to it.

10            THE COURT:  It sure is.  But it's better than

11    having a case with a hung jury.  We've only got a couple

12    of bodies left.

13            I'm going to put Ms. Janney on as No. 10.  She

14    looked very uncomfortable.  I wonder if she's got

15    something going on other than the fact that she's new to

16    this.

17            MR. REVERCOMB:  To be perfectly honest, I know

18    her sister.  I grew up with her sister, but I don't know

19    her.  I spoke to her one time, I think, in my whole life.

20    I know her sister, but I don't know her.  Her sister and

21    her are seven years apart.

22

23            WHEREUPON, John Williamson was brought to the

24    Jury Room for individual voir dire.

1          THE COURT:  Hi, John.  Come on in.

2          JUROR WILLIAMSON:  Hi.

3          THE COURT:  We're going to make this as quick as

4     we can.

5          Tell me first -- you put your hand up when I

6     asked if you had heard anything about this case on TV or

7     anything.  What did you hear?

8          JUROR WILLIAMSON:  I remembered that, in the St.

9     Albans area I think, that -- and that Mr. Moss had been

10    convicted.  I think the Supreme Court overturned the case

11    due to some irregularities in the case, and it was

12    brought back for retrial.

13         THE COURT:  Do you remember that the husband was

14    originally charged?

15         JUROR WILLIAMSON:  Yes.

16         THE COURT:  There was some testimony there, or a

17    confession, I think.  It seems like if I remember, it was

18    a father-in-law or somebody else who gave a confession

19    or some sort of thing.

20         THE COURT:  Now, having that recalled, would that

21    cause you any difficulty at all in being a fair and

22    impartial juror in this case do you think?

23         JUROR WILLIAMSON:  Well, with all due fairness to

24    Mr. Moss, I'd have to say that I would try to be fair,

1    but there is some doubt in the back of my mind.

2         THE COURT:  Based on what you know already?

3         JUROR WILLIAMSON:  Yes.

4         THE COURT:  I think you probably know yourself

5    that it's very important that this case be considered on

6    its own merits.

7         Do you think that you would have any trouble

8    doing that?

9         JUROR WILLIAMSON:  You know, it's a difficult

10   situation and an awesome responsibility.  I think I might

11   have some problems.

12        THE COURT:  Okay.  Let me just ask a couple of

13   other quick questions.

14        Did you know that this case was starting before

15   yesterday?

16        JUROR WILLIAMSON:  Before I came in yesterday?

17        THE COURT:  Yes.

18        JUROR WILLIAMSON:  No.

19        THE COURT:  Have you heard any of the other

20   jurors talk about this case?

21        JUROR WILLIAMSON:  No, I have not.

22        THE COURT:  When you went to high school, was it

23   an integrated school?

24        JUROR WILLIAMSON:  Yes, I'm sure.

1    THE COURT:  When did that happen -- do you know?

2    JUROR WILLIAMSON:  Yes, in 1956.  I was a

3    sophomore at Huntington High School.

4    THE COURT:  Did it go relatively easily?

5    JUROR WILLIAMSON:  Uh-huh.

6    THE COURT:  Have you ever belonged to a club or

7    organization that systematically excluded blacks from

8    membership?

9    JUROR WILLIAMSON:  Yes.  When I was in college

10   there was a fraternity at that time that did exclude

11   blacks.  I don't think they do today, but they did at

12   that time.

13   THE COURT:  Your dad was a Prosecutor?

14   JUROR WILLIAMSON:  Assistant Prosecutor.

15   THE COURT:  I didn't know that.

16   JUROR WILLIAMSON:  He was also Assistant Attorney

17   General, at one time.

18   THE COURT:  Would his history as a Prosecutor

19   color your feelings on the case?

20   JUROR WILLIAMSON:  No.

21   THE COURT:  Have any members of your family ever

22   been convicted of a crime other than traffic tickets?

23   JUROR WILLIAMSON:  No.

24   THE COURT:  Now, the jury in this case is going

318

1    to have to decide not only whether the defendant is

2    guilty but I'm sure the Prosecutors are going to ask the

3    jury to return a verdict of first degree murder without

4    mercy.

5         If the jury returns that verdict, that would mean

6    that Mr. Moss would go to the penitentiary for the rest

7    of his natural life, without any possibility of parole?

8         If the evidence proved that, could you return

9    that verdict?

10        JUROR WILLIAMSON:  Yes.

11        THE COURT:  Obviously, the other side of that is

12   that Mr. Moss has pleaded not guilty and is presumed by

13   the law to be not guilty.

14        If the Prosecutor puts on -- not a nasty case,

15   but a case that does not prove Mr. Moss's guilt beyond

16   a reasonable doubt, would you have any hesitation in

17   finding him not guilty?

18        JUROR WILLIAMSON:  I don't think so.

19        THE COURT:  Mr. Bickley?

20        MR. BICKLEY:  Mr. Williamson, you, of course, due

21   to your background, understand that the presumption of

22   innocence goes with Mr. Moss throughout the entire trial,

23   up to the time you all get back in the Jury Room?

24        JUROR WILLIAMSON:  Yes, I understand that.

1          MR. BICKLEY:   And do you understand that the

2     State -- I mean Mr. Moss, does not have to do anything

3     to prove his innocence?   He could just sit there maybe

4     throughout the trial, but it is the burden of the State

5     to prove his guilt beyond a reasonable doubt?

6          JUROR WILLIAMSON:   Yes, sir.

7          MR. BICKLEY:   And do you understand that if you

8     were to come into the Jury Room after all of the

9     deliberation and all of the evidence, and you searched

10    your mind and tried to arrive at a fair decision about

11    the case, and you come to the conclusion that there is

12    only a strong suspicion that he might be guilty and you

13    arrive at the conviction, honestly, that after

14    considering the evidence and listening to the rationale

15    of the others in the Jury Room, do you understand that

16    you would be obligated to vote not guilty, if that was

17    all that you had?

18         JUROR WILLIAMSON:   If I was not convinced?

19         MR. BICKLEY:   If you were just suspicious.

20         JUROR WILLIAMSON:   Yes, I understand.

21         MR. BICKLEY:   Let me ask you, sir, say that you

22    had arrived at this conclusion and you were suspicious,

23    but you didn't really feel that the State had proved all

24    of the elements of the crime, and you are in that Jury

320

1    Room with all of the other eleven all convinced that Mr.

2    Moss is guilty -- could you, after listening to them,

3    still hold the conviction that the State had not done

4    what they should have done?  Would you not hold that

5    against him?

6         JUROR WILLIAMSON:  Yes, I would depend upon the

7    strength of my conviction.  And if I truly felt that Mr.

8    Moss was not guilty and that they had not proved the

9    case, I would stand my ground.

10        MR. BICKLEY:  Thank you, sir.

11        MS. LUSK:  Would you, also, if you were in that

12   situation where there were eleven people who were

13   convinced that the case had been proven, would you listen

14   to their reasons that they thought the case had been

15   proven?

16        JUROR WILLIAMSON:  Yes.

17        MS. LUSK:  And take into consideration and talk

18   about it with them and try to reach a verdict.

19        JUROR WILLIAMSON:  Sure.

20        MS. LUSK:  Now, Mr. Bickley has indicated to you

21   that it is the State's burden to prove the case beyond

22   a reasonable doubt.  The burden is not to prove the case

23   beyond all doubt or beyond a shadow of a doubt.  Do you

24   think that  you could follow the law and not hold the

1  State to a greater or stricter burden than the law

2  requires?

3      JUROR WILLIAMSON:  I could, yes.

4      MR. BICKLEY:  There is likely to be some

5  testimony from witnesses who may declare that they are

6  born again christians.  Do you believe that you would be

7  able to give them greater credibility than anyone else

8  just because they say that they are born again

9  christians?

10      JUROR WILLIAMSON:  No, sir.

11      MR. BICKLEY:  And uniformed Officers that will be

12  testifying -- do you believe that just because they are

13  uniformed Officers that their testimony has greater

14  credibility than any other witness's?

15      JUROR WILLIAMSON:  No, sir.

16      MR. BICKLEY:  Thank you very much.

17      THE COURT:  Thank you, John.  You may go back and

18  have a cup of coffee if you want.  We'll get back to you.

19

20      WHEREUPON, John Williamson returned to the Jury

21  Lounge.

22

23      MR. BICKLEY:  For cause.

24      THE COURT:  No hesitation about that?

322

1     MR. BICKLEY:  No.

2         THE COURT:  The reason I asked additional

3     questions is because -- who is that guy, Geary somebody

4     who defended Angela Davis -- his last name was Geary?

5     He said he did a racial examination of the jury looking

6     for anything he could find to indicate prejudice.  He

7     said the jurors he always wanted were the ones who said,

8     "Yeah, I can't tell you a lie.  That's the feelings I

9     grew up with -- in an environment where my father hated

10    black people and Chinese people."  He said, "I'd do my

11    best to put that all aside."  He wanted people who were

12    candid and frank; and I think that if I were picking a

13    jury, I'd like him just because he's intelligent and he's

14    honest enough to tell the truth.

15        MR. BICKLEY:  I want him off.  My problem with

16    him was that I think he has been forthright, but he has

17    too much knowledge about the case.

18        MR. REVERCOMB:  That doesn't dismiss him.

19        MR. BICKLEY:  He said that it would cause him

20    some problems.

21        THE COURT:  That's why I'm taking him off.

22        MR. REVERCOMB:  Your Honor, he said it may be

23    harder on him, but that's the exact same thing Carol Hays

24    said, that it would be hard to put someone in the

323

1    penitentiary because of what she´s been through.

2          MR. BICKLEY:  She didn´t say that.

3          MR. REVERCOMB:  Oh, yes, she did say that.

4          MR.  BICKLEY:   She  said  she  could  trust  her

5    judgment.

6          MR. REVERCOMB:  I can´t argue with what she said,

7    but I can draw a comparison with him and Carol Hay.

8

9          WHEREUPON,  John  Williamson  was  excused  from

10   serving on this jury.

11

12         WHEREUPON,  Steve  Gancs  was  brought  to  the  Jury

13   Room for individual voir dire.

14

15         THE COURT:  Hello.  How are you Mr. Gancs?

16         JUROR GANCS:  Fine.

17         THE COURT:  I apologize to you for keeping you

18   waiting all day yesterday and up to now today.

19         Let me start by asking you if you recall having

20   heard anything at all about the case?

21         JUROR GANCS:  Not really.  I mean just basically

22   the State versus Moss; and that´s it.

23         THE COURT:  Do you remember hearing anything on

24   television or newspapers about it?

324

1       JUROR GANCS: No.

2       THE COURT: Have you lived here all of your life?

3       JUROR GANCS: Uh-huh; except for three months

4  when I was in Florida.

5       THE COURT: Okay. This happened in 1979. That

6  was a little while back.

7       If, in the course of this trial, you recall

8  having heard something you may have heard or seen on

9  television, can you put that out of your mind and base

10  your verdict only on the evidence that comes to you in

11  the Courtroom during the course of this trial?

12       JUROR GANCS: Yes, sir.

13       THE COURT: It's very important to the State and

14  the defendant for two reasons: One is, as a juror, you

15  are going to know what is going on more than anybody else

16  who is reading or writing the paper because they just

17  stop in for a few minutes and that's it.

18       Another thing -- it's very important to the

19  lawyers in this case that they know the evidence that is

20  put on so that they can respond to it and then you can

21  just base your verdict on this evidence in this case.

22       JUROR GANCS: What's going on in the Courtroom?

23       THE COURT: Yes.

24       Did you know that this trial was starting before

325

1   yesterday?

2           JUROR GANCS:  No.

3           THE COURT:  Have you heard any jurors say

4   anything about this case at any time?

5           JUROR GANCS:  No.

6           THE COURT:  Okay.  Now, where did you attend high

7   school at?

8           JUROR GANCS:  DuPont.

9           THE COURT:  I would guess, based on my estimate

10  of your age that DuPont was integrated when you went

11  there?

12          JUROR GANCS:  Yes.

13          THE COURT:  You went to school with black people?

14          JUROR GANCS:  Yes.

15          THE COURT:  Do you work with black people?

16          JUROR GANCS:  Yes.

17          THE COURT:  As a result of your contact with

18  black people, have you formed any opinions that they are

19  more likely to commit some sort of crime?

20          JUROR GANCS:  No more than whites or Indians or

21  anybody else.

22          THE COURT:  Have you ever belonged to any clubs

23  or organizations that systematically excluded black

24  people or other persons because of race?

1          JUROR GANCS:  At one time, I used to belong to

2     the Knights of Pythias.  That's been so long ago, I'm not

3     sure if they do or they don't.

4          THE COURT:  When was that?

5          JUROR GANCS:  1970 to '75, I guess.  Maybe '73,

6     somewhere in that neighborhood.

7          THE COURT:  Have any members of your family ever

8     been convicted of a crime other than traffic citations?

9          JUROR GANCS:  No.

10         THE COURT:  In this case, the Prosecutors are

11    going to ask the jurors, after hearing all of the

12    evidence in this case, to return a verdict of first

13    degree murder.  The Prosecutors are also going to ask the

14    jury to not make a finding of mercy.  The result of such

15    a verdict of guilty of first degree murder without mercy

16    would be for the defendant, Mr. Moss, to go to the

17    penitentiary for the rest of his life, without ever

18    having the opportunity for parole.

19         If the evidence so warrants it, could you bring

20    back such a verdict?

21         JUROR GANCS:  Yes, sir, if the evidence warranted

22    it.

23         THE COURT:  Now, Mr. Moss is presumed in this

24    case to be innocent; okay?

327

1        JUROR GANCS:  Uh-huh.

2        THE COURT:  The law says that as we speak, he is

3    an innocent man.  And he is presumed to be innocent until

4    the State proves to the satisfaction of all of the jurors

5    that he is guilty beyond a reasonable doubt.

6        Now, in case the Prosecutor fails to prove that

7    Mr. Moss is guilty beyond a reasonable doubt, would you

8    have any difficulty at all in finding him not guilty?

9        JUROR GANCS:  No.

10       MR. BICKLEY:  Mr. Gancs -- am I pronouncing that

11   right?

12       JUROR GANCS:  Yes, sir.

13       MR. BICKLEY:  Sir, it is expected that there may

14   be one or two witnesses who may testify, and during the

15   course of their testimony they may say that they are born

16   again christians.  Would you give more credibility to

17   their testimony just because they say that they are born

18   again christians?

19       JUROR GANCS:  No.

20       MR. BICKLEY:  Also in this case, there will be

21   people testifying who are Police Officers, State Police,

22   or what-have-you.  Would you give more credibility to

23   their testimony simply because they are Police?

24       JUROR GANCS:  No.

328

1        MR. BICKLEY:  Now you understand that -- I'm

2    certain you do, but I just wanted to be positive.

3        Mr. Moss enjoys the presumption of innocence

4    throughout the entire trial, up until you walk into the

5    Jury Room to deliberate.

6        JUROR GANCS:  Yes.

7        MR. BICKLEY:  Do you understand that?

8        JUROR GANCS:  Yes.

9        MR. BICKLEY:  Do you further understand that Mr.

10   Moss doesn't have to do anything -- that he may remain

11   silent and sit there mute throughout the whole trial, but

12   the State has the burden to prove this case beyond a

13   reasonable doubt?

14       JUROR GANCS:  Yes, sir, I do understand that.

15       MR. BICKLEY:  Now, sir, there may come a trial in

16   this trial that when you search in your heart and in your

17   mind that you will come to the conclusion that the State

18   had not carried its burden and that there was a strong

19   suspicion that he might be guilty.  You do understand

20   that you would be required to find him not guilty, if

21   that were the situation?

22       JUROR GANCS:  Yes, if they didn't prove it beyond

23   a shadow of a doubt.

24       MR. BICKLEY:  They have to prove beyond a shadow

329

1    of a doubt, but you might have an inkling that he might

2    be guilty, but that's not enough.

3          JUROR GANCS:   Right.

4          MR. BICKLEY:   You might be suspicious, but that's

5    not enough?

6          JUROR GANCS:   Right.

7          MR. BICKLEY:   Well, let's say, sir, that you

8    arrived at that stage where you are suspicious that he

9    might be guilty and you come into this Jury Room and the

10   other eleven jurors are convinced that he is guilty, and

11   after they have given you their rationale for why they

12   believe that he is guilty, you are still convinced in

13   your own mind that the State had not proven its case

14   beyond a reasonable doubt.   Could you stand firm?

15         JUROR GANCS:   If, in the Courtroom, the State had

16   not proven beyond a shadow of a doubt the evidence and

17   all that he was guilty, then no, I would not go along

18   with the other jurors.

19         MR. BICKLEY:   Thank you very much, sir.

20         MS. LUSK:   Mr. Gancs, can you say -- I know you

21   haven't had the opportunity yet to hear the law that the

22   Judge will later instruct you -- but the law doesn't

23   require the State of West Virginia to prove its case

24   beyond a shadow of a doubt or beyond all doubt or beyond

330

1    any possibility of a doubt.  The law requires that we

2    prove a case beyond a reasonable doubt, using the reason

3    and the common sense that you bring into the Courtroom

4    with you.

5          JUROR GANCS:  Okay.

6          MS. LUSK:  That being the law -- that we prove a

7    case beyond a reasonable doubt, do you think that you

8    could follow a law -- now, in other words, the law say

9    we don't have to prove beyond a shadow of a doubt -- only

10   beyond a reasonable doubt.

11         JUROR GANCS:  Well ---

12         MS. LUSK:  Reasonable doubt, using your reason

13   and logic that you bring into the Courtroom.

14         JUROR GANCS:  Uh-huh.  Yes.

15         MS. LUSK:  And you would not require us, in other

16   words -- or hold us to a stricter burden than that?  You

17   think that you could follow the law?

18         JUROR GANCS:  No more than what the law requires,

19   if that's what the law says?

20         MS. LUSK:  Yes.

21         We all know that you haven't had the benefit of

22   the Judge telling you what the law is yet, and you

23   wouldn't be expected to know what it is.

24         Mr. Bickley set an example here where you are in

1    the Jury Deliberation Room and there were eleven jurors

2    who say that the State has met the burden of proof that

3    John Moss is guilty beyond a reasonable doubt.  If you

4    were in that situation that Mr. Bickley put you in, where

5    you were suspicious that he was guilty, do you think that

6    you could listen to the other jurors with an open mind

7    and discuss with them their views of why they believe we

8    have proven the case beyond a reasonable doubt?

9          JUROR GANCS:  Yes.

10         MS.  LUSK:    And   take   those   views   into

11    consideration and try to reach a verdict in this case?

12         JUROR GANCS:  Uh-huh.

13         MS. LUSK:  Thank you.

14         MR. BICKLEY:  I have nothing further.

15         THE COURT:  Thank you, Mr. Gancs.  If you want to

16    go back and have a cup of coffee, we'll get back with

17    you.

18         MR. REVERCOMB:  Judge, I do have one question.

19         Would you tend to believe a Police Officer's

20    testimony less because he is a Police Officer?

21         JUROR GANCS:  No.  Not one way or the other,

22    because -- well, just like every other walk of life,

23    whether it be a doctor -- there's a good example.  You

24    go to some doctors who are caring and are there because

332

1    of the patients; and then you have other doctors that are

2    there for the money only, and they could care less.

3          Police officers, I think, are, you know, like I

4    said, along with every other walk of life, there are some

5    that are there for one reason, and there are some that

6    are there for the reason they should be, which is to

7    uphold the law.

8          MR. REVERCOMB:  Thank you.

9          THE COURT:  Thank you, Mr. Gancs.  We'll get back

10   with you shortly.

11

12         WHEREUPON, Steve Gancs returned to the Jury

13   Lounge.

14

15         THE COURT:  Does the Knights of Pythias exclude

16   blacks?

17         MR. BICKLEY:  It's an offshoot of the Masons.  I

18   think it's another branch of the Masons.

19         MS. LUSK:  Do Masons exclude still yet?

20         MR. BICKLEY:  There are black Masons and white

21   Masons, but obviously, his affiliation -- he didn't know

22   too much about it.

23         MR. REVERCOMB:  He was young.  He was probably in

24   school.

333

1        THE COURT:  We need to gauge.  Let's bring Terrie

2   Janney back, and if I leave her on, then he'll take No.

3   15.  If I take her off, then I'll put him in No. 10.

4

5        WHEREUPON, Terrie  Janney  returned  to  the  Jury

6   Room.

7

8        THE COURT:  Hi, Ms. Janney.  Come on back one

9   second.  I just wanted to ask you -- Mr. Revercomb said

10   that  he  had  met  you  and  knew  your  sister.   Do  you

11   remember him?

12        JUROR JANNEY:  Yes.

13        THE COURT:  Is that a fact?  And would that in

14   any way affect your ability to be impartial in this case?

15        JUROR JANNEY:  No, sir.

16        THE COURT:  Are you sure?

17        JUROR JANNEY:  Yes.

18        MR. BICKLEY:  I have no questions.

19        THE COURT:  That's all.

20        Okay.  Steve Gancs will go to 15.  Emma Lou, you

21   want to roll us out one there?

22        I excused Mr. Smith and I'm going to excuse Mr.

23   Wayne, and John Williamson, also.  You just need to tell

24   them though that they are going to be needed after lunch;

334

1     right?

2          THE CLERK:  We can let them go on home.

3          THE COURT:  Tell them we all thank them for their

4     patience.

5          THE CLERK:  Do you want one or two rolled out?

6          THE  COURT:   One.   I'm going  to  overrule  the

7     State's motion with regard to Brenda Allen and Carol Hay.

8     So, we need to fill twenty-four and that's it.

9

10         WHEREUPON, Joe Duffie was brought to  the  Jury

11    Room for individual voir dire.

12

13         THE COURT:  Come on in, Mr. Duffie, and have a

14    seat.   Let me start by asking you if you have been

15    represented by any of these lawyers?

16         JUROR DUFFIE:  No, I haven't.

17         THE COURT:  Are you acquainted with any of them?

18         JUROR DUFFIE:  No.

19         THE COURT:  Are you related by blood or marriage

20    to Mr. Moss or the Reggettz people?

21         JUROR DUFFIE:  No.

22         THE COURT:  Are you acquainted with any of those

23    people whose names I read to you?

24         JUROR DUFFIE:   No, I didn't recognize  any  of

335

1    those names.

2             THE COURT:  Not a name?

3             JUROR DUFFIE:  No.

4             THE COURT:  Have you heard anything about this

5    case?

6             JUROR DUFFIE:  Yes, sir.

7             THE COURT:  Tell me what you've heard.

8             JUROR DUFFIE:  On TV.  I've heard TV about it.

9             THE COURT:  Tell me what you've heard on TV.

10            JUROR DUFFIE:  When it first come out, the lady's

11   husband was tried, and then later on, Mr. Moss was tried

12   in Court.  That was probably a year -- year and a half

13   or two years later, after the lady's husband was tried.

14   And I've heard remarks since then on TV and I've read in

15   the paper since then.  I didn't know I was going to be

16   on the case, so I read something the other day.

17            THE COURT:  That's okay.  What do you remember

18   reading the other day?

19            JUROR DUFFIE:  About -- that there was going to

20   be a new trial.

21            THE COURT:  Now, would any of that publicity or

22   anything you've read give you any difficulty or cause you

23   any problems at all in being objective in this case?

24            JUROR DUFFIE:  Truthfully, I would say yes,

336

1    Judge.

2         THE COURT:  You think it would?

3         JUROR DUFFIE:  Yes.

4         THE COURT:  So, you would have some difficulty

5    listening to the evidence and not being able to put that

6    out of your mind?

7         JUROR DUFFIE:  To put it out of my mind, I would

8    have to say, yes, Judge.

9         THE COURT:  Well, I appreciate that very much,

10   Mr. Duffie.

11        Do you all have any questions?

12        MR. BICKLEY:  No.

13        THE COURT:  We appreciate it.  I'm going to

14   excuse you and you can go on home, play hooky, or

15   whatever you prefer to do.

16        JUROR DUFFIE:  Thank you.

17

18        WHEREUPON, Joe Duffie was excused from the panel

19   for this jury.

20

21        WHEREUPON, Albert Myers was brought to the Jury

22   Room for individual voir dire.

23

24        THE COURT:  Good afternoon, Mr. Myers.  How are

337

1    you?

2         JUROR MYERS:   Good.

3         THE COURT:   Let me start with basically the same

4    questions that I asked to select the jurors that were

5    selected this morning.

6         First, did you understand basically what the case

7    is about?

8         JUROR MYERS:   Yes.

9         THE COURT:   Have you ever heard anything about

10   this case in the news media or anything?

11        JUROR MYERS:   Yes, it's in the paper this

12   morning.   I also heard about it on the radio this

13   morning.

14        THE COURT:   Tell me what you have read or heard?

15        JUROR MYERS:   Well, about the same thing -- that

16   the man who committed it admitted it when this happened,

17   and I've followed it ever since they acquitted him -- I

18   mean, the Grand Jury.

19        THE COURT:   When was that -- do you remember?

20        JUROR MYERS:   In '87 or '88.

21        THE COURT:   Do you remember any of the facts that

22   you read in the paper?

23        JUROR MYERS:   About what it is supposed to be

24   about?

338

1          THE COURT:  Yes.

2          JUROR MYERS:   Well,  I  thought  it  was  pretty

3     clear.

4          THE COURT:  On what?

5          JUROR MYERS:   Well,  due  to  the  fact  that  he

6     admitted it.

7          THE COURT:  Would the fact that you've read those

8     articles cause you to believe that he is probably guilty?

9          JUROR MYERS:   I  think  it  would  have  a  strong

10    bearing on -- that I could sit on a jury.

11         THE COURT:  You think it would?

12         JUROR MYERS:   Yes,  sir,  and  a  strong  bearing,

13    your know, on guilty or not guilty.

14          THE COURT:   A strong bearing on the outcome,  or

15    what?

16         JUROR MYERS:  My decision.

17         THE COURT:  So,  you  think  you  would  have  some

18    difficulty?

19         JUROR MYERS:  Yes, sir, I know I would.

20         THE COURT:  Unless there is an objection, I'll

21    let Mr. Myers go.

22         Thank  you,  Mr.  Myers.   I  appreciate  you  being

23    honest with us.

24         JUROR MYERS:   I'm  not  saying  that  the  man  is

339

1  guilty or not guilty.  I´m just saying that it would be

2  difficult.

3          THE COURT:  I´ll let you go on home, then.

4

5          WHEREUPON, Albert Myers was excused from this

6  jury panel.

7

8          WHEREUPON, George Ball was brought to the Jury

9  Room for individual voir dire.

10

11         THE COURT:  Come on back, Mr. Ball and have a

12  seat right there.  How are you this morning?

13         JUROR BALL:  Fine.

14         THE COURT:  Let me start by asking you a couple

15  of questions like I´ve asked these other jurors.

16         Have you heard anything about this case?

17         JUROR BALL:  No.

18         THE COURT:  How old are you?

19         JUROR BALL:  28.

20         THE COURT:  So, you would have been in high

21  school back in about 1979?

22         JUROR BALL:  Yes.

23         THE COURT:  You´re from St. Albans?

24         JUROR BALL:  Yes.

340

1       THE COURT:  You graduated from St. Albans?

2       JUROR BALL:  Yes.

3       THE COURT:  All of this stuff happened back in

4  St. Albans.  If you were to hear the evidence in this

5  case and it reminds you of something that you heard about

6  it at the time this all occurred, could you put what you

7  heard about it out of your mind and decide this case

8  solely on the evidence that occurs here in the Courtroom?

9       JUROR BALL:  Yes.

10      THE COURT:  Now, I asked the other folks -- have

11  you ever been represented by any of the lawyers in this

12  case?

13      JUROR BALL:  No.

14      THE COURT:  Are you related by blood or marriage

15  to Mr. Moss or any of the Reggettz family?

16      JUROR BALL:  No.

17      THE COURT:  I've listed a whole list of names of

18  prospective witnesses.  Where any of them familiar to

19  you?

20      JUROR BALL:  I went to school with a guy named

21  Scott Leasure.  That was really the only one I

22  recognized.  Now, whether it's the same one -- I don't

23  know.

24      THE COURT:  In high school?

341

1    JUROR BALL:  Yes.

2    THE COURT:  In St. Albans?

3    JUROR BALL:  Uh-huh.

4    THE COURT:  Do you think that's him?

5    MR. REVERCOMB:  Probably.

6    THE COURT:  Were you a friend of his when you

7    were in high school?

8    JUROR BALL:  I just knew the name.

9    THE COURT:  Was he a guest in your home?

10   JUROR BALL:  No.

11   THE COURT:  Were you a guest in his house?

12   JUROR BALL:  No.

13   THE COURT:  Did you play any sports together?

14   JUROR BALL:  I think he might have -- if it's the

15   same one, I think we might have played Junior High

16   basketball -- on the same team, in the seventh grade or

17   eighth grade, one year.

18   THE COURT:  Have you seen him lately?

19   JUROR BALL:  No.

20   THE COURT:  Would the fact that you know him

21   cause you to believe him more or less than any other

22   witness?

23   JUROR BALL:  No.

24   THE COURT:  Do you remember any other names?

342

1         JUROR BALL:  No.

2         THE COURT:  Before yesterday, did you know that

3  this case was set for trial?

4         JUROR BALL:  No.

5         THE COURT:  Have you heard any jurors talk about

6  the case?

7         JUROR BALL:  No.

8         THE COURT:  Now, when you went to St. Albans High

9  School, it was integrated; wasn't it?

10        JUROR BALL:  Yes.

11        THE COURT:  Have you -- since you got out of high

12  school, worked with black people?

13        JUROR BALL:  Uh-huh.

14        THE COURT:  As a result of your experience with

15  black people, are you -- do you think that they are more

16  likely to commit a crime than anybody else?

17        JUROR BALL:  No.

18        THE COURT:  Have you ever belonged to any clubs

19  or organizations that excluded persons because of their

20  race?

21        JUROR BALL:  No.

22        THE COURT:  Have any members of your family ever

23  been convicted of any crime other than a traffic

24  violation?

343

1      JUROR BALL:  No.

2      THE COURT:  Now, this is a capital offense.  What

3  that means is this:  At the close of the evidence in this

4  case, the Prosecutors are going to ask the jury that

5  hears this case to find Mr. Moss guilty of three counts

6  of first degree murder, and they are also going to ask

7  the jury to not find mercy in the case.

8      If Mr. Moss is found guilty of any one or more

9  counts of first degree murder without a finding of mercy,

10  that means that he would go to the penitentiary for the

11  rest of his life, with no chance of ever being released.

12      If the evidence warrants it, could you find such

13  a verdict?

14      JUROR BALL:  Yes.

15      THE COURT:  Now, Mr. Moss's side of that case is

16  pretty simple, too.  He's pleaded not guilty and the law

17  presumes him to be innocent.  He doesn't have to prove

18  that he is innocent.  The fact is that the Prosecutors

19  have got to prove that he is guilty, and they have to

20  prove that he is guilty beyond a reasonable doubt.

21      Now, if they put on evidence about it -- it's a

22  pretty unpleasant crime, but if that evidence didn't show

23  that Mr. Moss is guilty beyond a reasonable doubt, do you

24  believe that you could still find him not guilty?

344

1        JUROR BALL:  Yes.

2        MR. BICKLEY:  Mr. Ball, sir, we expect, during

3   the course of the trial that there may be one or two

4   witnesses who may get on the witness stand and indicate

5   that they are born again christians.  Would that fact

6   alone make you give them greater credibility of their

7   statements than anyone else?

8        JUROR BALL:  No.

9        MR. BICKLEY:  Also, it's expected that several

10  Police Officers will testify.  The fact that they are

11  Police Officers alone, would that make them have greater

12  credibility in your mind?

13       JUROR BALL:  No, sir.

14       MR. BICKLEY:  Now, sir, you know that the

15  presumption of innocence follows Mr. Moss throughout the

16  entire trial, until you come into this Jury Deliberation

17  Room to deliberate.

18       Further, Mr. Moss does not have to do anything to

19  prove his innocence -- nothing.  But the State has the

20  burden of proving their case beyond a reasonable doubt.

21       Now, I ask you if, at the end of the State's

22  case, and you have listened to and heard all of the

23  testimony and evidence that have been presented, and you

24  come to the conclusion that the State had not proven its

1    case, that there was a suspicion that Mr. Moss might be

2    guilty -- do you understand that you must vote not guilty

3    if that is how you feel?

4         JUROR BALL:  Yes.

5         MR.  BICKLEY:   Okay.   Now,  let's  take  that

6    hypothetical one step further.   Let's assume that you

7    come to this after you have searched your soul, and you

8    said to yourself that the State had not proven its case

9    beyond a reasonable doubt -- "I may think he might be

10   guilty but they haven't proved it."  Can you walk into

11   the Jury Room with eleven other people in there saying

12   that he's guilty, and after you listen to them in their

13   deliberation and you are still convinced that the State

14   has not proven its case, can you stand alone?

15        JUROR BALL:  Yes.

16        MR. BICKLEY:  Thank you very much, sir.

17        MS. LUSK:  If, on the other hand, when you went

18   into the Jury Deliberation Room and those other eleven

19   people were telling you that they thought that the State

20   had proven its case, and you were suspicious that he was

21   guilty, as Mr. Bickley has indicated -- do you think you

22   could listen to those other eleven people and discuss

23   with them their views and their reasons that they believe

24   that the State has proven its case?

1          JUROR BALL: You mean, if they all think that he

2     is guilty -- or whatever you said?

3          MS. LUSK: Uh-huh.

4          JUROR BALL: I could understand that.

5          MS. LUSK: You would listen to them?

6          JUROR BALL: I could do it, but that would be

7     like maybe beyond a reasonable doubt.

8          MS. LUSK: Sure. But would you talk to them and

9     listen to their reasoning for why they thought that the

10    case had been proven?

11         JUROR BALL: Oh, yeah.

12         MS. LUSK: Now, Mr. Bickley has indicated that

13    the State has to prove its case beyond a reasonable

14    doubt. That's always our burden in a criminal case.

15    It's not our case, however, to prove our case beyond all

16    doubt or beyond any doubt. It's a doubt based on reason

17    and common sense, beyond a reasonable doubt.

18         Do you think that you could follow that law and

19    not hold the State to any higher or stricter burden than

20    the law requires?

21         JUROR BALL: Yes.

22         MS. LUSK: Now, you say you are from St. Albans?

23         JUROR BALL: Yes.

24         MS. LUSK: When you went to high school there,

1    did you ever go to school with anybody named Moss?

2         JUROR BALL: Kevin.

3         MS. LUSK: Kevin Moss?

4         JUROR BALL: Yes.

5         MS. LUSK: Did you see him yesterday?

6         JUROR BALL: Yes.

7         MS. LUSK: Did you talk to him?

8         JUROR BALL: Yes.

9         MS. LUSK: Did you talk to him about this case?

10         JUROR BALL: No. I didn't even know about this

11    case.

12         MS. LUSK: Would it present any difficulty for

13    you?

14         JUROR BALL: No.

15         MS. LUSK: It wouldn't?

16         JUROR BALL: It wouldn't create any difficulty

17    for what -- because his name is Moss?

18         MS. LUSK: Yes.

19         JUROR BALL: No.

20         MS. LUSK: Or that he was related to this man

21    named Moss?

22         JUROR BALL: No.

23         MS. LUSK: If you were to find yourself in a

24    position where you thought that John Moss was guilty and

348

1  that he should spend the rest of his life in the

2  penitentiary, could you face Kevin Moss and say, "I was

3  right." That wouldn't create any difficulty for you or

4  make you uncomfortable with him?

5      JUROR BALL:  No.

6      MS. LUSK:  How about any other Moss's?  Do you

7  know any other Moss's from St. Albans?

8      JUROR BALL:  No.

9      MS. LUSK:  You don't remember John Moss from St.

10 Albans High School?

11     JUROR BALL:  No.

12     MR. REVERCOMB:  I don't know if Judge MacQueen

13 has already asked you this, but let's say during the

14 trial that some evidence comes in that jogs your memory

15 and you think, "Oh, I was a senior in high school," or,

16 "I remember when that happened."  Can you put that out

17 of your mind and consider only what evidence comes to you

18 in the Courtroom?

19     JUROR BALL:  Oh, yes.

20     MR. REVERCOMB:  Thank you.

21     MR. BICKLEY:  No more questions.

22     THE COURT:  You can go back and join the rest of

23 the jurors, and we'll get back to you in just a moment.

24

349

1    WHEREUPON, George Ball returned to the Jury

2    Lounge.

3

4        MR. BICKLEY:  Would you let Mr. Moss, Cathy and

5    I huddle in here to consider our strikes, before we go

6    out there?

7        THE COURT:  Oh, absolutely.  Right.  I'm going to

8    give you some time.  What I'm going to do -- what does

9    this mean -- George?

10       MS. LUSK:  George Ball?

11       THE COURT:  Let's go through these names and make

12   sure that we've got the same information; okay?

13       No. 1, David Smith; 2, Patrick Cooke; 3, Frances

14   Batman; 4, Elizabeth Stern; 5, Carol Hay; 6, Sherry

15   Grubb; 7, Jacqueline Hill; 8, Martha Brady; 9, Michele

16   Williamson; 10, Terrie Janney; 11, Wanda Young; 12, Helen

17   Christ.

18       MR. BICKLEY:  11 is who?

19       THE COURT:  Wanda Young.  13, William Burroughs;

20   14, Carl McLaughlin; 15, Steve Gancs; 16, William Boyd;

21   17, Linda Haynes; 18, Nolan Holstein; 19, Brenda Allen;

22   20, Alice Fawcett; 21, Lonnie Kilgore; 22, Beverly

23   Samples; 23, Tammy Edwards; and 24, George Ball.

24       Let the record show that we have taken the

350

1   worksheets that he had, based on a confirmation of those

2   names, and have made a separate strike sheet, instead of

3   a strike sheet that would have all of the names on it.

4           What we will do, is between now and the close of

5   this trial, we will do another strike sheet that simply

6   preserves the record of who all was called and where they

7   will replace people and how they were excused and the

8   like.   It is just so much easier to work with a clean

9   strike sheet.

10          Okay.   Neva?

11          MS. LUSK:   Judge, we would like to ask the Court

12  to not swear the jury in and empanel them until at least

13  after the lunch recess, just on the off-chance that the

14  Supreme Court would grant the Petition for a Writ of

15  Prohibition that has been filed by the defendant this

16  morning.

17          I don't know if they will give us any information

18  after we come back or not, but we would at least like as

19  much time lag as possible in order to determine whether

20  the Supreme Court is going to grant that.

21          MR. BICKLEY:   We have information, I guess, in

22  support of our motion.

23          THE COURT:   I'm going to do that, although, I

24  frankly, believe that if we empanel the jury and we've

1   got a writ, that that would be such manifest necessity

2   as would warrant either holding the jury forever, or more

3   likely granting a mistrial.

4         I would imagine that it's going to take a month

5   or two anyway for them to answer.

6         MR. BICKLEY:  You know, I've talked to Tom and he

7   has said that he will convey to the Court precisely what

8   we are doing and try to get a decision out as quickly as

9   possible.

10        THE COURT:  Okay.  We'll just seat them and send

11   everybody who we're not going to use home and ask them

12   to come back at 1:30.  We'll decide where to go from

13   there if we still haven't gotten some response from the

14   Supreme Court.

15        We can then swear them in and then do the

16   openings.

17

18        WHEREUPON, the Defendant, his counsel, the

19   Prosecutors, and the Court staff then returned to the

20   Courtroom.

21

22        THE COURT:  Ladies and gentlemen, as your names

23   are called, would you take a seat in the jury box in the

24   anticipated position please?

1        Juror No. 36, Steve Gancs, Seat No. 1; Juror No.

2    10, William Boyd, Seat No. 2; Juror No. 6, Frances

3    Batman, Seat No. 3; Juror No. 107, Elizabeth Stern, Seat

4    No. 4; Juror No. 4, Linda Haynes, Seat No. 5; Juror No.

5    40, Sherry Grubb, Seat No. 6; Juror No. 50, Jacqueline

6    Hill, Seat No. 7; Juror No. 11, Martha Brady, Seat No.

7    8; Juror No. 124, Michele Williamson, Seat No. 9; Juror

8    No. 51, Nolan Holstein, Seat No. 10; Juror No. 126, Wanda

9    Young, Seat No. 11; Juror No. 32, Alice Fawcett, Seat No.

10   12; Juror No. 96, Beverly Samples, Seat No. 13; Juror No.

11   5, George Ball, Seat No. 14.

12        THE COURT:  Those of you whose names I did not

13   call are excused from further participation in this

14   trial.  I would ask two things of you.  One of them

15   relates to this case.  I would ask that you not discuss

16   any of the things which have occurred during the course

17   of this trial, either with the members of the jury or

18   with other persons outside the jury, until you have word

19   that this trial has been concluded and that a verdict has

20   been reached.

21        The second thing I would ask you to do is to

22   please call the Clerk's number this afternoon or this

23   evening just on the off-chance that there may be a trial

24   to begin tomorrow.

1       I thank you all very much for your patience and

2   your consideration through what I'm sure is relatively

3   a trying time in terms of the waits that you have had to

4   go through.  Thank you very much.

5       Now, the rest of you are jurors who have been

6   selected in this case and to determine the issues in

7   controversy.  I'm going to excuse you for lunch and I

8   would ask that you come back at ten minutes of two.

9   That'll give you an hour and twenty-five minutes.

10      Before I do that, I want to ask a couple of

11  things that I think are extremely important of you.

12      First, I read the first piece of news coverage in

13  this case for this trial in this morning's paper.  I am

14  going to ask you that during the entire process of this

15  trial, that you not read any newspaper accounts or watch

16  television or listen to radio accounts that relate to

17  this case.  My experience is that you will get coverage

18  tomorrow and the next day and then it will kind of

19  dwindle off and there will be a little blurb here and a

20  little blurb there.  Then as we approach the end of the

21  case, the news coverage will pick back up.

22      Nevertheless, do everything you can to keep any

23  independent information on this case away from yourself,

24  by the media or otherwise.  Please do not discuss the

1   case among yourselves, and I'll be giving you some more

2   details about why that is so important after lunch.   Nor

3   should you discuss it with anyone else.

4        In this Courthouse, we have the luxury of having

5   some room.  We also have the luxury of having two general

6   areas of coming and going, so you are able to leave in

7   the back and not be in the general proximity of the

8   witnesses, and so forth.

9        In addition, the State and defense counsel will

10  instruct their witnesses not to have any conversations

11  with you jurors.  Nonetheless, if anyone should attempt

12  to discuss this case with you under any circumstances,

13  I would ask that you tell them that the conduct is

14  improper, and alert me as soon as it happens.  I have no

15  reason to believe that it is going to happen, but in the

16  event that it does, I really need to know about it about

17  a quickly as it does.

18        With that, I'm going to excuse you until twenty

19  minutes till two, where we'll pick up with the evidence

20  and opening statements, and such other activities in this

21  case as may be appropriate.  Hopefully, we'll be able to

22  introduce some evidence this afternoon.

23        Thanks again for your patience.  When you come

24  back, just come on back to the Jury Lounge at twenty

355

1    minutes till two and we´ll start shortly after that.

2

3          WHEREUPON, the Court stood in the noon recess in

4    the hearing of this case.

5

6          (Back on the Record after Noon Recess)

7

8          THE COURT:  The State has a number of photographs

9    which you want to tender into evidence in this case.  Do

10   you want to go through them in the order that we´ll take

11   them up?

12         I want to see them, number one, and also, we want

13   to address any objections other than authenticity.  I

14   assume that we´re going get some -- that the guy who has

15   taken the pictures is going to testify?

16         MR. REVERCOMB:  Right.

17         MR. BICKLEY:  Did you keep the exhibits numbered

18   the same?

19         MR. REVERCOMB:  They´re exactly the same.

20         MS. LUSK:   There are  a  few  additional  ones.

21   These photographs that I showed you the other day, and

22   that  Tim  looked  at,  the  Polaroids,  and  there´s  a

23   handkerchief box that hasn´t been marked.   Vanessa´s

24   nightgown had previously not been marked.

356

1    MR. BICKLEY:  Were they introduced in the first

2  trial?

3    MS. LUSK:  No.  Paul Eric's pajamas -- T-shirt

4  and pajamas has not been marked.

5    MR. REVERCOMB:  We're not going to use the

6  curtain rod or anything like that.

7    THE COURT:  Let's see what you have.

8    MR. REVERCOMB:  Your Honor, these are in order.

9    MS. LUSK:  They're in the order in which he is

10  going to use them, which is not in order of one through

11  whatever.

12    MR. REVERCOMB:  They're basically in order of

13  outside the house, and then room-by-room.

14    THE COURT:  All right.  In the first series of

15  photographs, there's State's Exhibits 1, 3, 4, 5, 12, 85,

16  86, 87, 88 and 89.  Do you want to take a look at all of

17  those?  They're a bunch of external photographs.

18    Do you have any objections to any of those?

19    MR. BICKLEY:  No, we have no objection.

20    THE COURT:  No objection to that series; okay.

21    The next group are 50, 47, 57, 63, 46, 51, 48,

22  65, 21, 49, 58 and 84; with the exception of number 65,

23  which shows the feet of someone through the door.  They

24  are all just generally photographs of inside.  There are

357

1    occasional pictures of blood stains and that sort of

2    thing.

3             Is the bed wet from water out of the bathtub?

4             MS. LUSK:  Yes.

5             MR. BICKLEY:  I have no objection.

6             THE COURT:  Okay.  Now, I have got another

7    series, each of which contains photographs of parts of

8    the household.  They are 81, 83, 32, 29, 41, 25, 27, 35,

9    40, 56, 44, 34, 17, 18, 16, 6, 20 and 45.

10            MS. LUSK:  Are you going through those in the

11   same order that he had them?

12            THE COURT:  Yes.

13            MS. LUSK:  Because there was another group.  He

14   had those organized by witness, and another group

15   organized by a different witness.  There are more

16   pictures of people, and so forth.  Okay.

17            I didn't want your Honor to think that that was

18   the only group of people pictures.

19            THE COURT:  Right.

20            MR. BICKLEY:  Your Honor, do we have these

21   pictures in black and white?

22            MS. LUSK:  No, we don't.  The autopsy photographs

23   are in black and white.

24            MR. BICKLEY:  These are the ones that I'm talking

1    about.

2           MR. REVERCOMB:  None of them are black and white.

3           MR. BICKLEY:  Do you have to show both of them?

4           MS. LUSK:  Both of what?

5           MR. BICKLEY:  Of Mrs. Reggettz.

6           MS. LUSK:  That's not bloody.  What are you

7    objecting to?

8           MR. BICKLEY:  It's gruesome, the blood is.

9           What's the difference?  What do these two

10   pictures show different?  What do you want to prove?

11          MS. LUSK:  Are you stating an objection that we

12   are going to argue here?

13          MR. BICKLEY:  Are you using both of them?  That's

14   the argument.

15          MS. LUSK:  You can't see the way the cord comes

16   out of the door on this one.  What number are those?

17          MR. REVERCOMB:  9 and 32.

18          MS. LUSK:  What pictures are you looking at?

19          MR. BICKLEY:  I'm looking at 32 and 29.

20          THE COURT:  What's this spackled mark on her

21   face?

22          MS. LUSK:  Petechiae; it's a hemorrhage from

23   suffocation.

24          THE COURT:  That's the knife wound -- or, I mean

1    the scissors wound?

2         MS. LUSK:  Yes.

3         MR. BICKLEY:  Your Honor, I take exception to 25

4    and 27.  I think they are redundant, and I believe that

5    35, I believe, and 41, or 35 and 29 tells the same story.

6         MS. LUSK:  32 and 29.

7         MR. BICKLEY:  Okay, 32 and 29 is what it was.  27

8    and 25.

9         THE COURT:  You think those are all essentially

10   the same?

11        MR. BICKLEY:  It's two different pictures of two

12   different things.  One, I don't know the purpose of these

13   two are, 27 and 25.  I can understand showing one of

14   these.  We're not denying that the lady is dead.  We just

15   think that it's redundant and overkill and tends to be

16   gruesome.  We think only one of these should be shown,

17   and I don't know whether either one of these should be

18   shown.  I don't know what purpose is served other than

19   to say that she had the scissors in her chest.

20        THE COURT:  Okay.  Let's deal.  What are those

21   numbers -- 35 and 32?

22        MS. LUSK:  I thought 32 and 29 was your

23   objection.

24        MR. BICKLEY:  You grabbed them a minute ago.

360

1   It's the two of Mrs. Reggettz lying down -- not the half

2   shots.  One of those, obviously, you could show; but I

3   don't see the need for two.

4        MS.  LUSK:     Judge,  they  show  a  lot  of

5   relationships.  They show the relationship of the knife

6   blade to the blood ---

7        THE COURT:   I may be leading this issue, but in

8   this bunch, you've got more of the same.  Have you pared

9   these photographs down to what you think is essential to

10  your case?

11       MR.  REVERCOMB:    We've done that two or three

12  times, your Honor.

13       MS. LUSK:   Your Honor, I might add, too, that in

14  this group -- and there may be some in this group over

15  here that you haven't seen yet (Indicating), that may be

16  somewhat repetitive because -- no, I mean that you

17  haven't seen in this group that they haven't seen -- they

18  might be repetitive, but my first inclination was to set

19  them up in a manner in which no witness was going to have

20  to look at a slide that another witness had looked at.

21  I wanted to set up a carousel once, so that it would flow

22  easily and we wouldn't have to go back and try to shuffle

23  through this lot, put it back in the carousel in

24  different directions -- although I thought essentially

361

1    they were some of the same photographs.

2         If it's this group (Indicating) that the Court

3    has a problem with, there being some repetitive things

4    in, then we can always reshuffle the carousel.  That

5    would take a little bit of time in the reshuffling.

6         THE COURT:  I think one or both of you told me

7    that all of these photographs were admitted in the

8    previous trial.  I have no idea if the issue was ever

9    raised on repeating.

10        MS. LUSK:  I don't think it was.

11        THE COURT:  There are some times in which I am

12   willing to get very aggressive in restricting evidence,

13   and then there are times that I will let you hand

14   yourself.  There isn't any question that you need some

15   of these photographs to just graphically depict the

16   circumstances.  And obviously, it makes it much easier

17   to understand.

18        At some point of another, you may go over the

19   line, it seems to me, of just hammering -- I'm not sure

20   that it's gruesome though, frankly.  I found the

21   photographs distressing more than gruesome.  And you and

22   I have seen these photographs.  We have seen other

23   photographs of this type often.  And I doubt that any

24   member of this jury has ever seen this offensive a

1    photograph.

2         MS. LUSK:  Because of that, too, I think we know

3    that this is not gruesome.  We've seen gruesome

4    photographs, and there are some photographs out there

5    that are gruesome.

6         THE COURT:  I don't know what gruesome means.

7    You've got a couple that are kind of gruesome.  Grisly,

8    if not gruesome.

9         I'm concerned that you're just going to

10   overreach, and all I need to know is do you believe that

11   each separate photograph has, standing alone, such

12   probative value as warrants admission of all photographs

13   that you've labeled?

14        MS. LUSK:  Judge, we've gone through them all and

15   chosen reasons for each one of them.  There is a good

16   reason for each one of them.  If that answers the Court's

17   question.  I mean, I -- you know, we spent a lot of time

18   looking at these pictures -- hours and hours looking at

19   these photographs.

20        THE COURT:  Okay.  That is, in fact, the same

21   photograph?

22        MS. LUSK:  That is one of the ones that I was

23   talking about that might be repetitive, because we were

24   talking about having a carousel of slides.

1          THE COURT:  Is there anything in number 28 that

2     is not contained in that one right there (Indicating) or

3     in this one (Indicating), or vice versa?

4          MS. LUSK:  Let me see what you´re looking at.

5          MR. REVERCOMB:  They´re obviously close, that´s

6     for sure.

7          THE COURT:  This one (Indicating), and the one

8     just below it are almost identical.

9          This one and this one (Indicating) are; they are

10    very close.

11         And  this  one  is  exactly  the  same  as  that

12    photograph over there.

13         MS. LUSK:  Right.  But Judge, that´s why I had

14    sorted  out  and  kept  separate  the  group  that  you´re

15    holding, because some of those are repetitive of these.

16    These, we had chosen for one witness; and the group that

17    you´re holding were chosen for three different witnesses.

18    Do you know what I mean?

19         But  if  the  Court  is  concerned,  though,  for

20    instance about ---

21         THE COURT:  Probably, I don´t have any problems

22    if you´ve got those same photographs that you´re just

23    simply going to show to different witnesses and consider

24    it  a  single  photograph,  instead  of  showing  the  same

364

1   photograph -- I don't have any problem with that.

2       What I think I would have a problem with is

3   immediately here we're looking at maybe a total or eight

4   or nine photographs of Mrs. Reggettz, all different.  And

5   what I need to know is -- if you take all of those

6   photographs and labeled it independently as having

7   probative value to admit these separate photographs, can

8   you cut it down to the same information using four

9   instead of eight?

10      Was this case tried before the gruesome

11  photograph rule?

12      MS. LUSK:  No.  Are you talking about Rowe, that

13  Wood County case?  There's Rowe and there's Beck ----

14      THE COURT:  Yeah, but the one that they really

15  came down with the gruesome rule on was the Parkersburg

16  case -- I can't remember when it was.

17      MR. REVERCOMB:  '79.  Your Honor, these are

18  distressing photographs, but I think by law they wouldn't

19  qualify as gruesome.

20      MS. LUSK:  This -- we will take out 44, if you

21  have an objection to that.

22      MR. HUFFMAN:  Is that the bathroom?

23      MR. BICKLEY:  No, it's the blood on the floor.

24      What about those two right there?

1      MS. LUSK:  This one shows the noose, and this

2   other one shows the scissors.

3      MR. BICKLEY:  You've got the scissors twice.

4      MS. LUSK:  But you can't see the nightgown in

5   this one (Indicating), where there's blood on her

6   nightgown.

7      I take it, if we would withdraw 25, you would not

8   have an objection to 27?

9      MR. BICKLEY:  Which is 27?

10      MS. LUSK:  Less of her face in 27, that's why I

11   chose it, and more of the cord.

12      MR. REVERCOMB:  Except 25 is out.

13      MS. LUSK:  All right.

14      THE COURT:  You want to put that right there

15   (Indicating)?

16      MS. LUSK:  27 is in.

17      MR. BICKLEY:  What's 16 for?

18      MR. REVERCOMB:  It's nothing bad; you can just

19   barely see his feet.

20      MS. LUSK:  Why are you objecting to that, Mr.

21   Bickley?

22      MR. BICKLEY:  I can't say it's gruesome, if

23   that's what you're talking about.  I'm just trying to

24   find out why.

366

1    MS. BECKETT:  Are these two different?

2    MS. LUSK:  You can see the cord by her feet in

3 this one.

4    MR. BICKLEY:  Have we shown one of the kid's

5 pictures?

6    MS. LUSK:  We're still on Vanessa.

7    MS. BECKETT:  What's this one?

8    MR. REVERCOMB:  It's a reverse view of this

9 doorway into the front bedroom.

10    THE COURT:  What are those two numbers?

11    MS. LUSK:  32, 35 and 42.

12    THE COURT:  I'll let you have 32, 35 and 40.  And

13 there was another one over there with a much closer shot

14 that you wanted to use.

15    MR. REVERCOMB:  Your Honor, we want 29.

16    THE COURT:  Yeah, right.  What's the number of

17 that?

18    MS. LUSK:  27.

19    THE COURT:  You may use 37, also.  Isn't that the

20 same thing?

21    MR. REVERCOMB:  We'll substitute 29 for ---

22    MS. LUSK:  You don't ---

23    THE COURT:  You don't see the blood spot in that

24 one as well as you do in this one.  So we'll take out 35.

367

1       MS. LUSK:  We're going to withdraw 25.

2       MR. REVERCOMB:  This one shows the blood spot

3 well too, though.

4       MS. BECKETT:  So does this one (Indicating).

5       THE COURT:  Whatever this one is, if you want,

6 you may use both of these photographs.  I don't find them

7 that -- what is this one?

8       MR. REVERCOMB:  29 and 35.

9       THE COURT:  29 and 35; okay.  Now, what else do

10 you have?

11       MS. LUSK:  Do you have an objection to that one

12 down there, Nelson?

13       MR. BICKLEY:  No.

14       MS. LUSK:  What number is that?

15       MR. BICKLEY:  16.

16       THE COURT:  16 may come in, then.

17       There are two that are face down right there.

18 What are those?

19       MS. LUSK:  You don't object to those?

20       MR. BICKLEY:  No.

21       MS. LUSK:  Tell us those numbers.

22       MR. BICKLEY:  41, 38, 81.

23       THE COURT:  Those will all be admitted.  38 was

24 probably out of this stack over here (Indicating).

368

1      MR. BICKLEY:  What about those two right there?

2  Did we decide on those two?  Were you going to need both

3  of those pictures?

4      MR. REVERCOMB:  What we liked about this, this

5  one shows the pistol grips, which is a big part of this

6  case.  And that's State's Exhibit 18.  It also shows the

7  powder burns on the back of the bed there.

8      MR. BICKLEY:  Well, why don't you keep that one

9  and take this one out?

10     MR. REVERCOMB:  This one shows the rest of the

11  outline.

12     MR. BICKLEY:  That one shows the outline; what

13  does the other one ---

14     MR. REVERCOMB:  This one has ---

15     MR. BICKLEY:  It's also more gruesome than the

16  other one, too.

17     MR. REVERCOMB:  What the difference between

18  graphic and gruesome?

19     THE COURT:  May I see this one?

20     MR. BICKLEY:  I think the other picture can do

21  the job and has more -- does more than that one right

22  there.

23     MR. REVERCOMB:  Her panties are shown in this

24  one.

369

1      MR. BICKLEY:  You have to have a picture to show

2   the panties?  Just show the panties as an exhibit.

3      MS. BECKETT:  What does this one show that is so

4   special in this one (Indicating)?

5      MS. LUSK:  The grips.

6      MS. BECKETT:  You've got the grips right here.

7      THE COURT:  Show 18 as withdrawn.

8      MS. LUSK:  You don't have an objection to 17,

9   since it's not repetitive; right?

10      MR. BICKLEY:  Right.

11      THE COURT:  And I'll let 20 in, noting the

12   defendant's objection to it.

13      Do you object to that, Ms. Beckett?  Look at

14   these two.  If the point you want to show -- I see the

15   difference in the woman's leg, but other than that ---

16      MS. LUSK:  This is one we've already marked in,

17   number 17.

18      MR. REVERCOMB:  Number 20 shows the powder burns

19   on the sheet.

20      MR. BICKLEY:  We've got the powder burns up there

21   in the blowup.

22      THE COURT:  One of the things I'm going to let

23   them try to do is depict the relative positions of stuff,

24   and that's why a photograph like this seems to me to be

1   as valuable as anything of the lot.

2          MS. LUSK:  We're using 20 as a example.

3          THE COURT:  Right.  And frankly, I don't have any

4   problems with that photograph, either.  I think that the

5   question was, we need both of these photographs -- what

6   did we say, these photographs that we're talking about,

7   number 34 and number 20?

8          MR. REVERCOMB:  Do we have another picture that

9   shows -- well, these show where the bodies were at.

10         MS. BECKETT:  Picture 45 shows the back room.

11         MS. LUSK:  We withdraw 34.

12         MR. REVERCOMB:  Do we have the relationship of

13  this blood?

14         MS. BECKETT:  Yeah, it's in one of the others.

15         THE COURT:  I'm going to let them use those three

16  photographs.  I don't think that they are adequately

17  repetitive of some unpleasant aspect of this case to the

18  extent that it's going to make any difference, and the

19  three  in  combination  really  do  show  the  relative

20  positions.

21         So you all probably want to object then to the

22  designation of the material depicted in 34, 20 and 45,

23  but I'll let the State use them.

24         Now,  those  two  photographs  (Indicating)  --

371

1    there's no problems with them?

2          MS. LUSK:  No.  This one we marked no objection

3    on my sheet.  It's been 36.

4          THE COURT:  The next set are in order.  52, 59,

5    82, 22, 8, 9, 64, 15 ---

6          MR. REVERCOMB:  Stop there.  You're going into a

7    different room as you leave 15.

8          THE COURT:  24, 54, 55, 66, 67, 69, 10 and 79.

9    I don't think that there are any people depicted in any

10   of these photographs.  That's what I lumped them

11   together.  Look at those to see if they are accurate.

12        Any problem with that series?

13        MR. BICKLEY:  I don't see any.

14        Do you see any problem, Kathy?  If so, speak up.

15        MS. BECKETT:  Well, maybe not.  Well, no.

16        THE COURT:  Okay.  The next in the series are 71,

17   73 and 74.

18        MR. BICKLEY:  Why do we need -- we take exception

19   to State's Exhibit 74.  We believe that the evidence they

20   desire to present is available in State's 73.

21        THE COURT:  Let me ask you this -- tell me what

22   you're going to attempt to show, other than the

23   relationship of perspective in these photographs?

24        MR. REVERCOMB:  Of course.

1          THE COURT:  Assume one thing as a given -- that

2     there is not going to be any contest that these three

3     people were killed.

4          MR. REVERCOMB:  Right.

5          THE COURT:  So, they didn't die by some natural

6     causes.

7          MR. REVERCOMB:  Your Honor, this photograph shows

8     an important thing; it's just better than the two others.

9     It does show the mottling in her legs.  Dr. Sopher will

10    testify significantly to that.

11         Now, this photograph 73, you just don't see it as

12    well.  You just don't see the condition of her legs.  73

13    also shows the blood.

14         MR. HUFFMAN:  I propose that we have problems

15    with 74 ---

16         MS. LUSK:  Your Honor ---

17         MR. HUFFMAN:  -- as well as 73.

18         MS. LUSK:  I'm sorry.  I didn't mean to cut you

19    off.

20         MR. HUFFMAN:  I don't know what you're attempting

21    to show, but my feeling is that the closeup shot -- I

22    mean, it shows things that are available in other

23    photographs.  I just think it has the ability to inflame

24    the jury.  I just don't think that it shows anything

373

1    different that you can't get from the other photographs.

2          MS. LUSK:  It's 74 that you're speaking of?

3          MR. HUFFMAN:  Yes.

4          MS. LUSK:  It shows the mottling of the legs,

5    which is very significant in the legs because the child

6    was hung.  That's a condition of rigor mortis.  That

7    condition had shifted by the next day at autopsy, which

8    is also significant.  We need to see it at the time at

9    the scene.

10         MR. HUFFMAN:  I understand that, and I'm

11   certainly no physician, but it appears to me that the

12   condition of the legs is the same in both 73 and 74.

13         MS. LUSK:  You can't see it, it's too far away in

14   the one you're talking about, Tim.

15         MR. REVERCOMB:  We're not going to offer 75.

16         MS. LUSK:  Yes, we are.  This is for Sopher.

17   This is to show the drying on the tip of her tongue,

18   which is a significant concern on that one.

19         THE COURT:  Because of time?

20         MS. LUSK:  It's a symptom of hanging.  The

21   mottling has to do with time.

22         THE COURT:  Is there any dispute that she was

23   hanged?

24         MR. REVERCOMB:  It's important to show that.

374

1       MS. LUSK:  It was important the last time.  I

2   don't know if it is this time or not.

3       MR. BICKLEY:  Did it ---

4       MR. REVERCOMB:  McKittrick had the Troopers put

5   evidence in that she was hanged, and that's what we need

6   for the confession that is purported to be Reggettz'.

7   That's why it's important.

8       MR. HUFFMAN:  He didn't introduce any evidence

9   that to -- that she died any other way, did he?

10      MR. REVERCOMB:  No.  He attacked the Troopers for

11  leaving her.

12      THE COURT:  Let me interrupt for a second and

13  tell you what my thinking is.  If you're going to ask for

14  a defense verdict -- and the fact that somebody would

15  intentionally kill a child like that -- it's a fact of

16  life to be considered by this jury.

17      There isn't any question of that.  And the

18  vividness of that child's death is simply that you don't

19  have any problems getting by me in terms of the probative

20  value, and my concern is that there is an oversell point,

21  and in order to go beyond a photograph or two to do that,

22  you need to show me something that is particularly

23  relevant to the conviction of Mr. Moss.  That's all.

24      Do you all contest the strangulation?

1      MR. BICKLEY:  Your Honor, I think I should have

2   put everyone on notice that I intend to file a motion

3   -- or to make a motion in limine that the State do not

4   argue mercy.  My reason for this is, it´s a mandatory

5   instruction by the Court, and it makes the jury jump to

6   guilty before they leave the jury box to decide mercy.

7   It places the defense in an awkward position because if

8   I argue mercy, it presupposes that my client is guilty.

9   I  can´t  argue  in  the  alternative.    I´m  not  that

10   persuasive.

11      THE COURT:  I have checked this out at a couple

12   of conferences.  One Judge agreed with me, one did not,

13   and one said that it was a mandatory instruction.  If it

14   was optional, it would be a different matter, but it´s

15   a mandatory instruction the Court must give.  And it´s

16   always argued in rebuttal.

17      It´s the last thing to the box, and it´s always

18   a good swan song they can make.  It´s a litany.  They´ll

19   sound better than Martin Luther King.  Repeat those,

20   you´ll never small a rose, and so forth and so on.  The

21   defense could never argue mercy because it makes a jury

22   say,  "Well,  he´s  guilty;  now  they´re  looking  for

23   leniency."  It presupposes that, and I have been in an

24   awkward position.  And I think that if I argue mercy in

1   my argument, then I'm fair game.  And I think the State

2   has every right to wait for rebuttal to argue mercy.

3           They can argue mercy at any time in the closing.

4   It puts the defense in an awful position.

5           THE COURT:  If they don't argue it in that first

6   argument, then they waive the ability to argue it

7   further.  So, what are you suggesting?

8           MR. BICKLEY:  That they argue guilty or innocent.

9           THE COURT:  How do you determine the question of

10  mercy or no mercy?

11          MR. BICKLEY:  Of course, you're going to read the

12  instructions to them.  One of the things that they are

13  to consider is mercy.

14          But for them to argue to not give this person

15  mercy -- I can't counter that, because that presupposes

16  that he is guilty.

17          THE COURT:  Well, we'll get to that.  We still

18  have to deal with this immediate issue.

19          MS. LUSK:  Do you want to hear our argument on

20  that?

21          THE COURT:  No, not right now.

22          MS. LUSK:  We will have one.

23          THE COURT:  Yeah.  We're at least a couple of

24  days from arguing.

1    MS. LUSK:  Judge, there are two -- okay, Judge,

2    we're making this 74 and 75.  There are some difference

3    in the photographs, but I think that we can probably

4    withdraw 75 and use only 74.

5    THE COURT:  Okay.  You want to break out the set?

6    We might as well identify them by number.

7    MS. LUSK:  Is there an objection to 74 since

8    we've withdrawn 75?

9    THE COURT:  Yeah, they objected to 74 on the

10   basis that either one of the shots showed the same thing.

11   MS. LUSK:  Well, okay.  It really doesn't,

12   though, your Honor.  The mottling is certainly better

13   depicted in the photograph 74; the tongue-drying and

14   extending is better depicted in that; those are

15   depictions of a hanging.

16   You can see the blood on the pillow better;

17   that's Vanessa's blood on that pillow.

18   THE COURT:  The blood is of the same type?

19   MS. LUSK:  Uh-huh.  She is the only one who had

20   blood of that type.

21   THE COURT:  Do you want them all?

22   MS. LUSK:  No, I think we can pare down some of

23   these that I took out of this stack over here.  We

24   certainly don't need both of these if we're not going

378

1    about repeating the slides.

2          Like I said, some of them were repetitive because

3    I was going to try to use them on a slide carousel.

4          THE COURT:  If you've got one picture to show to

5    sixteen different witnesses, that's not a problem.

6          MS. LUSK:  Let's withdraw 72.  This one shows the

7    chest of drawers ransacking, with the change purse on it.

8          THE COURT:  And the furniture shots?

9          MS. LUSK:  This one shows the cord coming under

10   the chair.

11         That one's a better picture of the change purse.

12   I don't think we need this one.

13         MS. BECKETT:  There's one more with a view from

14   the living room to the bed room that you've got a view

15   of the cord.

16         THE COURT:  I think they got around to putting

17   this photograph in.  I honestly think this stuff here is

18   all fluff in terms of what kind of inflammatory impact

19   this is going to have, and I think they have got a basis

20   for that, and I'll let them use the basis for that.

21         What I'm referring to is 74.  I'll let the State

22   use 74, 71 and 73, and note the defendant's objection as

23   to  those  photographs  being  redundant  and  unduly

24   prejudicial and inflammatory.

379

1          Will that do it?

2          MR. BICKLEY:  That'll do it.

3          MS. LUSK:  We would withdraw 76.

4          MR. BICKLEY:  Are those other pictures planned on

5     being introduced?

6          MS. LUSK:  We're not finished with the big ones,

7     yet.

8          THE COURT:  Let's go down to the black and

9     whites.  Read the numbers off first.

10         MS. LUSK:  These are 28, forget 11, 23, we'll

11    take out 26, and we'll take out 36.  Take out 60, take

12    out 62, take out 80 -- it's after the bodies have been

13    removed.

14         THE COURT:  By the Police?

15         MS. LUSK:  Yeah.  Take out 28 and 23.

16         THE COURT:  The next series will be 163, 164,

17    165, and 166, which show -- incidentally, what do these

18    show?

19         MS. LUSK:  Judge, these are Polaroid photographs

20    which Paul Reggettz will say were taken with his handle

21    camera.

22         MR. BICKLEY:  Do we need all of the photographs

23    to say that he took them with his handle camera?  Do we

24    need all of the photographs to verify that he took them?

380

1          MS. LUSK:  It's just a small group.  He took

2     albums of them.

3          THE COURT:  How does this become an issue?

4          MS. LUSK:  The handle camera was recovered from

5     John Moss's home in Cleveland.

6          MR. BICKLEY:  A handle camera.

7          MS. LUSK:  And two more pieces of evidence that

8     he told the Police about during his confession, that they

9     did not have previous knowledge of.

10          THE COURT:  That Moss told the Police of?

11          MS. LUSK:  Right.  That they did not have

12     previous knowledge of, that they took from his house.

13          THE COURT:  And there is a dispute about whether

14     ---

15          MS. LUSK:  There is no independent evidence,

16     though, other than Reggettz statement that he even owned

17     a Polaroid camera.

18          THE COURT:  The photographs are innocuous enough

19     and the fact that there are three or four versus two or

20     one doesn't make any difference; does it?

21          MR. HUFFMAN:  It depends on what they are.

22          THE COURT:  They are pictures of statues.

23          MS. LUSK:  He cropped them to fit in his photo

24     album.  The other pictures are not cropped.

381

1          THE COURT:  With the same camera?

2          MS. LUSK:  Yes.

3          MR. HUFFMAN:  Is that the Christmas photo?

4          MS. LUSK:  No.

5          THE COURT:  Okay.  Now, with respect to the four

6     that I've just identified, do you have any problems with

7     those?

8          MR. BICKLEY:  No, I don't have a serious problem

9     with those.

10          THE COURT:  If you can establish a foundation, I

11     see no problem with those.

12          Now, the next set of four are 159, 160, 161 and

13     162.  Again, they are photographs used to show that he

14     had a Zinger camera.  It is a handle camera.

15          MR. HUFFMAN:  I refer ---

16          MS. LUSK:  There is a Polaroid photograph, Judge,

17     to tell you what they are talking about.  It's depicted

18     in one of these pictures.  It's Santa with one of the

19     kids sitting in his lap.  I have that in one of the

20     groups that I showed Tim the other day and told him that

21     I was going to use them, but I told him that I wasn't

22     going to use the picture of the kid sitting on Santa's

23     lap.

24          THE COURT:  I take it none of these photographs

382

1    were admitted in the last trial?

2         MS. LUSK:  None of them.

3         MR.  BICKLEY:   We  don't  see  the  use  of  these

4    pictures to show that he had a Polaroid camera.  We think

5    the  purpose  of  these  pictures  is  entirely  different.

6    These pictures are for the purpose of visiting some type

7    of emotions by virtue of the fact that the pictures show

8    them live.

9         THE COURT:  In a recent case in the last year and

10   a half, about putting in pictures of a live person in a

11   wrongful death case or something like that, they put on

12   pictures  of  a  kid  and  the  Supreme  Court  found  some

13   problems with that.  Have you read that?

14        MS. LUSK:  No.

15        MR. REVERCOMB:  Your Honor, the significance of

16   these were taken five weeks before the murder took place

17   which shows that Paul Reggettz had the camera.

18        MR.  BICKLEY:   Put his picture  in to  show  that

19   five weeks before, he had the camera.   The others are

20   just intended to inflame the jury.

21        MS. LUSK:  There is a different reason for one of

22   these at least.

23        MR. BICKLEY:  Tell me what it is, if you can?

24        MR. REVERCOMB:  We can't tell you.

383

1      MS. LUSK:  We'll have to tip our hand.

2      THE COURT:  I'm not going to let you have the

3  ones -- except the one of him.  I think there are

4  important problems with that.  If you've got some other

5  important points you want to bring on, do.

6      MS. LUSK:  Judge, we don't have any problem with

7  that.  We could even withdraw the two that Bickley's got.

8  Which two are those, Nelson?  What's the number on the

9  back?

10     MR. BICKLEY:  160 and 161.

11     MS. LUSK:  The other photograph of Vanessa, we

12  have a reason for offering it.

13     THE COURT:  Raise it at the time, then.

14     MS. LUSK:  We'll raise it at the time.

15     MS. BECKETT:  So, 159 is the one you want to keep

16  in?

17     MS. LUSK:  159 is the one I'm concerned with.

18  161 and 162 are the ones that I'm going to withdraw.

19     THE COURT:  And you're going to put in 161 and

20  162, which is Reggettz?

21     MS. LUSK:  162 is Reggettz.

22     THE COURT:  And that's the one that has the date

23  marked on it?

24     MS. LUSK:  It does.  And 159 -- we're going to

384

1    hold on that one.

2         THE COURT:  If you want to tell me about it, what

3    it's about at the time, we'll take it up then.

4         MS. LUSK:  All right.

5         THE COURT:  Do you want all of these?

6         MS. LUSK:  No.

7         MR. BICKLEY:  Why do we have to have those?

8    You've got those pictures of her dead already.

9         MS. LUSK:  There is only one photograph of

10   Bernadette.  It shows the high end mark, which is very

11   probative.

12        THE COURT:  What's a high end mark?

13        MS. LUSK:  The end of the noose.  See, it comes

14   up to her ear and shows that she was hung, rather than

15   these marks which show that there is a horizontal

16   ligature, which shows that she was strangled both ways.

17   You can see it here, the horizontal ligature mark and the

18   higher mark, which was the hanging.

19        THE COURT:  The issue of hanging isn't disputed

20   in this case; is it?

21        MS. LUSK:  It was the last time, Judge.

22        THE COURT:  If they put in a dispute on that,

23   they'll get their photograph.  They'll lay a foundation

24   for the photograph.

385

1    MR. BICKLEY:  Dispute what?

2    MS. LUSK:  That Bernadette was hanged.

3    MR. BICKLEY:  I'm not disputing the issue of her

4    being hanged.

5    THE COURT:  There is, in fact, a technical

6    difference.

7    MR. BICKLEY:  I'm not disputing that.

8    MS. LUSK:  We can't always perceive what you're

9    going to do and not going to do, Mr. Bickley.

10   THE COURT:  Now, see, those are the kinds of

11   photographs that -- if that's got anything valuable in

12   it ---

13   MS. LUSK:  Well, this is a close-up, but you can

14   really see it better in the ones that aren't as close.

15   THE COURT:  What?

16   MS. LUSK:  Her neck, the ligature marks.

17   THE COURT:  Is that what that is?  Because she

18   was strangled?

19   MS. LUSK:  Right.

20   THE COURT:  Is that disputed issue, that she was

21   strangled?

22   MR. BICKLEY:  We don't dispute that she was

23   strangled -- with a cord, you mean?

24   MS. LUSK:  On the other side of her neck.

1        THE COURT:  Is Sopher going to say that she died

2    from that strangulation?

3        MS. LUSK:  Yes.

4        MR. BICKLEY:  From the cord?

5        MS. LUSK:  Yes, yes.  You can see what he calls

6    the darkening of the face, as compared to the rest of the

7    body.  And I'm looking here at number 95, which was

8    admitted the last time, but this is a symptom of

9    suffocation, the darkening of the face.

10        And I want to note, too, that these autopsy

11    photographs are in black and white.

12        MR. REVERCOMB:  And it's before she's opened up

13    or anything.

14        MS. LUSK:  They're pre-autopsy.

15        THE COURT:  Again, if that is to show that she

16    was strangled, strangulated, that is not disputed -- or

17    is it disputed?

18        MR. BICKLEY:  No.

19        THE COURT:  Is there any dispute about -- I have

20    no idea what the nuances of the State's case are, in

21    order to -- obviously, you've got the confession, but

22    you've also got to show evidence more consistent with the

23    defendant's conduct and statements, than it is with the

24    husband's.

387

1         So, if there is some issues here that make that

2    distinction, I think it's valuable.  But, are there in

3    any of these photographs?

4         MR. BICKLEY:  No.

5         THE COURT:  Sopher is going to identify that as

6    a wound from a cord, okay?  What did Reggettz say?

7         MR. REVERCOMB:  Reggettz doesn't remember hitting

8    her.

9         MR. BICKLEY:  He says he swung at her.  He

10    doesn't remember if she went down.  So, it was all the

11    implication that he hit her.

12         THE COURT:  Did Moss say that he hit her?

13         MR. REVERCOMB:  Yes, he did.

14         MR. BICKLEY:  Both said they hit her.  Reggettz

15    doesn't come right out and say he hit her, but he

16    implicated that he swung the gun and hit her and she went

17    down.  Then he carried her to another room.

18         MR. REVERCOMB:  I think Moss's confession talks

19    about the pistol breaking, and throwing it away later

20    that morning.

21         THE COURT:  Is that what the pieces of grip are?

22         MR. REVERCOMB:  A piece of the butt, too, the

23    metal butt.

24         THE COURT:  That's what I mean.  Well, is any of

388

1    this more consistent with the defendant's guilt than

2    Reggettz'?

3            MR. BICKLEY:  The pictures are not.

4            MS. LUSK:  I think particularly the pattern of

5    injury.  I mean, this is not a photograph that even shows

6    Vanessa's face.

7            THE COURT:  I understand that.

8            MS. LUSK:  Number 130.

9            MR. REVERCOMB:  I think we need that picture.

10            THE COURT:  I don't have any problem with that

11    one at all.

12            Defense, do you all want to note any objections?

13            MR. BICKLEY:  No.  Reggettz hit her.  We don't

14    have any objection to that one.

15            THE COURT:  What else do you have?

16            MR. BICKLEY:  Have we shown 98 yet?

17            MR. REVERCOMB:  Again, I know what your concern

18    is, Judge, but the State is entitled to put on its case.

19            THE COURT:  I understand that, and I'm not trying

20    to hamstring you.

21            MR. REVERCOMB:  I mean, I can't argue what their

22    defense is going to be in my opening statements.

23            THE COURT:  Oh, and if they do something that

24    paves the way for the admission of these things -- at

1    this point, though, in your case in chief, basically what

2    you've got to do is, you've got to anticipate the alibi

3    defense and you've got to anticipate that you are going

4    to get hit with the fact that Paul Reggettz knew the

5    defendant.  Okay?

6          Now, I have no idea what the nuances of that

7    proof are going to be.  One of the things that occurs to

8    me is that Mr. Reggettz -- I don't know how big Mr. Moss

9    was.  Mr. Reggettz, as I recall, was a thin, spindly sort

10   of guy.  There is a great use of force.  That's just

11   something that occurs to me.  I don't know if any of it

12   applies to this or not, but what I'm saying is that it

13   just seems to me that to make this probative, you've got

14   to make probative of the contested issues in the case,

15   because I think the Court would have a problem with that

16   otherwise.

17         Let me see if I can't introduce a fact that I

18   think is what is going to count, although the Supreme

19   Court has never articulated this rule, that you can get

20   off on your photograph if it is an essential element.

21   You can get the worst possible photograph.

22         Now, if it's very, very relevant, you can't get

23   that photograph, but you can get one that's semi-

24   gruesome, but it's relative to what you're trying to

1    prove, because what I think my job is, is to make sure

2    that the jury doesn't get inflamed to the point where

3    they put aside their responsibility to decide the

4    defendant's guilt based upon objective evidence.  Okay?

5         And you and I see autopsy pictures a lot.  But

6    the fact of the matter is, that if I were to take these

7    home to my wife, she wouldn't sleep that night.

8         Now, we don't have any idea what the sensitivity

9    of these jurors are, but there is going to be some jurors

10   that are flat shocked out of their shoes by these

11   photographs.  Use the ones you have to have.  I'm not

12   trying to curtail your proof in your case at all.

13        MS. LUSK:  Maybe Steve and I can discuss these

14   autopsy photographs later.

15        THE COURT:  You're not going to put them on

16   today, anyway, are you?

17        MS. LUSK:  No.  But I do think that there are

18   some probative things that, you know, this one in

19   particular, with that hanging -- you can't describe that.

20   And to see in your mind what a noose furrow with a high

21   end mark is ---

22        MR. BICKLEY:  There is no one denying that she

23   was strangled.  She was hung.  It's a gruesome picture.

24        MS. LUSK:  It is gruesome.

1        MR. BICKLEY: The first time I saw it, I was

2  repulsed.

3        THE COURT: I don't think it's gruesome. What I

4  think it is, is unsettling; and I don't think that there

5  is a lot of difference, frankly, because what you're

6  looking at is what the impact on the average guy on the

7  street or the average woman on the street is going to be.

8        Go ahead. You all talk about it and then we'll

9  get back to it.

10       MR. REVERCOMB: We do want this, number 130.

11       THE COURT: Okay. Now, these are all withdrawn.

12  This stack -- you want to take those? You'll probably

13  want to hang on to them, because they may come up at some

14  point in the future.

15       MS. LUSK: We've also got another stack

16  downstairs that we've marked. I don't know if they used

17  them. I haven't really gone through and checked them all

18  or not, to see if we used them the last time or not. But

19  there are additional photographs, if the defense wants

20  to see them.

21       THE COURT: Have you all had a chance to look

22  through them in case there are any photographs that you

23  might find helpful to your case?

24       Why don't you take a look at them?

1      MR. BICKLEY:  We´ll do that.

2      MS. LUSK:  I´ll tell you, there are no additional

3   photographs -- I know you´ve looked at all of the

4   exhibits and stuff that were downstairs in the Clerk´s

5   office.  They were all marked before.  They were not all

6   admitted, but they were all marked.  So, if you would

7   look through them, and I know you have because you told

8   me you have, but if you´ve looked through the ones in

9   the Clerk´s office, you´ve seen them all.  But we have

10   them in the larger version, if you want to see them.

11      THE COURT:  Let´s take then minutes, then we´ll

12   go do openings.

13

14      WHEREUPON, the Court stood in a recess in the

15   hearing of this case.

16

17      (Back on the Record)

18

19      WHEREUPON, the jury was sworn in.

20

21      THE COURT:  Let me just start with a couple of

22   observations.  I suspect that those of you who have tried

23   a case have been admonished by the Judges who have tried

24   those cases not to discuss the case among yourselves or

393

1    with other persons during the trial.  If you've heard

2    that a lot of times, I suspect that you're probably at

3    the point whether you think, "Why do they keep telling

4    me that?"

5         Well, a Judge wouldn't tell you that again and

6    again if it wasn't important.  I'd just like to take a

7    minute to tell you why.

8         The reason we ask you not to discuss this case

9    among yourselves is that when you talk about the case

10   among yourselves, you are deliberating, and that

11   shouldn't occur until, first, all of the evidence is in;

12   second, you have heard my instructions on the law; and

13   third, you have heard the arguments of counsel.  So, if

14   a couple of you go off to lunch and you discuss the last

15   witness who was on and what you thought, or that a

16   witness was believable or not, and that sort of thing,

17   you are actually deliberating before it's time.

18        I ask you not to discuss the case with other

19   people for two reasons.  The biggest reason is because,

20   as I told each and every one of you in individual voir

21   dire, the only evidence that should come to your

22   attention that you consider in this case is that which

23   comes from the witnesses and the exhibits which are

24   received in evidence in this Courtroom, with all of the

394

1   parties present.  So, if somebody should try to tell you

2   something about this case away from this Courtroom, they

3   are acting improperly.  Don't let them do that.  And tell

4   me, as I told you, if that occurs.

5        The other reason we ask you not to discuss this

6   case with other people is, when you go home and your

7   spouse or friends or relatives want to ask you what you

8   are doing, what you are doing may be of some interest to

9   those people, and they'll say, "Well, what happened

10  today?"  Just tell them, other than today, you can tell

11  them you just sat around all day.  But when the evidence

12  starts coming in, you'll have some things that might be

13  of interest to them.  If you discuss that evidence with

14  them, they would be in a position to be almost like

15  another juror, because they could react to what you say.

16  You could say, "He said what."  And they could say,

17  "Well, I don't believe it."  So, then you've got somebody

18  who is not a juror being a part of the process.

19       What you really need to do is to hold all of that

20  stuff until we're all finished with this case, and you've

21  got a verdict, then you can elect to discuss it with your

22  friends and relatives and that sort of thing.  You are

23  free to do that.

24       So that everybody is assured of a fair and just

1    trial in this case, I ask you not to violate those two

2    rules.

3         There are a couple of other things that I would

4    specifically ask you to remember. Don't take any notes

5    during the course of the trial. This is not a trial in

6    which it would be appropriate for you to take notes.

7         Second, don't conduct any experiment or engage in

8    any independent investigation on your own in an attempt

9    to discover any facts in this case.

10        Again, the facts that you will need to know will

11   all come to you here in the presence of the State and of

12   the defendant and me.

13        During the course of this trial, it will not be

14   uncommon for you to hear one side or the other object to

15   a question or object to an answer that was given. And

16   as a Judge, it is my responsibility to rule when those

17   objections are made. When I rule, I hope you understand

18   that I am not indicating that I favor one side or the

19   other in this case, because I don't. I'm ruling because

20   I understand that the Rules of Evidence govern certain

21   questions in certain ways, and I'm just following what

22   my understanding of the law is.

23        Also, when I exclude certain pieces of evidence,

24   I'm not trying to keep anything from you that's important

1    in the case, because I would not do that. From time to
2    time, it will be necessary that we take up certain
3    matters out of your presence. More often than not, that
4    happens, as you've already seen, in the process up here.
5    Occasionally, we may ask you to be excused from the
6    Courtroom and we'll take something up in the Courtroom,
7    or I might excuse us and we'll all go off in my office
8    or someplace else to discuss the matter. When we're
9    doing that, we're not trying to keep you -- anything
10   important from you, but we're simply following the law
11   that requires us, from time to time, to take up certain
12   matters our of your presence.
13           Now, at this point, counsel will give their
14   opening statements. Their opening statements in this
15   case, as are all of these statements of counsel, are not
16   evidence. The evidence will be that which comes to you
17   from witnesses who have been sworn and take the witness
18   stand and give testimony. That does not mean, however,
19   that the opening statements of counsel are unimportant.
20   They are, in fact, a very important part of the case.
21   So, treat these opening statements of the attorneys --
22   these attorneys will try to give you some advance notice
23   of what you might expect, so that if the evidence does
24   come in, it will fall into place. It will take form

1    according to the way the attorneys have attempted to

2    develop that evidence. And I've told you that they would

3    attempt to develop that evidence. So, that is why I'm

4    going to turn the case over to counsel for the making of

5    opening statements.

6

7                      OPENING STATEMENTS

8

9                     (For the State)

10

11   By Mr. Revercomb:

12

13       May it please the Court. Ladies and gentlemen of

14   the jury, on December 13, 1979, this man, the defendant,

15   entered the home of the Paul Reggettz family down in St.

16   Albans. Paul Reggettz was at work. His wife, Vanessa,

17   and two children, Paul Eric and Bernadette Lynn, were in

18   the back bed room of that house that day.

19       This is perhaps the most horrifying crime that

20   was ever committed in this State. John Moss brutally

21   murdered Vanessa Reggettz, Paul Eric Reggettz, and

22   Bernadette Reggettz. He did it all for a .22 rifle and

23   a .22 pistol, a camera, a set of flatware, and a few

24   dollars.

1          As introduced before, my name is Steve Revercomb

2     and I'm an Assistant Prosecuting Attorney, and along with

3     Ms.  Lusk,  we'll  be  representing  the  State  of  West

4     Virginia  and  the  people  of  this  County  in  this  case.

5     I'll  also  introduce  to  you  Mr.  Nelson  Bickley,  Tim

6     Huffman,  and  Kathy  Beckett,  the  defense  counsel  for  the

7     defendant,  John  Moss,  who  is  also  here  present.

8          Now,  you  jurors  have  been  summoned  here  for  an

9     important  duty.   I'm  here  to  represent  the  good  people

10    of  this  County,  the  citizens  of  this  County,  and  you  are

11    to  determine  whether  John  Moss  is  guilty  or  innocent  of

12    three  counts  of  murder  in  the  first  degree.   Your  duty

13    is  to  apply  the  facts.   You  are  the  jurors  and  judges  of

14    the  facts  that  come  from  the  witness  stand,  and  to  apply

15    the  law  that  Judge  MacQueen  will  tell  you  about.   He'll

16    instruct  you  on  the  law.   But  you  are  the  judges  of  the

17    law  and  you  are  sworn  to  follow  that  law.   You  jurors  are

18    the  judges  of  the  facts.

19         Now,  the  charges  that  come  to  you  through  the

20    Kanawha  County  Grand  Jury  --  the  Grand  Jury  meets  and

21    they  decide  whether  to  indict  people.

22         I'll  tell  you  right  up  front  that  the  fact  that

23    they  have  indicted  John  Moss,  or  anyone  else  for  that

24    matter,  is  not  to  be  considered  evidence  of  their  guilt.

399

1    I am telling you that now, and I'm sure Mr. Bickley and

2    the other defense counsel will tell you that.  I'm sure

3    the Judge will read to you an instruction on that point

4    of law.   The fact that one is indicted is not to be

5    considered  by  you  all  as  evidence  of  guilt.    An

6    indictment is a formal instrument setting a person for

7    trial by a jury of his peers.

8           At this time, I'll read the Indictment, so please

9    bear with me.

10          "The State of West Virginia, Kanawha County, in

11   the Circuit Court of the aforesaid County, the Grand Jury

12   of West Virginia, in and for the County of Kanawha, now

13   attending said Court, upon their oaths present that John

14   Moss, Jr., also known as John Moss, III, on the blank day

15   of December, 1979, and in the said County of Kanawha, did

16   feloniously,   maliciously,   willfully,   deliberately,

17   premeditatedly and unlawfully slay, kill and murder one

18   Paul Eric Reggettz in violation of Chapter 61, Article

19   2, Section 1 of the West Virginia Code, 1931, as amended,

20   against the peace and dignity of the State.

21          "Count 2:  The Grand Jurors aforesaid, upon their

22   oaths aforesaid, further present that John Moss, Jr.,

23   also  known  as  John  Moss,  III,  on  the  blank  day  of

24   December, 1979, and prior to the date of the filing of

400

1   this Indictment in the said County of Kanawha, did

2   feloniously, maliciously, willfully, deliberately,

3   premeditatedly and unlawfully slay, kill and murder one

4   Bernadette Reggettz, in violation of Chapter 61, Article

5   2, Section 1 of the West Virginia Code, 1931, as amended,

6   against the peace and dignity of the State.

7           "Count 3:  The Grand Jurors aforesaid, upon their

8   oaths aforesaid, further present that John Moss, Jr.,

9   also known as John Moss, III, on the blank day of

10  December, 1979, and prior to the date of the filing of

11  this Indictment in the said County of Kanawha, did

12  feloniously, maliciously, willfully, deliberately,

13  premeditatedly and unlawfully slay, kill and murder one

14  Vanessa Gail Reggettz, in violation of Chapter 61,

15  Article 2, Section 1 of the West Virginia Code, 1931, as

16  amended, against the peace and dignity of the State.

17          "Found during the September Term of Court.

18          "Trooper Terry Williams of the West Virginia

19  Department of Public Safety at South Charleston, West

20  Virginia, who came before the Court to give evidence

21  before that body, signed James E. Roark, Prosecuting

22  Attorney."

23          Now, the burden of proof in a criminal case,

24  you've already been told about this, and the burden of

1    proof is on the State in every criminal case.  We accept

2    our burden.  The burden of proof is on the State to prove

3    each and every element of a crime, beyond a reasonable

4    doubt.   The burden is one of reasonable doubt.   The

5    burden is not one of all doubt.  We don't have to prove

6    this case against this man against all doubt or beyond

7    all possible doubt.  We have to prove his built beyond

8    a reasonable doubt, and a reasonable doubt is one based

9    upon reason.

10        I ask you to keep in mind, as you listen to the

11   evidence, what the word reasonable means because the only

12   tools you have to determine what the truth is in this

13   case is your common sense, your life experiences, and

14   your sense of what is reasonable and what is not

15   reasonable.

16        You have also been told, I believe, that briefly,

17   there will be some circumstantial evidence in this case.

18   And what circumstantial evidence is, it's one fact or one

19   set of facts, or you can infer another set of facts, for

20   instance I believe that Judge MacQueen used the example,

21   if you are in the Jury Room looking out the window, you

22   can see it raining.  You can see the dark clouds come

23   rolling in and puddles forming on the ground.  That is

24   direct evidence.  You can see it raining.

1    However, if you've been in this Courtroom for two

2    house and it was sunny when you came in here and someone

3    comes to the door and comes in with a raincoat on and an

4    umbrella with water dripping off of it, you can infer

5    that it's raining outside.   And that's a reasonable

6    inference.   That is circumstantial evidence.

7    But I would also ask you to pay attention in this

8    case.   Pay attention, because this is a very serious

9    charge, the most serious charge that a jury can decide.

10   This is not TV, ladies and gentlemen, this is real.   What

11   happened on December 13, 1979 is real.   Remember that.

12   A four year old girl is dead, a seven year old boy is

13   dead, and their twenty-six year old mother is dead.   I

14   ask you to pay attention, because it's not like the case

15   will unfold.   We may call witnesses out of turn.   There

16   are bits and pieces of evidence that will arise.

17   The Judge has said that you're not allowed to

18   take notes, so please pay attention to what is said.

19   Listen to the testimony, whether you believe it or not,

20   or how much of it you believe.

21   Some of the parts of this trial will be rather

22   tedious; some exhibits and the photographs, certain

23   witnesses will take maybe a whole day.   Certain witnesses

24   will be short.   You will get tired, like everyone else

403

1  will, but I still ask you to please pay attention.

2  On December 13, 1979, Paul Reggettz got up at

3  approximately 1:00 a.m. to go to work.  He worked the

4  night shift at UPS in Rand.  He lived in St. Albans, at

5  7027 Chesapeake Avenue.  He worked the shift from 2:30

6  a.m. until 11:30 a.m. in the morning.

7  At about 1:00 in the morning, he got up, got

8  dressed, and talked to his wife Vanessa.  They had some

9  coffee together.  About a quarter until two, it was time

10  to leave.  He kissed his wife goodbye and left.  He went

11  to work.  He worked all morning and got off at 11:30 a.m.

12  He then went home, shortly after noon, or at about noon.

13  He was expecting to meet his wife and daughter,

14  Bernadette, at the intersection of Route 60 and Fourth

15  Avenue in St. Albans, or near St. Albans.  He expected

16  to meet them there and they were going on together to K-

17  Mart to look for a watch that he had seen advertised, for

18  a Christmas present.

19  When he gets to the intersection though, they are

20  not there.  But it has been raining off and on, so he

21  thinks maybe they are at the house because of the rain.

22  So, he turns down Fourth Avenue and he goes to the house.

23  He parks in the driveway between his house and his

24  landlord's house, Mr. Fortson.  He goes to the front door

1    and he knocks, but there is no answer.  He walks around

2    the back and looks at the back door.  He goes to it and

3    realizes that it is not shut all the way.  He pushed it

4    open.  Immediately, he sees, some ten feet away from him

5    -- the door is open to the kitchen, but he could see his

6    wife´s legs sticking out of the doorway between the back

7    bed room and the TV room which is off the kitchen.

8         He rushes to his wife.  She is lying in the

9    doorway, a cord around her neck, one cord -- two cords

10   around her neck.  One cord extends up through a hold in

11   the door where a door knob had once been.  They didn´t

12   have a door knob on it that day.  He also notices some

13   scissors in her chest.

14        Ladies and gentlemen, his worst nightmare was

15   just beginning.  The nightmare would get worse -- much

16   worse.  He wondered immediately where his little girl

17   was.  He found his little girl hanging on the door

18   separating the front bed room from the living room.  He

19   took her down from that door.

20        Paul Reggettz found his son, Paul Eric Reggettz,

21   in the bathtub, face down, hands tightly bound behind

22   him, with a cord coming up around his neck.  All three

23   were dead, just as surely as his wife was to meet him at

24   noon on December 13, 1979.

405

1    Paul then left the house and had someone call the

2    Police.  Fourteen hours later, at approximately 2:30 a.m.

3    down at the State Police Detachment in South Charleston,

4    Paul Reggettz confessed to killing them.  He gave a very

5    colorful and very graphic description of what he had

6    done.  He went so far as to say that he had put his

7    little girl on the door because she liked to swing; he

8    put his little boy in the bathtub because he liked to

9    swim.

10    Also, later that morning, on December 14th, he

11    returned to his home on Chesapeake Avenue, where Law

12    Enforcement Officers demonstrated how he had murdered his

13    family.  There was only thing left out.  Paul Reggettz

14    didn't kill his family.  He didn't kill his wife and

15    little boy or his little girl.  The Police, at that time,

16    had his confession.  They'll tell you that as soon as the

17    Police arrived that day, he didn't show much remorse.

18    He wasn't hysterical.

19    You'll hear the time of death, established by the

20    Medical Examiner.  He'll say that the time of death is

21    in the range, it's not exact, that it could have been

22    between 12:00 midnight or five, six, or seven in the

23    morning.  Paul will tell you that he didn't leave for

24    work until a quarter till two.  The Police were sure they

1    had the killer.

2         Now, the case begins to unravel soon after that,

3    because at the scene that day on December 13th, when the

4    Troopers showed up and the Lab people showed up, the

5    photographer showed up, a person from the Serology Lab,

6    a person who is a forensic serologist, showed up along

7    with a fingerprint man.  The serologist, a man by the

8    name of Fred Zain, the chief forensic serologist for the

9    State -- he'll tell you that there was a lot of blood at

10   the scene.

11        Vanessa Reggettz had an injury.  We all know how

12   a head injury is.  For example, Fred Zain will tell you

13   that he took his samples of blood from every blood stain

14   in that house.  He will tell you that he took those

15   samples from this house, then he went back to the lab

16   where he analyzed them.  Of course, in the meantime, he

17   had the known blood samples of the victim, the mother.

18   He got a known blood sample of Paul Reggettz shortly

19   thereafter.

20        He will tell you that the blood samples that he

21   took from a drawer in the kitchen and from a flashlight

22   in the TV room, from a Christmas package, some Christmas

23   wrapping paper, blood samples from the door between the

24   living room and the front bed room.  He took blood

1   samples from that door, a change purse from the chest of

2   drawers in the front bed room, a pillow case from the

3   back bed room, a curtain on the back door, even the

4   little pajama top that Bernadette reggettz was wearing

5   when she was murdered.

6          He will tell you that when he took that samples,

7   he analyzed them in the lab.  He found samples of blood

8   taken from all of these people that I've just listed,

9   that did not match any member of the Reggettz family.

10  The blood didn't belong to Vanessa, from the head wound.

11  It didn't belong to Paul Eric.   It didn't belong to

12  Bernadette.  And it didn't belong to Paul Reggettz.

13         So, the Police continued their investigation.  On

14  April 22, 1980, they traveled to Cleveland, Ohio, to take

15  a blood sample from a young man.  During the course of

16  their investigation, at the time of these murders, this

17  man was living with his grandfather, some one hundred to

18  two hundred yards straight down the road from the

19  Reggettz home.  And shortly after the murders, after

20  about a week, that young man returned to Cleveland.  That

21  young man, ladies and gentlemen, is sitting right here

22  (Indicating), John Moss, the defendant.  His blood was

23  taken that day in April and brought back to Fred Zain,

24  the serologist, and his blood was found to match the

1    blood found in the house.

2         Now, we all know about some bloodwork.  Everyone

3    has an ABO type; either O, A, or AB, or B.  Trooper Zain

4    -- or Lieutenant Zain will tell you that the bloodwork

5    at the time, was broken down scientifically and

6    forensically, and can be broken down to a number of

7    samples, to nine genetic markers or enzymes, all

8    independent of each other, which is important.  Some of

9    the blood samples that were taken from the house were

10   taken from the curtains on the back door, from

11   Bernadette's pajama top, from Christmas wrapping paper,

12   I believe the Christmas package.  And those blood samples

13   were able to be broken down by Fred Zain into those nine

14   genetic markers.  And one at a time -- that blood exactly

15   matched John Moss's -- the genetic markers, those nine

16   genetic markers, in the sample of blood.

17        And Fred Zain will further tell you that the

18   combination of those nine genetic markers found in the

19   defendant's known blood and on those exhibits, the

20   exhibits that I just listed, occur in three of every ten

21   thousand people, point zero three percent of the

22   population in this State.  Three in every ten thousand.

23   Fred Zain will further tell you that some of the other

24   samples, the other ones I listed, for lack of sufficient

1    sample or whatever reason, he was able to break it down

2    into seven of the nine genetic markers.  And again, he'll

3    tell you that those seven genetic markers found on those

4    exhibits matched right down the line to the defendant's

5    known blood.

6            Fred Zain will tell you that that combination of

7    those seven genetic markers occurs in one of every

8    thousand, twenty-one percent.

9            On October 28, 1980, Trooper Williams and Trooper

10   Smith, two investigating officers in this case -- they

11   traveled to Mansfield, Ohio, where they picked up John

12   Moss to bring him back here to West Virginia.  Along the

13   way, they stopped at the Parkersburg Detachment of the

14   State Police Detachment.  On October 28, 1990, John Moss

15   confessed to murdering Vanessa Reggettz, confessed to

16   murdering Paul Eric Reggettz, and confessed to murdering

17   Bernadette Reggettz.  And while his confession was not

18   as colorful, perhaps, as Paul Reggettz, it was more

19   detailed.

20           There are some important details in his

21   confession that aren't in Paul Reggettz'.  One of them

22   was a camera.  John Moss says he stole a camera from the

23   Reggettz household.  The Police didn't even know that a

24   camera had been stolen until John Moss told them about

410

1    it.   He also told them about some flatware and some

2    dishes -- actually, in his confession he said he stole

3    some dishes from the residence.   He said he murdered the

4    family; went to the Christmas tree and opened the

5    packages; and said he took one gift -- it was a set of

6    dishes -- and he gave it to his best friend's mother for

7    a Christmas gift.   He took it home, rewrapped it, and

8    gave it away.

9        The State will put on a witness and she'll tell

10   you that she received the Christmas gift, which was one

11   set of dishes and one set of flatware.   There are a

12   couple of details that are in John Moss's confession that

13   were not in Paul Reggettz' confession.

14       The defendant confessed twice.   He confessed

15   orally, and you'll hear about that.   He also confessed

16   on tape, and you'll get to hear his confession.   In his

17   confession, one thing he said, is that Vanessa Reggettz

18   cut him with a knife, and you'll hear about that.

19       More importantly, he says in his confession, he

20   went into the Reggettz home that night to steal, commit

21   burglary.   The reason that's important, ladies and

22   gentlemen, we have in this State what is called felony

23   murder.   It's a rule of law that if a person commits a

24   murder in the course of committing or attempting to

411

1    commit either a rape, a robbery, an arson or a burglary,

2    then that person is automatically guilty of first degree

3    murder.  The State doesn't have to prove that there was

4    any malice or premeditation or deliberation.  The State

5    has to prove that the underlying offense, in this case

6    a burglary, was committed.  Burglary is the breaking and

7    entering of a dwelling, or entering without breaking of

8    a dwelling, with the intent to steal.  Along with the

9    murder, that is a felony.

10        The State's evidence in this case will show that

11   John Moss entered the Reggettz home that night in the

12   middle of the night with the intent to commit a larceny.

13   We can prove that by his confession.  He had already

14   stolen two guns, some money, the flatware and the camera.

15        Once again, the felony murder rule is that if

16   someone kills somebody, murders somebody in the attempt

17   or in the commission of either rape, robbery, arson or

18   burglary, they are automatically guilty of first degree

19   murder.

20        What the jury is to decide is, if you find him

21   guilty, is whether or not he gets mercy, whether or not

22   he is entitled to mercy.

23        After the Moss confession, Paul Reggettz was let

24   out of jail and the charges against him were dismissed.

412

1   That's important because, as I stand before you today and

2   this week, because John Moss is the defendant, not Paul

3   Reggettz.   And at the conclusion of this trial, we are

4   going to ask you to find this man, John Moss, guilty of

5   murder in the first degree, of Vanessa Reggettz, guilty

6   of murder in the first degree of Paul Eric Reggettz, and

7   guilty of murder in the first degree of Bernadette

8   Reggettz.   We are going to ask you -- we want him to

9   spend the rest of his natural life in the penitentiary.

10   So, it's very important that you listen.   It's important

11   to John Moss.   And it's important to the people of this

12   County.

13          Thank you.

14

15                  (For the Defendant)

16

17   By Mr. Bickley:

18

19          May it please the Court.   Ladies and gentlemen of

20   the jury, the reason why we're here is because there are

21   two side to this story, but first I'd like to reintroduce

22   the legal team; Kathy Beckett and Tim Huffman and I'm

23   Nelson Bickley.

24          It is our distinct privilege to be defending John

1    Moss, our client.  We're about to begin the ordeal of

2    trial for John Moss.   And as Steve, Mr. Revercomb,

3    indicated, he was brought here on a charge of Indictment,

4    an Indictment where he was not able to go.  He was not

5    able to present his side.  He had no lawyers represent

6    him, no witnesses to testify in his behalf.   Someone

7    presented a set of facts and John Moss was charged with

8    first degree murder.   And Mr. Revercomb has already

9    indicated that he was charged with an Indictment, that

10   as of this time, is absolutely useless.  It has no value.

11   He is now represented by counsel, and you are the judges

12   of the facts.  And the Prosecutor and the Prosecutrix are

13   doing their job.

14        This is just another of a hundred trials that

15   they may do during the course of a year, but to John

16   Moss, this trial is most important, for his life hangs

17   in the balance.  And as the facts unfold in this case,

18   you are going to realize that John Moss, III or Junior,

19   is innocent.  And Paul Reggettz, who is going to testify

20   from that stand, is guilty of murdering his family.

21        Now, Mr. Revercomb gave you the story as he would

22   like for it to be presented.  The facts are there, but

23   the details are not.

24        When Paul Reggettz confessed, he confessed in

414

1    intricate detail -- intricate detail that I cannot

2    imagine anyone forcing him to do.  Now, they will make

3    much of the fact that he was up for twenty hours, but

4    forgetting that his timeclock was not like ours.  He went

5    to work at 2:00 o'clock, and he worked all day, and you

6    will find from the witness stand that he is used to two

7    or three hours of sleep.

8         But, of no mind, you will find that he will

9    testify that he wanted his wife killed.  You will find

10   that what he testified to was that he was a member of a

11   Satan group.  He said he wasn't a regular member, but

12   just liked to hang around with the guys.  He didn't have

13   a motorcycle, at one time, then he had one.

14        You will find that Paul Reggettz will testify

15   that he was tight with his money.  And let me tell you

16   about this Paul Reggettz.  He lived in a motel for about

17   seven motel, the Gene's Motel, owned by Mr. Moss's uncle.

18   One room.  Their refrigerator was a beer cooler.  With

19   two kids and his wife.

20        The Fortson's allowed them to rent the home where

21   his family was murdered.  They had no furniture.  The

22   family that allowed them to rent the home gave them a

23   refrigerator.  He would not help his wife move it to the

24   house.  They had to move them there.  The furniture --

415

1 the neighbors came to give.  He was working at UPS, and

2 I assume, making better than five to six dollars an hour.

3   Mr. Reggettz had a phobia about death.  He owned

4 a car, a blue Honda.  He was making payments on it every

5 week to get over making payments on the car, while

6 denying his family.  You will see that he will admit that

7 he was penny-pinching.

8   On the night of the murder, in his confession, he

9 testified that the kids were running around.  He was

10 irritated and he got into an argument with his wife.  She

11 went in the bed room and got a pistol.  He struggled with

12 her, the gun goes off, he slashed at something -- he

13 didn't know whether he hit her or not, but she fell.

14 Then he put a cord around her neck and pulled it tight

15 until she quit moving.

16   His son ran by and he grabbed his son and put his

17 knees in his son's back and tied him, just as Mr.

18 Revercomb illustrated, and put him in a tub.  His

19 daughter -- he hung on a door.

20   Then Mr. Reggettz picked up some scissors and

21 comes in and kneels down and punches, not stabs, but

22 pushes them into his wife's chest.

23   Ladies and gentlemen of the jury, he is

24 confessing this.  The State is not asking for this.

1    Before he goes off to work, he takes his daughter down

2    and puts her on the bed.  Before he goes to work that

3    night, he takes his son out of the tub and puts him on

4    the bed.  When they see the scene of the crime, these two

5    kids are on the bed.  Who told them that the son was in

6    the tub?  They might have known from the wet spot, but

7    the Police did not know those facts.  They did not know

8    these facts.  He said he tore a sheet down and put the

9    flatware around to make it look like a robbery.

10        How can you make me confess that?  How can you

11   make anybody confess?  I don't care how long they've been

12   up.  I don't care how long.

13        Listen to Paul Reggettz, the Satan lover.  The

14   man who is tight with a penny, who wanted his wife out

15   of the way, who was a burden and too much responsibility.

16   He's a far different person that you and I know.  I don't

17   believe that anyone could force me to testify in such

18   intricate, colorful detail.

19        Mr. Reggettz later came back the next day with

20   the Police entourage and demonstrated in detail what he

21   did the night before.  He demonstrated how he killed his

22   wife, how he killed his children, showed them how he

23   stabbed her.  Is that forcing something?  I can see him

24   saying, "I'm guilty and I'm sorry and I don't know why

417

1    I did it."    But going through such an elaborate

2    confession, it boggles the mind.

3         Let's move to October 28th.    Two State Troopers

4    go up to get John Moss.    They put John Moss in a sedan,

5    one State Trooper -- they handcuffed him to the back of

6    the front headrest of the front seat.    The other State

7    Trooper crawled in the back with John Moss.

8         Now, why did they do that?    They couldn't talk,

9    the windows were down?    Why would you suspect that he

10   crawls into the back seat with John Moss -- so he could

11   hear him better?    Huh?    And for three hours, he was back

12   there talking to John Moss.    For three hours he was back

13   there softening John Moss up for Parkersburg.    The

14   electronic confession of this man for over two and a half

15   hours, on twenty-six minutes of tape.    What happened all

16   this time?    In his oral confession, he took twice as

17   long.

18        Now, let me tell you something else, you see at

19   one them there was a theory that Paul Reggettz and John

20   Moss was in a conspiracy to do this deed.    And, you'll

21   notice in John Moss's confession, that he had never heard

22   Paul Reggettz' confession, he didn't even know about it.

23   And John Moss's confession is not, as Mr. Revercomb

24   indicated, as colorful.    What he meant was that it was

418

1    not in as minute detail as Reggettz´, but some of the

2    same things come up, but every now and then John would

3    mess up.  He would say he stabbed her with a knife, when

4    it was scissors.  That´s what it was, scissors.  But here

5    is the kicker.

6         In John Moss´s confession, ladies and gentlemen,

7    he said the Trooper asked him about was the Honda, the

8    blue Honda that Reggettz owned, did he see it?  And John

9    is supposedly to have said "Yes, it was in front of the

10    Fortson home."  They were trying to make the conspiracy

11    work.

12         The State is trying to get you to do what the

13    Grand Jury refused to do.  They submitted this bloodwork

14    analysis and they refused to indict him.  They indicted

15    Paul Reggettz.

16         MS. LUSK:  Your Honor, we would object to that

17    characterization.

18

19         WHEREUPON, a bench conference was held where the

20    following transpired:

21

22         MR. BICKLEY:  Your Honor, he was an unindicted

23    co-conspirator.

24         MS. LUSK:  He was not.

419

1       MR. BICKLEY: He was named in the indictment.

2       MS. LUSK: He was named in the indictment. It

3  was the Reggettz indictment. It was never presented

4  against him, Judge, because he was 17 years old. We

5  didn't try to present the case to the Grand Jury because

6  he was a minor. We had to transfer him first. And

7  Nelson is up there arguing that the Grand Jury refused

8  to indict Moss in 1980. That is a flat lie.

9       THE COURT: Do you have something else, some

10  other proof?

11      MR. BICKLEY: He was named in the indictment, and

12  I just assumed they refused to indict him.

13      THE COURT: I'll sustain the objection.

14      MR. REVERCOMB: He didn't have a blood test yet,

15  either. Reggettz was indicted in April of 1980. They

16  didn't do the blood test until later. He had to be

17  transferred and indicted then.

18      MR. BICKLEY: Well, he was named in the

19  indictment.

20      MS. LUSK: He wasn't presented. It was not

21  presented. It was not refused.

22

23      WHEREUPON, the bench conference was concluded.

24

420

1      (Back on the Record)

2

3    By Mr. Bickley:

4

5          Ladies and gentlemen, I stand corrected.   John

6    Moss was in the indictment, his name was in the

7    indictment but it was not presented to the Grand Jury.

8    At that time, he was a juvenile, 17 years old.  But his

9    name was in there.   It was believed -- the theory of

10   conspiracy was alive and well.

11         Now, the defense will put on witnesses, but there

12   is no witness more important than the witness who is in

13   this room right now.  Besides John Moss, the person with

14   the presumption of innocent, the witness is silent and

15   unseen, but it is very important.  He stands between the

16   State and himself.  And you must respect the mandate of

17   the law to give him that presumption.

18         We chose you because we believed you to be the

19   most   sincere,   the   most   intelligent   and   the   most

20   courageous people we could find to serve.   You hold my

21   client's entire future in your hands -- all of his hopes

22   and dreams and aspirations, as you assume this grave

23   responsibility.   I ask only that you do what is right.

24         I asked you earlier if you could stand by your

421

1   conviction when it came time to vote on the guilt or

2   innocence of my client.  You assured me that you would

3   do that.  You even told me that you would stand alone.

4        My client is ready to proceed in this matter,

5   knowing that his fate rests in your hands, the hands of

6   men and women of character.

7        Thank you very much.

8

9        THE COURT:  Folks, at this point, ordinarily we

10  would put on some evidence, but it's going to be

11  necessary for us to go through some preparations, and so

12  rather than make you sit around for another ten or

13  fifteen minutes and then only go for another fifteen or

14  twenty after that, I'm going to recess for the day.

15       But I would ask you to come back tomorrow morning

16  at 9:00 o'clock and just assemble in the Jury Lounge.

17  It is not necessary that you go back to the other room.

18       Again, I would implore you -- do not discuss the

19  case among yourselves or with other persons.  When you

20  see television cameras here, you can get your relatives

21  to videotape it, but don't watch it tonight.  I see

22  representatives of the newspapers here as well.  I am

23  confident that there will be some coverage of this case

24  in the newspapers.  Please don't read it.

422

1          Enjoy the rest of your evening, and we'll see you

2    tomorrow morning at 9:00 o'clock.

3

4          WHEREUPON, the jury was excused for the day.

5

6          (Back on the Record)

7

8          MR. BICKLEY:   Are you aware that the Supreme

9    Court turned us down?

10         THE COURT:   Yeah.   That's what I told you.

11         MR. BICKLEY:   I'm surprised.

12         THE COURT:   Okay.   Why don't you all come on in

13   here at 9:00 o'clock, and we'll get hopping.

14

15         WHEREUPON, the Court stood in a recess in the

16   hearing of this case.

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:


I, Connie L. Cooke, Official Reporter for the Circuit Court of Kanawha County, do hereby certify that the foregoing is a true and correct transcript of the proceedings had and reported in the matter of the State of West Virginia versus John Moss, Jr., aka John Moss, III, upon action number 82-F-221, as stated in the caption hereto, had on the 17th day of April, 1990, during the May 1990 Term of said Court, as reported by me and transcribed into the English language.

I hereby certify that the transcript within meets the requirements of the Code of the State of West Virginia, 51-7-4, and all rules pertaining thereto as promulgated by the Supreme Court of Appeals.

Given under my hand this 13th day of July, 1990.


*Connie L. Cooke*

Official Reporter

1    N THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2

3

4    STATE OF WEST VIRGINIA

5

6    vs.                          Action No. 82-F-221

7

8    JOHN MOSS, JR., aka JOHN MOSS, III

9

10

11        BEFORE:  Hon. A. Andrew MacQueen, Judge

12                 Day 3

13

14

15               APPEARANCES

16

17

18        For the State:  Neva Lusk and Stephen Revercomb,

19   Assistant Prosecuting Attorneys for Kanawha County.

20        For the Defendant:  The Defendant, in person, and

21   by Nelson R. Bickley, Timothy N. Huffman and Kathy

22   Beckett, his counsel.

23

24                         Connie L. Cooke

25                         Official Reporter

FILED

JAN 23 1990

ANCIL G. RAMEY, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

- 3 -

2

WITNESSES FOR THE PLAINTIFF

| | | | D | X | RD | RX |
|---|---|---|---|---|---|---|
| 1) | Trooper Terry Williams | | 425 | 590 | 612 | 619 |
| 2) | Scott Leasure | | 625 | 630 | | |
| 3) | John Fulks | | 631 | | | |
| 4) | Joe Dean Jarrell | | 635 | 640 | | |
| 5) | William D. Estep | | 643 | | | |
| 6) | Lt. Clarence Ralph Lane | | 650 | 654 | | |
| 7) | Paul Reggettz | | 661 | 735 | 762 | 764 |
| 8) | Trooper Robert R. Custer | | 767 | 779 | 781 | |
| 9) | Sgt. R. L. Presson | | 782 | 796 | 798 | |
| 10) | Irvin R. Sopher, M.D. | | 799 | 864 | 865 | |
| 11) | Paul Fortson | | 870 | | | |
| 12) | Arbutus Johnson Pomeroy | | 896 | 903 | 905 | |
| 13) | Michael D. Smith (In Camera) | | 907 | 913 | | |
| 14) | John Moss (In Camera) | | 917 | 919 | 914 | |
| 15) | Michael Don Smith | | 931 | 978 | | |
| 16) | Charles E. Pettry, Jr. | | 997 | 1004 | 1009 | |
| 17) | Lt. David H. Shumate | | 1021 | 1045 | | |
| 18) | Fred S. Zain | | 1048 | 1053 | | |
| | and | | 1065 | 1125 | 1135 | 1137 |

3

WITNESSES FOR DEFENDANT

|  |  | D | X | RD | RX |
|---|---|---|---|---|---|
| 1) | Alexander Fortson | 1164 | 1173 | | |
| 2) | Willie James Moss | 1179 | 1187 | 1191 | 1192 |
| 3) | John Moss, Jr. | 1193 | | | |
| 4) | John C. Wideman | 1202 | 1204 | | |
| 5) | Trooper Howard Woodyard | 1208 | 1222 | 1233 | 1234 |

425

1          BE IT REMEMBERED, that on Wednesday, the 18th day

2     of April, 1990, during the May 1990 Term of said Court,

3     in the matter of the State of West Virginia versus John

4     Moss, Jr., aka John Moss, III, upon Action No. 82-F-221,

5     as   stated   in   the   caption   hereto,   the   following

6     transpired:

7

8          (On the Record with the Jury Present)

9

10         THE   COURT:   Welcome back.   At this point the

11    State will begin the presentation of its evidence.

12

13              (For the Plaintiffs)

14

15         MR.   REVERCOMB:   At this time, the State would

16    call Trooper Terry Williams.

17

18         WHEREUPON, Trooper Terry Williams was sworn, upon

19    his oath, and the following transpired:

20

21              DIRECTION EXAMINATION

22

23    BY MR. REVERCOMB:

24

Williams - Direct                                      426

1          Q          Would you please state your name for
2     the record, sir?
3          A          Terry Williams.
4          Q          You'll have to speak up so we can all
5     hear.
6          A          Terry Williams.
7          Q          Where   are   you   employed,   Trooper
8     Williams?
9          A          The Department of Public Safety.
10         Q          That's the State Police?
11         A          Yes.
12         Q          Where are you stationed?
13         A          South Charleston.
14         Q          How long have you been a State Trooper?
15         A          A little over eighteen years.
16         Q          And what do your duties consist of as
17    a State Trooper?
18         A          Well, right now, I give commercial
19    driver's licenses.   It also consists of road patrol,
20    criminal investigations, accident investigations, just
21    a little bit of everything.
22         Q          How long have you been on commercial
23    driver's licenses?
24         A          Since August of '89.

Williams - Direct                                                    427

1          Q          And before that, it was road patrol and

2    criminal investigations?

3          A          Yes.

4          Q          Were you so employed in December of

5    1979?

6          A          Yes.

7          Q          Did you have occasion on the 13th --

8    let me call your attention to December 13, 1979.  Were

9    you called to the scene of a murder?

10         A          Yes.

11         Q          Tell us how you got the call?

12         A          I received a call on my radio that

13   there was a possible Signal 18 at 7027 Chesapeake Avenue,

14   St. Albans, West Virginia.

15         Q          Is  that  in  Kanawha  County,  West

16   Virginia?

17         A          Yes.

18         Q          A Signal 18 -- what is that?

19         A          Murder.

20         Q          And approximately what time did you get

21   that call?

22         A          12:15 p.m.

23         Q          Right after noon?

24         A          Yes.

Williams - Direct                                          428

1          Q          Where were you when you got the call?

2          A          I was in Spring Hill.

3          Q          How long do you think it took you to

4     get to the scene?

5          A          About five minutes.

6          Q          Tell us what you found upon arriving at

7     the scene?

8          A          I traveled west on U.S. 60, and as I

9     approached the intersection of U.S. 60 and Fourth Street,

10    there was the subject standing there at the corner,

11    waving his arms.

12         Q          Did you later learn the identity of

13    that subject?

14         A          Yes.

15         Q          Who was it?

16         A          Paul Reggettz.

17         Q          Go ahead.

18         A          I turned left onto Fourth Street, and

19    I rolled down the passenger window.  He knelt down into

20    the window and said, "Someone killed my family."

21         And I said, "Where do you live?" and he took off

22    running down Fourth Street.

23         Q          He didn't get into the cruiser?

24         A          No.

Williams - Direct                                                429

1          Q          He ran down Fourth Street?

2          A          Yes.

3          Q          What did you do?

4          A          I followed him in my cruiser.

5          Q          Where did you follow him to?

6          A          He ran up into his yard and I stopped

7    at the intersection of Chesapeake Avenue and Fourth

8    Street, and I got out and went up into the yard.

9          Q          Where was this yard in relation to that

10   intersection of Fourth Avenue and Chesapeake?

11         A          It's right there at the intersection.

12         Q          Go ahead.

13         A          He again stated that someone killed his

14   family.  And we walked into the front door of the house.

15         Q          What did you find?

16         A          Upon entering the front door, I looked

17   immediately to the right and saw a little girl lying on

18   a bed in the front bed room.

19         Q          Where did you go to then?

20         A          From there, I went through the living

21   room, into the TV room, and as we entered the TV room,

22   I saw the legs of a woman sticking out into the TV room.

23         Q          When you seen the little girl to the

24   right, did you go over and check her?

Williams - Direct                                    430

1        A        No.

2        Q        Go ahead.

3        A        In the doorway, between the TV room and
4   the back bed room was a lying in the floor.  She had some
5   cord wrapped around her neck and a pair of scissors in
6   her chest.  She had what appeared to be blood on her
7   nightgown and face, and at that point, I also observed
8   a little boy lying on a bed in the back bed room.

9        Q        What was the condition of the people?

10       A        They appeared to be deceased.

11       Q        What did you do at that point?

12       A        At  that  point,  myself  and  Paul
13  Reggettz, I took him outside.  I told him to sit on the
14  front porch and don't go anywhere.  I went across the
15  street to make a phone call.

16       Q        Who did you call?

17       A        I  called  my  office,  and  talked  to
18  Trooper Woodyard.  I told him what I had, and that I
19  needed some assistance down there.  I wanted him to
20  contact the lab people, serology, the photo lab, the
21  fingerprint lab, and have them come down and assist me
22  at the scene; and also, to contact the Medical Examiner
23  and the Prosecuting Attorney's office.

24       Q        After you made this phone call, where

Williams - Direct                                         431

1    did you go?

2         A          I went back over to **Mr.** Reggettz where

3    I told him to **sit.**  He was still sitting there.  And at

4    that point, I said, "I want you to show me exactly what

5    you found."  And he did.

6         Q          How did he show you that?

7         A          He said he went up on the front porch

8    when he came home from work.  He stated that he was

9    supposed to meet his family out on Route 60, but they

10   weren't there when he got home.  They was going to go to

11   K-Mart and buy a watch that he saw in a K-Mart ad.  He

12   was going to buy it for Christmas.

13        He said he walked up to the front door.  He

14   showed me that he walked up on the front porch and the

15   door was locked.  He knocked on the door and no one

16   answered.  Then he went around back and pushed the back

17   door open, and he noticed his wife's legs sticking out

18   into the TV room and he knew something was wrong.

19        He showed me that he walked over to his wife and

20   found his wife partially tied up to the door between the

21   TV room and the back bed room, with a cord wrapped around

22   her neck, and one of the cords was going through the hole

23   in the door -- a hole where the door knob should be.

24        Q          Did he indicate that a door knob had

Williams – Direct                                        432

1    been taken out of the door?

2            A          No.

3            Q          It just hadn´t been there for some
4    time?

5            A          He didn´t indicate one way or the
6    other.   There was no door knob on the door.

7            He then stated -- or he showed me that he took
8    her down, loosened the cords from around her neck, and
9    then he started to look for his little girl.

10           He stated that -- he showed me how he found his
11   little girl hanging on the door between the living room
12   and the front bed room with a cord wrapped around her
13   neck.   She was hanging on the door, and the door was
14   shut.   She was hanging facing the Christmas tree.

15           He showed me that he took his little girl down
16   and laid her on the bed in the front bed room.   He then
17   showed me -- he started looking for his little boy and
18   found him lying in the bath tub, face down, with his
19   hands tied behind him with a cord wrapped around his
20   neck, with the cord going down around his wrists behind
21   his back.

22           He stated that the bath tub was about half full
23   of water.   He took him out and laid him on the bed in the
24   back bed room, and the took the cords off his right wrist

Williams - Direct                                      433

1   and around his neck.

2          And at that point, we went back outside.   I took

3   him back outside.

4          Q         Why did you go back outside, Trooper

5   Williams?

6          A         Well, I didn't want to disturb anything

7   further at the crime scene.   I just wanted to observe

8   everything at the crime scene so the lab people could get

9   down there and do their jobs.

10         Q         How would you describe his demeanor at

11  this point?

12         A         Well, he seemed a little nervous to me,

13  but he had a -- sort of a blank look on his face.   I

14  can't explain it.   He just had sort of a blank look.

15         Q         Did he show any emotion?

16         A         No.

17         Q         Did he at any time indicate that

18  afternoon that he had killed his family?

19         A         No.

20         Q         Once you got outside, did other Police

21  Officers start arriving?

22         A         Yes.

23         Q         Do you remember who they were?

24         A         The first two that arrived was Dave

Williams - Direct                                434

1    Williams and Trooper Woodyard.

2          Q          And what was done with Mr. Reggettz at

3    that point?

4          A          I placed him in the back seat of my

5    cruiser.

6          Q          For what purpose?

7          A          I just wanted to get him away from the

8    scene itself.

9          Q          Where was he taken -- do you know?

10         A          Later, he was taken to our office in

11   South Charleston at the detachment.

12         Q          You stated that Trooper Williams and

13   Sergeant Woodyard were there.  Did any one else arrive?

14         A          Yes.     Corporal   Shumate   from   the

15   fingerprint lab arrived and Sergeant Fulks from the photo

16   lab,  Zain  from  serology,  Chuck  Pettry  from  the

17   Prosecutor's office, and the Medical Examiner arrived.

18         Q          And Dr. Sopher?

19         A          Yes.

20         Q          And when you asked Paul Reggettz to

21   show you exactly what he found, when you came back across

22   the street from making the phone call, which door did he

23   go in?

24         A          We went in the back door.

Williams - Direct                                                   435

1        Q         That's how he told you he found them?

2        A         Yes.

3        MR. REVERCOMB:  Your Honor, I'd ask that the

4    witness be allowed to step down ---

5        THE COURT:  That's fine.

6        MR. REVERCOMB:  -- and that the lights be dimmed.

7        THE COURT:  Sure.

8        MR. REVERCOMB:  (To the Jurors)  Can you all see

9    the screen?

10       JURORS:  Yes.

11   BY MR. REVERCOMB:

12       Q         Trooper Williams, if you will, describe

13   the outside of the house as you found it that day.

14       A         Well, when I came down Fourth Street to

15   the intersection of Chesapeake Avenue, there was a white

16   frame house that had red trim, and a thick, grassy area

17   in the front, and a driveway.  There was a house on both

18   sides of this residence.  There was also a driveway, a

19   rock driveway.

20       Q         I'm going to now show you a slide that

21   corresponds with a photograph that's been marked State's

22   Exhibit No. 1, and ask you to examine this.

23       A         This is a photograph of the outside of

24   the Reggettz home.

Williams – Direct                                          436

1      Q          From what direction?

2      A          This was taken from the direction of

3   Chesapeake Avenue.

4      Q          Is that the front or rear of the house?

5      A          That's the front, the front left side.

6      Q          Does that slide accurately depict what

7   it looked like at that time?

8      A          Yes.

9      Q          Now, I'll show you a slide which

10  corresponds with State's Exhibit No. 3.

11     A          This is a rear portion of the Reggettz

12  home with the railroad tracks behind a wooden house.

13     Q          Does that slide accurately depict what

14  the scene looked like on December 13th?

15     A          Yes.

16     Q          Do you know who took the photographs?

17     A          Yes.

18     Q          Who?

19     A          Sergeant Fulks of the photo lab.

20     Q          I'll now show you a slide that

21  corresponds to a photograph marked State's Exhibit 4.

22     A          This is a closeup photo of the rear of

23  the Reggettz home.  The back door and the porch.  You can

24  see one of the houses next door.

Williams - Direct                                            437

1        Q        Trooper, do you have a pointer there?

2        A        Yes.

3        Q        You might want to use your pointer.
4    I'll now show you a slide that corresponds with what's
5    been marked State's Exhibit 5.

6        A        This is a closeup view of the rear door
7    of the Reggettz home.  It shows the handle here.  Right
8    here is what appears to be blood on the door, on the
9    outside of the door.

10       Q        I know it's hard to see, but does the
11   photograph show it better?

12       A        Yes, the photograph shows it better.

13       Q        Is there any other blood in this slide?

14       A        There  is  some  blood  right  here
15   (Indicating), above the handle.

16       Q        Does that accurately depict what that
17   door looked like on December 13, 1979?

18       A        Yes.

19       Q        And now, I'll show you a slide which
20   has been marked State Exhibit 12.

21       A        This is a photo taken outside of the
22   Reggettz home, showing the front yard area.  This is that
23   grassy area here.  This is Fourth Street that runs down
24   Route 60, and this road that runs this way is Chesapeake

Williams – Direct                                           438

1    Avenue.

2         Q        Does that slide accurately depict what

3    the scene looked like on that date?

4         A        Yes.

5         Q        And those are State Police cruisers?

6         A        Yes.

7         Q        Describe  the  condition  of  the  yard

8    there.

9         A        Well, this is a thick, grassy area here

10   (Indicating).  It was wet because it had been raining on

11   and off, but there was no mud in this area here at all.

12        Q        Was  there  mud  found  on  any  of  the

13   grassy areas around?

14        A        No.

15        Q        Now, I'll show you a slide which has

16   been marked State's Exhibit No. 5.

17        A        This is another photo of the rear of

18   the Reggettz home.  It shows the backyard area.  It's

19   also a thick, grassy area, a house next door, and this

20   is a driveway between the houses.

21        Q        Does that accurately depict what you

22   found at the scene?

23        A        Yes.

24        Q        Does this slide -- what corresponds

Williams - Direct                                           439

1    with State's Exhibit 86?

2         A        This is another photo of the front

3    portion of the Reggettz home, showing the front porch and

4    the grassy area and the driveway, which has rock and

5    brick, and it does have some mud in it.

6         Q        Then, you did see some mud in the

7    driveway area?

8         A        Yes.

9         Q        I'll show you now a slide that

10   corresponds with what's been marked as State's Exhibit

11   87.

12        A        This shows another house next door on

13   the other side of the Reggettz home. This house here is

14   abandoned. No one lives in it. It shows the grassy area

15   and this is the Reggettz house right here (Indicating).

16        Q        Is it your testimony that no one was

17   living in that house at the time?

18        A        That's correct.

19        Q        Now, I'll show you a slide that

20   corresponds with what's been marked -- a photograph

21   that's been marked as State's Exhibit 88.

22        A        This is another photo of the Reggettz

23   home. It shows an overall view of the front yard, the

24   front porch of the Reggettz home.

Williams – Direct                                          440

1          Q          Does this slide accurately depict what

2     the place looked like on December 13, 1979?

3          A          Yes.

4          Q          Now,  I'll  show  you  a  slide  that

5     corresponds with what's been marked as State's Exhibit

6     89.

7          A          This is the rear yard of the Reggettz

8     home, showing a junked car here at the railroad tracks

9     at the back of the house.

10         Q          When was this photograph taken?

11         A          December 13, 1979.

12         Q          The condition of the railroad and the

13    bank leading up to the railroad tracks, is there mud

14    there?

15         A          No, this area along the railroad tracks

16    is rocked and cinders.

17         Q          Now, tell us what you found in the

18    kitchen, Trooper Williams.

19         A          I went through the rear door, and lying

20    on the floor as you enter the kitchen, was a sheet that

21    had some spoons on it.

22         The curtain on the rear door was partially torn

23    down.   There was what appeared to be blood on the

24    curtain.

Williams – Direct                                    441

1          Also, on the sink, there was what appeared to be

2     blood on the sink.  And on the outside of the utensil

3     drawer was what appeared to be blood on it.

4          Q          I'll  now  **show**  you  a  slide  that

5     corresponds with what has been marked as State's Exhibit

6     50 -- a photograph that has been marked as State's

7     Exhibit 50.

8          A          This is a photo of part of the kitchen,

9     which shows the sink.  This is the utensil drawer over

10    here.  And there was blood -- well, what appears to be

11    blood right here, on the utensil drawer and right here

12    on the sink.  Those show up better in the photo.

13         Q          Can you describe some of the objects

14    you see?

15         A          Dishes in the sink, dishes setting on

16    the stove, you've got a pan here and a coffee pot, a

17    percolator, right here.

18         Q          Does that slide accurately depict what

19    you found at the scene?

20         A          Yes.

21         Q          Now,  I'll  show  you  a  slide  that

22    corresponds with State's Exhibit 47.

23         A          Okay.  This is another photo of the

24    kitchen area.  This is what we saw when we walked into

Williams - Direct                                    442

1     the back door.  This is the sheet, and there are the

2     spoons on the sheet.  The refrigerator and the hot water

3     tank.

4           Q          Is  this  an  opposite  view  of  the

5     previous exhibit?

6           A          Yes.

7           Q          Now, I´ll show you what has been marked

8     as State´s Exhibit 57, or a slide that corresponds with

9     what´s been marked as State´s Exhibit 57.

10          A          This photo was taken from the TV room

11    into the kitchen.  This is the back door here.  This is

12    the curtain that I was speaking of, it´s partially torn

13    down.  Right here is what appears to be blood on the

14    curtain.  And here is the sheet with the spoons on it.

15    And the trash can right there.

16          Q          Does that accurately depict what you

17    found at the scene that day?

18          A          Yes.

19          Q          Now, I´ll show you a slide that´s been

20    marked State´s Exhibit 63.

21          A          This is a closeup of the curtain on the

22    back door.  You can see the curtain partially torn down

23    here.  Right here, you can see what appears to be blood

24    here on the curtain.

Williams – Direct                                    443

1       You can see part of the door latch, the bolt,

2   right here.

3       Q       Is there any other blood or what

4   appears to be blood on there?

5       A       There is what appears to be blood here

6   and here and here.

7       Q       And does this slide accurately depict

8   what that curtain looked like on December 13, 1979?

9       A       Yes.

10      Q       That lock you described, did you test

11  that lock or have that lock analyzed in any way?

12      A       We have a photograph, but we didn't

13  test it.

14      Q       This is the photograph?

15      A       Yes.  I believe there is another one,

16  too.

17      Q       Is there a photograph of the door

18  facing itself?

19      A       Yes.  The door facing up here at the

20  lock is partially torn.

21      Q       My question is, did you view the

22  photographs on the actual inside of the actual inside of

23  the door facing?

24      A       Yes.  There are photographs of the door

Williams - Direct                                    444

1    facing.

2           Q        Is that the only lock on the door, the

3    one you described?

4           A        Yes.

5           Q        What is the condition of the slide bar

6    there appear to be?

7           A        It's engaged in the lock position.

8           Q        Even it that door is not shut?

9           A        No.

10          Q        Now, I'll show you what has been marked

11   for identification purposes as State's Exhibit 46.

12          A        This is a closeup view of the scene in

13   the kitchen.  We've got what appears to be blood here and

14   here, and you can see the dishes inside the sink.

15          Q        Does that accurately depict what it

16   looked like on that date?

17          A        Yes.

18          Q        Now, I'll show you a slide that

19   corresponds with State's Exhibit 51.

20          A        This is another closeup view.  This is

21   the sink, this is the utensil drawer right here.  You've

22   got what appears to be blood on the outside of the

23   utensil drawer, and on a can of food down under the

24   cabinet.

Williams - Direct                                            445

1      Q        Does this slide accurately depict the
2   scene of the crime?

3      A        Yes.

4      Q        Now, I'll show you a slide that
5   corresponds to a photograph that has been marked as
6   State's Exhibit 48.

7      A        This is a closeup view of the trash can
8   in the kitchen. It shows a fish box, a cereal box. This
9   right here is coffee grounds.

10     Q        Now, Trooper Williams, would you tell
11  us what you found in the TV room?

12     A        Upon entering the TV room, I saw the
13  legs of a white female sticking out into the TV room.
14  There was also a knife handle on the floor of the TV
15  room. There was a chair with a green lantern in it. A
16  couch, a TV, a bar with two stools.

17     Q        Could you show us on this diagram where
18  the TV room is located?

19     A        This is the TV room right here,
20  (Indicating) this area right here.

21     Q        That's between the kitchen and the
22  living room?

23     A        Yes.

24     Q        Right next to the back bedroom?

Williams - Direct                                      446

1          A        Yes.

2          Q        Where is the back door in the kitchen?

3          A        This is the back door right here.  This

4    is the kitchen.  You come in the back door, you would be

5    in the kitchen as soon as you enter the back door.

6          THE COURT:  Can you all see the diagram?

7          THE JURORS:  Yes.

8    BY MR. REVERCOMB:

9          Q        Now, I'll show you a slide that

10   corresponds with a photo marked  State's Exhibit 65.

11         A        This is a photo taken from the kitchen

12   into the TV room.  You can see the knife handle right

13   here.  The woman's legs right here.  Her body was into

14   the back bed room.

15         Q        This is a view you see upon entering

16   the back door?

17         A        Yes.

18         Q        That's what you found upon entering the

19   back door?

20         A        Yes.

21         Q        I'll now show you a slide that

22   corresponds with what has been marked as State's Exhibit

23   21.

24         A        That is a photo of the TV room.  You

Williams - Direct                                    447

1   see the TV here, the couch here, a newspaper laying right

2   here on the couch.

3          Q        Where is the doorway next to the TV

4   room?

5          A        There is a doorway that goes into the

6   living room.

7          Q        So, the TV is in front of the wall

8   separating the TV room and the living room?

9          A        Yes.

10         Q        Now, I´ll show you what has been marked

11  -- a slide corresponding with what has been marked

12  State´s Exhibit 49.

13         A        This is a different view of the TV

14  room.  This, back here, is the kitchen.  This doorway

15  goes to the kitchen.  You´ve got a chair with a green

16  lantern sitting in the chair.  You´ve got two coffee cups

17  sitting here on the table and an ash tray.

18         Q        Does that accurately depict what you

19  found at the scene?

20         A        Yes.

21         Q        Now, I´ll show you a slide that

22  corresponds with what has been marked as State´s Exhibit

23  58.

24         A        This is another view of the TV room.

Williams - Direct                                        448

1    It shows the couch here.  This is a K-Mart ad laying on

2    the couch.

3         Q         I'll now show you a slide which

4    corresponds to a photograph marked as State's Exhibit 84.

5         A         This is a different view of the TV

6    room.  It shows the couch with the K-Mart ad, a piece of

7    a newspaper right here in the floor.

8         Q         I'll now show you a slide that

9    corresponds with State's Exhibit 81 in the photograph.

10        A         This is the bar I was speaking of with

11   two stools.  You can see the chair with the green lantern

12   in the chair.

13        Q         Does that accurately depict what the

14   bar looked like at the time you found it?

15        A         Yes.

16        Q         Now, I'll show you what's been marked

17   as a slide corresponding with what's been marked as

18   State's Exhibit 38.

19        A         This is a photo taken from the TV room.

20   This goes into the back bed room.  You can see the female

21   lying here in the floor, and you can see the cords going

22   up to the door.

23             Also, there was a piece of cord lying right here

24   at her foot.

Williams - Direct                                                    449

1        Q        Did you learn the identity of this
2    female?

3        A        Yes.

4        Q        What was her name?

5        A        Vanessa Reggettz.

6        Q        Now, if you will, tell us what you
7    found in the back bed room.

8        A        Upon entering the back bed room, I
9    found Vanessa Reggettz lying in the floor.  She had two
10   cords going around her neck, one of the cords going up
11   through the hole where the door knob should be.

12       There was what appeared to be a lot of blood on
13   her gown, and about her face.

14       Also, there was a young, white male lying on the
15   bed in the back bed room.

16       Q        Did you learn his name?

17       A        Yes.

18       Q        Who was that?

19       A        Paul Eric Reggettz.

20       Q        Did you learn how old he was?

21       A        Yes.

22       Q        How old was he?

23       A        7.

24       Q        What else did you find in the back bed

1   room?

2          A          Vanessa -- besides the cord going

3   around her neck, she also had a pair of scissors stuck

4   in her chest.

5          Paul Eric -- his pajamas were wet.  His hair was

6   wet.  And the bed was wet around him.  He also had a

7   white cord lying down beside his right lower leg.

8          There was a large amount of what appeared to be

9   blood on the floor, with pieces of a broken knife in the

10  blood.   There was pieces of a gun butt lying on the

11  floor.

12         Q          Pieces of a broken gun butt?

13         A          Yes, part of the grip of a gun.

14         Q          What was the overall condition of the

15  room?

16         A          It was a mess.

17         Q          And this white cord that you testified

18  as being lying on the bed beside Paul Eric's leg -- were

19  you able to determine where that cord came from?

20         A          Yes.

21         Q          Where was that?

22         A          It came from a clock radio that was on

23  the floor at the foot of the bed.

24         Q          Was it still attached to the clock