**MOSS v. BALLARD
CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 20
(CONTINUATION, pp. 751 - 900)**

Reggettz - Cross                                        751

1    back and crossed the child's wrists and pulled the cord

2    tight around his hands; do you recall that, sir?

3           A        Yes, sir.

4           Q        And yet you carried the child into the

5    bathroom and placed him face down in the remains of bath

6    water that was still standing in the tub; did you tell

7    them that?

8           A        I remember telling them that I carried

9    him into the bathroom.

10          Q        Do you remember making that statement?

11          A        No, I was just telling you what I

12   remembered that I told them -- that I picked him up and

13   put him into the bathtub.  I don't remember anything

14   about the water.

15          Q        Do  you  remember  telling  Trooper

16   Woodyard that your son said, "Don't, daddy; don't,

17   daddy"?

18          A        Yes, I told him that.

19          Q        And you stated after putting your son

20   in the tub, you returned to the bedroom where you saw

21   your daughter at her mother's side, and you said the

22   little girl was pushing at her mother saying, "Get up,

23   mommy.  Wake up."

24          Do you remember saying that, sir?

Reggettz - Cross                                               752

1          A          I told them that.

2          Q          And you then grabbed the child around

3    the waist with one hand and carried her into the front

4    bedroom; do you recall that?

5          A          No, I don't.

6          Q          Then you grabbed an electrical cord and

7    wrapped it around the child's neck and pulled it tight

8    until she stopped moving.

9          Do you recall that?

10         A          I remember saying something like that.

11         Q          You tied that cord around her neck and

12   picked her up and looped the cord over top of the door

13   and let her body be against the door; do you remember

14   telling them that?

15         A          Yes, I told them that.

16         Q          And you walked into the back bedroom

17   where your wife's body was and you became afraid she

18   might still be alive and you went into the bathroom and

19   found a pair of scissors; do you recall telling them

20   that?

21         A          Yes, sir.

22         Q          And you went to your wife's body and

23   knelt down, and using both hands, pushed the scissors

24   into her chest; do you recall that?

Reggettz - Cross                                              753

1        A        I remember but I thought I told them I

2   put the scissors in her in her bedroom; I don't remember

3   being in the front bedroom.  I thought I told them I put

4   the scissors in her in the back bedroom.

5        Q        Do    you    remember    telling    Trooper

6   Woodyard that you felt very tired?

7        A        Yes, sir.

8        Q        So, you laid down on the bed and went

9   to sleep?

10       A        Yes, I told them that.

11       Q        And you slept until 1:00 o'clock, and

12  then you got up and dressed for work; do you remember

13  that?

14       A        No, I don't remember that.

15       Q        You    watched    part    of    Baretta    on

16  television; do you remember that?

17       A        Yeah, I had watched Baretta.

18       Q        And you put the broken handgun on the

19  floor and took the rifle that you had in the house down

20  to the car; do you recall that?

21       A        Yes, sir.

22       Q        You said you thought you should get rid

23  of the rifle because you didn't want the Police to think

24  you might be a dangerous person; do you recall that?

Reggettz - Cross                                                    754

1          A          No, I don't.

2          Q          You returned to the house and pulled

3    down the sheet from the door in the kitchen and placed

4    it on the floor; do you recall that?

5          A          No, I don't.

6          Q          And you took some spoons and placed

7    them on the sheet, and you did this for the purpose of

8    making it appear that someone had broken into the house

9    in an attempt to steal; do you recall that?

10         A          I vaguely remember something about

11   that, but I don't remember it very well.

12         Q          And you said you felt -- by having your

13   family dead -- you felt that a heavy weight had been

14   taken off of you; do you recall that?

15         A          Yes.

16         Q          And you testified that ---

17         A          I testified -- I told them ---

18         Q          And you told Trooper Woodyard -- and I

19   quote, "I felt free"?

20         A          Yes, I told him that.

21         Q          You felt free to be relieved of no

22   longer having a responsibility; do you remember saying

23   that?

24         A          No, I don't.

Reggettz - Cross                                           755

1      Q          And you stated that while driving to
2   work, on the bridge on I-77, you threw the rifle into the
3   river; do you recall that?

4      A          No.  I just remember telling him that
5   I threw the rifle in the river at the first -- I don't
6   know exactly what bridge -- the first bridge that crosses
7   the Kanawha River.  I just said I threw the gun in the
8   river.

9      Q          And you said that the gun was thrown
10  out and that you could not remember where; do you
11  remember that?

12     A          No, I don't.

13     Q          And you further stated that while at
14  work you felt good, you started getting a little nervous
15  around quitting time; do you remember that?

16     A          Yeah, I told him that.

17     Q          And you stated that you parked your car
18  at the house and went in the back door and walked through
19  the house looking at the bodies, and you started to go
20  out the front door but decided to take your daughter's
21  body down; do you recall that?

22     A          No, I don't.

23     Q          You said you lifted the body off the
24  bedroom door and laid it on the bed; do you recall

Reggettz - Cross                                              756

1    telling them that?

2         A          No, I don't.

3         Q          You stated that you went out the front

4    door and ran down the driveway and out to Route 60.   Do

5    you recall telling him that?

6         A          I    remember    telling    him    that.

7    Originally, what happened ---

8         Q          This is December 13th you were telling

9    him that; do you remember that?

10        A          I remember telling the incident that

11   had happened the night before, that night and that

12   morning, when I come home.

13        Q          And that you went inside there and came

14   back out; do you recall that?

15        A          No, I don't.

16        Q          A few minutes later, you entered the

17   restaurant and laid a dollar on the counter and told the

18   Clerk to call the Police, that your family had been

19   killed.  You then left the restaurant and returned home.

20   Do you recall that?

21        A          I didn't say -- I told him -- what I

22   told him was, I throwed a dollar down and I said, "Call

23   the Police, somebody has murdered my wife," or, "killed

24   my wife."  I don't remember exactly the words.  Somebody

Reggettz - Cross                                         757

1    killed my wife.

2         Q         You further stated to Trooper Woodyard

3    on this occasion that upon re-entering the house, you

4    went into the bathroom, you lifted your son out of the

5    tub and carried him into the bedroom and laid him on the

6    bed; do you recall that?

7         A         I told him that when he had asked me

8    what I had found in the house, the day before.  I don't

9    remember telling him that in the confession.

10        Q         And then you said that you untied the

11   cords from around his hands; do you remember that?

12        A         No, I don't.

13        Q         Then, you then said you tried to get

14   the cords off of your wife's body but the Police arrived

15   at the scene; do you recall that?

16        A         No, I don't.

17        Q         You further stated that you wanted to

18   appear tore up?

19        A         I told him that.

20        Q         But when the Police arrived, you could

21   not force yourself to show those emotions because you

22   felt too relieved and free; do you recall that?

23        A         I remember the relief part.  I remember

24   saying that I couldn't force myself to do anything.

Reggettz - Cross                                        758

1          Q          You further told him the reason you

2    took your daughter from the door is your daughter liked

3    to swing, and you hung her up there so she could; do you

4    recall that?

5          A          Yes, I do.

6          Q          And your explanation for putting your

7    son in the tub was that the child liked to swim; do you

8    recall that?

9          A          Yes, sir.

10         Q          Now, sir, on the following day, you and

11   the Prosecuting Attorney, then James Roark, and others

12   went to the home?

13         A          Yeah.

14         Q          And at that home, you demonstrated what

15   happened; is that true?

16         A          It was what they call a walk-through.

17   I was supposed to show them what I had done.

18         Q          And you did a walk-through; is that

19   correct?

20         A          Yes.

21         Q          I'd like for you to show the jury the

22   first walk-through that you did by using the chart and

23   demonstrating just like you did -- I want you to walk

24   through, taking your wife from one room to another.

Reggettz - Cross                                        759

1          A          I don't remember all of it.  The only

2    thing I remember in the walk-through is that they told

3    me that she'd been carried from this room to this room

4    (Indicating), and dropped on the floor.

5          Q          Show us what you did then.

6          A          I acted like I picked her up and walked

7    through the doorway and dropped her in the floor

8    (Demonstrating).

9          Q          Thank you.

10          I'm handing the defendant State's Exhibit 158.

11   Would you identify that, sir?

12         A          It's a pair of scissors like we had

13   back at the house.

14         Q          And isn't that the same pair of

15   scissors that was found in your wife's chest?

16         A          As far as I know, yes.

17         Q          And on this occasion, did you

18   demonstrate for them how you used these scissors on your

19   wife?

20         A          Yeah.  They asked me to show them how

21   I pushed them down in her.

22         Q          And you showed it to them, then, didn't

23   you?

24         A          Yes, I did.  Now, I'm saying I did in

Reggettz - Cross                                           760

1    the fact that they said I did, and that's the only way

2    I remember it.

3           Q          I'm asking you if you showed them how

4    you placed these scissors in your wife's chest on that

5    day; is that a correct statement?

6           A          Yes, I did.

7           Q          Okay.  Now, you also demonstrated what

8    you did to your son, too; is that correct?

9           A          Yes, sir.  As far as I can remember, I

10   did.  I don't know for sure.  I'm not for sure.  The

11   thing that sticks out in my mind more than anything else

12   that happened in that house was my wife.

13          Q          You don't remember the demonstration

14   that you did for your son?

15          A          I think I told them I picked him up off

16   the floor and laid him in the bathtub.

17          Q          You don't remember telling the State

18   that you grabbed your son around the neck as he attempted

19   to run?

20          A          Yeah, I told them that.

21          Q          You don't remember that you threw the

22   child face down on the floor and held him there by

23   placing your knee on his buttocks?

24          A          I told them that.

Reggettz - Cross                                                761

1          Q          Okay.  And then, you do not remember

2    demonstrating this?

3          A          No, I don't.  I just remember picking

4    him up out of the bathtub.  I'm not sure that I showed

5    them how I put him in the bathtub.  All I remember is

6    taking him out of the bathtub and letting him drain a

7    little bit.  That's what I remember about my little boy.

8          Q          And what do you remember about your

9    daughter that you demonstrated?

10         A          They asked me to show them how I hung

11   her on the door, and I took the cords and like, pushed

12   them up over the door like this (Indicating), and pushed

13   the door to.

14         Q          Which door?

15         A          The front bedroom.

16         Q          Now, sir, I'd like for you to

17   demonstrate for the jury how you showed them that you

18   used those scissors on your wife.

19         A          I told them -- he said I pushed them in

20   her chest and I went like this (Indicating).

21         Q          Some of the jurors couldn't see.  Would

22   you move further out here, sir?

23         A          (Indicating again).

24         MR. BICKLEY:  No further questions.

Reggettz - Cross                                          762

1

2                        REDIRECT EXAMINATION

3

4      BY MS. LUSK:

5

6            Q        You said when you lived at the Gene's
7      Motel, it was forty-five dollars a week?

8            A        Yeah.  I think they charged me forty-
9      five dollars a week.

10           Q        Was it more expensive than that when
11     you moved into the house?

12           A        No.  I think she said we could have it
13     for seventy-five a month.

14           Q        So, it was cheaper for you to live in
15     the house than in the motel?

16           A        Oh, yes.

17           Q        Do you remember having an argument with
18     Vanessa about a color television?

19           A        No, I don't.

20           Q        When Mr. Bickley asked you if you had
21     any of the things you wanted, he mentioned the fact that
22     you wanted a watch for Christmas.

23           A        Yes, I did.

24           Q        How much did that watch cost?

Reggettz – Redirect                                        763

1       A       Eight dollars is what I remember; about

2   eight dollars.

3       Q       Who    was    the    presents    under    your

4   Christmas tree for?

5       A       All of us.  There was presents for each

6   one of us.

7       Q       Were there more for the rest of your

8   family members than for you?

9       A       To sit and think about what was under

10  there, I don´t know what all was under there, but most

11  of it was for them.

12      Q       Do you specifically recall saying that

13  you wished your wife was dead?

14      A       I´m sure I´ve told her that several

15  times.  When I was arguing or something, I would say --

16   what I told her was, "I wish somebody would kill you."

17  That´s what I remember telling her.  "I wish somebody

18  would kill you."

19      Q       What were the circumstances?

20      A       I don´t know.  We´s just arguing.

21      Q       Was it true?

22      A       No.  Lord, no.

23      Q       Did you mean it?

24      A       Not from my heart, no, I did not.

Reggettz - Redirect                                              764

1        Q          Did you mean it if you said you wished

2   your son wasn't born?

3        A          No, not really.

4        Q          Are you sure?

5        A          Positive.

6        Q          The things that Mr. Bickley went

7   through in the statement that you made down at South

8   Charleston -- when you said you killed your wife, did you

9   kill your wife, Mr. Reggettz?

10       A          No, I did not, ma'am.

11       Q          Did you kill Paul Eric?

12       A          No, I did not, ma'am.

13       Q          Did you kill Bernadette?

14       A          No, I did not, ma'am.

15       MS. LUSK:   That's all I have.

16

17                  RECROSS-EXAMINATION

18

19   BY MR. BICKLEY:

20

21       Q          I just have one statement or question

22   for you.

23       You stated that you didn't want your wife dead,

24   and do you recall after seeing her dead, you said, "I

Reggettz - Recross                                      765

1    felt free"?

2            A        Yes, sir.

3            MR. BICKLEY:  No further questions.

4

5                    RE-REDIRECT EXAMINATION

6

7    BY MS. LUSK:

8

9            Q        And then, what did you feel?

10           A        I felt like I'd died.  Let me clarify

11   that.  He said I said it up there.  I'm not saying I

12   didn't.  What I told you was, I felt that as I come out

13   on the porch, all of the responsibility came off of me,

14   then I said I felt like I died.  I did say I felt like

15   I was free because the responsibility had been taken off

16   of me.  But then I felt like I'd died.

17           Q        You felt like you had died?

18           A        Yes, ma'am.

19

20                    RE-RECROSS EXAMINATION

21

22   BY MR. BICKLEY:

23

24           Q        Mr. Reggettz ---

Reggettz - Re-recross                                          766

1          A          That's what I said, but I told him,

2    yes, I felt like the responsibility had been taken off

3    of me.

4          Q          And you felt free?

5          A          That's what I said.

6          MR. BICKLEY:  That's all I have.

7          MS. LUSK:  That's all we have, Judge.

8          THE COURT:  Thank you, Mr. Reggettz, you may step

9    down.

10         May he be excused?

11         MR. BICKLEY:  Yes, sir.

12         THE COURT:  Might he be subject to recall?

13         MR. BICKLEY:  Not by me.

14         MS. LUSK:  I don't think so.

15         THE COURT:  You want to call your next witness,

16   please?

17         MS. LUSK:  Judge, this might be a good time to

18   take a break.

19         THE COURT:  Folks, we're going to recess early

20   for lunch now.  We're also going to start back early

21   after lunch.  So, if you would come back at quarter after

22   one, we'll start the trial back up at that time.

23

24         WHEREUPON, the Court stood in the noon recess in

767

1    the hearing of this case.

2

3         (Back on the Record)

4

5         THE COURT:  While we're waiting briefly, I'd like

6    to ask if anyone in the Courtroom is a witness, I'd like

7    to ask you to step out of the Courtroom.  The spectators

8    are free to stay.

9         MR. REVERCOMB:  Your Honor, the State would call

10   Sergeant Custer.

11

12        WHEREUPON, Sergeant Robert R. Custer was duly

13   sworn, and upon his oath deposed as follows:

14

15                    DIRECT EXAMINATION

16

17   BY MR. REVERCOMB:

18

19        Q         Would you please state your name, sir?

20        A         I'm Sergeant Robert R. Custer.

21        Q         Where are you employed?

22        A         I'm employed at the State Police

23   Detachment in Glasgow, by the West Virginia State Police.

24        Q         What is your rank there?

Custer - Direct                                              768

1          A          I'm Sergeant and Detachment Commander

2     of the Glasgow Detachment.

3          Q          How long have you been a State Trooper?

4          A          Approximately twenty years.

5          Q          And have you ever been a detective,

6     especially within the Department of Public Safety?

7          A          Yes, the first fourteen years of my

8     service with the Department, I was involved in scuba

9     diving, and I presently have two Instructor's

10    Certifications, and one MCA in padding organizations.

11         Q          What is padding organizations?

12         A          A professional organization of diving

13    instructors.

14         Q          Are you authorized to certify diving?

15         A          Yes.

16         Q          You actually teach it?

17         A          Yes, I have.

18         Q          You've conducted dives for the

19    Department of Public Safety?

20         A          Yes, I have.

21         Q          How many would you say you've conducted

22    during the years you have been a State Trooper?

23         A          In excess of a hundred.

24         Q          Do you also dive for pleasure?

Custer - Direct                                                           769

1          A          Yes.

2          Q      .      What do you dive for when you dive for

3     the Department of Public Safety?

4          A          We call it search and recovery diving.

5     We dive for evidence, and by evidence it is usually

6     weapons, stolen articles, vehicles, bodies.

7          Q          And how do you prepare for a dive?

8          A          We first check, of course, the

9     location, and the water conditions at the time of the

10    year, and the weather.  We also see if there were any

11    witnesses who may have seen something being thrown into

12    the water, and also the safety factors involved in the

13    dive.

14         Q          Once you've decided that it's a safe

15    dive, could you describe some of the techniques you use?

16         A          Depending on the area that we're going

17    to search, if it's from the bank, we use what we call a

18    pendulum pattern, with a rope.

19          If it's in the middle of the body of water, we

20    usually use what we call a circular pattern conducted in

21    a three hundred sixty degree circular pattern with a

22    rope, under water.

23         Q          Could you explain in more detail the

24    pendulum pattern?

Custer - Direct                                              770

1          A          It normally begins from the bank where
2     a person who would know what they are doing or are
3     somewhat familiar with diving would hold a rope.  We'd
4     take about a hundred foot rope and put divers on the end
5     of that rope, depending on the water visibility, and
6     would swing back and forth, searching a given area.
7               We go to one end of the search, and we usually
8     come in about five or ten feet, then we'll go to the
9     other end and continue to come in until we are satisfied
10    that we've searched that area thoroughly.
11         Q          That's the pendulum search?
12         A          Right.
13         Q          What about the circular pattern search?
14         A          We'll go out and we'll anchor boats.
15    We'll secure the anchor at the bottom of the river or
16    lake, or whatever it may be.  We'll put a rope onto the
17    anchor rope and then we'll conduct a three hundred sixty
18    degree circular search.
19              These are usually made with a rope, depending on
20    our water visibility, how many guys we put on a rope.
21    We'll complete the circle, coming in about ten feet at
22    a time, then we'll leave the boat and make another
23    circular pattern.
24         Q          So, you go around and around, as divers

Custer - Direct                                          771

1    come in, three hundred sixty degrees, do another three

2    hundred sixty, come in, and then do another three hundred

3    sixty?

4         A         That's right.

5         Q         Sir, if the water is muddy or murky,

6    how do you do a search?

7         A         It's just really a hand search.  Divers

8    will get out at the end of the rope and go hand-to-hand

9    until we can feel our hands touch.  We'll hold one hand

10   on the rope and we'll take our other hand and move it

11   along the bottom of the water, and search with our hand.

12   We cannot see at all.

13        Q         I'd like to call your attention to

14   December 13, 1979.  Did you conduct a search here in

15   Charleston?

16        A         Yes, we did.

17        Q         Which bridge was that?

18        A         It was the Virginia Street bridge, it's

19   called, from the I-64 span, from the Oakwood to the

20   Virginia Street exit.

21        Q         Do you own any rifles, yourself?

22        A         Yes, I do.

23        Q         Do you have a .22 caliber rifle?

24        A         Yes, I do.

Custer - Direct                                              772

1       Q        You are familiar with that type of
2    rifle?

3       A        Yes, I am.

4       Q        How much would a .22 rifle weigh?

5       A        About five or six pounds.

6       Q        Going back to this dive you conducted,
7    was that dive in December of '79, some time after
8    December 13th?

9       A        Yes, it was.

10      Q        What were you searching for?

11      A        We were searching for a rifle.

12      Q        A .22 rifle?

13      A        Yes.

14      Q        How many divers or how many people were
15   involved in that search?

16      A        Counting the people in the boats that
17   were assisting us, I would say about fourteen or fifteen.

18      Q        How many divers were down in the water?

19      A        We had about ten divers in the water.

20      Q        How long did the dive last that first
21   day?

22      A        It lasted almost eight hours.

23      Q        Did each of those ten divers stay in
24   the water that long?

Custer - Direct                                                          773

1          A          Yes, they were.

2          Q          How many divers did you have the second

3     day?

4          A          There were just three of us.

5          Q          How long did it last that second day?

6          A          About eight hours.

7          Q          The divers, again, were under water for

8     at least that long?

9          A          Yes.

10         Q          Could you tell us a little bit about

11    the Kanawha River area, or the Kanawha River in that

12    area?  What it looks like down there?

13         A          The area of the channel, where the

14    normal boat traffic or the barges that you seen going

15    down the river, travel, is about ten to fifteen feet in

16    depth in normal water conditions.

17         It's a hard, course, sandy bottom with very

18    little debris on the bottom of the river.

19         Q          It's not littered like one would think?

20         A          No, it isn't.

21         Q          Why is that?

22         A          The barges and the normal current will

23    have a tendency to wash the things like pop cans and

24    other litter to the sides.

Custer - Direct                                                774

1        Q          Depending on the weight?

2        A          Right.

3        Q          You say that bottom is hard or soft?

4        A          It is soft.

5        Q          Where does the channel begin in
6   relation to the bank?

7        A          Normally, from the bank, if you walk
8   out from the bank into the river, it will drop off
9   sharply at about ten feet.

10       Q          It drops off into the channel there?

11       A          Yes, it does.

12       Q          I want to recall your attention to the
13  days you dove back in '79, looking for this rifle, and
14  I would ask you to describe the water on those two days.

15       A          I remember it very well, because from
16  diving into the river -- all of the diving I have done,
17  the water conditions usually aren't that good.   These
18  particular days were bright, sunny days.

19       The water was in real good shape and had about
20  four or five feet visibility, which is about as good as
21  you can have in the river out here.

22       Q          Had you ever seen the river conditions
23  in the Kanawha River better than that?

24       A          No, I haven't.

Custer - Direct                                                775

1        Q          Before you worked at the Department of

2    Public Safety, where did you live?

3        A          I grew up in the Belle area, along the

4    Kanawha River.

5        Q          You're very familiar with the Kanawha

6    River?

7        A          Yes.  I've been swimming in the river

8    since I've probably been about six years old.

9        Q          How long have you been a diver?

10       A          Now, it's been about nineteen years.

11       Q          You've been diving in the Kanawha River

12   since that time?

13       A          Yes, I have.

14       Q          Did you use any lighting equipment that

15   day?

16       A          No, we didn't need any lights.  It was

17   a bright, sunny day.  We wouldn't have needed lights.

18       Q          Who told you where to dive for this

19   gun?

20       A          I believe Trooper Smith who was

21   stationed at that time at the South Charleston

22   Detachment.

23       Q          Did you know Paul Reggettz at that

24   time?

Custer - Direct                                          776

1          A          I know of him, but I didn't know him

2     personally.

3          Q          Was he there to tell you where to dive?

4          A          No, he wasn't.

5          Q          What areas did your search cover?

6          A          We began in the middle of the river

7     under the channel, near the Virginia Street and the I-64

8     bridge, and we covered several hundred yards in a north-

9     south, east-west direction from that area there in the

10    middle of the river.

11         Q          A hundred yards upstream from the

12    bridge, and downstream?

13         A          Yes.

14         Q          When you teach dive recovery and

15    search, do you drop things in the water?

16         A          Yes, I do.

17         Q          Why -- for what purpose?

18         A          To show if it will float, and also to

19    show how things sink to the bottom, and if they move very

20    much from where they're thrown in, if they have a

21    tendency to sink fast, or whether they just lay on the

22    bottom once you've thrown the object in.

23         Q          The conditions observed on those days

24    in 1979, how far would you expect a .22 rifle to move?

1          A          Only a matter of feet.

2          Q          What is that?

3          A          Because it weighs about five or six

4     pounds and it would go directly to the bottom.

5          Q          If it had rained one day before this

6     search, how does that affect it?

7          A          If it would have rained heavily, after

8     all of the tributaries or the hollows would empty into

9     the muddy water to it, it would, of course, be real bad

10    water conditions.  But it hadn't rained that day.  I

11    believe we might have had some light rain, but nothing

12    at all that would have affected the water at that time.

13         Q          Did you find a rifle that day?

14         A          We did not.

15         Q          Either day?

16         A          We did not.

17         Q          Can you describe the banks' condition?

18         A          They were soft and muddy and kind of

19    slick.

20         Q          How far did this extend into the riv'

21         A          Just a matter of feet, ther

22    off real sharply into the channel.

23         Q          Would you nar

24    you've recovered in your searche

Custer - Direct                                          778

1          A          I've recovered money from bank

2     robberies; I've recovered pistols and rifles, vehicles,

3     bodies, all different kinds of evidence.

4          Q          What small objects have you recovered?

5          A          Probably the smallest thing that I've

6     recovered was a ring one time.

7          Q          Is it as easier to find a rifle than it

8     is a pistol?

9          A          Yes, it is.

10         Q          Why is that?

11         A          It's larger and heavier.

12         Q          The conditions you've described,

13    Sergeant Custer, that existed that day, those two days

14    in December -- if the rifle had been there, would you

15    have expected to find it?

16         A          Yes, I would.

17         Q          Have you ever had occasion to dive for

18    an object and later find that it wasn't there in the

19    first place?

20         A          Yes, I have.

21         MR. REVERCOMB:  That's all I have, your Honor.

22

23

24                    CROSS-EXAMINATION

Custer - Cross                                        779

1

2    BY MR. HUFFMAN:

3

4           Q          Sergeant Custer, what date did you make

5    this dive?

6           A          I believe it was about the 19th or 20th

7    of December.  It was just a few days before Christmas.

8           Q          Why didn't you dive before then?  Were

9    the river conditions such that you were unable to dive

10   before then?

11          A          We go when we receive information or a

12   request from these people asking us to dive.

13          Q          You've already testified on direct that

14   you didn't talk to Paul Reggettz; is that correct?

15          A          That's correct.

16          Q          He wasn't there to point out anything

17   to you?

18          A          Right, that's correct.

19          Q          If I understand your testimony on

20   direct, you went out in the Kanawha River, about a

21   hundred yards in each direction.  Did you start right

22   under the bridge?

23          A          No, we started back this way about a

24   hundred yards.

Custer - Cross                                              780

1        Q        Upriver from the bridge?

2        A        Right.

3        Q        If we were standing on the bridge when

4   you started, did you start upriver or downriver?

5        A        Back up toward the South Side bridge.

6        Q        You started from a hundred yards from

7   there?

8        A        From the middle of the river, we went

9   a hundred yards in each direction.

10       Q        Okay.  And you started how far from the

11  bridge into the channel did you start back upriver?

12       A        We started around the middle of the

13  river, from bank to bank, as you would from the middle

14  of the river.

15       Q        I understand where you started in

16  relation to both sides.  What I'm trying to determine is

17  where did you start your search in relation to the

18  bridge, how far upriver were you?

19       A        About a hundred yards.

20       Q        And then you went from there a hundred

21  yards back towards the bridge, and then another hundred

22  yards back upriver?

23       A        Yes.

24       Q        If there had been an object in the

Custer - Cross                                              781

1    river that was a hundred and twenty-five yards from where

2    you started, you wouldn't have found it; is that correct?

3           A       That's probably a logical assumption.

4           Q       And I assume you make dives in the

5    river and there are times when you don't find things; is

6    that not correct?

7           A       That's true.

8           Q       And because you don't find it, that

9    doesn't necessarily mean that it wasn't there to begin

10   with?

11          A       That's true.

12          MR. HUFFMAN:  I don't have any further questions.

13                                                  .

14                  REDIRECT EXAMINATION

15

16   BY MR. REVERCOMB:

17

18          Q       I want to clarify one question.  You

19   said a hundred yards on each side of the bridge?

20          A       Yes.

21          Q       And how far in each direction?

22          A       About a hundred yards.

23          MR. REVERCOMB:  I have no further questions.

24          THE COURT:  You may step down.

782

1          Would you call your next witness, please?

2          MR. REVERCOMB:   The State would call Sergeant R.

3    L. Presson.

4          JUROR NO. 2:   Your Honor, this vacuum over here

5    on the steps -- someone is going to fall over that.  They

6    keep stepping over it.

7          THE COURT:   Thanks.

8

9          WHEREUPON, Sergeant R. L. Presson was duly sworn,

10   and upon his oath deposed as follows:

11

12                    DIRECT EXAMINATION

13

14   BY MR. REVERCOMB:

15

16        Q         Would you please state your name, sir?

17        A         Robert L. Presson.

18        Q         Where are you currently employed?

19        A         By the Division of Highways, Weight

20   Enforcement Section.

21        Q         Prior to that, where were you employed?

22        A         With the Department of Public Safety of

23   the State of West Virginia.

24        Q         How long were you a State Trooper, sir?

Presson - Direct                                              783

1      A          Twenty-eight years.

2      Q          Were you still employed in October of

3  1980?

4      A          Yes, sir, I was.

5      Q          Where were you stationed at that time?

6      A          At the Parkersburg Detachment in Wood

7  County.

8      Q          In what capacity?

9      A          As a District Sergeant.

10     Q          What does a District Sergeant do?

11     A          He's in charge of the Troopers that are

12  assigned to that particular district.

13     Q          You had more duties than just the one

14  detachment?

15     A          Yes, sir.  The Wood County Detachment

16  covers Wirt County and Jackson County.

17     Q          You were the Trooper in charge of all

18  of those counties?

19     A          Yes, sir, I was.

20     Q          Now, I want to call your attention more

21  specifically to October 28th of 1980 at approximately

22  6:30 p.m. and ask you if you had occasion to see Troopers

23  Terry Williams and Mike Smith and a young man come in the

24  back of the detachment there?

Presson - Direct                                              784

1        A         Yes, sir, I did.

2        Q         Did you later learn the identity of the

3   young man who was with them?

4        A         Yes, sir.

5        Q         Who was that?

6        A         John Moss.

7        Q         Were you expecting them, Sergeant

8   Presson?

9        A         No, sir.

10       Q         And when did you know -- first know of

11  their presence?

12       A         When I saw them come down the hallway

13  there, in the back door of the barracks.

14       Q         At that time, was John Moss restrained

15  in any way?

16       A         Yes, sir, he was.

17       Q         How was that?

18       A         He had handcuffs on the front part of

19  his body.

20       Q         Would you describe his demeanor at that

21  time?

22       A         He appeared to be normal.

23       Q         Did there come a time when the

24  handcuffs were removed?

Presson - Direct                                          785

1        A        Yes, sir.

2        Q        When was that?

3        A        A short time after coming into the

4    barracks.

5        Q        His hands were free at that point?

6        A        Yes, sir.

7        Q        And after they brought him into the

8    barracks, what did Troopers Smith and Williams do?

9        A        They advised me that they wanted to use

10    the bathrooms there at our detachment, which they did.

11        Q        Where was John Moss when they went to

12    the restroom?

13        A        We had him in the office there at the

14    barracks.

15        Q        You say we -- who was in that office

16    with him?

17        A        Myself and John Moss.

18        Q        Anyone else?

19        A        No, sir.

20        Q        How long would you say you were with

21    him at that time?

22        A        Approximately four or five minutes.

23        Q        During that time, did you have any

24    conversation with him at all?

Presson - Direct                                          786

1      A        Yes, sir, I did.

2      Q        What about?

3      A        I asked John where he was from and he

4  said St. Albans. And I asked him if he knew a couple of

5  my friends that I went to college with that lived in the

6  St. Albans area and he said he did not.

7      Q        During the time you were alone with him

8  in the room, did he complain of any mistreatment at the

9  hands of the Troopers?

10     A        No, sir, he didn't.

11     Q        Did you notice anything unusual about

12 his appearance?

13     A        No, sir.

14     Q        Any bruises?

15     A        No, sir.

16     Q        Marks on his body?

17     A        No, sir.

18     Q        You did observe his physical

19 appearance?

20     A        Yes, sir, I did.

21     Q        And this office you and John Moss were

22 in, where in relation to the restroom was it?

23     A        Directly across the hall.

24     Q        And would you describe this office for

Presson - Direct                                                787

1    us?

2        A          It's a normal size office.  There's a

3    couple of desks in there and three or four chairs.  It's

4    more of a squad room for the Troopers to use.

5        Q          That's where they write their reports

6    and such?

7        A          Yes, sir.

8        Q          Is that your office?

9        A          No, sir, it's the Troopers' office.

10       Q          Did Mr. Moss, at the time you saw him,

11   appear to be in any pain or discomfort?

12       A          No, sir.

13       Q          When Terry -- or Troopers Williams and

14   Smith came back from the restroom, was Mr. Moss allowed

15   to use the restroom?

16       A          Yes, sir, he was.

17       Q          Did the Troopers ask you for any

18   supplies at that time?

19       A          Yes, sir.  They needed some legal pads.

20       Q          Are you familiar with DPS Form 79?

21       A          Sir?

22       Q          Are you familiar with what's called DPS

23   Form 79?

24       A          Yes, sir, I am.

Presson - Direct                                        788

1          Q          What is that?

2          A          That's the rights of the individual,

3    commonly called the Miranda Warning.

4          Q          Did you have some of those forms in

5    your office?

6          A          Yes, sir, I did.

7          Q          And they asked for them?

8          A          Yes, they did.

9          Q          What did Trooper Smith and Trooper

10   Williams -- did they ask for office space at that time?

11         A          Right.  They asked me if they could use

12   that office -- they needed to talk to John, and I told

13   them they could.

14         Q          And they went into that office with

15   John?

16         A          Yes.

17         Q          Where there any breaks taken when they

18   were in that office; do you know?

19         A          I believe a short time after they came

20   there, we had something to eat there in the office, some

21   sandwiches.

22         Q          Some sandwiches.  Do you know where

23   that food came from?

24         A          No, sir.  I sent one of the girls that

Presson -- Direct                                              789

1    works there in our office out to get sandwiches.

2        Q        And she brought food back?

3        A        Yes, sir, she did.

4        Q        Did you eat with them?

5        A        Yes, sir, I did.

6        Q        Did John Moss have food and drink?

7        A        Yes, sir.

8        Q        Did there come a time that you advised

9    John Moss of his rights?

10       A        Later in the evening.

11       Q        Do you recall what time that was?

12       A        Shortly after 9:00 o'clock, I believe.

13       Q        Prior to that, had Trooper Williams and

14   Trooper Smith asked for any further supplies?

15       A        They needed a blank tape.

16       Q        For what purpose?

17       A        I guess, during the interview of John

18   Moss they wanted to tape the conversation.

19       Q        Were you able to find a blank tape?

20       A        No, sir.

21       Q        What kind of tape did you end up

22   finding?

23       A        One that had partially been used.

24       Q        And prior to the taking of that

Presson - Direct                                                    790

1    statement from Mr. Moss, who read him his rights?

2         A         I did.

3         Q         Sergeant Presson, I'm going to show you

4    what has been marked for identification purposes as

5    State's Exhibit 93.  I'd ask you to examine that.

6         Can you tell us what that is?

7         A         It's a Rights Form.

8         Q         Is that the Rights Form that you read

9    John Moss his rights from that evening?

10        A         Yes, sir, it is.

11        Q         And how do you know that?

12        A         It has my signature at the bottom of

13   the form, there, plus my initials.

14        Q         What is the time and date on that form?

15        A         At the time on the form, you have the

16   time of 9:22 p.m., Eastern Standard Time.

17        Q         What about the date?

18        A         And the date is October 28.

19        Q         Now, would you read those rights to the

20   jury and the Court here today as you read them to John

21   Moss back in October of 1980?

22        A         All right.  On the Rights Form it says:

23        "Before we ask you any questions, you must

24   understand your rights.  You have the right to remain

Presson - Direct                                                791

1    silent, and anything you say can be used against you in

2    Court.  You have the right to talk to a lawyer for advice

3    before we ask you any questions and to have him with you

4    during questioning.  If you cannot afford a lawyer, one

5    will be appointed for you for any questioning, if you

6    wish.  If you decide to answer questions without a lawyer

7    present, you will still have the right to stop answering

8    at any time.  You also have the right to stop answering

9    at any time until you talk to a lawyer."

10           And below this, there is a Waiver of Rights.  It

11   says:

12           "I have had this statement of rights read to me

13   and I understand what my rights are.  I am willing to

14   make a statement and answer questions.  I do not want a

15   lawyer at this time.  I understand and know what I am

16   doing.  No promises or threats have been made to me and

17   no pressure or coercion of any kind has been used against

18   me."

19           And below that it is signed:  "John Moss, III."

20           Q        Who witnessed his signature?

21           A        Witness: Sgt. R. L. Presson, Member of

22   the Department of Public Safety, at 9:28 p.m., and also

23   a Terry Williams, Member of the Department of Public

24   Safety, 9:28 p.m.

Presson - Direct                                          792

1      Q        And as you read his rights to him, or

2  afterwards, did Mr. Moss indicate to you that he

3  understood his rights?

4      A        Yes, sir, he did.

5      Q        Now, the jury has already heard the

6  tape-recorded confession of Mr. Moss.  Does your voice

7  appear anywhere on that tape?

8      A        I am in the very first part of the

9  tape.  I talked to John there on the tape.

10     Q        For what purpose?

11     A        To make sure the tape was working

12 right, and, you know, basically, that was about it.

13     Q        Is it also true, in fact, that you

14 advised him of his rights?

15     A        Yeah, I advised him that he had

16 something to eat with us.

17     Q        Did you ask him any questions about

18 these murders?

19     A        No, sir, I didn't.

20     Q        After your part on the tape, after you

21 made sure that he had been advised of his rights, where

22 did you go?

23     A        I left the office and went back to my

24 office.

Presson - Direct                                           793

1          Q          And who was with John Moss at that

2    time?

3          A          Terry Williams.

4          Q          Mike Smith wasn't in there?

5          A          No, sir, I don't believe so.

6          Q          Did there come an occasion later in the

7    evening when Trooper Williams and Smith left your

8    detachment?

9          A          Yes, sir.

10         Q          Do you know where they were going?

11         A          They said they was going up into Ohio.

12         Q          Do you know what time that was?

13         A          In the neighborhood of 11:00 o'clock.

14         Q          Where was John Moss when they left to

15   go to Ohio?

16         A          He was in the office there at the

17   Parkersburg Detachment.

18         Q          He was with you?

19         A          Yes, sir.

20         Q          He was in your presence after Troopers

21   Williams and Smith left?

22         A          Yes, sir, John was.

23         Q          Did you notice anything at that point

24   unusual about his physical appearance?

Presson - Direct                                           794

1          A          No, sir.

2          Q          Did you notice any marks or bruises on

3     him?

4          A          No, sir.

5          Q          Did he make any complaints to you about

6     his treatment by the Troopers?

7          A          No, sir, he didn't.

8          Q          Did  he  seem  to  be  feeling  any

9     discomfort or pain?

10         A          No, sir.

11         Q          After the Troopers left to go to Ohio,

12    why was John left with you -- for what purpose?

13         A          We made arrangements to relay John back

14    down to the Kanawha County Jail.

15         Q          And how was that accomplished?

16         A          We set up a relay.  A Trooper from

17    Parkersburg took him down into Jackson County, and I

18    believe a Trooper from Kanawha County met them up on

19    I-77 there in Jackson County.

20         Q          I believe you testified that -- is that

21    the man (Indicating) that you testified being at your

22    detachment on October 28, 1980?

23         A          Repeat the question, Steve.  I didn't

24    hear you.

Presson - Direct                                        795

1          Q          The man you testified as being in the

2    custody of Troopers Williams and Smith on October 28,1980

3    -- do you see him here in the Courtroom?

4          A          Yes, sir, I do.

5          Q          Would you please point him out?

6          A          He's the individual at counsel table in

7    the maroon blazer.

8          MR. REVERCOMB:  Let the record reflect that he

9    has indicated the defendant, your Honor.

10          That's all I have.

11

12                    CROSS-EXAMINATION

13

14   BY MR. HUFFMAN:

15

16         Q          Sergeant Presson, the DPS Form that you

17   just testified to, that you actually witnessed, that one

18   was signed at 9:22, right before the taped statement was

19   taken; is that correct?

20         A          Yes, sir.

21         Q          And at that time, that wasn't the first

22   time that Mr. Moss had been questioned, when he arrived

23   at the detachment; is that correct?

24         A          I couldn't answer that, sir.

Presson - Cross                                              796

1          Q          He had actually been questioned as

2    early as ten minutes to seven that evening; do you recall

3    that?

4          A          No, sir, I wasn´t present when that

5    occurred -- if it did occur.

6          Q          But you were present when they arrived

7    at the detachment; weren´t you?

8          A          Yes, sir.

9          Q          What time was that?

10         A          In the neighborhood of 6:30.

11         Q          You weren´t in there at any time when

12   he was being questioned then, prior to the taped

13   questioning that took place at 9:30 then, is that

14   correct?

15         A          I was not in the room.

16         Q          So, you weren´t present at any time

17   when he may have been struck by Trooper Smith, then; were

18   you?

19         A          No, sir.

20         Q          You didn´t observe him being mistreated

21   by the Troopers; is that correct?

22         A          No, sir.

23         Q          You didn´t observe him being struck

24   between the legs by Trooper Smith when he exited the

Presson - Cross                                          797

1    patrol car when the arrived; did you?

2         A        No, sir.

3         Q        You didn't participate in any striking

4    or abuse or intimidation of Mr. Moss; is that correct?

5         A        Yes, sir.

6         Q        But you weren't there the entire time

7    he was questioned; were you?

8         A        No, sir.

9         Q        How far is it from the Parkersburg

10   Detachment to Charleston; do you know?

11        A        Seventy-seven miles, approximately

12   seventy-seven miles.

13        Q        About an hour and fifteen minutes'

14   worth of driving time?

15        A        About that.

16        Q        You testified that you didn't see any

17   marks on Mr. Moss; is that correct?

18        A        Yes, sir.

19        Q        You wouldn't have been able to see any

20   marks that were under his clothing; would you?

21        A        No, sir.

22        MR. HUFFMAN:  No further questions, Judge.

23

24                      REDIRECT EXAMINATION

Presson - Redirect                                          798

1

2      BY MR. REVERCOMB:

3

4           Q          One final question.  During the time

5      you weren't in the room, were you in the detachment that

6      night?

7           A          I was there all night.

8           Q          Did you hear any ruckus or riot in that

9      room?

10          A          No.

11          Q          Any groans or moans?

12          A          No.

13          Q          Any furniture turning over or anything

14     like that?

15          A          No.

16          MR. REVERCOMB:  That's all I have.

17          MR. HUFFMAN:  No additional questions.

18          THE COURT:  Thank you, Mr. Presson.  You may step

19     down.

20          May he be excused?

21          MR. REVERCOMB:  Yes, thank you.

22          MR. BICKLEY:  Yes.

23          THE COURT:  Will the State call your next

24     witness, please?

799

1       While the next witness is coming in, would you

2   all step up here for a second?

3

4       WHEREUPON, a bench conference was had, which was

5   off-the-record.

6

7       (Back on this Record)

8

9       WHEREUPON, Irvin Sopher, M.D., was duly sworn,

10   and upon his oath, deposed as follows:

11

12                   DIRECT EXAMINATION

13

14   BY MS. LUSK:

15

16       Q        Would you state your name, please?

17       A        Irvin M. Sopher, that´s spelled

18   S-o-p-h-e-r.

19       Q        Are you employed?

20       A        Yes.

21       Q        By whom?

22       A        By the Department of Health, State of

23   West Virginia.

24       Q        In what capacity?

Sopher - Direct                                                    800

1          A          In the capacity as Chief Medical

2    Examiner of the State of West Virginia.

3          Q          Do you hold any college degrees?

4          A          Yes, ma´am.

5          Q          What are they?

6          MR.   BICKLEY:     Your   Honor,   Dr.   Sopher´s

7    qualifications are well known in West Virginia.  In fact,

8    Dr. Sopher, the Medical Examiner, is known all over the

9    United States.

10         We´ll waive his qualifications.

11

12   BY MS. LUSK:

13

14         Q          Are you a physician?

15         A          Yes, ma´am.

16         Q          You hold a medical degree?

17         A          That´s correct.

18         Q          And what other degrees do you hold?

19         A          I hold a Bachelor of Science degree

20   from the University of Maryland, 1959 and a Doctor of

21   Dental Surgery degree, 1962 from the University of

22   Maryland School of Dentistry.

23         Q          Does that mean that you are dentist,

24   then -- a physician?

Sopher - Direct                                         801

1        A          That's   correct.    But   I   practice

2    medicine.

3        Q          What is a forensic pathologist?

4        A          A    forensic    pathologist    is    a

5    subspecialty of medicine and the primary responsibility

6    of this specialty is what one calls the medical/legal

7    investigation of death.

8            That is -- in medicine, there are obviously many

9    specialties.  One has a specialist for the heart, for the

10   kidneys, for any system of your body, as well as general

11   family practitioners and general practitioners.    And

12   there is a specialty known as forensic pathology which

13   deals with the medical/legal investigation of death.  It

14   is  a  subspecialty  of  the  general  hospital  area  of

15   pathology,  and  the  responsibility  of  the  forensic

16   pathologist  is  primarily  autopsy  examinations  and

17   studies.   That's  on  persons  who  die  as  a  result  of

18   homicide,  accident,  suicide,  or  what  in  the  final

19   analysis may be an unattended natural death -- that is,

20   a death due to a heart attack but there was no witness

21   present and the person had never seen a physician.

22           There  is  a  subspecialty  of  forensic  pathology

23   that involves five years of training beyond the medical

24   school, and requires Board Certification by examination

Sopher - Direct                                    802

1    in the area of medical/legal death investigation.

2           A forensic pathologist also becomes involved in

3    certain cases, depending on the circumstances, with the

4    scene of death, perhaps with a deceased individual at

5    the scene of death, and perhaps with evidence at the

6    scene of death such as blood splatter patterns in an

7    attempt to reconstruct what may have occurred at the time

8    the person died.

9           Q        Are you a forensic pathologist?

10          A        Yes, I am.

11          Q        In your capacity as the Chief Medical

12   Examiner for the State of West Virginia, what do you do?

13          A        Well, my primary responsibility is that

14   of practicing the specialty of forensic pathology; that

15   is, the performance of autopsy examinations as mandated

16   by the Medical Examiner Law of the State of West

17   Virginia, and I don't think it's surprises anyone that

18   certain modes of dying and certain types of death require

19   investigation by a State agency; that is, by the Medical

20   Examiner Law of the State.   And specifically, that

21   specifies that any death due to a homicide, accident, or

22   suicide, or what we call an unattended natural death or

23   a death with suspicions of violence, must be investigated

24   by the Medical Examiner system of this State.

Sopher - Direct                                              803

1       So, as a forensic pathologist and as the Chief

2   Medical Examiner of the State system, my primary

3   responsibility is the performance of my medical

4   specialty, and that is the autopsy examinations,

5   assisting, perhaps, law enforcement in closure of a case,

6   and then testifying in a legal forum, in a Courtroom or

7   in another legal setting as we have here today, regarding

8   the findings of any particular case.

9       Q       How long have you been the Chief

10  Medical Examiner?

11      A       Fifteen years.

12      Q       Was that the inception of the Medical

13  Examiner's office?

14      A       That's correct.  For the State of West

15  Virginia.

16      Q       What is an autopsy?

17      A       An autopsy examination is really an

18  extension of basic surgical type operations which are

19  performed, of course, upon the human body, by instruments

20  used or surgical type instruments.  And various incisions

21  are made upon the body so as to enable the pathologist

22  to examine all of the internal organs of the body and all

23  of the tissues of the body, and by such examination to

24  arrive at certain conclusions regarding the findings

Sopher - Direct                                            804

1    which are present.   That is, is heart disease present,

2    is  kidney  disease  present,  are  there  any  injuries

3    present, and if so, what would be the origin of these

4    injuries.   What's the identification of the body upon

5    it's dealing with the skeleton, for instance.   How long

6    has a person been dead, if that becomes a question in any

7    particular case.

8            So, these are the primary areas of the autopsy

9    examinations.

10           Q        Do you actually examine internal organs

11   of a person?

12           A        That is correct.

13           Q        One by one?

14           A        One by one, or sometimes two by two.

15   But at any rate, both by naked eye examination and by the

16   microscope, if such applies, in a particular case.   It

17   depends on each case as to what is specifically required.

18           Q        In  your  capacity  as  Chief  Medical

19   Examiner, were you called to Chesapeake Avenue in St.

20   Albans on December 13, 1979?

21           A        That is correct.

22           Q        Did you observe three bodies; those of

23   Vanessa Reggettz, Paul Eric Reggettz,  and Bernadette

24   Reggettz?

Sopher - Direct                                                    805

1        A          That is correct, yes.

2        Q          Did you view those bodies before they

3   were moved to the Medical Examiner's office?

4        A          Yes, I did.

5        Q          Now, in your observation of Vanessa

6   Reggettz, did you find a cord around her neck?

7        A          I believe at the time I first saw the

8   body of Vanessa Reggettz, she was lying upon the floor

9   next to a door, and my recollection at this point is that

10  a pair of electric cords were present, adjacent to the

11  body, that is, around her head and neck region.  I don't

12  specifically recall that either cord, at the time that

13  I saw her body, was in position around her body.

14       But my recollection is that they were present

15  next to her head, especially a brown cord, which was not

16  secured to the adjacent door, as was a white electric

17  cord.

18       Q          Which was secured to the door?

19       A          Which was not only secured to the door,

20  but was not easily removed.  As I recall, the white

21  electrical extension cord had been wedged through a

22  defect in the door where the knob system was previously

23  in existence.  This had been shoved through the door and

24  could not easily be removed.  It was difficult to pull

Sopher - Direct                                          806

1    it back through because the cubed tab at the opposite end

2    was preventing it from coming through the defect in the

3    door.

4            Q          And the cord actually had to be cut to

5    remove it; is that correct?

6            A          That's correct.

7            Q          Did you take with you at that time the

8    white cord which had been around her neck; in other

9    words, not the part that remained on the door, as well

10   as the brown cord?

11           A          That's correct.

12           Q          Let me hand you at this time, Doctor,

13   State's Exhibit 110-A and 111, and ask you if you would

14   examine those two exhibits.

15           Are those the two cords that you took with you on

16   December 13, 1979?

17           A          That's correct.  And these were given

18   ultimately to Trooper Williams, my notes indicate.

19           Q          Now, that would have been on December

20   17, 1979?

21           A          On December 17, 1979, yes.

22           Q          During the time you held those two

23   cords, Dr. Sopher, did you make any alterations or

24   changes to them?

Sopher - Direct                                                          807

1        A        No, no.

2        Q        Now, just from your view, before any of

3   the bodies were moved, particularly of Vanessa Reggettz,

4   were there any apparent injuries on her?

5        A        Yes, there were several apparent

6   injuries.

7        Q        I'm going to place upon the witness

8   stand State's Exhibit No. 40, which is a photograph, Dr.

9   Sopher, and I'd like to ask you what injuries were

10  apparent, just from your visual examination?

11       A        It was obvious, actually from a

12  distance, from the outset that the body of Mrs. Reggettz,

13  which was reclined upon her right side upon the floor and

14  adjacent to the door from which the white electric cord

15  was secured, had a scissor -- a pair of scissors which

16  was embedded in her chest.  That was rather obvious, when

17  one even glanced at the body.

18       Another obvious change of the body was that the

19  face showed a very dark bluish, purplish discoloration.

20  Furthermore, just a superficial look of the outside of

21  the neck revealed that she had a pattern of injury about

22  her that resulted from what one sees, from what we call

23  ligature strangulation.

24       Q        Can you see that strangulation on

Sopher – Direct                                                    808

1    State´s Exhibit 40?

2         A         Not very clearly, but one can see the

3    marked bluish, purplish coloration of the face in State´s

4    Exhibit 40.

5         Q         What does that consist of?

6         A         It actually consists of what we call

7    suffusion.    That is caused by  -- or it´s spelled

8    s-u-f-f-u-s-i-o-n  --  suffusion, or a backup of blood

9    into the skin of the face, in this particular case, which

10   occurs actually about any part of the body.

11        If one tightly ties a tourniquet -- a tourniquet-

12   like material around a part of the body -- that is to say

13   if one were to take a rope or a tourniquet as is used in

14   venipuncture and the blood bank, for example, if you use

15   that or leave that on your arm long enough, the distal -

16   - what we call the distal aspect of your extremity, that

17   is, the area below the tourniquet will turn blue.   And

18   if you leave it on long enough, eventually, your whole

19   limb may drop off.

20        So, this is what we call or what we mean by

21   suffusion.   It´s caused by a constriction of the vein

22   itself of that part of the body, whether it be the veins

23   draining the hand, in the case of a tourniquet, or a

24   ligature around the hand, or in the case of an extremity

Sopher - Direct                                        809

1    the vein bringing the blood back up your hand, up your

2    extremity to your heart.

3           So, that's the cause of this condition, and of

4    course, what is also associated with this constriction

5    phenomenon is small little hemorrhages which may develop

6    in the skin or in the whites of the eyes or in the inner

7    aspects of the eyelids.  These are classic findings noted

8    in ligature strangulation.

9           Q       Did you make such observation at the

10   scene?

11          A       That's correct.

12          Q       Now, you started to tell the jury what

13   a ligature is?

14          A       A ligature, by definition, is any

15   flexible object or item that would be used to secure

16   about a part of the body -- a belt, for example, is a

17   ligature about the waist.  When we're talking about

18   semantics or definition here, of specific reference to

19   the neck, it's any type of object which is flexible and

20   long enough so that it secures the neck in a tight

21   manner, and that would be a ligature.

22          Common ligatures are ropes, wires, rolled up

23   stockings, rubber tubing, any of those items which can

24   be tightly secured about the neck would be regarded as

Sopher - Direct                                             810

1   a ligature.

2        Q        Does a ligature generally leave marks?

3        A        Generally speaking, a ligature would

4   leave marks, yes, ma´am.

5        Q        At the scene of death, were you able to

6   observe marks consistent with a ligature on the body of

7   Vanessa Reggettz?

8        A        Yes, ma´am.

9        Q        Did you also observe a certain head

10  injury to Vanessa Reggettz at the scene?

11       A        Yes, ma´am.

12       Q        Where as that injury, Doctor?

13       A        The injury that was readily obvious at

14  the scene actually was a pair of injuries represented by

15  two parallel lacerations which are open gashes of the

16  skin.  These were positioned in the left frontal hairline

17  area; that is, at the approximate junction of the left

18  upper forehead with the left hairline.  And these two

19  lacerations which were roughly an inch to an inch and a

20  half in length represented what we call in forensic

21  pathology as a patterned injury; that is, patterned

22  e-d injury, in that each of these lacerations were

23  perfectly parallel to each other and would represent a

24  blow from a solitary impact, with intact normal skin

Sopher - Direct                                          811

1    existing between these pairs of lacerations which would

2    present as railroad track trails, if you will.  That is,

3    straight lines perfectly parallel to each other.

4         Q         So, it was your opinion at the scene

5    that those two injuries were caused by one blow?

6         A         That is correct; and from an object

7    which would result in a parallel type laceration.

8         Q         Now, did you in fact, make a comparison

9    of that injury with an object that was present at the

10   scene?

11        A         Yes, ma´am.

12        Q         Let me hand you what has been marked as

13   State´s Exhibit 103 and ask you to examine this exhibit.

14   Do you recognize it?

15        A         Yes, ma´am.

16        Q         How?

17        A         This represents the segments of a

18   handgun which were found, as I recall, in what I refer

19   to as the second bedroom, or the bedroom wherein the body

20   of Mrs. Reggettz was found.  And this was found in that

21   approximate area.

22        Q         Can you show the area -- the jury the

23   portion of the gun you are holding?

24        A         Actually, what we are dealing with here

Sopher - Direct                                              812

1   is the grip area of the weapon which is now disassembled.

2   Actually, as I recall at the scene, it was found in

3   pieces and what one has when this is intact, it´s a pair

4   of plastic grips around a metal frame which has been

5   broken, in keeping with the metal frame, which would

6   intrude from the plastic grip handle, approximately one-

7   half inch or nine-sixteenths of an inch.  That´s a

8   separation measured on the forehead skin of Mrs.

9   Reggettz, wherein the pair of two parallel laceration

10  injuries was noted.  And if one were to take an intact

11  weapon grip, as we have here, and strike a forehead of

12  an individual, one would see a pair of parallel

13  lacerations which would be identical to the injury noted

14  on Mrs. Reggettz.

15          Q       Did you actually take the metal center

16  portion and compare it to the injury on Mrs. Reggettz´

17  head?

18          A       That is correct.

19          Q       And what was your finding?

20          A       That it matched with the parallel

21  pattern and the separation between the two parallel

22  lacerations of the intact skin -- that is what one would

23  see if one were struck with a weapon of this nature.

24          Of course, there is nothing to say that that

Sopher - Direct                                              813

1   injury had to be absolutely from this weapon, but it's

2   very consistent with this weapon and the fact that you

3   have the broken weapon at the scene which suggests that

4   it was used to commit those injuries.

5           Q       Did you later photograph that injury on

6   Mrs. Reggettz' head?

7           A       Yes, I did.

8           Q       In order to take the photograph, did

9   you have to shave part of her hair?

10          A       Yes, ma'am.

11          Q       Let me hand you State's Exhibit 130 and

12  ask you if you recognize that?

13          A       Yes, ma'am.

14          Q       Could you describe to the jury what

15  that photograph depicts?

16          A       This photograph depicts a pair of

17  parallel lacerations that we've just been describing.

18  The scalp hair adjacent to the lacerations has been

19  shaven by myself at the time of the examination, so as

20  to obtain proper photography of the injury.

21          That is, we would shave the hair so as to have a

22  clear photograph of the injury, as evidenced -- and, of

23  course, what the photograph shows, are a pair of parallel

24  lacerations, or gashes, in the skin from what we call a

Sopher - Direct                                              814

1    blunt force trauma.   And these are separated by a

2    distance of nine-sixteenths of an inch from each other,

3    which is the width of the metal portion of the butt area

4    of the grip portion of the gun.

5            Q        Is State's Exhibit 130 a black and

6    white photograph?

7            A        Yes, ma'am.

8            Q        Does that truly and accurately depict

9    the injury as you photographed it that day?

10           A        Yes, it does.

11           MS. LUSK:  Your Honor, at this time, I would move

12   the admission of State's Exhibit No. 130, and ask if Dr.

13   Sopher be permitted to show it to the jury.

14           THE COURT:  It will be admitted.

15

16   BY MS. LUSK:

17

18           Q        Would you show it to the jury, Dr.

19   Sopher?

20           A        Yes, ma'am.

21           This photograph that we're discussing and is

22   taken from the left front side of the woman's head so

23   that you can actually see a portion of the left eyebrow

24   there and the lower portion of the eyebrow, both.  This

Sopher - Direct                                                    815

1   will also show the outer aspect of the left forehead.

2   What you see are two dark lines.  The lower one of which

3   is a gaping wound, as lacerations will gape after the

4   skin tension is released; that is, when one gets a gash

5   of this nature, they gape open and you see two parallel

6   railroad track-like lines, and this is what we have been

7   describing.  And in between, of course, is the intact

8   area of normal skin, and the pattern of a blow as from

9   the weapon which we have been describing would be

10  identical to that type of pattern, with the metallic

11  edges of the metallic grip which would come back to the

12  skin, and I guess, the underlying skull, and result in

13  the splits in the skin with a normal impact.

14          Q          Thank you.

15      While you were still at the scene, Dr. Sopher,

16  did you have occasion to take the temperature of Vanessa

17  Reggettz?

18          A          Yes, ma´am, I did.

19          Q          What was the purpose of that?

20          A          The purpose of the temperature -- and

21  this was taken rectally -- was that the post-mortem

22  temperature of a body is of some assistance in evaluating

23  the approximate time since that person died.

24          Q          What time did you take her temperature?

Sopher – Direct                                                    816

1          A          At 3:30 p.m. on the afternoon of

2     December 13, 1979.

3          Q          What was her temperature?

4          A          The rectal temperature of Mrs. Reggettz

5     was eighty-two degrees fahrenheit.

6          Q          Do you have a formula that you use?

7          A          Yes, ma´am.

8          Q          What is that formula?

9          A          Generally speaking, there is a lot of

10    variation in the amount of heat loss from a body after

11    death.  Generally speaking, a body will lose one and a

12    half degrees fahrenheit per hour after death.  There is

13    a variation in that.

14            There is also, initially, about a two-hour

15    plateau where little heat is lost, and that´s basically

16    the formula for heat loss post-mortem.  But there is much

17    variation in that, and as a matter of fact, many forensic

18    pathologists don´t even take body temperatures post-

19    mortem because they don´t feel that they are reliable

20    enough to be of any assistance in establishing the time

21    of death.  And I don´t agree with that.

22            Q          Is this formula for a person of average

23    weight?

24            A          That´s correct.

Sopher - Direct                                          817

1          I think -- for just a moment, to lay a

2   background, the heat loss post-mortem, one has to

3   understand that any substance, whether it be a human body

4   or whether it be a heating pad, of course -- once the

5   heat source of that object is diminished, whether it be

6   death whereby your body temperature begins to drop after

7   a bit, because your body, in itself, is like a factory,

8   and we all have a normal temperature during life.    I

9   mean, there is some variation of that, as well.

10         But generally, in life, the healthy person will

11  have a one hundred degree fahrenheit rectal temperature,

12  and ninety-eight point six by mouth.    Some people in

13  life, even though they are healthy, they run a little

14  above that or below that.  But once a person is deceased,

15  that body now representing a reservoir of heat will lose

16  heat to the environment, just like your heating pad or

17  your frying pan, which eventually cools off after the

18  heat source is gone.

19         Now, the ability of the body to lose heat to the

20  environment depends upon many factors.  Obviously, if the

21  body is clothed or unclothed, that's a factor, because

22  if you wear clothing, that insulates the body.   And one

23  has a diminished loss of body heat if you have a fully

24  clothed body, for instance, as opposed to a nude body.

Sopher - Direct                                          818

1      An obese body or a large-statured individual who
2  had much body fat under the skin, or much muscle mass,
3  will retain heat longer and will cook at a slower rate
4  than a skinny, thin person, for example, irrespective of
5  the clothing.
6      The actual environmental temperature is important
7  as to how fast a body will lose heat.  I figure that as
8  a forensic pathologist, I use one and a half degrees
9  fahrenheit, based upon a room temperature of roughly
10  seventy to seventy-two degrees.  If it's much colder than
11  that, then your body loses heat much more quickly.
12      So, there are many, many factors involved in the
13  heat loss from the body, even an individual, a deceased
14  individual, who is doubled upon him or herself will not
15  lose heat as rapidly as a body which is out-stretched in
16  a spread-eagle manner.
17      So, that's the basis upon which  -- and also, at
18  post-mortem, I found the rectal temperatures were
19  helpful, personally speaking, but as I've stated, other
20  forensic pathologists do not place much reliability upon
21  body temperature, post-mortem, as a means of estimating
22  how long a person has been dead.  There are just too many
23  variables involved, as is the whole question of time of
24  death.

Sopher - Direct                                                    819

1          Q          Is the person's body temperature likely

2     to drop below room temperature?

3          A          That   cannot   happen,   and   as   the

4     environment is warmer or is cooler than the body, the

5     body will gain heat, post-mortem.

6          That is, if a person is deceased in a room that

7     happens   to   be   a   hundred   and   four   degrees,   that

8     temperature at death of a hundred degrees will rise very

9     slowly over a number of hours until it, itself, will

10    obtain a heat of a hundred and four degrees.

11         Conversely,   the  body,  generally  speaking,  will

12    cool down to the temperature of the environment in about

13    a twenty-two to twenty-four hour period.  So, that if I

14    were to expire right now, in this room, and you observed

15    me for twenty-four hours, at about that time, twenty-two

16    to twenty-four hours later, my rectal temperature will

17    be about the same as this room temperature.

18         Q          Were  you  able  to  observe  and  make

19    certain findings regarding the rigor mortis of Vanessa

20    Reggettz?

21         A          That is correct.

22         Q          What is rigor mortis?

23         A          Rigor   mortis   is   a   phenomenon   that

24    affects the deceased individual, and actually, medical

Sopher - Direct                                    820

1    people and forensic pathologists are unsure as to what

2    causes this phenomenon, but what it results in is that

3    there is a stiffening of the muscles of the body so that

4    your arms and legs and jaws and neck become stiff and

5    rigid, and in well-muscled individuals such as a

6    construction worker, for example, that stiffening can be

7    so severe after several hours that I myself may have

8    trouble straightening out, for example, an upper

9    extremity which has been bent or flexed at the time of

10   death.

11        Q       You say upper extremity, do you mean an

12   arm?

13        A       An arm, that's correct.  Or for that

14   matter, a knee-joint.  So this change occurs after death

15   in the muscles.  It has to do with the muscle chemistry

16   in that the muscles stiffen.  They will not move -- your

17   extremity, your jaws, or your neck -- they will freeze

18   you, so-to-speak, in the position that you resided at the

19   time you died.  So, that's what rigor mortis is.

20        Q       Approximately how long after death does

21   rigor mortis begin?

22        A       Rigor mortis begins, if you follow the

23   classic textbook description of it, it begins in certain

24   areas of the body ahead of others.  So that typically

Sopher - Direct                                                    821

1   speaking, the jaws and neck of a deceased individual will

2   be markedly stiff at about two to three hours after

3   death, so that if we have, in the classic sense, now, one

4   of the problems here is that there is not a variation,

5   but the classic picture of a deceased individual, for

6   example, two to three hours after death would be that the

7   jaws would not be able to be moved by an examiner at the

8   scene, and that the neck would already be stiff.

9        So, if one puts the hand of the examiner behind

10  the head, you would have difficulty in moving the head.

11  And in contrast, the arms and legs will be very flaccid

12  or floppy. You could move them with no problem because

13  as the time after death proceeds, so that when you

14  approach five or six hours after death and examine the

15  same body, in the classic presentation, now, of rigor

16  mortis, r-i-g-o-r, rigor, and mortis, m-o-r-t-i-s, means

17  death, rigor of death. If you observed the body at five

18  or six hours after death, you would still have the jaws

19  and the neck stiff, but in addition now, the upper

20  extremities will be stiff. You will have difficulty in

21  moving the arm or the elbow joint in either direction.

22  And ultimately, the same procedure extends to involve the

23  lower extremities at about eight to ten, or maybe twelve,

24  hours after death, at which point the entire body is

Sopher - Direct                                                    822

1   markedly stiff, and then that stiffness, at standard room

2   temperature, may last for an additional twelve or twenty-

3   four hours, even, before the process begins to break

4   down.

5           Q       What happens when it breaks down?

6           A       Well, then the muscles relax again, and

7   in the classic textbook presentation, this relaxation

8   starts in the muscles of the jaw and the neck first, then

9   the upper extremities, and then the lower extremities.

10  But that doesn't occur until maybe twenty-four or thirty-

11  six hours after death, after which time the other changes

12  in the body occur as well, because the body is no longer

13  fresh.

14          So, briefly, that is what rigor mortis is.

15          Q       Did you note the rigor mortis of

16  Vanessa Reggettz at the scene?

17          A       Yes, ma'am.

18          Q       What was it?

19          A       The rigor mortis of Vanessa Reggettz at

20  the scene, and this was at 3:30 p.m. on December 13,

21  1979, she had marked rigor of the jaws and neck.  She had

22  moderate rigor of the right upper extremity, that is, the

23  right arm and forearm.  She had marked rigor, meaning the

24  most you can have, of the left arm and forearm.    And

Sopher - Direct                                    823

1   moderate rigor of the right leg, and mild rigor of the

2   left leg.   And there were various gradations, if you

3   will, of this post-mortem stiffness of the body of

4   Vanessa Gale Reggettz at that time, with the marked

5   change, the marked stiffness noted at the jaws and neck.

6         Q         Did you perform an autopsy upon the

7   body of Vanessa Reggettz?

8         A         Yes, ma´am.

9         Q         When did you do that?

10        A         That was done the following morning on

11  December the 14th, roughly beginning at about 11:00 a.m.

12        Q         What was the condition of rigor mortis

13  at that time?

14        A         The condition of rigor mortis at that

15  time was that she had fully developed rigor throughout

16  all of her extremities, and of course, still had the

17  persistent rigor of the neck.

18        Q         Were you able to determine her weight?

19        A         Yes, ma´am.

20        Q         What was her weight?

21        A         Mrs. Reggettz had a body weight of

22  eighty-seven pounds.  She was a small woman.  She had a

23  length, or height of life, if you will, of four feet

24  eleven inches.

Sopher - Direct                                                 824

1          Q          Would a person of small body such as
2    Mrs. Reggettz lose body temperature quicker than a
3    heavier person?

4          A          Very definitely.

5          Q          How was she clothed?

6          A          She was clothed in a nightgown.  That
7    is, a thigh- or knee-length nightgown that was either
8    cotton or a cotton flannel composition.

9          Q          Let me hand you, at this time, State's
10   Exhibit 155, and ask you if you recognize this?

11         A          Yes, ma'am.

12         Q          Is this the nightgown of Vanessa
13   Reggettz?

14         A          That's correct.

15         Q          Did you remove it from her body at the
16   time of autopsy?

17         A          That's correct; yes, ma'am.

18         Q          And at that time, did you give it to
19   Trooper Smith?

20         A          That is correct.

21         Q          Did you alter or change it in any way?

22         A          No, ma'am.

23         Q          Did you also extract a blood sample
24   from Mrs. Reggettz?

Sopher - Direct                                                   825

1       A          Yes, ma'am.

2       Q          What did you do with that?

3       A          That was also transferred to Trooper

4    Smith at the same time the nightgown was transferred.

5       Q          Did you give him anything else?

6       A          I'm sorry -- did you say, "anything

7    else"?

8       Q          Did you give him anything else?

9       A          Yes, ma'am.

10      Q          What was that?

11      A          Also, some hand swabs that were

12   performed for gun powder residue, which were given to him

13   at that time.  And also, if you are referring to -- no,

14   that was Trooper Williams, I'm sorry.

15            So, that's what was given to Trooper Smith.

16      Q          Could you tell the jury what livor

17   mortis is?

18      A          Livor mortis, that first word is

19   spelled l-i-v-o-r, is the color of death.  And livor

20   mortis occurs in almost every deceased individual, and

21   it characteristically, is a purplish, maroon color which

22   is noted of the skin, and is due to the fact that the

23   blood, in fact, settles under the skin of what we call

24   dependent areas of the body.

Sopher - Direct                                                    826

1          I think first, it is important to understand that

2     during life, obviously your blood is pumped throughout

3     your body. The heart is a sort of a pump, or the source

4     of the pumping action. And little small blood vessels

5     in your skin carry the blood to the skin surfaces.

6          And while one has a heartbeat and a blood

7     pressure, the blood circulates through these little tubes

8     of the vessel system in our skin, and it doesn't

9     excessively accumulate in any one place in our body,

10    because it is being driven by the tube system, or through

11    the tube system, by our heartbeat.

12         It's much like water in a garden hose that is

13    just flowing through the hose to the end of the lawn.

14    However, when death occurs, the heartbeat stops,

15    obviously, and then the blood in the skin of the body

16    -- and of course your blood stays liquid for several

17    hours after death. In some cases it may stay liquid for

18    twenty-four hours after death.

19         But at any rate, the blood in life is liquid

20    because it is pumped around. The blood, after death,

21    will stay liquid for only several hours, and with the

22    absence of a heartbeat now -- and if one takes a deceased

23    body lying on its back on the floor, let's say, and one

24    then observes the back of such a person, there will be

Sopher – Direct                                        827

1   a purplish blue hue or color of the skin, which is the

2   settling, post mortem, after death, of this liquid blood

3   from the outside portions of the chest and the inside of

4   the chest, under the skin.

5        This blood will drain and accumulate in excess in

6   the rear portion of the body and it´s not -- this

7   phenomenon is not too dissimilar to what would happen,

8   for example, in an oil-soaked sponge.

9        If you were to take a sponge and you soaked it

10  with oil and you set it on a tabletop, and if you come

11  back an hour later, you will have an accumulation of oil

12  because it´s heavy, and the lower part of the sponge, if

13  you go and examine the sponge, there will be more oil

14  soaked, or soggy, or whatever, whatever word you want to

15  use, on the lower surface adjacent to the table.

16       So, that´s perhaps, the best way to explain why

17  this livor phenomenon occurs.  It settles in the deep end

18  of the body.  You may have an occasion where an upper

19  extremity -- the person has died in bed, and had an arm

20  hanging off the bed, that arm will be accentuated in its

21  bluish purple coloration because all of the blood from

22  the shoulder and the upper part of the extremity, the arm

23  itself, will drain down into the hand and the lower part

24  of the extremity.

Sopher - Direct                                         828

1       The post mortem phenomenon, or the shifting of
2  blood, is due to the fact that there is no heartbeat any
3  longer.
4       Q       Are there dependent areas which do not
5  accumulate or show this symptom of livor mortis?
6       A       Yes.  There is no pressure behind this
7  gravitational settling of the blood.  Actually, that's
8  not really true -- there has to be some pressure, but
9  it's not significant.  It is a very small force, or small
10 pressure, insufficient, for example, when with our body
11 lying on the floor, obviously the body is touching the
12 floor in certain areas and it's usually a shoulder blade
13 area and the buttocks, because you have a little
14 curvature in your back, and generally, that will not be
15 resting on the floor, where your body weight is now
16 exerting pressure against the floor surface.  The blood
17 will not settle into those areas.  There you will have
18 a normal colored skin, which is what we call blanching,
19 b-l-a-n-c-h-i-n-g, blanching.
20      Q       Is that because the capillaries are
21 squeezed and the blood can't flow into them?
22      A       That is correct.  It's a pressure
23 exerted by the weight of the body, itself, and the blood,
24 not being under pressure, cannot get under there.

Sopher - Direct                                          829

1        So, the skin is then colored.  As it is normally

2   colored, there is no purplish color in those areas.

3   Tight clothing may give you the same phenomenon.   A

4   brazziere strap or a tight belt or undershorts with an

5   elastic band will do the same thing.

6        Q        What is cyanotic livor mortis?

7        A        Cyanotic is a description of the blood

8   which implies a low oxygen level.  It's a bluish, maroon

9   coloration, and you see this color of the body that we're

10  seeing after the death in a person who dies an asphyxial

11  death, low oxygen level in the blood.

12       At the time of death, the blood will have a much

13  bluer appearance than will a person who has died of other

14  causes.  And that's what the term cyanotic or cyanosis,

15  c-y-a-n-o-s-i-s, refers to.  And even living persons may

16  show some of this.

17       If you have a bad case, for example, of lung

18  disease or any obstruction in the -- where you have low

19  oxygen, the person may develop a blueness around the

20  lips.  That's what we're talking about.  That's what

21  cyanosis refers to.

22       Q        Doctor, when you were removing the

23  nightgown of Vanessa Reggettz, did you find any other

24  clothing on her body?

Sopher - Direct                                                          830

1          A          No, ma´am.  I believe that was the only

2    clothing she had on.

3          Q          She wasn´t wearing underwear?

4          A          No  underwear,  no  brazziere,  nothing

5    else.

6          Q          What   did   you   find   upon   autopsy

7    examination of Mrs. Reggettz?

8          A          The   autopsy   examination   of   Mrs.

9    Reggettz, first off, showed that she had died of ligature

10   strangulation.    Earlier   in   the   testimony,   we   had

11   mentioned what that means.

12         When  a  ligature  is  applied  to  the  neck  of  a

13   sufficient  magnitude  to  constrict  the  blood  vessels

14   running from the chest, that is, the heart up to the

15   brain, and when there is sufficient magnitude to also

16   constrict  your  windpipe  system  and  you  have  a  fatal

17   situation, and this results in the purplish color that

18   we  talked  about,  the  hemorrhages  in  the  eyes  that  we

19   talked about.  And, of course, in addition, the external

20   neck of Mrs. Reggettz showed a broad area of about a two-

21   inch width or several wraps of a wire, electric wire type

22   material that had been placed around the neck.

23         Q          Did the wraps go all the way around her

24   neck?

Sopher - Direct                                                          831

1      A        That is correct; totally around.

2      Q        Now, the little hemorrhages that you

3  were talking about, what are those called?

4      A        Well, we didn't get into that, but they

5  are called petechiae, p-e-t-e-c-h-i-a-e, petechiae.  The

6  petechiae hemorrhages, they are very small hemorrhages

7  about the size of the head of a pin or smaller, and they

8  occur from ruptured blood vessels, such as when one has

9  a tourniquet around the part of the body -- because the

10 blood can't get back to that area of the body, the

11 arteries are pumping it in and it can't get back, it gets

12 dammed up above the tourniquet and that's what that is

13 from.

14         THE COURT:  I know this is not the best time in

15 his testimony to take a break, but I notice that

16 everybody looks like they are warm, so I might ask Tom

17 to fool with the air conditioner.

18         So, let's go ahead and take about ten minutes.

19

20         WHEREUPON, the Court stood in a recess in the

21 hearing of this case.

22

23         (Back on the Record)

24         THE COURT:  Okay.  Are you ready?

Sopher - Direct                                                  832

1          MS. LUSK:  Yes, your Honor.

2

3    BY MS. LUSK:

4

5          Q       Dr. Sopher, I think you just described

6    petechiae, the little hemorrhages.    Are there larger

7    hemorrhages as well?

8          A       Yes, ma´am.

9          Q       What are those called?

10         A       Well, then you would have ecchymosis,

11   e-c-c-h-y-m-o-s-i-s, which are very small hemorrhages,

12   maybe a quarter inch in maximum diameter.

13         Q       Are they caused by the same process as

14   petechiae are caused?

15         A       That´s right.

16         Q       What are your findings?  I think you

17   were describing your findings upon autopsy of Vanessa

18   Reggettz.

19         A       We found the ligature injury, and that

20   was the cause of death.  We´ve mentioned the pair of

21   lacerations of the left front forehead scalp area, which

22   is consistent and suggestive of the gun butt situation.

23         And in addition, she had another -- or several

24   other lacerations.  These are open gashes to the scalp,

Sopher -- Direct                                                  833

1    ranging from one-half inch to one inch, and these were

2    located in the right front area, roughly where I am

3    pointing with my first finger.  And then the left scalp,

4    above the ear, and the left rear scalp.

5            So, there were three other lacerations.  These

6    are non-specific.  And by that, what do I mean -- in a

7    single, solitary open wound, either possibly from a blunt

8    object or possibly from falling and striking her head.

9            In addition, there were several, what we call

10   non-specific scratch marks about her lower lip, on her

11   right chest, and above the breast area.  There were three

12   very small three-inch bruises on the front of the left

13   armpit area -- again, non-specific.

14           And there were several areas of scraped skin on

15   her left and right hands, that is, the fingers son the

16   left and rights hands.

17           And then we come to a final injury, which gets us

18   back to the scissors, which was plunged into the chest.

19   I noted this at the scene, that they had entered the

20   chest cavity, and finally, come to rest adjacent to the

21   heart.  There was no hemorrhage surrounding this wound

22   path.

23           Q       What do you mean by that?

24           A       Well, when one has a significant

Sopher - Direct                                               834

1    heartbeat in life and you have an injury, the body will

2    bleed. I mean, inside as well as outside. And along the

3    path of this knife stab wound, and it´s really a stab

4    wound, or excuse me, scissors, it´s a scissors stab

5    wound, there was no hemorrhage along the path of the

6    instrument. This would indicate that the injury was

7    inflicted at about the time of death or after death,

8    after the person had already been deceased, and the body

9    was stabbed. And of course the dead body would not bleed

10   because there is no blood pressure in the area of injury,

11   you see.

12              Q        So, it is your opinion that the stab

13   wound was not a cause of Vanessa Reggettz´ death?

14              A        Very definitely not.

15              Q        Now, is there a cut or tear on the

16   nightgown, Dr. Sopher, which corresponds with the scissor

17   wound?

18              A        I would imagine that´s what we´re

19   talking about.

20              Q        It has very little blood around it?

21              A        That´s correct. There is some blood,

22   but not very much, and of course, that would be absorbed

23   after death as well.

24              But the hemorrhage that we´re talking about is a

Sopher – Direct                                          835

1   hemorrhage inside the body when one has an injury while

2   there is sufficient heartbeat and blood pressure.

3          Q        And I believe you stated earlier that

4   in your opinion, to a reasonable degree of medical

5   certainty, it is your opinion that Vanessa Reggettz died

6   of a strangulation injury?

7          A        That's correct.  There is no question

8   about that.

9          Q        Were you able to, or did you, examine

10  Vanessa Reggettz' stomach contents?

11         A        Yes, I did.

12         Q        What did you find?

13         A        In the stomach of Mrs. Reggettz, we

14  found roughly one to two tablespoons worth of a markedly

15  digested material, with recognizable lima beans, slivers

16  of onions, portions of apparent pickle, and a solitary,

17  a single about one and a half inch rectangular meaty,

18  white fleshy material, which appeared to be fish.

19         Q        About how long does it generally take

20  for an average adult or person to totally digest their

21  food after they eat?

22         A        Well, there is a variation in that as

23  well, but generally speaking, a healthy adult individual,

24  upon eating a standard size meal, will empty the stomach

Sopher - Direct                                    836

1    in about three to four to five hours.

2            Q        What might that depend on?

3            A        That depends on many factors.  Just to

4    begin, how well the food may be chewed and how acid a

5    basic food is will determine who quickly the stomach

6    empties.  Also how much fat is in the food.  If you eat

7    a fatty meal, it sits in your stomach for a much longer

8    amount of time.

9            It also depends on the status of your gall

10   bladder, which is very important in absorbing and

11   digesting fatty foods.  What is the condition of your

12   stomach and your gastrointestinal system.  That is,

13   certain people have faster emptying times than others.

14           Persons with ulcer conditions, for example, may

15   not empty their stomachs as rapidly as non-ulcer

16   patients.

17           The state of anxiety for an individual -- for

18   example, an individual who may be bound or in a

19   frightened situation may have just recently eaten a meal,

20   and of course, the anxiety state would delay the emptying

21   time of the stomach of the food which you've eaten.

22           People that have a head injury may be in the

23   hospital in a coma for three days, and alive and in a

24   coma, and subsequently expire.  And then we may see upon

Sopher - Direct                                                    837

1    examination, a hamburger or a hot dog in the stomach and

2    we know they'd been alive for three days.  But head

3    injury cases, again, the motility, the movement and the

4    action of the stomach and intestinal system slows down

5    or maybe totally stops.

6         So, these are just some of the factors.  There is

7    a lot of variation about how quickly your stomach

8    empties, but generally speaking, in a three to five hour

9    time period, a standard size meal would no longer be seen

10   in the stomach, after it's eaten.

11        Q        I believe your report indicates, Dr.

12   Sopher, that you examined the vaginal contents of Vanessa

13   Reggettz and found that they were mildly bloody; is that

14   correct?

15        A        That's correct.

16        Q        Now, these head injuries that you

17   described, would you have an opinion as to whether the

18   injuries were inflicted before or after death?

19        A        Yes, ma'am.

20        Q        What is that?

21        A        The injuries were inflicted while the

22   patient was living and had a blood pressure.

23        Q        Now, the petechiae that you described

24   on the face, and where else did you see it?

Sopher - Direct                                                      838

1          A          The eyes -- the whites of the eyes, and

2    her eyelids.

3          Q          Could that have been, or could that

4    have developed after death?

5          A          Well, that's complex.   In this case,

6    no, they could not have developed after death, because

7    that is the total pattern of what one sees when there is

8    a   ligature   strangulation;   or   for   that   matter,   a

9    strangulation by the hands.   A throttling by the hands

10   will give you the same type of pattern.   It's usually

11   more extensive when a ligature is tight around your neck

12   than when a hand is used, because throttling -- but to

13   answer your question totally, you may also see these in

14   a non-strangulation case.

15         If a person's head is hanging off the edge of the

16   bed, they may get little hemorrhages after death.

17         Q          But in this case?

18         A          After -- but in this case, after the

19   neck injury, the suffusion -- this is a classic sign, a

20   classic picture of ligature strangulation.

21         Q          So, could you say that these petechiae

22   had developed before the time the scissors were ---

23         A          That's correct.   They are related to

24   the cause of death, which is the ligature strangulation.

Sopher - Direct                                    839

1        Q        Now, Dr. Sopher, on December 13, 1979,

2   did you also view the body of Paul Eric Reggettz at the

3   scene?

4        A        That's correct.

5        Q        Where was he?

6        A        This youngster was on the bed in the

7   middle bedroom; that is, the same bed -- I forget if

8   there were two or three bedrooms, but he was in the same

9   bedroom with the mother, but he was placed on the bed

10  near where the mother's body had lain.

11       Q        Let me hand you State's Exhibit 17 and

12  ask you to examine that photograph.

13       Does that photograph depict the body of Paul Eric

14  Reggettz, as you found it on December 13, 1979?

15       A        Yes, it does.

16       Q        What was the condition of the bed

17  clothing and mattress?

18       A        Well, the infant was -- or child, I

19  should say, was obviously wet. I mean, all of the

20  clothing was thoroughly water-soaked. The scalp hair was

21  thoroughly wet, and there was extensive soaking of the

22  bed clothing and mattress and pillow which were adjacent

23  to the body, upon which the body was lying.

24       Q        Was the body also wet?

Sopher - Direct                                        840

1      A         Well, the body -- yes, it was moist,
2  the skin surface was.

3      Q         What about the clothing?

4      A         And the clothing was thoroughly moist.

5      Q         What about the child's hair?

6      A         The scalp hair was wet.

7      Q         Did you, at that point, Dr. Sopher,
8  gather a cord which is depicted in that photograph?

9      A         That's correct.

10     Q         I'll now hand you what has been marked
11  as State's Exhibit 113, and ask you to examine that
12  please.

13          Is that the cord that you gathered from the bed
14  that Paul Eric Reggettz lay on?

15     A         That's correct.

16     Q         Did you give that cord to Terry
17  Williams on December 17, 1979?

18     A         Yes, ma'am.

19     Q         Did you alter or change it in any way?

20     A         No, ma'am.

21     Q         At the scene, Doctor, did you also take
22  the rectal temperature of Paul Eric Reggettz?

23     A         Yes.

24     Q         What time was that?

Sopher - Direct                                              841

1          A          It was also approximately 3:30 p.m. on

2     the same date, the 13th.

3          Q          What was his temperature at that time?

4          A          His rectal temperature was sixty-three

5     and a half degrees fahrenheit.

6          Q          Now, that would be below the

7     temperature of the room; would it not?

8          A          That's correct.

9          Q          Can you explain that?

10         A          Well, of course, this child was

11    obviously immersed in water, which it could have been

12    cold water or cool water.  And furthermore, we have now

13    altered in our whole equation for body loss after death,

14    because a body with evaporation process such as wet

15    clothing and moisture will cool more rapidly than a body

16    which is not wet and has not been immersed.

17         More importantly, children cool at a much more

18    rapid rate than do adults.  I didn't get into that

19    before, but a child has less body mass.  He is less of

20    a furnace than an adult, because he has much less body

21    core.  He builds up the same body temperature in life,

22    but he loses it a lot more quickly after death.  So, our

23    formula of one and one-half degrees loss per hour just

24    doesn't apply to children.  In fact, there is no study

Sopher - Direct                                          842

1   that I know of that has measured or studied post mortem

2   heat loss in children versus hours after death.

3           Q        If the child's body was actually

4   immersed in water, would that have an effect on the

5   cooling process?

6           A        Very definitely.  If the temperature of

7   the water was cooler than the room temperature -- but on

8   the other hand, if it is warmer than the room

9   temperature, the body would absorb the heat.  But, of

10  course, then we would see changes in the body from

11  excessive heat, et cetera.

12          Q        Did you note the development of the

13  stage of rigor mortis of Paul Eric Reggettz at the scene?

14          A        Yes, ma'am.

15          Q        What notation did you make?

16          A        This was all at 3:30 p.m. on December

17  13th, and the youngster, Paul Reggettz, as my notes

18  indicate, had marked stiffening of the jaws and neck at

19  this time, marked stiffening of the right upper

20  extremity, moderate of the left upper extremity, and

21  marked stiffening of the lower extremities.

22          Q        Did you subsequently perform an autopsy

23  on the body of Paul Eric Reggettz?

24          A        Yes, ma'am.

Sopher - Direct                                    843

1        Q        When?  Was that the next day?

2        A        Yes, I'm sorry.  You said, "When?"

3    Yes, that's correct.  The next day, on the 14th, in the

4    morning hours.

5        Q        How much did he weigh?

6        A        The youngster, Paul Reggettz, weighed

7    thirty-nine pounds, and he was thirty-four inches tall

8    in life.

9        Q        Did he appear to be his purported age

10   of seven and a half?

11       A        That's correct.

12       Q        What was he wearing?

13       A        He was clothed in a matching pajama

14   type clothing.  Actually, if you want to be more

15   specific, a white T-shirt with a child's football helmet

16   design, was underneath of his pajama top and bottom.  So,

17   those were his items of clothing.

18       Q        And he was wearing underwear?

19       A        That's correct.

20       Q        Let me hand you what has been marked as

21   State's Exhibit 156, and ask you if you recognize those

22   items?

23       A        Yes, ma'am.

24       Q        Are those the pajamas of Paul Eric

Sopher - Direct                                            844

1   Reggettz?

2        A        Yes, that's correct.

3        Q        Did you remove them at the time of the

4   autopsy?

5        A        Yes, I did.

6        Q        Did you deliver them to Trooper -- or

7   did Terry Williams pick them up on December 17, 1979?

8        A        Yes, he did.

9        Q        Did you alter them or change them in

10  any way?

11       A        No, ma'am.

12       Q        Did you also collect a blood sample

13  from the body of Paul Eric Reggettz?

14       A        Yes, I did.

15       Q        What did you do with that?

16       A        That was given to Trooper Williams on

17  the 17th of December.

18       Q        Upon autopsy examination, what did you

19  find?

20       A        The autopsy examination on the

21  youngster, Paul Eric Reggettz, showed that he had

22  drowned, that is, he had typical signs of inhalation of

23  water, and in addition he had been also ligature

24  strangled about the neck.

Sopher - Direct                                        845

1          He had, again, a ligature pattern around the

2     front portion of his neck, extending to the sides.  It

3     was not totally encircling, as we saw and previously

4     described of the mother, but rather suggestive that he

5     was grabbed from behind with a ligature across the front,

6     such as a horse bridle, for example.   And he was

7     incapacitated, but alive, when put in the water.

8          Now, whether -- he would be expected to be

9     unconscious at the time he was placed in the bathtub, but

10    he was definitely alive and breathing at the time he was

11    immersed into the bathtub, so that he had inhaled water.

12    His actual cause of death was drowning.

13         Q        Did you find any other indications of

14    binding?

15         A        Yes.

16         Q        What was it?

17         A        There were present upon both wrist

18    areas a patterned injury indicating at least that there

19    were not at least two, but there were two solitary wraps

20    of a binding agent around his wrists, or each wrist.

21         Q        Did you see the suffusion about his

22    face as you noted on his mother?

23         A        No, ma´am.

24         Q        What about petechiae?

Sopher - Direct                                              846

1        A          There were a few petechiae noted on his

2    face and eyes.

3        Q          Do you have any further evidence of

4    injury?

5        A          He had other various and insignificant

6    injuries, but indicative of trauma, which was represented

7    by a one and one-quarter inch scratch and abrasion.   An

8    abrasion is a scratch-type pattern on the skin, which was

9    present on the left cheek area.

10        He had a pair of very small, one-eighth inch

11    little scratch abrasions on the tip of the nose, and on

12    the midline of the upper lip.  And his lower lip showed

13    three very small little bruise and scrape marks where his

14    teeth had been bitten, if you will, or impacted against

15    the lower lip.

16        Q          Did you examine the stomach contents?

17        A          Yes, I did.

18        Q          What did you find?

19        A          The stomach contained only water, or I

20    should say, a watery substance, which is another sign of

21    drowning; that is, inhalation of water.   There was no

22    food stuff within the stomach.

23        Q          Was his stomach content consistent with

24    him having eaten at 7:30 and being killed at 6:00 o'clock

Sopher - Direct                                                          847

1     in the morning?

2          A          Yes, that would be so.

3          Q          And you stated, I believe, that the

4     cause of death was drowning?

5          A          This was correct, and contributory was

6     the ligature strangulation.

7          Q          Did you view the body of Bernadette

8     Reggettz?

9          A          Yes, ma'am.

10         Q          At the home?

11         A          That's correct.

12         Q          Where did you find her?

13         A          She was lying on the bed in the first

14    bedroom.

15         Q          At this time, I'll hand you Exhibits 73

16    and 74, Dr. Sopher.

17         Have you examined those photographs?

18         A          Yes, ma'am.

19         Q          Do they depict the child as she was

20    lying and as you viewed her at the scene?

21         A          Yes, they do.

22         Q          Now, at the scene, did you note

23    evidence of injury?

24         A          Yes.

Sopher - Direct                                            848

1          Q          What did you note at the scene?

2          A          It was very obvious upon the external

3    examination of the body that she had suffered, that is,

4    Bernadette had suffered, once again, injury about the

5    neck.  And she had a combination of neck injury trauma;

6    one being, again, ligature binding about the neck,

7    meaning a horizontal-type of pattern which completely

8    encircled her neck, number one.  And then, of course, a

9    typical, loose hanging pattern from a body suspended from

10   a noose.  That is, the body lays at an angle to the

11   noose, which in and of itself, is perpendicular to the

12   ground.  So, the body hangs from a high end, if you will,

13   and this is a typical pattern in a noose indentation of

14   the neck which was present, and the high end was behind

15   the right ear.  That is to say that the body would have

16   been suspended.

17          When I saw the body, it was lying on the bed, and

18   the noose was removed.  But she would have been hung with

19   her head slumped over to the left and this patterned

20   noose coming up in front of the right ear and behind the

21   right ear, so you had that hanging pattern there, in

22   addition to a separate pattern of a solitary, totally

23   encircling ligature around the neck as well.

24          Q          So, it's my understanding that she was

Sopher - Direct                                              849

1    strangled on two separate occasions?

2           A          That's correct.  She's had two modes of

3    strangulation, both ligature and hanging.  Both of those

4    are both strangulation, and the third mode is manual,

5    using the hands, just to clarify.

6           Q          When she was hanged and the noose was

7    placed around her neck, could the horizontal ligature

8    have been underneath it?

9           A          That could be possible.  That could be

10   possible, but if that were the case, in most instances

11   like this, where you have both modes of both ligature and

12   hanging, you would think the initial wire would still be

13   in place.

14          It may even be that the noose itself within which

15   the body was found suspended, may have been the item used

16   for the ligature.

17          Q          Was there any indications -- I believe

18   you said there was a noose mark on her neck?

19          A          Yes, that's correct.

20          Q          Was there any indication that there had

21   been another ligature underneath that at the time of the

22   hanging?

23          A          I believe there was a pattern that was

24   different from the noose pattern.  If that's important,

Sopher - Direct                                             850

1    I'd have to look through my notes.  It was a different

2    pattern.  The obstruction of a noose, as such, that it

3    wouldn't give you a totally encircling ligature pattern

4    as we saw on her.

5          What I meant to say earlier, but what I was

6    mentioning, is that prior to making the noose, this same

7    noose material may have been used as a ligature and then

8    it was removed and a noose made to suspend the body.

9          Q        But at the time she was hung, the

10   horizontal ligature was not in place under the noose?

11         A        That's correct.  Generally, one would

12   not remove the one.  They would leave both in place.

13         Q        When you say, the high end, what about

14   the neck tells you that that was there?  Is there an

15   indentation?

16         A        Yes, ma'am.  There was an obvious

17   inverted "V" pattern where your noose, which, of course,

18   is encircling, but it leaves the neck at a certain point

19   and leaves the neck at other points from which the body

20   is suspended, so that the deepest injury in a person who

21   was suspended in an noose is on the opposite side as to

22   where the noose is attached, to whatever the suspension

23   system is.

24         Q        Did you find that in this case?

Sopher - Direct                                                         851

1        A        That's correct.

2        Q        At the scene, did you observe the rigor

3   mortis of Bernadette?

4        A        Yes.

5        Q        What did you find?

6        A        I found that she had marked and

7   diffused livor of the lower extremities, and the front,

8   back and especially the soles and heels of the feet,

9   which is what one would expect, of course, based upon

10  what we talked about earlier in an individual who has

11  been suspended with feet off the ground.

12       Q        If she had not had her feet off the

13  ground, would you expect to find something different?

14       A        Yes.

15       Q        What would that be?

16       A        Well, if her feet were touching the

17  ground -- first, let me clear up something else.

18       One doesn't have to be totally suspended, that

19  is, your whole body off the ground, to be hung.  In fact,

20  you can hang oneself, really, almost by lying down.

21       That is to say, you can fashion a noose around

22  your neck and tie it to a door knob and lean forward.

23  You could even sit next to the door and lean forward and

24  you will asphyxiate yourself, or you can attach it to the

Sopher - Direct                                                852

1   door knob and lay in the noose -- as long as your head,

2   neck and shoulders are above the level of the floor and

3   suspended in the noose, that will result in the death.

4   That's point number one.  So, the body doesn't have to

5   be totally elevated off the ground to hang oneself.

6        Point number two is, in some cases, we do see

7   individuals who hang themselves; usually, it's a suicide,

8   from, for example, a closet rod, but their feet are still

9   touching the ground, or barely touching the ground.

10       In those cases, they, of course, show the

11  dependent livor mortis into the legs, which is very

12  prominent, but where the balls of their foot or their

13  heel is touching the floor, for the same reasons we

14  discussed earlier, they are the same color as the normal

15  skin.

16       You see this blanching pattern in the case of the

17  infant, Bernadette.  She had the livor mortis throughout,

18  and no blanching of the heels and the soles.  So, of

19  course, that indicates that she was totally -- her feet

20  were totally off the ground, her body was totally

21  suspended from the neck.

22       Q        And if Bernadette Reggettz had laid on

23  the bed all night long, would you have expected to find

24  a livor mortis pattern as you did?

Sopher - Direct                                         853

1          A          No, ma'am.

2          Q          How would it have been different?

3          A          Well, the livor mortis would have

4    settled into the legs only, and would not have been

5    diffuse, that is, on all surfaces, including the front

6    surface of the heels and soles.

7          It would be a different pattern for the reasons

8    that we talked about earlier. The livor mortis would set

9    in according to gravity, and here you have a young child

10   who had been lying on the bed, I guess you mean many

11   hours. At the time I saw her, she would not have had the

12   overall pattern of livor of the legs as was seen at the

13   scene of death.

14         Q          Could the degree of livor that you saw

15   have developed in say, a couple of hours?

16         A          Probably not.

17         Q          What is that?

18         A          It's too intense for that.

19         Q          So, this pattern of livor on

20   Bernadette, then, would be inconsistent with her hanging

21   for two hours or twelve hours?

22         A          That's correct. Well, inconsistent, at

23   which point she was placed on the bed.

24         Q          Let me ask you two separate questions.

1    If she had been placed on the bed at 10:00 or 12:00

2    o'clock, after she -- well, no, wait.  If she had hung

3    on the door for a couple of hours, and then placed on the

4    bed there to lie for the whole night long, what would you

5    have expected to find?

6         A          Then we would not have seen the livor

7    pattern on her lower extremities, as we were seeing at

8    3:00 o'clock in the afternoon.

9         Q          If she had been hung the previous

10   night, prior to midnight and had been hanged on the door

11   until, say, noon the next day, twelve hours, what would

12   you have expected to find?

13        A          Then it would be possible that it would

14   have fixed in that condition; that would be possible.

15        Q          Are you saying that it did not fix in

16   that location?

17        A          I'm stating that when I saw her, it had

18   settled in the legs in that pattern.

19        Q          But it wasn't fixed?

20        A          That's correct.  She had not been on

21   the bed for a long period of time, let's put it that way,

22   since, like, midnight, for example.

23        Q          Did you say, though, you also expected

24   this livor pattern to be more intense if she had hung for

Sopher - Direct                                                     855

1    twelve hours?

2          A          That's correct.

3          Q          Now, did you also notice some mottling

4    of her legs?

5          A          Yes, ma'am.

6          Q          Would you describe for the jury what

7    that is?

8          A          Well, mottling is really just a

9    confluence of -- that's m-o-t-t-l-i-n-g, mottling -- it's

10   just a confluent livor mortis; that is, it's blotchy ---

11    blotchy would be a good description.  It's a blotchy

12   discoloration of the skin, which is due to the livor

13   pattern.

14         Q          Did you note such pattern on her legs?

15         A          Yes, I did.

16         Q          What is that consistent with?

17         A          Well, that's just a livor mortis, of

18   course, settling in her legs.  That's what we're

19   describing.

20         Q          If she had laid on the bed for twelve

21   hours, would you have expected to find the mottling

22   pattern that you found?

23         A          No, ma'am.

24         Q          How would it be different?

Sopher - Direct                                              856

1        A        Well, it would have shifted from the

2   front part of the legs to the back.  As I stated earlier,

3   it would not be diffused and involving her legs as we saw

4   at the scene.

5        Q        At the time of autopsy, had it, in

6   fact, shifted?

7        A        I think it had, yes.  But of course, at

8   the time of the autopsy examination, the heels and the

9   soles of the feet had maintained the livor pattern, which

10  was important and noted at the scene the day before.  But

11  there was some shifting of the livor from the front of

12  the extremities toward the back.

13       Q        Did you notice ---

14       A        By the way, I would note that she had

15  not been suspended, for example, since midnight or 1:00

16  a.m. and then placed on the bed at a later time.

17       Q        Because you wouldn't have expected it

18  to have later shifted?

19       A        That's correct.

20       Q        So, the mottling pattern of the livor

21  mortis pattern in Bernadette Reggettz is much more

22  consistent with the time of death in the neighborhood of

23  6:00 o'clock in the morning than at midnight the day

24  before?

Sopher - Direct                                                857

1       A       That's correct, if one is assuming that

2   she was -- one has to know how long she was suspended.

3   You see what I'm saying?

4       Q       Sure.  If she had not been suspended

5   for more than a couple of hours?

6       A       That's correct, and placed on the bed

7   within a short time.  It had been several hours when that

8   livor pattern was seen.

9       Q       Did you take her temperature at the

10  scene?

11      A       Yes, ma'am.

12      Q       Was that also around 3:30 in the

13  afternoon?

14      A       That's correct.

15      Q       What was her temperature?

16      A       Her temperature, I believe, was

17  seventy-four degrees -- correction, that's seventy-four

18  degrees fahrenheit.

19      Q       Did you also notice the rigor mortis

20  development of her body?

21      A       Yes, I did.

22      Q       At the scene, at about 3:30, what did

23  you find?

24      A       Bernadette had, at that time, of her

Sopher - Direct                                              858

1    jaws and neck, she was markedly stiff.  Of her upper

2    extremities, she had moderate to marked rigor mortis, and

3    of the lower extremities, moderate to mild rigor mortis.

4    So, she had marked to mild rigor.

5              Again, of the jaws and neck, it was similar to

6    the mother.

7              Q        So, her rigor mortis had not fully

8    developed?

9              A        That´s correct.

10             Q        At the time of the autopsy the next

11   day, it had been fully developed?

12             A        At the time of the autopsy examination

13   the next day, she still had -- excuse me, it had fully

14   developed throughout; that´s correct.

15             Q        Did you notice anything in particular

16   about Bernadette´s tongue, at the scene, Dr. Sopher?

17             A        Yes.  The tongue was protruding between

18   the lips, and it was dry.  That´s what we see in hanging

19   deaths, again.  That is, in a body suspension.

20             Q        Did you perform the autopsy examination

21   of Bernadette Reggettz?

22             A        Yes, ma´am.

23             Q        Was that on December 14, 1979?

24             A        That´s correct.

Sopher - Direct                                             859

1          Q          Did she appear to be her reported age

2    of four years?

3          A          Yes, ma´am.

4          Q          How much did she weigh?

5          A          Twenty-nine pounds.

6          Q          How long was she?

7          A          Forty inches.

8          Q          What was she wearing at the time?

9          A          She was clothed in a pair of long-

10   sleeved pajama shirt that had the name Champ, C-h-a-m-p,

11   on the front.  She had an underlying white T-shirt on,

12   and underpanties, all in normal position on the body.

13         Q          Let me hand you what´s been marked as

14   State´s Exhibit 116-A, and ask you if this is the shirt

15   of Bernadette Reggettz?

16         A          That´s correct.

17         Q          Did you remove it from her body at the

18   time of autopsy?

19         A          Yes.

20         Q          And did you later turn it over to

21   Trooper Terry Williams?

22         A          Yes, I did.

23         Q          When was that, Dr. Sopher?

24         A          December 17th of ´79.

Sopher - Direct                                        860

1          Q          At the same time, did you also give

2     Trooper Williams a blood sample from Bernadette?

3          A          Yes, I did.

4          Q          During the period of time that

5     Bernadette's clothes were in your possession, did you

6     alter them or change them in any way?

7          A          No, ma'am.

8          Q          What did you find upon autopsy -- or,

9     Doctor, before I get to that, in the photograph there

10    appears to be some bluish or greenish marks on

11    Bernadette's skin.  Do you know what those are?

12         A          Those are tattoos.  She had obvious

13    tattoos; I imagine that's what you're referring to.

14         Q          Yes.

15         A          On the left upper extremity, a child's

16    transfer tattoos, that they moisten and put on their

17    skin.  She had a pair of these on the left upper

18    extremity, one on her nose, and I think the boy also had

19    one of those.  And I think maybe the mother as well.  But

20    I remember those.

21         Q          What did you find upon autopsy

22    examination of Bernadette Reggettz?

23         A          The findings of the autopsy upon

24    Bernadette were that she had died of ligature

Sopher - Direct                                                861

1    strangulation by hanging, and when you have a mode of

2    exodus involving two causes of death, one cannot separate

3    one from the other in this particular case.

4           In other words, what I'm saying is that whether

5    she were alive or not when suspended from the door, I

6    can't be certain.   She certainly had ligature

7    strangulation injury about the neck, and also had

8    strangulation injury about the neck, and had little

9    petechial hemorrhages, which we talked about earlier, of

10   her face and eyes as well.

11          As to whether she was definitely alive at the

12   time she was hung up, having been dead already from

13   ligature strangulation, I think it's too close to call.

14   So, she may or may not have been dead at the time she was

15   hung, or she may have been just unconscious from the

16   ligature and then hung on the door, and died from

17   hanging.  Either one could be responsible for her death;

18   there's no question.

19          And there was no other cause of death about her.

20   Q        Did her face also show the suffusion?

21   A        Yes, it did.

22   Q        Was it as marked as on her mother?

23   A        Not as marked, no, ma'am.

24   Q        Did she have petechiae?

Sopher - Direct                                                   862

1          A          Yes, she did.

2          Q          Whereabouts?

3          A          Of the face and the eyes.

4          Q          Did you examine her stomach contents?

5          A          Yes, I did.

6          Q          What did you find?

7          A          The stomach contents were negative;
8    that is, there was no presence of food of any type within
9    her stomach.

10         Q          Is that consistent with eating dinner
11   in the evening and being killed at 6:00 o'clock in the
12   morning?

13         A          Yes, it is.

14         Q          Do you have an opinion about whether
15   these people could have been killed as early as 9:00
16   o'clock the previous evening?

17         A          Yes, I do.

18         Q          What is that?

19         A          Assuming, number one, that they had
20   eaten a meal at the usual dinner hour, and I think that
21   was part of the original history that was obtained by law
22   enforcement, that is, that there was a meal in between
23   6:00 and 8:00 p.m., something of that nature, although
24   it was unknown how much the children may have eaten, as

Sopher - Direct                                           863

1    I recall, that was back a few years.

2        Plus, the absence of the rigor mortis and the

3    level of the mother, that would not be expected that at

4    9:00 p.m. on the night of December 12th, is too early of

5    a timeframe for it not to be expected to represent the

6    time of death of these individuals.

7        Q       On the evening of December 13, 1979,

8    did you examine Paul Reggettz, the adult?

9        A       Yes, December 13th it would have been;

10   that's correct.

11       Q       Did you ask him to show you his arms

12   and legs?

13       A       That's correct.  And I think I lifted

14   up his shirt and he dropped his trousers.

15       Q       What were you looking for?

16       A       Well, having been at the scene, and

17   there was evidence of various blood splatters about the

18   house, that ---

19       Q       You were looking for evidence of

20   injury?  Did you find any?

21       A       No.  There was no evidence ---

22       MR. BICKLEY:  Your Honor ---

23       THE WITNESS:  -- of injury of any type on the

24   areas examined, which would be on his hands, arms, legs,

Sopher - Direct                                                  864

1    et cetera.  I think he lifted up his shirt and dropped

2    his trousers, but I'm not sure of that at this point.

3              I remember that there was no visible injury,

4    however, certain to the exposed areas of the body, which

5    would include his hands, forearms, and face.

6              MS. LUSK:  I think that's all I have at this

7    time, your Honor.

8

9                        CROSS-EXAMINATION

10

11   BY MR. BICKLEY:

12

13        Q         Dr. Sopher, if I tell you that there

14   was testimony previously that the children did not have

15   any dinner that evening, and you finding no food in their

16   stomach, would that be inconsistent testimony, vis-a-vis

17   what you actually saw?

18        A         Well, of course, the stomach contents

19   are one aspect that we look at in estimating the time a

20   person died.  And if someone hasn't, in fact, eaten, then

21   you can't use that three to four to five hour interval,

22   but the degree of rigor mortis, or stiffening of the

23   body, and the temperature of the mother would suggest

24   that they, in fact, had not been deceased since 9:00

Sopher - Cross                                                    865

1    p.m., if that's the situation that you're asking me

2    about. That is, they don't show enough stiffening or the

3    mother hasn't lost enough, you know, body heat, for one

4    to conclude or reasonably expect that the deaths would

5    have occurred as early as 9:00 p.m.

6           Q          Would it be safe to say that the

7    possible time of death could have been arranged say,

8    between 12:00 o'clock to 3:00 o'clock?

9           A          Possibly, but not likely.

10

11                     REDIRECT EXAMINATION

12

13   BY MS. LUSK:

14

15          Q          At the time this estimate was raised,

16   had you weighed Vanessa Reggettz?

17          A          At the time this estimate was raised,

18   this was based upon the amount of rigor mortis noticed

19   at the scene, and the rectal temperature that we talked

20   about earlier, which was taken at the house of the

21   individuals where the murders and deaths occurred.

22          The stomach contents were not available at that

23   point, because we had not done the autopsy examinations

24   at that point, and of course, I realize that most of you

Sopher – Redirect                                         866

1    have never been involved with a death investigation, but

2    at a death scene, based upon the rigor mortis and body

3    temperature, plus other information that may incoming

4    from the scene itself, an estimate is derived and a

5    forensic pathologist will derive an estimate from law

6    enforcement even at that early stage of the

7    investigation.

8             As to during what timeframe, the pathologist

9    thinks the deaths occurred, and primarily upon the body

10   temperature at that point, of Mrs. Reggettz, the window

11   was provided to the law enforcement agency that you're

12   probably looking at somewhere between 12:00 midnight of

13   the 13th; that is, 12:01 a.m. of the 13th, and like 4:00

14   a.m. of the 13th.

15            But as I've been mentioning, there's a lot of

16   variation in everything one looks at for time of death

17   estimation; it's an estimate, not like what one sees on

18   Perry Mason or our friend, Quincy.  By the way, Quincy

19   is a forensic pathologist, you know.  We're not as good

20   as Quincy, and there is no person, for example, when

21   you're talking about estimating time of death between,

22   let's say 2:00 a.m. in the morning or 1:00 a.m. in the

23   morning or 6:00 a.m. in the morning, when you're looking

24   at bodies at 3:00 o'clock or 3:30 the next afternoon.

Sopher - Redirect                                              867

1        The dead body is just not that specific in what

2   we have to observe or measure to narrow it down to either

3   one of those times.

4        Q        When you looked at, or when you gave

5   this window at the scene, Dr. Sopher, had you weighed

6   Vanessa Reggettz?

7        A        At that point, she was not weighed.

8   She would have been weighed later that evening.

9        Q        And did you state earlier that the

10  formula that you used was for a person of average body

11  weight?

12       A        That's correct.

13       Q        And that means that Vanessa Reggettz

14  would lose body temperature quicker than the average

15  person because of her slight stature?

16       A        That's correct.

17       Q        Now, when you look at the time of death

18  in this case, Dr. Sopher, as we were stating earlier, let

19  me ask you this first.

20       Is there anything about any of these three bodies

21  that is inconsistent with the time of death being at 6:00

22  o'clock in the morning?

23       A        There is nothing in any of the three

24  bodies that would eliminate 6:00 a.m. on the 13th of

Sopher - Redirect                                          868

1    December as being the time of death.  And, for that

2    matter, even 7:00 a.m.  It isn't that specific.

3              But to answer your question directly, there is

4    nothing that eliminates that possibility.

5              Q        When you look at the livor mortis

6    pattern and the mottling pattern of Bernadette Reggettz's

7    legs, is -- let me pose two hypotheses:  If Bernadette

8    Reggettz had been killed and hung on the door some time

9    prior to midnight, no earlier than, say, 11:00 probably.

10   And if she had hung on that door until 1:30 and was taken

11   down and placed on the bed ---

12             MR. BICKLEY:  May we approach the bench, your

13   Honor?

14             THE COURT:  Yes.

15

16             WHEREUPON, a bench conference was held, and the

17   following transpired:

18

19             MR. BICKLEY:  She had rested.  I asked two

20   questions, and now we open up the argument again.

21             MS. LUSK:  The whole thing is the time of death,

22   Judge.  That's the whole thing.

23             MR. BICKLEY:  We've been through this livor

24   mortis once, and I asked nothing about livor mortis.

Sopher - Redirect                                            869

1          MS. LUSK:  He asked time of death questions.

2          THE COURT:  I understand that.  But is he going

3    to testify to something that he hasn't already testified

4    to?

5          MS. LUSK:  No.

6          THE COURT:  Well, it's just repetition, then.

7

8          WHEREUPON, the bench conference was concluded.

9

10         (Back on the Record)

11

12         MS. LUSK:  That's all I have.

13         MR. BICKLEY:  I have no further questions, your

14   Honor.

15         THE COURT:  Doctor, you may step down.

16         May he be excused?

17         MS. LUSK:  Yes.

18         MR. BICKLEY:  Yes, your Honor.

19         THE COURT:  Folks, we'll take about five minutes.

20

21         WHEREUPON, the Court stood in a recess in the

22   hearing of this case.

23

24         (Back on the Record)

870

1      WHEREUPON,  the  was  an  off-the-record  bench

2   conference.

3

4      (Back on the Record)

5

6      THE COURT:  Let me apologize for the delay.  By

7   the way, I think they got the air conditioning fixed.

8   I was embroiled in telephone calls that took longer than

9   I thought.  It was purely my fault.

10      Okay.  You want to call your next witness?

11      MR. REVERCOMB:  Yes, your Honor.  The State would

12   call Paul Fortson.

13

14      WHEREUPON, Paul Fortson was duly sworn, and upon

15   his oath, deposed as follows:

16

17                DIRECT EXAMINATION

18

19   BY MR. REVERCOMB:

20

21      Q       Would you please state your name, sir?

22      A       My name is Paul Fortson.

23      Q       You need to speak up.  Can you please

24   speak into the microphone?

Fortson - Direct                                             871

1          A         My name is Paul Fortson.

2          Q         Where do you live?

3          A         1725 Chesapeake Avenue, in St. Albans.

4          Q         Are you familiar with the house at 1727

5    Chesapeake Avenue?

6          A         Yes, I am.

7          Q         Is that next door to you?

8          A         Yes, it is.

9          Q         Who owns that house?

10         A         It's owned by my father, Alexander

11   Fortson.

12         Q         How long have you lived at 1725

13   Chesapeake Avenue?

14         A         Twenty-six years.

15         Q         Mr. Fortson, I'm going to have you

16   what's been marked for identification purposes as State's

17   Exhibit 1, and ask you to examine that photograph, and

18   tell us what that photograph depicts?

19         A         It's a house next door to my house --

20   my father's house.

21         Q         Is that the way it appeared in 1979?

22         A         Yes, it is.

23         Q         I will now hand you what has been

24   marked for identification purposes as State's Exhibit 3

Fortson - Direct                                    872

1    and ask you to speak up and tell us what that is?

2         A         It's the house next door to mine, this

3    is my grandfather's house and grandmother's house.

4         Q         Is that the same house at 1727?

5         A         Yes, it is.

6         Q         What view is that of the house?

7         A         This is the rear view of the back, off

8    of the railroad tracks.

9         Q         Does that depict the house as it

10   existed on December 13, 1979?

11        A         Yes, it does.

12        Q         In State's Exhibit 3, can you see the

13   back door?

14        A         Yes, I can.

15        Q         Can you tell us how this back door was

16   hung on its hinges?

17        A         Okay.  The top hinges were -- the

18   screws were kind of loose, so you'd have to lift up on

19   the door to close it.

20        Q         How did you close it?  Did the door

21   open into or outside of the house?

22        A         It opened into the house.

23        Q         So, if you were closing it in the

24   kitchen, how would you close it?

Fortson - Direct                                      873

1        A        You'd have to lift up on it and push on

2   it in order to shut the door if you's going inside.

3        Q        For it to fit into the door frame?

4        A        Yes.

5        Q        Since 1979, have you done some work on

6   this house?

7        A        Yes.  We've done extensive work on that

8   house on the inside of it.

9        Q        On the inside?

10       A        Yes.

11       Q        It's been painted on the outside, too,

12  hasn't it?

13       A        Yes.  The outside's been painted.

14       Q        What's been done on the inside of the

15  house?

16       A        Well, we paneled three rooms, put in a

17  new drop ceiling which is in the living room, taken the

18  door off the back bedroom which leads to the bathroom,

19  and built a new closet in there.

20            We've taken and built some walls out of

21  sheetrock.

22       Q        Did you put up the new sheetrock in the

23  same location as the previous walls were located?

24       A        Yes.

Fortson - Direct                                          874

1       Q        So, you built a closet in the back

2    bedroom -- can you describe that a little bit?

3       A        It's made out of cedar.  Where the

4    doorway is when you come out of the dining room into the

5    bedroom, it starts right at the doorway and goes and cuts

6    back towards the bathroom.

7       Q        Would you please step down and show

8    that to us on this diagram?

9       A        (Indicating)

10      Q        Where is the room that you call the

11   dining room?  Is this the back room door?

12      A        This would be the dining room here

13   (Indicating).

14      Q        Where is the back bedroom that you

15   talked about putting the closet in?

16      A        It would be behind this door and we

17   built the closet to go around there.

18      Q        You've done that since the murders in

19   1979?

20      A        Yes, I have.

21      Q        Have you done anything in this living

22   room next to the fireplace?

23      A        Yes.  We have closed in the fireplace

24   all the way up.

Fortson - Direct                                                  875

1     Q          What about the front bedroom?  This

2     door between the front bedroom and the living room?

3     A          Okay.  It's closed right now.  And the

4     door is kept shut.

5     Q          It is not used?

6     A          No, it's not used.

7     Q          And this is the front door?

8     A          Yes, it is.

9     Q          Now, I'll show you what's been marked

10    for identification purposes as State's Exhibit 21 and ask

11    you if you can identify what room this is a photograph

12    of?

13    A          Okay.  It's the dining room -- I call

14    it the dining room.

15    Q          Is the TV room in this room?

16    A          Yes, it was sitting right there

17    (Indicating).

18    Q          Now, which wall would the TV have been

19    against in this photo in 1979?

20    A          Against this wall.

21    Q          In 1979, were there any electrical

22    outlets on this wall?

23    A          No, there wasn't.

24    Q          Are there now?

Fortson - Direct                                            876

1          A          Yes, sir, there is.  There is one on

2     each wall now.

3          Q          On each of these walls?

4          A          Yes, on all four walls.

5          Q          What is that a result of?

6          A          We've rewired the house and put in a

7     new panel box.

8          Q          You have electrically rewired the whole

9     house?

10         A          Yes.

11         Q          And it's your testimony that there was

12    no outlet on this wall in '79?

13         A          No.

14         Q          What about this wall (Indicating)?

15         A          No.

16         Q          What about this wall over here?

17         A          No, there wasn't.

18         Q          How about on this side wall here where

19    you go into the living room?

20         A          Yes, there was.

21         Q          In 1979, there was?

22         A          Yes.

23         Q          I believe there was a heater there at

24    that time, too?

Fortson - Direct                                                     877

1          A          Yes, there was.

2          MR. REVERCOMB:  I believe that´s all I have.

3          MR. HUFFMAN:  We have no questions at this time,

4     although I would note that the witness has also been

5     subpoenaed by the defense.

6          THE COURT:  Will you give him notice if you need

7     him?

8          MR. HUFFMAN:  Yes, I will.

9          THE COURT:  I´m going to excuse you now, Mr.

10    Fortson.  If needed, your attorney will contact you.

11         THE COURT:  Okay, call your next witness.

12         MR. REVERCOMB:  Your Honor, I believe that´s all

13    of the witnesses that we have for today.

14         THE COURT:  Well folks, it looks like you will

15    get off early again today.  The pace is really moving a

16    bit more quickly than expected and we anticipate that

17    it´s not going to take the full two weeks that we had

18    originally planned.  That´s why I´m not hesitant to knock

19    off and recess a little bit early.

20         As you know, you´ve all been members -- seen

21    members of the media here, both television and newspaper.

22    I´ll remind you of my admonition to please do not watch

23    any television coverage or read any newspaper articles

24    because it is sure to be there.

878

1        Now, put the case out of your minds until you

2    return tomorrow.  We´ll get started at 9:00 o´clock.

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:


I, Connie L. Cooke, Official Reporter for the Circuit Court of Kanawha County, do hereby certify that the foregoing is a true and correct transcript of the proceedings had and reported in the matter of the State of West Virginia versus John Moss, Jr., aka John Moss, III, upon action number 82-F-221, as stated in the caption hereto, had on the 19th day of April, 1990, during the May 1990 Term of said Court, as reported by me and transcribed into the English language.

I hereby certify that the transcript within meets the requirements of the Code of the State of West Virginia, 51-7-4, and all rules pertaining thereto as promulgated by the Supreme Court of Appeals.

Given under my hand this 13th day of July, 1990.


*Connie L. Cooke*

Official Reporter

```
 1      IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

 2

 3

 4      STATE OF WEST VIRGINIA

 5

 6      v.                                    Action No. 82-F-221

 7

 8      JOHN MOSS, JR., aka JOHN MOSS, III

 9

10

11             BEFORE:  Hon. A. Andrew MacQueen, Judge

12                              Day 5

13

14

15                          APPEARANCES

16

17          For the State:  Neva Lusk and Stephen Revercomb,

18      Assistant Prosecuting Attorneys for Kanawha County.

19          For the Defendant:  The Defendant, in person, and

20      by Nelson R. Bickley, Timothy N. Huffman, and Kathy

21      Beckett, his counsel.

22

23

24                          Connie L. Cooke

25                          Official Reporter
```

FILED

JAN 23 1990

ANCIL G. RAMEY, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

2

1                    WITNESSES FOR THE PLAINTIFF

2

3                                              D      X     RD    RX

4      1)  Trooper Terry Williams            425    590   612   619

5      2)  Scott Leasure                     625    630

6      3)  John Fulks                        631

7      4)  Joe Dean Jarrell                  635    640

8      5)  William D. Estep                  643

9      6)  Lt. Clarence Ralph Lane          650    654

10     7)  Paul Reggettz                     661    735   762   764

11     8)  Trooper Robert R. Custer          767    779   781

12     9)  Sgt. R. L. Presson                782    796   798

13    10)  Irvin R. Sopher, M.D.            799    864   865

14    11)  Paul Fortson                      870

15    12)  Arbutus Johnson Pomeroy          896    903   905

16    13)  Michael D. Smith (In Camera)     907    913

17    14)  John Moss (In Camera)            917    919   914

18    15)  Michael Don Smith                931    978

19    16)  Charles E. Pettry, Jr.               997  1004   1009

20    17)  Lt. David H. Shumate            1021   1045

21    18)  Fred S. Zain                    1048   1053

22                               and       1065   1125   1135  1137

23

24

3

1            WITNESSES FOR DEFENDANT

2

3                                    D     X    RD    RX

4

5    1)  Alexander Fortson          1164  1173

6    2)  Willie James Moss          1179  1187  1191  1192

7    3)  John Moss, Jr.             1193

8    4)  John C. Wideman            1202  1204

9    5)  Trooper Howard Woodyard    1208  1222  1233  1234

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

881

1    BE IT REMEMBERED, that on Friday, the 20th day of

2    April, 1990, during the January 1990 Term of said Court,

3    in the matter of the State of West Virginia versus John

4    Moss, Jr., aka John Moss, III, Action No. 82-F-221, as

5    stated in the caption hereto, the following transpired:

6

7    (The following took place in the Jury Room,

8    whereupon the Judge conducted individual voir dire)

9

10    THE COURT:  Bring in Steve Gancs.

11

12    WHEREUPON, Steve Gancs was brought to the jury

13    room.

14    THE COURT:  Good morning, Mr. Gancs.  Please have

15    a seat.  I know that -- you know that I've asked you all

16    not to read the newspapers.  I just want to know if

17    you've read the newspapers?

18    JUROR GANCS:  No, I've stayed away from them.

19    THE COURT:  Has anybody talked to you about what

20    is in the newspaper this morning?

21    JUROR GANCS:  No.

22    THE COURT:  Nothing?  Nothing at all?

23    JUROR GANCS:  No.

24    THE COURT:  Do you have any questions?

882

1        MS. LUSK:  No, Judge, I have no questions.

2        MR. BICKLEY:  No, we have none.

3        THE COURT:  Now, don't tell anybody what we're

4   calling everybody back here for.

5        JUROR GANCS:  All right.

6        THE COURT:  Okay.  Please bring in Mr. Boyd.

7

8        WHEREUPON, William Boyd was brought to the jury

9   room.

10       THE COURT:  Hello, Mr. Boyd.  Have a seat.

11       As has been the case, typically there was a piece

12   in the newspaper this morning.  Did you see it?

13       JUROR BOYD:  No, I didn't.

14       THE COURT:  Have you heard anybody discuss it or

15   say anything about it?

16       JUROR BOYD:  No.

17       THE COURT:  If anybody should bring that article,

18   or any article, to your attention, would you please tell

19   me?

20       JUROR BOYD:  Yes, sir.

21       THE COURT:  Very good.  Thank you.

22       JUROR BOYD:  My wife looks at the paper, but she

23   doesn't know what I'm on or anything.

24       THE COURT:  She doesn't?  I'll bet she'll be

883

1    surprised when you get back.  She hasn't see you on TV;

2    has she?

3              JUROR BOYD:  No, not yet.

4              THE COURT:  Okay.  You can go on back.

5              JUROR BOYD:  Thank you.

6              THE COURT:  Please bring back Frances Batman.

7

8              WHEREUPON, Frances Batman was brought to the jury

9    room.

10             THE COURT:  Hi, Ms. Batman.  Is it Batman or

11   Bateman?

12             JUROR BATMAN:  Batman.

13             THE COURT:  As there has been throughout most of

14   this trial, there is an article about this case in this

15   morning's paper.  Did you see it?

16             JUROR BATMAN:  No, we don't get that paper.

17             THE COURT:  Has anybody tried to discuss that

18   article with you?

19             JUROR BATMAN:  No.

20             THE COURT:  If anybody should do that, would you

21   tell me, please?

22             JUROR BATMAN:  I will.

23             THE COURT:  Good.  Thank you very much.

24             JUROR BATMAN:  I haven't been able to watch

884

1 television or read the newspapers since I´ve been here.

2 THE COURT:  Thank you, ma´am.

3 Okay.  Bring in Elizabeth Stern.

4

5 WHEREUPON, Elizabeth Stern was brought to the

6 jury room.

7 THE COURT:  Good morning.  How are you, Mrs.

8 Stern?

9 JUROR STERN:  Fine.

10 THE COURT:  There´s nothing in particular --

11 there´s just a piece in this morning´s newspaper, and I

12 just wondered -- did you have a chance to see that?

13 JUROR STERN:  No, I didn´t see this morning´s

14 paper.

15 THE COURT:  Well, let me ask you to please not

16 see it, and as I´ve asked before, has anybody mentioned

17 anything to you about it?

18 JUROR STERN:  No, I talked to my boss this

19 morning, but he didn´t say anything.  He usually makes

20 some crack about how this is supposed to last longer than

21 two weeks.

22 THE COURT:  He doesn´t know that we´re going to

23 get out of here early.  If anyone should say something

24 to you about any of these things, please let me know.

885

1          JUROR STERN:  All right.

2          THE COURT:  Okay.  Bring in Linda Haynes.

3

4          WHEREUPON, Linda Haynes was brought to the jury

5      room.

6          THE COURT:  Hi, Ms. Haynes.  Have a seat.  How

7      are you this morning?

8          JUROR HAYNES:  Fine.

9          THE COURT:  We're just doing a kind of routine

10     check.  There was a piece in this morning's paper about

11     this case.  Did you have a chance to see that?

12         JUROR HAYNES:  No.

13         THE COURT:  Have you heard anybody discuss it?

14         JUROR HAYNES:  No.

15         THE COURT:  Well, if anybody should tell you

16     anything about that or any other publicity, would you let

17     me know?

18         JUROR HAYNES:  Okay.

19         THE COURT:  Good.

20         Okay.  Bring in Sherry Grubb.

21

22         WHEREUPON, Sherry Grubb was brought to the jury

23     room.

24         THE COURT:  Hi, Ms. Grubb.  How are you this

886

1   morning?

2        JUROR GRUBB:  Just fine, thank you.

3    ,   THE COURT:  We just want to ask -- there's an

4   article in this morning's paper about this case, and --

5   did you have a chance to see that?

6        JUROR GRUBB:  No.  I don't get the morning paper.

7        THE COURT:   Good.   Has anybody talked to you

8   about it or said anything about it?

9        JUROR GRUBB:  No.

10       THE COURT:   If anybody tells you anything about

11   that or any other stories or something on television,

12   would you let me know?

13       JUROR GRUBB:  Okay.

14       THE COURT:  Thank you.

15       Okay.  Bring back Jacqueline Hill.

16

17       WHEREUPON, Jacqueline Hill was brought to the

18   jury room.

19       THE COURT:  How are you, Ms. Hill?  You want to

20   sit down for just a second?  We're just kind of checking

21   in with everybody.

22       There was an article and a news story about this

23   case in this morning's newspaper.  Did you have a chance

24   to see that?

887

1      JUROR HILL:  No, sir.

2      THE COURT:  Has anybody talked to you about this

3  or any other articles so far that have been in the paper

4  or on television?

5      JUROR HILL:  No, sir.

6      THE COURT:  Wonderful.  I expected that you would

7  follow my instructions.

8      JUROR HILL:  All of our papers are folded in

9  rubber bands.

10      THE COURT:  You´d better get back there.  There

11  might be some sale or something ---

12      JUROR HILL:  No, I´m afraid to touch them.

13      THE COURT:  Thank you very much.

14      Please bring back Martha Brady.

15

16      WHEREUPON, Martha Brady was brought back to the

17  jury room.

18      THE COURT:  Good morning.

19      JUROR BRADY:  Good morning.

20      THE COURT:  How are you?

21      JUROR BRADY:  I´m fine.  How are you?

22      THE COURT:  I´m okay.  It´s a Friday and another

23  weekend of rain.

24      Every morning there has been a piece in the

888

1    paper, and we're doing kind of a status check. Have you

2    had a chance to see anything in the paper?

3                THE JUROR BRADY: This morning, I looked at James

4    Dent's column, but I folded the paper over.

5                THE COURT: I expected that's what you did. Has

6    anybody else said anything about this case or anything?

7                JUROR BRADY: No.

8                THE COURT: That's marvelous. I thank you very

9    much. If anybody should say anything, will you let me

10   know?

11               JUROR BRADY: Yes, sir.

12               THE COURT: Thank you very much.

13               Please bring in Michele Williamson.

14

15               WHEREUPON, Michele Williamson was brought to the

16   jury room.

17               THE COURT: Good morning. How are you?

18               JUROR WILLIAMSON: I am fine.

19               THE COURT: Let me ask you this -- there has been

20   a piece so far as I can tell, in the morning and the

21   afternoon papers every day on this case. There was a

22   piece in there this morning; did you see it?

23               JUROR WILLIAMSON: I don't read the papers.

24               THE COURT: Did anybody talk to you about it?

889

1    JUROR WILLIAMSON:  No, I've been real lucky.

2    THE COURT:  Terrific.  If anybody should say

3    anything about anything in the newspapers or on

4    television, I suspect there may also be radio coverage,

5    would you please let us know?

6    JUROR WILLIAMSON:  I sure will.

7    THE COURT:  Thank you.

8    Okay.  We're ready for Nolan Holstein.

9

10   WHEREUPON, Nolan Holstein was brought to the jury

11   room.

12   THE COURT:  Hi, Mr. Holstein.  How are you?

13   JUROR HOLSTEIN:  Fine.

14   THE COURT:  Every day both newspapers have had

15   some coverage about this case.  I just wondered if you

16   saw a piece in this morning's paper?

17   JUROR HOLSTEIN:  No, I haven't.  The only thing

18   I saw was your picture and his picture on the front of

19   the newspaper one day this week.  Somebody had it in

20   there.  We kept turning it over, and somebody kept

21   turning it back over.

22   THE COURT:  Do you mean back in the jury room?

23   JUROR HOLSTEIN:  Right.

24   THE COURT:  Good for you.  I take it, then, that

1   nobody has talked to you about anything in this case?

2          JUROR HOLSTEIN:  No, sir.

3          THE COURT:  Good.  If anybody should do that,

4   would you tell me?

5          JUROR HOLSTEIN:  Yes, sir.

6          THE COURT:  Marvelous.  Thank you very much.

7          JUROR HOLSTEIN:  If they do, I'll try my best to

8   get their names.

9          THE COURT:  Thank you.

10         Okay.  Wanda Young.

11

12         WHEREUPON, Wanda Young was brought to the jury

13   room.

14         THE COURT:  Good morning, Ms. Young.  How are

15   you?

16         JUROR YOUNG:  Fine, thank you.

17         THE COURT:  We're just doing a sort of periodic

18   check.  There has been newspaper coverage of this case

19   every day.  Have you seen anything in the newspapers?

20         JUROR YOUNG:  No, sir.

21         THE COURT:  Did you see anything this morning?

22         JUROR YOUNG:  No.

23         THE COURT:  Has anybody talked to you about any

24   of the articles that were in the newspaper or on

891

1    television?

2           JUROR YOUNG:  No.

3           THE COURT:  Good.  If someone should come to you

4    and offer some information, please let me know.

5           JUROR YOUNG:  All right.

6           THE COURT:  Thank you.

7           Please bring in Ms. Fawcett.

8

9           WHEREUPON, Alice Fawcett was brought to the jury

10   room.

11          THE COURT:  Hi, Ms. Fawcett.  How are you this

12   morning?

13          JUROR FAWCETT:  Fine, thank you.

14          THE COURT:  Great.  We've had news coverage of

15   this case by just about every news media, although I

16   haven't heard it on the radio.  I'm just wondering if you

17   saw a news article in the newspaper this morning?

18          JUROR FAWCETT:  No, I haven't read the newspaper

19   or listened to the news since this trial started.

20          THE COURT:  Marvelous.  We couldn't ask for

21   anything more.  Have you heard anybody -- has anybody

22   told you about anything?

23          JUROR FAWCETT:  No.

24          THE COURT:  Good.  Well, if somebody should do

892

1    that, please tell me.

2         JUROR FAWCETT:   Nobody knows that I'm on this

3    trial.

4         THE COURT:   Nothing would please me any better

5    than that.   Thank you.

6         We're ready for Beverly Samples.

7

8         WHEREUPON, Beverly Samples was brought to the

9    jury room.

10        THE COURT:   Hi, Ms. Samples.   Are you catching a

11   cold?

12        JUROR SAMPLES:   I think I'm trying to.

13        THE COURT:   We've had newspaper and television

14   coverage every day that we've been on this case.   Have

15   you seen anything -- any kind of coverage?

16        JUROR SAMPLES:   No.

17        THE COURT:   Did you see the piece in this

18   morning's paper?

19        JUROR SAMPLES:   No.

20        THE COURT:   Have you heard anybody discuss the

21   case or any news coverage?

22        JUROR SAMPLES:   No.   I have been trying to avoid

23   it the best I can.

24        THE COURT:   That's all I ask.   Thank you.

893

1          Okay.  Bring in George Ball, please.

2

3          WHEREUPON, George Ball was brought to the jury

4    room.

5          THE COURT:  Good morning.  How are you, Mr. Ball?

6          JUROR BALL:  Fine.

7          THE COURT:  You may or may not know that we've

8    had newspaper and television coverage every day of this

9    trial.  Have you seen any articles in the newspaper this

10   morning?

11         JUROR BALL:  No.

12         THE COURT:  Has anybody talked to you about any

13   newspaper or television coverage?

14         JUROR BALL:  No.

15         THE COURT:  If anybody should try to bring any of

16   that information to your knowledge, would you tell me

17   about it?

18         JUROR BALL:  Yes.

19         THE COURT:  That's all I need to know.  Thank

20   you.

21

22         WHEREUPON, Juror Ball returned to the Jury

23   Lounge.

24

894

1     MR. BICKLEY: I'm going to tell you about a phone

2     call, obviously, that we can't use in the trial.

3     We had a phone call last evening up at my office.

4     This guy asked me -- he wouldn't give me his name -- and

5     I put him on the speaker phone, and I said, "Can I put

6     you on the speaker phone, I have my other colleagues

7     here?" He said, "Which lawyer are you?" And I said,

8     "Why?" He said, "I want to tell you something, but I

9     want to know which lawyer you are." I said, "What

10    difference does that make, if you're not going to tell

11    me your name? Just tell me what you're going to tell

12    me."

13    I didn't know which way to jump. So, he said,

14    "Are you Moss's lawyer or are you Reggettz's lawyer?"

15    And I said, "Well, first, you tell me who you are." He

16    said, "Well, I'll tell you anyway." He said, "Reggettz

17    did it." I said, "What?" He said, "Reggettz did it."

18    I said, "Reggettz did what? Why don't you come forward?

19    How do you know that?" He said, "Reggettz's wife told

20    my wife a week before she died that she was going to get

21    killed."

22    I said, "I don't think we can use that, but I'd

23    like for your wife to go talk to the Prosecutor. We

24    can't do anything in Court. I don't think I can get it

895

1    in." But I said, "That's some interesting information

2    for the world to know about." I said, "How long have you

3    been keeping this information?"

4         He said, "I don't like that guy. Do you know

5    where Mrs. Reggettz had to sleep?" I said, "I don't have

6    any idea." He said, "She had to sleep with the kids, and

7    when he wanted to make love, she had to go back over to

8    his bed, then he would put her back out. I hated that

9    guy. He would make her divide up one hot dog for three

10    people." And he went on and on.

11         THE COURT: And that guy never identified

12    himself?

13         MR. BICKLEY: He never identified himself. He

14    wouldn't tell me who he was.

15         MS. BECKETT: A friend of Paul's though.

16         MR. BICKLEY: He said he'd been a friend of Paul

17    Reggettz.

18         THE COURT: If he knows those things and they are

19    true, that sounds like he's a damned good friend, not to

20    tell it.

21         MS. BECKETT: He said they used to be together as

22    couples and families.

23         MR. BICKLEY: They also heard him on the speaker

24    phone. He said, "I just wanted you to know," and then

896

1   he called back later about this sex thing, said she slept

2   in the other bedroom, and then whenever Reggettz felt

3   amorous, she was summoned.

4       I'm just reporting to you.

5

6       WHEREUPON, the proceedings in the jury room were

7   concluded.

8

9       (Back on the Record in the Courtroom)

10

11      THE COURT:   Okay.   Steve.

12      MR. REVERCOMB:   We call Arbutus Johnson to

13  testify.

14

15      WHEREUPON, Arbutus Johnson Pomeroy was duly

16  sworn, and upon her oath, deposed as follows:

17

18                  DIRECT EXAMINATION

19

20  BY MR. REVERCOMB:

21

22      Q       Would you state your name for the

23  record, please?

24      A       Arbutus Pomeroy.

Pomeroy - Direct                                                    897

1         Q         Could you speak up, please, so we all

2    can hear you?

3         A         Arbutus Pomeroy.

4         Q         And Ms. Pomeroy, you´re from Texas now?

5         A         Yes, sir.

6         Q         Where did you live in 1979?

7         A         St. Albans, at the Town ´N Country

8    Motel.

9         Q         And what -- did you work there?

10        A         Yes, I was the manager.

11        Q         And is that in St. Albans, Kanawha

12   County, West Virginia?

13        A         Yes.

14        Q         I would call your attention more

15   specifically to December of 1979, and ask you if you were

16   working in St. Albans then?

17        A         Yes.

18        Q         And were you at that time acquainted

19   with the defendant, John Moss?

20        A         Yes.

21        Q         How did you know him?

22        A         He was a friend of my son, Billy.  They

23   went to school together.

24        Q         Did he come to your home?

Pomeroy - Direct                                                898

1          A        Yes.

2          Q        Do you recall the homicide -- the

3    murders that occurred down there in December of 1979?

4          A        Yes, I do.

5          Q        Did you see John Moss after those

6    murders?

7          A        Yes.

8          Q        Let me ask you, did he give you

9    anything for christmas that year?

10         A        Yes, he did.

11         Q        What was that?

12         A        A set of silverware.

13         Q        Ms. Pomeroy, I'm going to hand you what

14   has been marked for identification purposes as State's

15   Exhibit 100, and ask you to examine this exhibit.  Have

16   you seen this before?

17         A        Yes, I have.

18         Q        Where have you seen it before?

19         A        At my house.  He gave me a set of

20   silverware for Christmas.

21         Q        You say he -- is that John Moss, the

22   defendant?

23         A        Yes.

24         Q        This is the set of silverware that he

Pomeroy - Direct                                          899

1    gave to you in December of 1979?

2         A        Yes, or one just like it.  That's been

3    a lot of years ago.

4         Q        I understand that.  Do you recall when

5    he gave this present to you?

6         A        It was shortly before Christmas, just

7    a few days before Christmas, during the holidays.  He was

8    going to go back to Cleveland, moving back to Cleveland.

9    And he gave it to me, like, the night before.

10        Q        Did he give this present to you after

11   the murders?

12        A        Yes.

13        Q        At that time, did you notice any cuts

14   or marks on him?

15        A        Billy came home one day after school

16   ---

17             MR. BICKLEY:  Objection.

18             THE COURT:  You can't tell us what Billy told

19   you.

20             THE WITNESS:  Billy told me that ---

21             MR. BICKLEY:  Objection.

22             THE COURT:  You can't say what somebody else

23   said.

24             THE WITNESS:  John came to our house that night

Pomeroy - Direct                                           900

1    because he was going to be moving the next day, or

2    leaving.   So, I was told he was going to come to our

3    house to visit that night.

4

5    BY MR. REVERCOMB:

6

7          Q        Did he?

8          A        Yes, he came to visit.

9          Q        Did you notice any marks or scratches

10   on him?

11         A        Yes, he had scratches on his face.

12         Q        Would you describe them, the best you

13   remember?

14         A        There was just a Band Aid, some

15   scratches and a Band Aid.  So, I just asked him what

16   happened?

17         I said, "What happened to your face?"  It was

18   just sort of a comment.

19         Q        Did John Moss answer you?

20         A        No, not really.

21         Q        When you say scratches, was there more

22   than one scratch?  Could you describe it?

23         A        I think there was more than one

24   scratch.  There was a Band Aid, like, in the center of