**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 20**
**(CONTINUATION, pp. 901 - 1050)**

Pomeroy - Direct                                                  901

1    the scratches.   There was one Band Aid.

2          Q          But more than one scratch?

3          A          Yes.

4          Q          Where on his face were they?

5          A          I really couldn't say just exactly

6    where.   They were just on his face.

7          Q          Previously, I handed you what has been

8    marked as State's Exhibit 100.   You testified John Moss

9    gave you silverware that night prior to going back to

10   Cleveland.   What did you do with that silverware later?

11         A          When he gave it to me, I opened it,

12   since he wasn't going to be there Christmastime, I opened

13   it in front of him and thanked him, then I just took it

14   to my bedroom and put it in a chest of drawers.

15         Q          You say you opened it.   What do you

16   mean?

17         A          I took the wrapping paper off.

18         Q          It was wrapped in wrapping paper?

19         A          Right.

20         Q          What about the plastic wrap around the

21   gift itself?

22         A          I left it on there.

23         Q          You never opened that?

24         A          I never really opened the silverware.

Pomeroy - Direct                                        902

1          Q         You say you put it on your chest?

2          A         Yes.

3          Q         Did there come a time when you gave it

4     to someone else later?

5          A         Yes.

6          Q         Who was that?

7          A         Two officers came to the motel to ask

8     me questions, if I knew John Moss.  We talked for some

9     time, and they asked me different questions, and I

10    offered the silverware to them, saying that he gave it

11    to me as a gift.

12         Q         Were those officers State Police?

13         A         Yes.

14         Q         Do you see John Moss in the Courtroom

15    here today?

16         A         Yes, I do.

17         Q         Would you please point him out?

18         A         He´s sitting there with the beige and

19    brown jacket on, and a brown tie.

20         MR. REVERCOMB:  Let the record reflect that she

21    has indicated the defendant.

22

23    BY MR. REVERCOMB:

24

Pomeroy - Direct                                          903

1          Q          Now, is this the man that gave you the

2     silverware?

3          A          Yes, it is.

4          MR. REVERCOMB:  That's all I have.

5

6                          CROSS-EXAMINATION

7

8     BY MR. HUFFMAN:

9          Q          Ms. Pomeroy, your name at that time was

10    Johnson, is that right?

11         A          Yes.  Arbutus Johnson Pomeroy.

12         Q          How long were you the manager there at

13    the Town 'N Country Motel?

14         A          For about two years.

15         Q          And your son Billy was a schoolmate of

16    John Moss; is that correct?

17         A          Yes.

18         Q          And I think they also worked together

19    at Chef Wong's; is that right?

20         A          Yes.

21         Q          And throughout the course of their

22    friendship, Mr. Moss has spent a fair amount of time at

23    your place where you stayed at the motel.  That's true;

24    isn't it?

Pomeroy - Cross                                                    904

1         A          Yes.

2         Q          And in fact, he was there in the

3    summertime and swam in the pool that you had -- there was

4    an olympic size pool there; is that right?

5         A          Right.

6         Q          Would it be fair to say that he has

7    spent a fair amount of time at your house and even shared

8    meals there; is that correct?

9         A          Yes.

10        Q          You don't really remember what day it

11   was that John gave you this silverware; do you, like,

12   Monday, Tuesday, Wednesday, or something like that?  Or

13   the date, as the 13th, 16th, the 12th, the 11th?  You

14   don't remember the exact date; do you?

15        A          No, I just know that it was during the

16   holidays.  It was at Christmastime.  We were decorating.

17        Q          Now, if I understand your testimony

18   correctly, the scratches you observed on John were on his

19   face; is that correct?

20        A          Yes.

21        Q          And then you talked with two Police

22   Officers in February of 1980?

23        A          Yes.

24        Q          And at that time, they didn't

Pomeroy - Cross                                                      905

1    specifically say to you, "Did someone give you a gift of

2    silverware?"   Is that correct?   They didn't ask you

3    anything specific like that; did they?

4           A           That's correct, no.

5           Q           John never gave you a set of dishes;

6    did he?

7           A           No.

8           MR. HUFFMAN:  I don't have any further questions,

9    Judge.

10

11                      REDIRECT EXAMINATION

12

13   BY MR. REVERCOMB:

14

15          Q           Mr. Huffman asked you, or stated to

16   you, that you didn't know the exact date he gave you the

17   silverware; is that correct?

18          A           No.

19          Q           I think you've already stated that it

20   was the night before he went back, or a couple of nights?

21          A           It was the night before.   He wasn't

22   going to be there for Christmas.   He wanted to give me

23   the gift, so he brought it to the motel the night before

24   he left to go to Cleveland.

Pomeroy - Redirect                                          906

1          Q          Do you know approximately how close to

2   Christmas it was?

3          A          It was just a few days, just a short

4   time before Christmas.

5          Q          Two or three?

6          A          I know we were decorating.

7          MR. HUFFMAN:  Your Honor, I'm going to object to

8   Mr. Revercomb's testimony.  He is feeding her the

9   answers.

10         THE COURT:  Objection sustained.

11

12  BY MR. REVERCOMB:

13

14         A          I don't remember the exact date, no.

15         Q          But it was after these murders?

16         A          Yes.

17         MR. REVERCOMB:  That's all I have.

18         MR. HUFFMAN:  No further questions.

19         THE COURT:  Thank you, Ms. Pomeroy.  You may step

20  down.

21         Folks, we're going to take up a brief matter out

22  of your presence, as I said we might do from time to

23  time.  I'm going to excuse you, then, for about -- how

24  long do you think, about fifteen minutes?

907

1        MS. LUSK:  Yeah, that would be all right.

2        THE COURT:  You'll have time to go get a cup of

3    coffee.

4

5        WHEREUPON, the jury stood in a recess in the

6    hearing of this case.

7

8        (Back on the Record with the jury not present)

9

10       WHEREUPON, Sergeant Michael Don Smith was duly

11   sworn, and upon his oath, deposed as follows:

12

13                    DIRECT EXAMINATION

14                       (In Camera)

15

16   BY MS. LUSK:

17

18       Q        Would you state your name, please?

19       A        Michael Don Smith.

20       Q        You are employed by the West Virginia

21   State Police?

22       A        Yes, I am.

23       Q        Were you so employed in 1979 and 1980?

24       A        Yes.

Smith - Direct (In Camera)                                              908

1          Q          In  January  of  1980,  did  you  have

2   occasion  to  travel  to  Cleveland,  to  the  Juvenile

3   Detention Center, there to meet with John Moss, III?

4          A          Yes, I did.

5          Q          Is  he  present  here  in  the  Courtroom

6   today?

7          A          Yes.

8          Q          Could you point him out for us?

9          A          He's sitting right there at this table

10  to the right.

11         MS.  LUSK:   May  the  record  reflect  that  the

12  witness has identified the defendant.

13

14  BY MS. LUSK:

15

16         Q          Upon meeting with him at the Juvenile

17  Detention  Center,  did  you  advise  him  of  his

18  constitutional rights?

19         A          Yes, ma'am.

20         Q          How did you do that?

21         A          From  the  back  of  the  --  there's  a

22  Miranda Warning on the back of my Department of Public

23  Safety I.D. card, and I read that Miranda Rights -- or

24  the Miranda Warning from the back of the card.

Smith - Direct (In Camera)                                    909

1          MR. BICKLEY:  May we approach the bench, your

2     Honor.

3          THE COURT:  Yes.

4

5          WHEREUPON, a bench conference was held, where the

6     following transpired:

7

8          MR. BICKLEY:   I  believe  that  this  entire

9     transaction is the time when they legally obtained blood

10    from John.

11         THE COURT:  Illegally?

12         MR. BICKLEY:   Illegally -- they had to get it

13    back.   And I think that everything here is tainted

14    because of that.

15         THE COURT:  Well, I've got to hear it to find

16    out.

17         MR. BICKLEY:  All right.

18

19         WHEREUPON, the bench conference was concluded.

20

21         (Back on the Record_

22

23    BY MS. LUSK:

24

Smith - Direct (In Camera)                          910

1        Q          Now, let me hand you what has been

2   marked as State's Exhibit 91, and ask you if you can

3   identify that item?

4        A          Yes.

5        Q          What is it, please?

6        A          It's the I.D. card that I was speaking

7   of.

8        Q          Is that the one you used in 1980, in

9   January of 1980?

10       A          Yes.

11       Q          Is that the one you used to advise John

12  Moss of his constitutional rights?

13       A          Yes.

14       Q          How did you advise him of his rights?

15       A          I verbally read to him the Miranda

16  Warning that's on the back of this card.

17       Q          Would you read it as you did in January

18  of 1980?

19       A          Yes.  It says:

20       "You have the right to remain silent.  If you

21  agree to answer questions, anything you do say may be

22  used against you in a Court of Law.  You have the right

23  to consult with an attorney before speaking to the Police

24  and to have an attorney present upon or before any

Smith - Direct (In Camera)                          911

1    questioning, now or in the future.  If you cannot afford

2    an attorney, one will be provided for you without cost.

3    If you do not have an attorney available, you have the

4    right to remain silent until you have had an opportunity

5    to consult with one.

6          "Now that you have been advised of your rights,

7    are you willing to answer questions without an attorney

8    present?"

9          Q        What was his response?

10         A        He stated that he would talk to us, and

11   that he did understand what I had read to him.

12         Q        Was Trooper Williams with you?

13         A        Yes.

14         Q        And John Moss was being held in a

15   Juvenile Detention Center there on Ohio charges?

16         A        Yes.

17         Q        That was before he was transferred to

18   adult status in Ohio?

19         A        Yes.

20         Q        After you read the Miranda Warnings,

21   what happened?

22         A        Well, I asked him some questions

23   concerning some other matters.

24         Q        Concerning some other crimes?

Smith – Direct (In Camera)                        912

1          A          Some other crimes, yes.   And also, I

2     mentioned the murders in the Reggettz family, if he had

3     some knowledge of that, and he said yes.

4          In West Virginia, prior to leaving West Virginia

5     ----

6          THE COURT:   I'm sorry.   When did this occur?

7          THE WITNESS:   This actual meeting with John?

8          THE COURT:   Yes.

9          THE WITNESS:   January 30th of 1980.

10

11    BY MS. LUSK:

12

13         A          After    that,    he    said    he    was

14    knowledgeable that that had occurred.

15         I asked him if he had any knowledge of who may

16    have had a personal knowledge of it, and he said that he

17    didn't.

18         And I asked him if he thought Vanessa Reggettz

19    was pretty, and his response to that was, he thought she

20    had bumps, and he also took his hands and kind of

21    motioned in the area of her chin and lower cheeks,

22    stating that he thought she had bumps.

23         MS. LUSK:   That's all I have.

24         Oh, wait, let me ask a couple of more foundation

Smith - Direct (In Camera)                                        913

1    questions, excuse me.

2         Q         During this period of time, did you

3    make any promises or threats to John Moss?

4         A         No, I didn´t.

5         Q         Did he indicate to you at any time that

6    he did not want to talk to you or that he wanted to stop

7    talking to you?

8         A         No, he didn´t.

9         Q         Did he ever indicate that he had a

10   lawyer or that he wanted a lawyer?

11        A         He told me that he did not have a

12   lawyer.

13

14                       CROSS-EXAMINATION

15                          (In Camera)

16

17   BY MR. BICKLEY:

18

19        Q         On that same occasion, did none of the

20   lawyers come over and tell you that he had a lawyer?

21        A         What?

22        Q         Were you advised by a female lawyer who

23   was also in the room at that time that he had a lawyer?

24        A         No, sir, I was not.

Smith - Cross (In Camera)                              914

1      Q        Did you not take some blood from him at

2  that time, on that occasion?

3      A        Yes, sir, there was some taken at that

4  time.

5      Q        And was it not subsequently that that

6  blood had to be returned to Cleveland?

7      A        Yes.

8      Q        Is that not true?

9      A        Yes, that's true.

10     Q        Why was that true?

11     A        We were told that we had to give the

12  blood back because, I guess, it was against their

13  procedures there in Ohio.

14     Q        Against their procedures in Ohio?

15     A        Yes.

16     Q        I see.  And so the blood was illegally

17  taken, would that be a correct statement?

18     A        We were told through the Court in Ohio

19  that we were to give it back to them.

20     Q        Did they tell you why you had to give

21  it back?

22     A        It was my understanding that it was

23  against their rules or their procedures as to the way

24  that the blood was taken.

Smith - Cross (In Camera)                                    915

1        Q        Sergeant Smith, did you all run any

2    tests on that blood before you gave it back?

3        A        No, sir, we gave it back immediately.

4        Q        You gave the entire sample back; you

5    didn't turn anything over to the serology lab?

6        A        No, sir.

7        MR. BICKLEY:  No further questions, your Honor.

8        MR. LUSK:  I don't have any further redirect.

9        THE COURT:  May the officer step down?

10       MS. LUSK:  Yes.

11       THE COURT:  Thank you.

12

13       WHEREUPON,  Sergeant  Michael  Don  Smith  was

14   excused.

15

16       THE COURT:  Now, tell me what this is in aid of?

17       MS. LUSK:  What it's in aid of?

18       THE COURT:  Yes.

19       MS. LUSK:  Well, your Honor, it's our position

20   that the photographs you can see of Vanessa Reggettz at

21   the scene, after her death, she looks like she has acne.

22   The  petechiae,  which  the  Medical  Examiner  notes  as

23   petechiae, to a layman looks like acne, and we have the

24   Polaroid photograph that shows that in life, she had a

1    pretty complexion, but in death, she looks like she had

2    acne.

3         THE COURT:  Is there a date on that?

4         MS. LUSK:    November 5, 1979.   So, it's our

5    position that in life she had a pretty complexion, and

6    in death she looked like she had acne.   And only the

7    murderer would know that.

8         MR. BICKLEY:  Your Honor, we think that the whole

9    statement ought to be exempted.   They were there.   They

10   illegally obtained blood, and they had to return all

11   evidence of the blood that they had received from John

12   Moss at that time.   In fact, they had to go back, which

13   they did in April, and -- to obtain the blood in the

14   correct manner.   And it wasn't just Ohio law, it was West

15   Virginia law, as well, as far as the procedure, in order

16   to secure the blood from a juvenile.

17        Number two, I think that the conjecture between

18   this ---

19        THE COURT:  Do you know what the procedures are

20   in West Virginia and in Ohio law?   Surely, there is no

21   constitutional bars about the taking of blood?

22        MR. BICKLEY:   Well, what I read, and I'm not

23   positive because the Trooper has denied it, but, that at

24   the time they were there, a female lawyer went over, and

917

1   maybe one of them was Trooper Smith -- keep in mind that

2   I'm not doubting what has just been said -- but she

3   informed him that he did have an attorney, and that he

4   should contact the attorney, or they should contact the

5   attorney. And they failed to do that when they took the

6   blood, or at least that's the information that I

7   received.

8        But in any event, they had to return the entire

9   sample. And since the jury is out for the limited

10  purpose of this testimony, we'll put Mr. Moss on the

11  stand to testify as to what actually transpired.

12       THE COURT: Okay.

13

14       WHEREUPON, John Moss was duly sworn, and upon his

15  oath deposed as follows:

16

17               DIRECT EXAMINATION

18                 (In Camera)

19

20  BY MR. BICKLEY:

21

22       Q      Would you state your name, please?

23       A      John Moss, III.

24       Q      Are you the defendant in this case?

Moss - Direct (In Camera)                                918

1          A          Yes, I am.

2          Q          Mr. Moss, I want to direct your

3    attention to January the 3rd, when Trooper Smith and

4    Trooper -- uh, on January the 30th, when Trooper Smith

5    and Trooper Williams came to Cleveland to see you.

6          Would you tell the Court exactly what transpired?

7          A          Well, I was -- a guard came down and

8    told me I had some visitors out in the visiting room, so

9    I go down in the visiting room and visit with the

10   lawyers, but Trooper Smith and Trooper Williams was out

11   there waiting on me.  So, they asked me a few questions.

12   They asked me did I want to talk to them about some

13   crimes here in West Virginia, and I told them, "I ain't

14   got nothing to tell them.  I don't know nothing about

15   what's going on down in here besides what I seen in the

16   paper."

17         They were referring to the Reggettz murders, and

18   they asked me if I would give them a sample of blood and

19   I told them yes, I had nothing to hide.

20         And this lady lawyer that was sitting -- I don't

21   know, about seven or eight feet from us -- she come over

22   there and said, "Do you know this child has a lawyer?"

23   And she asked them had they talked to the lawyer and they

24   said, "We didn't know he had one."  So, she asked them

Moss - Direct (In Camera)                                919

1    to come back when they had talked to my lawyer, and I had

2    a chance to talk to mine.   And they just left.   And

3    that's the last I seen of them that day.

4         Q        Do you recall telling Trooper Smith

5    about the acne on Mrs. Reggettz?

6         A        No, he never asked me anything about

7    how she looked.

8         MR. BICKLEY:  I have no further questions.

9

10                      CROSS-EXAMINATION

11                        (In Camera)

12

13   BY MS. LUSK:

14

15        Q        Do you recall that Trooper Smith --

16   Sergeant Smith advised you of your rights from the I.D.

17   card?

18        A        On January 30th?

19        Q        Yes.

20        A        No.

21        Q        You're saying that he did not advise

22   you of your rights?

23        A        No.   He did not advise me of any

24   rights.

Moss - Cross (In Camera)                                    920

1        Q        He just came in there and said, "Hey,

2   I want to talk to you about some crimes?"

3        A        He was there when I got there.

4        Q        The first thing he said to you was, "I

5   want to talk to you about some crimes in West Virginia?"

6        A        He asked me how I was doing, and making

7   a little small play, and he asked about some of my

8   family, and said he wanted to talk to me about some

9   crimes in West Virginia.

10        Q        So, he just launched into conversation

11   about crimes, without advising you of your rights?

12        A        That's what he did.

13        Q        You didn't have any conversation

14   whatsoever about the Reggettz case?

15        A        He asked me if I knowed who committed

16   it.

17        Q        He didn't ask you if you thought

18   Vanessa was pretty?

19        A        No.

20        Q        You didn't tell him you had a lawyer?

21        A        Yes, I did.

22        Q        You didn't have a lawyer on any West

23   Virginia charges; did you?

24        A        I was in Ohio.

Moss - Cross (In Camera)                                        921

1       Q          You didn't have a lawyer on any West

2  Virginia charges; did you?

3       A          Yes, I did.

4       Q          What charge?

5       A          I think it was grand larceny.

6       Q          Is that the only one?

7       A          A grand larceny and assault, I believe.

8       Q          You certainly didn't have a lawyer on

9  the Reggettz murders?

10      A          No, I didn't.   I wasn't charged with

11 the Reggettz murders.

12      Q          Did Trooper Smith ask you about other

13 crimes in West Virginia?

14      A          Yes, he did.

15      Q          What crimes did he ask you about?

16      A          He asked me about the Reggettz murders.

17      Q          Any other crimes?

18      A          No.

19      Q          Did you have any conversations with him

20 about the felonious assault at the Moose Club?

21      A          He might have mentioned it; I don't

22 remember.   I'm not real sure.   That was over ten years

23 ago.

24      Q          Whatever conversation you had with him,

Moss - Cross (In Camera)                                   922

1    what crimes in West Virginia, occurred before your blood
2    was drawn; right?
3           A        Would you repeat the question?
4           Q        Whatever conversation you had with
5    Trooper Smith occurred before he pricked your finger and
6    you gave him a sample of your blood?
7           A        It would have to be.  If he talked to
8    me on the 30th and he got my blood on the 30th.
9           Q        On the 30th, the order of events was,
10   you talked to Smith about crimes and then you pricked
11   your finger and then the lady come over and talked to the
12   Trooper?
13          A        Yes.
14          Q        So, whatever conversation you had with
15   Smith about crimes, occurred way before the lady came
16   over and talked to the Troopers, because you had even
17   pricked your finger and given the blood?
18          A        Yes, it might have been.  I'm really
19   not sure.  That was a long time ago.
20          The only thing I remember about the lady coming
21   over there, asking them had they talked to my lawyer, and
22   that was it.  They got up and left.  I don't know if this
23   was before the taking of the blood or after.
24          Q        Whatever conversation you had with the

Moss - Cross (In Camera)                                    923

1     Troopers occurred before the lady came over, because they

2     immediately left after she came over?

3           A          She asked them about the pricking my

4     finger.  I'm saying I don't know if it was before or

5     after they took the blood.

6           Q          Okay.  Forget the pricking of the

7     finger for a moment.

8           The conversation with Trooper Smith about crime

9     in West Virginia occurred certainly before the lady came

10    over and talked to you?

11          A          It might have.

12          Q          Because there was no conversation after

13    the lady came over?

14          A          That's right.

15          Q          Now, the pricking of the finger -- they

16    asked you if you would voluntarily give them a sample of

17    your blood; right?

18          A          Yes.

19          Q          And you did?

20          A          Yes, I did.

21          Q          You pricked your own finger, put a

22    little bit of the blood on a cloth or some kind of ---

23          A          Smith -- he pricked my finger.

24          Q          Smith pricked your finger?

Moss - Cross (In Camera)                                    924

1          A          He stuck it with a little metal piece.

2     I was sticking it and he said you ain't got -- trying to

3     stab it or nothing like -- he took my finger and just

4     stuck it and squeezed it out on a little cotton pad.

5          Q          Your testimony is that you didn't do it

6     yourself?

7          A          No.  He squeezed my finger on a cotton

8     pad.

9          Q          But you consented to it, no matter who

10    did it?

11         A          Oh, yes.

12         MS. LUSK:  That's all.

13

14                    REDIRECT EXAMINATION

15                        (In Camera)

16

17    BY MR. BICKLEY:

18

19         Q          Mr. Moss, how old were you at the time?

20         A          I was 17.

21         MR. BICKLEY:  No further questions.

22         MS. LUSK:  That's all.

23         THE COURT:  Thank you, Mr. Moss.  You may step

24    down.

Moss - Redirect (In Camera)                                925

1          Okay.

2          MR. BICKLEY:   Additionally, your Honor, I think

3     that the probative value of this is minimal, and then,

4     we've taken great pains to avoid any institutional talk

5     about John Moss' previous location.   Then, we have a

6     Trooper who comes in and tells this.   I don't think --

7     I think the connection there is so circumstantial that

8     the value of -- the probative value is minimal, and I

9     think its prejudicial value is very, very great.

10         MS. LUSK:   Judge, the statement certainly has

11    probative value.   I thought that was acne on those

12    photographs.   I was very surprised to learn that it

13    wasn't.   I think it's very important that he perceived

14    that she had acne.

15         As for the talk about the institution, Judge,

16    what I would propose is that after Sergeant Smith

17    testifies about the oral statement, I can ask him if he

18    also had the opportunity to ask John Moss if he thought

19    Vanessa Reggettz was pretty, and he can go into it right

20    then and it will sound like it's part of the same

21    transaction, the same oral confession.

22         THE COURT:   By oral confession, are you talking

23    about the one in Parkersburg?

24         MS. LUSK:   Uh-huh.   Put it between the oral

926

1  confession and the taped confession testimony.

2      THE COURT:  Well ---

3      MS. LUSK:  I mean, that's just food for thought.

4  That's what I would propose to do.

5      THE COURT:  Show me the photographs again.

6      MR. HUFFMAN:  Additionally, Judge, we'd like to

7  know if this is going to be some kind of objection.  We'd

8  like to register an objection on it.

9      MR. REVERCOMB:  Judge, there was no probable

10  cause at that point.

11      MS. LUSK:  There are probably other photographs

12  that show it better than those.  When we were going

13  through the photographs back in chambers the other day,

14  I think we tried to eliminate the ones that had a full

15  face view of Vanessa Reggettz.

16      THE COURT:  Yeah.

17      MS. LUSK:  These are the ones where you can only

18  see part of her face, the ones that show a full view show

19  it better.  And of course, the Polaroids show how clear

20  her complexion is.

21      THE COURT:  Let's take five minutes.

22

23      WHEREUPON, the Court stood in a recess in the

24  hearing of this case.

927

1       (Back on the Record)

2

3       THE COURT:  It seems to me like there are two

4  basic issues that I've got to resolve here.

5       The first is the voluntariness, and the second is

6  relevance.  I'm not sure they have to be taken up in that

7  order, but that's the way I'm going to take them up.

8       In the absence of some indication that the taking

9  of this statement is unlawful, under the laws of the

10  State of Ohio, and was unlawful in the manner in which

11  would require deference by the State of West Virginia,

12  I don't find anything under the laws of the State of West

13  Virginia that would invalidate the taking of a statement.

14       With respect to counsel -- and even in the

15  dispute, Mr. Moss says that the officers weren't told

16  about him having a lawyer until after he had made a

17  statement to them.  The fact that he had a lawyer in

18  unrelated proceedings, I don't think, imposes upon the

19  officers in this case the obligation of refraining from

20  having some conversation as to what he didn't know about

21  it.

22       I don't find anything in here that it was

23  coercive or involuntary, and I would note also, that I

24  don't know of any law in the State of West Virginia which

928

1  would prohibit a law enforcement officer from taking

2  blood exemplars as it was taken in this case. It wasn't

3  very clean, legally. You might say to yourself, why in

4  the world would they do this without consulting the

5  appropriate Ohio authorities, but in West Virginia, it

6  can be done. And that's not because West Virginia is

7  possessed of a lot of arcane laws, because there is no

8  difference in taking a blood exemplar and taking a

9  photograph.

10     The long and short of that -- I don't find

11  anything in the nature of the taking of the statement

12  which would invalidate it constitutionally, under the

13  laws of West Virginia.

14     The question then, is it relevant in this case?

15  Probably, more than in any case that I've tried. Before

16  a case turns on the voracity of the confession and in the

17  instance of Mr. Moss's confession, the jury is going to

18  have to evaluate whether his confession is based upon

19  whether Mr. Moss knew particular facts, that is, facts

20  particular to this offense, which would indicate that he

21  is one, or the only one, who could have known those

22  things. And this evidence, and such evidence, as put

23  into context -- as you know, I had some reservations

24  about introduction of the photograph of Vanessa Reggettz

929

1    in life, and I don't think that there is much question

2    that that has a prejudicial effect.

3         I find that there is relevance, and that the

4    relevance outweighs any prejudicial effect of the

5    introduction of the photograph of Vanessa Reggettz in

6    life.  I would note that it was also taken a very short

7    period of time before the -- prior to her death.  And

8    Paul Reggettz has identified that that photograph fairly

9    represents not only her, but the condition of her

10   complexion at the time the photograph was taken.  So,

11   I'll allow it.

12        MR. BICKLEY:  Please note our objection, your

13   Honor.

14        THE COURT:  Fine.

15        MS. LUSK:  Your Honor, also, when we went through

16   the photographs the other day at the scene, we had pulled

17   the close-up photographs of Vanessa in favor of the ones

18   which showed more area within the room.  I think at this

19   point, a closer photograph of Vanessa is relevant to the

20   case, and I would propose that they can see Exhibit 26.

21        THE COURT:  Was Exhibit 26 pulled or not offered

22   in that preliminary evidence hearing?

23        MS. LUSK:  Right.

24        MR. BICKLEY:  Your Honor, we object to this

1   photograph being offered, for the same reason we objected

2   at the time, even before this was considered.  We think

3   it's very prejudicial and they have sufficient

4   photographs to show Mrs. Reggettz already into evidence,

5   which we have prepared.

6        THE COURT:  Neva, would you do me a favor,

7   please, and just pull -- go through the photographs you

8   have there and pull the photograph of Vanessa Reggettz?

9        MS. LUSK:  Yes, sir.  I would note, also, Judge,

10   that the photo of Vanessa Reggettz that we have in life,

11   is State's Exhibit 159.

12        THE COURT:  Did your new photograph get washed?

13   Has it been authenticated?

14        MS. LUSK:  Fulks authenticated all ninety-one

15   photographs that he took, and said that there was one

16   missing, the one of Sopher and Roark at the back door.

17        THE COURT:  I don't see another photograph in

18   here that precisely depicts the articles Dr. Sopher

19   referred to.  I'm going to let them have them.

20        MR. REVERCOMB:  Thank you.

21        THE COURT:  Tom, will you get the jury, please?

22        While the jury is being summoned, do you have a

23   continuing objection to the introduction to Smith's

24   testimony about the statement that was just referred to?

931

1       MR. BICKLEY:  Yes.

2       THE COURT:  The photograph of Vanessa Reggettz in

3   life and the second conditional photograph of her which

4   has been identified as State's Exhibit 26 ---

5       MR. BICKLEY:  Yes, we had that one out before.

6   Did you decide to admit it?

7       THE COURT:  Yes.  And you don't need -- just to

8   avoid the confusion -- an adverse implication.  You won't

9   have to make an objection now.

10

11      WHEREUPON, the jury entered the Courtroom.

12

13      THE COURT:  Come on in.

14   Would you call you next witness, please?

15      MS. LUSK:  The State would call Sergeant Michael

16   Don Smith.

17      THE COURT:  The trooper has been previously sworn

18   to abbreviate the procedure a little bit.

19

20                    DIRECT EXAMINATION

21

22   BY MS. LUSK:

23

24      Q       Would you state your name, please?

Smith - Direct                                                          932

1          A          Michael Don Smith.

2          Q          Are you employed?

3          A          Yes, I am.

4          Q          By whom?

5          A          The West Virginia Department of Public

6     Safety.

7          Q          Is that the same thing as the State

8     Police?

9          A          Yes, ma'am.

10         Q          How long have you been with the State

11    Police?

12         A          Approximately nineteen years.

13         Q          Where are you stationed currently?

14         A          Berkeley    County,    Martinsburg

15    Detachment.

16         Q          Did I ask you how long you have been a

17    State Policeman?

18         A          Approximately nineteen years.

19         Q          Have you ever been stationed in Kanawha

20    County?

21         A          Yes.

22         Q          When was that?

23         A          From 1971 through -- until April of

24    1980.

Smith - Direct                                               933

1          Q          In 1979, the summer of 1979, were you

2     stationed in Kanawha County?

3          A          Yes,    at    the    South    Charleston

4     Detachment.

5          Q          Did    you    become    involved    in    an

6     investigation of the Reggettz homicide in December of

7     1979?

8          A          Yes, I did.

9          Q          Now, when the bodies were discovered,

10    Sergeant Smith, on December 13, 1979, were you in the

11    house?

12         A          No.

13         Q          Did you have occasion on December 14,

14    1979 to view a portion of the autopsy of Vanessa

15    Reggettz?

16         A          Yes, I did.

17         Q          At that time, did you take custody of

18    her nightgown, her known blood, and some hand swabs from

19    the Medical Examiner?

20         A          Yes, I did.

21         Q          Let me hand you at this time, State's

22    Exhibit 155, the nightgown, and ask you if this is the

23    same nightgown that  you took custody of from Dr. Sopher?

24         A          Yes, it is.

Smith - Direct                                                    934

1       Q          What did you do with that, please?

2       A          I carried it over to the chemistry lab

3   at the South Charleston headquarters and turned it over

4   to their custody.

5       Q          What did you do with the blood samples?

6       A          It was also turned in at the same time.

7       Q          Approximately how long were they in

8   your possession?

9       A          Approximately ten or fifteen minutes.

10      Q          Did you change them or alter them in

11  any way while they were in your possession?

12      A          No, I didn't.

13      Q          Some time after December 13, 1979, did

14  you make a check to determine whether the TV show Baretta

15  had aired at 1:00 o'clock in the morning, and on the

16  13th, whether the story line was about a contagious

17  disease or germ?

18      A          Yes, I did.

19      Q          Was it, in fact?

20      A          Yes, it was.

21      Q          On February 6, 1980, did you speak with

22  a woman named Arbutus Johnson?

23      A          Yes.

24      Q          Did you take an item from her?

Smith - Direct                                                    935

1          A          Yes, I did.

2          Q          Let me hand you at this time, State's

3     Exhibit 100, and ask you if you recognize this item?

4          A          Yes, I do.

5          Q          Would you identify it, please?

6          A          That's the item that I received from

7     Arbutus Johnson on February 6th.

8          Q          What did you do with it?

9          A          Right after getting it from her, I

10    turned it over to Trooper Terry Williams.

11         Q          How long was it in your possession?

12         A          A minute or two.

13         Q          Did you change it or alter it in any

14    manner while you had it in your possession?

15         A          No, I didn't.

16         Q          Was Trooper Williams with you when you

17    were speaking with Mrs. Johnson -- when you received the

18    silverware?

19         A          Yes.

20         Q          Directing your attention to October the

21    28th, 1980, Sergeant Smith, did you have occasion to make

22    a trip to Mansfield, Ohio?

23         A          Yes, I did.

24         Q          Who were you with?

Smith - Direct                                        936

1      A        Trooper Terry Williams.

2      Q        How did you get there?

3      A        In a West Virginia State Police car.

4      Q        Was it marked or unmarked?

5      A        It was an unmarked car.

6      Q        On October 28, 1980, were you in

7   uniform?

8      A        No, ma´am.

9      Q        Was Trooper Williams in uniform?

10     A        No.

11     Q        Were you armed?

12     A        Yes.

13     Q        What were you armed with?

14     A        I had a .38 snub nose revolver.

15     Q        Where did you have it?  Where were you

16   carrying it?

17        A        I carried it -- I had civilian attire

18   on.  I carried it inside my pants.  My belt kind of held

19   it in place.  I also had a lightweight jacket on, which

20   kept it from being in public view.

21        Q        Are you aware of whether Trooper

22   Williams was armed?

23        A        Yes, he was.

24     Q        Do you know what with?

1         A          With a nine millimeter pistol.

2         Q          Was he also wearing civilian clothes?

3         A          Yes, he was.

4         Q          Did you see his weapon?

5         A          He carried his weapon in the same

6    manner I did.  And he also had a lightweight jacket on

7    which kept the pistol from being revealed to the public.

8         Q          Did you take custody of John Moss, III

9    in Mansfield, Ohio?

10        A          Yes.

11        Q          While walking to your car with him, was

12   he handcuffed?

13        A          Yes, he was.

14        Q          Where?

15        A          With the cuffs on his hands, and his

16   hands were behind his back.

17        Q          Once you arrived at the car, did you

18   change the handcuffing?

19        A          Yes.

20        Q          How?

21        A          We released the cuffs, as far as

22   letting his hands come to the front.  As we placed him

23   in the back seat of the patrol car, the cuff that had

24   been on his left hand was placed on the bar of the

Smith - Direct                                        938

1    headrest.

2            Q         Why did you do that?

3            A         For security purposes, because we were

4    still -- we would be leaving town and there would be stop

5    signs and traffic lights.  Also, we were going to stop

6    and get some gas.

7            Q         What kind of locking system did this

8    cruiser have?

9            A         This cruiser had two locks.  It had the

10   passenger's door and the driver's door.  You just simply

11   pull them up or down to release them or to lock them.

12           Q         Was it a four-door car?

13           A         Yes, it was.

14           Q         Did either back seat door have a -- one

15   of the push knobs on it?

16           A         No.  The doors in the back could only

17   be locked or unlocked by these two knobs, on the two

18   front doors.

19           Q         Where were they located on the two

20   front doors?

21           A         Sort of like in most cars, just

22   directly behind your shoulder.  But they could be easily

23   reached by someone sitting in the back seat just by

24   pushing up, which would also release the locks on all

Smith - Direct                                      939

1   four doors.

2          Q       So, if the person in the back seat

3   reached up and pulled up on the knob, it would unlock all

4   four doors on the car?

5          A       Yes, it would.

6          Q       Was John Moss able to smoke in that

7   vehicle?

8          A       Yes, he was.

9          Q       Did he, in fact, smoke?

10         A       Yes.

11         Q       Who was driving?

12         A       Trooper Williams was.

13         Q       Did you have any trouble getting back

14  on the interstate?

15         A       Yes.  After we got our gas, while in

16  town, we had just a little bit of trouble getting back

17  out onto the interstate, taking us back over to Route 7

18  which goes south, bringing us back to West Virginia.

19         Q       Did you get gas before you left town?

20         A       Yes.

21         Q       Once you were on the interstate, did

22  you change the manner in which you had John Moss

23  handcuffed?

24         A       Yes, I did.

Smith - Direct                                                    940

1       Q       How did you change it?

2       A       I took a handcuff key and unlocked it

3   from the headrest, and placed it back on his left hand

4   so that they were both in front at that time; he could

5   still use both hands to smoke.

6       Q       So, both of his hands were handcuffed

7   to each other, but nothing else?

8       A       Correct.   One cuff on the right hand

9   and one cuff on the left hand.

10      Q       They were in front of him?

11      A       Yes, ma'am.

12      Q       Where were you when you changed that

13  handcuff?

14      A       In the front passenger seat.

15      Q       Did you turn around and lean over to do

16  it?

17      A       I was able to turn around this way, the

18  headrest was right here (Indicating), and just released

19  it.  I turned around and placed it back on his left hand.

20      Q       You didn't have to get into the back

21  seat to do that?

22      A       No, I didn't have to get into the back

23  seat to do that.

24      Q       About   what   time   did   you   leave

Smith - Direct                                          941

1    Mansfield?

2          A        Approximately 2:00 or 2:30 p.m.

3          Q        Did there come a time when you got into

4    the back seat of the vehicle?

5          A        Yes.

6          Q        Approximately how far out of Mansfield

7    was that?

8          A        Approximately   fifteen   or   twenty

9    minutes.

10         Q        Did you take the gun with you into the

11   back seat?

12         A        No, I didn't.

13         Q        How did you get into the back seat?

14         A        After  placing  my  gun  in  the  glove

15   compartment  of  the  front  seat,  or  in  the  front

16   compartment, there was a little bench that folds up and

17   down in that area, and I just put that down and stepped

18   over into the back seat.

19         Q        What did you do back there?

20         A        I sat down in what would be to John's

21   left, with him sitting across from me.  I told him I'd

22   like to discuss a matter with him.

23         I told him that the matter concerned a crime

24   which occurred in West Virginia, and asked him if he

Smith - Direct                                                    942

1    would discuss it with me.  And he said he would.

2            Then, after he told me he would discuss it with

3    me, I told him that before we could discuss it, I would

4    have to -- I wanted him to be aware of his constitutional

5    rights.

6            Q        Did    you    advise    him    of    his

7    constitutional rights?

8            A        Yes, I did.

9            Q        Let me hand you what has been marked as

10   State's Exhibit No. 91, and ask you to examine that

11   exhibit.

12           Can you tell the jury what that is?

13           A        That's my I.D. card with my picture, my

14   name, date of birth, my signature on it.

15           Q        Is that the I.D. card that you had in

16   October of 1980?

17           A        Yes, it is.

18           Q        What did you do with that?

19           A        Well, I carried that in an I.D. folder.

20   I took that out and told John -- as I said, he would have

21   to be aware, and I him to understand his rights before

22   speaking with me concerning that matter.

23           So, on the back of this card, there is the

24   Miranda Warning which has these rights written down on

Smith - Direct                                          943

1    it.  I took the card and read those rights to John from

2    the card.

3           Q          Would you read them to the jury as you

4    read them to John Moss on October 28, 1980?

5           A          Yes.  The card states here the Miranda

6    Warning.  It says:

7           "You have the right to remain silent.  If you

8    agree to answer questions, anything you do say may be

9    used against you in a Court of Law.  You have the right

10   to consult an attorney before speaking with the Police

11   and to have an attorney present during any questioning,

12   now or in the future.  If you cannot afford an attorney,

13   one will be provided for you without cost.  If you do not

14   have an attorney available, you have the right to remain

15   silent until you have an opportunity to consult with one.

16          "Now that you have been advised of your rights,

17   are you willing to answer questions without an attorney

18   present?"

19          Q          Did John Moss respond to that question?

20          A          After reading that, I asked him, you

21   know, if he did hear me, and if he understood what I read

22   to him, and he said he did.

23          I asked him if he was willing to talk with me and

24   he said yes, he was.

Smith - Direct                                                  944

1        Q        Go ahead.  What happened?

2        A        Well, after telling him that, I said,

3    "The issue that I'm talking about -- the matter I want

4    to talk to you about is probably hard to talk about and

5    it's really even hard for me to begin to explain the

6    importance and how serious this matter is.  And I want

7    you to think about it, because there is a lot of things

8    we need to know and some answers we need to get."

9            And I said, "Do you know what I'm talking about?"

10   At first, he said he didn't know what I was talking

11   about, and I repeated it again.  I said, "Now I want you

12   to really think about this, because this is," as I said,

13   "it's very, very serious and it's very important that we

14   get some answers.  That's why I'm trying to talk to you

15   about it."

16           I said, "What do you think, John?"  I said, "You

17   know why we got your blood, don't you?"  When I said

18   that, John's eyes -- I mean, you could really see an

19   expression come across his face.  His head sort of

20   dropped, kind of like, well, hey, you know, I've been

21   had.  And I said, "John, you do know what I'm talking

22   about, don't you?"  And he shook his head yes, that he

23   did.

24           And I said, "Well, I think, then, in order for us

Smith - Direct                                                945

1    to talk about something like this, that's that serious

2    and that important, that I don't really think this is the

3    place.  We ought to wait until we get to a place where

4    we can sit down look each other in the eye and discuss

5    something as serious -- this serious, other than in the

6    back seat of this car."  I said, "What do you think?"

7    And he agreed.

8            And I said, "We can talk about it in a little

9    while when we do get to a place like that."  And he

10   agreed that we could.  I said, "Well, until we get to a

11   place like that, we can just go ahead and talk about

12   other things."  And that's what we did.  We just had a

13   general conversation.

14           We went on down the road until we got into

15   Parkersburg, West Virginia.

16           Q       Did you get back into the front seat?

17           A       Yes, approximately ten to fifteen

18   minutes later after that.

19           Q       About how long did this conversation

20   last?

21           A       Approximately five minutes.

22           Q       About how long were you in the back

23   seat?

24           A       Total -- after getting into the back

Smith - Direct                                               946

1   seat, I'd say, thirty-five, forty minutes, probably.

2            Q          During the remainder of that time, were

3   you talking about other matters?

4            A          Yes, we were.

5            Q          Did John Moss ever indicate to you that

6   he wanted a lawyer?

7            A          No, he didn't.

8            Q          Did he ever mention the word lawyer?

9            A          No.

10           Q          Did he ever mention a lawyer's name?

11           A          No.

12           Q          Did he ever indicate to you that he was

13   unwilling to speak with you?

14           A          No.

15           Q          Did you threaten him in any manner?

16           A          No.

17           Q          Did you make him any promises?

18           A          No.

19           Q          Did you strike him in any way?

20           A          No.

21           Q          Did you make any other stops?

22           A          Yes.  We stopped for gas in Mansfield,

23   Ohio, and we stopped, probably somewhere halfway between

24   Mansfield and Parkersburg at a gas station.  We all three

Smith - Direct                                        947

1    had the opportunity, and did, use the restroom.  We got

2    some drinks and some snacks out of the machines there at

3    the station.

4         Q       That stop you made for gasoline about

5    halfway, was that before or after you had been in the

6    back seat?

7         A       We stopped for the gasoline in

8    Mansfield.  That second stop was strictly to use the

9    restroom and to get some drinks, and that was after

10   getting back up to the front seat.

11        Q       When you got back into the car after

12   using the restroom, did you get into the front seat or

13   the back seat?

14        A       I stayed in the front seat.

15        Q       At any time in the car, did you tell

16   John Moss the facts of the Reggettz case?

17        A       No.

18        Q       Did you mention the word Reggettz?

19        A       No.

20        Q       Did you mention the word murder?

21        A       No.

22        Q       Did you mention the word homicide?

23        A       No.

24        Q       Did you make any more stops after you

Smith - Direct                                               948

1    stopped to go to the restroom?

2           A          At Parkersburg, West Virginia.

3           Q          Is there a State Police Detachment at

4    Parkersburg?

5           A     Yes.

6           Q          Is  that  the  first  State  Police

7    Detachment you come to in West Virginia on the Route you

8    were taking?

9           A     Yes, it is.

10          Q          Prior  to  the  time  you  stopped  in

11   Parkersburg, were you in the State of Ohio?

12          A     Yes.

13          Q          At  approximately  what  time  did  you

14   arrive in Parkersburg?

15          A          At approximately 6:30 p.m.

16          Q          What did you do?

17          A          Well, we stopped there.  We went in and

18   made our presence known to the officer that was in charge

19   there at the detachment, which was Sergeant Presson.  He

20   was the district sergeant in that district.

21               He was on station at that time, and I kind of

22   advised Presson as to what we were doing -- coming from

23   Ohio, and that we needed to stop and would like to use

24   the restroom, and that we would also like to get a room,

Smith - Direct                                                  949

1    as I said earlier, where we could talk and have something

2    to drink and eat, a more comfortable place to talk to

3    John.  And I kind of briefed him on what we were going

4    to talk to John about.

5              Q         Did you order something to eat?

6              A         Yes, we did.

7              Q         What happened after you briefed

8    Sergeant Presson and asked for a room?

9              A         Well, he made the arrangements to have

10   one of the girls who was working there at that detachment

11   to take our order for food.  He set us up with a room

12   which had a couple of desks and chairs for everybody.

13   And he also got me some Department of Public Safety

14   Rights Forms.  It's the Miranda Warning, again, but it's

15   on paper, printed out.

16             Q         Did you have any of those forms with

17   you in the car?

18             A         No, we didn't.

19             Q         Did you go to the restroom?

20             A         Yes, we all three went; myself, Trooper

21   Williams and John Moss.

22             Q         Did Moss go at the same time you did?

23             A         No, not all at the same time.

24             Q         Where was he when you were in the

Smith - Direct                                           950

1    restroom?

2          A          Sergeant Presson was with him.

3          Q          Did you take off John Moss's handcuffs?

4          A          Yes.

5          Q          Let me hand you what has been marked as

6    State's Exhibit 92, and ask you if you recognize this

7    form?

8          A          Yes, I do.

9          Q          How do you recognize it?

10         A          That's the form that I was mentioning.

11   It's the Department of Public Safety Rights Form.  I've

12   witnessed this form and Trooper Williams was a witness

13   prior to me, but John Moss had signed it.

14         Q          Were you present when the top section

15   which states the date, place and time was filled in?

16         A          Yes, I was.

17         Q          Were you present when Trooper Williams

18   read the top section of the Rights?

19         A          Yes.

20         Q          Were you able to observe John Moss as

21   Trooper Williams read him his rights?

22         A          Yes, I did.

23         Q          Did he appear to be listening?

24         A          Yes.

Smith - Direct                                                      951

1        Q          Were you present when Trooper Williams

2   read the Waiver section of the form?

3        A          Yes.

4        Q          Did John Moss appear to be listening at

5   that point?

6        A          Yes, he did.

7        Q          Did John Moss ask any questions

8   relating to the form?

9        A          No.

10       Q          Did he state that he understood his

11  rights and was willing to waive them?

12       A          Yes, he did.

13       Q          Did he sign this form waiving his right

14  to remain silent?

15       A          He did.

16       Q          Were any threats or promises made to

17  him?

18       A          No.

19       Q          Did he ask to speak with a lawyer?

20       A          No.

21       Q          Did he ask -- was this followed by some

22  questions on this part?

23       A          Yes, it was.

24       Q          Who was present?

Smith - Direct                                                          952

1        A          Trooper Williams.

2        Q          And John Moss and you?

3        A          Yes, ma´am.

4        Q          Who did most of the talking?

5        A          I did.

6        Q          Did you take any breaks?

7        A          Yes.

8        Q          About how long did you talk to him?

9        A          Probably and hour and a half, covering

10   the period -- maybe two hours.

11       Q          Was food brought in during this period?

12       A          Yes.

13       Q          Did John Moss eat dinner?

14       A          Yes, he did.

15       Q          Did you ever inform John Moss of any of

16   the facts of the Reggettz murders?

17       A          No.

18       Q          How did you start your conversation?

19       A          Well, the way it started is sort of the

20   way it ended in the car.  As I said earlier, I was

21   explaining to him the seriousness of the issue, of the

22   crime that I wanted to talk to him about that had

23   occurred in West Virginia.

24              And as it ended in the car, I said that "it was

Smith - Direct                                              953

1    extremely serious, and like I said, it's really hard to

2    even begin to explain how serious an issue this is." And

3    that we'd "already agreed that you were going to talk to

4    me about it, and that you did know what I was talking

5    about."

6           And, again, he kind of acknowledged -- shook his

7    head yes. I said, "Well, I need you to tell me about it

8    and I really need to know the details, exactly what

9    happened, why it happened, and how it happened."

10          John's response was, "It just happened."

11          I said, "Well, okay, but tell me how, John." He

12   said, "It just happened." I said, "We really need to

13   know why. Would you think about it? We really need to

14   know why and how?" He said, "Because I got scared." He

15   said, "It happened because I got scared."

16          I said, "What happened once you got scared?" He

17   said his blood started rushing. I said, "Well," again,

18   I said, "we still need to know how this happened." And

19   he said he was having trouble remembering, and I said,

20   "Well, I want you to sit there and think about it. Just

21   take your time and think about it."

22          As I said, when he was in the car earlier, you

23   could tell he was really trying to appear to be thinking

24   about what I was asking him about.

Smith - Direct                                            954

1        I asked him, I said, "You told me it happened

2   because you got scared," and he agreed again, yes.  And

3   I said, "Do you remember where you were when you first

4   remember being scared?"   And he answered, "On the

5   tracks."  And I said, "Railroad tracks?"  And he said,

6   "Yes."  I said, "Was that before or after it happened?"

7   He said, "After."  I said, "Then, did you get scared

8   before it happened?"  And he said that he did.

9        I then said, "Where was that at, or where were

10  you at?"  And he said, "At the door."  I said, "Which

11  door?"  And he said, "The back door."  I said, "What did

12  you do at the back door?"  He said, "I pushed it in and

13  went on in."

14       I said, "Who was inside?"  He said, "They were."

15  I either said, "Who was inside?" or "Was anyone inside?"

16  and he said, "They were."   And I said, "Who is they?"

17  And he said, "The woman and kids."

18       And I said, "What happened then?"  He said he

19  couldn't remember.  I said, "You know, back to the same

20  thing, I want you to really think on it.  We really need

21  to know what happened," and he was sitting there

22  thinking.  I said, "Now, do you remember what happened?"

23  He said, "I just don't remember."  And I said, "Well,

24  what did you think the next morning?"  His answer was,

Smith - Direct                                                     955

1    "It shouldn't have happened."  I said, "Why do you say

2    that?"  And he said, "Because of the kids."  I said,

3    "What do you mean by that?" and he said, "Well, they were

4    so young."

5          And then I asked him, "How did you get there?"

6    And he said that he had walked from his house where he

7    had been staying, down the tracks, directly to that

8    house, and that he went to the back door.  I asked him

9    how he got in and he said he just pushed it open.

10         I said, "What did you do then?"  He said, "I went

11   in and looked around for a while."  I asked him why he

12   had gone there and he said, "To get some money."

13         After telling me that he had looked around for a

14   while, I said, "Where were they at?"

15         Q         Did you ask him why he did this act?

16         A         Yes.  I asked him that.  His answer

17   was, he just did.

18         Q         Did you ask him if he knew whether they

19   were in there?

20         A         Yes, I did, and he said he did know

21   they were in there.

22         Q         Did you ask him what time it might have

23   been?

24         A         Yes, and his initial response to that

Smith – Direct                                      956

1    was that he really couldn't remember what time it was.

2           Q        Did you have any further conversation

3    at that time?

4           A        Yes.  I told him, you know, to think

5    about that, that it's important that we know about the

6    time, for him to try to remember the time.

7           I asked him some things like, "Think about it.

8    Do you remember who you were with that day?  Do you

9    remember going anywhere that day?"  His answer to both

10   of those was that he didn't remember being with anybody

11   that day.  He didn't remember going anywhere that day.

12   This was asked to try to help him remember something

13   about the time that day.

14          I remember asking him, "Do you remember where you

15   were just before you went there?"  And he said he had

16   just been listening to the radio.  I said, "Do you

17   remember anything about the radio that would help you

18   with your memory as far as time?"  And he said that

19   really didn't mean anything as far as remembering, but

20   just as that was laying on the bed listening to the

21   radio.  I asked him how long he had been listening to the

22   radio and he said that he didn't know that either.  He

23   just remembers when he was laying in bed listening to the

24   radio prior to going down to the house.

Smith - Direct                                              957

1          Q          Was he ever able to tell you anything

2     which gave you an idea of about what time it was, then?

3          A          Yes.  After listening to the radio, he

4     said it must have been late, because "When I got home

5     after going there this morning, it was almost daylight."

6          Q          Now, what did he tell you happened

7     after he got inside?

8          A          He said he got inside and was looking

9     around.  He told me they were in bed.  And I said, "Do

10    you know where the lady was at the first time you ever

11    saw her awake?"  And he said -- he told me that she was

12    standing near the head of the bed with a gun in her

13    hands.

14         Q          Did he tell you whether there was any

15    lights on?

16         A          I asked John if there were any lights

17    on in that house when he went in, and he said that there

18    was a light on in the bathroom, and the believed that

19    there was a light on in the living room.

20         Q          Did he say what happened after he saw

21    her standing beside the bed with the gun?

22         A          He said when he saw the woman at the

23    bed with the gun, the two of them got into a struggle

24    with the gun, and during the struggle, the gun went off.

Smith - Direct                                    958

1    He said he got the gun from her, he struck her a couple

2    of times with the gun and knocked her down, and at that

3    point, he said he ran out the back door of the house.

4          I asked him, "What did you do after you ran out

5    of the house?"

6          Q          Did he ever say whether the gun had

7    went off?

8          A          He said it went off one time.

9          Q          One time?  Did you ask him whether he

10   thought anybody was shot?

11         A          He said as far as he knew, nobody was

12   shot.

13         Q          Did you ask him which room he was in

14   when the gun went off?

15         A          He said when the gun went off, when

16   they were struggling with the gun, was in the bedroom and

17   into the bathroom.

18         Q          Now, after he ran outside, what did he

19   say he did then?

20         A          He said he looked back and saw the lady

21   at the door.  She appeared to be trying to do something

22   at the door -- get something against the door.  He ran

23   back to the door and forced his way back inside.

24         At this time, he had another struggle, and during

Smith - Direct                                                   959

1    this struggle she had a knife in her hand.  He made the

2    motions that she was swinging it at him.   He said that

3    his left little finger had been cut during the struggle

4    and he showed me a scar, a small scar, on his left finger

5    -- his left little finger.   He said that had occurred

6    during the struggle with the lady.

7            Q        Did he say what happened to the knife?

8            A        No.  I asked him some questions about

9    the knife, and he couldn't say anything about the knife

10   other than that he got it away from her.

11           Q        He took it from her?

12           A        Yes.

13           Q        Did you ask him where the children were

14   during the struggle?

15           A        Yes.  He said that there were pushing

16   and hitting at him, trying to get him to stop, and he

17   would push them back down away from him.

18           Q        Did you ask him what happened after he

19   got the knife away from her?

20           A        He said he knocked her down, took her

21   and tied her to the door.

22           Q        Did you ask him how?

23           A        He said he took some cords, used cords,

24   to hang them around her neck and tie her to the door.

Smith - Direct                                        960

1        Q          Then, what did he do?

2        A          He said he got the little boy, and

3   choked the little boy with his hands and with a cord.

4   He said he tied his hands up with the cords and put him

5   in the bathtub of water.

6        Q          Did you ask him if he had done anything

7   else to the mother?

8        A          He said that he got a knife or

9   something and stabbed her in the chest.

10       Q          Did you ask him why he had done that?

11       A          To make sure she was dead.

12       Q          Did you ask him why he put the boy in

13  the bathtub?

14       A          He said it was to make sure he was

15  dead.

16       Q          Did you ask him why he did this?

17       A          I asked him why he wanted to kill the

18  people.   Other than being scared, he could give no

19  reason.   He said he just got scared.

20       Q          Did you ask him what happened after he

21  stabbed the woman and put the boy in the tub?

22       A          He said he got the little girl and

23  killed her.

24       Q          And killed her?

Smith - Direct                                                961

1          A        And killed her.

2          Q        Did you ask him how he killed her?

3          A        He said he first choked her.  He got

4   the little girl from the room near the mother and choked

5   her with his hands, then took a cord and wrapped it

6   around the little girl's neck and hung her over the door.

7          Q        Did you ask him which door?

8          A        I asked him to explain how he did that,

9   which door, and he said the front bedroom door.  He took

10  the cord that he wrapped around her neck and placed that

11  cord up over top of the door and shoved the door and left

12  her hanging on the door.

13         Q        Which side of the door?

14         A        He was asked which side of the door she

15  was on, and he said she was facing the Christmas tree.

16         Q        Did you ask him how he tied the woman

17  up?

18         A        He said that he had taken some cords

19  and wrapped them around her neck and tied her to the

20  door.

21         I asked him to explain this to me, how he tied

22  her to the door.  He said there was a hole in this door,

23  and he said the hole was from where the door handle

24  should be or a door knob, that somebody had left a hole

Smith – Direct                                                      962

1    in the door.  And that's what -- he put the cord through

2    the hole and tied her up.

3              He was asked which door this was and he said the

4    door was a bedroom door next to the bathroom.

5              Q         Did you ask him if anyone had ever

6    asked him to break into the house?

7              A         Yes, I did.

8              Q         And what did he say?

9              A         He said he never discussed it with

10   anyone.  That no, nobody had asked him.

11             Q         Did you ask him if he knew who lived in

12   the house before going there that night?

13             A         Yes, I did.

14             Q         What did he say?

15             A         He said Paul and them.

16             Q         Did you ask him who Paul was?

17             A         Yes.

18             Q         What did he say?

19             A         His answer was "Paul."

20             Q         Did you ask him if they were friends?

21             A         Yes.

22             Q         What did he say?

23             A         He said he just knew him, but they were

24   not friends.

1          Q          Did you ask him if Paul knew that he

2    was going to break into the house?

3          A          Yes.

4          Q          What did he say?

5          A          He said, "No, Paul didn't know

6    anything."

7          Q          Did you ask him if Paul had asked him

8    to break into the house and do something to his family?

9          A          Yes, I did ask him that.

10         Q          What did he say?

11         A          He said no.

12         Q          Did you ask him if Paul was at home

13   that night or in the house?

14         A          Yes.

15         Q          What did he say?

16         A          He said no.

17         Q          Did you discuss with him what was taken

18   from the house?

19         A          Yes.

20         Q          What did he say?

21         A          Well, when I asked him what he took

22   from the house, his first response -- the first thing he

23   said he took was a couple of dollars.

24              I said, "Did you get anything else?" and he said,

Smith - Direct                                                    964

1   "No."  I told him we knew there were some other things

2   taken from the house, for him to think about it.  He came

3   back and said that he'd gotten a rifle.  I asked him what

4   type of rifle, and he said it was a .22 rifle.

5          I told him that also we knew that there were some

6   other things taken, for him to think about it.  He told

7   me then that he had taken a gun from the house, an old

8   gun.  I said, "What do you mean, a little gun?" and he

9   said, "A pistol."  I asked him to describe the pistol and

10  he said that it was a .22 pistol and that it was a Civil

11  War color.

12          Q       Did you ask him to describe the rifle?

13          A       Yes.  He described it as a bolt action

14  .22 with a scope.

15          Q       Now, had you checked on the description

16  of this rifle?

17          A       Yes, I did.

18          Q       Did the description John Moss gave

19  match the description that you had?

20          A       Yes.

21          Q       Did you ask him where the guns were?

22          A       Yes.

23          Q       What did he say to that?

24          A       At first, he didn't remember.  Then I

Smith - Direct                                                          965

1    asked him where the gun was that morning in the home, and

2    he said that he had placed it under the bed there at the

3    house where he was staying in St. Albans, but he didn't

4    know where it was at that time.  I asked him again about

5    the pistol and he said that he threw it away.  I asked

6    him why he  threw it away, and he said, "Because it was

7    broken."

8          I asked him how did it get broken, and he said,

9    "When I hit the lady with it."  I asked him where it had

10    been broken and he said -- he held his hand up, and he

11    said, "At the back, where you hold it."  And of course,

12    I asked him if he had ever shown these guns to anybody

13    or if anybody had ever seen them.  He said that he had

14    showed them to no one.  I asked him where he threw the

15    pistol away, and he said that morning after it happened,

16    he had taken the pistol to school in a paper bag and

17    threw it away in a large garbage can at school that

18    morning, and had showed it to no one at the school.

19          Q     Did you ask him where the rifle might

20    be?

21          A     Yes.

22          Q     What did he say?

23          A     He just said that he didn't know.  The

24    last time he remembered was he had placed it there that

Smith - Direct                                          966

1    morning after it had happened, under the bed there at the

2    house.

3              Q         Now, at that time, Sergeant Smith, did

4    you leave the room?

5              A         Yes.

6              Q         Who was left in the room?

7              A         Trooper Williams.

8              Q         About how long were you gone?

9              A         Probably twenty or thirty minutes.

10             Q         What happened when you went back into

11   the room?

12             A         When I walked back into the room,

13   Trooper Williams started speaking to me, and made me

14   aware of some things that he had learned from John while

15   I was out.

16             Q         What were those things?

17             A         Well, he told me that John told him

18   that he had taken a box of dishes from the house that

19   night; that he had also taken a camera from the house

20   that night.

21             Q         Prior to the time Trooper Williams told

22   you he had discussed those things with John Moss, were

23   you aware that there might have been missing dishes or

24   gifts from the house?

Smith - Direct                                                    967

1          A          I had no idea that the camera was taken

2     from the house.  I had no idea that any dishes had been

3     taken from the house.

4          Q          Had you discussed those two things with

5     John Moss?

6          A          No.

7          Q          You were not aware of those two things

8     until Trooper Williams told you that John Moss had

9     discussed them in your absence?

10         A          That's correct.

11         Q          Was there anything else that occurred

12    in your absence?

13         A          Trooper Williams also told me that John

14    said that he had noticed Paul's car parked out in front

15    of the house just prior to going into the house.

16         Q          And you said Paul wasn't there?

17         A          He said Paul wasn't there.

18         Q          Did you ask him where the camera was

19    that he was talking about?

20         A          Yes.

21         Q          What did he say?

22         A          He said it was at his parents' home in

23    Cleveland, Ohio.

24         Q          Did you ask him what kind of camera it

Smith - Direct                                                  968

1    was?

2         A         He said it was a Polaroid or Kodak.

3         Q         Did you again ask him where the rifle

4    was?

5         A         Yes.

6         Q         What did he say?

7         A         He said that he had taken the rifle to

8    Cleveland, Ohio with him when he went back, from St.

9    Albans, just before Christmas, going back to Cleveland.

10        Q         Did you ask him if that was together?

11        A         Yes, I did.

12        Q         What did he say?

13        A         He said he had taken it apart and put

14   it in his luggage when he went back to Cleveland.   He

15   took a screw loose underneath the rifle and took it apart

16   and he put it in his luggage when he went back to

17   Cleveland.   He carried it that way.

18        Q         Were you able to confirm that this type

19   of rifle does come apart in the manner which John Moss

20   described?

21        A         Yes.

22        Q         And it does?

23        A         It does.

24        Q         Did you ask him where the rifle was?

Smith - Direct                                              969

1       A       After he took it home with him?

2       Q       Yes.

3       A       He said that he had sold it to a

4   friend.

5       Q       Did he tell you the friend's name?

6       A       I told him that -- he first said that

7   he would like to just -- he felt like he could get the

8   rifle back and have it brought to his house, and I told

9   him that it was really important that we get the rifle

10  back, that we needed to talk to his friend.  I told him

11  as long as we got the rifle back, we could talk with his

12  friend.  The friend wasn't going to get into any trouble,

13  I didn't think.  I didn't think the friend was going to

14  get into trouble for having the rifle.  I told him that

15  it was extremely important that we get the rifle back.

16      Q       Go ahead.

17      A       Okay.  That's when he said that it was

18  at the house; that the rifle was there at his parents'

19  home in Cleveland, at his parents' home in his bedroom

20  in a closet.

21      Q       Did you ask him if he'd shown it to

22  anyone?

23      A       He said, yes, he'd shown it to a

24  brother that he has by the name of Carl, that Carl had

Smith - Direct                                          970

1    seen the rifle there at the house.

2         Q         Did you ask him if it was together or

3    broken down?

4         A         He said the rifle had been put back

5    together, but he didn't believe that the scope was on it.

6         Q         Did you ask him the last location he

7    remembered seeing the camera?

8         A         He said it was on top of a dresser in

9    his bedroom.

10        Q         What was his parents' address?

11        A         I asked him his parents' address, and

12   he said it was 1725 Zoeder Avenue.

13        Q         Was that accurate?

14        A         Yes.

15        Q         Did you ask him his parents' names?

16        A         Yes.  He said his father's name was

17   John and that his mother's name was Marcy.

18        Q         Was that accurate?

19        A         Yes.

20        Q         Did you ask him if he took any other

21   dishes or gifts from the home?

22        A         He was asked about that.  He said that

23   the dishes that he'd taken from the house that night had

24   been a Christmas gift, that they'd been under a tree and

Smith - Direct                                                  971

1    been wrapped up, that he'd took this gift and that it was

2    the only gift he took from the house, that he later gave

3    this gift, that same gift, after he had rewrapped it.

4         I said, "Did you rewrap this gift or did someone

5    else rewrap it before giving it away?"  He said that he

6    was the one who had rewrapped it, and that the took it,

7    then, and gave it as a Christmas gift to Arbutus Moss.

8         Q        Arbutus Johnson?

9         A        Yes, I'm sorry, Arbutus Johnson.

10        Q        Did she have some relationship to him?

11        A        He had a best friend by the name of

12   Bill Johnson, and that was his answer.  "I gave it to my

13   best friend's mother."

14        Q        Did you ask him her name?

15        A        Yes.

16        Q        And his response?

17        A        His response was Mrs. Johnson.  He

18   didn't say the first name, he just said Mrs. Johnson.

19        Q        Did you have any discussion with him

20   about his clothes or blood?

21        A        Yes.  I asked him to try to remember

22   about his clothing, what he was wearing.  He said that

23   he didn't remember whether he wore gloves that night or

24   not, but that he did have blood on his clothing, that no

Smith – Direct                                          972

1  one saw his clothing as far as seeing blood on it, that

2  he had taken his clothing himself and washed it himself.

3       Q       Did you have an occasion to ask John

4  Moss if he thought Vanessa Reggettz was pretty?

5       A       Yes.

6       Q       What did he do?

7       A       He took his hand and motioned in the

8  area of the chin and lower cheeks, and his answer was

9  that he thought she had bumps.

10      Q       Now, you viewed a portion of her

11 autopsy; is that correct?

12      A       Yes.

13      Q       During the time of her autopsy, did it

14 look like she had bumps?

15      A       She had spots on her face that appeared

16 to be like acne or facial blemishes.  There was a lot of

17 spots.

18      Q       Now, after you had this conversation

19 with John Moss, did you make arrangements with Sergeant

20 Presson to take a taped statement?

21      A       Yes, I did.

22      Q       Were you present when John Moss was

23 read his rights for the third time that day?

24      A       No.

Smith - Direct                                              973

1          Q          Were you present when the taped
2    statement was taken?
3          A          No.
4          Q          After the taped statement was taken,
5    did you go back to Cleveland with Trooper Williams?
6          A          Well, we didn't go back to Cleveland.
7    We had come from Mansfield to Parkersburg.
8          Q          And then you went to Cleveland?
9          A          After we went to Parkersburg that
10   night, we went to Cleveland, Ohio.
11         Q          Did you obtain a search warrant for
12   John Moss's parents' home?
13         A          Yes, we did.
14         Q          While you were there, were you able to
15   locate the rifle?
16         A          No.
17         Q          Did you make some kind of arrangement
18   with Charleston?
19         A          I made arrangements through one of my
20   superiors for us to have permission to go to Cleveland.
21         Q          After you got there and you couldn't
22   find the rifle, though, did you make a phone call back
23   to Charleston?
24         A          Yes, I did.

Smith - Direct                                                     974

1         Q         Who was that to?

2         A         An Assistant Prosecutor with the

3    Kanawha County Court system here.  The Prosecutor's name

4    was Chuck Pettry or Charles Pettry.

5         Q         And did Mr. Pettry make arrangements to

6    have John Moss speak to you on the telephone?

7         A         Yes, he did.

8         Q         Was it your testimony that he was

9    advised of his rights before talking on the telephone?

10        A         Yes.  I advised him.

11        Q         What conversation did you have with him

12   on the phone?

13        A         The reason I had Mr. Pettry do this was

14   so that  --  we were searching the house up there, and

15   at the time, we had not found the camera in the house,

16   and we had not found the gun.  John had told me earlier

17   that the camera was supposed to have been on top of the

18   dresser in his bedroom and the gun was supposed to have

19   been in his closet next to his bedroom, so I wanted to

20   make sure that we were looking in the right bedroom, the

21   right dresser, and had the right closet.  So, that's what

22   the phone call was about.

23             And in talking with John, he was telling me that

24   I was looking  --  that we were looking in the right

Smith - Direct                                          975

1    bedroom, that we had the right closet. I even further

2    verified this by having him talk to his mother, to make

3    sure we were in the right location.

4         I gave the phone to Marcy Moss and asked her to

5    talk with him to make sure that we were in the right

6    location, and of course, she got on the phone and talked

7    with him.

8         Q    How was John Moss´s voice when you were

9    on the telephone with him?

10        A    I´d say John´s voice was much the same

11   as it had been the evening and day before.

12        Q    Was he cooperative?

13        A    Yes.

14        Q    Did he ever indicate to you that he did

15   not want to talk to you?

16        A    No. He seemed real sincere and real

17   concerned about wanting to help us locate those items at

18   that time.

19        Q    Did he express any unwillingness to

20   cooperate or to give this information to you?

21        A    No, he didn´t.

22        Q    Was his attitude about the same as it

23   was on the previous day?

24        A    It was just exactly the same;

Smith - Direct                                                      976

1     cooperative and sincere.

2           Q         Now, you say you handed the telephone

3     to his mother?

4           A         Yes.

5           Q         Did he mother have a conversation with

6     him?

7           A         Yes, she did.

8           Q         Was she cooperative as well?

9           A         Yes, she was.

10          Q         Were you able to recover the rifle?

11          A         No.

12          Q         Corporal Smith, have you ever had a

13    complaint filed against you with the Department of Public

14    Safety?

15          A         No.

16          Q         Have you ever been subject to an

17    Internal Affairs investigation as a result of some

18    complaint of excessive force or brutality?

19          A         No, I haven't.

20          Q         Have you ever been disciplined by the

21    Department of Public Safety?

22          A         Yes, I have.

23          Q         What were you disciplined for?

24          A         There was one disciplinary action that

Smith - Direct                                                    977

1    I received, which was concerning the fact that I had let

2    a prisoner escape from my custody.

3            Q        Have you received promotions?

4            A        Yes.

5            Q        What were your prior ranks?

6            A        When I was stationed down here in this

7    area of Kanawha County, in the Kanawha Valley, I was a

8    Trooper, then I was sent to C Company, which is in my

9    area now, the eastern panhandle, and I received a

10   promotion over there to Trooper First Class.

11           From Trooper First Class to Corporal, then to

12   Sergeant.

13           Q        What is your present position?

14           A        My present position is that I'm

15   Assistant Detachment Commander at the Martinsburg

16   Detachment, which is in Berkeley County.  It has fifteen

17   men working for that station.

18           Q        What was your position previous to

19   that?

20           A        I was the Detachment Commander and also

21   the Assistant to the District Sergeant for the Fourth

22   District of C Company, which has four counties in it.

23           Q        How did you know that the description

24   of the rifle that John Moss gave fit the description of

Smith - Direct                                                 978

1    the .22 rifle?

2            A        We obtained a sales receipt from where

3    Mr. Reggettz had purchased the rifle, at the Heck's store

4    in St. Albans.

5            The sales receipt showed it to be that model, a

6    bolt action .22 rifle.

7            Q        The John Moss that confessed to you in

8    Parkersburg, is he present in the Courtroom today?

9            A        Yes.

10           Q        Would you point him out, please?

11           A        He is sitting here in the brown pants

12   at the table to the right of Mr. Bickley's left.

13           MS. LUSK:   May the record reflect that the

14   witness had identified the defendant.

15           THE COURT:  It is so noted.

16           MS. LUSK:   That's all I have right now.

17

18                        CROSS-EXAMINATION

19

20   BY MR. BICKLEY:

21

22           Q        Trooper Smith, you have a reputation of

23   having a quick temper; is that correct?

24           A        I've never been told that.

Smith - Cross                                                    979

1          Q          Now, coming back from Mansfield was

2     just yourself and Trooper Williams and Mr. Moss; is that

3     correct?

4          A          Yes, sir.

5          Q          So, it's Mr. Moss's word against you

6     and Trooper Williams?

7          A          Yes.

8          Q          Now, if I understand correctly, you

9     read him his Miranda Rights after you crawled into the

10    back seat?

11         A          Yes, sir.

12         Q          And was it your belief that he could

13    not hear the Miranda Rights if you remained in the front

14    seat?

15         A          No, I wouldn't say that was my belief.

16         Q          Then, you crawled into the back seat

17    for a different reason; would that be a true statement?

18         A          Yes.

19         Q          And that reason is to soften him up for

20    the eventual conversation in Parkersburg; isn't that

21    true?

22         A          No, sir.

23         Q          Say that again?

24         A          No, sir.

Smith - Cross                                                  980

1      Q        It's not true?

2      A        I wouldn't say to soften him up.

3      Q        Would you tell the jury that you didn't

4   hit him?

5      A        If I did sir, I would, but I didn't.

6      Q        Okay.  Now, is it also true that once

7   you got to Parkersburg, did you not hit him on his leg

8   as he was getting out of the sedan?

9      A        I hit John Moss at no time ever.

10     Q        Did there come a time when John Moss's

11  memory wasn't too good, that he was basically having a

12  memory problem, and Trooper Williams indicated that he

13  would step out for about five or ten minutes and leave

14  him with you.  And then when Trooper Williams came back,

15  his memory had improved immeasurably?

16     A        There was a time Trooper Williams left

17  the proceedings.

18     Q        But during the time before he left,

19  John was having a little problem remembering and

20  retaining those facts that you were giving him; is that

21  correct?

22     A        I wasn't giving him any facts.

23  Trooper Williams left the area where John was

24  saying that it just happened.

Smith - Cross                                                      981

1          Q          And when Trooper Williams returned, Mr.

2     Moss -- miraculously now, his memory was pretty good?

3     Is that correct?

4          A          John was just getting to the point, I

5     think, where, you know, in the beginning -- saying I

6     remember going there.

7          Q          And is it not true that John had

8     rehearsed, if you will, for two hours, I believe you

9     testified, two hours of oral conversation, if you will,

10    or oral confession with John prior to the electronic

11    taping?

12         A          I talked to John probably an hour or an

13    hour and a half, but I wouldn't call it a rehearsal.

14         Q          But you discussed the confession, the

15    material for the confession was discussed in this hour

16    and a half; wasn't it?

17         A          Yes.

18         Q          Now, Trooper Reggettz -- or excuse me,

19    Trooper Smith, are you familiar with the Reggettz

20    confession?

21         A          Yes.

22         Q          And you are familiar with the details

23    of his confession?

24         A          Yes.

Smith - Cross                                    982

1        Q        In   fact,   you   and   the   chief

2   investigating officer -- or were you, in fact, the chief

3   investigating officer in this case?

4        A        I would say one of two, myself and

5   Trooper Williams.

6        Q        And Trooper Williams?

7        A        Yes.

8        Q        So, you knew the details.  You had been

9   to the scene of the crime?

10       A        Yes, I had been to the scene of the

11  crime, a lot later.

12       Q        You did not get there when the bodies

13  were there?

14       A        No, sir.

15       Q        But you were familiar that Mr. Reggettz

16  had confessed in some detail about these murders?

17       A        Yes.

18       Q        And you were aware of the different

19  positions of the body in his confession?

20       A        I was aware of how he had -- what he

21  said he did with those people -- I beg your pardon?

22       Q        You are aware of what Mr. Reggettz said

23  he did to his family?

24       A        Yes, sir.

Smith - Cross                                              983

1      Q       So, you had that knowledge when you
2  talked to Mr. Moss; is that correct?
3      A       Yes.
4      Q       Now, did you beat up on Mr. Reggettz to
5  get his confession?
6      A       No, sir.
7      Q       Then, were you there when he was giving
8  his confession?
9      A       I was in the office.  I wasn't present
10 when he was giving his confession, to be able to hear it
11 or anything like that.
12     Q       Did  you  talk  to  him  about  the
13 allegations?  Did you talk to Mr. Reggettz when he was
14 at the detachment?
15     A       Yes, I did.
16     Q       Did it appear that anyone was harassing
17 him?
18     A       No, sir.
19     Q       Did it appear that he was shaken and
20 upset?
21     A       No, sir.  Not the times I viewed him,
22 no.
23     Q       So, from outward appearances, Reggettz
24 appeared normal when you saw him at the detachment?

Smith - Cross                                    984

1          A        Yes.

2          Q        Now, isn't it true that at one time,

3    Mr. Moss did not want to talk to you all?

4          A        There was no time that Mr. Moss didn't

5    want to talk to us.

6          Q        Now, Trooper Smith, wasn't there an

7    occasion, in fact, along the period we're talking,

8    November 7, 1979, you received a letter from Corporal

9    Cook in reference to his believing that you were not

10   being all that you should be as a trooper?  Do you recall

11   that?

12         A        Receiving a letter?

13         Q        A letter from Corporal Cook, to which

14   you responded back on November 15, 1979?

15         A        I don't remember the letter as to what

16   you're wording, no.

17         Q        Did you receive a letter, a copy -- let

18   me show you the letter.

19         Let me ask the question differently.  Did you

20   receive -- or did that letter come to your attention,

21   sir?

22         A        Yeah, I saw this letter, but I couldn't

23   tell you -- I think was probably a lot later than what

24   the letter is dated, because that letter is not to me.

Smith – Cross                                                              985

1        Q        I know, but did you receive a copy,

2   because you responded to the letter?

3        A        Oh, yeah, but it was a lot later than

4   what this letter is dated.

5        Q        I understand that you were privileged

6   to see the letter complaining about your conduct?

7        A        Yes.

8        Q        Would you read the contents of that

9   letter, please?

10       MS. LUSK:  Objection.  May we approach?

11       THE COURT:  Yes.

12

13       WHEREUPON, a bench conference was held and the

14   following transpired:

15

16       MS. LUSK:  We saw you take it out.

17       THE COURT:  How many have you got?

18       MR. BICKLEY:  How many letters?  I have his

19   response to that letter.

20       THE COURT:  I mean, all told?

21       MR. BICKLEY:  How many letters I have?

22       THE COURT:  Out of the personnel file, how many

23   do you have?

24       MR. BICKLEY:  Of the letters?

Smith - Cross                                                986

1       THE COURT:  Anything.

2       MR. BICKLEY:  That's all I have.  That's all we

3   pulled out.

4       MR. HUFFMAN:  There's other matters in there that

5   relate to that, but that's the only one we've got.

6       THE COURT:  I simply asked because I want to

7   review them all at the same time.

8       MR. BICKLEY:  Do you want his response?

9       THE COURT:  Yes.  But let's go ahead and take a

10  lunch break.

11      Ladies and gentlemen, we're going to recess until

12  1:30.  You may be excused until that time.

13

14      WHEREUPON, the Jury was excused for a lunch

15  recess in the hearing of this case.

16

17      WHEREUPON, the bench conference resumed as

18  follows:

19

20      MS. LUSK:  I think this opens up all of the good

21  evaluations.

22      THE COURT:  What?

23      MS. LUSK:  There are a lot of good evaluations.

24      THE COURT:  What's this for?

Smith - Cross                                              987

1       MR. BICKLEY:  It was irrelevant until they opened

2   it.  I don't know why they opened it.

3       THE COURT:   You could have objected; couldn't

4   you?

5       MR. BICKLEY:  Yeah, I had rebuttal.

6       THE COURT:  I know.  What if she said, now, let

7   me ask you, did you ever beat your wife?  And he said,

8   I've never done it in my life.  Would you be entitled to

9   put on evidence that he had beat his wife?

10      MR. BICKLEY:  If I could do it, I think.

11      THE COURT:   That's collateral.   I think it's

12  collateral.  I don't think this is -- this doesn't have

13  anything to do with voracity; does it?

14      MR. HUFFMAN:  Sure, it does.  It says right in

15  there that he told the Trooper he denied he said what he

16  said.

17      MR. BICKLEY:  It has a lot to do with voracity.

18      THE COURT:  Do you mean because there was ---

19      MR. HUFFMAN:   Apparently, there was a verbal

20  confrontation between ---

21      THE COURT:  Because this says something different

22  than what he says?

23      MR. BICKLEY:  He says, if you tell anybody, I'll

24  deny it.

Smith - Cross                                    988

1       MR. REVERCOMB:  That was in dispute, your Honor,

2  that's not a false statement.

3       MR. BICKLEY:  If you hadn't brought the character

4  up, we weren't going to put anything in the record.

5       MS. LUSK:  Judge, if you do consider admitting

6  this, I think we should be able to present all of the

7  good evaluations he has in the file, also.

8       THE COURT:  I'll tell you after lunch.

9       We'll all come back at 1:30.

10       MR. BICKLEY:  Your Honor, we withdraw the letter.

11       THE COURT:  You withdraw the letter?

12       MR. BICKLEY:  Yes, sir.

13       THE COURT:  Okay.  Do you want to make that

14  announcement when your client is brought out?

15       MR. BICKLEY:  Yes, I'd better do that.

16       MR. REVERCOMB:  Your Honor ---

17       THE COURT:  Can we elicit how much was heard

18  about that letter?

19       MR. BICKLEY:  They didn't hear anything.

20       MR. REVERCOMB:  You mentioned the letter.

21       THE COURT:  It's obvious to me that the letter

22  was critical.  I'll just tell the Jury that it has been

23  withdrawn and that they are not to consider it favorably

24  or unfavorably in this case to anyone.

Smith - Cross                                                        989

1        WHEREUPON, the Court stood in a recess in the

2   hearing of this case.

3

4        (Back on the Record)

5

6        THE COURT:  Welcome back.  Mr. Bickley, are you

7   ready to pick back up?

8

9                    CROSS-EXAMINATION

10                     (Continued)

11

12  BY MR. BICKLEY:

13

14       Q        Your Honor, I withdraw the letter that

15  was previously submitted and I have no further questions.

16

17       THE COURT:  Members of the jury, right before the

18  recess at lunch time, there was a letter tendered and a

19  couple of questions asked about it.

20       I want you to forget any questions asked or any

21  answers given.   The letter should not be considered

22  favorably or unfavorably to anyone in this case.

23

24

Smith - Redirect

990

REDIRECT EXAMINATION

1

2

3    BY MS. LUSK:

4

5        Q       Sergeant Smith, why did you get in the

6    back seat of the cruiser on the way to Charleston?

7        A       Well, it's like I stated earlier, it

8    was to have a talk with him.   It was real awkward to

9    turn around and really keep eye contact, and to hear

10   exactly what he was saying.

11       When you are moving out on the road like that --

12   and I'm just a little bit hard of hearing -- and I

13   stepped over into the back to make sure that he could

14   hear me and that I could also hear him and have to eye

15   contact.

16       Q       Now, Mr. Bickley asked you if you saw

17   Paul Reggettz at the South Charleston Detachment on

18   December 13, 1979?

19       A       Yes, he did.

20       Q       Do you know what time Mr. Reggettz

21   arrived at the detachment?

22       A       I'm thinking -- I would say

23   approximately 1:30 p.m. in the afternoon.

24       Q       Are you aware of his being advised of

Smith - Redirect                                              991

1    his rights?

2           A        I was made aware of the fact that he

3    had been advised of his rights.

4           Q        Was that early?

5           A        It was some time in the afternoon, yes.

6           Q        What time did you talk with him?

7           A        I talked with Mr. Reggettz, maybe

8    around 7:30 p.m.

9           Q        Now, he stated that you were asking him

10   questions, quickly firing questions at him.    Is that

11   true?

12          A        I would not say they were rapid

13   questions, but I asked him a lot of questions.

14          Q        Were you aware that he had confessed

15   there at the detachment?

16          A        Later that next morning.

17          Q        Do you know what time that was?

18          A        It was probably 3:00 or 4:00 a.m.,

19   maybe.

20          Q        Did you go to the house with them the

21   next morning?

22          A        I didn't go into the house.   I was in

23   the area, but I wasn't in the house.

24          Q        What time was that?

Smith - Redirect                                      992

1           A          I would say approximately 8:00 or 8:30

2     a.m.

3           MS. LUSK:  That's all I have, Judge.

4           MR. BICKLEY:  No further questions.

5           THE COURT:  Thank you, sir.  You may step down.

6           Are you all ready to do the view?

7           MS. LUSK:  Yes.

8           MR. BICKLEY:  Yes, your Honor.

9           THE COURT:  Ladies and gentlemen, we're going to

10    -- we've got a bus outside and we're all going to get in

11    buses and our cars and drive down to the site.

12          There is something that I want to tell you about

13    a view.  A view is not a place where you can take any

14    evidence.  We're not going to have a Court Reporter

15    present, and there is not going to be anybody testify.

16    If you have questions, I'm going to let you ask those

17    questions of me, and if I can answer them and they can

18    be agreed to by counsel, I'll do it.  Otherwise, the

19    purpose isn't so much to get evidence or testimony, but

20    to give you the opportunity just to look around, in light

21    of the testimony which you've heard in this case.

22          It's going to take us about five minutes to get

23    ready to go, so if you all want to go on back to the Jury

24    Lounge, one of the Bailiffs will come pick you up and

993

1   escort you downstairs in about five minutes.

2

3   　　　　　WHEREUPON, the Jury was escorted by the Court on

4   a view of the scene of the crime.

5

6   　　　　　(Back on the Record after the view of the scene,

7   out of the hearing of the jury)

8

9   　　　　　MR. REVERCOMB:  Your Honor, we'd like to put on

10  the record some of the things that we observed at the

11  view.

12  　　　　　THE COURT:  Let me see if I can at least give it

13  a start.

14  　　　　　We have just returned from a view taken of the

15  premises of the events which occurred in this case, or

16  gave rise to this case.

17  　　　　　Initially, I think it's appropriate to note that

18  I asked the Deputies who had the defendant in custody to

19  be sure that they did not transport him in a manner which

20  would indicate to the jury that he was in custody, and

21  to accomplish that, I asked my Bailiff, who was attending

22  the jury to hold them up for about ten minutes.  We got

23  there probably almost ten full minutes in advance of the

24  jury, and by the time counsel and I got there, the

994

1    defendant and two officers were just pulling in.  He had

2    a chance to alight from the car and we assembled and

3    discussed very briefly what both sides wanted me to show

4    the jury.    And thereafter we went into the house

5    ourselves.

6         By agreement, we brought the jury up and pointed

7    out the house, the location of the house; the location

8    of Chesterfield -- Chesapeake Avenue; the railroad track;

9    Fortson's house; and another house adjacent to the

10   Reggettz home.

11        We then separated the jury into two groups of

12   seven each, because of the limited space inside of the

13   house.  And by agreement, I simply pointed out each of

14   the rooms, those being:  the kitchen, a room which is

15   characterized as being the TV room, the front and rear

16   bedrooms, and the bathroom which is attached to the rear

17   bedroom, and the living room.

18        In addition, I pointed out to the jurors the

19   addition of a closet in the back bedroom, and of some

20   general things about the fact that the house had been

21   remodeled, the location of the bar, the location of the

22   television and the location of the Christmas tree in the

23   house.

24        I instructed them that if they had questions,

995

1    they could ask those questions.  I would then confer with

2    counsel to determine if there was an agreed or stipulated

3    response.     And in the instance of virtually every

4    question that was asked, we had either an agreement to

5    a simple answer to be given to the jury, or agreement

6    that the jury should not be given any answer whatsoever.

7        So far as I am able to determine, I heard

8    objections from neither the State nor the defendant

9    regarding the conduct of the view itself.   One very

10   disconcerting part of this case was the fact that a local

11   news person approached the defendant with a microphone

12   and asked him if he did this crime, or committed the

13   murders, or something in that general line of inquiry.

14   He answered "No", or "I did not", or something of this

15   response.

16       I instructed the members of the media to stay

17   clear of both the defendant and the jurors thereafter.

18   They were relative obedient to that instruction.

19       Now, is there anything, Steve, that you would

20   like to add to that?

21       MR. REVERCOMB:  Yes, just a couple of things to

22   go into more detail.

23       In the TV room, I believe you pointed out that

24   -- about the testimony that we had had about the lack of

996

1   outlets.   And I pointed those out, the fact that the
2   walls had been paneled, the bathroom had been remodeled.
3   You pointed out that there was a door that separated the
4   front bedroom from the living room, and the front door
5   was where the fireplace had been.
6           You pointed out, I think in response to a
7   question, I believe, the duration of the -- John Moss´s
8   -- or where John Moss´s grandfather´s house was.   You
9   directed them as to Gene´s Motel and told the jury of the
10  A&W Rootbeer site.   I believe the other questions were,
11  we agreed, that they would have to rely on the testimony.
12          I´d like to point out that the defendant at no
13  time was handcuffed down there in the presence of the
14  jury.   They never saw him in the car or in the full
15  custody of a Deputy.   He wasn´t seen entering or exiting
16  the car.
17          I guess I´d like for the defense to stipulate to
18  this.
19          THE COURT:   Yes.   Nelson, is that an accurate
20  characterization?
21          MR. BICKLEY:   It is, your Honor.
22          THE COURT:   I might add that at all times we had
23  the jury doing anything, I made every effort I could to
24  make sure that Mr. Moss was there, and that Tim -- Mr.

997

1  Huffman was with us, as well as Mr. Bickley.

2      Mr. Moss, was there anything down there that went

3  on with that jury that you weren't present for?

4      THE DEFENDANT:  I was present at all times, your

5  Honor.

6      THE COURT:  Have we fairly characterized what

7  went on, Mr. Bickley?

8      MR. BICKLEY:  You have.

9      THE COURT:  Obviously, -- very well.  Okay, Tom,

10  bring the jury in.

11

12      (Back on the Record with the jury present)

13

14      WHEREUPON, Charles E. Pettry, Jr. was duly sworn,

15  and upon his oath deposed as follows:

16

17      THE COURT:  Ladies and gentlemen, Mr. Pettry has

18  already been sworn.    I think I might make one

19  observation to you.  I've told all of you on a couple of

20  occasions that you would have a chance to compare what

21  you saw down there with the photographs.

22      Just in case you're not really in on what we know

23  about the photographs, there are a number of photographs

24  that you probably have watched that have been marked and

998

1    have been given to the Reporter or the Clerk.  Those

2    photographs correspond to the slides which you've seen.

3    Basically, what happened is, we had a picture made and

4    then had a slide made from the photograph.  All of those

5    pictures which are admitted into evidence in this case

6    will be given to you to take to the Jury Room to look at

7    at the time you deliberate in the case.

8

9                      DIRECT EXAMINATION

10

11   BY MS. LUSK:

12

13        Q        Would you state your name, please?

14        A        Charles Pettry.

15        Q        Are you employed?

16        A        Yes, ma'am.  I'm an attorney.  I

17   practice here in Charleston.

18        Q        You are self-employed?

19        A        I have a firm, Goodwin and Pettry.

20        Q        Prior to the private practice of law,

21   did you hold any other employment?

22        A        Yes, ma'am.  I was an Assistant

23   Prosecuting Attorney for Kanawha County in 1978 and 1979

24   and 1980.

Pettry - Direct                                          999

1     Q        So, in October of 1980, you were an

2  Assistant Prosecuting Attorney for Kanawha County?

3     A        Yes, ma´am.

4     Q        Had you worked on the case in the

5  Reggettz homicides?

6     A        Yes, ma´am.

7     Q        Did there come a time, Mr. Pettry, on

8  October the 29th, 1980, when you received a telephone

9  call from Cleveland, Ohio, from Trooper Mike Smith?

10     A        Yes, ma´am.

11     Q        And as a result of that telephone call,

12  did you make arrangements for John Moss, III to speak to

13  Trooper Smith on the telephone?

14     A        Yes, ma´am, I did.

15     Q        Now, prior to handing Mr. Moss the

16  telephone, did you advise him of any of his

17  constitutional rights?

18     A        Yes, ma´am, I did.  I wasn´t sure that

19  I needed to, but out of an abundance of caution, I went

20  ahead and gave him what the Police call the Miranda

21  Warning, and told him what his rights were; what he could

22  do and what he didn´t have to do if he didn´t want to.

23     Q        Go ahead.

24     A        I told him, first of all, that he

Pettry – Direct                                    1000

1    didn´t have to speak to Trooper Smith, and that he didn´t

2    have to talk to me, either, but that if he did talk to

3    Trooper Smith or to me, or particularly to Trooper Smith,

4    anything he said might be used against him in a

5    Courtroom.

6         I also told him that if he wanted to speak with

7    an attorney, he could do so.  If he didn´t have one at

8    that point, also, I think he did -- that one would be

9    appointed for him.

10        Q       Did you threaten him in any manner?

11        A       No, ma´am.

12        Q       Did you make any promises to him?

13        A       No.

14        Q       Did he indicate to you that he wanted

15   to talk to a lawyer?

16        A       No.

17        Q       You weren´t wearing any kind of

18   uniform; were you?

19        A       No; the same kind of uniform I have on

20   today, a suit and tie.

21        Q       Were you armed?

22        A       No, ma´am.

23        Q       What was John Moss´s attitude?

24        A       He seemed cooperative.  He didn´t -- he

Pettry - Direct                                          1001

1   was cooperative is the best way to describe it.

2            Q        Did you hear him talk on the telephone?

3            A        Yes, ma'am, I was right there.

4            Q        What happened?

5            A        Well, as I recall, when Mike Smith

6   called me, I was in the Prosecutor's office, in the old

7   Prosecutor's office.

8            We went down to the Jail and I had Mr. Moss -- we

9   were up on the third floor, out in the main waiting area

10  there at the Jail. And I called, as I recall, Mike

11  Smith, at a number he had given me to call. I called him

12  back in Cleveland and talked to Mike and told him that

13  John was on the phone here with me and wanted to speak

14  with him, and I handed him the phone.

15           Then I heard Mr. Moss's half of the conversation

16  with Trooper Smith.

17           Q        What did you hear?

18           A        Well, I heard him talk about telling

19  him that there was -- as I recall, there was a gun, a

20  rifle, a .22 rifle, and a camera that they were talking

21  about. And he told Mike -- he told Trooper Smith to look

22  upstairs in the closet, I think, to the best of my

23  recollection. And he also talked to his mother.

24           Q        Did he tell them, with regard to the

Pettry - Direct                                        1002

1    rifle, that another family member might know where it

2    was?

3         MR. HUFFMAN:   Excuse me, Judge.   She is leading

4    the witness.

5         THE COURT:   Sustained.

6

7    BY MS. LUSK:

8

9         Q       Do you want to go ahead and answer now?

10   Did he tell them anything else with regard to the rifle?

11        A       He told Mike, and I think he also told

12   his mother, that if it wasn't up there, to ask Carlton

13   where it was, that Carlton might know where it was.   And

14   I understood at that point that Carlton was his brother.

15        Q       How do you know he talked to his

16   mother?

17        A       Well, at that point, or at one point,

18   I heard -- there was a pause, and it seemed to me that

19   someone else got on the phone just from the pause.   And

20   he said, "Hi, Mom" or "Hi, Mama" or words to that effect.

21        So that suggested very clearly to me that he was

22   talking to his mother.   He told her -- he said, "I'm

23   okay.   I'm all right," or something like that.

24        Now, he told her basically the same thing he said

Pettry - Direct                                                1003

1    to Mike.  He said, "Tell them to look up in the closet,

2    and if they can't find it, to have Carlton -- see if

3    Carlton knows where it is."  As generally speaking, it

4    was words to that effect.

5             Q        He indicated to his mother that he was

6    okay?

7             A        Yes, ma'am.

8             Q        Did he make any complaints to you?

9             A        No.

10            Q        When  you  were  speaking  of  the

11   conversation, that they were looking for something in the

12   closet, did you know what they were talking about?

13            A        I thought they were talking about the

14   .22 rifle.  There was a rifle, I think a .22, and a

15   camera, I think it was one of those little Instamatic

16   cameras, or something like that.

17            But at that point, it was the subject of the

18   investigation.

19            Q        At any time, was he uncooperative?

20            A        No.

21            Q        No complaints?

22            A        No.

23            Q        So he was okay?

24            A        Yes, ma'am.

Pettry - Direct                                                1004

1         Q        Is the John Moss, III that you

2    overheard this conversation here within this Courtroom

3    today?

4         A        Yes, ma´am.

5         Q        Would you point him out for the jurors,

6    please?

7         A        He is sitting next to Mr. Bickley there

8    at counsel table.

9         MS. LUSK:    May the record reflect that the

10   witness has identified the defendant.

11        That´s all I have.

12

13                     CROSS-EXAMINATION

14

15   BY MR. BICKLEY:

16

17        Q        Your name is Charles Pettry; is that

18   correct?

19        A        Yes, sir.

20        Q        Are you commonly known as Chuck Pettry?

21        A        Yes, sir.

22        Q        And you´re more commonly known as Chuck

23   Pettry than Charles Pettry; I take it?

24        A        Right.

Pettry - Cross

1    Q        Now, you say you worked on the Reggettz

2    case as an assignment when you were in the Prosecutor's

3    office; is that right?

4    A        That's right.

5    Q        And you weren't at Parkersburg when the

6    confessions were obtained from John Moss; were you?

7    A        No.

8    Q        So, you don't know what went on at

9    Parkersburg; do you?

10   A        I don't have any idea.

11   Q        But you were, on occasion, at the

12   headquarters of the State Police when the confession was

13   taken from Paul Reggettz?

14   A        I was in and around headquarters that

15   evening.

16   Q        And did you, while you were in and out,

17   did you have an opportunity to observe Mr. Reggettz?

18   A        From time to time.

19   Q        Did you at any time see the Police work

20   him over?

21   A        Work him over?

22   Q        Yes, sir.

23   A        No, sir.

24   Q        Did you, at any time, see Mr. Reggettz

Pettry - Cross

1     -- did you see anyone put a gun to his head or anything

2     of that nature?

3         A       I never saw anything like that, no.

4         Q       Was there any indication that the

5     confession by -- obtained from Mr. Reggettz was by

6     someone putting words in his mouth?

7         A       Was there what?

8         Q       Was there any indication ---

9         MS. LUSK: I'm going to object to this, Judge.

10     He said he wasn't present when the statement was taken.

11         MR. BICKLEY: I was going to ask him on both

12     questions -- or, I mean occasions. I thought that was

13     pretty clear.

14         THE COURT: I'll allow the question.

15

16     BY MR. BICKLEY:

17

18         Q       Chuck -- Mr. Pettry, I'm only talking

19     about the occasions when you had the opportunity to

20     observe Mr. Reggettz?

21         A       Yes, sir.

22         Q       And during those occasions, was anyone

23     trying to force-feed Mr. Reggettz with the facts of the

24     case?

Pettry - Cross

1    A        No.

2    Q        Or tell him how he committed the

3    crimes?

4    A        No.  Let me explain very briefly, if I

5    might.  I was at Company B headquarters, and as I recall,

6    they questioned Mr. Reggettz in a particular room.  I was

7    only in that room once or twice.  I was in and around the

8    area.

9         I was attempting, as it turned out

10   unsuccessfully, to not make myself a witness in the case,

11   just in case I would be the Prosecutor.  I didn't want

12   to be a witness.  So, I was there, available, for

13   questions about legal issues that might come up, and if

14   they came up.  And that was basically my function there.

15        I wasn't there as an interrogator, so my

16   involvement in the interrogation was peripheral.

17   Q        Did you go to the scene of the crime?

18   A        The next day?

19   Q        The next day, with Mr. Reggettz?

20   A        No, I had been there the day it

21   happened, so I did not go back the next day.

22   Q        Was Mr. Reggettz there the day it

23   happened, when you were there?

24   A        Yes, sir.

Pettry – Cross                                                    1008

1      Q        He was there?

2      A        He was there in a Police car when I

3  arrived.

4      Q        Were you and him in the home at the

5  same time?

6      A        I don´t think so.

7      Q        So, on the one occasion or two

8  occasions that you observed Mr. Reggettz at the Police

9  Detachment, for all intents and purposes he was normal,

10 or what-have-you; that is, he didn´t give the appearance

11 of having been "worked over" by the Police?

12     A        He didn´t appear to have been worked

13 over. He was distraught, as you might expect. He didn´t

14 look like he had just come back from Disneyland, or

15 anything. But he was upset.

16         I don´t know if that answers your question or

17 not, Mr. Bickley.

18     Q        Did you, during the time while you were

19 outside, did you hear any officers say, "Let us have

20 him."

21     A        "Let us have it?"

22     Q        "Let us have him."

23     A        No.

24     MR. BICKLEY:  No further questions.

Pettry - Redirect                                                    1009

REDIRECT EXAMINATION

1

2

BY MS. LUSK:

3

4

5          Q          Mr. Pettry, of the twenty-one or

6    twenty-two hours that Paul Reggettz was at the South

7    Charleston Detachment, or in the custody of the Police,

8    how much of that time were you with him?

9          A          Probably an hour.

10         Q          During the rest of that time, were you

11   on the same floor that he was?

12         A          Probably not. As I recall, I think the

13   room was in the basement, and I was not in the basement,

14   I was up in the main area, as you walk in, the ground

15   level area as you come in from the parking lot.

16             And I spent a lot of time with another Trooper

17   going through Mr. Reggettz' vehicle. That took us

18   several hours.

19         Q          You didn't find anything in his

20   vehicle; did you?

21         A          No. Well, we found things, but nothing

22   significant.

23         Q          Nothing that you kept?

24         A          No, nothing that we kept.

Pettry - Redirect                                        1010

1      Q          What were you looking for?

2      A          We didn't know, which made the search

3   a little more difficult.  We were just looking around to

4   see if we saw anything that might turn out to be

5   important from an investigative standpoint.

6      Q          And you didn't take anything out of the

7   car?

8      A          No, there was nothing significant in

9   the car.

10     MS. LUSK:  I have nothing further.

11     MR. BICKLEY:  Nothing further.

12     THE COURT:  You may be excused.

13     Is that your last witness for the day?

14     MS. LUSK:  Yes.

15     THE COURT:  Will your first witness be available

16  at 9:00 o'clock on Monday?

17     MR. REVERCOMB:  Yes, sir.

18     THE COURT:  Folks, we're going to release you

19  now.  I thought we would be a little bit earlier, but

20  we're doing okay.

21     First, I want to apologize for that crowd of news

22  people.  They've got a job and we have our jobs, and

23  they, frankly, were pretty well behaved.

24     I thank you also for your attention out there,

1011

1    but I do want to make, again, as forcefully and as

2    completely as I can, the point that it is absolutely and

3    terribly important that you don't watch -- I know it

4    seems like I'm treating you like a bunch of children, and

5    I apologize for that, I really don't mean it that way at

6    all.  It's just important enough for me to remind you

7    -- don't watch any of the news or read any of the papers,

8    and enjoy yourselves otherwise.

9          See you Monday morning at 9:00 o'clock.

10

11         WHEREUPON, the jury was excused for the weekend

12   recess in the hearing of this case.

13

14         (Back on the Record)

15

16         THE COURT:  Do we need to do anything before we

17   quit today?

18         MS. LUSK:  I don't think so.

19         THE COURT:  Let me ask that you bring in your

20   substantive material on Monday.  I will provide you,

21   hopefully the first thing Monday morning, with a copy of

22   my basic charge.

23         And what I intend to do Monday is finishing up

24   the evidence and trying to window dress it in that

1012

1     fashion.  I think we ought to be able to put together a

2     charge in this case that is relatively free of objections

3     from anybody.   It seems to me that the instructions

4     should be relatively straight-forward in this case.

5          MR. BICKLEY:  I think so.  There may be -- I may

6     fashion a unique instruction which I think will able to

7     be used in this case, according to the law.

8          I have to get to my office pretty quick because

9     my secretaries get out of there, and we also have the

10    instructions that were used the last time.  But they look

11    like  boilerplates;  I  don't  see  any  need  for  new

12    instructions in there.

13         THE COURT:   The case has had a few twists and

14    turns but nothing that has to do with the law.

15         See you on Monday.

16         MR. BICKLEY:  All right, your Honor.

17

18

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:

I, Connie L. Cooke, Official Reporter for the Circuit Court of Kanawha County, do hereby certify that the foregoing is a true and correct transcript of the proceedings had and reported in the matter of the State of West Virginia versus John Moss, Jr., aka John Moss, III, upon action number 82-F-221, as stated in the caption hereto, had on the 20th day of April, 1990, during the May 1990 Term of said Court, as reported by me and transcribed into the English language.

I hereby certify that the transcript within meets the requirements of the Code of the State of West Virginia, 51-7-4, and all rules pertaining thereto as promulgated by the Supreme Court of Appeals.

Given under my hand this 13th day of July, 1990.

*Connie L. Cooke*

Official Reporter

1    IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2

3

4    STATE OF WEST VIRGINIA

5

6

7    vs.                     Action No. 82-F-221

8

9

10   JOHN MOSS, JR., aka JOHN MOSS, III

11

12

13        BEFORE:  Hon. A. Andrew MacQueen, Judge

14                 Day 6

15

16               APPEARANCES

17

18       For the State:  Neva Lusk and Stephen Revercomb,

19   Assistant Prosecuting Attorneys for Kanawha County.

20       For the Defendant:  The Defendant, in person, and

21   by Nelson R. Bickley, Timothy N. Huffman, and Kathy

22   Beckett, his counsel.

23

24                      Connie L. Cooke

25                   Official Reporter

FILED

JAN 23 1990

-c-

572

2

1                       WITNESSES FOR THE PLAINTIFF

2

|     |                                    | D    | X    | RD   | RX   |
|-----|------------------------------------|------|------|------|------|
| 1)  | Trooper Terry Williams             | 425  | 590  | 612  | 619  |
| 2)  | Scott Leasure                      | 625  | 630  |      |      |
| 3)  | John Fulks                         | 631  |      |      |      |
| 4)  | Joe Dean Jarrell                   | 635  | 640  |      |      |
| 5)  | William D. Estep                   | 643  |      |      |      |
| 6)  | Lt. Clarence Ralph Lane            | 650  | 654  |      |      |
| 7)  | Paul Reggettz                      | 661  | 735  | 762  | 764  |
| 8)  | Trooper Robert R. Custer           | 767  | 779  | 781  |      |
| 9)  | Sgt. R. L. Presson                 | 782  | 796  | 798  |      |
| 10) | Irvin R. Sopher, M.D.              | 799  | 864  | 865  |      |
| 11) | Paul Fortson                       | 870  |      |      |      |
| 12) | Arbutus Johnson Pomeroy            | 896  | 903  | 905  |      |
| 13) | Michael D. Smith (In Camera)       | 907  | 913  |      |      |
| 14) | John Moss (In Camera)              | 917  | 919  | 914  |      |
| 15) | Michael Don Smith                  | 931  | 978  |      |      |
| 16) | Charles E. Pettry, Jr.             | 997  | 1004 | 1009 |      |
| 17) | Lt. David H. Shumate               | 1021 | 1045 |      |      |
| 18) | Fred S. Zain                       | 1048 | 1053 |      |      |
|     | and                                | 1065 | 1125 | 1135 | 1137 |

3

WITNESSES FOR DEFENDANT

| | | D | X | RD | RX |
|---|---|---|---|---|---|
| 1) | Alexander Fortson | 1164 | 1173 | | |
| 2) | Willie James Moss | 1179 | 1187 | 1191 | 1192 |
| 3) | John Moss, Jr. | 1193 | | | |
| 4) | John C. Wideman | 1202 | 1204 | | |
| 5) | Trooper Howard Woodyard | 1208 | 1222 | 1233 | 1234 |

1015

1    BE IT REMEMBERED, that on Monday, the 23rd day of

2    April, 1990, during the January 1990 Term of said Court,

3    in the matter of the State of West Virginia versus John

4    Moss, Jr., aka John Moss, III, Action No. 82-F-221, as

5    stated   in   the   caption   hereto,   the   following

6    transpired:

7

8    WHEREUPON, a bench conference was held, and the

9    following transpired:

10

11    MR. BICKLEY:   The next witness is Mr. Shumate,

12    Trooper Shumate, and we'd like a motion in limine on the

13    gloves.

14    He mentioned something about the gloves were

15    smudged, which he can't identify to our defendant, but

16    I believe that testimony was based primarily on the

17    October 30th confession, which was thrown out by the

18    Supreme Court.

19    So, there is no need to bring up the gloves, in

20    our opinion.   It doesn't indicate to John, but it leaves

21    a strong inference which is prejudicial.

22    THE COURT:   Is that the only statement in which

23    he indicated that he used gloves?

24    MR. BICKLEY:   The other one said he did not

1016

1   remember, or something like that, in another statement,

2   but he did in the October 30th statement, yes.

3        MR. REVERCOMB:   Your Honor, under Rule 72, his

4   testimony was as to trier of facts, and I would argue

5   that he does have expertise in seeing glove prints, he's

6   familiar with them over the years.

7        As a print examiner, he can describe them.   He

8   now reports that he has tests that can recognize glove

9   prints.

10       THE COURT:   He reports them out?

11       MR. REVERCOMB:   Uh-huh, he says he can't compare

12  a glove print to a glove, but he can compare glove prints

13  to each other, and he can recognize what a glove print

14  is.   That's what Shumate will say.

15       THE COURT:   What does it prove in this case?

16       MR. REVERCOMB:   One thing is to prove, of course

17  -- if we have to prove that Paul Reggettz didn't commit

18  this, for one thing, our arguments, of course, will be

19  that Mr. Reggettz didn't put gloves on with an argument

20  with his wife, to murder those people.

21       And second, one of the glove prints was found in

22  a glove consistent with that of the defendant.

23       MR. BICKLEY:   One glove print?

24       MR. REVERCOMB:   Yes, on the wrapping paper.   It's

1017

1    found, and it is consistent with that of the defendant.

2          THE COURT:   You mean that the glove print is

3    consistent with that of the defendant?

4          MR. REVERCOMB:   Right.

5          THE COURT:   Does he identify the prints?

6          MR. REVERCOMB:   The glove prints, your Honor?

7          THE COURT:   No, fingerprints -- anybody's?

8          MR. REVERCOMB:   Yeah, there are fingerprints

9    found in the house, but so are Reggettz's.

10         MR. BICKLEY:   Reggettz's are identified.

11         THE COURT:   And there are no unidentified

12   fingerprints?

13         MR. REVERCOMB:   There are a lot of unidentified

14   prints.

15         THE COURT:   I mean clear fingerprints that are

16   unidentified as to the person?

17         MR. REVERCOMB:   Yes, there are.   But, you know,

18   they are not John Moss's.   He had John Moss's prints.

19   No prints of John Moss, the defendant, were found in the

20   house.

21         He will testify that the impression of the glove

22   prints, or prints from gloves, were found on the

23   scissors, on Vanessa Reggettz's body, on the knife

24   handle, on the door that Vanessa Reggettz was tied to,

1018

1  on a handkerchief box under the tree, on the wrapping

2  paper that has blood consistent with the defendant's, and

3  on the flatware box that Arbutus Johnson got from him.

4  THE COURT:  Is he able to say that those are the

5  same glove prints?

6  MR. REVERCOMB:  He officially compared them to

7  him and they were the same.

8  MR. BICKLEY:  He will also acknowledge, your

9  Honor, that he has no scientific expertise, other than

10  to say that they are glove prints.  He cannot say that

11  they are the same glove prints; even he will admit that.

12  He admitted it at that time.

13  THE COURT:  And is his expertise better since the

14  last trial?

15  MR. REVERCOMB:  Your Honor, he'll say that

16  they're glove prints.  He doesn't compare glove print to

17  glove print except visually.

18  And as a matter of fact, he does have more

19  expertise now, because he does see them daily in his

20  work.  He examines these things, and has in all sorts of

21  cases.

22  MR. BICKLEY:  I don't find that probative, your

23  Honor.  It's very prejudicial.  The glove prints are

24  indicative that they are glove prints.  They trace

1019

1    nothing to Mr. Moss.

2         THE COURT:  Wait a minute, wait a minute.  What

3    about the impression that's left after -- however,

4    though, if he gets on the stand and testifies that your

5    client's prints weren't found anywhere in the house, and

6    you get up and argue that as a piece of exculpatory

7    evidence ---

8         MR. HUFFMAN:  It is exculpatory evidence, Judge.

9    His prints weren't found in the house.

10        THE COURT:  I understand that, but at least the

11   State has an explanation about why your client's prints

12   aren't there.

13        MR. HUFFMAN:  There could be multiple

14   explanations for things drawn out of the middle of mid-

15   air.  There is just no evidence to support that.

16        THE COURT:  That's the difference between this

17   evidence and the evidence -- I mean, he isn't just

18   manufacturing something.  Lord knows, he could have been

19   wearing gloves, but now he'd got somebody to testify that

20   the prints were ---

21        MR. BICKLEY:  They can't have it both ways.

22   Either he was bleeding like a stuck hog all over the

23   place, or he had gloves on, or conceivably both.

24        THE COURT:  It seems to be a matter of argument.

1020

1    I'm going to allow the witness to testify.

2         MR. BICKLEY:  You are?

3         THE COURT:  Yeah.

4         MR. BICKLEY:  Will you note my objection?

5         THE COURT:  Sure.

6         MR. REVERCOMB:  Thank you, your Honor.

7

8         WHEREUPON, the bench conference was concluded.

9

10        (Back on the Record)

11

12        THE COURT:  Sally, will you go get the jury,

13   please?

14

15        (With jury present)

16

17        THE COURT:  Good morning.

18        Okay, we're ready to pick up where we left off.

19   Call your next witness, please.

20        MR. REVERCOMB:  Yes, your Honor.

21        The State would call David Shumate.

22

23        WHEREUPON, David H. Shumate was duly sworn, and

24   upon his oath, deposed as follows:

Shumate - Direct                                    1021

DIRECT EXAMINATION

1

2

3    BY MR. REVERCOMB:

4

5        Q        Would you please state your name, sir?

6        A        David H. Shumate.

7        Q        Where are you employed?

8        A        I'm employed by the West Virginia

9    Department of Public Safety in the Criminal

10   Identification Bureau at our headquarters at South

11   Charleston, West Virginia.

12       Q        In what capacity?

13       A        I'm a latent fingerprint examiner. I'm

14   supervisor of the latent section.

15       Q        What is your rank?

16       A        I hold the rank of First Lieutenant.

17       Q        How long have you been a First

18   Lieutenant?

19       A        For over seventeen years.

20       Q        What training have you received in the

21   field of fingerprints?

22       A        I was employed by the FBI in

23   Washington, D.C. as a fingerprint identification clerk.

24   At that time, I attended and completed a fingerprint

Shumate – Direct                                        1022

1    identification school.  I've attended and completed the

2    Case  Western  Reserve  University  latent  fingerprint

3    school.  I've attend and completed the FBI administrative

4    latent  fingerprint  school,  along  with  a  latent

5    fingerprint photography school.

6         I hold certification through the International

7    Association of Board Certification as a Certified Latent

8    Fingerprint Examiner.

9         Q       Have you ever testified as an expert in

10   other Courts around the state?

11        A       I have testified in forty-six counties

12   in the state of West Virginia, and in federal Court in

13   several locations in the state of West Virginia.  Also,

14   I've testified in Circuit Courts in the state of Florida.

15        Q       You have testified in the Circuit Court

16   of Kanawha County before?

17        A       Yes, numerous times.

18        Q       About  how  many  latent  print

19   examinations would you estimate that you've done in your

20   career?

21        A       Thousands of examinations.

22        MR. REVERCOMB:  Your Honor, I would ask the Court

23   to acknowledge Lieutenant Shumate as an expert witness

24   in latent fingerprint examination.

Shumate - Direct                                        1023

1          THE COURT:  Why don't you all come up here for

2     just a second.

3

4          WHEREUPON, a bench conference was held, and the

5     following transpired:

6

7          THE COURT:  I'm going to let you go into his --

8     any fingerprints -- you're going to have to develop an

9     independent foundation for it, though.

10         MR. REVERCOMB:  Fine.

11

12         WHEREUPON, the bench conference was concluded.

13

14         (Back on the Record)

15

16    BY MR. REVERCOMB:

17

18         Q          First, Lieutenant Shumate, would you

19    tell us what a latent fingerprint is?

20         A          A latent fingerprint, by definition, is

21    the imprint that has to be developed.  We have several

22    ways of developing fingerprints:  Through the powder

23    crush method, which is seen a lot.  Also, there are

24    chemicals that can develop fingerprints on paper and

Shumate - Direct                                          1024

1    unfinished things such as this.

2           It's an outline of prints and ridges on the palms

3    of the hands or the soles of the feet, whichever, that

4    is left in perspiration, or can be left upon a porous

5    substance.

6           Q          And what is an inked or known

7    fingerprint?

8           A          An inked or known fingerprint is one

9    that occurs where printer's ink is placed on the finger

10   or palms of the hands or whatever, then the finger is

11   rolled onto a background card that contrasts with the

12   black ink -- a white card, making a permanent record of

13   how those ridges appear on the finger.

14          Q          And what is meant by lifting a

15   fingerprint?

16          A          Lifting fingerprints is where you take

17   fingerprint powder -- a powder designed specifically for

18   this purpose. We have usually a black or a white powder

19   which is most generally used.

20          This powder is placed on a brush and then dusted

21   over a surface that you're attempting to develop prints

22   on. The moisture in the fingerprint will collect the

23   powder, or the powder adheres to the moisture in the

24   fingerprint, making the print visible to you.

Shumate - Direct                                    1025

1        Then, after the print is visible, you take a wide

2   variety of scotch tapes, one of which we call fingerprint

3   tape, and place it over top of that print on the object.

4   The powder then adheres to the adhesive on the tape.  You

5   then place it onto a background that contrasts, again,

6   with the powder.

7        Again, if you're using a black powder, then you

8   would use a white card; or, you would use a black

9   background if you were using a white powder.  That makes

10  a permanent record of how that print appeared as it was

11  developed on that object.

12       Q       Could you explain to the jury what a

13  smudge is?

14       A       The majority of the time, as you place

15  your hands on an object, you don't just place them down

16  flat, then lift them straight up.  You will twist your

17  hands or slide your hands on it when you grip the object.

18  Most of the prints that you leave on an object would be

19  smudges.  The majority of the prints that you would leave

20  would be smudges, because of the twisting and turning,

21  or a lot of other factors, such as how much perspiration

22  you might have on your hands.

23       If you wiped them against another object prior to

24  touching the second object, then you would have less of

Shumate – Direct                                    1026

1    a chance of leaving a print.  But the majority of the

2    time you leave smudges and smears.

3         Q         Is  an  entire  print  needed  for  a

4    picture?

5         A         No.   We  made  identifications  with

6    fractions  of  fingerprints,  a  third  or  a  fourth  of  a

7    fingerprint, depending on how many characteristics are

8    present in that print.

9         Q         In doing your work, Lieutenant Shumate,

10   do you wear anything on your hands?

11        A         When  using  fingerprint  powders  or

12   chemicals, I wear gloves, for two reasons.  One, to keep

13   the chemicals and powders off my hands.  Also, to keep

14   from  leaving  my  prints  on  those  objects  that  I´m

15   processing.

16        Q         When you go back over the work you´ve

17   examined, do you come across your own glove prints?

18        A         Yes, sir.

19        MR.  BICKLEY:   Your  Honor,  may  we  approach  the

20   bench?

21        THE COURT:  Yes.

22

23        WHEREUPON, there was a bench conference, and the

24   following transpired:

Shumate - Direct                                          1027

1       MR. BICKLEY:  My objection here is he's just

2   testified that he's an expert at fingerprinting, to which

3   I have no objection.

4       Now, from the testimony, he's admitting that

5   gloves, which he's not an expert in, but he still gets

6   it in, leaving the impression to the jury that he is an

7   expert in glove printing.

8       THE COURT:  He's got to establish a foundation.

9       MR. REVERCOMB:  That's what I'm trying to do.

10      MR. BICKLEY:  I'm just saying that at some point

11  he's got to say that he has no more expertise than the

12  jury does in glove printing.

13      MR. REVERCOMB:  But ---

14      THE COURT:  That's fine.

15

16      WHEREUPON, the bench conference was concluded.

17

18      (Back on the Record)

19

20  BY MR. REVERCOMB:

21

22      Q      Lieutenant Shumate, I believe when you

23  come across -- when you're examining objects, you come

24  across your own glove prints?

Shumate - Direct                                    1028

1         A         Yes.

2         Q         Do you know what they look like?

3         A         Yes, I do.

4         Q         In your work, do you ever come across

5    other glove prints?

6         A         Yes.   In processing the prints, and

7    also in the evidence that has been submitted to me on

8    numerous occasions, I've developed glove prints on

9    objects.

10        Q         What do glove prints look like?

11        A         A glove print would look like a

12   fingerprint.  It would have the outline of some part of

13   the hand or finger or whatever, but instead of having the

14   ridged detail that the fingerprint has, you would see a

15   fabric weave, a symmetrical pattern in that print, rather

16   than the ridge print, the ridges of the normal

17   fingerprint.

18        Q         Where do you look for glove prints and

19   where do you usually find them?

20        A         In the processing that we do, it's in

21   places or on objects where it's thought that the

22   perpetrator of a crime might have touched the objects or

23   were placed at the crime scene.  So, when we're trying

24   to develop the perpetrator's prints, we look where

Shumate - Direct                                          1029

1    they're likely to be developed.

2          Q          So, you would look where you would

3    expect to find fingerprints?

4          A          That's correct.

5          MR. REVERCOMB:   Your Honor, can we approach the

6    bench?

7          THE COURT:   Yes.

8

9          WHEREUPON, a bench conference was held, and the

10   following transpired:

11

12         MR. REVERCOMB:   Your Honor, I would like to refer

13   you to Rule 702.   Your Honor, he is testifying that in

14   his work he has come across glove prints that were found

15   in places that you would expect to find fingerprints.

16   He is testifying as to what they look like.   I would say

17   that his expertise over the years as a State Trooper is

18   beyond that of a normal lay person, and can assist the

19   trier of facts in this case.

20         I think we ought to show that he has -- that as

21   an expert, that he has more knowledge than the lay

22   person.

23         MR. BICKLEY:   His knowledge is recently found,

24   because in his prior testimony, he had absolutely no

Shumate - Direct                                     1030

1   expertise in this and could not make a comparison between

2   the gloves, and he cannot testify ---

3        THE COURT:  I don't understand.  Is the going to

4   testify that he is able to make a comparison?    I

5   understand that he is just going to testify that there

6   are different prints made by gloves?

7        MR. REVERCOMB:  That's right.

8        MR. BICKLEY:  But he is giving the impression

9   that he has expert knowledge.   Anybody can identify

10  gloves.  But he is saying that he has special knowledge

11  of glove prints, which did not exist before.  He has just

12  seen glove prints.  He cannot tell you that the glove

13  print here, and another glove print over there ---

14       THE COURT:  Isn't that like a doctor identifying

15  a print of a knuckle or the ridge of a knuckle of

16  somebody's body, and say that it was a strong hand as

17  opposed to being struck by somebody else or something

18  else?

19       If I understand correctly, all he's going to be

20  able to testify to is that the prints on various objects

21  around the house were made by gloves.

22       MR. REVERCOMB:  And they were in six locations.

23  And we have evidence that we can visually compare and

24  find them to be similar in shape to his.

Shumate - Direct                                          1031

1          MR. BICKLEY:   Your Honor, he is making a

2    comparison.  You cannot do that in the last trial.

3          MR. REVERCOMB:  That's not true.  He compared,

4    visually, the two glove prints.  He can compare a glove

5    to a glove.

6          MS. LUSK:  He can say only a glove made this

7    glove print.  He may not have been asked to do that.

8          MR. BICKLEY:  He's saying he can make a

9    comparison of glove prints, though.  He said ---

10         MS. LUSK:  That's true.  He can't say this is

11   definitely a certain glove print.

12         THE COURT:  I'll save your objection, but -- and

13   I'm going to give you an opportunity to cross-examine

14   him, if you want to.

15

16         WHEREUPON, the bench conference was concluded.

17

18         (Back on the Record)

19

20   BY MR. REVERCOMB:

21

22         Q        Lieutenant Shumate, I would like to

23   call your attention to December 13, 1979, and ask you if

24   you recall at that time being at the scene of a triple

Shumate – Direct                                    1032

1   murder?

2       A        Yes, I was.

3       Q        Was that in St. Albans?

4       A        Yes, it was.

5       Q        What time did you arrive?

6       A        Approximately 1:00 p.m.

7       Q        How long were you there?

8       A        Until about 8:00 or 9:00 o'clock that

9   evening.

10      Q        Was there any other lab people there

11  with you?

12      A        There was John Fulks, the photographer

13  at that time.   Also, Fred Zain out of our serology

14  department.

15      Q        What is the protocol at a crime scene

16  such as this, with you and Trooper Zain and Lieutenant

17  Fulks?

18      A        The photographer would go through first

19  and photograph the scene as it was found.   And then, the

20  serologist and myself would work the crime scene, sort

21  of together.   We'd look at some of the same objects and

22  process the scene.

23      Q        Was Trooper Zain there with you all

24  day?

Shumate - Direct                                              1033

1          A          Yes, he was.

2          Q          All right, Lieutenant Shumate, I'm

3    going to have you what has been marked for identification

4    purposes as State's Exhibit 158.

5          Have you seen this exhibit before?

6          A          Yes.  This is a pair of scissors that

7    Trooper Zain retrieved at the scene, and then released

8    to me.

9          Q          He released them to you at that time?

10         A          Right, on December 13, 1979.

11         Q          And you took this back to the lab, and

12   what did you do with it at that point?

13         A          I photographed it, and then further

14   processed it with fingerprint powder.

15         Q          Into whose custody did you return it

16   to?

17         A          I returned it to Trooper Williams on

18   January 23, 1980.

19         Q          I will now hand you what has been

20   marked for identification purposes as State's Exhibit 99,

21   and ask you to examine this, and tell us what this is?

22         A          It's a children's dish set that I

23   obtained at the scene on December 13, 1979.  It was

24   transferred to Trooper Williams on January 23, 1980.

Shumate - Direct                                    1034

1          Q          And while this was in your care,

2    custody and control, what was done with it?

3          A          It was processed and fingerprinted.

4          Q          I would now hand you what has been

5    marked for identification purposes as State's Exhibit

6    101.

7          Have you seen this exhibit before?

8          A          Yes.   I obtained this at the crime

9    scene on December 13, 1979, and transferred it to Trooper

10   Williams on January 23, 1980.

11         Q          And did you process this exhibit for

12   fingerprints?

13         A          Yes, I did.   I processed it and

14   photographed it.

15         Q          I now hand you what has been marked for

16   identification purposes as State's Exhibit 106.

17         Would you identify this exhibit, please?

18         A          It is a lantern obtained from the scene

19   on December 13, 1979, and later released to Trooper Zain

20   on February 18, 1979.

21         Q          February 18th or December 18th?

22         A          I mean December 18th.   I'm sorry.

23         Q          And while this was in your care,

24   custody and control, did you process it for prints?

Shumate - Direct                                                1035

1        A          Yes, I did.

2        Q          I now show you what has been marked for

3    identification purposes as State's Exhibit 105, and ask

4    you if you have seen this exhibit before?

5        A          Yes.  It's a vacuum cleaner and cord

6    that I obtained from the crime scene on December 13,

7    1979, and released to Trooper Williams on January 23,

8    1980.

9        Q          What is this black powder that is on

10   this exhibit?

11       A          That is fingerprint powder.

12       Q          And that was done by you at the lab?

13       A          That's correct.

14       Q          I now hand you what has been marked for

15   identification purposes as State's Exhibit 107.  I'd ask

16   you to examine that, and tell the jury what this exhibit

17   consists of?

18       A          It is a bowl that I obtained from the

19   scene.

20       Q          How do you recognize this exhibit?

21       A          It has my case number and my initials

22   on it; my case number being L 10660, and my initials,

23   D/S.

24       Q          Does it have anyone else's initials on

Shumate - Direct                                      1036

1    it?

2         A         Yes, it does.   It has another case

3    number and the initials, F/S/Z.

4         Q         Do you know whose those are?

5         A         Those are Trooper Zain's initials.

6         Q         Did you give this exhibit to Trooper

7    Zain after you were through with it?

8         A         Yes, I'm sure I did, but I can't

9    determine exactly when I gave it to him.

10        Q         I hand you now what has been marked for

11   identification purposes as State's Exhibit 127, and ask

12   you if you've seen this exhibit before?

13        A         Yes.  This is the radio that I obtained

14   from the crime scene on December 13, 1979, and later

15   turned over to Trooper Williams on January 23, 1980.

16        Q         What is this black powder?

17        A         That is fingerprint powder.

18        Q         That was done by you in the lab?

19        A         That's correct.

20        Q         Other than putting fingerprint powder

21   on this exhibit, did you alter or change it in any way?

22        A         No, I did not.

23        Q         Did you change the time setting or the

24   dial setting?

Shumate – Direct                                              1037

1        A          No, I did not.

2        Q          I now hand you what has been marked for

3   identification purposes as State's Exhibit 157, and ask

4   you to identify this exhibit?

5        A          It's a box of handkerchiefs that I

6   obtained from the scene on December 13, 1979, and later

7   turned over to Trooper Williams on January 23, 1980.

8        Q          This is State's Exhibit 100.  Would you

9   identify that, Lieutenant Shumate?

10       A          It is a box of stainless steel flatware

11  that was delivered to me by Trooper Williams on February

12  6, 1980, which I released to Trooper Zain on February 6,

13  1980.

14       Q          You gave it to him the same day?

15       A          That's correct.

16       Q          I now hand you what has been marked for

17  identification purposes as State's Exhibit 114, and ask

18  you to open that up and tell us what that is?

19       A          It's Christmas wrapping paper that I

20  obtained at the scene on December 13, 1979, and delivered

21  to Trooper Zain on December 18, 1979.

22       Q          I call your attention to Item 127, the

23  clock radio.  In your analysis, did you find any

24  identifiable fingerprints on that exhibit?

Shumate - Direct                                         1038

1        A        There were three identifiable latent

2   fingerprints on the clock radio.

3        Q        Whose were they?

4        A        One belonged to Paul Reggettz.    The

5   other two were not identified.

6        Q        In the course of your investigation in

7   this case, did you receive the known fingerprints of Paul

8   Reggettz?

9        A        Yes, I did.

10       Q        Were the victims, Vanessa Reggettz and

11  Paul Eric Reggettz and Bernadette Reggettz's prints on

12  there?

13       A        Not that I know of.

14       Q        Did you ever see the known fingerprints

15  of John Moss?

16       A        Yes, I did.

17       Q        You testified that you had one of the

18  known fingerprints of Mr. Reggettz on the clock radio?

19       A        That's correct.

20       Q        How did the size of the other prints

21  not identified compare with Mr. Reggettz's?

22       A        The prints were smaller in size.

23       Q        And I would call your attention to

24  Exhibit 107.  Did you find any prints on that?

Shumate - Direct                                    1039

1       A       There were two identifiable latent

2   fingerprints on that.

3       Q       And whose were those?

4       A       Two prints of the right thumb of Paul

5   Reggettz.

6       Q       And State's Exhibit 106, the flashlight

7   -- did you find any identifiable fingerprints on that

8   exhibit?

9       A       There were two identifiable latent

10  fingerprints developed on the battery inside the

11  flashlight.

12      Q       And whose were those?

13      A       The right thumb and right middle finger

14  of Paul Reggettz.

15      Q       Now, Lieutenant Shumate, I want to call

16  your attention to State's Exhibit 101, the knife handle;

17  159, the scissors; 157, the handkerchief box; 114, the

18  wrapping paper; and also, ask you at this time if you

19  examined a door -- the door that Vanessa Reggettz was

20  tied to?

21      A       Yes, I examined all of those.

22      Q       Okay.  What did you find?

23      A       I found fabric marks consistent with a

24  design that were similar to each other and what appeared

Shumate – Direct                                    1040

1   to be glove marks.

2        Q        And did you make photographs of these

3   designs?

4        A        Yes, I did.

5        Q        I want to hand you now what has been

6   identified for identification purposes as State's Exhibit

7   121, and ask you to tell us what that photograph

8   involved?

9        A        It's an actual lift from the knife

10  handle showing the fabric marks.

11       Q        So, that's an actual lift?

12       A        That's an actual lift from the object.

13       Q        I now show you State's Exhibit 122 for

14  identification.

15       A        It's an actual lift from the scissors

16  showing the fabric marks on the scissors.

17       Q        And State's Exhibit 123?

18       A        It's two lifts taken from the bedroom

19  door showing fabric marks.

20       Q        Okay.  State's Exhibit 124?

21       A        It is a lift from the handkerchief box

22  showing fabric marks.

23       Q        Going back to this bedroom door that

24  you testified to taking lifts from, were these fabric

Shumate - Direct                                        1041

1   glove print impression found on one side of the door or

2   on both sides?

3          A       As I remember, there was one on one

4   side of the door and two on the back side, opposite the

5   one on the front.

6          Q       And what relationship would these be?

7          A       It would have been like a thumb on one

8   side and two fingers on the other side.

9          Q       Now, I hand you what has been marked

10  for identification as State's Exhibit 125.

11         A       It's a photograph from the Christmas

12  wrapping showing the fabric marks on what was apparently

13  dried blood.

14         Q       In the course of your career, have you

15  had occasion to take fingerprints off blood, or from

16  dried blood, before?

17         A       Yes, I've seen it on numerous

18  occasions.

19         Q       I hand you back State's Exhibit 114,

20  and ask you to examine and identify this exhibit, and

21  show us where this -- what this photograph -- what is

22  visible on this exhibit?

23         A       It's the darkened area right below my

24  case number and initials that shows the fabric marks.

Shumate - Direct                                              1042

1       Q           And in comparing State's Exhibit 121

2   and State's Exhibit 125, these photographs that you've

3   just testified to, were they consistent?

4       A           They appeared to be of the same shape

5   and design.   All of the items had the same apparent

6   markings.

7       Q           I know, again, rehand you what has been

8   marked as State's Exhibit 100.

9           I believe you testified that you received that

10  from Trooper Williams on February 6th.  Did you process

11  this for latent prints?

12      A           Yes, I did.

13      Q           Were there any found?

14      A           There were seven identifiable latent

15  prints found on this stainless steel box.

16      Q           And whose prints were they?

17      A           They   were   identified   as   the

18  fingerprints of Trooper Michael Don Smith.

19      Q           Did you have the known fingerprints of

20  Arbutus Johnson at that time?

21      A           Yes, I did.

22      Q           Were any of her identified prints found

23  on this?

24      A           No prints of Arbutus Johnson were found

Shumate - Direct                                    1043

1    -- no identifiable prints of Arbutus Johnson were found

2    on this.

3            Q        Did you find any other identifiable

4    prints on this exhibit?

5            A        There were markings of similar shape

6    and size to the markings previously developed on the

7    knife and the scissors, the bedroom door, the

8    handkerchief box, and the Christmas wrapping paper.

9            Q        Did you take a photograph of that?

10           A        Yes, I did.

11           Q        I hand you now what has been marked as

12   State's Exhibit 126, and ask you to examine that and tell

13   us what that is?

14           A        It's a photograph of the fabric marks

15   as they appeared on the box.

16           Q        Now, Lieutenant Shumate, you testified

17   that these markings were of similar shape and size -- are

18   you able to compare a fabric or a glove print to a glove?

19           A        No, I am not.

20           Q        So, what you are testifying to is

21   simply a visual comparison that you've done?

22           A        That's correct.

23           MR. REVERCOMB:  May I have just a moment, your

24   Honor?

Shumate - Direct                                        1044

1            THE COURT:  Of course.

2

3    BY MR. REVERCOMB:

4

5            Q        Lieutenant  Shumate,  the  photographs

6    that  I  showed  you,  marked  121  through  126,  do  they

7    accurately  depict  what  you  observed  on  the  scene  on

8    December 13th?

9            A        Yes, they do.

10           MR. REVERCOMB:  At this time, your Honor, I would

11   move to admit those into evidence.

12           THE COURT:  Saving your objection?

13           MR. BICKLEY:  We haven't seen them, your Honor.

14           We'll reserve our objection, your Honor.

15           THE COURT:  They'll be admitted.  You may pass

16   them around.

17           I haven't seen them either.  Let me see them very

18   quickly.

19           MR. REVERCOMB:  I'm sorry, your Honor.  I thought

20   you had already seen them.

21

22   BY MR. REVERCOMB:

23

24           Q        One last question, Lieutenant Shumate.

Shumate -- Direct                                          1045

1   Did any identifiable prints belong to the defendant, John

2   Moss?

3          A         No, they did not.

4          MR. REVERCOMB:  Your Honor, I believe that's all

5   I have at this time.

6

7                    CROSS-EXAMINATION

8

9   BY MR. BICKLEY:

10

11         Q         Trooper Shumate, you've pretty much

12   answered all of my questions, I think.

13         I'm just going to do it over again, real quickly,

14   since you've been so kind.  Just one more time for the

15   road.

16         You said you don't find any fingerprints of John

17   Moss?

18         A         No, I did not.

19         Q         And you have no training in glove

20   comparison?

21         A         No, I do not compare gloves to prints.

22         Q         And normally, crime scene detectives

23   and other people wear gloves; is that a true statement?

24         A         They should.  But a lot of times they

Shumate - Cross                                              1046

1    do not.

2                Q          They're careless when they do not,

3    right?

4                A          That's correct.

5                Q          And those smudge prints that we have in

6    exhibits that are being published to the jury could have

7    been made by anyone wearing gloves?

8                A          Yes, sir.

9                MR. BICKLEY:  I have no further questions.

10               MR. REVERCOMB:  Nothing further.

11               THE COURT:  Thank you, Lieutenant.  You may step

12   down.

13               Would you like to call your next witness, please?

14               MR. REVERCOMB:  Yes, your Honor.  The State would

15   call Mr. Fred Zain at this time.

16

17               WHEREUPON, a bench conference was held, and the

18   following transpired:

19

20               MR. HUFFMAN:  Judge, with regard to Mr. Zain --

21   Judge, I realized when he testified the last time there

22   wasn't much foundation laid for him as a witness,

23   particularly with regard to the procedures that he

24   utilized, to which he is going to testify.

1047

1    I also note that on discovery, we received the

2    report that has been filed with the Court.  It appears

3    that Randy Murphy -- and I think that's Randy Murphy's

4    signature as opposed to Zain's --   I think in this

5    particular case that he -- it's not necessary for the

6    Prosecution to allow us to show what part he played in

7    the analyses that were taking place, and what procedures

8    were done in compliance with -- specifically, the

9    procedures that were involved in the examination.

10    THE COURT:  Yes.

11    MR. REVERCOMB:  That's fine.

12    THE COURT:  I think that's appropriate.

13

14    WHEREUPON, the bench conference was concluded.

15

16    (Back on the Record)

17

18    THE COURT:  Folks, we're going to give you about

19    fifteen minutes.  You've got plenty of time to go get a

20    cup of coffee.

21

22    (On the Record with the Jury Not Present)

23

24    WHEREUPON, Fred S. Zain was duly sworn, and on

1048

1    his oath, deposed as follows:

2

3                        DIRECT EXAMINATION

4

5    BY MR. REVERCOMB:

6

7            Q          Would you state your name, sir?

8            A          Fred Salem Zain.

9            Q          Where are you currently employed?

10           A          I am currently employed as the Chief of

11   Physical Evidence of the Bayer County Crime Laboratory

12   in San Antonio, Texas.

13           Q          In  1979  and  1980,  where  were  you

14   employed?

15           A          I was  employed  by  the  West  Virginia

16   Department  of  Public  Safety,  stationed  in  Criminal

17   Identification  Bureau  at  South  Charleston,  and  was  in

18   charge  of  one  of  the  identification  units  that  handled

19   physical evidence pertaining to the blood and body fluids

20   and  hair  samples.

21           Q          Is that called serology?

22           A          Yes, that's correct.

23           Q          You say that you were in charge -- what

24   was your rank?

Zain - Direct                                                    1049

1          A          Lieutenant.

2          Q          Were you involved in an investigation

3    of the Reggettz murders back in December of 1979?

4          A          Yes, sir, I was.  I was called in to

5    process the crime scene at the particular residence of

6    the Reggettz family.

7          Q          And did you collect samples at that

8    scene?

9          A          Yes, sir, I did.

10         Q          And were some exhibits submitted to

11   you?

12         A          Yes, they were.

13         Q          Who performed the analysis on those

14   exhibits?

15         A          I did.

16         Q          I see a Sergeant Murphy's signature on

17   this report, dated June 10th of 1980.  Is it your

18   testimony that you performed these analyses, too?

19         A          Yes, sir.  Sergeant Murphy, at the

20   time, was in charge of a section, and we both counter-

21   signed reports.  And I processed all of the evidence that

22   was submitted to me at the serology section at the time.

23         The reports were either issued by himself or

24   myself after conferring as to what should be issued in

Zain - Direct                                          1050

1    a report.

2           Q           But it is your testimony that you

3    performed the analysis?

4           A           Yes, that's correct.

5           Q           And what training had you received at

6    that time in performing -- to perform such analysis?

7           A           My formal education was a degree in

8    biology, with a minor in chemistry.

9           I also received an Associate Degree in Police

10   Sciences, and specialized training at the FBI academy at

11   Quantico, Virginia, relating to the specific field of

12   forensic science, and more particularly, serology, or

13   tests and methods utilized in the identification of blood

14   and body fluids.

15          Both basic and advanced courses were obtained by

16   me from the FBI Academy and other specialized training

17   sessions that I had attended, as well as scientific

18   organizations which I belong to, such as the Southern

19   Association of Forensic Scientists, and other peer

20   groups.

21          Q           At the time, in 1979, how long had you

22   been a forensic serologist?

23          A           I transferred from the Department of

24   Natural Resources in 1976, where I was a chemist and a