**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 20**
**(CONTINUATION, pp. 1051 - 1200)**

Zain - Direct                                          1051

1    conservation specialist.

2         With a background still relating to the different

3    types of analysis, I received specific training and

4    designation at the CIB in the capacity which I spoke of.

5    I was hired specifically to develop and implement

6    forensic serology techniques for the State Police.

7         Q    You examined the blood in this case by

8    in 1979 for scientific testing procedures -- or testing

9    was done?

10        A    The methodologies were:  One, I would

11   take a staining that would identify ABO type on the

12   stain, which was called the Howard-Martin Absorption

13   Elution technique.

14        Secondly, to identify electrophoretic protein

15   enzymes from blood staining by a method of

16   electrophoresis.  Those were, and still are, the routine

17   blood typing techniques which are used, as well as

18   scientific ways.

19        Q    At the time of this murder, did you

20   obtain any serology samples for your department?

21        A    Well, what was utilized was a PGM

22   subtyping system, which was utilized at the time, as well

23   as other cases in this time frame, and additional blood

24   blocking tests were made routinely, also, such as

Zain - Direct                                                    1052

1    haptoglobin and geso-typetesting, that were used during

2    this time period also.

3              Q          You, yourself, have used these methods?

4              A          With the methodology and techniques

5    were used, it not only was refined for these particular

6    blood-typing systems, but there was evolutions occurring

7    in the scientific arena where a variety of blood-typing

8    tests were being utilized that never had been before.

9              For example, the primary blood-typing systems

10   that were utilized in 1976 was one ABO blood-typing,

11   which was used for years.  And secondly, a protein enzyme

12   type typing called biregular PGM, or phosphoglucomutase;

13   and also another method of EAP, or erythrocyte acid

14   phosphatase, was used.  These are abbreviations for

15   blood-typing systems.

16             So, any additional blood-typings other than those

17   were not routinely used or developed at the State Police

18   lab until after I was hired.

19             Q          And you implemented those prior to your

20   testing in this case?

21             A          Yes, that's correct.

22             MR. REVERCOMB:  May I have a moment, please, your

23   Honor?

24             THE COURT:  Sure.

Zain - Direct                                                    1053

1          MR. REVERCOMB:   I have nothing further at this

2     time, your Honor.

3

4                         CROSS-EXAMINATION

5

6     BY MR. HUFFMAN:

7

8          Q        Mr. Zain, you testified that you

9     actually did the analysis that was presented here in this

10    particular case; is that correct?

11         A        Yes, sir, that is correct.

12         Q        So, how long after these scrapings were

13    obtained was the analysis performed?

14         A        Within the next day or so.

15         Q        So, the fact that the report is dated

16    in June, that doesn't indicate that's how long it was

17    before the actual analyses were done; is that correct?

18         A        That's correct.

19         Q        At the time, whenever you performed

20    these analyses, which would have been in late 1979, or

21    in early 1980, it was a multi-system of electrophoresis

22    used by the State Police?

23         A        Yes, sir.

24         Q        Was that the particular method that was

Zain - Cross                                        1054

1    utilized in this case?

2           A        These systems were run singularly and

3    multi.

4           Q        Did   you   utilize   the   four-and-one

5    method,  which  was  a  derivative  of  the  multi-system

6    approach?

7           A        No.

8           Q        You didn't use that method?

9           A        No, sir.   The PGM subtyping system was

10   utilized as a singular system, and that is how it was

11   originally introduced by the people that developed the

12   technique.

13          Q        Was    the    multi-system    technique,

14   utilizing that system, which I believe you -- that

15   Drexall had done studies on?

16          MR. REVERCOMB:   Your Honor, I'm going to object

17   to this.   This should be done in front of a jury.   It's

18   like discovery, and it ought to be done in front of a

19   jury.   I don't see the purpose of it.

20          MR. HUFFMAN:   Judge, the purpose of it is, in

21   1979, the testimony has been that there was a fairly --

22   even though Mr. Zain hasn't said it yet, this method of

23   typing blood was well accepted within the scientific

24   community.   I don't know that that's particularly the

Zain - Cross                                                    1055

1   case.

2          In fact, I have a decision from 1988 from the

3   State of New York, as well as one from the State of

4   Michigan, in which it was decided in 1989, which

5   questions this particular method of typing blood.  There

6   was some question raised in both of those particular

7   cases as to whether or not there was particular

8   reliability in that.

9          In fact, one of the fellows who apparently is an

10  expert in the field, testified that there was some

11  question as to this method of the typing of blood.  In

12  both the New York case and the Michigan case, that formed

13  the basis of a reversal, because there was some question

14  as to whether or not a specific scientific foundation

15  under the Frye case a bit later, established by the

16  Prosecution.  I don't think they've identified ---

17         THE COURT:  I'll let him testify.

18

19  BY MR. HUFFMAN:

20

21         Q       What laboratory controls were utilized

22  whenever you actually did this analysis?

23         A       Internal and external quality control

24  standards were used in all testing.

Zain - Cross                                                1056

1          In reference to the multi-systems, the two points

2   that you raised are, there was a controversy as to time

3   and place, which was totally nullified as to the people,

4   or qualified people, who were actually running the

5   analysis.

6          The particular systems and the qualifications of

7   the systems have been upheld and have no longer been in

8   controversy in any manner.

9          Q          How late do you recall the controversy

10  to be? When was it you recall the controversy within the

11  scientific community was resolved?

12         A          In the beginning, or at the inception

13  of the technique, that was simply due to the

14  nonfamiliarity of the new system.  And also, the main

15  point is that these systems were run individually and

16  separately.   The multi-system was used simply in

17  conjunction with, and not as a sole source.   So,

18  therefore, the analysis that was reported was done on

19  independent, singular systems which have nothing to do

20  with the multi-system technique.

21         Q          So, what you're telling me is that all

22  of the items you identified were done on the singular

23  system?

24         A          That's correct.

Zain - Cross                                                    1057

1      Q        Were all of the tests repeated by

2  someone else?

3      A        The tests were read and looked at by

4  both people working in the area at the time.    The

5  scientific method was followed completely.

6      Q        Were photographs made of the actual

7  plates?

8      A        No.    We did not have photographic

9  capabilities in-house at that time.

10     Q        So, at this point in time, there is no

11 way to actually review the results of the typing that was

12 done; is that correct?

13     A        Other than the report itself, that is

14 correct.

15     Q        And the report itself, you think is

16 conclusory as to what was specifically obtained; is that

17 correct?

18     A        The results of the tests were reported

19 as they were done, and confirmed.

20     Q        And that is the report that was signed

21 off on by Sergeant Murphy; is that correct?

22     A        That's correct.

23     Q        Were there any documents that were

24 available or were there any kept in 1979 relating to the

Zain - Cross                                                    1058

1    maintenance of the machine that was utilized in the

2    testing?

3          A          Maintenance, as far as equipment used

4    in electrophoresis, consisted of a tank and power supply.

5    It either works or it doesn't work.

6          Q          What you are telling me is that there

7    were no records kept as to either of the machines that

8    were utilized; is that correct?

9          A          What I'm telling you is that it's not

10   really a machine on which records need to be kept.  The

11   power supply either works a hundred percent, or it

12   doesn't work at all.  The results are either positive or

13   negative.  There is no gray tone of interpretation.

14         The  PH  buffers  are  commercially  bought  and

15   standardized  by  lot  number,  and  everything  is

16   standardized and maintained to the specificity of the

17   manufacturer.

18         Q          But you all didn't manufacture the

19   machine; is that correct?

20         A          No,  sir,  we  did  not  make  the

21   electrophoresis machines.

22         Q          And you didn't work on them, either, at

23   that time?

24         A          An electrophoresis tank is a plastic

Zain - Cross                                    1059

1    tank that you put some buffer solutions in, and you place

2    a jello-type slab of substance on it, and put some blood

3    stains in it, and it shoots the power through it to

4    separate out the blood into some specific components.

5    The interpretation of what those components are is

6    reported, and those are compared to standards that are

7    used in every comparison that is made.

8           Q       Were there any controls utilized to

9    account for the effects of the crime scene contaminants?

10          A       Crime scene contamination on bloods are

11   primarily such that would affect ABO typing, but

12   therefore, controls aren't used at the crime scene, and

13   are utilized on each analysis of ABO typing.

14          Q       ABO typing is different than what we're

15   talking about, electrophoresis, is that correct?

16          A       That's the only time contamination

17   would interfere in any way, shape or form because of the

18   sensitivity.

19          Q       Then you would agree with the Supreme

20   Court opinion from Michigan where they reversed the Court

21   in the case because there weren't sufficient controls for

22   contamination of the crime scene; is that correct?

23          A       No, sir. What I'm saying here, was

24   that on protein enzyme analysis, what they are referring

Zain - Cross                                                    1060

1    to is controls which are really standards that are used

2    on every plate for an exact comparison of what you are

3    tying to identify.  You do not try to identify unknowns

4    by not having known standards, and I believe what they

5    mentioned is controls as referred to as standards.  And

6    those  were  used  on  every  protein  enzyme  that  was

7    identified.

8              Q         Is it not possible that certain enzymes

9    are affected by contaminants, and could cause a false-

10   positive reading?

11             A         A false-positive -- there could be an

12   interpretation made, for instance, if sodium chloride is

13   viewed on whole blood which was not found at the crime

14   scene,  there  could  be  alterations  that  would  totally

15   destroy  or  denature  a  blood  typing  that  may  be

16   interpreted incorrectly by a non-experienced individual,

17   whereby the protocol and the proficiency that we used at

18   the State Police crime lab in the mid-'70s through the

19   '80s including now, are of the highest proficiency.  And

20   that is why there were proficiency tests that were done

21   in-house, as well as out of State.

22             So,  the  quality  control  would  be  maintained  in

23   such  instances  as  criminal  cases  because  of  the

24   importance of the standards, the scientific methods, and

Zain - Cross                                               1061

1    the   closest   scrutinization   of   quality   control   was

2    utilized at the bureau, and still is today.

3         Q         And   that   was   based   upon   your

4    recollection, and not based upon any independent ---

5         A         It was based upon what I worked at and

6    what I was in charge of.  The protocols that I set forth

7    as the standards to be used, based on what was accepted

8    across the United States in over three hundred sixty-five

9    crime  laboratories, as of which now I am in charge of

10   one, they used the same protocols and standards that are

11   accepted, not only by law peer groups, but in the Court

12   systems in the United States.

13        Q         Do you recognize Dr. Benjamin Grunbaum

14   as an expert in electrical phoresis?

15        A         No,    not    in    the    field    of

16   electrophoresis.

17        Q         What would you recognize him as an

18   expert in?

19        A         He was an expert witness for Beckman

20   Industries Instruments.

21        Q         He didn't -- Dr. Grunbaum is not the

22   author   of   a   book,   of   a   handbook,   for   the

23   individualization or analysis for the individualization

24   of blood stains?

1   complied with our own evidentiary requirements to perform

2   a foundation.

3       I don't think, as an expert, that he, himself --

4   I'm not even sure he says that he is. I'm sure that he

5   will say that he's been accepted in the scientific

6   community, but it requires some independent testimony

7   other than him as to an expert to testify in this case.

8       MR. REVERCOMB:   Judge, that's simply not true.

9   He cites two opinions from other states. They are States

10  in which the Supreme Court has upheld blood testing in

11  several cases.

12      MR. HUFFMAN:   Judge, I might point out that there

13  is a difference between blood testing and ABO typing and

14  blood testing for the purpose of excluding an individual

15  in a paternity case, and attempting to use certain types

16  of blood testing to put an individual in a category in

17  a criminal case.

18      THE COURT:   I understand.   I'm not sure that I'm

19  grasping -- you're suggesting that he's got to lay a wide

20  foundation for the process itself?

21      MR. HUFFMAN:   I think he does.   I think the

22  record is that it is required.   I think the State, in

23  order to lay the proper foundation, has got to supply

24  evidence other than the expert who is going to testify

Zain - Cross                                                    1062

1      A          Professor Grunbaum is in a precarious,

2   and has been, in a situation working for a private

3   company in projecting that company's image and the

4   instrumentation that they sell, which is the way his

5   interpretations assert methodologies and techniques,

6   because they are different than what could be utilized

7   in a particular situation.

8      Q          Professor Grunbaum happens to disagree

9   with you and most other lab technicians on the type of

10  electrophoretic testing; doesn't he?

11     A          I'm not a lab technician.  Secondly,

12  I'm not ---

13     Q          I'm not addressing you as a lab

14  technician.

15     A          You stated lab technician.  I'm just

16  simply saying that Dr. Grunbaum has been perjured on the

17  stand, because of the unreliability of his testimony.

18     Q          That's your opinion?

19     A          That's my opinion.

20     MR. HUFFMAN:  Judge, I have no further questions.

21     THE COURT:  So, you're objecting to his being

22  offered?

23     MR. HUFFMAN:  I don't question per se, Mr. Zain's

24  qualifications.   I don't think that the State has

1064

1    and say that it is acceptable in scientific communities,

2    this method of doing precisely what they're offering

3    evidence for.

4           THE COURT:  So, the expert himself can't testify

5    to that?

6           Is there some law to that effect?  The last case

7    we had to that effect was that bite mark case that Dr.

8    Sopher did, in which he identified -- he testified about

9    that field of forensic examination and laid a foundation

10   himself.

11          MR. HUFFMAN:  I don't know if that was objected

12   to, your Honor.

13          THE COURT:  No, as a matter of fact, I don't

14   think it was.

15          MR. HUFFMAN:  But that wasn't the precise -- the

16   Michigan case that I referred to is People v. Young,

17   decided in 1985.

18          MS. LUSK:  Judge, I know we've got a drug case in

19   West Virginia where the lab, the chemistry expert from

20   the lab, testified to the reliability of the methods

21   which he used in identifying, I believe it was,

22   marijuana.  There wasn't any independent expert called

23   in to state that this particular method of identifying

24   controlled substances was reliable in the community.  She

1065

1     testified to it herself.

2            THE COURT:  What other cases do you have?

3            MR. HUFFMAN:  Judge, just note my objection.

4            THE COURT:  I'm going to allow it.

5        Do you all want to take a five minute break

6     yourselves?

7

8            WHEREUPON, the Court stood in a recess in the

9     hearing of this case.

10

11           (Back on the Record with the Jury Present)

12

13           THE COURT:  Go right ahead.

14           (To the Jurors)  He's already been sworn.

15

16                      DIRECT EXAMINATION

17

18    BY MR. REVERCOMB:

19

20           Q        Would you please state your name, sir?

21           A        Fred Salem Zain.

22           Q        Mr. Zain, where are you currently

23    employed?

24           A        I am employed as the Chief of Physical

Zain -- Direct                                        1066

1   Evidence with the Bayer County Crime Lab in the Court

2   Examiner's Office in San Antonio, Texas.

3        Q          Previous to that, where were you

4   employed?

5        A          I was employed as a member of the

6   Department of Public Safety here in West Virginia.  I was

7   stationed at the Criminal Identification Bureau in South

8   Charleston, and was the Lieutenant in charge of the

9   identification unit which received and examined physical

10  evidence, such as blood, body fluids, hair samples, and

11  such for examination.

12       Q          Is that called the serology section?

13       A          That's correct.

14       Q          In what capacity were you employed

15  there?

16       A          I was the Lieutenant in charge of a

17  particular unit, in charge of training and development

18  of that particular unit, from the time I came into the

19  Department of Public Safety until the time I left.

20       Q          And how long were you a State Trooper?

21       A          For over thirteen years.

22       Q          Would you tell the jury and the Court

23  your qualifications?

24       A          My formal education is, I have a

Zain - Direct                                                    1067

1    Bachelor of Science degree in Biology, and a minor in

2    Chemistry.

3           I have an Associate Degree in Applied Sciences

4    from Marshall University.  Also, I've got a Master's

5    Degree in Biological Sciences from Marshall University.

6           I've done graduate work involved in the field of

7    sciences, both biological and social sciences.  I'm also

8    an Associate Professor at the University of Texas, where

9    I teach criminalistics.  I'm also a guest lecturer and

10   I continually lecture at a variety of colleges in the San

11   Antonio area, as well as the State of West Virginia.

12          I have spoken at the West Virginia University

13   Medical College routinely, as well as -- I have performed

14   at the inception and development of legal investigation

15   seminars, which are developed by the legal examiner

16   system in the State of West Virginia.

17          Q        Go ahead.

18          A        My peer group associations -- I am a

19   member of the Southern Association of Forensic

20   Scientists.  I am a member of the Canadian Society of

21   Forensic Scientists.  I am a member of the American

22   Academy of Forensic Scientists.

23          Also, I hold memberships and work with the

24   International Society of Electrophoresis, the

Zain - Direct                                    1068

1   International Society of Hemogenetis, the Academy of
2   Criminal Justice Scientists, and the American Society of
3   Blood Banking.  I´m also a Certified Peace Officer with
4   the State of Texas, and I´m an advanced instructor for
5   law enforcement in the State of Texas, and am in charge
6   of two training programs, one with the Sheriff´s
7   Department in the County in which I am employed, as well
8   as the San Antonio Police Department.

9        I´m also -- have made application for and
10  acceptance to the International Association of
11  Identification and am also a member of the American
12  Association of Crime Laboratory Directors.  I think that
13  covers the peer groups.

14       As far as publications, I´ve published papers
15  specifically regarding electrophoresis analysis and blood
16  typings and genetic marker identification, using multi-
17  systems and single systems in the State of West Virginia
18  for six years, which was a survey of not only case
19  studies, but whole bloods.  And I was published with the
20  American Academy, Journal of Sciences.

21       I have written other papers with regard to
22  methodology and techniques used in forensic serology and
23  personal lectures which have been given as far as the
24  collection of evidence at the crime scene and surveys of

Zain - Direct                                    1069

1    crime   scene   processing,   and   even   presently   I   am

2    continuing   to   give   lectures   pertaining   to   physical

3    evidence.

4            I have also been in charge of training programs

5    which were developed with the West Virginia State Police

6    and include the people that are now presently employed,

7    in doing the work and serological techniques at the

8    Police Criminal Identification Bureau.

9            Primarily,   that   generally   sums   up   my

10   qualifications.

11           Q        Have you been trained in the field of

12   DNA testing?

13           A        Yes, sir, I've had specific training at

14   the Canadian Society of Forensic Sciences Center in

15   Toronto, Canada.  I have also had specialized training

16   with the Connecticut State Police at Westhaven University

17   in New Haven, Connecticut.  I also have specific training

18   and instruction with the Analytical and Genetic Testing

19   Center out in Colorado, where I helped put on a DNA

20   workshop for criminal litigators for DNA testing, and

21   for paternity testing, as well as, our crime laboratory

22   does DNA testing and processes criminal and civil cases

23   independently.

24           Q        Have you ever testified as an expert in

Zain - Direct                                          1070

1    the field of forensic serology before?

2         A       Yes, sir, I have testified in

3    approximately forty-eight counties in the State of West

4    Virginia and surrounding states, including Florida and

5    Texas, regarding any and all serological techniques, be

6    they basic serology or advanced techniques involving DNA

7    analysis.

8         Q       You have testified an expert in DNA

9    analysis?

10        A       Yes, sir, I have.

11        Q       What are the tests that you use in

12   processing cases in your work as a forensic serologist?

13        A       The primary tests are examinations used

14   in serology that are either visual tests and exams or

15   chemical tests.  Chemical tests give you an idea of

16   whether something is positive or negative, and you can

17   continue on with that process as far as -- you obtain as

18   much information as possible.

19            For example, all of the methods and techniques

20   that are utilized in forensic today are accepted, not

21   only in forensic scientific community, but in the general

22   scientific community as it relates to forensic evidence

23   or clinical evidence.  The development of processes, even

24   as of today, have been developed from clinical

Zain - Direct                                              1071

1    processing.

2           A lot of the origin of electrophoretic techniques

3    were developed in Europe in the 1940s and '50s, that

4    pertain to paternity testing, that have to do with the

5    biological father of a child, for example.  These

6    techniques were utilized and implemented into the

7    forensic community and standardized across the United

8    States.  The same thing, right now, is being done.

9           The primary two areas are one, abuse of a

10   microscope for determining an ABO type, because you can

11   visually see it through a microscope, whether it is

12   positive or negative, and whether you are an A, a B, an

13   AB, or an O, from a stain.

14          And second, is to use a method of

15   electrophoresis, which is a long name.  It means a very

16   simple process.  Electrophoresis, very simply, is a

17   jello-type substance is put on the last plate.  You put

18   a portion of the stained item on that jello, then you

19   pass through the jello a current which separates out the

20   particular blood stain or body fluid.

21          Q       Like an electrical current?

22          A       Yes.  That would sort out the blood

23   stain into some components that you can add some coloring

24   agents to and receive the patterns.  If you see any

Zain – Direct                                                         1072

1  banding patterns, they may match up or they may not.  If

2  they match up, then it's a positive identification.  And

3  if it doesn't match up, it's different, and that's

4  exactly how it's reported.

5       For example, if you get three drops of a person's

6  blood and then you add three specific substances, one

7  will react to an A blood type, and one will react to a

8  B blood type, and one will react to an O blood type.  The

9  same thing is the method of electrophoresis.  You use

10 standards.  You use quality control so that you don't

11 misinterpret anything that may be available.  And when

12 the results are issued, they are either positive or

13 negative as far as the conclusion of whether they match

14 or not.

15      Q       Are these tests accepted within

16 scientific communities?

17      A       Yes, sir, they are.

18      MR. REVERCOMB:  Your Honor, at this time, I would

19 ask that Mr. Zain be qualified as an expert forensic

20 serologist.

21      THE COURT:  Subject to the defendant's -- noting

22 the defendant's objection, he may be permitted to testify

23 at this point.

24      MR. REVERCOMB:  Thank you, Judge.

Zain – Direct                                                    1073

BY MR. REVERCOMB:

1

2

3        Q        Now, Mr. Zain, I want to call your

4    attention to December 13, 1979, and ask you if you recall

5    being at the scene of a triple murder?

6        A        Yes, sir.   At that time, I was

7    stationed at headquarters, and as I mentioned previously,

8    I was directed through the Company B to go to a

9    particular residence to process a crime scene.

10       Q        Do you remember where that location

11    was?

12       A        It was in the St. Albans area.   I

13    forget the exact location, but it was a residence of the

14    Reggettz family.

15       Q        At what time, approximately, did you

16    arrive?

17       A        To the best of my recollection, it was

18    after noon, probably around 1:00 o´clock, or so.   I know

19    that once I got there, the processing of the crime scene

20    went on through the evening until about dark.

21       Q        For what purpose were you called there?

22       A        Specifically, I was designated to go to

23    the crime scene, one, to collect any physical evidence

24    that may be available at the scene for testing and

Zain - Direct                                              1074

1    analysis.

2         Q         And in general terms, what do you look

3    for at the crime scene?

4         A         My specific job capacity would have

5    been to look for hairs, fibers, and blood stains.  And

6    seeing how it was all at the crime scene, the primary

7    physical evidence around and through the house which I

8    inspected was a majority and variety of blood staining.

9         Q         Did you find that blood stain at the

10   Reggettz home that day?

11        A         Yes, sir.  There was blood staining in

12   the majority of the rooms of the residence, as well as

13   on the outside of the residence.

14        Q         Did you take samples of the blood

15   stains and objects that had blood on them from the scene

16   that day?

17        A         Yes, sir.  I collected, I believe,

18   seventeen items from the crime scene, myself, personally,

19   as well as I received other items of evidence that were

20   submitted for analysis at the time, from Trooper Smith

21   and Trooper Williams.  And also I received other items

22   internally from other people in reference to this

23   particular case.

24        Q         Do you have a list of all of the items

Zain - Direct                                                    1075

1    which you took from the scene in 1979?

2          A          Yes, sir.  I've got a copy of my report

3    that was issued, that you gave me, as well as the items

4    that I reported.

5          MR.   REVERCOMB:    Your  Honor,  I  would  like

6    permission to request Trooper Zain to step down and point

7    on the chart where he took these items and samples.

8          THE COURT:  Fine.

9          MR.   REVERCOMB:    Your   Honor,  I'm  referring

10   Lieutenant Zain to Exhibit 147.

11

12   BY MR. REVERCOMB:

13

14         Q          First  of  all,  Mr.  Zain,  does  this

15   Exhibit 147 accurately depict the layout of the house as

16   you found it on December 13, 1979?

17         A          Yes, sir, I did a -- it looks like a

18   pretty accurate drawing, or a non-scale drawing which I

19   made at the time, of the crime scene, which would more

20   or less give me a quick orientation of the samples I

21   made.  I've got the same format here, where the items are

22   marked, are pretty evident.

23         You've got item number one which is right here

24   (Indicating).   It was in this one bedroom area, where

Zain - Direct                                          1076

1   there were pieces of a knife, a broken knife, laying

2   around this area, is number one.

3        Number two was a sample that I removed from the

4   pool of blood where Vanessa Reggettz was lying, or where

5   she was when I came into the residence.

6        Example number three was a portion of bloody

7   carpet which I removed from this area, which I didn't

8   assume anything at the time, but it was the second larger

9   pool of blood in the home.

10       Q        What room was that in?

11       A        That was in the front bedroom which is

12  close to the -- right next to the living room.

13       Q        And it also was Reggettz' blood?

14       A        Number four was blood from a bed in the

15  front bedroom, this area (Indicating), where the little

16  girl was lying, where she was placed.

17       Number five was a pillow case, also from the

18  front bedroom.

19       Number six was the electrical cord which was

20  removed from around Vanessa Reggettz' neck. She was hung

21  up on the door right here (Indicating).

22       Number seven was a curtain that was on the back

23  door. The curtain had slight blood staining present on

24  it.

Zain - Direct                                                    1077

1       Number eight was a sample from the sheet in the
2    kitchen floor. Number eight was right here (Indicating).
3       Number nine was a sample from outside the back
4    door, below the door handle, on this same door, on the
5    outside, below the door handle, there was some blood
6    staining smears. They weren't drops or splatters; it was
7    like somebody had shoved the door. If you have a cut
8    finger, it would leave a smear as you are going out or
9    coming in, one or the other.
10      Number ten -- there was a blood smear on the edge
11   of the sink, which I removed a portion of it.
12      Number eleven is the same, only from the utensil
13   drawer in the kitchen.
14      Number twelve is a pillow case from the bedroom
15   situated right here (Indicating), where the son was.
16      Number thirteen is a sample from the door which
17   was right in this area (Indicating).
18      Number fourteen was a sample of blood from the
19   door area, right here (Indicating).
20      Number fifteen was from a change purse that was
21   on a dresser.
22      Number sixteen was from an item that was located
23   here (Indicating) in the stack of clothes that was piled
24   up right in this area near the closet and the doorway.

Zain - Direct                                                    1078

1          And number seventeen was also in that same
2     locale.
3          Those were the majority of items that I either
4     physically removed the item if it was moveable, or
5     extracted it or took a portion of blood stain that may
6     have been present on any of the items there. There were
7     other items that were blood-stained which I can identify
8     later, but these were the items that I personally
9     removed, taking into my care and custody through the
10    analyses, until the work was done on them.
11         Some of the items, because they were extracted,
12    say, for example, from an item there wasn't a blood stain
13    on, something that could be tangibly removed, I just
14    removed a small portion for use during the analysis. And
15    it's like having a blood stain on a piece of thread.
16    We'd use the thread for analysis and then there isn't any
17    thread left.
18         But some of the items were returned to the
19    investigating officer and some of them were not.
20         Q          Okay, you may take your seat now.
21         Before we go on Trooper, or excuse me, Mr. Zain,
22    item seventeen, the jockey shorts -- is that correct?
23         A          Yes.
24         Q          Where was that found in regard to the

Zain - Direct                                              1079

1    bodies?

2            A          It was underneath the pile of clothes,

3    and I designated that as such in the report.          I

4    specifically stated jockey shorts found under pile of

5    clothes in the master bedroom.

6            Q          Mr. Zain, I want to now hand you what

7    has been marked for identification purposes as State's

8    Exhibit 108, and ask you if that corresponds to any of

9    the exhibits which you removed from the house on December

10   13, 1979?

11           A          Yes, sir.  This is the first item which

12   I mentioned.  On the outside, it's -- I'll hold it so it

13   won't come through the plastic.  On the outside of the

14   bag, the normal procedure is to mark the item, but more

15   specifically, to designate a case number.  That way we

16   specifically know where and when the item was picked up,

17   because that's how all items are submitted to the bureau,

18   whether I did the investigation at the crime scene or

19   someone else did.

20           And then, below that is the initials of the

21   person that analyzes the evidence or collects it.  And

22   the FSZ is, of course, my initials.  The case number for

23   this State's Exhibit 108, which will remain consistent

24   through all of the items, except for supplemental, which

Zain - Direct                                           1080

1    was 79-2566.  That's the official case number that was

2    given to these particular items at the bureau.

3         Q          I refer your attention more closely to

4    the piece of knife blade there.  Please describe its

5    condition as it appears today.

6         A          Except for the coloration since the

7    last time I saw this item of evidence, it remains and

8    appears to be in similar condition as it was the last

9    time I saw it.  You can see, actually, on the blood

10   stain, the total mass of blood stains present.  There are

11   two little clear places.  It might be a little rough for

12   you to see, but right here and right here (Indicating),

13   there's a clear space where there isn't any blood.

14   That's because those are the areas of the knife that I

15   actually removed some of the blood stain from for testing

16   purposes.

17        Q          And once you were through with the

18   processing of this, who did you return it to?

19        A          Like the majority of the items, they

20   remained in my sole care and custody, and I returned them

21   to  Trooper  Williams,  who  was  one  of  the  major

22   investigating officers.

23        Q          Do you recall when that was?

24        A          I believe it was on March 31, 1979, the

Zain - Direct                                                      1081

1    majority of the items were turned over to him.

2         Q          March of '79 or March of '80, Mr. Zain?

3         A          I'd say March of '80.

4         Q          I want to hand you what's been marked

5    for identification purposes as State's Exhibit 35, and

6    ask you if that photograph depicts where that knife was

7    found?

8         A          Yes, sir, that's the specific area by

9    photo representation that I pointed out on the crime

10   scene sketch there.  The larger portion of the knife is

11   right at the edge of the blood stain, and there are other

12   scattered pieces of the knife which are also around the

13   piece, yes, sir.

14        Q          All right.  Thank you.  I now want to

15   hand you what has been marked for identification purposes

16   as State's Exhibit 110-B.

17        Would you examine that and tell us what it is?

18        A          It's a portion of cut cord that I

19   examined, Exhibit 110-B, and my initials are on the cord

20   as to when I received it, and it would have been in

21   another bag with whatever -- other than just being loose.

22   But it also was removed and appears to be in similar

23   condition since the last time I saw it.

24        Q          Does that comport with item number six

Case 2:09-cv-01406 Document 17-8 Filed 10/29/10 Page 33 of 151 PageID #: 1969

1    on your chart?

2          A          Yes, it does.

3          Q          This was in your care, custody and

4    control while you were examining it?

5          A          Yes, sir.

6          Q          Who did you return it to?

7          A          I also returned it to Trooper Williams.

8          Q          Now, I want to hand you what has been

9    marked for identification purposes as State's Exhibit 115

10   and ask you to look inside that envelope and tell us what

11   that consists of?

12         A          It's State's Exhibit 115. It

13   corresponds with my marked item number up here in the

14   corner with the case number C-79-2566, and my initials.

15   The marks are still on the item, the change purse,

16   inside. You can see right in this particular area there

17   is -- you may not be able to see it too good, but that's

18   a hole right there (Indicating), and that's where I

19   removed some of the blood stain that was present.

20              And it appears to be a small drop of blood or so

21   on the change purse, but it appears to be in similar

22   condition which the last time I saw it.

23         Q          And do you recall where that was

24   recovered?

Zain - Direct                                          1083

1        A        I believe that was on the dresser in
2    the front bedroom.  It also remained in my care and
3    custody until I returned it to Trooper Williams.

4        Q        I now hand you what has been marked as
5    State's Exhibit Number 79, and ask you to look at that
6    photograph and see if you can identify the change purse?

7        A        Yes, sir.  On the dresser, on the left
8    side, right about in this area (Indicating) there appears
9    to be the purse that we're looking at.

10       Q        I will now hand you what has been
11   marked for identification purposes as State's Exhibit 109
12   and ask you to take that out, and tell the jury what that
13   is?

14       A        First of all, State's Exhibit 109, it
15   was referred to in my report as item number seven, and
16   that was a curtain from the back kitchen door which I
17   spoke of earlier.  On the outside of this envelope, you
18   have got the case number which was originally issued.

19       Also, I want to point out so that it won't be
20   confusing, there is another number on there that says FD
21   89-445, also with my initials, and the date, 12/15/89.
22   That was when I had looked at this when the crime
23   occurred and rechecked some of the blood staining for
24   additional technical analysis that was not available ten

Zain - Direct                                    1084

1    years ago.

2         On the curtain itself, you have a large cutting

3    that was taken in this area right here (Indicating),

4    where there was some blood staining and some smears.

5    This was done specifically for DNA analysis, but there

6    was additional blood testing done here (Indicating)

7    originally, which was reported in this report.

8         Also on the curtain, is the same case number and

9    there were some other cuttings from, like right through

10   here, which I'll stick my finger through to show you.

11   There was blood staining in this area, and also in this

12   area (Indicating).

13        And when I originally pointed out that it appears

14   to be similar in condition to which I recently last saw

15   it, and the original cuttings that were made on it were

16   made by me, even though it was ten years later. And it

17   originally looks to be the same as when I removed it from

18   the residence.

19        Q         After your initial examination of this

20   item in 1979, who did you return it to?

21        A         It also -- after I was finished and the

22   evidence was picked up, it was picked up by Trooper

23   Williams at the same time as was originally designated,

24   on the 31st of March, 1980.

Zain - Direct                                                    1085

1          Q          You say you later received it back; who

2     did you receive it from?

3          A          Also Trooper Williams.  He sent it to

4     the crime laboratory in Texas, because there was not the

5     availability to do the type of testing in this State.

6     He sent it to us and we tried to do DNA testing on it.

7     There was DNA material present in the blood stain, but

8     the grade or the condition was such that we were unable

9     to get any additional information.  It had just been too

10    long since the occurrence, plus it would have probably

11    preserved the evidence in a frozen condition.  That would

12    have been the best way to keep it from ten years ago.

13         The technology on DNA testing wasn't even heard

14    of, much less being tried on forensic evidence then.  We

15    still thought we would try and see if we could possibly

16    gain some additional information.

17         Q          I don't know if I asked you this, but

18    State's Exhibit 115, the change purse, did you also

19    return that to Trooper Williams?

20         A          Yes, sir.

21         Q          State's Exhibit 63 is a photograph.  I

22    would ask you if that depicts the curtain which you just

23    testified to?

24         A          Yes, sir.  It shows the same areas of

1    blood stains, which I stuck my finger through that one

2    place, which is in this area here (Indicating), on the

3    curtain.  And that's a pretty good photo-likeness of the

4    item at the house.

5              Q         That's the item that was found?

6              A         Yes.

7              Q         Prior to your processing it?

8              A         Yes, that's correct.

9              Q         Now, I want to hand you what has been

10   marked for identification purposes as State's Exhibit 41,

11   and ask you what this photograph depicts?

12             A         State's   Exhibit   41   is   the   blood

13   staining smear on the door.  This is the door between the

14   back bedroom and, I think they call it a family room, if

15   I'm not mistaken.  And that would be the sample or item

16   number  thirteen  which  I  believe  I  referred  to  in  my

17   notes.  It was a large blood stain which you can see from

18   the photo, near where Mrs. Reggettz was found.

19             Q         I now hand you what has been marked for

20   identification purposes as State's Exhibits 54 and 55,

21   and ask you to tell the jury what these photographs

22   depict.

23             A         Those particular two photographs are

24   the same door area; one is just a little larger than the

Zain - Direct                                                    1087

1    other, but there is blood stains and smears on it, that

2    appears on the edge of this doorway.

3            And if my memory serves me correctly, that would

4    be -- I removed a blood stain from that particular area

5    which was referenced as a sample from the door between

6    the -- what I call the master bedroom and the front door,

7    or the front door area, if I'm not mistaken.

8            That would have been item number fourteen, which

9    I referred to in the picture up there.

10           Q       Is that the master bedroom, the front

11   bedroom?

12           A       That's correct.

13           Q       I now hand you what has been marked for

14   identification purposes as State's Exhibit 46, and ask

15   you what this photograph depicts?

16           A       This is the photo, State's Exhibit 46,

17   which is a sample from the kitchen sink area.  You can

18   see that there is a reddish color blood stain present on

19   the edge, as well as water staining.  This blood stain

20   has been moist or it has been possibly some detergent or

21   whatever may have been intermingled with it, but it's

22   diluted.  It isn't just a blood smear, straight-out.  And

23   I believe we weren't able to identify it, other than

24   being blood, although it looks to be a whole there.

Zain - Direct                                                1088

1          That's the sample I removed from the kitchen

2    sink.  I believe that was listed as item number ten.

3          I might say that the sample, like I was

4    explaining earlier, the samples that were removed, such

5    as from that particular area, a small portion of it was

6    removed and that was used during the analysis, and the

7    remainder of the blood stain, of course, remained on the

8    scene or whatever the blood was deposited on originally.

9          Q          State's Exhibit 51?

10         A          This is the drawer in the kitchen that

11   I made reference to.  Item number eleven is a sample from

12   the utensil drawer in the kitchen.  It's right here in

13   this area.  You can see the reddish color stain, and

14   that's on State's Exhibit 51, of that particular item.

15         I also removed a small portion of that stain and

16   it was used during analysis.

17         Q          State's Exhibit 57, for identification

18   purposes?

19         A          This is the sheet that was lying in the

20   middle, or lying in the walk-through area of the kitchen.

21   It pretty much depicts the accurate position of where the

22   sheet was.  There was a couple of things that were strewn

23   about, some spoons or some utensils lying on the sheet.

24   I identified some blood staining which you can actually

Zain – Direct                                          1089

1    see.  You might be able to see a small portion of the

2    blood stain on the sheet right about in this area right

3    here (Indicating).

4           But on State's Exhibit 57, it's what I made

5    reference to as example number, or item number eight.

6           Q          State's Exhibit 73?

7           A          State's Exhibit 73 is the sample which

8    I removed from the bed spread in this area (Indicating).

9    It was on the bed where one of the children was lying,

10   and that was item number four in my report.

11          Q          Is there any other blood visible in

12   this photograph?

13          A          Yes, sir.

14          Q          What I made reference to was example or

15   item number three in my report, a sample from the carpet

16   area, right in this area (Indicating).  That is what I

17   was talking about earlier.  That's also on the board up

18   there.

19          Q          Finally, I'll refer you to the upper

20   right corner.  It's hard to see in the photograph.  See

21   if there is any other blood in that photograph.

22          A          There is.  You can see it by shadow of

23   the pillow on the far side away from the child, in this

24   area right here, there is a blood stain on the pillow,

Zain - Direct                                                    1090

1  and that also, was referred to as a pillow case from the

2  front bedroom, or item number five.

3       Q       I now hand you what has been marked for

4  identification purposes as State's Exhibit 5. What does

5  this photograph depict, if you know?

6       A       This is an enlargement of Exhibit No.

7  5, which shows the outside back door. The blood staining

8  which I made reference to primarily in the report, is

9  this small portion of the blood which I removed below the

10 handle, right there (Indicating). That's on the outside

11 of the house. When I made reference that I collected it,

12 that was inside and outside of the house, this is what

13 I was referring to. But that's the item which I marked.

14      Item number nine, which I specifically stated was

15 a sample from the outside of the back door, is below the

16 door handle.

17      Q       Now, Mr. Zain, I want to hand you what

18 has been marked for identification purposes as State's

19 Exhibit 158, and ask you if you've seen this exhibit

20 before?

21      A       Yes, sir, unfortunately. This has got

22 my initials on the outside, with a ballpoint pen. You

23 can hardly see it here (Indicating).

24      These particular items, a pair of scissors, is

Zain - Direct                                                    1091

1    what  I  removed  --  personally  removed  from  Vanessa

2    Reggettz's chest at the crime scene, by direction of Dr.

3    Sopher.

4            Q            Who did you give this exhibit to at

5    that time?

6            A            Well,  that  exhibit  remained  in  my

7    direct care until I removed a blood sample from the

8    scissors myself, and then it was turned over for printing

9    to the latent print section.

10           Q            Do you remember what date that was?

11           A            No, sir, not specifically.  The blood

12   sample was removed probably that day or the next, and

13   immediately turned over and handled as a latent print

14   item.    But because I had removed it from the victim

15   personally, then I just went ahead and retained it to get

16   the blood sample, the biological sample, off the item

17   before it might have been denatured.

18           Q            Who did you give it to?

19           A            It was given to Corporal Shumate, with

20   the latent department.

21           Q            Who is now a Lieutenant?

22           A            That's correct.

23           Q            I believe you've already testified that

24   you received some items back and that you tried to do

Zain - Direct                                                    1092

1    some DNA testing?

2         A         There were several items that were

3    submitted to the crime laboratory, which is an

4    independent crime laboratory in San Antonio, Texas. They

5    were submitted to possibly obtain additional information

6    pertaining to this case that was not available to be done

7    by any crime laboratory ten years ago.

8         What we did was check the blood staining that was

9    available on the items that were submitted.  The blood

10   staining was extracted to determine if DNA banding

11   patterns could be identified.   There was material

12   present, but it's what was called "low molecular weight"

13   size, which was inappropriate for identification

14   purposes.  That material had degraded to the point where

15   no further analysis could be performed on it.

16        Q         So, your results of the DNA testing

17   were what?

18        A         The results of our banding patterns

19   were negative, or inconclusive.  None were obtained.

20        Q         I want to call your attention to

21   December 14, 1979.  Did you have occasion to see the

22   clothing identified as belonging to Paul Reggettz?

23        A         Yes, sir, I received a -- on December

24   14, 1979, quite a variety of clothing that I received

Zain - Direct                                              1093

1    from Trooper Williams.  It consisted of -- it would be

2    easier to go down the list here:  Two pairs of brown

3    pants, one shirt worn from work -- I'm going to read to

4    you specifically what was submitted -- two pairs of blue

5    jeans, one work glove, one pair of brown suede boots, one

6    blue jean jacket, one pair of white athletic socks, one

7    pair of brown work pants, two pairs of long underwear,

8    one thermal underwear shirt, one white T-shirt, one pair

9    of white jockey shorts, one tan workshirt, one blue

10   sweatshirt, one red bandanna handkerchief, and one blue

11   toboggan.

12        All of these items were submitted as belonging to

13   Paul Reggettz, III.

14        Q       I also ask you, on that occasion,

15   December 14, 1979, did you receive any other items from

16   Trooper Smith?

17        A       Yes, sir.  On that same day, I received

18   from Trooper Smith, M. D. Smith, one blood specimen that

19   was from Vanessa Reggettz, and also a plastic bag

20   containing the nightgown of Vanessa Reggettz, which she

21   had been wearing at the time of the particular incident.

22        Q       I call your attention now to December

23   17, 1979 and ask you what evidence pertaining to this

24   case you received at that time?

Zain - Direct                                                1094

1       A          On December 17, 1979, I received a

2   known blood specimen of Paul Eric Reggettz, the son, the

3   little boy, and a blood sample of Bernadette Reggettz,

4   the little girl. I received both of these items from

5   Terry -- Trooper Williams, on December 17, 1979.

6       Q          Of all of the blood work which you

7   received in this case, did you ever return it to the

8   investigating officer?

9       A          No, sir. The whole bloods were

10  utilized during analysis and kept for quite a long period

11  of time in refrigeration until they were disposed of, as

12  is normal protocol.

13      Q          Mr. Zain, I also want to ask you, or

14  call your attention to December 18, 1979, and ask you if

15  you had occasion to receive any evidence or exhibits in

16  this case from Corporal Shumate?

17      A          Yes, sir. On December 18, 1979, I

18  received some items that were also at the crime scene

19  when I was there, that I did not process or physically

20  take them in hand at the time, but we did take caution

21  of the biological presence that was on them. It

22  consisted of a flashlight, a Christmas package that was

23  under the Christmas tree, and also some Christmas package

24  wrappings, which were also around the Christmas tree.

Zain - Direct                                          1095

1          These items I received from Dave Shumate, of the

2     latent print section.

3          Q          Lieutenant Zain, I want to hand you

4     what has been marked for identification purposes as

5     State's Exhibit 155, and ask you if you have seen this

6     exhibit before?

7          A          Yes, sir, that's the particular item

8     -- that's Exhibit 55 that was submitted to me by Trooper

9     Williams as being the nightgown of Vanessa Reggettz.

10         Q          That was submitted by Trooper Williams

11    or Trooper Smith?

12         A          It was submitted by Trooper Smith, I'm

13    sorry.

14         Q          Who did you return it to?

15         A          It also was returned to Trooper

16    Williams on March 31, 1980.

17         Q          And did you conduct tests on this item?

18         A          Yes, sir.  A variety of blood stains on

19    the item were checked, and blood staining origin as to

20    who it was originally from was identified.

21         Q          And I want to hand you what has been

22    marked for identification purposes as State's Exhibit

23    107.  I'd like you to look at that.

24         A          This, also -- I've got it marked on

Zain – Direct                                              1096

1    here, the case number is in this area (Indicating), and

2    my initials.  This box had a glass bowl in it.

3         Q          Who did you receive this item from?

4         A          That was also received from Dave

5    Shumate at the bureau for identification.

6         Q          And who was it returned to?

7         A          It was also returned to Trooper

8    Williams.

9         Q          And did you conduct tests on that?

10        A          Yes, sir.  There was a blood stain on

11   the bottom part of the box, that I checked out, and

12   reported.

13        Q          State's Exhibit 106?

14        A          This is a flashlight that was lying on

15   a chair in the house that Shumate picked up.  It's got

16   my initials on the outside rim of the front part here

17   (Indicating), which I marked at the time.  That also was

18   returned to Trooper Williams after I received it and

19   tested it for blood staining.

20        Q          I now hand you what has been marked for

21   identification purposes as State's Exhibit 114?

22        A          There, again, as I pointed out earlier,

23   there is some double numbers here and initials.  That's

24   due to it being resubmitted to me for examination.  It

Zain - Direct                                          1097

1    should just contain a variety of what we call Christmas

2    package wrappings, with a variety of holes cut in here.

3    Where the holes are cut, are primarily where the blood

4    staining was identified.  You can see there is still some

5    apparent blood staining in this area right here.

6           And also, in this area here, these areas were

7    tested the first time, where I gained the original

8    information.  And then also, I utilized the same areas

9    of the blood staining where we tried to do the DNA

10   testing.  This is just one of the pieces of paper.

11          Q        Are there also blood stains on this

12   piece, too?

13          A        Yes, sir.  These, like I say, they're

14   getting sort of worn out, but there is blood staining

15   apparent, visible blood staining, in these areas here.

16   You can see the cuttings, the holes in the paper that are

17   small cuttings.  That is where blood staining was

18   identified.

19          We got some anhydrant spray from the latent print

20   section.  And these all remained in my care, custody and

21   were returned to Williams the first time, then just

22   recently received and returned back to him again.

23          Q        Did you receive these from Corporal

24   Shumate?

Zain - Direct                                                    1098

1       A        I received them from Shumate, from

2   internal, and then for re-exam.  I received them from

3   Trooper Williams and then returned them to him after I

4   was done with them.

5       Q        Now, I hand you what has been marked

6   for identification purposes as State's Exhibit 116, and

7   ask you to examine that.

8       A        116-A, which you can tell is a child's

9   item here, that I examined twice.  The markings that are

10  made on here now and labeled were areas that I marked in

11  the photos for DNA analysis.  But these items and the

12  cuttings from this were made by me for testing purposes.

13  It takes a little bit more blood staining, especially

14  when it gets old, to try to identify DNA patterns.  There

15  is a variety of blood stains on this item.

16      Q        Was this item also tested in 1979 by

17  you?

18      A        Yes, sir, it was.

19      Q        And in 1980, who did you receive this

20  from?

21      A        I received that January 7, 1980 from

22  Trooper Williams, and I also returned it to him on the

23  same day that I returned the other items.

24      Q        On March 31st?

Zain - Direct                                                1099

1        A         March 31, 1980.

2        Q         I would hand you what has been marked

3   for identification purposes as State's Exhibit 100, and

4   ask you if you have seen this exhibit before?

5        A         Yes, sir, I've got it marked on this

6   piece of plastic here.  The case number, my initials, and

7   when we received it.  This was one of the items that was

8   examined, the flatware, or kitchenware, a box of

9   stainless flatware.  I received this from Shumate on

10  February 6, 1980, and also returned it to Trooper

11  Williams along with the other items on March 31, 1980.

12       Q         I would like at this time to hand you

13  what has been marked for identification purposes as

14  State's Exhibit 63, I believe, and ask you to tell us

15  what this -- oh, excuse me, number 64, and tell us what

16  that photograph depicts?

17       A         State's Exhibit 64 is a blood staining

18  which, I believe that I was showing you on the paper

19  there a while ago, the larger blood stain that was

20  present at the time we were at the crime scene.  That's

21  the way it appeared to us as we were going through the

22  house, looking at particular items, and that is one of

23  the blood stains that was analyzed and reported.

24       Q         That was done before you did your

Zain – Direct                                                    1100

1    testing?

2         A          That's correct.

3         Q          Mr. Zain, I want to ask you if you had

4    occasion on January 2, 1980, to receive the known blood

5    of Paul Reggettz, III, the father and husband?

6         A          Yes, sir.   I received that blood

7    specimen from Mr. Reggettz, because I received it from

8    Trooper Williams.

9         I requested that a known blood specimen be

10   obtained from the father, number one, because of the

11   ongoing investigation, and number two, because the

12   samples from the scene that I had removed showed  that

13   the blood staining did not originate from anybody at the

14   house at that time, which left the question, because of

15   the freshness of the blood staining throughout the home,

16   and because it would be assumed that because there was

17   only one person bleeding, and that would have been

18   Vanessa Reggettz, that when I identified the blood

19   staining on a variety of the items throughout that house,

20   and on the outside of the house, it did not originate

21   from her.

22        Then I suggested that we start obtaining blood

23   samples from any and all people that would have had

24   access to the house, or could possibly have been involved

Zain – Direct                                        1101

1    in this particular crime, at which time Trooper Williams

2    and Trooper Smith, being the primary investigators in the

3    case, obtained the blood specimen of Mr. Reggettz, and

4    testing was done on his blood, which also excluded it

5    from being his blood in the house.

6            Q       What are you saying -- that after you

7    received Mr. Reggettz's blood, you still had a variety

8    of  blood  samples  that  didn't  match  anybody  in  the

9    Reggettz family?

10           A       What  I'm  saying  is,  there  were  a

11   variety of blood stains that I had removed from the

12   house, or identified on items from the crime scene, that

13   could not have originated from Mrs. Reggettz or either

14   of the two children.  So I requested a blood sample from

15   the father, seeing as how he was the fourth person who

16   had ready access to the house at any time.

17           The blood staining was not identified as being

18   his. He was totally excluded, and there ensued obtaining

19   or trying to find out where the blood came from, because

20   the blood staining was fresh.  It was on stuff that

21   hadn't been there that long or could not have lasted that

22   long on items that the blood was deposited on, and it

23   indicated in the investigation that there had been blood

24   staining deposited by another person, other than the

Zain - Direct                                                    1102

1    people that we already knew about.

2          Q          Do you have charts for selecting blood

3    characteristics of the family members?

4          A          No, sir, I don't.  I've just got the

5    report.

6          Q          Do you ever make charts?

7          A          Sure.

8          Q          I'm going to hand you what's been

9    marked State's Exhibits 143, 144, 145, and 146, and ask

10   you to compare the blood on the members of the Reggettz

11   family.  Would you do that for us?  Show the jury?

12         A          I can; it's not problem.  It might be

13   easier, instead of using a whole lot of these numbers and

14   letters, if I could just put it on the board there.

15         Q          That would be fine.

16         A          It would be easier for everybody, and

17   simpler, and I won't write anything contrary to what's

18   on this.  I just won't write as many things, to make it

19   easier.

20         What I'll do is simply this:  I'll mark it, using

21   initials.  There might be a conflict of initials, so I'll

22   put mother, father, son, daughter, and use initials from

23   there on.

24         You've got the primary victim from the standpoint

Zain - Direct                                          1103

1    of a person bleeding, known as the mother.  You've got
2    the daughter, designated as "D", and the son as the
3    little boy, and on here, the father, Mr. Reggettz -- I
4    originally was going to do this so that you could relate
5    to what I'm talking to you about today.

6         Everybody can associate with an ABO blood type.
7    All of the people in the family were blood type O.  One
8    of the other blood typings -- all blood typings are
9    separate and independent of each other -- in other words,
10   the blood type O does not make -- anything else that I
11   talk about is not necessary for any of these other blood
12   typings nor any of the other blood typings necessary
13   because of this particular one here.  So, I'm just going
14   to use one blood type.

15        I'm going to show you all why I requested a known
16   blood specimen from Mr. Reggettz and why I requested a
17   known blood specimen, even after I analyzed his blood.

18        Another blood characteristic, which is called
19   ESD, that's an abbreviation for extra-esteration-D blood
20   type.  They don't change.  Everybody in here has got one;
21   they don't change.  They are not altered, they are
22   genetically engineered, and they are inherited by what's
23   Mendelian's Laws.  You have three basic types of
24   esterates.  You have a 1, a 2, and a 2-1; that's how

Zain - Direct                                             1104

1   they're designated.  Just like the blood types in an ABO

2   are A, B, AB, and O.

3        The mother is blood type 1; the daughter, type 1;

4   the son, type 1; and Mr. Reggettz was type 1.  The

5   majority of the samples from the scene -- for example,

6   the stain on the curtain, the sample from the kitchen

7   drawer, the sample from the Christmas packages -- this

8   is right at Christmastime -- the samples that were taken

9   throughout the house, the doorframes and such, so, we're

10  just going to call them questionable samples.  We don't

11  know where they came from.  We're just picking them up.

12       Say, two were ABO type O, and they were of the

13  Esterase-D type 2-1.  Now, any way you cut it, that blood

14  did not come from any of the people in the house.  So,

15  I recommended to the investigators that there was

16  somebody else bleeding at approximately the same time

17  that all of the other blood was being distributed in the

18  house, and they needed to find out who it came from.

19  That's where I left it.

20       From that point on, is when we ensued additional

21  blood samples from a variety of different people that

22  could possibly have been in the house and deposited blood

23  there, or maybe not, I don't know.  But that is the

24  simplest form of even showing you that you can -- whoever

Zain - Direct                                                      1105

1    deposited this blood excluded this whole family of
2    leaving the blood in the house.   One individual's blood
3    type if very different from another individual's, and can
4    be one hundred percent exclusive that that blood is
5    coming from another individual.   The more you try to
6    exclude somebody as depositing blood somewhere, the more
7    you include them as couldn't possibly contributing blood
8    in a certain place.

9        In other words, the harder I tried to say that
10   this blood didn't come from you, the more tests I run to
11   show that it didn't come from you, if it doesn't exclude
12   you, it makes it even that much more apparent that it
13   probably did come from you.

14       That's all the purpose of forensics.   It's not to
15   try to catch somebody because you're trying to get all
16   of the blood types.   It's really in reverse of trying to
17   exclude somebody as being the possible depositor of the
18   blood stains, no matter what kind of forensics it is.
19   But on these charts, you've got an ABO type, you've got
20   an Esterase-D type, all of these other designations or
21   additional blood characteristics that everybody has.
22   They don't change.   They're not altered, and they're not
23   hard to identify.   And these typings were not identified
24   in Mr. Reggettz blood, and from Bernadette's, the little

Zain - Direct                                          1106

1    daughter's, from the father, and from the son.

2          You get a percentage of the population, that

3    these people that the blood typings occur in, not how

4    many people really have it, but they're not based on

5    statistics, they're based on gene frequencies.

6          On a paper that I published in West Virginia,

7    over six to eight years of work was based on a variety

8    of blood samples; fresh blood samples, forensic blood

9    samples -- they always were exactly compared to each

10   other.  If I analyze a very small sample size -- in other

11   words, a very small blood stain on that back door that

12   I showed you all, if I can only get one or two or three

13   or four of these blood characteristics, it doesn't mean

14   that blood's different, than if I get all nine of them.

15   What it tells me is, if I only get half this many, I can

16   only say that the blood stain still has some blood types

17   identified on these.  I just can't scientifically say

18   that it is as good, because like I say, the more blood

19   typings you get to try to exclude somebody as depositing

20   blood, then you can narrow down the number of people that

21   actually have that whole total amount of blood typings.

22          It's like, of course, to use as an example --

23   approximately forty-five percent of the population are

24   blood type O.  Well, that's a pretty good large amount

Zain - Direct                                          1107

1    of people, but only three percent of the population are

2    AB.  So, if you've got somebody who's a type AB, then

3    you've already excluded ninety-seven percent of the

4    population, because that's just how the curve falls.

5    It's genetically inherited, so you get all of these blood

6    types together and you get a certain percentage.  And I'm

7    pretty sure they're going to have me testify to what the

8    total combination of all of these blood types are.

9         But the key is that if the blood typings

10   identified from the crime scene would have matched up

11   with Mr. Reggettz or the daughter or the son or the

12   mother, it still wouldn't mean that it specifically, one

13   hundred percent, came from that person.  But it would say

14   that it would be very highly likely that it did.  But

15   because there was not only just one blood type, which is

16   all you need to say that it didn't come from anybody

17   there, there were several blood typings that were

18   different than what is found in the whole family

19   scenario.

20        So, as soon as I identified the one blood typing,

21   it was readily apparent to me that the investigation

22   needed to occur, no matter what may appear on the surface

23   at the time, to find out who was bleeding in the house.

24             It's a part of our job as being a State

Zain - Direct                                    1108

1    Policeman, to be investigators and to use investigative

2    tools to try to find out as much information about a

3    crime as possible, and this is what warranted us to

4    continue the investigations at a more rapid pace.   The

5    longer time goes on after a crime, the more chances there

6    are of losing physical evidence.  That's exactly what our

7    department did.

8         Q         Mr. Zain, before we leave this subject,

9    I see Paul Reggettz's chart there.  He's got nine blood

10   typings?

11        A         Yes, sir.

12        Q         I guess the importance of all of this

13   is that all of those are separate and independent from

14   the others?

15        A         That's correct.   In other words, I

16   could do a blood typing on you, and I could just type

17   your blood for, say, what's designated at the bottom

18   there, as GC, that stands for group specific component

19   blood type, it's a big word for just blood type.  I can

20   identify what your GC is and it doesn't matter what that

21   is compared to what your ABO type is, or any of these

22   others that are on that board.   And it's just as

23   important as getting an ABO type.  About the only time

24   you work that in is because if you're A positive or B

Zain - Direct                                          1109

1   negative, or you worry about having kids because of your

2   RH factor, and stuff like that.

3            Well, these other blood typings are not

4   clinically important.  In other words, if you have a

5   transfusion or give somebody blood, these other blood

6   typings aren't going to interfere.  They're not going to

7   be of any relevant importance from the standpoint

8   clinically, but they are genetically important to

9   forensic applications, and they are genetically important

10  to population studies.  They are sort of an added plus

11  to find out an internal characterization of an

12  individual.  It's just like having brown hair or blue

13  eyes, or long arms or short fingers, and things along

14  this line.  That gives you a physical makeup of what an

15  individual looks like.

16           For blood characteristics, when used, and the way

17  they're used forensically, and in population studies by

18  anthropologists, give you an internal makeup of

19  individuals of a certain area, and the study I did was

20  on a thousand people and a thousand cases in the State

21  of West Virginia.  It shows that the population was

22  primarily ninety-six percent caucasian and three percent

23  black.  And it confirmed the national gene frequencies

24  that were being used scientifically in forensics and

Zain - Direct                                                    1110

1   otherwise, of what was used in the crime laboratory at

2   the time, and is now, the gene frequencies to give us an

3   idea of what type of population or how many people, say,

4   should have a certain set of blood typings are right in

5   sync with what is across the United States.

6            Q        Before going any further, was any blood

7   found in the house that was consistent with the blood of

8   Paul Reggettz, III, the father?

9            A        There was no blood stain in the

10  residence or on any item that identified -- or that I

11  tested that had any blood staining the same as Mr.

12  Reggettz's or anybody else, other than Mrs. Reggettz, and

13  the blood samples that I took from Mr. Moss.

14           Q        And you've also testified that you had

15  clothing submitted by Trooper Williams in December of

16  1979 that was identified as belonging to Paul Reggettz.

17  Was any blood found on any of those items?

18           A        No, sir, there was no blood that could

19  be identified visually or chemically.

20           Q        I want to call your attention to April

21  22, 1980, and ask you if you had occasion on that date

22  to see the known blood of the defendant, John Moss?

23           A        Yes, sir.

24           Q        Who did you receive that from?

Zain - Direct                                                    1111

1          A          I received a known blood sample of Mr.

2     Moss's blood from Terry Williams on April 22, 1980.

3          Q          And you compared his blood to the blood

4     of the Reggettz family?

5          A          It was tested, just like the other

6     blood samples and stains that I had done.   The blood

7     typings which were identified were the same blood typings

8     which I supplied from the samples from the scene.

9          Q          One thing I think you testified about,

10    one inconclusive marking can exclude a person?

11         A          That's correct.  If I were to check Mr.

12    Moss's blood or that of anybody else and find that he is

13    a blood type B, then there is no way he could have

14    deposited the blood at the scene.

15         If he was an esterase type 1, there is no way

16    that the blood could have come from him.

17         If he was any other blood typing than what I

18    identified or what he is, it would have excluded him from

19    being the depositor of the blood stain, at that place or

20    anywhere else.   But it didn't.

21         Q          Was the blood identified consistent

22    with Vanessa Reggettz's blood found anywhere at the

23    scene?

24         A          Yes, sir.  I can tell you very quickly,

Zain - Direct                                                          1112

1    I hope, on the items that I removed from the scene.

2    Personally, all of the items -- I'll just go through

3    these by item numbers, because there are right there on

4    that board and you've talked about them several times

5    already.

6           But items one through five, which is from the

7    pieces of the knife, samples from the doorways, the

8    carpet, the bedspread, and the pillowcase ---

9           Q          Which pillowcase is that?

10          A          That's the pillowcase from the front

11   bedroom.

12          Also, number six, the electrical cord which was

13   removed from around her neck.  The sample from the sheet

14   on the kitchen floor, which had a couple drops of blood.

15   A sample from outside the back door, below the door

16   handle, which is sort of unusual.

17          Q          That was consistent with Vanessa

18   Reggettz's blood?

19          A          That's right.  I'm going to include

20   everything that was on my sample that was hers.

21          There was a sample from the door between the

22   bedrooms, and the living room.

23          Q          The living room or the TV room?

24          A          The TV room.

Zain - Direct                                                      1113

1        Q        Is that the door at which Vanessa was

2   found?

3        A        That's correct.  And also, the medium

4   white  T-shirt was found under a pile of clothes in the

5   master bedroom, and was the same as her blood.

6        Q        It was underneath some clothes?

7        A        Right.  And then, of course, the known

8   blood sample on her nightgown, which we've already talked

9   about.  All of those samples that I referred to had blood

10  staining  on  them  and  the  blood  types  which  were

11  identified were the same as hers.

12       The  other  items  where  there  was  human  blood

13  identified, and the identified characteristics -- or they

14  were identified as being the same as Mr. Moss's, and that

15  was  from  the  sample  from  the  door  between  the  master

16  bedroom,  or  what  I  called  the  master  bedroom,  the  front

17  bedroom,  and  the  front  door.

18       The  change  purse,  a  sample  from  the  utensil

19  drawer  in  the  kitchen,  the  pillowcase  from  the  bedroom

20  beside  the  bath,  the  curtain  from  the  back  door,  and

21  you've got the flashlight, the Christmas package wrapping

22  -- those items, if I'm not mistaken there might have been

23  another  one,  but  all  of  those,  for  sure,  had  blood

24  staining on them of the blood type the same as Mr. Moss,

Zain - Direct                                              1114

1     and nobody else in the family.

2              Q          Mr. Zain, what is meant by the term

3     "consistent with blood samples consistent with a member

4     of the family?"  Does that mean that it is his blood?

5              A          Consistent or not consistent is a way

6     of reporting where you're not scientifically, at least

7     at that time, you could not say the blood specifically

8     one hundred percent came from an individual, unless you

9     were there at the time the blood was deposited, or at

10    least with a certainty that the type of blood, and the

11    number of times you eliminated the vast majority of

12    people -- the policy was, which I set forth, was to

13    assure that reports were consistent or not consistent.

14             Q          What does not consistent mean?

15             A          Not consistent means that you one

16    hundred percent exclude someone as being the possible

17    depositor of blood or other body fluids.

18             Consistent means that all of the blood typings,

19    whether you have one or whether you have nine, are

20    consistent with what you are comparing to, and the person

21    cannot be eliminated at all from the positive, depositing

22    the blood or body fluids, if the same genetic markers are

23    identified from item to the next, which make it

24    consistent with each other.

Zain - Direct                                              1115

1        Q           I have a hypothetical for you, Mr.

2  Zain.

3            Suppose an item, possibly a small amount of blood

4  of person "X" and a large amount of person "Y", you found

5  in a pool consistent with person "Y", in your testimony

6  of what you would expect to find?

7        A           I think I've used in this Court the

8  analogy -- if you take a cup of water and throw it in the

9  ocean, you are not going to be able to identify the cup

10 of water.   That's about as simple as you can say it,

11 because you've got such a small portion of blood in a

12 large portion of another blood, then you're not going to

13 be able to identify it.

14       Q           I want to again refer your attention to

15 State's Exhibit 108, and I'll ask you to look at the

16 biggest piece of the knife blade.   I believe you've

17 identified that as being a blood stain?

18       A           Yes, sir.

19       Q           Whose blood was that consistent with?

20       A           That's the same blood type as Mr. and

21 Mrs. Reggettz.

22       Q           If she had cut someone with that knife,

23 would you expect to find the other person's blood on it?

24       A           Well, it depends upon a variety of

Zain - Direct                                              1116

1   situations, but it's not really that complicated.

2          If you have one, you just cut somebody or you

3   just cut at somebody and even though you may cut them,

4   you're not going to have blood on that item which you cut

5   them with.  You have to have repeated exposure to an

6   item, at least more than once, before you can have blood

7   left on an item, particularly with a knife.

8          When you have a knife and it's just a cut

9   through, it's primarily cutting through a variety of

10  tissues, and the skin -- the skin is pretty tough.  But

11  when you cut through the first time, you've got to cause

12  some bleeding to occur before blood can be left on

13  something.

14         If you stab yourself when you're cutting an apple

15  or something like that with a pocket knife, or when

16  you're working in the kitchen, and you cut your hand, you

17  cut your hand, but after you know that you've cut

18  yourself is when you start bleeding, because there is no

19  blood on the item that you cut yourself with.

20         Now, if you lay a knife down where you've got

21  someone bleeding on it, then of course you're going to

22  have blood deposited on it.

23         Q       I believe you've already testified that

24  the largest piece of that knife was found in a pool

Zain - Direct                                          1117

1    consistent with Vanessa Reggettz's blood?

2         A         Yes, that's true. And it is showed by

3    the photograph. But even if, for example, this was used

4    to cut somebody, with the amount of blood that is present

5    on here, and from the area that I assembled from, you're

6    only going to identify one set or combination of blood

7    typings. And even if you had a fifty-fifty mixture, just

8    keeping it real simple, adding one person's blood to

9    another person's blood and you mix them up, you put them

10   on something, then by running the variety of blood

11   typings which were run, we'd be able to differentiate as

12   to the blood typings that were identified, no doubt.

13        Q         Mr. Zain, I'm going to have you what

14   has been marked as State's Exhibit 152 for

15   identification, and ask you to tell us what that is?

16        A         It's a card that just simply says the

17   blood typings or blood characteristics that were

18   identified from Mr. Moss's blood sample, which is

19   depicted -- his blood type is O. I'll put that on the

20   board.

21        These other characteristics are abbreviated.

22   They are protein enzyme-type blood characteristics. The

23   PGM is 1-plus, 1-minus. There are ten blood

24   characteristics in a PGM blood typing system, just like

Zain – Direct                                                    1118

1    there is four in the ABO blood typing system.  ESD was

2    2-1, GLO-1 was type 2.  The EAP type was a BA.  The AK

3    type was a 1.  ADA type was a 1.  The HP type was 2-1,

4    and the GC type was a 1.  These are the blood typings

5    which I identified from the known blood sample.  These

6    typings were compared to the blood typings which were

7    identified from the stains present at the crime scene

8    which I mentioned earlier.

9         A variety of the stains, I was able to identify

10   a majority of the blood characteristics.  All of them,

11   for comparison purposes, but on some of them, I was only

12   able to identify -- which is quite a vast amount in

13   itself -- let's say, seven out of nine.  That's simply

14   because for these two particular blood typing systems

15   that are run individually and separately, you need a

16   fairly large portion of the blood stain.  And I think you

17   all have seen what I tried to show you all on a variety

18   of the items, either by a picture or by the items

19   themselves.

20        A lot of samples that were present at the crime

21   scene, there wasn't a whole heck of a lot of blood --

22   just a smear of blood here, a drop of blood there.  And

23   you have to have a certain amount of blood, even when it

24   is in the best condition, to be able to identify any

Zain - Direct

1    information from it at all.

2         So, it doesn't make them different from each

3    other; it just makes them -- we got more information from

4    some blood stains than we did from others.

5         But the bottom line is, they still could not

6    exclude Mr. Moss as being the possible contributor of the

7    blood stains.    And on the other hand it definitely

8    excluded anyone else in that family from having deposited

9    the blood at the crime scene.

10        Q        Mr. Zain, I want to go through each of

11   these items one-by-one, starting first with the change

12   purse.  That's State's Exhibit 115.

13        A        Yes, sir.

14        Q        How many genetic markers were you able

15   to identify in your analysis of that exhibit?

16        A        This is going to take a little time,

17   going down through these, from the items per se.

18        Q        How about this:  Only on what's been

19   marked for identification purposes, as State's Exhibit

20   134?

21        A        Okay.  These are my item numbers from

22   the case, correct?

23        Q        Yes.

24        A        Okay.

Zain -- Direct                                                    1120

1        Q          You identified it on the change purse;

2    is that correct?

3        A          Right.

4        Q          Item No. 15, the change purse from the

5    dresser -- I identified seven blood characteristics from

6    the blood staining I showed you.   The blood staining

7    identified on there eliminated ninety--nine percent of the

8    population.

9        Q          Is that what is meant by one person in

10   a thousand?

11       A          It's ninety-nine point nine percent of

12   the population, so say, one in a thousand people could

13   have a combination of blood types that are identified

14   here.

15       Q          Does John Moss have that combination?

16       A          Yes, sir, he does.

17       Q          I hand you now what has been marked for

18   identification purposes as State's Exhibit 136.     I

19   believe that represents the stain that you took from the

20   utensil drawer?

21       A          Yes, sir.   There, again, the same seven

22   blood characteristics were identified.   And I want to

23   point out from the door, there was a smear of a blood

24   stain; there wasn't a whole lot.   And we utilized -- I

Zain - Direct                                              1121

1    tested to get the information that I could readily obtain

2    from the stain without destroying it.

3            These seven blood characteristics were identified

4    as the same ones as before that had occurred, and it

5    eliminated ninety-nine point nine percent of the general

6    population.

7            Q        And John Moss has those same blood

8    characteristics?

9            A        Yes, sir, that's correct.

10           Q        Now, I hand you what has been marked

11   for identification purposes as State's Exhibit 138, and

12   ask you what that corresponds to?

13           A        The same blood characteristics, again,

14   were identified, which eliminated ninety-nine point nine

15   percent of the population.

16           Item No. 14 is what I designated as between the

17   front bedroom, or master bedroom as I've been calling it,

18   and the front door, that was the entrance to the home,

19   into the bedroom.  But it did also have the same blood

20   type as John Moss.

21           Q        You removed that blood stain sample

22   from that door?

23           A        Yes.

24           Q        Now, I hand you what has been marked

Zain - Direct                                                          1122

1   for identification purposes as State's Exhibit 139.

2        A          139 also, as Item No. 12 in my report,

3   is the pillowcase from the bedroom beside the bath.  It

4   has the same blood typings as Mr. Moss.  It occurs in one

5   person in a thousand.  That eliminates ninety-nine point

6   nine percent of the blood typings, as report earlier.

7        Q          Although you don't have a chart for it,

8   I believe you also found blood on the flashlight?

9        A          Correct.

10       Q          Is that State's 106?

11       A          Right.  The blood typings and smears

12  that were on the flashlight were identified as being the

13  same blood type as on these previous items, and it occurs

14  in approximately the same percentage, ninety-nine point

15  nine, and due to the amount of the sample that was

16  present on the particular item.

17       Q          Now, I hand you what has been marked

18  for identification purposes as State's Exhibit 137.

19       A          I mentioned earlier about the curtain

20  from the back door.  You all have seen it.  I have showed

21  you where the blood staining was present on the curtain.

22  You can see that there was a fairly large amount of blood

23  staining present at the time that it was removed from the

24  crime scene, and it was readily available to see the

Zain - Direct                                              1123

1    amount of staining still present on it.

2          I was able to obtain nine blood characteristics.

3    The combination of these blood types occurs probably in

4    about three people in ten thousand, who would have the

5    same combination of blood characteristics as that which

6    are identified.  These are the same blood typings that

7    Mr. Moss has.

8          Q         That's three in ten thousand people?

9          A         Yes.

10         Q         What percentage of the population does

11   that exclude?

12         A         Because  of  the  gene  frequency  in

13   occurrence, it eliminates ninety-nine point ninety-nine

14   -- seven percent of the population.

15         Q         Ninety-nine point ninety-seven percent

16   of the population?

17         A         That's correct.

18         Q         I will now hand you what has been

19   marked as State's Exhibit 135.

20         A         This is also -- we had a large amount

21   of stain, which I have shown you.  We've talked about it

22   previously -- the Christmas package.

23         Also,  the  same  number  and  types  of

24   characteristics were identified, as I just stated, from

Zain - Direct                                                    1124

1    the curtain.  The same package -- percentage and the same

2    blood typings as Mr. Moss, and that occurred -- ninety-

3    nine point ninety-seven percent had been eliminated as

4    being possible contributors of the blood.

5            Q         And that's the bowl box exhibit that

6    you identified?

7            A         That's correct.

8            Q         And State's Exhibit 140 ---

9            A         The wrapping paper which I showed you

10   earlier -- there is still some blood staining present on

11   the paper.  It's the same blood characteristics which

12   have been identified, the same ones as Mr. Moss's, which

13   occur in the same percentage, and eliminated ninety-nine

14   point ninety-seven percent of the general population.

15           Q         Now, I hand you what has been marked as

16   State's Exhibit 141.

17           A         Okay.  On the clothing of Bernadette,

18   the daughter, you've got nine blood characteristics

19   identified, the same blood typings as Mr. Moss's, and it

20   eliminated ninety-nine point ninety-seven percent of the

21   population, the same blood typing we previously talked

22   about.

23           Q         Does that chart represent what you

24   found on Exhibit 189?

Zain - Direct                                                    1125

1          A          Yes, sir, that's correct.

2          MR. REVERCOMB:  May I have a moment, your Honor?

3          THE COURT:  Yes.

4

5          (Back on the Record)

6

7          MR. REVERCOMB:  I believe that's all I have.

8

9                          CROSS-EXAMINATION

10

11    BY MR. HUFFMAN:

12

13         Q          Mr. Zain, I think you've already

14    testified on direct examination as to why you use the

15    term consistent with; is that correct?

16         A          Yes, sir.  I believe so.

17         Q          That's because, based on this type of

18    testing which was done in 1979, you were unable to

19    specifically say that this specific sample which you

20    reviewed came from a particular person; is that correct?

21         A          Yes, sir, it is.

22         Q          And I think that you've already

23    indicated that these tests were actually tests of

24    exclusion; that's what they are generally referred to.

Zain - Cross                                    1126

1    Is that correct?

2          A          Yes, sir.

3          Q          Now, the statistics that you used here

4    for purposes of your analysis, three in ten thousand, one

5    in one thousand -- where did those come from?

6          A          First of all, they are not statistics.

7    They are gene frequencies.

8          Q          Oh, okay.  Where did they come from?

9          A          Gene  frequencies  are  what  can  be

10   genetically  inherited  in  a  given  population.    The

11   population statistics, that you are calling statistics,

12   are  gene  frequencies that are used here, are what is

13   being  used  in  a  cross-section  of  national  gene

14   frequencies at this time and place.

15         Q          Who compiled those statistics, or the

16   gene frequency numbers, which you used?

17         A          The  primary  information  was  done

18   through the FBI facilities, the major crime laboratory,

19   in the United States.

20         Also,  there  was  work  done  by  Dr.  George

21   Sensabaugh at the University of California in Berkeley.

22   And also there were anthropological studies done on a

23   wide variety of populations, which are available, as well

24   as the major gene frequencies which were used at the time

Zain - Cross                                                    1127

1    of this report, was from the -- is from Scotland Yard.

2         The Metropolitan Police Department of Scotland

3    Yard, which is pretty much a closed pattern of what types

4    of population we have in West Virginia.

5         Q       Are you familiar with the West Virginia

6    Blue Book?

7         A       Yes, sir.

8         Q       In fact, I think your name is in here;

9    isn't it?

10        A       Probably in a couple of them.

11        Q       Let me let you take a look at the Blue

12   Book that I've got and we'll note -- we'll let you tell

13   us for the record what that represents.

14        A       This was issued in 1979, probably for

15   1978.

16        Q       I've got a couple of tabs marked there

17   beside -- the first one, you don't need to worry about,

18   but if you will turn to this tab right there

19   (Indicating).

20        MR. REVERCOMB:  Your Honor, may we see that book

21   before he shows it?

22        THE COURT:  All right.

23

24        WHEREUPON, Mr. Revercomb was shown the reference.

Zain - Cross                                                    1128

1    BY MR. HUFFMAN:

2

3          Q          Let me hand you this Blue Book back,

4    Mr. Zain. Where I've got the tab marked, I believe, has

5    information in there about Kanawha County; is that

6    correct?

7          A          Yes, sir, that's correct.

8          Q          Does it show there on the page, close

9    to where my tab is, what the population was reported to

10   be in Kanawha County at that time?

11         A          Yes, sir, it's got population, 1970,

12   229195.

13         Q          All right. Let me turn to the other

14   tab and you tell me what county this is for? Can you

15   tell where I've got the tab there?

16         A          Let's see. Are you referring to Putnam

17   County?

18         Q          Putnam. What's the population shown in

19   the Blue Book for Putnam County that year?

20         A          Population, time period 1970, twenty-

21   seven thousand six hundred twenty-five.

22         Q          Okay. Now, if you were to take the

23   three in ten thousand figure that is on the report here

24   and were to figure that into utilizing the population in

Zain - Cross                                        1129

1    Kanawha County, according to the Blue Book, do you know

2    what figure that would give us, based on a population in

3    Kanawha County as reported, in terms of the number of

4    people that you expect to see who would fall into this

5    category?

6           A        I think the map would probably call for

7    what -- three hundred thousand. I mean, I want you to

8    use which ever ---

9           Q        Let me tell you what I came up with and

10   you tell me if that sounds right.

11          A        Okay.

12          Q        I think this is right, because I did it

13   on my calculator. Based upon a population in Kanawha

14   County of two hundred twenty-nine five-oh-five, I came

15   up with a figure for the three in ten thousand formula

16   of three six five; is that right?

17          A        Yes.

18          Q        So, if, then, we were to assume that

19   these characteristics would occur in three in ten

20   thousand people, could we then assume that there were

21   approximately sixty-eight point eight-five people in

22   Kanawha County who had these genetic markers for any

23   particular period; would that be right?

24          A        As far as possible, or probable,

Zain - Cross                                                1130

1   individuals that could have the same blood typings, that

2   is correct.

3        Q        And on the one and one thousand

4   figures, if we were to do that same type of calculation,

5   and again my calculator tells me, assuming it's correct,

6   that the number for Kanawha County, again, based on the

7   same population, would be six hundred ninety-four point

8   two-four.  Does that sound about right?

9        A        That sounds correct.

10       Q        So, we're talking about six hundred and

11  ninety-four point two-four people that would apply to?

12       A        Correct; who could possibly have the

13  combination of blood types.

14       Q        Would you come down for a minute.  I

15  want to ask you some questions about the crime scene

16  here.

17       Item 1, which Mr. Revercomb asked you about, is

18  the change purse.  Where on there, on the change purse,

19  does it appear?

20       A        Which item?

21       Q        Item No. 1, the change purse.

22       A        That's the piece of a knife, right

23  here.

24       Q        No, I'm sorry.  I'm going through the

Zain – Cross                                                    1131

1  last list of things that Mr. Revercomb gave you, not

2  specifically the item.

3          Let me ask about the specific item, or this

4  change purse.

5          A       The change purse was my numbered item

6  15.  It was found on the dresser.

7          Q       And that's the one in one thousand.

8  Let's point out a mistake my calculator made.  Let's

9  start again.

10          One in one thousand would not be six hundred

11  ninety-four people, but would be two hundred twenty-nine

12  people; is that correct?

13          A       It's your calculator.  You've got to

14  remember, I was agreeing with your calculator.

15          Q       I'm going to agree with her

16  calculations; two-twenty-nine.

17          The change purse has characteristics which would

18  put it in the one in one thousand category; is that

19  correct?

20          A       Yes, sir, that's the item on the

21  dresser.

22          Q       So, we're talking about two hundred and

23  twenty-nine people; is that correct?

24          A       Yes, sir.

Zain - Cross                                                    1132

1        Q        Would you stick that on there where the

2   change purse was?

3        A        All right.

4        Q        The next item was the utensil drawer.

5   Would you show us where that is?

6        A        That's the drawer in the kitchen, which

7   would be right here (Indicating).

8        Q        That's also in the one in one thousand

9   category; is that correct?

10       A        Yes.

11       Q        So, I'll give you a two-twenty-nine to

12  put on there.

13       The next item is the door between the master

14  bedroom and the living room.   Would you show the jury

15  where that is?

16       A        This is Item No. 14.

17       Q        I've got it marked also as the one in

18  one thousand category; is that correct?

19       A        Yes, sir.

20       Q        Let me give you a sticker for that.

21       Okay.   The next item I have is a pillowcase from

22  the front bedroom -- I'm sorry, it would have been the

23  other pillow case.

24       And that item also was in the one in one thousand

Zain - Cross                                                                1133

1    category; is that correct?

2        A        I believe so.

3        Q        Let me give you a sticker for that one.

4    Now, the next item I have is the flashlight which

5    was in the chair, I believe, in the TV room; is that

6    correct?

7        A        Yes, sir.

8        Q        That was also in the one in one

9    thousand category, which was two hundred twenty-nine

10   people; is that correct?

11       A        Right.

12       Q        And now the next item which was removed

13   from the back door -- since my figure was sixty-eight

14   point eight-five, I could round off to sixty-nine, but

15   I'll say sixty-eight.  That item was in the three in ten

16   thousand category; right?

17       A        Yes.

18       Q        Now, the Christmas package and wrapping

19   paper was put in the same area; is that correct?

20       A        Yes.

21       Q        And the paper appears to be paper that

22   came from that same package, which was also tested; is

23   that correct?

24       A        That's correct.

Zain - Cross                                                    1134

1     Q        And that's also in the three in ten

2     thousand category, which would give us sixty-eight

3     people; is that correct?

4     A        That's correct.

5     Q        And the final item that was tested was

6     clothing of Bernadette, and it's also in the three in ten

7     thousand category.  Where was it located?

8     A        The bedroom of the daughter.

9     Q        And that would be sixty-eight; is that

10    correct?

11    A        Correct.

12    Q        Where -- let me ask you this.  There is

13    a pool of blood located in the front bedroom by the bed;

14    is that correct?

15    A        It's number 3 on my crime report.

16    Q        That blood was consistent with the

17    blood of Vanessa Reggettz?

18    A        That's right.

19    Q        As was the blood that was found on the

20    bedspread there in that bedroom; is that correct?

21    A        Yes.

22    Q        Right on the corner, there; wasn't it?

23    A        Yes, it's designated as number 4 on the

24    report.

Zain - Cross                                                    1135

1          Q          And the blood -- was it consistent with

2     Vanessa's blood which was also found on the pillow case;

3     is that correct?

4          A          Yes, sir, that's correct.  The blood

5     stain was found on the pillow, to the right of the child.

6          Q          You may take your seat again.

7          MR. HUFFMAN:  I don't have any further questions.

8

9                         REDIRECT EXAMINATION

10

11    BY MR. REVERCOMB:

12

13         Q          Mr. Zain, Mr. Huffman asked you about

14    a number of items that were removed from the scene there

15    and were submitted to you later as being -- they fell in

16    the one in ten thousand or the three in ten thousand

17    group.  Are all of those blood samples taken from those

18    various items, are they all consistent with each other?

19         A          Yes, sir.

20         Q          They could all have originated from the

21    same person?

22         A          It's very likely that they did; yes

23    sir.

24         Q          What  percentage  --  three  in  ten

Zain - Redirect                                            1136

1   thousand people have the blood characteristics of the

2   defendant, John Moss -- what percentage of that would be

3   ---

4        A        The normal populations which are taken

5   into consideration -- gene pools are usually fifty-two

6   to fifty-four percent of the population in female, and

7   forty-eight -- forty-six to forty-eight in males,

8   normally.

9        Q        So, assuming a man committed this

10  crime, it would cut these numbers in half?

11       A        It could.  But, depending on a given

12  population, in a general sense, yes.

13       Q        And once again, the blood

14  characteristics of John Moss and the blood

15  characteristics found on several of these items, the

16  little girl's pajama top, the curtain on the back door,

17  and the Christmas wrapping paper would exclude ninety-

18  nine point nine percent of the population?

19       A        So far as being the possible

20  contributors that would have that combination of blood

21  types, yes.

22       Q        They don't exclude the defendant; do

23  they?

24       A        That's correct.

Zain - Redirect                                                    1137

1      MR. REVERCOMB:  That's all I have.

2

3                    RECROSS-EXAMINATION

4

5  BY MR. HUFFMAN:

6

7      Q       I've got one question, Mr. Zain.  The

8  blood you tested from the scene, you can't determine from

9  those tests whether it came from a man or a woman; can

10  you?  Based on the sample that you used, you can't tell

11  -- based on what you saw?

12      A       At the time and place at that analysis

13  time, it was unavailable to me.  It can be done, is why

14  I'm hesitating.  But it was not available to be done at

15  the time.

16      Q       And DNA testing is what you do now; is

17  that correct?

18      A       Yes, sir.

19      Q       And in this particular case, the DNA

20  testing that was done most recently by you was

21  inconclusive; is that correct?

22      A       Yes, sir.

23      MR. HUFFMAN:  No further questions.

24

Zain - Re-redirect                                              1138

1                      RE-REDIRECT EXAMINATION

2

3    BY MR. REVERCOMB:

4

5              Q           DNA testing wasn't available in 1979;

6    was it?

7              A           That's correct.

8              MR. REVERCOMB:   No further questions.

9

10             THE COURT:   Folks, we're going to recess until

11   1:30.

12

13             WHEREUPON, the jury was excused for the noon

14   recess.

15

16             THE COURT:   Steve, do you have anything else?

17             MR. REVERCOMB:   We need to move these into

18   evidence.  We need to talk about the possibility of maybe

19   calling another witness, probably an hour.

20             THE COURT:   Okay.

21             Do you all have some witnesses?

22             MR. BICKLEY:   We have two, that I've seen, your

23   Honor.  We have two others that I've not seen, but they

24   were to be here at 1:00 o'clock, anyway.

1139

1   THE COURT:  Okay.

2   Mr. Zain, thank you.  You may step down.

3

4   WHEREUPON, the Court stood in a recess in the

5   hearing of this case.

6

7   (Back on the Record after Noon Recess)

8

9   THE COURT:  Sally, tell the jury that we're going

10  to deal with exhibits, and it will be about ten more

11  minutes.

12  Okay.  You want to do some house cleaning now, I

13  take it?

14  MS. LUSK:  Yes.  The first matter is -- we would

15  simply ask the Court to poll the jury this morning and

16  ask if they have seen that crazy question that Channel

17  13 reporter had asked him out at the scene, when she put

18  a microphone up to his face.  We had forgotten to do

19  that.  If it's not too late, I would still like to know

20  if any of the jury members saw that.

21  THE COURT:  Why don't we bring them in and just

22  ask it?

23  MS. LUSK:  I would like to ask them one-by-one,

24  if that would be okay with the Court.

1140

1    MR. BICKLEY:  Would that be reversible error if
2    they saw that?

3    If he said he is innocent, would the be
4    reversible error?  Why do that?

5    MS. LUSK:  Because we didn't have the opportunity
6    to cross-examine him on those statements, and there is
7    a possibility someone could have heard that.

8    MR. REVERCOMB:  Or heard about it; that's my
9    concern.

10   I'm worried about one of their friends saying,
11   "Hey, I saw you on TV at the scene."

12   MS. LUSK:  Judge, there's another matter that Mr.
13   Bickley had raised in the pre-trial conference -- or Mr.
14   Moss had raised the speedy trial issue.  And we had
15   indicated to the Court that the first two continuances
16   were made on motion of the defense, and the third
17   continuance was made on motion of the State.

18   I didn't go through the file itself, but I looked
19   at the Clerk's fee sheet on the computer and was unable
20   to ascertain when Orders had been entered reflecting the
21   two earlier motions, when they were made by the defense.

22   The third motion, made by the State -- there is
23   a motion Order entered -- or the fee sheet reflects that
24   there is one.

1       I took the liberty of asking Judge Canady's Court

2  Reporter to transcribe those two previous hearings.

3  Judge Canady heard both motions.  The first one was on

4  March 3rd of 1989, and was very shortly after Mr. Bickley

5  was appointed in the case.  At that time, he had

6  different co-counsel, who had moved to withdraw from the

7  case.  Mr. Bickley asked the Court to continue the case

8  to the May 1989 Term of Court.  So, the defendant

9  specifically agreed to that, as the case reflects.

10       The case was scheduled for trial on September 5,

11  1989.  I've prepared an Order reflecting what the

12  transcript shows from that hearing.  On September the

13  5th, 1989, Mr. Bickley again appeared and indicated to

14  the Court that at that time he was not prepared to go

15  forward with the case, and he moved the Court to withdraw

16  as counsel.  Judge Canady listened to his dissertations

17  and denied the motion to withdraw.

18       At the request of counsel for the defense, the

19  case was scheduled for trial December 11, 1989, and I've

20  prepared an Order reflecting that action as well.

21       I am wondering if the Court -- do you want me to

22  present these to Judge Canady or do you want to enter

23  them both?

24       THE COURT:  I think you're probably going to have

1  to present them to him, only because those are probably

2  effectively nunc pro tunc Orders that he's going to have

3  some documenting memoranda that is going to permit him

4  to recall those.

5       MS. LUSK:  It's in the transcripts as well.

6       THE COURT:  Okay.  How about the exhibits?  You

7  want to make a motion to put those in; right?

8       MR. REVERCOMB:  Yes.

9       THE COURT:  You've got a series of numbers.

10      MR. REVERCOMB:  Your Honor, I could probably go

11  through them -- the photographs, I have them grouped

12  individually.  It shouldn't take too long.

13      Do you want to do that outside the presence of

14  the jury?

15      THE COURT:  Yes.

16      MR. REVERCOMB:  Your Honor, at this time, the

17  State would move into evidence the following photographs:

18    1, 3, 4, 5, 12, 85, 86, 87, 88, 89, 50, 47, 57, 63, 46,

19    51, 48, 65, 21, 49, 58, 84, 81, 38, 32, 29, 41, 27, 35,

20    40, 56, 34, 17, 16, 6, 20, 45, 52, 59, 82, 22, 8, 9, 64,

21    15, 24, 54, 55, 66, 67, 69, 10, 79, 73, 74, 71, 130,

22  which is the autopsy of Vanessa Reggettz, showing the

23  gashes in her head, consistent with the gun butt; State's

24  Exhibit 126, which is a photograph showing a close-up of

1143

1    her face, showing the petechiae that Dr. Sopher

2    described. State's Exhibit 159, that's Vanessa Reggettz

3    in life, taken on November 5, 1979. State's Exhibits 121

4    through 126, which are the lifts, or photographs of

5    lifts, that Lieutenant Shumate testified to.

6          THE COURT:  Lifts, l-i-f-t-s?

7          MR. REVERCOMB: Yes, lifts. The rest of them are

8    photographs. State's Exhibit 162, 163, 164, 165 and 166.

9    The last four named are battle ground scenes which are

10   photographs taken by Mr. Paul Reggettz. 162 is a picture

11   of Paul Reggettz taken on November 5, 1979.

12         Those, your Honor, I believe, are the

13   photographs.

14         As to the other exhibits, the State would move

15   into evidence Exhibit No. 91, the I.D. card which Trooper

16   Smith testified to. Both 92 and 93, those are the Waiver

17   of Rights forms, taken on October 28, 1980, dealing with

18   the defendant, John Moss. 92 and 93, and State's Exhibit

19   98, the time card of UPS, that's Paul Reggettz's time

20   card. State's Exhibit 99, which is a child's dish set.

21   State's Exhibit 100 is silverware or flatware which Mrs.

22   Arbutus Johnson testified to.  101 is the type handle

23   camera, and number 102 is the camera taken -- which the

24   Troopers received from John Moss's father on October 29,

1144

1    1980.   That's also the camera that Paul Reggettz

2    identified as his.

3            103 is pistol grips.   104 is powder residue.   105

4    is the vacuum cleaner cord, 106 is the lantern or

5    flashlight, 107 is a Christmas bowl box, 108 is pieces

6    of a knife blade, 109 is the curtain from the back door.

7    110-A and B is a cord, a white cord, one that is cut in

8    pieces, it's cut in two.   110-A is the long piece and

9    110-B is the short piece which Trooper Zain testified to.

10   110-B is the piece that was stuck to the door, and 111

11   is also a cord.   112 is an electrical cord, 113 is an

12   electrical cord from the clock radio.

13           114 is Christmas wrapping that consists of a

14   couple of pieces in that envelope.   115 is the change

15   purse.   116-A is Bernadette Reggettz's little pajama top,

16   117, 118, and 119 are three more cameras taken from the

17   Moss home in Cleveland on October 29, 1980.

18           120-A should be sealed probably and not put into

19   evidence but put into the Court file, 120-B is a

20   duplicate tape of the confession.   I've already listed

21   the photographs 121 through 126.   127 is the clock radio.

22   I've already listed 130, the autopsy photo of Vanessa,

23   showing the head gash.

24           State's Exhibits 134 through 137, that consists

1145

1  of charts that Trooper Zain testified to today, as well

2  as the crime scene chart.

3      THE COURT:  This (Indicating)?

4      MR. REVERCOMB:  Yes, sir.

5      155 is Vanessa's nightgown, 156 is Paul Eric's

6  pajamas, two pieces.  157 is a handkerchief box, 158 is

7  the scissors.  I've already listed 159.

8      Your Honor, I believe that's it.  Let me check

9  just to make sure.

10     Your Honor, other than that, some of these

11 exhibits -- the photographs have been renumbered as

12 exhibits, but that corresponds with the numbers used the

13 last time, the same photographs.  However, these other

14 exhibits may have stickers with Ernestine Whitlock's

15 initials, dated from '84.

16     THE COURT:  We'll switch them all before anything

17 goes to the jury.  We'll sanitize the whole treatment.

18     MR. REVERCOMB:  At this time, I would move those

19 into evidence, your Honor.

20     THE COURT:  Now, that series of numbers which you

21 gave on the photographs, now I take it those are the

22 photographs that we've reviewed at some length during

23 pre-trial conference?

24     MR. REVERCOMB:  That's true, your Honor.  They

1146

1  were grouped by room, as to inside and outside of the

2  house.  That's how we reviewed them, I believe.

3      MR. BICKLEY:  I'm assuming, like yourself, your

4  Honor, that those photographs -- there's no addition to

5  what we've reviewed in the back?

6      MR. REVERCOMB:  Your Honor, there are a couple of

7  additions.  126 -- or I mean 26, is a close-up of

8  Vanessa's face.

9      MR. BICKLEY:  I recognize that.

10      MR. REVERCOMB:  Of course, we reviewed 159 back

11  there at the time and laid a foundation with Dr. Sopher.

12      THE COURT:  Here's what I'm going to suggest.

13  I'm going to admit all of these photographs and

14  documents, saving the objections you've previously made.

15      Also, before anything goes to the jury, we'll go

16  one-by-one through them, to make sure there are no

17  markings on them that we need to change labels.  We'll

18  do all of that stuff before we send anything back there.

19      MR. BICKLEY:  That's fine.

20      THE COURT:  They'll be received.

21      Do you have any further evidence to put on?

22      MS. LUSK:  No.

23      THE COURT:  The State rests?

24      MS. LUSK:  Yes.

1147

1   THE COURT:  Do you want to announce that before

2   the jury?

3   MS. LUSK:  Yes.

4   THE COURT:  You want to argue motions; don't you?

5   MR. BICKLEY:  Yes, your Honor.

6   THE COURT:  Let's go ahead and do it.

7   MR. BICKLEY:  We would move for a directed

8   verdict.  We feel that the State has not proven its case

9   beyond a reasonable doubt and have not put on a prima

10  facie case.  And I think the Court should move for a

11  directed verdict.

12  THE COURT:  The motion will be overruled.

13  MS. LUSK:  Should we move the admission of the

14  exhibits before the jury, too?

15  THE COURT:  I don't think so.  That's all right.

16

17  (Back on the Record with the jury present)

18

19  MS. LUSK:  Judge, are you going to poll the jury?

20  THE COURT:  Do you mean individually?  Let's see

21  what reaction we get generally, and then we'll see if we

22  need to poll them individually.

23  Just before we get started, let me ask, folks,

24  although it is readily apparent that there was a bunch

1148

1  of news people at the former residence of the Reggettz's,

2  and I know that all of you have been careful not to watch

3  any news reports, but accidentally, did any one of you

4  see that news coverage?

5      (No response from the Jurors)

6      THE COURT:  It's something that is totally out of

7  your control.   You can be the most circumspect and

8  cautious jurors in the world, and somebody can talk to

9  you about that coverage.

10     Have any of you had friends come up and say

11  anything to you, that they had seen your face in the

12  newspaper or on television or anything?

13     JUROR:  (Raising hand)

14     THE COURT:  Yes?

15     I think what I'm going to do -- and there is not

16  a thing you can do about that one way or another.   I am

17  going to take just a couple of minutes and ask that each

18  of you individually come back to the Jury Room and I'll

19  talk with each of you briefly about it.   It shouldn't

20  take more than about five minutes.

21

22     WHEREUPON, the Court stood in a recess in the

23  hearing of this case.

24

1149

1    (Back on the Record in the Jury Room)

2

3    THE COURT:  Sally, would you bring in Mr. Gancs,

4    please?

5

6    WHEREUPON, Juror Steve Gancs was brought to the

7    Jury Room for individual voir dire.

8

9    THE COURT:  Mr. Gancs, come on in.  After having

10   seen you, did any of your friends talk to you?

11   JUROR GANCS:  They just -- I think it was

12   Saturday, I had some friends say they had seen me on the

13   news, and I said, "Well, that's nice, but I'd rather you

14   not tell me anything about it.  Don't go into anything."

15   THE COURT:  Did they say anything else?

16   JUROR GANCS:  No, they just said, "Okay, why

17   can't you?"  And I said, "Because I'm not allowed to talk

18   about it.  The Judge said no, and I don't want to discuss

19   it."

20   THE COURT:  Did they tell you any specifics or

21   anything they saw?

22   JUROR GANCS:  I didn't give them a chance to.

23   THE COURT:  Terrific.

24

1150

1    WHEREUPON, Steve Gancs was released, and William

2    Boyd was brought to the Jury Room for individual voir

3    dire.

4

5    THE COURT:  Hi, Mr. Boyd.  How are you?  Did you

6    have some friends who said something to you about

7    something on TV?

8    JUROR BOYD:  Just that they asked me if I had

9    seen myself on TV, and I said, "No, not since Christmas."

10   And somebody asked me if I had seen my picture in the

11   paper, and I said, "Not since Christmas," and left there.

12   THE COURT:  That's it?

13   JUROR BOYD:  And one attorney who is a friend of

14   mine said, "Was your picture in the paper?" and I said

15   that I didn't see it.

16   THE COURT:  Who was that?

17   JUROR BOYD:  Bob Louderback.  He goes to our

18   church.  We were cooking pancakes, a couple of guys in

19   the kitchen.

20   THE COURT:  So, nobody has told you anything

21   other than that they had seen your picture in the paper?

22   JUROR BOYD:  That's all they've said.

23   THE COURT:  Thanks.

24

1151

1    WHEREUPON, William Boyd was released, and Frances

2    Batman was brought to the Jury Room for individual voir

3    dire.

4

5    THE COURT:  Hi, how are you?

6    JUROR BATMAN:  I'm fine.

7    THE COURT:  Did any of your friends see you on TV

8    or in the newspaper?

9    JUROR BATMAN:  No.  A lady at church yesterday

10   said, "I seen your picture on the TV.  You had your back

11   to me."  I said, "Well, don't talk to me about it."

12   THE COURT:  Did she say anything to you at all

13   about what she had seen on there?

14   JUROR BATMAN:  No.  That was all that was said.

15   THE COURT:  Good.

16

17   WHEREUPON, Frances Batman was released.

18

19   THE COURT:  I think it's more important to the

20   defendant than to you guys because they saw the defendant

21   say he didn't do it, and then he doesn't take the stand.

22   I think that's much more -- creates much more of a

23   problem for him than it does for you.

24   MR. REVERCOMB:  I agree.

1152

1    MS. LUSK:  The whole question was so inane

2    anyway.  What would you expect him to say -- yes?  For

3    heaven's sakes.

4

5    WHEREUPON, Elizabeth Stern was brought to the

6    Jury Room for individual voir dire.

7

8    THE COURT:  Did somebody say something about

9    seeing you?

10    JUROR STERN:  Yeah, I've had a couple of people

11    say they've seen me.

12    THE COURT:  What did they say?

13    JUROR STERN:  Well, my boss mentioned that he saw

14    me, and he's got jury duty next time.  He called me at

15    home Saturday morning to tell me that he had got this

16    letter saying that he'd been accepted.  I said, "Well,

17    as much as you travel, you could probably get off."  He

18    said, "No, I want a case like yours so my picture is in

19    the paper."  That's the first thing I knew about it.

20    Other than that, my mother did see me on TV, but

21    she didn't mention the picture on Saturday.  She showed

22    me the picture, but I didn't read the article.

23    THE COURT:  It was a great picture of me, wasn't

24    it?

1153

1    JUROR STERN:  It was good.

2    THE COURT:  My wife said, "Were you mad at all of
3    those poor people?"  She said I looked like I was
4    shouting at everyone.  I told her I was trying to hide
5    from the camera.

6    Has anybody talked to you about anything of
7    substance in this matter?

8    JUROR STERN:  No.  The only remark that was made
9    was made by my mother.

10   THE COURT:  What did she say?

11   JUROR STERN:  I can't tell you right now.

12   THE COURT:  Even if I insist?

13   JUROR STERN:  I'd prefer not to, but I will if
14   you insist.  She is slightly prejudiced.  So I take it
15   with a grain of salt.

16   THE COURT:  What did she say?

17   JUROR STERN:  She made some remark, and I said,
18   "Well, hey," ---

19   THE COURT:  Let me ask you an important question.
20   Did what she said have any influence on you?

21   JUROR STERN:  My mother hasn't had any influence
22   on me for years.  I'm sorry.  We don't get along too well
23   sometimes, so I just kind of say yeah, okay, and go on.

24

1154

1    WHEREUPON, Elizabeth Stern was released, and

2    Linda Haynes was brought to the Jury Room for individual

3    voir dire.

4

5        THE COURT:  Hi.  Did anybody happen to say that

6    they saw you?

7        JUROR HAYNES:  No.  My husband mentioned that he

8    saw some jurors go through.  He didn´t even recognize me.

9        THE COURT:  He´s not very observant?

10       JUROR HAYNES:  No.

11       THE COURT:  Did anybody tell you what they heard?

12       JUROR HAYNES:  No.

13       THE COURT:  Thanks.

14

15       WHEREUPON, Linda Haynes was released, and Sherry

16   Grubb was brought to the Jury Room for individual voir

17   dire.

18

19       THE COURT:  Did somebody call you and tell you

20   that they saw you on TV?

21       JUROR GRUBB:  Yes, my mother called.  She didn´t

22   tell me; she told my husband that she saw me in the

23   paper.  When I called her this morning from work, the

24   receptionist inquired as to what case I was on, and I

1155

1    told her that I couldn't tell.

2         THE COURT:  So, nobody has talked to you about

3    anything?

4         JUROR GRUBB:  No.

5         THE COURT:  Good.

6

7         WHEREUPON, Sherry Grubb was released, and

8    Jacqueline Hill was brought to the Jury Room for

9    individual voir dire.

10

11        THE COURT:  Ms. Hill, did anybody say that they

12   saw you on TV?

13        JUROR HILL:  On TV and in the paper, too.

14        THE COURT:  What did they say?

15        JUROR HILL:  They called me, Mrs. Jordan and Mrs.

16   Lafferty, and I said, "No comment," and went on.

17        THE COURT:  Nobody has told you what they saw

18   other than just to see your picture?

19        JUROR HILL:  No, sir.

20        THE COURT:  That's all.  Thanks.

21

22        WHEREUPON, Jacqueline Hill was released, and

23   Martha Brady was brought to the Jury Room for individual

24   voir dire.

1156

1       THE COURT:  Hi.  Did people say they saw you on

2   TV?

3       JUROR BRADY:  I saw me on TV, but I had the mute

4   off.

5       THE COURT:  Tell me what you saw.

6       JUROR BRADY:  I just saw us in a group, that's

7   all I saw, and then I turned it over.

8       THE COURT:  Has anybody talked to you?

9       JUROR BRADY:  The only thing they said is they

10  saw me on television -- family and neighbors.

11      THE COURT:  They didn't tell you anything about

12  it?

13      JUROR BRADY:  I just told them that I couldn't

14  talk about, and that's all.

15      MS. LUSK:  What channel do you watch?

16      JUROR BRADY:  I have a remote, so I switch.

17      THE COURT:  They have a pool camera.  It was 13

18  that was out there.

19      MR. BICKLEY:  13 had their own camera.

20      MS. LUSK:  They all had their own.

21      THE COURT:  You don't recall -- it wouldn't have

22  any effect on you as a juror?

23      JUROR BRADY:  No.

24      THE COURT:  Thank you.

1    WHEREUPON, Martha Brady was released, and Michele

2    Williamson was brought to the Jury Room for individual

3    voir dire.

4

5    THE COURT:  Hi, how are you?  Did somebody say

6    they saw you?

7    JUROR WILLIAMSON:  Just to save you time, I'm as

8    pure as the driven snow, as far as this goes.

9    THE COURT:  You don't know nothing at all?

10   JUROR WILLIAMSON:  One person this morning kind

11   of said that his first case lasted nine weeks, so we

12   asked him to change the subject and he did.

13   THE COURT:  Who was he?

14   JUROR WILLIAMSON:  I have no idea who he was.

15   THE COURT:  But he was not in your group?

16   JUROR WILLIAMSON:  No, no.  It was the other

17   guys.

18   THE COURT:  Will that have any effect on your

19   considerations here?

20   JUROR WILLIAMSON:  I don't know why it would.

21   THE COURT:  Well, you know better than anybody

22   else.

23   JUROR WILLIAMSON:  I didn't put much stock in it.

24   I figured well, as long as he doesn't say anything else,

1158

1    it's okay.

2              THE COURT:   Thank you.

3

4              WHEREUPON, Michele Williamson was released, and

5    Nolan  Holstein  was  brought  into  the  Jury  Room  for

6    individual voir dire.

7

8              THE COURT:   Hi, Mr. Holstein.

9              JUROR HOLSTEIN:   How do you do, sir.

10             THE  COURT:    Has  anybody  talked  to  you  about

11   seeing you on television?

12             JUROR HOLSTEIN:   No, sir.

13             THE COURT:   Has anybody talked to you about any

14   of the news coverage or what you are doing?

15             JUROR HOLSTEIN:   My boy came in and said I was on

16   TV.  We didn't even discuss it.

17             THE  COURT:    You  wouldn't  let  him  talk  to  you

18   about it?

19             JUROR HOLSTEIN:   No.

20             THE COURT:   Have any jurors in this case or any

21   other case talked to you about this case or mentioned it

22   to you?

23             JUROR HOLSTEIN:   No, sir.

24             THE COURT:   Not at all?

1159

1        JUROR HOLSTEIN:  No.

2        THE COURT:  Thank you.

3

4        WHEREUPON, Nolan Holstein was released, and Wanda

5   Young was brought to the Jury Room for individual voir

6   dire.

7

8        THE COURT:  How do you do, Mrs. Young.  How are

9   you?

10       JUROR YOUNG:  Fine.

11       THE COURT:  Has anybody seen you on TV or said

12  anything to you about it?

13       JUROR YOUNG:  No.

14       THE COURT:  Or in the newspaper?

15       JUROR YOUNG:  No.  I saw a picture Saturday, but

16  I did not read the article.

17       THE COURT:  I didn't either, as I usually don't.

18  Has any other juror, either on this case, or in any other

19  case, said anything to you about the case?

20       JUROR YOUNG:  I heard someone mention it in the

21  Jury Lounge this morning.  Someone else told him to shut

22  up.

23       THE COURT:  Do you remember what anybody said

24  about it?

1160

1       JUROR YOUNG:  No, I don't.

2

3       WHEREUPON, Wanda Young was released.

4

5       THE COURT:  Sally, before you go after the next

6   one -- were you in with them this morning?

7       THE CLERK:  No.  I just went in to get them and

8   that's all.

9       THE COURT:  Have you heard anybody say that the

10  first trial was nine weeks?

11      THE CLERK:  No.

12      THE COURT:  Do you know if there has been any

13  other Clerks back there?

14      THE CLERK:  When I went in this morning, she had

15  already made the roll call.

16      THE COURT:  Who would have done that?

17      THE CLERK:  Darlene Smith.

18      THE COURT:  Would you do me a favor?  Once we get

19  the next witness on the stand, would you break away from

20  us and ask her if she would come up, please?

21      THE CLERK:  Okay.

22

23      WHEREUPON, Alice Fawcett was brought to the Jury

24  Room for individual voir dire.

1161

1    THE COURT:  Hi, how are you?

2    JUROR FAWCETT:  Fine.

3    THE COURT:  Let me ask you something.  Has

4    anybody mentioned seeing you on TV or in the newspapers?

5    JUROR FAWCETT:  No one even knows that I'm on

6    this case but my husband.

7    THE COURT:  Okay.  Have you heard any of the

8    jurors, either from this case or from some other case,

9    say anything about it?

10    JUROR FAWCETT:  No.

11    THE COURT:  Nothing at all?

12    JUROR FAWCETT:  No.  From all I've heard, the

13    case isn't even going on.

14    THE COURT:  That's great news.  Thanks.

15

16    WHEREUPON, Alice Fawcett was released, and

17    Beverly Samples was brought to the Jury Room for

18    individual voir dire.

19

20    THE COURT:  Hi.

21    JUROR SAMPLES:  Hello.

22    THE COURT:  I just wanted to know if anybody has

23    seen you on TV or said something to you about it?

24    JUROR SAMPLES:  They did say, "I saw you on TV,"

1162

1   and I would say, "You did?"  And that's it.

2          THE COURT:  Nobody has told you anything about

3   what they've seen or heard?

4          JUROR SAMPLES:  Just that they saw somebody they

5   knew.

6          THE COURT:  I didn't even see myself and I've had

7   everybody say that they've seen me.

8          Have you heard any of the jurors, either the

9   jurors who are a part of this panel or other jurors, say

10  anything about the case?

11         JUROR SAMPLES:  No, not in my hearing.

12         THE COURT:  Thank you.

13

14         WHEREUPON, Beverly Samples was released.

15

16         THE COURT:  Okay, Sally?

17         THE CLERK:  Judge, your answer to that was no,

18  she did not hear anybody say anything in the Jury Lounge.

19         THE COURT:  I'll tell you what I'm going to do,

20  I'm going to have them come in in the morning and have

21  them come back here.

22         MR. BICKLEY:  The jury panel?

23         THE COURT:  Yes.  Instead of going back there.

24

1163

1    WHEREUPON, George Ball was brought to the Jury

2    Room for individual voir dire.

3

4        THE COURT:  Hi.

5        JUROR BALL:  Howdy.

6        THE COURT:  Have a seat.  Has anybody seen you on

7    TV and said something to you about it?

8        JUROR BALL:  Yes, sir.

9        THE COURT:  Have they?  Did anybody say anything

10   about the case, other than seeing you on television?

11       JUROR BALL:  No.

12       THE COURT:  Nobody has told you anything about

13   what they saw or anything?

14       JUROR BALL:  My wife criticized me for my

15   appearance.

16       THE COURT:  She did?

17       JUROR BALL:  She told me I need a haircut.

18       THE COURT:  You should have told her that you

19   weren't expecting an audition.

20   Have you heard any of the other jurors talk about

21   the case, or any other jurors that are not a part of this

22   case?

23       JUROR BALL:  No.

24       THE COURT:  Fine.  Thank you.

1164

1        WHEREUPON, George Ball was released.

2

3        (Back on the Record in the Courtroom, with the

4    Jurors present)

5

6        THE COURT:  Does the State rest?

7        MS. LUSK:  Yes, the State rests.

8

9        WHEREUPON, Alexander Fortson, was duly sworn,

10    upon his oath, and testified as follows:

11

12        THE COURT:  The Defense has already called their

13    first witness, who has already been sworn.

14

15                    DIRECT EXAMINATION

16

17    BY MR. HUFFMAN:

18

19        Q        Would you state your name, please, for

20    the record?

21        A        Alexander Fortson.

22        Q        Make sure that you scoot near the

23    microphone so that everyone can hear you.

24        Where do you live?

Fortson - Direct                                                    1165

1          A          7025 Chesapeake Avenue, St. Albans.

2          Q          And that house is next door to the

3   house that the Reggettz's were living in; is that right?

4          A          That's right.

5          Q          And for the jury's benefit, you were

6   the landlord who owned that house, from whom they rented;

7   is that correct?

8          A          Yes.

9          Q          When did the Reggettz's first move into

10  that house?

11         A          It was in the spring. I don't know the

12  exact date, but it was in the spring.

13         Q          Was it in the spring of 1979?

14         A          Right.

15         Q          Do you know where they were living

16  before they moved into your house?

17         A          They lived in Gene's Motel in -- on

18  MacCorkle Avenue, about a quarter of a mile up the

19  highway.

20         Q          Whenever they moved into your house,

21  the house next door to you that they rented from you, do

22  you recall if they had any possessions?

23         A          Furniture-wise, no, they didn't have

24  any.  They had a few personal things, but no furniture.

Fortson - Direct                                    1166

1          Q          As far as appliances in the house, was

2     there a refrigerator there when they went and moved in?

3          A          No.

4          Q          At the time they moved in, what were

5     they using, if you know, for a refrigerator?

6          A          One of those coolers, like a Coleman.

7     I don't know the exact name of it, but it was that type

8     of a cooler.

9          Q          Was a refrigerator later put in the

10    house?

11         A          Yes.

12         Q          Describe for the jury how that

13    happened, how that all came about?

14         A          Well, we had bought a refrigerator --

15    a new refrigerator-freezer, and we had this one in a

16    utility room, and we knew that they didn't have one, so

17    my wife said we ought to give it to Vanessa.  If she

18    wanted to use that refrigerator, we could send it over

19    there and let her use it.

20         Q          How did that refrigerator come to end

21    up in the house?

22         A          I think Paul -- Mr. Reggettz's

23    grandmother paid some boys to move it over.

24         Q          Did you discuss at all with Mr.

Fortson - Direct                                           1167

1    Reggettz about him moving the refrigerator?

2         A         No, I just told my wife that I wasn't

3    going to move it, because at the time I was under a

4    doctor's care, anyway.

5         Q         Did Mr. Reggettz come to you personally

6    and make any arrangements for the new refrigerator to be

7    moved, himself?

8         A         No.

9         Q         Did you ever observe Mr. Reggettz do

10   any work around the house while he lived there?

11        A         No.

12        Q         Did he ever mow the grass?

13        A         No.

14        Q         Did Mrs. Reggettz ever mow the grass?

15        A         Yes, I know that because she used my

16   lawn mower.

17        Q         Now, again, let me direct your

18   attention to December, 1979 -- they were still renting

19   from you at that time; is that correct?

20        A         Right.

21        Q         Now, I believe in December of 1979 you

22   were employed at Union Carbide; is that correct?

23        A         Yes.

24        Q         On a normal day, what kind of -- what

Fortson – Direct                                           1168

1   time of day did you normally get up?

2       A       5:00 o´clock.

3       Q       That´s a.m., correct?

4       A       In the morning, yes.

5       Q       Did you drive yourself to work?

6       A       No.

7       Q       How did you get to work?

8       A       I rode with a fellow who picked me up

9   out there at what is called the A&W, out on MacCorkle.

10      Q       What time did you normally leave your

11  house to catch the ride to go to work?

12      A       I would normally come out about five

13  after six.

14      Q       6:00 a.m., is that correct?

15      A       Yes.

16      Q       Do    you    recall,    in    December

17  specifically, going to work on December 13, 1979?

18      A       Yes.

19      Q       What time did you get up that day?

20      A       The same time, 5:00 o´clock.

21      Q       Did you leave the house at the same

22  time that day as you usually did?

23      A       Yes.

24      Q       Is that correct?

Fortson - Direct                                                1169

1          A          Yes.

2          Q          On that particular morning, whenever

3    you got up at 5:00 o´clock in the morning, did you hear

4    any noise coming from the house next door?

5          A          No.

6          Q          First, let me ask you, I know that the

7    jury has been there -- about how far -- what´s the

8    distance between your house next door and the house that

9    the Reggettz´s were living in?

10         A          It´s a little less than twenty-five

11   feet.

12         Q          Between 5:00 and 6:00 o´clock in the

13   morning, did you see anyone going in or out of that house

14   next door?

15         A          No.

16         Q          Did you hear any sounds, such as a gun

17   shot, in that house?

18         A          No.

19         Q          Did you notice anything unusual about

20   the house when you left to go to work that morning?

21         A          The only thing I can remember was the

22   lights were on, on this side of the house. As I come out

23   my back, the lights were on in the kitchen and that next

24   room, right there. They are normally not on at that time

Fortson - Direct                                    1170

1   of the morning because he was at work and they were in

2   bed, evidently.

3           Q       Now, the side of their house -- if we

4   look at this diagram up here (Indicating), the side of

5   the house that is close to your house is the side of the

6   house that the kitchen is on and what has been referred

7   to as the TV room and the living room; correct?

8           A       Right.

9           Q       On that day, did you leave your house

10  -- well, let me ask you this.  What door did you go out

11  when you left to go to work?

12          A       I went out the back.

13          Q       So, when you left to go out the back of

14  your house, how would you get out to the street?

15          A       I'd make a left turn after I'd get out

16  of the house, then I'd make a right turn down the

17  driveway and walk out to the highway.

18          Q       That's the driveway between your house

19  and the house that the Reggettz's lived in?

20          A       That's right.

21          Q       The other day when we were all out

22  there, and the jury was there, and they saw the yard

23  around the house, there is something different now about

24  the back yard than there was in December of 1979?

Fortson - Direct                                                    1171

1        A          Yes.  About fifteen feet at the back,

2   it's kind of -- now, it's been filled in, when they put

3   the sewer in that area, they had extra dirt and they just

4   filled that in and leveled that off in the back.  It used

5   to be kind of swampy back there.

6        Q          So, the present grade level of the back

7   yard is higher than it was in December of 1979?

8        A          Right.

9        Q          Is that correct?

10       A          Right.

11       Q          Do you remember what the weather was

12  like that day?

13       A          Well, it was rainy and damp.

14       Q          Do you recall if there was any water

15  standing in the back yard?

16       A          Any time it rained.

17       Q          When we were out at the house the other

18  day, is there anything else that is different about the

19  house, other than what the jury had already understood

20  is different now from what it was in December of 1979?

21  Particularly, I'm talking about the bath room.

22       A          The bath room had a window and we took

23  the window out and closed the opening there when we built

24  the shower in, put a show kit in there, which went up

Fortson - Direct                                    1172

1    over top of the window there.  So, we just boarded it up

2    and filled it up.

3            We put a closet with utility shelves at the end

4    of the bath tub.

5            Q         And that window was apparently there in

6    December of 1979; is that correct?

7            A         Oh, yes.

8            Q         And it was still there throughout the

9    next year?

10           A         Right.  Yeah.  For fourteen months, or

11   a little better.

12           Q         After    the    Police    were    there

13   investigating on December the 13th, what happened at the

14   residence?

15           A         Well, the window had been opened, and

16   the front door was opened.  The reason the door was open,

17   I think, is because whoever went in there went out the

18   front and left the door unlocked.

19           Q         When the Police left there on December

20   13th of 1979, did they lock the house up?

21           A         Right.

22           Q         Did you later discover some time that

23   winter that someone had been inside that house?

24           A         Right.

Fortson - Direct                                    1173

1          Q          That's one of the reasons the back

2     window was eliminated; is that correct?

3          A          Well, yes.  Then, again, like I said,

4     we put that shower in there.

5          Q          Do you recall when you discovered the

6     front door of that house open?  Do you recall which month

7     it was?  What year?

8          A          It was the next year.  It was '80, I

9     guess, but I don't know exactly.  It was during the

10    winter months, because I was kind of curious about how

11    much longer the thing was supposed to be on the door.

12    And that's one reason I noticed the door being open.

13         Q          So, it would have been some time after

14    Christmas, or the early part of 1980?

15         A          Oh, yes.

16    MR. HUFFMAN:  No further questions.

17

18                    CROSS-EXAMINATION

19

20    BY MS. LUSK:

21

22         Q          Mr. Fortson, after this incident

23    occurred next door to you, the Police talked to you about

24    it when it was fresh on your mind; is that right?

Fortson - Cross                                          1174

1       A        Yes.

2       Q        Now, do you recall whether Mr.

3    Reggettz's car was at home at 6:00 o'clock in the morning

4    when you went out?

5       A        No, no, I don't recall that it was

6    there, no.

7       Q        You don't believe that it was there or

8    you don't remember?  I didn't mean to confuse you.

9       A        I don't recall seeing it.  It's not

10   that I don't remember; I just don't recall seeing it.

11      Q        Do you remember -- and the reason that

12   I'm asking you this -- do you remember talking to the

13   Police on December 13th of 1979?

14      A        When?

15      Q        The day they found the bodies.

16      A        Yes.

17      Q        At that time -- I don't know if you

18   recall, you told the Police that Paul's car was not at

19   home.  And I'll hand you a typewritten statement.  Would

20   you examine that?

21      A        What, the paper?

22      Q        Yes.  Does that help jog your memory

23   about whether the car was there?

24      A        Not really.

Fortson - Cross                                              1175

1          Q          Now, let me ask you this, Mr. Fortson,

2     when you were describing the lights that were on in the

3     house -- which you saw in the house ---

4          A          Yes.

5          Q          -- they were on the side of the house

6     that you lived on; right?

7          A          Right.

8          Q          Now, the bathroom, the one Mr. Huffman

9     was asking you about the window, that bathroom window

10    would have been on the other side of the house; is that

11    right?

12         A          That's right.

13         Q          That was not on the same side of the

14    house that you lived on?

15         A          What?

16         Q          That was not on the same side of the

17    house that you lived on?

18         A          Right.

19         Q          Now, on December 13th of 1979, do you

20    remember where Paul Reggettz parked his car when he came

21    home from work?

22         A          Where he normally parked or where he

23    parked it then?

24         Q          Where he parked it that day.

Fortson - Cross                                    1176

1        A          Where he parked it that day was in the

2    driveway.

3        Q          That was a different place than he

4    normally parked it; wasn't it?

5        A          Right.

6        Q          He probably had never blocked your

7    driveway before; had he?

8        A          No, he didn't.

9        Q          He usually had a parking space that was

10   down in front of your house where traffic could pass; is

11   that right?

12       A          That's right.

13       Q          Now, the back door of this home, Mr.

14   Fortson, didn't really have a regular knob on it; did it?

15       A          No.

16       Q          And when you went to close it, it was

17   kind of hard sometimes; wasn't it?

18       A          Well, you raise it up and tilt it up

19   and push.

20       Q          You had to pull up on it and push?

21       A          Yes.

22       Q          And then it had a slide for a type of

23   lock?

24       A          Right.

Fortson - Cross                                          1177

1    Q        So, the door had to be pulled up and

2  shut and then the slide part closed; right?

3    A        Right.

4    Q        Now, if the slide bar was in the

5  engaged position before you pushed on the door, the door

6  wouldn't close; would it?

7    A        No.

8    Q        Now, Mr. Huffman asked you about

9  whether you heard anything when you got up for work and

10 you told him that you did not; right?

11   A        Right.

12   Q        But the fact of the matter is, you

13 didn't hear anything going on; did you?

14   A        No.

15   Q        You didn't hear a gun shot, regardless

16 of when it went off?

17   A        Right.

18   Q        It could have gone off at 10:00

19 o'clock, or 2:00 o'clock, or 6:00 o'clock, but you didn't

20 hear the gun shot?

21   A        If it had of went off before 11:00

22 o'clock, I would have heard it, because I was up.

23   Q        But whatever time it went off, you

24 didn't hear it?

Fortson - Cross                                          1178

1          A       No.

2          Q       Mr. Fortson, just to clarify something

3    -- I think I understood you to say that there was no

4    standing water in the back yard?

5          A       It has -- there has been water standing

6    every time it rained.  It had been raining pretty hard

7    at that time.

8          Q       You're talking about back close to the

9    railroad tracks?

10         A       Well, about ten or fifteen feet from

11   the railroad tracks, where they filled it in.  It kind

12   of slipped down.

13         Q       Uh-huh.

14         A       That's where the water used to stand.

15         MS. LUSK:  That's all of the questions that I

16   have.

17         MR. HUFFMAN:  We have no further questions of

18   this witness.

19         THE COURT:  May he be excused?

20         MR. HUFFMAN:  Yes.

21         THE COURT:  Mr. Fortson, you may step down.

22         Okay.  Mr. Moss, would you step up here and be

23   sworn, please.

24

1179

1    WHEREUPON, Willie James Moss was duly sworn, and

2    upon his oath, deposed as follows:

3

4

5                    DIRECT EXAMINATION

6

7    BY MR. BICKLEY:

8

9        Q        Would you state your name please, and

10   your address, for the record?

11       A        My name is Willie James Moss.  I live

12   at 13817 Eaglemere Avenue, Cleveland, Ohio.

13       Q        Are you any relation to John Moss, the

14   gentleman sitting here in the maroon coat?

15       A        I know John.

16       Q        Now, sir, I guess the simplest thing I

17   need to do -- did you have occasion to be living in St.

18   Albans, West Virginia, in 1979?

19       A        Yes, I did.

20       Q        Where did you live?

21       A        My father's house.

22       Q        Who was living with you at that time?

23       A        My mother and father and John and

24   myself.

Moss, Willie - Direct                                              1180

1       Q       That would be John's grandparents?

2       A       Yes.

3       Q       Sir, would you put on the board there,

4    and draw a sketch of your father's home, as it was at

5    that time?

6       A       This here is what used to be a porch,

7    but it was enclosed.  It covered the front of the house

8    into a room.  This was my father's room (Indicating).

9       Q       Put your father's room, FR.

10      A       This is a room with a door leading out

11   of here, this is my mother's room.

12      Q       Where is the door to the room, the

13   entrance?

14      A       There's an entrance here and an

15   entrance here.

16      Q       All right, sir.  Go ahead, please.

17      A       This is the room that John slept in.

18      Q       Okay.

19      A       Over here is the living room.  This is

20   the kitchen.  This is completely open here.

21      Q       All right.

22      A       Back here was a little bath room.

23   There is a door coming out here into the kitchen, and

24   then from the kitchen to the outside.

Moss, Willie - Direct                                           1181

1      Q          Okay.  Would you close that wall off

2      there -- kind of close up the house, if you will.

3      A          This is a doorway coming out of the

4      kitchen, and this is a garage over here.  There is a door

5      going in here.  There is a little patio-like thing here

6      at the front door, coming out.

7      Q          All right.  Is there any other exit out

8      of the house, other than that door?

9      A          Over here is the only other exit.

10     Q          Okay.  And where were you sleeping?

11     A          I was sleeping here on the couch.

12     Q          Okay.  Would you take your seat now, if

13     you're finished.

14         Before I go into the explanation of the house,

15     Mr. Moss, did there come a time that you had to send John

16     to Cleveland?

17     A          Yes, sir, there was.

18     Q          What was the problem?

19     A          I had just come to live there and I

20     noticed that John was smoking marijuana, or whatever it

21     was, and I smelled it.  And my father -- they didn't know

22     anything about it, but soon after I came to live there

23     I recognized it right away.

24         I got after him about using it in the house, and

Moss, Willie - Direct                                    1182

1   I promised him that if he did it again I would talk to

2   his parents about it.  And he did it again, so I called

3   his parents and explained to them the situation.

4          Q        Did he go home?

5          A        His parents asked me if I was coming up

6   at Christmas time.  At that time, my mother was living

7   in Cleveland with my sister, and my father and I -- we

8   were going up to spend the Christmas holidays with them.

9          They asked me could I put up with him until we

10  came back to Cleveland on our Christmas break.  So he

11  stayed until we all went back to Cleveland at Christmas

12  time.

13         Q        Okay.  Now, I want to direct your

14  attention to December the 12th, on the evening before the

15  tragic murders of the Reggettz family.

16         So you recall when John came home from school

17  that day?

18         A        It was in the afternoon after school,

19  I would say about 4:00 or 5:00 o'clock.

20         Q        Did you all do anything?

21         A        I was cleaning up the yard.  When John

22  came, he just pitched in and started helping me.

23         Q        He started helping you clean the yard

24  up?

Moss, Willie - Direct                                          1183

1      A        Yes.

2      Q        Do you recall whether or not he went

3  out that evening -- at any time that evening?

4      A        No, I don't.

5      Q        Did he go out?

6      A        I don't think so; no.

7      Q        Do you recall when he went to bed?

8      A        About 8:30 or 9:00 o'clock.

9      Q        Now, you say John slept in the room

10 where it says JR?

11     A        Right.

12     Q        And you slept on the couch, almost near

13 the -- I guess, in the living room where you've got LR?

14     A        Yes.

15     Q        Now, would you be able to observe

16 anyone coming in and out of that house if John was to

17 leave that room?

18     A        Yes, I would have to see him.

19     Q        What -- could John possibly sneak out

20 of the room without your knowing about it?

21     MS. LUSK:  Objection.

22     THE COURT:  I'll sustain the objection.

23

24

Moss, Willie - Direct                                    1184

1    BY MR. BICKLEY:

2

3         Q         Is there any way anyone could leave

4    that room without you seeing them?

5         A         No.

6         Q         Why would you say that?

7         A         Because it is completely open.   The

8    living room and kitchen is completely open, you would

9    have to go through the kitchen, and I would be looking

10   right at it.

11        Q         Suppose you were asleep, sir?

12        A         At that time, there was a swinging door

13   there.  I could tell.  I'm a light sleeper, anyway, and

14   I was there listening for my sick parent, anyway.

15        I was very attuned to noises.

16        Q         Your father was sick or your mother?

17        A         My mother was sick.

18        Q         And you, as far as you know -- John

19   never left the house that night?

20        A         Not to my knowledge.

21        Q         What time did he wake up in the

22   morning?

23        A         About 6:00 or 6:30.

24        Q         Who prepared breakfast?

Moss, Willie - Direct                                              1185

1       A        We always worked together on that.  We
2   both -- we'd cook.  We helped each other with it.
3       Q        This is the morning of December 13th.
4   Did he help you prepare breakfast?
5       A        Yes.
6       Q        Did you notice anything unusual about
7   him?
8       A        No.                                    .
9       Q        Do you recall, did he go to school that
10  morning?
11      A        Yes.
12      Q        Did you see him take any packages to
13  school?
14      A        No more than regular school equipment.
15      Q        So, you did not notice anything unusual
16  about him?
17      A        No.
18      Q        He helped you prepare breakfast, or he
19  prepared his breakfast, or whatever?
20      A        Yes.
21      Q        Is that correct?
22      A        Yes.
23      Q        When he went on to school, he had no
24  more than normal school equipment?

Moss, Willie - Direct                                      1186

1          A         Yes.

2          Q         Was John working during this particular

3    period of time?

4          A         Yes.   I  think  he  was  working  at  a

5    little drive-in restaurant.

6          Q         A drive-in restaurant?

7          A         Yes.

8          Q         And was he receiving any money from any

9    other source?

10         A         I  think  my  father  gave  him  a  little

11   allowance for school lunches and stuff like that.

12         Q         Now, Mr. Moss, I want to clear up a

13   point.  During this particular time, you testified that

14   your mother was in Cleveland with your sister.  Was she

15   there  with  you  all  during  this  time  or  was  she  in

16   Cleveland with your sister?

17         A         She was there at the time when I was

18   there.

19         Q         She was there during the time you and

20   John -- the period of time that we're talking about?

21         A         Yes.

22         Q         She wasn't in Cleveland at this point?

23         A         No.  Well, wait a minute.  She has been

24   back and forth so much, it's hard to remember.  I can't

Moss, Willie - Direct                                        1187

1   really pin it down.

2           My sister would come down and pick her up and

3   take for a month and bring her back.

4           Q           I understand, but do you remember

5   whether or not your mother was home during this

6   particular time that we're talking about -- December 12th

7   through December 13th?

8           A           I really am not sure.

9           Q           Now, was your father's health good?

10          A           He could get around, but he was very

11  old.  He was in his late '80's.  He couldn't cook for

12  himself, but he could still move.

13          Q           And you and John cooked for him?

14          A           Right.

15          MR. BICKLEY:  I have no further questions.

16

17                      CROSS-EXAMINATION

18

19  BY MS. LUSK:

20

21          Q           So, I take it, Mr. Moss, that you don't

22  know whether your mom was in Cleveland or Charleston;

23  then that's why you're not so sure your going to

24  Cleveland was to visit her, because she might have been

Moss, Willie - Cross                                    1188

1   here?

2        A        I'll say it again.  She goes up -- my

3   sister would come down and pick her up one weekend, bring

4   her back and forth, like that.  There was no going up

5   there and staying four or five months, like that.

6        Q        But  you  weren't  going  home  for

7   Christmas to visit your mother in Cleveland if she was

8   in Charleston?

9        A        I'm not sure if she was there at the

10  time when I was there with John or not.  But when we left

11  going  to  Cleveland,  we  were  going  up  there  for  the

12  Christmas holidays.

13       Q        Now, you said that John went to bed at

14  8:30 or 9:00 o'clock at night?

15       A        Yes.

16       Q        So, he'd had a full night of sleep --

17  eight  hours  of  sleep  by  4:00  o'clock  in  the  morning;

18  wouldn't he?

19       A        I guess.

20       Q        You said you worked together to make

21  breakfast that morning, Mr. Moss.  What about the day

22  after?

23       A        We  did  it  all  the  time;  breakfast,

24  lunch, and supper.

Moss, Willie - Cross                                      1189

1          Q          So, your recollection is a general one

2    because that's generally what you did?

3          A          No.  We had to eat.  We did that.

4          Q          But you don't specifically remember

5    December 11th or 12th?

6          A          Not that date, no.

7          Q          Or December 13th or December 14th;

8    right?

9          A          Not the date itself, no.

10         Q          You were telling the jury what your

11   routine was?

12         A          Yes.

13         Q          Right.

14         A          Yes.

15         Q          You're not telling them that you recall

16   that specifically, making breakfast on December 13, 1979?

17         A          Recalling back.

18         Q          You're not telling them that you recall

19   eating breakfast on December 13, 1979?

20         A          We made it every day.  We did it every

21   day.

22         Q          But you don't have a specific

23   recollection of it?

24         A          Not specific, no.

Moss, Willie - Cross                                    1190

1          Q          And you don´t specifically recall what

2    John took to school on December 13, 1979?

3          A          No, I don´t.  I don´t know what he

4    carried to school.

5          Q          And you don´t specifically recall what

6    time he went to school on December the 13th?

7          A          Generally the same time every morning.

8    But specifically, no, I don´t.

9          Q          Now, you say that you went to Cleveland

10   before Christmas, and you took John home?

11         A          Yes.

12         Q          You whisked him out of Charleston

13   within a week of these murders; didn´t you, Mr. Moss?

14         A          Pardon me?

15         MR. BICKLEY:  Objection to "whisked him out of

16   Charleston."

17         THE COURT:  Sustained.

18

19   BY MS. LUSK:

20

21         Q          You didn´t even withdraw him from

22   school; did you?

23         A          I don´t know from what you mean by

24   "whisk him out."

Moss, Willie - Cross                                    1191

1        I had planned for him to go when I called his
2    parents.    They asked me to bring him home on the
3    holidays, when the school vacation began.   And that's
4    when he had time to go.
5            Q        He didn't even withdraw from school;
6    did he?  He didn't take time to withdraw from school?
7            A        I don't know how that works.
8            Q        You told the Police, Mr. Moss, in
9    February of 1980, that shortly before Christmas you had
10   seen John in the back yard with a BB gun or a .22 rifle;
11   didn't you?
12           A        No, I didn't.   I never told anyone
13   that.
14           Q        You didn't tell the Police that on
15   February 13, 1980?
16           A        No.
17           MS. LUSK:  May I have just a moment, Judge?
18           THE COURT:  Yes.
19
20   BY MS. LUSK:
21
22           Q        Mr. Moss, is that a one-story home or
23   a two-story?
24           A        One.

1192

1       MS. LUSK:  That's all I have.

2       THE COURT:  Any re-direct?

3       MR. BICKLEY:  Yes, your Honor.

4

5

6                    RE-DIRECT EXAMINATION

7

8   BY MR. BICKLEY:

9

10      Q       Mr. Moss, would it be fair to say that

11  yours and John's routine was every day?

12      A       Yes.

13      Q       Would it also be fair to say that if he

14  had  broken  that  routine,  you  would  probably  have

15  remembered it?

16      A       Yes.

17      MR. BICKLEY:  I have no further questions.

18

19                   RE-CROSS-EXAMINATION

20

21  BY MS. LUSK:

22

23      Q       Isn't it also true, Mr. Moss, that the

24  first time you were called upon or even asked about your

Moss - Re-Cross                                    1193

1    routine was in 1984?

2          A        In '84 -- I'm not sure of the date.

3          Q        The first time that anybody asked you

4    what your routine was in 1979, was in 1984?

5          A        I'm not sure of the dates, ma'am.

6          MS. LUSK:  That's all I have.

7          MR. BICKLEY:  No further questions, your Honor.

8          THE COURT:  Mr. Moss, you may step down, sir.

9          May he be excused?

10         MR. BICKLEY:  Yes.

11

12         WHEREUPON, Mr. Willie James Moss was excused.

13

14         THE COURT:  Okay.  Would you step right over

15   here, sir?

16

17         WHEREUPON, John  Moss,  Jr.,  father  of  the

18   defendant, was duly sworn, and upon his oath, deposed as

19   follows:

20

21

22                 DIRECT EXAMINATION

23

24   BY MR. BICKLEY:

Moss, John - Direct                                          1194

1            Q            Mr. Moss, are you any relation to the

2       gentleman who is sitting there in the maroon coat?

3            A            That's my son, John, III.

4            Q            Now, Mr. Moss, I want to -- did I ask

5       you to provide a picture of John when he was about

6       seventeen or eighteen years old?

7            A            Yes.

8            Q            Do you have that picture?

9            A            Yes, I do.

10           Q            At what age is the picture there that

11      John is?

12           A            This is when he was seventeen.

13           Q            And this is a picture of John when he

14      was seventeen?

15           A            Yes.

16           MS. LUSK:  Your Honor, may we approach the bench?

17           THE COURT:  Yes.

18

19           WHEREUPON, a bench conference was held, and the

20      following transpired:

21

22           MS. LUSK:  Your Honor, it's our position that Mr.

23      Bickley is trying to show that he was a scrawny little

24      runt, for some reason.   I think that we should be

Moss, John - Direct                                    1195

1    permitted to get into the fact that within four weeks of

2    this murder, he raped a woman in Cleveland, Ohio.  He was

3    absolutely ---

4           MR. BICKLEY:  That's absolutely ludicrous.

5           THE COURT:  What are you offering this for?

6           MR. BICKLEY:  To show that that's a different

7    John Moss than the one sitting here now.

8           THE COURT:  Different in what respect?

9           MR. BICKLEY:  His physical size.

10          THE  COURT:  You  can't  tell  that  from  this

11   picture; can you?

12          You can put it in.

13          MR. BICKLEY:  Well, she can't put that in, what

14   she's talking about; can she?

15          THE COURT:  Not yet.  Let's see how much trouble

16   you get in.

17          MR. BICKLEY:  All I want to do is put it in to

18   show the difference between John Moss then and now, and

19   also how young he was.

20          THE COURT:  You can do that, and you won't get

21   into any trouble.

22          MR. BICKLEY:  That's all I want to do with this.

23   But she can't bring that other stuff up?

24          MS. LUSK:  No?

Moss, John - Direct                                    1196

1          THE COURT:  No.

2          MR. REVERCOMB:  I don't think you ought to be

3     able to show -- to publish that until later.

4

5          WHEREUPON, the bench conference was concluded.

6          (Back on the Record)

7

8     BY MR. BICKLEY:

9

10         Q          This is a picture of John Moss when he

11    was seventeen?

12         A          Right.

13         MR. BICKLEY:  Judge, I'd like to have this marked

14    as Defendant's Exhibit No. 1.

15

16    BY MR. BICKLEY:

17

18         Q          Did there come a time, approximately

19    October 28th or 29th, that State Troopers came and got

20    some cameras from you?

21         A          Yes, they did.

22         Q          And I will show you what has been

23    identified as State's Exhibit 102, and State's Exhibit

24    119 -- are these similar to the cameras that they got

Moss, John - Direct                                    1197

1        from you; those two?

2               A        They were taken from my home, yes.

3               Q        Those two?

4               A        Yes.

5               Q        Now, did you have any other cameras in

6        your home at the time?

7               A        Yes.

8               Q        What kind of cameras did you have?

9               A        The same kind.   My daughter had a

10       camera and John had a camera.  She also had a camera that

11       a neighbor had given her.

12              Q        She had your neighbor's camera?

13              A        Yes.

14              Q        A camera of this make?

15              A        Yes.

16              Q        So, at the time, on October 28th, you

17       say that there were what, four cameras in your home?

18              A        Yes.

19              Q        And would you identify them again,

20       please, who owned those cameras?

21              A        My son, John, had one.  I had one, and

22       my daughter had two -- one of her own, and one of a

23       neighbor's.

24              Q        So, which camera did your son have?

Moss, John - Direct                                    1198

1          A          That's been a while ago.  I think it's

2     one of these (Indicating).

3          Q          The one with the handle?

4          MR. REVERCOMB:  I object to his leading, your

5     Honor.

6          THE COURT:  I'll allow it.

7

8     BY MR. BICKLEY:

9

10         Q          Was it a Kodak?

11         A          It was a Kodak.

12         MR. REVERCOMB:  Your Honor, I'd like the record

13    to reflect that Mr. Moss indicated one of two cameras

14    closest to him.

15         THE COURT:  I'm sure the jury saw that.

16

17    BY MR. BICKLEY:

18

19         Q          Mr. Moss, just to set the record

20    straight, would you pick up the camera which you believe

21    belonged to your son?

22

23         WHEREUPON, the witness picked up a camera and

24    held it up for the jury to see.

Moss, John - Direct                                    1199

1          THE COURT:  Does that have a red sticker with a

2     number on it, Mr. Moss?

3          THE DEFENDANT:  Unintelligible.

4          MR. REVERCOMB:  Your Honor, did he say what

5     number was on it?

6          THE COURT:  He said he didn't see a number on it.

7          MS. LUSK:  It's on the bottom.

8

9     BY MR. BICKLEY:

10

11         Q        How can you tell that that's the camera

12    that belonged to your son?  Or are you saying that this

13    camera belonged to your son?

14         MS. LUSK:  Objection.

15         THE COURT:  That's two questions.  You can only

16    ask one at a time.

17

18    BY MR. BICKLEY:

19

20         Q        Are you certain that that's the camera

21    that belonged to your son?

22         A        I know he had a camera, but I can't

23    remember exactly which one now.

24         Q        Did he have any pictures that was ever

Moss, John - Direct                                    1200

1    taken with the camera?

2         A         My daughter has pictures that was taken

3    with the camera.

4         Q         Your daughter has pictures that were

5    taken with the camera?

6         A         Yes.

7         Q         Did you bring any of those pictures

8    with you?

9         A         Yes, I did.

10        Q         Could I see a picture, please?

11        A         This is a picture that was taken with

12   John´s camera (Indicating).  And this one (Indicating)

13   was taken with my daughter´s.

14        MR. REVERCOMB:  Objection to what the daughter´s

15   says.

16        THE COURT:  Sustained.

17        MR. REVERCOMB:  Would you please tell the jury to

18   disregard that?

19        THE COURT:  Jurors, I have sustained the State´s

20   objection because the witness can´t testify to what

21   someone else said, or he can testify to it, but you can´t

22   pay attention to it.

23        MR. BICKLEY:  Just a minute, your Honor.

24