**MOSS v. BALLARD
CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 20
(CONTINUATION, pp. 1201 - 1350)**

Moss, John – Direct                                    1201

1    BY MR. BICKLEY:

2

3        Q        Mr. Moss, can you testify that John had

4    a camera?

5        A        Yes, sir, I can.

6        Q        And he had a camera before the Police

7    came to your home on October 28th?

8        A        Yes.

9        Q        Is that correct?

10       A        Yes.

11       MR.  REVERCOMB:    I  object  to  him  leading  the

12   witness.

13       THE  COURT:    The  question  has  been  asked  and

14   answered.

15       MR.  BICKLEY:   That's all I have.

16

17                    CROSS-EXAMINATION

18

19       MR.  REVERCOMB:   Your  Honor,  I  don't  think  the

20   State has any questions.

21       THE  COURT:   Thank you, Mr. Moss.   You may step

22   down.

23       I take it, he can be excused?

24       MS.  BECKETT:   Yes, he can be excused.

1202

1     THE COURT:  Do you remember how you found your

2  way in?

3     THE WITNESS:  Yes.

4     THE COURT:  Okay.  Call your next witness,

5  please.

6     MS. LUSK:  Your Honor, I would like for the

7  record to show that the witness was handling Exhibit No.

8  117.

9     THE COURT:  Okay.

10

11     WHEREUPON, John C. Wideman, was duly sworn, and

12  upon his oath, deposed as follows:

13

14                    DIRECT EXAMINATION

15

16  BY MR. BICKLEY:

17

18     Q     Would you state your name, please, for

19  the record?

20     A     My name is John C. Wideman.

21     Q     Now, Mr. Wideman, do you have a

22  profession?

23     A     I'm a licensed private investigator in

24  the State of West Virginia.

Wideman - Direct                                        1203

1           Q          Mr. Wideman, I would like to direct

2    your attention to some time in 1984. Do you recall going

3    the route that Mr. Reggettz traveled to work?

4           A          Yes, sir.

5           Q          Would you tell the Court in your own

6    words exactly what you did, please?

7           A          Beginning on a Thursday morning at

8    approximately -- at exactly 1:47 a.m. in the morning, I

9    left the residence at 7027 Chesapeake Avenue, in St.

10   Albans, and I drove up the little short street to Route

11   60, which is an extension of Fourth Street.

12          I turned eastbound on Route 60, which is

13   MacCorkle Avenue, and drove via MacCorkle Avenue to exit

14   54 of Interstate 64. I went up on Interstate 64,

15   proceeded eastbound on Interstate 64 to the bridge over

16   the Kanawha River, where I made a stop. And that stop

17   was for a minute and twenty seconds.

18          I then proceeded onward eastbound on Interstate

19   64 to the exit to Route 60, which is just before getting

20   off the turnpike on the east side of Charleston.

21          I proceeded up Route 60 there to the Malden ramp

22   exist. I got off at the Malden ramp exit, went by Malden

23   Avenue which becomes Midland Avenue as you're going

24   through Rand.

Wideman - Direct                                      1204

1        I traveled to Bluefield Street and turned right,

2   which is out Bluefield Street.  I went to Raven Street

3   and turned, again, right on Raven Street, which would be

4   coming back westbound to the old United Parcel Services

5   facility, which is where Mr. Reggettz worked.

6        Q        What was the total lapse of time?

7        A        Going in that direction at that time of

8   the morning, the total lapse of time was twenty-six

9   minutes and seven seconds, including the minute and

10  twenty-seven seconds out by the bridge.

11       Q        What was the purpose of this minute and

12  twenty seconds?

13       A        The stop on the bridge was to simulate

14  the stopping on a bridge, taking an object from a

15  vehicle, walking to the rail of the bridge, and throwing

16  into the Kanawha River, then coming back and getting into

17  the car and driving off.

18       MR. BICKLEY:  I have no further questions.

19

20                    CROSS-EXAMINATION

21

22  BY MR. REVERCOMB:

23

24       Q        Mr. Wideman, the bridge that you're

Wideman - Cross                                      1205

1   talking about, is that the first bridge you came to after

2   you got up on I-64 from the MacCorkle Avenue exit?

3         A        I got on at exit 54, which is the South

4   Charleston/MacCorkle Avenue exit.

5         Q        There at Jefferson Road?

6         A        Beg your pardon?

7         Q        There at Jefferson Road?

8         A        That's right.

9         Q        You got on eastbound, and the first

10  bridge that you come to crossing the river is the Oakwood

11  Road and Virginia Street?

12        A        Right.

13        Q        You stopped?

14        A        Right.

15        Q        Where did you stop?

16        A        I stopped on the east side of the

17  bridge, as near the rails as possible, out of the

18  roadway, approximately in the center of the span.

19        MR. REVERCOMB:  That's all I have.

20        MR. BICKLEY:  No further questions, your Honor.

21        THE COURT:  Thank you.  You may step down.

22

23        WHEREUPON, Mr. John Wideman was excused.

24

1206

1    MR. BICKLEY:  You want to take a break before we

2  put on the next witness?

3    THE COURT:  Sure.

4    Ladies and gentlemen, we'll take a ten minute

5  recess.

6

7    WHEREUPON, the Court stood in a recess in the

8  hearing of this case.

9

10    (Back on the Record)

11

12    WHEREUPON, a bench conference was held, and the

13  following transpired:

14

15    THE COURT:  Mr. Moss, I'm going to take a minute

16  at this point to tell you about your right to either

17  testify and be a witness in this case, or to decide not

18  to testify and not give evidence.

19    Under the Constitution of the State of West

20  Virginia, and of the United States, you have got the

21  right to remain silent.  What that means is, you don't

22  have to testify.  No one can force you to testify.  The

23  Prosecutor can't call you as a witness and make you give

24  any evidence; and if you don't testify, at the close of

1207

1   the trial in this case, when I instruct the jury, I´ll

2   instruct the jury that they can´t hold your silence

3   against you.   That is, they can´t decide that you are

4   guilty, in whole or in part, just because you don´t take

5   the witness stand in your own behalf.

6       The other side of that right is your right to

7   testify.   And if you wish to do so, you can take the

8   witness stand and give evidence in your own defense.   And

9   if you did that, I would instruct the jury that the jury

10  couldn´t disbelieve you just because you were the

11  defendant in this case, and they would have to treat your

12  evidence just as that of any other witness that appears

13  in the case.

14      If you were to testify, the State, the

15  Prosecuting Attorney, could ask you any questions which

16  are relevant to the question of your guilt or innocence.

17      Now, by telling you these things, I don´t mean to

18  suggest that I think you ought to testify or that I think

19  you ought to remain silent.   That has to be your

20  decision, after conferring with your attorneys.   And I´m

21  not trying to make you make a decision one way or

22  another.   Instead, I´m just trying to make sure that you

23  understand everything you need to know in order to make

24  that decision yourself.

1208

1    Do you understand that?

2    THE DEFENDANT:  Yes, I do.

3    THE COURT:  Do you have any questions at all?

4    THE DEFENDANT:  No, I don't.

5    THE COURT:  Okay.

6    MR. BICKLEY:  Thank you, your Honor.

7

8    WHEREUPON, the bench conference was concluded.

9

10   WHEREUPON, Howard F. Woodyard, was duly sworn,

11   and on his oath, deposed as follows:

12

13   (Back on the Record)

14

15   THE COURT:  Again, to save time, the witness has

16   been sworn out of your presence.

17

18                    DIRECT EXAMINATION

19

20   BY MR. HUFFMAN:

21

22        Q        Would you state your name for the

23   record?

24        A        Howard F. Woodyard.

Woodyard - Direct                                    1209

1      Q          And you are a Sergeant with the West

2   Virginia Department of Public Safety; is that correct?

3      A          Yes, sir, I am.

4      Q          I believe you are presently stationed

5   in Madison?

6      A          Yes, sir.

7      Q          Were you previously stationed with the

8   Company B Detachment at South Charleston?

9      A          Yes, sir, I was.

10     Q          Were you there in December of 1979?

11     A          Yes, sir.

12     Q          In December of 1979, did you have

13  occasion to question Paul Reggettz?

14     A          Yes, sir, I did.

15     Q          I assume your questioning related to

16  the deaths of his family, his wife and two children which

17  occurred on December 13th at the residence in St. Albans;

18  is that correct?

19     A          Yes, sir, it is.

20     Q          During the time that you questioned Mr.

21  Reggettz, did you ever threaten him in any manner?

22     A          No.

23     Q          Were any threats or promises made?

24     A          No, sir.

Woodyard - Direct                                    1210

1          Q          Did you observe in the period of time
2    that you were with him that he was threatened by any
3    other State Trooper there at Company B?
4          A          No, sir, not in my presence.
5          Q          In the course of taking his statement
6    -- actually, you took two statements, is that correct?
7          A          Yes, sir.
8          Q          In the course of taking either
9    statement, did you attempt to put any words in Mr.
10   Reggettz's mouth?
11         A          No, sir.
12         Q          Did you record accurately what he told
13   you on both of those occasions?
14         A          Yes, sir.
15         Q          What did Mr. Reggettz tell you in the
16   first statement that you took from him regarding what had
17   happened at his house on the evening of December 12,
18   1979?
19         A          In his first statement, the only
20   statement he made to me was that he did kill his wife and
21   children.
22         Q          And thereafter, was there actually a
23   detailed statement, sort of in essence that you took
24   three statements from him; is that correct?

Woodyard - Direct                                          1211

1        A        Yes, sir.

2        Q        Now, I'm talking about the second
3   statement where he gave the details.  What was it that
4   he told you at the beginning of the statements regarding
5   the activities at his home on December 12, 1979?

6        A        Do you mean in detail, what he told me?

7        Q        Do you recall basically -- do you
8   recall what he told you about eating dinner with his wife
9   and two children that day?

10       A        Yes, I do.

11       Q        What did he tell you?

12       A        He told me that the children were
13  acting up at that time, that it made him nervous and
14  upset, and he asked his wife to quiet the children down.

15       Q        Did he then tell you that he and his
16  wife got into an argument about the children?

17       A        Yes, sir, he did.

18       Q        What, specifically, did he tell you
19  about that?

20       A        He said his wife was punishing the
21  children and he felt that she was being too harsh, and
22  that initiated an argument between the two of them.

23       Q        Did he also tell you that that argument
24  involved following each other from room to room, pushing

Woodyard - Direct                                    1212

1    and yelling around?

2           A          Yes, he did.

3           Q          What did he tell you happened after

4    that?

5           A          He said at one point, the argument

6    became so severe that his wife threatened to get a gun,

7    that she went into a bedroom where the gun was kept

8    beside the bed, and he followed her into that room.

9           Q          What did he tell you about her pointing

10   the gun; or did he tell you that?

11          A          He said that his picked up the gun,

12   then he struggled with her and took it away from her.

13   He said he swung the gun or something, but he didn't

14   remember hitting anything with it; or that he could

15   remember hitting something but he could not recall what

16   that was.

17          Q          Did he tell you what happened to his

18   wife after that?

19          A          He said she was knocked to the floor.

20          Q          Did he tell you whether or not she was

21   making any noise or moving?

22          A          At one point, he did say that she was

23   moaning and appeared to be moving.

24          Q          Then what did he do?

Woodyard - Direct                                    1213

1          A          He said he strangled her with an
2    electrical cord.
3          Q          Did he tell you anything about carrying
4    her into the other room?
5          A          Yes. He said he moved from the bedroom
6    in which they were arguing, into the second bedroom, near
7    the television room.
8          Q          Was that when he took the extension
9    cord and put it around her neck?
10         A          That's what he told me.
11         Q          Did he tell you anything that was going
12   on with his children?
13         A          He said they were yelling and
14   screaming, and that it was causing his head to pound; and
15   things were happening kind of in a haze to him.
16         Q          Did he describe to you any attempts to
17   tie his wife up?
18         A          Yes, sir. He said he attempted to
19   secure her to a door by some means.
20         Q          Did he give you any specific details
21   about that?
22         A          Not a whole lot of detail. He said he
23   tried to secure her to a door with an electrical cord,
24   and that he had some difficulties in securing her that

Woodyard - Direct                                     1214

1    way.

2         Q          Did he then tell you what happened with

3    regard to his son?

4         A          He said the boy ran past him.    He

5    grabbed him and threw him down in the floor and strangled

6    him with a cord.

7         Q          Did he indicate to you exactly how he

8    held the child?

9         A          He said he placed his knee across the

10   boy's buttocks and lower legs and put him face down on

11   the floor.

12        Q          Did he tell you that he put him down on

13   the floor on his face?

14        A          He said he held him down on the floor

15   with his face to the floor.

16        Q          Did he tell you where the cord came

17   from that he choked his son with?

18        A          It was an appliance cord, as I recall.

19        Q          Did he indicate to you that he pulled

20   the cord tight until the movement stopped?

21        A          Yes, he did.

22        Q          Then, what did he say he did?

23        A          Uh -- he -- nothing at that point.    I

24   asked him what he had done with the little boy.

Woodyard – Direct                                                 1215

1      Q        Did he give you any details about

2  pulling the cord tight around this child's neck and

3  drawing it down his back and tying his hands?

4      A        Yes, he did.

5      Q        He told you that, specifically; is that

6  correct?

7      A        Yes, sir.  I asked him how he secured

8  -- what he had done with the little boy, and he told me

9  that.

10     Q        Did he tell you what he did with the

11 little boy after he choked him and tied him?

12     A        Yes, sir, he said he placed him face

13 down in the remainder of some bath water in the bathtub.

14     Q        Did he describe to you anything that

15 his son was saying while this process was taking place?

16     A        Yes, sir.

17     Q        What did he say that his son said?

18     A        "Don't, daddy, don't."

19     Q        What did he say he did after he put his

20 son in the bathtub?

21     A        The little girl was in the house

22 somewhere, and he grabbed her.  I believe he said he

23 carried her into another room and placed a cord around

24 her neck, too.

Woodyard - Direct                                            1216

1        Q          Did he tell you that the little girl

2   was at her mother's side?

3        A          Yes, sir.

4        Q          Did he tell you what, if anything, she

5   was saying?

6        A          She was telling her mother to get up.

7        Q          Did he indicate that she was saying,

8   "Get up, mommy, get up"?

9        A          Yes, sir.

10       Q          What did he tell you he did after he

11  picked her up?

12       A          He secured her over a door.

13       Q          Did he tell you that he wrapped an

14  electrical cord around her neck?

15       A          Yes, sir.

16       Q          Did he tell you that he pulled it tight

17  until she stopped moving?

18       A          Yes, sir.

19       Q          Did he tell you then that he then hung

20  her over the door and let her hang against the door?

21       A          Yes, sir.

22       Q          What did he tell you was the next thing

23  he did?

24       A          I think at that point he returned to

Woodyard - Direct                                    1217

1    his wife's body and got a pair of scissors from the

2    bathroom and stabbed her with a pair of scissors.

3         Q          Did he tell you that he knelt down and

4    with both hands pushed the scissors into her chest?

5         A          Yes, sir.

6         Q          Did he tell you that after that

7    occurred, that he went to bed?

8         A          Yes, he said he went to sleep for a

9    while.

10        Q          Did he tell you when he woke up?

11        A          Around 1:00 o'clock.

12        Q          And did he get dressed and go to work?

13        A          Yes, sir.

14        Q          Did he tell you that when he left to go

15   to work, he took a .22 rifle out of his house?

16        A          Yes, sir.

17        Q          What did he tell you he did with it?

18        A          He told me that he threw it off the

19   Interstate bridge into the Kanawha River.

20        Q          Did he also tell you that he pulled a

21   sheet down and put it in the kitchen floor?

22        A          Yes, sir.

23        Q          Did he tell you that he put anything on

24   that sheet?

Woodyard - Direct                                        1218

1          A          Yes, sir.  He said he put some spoons,

2    or something of that nature, some kitchen utensils.

3          Q          Did he tell you that after his family

4    was killed, he felt that a heavy weight had been taken

5    off of him?

6          A          Yes, sir.

7          Q          Now, Trooper, after this statement was

8    given, I think Mr. Reggettz returned to the house, the

9    very next day; is that correct?  Or the same day --

10   actually that morning; is that correct?

11         A          Yes, sir.

12         Q          And was another statement then taken on

13   Friday morning, December 14th, at 8:20 a.m.?

14         A          Yes, sir.

15         Q          Were you present at that time?

16         A          Yes, sir, I was.

17         Q          Were there any threats made to Mr.

18   Reggettz at that time?

19         A          No, sir.

20         Q          Was he beaten or abused at all at that

21   time?

22         A          No, sir.

23         Q          Were there any promises made at that

24   time?

Woodyard - Direct                                        1219

1        A        No, sir.

2        Q        In addition to yourself, I believe

3    there were other people present?

4        A        Pardon me?

5        Q        There were other people present besides

6    you and Reggettz?

7        A        Yes, sir.

8        Q        Do you remember who they were?

9        A        Trooper Steve McGowan, Trooper Terry

10   Williams, and Mr. Roark, who was the Prosecuting

11   Attorney.

12       Q        Did Mr. Reggettz again go through the

13   scenario of what had occurred at his house?

14       A        Yes, sir.

15       Q        And in the course of doing that, did he

16   demonstrate a number of things to you and the other

17   people who were there?

18       A        Yes, he did.

19       Q        Now, did he tell you again at that time

20   -- did he indicate that he and his wife had had an

21   argument on the evening of December 12th?

22       A        Yes, sir.

23       Q        Did he also again tell you that they

24   had struggled over a gun?

Woodyard – Direct                                              1220

1          A          Yes, sir.

2          Q          What did he tell you about swinging the

3    gun?

4          A          He basically said the same thing.  He

5    said his wife had the gun and they were struggling in a

6    back and forth motion.  But he could not tell us whether

7    he had hit his wife or some article of furniture in the

8    house.

9          Q          When he told you this, did he also

10   demonstrate how it happened?

11         A          Yes.

12         Q          Would you stand up over here at the

13   jury box and demonstrate how Mr. Reggettz said he did it?

14         A          He said he made a swinging motion of

15   his hand across her body, like this (Indicating).  That

16   was about the extent of that.

17         Q          Now, during the course of time you were

18   there, did he also demonstrate to you how he picked his

19   wife's body up?

20         A          Yes, sir, he did.

21         Q          And for demonstration purposes, would

22   you show us what he did?

23         A          Yes, sir, he said he knelt down beside

24   his wife's body, cradled her in his arms like this

Woodyard - Direct                                        1221

1    (Indicating), and raised himself up and carried her into

2    another room, and lowered himself down, pulled his hands

3    away and dropped the body.

4          Q          Did he demonstrate to you at that time

5    how he put his boy on the floor, put his knee down on his

6    back, and held him down?  Do you recall?

7          A          I don't recall that he did.

8          Q          And again, at this time, when you were

9    at the house, did he again indicate to you what his

10   children were saying while all of this was taking place?

11         A          Yes.  The kids were in the house too.

12         Q          Did he again reply that the young girl

13   said, "Get up, mommy, get up"?

14         A          Yes, sir.

15         Q          And there was one other thing that he

16   demonstrated while you were there.

17         Let me hand you what has been marked as State's

18   Exhibit 158.

19         What is that, Sergeant?

20         A          That is a pair of barber scissors.

21         Q          Would you step down here in front of

22   the jury box?  Would you show the jury how Mr. Reggettz

23   demonstrated to you that he put the scissors into his

24   wife's chest?

Woodyard - Direct                                          1222

1          A          First of all, he did not have any

2     scissors in his hands at that time.  He simply made a

3     motion like this (Indicating) with his hands.  He did not

4     have scissors in his hands at that time, when he

5     demonstrated that.

6          Q          Pushing it down into his wife's chest;

7     is that right?

8          A          Yes.

9          MR. HUFFMAN:  I have no further questions.

10

11                         CROSS-EXAMINATION

12

13    BY MR. REVERCOMB:

14

15         Q          Sergeant Woodyard, when you arrived --

16    you went to the scene that day, didn't you?

17         A          Yes, I did.

18         Q          And you transported Paul Reggettz back

19    to the Company B Detachment?

20         A          That's right.

21         Q          Do you remember what time that was?

22         A          Around 1:00 o'clock.

23         Q          You got a call at about 2:00 o'clock;

24    didn't you, saying that the time of death could have been

Woodyard - Cross                                                    1223

1    as early as midnight the previous day?

2          A          Yes.

3          Q          At that time, you read him his rights?

4          A          Yes, I did.

5          Q          That call came at about 2:00 o'clock?

6          A          Yes, sir, it did.

7          Q          2:00 p.m.?

8          A          Yes, sir.

9          Q          I'll hand you what has been marked for

10   identification purposes as State's Exhibit 157.  Do you

11   recognize that exhibit, sir?

12         A          Yes, I do.

13         Q          What is it?

14         A          It's a Waiver of Rights form bearing

15   the Miranda Warnings.  It's dated at the South Charleston

16   Detachment on December 13, 1979, at 2:10 p.m., Eastern

17   Standard Time.

18         It is signed by both myself and Paul Reggettz.

19         Q          And you read those rights to Paul

20   Reggettz?

21         A          Yes, sir, I did.

22         Q          Again, it was at 2:10 p.m.?

23         A          Yes, it was.

24         Q          And after that, you proceeded to

Woodyard - Cross                                              1224

1    question him; is that right?

2         A        Yes, sir, I did.

3         Q        Was there ever a time when more than

4    one person was questioning him?

5         A        Yes.

6         Q        How many people would have been

7    questioning him; if you know?

8         A        There were three or four people in the

9    room at that time.

10        Q        Did all four of them ask questions of

11   Mr. Reggettz?

12        A        Yes, sir.

13        Q        Do you recall when and what time during

14   the day that would have been?

15        A        That would have been in the late part

16   of the afternoon, in the office, in the basement of the

17   State Police office.

18        The time was somewhere around 5:00 o'clock, I

19   think.

20        Q        He had been there since about 1:00

21   p.m.?

22        A        Yes, sir.

23        Q        It wasn't until after 2:30 a.m. that

24   Mr. Reggettz ever made any inculpatory statement; is that

Woodyard - Cross                                          1225

1    true?

2         A          That's true.

3         Q          At that time, he had been there

4    fourteen hours, almost?

5         A          Yes, sir.

6         Q          And isn't it true that when he made his

7    first inculpatory statement, he said, "If I tell you what

8    you want, then you won't let them hurt me?"

9         A          Yes, he did.

10        Q          Did you ever ascertain who "they" were?

11        A          No, I did not.

12        Q          That is all that Mr. Reggettz said at

13   that time?

14        A          Yes, sir.

15        Q          He was looking up to you; wasn't he?

16        A          Yes, sir.

17        Q          For protection?

18        A          Yes, sir.

19        Q          You played up to that; didn't you?

20        A          Yes, sir, I did.

21        Q          At that time, you made the simple

22   statement that you wouldn't let anyone hurt him --- but,

23   "Okay, I killed my wife and two children"?

24        A          Yes.

Woodyard - Cross                                        1226

1       Q          After that time, you went into a

2   detailed statement that took several hours?

3       A          Yes, it did.

4       Q          It was completed at 6:00 a.m.?

5       A          Yes.

6       Q          Mr. Reggettz hadn't had any sleep; had

7   he?

8       A          No, sir.

9       Q          He had had only four to six hours'

10  sleep in the past two days; hadn't he?

11      A          That's true.

12      Q          Were you tired, too?

13      A          Yes, I was.

14      Q          During the questioning, he answered

15  your questions with a response; didn't he?

16      A          Yes.

17      Q          In fact, he gave a response to every

18  question you asked?

19      A          Yes, sir.

20      Q          Mr. Reggettz had discovered the bodies

21  of his family; hadn't he?

22      A          Yes.

23      Q          He had seen Vanessa Reggettz, his wife,

24  and how she was tied to the door?

Woodyard - Cross                                    1227

1        A        Yes.

2        Q        He had seen the scissors in her chest;

3   hadn´t he?

4        A        Yes.

5        Q        He had seen his little boy in the

6   bathtub?

7        A        Yes, sir.

8        Q        With his hands tied behind his back?

9        A        Yes, sir.

10       Q        And he had seen his little girl, and

11   had taken her down off the door; didn´t he?

12       A        Yes, sir.

13       Q        Were you ever able to understand his

14   explanation?

15       A        No, sir, I never could.  He was never

16   able to make me understand with respect to what he had

17   done, in that respect.

18       Q        In the autopsy of the little boy, there

19   were no bruises on his buttocks; were there?

20       A        Not that I´m aware of.

21       Q        And he told you that he had kneeled on

22   him?

23       A        Yes, sir.

24       Q        And that was in response to a question

Woodyard — Cross                                              1228

1    you asked him; wasn´t it?

2          A          Yes, it was.

3          Q          And what he said, "Don´t, daddy,

4    don´t;" that was in response to you asking him what his

5    little boy was saying; wasn´t it?

6          A          Yes, it was.

7          Q          When he told you how he tied his little

8    boy´s hands, his response to that was when you asked him

9    how he had tied him up?

10         A          Yes, it was.

11         Q          He´d seen that; hadn´t he?

12         A          Yes, he had.

13         Q          And when he told you that his little

14   girl was saying, "Wake up, mommy, get up, mommy;" that

15   was in response to you asking him what the little girl

16   was saying?

17         A          Yes, sir.

18         Q          When you went to the demonstration, it

19   was some twenty hours after he had gone through tragedy;

20   wasn´t it?

21         A          That´s correct.

22         Q          And he had had no sleep?

23         A          That´s right.

24         Q          You didn´t just simply walk in and ask

Woodyard - Cross                                           1229

1    him to demonstrate what he did; did you?

2              A         No, sir.

3              Q         He was asked to demonstrate some

4    things; wasn't he?

5              A         Yes, he was.

6              Q         You asked him to demonstrate how he

7    picked up his wife's body and carried it?

8              A         Yes.  We asked him to demonstrate

9    everything that happened in each room.

10             Q         You asked him how he stabbed her with

11   the scissors?

12             A         Yes.

13             Q         He didn't just volunteer to go from one

14   place to the next, he was instructed to; wasn't he?

15             A         Yes, he was.

16             Q         When he said that he felt that a great

17   weight had been taken off of him, that was in response

18   to  you asking him how he felt; wasn't it?

19             A         Yes.

20             Q         And again, at the scene, when he told

21   you what the kids were saying, again, it was a response

22   to "What were the kids doing, what were the kids saying?"

23             A         Yes, it was.

24             Q         The first statement you took from Paul

Woodyard - Cross                                               1230

1    Reggettz was early in the afternoon; is that correct?

2         A         Yes, it was.

3         Q         And in that statement, he didn't say

4    anything about killing him family; did he?

5         A         No, sir.

6         Q         In that statement, he told you that his

7    name was Paul Reggettz and that he was 35 years old;

8    didn't he?

9         A         Yes, sir.

10        Q         He told you where he lived, at 7027

11   Chesapeake Avenue?

12        A         Yes, sir.

13        Q         And that he worked for United Parcel

14   Service?

15        A         Yes, sir.

16        Q         And he told you that he was at home on

17   the evening of December 12, 1979 with his wife, Vanessa,

18   and two children, Paul and Bernadette?

19        A         Yes.

20        Q         He told you that he went to bed around

21   9:00 p.m. or 9:30 on December 12, 1979?

22        A         Yes.

23        Q         And he told you that his wife had

24   already put the kids to bed?

Woodyard - Cross                                                    1231

1          A          Yes.

2          Q          And that she had stayed up after he

3   went to bed to watch a show on TV?

4          A          Yes, sir.

5          Q          He went to sleep and got up about 1:00

6   o'clock or 1:00 a.m. on Thursday, December 13, 1979?

7          A          Yes, sir.

8          Q          He started getting ready for work?

9          A          Yes, sir.

10         Q          And he talked to his wife and drank a

11  cup of coffee?

12         A          Yes, sir.

13         Q          He told you that he left the house at

14  about a quarter til two, or about 1:45 a.m.?

15         A          Yes, sir.

16         Q          That his wife had gone to the door with

17  him?

18         A          Yes, sir.

19         Q          She had seen how hard it was raining

20  and told him to get safely to work?

21         A          Yes.

22         Q          He told you that he went down to his

23  car and looked back and saw that she was standing at the

24  door?

Woodyard - Cross                                    1232

1          A          Yes, sir.

2          Q          He drove to work in his car.  At that

3     time, it was a 1978 Honda Civic?

4          A          Yes, sir.

5          Q          He got to work at about 2:15 or 2:20

6     a.m.?

7          A          Yes, sir.

8          Q          His work shift actually started at

9     2:30; is that right?

10         A          Yes.

11         Q          And he was to get off work at 11:30

12    a.m.?

13         A          Yes, sir.

14         Q          And that's the time, I guess, when you

15    were actually taking the statement?

16         A          Yes.

17         Q          Did you cease taking his statement?

18         A          Yes.

19         Q          In the course of your investigation at

20    that time, you determined that Paul Reggettz had, in

21    fact, been at work that night?

22         A          Yes.

23         Q          In his first statement you took, when

24    he told you what he had done, he had stuck to this story

Woodyard - Cross                                           1233

1   until 2:30 a.m. the next morning; didn't he?

2          A       Yes.

3          Q       For fourteen hours he stuck to this

4   story?

5          A       Yes, sir.

6          Q       He stuck to this story until he asked

7   you, "You won't let them hurt me if I tell you what you

8   want?"

9          A       That's right.

10

11                        REDIRECT EXAMINATION

12

13  BY MR. HUFFMAN:

14

15         Q       Sergeant Woodyard, this first statement

16  was terminated because you got a call from Sergeant Smith

17  at the scene of the crime; is that right?

18         A       Yes.

19         Q       And Sergeant Smith called you and told

20  you that Dr. Sopher had tentatively placed a time of

21  death of the victims at about midnight; is that correct?

22         A       Yes, sir.

23         MR. HUFFMAN:  I have nothing further, your Honor.

24         THE COURT:  Any recross?

Woodyard - Redirect                                          1234

1          MR. REVERCOMB:  Yes, your Honor.

2

3                      RECROSS-EXAMINATION

4

5   BY MR. REVERCOMB:

6

7          Q          Objection.  Actually, he told you it

8   could have been; he didn't tell you that it was; did he?

9          A          He just called me and said that the

10  Medical  Examiner's  office  had  done  a  tentative

11  examination of the bodies, and they said the time of

12  death could have occurred as early as midnight.

13         Q          That's not did occur, that's could have

14  occurred?

15         A          Yes, sir.

16         MR. REVERCOMB:  I have nothing further.

17         MR. HUFFMAN:  No further questions.

18         THE COURT:  May he be excused?

19         MR. HUFFMAN:  He may be excused.

20         MR. BICKLEY:  Your Honor, we have no further

21  witnesses at this time.

22         THE COURT:  Come on up.

23

24         WHEREUPON, a bench conference was held and the

Woodyard - Recross                                        1235

1   following transpired:

2

3        THE COURT:  Do you have any problem with sitting

4   down and working on instructions?

5        MR. BICKLEY:  No, let's do that the rest of the

6   day, and then we'll come in in the morning and either put

7   the defendant on or rest.

8        THE COURT:  Okay.

9        (To Ms. Lusk)  Have you got any rebuttal?

10       MS. LUSK:  Well, probably at least one short one

11   so far.  But it could be a long one.

12       THE COURT:  Okay.  Well, I'm going to go ahead

13   and wrap up the instructions business.  I'll go ahead and

14   let them loose.

15

16       WHEREUPON, the bench conference was concluded.

17

18       (Back on the Record)

19

20       THE COURT:  Ladies and gentlemen, we're going to

21   recess for the day.  Again, I would ask that you not

22   discuss the case or allow the case to be discussed with

23   you.  I ask that you not watch any television or read any

24   newspaper accounts of the trial, and if you will come

1236

1    back tomorrow at about 9:00 o´clock, we´ll get started

2    very shortly after that.

3          MR. REVERCOMB:  Your Honor, before we forget it,

4    can we move the admission of Exhibit 167, the Rights

5    Form?

6          THE COURT:  Okay.  Is there any objection?

7          MR. BICKLEY:  No.

8          THE COURT:  It will be received.

9

10         WHEREUPON, the jury was excused for the rest of

11   the day.

12

13         THE COURT:  What I´d like for you to do, I´ve got

14   both sets of instructions.  I think you´ll find that --

15   you´ll find two things:  That my charge, on general

16   principle, covers ninety-nine percent of what you all

17   have already been -- all except for the -- using

18   acceptable doubt.

19         You will also find that I didn´t read the signals

20   right, and drafted a felony murder instruction, based on

21   robbery instead of burglary.  I´m going to change that.

22         If you all would take the next twenty minutes or

23   so and read those, read that charge, and that single

24   instruction, that will give us a starting point.

1237

1    In the meantime, I will try to tidy up this

2    burglary charge.

3

4    WHEREUPON, the Court, the Prosecuting Attorneys

5    and counsel for the defendant discussed the instructions

6    to be given by the Court in closing.

7

8    THE COURT:  Okay.  Let´s go through the charge

9    real quickly.  Did you find anything the matter with the

10   charge?

11   MR. REVERCOMB:  Yes.  The reasonable doubt

12   language -- we´ve always used a Golf instruction.  Of

13   course, it´s a defendant instruction.  I think it says

14   it better.  We have a couple of problems with it.

15   MR. BICKLEY:  You´re talking about the charge?

16   MR. REVERCOMB:  The one that gives the reasonable

17   doubt.

18   MR. HUFFMAN:  What page is that?

19   MS. LUSK:  Six.

20   THE COURT:  It´s almost verbatim of Golf.

21   MR. REVERCOMB:  No, it isn´t.  It starts out, the

22   first sentence, Judge ---

23   THE COURT:  What are you looking at?

24   MR. REVERCOMB:  The second to the last paragraph.

1238

1     "The law presumes the defendant to be innocent of a crime

2     ...", that's the beginning of Golf.

3         THE COURT: Right. It talks about "it seems

4     like" with no evidence against him, but then it strays

5     away from it.

6         All right.

7         MR. BICKLEY: It's not a misstatement of the law.

8         MR. REVERCOMB: We'll go over that, at least it's

9     called fair. It goes on on the next page -- one thing

10     that's in Golf, of course, even though it's a defense

11     instruction, it's not reasonable for the State to prove

12     beyond all doubt and beyond all reasonable doubt.

13         Down here (Indicating), at the bottom of page

14     seven.

15         THE COURT: We've instructed every one of those

16     jurors about that already. Why should I have to tell

17     them again?

18         MR. REVERCOMB: Well, Judge, at the bottom of

19     page seven, it does not require us to prove them in

20     absolute certainty or possibility of mistake. That seems

21     to raise our burden, I think.

22         THE COURT: It does.

23         MR. REVERCOMB: I think it does. I think

24     absolute certainty -- it seems to ---

1239

1     THE COURT:  Does not require proof of ---

2     MR. REVERCOMB:  The Golf instruction, I think,

3     just says it in a much cleaner way.  Also, any essential

4     fact ---

5     THE COURT:  Now, wait a minute.  Tell me where

6     you have Golf untampered with.

7     MR. REVERCOMB:  Well, I have the Golf instruction

8     right here.

9     MS. LUSK:  No, he's asking about it here.

10     MR. REVERCOMB:  I didn't submit it because you

11     told us you were going to take care of the jury charge.

12     But I have a copy of State v. Golf right here.

13     THE COURT:  Is this out of the original trial?

14     MR. REVERCOMB:  Yes.  And it's always the one

15     we've used.

16     THE COURT:  This isn't verbatim out of Golf; is

17     it?

18     MR. REVERCOMB:  That's the Golf charge.

19     THE COURT:  This stuff here (Indicating)?

20     MR. REVERCOMB:  It is.  It's what we've always

21     called the Golf instruction.

22     THE COURT:  I'll put that and look at it.

23     What else have you got?

24     MR. REVERCOMB:  If it's not, I'll certainly be

1240

1    surprised.

2         It talks about any one essential fact proved to

3    the satisfaction of the jury. It's our ---

4         MS. LUSK: Contention -- that should be element.

5    That's on page seven, I guess, at the bottom paragraph.

6    It starts out, "The burden of proof on the State requires

7    that each and every material element of the charge

8    against the defendant be proved beyond a reasonable

9    doubt." Reasonable doubt doesn't mean that there is not

10   going to be a conflict or a contradiction of the

11   evidence. And that seems -- the language, if any one

12   essential fact hasn't been proven, or is proved to be

13   inconsistent, that's sufficient to raise a reasonable

14   doubt.

15        I'm not sure that that's true. Name one

16   essential element ---

17        THE COURT: The only reason I have it that way is

18   because, since it's a circumstantial evidence case, what

19   you've got is a bunch of facts that are not contested.

20   I mean, there is not a bunch of complex facts that give

21   rise to an element.

22        Let's take breaking and entering as a perfect

23   example. You're talking about specific facts on that.

24        MR. REVERCOMB: My point, Judge, you just said

1241

1    there are several facts, and not very complicated, which

2    are contested.  That language seems to say that if they

3    are contested, that raises a reasonable doubt.  That's

4    what it says, "If one essential fact."

5        We don't have to prove facts beyond a reasonable

6    doubt.  We have to prove the elements of the crime.

7    Reasonable doesn't mean that there is no contradiction

8    or conflict in the evidence.

9        THE COURT:  It says, "One essential fact."

10       MR. REVERCOMB:  It also leaves us with, how do

11   you define an essential fact?

12       THE COURT:  What are you saying?  Are you

13   suggesting that it's an alternative, other than that

14   instruction, because you're talking about something else

15   now.

16       MR. REVERCOMB:  Well, essential element, if we

17   fail to prove an essential element of a crime.

18       THE COURT:  But they don't prove any elements in

19   your proof, which is exculpatory; it has to be proven of

20   a fact; doesn't it?

21       MR. REVERCOMB:  I don't know how you'd put it.

22       MS. LUSK:  Why wouldn't the Golf reasonable doubt

23   instruction cover this whole page?

24       THE COURT:  Well, in the first place, it's been

1  washed by the Supreme Court as a terrible instruction.

2  Any first year law student could write a better

3  instruction. I don´t mean that this is going to present

4  any -- that it ought to be sent off for any national

5  awards or anything, but it´s a terrible instruction. The

6  stuff in the center, I´m confident, is in Golf. Maybe

7  that´s why it is.

8       Do you want to go ahead and make five copies?

9       I´m much more concerned about not doing some --

10  not about doing the Golf thing, but giving up the "What

11  is a fair and reasonable doubt" instruction.

12       MR. REVERCOMB: I agree, your Honor. And I think

13  they should be instructed that proof beyond a reasonable

14  doubt does not necessarily mean proof beyond

15  contradiction or conflict. Nowhere does it say that.

16       THE COURT: Okay. So you want that in there.

17  What else?

18       MR. REVERCOMB: Again, essential facts, that just

19  disturbs me. The way this is worded. I don´t know what

20  an essential fact is. There are facts in contest, of

21  course. I don´t know how else it may be worded.

22       MS. LUSK: Do you need those two sentences there

23  (Indicating)? I mean, is it a fair statement without it?

24       THE COURT: To give their version of it, okay.

1243

1    I want to give their version of some similar instruction,

2    which I think they're probably entitled to.

3        And if there are facts inconsistent with facts

4    that the jury finds are inconsistent with guilt, and they

5    believe those facts, then they've got to find the

6    defendant not guilty.  There isn't any question about

7    that.  Right?

8        MS. LUSK:  Right.

9        THE COURT:  Now, they're entitled to some sort of

10    instruction in there that says basically that, and that's

11    about as neutral one as I could find.  And it's not

12    proof of an alibi; that's not what the purpose is.  I

13    take it as somewhat being a departure from the

14    Indictment.  If the jury doesn't believe that it's

15    December the 13th, but December the 12th ---

16        MR. REVERCOMB:  The Indictment doesn't say the

17    date of it.

18        THE COURT:  I just used that as an example.

19        MR. REVERCOMB:  There are other facts that would

20    probably be better to use.  And Paul Reggettz is a fact;

21    that he gave an inculpatory statement, there is no

22    question about it.  True or false, he gave it.

23        Is that an essential fact that inconsistent?

24        THE COURT:  No, the essential fact that is

1244

1    inconsistent is Paul Reggettz's guilt, not that he made

2    the confession, but that he killed his wife.  The jury

3    is not going to miss that point.

4         I hope they don't miss that point.

5         MR. REVERCOMB:  You've got more faith in them

6    than I do.

7         THE COURT:  Certainly, changing this isn't going

8    to help if they've missed the point that egregiously.

9         MR. REVERCOMB:  What is the essential fact that

10   hasn't been proved?

11        THE COURT:  I don't know.  I'm not going to argue

12   each side of the case.

13        MR. REVERCOMB:  Again, we're required to prove

14   the elements of the crime beyond a reasonable doubt.  Our

15   theory of the murder, is that he entered the dwelling

16   with the intent to commit a felony or a larceny therein,

17   and in the course of that, killed those three people.

18   And there is not one essential fact -- I see a problem

19   with the language, Judge, in the charge, as you have

20   articulated it.

21        THE COURT:  Well, what else?

22        Brenda will have a copy of this felony murder

23   instruction here in a minute.  I didn't find any big

24   significant difference, other than that I had the wrong

1245

1    felony in there.

2        MS. LUSK:  You're thinking of sending the charge

3    back with the jury?

4        THE COURT:  If I get it dusted and clean, yeah.

5        MS. LUSK:  I've never done that before.

6        THE COURT:  I've done it a bunch of times.  You

7    don't have to be afraid of that.  All it does is just

8    keeps the jury from coming back in here so many times and

9    us going through the motions of making out what we're

10   going to read to them.  But let's not deal with that now.

11       Let's talk about content.

12       MS. LUSK:  Do you want to know about a typo?

13       THE COURT:  Yeah.  Tell me what all are the

14   typos?

15       MS. LUSK:  Just a teeny-weeny one.  If you're

16   going to send it back to the jury, it's on page eight,

17   three lines down, the second form of evidence, it says,

18   "From".  That's just transposed.  It's three lines from

19   the top on page eight.  The "second form" of that.

20       MR. BICKLEY:  It says, "Second from of evidence."

21       THE COURT:  Thank you.  Do you find anything else

22   at all?  I'll see what I can do about dusting and

23   cleaning the rest of the reasonable doubt stuff.

24       MR. REVERCOMB:  The reasonable doubt is the only

1246

1  problem I have.

2      THE COURT:  How about you guys?  What did you

3  find?

4      MR. BICKLEY:  I didn´t find anything.  It´s

5  beautifully written.

6      MR. HUFFMAN:  We like it the way it is.

7      THE COURT:  Don´t convince me; you´ve got to

8  convince those guys.

9      Why don´t you all huddle and take a look at this.

10     MR. BICKLEY:  The only thing you changed was the

11 robbery to B&E?

12     THE COURT:  I changed robbery to burglary, and

13 then I changed -- took out the definition of robbery and

14 put in the definition of burglary, which is pretty much

15 verbatim from there, except it more accurately tracks the

16 statute on the ---

17     MR. REVERCOMB:  On page five, it talks about --

18 at the top of the page, it talks about resolving any

19 conflicts, "You should weight one expert against

20 another;" I don´t think that´s applicable there.

21     THE COURT:  I think you´re right.

22     MR. REVERCOMB:  I don´t want them comparing Zain

23 and Shumate.

24     MR. HUFFMAN:  I think it´s about the length of

1247

1　　time they testified.

2　　　　　　MR. REVERCOMB:　But basically, that just doesn't

3　　apply in this case.

4　　　　　　THE COURT:　That's correct.

5　　　　　　MR. REVERCOMB:　Just take that sentence out.

6　　　　　　MR. HUFFMAN:　I'll tell you one thing, Judge, the

7　　part where you're not bound to accept expert opinions as

8　　conclusive ---

9　　　　　　THE COURT:　That's going to stay in.　Let's just

10　　take that sentence out, okay?

11　　　　　　MR. BICKLEY:　Which one is that -- resolving

12　　conflict?

13　　　　　　THE COURT:　"And in doing this ...".

14　　　　　　MR. REVERCOMB:　You could reword the second

15　　sentence.

16　　　　　　THE COURT:　Well, except it all deals with

17　　multiple experts.

18　　　　　　MR. REVERCOMB:　Okay.

19　　　　　　MR. BICKLEY:　You got into -- you're taking that

20　　sentence out also?

21　　　　　　THE COURT:　Yes.

22　　　　　　MR. REVERCOMB:　That's fine.

23　　　　　　THE COURT:　Do you have any problem with the

24　　felony murder instruction?

1248

1       MR. REVERCOMB:  Let me finish.

2       THE COURT:  Do you want an alibi instruction?

3       MR. BICKLEY:  I think we should.  I can get one

4   for you here tomorrow.

5       THE COURT:  I'm just trying to think if I do have

6   an alibi instruction.  I've got one, but I don't know if

7   it's going to apply.  Let me go in there and look on the

8   Gregory Burdette one.

9       Here it says, "Evidence has been presented that

10  the defendant was not present at the time or place where

11  this homicide was committed.  This is known in law as the

12  defense of alibi.  You are instructed that the defendant

13  may not be convicted unless the Prosecution proves beyond

14  a reasonable doubt that the defendant was present at the

15  time and place that the alleged crime was committed.

16      "If, after consideration of all of the evidence,

17  you have reasonable doubt whether the defendant was

18  present at the time and place of the alleged offense, you

19  must find him not guilty."

20      MR. BICKLEY:  I ask that we not use that.

21      MR. REVERCOMB:  That's not burden, is it?

22      THE COURT:  No, that's of my own making.

23      MR. REVERCOMB:  It doesn't shift the burden of

24  proof to him?

1249

1    THE COURT:  No, it doesn´t.  Are you satisfied
2    with that?

3    MR. BICKLEY:  Yes, I´m satisfied with it.

4    THE COURT:  I´ll pull that.

5    Okay, what about your felony murder instruction?
6    Are you satisfied with that?

7    MR. REVERCOMB:  Yes, your Honor.  It´s the law.

8    THE COURT:  What does it do, do you think?

9    THE REVERCOMB:  It´s just something -- the last
10   part of it, is not very favorable to us, as it is to the
11   defendant, but ---

12   THE COURT:  What last part?

13   MR. REVERCOMB:  The part about the parole board.

14   THE COURT:  Do you know where that comes from?

15   MR. REVERCOMB:  Where?

16   THE COURT:  That´s Peter Carter Brown´s language.

17   MR. REVERCOMB:  In the last instructions given in
18   this case, it wasn´t in there.

19   MS. LUSK:  I don´t know why it says "only" at
20   such time in there.

21   MR. REVERCOMB:  You could take the only out of
22   there and it would be all right.

23   THE COURT:  You guys are nuts.  This is the
24   furthest thing from an issue in your case.  If they

1250

1    believe in your case, they are going to read right over

2    that. Any jury who believes that the defendant is guilty

3    in this case is going to send him away forever.

4        MS. LUSK: You never know what they'll do, Judge.

5        MR. REVERCOMB: Unless you've got someone holding

6    out.

7        THE COURT: Well, you all may have someone

8    holding out for a compromise, but this won't change that

9    either. I'm going to leave that in there.

10       Do you have any problem with that?

11       MR. BICKLEY: No.

12       THE COURT: Do you have any other problem with

13   this?

14       MR. REVERCOMB: No. It's a good instruction,

15   Judge.

16       THE COURT: Okay, then. We'll use that.

17       Wait a minute. Let me look by here and let's do

18   this: Let's go through the State's instructions first

19   and find out if there is anything in there that we need

20   to incorporate.

21       MR. BICKLEY: We object to 1, because we think

22   it's given in the charge.

23       MS. LUSK: What?

24       MR. BICKLEY: 1 is already given in the charge.

1251

1    MR. REVERCOMB:  Sure.  Yeah, it is.

2    THE COURT:  It's not in the charge, it's in that

3  felony murder charge.

4    MS. LUSK:  We'll withdraw that.

5

6    "STATE'S INSTRUCTION NO. 1

7

8    "The Court instructs the jury that the crime of

9  felony-murder in this State does not require proof of the

10  elements of malice, premeditation or specific intent to

11  kill.  It is deemed sufficient if the homicide occurs

12  accidentally during the commission of, or the attempt to

13  commit, one of the felonies of rape, robbery, arson or

14  burglary."

15

16  Withdrawn

17  4/23/90

18              ----------

19

20    MR. BICKLEY:  No objection to State's instruction

21  No. 2.

22    THE COURT:  No. 2 is your felony murder

23  instruction.  You're going to withdraw that; aren't you?

24    MS. LUSK:  That only sets out each count of

1252

1    murder separately.

2        MR. REVERCOMB:    It  sets  out  the  counts

3    separately.

4        MS. LUSK:  It doesn't say and/or; it just sets

5    them out separately.

6        MR. REVERCOMB:  I like it when they set out the

7    counts.  Count 1, 2, 3.

8        THE COURT:  My professors at Judge School taught

9    us not to do that, say the same thing three times.

10       MR. REVERCOMB:  Okay.  We'll withdraw it.

11

12            "STATE'S INSTRUCTION NO. 2

13

14       "The Court instructs the jury that any killing in

15   the commission of or attempt to commit burglary, be it

16   intentional or not, is murder of the first degree.

17       "The Court further instructs the jury that if any

18   person shall in the nighttime break and enter or enter

19   without breaking or shall in the daytime break and enter

20   the dwelling house or an outhouse adjoining thereto or

21   occupied therewith of another with intent to commit a

22   felony or any larceny therein, he shall be deemed guilty

23   of burglary.  The Court further instructs the jury that

24   if any person shall in the daytime enter without breaking

1253

1  a dwelling house or an outhouse adjoining thereto or

2  occupied therewith of another with intent to commit

3  felony or any larceny therein he shall be deemed guilty

4  of burglary.

5  "The Court instructs the jury that actual

6  breaking involves the application of some force, slight

7  though it may be, whereby the entrance is effected.

8  Merely pushing open a door, turning the key, lifting the

9  latch, or resort to other slight physical force is

10  sufficient to constitute this element of the crime.

11  "Therefore the Court instructs the jury that if

12  you believe beyond a reasonable doubt that JOHN MOSS,

13  JR., AKA JOHN MOSS, III, did in the nighttime break and

14  enter or enter without breaking or if you believe from

15  all of the evidence in the case beyond a reasonable doubt

16  that he did in the daytime break and enter or enter

17  without breaking the dwelling house of Paul and Vanessa

18  Reggettz, with the intent to commit a felony or any

19  larceny therein and if you further believe beyond a

20  reasonable doubt that the death of Paul Eric Reggettz

21  occurred during or as a result of the burglary then you

22  may find the defendant, JOHN MOSS, JR., AKA JOHN MOSS,

23  III, guilty of first degree murder as charged in Count

24  One of the indictment.

1254

1    "The Court further instructs the jury that is

2    (sic) you believe beyond a reasonable doubt that JOHN

3    MOSS, JR., AKA JOHN MOSS, III, did in the nighttime break

4    and enter or enter without breaking or if you believe

5    from all the evidence in the case beyond a reasonable

6    doubt that he did in the daytime break and enter or enter

7    without breaking the dwelling house of Paul and Vanessa

8    Reggettz, with the intent to commit a felony or any

9    larceny therein and if you further believe beyond a

10   reasonable doubt that the death of Bernadette Reggettz

11   occurred during or as a result of the burglary then you

12   may find the defendant, JOHN MOSS, JR., AKA JOHN MOSS,

13   III, guilty of first degree murder as charged in Count

14   Two of the indictment.

15   "The Court further instructs the jury that is

16   (sic) you believe beyond a reasonable doubt that JOHN

17   MOSS, JR., AKA JOHN MOSS, III, did in the nighttime break

18   and enter or enter without breaking or if you believe

19   from all the evidence in the case beyond a reasonable

20   doubt that he did in the daytime break and enter or enter

21   without breaking the dwelling house of Paul and Vanessa

22   Reggettz, with the intent to commit a felony or any

23   larceny therein and if you further believe beyond a

24   reasonable doubt that the death of Vanessa Dale Reggettz

1255

1    occurred during or as a result of the burglary then you

2    may find the defendant, JOHN MOSS, JR., AKA JOHN MOSS,

3    III, guilty of first degree murder as charged in Count

4    Three of the indictment."

5

6    Withdrawn

7    4/23/90

8                          ----------

9

10        MR. BICKLEY:   State's Instruction No. 3, we

11   object.  It's in the charge.

12        THE COURT:  Do you want to show it withdrawn?

13        MR. REVERCOMB:  Yes, sir.

14

15            "STATE'S INSTRUCTION NO. 3

16

17        "The Court instructs the jury that one of three

18   (3) verdicts may be found under the indictment in this

19   case, if the evidence in the case so warrants:   (1)

20   murder in the first degree;  (2)  murder in the first

21   degree with a recommendation of mercy; and  (3)  not

22   guilty.

23        "The Court further instructs the jury that under

24   the law of the State of West Virginia, murder in the

1256

1    commission of a burglary is murder in the first degree.

2        "The Court instruct (sic) the jury that should

3    you find defendant, JOHN MOSS, JR., aka JOHN MOSS, III,

4    guilty of murder in the first degree and do not recommend

5    mercy, then the defendant, JOHN MOSS, JR., aka JOHN MOSS,

6    III, shall be punished by confinement in the penitentiary

7    of this State for the rest of his natural life and he

8    shall not be eligible for consideration for parole.  On

9    the other hand, if you find the defendant, JOHN MOSS,

10   JR., AKA JOHN MOSS, III, guilty of murder in the first

11   degree and add a recommendation of mercy then the

12   defendant, JOHN MOSS, JR., AKA JOHN MOSS, III, shall be

13   confined in the penitentiary of this State for the rest

14   of his natural life, but he would be eligible for

15   consideration for parole only after having served a

16   minimum of ten (10) years of such sentence, such

17   eligibility in no way guaranteeing immediate release.

18   State v. Headley, 282 S.E.2d 872."

19

20   Withdrawn

21   4/23/90

22

23                    ----------

24

1257

1         MR. BICKLEY:  State's Instruction No. 4, we

2 object to this.  You say you have an abiding conviction

3 of the truth to the charge -- truth contained in the

4 Indictment.  I don't like that language.

5         THE COURT:  Let's put this off to the side.  The

6 only place we're going to end up fighting in this thing

7 is how much reasonable doubt -- you guys probably

8 tendered six or seven.

9         MR. HUFFMAN:  What's troubling us about that,

10 Judge, your a Judge instructing the jury about

11 conviction.  I don't care how they take it.

12         MR. REVERCOMB:  Change the word "convicted" to

13 "believed."

14         MR. BICKLEY:  We -- the circumstantial evidence,

15 we think that's too ---

16         THE COURT:  Do you think the circumstantial

17 evidence is covered in the charge?  I just don't know if

18 it covers what you want.

19         MR. REVERCOMB:  For one thing, you define

20 circumstantial evidence as two types of evidence.  But

21 this tells them that they can consider circumstantial

22 evidence alone, or coupled with other evidence.

23         MS. LUSK:  Sometimes, it's the only motive of

24 proof.

1258

1    THE COURT: You know, of all the things we do to

2    juries, we just assume that they are going to make some

3    sense out of all of this legal crap. And what I've

4    always thought was some of the worst legal jargon that

5    we throw at them is reasonable hypothesis consistent with

6    ---

7    MR. REVERCOMB: We throw a lot of things at them,

8    and they don't understand it or don't listen to what

9    they've had. But you did some fine circumstantial

10   evidence. They're not really told what they can do with

11   it.

12   MS. LUSK: Judge, that particular language that

13   I think I've picked out of here is on the seventh line

14   down, it starts on Instruction 5, on the seventh line

15   down, it starts with, "They have the right to convict the

16   defendant upon circumstantial evidence alone."

17   Then, at the end down here, sometimes that's the

18   only motive proof. That's the language that's not

19   covered, that I think is important.

20   THE COURT: All right. Here's what I've done.

21   On page eight, the last sentence of the first paragraph,

22   "The law accepts both direct and circumstantial evidence

23   to establish the guilt of a defendant, and in some cases,

24   circumstantial evidence is the only source of proof.

1259

1  "But where the State relies on circumstantial

2  evidence, such evidence must exclude all other reasonable

3  hypotheses consistent with the innocence of the defendant

4  before he may be found guilty."

5  MR. REVERCOMB:  That still leaves that language

6  of circumstantial evidence, coupled with other evidence.

7  THE COURT:  Doesn't that say that?

8  MR. REVERCOMB:  I don't think so.

9  THE COURT:  It says both direct and

10  circumstantial evidence.  You don't have any direct

11  evidence in this case; do you?

12  MR. REVERCOMB:  His confession, and

13  circumstantial evidence covered with it, is the basis of

14  our case.

15  THE COURT:  Is there anything to confuse the jury

16  about this?

17  MR. REVERCOMB:  I'm not saying that it will

18  confuse them.

19  THE COURT:  I'm going to leave that like it is,

20  with that adjustment.

21  MR. REVERCOMB:  Note our objection, Judge.

22  THE COURT:  Incidentally, note the State's

23  objection to Instruction No. 5.

24

1260

"STATE'S INSTRUCTION NO. 5

"The Court instructs the jury that one charged with crime may be convicted upon circumstantial evidence alone, or upon circumstantial evidence connected with other evidence, if the jury believe beyond a reasonable doubt from the circumstantial evidence connected with other evidence, that the person or persons so charged are guilty of the crimes alleged against them in the indictment; therefore, the Court instructs the jury in this case that they have the right to convict the defendant upon circumstantial evidence alone, or upon circumstantial evidence coupled with other evidence, if the jury from such circumstantial evidence connected with other evidence, believe the guilty (sic) of the defendant beyond a reasonable doubt.  And the Court further instructs the jury that circumstantial evidence is not only competent, but is sometimes the only mode of proof, and, therefore, if the jury believe from the evidence and circumstances in this case, beyond a reasonable doubt, that the accused committed the offenses as charged against him in the indictment herein, then it is their duty to find him guilty."

1261

1    Refused

2    4/23/90

3                    _____

4

5            Okay.  No. 6.  Does this have anything?

6            MR. BICKLEY:  I don't think so, your Honor.

7            MS. LUSK:  Judge, I believe this instruction is

8    commonly given, especially the first paragraph, in a

9    circumstantial evidence case.  It's been recently cited

10   by the Supreme Court.  The time, place, means,

11   opportunity and mode of conduct.

12           THE COURT:  What does any of that say?  In the

13   first place, I'm not sure -- what is the exception to

14   time and place?  Any of those are issues that the State

15   proves under West Virginia law.  Right?

16           Opportunity, you don't prove.  Motive, you don't

17   prove.  Means, you don't prove.

18           MS. LUSK:  We have proved motive in this felony

19   murder case -- the intent to break in.

20           THE COURT:  Right.

21           MS. LUSK:  That's what I'm talking about.

22           MR. REVERCOMB:  His opportunity is, of course,

23   the circumstantial occasion where he lived.

24           THE COURT:  This is an instruction that comes out

1262

1   of another state or something.

2       MS. LUSK:  I remember using the instruction when

3   I tried the Jack Beasley case, back about six or seven

4   years ago.

5           Then, there was another case here last summer.

6   There was another murder for insurance proceeds case in

7   which the Supreme Court cited this, as I recall.

8       COURT:  The Court cited it in what context?  Was

9   it necessary to give it?

10      MS. LUSK:  They were talking about whether there

11  was enough proof to convict this fellow.

12      MR.  REVERCOMB:    There   was   very   little

13  circumstantial evidence in the case.

14

15              "STATE'S INSTRUCTION NO. 6

16

17      "The Court instructs the jury that in all cases

18  when the proof is circumstantial evidence, if the time,

19  place, means, opportunity, motive and conduct, or such

20  of these facts as may be proved without other facts, if

21  any, all concur in pointing out the accused beyond a

22  reasonable doubt, then you should find the defendant

23  guilty as charged in the indictment.

24      "The Court further instructs the jury that while

1263

1  they must be convinced of the guilty (sic) of the

2  defendant, beyond a reasonable doubt, from the evidence

3  in this case, yet the proof need not be direct evidence

4  of persons who saw the murders, described in the

5  indictment; the acts constituting the crime may be proved

6  by all the facts and circumstances in the case."

7

8  Refused

9  4/23/90

10  —————————

11

12  MS. LUSK: No. 7 is covered. We'll withdraw it.

13  THE COURT: Okay.

14

15  "STATE'S INSTRUCTION NO. 7

16

17  "The Court instructs the jury that you should

18  carefully consider the testimony of each and every

19  witness and not disregard or overlook any testimony,

20  witness or evidence.

21  "You are the sole judges of the credibility of

22  the witnesses and the weight of the evidence. As used

23  in these instructions "the credibility of a witness"

24  means the truthfulness or lack of truthfulness of the

1264

1    witness. "The weight of the evidence" means the extent

2    to which you are or are not convinced by the evidence.

3        "The number of witnesses testifying on one side

4    or the other of an issue is not alone the test of

5    credibility of the witnesses and the weight of the

6    evidence. If warranted by the evidence, you may believe

7    one witness against the number of witnesses testifying

8    differently. The test is: How truthful is the witness

9    against the number of witnesses testifying differently.

10   The test is: How truthful is the witness and how

11   convincing his or her testimony is in light of all the

12   evidence and circumstances shown. "The evidence should

13   be considered by you in the light of your own

14   observations and experiences in the ordinary affairs of

15   life."

16       "In determining the credit and weight you will

17   give to the testimony of any witness who has testified

18   before you, you may consider, if any be found by you from

19   the evidence, (1) the good memory or lack of memory of

20   the witnesses (2) the interest or lack of interest of

21   the witness as to the outcome of the trial (3) the

22   demeanor or manner of testifying of the witness (4) the

23   opportunity and means, or lack of opportunity and means,

24   of having knowledge of the matter concerning which the

1    witness testified (5) and, the reasonableness or

2    unreasonableness of such testimony. From these

3    consideration (sic) and all other conditions and

4    circumstances appearing from the evidence, you may give

5    to the testimony of the witness such credit and weight

6    as you believe it entitled to receive.

7        "If you believe that any witness in this case has

8    knowingly testified falsely as to any material fact, you

9    may, after considering and weighing the testimony of such

10   witness, disregard the whole of the testimony of such

11   witness or give it or any part thereof, such weight or

12   credit that you may believe it entitled to receive."

13

14   Withdrawn

15   4/23/90

16                         ----------

17

18        THE COURT:  We're now to Defendant's No. 1.

19        It may not be artfully done, but that's all

20   covered, isn't it, Nelson?

21        MR. BICKLEY:  Pardon, your Honor?

22        THE COURT:  That's all done; isn't it?

23        MR. BICKLEY:  In the charge?

24        THE COURT:  Yes.

1266

1    MR. BICKLEY:  I'd like to get around the fringes

2    of it.

3    THE COURT:  The one I was looking at is whether

4    or not it -- yeah, "nor will speculation, conjecture or

5    proof by a preponderance of the evidence, or by a clear

6    and convincing evidence," which you didn't put in yours.

7    MR. BICKLEY:  We'll probably cover it later on.

8    THE COURT:  I'm going to note that one as

9    refused.

10   MR. BICKLEY:  You're going to refuse this one?

11   THE COURT:  Yes.

12   MR. BICKLEY:  I want to object to this.

13   THE COURT:  You don't have any errors apparent in

14   here, do you?

15   MR. BICKLEY:  No.

16

17   "DEFENDANT'S INSTRUCTION NO. 1

18

19   "The Court instructs the jury that the burden of

20   proof is upon the State to establish the guilt of the

21   accused beyond a reasonable doubt.  All presumptions of

22   law are in favor or (sic) the innocence of the defendant,

23   John Moss, and every defendant is presumed to be innocent

24   until he is proven guilty beyond a reasonable doubt.

1267

1   This presumption of innocence is not a mere matter of

2   form, but a substantial part of the law of the land that

3   goes with the accused throughout every stage of the

4   trial.  If, after hearing the evidence in this case,

5   there remains in the mind of the jury a reasonable doubt

6   as to the guilt of the accused, the accused is entitled

7   to the benefit of that doubt and the jury must acquit

8   him.  It is not sufficient of the probability of his

9   guilt, but the fact must be established by strong and

10  convincing evidence sufficient to remove from the minds

11  of the jury every reasonable doubt to the contrary, and

12  unless the jury have been convinced by evidence that

13  satisfies the mind and conscience of each and every

14  member of the jury, then the jury cannot find the

15  defendant, John Moss, guilty.

16  State v. Foley, 131 W.Va. 326, 47 S.E.2d 40;

17  State v. Reppert, 132 W.Va. 675, 51 S.E.2d 820;

18  State v. Justice, 107 W.Va. 490, 148 S.E. 843"

19

20  Refused

21  4/23/90

22

23                        ----------

24

1268

1         THE COURT:  What about No. 2?

2         MS. LUSK:  It sounds like a voir dire question.

3         THE COURT:  It sounds like what you've already

4 argued to the jury.

5         MR. BICKLEY:  We haven't given them instructions

6 of the law.

7         THE COURT:  If I tell them that one more time,

8 they'll go to sleep on us.

9         MR. BICKLEY:  You're not refusing this one, are

10 you?

11         THE COURT:  Absolutely.

12         MR. BICKLEY:  Do you have suspicion in there

13 anywhere?

14         THE COURT:  Yeah.  I've got speculation,

15 conjecture, suspicion, proof by a preponderance of the

16 evidence, and clear and convincing evidence.

17         MR. BICKLEY:  Note my objection -- note my

18 standard objection.

19

20       "DEFENDANT'S INSTRUCTION NO. 2

21

22     "The Court instructs the jury that you cannot

23 find John Moss guilty because you think he might be

24 guilty; you can't find John Moss guilty because you think

1269

1    he most likely is guilty; you can't find John Moss guilty

2    because you think he is probably guilty; and you can't

3    convict John Moss on a suspicion of guilt, but instead

4    in order for you to find John Moss guilty the State must

5    prove his guilt beyond a reasonable doubt that is to a

6    moral certainty."

7    Refused

8    4/23/90

9                        ----------

10

11            MR. REVERCOMB:  No. 3 is covered, your Honor.

12            THE COURT:  Yeah, sure.

13            MR. BICKLEY:  You're giving this one?

14            THE COURT:  Mine's nicer than this.

15            MR. REVERCOMB:  I think so, too.

16            MR. BICKLEY:  Does this mean that we're not

17    getting this one?

18            THE COURT:  I'm refusing it.

19            MR. BICKLEY:  There's nothing wrong with

20    repetition, you know.

21            THE COURT:  That's one place where I disagree

22    with you.  They stop paying attention after a point.  If

23    I had my way, I'd cut that charge down of mine a lot.

24

1270

1                  "DEFENDANT´S INSTRUCTION NO. 3

2

3             "The Court instructs the jury that you do not

4    have to believe the defendant, John Moss, is innocent of

5    the charge against him in order to find a verdict of not

6    guilty; your verdict of not guilty only means that the

7    State has failed to prove to you the guilt of the

8    defendant, John Moss, beyond a reasonable doubt.

9           "You are further instructed, therefore, that the

10   defendant, John Moss, does not have to put on any

11   evidence of his innocence in order for you to find him

12   not guilty."

13

14   Refused

15   4/23/90

16                    - - - - - - - - - - - -

17

18        THE COURT:  No. 4, this is a piece of boilerplate

19   -- I´ll put it aside for a minute.

20        No. 5, that´s all been stated; hasn´t it?

21        MR. BICKLEY:  Note my objection.

22        THE COURT:  Sure.

23

24

1271

"DEFENDANT'S INSTRUCTION NO. 5

1

2

3       "The Court instructs the jury that they are the

4  sole judges of the weight of the testimony of any witness

5  who has testified before them in the case at bar, and

6  that in ascertaining such weight, they have the right to

7  take into consideration the credibility of such witness,

8  as disclosed from his evidence, his manner of testifying

9  and demeanor upon the witness stand, and his apparent

10  interest, if any, in the result of the case.  And, if the

11  jury believes that any witness has knowingly and

12  intentionally testified falsely as to any material fact,

13  they have the right to disregard all the testimony of

14  such witness so testifying falsely, or to give his

15  testimony or any part thereof, such weight only as the

16  same, in their opinion may be entitled to."

17

18  Refused

19  4/23/90

20                      ----------

21

22       THE COURT:   No. 6.   What's this relate to,

23  Nelson?

24       MR. BICKLEY:   Which one?

1272

1    THE COURT:  6.

2    MR.  REVERCOMB:   Do  they  have  to  weigh  his

3    testimony  in  the  same  manner  that  they  would  everyone

4    else's?

5    THE COURT:  Doesn't it have that in there?

6    MR. REVERCOMB:  Yeah.

7    MR. LUSK:  You've got a credibility instruction?

8    THE COURT:  Yeah.

9    MR.  REVERCOMB:   A  detailed  credibility

10   instruction.  Do you have some law on this, Mr. Bickley,

11   or did you make that up?

12   THE COURT:  Where are we?

13   MS.  LUSK:   He's  looking  at  6,  about  the

14   credibility argument.

15   MR. BICKLEY:  It's not in there, is it?

16   THE COURT:  Yeah, it's in there.

17   MR. BICKLEY:  Please note my objection.

18

19        "DEFENDANT'S INSTRUCTION NO. 6

20

21        "The Court instructs the jury that all evidence

22   given by any witness who feels or is of the opinion that

23   his or her circumstances would be improved by the giving

24   of testimony unfavorable to the accused, John Moss, or

1273

1  whose self-interest might tend to prompt such witness to

2  testify unfavorable to the accused, John Moss, then the

3  jury should consider such testimony and evidence in that

4  light and give such evidence only such weight as the jury

5  feels  evidence  should  be  given  under  those

6  circumstances."

7

8  Refused

9  4/23/90

10                          ----------

11

12       MR. BICKLEY:  Okay, 7.  I don't need this one.

13  I'll withdraw this one.  We didn't impeach anybody; did

14  we?

15       THE COURT:  Nobody did, because that's in mine.

16       MR. BICKLEY:  Everybody was ready to impeach, on

17  both sides.

18       THE COURT:  I thought you ---

19       MR. REVERCOMB:  I think he admitted everything

20  and more.

21       MR. BICKLEY:  I thought I was going to have to

22  impeach ---

23       MR. HUFFMAN:  I don't think anybody got impeached

24  -- Reggettz or anybody.

1274

1  THE COURT:  I´ll just strike it out of mine.

2  MR. BICKLEY:  We´re withdrawing that one.

3

4  "DEFENDANT´S INSTRUCTION NO. 7

5

6  "The testimony of a witness may be discredited or

7  impeached by showing that he previously made statements

8  which are inconsistent with his present testimony.  The

9  earlier contradictory statements are admissible only to

10  impeach the credibility of the witness and not to

11  establish the truth of these statements.  It is the

12  province of the jury to determine the credibility, if

13  any, to be given the testimony of a witness who has been

14  impeached.

15  "If a witness is shown knowingly to have

16  testified falsely concerning any material matter, you

17  have a right to distrust each witness´s testimony in

18  other particulars; and you may reject all the testimony

19  of that witness or give it such credibility as you may

20  think it deserves.

21  "United States v. Hill, 481 F.2d 929 (5th Cir.,

22  1973), cert.

23  "Martin v. United States, 528 F.2d 1157 (4th

24  Cir., 1975)"

1275

1   Withdrawn

2   4/23/90

3   ----------

4

5   MR. BICKLEY:  On No. 8, what do you think?

6   THE COURT:  Criminal trial in Virginia -- now,

7   seriously, is that something that is going to be helpful

8   to you at some point?

9   MR. BICKLEY:  We're going to offer it in theory,

10  and if they think it's ---

11  THE COURT:  In the first place, in circumstantial

12  evidence, I've got reasonable hypothesis consistent with

13  his innocence theory.

14  Yeah, this is what we're dealing with -- is this

15  part here (Indicating), on page seven.  "If there is any

16  one essential proven fact which is inconsistent with the

17  guilt of the defendant, similarly, if that essential fact

18  has not proven to the satisfaction," et cetera, et

19  cetera.

20  Don't you think that that covers it if I leave

21  that in there?

22  MR. BICKLEY:  Right.

23  THE COURT:  We'll put this over here with No. 4,

24  then.

1276

1   THE COURT:  I've got 9 covered.

2   MR. BICKLEY:  9 is included in the charge?

3   THE COURT:  Yeah, don't you think?

4   MR. BICKLEY:  Yeah, we may pull that in the

5   morning.  We'll see.

6   MR. REVERCOMB:  If he does testify ---

7   MR. BICKLEY:  I'm going to bring in another

8   instruction if he does testify.

9   MR. REVERCOMB:  But another instruction sets

10  forth the theory of the case.

11  MR. BICKLEY:  Alibi is a theory of the case that

12  we've already got.

13  MR. REVERCOMB:  This is covered, I think.   I

14  object to this.

15  MS. LUSK:  Did you withdraw No. 9?

16  THE COURT:  Yeah.

17  MR. BICKLEY:  Yeah.  I'll withdraw it at this

18  time.

19

20  "DEFENDANT'S INSTRUCTION NO. 9

21

22  "The Court instructs the jury that the fact that

23  the defendant, John Moss, did not testify as a witness

24  in his own behalf creates no presumption of guilt against

1277

1  him and cannot be taken or considered by the jury as any

2  evidence or even a circumstance showing or tending to

3  show in the slightest degree the guilt of the accused,

4  the plea of not guilty denies every material allegation

5  in the indictment charged.

6      "The law never imposes upon a defendant in a

7  criminal case the burden or duty of calling any witnesses

8  or producing any evidence."

9

10  Refused

11  4/23/90

12              ----------

13

14      MR. BICKLEY:  Now, we're on 10?

15      THE COURT:  Yeah, I'll tell you what that's like

16  --- it's like a Chinese puzzle.

17      What does that mean?

18      MR. BICKLEY:  It's beautiful.  You can't get any

19  better than that.

20      MS. LUSK:  I've never seen this "inconsistent

21  with innocence" language.

22      MR. BICKLEY:  Evidence is always inconsistent

23  where the evidence proves or tends to prove some other

24  reasonable hypothesis.

1278

1    THE COURT:  It may still be true.

2

3              "DEFENDANT'S INSTRUCTION NO. 10

4

5        "The Court instructs the jury that if after you

6    have weighed, analyzed and considered the evidence in

7    this case, you find that you cannot say that it excludes,

8    beyond a reasonable doubt, every reasonable hypothesis

9    inconsistent with the innocence of John Moss, that is,

10   if such evidence creates only an inference or conclusion

11   of strong suspicion that John Moss was in some way

12   connected with the crime, then it is not sufficient to

13   justify a verdict of guilty.   For suspicion alone,

14   however, strong, is never sufficient to convict.

15   Evidence is always insufficient, where, assuming all to

16   be proved which the evidence tends to prove, some other

17   reasonable hypothesis may still be true; for it is the

18   actual exclusion of every other reasonable hypothesis

19   which invests suspicion with the force of truth, and

20   where the evidence leaves it indifferent which of several

21   hypotheses is true, or establishes only some finite

22   problem in favor of one hypothesis, such evidence cannot

23   amount to proof, however great the probability may be.

24   John Moss is entitled to an acquittal unless the fact of

1279

1      guilt  is  proven  to  the  actual  exclusion  of  every

2      reasonable hypothesis of innocence."

3

4      Refused

5      4/23/90

6                              ----------

7

8              THE COURT:  Now, read the next one.  I love this.

9      This is a sweet piece of work.

10             MR. BICKLEY:   It is the act, or exclusion of

11     every  other  reasonable  hypothesis,  which  invests

12     suspicion with the force of truth -- are you all taking

13     umbrage at this?  I inherited this instruction.  I want

14     to point that out.

15             THE COURT:  Gary Barkus wrote that; right?

16             MR. BICKLEY:  No. Gary didn't write this.

17             Does that mean you're not giving it?

18             THE COURT:  Refused.

19             MR. BICKLEY:  Note my objection.

20             THE  COURT:    Incidentally,  what's  in  there  --

21     what's covered?

22             MR. BICKLEY:  That's the circumstantial evidence

23     instruction.

24

1280

"DEFENDANT'S INSTRUCTION NO. 11

1

2

3      "Direct evidence of a fact to be proved is

4  usually the testimony of a witness who saw or heard or

5  otherwise observed the fact.  As an example, when it is

6  sought to prove that it was snowing at 3:00 o'clock a

7  witness testifies that at 3:00 o'clock he looked out of

8  the window and saw it snowing.

9      "Circumstantial evidence of a fact to be proved

10  is usually the testimony of a witness who saw, heard or

11  otherwise observed some separate circumstantial fact,

12  which from the usual connection of things and from the

13  relation of cause and effect lead to a reasonable

14  inference and conclusion that the fact to be proved

15  exists.  As an example, when it is sought to prove that

16  it was snowing at 3:00 o'clock a witness testifies that

17  at 3:00 o'clock when John Doe entered the house from

18  outdoors there were snow flakes on his hat and overcoat.

19      "When the State seeks to prove John Moss guilty

20  of any one or more of the material elements of an offense

21  or the whole offense charged in an indictment, by

22  circumstantial evidence, you should weigh and determine

23  the circumstantial evidence under the following rules:

24      1.  Each material circumstantial fact from which

1281

1   guilt is to be inferred must be proved beyond a
2   reasonable doubt.

3        2.   All the material circumstantial facts so
4   proved beyond a reasonable doubt must be consistent with
5   each other and with guilt.

6        3.   All the material circumstantial facts so
7   proved beyond a reasonable doubt when considered together
8   must be conclusive and the inferences of guilt therefrom
9   so strong and so convincing that when the material
10  circumstantial facts are believed guilt must be believed.

11       4.   If all the material circumstantial facts so
12  proved beyond a reasonable doubt when considered together
13  raise in your mind only a suspicion of guilt or do no
14  more than convince you that guilt is possible or
15  probable, they are not sufficient proof of guilt.

16       5.   All the material circumstantial facts so
17  proved beyond a reasonable doubt must exclude (sic) every
18  reasonable inference and theory of innocence and be
19  compatible only with guilt.

20       6.   If you can reconcile all the material
21  circumstantial facts so proved beyond a reasonable doubt
22  with any reasonable theory of innocence or reach any
23  reasonable explanation of them except guilt you should
24  do so and find John Moss not guilty.

1282

1        7.  You may convict John Moss on circumstantial

2    evidence alone or on both circumstantial evidence and

3    direct evidence if after impartially weighing the

4    circumstantial evidence with these circumstantial

5    evidence rules, such circumstantial evidence together

6    with all the evidence convinces you beyond a reasonable

7    doubt that the defendant is guilty as charged.

8        8.  These circumstantial evidence rules do not

9    apply to circumstantial facts tending to prove the

10   defendant not guilty, such circumstantial facts are

11   sufficient if they raise in your minds a reasonable doubt

12   of the guilt of the defendant."

13

14   Refused

15   4/23/90

16            ----------

17

18       MS. LUSK:  This is similar.

19       MR. BICKLEY:  It's good, isn't it?

20       THE COURT:  I'm not sure.  It made my brain numb.

21       MR. BICKLEY:  This one is clear.

22       THE COURT:  Well, you know, you did pretty good

23   for a while, there.

24       MS. LUSK:  Where?

1283

1     THE COURT:  I don't know, 1, 2 and 3 aren't bad.

2     MS. LUSK:  What about up above it?

3     THE COURT:  Other than just scrambling brains,

4  does this accomplish anything for you?  Seriously.

5     MS. LUSK:  Judge, I have a real serious problem

6  with any language in which there is an instruction

7  relating to the theory of innocence.  I just think that's

8  setting up problems in the future.  I think the only time

9  innocence should ever be mentioned in the charge is when

10  the Court tells the jury that the defendant doesn't have

11  to prove himself innocent, and a verdict of not guilty

12  does not mean anything except that the State has not

13  proven its case beyond a reasonable doubt.

14     So, when you set it up, you start talking about

15  the defendant's theory of innocence.  You're telling the

16  jury that something other than what the law is, I think.

17     I mean, this is better for us to argue,

18  certainly.  We can certainly argue that there is no

19  theory of innocence, but I think that's a real problem.

20     THE COURT:  Yeah.  There is.  The hypothesis

21  consistent with his innocence, or however you want to

22  characterize it, is Reggettz's guilt; right?

23     I mean, that's the circumstantial fact that they

24  want to ---

1284

1     MS. LUSK:  Well, maybe it's a strategical issue.
2     Maybe they want this language; I don't know.
3         THE COURT:  I'm serious.  What does this -- what
4     is  this?    It's  a  pretty  good  job,  in  part,  of
5     articulating  a  nice  set  of  legal  principles.    I  just
6     wonder if you want to do that to the jury.
7         You  get  down  here  and  you  say,  if  all  the
8     materials are circumstantial facts, and so proved beyond
9     a  reasonable  doubt,  considered  together  raise  in  your
10    mind only a suspicion of guilt -- it can do more than
11    convince  you  of  the  guilt.    It  is  more  possible  than
12    probable that that's not sufficient proof of guilt.
13        It  just  goes  on  and  on  and  on  with  a  lot  of,  I
14    think,   probably,   accurate   principles,   but   it's
15    mesmerizing in the process.
16        MR. REVERCOMB:  It's confusing, Judge.
17        THE COURT:  Only to non-lawyers.
18        MR.  REVERCOMB:    It'll  confuse  the  jury  if  you
19    read it to them.
20        THE COURT:  I'm going to refuse that one.  I'm
21    going to refuse No. 12.
22        MR. BICKLEY:  May I note a strenuous, a strong,
23    and emotional objection.
24        THE COURT:  I think what you've got in there and

1285

1  what you want in there is probably governed.

2        MR. BICKLEY:  I think this is different, given

3  ---

4        MS. LUSK:  Are you withdrawing it?

5        MR. BICKLEY:  Right.

6

7

8        "DEFENDANT´S INSTRUCTION NO. 12

9

10        "The Court instructs the jury that a distinction

11  is to be noted between civil and criminal cases in

12  respect to the degree or quantity of evidence necessary

13  to justify the jury in finding their verdict for the

14  State.  In civil cases, the jury´s duty is to weigh the

15  evidence carefully and find for the party whose evidence

16  out weighs the other, although it be not free from

17  reasonable doubt; but in criminal trials the party

18  accused is entitled to the benefit of the legal

19  presumption in favor of innocence which, in doubtful

20  cases, is always sufficient to turn the scale in his

21  favor. It is, therefore, a rule of criminal law that the

22  guilt of the accused must be fully proved beyond any

23  reasonable doubt; neither a mere preponderance of

24  evidence as in a civil case is sufficient to convict the

1286

1   accused.   The persuasion of guilt based on the evidence

2   in a criminal case must and ought to amount to a moral

3   certainty, or such a moral certainty as convinces the

4   minds of the jury as reasonable men beyond all reasonable

5   doubt.

6   <u>State v. Gebhart</u>, 70 W.Va. 232, 73 S.E. 964"

7

8   Withdrawn

9   4/23/90

10

11                      ----------

12

13          THE COURT:  Every paragraph in this is covered.

14          MR. BICKLEY:  Which one, 13?

15          THE COURT:  Yeah.  That is in the charge.

16          MR. REVERCOMB:  That's true.  Are you going to

17   withdraw it?

18          THE COURT:  Is that about the jury stuff?

19          MR. REVERCOMB:  Are you going to withdraw it?

20          MR. BICKLEY:  No.  This is appeal stuff.

21          MS. LUSK:  Are you withdrawing it?

22          THE COURT:  I'll show it refused.

23          MR. BICKLEY:  Show it refused; I want to object.

24

1287

1    "DEFENDANT'S INSTRUCTION NO. 13

2

3        "The Court instructs the jury that upon the trial

4    of a criminal case by a jury, the law contemplates the

5    concurrence of twelve minds in the conclusion of guilt

6    before a conviction can be had.  Each individual juror

7    must be satisfied, beyond a reasonable doubt, of the

8    defendant's guilt before he/she can rightly under his/her

9    oath, consent to a verdict of guilty.  Each juror should

10   feel the responsibility resting upon him/her as a member

11   of the jury, and should realize his/her own mind must be

12   convinced beyond a reasonable doubt of John Moss's guilt

13   before he/she can consent to a verdict of guilty.

14   Therefore, if any individual juror, after having duly

15   considered the evidence in the case, the instructions of

16   the Court, the argument of counsel, and consulting with

17   his/her fellow jurors, should entertain a reasonable

18   doubt of John Moss' guilt, it is his/her duty not to

19   surrender his/her own conviction simply because all or

20   some of the jurors entertain a different opinion, and in

21   such case any juror entertaining a reasonable doubt of

22   John Moss' guilt must not surrender his/her own

23   conviction and must insist on a verdict of not guilty.

24   State v. Wiseman, 94 W.Va. 229, 118 S.E. 139."

1288

1   Refused

2   4/23/90

3          ----------

4

5          MR. BICKLEY:  Okay.  14, now.

6          THE COURT:  Now, that's my language.

7          MR. BICKLEY:  That's good.  Do you want to give

8   this one?

9          THE COURT:  No, I've already given it.

10          MR. REVERCOMB:  I understand that a verdict of

11   not guilty is cited specifically in there.

12          MR. BICKLEY:  I must have got that off of you.

13          MS. LUSK:  Are you withdrawing it?

14          MR. BICKLEY:  I'm withdrawing this one.

15

16          "DEFENDANT'S INSTRUCTION NO. 14

17

18          "The Court instructs the jury that upon the trial

19   of this case, if a reasonable doubt of any material fact

20   necessary to establish the guilt of John Moss as charged

21   in the indictment be raised by the evidence or lack of

22   evidence, such doubt is decisive, and the jury must

23   acquit John Moss, since a verdict of "not guilty" means

24   no more than that the guilt of John Moss has not been

1289

1   established in the precise, specific and narrow form

2   prescribed by law.

3

4   Withdrawn

5   4/23/90

6

7                    ----------

8

9          THE COURT:  15.

10         MR. BICKLEY:   Is that in your charge?

11         THE COURT:  Yeah.  And I don´t let them take the

12   indictment with them.

13         MS. LUSK:  You don´t?

14         THE COURT:  No.   Why?   What does that add to

15   anything?

16         MS. LUSK:   If you don´t let them read the

17   indictment, then maybe we should repeat the ---

18         THE COURT:  They like that part where you tell

19   them, just because a Grand Jury -- where you guys are

20   just a Petit Jury ---

21         MR. BICKLEY:  That´s the most enlightening thing

22   they´ve ever had happen around here.

23         THE COURT:  It´s in there.  I´ll refuse it; or

24   I´ll refuse 15.

1290

1    MR. BICKLEY:   Note my objection.

2

3              "DEFENDANT'S INSTRUCTION NO. 15

4

5        "The Court instructs the jury that the indictment

6    in this case is not to be considered by the jury in the

7    slightest degree indicative of the guilt of John Moss,

8    and while the jury have the right to take the indictment

9    to their room, yet they shall not consider the same as

10   being any evidence whatsoever of the guilt of the

11   defendant, and it is not to be considered by them as

12   having any weight whatever as evidence against him in

13   this case.

14

15   Refused

16   4/23/90

17                     -----------

18

19        THE COURT:   This is all of the stuff we had

20   before on 16.  On 17, that's in there, not verbatim, but

21   it's refused.

22        MR. BICKLEY:   Note my objection.

23

24

1291

1  "DEFENDANT'S INSTRUCTION NO. 17

2

3  "The Court instructs the jury that a reasonable

4  doubt in every criminal case is not a mere form to be

5  disregarded by the jury, but a substantial part of the

6  law of this land, and before you can convict the accused,

7  John Moss, in this case, you must have an abiding

8  conviction in your minds, based upon the evidence in this

9  case that he is guilty beyond a reasonable doubt.

10  The Criminal Trial in the Virginias by Lee, page 424"

11

12  Refused

13  4/23/90

14  ----------

15

16  THE COURT: Okay. We have 16, 8, 4 and 4. I'm

17  going to make it easy; I'm going to rely on my instincts.

18  MR. BICKLEY: Which one is that, 16 gone?

19  THE COURT: No. 16 refused -- Defendant's 16;

20  Defendant's 8 refused.

21  MR. BICKLEY: Objection to both of those.

22  THE COURT: Defendant's 4 refused.

23  MR. BICKLEY: Note my objection.

24  THE COURT: And State's 4 also refused.

1292

"DEFENDANT'S INSTRUCTION NO. 16

"The Court instructs the jury that a reasonable doubt is such a doubt as exists or would exist in the mind of an ordinary prudent man as to cause him to hesitate to act in his own most important affairs.
State v. Brady, 104 W.Va. 523, 140 S.E. 546"

Refused

4/23/90

----------

"DEFENDANT'S INSTRUCTION NO. 8

"The Court instructs the jury that it is your duty to consider the whole evidence in this case, and if you can reconcile the evidence before you upon any reasonable theory consistent with the defendant's innocence, you should do so and find John Moss, the defendant, not guilty.
State v. Stafford, 89 W.Va. 301, 109 S.E. 326
The Criminal Trial in the Virginias by Lee, page 1010"

1293

1  Refused

2  4/23/90

3

4                    -----------

5

6          "DEFENDANT´S INSTRUCTION NO. 4

7

8          "The Court instructs the jury that if they find

9   a conflict in the evidence in this cause on any material

10  fact or circumstance tending to establish the guilt or

11  innocence of John Moss, a part of which is in favor of

12  the theory of the State and a part of which is in favor

13  of the theory of John Moss, and the jury should entertain

14  a reasonable doubt as to which is true, then it is the

15  duty of the jury in arriving at their verdict to adopt

16  the evidence, theory and conclusion most favorable to

17  John Moss and return a verdict of not guilty.

18  State v. Noble, 96 W.Va. 440, 123 S.E. 237"

19

20  Refused

21  4/23/90

22

23                    -----------

24

1294

1    "STATE'S INSTRUCTION NO. 4

2

3        "The Court instructs the jury that proof beyond

4    a reasonable doubt does not necessarily mean proof

5    without contradiction, or without conflict, but, if after

6    considering all the evidence and circumstances produced

7    in the case, you can say that you have an abiding

8    conviction of the truth of the charges contained in the

9    indictment, then you are satisfied beyond a reasonable

10   doubt and may find the defendant, JOHN MOSS, JR., aka

11   JOHN MOSS, III, guilty."

12   Refused

13   4/23/90

14                    ----------

15

16       MR. REVERCOMB:   Your Honor, I don't mind.   I

17   don't know of a good way to put it -- State's 4 -- I

18   don't necessarily ask that you give it all, the whole

19   instruction, but leave part of it in, and then you will

20   have no conflict, if you can just stick part of it in

21   your instruction.

22       MR. BICKLEY:   What is that?

23       MR. REVERCOMB:   What is in this is proof beyond

24   an absolute certainly.   That's certainly not what that

1295

1     says.

2          MR. BICKLEY:   It's says abiding conviction.

3          MR. REVERCOMB:   No, I'm withdrawing that part of

4     it.   I just want the first -- not even the first whole

5     sentence of it, up to the but.

6          THE COURT:   What's the difference?

7          MR. REVERCOMB:   There's definitely a difference,

8     Judge, that the law doesn't require proof beyond every

9     possibility of mistake, and the Court instructs the jury

10    that proof beyond a reasonable doubt doesn't mean proof

11    beyond all conflict, because there is going to be

12    conflict.

13         THE COURT:   All right.   It's in there.

14         MR. REVERCOMB:   It's beyond a reasonable doubt

15    -- it does not necessarily mean ---

16         THE COURT:   I inserted it.   It's in that sentence

17    on page -- that starts with the term reasonable doubt.

18    I just put it at the very end.

19         What I'll do with this stuff is this, I'll give

20    this to Brenda and have her type this alibi instruction

21    also.

22         Then, what I'm going to try to do is integrate

23    the thing so that it's all just one continuous document

24    and we can talk about it and send it back to the jury.

1296

1       MS. LUSK:  Well, she can't print it out until you

2   see whether the defendant testifies or not.

3       MR. BICKLEY:  Right.

4       THE COURT:  That's right.  But I'll have a copy

5   that I can work with to read it.  And then, while you

6   guys are making your closing arguments, she can have the

7   other ready.

8       MS. LUSK:  All right.

9       MR. BICKLEY:  All right.  See you in the morning.

10      THE COURT:  Let's talk about one more thing

11  before we get out of here.  I'll let you all decide what

12  you want to do.

13      If we get started at 9:00 and we've got an hour's

14  worth of stuff, and both sides want two hours ---

15      MR. BICKLEY:  You giving both sides two hours

16  each?

17      THE COURT:  Yes, right.

18      MR. BICKLEY:  We can have two hours, but ---

19      THE COURT:  You want what they get?

20      MR. BICKLEY:  I want what they get, but to be

21  honest, I don't know that we'll need two hours.

22      MR. REVERCOMB:  I don't know that either.

23      THE COURT:  I understand.  You're going to have

24  to judge that on the number of faces going down in their

1297

1   laps.  But obviously, we won't get four hours in before

2   lunch, so what I propose to do is, we could take the

3   State's opening close and part of yours, and whatever

4   time you think that it's appropriate to break, recess for

5   lunch, and then come back and finish up after lunch,

6   because we're not going to get four continuous hours.

7        If we do it after lunch, we end up coming up on

8   5:00 o'clock, were the jury is too tired.

9        MR. REVERCOMB:  Your Honor, you might see how it

10  goes.  If I finish in half an hour, then he ---

11       THE COURT:  No question about it.  If it looks

12  like we're going to finish it, then we'll do it.  We'll

13  go on through the lunch hour.

14       MR. BICKLEY:  I think we have a shot at getting

15  it in and not have to deal with the mechanics of it

16  tomorrow and decisions that we make and so forth.

17       THE COURT:  I understand that.  But what I did

18  not want to do, though, is I don't want a break in there

19  that creates some discontinuity.

20       All right?

21       MR. BICKLEY:  Fine.

22       MR. REVERCOMB:  Yes, your Honor.

23       See you tomorrow.

24

1298

1     WHEREUPON, the Court stood in a recess in the

2  hearing of this case.

3

1    IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2

3

4    STATE OF WEST VIRGINIA

5

6    vs.                          Action No. 82-F-221

7

8    JOHN MOSS, JR., aka JOHN MOSS, III

9

10

11          BEFORE:  Hon. A. Andrew MacQueen, Judge

12

13                  Day 7

14

15

16             APPEARANCES

17

18        For the State:  Neva Lusk and Stephen Revercomb,

19    Assistant Prosecuting Attorneys for Kanawha County.

20        For the Defendant:  The Defendant, in person, and

21    by Nelson R. Bickley, Timothy N. Huffman, and Kathy

22    Beckett, his counsel.

23

24                          Connie L. Cooke

25                          Official Reporter

FILED

JAN 23 1990

-7-

573

1301

1    BE IT REMEMBERED, that on Tuesday, the 24th day

2    of April, 1990, during the January 1990 Term of said

3    Court, in the matter of the State of West Virginia versus

4    John Moss, Jr., aka John Moss, III, upon Action No.

5    82-F-221, as stated in the caption hereto, the following

6    transpired:

7

8    (On the Record, out of the presence of the Jury)

9

10   THE COURT:  Are we ready?

11   MR. BICKLEY:  Yes, your Honor.  For the record,

12   this is the legal team for John Moss of Tim Huffman,

13   Kathy Beckett, and Nelson Bickley.  Were are talking to

14   our client, John Moss.

15   The purpose of our talk is to express to John his

16   rights which he has, whether or not he should take the

17   stand, and the problems inherent thereto.  John has the

18   right to take the stand or he has the right to remain

19   silent.  But if he should elect to take the stand, then

20   he would be subject to cross examination by the State,

21   and a possibility of a third confession being used as

22   impeachment against him, and a remote possibility -- I

23   don't think a good possibility exists -- of having his

24   character brought into question.

1302

1    However, he has the right to take the stand and

2    to put on his own defense and to present evidence to the

3    jury for their consideration.

4    John, what do you desire to do?

5    THE DEFENDANT:  I desire not to take the stand.

6    MR. BICKLEY:  Is this decision made by your own

7    free will?

8    THE DEFENDANT:  Yes.

9    MR. BICKLEY:  After considering the advice of

10   your counsel?

11   THE DEFENDANT:  Yes.

12   THE COURT:  Are you all ready to go forward?

13   MR. BICKLEY:  We're ready, your Honor.

14   THE COURT:  Are you going to call the defendant

15   at this time?

16   MR. BICKLEY:  Your Honor, the defendant's rights

17   were explained to him on the pros and cons of whether he

18   should or should not testify, and he has elected to

19   remain silent.

20   THE COURT:  Are you going to put on any

21   additional evidence?

22   MR. BICKLEY:  The defense rests.

23   THE COURT:  Do you have any rebuttal?

24   MS. LUSK:  No, sir.

1303

1   THE COURT:  Are you all ready to step right into

2   closing arguments, then?

3   MR. BICKLEY:  We're ready, your Honor.

4   MS. LUSK:  Yes, sir.

5   THE COURT:  Okay, I'm going to kind of give you

6   the strategic decision here.

7   At some point this morning, somebody is going to

8   have to make a decision about whether to go on a break

9   for the lunch hour in the middle of closing arguments.

10  If we get up to noon, and we're forty-five minutes away

11  from completion, I'll go through the lunch hour.

12  Otherwise, if you get up close yourself, and you want a

13  break, here is what I would like to avoid, frankly.  I

14  would like to avoid the situation where the State puts

15  on their opening close, you put on all of your close,

16  then we've got to recess for lunch. I don't think that's

17  fair to the defense.

18  MR. BICKLEY:  I agree.

19  THE COURT:  So, you take a look.  If it looks

20  like there is a time in there that you want to recess,

21  when your team makes the strategic decision to do that,

22  just call time and come on up here and tell me where you

23  stand.  If you look like you're going to get to a point

24  where the argument is going to be finished within an hour

1   or so after the lunch hour, then we'll go on.

2       MR. BICKLEY:  Your Honor, I'd like to know if the

3   State is aware how they plan on splitting their time.

4   It would be better for me to know if Neva could finish

5   before lunch, if I go unfinished.

6       If they are taking an hour apiece, then I would

7   know.

8       THE COURT:  Do you all have any idea how you are

9   going to handle that?

10      Let me say this:  The local rule, written or

11  otherwise, is if you've got two hours, it doesn't matter

12  what you take in the first half.

13      MS. LUSK:  We would be charged with that, then

14  the most I could take would be an hour.

15      MR. BICKLEY:  Then, I'll assume that you'll take

16  an hour, whether you do or not.

17      Now, I assume that the batting order will be

18  Steve, then Tim, then I make a decision at that point,

19  knowing what I have to say and what I think Neva will say

20  ---

21      THE COURT:  I don't care how you split yours.

22  You can split it three ways, or with any time difference.

23  You've just got two hours total.

24      MR. BICKLEY:  Right.  I'll make the decision when

1305

1    I come up at the end of Tim´s, whether or not I´ve got

2    enough time to do mine, and whether Neva can do her hour

3    before lunch.

4           THE COURT:  Right.

5           MS. LUSK:  You mean by 1:00 o´clock or so?

6           MR. BICKLEY:  Yeah, by 1:00 o´clock.

7           THE COURT:  Again, I´m going to take recesses if

8    they appear necessary.  I don´t mind those recesses

9    interrupting things for just a couple of minutes.  I just

10   don´t want a lunch hour in the middle of it.

11          MR. BICKLEY:  Thank you, your Honor.

12          THE COURT:  Unless both sides come up, they can

13   both come back and finish up.

14          Sally, would you get the jury, please?

15          Let me ask you this, Neva, do you want me to give

16   you a time mark, or do you want to keep your own time?

17          Ordinarily, I don´t say anything, unless you want

18   me to give you some indication of how much time is

19   elapsing.

20          MS. LUSK:  I don´t think it´s necessary.  Thanks.

21

22          WHEREUPON, the jury was brought into the

23   Courtroom, where the following transpired:

24

1306

1         THE COURT:  Good morning.  Mr. Bickley?

2         MR. BICKLEY:  The defense rests, your Honor.

3         THE COURT:  Does the State have any rebuttal

4    evidence?

5         MS. LUSK:  No, your Honor.

6         THE COURT:  Are you ready to proceed with the

7    closing arguments?

8         MS. LUSK:  Yes, sir.

9         MR. REVERCOMB:  Yes.

10        THE COURT:  Members of the jury, at this point I

11   am going to read to you the Jury Charge, or my

12   instructions in the case.  In this case, I am going to

13   also, in all likelihood, give you a copy of the

14   instructions to take with you to your Jury Room.  I tell

15   you ahead of time that I was tempted not to tell you,

16   because I was afraid you might not listen.

17        I think it's extremely important, but also, you

18   are going to have these instructions in hand when you

19   deliberate on the evidence, that you pay attention to

20   these instructions at this point, because the attorneys'

21   arguments will discuss various aspects of these

22   instructions.  And having heard them is going to put

23   their arguments into better context.

24        So, these are the instructions.

1307

JURY CHARGE

        Ladies and gentlemen of the jury, at this point
in the trial, it is my responsibility to instruct you
concerning  the  law  as  it  governs  you  in  your
deliberations in this case.  These instructions contain
the law which you must apply to the facts as you believe
those facts to have been proved and it is your exclusive
duty to determine what the true facts are from among all
of the evidence and testimony which has been brought
before you in this trial.

        It is important at this stage of the trial that
it be made clear to you the exact nature of your
responsibilities.  It is the jury's duty to make a
determination of what occurred factually, based upon the
exhibits and testimony brought before you.  It is my duty
as Judge to consider and determine the law as it applies
to those facts and to announce that law to you.  I have
no right to tell you which facts are established by the
exhibits  and  testimony,  as  that  determination  is
exclusively yours.

        Each instruction is as important as any other.
You  should  not  draw  any  inference  from  the  order,
language,  or  manner  in  which  these  instructions  are

1308

1   stated. Do not pick out any one statement or instruction

2   and ignore the other instructions or parts of

3   instructions. You should consider and apply these

4   instructions together as a whole. Also, if you have any

5   personal opinion as to what the law should be, you should

6   put that opinion aside and accept and apply the law as

7   it is.

8       In your deliberations, you must not permit

9   yourself to be influenced by sympathy, passion,

10  prejudice, or public sentiment for or against the

11  defendant or the State. You must determine the facts of

12  this case from the evidence alone; that is, from the

13  testimony of the witnesses and the exhibits received in

14  evidence.

15      The arguments, statements and remarks of counsel

16  are intended to help you in understanding the evidence

17  and applying the law, but these are not evidence. If any

18  argument, statement, or remark of counsel is not based

19  upon the evidence, then you should disregard that

20  argument, statement, or remark. Disregard entirely

21  questions and exhibits to which an objection was

22  sustained and the answers or exhibits ordered stricken

23  from the evidence.

24      Nothing that I have said or done at any time in

1309

1   this trial should be considered by you as evidence of any

2   fact or as indicating any opinion concerning any fact,

3   the credibility of any witness, the weight of any

4   evidence, or the guilt or innocence of the defendant.

5   Neither by these instructions, nor by any ruling or

6   remark which I have made or will make, have I meant nor

7   do I mean to indicate any opinion as to the facts of this

8   case.  The facts are for you, the jury, to decide.

9       The indictment in this case is only an accusation

10  or charge against the defendant, and is no evidence

11  against him.

12      During your deliberations, you should carefully

13  consider the testimony of each and every witness and not

14  disregard or overlook any testimony, witness, or

15  evidence.

16      As jurors, you are the sole and exclusive judges

17  of the credibility of the witnesses and the weight of the

18  evidence.  As used in my instruction, the "credibility

19  of a witness" means the truthfulness or lack of

20  truthfulness of a witness.  The "weight of the evidence"

21  means the extent to which you are or are not convinced

22  by the evidence.

23      The number of witnesses testifying on one side or

24  the other of an issue is not alone the test of the

1   credibility of the witness or the weight of the evidence.

2   If warranted by the evidence, you may believe one witness

3   against a number of witnesses testifying differently.

4   The tests are:   How truthful is the witness and how

5   convincing was his or her evidence in light of all the

6   evidence and circumstances shown?

7           In determining whether to believe the testimony

8   of any witness that testified before you, you should

9   start with the proposition that all witnesses, under

10  oath, are presumed to speak the truth.  Thereafter, when

11  there appears a conflict in the evidence between

12  witnesses, you must determine whether that conflict

13  arises from simple misrecollection, difference of

14  opinion, or from deliberate falsehood.

15          To resolve these conflicts and to further

16  determine the credit and weight you will give the

17  testimony of witnesses, you should further take into

18  consideration the good memory or lack of memory of the

19  witness; the interest or lack of interest in the outcome

20  of the trial; the demeanor and manner of testifying of

21  the witness;  the opportunity and means, or lack of

22  opportunity and means, of having knowledge of the matters

23  concerning which the witness testified;  the apparent

24  fairness or lack of fairness of the witness;  the bias,

1311

1    prejudice, hostility, friendliness or unfriendliness of

2    a witness; and such other factors as cause you to believe

3    or disbelieve the statements of the witness.

4           If you believe that any witness in this case has

5    knowingly testified falsely as to any material fact, you

6    may, after considering and weighing the testimony of such

7    witness, disregard the whole of that testimony or give

8    to it, or any part thereof, such weight and believability

9    as you believe it is entitled to receive.

10          If you believe from the evidence that the

11   statement of a witness or witnesses is contrary to proved

12   physical facts, then you may disregard that testimony

13   insofar as it is contradicted by proved physical facts.

14          A person is qualified to testify as an expert if

15   he or she has special knowledge, skill, experience,

16   training or education sufficient to qualify him or her

17   as an expert on the subject of which the testimony

18   relates.  Duly qualified experts may give their opinions

19   on questions in controversy at a trial.  To assist you

20   in deciding such questions, you may consider the opinion

21   with the reasons given for it by the experts who give the

22   opinions.  You are not bound to accept an expert opinion

23   as conclusive, as you are the judges of the facts, but

24   you should give to any expert opinion the weight that you

1312

1  find it entitled to.

2  Any witness may be impeached or discredited by

3  prior inconsistent statements, and if you believe from

4  the evidence in this case that any witness has made a

5  statement or statements following the incident which is,

6  or are, inconsistent with and contrary to his or her

7  testimony on a material fact in this case, then you have

8  the right to consider that inconsistency in determining

9  the believability of that witness and the weight to be

10  given to his or to her testimony.

11  The defendant, John Moss, III, has exercised his

12  right to not be a witness in this case.  The

13  Constitutions of both the United States and of the State

14  of West Virginia give a defendant an absolute and

15  inalienable right to refuse to testify, and the exercise

16  of this right can not be held against the defendant or

17  in any way affect the outcome of his trial.  Thus, in

18  your deliberations, you may not draw any inferences from

19  the defendant's decision not to testify; you cannot

20  conclude that his decision is even remotely indicative

21  of his guilt; and you must not speculate what his

22  testimony might have been or why he chose not to be a

23  witness or give evidence.

24  The law presumes a defendant to be innocent of

1313

1   crime.   Thus, John Moss, III, although accused, begins

2   the trial with a "clean state" -- with no evidence

3   against him.   The presumption of innocence stays with the

4   defendant throughout the trial and prevails at the close

5   unless overcome by evidence which satisfies you of the

6   defendant's guilt beyond a reasonable doubt.   The

7   defendant is not required to prove his innocence.

8       The burden of proving the defendant guilty of

9   every material element of a crime charged is upon the

10   State.   Before you can return a verdict of guilty, the

11   State must prove to your satisfaction beyond a reasonable

12   doubt that the defendant is guilty.   The burden of proof

13   never rests on the defendant nor does the burden shift

14   to the defendant to prove any fact or present any

15   evidence.

16       The term "reasonable doubt" means a doubt based

17   upon reason and common sense.   It is a doubt for which

18   reason can be given arising from a fair and rational

19   consideration of the evidence, or want of evidence.

20   Proof beyond a reasonable doubt does not necessarily mean

21   proof without conflict or contradiction.

22       The presumption of innocence is not a mere matter

23   of form or legal nicety to be disregarded by the jury.

24   A defendant cannot be convicted on speculation or

1314

1  conjecture, nor will suspicion, however strong, or proof

2  by a preponderance of the evidence, or by clear and

3  convincing evidence, suffice to demonstrate the

4  defendant's guilt beyond a reasonable doubt.

5      The burden of proof on the State requires that

6  each and every material element of the charge against the

7  defendant be proved beyond a reasonable doubt. If there

8  is any one essential fact proved to the satisfaction of

9  the jury which is consistent with the guilt of the

10  defendant, this is sufficient to raise a reasonable

11  doubt. Similarly, if any essential fact has not been

12  proved to the satisfaction of the jury, this also, is

13  sufficient to raise a reasonable doubt. You should

14  understand that a verdict of not guilty means no more

15  than the guilt of the accused has not been established

16  in the precise, specific and narrow form prescribed by

17  law. However, the law does not require proof amounting

18  to an absolute certainty, nor proof beyond possibility

19  of mistake.

20      Generally speaking, there are two kinds of

21  evidence which a jury may consider. (1) The first is

22  direct evidence, such as the testimony of any eye-

23  witness. (2) The second form of evidence is

24  circumstantial evidence. Circumstantial evidence is that

1315

1     kind of proof which tends to show a disputed fact by

2     proof of other facts which logically and reasonably tend

3     to prove the truth of the disputed fact.   And (3), the

4     law accepts both direct and circumstantial evidence to

5     establish the guilt of the defendant, and in some cases,

6     circumstantial evidence is the only source of proof.   But

7     where the State relies on circumstantial evidence, such

8     evidence must exclude all other reasonable hypotheses

9     consistent with the innocence of the defendant, before

10    the defendant may be found guilty.

11         The defendant, John Moss, III, is charged by the

12    indictment with three counts of murder in the first

13    degree.   While several different kinds of homicide are

14    considered to be murder under the law, in this case, the

15    law of the State of West Virginia provides that any death

16    of another person caused in the commission of, or attempt

17    to commit, arson, rape, robbery, or burglary, is murder

18    in the first degree.   One of three verdicts may be

19    returned for each of the counts in the indictment:   (1)

20    Not guilty;   (2)  Guilty of murder in the first degree;

21    and   (3)  Guilty of murder in the first degree with a

22    recommendation of mercy.

23         In order to prove murder in the first degree

24    under this law, the State must prove beyond a reasonable

1316

doubt: (1) The commission of or attempt to commit a burglary; (2) the active, intentional, and voluntary participation of the defendant in the burglary; and (3) The death of a person as a result of injuries sustained during the course of the burglary or attempted burglary. For the purposes of this instruction, burglary is committed when a person, in the nighttime, breaks and enters or enters without breaking, or in the daytime breaks and enters the dwelling of another with the intent to commit larceny, or another felony therein. Breaking involves the application of some force, slight as it may be, to obtain entrance. Merely push open a door, turning a key, lifting a latch, or resort to other physical force is enough to constitute a breaking.

Before John Moss, III can be convicted of murder in the first degree, the State must overcome his presumption of innocence and prove to your satisfaction beyond a reasonable doubt that he did, on the 13th day of December, 1979, in Kanawha County, West Virginia, intentionally, willfully and voluntarily commit or attempt to commit a burglary during, and as a result of which, Bernadette Reggettz, and/or Paul Eric Reggettz, and/or Vanessa Reggettz, received injuries directly causing death.

1317

1   You are further instructed that if you find the

2   defendant guilty of murder in the first degree on one or

3   more counts, it is your duty to decide whether or not to

4   add a recommendation of mercy to your verdict.  If you

5   do not recommend mercy, then John Moss, III will be

6   confined to the penitentiary of this State for the

7   remainder of his lifetime without possibility of parole.

8   If you should recommend mercy, the defendant will

9   be confined in the penitentiary of this State for life,

10  but he will be eligible to be considered for parole after

11  serving a minimum of ten (10) years of his sentence.  The

12  fact that the defendant is eligible to be considered for

13  parole does not guarantee his release after serving ten

14  (10) years.  Instead, he would be released only at such

15  time as the West Virginia Board of Parole, after

16  considering his record and his conduct during his

17  sentence, is of the opinion that the best interests of

18  society and the defendant are served by such release.

19  Evidence has been offered that the defendant was

20  not present at the time when and the place where the

21  homicides in this case were allegedly committed.  This

22  is known in law as the defense of alibi.  You are

23  instructed that the defendant may not be convicted unless

24  the State proves beyond a reasonable doubt that the

1318

1  defendant was present at the time and place the alleged

2  crime was committed.  If, after consideration of all of

3  the evidence, you have a reasonable doubt whether the

4  defendant was present at the time and place of the

5  alleged homicides, you must find him not guilty.

6       Upon retiring to your Jury Room, you should

7  select a person to act as your Foreman, whose

8  responsibility will be to preside over your

9  deliberations.  In addition, it is the responsibility of

10 the Foreman to endorse the appropriate verdict forms

11 which reflect the decision of the entire jury.

12      Upon the trial of a criminal case by a jury, the

13 law contemplates the concurrence of twelve minds in the

14 conclusion of guilt before a conviction can be had.  Each

15 individual juror must be satisfied beyond a reasonable

16 doubt of the defendant's guilt before he or she can,

17 under his or her oath, consent to a verdict of guilty.

18 Each juror should appreciate the individual

19 responsibility resting upon that juror as a member of the

20 jury and should realize that he or she must be convinced,

21 beyond a reasonable doubt, of the defendant's guilt.  It

22 is the duty of each juror to consider all of the evidence

23 in the case, the instructions of the Court, and the views

24 of your fellow jurors in arriving at your individual

1319

1    verdicts.  No juror should surrender an opinion simply

2    because other jurors are of a different opinion and no

3    juror entertaining a reasonable doubt as to the guilt of

4    the defendant should join in a verdict of guilty.

5         Nevertheless, the Jury Room is not a place for

6    pride of opinion or stubbornness, but rather each and

7    every one of you should attempt to give fair

8    consideration to your fellow jurors' views and, if it is

9    possible, to reach a verdict without a sacrifice of a

10   conscientiously held opinion, each individual juror is

11   bound to attempt to make such efforts.

12        When you have reached a verdict, your foreman

13   should endorse that verdict on the form which you have

14   been given and should sign and date the form.  You should

15   then notify the Bailiff that you have completed your

16   work.  Counsel, the Defendant, and I will then assemble

17   to receive your verdict.

18

19        THE COURT:  At this point, counsel will give

20   their closing arguments.

21

22        MR. BICKLEY:  May we approach the bench?

23        THE COURT:  Yes.

24

1320

1    WHEREUPON, a bench conference was held, and the

2    following transpired:

3

4        MR. BICKLEY:  Your Honor, I just want to go on

5    record -- I object to the State being able to order mercy

6    because of a mandatory instruction.  I think that leads

7    the jury to the quantum jump of guilty before they leave

8    the Jury Box, and the defense has no retort because,

9    also, if he argues mercy, his is arguing, in fact, that

10   his client is already guilty.  And I think that this

11   issue should be resolved.

12       THE COURT:  Okay.

13       MS. LUSK:  There is one thing, I think, during

14   Mr. Bickley's opening statement, he made some statements

15   about when he couldn't believe, and he kind of testified.

16   I wish we could avoid an objection during the course of

17   the closing, to settle that.

18       THE COURT:  Don't state your own beliefs.

19       MR. BICKLEY:  All right.

20

21       WHEREUPON, the bench conference was concluded.

22

23       (Back on the Record)

24

1321

CLOSING ARGUMENTS

(For the State)

BY MR. REVERCOMB:

MR. REVERCOMB:  May it please the Court.

Good morning, ladies and gentlemen.  At this time, I would like to take the time to thank you all on behalf of everyone.  You have paid close attention this past week, this past seven days, and sometimes it has been hard to stay awake.  It has been hot in here, and there has been some tedious evidence.  But I've watched you.  It is obvious that you have paid close attention to all of the evidence, and I am sure that I speak on behalf of everyone in thanking you.

I've also noticed that you have taken this case very seriously, as it is.  Your duty is important.  Ms. Lusk and I, we take our jobs very seriously, as do Mr. Bickley, Mr. Huffman, and Ms. Beckett.

At this time, I would submit to you that the State has met its burden of proof.  We have proved the defendant, John Moss, guilty beyond a reasonable doubt of the first degree murder of Bernadette Reggettz,

1322

1   Vanessa Reggettz, and Paul Eric Reggettz.   I say that

2   because we have proven each and every element of felony

3   murder, beyond a reasonable doubt.

4          We proved that the defendant entered -- broke and

5   entered the Reggettz home on December 13, 1979, in the

6   early morning hours, with the intent to commit a larceny

7   therein.   His confession says that, "I went in there to

8   steal," and he did steal.   He took some flatware, the

9   camera -- and in the course of doing that, in committing

10  that felony burglary, he murdered three people, ladies

11  and gentlemen.   He murdered a little girl, a seven year

12  old boy, and their mother.

13         The defense in this case has been Paul Reggettz's

14  confession.   I want to stress that fact.   Mr. Reggettz -

15  - you saw him on the stand.   He told you -- and the

16  evidence shows -- that he was at the State Police

17  Detachment for fourteen and a half hours.   That's that

18  day, on December 13, 1979, before he confessed.   He had

19  had four to six hours' sleep in the past two days.   He

20  had worked the night shift at UPS.   He had gone to

21  Company B down there with Trooper -- Sergeant Woodyard,

22  to try to help them solve this crime.   That day, he came

23  home and found that his family had been murdered.

24         You heard from Scott Leasure, the man who worked

1323

1    at the A&W.  What did he tell you about Paul Reggettz?

2    He told you that he came in there and that it was obvious

3    that something dramatic had happened to him.  He was

4    shook up, he didn't know what he was doing, he didn't

5    even know how to ask for anything.  He didn't know what

6    to do.  So, what did he do?  That day, he was shook up.

7    He threw a dollar down on the counter and says, "Call the

8    Police.  Someone has killed my wife."  And then he ran

9    back toward the house to see if there was anything else

10   he could do to help the situation.

11          Then, when Trooper Williams arrived, Trooper

12   Williams represented help.  He wanted help.  Trooper

13   Williams was there to give it to him.  He said he told

14   Trooper Williams what he had found.  Paul doesn't even

15   remember going back into the house that day.  He doesn't

16   remember that.

17          You heard what Trooper Williams told you, that he

18   went back into the house twice, and Paul told him exactly

19   what he had found.  Paul doesn't remember that.  Trooper

20   Williams said he didn't show much emotion or no emotion,

21   that he had a blank look.  Paul told you that something

22   inside of him died.  You heard him say it.  He said,

23   "I've got to tell this Trooper what I found."

24          You heard from Chuck Pettry Friday.  What did he

1324

1   say about Paul Reggettz when he saw him at Company B that

2   afternoon?  He said he was distraught, upset.

3       Paul Reggettz told you that later on that evening

4   he realized that the Troopers, Dr. Sopher, and Law

5   Enforcement -- he realized that they suspected him of

6   doing it, and he just couldn't understand that.  He

7   couldn't believe it.  He told you how they fired

8   questions at him; one person asking a question and before

9   he got it answered, somebody else would ask him a

10  question.  That went on for hours.  The same questions

11  over and over again.

12      Sergeant Woodyard testified yesterday that that

13  could be true.  There were times when there were three

14  or four people asking him questions at the same time, for

15  fourteen and a half hours.

16      You heard what Paul said about Dr. Sopher.  He

17  said he was insinuating things -- "You did this, you did

18  it like that, didn't you?"

19      Dr. Sopher admitted that he made him take his

20  clothes off and he didn't find any cuts on Paul Reggettz.

21  He checked Paul Reggettz's boots for blood, for blood

22  splatters.  I think I remember Trooper Williams testified

23  that there was no blood on any of Paul Reggettz's clothes

24  or boots.

1325

1    The final straw came at 2:30 a.m. Two men came
2  downstairs. He didn´t know who they were. They said,
3  "Let us have him. We´ll take care of him." A couple of
4  minutes later, another man came and said, "They want
5  blood. I don´t want any part of this." He said that at
6  that point, that was it -- "I had to tell them something
7  to make them quit asking me questions and leave me
8  alone." Paul said, "I´ll tell you what you want, if you
9  don´t let them hurt me."

10   You heard Sergeant Woodyard yesterday. He said
11  that Paul Reggettz said that to him. He admitted that,
12  that he had said, "If I tell you what you want, will you
13  make them leave me alone?" Sergeant Woodyard said he
14  didn´t know who he meant, but he was afraid of something.

15   Paul was also tired. He wanted the questioning
16  to stop. Paul´s confession, his first confession, was
17  simply, "Okay, I killed my wife and kids." Later on, he
18  went on into detail.

19   You heard Sergeant Woodyard yesterday in cross-
20  examination. His every response to the question, "What
21  did you kill your wife over?" His answer was, "We got
22  into a pushing match over the kids playing." When he
23  said, "Don´t, daddy," every response he gave was to a
24  specific question.

1326

1   Now, one thing he couldn't have fabricated,

2   ladies and gentlemen, he had seen it. He had seen

3   everything. He came home and found his little girl

4   hanging on the door; he found his wife tied to another

5   door; he found his little boy in the tub. When he said

6   he put his little girl on the door because she liked to

7   swing, this was in response to a question. When he said

8   he put his little boy in the tub, that was a response to

9   a direct question.

10   Paul told you that he just couldn't take it. He

11   wanted to be left alone. He was scared. Consider this:

12   Where did Paul have to go? Who did he have to go home

13   to? No one.

14   We know that Paul Reggettz's confession is not

15   true. How do we know that? We know that from the

16   evidence. The blood found on the Christmas presents and

17   wrapping paper is not Paul Reggettz's blood. Remember

18   what Trooper Zain said yesterday? He said one

19   inconsistent marker excludes people one hundred percent.

20   The blood found at the scene wasn't Vanessa's. It was

21   consistent with the defendant's. It can be Paul's. A

22   hundred percent.

23   Paul's confession, or the so-called confession,

24   he never mentioned any Christmas gifts. I doubt if he

1327

1  knew it. After all, his little girl was hanging on the

2  door there.

3  Whose confession is it consistent with? That man

4  right there (Indicating). Whose blood is it consistent

5  with? John Moss's.

6  John Moss told you about opening those gifts --

7  not Paul. The blood found on the curtain at the back

8  door was not Paul Reggettz's blood. Again, he is

9  excluded a hundred percent. Vanessa Reggettz's blood is

10  on the outside of that door, you could see that in

11  Exhibit 5. The curtains were partially torn down on that

12  back door. Whose confession is that consistent with?

13  Whose blood is it consistent with on that curtain? John

14  Moss's.

15  Paul Reggettz -- in his confession, there was

16  never a struggle at the back door. They weren't even in

17  the kitchen.

18  Alex and Paul Fortson both testified that you had

19  to lift that back door to shut it, that it didn't fit the

20  door frame very well. Whose confession is that

21  consistent with, ladies and gentlemen? Who said he saw

22  Vanessa at the back door after he ran out of the house,

23  trying, in his words, "to put something against it, a

24  chair or something"? What she was trying to do was to

1328

1 lift that door and shut it.

2 The blood found on little Bernadette's pajama top

3 -- blood on the side where she was man-handled when the

4 cord was wrapped around her neck. Blood here

5 (Indicating), when she was picked up and hung on that

6 door. Whose blood is that? It's not Paul Reggettz's.

7 It's consistent with that man right there (Indicating).

8 It's consistent with his confession.

9 Paul Reggettz -- according to Sergeant Woodyard,

10 it was never explained to him how he hung that little

11 girl on the door. Why? Because he didn't do it.

12 The fact that the defendant's blood, or

13 consistent with his blood, on that shirt, shows two

14 things. First of all, it excludes ninety-nine point nine

15 percent of the population -- ninety-nine point nine-seven

16 percent. That's nine hundred and ninety-seven --

17 actually, it's nine thousand nine hundred ninety-seven

18 people out of ten thousand, excuse me. But it does more

19 than that. Paul Reggettz is excluded a hundred percent

20 as the depositor of that blood. It shows that he didn't

21 hand his girl on that door.

22 The defense would have you believe that Paul

23 Reggettz cut his family, then went out and got someone

24 else's blood and sprinkled it around the scene. Is that

1329

1  reasonable?

2       They would further have you believe that it

3  happened to be another person's blood they got. It just

4  happened to be that man's right there (Indicating). Is

5  that believable? That's absurd. Paul Reggettz just

6  happened to find some blood that excluded ninety-nine

7  point nine-seven percent of the population? That's just

8  not reasonable.

9       Paul's confession -- his so-called confession --

10  is just not true, ladies and gentlemen. Little

11  Bernadette's body tells us that. The livor mortis is the

12  color of death. You heard Dr. Sopher's testimony. She

13  had livor mortis in her feet, consistent with being hung,

14  suspended completely. That's in John Moss's confession,

15  and Paul Reggettz saw that when he took her down. What

16  did Dr. Sopher say about it? He said it wasn't intense

17  enough for her to have hung for twelve hours, but it was

18  too intense for her to have hung for two hours. What

19  that does -- that excludes both of Paul Reggettz's

20  confessions, when he first told Sergeant Woodyard that

21  he took the little girl down before he had gone off to

22  work. We know that's not true, from the color of death.

23  She had not hung on that door for twelve hours.

24       Later, at the scene, he said he took a nap before

1330

1    he went to work.  We know that's not true either, because

2    when they found her lying on the bed, she had not been

3    lying on that bed for twelve hours.  The livor mortis

4    would have been in the back of her legs, her back, her

5    torso.  There wouldn't be the mottled effect on the front

6    of her legs, which is consistent with the color all

7    around her legs.  So, she didn't hang for twelve hours

8    and she didn't lie for twelve hours.  So, whose

9    confession is that consistent with?

10          Finally, we've got to use logic and common sense.

11    What effect did Paul Reggettz's confession have on John

12    Moss?  None whatsoever.

13          Paul Reggettz's confession, and any evidence

14    against John Moss, is completely separate and

15    independent.

16          How does the Reggettz confession change the

17    evidence, the blood evidence?  How does that change the

18    evidence against John Moss?  How does it change John

19    Moss's confession?  How does it change the other

20    evidence, the flatware that he took, the glove prints?

21    It doesn't change any of the tangible evidence.  You can

22    leave Paul Reggettz's confession in or you can take it

23    out; it doesn't affect the evidence against this man.

24          You saw Paul Reggettz on the stand.  He told you

1   that -- he admitted things that he didn´t have to about

2   the initial relief that was placed on him.  He was just

3   being honest, ladies and gentlemen.  He admitted things

4   that would hurt him, and he didn´t remember things that

5   would help him.  He said, "Oh, yeah, I remember going

6   back in with Trooper Williams," but he didn´t remember

7   those things before.

8           I want you to ask defense counsel -- again, ask

9   them to explain how Paul Reggettz´s confession changes

10  any of the evidence against John Moss.  See if they can

11  explain it.

12          Some other facts -- Paul didn´t know that the

13  camera was missing or the flatware.  He had never had a

14  chance to do an inventory.  He knew the guns were

15  missing.  And speaking of guns, he explanation was, he

16  took those guns and threw them away because he didn´t

17  want the Police to think that he was dangerous.  Well,

18  that´s absurd too.  I mean, he´s got three bodies right

19  there.  Someone obviously dangerous had been there.  And

20  he gave the explanation that he left because he was

21  upset.  That didn´t make sense either.  It´s not

22  reasonable, it´s not consistent.  The rifle wasn´t where

23  he said he threw it.  He couldn´t tell them anything

24  about the pistol.

1    This man (Indicating) told about the pistol,
2  didn't he?  He told them it was broken and it wasn't any
3  good, so he put it in a bag and dumped it in the St.
4  Albans High School trash.  Did the Police make that up?
5  Did he make that confession up?  Is that reasonable?  Did
6  they put that fact in there that he threw it away at the
7  high school?

8    John Moss told them about the rifle, too.  He
9  said that he took it.  And Chuck Pettry, on October 29,
10  1980 -- you heard the defendant on the stand tell his
11  mother where to look for that rifle.  If she didn't find
12  it, then ask Carlton.

13    Is that reason to believe that Paul Reggettz
14  stopped in the middle of a quarrel with his wife?
15  Incidentally, if the quarrel was over her attempts to
16  discipline the kids, then would he kill the three of
17  them?  Does that make sense?  Is it reasonable to believe
18  that he stopped in the middle of that quarrel to kill
19  them?

20    And once again, on the wrapping paper, on State's
21  Exhibit 114, two pieces of wrapping paper with blood on
22  them.  There was a glove print on one of them.  You can
23  see it clearly in the blood.  That blood could not be
24  Paul Reggettz's blood.

1333

1    Again, I think I've already mentioned, there is
2  no blood mentioned on any of the clothing submitted by
3  Paul Reggettz.  Plus, he had no blood or cuts, according
4  to Dr. Sopher.  There was no rifle, according to Sergeant
5  Custer.  There was no prints, from Mr. Shumate.  There
6  was no blood on his clothes, according to Trooper Zain.
7  There was no bruising found on little Paul Eric's
8  buttocks, which the father said he did.

9    Paul Reggettz's confession is not true.  He
10  didn't kill that family.

11    Now, we come to John Moss and the evidence
12  against him.  His confession, ladies and gentlemen, you
13  will have to chance to play this tape over back there.
14  All you do is hit this play button, and listen to his
15  taped confession, and listen to his voice.  Listen to the
16  tape.

17    In his confession, he is corroborated by what --
18   by the blood.  And once again, John Moss said this
19  several times.  You can consider this evidence.  And lots
20  of times you can consider it together.  It's not just his
21  blood.  It's his confession, his blood, and everything
22  else.

23    His confession, in the first place, is
24  corroborated by his blood.  You've got it on the

1334

1. Christmas paper, the wrapping paper, the utensil drawer,
2. the curtain in the back, on the back door in the kitchen,
3. the change purse on top of the chest of drawers, the
4. rifle is gone, the door that little Bernadette was hanged
5. on, the pillow case in the back bedroom, the flashlight
6. in the TV room, used to help him search the house in the
7. dark, and the little pajama top of Bernadette -- blood
8. consistent with his blood found in every room in that
9. house except the bathroom.   Blood was found on those
10. items in that house consistent with his, which excludes
11. ninety-nine point nine-seven percent of the population.
12. It excludes Paul Reggettz and every member of his family
13. and it excludes nine thousand nine hundred ninety-seven
14. out of every ten thousand people.
15.       The burden of proof, ladies and gentlemen, is
16. beyond a reasonable doubt, not beyond all doubt or all
17. possible doubt.   It is beyond a reasonable.   Evidence
18. against the defendant is overwhelming.   The blood alone
19. excludes ninety-nine point nine-seven percent of the
20. population.
21.       The population of St. Albans -- Mr. Huffman made
22. a big deal about Putnam County or Kanawha County.   The
23. population of St. Albans is ten thousand to twelve
24. thousand people.   How many of those people were excluded

1335

1 statistically?

2      There is more than that, ladies and gentlemen.

3 And I ask you to consider it all, not just the blood, not

4 just the confession, not just the glove prints.

5      What did they find?  They found the scissors in

6 Vanessa Reggettz's chest; they found the knife handle;

7 they found blood on the handkerchief box and the door

8 that Vanessa was tied to; on the wrapping paper and the

9 flatware box.  And then John testified that he gave it

10 to another lady.

11      Moss's confession that he didn't remember whether

12 he wore gloves or not --- I would say he did.  He was in

13 a frenzy, ladies and gentlemen.  His blood was rushing.

14 That's what he told you.

15      Exhibit 114, ladies and gentlemen, I submit to

16 you, is his signature, right there (Indicating).  This

17 blood that is consistent with his.  That bloody glove

18 print is consistent in shape and size to the glove print

19 found on the scissors shoved in Vanessa Reggettz's chest.

20 Look at these exhibits.  They are not pleasant, but they

21 are important to look at.  That's not Paul Reggettz's

22 blood, it is John Moss's blood.  It corroborates his

23 confession --- Moss's confession.

24      After murdering three people, the little girl,

1336

1    the little boy, and their mother, he went to their

2    Christmas gifts under the Christmas tree, opening their

3    gifts, just looking -- those were his words.  Listen to

4    the tape.  Just looking, with the little girl hanging

5    behind him on the door.

6         Again, this glove print here is consistent with

7    the one found on the scissors.  In his confession, he

8    says he stabbed her with a knife or something.  He

9    doesn't know if it was a knife or what.  And again, you

10   have got to consider all of the evidence.

11        So far, we have the blood; the glove prints; the

12   wrapping paper; and the scissors.  What else?  This man,

13   in his confession, said that Vanessa Reggettz cut him

14   when he came back in that door after leaving.  We'll get

15   to that.

16        He said she cut him with a knife on his hand.

17   What did he say?  He says, "I took the knife away from

18   her and threw it down."  The glove print consistent with

19   the one on the scissors and the one on that wrapping

20   paper -- even his blood was found on this knife.

21   Evidently, he just threw it down.

22        Paul Reggettz never mentioned a knife, ladies and

23   gentlemen.

24        The door to which Vanessa Reggettz was tied --

1337

1    the glove print with one impression on one side and two

2    on the other, a thumb and two fingers.   According to

3    Lieutenant Shumate, what were those glove prints doing

4    there?  They were put there when John Moss tied Vanessa

5    to that door.

6        The handkerchief box under the tree, you can see

7    that exhibit, too.  He was at the tree, just looking

8    through the gifts.  The flatware -- he gave the flatware

9    box to Arbutus Johnson.  I want you to look at that, too,

10   the silverware.  It had the same glove print on it.  A

11   thumb print, consistent with the shape and design of the

12   one found on the blood on the scissors sticking into

13   Vanessa's chest; and on the wrapping paper.  The flatware

14   that Arbutus Johnson has identified in this Courtroom,

15   the flatware that Paul Reggettz identified in this

16   Courtroom, Paul Reggettz -- that it came from under his

17   Christmas tree.

18       Arbutus Johnson said that man gave it to her.

19   She also said he has scratches on his face when he came

20   gave it to her.  Vanessa must have put up a fight.

21       John Moss's confession says, "dishes".  I submit

22   to you that he is confused, ladies and gentlemen, because

23   he didn't know what this is (Indicating).  He saw this

24   gift under the tree when he opened it.

1338

1   We have the cameras.  The first time the Police

2   had ever heard about the cameras was October 28, 1980,

3   when John Moss told them that he took the cameras home.

4   The Police went to Cleveland and searched the house once.

5   It wasn't there.  They get a phone call -- John told his

6   mom where to look for it -- "On a dresser in my bedroom."

7   She looked and found it in his father's car.  So, they

8   went back that evening and got State's Exhibit 102 from

9   Mr. Moss's father.  That camera has been identified by

10  Paul Reggetz as being his, and we have entered

11  photographs which were made with that camera.

12      The defendant's father testified yesterday.  Mr.

13  Bickley asked him to pick up John Moss's camera.  Which

14  camera belonged to John?  He picked up the State's

15  Exhibit 117, not 102, not Paul Reggettz's camera.

16      The defense asked Mr. Fortson yesterday, some

17  questions about how the house had been entered after he

18  was brought into custody, insinuating that those cameras

19  were stolen then.  I don't know.  But if that were true,

20  why did John Moss tell the Police about it?  Why did he

21  confess to taking the camera?  He told them that himself.

22  Paul Reggettz didn't even know the camera was missing.

23      And again, this phone call, when John Moss talked

24  to Mike Smith, two hundred fifty miles away in Cleveland.

1339

1   He talked to his mother and told his mother where to look

2   for the camera, where it had been, on his dresser.   The

3   rifle was in the closet, or if it´s not there, ask

4   Carlton about it.

5           Chuck Pettry overheard the things he was saying.

6   He told his mother he was okay.   He told her where the

7   camera and where the rifle were.

8           We´ve got the time of John Moss´s confession.

9   They asked, "Do you know what time it was, John?" and he

10  said, "No, I don´t.   It must have been late, because it

11  was almost daylight when I got home."   Almost daylight

12  when I got home.

13          State´s Exhibit 127, ladies and gentlemen, is a

14  clock radio.   What time did it stop?   When the cord was

15  snapped -- 6:15.   The rest of this cord was used to kill

16  Paul Eric Reggettz.   It´s consistent with John Moss´s

17  confession, corroborating his confession.   The confession

18  about the time -- that´s the clock the Reggettz family

19  went by.

20          You heard Paul testify that Vanessa would wake

21  him up for work.   She would holler, "It´s 1:00 o´clock,

22  Paul, time to get up for work."   The only other clock in

23  the house, you heard testimony too, is a wind-up clock

24  in the front bedroom.   Paul says it wasn´t used except

1340

1     on weekends when he wanted to get up early.

2         You can tell in this photo of the clock that it

3     was taken some time in the afternoon, 1:00, 2:00, 3:00

4     o'clock in the afternoon, by Lieutenant Fulks.   This

5     photo shows a clock with a reading of 9:30,

6     approximately.

7         You've got to consider all of this evidence

8     together, ladies and gentlemen, the blood; the glove

9     prints; John Moss's confession; the clock; the time.

10     John Moss's confession was live.   You heard it on tape.

11     The troopers didn't give him that information; they

12     didn't feed it to him.

13         In his confession, he says he stabbed Vanessa

14     Reggettz with a knife or something.   Later on, he says

15     a knife or a fork.   Ladies and gentlemen, if he had been

16     told what to say, he would have gotten it right; he would

17     have said scissors.   They would have made sure that John

18     Moss got that right.   But he wasn't told what to say.

19         The camera -- the Police didn't know about that.

20     If there were making up that confession, are they going

21     to drive to Cleveland, go all of that way from

22     Charleston?   I don't believe so.

23         If the Troopers are making up John Moss's

24     confession, what about the flatware, the silverware?   If

1341

1  they were leading Moss and telling him what to say, they
2  would have said, "Who put the little boy face-down in the
3  tub?" Reggettz said, "I don't remember. I just put him
4  in the tub." Remember, that's what he told you. Listen
5  to the confession.
6        Vanessa and the children were in bed together.
7  That's how they slept because Paul worked at night. In
8  Moss's confession, there was no one else there. Paul
9  wasn't there. Paul didn't ask him to do this. Do you
10  think the Police want to admit that they were wrong about
11  Paul Reggettz, that they made a mistake?
12        That piece of evidence about Paul's car -- John
13  Moss knew they lived in the neighborhood. The Reggettz
14  family had lived in his aunt and uncle's motel. He knew
15  that they drove a little blue Honda. He knew that Paul
16  Reggettz worked the night shift. It's in his confession.
17        When asked, "Was the blue Honda there?" he said,
18  "Yeah." He knew that people would be in that house --
19  Vanessa and the two children. Vanessa weighed eighty-
20  seven pounds. If the Police were making this up, they
21  wouldn't have thrown in loose ends about the car.
22        What did Mr. Fortson tell you about Paul's car
23  that day when he got home? That it wasn't parked in its
24  usual spot in front of the Fortson home; it was parked

1342

1   in the driveway by his house.  Is that consistent with

2   Paul Reggettz's confession?  His confession is consistent

3   with his testimony that he was going to K-Mart and he had

4   come to see about his wife and little girl.  He told you

5   that he was supposed to pick them up out on Route 60, but

6   because it had been raining off and on he figured they

7   were at the house.  So, he pulled up to the house and

8   left the engine running in the driveway.  He went in to

9   get his little girl and his wife and go to K-Mart, but

10  that's not what happened.

11        In John Moss's confession, he says he went in the

12  house initially, had a confrontation, struck Vanessa with

13  the gun and knocked her down, then he went out of the

14  house.  He said he looked back and saw her at the door.

15  He went back and forced his way back in.  Is that

16  reasonable to believe that the Troopers made up that?

17        You've got to consider this thing.  Listen to

18  that tape.  You are going to be asked to decide whether

19  or not to recommend mercy or not to recommend mercy for

20  John Moss.  I want you to listen to that tape -- how this

21  man's own voice talks when he talks about what he did to

22  those people -- when he knocked Vanessa down and tied her

23  up with the cord and strangled her, put scissors in her

24  chest, tied her to the door.

1343

1    And little Paul Eric -- he hog-tied him and put

2    him in a tub, and then he tied the little girl to the

3    door with a cord around her neck and strangled her, then

4    hanged her on the door.

5    Listen to him tell it with his own voice and

6    consider the horror they went through.  The children

7    watch this man kill their mommy -- the mother not knowing

8    what's going to happen to her babies.

9    Look at the photographs, ladies and gentlemen.

10   They are not pleasant, but they are real.

11   I submit to you that it is all or nothing in this

12   case.  If you believe beyond a reasonable doubt that the

13   evidence is overwhelming that John Moss murdered the

14   Reggettz family, that he murdered little Bernadette, Paul

15   Eric, and Vanessa -- there is no room for mercy.  He

16   should spend the rest of his life in the penitentiary.

17   His father could visit him in the penitentiary.  Paul

18   Reggettz will never have visitation day.

19   Consider what mercy John Moss showed the Reggettz

20   family.  After the initial confrontation, he left the

21   house.  They were all alive, ladies and gentlemen.  He

22   went back in when he saw Vanessa at the door for one

23   reason -- his blood was rushing and he went back in that

24   house to kill them.  And that's exactly what he did.

1344

1   What mercy did he show them?  None.

2        I'm asking you to find that John Moss is guilty

3   of first degree murder of Paul Eric Reggettz as set out

4   in Count One, and show him no mercy.  I'm asking you to

5   find that he is guilty of the first degree murder of

6   Bernadette Reggettz, in Count Two, no mercy.  I'm going

7   to ask you to find him guilty of the murder of Vanessa

8   Reggettz -- no mercy.  He should spend the rest of his

9   life in the penitentiary for what he did.

10       Thank you.

11

12       THE COURT:  Mr. Huffman, I tell you what let's

13  do, let's let this jury have about ten minutes.

14       MR. HUFFMAN:  Fine.

15       THE COURT:  Folks, we'll take a brief recess.

16

17       WHEREUPON, the Court stood in a recess in the

18  hearing of this case.

19

20       (Back on the Record)

21

22       THE COURT:  Go right ahead Mr. Huffman.

23       MR. HUFFMAN:  Thank you, your Honor.

24

1345

CLOSING ARGUMENTS

1

2

3                              (For the Defendant)

4   BY MR. HUFFMAN:

5

6          Ladies and gentlemen, this is a puzzling case.

7   It's the duty of the Prosecutor to put this puzzle

8   together with the pieces, and convince you -- convince

9   each of you beyond a reasonable doubt that the defendant

10  is guilty of this crime.  I don't know if any of you work

11  jigsaw puzzles.  I know we do at my house.  There are

12  ways that you go about putting them all together.  Let

13  me, if I can, indulge you to consider how the Prosecutor

14  has got his puzzle put together here.

15         Now, In considering this puzzle, the Judge has

16  given you some rules, which you ought to keep in mind.

17  Let me touch on a couple of those.  You have heard them

18  throughout the course of this trial.

19         One, is the presumption of innocence.  That is,

20  the defendant is presumed to be innocent.  You have heard

21  throughout the course of this trial that the State has

22  the burden of proving every material element of a crime.

23  Now, the Judge has told you in this particular case what

24  the particular elements are:  The Prosecutor must prove

1346

1    to you  beyond a reasonable doubt that there was the

2    commission of a burglary; that there was an act of

3    intentional and voluntary participation of the defendant

4    in the burglary; and that the death of a person as a

5    result of the injuries sustained during the course of a

6    burglary is accomplished.

7         Now, as you can consider these rules, consider

8    this puzzle.  Let´s take a look together at how this

9    puzzle fits together, how the State has put the pieces

10   in.   In the course of doing that, you must consider

11   whether or not they have carried the burden, as the Court

12   has instructed.  I don´t know about you, but whenever I

13   start to work a jigsaw puzzle, you look at the box on the

14   outside and try to figure out what all of the pieces are,

15   depending on how big it is.   I always look for the

16   outside pieces, the ones with the straight edges on them,

17   to determine where the four sides are.  And there is an

18   outside piece to this puzzle, too, and we know what they

19   are.

20        The first piece is that a woman and her two

21   children were killed.  There is no question about that.

22   The second piece -- outside piece, I would submit to you,

23   is the manner in which they were killed.   That

24   information comes to us through the testimony of Dr.

1  Sopher, and through his autopsies that were performed.

2  In this particular case, we know that in the case

3  of Vanessa Reggettz, Dr. Sopher examined the body, and

4  on his post-mortem examination, and as he testified, he

5  estimated originally the time of death at 12:00 a.m.  He

6  also testified here that that could be a range in the

7  period of time, and that there are a lot of uncertainties

8  in the estimating of a specific time of death, and this

9  one comes in a general range, he told you, and it's

10  evident from the autopsy that he prepared on December

11  14th at 11:00 a.m.

12  He told you that Mrs. Reggettz died as the result

13  of ligature strangulation; that is, that she was

14  strangled with a cord.  You'll recall there were two

15  cords on her neck.

16  Dr. Sopher also told you, and it's also apparent

17  in this autopsy, with regard to the little boy, Paul Eric

18  Reggettz.  He died because he drowned in the bathtub.

19  He was strangled with a cord.  He was unconscious, but

20  still alive when he was placed in the bathtub, and as a

21  result, he drowned.

22  Dr. Sopher also told you with regard to the

23  little girl -- she was strangled and hung on the door.

24  He testified that he believed that strangulation to have

1348

1   been -- the hanging to have been with the same sweeper

2   cord.  The sweeper cord is already in evidence.  That's

3   one of the side pieces to the puzzle that we have.

4          Now, another side piece to the puzzle that we're

5   going talk about -- we're going to talk about a number

6   of things -- are the physical location of some of the

7   items that were in the residence when the Police arrived.

8   You have to keep in mind one thing:  No matter which way

9   you believe, Paul Reggettz, in his confession, he

10  admitted to the Police that he had moved two of the

11  bodies before they ever got there.  So, the Police

12  weren't there on the scene to observe certain things.

13         The other side of this outside of our puzzle is

14  the time of death, which we know to be within a range of

15  12:00 a.m., as Dr. Sopher said, until 6:00 a.m. in the

16  morning.  Now, how these other pieces of the puzzle fit

17  in, in relation to the sides, will determine for you

18  whether or not you believe that the State has met its

19  burden.

20         Let's talk for a few minutes about the pieces of

21  the puzzle which Mr. Revercomb told you about -- whether

22  or not those pieces fit.  And one other thing about

23  jigsaw puzzles which is particularly -- seems to be the

24  case in this particular case is -- it kind of looks like

1349

1    you've got two puzzles in one box, and there is probably

2    too many pieces for one puzzle.  Some of the pieces may

3    fit and some of them may not.  Some of the pieces may fit

4    more than one way.  You've got to decide which way you

5    want to put them.

6              The  State  would  have  you  believe  that  Mr.

7    Reggettz's confession was not voluntary, that he was fed

8    all of these answers when he was at the Police Station.

9    You  heard  Sergeant  Woodyard  testify  that  it  was

10   voluntary, and that he saw no one threaten Mr. Reggettz

11   nor heard no one threaten him, that no promises were made

12   to him.  And the State will make -- already has made a

13   big case for why he had questions fired at him.  There

14   is no indication that he ever had any answers supplied

15   to him.

16             The State also says in another piece of their

17   puzzle -- and I submit to you that that piece of the

18   puzzle is the voluntariness of the confession.  We can

19   pull  that  one  right  out.   Mr.  Reggettz  says  that

20   something inside him died.  I think you also remember

21   that's not what all he said.  The first thing he said was

22   that he was relieved, relieved of the responsibility of

23   his family.

24             Another  piece  to  the  State's  puzzle  was,  there

1   was no blood on Mr. Reggettz's clothing. Mr. Reggettz

2   also told you that the clothing he apparently wore to

3   work that day, that he was involved in a diesel spill at

4   work. We don't even know for sure that that's the

5   clothes they ever looked at. And another piece of the

6   Prosecutor's puzzle is that Mr. Reggettz was threatened

7   while at Company B. That piece doesn't seem to fit,

8   because Sergeant Woodyard said he never heard such

9   threats.

10        Sergeant Woodyard also testified that he didn't

11   tell Mr. Reggettz to say that his children -- that his

12   little body said, "Don't, daddy, don't." And that his

13   little girl said, "Wake up, mommy. Mommy, wake up."

14   Those weren't words that were put in his mouth.

15        Now, there is one thing to keep in mind about

16   these puzzle pieces, and from the Prosecutor's

17   standpoint, it all relates back to John Moss's

18   confession. By the time John confessed in October of

19   1980, the Police who were taking his confession knew the

20   facts surrounding this case. They knew what had

21   happened. They knew what was going on. They knew what

22   was necessary.

23        Mr. Revercomb also told you that Trooper Woodyard

24   said -- he did say that he was never able to understand