**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 20**
**(CONTINUATION, pp. 1351 to end)**

1351

1   Mr. Reggettz's understanding of hanging his little girl.

2   Well, he gave you an explanation for it. Whether or not

3   Trooper Woodyard understood that, he gave a possible

4   explanation for how he hung the little girl.

5        Another piece of the Prosecutor's puzzle is the

6   rifle that Mr. Reggettz said that he threw into the

7   Kanawha River. The fact that it was never found, the

8   Prosecution would submit to you was because it was never

9   thrown in there. But you heard, I think Sergeant Custer,

10   as to how far they went in the search, and if they didn't

11   go far enough, they wouldn't have found it. And I submit

12   to you that that's a puzzle piece that doesn't fit the

13   way it was put in there.

14        The glove issue, now, is kind of a big issue in

15   this case. The glove prints here and there that you

16   heard Shumate testify -- he can't compare glove prints

17   to glove prints, or match glove prints to a particular

18   glove. You also heard him say that everybody at the

19   crime scene is supposed to be wearing gloves.

20        And I also submit to you that if you look at the

21   rest of the items that were examined by Mr. Reggettz, you

22   will find one glove there on the list. Where is the

23   other glove?

24        The Prosecution also makes an issue -- or a piece

1     of their puzzle is that Paul Eric had no bruises on his

2     behind. Maybe he didn't. But I'll tell you what he did

3     have, and this is a piece of the puzzle that we'll take

4     out. What he did have was scratches on his face, and

5     ridges on his face, consistent with being thrown face-

6     down on the floor, consistent with the confession of Paul

7     Reggettz -- both of them.

8         The Prosecution also makes an issue out of the

9     camera. I guess that's to assume -- for you to assume

10    then, that there are very few of these cameras around.

11    And also, as I recall Mr. Reggettz's testimony, even he

12    discovered that his camera was missing when he returned

13    to his house after he was released some time in late

14    1980. But you also heard Mr. Fortson testify that after

15    the house was sealed off, someone had been in the house,

16    had been inside the house and had gone out the front

17    door. No one knows what was missing from the house or

18    what was taken.

19         Another piece of the Prosecution's puzzle is the

20    clock radio. They sat it right down here and it's got

21    6:15 or 6:17 or so on it. That piece of the puzzle fits

22    if you assume that that clock is correct. The Prosecutor

23    tells you that it is correct because there was another

24    clock in the house, and that Mr. Reggettz didn't use that

1353

1    wind-up clock to get up with.  If you take a look at that

2    photograph that has the wind-up clock in it, you'll see

3    that  the  alarm  on  that  clock  is  set  at  1:00.    Mr.

4    Reggettz told you that he used that only on weekends.

5    I certainly don't get up at 1:00 o'clock on weekends.

6    I'm not sure he does either.  That clock was used after

7    he killed his family, to get up at 1:00 o'clock, as he

8    testified, to go to work.

9         A big piece of the Prosecutor's puzzle is, as

10   I've already said, that the State Police were feeding him

11   the answers that day.  That's not what Trooper Woodyard

12   says.  They didn't put words in his mouth.  They didn't

13   make Paul Reggettz confess to the manner in which he

14   killed his family.

15        A major piece of the Prosecution's puzzle was the

16   blood -- that's why all of these charts are here.  The

17   Prosecutor  explained  them  for  you  a  little  bit.    You

18   remember Mr. Zain's testimony.  He testified yesterday

19   that these figures, or the one at the bottom, the three

20   in ten thousand, that's probability that these things are

21   consistent with.  They can't identify specific blood on

22   this as Mr. Moss's.  He said they couldn't do that.

23        You also saw -- and those figures are still on

24   there -- when you apply these figures of probability, to

1    the real figures of the population, there were sixty-nine

2    people, from a statistical standpoint, with the same

3    blood characteristics in Kanawha County.  There were two

4    hundred twenty-nine people, if you look at the one in one

5    thousand ratio.   There's one big assumption with the

6    blood work here, and nobody has said this, that it is to

7    be assumed, and that assumption is, one, that it is John

8    Moss's blood, which is an assumption.  Because we know

9    that  it  is  still  within  the  realm  of  statistical

10   possibility.  The other assumption is that whoever that

11   was who left the blood in the house, whoever that was of

12   these  sixty-nine  people,  that's  the  person  who  also

13   killed  this  family.     That's  an  assumption  --  an

14   assumption that I think would pull that puzzle piece out

15   and turn it around.  I don't think it fits that way.

16        Now, there are pieces of physical evidence which

17   I think go back into this puzzle that are different from

18   what the Prosecutor will tell you.  One of those, Mr.

19   Reggettz confessed, and stated that his family had supper

20   at 7:30 that night, but that his children didn't eat.

21   Dr. Sopher testified, and his autopsy report showed, no

22   recognizable food in the stomach of the children.   But

23   in Mrs. Reggettz's stomach, which would have emptied in

24   three to five hours, he found lima beans, amounts of a

1355

1   fleshy material which was probably fish, onions, and a

2   pickle.

3          Let me say something else about the blood issue.

4   This is another piece of the puzzle that is so different

5   from the Prosecutor's puzzle, that we'll pull out and put

6   back in.

7          Mr. Zain testified to this, and you will notice

8   on here, Mrs. Reggettz's blood -- he testified that there

9   is a pool of blood that starts in the first bedroom.

10  There was also blood consistent with hers on the end of

11  the bedspread, as well as on the pillowcase here.

12         In John Moss's confession, he didn't struggle

13  with Mrs. Reggettz in this bedroom.  Mr. Reggettz did.

14  He hit his wife and she fell down.  He picked her up.

15  When she fell down, she bled right here on the carpet.

16  That's a physical element of this case, a piece that will

17  fit right back in, that is different from what the

18  Prosecutor would have you believe.

19         As far as the son is concerned, Dr. Sopher says

20  that the lacerations on his face -- he was choked with

21  a cord and then placed in the tub, face-down.  He was

22  unconscious, but alive when he was put in that tub.

23         In John Moss's first confession, he said he

24  choked him with his hands, and when you listen to this

1356

1   taped confession, as Mr. Revercomb suggests you do, you

2   will hear when they get to this part, the Police are

3   feeding him the answers then.  You will see.

4          Mr. Reggettz's confession was precisely that he

5   threw him down on the floor with his knee on his

6   buttocks, and he grabbed a radio cord from that radio and

7   choked him.  He tied his hands up and put him in the tub,

8   face-down.  That's a piece of the puzzle that's different

9   from the Prosecutor's, and I ask you to put it back in.

10          Dr. Sopher testified -- it's in his autopsy

11   report, that Bernadette Reggettz was choked with a

12   sweeper cord, and she was hung.  John Moss, the first

13   time he confessed, before he got it right for the Police,

14   choked her with his hands.  Paul Reggettz says he choked

15   his little girl until the movement stopped, then he hung

16   her on the door.

17          How was Paul Reggettz able to confess to this in

18   this detail at 2:30 in the morning, and again at 8:30

19   a.m. in the morning, before Dr. Sopher's autopsy was

20   available at 11:00 o'clock?  Because he was the killer,

21   that's how.  That's how he knew.

22          The last piece of the puzzle, and we'll put it in

23   to replace the piece the Prosecutor had, the last piece

24   of the puzzle -- John Moss didn't say that he stabbed her

1357

1  with scissors, he says a knife or something.  Mr.

2  Reggettz tells you -- he admitted, he showed you how he

3  took the scissors and he pushed them in her chest.  He

4  knelt down.  I noticed something yesterday when Sergeant

5  Woodyard was here.  He knelt down to show you what Mr.

6  Reggettz did, and what he did with his hands, he had both

7  hands pushing down.  Dr. Sopher will tell you that those

8  pair of scissors were three and a half inches and were

9  shoved into her chest after she was already dead.  Mr.

10  Reggettz did that, and that's a piece of this puzzle that

11  goes in there.

12      Ladies and gentlemen, I submit to you that the

13  Prosecutor's puzzle pieces don't fit.  Some of them may

14  go in, some of them may be part of a long puzzle or the

15  wrong puzzle, and some of the pieces that do fit are the

16  puzzle pieces that say that Paul Reggettz killed his

17  family.  And that's the way it happened.

18

19

20                    CLOSING ARGUMENT

21

22                   (For the Defendant)

23

24  BY MR. BICKLEY:

1358

1    Before I make any comments about the evidence in

2    this case, again, on behalf of Mr. Moss and his legal

3    team, we want to thank you for being very patient.  You

4    all have been attentive, and that is good.  But what you

5    are doing in the jury system is the bulwark of our

6    justice system, and we recognize that you all have made

7    sacrifices, leaving your homes, businesses and loved

8    ones, and you have various other obligations.  But what

9    you do is to make sure that justice is served.  On behalf

10   of Mr. Moss, we appreciate that.

11   Now, it is time to discuss the evidence in this

12   case, and I want you to know that I am not here to appeal

13   to your emotions.  I´m not here to appeal to your

14   sympathies.  I want to let you know, ladies and

15   gentlemen, what I think the reasonable doubts are in this

16   case, by reviewing the evidence.

17   Now, if there is any conflict in what I tell you

18   and what your recollection or what you heard from the

19   witness stand, you are to be governed solely by that from

20   the witness stand.  If I misquote any testimony, I can

21   assure you that it is not intentional.

22   Folks, at the beginning of this trial, when I

23   asked you in voir dire to assume John Moss innocent

24   throughout the trial, you said you would do that.  And

1359

1    I asked you to make the State prove its case beyond a

2    reasonable doubt, and you said you would do that.  And

3    the Court has instructed you that mere suspicion, yet

4    even strong suspicion, is not enough to convict John

5    Moss.  It must be beyond a reasonable doubt.

6         Now, I am going to plow some of the same field

7    that Mr. Huffman talked about, because I can only deal

8    with the facts, and the facts as they are related to you.

9         We have about five confessions in this case.  We

10   have two confessions from John Moss, and we have two

11   confessions from Paul Reggettz, and a demonstration.  So,

12   let's consider John Moss's confession.  Let's consider

13   motive.  John Moss knew that Reggettz lived in the Jean's

14   Motel, so he was aware that they had absolutely no money.

15   They lived for seven months in this motel, one room, and

16   it wasn't until the Fortson's allowed them to rent their

17   home for seventy dollars, they were able to move.  They

18   had no furniture.  In fact, Mr. Fortson testified that

19   he gave, or offered the Reggettz's, their refrigerator,

20   which Mr. Reggettz refused to assist in moving, and it

21   was his grandmother who aided them in getting the

22   refrigerator transferred into their home.

23        Now, just what reason would he have to go rob

24   somebody who is known in the community to have no money?

1360

1    It's a motive.

2           Does Paul Reggettz have a motive?  I think so.

3    We'll get to that.  And I want to cover very basically,

4    the confession of John Moss, and ask you to remember with

5    me, to go back in your mind's eye.

6           Do you recall that Trooper Smith crawled over the

7    back seat to get into the back seat to talk to John Moss

8    because he was hard of hearing?  Now, you would think

9    that that sedan was a limousine, that he had to crawl

10   over the wet bar, the TV stand, walk all the way back to

11   the back seat, when all that he wanted to do, he said,

12   was to read him his Miranda Rights and sort of talk about

13   something important, that we'll discuss later on.  But

14   for forty-five minutes, he sat in the back with John

15   Moss.  It is reasonable to conclude -- reasonable to

16   conclude, that he was softening John Moss up for what was

17   to come.

18          Now, you must keep in mind, and I will prove it

19   to you, in John Moss's statement -- and you must remember

20   that when I finish, Ms. Lusk is going to have to come up

21   here and you are going to have to ask her to answer some

22   of these questions.  I will show you how Trooper Williams

23   and Trooper Smith messed up.

24          Now, you recall that John Moss was having some

1361

1   memory problems.  Trooper Williams testified that John
2   Moss was having some memory problems, and he felt that
3   it was best that he leave the room and leave Trooper
4   Smith with John Moss.  You also recall that when he
5   returned, John Moss's memory came back.  Okay.
6       Now, here is where they messed up.  Now, as they
7   told you, Trooper Williams and Trooper Smith were the
8   chief investigators of this crime.  They were aware in
9   detail how the crime was committed, what Paul Reggettz
10  said that he did, but they also believed that it was a
11  conspiracy.  In John Moss's statement, which you will
12  probably hear if you listen to it on the tape, remember
13  this question:  "Did you see Paul Reggettz's car?"
14      Now, they have offered into testimony, and have
15  offered into evidence, Paul Reggettz where he checks into
16  the UPS, allegedly worked all night, and got oil on him
17  to prove that he didn't go anywhere.  He then came home
18  the next day.  John Moss said, "Yes, he saw Paul
19  Reggettz's car."  That's what he said.  He couldn't
20  possibly have said yes.
21      Was he fed that?  It just begs the question.  Why
22  would they ask him that question when they knew the
23  answer?  They wanted the conspiracy to be.  That's it.
24  Look for it.  Ask yourself the question, they knew that

1362

1    Paul Reggettz's car could not have been there, yet John
2    Moss saw the car?  He could not have seen it.  This could
3    not be.

4         Now, let's talk about Paul Reggettz.  Paul
5    Reggettz, who hated his family, who hated the
6    responsibility, who was a Satanist, who had tried to
7    resurrect Satan, unsuccessfully, but he gave it a shot.
8    Paul Reggettz, who had a phobia about death, did not want
9    to provide for his family for anything; he testified to
10   this.  Paul Reggettz, who paid off his car weekly, just
11   to get out of debt, who hoarded his money, who gave his
12   family little or nothing.  He admitted to that.  Paul
13   Reggettz, who said when he saw his family, "I felt free."

14        Now, the State would have you believe that
15   because he was up fourteen hours, that was why he
16   confessed.  What they fail to realize, is that Paul
17   Reggettz's internal clock was much different than yours
18   and ours.  He went to work at 2:00 o'clock in the
19   morning.  He got off work at about 11:30, and he said he
20   only needed four or five hours of sleep, that he didn't
21   need much sleep.  He just didn't need it.  So, who was
22   probably in worse shape, as far as Woodyard, who was up
23   there questioning him?  He was used to it.  His internal
24   clock is different from ours.

1363

1   And then we get to the confession.  Ladies and
2   gentlemen, just as the Troopers messed up in the
3   confession of John Moss, they did so in the confession
4   of Paul Reggettz, and therein lies a clue.  Look at the
5   evidence, the physical evidence, of the Reggettz
6   confession.

7   First the evidence.  It has been mentioned that
8   they ate supper, but the children did not eat theirs.
9   There was no food found in their stomach.  He says he
10  began swinging the gun several times, and she fell to the
11  floor.  His wife, right there, in a pool of blood in the
12  back bedroom.  John Moss was never there.

13  He grabbed an extension cord.  He told precisely
14  how he murdered his family.  He said he became annoyed
15  with the children as he tried to watch television, and
16  he told his wife on several occasions to make them be
17  quiet.  He said the kids continued to play, and he was
18  beginning to get a headache.  He said he finally told his
19  wife to put the children to bed.  He saw the children
20  getting out of bed, and he began to argue with his wife
21  about the children, and making them mind.  Paul Reggettz
22  said his wife went into the bedroom and began spanking
23  the children, and he felt that she was a little too
24  rough.  He went into the bedroom and told her to keep

1364

1    them in bed, and they began arguing and pushing with each

2    other.

3        Then Reggettz stated that him and his wife were

4    standing in the television room arguing with each other

5    when she said she was going to get the gun.

6        Now, as I relate this confession to you, how in

7    God's green earth can you testify -- can you confess to

8    something that you didn't do with such infinite detail?

9    Tell me.  Tell me.

10       He followed his wife into the front bedroom where

11   she took a handgun from where it was kept hanging on

12   their bed.  They began scuffling and he took the gun away

13   from her, then he began swinging the gun several times.

14   He felt that he had hit something but he could not

15   remember hitting his wife.  But she fell to the floor and

16   was kind of moaning afterward.

17       He picked her up in his arms and carried her into

18   the children's room and dropped her on the floor of the

19   room next to the television room.  He could hear the

20   children screaming.  And he said he thought he saw his

21   wife start to move, so he grabbed an extension cord lying

22   by the door and wrapped it around her neck and pulled

23   until the movement stopped.  He became afraid she might

24   come to and continue to fight with him, so he tried to

1365

1   tie her to the door of the television room.  Mr. Reggettz

2   said he was unable to do this because the end of the cord

3   would not fit around the hole in the door.

4        The children were crying and screaming and trying

5   to help their mother.  Mr. Reggettz said the screaming

6   was causing his head to pound.  He had to stop them.  He

7   said he was on his knees by his wife's body when his son

8   tried to run.  He turned and grabbed the child around the

9   waist and threw him face-down on the floor, near the bed.

10  He held the child down, and placed his right knee in the

11  child's buttocks.  Mr. Reggettz then reached to his left

12  and grabbed the cord off the radio which was at the end

13  of the bed.  He yanked the cord out of the outlet and

14  wrapped it around his son's neck.  He pulled the cord

15  tight until the child stopped screaming.  He then drew

16  the cord down the son's back, and across the child's

17  wrists, and pulled the cord tight and tied his hands.

18  He then carried the child into the bathroom and placed

19  him face-down in the remains of the bath water that was

20  still standing in the tub.  You'll recall he added that

21  his son liked to swim, and he could only remember his son

22  screaming, "Don't, daddy; don't, daddy."

23       Mr. Reggettz stood up after he put his son's body

24  in the bathtub, then he returned to the bedroom where he

1366

1   saw his daughter at her mother´s side.  The little girl

2   was pushing at her mother´s body saying, "Get up, mommy.

3   Mommy, get up."   And he grabbed the child around the

4   waist with one arm and carried her into the front

5   bedroom.  He grabbed an electrical cord of the sweeper

6   and wrapped it around the child´s neck and pulled it

7   tight until she stopped moving.

8        Mr. Reggettz then said that he tied the end of

9   the cord around her neck and looped the cord over the top

10  of the door and let her body hang against the door,

11  because she liked to swing.

12       Ladies and gentlemen of the jury, right there is

13  the nugget we need to nail Paul Reggettz down.  Only two

14  people would know that that child was choked and then

15  hanged -- only two.  With a cord -- strangled with a

16  cord, and then hanged.  The murderer, and Dr. Sopher.

17  There was no one else to know.  The Police could not

18  know.  The Police could not feed him that information,

19  and he told them that at 2:00 o´clock in the morning --

20  or 2:00 o´clock at night, and again at 8:00 o´clock the

21  next morning.

22       Dr. Sopher did not perform his autopsy until

23  11:00 o´clock.  Ask Ms. Lusk to give you that answer.

24  How did Paul Reggettz know that his daughter was choked

1367

1    and then hung?

2           Then he walked back into the bedroom where his

3    wife's body was. He became afraid she might still be

4    alive, so he went into the bathroom and found a pair of

5    scissors. And he then went back to his wife's body and

6    knelt down, and using both hands, pushed the scissors

7    into her chest. He was very tired. He laid down to

8    rest.

9           And Mr. Huffman said to look at the mechanical

10   clock -- it said 1:00 o'clock. He didn't have Vanessa

11   to wake him up.

12          Ladies and gentlemen, Vanessa was laying there

13   inert, still, not moving. John Moss would have no need

14   to go around looking for scissors to put into this

15   woman's chest. Only someone with a Satanic mind -- only

16   someone who hated his wife -- only someone who just

17   wanted to do one last vengeful act would do that. And

18   that person was Paul Reggettz.

19          Paul Reggettz testified from the stand with all

20   of the candor -- but I think he overplayed his hand.

21   Months have passed. Years have passed. When I asked him

22   to make a demonstration, he moved almost with alacrity

23   to show you. He knew that he has almost pulled the

24   perfect crime, but I think the fact that he was aware

1368

1    that Bernadette was strangled first, then hung, and only

2    he could know that -- if the truth would only come to

3    light.    Only the Police, only Dr. Sopher, and the

4    murderer -- and then when you look back over the

5    confession, how can you make someone who don't want to

6    do it, add little tidbits like, my daughter likes to

7    swing so I hung her on the door; my son likes to swim so

8    I put him upside down in a tub?  Can you beat that out

9    of somebody?  Even the most coward of cowards -- can you

10   -- do you believe that a reasonable?  I think not.  I

11   think not.

12            I think Paul Reggettz truly hated Vanessa, that

13   he truly was sorry to have a family and responsibility,

14   and his horrifying initial reaction which he testified

15   to upon seeing his family dead, was that he was free.

16   And thus far, ladies and gentlemen, he has been free, and

17   he should not be free.    Paul Reggettz murdered his

18   family.

19            This case will soon be over, and I've tried my

20   best to show you the many contradictions that the events

21   of December 13, 1979, could not have happened as it has

22   been asserted by the State.  When I finish, Ms. Lusk will

23   respond.  My voice is the last friendly voice that will

24   be raised on behalf of John Moss, the victim of

1369

1   horrifying, coincidental circumstances, while the true

2   murderer walks and roams the land.

3        You must ask Ms. Lusk to answer my questions.

4   Soon, it will rest in your hands, and when it is over,

5   you, from time to time, will reflect on this, as I will.

6   Some of you will be in the mornings, others of you at

7   work, and when you're trying to fall asleep, wanting to

8   know, did you do the best, did you do justice to John

9   Moss?

10        If you have any doubts about this case, have them

11   now.  There is no second chance for John Moss.  There is

12   no tomorrow.  Ask yourself the hard questions.

13        If, during deliberation, you will keep that in

14   mind, I know that you will find John Moss not guilty.

15        Thank you.

16

17        THE COURT:   Do you want to take five minutes

18   before you start?

19        MS. LUSK:   Whatever you say.

20        THE COURT:   Let's take five minutes, folks.

21

22        WHEREUPON, the Court stood in a recess in the

23   hearing of this case.

24

1370

1    (Back on the Record)

2

3                    CLOSING ARGUMENT

4

5                  (For the State)

6

7    BY MS. LUSK:

8

9         Did you notice, ladies and gentlemen, that they

10   didn't talk about the blood?  Did you notice that there

11   is no explanation for this blood that's consistent with

12   John Moss's being in this house?

13        They are arguing out of both sides of their

14   mouths.  If you believe that Paul Reggettz committed this

15   crime, then where did this blood come from that doesn't

16   belong to any member of his family?  Do you think

17   somebody came into the house and burglarized the house

18   after these people were already dead?  That they went

19   through the house, cut themselves shaving, and bled all

20   over the house?

21        Where did the blood come from?  These people were

22   already dead.  There is certainly no struggle that

23   ensued.  There is no one to struggle with, so where did

24   the blood come from?  The blood came from the murderer,

1371

1    and that was John Moss.  The blood came from the person

2    who struggled with Vanessa Reggettz at the back door.

3         We know that there was a struggle at the back

4    door.  There is blood on the back door.  There is blood

5    on the curtains.  Vanessa's blood is on the outside of

6    the back door where she tried to close the door.  The

7    curtain is partially torn down.  The murderer's blood is

8    on the utensil drawer over where the knives are, because

9    there is a struggle.

10        The knife that was taken away from Vanessa

11   Reggettz had a glove print on it.  It's like Mr.

12   Revercomb said, do you think Paul Reggettz took the time

13   to put gloves on?

14        Every room in the house is consistent with John

15   Moss.  There is a flashlight in the family room that has

16   got his blood on it.  He used it to go through the house

17   and look for stuff to steal.  But he didn't need the

18   flashlight, because all the lights in the house were on.

19        We know that there are two coffee cups in that

20   family room, just like Paul Reggettz said.  He sat up and

21   watched TV with his wife.

22        There is the K-Mart ad, where he was going to go

23   buy himself a Christmas present.  Vanessa was going to

24   buy it for him the next day.

1    There is the struggle with Mrs. Reggettz. She is

2    hit in the head with a gun. Dr. Sopher compared the gun

3    with the wound on her head. The gun butt -- just like

4    John Moss said. His blood was rushing. He snatched a

5    cord. He didn't know where he got the cord from, he was

6    frenzied. His blood was rushing. He took the cord and

7    tied these victims up.

8    Mr. Huffman started talking to you about the time

9    of death. I want to talk to you a little bit more about

10   that. We know that there is a preliminary time of death

11   range given by the Medical Examiner. We know that that

12   preliminary time of death is given at about 2:00 o'clock

13   in the afternoon, because it caused the State Police to

14   read Paul Reggettz his rights.

15   Let's look at the objective factors. At 2:00

16   o'clock in the afternoon, you have the preliminary time

17   of death stated. Then we know that at 3:30, there is

18   actually an on-the-scene check done by the Medical

19   Examiner. He testified that at 3:30, he checked the

20   rigor mortis of the victims and he took their

21   temperatures. After looking at his findings, his

22   objective findings, at 3:30 in the afternoon, first,

23   rigor mortis of Vanessa was not yet fixed. It was marked

24   in her neck and jaws, moderate in part, of her body, and

1373

1   mild in part of her body.

2         What did the Medical Examiner tell us about the

3   rigor?  It generally fixes in eight, ten, twelve hours.

4   From the time he was checking it at 3:30 in the

5   afternoon, what does that back you up to?  3:30 a.m. to

6   7:30 a.m.  Who is that consistent with?  John Moss -- not

7   Paul Reggettz, he was at work.

8         The second rigor mortis check was of Paul Eric

9   Reggettz, with the same results.  Rigor mortis is not

10  fixed throughout his body.  Back it up, eight, ten,

11  twelve hours -- 3:30 a.m. to 7:30 a.m. -- John Moss.

12        The third victim -- look at that rigor mortis of

13  Bernadette Reggettz.  The same results.  Her rigor is not

14  fixed either.  3:30 a.m. to 7:30 a.m. -- John Moss.

15        Look at the temperature of Vanessa Reggettz.

16  Now, we know that the body temperature of the children

17  doesn't tell us a whole lot.  There are no studies on

18  that.  Vanessa's temperature was eighty-two degrees.  The

19  Medical Examiner said you take that and subtract it from

20  a hundred, though, because we are telling what the rectal

21  temperature was.  You subtract a degree and a half per

22  hour -- that backs you up twelve hours from the time he

23  is checking -- 3:30 a.m.  But what did he say about

24  Vanessa, though?  She is a teeny-tiny woman.  She is

1374

1  going to cool faster than the average adult. That tells

2  us, doesn't it, after 3:30 -- John Moss. Paul Reggettz

3  was at work.

4         Fifth, let's look at the livor mortis on

5  Bernadette. It is intense in the soles of her feet, from

6  the hanging. We know that she was totally suspended,

7  because there is no blanching on the bottom of her feet,

8  no area of pressure where her feet were resting on the

9  floor and the blood vessels would have been pinched, so

10  that they couldn't fill with blood. That didn't happen.

11  She was totally suspended. Intense livor of her soles

12  of her feet.

13         What did the doctor say about that? She wasn't

14  up there twelve hours. It wasn't intense enough. That

15  was Reggettz's first statement; wasn't it -- that she

16  hung there all night. And consistent with that, tells

17  us -- John Moss.

18         The next that we'll look at is the livor of

19  Bernadette, which is not intense enough for just two

20  hours. If Reggettz hung her up there, then took her back

21  down before he went to work, it would have been more

22  intense. What does that tell you? Is it consistent with

23  Reggettz? No, it must have been John Moss.

24         Dr. Sopher also in looking at the livor of

1    Bernadette, said she didn't lie on that bed for twelve

2    hours, for two reasons:  That you know that Reggettz did

3    not put her up for only a couple of hours, it was not

4    intense enough.  He didn't lie her on the bed for twelve

5    hours, because the livor was totally around her legs.

6    If she had been on the bed all night long, the liver

7    would have drifted to the back of her legs.  That's not

8    the finding.  You can see the mottling in the photograph,

9    ladies and gentlemen.  Not Paul Reggettz -- John Moss.

10         Next, let's look at the clock.  What does the

11   time on the clock say?  6:17.  Look at it.  6:17, ladies

12   and gentlemen.  This is all consistent with John Moss;

13   not Paul Reggettz.

14         Let's look at another feature on this clock

15   radio.  You can see that the alarm is set for 7:00

16   o'clock in the morning, that's about when mom would get

17   up her son to go to school.  Vanessa set the alarm

18   because she went to bed that night expecting to get her

19   son up for school the next day.  The alarm is set at 7:00

20   o'clock; and you can look at something else on this

21   alarm.

22         When it was smashed into the floor when the cord

23   was removed, it broke in the position in which it was

24   found.  It is on -- the alarm is set for 7:00 o'clock and

1   is in the "on" position, wake to music.  And that is

2   because Mrs. Reggettz sent her husband off to work, set

3   her alarm clock to get her son up, and was killed.  The

4   alarm is on.  Everything about this clock radio, all

5   three factors, tell you Moss -- Moss -- Moss.

6           What else do we know about the time of this

7   crime?  John Moss's confession.  What time does he say

8   it happened?  It was almost daylight.  So, what did he

9   say is the truth?  Is that consistent with the bodies?

10  Is it consistent with the clock?  It's all consistent;

11  and the reason for that is, he told the truth.  John

12  Moss.

13          There is not a single thing about these bodies

14  -- not a single objective factor that you can look at

15  which points to Paul Reggettz.  Every single one has this

16  defendant's name right on it.  The reason for that is

17  simple; he did it.  He committed the crime.  He bled in

18  the house.  He went in there, he said, looking for money.

19  Mr. Bickley said, "Well, he should have known that they

20  didn't have any."  He knew Vanessa Reggettz was there by

21  herself with her two children, didn't he?  He knew that

22  her husband worked at night.  He didn't necessarily tell

23  the whole story.  Perhaps that's why Vanessa Reggettz's

24  panties are on the bed -- not on her body.  Why her

1377

1   sanitary napkin was on the floor -- a homemade sanitary

2   napkin, not a store-bought one, something that has no

3   pins to secure it, no tape to secure it, no belt to

4   secure it.  It was secured in place by her underwear, but

5   her underwear is off of her body and her sanitary napkin

6   is on the floor.

7         He did leave out a struggle in the front bedroom,

8   and he left out taking off her underwear.  But what he

9   did tell you in his confession, that is corroborated.

10        We know that he took certain items from the

11  house, and we know that he took exactly what he said.

12  He was telling the truth.

13        He told the Police who his parents were.  He told

14  the Police where his parents lived.  He told the truth.

15        He told the Police that there was a struggle at

16  the back door.  That's corroborated by all of the

17  evidence; that he was cut, of course he was cut.  There

18  was a struggle with a knife, and there is a broken knife.

19  There is blood.  He rifled through the house with a

20  flashlight.

21        Why did he kill Vanessa Reggettz?  He doesn't

22  say, but he does say that he put the scissors in her

23  chest.  He wanted to make sure she was dead.  He wanted

24  to make sure she was dead.

1    The Police asked him why he put that boy in the

2    bathtub after he had already strangled that child, and

3    what did he say?  "I wanted to make sure he was dead."

4    Cold.

5         "What did you do next, Mr. Moss?"

6         "I got the girl and I killed her."  He did what

7    he intended to do.  He killed her.  He took her little

8    body, strangled her and put her up on the back of the

9    door facing her Christmas tree, where he opened her

10   presents, all of the gifts that her mom and dad had

11   bought her for Christmas.  John Moss opened them.  He

12   bled on that door as he hung her up, and he bled on her

13   shirt.  You can look at her shirt.  You can see where the

14   Police cut out the blood from her shirt.

15        When you hold this shirt up, to hang the child on

16   the back of the door, what do you find?  A bloody

17   thumbprint right where the murderer hung her.  Whose

18   blood is that?  It's John Moss's blood.  This shirt

19   proves that the murderer in this case hung this child,

20   bleeding.  Right here, the thumbprint, that is not Paul

21   Reggettz's blood; it is John Moss's.  And the reason for

22   that is that Paul Reggettz didn't hang this child.  The

23   murderer hung this child, and the proof is right there.

24   He bled on the door where this child was.  He left

1379

1  thumbprints, fingerprints, and glove marks on the door

2  where he hung Mrs. Reggettz -- two on one side of the

3  door and one on the other side of the door.  You know,

4  like you would hold a door while you are struggling to

5  get a cord through a hole.

6      The person who struggled to get that cord through

7  that hole was wearing gloves.  He left glove prints on

8  the front and the back, just like you were holding that

9  door.

10     The person who plunged those scissors into Mrs.

11 Reggettz's chest was wearing the gloves.  Do you think

12 that the father is going to stop and put on a pair of

13 gloves in the heat of this passion?  A murderer is going

14 to wear gloves.  John Moss wore gloves.

15     The person who opened those Christmas gifts wore

16 gloves, bled right into the glove, and left a print of

17 the glove in the blood.  It's not Paul Reggettz's blood;

18 it's John Moss's blood.

19     The person who rifled through the house, bled on

20 the flashlight, as I've said.  Does it make sense to you,

21 ladies and gentlemen, that a man, the father, would kill

22 his family, then spend the whole night thinking about it?

23 What is he going to do when he gets home?  And what he

24 does is tamper with the scene.  "Gosh, I've been thinking

1380

1    about this all night, but I´m going to have to go into

2    the house and take the little girl down. I´m going to

3    try to get my wife down, then I´m going to run frenzied

4    to the A&W to call the Police, then I´m going to run back

5    to the house and take the little boy out of the bathtub."

6    Those are the actions of a man who was not expecting --

7    who had not idea of what he was going to find when he

8    came home.

9            Of a father -- is a father going to leave his

10   child hanging on the back of a door if he had killed her?

11   He knew she was there. He wouldn´t have moved her. And

12   he did the same thing with his son. He took him out of

13   the water.

14           Look at John Moss´s confession. You look at the

15   oral confession, because you are going to have the tape

16   in there. You can listen to it. John Moss told the

17   Police that he thought Vanessa Reggettz had bumps on her

18   face.

19           Now, you´re going to have the opportunity, ladies

20   and gentlemen, to look at the photographs in this case.

21   This is very important; you are going to see it. There

22   is a photograph, a Polaroid photograph, of Vanessa

23   Reggettz as she appeared in life. The photograph is

24   dated November 5, 1979. You´ll see by the flash on the

1   camera that her forehead and cheeks are shiny and clear.

2   She had a clear complexion.  In life she had a beautiful

3   complexion.  The Medical Examiner described to you that

4   the suffusion, the suffocation, caused blood to collect

5   in her head, which discolored her face and made it look

6   darker.   And also, that that caused little pinpoint

7   hemorrhages on her face.

8        Trooper Smith told you that he viewed a part of

9   the autopsy and it appeared that those hemorrhages could

10  have been bumps, acne.   There is a photograph that you

11  can look at yourself.  You can look at her chin, and you

12  can see that she looks like she does have pimples on her

13  chin. Only the murderer would know that.  Only John Moss

14  saw her in a state in which she appeared to have acne.

15  Only the murderer.

16       He motioned to Trooper Smith, "I thought she had

17  bumps on her face."  The last time he saw her, she did

18  look like it, didn't she?   That's exactly the way she

19  appeared the last time he viewed her, in death.

20       What else did he tell the Police?   The Police

21  asked him, "Why do you think we got your blood?"   He

22  became wide-eyed, but he sat down.  He'd been caught and

23  he knew it.   He knew that he had bled all over the

24  Reggettz residence.  What did he tell them?  "Well, I was

1382

1    scared.  When I'm scared, my blood rushes.  And I was

2    scared.  I got scared at the back door.  I was scared

3    before it happened, and after, my blood was rushing."

4         He knew she was in there.  Yes, she and the kids.

5    He said he had gone in there to get some money and that

6    he couldn't find any.  Well, we know that his blood is

7    on the changepurse.  It sure is, right there on the

8    dresser.  You can look at that exhibit on the

9    changepurse.  It is photographed also, in the master

10   bedroom.

11        He said that it was almost daylight when he got

12   home -- we know that was true.  He said that he walked

13   directly from his house to their house, walked there by

14   walking down the railroad tracks -- that's true too,

15   isn't it?  His grandfather lived right up the railroad

16   tracks.  He said she was there at the bed with a gun --

17   she sure was, wasn't she?  Right there with the broken

18   gun, where he had broke it on her head.  She and the

19   kids, right there in bed together.

20        He knocked her to the floor, struck her with the

21   gun.  We know that's true.  We know she was in the floor,

22   certainly, because there is a large pool of blood there.

23   He said the gun went off.

24        "How many times did the gun go off?"

1383

1    "Once." That's true, isn't it?

2    "Was anyone shot?"

3    "No, I don't think so." That's true, too.

4    He says he went to the back door, he ran out.

5    You'll hear in the confession, the taped confession,

6    where he says, "It was a curtain or a sheet in the

7    kitchen." You'll see that every other room, all the

8    other doorways, where there isn't an actual wooden door

9    there is a bedspread or a sheet hanging to close off the

10   rooms for heat, save the kitchen. The reason for that

11   is that it was torn down in the struggle with John Moss.

12   We know that because he said it was a curtain or a sheet.

13   He knew its former position; he knew where it had been

14   before it got to the floor. You see the curtain rod

15   underneath Vanessa Reggettz's body.

16   We also know that Vanessa Reggettz bled on that

17   sheet, drops of blood, drops of blood that could only

18   occur when she was alive.

19   Paul Reggettz said that he put that sheet on the

20   floor after his family was already dead to make it look

21   like a burglary. If it was hanging -- now, these aren't

22   smears or smudges -- Vanessa Reggettz could not have

23   dropped the blood upon it. That had to have occurred

24   while she was still walking around, still having a

1384

1  struggle at the back door, still looking for a knife,

2  still swinging a knife at John Moss.  The sheet in the

3  kitchen tells you that John Moss is the murderer.  He

4  said he tied her up and he placed the scissors in her to

5  make sure that she was dead.  The same for the boy,

6  making sure he was dead.

7         He killed each of them twice.  He killed them

8  each twice.  He was making sure they were dead.  He did

9  make sure they were dead.  He was successful.  He

10  strangled Vanessa Reggettz with a cord, and he stabbed

11  her with the scissors.  He took the boy and strangled him

12  with a cord, and he drowned him.  He took the girl and

13  strangled her with a cord, and then he hung her.  He

14  killed them each twice.  He was successful.

15         What else did he tell the Police?  Well, he took

16  the little gun because it was broken.  We know that to

17  be true.  He took a .22 rifle, and he described it

18  accurately.  "Well, it was a bolt action, it was a .22.

19  It had a screw underneath the stock where it all came

20  apart."  That was all true.  He knew how to describe that

21  rifle, because he had it.  He had taken it apart.  He

22  took it to Cleveland.  He said, "Check with my brother,

23  Carlton."

24         He said that he took a Christmas gift; we know

1    that's true.  He took flatware from underneath that tree,

2    and he called it dishes.  Of course, as you've seen, he

3    saw dishes beneath that tree.  He said he only took one

4    gift and he gave it to his best friend's mother, Mrs.

5    Johnson.  She kind of left it on the dresser; didn't she?

6    Why didn't she open it?  Why did she just leave it

7    sitting?  But he only took one gift, and that, he gave

8    to Mrs. Johnson.  Mrs. Johnson told you, "Right there it

9    is, the flatware."  That's what John Moss gave her;

10   that's what John Moss stole from under the Reggettz new

11   Christmas tree.

12        What about the camera?  He took a handle camera

13   -- Paul Reggettz's handle camera.  We knew that Paul

14   Reggettz had a Polaroid camera with a handle.  We've got

15   some of the photographs that he took of battle scenes;

16   the Civil War was his hobby.

17        We also knew that John Moss's sister had a handle

18   camera.  This is a camera that he was familiar with.  Her

19   name is on it, but it's broken.  She needed a new one;

20   he saw the opportunity.  Right there it was for her, a

21   new handle camera that works.  The Police didn't even

22   know that was gone, and they didn't know that the

23   flatware belonged in the house because they couldn't talk

24   to Paul Reggettz about it.

1386

1    Well, we know it was.  John Moss told us it was.

2    And now Paul Reggettz says -- he's able to testify and

3    he can say, "Yes, I bought my wife that flatware.    I

4    remember the rose pattern."  John Moss says he took it

5    from the house and gave it to Mrs. Johnson, where he left

6    his glove print, the same as the one that is in the

7    house.  He said he wrapped it back up and gave it to her.

8         It's all the way it happened; all of it.  Look at

9    the blood; look at the reliability of the blood, ladies

10   and gentlemen.

11        We're in a situation where the Police have a man

12   in jail for murdering his family.  The serologist and the

13   chemist start examining this blood and say, "There's a

14   problem here, folks."  There is a problem here.    There

15   is some blood in this house that doesn't belong to these

16   Reggettz family members.  This crime didn't occur the way

17   Paul Reggettz said it occurred.    They don't know what

18   happened.    They didn't know how it happened at this

19   point.  All they know is that it didn't happen like Paul

20   Reggettz said it did.    So, they talked to John Moss.

21   They want to know if Paul Reggettz was there.

22        They asked him, "Was he with you?  Was he helping

23   you?  Was he an accessory?"

24        "No, he was not.  He wasn't there."

1      "Was Paul Reggettz in the house?" He said,

2      "No."

3      "Well, had you talked to him about Vanessa?" He

4      said, "No. I did it all by myself."

5      And that's the truth. He did do it all by

6      himself. He certainly did. Look at the circumstances

7      of taking his confession. Trooper Smith and Trooper

8      Williams both told you he was very cooperative, very

9      cooperative. Trooper Smith talked with him for maybe

10     five minutes about this serious crime. He didn't want

11     to describe the triple homicide case in the back of a

12     patrol car where he didn't have the rights forms. He

13     didn't have a tape recorder. He didn't have any of the

14     proper equipment that is good police work. So, they

15     stopped at the first State Police Detachment they came

16     to when they hit the West Virginia border.

17     John Moss was so cooperative. He was advised of

18     his rights on three separate occasions. When he came in

19     there, he made no complaints of any mistreatment in the

20     car. The reason for that was, there was none. He made

21     no complaints to Williams about his treatment.

22     The following day, he is at the Kanawha County

23     Jail and Chuck Pettry talks to him. Pettry is not a

24     Police Officer, he is not wearing a uniform. He isn't

1     armed.  He isn't a threatening figure.  Pettry says,

2     "We'd like for you to talk to Trooper Smith, okay?"  And

3     he says, "Okay, I'll talk to Trooper Smith."

4              They're having a little trouble finding your

5     camera and they want to make sure they are looking in the

6     right closet.  They want to check on that, okay?  He

7     didn't complain any to Chuck Pettry.  These Troopers are

8     two hundred fifty miles away, they are up in Cleveland.

9     And he talked to his mom, and did he say to his mom,

10    "Well, gee, whiz, these guys are really mean.  You'd

11    better watch yourself there.  You're alone with those

12    Troopers"?  Heck, no.  He said, "I'm fine," because he

13    was.  He didn't say, "Gosh, they're mistreating me down

14    here, mom."  He said, "I'm fine.  I'm okay."  And he

15    continued to be just as cooperative with them as he had

16    been the day before, the same attitude, the same voice,

17    the same level of cooperation.  He wanted to help them

18    find the rifle at the time.

19              He gave them a truthful statement, ladies and

20    gentlemen, and all of the evidence bears that out.

21              Mr. Huffman wants you to look at these figures on

22    this blood.  We didn't talk about it that much, but let's

23    look at the circumstances surrounding the blood.

24              Did anybody else in the Kanawha Valley who has

1389

1    this blood confess?  Nope.

2         Did anybody else in the Kanawha Valley who has

3    this blood -- do we have any evidence of anybody else

4    who lived up the tracks?  John Moss did.

5         Did anybody else enter the house, knowing that

6    Vanessa was there alone with her children?  Nope.

7         Did anybody else have a camera taken from the

8    Reggettz house?  No.

9         Did anybody else have flatware taken from the

10   Reggettz house?  No.

11        Did anybody else take a small broken pistol and

12   throw it away at St. Albans High School?  No.

13        Did anybody else take a rifle out of the house

14   and take it home to Ohio?  No.

15        Did anyone else kill the Reggettz family?  No.

16        You look at this case, ladies and gentlemen, and

17   you look at the reasonableness.  You look at reasonable

18   hypotheses.  Sometimes there are two hypotheses which are

19   reasonable in a case, given a set of circumstances.

20        Say, you're back in your deliberation room and

21   you're looking down on Virginia Street and you see a car

22   coming east, one car.  The windshield wipers are on.  You

23   can't see any rain, so you say, gee, I guess it could be

24   raining; or perhaps a person is just cleaning their

1390

1    windshield.  Those things are both very reasonable under

2    that circumstance.  Very reasonable.  But then, the light

3    up at Clendenin Street turns green, and three or four or

4    five more cars come down Virginia Street, all of them

5    have on their windshield wipers.  What does that tell

6    you?  It is no longer reasonable that the windshield

7    wipers are on cleaning the windshield.  Six cars coming

8    down Virginia Street with the windshield wipers on tells

9    you that it's raining.  One reasonable; now one

10   unreasonable.

11        You have the same thing in this case.  One thing,

12   and one confession.  Just the confessions.  You don't

13   know, do you?  That's why you have to look at everything

14   else.  You have to look at the blood.  You have to look

15   at the flatware.  You have to look at the camera, at the

16   rifle, at the opportunity, at the knowledge, the money -

17   - he took change, he took Christmas presents.  Everything

18   he said is the way it happened.  And he said more than

19   the Police knew.

20        Look at it all, and when you look at it all, you

21   will find that there is only one reasonable hypothesis.

22   There are other hypotheses, sure.  But they are absurd.

23   There is one reasonable hypothesis, and that is that John

24   Moss killed the three members of the Reggettz family.

1391

1    At this time, I want to ask you to think about

2    the evidence. Think closely about what happened to these

3    three people in St. Albans in December of 1979. Think

4    about the brutality. Think about the children, who

5    watched their mother die. The children, who were hung

6    by a man so cold that he could open their Christmas

7    presents with a dead baby hanging over his shoulder

8    looking at him.

9    I ask you to go back in your Jury Deliberation

10   Room and find John Moss guilty of all three counts in

11   this indictment.

12

13   MR. BICKLEY: May we approach the bench, your

14   Honor?

15   THE COURT: Yes.

16

17   WHEREUPON, a bench conference was held, and the

18   following transpired:

19

20   THE COURT: I know you're going to register an

21   objection. Number one, is it something that you think

22   you want a curative instruction on, or is it

23   instructional?

24   MR. BICKLEY: I don't know.

1392

1       THE COURT: The reason I ask is this, if you

2    don't think it's something that can be taken care of by

3    a curative instruction, I'm going to go ahead and tell

4    the jury that they can be excused to go back to the

5    Deliberation Room, then we'll take it up.

6       You've made the timely request to object. I take

7    it, you object to the inference drawn from the panties,

8    and such?

9       MR. BICKLEY: Yes.

10       THE COURT: Well, what ---

11       MR. BICKLEY: May I have a moment to consult with

12    my legal team?

13       THE COURT: Sure.

14

15       (Back on the Record)

16

17       MR. BICKLEY: There is an advantage and a

18    disadvantage.

19       THE COURT: Sure. I'm not suggesting that I will

20    give one.

21       MR. BICKLEY: What else is my choice? It's

22    either curative, or no prior error.

23       THE COURT: The reason I ask that question is, I

24    just want to know what to do with the jury right now.

1393

1    MR. BICKLEY:  Can we make a quick decision?

2    We'll take the curative instruction.

3    THE COURT:  Okay.  It's going to take me a minute

4    to hear some argument on this.  I'm going to excuse the

5    jury.  I'm just going to excuse them to go back to the

6    Jury Room, but not to begin deliberations until this

7    instruction is given.

8

9    WHEREUPON, the bench conference was concluded.

10

11    (Back on the Record)

12

13    THE COURT:  Folks, I'm going to excuse all of you

14    from the Courtroom for just a minute.  There's a matter

15    that I've got to take up with counsel.

16    If you would, I'm going to ask the Clerk to

17    escort you back, not to the Lounge, but to the Jury

18    Deliberation Room.  At this point, I ask you not to begin

19    your deliberations until I instruct you to do so.

20

21    WHEREUPON, the jury was excused from the

22    Courtroom and escorted to the Jury Room.

23

24    (Back on the Record with the jury not present)

1394

1          THE COURT:  Okay.

2          MR. BICKLEY:  Your Honor, I object to the closing

3   arguments about sex between the defendant and Vanessa

4   Reggettz.  I think it is highly prejudicial in this

5   particular case, and I think it's tremendously

6   prejudicial to the defendant when we have the majority

7   of the panel who are women, and we have a black

8   defendant.

9        I do think that the inference is very prejudicial

10  an jeopardizes my client to a fair trial.  No evidence

11  was presented from the witness stand.  There was no

12  testimony about sex, about those panties, about the

13  Kotex, nothing -- or whatever it was.  There was nothing

14  to infer that John had anything to do with Vanessa

15  Reggettz in a sexual context.

16      In fact, Dr. Sopher's testimony was that her

17  vaginal smear was negative for spermatozoa.  So, I think

18  that the statement was highly prejudicial, and

19  jeopardizes Mr. Moss in having a fair trial.

20        THE COURT:  And your request is what?

21        MR. BICKLEY:  A curative instruction, your Honor.

22        THE COURT:  I take it that's in lieu of a motion

23  for mistrial?

24        MR. BICKLEY:  No, sir.

1395

1    THE COURT:  Well ---

2    MR. BICKLEY:  We move for a motion for mistrial.

3    THE COURT:  What's the State's response?

4    MS. LUSK:  Your Honor, I simply stated -- the

5    evidence in this case is how I described it in closing

6    argument. Vanessa Reggettz was not wearing panties when

7    she was examined at the Medical Examiner's office.  All

8    of the sheets are pulled off of the bed, the panties are

9    up on the bed, and her husband testified to what the

10   napkin with the blood on it was on the floor.  It was

11   what she used as a sanitary napkin.  He said it was still

12   there when he went back in the house in November.

13       In Dr. Sopher's report, there was no testimony

14   about it from the witness stand.  Sopher's report says

15   that there is no spermatozoa, but if there had been such

16   testimony, he would also have stated that there was no

17   examination for seminal fluids conducted on either her

18   or her clothing.

19       I don't believe there was an implication in my

20   closing argument that an act of sexual intercourse was

21   completed.  The implication was that it was possible that

22   money was not the only reason that he went in there; and

23   that's the truth.  Her blood is on the bed; his blood is

24   on the pillow.  I mean, when you put it all together,

1    Judge, it's there.

2          THE COURT:  I'm going to overrule the motion for

3    a mistrial, and I will deny the request for a curative

4    instruction.  I, frankly ---

5          MR. BICKLEY:  Note my objection.

6          THE COURT:  I, frankly, believe that the only way

7    for me to frame a curative instruction would be to

8    further accentuate the argument -- inferences from the

9    argument, rather than to effectively -- effectively tell

10   the jury to disregard it.  And to be frank, I don't know

11   that the argument was enough to warrant a mistrial, but

12   obviously, I am going to have to consider that at some

13   point.

14         MR. BICKLEY:  I can't get a curative instruction,

15   your Honor?

16         THE COURT:  Well, Nelson, if you've got some real

17   good ideas about what kind of curative instruction -- it

18   seems to me like bringing the jury back here at this

19   point and making any reference to that is only going to

20   be effective at drawing the jurors' attention to it in

21   a profound way.

22         Now, the last thing I could offer to do to help

23   your client is to say -- to tell the jury, if the

24   argument was presented, the last thing I could do is say

1397

1    to the jury, "Ladies and gentlemen, the Prosecutor made

2    arguments which gives rise to an inference that the

3    defendant was guilty of an attempt at sexual assault, or

4    sexual assault. You will disregard that.

5          That's not going to help; that will just compound

6    any problems that might be created.

7          MR. BICKLEY: I agree. Would you just note our

8    objection, strenuously?

9          THE COURT: Yeah. Let's deal with a procedural

10   matter, now.

11         MR. BICKLEY: We have on other thing ---

12         MR. HUFFMAN: Judge, at this time also, we would

13   ask -- I understand the way this has come about, and

14   obviously, as a result -- let me first state what it is.

15         We object to the jury, even though it's in a

16   piece of evidence, being able to take those tapes back

17   to the Jury Room and being able to play it over and over.

18   Mostly, because, even though it is a matter in evidence,

19   we think that it has a tendency to ---

20         THE COURT: That's going to take a little while.

21   We've still got to go through all of these exhibits one-

22   by-one, and when we get to that, I'll take it up.

23         MR. HUFFMAN: All right.

24         THE COURT: Let's get the jury back in here. Let

1  me excuse the two alternates, and tell them that I want

2  them to go about the business of selecting a Foreman, and

3  then beginning to deliberate. We'll review the

4  documents. And I would prefer that they not go to lunch

5  just yet. I'll tell them that at some point, they are

6  free to make the decision to do that themselves, but I

7  would rather they do it after they have been given all

8  of the evidence and so forth.

9      MR. REVERCOMB: Judge, before we do that, I would

10  just like to determine what the law is on their request

11  for a curative instruction. I understand why -- I don't

12  necessarily want it either, but I would like to be sure

13  about your refusal to grant their request.

14      THE COURT: I can tell you exactly what an

15  effective refusal is. If the argument was inappropriate,

16  then we'll have this case right back.

17      If it's error and I can fix it, then I ought to

18  do it. I don't know the answer, frankly, whether it's

19  error. What I've got is seven days worth of trial and

20  a jury ready to go decide what's going on in this case.

21      There's precious little time to do anything

22  except confound them if I don't send them on about their

23  job. I don't know if I can fix it afterward. If it is

24  error, I'll just set aside the verdict.

1399

1    I don't think you're -- you don't want to look at

2    the law on curative instructions, do you?  That's not

3    going to be helpful at all.  I can tell you a law that

4    is really very simple.  If I can repair damage done by

5    an erroneous argument by giving a curative instruction,

6    I have the responsibility to do that.  You all have to

7    decide yourselves whether or not you believe -- if there

8    is nothing wrong with the argument, the argument was a

9    legitimate argument, then there is no reason to do

10   anything, except to deny their motions, or oppose a

11   mistrial, and a curative instruction.

12       If the argument was erroneous and I can fix it

13   with a curative instruction, then I have the

14   responsibility to do that.  The offer to do it makes a

15   basis for setting aside the verdict.

16       Sally, would you ask the jury to come on back in,

17   please?

18

19       (Back on the Record with the jury present)

20

21       THE COURT:   First, let me say this, the

22   conference which I have just had with counsel didn't have

23   any bearing whatsoever on your deliberations in this

24   case.

1400

1       Like all of the questions that -- all of the
2   objections and my rulings on those objections, they have
3   been made exclusively to questions involved. So, please
4   don´t throw any inferences, or draw any inferences from
5   the fact that we have had conferences, bench conferences.
6       Now, let me just start by saying a couple of
7   things. My practice as a Judge is not to ride herd on
8   a jury that is deliberating, and set a schedule for them.
9   I am going to allow you to do that as a result of
10  conferring with one another.
11      It is now twenty-five minutes til one. It´s past
12  the hour at which we would ordinarily recess for lunch.
13  I´m going to ask you to do one thing: What I routinely
14  do is allow a jury to just make a decision about when you
15  want to go to lunch and give you a couple of rules --
16  don´t discuss the case among yourselves while you are at
17  lunch, and don´t begin deliberation until all twelve of
18  you back together. But I would ask you in this case,
19  however, to do this: Go back and confer with one another
20  and make a decision as to which member of this jury you
21  choose to have be your Foreman. The second thing I would
22  ask you to do is to begin at least deciding how you want
23  to go about discussing this case.
24      We have got to take just a few minutes -- I say

1401

1　a few minutes, it's probably going to be about ten or

2　fifteen minutes -- to go through the evidence that we

3　have here, in order to get it all assembled to bring back

4　to you.

5　　　　In addition, we've got to give you a verdict form

6　that you need to look at just to see what that's all

7　about.  Actually, it's a very uncomplicated verdict form,

8　and it's just consistent with the instructions which you

9　were given in the case.

10　　　　The long and short of all of this is that I ask

11　you to go back and begin the process of your

12　deliberations.  Once we get the exhibits to you, from

13　that point on, you may choose to recess for lunch and

14　recess just for breaks whenever you want to do that.

15　When you do decide that you want to go to lunch, or if

16　you just want to take a break and get out of the Jury

17　Room for a few minutes, tell the Bailiff that you are

18　going to do it.  Set a schedule for  yourselves to come

19　back at a certain time.

20　　　　And  while  you  are  on  recess  from  your

21　deliberations, do not discuss the case among yourselves

22　or with any other person.  And also, while you are on

23　recess, don't begin again your deliberations until all

24　twelve of the jurors are together, so that that's a group

1402

1    process.

2          Now, Ms. Samples and Mr. Ball, you know you are

3    alternates in this case.  As alternates, you are here as

4    kind of an insurance policy, in case we need you.  The

5    twelve jurors seated before you will be the formal twelve

6    jurors who actually decide this case.  So, it´s my

7    responsibility to discharge you.

8          I want you to understand that even though I´m

9    letting you go, your attendance and participation in this

10   trial is extremely important.  Had any one of the jurors

11   had to be replaced in what we thought was going to be a

12   longer trial, it would have been necessary for one of you

13   to step up and fill that juror´s place.  Even though you

14   did not do that, your presence here made it possible for

15   us to feel comfortable proceeding on to trial.

16         You are welcome to stay if you want and see what

17   transpires.  I don´t tell you that to suggest it, but it

18   has  been  my  experience  that  some  jurors  who  have

19   participated as long as you have, have some interest in

20   what the outcome of the case is.  So, you are welcome to

21   stay if you want.  But for your own benefit, I would

22   suggest to you that you probably not discuss with anybody

23   what your feelings are about the evidence, simply because

24   if you decide not to do that, you are not going to have

1403

1    anybody pestering you.  But you are free to tell somebody

2    if they do ask.

3          Now, I am going to excuse the two of you and ask

4    that  the  remainder  of  you  go  back  to  the  Jury

5    Deliberation Room and proceed as I have directed.

6

7          WHEREUPON, the jury was excused to go the Jury

8    Deliberation Room.

9

10         (Back on the Record with the jury not present)

11

12         THE  COURT:   1  is  a  photograph;  it  will  be

13    received.

14         2 is a photograph; it is marked only.

15         3 and 4 and 5 are photographs admitted without

16    objection.

17         We have two exhibits, 120-A and 120-B.  120-A is

18    the  original  confession,  which  by  everybody's

19    acknowledgement should be received into evidence, but

20    should not be disclosed to the jury because it contains

21    a reference to the fact that the defendant was in the

22    reformatory.

23         120-B is a redacted version, and it has been

24    received in evidence, with objection.  The objection that

1404

1    the defendant has is that it should not be sent to the

2    jury to be replayed, because it causes a repetition of

3    a single piece of evidence, which the jury could not

4    repeat otherwise.

5         MR. HUFFMAN:   That's exactly right.   And also,

6    they have been encouraged by the Prosecution that they

7    play it.   This decision is going to turn on which

8    confession do you believe, and the jury is not going to

9    have before it a tape of the other confessions.   But they

10   will of this confession.   I think it is prejudicial.

11        MS. LUSK:   Judge, they are not going to have the

12   oral confession of John Moss.

13        MR. HUFFMAN:   That's another reason why that tape

14   shouldn't go back, because there is differences between

15   those two confessions.   Part of the basis of the

16   defendant's case is that this confession was rehearsed

17   and had all of the issues right.

18        THE COURT:   There is not a written version?

19        MR. REVERCOMB:   No, not a signed statement.

20        THE COURT:   What about Reggettz's confessions?

21        MS. LUSK:   They are not signed.

22        THE COURT:   They have been marked and admitted

23   into evidence?

24        MR. HUFFMAN:   No, because they were Trooper

1405

1   Woodyard's testimony of what the summaries that he wrote.

2        MS. LUSK:  Mr. Bickley also encouraged the jury

3   to listen to the tape of John Moss.

4        MR. BICKLEY:  I don't remember telling them that.

5        THE COURT:  Here is what my concern is.  The best

6   analogy I have is when you get an expert's report.  I

7   routinely don't allow that expert to testify and to also

8   send a report back, because that unfairly punctuates that

9   expert's opinion and allows the jury to see it four or

10  five times.  Other than recalling what they heard, the

11  difference in this case is that this giving of this piece

12  of evidence is a fact, and I think it's probably --

13  frankly, I think they're trying to draw you into the

14  briar patch, myself.  I don't think you lose anything.

15  The confession is flat.  He is led into virtually all of

16  the answers in this confession, and I don't think it

17  hurts your case strategically, although that may not be

18  a basis for a decision.  I think it does reflect his

19  confession, and it ought to be sent back, and I'll allow

20  it.

21        MR. HUFFMAN:  Note our strenuous objection.

22        MR. BICKLEY:  We object.

23        THE COURT:  Your objection is to 121, 122, 123,

24  124, 125 and 126.  They will be admitted.

1406

1      WHEREUPON, the jury gave a note to the Bailiff to

2   present to the Court.

3

4      THE COURT:  At about 2:55 -- let the record show

5   that the defendant is present with his counsel, as is the

6   State of West Virginia, and also let the record show that

7   about seven minutes ago, the jury returned a note which

8   said, "Need tape player with Moss´ confession."

9      While I intend to send it back, I thought it

10  would probably be appropriate to -- while probably

11  unnecessary, but to let the defense again articulate an

12  objection.

13     MR. HUFFMAN:  Judge, the same objection we had

14  before.  We feel that this allows them to place undue

15  evidence on one particular item, and not necessarily

16  consider all of the evidence in this case.

17

18     WHEREUPON, the jury gave a note to the Bailiff to

19  present to the Court.

20

21     THE COURT:  Tom, hang on to the note.  Give it to

22  Sally, and take the machine back to them.

23

24     WHEREUPON, the jury returned to the Courtroom.

1407

1    (Back on the Record with the jury present)

2

3    THE COURT:  If I understand correctly, you all

4    would like to go home and come back tomorrow morning at

5    9:00?

6    JURORS:  Yes.

7    THE COURT:  I brought you back just to remind you

8    not to read the newspapers or watch television.  You have

9    come to the point now, where it is critical that none of

10   your judgments be colored by anything other than your

11   decisions about the evidence.

12   I am not going to make you line up to check in.

13   So, when you come in in the morning, please go straight

14   back to the Jury Deliberation Room and begin when all

15   twelve of you are present.  It is very important that you

16   don't do anything until you are all there.  As soon as

17   you are ready, you are free to go on with your

18   deliberations.  We'll be close at hand, if you want to

19   take a break.

20   Again, you are on your own schedule.  I am not

21   going to shepherd you.  If you reach a verdict, just pass

22   the word on.

23

24   WHEREUPON, the jury was excused for the day, and

1408

1    the Court stood in a recess in the hearing of this case.

2

3

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:


I, Connie L. Cooke, Official Reporter for the Circuit Court of Kanawha County, do hereby certify that the foregoing is a true and correct transcript of the proceedings had and reported in the matter of the State of West Virginia versus John Moss, Jr., aka John Moss, III, upon action number 82-F-221, as stated in the caption hereto, had on the 24th day of April, 1990, during the May 1990 Term of said Court, as reported by me and transcribed into the English language.

I hereby certify that the transcript within meets the requirements of the Code of the State of West Virginia, 51-7-4, and all rules pertaining thereto as promulgated by the Supreme Court of Appeals.

Given under my hand this 13th day of July, 1990.


*Connie L. Cooke*
_____
Official Reporter

```
 1    IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

 2

 3

 4    STATE OF WEST VIRGINIA

 5

 6    vs.                              Action No. 82-F-221

 7

 8    JOHN MOSS, JR., aka JOHN MOSS, III

 9

10          BEFORE:  Hon. A. Andrew MacQueen, Judge.

11

12                         Day 8

13

14

15

16                       APPEARANCES

17

18       For the State:  Neva Lusk and Stephen Revercomb,

19    Assistant Prosecuting Attorneys for Kanawha County.

20       For the Defendant:  The Defendant, in person, and

21    by Nelson R. Bickley, Timothy N. Huffman, and Kathy

22    Beckett, his counsel.

23

24                            Connie L. Cooke

25                            Official Reporter
```

FILED

JAN 2 3 1990

-- 8 --

1410

1     BE IT REMEMBERED, that on Wednesday, the 25th day

2  of April, 1990, during the January 1990 Term of said

3  Court, in the matter of the State of West Virginia versus

4  John Moss, Jr., aka John Moss, III, upon Action No.

5  82-F-221, as stated in the caption hereto, the following

6  transpired:

7

8     THE COURT:  What time is it?  4:17?

9     MR. BICKLEY:  4:17.

10    THE COURT:  The jury has sent us a message

11  wanting a couple of questions answered.  The first

12  question is essentially whether he will receive credit

13  for time he has served against a ten years life with

14  mercy.  And the second is, if he is convicted upon a

15  verdict of life without mercy, if he will have the

16  opportunity to have appealed such verdict if it is later

17  discovered that there is new evidence.  Basically, that

18  is what it is.

19    We all know what the answer to those two

20  questions is.  The question is, what answer do we tell

21  the jury?

22    MS. LUSK:  Of course, I'd like to see you give an

23  answer in the affirmative to both of those questions.

24  I'm more inclined to think the first question could be

1411

1   answered, because punishment is set forth in the charge,

2   with the ability for parole, as being considered by them,

3   since this is a murder case, which makes it unlike other

4   cases.

5        THE COURT:   Of course, if I answer that, then

6   they have relatively -- you have a relatively good

7   picture of what the sentence is going to be.

8        If I told them, for example, there is going to be

9   consecutive ---

10       MS. LUSK:   That's true.

11       THE COURT:   Do you think that number two is not

12   a question to be answered?

13       Have you guys found a case that bears on this?

14       MS. LUSK:   Well, we were trying to see if there

15   is some general law, and whether to instruct or not

16   instruct.  We wouldn't expect to find one on the first

17   question, but I thought there might be some general law

18   on the second question.   I don't think he has found

19   anything that would apply at this point.

20       THE COURT:   What is your motion, Nelson?

21       MR. BICKLEY:   I think you're absolutely correct

22   if you answer the first one, it seems to me, because of

23   the other two counts.  And I think it's misleading.   I

24   don't think we should answer the second one because I

1412

1    don't think it is in the jury's purview what happens

2    after they find him guilty or not guilty, with or without

3    mercy.   But I don't think you can answer the first one

4    without some explanation, and so it gets down to the fact

5    that the only thing I think you should do, unless you

6    want  to  give  the  explanation  --  if  you  give  the

7    explanation, then I think if you can, refer them to the

8    charge which has the, you know, it's there.   But I think

9    it's misleading also, in view of the questions that they

10   asked.

11          MS. LUSK:   Judge, if you're not going to answer

12   them both, then I'd just as soon you not answer them.

13          THE COURT:   And let it just go at that?

14          MS. LUSK:   And not direct them to something that

15   doesn't answer their question.

16          THE COURT:   Are you satisfied with that?

17          MR. BICKLEY:   I'm inclined to go along with that.

18   I think if you direct them to the charge again, it's back

19   to the same question.

20          THE COURT:   I could just say that I'm unable to

21   answer either question.

22          MS. LUSK:   Right.

23          THE COURT:   Let me have that and I'll initial the

24   note and send it back.

1413

1       Incidentally, this jury went out on the 24th six

2   years ago, and if they hold over, they may come back on

3   the 26th, which is when they came back the last time.

4       Is that satisfactory?

5   MS. LUSK:  Yes.

6   MR. BICKLEY:  Yes.

7       MS. LUSK:  Is Tom going to tell them to hang onto

8   the note?

9       THE COURT:  Yeah, we always do that.

10

11                    ----------

12

13       WHEREUPON, a note was given to the Bailiff to

14   present to the Court from the jury.

15

16       THE COURT:  We have just received an additional

17   message, dated 5:15 p.m.  The note states:  "We have

18   voted several times."  The note then describes the

19   division and so far, no one seems to be ready to change

20   or to give up.  "We need advice on where to go from

21   here."

22       I'm going to call them in and just see how

23   profound the deadlock is, and then make proposals which

24   will include taking a recess, having dinner, any number

1414

1     of things like that.  And before I make any decision, by

2     the way, I'll let you all huddle up back there.

3          If you will just take your seat at counsel table.

4

5          WHEREUPON,  the  jury  was  brought  into  the

6     Courtroom.

7

8          (Back on the Record with the jury present)

9

10         THE COURT:  I have read your note and understand

11    that you are perhaps at an impasse.  Let me say that I

12    would ask that you not disclose -- while I know what the

13    division, what the split is, I would ask that you not

14    disclose that in responding to any of my questions,

15    because I haven't told the attorneys or the parties what

16    that's about, or what that split is.

17         Actually, when you get this far in a case, there

18    is only two things that can happen.  That is, you can

19    work until you reach a verdict, or you conclude that no

20    amount of additional work is going to result in reaching

21    a verdict or a consensus.  What I am going to offer to

22    you is not so much some guidance in terms of some wisdom,

23    but rather some guidance in terms of some of the options

24    that are available.

1415

1    Two of those possible options would be -- one is,
2    we recess and all go home tonight.  Just put this case
3    out of your mind completely.   And I understand that
4    that's not going to be so easily done as that, but
5    anyway, you could go home and do something else to
6    distract yourself, and come back tomorrow morning after
7    a good night's sleep, and take the opportunity to think
8    about something else.  It might give you some new energy
9    and insights yourself.

10    The other option is if you would like to stay
11    around, to make you  comfortable, we can provide dinner
12    for you and let you take a recess and come back this
13    evening.  We can try that.  Beyond that, I honestly don't
14    have any suggestions and I really wanted to see if either
15    of those two options sounded attractive to you.

16    Incidentally, if you would like to discuss this
17    among yourselves privately, you can do that.

18    And incidentally, those aren't, obviously, all of
19    the options.  If you've got some other thoughts, you're
20    in the driver's seat as to how you want to progress.

21

22    WHEREUPON, the jury was excused to make a
23    decision as to their deliberation progress.

24

1416

```
 1          (Back on the record with the jury present)

 2

 3          THE COURT:   Ordinarily, I don't make it a point

 4    to bring the jury back from the Jury Room just to let

 5    them go, but I wanted to bring you back just to share a

 6    thought.  First, while press coverage and media coverage

 7    up to this point has been just largely a reiteration or

 8    a   restatement   of   the   evidence,   now   the   newspaper

 9    reporters   and   television   people   are   going   to   start

10    speculating about what's going on in this case.   And

11    they   are   going   to   make   some   observations   in   their

12    coverage that are going to be different than what has

13    gone   on   in   the   Courtroom.    So,   it   becomes   even   more

14    important for me to remind you not to talk or listen or

15    watch or hear or anything else.

16          There is another thought that occurred to me, and

17    I   think   I   probably   ought   to   just   say   this   --   say

18    something about it very quickly.   You all have got ten

19    or better hours in this process of deliberation now.   And

20    I recognize that that's a lot of hard work.   And it's

21    emotionally draining work, and that you would like to go

22    home and look for some sympathy when you get there, to

23    sit   down   with   your   friends   and   your   spouses   and   say,

24    "This has really been an awful day," and tell them how
```

1417

1    and why the day has been awful.

2         I'm going to ask you not to do that.  You're

3    going to have to make it through the evening without

4    seeking that kind of support, guidance and counsel,

5    because it is your job to decide this case.  It is yours,

6    and not somebody else's.  So, get support, but don't be

7    specific about it.

8         All right.  Had you planned to come back at 9:00

9    o'clock?

10        JURORS:  Yes.

11        THE COURT:  Very well.  Just remember, again, I

12   am not going to make any comments about it.  You can just

13   start when you are all there.

14        Okay.  Thank you.

15

16

17

18

19

20

21

22

23

24

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:

I, Connie L. Cooke, Official Reporter for the Circuit Court of Kanawha County, do hereby certify that the foregoing is a true and correct transcript of the proceedings had and reported in the matter of the State of West Virginia versus John Moss, Jr., aka John Moss, III, upon action number 82-F-221, as stated in the caption hereto, had on the 25th day of April, 1990, during the May 1990 Term of said Court, as reported by me and transcribed into the English language.

I hereby certify that the transcript within meets the requirements of the Code of the State of West Virginia, 51-7-4, and all rules pertaining thereto as promulgated by the Supreme Court of Appeals.

Given under my hand this 13th day of July, 1990.

*Connie L. Cooke*
Official Reporter

1   IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2

3

4   STATE OF WEST VIRGINIA

5

6   vs.                              Action No. 82-F-221

7

8   JOHN MOSS, JR., aka JOHN MOSS, III

9

10      BEFORE:  Hon. A. Andrew MacQueen, Judge

11

12                 Day 9

13

14

15

16              APPEARANCES

17

18      For the State:  Neva Lusk and Stephen Revercomb,

19  Assistant Prosecuting Attorney for Kanawha County.

20      For the Defendant:  The Defendant, in person, and

21  by Nelson R. Bickley, Timothy N. Huffman, and Kathy

22  Beckett, his counsel.

23

24                Connie L. Cooke

25                Official Reporter

FILED

JAN 2 3 1990

-9-

1419

1        BE IT REMEMBERED, that on Thursday, the 26th day

2    of April, 1990, during the January 1990 Term of said

3    Court, in the matter of the State of West Virginia versus

4    John Moss, Jr., aka John Moss, III, upon Action No.

5    82-F-221, as stated in the caption hereto, the following

6    transpired:

7

8        THE COURT:  Nelson indicated that he would like

9    for me to poll the jury, and I don't have any problem

10   with polling the jury.  It's probably the proper thing

11   to do.  I don't know that I can poll them individually,

12   once they have been sent to deliberate.

13       Do you know?

14       MR. BICKLEY:  I don't know.  You wouldn't poll

15   the verdict anyway, you would poll the whole jury?

16       THE COURT:  Right.  On a case like this, I do

17   routinely.

18       MR. BICKLEY:  And what about asking about the

19   publicity?

20       THE COURT:  Yeah.  I guess you could ask them out

21   of the box, but ask them if anyone has talked to them

22   about any of these articles.

23       Let me do this.  Let me have the Foreman deliver

24   the verdict to the Bailiff.  Okay?

1420

1     MR. BICKLEY:  Yes.

2     THE COURT:  We'll consider that done.  And then

3     I'll do a group inquiry.  And if it draws any fire, we'll

4     decide what to do from there on.  Okay?

5     MR. BICKLEY:  Fine.

6     THE COURT:  You all can take a few minutes.  The

7     Deputies thought that for a matter of security, they

8     ought to check everybody.  They have been checking

9     everyone who comes in.

10

11     WHEREUPON, the jurors were returned to the

12     Courtroom.

13

14     THE COURT:  Good morning, everyone.  Mr. Boyd, I

15     understand that you were selected as Foreman.  Is that

16     correct?

17     JUROR BOYD:  Yes, sir.

18     THE COURT:  Do you have a verdict?

19     JUROR BOYD:  Yes.

20     THE COURT:  Would you give the verdict to Mr.

21     Scarbro, please?

22     Before I read the jury's verdict, let me ask you,

23     as I have done a couple of times before.

24     We've all received some television coverage and

1421

1    newspaper coverage in bits and pieces.  Over the recess,

2    did any of you have the opportunity to watch, read, or

3    see any of this material at all?

4          JURORS:  No.

5          THE COURT:  Did any one of you have anyone

6    attempt to discuss this matter with you?

7          JURORS:  No.

8          THE COURT:  All right.

9          The verdict of the jury is as follows:  With

10    regard to the charge of the murder of Paul Eric Reggettz,

11    we, the jury, find the defendant, John Moss, III, guilty

12    of murder in the first degree.

13          With regard to the charge of the murder of

14    Bernadette Reggettz, we, the jury, find the defendant,

15    John Moss, III, guilty of murder in the first degree.

16          With regard to the murder of Vanessa Dale

17    Reggettz, we, the jury, find the defendant, John Moss,

18    III, guilty of murder in the first degree.

19          So say all of you ladies and gentlemen?

20          JURORS:  Yes.

21          THE COURT:  Will you poll the jury, please.

22          THE CLERK:  Ladies and gentlemen, I will call on

23    each of you by name, and ask, "Is this your verdict?"

24    And you will reply, "This is my verdict," or "This is not

1422

1    my verdict."

2            Juror Number One, Steve Gancs, is this your

3    verdict?

4            JUROR GANCS:  This is my verdict.

5            THE CLERK:  Juror Number Two, William Boyd, is

6    this your verdict?

7            JUROR BOYD:  This is my verdict.

8            THE CLERK:  Juror Number Three, Frances Batman,

9    is this your verdict?

10           JUROR BATMAN:  This is my verdict.

11           THE CLERK:  Juror Number Four, Elizabeth Stern,

12   is this your verdict?

13           JUROR STERN:  This is my verdict.

14           THE CLERK:  Juror Number Five, Linda Haynes, is

15   this your verdict?

16           JUROR HAYNES:  This is my verdict.

17           THE CLERK:  Juror Number Six, Sherry Grubb, is

18   this your verdict?

19           JUROR GRUBB:  This is my verdict.

20           THE CLERK:  Juror Number Seven, Jacqueline Hill,

21   is this your verdict?

22           JUROR HILL:  This is my verdict.

23           THE CLERK:  Juror Number Eight, Martha Brady, is

24   this your verdict?

1423

1    JUROR BRADY:  This is my verdict.

2    THE    CLERK:    Juror   Number   Nine,   Michele

3    Williamson, is this your verdict?

4    JUROR WILLIAMSON:  This is my verdict.

5    THE CLERK:  Juror Number Ten, Nolan Holstein, is

6    this your verdict?

7    JUROR HOLSTEIN:  This is my verdict.

8    THE CLERK:  Juror Number Eleven, Wanda Young, is

9    this your verdict?

10   JUROR YOUNG:  This is my verdict.

11   THE CLERK:  Juror Number Twelve, Alice Fawcett,

12   is this your verdict?

13   JUROR FAWCETT:  This is my verdict.

14

15   THE  COURT:   Members  of  the  jury,  when  I  gave

16   orientation to a group of you not too long ago, I told

17   you that probably the hardest thing you would have to do

18   as jurors is to wait.  And while this case indicates that

19   that is probably not true, for a whole lot of reasons,

20   this is not a particularly easy trial for me to preside

21   over,  not  because  it  was  difficult,  but  because  the

22   evidence was the way it was.

23   We  ask  the  juries  to  do  some  very  difficult

24   things, and this is one of those difficult things which

1424

1    we ask a jury to do.

2         You have done it carefully, and thoughtfully, and

3    well, and you are entitled to my thanks and the thanks

4    of everyone else associated with the judicial system.

5         Now, I wouldn't be surprised if news people and

6    lawyers, and Lord knows who else, want to know what

7    happened and what your thoughts are about this case.

8    There is no Court rule that prevents people from asking

9    you, and there is no Court rule that prevents you from

10   answering.  I am going to suggest to you, however, that

11   for -- out of consideration for each other, that whatever

12   you do, you do not discuss the deliberation process; that

13   is, who felt what, at what time, and that sort of thing.

14   Frankly, I think that is something that is best kept to

15   yourselves.

16        You don't have to follow that advice.  You can do

17   what you want.

18        Thank you very much, and I'll excuse you all.

19

20        Mr. Bickley, there is no reason for you to make

21   any motions at this point, other than post-trial motions.

22   Do you have any other things that you would like to

23   address before I excuse everyone.

24        MR. BICKLEY:  No.

1425

1    THE COURT:  Do you want me to set a date for
2    post-trial motions at this point, or do you want to
3    recoil a little bit and come back and get a date?
4        MR. BICKLEY:  Let us talk a little bit and we'll
5    come back and get a date.
6        THE COURT:  That's fine.  Thank you all.
7        Let me say to everyone among the attorneys, this
8    is as well tried as this case could have been tried.
9    Thank you.
10
11       WHEREUPON, this matter was concluded.
12