**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 21**
**(JUVENILE TRANSFER HR'G, pp. 1 - 123)**

VOLUME I

IN THE CIRCUIT COURT OF KANAWHA COUNTY

WEST VIRGINIA

FILED
In Kanawha Circuit Court
Clerk's Office

DEC 2  1982

IN THE INTEREST OF:                )
                                   )
JOHN MOSS, JR., also known as      )  JUV-80-775, 776, 777
JOHN MOSS, III, a Child Under      )
the Age of 18 Years                )  TRANSFER HEARING


BEFORE:   HONORABLE PENBREY,

          Judge



FEB - 9 1987

APPEARANCES:

CLERK OF THE
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

    FOR THE STATE:  Mr. James C. Stucky and Miss Neva Lusk,

Assistant Prosecuting Attorneys for Kanawha County.

    FOR THE JUVENILE:  The Juvenile, Mr. John Moss, Jr.,

also known as John Moss, III, was present in person, and

represented by Mr. Parrish McKittrick and Mr. Harry C. Taylor,

II, Attorneys at Law, his counsel.

    Mr. William Moss, a cousin of the Juvenile, was also

present.

                              Basil J. Ferrebee
                              Official Reporter



I N D E X

| State's Witnesses: | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| Terry Williams | 56 315 | 388 | 457 | 461 |
| Michael Don Smith | 67 | 103 151 | 262 | 290 |

| Defendant's Witnesses: | Direct | Cross |
|---|---|---|
| Paul Reggettz, III | 135 | 148 |
| Howard Francis Woodyard | 476 | |

| State's Exhibits: | Marked | Received |
|---|---|---|
| No. 1, Returns of Notices | 13 | 13 |
| No. 2, I.D. Card | 77 | 473 |
| No. 3, D.P.S. Form #79 | 86 | 352 |
| No. 4, D.P.S. Form #79 | 87 | 338 |

| Defendant's Exhibits: | Marked | Received |
|---|---|---|
| No. 1, Statement of Paul Reggettz | 133 | 141 |
| No. 2, Statement of Paul Reggettz | 133 | 156 |
| No. 3, Statement of Paul Reggettz | 133 | 145 |
| No. 4, Statement of Paul Reggettz | 133 | 146 |
| No. 5, Statement of Paul Reggettz | 133 | 148 |
| No. 6, Order, 4/30/80 | 133 | |

I N D E X   (Cont'd.)

| Defendant's Exhibits: (Cont'd.) | Marked | Received |
|---|---|---|
| No. 7, Sketch | 394 | 395 |
| No. 7A, Sketch | 398 | |
| No. 8, Timecard | 425 | 427 |

(BE IT REMEMBERED that heretofore, to-wit, on Friday, the 24th day of September, 1982, during the September 1982 Term of said Court, in the matter of In the Interest of John Moss, Jr., also known as John Moss, III, Juvenile Petition Nos. JUV-80-775, 776 and 777, as stated in the caption hereto, the following transpired:)

(WHEREUPON, a discussion was held off the record.)

THE COURT:  Let the record clearly reflect, on the record, that your firm was employed, you have a number of lawyers in your firm, and on several other occasions when this matter came before the Court, you did not appear, Mr. Harry Taylor appeared in your stead.

Now the matter is going at 10:30.

MR. McKITTRICK:  If the Court wants to make that kind of a record, my objection is that we did not have reasonable notice to be here.  I had other matters set.  All I simply did was ask the Court's indulgence so I could argue some motions which I have already indicated to the Court is in another Court that has been set for about a month and a half pursuant to a case that I have to try early in October, and it will not take me that long.

That is all I have asked the Court to do.

THE COURT:  Let the record reflect further the Court was here at 9:30 and you arrived at 9:40-something.

All right, you can talk to Mr. Stucky and you can talk to Miss Lusk, and if they have no objections, you tell me how long you think it will take you to argue those motions in another Court.

MR. McKITTRICK:  Assuming counsel is there and assuming the Court expeditiously moves the motions, it should not take more than fifteen minutes, Your Honor.

THE COURT:  What time are they scheduled for?

MR. McKITTRICK:  For 9:30.

THE COURT:  Nine-thirty (9:30)?

MR. McKITTRICK:  That is correct.

THE COURT:  I think I have already told you, and I think the record will reflect, I have given you until 10:30.  It is now 9:40.

MR. McKITTRICK:  I realize that.

(WHEREUPON, a recess was taken, after which the following proceedings were had.)

THE COURT:  We are here in the interest of John Moss, Jr., also known as John Moss, III, Juvenile Petitions 80-775, 776, and 777, three counts of murder in the first degree.

The Defendant is present in person and by employed counsel, Mr. McKittrick and Mr. Taylor.  The State of West Virginia is present by Miss Lusk and Mr. Stucky.

There is a Mr. Moss out there, a member of the family.

I don't object if he is here if the State doesn't object.

MR. STUCKY:  Your Honor, I believe if the Defendant wants him here, he is entitled to have him here, unless he objects.

THE COURT:  All right, tell Mr. Moss he can come in.

All right, I am ready whenever everyone else is.

All right, no other persons being present, the Courtroom is closed.

MR. STUCKY:  Your Honor, I think we need to place on the record that I believe one of the Defendant/Juvenile's relatives is present in the Courtroom, and I believe he is here with the permission and consent of the defense counsel.

MR. McKITTRICK:  That is correct, Your Honor.

THE COURT:  What is your name, sir?

MR. WILLIAM MOSS:  William Moss.

THE COURT:  What is it?

MR. WILLIAM MOSS:  William Moss.

THE COURT:  What is your relationship to the Juvenile?

MR. WILLIAM MOSS:  My first cousin.

THE COURT:  All right, let the record show that Mr. Moss, first cousin of the Juvenile, is present, no other persons being present except authorized Court personnel.

This matter comes on by way of a reversal by the State Supreme Court, in which this Court ordered the Juvenile

transferred to adult status on a prior date.  That transfer was reversed in Slip Opinion No. 15490 and remanded to this Court for further proceedings consistent with the opinion.

All right.

MR. McKITTRICK:  Your Honor, the Defendant would like to make some motions at this time, and it probably would be the thing to take up.

THE COURT:  Sure.

MR. McKITTRICK:  Before we start those motions, Your Honor, I would like to set forth the chronology of events prefacing our attendance of the hearing here today.

I first heard about -- or as the Court knows and has amply placed on the record, the State of West Virginia, after the reversal of the last transfer hearing by the West Virginia State Supreme Court, --

THE COURT:  (Interposing)  You can sit down if you want to, Mr. McKittrick.  There is no one here but Court personnel.

MR. McKITTRICK:  Okay.  The State filed a petition for rehearing, and that petition for rehearing was denied on Thursday of last week, which would have been -- do you have a calendar there, Your Honor?

THE COURT:  Yes, sir.

MISS LUSK:  The 16th.

THE COURT:  Last Thursday, the 16th of September, 1982.

MR. McKITTRICK:   Which would have been the 16th of September, 1982.

Thereafter, my office and myself, respectively, was not notified as to the rehearing petition being denied by the West Virginia Supreme Court until I talked with Neva Lusk, Assistant Prosecuting Attorney of the Kanawha County Prosecuting Attorney's Office, at approximately three to four o'clock on the 22nd day of September, 1982.

The essence of our conversation was that Miss Lusk was to meet with Prosecutor James Roark to make a determination of how she would go about bringing the proceedings on by the State of West Virginia, and I did not hear from the Prosecutor's Office until the next day, which would have been the 23rd day of September, 1982, a Thursday.

It is my understanding, or I was informed at the time that the Prosecutor's Office called my office for me after nine o'clock on the 23rd day of September, 1982, and at that time was looking for me, but apprised my girls of nothing with regard to a hearing.

The next time that we heard from any Court personnel, it was Your Honor's secretary who called one of my secretaries and indicated to her that this matter would come on for hearing at 9:30 o'clock the morning of the 24th day of September, 1982.

I had not at that time been served with any formal notice.

My client, John Moss, a juvenile, had not been, as contemplated by the juvenile statute, served with any formal written notice. My client's parents, who live in Cleveland, Ohio, had not at that time been served with any formal written notice.

Thereafter, I made a telephonic call to Jim Stucky, Assistant Prosecuting Attorney for the Kanawha County Prosecutor's Office, and had a conversation with him at approximately 20 minutes until 12 on the 23rd day of September, 1982. In that conversation, I was apprised that the matter of transfer in the interest of John Moss would come on for hearing at 9:30 o'clock on the 24th day of September, 1982.

I indicated to Mr. Stucky that I felt that at that time it was not reasonable notice to us for preparation of this hearing, and that I had a full schedule on the afternoon of the 23rd day of September, 1982, and felt that it was absolutely impossible for me to prepare effectively to defend John Moss or any other person in my firm to effectively prepare to represent John Moss on a transfer hearing.

I will get into that a little later in detail when I make some other motions, Your Honor.

At three o'clock p.m. on the 23rd day of September, 1982, my office was served -- I was not there -- my office was served with the notice of the hearing which is being held this morning.

At 3:30 o'clock p.m. on the 23rd day of September, 1982, my client, John Moss, who was incarcerated in the Kanawha County Jail, was also served with a notice of the hearing here this morning.

At 9:30 o'clock p.m. on the 23rd day of September, 1982, my client's parents, who live in Cleveland, Ohio, were served with notices of the hearing which is being held here this morning; and I would request, Your Honor, that we make as part of the record in this case at this time the returns on those notices, if the Prosecutor's Office would voluntarily submit those to the Court or produce them before the Court.

MR. STUCKY:  Your Honor, basically the chronology which Mr. McKittrick has set forth is correct.  I believe a few things need to be brought to the Court's attention.

Number one, the conversation with Neva Lusk, being on September 22, at 3 p.m., which Mr. McKittrick referred to, in that conversation, Miss Lusk advised Mr. McKittrick that the Court, that being yourself, had cleared his docket for Friday, the 24th day of September, in order to allow us to have and proceed with this transfer hearing today and, if necessary, to continue over until the 25th, being Saturday, tomorrow morning.

After that, things became more apparent that the hearing would proceed today for sure. Miss Lusk then called Mr.

McKittrick at the office, found out he was not there, attempted to call him twice that evening at home, and Mr. McKittrick was not at home that evening.

On the 23rd of September, being yesterday, I called his office at approximately 9:10 in the morning and was apprised by his secretary that he was at the Supreme Court of Appeals and would be back after noon. I told her that I needed to talk with him as soon as possible with regards to the John Moss matter.

It later was discovered by our office that Mr. McKittrick was in fact in front of Judge Canady here in the Circuit Court, and his secretary apparently did not know that. However, he did not make any effort to attempt to come in and inquire as to what we had wanted or to talk to Neva to see what position this transfer hearing was in at that time.

On the 23rd, we then had a conversation, or I had a conversation with Mr. McKittrick at 11:30 in the morning, or 20 till 12, as he stated, at which time he was informed that there would be a hearing. His representations to the Court are very accurate with regards to that conversation.

We then made efforts and in fact telecopied notice of this hearing to the Cleveland Sheriff's Department, which we do have the notice or the service returned, stating that on Marzee Moss, which is the Defendant's mother, it was served

at 1840 hours at their home at 7025 Zoeter, Z-o-e-t-e-r, Street, that being approximately 6:40 in the evening, and that John Moss was served, was accepted by Marzee Moss, at 2100 hours by Detective Gall from the Cleveland Sheriff's Department, that being, what, 9 o'clock. So apparently they went to the house on at least two occasions to attempt to personally serve the father.

Also, in addition to that, Miss Lusk made numerous calls to the Cleveland area, both to the Moss home, and talked to a daughter of the Mosses, informing them that there would be a hearing and that we needed to talk to Mrs. Moss and Mr. Moss. We called the Cleveland Clinic, where Mrs. Moss is employed, and talked to her employer. They assured us they would give her our message at the noon hour to call us. Although we couldn't get the written notice to them, we could give them oral notice and they could make arrangements to get down here if they desired.

We called the place of employment of Mr. Moss. His dispatcher, or foreman, informed Miss Lusk he would make sure Mr. Moss got the message and he would call us in a few moments.

Miss Lusk informs me that she heard over the telephone the dispatcher calling for Mr. Moss and that Mr. Moss responded that he would call back in a moment.

To this date and this time, Mr. Moss nor Mrs. Moss have

made any attempts to telephone our office to see what we wanted; and I am sure when they found out at 6 o'clock yesterday evening that there would be a hearing today, they were then aware of the proceedings.

In addition, Your Honor, on August 16, 1982, --

THE COURT: Excuse me. Go down and get my Chapter 62.

MR. McKITTRICK: I have one here, Judge.

THE COURT: She will go get one.

MR. STUCKY: On August 16, 1982, Miss Lusk sent a letter, certified, and it was signed, in fact, John Moss, that he received it on August 20, 1982, that informed them what was going on, that the Supreme Court had overturned a previous transfer hearing, that we were filing a reconsideration, that we would expect that if the Court refused the reconsideration that the hearing may begin in the last two weeks of August, sometime between August 16 and August 31, and that if you desire to attend these proceedings, since we will be only able to give you notice a day or two before each hearing, we ask that you make arrangements to enable you to leave Cleveland quickly.

So as of August 16, they were apprised that something was going to happen in the very near future.

Yesterday, we got the notice to them just as quickly as we could that in fact today was the day for the hearing.

I would tender to the Court for proper filing the returns of the notices on John Moss and Marzee Moss and also on the back of the original notice for hearing, the service of Deputy Abner on John Moss, Jr. in person at 3 p.m. yesterday afternoon.

MR. McKITTRICK:  May I see them?  I have no objections, Your Honor, to their introduction.

THE COURT:  All right, they will be so introduced and marked without objection.

(WHEREUPON, the returns of notices on John Moss, Marzee Moss and John Moss, Jr., were marked for identification as State's Exhibit No. 1 and received into evidence.)

MR. STUCKY:  The State is ready to proceed with the transfer hearing.  At this time, we have our necessary witnesses. We have informed the defense counsel who those witnesses are and what we plan to proceed with here this morning.  That information was given to Mr. McKittrick and Mr. Taylor earlier this morning when they first arrived.  We expressed to them that Trooper Terry Williams and Trooper Mike Smith would be the witnesses which we intended to call here this morning.

THE COURT:  I think Mr. McKittrick has some other motions.

MR. STUCKY:  Yes, sir.

MR. McKITTRICK:  Your Honor, I would like to make one amendment to what Mr. Stucky said, and that simply is on the

morning of the 23rd day of September, 1982, I had a hearing

before Judge Canady in this Circuit from 9:30 until 11

o'clock in the morning.  I was in the Courthouse here.  When

I returned to where I had access to a telephone and talked

with my office, I almost immediately called Mr. Stucky to

inquire what he wanted earlier that morning.

Your Honor, one of the reasons that I preface our motions

with this chronology is that we have not had an opportunity

to take time at our office to prepare any written motions for

Your Honor's consideration, and I hope that the Court would give

us leave to as best we can because we are not fully prepared

to argue some of the motions that we will make this morning,

as best we can to argue those motions orally and then there-

after follow those oral arguments with written motions,

which the Court may or may not want to deliberate upon at that

time.

THE COURT:  I think if you are alleging, Mr. McKittrick, --

and either side can correct me if I am wrong -- if you are

alleging that you did not have sufficient time to prepare for

this hearing, we are all familiar with the chronology of events.

I think 62-14-1, the agreement on detainers, is clear

that the 120 days may be expanded for good cause shown, and

that if you are moving for a continuance for time to

sufficiently prepare, I think that tolls and stops the running

of the detainer statute.

MR. McKITTRICK:  Your Honor, I want to address that issue before the Court, because I do have some philosophical theories about the question that the Court has rasied, but I think that I must make another motion before that.

THE COURT:  All right.

MR. McKITTRICK:  And the motion that I would like to respectfully make to the Court, the Defendant, John Moss, would move the Court to disqualify or recuse itself in this matter as a result of the opinion handed down by the State Supreme Court In the Interest of John Moss, which was handed down on the 15th day of July, 1982.  I think it's numbered 15490.

In any event, Your Honor, one of the issues that was adjudicated and addressed in that opinion was the issue of whether a person other than the accused committed the crimes charged has any bearing on the determination of probable cause; and, in substance, the Supreme Court went on to say that the Defendant has the right to present witnesses if he may or to thoroughly and detailedly cross-examine persons concerning guilt of another person who may have committed the crimes, and that is including but not limited to the possibility of cross-examination on a confession or the introduction of a confession of another person.

Now, Your Honor, another chronology is probably not

necessary for this Court, but I think for the purpose of this record, it is probably necessary that I place the facts there.

As this Court knows and remembers, and so do the Assistant Prosecutors, the State of West Virginia, some several terms ago, filed indictments or presented a case and indictments were returned against Paul Reggettz. In those indictments, Paul Reggettz was charged with the same crimes that John Moss allegedly committed. This Court was inexorably intertwined in the State versus Paul Reggettz case, for in that case, Your Honor, this Court participated in pre-trial motions, which included but was not limited to much evidence which incriminated Paul Reggettz of the crimes that John Moss is supposed to have committed. This Court, among other things, passed on the voluntariness of the confessions of Paul Reggettz under those indictments. In other words, in essence, this Court indicated and concluded that the confessions given by Paul Reggettz were voluntary and, therefore, competent evidence for the jury to deliberate upon in determining the innocence or guilt of Paul Reggettz upon trial.

We feel that State versus McArdle, which sets out many due process rights that the juvenile has in this transfer hearing, requires that the Judge involved be an independent and neutral Judge.

We feel under the circumstances that since the Court --

and we can represent to the Court right now, and it is probably not a shock, shocks no one's sensibility, that we do intend to get into the confession of Paul Reggettz in this transfer hearing. We intend, if we are allotted appropriate time, which we feel we have not at this point, to bring on witnesses who will testify to the taking of those confessions given by Paul Reggettz.

We feel that the Court's independent processes, mental processes, have been tainted and that the Court is no longer neutral and will not hear a confession or evidence pertaining to Paul Reggettz's guilt for the first time, and that falls without the definition of what we think due process contemplates, a neutral and independent judge to hear the transfer hearing, should be.

THE COURT: Under Rule XVII of the Supreme Court of Appeals involving recusal, the procedure is set forth as follows: Rule XVII, Section (A), Sub-Section (l), "In any proceeding, except an injunction or summary contempt proceeding, a written motion for disqualification of a judge may be filed. The motion shall be verified and shall state the facts and reasons for disqualification and shall be accompanied by a certificate of counsel of record stating it is made in good faith and has evidence to support the same. The motion shall be filed at least seven days in advance of any trial date set in the

proceedings. Upon the filing of such motion, if the involved judge desires to voluntarily recuse himself, he shall ascertain if agreement can be reached between the parties as to the selection of another judge, either from within or without the circuit, to hear the proceedings."

Well, obviously we don't have a written motion. It goes on further, but we don't have a written motion here.

Now under Sub-section (c), "In the event the motion is filed less than seven days prior to the date set for trial, or in the event the matter is an injunction proceeding or a proceeding for summary contempt and no stipulation can be reached under the provisions of A(1) above, the involved judge shall proceed to have an immediate hearing upon the motion for disqualification, allow the moving party to make a full record and shall then rule upon the motion for disqualification. If the judge overrules the motion for disqualification, he shall proceed with the case." And it goes on and on.

There has been no written motion filed, no affidavit in support thereof, as required under Rule XVII. However, I will let you make any record you care to make at this time, if you have anything additional than what you have just put on the record as to recusal, because I might say that I am refusing to recuse myself.

MR. McKITTRICK:  Well, Your Honor, we find that again we have been placed at a disadvantage because we have not had an opportunity to fully execute the requirements of Rule XVII, as you have just read it.  I know the Court has granted us leave to file written motions complying or stating the essence of our oral arguments at a later time, and I appreciate that, Your Honor, but I haven't fully thought this motion out, and I would admit that to the Court, and probably at the same time that I admit that to the Court, it is at the expense of probably admitting that I am ineffectively representing my client; but again I say to the Court that we do not have -- we have not had the time to sit down and deliberate upon how we would proceed with this case.

Now the pitfall that I see as a lawyer, tactfully, is that if I don't make this motion to recuse, firstly, and it be ruled upon, and then come before Your Honor and make another motion and allow the Court to start ruling on other motions, that I may run the risk of waiving my motion for disqualifica-tion.

Now maybe I can address the question now that you raised before.  That question simply was are you asking for a continuance.  I feel that the Supreme Court has concertedly reflected in all of its opinions concerning the giving up of constitutional rights by a defendant that a defendant does not

have to give up one constitutional right in order for him

to secure another.  For example, in this case, the Defendant

would be giving his constitutional right, his sixth amendment

right to effective counsel, up if he were forced into a

position of continuing the case because if he continued the

case, his due process rights of a fair and reasonable notice

would be violated.

What I mean by that simply is this:  If John Moss were

to come before this Court because he has unreasonable

notice --

THE COURT:  (Interposing)  Excuse me.  I don't mean to

interrupt you, but let the record reflect apparently Mr.

Moss' cousin, whom the Court allowed to sit in the Courtroom,

has voluntarily absented himself.  So apparently, for what-

ever reason, he has left the Courtroom.

MR. McKITTRICK:  He indicated to me, Your Honor, he

had to go to work.

THE COURT:  All right.  The Grand Jury is leaving.

Perhaps you had better wait.  Just hold off.

MR. McKITTRICK:  Yes.

(WHEREUPON, a recess was taken until the Courtroom was

cleared, after which the following proceedings were had.)

THE COURT:  All right, they have cleared the Courtroom,

Mr. McKittrick.

MR. McKITTRICK: Your Honor, assuming that John Moss was given unreasonable notice of the hearing, -- and I don't mean John Moss, because the McArdle case here in West Virginia indicates that fair and reasonable notice under the juvenile transfer statute contemplates not only a fair, detailed notice of the proceedings, but time, and let me read it to you, Your Honor. It says, "State versus McArdle provides for substantial due process rights that must be accorded a juvenile at a transfer hearing including, one, advanced, written notice of the grounds relied upon for transfer."

That has not been the case here. There is nothing in the notice in this case that sets forth the grounds. It is simply a notice of a hearing.

So we contend that the notice is invalid on its face.

"Two, an opportunity to be heard in person and to present witnesses and evidence."

Now with notice of approximately twelve to twenty hours, there is no way that John Moss' lawyers had an opportunity to sit down not only with themselves and deliberate upon a very serious transfer case in a triple homicide matter, but we did not have the time to even sit down with our client and make a determination of what witnesses we would present here today because we have a right to do that in In the Interest

of John Moss.

Even if we had had an opportunity to sit down and reflect upon that for three hours, the time for us to use the process of this Court through the services of subpoena would have been gone.  We would not have time to subpoena witnesses.

We are now sitting here on a Friday.  I assume the State's case will go, as the Court has already indicated, into Saturday, when we still can't get service of process.

In any event, Your Honor, we haven't had opportunity to that second due process right set out in State versus McArdle, the opportunity to sit down and determine what witnesses we could present; and a good example of that is pursuant to the motion that I made for disqualification.  I can conceive as I sit here of witnesses that would have to be presented to show Your Honor's involvement in the previous proceeding against Paul Reggettz where he was charged with the same matters as John Moss is charged.

Then State versus McArdle goes on and lists or enumerates a third right, the right to confront and cross-examine adverse witnesses.

Now we feel that implicit in that right is the opportunity of a lawyer, and this Court has been a trial lawyer in the past and fully realizes what it takes to present and prepare for an adversary proceeding and for cross-examination, and we

think that that right granted to a juvenile by <u>State versus McArdle</u> implicitly says that the defense lawyer should have an opportunity to sit down and prepare cross-examination, to confront witnesses in the transfer hearing against the Defendant.

Now Mr. Stucky, the Assistant Prosecuting Attorney for Kanawha County, is correct. He advised us after the time had been set for this hearing, which he has stated to the Court, the witnesses that the State of West Virginia envisioned calling.

Your Honor, I would submit to the Court no matter what the qualifications of a good trial lawyer, he does not have time to sit down and prepare cross-examination, to thoroughly and effectively assist his defendant in his defense in the transfer hearing after that time limit on that apprisal.

The fourth right, Your Honor, is a neutral hearing officer. We have already addressed that, and the other rights probably do not apply to the argument.

Your Honor, we feel that if we would move for a continuance that we would give up John Moss' due process rights to a fair and reasonable notice of the proceedings. For example, I would contemplate, and it is only my position, Your Honor, that if we had received a notice that was valid on its face on yesterday's date, which would have been the

23rd, this matter could have come on on Monday's date, and we would have had two or three days to get ready, which would have been a sufficient time; but we have been placed at this hearing in sixteen hours, not even having enough time to determine what witnesses we would subpoena, not having the time to have subpoenas issued, not even having enough time to counsel, for example, with our client, the Defendant in this case, to consider, among other things, whether or not he would testify in a voluntariness hearing, which the State of West Virginia, through its Supreme Court, has indicated this Court must hold. We haven't even discussed with our client the confession. We haven't had time at this point to discuss the strategy and the advantages and disadvantages of him testifying in the hearing in this case.

We feel that we should not be forced into making a continuance motion because the State has taken it upon themselves to give us unreasonable notice.

What we would request of the Court is that the Court direct the Prosecuting Attorney's Office of Kanawha County to give us a reasonable notice so that we can sit down and properly prepare for this case rather than having us to come before the Court and ask for a continuance. What does, in effect, is the Prosecuting Attorney makes a mistake and this Court, if it directed us or gave us the only option of

asking for a continuance, it pulls the Prosecutor up by his
boot straps and he makes a mistake and the Court directs us
or we are being forced into making a continuance motion,
and it helps their case by doing that and John Moss gives up
the right to effective assistance of counsel under the sixth
amendment so that he can adhere or comply or have the State
comply with his due process rights of a reasonable notice for
us to defend him.

MISS LUSK:  Your Honor, I would first address myself to
Mr. McKittrick's assertion that the notice --

THE COURT:  (Interposing)  Wait a minute.

MISS LUSK:  I'm sorry.

THE COURT:  We are at this point in the law where I am
not sure whether you have to put the horse before the cart or
the cart before the horse.  You have made a motion to recuse.
I have refused on the ground, among other things, that you did
not comply with Rule XVII of the West Virginia Supreme Court of
Appeals.  I have afforded you an opportunity, although I am
not sure I had to under that rule, to place on the record
your reasons for the recusal.

Now have you placed all of the reasons on the record?
Let's take the recusal first.  Have you placed all your reasons
on the record for the recusal you care to place on the record?

MR. McKITTRICK:  We have placed our reasons.  We have

placed our arguments on the record, Your Honor, but we have not placed on the record testimony of witnesses that we think are relative to our motion.

THE COURT:  Then are you moving then that this matter be continued in order to allow you an opportunity to secure witnesses to testify on the recusal hearing?

MR. McKITTRICK:  We are stating to the Court that we will not be forced into moving for a continuance and feel that we are being forced to move for a continuance because the State of West Virginia has given us an unreasonable notice to prepare a defense for John Moss in the transfer hearing.  In preparing a defense, that includes but is not limited to the motions that we would file for John Moss, one of which is the motion that we orally made to the Court to recuse or disqualify because we did not have time to make that a written motion.

THE COURT:  Have you placed on the record this morning all of your reasons for recusal?

MR. McKITTRICK:  We have placed on the record, Your Honor, the reasons by argument, not substantiated by facts, which we would like to do if we would have had a reasonable notice to defend.

THE COURT:  That is not what the rule says, and I quote from the rule, Mr. McKittrick, under Sub-section (c), under Rule XVII A (1) (c), it says, "In the event the motion i

filed," -- and there has not been a motion filed.  This

contemplates a written motion.  There has never been one

filed.  "In the event the motion is filed less than seven

days prior to the date set for trial", -- and in this case, a

transfer hearing -- "or in the event the matter is an

injunction proceedings or a proceeding for summary contempt

and no stipulation" -- that is, an agreement for another judge

or judge's disqualification or voluntary recusal -- "is reached

under A(l) above, the involved judge shall proceed to have" --

and I emphasize to have -- "an immediate hearing" -- emphasis

by the Court, immediate hearing -- "upon the motion for dis-

qualification, allow the moving party to make a full record

and shall then rule upon the motion for disqualification."

Now I ask you, do you have any other evidence to put

on at this time on the recusal of this Judge?

MR. McKITTRICK:  Your Honor, we would move the Court to

have the Prosecutor give us a reasonable notice so we would

have time to bring facts, testimony, and witnesses before

this Court to substantiate our legal argument.

THE COURT:  You are not responding to the Court's

question.  I have read you the rule and you understand the

rule.  I am asking you do you have any other evidence to

place on the record now, immediately, in keeping with Rule

XVII on the recusal of this Judge?

MR. McKITTRICK: Your Honor, I stand mute. I think I have responded to the Court's question as best I can.

THE COURT: I don't think you have. Is that your response?

MR. McKITTRICK: That is my response.

THE COURT: Then the Court rules that it is not disqualified from hearing this matter and refuses to disqualify itself. The Court would also place on the record that you are aware or should be aware of Rule XVII of the Supreme Court's Administrative Rules, Mr. McKittrick, and the reversal of the prior hearing in the **Moss** matter, Opinion No. 15490, was handed down on July 15, 1982, some two months and two weeks, several weeks ago, some nine or ten weeks. You have had knowledge of the opinion. You have had some two months to read the opinion and you have had some two months for the purpose of the record to file a written motion for recusal as required by Rule XVII of the Supreme Court of Appeals. You haven't done so. You have waited until this moment, and I re-emphasize you have had two and a half months to read the opinion of the Supreme Court and to file that motion and have a proper hearing conducted under the provisions of Rule XVII.

This Court has no prejudice towards this Defendant. This Court starts de novo; and some time ago, not too long ago, a recusal motion was made and this Court refused to recuse and

was upheld.   One of the arguments for failing to recuse was that -- one of the reasons for moving the recusal was that the Court, meaning me, signed warrants one evening on felony charges.   I believe it was drug charges.   Counsel moved to recuse on the grounds that I had signed the warrants and, of course, heard testimony as to the justification for issuing the warrants.   The Supreme Court affirmed my refusal to recuse.   One of the grounds I raised was what do you do in a county or in a circuit where you have one judge.   What do you do in a case where the trial court presides over a trial, hears all of the evidence, a conviction is had and an appeal is made and for reasons best known to the Appellate Court and within their function, the trial court is reversed and a new trial must be held?   Does that preclude the Judge who heard the original trial?   I think not, and I believe I have been affirmed by the Supreme Court of Appeals.

As far as this Court is concerned, this is a de novo proceeding, although I think you are absolutely right, Mr. McKittrick, in the holding in the reversal in the Moss transfer.   I think you have every right to put on evidence to attempt to show that some other person committed the crime, that it was not this Defendant/Juvenile.   I think you have that right; but for the reasons aforesaid in the record and the fact that this is a de novo proceeding, this Court refuses

to recuse itself.

MR. McKITTRICK:  Your Honor, may I just for the purpose of the record -- I'm sure the Court is going to see this some day -- the Court had implied in its statement to counsel that we had an opportunity subsequent to the time that the Supreme Court reversed the last transfer hearing to file a motion for recusal of His Honor.  Now as this Court well knows, after the reversal of the transfer hearing, the matter is stayed until certification to the Circuit Court of Kanawha County, West Virginia, and the rule on that is that the certification is made within thirty days, and within that thirty-day period, all matters are stayed before the Circuit Court of Kanawha County; and one of the reasons for that thirty-day period is so the State of West Virginia can use its prerogative to file a petition for a rehearing, which it did in this case. After it filed a petition for a rehearing, that further stayed the proceedings before the Circuit Court of Kanawha County.

The Defendant nor the Prosecution could do anything with regard to the case of State of West Virginia versus John Moss. We, the defense in this case, did not have the opportunity to file any motions before this Court until the time that the petition for rehearing was denied by the State Supreme Court of this State, which I have already informed the Court I did not

hear about until three or four o'clock on the 22nd day of September, 1982, which would not have given us an opportunity to file a recusal motion because I had not been served with a notice from the State of West Virginia as to what they were going to do with regards to a transfer hearing.

It is not encumbent upon the Defendant nor the burden of the Defendant to anticipate how the State of West Virginia intends to proceed to prosecute a juvenile. We are supposed to defend that juvenile after we receive notice. We don't have to anticipate that they will file a notice on us and give us ten days' notice to get down here and prepare for a hearing because the statute and due process, Your Honor, requires that we be given reasonable notice so we can sit down and prepare a defense as any trial lawyer would want to do.

THE COURT: In response to that, Mr. McKittrick, neither the Court nor the State was advised on the 16th day of September, 1982, at which time they denied the State's petition for rehearing. The Court was advised -- and I will let the State represent when they were notified -- the Court was notified by routine, first-class mail some six days later. So the Court wasn't notified until some six days later, even though the order denying a rehearing was entered, and I quote, "At a regular term of the Supreme Court of Appeals, continued and held at Charleston, Kanawha County, on

the 16th day of September, 1982".

This is the 24th. That is one, two, three, four, five, six, seven, eight, nine days -- eight days exclusive of the 16th -- which still falls within the seven-day requirement of Rule XVII. If you were not notified prior to that, that is not obviously the fault of the State of West Virginia or of this Court. That delay lies with the West Virginia Supreme Court of Appeals.

MR. McKITTRICK: Even so, Your Honor, the Defendant's rights cannot be prejudiced because it lies with some third party.

Your Honor, my second motion after the Court's ruling, which I respect, is that the Court grant us time at this time, ten - fifteen minutes, to prepare a written motion with the reasons of argument set forth for the disqualification motion.

THE COURT: No, sir, I will not do that. I have ruled on the disqualification.

Now if you want to move for a continuance of these proceedings under the applicable provisions of 62-14-1, staying the 120-day detainer, as allowed under that provision for good cause shown, if you want to represent to the Court you need a continuance for good cause shown, I am serving notice on you now that I will grant it.

Now is it your desire to move for a continuance under that provision, 62-14-1, for good cause shown?

MR. McKITTRICK:  It is not our desire because we feel that the Defendant would be giving up certain constitutional rights if we did so.

THE COURT:  All right, sir.  All right, then the matter will proceed.  It is now noon, and we will recess for lunch and reconvene at 1:30; but I have made my ruling on the recusal and I am not going to permit you during the lunch hour to submit a written motion of recusal to the Court for the reasons aforesaid in the record.

Now frankly, you have got an hour and a half, if you want to go to the Supreme Court.  They are just a mile and a half up the street.  It would not be the first time lawyers have gone up there on the lunch hour.

Absent any ruling from the Supreme Court, I expect to proceed at 1:30.  I have given you an opportunity to ask for a continuance.  You have indicated it is not your desire.  Therefore, we will resume at 1:30 p.m.

MR. McKITTRICK:  Thank you, Your Honor.

THE COURT:  Would you mind putting in the record when the State was served?

MISS LUSK:  Oh, yes, certainly.  In this particular instance, I believe the record would reflect, Your Honor, that

Mrs. Beverly Selby drafted the petition for rehearing in this case. As the Court has stated previously, the petition for rehearing was denied on the 16th of September, 1982. In regular, first-class mail, on Wednesday, September 22, the State received a copy of the order denying the petition. That letter, or envelope, was addressed to Miss Frances McCoy, who was not the particular Prosecutor on the particular case up at the Supreme Court; but in any event, the State did receive notice at approximately three o'clock on Wednesday afternoon of this week. Therefore, the State would also submit that everyone that has been involved in this case has known that there are time limitations with it, time problems with it, and we knew that as soon as the Supreme Court took some kind of action on the petition for rehearing that the ball would have to get rolling quickly.

I would add that the State has had no more opportunity to prepare for this transfer hearing than Mr. McKittrick has had.

I would also like to point out that Mr. McKittrick has been quoting the opinion of the State versus McArdle and the due process rights contained therein. I would like to quote the case of In the Interest of John Moss. As the Court will recall, previously the State reopened the prior transfer hearing. At that time, Mr. McKittrick asserted that he was

surprised and had inadequate time to prepare.  This Court

offered Mr. McKittrick an opportunity to continue that case,

that hearing, and he declined that opportunity.

I would like to quote from the opinion In the Interest

of John Moss, and at Page 16 of the Slip Opinion, it states,

"In addition, after rendering his decision to reopen," -- making

reference to the Trial Court -- "the transfer Judge offered to

allow defense counsel a continuance in order to mitigate any

effect of surprise or lack of adequate preparation.  This

offer was refused by defense counsel, even though he now

argues on appeal that he was afforded inadequate notice of the

motion to reopen and was not aware that evidence would be

offered upon the Court's granting of the motion.  Clearly,

if the Appellant had been unfairly surprised by the reopening,

he could have taken advantage of the transfer Court's offer

of more time.  He rejected the opportunity to prepare further."

I would state to the Court that that particular situation

is absolutely analogous to this one.

THE COURT:  All right, is there anything further?

MR. McKITTRICK:  May I have a chance to respond to that?

THE COURT:  Absolutely.  Certainly, you do, Mr. McKittrick.

Go right ahead.

MR. McKITTRICK:  I think the rules with regard to surprise

cannot be compared to violation of a defendant's constitutional

rights.  There is not a violation of a person's constitutional rights when he is advised of a case and the rules with regard to continuance are clear and obvious.  The context is distinguishable.  The Defendant, John Moss, in this case, to secure a constitutional right, we do not intend to be forced by the State of West Virginia to give up a constitutional right.

THE COURT:  Any rebuttal, or is that it?

MISS LUSK:  Just that Mr. McKittrick has only addressed himself to surprise, and the quote which I just read addresses itself to mitigation of any effect of surprise or lack of adequate time to prepare.

THE COURT:  Okay, is there anything further?  I want to give you an opportunity, Mr. McKittrick, to rebut the rebuttal if you care to.

MR. McKITTRICK:  No, nothing further.

THE COURT:  All right, we will stand in recess until 1:30.

Off the record.

(WHEREUPON, a discussion was held off the record.)

(WHEREUPON, the noon recess was taken, after which the following proceedings were had.)

(WHEREUPON, at 1:50 p.m., the hearing resumed, all parties heretofore mentioned being present.)

THE COURT: Show the resumption of the proceedings In the Interest of John Moss, Jr., also known as John Moss, III, Juvenile Transfer Hearing to Adult Status, murder in the first degree, three counts.

The Defendant/Juvenile is present in person and by employed counsel, Mr. McKittrick and Mr. Taylor, State of West Virginia by her Assistant Prosecuting Attorneys.

All right, Mr. McKittrick, do you have any other matters?

MR. McKITTRICK: Yes, Your Honor, I do. The Defendant, John Moss, would move the Court --

THE COURT: (Interposing) Take your time. I know the flu is going all over the place.

MR. McKITTRICK: I think I am getting it. -- to strike the notice of this hearing on the basis that it is invalid on its face and hold the same null and void, one of the purposes, pursuant to 49-5-10 of the Code, failure to state the grounds for requested transfer.

There has never been, firstly, a motion to my knowledge. Maybe there has, Your Honor. I have the Court's file that the Court's Clerk just handed to me, and I have went through the Court's file and cannot find the motion has been filed pursuant to 49-5-10, requesting the Court to transfer the Juvenile.

MISS LUSK: I copied this out of the Court's file this

morning.  It is in there.

MR. STUCKY:  Your Honor, not meaning to interrupt, but it was filed in the Kanawha County Clerk's Office on January 20, 1981, and we have a copy with the stamp "filed", and I believe Miss Lusk copied that out of the Court file this morning prior to the commencement of this hearing.

MR. McKITTRICK:  Could I see it?

MR. STUCKY:  Sure.

MISS LUSK:  It is about the fifth or sixth thing down there.

MR. STUCKY:  Also, a certificate of service on the back that attests that a copy was served on the defense counsel.

MR. McKITTRICK:  Your Honor, I admit that there is a motion to transfer in this case relative to the original transfer hearing.  We take the position that this is a de novo transfer hearing and that it is necessary for the State to file another motion to transfer; and for that reason, Your Honor, for that reason, we would move the Court to quash the notice of the hearing today and hold the hearing as being null and void, void of procedural due process under 49-5-10.

MR. STUCKY:  Your Honor, in response to that motion, the motion to transfer was in fact filed January 20, 1981, which meets the procedural and due process requirements of the juvenile statute, whereby it sets forth the grounds and

conditions and reasons why the State of West Virginia is asking the Court to transfer this Juvenile from the juvenile jurisdiction of the Circuit Court to the criminal jurisdiction of the Circuit Court. Copies were sent to John Moss, Jr., also known as John Moss, III, at Kanawha County Jail, to John Moss and his mother, Marzee Moss, at their address in Cleveland, Ohio, and also his grandfather, I believe it is, John Moss, at Chesapeake Avenue, St. Albans, which also meets the requirements, by enclosing it and sending it first-class mail.

At that time, a transfer hearing was scheduled before this Court. Certain defense motions were granted, that being for psychiatric and psychological testing, and eventually the transfer hearing was in fact held some time in 1982, I believe in June of 1982.

MR. McKITTRICK: Eighty-two ('82).

MR. STUCKY: So it is the State's position that this is not a transfer hearing de novo. The Supreme Court has set aside this Court's ruling, and the evidence will come in anew. However, the hearing will be on the State's motion to transfer, and the Court did not address or say that anything was improper in the motion to transfer, and the State believes that this hearing today is on the motion to transfer that the State filed on January 20, 1981, and we are ready

proceed on that.

The notice which we sent informing them of a hearing today was meant to notify and did in fact notify them that a hearing on the motion to transfer which the State had filed previously in January 1981 was to be held today; and I believe the defense counsel, Defendant and his parents all had sufficient notice that that is why we are here today.

MR. McKITTRICK:  Your Honor, just so I might make it clear, I think I inadvertently made two motions in one. We would move that the notice be quashed on the basis that it does not follow a motion, which is necessary.  We also move that the notice be quashed on the basis that it does not set forth those things that are necessary to give us proper notice of this hearing.  We also move that the notice be quashed on the basis that a motion was not filed, and the notice is a predicate to the motion pursuant to 49-5-10.

THE COURT:  I think I have already ruled on two of those three motions.  As to the third one, that a new motion for transfer be filed, it is without merit.  This is a de novo proceeding only insofar as evidence is to be had and taken. It is not required of the State, in this Court's judgement, to have to file another written motion for hearing.  I thought we took care of that this morning, and I reaffirm all of the rulings I made this morning.

I have offered you an opportunity for a continuance on several occasions this morning under West Virginia Code 62-14-1 and any other applicable Code provision, and you have indicated, and I am not going to burden the record, your reasons you don't want a continuance.

I find that the hearing today is de novo only in the sense that the evidentiary portion thereof is de novo, but the State is not required to give any other notice to you than it has already given.  The motion is denied.

MR. McKITTRICK:  All right, the Defendant, John Moss, would move the Court to discontinue this hearing on the basis that the parents of John Moss have the right to be given reasonable notice so they may appear at the hearing, the transfer hearing; and under the facts that have already been outlined by the Prosecuting Attorneys Office, and also the defense, reasonable notice was not given to the parents of John Moss.  Therefore, the notice should be quashed and the hearing should not be held.

THE COURT:  I think we have been through this before.

MR. McKITTRICK:  Your Honor, I don't think I have gotten a formal ruling on my motion.  I am just trying to make the record.

THE COURT:  I thought I did rule on them formally, but take them one at a time.  I don't know what you mean by

discontinuance of this hearing. I am not sure where that appears in any statute of the law. If you are asking for a continuance, I will grant the continuance. If you don't want a continuance as offered by the Court under the appropriate statute, -- and we have been over this before time and time again -- if you want a continuance, I will grant it. If you don't want a continuance, I don't know what discontinuance of a hearing means. I know nothing in the statute that encompasses that language. If you are asking for a continuance, I will grant it. If you are not asking for a continuance, then we are going to proceed.

MR. McKITTRICK: What we are saying in essence, Your Honor, so the record will be clear, is that one of the due process rights that is granted to a juvenile because he is in fact a juvenile is the right for him to have his parents present at a transfer hearing and that the parents should be given reasonable notice of that transfer hearing.

In this case, it is defense counsel's position and contention that reasonable notice was not given to the parents and, therefore, the due process rights of the Defendant was circumvented, and the statute was not complied with. Therefore, this hearing should not be held because there was improper notice and that it should not be held because the due process rights of the Juvenile have been violated.

THE COURT:  Well, I don't know what that motion for discontinuance is, but I will deny it, whatever it is.

MR. McKITTRICK:  It is not a motion for discontinuance. It is a motion to quash the notice.  It is a motion that says that the Defendant's due process rights have been violated and, therefore, any hearing is null and void.

THE COURT:  I think I have ruled on that several times today, but if you would like, I will rule again.  It is proper notice and I would note I think this is simply a trial tactic on the part of defense counsel, of course, which he is entitled to try, but this is a tactical position to delay this matter for some more period of time without asking for a continuance.

Now in Footnote No. 4 in the Moss opinion, which reversed and remanded this, and I quote, "We note that the State's representation that only six days remain on the detainer are incorrect, and without so holding, we recognize that under the State's chronology of events in this case, at least 16 and possibly as many as 24 days remain within which the appellant may be brought to trial, without even considering that the provisions of W. Va. Code §62-14-1 requiring good cause for continuance may be less stringent than analagous provisions of W. Va. Code §62-3-1 and 62-3-21." And it goes on with further citations.

In any event, even by the holding of the Supreme Court, it would appear that the maximum time remaining without the motion for continuance for good cause would be a total of twenty-one days.  The motion to continue this matter was offered to defense counsel.  Defense counsel did not see fit to move for that.  Therefore, the Court finds that there has been sufficient and proper notice under the law, and the motion to discontinue, or whatever phrase you used, is denied.

MR. McKITTRICK:  Your Honor, I am sure the Court probably believes it has ruled on the next motion, and maybe it has, and I'll make it short because we have already laid the foundation in the record, and that is simply that the notice that was served on the Defendant, Defendant's counsel and Defendant's parents does not give the Defendant enough time to adequately and effectively defend himself, and, therefore, the Court should quash the notice and not hold the hearing.

MR. STUCKY:  Your Honor, I would like to put on the record it just seems to me that the defense counsel is either baiting this Court or baiting the State of West Virginia, the Prosecuting Attorney's Office, in saying, number one, if we don't have a hearing, and I am not going to do anything to delay this hearing, then my client should be able to take advantage of some statutory language that time limits have run and, therefore, be discharged from prosecution; and on the other

hand, if we go through the hearing so as not to let that time limit run, then I am not effective and I can't be ready. I don't think he can have it both ways. I think if he is not ready, then he should ask the Court and he should have the duty to his client to protect him and to give him effective assistance of counsel. I don't think he can sit there and say he is not ready but I want to go forward when I'm not ready and then claim that he is ineffective. He has been before this Court and every other Court in the State of West Virginia and the Federal Government on many criminal cases. He served as an Assistant Prosecuting Attorney. He is very talented and knows how to be prepared and how to defend Mr. Moss. He has done an adequate and admirable job thus far and has thwarted the efforts of the State of West Virginia thus far, and I think to bait this Court in saying let's go ahead but I'm not prepared, I'm going to put it on the record I'm not prepared, is not fair to the Defendant, is not fair to the State of West Virginia.

THE COURT: The Court has offered Mr. McKittrick no fewer than three and perhaps as many as a half a dozen occasions today to continue this matter in the best interest of his client, if he so feels that a continuance would be in the best interest of his client.

I will take notice that Mr. McKittrick is a very skilled

practitioner of the law, having been, as the Prosecuting

Attorney's Assistant said, an Assistant Prosecuting Attorney

for a number of years.  He has appeared in this Court on

criminal matters a number of occasions with a good batting

average, good success.  On several occasions in the past in

the Moss hearing he hasn't seen it necessary to be here and

has sent very adequate and competent counsel, Mr. Taylor, of

his firm to represent Mr. Moss.

I am not going to be baited.  I have been baited all I

intend to be in the past several days in other matters.  So I

am willing to sit here until midnight to hear whatever other

motions you care to make, Mr. McKittrick.

MR. McKITTRICK:  Your Honor, do I take it from the

Court's statement that the last motion is overruled?

THE COURT:  Well, with all this, would you mind

refreshing my memory, or would you like me to have the Clerk

go into the record?

MR. McKITTRICK:  Yes, I would, Your Honor.

THE COURT:  Sure.  Mr. Reporter, would you read the last

motion back, please?

(WHEREUPON, the last motion was repeated by the Reporter.)

THE COURT:  The motion to quash the notice, and in the

words of distinguished defense counsel, "not to hold the hearing",

is denied.  I have ruled on that a half dozen times.  I have

given counsel a half dozen opportunities to continue this matter as provided by law, and I am willing to offer an additional one, once again, to counsel an opportunity to continue this matter if he wishes; but the motion to hold the notice for naught and to, if you will, prohibit this hearing today is denied.  I find the notice sufficient as aforesaid at least a half a dozen times in this transcript.

MR. McKITTRICK:  The Defendant, John Moss, moves the Court to direct the Prosecuting Attorney's Office to grant to John Moss a preliminary hearing before this transfer hearing is held.  The Defendant concludes as a result of the language in the case of In the Interest of John Moss that the Supreme Court of this State requires in this case that a preliminary hearing be held before the transfer hearing is held for certain of John Moss' due process rights were violated in the original preliminary hearing before the last transfer hearing which was reversed.

MISS LUSK:  Your Honor, the State would respond.  As the Court may know, the opinion In the Interest of John Moss does address the issue of probable cause.  There was some question in the State's mind with reference to exactly what the Appellate Court was referring to and exactly what stage in these proceedings we should begin after the transfer hearing had been reversed.

I have searched this opinion and looking at the language which grants the Defendant the opportunity or should grant the Defendant or the Respondent the opportunity to introduce the kind of exculpatory evidence which we know will be coming about in this case, that being the confession of Paul Reggettz, the Court addresses itself to a determination of probable cause and rules that the Defendant, that the accused should be entitled to rebut the State's proof by an introduction of that particular confession.

However, the Supreme Court in its ultimate ruling seems to be focusing upon the probable cause determination at the transfer hearing, and it ultimately holds, and I quote, "We, therefore, conclude that the Court erred in restricting the Appellant's evidence on this issue at the transfer hearing." That is at Page 10 of the Slip Opinion.

From that, we are taking it that the Court, the higher Court, ultimately ruled that the error was at the transfer hearing. Even at that, the Supreme Court did not rule that it was reversible error on this particular point. I believe that there were other reversible errors that were held; but on this particular point, there was not a reversible error.

The State would also contend, this being the transfer hearing, it is clear from the Court's indication, the juvenile

case of Clark, the combination of Clark and the Moss case, that the State will put on evidence at that transfer hearing, independent evidence on the issue of probable cause, and we will make a showing today that there is probable cause to believe that John Moss committed these three murders as alleged in these three juvenile petitions.

The State would, therefore, urge the Court to deny the motion since from a reading of this opinion I really can't see where the Supreme Court has held that there was error at the preliminary hearing, but only that there was error and not reversible error at this point at the transfer hearing.

THE COURT:  I have read and re-read this opinion, and I see nothing in there that cites any error in the preliminary hearing.  You have had a preliminary hearing, and the way I read the opinion, the preliminary hearing obviously is for the benefit of the Defendant to get as much discovery as they can, and they have had that.  There is nothing in the opinion that refers to the preliminary hearing.  This matter was remanded and reversed on other grounds, none of which had anything to do with the preliminary hearing, except that the Supreme Court indicated that the Circuit Court must hold an independent probable cause hearing and not adopt the findings of probable cause of the Juvenile Referee.  They found it improper that the transcript of the preliminary hearing be incorporated in the

proceedings in the Circuit Court. I see nothing in the opinion that requires that you be given a second preliminary hearing since you have already had one and it was a rather complete one; and I find that this is just a matter of trial tactic on the part of defense counsel to further delay these proceedings. I find that the constitutional rights of the Defendant for preliminary hearing has been fully filled, and we are here today at this transfer hearing solely for the purpose of the Circuit Court to make an independent finding as to whether or not probable cause existed to transfer this juvenile to adult status and whether or not in fact one of the enumerated offenses in the statute, among them one being murder in the first degree, has been committed and whether or not there is probable cause to believe that this Defendant/ Juvenile committed them.

Therefore, the motion is denied.

MR. McKITTRICK: That is all the motions that the Defendant, John Moss, has.

THE COURT: All right, sir. I have a child custody matter, and it won't take fifteen minutes because I have all the reports read and I am ready to make my ruling on it.

(WHEREUPON, a recess was taken, after which the following proceedings were had, all parties heretofore mentioned being present.)

THE COURT: What are we waiting for?

MR. McKITTRICK: We can go.

MR. STUCKY: Mr. Taylor is not here.

THE COURT: Mr. Taylor doesn't have to be here, unless Mr. McKittrick wants to wait for Mr. Taylor.

MR. McKITTRICK: That's all right. We wanted to put on the record --

MR. STUCKY: (Interposing) Oh, yes.

MR. McKITTRICK: Your Honor, as a result of lack of time that we have had to subpoena witnesses in this matter, because of the inadequate notice that we have received for this hearing, I have requested of the Prosecuting Attorney's Office to seek their indulgence to assist us in getting a State Policeman here that we anticipate using as a witness, and they have indicated to us that they will do that.

MR. STUCKY: Your Honor, Mr. McKittrick asked me about ten minutes ago if we would supply Trooper Woodyard for them for their case. I suggested to him that he issue a subpoena for Trooper Woodyard, and he stated that there might be some problem getting it issued and served, and I offered the services of our investigator and Peggy Griffith in our office to be of any assistance to Mr. McKittrick or Mr. Taylor in obtaining the testimony of Trooper Woodyard, whatever our services can be. Certainly, they don't answer our beck and call,

but we will do anything that Mr. McKittrick asks of our office to do.

THE COURT:  Do you anticipate concluding your case in chief today?  It is now 2:30 p.m.

MR. STUCKY:  Your Honor, our testimony, we can conclude our testimony.  However, their cross-examination, I'm sure, from looking at the preliminary hearing and the last transfer hearing, is going to be quite lengthy, and I doubt it.

THE COURT:  My point is why have Woodyard sitting around here all afternoon, when perhaps it would be best to have him here at 9:30 in the morning.

MISS LUSK:  I think that is what he wants.

MR. McKITTRICK:  I think that is right, Your Honor. I think that is what we want.

THE COURT:  Do you want to start at 9 or 9:30?  It makes no difference to me.

MR. STUCKY:  It makes no difference to the State, Your Honor.  Which ever.

THE COURT:  What would you prefer?

MR. McKITTRICK:  Either one.

THE COURT:  All right, let's see how late we go today. In the interest of cooperation, have Woodyard available at 9:30 in the morning.

MR. STUCKY:  Yes, sir.

THE COURT: Where is your witness?

MR. STUCKY: Your Honor, I would like to place on the record that this is a transfer motion involving three petitions, Nos. 80-775, 776, and 777. There are three separate petitions for the reason that although the current state of the law in criminal jurisdictions of Circuit Court is that they allow mutiple-count indictments and multiple-count informations. However, I don't believe that the juvenile jurisdiction has progressed quite so far. For that reason, we have three independent petitions. However, the evidence of all three petitions is exactly the same, the evidence is the same, the occurrence is the same. The victims in the three petitions are in fact related, one being a mother and her two children. For that reason, I ask the Court to allow us to proceed with evidence on all three at one time, allow defense counsel to cross-examine on all three at one time, although the Court, I believe, would need to make a ruling for transferring or not transferring from the juvenile jurisdiction of Court separately on all three petitions.

MR. McKITTRICK: Your Honor, we would object to that. We feel that the State should proceed on each individual petition, on each individual charge.

MR. STUCKY: Your Honor, there is no benefit whatsoever.

THE COURT: This is a de novo evidentiary hearing.

Suppose you outline for me the alleged facts in the case.

MR. STUCKY:  Your Honor, in brief, the alleged facts are that on December 13, 1979, in Kanawha County, that John Moss, Jr., also known as John Moss, III, and being the Juvenile sitting at the end of this table, did enter the Reggettz home located in St. Albans, I believe, Kanawha County, West Virginia, in an attempt to burglarize the home, to attempt to find money, guns or anything else of value; that he entered that home; that subsequent to entering that home, he found or learned that Mrs. Reggettz and her two children were in fact in the home; that during the commission of this burglary that he did slay, kill and murder Bernadette Reggettz, Vanessa Reggettz and Paul Eric Reggettz, unlawfully, feloniously, wilfully, maliciously and premeditatedly.  He then continued throughout the house to carry on with his burglary and in fact did steal, take and carry away certain objects, certain amount of money and other Christmas presents, I believe that were under the Reggettz's Christmas tree at that time.  It is all related.

If and when we are permitted by this Court to seek an indictment, we would anticipate returning a three-count indictment inasmuch as the alleged murders occurred on the same date, in the same residence, the victims were related and they were victims of a felony murder under the laws of the

State of West Virginia on the same burglary.

THE COURT:  Did all the three alleged murders take place in the same period of time, that is to say within a short period of time of each other, within the same location?

MR. STUCKY:  Within the dwelling house of the Reggettz located in St. Albans and prior, from the time that the Defendant entered the home until he left the home, all three acts were committed.

THE COURT:  The motion, or the objection to probable cause hearing and transfer on all three to be had at the same time is denied.  However, the State will, of course, be expected to present testimony as to each individual and separate homicide.  It would be ludicrous, it seems to this Court, to require burdensome testimony on all three allegations when it has been represented they all arose from the same act, that is, three individual acts, all coupled in time one right after the other, or within a close period of time, and at the same location.

However, I am going to overrule the objection of the defense counsel, but I am going to require the State, obviously, to show probable cause on each individual alleged homicide on each alleged victim.

All right.

MISS LUSK:  The State would call Trooper Terry Williams

at this time, Your Honor.

    THE COURT:  Call him.

    (Witness sworn.)

    (Thereupon, TERRY WILLIAMS was called as a witness in behalf of the State, having been first duly sworn to tell the truth, testified as follows:)

DIRECT EXAMINATION

BY MISS LUSK:

    Q.   Would you state your name, please?

    A.   Terry Williams.

    Q.   Are you employed?

    A.   Yes.

    Q.   By whom?

    A.   Department of Public Safety.

    Q.   In what capacity?

    A.   I'm a trooper.

    Q.   How long have you been a trooper?

    A.   Ten years and nine months.

    Q.   Were you so employed on December 13, 1979?

    A.   Yes, I was.

    Q.   Were you on duty on that particular date?

    A.   Yes.

    Q.   Did you have occasion to respond to a call or communication which directed you to the residence at 7025

Chesapeake Avenue in St. Albans?   7027, let me correct that.

    A.   Yes, I did.

    Q.   In what county is that particular residence?

    A.   Kanawha County.

    Q.   How did that -- what caused you to go to that particular house?

    A.   I was given a call over my radio that there was a possible Signal 18.

    THE COURT:   Excuse me, what was that address?   7027 what?

    MISS LUSK:   Chesapeake Avenue, St. Albans.

    THE COURT:   Thank you.

BY MISS LUSK:

    Q.   Was that Kanawha County, West Virginia, Trooper?

    A.   Yes.

    Q.   Thank you.  Go ahead.  A Signal what?

    A.   Eighteen (18).

    Q.   Which is?

    A.   A murder.

    Q.   Okay, and what did you do in response to that communication?

    A.   I went to the scene.

    Q.   What did you find there?

    A.   I found three bodies.

    Q.   Well, let's back up a little bit.  What time was that?

A.    They gave me the call at 12:15 p.m.

Q.    Approximately what time did you arrive?

A.    Approximately five minutes later.

Q.    What exactly happened when you arrived?

A.    Well, I went down MacCorkle Avenue, Route 60, and I turned onto Fourth Street, which runs into Chesapeake Avenue; and as I was making a left turn onto Fourth Street from Route 60, I was met there by a subject that I learned later the name was Paul Reggettz.

Q.    Could you spell that for the Reporter?

A.    R-e-g-g-e-t-t-z.

Q.    Thank you.  What happened when you met there with Mr. Reggettz?

A.    I rolled down my window and he stated that someone had killed his family; and I said, "Where do you live?"  And he took off and ran down Fourth Street towards Chesapeake Avenue, and I followed him in my cruiser.

Q.    What happened then?

A.    We went up on the front porch, into the house, and the first thing I saw when I went into the house, there was a bedroom right off to the right, and I noticed the little girl lying on the bed.

Q.    What room were you in when you entered the house?

A.    The living room.

Q    In which direction was this bedroom?

A    To the right.  Immediately to the right as you entered the house.

Q    Okay, did you enter that bedroom at that time, or did you go through a different room?

A    I went through a different room.  I went straight through the living room, into what we call the t.v. room, and I saw a white female lying in the floor, and she was dead.

Q    Is this an adult or another child?

A    It is an adult.  And then I looked over to the right and there was another bedroom, and I saw a little boy lying on the bed, and he was dead.

Q    What did you do at that particular point?

A    At that particular time, he showed -- Mr. Reggettz showed me what he had found, and at that time, we went out of the house and he sat down on the front porch and I went across the street and used the telephone and called my office and told them what I had, to send me some assistance.

Q    Did you go back to the house then?

A    Yes, I did.

Q    Okay, Trooper, did you have the opportunity -- strike that.  Were you one of the investigating officers in this particular case, or was your involvement longer than just your initial inquiry here?

A.    Yes, it was.

Q.    Did you have the opportunity to study this scene?

A.    Yes.

Q.    How long were you at the scene after you had arrived?

A.    Well, I arrived there, it was approximately 12:20 p.m.
I left somewhere between 10 and 11 that night.

Q.    Okay, would you describe for the Court the condition
of this woman that you found, the adult?

A.    Okay.  She was lying in the floor and she had some
type of gown on.  She had some cords around her neck, and she
had some wounds on her head, and there was blood all over her
face and she had a pair of scissors stuck in her chest.

Q.    Did you notice from looking around the rest of the
house whether there was what would appear to be blood anywhere
else other than on the woman's head?

A.    Yes.  There was blood in every room of the house
except for the bathroom.

Q.    Could you describe exactly the quantity, whether it
was droplets or pools or what the quantity was?

A.    Well, there was quite a bit of blood in both bedrooms.

Q.    What do you mean by quite a bit?

A.    There was spots of blood that big around (indicating).

Q.    For the record, how wide are your hands apart there?

A.    Oh, about a foot.

Trooper Williams - Direct

Q. Okay.

A. And then there was drops of blood throughout the rest of the house except for the bathroom.

Q. Did you examine this woman to see if her heart was beating or if she was breathing?

A. She was not breathing.

Q. Did you have the opportunity to look at the little boy closely?

A. Yes, I did.

Q. Could you describe his appearance, please?

A. Well, he was lying on the bed. He had his pajamas on, and his pajamas and the bed, the sheets and the mattress around him was wet, and he was dead. He was not breathing.

Q. Did you observe any kind of injury on the child?

A. There was some marks on his neck.

Q. Okay, do you recall whether those marks totally circumscribed the neck or whether they were marks that you would ascribe as bruises or something that would be inter-mittent as opposed to totally circling?

A. I don't know if the marks went clear around his neck. It went, from what I could tell, in lying on the bed, it went from one side of his neck to the other.

Q. You don't know whether it was in the back or not; is that correct?

A.    That is correct.

Q.    Was the little boy breathing?

A.    No, he was not.

Q.    Did he have any visible wounds that might have been bleeding?

A.    No.

Q.    Now the little girl, what was her condition?

A.    She was lying in the bed in the front bedroom, and she had a mark around her neck, not completely around it, just on the front; from what I could tell, on the front part of her neck from one side to the other.

Q.    Did you examine the back side of her neck?

A.    No, I did not at that time, and she was not breathing.

Q.    Were there any injuries that you could see on her that would have been visibly bleeding?

A.    No.

Q.    Okay, the woman, the adult, was she still bleeding, or could you tell whether this was not an active process or whether it was still an active process on her?

A.    As far as I could determine, she was not bleeding any more.

Q.    What was the condition of the house itself, besides the blood?

A.    Well, it was a pretty big mess.  There was clothes

in both bedrooms strung all over the place; and under the

Christmas tree, all of the packages had been opened.   The

house throughout was just normally a wreck.   It was pretty

tore up.

    Q.   Did you learn, Trooper, the identity of these three

people?

    A.   Yes, I did.

    Q.   Who were they?

    A.   Vanessa Reggettz.

    Q.   Which one was that?

    MR. McKITTRICK:  We object to the answering of this

question on the basis no foundation has been laid, Your Honor,

for the answer.

    THE COURT:  Oh, I think she asked if he learned the

identify of the victims at a later time.   That is sufficient.

    Proceed.   Overruled.

    MR. McKITTRICK:  Show our exception.

BY MISS LUSK:

    Q.   Go ahead.

    A.   The adult's name was Vanessa Reggettz; the little

boy's name was Paul Eric Reggettz; and the little girl's

name was Bernadette Reggettz.

    Q.   Were they related?

    A.   Yes.

Trooper Williams - Direct                                    64

Q.   How?

A.   Vanessa was the mother of the two children.

MR. McKITTRICK:   Objection, Your Honor.

THE COURT:   I would sustain that until you lay a more proper foundation.

MISS LUSK:   Your Honor, the State at this time would like to inform the Court of what we would like to do and ask leave of the Court to do so.  We called Trooper Williams to set up the set for what occurred on December 13, 1979.  He was the first officer on the scene, and probably no one knows better than he exactly what the condition of the house was when the police were first called.  The State would, or has planned to attempt to introduce a statement of John Moss which was made at a later time; but before we would attempt to do that, we would like to call Trooper Mike Smith and set the foundation for the voluntariness of that statement and then ask the Court to allow us to recall Trooper Williams to actually play  the taped statement.

MR. STUCKY:   Your Honor, the problem that we have is that the Moss decision requires the Court to determine whether or not the statement was voluntarily and intelligently taken.

THE COURT:   I understand that.

MR. STUCKY:   The reason that the State feels is necessary before the statement is introduced, and Trooper Williams took

the statement, but prior to the playing of the statement,

we believe that it is necessary to comply with the Moss

decision to bring Trooper Smith in to testify as to events

relating to the taking of the statement and events prior to

the taking of the statement.  However, we felt that that was

inappropriate to start this hearing with him prior to laying

the foundation that in fact a crime exists.  Therefore, we

brought Trooper Williams on, and we ask now to limit the

cross-examination to the facts that he has testified to,

reserving the right of the State to recall Trooper Williams

once the foundation of the statement has been laid.

THE COURT:  All right, do you have any objections?

MR. McKITTRICK:  Your Honor, I only have an objection

to what Jim said there at last where he said limiting the

cross-examination to the direct.  As I understand all the

decisions in criminal cases, when we come to this voluntari-

ness hearing, it is an independent hearing; and as I under-

stand it, they want to go through that hearing at this time

and then present whatever witnesses they want out of order

for that hearing, and I have no objection to that.

THE COURT:  I think you are probably right.

MR. McKITTRICK:  But I don't want to cross-examine this

man, this witness, in the middle of his testimony.

THE COURT:  I think you are probably right, and I will

sustain it.  You can finish your examination of this witness and then you can call him back.  You can call another witness out of turn and call Trooper Williams back for the purpose of a confession.

MR. STUCKY:  That's what we are doing.  We are finished with him at this point; and if they don't want to cross-examine him on what he has testified to, or if they want to wait until he gets back on the stand and cover this area.

THE COURT:  I understand that.  Are you finished with him except as to the confession?

MR. STUCKY:  That is correct, Your Honor.

THE COURT:  This is in chief, except for the confession. Are you finished with this witness and your examination in chief except for recalling him for the confession?

MR. STUCKY:  And the events that led up to the confession, to explain that to the Court.  Trooper Williams and Trooper Smith went to Mansfield, Ohio, obtained custody of the Defendant, brought him back; and on his way to Kanawha County, West Virginia, a confession was obtained.

THE COURT:  I understand all that.

MR. STUCKY:  That's the only thing else we are going to go into with Trooper Williams.

THE COURT:  All right.  Okay, do you want to reserve your right of cross-examination?

MR. McKITTRICK:  Yes, I do, Your Honor.  Thank you.

THE COURT:  All right, you may step down, and you can call your next witness.  Stand by, Trooper, subject to recall.

THE WITNESS:  Yes, sir.

(Witness stood aside.)

MR. STUCKY:  I call Trooper Mike Smith.

(Witness sworn.)

(Thereupon, MICHAEL DON SMITH was called as a witness in behalf of the State, having been first duly sworn to tell the truth, testified as follows:)

DIRECT EXAMINATION

BY MR. STUCKY:

Q.    Trooper Smith, would you state your full name, please?

A.    Michael Don Smith.

Q.    Are you employed?

A.    Yes.

Q.    By whom?

A.    Department of Public Safety, State of West Virginia.

Q.    In what capacity?

A.    Trooper.

Q.    How long have you been employed by the Department of Public Safety as a trooper?

A.    Approximately eleven and a half years.

Q.   Where are you stationed currently, Trooper?

A.   Winfield, Putnam County, West Virginia.

Q.   How long have you been stationed in Winfield?

A.   Two years, six months.

Q.   In October of 1980, where were you stationed?

A.   I'm going to have to think about that for a few
seconds.  Winfield.

Q.   In October of 1980, were you assigned to a certain
investigation of three murders that occurred in St. Albans,
Kanawha County, West Virginia?

A.   I had been assigned earlier to that investigation.

Q.   Those were the investigations of the so-called, I
guess, Reggettz murders?

A.   Yes.

Q.   And in October of 1980, you were still working on
those; is that correct?

A.   Yes.

Q.   Who was assisting you, or who were you assisting in
that investigation?

A.   Trooper Williams, Terry Williams.

Q.   Did there come a time in October 1980 where you
were required or it was necessary for you to travel out of
the State of West Virginia to the State of Ohio during that
investigation?

A.   Yes.

Q.   And did there come a time, specifically, I believe, in October, October 28, 1980, when you went to the State of Ohio with regard to this investigation?

A.   Yes.

Q.   What was the purpose of going to Ohio?

A.   To bring back a subject that was related to some charges here.

Q.   All right, and what date did you go to the State of Ohio?

A.   I believe October 28, '80.

Q.   And where did you go in Ohio?

A.   To the State Reformatory in Mansfield, Ohio.

Q.   And the subject that you were going to see, who was that?

A.   John Moss, Jr.

Q.   Is he present today in the Courtroom?

A.   Yes.

Q.   Would you point him out and describe what he is wearing?

A.   Sitting right here in the orange coveralls.

MR. STUCKY:  May the record reflect he has indicated the Defendant, John Moss, Jr., also known as John Moss, III?

THE COURT:  The record will so reflect.

Trooper Smith - Direct                                      70

BY MR. STUCKY:

    Q.   Who went with you to Mansfield, Ohio?

    A.   Trooper Terry Williams.

    Q.   And did you leave from Charleston and go to Mansfield that particular morning, or day?

    A.   Yes, sir.

    Q.   How did you get to Mansfield?

    A.   We went --

    Q.   (Interposing)  What mode of transportation?

    A.   In a Department of Public Safety car.

    Q.   Basically, I guess, that's a State Police car?

    A.   Yes.

    Q.   Marked with lights?

    A.   No, this was an unmarked cruiser.

    Q.   What did it look like?  Would you describe it?

    A.   Four-door, probably a Dodge or Plymouth.

    Q.   What about the interior?

    A.   It is probably in the line of a brand like a Fury or something like that.  It is carpeted, front and back seats, front seats are somewhat a bucket seat, which has a bench that folds down in the middle.

    Q.   Does it have any weapons or restraining devices in the interior?

    A.   No, they don't.  Not that car.

Q.   When you went to Mansfield, what time did you arrive up in Mansfield?

A.   Probably somewhere, you know, between -- probably around noon, one o'clock, something like that.

Q.   Did you proceed to explain to someone up there what your purpose for being there was?

A.   Yes.

Q.   And did there come a time when you received custody of John Moss, Jr. at that time?

A.   Later, after arriving there.

Q.   At approximately what time did you receive custody of John?

A.   Probably around two o'clock, give or take twenty minutes either side of that, to a half hour.

Q.   Two o'clock a.m. or p.m.?

A.   P.M.

Q.   Once you obtained custody of him, what if anything did you do with him?

A.   We took him from the reformatory out to our car, which was parked just outside the reformatory.

Q.   Was he restrained in any manner at that time?

A.   Yes, he was.

Q.   And how?  In what manner was he restrained?

A.   He was handcuffed behind as we were taking him out of

the reformatory.

Q.   When you say handcuffed behind, you are talking about having his hands behind his back?

A.   Yes, only his hands.

Q.   Did there come a time when that mode of restraint changed?

A.   It changed just as we were putting him in the back seat of the police car.  We changed him from the back to the front.

Q.   Why did you do that?

A.   To make it more comfortable for him.

Q.   Did you then proceed to return to the Charleston, West Virginia, area?

A.   Yes, we did.  We started back.

Q.   Who was driving at that time?

A.   Trooper Williams.

Q.   Where were you located in the car?

A.   In the front seat, on the passenger side.

Q.   Were you and Trooper Williams in uniform?

A.   No, sir.

Q.   How was Trooper Williams dressed at that time?

A.   Oh, just casual dress, I would think.  We probably both had blue jeans on, just a casual shirt, jacket, maybe.

Q.   Did John Moss know your identity, that being a West

Virginia State Trooper?

    A.   Yes.

    MR. McKITTRICK:  Objection.  Leading.

    THE COURT:  Rephrase it.  Sustained.

BY MR. STUCKY:

    Q.   Did John Moss know who you were?

    A.   I'm sure he did.

    Q.   Did he know where you worked?

    A.   Yes.

    Q.   How did he know that?

    A.   I had introduced myself earlier to him several months before that, myself and Trooper Williams.

    Q.   Where did you introduce yourself to John Moss?

    A.   At a detention center in Cleveland, Ohio.

    Q.   Did you leave immediately from the Mansfield area once you got John in the car?

    A.   Well, before leaving Mansfield, we stopped and gassed up.

    Q.   Okay, then where did you go?

    A.   Proceeded -- we had a little trouble getting ourselves out of Mansfield, but we proceeded back towards Parkersburg, or south, back towards West Virginia.

    Q.   Did you make any stops along the way from Mansfield before you got to the Charleston, West Virginia, area?

A.    We stopped one time to get some refreshments and for everyone to use the restroom.

Q.    Was John afforded the opportunity for refreshments?

A.    Yes, he was.

Q.    Was he afforded the opportunity to go to the bathroom at that time?

A.    Yes.

Q.    Did he in fact go to the bathroom at that time?

A.    Yes, he did.

Q.    Did there come a time on the trip back from Mansfield that you had any conversations with John Moss?

A.    Yes.

Q.    And when was the first time that you had any kind of conversations with John?

A.    Oh, the first time?

Q.    In the car, on the trip, yes.

A.    Oh, probably just as soon as we were leaving the reformatory.

Q.    And what were the essence of those conversations at that time?

A.    Oh, it was just general talk about, you know, what was available to him there at the penitentiary and the fact he looked like he had gained some weight since the last time I had seen him, what was his job there, things like that.

Q.    Did there come a time that you made any inquiries of John concerning criminal activities in the State of West Virginia?

A.    Yes.

Q.    When was that?

A.    It was probably twenty minutes to a half hour after leaving the reformatory.

Q.    Did you do anything prior to asking those questions? Did you say anything to John?

A.    I verbally advised him of his rights.

Q.    And by advising him of his rights, what rights are you talking about?

A.    His constitutional rights.

Q.    And how was that done?

A.    It was done from the rights that we have on the back of our I.D. cards, Department of Public Safety I.D. cards.

Q.    Do you have your I.D. cards with you?

A.    Yes.

Q.    Is that the same I.D. card you used to advise John Moss of his rights on October 28, 1980?

A.    Yes.

Q.    Would you produce that for me, please?

A.    Do you want it or one like it?

Q.    I want it.

A.   I would like to say that if -- it is possible that may not be it.

THE COURT:  Wait a minute.

MR. STUCKY:  Your Honor, I would ask that this be marked as State's Exhibit No. 2 for identification purposes only.

THE COURT:  He wanted to add something.

THE WITNESS:  As far as I know, that is the same one, unless they have changed it.  I have been to a retraining school since then.  It is possible that they could have.

MR. STUCKY:  This doesn't have a date of issue on it.

BY MR. STUCKY:

Q.   Can you tell by the picture that appears on the front?

MR. McKITTRICK:  Objection.  That is a leading question, Your Honor.  It is in a crucial area now.

THE COURT:  He either knows that it is his I.D. card or it isn't his I.D. card.

MR. McKITTRICK:  Your Honor, I think the issue is he has already answered it on the record.  It is possible it is. He can't testify that it is.

THE COURT:  You are right.  I think he has.

MR. STUCKY:  I am trying to clear that area up.

THE COURT:  Go ahead and try to clear it up.

BY MR. STUCKY:

Q.   Is that or is that not the same card that you advised John Moss of his constitutional rights from?

MR. McKITTRICK:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  As far as I know, this is the same card. If not, it is one exactly like it, other than the picture. I mean we have had these for several years.  They do change them periodically.

THE COURT:  What do they change?

THE WITNESS:  Only our picture.

BY MR. STUCKY:

Q.   They do not change the <u>Miranda</u> Warning?

A.   No.

MR. McKITTRICK:  Objection.  Leading question.

BY MR. STUCKY:

Q.   Do they change the back for the <u>Miranda</u> Warning on that card?

A.   They haven't for several years.  This would have been the same format at that time.

(WHEREUPON, the I.D. card referred to was marked for identification as State's Exhibit No. 2.)

BY MR. STUCKY:

Q.   I would ask you to examine the back of that card and read the back of that I.D. card.

Trooper Smith - Direct                                                    78

A.    It has on it, "Miranda Warning".

MR. McKITTRICK:  Objection.

BY MR. STUCKY:

Q.    Just read it to yourself.

A.    "Miranda Warning".

Q.    No, to yourself.  To yourself.  Trooper, I would now ask you are those the exact rights or the exact words which you read to John Moss, Jr. on October 28, 1980, in the car, in the State Police car, coming from Mansfield, Ohio, to the State of West Virginia?

A.    Yes, sir.

MR. McKITTRICK:  Objection, Your Honor.  Now that is a way to circumvent what he is trying to do, and what he is trying to do here is substantiate what was advised by the introduction of this document.  He is trying to circumvent that now by coming in the back door and asking him if that is the same thing he told him.

THE COURT:  Read the last question back.

(WHEREUPON, the last question was repeated by the Reporter.)

THE COURT:  Objection overruled.

THE WITNESS:  Yes, they are.

BY MR. STUCKY:

Q.    Would you now read to the Court what you told or what you read to John Moss on October 28, 1980, and read those

in the same manner and fashion as you did on that particular
date?

    MR. McKITTRICK:  Objection, Your Honor.  That document
has only been identified, not introduced in evidence, and
obviously it cannot be because the proper foundation has not
been laid.

    THE COURT:  You asked him if he read the exact --

    MR. STUCKY:  (Interposing)  That was the last question.

    THE COURT:  I understand that, the exact rights contained
on this card.  He asked him if those were the exact warnings,
Miranda Warnings, he read to the Defendant.  I think it is
a proper question.  Overruled.

    THE WITNESS:  "You have the right to remain silent and
refuse to answer questions.

    "Anything you do say may be used against you in a court
of law.

    "You have the right to consult an attorney before speaking
to the police and to have an attorney present during any
questioning now or in the future.

    "If you cannot afford an attorney, one will be provided
for you without cost.

    "If you do not have an attorney available, you have the
right to remain silent until you have an opportunity to
consult with one.

"Now that you have been advised of your rights, are you willing to answer questions without an attorney present?" BY MR. STUCKY:

Q.   During the reading by you of that card, were you able to observe the Defendant, John Moss?

A.   Yes.

Q.   Did he appear to be listening to what you were saying?

A.   Yes, he did.

Q.   Did you say anything else with regards to his <u>Miranda</u> Rights other than reading them off of that card?

A.   Yes, I did.

Q.   What did you tell John at that time?

A.   I asked him if he had any questions concerning what I just read him, if he fully understood the rights that I had read to him, and if he was willing to speak to us again, and if he did, did he have any more further questions concerning that.

Q.   Did he indicate to you whether or not he understood the rights which you advised him of?

A.   He did.

Q.   Did he indicate to you that he had any other questions about those rights?

A.   No, he did not.

Q.   Did he indicate to you whether or not he was willing

to talk or give a statement to you after being advised of
those rights?

    A.   He did.

    Q.   What did you do after that?

    A.   I just asked him, let him know that we were concerned
about crimes that had occurred here in West Virginia and
asked him if he would tell me about the ones that he was
involved in or had knowledge of here in West Virginia.

    Q.   Did there come a time that he told you about the
so-called Reggettz murders?

    A.   Yes.

    Q.   I believe that he told you about some other crimes
he has been involved in in West Virginia prior to that; is
that correct?

    A.   About one.

    Q.   Will you stay away from that, as not to taint the
record with those statements at this time?  When did he tell
you, if he did, that he was willing to talk about the Reggettz,
or how did the conversation of the Reggettz murders come to
take place?

    A.   I just explained to him that there was a crime that
I was concerned about, or we were concerned about, here in
West Virginia, a very serious and very important crime, and
that we felt like he had knowledge of it and that he could

help to explain as to what had happened.

Q.   Was that conversation inside the police cruiser,
again still coming towards the State of West Virginia?

A.   Yes, it was.

Q.   Did John Moss indicate whether or not he knew what
you were talking about or was willing to talk to you about that
particular thing?

A.   Yes, he did.

MR. McKITTRICK:   Objection, Your Honor, to the continued
leading.  He can ask what is the next thing that was said by
John Moss.

THE COURT:   Sustained.  Quit leading him.

BY MR. STUCKY:

Q.   Did John Moss reply to that question?

A.   Yes, he did.

Q.   What was his response?

A.   He shook his head yes, acknowledging that he did.

Q.   Once he acknowledged to you that, yes, he understood,
what did you do then?

A.   Told him I felt like a crime of this importance
should be discussed someplace where it would be more comfortable,
where we could sit down, look each other in the face, get
something to drink, eat, and discuss what had occurred.

Q.   Did he make any reply to that remark?

A.   He just agreed.

Q.   During this conversation, where were you located in the automobile?

A.   In the back seat.

Q.   Where was John?

A.   In the back seat.

Q.   Where was Trooper Williams?

A.   Driving.

Q.   During these conversations that you have testified to, did at any time you make any threats or intimidating jestures to John Moss?

A.   No.

Q.   Did Trooper Williams in any way make any threats or intimidating jestures to John Moss during this period of time?

A.   No.

Q.   Did you make any promises of any sort to John Moss to attempt to induce him in any way to act in any certain manner?

A.   No.

Q.   Did Trooper Williams?

A.   No.

Q.   What did you do next?

A.   After he agreed, I just said that we would talk about other things not related to crimes until we got on down the

road where we could find a place where we could sit down and

discuss it.

 Q. Did you do that?

 A. Yes, we did.

 Q. What did you talk about, if you know?

 A. Everything, the land we were driving by, to the

penitentiary.

 Q. Where did you proceed from there?

 A. On to Parkersburg, West Virginia.

 Q. Once you got to Parkersburg, what did you do?

 A. We stopped at the State Police Detachment there in

Parkersburg.

 Q. Where is that located?

 A. Oh, I don't know whether it is inside the city

limits, but it is just outside of Parkersburg, just approxi-

mately a half a mile or mile off of Interstate 77.

 Q. Approximately what time did you arrive at the

Parkersburg State Police Detachment?

 A. Approximately around six o'clock.

 Q. What did you do once you arrived there?

 A. We stopped and went inside the detachment.

 Q. Who is we?

 A. John Moss, myself and Trooper Terry Williams, at which

time we let the sergeant that was in charge of the station

at that time, informed him of the fact we were stopping there

and we wanted a place to discuss some things and we wanted to

be getting some refreshments and some food.

Q.   Who was that sergeant in charge?

A.   Sergeant Presson.

Q.   What happened next?

A.   We let John use the restroom there at the office,

got him either a soft drink or some coffee, had some food

ordered, got us set up in a room there where we could talk,

that had a desk or something.  We didn't set it up.  We got

us an office available where we could.

Q.   Where was this office located?

A.   It is just an office inside the detachment there.

Q.   Is the detachment a one-story or two stories?

A.   One-story block building.

Q.   Would you describe the size of the room and the

interior decorations of that room?

A.   Some chairs and a couple of desks, telephone.  Of

course, there was a door leading into it.  It was probably,

I would say, twelve feet wide, fifteen feet long, something

like that.

Q.   Once you got in the room, what did you do?

A.   We probably drank our refreshments, coffee, whatever;

and as soon as we got a chance, we immediately advised John of

Trooper Smith - Direct

his rights with a Waiver of Rights form that our Department

has.

    Q.  Who did that?

    A.  Trooper Williams and myself.

    Q.  Do you have a copy of that or the original of that

Waiver of Rights form?

    A.  It should be in this report here.

    Q.  Would you check and see if it is?

    Trooper, would you take that out of your report there,

please?

    MR. STUCKY:  Your Honor, I would ask that this document

be marked as State's Exhibit No. 3 for identification

purposes.

    THE COURT:  Has Mr. McKittrick seen it?

    MR. STUCKY:  No, sir.  It is just for identification.

I was going to show him.

    THE COURT:  All right, for identification purposes only.

Show it to defense counsel.

    MR. McKITTRICK:  Your Honor, --

    THE WITNESS:  (Interposing)  Here it is.  They were back

to back.

    (WHEREUPON, the document referred to was marked for

identification as State's Exhibit No. 3.)

    MR. STUCKY:  Your Honor, I have another D.P.S. Form #79,

Trooper Smith - Direct

which I would like to have marked as State's Exhibit No. 4

for identification purposes only.

(WHEREUPON, the document referred to was marked for

identification as State's Exhibit No. 4.)

MR. McKITTRICK:  Your Honor, I don't see how this witness

can identify this, these documents.  I think both of them --

let's see -- well, now Exhibit 3, what has been identified

as Exhibit No. 3, is witnessed by two individuals other than

this witness.  I don't know how he can identify that document.

THE COURT:  Well, it can be marked for identification

purposes only.  When he tries to move it into evidence, that is

a horse of a different color.

MR. McKITTRICK:  Well, I assume that this witness has

got to identify it, and it is the original, and I don't know

how they can identify it even.

MR. STUCKY:  I haven't asked him to identify it yet,

Your Honor.

MR. McKITTRICK:  How can you mark it for identification

purposes?

THE COURT:  He can mark it for identification.

MR. STUCKY:  So we know what we are dealing with.

THE COURT: It is not in evidence.  I think your objection

is premature.

MR. McKITTRICK:  I thought you asked him about it

Trooper Smith - Direct

didn't ask him about it?

    MR. STUCKY:  No.  I just asked him so I could have it in my possession.

    MR. McKITTRICK:  I'm sorry.  I thought you asked him about it, but you didn't ask him about it.

    MR. STUCKY:  Not yet.

BY MR. STUCKY:

    Q.  Trooper, I will show you what has been marked as State's Exhibit No. 4 and ask you if you can identify that?

    A.  Yes.

    Q.  Would you so describe what that is?

    A.  It is the Department of Public Safety Waiver of Rights form, D.P.S. Form #79.

    Q.  All right, and it is entitled what at the top?

    A.  "Your Rights".

    Q.  And there appears to be blank spaces with "Place", "Date", and "Time".  Were those filled in?

    MR. McKITTRICK:  Objection, Your Honor.  The document speaks for itself.

    THE COURT:  He can identify it as being a D.P.S. Form ber whatever it is, a "Waiver of Rights", but certainly if attempts to move it in evidence, he is going to have to establish that this witness has personal knowledge of tha particular exhibit.

Trooper Smith - Direct

MR. McKITTRICK:  I think we are just encumbering the record.

THE COURT:  I think we are, too.  If what you represented earlier as to this witness is correct, I think we are, too.

MR. STUCKY:  There is, Your Honor.  There is on this document, not on No. 3.  What he has done now, he has taken them out of order and he has No. 4 in his hands.

BY MR. STUCKY:

Q.  Your name, Trooper, appears as a witness on that form; is that correct?

A.  Yes, it does.

Q.  Is that your signature?

A.  Yes, it is.

Q.  Did you in fact witness whatever happened with that form?

A.  Yes, I did.

Q.  Again, there is a place at the top that is entitled, "place", and there is a blank line.  That blank line has been filled in; is that correct?

A.  Yes, sir, it was.

Q.  And what was filled in in that line?

A.  "Parkersburg State Police Detachment".

Q.  Who filled that in?

A.  Trooper Williams.

Trooper Smith - Direct

Q. There is a place for date on it.  What is filled in there?

A. "10-28-80".

Q. Who filled that line in?

A. Trooper Williams.

Q. There is a place for time.  Who filled that line in?

A. Trooper Williams.

Q. What does that say?

A. "6:50 p.m."

Q. Eastern Standard Time?

A. Yes.

Q. Were you present when this line, or these lines, were filled in by Trooper Williams?

A. Yes.

Q. What else was done with that document after those lines were filled in, if anything?

A. This form was explained to John Moss.

Q. Who did that?

A. Trooper Williams.

Q. Was that in your presence?

A. Yes, it was.

Q. How did he explain that form to John Moss?

A. He read it to him.

Q. Were you there when he read that form to John Moss?

Trooper Smith - Direct

A.   Yes.

Q.   There appears to be a second part to that, and it is entitled "Waiver of Rights"; is that correct?

A.   Yes.

Q.   What if anything was done with that part of the form?

A.   It was also read to John.

Q.   Did John Moss do anything with that form?

A.   He signed it.

Q.   When did he sign it?

A.   After it was explained to him and he agreed to it.

Q.   What was the purpose of having him sign that?

A.   So that he would understand his rights.  His signature was there so as to prove that he did understand it.

MR. McKITTRICK:  Objection, Your Honor.  That is a conclusion on the part of this witness and that is within the prerogative of this Court and  not for this witness to do.

THE COURT:  He can give that answer in the course of his experience as a member of the Department of Public Safety for some eleven and a half years.  Overruled.

BY MR. STUCKY:

Q.   There appears a line there called "Signed", and that is filled in.  What is filled in on that line?

A.   "John Moss, III".

Q.   And did you watch how that was placed on the paper?

Trooper Smith - Direct

A.   Yes.

Q.   How was that placed on the paper?

A.   By John Moss.

Q.   That is John Moss' signature; is that correct?

A.   Yes.

Q.   After that State's Exhibit No. 4 was executed, what took place?

A.   He was questioned concerning the Reggettz murders.

Q.   And who was he questioned by?

A.   Myself and Terry Williams.

Q.   Was this Sergeant Presson present during that questioning?

A.   Part of it.

Q.   And how was this questioning performed?

A.   Just verbal.  All verbal at that time; nothing in writing.

Q.   Was it in question and answer form or narrative form?

A.   A lot of it was questions and answers mostly.

Q.   Who was asking the questions?

A.   All of us.  Myself, Trooper Williams, Presson.

Q.   Who was giving the answers?

A.   John.

Q.   Were those questions and answers written down anypla during this period of time?

A.   During that period of time, no.

Q.   How long did this question and answer period last?

A.   Probably a couple of hours.

Q.   All right, other than the answering, asking questions and receiving answers and giving answers, what did the three of you do during this period of time?

A.   At one time or another, we had all left to get some coffee or a drink or just to step out of the office.  In the beginning, I did most of the questioning.

Q.   Was there any food or drink offered to the Defendant, John Moss, during this period of time?

A.   Yes, there was.

Q.   When and what food and drink was offered to John Moss during this question and answer period?

A.   I would say approximately a half hour or so after we arrived there at the detachment, which is fifteen to maybe twenty minutes after the rights form was signed.

Q.   Again, what food and who offered it?

A.   Okay, it was given to him by either myself or Officer Williams inside the office where we were at, and it was like some coke and sandwiches.

Q.   Did you and Trooper Williams eat during this period of time, also?

A.   Yes.

Q.   Was the Defendant allowed to smoke cigarettes and do things of that nature?

A.   Yes, he was.

Q.   Was he allowed to go to the bathroom or refresh himself as he required?

A.   Yes.

Q.   During this question and answer period, at any time did you or anyone else in your presence make any threats to John Moss?

A.   No.

Q.   Did you or anyone in your presence make any promises to John Moss to induce him to give you certain answers to your questions?

A.   No.

Q.   At any time during this question and answer period, did more than one person ask questions at a time?

A.   No.

Q.   Were the questions more or less in an orderly fashion from one person then another, or were they rapid-fire type questions from everyone?

MR. McKITTRICK:  Objection, Your Honor.

THE COURT:  Just a minute.  Hold on just a moment.

MR. STUCKY:  Your Honor, I will rephrase that question. It will probably take care of it.

Trooper Smith - Direct

THE COURT:  Just a minute.  All right, the objection is sustained.  Prosecutor, rephrase the question.

BY MR. STUCKY:

Q.  What procedure was used and followed during this question and answer period?

A.  As I stated earlier, most of the questioning was done by me, and I would say on a percentage basis, probably I did 75 or more of the questions.  Occasionally, one of the other officers might ask a question.  Now that's when I was in there.  Once I left, I don't know who did the majority of the questioning.

Q.  Once -- well, strike that.  During the question and answer period, did at any time John Moss indicate that he wanted to stop the questioning or the answers that he was giving?

A.  No, he did not.

Q.  Did at any time during this question and answer period he indicate that he wanted a lawyer present?

A.  No.

Q.  Once the question and answer period was completed, what happened, if anything?

A.  After the part that I was involved in, as far as the questioning and answering verbally, there was another answer and question period which was taped.

Q.   Were you present during that particular question and answer period?

A.   No, not in the office where they were taping it.

Q.   You did not participate in that question and answer period?

A.   That was on tape, no.

Q.   Who did participate in that, if you know?

A.   Sergeant Presson and Trooper Terry Williams.

Q.   Where were you during the taped question and answer session?

A.   I was inside the detachment, but I was out of the office where it was being taped.

Q.   Do you have any idea how long or approximately how long that question and answer period took place?

A.   I'm going to say approximately a half hour.

Q.   Once that was completed, what if anything took place?

A.   I went on to Cleveland, along with Trooper Williams, from there and we had John Moss relayed with some other Department of Public Safety members to Kanawha County.

Q.   You said you had him relayed.  What does that mean? What did you do?

A.   He was transported in a different State Police car by other Department of Public Safety members.

Q.   To your knowledge, did those Department of Public

Safety members question him at any time on their way to

Kanawha County?

     A.   Not that I was aware of.

     Q.   Where was John Moss taken from the Parkersburg

Detachment?

     A.   I would assume he was taken to the Kanawha County

Jail.

     MR. McKITTRICK:  Objection and move to strike.

     THE COURT:  Sustained.  Strike the last answer.

BY MR. STUCKY:

     Q.   Trooper Smith, are you aware of any time that John

Moss was out of the presence of either yourself or Trooper

Williams?

     A.   At any time?

     Q.   Yes, sir.

     A.   Yes.

     Q.   When was that?

     A.   That would have been at the detachment that evening,

late.

     Q.   What do you mean, late?

     A.   Well, around sometime during the time that it was

being taped, the taped question and answer period.

     Q.   During the taped question and answer period, there

was a period of time that yourself and Terry Williams were not

in there?

    A.   Yes.

    Q.   Who was with John Moss at that time?

    A.   The Sergeant.

    Q.   Sergeant Presson?

    A.   Yes.

    Q.   Why was Sergeant Presson by himself with John Moss that evening during that period of time?

    A.   Trooper Williams wanted to speak with me about the tape.

    Q.   How long a period of time was John with Sergeant Presson by himself?

    A.   Five minutes, approximately.

    Q.   Was that in the beginning, middle, end of the taped statement, if you know?

    A.   Towards the end.

    Q.   Is that the only time until you and Trooper Williams left the Parkersburg Detachment that either you or Trooper Williams were not with John Moss?

    A.   That is the only time I can recall.

    Q.   Have you had occasion to hear the taped question and answer period?

    A.   Yes.

    Q.   Have you had occasion to review the contents of the

taped question and answer period as it relates to the answers

that John Moss gave to you during the untaped or oral question

and answer period?

    A.    Would you repeat that?

    Q.    Have you had an occasion to compare or relate what

John Moss, what the recorded question and answer period tape

says with what answers John gave to you when you asked him

orally questions and those were not recorded?

    A.    Yes.

    Q.    Were his answers on the tape consistent with and the

same as his answers in the untaped session?

    MR. McKITTRICK:  Objection.

    THE COURT:  On what grounds?

    MR. McKITTRICK:  On the ground that the taped statement

and the tape speaks for themselves.

    THE COURT:  Well, I am going to let him answer if he

was present.  If he wasn't present at both, then I am not

going to let him answer.

    MR. McKITTRICK:  He wasn't present.  He has already

testified he wasn't present.

    MR. STUCKY:  Your Honor, that is not the question.  He

has testified he listened to the tape and he knows what the

tape says.  My question is whether what was said on the tape

is consistent with and the same as the questions and answers

Trooper Smith - Direct

that were not recorded.  The testimony is that Trooper Smith and the Defendant had a dialogue question and answer period about these crimes.

THE COURT:  Yes.

MR. STUCKY:  That was not recorded.  Okay, for example, Trooper Smith -- and again this is purely for an example -- Trooper Smith may have asked on what day did this occur, and the Defendant may have answered October or December 13th.

THE COURT:  I am going to sustain the objection.  I am only concerned with this hearing with what was in evidence, what confesssions you had.  That is what you are concerned with, the validity of a confession.

MR. STUCKY:  We have got an oral confession and a taped confession, Your Honor.  What I was trying to get at is that the tape --

THE COURT:  (Interposing)  Are you attempting to admit the oral confession as well?

MR. STUCKY:  I don't think I have gone that far.  What I am attempting to indicate is that the questions that were recorded on the tape or the answers that were recorded on the tape are the same as the answers that were given orally to the Trooper prior to starting the tape.

THE COURT:  Are you trying to get in an oral confession?

MR. STUCKY:  No, sir.  I don't believe at this hearing

we will tender.the oral confession.

THE COURT:  That's all we are concerned with at this

hearing is the taped confession.  Objection sustained, for

the purpose of this hearing and this hearing only.

MR. STUCKY:  Yes, sir.

BY MR. STUCKY:

Q.    Trooper, during this trip from Mansfield to the

State of West Virginia, were you armed?  Did you have a

weapon?

A.    Yes.

Q.    What kind of weapon did you have?

A.    A .38 snub-nose.

Q.    And where was that weapon kept during this trip?

Did you have it on your person?

A.    Part of the time.

Q.    Okay, did you have it on your person when you picked

John up from the Mansfield Reformatory?

A.    Yes.

Q.    When did you have it with you?  Did you have it

with you in the front seat when you started out of Mansfield,

Ohio?

A.    Yes.

Q.    Did there come a time when you no longer had the

weapon on your body?

A.    Yes. ˙

Q.    When was that?

A.    I placed it in the glove box in the front passenger area.

Q.    Why did you do that?

A.    Because, for -- when I got in the back seat with John, I wanted it up there in the glove box where it wouldn't be accessible to John in case something would happen.

Q.    Did you at any time threaten John with that weapon or make any mention to him of the weapon?

A.    Never.

Q.    Did Trooper Williams have a weapon on him, if you know?

A.    Yes, he did.

Q.    And was it also on his body?

A.    Yes, it was.

Q.    And what kind of weapon was that, if you know?

A.    A 9 millimeter automatic.

Q.    And where was that on his body, if you know?

A.    To the best of my memory, it was on his, kind of probably on his left or right hip area.

Q.    Was it in plain view of the Defendant and others?

A.    Not totally.   Partially.

Q.    Was it ever taken out of that position at any time

in front of the Defendant?

    A.  No.

    MR. STUCKY:  I don't have anything further of this witness, Your Honor.

    THE COURT:  All right.  Mr. McKittrick.

CROSS-EXAMINATION

BY MR. McKITTRICK:

    Q.  Trooper, when was your last day of service for the Department?

    A.  Today.

    Q.  Prior to today, when was your last day of service?

    A.  The day before.

    Q.  You worked yesterday?

    A.  Yes, sir.

    Q.  You were on duty yesterday?

    A.  No, I was relieved of duty yesterday.

    Q.  What do you mean, you were relieved of duty yesterday?

    A.  Well, I'm not sure how to answer that myself.  I don't know whether I was relieved of duty yesterday or actually working.

    Q.  Well, when you said that you were relieved of duty yesterday, what did you mean by that?

    A.  I had a -- I received a notice this week and I was

relieved of duty the day before yesterday and the day before

that.

Q.   And what was the reason that you were relieved of

duty?

A.   To prepare for an upcoming hearing concerning a

suspension before an Appeals Board.

Q.   Was there ever an internal investigation that

surrounded your activity as it related to the investigation

of either Paul Reggettz or John Moss?

A.   No, sir.

Q.   Was there ever any kind of an investigation,

excluding an internal investigation, formal internal

investigation of the State Police, surrounding your partici-

pation as an investigator of either Paul Reggettz or John

Moss' case?

MR. STUCKY:  Your Honor, I would object to that, only

if he knows the answer.

MR. McKITTRICK:  I wouldn't ask him to answer something

he doesn't know.

MR. STUCKY:  You have asked whether or not there has been

an investigation.  There could have been an investigation by

someone he doesn't know of.

MR. McKITTRICK:  He can't answer what he does not know.

THE COURT:  If he knows it of his own knowledge, he may

answer.  If he doesn't know, then quite obviously, as Mr.

McKittrick points out, he can't answer it.

THE WITNESS:  If there was, I have no knowledge of it.

BY MR. McKITTRICK:

Q.  Have you ever had an occasion to meet with a superior

who questioned your role in any manner, means or form relating

to your investigation activities of either Paul Reggettz's

case or John Moss' case?

MR. STUCKY:  Your Honor, I am going to object as being

outside the scope of direct.  When you're talking about the

Reggettz case, we are here on the Moss case, and he is only

testifying as to a statement, a limited time on October 28,

1980, and not --

MR. McKITTRICK:  (Interposing)  No, he testified that

he was assigned to this case prior to that time.  You

opened that door, and I have a right to go into it.

THE COURT:  Well, we might save time.  I think I could

probably sustain the objection and limit it to the scope,

but then I am going to permit him to call this Trooper at

a later time as his own witness, declare him hostile and open

it up.  We can save time by letting him get into it now.

The objection is overruled.

BY MR. McKITTRICK:

Q.  Go ahead.

Trooper Smith - Cross                                106

A.   Would you repeat the question?

Q.   Were you ever questioned by a superior officer
concerning your activities or your investigation of either
Paul Reggettz's case or John Moss' case?

A.   Questioned?

Q.   Questioned concerning your activities?

A.   No.

Q.   You are familiar with the investigation of Paul
Reggettz, aren't you?

A.   Yes.

Q.   In fact, I think you signed that report?  You signed
the Reggettz C.I.B. activity report?

A.   I don't think I did.

Q.   How come it is that you are familiar with it?

A.   I was one of the officers.

Q.   When you say you don't think you did, are you saying
you didn't or you don't remember it?

A.   You said it.  I was taking it you said I did.

Q.   No, I'm asking you whether you did, Mike.

A.   No.

Q.   As you said, you are familiar with it; is that
correct?

A.   Yes.

Q.   And that is a result of your investigation of the

Trooper Smith - Cross                                        107

allegations surrounding Paul Reggetz's involvement in those

three homicides; is that correct?

     A.   That is what now?

     Q.   Your familiarity with that file is as a result of

your investigation of the allegations surrounding Paul

Reggetz's involvement in those homicides; is that correct?

     A.   No.   I was assigned to assist in the investigation

the day that it was discovered or the day that the crime was

discovered.

     Q.   Okay.   So what I am saying is your familiarity with

the C.I.B. activity file on Paul Reggetz is as a result

of your investigating the case; is that right?

     A.   As to what is on file with the C.I.B. concerning

Paul Reggetz?   Is that what you are saying?

     Q.   No.   When you present an indictment to the Grand Jury,

you submit to the Prosecuting Attorney's Office of this

county a C.I.B. activity report, correct?

     A.   Yes.

     Q.   All right, and it has certain documents that reflect

physical evidence and the statements and so forth?

     A.   Yes.

     Q.   That is what I am concerned with.

     A.   Yes.

     Q.   My question to you, Mike, is you are familiar with

that C.I.B. activity report as it relates to Paul Reggettz

because you assisted in the investigation of the allegations

that Paul Reggettz committed those homicides?

    A.   Yes.

    Q.   All right, and I take it that you have been through

that many times, that file many times, not only for your

preparation here today but before today; is that correct?

    A.   That is not true.

    Q.   Have you ever been through that file?

    A.   I'm sure I have.

    Q.   How many times would you say you have?

    A.   Once or twice.

    Q.   When you told Mr. Stucky that you had been assigned

to investigate the allegations surrounding Paul Reggettz's

involvement in those homicides, the Reggettz homicides,

commonly known, when were you first assigned to that

investigation?

    A.   The day that they discovered that the crime had

occurred.

    Q.   And was that the 13th day of December, 1979?  You

can refresh your memory from the report that you have

brought here today.

    A.   I believe it is either the 13th or the 14th.  From

looking at this, it was discovered the 13th.  So that would

have been the date, the 13th day of December, 1979.

    Q.   Who assigned you to that investigation, Mike?

    A.   I would have to say the way it came about, D. L.

Lemon.

    Q.   When you were assigned to that investigation, would

you say for the next several days or weeks that your primary

activity was the investigation concerning the allegations of

Paul Reggetz's role in those homicides?

    A.   Would you repeat that again?

    MR. McKITTRICK:  Can you read it back, please?

    (WHEREUPON, the question was repeated by the Reporter.)

    THE WITNESS:  Yes.

BY MR. McKITTRICK:

    Q.   How long was that your primary activity after you

were assigned on the 13th day of December, 1979?

    A.   As far as the case, when I went on it, I worked it

for months.

    Q.   How long approximately?

    A.   Four months.

    Q.   And during that four months that was your primary

activity to work the case, the Paul Reggetz case, and it is

my understanding that you worked in association with

Trooper Terry Williams; is that correct?

    A.   Yes.

Q.   Now did you go to the Reggetz home on December 13, 1979?

A.   No.

Q.   When was the first day that you went to the Reggettz home?  Strike that.  Let me ask you this.  When was the first time that you ever met Paul Reggettz?

A.   The 13th.

Q.   The 13th of December, 1979?

A.   Yes.

Q.   Where was it that you first met Paul Reggettz?

A.   In one of the offices in the basement of the South Charleston Detachment.

Q.   What time of the day or night was that?

A.   That I met him?

Q.   Yes.

A.   Well, sometime in the afternoon.

Q.   Can you give us an approximate time?

A.   I want to say one, two o'clock, something like that, p.m.

Q.   Did you have a conversation with him on that occasion?

A.   Nothing other than to maybe introduce myself.

Q.   Who was Paul Reggettz with at that time?

A.   Trooper Woodyard.

Q. Was there anyone else there?

A. Not at that time.

Q. Do you know from your own personal knowledge how long before the time that you first saw Paul Reggetz that he was brought to the detachment there in South Charleston?

A. From the time that I saw him?

Q. How long before you first saw him, approximately one p.m., that he was brought to the detachment there in South Charleston? Do you know how long it was?

A. Not exactly, no.

Q. Can you give us an estimate?

A. I'm going to say an hour.

Q. Did you have occasion to converse with Paul Reggetz the first time that you saw him?

A. Other than to speak to him, to introduce myself, and that was it.

Q. Other than that?

A. No. The first time, you are saying?

Q. Yes.

A. No. That's it.

Q. Where specifically was Paul Reggetz at when you first saw him?

A. In one of the two offices in the basement at South Charleston.

Trooper Smith - Cross

Q. Now after you introduced yourself, did you leave the room?

A. Yes.

Q. When is the next time timewise that you saw Paul Reggettz?

A. I may have seen him. I know for a fact that I seen him around 7:30 or 7 o'clock that evening again. I could have seen him for like a minute or two.

Q. On the occasion that Paul Reggettz was in your presence at one o'clock, how long was he in your presence?

A. At one o'clock?

Q. Yes.

A. Or the approximate time, between around one and two?

Q. Yes, approximately.

A. A couple of minutes.

Q. Did you notice anything unusual about him at that time?

A. No, sir, I did not.

Q. Did he seem upset or nervous or emotional or anything like that at the time that you first saw him, met him?

A. No, sir, not to me.

Q. All right, now when you saw him at 7:30, Paul Reggettz, that is, where was he on that occasion?

A. In what we call the N.V.I. Office.

Trooper Smith - Cross                                          113

Q.   Where is that located?

A.   It is in the basement of the South Charleston.

Q.   How large is that office?

A.   Oh, I would say seven - eight feet wide and twelve - fifteen feet long.

Q.   Now between the time that you first saw Paul Reggettz at approximately one or two o'clock and the time that you saw Paul Reggettz on the second occasion at approximately 7:30 p.m., what did you, yourself, do in the interim?

A.   Between the time?

Q.   Yes.

A.   I just stayed around upstairs, really just waiting to see if anybody had anything they wanted me to do.

Q.   Now what occasion was it that you had to see Paul Reggettz at 7:30 on that evening?

A.   I had a chance to talk with him for a short period of time.

Q.   What motivated you to go talk to Paul Reggettz at 7:30 that evening?

A.   I just felt like I wanted to ask him a few questions.

Q.   Is it your testimony to His Honor that you were up-stairs waiting to see what someone wanted you to do, and you took it upon yourself to go downstairs because you wanted to ask Paul Reggettz some questions?  Is that your testimony?

A.   Yes. ·

Q.   Did you consult with any of your superiors or anyone else prior to going downstairs and talking to Paul Reggettz at approximately 7:30 on December 13, 1979?

A.   I don't recall doing that.

Q.   When you went downstairs to ask Paul Reggettz a couple of questions, as you have stated, who was there?

A.   Woodyard.  Trooper Woodyard, Howard Woodyard.

Q.   Had you, between one or two o'clock, when you first saw Paul Reggettz, and 7:30, when you secondly saw Paul Reggettz, had an opportunity to go downstairs and see whether Paul Reggettz was kept in that same room?

A.   Say between seven -- between one and two and seven?

Q.   Yes.

A.   I'm sure I had the occasion.  As to whether I did or not, you know, I can't recall.

Q.   When you went downstairs that second time to ask Reggettz some questions, when Woodyard was the only one that was present, --

A.   (Interposing)  Dr. Sopher, State Medical Examiner, was also present.

Q.   I see.  When you walked in the room, what was Dr. Sopher and Woodyard doing?

A.   They were either like one sitting, one standing, or

both sitting. .

    Q.  Were they asking Mr. Reggettz any questions?

    A.  I can't recall whether they were at that time or not.

    Q.  Was there any conversation whatsoever going on?

    A.  At that time, when I walked in?

    Q.  Correct.

    A.  I can't recall.

    Q.  When you walked in, did you introduce yourself again to Paul Reggettz?

    A.  I can't recall whether I introduced myself again or not.

    Q.  When you walked in and you observed Paul Reggettz, would you say his demeanor was approximately as it was when you saw him at approximately one or two o'clock that afternoon?

    A.  Yes, I would.

    Q.  Was there anything changed about it?

    A.  No, sir.

    Q.  And did you, Trooper Smith, have the opportunity to ask Paul Reggettz some questions that occasion at 7:30?

    A.  Yes, I did.

    Q.  How long were you there after you arrived?

    A.  You mean around 7 - 7:30?

    Q.  How long did you stay there after 7:30 when you went to see him?

A.    Twenty to thirty minutes.

Q.    And did you ask him questions by yourself all that

time?

A.    No.

Q.    Were you asking him questions along with other

people?

A.    Yes.

Q.    What did those questions concern?

A.    Mainly what he did the night before the 13th, from

around ten to one or two o'clock.

Q.    Okay, and did Mr. Reggettz at that time freely

converse with you and Dr. Sopher and Trooper Woodyard?

A.    Yes, he did.

Q.    During that twenty or thirty minutes, what did Paul

Reggettz tell you that he did?

MR. STUCKY:  Your Honor, I would object.  Number one,

it is hearsay and inadmissible at this time.

THE COURT:  I think it is.  I am going to sustain the

objection now.  I think you have the right to show, laying

a proper foundation, if what you are getting at if anybody

else confessed to the crime, I think you have got a proper

right to show that, but I don't think in this manner.

MR. McKITTRICK:  All right, let me see if I can lay a

foundation, and you may still sustain the objection, but I

will try it.

BY MR. McKITTRICK:

    Q.   Of course, as the investigating officer, as one of

the investigating officers in the Paul Reggetz case, you are

now familiar with the fact that Paul Reggetz later confessed

to the homicides of his two children and wife; is that

correct?

    A.   Yes.

    Q.   All right, and in that -- how many confessions did

he make, by the way?  How many confessions did Paul Reggetz

make?

    A.   How many confessions?

    Q.   How many separate confessions at separate times did

Paul Reggetz make?

    A.   I'm only aware of, you know, one confession.

    Q.   Were you present during that confession?

    A.   No, sir.

    Q.   Excuse me?

    A.   No, sir.

    Q.   All right, but you are aware that Paul Reggetz

confessed to those homicides?

    MR. STUCKY:  I will object to that.

    THE COURT:  Sustained.  He just finished saying he wasn't

there at the time of any confession.  I will sustain the

objection.       .

BY MR. McKITTRICK:

     Q.   Have you had an occasion as an investigating officer

surrounding the allegations of Paul Reggetz's involvement

in the homicides of the Reggetz children and his wife, have

you observed in the C.I.B. activity report a confession or

the synopsis of a confession by Paul Reggetz?

     MR. STUCKY:  Your Honor, I would object to that.  Again,

it is still hearsay.

     THE COURT:  I am going to sustain it.  You have every

right to attempt to get in a confession by another party, but

not through this witness.  He said he wasn't there during any

purported confession by Reggettz.

     MR. McKITTRICK:  I understand.

BY MR. McKITTRICK:

     Q.   After the twenty or thirty minutes that you spent

with Paul Reggetz at approximately 7:30 until ten of eight

on December 13, 1979, did you leave the room?

     A.   Yes.

     Q.   All right, when is the next time that you saw Paul

Reggettz?

     A.   I don't ever recall seeing him again.  I mean, like

I guess the next morning.

     Q.   Were you present with Paul Reggettz when he went to

the home where these homicides occurred?

    A.   Was I present when he went to the home?

    Q.   Yes.

    A.   No, I didn't go to the home.

    Q.   Is it your testimony then that after the 13th day

of December, 1979, that you never seen or talked -- you never

saw nor talked to Paul Reggettz again?

    A.   After when?

    Q.   Approximately 7:30 on the 13th day of December,

1979.

    A.   No, I said I seen him again on the morning of the

14th.

    Q.   Where did you see him at that time?

    A.   At the South Charleston Detachment.

    Q.   What time was it?

    A.   Probably 7:30 - 8 o'clock.  I don't know.

    Q.   Where was he at on that occasion?

    A.   He was at the office at South Charleston.

    Q.   Who was present with him?

    A.   Oh, numerous people.  I remember Mike Roark,

Prosecutor, myself, Trooper Williams, I believe.  I'm not

sure Woodyard was still there.

    Q.   When you were in his presence, were the individuals

that were also there questioning him about the homicides?

A.   Then?

Q.   Yes.

A.   I couldn't answer that, really.

Q.   What was going on when you were present there?

A.   They were preparing to leave the detachment with him.

Q.   With Paul Reggettz?

A.   With Paul Reggettz.

Q.   You did not go with him; is that correct?

A.   I went in another cruiser, or car.  You know, I mean
I went with them down to the area of the house, but I did not
go into the house.

Q.   You did not go in with them?

A.   No.

Q.   I see.  If you were to describe Paul Reggettz's
demeanor on that morning of the 14th, would you describe it
to us?

A.   He still seemed to be, you know, pretty much like
he was the day before that.

Q.   Was he upset or emotional?

A.   He didn't appear to be to me.

Q.   All right.  Now what investigation, if any, did you
do after the homicides occurred on or about the 13th day of
December, 1979, with regard to proving the guilt of Paul
Reggettz?

A.   On that date?

Q.   Thereafter, that day or thereafter.

A.   Questioned a lot of people.

Q.   And, of course, you know that Paul Reggettz was indicted by the Grand Jury of Kanawha County, West Virginia, for the homicides of his two children and his wife; is that correct?

A.   To the best of my recollection, he was.

Q.   Do you know how long after December 13, 1980 that the Grand Jury of Kanawha County, West Virginia, returned those indictments against Paul Reggettz?

A.   I don't recall that.

Q.   Can you approximate it?

A.   Not really.  I don't recall.

MR. McKITTRICK:  Your Honor, may I have the Court file so I can refresh the memory of this witness?

THE COURT:  Which one do you want?

MR. McKITTRICK:  If you know it, Jim, we can refresh his memory.

MR. STUCKY:  I have no idea.

THE COURT:  Here is the Court file.  If it is not in there, there is some more I will give you.

MISS LUSK:  That is the Moss file.

MR. McKITTRICK:  That is the Moss file.

Trooper Smith - Cross

THE COURT:  Oh, I don't have the Reggettz file here that I know of.  I don't think I do.  If I had it, you could look at it.

MISS LUSK:  That is the transcript for the appeal, Judge.  I have been in that file before, too.

MR. McKITTRICK:  You have the activity report, don't you?

MISS LUSK:  You need to see the indictment.  It is not in there.

THE COURT:  These are just the transcripts.

MR. STUCKY:  I can tell you when his preliminary hearing was.

THE COURT:  If you want to take a break in your cross, I will give you time to locate it.  It is 10 after 4.  If you want to see the Reggettz file, I will see that it is made available to you.  I don't have it with me right now.  No one requested it.

MR. McKITTRICK:  Judge, if you will indulge me for a moment, I may be able to find it.

(WHEREUPON, a recess was taken, after which the following proceedings were had, all parties heretofore mentioned being present.)

THE COURT:  It is obvious that your cross is going to take some more considerable time, and you have indicated you will

want, Mr. McKittrick, to have available the Reggettz file,

and I don't have it up here since it wasn't requested.  So

we are going to take our evening recess to give you an

opportunity to secure and review whatever documents you need

to in the Clerk's Office.

So we will stand in recess until 9:30 tomorrow morning.

Before we do, Trooper, I might admonish you not to

discuss your testimony in chief or your partial cross-

examination with any other witness, any other person, or any

member of the Prosecuting Attorney's Office; and, for that

matter, I don't want you discussing it with anybody.

All right, we will stand in recess until 9:30 a.m.,

tomorrow morning.

MR. STUCKY:  Thank you, Your Honor.

(Witness stood aside.)

(WHEREUPON, at 4:20 p.m., the hearing was recessed until

9:30 a.m., Saturday, September 25, 1982.)

- 0 -