**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 21**
**(CONTINUATION, pp. 124 - 265)**

IN THE CIRCUIT COURT OF KANAWHA COUNTY

WEST VIRGINIA

IN THE INTERST OF:                    )
                                      )
JOHN MOSS, JR., also known as         )    JUV-80-775, 776, 777
JOHN MOSS, III, a Child Under         )
the Age of 18 Years                   )    TRANSFER HEARING


BEFORE:   HONORABLE JOHN HEY,

Judge

FEB - 9 1987

APPEARANCES:

CLERK OF THE
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

FOR THE STATE:  Mr. James C. Stucky and Miss Neva Lusk,

Assistant Prosecuting Attorneys for Kanawha County.

FOR THE JUVENILE:  The Juvenile, Mr. John Moss, Jr.,

also known as John Moss, III, was present in person, and

represented by Mr. Parrish McKittrick and Mr. Harry C. Taylor,

II, Attorneys at Law, his counsel.

MR. M. JOSEPH THOMAS, Attorney at Law, counsel for

the witness, Paul Reggettz, III.

                          Basil J. Ferrebee
                          Official Reporter



<u>SECOND DAY</u>

(BE IT REMEMBERED that heretofore, to-wit, on Saturday, the 25th day of September, 1982, during the September, 1982 Term of said Court, in the matter of In the Interest of John Moss, Jr., also known as John Moss, III, Juvenile Petition Nos. JUV-80-775, 776 and 777, as stated in the caption hereto, the following transpired:)

THE COURT:  What are we waiting for?  Get Trooper Smith out here.

MR. McKITTRICK:  We have served Paul Reggettz.

THE COURT:  He is out there.

MR. McKITTRICK:  And one of his lawyers, Joe Thomas, called me, and he was going to come up here today and wanted to know whether or not there was any way we could stipulate --

THE COURT:  (Interposing)  There is Joe Thomas right there.

MR. McKITTRICK:  -- any way we could stipulate the confessions into evidence and save us a great deal of time.

THE COURT:  Those confessions?  All of them?

MR. McKITTRICK:  No, just Reggettz.  We will put them in anyway.

MR. STUCKY:  I guess are you asking merely if we can put in the --

MR. McKITTRICK:  (Interposing)  The activites.  You know,

there is about three activities of a police officer.  If we can stipulate that that is a reflection of what he would testify to, then we wouldn't have to put him on the stand.

MR. STUCKY:  I would have to see the activities that you are referring to and confer with the police.

MR. McKITTRICK:  Your Honor, can we have a couple of seconds?

THE COURT:  Yes, go ahead.

(WHEREUPON, a discussion was held off the record.)

(THEREUPON, counsel approached the Bench and the following discussion was had at the Bench, within the hearing of the Defendant.)

MR. STUCKY:  Your Honor, the State takes the position that these activity reports or the testimony of a police officer about these activities --

MR. McKITTRICK:  (Interposing)  You had better preface your remarks, because the record doesn't know what we are addressing.

MR. STUCKY:  Mr. McKittrick handed to me a D.P.S. Form #79, which is a waiver of rights and advice of rights form.  It was apparently given to Paul Reggettz at the South Charleston State Police Detachment on November 7, 1980, along with a statement of Paul Reggettz, statement taken by Trooper H. F. Woodyard on Thursday, December 13, 1979,

approximately 1:40 p.m., South Charleston Detachment; also, a report that is styled "The following is an account of what was discussed with the accused when interviewed by Trooper M. D. Smith in the presences of Trooper H. F. Woodyard and Doctor I. M. Sopher."; also, a report styled "The following is a summarized account of the oral confession of Paul Reggettz, III, as it was related to Trooper H. F. Woodyard on December 14, 1979, at approximately 2:30 A.M., by the accused, Paul Reggettz, III."

MR. McKITTRICK:  I think that is the same thing.

MR. STUCKY:  And then there is a handwritten summarized account of oral confession; then there is also "The following is a summarized account of the oral confession of Paul Reggettz as related to the undersigned officer in the presence of Trooper S. P. McGowan, Trooper T. Williams and Kanawha County Prosecuting Attorney, James E. Roark.  These statements were made at 7027 Chesapeake Avenue, St. Albans, West Virginia, the residence of the accused, Paul Reggettz, on Friday, December 14, 1979."

I think that is the total list of the documents that have been handed to me by Mr. McKittrick.

Your Honor, it is the State's position that to introduce these documents or to have the troopers, the State Policemen, testify as to what Paul Reggettz told them would be

inadmissible in this hearing of John Moss for the simple
reason that it is in fact a hearsay, would be pure hearsay
testimony, that being the only reason that a statement of
an accused is admissible in a court of law is because it is
a statement against interest.  This statement, or these
statements, are not against the interest of John Moss or
anything else.

Mr. McKittrick has advised the Court that Mr. Reggettz
is in fact present today, and Mr. Reggettz is the person who
should testify before this Court of what in fact he said
about this crime, if in fact he said anything.  Then if his
testimony is contrary to what was said in these documents,
then I think Mr. McKittrick would be entitled to impeach or
to question the express statements that Mr. Reggettz would
say with the testimony of the State Policemen; but to put the
cart before the horse, I don't think that is proper.

Now I understand that the Moss decision says that it
was improper for the Court to not hear testimony about someone
else committing the crime, but I don't think they throw the
rules of evidence out the window when they say that.

MR. McKITTRICK:  Of course, Your Honor, there have been
several cases of which I can't bring to mind right now, and
in fact it is commented on in the Moss case, that says that a
transfer hearing is open to hearsay.  This Court can be

receptive to the adducement of hearsay before the Court.

THE COURT: I think the State's position is meritorious. Syllabus Point 2 in the <u>Moss</u> decision refers to the original transfer hearing and says, "The accused is entitled"-- the accused emphasized; I emphasize it -- "to rebut the State's proof of probable cause at a preliminary or transfer hearing by showing that he was not the person who committed the crime."

I think you have every right to put Mr. Reggettz on to rebut the State's position and to attempt to show that there was someone other than Mr. Moss who committed the crime.

MR. McKITTRICK: All right, at this juncture in the hearing, Your Honor, I did not come before the Court to adduce these as evidence. What I did was I tried to convenience counsel for Mr. Reggettz, Joseph Thomas, who has come up here this morning, and ask the State to enter into a stipulation that the documents that were enumerated by Mr. Stucky would merely reflect the testimony of Mr. Reggettz with regard to what he said to the troopers that are involved.

Now if you don't want to accept that stipulation, that's fine. I will have to make a record, however, and I will. I understand the State is not willing to do that.

MR. STUCKY: Your Honor, again, I don't think it is admissible evidence and I don't know what Mr. Reggettz is

going to say.

THE COURT:  Getting down to the bottom line of it, you oppose the stipulation.  Is that your position?

MR. McKITTRICK:  Yes, that is it.

MR. STUCKY:  I don't think the State is in any position to accept the stipulation.

THE COURT:  Then you oppose the stipulation.  It is not stipulated.  You would put on your evidence as you would normally put it on.

Are you ready for Smith?

MR. STUCKY:  Yes, sir.

THE COURT:  Bring out Trooper Smith, please.

(WHEREUPON, the discussion at the Bench ended, and the proceedings resumed.)

THE COURT:  Do you have any objection to the Courthouse janitor sitting in the Courtroom?

MR. McKITTRICK:  No, Judge.  He is a personal friend of mine, and I don't have any objection to that.

THE COURT:  All right, I want it on the record, no objection by the defense counsel.

MR. STUCKY:  Your Honor, I think you need to make inquiry of the Defendant himself.  He is entitled to the privacy.

THE COURT:  I want to hear it from him.  Mr. Moss, do you have any objection?

THE DEFENDANT:  No.

THE COURT:  All right.

MR. STUCKY:  Your Honor, in light of Mr. Thomas being present before the Court, the State is agreeable to allowing Mr. Reggettz to testify out of turn at this point.  The State again still feels that the stipulation is not proper; and in the interest of justice, in case the appellate body wants to review that testimony of Mr. Reggettz, then I believe the Court may want to see the demeanor of the witness that comes before the Court; but the State is willing to allow him to break Trooper Smith's testimony and allow him to take the stand at this point in the Defendant's case to attempt to rebut the State's expected testimony, I assume, for this transfer hearing.

THE COURT:  Mr. McKittrick, is that a fair representation?

MR. McKITTRICK:  I apologize to Your Honor.  I did not hear the representation.

THE COURT:  I know you didn't.  You were doing something else.

MR. McKITTRICK:  I was trying to expedite this matter to convenience Mr. Thomas and this Court.

THE COURT:  It doesn't bother the Court.  It is no inconvenience to me.  This is a very serious matter.  We will

stay here all day if we have to and all day Monday and Monday

night if we have to.

MR. McKITTRICK:  What was the representation, to save

time?

MR. STUCKY:  I simply stated on the record the State is

willing to allow Mr. Reggettz to testify out of turn now in

an attempt on your part to rebut the upcoming testimony

or the expected testimony of the transfer hearing.

MR. McKITTRICK:  That is correct.

THE COURT:  In other words, the defense counsel wants

to put Mr. Reggettz on out of turn and interrupt the cross-

examination of Trooper Smith for the purpose of attempting

to rebut what the State expects to present or to prove

against your client.  You want to put Reggettz on now to

attempt to rebut what you expect the State to offer in the

probable cause hearing against your client; is that correct?

MR. McKITTRICK:  We want to rebut the State's burden

of proof of probable cause by the witness we are going to

present to the Court.

THE COURT:  The State's burden on probable cause which

you expect them to offer, which they have not yet offered?

MR. McKITTRICK:  That is correct.

THE COURT:  So the record is clear, you are calling this

witness as a defense witness out of turn before the State has

completed their case in chief?

MR. McKITTRICK:  That is correct.

THE COURT:  All right, Trooper, go have a seat nextdoor now.

MR. McKITTRICK:  Judge, we would need about five minutes. I am going to have him look those documents over and run them off so we can present them, and he is going to admit he said those things and I am going to leave him.

THE COURT:  Let him do it back in the hallway or back here.  I don't want him to do it in here.

MR. McKITTRICK:  That is what he is doing now.

THE COURT:  All right, you've got a five-minute recess.

(WHEREUPON, a recess was taken, after which the following proceedings were had, all parties heretofore mentioned being present.)

(WHEREUPON, the statements previously referred to and an order dated April 30, 1980, were marked for identification as Defendant's Exhibits Nos. 1 through 6.)

THE COURT:  All right, show the resumption of these proceedings, the Defendant being present with counsel, the State of West Virginia by her Assistant Prosecuting Attorneys.

All right, Mr. McKittrick.

MR. McKITTRICK:  The Defendant moves the introduction of Exhibit No. 6, without objection by the State, Your Honor.

THE COURT:  Are you moving for its identification and into evidence?

MR. McKITTRICK:  Yes.

THE COURT:  Is there any objection?

MR. STUCKY:  No objection to Defendant's Exhibit No. 6, Your Honor.  I don't know how we got Defendant's Nos. 1 through 5.  You have just done those ahead of time?

MR. McKITTRICK:  Yes, to make it go faster.

MR. STUCKY:  There are five documents.

THE COURT:  That haven't been introduced yet.

MR. STUCKY:  That are marked.

THE COURT:  He is just trying to save time.  It may not be No. 6 when it goes in if I don't let the others in.

MR. STUCKY:  For identification purposes, I guess it is No. 6.

MR. McKITTRICK:  Right.

THE COURT:  Let's have it for identification purposes only as Defendant's Exhibit No. 6, without objection by the State.

All right, is Reggettz ready?  Are we ready?

MR. McKITTRICK:  Yes, Your Honor.

MR. THOMAS:  Do you want Paul?

MR. McKITTRICK:  Yes.

THE COURT:  All right, let's go.  Swear the witness.

(Witness sworn.)

(Thereupon, PAUL REGGETTZ, III, was called as a witness in behalf of the Defendant, and, having been first duly sworn to tell the truth, testified as follows:)

THE COURT:  Identify the witness, and then I want you to stop.

### DIRECT EXAMINATION

BY MR. McKITTRICK:

Q.   State your full name, please, sir.

A.   My name is Paul Reggettz, III.

THE COURT:  Mr. Reggettz, before you proffer any testimony, let me advise you that whatever you say, you have a Fifth Amendment right not to testify.  Whatever you say can and will be used against you in a court of law.  I must further advise you that on a prior date you were indicted on three counts of murder, Felony Indictment No. CR-80-F-121.  I have the order in front of me which nolled those indictments entered on the 27th day of February, 1981, and a reading of the order indicates to me that they were not dismissed with prejudice, which means anything you say under oath on this witness stand can and will be used against you in a court of law.  You have the right to refuse to testify.

I also notice your attorney, Mr. Thomas, is present in the Courtroom.  Have you had ample opportunity to discuss with

Mr. Thomas your Fifth Amendment rights and your right to refuse to testify?

THE WITNESS:  Yes, sir.

THE COURT:  And has he explained to you, as I just have, that anything you say can and will be used against you in a court of law?

THE WITNESS:  Yes, sir.

THE COURT:  Is it your desire to invoke your Fifth Amendment rights, or do you waive your Fifth Amendment rights and voluntarily testify?

THE WITNESS:  I waive my Fifth Amendment rights and voluntarily testify.

THE COURT:  Mr. Reggettz, you fully understand your Fifth Amendment rights I have just explained to you?

THE WITNESS:  Yes, sir.

MR. STUCKY:  Your Honor, may we ask Mr. Thomas to place on the record the extent of his conversations and advice of the Fifth Amendment rights, also?

THE COURT:  Yes.  Mr. Thomas, would you please?

MR. THOMAS:  Judge, I gave Mr. Reggettz the same advice just given by the Court, that --

THE COURT:  (Interposing)  For the record, your full name is Joseph Thomas?

MR. THOMAS:  Yes.  I advised him that the nolle order

entered by the State in  his indictment was without prejudice

and that conceivably at a later date he could be reindicted

by a Grand Jury and charged with crimes again, and that if

that be so, then things that he said today could be used

against him at a later date.

    That is basically it, and then I discussed with Mr.

Reggettz the pros and cons and knowing in advance as to what

the substance of his testimony will be today, he will not be

inculpating himself in any wise.

    THE COURT:  Did you explain to him if he waives his

Fifth Amendment rights he subjects himself to cross-examination

by the State?

    MR. THOMAS:  Yes.

    THE COURT:  And do you feel he clearly understands and

intelligently understands your explanation to him of his

Fifth Amendment rights?

    MR. THOMAS:  Yes, Your Honor.

    THE COURT:  Understanding that, then was it still his

desire to waive them after consulting with you and he agreed

to testify?

    MR. THOMAS:  Yes.

    THE COURT:  All right, thank you very much.

BY MR. McKITTRICK:

    Q.  Mr. Reggettz, what is your age, sir?

Mr. Reggettz - Direct

A.    I'm thirty-eight.

Q.    Where do you presently reside?

A.    6716 MacCorkle Avenue, St. Albans.

Q.    Prior to December 13, 1979, were you married, sir?

A.    Yes, sir.

Q.    To whom?

A.    Vanessa Reggettz.

Q.    Was there two children born as a result of that marriage?

A.    Yes, sir.

Q.    And what were their names, sir?

A.    Paul Eric and Bernadette.

Q.    On the 13th day of December, 1979, did you have occasion to go to your home and find your wife and children there?

A.    Yes, sir.

Q.    And as best you could determine, were they deceased?

A.    Yes, sir.

Q.    Now after the 13th day of December, 1979, did an investigation ensue by the West Virginia Department of Public Safety into who was the suspect that committed the homicides upon your children and your wife?

A.    Yes, sir.

Q.    And did you become a suspect in that investigation?

A.   Yes, sir.

Q.   During that investigation, did you have occasion to talk to several troopers of the Department of Public Safety?

A.   Yes, sir.

Q.   And either shortly after or a couple of months after the investigation started into the homicides of your children and your wife, were you indicted by the January Term of the Kanawha County Grand Jury?

A.   Well, I'm not sure the date.  I guess it was January, but I was indicted, yes.

Q.   In any event, it is a fair statement to say there were three indictments returned by the Kanawha County Grand Jury against you for the homicides of your children and your wife; is that correct, sir?

A.   Yes, sir.

Q.   Now during the investigation of the West Virginia Department of Public Safety, you had occasion to speak with several troopers; is that correct?

A.   Yes, sir.

Q.   And I believe that you remember by name one trooper by the name of Woodyard?

A.   Yes, sir.

Q.   Let me hand you what has been marked for identification purposes as Defendant's Exhibit No. 1 and ask you to look

that over carefully, Mr. Reggettz, and tell us if that is a

fair reflection of your conversations with Trooper Woodyard on

that date.

    MR. STUCKY:  For the record, first, could you identify to

us what No. 1 is, which document?

    MR. McKITTRICK:  Paul, let me see it just a second.

BY MR. McKITTRICK:

    Q.   Is the answer to my question yes, Mr. Reggettz?

    A.   Well, I haven't read all of it.  Yes, it looks like

what I told him, to the best of my memory.

    MR. McKITTRICK:  Your Honor, we would move the introduc-

tion of that document into evidence.

    THE COURT:  As what?

    MR. McKITTRICK:  I'm sorry?

    THE COURT:  As what?

    MR. McKITTRICK:  Defendant's Exhibit No. 1.

    THE COURT:  Is there any objection?

    MR. McKITTRICK:  Let me hand you --

    THE COURT:  (Interposing)  Wait a minute.  Wait a minute.

    MR. STUCKY:  Your Honor, the State doesn't have any

objection to the introduction of what is said in the statement.

I think, however, for defense counsel merely to ask him if

these are accurate and submit them without getting into what

they say may be some problem as far as cross-examination and

things of that nature.

THE COURT: Where is the problem if it is admitted in evidence? You can certainly impeach him or attempt to impeach him on anything in that document. Doesn't the document speak for itself?

MR. STUCKY: Your Honor, the document, however, is hearsay as to what the Trooper was told by Mr. Reggettz.

THE COURT: All right, then you are objecting to the introduction.

Lay your foundation and go through the document. I would like to move this thing along. At the rate we are going, we will be here until Christmas.

MR. STUCKY: Your Honor, to expedite this matter, the State would withdraw its objection to the introduction of No. 1.

THE COURT: With the understanding that I believe counsel for the Defendant would agree the document speaks for itself and he can impeach him on that document and any statements contained therein; is that not correct, Mr. McKittrick?

MR. McKITTRICK: That is correct, Your Honor.

(WHEREUPON, Defendant's Exhibit No. 1 was received into evidence.)

BY MR. McKITTRICK:

Q. Mr. Reggettz, let me hand you what has been marked

for identification purposes as Defendant's Exhibit No. 2, and

I will ask you to look that over carefully, read it, if you

will, and tell us --

    MR. STUCKY:  (Interposing)  Which one is that?

    MR. McKITTRICK:  The one with Dr. Sopher.

BY MR. McKITTRICK:

    Q.  And tell us if that is a clear and true reflection

of what you said and what you did with the Trooper and Dr.

Sopher at that time.

    THE COURT:  To save time, before you hand him the next

one, show it to the State so they will know what you are going

to hand him.

BY MR. McKITTRICK:

    Q.  Is the answer to the last question I asked you,

Paul, yes then, sir?

    A.  To the best of my memory.

    MR. McKITTRICK:  We would move the introduction of

Defendant's Exhibit 2, Your Honor.

    MR. STUCKY:  Your Honor, before the introduction of

Defendant's Exhibit No. 2, there appears no date or title,

and I would like to elicit some testimony of when and where

this statement was taken, what it accurately reflects, what

conversations, when and where.

    MR. McKITTRICK:  Your Honor, I think if there isn't a

143

date and there is not a time on there, and I think that the

testimony of Trooper Smith, referring to this conversation,

was that it was 7:30 on December 13, 1980, and I can have him

identify it when he comes back on cross and introduce it at

that time if you like.

MR. STUCKY:  Your Honor, there is no -- there has been

no testimony that this is the same conversation or that there

was only one conversation with Mike Smith, Dr. Sopher and

Trooper Woodyard.

THE COURT:  He has just said he will withhold attempting

to introduce it until you put Smith back on the stand and he

will attempt to corroborate through Smith the time and date.

So he is withholding his attempt to put it now into evidence.

It is simply going to be marked or identified as Defendant's

Exhibit No. 2 at this time.

MR. STUCKY:  All right.

BY MR. McKITTRICK:

Q.  All right, now, Paul, let me hand you what has been

marked for identification purposes as Defendant's Exhibit 3

and ask you to look that over carefully and read it, if you

will.

Paul, is Defendant's Exhibit No. 3 a true reflection of

what you said and what you did with those representatives

of the West Virginia Department of Public Safety on the date

and time stated in that document?

    A.   To the best of my memory, except for one thing.   I
don't remember saying this.

    Q.   Where is that located in the document, Paul?

    A.   It says, "He said he then untied the cord from his
hands."  As far as I remember, you know, most of it I
remember I told those people, but I don't remember saying
that.

    MR. McKITTRICK:  Okay, Your Honor, we would move the
introduction with that amendment into evidence of Defendant's
Exhibit No. 3.

    THE COURT:  Any objection?

    MR. STUCKY:  Where is that amendment?  Could you point
it out?

BY MR. McKITTRICK:

    Q.   Let me hand you, Mr. Reggettz, Defendant's Exhibit
3 and ask you to look at Page 4.  Is the amendment you talked
about with regard to what you cannot remember that you said
on Page 4 and the next to the last paragraph?  And, if you
may, read that into the record, sir.

    A.   It says, "He said he then untied the cords from his
hands."  To the best of my memory, I don't remember saying
that.

    MR. STUCKY:  Your Honor, with that amendment, no objection.

THE COURT:  It will be introduced in evidence and marked as Defendant's Exhibit No. 3, as amended, without objection.

(WHEREUPON, Defendant's Exhibit No. 3 was received into evidence.)

BY MR. McKITTRICK:

Q.  Mr. Reggettz, let me hand you what has been marked for identification purposes as Defendant's Exhibit No. 4.  I will ask you to look that over carefully, read it, if you will, and tell us if that is a true reflection of what you did and what you said to those representatives of the Department of Public Safety on the date and time stated in that document.

Is the answer to my last question yes, Paul?

A.  Part of this I don't remember saying, you know, part of my memory.  I'm not sure about it, that I even said part of this.  I mean it says --

Q.  (Interposing)  All right, let me ask you this question:  Are you telling the Court that you don't remember saying them, or are you saying that you didn't say them?

A.  No.  I don't remember.  I'm saying most of them, I remember saying, but I would say part of them, I don't remember whether I did or not.  That's what I was saying.  I don't know.  I don't remember.  There is one about reaching in to get -- it says "... reached into the television room and grabbed an extension cord..."  I'm not sure if I remember

Mr. Reggettz - Direct

saying that or not.  I don't remember.

    Q.   What page is that on, Paul?

    A.   Page 2.  It's not whether or not I did or not.  It's I just don't remember.  I remember, you know, most of it, but I don't remember that.  Just parts of it I don't remember.  I can't say I did.

    Q.   Other than that specific part that you pointed out in Defendant's Exhibit 4 that you just don't remember whether or not you said it, are there any other parts that you don't remember whether or not you said it, or are all the other parts --

    A.   (Interposing)  I think that's the only one I can think of.  I'm not for sure.

    MR. McKITTRICK:  We move the introduction of Defendant's Exhibit No. 4 with that amendment.

    MR. STUCKY:  No objection.

    THE COURT:  All right, it will be introduced into evidence without objection as amended and marked Defendant's Exhibit No. 4.

    (WHEREUPON, Defendant's Exhibit No. 4 was received into evidence.)

BY MR. McKITTRICK:

    Q.   Mr. Reggettz, let me hand you what has been marked for identification purposes as Defendant's Exhibit No. 5.

I will ask you to look that over carefully, read it, if you will, and after you have read it, tell us whether that is a true reflection of what you said and did to those members of the West Virginia Department of Public Safety on the date and time stated in that document.

Paul, is the answer to my last question yes?

A.   Well, there is another one here that says "... said he couldn't remember how he got the cord..."  Now it said something about radio cord.  I'm not for sure I said it. Again, I'm not saying I didn't say it; I'm just saying I don't remember it.  I'm not sure of that.

Q.   Can you point that out on that document, where it is located?

A.   About half-way down.

Q.   On the first page?

A.   Yes.

Q.   Of Defendant's Exhibit 5?

A.   Yes.  It says, "He said he then grabbed the radio cord which was attached to the radio at the foot of the bed on the floor."  I'm not saying I didn't say it; I'm saying I don't remember it.  I'm not sure memory-wise.

Q.   Other than that statement, I take it that the remainder of the Defendant's Exhibit No. 4 is a true reflection of what you did and said to those representatives of the

Department of Public Safety; is that correct?

    A.   That's right.

    MR. McKITTRICK:  I move the introduction of Defendant's Exhibit 5 subject to that amendment.

    THE COURT:  Any objection?

    MR. STUCKY:  No, Your Honor.

    THE COURT:  It will be introduced into evidence without objection as amended and marked as Defendant's Exhibit No. 5.

    (WHEREUPON, Defendant's Exhibit No. 5 was received into evidence.)

    MR. McKITTRICK:  Your Honor, could you indulge me for just one second?

    That's all the questions I have, Your Honor.

    THE COURT:  All right, Mr. Stucky.

CROSS-EXAMINATION

BY MR. STUCKY:

    Q.  Mr. Reggetz, you have stated to Mr. McKittrick that you remember saying the things that are written here in Defendant's Exhibit No. 3, except for on Page 4, you don't remember saying "He said he then untied the cords from his hands." Is that correct?

    A.   That is correct.

    Q.  All right, I will give you that.

    THE COURT:  Is that No. 3 you are working on?

Mr. Reggettz - Cross

MR. STUCKY:   That is No. 3, Your Honor.

BY MR. STUCKY:

Q.   Are the statements that you made and that are written down here in Defendant's Exhibit No. 3 that you remember saying that relate to your killing your wife and two children, are they true?

A.   No, sir.

Q.   I will give you Defendant's Exhibit No. 4.   Again, I believe you stated that you remember making the statements in this written document, except that you did not remember on Page 2 the statement that "he then reached into the television room and grabbed an extension cord that was lying just inside the door."  Is that correct?

A.   Yes, sir.

Q.   You remember making these statments.  I also again ask you as to Defendant's Exhibit No. 4, are the statements relating to your actions in killing your wife and two children true?

A.   No, sir.

Q.   As to Defendant's Exhibit No. 5, I believe you told Mr. McKittrick that you recognized or remembered giving all the statements except the middle of the first page, the statement "He said he then grabbed the radio cord which was attached to the radio at the foot of the bed on the floor."  Is that

correct?

    A.   Yes, sir.

    Q.   I hand you that document and ask you again as to the statements with regard to your activities in killing your wife and two children, are these statements true?

    A.   No, sir.

    Q.   Mr. Reggettz, did you, on the 13th day of December, 1979, kill or cause to be killed Bernadette Reggettz?

    A.   No, sir.

    Q.   Did you, on the 13th day of December, 1979, kill or cause to be killed Vanessa Reggettz?

    A.   No, sir.  No, sir.

    Q.   Mr. Reggettz, did you, on the 13th day of December, 1979, kill or cause to be killed Paul Eric Reggettz?

    A.   No, sir.  No, sir.

    MR. STUCKY:  I have no other questions, Your Honor.

    MR. McKITTRICK:  I have no other questions, Your Honor.

    THE COURT:  All right, Mr. Reggettz, thank you.  You may step down.

    (Witness stood aside.)

    THE COURT:  Mr. Thomas, let me see you for just a second.

    (WHEREUPON, a discussion was held off the record.)

    THE COURT:  All right, thanks for coming in, Joe.

MR. THOMAS: Yes, sir, Your Honor.

(WHEREUPON, at this point in the proceedings, Mr. Thomas, counsel for the Witness Reggettz, was excused from the proceedings.)

THE COURT: All right, Trooper Smith. You want Trooper Smith back out here.

THE CLERK: You are still under oath, Mr. Smith.

(Thereupon, TROOPER MICHAEL DON SMITH, a witness in behalf of the State, having been previously duly called and sworn, resumed the stand and testified as follows:)

CROSS-EXAMINATION (Cont'd.)

BY MR. McKITTRICK:

Q. Your name is Trooper Smith?

A. Yes.

Q. You testified yesterday?

A. Yes, I did.

Q. You realize you are still under oath?

A. Yes.

Q. Mr. Smith, in your testimony, either on direct or cross-examination, -- I believe it was on cross-examination -- you indicated that on the 13th day of December, 1979, at approximately 7:30 p.m., you were in a room with Dr. Sopher and Trooper Woodyard and Paul Reggettz; is that correct?

A. Yes.

Q.   Now is that the only time on the 13th day of December,
1979, that you and Dr. Sopher and Woodyard were in the same
room with Paul Reggettz questioning him?

A.   The three of us?

Q.   Yes, sir.

A.   Yes.

Q.   Let me hand you what has been marked for identifica-
tion purposes as Defendant's Exhibit No. 3 and ask you if
that is a true reflection of what went on at that meeting at
7:30 on the 13th day of December, 1979, that you described?
Just read that over carefully, if you would.

Is the answer to that question yes?

A.   Would you repeat the question?

Q.   Is that a -- is Defendant's Exhibit 3 a true
reflection of what went on at approximately 7:30 on the 13th
day of December, 1979, in your meeting with Dr. Sopher,
Trooper Woodyard and Paul Reggettz?

A.   At that time?

Q.   Yes, sir.

A.   No.

Q.   It is not?

A.   I never heard any of this stuff then, no.

MR. McKITTRICK:   I think I've got the wrong one.

THE COURT:   Obviously.

MR. STUCKY:  No. 2.

MR. McKITTRICK:  Let the record show that counsel for the
Defendant made a mistake.

THE COURT:  Inadvertently picked up the wrong document.

MR. McKITTRICK:  Thank you, Your Honor, for coming to
my defense for ignorance.

THE COURT:  That's all right, sir.

MR. McKITTRICK:  I have handed the Witness Exhibit
No. 3, Defendant's Exhibit 3, which has already been intro-
duced into evidence without objection.

BY MR. McKITTRICK:    .

Q.    I'm sorry, Trooper Smith, would you look at what I
just handed you, which has been marked for identification
purposes as Defendant's Exhibit No. 2, which I believe
purports to be a meeting where Dr. Sopher, Trooper Woodyard
was present, along with you and Paul Reggettz, and I will ask
you again whether that is a true reflection of what occurred
in that meeting?

Is the answer to that question yes?

A.    Is that a true account?

Q.    Yes.

A.    There is a mistake about the time.

Q.    The time.  What kind of a mistake?

A.    Towards the end, on the last page, it says 1:40 p.m.,

Trooper Smith - Cross                                                    154

Eastern Standard Time.

    Q.  Yes.

    A.  That is a mistake here.  The 1:40 is a mistake,

because this took place around 7 - 7:30 that evening, not at

1:40.

    Q.  Other than that amendment, is that a true reflection

of what occurred?

    A.  Yes, it is.

    THE COURT:  Is that No. 3?

    MR. McKITTRICK:  Yes.  No, No. 2, Your Honor.  We now

move the introduction of No. 2 into evidence.

    MR. STUCKY:  Your Honor, I am going to object to that on

the basis of relevancy.  The contents of this statement, as

best I can tell, and maybe Trooper Smith can explain a little

bit better, has nothing to do whatsoever with the occurrences

on December 13th.

    THE COURT:  Well, since I haven't been provided a copy

of it, I don't know what it says.

    What probative value does this have?

    MR. McKITTRICK:  Firstly, Your Honor, I think that I would

say, firstly, and I am not trying to evade the Court's

question, because I will answer it if the Court wants me to

continue, but I believe that counsel for the State has waived

any objections to this document at this time, for the only

155

thing that Trooper Smith was supposed to do was to state the time and the date and that it was a true reflection of what occurred, and there was no objection when it was introduced. There was no objection at that time, and I think that was the representation made by the State to the Court; and now there is an objection on the record.

THE COURT:  I don't find the State has waived their objections.  Now my question is what probative value does it have?

MR. McKITTRICK:  Your Honor, that is a reflection of what Paul Reggettz did on the night that the homicides occurred. We believe the evidence that will come in by the State's own witnesses will indicate that Paul Reggettz was present when the homicides occurred.

THE COURT:  Well, if you are attempting to use this -- if you are attempting to use this --

MR. McKITTRICK:  (Interposing)  To rebut probable cause again.

THE COURT:  To rebut probable cause and to show that your client was not the person that committed the crime, I am going to allow it in for whatever it is worth over the State's objections, if that is the purpose of it, to attempt to show another person committed the crimes.  I am going to admit it. I think it is clear under Syllabus Point Two in the Moss

Trooper Smith - Cross

holding, but it is in over the objections of the State.

(WHEREUPON, Defendant's Exhibit No. 2 was received into evidence.)

BY MR. McKITTRICK:

Q.   Trooper Smith, I want to hand you Defendant's Exhibit No. 6, which is a reflection that Paul Reggettz -- I want to continue my questioning from yesterday now -- it is a reflection that Paul Reggettz was indicted in the latter part of April, 1980, by the January Term of the Kanawha County Grand Jury.  Does that refresh your memory?  Does it assist you in approximating the date?

A.   Yes, somewhat.  Somewhat.

Q.   Mike, did you appear before that Grand Jury that indicted Paul Reggettz and testify?

A.   I don't recall being there.

Q.   In any event, after your assignment to investigate the allegations that Paul Reggettz may be a suspect in the homicides of the two Reggettz children and Vanessa Reggettz until the Grand Jury indicted Paul in the latter part of April, 1930 -- or 1980 -- what is the first thing that you did in your investigation?  What is the first thing that you did after you were assigned on December 13, 1979?  What is the first thing you did?

A.   What is the first thing I did?

Trooper Smith - Cross

Q.   Yes.  You have an activity report that you go by that reflects what you did in your investigation, do you not?

A.   I guess it would be the exhibit we looked at a little bit ago where I interviewed Mr. Reggettz.

Q.   Now on the 14th day of December, you have indicated to us that your primary job thereafter was to investigate the Paul Reggettz case; is that correct?

A.   Yes.

Q.   Now as best you can, in chronological order, what is the next thing that you did to investigate Paul Reggettz case?

A.   I remember going over to the Medical Examiner's Office and viewing the parts of the autopsies.

Q.   When was that?

A.   Seems like it was that day, but it could have been the next day.  It could have been the 15th.

Q.   Was Dr. Sopher assisting the State in the investigation of these homicides?

A.   Yes.

Q.   Excuse me?

A.   Yes.

Q.   And I take it that you had conversations with Dr. Sopher, just as you had with other troopers, concerning this

Trooper Smith - Cross

investigation; is that correct?

    A.    Yes.

    Q.    Did you have a conversation with Dr. Sopher concerning

the time of death of the Reggettz Children and Mrs. Reggettz?

    A.    I'm sure I did.

    Q.    Do you remember the essence of that conversation

at this time?

    MR. STUCKY:   Your Honor, the State is going to object

to this line of questioning.   The John Moss recent Supreme

Court case states, as the Court is well aware, that the

defense can rebut the State's proof of probable cause by

showing that another person committed the crime and such

evidence should show that the Defendant could not have

committed the crime.

    Now the time of death, if it is going to be introduced

here, I don't see how that is to rebut our probable cause

with this witness when we haven't even put our probable cause

on; and until we put our probable cause on, Trooper Smith

testified merely to the voluntariness of the statement

that was taken.   The statement hasn't been introduced.   The

Court has allowed Mr. McKittrick great latitude from the

beginning in order to save time, but he is trying to rebut

evidence that hasn't been before the Court yet, and this may

or may not be admissible once the evidence is before the Court.

Trooper Smith - Cross

THE COURT:  I think that is probable right.  I am going to sustain it at this point, but I want the record to clearly reflect I am not going to limit you in any way to attempt to rebut the State's evidence on probable cause, but the probable cause evidence has not, I think, as Mr. Stucky states, been introduced yet.  The only thing this witness testified to is that Reggettz gave him the statement, and --

MR. McKITTRICK:  (Interposing)  Your Honor, could I argue this outside the presence of the witness to the Court?

THE COURT:  Step over there nextdoor until we call you.

(WHEREUPON, at this point in the proceedings, the witness left the Courtroom, and the following proceedings were heard outside the presence and hearing of the witness.)

MR. McKITTRICK:  Your Honor, respectfully, I would say to the Court that the decision of the Supreme Court In the Interest of John Moss not only indicated that the Defendant has the right to present testimony but also that the Defendant has the right to cross-examine the State's case in order to rebut the State's burden of proving probable cause.

Now the reason, one of the reasons that we are here is for the State to prove probable cause, and I think that I should have an opportunity to cross-examine this witness and all their witnesses not only to show what they said may not be true or to receive an affirmative or negative answer on a

Trooper Smith - Cross

question, but to also bolster or substantiate our case in rebutting probable cause.

Now, for example, if I could show by this witness -- and I'm not sure I can, but that is what I am attempting to do, and this is cross-examination -- if I can show by this witness that as a result of the time of the death that Paul Reggettz was the only one that was present in the house, according to his own statements which have been introduced into evidence in this case, i.e., the last document that we discussed, that would be the reason for this cross-examination, Your Honor.

I think it is very important at this juncture of this case that I be allowed to do that.

MR. STUCKY:  Your Honor, the State would respond in that Mr. McKittrick is not correct that this is cross-examination, at least in the State's view.  The State put this witness on and his testimony was limited to the voluntariness and the informative labors of the Defendant, waiver of the Defendant's constitutional rights when he gave the statement, which is yet to be introduced into evidence.

That is the only purpose of his testimony.  That is all he testified to.

Mr. McKittrick then got outside the scope of that examination on cross-examination, and the Court ruled he could do that, make him his own witness and you would declare him a

Trooper Smith - Cross

hostile witness for purposes of examination outside of that area.

I think the State, in the interest of justice, has the right to put on an orderly case of probable cause before Mr. McKittrick gets into things outside of that, and I don't think there is any prejudice to the Defendant or to Mr. McKittrick by allowing us to complete our case and then allowing Mr. McKittrick to call Trooper Smith back up to present whatever evidence he wishes to present.

The objection is that he is trying to rebut what is yet to be put into evidence, and I think that it is impossible.

THE COURT:  I think that is probably a meritorious objection.  I am going to sustain the objection, but I want the record to be absolutely clear Mr. McKittrick will be permitted, after the State has concluded its case in chief, to call Trooper Smith as his own witness and upon a proper foundation have him declared a hostile witness to go outside the scope of direct; but I think at this point at least, Mr. McKittrick, you are limited to the scope of direct-examination, although I want to make it abundantly clear in the record at the appropriate time I will certainly permit you to call him back as a hostile witness to attempt to show again under the holdings of Syllabus Point Two that your client was not the person who committed the crimes.  All right.

Trooper Smith - Cross

(THEREUPON, the witnesses returned to the Courtroom and resumed the stand, and the proceedings continued as follows:)

THE COURT:  The witness is still under oath.

MR. McKITTRICK:  Your Honor, if I could have a clarification from the Court, the reason -- I understand the Court's ruling now, and the reason that I tried to cross-examine this witness was because of the Court's previous ruling that there was no reason to call this witness back.

THE COURT:  Well, the State has objected.  Subsequent to that ruling, the State objected to your going outside the scope of direct, as I understand him.  So this witness is under subpoena and he will be under a continuing subpoena, or you can lay a subpoena on him.

MR. STUCKY:  Your Honor, we will make him available at all times throughout this proceeding.

MR. McKITTRICK:  Well then, Your Honor, at this time, I will just confine myself to the voluntariness.

THE COURT:  That's what I just ruled, that you had to confine yourself to the direct.  Go ahead.  Proceed.  The point is, as I have told you, you can call him, and the State has indicated they will keep him under subpoena, and if you wish to call him back at a later time as your own witness, you may do so.

BY MR. McKITTRICK:

Trooper Smith - Cross

Q.   Trooper Smith, you have indicated that you had introduced -- when is the first time that you met John Moss?

A.   The first time I met John Moss?

Q.   Yes.

A.   I would say sometime in January, towards the end of January, middle of January.

Q.   Of what year?

A.   Of '80.

Q.   Where was that?

A.   In Cleveland, Ohio.

Q.   And what were you doing in Cleveland, Ohio, in January of 1980?

A.   I went to see John Moss.

Q.   Who was with you?

A.   Trooper Terry Williams.

Q.   Before you went to Cleveland, Ohio, to see John Moss, had you discussed your trip with anyone here in Kanawha County?

A.   Several people.

Q.   Had you discussed your trip with anyone in law enforcement from Kanawha County?

A.   Yes.

Q.   Specifically, had you discussed your trip with anyone in the Prosecuting Attorney's Office in Kanawha County?

Trooper Smith - Cross

A.   I can't -- I'm not sure whether I did or not.  It is very possible.  To say right now, though, I couldn't.

Q.   Do you have an activity with you?

A.   There is a report here with me.

Q.   Let's assume that you were in the trial of this case and you prepared for your testimony.  How would you find out that answer to that question?  Where would you look to find out whether you talked to anybody from the Prosecutor's Office?

A.   I would probably look in the report.

Q.   Do you have the report with you?

A.   Yes, I do.

Q.   Would you look in the report, please, and see if you can find the answer to that question?

A.   That answer is not in here, not in the report, after having read it.  I would say that I don't remember having spoken to anybody here about making the first trip.

Q.   Did you speak with any of your superiors about making the trip to Cleveland, Ohio?

A.   Yes, sir.

Q.   Who did you speak with?

A.   Well, it would either have been probably one of the -- whoever was in charge of the company at that time.

Q.   Who was it?

Trooper Smith - Cross

A.    I'm not positive, but I believe it was Captain Lemon.

Q.    What was the reason you spoke to him about this?

A.    To get permission to go to Cleveland.

Q.    Is it a fair statement to say that you went to Cleveland to pursue your investigative activities surrounding the Reggettz deaths and that the only one you consulted before you left was Captain Lemon?

A.    No.  He wasn't the only one.

Q.    What superior other than he did you consult?

A.    Well, it could have either been Corporal Cook or Sergeant Smith, because I would have gotten permission from somebody between myself and the Department before going. to him.

Q.    And the reason that you consulted these superiors, whoever they were, was to seek their permission to go to Cleveland, Ohio?

A.    Yes.

Q.    All right, is that the only reason that you consulted these superior officers?

A.    Yes.

Q.    Who did you go to Cleveland, Ohio, with?

A.    Trooper Terry Williams.

Q.    Now when you went to Cleveland, Ohio, what was your

objective on that occasion?

A.    To speak with John Moss and also get a weapon

test firing.

Q.    Now when you say to speak with John Moss, what did

you want to speak with John Moss about?

A.    About an armed robbery and also the Reggettz

murders.

Q.    Now when did the armed robbery come to your attention?

A.    When did it come to my attention?

Q.    Yes, sir.

A.    When it occurred, and I believe the date would have

been sometime in May, around May of '79.

Q.    All right, and who had been investigating the

armed robbery?

A.    The Sheriff's Department of Kanawha County.

Q.    And had you worked with the Sheriff's Department

in that investigation?

A.    Yes, I did.

Q.    Who did you work with specifically?

A.    I don't remember.  I remember Mark McMillion.

Q.    What did you do in that investigation?

A.    I assisted him at the crime scene that night.

Q.    What did you do?

A.    Helped him secure evidence, talked to people at the

Case 2:09-cv-01406 Document 17-12 Filed 10/29/10 Page 45 of 143 PageID #: 2485

scene.

Q.    Did you take any statements?

A.    No, I took no written statements.  No, sir.

Q.    What did you do of a formal nature in that investiga-
tion?

A.    Helped him with their cameras.

Q.    When you say you helped them with their cameras,
what did you do, carry them or what?

A.    I can't remember exactly.  I remember holding the
flashlight on some of the stuff to help them focus the
camera, some of the pictures that were taken.

Q.    This was the night that it occurred?

A.    Yes.

Q.    Is it a fair statement to say that on the night
that that armed robbery occurred -- and I believe that was
over at the Moose Club; is that correct?

A.    Near St. Albans, yes.

Q.    Okay, but you actually didn't do any formal
investigation by trying to find out who committed the crime,
in that you took no written statements from anyone; is that
a fair statement?

A.    As far as statements go?

Q.    Yes.

A.    I took no statements.  No.

Trooper Smith - Cross

Q.   Did you leave the crime scene itself and pursue a formal investigation to determine who committed that armed robbery?

A.   Not a formal investigation, no.

Q.   Was it an informal investigation?

A.   I attempted to, you know, find what information I could, just through my own routine duties.

Q.   In other words, if it would come across your desk or you would be talking to some defendant and you had knowledge of it, you would pass it on to the Sheriff's Department, something like that?  Is that what you are saying?

A.   I would assist to get hold of him and work with him.

Q.   As far as you personally pursuing a formal investiga-tion on that armed robbery that occurred at the Moose Club, you didn't do that; is that correct?

A.   Not a formal investigation, no.

Q.   In other words, you knew what happened, just like you know a lot of crimes happen?  You were not working on it, but if you found out something, you would be willing to tell the Sheriff's Department?  Is that a fair statement?

A.   And assist them on it.

Q.   And assist them on it after you found out.  Is that a fair statement?

A.   Yes.

Trooper Smith - Cross

Q.   Now from May of 1979, when that armed robbery occurred, until January of 1980, when you went to Cleveland, Ohio, to speak with John Moss, what other things did you do on that armed robbery investigation other than when it happened and the night it happened?

A.   Well, I just kept it in my mind and I asked some people, you know, if I got a chance, like if they could think of anybody that could have done this.

Q.   Did you write an activity on what you did?

A.   I have nothing in writing.

Q.   Nothing in writing.  Did you submit any writing in any manner, means or form to the Sheriff's Department of Kanawha County concerning that robbery from the night that it occurred until January of 1980 when you went to Cleveland, Ohio, to see John Moss?

A.   No, sir.

Q.   All right.  When you went to Cleveland, Ohio, to see John Moss, Trooper Smith, one of the things that you wanted to talk with him about was the Reggettz murders; isn't that correct?

A.   Yes.

Q.   What if anything had you found up to that time that implicated John Moss as a possible suspect in the Reggettz murders, before you went to Cleveland, Ohio, in January of 1980?

Trooper Smith - Cross

Let me make it easier on you.  Did you have any physical

evidence whatsoever that implicated John Moss in the

Reggettz murders before you went to Cleveland, Ohio, in

January of 1980?

    A.   No.

    Q.   Did you have any statements from any witnesses

surrounding that investigation that implicated John Moss as

a suspect in the Reggettz murders?

    A.   No.

    Q.   In other words, you had no direct evidence of any

kind that would implicate John Moss as being a suspect in

the Reggettz murders at the time you went to Cleveland, Ohio,

in January of 1980; is that correct?

    A.   That is correct.

    Q.   Did you go to Cleveland, Ohio, with the objective

in mind that John Moss may have been the person that committed

those murders and you wanted to see if you could talk to

him and if he would tell you about the murders?  Is that a

fair statement?

    A.   I would say that I went to Cleveland with the idea

in mind that he could possibly shed some light on the

investigation.  To what extent, I don't know.  I didn't

know.

    Q.   Did you think in the back of your mind when you went

Trooper Smith - Cross

to Cleveland, Ohio, that he may have been a suspect in those murders even though you had no evidence, a gut feeling, so to speak?

A.   I thought there could be a remote possibility that he could be a suspect.

Q.   And, therefore, you were willing to talk to him, and if he committed those murders, you would have talked to him about committing the murders, is that correct, when you got to Cleveland, Ohio?

A.   Or if he had any knowledge of it, as far as that goes.

Q.   But the answer to my question in a word is yes; is that correct?

A.   Would I have been willing to talk to him?

Q.   Yes.

A.   Certainly.

Q.   And that wasn't beyond the realm of possibility in your mind when you went to Cleveland, Ohio, to speak with John Moss about the Reggettz murders, was it?

A.   I think I already stated that I felt there was a possibility.

Q.   Now what did you know about John Moss before you went to Cleveland, Ohio, in January of 1980?

A.   Not a whole lot, other than, you know, that he was

here.

    Q.   Let me ask you this:  Did you have any background on him at all?

    A.   A little.

    Q.   Where did you get that background?

    A.   From two places.

    Q.   Where?

    A.   One, a person, his uncle, Arthur Moss; and two would be a newspaper clipping from the paper.

    Q.   What did Arthur Moss tell you?

    MR. STUCKY:  Objection, Your Honor.  Hearsay.

    THE COURT:  Sustained.

    MR. McKITTRICK:  It is his investigation, Your Honor.

    MR. STUCKY:  It is still not admissible.

    MR. McKITTRICK:  It is not being asked for the truth of the matter stated.  It is asked for that it in fact was said.

    THE COURT:  If it is not being offered for the truth of the statement, I will let you go ahead.  Overruled.

    MR. McKITTRICK:  It is really not significant.

    THE COURT:  It must be or you wouldn't be asking the question.

    THE WITNESS:  Well, it has been a long time.  I didn't take anything in writing at that time.  You know, no big thing.

It is just basically it was his relative and that he had been accused of a crime.

BY MR. McKITTRICK:

Q.   Did you know that John was going to high school at that time?

A.   Yes.  He informed me that John had been here back around the time the murders occurred.

Q.   And that he had been in high school?

A.   That he had been going to St. Albans High School, living with his grandparents, which was Arthur Moss' parents.

Q.   And you knew at that time that John was a juvenile?

A.   Yes.

Q.   And how old was John at that time?

A.   Seventeen.

Q.   Seventeen, and you knew this when you went to Cleveland, Ohio, to see him in January of 1980, because you talked to Arthur about that; is that correct?

A.   That is not the only reason, but I knew it, yes.

Q.   What other reason did you know that?

A.   Due to the fact he was being held in a juvenile detention center.

Q.   I see.  So when you went to Cleveland, Ohio, before you went, did you get hold of John Moss' parents and tell

them you were going to go up there and talk to John Moss

about these murders, about this armed robbery?

    A.   No, sir.

    Q.   Did you try to make a determination of whether or not

John Moss had a lawyer in Cleveland, Ohio?

    A.   Yes, sir.

    Q.   Did you find out that he did before you went to

Cleveland in January of 1980 to speak with John Moss about

these murders and about this armed robbery?  Did you find out

that he had a lawyer in Ohio?

    A.   It was my understanding he did not.

    Q.   Who told you that?  Where did you get that under-

standing?

    A.   A police officer in Cleveland.

    Q.   A police officer in Cleveland?

    A.   Yes.

    Q.   Did you know why John was in this juvenile detention

center?

    A.   What I read out of the clipping.

    Q.   Did the clipping indicate that John had already

come to trial or had he been to trial at that time?

    A.   It just stated that he was charged, as best I can

remember without referring back to the clipping.

    Q.   You have that clipping with you in your activities,

don't you?

    A.   I'm sure either it or a copy of it.

    Q.   Would you find that for the Court, please?

    THE COURT:  What time do they feed them over there?  I was concerned about what time they fed lunch over there in the jail.

    MR. McKITTRICK:  That's right.  I forgot about that.

    THE WITNESS:  May I ask something?

    THE COURT:  Yes.  The question was do you have a clipping or a copy of it.

    THE WITNESS:  Well, I didn't put this report together. I don't know how long it is going to take me to find it; but in the action taken in this report, it states what the clipping said.

    MR. McKITTRICK:  Do you want to adjourn now, Judge, and eat?

    THE COURT:  Yes, if you want to give him time.  He said he didn't put that report together.  If you want to give him time to go through and look at that clipping, we will take a recess now.  It is about twelve o'clock.  Let's stand in recess until 1:30.

    Trooper Smith, I admonish you not to discuss your testimony with anyone during the luncheon recess.

    THE WITNESS:  May I have some assistance in finding this?

Trooper Smith - Cross

THE COURT:  Mr. McKittrick, do you have any objection if he seeks assistance in going over that report to find it?

MR. McKITTRICK:  None whatsoever, Your Honor.

THE COURT:  All right, for that limited purpose, you may discuss it.

(WHEREUPON, the noon recess was taken, after which the following proceedings were had.)

(WHEREUPON, the proceedings resumed after the lunch recess, all parties heretofore mentioned being present.)

THE COURT:  Show the resumption of these proceedings, all parties heretofore present here again, including the Defendant and his counsel.

I would remind the witness that you are still under oath, Trooper Smith.

THE WITNESS:  Yes, sir.

THE COURT:  Okay, Mr. McKittrick.

BY MR. McKITTRICK:

Q.   Trooper Smith, before the recess, I had asked you if you could get me the clipping that you alluded to, and you are now handing me a copy of a clipping.  Is that the newspaper clipping we are talking about?

A.   That is a copy of it.

MR. McKITTRICK:  Your Honor, would the Court indulge me so that I may read it?

Trooper Smith - Cross

THE COURT:  Yes, sir.  Go right ahead.

BY MR. McKITTRICK:

Q.   Mike, before January of 1980, when you went to Cleveland, Ohio, to talk to John Moss about this armed robbery and the murders of the Reggettz, how long before that time had you corresponded with the Kanawha County Sheriff's Department about the investigation on the armed robbery case?

A.   Before January?

Q.   Yes.

A.   Just the night that the crime occurred.

Q.   Which was when?

A.   Sometime in May.

Q.   May of 1979?

A.   Yes.

Q.   Okay, and it is my understanding then that you had not talked to anybody at the Kanawha County Sheriff's Department about their investigation and whether or not it was successful and what turns it had taken since the night the crime occurred?

A.   That is right.

Q.   When in January of 1980 did you go to Cleveland, Ohio?

A.   When?

Q.   Yes, sir.

A.   As far as an exact date, I would have to refer to
the report.

Q.   Okay, you may want to get that place in the report
because we will be going over that activity.

MR. McKITTRICK:   Let the record show that the witness is
taking the report and is now leafing through it.

BY MR. McKITTRICK:

Q.   Do you have it?

A.   Okay, I have that area.

Q.   What was the date that you went to Cleveland, Ohio,
to talk with John Moss?

A.   Wednesday, January 30, 1979.

MISS LUSK:   '71?

THE COURT:   '79.

THE WITNESS:   That's what the report says, but it would
have been '80.

BY MR. McKITTRICK:

Q.   So the report is incorrect?

A.   Yes, on the year.

Q.   Who accompanied you to Cleveland, Ohio?

A.   Trooper Williams.

Q.   What time did you arrive there in Cleveland?

A.   I'm going to make a guess -- ten - eleven o'clock.
Between nine and eleven.

Q.  In the morning?

A.  In the morning.

Q.  Did you leave from Charleston, West Virginia, to go to Cleveland?

A.  Yes.

Q.  Did you make any stops between Charleston and Cleveland relative to anything with regard to the investigation of the Reggettz murders?

A.  Before getting to Cleveland?

Q.  Before getting to Cleveland.

A.  No, sir.

Q.  Now when you got to Cleveland, what is the first thing that you did?

A.  I'm sure we went to --

MR. STUCKY:  (Interposing)  Your Honor, just for the record, I would like to object at this point to things that occurred in January of 1980 as they relate to the voluntariness of the statement that was taken in October 1980, unless Mr. McKittrick can tie those things together.  There is a ten-month lapse there, and I don't see what it has to do with the statement taken in October.

MR. McKITTRICK:  Your Honor, this witness has already indicated he had conversations with the Defendant in Cleveland, Ohio, and we are trying to get to those statements and I want

Trooper Smith - Cross

to find out what he did prior to the time he got there.

THE COURT:  If you can tie the January conversation with this witness and the Defendant to the October confession, I will let it in.  If you cannot, then I will entertain the motion to strike when he has completed his testimony.

MR. McKITTRICK:  Okay, that's what I am trying to do. I don't want to burden this record because I am going to have to pay for it on appeal.

BY MR. McKITTRICK:

Q.  What is the first thing that you did when you arrived in Cleveland?

A.  I'm sure we either contacted or went to the police department that we needed to get with so that we could go further from there.

Q.  Who did you meet there?

A.  We meet several people, but the person we actually ended up working with is a Detective Vaughan of the Cleveland Police.

Q.  Was it Detective Vaughan that told you John Moss did not have a lawyer at that time?

A.  No, sir.

Q.  Who was it that told you?

A.  That was a different detective that I had spoken with over the telephone the evening before.

Q.   What was his name?  Is that in your activity?

A.   It could be.

Q.   Would you check?

A.   No, sir, this is not necessarily my activity.  This is the police report itself.

Q.   All right, is your activity contained in that?

A.   Is my activity?

Q.   Yes.

A.   Along with a lot of others.

Q.   Well, whatever investigation that you did would be in that report if it was reflected in writing, would it not?

A.   If it was in writing, yes.

Q.   Okay, would you have any notes anyplace else of your activities that are not reflected in that report?

A.   No, sir.

Q.   Can you check to see who that detective was?

A.   I'm not positive, but I believe it was a Detective Brown, and it may well be in here.  It shouldn't take long for me to look through it.

Q.   All right, why don't you check?

A.   I don't believe the name is in here.  I'm pretty sure that it is not in here, and I'm saying I'm not positive that that was the name, but I did talk with a police officer with the Cleveland Police the evening before, and he did tell

me he did not have an attorney.

    Q.   For what reason did you make that inquiry?

    A.   Due to the fact that if he did, I would have contacted probably his attorney first.

    Q.   Why would you have contacted his attorney?

    A.   For permission to interview his client.

    Q.   So I take it when you found out you thought he did not have an attorney, you did not feel it necessary to contact anyone else to garner permission for you to talk to him; is that correct?

    A.   Not at that time, no.

    Q.   Nor did you at any time before you in fact talked to John when you went to Cleveland that first time?

    A.   Other than just, you know, going through the procedures of whatever, you know, deemed necessary to get inside the detention center.

    Q.   Now is there anyplace that you can go to in your activities or is there any person you can talk to to determine who you talked to in Cleveland that told you that John did not have a lawyer?

    A.   The only way I could do that would be to call the policemen up there and see if they might recall or do some checking as to who it could have been.

    Q.   This police officer you talked to on the phone, did he

tell you the foundation for his conclusion that John did not

have a lawyer?

    A.   Well, I said now I believe it was Brown, but I'm

not positive, and I think he was the investigating officer

or one of them.

    Q.   On the charge?

    A.   On the charge that he had at Cleveland.

    Q.   What is the date of the article that is in the

newspaper, the copy that you have just showed us?

    A.   Unless it is on the copy, I'm not sure.

    Q.   Could you look at that copy?

    A.   No, it isn't.

    MR. McKITTRICK:  Is it on yours, Jim?

    MR. STUCKY:  What is that?

    MR. McKITTRICK:  The date.

    MISS LUSK:  No, it is not.  The date is not on our copy.

BY MR. McKITTRICK:

    Q.   Do you know the date on which the crime occurred

and which John was being detained for?

    A.   No, sir, I don't.

    Q.   Do you know how long before you went to Cleveland

on January 30, 1979, that that crime occurred, the crime?

    A.   Did I say the 30th or the 29th?

    Q.   You said January 30th.  I'm talking about the crime

in Ohio now.  Do you know how long before January 30, 1979

it occurred?

     A.  I'm going to make a guess.  It could have been

anywhere from maybe a week to maybe three weeks.  I would

want to say more in the line of approximately ten days.

     Q.  Now did you talk with anyone or did anyone on your

behalf talk to anyone in Cleveland, Ohio, other than this

Detective Brown, or whoever it was you did talk to on that

occasion, before you went to Cleveland on the 30th day of

January, 1980?

     A.  Before Brown?

     Q.  Yes, anyone other than him?

     A.  It is possible that I could have talked to someone

before getting hold of him, but --

     Q.  (Interposing)  Do you have any independent recollec-

tion of that?

     A.  I can give you no names, but it is very possible

I could have spoke with someone, you know, to find out, to

get to talk to Brown.

     Q.  Oh, other than that.

     A.  You know, like I probably called and said who is the

investigating officer, can you put me with someone that can

give me that.

     Q.  Other than that, did you talk with anyone else?

A.   No, sir.

Q.   Now when you got to Cleveland and you went to the Police Department, did you talk to anyone about the Reggettz murders at the Police Department in Cleveland, Ohio?

A.   We probably briefed Vaughan, the detective that we were with, probably on everything, why we were coming up there.

Q.   Do you remember what you told Vaughan  your objective for coming up there was?

A.   Well, it was for both the robbery and any information we might be able to obtain on the Reggettz murders.

Q.   Did Vaughan accompany you and Trooper Williams to where John Moss was being detained?

A.   Yes, sir.

Q.   And how long after you arrived at the Police Department there in Cleveland, Ohio, did you go see John?

A.   I'm going to guess, say around an hour.

Q.   An hour?

A.   Yes, sir.

Q.   What did you do within that hour there at the Police Department?

A.   Oh, you know, several things.  We discussed the trip up, you know, and introduced ourselves, things like that. Vaughan had to get a car and I believe, as a matter of fact,

Vaughan may have had to do some checking it, too, about him

obtaining a car to drive us over. I mean there was a slight

problem there as far as the time factor.

Q. When you left the Cleveland Police Department

and you went to where John was, where did you go? Where did

you go to where John was? Where was he?

A. I couldn't tell you. I just know it was a detention

center someplace.

Q. After you arrived at the detention center, what

did you and Vaughan and Williams -- were you in each other's

presence from the time that you arrived until the time that

you left with John, or from the time that you arrived until

the time that you left?

A. Are you talking about at the detention center?

Q. Yes.

A. No. I'm sure at one time or another we were outside

from each other.

Q. How did you get inside the detention center?

A. We just walked in. I'm sure we identified ourselves.

Q. Did you have your uniforms on?

A. No, I don't think so. I'm sure we went in civilian

clothes.

Q. Okay, and what happened then? You walked inside?

A. It was arranged so that we could have a place to talk

with John.

    Q.    And they brought John Moss to you?

    A.    Either that or took us to John Moss.

    Q.    And where did you go to talk to John Moss?

    A.    Somewhere in the detention center.  I believe it was upstairs, because I can remember going up on an elevator.

    Q.    Did they put you in a room someplace?

    A.    A large room.

    Q.    Who was in that room?

    A.    Oh, there was myself, Trooper Williams, Vaughan, John Moss, and there was another -- there was probably anywhere from maybe two to four people in there.  Who they were and what they were doing, I'm not exactly sure.  I'm sure one was one of the officers, security or whatever there.

    Q.    All right, now in chronological -- how long did that meeting take place with John?

    A.    Twenty - maybe -- I'm going to say around twenty minutes.

    Q.    In chronological order, to the best of your memory, and I want you to try to remember as best you can, I want you to tell us the chronology of conversations during that meeting.

    A.    Well, of course, we all introduced ourselves, made John aware of who we were, showed him, you know, our

identification.

Q.   Did you tell him the purpose for which you were
there?

A.   No.  We just told him we had some questions that we
would like to ask him.

Q.   So you are saying that you did not tell him the
purpose for which you were there; is that correct?

A.   Not right off the bat, no.

Q.   Did you ever tell him the purpose for which you
were there?

A.   Yes, just shortly after introducing ourselves.

Q.   All right, what did you tell him your purpose was?

A.   That we were concerned about some things that had
happened in West Virginia, speaking of, you know, crimes,
and that before we did anything, any questioning, and he was
asked if he had a lawyer, and he said no, and we asked him
if he had any objections to talking to us.  He said no, and
then he was explained his constitutional rights by myself
from a card which I had at that time in the presence of
Williams and Vaughan.

Q.   Did you tell him why you were giving him his
constitutional rights?

A.   Because we wanted to question him about any fact
or knowledge that he may have to that effect of some crimes

Case 2:09-cv-01406  Document 17-12  Filed 10/29/10  Page 67 of 143 PageID #: 2507

which had occurred in West Virginia.

    Q.   Okay, before you entered that room to talk to John Moss on the 30th day of January, 1979, did you have any evidence whatsoever that implicated John Moss in the armed robbery which occurred at the Moose Club in May of 1979?

    A.   Any real, physical evidence?

    Q.   Any kind of evidence.

    A.   No.  I couldn't say we had any evidence.

    Q.   Did you have any kind of evidence whatsoever that made John a suspect in your mind that he may have been there, that he may have committed that crime at the Moose Club?

    A.   Did I have it?

    Q.   Yes, sir.

    A.   I didn't have.

    Q.   Do you know anybody that did have it that pointed to John Moss now?

    A.   Are you speaking of the robbery?

    Q.   Yes.

    A.   Mark McMillion.

    Q.   What did he have?

    A.   Bullets, .25 caliber bullets.

    Q.   All right, and how did you link them up with John Moss?

A.    From the newspaper clipping.

Q.    The newspaper clipping said that there were .25 caliber bullets used in the crime there in Ohio; is that correct?

A.    Yes.

Q.    When did you get that newspaper clipping?

A.    January.

Q.    When?

A.    When Arthur Moss brought it to the detachment.

Q.    All right.  Now did Arthur Moss link those .25 caliber bullets up in any way with the crime that had occurred at the Moose Club?

A.    Did he link them up?

Q.    Yes.

A.    No.

Q.    Did he suggest that they may be the same?

A.    The possibility.

Q.    Strike that.  Did you discuss with Arthur Moss when he talked to you the crime that occurred at the Moose Club in May of 1979?

A.    I don't know whether I did or not.

Q.    You don't remember?

A.    No, I don't remember.

Q.    Who was with you when you talked with Arthur Moss?

A.    Trooper Woodyard part of the time or all of the
time.  I don't know whether Trooper Woodyard was there the
whole time I talked with Moss.

Q.    When was it that you interviewed Moss?

A.    The day before going to Cleveland.  So it would have
been the 29th of 1980 -- January.

Q.    When did you plan to go to Cleveland?

A.    That evening, after talking to Moss.

Q.    After talking with Moss?

A.    Yes.

Q.    Did you call Mark McMillion on the phone and tell
him the reason you were going to Cleveland?

A.    Yes.

Q.    You said the .25 caliber may be the same?

A.    Could possibly be.

Q.    Is that what you told McMillion?

A.    I said it's a possibility, yes.

Q.    Then you had a conversation with Mark McMillion
other than your superior officers about going to Cleveland?

A.    I did.

Q.    All right, now when you started talking to John Moss,
what is the first thing that you raised concerning the
crimes?

A.    You mean after advising him of his rights?

Q.   Correct.

A.   Well, I'm sure that it was in the line of I under-
stand you have a .25 automatic, and did you ever have it in
West Virginia, could you have been involved in the shooting
of a woman at the Moose Club.

Q.   What was his answer to those questions?

A.   That he was not.

Q.   All right.

A.   And that he did not have the .25 in West Virginia.

Q.   That's the first thing you talked to him about?

A.   Yes.

Q.   Then what did you talk to him about?  I mean did you
leave that subject of the Moose Club, drop right there?

A.   I don't think it was dropped.

Q.   All right, what else did you talk to him about
concerning the Moose Club?

A.   I asked him if he was familiar with the Reggettz
family.

Q.   All right, let's go back to the Moose Club.  You
asked him three questions that you have told His Honor
about, about the Moose Club, and he denied those?

A.   There was more questions than that.

Q.   All right, what other questions were there?

A.   I asked him if he might have any knowledge as to who

could have possibly done this.

Q.   And he said he did not?

A.   He said he did not.

Q.   Did you ask him any other questions?

A.   It is very possible, but, you know, for right now,
that's basically all I remember.

Q.   Did anyone else that was there in your presence
ask him any other questions than what you have already stated
to us about the Moose Club shooting and robbery?

A.   Not that I can recall, no.

Q.   All right, then as I understand it, you got into
the Reggettz murders with him?

A.   Approximately, you know, soon after those questions.

Q.   Was there any lapse of time?

A.   No.

Q.   Then immediately after you asked him those four
questions or so about the shooting and robbery at the Moose
Club, you started asking him questions about the Reggettz
case, correct?

A.   I think I probably asked him if he would -- I think
the question was raised had he ever been injured, you know,
back before he came back to Cleveland, before going back to
Cleveland from West Virginia.

Q.   What was his answer there?

A.    "Not that I can remember; nothing serious."

Q.    And then did you immediately start into the Reggettz case?

A.    I'm not sure if I asked him for a sample of his blood immediately starting into the Reggettz case or just -- it was either I asked him for a sample of his blood voluntarily, a voluntary sample, and that was either just after, oh, it was mentioned are you aware of what happened, are you aware of the murders, and he was.

Q.    He was aware of the murders?

A.    Oh, yes.  Yes.  I remember asking him to the effect how did you become aware of it, and he said, "My friends.  I first heard it at school."

Q.    And then you asked him for the blood?

A.    Well, somewhere close to that.  I mean there could have been some other questions, like do you remember who it was that told you.

Q.    All right, now did he readily agree to give you a blood sample?

A.    Yes, he did.

Q.    Did you take a blood sample at that time?

A.    I let him do it, but there was a blood sample taken.

Q.    Did you have a doctor present?

A.    No.

Q.   So, in other words, after John Moss said yes to voluntarily giving you a blood sample, you took blood from him immediately?

A.   I let him do it when it was taken.

Q.   How did he do it?

A.   Our Department has a little metal thing that they keep in a sealed paper-type thing for sanitary purposes. You tear that off, or tear your little metal thing open, prick your finger and dab it on a cloth.

Q.   Then did you start getting into questioning him about the Reggettz murders after the blood sample was taken?

A.   There was a few more questions.  There was not a lot of questions concerning the Reggettz murders.  I asked him --

Q.   (Interposing)  Well, is this consistent with what you remember happened, as Terry Williams has testified before this time that you said, the essence of which was, "John, were you involved in committing the murders of the Reggettz family?"  And he said, "No."  And you said, "Do you know who might have committed those murders?"  And he said, John said, "No, I have no idea."  Is that a fair reflection of the questions and the answers that were asked of John Moss about the Reggettz murders there in the detention center?

A.    I personally do not remember, nor do I remember

hearing anyone ask John if he had murdered the Reggettz.

Now as for having any knowledge as to who might have, I'm

sure I did.  If I didn't -- I remember asking that one myself.

Q.    Well, during this twenty minutes that you were with

John Moss, you did all the questioning, didn't you?

A.    No.

Q.    Did Trooper Williams do some of it?

A.    I'm sure he did.

Q.    Did Detective Vaughan do some of it or --

A.    (Interposing)  No.

Q.    I take it that Detective Vaughan did not do any of it

because he wasn't familiar with the facts?

A.    He was just there to, you know, show us where we

needed to go, get us into the place.

Q.    You and Williams were doing all of the questioning

then; is that right?

A.    Yes, sir.

Q.    So then you and Williams, as I understand it, went

into the large room and questioned John Moss for twenty minutes,

and then you and Williams left; is that correct?

A.    I guess I would I would have to say that, yes.

Q.    And during that twenty minutes, Detective Vaughan

was with you at all times?

Trooper Smith - Cross

A.  No, sir.  With me?

Q.  With you and Williams.

A.  No.  There was a time that he went back into another area, you know, in the room.  There was like a small office section that had glass, and he was in that area with a security guard.

Q.  And he left you and Williams there to talk to John?

A.  Part of the time.

Q.  And part of the time he was there?

A.  Part of the time he was there.

Q.  But you didn't leave at any time?

A.  Yes, I did.

Q.  You stayed there; is that correct?

A.  No, I left.

Q.  You left?

A.  And Williams was still there.

Q.  Williams was still there?

A.  Yes, and I'm sure they had conversations.

Q.  What was the reason that you left during those twenty minutes?

A.  To speak with Vaughan.

Q.  How long were you gone?

A.  Five minutes.

Q.  Do you know from an apprisal from Williams what he,

Trooper Smith - Cross

Williams, talked to Moss about?

    MR. STUCKY:  Objection, Your Honor.

    THE COURT:  Sustained.  That's hearsay.

BY MR. McKITTRICK:

    Q.  Do you know from your own personal knowledge that

Williams talked to Moss during that five minutes that you

were gone?

    MR. STUCKY:  Objection, Your Honor.  He couldn't possibly

know from his personal knowledge.

    THE COURT:  He said of his own personal knowledge.  If

he knows of his own personal knowledge, he can answer.

    MR. STUCKY:  Your Honor, the second part of that question

is while he was gone.  He can't answer that.

    THE COURT:  He can't answer that.  I will let him answer

of what he knows of his own personal knowledge of the

conversation.

    MR. McKITTRICK:  He could have heard it.  That's why

I said own personal knowledge.  I'm yelling at him, Judge,

not at you.

    THE WITNESS:  You had better repeat the question.

BY MR. McKITTRICK:

    Q.  Do you know from your own personal knowledge whether

Williams talked to Moss about the Reggettz murders during

the time you were gone during that five minutes?

Trooper Smith - Cross

A.   I'm going to have to say no.  I was out of hearing distance, so I couldn't hear.

Q.   That's good.  Did you feel it necessary when you returned to inquire of Trooper Williams what he had discussed with Moss?

A.   No, because Trooper Williams came and got me and said he was finished and suggested that we could go.

Q.   Without telling us what he said, because the Prosecutor is going to object to that as hearsay, did you inquire of Trooper Williams what he talked to John Moss about during that five minutes, during that five-minute period that you were gone?

A.   Not at that time.

Q.   Did you at any time?

A.   I'm sure I did.

Q.   Do you remember what Williams told you that Moss and he had discussed?

A.   Not really.

Q.   You don't remember?

A.   No, because it wasn't that long.

Q.   Well, let me ask you this:  You say you don't remember it.  I take it that if it was important and it related to the Reggettz murders you would remember it, correct?

Trooper Smith - Cross

A.   I would think so.

Q.   All right.  Of course, thereafter, Trooper Smith, you found out that John Moss had a lawyer, didn't you?

A.   No, I didn't.  I can't say that.  No, not -- I'm not even sure now that he had a lawyer.  So there is no way that I can answer that.  Not at that time.

Q.   Were you confronted by a court in Ohio relative to blood that you had taken from John Moss?

A.   Yes, sir.

Q.   When?

A.   Probably within fifteen minutes after.

Q.   After you took the blood?

A.   Within fifteen to twenty minutes after we took it, or fifteen minutes to a half hour after we obtained it.

Q.   Did John Moss have a lawyer representing him before that court?

A.   Before the court?

Q.   Yes, before the court.

A.   I can't honestly answer that because I don't know.

Q.   Well, so His Honor that's listening to the facts will know, isn't it a fair statement to say that in Ohio a court intervened and directed that you either destroy or give back the blood sample to John Moss?

MR. STUCKY:  Your Honor, I am going to object to the

Trooper Smith - Cross

relevancy to that to the voluntariness or admissibility of the statement taken in October.  I have no idea how that can be relevant to the statement.

THE COURT:  I don't either.  How is it relevant, Mr. McKittrick?

MR. McKITTRICK:  Well, other than showing a pattern of conduct on the part of these state police investigators, I don't know if it is.

THE COURT:  All right, I am going to sustain the State's objection.

BY MR. McKITTRICK:

Q.    When is the next time that you saw John Moss?

A.    After the 30th?

Q.    Yes.

A.    I think in April.  There or around sometime in April.

Q.    Of 19--

A.    (Interposing)  '80.

Q.    Where did you see him on that occasion?

A.    It was in Cleveland.  I believe it was at the Justice Center, but I could be wrong about the Justice Center, but it was definitely in Cleveland.

Q.    Now who was with you on that occasion?

A.    Trooper Williams and at that time Assistant

Trooper Smith - Cross

Prosecutor Charles Pettry.

Q.   And what was the reason that you saw John Moss on that occasion?

A.   They were obtaining the blood samples.

Q.   On that occasion, did you have any conversation with John Moss?

A.   Just how have you been and, you know, how has things been going.

Q.   Did you discuss the Reggettz murders?

A.   No, sir.

Q.   On that occasion, I think you all obtained another blood sample; is that correct?

A.   Yes, sir.

Q.   Did you do anything else in Cleveland, Ohio, on that occasion?

A.   Concerning this case of John Moss?

Q.   Yes.

A.   We obtained the sample and, like I said, I spoke to him, but nothing more.

Q.   Now what was the date?  What was the date that you went up there on that second occasion?

A.   I need to refer to the report.

Q.   Go ahead.

A.   Tuesday, April 22, 1980.

Trooper Smith - Cross

Q.    All right, between January 30, 1980, and April 27, 1980, was it?

A.    April 22.

Q.    April 22.  What did you do to assist the Kanawha County Sheriff's Department in the investigation of the armed robbery case?

A.    Submitted bullets which were test fired in Cleveland and handed over to myself.  I submitted them to our Ballistics Lab in South Charleston to be compared.

Q.    When did you receive those?

A.    The 30th of January, '80.

Q.    Where did you get them at?

A.    At the Police Department there in Cleveland, their Ballistics Lab.

Q.    You transferred them back to Charleston?

A.    Transmitted them back here.

Q.    Did you do anything else with regard to the armed robbery?

A.    I may have notified McMillion that they were there, that they had been submitted.

Q.    When did you decide to get those .25 caliber bullets and bring them back to Charleston?

A.    Oh, I think I had stated earlier we had planned on it.  I think I did.  We had planned to obtain them on our way

Trooper Smith - Cross

up there, before going up.

    Q.   After you got there?

    A.   On the evening of the 29th, that we were going to attempt to get them if at all possible.

    Q.   When is the next time after April 22, 1980, that you saw John Moss?

    A.   October, I think, 1980.

    Q.   October what?

    A.   I need to refer to the report.  Tuesday, October 28, 1980.

    Q.   And where was that at, Trooper Smith?

    A.   At the reformatory at Mansfield, Ohio, United States Reformatory.

    Q.   And what was the reason that you went there?

    A.   We were bringing him back concerning charges here in West Virginia.

    Q.   What charges?

    A.   The armed robbery at the Moose Club in St. Albans.

    Q.   Now when did you decide to go get John Moss and bring him back on the armed robbery charges?

    A.   Sometime after the blood sample, the second blood sample, was taken, was obtained.

    Q.   Now this is the trip that you took and picked up John Moss when you have testified to His Honor that he made a

Trooper Smith - Cross

statement concerning the Reggettz murders; is that correct?
This is the trip when you brought him back?

    A.   Statement, or confession, same thing.  Is that what
we are talking about?

    Q.   Sometimes I wonder what a confession is.  I call it
a statement.  A statement that you took from Mr. Moss and you
taped it.

    A.   No, I didn't tape one.

    Q.   Who taped it?

    A.   Trooper Williams.

    Q.   Well, that's the same time.  I'm not trying to
quibble over words with you.  The time that you went up there
on October 22nd and brought him back, you all took a taped,
recorded statement from him concerning the Reggettz murders,
correct?

    A.   Oh, yes, there was a taped statement taken on
October 28th.

    Q.   All right, now October 28th?

    A.   I believe that's what I stated.  Maybe I'm wrong.

    Q.   Maybe I am wrong.

    A.   Do you want me to look again?

    MR. McKITTRICK:  Is it the 28th?

    MISS LUSK:  The 28th.

BY MR. McKITTRICK:

Q.   Now before you went up there on the 28th, as I under-
stand, you went up there to bring him back on the robbery
charges, the robbery of the Moose Club?

A.   Yes.

Q.   Who did you discuss going to Ohio with?  Was that
Mansfield, Ohio?

A.   Yes.

Q.   Who did you discuss from the Prosecuting Attorney's
Office about going to Mansfield, Ohio, and bringing John
Moss back?

A.   I'm not sure whether it was Mr. Roark or Mr. Pettry,
or both, but, you know, it was discussed.

Q.   All right.  Now, Mike, when you came back with the
blood sample, what did you do with that blood sample?

A.   Submitted it to the State Police Lab.

Q.   Were you still working on the Reggettz murders at
that time?

A.   Yes.

Q.   Was Terry Williams still working on the Reggettz
murders at that time?

A.   Yes.

Q.   Were you the only two officers in the State Police
who were actively and primarily working on the Reggettz
murders at that time?

Trooper Smith - Cross

A.   I would say that we were the only two still actively assigned to the Reggettz murders at that time.

Q.   And you spent most of your time investigating those murders at that time; is that correct?

A.   Now I was stationed at that time at Winfield.

Q.   But you were still assisting in the investigation?

A.   If anything, you know, was being done on it, I was assisting.

Q.   All right, when was it brought to your attention -- strike that.  When were the results of the blood sample brought to your attention?

A.   I can't remember for sure.  Do you want me to guess?

Q.   Do you want to look at your activities?

A.   I'm not sure if that would even state as to when it was brought to our attention.  We can look and see when the results were dated.  I'm sure I was told or aware of it a day or two afterwards.

Q.   Would you do that, Mike?

A.   This is going to take some time.

Q.   Do you remember the last question?

A.   Pardon?

Q.   Do you remember the last question?

A.   I believe so.

Q.   Okay, what is your answer?

Trooper Smith - Cross

A.   I have looked in this and this says, from what I am looking at, we gave it to them on the 22nd, which was the day that we got it.

Q.   The 22nd of April?

A.   April.

Q.   All right.

A.   It has got results of examination on this.  It doesn't say a date.

Q.   On this what?

A.   What I am looking at, referring to here.

Q.   Okay.

A.   It doesn't give a date, and I'm not sure what I am looking at.  I mean I wouldn't want to, you know, --

MR. STUCKY:  (Interposing)  Your Honor, to expedite matters, I believe we have it.

MISS LUSK:  I have a copy of the C.I.B. report of the blood test examination right here.  It has a date on it.

MR. STUCKY:  It has a date of June 10, 1980.  There ought to be one in the report someplace.

THE WITNESS:  That's what it says.  I thought they did it sooner than that.  I mean but I can't testify to that, as to what they have on record down there.

BY MR. McKITTRICK:

Q.   Do you know when it came to your attention, the results?

A.   Not exactly, but I thought it was a lot sooner than June 10th.

Q.   After the blood test came to your attention, what did you do with the results, if anything?

A.   What did I do with the results?

Q.   Yes, as far as the investigation is concerned.

A.   I'm not sure at what point, you know, that the results, you know, were made available to me.  Like I said, I thought it was before June 10th.

Q.   All right, let's assume that it was in June sometime, what did you do with the results once you got them as an investigator of the Reggettz murders?

A.   If it was in June, I did nothing because I remember doing nothing, working on that in June.

Q.   Did you work on it in July?

A.   Seems like I worked on it in -- no.

Q.   Did you work on it in August?

A.   No.

Q.   This is 1980.

A.   Nothing major or nothing like that, you know, that I can recall right now.  There may be some small things.

Q.   Did you work on it in September of 1980?

A.   No.

Q.   Did you -- do you know if Trooper Williams worked on

it either in June, July, August or September, 1980?

    A.   Not to my knowledge.

    Q.   Now who ordered you to go to Mansfield, Ohio,

to pick up John Moss on the armed robbery charges?

    A.   Who ordered us?

    Q.   Yes.

    A.   We had permission.

    Q.   From whom?

    A.   From the company commander, whoever that would have

been at that time.

    Q.   Who first brought it to your attention that you would

be going to Mansfield, Ohio?

    A.   The Prosecutor's Office, I believe.  I'm sure that

that was, you know, discussed between myself, Trooper Williams,

Mr. Pettry or Mr. Roark, one of the two.

    Q.   And that was in October of 1980?

    A.   Or earlier.  It may have been discussed earlier

than that, you know, whenever they started the paperwork.

I think we knew then we were going to go.

    Q.   Whenever you say, whenever they started the paper-

work, what paperwork are you talking about?

    A.   Whatever paperwork it takes to have him brought back

from Ohio.

    Q.   Do you know what that is?

A.   No, sir.

Q.   Were you told what it was?

A.   Basically.

Q.   Do you have that in your activity report?

A.   It is not my activity report.

Q.   Excuse me, do you have it in the activity report which is labeled the Reggettz investigation?

A.   I don't know.

Q.   Well, what papers were you told were necessary?

A.   Well, papers that we had to take to Ohio and had to be processed through Ohio and I'm sure processed down here; and what the procedure is or what they did, I couldn't tell you.

Q.   We would have to bring the assistant prosecutor in to talk about that as far as you know; is that correct?

A.   Somebody besides me, because I don't know.  I couldn't tell you.

Q.   All right, when you went to Mansfield, Ohio, where did you go?

A.   To the reformatory.

Q.   Prior to going to the reformatory, did you go anyplace else in Ohio?

A.   Concerning this?

Q.   Yes, sir.

Trooper Smith - Cross

A.   No, sir.

Q.   Prior to going to the reformatory, did you, yourself, make any calls to the State of Ohio alerting them that you were coming?

A.   I don't know whether I did or not.

Q.   You would have to check your activity?

A.   I'm not sure that it would reflect it.

Q.   All right, when you went to Mansfield, where did you go directly to?

A.   The reformatory.

Q.   All right, who did you meet there?

A.   I couldn't tell you.

Q.   Is that in your activity?  This is important at this point.

A.   I don't know.

Q.   Can you check?

A.   No, it doesn't reflect it anywhere as to who we talked to, no names of any officials there.

Q.   All right, do you remember who it was that you talked to without the names being mentioned?  Do you remember what the capacities were?

A.   No, sir.

Q.   Well, do you remember what you did?

A.   We seen whoever we needed to see and got whatever

Trooper Smith - Cross                                    213

paperwork we were carrying, we showed it to them and then it

was done, whatever needed to be done by them.

    Q.   What paperwork were you carrying at that time?

    A.   What was given to us by the Prosecutor's Office.

    Q.   Do you have a copy of that with you?

    A.   No, sir, not unless it's in here.

    Q.   You don't know if it's in there?

    A.   No, sir.

    Q.   Would you please look?

    A.   The papers you are asking about or a copy of them?

    Q.   Yes.

    A.   To the best of my knowledge, they are not in either

one of these reports here.

    Q.   Could you remember what they are?

    A.   I told you they were just whatever papers that the

Prosecutor's Office prepared.

    MR. McKITTRICK:  All right, Your Honor, we would ask the

Court that we have the Prosecutor's cooperation at this time

to produce those papers so that we can cross-examine this

witness on them.

    MR. STUCKY:  Your Honor, I can speak for myself and I

think for Miss Lusk, but I have no idea where those papers

are.

    MISS LUSK:  Even if we did, he obviously doesn't know

Trooper Smith - Cross

what he was carrying.  So how could you --

MR. McKITTRICK:  (Interposing)  We don't know that

until we try to refresh his memory.

THE COURT:  The Prosecutor says he doesn't have any such

papers in his files.  I suggest if you want you can issue a

subpoena duces tecum to the Department of Public Safety.

MR. STUCKY:  Your Honor, I doubt if they have them.

Peggy Griffith from our office would know where they are,

where they exist, I believe.  However, it is Saturday

afternoon, fifteen till three, and she is not in the office.

THE COURT:  I understand.  If you want to issue a

subpoena duces tecum for Mrs. Griffith on Monday morning,

you may do so, although it might save time if she does know

where they are or if they do exist if the Prosecutor's Office

simply on Monday morning makes them available to counsel.

MR. STUCKY:  We will make anything we have available

to defense counsel.

THE COURT:  Okay.

MR. McKITTRICK:  Your Honor, could I have leave of the

Court to continue this portion of the cross-examination on

Monday with this witness?

THE COURT:  Yes, sir.

MR. STUCKY:  Mr. McKittrick, hold on a minute.

MISS LUSK:  Hold on.  This is the second detainer.  You

were asking him about the first one.  I don't think that

I've got it.  This is the second one.  I don't think I have the

first one.  Let me look again.

     MR. McKITTRICK:  Your Honor, can we take about a ten-

minute recess so we can go over this?  We are going to have to

read them anyway.

     THE COURT:  How many pages is it?

     MR. McKITTRICK:  It looks like ten or twelve.

     THE COURT:  Ten minutes, and that's it.

     (WHEREUPON, a recess was taken, after which the following

proceedings were had, all parties heretofore mentioned

being present.)

BY MR. McKITTRICK:

     Q.   Trooper Smith, after you got to the reformatory in

Ohio, did you participate in or go through any hearings?

     A.   At the reformatory?

     Q.   Yes.

     A.   No, sir.

     Q.   Do you know whether or not John Moss was in any

hearings at the reformatory?

     A.   No, sir.

     MISS LUSK:  I'm sorry, Your Honor, I thought the answer

was unclear.  Was he answering he was not aware or that John

Moss was not in any hearings?

THE COURT:  Let the Reporter read it back.

(WHEREUPON, the question and answer was repeated by the Reporter.)

THE WITNESS:  I don't know.

BY MR. McKITTRICK:

Q.   After you got to the reformatory, were you taken directly to John, or was he brought to you?

A.   After we got to it initially?

Q.   Yes.

A.   No, we talked to somebody and we left and came back later.

Q.   You came back later?

A.   Yes.

Q.   How long were you gone?

A.   An hour, maybe an hour and a half.

Q.   Was there a reason why you left and came back later?

A.   They said it was going to take some time to get him ready.

Q.   Did they tell you what would be entailed in getting him ready?

A.   No, sir.

Q.   Had you contacted John Moss' parents before you went to Mansfield, Ohio, to pick him up?

A.    Would you state that again?

Q.    Had you  or anyone on your behalf contacted John Moss' parents before you went to pick him up at the reformatory in Mansfield and bring him back to Charleston, West Virginia?

A.    Concerning picking him up there at the reformatory?

Q.    Yes.

A.    I don't know whether anybody else did, but I didn't.

Q.    When you came back an hour or hour and a half later, were you taken directly to John?

A.    No, sir.

Q.    What happened when you came back?

A.    We did the paperwork that was -- that we had with us and I'm not -- I don't know who we did it with, but whatever official there, we got with them.

Q.    When you say we did the paperwork, did you do it or did Trooper Williams do it?

A.    I can't recall right now whether I signed, you know, for us, you know, the paperwork that we signed or Trooper Williams.  I believe it was myself.

Q.    Do you remember what you signed?

A.    No, sir.

Q.    Did John Moss sign anything in your presence?

A.    Not that I recall.  He could have.

Q.   Was any explanation whatsoever made to John Moss in your presence of the purpose for his return to Charleston, West Virginia, or any circumstances surrounding his returning to Charleston, West Virginia?

A.   Not that I can recall.

Q.   How long after you arrived at the institution in Mansfield the second time was John brought to you or were you taken to John?

A.   I'm going to say anywhere from an hour, half hour, either side of that.

Q.   Do you know what was taking place during that hour or half hour with regard to readying John to leave?

A.   Some of it was the paperwork.

Q.   Paperwork?

A.   Paperwork that was being done and I'm assuming some of it maybe they were still getting John ready.

Q.   Was John in your presence during that half hour or hour?

A.   No.

Q.   Did you have your police uniform on at that time?

A.   No, sir.

Q.   Did Trooper Williams?

A.   No, sir.

Q.   When John was brought out, I take it then you took

Trooper Smith - Cross

him out in the car and you left for Charleston, West Virginia; is that correct?

A.   After getting his things and handcuffing him, we took him on out to the car.

Q.   Okay, did John have any questions of you as to why he was returning to West Virginia?

A.   No, sir.  I can't recall him ever, you know, asking any questions to myself.

Q.   Did either you or Trooper Williams in your presence advise John why he was coming back to the State of West Virginia from Ohio?

A.   At that time?

Q.   Yes.

A.   Not that I can recall.

Q.   Did you serve any papers on John at that time which would have apprised him or told him the purpose for which he was coming back to the State of West Virginia?

A.   It is possible, but I don't recall right now.

Q.   What time did you leave Mansfield?

A.   I'm going to say, guessing, around two o'clock.

Q.   What time did you arrive in Parkersburg, West Virginia at the detachment?

A.   At the detachment, 6 - 6:30, probably, in the evening.

Trooper Smith - Cross

Q.   How many miles is it from Mansfield, Ohio, to Parkersburg, West Virginia, to the best of your guesstimate or estimate?

A.   My guess?

Q.   Yes.

MR. STUCKY:   Your Honor, I would ask the Court to instruct the witness not to guess, but if he doesn't have any reasonable basis for his answer not to answer the question.

THE COURT:   Well, I have been very generous to defense counsel all day long.  Now if he knows the distance, he can answer it.  If he doesn't, he is not going to guess.  He told you it took him about four hours to get back.  If he knows the distance, he can answer it.  He is not going to guess.

BY MR. McKITTRICK:

Q.   Do you know the distance, approximately?

A.   The route that we took?

Q.   Yes.

A.   No, sir, I don't.

Q.   What route did you take from Mansfield, Ohio, to Parkersburg, West Virginia?

A.   Well, we went south.  I can't tell you what -- I remember taking 70.  I remember it appearing that we took 70 on across, which is somewhat south of Mansfield, over to 77 and then 77 into Parkersburg.

Q.   Did you stop on the way from Mansfield to Parkersburg?

A.   From Mansfield to Parkersburg?

Q.   Yes.

A.   Yes, sir.

Q.   How long did you stop?

A.   Fifteen to twenty minutes, approximately.

Q.   Was that on one occasion?

A.   One occasion.

Q.   What was the reason for the stop?

A.   To get some snacks, refreshment, and all three of us used the restroom.

Q.   After you left Mansfield, how long was it before you started to talk to John Moss about the robbery case at the Moose Club?

A.   Twenty - thirty minutes.

Q.   Before you started to talk to John about the robbery case, did you mention the Reggettz murders to him at all?

A.   That day?

Q.   Yes.

A.   No.

Q.   That day?

A.   That day?

Q.   Yes.

A.   No.

Trooper Smith - Cross                                    222

Q.    How long after --

A.    (Interposing)  When you say that day, are you talking about between Mansfield and Parkersburg?  That's what I thought you were talking about.

Q.    Yes.

A.    No, I did not.

Q.    You didn't mention the Reggettz murders at all between Mansfield and Parkersburg?

A.    No, sir.

Q.    Is the only thing that you discussed between Mansfield and Parkersburg the armed robbery at the Moose Club?

A.    And the crime in Ohio.

Q.    And the crime in Ohio?

A.    Yes, and then it was mentioned of another crime, but it was not stated as to what.

Q.    But you didn't discuss that other crime at all?

A.    At that time?

Q.    Yes.

A.    No.

Q.    And that's when you told John without mentioning the crime that it was a serious crime and you ought to go some-place where it was comfortable to talk about it?

A.    I made a comment to that effect, yes.

Trooper Smith - Cross

Q. All right, now you left Mansfield and twenty or thirty minutes later you started mentioning the armed robbery of the Moose Club, correct?

A. Yes, I did.

Q. Now did you talk to John about that particular crime and did he confess to it?

A. The Moose Club?

Q. Yes.

A. Yes, sir.

Q. How long did it take him to give you that confession after you left the twenty or thirty minutes from Mansfield?

A. It really wasn't very long. I would say five minutes - ten minutes at the most.

Q. Where were you sitting when he gave you the confession to the armed robbery of the Moose Club?

A. The back seat of the car with John.

Q. Did you write that confession down?

A. No, I didn't take the confession in writing. It was a verbal confession.

Q. It was a verbal confession?

A. Yes, sir.

Q. Did you ever write it down?

A. I made what I call a summary, but not a written statement which he signed or anything like that.

Q.    Now you brought John Moss back from Mansfield, Ohio, on a detainer which indicated that he was charged in the State of West Virginia with committing the armed robbery of the Moose Club, correct?

A.    Is that what you are telling me that it was, a detainer?

Q.    Yes.

A.    I know that I had -- we did -- we were bringing him back over charges concerning the Moose Club, the attempted robbery.

Q.    Okay, and you are telling this Court that John Moss confessed to that crime in the first twenty-five to thirty-five minutes after you left Mansfield?

A.    I would say thirty to forty minutes, maybe fifty minutes.

Q.    He gave you a full confession?

A.    I would call it pretty much of a full confession, somewhat detailed.

Q.    Did he ever later give you more details of the Mansfield armed robbery, or the Moose Club armed robbery?

A.    More details?

Q.    Yes.

A.    No, not more details, but --

Q.    (Interposing)  But what?

Trooper Smith - Cross

A.   I'm sure that it was mentioned.

Q.   And you did not reduce it to writing at that time?

A.   At that time, no.

Q.   Yes.

A.   No.

Q.   And never did?

A.   Just the fact that he confessed to it, not into detail.

Q.   Now, Trooper Smith, after it took him five minutes to give you his confession of the armed robbery at the Moose Club, did you ever discuss the armed robbery of the Moose Club again before you got to Parkersburg?

MR. STUCKY:   Your Honor, I would object to defense counsel misstating the evidence.  The testimony of the witness was it took five minutes to ten minutes, and now he is saying it took five minutes.  I think you ought to be fair to the witness.

MR. McKITTRICK:   I'm sorry if I said five and the evidence is five to ten minutes.

BY MR. McKITTRICK:

Q.   Do you understand the question?

A.   Was it discussed again?

Q.   Yes, was it discussed again.

A.   I'm sure it was mentioned again.

Trooper Smith - Cross

Q.    Well, did you discuss it in any detail?

A.    No, not to any detail.  No.

Q.    And he didn't confess to it again, in other words?

A.    We didn't, or I didn't ask him to confess to it again, no.

Q.    When you say that you mentioned it, what would you mention it for?  What would be the reason for mentioning it again after he confessed to it?

A.    It might have been brought up again, like, you know, why it had happened.

Q.    Anything else like that?

A.    Basically just to the effect that something like that happened.

Q.    Which would have taken maybe ten - fifteen seconds to verbalize?

A.    Thirty seconds - forty seconds, maybe.

Q.    How many times did you do that on your four-hour drive after he confessed?

A.    How long or how many times?

Q.    How many times.

A.    I don't know how many times.  I would say maybe four or five, eight.  I don't know, something like that.

Q.    In other words, it is a fair statement to say that after John Moss confessed to the armed robbery of the Moose

Club thirty - thirty-five minutes outside of Mansfield, you

really didn't talk about it again; you talked about other

things to him, correct?

    A.    Well, we did talk about other things, yes, after he

confessed to that.

    Q.    And you really didn't talk about the armed robbery

of the Moose Club except for maybe four occasions of thirty

seconds, and that was just in passing; is that a fair state-

ment?

    A.    I'm not sure what you are saying.  Are you saying

I really didn't do what now?

    Q.    All right, I want you to understand what I am

saying, because it is important to the Court.  You have

indicated to the Court that John Moss gave you a five-to-ten-

minute confession of his involvement in the armed robbery of

the Moose Club, correct?

    A.    That's my estimation as to how long it would have

taken.

    Q.    And that that happened and was concluded thirty to

thirty-five to forty minutes after you left Mansfield, Ohio,

the reformatory, correct?

    A.    Yes.  I would say that's close.

    Q.    All right.  Now after that thirty to thirty-five or

forty minutes, it is my understanding that your testimony is

Trooper Smith - Cross

that the only time you talked to John Moss about the armed robbery at the Moose Club was in passing, and in passing means that you had some very short thirty-second remarks between you and he, on about four occasions; is that correct?

A.   Which was within this area of time that we are talking about.

Q.   The area after you finished the confession, after he finished his confession and before you got to Parkersburg, correct?

A.   It all didn't take more than an hour.

Q.   All right, after the forty minutes when he concluded his confession, Trooper Smith, how many times did you discuss the armed robbery of the Moose Club with John Moss before you got to Parkersburg, approximately?  Was it approximately four times, as you have told the Court in the past in your testimony?

A.   Three, four, maybe six or eight.  I don't know.

Q.   Okay, and these three, four, maybe six or eight were just thirty-minute bursts of conversation, is that correct, between you and John?

A.   I don't understand what you are saying when you say thirty-minute bursts.

Q.   All right, you said that after he concluded his confession to you thirty - thirty-five- forty minutes out of

Mansfield, you did not discuss the armed robbery of the Moose Club in any detail with him.

A.    That's right.

Q.    That the only way that it may have been discussed was in passing, as you said, where you may have said why did it happen and he answered the question, and it only took thirty seconds, correct?  Isn't that what your testimony is?

A.    I'm saying within that time.

Q.    All right, and then I asked you how many times did that happen, and you said about four times.

A.    I said maybe four.

Q.    Six or eight.

A.    And really that's a guess on my part.

Q.    All right, now those four - six - eight times that we are talking about that it happened, the duration of each one of those conversations, as I understand your testimony, was approximatley thirty seconds apiece.  Is that a fair statement?  Is that correct?

A.    You mean like thirty seconds for each one of them?

Q.    Yes, approximately.

A.    So if we are talking about four, we are talking about one hundred twenty seconds?

Q.    Right.

A.    Which is two minutes.

Trooper Smith - Cross                                    230

Q.   Is that a fair statement?

A.   I am not going to say those occurred within two
minutes, nor can I say they occurred within two.

Q.   The duration of all of them, if you totaled them
all.

A.   That's my approximate guess.

Q.   All right, so if there was six of them, it would have
been approximately one hundred eighty seconds?

A.   Yes.

Q.   All right, and if there were eight, it would be
approximately three hundred twenty seconds or two hundred
forty seconds, correct?

A.   Yes.

Q.   All right, and that's all the time that you discussed
the Moose Club shooting with John Moss during the trip from
Mansfield to Parkersburg, correct?

A.   Correct, if that's the way you are wording it.

Q.   All right.  Now what else did you discuss with John
Moss other than the first thirty - thirty-five -- forty minutes
out of Mansfield, and excluding those thirty-second conversa-
tions that you have already told us about, about the armed
robbery?  What else did you discuss in that period of time
before you got to Parkersburg?

A.   Before we got to Parkersburg?

Q.   Correct.

A.   But you stated in there forty - forty-five minutes. You are talking about after that?

Q.   Exclude that.

A.   Exclude that?

Q.   Right.

A.   Just everything in general, you know, like the lay of the land, you know, like do you like sports, you know, how do you do in school, who are your friends, just things in general.

Q.   When you -- after the confession of John Moss to the armed robbery of the Moose Club, did you ever consider in your mind that you would question him about the Reggettz murders?

A.   After the confession?

Q.   To the Moose Club.

A.   Yes.

Q.   What prompted you not to ask him any questions about the Reggettz murders immediately after he confessed to the armed robbery of the Moose Club?

A.   Because I felt like as far as talking to him that it would be better, you know, to talk about something like that, due to the fact that it was a lot more serious, you know, at a place where he would feel more comfortable, more

Trooper Smith - Cross

at ease.

Q.   Did you not feel that an armed robbery and shooting at the Moose Club was important?

A.   Yes, sir.

Q.   Did you feel that he was comfortable enough where you asked him questions about that crime in the back seat of that cruiser?

A.   Did I feel like that was good enough?

Q.   Yes.

A.   Yes.

Q.   Other than the lay of the land and sports and other social remarks that passed between you and John Moss after he concluded his conversation or confession with you, to you, about the armed robbery of the Moose Club, what other things did you discuss?

A.   After the confession of the Moose Club robbery?

Q.   After, and before you got to Parkersburg.

A.   I made mention to John that there was another more serious and important crime that we were concerned with that we felt that we needed, you know, to get information on, to get straightened out.

Q.   How long out of Mansfield, Ohio, had you been before you mentioned that?

A.   Well, --

Trooper Smith - Cross                                    233

Q.    (Interposing)  Approximately.

A.    Forty - fifty minutes, fifty-five minutes, something
like that.

Q.    And what was John's reply to that?

A.    At first?

Q.    Yes.

A.    To the effect that he didn't know what I was talking
about.

Q.    Did you ever bring it up again after that first
question?

A.    Yes.

Q.    How long after the forty or fifty minutes out of
Mansfield did you bring it up again?

A.    Well, after I brought it up the first time, I
probably brought it up in a few seconds, thirty seconds,
maybe.

Q.    What did you say then?

A.    I explained to him that I felt like he did, you know,
have knowledge or could add, you know, information that we
needed concerning the crime, to that effect, and I felt like
he was aware of it and could help us.

Q.    But it is your testimony that you never mentioned
the crimes that you are talking about; is that correct?

A.    You mean as to which crime I was referring to?

Trooper Smith - Cross                                                    234

Q.    Correct.

A.    Other than the fact that it was a serious crime which had occurred in West Virginia, much more serious than the armed robbery and what had happened in Ohio.

Q.    Now up to this time, -- strike that.  Now this conversation with John, as I understand it, occurred approximately forty to fifty minutes out of Mansfield, Ohio, after you left?

A.    That would be my guess.

Q.    And you left at two o'clock, approximately?

A.    Around two o'clock.

Q.    All right.  Now what did John say to that second statement of yours?

A.    He still stated that to the effect that he wasn't really aware or didn't know what I was talking about.

Q.    Did you tell him what you were talking about?  Did you tell him what you were talking about?  Did he say, "Trooper Smith, I don't know what you are talking about"?

A.    No.  No, I didn't, other than the fact it was very serious and very important and it was very important we could get information to get it straightened out.

Q.    And he told you I don't know what you are talking about, correct?

A.    To that effect.

Q.  You did not tell him at that time what you were talking about?

A.  No.

Q.  All right, now did you say anything back to him?

A.  Yes.

Q.  What did you say?

A.  I asked him why did he think that we obtained a sample of his blood, and then stated, "Now, John, do you know what I'm talking about?  Do you know what I am referring to?"

Q.  And what did he say?

A.  He didn't say anything.

Q.  And what did you do?

A.  Because he shook his head that he did know what I was talking about, I said to the effect, you know, --

Q.  (Interposing)  In other words, he didn't say anything after you mentioned the blood sample, but he shook his head?

A.  Acknowledging that he did know what I was talking about.

Q.  How did he shake his head?

A.  By going (indicating).

Q.  Shaking it up and down?

A.  Yes.

Q.  And did you-- you took that as his saying I know what

you're talking about; is that correct?

A.   I took it as I felt that he was telling me that,
yes, Trooper Smith, I know what you are talking about.

Q.   But you did not take that as acknowledging that he
participated in the crime, did you?

A.   At that time?

Q.   Yes.

A.   No.

Q.   You took that as meaning yes, I know why you took
my blood sample, because you talked to me about the Reggettz
murders when you took it.  Isn't that what you thought when
he nodded his head?

A.   No.  Let's see, reword it again.

Q.   When John nodded his head, you thought to yourself
he is saying now I know what you're talking about because
you talked to me about the Reggettz murders when you took my
blood sample, correct?

A.   And that he had information and knowledge concerning
the crime?

Q.   Yes.  Right.

A.   Yes.

Q.   And now after he nodded his head and didn't say
anything, did you say anything back to him about this conver-
sation you were having with him?

Trooper Smith - Cross

A.  I asked him if he was willing to tell me about it, you know, what he knew, to the effect of what he knew or the information he might have concerning that crime.

Q.  This is a critical statement that you made to John. I want you to look back in your mind and try to tell the Court exactly what you said, not in effect, but exactly what you said after he nooded his head.

A.  There is no way I can tell you exactly what I said, you know, verbatim.

Q.  You can't tell us verbatim?

A.  No, sir.

Q.  Have you ever reflected that in writing on an activity report anyplace?

A.  Yes.  Not on an activity report.  It was a couple of days later that I made some notes and had them typed up.

Q.  Did that reflect exactly what you said?

A.  Either exactly what I thought I said at that time or to the effect of what I said.

Q.  All right, either one or the other?

A.  One or the other.

Q.  You can't remember at this time?

A.  No, sir.

Q.  And are you telling the Court that whatever you put in that activity report with regard to the statements between

Trooper Smith - Cross

23

you and John could have been the effect of what was said but not exactly what was said?  Is that a fair statement?

A.   One or the other.

Q.   One or the other, and you don't know as to what statements one or the other applies; is that correct?

A.   At this time?

Q.   Yes, if you were to look at that activity of what happened in that car that you wrote up, you couldn't tell which ones of those statements were exactly what was said as opposed to in effect that was what was said.  Is that a fair statement?

A.   Whatever my notes would say, I would feel that was what was said.

Q.   Exactly what was said or in effect to what was said?

A.   As close as I could remember.

Q.   So it could have been in effect what was said, not exactly what was said; is that correct?

A.   Is that the same thing as saying as close as I can remember, to the best of my knowledge?

Q.   In other words, it was the essence of what was said, but not the exact words?  Is that a better way to put it?

A.   I would agree with that.

Q.   All right.  Now after John nodded his head, what in

Trooper Smith - Cross

essence did you say then to him?

A.   Then are you willing to tell me about it and help us get it straightened out, you know, are you telling me that.

Q.   Did he respond to that question?

A.   He said that he would.

Q.   All right, again I take it in your mind that you did not take that as an admission that he was involved in it, but that only he may have some information to help you clear that crime up; is that correct?

A.   At that time?

Q.   Yes.

A.   Yes.

Q.   That's how you felt?

A.   Yes.

Q.   All right, now was there anything else stated about what you were talking about after he told you that?

A.   Other than the fact that wait, the best place to talk about something this important, this serious, should be done at a place where we can sit down, look at each other, have something to drink, a more relaxed place, a better place than the back seat of a police cruiser.

Q.   And then for the next three hours and ten minutes or twenty minutes, how ever long it took you to get to Parkersburg,

Trooper Smith - Cross

you never mentioned anything concerning what you knew to be

the Reggettz murders but what John didn't really know because

you hadn't characterized it; is that correct?

    A.   I would have to say it is.

    Q.   All right.  When you pulled into the detachment there

at Parkersburg, did you and Trooper Williams immediately exit

the car and go into the detachment?

    A.   I'm sure we did.

    Q.   And did you take John with you?

    A.   Yes.

    Q.   In other words, what I am asking you is you didn't --

is it a fair statement to say that you and Trooper Williams

didn't sit in the car there at the detachment in Parkersburg

with John Moss for several minutes, but you went into the

detachment?

    A.   Yes, I'm sure we didn't.

    Q.   Now in your ride from Mansfield to Parkersburg, did

you ever give John Moss his rights?

    A.   Yes.

    Q.   Do you have a form that reflects that you gave John

Moss his rights during that ride?

    A.   My I.D. card, or an I.D. card, which has the <u>Miranda</u>

Warning on the back of it.

    Q.   Do you have a waiver form signed by John Moss?

Trooper Smith - Cross

A.   That was signed between Mansfield and Parkersburg?

Q.   Yes, sir.

A.   No, sir.

Q.   When I talk about a waiver form, what am I talking about?

A.   A waiver of rights form, a <u>Miranda</u> Warning form, whatever.

Q.   What is that used for?

A.   Basically it is used for the same purpose as what I stated I had on the back of my I.D. card.

Q.   You had John sign a couple of those when he gave his confession at the Parkersburg Detachment, didn't you?

A.   I had John sign --

Q.   (Interposing)  Either you or Trooper Williams or Sergeant Presson.

A.   I was present when one was signed.

Q.   Okay, how long after you left Mansfield did you apprise John of these rights on this card?

A.   How long?

Q.   Yes.

A.   I'm going to say I estimate it between twenty to thirty minutes after leaving Mansfield.

Q.   Now you have that card with you, don't you?

A.   It is -- I gave it, I think, yesterday as an exhibit.

Q.  What was the reason that you gave John Moss his rights after you left Mansfield?

A.  Why?

Q.  Why.

A.  I do that any time that I feel that someone may be involved in a crime that I want to talk to them, to try to get some information from them.

Q.  And when you gave John these rights, you gave him these rights fully intending in your own mind to discuss with John his involvement in the armed robbery of the Moose Club. Is that a fair statement?

A.  Yes.

Q.  Now this State's Exhibit 2 that I am handing to you, which purports to be this card with these rights on them, when was that issued to you by the Department of Public Safety of West Virginia?

A.  This actual card?

Q.  Yes, sir.

A.  I'm not sure.

Q.  Could it have been issued to you within the last year?

A.  In '82?

Q.  Yes, sir.

A.  No, sir.

Q.   In '81?

A.   I'm not sure.

Q.   It could have been?

A.   Could have been.

Q.   So then it is a fair statement to say that State's Exhibit No. 2 may not have been the card that you took from your person to read to John Moss on the 28th day of October, 1980; is that correct?

A.   Yes, sir.

Q.   Do you remember what the rights say on this card without reading the card?

A.   Not word for word, no.

Q.   You can't remember it word for word?

A.   No, sir.

Q.   Can you remember what the card said word for word that was issued to you before you got State's Exhibit 2?

A.   No, sir.

Q.   Can you remember, Trooper Smith, the essence of the words that you read to John Moss in October of 1980 as it related to his rights?

A.   I could probably come close to stating what was on there but, as I said, not word for word.

Q.   All right, would you put into the record what rights you advised John Moss of on October 28, 1980, that you

Trooper Smith - Cross

remember?

    A.   Without the card?

    Q.   Without the card.

    MR. STUCKY:  Your Honor, I am going to object.

    MR. McKITTRICK:  This is cross-examination, Your Honor,

and this is an important issue.

    MR. STUCKY:  On direct examination, he testified that

the way he gave his rights was from reading the back of a

card, not from oral memory.  So, therefore, anything he

remembers about what he read is irrelevant to what he actually

did.

    THE COURT:  I think the record -- the objection is

sustained.  The record will reflect what his direct testimony

is.

BY MR. McKITTRICK:

    Q.   After you read the rights to John Moss, Trooper

Smith, what did John do, if anything?

    A.   After he was -- after I read them to him?

    Q.   Just tell us in your own words what you did when you

started reading the rights to John, what transpired after

that time.

    A.   I just made -- you know, he told me he was aware of

what I read to him and stated that he understood and that

he was willing, you know, had no problems about talking with

Trooper Smith - Cross

me about any crimes I wanted to ask about.

Q.   Did he ask you any questions about his rights?

A.   No, sir.

Q.   Did you make any explanation to him about them?

A.   Other than the fact I was giving them to him due to the fact I was going to ask him about some crimes which had occurred in West Virginia.

Q.   Now when you went into the Detachment in Parkersburg, what is the first thing that you all did?

A.   We let the sergeant that was on station, on duty, at that time know what we were doing, that we were stopping and the fact that we were there, who we had, and asked him to the effect could he give us a room where we could talk, get something to eat.

Q.   All right, now you arrived at the Parkersburg Detachment at 6 to 6:30?

A.   That's my guess.

Q.   What time did you finish or your fellow troopers finish taping the statement of John Moss?

A.   What time did they finish?

Q.   Yes.

A.   Now I'm guessing around ten o'clock.

MR. STUCKY:  Your Honor, again --

THE COURT:  (Interposing)  If he knows of his own personal

knowledge, he can answer.  If he doesn't know what it it was,

and if I understand, he doesn't, then he can't answer.

BY MR. McKITTRICK:

    Q.   If you don't know the answer to any of my questions,

you are not supposed to answer.  You know that, don't you?

    A.   I don't know the exact time.  I would say approxi-

mately ten o'clock.

    Q.   Okay.

    A.   That they finished taping the statement.

    Q.   All right, when after you arrived at 6 or 6:30 did

you start taking the confession of John Moss or talking to

him about the Reggettz murders?

    A.   When did we start talking to him?

    Q.   Yes.

    A.   Probably around seven.

    Q.   Did you eat before you started talking to him?

    A.   No.

    Q.   Where did you take him and talk to him?

    A.   In one of the offices inside the detachment.  There

is different office areas there.

    Q.   Who was in that office there with him?

    A.   In the beginning, myself, Trooper Williams.

    Q.   Did you advise him of his rights again?

    A.   Yes.

Trooper Smith - Cross

Q.   Is that before you started talking to him?

A.   Yes, concerning any crimes of any kind.

Q.   Let me hand you State's Exhibit 4.  Is that the form that reflects that you advised him of his rights?

A.   Yes, sir.

Q.   The first time?

A.   Yes, sir.

Q.   In the detachment.

A.   At Parkersburg, yes.

Q.   And that is dated 6:50; is that correct.

A.   Yes, 6:50 p.m.

Q.   Yes.

A.   You mean the time?

Q.   Yes, dated 10-28-80, 6:50 p.m.

A.   Right.

Q.   Now did John indicate to you at that time that he would answer your questions?

A.   Yes, sir.

Q.   And when he indicated that to you, what did you do that reflected that he was willing to answer your questions?

A.   What did we do?

Q.   Yes.

A.   You mean after he was advised of this and signed this?

Trooper Smith - Cross

Q.  Yes.

A.  Started asking him the questions.

Q.  Well, first, though, you had him sign a waiver of rights form, didn't you?

A.  Yes.

Q.  And is that contained on State's Exhibit 4?

A.  That's what this is.  I'm looking at State's Exhibit 4.  It's a waiver of rights form.

Q.  It also has his rights on there, too?

A.  Yes.

Q.  It is two different parts, isn't it, contained in one?

A.  Yes.  Well, it's a rights form and down here it says "Waiver of Rights".  It's one form.  It's D.P.S. Form #79.

Q.  Now I notice that there is seven minutes difference between the rights part of that form and the waiver of rights.

A.  Yes.

Q.  What occurred during that seven minutes?

A.  This is dated -- that would have been put on before the reading started.  This would have been read and he would have signed it and he would --

Q.  (Interposing)  For the record, you are going to have

Trooper Smith - Cross

to say what this means.

A. Okay, where it says time and it has 6:50 p.m., Eastern Standard Time, that's put in just before this is explained to him.

Q. Then what transpired?

A. After the time was placed on there?

Q. Right.

A. It was explained to him, read to him.

Q. It was read to him?

A. Yes.

Q. Then he immediately signed the waiver of rights form; is that correct?

A. After the whole form was read to him, yes, that we have here now.

Q. Then you started talking to him about the Reggettz murders?

A. Within a few minutes after that, I'm sure we would have.

Q. All right, now did John initially say to you that he had not committed the Reggettz murders?

A. Initially?

Q. Yes.

A. Are we talking about any particular date?

Q. I'm talking about after he signed that form, State's

Exhibit 4.

A.    This?

Q.    Yes.

A.    He never once said that he didn't.

Q.    He never once said that he didn't?

A.    He said that he didn't know, couldn't remember.  He made a statement in the beginning that he wasn't sure what I was talking about.

Q.    Tell us what he said along those lines.  It is important.

A.    Well, I said, relating back to the crime, you know, about the seriousness of the crime, started out basically how did it happen, you know.  He said, "It just happened."

Q.    Then what was said?

THE COURT:  Go ahead.

THE WITNESS:  He said, "It just happened."  He said -- I asked him --

BY MR. McKITTRICK:

Q.    Now at this point, Trooper Smith, what I would like you to do is give the Judge a chronology of exactly, to the best of your memory, what was said and what happened after he signed this waiver of rights form, which is State's Exhibit 4.

A.    Okay, it was mentioned of the serious crime that we

had mentioned, that I had mentioned to John coming down the road, and I asked John why did this happen, how did it happen, one or the other, and he stated something to the effect, "It just happened", or "It did happen", and he was asked why, and he said, "Well, you know, I don't know", or "It just happened." Again, I asked him was it because he got scared, like on the other crimes, the one in Ohio and the one in West Virginia at the Moose Club, and he acknowledged, either saying yes or shaking his head yes and the fact that he got scared; and I said, "Well, what do you mean, you got scared?" Or, "What happens when you get scared?" And he said, "My blood starts rushing."

Q. And did he say that the Reggettz -- at this time in your conversation, did he say that the Reggettz homicides occurred because he got scared?

A. No, sir.

Q. All right, what happened then?

A. He said -- or I said, "Well, you know, tell me why you got scared or what happens when you get scared." Once, twice, maybe three different times he might have stated on this, "I can't remember." I stressed to him it was very important that he remember and I felt like he could help us, he probably did remember, that that was something he remembered, something of that nature, that it was probably hard to talk

Trooper Smith -- Cross

about, that he might be having a little trouble remembering, but that I wanted him to try very hard to remember what had happened and why.

Q.   Then what occurred?

A.   He said, "Well, I'm still having trouble."  I said to the effect when was it that you remember getting scared, and he stated "On the tracks."  And I asked him if that was before or after it happened, and he stated it was after.  I think we were talking now about -- you said to the best of my knowledge without looking?

Q.   The chronology.

A.   To the best of my knowledge without looking.  Okay, I said, "Could you remember where you were at when you first got scared before this happened?"  And he said, "At the back door."  I said, "Well, you know, what happened then?"  And he said something like, you know, "I'm having trouble remembering", or "I don't know", and I said to the effect -- I did say, "What did you think the next morning?"  And he said -- before that, I asked him, when he said at the back door, I asked him what had happened after he got inside, was there anybody there, or what happened, and he said, "They were."

Q.   They were?

A.   They were.  I asked him who they were.

Q.   You mean at the back door?

A.   After he got inside.

Q.   Okay.

A.   He said, "They were."  I asked him who they were, and
he said, "Her and the kids."  I asked him what happened then,
and he said, "I can't remember", or to the effect of I don't
know or I can't remember.  I stressed -- when questions like
this was asked, John was somewhat -- he would hesitate,
thinking about it.  I would say what is wrong and he would
say I'm having trouble remembering or I can't remember, and
I asked him what he thought the next morning after, and he said
that it shouldn't have happened.  I said what do you mean, it
shouldn't have happened, or why shouldn't it have happened.
He said, "Because of the kids."  I said what do you mean,
because of the kids, and he said, "Because they were so
young."

Q.   Trooper Smith, did he continue on then to give you
a confession of what occurred there in the house?

A.   At that time?

Q.   Yes.

A.   As I was asking him the questions, you know, he
would tell me things that had happened.

Q.   You would ask him the questions and you kind of
led him through and asked him the questions as to what

happened?

    A.   As to what happened?

    Q.   Yes.

    A.   I was asking him questions, you know, what happened after you remember this or after you remember that.

    Q.   Now after you finished or after he finished, did you feel that he had confessed to killing the two children, the two Reggettz children, and Vanessa Reggettz?

    A.   After I finished -- I'm not sure at what point we are talking about.

    Q.   After he concluded with his discussion with you.

    A.   For the evening?

    Q.   Yes, where he said he left the home and went wherever he went, did you feel that he had confessed to the homicides of the two Reggettz children and Vanessa Regettz?

    A.   After I finished questioning him, I felt that he had confessed.

    Q.   Now you started questioning him about seven o'clock?

    A.   Yes.

    Q.   What time was it when you felt that he had confessed?

    A.   Oh, as far as confessing, as far as my questioning went, I was finished around nine o'clock.

    Q.   Nine o'clock?

    A.   Give or take.

Q.    It took two hours?

A.    Yes.

Q.    All right, now during the taking of the confession from seven o'clock until nine o'clock, did you and John ever go over the same area more than one time?

A.    I'm sure we did, some different areas.  I mean, you know, like we would go back through something.

Q.    What time of the night on the 28th day of October, 1980, was the taped recording of the confession made, or started?

A.    To the best of my recollection, between 9 and 9:30.

Q.    Between 9 and 9:30?

A.    Started.

Q.    All right, after you concluded at nine o'clock?

A.    Approximately nine.

Q.    Approximately nine, where you felt that John had confessed to these homicides, did you or anyone else go over the story with John again before it was placed on tape?

A.    Yes.

Q.    Who went over it with him?

A.    Trooper Williams.

Q.    How many times?

A.    The whole story?

Q.    Yes.

Trooper Smith - Cross

256

A.    Once, maybe.  It might have been twice.  Once or twice.

Q.    Okay, were you present?

A.    Part of the time.

Q.    Was Trooper Williams present when you talked to John from seven o'clock until nine o'clock?

A.    A big part of the time.

Q.    How long did it take you to tape record the confession?

A.    I didn't.

Q.    I'm not asking you that.  Do you know how long it took to tape record the confession?

A.    Approximately a half hour.

Q.    Okay.

MR. McKITTRICK:  Your Honor, could you indulge me for just a couple of seconds?

(WHEREUPON, a discussion was held off the record.)

BY MR. McKITTRICK:

Q.    Trooper Smith, from 6:30, when you arrived at the Parkersburg Detachment, until approximately ten o'clock, when you finished taping the confession and so forth, what food if any did John have?

A.    He had -- as soon as we got there, he was allowed to get a drink of water, and we obtained a coke within a half

hour after getting there -- a half hour to forty minutes after

getting there, anyway.  Also, a sandwich, which I believe

was either something like a Submarine sandwich of some type,

ham sandwich, steak sandwich, and there was plenty of coffee

available.  I don't know whether John drank coffee or not,

but any time he wanted something to drink, coke, water,

whatever, it was given to him.

Q.   Did John smoke?

A.   Yes.

Q.   Was he allowed to go to the bathroom?

A.   Yes.

Q.   How many times did he go?

A.   He went at least once and he could have went a

couple more times after that, as far as that goes.

Q.   Do you know that he did?

A.   The one time, yes.

Q.   Did John ever indicate at any point during your

questioning or anyone else's questioning that he wanted to

stop the questioning?

A.   No, not at any point.

Q.   Did John indicate to you at any time or anyone else

in your presence that he did not remember a specific thing?

A.   What do you mean, not specific?

Q.   That he did not remember something you were questioning

him about concerning these murders.

A.   There was different times, as I have already stated, he said he didn't remember what I was asking him.

Q.   All right, what I want you to do is list for us the things he said he didn't remember.

A.   To list for you?

Q.   Yes.

A.   He didn't remember why it happened at one time, and then later he did.

Q.   He didn't remember what or why it happened?

A.   Either how it happened, why it happened, and then at one time he didn't remember what happened after he got inside the house, didn't remember what happened after he saw them in the house.  He didn't remember -- there was numerous things that he did not remember at first.

Q.   All right, try to think of them.  I know it is probably difficult for you, but take your time and try to think of it.

A.   He didn't remember what all occurred in the house.

Q.   You mean with regard to the homicides?

A.   Numerous things.  Again, he didn't remember what happened to some articles that came out of the house, he didn't remember what he did after seeing them, where she was at, meaning the mother.

Q.   Did he get confused on the sequence of events in the

Trooper Smith - Cross

259

house as they happened?

A. No, I couldn't say that he was confused on the sequence of what happened, you know, in the house.

Q. What else couldn't he remember that you are talking about? You said as to the actual murders themselves, I think you said once before. What else couldn't he remember?

A. Oh, he couldn't -- it was asked about gloves, and he said he couldn't remember whether he wore gloves or not. That question was asked. It was asked if he could remember what he was doing before going down there to the residence. That's just right now basically all that I can remember.

Q. Could there have been other things you just can't remember right now?

A. I'm telling you, like I said, numerous things.

Q. Numerous things he couldn't remember, and you have cited for us as best you can remember the things that he didn't remember at the time, but there could be more; is that correct?

A. Yes, there could be.

Q. Okay. Now you were the investigating officer throughout this Reggettz matter, these Reggettz homicides, were you not?

A. The investigator?

Q. One of the investigating officers.

A.   Yes, one of them.

Q.   And you said before, you are very familiar with the evidence in the case; is that correct?

A.   With a lot of the evidence, yes.

Q.   Is there anything about the confession that was taken from John Moss that is inconsistent with the evidence as you found it to be as an investigator in these cases?

A.   Inconsistent?

Q.   Yes, sir.

MR. STUCKY:  Your Honor, one thing.  I would like defense counsel to clarify which confession.  We have talked about an oral confession and we have talked about the taped confession.

MR. McKITTRICK:  Talking about the taped confession.

THE WITNESS:  You are?

MR. McKITTRICK:  Yes.

MR. STUCKY:  He did't take the taped statement.

BY MR. McKITTRICK:

Q.   Well, it would be an insult to your intelligence, wouldn't it, Trooper Smith, to say that you haven't read John Moss' taped confession, wouldn't it?

A.   I have read John Moss' taped confession.

Q.   Probably many times, haven't you?

A.   Several.

Q.   Can you answer my question now?

A.   I want you to -- would you repeat it once again, please?

MR. McKITTRICK:  Can you read it back?

(WHEREUPON, the question was repeated by the Reporter.)

MR. STUCKY:  Your Honor, I would object to the question. I think it needs to be qualified as to the personal observations and information that he has not based on the hearsay which is included in the voluminous pages that he has in front of him in the report.  I don't think he is qualified to testify about that.  He has already testified he wasn't at the scene the day of the crime.  So I'm not sure what personal information he has that is inconsistent with the confession.

MR. McKITTRICK:  Your Honor, this witness has testified for six hours, and he has stated on two different occasions when I first started cross-examining him and I tried to qualify these questions, he was the primary, one of the primary or one of the officers whose primary job was to investigate the Reggettz murders.  He has indicated several times and reflected by his testimony several times that he is intimately familiar with the physical, testimonial and other evidence in the investigation.  If this officer, without me going any further, can't answer that question, there is no one on the face of this earth that can.

THE COURT:  I will let him answer it with the qualifica-

tion that he was not at the murder scene on the day of

the alleged crime.

MR. McKITTRICK:  Yes, Your Honor.

THE COURT:  Subject to that disclaimer, I will order him

to answer.

MR. McKITTRICK:  Sure.

THE WITNESS:  Based on what John Moss told me and that

I am aware of John Moss, any confession that he made that

night that I have knowledge of, there is nothing that I know

of that is inconsistent.

MR. McKITTRICK:  That's all the questions.

THE COURT:  Any redirect?

MR. STUCKY:  Yes, Your Honor, we do.

THE COURT:  Then go ahead and start it.

MR. STUCKY:  Yes, sir.

                    REDIRECT EXAMINATION

BY MR. STUCKY:

Q.  Trooper Smith, the last question I believe that you

were asked by Mr. McKittrick was are you aware of any

inconsistencies between the confession given by John Moss

that is on tape and the events that occurred in the Reggettz

home when Mrs. Reggettz and the two children were murdered.

That was the last question, and you answered that you didn't

Trooper Smith - Redirect

know of any inconsistencies?

A.    I cannot think of any inconsistencies.

Q.    You were not presence when Mrs. Reggettz was murdered nor the two children.  So the only thing that you know about how they were killed is, number one, I guess, the statements that Mr. Reggettz gave, and, number two, the statements that John Moss gave?

MR. McKITTRICK:  Objection, Your Honor.  That is so leading to this witness.

THE COURT:  Don't lead him.  Sustained.  Rephrase the question.

BY MR. STUCKY:

Q.    What information do you have that you are basing your knowledge as to what occurred in the Reggettz home on December 13, 1979?

A.    Just what I have been told, informed of or, you know, through the investigation as to what they felt occurred there.

Q.    Where did that information come from?

A.    Well, it came from different places, the officer that arrived at the scene, what he saw there, and some of it from the medical examiner's office, you know, what I was told by the medical examiner.

Q.    You learned at some time, at least, of one instrument that was used in the murder?

MR. McKITTRICK:  Objection, Your Honor.

THE COURT:  Now that is leading.  I'm going to sustain the objection.  You've got a proper way of phrasing that question.

BY MR. STUCKY:

Q.  Did you ever learn what instruments were used in the commission of the murder on Vanessa Reggettz?

MR. McKITTRICK:  Your Honor, now what he is trying to do, he has done two things here.  Number one, he has asked a leading question.  He has told the witness what the answer is. Then he comes back and he asks a question that is not leading. That's number one.  We object to it.  Number two, what he is doing, he has an answer out of his witness and it is not the answer he wants, and now he is trying to impeach his own witness by trying to rehabilitate the answer.

Now I know that this Court does not know all of the evidence in this case because it hasn't been presented to the Court all of the evidence, but it is very -- Your Honor, let us come to the Bench and I can explain.

THE COURT:  There is no jury here.  It is almost 4:30 and, as you said a few moments ago, Mr. McKittrick, he has been on the stand almost six hours.  Perhaps this is a good place to quit, and I will sustain the objection at this time and we will take up redirect Monday morning at 9:45.

MR. McKITTRICK:  Your Honor, I would request an admonishment that this witness not be talked to by the State between now and Monday morning.

THE COURT:  Absolutely.  Trooper Smith, I am going to admonish you not to talk to anyone, not only the State, to anyone regarding your testimony here today over the short weekend recess.  Be back here at 9:30 and we will be picking this up at 9:45.

Now I am going to start at 9:45 because I have only got one small matter on my docket.

MR. McKITTRICK:  I will be here.

THE COURT:  Good.  I hope so.  I would hate to have to send for you.

MR. McKITTRICK:  Have a nice weekend, Judge.

THE COURT:  Yes, you, too, Mr. McKittrick.

Let the record show we are concluding this proceeding today at approximately 4:26 p.m., Saturday, September 25, 1982.

(Witness stood aside.)

(WHEREUPON, at 4:26 p.m., the hearing was recessed until 9:45 a.m., Monday, September 27, 1982.)

- 0 -