# MOSS v. BALLARD
# CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 21
# (CONTINUATION, pp. 266 - 400)

<u>VOLUME III</u>                                              266

IN THE CIRCUIT COURT OF KANAWHA COUNTY

WEST VIRGINIA

IN THE INTEREST OF:                )
                                   )
JOHN MOSS, JR., also known as      )   JUV-80-775, 776, 777
JOHN MOSS, III, a Child Under      )
the Age of 18 Years                )   TRANSFER HEARING

BEFORE:  HONORABLE JOHN HEY,

                    Judge   FEB - 9 1987



                                        CLERK OF THE
                                SUPREME COURT OF APPEALS
                                    OF WEST VIRGINIA
            APPEARANCES:


     FOR THE STATE:  Mr. James C. Stucky and Miss Neva Lusk,

Assistant Prosecuting Attorneys for Kanawha County.

     FOR THE JUVENILE:  The Juvenile, Mr. John Moss, Jr.,

also known as John Moss, III, was present in person, and

represented by Mr. Parrish McKittrick and Mr. Harry C. Taylor,

II, Attorneys at Law, his counsel.




                              Basil J. Ferrebee
                              Official Reporter

<u>THIRD DAY</u>

(BE IT REMEMBERED, that heretofore, to-wit, on Monday, the 27th day of September, 1982, during the September 1982 Term of said Court, in the matter of In the Interest of John Moss, Jr., also known as John Moss, III, Juvenile Petition Nos. JUV-80-775, 776, and 777, as stated in the caption hereto, the following transpired:)

THE COURT:  All right, show the resumption of the pro- ceedings In the Interest of John Moss, Jr., transfer hearing, Juvenile 80-775, 776, 777, murder in the first degree.

The Defendant is present in person and by counsel, State of West Virginia by her Assistant Prosecuting Attorneys.

Where are we?

MR. McKITTRICK:  Ready to proceed, Your Honor.

THE COURT:  All right, I want the record to reflect, however, we have a time problem.  It is now 10:30 a.m., and counsel for the Defendant requested I permit him almost an hour's time to discuss the situation with his client.  So that is an hour that has been used up this morning, and it may very well be we are going to work this evening if we don't conclude it this afternoon.

All right, proceed.  I am telling all parties right now be prepared to go about 6:30 p.m.

You are still under oath, Trooper Smith.  Proceed.  We

are on redirect.

    (Thereupon, TROOPER MICHAEL DON SMITH, a witness in

behalf of the State, having been previously duly called and

sworn, resumed the stand and testified as follows:)

             REDIRECT EXAMINATION (Cont'd.)

BY MR. STUCKY:

    Q.   Just for the record, would you state your full name

again?

    A.   Michael Don Smith.

    Q.   You are the same Trooper Smith that has been testify-

ing for the last two days in this transfer hearing; is that

correct?

    A.   I am.

    Q.   You understand you are still under the oath that

was administered by the Judge on Friday?

    A.   Yes.

    Q.   Mike, I believe you testified October 28, 1980 was

the date that you and Trooper Williams went to Mansfield,

Ohio, to obtain custody or possession of the Defendant; is

that correct?

    A.   Yes.

    Q.   And again what time did you arrive at Mansfield that

day?

    A.   I am going to say between eleven and one.

Q.   And you obtained possession of the Defendant Moss,
and what time did you leave Mansifled?

A.   Probably around two o'clock.

Q.   There came a time that you advised the Defendant
of his rights, I believe; is that correct?

A.   Yes.

Q.   What time was that?

A.   Probably a half hour after leaving Mansfield.

Q.   There has been a lot of questions by Mr. McKittrick
on how that was done.  Would you relate to the Court
once again how, what procedures were used in advising him
of his rights?

MR. McKITTRICK:  Objection.  Asked and answered on direct.

THE COURT:  I think you are correct.  It has already
been asked and answered.  Sustained.

BY MR. STUCKY:

Q.   What time did you arrive at Parkersburg that
evening?

A.   Around 6:30.

Q.   And at that time, I believe you answered Mr.
McKittrick's question, at some point there, shortly thereafter,
you started asking Mr. Moss questions about the Reggettz
murders; is that correct?

A.   After he was advised of his rights.

Trooper Smith - Redirect                                      270

    Q.   And would you relate to the Court again how you

began that conversation with Mr. Moss concerning the

Reggettz murders?

    MR. McKITTRICK:  Objection.  Asked and answered.

    MR. STUCKY:  Your Honor, it was asked and answered on

cross-examination.

    THE COURT:  You are talking about the oral confession

now?

    MR. STUCKY:  Yes, sir.

    THE COURT:  Yes, I agree with you.  Overruled.  You

opened it up on cross-examination.  I sustained your original

objection and you got into the oral confession extensively

on cross-examination.  Overruled.

    MR. McKITTRICK:  Was the question concerning the oral?

    MR. STUCKY:  Yes.

    THE COURT:  I want the record to be clear I sustained

your original objection, Mr. McKittrick, about the oral

confession.  I wouldn't let the State get into it on direct.

You brought it out on cross-examination extensively.

    MR. McKITTRICK:  I don't remember that.

    THE COURT:  The transcript will speak to that point.

BY MR. STUCKY:

    Q.   Would you relate to the Court how you began the

conversation between you and Mr. Moss with regard to the

Reggettz murders?

    A.   Well, it was begun by saying that we were investigating a very serious, very important crime and we needed to get it straightened out, and he had already agreed before getting there that he would discuss it with us, and he again agreed he was still willing to discuss it.

    Q.   What was his initial response to that statement or question that you just related to the Court?

    A.   About still willing to talk with us about it?  He just simply agreed that he would talk about it.

    Q.   Then what did you say next?

    A.   I asked him to the effect of like why or how that this happened.

    Q.   What was his response to that?

    A.   I think, also, he said that it happened, right before this, and I asked did it happen because you got scared.

    Q.   That's what you said, what you asked him?

    A.   Yes, before asking him why and how.

    Q.   What was his response to that?

    A.   After being told did it happen because you got scared?

    Q.   Yes.

    A.   He said, "Yes."

    Q.   Then what was the next thing that you said?

A.   Why or how did this happen.

Q.   And what was his response to that?

A.   Either "I don't know" or "I can't remember".

Q.   In your own mind, what did that mean to you?  What did that response mean to you?

MR. McKITTRICK:  Objection.  That's a prerogative of the Court, an invasion.

THE COURT:  I'm going to sustain that.  I'm going to sustain the objection.

BY MR. STUCKY:

Q.   Once he said he couldn't remember and didn't remember, what did you say?

A.   I asked him if he thought he could try harder, and he said -- and I said that was very important and if he could try to remember or to the effect if he could remember, that it was very important, that we needed to know.

Q.   Did you say anything else at that time?

A.   Basically that's about what I can remember asking him.

Q.   What was his response at that time?

A.   At that time, he said something to the effect that I'm still, you know, it's hard to remember, can't remember.

Q.   Then what did you say?

A.   I made some notes on this.  Would it be all right

if I would refer to them?

    Q  Yes, sir.

    MR. McKITTRICK:  Your Honor, I don't understand the reason for this on redirect.  It's in effect direct testimony; and as far as I can see, there is no rehabilitation.  It is the same exact testimony on cross-examination.  I don't understand the reason for it.  It is already in the record in this case.

    MR. STUCKY:  Your Honor, I don't know what he is going to say.  He brought it up on cross-examination.  I am entitled to go back into it on redirect and review what he said on cross-examination.

    MR. McKITTRICK:  What I am saying to the Court is we didn't try to impeach him on cross-examination; and if we had, then he could rehabilitate the witness, but we didn't do that. It is in the record and it speaks for itself.  This is burdening the record.  It is the same exact testimony this witness gave, and that is not the purpose for redirect.

    THE COURT:  Well, I don't know that it is going to be. I don't think anybody knows whether it is going to be the same or not.  As I stated earlier, you brought it up on cross.  I think he is entitled to go into it on redirect. We are here for probable cause.  We are not here in front of a jury in a trial where the strict rules of evidence are

followed.  Although we are bound by the rules of evidence,

it is not as strict as it would be at a trial before a jury.

The objection is overruled.

       Go ahead.  You may refer to your notes.

       THE WITNESS:  I told him to the effect it was probably

something that was hard to talk about, but to try to think

about it and to the best of his knowledge to remember as

much as he could about it.

BY MR. STUCKY:

       Q.  What was his response to that at that time?

       A.  Again, at that time, he just stated, you know, he

was still having trouble remembering.

       Q.  Then what happened?

       A.  I asked him if he remembered where he was when he

first remembered being scared.

       Q.  And his response to that?

       A.  It was "Upon the tracks."

       Q.  And then what did you say?

       A.  I asked him if that was on the railroad tracks, and

he said, "Yes."  I also asked him if it was before or after

it had happened, and he said, "After it happened."  Then I

went on to say and ask the question, "Do you remember where

you were when you got scared before it happened?"  And he

stated, "At the back door."  And I think I asked him to the

effect, "Well, what did you do?  What do you remember next?"

He told me at one time he went on inside, and I asked him

what happened after he got inside, and he stated to the

effect I think that he couldn't remember.

    Q.   All right.  So he said he couldn't remember what

happened once he got inside; is that correct?

    A.   At one time.

    Q.   Then what did you say?

    A.   I think probably at one time he did remember.

    MR. McKITTRICK:  Objection to I think probably, Your

Honor.

    THE COURT:  I agree.  Sustained.  Strike the last

answer.

    THE WITNESS:  Okay, I would have to refer to my notes

here.  He was asked at one point as to who was in the house,

and he stated, "They were."

BY MR. STUCKY:

    Q.   Once he said that they were, what did you say?

    A.   The question was asked who was they, and he

answered, "Her and the kids" or "The woman and the kids".

    Q.   What took place next?

    A.   He couldn't remember around at that point.  So a

short time after that, I asked what he was thinking the next

morning, and he stated that it shouldn't have happened; and,

of course, I asked, "What do you mean by the fact that it

shouldn't have happened?"  And he stated, "Because of the

kids."  And I said to the effect of what do you mean,

because of the kids, and it was stated, "Because they were

so young."

    Q.   Then what did you say?

    A.   There was a question asked as to what time that this

could have happened, and he said that he really couldn't

remember.  I asked the question as to what he was doing

before going there, and it was stated, "Listening to the

radio."  At one time in the interview, it was asked, "Do you

remember about listening to the radio?  Would that help you

recall the time?"  And he said, "No."  I asked him at one

point and he said that it must have been late because when he

had left the house, it was almost daylight.  I asked him

did he remember -- I asked him what he first did when he

got in the house, and he remembered at one time saying "just

looked around".  I asked him if he remembered any lights being

on in the house, and he said he believed there was one on,

that he thought the bathroom light was on and he believed

the living room light was on.  I asked him when he first went

in where he remembered the woman and the kids being, and he

said, "In bed."  It was asked do you remember where you

first saw the lady when she was awake or awakened, and he

stated, "Standing near or at the bed with a gun." I asked

him what happened then, and he said, "I got in a struggle" --

to the effect he got into a struggle, that he got into a

struggle with her when she had the gun, and it was asked

what had happened during the struggle, and he answered that

the gun went off. It was asked of him how many times, you know,

how many shots were fired, you know, was anybody shot, and he

stated that it went off one time. He said he didn't think

anyone got shot. It was asked as to which room that this

struggle occurred, where the shot went off, and he stated it

was in a bedroom next to the bathroom. It was asked what

else happened during the struggle, and it was to the effect

that he got the gun from the woman, stated that he hit her

with it, knocking her down; and at that time, he stated that

he ran from the house.

I asked him which door did he exit, and he stated it

was the back door. I asked him what happened after he ran

out the back door, and he stated to the effect he looked

back and saw the woman at the back door, trying to put

something against the door. It appeared to him that that

was what she was doing. I said to the effect of what did you

do when you seen this, and he stated that he ran back and

forced his way in, and when this happened, another struggle

occurred between him and her, which involved a knife, and that

during the struggle that he got cut; and during the inter-
view, it was asked where he was cut, and he stated, "On the
left, little finger."  He did state he was -- I asked, you
know, did he -- to the effect, you know, of what had happened
after the struggle, and he said he finally got the knife
away and he choked her with a cord, tying her to a door.
Of course, at one time during the interview, it was asked
that he explain how he tied her to the door, and he stated
that he tied her -- and as to which door in the house, and
he stated that he tied her to the bedroom door which leads,
which is next to the bathroom, meaning the bedroom to the
bathroom.  He stated that there was a hole in the door
where a door knob should be, and that that is where the cord
was tied.

    Also, it was asked about the struggle in the kitchen
involving the knife, he was asked to the effect of what were
the children doing or where were they, and he said that they
were hitting at him, trying to stop him.  When asked what
did he do about this, he stated that he just pushed them
back at that time.  He stated that after he got the lady tied
to the door that he got the little boy and was choking him.
It was asked of him how he went about this, and he said
choking him with his hands and then a cord.  It was asked
did he do anything else to the boy, and he stated he tied his

hands behind his back with the cords, or with a cord, and

placed him in a tub which had water in it in the bathroom.

    Of course, it was asked what happened after he did this

to the boy.  He stated that he got the little girl and

choked her with his hands and, of course, it was asked did

he do anything else, to the effect did you do anything else

to the little girl, and he stated that he got a cord, wrapped

it around her neck, placing it over a door and shutting the

door; and I asked him which door in the house, and he stated

it was the front bedroom door.  I asked him which side of

the door was the little girl on and he said that she was

facing the Christmas tree.

    Then at one point, I referred back to the lady, as far

as did he do anything else to her besides tying her to the

door, and he stated that, yes, he stabbed her in the

chest with a knife or something.  Then it was asked why did

he do this, and he said to make sure that she was dead.  It

was asked at one point why he put the boy and the girl in

the tub and on the door in the manner in which he did, and he

said to the effect to make sure that they were dead.

    At one point in this verbal interview, it was asked

concerning what things he may have taken from the house, and

he stated that .22 rifle, or a rifle, and that was cleared

up at a later point by asking him what kind of a rifle and

he said the .22 rifle.  I asked him to describe it, and he
described it as a .22 bolt action with a scope.  Then, of
course, it was said what other things was taken, and at one
time he said a small gun.  I asked him what kind of a small
gun or what did he mean a small gun, or to describe it, and
he described it as a .22 pistol, silver in color.  It was
asked was there anything else, and at one time he stated "a
couple of dollars".

     I told him to think about it because I felt like there
was other things or there was maybe more things that was
missing from the house, and he stated that he took a package
from under the tree, the Christmas tree, and then at one time
he explained that he later gave the package to a friend's
mother.

     He was asked, of course, other questions as to where,
you know, these articles, the other articles, went; and as
for the small gun or the pistol, he said he threw it away.
I asked him why he threw it away, and he said because it was
broken.  I asked him how did it get broken or why it got
broken, and he stated that it was broken when he hit the lady
with it, or the woman.  I asked him how the gun was broken,
and he said that the handle or where you hold it was broken.
I tried to see if John could tell me where it was so that we
might recover it, and he said he threw it away the next

morning, that he carried it to school in a paper bag and
threw it in the dumpster, or a large garbage can, at St.
Albans High School the very next morning.

     At one time, after going through a lot of these
questions, as far as he was answering, I felt like he pretty
much told, you know, the events, you know, murdering all the
members of the family that was there that night.  I still
felt like there was some things that needed to be straightened
out, that maybe we could find some things, and I told him to
talk to Trooper Williams and for them to kind of go over some
things and maybe he could remember some things a little
better than what he had up to that point.

     I left the room and was gone for approximately twenty -
thirty minutes, came back and spoke with Trooper Williams and
found out from John that he had remembered some other things
and we discussed it.  At that time was when the package
came in, and that is also when it came out that again he was
still having trouble remembering exactly what the woman was
stabbed with, which he was still saying at that time a knife
or something.  And after coming back, I asked him about could
he remember or did he wear gloves that night, and he stated
he could not remember.  As for the rifle, he was still at
that time stating that he couldn't remember.  There was some
more questions about the possible location of the rifle, and

Trooper Smith - Redirect

I remember asking him what he did with it, you know, after getting it from the house, and he stated he remembered keeping it under his bed at his grandfather's house until going back to Cleveland.  It was asked what happened to it when he went back to Cleveland, and he stated he couldn't remember or didn't know.

Then later on in the interview -- it was just a short time after that, it was stated that -- he did state that he did take it back to Cleveland.  I asked him how he took it back, and he said when he went back with his uncle.  It was stated did anyone see it, did he ever show it to anybody, did he ever shoot it, and it was no to all those questions.  He said that he broke it down by unscrewing it underneath the stock, which would allow it to break down, that he also took the scope off of it.

Then it was asked what he did with it or where it was now in Cleveland, and he stated at one time that he didn't know, and at one time later he finally remembered, stating that he gave it to a friend, but he evidently wasn't telling the truth, because later he told us that it was still at his house, at his parents' home in Cleveland, and he was -- he told us at one time that he could get the rifle back, that a friend had it and then that he would call the friend and have it returned to his residence.

Of course, I told him that it was important that we
contact his friend and get it back ourselves immediately,
as soon as possible.  He was concerned with the fact that his
friend might get in trouble, and I assured him that his
friend would not get in trouble if the rifle was returned
to us.  When I finally -- his last statement, or the last
as far as I know during the interview, was it came out that
the rifle was still at his residence in Cleveland, at his
mother's.

He was also asked during the interview if he ever had
knowledge as to what was in the house before going to the
house, did he ever talk to anybody about wanting to break
into the house.  He was asked the questions about as far as
he knows, questions I just stated he was asked, and he
answered no, or the answer was no.

We asked him, or I asked him that during what was
occurring in the house with the kids and the woman, if he ever
saw anybody else in the house, and he said no, or the answer
was no.  It was also asked of Paul did anyone ask or talk
to him about wanting to break into the house.

THE COURT:  You've lost me somewhere.  It was asked of
Paul?

THE WITNESS:  I'm sorry, asked about Paul to John if
Paul Reggettz ever talked to him or discussed with him

doing anything to his family, breaking into his home, and

to that effect, and the answer was no.  It was also asked was

there anybody in the house besides the children and the girl,

or the woman, and I probably already said that the answer was

no.

     Could I look back at these?

BY MR. STUCKY:

     Q.   Certainly.  Let me ask you one question.  Were the

contents of the package which he stated he removed from the

home, was that discussed in this question and answer period?

     A.   Yes.

     Q.   What discussion took place with regard to that?

     A.   Where did the package come from, which he stated it

was under the Christmas tree; and it was asked what was in the

package, and he said that it was dishes.  I asked him what

happened to the package.  He said he gave it to a friend, to

his friend's mother for a Christmas gift.  It was asked of

him, you know, since he said it was wrapped, and it was at

one time, but he stated -- it was asked was it wrapped when

he gave it to his friend's mother, or did he re-wrap it.  He

said he did re-wrap it before giving it to his friend's

mother.

     Q.   Okay, were you able at some point in your investiga-

tion to ascertain who that friend's mother was?

A.    Yes.

Q.    Who was that?

A.    It was -- his friend was Bill Johnson, and I'm not
sure if his mother's name is Mrs. Johnson, but we talked with
her and we did recover it.

Q.    You recovered the package?

A.    Recovered it.  It was still -- it was a box of flat-
ware, which she stated was given to her, and it was given to
myself and another officer by Mrs. Johnson.

Q.    You say flatware.  Is that knives, spoons, forks?
What do you mean when you say flatware?

A.    Silverware, flatware, knives, spoons, forks.  It
wasn't wrapped in like wrapping paper, but it still had
cellophane around it and had not been opened as far as the
contents of the box itself.

Q.    Prior to talking with John Moss that evening, were
you aware that flatware had been taken from under the Christmas
tree at the Reggettz residence?

A.    No.

Q.    Were you aware of Mrs. Johnson having any items from
the Reggettz residence at that time, prior to talking to John?

A.    Prior to talking to him?  We had already gotten the
box of flatware from Mrs. Johnson; but as I already stated,
we didn't know at that time when we received them that they

were taken from the Reggettz family or Reggettz house.

    Q.   Prior to talking to John that evening, were you aware that a .22 rifle had been taken from the Reggettz home?

    A.   Yes.

    Q.   Were you aware of the whereabouts or the place where that was located?

    A.   You mean where it was located at one time?

    Q.   After it was taken.  Did you know where it was on October 28th?

    A.   No.

    Q.   John told you where it was?

    A.   Yes, he did.

    Q.   And was what he told you about the location of the .22 rifle confirmed?  Was it accurate?

    A.   I would have to state we didn't actually physically recover it, but I have reason to believe that it was there.

    MR. McKITTRICK:  Objection.

    THE COURT:  Sustained.  Strike the last answer.

BY MR. STUCKY:

    Q.   Do you have any evidence to confirm that what John told you about the .22 rifle was in fact correct?  And if you do, relate to the Court what evidence that is.

    A.   A scope and a statement.

    Q.   A statement from whom?

Trooper Smith - Redirect                                    287

A.    His brother.

Q.    His brother being?

A.    Carlton.  I believe that is the first name,
Carlton Moss.

Q.    Carlton Moss.  Where does he live?

A.    In Cleveland.

Q.    And what was the essence of the statement taken
from him with regards to the .22 rifle?

A.    I talked with him and obtained a statement that
John did bring a .22 rifle back.

MR. McKITTRICK:  Your Honor, we are going to object.
Hearsay.

THE COURT:  Sustained.

MR. McKITTRICK:  Move to strike.

THE COURT:  Strike it.

BY MR. STUCKY:

Q.    I believe you stated that Mr. Moss stated that he
had stabbed Mrs. Reggettz, or the woman, with a knife or
something; is that correct?

A.    Yes.

Q.    During your investigation, did you ascertain that
she was in fact stabbed with a knife?

A.    No.

Q.    Did you ascertain whether or not she was stabbed?

A.    Yes, she was stabbed.

Q.    And what was she stabbed with?

A.    A pair of scissors.

Q.    And how do you know this?

A.    Talking with and seeing pictures.

Q.    And in these pictures, it indicates that she was
stabbed with scissors?

A.    Yes.

MR. McKITTRICK:  Objection.  Best evidence, Your Honor.

THE COURT:  Sustained.

MR. McKITTRICK:  Move to strike.

THE COURT:  Strike it.

BY MR. STUCKY:

Q.    At any time during this question and answer period
were any of the facts of the Reggettz investigation which
you knew at that time related to John Moss?

A.    Okay, would you say that once again so I'm clear
on that?

Q.    Prior to talking to John Moss, you had accumulated
a lot of facts and information with regard to the Reggettz
murders?

A.    Yes.

Q.    Right?

A.    Yes.

Q.    During the question and answer period that you have just described with John Moss, at any time during that did you relate any facts that you knew about the investigation to John Moss?

A.    No, I didn't.

Q.    Were you present at the entire period, this question and answer period which you have described to the Court just now?

A.    I did leave for twenty to thirty minutes at one point.

Q.    That was at the end of the conversation when Trooper Williams was talking to him; is that correct?

A.    At the middle, towards the end.

Q.    Okay, during the period prior to leaving, who was present?

A.    Myself and at times Trooper Williams and Sergeant Presson.

Q.    Did Sergeant Presson, to the best of your knowledge, know any of the facts with regards to the Reggettz murders?

A.    Only what few I might have mentioned, you know, when we first arrived at the station.

Q.    What would those have been?

A.    Just basically, I mean the fact that there was some murders, that we suspected that John might have knowledge or

could be involved in them.

Q    Had you informed Sergeant Presson of the manner or
mode of the murders as you knew them at that time?

A    No.

Q    Trooper Williams was aware of the facts of the
investigation?

A    Yes.

Q    At any time in your presence did Trooper Williams
relate any of the facts of the Reggettz murders to John Moss?

A    No.

Q    And just so the record is clear, did Sergeant
Presson at any time in your presence relate any facts
concerning the Reggettz murders to John Moss?

A    No.  No, he didn't.

MR. STUCKY:  Just a second, Your Honor.

THE COURT:  Yes.

MR. STUCKY:  That's all the questions we have, Your
Honor.

THE COURT:  All right, any recross?

                    RECROSS-EXAMINATION

BY MR. McKITTRICK:

Q    Trooper Smith, for the first time, you mentioned a
.22 rifle; is that correct?

A    Yes.

Q.    You did not recover the .22 rifle?

A.    No.

Q.    But you recovered the scope, a scope; is that correct?

A.    Yes.

Q.    Now your investigation up to this date has not indicated that the scope came off the .22 rifle in question that was taken from the Reggettz house that night on the 13th day of December, 1979; is that correct?

A.    You say as far as the investigation goes?

Q.    Yes.

A.    Not at this time.

Q.    So on this date, today, if you were in the middle of the trial of the case against John Moss, you couldn't introduce that scope because you can't --

MR. STUCKY:   (Interposing)  Objection, Your Honor.

THE COURT:   I am going to sustain the way it is phrased. The Court will rule on the introduction of the evidence. You have a right to further inquire on that, but I think it is improperly phrased.

BY MR. McKITTRICK:

Q.    So, in other words, you do not consider at this time, on this date, that that scope is evidence that could be used against John Moss to prove that he committed the murders

of the Reggettz.  Is that a fair statement?

    MR. STUCKY:  I will object to that, Your Honor.

    THE COURT:  I am going to overrule the objection.  He

can testify as to his experience as an experienced State

Policeman.

    THE WITNESS:  I don't think I am in a position to state

really as to whether it is or it isn't at this time.

BY MR. McKITTRICK:

    Q.  What evidence do you have that it is?

    A.  What John told me.

    Q.  Other than what John told you?

    A.  What his brother told me.

    Q.  Did John give you identification numbers on that

scope?

    A.  No.

    Q.  Did you have the scope present when you were

questioning John and show it to him and say is this the

scope?

    A.  Did I ask John if this was the scope and showed it

to him?

    Q.  Yes.

    A.  No.

    Q.  In other words, what you are telling the Court is

that John Moss never saw the scope that you are talking about

when you questioned him?

    A.   As far as me showing it to him?

    Q.   Yes.

    A.   As far as me showing it to him, no.

    Q.   So John Moss -- it is a fair statement to say that

John Moss has never personally looked at, to your knowledge,

and identified the scope in question; is that correct?

    A.   That is correct.

    Q.   All right, and it is true from your personal

knowledge that no one else has looked at the scope and

identified it as being the scope that came out of the

Reggettz house on the 13th, the night of the 13th day of

December, 1979.  Is that a fair statement?

    A.   That is fair.

    Q.   All right.  Now the flatware in question, did John

tell you in his oral confession or his written confession

that was signed by him, what you say is his confession, that

he took the flatware from the Reggettz home on the 13th day of

December, 1979?

    A.   No, he just said he took dishes.

    Q.   He said he took dishes.  Has anyone indicated to

you -- strike that.  Where is this flatware that you have

in your possession?

    A.   It should be in probably the evidence locker at South

Charleston.

Q.    When you say flatware, can you describe it for His
Honor?

A.    Well, I'm speaking of knives, spoons and forks, or
eating utensils.

Q.    No dishes?

A.    No dishes.

Q.    Has anyone to your knowledge identified that flat-
ware, anyone, as being flatware that came from the Reggettz
home on the 13th day of December, 1979?

A.    No, not to my knowledge.

Q.    Do you have any evidence whatsoever that the flatware
that you have in your possession was the flatware that came
from the Reggettz home on the 13th day of December, 1979?

A.    Do we have?

Q.    Yes.

A.    I would say based on what John told us.

Q.    All right, did John tell you he took flatware?

A.    No.  He told me he took a gift.

Q.    He told you he took a gift.  Did he describe the
gift?

A.    As dishes.

Q.    As dishes?

A.    Yes.

Q.   But not flatware?

A.   Not flatware.

Q.   All right, tell this Court how you consider that to be evidence that John took flatware out of the Reggettz home on December 13, 1979?

A.   Would you say that one more time?

Q.   Tell the Court how, when John tells you that he took a gift which was dishes from the Reggettz home, that that had anything to do with flatware.

A.   Because he said that that was the only gift that he took, and he gave it to his friend's mother.

Q.   Did he say it was dishes or flatware?

A.   He said it was dishes.

Q.   Not flatware?

A.   Not flatware.

Q.   Has John ever had an opportunity while you were questioning him or to your knowledge while anyone else was questioning him to look at the flatware in your possession and tell you in essence that is the flatware that he took from the Reggettz home on December 13, 1979?

A.   You are asking me if John has ever been shown the flatware?

Q.   John Moss.

A.   Not to my knowledge.

Q.   Now you also told His Honor that you asked John whether or not he had ever thought of breaking into or going into the Reggettz home with the intention of taking anything prior to the 13th day of December, 1979; is that correct? Did you ask him that question, the essence of that question?

A.   I asked John if he had ever thought about going to the residence to take something prior to this?

Q.   Yes.

A.   I think I might have said either that or had he discussed it with anyone.  I believe that's what I had testified to.

Q.   All right, and what was John's answer?

A.   What was his answer?

Q.   Yes.

A.   No.

Q.   Did he acknowledge that he had done that?

A.   No.  He acknowledged that he had not discussed it with anyone prior to that.

Q.   Did you find out later in your investigation that that was untrue?

A.   That he had discussed it with someone?

Q.   Yes.

A.   Yes, I did.

Q.   And what did you find out?

A.   I found out that he had spoken to someone about it.

Q.   Who was that someone?

A.   Bill Johnson.

Q.   And what had he said to this someone?

A.   That he discussed it with Johnson about breaking into their home.

Q.   He being John Moss?

A.   John talked with Bill Johnson about it.

Q.   Their home being the Reggettz home?

A.   Yes.

Q.   All right.  Now when you went through this lengthy oral confession, as the Court characterized it, is that the first time that you had confronted John Moss about the murders of the Reggettz family?

A.   On the 28th?

Q.   Yes.

A.   No.

Q.   Maybe that's not a clear question.  Was that the first time that you discussed in detail with John Moss the murders of the Reggettz family?

A.   Are you talking about --

Q.   (Interposing)  The confession.

A.   The oral?

Q.   Yes.

A.   Yes, the question and answer.  Yes, in detail.

Q.   In detail?

A.   Yes.

Q.   Now before you discussed that confession in detail
where he told you these things that you related to His Honor,
did you discuss any of the details of the murders?

A.   With him?

Q.   Yes.

A.   Before the interview?

Q.   That is correct.

A.   No, sir.

Q.   All right.  Now I notice that what you gave to the
Court, you didn't even hesitate but continued to tell the
Court what the dialogue was between you and John Moss; is that
correct?

A.   To the best of my recollection.

Q.   And is that exactly what happened?

A.   Exactly?

Q.   In essence, is that what happened?

A.   Where?

Q.   When you took this statement from John orally.  In
other words, he told you in the fashion that you related to
the Court, there were no breaks, no interruptions or nothing
else said in between what he told you he did?

MR. STUCKY:  Your Honor, for the record, we asked the

witness to relate to the Court the questions and answers.

He was not doing that in that manner.  Now to be asked to

indicate to the Court how long a pause there was or anything

else, I think he is being unfair to the witness to indicate

that that is what he tried to tell the Court.  He merely

related the questions and answers.  It wasn't a dramatic

display of how it was done.

THE COURT:  I think that is correct.  He didn't attempt

to read -- this is a play on words, I suppose.  He didn't

attempt to read the oral statement verbatim.  He gave us a

synopsis of it, not necessarily in the order in which the

questions were asked and answered.

BY MR. McKITTRICK:

Q.  Well, let me ask you then, did you give us a snyopsis,

as the Court has indicated, in the order in which the

questions were asked and answered when you gave us the

details of the oral confession that you took in the conversa-

tion you had with John Moss just here five - ten - fifteen

minutes ago?

A.  You are talking about what I have testified to?

Q.  Yes.

A.  Fifteen to twenty minutes ago?

Q.  Yes.

A.   Was it in order as to how this happened during the
interview?

Q.   Yes.

A.   No, not exactly.

Q.   All right, tell us how it was.

A.   How it was?

Q.   Yes.

A.   You mean in order?

Q.   Yes.

A.   It would be very difficult for me to say exactly
in what order.

Q.   So when you were preparing to give that testimony,
and I take it that you did prepare for that, did you not?

A.   Well, I reviewed my notes; but as far as going into
detail for preparing, no.

Q.   Well, actually what you did, did you not, Trooper
Smith, was that you read the written confession that had been
taped of John Moss, and then you reflected what that said,
didn't you?

A.   Since we have been in here in this Courtroom?

Q.   Before you got into this Courtroom.

A.   I haven't read that statement for months.

Q.   Listen to my question. In preparing for your testimony,
you read the written confession of John Moss?

A.    From the taped?

Q.    Yes.

A.    No, not to prepare for the Court.

Q.    Did you use that in any way to give the Court a recitation of the facts as they occurred when John gave you the oral confession?

A.    What I am testifying to as far as me doing any reviewing has been from my notes, typed notes, as to what was said during the two-hour interview or question and answer period.

Q.    Exactly.

A.    I did not read it.

Q.    Are you telling the Court that when you gave the Court the oral recitation or the recitation of the oral confession that you took from John Moss that you took it chronologically from a reflection on your notes?

A.    No.  I am telling you that since I have testified here today that I just told you or told Mr. Stucky as best as I could remember what questions and answers, you know, were asked by me of John.

Q.    Are you telling us that they were in the order in which they were discussed, also?

A.    No.  I have already stated that.

Q.    Were they in the order in which they were reflected

in your notes?  When you gave your testimony, was it --

    A.  (Interposing)  They were not in any order, just
the order that I could remember them.  There was no order.
I was just stating what I remember the way the questions
and answers and things were said.

    Q.  All right, did you take that from your notes?

    A.  Did I take them from my notes?

    Q.  Yes.  In other words, did you refresh your memory?

    A.  A lot of it.  Some of it, sure.

    Q.  Did you refresh your memory from your notes?

    A.  Yes, I did.

    Q.  Is that what you used to refresh your memory?

    A.  Yes.

    Q.  From your notes?

    A.  Yes.

    Q.  Yes.

    A.  Which I have here, yes.

    Q.  Is that correct?  Is that the only thing?

    A.  That and what I remember on my own.

    Q.  All right, during that oral confession, I take it
there were times John could not remember certain things?

    A.  Or he stated that he was -- he could not remember.

    Q.  Now you did not include that in what you told the
Court was the conversation between you and John?

Trooper Smith - Recross                                          303

MR. STUCKY:  Your Honor, I am going to object to that.

He did on numerous times say he could not remember.

THE COURT:  I think he did.  That is my recollection,

and the record will speak to that.  Sustained.

BY MR. McKITTRICK:

Q.  All right, tell us then what things during his oral

confession that he could not remember.

A.  What things?

MR. STUCKY:  Your Honor, that was asked and answered on

previous cross-examination.

THE COURT:  I think it was.  We are starting to go

over it.  I have been very patient and liberal these three

days.  We are going over and over and over the same things.

I will let you ask it this one last time.

THE WITNESS:  Would you ask it again?

BY MR. McKITTRICK:

Q.  What things during this oral confession that you

took from John Moss could he not remember?

MR. STUCKY:  Your Honor, I am going to object to the

manner of the question.  He doesn't know what he can remember

or not.  He merely knows he stated he could not remember.

The testimony has been he very quickly --

THE COURT:  (Interposing)  I think it could have been

better phrased.  However, if the Trooper can answer those

things he remembers that the Defendant didn't remember, he

may.

    MR. STUCKY:  Well, the Trooper doesn't --

    THE COURT:  (Interposing)  What he remembers.  That's

all I said.

    MR. STUCKY:  However, the Trooper only knows he said

he didn't remember, not that he did not remember.

    MR. McKITTRICK:  That's all I asked him.

    THE COURT:  I understand.

    MR. McKITTRICK:  What he said he did not remember.

    THE COURT:  I understand that.  Ask your question

again.

BY MR. McKITTRICK:

    Q.  For Mr. Stucky's benefit at this time, tell us during

the oral confession that you took from John Moss what did he

tell you that he could not remember?

    A.  I can remember -- again, may I refer to the notes

here?

    Q.  Sure.  Do you have an enumeration of those things

that John told you he could not remember in the notes?

    A.  In order, no.

    Q.  In any order?

    A.  No.  I mean they are listed here, some things that

he stated.

Q.   That he couldn't remember?

A.   That he stated that he couldn't remember.  We are
talking about at Parkersburg?  Is that what you are saying?
We are talking about the oral interview in Parkersburg?

Q.   You said that was the only oral interview you had
with John.

A.   Concerning the murders.

Q.   The murders, yes.

A.   Yes, detailed interview.  I asked him if this happened
because he got scared, and he said it did; and I asked him
after that did he -- you want me to tell you what he said he
couldn't remember?

Q.   What I am talking about are things that relate
to going in the home and the actual murder itself.

A.   He was asked what occurred when he first walked in,
and now he stated at that time and clarified it later, but
at that time, he stated that he couldn't remember what happened
after he walked inside.

Q.   All right, what was your response to him when he said
that he couldn't remember?

A.   Without looking at my notes and seeing, --

Q.   (Interposing)  Do you have that in your notes, that
he said he couldn't remember when he walked in the house?

A.   No, not -- that doesn't say that exactly, but it is

to the effect of what happened after he walked in, and he

stated to the effect that he could not remember at that time.

    Q.   Is that in your notes?

    A.   That he couldn't remember?  It's what it says.

    Q.   And what was your response to that?

    A.   Try a little harder, think about it, we needed it,

it was important.

    Q.   Did he remember that?

    A.   He still said he couldn't remember.

    Q.   Then what did you say to him?

    A.   There was a question asked about what did he think

the next morning.

    Q.   What other things couldn't he remember as to the

details of what happened relative to the murders?

    A.   As to the details?

    Q.   Yes, sir.

    A.   I would say that -- but we are talking about what he

stated that he couldn't remember?

    Q.   That is correct.

    A.   The time.

    Q.   The time he went in?

    A.   The time that it occurred, the time that he went

in.

    Q.   Did he ever remember that?

A.   Other than saying that it was almost daylight
when he left.

Q.   Anything else?

A.   I think that's basically about it.

Q.   All right.  Now you told His Honor in your testimony
that he couldn't remember, that John Moss couldn't remember
certain things, and you left the room and when you came back
you found out that he started to remember those things?

MR. STUCKY:  Your Honor, I am going to object to that.
It is not what he said.

THE COURT:  I don't recall that.  The record will speak
to it.  If he said it, the record will reflect it.  I don't
recall that as being his testimony.  The objection is
sustained.

BY MR. McKITTRICK:

Q.   Did you tell the Court that you left the room, and
when you came back, John Moss remembered certain things that
he couldn't remember before you left?

A.   A little more detail maybe.

Q.   Yes.  Did you tell that to the Court?

A.   There was some things that either maybe he had
mentioned or had thought about and had remembered.

Q.   What were those things?

A.   That he had taken a camera from the house, that he had

seen Paul Reggettz's car there, and right now that's all I

can think of.  There may be something else if you will let me

refer back to my notes here.

    Q.   Yes.

    A.   I'm finished.

    Q.   Trooper Smith, if I were to ask you to put the

substance of that oral confession in chronological order as

it related to your conversation with John Moss when you took

it, would that be impossible for you to do?

    A.   For me to put it in chronological order?

    Q.   The substance of what was said by you and what

was said by John.

    A.   I don't think it would be impossible but I'm not

saying that I would be, you know, --

    Q.   (Interposing)  Could you do the best job that you

can think of when you look back in your mind and give us

from the beginning to the end the taking of that oral state-

ment from John, as best you can remember, in chronological

order?  In other words, what happened first, what happened

second, what happened third, until it was finished.  Could you

do that?

    A.   I could try.

    Q.   Go ahead.

    A.   In the beginning, it more or less started out, as I

said, you know, what happened, and it just happened; and

what did you think, where did you first get scared, when

do you first remember being scared, which was on the rail-

road tracks; and I asked him where did you remember -- this

is to the effect the question that was put, where do you

remember being scared first before it happened, and he

stated at the back door.  Then it was either said, like, well,

you know, what do you remember then, or what happened at the

back door, and it was he went on inside.  It was asked how did

he get inside, and just pushed the door open.  Then, what

did you see, you know, or what happened after you got inside,

and he made the comment that they were there.

  Q. Who made the comment?

  A. It was asked they, meaning who.

  Q. Who made that comment?

  A. John.  And then it was asked who is they, and

he said her and the children; and then I said what happened,

and then he said he couldn't remember.  Then I think the next

thing would have been what did he think the next morning, and

he said to the effect that it shouldn't have happened.  Then

I asked why, what did he mean it shouldn't have happened,

and he said, well, because of the children.  I asked what

did he mean because of the children, you know, and he said

because they were so young.

Q.   Now when he said -- and I don't mean to interrupt

you; you remember your place.  When he, John Moss, stated that

it shouldn't have happened, that was at the beginning of the

statement, correct?

A.   No, sir.

Q.   You are telling us --

A.   (Interposing)  He said back at the beginning.  You

are talking about the very beginning.  There was a comment

made why or how, and it just happened.

Q.   In other words, John Moss said that before he went

into the details of how the Reggettz family was murdered?

A.   That it just happened?

Q.   Yes.  No, no, that it shouldn't have happened.

A.   You mean before he went into the details of how he

did it?

Q.   Okay, go ahead.  Continue.

A.   Of course, it was asked what did he mean, and he

said the children.  The question was asked what about the

children, and he said the fact they were so young.  Okay, so

it went back to what did you do when you first went in, did

he remember what he did when he first went in, and he said

just looked around.  Then it was asked were there any lights

on in the house when he first went in, and he said that there

was in the bathroom and maybe in the living room.  It was asked

where were they at or where was they at, and he said in bed.

It was asked where was she, or the woman, at when she first

awakened or when he actually saw her awaken, and he said

standing at the bed or near the bed with a gun.  Then I asked

what happened then, and he said we got into a struggle with

the gun.  Of course, it came out the gun went off, that he got

it from her, hit her with it, knocking her down, and ran out.

It was asked what happened then, and he said he looked back

and saw the woman putting something or trying to get the

door closed, putting something against it or on it, and he

went back, forced his way in and another struggle occurred,

this time with a knife.  And then he went on that he carried

her in, choking her with some cords and took the cords and

tied her to the door.

Q.    All right, now he told you there was a struggle with

a knife?

A.    Yes.

Q.    Did he tell you how he got the knife away from her?

A.    Just, I guess, wrestled it away from her.  He just

stated he got it away from her.

Q.    You guess, or did he tell you?

A.    He said he got it away from her.

Q.    Go ahead.

A.    That he was cut.  Now we were talking, you know, about

the knife at this time, and he mentioned that he was cut

on the little finger.  Now the little finger may not have

been said right then and there, but the question was asked

where he was cut.  I mean that could have been asked around

that area or maybe, you know, a few minutes later.

     Q.  Go ahead.

     A.  Okay.  Of course, I asked him about getting her

tied.  Also, as far as the order goes, it was asked when he

was in the struggle in the kitchen with the woman, where

were the children, and he said they were hitting at him, you

know.  It was asked what did he do about that, and he said

he pushed them back.  And then, of course, he went through

the story about the fact that he tied her up and got the

little boy, choking him, and after getting the boy, he got the

girl and how he did that, and there was some questions as to

the gun going off.  It was asked which room that the shot

was fired in, how many shots, and as far as -- it was in

around the same time, you know, close, and I might have asked

one question and come back and asked another one.  You know,

like I say, without referring to the notes and doing the

best I can, --

     Q.  (Interposing)  When you say you asked one question,

did you ask -- how did you ask your questions?  What would

you say?

A.   It would be more or less like what happened after that, what did he do next.

Q.   Trooper Smith, when you talked to John Moss about the cut on his finger, did you ask him to describe it?

A.   He pointed.

Q.   Did you see the cut on his finger?

A.   The scar.

Q.   You saw the scar on his finger.  Did you ask him whether it was bleeding bad?

A.   I don't remember whether I asked him if it was bleeding bad.

Q.   Did you ask him whether or not any blood from his finger got on anything to his knowledge in the house?

A.   He stated that he did have blood on his clothing. He didn't say whether it was, you know, his or whose.

Q.   Is your answer to my question no?

A.   Did he state -- I can't remember him saying he got blood on anything.

Q.   Did you discuss with him how he got blood from his finger on the floor or anything like that?

A.   No.

Q.   Did you discuss anything else about the cut on his finger or other than what you have told His Honor?

A.   Not that I can recall at this time.

Q.   Did John Moss tell you that he took the articles

in question, the gun and the camera and whatever else you

said he took, after he committed the homicides?

A.   The way the question and everything went, I would,

you know, say that's when it was done.  That's from where

he told me he would have gathered them up.  As far as him

saying he took them all afterwards, gathered them up, --

MR. McKITTRICK:  (Interposing)  That's all the questions

I have.

MR. STUCKY:  No more questions.

THE COURT:  All right, you may step down.  Thank you.

(Witness stood aside.)

THE COURT:  Gentlemen, and lady, I assume that your next

witness is going to be whom?  Williams?

MR. STUCKY:  Trooper Williams, Your Honor.

THE COURT:  That will be rather lengthy?

MR. STUCKY:  I suspect it could be at least as long as

Trooper Smith, probably.

THE COURT:  It is approaching the noon hour.  Let's be

back here at 1:30 and we will start with Trooper Williams

or whoever your next witness is.

MR. STUCKY:  Thank you, Your Honor.

MR. McKITTRICK:  Thank you, Your Honor.

THE COURT:  Just so you will be prepared, I am serving

notice right now that you will probably be working until

about a quarter till five and then coming back at 6:30 this

evening.

(WHEREUPON, the noon recess was taken, after which the

following proceedings were had, all parties heretofore

mentioned being present.)

THE COURT: Show the resumption of the proceedings

In the Interest of John Moss, Jr., Juvenile 80-775, 776 and

777.

The Defendant is present in person and by counsel, Mr.

McKittrick, the State of West Virginia by her Assistant

Prosecuting Attorneys for Kanawha County.

All right, call your next witness.

MR. LUSK: The State calls Trooper Terry Williams. He

has already been sworn.

THE COURT: Swear him again.

(Witness sworn.)

(Thereupon, TROOPER TERRY WILLIAMS, a witness in behalf

of the State, having been previously called and sworn, resumed

the stand and testified as follows:)

DIRECT EXAMINATION (Cont'd.)

BY MISS LUSK:

Q. Would you state your full name, please?

A. Terry Williams.

Q.   Are you the same Terry Williams who previously
testified in this hearing?

A.   Yes.

THE COURT:  Wait a minute.  All right, I'm sorry, go
ahead.

BY MISS LUSK:

Q.   I believe you testified previously, Trooper Williams,
of your employment and the start of your investigation into
the murders of the Reggettz family in 1979; isn't that
correct?

A.   Yes.

Q.   I would like to pick up your testimony and direct
your attention to the 28th day of October, 1980 and ask you
if you had occasion to make a trip to Mansfield Reformatory
in Ohio?

A.   Yes, I did.

Q.   Who was with you?

A.   Mike Smith.

Q.   And he is a Trooper, also?

A.   Yes.

MR. McKITTRICK:  Your Honor, may I inquire of the
Prosecutors whether or not we are still presenting evidence
concerning the voluntariness of the confession?

THE COURT:  Which confession?  There are now two under

consideration.

    MR. McKITTRICK:  Both.

    THE COURT:  Both?

    MR. McKITTRICK:  Yes.

    MISS LUSK:  Yes.

    MR. McKITTRICK:  Okay.

    MR. STUCKY:  Your Honor, speaking to that, there is not a jury present.  The State has not anticipated having a voluntariness hearing and then re-presenting all that was said in a suppression hearing and then before the jury.  We are merely presenting the voluntariness issue to the Court along with any other testimony at this part of the transfer hearing and the Court, we anticipate, making a finding first whether or not the statement was voluntarily taken and then, second, if it was taken, whether the statement in fact is enough evidence for probable cause in this case.

    THE COURT:  You have lost me somewhere.  The purpose of this hearing is to find out whether or not probable cause exists to transfer this Defendant, who is now an adult, who was a juvenile at the time of the alleged offense, to adult status.  It has no bearing if the Court finds in fact and concludes in law that probable cause has been established and that the confessions were voluntarily made in nature and that a crime of murder, treason, et cetera, was committed and

finds probable cause to transfer. That, of course, does not preclude Mr. McKittrick, should it come to trial in a criminal court, from attacking the voluntariness of the confession.

MR. STUCKY: That is correct, but the <u>Moss</u> decision states that this Court must find that the statement was voluntarily taken or given.

THE COURT: That is correct.

MR. STUCKY: And when Mr. McKittrick refers to this as a voluntariness hearing, I think that was probably incorrect. The evidence being presented is on the voluntariness of the statement along with probable cause, as you have already heard from Trooper Smith.

THE COURT: The way I read the <u>Moss</u> decision that remanded this back for another hearing, Syllabus Point 6, "At a transfer hearing", and that is what we are now under-going, "the Court must determine the validity of a confession before allowing it to be used against the accused." I think we are here to determine whether -- we are into syntax now -- whether or not the confession was valid. By valid, I assume they mean voluntary.

Should it come to trial before a petit jury, then at that point, Mr. McKittrick has every right to attack the validity and voluntariness of it.

We are here today to determine for the purpose of this
transfer hearing -- I don't know what they mean by valid.  I
assume they mean the same thing as voluntary.  We are here
to determine whether or not, and just to be assured that we
are cautious -- whether it was valid.  By that, I assume they
mean voluntary.

MR. STUCKY:  Right.  That is correct.

MR. McKITTRICK:  I don't think we disagree with the
substantive holding of the Court.  The only thing, Your Honor,
that I am inquiring is as to the procedural holding of the
Court.  In most cases -- and I don't have to remind the
Court; it has been through more than I have -- in most
cases there is a separate hearing to determine the voluntariness
of the statement, and it was my understanding that when we
interrupted Trooper Williams' testimony after he started
testifying and brought on Mike Smith at that time we were
going into a separate hearing to determine the voluntariness
or whether the confession was valid as to the confession
alone and not as to the substantive evidence on probable
cause.

Now my inquiry is pursuant to my understanding that
Mike Smith's testimony was adduced before this Court on
one issue alone, and that was the voluntariness of the state-
ment, whether or not Trooper Williams' testimony goes to that

voluntariness issue or whether or not he is testifying now
concerning probable cause, and I think those are two
different matters.

MR. STUCKY:  Your Honor, Mr. McKittrick's position
almost reaches the realm of absurdity when you think the
Court is going to hear the same testimony from Mike Smith for
three days on whether or not the statement was voluntary
and then have to put on the exact same testimony for the
probable cause hearing.  There is no jury; so that anything
that the Court has heard that the Court feels is relevant,
the Court can consider anything that it feels is irrelevant
or tainted and, therefore, the Court has the power to
disregard that.  It is not like an untrained lay jury; and
for Mr. McKittrick to say we have to go through this on five
days on voluntariness, present another five days of the exact,
duplicate testimony for the probable cause part is absurd and
a waste of this Court's time.

THE COURT:  It is not the purpose of this hearing, Mr.
McKittrick. Under the teachings and holdings in Moss, supra,
this Court must determine among other things whether or not
there is sufficient evidence to believe that an offense
of murder in this case, murder, treason, et cetera, but
in this case murder has been committed, whether or not there is
probable cause to believe or to warrant a prudent person to

believe that the accused committed it.  Thirdly, this Court

must determine if there was a confession whether or not that

confession was voluntary in nature, and those are the

reasons we are here.

    If that is an objection you made earlier, overruled.

    Proceed.

    MR. McKITTRICK:  Okay, let me make the record clear.  I

am sure the Court is going to see this.  When I was cross-

examining Trooper Smith the objection was raised by the State

that I was going outside the purpose of which Smith's testimony

was adduced before the Court, and I was not allowed to cross-

examine as to those matters that had to do with probable

cause because Smith's testimony was only adduced as to those

matters concerning the voluntariness of the confession.

    Now the Court sustained that objection, and now I am

going to an argument by the Prosecutor that it would be an

absurdity for this Court to hear evidence twice.  So concerning

voluntariness and probable cause, that the Court should be able

to separate the wheat from the chaff.  If that be the case,

and I am not saying necessarily that I object to that, I am

saying, though, that on a prior occasion, at a prior time,

that the State's objection to my cross-examination was on the

ground that I was going outside the voluntariness issue.  I

object to that.

MR. STUCKY:  Your Honor, --

THE COURT:  (Interposing)  Just a minute.  Let Mr. McKittrick finish.

MR. STUCKY:  I apologize.  I thought he was finished.

MR. McKITTRICK:  And I object to that at this time, Your Honor.

MR. STUCKY:  Your Honor, the objection that was made and sustained was that the questions and the area of questioning Mr. McKittrick was asking was beyond the scope of direct and that the State had a right to put on its case in an orderly fashion, and that in fact he was questioning Mike Smith on areas and attempting to rebut the State's evidence, which was not in yet; and you cannot rebut evidence until you have the evidence before the Court.  Therefore, we objected and stated on the record that once we completed our case we would make Mike Smith available for any evidence which Mr. McKittrick intended or wished to put before the Court at the proper time, and the Court, I believe, rightfully sustained that objection, saying the only area we covered was the voluntariness of the statement and we did not get into the probable cause issue with Mike Smith until on cross-examination Mr. McKittrick got into the oral statement at that time.  On redirect, we did get into the probable cause issue on the oral statement.  However, prior to that time and at the

Trooper Williams - Direct                                            323

time the objection was sustained, Mr. McKittrick -- the

State had only introduced evidence of voluntariness and Mr.

McKittrick got on these far afield investigations of the

Reqgettz matter which was rebutting evidence that had not

been put in before the Court.

THE COURT:  In the event this matter reaches an appellate

body, I am not going to burden the record any further.  It is

verbose enough as it is.  I shall trust to the wisdom of

those five gentlemen on the Supreme Court of Appeals to

separate the wheat from the chaff.  I reaffirm my prior

rulings.

Proceed.

BY MISS LUSK:

Q.   Trooper Smith, on October 28, 1980, what kind of a

car did you drive to Mansfield, Ohio, in?

A.   I'm Trooper Williams.

Q.   I mean Trooper Williams.  I'm sorry.

A.   An unmarked State Police car.

Q.   Could you describe the interior of that car?

A.   Well, it has a back seat and a front seat, and in

the front seat, it has --in the middle, it has an arm rest;

when you have it down, it's like a bucket seat.  Only two

people can sit in the front.

Q.   What kind of clothes were you wearing?

A.    Civilian clothing.

Q.    What kind of clothes were Trooper Smith wearing?

A.    Civilian clothing.

Q.    Were you armed?

A.    Yes.

Q.    Was that a handgun or a rifle?

A.    Handgun.

Q.    Where was that handgun on your person?

A.    Yes, it was.

Q.    Was it located on your person?

A.    Yes, on my right side, down in my pants.

Q.    Were you wearing a holster of any type?

A.    No.

Q.    Was the gun visible with the naked eye?

A.    No.

Q.    What was covering it, if anything?

A.    I had a jacket on.

Q.    At any time during the day did you take your jacket off?

A.    Not that I can recall.

Q.    Approximately what time did you arrive in Mansfield?

A.    Oh, it was about 11:30 - 12 o'clock, something like that.

Q.    Where did you go?

A.   We went to the Mansfield Reformatory.

Q.   Did you speak with anyone at the Reformatory?

A.   Yes.

Q.   What did you tell them there?

A.   We told them what we were there for.

THE COURT:   Excuse me, it has not been established whether that was a.m. or p.m.

BY MISS LUSK:

Q.   I'm sorry, was that a.m. or p.m.?

A.   A.M.

Q.   On the 28th of October, 1980?

A.   Yes.

Q.   And what did you tell them your purpose was?

A.   That we were there to pick up John Moss to take him back to West Virginia.

Q.   Did you pick up John Moss at that time?

A.   Yes.  Not at that time, no.

Q.   Why not?

A.   We told them we were going out to eat and we would be back in about an hour - hour and a half.

Q.   Do you remember what time you got back to the Reformatory?

A.   About two o'clock.

Q.   A.M. or P.M.?

A.    P.M.

Q.    Same day?

A.    Yes.

Q.    Did you pick up John Moss at that time?

A.    Yes, we did.

Q.    Was he handcuffed?

A.    Not when they brought him down, he wasn't.  We were in a room, and they brought him to the room we were in. Before we left with him, I searched him and handcuffed him.

Q.    Did you handcuff him in the front or in the back?

A.    In the back.

Q.    What did you do next?

A.    Went out to the car and put him in the car.

Q.    Was he still handcuffed in the back?

A.    When we put him in the back, we handcuffed him in the front.

MR. McKITTRICK:  I'm sorry, I didn't hear.

THE COURT:  Handcuffed him in the front.  Is that what you said?

THE WITNESS:  When we put him in the car, we switched the handcuffs to the front.

BY MISS LUSK:

Q.    Where was he in the car?  In the back seat or front seat?

A.    Back seat.

Q.    Where were you?

A.    Front seat.  I was driving.

Q.    Where was Trooper Smith?

A.    He was sitting in the passenger side in the front
seat.

Q.    Okay, did you make any stops leaving Mansfield?

A.    Yes, we did.

Q.    Where did you stop and for what purpose?

A.    We stopped to get some gas at the gas station.

Q.    Okay, did you stop at any time from Mansfield on
your return home?

A.    Yes, we did.

Q.    Where did you stop and for what purpose?

A.    We stopped again along the highway to go to the
restroom and get a Coke, and then we stopped again at
Parkersburg.

Q.    Okay, en route from Mansfield to Parkersburg, did
you or Trooper Smith have any conversation with John Moss?

A.    Yes.

Q.    Let me ask you, Trooper Williams, the John Moss
that you have been speaking of, is he in the Courtroom today?

A.    Yes, he is.

Q.    Would you point him out to the Court, please?

A.   He is sitting there at the end of the table with
the orange coveralls.

MISS LUSK:   May the record reflect the witness has
identified John Moss, the respondent?

THE COURT:   The record will so reflect.

BY MISS LUSK:

Q.   Again, Trooper Williams, did you or Trooper Smith
have any conversation with John Moss on your return trip?

A.   Yes.   Trooper Smith did.

Q.   Did you hear the context of that conversation?

A.   Yes.

Q.   Was John Moss advised of his rights?

A.   Yes, he was.

Q.   Who did that?

A.   Trooper Smith.

Q.   Did you hear and see that done?

A.   I heard that.

Q.   Were you able to see or hear how Trooper Smith
advised John Moss of his rights?

A.   Yes.

Q.   How was that done?

A.   He got his I.D.   We carry an I.D. card, and he
read the rights off of the card, off of the I.D. card.

Q.   Where was Trooper Smith located at that time in the

car?

    A.   He was in the back seat.

    Q.   You could see through your rear-view mirror?

    A.   Yes, I could.

    MR. McKITTRICK:  Objection.  She's a little leading.

    THE COURT:  Overruled.

    MR. McKITTRICK:  Could you see through your rear-view

mirror?

    THE COURT:  Proceed.

BY MISS LUSK:

    Q.   Were you able to see John Moss' responses to the

questions that Trooper Smith asked -- see or hear?

    A.   I could hear and I could see partly.  I was driving.

I had to keep, you know, my eyes on the road part of the time.

    Q.   Did you at any time hear John Moss ask that

questions be stopped?

    A.   No, I didn't.

    Q.   Did you at any time hear John Moss ask for a lawyer?

    A.   No.

    Q.   Did you at any time make or hear any promises or

threats being made to John Moss in the car?

    A.   No.

    Q.   Did you hear John Moss' response to whether he under-

stood his rights as read to him by Trooper Smith?

A.   Yes, I did.

Q.   What was the answer to that?

A.   He said yes, that he understood.

Q.   Did you hear the context of the conversation between Trooper Smith and John Moss?

A.   Yes, I did.

Q.   Would you briefly relate that to the Court what that conversation was in the back seat of the car?

A.   Well, when we first got out of Mansfield, we basically was just talking to him about how he had been and, you know, things like that, just general conversation.  Then when Trooper Smith started asking him about some crimes in West Virginia, before he done that, he advised him of his rights.

Q.   About how far out of Mansfield was that, if you recall?

A.   Oh, I would say twenty minutes or so.  It's a guess. I'm not sure of the time.

Q.   Go ahead.

A.   And then Trooper Smith started asking him about a shooting that occurred at the Moose Club at St. Albans back in May of '79; and at first, he said he didn't know anything about it or that he didn't do it, and then Trooper Smith told him that we had had the gun test fired that he had shot the lady with in Cleveland and we had it test fired and

compared the bullets that was taken from the woman at the

Moose Club in St. Albans and that they matched; and then

Trooper Smith asked him again about the woman at the Moose

Lodge and he confessed that he did shoot the woman at the

Moose Lodge and that the reason he had done it was because

she resisted and he got scared and shot her.

Q.   What was the next thing in the conversation?

A.   Trooper Smith finished talking about the Moose

Club shooting, as we called it, and he told John that there

was a more serious thing that occurred in West Virginia that

we needed to get straightened out, but that it would be

better if we discussed it at a place where we could sit down,

get something to eat or drink rather than in the back seat of

a police car.  John acknowledged that he knew what we were

talking about.

Q.   Did he agree to talk to you about it?

A.   Yes, he did.

Q.   Do you remember what he said in making that

agreement?

A.   To the best of my recollection, Trooper Smith asked

him if he knew what he was talking about, and he shook his

head yes.

Q.   How do you know that?

A.   I saw it.  I was watching him in my rear-view mirror

while I was driving.

    Q   Was there any further conversation in reference
to this serious crime?

    A.   Not in the State Police cruiser.

    Q   Was the word or were the names Reggettz ever mentioned
in the State Police car?

    A.   No.

    Q   What did Trooper Smith do after John Moss agreed to
discuss this matter?

    A.   We never discussed anything else after that, to the
best of my recollection.  I never heard any other discussions
other than maybe just general conversations if any at all.

    Q   Okay.  So then you proceeded on to Parkersburg?

    A.   Yes.

    Q   Did you make any stops in Parkersburg?

    A.   We stopped at the State Police Office in Parkersburg.

    Q   Where is that State Police Office located?

    A.   I believe it is on Route 47.

    Q   What did you do upon arrival at the State Police
Office in Parkersburg?

    A.   We went into the office and --

    Q   (Interposing)  Who went into the office?

    A.   Myself, Trooper Smith and John Moss, and we went
into an office and then me and Trooper Smith stepped outside

the office and left John in there.

    Q.   Did you have a conversation with Trooper Smith?

    A.   We had a short conversation.

    Q.   Okay, what happened next?

    A.   Well, myself, Trooper Smith -- first off, we ordered something to eat and one of the radio operators went out to get it, to pick it up and bring it back; and while she was doing this, me and Trooper Smith went into the room where John was at; and first off, what we did, we advised him of his rights.

    Q.   How did you do that?

    A.   On D.P.S. Form #79, the rights form.

    Q.   Did you have that with you or was it provided for you?

    A.   It was provided for us.

    Q.   By whom?

    A.   We got one there at the Parkersburg Office, State Police Office.

    Q.   Trooper, I have what has been marked for identification purposes as State's Exhibit No. 4.  I would ask you to examine that, please.

    MR. McKITTRICK:  I don't think that is identified.  I think it is in evidence, isn't it?  Isn't that in evidence?

    MISS LUSK:  No, it hasn't been moved in yet.

MR. McKITTRICK:  It hasn't been moved?

MISS LUSK:  No.

BY MISS LUSK:

Q.   Can you identify that, please, State's Exhibit No. 4?

A.   Yes.  This is the form I read John Moss his rights.

Q.   Exactly how did you read those rights, Trooper?

A.   I just read what it says here on the paper.

Q.   First of all, up in the upper right-hand corner,
who filled in those blanks?

A.   I did.

Q.   What time did you fill in those blanks?

A.   At 6:50 p.m.

Q.   Who was in the room at that particular time?

A.   Myself, Trooper Smith and John Moss.

Q.   Could you describe this room for us?

A.   I believe it had two desks and three or four chairs
and had a telephone in it.

Q.   Do you know the approximate size of the room?

A.   Guessing, -- I'm not real sure -- I would say ten by
fifteen, something.  I could be way off.  I don't know the
size.

Q.   Okay, exactly how did you advise John Moss of his
rights from this form?

A.   Well, I said, "Before we ask you any questions, you

must understand your rights.

"You have the right to remain silent.

"Anything you say can be used against you in court.

"You have the right to talk to a lawyer for advice
before we ask you any questions and to have him with you
during questioning.

"If you cannot afford a lawyer, one will be appointed
for you before any questioning if you wish.

"If you decide to answer questions now without a lawyer
present, you will still have the right to stop answering
at any time.  You also have the right to stop answering
at any time until you talk to a lawyer."

Then there is a waiver of rights.  "I have had this
statement of my rights read to me and I understand what my
rights are.  I am willing to make a statement and answer
questions.  I do not want a lawyer at this time.  I understand
and know what I am doing.  No promises or threats have been
made to me and no pressure or coercion of any kind has
been used against me."

Q.   Did you read the entire form to John Moss as you
have just read it to the Court?

A.   Yes, I did.

Q.   Did you ask John Moss if he understood the rights
as you read them to him?

A.    Yes, I did.

Q.    Did he respond?

A.    Yes.

Q.    What was his response?

A.    He said yes, he understood.

Q.    Did he answer aloud yes?

A.    He just said yes.

Q.    Did he indicate to you whether he wanted a lawyer?

A.    No, he didn't.

Q.    Did he ask that questions be stopped at any time?

MR. McKITTRICK:  Your Honor, I object now.  This thing is leading and leading and leading.  She can ask this Trooper what else, if anything, was said.

THE COURT:  Overruled.  The Court has to determine whether or not the confession was voluntary, and I think the questions are proper by the State.

BY MISS LUSK:

Q.    Did you read the waiver of rights aloud to John Moss as you have just read it?

A.    Yes, I did.

MR. McKITTRICK:  Same objection.

THE COURT:  I will give you a continuing objection if you want.  Overruled.

BY MISS LUSK:

Q.    What did you do with the form then?

A.    After I asked him if he understood it, he said yes;
and then I asked him to sign it, and he signed it.

Q.    Did you hand it to him to do that?

A.    Yes, but before I had him to sign it, I told him to
read it; and whether he read it or not, I don't know.

Q.    Was there any type of a pause?

A.    No.  He just signed it.

Q.    Okay, did he sign it in your presence?

A.    Yes, he did.

Q.    And is this your signature at the bottom?

A.    Yes, it is.

Q.    Now the top -- what is the time that is beside your
signature?

A.    It's 6:57 p.m.  That's the time I signed it.

Q.    Okay, and at what point would that have been?

A.    It would have been right after he signed it.

Q.    Did you see Trooper Smith sign this form?

A.    Yes, I did.

Q.    Was he in the room while this entire reading and
signing was going on?

A.    Yes, he was.

MISS LUSK:  At this time, the State would move for the
admission of State's Exhibit 4 into evidence.

THE COURT:  Any objection?

MR. McKITTRICK:  I have no objection.

THE COURT:  It may be admitted and marked as State's
Exhibit No. 4 and introduced into evidence without objection.

(WHEREUPON, State's Exhibit No. 4 was received into
evidence.)

BY MISS LUSK:

Q.   Trooper, what exactly happened after John Moss
signed this form?

A.   Well, Trooper Smith was doing most of the questioning
or talking, and he, to the best of my recollection, said we
would need to get this thing straightened out about this
serious crime that occurred in West Virginia, and he asked
John if he knew what we were talking about and John said yes.

Q.   Then what?

A.   And then he asked him, said, well, I will have to
look at my notes.  He then asked him if this happened
because he got scared, and John said yes, and he asked him
why it happened, and he said it just happened.  Then it
was asked of him, well, what happened, and he says, well,
I don't remember.

Q.   Go ahead.

A.   And then he asked John, he said something to the
effect why don't you remember, and he said I'm just having

some trouble remembering, and then this went on maybe five

or ten minutes, and I felt like maybe that -- I asked John

if he wanted me to leave the room, and I waited about a

minute, and John said no.  I waited about a minute or so and

then I got up and left.

    Q.   How long were you gone?

    A.   Oh, I would guess fifteen or twenty minutes, maybe.

    Q.   What did you do after this fifteen or twenty

minutes?

    A.   Well, the radio operator brought the food that we

had ordered, and then I took it back in.  Then we ate dinner.

    Q.   What did you eat?

    A.   I think it was a ham sandwich, but I'm not sure.

    Q.   All three of you or one of you?

    A.   All three of us ate, myself, John and Trooper

Smith.

    Q.   Did he eat?  Was he offered anything to drink with

his food?

    A.   Yes.  We got a soft drink to drink.

    Q.   Was he permitted to smoke?

    A.   Yes, he was.

    Q.   Did you provide him cigarettes?

    A.   Not to my knowledge.  Myself and Trooper Smith don't

smoke, and I believe John had cigarettes with him, but I do

know that he did smoke while we were there.

    Q.    During the course of your meal, did the conversation continue?

    A.    Yes, it did.

    Q.    And at that time, who was questioning?

    A.    Trooper Smith.

    Q.    Do you remember the sum and substance of that conversation?

    A.    Just that he was asking when he first got scared. He said at the back door, and then he was asked how he got into the house, and he said he just pushed open the back door. And we asked him what happened after he went in, and he said the lady woke up. And we asked him if he knew they were in there before he went in the house, and he said yes, but he was going to try to go in there without waking them up. We asked him why he was going to go in there, and he said something to the effect for money, to get some money; and then we asked him what happened after the lady woke up, and he said that they struggled, that she had a gun and she struggled with him and the gun went off and he got it away from her and hit her with it twice in the head and then he ran out the back door up on the railroad tracks.

    Q.    Go ahead.

    A.    And then he said he looked back down at the door and

saw her at the back door and it looked as though she was
putting something against the door, and he felt maybe she
might recognize him.  So he went back down there and pushed
open the door and he said that she grabbed a knife and was
swinging it at him and hit him on the little finger and cut
him, and he got the knife away from her and knocked her down
and then threw the knife down; and then we asked him what the
kids were doing at this time, and he said that they were beat-
ing him on the back and legs, saying to leave their mommy
alone, leave mommy alone.  Then we asked him what happened,
and he said after he knocked the lady down, he said he tied
her up and got a cord and wrapped it around her neck.  Then
we asked him what he did after that.  He said he got the little
boy and choked him with his hands and then got a cord and
wrapped it around his neck, and then he said he tied the
little boy's hands together and placed him then in the bathtub.
Then it was asked how he placed him in the bathtub, face down
or face up, and he said face down.  Then he said he got the
little girl, picked her up and carried her towards the front
bedroom.  We asked him what he did.  He said he choked her
with his hands and then got a cord and choked her with it and
then hung her over the door.  We asked him how he hung the
little girl over the door, and he said with a cord.  He
wrapped it around her neck and draped it across the door and

shut the door, so she would just hang there on the door.
And then we asked him which door he hung her on, and he said
the door in the front bedroom; and we asked him which side
of the door she was hanging on, and he said the side facing
the Christmas tree.

     And then we asked him -- he said he then tied the woman
up to a door in the back bedroom, and we asked him how he
tied her up.  He said he put the cord through a hole where
the door knob should have been.

     After that, he asked if -- or we asked him if he had
ever discussed this crime with anyone else.  He said that
he had not, that he just planned to break in the house that
day.  We asked him if he knew if there was any guns in the
house.  He said no, and then we asked him if he asked anyone
or had anyone help him break into the house, and he said he
did not.  We asked him if he knew Paul, and he said he knew
Paul but he didn't know his last name.

     Q.   Did you ever mention the last name to him?

     A.   No, we did not.  And then we asked him if Paul had
asked him to break into the house, and he said no.  We asked
him if Paul had ever asked him to do anything to his family,
and he said no.

     MR. McKITTRICK:  Your Honor, I notice that this witness
countinues to look at notes that he has before him.  I don't

believe that any foundation whatsoever has been laid for his

using those notes.  I object to him doing it.

        THE COURT:  Well, Mr. McKittrick, you can attempt to

impeach on cross-examination, and you certainly are entitled

at that time to see the notes that this witness is referring

to.  Overruled.

BY MISS LUSK:

        Q.  Go ahead, Trooper.

        A.  Okay.  We asked him if Paul was home that night when

he was in the house, and he said no.  We asked him what he

took from the house.  He said he remembered only getting a

couple of dollars.  We then told him we knew there was some

other things taken.  He then told us that he did take a gun.

We asked him what kind it was, and he said it was a .22

rifle.  We asked him if he took anything else.  He said he

took a little gun.  We asked him what kind of gun that was.

He said it was a little pistol and it was a .22.  We asked

him what color it was and he said it was sliver; and we

asked him what else was taken.  He said he remembered just

the two guns and the money.  We then told him that there was

at least one other thing missing from the house, but he said

he could still remember only the guns and the money.  When

we asked him to describe the guns, he described one of them

as a .22 rifle, bolt action with a scope, and the other one,

it was a .22 pistol and it was silver.

We asked him where the guns were.  He said he didn't

know where the rifle was, but that he threw the pistol away.

We asked him where he threw it away at.  He said he took it

to school the next morning and threw it in a big green garbage

can at the St. Albans High School.  We asked him why he threw

it away.  He said because it got broken.  Then we asked him

where was it broken, and he said where you hold it.  And we

asked him how it got broken, and he said when he hit the lady

with it; and we asked him about the rifle again, and he said

he still didn't know where it was.  We questioned him what

he did with it that night, and he said that he took it home and

put it under his bed.  He said that he didn't show it to

anyone and couldn't remember where it was at when he returned

to Cleveland; and then at that point, we asked him if he

wanted or needed anything, and Trooper Smith left the room

and then John got up and used the bathroom and got a drink of

water, and then we came back in the room.

Q.   Who is we?

A.   Myself and John.  And he was then asked if he remember-

ed doing anything else after he killed them.  At first, he

said no.  Then he said he remembered getting under the Christmas

tree and opening the Christmas packages.  We asked him why he

did this.  He said he was just looking.  We asked him if he

took any of the Christmas packages, and he said he took one.

We asked him what it was, and he said dishes.  He remembered

it as dishes.  We asked him what he did with it.  He said

he took it home, re-wrapped it.  We asked him what he did

with it then.  He said he gave it to his mother's best friend.

We asked him who that was, and he said Mrs. Johnson.

     Q.  His mother's best friend?

     A.  His best friend's mother, excuse me.  And he told

us that Mrs. Johnson was the one that ran the Town & Country

Motel near St. Albans.  Then he said -- he remembered taking

a camera.  We asked him if he remembered wearing gloves, and

he said he couldn't remember if he did or not while he was in

the house.  And we also asked him if he remembered -- if he

remembered what he had stabbed the woman with, and he said he

remembered it as a knife or a fork or something.  And we asked

him again if Paul was there and he said no.  Then he said

that he saw Paul's car parked outside when he was leaving

the house.  We asked him what kind of car Paul had, and he

said it was a blue Honda.

     Then about this time, Trooper Smith came back into the

room.  We asked him where Paul's car was parked.  He said it

was parked in the road near the Fortson residence.

     Q.  Do you know where that is in relation to this

residence?

A.   Yes, I do.  It is right nextdoor.  And we asked John where the camera was at now, and he said it was in his parents' house in Cleveland.  We asked him where at in the house. He said in his bedroom.  We asked him what kind of camera it was.  He said it was a Kodak or Polaroid.  We asked him about the rifle again, and he said he took it to Cleveland when he went home for Christmas.  He said that no one knew he was taking it home with him.  And we asked him how he got it home without anyone knowing it.  He said he broke it down and put it in a suitcase.  We asked him how he broke it down. He said unscrewed a screw on the stock and took it apart. We asked him again where the rifle was at.  He said he didn't know, but he said he thought he could get it back.  And we asked him again where it was at, and he said that he had sold it to a friend.  He didn't want to give us the friend's name because he didn't want to cause his friend to get in trouble. John then told us that the gun was in the closet in his bedroom in Cleveland, at his parents' house.  We asked him if anyone else knew about the rifle, and he said that his brother, Carlton, knew about it.  He said that he had shown it to Carlton and Carlton knew where he kept it.  We asked him if the rifle was together, if it was still broken down or was it put back together, and he said that he had put it back together after he got back up there in Cleveland.  We asked him if the

Trooper Williams - Direct

scope was still on it, and he said that he had taken the scope off and that he didn't know where it was at.

Q.   I'm sorry, that he did not know where the scope was?

A.   He did not know where the scope was at.  And we asked him again about the camera, and he said it was on his dresser in his bedroom.  He said it should still be there; and we asked him where he lived in Cleveland, and he told us 7005 Zoeter Avenue.

Q.   Would you spell that for the reporter, please?

A.   Z-o-e-t-e-r.

Q.   Thank you.

A.   We asked him what his parents' names were, and he said John and Marzee Moss.

Q.   How do you spell Marzee?

A.   M-a-r-z-e-e is the way I spelled it.

Q.   All right.

A.   We asked him about the dishes again, and we asked him if it could have been something else besides dishes, and he said no, he remembered it as dishes; and we asked him about the clothes he wore that night, and he said he did not remember wearing gloves and he was asked if he got any blood on his clothes and he said he did get blood on his clothes but that he washed it out.  He washed his own clothes.  And we also asked him about a knife that had got broken at the scene.  He

Trooper Williams - Direct                                          348

couldn't explain how a knife got broken.  He didn't know
how it got broken.  And then that's about it.  After that,
there was a taped confession taken.

     Q.  Okay, at the conclusion of this oral statement, what
did you do?

     A.  I took the taped confession.

     Q.  Where did you get the tape and the tape player?

     A.  I got it at Parkersburg State Police Office.

     Q.  How did you go about getting those things?

     A.  Sergeant Presson, who was the District Sergeant
at that detachment, at that time we asked him if he had a
tape player that we could use.

     Q.  Okay, what happened?  Did you remain in the same
room when you started to take this taped statement?

     A.  Well, to the best of my recollection, after we
got through with the oral interview, myself and Trooper Smith
got up and left, went out of the room and left John in there
by himself.

     Q.  By himself.  How far did you go?

     A.  Just right outside the door.

     Q.  Then what happened?

     A.  Then we got the tape player and the tape and I
taped the confession in that room, went back in the room.

     Q.  Were you alone?

Trooper Williams - Direct                                      349

A.   No.

Q.   How did that begin?  Who was in the room?

A.   Myself, Sergeant Presson and John Moss.

Q.   Did you have occasion to advise John Moss of his rights again?

A.   Yes, I did.

Q.   And who did that?

A.   I believe it was Sergeant Presson.

Q.   I would hand you what has been marked for identification purposes as State's Exhibit 3 and ask you to review that, please.  Can you identify that document?

A.   Yes.

Q.   What is it?

A.   It is a rights form.

Q.   Have you seen it before?

A.   Yes, I have.

Q.   When?

A.   It was on October 28, 1980.

Q.   Where?

A.   At the Parkersburg State Police Office.

Q.   Do you know who filled those blanks in on that form?

A.   Yes.

Q.   Who?

A.   Trooper Smith filled in the part where it says place

and date.  Then Sergeant Presson put in the time and Sergeant

Presson signed it, my signature is on it and John Moss'

signature is on it.

    Q.   What was done with this rights form?

    A.   Sergeant Presson read it to John Moss.

    Q.   Did you hear Sergeant Presson read it to John Moss?

    A.   Yes, I did.

    Q.   Did he appear to read it directly from the document?

    A.   Yes, he did.

    Q.   Did he ask any questions of John Moss in relation to

his rights?

    A.   After he finished reading it, he asked him if he

understood them.

    Q.   What was John Moss' response?

    A.   Yes.

    Q.   Did John Moss ask for a lawyer?

    A.   No, he didn't.

    Q.   Did he ask that questions be stopped at any time?

    A.   No.

    MR. McKITTRICK:  Show my objection, Your Honor.

    THE COURT:  You have a continuing objection.  It is

overruled.

BY MISS LUSK:

    Q.   Were any threats or promises made to John Moss?

A.    No.

Q.    Was the waiver of rights read aloud to John Moss, also?

A.    Yes, it was.

Q.    Who read that?

A.    Sergeant Presson.

Q.    Then what was done with the form?

A.    After it was read to him, it was given to him to read and sign.

Q.    Did he sign it?

A.    Yes, he did.

Q.    Did you see him sign it?

A.    Yes, I did.

Q.    Did you see the other people who signed the document sign it?

A.    Yes, I did.

Q.    And who were those?

A.    Sergeant Presson and myself.

Q.    Now there is a time beside your signature, Trooper. What is that time?

MR. McKITTRICK:   Objection, Your Honor.   The document speaks for itself.

THE COURT:   Overruled.

THE WITNESS:   It's 9:28 p.m.

BY MISS LUSK:

    Q.   What caused you to put that time on the document?

    A.   That's the time I signed it.

    MISS LUSK:  At this time, I would move for the admission
of State's Exhibit 3.

    MR. McKITTRICK:  Let me see it, please.

    MISS LUSK:  Sure.

    MR. McKITTRICK:  Thank you.  No objection, Your Honor.

    THE COURT:  All right, it will be introduced in evidence,
marked and received as State's Exhibit No. 3 without objection
by the Plaintiff.

    (WHEREUPON, State's Exhibit No. 3 was received into
evidence.)

BY MISS LUSK:

    Q.   What happened after this document was signed,
Trooper Williams?

    A.   We talked to him on a cassette tape and put it on
tape.

    Q.   Can you describe for the Court what kind of a tape
player you used?

    A.   It was a cassette tape player.  It was a Panasonic.
About every detachment of the State Police has one.

    Q.   What does it look like?

    A.   It looks just like this one.

Q.   Would you describe that into the record, please?

A.   Well, it has a button that says "Eject".  Then it has a "Stop" button, and it has a button that says "FF", "Key", and it has a "Review" button, a button for "Play" and "Record".

Q.   Do you know what all those buttons are for?

A.   Yes, I do.

Q.   What are they for?

A.   The "Eject", you eject the tape out of the machine.  The "Stop" button is to stop the cassette from playing.  The "FF" button is to move the tape forward, and the "Review" button is to put it in reverse.  Then the "Play" button and "Record" button, the "Play" button is to play the tape.  Then you push the "Play" button and the "Red" button for "Record" and records the conversation.

Q.   The tape player in Parkersburg, did it have those same kind of buttons on it?

A.   Yes, it did.

Q.   Have you used that kind of a tape player in the past?

A.   Yes, I have.

Q.   How many times, approximately?

A.   I'm not sure.  Maybe ten - fifteen.  That's a guess. I'm not sure.

Q.   Trooper, do you have the tape with you today that you used to record this statement?

A.   Yes, I do.

Q.   Would you present it, please?

MR. STUCKY:  Your Honor, at this time, in the next couple of questions, the State intends to introduce what is contained on this tape cassette.  A problem that the State foresees is that if we introduce the original tape cassette into evidence at this hearing, then it may or may not be available or readily available at the trial, if there is in fact ever a trial in this matter.  What we would propose to do is during the playing of this tape have the court reporter transcribe as best he is able what is being said on the tape, along with a -- I reviewed the problem with the court reporter ahead of time, and he is in fact equipped with a tape recorder, and allow him, under his official court reporter functions, to duplicate in the courtroom the tape as it is being played so that we will be able to preserve the original tape and its chain of custody for introduction at the trial.

THE COURT:  Is there any objections?

MR. McKITTRICK:  I have no objections to that.

THE COURT:  All right, without objection, it will be so done.  The court reporter has permission of the Court to use

electronic equipment, that is to say his own tape recorder, to
record the taped recording of the original purported con-
fession that Trooper Williams, I assume, will be playing here
in a few moments.

BY MISS LUSK:

    Q.    Trooper Williams, how do you know that the tape
you have in your hand is the same tape that was used in
Parkersburg?

    A.    Because it has been in my custody ever since I took
the confession.

    Q.    Are there any markings on it that you might have
made?

    A.    Yes, there is.

    Q.    What are those markings?

    A.    On one side of it, I've got it marked "Side One" and
it says "Reggettz and Moss".

    THE COURT:  Wait a minute.  The courtroom is closed.  It
is open to court personnel.  Go ahead.

    THE WITNESS:  And on the other side, it has got "John
Moss" and then it has got "No. 2", and I've got the date
10/28/80.  It is also written on this side.  It says "Tip on
Stolen Equipment, 10/28/80, 1030 Hours".

BY MISS LUSK:

    Q.    Did you make that marking?

A.   No, not that marking.

Q.   Do you know what it pertains to?

A.   Something about some stolen equipment.  I really don't know anything about that.

Q.   Do you know when that marking was placed on the tape?

A.   I am assuming on 10/28/80.  I don't know.

Q.   Was it on there when you received the tape?

A.   Yes, it was.

Q.   Okay, is there anything on that tape which relates to that marking on the tape?

A.   There is another conversation on the tape.

Q.   Have you ever listened to that entire conversation?

A.   No, I haven't.

Q.   Do you know what it pertains to?

A.   No, not really.

Q.   Did you have anything to do with putting it on there or having it put on there?

A.   No.

Q.   No?

A.   No, I didn't.  No.

Q.   Trooper, where has this tape been since October 28, 1980?

A.   Well, it has been in my custody since that time.

Most of the time, it has been in -- I have a locker with

a lock on it at the office in South Charleston, and it has

been in that locker most of the time.

    Q.   Has it been in your continued custody and control

since October 28, 1980 exclusively?

    A.   Yes.

    Q.   Have there been any changes, additions or deletions

made to the tape since it was made in Parkersburg?

    A.   No.

    Q.   Could you tell the Court the identity of all the

speakers on this tape?

    A.   Not all of them.

    Q.   All but who?

    A.   The part, the other conversation.  Evidently it is

about this stolen equipment.  I don't know who is talking

on it.

    Q.   The part that is the subject or at issue in this

particular hearing?

    A.   Yes, I know who they are.

    Q.   Who is that?

    A.   Myself, John Moss and Sergeant Presson.

    MISS LUSK:  At this time, Your Honor, the State would

like to play the tape for the Court.

    THE COURT:  All right.  While he is getting the tape

recorder set up, we will take a five-minute recess so counsel

can overcome their nicotine fits, have a cigarette and what-

ever.  Five minutes.

    (WHEREUPON, a recess was taken, after which the following

proceedings were had, all parties heretofore mentioned being

present.)

    THE COURT:  I'm ready when everybody else is.  Show the

resumption of these proceedings, all parties present hereto-

fore present here again, including the Defendant and his

counsel, State of West Virginia by her Assistant Prosecuting

Attorneys.

    Go ahead.

BY MISS LUSK:

    Q.   Trooper, I am going to ask you to go ahead and play

the tape; but, first, identify the first voice on the tape,

and then as a new voice comes on the tape, identify it, stop

the tape and identify the voice.

    A.   Okay.

    Q.   Or any voices.

    THE COURT:  Okay, go ahead.

        "SERGEANT PRESSON:  October 28, 1980."

    THE WITNESS:  Okay, the first voice is Sergeant Presson.

        "SERGEANT PRESSON:  At this time, I'm speaking to

    John Moss at the Parkersburg..."

MR. STUCKY:  Your Honor, I have been informed that
the Grand Jury is finished for the day and wishes to leave.
So I think probably we ought to --

THE COURT:  (Interposing)  Moving right along in our
Eighteenth Century Courthouse, just hold up for a minute and
get the Grand Jury out of here.

(WHEREUPON, a discussion was held off the record.)

THE COURT:  All right, go ahead.

MISS LUSK:  May the record reflect, Your Honor, the
Courtroom is again clear of all persons except court personnel?

THE COURT:  Oh, my God, I hope so; and, Basil, put that
in the record, would you.

MISS LUSK:  Trooper, I believe you had identified one
of the parties on the tape as Sergeant Presson; is that correct?

THE WITNESS:  Yes, sir.

MISS LUSK:  Go ahead.

"SERGEANT PRESSON:  John, I'm going to ask you a few
questions; but, first, I want to advise you of your
rights.  Have your rights been -- have you been advised
of your rights prior to your questioning by the State
Police Officers?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  All right, and where did this
occur at?

"MR. MOSS:  At Parkersburg.

"SERGEANT PRESSON:  All right, and in whose presence?

"MR. MOSS:  Yours.  Presson.

"SERGEANT PRESSON:  All right, Sergeant Presson and
Trooper Terry Who?

"MR. MOSS:  Williams.

"SERGEANT PRESSON:  All right.

"MR. MOSS:  And Smith.

"SERGEANT PRESSON:  All right.  Now on the afternoon
of October the 28th, were you picked up by these officers
at the Mansfield Reformatory in Ohio?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  And after you were picked up
there at the Reformatory, were you relayed back into
West Virginia?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  Did you make any stops on your
way back out of Ohio into West Virginia?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  And for what reason?

"MR. MOSS:  To get some gas.

"SERGEANT PRESSON:  And you were later brought in to
the Parkersburg Detachment Office?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  And who was in your presence

at that time?

"MR. MOSS:  Officer Terry Williams and Officer

Mike Smith.

"SERGEANT PRESSON:  Okay, and while at the Parkers-

burg Office, were you served your dinner at the

Detachment Office?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  And what did you have for

dinner, John?

"MR. MOSS:  Ham salad sandwich.

"SERGEANT PRESSON:  A ham sandwich?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  Coca-Cola?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  Okay, and did these Officers

at that time have a sandwich with you?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  And while you have been in the

custody of these two officers, have you been threatened

or made any promises or mistreated in any manner?

"MR. MOSS:  No.

"SERGEANT PRESSON:  All right, and while at the

Parkersburg Detachment Office, at approximately nine

o'clock, have you talked to myself in regard to an

incident in Kanawha County?

    "MR. MOSS:  Yes.

    "SERGEANT PRESSON:  And this was in the presence of

Trooper Terry Williams?

    "MR. MOSS:  Yes.

    "SERGEANT PRESSON:  And prior to discussing the

incident in Kanawha County, were you advised of your

constitutional rights by myself and Trooper Williams?

    "MR. MOSS:  Yes.

    "SERGEANT PRESSON:  And this took place in the

Parkersburg Detachment Office?

    "MR. MOSS:  Yes.

    "SERGEANT PRESSON:  Were these rights -- were you

given a chance to read these rights before you signed

it?

    "MR. MOSS:  Yes.

    "SERGEANT PRESSON:  And it was along with myself and

initialed later on after you signed this waiver of rights?

    "MR. MOSS:  Yes.

    "SERGEANT PRESSON:  All right, and after you signed

your waiver of rights, were you then questioned in regard

to an incident in Kanawha County?

    "MR. MOSS:  Yes.

Trooper Williams - Direct

"SERGEANT PRESSON:  And who was present at that time?

"MR. MOSS:  Terry Williams and Mike Smith and --

"SERGEANT PRESSON:  And myself?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  Sergeant Presson.

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  At the Parkersburg Detachment?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  And at this time, which was approximately 9:30, did you relate to Trooper Williams the incident that occurred in Kanawha County in December of 1979?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  Did you go into details as to what happened there at the house?

"MR. MOSS:  Yes.

"SERGEANT PRESSON:  Okay.  Terry, you go ahead and ask John what you need to ask him there in regard to this particular murder in Kanawha County."

BY MISS LUSK:

   Q   Trooper Williams, having just stopped the tape, would you identify to the Court, please, the voices we have just heard on the tape?

   A   It was Sergeant Presson was asking the questions and

Trooper Williams - Direct                                    364

John Moss was answering them.

     Q.   And your previous knowledge of the tape, whose
voices will we hear from now on out?

     A.   Mine and John Moss'.  Then when we switch over to the
other side, it will be -- I don't know who they are on that
other conversation.

     Q.   You're talking about the tip  on the stolen property?

     A.   Yes.

     Q.   As to the conversation with John Moss, is there any
other voice that we will be hearing besides John Moss' and
yours?

     A.   Not other than on that conversation about the stolen
property.

     Q.   Okay, now does Sergeant Presson stay in the room with
you from now on out?

     A.   No.

     Q.   Where does he go?

     A.   He leaves the room, and it's just myself and John
are the only ones in the room.

     Q.   When does he leave on the tape?

     A.   Immediately after he stopped talking.

     Q.   Okay, go ahead.

          "TROOPER WILLIAMS:  Okay, John, what exactly did you
     do first off that night?

"MR. MOSS:  I was at home listening to the radio.

"TROOPER WILLIAMS:  Then what did you do?

"MR. MOSS:  Went off down the tracks, down the railroad tracks, and I went in Paul's house.

"TROOPER WILLIAMS:  Do you know what Paul's last name is?

"MR. MOSS:  No.

"TROOPER WILLIAMS:  Is it Reggettz?

"MR. MOSS:  I can't remember.

"TROOPER WILLIAMS.  Okay, how did you get in the house?

"MR. MOSS:  I pushed open the door.

"TROOPER WILLIAMS:  What door?  The front door or the back door?

"MR. MOSS:  The back door.

"TROOPER WILLIAMS:  Then what happened?

"MR. MOSS:  I went in, looking around, and the lady woke up.

"TROOPER WILLIAMS:  What did you go in there for?

"MR. MOSS:  Money.

"TROOPER WILLIAMS:  Okay, then what happened after the lady woke up?

"MR. MOSS:  She had a gun.  We struggled with it. The gun went off, and I took it from her and hit her

with it.

"TROOPER WILLIAMS: What room of the house was she in when you were struggling for the gun?

"MR. MOSS: In the bedroom.

"TROOPER WILLIAMS: Which bedroom? The front bed-room or the bedroom next to the bathroom?

"MR. MOSS: The bedroom next to the bathroom.

"TROOPER WILLIAMS: Okay, were the children in bed with her?

"MR. MOSS: Yes.

"TROOPER WILLIAMS: Okay, when you were struggling for the gun, you say the gun went off?

"MR. MOSS: Yes.

"TROOPER WILLIAMS: Then you took the gun away from her?

"MR. MOSS: Yes.

"TROOPER WILLIAMS: And you hit her with the gun?

"MR. MOSS: Yes.

"TROOPER WILLIAMS: How many times did you hit her?

"MR. MOSS: About two times.

"TROOPER WILLIAMS: Were you still in that second bed-room or were you in the front bedroom?

"MR. MOSS: It was the second bedroom.

"TROOPER WILLIAMS: Did you ever go in the front

bedroom?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Did you struggle in there with

her?

"MR. MOSS:  No.

"TROOPER WILLIAMS:  Did you ever knock her down in that

bedroom?

"MR. MOSS:  Front bedroom?

"TROOPER WILLIAMS:  Yes.

"MR. MOSS:  No.

"TROOPER WILLIAMS:  Okay, after you hit her and

knocked her down, then what did you do?

"MR. MOSS:  I went running out the house.

"TROOPER WILLIAMS:  Which door did you go out?

"MR. MOSS:  Back door.

"TROOPER WILLIAMS:  Okay, after you ran out the back

door, what did you do?

"MR. MOSS:  I looked back and I seen her trying to

put something against the door.

"TROOPER WILLIAMS:  Is that the door -- the back

door, is that the door at the kitchen?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Okay, was the lights on in the

kitchen?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  You could see her putting some-
thing up against the back door?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Do you know what that was?

"MR. MOSS:  A chair, I think.

"TROOPER WILLIAMS:  Well, then what did you do then?

"MR. MOSS:  I ran back and knocked the door back
open, and she grabbed a knife off of the sink.

"TROOPER WILLIAMS:  Do you know what kind of knife
it was?

"MR. MOSS:  Kitchen knife, steak knife or something.

"TROOPER WILLIAMS:  What did she do with that knife?

"MR. MOSS:  She was swinging it at me and she hit my
hand and cut my finger.  I took it from her and I pushed
her back into the bedroom and knocked her down and
throwed the knife down.

"TROOPER WILLIAMS:  Do you know what happened after
that?  What did you do after that, after you knocked her
down?  Was she still trying to get up any more after
that?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  What happened?

"MR. MOSS:  I was hitting her and tried to choke her.

"TROOPER WILLIAMS:  What did you choke her with?

"MR. MOSS:  First I had my hands; then I had a cord.

"TROOPER WILLIAMS:  What were the children doing at this time?

"MR. MOSS:  Beating on me in the back.

"TROOPER WILLIAMS:  Were they hollering or screaming or anything?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  What were they saying?

"MR. MOSS:  'Leave my mother alone'.  And I knocked them down.

"TROOPER WILLIAMS:  Did you knock both of them down?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  What did you do then?

"MR. MOSS:  And I tied her up.

"TROOPER WILLIAMS:  You tied the woman up?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  How did you tie her up?

"MR. MOSS:  Tied her to the door.

"TROOPER WILLIAMS:  Could you explain that to me, to what door?

"MR. MOSS:  There was a door in the bedroom.  One of the doors in the bedroom.

"TROOPER WILLIAMS:  How did you tie her up?

"MR. MOSS:  Around her neck.

"TROOPER WILLIAMS:  Then what did you do?  With the cord, you're saying?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  What did you do with the cords after you tied them around her neck?

"MR. MOSS:  I took the boy.

"TROOPER WILLIAMS:  What did you do with the boy?

"MR. MOSS:  I took him in the bathroom and put him in the tub.

"TROOPER WILLIAMS:  Did you do anything to him before you put him in the tub?

"MR. MOSS:  Tried to strangle him.

"TROOPER WILLIAMS:  How did you strangle him?

"MR. MOSS:  I don't remember.  With my hands.  I think I had a cord around his neck.

"TROOPER WILLIAMS:  Do you remember where you got that cord from?

"MR. MOSS:  No.  Just snatched it off the floor, off the wall.

"TROOPER WILLIAMS:  Okay, you say you strangled the boy with the cord?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Did you do anything else to him

before you put him in the bathtub?

"MR. MOSS:  I don't think so.

"TROOPER WILLIAMS:  Did you tie him up?

"MR. MOSS:  Yes.  Yes, I think so.

"TROOPER WILLIAMS:  How did you tie him up?  Did you
tie his hands together or what?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  How did you do that?

"MR. MOSS:  I just tied him up.

"TROOPER WILLIAMS:  Then what did you do after you
tied him up?

"MR. MOSS:  I laid him in the tub.

"TROOPER WILLIAMS:  How did you put him in the tub?

"MR. MOSS:  I just put him in the tub.

"TROOPER WILLIAMS:  You're talking about the bathtub
in the bathroom?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Was there any water in the bath-
tub?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  How much water was in it?

"MR. MOSS:  About half full.

"TROOPER WILLIAMS:  How did you place him in the bath-
tub?

"MR. MOSS:  I don't know.

"TROOPER WILLIAMS:  Did you place him in face down or face up?

"MR. MOSS:  I don't know.  I just put him in there.

"TROOPER WILLIAMS:  What did you do after that?

"MR. MOSS:  I went and got the little girl.

"TROOPER WILLIAMS:  Then what did you do with her?

"MR. MOSS:  I started choking her.

"TROOPER WILLIAMS:  Where was you at when you started choking her?

"MR. MOSS:  In the living room.  I took her out of the room where her mama was.

"TROOPER WILLIAMS:  What did you choke her with?

"MR. MOSS:  A cord.

"TROOPER WILLIAMS:  Do you know where that cord come from?

"MR. MOSS:  Just on the floor somewhere.

"TROOPER WILLIAMS:  Okay, what did you do after you choked her?

"MR. MOSS:  Put her on the door.

"TROOPER WILLIAMS:  How did you put her on the door?  Could you explain that?

"MR. MOSS:  She was just hanging there on the door.

"TROOPER WILLIAMS:  How did you hang her across over

the door?

"MR. MOSS:  I put the cord on the door and closed the door.

"TROOPER WILLIAMS:  Okay, which door are you speaking of?

"MR. MOSS:  The door in the front, in the front of the -- next to the Christmas tree.

"TROOPER WILLIAMS:  Is that the door between the living room and the bedroom?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Okay, which way was she facing on the door?

"MR. MOSS:  The Christmas tree.

"TROOPER WILLIAMS:  Towards the Christmas tree?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Okay, going back to the woman, after you tied her up, put the cords around her neck, was she laying down or what?

"MR. MOSS:  Yes.  She was laying down.

"TROOPER WILLIAMS:  Did you do anything else to her?

"MR. MOSS:  I stabbed her with a knife or something.

"TROOPER WILLIAMS:  Do you remember what you stabbed her with?

"MR. MOSS:  No, just -- I don't know what I stabbed

"TROOPER WILLIAMS:  How many did you take?

"MR. MOSS:  One.

"TROOPER WILLIAMS:  Do you remember what it was?

"MR. MOSS:  Some dishes.

"TROOPER WILLIAMS:  Okay, did you take anything

else out of the house?

"MR. MOSS:  A gun.

"TROOPER WILLIAMS:  What kind of a gun was it?

"MR. MOSS:  It was a rifle.

"TROOPER WILLIAMS:  What kind?

"MR. MOSS:  A .22.

"TROOPER WILLIAMS:  Did it have a scope on it?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Do you remember what kind of

rifle it was, whether it was an automatic, bolt action,

semi-automatic?

"MR. MOSS:  Bolt action.

"TROOPER WILLIAMS:  Okay, did you take anything

else?

"MR. MOSS:  I took the gun away.

"TROOPER WILLIAMS:  What kind of a gun are you

speaking of?

"MR. MOSS:  A little gun that she had.

"TROOPER WILLIAMS:  A pistol?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  What kind was it?

"MR. MOSS:  I think it was a .22.

"TROOPER WILLIAMS:  What color was it?

"MR. MOSS:  Silver.

"TROOPER WILLIAMS:  Okay, what did you do with the pistol?

"MR. MOSS:  I put it in a bag and took it to school and dumped it in a big green garbage can.

"TROOPER WILLIAMS:  At the school?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Which school are you speaking of?

"MR. MOSS:  High school.

"TROOPER WILLIAMS:  St. Albans High School?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Okay, what did you do with the rifle?

"MR. MOSS:  I took it home with me.

"TROOPER WILLIAMS:  What home are you speaking of?

"MR. MOSS:  Home in Cleveland.

"TROOPER WILLIAMS:  Is that your parents' home?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  What's that address?

"MR. MOSS:  7025 Zoeter.

"TROOPER WILLIAMS: Could you speak up a little bit?

I couldn't hear you."

THE WITNESS: Okay, that's the end of it.

BY MISS LUSK:

Q.   Is that the end of Side One, Trooper?

A.   Yes.

Q.   What happened on Side Two?

A.   Myself and John are talking, and then there is that
other conversation about the stolen equipment.

Q.   Is the other conversation before you and John start
talking again or after?

A.   I believe it is after. I'm not real sure. It has
been a while.

Q.   During the time the other conversation about stolen
property was on the tape, when you were taking the statement,
did you -- were you asking questions as you were playing
that part of the statement? Were you asking questions of
John as that part of the tape was playing?

A.   No.

Q.   How did you go about passing that part of the tape?

A.   Well, like I say, I can't remember if it is before
or after I talked to John, but if it is the first conversation,
I played parts of it through till I got to the end of it.
Then I let a little bit of the tape go by and I started our

Trooper Williams - Direct                                378

conversation myself then.

Q.   Did you listen to the whole tip on the stolen

property?

A.   No.

Q.   How exactly did you do that?

A.   I just played bits and pieces.  I would run the tape

forward on this forward button on here.

Q.   Fast forward?  Is that what you are talking about?

A.   Yes.

Q.   Okay, go ahead with the playing of Side Two there,

Trooper.

     (WHEREUPON, a discussion was held off the record.)

     THE COURT:  All set?  Okay.

     THE WITNESS:  Okay, that's about the stolen equipment.  Do

you want me to play it through?

     MISS LUSK:  Go ahead.

     THE COURT:  All right, let's put it on the record that,

Mr. McKittrick, are you willing to skip over that portion

that does not relate to the case of John Moss?

     MR. McKITTRICK:  Absolutely.

     THE COURT:  All right, go ahead, Terry, and forward it

until you get to that.  Make sure you're at the beginning of

your questioning of Moss.  Now back up to the very beginning

of your interview.

THE WITNESS:  Okay, I start right after this.

THE COURT:  All right.

"TROOPER WILLIAMS:  This is the continuation of a statement..."

THE COURT:  Stop right there.  Somebody mark down the minutes on your tape so we will save time later where this begins.  Don't you have a time?

THE WITNESS:  Yes, but I didn't watch.  Sorry.

THE COURT:  That's all right.  Go ahead.

"TROOPER WILLIAMS:  -- given by John Moss, being taken by Trooper Terry Williams at the Parkersburg Detachment, West Virginia State Police.

"Okay, John, speaking about the items you took out of the house down at St. Albans, specifically talking about the Christmas present  you took, what did you do with that Christmas present?

"MR. MOSS:  Give it to a friend's mother.

"TROOPER WILLIAMS:  What's that friend's mother's name?  Do you know?

"MR. MOSS:  Mrs. Johnson.

"TROOPER WILLIAMS:  What's your friend's name?

"MR. MOSS:  Bill.

"TROOPER WILLIAMS:  Do you know where they live?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Where do they live at?

"MR. MOSS:  Town & Country Motel.

"TROOPER WILLIAMS:  Where is that?

"MR. MOSS:  On Route 60.

"TROOPER WILLIAMS:  Is that in St. Albans?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Okay, John, going back to when you first went down to the house, you walked down the railroad tracks and went in the back door?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Was Paul home when you went in the house?

"MR. MOSS:  No.

"TROOPER WILLIAMS:  Did you see him anywhere in the house?

"MR. MOSS:  No.

"TROOPER WILLIAMS:  Did you see him outside anywhere?

"MR. MOSS:  No.

"TROOPER WILLIAMS:  Did you see anything outside?

"MR. MOSS:  No.

"TROOPER WILLIAMS:  Did you see Paul's car?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Where was it at?

"MR. MOSS:  I think it was parked down in front of

Mr. Fortson's house.

"TROOPER WILLIAMS:  Where does Mr. Fortson live at?

"MR. MOSS:  Nextdoor to Paul.

"TROOPER WILLIAMS:  Okay, what kind of car does this

Paul have?

"MR. MOSS:  A Honda.

"TROOPER WILLIAMS:  What color is it?

"MR. MOSS:  Blue.

"TROOPER WILLIAMS:  But you didn't see Paul anywhere

in the house?

"MR. MOSS:  No.

"TROOPER WILLIAMS:  Okay, you stated before that you

took a rifle, .22 rifle, a .22 pistol and a Christmas

present from under the Christmas tree?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Did you take anything else out

of the house?

"MR. MOSS:  No.  A camera.

"TROOPER WILLIAMS:  What kind of camera was it?  Do

you know?

"MR. MOSS:  I think it was a Kodak.

"TROOPER WILLIAMS:  Was it a kind of camera that

develops its own pictures?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Where is that camera at now?

"MR. MOSS:  My house in Cleveland.

"TROOPER WILLIAMS:  Are you speaking of your parents'

house?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  The address you gave me before?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Okay, do you remember something

lying in the floor in the kitchen?

"MR. MOSS:  No.

"TROOPER WILLIAMS:  Or something up on the doorway,

hanging up on the doorway into the kitchen?

"MR. MOSS:  Yes, it was a curtain, sort of.

"TROOPER WILLIAMS:  What color was it?

"MR. MOSS:  White.

"TROOPER WILLIAMS:  Do you remember what happened

to it?

"MR. MOSS:  No.

"TROOPER WILLIAMS:  Was it tore down?

"MR. MOSS:  I don't know.  I just noticed it on the

floor.

"TROOPER WILLIAMS:  Where at?  What floor was it, or

at what room?

"MR. MOSS:  Kitchen.

Trooper Williams - Direct                                383

"TROOPER WILLIAMS:  In the kitchen?  Okay, after you searched through the house, you say you were looking for money?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  And you took those four items that were previously described?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Okay, then what did you do?

"MR. MOSS:  I ran out of the house.

"TROOPER WILLIAMS:  How did you leave the house?

"MR. MOSS:  I just ran out the door.

"TROOPER WILLIAMS:  The back door?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Then where did you go?

"MR. MOSS:  Home.

"TROOPER WILLIAMS:  What home are you speaking of?

"MR. MOSS:  To my grandfather's house.

"TROOPER WILLIAMS:  Where does he live in relation to this house, Paul's house?

"MR. MOSS:  What?

"TROOPER WILLIAMS:  Where does he live?

"MR. MOSS:  In West Virginia, St. Albans.

"TROOPER WILLIAMS:  How close does he live to this house that you ran out of?

"MR. MOSS:  Right down the railroad tracks.

"TROOPER WILLIAMS:  How far is that, approximately?

"MR. MOSS:  About two hundred -- maybe a hundred yards.

"TROOPER WILLIAMS:  Okay, then what did you do after you went in -- back home?

"MR. MOSS:  I went to bed.

"TROOPER WILLIAMS:  What did you do with the items that you took out of the house?

"MR. MOSS:  Hid them over beside of my bed.

"TROOPER WILLIAMS:  Okay.  Did you take the rifle apart?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  How did you take it apart?

"MR. MOSS:  I unscrewed the barrell from the handle.

"TROOPER WILLIAMS:  Okay, what did you do the next day?

"MR. MOSS:  I went to school.

"TROOPER WILLIAMS:  Did you take anything with you?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  What did you take to school with you?

"MR. MOSS:  I took the .22.

"TROOPER WILLIAMS:  Pistol?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Okay, what did you do with that

pistol?

"MR. MOSS:  I threw it in a garbage can there at the

high school.

"TROOPER WILLIAMS:  Why did you throw the pistol

away?

"MR. MOSS:  It wasn't no good.  It was broke up.

"TROOPER WILLIAMS:  How did it get broke?

"MR. MOSS:  I hit the lady with it.

"TROOPER WILLIAMS:  And you're saying it broke when

you hit the lady with it?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  How many times did you hit the

lady?

"MR. MOSS:  About two times.

"TROOPER WILLIAMS:  Where did you hit her at?

"MR. MOSS:  In the head.

"TROOPER WILLIAMS:  Okay, what did you do with the

rifle and the camera?

"MR. MOSS:  Took it back home.

"TROOPER WILLIAMS:  To Cleveland?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  And that rifle and camera is at

Trooper Williams - Direct

your mother and father's house in Cleveland?

"MR. MOSS:  Yes.

"TROOPER WILLIAMS:  Okay.  Okay, John,  is everything that you have told me tonight the truth to the best of your knowledge?

"MR. MOSS:  Yes."

THE COURT:  Is that it?

THE WITNESS:  That's it.

BY MISS LUSK:

Q.   Is that the end of the statement, Trooper?

A.   Yes.

Q.   Trooper, on the second side of that tape there seemed to be three interruptions in the taping.  Is that accurate?

A.   Yes.

Q.   What happened during those three times that the tape was stopped?

A.   I got up and went outside of the room and asked Trooper Smith if he knew of any other questions that needed to be asked of John.

Q.   How long were you gone on each occasion?

A.   About a minute or so.

Q.   Was anyone in the room with John Moss while you were gone?

Trooper Williams - Direct

A.   No.

Q.   At any time while the tape was stopped on those three occasions or on the occasions when you flipped the tape over from Side One to Side Two, were any questions asked of John Moss which were not recorded?

A.   No.

Q.   At any time when the tape was off or the tape recorder was off, did John Moss ask for a lawyer?

A.   No.

Q.   Did he at any of those four times ask that questions be stopped?

A.   No.

MR. McKITTRICK:  Objection to the leading questions.

THE COURT:  Overruled.

BY MISS LUSK:

Q.   Now, Trooper, at any time during the taping of this statement when you left the room, was Sergeant Presson in the room with John Moss?

A.   No.

Q.   Trooper, after hearing this statement and tape played today, is this the whole statement without any deletions or additions as related to you on tape by John Moss on October 28, 1980?

A.   Yes.

388

MISS LUSK:  You may inquire.

THE COURT:  Let's take a five-minute recess.  Your cross will probably take some lenghty period of time, won't it?

MR. McKITTRICK:  Yes.

THE COURT:  A five-minute recess.

(WHEREUPON, a recess was taken, after which the following proceedings were had, all parties heretofore mentioned being present.)

THE COURT:  Show the resumption of these proceedings, all parties heretofore present here again, including the Defendant and his counsel and the State of West Virginia by her Assistant Prosecuting Attorneys.

You may cross, Mr. McKittrick.

CROSS-EXAMINATION

BY MR. McKITTRICK:

Q.   What time did you receive the Signal 18?

A.   At 12:15 p.m.

THE COURT:  P.M.?

THE WITNESS:  P.M.

BY MR. McKITTRICK:

Q.   Where were you when you received that?

A.   I was in Spring Hill.

Q.   And what time did you arrive at the scene near the root beer stand, I believe it was?

A.    It was approximately 12:20 p.m.

Q.    And there my understanding is that you met Paul Reggettz?

A.    That's right.

Q.    Is that the first time you had ever met him?

A.    Yes.

Q.    What did Mr. Reggettz say to you on that occasion?

MR. STUCKY:  Objection, Your Honor.

THE COURT:  Sustained.

BY MR. McKITTRICK:

Q.    Did you and Mr. Reggettz have a conversation there?

A.    Yes.

Q.    As a result of that conversation, did Mr. Reggettz go someplace?

A.    Yes.

Q.    Where did he go?

A.    Towards his house.

Q.    How did he get to his house?

A.    Well, I turned onto Fourth Street.  Fourth Street intersects with Chesapeake Avenue, and he ran down Fourth Street towards his house.

Q.    He ran down Fourth Street or walked down Fourth Street or walking fast?  Which one?

A.    Sort of a fast walk.

Q.   Fast walk, and you followed him in your cruiser, I take it?

A.   Yes.

Q.   When you saw Paul Reggettz for the first time, did you notice anything unusual about him?

A.   No.

Q.   Did he seem emotionally upset or nervous?

A.   He seemed a little nervous.

Q.   What indicated to you that he seemed a little nervous?

A.   He just --

Q.   (Interposing)  I mean when you look at an individual like you are looking at me now, you think I seem a little nervous?

A.   No.

Q.   Well, I am nervous.  What makes you decipher nervousness in an individual, specifically Paul Reggettz that day?

A.   Well, I don't know any specific thing that I could say that is the reason he was nervous.  He just seemed to me he was a little nervous.  Nothing in particular.

Q.   You had never met him before that day; is that correct?

A.   That is correct.

Case 2:09-cv-01406  Document 17-13  Filed 10/29/10  Page 126 of 135 PageID #: 2709

Trooper Williams - Cross                                      391

Q.   Had you seen him after that day?

A.   After the --

Q.   (Interposing)  The 13th day of December.  Well, I guess that was the 14th day of December, wasn't it?

A.   The 13th.

Q.   The 13th that you saw him?

A.   Yes.

Q.   Did you see him after the 13th day of December?

A.   Yes.  Sure.

Q.   And on the occasions that you saw him, did he look nervous on those occasions?

A.   No, not really.

Q.   All right, what was the difference in his demeanor from the days afterward, after the 13th, when you saw him than when you saw him on the 13th that made you conclude that he was nervous?

A.   Well, like I said, I can't pinpoint anything specific.  It just seemed to me on that day he seemed a little.

Q.   A little nervous?

A.   Nervous, yes.

Q.   When you first were talking with him there at the car, I take it that you were in the car on the driver's side; is that correct?

A.   Yes.

Q.   And you had to roll down the window to talk to him?

A.   I rolled down the passenger window.

Q.   Down the passenger window?

A.   Yes.

Q.   He walked over and leaned over and looked in the passenger window on the auto; is that correct?

A.   Yes.

Q.   You were looking at him right in the face?

A.   Yes.

Q.   That's when you concluded he was a little nervous?

A.   Not specifically at that time.

Q.   Was it later?

A.   Yes.

Q.   At the time that you first looked him in the face there as he was bending down looking at you through the passenger side, did you notice anything unusual about him at all?

A.   No.

Q.   Now when you got to the Reggettz residence, I take it that you exited your car?

A.   Yes.

Q.   Did you go into the house?

A.   Yes.

Q. Did you have any conversation with Paul Reggettz from the time that you met him there at Fourth and MacCorkle until the time that you got to the house when you followed him there?

A. Yes.

Q. All right, when you got to the house and you went inside the house, did Paul Reggettz show you what he had found?

A. Yes.

Q. And what did he show you in chronological order?

A. Well, we went through the front door. When I walked in the front door, we went through the living room into what we call the t.v. room, which is the room right next to the living room. He showed me his wife lying in the floor.

Q. Now she was lying in the floor of the doorway; is that correct?

A. Yes.

Q. What doorway was that?

A. The back bedroom and the t.v. room.

Q. Now so the Court can better picture this, Trooper Williams, can you make a sketch of the inside of the house for the Court?

A. Sure.

Q. And label the bedrooms and the living room, if you

will, and the doorways.

    A.    All right.

    MR. STUCKY:  Parrish, I believe there is already a sketch

that has been made by Trooper Williams.  It is in his report,

if you wish to let him look at that and use that to save time.

BY MR. McKITTRICK:

    Q.    Do you have a sketch in your report?

    A.    Yes.

    Q.    And when did you draft that sketch?

    A.    That day.

    Q.    Okay, so it would be more to scale and it would show

more adequately what occurred, what you saw; is that correct?

    A.    Yes.

    Q.    Would you get that for the Court and let's run a

copy off?  It would save us some time.

    (WHEREUPON, a discussion was held off the record.)

    MR. McKITTRICK:  Would you mark this as Defendant's

No. 7?

    (WHEREUPON, the sketch referred to was marked for

identification as Defendant's Exhibit No. 7.)

BY MR. McKITTRICK:

    Q.    Let me hand you what has been marked for identifica-

tion purposes as Defendant's Exhibit No. 7, and I will ask

you whether or not that is a drawing, not to scale, of the

internal position of the Reggettz home which you found on

December 13, 1979?

    A.   That is right.

    MR. McKITTRICK:  Your Honor, do you have a copy of it?

    THE COURT:  Yes, sir.  Is that the one that purports to

show as you walk through the front door the living room,

t.v. room, kitchen, and on the back bedroom, bedroom, et

cetera?

    MR. McKITTRICK:  Yes, sir.  We would like to move that

into evidence at this time before he starts marking on it.

Do you have any objection?

    MISS LUSK:  No objection.  It is not completed.  I want

the record to show it is not a completed drawing.

    MR. McKITTRICK:  I want to complete it a little more.

All right?

    MISS LUSK:  It shows the layout of the rooms and that's

all.

    THE COURT:  It will be introduced in evidence and marked

as Defendant's Exhibit No. 7, with the understanding it is

not to scale and it is not a complete drawing of the interior

of the house.

    (WHEREUPON, Defendant's Exhibit No. 7 was received

into evidence.)

BY MR. McKITTRICK:

Q.    Throughout these proceedings, Trooper Williams, there have been some mention to a back door.

A.    That is right.

Q.    Where would that back door be located?

A.    It would be at the kitchen, in the back of the kitchen.

Q.    Would you take your pen and put an "A" where the back door would be and try to put the door in as best you can as you have the front door, please?

MR. STUCKY:  Your Honor, before he does that, it has been introduced into the record as it exists now, and Mr. McKittrick is now going to have the witness change the appearance of the piece of evidence.  I don't know --

THE COURT:  (Interposing)  I think it would be better done by a blackboard rather than interfering with the integrity of this exhibit.  Get the blackboard out of the back room there, please.  May I be of assistance?  Why don't you have Trooper Williams come down, draw that on the blackboard, and then ask whatever additional questions you want?  That way it won't tamper with the integrity of the exhibit.

Why don't you label "A", Trooper?

MR. McKITTRICK:  Let the record show that we have brought a blackboard into the Courtroom and it has -- it is a reflection of Defendant's Exhibit 7.

THE COURT:  Well, it is not a complete reflection of it.

Trooper Williams - Cross

MR. McKITTRICK:  Now it is.

THE COURT:  No, it is not.  What is all this stuff?

MR. McKITTRICK:  He is going to put that in there, isn't he?

THE COURT:  It is not in there yet.  Do you mind if I leave for a moment without putting anything further on the record until he finishes up?  Go ahead and finish.

(WHEREUPON, a recess was taken, after which the following proceedings were had, all parties heretofore mentioned being present.)

THE COURT:  All right, let's proceed.  Proceed.

MR. McKITTRICK:  Judge, what I would like to do is I would like to withdraw my motion to introduce Defendant's Exhibit No. 7, and I would like to have it marked as we go along so we can introduce it into evidence so the appeal court, if it ever goes before an appeal court, can read this record.  They are not going to be able to read this black-board.

THE COURT:  If he is going to mark up Defendant's Exhibit No. 7, then the integrity may be impaired.  Now I think what you can do, and I will permit this, you may intro-duce -- you have already introduced State's or Defendant's Exhibit No. 7 without any additions or corrections.  Leave that in there; and if you care to, I will permit you to

398

introduce a second copy.

    MR. McKITTRICK:  Which we can copy off the board.

    THE COURT:  No, a second copy like this.  He can work
on this one, if that's what you want, since you are stating
the State Supreme Court, if it ever reaches that body, can't
see the blackboard.  What I will permit you to do, if you
have no objection, Defendant's Exhibit 7 as introduced will
remain untouched.  I will permit you now, if you care to do
so, to introduce Defendant's Exhibit 7A, which he may mark up.
Is that agreeable with counsel?

    MR. McKITTRICK:  Yes.

    THE COURT:  All right.

    MR. McKITTRICK:  A good suggestion.

    THE COURT:  So let the original go in merely just as it
was.  Give the Clerk the original.  Now we will mark the
next one -- do you want to move -- wait until he finishes
marking it up, and then if you care to, Parrish, at the
proper time, you may move that in as Defendant's Exhibit
7A.

    MR. McKITTRICK:  I will just identify it right now.

    (WHEREUPON, the sketch referred to was marked for
identification as Defendant's Exhibit No. 7A.)

BY MR. McKITTRICK:

    Q.  Let me hand you what has been marked for

identification purposes as Defendant's Exhibit No. 7A, and

would you look at that carefully and tell us what that is,

please?

A.    This is a drawing that I made of the crime scene.

Q.    Okay.  Now, Trooper Williams, there has been some

mention in these proceedings of a front door and a back door.

I notice on Exhibit 7A the front door is already written in.

Would you please write in where the back door is that we have

been referring to?

A.    Sure.

Q.    Now when you entered the residence, you found among

those persons that you felt were deceased a young girl; is

that correct?

A.    Yes.

Q.    You found her on a bed in a bedroom?

A.    That is correct.

Q.    Would you draw in that bed and place the girl on the

bed where her head was and where her feet were?  Put an "A"

on that bed, please.

Now as I understand it, you also found a young boy on

a bed in that house; is that correct?

A.    Yes.

Q.    Would you draw that bed in and put a "B" now on it

and also put the young boy on the bed?

Now on that drawing, I notice there is placed in the doorway between the t.v. room -- is that correct? We have also talked about a front bedroom and a back bedroom; is that correct?

A.   Yes.

Q.   And would you label where the front bedroom is and the back bedroom?

Now I also notice what seems to portray a body lying in the doorway between the t.v. room and the bedroom.  Is that a correct statement?

A.   Yes.

Q.   Who was that that you found lying there?

A.   Vanessa Reggettz.

Q.   And is that the posture that you found her body in as it is drawn on that Defendant's Exhibit 7A?

A.   Yes.

Q.   I notice that her feet was what seems to be in the t.v. room somewhat; is that correct?

A.   Yes.

Q.   How far into the t.v. room was Vanessa Reggettz's feet?  How far into the t.v. room did she protrude?

A.   I have no idea.  I never measured it.

Q.   You did not measure it?

A.   No.