**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 21**
**(CONTINUATION, pp. 401 to end)**

Q.   As you think back, can you give us an approximation?

A.   Approximately -- this is just a guess now -- a foot -
foot and a half.  It could be a little bit more either way, more
or less.

Q.   Would that be close to her knees?  Her knees down-
ward were in the t.v. room.  Would that be a fair statement?

A.   It would be close to that.

Q.   Now, Trooper Williams, when you went into the bed-
room which you have labeled and found the little girl, was
the little girl lying face down or face up?

A.   Face up.

Q.   Did you look into the little girl's face?

A.   I didn't get right over top of it.  I saw her, and
she was face up.

Q.   What did you notice about her face, if anything?

A.   Well, I noticed that her tongue was kind of sticking
out.

Q.   What else?

A.   I noticed she had some rings around her neck --
marks, not rings, marks on her neck.

Q.   Did you notice whether or not her eyes were open
or closed?

A.   They were closed.

Q.   They were closed?

A.    Yes.

Q.    Are you sure of that?

A.    Positive.

Q.    All right, now when you looked at the little boy in the bed, did you look at his face?

A.    Sure.

Q.    What did you notice about his face?

A.    Well, he had some marks on his neck and his eyes were closed.

Q.    When you and Paul Reggettz went into the house, would you tell us in chronological order what he showed you?

A.    Okay.  We went in the front door and we walked straight through the living room into the t.v. room.  Now the doorways to the kitchen, the t.v. room and the front door are more or less in a straight line.  They are not exactly like this drawing shows.  They are almost in a straight line.

Q.    In other words, if you look through the living room door into the t.v. room, you could see through the kitchen door, also?

A.    You could see the back door, yes.

Q.    Okay.

A.    We walked straight through the living room, into the t.v. room.  He showed me his wife.

Q.    He?

A.    Paul Reggetz showed me Vanessa, who was lying in the floor.

Q.    When he showed her to you, what did he do?

A.    He didn't do anything.

Q.    He just showed her to you?

A.    He showed me, and then after he showed me Vanessa, of course, I had already looked over and saw the boy lying on the bed.  He showed me the little boy.

Q.    Did Paul Reggetz walk over to the little boy and show him to you?

A.    No.

Q.    Did you walk over to the little boy?

A.    I walked over to the little boy.  After that, then I --

Q.    (Interposing) Then what happened?

A.    Then I asked him what else he found, and he said that he found his little girl, who was lying -- he took me in the front bedroom and showed me the little girl lying on the bed in the front bedroom.

Q.    How did you walk in the front bedroom?

A.    From the back bedroom into the doorway into the front bedroom.

Q.    Did Paul Reggetz walk with you?

A.    Yes.

Q.   Did he show you his little girl in the bed?

A.   Yes.

Q.   Now at that time, when Paul Reggettz showed you his little girl in the bed, did you notice anything unusual about him at that time?

A.   About Paul?

Q.   Yes.

A.   That he seemed nervous.

Q.   Did he show any emotions?

A.   No.

Q.   Then what did he and you do?

A.   Well, we went outside on the front porch, and I told him to stay right on the front porch, and I went across the street to a house and used the telephone and called my office.

Q.   Where did Paul Reggettz go?

A.   He sat on the front porch.

Q.   How long did it take you from the time that you entered the front door until the time that you walked back out of the house with the intentions of making your telephone call?

A.   Oh, we were -- I would say we were in the house approximately five minutes or so.  That's a guess.  I'm not sure what time.

Q.   Did Paul Reggetts show you anything else in the house at that time besides the bodies?

A.   No.

Q.   You went and made your telephone call, I take it?

A.   Yes.

Q.   And did someone come and assist you?

A.   Yes.

Q.   Where was Mr. Reggetts during this time?

A.   Well, I told him to sit on the front porch and wait until I came back.

Q.   When you came back, was he there?

A.   He was sitting on the front porch.

Q.   Then what happened to him?

A.   Well, I asked him exactly what he found when he came home, and he showed me.

Q.   Showed you again?

A.   Yes.

Q.   Did he show you anything different the second time from what he had shown you the first time?

A.   Yes.

Q.   What did he show you that was different?

A.   Well, when I asked him to take me through exactly the way he found it when he came home, he said that he came up to the front porch and the door was locked.  He knocked

several times and no one answered. So he went around to the

back door and he said he just pushed the back door open;

and when he opened the back door up, he could see his wife's

leg sticking out into the t.v. room. He knew there was

something wrong, and then he run in there and saw that his wife

was dead. He said that he then thought about the children

and he went through the t.v. room into the living room, and

he said he found his little girl hanging from the door on

the door between the front bedroom and the living room by a

cord wrapped around her neck. He said that he took the cord

from around her neck and took her down and laid her on the

bed in the front bedroom.

Q.   All right, now did he tell you what time of day

he did this?

MR. STUCKY:  Objection, Your Honor.  Hearsay.

MR. McKITTRICK:  Your Honor, I realize that hearsay in

some proceedings is normally objectionable and this may or may

not be res gestae, may be an exception to the hearsay rule;

but as this Court knows, although a transfer hearing cannot

be held on exclusively hearsay evidence, hearsay evidence

can be admitted.  I think this is very, very important, and

if it is on the borderline, it should be admitted.

THE COURT:  I don't think it is on the borderline.

Reggettz is not a party to this action.  Sustained.

MR. STUCKY:  Your Honor, also, I would like to place

on the record that the defense counsel has objected on

numerous occasions to the State's attempt to introduce

hearsay evidence at this proceeding.

THE COURT:  I don't think this question is an exception to

the hearsay rule.  Reggettz is not a defendant or a party to

this proceeding and, therefore, you can call Reggettz back to

the stand and ask him; but you cannot do it through this

witness.  Sustained.

BY MR. McKITTRICK:

Q.  All right.  In any event, did you find out that it

was shortly before you accompanied Mr. Reggettz to the home

that he had found his wife and children?

MR. STUCKY:  Your Honor, objection.  He is trying to do

through the back door what he couldn't do through the front

door.

THE COURT:  Will the Reporter read the last question

back to me?

(WHEREUPON, the question was read by the Reporter.)

MR. McKITTRICK:  Your Honor, he is the investigating

officer.

THE COURT:  Let me rule,  will you.

MR. McKITTRICK:  I'm sorry.

THE COURT:  Overruled.  Go ahead.

Trooper Williams - Cross                                          408

THE WITNESS:  What was the question?

THE COURT:  The Reporter will read back the question.

(WHEREUPON, the question was read by the Reporter.)

THE WITNESS:  Yes.

BY MR. McKITTRICK:

Q.   Now did you, Trooper Smith, on the 14th day of
December, 1979, accompany Paul Reggettz back to the home?

A.   Did myself and Trooper Smith?

Q.   I'm sorry, did you, along with some other person,
accompany Paul Reggettz back to the home on the 14th day of
December, 1979?

A.   Yes.

Q.   And who else was with you?

A.   There was myself, Trooper Woodyard, Trooper McGowan,
who is no longer with the Department, and Mr. Roark,
Prosecuting Attorney.

Q.   Now on that occasion, did Paul Reggettz show you all,
the people that you named, exactly what he did as far as
committing the murders of his two children and wife?

A.   Yes.

Q.   And did he, as part of his complete explanation,
which is set forth in Defendant's Exhibit 4 that has already
been introduced in this proceeding, indicate anything
different about when it was that the child was taken from

Trooper Williams - Cross

the door?

A.   Well, I don't know what is in Defendant's Exhibit 4.
I don't know.

Q.   You are not familiar with it?

A.   I haven't seen it.

Q.   Let me hand you what has been introduced in this
proceeding as Defendant's Exhibit 4; and to save time, I will
ask you to allude to the last page of that exhibit, and
specifically the last paragraph in order for you to answer
that question.

A.   I would say that is a true statement.

Q.   Excuse me?

A.   That is a true statement.

Q.   What is the difference so His Honor will know?

A.   Well, he told us --

MR. STUCKY:   (Interposing)  Your Honor, I am going to
object again.  What the Trooper is going to relate now is
what Paul Reggettz told him the first evening versus what
Paul Reggettz said in that statement.

THE COURT:   I have already sustained the objection to
hearsay from Reggettz.  He is not a party to this.  That
exhibit will speak for itself.

MR. McKITTRICK:   He is not doing that, Judge.  He is
telling the difference in what he showed them he did.

Trooper Williams - Cross

MR. STUCKY:  He can't show time, Your Honor.  That is the question.  The question is what time it was done.

MR. McKITTRICK:  It is a chronological depiction of what he did.  He showed them in Exhibit 4 what he did.

THE COURT:  You can call Reggettz back to the stand and ask him, and then you can put this Trooper on in rebuttal if you care to.  I am not going to let you get into hearsay from Reggettz.  That's what this is.

MR. McKITTRICK:  It is not hearsay, Your Honor.  There is an exhibit where he took these people back to the house and showed them what he did.  I am not asking what he told them,  what he showed them, and that's what this says.

MR. STUCKY:  Your Honor, the exhibit says, and I will quote, "The accused stated", and then it goes on, "The accused stated", and then it goes on.  Each and every paragraph of this says "The accused stated".

MR. McKITTRICK:  Judge, this is an exhibit that is in evidence in this case and it is part of the investigation by this officer and other officers of the West Virginia Department of Public Safety, and it is already in evidence.

THE COURT:  I know, and the exhibit speaks for itself.  There is a proper way of getting in what you are trying to get in, and you are not doing it in the proper manner, and I am sustaining the objection.  There is a proper way to

phrase that question and get it in.

BY MR. McKITTRICK:

Q.   Trooper Williams, was there any difference in what
Paul Reggettz showed you he did with regard to taking the
body of his daughter down off the door on December 13, 1979
when he found her and what he showed you on December 14, 1979
with regard to taking his daughter off the door?

A.   Well, in the initial questioning of Mr. Reggettz,
I was not in on it.  So I don't know what he said other than
what the other troopers told me.  The only part of the con-
fession I was in on was the part he took us to the house.
I wouldn't know whether there was any difference or not.

Q.   Mr. Reggettz showed you what he did on December 13,
when he found his daughter, did he not?

A.   Yes.

Q.   And what did he do?

A.   He said he --

MR. STUCKY:  (Interposing)  Your Honor, again he is
getting into "he said".  I don't believe he is being
responsive inadvertently.  He is confused.

THE COURT:  The question that you posed a moment ago
was proper.  That was a proper question.  Let him respond
to that.

The Reporter will read back the question to the witness.

Trooper Williams – Cross

(WHEREUPON, the question was read by the Reporter.)

THE WITNESS:   I misunderstood the question.

BY MR. McKITTRICK:

Q.   That's all right.

A.   Yes, there was a difference.

Q.   Tell the Court what the difference was.

A.   On December 13, he told me --

MR. STUCKY:   (Interposing)   Your Honor, objection.

THE COURT:   I am going to sustain the objection to what he told you.  You can tell the difference, if there is a difference between the first time and the second them, but you can't tell what Reggettz told you.

BY MR. McKITTRICK:

Q.   What he showed you.

A.   He showed me he took his daughter down when he came home from work on the 13th.  On the 14th, he showed us that he took his daughter down before he went to work.

Q.   Now when you went back in the house the second time with Paul Reggettz, continue with what he said he showed you, or what he showed you, excuse me.

A.   Well, the first thing he did, we walked in the back door and he found, he saw his wife's legs sticking out of the back bedroom into the t.v. room.  Then he thought he wanted to find his kids.  So he went through the t.v. room into the

living room and saw his daughter hanging on the door.  He

took her down off the door.  Then he thought about his

little boy, and he started looking for his little boy and he

found his little boy, went through the front bedroom into the

back bedroom.  He was looking for his little boy.  He went

in the bathroom and found his little boy face down in the

bath tub.  He said the bath tub had water in it.

    Q.   Who said that?

    A.   Paul Reggettz.

    Q.   Are you saying he said when he found his little boy

in the bath tub that the bath tub had water in it?

    MR. STUCKY:  Your Honor, I am going to object.

    THE COURT:  Sustained.  I told you three times you can't

get into what Reggettz told this witness.

    MR. McKITTRICK:  Your Honor, I think that the rules of

evidence say that a witness being unresponsive is only

available to the questioner.  Now the witness answered the

question.  I didn't, Your Honor.  I didn't ask the witness to

tell me.

    THE COURT:  I have sustained the objection as to what-

ever Reggettz told this witness.

    MR. McKITTRICK:  My understanding is, as clarification

from Your Honor, that I cannot ask this witness any questions

concerning any admissions or any statements made by Paul

Reggettz to him; is that correct?

THE COURT:  No, that is not correct.

BY MR. McKITTRICK:

Q.  What did Paul Reggettz tell you with regard to whether or not there was water in the bathtub when his child was in it?

MR. STUCKY:  Objection, Your Honor.

THE COURT:  Are you using this for the purpose of attempting to show that someone other than this Defendant could have committed the crime?

MR. McKITTRICK:  Absolutely, Your Honor.

THE COURT:  All right, overruled.  Go ahead.

THE WITNESS:  He told me there was water in the bathtub.

BY MR. McKITTRICK:

Q.  In other words, Paul Reggettz told you that when he found his child in the bathtub there was water in the bathtub?

A.  That is correct.

Q.  Paul Reggettz then told you that he took his child out of the bathtub?

A.  Yes.

Q.  And carried his child to the bedroom?

A.  Yes.

Q.  And placed his child on the bed?

A.  Yes.

    Q.   Now when you saw the child lying on the bed, did the child have clothes on?

    A.   Yes.

    Q.   What kind of clothes?

    A.   Pajamas.

    Q.   Were the pajamas wet?

    A.   Yes.

    Q.   What kind of clothes did Paul Reggettz have on?

    A.   He had on work civilian clothes, like work clothes. He had a jacket on. I don't remember the exact color.

    Q.   Were any of Paul Reggettz's clothes wet?

    A.   No.

    Q.   What is the next thing that Paul Reggettz showed you that he did?

    A.   After he showed me how he found his little boy, we went back outside.

    Q.   Did Paul Reggettz soon thereafter then leave the scene?

    A.   Yes.

    Q.   How long thereafter?

    A.   I would say twenty minutes -- fifteen - twenty minutes, guessing.

    Q.   Now on the 14th day of December, 1979, when you accompanied Paul Reggettz with the other gentlemen that you have

already enumerated, what did he show you on that occasion and what did he tell you on that occasion?

MR. STUCKY:  Your Honor, I am going to object for the reason that Mr. Reggettz already has been on the stand.  He has testified to what he did and what he said and, in fact, the statements that were taken are admitted into evidence as Defendant's exhibits.  Therefore, the best evidence of what Reggettz said is what he has admitted saying and not what somebody else is going to say he said again after these are admitted into evidence.

MR. McKITTRICK:  Your Honor, this is cross-examination.

MR. STUCKY:  Your Honor, it is outside the scope of direct.

MR. McKITTRICK:  How could it be outside the scope?  He has testified to his investigation.  That is what I am questioning him about.

MR. STUCKY:  That is incorrect, Your Honor.

MR. McKITTRICK:  This evidence specifically goes to rebut the State's burden to prove probable cause.

MR. STUCKY:  Your Honor, again, Mr. McKittrick insists on rebutting our efforts to show probable cause prior to our case being concluded.

MR. McKITTRICK:  You can rebut evidence on cross-examination as well as your direct case.  I hope you can.

THE COURT:  Objection overruled.  Proceed.

THE WITNESS:  Well, first off, he said that he -- he was already home and he was watching t.v., and --

BY MR. McKITTRICK:

Q.    (Interposing)  We are talking about Paul Reggettz?

A.    Right.

Q.    Correct.  Go ahead.

A.    What he told us he did on the 14th?

Q.    Yes, sir.

A.    He said that him and his wife had gotten into an argument over the kids making noise and that his wife said she was going to get the gun.  So she went to get the gun and they got into an argument over it and the gun went off and that he had taken it away from her.

Q.    Did he tell you where they were when the gun went off?

A.    Yes.

Q.    Where?

A.    In the back bedroom.

Q.    All right, did you find a cartridge back there as a result of your investigation or as a result of the investigation of the Department of Public Safety?

A.    We found a spent bullet that had been shot.

Q.    Where was it found?

Trooper Williams - Cross

A.   In the floor.

Q.   Of what bedroom?

A.   The back bedroom.

Q.   All right, go ahead.  What else did Paul Reggettz tell you?

A.   He said that he had taken the gun away from her and started swinging it, and he said he remembered hitting something and that the gun broke.  Then he got some cords and choked her with them and then tied them around her neck and put them through a hole in the door between the back bedroom and the t.v. room; and then he got the little boy, who had tried to run.  He knocked him down and put his knee in his back, and he said he jerked the cord out of a radio and strangled the little boy with it.  Then --

Q.   (Interposing)  Now did you all find that cord?

A.   It was around his neck.

Q.   Did you find a radio without a cord on it?

A.   Yes.

Q.   Where is that radio?

A.   It is in our evidence room.

Q.   Okay, go ahead.

A.   Then he picked the little boy up, and he said he remembered the little boy liked to swim, so he put him in the bathtub and filled the bathtub about half full of water and

put him in the bathtub face down.

  Q. Now did he hold him down in the bathtub?

  A. No.

  Q. Did he indicate to you that he put his knee on the little boy in the bathtub?

  A. Not in the bathtub.

  Q. All right, go ahead.

  A. Then he got the little girl and saw the cord on the floor, a cord from the sweeper. He got that cord and choked her, wrapped it around her neck. He said he remembered that the little girl liked to swing; so he draped the cord around the little girl's neck, over the door between the front bedroom and the living room and put her, hung her on the door and closed it so she would be hanging suspended in the air.

  Q. All right. Now did Paul Reggettz tell you, Trooper Smith, that he ripped the cord from the vacuum cleaner or just pulled it from the vacuum cleaner and used it?

  A. I'm Trooper Williams.

  Q. I'm sorry. Did I say Smith? After the last eight hours of cross-examination, I apologize.

  A. He just said that he saw the cord lying on the floor from the radio and just jerked it.

  Q. On the vacuum cleaner?

  A. The vacuum cleaner?

Q.   Yes.

A.   He saw it lying on the floor and picked up the cord.

Q.   Do you have the vacuum cleaner?

A.   Yes.

Q.   Was the cord still attached to the vacuum cleaner?

A.   Yes.

Q.   Did you confirm that the little girl was strangled by the vacuum cleaner cord by your investigation or the investigation of the Department of Public Safety?

A.   Only by what Paul Reggettz told us.

Q.   Did you confirm in any manner, means or form that the little girl had been hung on the door that Paul Reggettz said he hung her on?

A.   No.

Q.   Continue now.  What did he say next?

A.   Well, after he hung the little girl on the door, he said that he got to thinking about his wife and he was afraid she would get up, and he was afraid of her.  So he got a pair of scissors from the bathroom and he said there was a pair of scissors that he trimmed his mustache with. He stabbed her in the chest.

Q.   All right.  Now when you saw Vanessa Reggettz lying on the floor when you first went in the house, was she lying on her back or was she lying on her stomach?

A.   Well, she wasn't completely lying on her back.  She
was sort of to the side, but not completely on her side --
about like that.

Q.   Did she have something stuck in her chest?

A.   Yes.

Q.   What was it?

A.   Scissors.

Q.   What type scissors was it that was sticking in her
chest?

A.   Well, I would say about the type that a barber
uses to cut hair.

Q.   To cut hair?

A.   Yes, the best I --

Q.   (Interposing)  And did Paul Reggettz see those
scissors after the 13th day of December, 1979?

A.   Did he see them?

Q.   To your knowledge.

A.   Yes.

Q.   And did he identify those scissors?

A.   Excuse me, wait a minute.  After the 13th?

Q.   Yes.

A.   Not to my knowledge, he didn't.

Q.   Go ahead.  Continue now.  What did he say?

A.   He said after he stabbed her with the scissors that he

got a cup of coffee and sat down and watched the t.v. for a

little while.  He watched "Baretta".

    Q.   Did you check in your investigation to determine

what time "Baretta" was shown that night?

    A.   Yes.

    Q.   What time was it shown?

    A.   I believe it was 11:30.

    Q.   What time was Paul Reggetz supposed to go to work?

    A.   I think he told us that he had to be there by two

o'clock.

    Q.   Did you check in your investigation to determine

what time Paul Reggettz got to work that night?

    A.   Yes.

    Q.   What time did he get there?

    A.   I would have to look at the timecard.  I don't

recall it.

    Q.   Would you please do it?

    A.   I don't know if I have it with me.  I don't know if

I do or not.  I don't think I have the timecard with me.  My

report don't have the timecard in it.

    THE COURT:  I think it is a good time to break.  He can

search for that timecard during the evening recess.  It is

now approaching five.  I want you all back here at 6:30

p.m.

I don't want you discussing your testimony, Trooper,

with anyone; and when we get back at 6:30, see if you don't

have that timecard available at that time.

All right, we will stand in recess until 6:30.

(WHEREUPON, the evening recess was taken, after which

the following proceedings were had, all parties heretofore

mentioned being present.)

THE COURT:  Let the record reflect the resumption of these

proceedings In the Interest of John Moss, Jr., the Defendant

being present in person and by counsel, State of West Virginia

by her Assistant Prosecuting Attorneys.

The matter now resumes at 6:30 p.m.

MR. STUCKY:  Your Honor, for the record, --

THE COURT:  (Interposing)  Trooper williams, you are still

under oath.

THE WITNESS:  Yes, sir.

MR. STUCKY:  At this time, I would respectfully renew our

previous objection made to the admission of about the last

forty-five minutes of questions and answers of Trooper

Williams based on the fact that they are eliciting hearsay

testimony from this Trooper of what Reggettz told him.

Now, number one, the State of West Virginia -- Your

Honor, number one, the State of West Virginia is going to be

denied the opportunity to cross-examine Mr. Reggettz on what he

has told this Trooper.  Mr. Reggettz was present under defense

subpoena.  He testified on the defense's case out of turn.

They had the opportunity to bring out each and every one of

these facts by Mr. Reggettz.  They did not do that.  What they

did was introduce five documents, that being synopses of

again statements that Reggettz apparently told not only

Trooper Williams but Trooper Smith, Dr. Sopher, Trooper

Woodyard, Trooper McGowan and Trooper McDowell, I believe.

Those are in evidence.  Whatever Mr. Reggettz said, or at

least what Mr. Reggettz said he said is already before this

Court in this written stuff.  To go through it step by step

with Trooper Williams and Trooper Woodyard and everybody

else is, number one, repetitive.  We can't cross-examine Mr.

Reggettz again as we were able to cross-examine him when we put

these in and he denied each and every thing that was said in

them.  Now we don't have the opportunity to do that with this

kind of testimony, and it is highly unfair, it is prejudicial

to the State's case and it is repetitious to what is already

in the record.

      THE COURT:  Perhaps I am missing the point somewhere,

but we are not at a trial of the issues.  We are at a probable

cause hearing.  I think if we were at trial, Mr. Stucky,

without doubt, without a moment's hesitation, I would sustain

your objection; but we are not here for that.  We are here for

Trooper Williams - Cross

probable cause, and the Court is aware of what the State and

the State is aware of what it must show in its burden of

proof, for probable cause and probable cause only for the

transfer.  Therefore, I am going to overrule your objection.

        Proceed, Mr. McKittrick.

BY MR. McKITTRICK:

        Q.   I think I asked you to look for the timecard.   Is

that where I left off?

        THE COURT:  Yes,  I believe it was, and I asked Trooper

Williams to have it available when we resumed.

        Do you have it, Trooper?

        THE WITNESS:  Yes.

        THE COURT:  All right, proceed.

BY MR. McKITTRICK:

        Q.   May we see that, please, sir?

        MR. McKITTRICK:  Do you want me to run a copy off?

        THE COURT:  Yes.

        MISS LUSK:  Make us one, too, Jim.

        MR. McKITTRICK:  Judge, mine is not legible.  Why don't

we get his testimony from the original, and if the State has

no objection, you can copy in that which is not shown on the

Xerox.

        Mark this as Defendant's Exhibit No. 8.

        (WHEREUPON, the document referred to was marked for

identification as Defendant's Exhibit No. 8.)

BY MR. McKITTRICK:

    Q.   Let me hand you what has been marked as Defendant's

Exhibit 8 and ask you if that is a copy of a timecard of

Paul Reggettz which you secured in your investigation of the

allegations of certain homicides of Mr. Reggettz's family on

December 12, 1979?

    A.   No, not on December 12th.

    Q.   December 13, '79.  Let me amend that question.   Is

that --

    A.   (Interposing)  That is correct.

    Q.   Notice on that card, as you compare it -- on

Defendant's Exhibit 8, as you compare it with the original,

I think you will notice that the times are not explicit

enough that you can read them in certain places; is that

correct?

    A.   On the copy here?

    Q.   Yes.

    A.   That is correct.

    MR. McKITTRICK:   If there is no objection from the

State, I am going to ask this witness to copy the times off

of the original onto the copy which is Defendant's Exhibit 8.

    MISS LUSK:   No objection.

    MR. McKITTRICK:   We would now move Defendant's Exhibit 8

into evidence.

THE COURT:  Any objection?

MR. STUCKY:  Your Honor, I would object to the relevancy
of that to this transfer at this time.

MR. McKITTRICK:  Your Honor, again it is evidence that
rebuts the State's burden to prove probable cause.

MR. STUCKY:  Your Honor, that is Mr. Reggettz's work
card.  I don't know how that rebuts the evidence of the
Defendant's confession.

MR. McKITTRICK:  It not only rebuts it, but it also
substantiates that Mr. Reggettz's own statements, which are
already introduced into evidence, not only by this Trooper
but also in exhibits, the exhibits of his confession.  It
is just another piece of evidence that substantiates those
confessions.

THE COURT:  I think what he is attempting to do is to
purport to show that Reggettz reported for work at a certain
time, that he punched out at a certain time, and I think that
probably in keeping with the Moss decision, that it is --
I would suspect that it is proper for  him to attempt to adduce
by that timecard that Reggettz had the opportunity to commit
the acts for which this juvenile/defendant is charged with.

Overruled.  That is, the State's objection is overruled.

(WHEREUPON, Defendant's Exhibit No. 8 was received

Trooper Williams - Cross                                        428

into evidence.)

BY MR. McKITTRICK:

    Q.   Now handing you Defendant's Exhibit No. 8, Trooper

Williams, did you secure that personally?

    A.   No, sir.

    Q.   Do you know who did?

    A.   Yes, sir.

    Q.   Who did?

    A.   Trooper Rinehart.

    Q.   Did you have an opportunity, after the document

was secured, to discuss it with anyone?

    A.   Yes.

    Q.   Did you discuss it with the persons, persons or

supervisors, of Paul Reggettz where he worked?

    A.   Yes.

    Q.   Do you feel that after your discussions you under-

stand the writings on that document fully and thoroughly?

    A.   I do now, yes.

    Q.   And could you -- do you think that you could

explain to His Honor so His Honor could more fully and

thoroughly understand?

    A.   Yes.

    Q.   Okay, what time of the night or day did Paul

Reggettz report to work?

A.    Well, it's got that he checked in at 2:30 hours,
which the 30 stands for 30/100 of an hour.

Q.    Okay, have you calculated approximately what time
that would be?

A.    Yes.

Q.    What time is it?

A.    It's 2:18 a.m.

Q.    Now what time of the night was Baretta on on the
13th, on the 13th day of December, as you have already stated?

A.    I'm thinking it was around the time of 11:30.
That comes to my mind, but I could be wrong about the time.

Q.    Now after Mr. Reggettz indicated that he watched
Baretta, what did he say that he did?

A.    To the best of my recollection, he said that he
laid down and took a nap.

Q.    Where is the physical facilities located where Mr.
Reggettz works?

A.    Now?

Q.    Then, on the 13th day of December.

A.    It was located in Rand.

Q.    Rand, West Virginia?

A.    Yes.

Q.    And did you calculate how long it would take for
one in the normal course of traffic to drive from the Reggettz

home in St. Albans to Rand, West Virginia?

    MR. STUCKY:  Objection, Your Honor.

    THE COURT:  Only if he knows.  If he doesn't know, he cannot answer it.

    MR. STUCKY:  I think it has to be limited to two o'clock in the morning, to begin with.  The regular course of traffic wouldn't have anything to do with it.

    THE COURT:  I think you are absolutely correct.  Mr. McKittrick, I will let you ask the question, but phrase it in terms of the time elements we are talking about.

BY MR. McKITTRICK:

    Q.  Have you ever, or do you know approximately how long it takes to drive from the Reggettz residence, the residence on the 13th day of December, 1979, to Mr. Reggettz's place of employment in Rand?

    A.  I don't know for sure.

    Q.  Can you give us a close approximation?

    A.  Yes.

    Q.  How long?

    A.  I would say about twenty minutes.

    Q.  Okay.  Mr. Reggettz indicated, did he not, that he awoke from his nap at 13 minutes till 2?

    A.  I believe he did.

    Q.  And he knew that because he picked up his watch and

looked at it; is that correct?

MR. STUCKY:  Your Honor, I am going to object now to the

leadingness of the questions.  It is clearly beyond the scope

of our direct; and if he is going to elicit the hearsay, I

think he ought to at least ask what Reggettz said and not

tell him what Reggettz said.

MR. McKITTRICK:  Your Honor, this is the investigating

officer.  He has testified to his investigation in response

to questions of the State.  This is cross-examination, and it

is impossible for me to lead this witness.  It is within the

scope of his investigation.

THE COURT:  Well, I think you are trying to ask questions

over and over again until you get the answers you want.  How-

ever, I will overrule the objection at this time and caution

you to ask questions, get your answers and go on to something

else and not keep asking the same question until you get the

answer you want.

MR. McKITTRICK:  Your Honor, I think it is sufficiently

in the record, also, and I just want to make sure that the

Court is getting the answers.  I don't mean to be repetitive.

THE COURT:  Oh, I think if this ever reaches an appellate

body that they can read the transcript for themselves and

determine what went on during this proceeding.

BY MR. McKITTRICK:

Q.   In all the time that you were with Paul Reggettz,
both on the 13th day of December, 1979, and on the 14th day
of December, 1979, when he showed both you and other members
or other individuals who you have already enumerated for
the Court what he had done when he committed the murders, did
Paul Reggettz ever indicate, to your knowledge, then or after-
ward to this date that John Moss was present when he, Paul
Reggettz, committed the murders of his two children and wife?

A.   No.

Q.   When you went to Mansfield, Ohio, to get John Moss
on October 28, 1980, did you have papers with you, any kind
of papers?

A.   I think we did, but I'm not real sure.

Q.   Do you know what kind of papers they were?

MISS LUSK:   Objection.   He said -- he already said he
didn't know if he even had any.

THE COURT:   Overruled.

THE WITNESS:   No.

BY MR. McKITTRICK:

Q.   When you arrived at the Reformatory or the peniten-
tiary or whatever kind of facility it was in Mansfield, Ohio,
who did you first talk to there?

A.   I don't know what their names were.

Q.   Were you introduced to anyone there?

A.   No.

Q.   While you were there, picking up John Moss, was John Moss ever in your presence when anyone from the penitentiary advised him of any rights that he may have before you transported him back to the State of West Virginia?

A.   No.

Q.   Did you or Trooper Smith advise John Moss of any rights that he may have under detainer or extradition statutes before he would be transported back to the State of West Virginia that day?

A.   No.

Q.   When you left Mansfield, Ohio, is it my understanding that approximately twenty minutes out of Mansfield, that Trooper Smith advised John Moss of his rights as they are commonly called?

A.   Yes, that's the approximate time.

Q.   Now was Trooper Smith in the front seat of the vehicle or in the back seat at that time?

A.   When he advised him of his rights?

Q.   Yes, sir.

A.   He was in the back seat.

Q.   How long -- strike that.  After you left Mansfield, was Trooper Smith in the front seat?

A.   When we left Mansfield?

Q.   Yes, sir.

A.   Yes, sir.

Q.   How long into your trip and after you left Mansfield,
Ohio, did Trooper Smith get into the back seat?

A.   I'm not sure of the time length.  I would say
fifteen or twenty minutes as a guess.  I'm not sure.

Q.   Do you know the reason why Trooper Smith asked you
to stop the car so he could get in the back seat?

A.   We never stopped.

Q.   He crawled over the seat?

A.   Yes.

Q.   Now you described the inside of the car.  John Moss
was sitting where in the back?

A.   On the passenger side.

Q.   Now did you indicate that when John got into the
car at Mansfield, just before you were leaving, that you
handcuffed him while his hands were in the front of him?

A.   We switched them from the back to the front.

Q.   All right, did you handcuff his hands to any portion
of the car inside the car?

A.   Not that I can recall.

Q.   Do you know whether Trooper Smith did that?

A.   Well, it has been such a long time.  He may have
handcuffed him to the headrest, one of them, but I'm not real

sure.

    Q.  How far into your trip would he have done that?

    A.  Done what?

    Q.  Handcuffed him to the headrest.

    A.  Well, it would have been before we left Mansfield.

    Q.  Okay, what is the reason that you handcuffed a prisoner to the headrest?

    A.  Well, I don't remember if we actually handcuffed him to the headrest.  We could have.

    Q.  What is the reason that you would do it?

    A.  So he couldn't jump out.

    Q.  So he couldn't jump out?

    A.  Yes.

    Q.  Are the doors in the back of the car that you were in able to be opened from the inside?

    A.  Yes.

    Q.  Where is the headrest located that you would handcuff a prisoner to?

    A.  It is on the front seat, the top of the front seat.

    Q.  What car did you use to transport John Moss back to the State of West Virginia?

    A.  What car?

    Q.  Yes.

    A.  It was an unmarked State Police car.  I'm not sure

whose vehicle it was.

    Q.   Do you know if it is still in service?

    A.   No, I don't.

    Q.   What was the number of the car?

    A.   I don't know.  It had Class A license tags on it.

    Q.   Where did you get the car from?

    A.   Our State Police Office.

    Q.   Who gave you permission to get that car?

    A.   I don't know.  One of our superiors.  I'm not sure
if it was the Sergeant or the Corporal or who.

    Q.   How do you garner permission to get a car?

    A.   You have to ask.

    Q.   Did you ask, yourself?

    A.   No.

    Q.   How come it was that you didn't use a regular State
Police Car to transport John back to West Virginia?

    A.   Well, normally on extraditions, any type of extra-
ditions, where we are picking up a prisoner and bringing
them back from out of State, we use an unmarked car.

    Q.   Did you have to document your request for that car
by papers?

    A.   No.

    Q.   It was orally done?

    A.   Yes.

Q. Who would be the superior you normally would go to to seek permission?

A. Well, we normally follow our chain of command, which we would go to our Corporal first normally if he is there. If not, we would probably go to our sergeant.

Q. How long a period of time did Trooper Smith discuss with John Moss the shooting at the Moose Club, as you called it?

A. In the vehicle?

Q. Yes, sir.

A. Well, I'm not sure exactly of the time length. I would say maybe an hour, maybe a little more, a little less.

Q. All right. Now after Trooper Smith advised John Moss of his rights, did he advise him of his rights because he was going to question him about the shooting at the Moose Club?

MR. STUCKY: Objection, your Honor.

THE COURT: Sustained.

BY MR. McKITTRICK:

Q. Did you discuss with Trooper Smith that he should advise John of his rights?

A. Did I discuss it with him personally?

Q. Yes, sir.

A. No.

Q    You did not discuss it with Trooper Smith before
Trooper Smith did so?

A    No.

Q    It is your testimony that Trooper Smith took it upon
himself to do so?

A    Sure.

Q    Did you discuss with Trooper Smith that he would get
in the back seat before he got in the back seat?

A    No.

Q    It is your testimony that Trooper Smith got in the
back seat on his own without talking to you about it?

A    That is right.

Q    Immediately after Trooper Smith advised John of his
rights, about twenty minutes out of Mansfield, did Trooper
Smith start to talk to John about the shooting at the Moose
Club?

A    I think, to the best of my recollection, he said
something to the effect we want to talk to John, we want to
talk to you about some crimes in West Virginia.

Q    All right, and then did he immediately take up
the shooting at the Moose Club or the Reggettz murders?

A    It was the Moose Club.

Q    The Moose Club?

A    Yes.

Q. And is it a fair statement to say that was between twenty and twenty-five minutes out of Mansfield?

A. I would say that would probably be right.

Q. And then is it also a fair statement to say for the next hour or thereabouts that Trooper Smith discussed with John Moss the shooting at the Moose Club?

A. For the most part.

Q. For the most part?

A. Yes.

Q. All right, when you say for the most part, that seems to qualify that hour. What do you mean for the most part?

A. Well, at the end of the talking about the Moose Club, Trooper Smith said something to the effect that we needed to talk to John about a more serious crime in West Virginia.

Q. Okay. What I am getting at is that about twenty to twenty-five minutes out of Mansfield, Trooper Smith started talking to John about the shooting at the Moose Club, and Trooper Smith and John continued that conversation for another hour, approximately; is that correct?

A. Yes.

Q. All right. Now when Trooper Smith and John stopped talking about the shooting at the Moose Club, to your knowledge,

did they ever start -- did they ever discuss it again before

you got to Parkersburg?

    A.   Not to my knowledge.

    Q.   To your knowledge, was it ever mentioned, even in

passing, that you heard?

    A.   I can't recall.

    Q.   You can't recall that it was or you can't recall

whether it was?

    A.   That it was.

    Q.   Okay.  Trooper Williams, you indicated to the

Assistant Prosecutor, Miss Lusk, that at times you were looking

in your rear-view mirror while you were driving and you could

see what John was doing in the back seat; is that correct?

    A.   Yes.

    Q.   How often did you do that?

    A.   I have no idea how often.

    Q.   Was it often?

    A.   It was pretty often.

    Q.   Was there any particular time -- strike that.  In

other words, were you trying to follow the conversation

between John Moss and Trooper Smith as they were having

their conversation in the back seat?

    A.   I was trying to.

    Q.   Could you hear everything they were saying?

A.   Not everything word for word, no.

Q.   Could you determine the substance of what they were saying there in the back seat?

A.   Yes.

Q.   In other words, you didn't hear every word in the sentence, but you could make out the gist of what they were talking about.  Is that a fair statement?

A.   That is a fair statement.

Q.   Was there any particular time during their conversation that you felt prompted to look into your rear-view mirror and look into the back seat and to look at John Moss?

A.   Yes.

Q.   At what particular times?

A.   Like when Trooper Smith would ask him a question that would require a yes or no answer.

Q.   And why would that prompt you?

A.   Because sometimes he would either shake his head or he would answer it verbally.

Q.   Any other times?

A.   Just I just looked up in the rear-view mirror off and on.  No other times in particular.

Q.   Now when Trooper Smith was talking to John about the shooting at the Moose Club, how often did he ask him a question that required -- or was it often that he asked him

a question that required a yes or no answer?

     A.   Well, I wouldn't say how many times.  I wouldn't
have any idea.

     Q.   Was it more than ten?

     A.   Probably.

     Q.   Would you say it was more than twenty?

     A.   I don't know for sure how many times.

     Q.   But it was --

     A.   (Interposing)  But, you know, it would be a wild
guess if I guessed.

     Q.   But it was many?

     A.   It was several times.

     Q.   Okay.  Now as I understand your testimony, then at
the conclusion of Trooper Smith's conversation with John
Moss concerning the shooting at the Moose Club, Trooper Smith
said something, the essence of which was there is another
serious crime that occurred in West Virginia that we would
like to talk to you about.  Is that a fair statement?

     A.   It wasn't that word for word, but that is a fair
statement.

     Q.   Okay.  Now when Trooper Smith first said that, did
John Moss indicate that he knew what Trooper Smith was
talking about?

     A.   To the best of my knowledge and recollection, he

acknowledged that he knew what we were talking about.

    Q.   How did he do that?

    A.   By shaking his head yes, in the affirmative.

    Q.   And that was to the first question asked by
Trooper Smith along those lines; is that correct?

    A.   To the best of my recollection, it is.

    Q.   And did you again look into the back seat because
you thought it required a yes or no answer?

    A.   Yes.

    Q.   And you saw John shake his head yes?

    A.   Yes.

    Q.   Now did Trooper Smith have to in any way remind
John what he was talking about, about a serious crime?

    MR. STUCKY:  Your Honor, I would object.  We are getting
into more hearsay of what Trooper Smith is now saying.

    THE COURT:  I agree.  Sustained.

    MR. McKITTRICK:  Judge, John Moss is sitting in the back
seat.

    THE COURT:  You can't ask him what Smith concluded in
his mind.

    MR. McKITTRICK:  I didn't.  I asked him what he said, Judge.
This is very critical at this point.

    THE COURT:  Everything has been critical for the past
three days in the mind of the defense counsel.

Will the Reporter repeat the last question?

(WHEREUPON, the question was read by the Reporter.)

THE COURT:  All right, I am going to let him answer that.
Overruled.

THE WITNESS:  He could have.  I'm not real sure if he
did or not.

BY MR. McKITTRICK:

Q.   You don't remember whether he did?

A.   It has been a while.  I don't remember.  He could
have.

Q.   When you say that he could have, are you saying that
because John indicated that he didn't know what Trooper Smith
was talking about?

A.   No.

Q.   Why are you saying that?

A.   It just seems maybe that he could have.  I'm not
real sure if he did or not.  I don't think that he did, but
he could have.

Q.   As I understand your testimony, until you got to
Parkersburg, nothing more was discussed about either the
armed robbery or this serious crime that you wanted to
talk to John about; is that correct?

A.   That is correct.

Q.   You left Mansfield at approximately two o'clock?

A.    That's about right.

Q.    And you arrived at Parkersburg approximately 6:30?

A.    That's about right.

Q.    And Trooper Smith concluded his conversation with John Moss approximately one hour and twenty minutes to one hour and twenty-five minutes out of Mansfield, the conversation concerning the shooting at the armed robbery -- or the shooting at the Moose Club; is that correct?

A.    That is an approximation.   It could be more or less.

Q.    All right.   Now for the next approximately three hours, or thereabouts, I know you stopped for a small time, fifteen minutes, but what was discussed in the car before you got to Parkersburg?

A.    Between whom?

Q.    Between either you and John Moss or Trooper Smith and John Moss.

A.    Nothing that I can recall.

Q.    Was it completely silent in the car?

A.    No.   I'm sure myself and Trooper Smith were talking.

Q.    But you didn't address John Moss in any respect; is that correct?

A.    Not that I can recall.   I didn't personally.

Q.    Did you hear Trooper Smith address John Moss in any respect?

A.    Not that I can recall.

Q.    Did Trooper Smith, after he asked John about talking
to him about that serious crime in West Virginia, jump back
up in the front seat?

A.    He got back up in the front seat, but I believe it
was after we made a stop that he got back in the front seat.
I'm not real sure.

Q.    Now when you got back to the Parkersburg Detachment,
as I understand it, that is where an oral confession was
taken from John by Trooper Smith and a taped confession was
taken by you from John; is that correct?

A.    Yes.

Q.    Were you present most of the time when the oral
confession was taken by Trooper Smith from John?

A.    I would say I was in on a pretty good part of it.

Q.    Would you also say that Trooper Smith did most of
the questioning?

A.    That is correct.

Q.    Percentagewise, would you say that he did ninety
percent of the questioning?

A.    That would be close.

Q.    That would be a close estimate?

A.    Yes.

Q.    Now I noticed, Trooper Williams, when you were

reciting to the Court the confession that you took from

John Moss or you heard given to Trooper Smith orally, that

you had to look at your notes to refresh your memory as to

what John said.  Is that a fair statement?

    A.   Yes.

    Q.   Is it further a fair statement to say that unless

you looked at your notes, you could not recite to His Honor

the confession of John Moss and how it happened in

chronological order?

    MR. STUCKY:  Objection, Your Honor.  If he is talking

about verbatim, I would like to clarify, or if he is talking

about the essence.

    MR. McKITTRICK:  I said the essence of it.

    MR. STUCKY:  I apologize if he did.  I thought he said

can you quote it.

    THE COURT:  I thought that was what he said, too, can

you quote it in chronological order.  If you want to

rephrase it and ask if he can quote the essence of it in

chronological order, I will permit that.

BY MR. McKITTRICK:

    Q.   I adopt the Judge's version.  Can you answer it?

    A.   Yes, I think I could.

    Q.   Would you recite the oral confession, the essence of

it, in chronological order for us without looking at your

notes?

     A.   All right.  He said that -- well, he asked John what

all he did that night.  He said that he had been home

listening to the radio; and it was asked what he did next,

and he said he went off down the railroad tracks and went to

the back door and pushed the door open.  It was asked of

him if he knew if there was anyone in the house, and he said

yes, he knew they were home, but he was going to try to go

in there and be quiet and not wake them up.  He said when he

first went into the back door into the kitchen, he said the

woman woke up and was standing up in the bed in the back

bedroom.  He said they got into a struggle.  I'll back up.

When asked what he went in there for, he said he went in

there to get some money.  Then after they started struggling

with the gun, the gun went off.  He took the gun away from

her and hit her twice in the head with the gun and knocked

her down; and he said he ran back out of the house, up onto

the railroad tracks, and he looked back at the back door and

he said she was putting something against the door.  He was

asked was there a light on in the kitchen, and he said there

was a light on in the kitchen where he could see her.  He

said he got scared and thought maybe they might be able to

identify him.  So he went back down to the back door, pushed

it open, and she grabbed a knife and started swinging it

at him.  He said it was a butcher knife, steak knife or

something.  She hit him on the little finger, and he took

the knife from her and knocked her down in the back bedroom,

and he said he threw the knife down and he choked her with

his hands.  Then he got a cord and choked her with the cord.

And I believe he said that he tied her up to the door.  He

then said that he got a pair of scissors and stabbed her

in the chest -- not a pair of scissors, excuse me, a knife

or something, and stabbed her in the chest.

    Q.  You were thinking of the Reggettz confession,

weren't you?

    A.  No.  Then he said that he got the little boy and

choked him with his hands.  Then he got a cord and he wrapped

it around his neck and choked him.  Then he put him in the

bathtub.  He said that the bathtub had been about half full

of water.

    Then he said he got the little girl and picked her up,

and I believe he said he got her, I think it was in the living

room, and he said he saw a cord lying on the floor and he

got it off the floor, choked her with his hands first before

he got the cord, and then he got the cord and wrapped it

around her neck, and he said he placed the cord over top of

the door between the living room and the front bedroom.  Then

he closed the door where she was hanging suspended in the air;

and it was asked which side of the door she was on, and he

said the side facing the Christmas tree.

Then it was asked what he did after that, and he said

that he looked around for some money.  We asked him how much

money he got, and he said a few dollars.  It was then asked

what all he did after that, and he said he got under the

Christmas tree and was opening the packages.  We asked him

if he took any of the packages, and he said he took one.

We asked him what it was, and he said he remembered it as

dishes.  We asked him what he did with those dishes.  He

said he gave them to his best friend's mother for Christmas.

He had taken it home and re-wrapped it.  We asked him what his

best friend's mother's name was, and he said Mrs. Johnson.

It was asked what his best friend's name was, and he said

Bill.  It was asked where Mrs. Johnson lives.  He said she

runs the Town & Country Motel near St. Albans, on Route 60.

Then we asked him if he took anything else out of the

house, and I believe at first he said no, but then we told him

that we knew there was some other things taken, and I think that

is when we asked him again could he remember, could he think

harder and remember what else he took, and he said he took a

.22 rifle.  Then we asked him if he took anything else, and

I believe that he said he took a .22 pistol.  We asked him

what he did with the pistol, and he said he threw it in the

green garbage can at St. Albans High School; and it was asked

why he threw the pistol away, and he said it was broke.  We

asked him how it got broke, and he said it got broke when he

hit the woman with it.  I believe we asked him what part of it

got broke, and I believe he said the handle and where the

trigger was.

Then we asked him if he could remember taking anything

else, and he said he remembered taking a camera.  It was

asked of him where the rifle was at, the .22 rifle, and he said

he didn't know where it was at.  We asked him -- we said we

needed to know, to try harder, that it was important that we

get the rifle back, and he was -- he said that a friend of

his had it, but he didn't want to tell, he didn't want to get

his friend in trouble.

Q.   Did you later find out that was the truth?

A.   No.

Q.   Are you saying that John lied to you about that?

A.   About the friend?

Q.   Right.

A.   Yes.  And then it was asked of him what he did with

the stuff that night when he left and how he left the house,

and he said he left through the back door and went down the

railroad tracks back to his grandfather's house where he was

living, where he was staying.  We asked him what he did with

the stuff, and he said he hid it beside of his bed.  We asked

him where the rifle and the camera was at, and he said it was

in Cleveland.  Then we got back to the rifle and asked him,

said we needed to get it back, and asked him who had it,

and he told us his brother, Carlton, had  knew where the

rifle was at and it was probably with him.  We asked him

where Carlton lived, and he said he lived with his mother

and dad.  We asked him where the camera was at, and he said

it was home, up in his bedroom and the rifle was home in his

bedroom, in the closet.  We asked him if he thought we could

get the rifle back, and he said if it was still there, we

could get it back, if Carlton didn't take it.

     I believe that's about it.

     Q.   Did you find any fingerprints of John Moss in the

Reggettz home?

     A.   No.

     Q.   Do you have one single thread of evidence, real or

testimonial, that implicates John Moss to those homicides

other than his confession?

     A.   We have his blood and the gift that we got from Mrs.

Johnson.

     Q.   Now the gift that you got from Mrs. Johnson is

what?

     A.   Flatware.

Q.   Did John tell you he took flatware out of the
house?

A.   No.

Q.   John told you he took dishes out of the house,
correct?

A.   He said he remembered it as dishes.

Q.   Now did you go to Mrs. Johnson and get the flatware?

A.   Yes.

Q.   And did she tell you it came from the Reggettz
house?

A.   No.

Q.   Did you get anyone who told you, including Paul
Reggettz or anyone else, that that flatware came from the
Reggettz house?

A.   No.

Q.   Other than the confession, whatever weight the blood
has that may be comparable to John Moss', circumstantially
that he was there, do you have any testimonial evidence from
any witness that John Moss was in the Reggettz home on the
night of December 13, 1979 and committed the murders of those
two children and their mother?

A.   No.

Q.   Other than the confessions and the blood that you
talk about, do you have any real evidence other than what you

think the flatware indicates that would implicate John Moss

committing the murders in the Reggettz home on the 13th

day or the night of the 13th of December, 1979?

A.   We have a statement from Bill Johnson.

Q.   Does Bill Johnson tell you that John Moss committed

those murders?

A.   No.

Q.   Does Bill Johnson tell you that John Moss was in

the Reggettz home on the 13th day of December, 1979?

A.   No.

Q.   The only thing that Bill Johnson tells us, as far as

John Moss is concerned, is that John Moss talked to Bill

Johnson and told him that he wouldn't mind burglarizing or

breaking into the Reggettz home and taking certain personal

items.  Isn't that a fair statement?

A.   That's a fair statement.

Q.   And that has absolutely nothing whatsoever to do

with the 13th day of December, 1979 nor the murders of the

Reggettz, does it?

A.   No.

Q.   Trooper Williams, to your knowledge, has any

member of any law enforcement agency or office done any

investigation on the Reggettz murders as they relate to John

Moss within the last year?

A.   I believe so.

Q.   Who is that?

A.   Well, Ed Leonard that works in the Prosecutor's

Office, one of the investigators.

Q.   Did you assist Ed Leonard in that investigation in

any manner, means or form?

A.   He came -- we had a meeting with him and he asked

us, you know, basically what happened.  We gave him sort of a

background of what all we had done to see if there was

anything else that needed to be done or anybody else that

needed talking to.

Q.   And has --

A.   (Interposing)  I personally did not do anything.

Q.   Has Ed Leonard, to your knowledge, concluded his

investigation?

A.   I have no idea.

Q.   Has Ed Leonard brought to your attention through

investigators that you have worked with on these murders

any evidence, either real or testimonial, that would

implicate John Moss in the murders of the Reggettz?

     MR. STUCKY:  Objection, Your Honor.  Hearsay.

     THE COURT:  Sustained.

BY MR. McKITTRICK:

Q.   Have you been presented any evidence, testimonial

or real, by the Prosecuting Attorney's Office or Ed Leonard

as the investigator, the primary investigator from the West

Virginia Department of Public Safety?

    MR. STUCKY:  Your Honor, I would object again.  It is the

same question.

    MR. McKITTRICK:  It is not the same.

    THE COURT:  It is not the same question.  Overruled.

    MR. McKITTRICK:  Can you read back the last question?

    (WHEREUPON, the question was read by the Reporter.)

    MR. McKITTRICK:  The question this time was have you been

presented with any evidence.  I think it is a proper

question.

BY MR. McKITTRICK:

    Q   Can you answer that, by either the Prosecutor's

Office or Ed Leonard?

    A   No.  No.

    Q   Are you aware of the existence of any testimonial

or real evidence gathered by any representative of any place,

agency or office within the year, within the last year,

that implicates John Moss in the Reggettz murders other than

what you have testified to?

    A   No.

    MR. McKITTRICK:  Your witness.

    THE COURT:  Redirect?

MR. STUCKY:  Can we have just a second, Your Honor?

THE COURT:  Yes.

(WHEREUPON, a discussion was held off the record.)

REDIRECT EXAMINATION

BY MISS LUSK:

Q.  Trooper, you stated to Mr. McKittrick that John Moss had stated to you that his brother, Carlton, knew something about the whereabouts of this rifle; isn't that right?

A.  Yes.

Q.  Did you have occasion then to discuss the rifle with Carlton?

A.  Yes.

Q.  When was that?

A.  I believe it was on, let's see, I'm not sure of the date, but I think it was the 30th of October.

Q.  Of 1980?

A.  Yes, 1980.

Q.  And where was that?

A.  Cleveland, at the Cleveland, Ohio, Police Department.

Q.  Okay, was Carlton able to lead you to that rifle?

A.  No.

Q.  Did he state to you that he had seen the rifle?

MR. McKITTRICK:  Objection, Your Honor.

THE COURT:  Mr. McKittrick is objecting, I assume because

of hearsay, but yet he has done nothing but introduce hearsay

testimony for the last three days.

MR. McKITTRICK:  Your Honor, for the -- the reason that

we introduced any hearsay evidence in this case was to

follow the dictates of In the Interest of John Moss.  This is

hearsay, the worst kind of hearsay, and it has no relevance

to probable cause whatsoever.

THE COURT:  Sustained.

BY MISS LUSK:

Q.  Trooper Williams, in answer to one of Mr. McKittrick's

questions, you indicated that there was some blood in this

house which matched that of John Moss?

A.  Yes.

Q.  In what room, or rooms, was that blood found?

A.  Well, let's see, there was blood in every room of

the house except for the bathroom; and to the best of my

recollection, one of the chemists took the blood, but I

think his blood was in the -- or blood that matched his was

in the kitchen, the living room, the --

MR. McKITTRICK:  (Interposing)  Your Honor, objection.

There has not been a proper foundation laid with this witness.

We have tried to get into the blood issue with this witness

before.  The objection from the State was that he wasn't the

proper person to testify because he was not an expert, and that

objection has been sustained in prior hearings.

THE COURT:  I think the record will show, and I will

rely on the record, Mr. McKittrick, that you opened that

issue on cross-examination of this witness.  The objection

is overruled.

BY MISS LUSK:

Q.  Go ahead.

A.  It was in the kitchen, it was on the back door in the

kitchen, it was in the living room, on the Christmas packages,

it was on Bernadette Reggettz's clothing, I think it was in

the -- I'm not sure if it was in the two bedrooms or not.

I don't recall right off hand.

Q.  Did you ascertain in the course of your investigation

the percentage of the population which would have this par-

ticular blood type?

MR. McKITTRICK:  Objection, Your Honor.

THE COURT:  I will let the record -- I will admit it is

a quarter of eight in the evening.  Maybe we are all getting

a little tired, but I will let the record speak for itself.

I think you opened up that issue on cross-examination of

this witness, Mr. McKittrick.

MR. McKITTRICK:  Your Honor, so the record can be clear

and I can put a specific objection on the record, my objec-

tion now goes to the fact whether I opened it as to the blood

issue, which I do want to cross-examine on, this witness has

not been qualified to answer that type of question.  He has

got to be an expert to do so.

THE COURT:  I agree with you on that issue.  I reverse

myself and sustain the objection.  You are absolutely

correct.  He has not been qualified as a blood expert and

I sustain the objection.  Strike the last answer.

MISS LUSK:  Your Honor, the State will not make an

attempt to qualify him at this point.

THE COURT:  All right.

BY MISS LUSK:

Q.   Trooper, in answer to one of Mr. McKittrick's

questions, I believe that you got into a statement of a Mr.

Bill Johnson and some specifics of what that statement

said.  Could you relate for the Court -- I believe Mr.

Parrish's question was that Bill Johnson --

THE COURT:  (Interposing)  Mr. Parrish?

MISS LUSK:  Mr. McKittrick's, I'm sorry.

BY MISS LUSK:

Q.   Mr. McKittrick's question was that something to the

effect that had Bill Johnson told you that John Moss had

stated to him that John wouldn't mind burglarizing the

Reggettz home and taking certain personal articles.  Do you

recall that question?

Trooper Williams - Redirect                                         461

A.    Yes.

Q.    Do you know from having taken that statement what those personal articles were that Bill Johnson related?

A.    Yes.

Q.    What were they?

A.    Guns.

MISS LUSK:   I don't believe we have anything further, Your Honor, on redirect.

RECROSS-EXAMINATION

BY MR. McKITTRICK:

Q.    When you say guns, are you saying that John Moss told Bill Johnson that he wanted to go in the Reggettz home to get guns?

A.    Well, I would have to look at the statement.  I don't know exactly verbatim what was said, but he said there was guns in the house.

Q.    Well, what you are saying is that Bill Johnson, at least, indicates that John Moss acknowledged that he knew there were guns in the Reggettz house?

A.    That Johnson did?

Q.    Yes.

A.    Yes.

Q.    Now did you and/or Trooper Smith in your presence ever ask John Moss if he went into the house for guns?

A.    No, I don't think we did.

Q.    Did you ever, either you and/or Trooper Smith in your presence, ever ask John Moss if he knew there were guns in the Reggettz house?

A.    I didn't.  I don't know whether Trooper Smith did or not.

Q.    All right.  Now you have indicated that there was blood which was comparable to John Moss' blood in the house; is that correct?

A.    Yes.

Q.    What kind of blood does John Moss have?

A.    What do you mean?

MR. STUCKY:  Your Honor, I would object to that.

MR. McKITTRICK:  What kind of blood does he have?

MR. STUCKY:  I am going to object to that on the same grounds that Mr. McKittrick objected to, that he is not a blood expert and he does have some reports that tell him what a blood expert says his blood is.

MR. McKITTRICK:  I am trying to impeach his testimony.

THE COURT:  No question he can refer to his reports. You asked him and I sustained your objection earlier.  He is not an expert, and you are now asking him what type of blood does John Moss have.  He is not a blood expert, but if you want the question answered, I will let him refer to his

Trooper Williams - Recross

notes, or reports.

BY MR. McKITTRICK:

    Q.   Go ahead.

    A.   I know what type he has got.

    Q.   You go to your reports and put it in the record, the type, the kind of blood John has.

    A.   He has Type O.

    Q.   Is it broken down to other constituent parts?

    A.   Yes.

    Q.   What is it?

    A.   I will have to look at my report.  I don't know.

    MR. McKITTRICK:  I will withdraw the question.

    THE COURT:  All right, the question is withdrawn.

BY MR. McKITTRICK:

    Q.   Where do you believe that blood that was comparable to that of John Moss was found in the Reggettz home?

    A.   Where was it found?

    Q.   Yes.

    A.   Well, I don't know the exact spots because I didn't take the samples.  I could guess, like I testified to before, where I think that was.

    Q.   Was that a guess, or you thought that was true, but you are not sure?

    A.   I know it was in those rooms.

Q.  But you are not sure where it was in those rooms?

A.  No, not right off hand.  I didn't take the samples.

MR. McKITTRICK:  We move to strike his testimony on that basis, Your Honor, from the record.

MR. STUCKY:  Your Honor, his testimony was it was gathered in those rooms.

MR. McKITTRICK:  Oh, this is a criminal case.  This isn't --

THE COURT:  (Interposing)  What part of his testimony are you moving to strike?

MR. McKITTRICK:  All his testimony with regard to where the blood was, Your Honor.

THE COURT:  I am going to sustain that on the ground that you all opened it up on redirect.  He is not an expert on blood samples, and I am going to sustain the objection. Strike the testimony insofar as and limited only to where the blood similar to the Defendant's blood was found in the house.

MR. McKITTRICK:  That's all the questions I have.

THE COURT:  Any re-redirect?

MISS LUSK:  May we have just a moment, Your Honor?

THE COURT:  Yes, ma'am.

(WHEREUPON, a discussion was held off the record.)

MISS LUSK:  We have nothing further of this witness,

MR. STUCKY:  The Defendant would probably have the right, if it chooses or if it has any evidence to present on the voluntariness issue prior to the Court's ruling.  It may be a proper inquiry.

THE COURT:  I believe that perhaps before the Court rules on the validity and voluntariness of the confession that the defense should be offered the opportunity to rebut the voluntariness of the confession before the Court makes that ruling.

MR. McKITTRICK:  We have no specific evidence, Your Honor.

THE COURT:  All right, the Court will then make the following findings of fact and conclusions of law as to the voluntariness of the confession, and I expect these findings and conclusions to be incorporated in the final order when one is handed down as required under the Moss decision.

The Court does so find in fact and conclude in law as follows:

The Court has had an opportunity to hear lengthy, lengthy testimony from Trooper Williams, who took the taped confession.  The tape was played for the Court and for counsel, and Sergeant Presson of the Parkersburg Detachment was heard on the tape giving the Defendant his rights, and then testimony was adduced that Trooper Williams then began

the interrogation on tape.

There was testimony, number one, from Trooper Smith that Moss was first given his Miranda Warning and rights some twenty to thirty minutes after they left Mansfield, Ohio, where they took Moss into custody from the Mansfield Reformatory.

There was further testimony they drove from Mansfield to Parkersburg. Smith testified before the so-called taped confession was taken, the Defendant was given Coke and water and a sandwich within a half hour to forty-five minutes after arriving at Parkersburg. The Trooper testified that while he, Trooper Smith, nor Trooper Williams smoked, that the Defendant had the opportunity to smoke.

Smith testified that at no time did Moss ask for a lawyer or did he ask that the questioning be stopped.

The taped confession indicates, that is, from a listening thereof, that Moss admitted to entering the Reggettz home, that according to the tape, Moss said that she, Mrs. Reggettz, had a gun, they fought over it, one shot was fired, he wrestled the gun from her, he left the house, looked back, it appeared that she was attempting to block the rear entrance to the home, so he re-entered the home and started beating on Mrs. Reggettz.

According to Moss, in the taped confession, the children

were hitting him and trying to stop him from hitting their mother.

Moss, on the tape, indicates that he tied up Mrs. Reggettz, then choked the little boy with his hands and a cord and then tied the boy's hands behind him and placed him in a tub that already had water in it.

According to the tape, Moss' own voice testifies that he then wrapped a cord around the little girl's neck, threw the cord over the door and closed it, leaving her hanging from the door with her body facing the Christmas tree.

He then testified, according to the tape, that he, Moss, stabbed the woman in the chest with a knife or "something".

He was asked on the tape why he did these things, committed these acts, and he responded "to make sure they were dead".

The tape then goes on to reflect that Moss, on the tape, said that he took a package from under the Christmas tree and gave it to a friend's mother.  There is some question as to whether it was flatware, knives, forks, spoons, or dishware as Moss indicated it was.

The testimony of Williams, Trooper Williams, was that they left Mansfield at approximately two o'clock, or there-abouts, that twenty minutes later, Smith advised Moss of his Miranda Warning and that at 6:57, the Defendant signed a waiver

of rights, and there was further testimony they arrived in Parkersburg from Mansfield at approximately 6:30.

Williams testified, Trooper Williams testified, also, again that the Defendant never had asked for a lawyer, never asked for the questioning to be stopped; and again at 9:28 p.m., a waiver of rights was signed by Moss for Trooper Williams. Williams went on to say that the Defendant never asked the taped statement to be stopped and never asked for a lawyer while the statement was being taped.

Both Troopers testified that the details of the Reggettz murders were never discussed with Moss prior to his oral and taped confessions.

The Court finds that Moss was advised of his Miranda Warning not once but at least twice, once by Trooper Smith and once by Sergeant Presson, that he was fed, given an opportunity to visit the restroom, was permitted to smoke, was provided food and drink, never asked that the questioning be stopped, never asked for a lawyer, that he knowingly, intelligently and voluntarily signed a waiver of rights; and the Court finds in fact and concludes in law that the taped confession was valid and given voluntarily, knowingly and intelligently by this Defendant after a full explanation of his Miranda Rights and a signing of the waiver of those rights.

The Court, therefore, concludes that the taped confession was indeed a valid confession and given voluntarily by this Defendant knowingly and intelligently after an explanation to him not once but twice of his Miranda Rights, and that he knowingly and intelligently waived the same.

Therefore, the Court concludes that the taped confession was given voluntarily and intelligently and is a valid confession.

MR. STUCKY:  Your Honor, so that the record is clear when an appellate body sees this, the State would ask for a similar ruling as to the voluntariness of the oral statement, which there has been a lot of testimony about, and I believe it was brought up first by defense counsel and it has been repeated here probably three or four times in this hearing, and I think the Supreme Court, when they do hear this, is going to have a lot of inquiries as to what went on prior to that; and I believe the Court probably is in a posture now to rule on the admissibility of the oral statement, also.

THE COURT:  Does the defense wish to offer anything in rebuttal to the oral statement?

MR. McKITTRICK:  No.  Your Honor, may I approach the Bench?

(WHEREUPON, a discussion was held at the Bench, off the record.)

THE COURT:  Now as to the oral confession, Mr. McKittrick, I can go through a **litany**, or I can incorporate my findings on the taped confession.  I can incorporate them with the oral confession, with this one addendum.  I do find in fact and conclude in law that the Defendant was knowingly and intelligently given his rights, that he knowingly, intelligently, voluntarily signed a waiver of those rights at 6:57 p.m. in the presence of Trooper Williams and Trooper Smith.

So if counsel wants me to lay out in the record the **litany** of my reasons, I will.  Otherwise, if counsel has no objection, I will incorporate my findings on the voluntariness of the oral confession as I did on the taped confession, with that addendum that the Court finds he was given his Miranda Warning by Williams and Smith, and he did sign a waiver of rights.

MR. McKITTRICK:  As I understand it, the Court would make the same findings of fact and conclusions of law that it has already made as to the taped confession relative to the oral confession?

THE COURT:  Yes, with the addendum that before he even gave an oral confession that he was advised of his rights by Smith no more than twenty minutes out of Mansfield when they picked him up at the Reformatory.

MR. McKITTRICK:  Your Honor, on behalf of John Moss, I have

no objection to requiring or requesting the Court to make a recitation of those same facts and conclusions of law.

THE COURT:  All right, then without your objection, I will incorporate my findings of fact and conclusions of law on the oral confession as I did on the taped confession, with one clear understanding, that I do find that twenty minutes out of Mansfield, Ohio, when Moss was taken into custody by Williams and Smith, that Trooper Smith did advise him of his constitutional rights and his Miranda Warning, and he knowingly and intelligently waived those rights and that he understood them.  So, therefore, the Court finds that the oral confession was also properly given by this Defendant to the State.

MR. STUCKY:  Your Honor, at this time, we would move into evidence State's Exhibit No. 2, that being the identification card of Trooper Smith.

THE COURT:  Do you have any objection?

MR. McKITTRICK:  Yes, we do object, Your Honor, on the basis that the evidence is clear both on direct and on cross-examination that Trooper Smith indicates to the Court that that may not be the same card that he read off the rights to John Moss when he was in the car on the 28th day of October, 1980.

THE COURT:  Oh, I think more than that.  I think he testified it was not the same card, but I think he further

testified it was a similar card, and that was what his D.P.S.

Form No. --

MR. STUCKY:  The D.P.S. Form #79, Your Honor.

THE COURT:  I think he testified it was not the same

card, but I think he further testified it was a similar card

that contained the Miranda Warning that is contained on all

D.P.S. I.D. cards.  I put that on the record for whatever

consideration an appellate body would want to give it, but

I will let it into evidence with the understanding I agree

with counsel it is not the same card from which he did read

the Miranda Warning, but he testified it was a similar card

and it contained the same Miranda warning as all I.D. cards

contain for the D.P.S.

MR. McKITTRICK:  Show my objection.

THE COURT:  Yes, sir.

(WHEREUPON, State's Exhibit No. 2 was received into

evidence.)

MR. STUCKY: Your Honor, in that same regard, the State

would move that the originals of State's Exhibits 2, 3, and

4 be photocopied and the copies substituted for the originals

for the same reason as the tape recording original, that

being if and when this would ever get to a --

MR. McKITTRICK:  (Interposing)  I have no objection.

THE COURT:  All right, no objection, then photocopies

may be substituted for those exhibits as mentioned, as
numbered and mentioned by the State.  Make sure that it is
done now and given to the Court Reporter before we leave here
tonight.

MR. STUCKY:  I will do that this evening, Your Honor.

Your Honor, we have been going here about an hour and a
half.  Can we take about a five-minute recess to make a
determination of whether or not the State would present any
further evidence?

THE COURT:  All right, it is ten after eight p.m.  I will
give you a five-minute break.

(WHEREUPON, a recess was taken, after which the following
proceedings were had, all parties heretofore mentioned being
present.)

THE COURT:  All right, show the resumption of the
proceedings, the Defendant accompanied by counsel and the State
by her Assistant Prosecuting Attorneys.

Call your next witness.

MR. STUCKY:  Your Honor, just to clarify one thing, and
then the State intends to rest, the State has moved the taped
statement, I guess through it being played in the Court and
transcribed by the Court Reporter on a tape that he has in his
possession and has not introduced nor has it admitted the
original tape that is in the possession of Trooper Williams.

Okay, so that we are clear that the tape, that the contents
of the tape are in the record and admitted as evidence,
even though the original tape is not in fact --

THE COURT: (Interposing)  Are you moving that the
Court Reporter's transcription in addition to the tape
that the Court Reporter took, are you moving the Court
Reporter's tape into evidence for appellate review?

MR. STUCKY:  Yes, Your Honor.

THE COURT:  Any objection?

MR. McKITTRICK:  Yes, I do object to that, Your Honor.

THE COURT:  I don't think you objected this afternoon
when they asked if they could substitute the original tape
or the Court Reporter using back-up equipment to tape it.

MR. McKITTRICK:  I agree with the Court.  I am not
objecting to that.  I am objecting to the fact that -- and I
do admit sitting here for thirty-five minutes and listening
to it, but I don't know that it reflects the original tape.
If I knew that, Your Honor, I would have no objection.

THE COURT:  Well, I am going to let it in.  Note the
objection of the defense counsel, but the Court would state
it is not only the back-up electronic equipment that the
Court Reporter used, but the Court Reporter also took down
the tape recording by his machine.  So if there is a variance
between the Court Reporter's electronic equipment and his

476

transcript, then I am sure that the appellate body, as this Court, would give greater wieght to the transcription thereof of the Court Reporter.

MR. STUCKY:  With that in mind, Your Honor, the State would now rest.

THE COURT:  All right, call your first witness, Mr. McKittrick.

MR. McKITTRICK:  Your Honor, for our witness, we would call Howard Woodyard.

THE COURT:  All right, Trooper Woodyard, raise your right hand, please.

(Witness sworn.)

MR. TAYLOR:  The witness has been sworn?

THE COURT:  Yes, he has.

(Thereupon, TROOPER HOWARD FRANCIS WOODYARD was called as a witness in behalf of the Defendant, and, having been first duly sworn to tell the truth, testified as follows:)

DIRECT EXAMINATION

BY MR. TAYLOR:

Q.  State your full name, please.

A.  Howard Francis Woodyard.

Q.  Are you employed, sir?

A.  Yes, I am.

Q.  Who are you employed by?

A.    West Virginia Department of Public Safety as a West Virginia State Policeman.

Q.    Where are you based at present?

A.    South Charleston Detachment.

Q.    How long have you been employed by the West Virginia Department of Public Safety?

A.    Eleven years and five months.

Q.    Were you employed by the West Virginia Department of Public Safety in December of 1979?

A.    Yes, sir, I was.

Q.    I would like to direct your attention to the date of December 13 and December 14 of 1979 and ask you if you had occasion on either one of those dates to go to the residence located at 7027 Chesapeake Avenue in St. Albans, Kanawha County, West Virginia?

A.    Yes, sir, I did.

Q.    And on which one of those days did you have occasion to go initially to that residence?

A.    December 13th.

Q.    At what time on December 13, 1979 did you go to 7027 Chesapeake Avenue in St. Albans?

A.    I arrived there at about 12:35 p.m.

Q.    Was this in response to a particular communication?

A.    Yes, sir, it was.

Q.   At about what time did you receive that communication?

A.   Approximately 12:15 to 12:20.

Q.   All right, after receiving the communication, I take it then -- strike that.  From whom did you receive the communication between 12 and 12:30?

A.   From Trooper Williams.

Q.   All right, and did he indicate to you that you should respond to the residence at 7027 Chesapeake Avenue?

A.   Yes, sir, he did.

Q.   All right.  Now I believe that you have indicated then that you arrived there at approximately 12:35?

A.   Yes, sir.

Q.   And upon arriving at the residence there, did you meet an individual named Paul Reggettz?

A.   Yes, sir, I did.

Q.   And where did you first see Mr. Reggettz?

A.   He was seated on the front porch of that residence.

Q.   Did you have occasion to enter the residence at 7027 Chesapeake Avenue?

A.   Yes, sir, I did.

Q.   All right, who was there?

A.   Trooper Williams, myself, and at that time, I was accompanied by Trooper David Williams also of the South

Charleston Detachment.

    Q.   Is David Williams still employed by the Department
of Public Safety?

    A.   Yes, sir, he is.

    Q.   All right, did you have any conversation with Mr.
Reggettz there at that residence?

    A.   Yes, sir, I did.

    Q.   All right, did there come a time when you transported
Mr. Reggettz from his residence at 7027 Chesapeake Avenue to
the headquarters on Jefferson Road in South Charleston?

    A.   Yes, sir.

    Q.   And at about what time did you transport Mr. Reggettz
to your headquarters there at Company B?

    A.   We left the residence on Chesapeake Avenue at 1:10
p.m. and arrived at the South Charleston Detachment about
1:20 p.m.

    Q.   All right, with regard to your transporting Mr.
Reggettz to Company B headquarters, was this consistent with
your investigation into the homicide/murders of the three
members of the Reggettz family there on Chesapeake Avenue
in St. Albans?

    A.   Yes, sir, it was.

    Q.   All right, did anyone accompany you when you took
Mr. Reggettz from his home in St. Albans to Company B head-

Charleston Detachment.

Q.    Is David Williams still employed by the Department

of Public Safety?

A.    Yes, sir, he is.

Q.    All right, did you have any conversation with Mr.

Reggettz there at that residence?

A.    Yes, sir, I did.

Q.    All right, did there come a time when you transported

Mr. Reggettz from his residence at 7027 Chesapeake Avenue to

the headquarters on Jefferson Road in South Charleston?

A.    Yes, sir.

Q.    And at about what time did you transport Mr. Reggettz

to your headquarters there at Company B?

A.    We left the residence on Chesapeake Avenue at 1:10

p.m. and arrived at the South Charleston Detachment about

1:20 p.m.

Q.    All right, with regard to your transporting Mr.

Reggettz to Company B headquarters, was this consistent with

your investigation into the homicide/murders of the three

members of the Reggettz family there on Chesapeake Avenue

in St. Albans?

A.    Yes, sir, it was.

Q.    All right, did anyone accompany you when you took

Mr. Reggettz from his home in St. Albans to Company B head-

quarters in South Charleston?

     A.    No, sir.

     Q.    Was there anybody else in the car with you during
that trip?

     A.    During the trip back, no, sir.

     Q.    All right, at about what time did you arrive at
Company B headquarters?

     A.    After leaving the residence?

     Q.    Yes.

     A.    About 1:20.

     Q.    All right, upon arriving at Company B headquarters
in South Charleston, where if anywhere did you take Mr.
Reggettz?

     A.    I took him to my office, which is located in the
basement of the South Charleston Detachment.

     Q.    Did anyone accompany you and Mr. Reggettz to your
office which is located in the basement there?

     A.    No, sir.

     Q.    All right, you have indicated that you took Mr.
Reggettz to your office.  What kind of office do you have?

     A.    My particular office?

     Q.    Yes.

     A.    It is a rectangular shaped room located in the base-
ment of the South Charleston Detachment.  It contains three

desks, and I share that office with two other troopers.

Q.   You have indicated that it has two desks?

A.   Three.

Q.   Three desks.  How many chairs does it have?

A.   Three.

Q.   Are you familiar with the rectangular dimensions
of this office?

A.   No, sir.

THE COURT:  What are you getting into?

MR. TAYLOR:  All right, Your Honor, I was trying to get
to the accommodations.

THE COURT:  Just ask him what the office looks like,
what it contains, what the dimensions are.

BY MR. TAYLOR:

Q.   What does your office look like?

A.   It is a large, rectangular room with a door that
enters at the bottom of the stairs at the Detachment.  Inside,
it is probably twelve feet wide by maybe eighteen feet long.
I'm not exactly sure of those dimensions.  It is just a
guess.

Q.   Okay, upon arriving at Company B headquarters, did
you discuss with Mr. Reggettz about his arrival at his
residence and his discovery of the dead bodies of his wife
and two children?

A.   Yes, sir, I did.

Q.   Did there come a time when Mr. Reggettz became a suspect in the homicide/death of his wife and his two children?

A.   Yes, sir.

Q.   At about what time was that?

A.   At about two p.m. on December 13th.

Q.   And what if anything caused Mr. Reggettz to become a suspect in the homicide/death  of his family?

A.   I received a public service call from Sergeant Smith who was at the Reggettz home, and he advised me that the Medical Examiner was there, and that according to the Medical Examiner's preliminary investigation of the bodies that death could have occurred prior to the time that Paul Reggettz had told us he had left for work.

Q.   Okay, would it be a fair statement to make then that the deaths had been placed somewhere around midnight?

MR. STUCKY:  Objection.

MISS LUSK:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. TAYLOR:

Q.   Then based upon the time of deaths as you ascertained in your mind, Mr. Reggettz became a suspect.  Would that be a fair statement?

MR. STUCKY:  Objection, Your Honor.  He didn't ascertain

any time of death.

THE COURT:  I think what his testimony was, was that

the Medical Examiner said it could have occurred at a certain

period of time, or at a certain time.  He didn't say it did.

He said it could have.

BY MR. TAYLOR:

Q.   Thereafter, Trooper Woodyard, what if anything did you

do in light of the fact that you considered Mr. Reggettz to be

a suspect?

A.   When I returned to my office, I advised Mr. Reggettz

that I would advise him of his constitutional rights at that

time.  That was about 2:20 -- 2:10 or 2:20 -- and I read him

his constitutional rights at that time and explained to him

why I was doing so.

Q.   All right, how did you advise Mr. Reggettz of his

rights?

A.   I read it from a card that is issued to us by our

Department.

Q.   Okay, do you have that same card?

A.   I do not have the same card with me today.  No, sir.

Q.   Do you have a similar card?

A.   Yes, sir, I do.

Q.   Could I see that card, please?

A.  Yes, sir.

MR. TAYLOR:  The record should reflect Trooper Woodyard

has handed me a West Virginia State Police I.D. card.

BY MR. TAYLOR:

Q.  You have indicated this is not the exact card.  When

was this particular card issued to you?

A.  This one, this was issued to me this year.

Q.  All right, approximately how long ago?

A.  I believe that was issued to me in June.  I'm not

exactly sure, but I think in June.

Q.  In June of 1982?

A.  Yes, sir.

MR. STUCKY:  Your Honor, for lack of a better reason,

I am probably going to object to this on the ground of

necessity.  The statements which were taken of Paul Reggettz

have already been admitted in evidence and they are before

the Court.  They are trying to show that he was advised of

his rights and everything prior to those statements, and it

only goes to the admissibility of the statements, and the

statements are already in evidence in the proceedings.

THE COURT:  They are already in.  I don't see what

the need is, why you should take up everybody's time by

ascertaining whether or not the Trooper gave Reggettz his

constitutional rights and whether or not he understood them.

The statements are in evidence.

MR. McKITTRICK:  Your Honor, can we then, to shorten

this witness' testimony, stipulate that in a previous volun-

tary hearing by this witness before this Court that this

Court adjudicated the voluntariness of the Reggetz confes-

sions and we can withdraw this witness?

MR. STUCKY:  Your Honor, the voluntariness of Reggetz's

statements is immaterial in that they are already into

evidence, voluntary or not.

MR. McKITTRICK:  I disagree with that.

MR. STUCKY:  The Court's ruling on a prior date as to the

voluntariness of the Reggetz confessions may or may not be

proper in light of two or three recent Supreme Court decisions

which may or may not have affected the voluntariness of the

Reggetz confessions.

THE COURT:  You are going against your own argument.

If that is your argument, then I will let him prove through

this witness they were voluntary.

MR. STUCKY:  That is not in issue, Your Honor.  They

are before the Court, voluntarily, beaten out of him or

anything else.  They are there.

THE COURT:  He just said if you will agree that they were

voluntarily, he will stipulate it.  I don't think it makes --

it is of little importance whether Reggetz's confessions, or

alleged confessions, were voluntary or not voluntary.  Now
the only thing that they are attempting to prove at this point
is that under the Moss ruling, as I understand it, they are
attempting to show that another person other than their
client could have committed the crime.  Maybe I'm losing
something at this time of night, but you tell me what difference
it makes whether Reggettz's confessions were voluntary or
involuntary.

     MR. STUCKY:  That's my point.  It doesn't matter, Your
Honor.  So I don't know whether we need a stipulation one
way or another is what I am saying.

     THE COURT:  Well, if you want to object to the
voluntariness, I am going to let Mr. Taylor proceed to attempt
to establish their voluntariness.

     MR. STUCKY:  Is the Court going to make a ruling on the
voluntariness of the Reggettz statements?

     THE COURT:  The voluntariness or involuntariness, unless
I am missing something, at this point doesn't mean a good
gosh darn.

     MR. STUCKY:  I understand that, and that is why I am
saying it is irrelevant.  Whether they were voluntary or
not, they are in the case.

     THE COURT:  They are in the case as exhibits, yes, only
for the purpose of --

Trooper Woodyard - Direct                                    487

MR. STUCKY:  They are into evidence.

THE COURT:  They are, only for the purpose not as to the truth of their content but only for the purpose of giving defense counsel an opportunity to show, if it can, that another person committed these crimes, and that is a finding and a conclusion the Court is going to have to make at the conclusion of these proceedings.

MR. STUCKY:  That is correct, Your Honor, and what the State is saying is that it doesn't matter one way or another and, therefore, I don't think this Court should make a finding of whether it is voluntary or not.  I don't think -- it doesn't matter.

THE COURT:  I agree it doesn't matter.

MR. STUCKY:  You are going to listen to it and read them whether it is voluntary or not and consider them whether voluntary or not.  They are admitted, and I don't see any purpose in the questioning.  I think everybody is in agreement.

THE COURT:  They are in evidence for the sole purpose not as to the truth of their content but as to whether or not this Court considers them under Syllabus Point 2 for the sole purpose of giving them whatever weight the Court thinks they are worth to determine whether or not the Court finds that this Defendant was not the person who committed the alleged

crimes. That is the only purpose they are in here for.

    MR. STUCKY: And the State does not contest that at all and will submit them and has already agreed to the admission of them.

    THE COURT: Then what is the argument? What are we arguing about?

    MR. STUCKY: We are not, Your Honor.

    MR. McKITTRICK: We are not arguing.

    MR. STUCKY: I am not going to stipulate they are voluntary. I don't care whether they are or not.

    MR. McKITTRICK: I didn't ask you to stipulate that they are voluntary. I asked you to stipulate that this witness was a witness in a previous hearing that determined the voluntariness of Reggetz's confessions and they were so determined by this Court. That is all I asked you to stipulate to.

    MISS LUSK: That is a matter of record.

    MR. STUCKY: That is a matter of record that this Court made a ruling at a prior hearing in the Reggetz matter as to the voluntariness of some statements. I don't know if they were those or not.

    THE COURT: This hearing, for the purpose of evidence, is de novo, but I will take judicial notice at a prior hearing these very same alleged confessions of Reggetz were

determined by me, sitting as the Court, to have been given

voluntarily.

    MR. McKITTRICK:  Can you give us just one second?

    THE COURT:  Yes.

    (WHEREUPON, a discussion was held off the record.)

    MR. McKITTRICK:  We will withdraw this witness' further

testimony, Your Honor.  We would like to leave whatever

testimony he has right now in the record.  We will withdraw

him as a witness.

    Do you all want to cross-examine on what he has put in

the record?

    MR. STUCKY:  No.

    THE COURT:  Thank you, Trooper Woodyard.  You are excused.

Do have a nice evening with your family, or what is left of

it.

    THE WITNESS:  Thank you, sir.

    MR. TAYLOR:  I am now handing back to the Trooper his

I.D. card.

    THE COURT:  The record will reflect that Mr. Taylor is

handing back Trooper Woodyard his I.D. card.

    (Witness stands aside.)

    THE COURT:  All right, call your next witness.

    MR. TAYLOR:  Can I have a moment, Judge?

    THE COURT:  Yes, sir.

(WHEREUPON, a discussion was held off the record.)

MR. McKITTRICK:  That's all the witnesses we have, Your Honor.  We rest.

THE COURT:  All right, I will hear argument, if there be any.

MR. STUCKY:  Your Honor, I will make it very brief.

THE COURT:  Wonderful.

MR. STUCKY:  Pursuant to the laws of the State of West Virginia with regard to the juvenile transfer proceedings, and more importantly with the most recent decision in the John Moss ruling, the State would move the Court at this time to find that there is probable cause to believe that, number one, a murder in the first degree, as defined by the West Virginia State Code, that being a murder committed while in the commission of a felony, more particularly a burglary, has in fact occurred -- three murders have occurred, one being Vanessa Reggettz, Bernadette Reggettz and Paul Eric Reggettz, those people being named in the three petitions that are before the Court at the present time; that there is also probable cause to believe that the Defendant that is before this Court, John Moss, Jr., also known as John Moss, III, did in fact commit those murders; and that based on those findings, that pursuant to 49-5-10, Subsection D(1) of the West Virginia Code, this Court needs to make no further inquiry upon the

finding of existence of probable cause of those two things shall be sufficient grounds for transfer without further inquiry.

In support of that motion, Your Honor, the State relies on the evidence that has been adduced in the last three days of testimony, mainly the confession or statement of John Moss, admitting to in fact killing the three individuals, Vanessa Reggettz, Paul Eric Reggettz and Bernadette Reggettz, in St. Albans, Kanawha County, West Virginia.

There has been no evidence tendered to this Court that would exclude John Moss from being the individual who in fact committed those three murders.

MR. McKITTRICK:  Your Honor, before the evidence and the record is closed in this matter by the Court's ruling, we would ask the Court to reaffirm its prior ruling that we have a right to submit to the Court written motions that are comparable to the oral arguments that we made at the inception of this case.

THE COURT:  You can submit whatever written motions you want to an appellate body, but I am prepared under the case law In the Interest of John Moss at the conclusion of the evidence, direct evidence, in these proceedings to make a finding.

MR. McKITTRICK:  As I understand the Court's ruling at the

492

inception of this case, it indicated that counsel for the
Defendant had the right to submit written motions that were
comparable to the oral motions that we made to the Court.

THE COURT:  I am not quite sure I understand what you
are saying.  I am saying that under the Moss decision, as I
understand it to be, that when the direct evidence is in,
the Court will then make its finding as to the transfer; and
if you have any additional motions to file, should this
Court rule adversely to your client, then I suggest you file
them with the State Supreme Court of Appeals.

MR. McKITTRICK:  No, Your Honor, they are not additional
motions.  When we came in here the first day, there were
certain motions we made, as you may remember, that had to do
with inadequate notice and things like that that the Court
ruled on.  We did not have written motions at that time, and
we indicated to the Court that we did not have time.

THE COURT:  Oh, I will give you leave to file those
written motions, but I am not going to delay my ruling on the
transfer.  Certainly, I will give you the right to file those
written motions; and should my ruling be adverse to your
client, incorporate them when you file an appeal in the Court
file for the benefit of the Supreme Court of Appeals.
Certainly.

MR. McKITTRICK:  That is all I am asking.

Your Honor, the burden of proof, as I understand it, in this hearing is on the State of West Virginia, and that is to prove to His Honor by clear and convincing evidence that John Moss committed the murders that occurred on the 13th day of December, 1979, in the Reggettz home.

We believe that the Court has -- or that the State has not sustained that burden of proof. We further believe that by our evidence, we have made the State's theory of probable cause inconsistent. We believe that the State's own evidence has excluded John Moss as the person who comitted those homicides.

The question was asked to Trooper Williams, who was familiar with the confessions of Paul Reggettz, whether Paul Reggettz at any time indicated when he said that he killed his two children and his wife that John Moss was present, and Terry Williams indicated to the Court at no time did Paul Reggettz implicate John Moss as being an assistant to the homicides in question.

We feel that there are inconsistent theories of probable cause here and that the Court should, under the evidence, rule in favor of the Defendant and not the State.

THE COURT:  Thank you.  The Court makes the following findings of fact and conclusions of law, and I want these incorporated in the order.

Quoting the Supreme Court in the previous Moss decision, and I quote: "Probable cause exists when the facts and circumstances as established by probative evidence are sufficient to warrant a prudent person in the belief that an offense has been committed and that the accused committed it."

Now the testimony of Troopers Smith and Williams was that they received what is known in the D.P.S., Department of Public Safety, as a Signal 18, possible murder. Williams testified he received such a Signal 18 at 12:15 p.m. on the 13th of December, 1979; that he arrived at the Reggettz home at 7027 Chesapeake Avenue, St. Albans, Kanawha County, West Virginia, within five minutes. He came upon Mr. Reggettz, who told him, Trooper Williams, "Someone has killed his family", someone had killed Reggettz's family. Trooper Williams went to the home with Reggettz, and therein he found a little girl lying on the bed dead, a white female adult dead with scissors protruding from her chest, a little boy lying in the bedroom on a bed dead. The woman had a cord around her neck; a pair of scissors was stuck in her chest. The children were lying dead on the bed, trussed up.

That would give any prudent person cause to believe that the crime of murder was committed. There were three bodies, three corpses, found in the manner reflected in the record

a moment ago, which would give any prudent person a warrant

and the belief that three homicides, three murders, were

committed.

Now the next thing this Court must find in a probable

cause hearing for transfer is whether or not this Defendant

committed those crimes.

Let me back up from that a moment to Syllabus Point 2

in the Moss decision, first that the accused is entitled to

rebut the State's proof of probable cause at a preliminary

transfer hearing by showing he was not, that is, the

Defendant here, Moss, was not the person who committed the

crime.  The defense attempted to establish this and rebut

this proof by one witness, Reggettz, Paul Reggettz, who was

the husband of the slain victim, Vanessa Reggettz, and the

father of the two slain children, Paul Eric Reggettz and

Bernadette Reggettz.

The Court did note and rule that Reggettz had at a

prior time, at another hearing, been indicted for these

crimes, and he had given a confession.  However, Reggettz

was indicted by the January 1980 Term of the Grand Jury of

Kanawha County.  However, under testimony, Reggettz, under

cross-examination, under direct examination, admitted that

he gave those confessions, but under cross-examination,

Reggettz testified "the statements admitting that I killed

my wife and children are not true". Thus, he repudiated

the alleged confessions that he gave at a prior time.

The Court would also note the demeanor of the witness

on the stand. He was emotional, in tears, had a difficult

time retaining his composure, but he did repudiate the truth

of the confessions that he gave at a prior time.

Therefore, the Court finds that the defense has not

rebutted the State's proof that this Defendant was the one

who committed the crime.

Thirdly, in the testimony adduced at this hearing, it

was not based entirely on hearsay; it was direct testimony,

as a perusal of the transcript of these proceedings held in

the last three days and one night will reflect.

This Court makes an independent finding that this

juvenile -- or he was a juvenile at the time of the

alleged offenses -- did commit one of the crimes specified

for transferring the proceeding to criminal jurisdiction,

and one of those crimes being murder in the first degree.

This Court finds there is probable cause to believe

that this Juvenile -- or he was a juvenile at the time of

the alleged offenses -- is the person who committed not

one, not two, but three counts of murder in the first

degree.

The Court further has found, as aforesaid in the

record, that the confession, the taped confession, was valid,
was given knowingly, intelligently and voluntarily by the
accused after having been fully informed of his constitutional
rights and a signing of a waiver thereof.

In the taped confession, this Defendant testified that
he struggled with Vanessa Reggettz over a gun, a shot was
fired, he left the house, he came back to the house, he
started wrestling or fighting with Mrs. Reggettz, and that
the children were hitting the Defendant on the back, trying
to stop him from hitting their mother; and in the taped
confession, he testified that he tied up Mrs. Reggettz, then
choked the little boy with his hands and a cord, and then
he tied the little boy's hands behind him and placed him in
a tub that already contained water, face down.  He then
wrapped a cord around the little girl's neck, threw the
cord over the door, and closed the door, leaving her
hanging from the door with her body facing the Christmas
tree.  He stabbed Mrs. Reggettz, the mother, in the chest with
a knife or "something"; and the Trooper testified when her
body was found, it had a pair of scissors sticking out of
her chest.

The Court finds and again reaffirms that the confession
was given knowingly, intelligently and voluntarily, was given
validly, and that the Defendant was properly apprised of his

constitutional rights; that during the taping of the con-
fession, he did not ask that it be stopped, the questioning
be stopped.  He never asked for an attorney.  He signed a
waiver of rights form knowingly, intelligently and voluntarily,
and that given the totality of the evidence and for the
reasons aforesaid, this Court makes an independent finding
that the confession was valid, was given voluntarily, is
admissible for the purposes of this hearing and that a
prudent person not only would but must conclude that the
crime of murder in the first degree was committed three times
and that a prudent person must at this hearing conclude that
this Defendant committed those crimes; and, therefore, the
Court finds that the State has sustained its burden of
proof necessary and orders that this Defendant Juvenile be
transferred to adult status on three counts of murder in the
first degree.

     Now what else do we have?  Are you moving for a stay?

     MR. McKITTRICK:  (Nods negatively.)

     THE COURT:  All right, then the matter is -- now you nodded
your head.  For the record are you moving for a stay, Mr.
McKittrick?

     MR. McKITTRICK:  I will have a discussion with my client
and determine how to proceed under the statute and what it
contemplates.

THE COURT:  Then I take that to mean that as of nine
p.m. this evening, September 27, 1982, you are not at this
time moving for a stay?

MR. McKITTRICK:  That is correct, Your Honor.  I believe
the statute gives us ten days in which to decide whether or
not to appeal this matter to the Supreme Court; and at that
time, within that time, we will decide what to do with the
matter, how to proceed, and we will determine whether to ask
the Court for a stay.

THE COURT:  Well, I am not being picky or splitting hairs,
but as of this moment, you are not moving for a stay and,
therefore, my order transferring him to adult status is in
effect.

MR. McKITTRICK:  Well, we disagree with that.  I think that
the Court and I have argued over this matter before.  I think
that he is still a juvenile until the Supreme Court of Appeals
has either reversed or affirmed his transfer.

MR. STUCKY:  Your Honor, the State would refer to
49-5-10, Subsection F of the West Virginia Code, which states
in part:  "In the event any such notice of intent to appeal
and request for transcript be timely filed, proceedings in
criminal court shall be stayed upon motion of the defendant
pending final action of the Supreme Court of Appeals thereon."

The State takes the position that until those things

in the statute are met that the proceedings are not stayed,
because if they were automatically stayed, that part of the
Code would not be present.

MR. McKITTRICK:  I imagine that is something that the
appeal court is going to have to address.  As Your Honor
knows, we raised that before when we tried to get them to
address it, and they did not do so.

THE COURT:  I would assume that it is something they
ordinarily would have to address, because I adopt the
State's representations of the statute, that unless you
affirmatively move for a stay, there is no stay in effect
and that he is ordered transferred to adult status.

MR. McKITTRICK:  To clarify the record, Your Honor, we
feel that it is not necessary to move for a stay because
we have an absolute right to appeal to the Supreme Court,
and we have ten days to decide whether to appeal.

THE COURT:  I think you have an automatic right to
appeal.  I don't think there is any question about that, but
there is a time problem here, as you are well aware of, and
unless you are affirmatively moving for a stay, even though
you have the automatic right to an appeal, I don't believe
that the State has to be penalized ten days while you make
that decision.

Now if you make that decision to appeal within those

ten days, I think you have an absolute right, as a matter

of law, but I am not staying it at this point without an

affirmative motion on your part.

MR. McKITTRICK:  I understand, Your Honor.

MR. STUCKY:  Your Honor, the local rules here, of

course, as you are well aware, require counsel for both

sides to sign orders before they are entered by the Court.

It would be the State's anticipation that the order

reflecting the Court's decision would be ready for entry

by this Court in the forenoon tomorrow, probably between

10:30 and 11:30 tomorrow; and we would like defense counsel

to be available somewhere.  They don't have to come to us,

but at least be available.

THE COURT:  I think Mr. McKittrick will make a member

of his firm available to sign that on behalf of the firm,

and I assume you want it noting the objections and

exceptions of defense counsel to all of the Court's rulings

adverse to your client.

MR. McKITTRICK:  Yes, Your Honor.

THE COURT:  I would ask that you have a member of your

firm, Mr. Taylor or someone, here tomorrow to sign that order.

MR. McKITTRICK:  Either that or Jim and I will work it

out where we will sign it tomorrow.  Either I will sign it

or someone.

502

THE COURT:  All right, as long as it can be entered tomorrow.

MR. STUCKY:  Thank you, Your Honor.

THE COURT:  All right, we will stand in recess at nine p.m., September 27, 1982.

(WHEREUPON, at 9:00 p.m., September 27, 1982, the hearing was recessed.)