**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 22**
**(SUPPRESSION HR'G, pp. 1 - 120)**

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA



STATE OF WEST VIRGINIA

**FILED**

DEC 17 1985

CLERK OF THE
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

vs.                              CR-82-F-221

**FILED**
In Kanawha Circuit Court
Clerk's Office

JAN 18 1983

CLERK

JOHN MOSS, JR.,
also known as
John Moss, III

BEFORE:   HONORABLE JOHN HEY, Judge

## APPEARANCES

    FOR THE STATE:  James C. Stucky, Prosecuting Attorney,
and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha
County.

    FOR THE DEFENDANT:  The Defendant, John Moss, Jr., also
known as John Moss, III, in person, and by Parrish McKittrick
and William Murray, his counsel.

A TRUE COPY
TESTE
COURT KANAWHA COUNTY, W. VA.

                              Patty Lou Frame
                              Official Reporter

4-90

2

# I N D E X

BEFORE THE COURT:

 FOR THE STATE:

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael Don Smith | 48 | 79 | 118 | 124 |
| Charles Pettry | 130 | 145 | 171 | 178 |
| Terry Williams | 186 | 218 | | |

 FOR THE DEFENDANT:

| | | | |
|---|---|---|---|
| Ernestine Whitlock | 235 | 240 | 240 |
| Beverly Selby | 242 | | |
| (Recalled) | 258 | | |
| Terry Williams | 245 | | |
| Michael Don Smith | 250 | | |
| Robert C. Murphy | 254 | | |
| Phyllis E. Griffith | 267 | | |
| James E. Williams | 272 | | |
| John Moss, III | 281 | | |

 FOR THE STATE (Rebuttal):

| | | |
|---|---|---|
| Michael Don Smith | 311 | 325 |
| Terry Williams | 328 | 340 |

I N D E X

EXHIBITS

FOR THE STATE:

| NO. | | IDENTIFIED | ADMITTED |
|-----|---|-----------|----------|
| 1 | - I.D. Card | 60 | 235 |
| 2 | - DPS Form 79 | 64 | 235 |
| 3 | - Affidavit | 133 | 235 |
| 4-A | - Search Warrant | 190 | 235 |
| 4-B | - Affidavit | 201 | 235 |
| 4-C | - Return | 197 | 235 |
| 4-D | - Receipt | 197 | 235 |
| 5 | - Statement of | | |
| | John Moss, Jr. | 208 | 235 |

FOR THE DEFENDANT:

| 1 | - Ohio Statute | 75 | 75 |
|-----|---|-----------|----------|
| 2 | - Affidavit | 103 | 105 |
| 3 | - Affidavit | 153 | 154 |
| 4 | - Xerox copy of | | |
| | Indictment | 238 | 239 |
| 5 | - Detainer | 260 | 265 |
| 6 | - Detainer | 265 | 266 |
| 7 | - Clerk's Notes | 269 | 270 |
| 8 | - Bible | 300 | |

BE IT REMEMBERED, That on Monday, the 19th day of September, 1983, in the September, 1983 Term of the Circuit Court of Kanawha County, West Virginia, in the Matter of STATE OF WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III, CR-82-F-221, the following transpired:

THE COURT:  We are here in the Matter of State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts.  The defendant is present in person and by Mr. McKittrick and Mr. Murray, heretofore employed on behalf of the defendant; the State of West Virginia by Mr. Stucky, Prosecuting Attorney, and Mr. Brown, Assistant Prosecuting Attorney for Kanawha County.

We come upon defendant's motion for argument of pre-trial motions.  The first thing I want to do logistically is for you to tell me which motions you wish to argue and in what order, and the clerk will pull them from the file as we read them off. I know it is a voluminous file but --

MR. McKITTRICK:  Yes, Judge, but I think I have it in pretty good order here.  But at times I know it is going to be difficult.

Firstly, there would be the motion for grand jury minutes.

MR. BROWN:  Is that one or two motions?  Two separate motions, Reggettz and Moss?

MR. McKITTRICK:  Right.

4

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

THE COURT: Grand jury minutes of what?

MR. McKITTRICK: The January, 1980 Grand Jury in which law enforcement officers appeared on behalf of the State of West Virginia, appeared against Paul Reggettz. The last time that we met the Court said that if those were available that the State should provide them for us. And Pete Brown, the Assistant Prosecuting Attorney for the State, indicated that he would check the records and make a determination if they were available.

THE COURT: Okay, are they available, Mr. Brown or Mr. Stucky?

MR. STUCKY: Your Honor, at the time of that grand jury, the Kanawha County Prosecuting Attorney's office did not transcribe the testimony of witnesses before the grand jury, nor were they required to by the Rules of Criminal Procedure. They had not gone into effect at that time. There are no transcripts or minutes of the grand jury. The only thing that exists are the clerk of the grand jury's handwritten notes, one sheet of paper capsulizing the testimony that took place there.

THE COURT: Is there any reason why you can't provide that to Mr. McKittrick?

MR. STUCKY: Your Honor, if the Court orders that, we will

5

provide that document to him, or a copy of that document.

THE COURT: Do you desire a copy of that document? Even though there was no rule of criminal procedure in effect at that time, nonetheless, I think out of an abundance of fairness to you and your client, if you want a copy of that, I will order the State to provide you with one.

MR. McKITTRICK: Yes, I would appreciate one.

THE COURT: All right, Mr. Stucky, please comply with the Court's order on that.

That takes care of that. What is the next one? What is this No. 1, motion in limine for pre-trial order restraining and enjoining the Prosecuting Attorney from cross-examining the defendant on his prior criminal record? What is that all about? We are all familiar with State vs. McAboy. I expect that the State is going to be in line with that. However, if you put his character in issue, that takes care of that. But if you don't put his character in issue, then, of course, the State doesn't have a right to examine him on his prior criminal record, if he has one.

MR. McKITTRICK: Yes, Your Honor.

THE COURT: You understand that, Mr. Stucky?

MR. STUCKY: Yes, sir.

THE COURT: Mr. Brown?

MR. BROWN: Yes, sir.

6

THE COURT:  All right, that takes care of that motion I should think, Mr. McKittrick.

MR. McKITTRICK:  Also, Your Honor, the motion makes reference to the defendant's prior criminal involvement.  Now, intertwined, as the Court knows, in the facts of this case, the Court is familiar with the fact that when the officers went to see John Moss in Ohio, both for the extraction of blood and also pursuant to a petition to bring him back on a detainer on felonious assault, that he was incarcerated in a reformatory in the State of Ohio.

We make reference, Your Honor, to the fact that he was incarcerated in Ohio.  We make reference also to the facts that surrounded the detainer petition, and that was relative to the felonious assault charge which supposedly or allegedly happened in Kanawha County.

You will remember, Your Honor, there was testimony that when Mr. Moss was brought back from Ohio, I believe on the 28th day of October, 1980, that there was some discussion in the state police car in transit to Parkersburg, West Virginia, concerning these various assaults that had no relevance whatsoever to the matter on trial.  And we would ask the Court to direct the Prosecuting Attorney and its witnesses not to directly or indirectly allude to those matters.

THE COURT:  Response?

MR. BROWN: Well, Your Honor, we don't really intend to, although there can come a time during a trial when it may be necessary to go into something like that. We don't anticipate that. We want to go right around that as much as Mr. McKittrick wants us to. However, sometimes you have to caution your witnesses a little bit to sidestep something like that. For instance, the officers, as Mr. McKittrick said, did preliminarily talk with Moss about another matter; and I think we could safely have them start off --

THE COURT: Well, I'm going to grant the motion in limine. I don't want any references to any other charges pending against this man except the murder charges. And by your own admission, your witnesses are state police officers; and you shouldn't have any trouble, using your lexicon, in toning them up to avoid any mention of any other crimes.

MR. BROWN: I think we can do that, Judge. The only other thing I can see is if someway, somehow system, motive and intent would be involved. But as I see it now, it is not.

THE COURT: I am granting the motion in limine, if that is what it be. I want no mention made of any other alleged crimes charged to this accused. And I am sure -- Your witnesses are professional policemen, and you can properly instruct them prior to their testimony.

Do you have a problem with that, Mr. Stucky?

8

MR. STUCKY:  No, sir.

THE COURT:  Go ahead, Mr. McKittrick.

MR. McKITTRICK:  Your Honor, for purposes of the record, so that I might clarify something we discussed in our last meeting before this Court, as the Court is aware, John Moss has requested, pursuant to motions to produce, certain materials from the State; and the State has made an effort to get those materials, belatedly.  We received them finally I believe it was on the 9th day of September, 1983.  We immediately, Your Honor, sent those to our experts.

I can see the possibility, after talking with our experts, that they are not going to have time to analyze the materials that we have sent them and comply with the Court's trial date.  Now, I don't know that to be true at this time.  I have asked them to make an expeditious analyzation of the materials we have sent them because I know the State of West Virginia and John Moss want to get this matter over with.

We have worked very hard in preparing to do just that, but I just wanted to tell the Court, so that I don't surprise you at a later date.

THE COURT:  Well, just so I don't surprise you, let me state for the record they have had them since September 9, and this matter is not scheduled to go to trial until October 17, which is some month and a half.  And it seems to this Court that that

9

is a reasonable period of time for them to get their work

completed. As far as I am concerned, the matter is scheduled

for trial on that date; but if need be, I will hear any motions

in that regard, should it arise. Right now it is premature.

MR. McKITTRICK: Secondly, Your Honor, one of the things the

defendant had asked production of was pictures. Mr. Brown gave

us several pictures, two sets of pictures, and indicated to me

when he gave them to me that he thought that was all the

pictures, but that he would check for us to see if there were

any other pictures. I would like to make a record on that and

determine whether or not he has ascertained whether there are

any other pictures.

MR. BROWN: I think the pictures Mr. McKittrick really is

concerned with are autopsy photographs. We provided Mr.

McKittrick with ten autopsy photographs. I have been unable to

determine if there are any others, but I did provide him with

ten autopsy photographs taken at the office of the State Medical

Examiner. At this time those are all the ones I know of, but I

am going to double check with Dr. Sopher to be sure because we

did have a little problem with some slides Mr. McKittrick

wanted. So I am going to double check. But we do have at least

ten autopsy photographs.

THE COURT: You will provide whatever copies are available

to Mr. McKittrick?

MR. BROWN: Yes, sir. We provided ten autopsy photographs and ninety-one crime scene photographs.

THE COURT: You have already provided those?

MR. BROWN: Yes, sir.

THE COURT: Does that take care of that, Mr. McKittrick?

MR. McKITTRICK: Yes, for now, Your Honor. But I would like for the Court to make sure they comply as quickly as possible, because again if there are some available, we have to get them to our expert.

THE COURT: Well, the State has indicated a moment ago, and I thought it was clear enough, they will provide them to you as soon as they have them in their hands. Sometimes you can't get these things overnight. I call your attention to the writ of prohibition in State of West Virginia vs. Timothy Lee Bess which was just denied by the Supreme Court in which the defendant sought prohibition of his trial because it required two and a half years for the state police, because of understaffing or whatever, to complete analyses of chemicals alleged to be drugs. And the Supreme Court denied the writ of prohibition.

The State has indicated and represented, and I accept their representation, that they will turn over to you, Mr. McKittrick, these photographs just as soon as they become available. I would urge the Prosecutor to urge the authorities in whose custody they are to try to expedite these matters.

11

MR. BROWN: If they in fact exist.

THE COURT: If they exist.

MR. McKITTRICK: The next motion is a motion to dismiss. It has to do with West Virginia Code Section 49-5-10.

THE COURT: Is that the juvenile transfer?

MR. McKITTRICK: Yes, Your Honor. That motion has been made before this Court before. The Court has addressed that motion before. The motion simply indicates that Mr. Moss was transferred on the 28th day of September, 1982. And the defendant feels that he was prematurely indicted before the ten day appeal time, as set forth in 49-5-10, had run.

The Court heretofore has ruled that he was not prematurely indicted. The defendant by this motion asks for a dismissal of the indictment because of the prematureness of the indictment.

THE COURT: Motion denied. The Court finds the motion is without any foundation of law. This matter has been argued a number of times -- I can't count the number of times -- before this Court and the West Virginia Supreme Court.

For the reasons aforesaid in the record, this Court reaffirms its prior rulings and denies the motion to dismiss on the grounds alleged by counsel.

MR. McKITTRICK: Your Honor, the next two motions to dismiss relate to the question of whether or not the time of 120 days has passed on the detainer statute. Now, there are two motions

12

to dismiss the indictments, one based on the fact that there is
a violation of due process as a result of the time running, and
the other based on the fact that there is a violation of John
Moss' speedy trial rights under the United States Constitution
and comparable provisions here in West Virginia.

At the last hearing we had the Court overruled the motion
with regard to John Moss' due process rights.  I assume for the
Court to be consistent that it also would overrule the motion to
dismiss on the basis of a speedy trial.

THE COURT:  You are correct, Mr. McKittrick.  Those matters
also have been addressed, not only by this Court but by the West
Virginia Supreme Court.  In addition to which, I might add for
the record, a number of these continuances have been occasioned
by motion of defense counsel.  The record will speak for itself.
It is voluminous enough now.

The Court reaffirms its prior rulings and denies the motion
for the reasons aforesaid in the record.

MR. McKITTRICK:  Your Honor, the remaining motions which we
would like to argue, and I assume the State would present
evidence on are motions to suppress certain evidence that was
secured in the City of Cleveland, Ohio, pursuant to a search
warrant, after a confession was given by John Moss on the 28th
day of October, 1980, and also motions to suppress the blood
that was extracted from John Moss on the 22nd day of April,

13

1980, in the State of Ohio, and also motions to suppress the confession.

I think, Your Honor, intertwined with those motions, which evidence will be taken upon, will be the motions that we have filed in limine concerning the same physical evidence which we have asked the Court to direct the Prosecuting Attorney and its witnesses not to directly or indirectly allude to nor introduce into evidence, that being specifically, Your Honor, silverware which allegedly was given to one Arbutus Johnson by the defendant, John Moss, a .22 rifle, which was never recovered, a Tasco scope --

THE COURT: Excuse me. How can you suppress a rifle that was never recovered?

MR. McKITTRICK: Also connected with the motions to suppress are motions in limine --

THE COURT: But how can you suppress a rifle that has never been recovered?

MR. McKITTRICK: What I'm saying, Your Honor, I'm not asking for the suppression, but connected with the suppression motions and to be considered under the evidence that will be taken on these motions will be the motions in limine concerning the rifle and any allusion to it by witnesses.

THE COURT: Okay.

MR. McKITTRICK: Also, Your Honor, there was some nebulous

14

allusion to the fact that Vanessa Reggettz had a confrontation of sorts with a black man on the railroad tracks. The man was never identified, and the troopers testified under oath that he couldn't be identified. That again would be pursuant to the motion in limine. And also, Your Honor, a camera or cameras that were secured pursuant to the search warrant. They cannot be independently linked to the Reggettz residence on the 13th day of December, 1979, when the murders occurred.

So, Your Honor, we would like to take up the motions to suppress at this time and would suggest to the Court that to save time, if the Prosecutors would agree, and I have already talked to Mr. Brown about this, we might take evidence on the entire matter, and the Court could rule on each suppression motion after all the evidence was taken.

THE COURT: Is that agreeable to the State or not?

MR. BROWN: No, I don't think so, Judge. As I understand, he wants to have just an all purpose hearing for everything. First of all, I don't think some of these matters should be considered by the Court.

Let's go back to the motions in limine. For instance, they talk about suppressing flatware. Your Honor, the flatware was retrieved by the police from a Mrs. Arbutus Johnson.

THE COURT: Does the State intend to connect it with the Reggettz home?

15

MR. BROWN: Yes, sir.

THE COURT: All right.

MR. BROWN: Now, Your Honor, what Mr. McKittrick is saying here, if I may be so bold as to interpret what he is saying, is that nobody can identify these things specifically. In other words, it is somewhat like money being stolen. If money was taken from the court reporter and it was a $10 bill, and later a defendant was apprehended with a $10 bill in his pocket, obviously she can't specifically identify the $10 bill; but she can say, "I had a $10 bill in my pocket. I was robbed, and I lost a ten."

The same is true with these items, Your Honor. These items will be identified as "Yes, I had silverware like that. Yes, I had a camera like that." He cannot say positively that that is the specific camera, but he can say "I had a camera just like that," items like that.

Now, as to the flatware or silverware, Your Honor, I say there is no sense in having any type of a hearing on that because the defendant has no standing on that silverware. The silverware was recovered from a lady, just a friend. And there would be evidence she was a friend of John Moss, and John Moss gave the silverware to her as a Christmas present. It was not recovered as a result of any search. She just turned it over.

The .22 rifle, of course, was not recovered, so there is not

too much wrong with the search on that, although Mr. Reggettz can say he had a .22 rifle with a scope in his house. A scope was recovered from John Moss' parents' home in Cleveland. That is not the same scope. So that scope is out. That will take care of that right now.

MR. McKITTRICK: You will not use the scope?

MR. BROWN: We will not use the scope, although there will be testimony that there was a scope on the .22 rifle that was taken. But we are satisfied that is not the same scope. We will not introduce that scope.

As to the camera, the camera was also recovered from the home in Cleveland. Mr. Reggettz will identify that camera as being the same camera. He will not say positively that is the exact same camera. He will say he had a camera just like that.

As to the blood, Your Honor, there is a motion in limine that the blood of John Moss does not have sufficient charac-teristics, not enough common characteristics between the blood at the scene and the actual blood of John Moss. I think the chemist reduced that, Your Honor, so that point three ten-thousandths of the people have that, in other words, 60 people in the Kanawha Valley would have that same kind of blood. Out of 200,000 people, 60 of them in this valley would be likely statisticswise to have that kind of blood. Now, Your Honor, I would argue that that is enough common characteristics of the

blood at the scene and the actual blood of John Moss.  And in any event, I think that is a jury question, Your Honor.  I think they can give that any kind of weight they want to.

Your Honor, Mr. McKittrick has discussed and asked that we not bring up the fact that prior to the death of Vanessa Reggettz she had had a confrontation with a black man on or near the railroad tracks in the vicinity of her home because there is no evidence to link that black man with John Moss; and that is true.  We can't link John Moss with that man, and we have no intention of even trying to do it.

THE COURT:  That takes care of that, doesn't it, Mr. McKittrick?

MR. McKITTRICK:  Yes, it does, Your Honor.

MR. BROWN:  Your Honor, there was a motion in limine on the flatware and also a motion to suppress on the flatware; and Your Honor, the motion to suppress, we feel is not founded since there is no standing by the defendant to object to any search or any procedure by which that flatware was taken from Arbutus Johnson.

MR. STUCKY:  Your Honor, the only thing left that hasn't been addressed by Mr. Brown is the motion to suppress the confession.

THE COURT:  You are getting into a number of items.  Let's take the ones we have discussed.  Do you have any responses to

18

those?

MR. McKITTRICK:  Yes, I do, Your Honor.

Mr. Brown talks about the silverware.  Your Honor, the evidence undisputably in this case is simply this:  The only time John Moss has ever been talked to was the confession taken on the 28th day of October, 1980.  The essence of that confession is that John Moss took dishes from the home of Reggettz.  It is the only gift as he calls it, characterizes it, that he took from the home, dishes.  Now, I went into, on a previous hearing, cross-examination very thoroughly on this matter, and both troopers, specifically Terry Williams, indicated that the flatware are knives and spoons, and that he cannot say that they came from the Reggettz home.

Let's assume that they could say, Your Honor, that they came from the Reggettz home.  That does not link John Moss with the silverware.  But from my cross-examination of the trooper in this matter, he said no one has identified the flatware as coming from the home firstly, and secondly, he is aware of the fact that after John Moss was questioned, after some seven hours about this matter, that he always only referred to dishes.

There is absolutely no link whatsoever between the silverware and Paul Reggettz' house.  I don't care who has them. And there cannot be any in this case.

Now, with regard to the camera, Your Honor --

19

THE COURT: Let's take one thing at a time. Do you have any response?

MR. BROWN: Arbutus Johnson will say she received the dishes or flatware, whatever you want to call them, from John Moss. And Mr. Reggettz will say that he had flatware under that Christmas tree.

THE COURT: I think the flatware or dishes, whatever you prefer to characterize them, goes to their weight, not admissibility. Motion denied.

Secondly, the defense has demonstrated no standing by this defendant in connection with these items and that he has any standing to move for suppression. I am going to deny the motion to suppress.

MR. McKITTRICK: Well, Your Honor, just assuming for the moment we don't have standing, we also filed a motion in limine on the basis there is no independent connection to the Reggettz home. Arbutus Johnson received a gift. She does not know where it came from.

THE COURT: I understand that. That is why I have overruled your motion and your motion in limine. It goes to weight, not to admissibility. You can argue that in your closing argument, or on your cross-examination.

MR. McKITTRICK: Secondly, Your Honor, Mr. Brown talked about the camera. The camera was taken from the residence

20

where John Moss was staying.  At the time we filed the motion to suppress with regard to that, we also filed a motion in limine. Now, when the search warrant was executed, as I remember the evidence in this case, there were three cameras taken.  The officers upon cross-examination in the previous hearing also indicated that no one could say that those cameras came from the Reggettz home.  So we would contend in our motion to suppress, which I think is relevant and the defendant obviously has standing to bring that motion, we would contend that the warrant was too general in nature.  And with regard to the motion in limine, there is no independent linking of those cameras to the Reggettz home again.

It has nothing to do with the weight of the evidence.  No one can say they came out of the Reggettz home, Your Honor.  And I say this respectfully to the Court because it is a very important matter, the same thing applies to the silverware.  It is not a question of weight, Your Honor.  It is a question of you could go out here and get anyone that John Moss gave a present to and there was something similar to it in the Reggettz home and put that in as evidence.  It doesn't go to the weight.

THE COURT:  It goes to the weight until and if it is reversed by the Supreme Court.  I have just ruled on it.  I realize you have to make a record, and you are doing so eloquently.  So you make your record, and I'll make my rulings;

21

and if it ever reaches an appellate body they can decide whether

to confirm or reverse me.

MR. McKITTRICK:  With regard to the camera, Your Honor, I

think the motion to suppress is a fair motion with standing.

THE COURT:  I think they are all fair motions,

Mr. McKittrick, or you wouldn't have made them.

MR. McKITTRICK:  And I think the motion in limine, Your

Honor, specifically applies to the camera in this instance.

THE COURT:  What is the response of the State, if they have

one?

MR. BROWN:  Well, Your Honor, Mr. Reggetz will positively

-- Well, he won't positively identify that camera.  But the

cameras that were taken are all a little bit different, and they

are not exactly the same type.  And Mr. Reggetz identified a

camera he felt was his.  It is a Kodak polaroid type camera.

There was another camera taken from the home, the Moss home,

that is the same type of camera.  However, it had a little

imperfection in it.  These cameras were called "The Handle

Camera".  I think after you took the picture you cranked a

little handle, and it caused the developed picture to come out.

The camera  Mr. Reggetz said he had was in good working order,

good condition.  He identified a camera just like that.

The other camera taken from the Moss home, which I believe

Mr. Moss, Sr. said it was his camera, was his very own camera,

22

that in fact had a broken handle and was not identified by
Mr. Reggettz. So there is a very obvious distinction there.

MR. McKITTRICK: As I understand Mr. Brown's representations
to this Court, it is to the effect he agrees that the camera is
not linked and he agrees that the silverware is not linked to
the Reggettz home, but he is representing to the Court that
Mr. Reggettz, who apparently he has already talked to and
apparently is going to testify, and he is going to identify
these matters. Is that right, Pete?

MR. BROWN: I think I said Mr. Reggettz can identify these
things. I don't think I said he is going to testify. I'm not
that far down the road yet. I think I said these items can be
identified. Now, what I do when it comes time for trial and who
I put on, I don't know. I'll have to cross that when I get to
it. I'm just saying that they are, to the State's way of
thinking, items that are admissible, and that we think we can
make admissible. And we think the Court would be premature in
its ruling right now, and that it is a matter that goes to the
weight. We feel we have somebody who can identify them and pick
them out.

MR. McKITTRICK: Your Honor, the reason we made the motions
now is so that we can determine what is going to happen at
trial. Now, if he has evidence that can link these up, that is
our very argument. If he takes that argument away from me, I

23

don't have any argument. That's why we made the motions. This is the time to hear the motions, not at trial.

Now, I could take from what Mr. Brown said he hopes Mr. Reggettz would identify these items, but he has never talked to him. And Your Honor, if that is the case, our motion should be sustained.

MR. BROWN: I have talked to him, Judge. He picked them out. But whether I'm going to put him on or put those items in, we haven't got that far, Judge. I'm just saying as it stands right now, those are items I can make, as I indicated to the Court, I can get those items in. I can have them identified. But I'm not going to say right now I'm going to put those items in or put Paul Reggettz on. I'm not going to make up my trial strategy yet. I'm not going to do that.

MR. McKITTRICK: Your Honor, I'm not asking him to do that. But I am asking the Court for a ruling that since the Prosecuting Attorney has represented to the Court that the only way he can identify these matters is through Mr. Reggettz, that if he doesn't use Mr. Reggettz on direct, that these matters will not be introduced into evidence. Now, the importance of that is this, Judge: Maybe the trooper who confiscated or got the silverware from Arbutus Johnson, maybe he will testify before they decide to put Reggettz on. And that is why our motion in limine.

24

Maybe the trooper will take the stand and maybe he will start alluding to these things and implying to the jury there is some connection when in fact there is absolutely none.   And Mr. Brown at that time concludes "I'm not going to put Reggettz on" -- All I'm asking from the Court, if Mr. Brown is representing to the Court that Mr. Reggettz is the only one who can independently link those physical items to his home, that if he doesn't do so, and I'm not asking him at this point to respond whether he will or not, but if he doesn't use him that those matters cannot be alluded to by the State's witnesses prior to them being identified.

THE COURT:  Is that it?

MR. BROWN:  Yes, sir.

THE COURT:  Motion denied as being premature.   It might very well be during the course of this proceeding, if the State attempts to introduce those items I will grant a motion, depending on argument at that time.   But at this point this is a motion in limine and I am treating it as a motion in limine, and I think it is premature.

For that reason it is denied.

MR. McKITTRICK:  As I understand what Mr. Brown has said with regard to this rifle, it is the same thing he said with regard to the scope; and that is that there will be testimony from someone that a rifle and a scope was taken from the

25

Reggettz residence, but there will be no other evidence connecting John Moss with the rifle because the rifle cannot be identified as the rifle that John Moss may have taken, if in fact he did. Correct, Pete?

MR. BROWN: I think there is somebody who will testify that they saw John with a .22 rifle at his parents' home in Cleveland, and that it had a scope on it, and also that a .22 rifle with a scope was taken from the home of Paul Reggettz and Moss was seen with one at the home in Cleveland. I think somebody else also can put a .22 rifle in his hand. I believe that John Moss' brother indicated he took a .22 rifle and got rid of it, that he knew John had; and that somebody else --

MR. McKITTRICK: I don't mean to cut you off, but there is nobody else. That is the reason for the motion. What happened was the officers went to Cleveland, and they talked to Carlton Moss, who is John's brother. And they found the scope in Carlton's room, not John's room. That is the scope they said doesn't even link up, and they are not going to use it.

The same thing happened with regard to the rifle, Judge. There is no one who can say that the rifle, if there was a rifle in Cleveland, Ohio, was the rifle that came out of the Reggettz home. The implication that will be left in the jury's mind is that that is the same .22 rifle that came out of St. Albans, when nobody can prove it, not one that came out of St. Albans,

26

came out of the Reggettz home.  And there is no one who can say that.

Your Honor, we don't object to the police saying that a rifle and scope were taken.  I don't know how they are going to say that because they weren't there when the alleged crimes occurred.  But we have no objection to somebody who knew they were there saying they were taken.  I assume that would be Mr. Reggettz, if he testifies.  But we do have an objection to any evidence being presented that someone saw John Moss with a rifle and a scope in Cleveland, Ohio.

MR. BROWN:  Judge, I think Mr. Moss told the officers where the gun was.  He told them he took it and where the gun was.

MR. McKITTRICK:  He told them where the gun was, Judge; and when they went there, it wasn't there.

THE COURT:  I think the motion in limine on that matter is premature.  Denied.  And again I want to emphasize I am treating it as, and in this context only, as a motion in limine and am denying it at this time.

MR. McKITTRICK:  Your Honor, our motion with regard to the blood, other than the extraction of the blood on April 22, 1980, has to do with the blood report itself.  The survey of the blood report indicates there are certain variances of blood samples found at the scene that are consistent with the blood of John Moss.  But they don't have all the variances, Your Honor.  In

27

other words, there may be ten variances in blood or twelve
variances in blood; and the officer has indicated there may be
three variances in a particular sample that is consistent with
John.  That is the blood we are moving that should not be used.

     MR. BROWN:  Judge, all blood is broken down into nine parts,
all of it is.  And starting with either the O, A, B or the AB we
are familiar with.  Those are the cellular breakdowns of blood.
The other eight breakdowns deal with enzymes and proteins.
There are some letter designations that I won't bore the Court
with, but all people have these, besides the letters, O, A, B or
AB, they all have the other eight designations, which are, for
instance, PGN, AK, that type of thing, ESD.  But each one of the
enzymes or proteins can be broken down into a sub group.  And
each one of those enzymes or proteins are just as distinctive to
a chemist as the O or the A or the B or the AB.

     And the chemist will say positively that any one of the
three distinctions that he makes here in that blood, in the nine
distinctions that he makes in that blood, three of them are
different and go specifically to John Moss' blood.  And he will
say that any one of those three is sufficient to go particularly
to a person with that type blood.  Any one of those three would
single out and differentiate that from any of the other blood
specimens taken, that of the three victims and that of Paul
Reggettz, the father and husband.  Those three items will

distinguish Moss' from any of those other four people, the three
victims and the father. And it is very distinctive. And as a
matter of fact, it is found in only point zero three ten-
thousandths of the population.

MR. McKITTRICK: Your Honor, that doesn't answer our
question. All we are asking for -- We are asking for an
evidentiary hearing on that.

THE COURT: Evidentiary hearing on what?

MR. McKITTRICK: What Pete and I were just discussing. I
don't believe some of the variances he has isolated are
consistent enough -- In other words, Judge, what I am saying,
there are a couple of samples that the officer has found that he
has concluded in this blood analysis that were consistent with
John's blood.

Then in another area in his report, which are not really
conclusions, he has indicated that there are certain variances
that John may have, but they are not the complete nine
consistencies in the variances he broke down in the conclusions
that he stated that were consistent with John's blood.

We are saying that the variances that he broke down there
may have been only one or two variances consistent with John's
blood, that they cannot be used in the trial of this matter,
that they are not reliable, they are not scientifically reliable
enough to be used to show to the jury they are consistent with

29

the defendant's blood.

Your Honor, I don't think this is something all courts concertedly hold, and there has never been any debate about it, and that is why we filed a motion to suppress.

MR. BROWN: Your Honor, as I understand what Mr. McKittrick said, he doesn't believe what the chemist said. If he doesn't believe him, he has a right to cross-examine him during the trial. I don't see how that is grounds for a motion in limine.

MR. McKITTRICK: I believe it is a motion to suppress, Your Honor, where the burden is on the State, not us. As I understand Mr. Brown's statement when he started, when he prefaced this whole argument, was the fact, Judge, we don't think that evidence should be taken on some of these things. Judge, we filed a motion to suppress. Evidence has to be taken. Now, if the Court decides after a motion to suppress is filed, whether it is as to physical evidence or as to a chemist's findings, the Court after hearing evidence could say there was no standing. That would be the Court's ruling. We filed a motion to suppress with regard to the report, what we say is untrue. So all I'm saying to the Court is evidence needs to be taken on that motion to suppress, and that motion is different from the motion on the blood extraction in Ohio on April 22, 1980.

MR. BROWN: Judge, there is no violation, no reason for the

suppression. What he said was he doesn't think this is a reliable test. He has a right to bring that out in front of a jury, that the test was not reliable, the chemist doesn't know what he is doing, the whole thing is fouled up. But that is not a suppression hearing, Your Honor. There is no violation of this man's constitutional rights, if the testing procedure wasn't right.

THE COURT: The Court agrees with and adopts the State's position and finds this is a matter that goes to the weight and not the propriety of the introduction of the evidence. And I have no doubt, Mr. McKittrick, and I have presided over a number of criminal trials in which you, Mr. McKittrick, have represented the defendants, and you are most capable in the art of cross-examination. And I believe that is the proper form to proceed in this matter. Motion denied.

All right, let's take a ten minute recess.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

THE COURT: All right, show the resumption of these proceedings with all parties present heretofore present here again, including the defendant and his counsel.

All right, proceed.

MR. BROWN: Your Honor, could I go back in time a moment over a motion we previously discussed. The motion for grand

31

jury minutes. I had originally thought that that motion went to

grand jury minutes as they related to Paul Reggettz. But that

also goes to John Moss. Whatever notes we have, we are going to

provide on Paul Reggettz. We probably should have a transcript

on Moss. But whatever we have on Moss, I'm going to provide

that also, Your Honor. We had just overlooked the grand jury

minutes as relating to John Moss.

THE COURT: All right, the State is willing and will turn

over whatever testimony it has relating to Moss. You will make

that available to defense counsel.

MR. BROWN: Yes, Your Honor.

THE COURT: All right.

MR. McKITTRICK: Judge, I don't know, you may have, but I

want to make the record straight -- I don't know whether the

Court specifically ruled on the motion in limine with regard to

the camera.

THE CLERK: It is denied as being premature.

THE COURT: I am advised I denied the motion as being

premature.

MR. McKITTRICK: Judge, I would like to as Mr. Brown has

just done, I would like to go back in time. I addressed earlier

a motion, Your Honor, to dismiss the indictment as violative of

defendant's due process of law rights I believe. I am not sure

if I did nor not. That is a motion I would like to take up last

32

in this matter, and I will present some evidence on that.

THE COURT:  I have no problem.  Why would you want to take it up last?  If I grant it, that is going to obviate the necessity of any other proceedings in this matter.  I am going to do it, but I just wanted to know why you want to take it up last.

MR. McKITTRICK:  Quite frankly, I have talked with my client in detail on it, but I haven't had time this morning to talk with him about it.

THE COURT:  Fair enough.  We will take it last then.

MR. McKITTRICK:  Your Honor, I believe the only motions left to address are the motions to suppress, which is a motion to suppress the flatware, the camera, the scope and the gun, the blood and the confession.

THE COURT:  The scope and the gun I thought had been disposed of.  Am I incorrect?

MR. BROWN:  You can't suppress the gun, Your Honor.  We don't have it.  And the scope, we are not going to use the scope.

MR. McKITTRICK:  The camera, the blood and the confession.

THE COURT:  All right.

MR. STUCKY:  Your Honor, if we might take those, or at least the beginning part in backwards order there, as far as the confession, it is the State's position that on September 24,

33

1982, the Court had a transfer hearing in which the Court heard lengthy testimony as to the voluntariness and admissibility of the confession of John Moss. And on page 465 of that transcript the Court began making its ruling, and carried over on page 469, and the Court finds that Moss was advised of his Miranda warnings not once but at least twice, that he was fed, given an opportunity to go to the restroom, permitted to smoke, provided food and drink, that he never asked that the questioning be stopped, never asked for a lawyer, that he knowingly, intelligently and voluntarily signed a waiver of rights, and the Court finds in fact and concludes in law that the taped confession was valid and given voluntarily, knowingly and intelligently by this defendant after a full explanation of his Miranda rights and the signing of the waiver of those rights.

The Court, therefore, concluded that the taped confession was indeed a valid confession, given voluntarily, knowingly and intelligently after an explanation to him not once but twice of his Miranda rights, and that he knowingly and intelligently waived the same. Therefore, the Court concludes that the taped confession was given knowingly and intelligently and is a valid confession.

And the Court went on to make the same findings as to the oral statements that were given.

It would be the State's position that the Court has already

34

heard suppression evidence and that was the sole purpose in the transfer hearing, to have a suppression hearing of the statement before the Court heard the statement as part of the transfer hearing.  The State's position is that the admissibility of the statement in the hearing of a suppression hearing at the transfer hearing is the exact same standard.  The Court made the exact same findings, the exact same evidence produced by the State, and the State would rest on Volumes 1, 2 and 3 of the transfer hearing as far as the suppressability in a suppression hearing of this statement and would ask the Court to find that in fact the statement is admissible in this proceeding.

MR. McKITTRICK:  I really can't believe the State would make such a motion in a case like this, but I will respond to it. Obviously there is a difference in finding whether a person voluntarily gives a statement and whether or not his constitutional rights have been violated either prior to the statement being taken or during the statement being taken. There was never any evidence whatsoever gone into by the defendant.  There was never a motion to suppress filed in the juvenile case with regard to many, many violations of John Moss' constitutional rights, which we would contend are obviously apparent, not only factually but legally in this case.

For example, let's just assume for example that this Court would suppress the extraction of blood on April 22, 1980.

35

It is inherent, and I believe that there are innumerable grounds to suppress that blood.  And I say to Your Honor that there would be obviously a poisonous tree argument if the blood was suppressed by this Court.  Your Honor, this Court has never thoroughly in detail examined the evidence pursuant to a motion to suppress, and that is completely different from this Court finding the defendant has voluntarily given a statement.

THE COURT:  I agree, Mr. McKittrick.  If you are not willing to accept the State's position without argument, then I am certainly not going to permit the State to enter that confession without a full blown hearing.  This is a trial de novo.  The confession issue raised in the juvenile proceeding was for the purpose of the juvenile transfer hearing and not as to the admissibility at trial in this matter, wherein the defendant was transferred to adult status.  This is a trial de novo, gentlemen for the State.  So if you have evidence to put on as to the confession, put it on.

I agree it would be a lot easier to adopt your position, but I am not going to do it in a trial of this magnitude when there is an objection by defense counsel.

MR. BROWN:  Your Honor, we will have evidence and witnesses to put on.  They will be here just shortly.  Whether or not a motion to suppress was filed in the matter, we felt we still had the burden of proving that the confession was taken voluntarily

and in regards to the defendant's constitutional rights. And of course, we felt that this Court had already ruled on that. We will be prepared to go forward, Your Honor, after lunch on the confession matter, although we really thought that the Court would be consistent, not that the Court is being inconsistent, but we thought that that particular ruling would stand through the adult matter, since it is the same burden.

THE COURT: I understand. And had Mr. McKittrick not objected to that, that is to say preserving his objection to my ruling, but not objecting to prior rulings, it would save a lot of time, and I would sustain your position, Mr. Brown. But Mr. McKittrick has raised an objection. This is a very, very serious matter, and this is a trial de novo. Therefore, I am going to require the State to sustain its burden as to the confession before this proceeding which is now an adult proceeding as distinguished from the prior juvenile proceeding.

MR. McKITTRICK: Your Honor, consistent with my prior suggestion, and it would save a lot of time, if we could take evidence with regard to all suppression motions at one time, because the direct examination and the cross-examination will be intertwined.

THE COURT: Mr. McKittrick, there are some who feel those of us in the judiciary are over paid; there are some who feel we are under paid. It is of little moment and makes little

37

difference to me whether this suppression hearing takes a day, a week or a month. I will be paid my same salary whether I am sitting here on the bench or in other matters. The State prefers not to incorporate all of these into one issue. Therefore, we will take them separately.

MR. BROWN: Your Honor, as I understand it then we have the motion to dismiss the indictment as violative of the defendant's due process.

THE COURT: We are going to take that last.

MR. BROWN: We have the motion to suppress the confession, motion to suppress the blood --

THE COURT: And the camera.

MR. BROWN: And the camera?

THE COURT: Camera, blood and confession is what I have written in my notes. Am I incorrect in that?

MR. BROWN: I thought the Court had ruled on that. Maybe not.

THE COURT: I ruled on the motion in limine, but not on the motion to suppress --

MR. McKITTRICK: I think what you did, Judge, you ruled on the flatware and with regard to suppression, you ruled the defendant didn't have standing. But the camera was taken from the home in which he was staying. He obviously has standing there.

THE COURT:  Yes, I understand.  I reflect four matters, camera, blood, confession, and dismissal of the indictment for alleged due process rights.  Mr. McKittrick has asked that that issue be taken up last to give him time to confer with his client.  We will take that last.  We will take the others in any order you want to take them in, camera, blood, confession.

MR. BROWN:  Your Honor, I wonder at this time if we could recess until 1:00 in order to give us time to talk with our troopers.  One trooper had a problem getting a baby sitter, and he may be down there just about now.  But we would like to talk to him if we could.

MR. McKITTRICK:  There is one motion, your Honor, we could argue quickly.  And that is the motion requesting the Court to call Paul Reggettz as its own witness.

THE COURT:  Yes.  That motion is denied.  You can call him if you want to call him and be bound by his testimony; and if the State wants to call him, they can call him.  The Court is not going to call him as the Court's own witness.

MR. McKITTRICK:  Can we make a record on that, Your Honor?

THE COURT:  Oh absolutely.  Go ahead.

MR. MURRAY:  Your Honor, as I am sure the Court is aware, the common law is replete with cases which allows the Court, gives the Court the authority to call its own witnesses.

THE COURT:  Let's emphasize, which allows the Court

authority to call them, if the Court so desires to call them.

MR. MURRAY: That is correct. Of course, I think that can be done, if the Court wants to, at the request of a party. Normally this may not be done. But we have a very unique case here. The circumstances are unique in that we have two persons who have confessed to the same crime. I think it goes without saying, of course, if we have a prior confession, another confession, that is evidence which tends to exculpate our client in this case. Likewise, his retraction of that confession would tend to inculpate our client.

I think and I know inherent in that, under Supreme Court cases, that in such a situation our client has a full right to have his confrontation and cross-examine such a witness in order that due process will be served. There are ways, of course, that this can be done. However, it would be much simpler for everyone involved and would allow the defendant confrontation at trial if indeed the Court will call Mr. Reggettz as its witness to allow us to further cross-examine him on the details surrounding the giving of the confession, the details of the confession; and it will also give the State a like opportunity.

THE COURT: I don't think there is any doubt in my mind the purpose of the motion, and the motion is denied. If you want to call Mr. Reggettz as a witness, you may call him; and you will have your confrontation. And you can examine him. If the State

40

wants to call him, then you can cross-examine him. But the Court is not going to call Mr. Reggettz as its own witness.

MR. McKITTRICK: Your Honor, the issue in the State of West Virginia that gives us some anxiety, and I know that legal commentators and the Supreme Court have worn it, the "voucher rule" as most trial lawyers call it -- The rule is you are not supposed to impeach your own witness, have worn that rule down. And in fact the federal rules have dissipated the rule, and the rule has been thrown out. There is no such thing.

In this case, Your Honor, if we would call Mr. Reggettz as our own witness, I am sure the Court is familiar with the Supreme Court cases that indicate that it would be a violation of due process for the voucher rule to be invoked to prevent us from cross-examining this witness. In other words, obviously from prior hearings the Court realizes that Paul Reggettz has taken the stand before Your Honor and has admitted that he confessed to these murders but then said he did not do it.

Now, upon that happening, Your Honor, I am sure that the State would object and say, "Well, these people now are trying to cross-examine their own witness, and they can't impeach their own witness." The reason we make this motion is that we don't want to vouch for the credibility of Paul Reggettz. His confession and the facts contained in the confession are so unquestionably consistent with the murders in this case that we

could not put him on and vouch for his credibility.

What I say to the Court is that with the uniqueness of this case as it has been characterized by the Supreme Court of the United States in the only case that has come before it, and it is almost on all fours with this case, that the defendant's due process rights would be served by the Court calling Mr. Reggettz so that he could be cross-examined not only by the State but also by the defense. And we wouldn't get into the voucher rule controversy, and whether or not the Supreme Court case applies or it doesn't apply.

Also, Your Honor, as the Court is aware, the case of <u>State vs. Williams</u> in the State of West Virginia now gives us an exception to the hearsay rule in the admission against penal interests. I remember in the transfer hearings some objections by the State was sustained by the Court on the basis that it was hearsay when other witnesses tried to testify to what Paul Reggettz said when he indicated in detail how he murdered his family. Under the <u>Williams</u> case, Your Honor, that would be an exception to the hearsay rule.

We wouldn't have to get into that kind of controversy in the trial of this case if Reggettz was called as a Court's witness so that both sides could cross-examine him. That is the reason for the motion, Your Honor.

THE COURT: Is that it?

42

MR. McKITTRICK:  Yes.

MR. BROWN:  Your Honor, if the Court were to call Mr. Reggettz, it would put the Court in the unusual position of the Court vouching for the witness' credibility.  And of course, the Court is not supposed to comment on any evidence or the testimony of any witness.  In some respects it would almost be like the Court saying, "This is my witness.  Pay special attention."  I think it would be improper.

Every criminal case, Your Honor, is fraught with a certain kind of  peril as to what witnesses you call or don't call.  I know  Mr. McKittrick has a problem with calling Mr. Reggettz. That may be a problem that I may have.  That is just a problem that we are going to have to face, both sides, as to whether he is called or not called.  I just think it would cause a special kind of problem for the Court to call this witness as its own witness.

The common law cases that are brought up where the court calls its own witnesses are generally cases where the court has called some kind of almost a neutral expert to explain the value of land or to shed a little light on some kind of a particular situation, or a witnesses that doesn't hurt either side, or a witness that is somewhat neutral.

But in this particular case, I don't have to beat you down on that.  You know that this particular witness is a very

crucial witness, his testimony will be very crucial, his

credibility will be really screened by the jurors.  And I think

it would just cause all sorts of problems for the Court to in

effect have vouched for the credibility of this person.

MR. McKITTRICK:  Well, Your Honor, Mr. Brown's statement as

to "He may have a problem" or "I may have a problem" is not what

we are trying to get to in this case.  We are trying to get a

full disclosure to this jury so that it can hear the facts.

This isn't a game of chance, and that is what the Supreme Court

said in Chambers vs. Mississippi.  It said under the cases with

this kind of facts, it so unique that you violate the due

process rights of the defendant when you adhere to these

anachronistic rules like the voucher rule and you can't bring in

third persons to testify that another person said, "I committed

that crime", because it is hearsay.  It is an admissions against

penal interests.  And the reason for this motion, Your Honor, is

to do away with some kind of a crap game and a courtroom where

jurors don't hear something because of anachronistic rules.  And

that is what -- I'm quoting the Supreme Court.  That is not my

argument, Your Honor.

THE COURT:  Which Supreme Court, the West Virginia Supreme

Court of Appeals or the United States Supreme Court?

MR. McKITTRICK:  The United States Supreme Court, Your

Honor, the United States Supreme Court.   And the case,

44

Your Honor, is almost on all fours with the case at hand.  And

Your Honor, in our survey in jurisdictions across the

United States, we have only been able to come up with three

cases on all fours with this case.  And every ones of those

cases follows what <u>Chambers vs. Mississippi</u> says.  And that is

the reason for this motion, Your Honor.

We want this jury to hear all the evidence and let it make a

decision.  We don't want to obviscate the evidence.  Obviously

the State does by what they have said, because they have said

this is a crucial witness in this case.  And it is.  And that

is why we ask the Court to call the witness, because it is a

crucial witness.  Why should the defense in a triple murder case

be offended and prohibited from cross-examining some witness

because of some evidence rule that the federal courts don't even

follow now?

MR. BROWN:  Your honor, of course, we think the exclusionary

rule is a little bit out of line too; but I guess they are not

going to do away with it.  Supposing the Court calls this man as

a witness.  Is the Court then going to have to familiarize

itself with this whole case?  We have down there I think two

file drawers.  The Court would have to familiarize itself with

the whole case.  And then what kind of direct examination would

the Court make?  Does the Court make an direct examination that

goes to the State's side?  Does it make a direct examination that

goes to the defense's side? Does the Court then do a redirect? That puts the lawyers at odds? If we would have a right to cross-examine, it would almost be us taking on the Court. Who is going to do the direct on this man if the man is called as the Court's witness? Do I do the direct, or does the defense do the direct? Who gets to do the cross? Does the Court have to be familiar with the whole file in order to know all the facts to do this kind of thing? I think it is causing way more problems than it will ever solve.

MR. McKITTRICK: Those questions, Your Honor, are easily answered because they don't even apply. The court doesn't call a witness -- Trial lawyers know this. And Pete Brown, who has been in the Prosecutor's office eleven years knows this -- and ask him questions. The court doesn't call his own witness to the stand and ask him questions. All the court does is have the clerk of the court issue a subpoena, a court subpoena. The jury doesn't even have to know it is a court's witness. When the person walks into this courtroom, he is not called by one party or the other. And that party don't vouch for his credibility; the Court don't vouch for his credibility. The court only calls him as a witness so he is subject to cross-examination by both parties.

We don't call him as a witness. If we call him as a witness, we can only directly examine him. We can't lead the

46

witness. I'll give to Mr. Brown, if he doesn't want to call this crucial witness in this triple murder case, I'll call him as a witness pursuant to the Court's subpoena, and I'll direct examine him through cross-examination.

THE COURT: Obviously that is what you want to do is cross-examine him through direct examination. I have already ruled. I am denying the motion. I am not going to call him as the Court's own witness. Now, that is a matter that might be addressed further down the road at some point should an adverse verdict be reached. This Court declines to grant the motion and so it does deny it.

You have made your record. If there is anything else you want to add in the record, go right ahead. Anything further?

MR. BROWN: We would just ask to recess until after lunch.

MR. McKITTRICK: What time do we return?

THE COURT: We will stand in recess until 1:15.

One other thing, I don't want to be redundant, but put in the record the Court reaffirms its prior rulings, and for the reasons aforesaid denies the motion of defense counsel to call Reggettz as the Court's own witness.

- O -

(Whereupon, a recess was had in the matter.)

(After recess.)

47

### AFTERNOON SESSION

WHEREUPON, the proceedings in the Matter of STATE OF WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III, CR-82-F-221, were resumed with all parties present as before noted, including the defendant and his counsel; the State by James C. Stucky, Prosecuting Attorney, and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha County.

THE COURT: All right, show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts, with all parties present heretofore present here again, including the defendant and his counsel.

All right, what do you want to take up first?

MR. STUCKY: Your Honor, I guess what we have left is the suppression, and the State would proceed with the suppression of the statement or the oral confession and the taped confession first.

THE COURT: Call your first witness.

MR. STUCKY: We would call Trooper Smith.

- 0 -

### AFTERNOON SESSION

WHEREUPON, the proceedings in the Matter of STATE OF WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III, CR-82-F-221, were resumed with all parties present as before noted, including the defendant and his counsel; the State by James C. Stucky, Prosecuting Attorney, and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha County.

THE COURT:  All right, show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts, with all parties present heretofore present here again, including the defendant and his counsel.

All right, what do you want to take up first?

MR. STUCKY:  Your Honor, I guess what we have left is the suppression, and the State would proceed with the suppression of the statement or the oral confession and the taped confession first.

THE COURT:  Call your first witness.

MR. STUCKY:  We would call Trooper Smith.

- O -

Michael Don Smith - Direct                    48

                    MICHAEL DON SMITH,

            Being thereupon called as a witness, after

            being first duly sworn, testified as follows:

                                    DIRECT EXAMINATION

BY MR. STUCKY:

    Q      Would you state your full name please.

    A      Michael Don Smith.

    Q      Where are you employed?

    A      Department of Public Safety, State Police.

    Q      In what capacity are you employed by the West Virginia

State Police?

    A      Trooper.

    Q      How long have you been a trooper with the West Virginia

State Police?

    A      Approximately twelve years and three months.

    Q      Where are you currently stationed?

    A      Winfield, Putnam County.

    Q      How long have you been stationed in Winfield?

    A      A little over three years.

    Q      In October, 1980 where were you stationed?

    A      Winfield.

    Q      And did there come a time when you were assigned an

investigation of three murders that occurred in St. Albans,

Kanawha County, West Virginia?

Michael Don Smith - Direct                                    49

A    Would you repeat the question.

Q    Were you assigned to an investigation of three murders

that occurred in Kanawha County, West Virginia, and specifically

in St. Albans, West Virginia, in October, 1980, or before that?

A    Yes.

Q    Who was assisting you, or who were you assisting in

that investigation?

A    Trooper Terry Williams.

Q    Did there come a time in October, 1980 when, during the

course of your investigation you left the Kanawha County area

and went to the State of Ohio?

A    Yes.

Q    And do you know particularly when that was?

A    It was October 28, 1980.

Q    And what was the purpose of going to Ohio at that time?

A    To go to the State Reformatory in Mansfield, Ohio, and

bring back a subject.

THE COURT:  Now, you understood my rulings this morning.  I

realize we are here now in suppression without a jury.  But you

heard my rulings this morning about any mention of any

penitentiary or reformatory in the State of Ohio.  I don't have

a problem right now because we are in suppression.

MR. STUCKY:  Your Honor, also the ruling, as I recall it, we

are not to bring up any prior convictions or prior criminal

Michael Don Smith - Direct                              50

record.  I don't think we can manufacture evidence as to the

fact that they had to go to the reformatory to pick this guy up.

THE COURT:  I'm not going to permit it.  Now, they can say

they went to the State of Ohio to pick Moss up, but I am not

going to permit any reference to any penitentiary or penal

institution.

MR. STUCKY:  All right.

Q    When you arrived in Mansfield, Ohio, did you --

MR. McKITTRICK:  I don't mean to interrupt, but as I

understood, you said you had no problem with it now because of

legal problems?

THE COURT:  I have no problem with it now because there is

no jury here.  We are not at trial.  This is a suppression

hearing before the Court.

Q    When you got to Mansfield, did you meet the subject you

went up there after or went up there for?

A    Yes.

Q    Who was that?

A    John Moss.

THE COURT:  Let me say this for clarification:  If you open

it up during the trial, it is fair game for the State.

MR. McKITTRICK:  I understand.

THE COURT:  All right.

Q    For purposes of the record, would you look around the

Michael Don Smith - Direct                    51

courtroom to see whether or not the person you went and

retrieved from the State of Ohio on October 28, 1980, is present

in the courtroom?

    A    Yes, he is.

    Q    Would you identify him please.

    A    He is setting at the end of the large table in front of

me in red coveralls.

    MR. STUCKY:  May the record reflect he has pointed to the

defendant, John Moss, III or John Moss, Jr.?

    THE COURT:  The record will so reflect.

    Q    Who went with you to Mansfield, Ohio?

    A    Trooper Terry Williams.

    Q    How did you get there, what mode of transportation?

    A    Department of Public Safety vehicle.

    Q    Was it a marked vehicle or unmarked vehicle?

    A    It was an unmarked vehicle.

    Q    Would you describe what type automobile it was and what

it looked like?

    A    Full size car, four door, front and back seats.  The

front seats were bucket type seats with a bench in the middle.

It was carpeted and has cloth type upholstery.

    Q    Were there any weapons or restraining devices in the

interior?

    A    No.

Michael Don Smith - Direct                    52

    Q    Approximately what time did you arrive in Mansfield?

    A    Probably around, somewhere around 12:00 to 1:00.

    A    And what did you do when you arrived there?

    A    I believe we did go to the reformatory and let them know we were there.  After we got to Mansfield, we met with the people we were supposed to meet with and went to lunch, and they made preparations of getting him.

    Q    There came a time when you received custody of John Moss; is that correct?

    A    Yes.

    Q    About what time was that?

    A    Well, it would have been sometime between 1:00 and 2:00.

    Q    What did you do once you obtained custody of him?

    A    We left from there, gassed our vehicle up and headed back toward West Virginia.

    Q    At that time was he restrained in any fashion?

    A    Yes.

    Q    How was that?

    A    Handcuffs.

    Q    When you got to the cruiser and placed him inside, was he still restrained at that time?

    A    Yes.  We had had him handcuffed behind and we changed it to the front and put him in the patrol car in the back.

Michael Don Smith - Direct                    53

Q    He rode in the back seat?

A    Yes.

Q    Where did Trooper Williams ride?

A    Trooper Williams was driving, and I was a passenger in the front.

Q    Was anyone else in the back seat with John Moss?

A    No.

Q    I believe you stated you went to a gas station and got gas?

A    Yes.

Q    Was that in Mansfield?

A    Yes.

Q    What did you do after you got gas in the automobile?

A    Well, we had a little trouble getting out of town.  We got on a route heading back toward West Virginia.  That was about it.  I had some discussion, we just talked among ourselves, the three of us in the car.

Q    Were you dressed in a West Virginia State Police uniform?

A    No.

Q    How were you dressed?

A    Blue jeans, casual shirt and jacket.

Q    How was Trooper Williams dressed?

A    The same way.

Michael Don Smith - Direct                    54

    Q    Did you have any weapons on your person at that time?

    A    Yes.

    Q    What kind?

    A    A .38 snub nose.

    Q    Where was that located?

    A    Most of the time it was on my hip.

    Q    Was it in plain view, or was it covered up by clothing?

    A    Covered up by my clothing.

    Q    What about Trooper Williams if you know?

    A    The same way.

    Q    When did you identify yourself to John Moss?

    A    Well, when I first saw him.

    Q    Was he aware that you were a West Virginia State
Policeman?

    A    Yes.  I had met him before, and we spoke there about
getting ready and we would be back.

    Q    So he was aware of your identity at that time?

    A    Yes.

    Q    What about Trooper Williams?  Did he know who he was?

    A    We both spoke to him, asked him how he had been since
we had seen him last.

    Q    Both of you had seen John Moss on previous occasions?

    A    Yes.

    Q    Did you make any stops on the way from Mansfield to

Michael Don Smith - Direct                          55

Charleston, West Virginia, or on your way back?

    A    Two, well, three.  Two after getting out of Mansfield.

    Q    Where was the first one?

    A    At a gas station which had some restrooms which we
used, the three of us.

    Q    What else?

    A    Then the next stop after that was at Parkersburg,
West Virginia, to gas up and get some refreshments, something to
drink.

    Q    From the time you left Mansfield until the time you
made your first stop at the gas station to go to the restroom,
did you have any conversations with John Moss?

    A    Yes, we did.

    Q    Did you say anything or do anything prior to having
those conversations with John?

    A    Well, no, other than as we were leaving we just talked
about, you know, maybe a weight gain, which I noticed he had
gained some weight, how he had been, how things had been going
for him.

    Q    Just casual conversations?

    A    Yes.

    Q    Did there come a time you had some conversation with
him with regard to the murder investigation which you were
conducting?

Michael Don Smith - Direct                    56

A    Yes.

Q    When was that along the trip, if you can remember?

A    I would say it was around twenty minutes or so after getting out of Mansfield, and after having some casual talk about how, as I said earlier, how things were going for him, his weight gain.

What I told him, before he started anything about any type of crime, his involvement in West Virginia, I told him I wanted to advise him of his constitutional rights and make him aware of them.

Q    Did you in fact advise him of his rights?

A    Yes, I did.

Q    How did you do that?

A    From the back of my I.D. card, Department I.D. card.

Q    Do you have with you this afternoon the I.D. card which you read to John Moss on October 28, 1980?

A    Yes, I do.

Q    Would you produce that for me please.

A    Yes.

MR. STUCKY:  Your Honor, I would ask that this be marked for identification purposes only as State's Exhibit No. 1.

THE COURT:  All right, it will be so marked.

(Whereupon, the document referred to was marked by the reporter as State's Exhibit No. 1.)

Michael Don Smith - Direct                    57

    Q    Trooper Smith, I'll show you what has been marked for identification as State's Exhibit No. 1 and ask you to identify that for the record. Can you identify that?

    A    Okay, this is my Department of Public Safety identification card.

    Q    Where do you get that?

    A    It is issued to us by our department.

    Q    And on the front of it it has what kind of information?

    A    It has "The West Virginia State Police", who I am, my height, weight, unit number and date of birth.

    Q    And on the reverse side of that, what information is contained?

    A    It is a Miranda warning.

    Q    What is the purpose of that being on the back of the card, if you know?

    A    So that we will have it available any time we want to advise a suspect or accused of his rights.

    Q    In your training to perform your duties as a West Virginia State Policeman, are you instructed on the necessity of advising people of their rights before asking them any questions in an investigation?

    A    Yes, we are.

    Q    And are you trained further in how to advise people of their rights?

Michael Don Smith - Direct                                    58

    A    Yes.

    Q    What instructions are you given as to the use or when

or how to use that particular card?

    A    Well, I think it is, for the most part it would be when

they become at an accusatory stage is when I have always been

told you should advise them of their rights.

    Q    Are you told how to advise them of their rights?

    A    You can either use your card, or we also have forms at

the office.

    Q    On this particular occasion, on October 28, 1980, how

did you advise John Moss of his Miranda rights?

    A    While in the patrol car that particular day I advised

him of his rights from the back of this card I have here.

    Q    You read them to him?

    A    Yes, I did.  I read them off the card.

    Q    All right, would you read them to us in the same

fashion you did coming back in the car from Mansfield, Ohio, on

October 28, 1980.

    A    Okay, the card states that "You have the right to remain

silent and refuse to answer questions.  Anything you do say may

be used against you in a court of law.  You have the right to

consult with an attorney before speaking to the police and to

have an attorney present during any questioning now or in the

future.  If you cannot afford an attorney, one will be provided

Michael Don Smith - Direct                    59

for you without cost.  If you do not have an attorney available,

you have the right to remain silent until you have an

opportunity to consult with one.  Now that you have been advised

of your rights, are you willing to answer questions without an

attorney present?"

    Q    Were you able to observe John Moss during the period of

time that you were reading that card?

    A    Yes.

    Q    Did he appear to be listening to you?

    A    Yes, he did.

    Q    When you read the Miranda warnings, was it done in such

a fashion that John Moss could easily understand you and hear

what you were saying?

    MR. McKITTRICK:  Objection.  He cannot testify as to what

John Moss could understand.

    THE COURT:  That is true.  I will sustain it on that basis.

You can rephrase.

    Q    Was it done in such a fashion that John Moss could

easily hear what you were saying to him?

    A    I felt that I did it in such a fashion that John was

listening and that I read them in such a fashion that if he had

had any questions or wanted to say anything, he would have had

an opportunity to say so at the time I was reading the rights.

    Q    Did you say anything with regard to his rights other

Michael Don Smith - Direct                    60

than merely reading them off the card?

     A    After I finished reading them, I asked if he did have

any questions and also asked him if he fully understood what I

had read to him.

     Q    Did he indicate he understood the rights you had

advised him of?

     A    He acknowledged to me he had no questions and he did

understand.

     Q    Did he indicate he was willing to talk to you or give a

statement after being advised of those rights?

     A    Yes, he did.

     Q    What did you do after that?

     A    I simply asked him or made him aware of the fact that

we were concerned with some crimes that had happened in

West Virginia and that I felt like he could help clear them up

or give us some answers as to how they came about occurring.

     Q    Did there come a time when he told you about the so-

called Reggettz murders, the murders of Vanessa and her two

children?

     A    Yes.

     Q    Would you relate to me how that took place?

     A    Well, when we got to the Parkersburg Detachment, we

stopped there.  And he was advised of his rights from a

Department of Public Safety form.

Michael Don Smith - Direct                    61

Q    I don't want to jump ahead.  Did he tell you anything
about the Reggettz murders in the car from Mansfield until you
got to Parkersburg?

A    No, he didn't.

Q    He didn't make any mention of it?

A    No, sir.

Q    And the reason for that was what?

A    The reason for that was I really didn't ask him about
the Reggettz murders.  I only stated that there was a very
serious and important crime I wanted to talk and discuss with
him about and wanted to know if he would agree to talk with me
about it.  And he did agree, and I told him I felt we would just
wait until we got to Parkersburg to talk about it.

Q    So at that point there was no questioning by yourself or
any information given by Mr. Moss regarding the Reggettz murders
from that time until you got to Parkersburg, West Virginia; is
that correct?

A    That is correct.

Q    Approximately how long a period of time was that?

A    A couple of hours probably, two or three.

Q    Once you arrived in Parkersburg, West Virginia, what
did you do?

A    We allowed all of ourselves the opportunity to go to a
restroom, got some coffee or water and made preparations to have

Case 2:09-cv-01406 Document 17-15 Filed 10/29/10 Page 65 of 122 PageID #: 2886

some food and drink brought to us, meaning the three of us,

myself, John and Trooper Williams, and also got a DPS Waiver of

Rights form, a Miranda form.

    Q    So that the record is clear, I know you have testified

to this on numerous occasions, where did you stop at

Parkersburg?

    A    At the state police detachment.

    Q    Where is it located, if you know?

    A    Approximately a mile off of Interstate 77.

    Q    That was where you made the arrangements for restrooms,

food and drinks; is that right?

    A    Yes, and also to gas our vehicle.

    Q    Was food provided to Mr. Moss?

    A    Yes.

    Q    Was he allowed to go to the restroom?

    A    Yes.

    Q    Was he provided any other amenities that you can

recall?

    A    I don't remember whether we got him any cigarettes, but

I recall him smoking.

    Q    Can you recall anything that he requested that wasn't

provided to him?

    A    No.

    Q    Approximately what time did you arrive at the

Michael Don Smith - Direct                          63

Parkersburg Detachment, if you recall?

    A     Probably around 6:00.

    Q     P. M.?

    A     P. M.

    Q     Did you immediately begin questioning Mr. Moss when you arrived?

    A     Probably within ten to fifteen minutes after that; after we went to the bathroom and got coffee and cokes, whatever was available at the office at that time before the food came from a restaurant.

    Q     Prior to questioning him at the Parkersburg Detachment, was he advised of his rights again or not?  What was done with regards to that?

    A     Prior to the detachment, before the arrival?

    Q     No, prior to questioning him at the detachment.

    A     Yes, he was advised of his rights concerning any crimes.

    Q     Who did that?

    A     I witnessed Trooper Williams.

    Q     How was that advising of rights done?

    A     With a Department of Public Safety form which we have.

    Q     Did John Moss sign that form?

    A     Yes, he did.

    Q     Do you have that form with you?

Michael Don Smith - Direct                         64

A    I believe it is in this report right here.

MR. STUCKY:  Your Honor, I would ask that this DPS Form 79,

dated 10/28/80 be marked as State's Exhibit No. 2 for

identification purposes for this hearing.

THE COURT:  It will be so marked.

(Whereupon, the document referred to was marked by the

reporter as State's Exhibit No. 2.)

MR. STUCKY:  For the record I probably should show it was

marked on September 24, 1982, as State's Exhibit No. 4 in the

transfer hearing and is in fact the same document.

Q    I show you what has been marked as State's Exhibit No.

2 and ask you to identify that please.

A    Yes.  This is the form that we gave to John, and I

witnessed at the Parkersburg Detachment.

Q    At the top of it it has a date, place and time, and

these are filled in with ink; is that right?

A    Yes.

Q    Do you know who filled that in?

A    Trooper Williams.

Q    Did you watch him fill that in?

A    Yes, I did.

Q    Would you read to us what that says.

A    "Parkersburg State Police Detachment, 10/28/80, 6:50

p.m., Eastern Standard time."

Michael Don Smith - Direct                    65

     Q     And there is a subtitle there "Your Rights" which goes

down six different paragraphs, and then there is another

subtitle there "Waiver of Rights", and it says "Signed" and

there is a signature there; is that right?

     A     Yes, there is.

     Q     Whose signature is that?

     A     John Moss, III.

     Q     Do you know who put that signature there?

     A     John Moss, III did.

     Q     Did you watch him put that signature there?

     A     Yes, I did.

     Q     That is the gentleman you previously pointed out in the

red coveralls?

     A     Yes.

     Q     And then there is a place for witnesses to sign, and it

is signed by two individuals.  Who are they?

     A     Myself and Trooper Williams.

     Q     Is there a time on there?

     A     Out from Trooper Williams' name it says 6:57 p.m.

     Q     Which would indicate it took some seven minutes to

complete reading that particular form and for John Moss, III to

sign it; is that correct?

     A     Yes.

     Q     Once that document was completed, what, if anything,

Michael Don Smith - Direct                          66

took place?

    A    Oh, numerous questions and answers, questions that I asked and answers that John gave.

    Q    Were those questions and answers recorded in any fashion?

    A    Not at that time, no.

    Q    More of a conversation between you and John?

    A    What was taking place between John and I at that time, yes, sir.

    Q    You didn't have any tape recorders or secretaries writing things down?

    A    Not at that time, no.

    Q    You weren't writing things down as the answers were being given?

    A    No, sir.

    Q    At any time prior to this question and answer session, did you or anyone in your presence make any threats or promises to John Moss?

    A    No.

    Q    Did, at any time prior to your questioning, John Moss request an attorney?

    A    No.

    Q    Did he at any time indicate he didn't want to talk to you?

Michael Don Smith - Direct                    67

A    No, he didn't.

Q    At any time during the questioning did he indicate he wanted to stop and didn't want to talk to you any more?

A    No.

Q    At any time prior to this questioning did you try to trick John into giving you a statement or threaten him or do anything to make him give you a statement?

A    No, sir.

Q    Do you recall what the conversation you and John Moss had contained?

A    After the rights form?

Q    Correct.

A    Yes.  I asked him if he would give us some answers, that I felt he could give us some answers to the very serious thing that had occurred here in West Virginia, that I couldn't explain how serious, but that it was something very serious and we needed some answers, and I felt like he could give us some answers and help us get the issue straightened up and why.

Q    You say you didn't record the answers at that particular session.  Did there come a time later on you wrote down what John Moss told you?

A    Yes.

Q    When did you do that?

A    After returning from Ohio, which was not the next day

Michael Don Smith - Direct                    68

but would have been two days later.

   Q    So two days after you had the conversation you wrote

down what you remembered John Moss told you during that

conversation; is that correct?

   A    As well as I remembered.

   Q    Do you recall from your memory today what John Moss

told you with regards to the Reggettz murder investigation?

   A    I can remember -- Without referring to my notes I can

remember parts of it, yes.

   Q    By referring to your notes, would that refresh your

recollection as to what he told you on October 28, 1980?

   A    Yes.

   Q    Do you have those notes with you?

   A    There are some typed copies here, yes.

   Q    Would your refresh your memory with your notes and

then tell the Court what the conversation you had with John Moss

involved.

   (Notes examined by witness)

   Q    Trooper, I believe the question was would you now

relate to the Court what conversation you had with John Moss

after you advised him or after he signed the DPS Form No. 79 and

prior to another tape recorded statement.

   A    It was, of course, the conversation and the questions

and answers was about a very serious and important crime and as

Michael Don Smith - Direct                                    69

to why it happened. And John stated it happened because of the
fact that he had gotten scared. And I asked him what happened
in the very beginning. He stated he couldn't remember. I
stated "Try a little harder because it is very important." He
still stated he couldn't remember; he was having trouble. I
asked him where it was when he first started being scared. He
said, "On the tracks". I said, "Was that before or after it
happened?" He said, "After it happened". There was a question,
"Where were you at when you remember being scared before it
happened?" And he said, "At the back door." And I asked him,
"What happened then, right after you were at the back door; what
happened then?" He stated he couldn't remember.

     And the question was put to him, "What do you remember the
next day? What did you think the next day?" He said, "It
shouldn't have happened". And I asked the question to that,
"What do you mean it shouldn't have happened", or why do you
say it shouldn't have happened. He said, "Because of the kids".
I asked him, "Why because of the kids", and he said, "Because
they were so young". And I also asked if he could remember what
happened after he got in and at one time or another he said he
couldn't remember. And he was asked, "Was there anybody else in
the house." He said, "They were". And I asked who was that and
he said her and the kids. And it was asked, "Where were they at
when you went into the house?" And he remembered back and said

Michael Don Smith - Direct                          70

that they were in bed and he went on to say in effect in the

statement they were all in bed together and were asleep when he

first got in the house and that later on he first remembered

seeing her, the mother, near the bed with a pistol, and that

they got into a struggle and the gun went off, that he got

the gun from her, struck her with it, knocking her down, ran

from her out the back door, looked back, saw her doing something

there at the back door, and he was scared at that point and ran

back, forced his way in on her and they got into another

struggle, and he got cut with a knife on his finger.  They were

struggling again and the kids were pulling at him, hitting at

him, and he was pushing them back.  And that he tied her to a

door and got the little boy and had tied him up and put him in

the bathtub and then got the little girl and tied her up and

tied a cord around her neck and hung it over a door and closed

the door, which left her hanging.  It was asked of John as to

which door, and he said it was the door in the living room, and

as to which side of the door, and it was the side of the door

which faced a Christmas tree.

A lot of times you would have to ask like, "What did you do

next?"  That is when he said like when he went from the woman to

the child, he stabbed the woman in the chest with something.  It

was asked, "What was it you stabbed her with?"  He stated, "A

knife or something."  He was asked about, "Did you get anything

Michael Don Smith - Direct                          71

from the house", and "Why did you go to the house"? He said he

originally went to the house to get money, and he later told

that he took a gun, two guns, a rifle and a pistol, and that he

took a camera and some dishes and that he gave the dishes to a

friend of his mother, a Mrs. Johnson, who ran a motel, Town and

Country I believe, near St. Albans, that he had taken the

pistol and threw it away the next day after this had happened

at a dumpster or trash can there at the high school due to the

fact that it had been broken during the struggle when he hit the

lady with it.

The rifle he said he disassembled it and put it in a

suitcase with his luggage, and took it back to Cleveland, Ohio,

when he went back with his uncle and put it in a house there

where his mother and father resides, and also he had taken a

camera and placed it there too.

I remember asking if anyone had helped him, you know, during

this crime or anything. He said no, that he had performed the

crimes or had done it by himself and had no help.

Q      Is there anything else you recall John Moss telling you

at that time?

A      Recall what?

Q      That John Moss told you at that time.

A      Well, I have six pages of notes here, and I briefed

myself on about the first page and a half, just to bring my

Michael Don Smith - Direct                    72

memory back on some of it.  Some things were more detailed.

Like he went into the fact that there was water in the bathtub.

He placed him, the little boy, in the bathtub with his hands

tied.  He did that to make sure he was dead.  And he stabbed the

woman to make sure she was dead or wouldn't give him any

more problems.

     Q    I don't want to drag this thing out a lot, but I would

like for you to continue going through your notes and see if

there is anything else you haven't told the Court that John Moss

told you that evening at the Parkersburg State Police Detachment

in the oral conversation between yourself and John Moss.

     THE COURT:  All right, we will take a five minute recess

while you complete your study of the notes.

     (Whereupon, a recess was had in the proceedings.)

     (After recess.)

     THE COURT:  Show the resumption of these proceedings in

State of West Virginia vs. John Moss, Jr., also known as John

Moss, III, with all parties present heretofore present here

again, including the defendant and his counsel; the State of

West Virginia by her Prosecuting Attorney and Assistant

Prosecuting Attorney.

     Have the State and the defense agreed on any stipulations?

Where are we?

     MR. McKITTRICK:  Yes, we have, Judge.  And I think we can

save the Court at least a couple of days of evidence the way we are going to propose to do this. What we would like to do is stipulate into the record the second transfer hearing. There are, as I remember, three volumes of that hearing.

THE COURT: Just give us the dates please, if you could.

MR. McKITTRICK: September 24, 1982. It goes on to around the 27th. It is the 24th, 25th and 27th, Your Honor.

THE COURT: Of 1982?

MR. McKITTRICK: Of 1982.

THE COURT: And you want to make those a part of the record?

MR. McKITTRICK: Yes, we want to make those a part of the record for the purpose of addressing the suppression hearing on the blood and the confession and the camera, subject to my cross-examination of some of the State's witnesses. And it will be abbreviated, Your Honor. And subject to the State, if it wishes, to bring on evidence that may rebut some cross-examination that I may have.

THE COURT: Is that a correct representation, Mr. Stucky?

MR. STUCKY: I think that is correct, Your Honor. Basically, as I understand it, Mr. McKittrick is going to go into some issues or may go into some issues that weren't covered by this particular hearing. This was basically a Miranda type situation, voluntariness, informed consent, that sort of thing. I think Mr. McKittrick is going to basically be delving into an

74

area of a fruit of a poisonous tree type thing at this time that really wasn't covered -- It was covered briefly but not extensively in this hearing; and we have agreed to allow this to stand, for him to put on evidence and for us to come back with evidence rebutting or refuting the testimony he has regarding the fruit of a poisonous tree situation.

THE COURT: As I understand it, at the appropriate time, at trial you are going to move to have these transcripts made a part of the record?

MR. STUCKY: No, just for suppression, Your Honor.

THE COURT: Oh, just for suppression. All right.

MR. McKITTRICK: First, Your Honor, we would like for the Court to take judicial notice -- if I may approach the bench -- of an Ohio statute regarding the taking of blood tests on the 22nd day of April, 1980. I have shown a copy of that statute to Mr. Stucky and Mr. Brown, and they have no objection to the Court taking judicial notice of that statute.

MR. BROWN: That is correct, Your Honor.

MR. McKITTRICK: At a later time, Your Honor, so that the Court knows what we are doing, we intend to introduce into evidence a court order, pursuant to a petition of the Ohio authorities and West Virginia authorities to take blood, requesting from the Ohio court an order directing John Moss to give blood and saliva, which was done. We will introduce those

75

documents by Chuck Pettry, who was an Assistant Prosecuting
Attorney at that time.

THE COURT: But you want the Court to take judicial notice
of Ohio Statute 2317.47 relating to blood tests; is that
correct?

MR. McKITTRICK: Yes. And we would like to have that marked
and moved into evidence at this time.

THE COURT: I understand the State has no objection?

MR. BROWN: That is correct, Your Honor.

THE COURT: All right, the Court will allow the exhibit and
will take judicial notice of Ohio Statute 2317.47 relating to
blood tests.

(Whereupon, the document referred to was marked by the
reporter as Defendant's Exhibit No. 1.)

THE COURT: I assume you have finished your direct?

MR. BROWN: That's correct.

THE COURT: How long is your cross going to take?

MR. McKITTRICK: I don't know. I don't think more than
twenty minutes, Your Honor.

THE COURT: It is getting late.

MR. McKITTRICK: Does the Court recess at 4:00?

THE COURT: Normally. You have cross; they may have some
redirect --

MR. McKITTRICK: We can do it tomorrow.

THE COURT: That's what I'm getting at. I would rather have you start it fresh. The witness has been in the witness chair for two hours and ten minutes; and in fairness to him, I would prefer that we start fresh in the morning. That way I won't have to interrupt your cross nor any redirect that may take place.

Let me find out logistically where we are in the morning.

(Whereupon, a discussion was had off the record and resumed back on the record as follows:)

THE COURT: Gentlemen, I have been advised I have a bond hearing at 9:00 a.m. That shouldn't take long. I believe it relates to murder in the first degree?

MR. STUCKY: That is correct, Your Honor.

THE COURT: That shouldn't take more than fifteen or twenty minutes, and I expect to be prepared to begin with Mr. Moss at 9:30. So we will stand in recess until 9:30 in the morning.

And Trooper Smith, let me admonish you not to discuss your testimony in chief with anyone during the recess.

THE WITNESS: Yes, sir.

THE COURT: All right, we will stand in recess until 9:30 a.m.

MR. McKITTRICK: Your Honor, Mr. Moss has some physical evidence that he would like to introduce into the hearing tomorrow, if Bill Ankeney would assist him in going to his

77

personal property at the jail.  It is a Bible.

    DEPUTY ANKENEY:  He already has it.

    MR. McKITTRICK:  Okay.

    THE COURT:  Are there any other matters for the record
today?

    MR. McKITTRICK:  No, Your Honor.

    THE COURT:  All right, we will stand in recess.

- O -

    (Whereupon, a recess was had in the proceedings.)

- O -

78

PROCEEDINGS HAD ON

TUESDAY, SEPTEMBER 20, 1983

WHEREUPON, the proceedings in the Matter of STATE OF WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III, CR-82-F-221, were resumed on Tuesday, the 20th day of September, 1983, with all parties present as before noted, including the defendant and his counsel.

THE COURT: Show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts. The defendant is present in person and by counsel, Mr. McKittrick and Mr. Murray, heretofore employed on his behalf; the State of West Virginia by James Stucky, Prosecuting Attorney, and Peter Brown, Assistant Prosecuting Attorney for Kanawha County.

Okay, where are we?

MR. McKITTRICK: Trooper Smith.

THE COURT: Let me remind you, Trooper Smith, you are still under oath.

THE WITNESS: Yes, sir.

MR. BROWN: Your Honor, just one other matter. Out of an abundance of caution, the State is a little bit concerned about the transcript that this Court, that the Circuit Court held yourself involving the confession, the admissibility of the

Michael Don Smith - Cross                              79

confession which we more or less stipulated yesterday.  As I

understand it, Mr. McKittrick, or counsel for the defense, will

move that that be introduced into evidence himself; is that

correct?

    MR. McKITTRICK:  Yes, sir.

    THE COURT:  Oh, the confession?

    MR. McKITTRICK:  No, the transcript.

    THE COURT:  That was my understanding yesterday.  I think,

have you not already moved that.

    (Whereupon, a discussion was had off the record and then

resumed back on the record as follows:)

    THE COURT:  It has already been moved by defense counsel

that those transcripts be placed in evidence for the purpose of

this suppression hearing, without objection by the State.

    All right, Mr. McKittrick, you may proceed with your cross.

                       - 0 -

                          CROSS-EXAMINATION

BY MR. McKITTRICK:

    Q    Trooper Smith, I want to take you to January 30, 1980,

if you will.  To refresh your memory, on that date I believe you

went with another officer to the State of Ohio for the purpose of

extracting blood from John Moss; is that correct, sir?

    A    And other proof.

    Q    Excuse me.

Michael Don Smith - Cross                              80

    A    And other proof.

    Q    At the time that you went -- Where did you go in Ohio at that time?

    A    You mean where John was at?

    Q    To extract the blood from John.

    A    We went mainly to talk with John, not to extract blood. That was only if, you know, if we would be able to or he would voluntarily give that, and that was at a detention center.

    Q    And I believe you have already indicated to His Honor in a previous hearing that you talked to John about the Reggettz cases, and you talked to John about a felonious assault case; is that correct?

    A    Yes, briefly.

    Q    And it is a fair statement to say when you talked to John about the Reggettz murder cases he denied firstly that he knew who committed those murders and denied that he committed them. I think that is your previous testimony.

    A    He denied any knowledge of who or whether he or anybody could have committed them. He said he had knowledge that it had occurred.

    Q    When did it first enter your mind at that time to extract blood from John Moss?

    A    Well, I couldn't say exactly when it first entered my mind. I just, you know, simply asked him if he would volunteer

Michael Don Smith - Cross                                    81

to give it.

    Q    You are not telling His Honor here you went to Ohio

without the intention of extracting blood from John Moss on the

30th day of January, 1980 --

    A    I went with the intentions that possibly I could not

get the blood, yes.

    Q    Excuse me.

    A    I went with the intentions I possibly would not obtain

the blood, yes.

    Q    But it is a fair statement you went to Ohio on the 30th

day of January, 1980, prepared to extract blood from John Moss.

Isn't that a fair statement?

    A    If he was willing to give it, yes.

    Q    What did you take with you at the time you went to

extract the blood?

    A    We have a little tiny package which contains a little

metal stick type pin sort of thing that you prick your finger

with.

    Q    When you went to Ohio on the 30th day of January, 1980,

you knew John Moss was charged with a crime in the State of Ohio

at that time?

    A    Yes.

    Q    And in fact you even talked to the law enforcement

authorities in the State of Ohio about those charges?

Michael Don Smith - Cross                              82

    A    Yes.

    Q    And you knew that John Moss was being held in the
juvenile center on the 30th day of January, 1980 for the purpose
of awaiting disposition on the charges that were against him in
the State of Ohio. Isn't that a fair statement?

    A    Some sort of, some type of disposition I am sure, yes.

    Q    He hadn't been tried, and he hadn't pled guilty at that
time?

    A    No, sir.

    Q    Did you, before you went to the State of Ohio on the
30th day of January, 1980, contact John Moss' lawyer?

    A    No. It was my belief that he didn't have a lawyer.

    Q    You talked with the Ohio authorities, and you knew he
was charged with very serious felonies in the State of Ohio; but
it was your conclusion he didn't have a lawyer?

    A    I was told that.

    Q    And you didn't look any further than somebody telling
you that?

    A    No, sir.

    Q    Do you know when these felonies occurred in the State
of Ohio that John was charged with before you went up there on
the 30th day of January, 1980?

    A    Not an exact date, no.

    Q    Can you approximate it for His Honor?

Michael Don Smith - Cross                                      83

    A    I would think sometime within a two week period, but probably much closer than that.

    Q    Now, you did extract blood from John on the 30th day of January, 1980. Isn't that a fair --

    A    I let John do it.

    Q    Blood was extracted from John Moss?

    A    I obtained blood that John gave me, yes.

    Q    And later an Ohio Common Pleas Court suppressed that blood and made you and Trooper Williams give it back?

    A    I was ordered by a judge there to turn the sample over to a detective we were with at that time.

    Q    And the conclusion was you had violated John's constitutional rights at that time, and that is why you had to give it back?

    A    Well, I don't know whether I would call it that.

    Q    That is what the judge called it; you know that; don't you?

    A    The judge simply ordered me to give the officer the sample.

    Q    Now, after you took the blood, and when you went through this proceeding where the judge ordered the return of the blood so that you couldn't use the same for any purpose, John Moss was represented by counsel; wasn't he?

    A    Would you repeat that again.

Michael Don Smith - Cross                              84

THE COURT: Let the court reporter read it back.

(Whereupon, the last question was read by the reporter.)

A    When are you saying he was represented by counsel?

Q    In the proceeding where the court directed the return of the blood that you extracted from John Moss on the 30th day of January, 1980.

A    I don't remember John being down there when this occurred.

Q    I didn't ask you that. I asked you whether or not John Moss was represented by counsel.

A    I still can't answer that because John told me he didn't have an attorney; and I still don't know whether he had an attorney at that time. I still believe he did not.

Q    Did you attend any hearing concerning the blood before the court in Ohio?

A    I went before a judge --

Q    Are you --

THE COURT: Now wait a minute. You asked the question. Now let him answer it.

A    I went before a judge. I don't know who was representing John or if it was just someone out of their juvenile office there or who it was.

Q    But what you are telling us, the answer to my question is yes, John Moss was represented by counsel?

Michael Don Smith - Cross                                      85

    MR. STUCKY: Your Honor. He just said he didn't know.

    THE COURT: That is correct. That is not a fair characterization of the answer.

    Q    Was John Moss represented by some lawyer at that hearing?

    A    I am sure someone must have been speaking in John's behalf, stating they didn't want us to have the sample.

    Q    And you later found out that the person who was representing John was the same lawyer representing him --

    A    No, I didn't.

    Q    Let me finish my question --

    A    I didn't find out who that person was.

    Q    You later found out that the lawyer who was representing John in that hearing was the same lawyer who represented him on the charges pending against him in the State of Ohio; isn't that correct?

    A    I have no idea who that person was as to relating to John, who his name was or how he would be related to John in any type of case.

    Q    Before you went to the State of Ohio on the 30th day of January, 1980 for the purpose, for one purpose of extracting blood from John Moss, did you consult the Prosecuting Attorney's office of Kanawha County?

    A    I don't recall doing so, no.

Michael Don Smith - Cross                                      86

Q    Did you talk with your superiors?

A    I got permission to go.

Q    Then it is a fair statement to say that you got
permission to go to the State of Ohio but they did not approve
in any way your taking blood from John. Is that a fair
statement?

A    I simply told them that I wanted to go up there, you
know, to interview John, to see what we could find out. I don't
think they knew exactly what we had intentions of doing.

Q    And I think you testified in a previous hearing that
you took it upon yourself to extract this blood from John?

A    Yes.

Q    And the reason that you did that is because you wanted
to see whether the blood of John Moss was consistent with blood
found at the scene of the Reggettz murders.

A    With some of the blood found, with some.

Q    Trooper Smith, when you went to the State of Ohio on
the 30th day of January, 1980, you had indicated to His Honor in
a former hearing that at that time you had no physical evidence
or any other kind of evidence that led you to the conclusion
that John Moss committed the murders in the Reggettz home on the
13th day of December, 1979. That is a fair statement of what
you said; isn't it?

A    I can't say that they had any real physical

Michael Don Smith - Cross                                      87

evidence, no.

Q    They had no testamentary evidence whatsoever?

A    No, not at that time.

Q    And then you went back to the State of Ohio on the 22nd

day of April, 1980 and at that time you did extract the blood;

is that correct?

A    It was extracted, yes.

Q    From John Moss?

A    Yes.

Q    And that was what, three months later after the first

time you went to Ohio to extract blood from John Moss, among

other things?

A    Approximately three months.

Q    When you went to Ohio on the 22nd day of April, 1980,

you have also indicated to His Honor in a prior hearing that you

still didn't have any evidence or testimony of any kind that

led you to the conclusion that John Moss committed the Reggettz

murders on the 13th day of December, 1979; isn't that correct?

A    No, I don't believe that is correct.

Q    Is it your testimony when you went -- Is it your

testimony that matters changed between January 30, 1980, and

April 22 of 1980 with regard to evidence against John Moss

concerning the Reggettz murders?

A    I want to say more information, probable cause.

Michael Don Smith - Cross                    88

    Q    Excuse me.

    A    Information, or maybe you might want to call it
probable cause to believe --

    Q    You had more information?

    A    Yes.

    Q    What other information did you have?

    A    Well, you kind of have to put your information
together.  I mean I can't give you a simple yes, you know.

    Q    I want to --

    A    Do you want the information?

    Q    Yes.  I want to know what other information you had.

    A    The information, we put it together with the fact that
we had the newspaper clipping.

    Q    You had the what?

    A    The newspaper clipping.

    Q    From Cleveland?

    A    Yes.

    Q    Concerning the murder?

    A    Explaining the murder there and also the information to
the police department, the fact that this did occur.  No, not
the murder, the attempted murder.

    Q    Let's go over this carefully now.  You are telling the
Court you had a newspaper advertisement or a newspaper article
that indicated John Moss was charged with a crime in the State

Michael Don Smith - Cross                                    89

of Ohio?

    A    Along with information from the police department up there.

    Q    Along with information from the police department up where?

    A    Cleveland, Ohio.

    Q    Concerning what?

    A    Concerning crimes John had been involved in up there.

    Q    What did that have to do with the Reggettz murders?

    A    Well, the fact that he had attempted murder by strangulation, and we had strangulation murders concerning the Reggettz; the fact that John was close to where he resided; he was now a suspect, and almost considered an accused, in an attempted robbery and felonious shooting, wounding, at the Moose Club, which is also close to the Reggettz residence.

    Q    What did that have to do with the Reggettz murders?

    A    Well, like I said, you know, you would have to think it is very probable that a person who could be involved in what I just explained to you could very possibly be involved in the Reggettz murders.

    Q    Would you have been willing to go before a magistrate and get an arrest warrant for John Moss based on the fact that there was a felonious shooting at a Moose Club, based on the fact that you had an article that a crime had occurred in Ohio,

Michael Don Smith - Cross                                    90

and John Moss was a suspect and was charged with a crime in

Ohio? Is that what you are telling His Honor?

    A    No, I certainly am not.

    Q    In other words, you wouldn't have done that?

    A    No, I wouldn't have gone and got an arrest warrant.

    Q    You are a trained police officer, correct, in

investigations with regard to the facts and probable cause;

aren't you?

    A    I think we had probable cause there with the

information. There is a lot of difference, fluctuation between

an arrest warrant and search warrant.

    Q    You do agree that probable cause means reasonable

grounds to believe that someone committed a crime. Isn't that a

fair statement of what it means?

    A    You can use it in that case.

    Q    I am asking you --

    A    I am speaking of information for a type of search

warrant.

    Q    Are you telling His Honor that between January 30,

1980, and April 22, 1980, that you concluded that you had

probable cause to believe John Moss committed the Reggettz

murders because a felonious assault had occurred near the

Reggettz home and that you had an article from an Ohio newspaper

where a crime had been committed and John Moss had been charged

Michael Don Smith - Cross                            91

with a crime?  Is that a fair statement?

    A    I am telling you I had information I felt was good

enough to sign an affidavit to try to obtain the blood.  That is

what I am telling you.

    Q    And the information is the information I just

enumerated?

    A    That is the information I just told you.

    Q    And there is no other information that you had between

January 30, 1980, and April 22, 1980, other than those two

things, that is the article in the Cleveland newspaper and the

felonious assault; is that correct?

    A    There are some other things, I mean, that goes along

with what I'm telling you.

    Q    Well, what are they?

    A    Well, you have -- I explained the fact that John lived

close to where the Reggettz residence was at.  We had good

reason to believe he was involved in a crime at the Moose Club,

which is either as close as his residence to their residence or

closer, the fact that you had the strangulation, attempted

strangulation in Cleveland, and that you had the strangulation

at the Reggettz'.

    Q    Is there anything else?

    A    Not that I can recall right now.  There may be.

    Q    When did the Moose Club crime occur?

Michael Don Smith - Cross                                    92

 A  May of '80.

 Q  May, 1980?

 A  Yes.

 Q  That was after the Reggettz murders occurred, almost

five months --

 A  It was before.

 Q  May of '80?

 A  I'm sorry, May of '79.

 Q  The blood sample then that you received -- Well, let me

ask you this:  In the Moose Club crime that you talked about,

there was no blood sample taken; was there?

 A  No, not that I recall.

 Q  So there was no question that blood was not in issue in

the felonious assault case?

 A  You mean as for evidence in the assault case itself?

 Q  That's correct.

 A  No.

 Q  No, it wasn't an issue?

 A  Not in the attempted assault or the assault at the

Moose Club.

 Q  Blood was not an issue in any way?

 A  No.

 Q  When in time did you receive this article from the

newspaper in Ohio?

92

Michael Don Smith - Cross                         93

   A     Well, let's see, I went up there on the 30th, so it would have been on the 29th.

   Q     The 29th of what?

   A     January of '80.

   Q     When in time were you notified that the felonious assault occurred at the Moose Club in St. Albans, West Virginia?

   A     The night that it happened.

   Q     Which was before -- Which was before January 30, 1980; correct?

   A     Yes.

   Q     So you knew two of the three things that you assigned to His Honor before January 30, 1980, that being that you got the article in the newspaper on the 29th of January, and you knew about the felonious assault at the Moose Club back in May of 1979?

   A     Yes, I did.

   Q     The only thing that you are telling this Court that you found out after January 30, 1980, which you considered gives you reasonable belief that John Moss committed the Reggettz murders was that he lived close to the Reggettz house; is that correct?

   A     I think I told you that was all I could recall at that time, you know. I just thought of another thing, the fact that we were told by a, quote, close friend of John's that he wanted to burglarize the Reggettz home a couple of weeks before this

Michael Don Smith - Cross                              94

happened.

    Q    Because a friend told you --

    A    John's friend, a friend of John's.

    Q    A friend of John's?

    A    Yes.

    Q    Told you that John had told him he wanted to burglarize the Reggettz home, that gave you reasonable grounds to believe that John Moss committed the Reggettz murders; is that correct?

    A    Led me to believe he could possibly be involved or have knowledge of it in some way.

    Q    Did it give you reasonable grounds to believe that he committed the murders because somebody told you that he wanted to burglarize their house?

    A    A person could assume that, but you definitely wouldn't have enough you could go out and make an arrest on.

    Q    And you wouldn't have enough with that and the other things to arrest John Moss for murder and prove he is guilty of the murders?

    A    No, I wouldn't think so.

    Q    Now, Trooper Smith, when you returned from Ohio after January 30, 1980, when you were ordered to give back this sample of blood which you extracted from John, did you then contact the Prosecuting Attorney's office of Kanawha County and tell them what happened?

Michael Don Smith - Cross                          95

    A    I am sure I made either the Prosecutor, who was Mr.

Roark at that time, or the Assistant Prosecutor, Chuck Pettry,

aware of what happened.

    Q    Chuck Pettry was the one that was working on the

Reggettz murders at that time; is that a fair statement?

    A    He was assigned to it by Mr. Roark.

    Q    Do you remember your first meeting with Mr. Pettry

concerning the blood?

    A    No, but I would think it would have been maybe that

evening or the next day.

    Q    When you returned from Ohio on January 30 or

thereabouts?

    A    I am sure I would have touched base with him, you know,

made him aware of what we found out, what had happened, as soon

as possible.

    Q    But you hadn't talked to him before you went up there?

    A    No, sir.  Let me say I don't recall talking to him

before I went up there.  As far as I know, I don't have any

knowledge of discussing it with the Prosecutor's office before

going up there.

    Q    Did Mr. Pettry indicate to you in any way he would then

petition the courts in the State of Ohio to extract John's blood

for you?

    A    I don't know.  I am sure we may have discussed it.   I

Michael Don Smith - Cross                          96

know that -- I am sure it was probably discussed.  As to exactly

what was said, I couldn't tell you.

    Q    Do you remember that Mr. Pettry was formulating some

papers so that you could go back to Ohio and extract some blood

from John Moss on April 22, 1980?

    A    I'm aware that was being prepared by somebody.

    Q    When is the first time you were advised that those

papers were prepared and that you could go to the State of Ohio

and get this blood that you needed?

    A    I couldn't honestly tell you.

    Q    Do you know how long before you went it was in days or

weeks?

    A    The only thing I could tell you, I was maybe made aware

of it the week before that we were going up on such and such a

date or just told the day before that.

    Q    All right, what preparations did you make to go to

Cleveland, Ohio, on the 22nd day of April, 1980?

    A    Myself, I really didn't make any preparations as far

as, you know, I went up and met with the Prosecutor's office and

did whatever I was supposed to do as far as signing the

affidavit.  Then we would have left.

    Q    Now, did you come to the conclusion in your own mind

that because -- Strike that -- Were you aware that John Moss was

still charged with the crimes in the State of Ohio when you went

                                                        96

Michael Don Smith - Cross                                    97

there on the 22nd day of April, 1980?

    A    I am not sure.  I couldn't say what -- I'm not sure

what John's status was as far as -- He was still either charged

or had been convicted.

    Q    Did you not think that was relevant?

    A    He was still in custody.  That is all I can tell you.

    Q    Well, did you not even consider the fact that John may

still have been charged and have a lawyer representing him?

    A    Are we talking about the 22nd --

    Q    The 22nd of April, 1980, did you not think in your own

mind that it was important to consider whether John Moss was

still charged with crimes in the State of Ohio and had a lawyer

representing him on those crimes before you went up to

Cleveland, Ohio, on the 22nd day of April, 1980?

    A    I probably wasn't considering that much on it because I

was figuring the Prosecutor's office was handling the paper work

and whatever had to be done, so I really wasn't thinking that

much about it one way or the other.

    Q    I guess you figured in your own mind that the

Prosecutor's office would take care of those matters?

    A    I did.

    Q    Now, when you traveled to Ohio to extract John's blood

on April 22, 1980, were you accompanied by Chuck Pettry and

Trooper Williams?

Michael Don Smith - Cross                          98

    A    Yes.

    Q    Tell us what happened when you got to Cleveland, Ohio.

    THE COURT:  What was that date, Parrish?

    MR. McKITTRICK:  The 22nd of April, 1980.

    THE COURT:  Thank you.

    Q    Tell us what happened when you got to the City of Cleveland, Ohio.  What did you do?

    A    Okay, we went to an office and met with, it was either -- It was someone out of the Prosecutor's office, you know, there in Cleveland.

    Q    You went to the Prosecutor's office in Cleveland?

    A    We went somewhere.  It was connected with the detention center or justice center in Cleveland, and met with whoever we needed to meet with about the paperwork the Prosecutor's office had sent up.

    Q    Were you present at the meeting?

    A    I am sure I was.  I was with Mr. Pettry and Trooper Williams.

    Q    Who did you meet with?

    A    I couldn't tell you.

    Q    What was the purpose of the meeting?

    A    Concerning the paperwork that was prepared or had been prepared to get the blood.

    Q    Do you know anything about that?

Michael Don Smith - Cross                          99

    A    Not other than the fact that I signed an affidavit and

the Prosecutor's office handled the rest of it.

    Q    Now, had you had conversations with Mike Roark

concerning the extraction of John Moss' blood on the 22nd day of

April, 1980?

    A    Did I have a conversation with Mike Roark on the 22nd

day of April --

    Q    And any time prior to the 22nd day of April.

    A    I am sure I probably did.

    Q    Do you remember them specifically?

    A    It seems to me like, you know, I think I made, I can't

say.  I don't know whether I touched base with Mr. Pettry or

Mr. Roark after coming back on January 30.

    Q    Between January 30, 1980, and April 22, 1980, do you

remember specifically as you sit here today having any

conversations or meetings with Mike Roark, the Prosecuting

Attorney of Kanawha County, concerning the extraction of

John Moss' blood on April 22, 1980?

    A    No.  I can't say that definitely, no.

    Q    Now, after you met with whoever you met with concerning

the papers that you don't know anything about, where did you go

next?

    A    Okay, I said I didn't know anything about the papers.

I do know of the affidavit, which I am sure would have been part

Michael Don Smith - Cross                        100

of the papers.  And I do know that the Prosecutor's office had

prepared the papers for getting the blood from John and had them

sent up to Cleveland.  What transpired with the papers was

handled by Mr. Pettry, and I don't know anything about that.

Q      Did you sign the affidavit?

A      Yes, down here.

Q      You signed the affidavit in West Virginia?

A      Yes.

Q      And the affidavit that you are speaking of is the

affidavit that was appended to the petition to extract John's

blood?

A      I am assuming that it was probably sent with those

papers.  I am assuming that.

Q      You mean you don't even know why you signed the

affidavit?

A      Sure I know why I signed the affidavit.

Q      Why did you sign it?

A      For the information for why we were wanting to extract

the blood.

Q      So the reason for the affidavit you signed in Kanawha

County, West Virginia, was to send up to Ohio the reason that

you had to extract John's blood on April 22, 1980.  Is that a

fair statement?

A      Yeah, I would say that is probably a fair statement.

Michael Don Smith - Cross                    101

    MR. McKITTRICK:  I would like to have this marked.

    (Whereupon, the document referred to was marked by the

reporter as Defendant's Exhibit No. 2.)

    MR. BROWN:  Judge, that appeared to be attached to some

other papers.  We would prefer all those papers go in as one

exhibit; since they were all attached, they should all go in

together.  It would be more fair to the witness, Your Honor.

    THE COURT:  Yes, I perfectly understand, Mr. Brown.

    MR. BROWN:  We would like all the papers to be submitted --

    MR. McKITTRICK:  These papers were all put together by

staples.  The papers he refers to, Your Honor, is a brief filed

by an Assistant Prosecuting Attorney in Ohio, which has nothing

to do with the case.

    THE COURT:  You can argue that separately, if you are not

going to agree on what goes with what.  Make your motion and let

me hear argument.

    MR. BROWN:  We object, Your Honor.  There has been

discussion about various papers that were at the Hall of Justice

in Ohio and now the papers are being separated.  We just feel if

the witness knows there are some papers, he should be allowed to

see the papers.  He should be allowed to see all of them and all

the papers go into evidence.

    MR. McKITTRICK:  That's a fair representation, Your Honor.

    Q    Mr. Smith, let me ask you, did you read any memorandum

                                        101

Michael Don Smith - Cross                                    102

of law that anyone from the State of Ohio may have submitted to

the court pursuant to the extraction of John Moss' blood on

April 22, 1980?

    A    No, I don't recall reading any papers up there.

    Q    You didn't look at any of them?

    A    No, sir.

    Q    But you did look at your affidavit?

    A    No.

    Q    Before you signed it you looked at it and read it?

    A    Up there?

    Q    Before you sent it up there?

    A    Sure.

    MR. BROWN:  Your Honor, I would like to know if this witness

knows personally that his affidavit was present in Ohio.

    THE COURT:  Why don't you ask him that on redirect?

    MR. McKITTRICK:  I'll ask him to serve the purpose of

justice, Mr. Brown.

    Q    When you went up to meet with this fellow that you

don't know who he was and you said you saw the papers, did you

see your affidavit that you had signed down here in

West Virginia?

    A    No, sir.

    Q    So you don't know what the papers were for that you

were meeting about.  Is that what you are telling His Honor?

Michael Don Smith - Cross                        103

     A     That is what I told you.

     Q     Let me hand you what has been marked as Defendant's

Exhibit No. 2, as I was originally going to do, and ask you to

look that over carefully and tell us if that is the affidavit

that you signed here in the State of West Virginia?

     (Document examined by witness.)

     Q     Trooper Smith, do you have an answer to my question?

     A     Repeat the question again.

     THE COURT:  The court reporter will read the question.

     (Whereupon, the last question was read by the reporter.)

     A     Yes.

     Q     All right, that is the same Defendant's Exhibit 2

affidavit that you were advised was the reasons that you were

assigning for taking John Moss' blood on April 22, 1980; is that

correct?  You assigned, did you not, in the affidavit that you

signed, which has been marked as Defendant's Exhibit 2, the

reasons that you needed to take John Moss' blood, which you took

on April 22, 1980.  Isn't that a fair statement?

     A     I think it contains the information stating that we

had information for the reason we would want his blood.

     Q     In other words, Defendant's Exhibit 2 contains the

reasons that you needed John Moss' blood; does it not?

     A     I'm not sure.  The way you are saying that, I'm not

sure.

Michael Don Smith - Cross                                104

    Q    I didn't say it; you said it a little while ago,

Trooper.  You said the affidavit you signed was the reasons for

which you needed John Moss' --

    A    I didn't say reasons.  I said information.  I stated

that information, and I think that contains it.

    Q    Contains the information?

    A    Yes.  For the most part, yes.

    Q    What kind of information?

    A    What I repeated to you earlier.  The fact that where he

resided, what had occurred, and what had occurred in Cleveland,

what other information we found out, his friend, what his friend

had told us, the fact that he was here when it happened, the

fact that he left shortly after that.

    Q    Where does it say anything in this Defendant's Exhibit

2 about John Moss' friend?

    A    Well, I think if you will read this whole thing it

states --

    MR. BROWN:  Excuse me, Your Honor.  Has that document been

introduced into evidence?

    THE COURT:  I don't think so.

    MR. McKITTRICK:  Not yet.

    MR. BROWN:  I don't think it is proper to cross-examine from

a document --

    MR. McKITTRICK:  I move the introduction of Defendant's

Michael Don Smith - Cross                          105

Exhibit No. 2 into evidence.

    MR. BROWN:  Objection.

    THE COURT:  Overruled.

    MR. BROWN:  Your Honor, may I explain something to the

Court?  The Court didn't get to see all of the --

    THE COURT:  The Court didn't get to see anything at this

point.

    MR. BROWN:  May I approach the bench?

    THE COURT:  Certainly.  You guys have been passing back and

forth --

    MR. McKITTRICK:  Your Honor, I'm sorry.  My apologies.

    MR. BROWN:  You will notice at the bottom of Defendant's

Exhibit 2 a volume number and a page number.

    THE COURT:  I can't even read it frankly.  Is it 387 at 894?

    MR. McKITTRICK:  The only reason we have introduced it is

for the sole purpose he identified it.  I am not even into this

yet.  That is not saying I won't get into it.

    THE COURT:  I don't even have this.  The only thing I have is

the trooper's affidavit.

    MR. BROWN:  If you will notice, this is all one sheaf of

papers with the same volume which indicates apparently it is all

one document.  The items all run together.  See the page

numbers, 799, 800, and they just go along with this affidavit --

    THE COURT:  The affidavit is part of that?

Michael Don Smith - Cross                                    106

MR. McKITTRICK:  No.

MR. BROWN:  Yes, Your Honor, that is our feeling, that the affidavit is part of all the orders concerning this blood extraction --

THE COURT:  I overruled the objection by the State.  If you want to move it later, Pete, you can go ahead and move it.  Note the objection of the State.  The objection is overruled.

Q    The fact is that there is nothing in Defendant's Exhibit No. 2 that says anything about John Moss' friend indicating to the state police that John Moss told his friend that he wanted to burglarize the Reggettz home; does it?  Does it?

A    Exactly what you said, the way you said it, as to your words, that is not there.

Q    It says nothing about John Moss' friend, doesn't characterize John Moss' friend in there, doesn't call him by name or even say that John Moss had a friend; does it?

A    No, it doesn't.

Q    In fact, it doesn't say that you got an article from Ohio; does it?

A    No, well, maybe I had better look at it again.

Q    Do you want to look it over again?

A    Yes.

(Document examined by witness.)

Michael Don Smith - Cross                                    107

    A    No, it doesn't say I have an article or that we have an article from Ohio.

    Q    But it does say that John Moss was a suspect in a felonious assault in West Virginia; doesn't it?

    A    Suspect in a certain armed robbery which occurred in Kanawha County, West Virginia.

    Q    That is the felonious assault at the Moose Club they are talking about; isn't it?

    A    Yes, I am sure it is.

    Q    Now, based on the fact that John Moss was a suspect in the felonious -- Do you know of any other armed robberies?

    A    No, sir.

    Q    Based on the fact that John Moss was a suspect in the felonious assault at the Moose Club, that would not give you reasonable grounds to get a warrant for the murders of the Reggettz family, would it, against John Moss?

    A    No, sir.

    Q    And it doesn't say, does it, that John Moss lived in any close proximity to the Reggettz house; does it?

    A    If you say it doesn't --

    Q    Do you want to look at it again?

    A    Yes, sir.

    (Document examined by witness)

    A    It says he lived in St. Albans, Kanawha County, at the

Michael Don Smith - Cross                              108

time of the homicides and left shortly thereafter.

    Q    Let's see if you can answer my question, my question

specifically, and listen to it first.  It doesn't say John Moss

lived in close proximity to the Reggettz home; does it?

    A    If you want, you know, if you want to get down in

specific areas, inside St. Albans, no, it wouldn't.

    Q    Do you know how big the city limits of St. Albans,

West Virginia, is?

    A    I have an idea.  I live there.

    Q    How big is it?

    A    Seven or eight miles.

    Q    And do you know the population of St. Albans,

West Virginia?

    A    No, I don't.

    Q    You don't know that because you live there?

    A    No, I don't.

    Q    Now, did you indicate to His Honor that you did not

have an opportunity to observe the papers that were at this

person's office in Ohio that you and Pettry and Williams went to?

    A    I wouldn't say I didn't have an opportunity to do so,

but I don't recall, you know, having any dealings with those

papers up there.

    Q    You don't know what they are?

    A    No, I don't.  I couldn't honestly say I knew exactly

Michael Don Smith - Cross                                    109

what was there, no.

    Q    Whatever papers they were, Trooper Smith, did you pick

them up at that time and take them with you?

    A    No -- Up there in Cleveland?

    Q    Yes.

    A    No. I don't recall doing anything like that, no.

    Q    Did Mr. Pettry take them with him?

    A    I would assume that he did. He was handling it.

    Q    When you were in his presence, as you indicated to the

Court, were they handed to him so he could take them with him?

    A    I couldn't tell you that. I don't recall that.

    Q    When you left the meeting, whose purpose it was to meet

on these papers, where did you go next?

    A    We went over to I believe it was the detention center

where arrangements had been made to meet with the people who

were going to take the blood from John.

    Q    By the way, other than meeting about these papers, did

you do anything else in that meeting?

    A    I don't remember doing anything.

    Q    In other words, you went there, whatever the papers

were about was the only purpose of of the meeting, you left and

you went to the detention center where John Moss was?

    A    The justice center. I don't think that is necessarily

the detention center. It may be connected with one or

Michael Don Smith - Cross          110

something.

     Q     Okay, did you contact the parents of John Moss before you went to the State of Ohio?

     A     No.

     Q     You knew that John Moss was still a juvenile under West Virginia juvenile law at that time; didn't you?

     A     As far as charges he would have still been considered a juvenile. He was still a juvenile at that time.

     Q     So you knew, in answer to my question?

     A     Yes.

     Q     Now, did anyone from the State of Ohio accompany you to where John Moss was incarcerated?

     A     I remember someone going with us, yes.

     Q     Who was it?

     A     It was either another police officer or someone from the Prosecutor's office. There was someone, you know, that took us to where we needed to go.

     Q     Did the person who accompanied you, Trooper Williams and Chuck Pettry to where John Moss was accompany you for the sole purpose of transporting you to where John was?

     A     I couldn't tell you that. I don't know what his sole purpose was, or maybe he had something to do with the paperwork or extracting the blood or what.

     Q     In your presence did that person who accompanied you

Michael Don Smith - Cross                               112

institution, the physical facility --

    A    I would say probably an hour.

    Q    An hour.  All right now, I want you to tell His Honor

in chronological order what you did in that hour's time.

    A    Well, we walked into the building and we had to either

meet somebody there or waited on somebody.  I remember being in

the downstairs area for a short time.  I remember that we had to

go up an elevator, and we had to be let in an area, a downstairs

area, a lower level.  And there were some bars and a gate there.

    Q    Who did you have to meet?

    A    I think we met a detective.

    Q    All right, what was the purpose for your meeting the

detective?

    A    For some reason or other, he was going up with us.

    Q    You don't know the reason?

    A    No, sir.

    Q    Okay, then what happened?

    A    Okay, we were upstairs, and the time it took was

just for them, whoever they were that was going to take his

blood, to get their things, to do it and hand it over to Trooper

Williams, you know.  That is basically all I can remember about

that.

    Q    And then you left immediately?

    A    Shortly thereafter.

Michael Don Smith - Cross                    113

    Q    All right now, when you were in the presence of

John Moss, who was present there?

    A    I remember Trooper Williams and Mr. Pettry.

    Q    Who else?

    A    And as far as any names, it seems like there was a lady

there.  She may have been a nurse or a nurse's assistant or

something like that, and either a doctor or whoever, a type

person that was qualified to take the blood; and I believe a

detective was there also.

    Q    Were you present when the blood was taken from John?

    A    I remember seeing them take blood from John.

    Q    How was the blood taken from John?  Tell His Honor --

    A    As far as I remember, it was taken out of his arm.

    Q    How much blood was taken, approximately?

    A    Three or four tubes maybe.  I'm not sure.  I know we

got two.

    Q    You got two tubes?

    A    Two small tubes, containers.

    Q    Did anyone else take any tubes?

    A    I can't recall.  I don't remember for sure

    Q    In other words, what I'm asking you is this:  When they

took the blood out of John, they put the blood in tubes, and

they gave it to Trooper Williams immediately.  Is that a fair

statement?

Michael Don Smith - Cross                      114

    A       We received some in tubes.

    Q       Did you receive them at the place where the blood was
taken?

    A       Yes, right there in the room.

    Q       Did you see any blood given to anyone else besides
Trooper Williams?

    A       No.

    Q       What did Trooper Williams do with that blood?

    A       He marked it.

    Q       Okay.

    A       And kept it until we got back to South Charleston.

    Q       Did he put it on his person?

    A       Well, I am sure he kept it somewhere on him.  I don't
know whether he put it in a pocket, held it in his hand, or
where he kept it.  But he kept it.

    Q       And when you brought the blood back to Charleston,
West Virginia, you did bring it back to Charleston,
West Virginia; didn't you?

    A       Trooper Williams did.

    Q       When did he bring it back; do you know?

    A       We came back the same day.

    Q       The same day.  And did you then give it to the lab?

    A       I am sure he submitted it to the lab as soon as we got
back.

Michael Don Smith - Cross                                    115

   Q    Do you remember who extracted the blood from John Moss?

   A    No.

   MR. McKITTRICK:  That is all the questions I have, Your

Honor.

   MR. BROWN:  Could we have about five minutes?

   THE COURT:  Sure.  We will take a five minute recess.

   Trooper Smith, I admonish you not to discuss your testimony

with anyone during the recess.

   (Whereupon, a recess was had in the proceedings.)

   (After recess.)

   THE COURT:  Show the resumption of these proceedings in

State of West Virginia vs. John Moss, Jr., also known as John

Moss, III, with all parties present heretofore present here

again, including the defendant and his counsel.

   I thought you had finished your cross.

   MR. McKITTRICK:  I just have a couple of questions,

Your Honor.

   THE COURT:  Omitted questions?

   MR. McKITTRICK:  Yes.

   THE COURT:  Go ahead.

MR. McKITTRICK CONT:

   Q   On the 22nd day of April, 1980, when the blood was

extracted from John Moss, how long in time were you in John

Moss' presence?

Michael Don Smith - Cross                                116

A     Twenty or thirty minutes maybe.

Q     Were you in the presence of Mr. Pettry and Mr. Williams from the time that you entered the institution where John Moss was incarcerated until the time that you left the institution?

A     I stayed with Trooper Williams and Mr. Pettry the whole time.

Q     Now, during this twenty or thirty minutes that you were in John Moss' presence, tell His Honor what occurred.

A     Well, I'm going to tell you just what I told you a little bit ago. I only remember being up there, standing around waiting, you know, until they got their preparations, whatever they had to do to draw the blood from John. Like I'm telling you, it seemed like it was like twenty or thirty minutes. It could have been fifteen minutes.

Q     Let me ask you this: During that twenty, thirty or fifteen minutes you were in John's presence at all times because Trooper Williams and Pettry were there. Is that a fair statement?

A     There is a room, a small room. It seems like one room connected to another. So I could have stepped in or they could have stepped into this room, like ten feet or eight feet apart, and you could have been, you know, out of sight from the other.

Q     Well, were you?

A     I don't know. I am just saying we were all up there

Michael Don Smith - Cross                              117

together, you know, where John was at, and the room where

they took him from the bench or wherever he was setting, to set

him down to draw the blood from.

    Q    My question to you is during the twenty or thirty or

fifteen minutes that you were all in John's presence, were you

there at all times?

    A    I'm telling you that I was with Trooper Williams and

Mr. Pettry upstairs where they had John to take the blood from

him.

    Q    And you were there at all times?

    A    I was up there with them at all times.

    Q    Did you hear any conversations with John Moss while you

were present during that fifteen, twenty or thirty minutes?

    A    I remember speaking to him about how he had been, you

know, looked like he had gained some weight, and that is about

it, just a few words, how are you doing.

    Q    Do you remember anything else said by anyone else in

your presence while you were there?

    A    I don't recall whether anyone actually said anything to

him or not, you know, as far as speaking to him.

    Q    All right now, did someone who was present have the

court order from the State of Ohio to take John Moss' blood?

    A    I'm not sure who had what.

    Q    Your answer is you don't know?

Michael Don Smith - Redirect                    118

     A     I don't know.

     MR. McKITTRICK:  That's all the questions I have.

     THE COURT:  Redirect?

                         - O -

                              REDIRECT EXAMINATION

BY MR. STUCKY:

     Q     We are talking about two different occasions, one on

January 30, 1980, and April 22, 1980.  The blood that you

received or Trooper Williams received on January 30, 1980, from

John Moss, you never had that examined or tested in any fashion;

did you?

     A     That was handled by Trooper Williams submitting it to

the lab.

     Q     January 30, 1980 --

     A     Oh, January 30, 1980.

     Q     Yes.

     A     No.  I gave that to an officer in Ohio, and that is the

last time I saw it.

     Q     No information in your investigation was obtained as a

result of that blood being given to you and returned back to the

authorities in Ohio; was it?

     A     No, sir.

     Q     In fact, you only had it in your possession a very short

period of time?

Michael Don Smith - Redirect                    119

A    Yes.

Q    Now, on April 22, 1980, I believe you told Mr.
McKittrick that you went up to Ohio with Trooper Williams and
Chuck Pettry; is that correct?

A    Yes.

Q    The only purpose for you and Trooper Williams going was
to maintain the custody of the blood; was it not?

A    Yes.

Q    You weren't there to get the blood or take the blood or
talk to John Moss or talk to the authorities in Ohio or anything
else?

A    Only for us to receive it once it was done.

Q    So you really weren't paying any attention on medical
things or legal things.  You were just standing there waiting
for the blood to be handed to you so you could head back to
West Virginia; is that correct?

A    That is correct.

Q    Mr. McKittrick asked you a bunch of things about what
you gained from January 30 to April 22, and the information that
you knew or had reason to believe John Moss was involved with
the killing of the Reggettz family, and you listed that you had
a newspaper clipping from Cleveland.  How did you get that
clipping?

A    That was given to me by a man by the name of

Michael Don Smith - Redirect                        120

Arthur Moss, who from what information he gave me, is related to

John.

    Q    He is in fact the uncle of John Moss; isn't he?

    A    To my understanding.

    Q    And he gave you the information at that time that you

ought to look into John as being a suspect in the Reggettz

murders --

    MR. McKITTRICK:  Objection, firstly on leading, and

secondly it calls for an answer based on hearsay.

    THE COURT:  Well, number one, I am going to sustain

the leading.  Rephrase the question.

    Q    What information did Arthur Moss give you?

    MR. McKITTRICK:  Objection.

    THE COURT:  Overruled.

    A    Arthur Moss gave me a newspaper clipping which

contained information about where John had been charged or a

juvenile had been charged in Cleveland on various charges,

attempted murder, rape, and Arthur told me that this clipping,

that he had got it from either the family or he had obtained it,

and it was concerning his nephew who was John Moss, and the fact

that he had been living here when this occurred, and he had been

staying with Arthur's father, who was John's grandfather, and

that the residence was close as far as the location from their

home to the Reggettz home.