**MOSS v. BALLARD
CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 22
(CONTINUATION, pp. 121 - 240)**

Michael Don Smith - Redirect                    121

THE COURT: Now, I'm going to let that in for this suppression hearing; but I wouldn't let anything like that in in front of a jury.

MR. STUCKY: I understand.

MR. McKITTRICK: Objection based on hearsay.

THE COURT: Well, this is a suppression hearing, and I'm going to let it in for the reasons aforesaid. But of course, I would not let something like that in before a jury.

MR. STUCKY: Again not going to the truth of the matter, but he had information given to him.

THE COURT: I have let it in for purposes of this suppression hearing, Mr. Stucky; but if it were before a jury, I doubt seriously that I would.

Q    Did you receive information as to when and how John Moss left the St. Albans area?

MR. McKITTRICK: Show my objection to the hearsay.

THE COURT: Overruled.

MR. STUCKY: There is no hearsay there. I said did you receive information.

MR. McKITTRICK: It requests an answer based on hearsay, did you receive information.

THE COURT: Again I want to emphasize, since all of you are so good at making records, this is for the suppression hearing only, and hearsay would not be admitted before a jury at trial.

Case 2:09-cv-01406 Document 17-16 Filed 10/29/10 Page 3 of 122 PageID #: 2946

Overruled on the grounds it is being admitted for suppression

only and not for the guilt or innocence of this accused.

A     I received information that he had went back to

Cleveland to his parents' home by transportation with some of

his relatives here in the St. Albans area and that he had left

shortly after the Reggettz murders, just right before Christmas,

and hadn't returned and was making no plans on returning as far

as anyone knew.

Q     And I believe you testified, not to Mr. McKittrick but

on prior occasions, that you learned that some flatware was

given to a lady by John Moss as a Christmas present; is that

correct?

A     Yes.  We obtained some flatware from a lady and found

out it had been given to her by John Moss.

Q     And you had some information some flatware had been

stolen from the Reggettz residence at the time of the murders?

A     No, I can't say that we had information that flatware

had been taken.

Q     What information did you have at that time?

A     As far as the flatware goes?

Q     Yes.

A     Nothing other than the fact that it had been given to a

lady as a Christmas gift by John.

Q     When did you learn anything had been taken from the

Michael Don Smith - Redirect                    123

Reggettz residence?

   ·A    Within the same day or a day or two after the crime occurred we knew of some articles missing.

   Q    What articles did you know were missing?

   A    Two weapons were missing.

   Q    Anything else?

   A    No, not at that time.

   Q    You testified that you learned or that a camera and flatware were taken from the Reggettz residence.  When did you learn that?

   MR. McKITTRICK:  Objection.  That is leading.

   THE COURT:  Sustained.

   MR. McKITTRICK:  He has already asked the question, and he answered it.

   THE COURT:  I will sustain it as to leading.  You can rephrase it.

   MR. STUCKY:  Your Honor, when -- That is not a yes or no --

   THE COURT:  Let the court reporter read it back, and you tell me whether or not it is leading.

   (Whereupon, the last question was read by the reporter.)

   MR. STUCKY:  When is not a yes or no --

   THE COURT:  I stand corrected.  Overruled.  The question was properly phrased.  Go ahead.

   A    I would say my first knowledge of that was after

Michael Don Smith - Redirect                          124

speaking to John.

    Q    At which time speaking to John?

    A    At which time?

    Q    When you took the confession or statement that is in
issue in this suppression hearing --

    A    The interview confession that was taken at Parkersburg.

    Q    So prior to that you didn't know that a camera
or flatware, dishes, had been taken from the Reggettz residence?

    A    We knew that there were two guns missing, but we didn't
know at that time that there was a camera and flatware.

    MR. STUCKY:  That's all I have, Your Honor.

- O -

RECROSS-EXAMINATION

BY MR. McKITTRICK:

    Q    What was the date that you talked to Art Moss?

    A    The date?

    Q    The date.  Look on your activity if you don't know.

    A    The 29th.

    Q    Of what?

    A    As far as the clipping goes, the 29th.

    Q    The 29th of January, 1980?

    A    The 29th of January, 1980.

    Q    Is that your answer?

    A    Yes.

Michael Don Smith  -  Recross                    125

    Q    All right now, what made you come to the conclusion
there was two weapons missing from the Reggettz home?

    A    We knew that from back in our initial investigation,
back when it first started.

    Q    What led you to that conclusion?  You told the Court
that --

    A    We had knowledge that Mr. Reggettz owned, or that there
were two guns that should have been in that residence that
wasn't.

    Q    You got that knowledge from Mr. Reggettz?

    A    No.  I said we had knowledge that Mr. Reggettz either
owned two guns or that there was two guns at that residence that
we could not find, so we assumed there were two guns missing.

    Q    Where did you get that knowledge?

    A    Where did we get that knowledge?

    Q    Yeah.

    A    That was told to me by other officers.  It was just
common knowledge to me during the investigation that there was
some guns missing from the residence.

    Q    You were one of two chief investigating officers on
this case, correct, not including the lab people?

    A    There was other people involved, but I would say that
myself and Trooper Williams was the main officers that
investigated it.

Michael Don Smith  -  Recross                      126

    Q    All right, what I am asking is where, from whom did you get that information that there were two weapons missing from the Reggettz house?

    MR. STUCKY:  Objection to the hearsay.

    THE COURT:  Overruled.  Go ahead.

    A    I remember Trooper Williams telling me.

    Q    Trooper Williams told you?

    A    Uh-huh.

    Q    Where did he get it from?  Do you know?

    THE COURT:  If he knows of his own personal knowledge.

    Q    Do you know?

    A    I know it came originally from information they had got, and when I say "they" I am talking about either Trooper Williams or another trooper by the name of Woodyard would have gotten from Mr. Reggettz.

    Q    In other words, what you are telling the Court, the conclusion that you came to and the other officers came to that there were two weapons missing out of the Reggettz home that day after -- Let me start over -- When you came to the conclusion the day after the Reggettz murders occurred that there were two weapons missing out of the home --

    A    There had been a discussion about weapons at the Reggettz home.  We couldn't find the weapons that had been discussed so then later we went and checked records and serial

Michael Don Smith  -  Recross                127

numbers and got proof of where these guns had been in the

ownership of Mr. Reggettz, that is the same guns I'm telling you

we couldn't locate.

    Q    But what I'm asking you is when you came to the

Reggettz home you didn't know what was in the Reggettz home --

    A    I didn't go to the Reggettz home.

    Q    When Mr. Williams, Trooper Williams and every other

trooper that was in the home, Prosecuting Attorney Mike Roark,

whoever, when they went to the Reggettz home, they didn't know

what was in there beforehand; did they?

    A    I doubt if they did.

    Q    All right now, how did you find out that there were two

weapons in there that were missing?  That's what I am asking

you.

    A    I just told you, from talking to the troopers.  After

they had talked to Mr. Reggettz they went down and looked later,

and the guns were not there.

    Q    Then it is a fair statement to say pursuant to Paul

Reggettz' confession that he murdered his wife and children the

troopers concluded two weapons were missing from the home?

    MR. STUCKY:  That is not what he said.

    MR. McKITTRICK:  I'm asking.  This is cross-examination.

    MR. STUCKY:  You said then it is fair to conclude.

    MR. McKITTRICK:  I am asking --

Michael Don Smith  -  Recross                    128

     THE COURT:  Read the question back.

     (Whereupon, the last question was read by the reporter.)

     THE COURT:  I am going to sustain the objection.  You are

asking what other troopers concluded.

     MR. McKITTRICK:  Judge, he said other troopers told him.

     MR. STUCKY:  Judge, he doesn't know where it came from.

     MR. McKITTRICK:  He said they told him.

     THE COURT:  Ask him where it came from.

     Q     Did you not already say that the other troopers

received the information two weapons were missing after they

interviewed Paul Reggettz?  Isn't that what you just told His

Honor?

     A     I think I told you -- You asked me when I originally

became aware of this and I think I told you it might have been

the next day or a couple of days later, that during the

investigation it was discovered that there were some guns

missing.  I was made aware of that through Trooper Williams, due

to the fact that they couldn't come up with them, and they were

supposed to be there.

     Q     Didn't you further tell the Court that they came to

that conclusion after interviewing Paul Reggettz?  Didn't you

tell the Court that?

     A     Yes.  It was after that that they came to that

conclusion because that is when they told me.

Michael Don Smith  -  Recross                    129

 Q All right, did the officers tell you that they came to that conclusion as a result of interviewing Paul Reggettz?

 A They didn't tell me in those words, you know --

 Q Well, the essence of those words.

 A They told me based on what they had discussed with Mr. Reggettz we were looking for some guns that should have been at the house. Then like I told you, we went and did some checking and found out --

 MR. McKITTRICK: That's all the questions I have.

 MR. STUCKY: Nothing further.

 THE COURT: Thank you. You may step down.

 (Witness Excused)

 (Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

 THE COURT: All right, we will stand in recess until 1:15.

      - 0 -

 (Whereupon, a recess was had in the proceedings.)

      - 0 -

Charles Pettry  -  Direct                        130

### AFTERNOON SESSION

        WHEREUPON, the proceedings in this matter were resumed

at 1:30 p.m. with all parties present as before noted, including

the defendant and his counsel, and the State of West Virginia by

James C. Stucky, Prosecuting Attorney, and Peter C. Brown,

Assistant Prosecuting Attorney.

    THE COURT:  Show the resumption of these proceedings in the

matter of State of West Virginia vs. John Moss, Jr., also known

as John Moss, III, CR-82-F-221, murder in the first degree,

three counts.  The defendant is present in person and by

counsel; the State of West Virginia by Mr. Stucky, Prosecuting

Attorney, and Mr. Brown, Assistant Prosecuting Attorney for

Kanawha County.

    Call your next witness.

    MR. BROWN:  Chuck Pettry.

                          - O -

                            DIRECT EXAMINATION

BY MR. BROWN:

    Q    State your name please.

    A    Charles Pettry.

    Q    And your occupation, sir?

    A    I am an attorney.

    Q    By whom were you employed in April of 1980?

    A    By Kanawha County.  I was an Assistant Prosecuting

Charles Pettry  -  Direct                    131

Attorney.

    Q    And on April 22, 1980, were you so employed?

    A    Yes, I was.

    Q    You are no longer with the Prosecuting Attorney's

office?

    A    That is correct.

    Q    On April 22, 1980, did you have an occasion to go to

the City of Cleveland in Ohio?

    A    Yes, I did.

    Q    What was your purpose in going there, sir?

    A    I had been requested to accompany Troopers Mike Smith

and Terry Williams to Cleveland.  The basic reason was to obtain

a blood sample.

    Q    Prior to April 22, 1980, or prior to leaving for

Cleveland, had you done anything in preparation to receiving

this blood specimen or the taking of this blood specimen?

    A    Yes, sir, I had.

    Q    Would you tell the Court please what you did.

    A    Basically as a result of information I received from

Troopers Williams and Smith we knew the defendant was in custody

in Cleveland, Ohio.  Initially by way of telephone conversations

with a member of the Prosecuting Attorney's office in Cleveland

we had made arrangements to get a blood sample because it had

become important as part of this investigation.

Charles Pettry  -  Direct                        132

   After the phone calls I followed it up with an affidavit
that I had prepared, and I forwarded it to I believe the
fellow's name was Peto.  John Peto, I think was the Assistant
Prosecutor in Cleveland I dealt with.

   MR. BROWN:  I would like to have this marked.

   (Whereupon, the document referred to was marked by the
reporter as State's Exhibit No. 3.)

   Q    I hand you now what has been marked for identification
purposes as State's Exhibit No. 3, which consists of several
pages marked Volume 387, Page 799 through Volume 387, Page 204;
is that correct, sir?

   A    804.

   Q    804, yes, sir, I'm sorry.

   A    Yes, sir, that is correct.  I might observe I believe
they start on Page 797.

   Q    All right, sir, I stand corrected.  Directing your
attention, sir, to an affidavit contained in that exhibit that
appears on Page 803 --

   A    Yes, sir.

   Q    Do you have that, sir?

   A    Yes, I do.

   Q    How many pages is that exhibit?

   A    I have two pages.

   Q    Would you tell the Court what you did in relation to

Charles Pettry  -  Direct                           133

that particular portion of State's Exhibit 3 there, the

affidavit.

A    This is an affidavit that I prepared in our office in

Kanawha County, which was essentially a supplement to the

proceeding in Cleveland.  It was an affidavit reflecting a

summary of the information that was available to us at the time

the affidavit was prepared.

After the affidavit was prepared, completed, signed, I

believe I forwarded that affidavit to the Prosecuting Attorney's

office in Cleveland, Ohio, and that was submitted to the court

along with their affidavit in support of their petition or

whatever you want to call it to obtain a blood specimen.

Q    All right, sir, in reviewing that particular affidavit,

were there, now that you have reviewed it, are there any things

in there you notice that were perhaps in error at this time?

A    Yes, sir.  In paragraph four there is a month and year

indicated and that is my handwriting.  I wrote those in.  At the

time I did that, which I presume was in February or April of

'80, I thought that was the date.  Apparently that is incorrect.

I now understand that is not even close.  That September, 1978,

that I wrote in there is just wrong.

Q    All right, after you had prepared that affidavit, what

did you do with it?

A    My recollection is I sent it to John Peto in the

Charles Pettry  -  Direct                              134

Prosecuting Attorney's office in Cleveland.

   Q     On April 22, 1980, did you have an occasion to see
that affidavit again, sir?

   A     Yes, I did.

   Q     And where did you see it?

   A     In the Prosecutor's office in Cleveland, Ohio.

   Q     And that is when you went up with Trooper Williams and
Trooper Smith?

   A     Yes, sir.

   Q     Tell the Court just in your own words how you came to
come back into possession of that affidavit and whether or not
there were any other papers accompanying it.

   A     Okay, I had been in telephone contact with Mr. Peto
from time to time after the affidavit had been sent up.  On the
22nd, I believe the date was, of April, Troopers Smith and
Williams and I left Charleston sometime in the very early
morning, got to Cleveland between 8:00 and 9:00 in the morning,
went to the office of the Prosecuting Attorney in Cleveland; and
at that point I met with John Peto, the Assistant Prosecutor.
At that time Mr. Peto presented me with a stack of papers, quite
frankly, which papers included a copy of the affidavit, a copy
of, I believe, their affidavit from their office relating to the
crime in Cleveland, a petition that he had filed with the court,
a brief memorandum of law that he had written in support of his

                                                        134

Charles Pettry  -  Direct                              135

petition, and I believe there was an order by the court granting

the petition.

Q    These papers Mr. Peto gave you, did they remain in your

possession?

A    Yes, sir.  That was my set.

Q    Would you take a look at State's Exhibit No. 3 and see

if those papers are copies of the papers you received in

Cuyahoga County, or in Cleveland on April 22, 1980?

A    Yes, sir, I think they are.  I don't recall getting

anything other than what is here, and I know I got all this

stuff.

Q    Do you have any recollection of giving any papers back

to anybody while you were up there?

A    No.  I carried these with me.

Q    Do you remember whether or not you went before any

judge or any person that appeared to be a judge or anybody in a

judicial capacity while you were up there, if you remember?

A    I don't recall that.

Q    All right, sir, after you received these papers from

Mr. Peto, where did you go?

A    What happened next?

Q    Yes, what happened next?

A    As I said, I was with the troopers.  We got the set of

papers from Mr. Peto, and we then went downstairs.  And by way

Charles Pettry  -  Direct                      136

of explanation, my recollection of the justice center or

whatever they call it in Cleveland, it is several buildings

connected by a common ground floor.  We went out of the judicial

portion of the building, down to a central area, information

desk, waiting area.  We were then met shortly thereafter by a

detective from the Cleveland Police Department whose name I

don't remember at all.  The reason for that was, one, they were

going to get their own blood sample at the same time, and also

we were going over to the jail side, and we couldn't wander in

and out of there without somebody from the Cleveland Police

Department.  So after he met us in that common area, my

recollection is we went up to another building in the same

complex, which was the county jail.

     Q     Did this detective remain with you throughout your --

Strike that -- Did there come a time when you came in the

presence of John Moss?

     A     Oh, yes, sir

     Q     Can you tell us whether or not this detective was with

you when you were in the presence of John Moss?

     A     Yes, sir.  He was kind of our ticket in there.  We

would not have been in there if he had not been with us.  What

happened, we all went up to the jail, which is a multi-story

building, went up on the elevator to a clinic area that they

maintain in the county jail there.  And there were the two

Charles Pettry  -  Direct                          137

West Virginia State Troopers, myself and the detective from

Cleveland.

    Q    All right, sir, tell the Court please what happened,

after you got to the clinic area.

    A    As I recall, when we got to the clinic area itself, we

had to enter through some locked doors and got into a treating

area, you know, medical clinic area.  My recollection is Mr. Moss

was not there when we arrived.  They called up or down for him,

and he arrived within minutes of our arrival.

    Q    All right, sir.

    A    There was a doctor there and a nurse, technician maybe,

assistant, whatever, as well.  When Mr. Moss arrived, the doctor

as I recall was getting ready to do his blood withdrawal.

    Q    Let me interrupt you just for a second.  At the time

the blood is actually taken, when the doctor begins to take the

blood, who all is present in the room?

    A    Okay, the same bunch of people, myself, Troopers

Williams and Smith, the fellow from the Cleveland Police

Department, the doctor and the nurse.  I am assuming she is a

nurse.  She looked like one.

    Q    Did the doctor look like a doctor?

    A    Yes, sir, he did.

    Q    What makes you think he looked like a doctor?

    A    He had on your basic doctor coat.  He had on a lab coat

Charles Pettry  -  Direct                              138

with a name plate on it.

    Q    Do you by any chance remember, or did you learn that

person's name?

    A    I learned his name because I expected at some point it

would become important, and I asked Mike Smith or Terry Williams

to please make a note of that doctor's name. I even, after

everything was finished, talked very briefly and got the details

on where his office was, because I had already learned at that

point his jail duty was part time on a contract basis, and that

he had a private office, private practice somewhere in the

Cleveland area. I got that information from one of the

troopers.

    THE COURT: Hold on just one second please.

    (Whereupon, a recess was had in the proceedings.)

    (After recess.)

    THE COURT: All right, proceed.

    Q    All right, to pick up, you have all your papers and all

of you, the people that you have already named proceed over to

the holding area or the clinic area --

    A    Clinic area, yes, sir.

    Q    Where Mr. Moss is. Would you go ahead and relate to

the Court what happened.

    A    When Moss was brought in, as I recall, by a uniformed

deputy or policeman, I, as I have testified, had the papers with

Charles Pettry  -  Direct                          139

me.  I went over to Mr. Moss and told him who I was.

    Q     Which Mr. Moss did you go over to, sir?  What was his

first name?

    A     John Moss.

    Q     The person you went to with these papers, is he in the

courtroom today?

    A     Yes, sir, he is.

    Q     Would you point him out to us please.

    A     He is seated by Mr. McKittrick, on Mr. McKittrick's

left.

    Q     Would you continue, sir.

    A     As I said, I went over and explained to him who I was,

who the troopers were, who everybody else was for that matter.

Told him what we were there for, what was going to happen in the

next few minutes, and told him I had a court order with me

signed by the judge, I guess, of the Common Pleas Court in

Cuyahoga County.

    Q     Did you present him with these papers?

    A     Yes, I did.  Well, I offered.  I said, "Here is the

Court order.  Here is the affidavit", all that.  "You can look

at them if you want to.  It is going to happen anyway."  That is

basically what I told him.  I obviously can't remember what he

said, but he didn't have any interest in reading the papers.

    Q     All right, sir, then what happened?

Charles Pettry  -  Direct                    140

     A    Having completed that, basically I got out of the way.

I didn't leave the room.  I just stepped back because the doctor

at that point was ready to proceed with the withdrawal of the

blood specimen, which he did.

     Q    Tell us what you remember about the drawing of the

blood specimen, what you observed, and what your recollection

was of the drawing of the blood specimen.

     A    As best I remember, we were all in the room, kind of

standing around.  It pretty well filled this room because there

were a lot of people in there at this point.  Mr. Moss had on a

jumpsuit kind of like he has on today.  As I recall, they

pushed his sleeve up.  I honestly can't tell you which arm we

are talking about here.  I think it was the left arm, but I

don't know that.  He was either seated in a chair or on an

examining table.  As I recall, they had an examining table

there, and they may have asked him to sit on that.  As I recall,

the next thing they did the nurse put a tourniquet on his upper

arm.  The doctor inserted a syringe in his upper arm, just above

his elbow and began drawing the blood specimen from the left

arm.

     Q    Was blood retrieved from his arm?

     A    Yes, it was.

     Q    What did the doctor do with the blood he got the first

time from the arm of Mr. Moss?

Charles Pettry - Direct                                    141

A    Well, he takes it out in the syringe. As I recall, it was a pretty good sized syringe, that portion of it, not the needle part but the syringe portion of it, and put it initially into two separate containers, vials, whatever you call them, and handed those to one of the troopers, either to Terry or to Mike. He then continued to take some blood for the Cleveland people because that was part of the deal, you see. They were getting their blood, and we were getting our blood at the same time.

Q    Do you know whether or not it had been ordered that they take blood for Ohio?

A    Yes, sir. You know, that is probably the reason, we were kind of riding the coattails of Cleveland. The court order said to take the blood for the Cleveland people and also for the Kanawha County people.

We got the blood. I asked Mike or Terry, the troopers, although I don't think I needed to tell them that, to initial the vials or containers of the blood specimen, which they did, taking note of the date and time, all that sort of stuff. Somebody there, I think, gave us a small white styrofoam container within which to place these vials of the blood specimen. I think they were placed in there, and I had somebody, Mike or Terry, initial and date and time the container itself, the box that they were put them in.

Q    After West Virginia received its blood specime , what,

Charles Pettry  -  Direct                    142

if anything, did the doctor do?

    A     He got some blood for Ohio.

    Q     Did you see him begin to draw that blood?

    A     Yes, sir.  I noticed him, just casually noticed him.
He took the blood and put it in a similar vial, as I recall, for
the Cleveland Police Department.

    As I recall from the court order, there was also to be a
saliva specimen taken.

    Q     Do you know whether or not a saliva specimen was taken?

    A     I can't really remember that.  I don't know.

    Q     Was the court ordered saliva test for the State of
West Virginia or State of Ohio, if you remember?

    A     It was for the State of Ohio, so I really didn't care
whether he got it or not, you know.

    Q     Did you ever take the blood specimens into your
possession?

    A     No.  I tried not to do that because I didn't want to
get myself in the chain of custody and someday have to testify.

    Q     Do you by any chance remember the doctor's name?

    A     Keppler, Scheppler, Weschler --

    Q     Keppler with a K?

    A     Yes, sir.  As I said earlier, after all the blood was
drawn and everything, I went over and talked to him because I
knew somebody would ask me someday what h s name was.  So that

Charles Pettry   -   Direct                           143

is why I did that, and got his address, which is probably

somewhere in the criminal investigation report.

    Q    All right, sir, did the doctor take any other specimen

of any kind for the State of West Virginia at that time?

    A    No, sir, just the two blood specimens.

    Q    After you received those specimens, and this was still

on April 22, 1980; is that correct?

    A    Oh, yes, sir.

    Q    Where did you go?

    A    Well, once we got everything marked and bundled up, we

were taken back out, were taken back out of the clinic area,

back downstairs and escorted, you know, to the area of the

common building.  At that point we retrieved the car, wherever

it was, and came back to Charleston.

    Q    Okay, what day did you arrive in Charleston?

    A    The same day.  We had left about 5:00 in the morning so

we could make it a one day trip.

    Q    Is that still April 22, 1980?

    A    Yes, sir.

    Q    Where did you finally disembark from the state police

car?

    A    We got back to the Company B Headquarters in South

Charleston in late afternoon.  I can't presume to tell you the

time.  That is when I parted company with the troopers.  I had

Charles Pettry  -  Direct                          144

driven from my residence to Company B, and we got in the state

police vehicle there.  That is how we traveled to Cleveland, in

a department vehicle.  So when we got back to Company B, I got

out.  They went somewhere at Company B, and I came back to the

office.

    Q     And what other building is located down in the area of

Company B, sir?

    A     Well, all the administrative offices, all the

laboratory and chemical, all the scientific portion of the

investigative arm of the Department of Public Safety is there.

    MR. BROWN:  Your Honor, I would move for admission into

evidence State's Exhibit No. 3, which is the paper that Mr.

Pettry has been testifying from.

    THE COURT:  Any objection?

    MR. McKITTRICK:  No objection, Your Honor.

    THE COURT:  All right, it will be marked and admitted into

evidence as State's Exhibit No. 3 for this hearing, without

objection by the defendant.

    MR. BROWN:  That's all I have at this time.

    THE COURT:  Cross?

    MR. McKITTRICK:  Yes, sir.

- O -

Charles Pettry - Cross                                        145

CROSS-EXAMINATION

BY MR. McKITTRICK:

    Q    Mr. Pettry, when did you become involved in the

Reggettz murder case?

    A    The day it happened.

    Q    You had an opportunity, I believe, to even go to the

scene; didn't you

    A    Yes, sir.

    Q    And did you work with law enforcement officers the day

of the 13th of December, '79, after the bodies were found?

    A    Did I what? I heard the rest of it.

    Q    Work with them?

    A    Yes, sir, to a certain extent.

    Q    And you, I take it, generally became familiar with the

scene and the facts surrounding the murders?

    A    Generally.  I was not -- I did not have an official

capacity there as far as an evidence gatherer.  I was there as

an Assistant Prosecutor.

    Q    But I take it one of the reasons you as an Assistant

Prosecuting Attorney of Kanawha County, West Virginia, were

assigned to this case at a later time was because you were

somewhat intimately familiar with the facts surrounding the

murders as they were investigated.  Isn't that a fair statement?

    A    That is a fair statement.  I don't know if  agree with

1

Charles Pettry - Cross                                    146

intimately acquainted, but basically that is a fair statement.

     Q     And from time to time, I take it, pursuant to your

duties, the officers who were investigating the Reggettz murders

consulted you.

     A     Yes, sir.

     Q     And they consulted you for things which included, but

were not limited to, the blood samples that are in question

here; isn't that correct?

     A     Yes, sir, that is correct.

     Q     And as a result of their consultations with you, and as

the days and weeks went by, I take it that you became very

familiar with the details of that murder case?

     A     Yes, sir.

     Q     Now, you have already indicated, I believe, to His

Honor that part of the allegation in the affidavit that is

appended to the request or petition to the court for a direction

from the court to extract John Moss' blood was incorrect?

     A     Yes, sir.  The date that I, the handwritten date on the

front page of that.

     Q     What was the reason for the filing of your affidavit

where you have already pointed out to the Court one of the

allegations was incorrect?

     A     I didn't say the allegation was incorrect.  I said the

date was incorrect.  You said the alleg tion was incorrect.

                                    146

Charles Pettry - Cross                                    147

Q    Well, when you say that John Moss was a suspect in an
armed robbery case which occurred in Kanawha County, West
Virginia, in the month of September, 1978, and in fact, it did
not occur until May, 1979, isn't that an incorrect allegation?

A    As to the date, yes.

Q    Because the crime didn't occur on that date.  Isn't
that a fair statement?

A    That is a perfectly fair statement.

Q    Now, what was the reason that the State of West
Virginia filed an affidavit to be appended to this petition to
extract John Moss' blood?  What was the reason it was necessary?

A    To -- Why did we went the blood, or why did we send the
affidavit?

Q    Why did you send the affidavit?

A    The affidavit was so we could be part of the
proceedings in Cleveland.  We obviously needed to have some
judicial process to do what we wanted to accomplish.

Q    What is the reason for the affidavit though?  Why is it
necessary for you, as a lawyer representing the Kanawha County
Prosecuting Attorney's office, to prepare an affidavit and
append it to this petition that goes to the court?  Why is that
necessary?

A    Well, one reason it was necessary, the Assistant
Prosecutor in Cleveland asked me for it; and another reason is,

Charles Pettry - Cross                                              148

my recollection is and my feeling at the time was without us

indicating some reason why we wanted it we didn't have any

standing to go to Cleveland for anything.

Q    So in other words, this affidavit that was appended was

supposed to give the court in Ohio probable cause to make a

direction that John Moss' blood be extracted, just like any

affidavit that is appended to any petition to the court.  Is

that a fair statement?

A    That is a reasonably fair statement.  They could have

gone on without us.

Q    When you say "They could have gone on" --

A    The Cleveland people didn't need us.

Q    When you say "They could have gone on", what you mean

is the State of Ohio didn't need the State of West Virginia for

Ohio to get their blood?

A    I don't think so.  That is a conclusion on my part.

Q    You don't know that?

A    That's right.

Q    You assume that?

A    Yes.

Q    But in order for the State of West Virginia to get

their blood, the State of West Virginia's blood from John Moss,

it was necessary for you to file an affidavit setting forth

probable cause for that court to direct John Moss' blood to be

Charles Pettry - Cross                                    149

extracted on the 22nd day of April, 1982.  Isn't that a fair

statement?

    A    I don't know.  I am not so sure we couldn't have got

that from the Cleveland people, quite frankly.

    Q    But you didn't?

    A    We didn't.

    Q    I am asking you the reason for this affidavit; and

isn't that the reason for this affidavit.  I am not asking you

what you might have done.  I'm asking you what you did do.

    A    What we did do is prepare the affidavit.

    Q    All right now, what I'm asking you is why --

    A    Why?

    Q    Yes.

    A    As I said, I was of the opinion we needed to do that to

give us some standing and, you know what I'm talking about,

Parrish.

    Q    Well, now what you said to us was you did it because

the Assistant Prosecuting Attorney in the State of Ohio asked

you to do it.

    A    We get back to the same thing, the standing issue.  I

can't say exactly.  My recollection is he and I had some

conversations about this, Mr. Peto and I; and I indicated I

would prepare and forward to him an affidavit so that when they

got their blood we could be in on it as well at the same time

Charles Pettry - Cross                                    150

without having to let them go ahead and get their blood and we

go up and try to borrow some of it, whatever, make us part of

the same proceeding.

Q    Are you then asking the Court on the other side of the

coin to accept your testimony as stating you didn't file this

affidavit that was appended to the request of the Ohio Court to

extract John Moss' blood for the purpose of providing probable

cause to the Ohio Court to give it a basis to make the

direction?

A    No.  No, I'm not saying -- If I understand your

question correctly, are you asking me if Ohio needed probable

cause to do anything?

Q    No.  I want you to exclude the State of Ohio.  I am

asking you simply what is the purpose, if any, of the affidavit

that you sent to Ohio, other than to give you standing as you

call it?

A    You mean to get the blood?

Q    Yes, to get the blood.

A    I am sure that would have something to do with it.  We

wanted the blood.

Q    What was the purpose, the legal significance of the

affidavit?  What was the significance of the affidavit?  That's

what I'm asking you.

A    I presume you want me to say probable cause.

                                                          150

Charles Pettry - Cross                                        151

Q    No, I want you to tell the Court why it was done.  I
assume that it was for probable cause purposes.  If that was the
reason, you can tell the Court.

A    My recollection is that is probably what it was for.

Q    Now, you indicated to His Honor that you prepared
personally the affidavit on Exhibit 3 here in Kanawha County,
West Virginia, and sent it to the State of Ohio.  And I will ask
you to look at that affidavit carefully before you answer that
question and tell us if that is true.

A    That is my recollection, Parrish.

Q    Is there anything about that specific affidavit that
refreshes your memory in answering that question?

A    As to what?

Q    Whether it was prepared --

A    As to whether I prepared it?

Q    Uh-huh.

A    There is nothing in particular about it I notice.  I
notarized it.

Q    Where did you notarize it?

A    I presume again in the office of the Prosecuting
Attorney in Kanawha County, West Virginia.

Q    How many affidavits did you prepare at that time, sir?

A    What do you mean at that time, on that day?

Q    Yes.

Charles Pettry - Cross                                    152

   A    I don't know. I would think only one.

   Q    Did you ever have occasion after that day to prepare an affidavit --

   A    I am sure.

   Q    An affidavit that complies with the language of this affidavit that is appended to State's Exhibit 3?

   A    I really don't know what you are talking about, Parrish. Have I ever prepared another affidavit?

   Q    That is my question.

   A    Sure.

   Q    You have prepared another one?

   A    Parrish, I have probably prepared --

   Q    Just like this one?

MR. STUCKY: Judge --

THE COURT: Come on. Be more specific. You guys have been fencing long enough. Ask your question, and you answer it.

MR. McKITTRICK: Judge, I think the question was very simple. I said did you at any time after you prepared this affidavit prepare an affidavit that had the same language as the affidavit appended to Exhibit 3.

   A    I don't think so.

   Q    I also notice that in the affidavit appended to Exhibit 3, when it comes to your notarizing the signature, that you don't have that completely filled in; is that correct?

Charles Pettry - Cross                                  153

     A    Yes, that's right.

     Q    What is the purpose of that?

     A    The purpose for it?

     Q    Yes.

     A    I don't think there is any purpose for it.

     Q    Does an affidavit, pursuant to notary rules and
regulations, have to be notarized?

     A    Yes, sir.

     Q    And does the date on which the person signs that
affidavit have to be filled in in order for the notary to be
correct and to comply with the provisions of the law?

     A    I suspect so.  I don't know.

     Q    But this doesn't do that?

     A    It doesn't have the day of the month filled in.

     MR. McKITTRICK:  I would like to have this marked.

     (Whereupon, the document referred to was marked by the
reporter as Defendant's Exhibit No. 3.)

     Q    Let me hand you what has been marked for identification
as Defendant's Exhibit No. 3.  We have been talking about
State's Exhibit No. 3; isn't that correct?

     A    Yes, sir.

     Q    I want to ask you if you have ever seen that affidavit
before?

     A    I am sure I have.  I notarized it.

Charles Pettry - Cross                           154

Q    Is that the same affidavit, with the same typing, and I think it is pretty clear, as the affidavit that is appended to State's Exhibit 3.

A    It looks like it, just glancing at it; it certainly does.

Q    Does it look like the same type?

A    Sure does.  One obviously is a reduction copy.  It is a little smaller.  It is set up the same.  The words track the same.

Q    But the typing looks different, doesn't it?

A    As I said, it is a reduction copy.  The type is smaller.

Q    A reduction copy?

A    That is what it appears to be, Parrish.  I mean, I'm no Xerox man, but one looks like a Xerox copy of the other.  You know what I'm talking about.  It's a reduction copy.

Q    And in paragraph 4 on Defendant's Exhibit 3, is that filled in?

A    No, no.  That is just blank.

Q    That is different from State's Exhibit 3?

A    Yes, sir, on State's 3 the blank is filled in.

MR. McKITTRICK:  We would move the introduction of Defendant's Exhibit 3 into evidence.

THE COURT:  Any objection?

Charles Pettry - Cross                                   155

MR. BROWN:  No objection.

THE COURT:  All right, it will be admitted into evidence and marked as Defendant's Exhibit No. 3 without objection by the State.

Q    Were you, as part of your duties as an Assistant Prosecuting Attorney, familiar with the facts surrounding the allegation in paragraph 4 of this affidavit appended to Exhibit No. 3?

A    Yes, sir, in a secondhand way.

Q    What do you mean by that?

A    I didn't -- I was not the Prosecutor assigned to that case and didn't really have any direct involvement with it when it happened.

Q    Well, you filed an affidavit and that was one of the allegations in the affidavit.  Did you not determine whether there were facts surrounding that case?

A    I'm not trying to joust with you, Parrish.  That is not my affidavit.  I prepared it in the sense of typing it.  I am not the affiant on it.  I am playing transcriber on that affidavit.  You understand that.

Q    I see.  I see.  So you didn't feel that as the Assistant Prosecuting Attorney of Kanawha County who was corresponding with Ohio authorities who requested that you file an affidavit, you didn't feel it your obligation to de ermine the

Charles Pettry - Cross                              156

facts stated in that affidavit were true and correct; is that

correct?

    A     No, that is not correct.  That is really not what I

said.

    Q     Did you determine whether the facts in this affidavit

appended to State's Exhibit 3 were true and correct?

    A     Insofar as I know, yes.  But Parrish, what you are

trying to get me to say I am not going to do.  I wasn't there.

I didn't know about that case like I knew about other cases I

prosecuted.  I am not the affiant there.

    Q     Did you state basically the facts of the case?

    A     Basically, yes.

    Q     Generally speaking what were the facts of that case?

    A     As I recall the facts of that case, a lady who was a

waitness, whose name I can't remember, who worked at the Moose

Club in St. Albans, I think, was robbed, and as I recall, shot;

and that is --

    Q     It is fair to say, as other officers have already

stated to His Honor, that blood was not in issue in that case

that you have just told us about, which is the substance

of allegation four in the affidavit appended to Exhibit 3.  Isn't

that a fair statement?

    A     That blood was not an issue?  I think that is fair,

yes.

Charles Pettry - Cross                                157

Q     But you would say, as you have said, that you were familiar with the facts surrounding the Reggettz murders?

A     Yes, sir.

Q     So that when you made the allegation in paragraph 6 of this affidavit appended to Exhibit 3 that John Moss, III is the subject of an ongoing investigation involving three homicides in Kanawha County, West Virginia -- Strike that.

MR. McKITTRICK:  Would the Court indulge me just a minute?

THE COURT:  Yes.

Q     Mr. Pettry, since you did not file the affidavit appended to the petition to the Ohio Court --

A     Since I didn't file it?

Q     Since you didn't sign it, I'm sorry.  Since you didn't sign the affidavit, what is the reason you accompanied Trooper Smith and Trooper Williams to Ohio for it?

A     I think there was a consensus of opinion it would be a good idea if somebody from the Prosecutor's office went with them, not for any particular reason.  They were certainly qualified enough to do that, but because of the nature of this case there had been some involvement right from the beginning, and you know, I was there; I was available.

Q     Would you say it was their role or your role to go to Ohio on that occasion on April 22, 1980, and to get those blood samples?

Charles Pettry - Cross                                    158

    A    Probably their role, quite frankly.

    Q    Their role?

    A    Yeah.  I was just there if something came up.

    Q    And did you feel anything came up?

    A    Probably nothing came up they couldn't have handled themselves, quite frankly.  There was no magic in me being there.

    Q    Now, you indicated to His Honor that when you showed John Moss these papers which were the court order ordering him to allow the doctor to extract this blood that you said that he could look at them or read them or do whatever he wanted to, but if he had any objections, you were going to do it anyway --

    A    I don't know if I told him that.  That is the way it was.  It didn't make any difference if he objected.

    Q    Well, didn't you tell the Court that today?

    A    I think I may have told the Court that.  I don't know to tell you the truth about it.

    Q    Now, did you advise John of his rights at that time?

    A    Me?

    Q    Yes.

    A    His rights to what?

    Q    I'm talking about his Miranda rights now.

    A    No.  I wasn't going to ask him anything and didn't ask him anything, I might add.

Charles Pettry - Cross                                    159

Q      Did any of the officers in your presence advise him of
his Miranda rights at that time?

A      Parrish, I can't remember; but we weren't there to talk
to him.

Q      When and after you confronted John Moss, was Trooper
Smith and Trooper Williams always in your presence until you
left John Moss?

A      Yes, sir.  It is not the kind of place -- We couldn't
wander around in there.

Q      Your answer is yes?

A      Yes.

Q      Do you remember either yourself, other than what you
have told the Court, or Trooper Williams or Trooper Smith having
any conversation with John Moss at all?

A      No.  No, I really don't.

Q      I take it from what you have already stated to the
Court that you didn't think it was necessary to advise John Moss
of his Miranda rights and try to get a consent from him to give
you this blood because you already had a court order?

A      We had a court order.

Q      Is that a fair statement?

A      That is a fair statement.

Q      So you didn't advise him of his rights and didn't try
to ge  any kind of a consent signed by him?

Charles Pettry - Cross                          160

    A     I don't think I did.

    Q     Did anyone else in your presence?

    A     Ask him for a consent form?

    Q     Yes.

    A     Not that I recall.

    Q     Did you, as a lawyer and as an Assistant Prosecuting Attorney, consider the taking of John's blood on April 22, 1980, to be a search and seizure?

    A     Did I think that?

    Q     Yes.

    A     No, I really didn't.  And I, quite frankly, still don't think that.  And what is the name of that case, Schmerber vs. California as I recall was the standard at that point.  I don't know if it still is or not.

    Q     Is that the reason you came to the conclusion, based on Schmerber vs. California, that this was not a search and seizure of John Moss?

    A     I can't remember why I thought that, Parrish.  That may have been it.

    Q     What is the reason you just mentioned to His Honor Schmerber vs. California?

    A     Just that is the case that sticks in my mind.  As you know, I haven't been in the prosecuting business for several years now, and I am sure things have changed.  That is the case

Charles Pettry - Cross                          161

I remember in prosecuting other criminal cases that when that

issue came up that is the case we went to for guidelines, if you

will.

Q       And did you feel that <u>Schmerber</u> <u>vs.</u> <u>California</u> applied

to the factual situation in John Moss' case?

A       I don't remember.  I'm not so sure what difference it

makes what I thought.  I don't remember.

Q       Well, what I have done is I have just asked you

whether you believed it was a search and seizure, and you have

indicated to me you didn't then and you don't now.

A       That's right.

Q       And the reason is you relied on <u>Schmerber</u> <u>vs.</u>

<u>California</u>.  What I am asking is do you believe that case

applies to the factual situation of John Moss, that is as it was

when you extracted the blood on the 22nd day of April, 1980?

A       Do I believe -- Did I believe it then?

Q       Then, yes.

A       I can't remember.  I probably did.  But that is -- You

know, you are asking me to look back a long time on something I

hadn't thought about.

Q       Now, Mr. Pettry, were you familiar with the fact that

Trooper Williams and Trooper Smith traveled to Ohio on the 30th

day of January, 1980, to extract blood from John Moss?

A       I knew they had been up there before.  I didn't know

161

Charles Pettry - Cross                                  162

the date.  You said January 30.  That's fine.  I don't know what

date it was.

    Q    Now, they have testified in this proceeding and other

proceedings that they, to the best of their memory, did not

contact you before they went up there on January 30, 1980.

Would you say that is a fair statement?

    A    That is a fair statement.  I don't know.  I don't

remember it.

    Q    Did you send them up there specifically on the 30th day

of January, 1980?

    A    No, sir.  I didn't have any the authority to send them

anywhere.

    Q    Did you request that they go up there?

    A    I don't think so, but I don't know that.

    Q    In any event, after Troopers Williams and Smith --

Well, let me ask you this:  Was it brought to your attention an

Ohio Court made Trooper Smith and Trooper Williams return the

blood sample that they extracted on January 30, 1980?

    A    I think so.  But the problem, you are asking me did I

know that before April 22?

    Q    That is exactly right.

    A    I think so, but I can't tell you with any real

certainty because obviously I now know it.  But I don't know

when I learned it.  I know that is not much of an answer, but it

Charles Pettry - Cross                                    163

is the best I can give you.

Q    Well, are you telling this Court when you had conversations with Trooper Williams and Trooper Smith and they indicated to you they needed a blood sample from John Moss on April 22, 1980, you didn't discuss that they had gone up there on January 30, 1980?

A    No.  That is not at all what I said just now.  If I did, I have made a mistake and misled you.

Q    Let me ask you this:  Did you have knowledge before you prepared the affidavit that Trooper Smith and Trooper Williams had gone to Ohio on the 30th day of January and had gotten a blood specimen and had then been ordered to give it back by an Ohio Court?

A    I expect I did, but I don't remember somebody bursting into my office and telling me that on a certain day.  I am qualifying my answer in that regard.

Q    I'm asking if you had knowledge.

A    I probably did.  I can't say for sure, you know --

Q    When approximately did you come to the conclusion it might be necessary for you to accompany Trooper Smith and Trooper Williams to Cleveland, Ohio, on April 22, 1980, to extract blood from John Moss?

A    When?

Q    Approximately when?  How long before you went?

Charles Pettry - Cross                          164

    A    I can't answer that.  I just flat don't know.

    Q    Would it have been a month?

    A    It could have been a month; it could have been a week.
I know how that looks to you, but I just don't know.

    Q    How long did you negotiate with Assiatant Prosecuting
Attorney Peto from Cleveland, Ohio, before you went up there?

    A    A week, maybe two weeks.  Again, that is the best I can
do for you.

    Q    What led you to the conclusion that you should go to
Cleveland, Ohio, on April 22, 1980, to extract blood from
John Moss?

    A    Why was it important for me to go?

    Q    Why was it important for law enforcement to go,
Mr. Pettry?

    A    Why did I think I should go, or why did I think Mike
and Terry should?

    Q    Why did you think it was important for law enforcement
to go?

    A    To get the blood sample.

    Q    For what purpose?

    A    As part of the investigation.

    Q    The investigation of what?

    A    Well, there was a joint investigation.

    I    Of what?

Charles Pettry - Cross                                    165

    A      Of the Reggettz murders.

    Q      And I take it that in your discussions with Troopers Williams and Smith and Assistant Prosecuting Attorney Peto from Ohio that you also learned that John Moss was charged with a crime or crimes in the State of Ohio at that time, that time being before April 22, 1980?

    A      Yes, sir, I knew that.

    Q      It also came to your attention before you went to Cleveland, Ohio, on the 22nd day of April, 1980, that John Moss was still waiting for disposition of the charges in the State of Ohio; isn't that correct?

    A      I'm pretty sure I knew that.

    Q      And you also knew, did you not, that John Moss was represented by counsel in the State of Ohio before you went up there on April 22, 1980; isn't that correct?

    A      Isn't that -- I'm sorry, I didn't hear the last word. Isn't that what?

    Q      Isn't that correct.

    A      Nobody ever told me that he was, but I think it is an obvious presumption somebody charged with that type of crime is going to have an appointed lawyer; and I am sure I knew that.

    Q      Did you try to contact John Moss' attorney in Ohio before you traveled from the State of West Virginia to Ohio to extract blood from John Moss on the 22nd day of April, 1980?

Charles Pettry - Cross                                    166

   A    I can't remember that.  I just don't know.

   Q    Did you ever contact any lawyer representing John Moss
before you traveled to Ohio on April 22, 1980, to extract his
blood?

   A    No.  I think that is the same question.

   Q    No.  It is a little different.

   A    Not that I recall, no.

   Q    Did you think it was necessary?

   A    Apparently not, since I didn't do it.

   Q    Did you know that John Moss on April 22, 1980, was a
juvenile under West Virginia law?

   A    I may have.  I don't know how old he is now.  I
probably did, but I don't know that.

   Q    Did you contact his parents and notify them that you
were going to go to the State of Ohio on the 22nd day of April,
1980, and extract blood from him?

   A    No, sir.  I didn't even know who they were.

   Q    And didn't attempt to find out?

   A    No.

   Q    Because you didn't think it was necessary?

   A    That sounds right, yeah.

   Q    Now, you knew, did you not, sir, that pursuant to the
investigations of the state police a case had been presented to
the January Term of the Kanawha County Grand Jury, the January,

Charles Pettry - Cross                          167

1980 Term?

    A    Can you tone that question down a little bit.  There were probably 250 cases.  Are you talking about Paul Reggettz, I presume?

    Q    Yes, the murder case.

    A    Did I know that was presented?

    Q    Yes.

    A    I am sure I did.

    Q    When you returned to West Virginia on the 22nd day of April, 1980, you were familiar with the fact that the blood samples that you took from John Moss were given to the laboratory for analysis because you received the blood results back on the next day; did you not?

    A    I can't remember that, Parrish.  You are asking me -- I presume you know that.  I don't.  I can't remember that.

    Q    Do you remember how long after you returned to West Virginia on April 22, 1980, that you received the blood analysis back?

    A    If I had to guess, I would say it was one day in the following week.  We went up in the middle of the week as I recall, Tuesday or Wednesday.  And I am just guessing.  I would think the first part of the next week.  There is no event I can recall, a phone call or something like that.  I can't remember that.

Charles Pettry - Cross                          168

Q    When Paul Reggettz was indicted on I believe the 24th

day of April, 1980, and the indictment was reported out in open

court, so that the Prosecuting Attorney's office knew you then

had a murder file on Paul Reggettz, were you assigned to that

file in the Prosecutor's office?

A    I can't remember, quite frankly.  I presume that I was,

but I don't know that.  That may not have been assigned.

Generally they weren't assigned right then, as I recall, you

know, right that day.  Sometimes they were, and I can't tell

you.  My name would be on the docket that day, I guess, and you

could find out.

Q    Were you familiar with the fact that when Paul Reggettz'

indictment was returned by the grand jury that John Moss' name

was in it?

A    Was I familiar with it?  Do I know that?  Do I now

remember it?

Q    Yes.

A    None of the above.  I don't --

Q    Assuming that to be true, do you remember --

A    Oh, sure, if the name was on the face of the indictment

I know I saw that on the indictment.

Q    You know he wasn't indicted, only Paul Reggettz was?

A    Yes.

Q    Do you remember that Sergeant Murphy, I believe it was,

Charles Pettry - Cross                           169

who did the blood analysis appeared before that January, 1980,

Grand Jury?

    A    No, I don't remember that.

    Q    You weren't in the grand jury at that time?

    A    I can't even tell you that, Parrish. I ran and worked

in ten or twelve grand juries while I was there, you know; and

as unfortunate as it may sound, there were plenty of murder

cases; and I don't know if I was in there that day or not, or

who was there.

    THE COURT: Let's take a ten minute recess.

    (Whereupon, a recess was had in the proceedings.)

    (After recess.)

    THE COURT: All right, show the resumption of these

proceedings with all parties present heretofore present here

again, including the defendant and his counsel.

MR. McKITTRICK CONT:

    Q    Mr. Pettry, you do remember, do you not, that John Moss

was returned to the State of West Virginia in October, 1980?

    A    I don't remember that specifically. I am sure it

happened some time.

    Q    Did you participate in preparing detainers for John Moss

to come back to West Virginia pursuant to a felonious assault

charge?

    A    I may have, Parrish. I don't have any specific

Charles Pettry - Cross                           170

recollection of that.

    Q    Do you have any specific recollection as to whether or not Troopers Williams and Smith went to Ohio to bring John Moss back on the 28th day of October, 1980?

    A    Yes.

    Q    All right now, what do you remember about that?

    A    Well, I don't remember anything about them going, them leaving, in that sense. As I recall, on the way back they called me at home. It was in the evening, night or in the middle of the night or something and indicated that they were in Parkersburg or the Parkersburg Detachment or something like that.

    Q    But you didn't know anything about them going up there?

    A    I don't remember anything about that. I am sure I knew it at the time that they were going up. If you are asking me do I now remember it, no, but I am certain I knew it at the time.

MR. McKITTRICK:  That's all the questions I have.

THE COURT:  Any redirect?

MR. BROWN:  Yes, sir.

- O -

Charles Pettry - Redirect                    171

REDIRECT EXAMINATION

BY MR. BROWN:

Q      On April 22, 1980, Mr. Pettry, what lawyer represented John Moss on the Reggettz case while John Moss was in Ohio?

A      No one.

Q      He didn't have a lawyer; did he?

A      He wasn't charged.

MR. McKITTRICK:  Objection to the leading.

THE WITNESS:  I was getting ready to say it anyway.

THE COURT:  Sustained.  Ask your next question.

Q      Did he have a lawyer?

A      No, sir.

Q      As regards the Reggettz case?

A      No, sir.  He wasn't charged with a crime.

Q      I hand you now State's Exhibit No. 3 and on Page 799, what is that, Mr. Pettry?

A      That is a court order from Cuyahoga County Common Pleas Court Criminal Division.

Q      Is it signed?

A      Yes, sir, it is.

Q      Is it signed by a judge?

A      Yes, sir.

Q      What does the judge order?

A      Orders that John Moss submit to the withdrawal of a

Charles Pettry - Redirect                          172

blood specimen and the taking of a saliva sample.

    THE COURT:   What is the date of that order?

    THE WITNESS:   I believe the order is dated April 15, 1980.

It is indicated as being dated April 15, 1980.

    Q     The judge did order that it be taken?

    A     Yes, sir.

    Q     There are two affidavits to that particular exhibit;

correct?

    A     Yes, sir.

    Q     One of the affidavits is from what state?

    A     West Virginia.

    Q     What is the other state?

    A     Ohio.

    Q     Would it be fair to say that the judge was satisfied --

MR. McKITTRICK:   Objection.

    A     He appeared to be.

MR. McKITTRICK:   Objection and move to strike.

    THE COURT:   Sustained.   Strike.   Ask your next question.

    Q     Are you familiar with the juvenile law in the State of

Ohio?

    A     No, sir.

    Q     You answered one of Mr. McKittrick's questions, sir, in

regards to getting the results of some blood back the next week

after April 22.   When you say you got the results back, what do

you mean exactly by results?  Do you mean a report, or did you

receive some other information that would be the results?

     A     My recollection of the results that I received were in

the phone conversation that I had with either Trooper Williams

or Smith.  I didn't get -- I didn't get a lab report back.  It

would not have come to me anyway.

     Q     Did you handle the portion of the case here regarding

the withdrawing of the blood and the matters relating to John

Moss in Ohio, or did Mr. Peto handle those matters in Ohio?

     A     Well, Mr. Peto handled those.

     Q     And in addition to the two affidavits and the court's

order on State's Exhibit 3, is there another item contained in

that State's Exhibit No. 3?

     A     Yes, sir.  I believe there is a petition that Mr. Peto

filed and a memorandum of law.

     Q     All right, and was that memorandum of law attached to

State's Exhibit No. 3 when you received those papers back?

     A     Yes, sir, I believe it was because I remembered making

note of it because it was not our usual custom and practice to

get quite that geared up for a motion of that sort.

     Q     And would you tell the Court what that memorandum of

law went to, the basic substance of it.

     A     It went basically to the authority of the court to

order the withdrawal of a blood specimen as I recall.  I haven't

Charles Pettry - Redirect                                    174

read that in three and a half years or so.

Q    I hand you now, sir, State's Exhibit No. 3 and ask you

to look at the portion of the exhibit that deals with your

affidavit.

A    The affidavit I prepared?

Q    Yes, sir.

A    Yes, sir, I have it.

Q    I hand you now Defendant's Exhibit No. 2.  Would you

identify that please.

A    Yes, sir.  That looks like the same affidavit.

Q    All right, I hand you now Defendant's Exhibit 3 and ask

you if you would identify that, sir.

A    Yes, sir.  Again that is another copy of that

affidavit, and it appears to be a third copy of the same

affidavit.

Q    In State's Exhibit No. 3?

A    Yes, sir.

Q    Look at the writing, the handwriting, any and all

handwriting that appears on there.  Is there any handwriting on

there that appears to be yours, sir?

A    Yes, sir.

Q    Would you look at the handwriting on Defendant's

Exhibit No. 2.

A    Yes, sir.

Charles Pettry - Redirect                    175

Q    Is there any handwriting on there that appears to be yours?

A    Yes, sir.

Q    Would you look at Defendant's Exhibit No. 3, and is there handwriting on there that appears to be yours?

A    Yes, sir.

Q    Are those the same three affidavits, sir?

MR. McKITTRICK:  Objection.  They speak for themselves. Your Honor, they speak for themselves and that invades the prerogative of this Court.  This Court is the fact finder here and not the witness.  It calls for a conclusion.

MR. BROWN:  That's true, Your Honor.  All of these exhibits have spoken for themselves right along.  However, Mr. McKittrick has made a point of indicating to Mr. Pettry that it is very possible that these aren't the same affidavits.  And I think Mr. Pettry is uniquely in a position, as being the person whose handwriting appears on there, I think he is qualified to give an opinion as to whether or not that is his handwriting and whether or not he believes these to be the same affidavit.

MR. McKITTRICK:  That wasn't the question, Your Honor.

MR. BROWN:  That is the question now, if it wasn't.

THE COURT:  All right, that is the question now then.

MR. McKITTRICK:  I have no objection to that question.

THE COURT:  All right, there is no objection to that

Charles Pettry - Redirect                                  176

question.

    Q    Would you answer the question.

    A    Yes, it is my handwriting.  I am sure it is my
handwriting on all three exhibits, and it appears to me they are
copies, they are all copies of the same thing.

    MR. McKITTRICK:  Objection and move to strike as being non-
responsive.

    THE COURT:  Strike as being non-responsive.

    Q    Are these three affidavits copies of the same thing?

    MR. McKITTRICK:  Objection.

    THE COURT:  I am going to overrule that objection.

    A    Yes, sir.

    Q    As to the typewritten portion, these are typed
documents basically?

    A    Yes, sir.

    Q    As to the typewritten portion or the machine printed
portion, sir, is there a difference?

    A    There is a difference in the size of print, but --
Well, let me strike that out.  Defendant's Exhibit No. 3, the
printing, the print is larger than on Defendant's Exhibit 2 and
on State's Exhibit 3.

    Q    All right sir, on State's Exhibit 3 would you compare
the printing on your affidavit with the mechanical printing on
the rest of the pages of that exhibit?

Charles Pettry - Redirect                          177

    A    Yes, sir, it is the same size.

    MR. McKITTRICK:  Objection and move to strike, Your Honor.

That is a conclusion, and it is non-responsive.  He said compare

it.  He didn't say what does it say, what does it look like.  He

said compare it.  The witness editorialized and said yes.

    THE COURT:  Objection sustained.  Do you have another

question?

    Q    Would you compare it please.  Have you made that

comparison, sir?

    A    Yes, sir.

    Q    Do you see any comparison with the printing on your

affidavit as to the rest of the mechanical printing there?

    MR. McKITTRICK:  Objection.

    THE COURT:  Overruled.

    Q    Do you see any?

    A    Yes, sir.

    Q    Would you tell us what it is?

    A    They are the same color.

    Q    All right, do you see any similarities?

    A    They are the same size.

    MR. BROWN:  That's all.

    MR. McKITTRICK:  My objection still stands, Your Honor.

    THE COURT:  You have your objection, and it is overruled for

the record.

Charles Pettry - Recross                          178

- O -

RECROSS-EXAMINATION

BY MR. McKITTRICK:

Q    As I understand it, Mr. Pettry, you or no other representative of the State of West Virginia went through a hearing and presented evidence to the court in Ohio?

MR. BROWN:  Objection, beyond the scope of redirect.

MR. McKITTRICK:  No, it isn't  You asked him about --

THE COURT:  We have been through that at great length.  We have already been through that at great length earlier in this proceeding in which you asked if they had a hearing.  He said no, he had a court order.  And the transcript will speak for itself.  I am going to sustain the objection.

Q    Okay, since Mr. Brown asked you to allude to the documents in State's Exhibit 3, and you included among your answers that there was a brief appended to it, would you look at that brief please.

A    Do you want me to read it?

Q    Yes, I want you to read it, not out loud but to yourself.  Or you can read it out loud if you want to, but you don't have to.

A    Do you want me to set here and read the whole thing?

Q    Yes.  It is only about two pages.

MR. BROWN:  I'm sorry, I don't have a copy of it.  Could he

Charles Pettry - Recross                                    179

read it out loud please.

THE COURT:  Do you want the court reporter to have to take this whole thing down as he reads it.

MR. McKITTRICK:  I'm not asking him to, and I have the witness on cross-examination.

MR. BROWN:  I don't have a copy, Judge.

THE COURT:  Go stand behind the witness --

MR. BROWN:  Is that all right with the Court?

THE COURT:  That's fine.

(Document examined by witness.)

Q     Are you finished reading?

A     Yes, sir, I am.

Q     Do you or did you agree with the statements and conclusions in that memorandum as it applied to the extraction of John Moss' blood on April 22, 1980?

MR. BROWN:  Objection.

MR. STUCKY:  That is not material or relevant.

MR. McKITTRICK:  This is important.  He has testified he was the Assistant Prosecutor representing the State of West Virginia, and the other gentleman was the Assistant Prosecutor representing the State of Ohio.  I understand in their dual capacities they both brought this petition.  I think it is a fair question.

THE COURT:  Well, I'm not going to let you ask if he agrees

Charles Pettry - Recross                                  180

with the conclusions of law, the law in the State of Ohio.

     MR. McKITTRICK:  They are not the State of Ohio.

     THE COURT:  I don't know what they are.  I haven't seen the

memorandum.  You all have been handing it back and forth.  I

haven't seen it.

     (Document examined by the Court.)

     THE COURT:  All right, repeat the last question of counsel.

     (Whereupon, the last question was read by the reporter.)

     THE COURT:  And again I will let him answer as to his legal

conclusion as to the United States federal law -- Now, just a

moment.  That memorandum also incorporates several references to

Ohio law.  I don't know whether Mr. Pettry is a licensed

attorney in the State of Ohio.

     MR. McKITTRICK:  Let me amend my question.

     THE COURT:  All right, amend your question.

     Q     Do you and did you agree with the statements and

conclusions of the federal law as it applied to the extraction

of John Moss' blood on April 22, 1980, as stated in the

memorandum contained in State's Exhibit 3?

     MR. BROWN:  Objection, Your Honor.

     THE COURT:  Overruled.

     A     There are two questions there.  Did I and do I?

     Q     That is correct.

     A     Did I then?

Charles Pettry - Recross                    181

Q     Yes.

A     I don't specifically remember.  Nobody asked me if I
agreed with them.  Mr. Peto didn't make any inquiry what I
thought about them.  I presume I agreed with it because the
judge granted the petition, but I don't remember, you know,
having some revelation about that memoranda, that I thought it
was really swell or something.  You know, it is just -- It was
his memorandum of law.  What did I care?

Q     Mr. Pettry, I think that you are trying to answer a
question I didn't ask you, sir.  I'm asking you to go back, and
that is why the judge asked me to amend the question.  I am
asking you to go back in your knowledge as a lawyer and an
Assistant Prosecuting Attorney of Kanawha County, West Virginia,
and I am asking you if you agreed with the statements and
conclusions of federal law stated in that memorandum.  I'm not
asking whether it was swell or whether you agreed with Mr. Peto.
I am asking you if you agreed with the statements and
conclusions of federal law as set out in that memorandum.

MR. BROWN:  Your Honor, the important thing is whether the
judge agreed or not.  It made no difference --

THE COURT:  Overruled.  Go ahead.

MR. BROWN:  I think it is the judge's decision.

THE COURT:  I understand; but if it doesn't make any
difference, let him answer the question, if he can answer

Charles Pettry - Recross                          182

the question.

    A    Did I agree with his conclusions in April of 1980?

    Q    And statements as to what the federal law was as it

applied to the extraction of John Moss' blood on the 22nd day of

April, 1980.

    A    I expect that I did.

    Q    You expect that you did?

    A    Well, Parrish, you know, we are talking three and a

half years ago.  What I thought about two pages of paper, I

don't remember.  You know, we are in the paper business,

Mr. McKittrick.  We deal with reams of it.

    Q    I'm not talking about paper.  I'm talking about

knowledge of the law, Mr. Pettry.

    THE COURT:  The question is clear enough.  Just answer the

question.

    A    As best I remember, yes.

    MR. McKITTRICK:  Your answer is yes?

    A    Yes.

    THE COURT:  Now do you care to explain?

    THE WITNESS:  No.  We have been here long enough.

    MR. McKITTRICK:  That's all I have, Your Honor.

    THE COURT:  Any redirect?

    MR. BROWN:  No, I don't have anything.

    THE COURT:  All right, Mr. Pettry, you may step down.

183

(Witness Excused.)

THE COURT:  All right, gentlemen, it is a quarter of four. Where are we?

MR. BROWN:  The State rests, Your Honor, on that question. We still have some evidence to put on with regard to the search of --

THE COURT:  Not today you don't.  All right now, how many more witnesses do you anticipate in its entirety there will be for the State's case on all issues or pre-trial issues?

MR. BROWN:  Your Honor, we anticipate Terry Williams taking the stand in regards to a camera that was retrieved in Cleveland.  It is a search type issue.  We won't have very much to offer on that I don't believe.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

THE COURT:  We can start at 9:00 in the morning and probably go an hour and a half.  Then we can probably start again around 1:30.  I can work the divorces in.  All right, let's start at 9:00 and see where we go.

We will stand in recess until 9:00 tomorrow morning.

- o -

(Whereupon, a recess was had in the proceedings.)

- o -

184

PROCEEDINGS HAD ON

WEDNESDAY, SEPTEMBER 21, 1983

WHEREUPON, the proceedings in the Matter of STATE OF
WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III,
CR-82-F-221, were resumed at 9:25 a.m. on Wednesday, the 21st
day of September, 1983, with all parties present as before
noted, including the defendant and his counsel, and the State of
West Virginia by James C. Stucky, Prosecuting Attorney, and
Peter C. Brown, Assistant Prosecuting Attorney for Kanawha
County.

THE COURT:  Show the resumption of these proceedings in
State of West Virginia vs. John Moss, Jr., also known as John
Moss, III, CR-82-F-221, murder in the first degree, three
counts.  The defendant is present in person and by Mr.
McKittrick, his counsel, heretofore employed on his behalf; the
State of West Virginia by Mr. Stucky, Prosecuting Attorney, and
Mr. Brown, Assistant Prosecuting Attorney for Kanawha County.

MR. McKITTRICK:  Your Honor, before the State proceeds this
morning, I have a couple of things I want to bring to the
Court's attention.

The State asked the defendant for a list of witnesses, which
I provided.  And we will have other witnesses, and I don't know
what their names are at this point.  They are witnesses from
governmental agencies on small things that we will provide to

the prosecution when we find out what their names are.  We are still trying to find out their names.  We don't know who we are going to subpoena, Your Honor, with regard to small matters.

Secondly, I had indicated to the Court when we started the motions, the last motion I wanted to take up had to do with John Moss' rights when he was returned on the detainer.  I take it, Your Honor, since we have accumulated all this evidence together that some of my cross-examination will and has gone to that matter.

THE COURT:  I think that matter has been gone into rather extensively, as reflected in the earlier transcript of these proceedings.

MR. McKITTRICK:  That is correct, Your Honor.

THE COURT:  If you want to open it up again, we will open it up again.  But I think it has been ruled on, not only by this Court but by the West Virginia Supreme Court as well.

MR. McKITTRICK:  Well, I think as far as the legal basis that we will raise and argue to the Court, it is a different legal basis than has ever been raised in this matter.

THE COURT: All right

MR. McKITTRICK:  But I think, as you said, the evidence has been gone into before in the other transcript.

THE COURT:  However you want to proceed on it, I will permit you to do so.  But I just want the record to reflect we do have

Terry Williams - Direct                                  186

transcripts of prior proceedings in which that issue was raised

and ruled on, not only by this Court but, as I said, the West

Virginia Supreme Court of Appeals.

    (Whereupon, a discussion was had off the record and then

resumed back on the record as follows:)

    THE COURT:  All right, call your next witness.

    MR. BROWN:  Terry Williams.

- O -

TERRY WILLIAMS,

    Being thereupon called as a witness, after

    being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BROWN:

    Q    Would you state your name please.

    A    Terry Williams.

    Q    And your occupation, sir?

    A    I am a trooper with the Department of Public Safety

    A    Trooper Williams, there was a time when you were in Wood

County, West Virginia, with John Moss.  Do you remember that?

    A    Yes.

    Q    And at that time John Moss gave you certain information

concerning some items.  Do you remember that?

    A    Yes.

    Q    Did he also tell you where he lived at tha  time?  Did

Terry Williams - Direct                          187

he give you an address where he lived?

    A    Yes.

    Q    Where was that address?

    A    7025 Zoerter Avenue, Cleveland, Ohio.

    Q    After John Moss provided you with the information as to

where he lived, what items did he specifically give you some

information about?

    A    A camera and a .22 rifle, bolt action.

    Q    After he gave you that information, did you leave the

Wood County area?

    A    Yes.

    Q    Who went with you, if anyone?

    A    Trooper Smith.

    Q    Where did you and Trooper Smith go to?

    A    Cleveland, Ohio.

    Q    About what day and what year did you arrive in

Cleveland, Ohio?

    A    We got back in Cleveland on the 29th of October.   I

don't remember what day that was.

    Q    Well, the date.   I don't care about the day.

    A    The 29th of October, 1980.

    Q    About what time did you arrive in Cleveland?

    A    It was around 3:00 in the morning, a.m.

    Q    Did you ultimately contact any office there in the

Terry Williams - Direct                              188

Cleveland area in relation to law enforcement?

    A    Yes, we did.

    Q    Where was that?

    A    We went to, I believe it was called a justice center.   We
went to the Cleveland Police Department.

    Q    What was your purpose in going to the Cleveland justice
building?

    A    Well, we wanted to get with a police officer and have
him take us to the Prosecutor's office in reference to getting
a search warrant.

    Q    Were you taken to the Prosecutor's office?

    A    Yes.

    Q    Was a warrant prepared for you at the Prosecutor's
office, portions of it?  Was an affidavit prepared there?

    A    Yes.

    Q    Did you take the items you had, or after you got the
affidavit, where did you go?

    A    I went before a judge.

    Q    What county was that in, what city?

    A    In Cleveland.  I believe it was Cuyahoga County.

    Q    Who actually went before the judge?

    A    I did.

    Q    Were you sworn in by the judge?

    A    Yes.

Terry Williams - Direct                                    189

Q     Did you raise your hand before the judge?

A     Yes.

Q     Did you say anything to the judge, or did he just read your affidavit?

A     He just read the affidavit.

Q     As a result of that hearing there in the judge's chambers, was a search warrant issued?

A     Yes.

MR. BROWN:  All right, I would like to have these marked as 4-A through 4-D.

(Whereupon, the documents referred to were marked by the reporter as State's Exhibits 4-A, 4-B, 4-C and 4-D.)

Q     I hand you now, sir, what has been marked for identification purposes as State's Exhibit 4-B, and ask you if you can identify that, sir.

A     Yes.

Q     What is that?

A     This is the affidavit for a search warrant.

Q     All right, sir, and is that the affidavit that you swore to, sir?

A     Yes.

Q     Before the judge in Cleveland?

A     Yes.

THE COURT:  This is the affidavit for the search warrant of

Terry Williams - Direct                                    190

the defendant's home in Cleveland?

    MR. BROWN:  Yes, sir.

    THE COURT:  Okay.

    Q    I hand you now what has been marked for purposes of

identification as State's Exhibit No. 4-A and ask you if you can

identify that.

    A    Yes.

    Q    And what is that, sir?

    A    This is the search warrant.

    Q    Is that the warrant that was actually issued by the

judge?

    A    Yes.

    Q    And State's Exhibits 4-A and 4-B, on what dates were

they signed?

    A    It would have been on the 29th of October, 1980.

    Q    The same day you returned to Cleveland?

    A    Yes.

    Q    Would you look at State's Exhibit No. 4-B, the

affidavit, sir, and about the sixth or seventh line down, where

it starts "Cleveland", would you read that line and the next

line.

    A    "Cleveland, more fully described as a 1 1/2 story

single family dwelling with white aluminum siding, and in

particular, the entire premises known as".

Terry Williams - Direct                                    191

Q     All right, and the next three words?

A     "7025 Zoerter Avenue."

Q     Who provided you with the address 7025 Zoerter Avenue?

A     John Moss.

Q     All right, how did you get the description of the one and one-half story single family dwelling with white aluminum siding?

A     We drove by the dwelling house.

Q     When did you do that?

A     On the 29th of October, 1980.

Q     Prior to --

A     Prior to getting the warrant.

Q     After these items were prepared and the search warrant was issued, where did you go and who did you go with?

A     Well, we went to 7025 Zoerter Avenue in Cleveland, Ohio, myself, Trooper Smith, and two detectives from the Cleveland P.D. One was named Bolton and one Vaughan. I don't know their first name. We got there, and there were two uniformed officers from Cleveland P. D.

Q     They didn't travel with you?

A     No. Myself, Trooper Smith and the detectives went in one car. They met us there.

Q     Were you in uniform or plain clothes?

A     Myself and Trooper Smith were in plain clothes.

Terry Williams - Direct                                    192

Q     The two detectives, how were they dressed?

A     In plain clothes.

Q     And there were two regular uniformed officers?

A     Yes.

Q     How many cars were involved?

A     Two.

Q     Were the cars marked or unmarked?

A     The car that we were in was unmarked.  And the car the uniformed officers were in was marked.

Q     Approximately what time did you arrive at the residence?

A     It was around noon, give or take ten or fifteen minutes.

Q     All right, was -- Did anybody approach this residence and see if there was anybody home?

A     Yes.

Q     Was there anybody home?

A     No.

Q     Did there come a time when somebody did arrive there?

A     Yes.

Q     About how long after you arrived there did someone show up at the house?

A     Thirty minutes.

Q     Did you all remain in that area waiting for someone to

Terry Williams - Direct                                   193

show up?

    A    Yes.

    Q    Who showed up?

    A    John Moss' mother.

    Q    Okay, and do you remember what her name was?

    A    Yes.

    Q    What was it?

    A    Marzee Moss.

    Q    Do you know how to spell that, sir?

    A    M-a-r-z-e-e.

    Q    And was the warrant executed there or served on

Mrs. Moss?

    A    Yes.

    Q    After the warrant was served on Mrs. Moss -- Who served

the warrant?

    A    I did.

    Q    After the warrant was served on Mrs. Moss, what

happened?  Just tell the Court there what you did and the best

that you can recall what the other people did that you saw.

    A    Well, we sort of like split up in teams, myself and one

of the detectives and one of the uniformed officers went

upstairs; and Trooper Smith and the other detective and the

other uniformed officer took the downstairs.  And we searched

through the house for the items specified in the warrant.

Terry Williams - Direct                              194

    Q    Okay, that was you and a detective and a uniformed

officer upstairs?

    A    Yes.

    Q    And Mike Smith, a uniformed officer and a detective

downstairs?

    A    Right.

    Q    Do you remember what the upstairs was like?  Can you

recall that at this time?

    A    Pretty much so.  You go to the top of the stairs, and

there is a bedroom and then I believe that there is a doorway in

that bedroom and you go straight through and there is another

bedroom.  And I believe there is another room off to the left.

It was pretty messy, pretty bad shape.

    Q    Was there any certain room you had in mind or any

certain place you had in mind to search for any particular

object?

    A    Yes.

    Q    Where was that you were going to search and what were

you searching for?

    A    It was John Moss' bedroom right at the top of the

stairs, and there was supposed to be a camera on his chest of

drawers, and the rifle was supposed to have been in the closet.

That is where we went first.

    Q    Was that the closet in his bedroom?

Terry Williams - Direct                          195

     A     Yes.

     Q     Did you find a rifle in that closet?

     A     No.

     Q     Did you find a rifle in that room?

     A     No.

     Q     Did you find a rifle in that house?

     A     Yes.

     Q     Did you seize that rifle?

     A     No.

     Q     Why not?  Tell the Judge why you didn't seize that
rifle.

     A     Because it wasn't the rifle that was specified on the
warrant.  It had the wrong serial number on it.

     Q     The rifle that you were looking for, sir, could you
tell the Court what exactly you expected to find.

     A     It was a Glenfield bolt action .22 rifle with the
serial number 27526931, and it had a scope on it.

     Q     All right, you expected to find a .22 rifle with a
scope?

     A     Yes.

     Q     You did not find a rifle; is that correct?  I mean, you
didn't find that particular rifle?

     A     No.

     Q     Did you find a scope?

                                                              195

Terry Williams - Direct                          196

A      Yea.

Q      Where did you find a scope?

A      It was in a drawer in Kenneth Moss' bedroom.

Q      Did you seize the scope?

A      Yes.

Q      Did you find a camera on that dresser?

A      No.

Q      Did you find a camera in that bedroom?

A      No,

Q      Did you find the particular camera you expected to find in that house?

A      No.

Q      Did you find any cameras in that house?

A      Yes.

Q      Did you find those cameras or did someone else find those cameras?

A      Someone else did.

Q      Tell us about those other cameras as best you can, sir, how many there were and where they were found, if you received that information from the other officer.

A      I'm not -- I don't know which rooms they were found in. They were found downstairs.  There was three cameras, and after they were gathered up they were turned over to me.

Q      Those cameras then were seized through this search

Terry Williams - Direct                          197

warrant; is that correct?

    A    Yes.

    Q    I hand you now, sir, what has been marked for identification purposes as State's Exhibit No. 4-D and ask you if you can identify that.

    A    Yes.

    Q    All right, what is that, sir?

    A    It is a receipt that we gave to Marzee Moss of the items that were seized in the search warrant.

    Q    And does that receipt accurately portray what was seized from that house around the noontime hour or around the hours that you indicated, probably about 1:00 or so in that house?

    A    Yes.

    Q    And what is number one?  Would you read that for me please.

    A    "One Kodak instant camera", and in parenthesis, "The Handle".

    Q    All right, number two, would you read, just start from number two and go on.

    A    "Two Polaroid Colorpack II", and in parenthesis, "Land Camera".

    Q    There are some initials out from the side.  What is that?

Terry Williams - Direct                                    198

A    "MDS".

Q    And there are some initials on the left side of the
two.  What is that?

A    "MM".

Q    Who placed those there?

A    The "MM" is the initials of Marzee Moss, and the "MDS"
is Trooper Smith's initials.

Q    And the next item, the third item listed there?

A    "One Volor 4x15 No. 627257 rifle scope".

Q    All right, and there is an indication on there where
these three cameras were discovered.  What does that say, sir?

A    "The three cameras were discovered in the bedroom of
Deatrice Moss. The scope was discovered in a dresser drawer
upstairs in the bedroom of Kenneth Moss."

MR. McKITTRICK:  Your Honor, now as I understand it, the
State has represented to the Court it is not going to use the
scope and will not refer to it; is that correct?

THE COURT:  That is what I understood.

MR. BROWN:  As far as I know, that is true.

MR. McKITTRICK:  Well, if you are not going to use it, why
go into it?

MR. BROWN:  Well, all these items are listed on there.  I'm
not going to skip it.  That's why the question about the scope
but --

Terry Williams - Direct                    199

THE COURT:  All right, but now as I understand it, when it comes to trial, you are not going to refer to any scope.

MR. BROWN:  No, but the scope was taken as part of the search.

MR. McKITTRICK:  Unless the defense opens it up.

THE COURT:  Oh, yes.

Q     Okay, the scope that was discovered, who discovered the scope; do you know?

A     I believe it was one of the uniformed officers that found it.

Q     Was that one of the uniformed officers that was with you, sir?

A     Yes.

Q     It says it was discovered in the upstairs bedroom of Kenneth Moss.  Was that the same bedroom you were searching that you thought was John Moss' bedroom or another bedroom?

A     It was another bedroom.

Q     It was not the bedroom that you were led to believe or it had been indicated to you was John Moss' bedroom.  Is that a fair statement?

A     Yes.

Q     And this scope that you indicated was not attached to any rifle; is that correct?

A     That is correct.

Terry Williams - Direct                                    200

Q     After you had completed that search, just for the purpose of this exhibit, did you give a return or give a receipt to the lady there at the house, John's mother, Marzee Moss?

A     Yes.

Q     And is that what State's Exhibit 4-D is?

A     Yes.

Q     And that was signed by yourself, Trooper Smith and Detective Bolton; is that correct?

A     Yes.

Q     Approximately what time of the day was it when you gave her this receipt to the best of your knowledge?

A     I would say it was probably a quarter till one or one o'clock, somewhere in that area.

Q     All right now, about what time did you arrive at the residence?

A     I'm thinking it was around noontime, maybe a little before or a little after.

Q     About how long was it before Mrs. Moss arrived?

A     About thirty minutes.

Q     About how long did it take you officers to complete your search once she let you in the house there?

A     Oh, I would say twenty or thirty minutes.

Q     Did you show her the search warrant?

A     Yes.

Terry Williams - Direct                                201

    Q    Did she indicate any unwillingness to let you in the
house?

    A    No.

    Q    I hand you now, sir, what has been marked for
identification purposes as State's Exhibit 4-C and ask you if
you can identify that.

    A    Yes.

    Q    What is that?

    A    This is the search warrant return.

    Q    Trooper Williams, on your search warrant return what
date does that indicate you received the search warrant?

    A    The 29th of October, 1980.

    Q    And of course, what date was the search warrant
actually executed?

    A    The 29th of October, 1980.

    Q    And the receipt given?

    A    The 29th of October, 1980.

    Q    And the return made, sir?

    A    The 29th of October, 1980.

    Q    And about a third of the way down on State's Exhibit,
on the return, whatever it is, in capital letters it says, "We
left attached Schedule B".  Is that the receipt?

    A    Yes.

    Q    And wh t State's exhibit number is also Exhibit B?

Terry Williams - Direct                                        202

A       Exhibit 4-D.

Q       Who all was home or who all was in the Moss house when you finally left?  Did there ever come a time when anybody else came in the house during this time that you served the warrant besides the six police officers and Mrs. Moss?

A       I can't remember anybody else being there besides us.

Q       No other members of the family that you can remember being there?

A       Not that I can remember.

Q       As these items were seized, who were they given to?

A       Me.

Q       And did you take them into your custody and possession?

A       Yes, I did.

Q       And did you keep them in your custody and possession?

A       Yes, I did.

Q       Until you returned to West Virginia?

A       Yes.

Q       Trooper Williams, I do want to call your attention to paragraph 6 of the affidavit.  It is the second page of your affidavit.  Would you read that, sir.

A       "Affiant states that he and other members of the West Virginia Department of Public Safety went to the Mansfield Reformatory in Mansfield, Ohio, and interviewed Mr. John Moss, III.  Affiant states that Mr. Moss, III was fully advised of his

Terry Williams - Direct                                    203

constitutional rights, and after being so advised admitted to

the affiant that he killed the three members of the Reggettz

family while he was burglarizing their home.  Mr. Moss, III

admitted to the affiant that he stole from the home a camera and

a Glenfield bolt action .22 caliber rifle."

Q     Did you hand write or prepare this affidavit?

A     No.

Q     How was this affidavit prepared?  Explain that to the

Court.

A     Well, I explained to the Prosecutor the circumstances

for the affidavit, and he filled it out.

Q     All right, in looking at paragraph 6, is that a

complete statement of what happened as to how you obtained these

facts?

A     No.

Q     What does that paragraph -- How do you interpret that

paragraph now, sir?

A     That we obtained the confession from John Moss at

the Mansfield Reformatory.

Q     Is that what happened?

A     No.

Q     It is an incomplete paragraph; is that correct, sir?

MR. McKITTRICK:  Objection.

THE COURT:  Quit leading.

Terry Williams - Direct                                204

    Q    Are all the facts in that paragraph.

    MR McKITTRICK:  Objection.  It speaks for itself, compared to the facts in the case.

    THE COURT:  Overruled.

    Q    Are all the facts as to how you obtained this information contained in that particular paragraph, sir?

    A    No.

    Q    At the top of that warrant, who all is it directed to?

    A    The Chief of Police of the Cleveland Police Department, and/or any member of said department, and/or West Virginia Department of Public Safety, and/or any member of said department.

    Q    Did you serve the warrant, sir?

    A    Yes, I did.

    Q    And made the search?

    A    Yes.

    Q    Was it daytime when you made the search?

    A    Yes.

    Q    Did you find any property there that you seized?

    A    Pardon me.

    Q    Did you find any property there that you wanted to seize?  Did you find any property in that house?

    A    Yes, we did.

    Q    Did you seize it?

Terry Williams - Direct                                    205

    A    Yes.

    Q    Did you leave a copy of the warrant at the house?

    A    Yes.

    Q    Did you leave a receipt for the property at the house?

    A    Yes.

    Q    Did you prepare a written inventory of the property
seized?

    A    Yes -- No, I didn't.

    Q    Was it prepared in your presence?

    A    Yes.

    Q    Who prepared it?

    A    Trooper Smith.

    Q    Were you one of the signers of that inventory of the
property or receipt?

    A    Yes.

    Q    Was a return made on the warrant?

    A    Yes.

    Q    Was the search made within three days of the issuance
of this warrant?

    A    Yes.

    Q    As a matter of fact, the warrant was issued when?

    A    The 29th of October, 1980.

    Q    And the search was made when?

    A    The 29th of October, 1980.

Terry Williams - Direct                                    206

    Q    While you were at the home you didn't find the rifle; you did find a scope; you did not find a certain camera you were looking for; is that correct?

    A    Yes.

    Q    Did you receive any information while at the house as to the whereabouts of that camera?

    A    Yes.

    Q    Who did you receive that information from?

    A    Marzee Moss.

    Q    As a result of what you learned, after you have then finished your search, what did you all do?

    A    We left.

    Q    All right, about what time of day was it?

    A    I would say around 1:00, maybe a little bit after.

    Q    Did there come a time when you returned to this house?

    A    Yes.

    Q    Tell the Judge just what happened.

    A    Well, I don't remember if Mrs. Moss called us or if we just went back.  I'm thinking we just went back to the house.

    Q    All right, go ahead.

    A    We went back for the purpose that Mrs. Moss told us that the camera we were looking for, that her husband had it in his car at work.  And we went back when Mr. Moss came home to get the camera.

Terry Williams - Direct                              207

MR. BROWN:  Could I have this marked as State's Exhibit No. 5.

(Whereupon, the document referred to was marked by the reporter as State's Exhibit No. 5.)

THE COURT:  Just for the sake of the record, identify who that person is that gave him the camera.  This indictment is against one John Moss, Jr., also known as John Moss, III, just for the sake of clearing up the record.

MR. BROWN:  Do you want me to go ahead and question him, or do you want to take a break now?

THE COURT:  We will take our morning break now.  We will take a fifteen minute recess, and then you can resume your questioning.

During this recess, Trooper Williams, I admonish you not to discuss this case or your testimony with anybody.

We will stand in recess for fifteen minutes.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

THE COURT:  All right, show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, with all parties present heretofore present here again, including the defendant and his counsel, and the State of West Virginia by her Prosecuting Attorney and Assistant Prosecuting Attorney.

Terry Williams - Direct                                    208

    You may proceed.

    MR. BROWN:  Would the court reporter read my last question

for me.

    (Whereupon, the last question was read by the reporter.)

MR. BROWN CONT:

    Q    I hand you now, sir, what has been marked as State's

Exhibit No. 5 for identification purposes and ask you if you can

identify that, sir.

    A    Yes.

    Q    All right, what is that, sir?

    A    It is a statement of John Moss, Jr.

    Q    All right, whose signature is at the bottom of this

document?

    A    John Moss, Jr.

    Q    Did you see State's Exhibit No. 5 signed?

    A    Yes.

    Q    You saw that person put his signature down there?

    A    Yes.

    Q    The person that you investigated --

    MR. McKITTRICK:  Did you move that document --

    MR. BROWN:  No.  I was going to move it all at the same

time.  Do you want me to now?

    MR. McKITTRICK:  Well, with regards to that particular

document, Your Honor, we are going to object to it

Terry Williams - Direct                               209

specifically on the basis of hearsay.  And I would move at this time to strike the testimony.

THE COURT:  Well, not until he has completed his examination of the witness on that document.

Q    The person that you investigated that this hearing is about, is that person in the courtroom here today?

A    Yes.

Q    Would you point him out to us please.

A    Setting at the table in a red jumpsuit.

Q    What is that person's name?

A    John Moss, III.

Q    And what signature appears on State's Exhibit No. 5?

A    John Moss, Jr.

Q    Was the person that signed that statement, State's Exhibit No. 5, the same person as you have pointed out here in the courtroom?

A    No.

Q    Who did you know that John Moss in Cleveland to be?

A    John Moss, III's father.

Q    All right, sir, tell the Judge -- Well, first of all State's Exhibit No. 5, does it indicate about what time you were at the Moss home?

MR. McKITTRICK:  Objection.  It speaks for itself.

THE COURT:  Overruled.

Terry Williams - Direct                                          210

    A     Yes, it does.

    Q     About what time was that, sir?

    MR. McKITTRICK:  Your Honor, it has not been introduced into

evidence and the witness is testifying as to its contents.

    MR. BROWN:  He can throw it out later if it is not

satisfactory to the Court.  I think I have a right to lay a

foundation.

    THE COURT:  I think you do too.  The objection is overruled.

    Q     What time does that show, sir?

    A     6:00 p.m.

    Q     Now, sir, would you tell the Court exactly what you

did, how you came to get that document, what you all did when

you went back to the Moss home, who all went back, all you can

remember.

    A     There was myself, Trooper Smith and the two detectives

from the Cleveland Police Department.

    Q     All right, sir.

    A     We went back to the house and Mr. and Mrs. Moss were

both there, and Mr. Moss gave us the camera.

    Q     All right now, when you get to the Moss home, is it a

house or is it an apartment type of building, or how would you

describe that?

    A     A house.

    Q     Does it front right on the street, or is there a little

Terry Williams - Direct                          211

walk up to the house?

    A    I believe there is a little walk up to the house.

    Q    Does it have a porch?

    A    I don't think it did.

    Q    When you got up to the house, what happened?  How did

you gain entrance to the house?  Did you knock, ring the bell?

Was the door opened?  Tell the Court how it happened.

    A    I am thinking there was a door on the side of the house

that leads into the kitchen.  I believe we went in that door.

    Q    How did you get in; just walk in?

    A    We knocked on the door.

    Q    Do you remember who opened the door?

    A    No, I don't.

    Q    What happened when you went in?  How far in the house

did you get at that time?

    A    We were invited in.  We went into the kitchen.  I

believe that is where we stayed, in the kitchen.

    Q    When you went into the door, what room did you walk

into?

    A    I believe it is the kitchen, but I may be wrong.

    Q    Did you leave that kitchen to go into any other area of

the house that evening?

    A    Not that I can recall.  If we did, we would have went

in the living room.

Terry Williams - Direct                    212

    Q    When you went in the house, what happened?   When you got in the kitchen, what happened?

    A    Well, Mr. Moss gave us the camera.

    Q    Did you say anything; did you say anything to him?

    MR. McKITTRICK:  Objection.

    THE COURT:  Rephrase the question.   Sustained.

    Q    Was anything said by yourself to Mr. Moss to indicate you wanted the camera?

    MR. McKITTRICK:  Objection.

    THE COURT:  Overruled.

    A    I didn't say anything.

    Q    Did anybody demand the camera from him?

    MR. McKITTRICK:  Objection.  That's leading.  Your Honor, this is a crucial part of the case, what was done there.

    THE COURT:  I'll sustain the objection.  Just rephrase the question.

    MR. BROWN:  Your Honor, the case of State vs. Damron, a 1982 case, says the Court can listen to leading questions.  Now, there is no jury here.  I am sure this Court can separate the wheat from the chaff.  All I want to do is get this information for your benefit, not for the jury's benefit.  I would like for you to hear this.

    THE COURT:  Well the Court can hear it.  And you are a competent, qualified and experienced trial lawyer, and you can

Terry Williams - Direct                                213

rephrase and get the information you want.   Rephrase it.

    Q    Did you say anything to Mr. Moss?

    MR. McKITTRICK:   Objection.   That has already been
sustained.

    THE COURT:   I sustained that, Pete.

    Q    What happened?   Tell us what happened.

    A    Well, after we got in the house, Mr. Moss gave us the
camera.   He gave it to me.   And right after he gave it to me I
believe Trooper Smith said, "You don't have any objection to
giving us this camera?"   And he said, "No."

    MR. McKITTRICK:   Objection and move to strike.

    THE COURT:   Lay the proper connection, and I'll permit it,
subject to the proper connection.

    MR. BROWN:   I'm not sure I understand the Court's ruling.
The man said what they said.

    THE COURT:   Well, it is very simple.   I sustained the
objection.   That's as far as I'm going.   I sustained the
objection.

    Q    Trooper Smith said, "Do you have any objection" --

    MR. McKITTRICK:   Your Honor --

    THE COURT:   I sustained the objection.   Strike it.

    Q    After Trooper Smith spoke, did Mr. Moss reply?

    MR. McKITTRICK:   Objection.

    THE COURT:   Overruled.

Terry Williams - Direct                          214

     A    Yes.

     Q    What did he say?

     MR. McKITTRICK:  Objection.

     MR. BROWN:  Judge, if you want to find out how this camera

ever got in their possession --

     THE COURT:  I don't care how it got in their possession.

The point is there is a way of getting this in.

     MR. BROWN:  That is just what I'm doing, Your Honor.

     THE COURT:  I'm not going to get in trouble in this record.

I sustain the objection.

     MR. BROWN:  The Court has the right to hear all the hearsay

it wants.

     THE COURT:  Show me the case.  You referred to a case.  Let

me see the Damron case you referred to.

     MR. BROWN:  All right, I might have them here.  My, my, look

here, State vs. Damron and State vs. Fairchild.

     (Documents examined by the Court.)

     THE COURT:  I am going to reverse my ruling based on State

of West Virginia vs. Fairchild No. 15501 and State of

West Virginia vs. Damron, No. 15580, Headnote 6:  "The allowance

of leading questions rests largely in the discretion of the

trial court and absent an abuse of such discretion the trial

court's ruling will not be disturbed."  And it goes on to

elucidate that within the opinion, and I will reverse myself and

Terry Williams - Direct                                    215

permit it.  However, I want to make it clear this would not be

permitted if a jury were here.

  Q  Would you tell the Court what Mr. Moss said in reply to

this.

  MR. McKITTRICK:  Show my objection.

  THE COURT:  Do you want to object every time, or do you want

a continuing objection?  It makes no difference to me.

  MR. McKITTRICK:  As to this line of questioning --

  THE COURT:  Do you want a continuing objection to this line

of questioning?

  MR. McKITTRICK:  Yes.

  THE COURT:  All right, you have it; and it will be preserved

in the record.

  Q  What did Mr. Moss say, sir?

  A  He said he had no objection to giving us the camera.

  Q  Was the camera handed over?

  A  Yes.

  Q  Who handed the camera over?

  A  Mr. Moss.

  Q  Who was it given to?

  A  Me.

  Q  Approximately how long were you officers in the home

from the time you went in the home until the time you left?

  A  Twenty minutes maybe.

Terry Williams - Direct                              216

    Q    Did Mr. Moss, the gentleman there at the house in Cleveland, indicate to you he did not want to cooperate?

    A    No.

    Q    Did Mrs. Moss ever indicate she did not want to cooperate?

    A    No.

    Q    Did either one of them ever express any desire for a lawyer?

    A    No.

    Q    Does State's Exhibit 5 indicate where the camera had been that day?

    MR. McKITTRICK:  Objection.  It speaks for itself.

    THE COURT:  I thought I gave you a continuing objection; but if you want to object each time, that's fine.  Overruled.

    A    Yes, it does.

    Q    Where was that, sir?

    A    It was in his car.

    Q    Since the time that those cameras were taken in Cleveland, sir, the three cameras as a result of the search warrant and the fourth camera that was taken or that was given to you by Mr. Moss, up until today, have those cameras ever been looked at by any person and identified?

    A    Yes.

    Q    Was the camera that was given to you by Mr. Moss in the

Terry Williams - Direct                                  217

evening ever identified?

    A    Yes.

    Q    Was it identified -- Who was it identified by?

    A    Paul Reggettz.

    Q    How did he identify it?  Did he identify it as a camera coming from his home?

    A    Yes.

    THE COURT:  So the record is clear, let it be shown that Mr. McKittrick had a continuing objection to that entire line of questioning which the Court overruled.

    THE COURT:  I think he objected generally to the questioning of this witness upon that document; didn't you, Parrish?

    A    Yes.

    THE COURT:  All right, and I overruled the same for the reasons aforesaid in the record.

    MR. McKITTRICK:  That document still hasn't been moved.

    THE COURT:  I know it.  Have you finished your direct?

    MR. BROWN:  Yes.

    THE COURT:  All right, Mr. McKittrick, cross-examination?

    MR. McKITTRICK:  Yes, sir.

                 - O -

Terry Williams - Cross                    ¦ 218

CROSS-EXAMINATION

BY MR. McKITTRICK:

Q     You have already identified State's Exhibit 4-B as the affidavit for the search warrant you signed; is that correct, sir?

A     Yes.

Q     And the information, as I understand it, that you received to put in your affidavit for the search warrant came from John Moss, III; is that correct?

A     No.  The information --

Q     Well, the information with regard to the physical objects that you wanted to seize came from John Moss, III; is that correct?

A     Yes.

Q     When was that information given to you?

A     On the 28th of October, 1980.

Q     Where were you when it was given to you?

A     At the state police office in Parkersburg.

Q     Are you telling His Honor that John Moss told you that there was a Glenfield bolt action .22 rifle, Serial No. 27526931, at his home?

A     He didn't tell us exactly that.

Q     Then you are saying he didn't give you all the information up here concerning the physical objects you attempted

Terry Williams - Cross                                    219

to seize.  Is that a fair statement?

 A Well, I'm not sure I know what you mean.  I don't know
whether that is a fair statement.

 Q He didn't give you all the information?

 A He didn't give us the serial number.

 Q Where did you get the serial number?

 A At Heck's in St. Albans.

 Q Heck's in St. Albans.  You, as I understand it, being
one of the primary investigating officers of the Reggettz
murders went to the home and was the first officer that found
the Reggettz family murdered; is that correct?

 A Yes.

 Q Now, the first time that you ever saw John Moss, as I
understand it, was on the 30th day of January, 1980; is that
correct?

 A Yes.

 Q Did you discuss anything about a rifle on that occasion
with John Moss?

 A No.

 Q The second time that you saw John Moss was on the 22nd
day of April, 1980; is that correct?

 A Yes.

 Q Did you discuss anything with John Moss about a rifle?

 A No.

Terry Williams - Cross                               220

    Q    Did you know on the 30th day of January, 1980, that a
rifle was missing from the Reggettz home?

    A    Yes.

    Q    How did you know that?

    A    Because Paul Reggettz told us.

    Q    Is that when he confessed to the crimes?

    A    When he confessed to the crimes?

    Q    Yes.

    A    Yes.

    Q    Now, did Paul Reggettz tell you that it was a Glenfield
rifle?

    A    Yes.

    Q    Would you please search your activity and show the
Court, if you will, where you find that Paul Reggettz told you
that a Glenfield rifle was missing from the home.

    A    I couldn't find it because I don't have it wrote down
anywhere.

    Q    In other words, you just remember --

    A    It was oral.

    Q    It was oral?

    A    Yes.

    Q    But you didn't think it was that important?

    A    Yes, we thought it was important.

    Q    But you didn't put it in your activity report?

Terry Williams - Cross                          221

    A    It is not in there about him telling us about it.

    Q    It wasn't important enough, I take it, to be put in your activity report?

    A    It is not in there as a Glenfield.  It is in there as a rifle.

    Q    Well, I know that.  My question is the information that you received orally from Paul Reggettz that a Glenfield rifle was taken from his home was not important enough to you as the officer who wrote the CIB activity for you to put it in there. Is that a fair statement?

    A    No, I couldn't say that is a fair statement.

    Q    What is the reason you did not put it in there?

    A    Maybe just an oversight.

    Q    An oversight?

    A    I couldn't tell you why I didn't put it in there.

    Q    Did Paul Reggettz also tell you that he had purchased the rifle at Heck's?

    A    Yes, I believe he did.

    Q    Can you show us that in your activity report?

    A    No.

    Q    Excuse me.

    A    No.

    Q    Is that not in there either?

    A    Not to my knowledge i 's not.

Terry Williams - Cross                        222

Q    So how do you know that a Glenfield rifle with this serial number was the rifle -- Strike that -- How do you know other than what Paul Reggettz told you that there was in fact a rifle missing?

A    I went to Heck's and checked the records.

Q    How do you know that that is the rifle -- How do you know that that rifle was in existence on the 30th day of December, 1979?

A    Well, I don't know it was in existence on the 13th of December.

Q    And you can't tell this Court that it was?

A    No.

Q    Now, did John Moss tell you in his so-called confession that there was ammunition with this gun that was supposedly at his house?

A    No.

Q    You have placed that in your affidavit; haven't you?

A    Yes.

Q    Did you take that on your own to do that?

A    Yes.

Q    When is the first time that you found out that a camera had been missing from the Reggettz home on the 13th day of December, 1979?

A    When was the first time?

Terry Williams - Cross                                     223

Q     Yes.

A     On the 28th of October, 1980.

Q     Where did you get that information?

A     John Moss, III.

Q     All right now, did John Moss describe to you that camera in his confession?

A     So to speak.

Q     In what respect?

A     I asked him about what kind of camera it was.  He told me he thought it was a Kodak or a Polaroid.  I said, "Is it the kind that develops its own pictures", and he said, "Yes."

Q     Is a Kodak a different make from a Polaroid?

A     They are different brands.

Q     And did John Moss describe the camera any more than that?

A     No.

Q     Did he ever describe it any more than that?

A     No.

Q     When did you have this meeting with Paul Reggettz?

A     What meeting are you speaking of?

Q     Where he identified this camera.

A     I believe it was last Monday.

Q     Where was that meeting held?

A     Here in the Prosecutor's office.

Terry Williams - Cross                                    224

    Q    Who was present?

    A    Myself, Paul Reggettz and Pete Brown, Assistant Prosecutor.

    Q    Did you have the Kodak camera that you had seized or taken from John's father with you when Paul Reggettz was in that meeting?

    A    Yes.

    Q    Did you have any other camera with you?

    A    Yes.

    Q    How many cameras did you have with you?

    A    Four.

    Q    And what were the nature and type of each of those cameras?

    A    Two of them were Polaroid and two of them were Kodak.

    Q    Where had you received those cameras, each one of them?

    A    Three of them we got when we executed the search warrant, and the fourth one we got from John's father.

    Q    When you executed the search warrant at John Moss' house; is that correct?

    A    Yes.

    Q    Is it your testimony that those three cameras were not iden'ified by Paul Reggettz as being the camera that came from his house on the 13th day of December, 1979?

    A    Yes.

Terry Williams - Cross                                    225

    Q     Have you returned those cameras to the Mosses?

    A     No.

    Q     Are you willing to do that?

    MR. BROWN:  Objection, Your Honor.

    THE COURT:  Sustained.

    Q     Now, tell us what happened in this meeting where Paul

Reggettz identified this camera, this Kodak camera.

    MR. BROWN:  Objection.  This is a suppression hearing going

to the constitutionality of the search.  He is now going into

whether or not we can identify certain items.  Now, Your Honor,

that is not at all what a suppression hearing is for.  We will

have to identify that camera when we bring it before this Court.

    THE COURT:  I agree.  This is a suppression hearing to

determine whether or not the items seized were seized in a

constitutional and lawful manner.  Now, at trial you have a

right, depending upon how the Court rules, then to bring in

evidence on how they were seized.

    MR. McKITTRICK:  Your Honor, I say this respectfully, but I

assume, and I am sure from the testimony that this camera was

contraband.  Now, if I can prove it wasn't contraband, that it

wasn't the camera missing out of the Reggettz home, then

obviously it should be suppressed.

    THE COURT:  I agree with you.

    MR. McKITTRICK:  'hat is what I am trying to do.

Terry Williams - Cross                    226

THE COURT:  But the point is that seems to me to be an issue

for cross-examination.  The purpose of suppression is to

determine whether or not this particular object was seized in a

lawful manner.  Now as to whether that object has any connection

with the underlying issue in this trial it seems to me is

properly brought out on cross-examination, should they attempt

to introduce the camera.

MR. McKITTRICK:  Well, Your Honor, let's say hypothetically

this trooper had not had Paul Reggettz look at this one camera.

He had four cameras.  Now, I'm asking you to suppress them all

in this hearing.  If he can't identify them, is the Court saying

I can't cross-examine to determine whether or not they were the

cameras that came out of the Reggettz home?  Just because he

went and seized them someplace don't make them the camera.  I

should be able to in this hearing pursuant to a motion to

suppress because one of the allegations in our motion is that he

can't identify it as coming from the Reggettz home, and that is

what I'm trying to cross-examine him on.

THE COURT:  That who can't identify it as coming from the

Reggettz home?

MR. McKITTRICK:  This trooper or anybody from law

enforcement because that has been the previous testimony up

until this time, Your Honor.

MR. BROWN:  Your Honor, these are matters to be brought out

Terry Williams - Cross                                    227

at a later hearing, but right now, the purpose of this hearing,

the reason this trooper is on the stand, is to determine whether

or not the search procedures were proper.  It makes no

difference if we seized eighty-five items and the Court throws

them all out later on because none of them can be identified.

That is not the point, Your Honor.  The point is did he use the

proper procedures to safeguard this man's constitutional rights

to an unlawful search of the home.  That's all.  Now, you can go

into this other stuff later on and have a hearing --

     THE COURT:  I'm not going to go into it later on and have

another hearing.  We can go into it now.  Objection overruled.

Proceed.  Get it out of the way now once and for all.

     MR. BROWN:  Excuse me, Your Honor.  Does this mean he can't

go into it later on?

     THE COURT:  What do you mean?

     MR. BROWN:  If we're going to have a hearing on it now, does

this mean Mr. McKittrick cannot have another in limine hearing

on this matter, on this camera?

     THE COURT:  In limine hearing?

     MR. BROWN:  Or another hearing about the identification of

this camera.  How many hearings do you get?

     MR. McKITTRICK:  I assume at the trial, Your Honor, we are

going to be able to voir dire this matter before it is

introduced to the jury.  I can't -- If Pete Brown comes in here

227

Terry Williams - Cross                                    228

and introduces that camera before the jury and then you find it

is not properly linked up, I can't take it from the jury's mind.

I assume I have a right to voir dire it on a motion in limine.

MR. BROWN:  Well, Your Honor, we're going to have hearing on

hearing.

THE COURT:  Well, you can have hearing on hearing on

hearing.  That's fine; then we'll have hearing on hearing on

hearing.

MR. BROWN:  I say it is not proper at this time, Your Honor;

and our witnesses were not advised of this.  We don't have

enough witnesses here, don't have the cameras here.  That wasn't

our purpose.  Our purpose was to study the scope of the

constitutional safeguards against unconstitutional searches.

MR. McKITTRICK:  I think the motion speaks for itself,

Your Honor.

THE COURT:  Proceed.  Would you read the last question.

(Whereupon, the last question was read by the reporter.)

MR. BROWN:  I object to that, Your Honor.  If he wants to

ask him if he identified that camera, that's fine.  But what I

did in there with Mr. Reggettz as any pre-trial preparation for

trial, I think that's --

THE COURT:  I agree with that, Mr. Brown.  I will sustain

that.  You can ask him whether or not Reggettz identified it,

but I'm not going to let you get into what else went on down

Terry Williams - Cross                                    229

there with the Prosecutor's trial tactics.  That is not proper.

MR. McKITTRICK CONT:

Q    What was the purpose of this meeting that you had with

Paul Reggettz?

A    For him to identify the camera.

MR. McKITTRICK:  All right.  I don't consider that pre-trial

strategy or work product or whatever, but if you --

THE COURT:  You can ask him what Reggettz did, but you are

not going to ask him what Mr. Brown did.  If you want to ask him

what Reggettz did, go ahead and ask him.  But you are not going

to ask him what Mr. Brown did.

Q    Well, let me go ahead and ask you what Mr. Brown did so

that the Court can sustain an objection.  What did Mr. Brown do?

MR. BROWN:  Objection.  He is at the back door getting in

the same thing, Your Honor.

THE COURT:  All right, he has made his record.  Sustained.

Q    What did Mr. Reggettz do with regard to identification

of the camera?

A    He picked out the camera that belonged to him.

Q    Did you show him the other cameras?

A    I laid them all four out there.

Q    Were any of the other cameras exactly the same as the

one he picked out?

A    Yes.

Terry Williams - Cross                                    230

Q    There was nothing different about them?

A    Well, there was something different.

Q    Did he explain to you what it was?

A    No, he didn't.  I mean there was something different about the cameras, some markings on the cameras.

Q    In other words, you had two cameras that were Kodak cameras, characterized as Kodak Handles; is that correct?

A    Yes.

Q    Were those cameras different?  Did they have any different characteristics?

A    No.

Q    Was there any markings on one that wasn't on the other?

A    Yes.

Q    Did Mr. Reggettz pick out the one with the markings or without the markings?

A    Without.

Q    Was there anything on the camera that Mr. Reggettz picked out that he indicated was the reason that he picked that camera?  Did it have any individual characteristic of any manner, means or form that indicated to him that that was his camera?

A    No.

Q    Did Mr. Reggettz indicate to you why he was so sure that the camera he picked out was his camera and was the camera

Terry Williams - Cross                                    231

that was in his home on the 13th of December, 1979?

    A    No.  He just said it was his camera.

    Q    Did you ask him?

    A    No.

    Q    Did you not think that was important?

    A    No.  I thought it was important that he picked out his

camera.

    Q    Do you have any idea why Mr. Reggettz picked that

camera out and said it was his?

    A    No.

    Q    Have you had an opportunity to investigate, to look at

any other Kodak Handle cameras?

    A    Besides the ones I have?

    Q    That's correct.

    A    No.

    Q    Is there anything on the camera that Mr. Reggettz

picked out, as far as you personally are concerned, that is

individualistic, in other words, a specific kind of

characteristic or a marking or something broke on it?

    A    Yes.

    Q    On the camera that Mr. Reggettz picked out?

    A    Yes.

    Q    What?

    A    On the back of it they have like little square stick

Terry Williams - Cross                              232

things with letters on them like you put your initials on.  They

were missing on that camera, like they had been taken off.

Q     Are you saying that there was some residue left or some

glue or something where they had been stuck on there?

A     Yes.

Q     Did Mr. Reggettz indicate to you that is the reason he

picked that camera out?

A     That was one of them.

Q     What else was there?

A     The handle was broken on the other camera.

Q     The handle was broken on the camera he did not pick

out?

A     Yes.

Q     And the handle on this camera was not broken?

A     Yes.

Q     All right now, the camera that he picked out, was there

any other kind of characteristics that you noticed or was brought

to your attention by anyone?

A     Yes.

Q     What?

A     There was a name on the other camera with little

sticker things, little stick letters.

Q     There was a name on the camera he did not pick out?

A     Yes.

Terry Williams - Cross                                    233

Q    What was the name?

A    Moss.  I don't remember the first name.  Something Moss.

Q    But the camera he did pick out, are there any other individualistics on that camera that looked like they were imposed or put on there after its manufacture or after its sale?

A    No.

Q    When you, Trooper Williams, brought those four cameras back to Charleston, West Virginia, did you know which one of those cameras, after you had seized them at the Moss residence, which one of those cameras may have been the camera that came from the Reggettz residence on the 13th day of December, 1979?

A    Yes.

Q    What camera did you believe came from the residence?

A    The one that John Moss, III's father gave us.

Q    How come you arrived at that conclusion?

A    By what John told us in his confession.

Q    And what did he tell you that made you arrive at the conclusion that that specific camera had come from the Reggettz home?

A    John told me that the camera he took from Paul Reggettz' home was on his chest in his bedroom.  When we went to his house in Cleveland, his mother and father's house with the search warrant, the camera was not there; and his mother told us

Terry Williams - Cross                                234

that that camera, that she had taken it and used it and put it

in his father's car, and that is where it was.

 Q The camera that was on his chest?

 A Yes.

 THE COURT:  I hate to be picky, but for the sake of the

record, by "chest", what are you referring to?

 THE WITNESS;  Chest of drawers.

 MR. Mckittrick;  That's all the questions I have, Your

Honor.

 THE COURT:  Any redirect?

 MR. BROWN:  No, Your Honor.

 THE COURT:  Okay, Trooper, you may step down.

 (Witness Excused.)

 MR. BROWN:  At this time the State would move into evidence

all of the exhibits it has had marked, which would be State's

Exhibits 1 through 5, including 4-A, B, C and D.

 THE COURT:  All right.

 MR. McKITTRICK:  Defendant objects to State's Exhibit No. 5

on the basis that it is a hearsay writing of another individual.

 THE COURT:  Would you gentlemen mind telling me what these

exhibits are.

 (Whereupon, a discussion was had off the record and then

resumed back on the record as follows:)

 THE COURT:  State's Exhibits 1 through 4-A, B, C and D will

234

Ernestine Whitlock - Direct                          235

be admitted into evidence without objection by the defense.

State's Exhibit 5 will be admitted into evidence over the

objection of the defense.

    All right, who is your next witness?

    MR. BROWN:  That's all we have, Your Honor, on these

matters, which as I understand are the search, the blood, the

confession and the detainer; and of course, we feel that

Mr. McKittrick will have the burden on the detainer.

    THE COURT:  Mr. McKittrick indicated he has five witnesses

he wishes to call on these issues.

    MR. McKITTRICK:  I may be able to get a couple of witnesses

on here real quick.

    THE COURT:  That's fine.  Call you first witness then,

Mr. McKittrick.

    MR. McKITTRICK:  Ernestine Whitlock.

                        - 0 -

                ERNESTINE WHITLOCK,

        Being thereupon called as a witness, after

        being first duly sworn, testified as follows:

                                DIRECT EXAMINATION

BY MR. McKITTRICK:

    Q    State your name please.

    A    Ernestine Whitlock.

    Q    Ernestine, are you employed?

Ernestine Whitlock - Direct                    236

    A    Yes, I am.

    Q    Where are you employed?

    A    In the Circuit Clerk's office of Kanawha County,
West Virginia.

    Q    What are your duties there?

    A    All of them?

    Q    What are your duties there relative to criminal matters
in the Circuit Court?

    A    I am presently serving as courtroom clerk to the
Honorable John Hey, one of the seven circuit judges.

    Q    Were you employed on January 1, 1980, by the Circuit
Clerk's office of Kanawha County, West Virginia.

    A    Yes, sir.

    Q    Were your duties relative to criminal matters in the
Circuit Court of Kanawha County any different at that time than
they are today?

    A    No.  They are about the same routine.

    Q    Did you have an opportunity in January of 1980 to do
anything with regard to the grand jury in Kanawha County,
West Virginia?

    A    Yes, sir.

    Q    Do you as part of your duties keep the official
indictments returned by the Kanawha County grand jury?

    A    Yes, sir.

Ernestine Whitlock - Direct                     237

    Q    And did you do so in January of 1980?

    A    Yes, sir.

    Q    Pursuant to the January Term of the Kanawha County grand jury?

    A    Yes, sir.

    Q    During the January Term, 1980 of the grand jury of Kanawha County, was an indictment returned against Paul Reggettz?

    A    Yes, sir.

    Q    And have you at my request brought a copy of that with you?

    A    A copy of the indictment?

    Q    Yes.

    A    No, sir, not a copy.  I have the original indictment.

    MR. McKITTRICK:  Your Honor, with your permission I would like to have this marked, and we can run a copy off --

    MR. BROWN:  Judge, excuse me.  Before you put that mark on there, could we just maybe indicate what that exhibit is and not put any kind of marking on an original.

    THE COURT:  Better than that, let's have that Xeroxed on both sides and then you can mark the Xerox copy.  Is there any objection to that by counsel for the defendant?

    MR. McKITTRICK:  None, Your Honor.

    THE COURT:  For the State?

Ernestine Whitlock - Direct                          238

    MR. BROWN:  No.

    (Whereupon, a discussion was had off the record and then

resumed back on the record.)

    THE COURT:  All right, proceed.

    (Whereupon, a Xerox copy of the document previously

referred to was marked by the reporter as Defendant's Exhibit

No. 4.)

    Q    Do you have records, and did you keep records at that

time that reflect what witnesses appeared before the grand jury

pursuant to the indictment of Paul Reggettz?

    A    Yes, sir.

    Q    And what witnesses appeared before the grand jury; and

tell us the dates that they appeared please.

    A    Robert Murphy appeared on April 28, 1980.  Williams

appeared on January 15, 1980.

    THE COURT:  Is that Terry Williams?

    THE WITNESS:  Yes, Your Honor.

    Q    Was that January 15?

    A    Yes, sir.

    Q    When was the indictment reported out by the grand jury?

    A    The indictment was returned on April 28, 1980; and the

order was entered and signed by Judge Hey on April 30, 1980.

    MR. BROWN:  Excuse me, what was the date for Murphy please?

    THE WITNESS:  Murphy was April 28.

Ernestine Whitlock - Direct                     239

     THE COURT:  The 28th?

     THE WITNESS:  Yes, Your Honor.

     THE COURT:  I'm confused.  I thought you said Williams was

the 28th and Murphy --

     THE WITNESS:  Murphy was the 28th, and Williams was

January 15.

     MR. McKITTRICK:  Now, Your Honor, I would like to move that

copy of the indictment into evidence.

     THE COURT:  Is there any objection to a copy of the

indictment of Paul Reggettz, returned by the January, 1980 grand

jury of the Circuit Court of Kanawha County, any objection to

that being introduced into evidence?

     MR. BROWN:  No, Your Honor.

     MR. STUCKY:  The indictment?

     THE COURT:  Yes.

     MR. STUCKY:  No.

     THE COURT:  All right, Defendant's Exhibit No. 4, a copy of

the indictment, will be introduced into evidence, without

objection by the State.

     Do you have any further questions of this witness?

     MR. McKITTRICK:  No, Your Honor.

     THE COURT:  Any cross-examination?

     MR. BROWN:  Yes, sir.

                         - 0 -

Ernestine Whitlock - Cross - Redirect          240

                                        CROSS-EXAMINATION

BY MR. BROWN:

    Q    Your records indicate that these people were subpoenaed

to appear before the grand jury on those dates; is that correct?

    A    This list that I hold is a copy of the list that is

prepared by the Prosecuting Attorney of Kanawha County.  Trooper

Terry Williams was subpoenaed to appear on January 15, 1980, at

1:30 p.m

    Q    That record just indicates subpoenaes were issued for

those dates and at those times?

    A    Right.

    Q    Do your records indicate, Mrs. Whitlock, that they were

subpoenaed to appear for a particular case or just that they

were subpoenaed to appear on that date?

    A    Mr. Brown, there is a number that appears after each

name on this list which means nothing to me.  I don't know.

    MR. BROWN:  That's all.

                            - O -

                                        REDIRECT-EXAMINATION

BY MR. McKITTRICK:

    Q    Mrs. Whitlock, to clear the record up, do you have

documents in your possession that indicate that those

individuals you have enumerated to the Court were sworn to go

before the grand jury and testify?

Ernestine Whitlock - Cross - Redirect          241

    A    I have a routine, when we open court the Judge calls for grand jury witnesses to be sworn.  If the person is here, I write a red or blue or green, or what have you, in the left side of the page the date that they appear to be sworn to go before the grand jury; and the swearing is done in open court.

    Q    And have you looked at your documents, and do they reflect that the witnesses you have enumerated, that is Mr. Williams and Mr. Murphy, were sworn to testify before the grand jury on the dates that you have enumerated for the Court?

    A    Yes, sir.

    MR. McKITTRICK:  That's all.

    THE COURT:  Any recross?

    MR. BROWN:  No, Your Honor.

    THE COURT:  All right, thank you, Mrs. Whitlock.  You may step down.

    (Witness Excused.)

    THE COURT:  Call your next witness.

    MR. McKITTRICK:  Beverly Selby.

                - 0 -