**MOSS v. BALLARD
CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 22
(CONTINUATION, pp. 241 to end)**

BEVERLY SELBY,

Being thereupon called as a witness, after

being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q      Would you state your name please.

A      Beverly Selby.

Q      Beverly, are you employed?

A      Yes, I am.

Q      Where are you employed?

A      At the Prosecuting Attorney's office here in Kanawha

County, West Virginia.

Q      What are you employed as at the Prosecuting Attorney's

office?

A      Assistant Prosecuting Attorney.

Q      And when were you so employed?

A      Around the first of January, 1981.

Q      Are you assigned to the juvenile division of the

Prosecuting Attorney's office of Kanawha County?

A      No, but I was.

Q      Did you have occasion to handle juvenile matters?

A      Not any more.

Q      Did you?

A      Yes.

Beverly Selby - Direct                                    243

     Q     Were you acquainted with the case of State of
West Virginia vs. John Moss as it related to an alleged
felonious assault shooting at the Moose Club in St. Albans,
West Virginia?

     A     Yes.

     Q     Do you have that file with you?

     A     It is back there.  The deputy has it.

     Q     Would you like for me to retrieve that for you?

     A     Yes.

     MR. STUCKY:  Your Honor, at this time, pursuant to the
confidentiality laws of West Virginia, as the Court is well
aware, it is a misdemeanor offense to release any juvenile
records to any person for any reason without a court order.  And
to prevent one of my assistants from committing a criminal
offense in West Virginia, I would ask that none of the records
either from my office or the circuit clerk's office regarding
John Moss as a juvenile be released without a court order
ordering that those be released for whatever purpose.  There are
specific purposes set forth in the statute, and I don't believe
this falls within one of those purposes.

     MR. McKITTRICK:  I believe it does, Your Honor, but one of
the easiest ways to remedy that, 'f there is no objection by the
State, is to get a court order, if you feel it is necessary.

     THE COURT:  Oh, I feel it is ne essary, because it occurs to

Beverly Selby - Direct                           244

me that only recently a circuit judge was chastized by the

Supreme Court for releasing certain juvenile information in the

southern part of this State.

I am going to sustain the objection at this time.

MR. McKITTRICK:  I will file a petition for an order if you

want me to.

THE COURT:  It is not a question of what I want.  They have

raised an objection, and I have sustained the objection.  File

your petition, and I'll act on it.  Why don't we take a two

minute informal recess and sit right here, and counsel for the

State and counsel for the defendant might be able to work this

thing out.

(Whereupon, a discussion was had off the record and then

resumed back on the record as follows:)

MR. McKITTRICK:  Your Honor, I am going to withdraw this

witness for the time being; and we are going to remedy this

problem during noon.

THE COURT:  All right, Beverly, step down and be available

around 1:00.

THE WITNESS:  Yes, sir.

(Witness stands aside.)

MR. McKITTRICK:  My next witness is Trooper Williams.

- 0 -

THE CLERK:  You are still under oath.

TERRY WILLIAMS,

Having been previously sworn as a witness,

further testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q     Your name please.

A     Terry Williams.

Q     You are the same Terry Williams who has testified in numerous hearings in State of West Virginia vs. John Moss; is that correct?

A     Yes.

Q     And you have testified in behalf of the State of West Virginia in these hearings in the last couple of days; is that correct -- On the behalf of the State of West Virginia in the last couple of days.

A     No, just today.

Q     Okay, just today.  Trooper Williams, as a part of your duties as a state police officer you investigated the Reggettz murders; is that correct?

A     Yes.

Q     And you signed, I believe, the CIB activity report that was an accumulation of that investigation; is that correct?

A     Yes.

Q     What is a CIB activity report, sir?

Terry Williams - Direct                                    246

     A     Well, it is what you do in an investigation.

     Q     And you were one of the two primary officers who
investigated the Reggettz murders?

     A     Yes.

     Q     Did you appear before the January, 1980 grand jury?

     A     Yes.

     Q     And did you appear at that grand jury on behalf of the
State of West Virginia to present evidence against Paul Reggettz
relative to his committing the murders of Vanessa Reggettz,
Bernadette Reggettz and Paul Eric Reggettz?

     A     Yes.

     Q     Did you go before that January Term of the Kanawha
County grand jury in 1980 in the month of January?

     A     I don't remember what month it was.  I think it was
January.

     Q     How many times did you appear before the January grand
jury before an indictment was returned against Paul Reggettz?

     A     Once.

     Q     Let me hand you what has been marked for identification
purposes as Defendant's Exhibit 4 and ask you if you are
familiar with that indictment which was returned by the January
Term of the Kanawha County Grand Jury against Paul Reggettz?

     A     If I was what now?

     Q     If you are familiar with it.  Read it over please.

Terry Williams - Direct                                    247

    A      This is the first time I have seen this.

    Q      It is the first time you have seen it?

    A      This, yes.

    THE COURT:  No offense to anybody, but that is, of course, a

copy of the original.

    MR. McKITTRICK:  Yes, it is, Your Honor.  Thank you.

    Q      Are you -- Strike that -- You are familiar with the

fact that Sergeant Murphy also appeared before that grand jury

and testified concerning the blood that you assisted in

extracting from John Moss on the 22nd day of April, 1980; is

that correct, sir?

    A      Repeat the question please.

    Q      You are familiar with the fact that Sergeant Murphy

also appeared before that grand jury and before that indictment

was returned and testified concerning blood that was extracted

from John Moss on the 22nd day of April, 1980?

    MR. STUCKY:  Objection, Your Honor.  Grand jury testimony is

secret in there, and Mr. Williams wasn't anywhere near the grand

jury when Murphy testified.  He has no way of knowing it.

    THE COURT:  I'm not going to let this witness testify as to

any testimony given by Sergeant Murphy before the grand jury.

Sustained.

    Q      You are familiar with the fact that Sergeant Murphy

appeared before that January Term of the grand jur ; are you

Terry Williams - Direct                              248

not?

 A  Not at that time, I didn't know.

 Q  Do you know now?

 A  It says on here he did.

 Q  Do you notice in Defendant's Exhibit No. 4 that John

Moss' name is stated, but he is not indicted?

 A  Yes.

 Q  Do you know the reason for that?

 A  No.

 Q  Did you tell me yesterday that the reason for that was

that the only evidence you had against John Moss at that time

was a blood sample?

 MR. BROWN:  Objection, Your Honor.

 THE COURT:  Now wait a minute.  He has denied it.  He said

he didn't know and counsel has indicated a conversation took

place opposite of that testimony.  I'm going to permit it.

 MR. BROWN:  Your Honor, that puts Mr. McKittrick's word

against the witness' word.  Mr. McKittrick is not under oath.

There is no way to cross-examine him.  He is putting his word

against the trooper's.

 MR. McKITTRICK:  That's exactly right.  This is a motion to

suppress and many defense lawyers have testified in motions to

suppress.  And I am an officer of this Court, and I am under

oath.

Michael Don Smith - Direct                          250

    (Whereupon, the last question was read by the reporter.)

    A     No, I did not.

    MR. McKITTRICK:   That's all the questions I have.

    THE COURT:   Any cross?

    MR. BROWN:   No, Your Honor.

    THE COURT:   Thank you, Trooper Williams.   Is he on standby
or is he excused?

    MR. BROWN:   Your Honor, we would like to keep him here until
this afternoon.

    THE COURT:   All right, be here at 1:30.   Anything further?

    (Witness stands aside.)

    MR. McKITTRICK:   Your Honor, I might be able to get one more
witness on.

    THE COURT:   Fine.   Call him or her, whomever.

    MR. McKITTRICK:   The defense calls Trooper Smith.

    THE COURT:   All right, Trooper Smith, take the stand.   You
are still under oath.

                          - O -

                    MICHAEL DON SMITH,

        Having been previously sworn as a witness,

        further testified as follows:

                              DIRECT EXAMINATION

BY MR. McKITTRICK:

    Q     You are the same Trooper Smith that has testified

Michael Don Smith - Direct                              251

heretofore in these proceedings?

    A    Yes.

    Q    Trooper Smith, you assisted in interrogating John Moss concerning the Reggettz murders; is that correct, sir?

    A    Yes.

    Q    And during your interrogation did John Moss indicate to you that he had been cut during the scuffle that led to the Reggettz murders?

    A    Yes.

    Q    Now, what else did John Moss tell you about that, that cut?

    A    That he received a cut on his left little finger.

    Q    And you have indicated that he showed that to you; is that correct?

    A    A small scar.

    Q    On his left little finger?

    A    Yes.

    Q    I am going to ask Mr. Moss to approach you and show you his left little finger; and if you would, for purposes of this record, would you point out where the scar is, sir?

    A    Well, there is a scar right here, right at the bottom.

    Q    Is that where he showed you?

    A    I just remember him showing me a scar on his left little finger.

Michael Don Smith - Direct                          252

     Q     Well, do you see any other scars on his left little
finger other than the one that appears there?

     A     No.  That is all I can see.

     Q     And the scar that we are talking about is on the
outside of the left little finger under the knuckle; is that
correct?

     A     Well, it is at the bottom.

     Q     It is under the knuckle where you make a fist?

     A     Yes.

     MR. McKITTRICK:  That's all the questions I have.

     THE COURT:  Let the Prosecutor see the scar to which you
were referring.

     (Scar examined by Prosecutors.)

     THE COURT:  Any cross?

     MR. BROWN:  No, I don't have any.

     THE COURT:  No cross?

     MR. BROWN:  No.

     THE COURT:  Thank you, Trooper Smith.  You may step down.
Do you want him on call also?

     MR. BROWN:  Yes, Your Honor, just until Mr. McKittrick
finishes.  We may have some redirect.  It could be possible, but
I don't anticipate it at all.

     (Witness stands aside.)

     MR. McKITTRICK:  Judge, I think that is all I am going to be

253

able to get on at this time.

THE COURT:  All right, if you gentlemen can work out the problem with Mrs. Selby's testimony, fine.  If not, we will take that up as the first order of business.  Let's try to get back here around 1:15 or 1:20.

MR. BROWN:  Yes, sir.

MR. McKITTRICK:  All right.

- O -

(Whereupon, a recess was had in the proceedings.)

- O -

AFTERNOON SESSION

WHEREUPON, the proceedings in the Matter of STATE OF WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III, CR-82-F-221, were resumed with all parties present as before noted, including the defendant and his counsel, and the State of West Virginia by James C. Stucky, Prosecuting Attorney, and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha County.

THE COURT:  Show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts.  The defendant is present in person and by his counsel; the State of West Virginia by Mr. Stucky, Prosecuting Attorney,

Robert C. Murphy - Direct                           254

and Mr. Brown, Assistant Prosecuting Attorney for Kanawha

County.

    All right, where are we, gentlemen?

    MR. McKITTRICK:  The defense calls Mr. Murphy as a witness.

    THE COURT:  Come forward to be sworn.

                    - O -

              ROBERT C. MURPHY,

      Being thereupon called as a witness, after

      being first duly sworn, testified as follows:

                        DIRECT EXAMINATION

BY MR. McKITTRICK:

    Q    State your name please.

    A    Robert C. Murphy.

    Q    Bob, are you presently employed?

    A    Yes, sir.

    Q    Where are you employed?

    A    I am employed as a chemist at the Department of Natural

Resources Organics Laboratory at Guthrie.

    Q    Were you formerly employed as a chemist by the

West Virginia Department of Public Safety?

    A    Yes, sir, I was.

    Q    When were you so employed?

    A    September of '71 until October of '82.

    Q    Let me direct your attention to April, 1980.  Did you

Robert C. Murphy - Direct                            255

receive blood samples from Trooper Williams concerning the what

is commonly called the Reggettz murder case, that blood being

the blood of John Moss, III?

    A    Yes, I did.

    Q    Did you do an analysis on that blood?

    A    Yes, sir.

    Q    When did you receive the blood?

    A    I actually received it, I believe it was the 23rd of

April.

    Q    Of 1980?

    A    Yes.

    Q    When did you complete your analysis?

    A    All of the tests were completed by the 26th of April.

    Q    Now, on the 28th day of April, 1980, did you appear

before the Kenawha County grand jury?

    A    Yes, sir, I did.

    Q    And did you testify before the grand jury?

    A    Yes, I did.

    Q    Did you testify before the grand jury concerning the

consistency of John Moss' blood with certain blood that was

taken as samples from the Reggettz murders?

    A    Yes, sir, I did.

    Q    Did you find that some of the samples taken from the

Reggettz murders which occurred on the 13th day of December,

Robert C. Murphy - Direct                          256

1979, were consistent with the blood that you analyzed of John

Moss, III?

    A    Yes, sir.

    Q    And did you so testify before the January Term of the

grand jury on the 28th day of April, 1980?

    A    Yes, sir, I did.

    Q    Other than testifying to your analysis of John Moss,

III's blood before the January Term of the grand jury of Kanawha

County, West Virginia, did you testify to anything else

concerning the investigation of the Reggettz murders?

    A    My testimony was limited exclusively to the blood

samples.

    MR. McKITTRICK:  That is all the questions I have.

    THE COURT:  Cross?

    MR. STUCKY:  None.

    THE COURT:  All right, thank you, Mr. Murphy.  You may step

down.

    (Witness Excused.)

    MR. McKITTRICK:  At this time, Your Honor, the defense would

ask permission to approach the bench.

    THE COURT:  All right.

    THE COURT:  And would lodge with the Court a petition which

requests the Court's approval, confirmation and permission to

use or to have certain information disclosed from what has been

characterized in these hearings as the felonious assault case at the Moose Club, which occurred in May of 1979.

THE COURT:  Any objection?

MR. BROWN:  Your Honor, there is no objection.  We would only ask that this portion of the testimony be not open to the public.

THE COURT:  Not what?

MR. BROWN:  Not open to the public, that this portion of the testimony that will be adduced not be open to the public.

THE COURT:  Any objection by the defense?

MR. McKITTRICK:  No, Your Honor.

THE COURT:  All right, Mrs. Selby, you may retake the stand. I would remind you you are still under oath.

Let the record show that this portion of the proceedings or these portions of the proceedings are closed to the public upon motion by the State and without objection by defense counsel. And the Court has a petition from defense counsel for disclosure and inspection of all juvenile law enforcement records on file pertaining to John Moss, III, Juvenile Action No. 80-664, which petitions the Court to call an Assistant Prosecuting Attorney for the purpose of testimony for John Moss, III in a pending criminal action against him, pursuant to West Virginia Code 49-5-17.  That petition will be granted without objection by the State.

- O -

BEVERLY SELBY,

Having been previously sworn as a witness,

further testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q    Mrs. Selby, you indicated to me that you are familiar

with the file in question and that you had it in your

possession; is that correct?

A    That's right.

Q    Now, does the file reflect to you the nature of the

charge against John Moss?

A    On the malicious wounding?

Q    Yes.

A    Yes, on the malicious wounding.

Q    What was the nature of the charge, and when did it

occur?

A    A malicious wounding against one Montina Diggert on may

31, 1979, sworn to before Norma Todd, June 6, 1980, and filed

September 9, 1980.

Q    Were the charges against one John Moss, III, who is

seated at counsel table with the red jumpsuit on?

A    Yes, sir.

Q    Were you assigned to handle this case for the

Beverly Selby - Direct                    259

Prosecuting Attorney's office for Kanawha County, West Virginia?

A    I was assigned to handle the juvenile proceedings on the homicide case, and then I just assumed that I was also to handle the other case on John Moss.

Q    And then I take it, pursuant to your duties as Assistant Prosecuting Attorney of Kanawha County, that you started to handle the malicious wounding case?

A    That's right.

Q    When did this file, to the best of your knowledge, come into your possession?

A    Probably around the first of March of '81 because it first came up for a preliminary hearing on March 5, 1981, and I generally get the file for a preliminary hearing about a week before, something like that.

Q    As a result of your handling this file, you were aware that John Moss, III, on the 28th day of October, 1980, was brought back to West Virginia pursuant to a detainer?

A    That wasn't in the file.

Q    Are you familiar with that as a result of your duties in the Prosecuting Attorney's office?

A    Of what, the detainer?

Q    Yes.

A    Yes.  I have seen the detainer since then, of course.

MR. McKITTRICK:  I would like to have this marked as

Beverly Selby  -  Direct                          260

Defendant's Exhibit 5.

     (Whereupon, the document referred to was marked by the

reporter as Defendant's Exhibit No. 5.)

     Q     Now, I take it you were familiar with the detainer

which John Moss was brought back on after he was brought back;

is that correct?

     A     I wasn't there when he was brought back.

     Q     I take it you were familiar with the detainer that John

Moss was brought back on to West Virginia?

     A     At one point, yes.

     Q     And that was after he was brought back?

     A     Yes.

     Q     To the State of West Virginia --

MR. STUCKY:  He is starting to lead his own witness.

MR. McKITTRICK:  I am just trying to hurry this proceeding.

THE COURT:  I agree, Mr. McKittrick.  Overruled.

     Q     And of course, the detainer has a great deal of

relevance to the case itself and how much time you have to

prosecute it; does it not?

     A     Right.

     Q     And in what regard does it?

     A     Well, that's when I became aware of the detainer was,

let's see, it was after the motions for the psychiatric

examination on the murder charges, and some time started lapsing

Case 2:09-cv-01406 Document 17-17 Filed 10/29/10 Page 20 of 106 PageID #: 3085

Beverly Selby - Direct                                261

and it occurred to me, "Don't you have just so many days on a

detainer." And it was at that point that I went to look at the

detainer and the date and the statute and all that. That was

after all this business on the malicious wounding charge.

    Q      And the detainer that you familiarized yourself with I

believe is the detainer that has been marked as Defendant's

Exhibit 5. Would you look that over carefully and tell us if

that is true.

    A      Do you also have the detainer on the homicide charge?

    Q      No. Is that not it?

    A      No, because --

    Q      The only one I am asking you about now is the felonious

assault charge.

    A      I don't know if I have ever seen this one or not. I

have seen one detainer. If I could compare this one with the

other one, I could tell you if this is the one I saw before.

    Q      What I have asked you so far, you have testified that

you handled the felonious assault case?

    A      Yes.                                    .

    Q      And that you familiarized yourself with the detainer

because it had some relevance in the felonious assault case

because you have to prosecute the defendant in a certain amount

of time, and you said yes. Is that a fair statement?

    A      I wasn't clear on which detainer you were talking

Beverly Selby  -  Direct                    262

about, okay?

    Q    Okay --

    A    The detainer I was concerned with was the one on the homicide charges; and I think that is the only one I have ever looked at.

    Q    Are you saying --

    A    I don't think I have ever seen this one before because it was not in the juvenile file.  It was kept in a separate file having to do with detainers.

    Q    Did you know John Moss had been brought back from the State of Ohio on a detainer?

    A    Yes.  I didn't know there were two separate detainers until later on after the motion for the psychiatric examination on the murder charges.  Only then did I become aware that there were two detainers.

    Q    Are you telling the Court that you are not familiar with this detainer at all?

    A    I don't think I have ever seen this particular one, although it might have in a stack of papers I Xeroxed for you in discovery.

    Q    It was --

    A    And didn't bother to set and read it.

    Q    Was John Moss ever prosecuted in the State of West Virginia on this felonious assault case at the Moose Club?

Beverly Selby - Direct                                    263

    A     I appeared a couple of times for the preliminary

hearing, but they were always continued.  And then eventually

Ed Moss just continued it generally until the other charges

were disposed of.  So no evidence was ever taken in a hearing or

anything.

    Q     Have the charges been dismissed?

    A     No.

    Q     Has the Court lost jurisdiction of the charges as a

result of John Moss being returned to the State of Ohio and

brought back on another detainer without being prosecuted on the

felonious assault detainer?

    MR. STUCKY:  Objection, Your Honor.

    A     There is some question about that.

    MR. STUCKY:  That is a judicial question for the Court not

for --

    MR. McKITTRICK:  This is a lawyer.

    MR. STUCKY:  The Court makes the ruling --

    THE COURT:  Sustained.

    MR. STUCKY:  Not the lawyer.

    THE COURT:  Sustained.

    Q     Are you familiar with the fact that John Moss, III was

returned to the State of Ohio and then brought back to the State

of West Virginia on a second detainer, which was the homicide

detainer that you speak of?

A     Yes.

MR. STUCKY:  Your Honor, if what defense counsel is wanting is for the record to contain the fact that John Moss was brought back in October, 1980, pursuant to a detainer for a malicious wounding, later returned to the State of Ohio, and subsequently brought back to the State of West Virginia in December of 1980 pursuant to a detainer for three homicides, I think the Court file or at least the records of this case should contain that information; and that information is in fact correct.  Anything further than that, I don't know --

MR. McKITTRICK:  I don't know if the court files do contain that information.  We have it here, Your Honor.  We have that information with regard to the detainer on the felonious assault and the homicides; and we can put it into evidence at this time.

MR. BROWN:  That is our copy, Your Honor.  We would like to get it back.

THE COURT:  All right, have it Xeroxed.  Is there any objection to a copy?

MR. McKITTRICK:  No, just so we can get it in.

Q     You are familiar, are you not, that John Moss, III was brought back from Ohio on a detainer pursuant to section four of the detainer for a felonious assault in the Moose Club case; isn't that right?

A     That's right.

Beverly Selby - Direct                              265

    Q    And that is represented by what has been marked as
Defendant's Exhibit 5?

    A    Right.

    MR. McKITTRICK:  We move the admission of Defendant's
Exhibit No. 5.

    THE COURT:  Any objection?

    MR. BROWN:  Is that all the detainer papers? That is all we
want to know.

    MR. McKITTRICK:  Yes.

    MR. BROWN:  All right.

    THE COURT:  All right, it will be admitted into evidence as
Defendant's Exhibit No. 5, without objection by the State.

    MR. McKITTRICK:  I would like to have this marked.

    (Whereupon, the document referred to was marked by the
reporter as Defendant's Exhibit No. 6.)

    Q    Now, let me hand you what has been marked for
identification purposes as Defendant's Exhibit No. 6 and ask you
if that is the detainer that you are familiar with concerning
the proceedings which John Moss was brought back on?

    A    Yes.  This is the one I have seen before.

    MR. McKITTRICK:  We move the introduction of Defendant's
Exhibit No. 6.

    THE COURT:  Any objection?

    MR. BROWN:  No objection.

Beverly Selby - Direct                                266

     THE COURT:  All right, it will be admitted into evidence as

Defendant's Exhibit No. 6, properly marked, without objection by

the State.

     Q    Now, you are familiar, are you not, as a result of

being in this case and handling the felonious assault case that

John Moss was returned to the State of Ohio after being brought

to the State of West Virginia pursuant to the felonious assault

and brought back to West Virginia on the homicide detainer?  Is

that a fair statement?

     A    Yes.

     MR. McKITTRICK:  That is all the questions I have, Your

Honor.

     THE COURT:  Any cross?

     MR. McKITTRICK:  No, Your Honor.

     THE COURT:  All right, thank you, Mrs. Selby.  You may step

down.

     (Witness Excused.)

     MR. BROWN:  We probably ought to open those doors again.

     THE COURT:  Yes.  Mangus, would you unlock the doors now and

open them.

     Call your next witness.

     MR. McKITTRICK:  Peggy Griffith.


                              - O -

Phyllis E. Griffith - Direct                    267

PHYLLIS E. GRIFFITH,

Being thereupon called as a witness, after

being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q    State your name please.

A    Phyllis E. Griffith.

Q    Are you employed?

A    Yes, sir.

Q    Where are you employed?

A    At the office of the Prosecuting Attorney.

Q    When were you so employed?

A    October 1, 1965.

Q    Were you employed during the course of the time that

the January, 1980 grand jury was setting?

A    Yes, sir.

Q    And as part of your duties in the Prosecuting

Attorney's office of Kanawha County, West Virginia, do you have

occasion to keep the grand jury notes on each case presented to

the grand jury?

A    Yes, sir.

Q    And have you at the request of your present Prosecuting

Attorney, James Stucky, pursuant to a court order, supplied me

with a copy of the grand jury minutes relative to State of

Phyllis E. Griffith - Direct                    268

West Virginia vs. Paul Reggettz?

A    Yes, sir.

THE COURT:  Let the record reflect that the proceedings are now open to the public.  All right.

Q    Was the case of State of West Virginia vs. Paul Reggettz presented to the January, 1980 grand jury?

A    Yes, sir.

Q    And what do you do with regard to your duties in presenting or having or assisting in having presented a case to the grand jury?

A    I type up the docket sheets, and then I schedule the investigating officer or the witness that is to testify before the grand jury.

Q    Did you work at that time in combination with Ernestine Whitlock?

A    Yes.

Q    Have you brought to the courtroom a copy of the minutes of the grand jury relative to the State of West Virginia's case against Paul Reggettz?

A    Yes, sir.

Q    Would you hand that to me please.

A    Yes.

MR. McKITTRICK:  I would like to have this marked as Defendant's Exhibit 7.

Phyllis E. Griffith - Direct                    269

     (Whereupon, the document referred to was marked by the

reporter as Defendant's Exhibit No. 7)

     Q     Let me hand you now what has been marked for

identification purposes as Defendant's Exhibit No. 7 and ask you

what that is.

     A     This is a copy of the clerk's sheet out of the docket

book for the grand jury.

     Q     Who is the clerk of the grand jury?  Is that the person

that takes the minutes of the grand jury?

     A     Yes.

     MR. McKITTRICK:   We move the introduction of Defendant's

Exhibit 7.

     THE COURT:   Any objection?

     MR. STUCKY:   Your Honor, the State would object simply

because what that appears to be is handwritten notes of a clerk

in the grand jury, what she may or may not have heard witnesses

testify to in the grand jury.  It is not a transcript.  It is

not represented to be complete.  The person who is testifying is

not even the clerk who wrote those notes.  I think it is purely

a document that contains partial or hearsay of a partial nature

of what the person heard, handwritten notes of bits and pieces

of information that was presented to the grand jury.  And I

don't know what purpose it serves here.  I don't think it is

proper in this hearing nor certainly in front of a jury on

Phyllis E. Griffith - Direct                    270

this issue.

THE COURT:  Well, inasmuch as counsel for the State and

counsel for the defense have both been consistent during all

these proceedings and I have not yet seen the exhibit -- I

wonder if I could see the exhibit before I rule.

MR. McKITTRICK:  I apologize to the Court, Your Honor.

THE COURT:  That's all right.  I am going to overrule the

State's objection for this suppression hearing only.  I think it

goes to weight and not admissibility.  At the trial that is a

horse of a different color, but for this suppression hearing

only I am going to let it in.  State's Exhibit No. 7 will be

admitted into evidence.  Show the objection of the State.

MR. McKITTRICK  That's all the questions I have.

THE COURT:  Any cross?

MR. STUCKY:  No.

THE COURT:  Thank you, Mrs. Griffith.

(Witness Excused.)

THE COURT:  Call your next witness.

MR. McKITTRICK:  Your Honor, I have a witness I called at

lunch, and they are supposed to be here, and I am waiting on

them.  My next witness after that will be John, and then I will

rest.

THE COURT:  Who is your next witness?  You have twenty

minutes to get him here.  I had set this matter down from 1:15

271

to 2:30.  It is now 2:10. I have six or seven divorce matters to

take up.  I'll give you until twenty after, Mr. McKittrick, to

get him here.  We probably won't be able to conclude the matter

today anyway, if you are going to put Mr. Moss on.

MR. McKITTRICK:  In the meantime, Your Honor, Mr. Moss has

some papers involved in this hearing that are in his personal

property over at the jail, and he needs to get into them.  And I

need to be with him when he looks through them.

THE COURT:  That's no problem.  I am sure the Prosecutor

will go across the street and tell the jailer that you need to

be with Mr. Moss when he looks through his personal property.  I

don't have any problem.  If you want me to call over there, I'll

call over there.  We will stand in recess for ten minutes.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

- O -

THE COURT:  Show the resumption of these proceedings in

State of West Virginia vs. John Moss, Jr., also known as John

Moss, III, with all parties present heretofore present here

again, including the defendant and his counsel.

All right, call your next witness.

MR. McKITTRICK:  The defense calls James Williams.

THE COURT:  Come forward to be sworn, Mr. Williams.

- O _

JAMES E. WILLIAMS,

Being thereupon called as a witness, after

being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q    State your name please.

A    James E. Williams.

Q    Jim, where do you live?

A    I live in Charleston, West Virginia.

Q    Do you practice a profession in the State of

West Virginia?

A    I do.

Q    What is that profession?

A    That of an attorney at law.

Q    When were you so admitted to practice your profession

in the State of West Virginia?

A    In the year 1974.

Q    Do you have occasion to practice criminal law in the

State of West Virginia?

A    I do.

Q    Were you contacted by the family of John Moss in late

1979 concerning employment in a criminal case?

A    I was.

James Williams - Direct                                    273

Q    What was the nature of that criminal case?

A    A charge of grand larceny.

Q    Were you later retained by the Moss family to represent John Moss, III in that grand larceny case?

A    I was, in January, 1980.

Q    Thereafter did you have an opportunity to meet with and consult with John Moss, III concerning that grand larceny case?

A    I did.

Q    Where did you do that consultation?

A    The consultation occurred in Cleveland.

Q    Cleveland, Ohio?

A    Cleveland, Ohio, at the local jail there.

Q    Was John Moss incarcerated at that time?

A    He was.

Q    Did you travel to Cleveland, Ohio?

A    I did.

Q    Did you meet with John Moss?

A    I met with John Moss as well as members of his family.

Q    What was the date of that meeting?

A    March 7, 1980.

Q    And did you discuss the grand larceny charges?

A    We did.

Q    Now, to the best of your knowledge do you still represent John Moss on those grand larceny charges?

James Williams - Direct                            274

A    Yes.  There has been no disposition made of that case.

Q    Jim, where are the grand larceny charges pending; in Kanawha County, West Virginia?

A    In Kanawha County, West Virginia, in the juvenile court.

MR. McKITTRICK:  That's all the questions I have.

THE COURT:  Any cross?

MR. STUCKY:  None.

THE COURT:  Thank you, Jim.  You may step down.

(Witness Excused.)

THE COURT:  Do you have any other witnesses other than Mr. Moss?

MR. McKITTRICK:  That's it.

THE COURT:  Do you want to start at 1:15 tomorrow?

MR. McKITTRICK:  Yes, sir.

THE COURT:  Without trying to box you in, I'm not trying to box anybody in, but can you give me some idea of how many more witnesses you are going to have, Mr. McKittrick?  Let me put it another way.  Do you think we can conclude it in another half day?

MR. McKITTRICK:  Oh, yeah, I do.

MR. BROWN:  Judge, we were just wondering -- How many divorces -- If the Court maybe had some divorces, the only thing that is holding us up here is that Mr. Moss needs to get over to

the jail and pick up these items; and we just thought there

might be a possibility if these divorces were done by say 3:30

or 4:00 -- We're not having much cross on this thing --

THE COURT: No. I'm not continuing it after 4:00. Now, let

me say this to you: It may be that I can get rid of these

divorces by 3:00. So if you want to try and --

MR. McKITTRICK: But you are not going to go past 4:00?

THE COURT: No, I am not. I have other matters.

MR. McKITTRICK: Judge, I think we probably ought to do it

tomorrow then.

THE COURT: Okay.

MR. McKITTRICK: If I could ask you this while I remember

it, during the trial of this case, is it your plan to adjourn at

approximately 4:00 each day most of the time? I think you said

before we wouldn't try it on Friday because of your motion day.

THE COURT: You can't pin me to this. In fact, I am

seriously considering -- You have filed a motion for individual

voir dire; haven't you?

MR. McKITTRICK: Yes, I have.

THE COURT: I am considering, in light of what you told me

the other day about your experts having certain evidence in their

possession, and it may not be here by the 17th, I'm giving some

thought to postponing this until the 24th. That will give them

another week -- I'm considering it. That will give them another

week to complete their analysis of the evidence they have in their possession.  And if we are going to have individual voir dire, I suspect that will take maybe, if we run into complications, maybe two days, maybe not.

Let me give you the ground rules as I understand them now to be, subject to amendment by the Court.  I anticipate going to trial Monday through Thursday, quitting at 4:00 or thereabouts. Now obviously, we may go over some days; some days we may have to quit early because of the absence of witnesses, whatever. Normally I would expect 4:00.

If it becomes necessary, and I do not know that it ever will, but if it becomes necessary, I'll hold court on Saturday; but usually, and I anticipate at this time, the holding of the trial Monday through Thursday from 9:30 or 9:00 until 4:00 or thereabouts.  If we have to go over, we'll go over.

Secondly, on the motion for individual voir dire, I don't know whether I have spelled this out before or not.  I think I did, but if I haven't, I will spell it out again.  I'm going to grant the motion for individual voir dire.  However, I will expect you to submit your questions to me, both sides, in writing in advance.  I will ask the questions.  If as a result of my questions and the answers elicited from the prospective jurors, you develop further questions, I'll permit them.  Just write them out and hand them to me when I have concluded your

first set.  If as a result of questions propounded by the State

you think of further questions you want me to ask, Mr.

McKittrick, write them out, and I will probably ask most of

those, unless there is a real reason not to.  But I intend to

conduct the voir dire.  I am very, very generous in the amount

of questions I permit to be asked, and very seldom do I ever

refuse a question of counsel for the defendant.  But I intend to

proceed with the actual questioning, subject to those written

questions you submit.  And as I said, as a result of the answers

I get, if you have more questions, write them out and hand them

to me.  Then when the State questions them, if they do, and

there are answers elicited which evoke more questions in your

mind, Mr. McKittrick, submit them to me; and I'll ask them.

MR. McKITTRICK:  Of course, I haven't communicated with my

experts, Your Honor, because as of yesterday they still hadn't

received our evidence.  We sent it to them --

THE COURT:  On the 9th of September I believe you told me.

MR. McKITTRICK:  We got it on the 9th.  That was on Friday,

I believe; and we sent it on Monday or Tuesday, as quickly as we

could get it prepared to go; and they hadn't received it today,

well yesterday.   I assume they got it today, hopefully.

When, subject to my talking to them, would we know about the

24th maybe?

THE COURT:  If there is no objection from either side, I'll

tell you now.  I don't have it in writing yet, but I anticipate

that I am going to be expected to attend a three-day judicial

conference the week of the 17th.  And once this proceeding gets

underway, I don't want to interrupt it.  So if there is no

objection from either side, I'll reschedule it now for the 24th.

MR. BROWN:  I have no objection.

MR. McKITTRICK:  I don't have any objection.

THE COURT:  All right then, this matter will go to trial

October 24, 1983, or as soon thereafter as it may be heard,

without objection from either the State or the defense.

Now, do you have any other questions about logistics?

MR. McKITTRICK:  No, I don't, Your Honor.

THE COURT:  We will stand in recess until tomorrow at 1:15.

Now, Parrish, if you have any difficulty over at the jail, and I

don't anticipate you will, one of you deputies take him over

there -- I think Deputy Ankeney is still between floors on the

security elevator -- tell whoever is in charge of the jail to

let Mr. McKittrick confer with his client.  And I want his

client's personal belongings brought out of wherever it is you

keep them over there.

Let me say this, Parrish:  Whatever their security is, if

they want a deputy in the room while you are going through his

things --

MR. McKITTRICK:  That's fine.

279

MR. BROWN:  And we would like a receipt for anything that is taken.

THE COURT:  Absolutely.  Make sure you get a receipt for anything Mr. McKittrick or his client removes.

All right, we will stand in recess until 1:15 tomorrow afternoon.

- O -

(Whereupon, a recess was had in the proceedings.)

- O -

280

PROCEEDINGS HAD ON

THURSDAY, SEPTEMBER 22, 1983

WHEREUPON, the proceedings in the Matter of STATE OF WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III, CR-82-F-221, were resumed on Thursday, the 22nd day of September, 1983, with all parties present as before noted, including the defendant and his counsel, and the State of West Virginia by James C. Stucky, Prosecuting Attorney, and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha County.

THE COURT:  Show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts.  The defendant is present in person and by Mr. McKittrick, heretofore employed on his behalf; the State of West Virginia by her Prosecuting Attorney, Mr. Stucky, and Assistant Prosecuting Attorney, Mr. Brown.

All right, Mr. McKittrick, call your next witness.

MR. McKITTRICK:  The defense calls Mr. John Moss.

THE COURT:  Come forward to be sworn.

- O -

John Moss, III - Direct                                    281

JOHN MOSS, III,

Being thereupon called as a witness, after

being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q      Would you state your name please.

A      John Moss, III.

Q      John, do you presently reside in the Kanawha County

Jail?

A      Yes.

Q      What is your age and date of birth?

A      I'm twenty-one years old.  I was born May 5, 1962.

Q      John, I want to direct your attention to the 30th day

of January, 1980.  On that date did you have occasion to see

Trooper Terry Williams and Trooper Mike Smith?

A      Yes.

Q      Did they visit you in the State of Ohio?

A      Yes.

Q      Where were you at the time?

A      At the detention home.

Q      Where is that located?

A      I believe it was off of Jefferson in Cleveland, Ohio.

Q      How did it come to your attention that they were there

to see you?

John Moss, III - Direct                           282

    A    One of the officers at the detention home come down and told me I had a visitor.

    Q    Did you meet with Officers Williams and Smith?

    A    Yes.

    Q    Where did you meet with the men?

    A    Where the attorneys talk to their clients.

    Q    Is it a small room of sorts?

    A    It is about the size of this courtroom here.

    Q    Was there anyone with Officers Smith and Williams?

    A    No.

    Q    In other words, they were by themselves when they met with you?

    A    Yes.

    Q    And what did they indicate to you occasioned their visit?

    A    They wanted to talk to me about a family being killed down here.

    Q    And did they tell you the name of that family?

    A    Yes.

    Q    And what did they tell you the name was?

    A    The Reggettz family.

    Q    Did they indicate or ask you whether you knew anything about the Reggettz family?

    A    Yes.

John Moss, III - Direct                              283

    Q     Did they ask you if you knew anything about the

Reggettz homicides or murders?

    A     Yes, they asked me about them.

    Q     What did you tell them?

    A     I said I didn't know nothing about it.

    Q     Did they ask you whether you committed those murders?

    A     Yes.

    Q     What did you tell them?

    A     No.

    Q     Did they ask you how you found out about those murders?

    A     I seen it on the news the next day.

    Q     And then what did they do?

    A     They asked me was I willing to talk to them about the

Reggettz murders.

    Q     What did you tell them?

    A     I told them I didn't have nothing to tell them because

I didn't know nothing about it.

    Q     Did you indicate to them at that time that you had a

lawyer?

    A     Yes, I told them I had a lawyer for the charges over in

Ohio.

    Q     Did you tell them that you wanted to see your lawyer at

that time?

    A     Yes.

John Moss, III - Direct                    284

Q    What did they say?

A    They told me they had talked to my lawyer already, and he would be over later.

Q    Then what did they do?

A    They asked me if I would give them a sample of blood. I told them, "Yeah, I'll give it to you; I don't have nothing to hide."

Q    Did they take a sample of blood from you?

A    Yes.

Q    And then what occurred?

A    When they took the blood from me?

Q    Yes.  How did they take that blood, John?

A    They had this little metal like a stick pin.  They stuck me in my index finger.  They squeezed it and a little bit of blood come out on a cotton pad.

Q    Then what happened after they took your blood?

A    They put it in some kind of container.

Q    Then what happened?

A    Then they kept asking if I was willing to talk to them about the Reggettz murders.

Q    Then what did you say?

A    I told them I didn't have nothing to say.

Q    Then what happened?

A    Well, they asked me about a few friends of mine down

John Moss, III - Direct                           285

here in West Virginia.

    Q    Then did a lady lawyer there intervene in your
conversation?

    A    Yes.

    Q    What was the purpose for her intervention?

    A    She seen that they was taking blood from me and my
lawyer wasn't there, because she had seen me there before and
she knew who my lawyer was.  She come over to the table and
asked me had they talked to my lawyer.  They said my lawyer was
in court, and she advised them to come back later when he was
in my presence, my lawyer was in my presence.

    Q    Did they leave?

    A    Yes.

    Q    Did they come back later?

    A    No.

    Q    Did you later talk with your lawyer in Ohio about this
matter?

    A    Yes.  He come back about fifteen minutes later.

    Q    Now, did your lawyer do something with regard to that
blood sample?

    A    Yeah.  At first he had told me what they had did, what
they had come down here for.  He asked me what they had did.  I
told him they had come here down to ask me about some murders in
West Virginia.  And he asked me what I said, and I told him I

John Moss, III - Direct                                    286

ain't said nothing.  He asked me did I give them any blood, and

I said yeah because I ain't got nothing to hide down here in

West Virginia.  And he told me they shouldn't have did it.

    Q    Did he have to go to court concerning that blood?

    A    Yes.  He said he was going to the courthouse about it.

    Q    And what was the result of that?

    A    He told me he got the blood stopped or something.

    Q    He got the blood samples back?

    A    Yeah.

    Q    Now, let me direct your attention to the 22nd day of

April, 1980.  Did you have occasion on that date to see Troopers

Terry Williams and Mike Smith and Assistant Prosecuting Attorney

Chuck Pettry?

    A    Yeah.

    Q    And did they come from the State of West Virginia to

the State of Ohio to see you?

    A    That's what they said.

    Q    And where did they see you on that occasion?

    A    In the justice center.

    Q    Where is that located?

    A    It is in downtown in Cleveland.

    Q    Okay now, at that time, John, I believe you were

incarcerated in that institution as a result of some charges

there against you in Ohio; is that correct?

John Moss, III - Direct                              287

    A    Yes.

    Q    Had those charges in Ohio been disposed of on the 22nd
day of April, 1980?

    A    No.

    Q    Those charges were not disposed of until the 1st day of
May, 1980.  Is that a fair statement?

    A    Yes.

    Q    Now, John, how did it come to your attention -- Strike
that -- Did you have the same lawyer in April, on April 22,
1980, as you had on the 30th day of January, 1980?

    A    No.

    Q    Did you have a different lawyer?

    A    Yes.

    Q    What was the name of your lawyer on the 30th day of
January, 1980?

    A    Gerald Stekowitz.

    Q    What was the name of your lawyer on the 22nd day of
April, 1980?

    A    Thomas Frye.

    Q    How did it come to your attention, John, on the 22nd
day of April, 1980, that these officers and Mr. Pettry were
there at this institution to see you?

    A    When did it occur to me?

    Q    How did it come to your attention?

John Moss, III - Direct                          288

    A    One of the C.O. officers come down to the juvenile

bullpen and told me I was wanted up in the clinic.  That is when

I met Pettry and Troopers Smith and Williams again.

    Q    Was there anyone with them on that occasion?

    A    Thee was some people standing around there.  I didn't

know who they were.

    Q    Did you have a conversation with any of them?

    A    Pettry and Smith.

    Q    Tell us what happened.

    A    At first Pettry come to me.  He said they wanted to get

some blood from me.  I told them I wanted to talk to my lawyer

before they take the blood because my first lawyer said they

couldn't come down and do that, take my blood like they did.

Then he showed me a court order.  He pointed out where it said

court order that said I had to give the blood up or not.  I said

"Okay", you know, "but still shouldn't my lawyer be here," and

he said, "No, because we have a court order here from the

judge."  So he left.

    Q    Did you want to give them that blood before you saw

that court order?

    A    No.

    Q    And did you indicate that to them?

    A    Yes.

    Q    Is that when Mr. Pettry said, "You're gong to give it

289

John Moss, III - Direct

to us anyway", or words to that effect?

    A    Yeah.

    Q    "Whether you want to or not"?

    A    Yeah.

    Q    Then what happened?

    A    He went into the clinic.

    Q    Who went into the clinic?

    A    Pettry.  He went into the clinic, and Trooper Smith, he called me to his side and we were waiting on the bench, and he started asking me about friends down here in West Virginia, who did I know, and he started talking about how good a friends him and my uncle were.

    Q    Did he ask you at that time about William Johnson?

    A    Yeah.

    Q    Then what happened?

    A    He started asking me am I willing to talk to them about the Reggettz murders.  I told them, "Like I told you before, I don't have nothing to say about it because I don't know nothing."

    Q    Then what happened?

    A    He started talking about some friends, asking me about this one girl, and later on they called me into the clinic.  I go in the clinic and Troopers Smith and Williams was standing there and Pettry and I guess he was a doctor and a nurse.  I was

John Moss, III - Direct                                   290

setting on the table or something, and you know, they told me to

stick out my arm so they can withdraw the blood from it.

Q     And did they take blood from you?

A     Yes.

Q     How much blood did they take?

A     I think about two or three tubes.

Q     What did they put it in?

A     Tubes, glass tubes.

Q     And did they hand that blood to Trooper Williams?

A     Yes.

Q     Then what occurred?

A     Williams, he marked something --

Q     On the blood?

A     On the bottles, yeah.

Q     Then what happened?

A     After a while they left, and they took me back

downstairs.

Q     John, let me direct your attention to the 28th day of

October, 1980. Did you have occasion to see Troopers Terry

Williams and Mike Smith on that date?

A     Yes.

Q     Where were you at that time?

A     When I met them?

Q     Excuse me.

John Moss, III - Direct                          291

    A     When I met them?

    Q     Yes.

    A     We was in a place where you call a holding cell.

    Q     Where was that located?

    A     In Mansfield.

    Q     In Mansfield, Ohio?

    A     Yes.

    Q     Was it at an institution?

    A     Yes.

    Q     A penal institution?

    A     Yes.

    Q     How did it come to your attention that Troopers Smith
and Williams were there to see you?

    A     I was at work in the kitchen.  I had a job there in the
kitchen, and they called me over the intercom and told me I was
going AWOL.

    Q     What does that mean?

    A     It means you are going back to court on a
reconsideration for your sentence or you are going back for
other charges.  So I assumed I was going back to get a time cut
because I wasn't thinking West Virginia was coming down there to
get me.

    Q     Okay.

    A     So they called me down to the office to go to the

John Moss, III - Direct                          292

bullpen.  I get the pass to go to the bullpen, and they told me

to go pack my stuff, I was going AWOL.

    Q    Who told you to go pack your stuff?

    A    One of the officers at the bullpen.  So I go pack my

stuff, and I come back down and turn in my mattress and

everything.

    Q    At the time, John, did you know you were going back to

the State of West Virginia?

    A    No.

    Q    Then what happened?

    A    I come back down to the bullpen where the officer was.

He signed my pass and took my pass.  He set me in the holding

cell until they was ready to call me up.

    Q    Then what happened?

    A    I set there in the holding cell about half an hour.

Then he called me out there where Trooper Smith and Williams

was.  They asked -- Smith said, "I told you we would be back."

He asked me was I ready, and I asked him ready for what.  He

said, "I told you we was coming back down here to get you."  I

asked him, "Coming to get me on what?"  And he said, "On the

Reggettz murders", and I said --

    Q    All right now, did they ever say anything to you, they

being Trooper Williams and Trooper Smith, about a felonious

assault at that time at the Moose Club?

John Moss, III - Direct                              293

    A    No.

    Q    And then what happened?

    A    Well, the asked me was I ready.  I said, "Ready for what?  I told you all I didn't know nothing about no murders down there.'

    Q    Did you have a conversation with Trooper Smith and Trooper Williams at that time about a lawyer?

    A    Yeah.  They was packing up my things, and I told them I wanted to talk to my lawyer first.

    Q    What lawyer are you talking about?

    A    A lawyer down here in West Virginia.

    Q    All right now, did they say that you didn't have a right to a lawyer?

    A    He said I didn't need no lawyer, that I can talk to a lawyer whenever I get there in West Virginia.

    Q    All right now, did you have a discussion with them concerning what you call extradition at that time?

    A    I told them that I wanted to fight it.

    Q    Fight what, John?

    A    Extradition or whatever they call it, you know, bringing me back down here.

    Q    You wanted to fight coming back to West Virginia from Ohio.  Is that what you are saying?

    A    Yes.

John Moss, III - Direct                          294

Q     What did they say to that?

A     They said they have some kind of papers, petitions, a detainer or something, to take me on back down there; and I can see my lawyer when I get there.

Q     All right, then did you leave with them?

A     Yes.

Q     Now, John, a couple of days before that had anyone indicated to you that the State of West Virginia was coming to get you?

A     Yes.  I think it was a social worker.

Q     Do you remember the name of the social worker?

A     Not exactly.

Q     Did you have -- Is that the only person at the penal institution that you were at that had a conversation with you about your going back to West Virginia?

A     Yes.

Q     Did you have a conversation with that person, whether it being a social worker or whoever it was --

A     Yes.

Q     About extradition?

A     Yes.

Q     And what did you say?

A     I told them I wanted to fight it.  I wanted to talk to my lawyer.

John Moss, III - Direct                          295

Q     And what did they tell you?

A     They said, "You don't need to bring no lawyer involved, just for you to know they are coming down here for you."

Q     John, did Troopers Terry Williams and Mike Smith handcuff you and take you out of the penal institution?

A     Yeah.

Q     Before you left the penal institution there in the State of Ohio, were you allowed to see or talk to your lawyer about fighting extradition, as you call it?

A     No, I wasn't.

Q     Did you have any kind of a hearing concerning your rights as to whether or not you had a right to fight coming back to West Virginia?

A     No.

Q     Did anybody advise you of what your rights were with regard to your fighting West Virginia authorities bringing you back to West Virginia?

A     No.

Q     Now, when Troopers Williams and Smith went to take you outside you indicated they handcuffed you; is that correct?

A     Yes.

Q     Did they handcuff you behind your back or in front of you?

A     Behind my back.

John Moss, III - Direct                                    296

 Q Did they take you to the car?

 A Yes.

 Q Did they put you in the car?

 A Yes.

 Q Where did they put you in the car?

 A In the back seat.

 Q Where were Trooper Smith and Trooper Williams sitting in the car?

 A Williams was driving, and Smith, he was on the passenger side.

 Q And then did you leave the area where the penal institution was in Mansfield, Ohio, at that time?

 A Yes.

 Q Where did you go?

 A Well, we was leaving to come down here.  They was looking for a gas station.

 Q Coming down here?

 A To West Virginia.  We stopped at a gas station.

 Q Now, was there a time after you left the institution in the State of Ohio with the destination in mind being the State of West Virginia, did Trooper Smith ever get into the back seat of the car?

 A Yes.

 Q And did he do that while the car was moving?

John Moss, III - Direct                                    297

A    Yes.

Q    How did he get in the back seat?

A    Crawled over the front seat.

Q    Where did he sit in the back seat?

A    On my left side.

Q    Now, when you left Mansifeld, Ohio, and just before you were placed in the car, did Officers Smith and Williams change the handcuffs on you?

A    Trooper Smith did.

Q    Where did he put the handcuffs?

A    On the headrest of the front seat.

Q    I'm talking about before you left Mansfield, Ohio.  You indicated to us that you were handcuffed in the back?

A    Yes.

Q    Was that changed?

A    When I left, when I got in the car?

Q    Yes.

A    I stayed that way until we was on the road.

Q    Was it changed after -- Strike that -- Were the handcuffs changed or repositioned after Trooper Smith got into the back seat while the car was moving?

A    Was they changed before he got in the back seat?

Q    Or after?

A    They was changed after he got in the back seat.

John Moss, III - Direct                                        298

   Q    What did he do; what did Trooper Smith do?

   A    He uncuffed one hand, one wrist, and cuffed them together behind the headrest of the front seat.

   Q    At that time, John, were you handcuffed in the front of your body?

   A    Yes.

   Q    Are you saying Trooper Smith handcuffed the handcuffs to the headrest of the front seat?

   A    Yes.

   Q    Then what happened?

   A    Well, after a while, after I was handcuffed, he asked me am I ready to talk about the Reggettz family.  I said, "I told you before, and I'm telling you again, I don't know nothing about no Reggettz family.  All I know, the people got killed by the father or the husband down there."

   Q    And then what occurred?  What did he say; what did he do?

   A    He said I know more than what I'm saying.

   Q    Are you saying Trooper Smith said, "You, John Moss, know more than you are saying"?

   A    Yes.

   Q    All right, then what happened?

   A    I -- He said something about Bill, a friend of mine named Bill.

John Moss, III - Direct                                        299

    Q    Bill Johnson?

    A    Yes.  He said Bill said I knowed something about them.

    Q    About what?

    A    The Reggettz murders.

    Q    All right.

    A    I told him, "I don't know nothing.  If you want to talk
to me, you talk to my lawyer."

    Q    Did you tell Trooper Smith at that time who your lawyer
was?

    A    Yes.

    Q    Who did you tell him your lawyer was?  Who did you tell
Trooper Smith your lawyer was?

    A    I told him Lawyer James Williams.

    Q    Now, James Williams is a lawyer in the State of
West Virginia; is that correct?

    A    Yes.

    Q    Was James Williams representing you at that time?

    A    Yes.

    Q    And what was James Williams representing you for?  Was
it a grand larceny charge in Kanawha County, West Virginia?

    A    Yeah, grand larceny.

    Q    Had you had an opportunity in the month of March, 1980,
to see, meet with and talk with James Williams in the State of
Ohio concerning that charge in West Virginia?

John Moss, III - Direct                          300

A     Yeah.

Q     Now, did you indicate to Officer Smith that you would be glad to talk to him about the Reggettz murders in the presence of your lawyer; is that correct?

A     I told him I would talk to him if my lawyer was here.

Q     Okay, did you then give Trooper Smith something so he could get hold of your lawyer?

A     I told him I had my lawyer's name and number written down in my Bible in my pocket.

Q     Now, did you have your Bible with you?

A     Yeah.  It was in my back pocket.

Q     Do you have your Bible with you today?

A     Yes.

Q     Is it the same Bible that you had at that time?

A     Yes.

Q     Would you please produce that for me.

(Bible produced.)

MR. McKITTRICK:  I would like to have this marked.

(Whereupon, the item referred to was marked by the reporter as Defendant's Exhibit No. 8.)

Q     All right now, did Trooper Smith reach and get your Bible?

A     He took it out of my back pocket.  I couldn't get it.

Q     Did you tell him where your lawyer's name and number

John Moss, III - Direct                                    301

was?

    A    Yes.

    Q    Where is it in the Bible?

    A    On the inside front page.

    Q    John, let me hand you what has been marked as
Defendant's Exhibit 8 and ask you if that is the Bible you are
talking about.

    A    Yes.

    MR. BROWN:  Judge, we want a few minutes to look through
this.

    THE COURT:  All right.

    (Exhibit examined.)

    Q    John, on the inside cover of Defendant's Exhibit No. 8,
what does it say with regard to your lawyer in West Virginia?

    A    James Williams' home and office telephone numbers.

    Q    And it has the name and then the phone numbers?

    A    Yes.

    MR. McKITTRICK:  We move the introduction of Defendant's
Exhibit 8 into evidence.

    MR. BROWN :  No objection.

    THE COURT:  All right, Defendant's Exhibit No. 8 will be
introduced into evidence for purposes of this hearing without
objection by the State.

    Q    John, when you handed Defendant's Exhibit 8, which is

John Moss, III - Direct                                    302

your Bible, to Trooper Smith, was it in the condition that it is

now?

    A    I didn't hand it to him.  He took it.

    Q    Was it in the condition that it is in now?

    A    No.

    Q    What is the difference in the condition?

    A    The book come out of the cover.

    Q    How did that happen?

    A    He took it and just threw it against the seat.

    Q    Now, when did he do that?

    A    After he looked in there and seen my lawyer's name.

    Q    What did Trooper Smith say about your lawyer in

West Virginia at that time?

    A    He said I can talk to my lawyer when I get there, I

didn't need no lawyer now.  Just that.

    Q    Did Trooper Smith ever advise you of the rights that

he said that he advised you of, that he read off of this card on

the trip from Mansfield, Ohio, to Parkersburg, West Virginia?

    A    No.

    Q    All right now, after Trooper Smith took your Bible and

looked at your lawyer's name and phone number, both home and

office, and threw it against the seat, did he start becoming

upset?

    A    Yes.

John Moss, III - Direct                                303

Q       What occurred then?

A       He told me I was a damn liar and hit me in the stomach.

Q       Now, John, so the Court will know, would you show the Court, if you can, the approximate angle at which your arms were connected to the front seat.

A       Well, I was handcuffed like this (indicating).

MR. McKITTRICK:  Let the record show that Mr. Moss holds his arms forward at probably a ninety-five degree angle.

Q       What happened then after Mr. Smith started to get upset?

A       I asked him what did he hit me for.  He said I'm not telling everything that he heard that I knew.

Q       That you weren't telling him, Trooper Smith, everything that you knew?

A       Yes.

Q       Then what happened?

A       He hit me again because I wasn't saying nothing.  The he asked me did I know that what is his name, Eric, got drowned. I told him no.  He called me a damn liar again and hit me in the ribs.

Q       When he was hitting you, where was he hitting you, John?

A       In my ribs.

Q       Was that underneath your arms as they were connected to

John Moss, III - Direct                         304

the front seat?

    A    Yes.

    Q    John, did Trooper Smith then on the remainder of the
trip systematically and continuously go through the facts of the
murder case with you?

    A    Yes.

    Q    Did he, Trooper Smith, ever strike you again after that
time?

    A    Yes.

    Q    Was it on separate and several occasions?

    A    Several.

    Q    Did he continue to go over the facts of the murders
cases with you?

    A    Yes.

    Q    Did you continue to tell Trooper Smith that you didn't
commit the murders?

    A    Yes.

    Q    That you didn't know who did commit the murders?

    A    Yes.

    Q    John, how did you feel physically and mentally as the
trip went on towards Parkersburg, West Virginia?

    A    Well, I was hurting a lot.  I didn't think I would make
it to Parkersburg because I wasn't saying whatever he wanted me
to say.

John Moss, III - Direct                          305

Q       What was Trooper Williams doing during this time?

A       He was just driving.

Q       John, when you got to Parkersburg, West Virginia, what happened?

A       Well, after a while, you know, he hit on me for a few hours on the way down.   He beat me for a few hours on the way down there.   When we got there in Parkersburg, I told him that I would go ahead and do whatever he wanted me to do.  I told Williams that.

Q       John, tell the Court when the car stopped there at Parkersburg, West Virginia, what happened.

A       Well, they asked me, Smith asked me was I ready to cooperate with them.  I told him yes, I would do anything; and I told Williams to tell him to stop hitting on me.

Q       What happened thereafter?

A       They was taking me out of the car.  I asked would I be able to call my lawyer now, and he said, "After a while you will be able to call him."

Q       Did Trooper Smith do anything to you when you got out of the car?

A       When he took one handcuff off, he hit me between the legs; and I just went down.

Q       What did he hit you with?

A       He had on black gloves.

John Moss, III - Direct                    306

    Q     Now, did they then take you into the detachment at
Parkersburg?

    A     Yes.

    Q     What happened there?

    A     Well, I seen a sergeant setting in the bed on one side
of me.  They took me in this little room.  He come out.  After a
while Smith, he comes in the room with me.

    Q     Is this the sergeant that the troopers have called
Presson?

    A     Yeah.

    Q     Was he introduced to you?

    A     Yes.

    Q     Go ahead, John.  What happened then?

    A     He goes up front of the station, I guess, and Smith, he
is in the room with me.  And Williams, he is out talking to
Presson.  And Smith, he is going over how things is supposed to
have happened with the killings, and I told him okay.

    Q     Did Smith indicate to you at that time that he was
going to tape a statement from you?

    A     Yes.

    Q     Now, what time, approximately, John, did you arrive at
Parkersburg?

    A     About 6:30 or twenty after, somewhere around in there.

    Q     Thereafter did Trooper Smith start this where he went

John Moss, III - Direct                           307

over the facts with you, preparing you for this tape recording?

    A    Yes.

    Q    And when approximately did you start taping the

confession?  Do you remember?

    A    It was about nine something.

    Q    There is an exhibit in evidence in this case where you

signed -- The troopers indicate that it was approximately 9:30

when they started taking this.  Would that be approximately

right?

    A    Yes.

    Q    Now, how long after you got to the Parkersburg

Detachment did Trooper Smith start this going over the facts of

these murders again with you?

    A    How long was it?

    Q    Yeah.

    A    How long was I there?

    Q    No.  How long after you arrived inside the Parkersburg

Detachment and you indicated that you are willing to cooperate

did Trooper Smith start going over these facts again with you?

    A    About a half an hour.

    Q    So he started what, quarter of seven or thereabouts?

    A    Yeah.  It was a little bit -- It was going on 7:00, you

know.

    Q    All right now, did Trooper Smith continue this up to or

John Moss, III - Direct                           308

almost up to the time that they taped this confession?

    A    Yes.

    Q    And what did he do during that period of time?

    A    He was writing everything down; and when I messed up,
he slapped me in my head.  Then we go over it again.  Then he
starts writing some more.

    Q    Was he telling you what to say?

    A    Yes.

    Q    Was he going over the facts of the crime as he knew
them and telling them to you?

    A    Yes.

    Q    Now, John, you signed some forms.  Do you remember
doing that?

    A    Yes.

    Q    Do you know what those forms were?

    A    No.

    Q    Tell His Honor what happened when you signed those
forms?

    A    I just signed them.

    Q    Who asked you to sign them?

    A    Smith.

    Q    And was Trooper Williams there when you signed the
second one?

    A    The second form?

John Moss, III - Direct                              309

    Q    Yes, Trooper Williams and Trooper Presson or Sergeant Presson.

    A    Was they both in the room there?

    Q    Yes.

    A    Yes.

    Q    Now, John, do you remember them taking your confession?

    A    Yes.

    Q    Do you remember in the confession on the tape where they said they had advised you of your rights?

    A    Yes.

    MR. McKITTRICK:  That's all the questions I have.

    THE COURT:  We will take a ten minute break before we begin cross-examination to give Mr. Moss a chance to go back and use the restroom, smoke a cigarette, whatever.  We will take a ten minute break.

    (Whereupon, a recess was had in the proceedings.)

    (After recess.)

    THE COURT:  Show the resumption of these proceedings with all parties present heretofore present here again, including the defendant and his counsel; the State by her Prosecuting Attorney and Assistant Prosecuting Attorney.

    Any omitted questions, Mr. McKittrick?

    MR. McKITTRICK:  Yes, Your Honor.

    Q    John, when you were at the Parkersburg Detachment of

John Moss, III - Direct                                    310

the state police, did you notice a difference in the attitudes

of Trooper Smith and Trooper Williams towards you?

 A  Williams asked Smith to just calm down a little bit,

and that is when Smith walked out and Presson came in.

 Q  Who took the taped confession?

 A  Williams.

 Q  Is it your testimony that during the time that Smith

was going over the facts after you got to the Parkersburg

Detachment, with you, over and over, that he was the one that

was doing most of the talking?

 A  Smith was.

 Q  At that time was Williams always in the room, or was he

in and out?

 A  He was just in and out.

 MR. McKITTRICK: That's all the questions I have.

 THE COURT: You may cross.

 MR. BROWN: No cross, Your Honor.

 THE COURT: All right, you may step down.

 (Witness Excused.)

 THE COURT: Do you have any other witnesses, Mr. McKittrick?

 MR. McKITTRICK: No, Your Honor. The defendant rests at

this time.

 Of course, we have gone through a lot of testimony, and I

would request, rather than argue some of the legal issues in

Michael Don Smith - Direct                    311

this case that are very detailed, that I would like to ask

permission to submit to the Court a memorandum of law on those

matters before the Court comes to a conclusion.

    MR. BROWN:  Judge, we thought we might put a little rebuttal

on.

    THE COURT:  I was going to ask that next.  Do you have

rebuttal witnesses?

    MR. BROWN:  Yes, sir.

    THE COURT:  All right, call your first rebuttal witness.

    MR. STUCKY:  We would call Trooper Mike Smith.

    THE COURT:  Let me remind you, Trooper Smith, you are still

under oath.

                         - O -

                   MICHAEL DON SMITH,

        Having been previously sworn, further testified as

        follows:

                                   DIRECT EXAMINATION

BY MR. STUCKY:

    Q    Trooper Smith, for the record would you state your full

name.

    A    Michael Don Smith.

    Q    You are the same Trooper Smith who has testified

previously in this hearing; is that correct?

    A    Yes.

Michael Don Smith - Direct                                    312

Q     Trooper Smith, on January 30, 1980, did you have
occasion to go to a detention home in Cleveland, Ohio, with
Trooper Terry Smith to see John Moss, III?

A     Trooper Terry Williams, yes.

Q     What was the purpose of going to see John Moss at that
time?

A     To interview him, ask him a few questions and possibly
obtain a blood sample.

Q     Did you in fact obtain a blood sample from John?

A     Yes.

Q     Did you obtain the sample by pricking his finger and
squeezing the blood into a vial at that time?

MR. McKITTRICK:     Objection.   Asked and answered on direct
already.

A     No.   John pricked his own finger and dabbed it on a
cloth.

Q     And why was that?

A     Well, I asked him if he would voluntarily give us a
sample, and he agreed.   He had no problems about doing that, and
he did so.

Q     At that time did you tell him that you had already
talked to his lawyer?

A     No.   I wasn't aware that he had a lawyer at that time.

Q     Did he at any time there tell you he wanted to see his

Michael Don Smith - Direct                          313

lawyer?

    A    No, sir.  As a matter of fact he was asked, and he said he did not have an attorney.

    Q    Now, on April 22, 1980, did you have occasion to once again go to Ohio to see John Moss?

    A    Yes.

    Q    Who went with you at that time?

    A    Trooper Terry Williams and Assistant Prosecuting Attorney Charles Pettry.

    Q    What was the purpose of that trip?

    A    To obtain blood samples.

    Q    Did you in fact obtain blood samples at that time?

    A    Yes, we did.

    Q    Prior to obtaining them, did you have any conversation with John Moss?

    A    You mean on that date?

    Q    That's correct.

    A    I spoke to him, asked him how he had been.

    Q    Did he at any time tell you he didn't want to give his blood?

    A    No.  The blood was never mentioned between John and I.

    Q    Did you at any time during that meeting ask him about any friends in West Virginia?

    A    No.

Michael Don Smith - Direct                           314

    Q    More specifically, did you ask him about a William Johnson?

    a    Not that I recall.  I don't remember asking him any questions about any friends.

    Q    Was there any questions prior to taking the blood about the Reggettz murders with John Moss?

    A    None.

    Q    Once again on October 28, 1980, did you have occasion to go to Ohio?

    A    Yes

    Q    What was the purpose of that?

    A    To bring John Moss back to West Virginia.

    Q    Where did you go when you got to Ohio?

    A    Mansfield.

    Q    Where in Mansfield did you go?

    A    The state reformatory.

    Q    Was John Moss an inmate there at the Mansfield reformatory at that time?

    A    Yes, he was.

    Q    Do you know what he was there for?

    A    He had been convicted of some charges in the State of Ohio and was serving his sentence.

    Q    Was John Moss then turned over to your custody at the Mansfield reformatory?

Michael Don Smith - Direct                          315

    A    Yes.

    Q    Was that pursuant to some legal papers or orders that
you had?

    A    Yes, that we transferred to the reformatory.

    Q    What kind of papers were those, if you know?

    A    A detainer.

    Q    Once he was turned over to your custody, what, if
anything, did you do with John Moas?

    A    We placed him in our patrol car, and on our way out of
town we stopped for gas.

    Q    Did you at any time in the reformatory tell him you
were back to get him for the Reggettz murders?

    A    No.  It was never mentioned.

    Q    Did you handcuff him on the way out of the reformatory?

    A    Yes, we did.

    Q    In what fashion was he handcuffed?

    A    Handcuffed behind, with his hands behind his back.

    Q    When you got to the car, was that changed?

    A    Yes, it was.

    Q    How was he placed in the car?

    A    He was handcuffed to the front, placed in the car, and
either his left or right hand, I believe it was his left hand,
with the other cuff placed on the headrest, to a bar on the
headrest to the passenger's seat.

Michael Don Smith - Direct                          316

Q     To explain that, one hand was free and one hand was in a handcuff?

A     The right hand would have been free, and the left hand would have been up in a handcuff.

Q     What did you do then?

A     Well, as I said, we just started leaving the reformatory and drove down to a gas station somewhere there in town, gassed up, and we had a little bit of trouble getting out of town because we weren't familiar with the town.

Q     At any time at the reformatory did John Moss say to you that he wanted to see any lawyer?

A     There was never any lawyer mentioned in any conversation with John as far as him having one or wanting one.

Q     Did he ever tell you he had a lawyer in West Virginia?

A     No.

Q     Did you ever tell him, "You don't need a lawyer.  You can talk to one when you get to West Virginia"?

A     No, sir.

Q     Did he ever tell you he wanted to fight extradition, that he didn't want to come back on the detainer?

A     It was never mentioned.

Q     Now, I believe you stated that you went to a gas station and got some gas?

A     Yes.

Michael Don Smith - Direct                            317

Q    And then what did you do after you got gas?

A    We just drove, started driving out of town.

Q    Did John Moss continue to stay handcuffed one hand to
the headrest?

A    Well, while we were in town, and you know, like we had
to stop for a red light or anything, when we were in kind of slow
traffic, yes.  But once we got out of town on the interstate,
four lanes, where the car was moving on and we didn't have to
make any stops, I unhandcuffed him from the headrest and placed
the other hand, which left him cuffed both hands to the front
which made it more comfortable for him to smoke.  I believe also
we had gotten him a coke as we were there at the gas station.

Q    So he was free then to move in the back seat, but
handcuffed two hands together; is that correct?

A    Yes.

Q    Where were you located in the car at that time?

A    In the front, the passenger's seat.

Q    And Trooper Williams?

A    I was still in the front seat, and Trooper Williams was
too.

Q    Did there come a time when you left the front seat?

A    Yes.

Q    And when was that?

A    It was, we had been talking casually probably maybe

Michael Don Smith - Direct                    318

fifteen or twenty minutes out, and I had asked John if he would

speak with us.   And I told him I wanted to speak with him about

some crimes, but before I started I wanted to make him aware of

his rights.   That is why I got in the back seat.

    Q    How did you get in the back seat?

    A    I just crawled over and just set there on the other

side in the rear.

    Q    What side of the rear were you sitting on?

    A    To his left.

    Q    Which would put you behind Trooper Williams?

    A    Behind Trooper Williams.

    Q    And John Moss was then behind the passenger's seat in

the rear?

    A    To my right, yes.

    Q    Was he still handcuffed at that time?

    A    Yes.

    Q    What, if anything, did you do when you got in the back

seat?

    A    Advised him of his rights.

    Q    I believe you testified how you did that from your

I.D. card; is that correct?

    A    Previously, yes.

    Q    At that time did John Moss state that he wanted a

lawyer?

Michael Don Smith - Direct                                    319

    A    No.

    Q    At that time did John Moss tell you that his lawyer's name was located in a Bible in his back pocket?

    A    No.

    Q    Did John Moss ever indicate to you that he had a Bible in his back pocket?

    A    Not that I recall, no.

    Q    Did you ever see a Bible on October 28, 1980, in the possession of John Moss?

    A    Not that I can recall, no.

    Q    Did you ever remove a Bible from John Moss' pocket in the back seat of the automobile?

    A    No.

    Q    I will show you what has been marked as Defendant's Exhibit No. 8 and ask you if you have ever seen that before?

    A    I can't say that I have.

    Q    I will ask you to open Defendant's Exhibit No. 8 and look at the front cover and ask you if that refreshes your memory as to ever having seen that particular item?

    A    No.

    Q    Did John Moss ever tell you that he was represented by James Williams, an attorney here in Charleston, West Virginia?

    A    No.

    Q    Did he ever indicate to you that he wanted to talk to

Michael Don Smith - Direct                                    320

James Williams?

    A    No.

    Q    Did you ever indicate to him that he couldn't talk to a

lawyer?

    A    I never did, no.

    Q    Did John Moss ever indicate to you that he would be

willing to talk to you if his lawyer was present?

    A    John said he would be willing to talk with me, but

there was never any mention of needing a lawyer present or

anything like that.

    Q    Did you at any time take what has been marked as

Defendant's Exhibit 8 and throw it, tear it up?

    MR. McKITTRICK:  Objection.  If he hasn't seen it, he

obviously couldn't throw it.

    THE COURT:  Oh, I think it is a legitimate question in light

of your examination.  This is rebuttal.  Overruled.

    A    No.  I didn't take anything and throw it at any time.

    Q    Did you ever strike John Moss?

    A    No.

    Q    Did you ever call him a damn liar in the car?

    A    No.

    Q    Did you ever hit him in the ribs?

    A    No.

    Q    During the transportation in the automobile from

Michael Don Smith - Direct                    321

Mansfield, Ohio, to Parkersburg, West Virginia, did you ever go

through and tell him the facts of the Reggettz murders?

A    No.  The Reggettz murders, as far as saying anything

detailed or mentioning Reggettz or anything like that was never

mentioned in the car.

Q    In fact, you deliberately didn't mention anything until

you got to Parkersburg where you could sit down; isn't that

correct?

MR. McKITTRICK:  Objection, Your Honor.

THE COURT:  Sustained.  That is leading.

Q    We have heard testimony from John Moss that for

several hours you remained in the back seat striking him in the

stomach and rib area.  Is that correct?

A    That is false.

Q    When you arrived at the Parkersburg Detachment, how

were you dressed?

A    How was I dressed?

Q    Yes, sir.

A    Blue jeans and a casual shirt.  I may or may not have

had a jacket on, but I had a jacket with me.

Q    Were your hands covered with black leather gloves?

A    No.

Q    When John Moss was taken out of the car, did you hit

him between the legs?

Michael Don Smith - Direct                          322

A    No.

Q    Did you ever strike him in any fashion while taking him out of the car?

A    Never.

Q    Or at any other time that day?

A    At no time that day.

Q    When you went inside the state police detachment in Parkersburg, West Virginia, did you then tell John Moss the facts of the Reggettz murders?

MR. McKITTRICK:  Objection, Your Honor.

THE COURT:  On what grounds?

MR. McKITTRICK:  I understand this is rebuttal, but these questions are leading questions not relating to rebuttal.  I object on that basis.

MR. STUCKY:  Your Honor, the testimony was that Smith and Presson got in there from approximately seven until almost nine thirty and told Mr. Moss exactly what to say and how the Reggettz murders occurred.

THE COURT:  I believe he did, Mr. McKittrick.  Overruled. The record will speak to whether he did or didn't.  I recall that he did.  Go ahead, Mr. Stucky.

Q    Did you from approximately seven until nine-thirty tell John Moss how the Reggettz murders occurred?

A    No, I did not.

Michael Don Smith - Direct                    323

Q     Did you tell him what to say as you were writing down notes at the Parkersburg Detachment?

A     At no time that day did I tell him what to say.

Q     And if John Moss didn't say what you told him to say, did you smack him in the head?

A     No, sir.

Q     I believe you witnessed a waiver of rights form; is that correct?

A     Yes.

Q     Prior to your signing the waiver of rights form, what took place concerning that particular form?

A     Well, it was filled out by Trooper Williams at the top. It was explained to John by Trooper Williams.  It was read to him, and they were read in such a manner if he had any questions concerning the reading he had plenty of time and an opportunity to state so, if he did have a question.  And John appeared to me he was listening, was paying attention.  And after it was done, he agreed to sign it, which he did.  Trooper Williams witnessed it; I witnessed it.

Q     We have heard testimony from you and others about John Moss telling you orally what occurred in December of 1979 with regards to the death of Mrs. Reggettz and her two children, and we have heard testimony that John Moss gave a tape recorded statement as to his involvement and what occurred during the

Michael Don Smith - Direct                          324

murders of Mrs. Reggettz and her two children.  At any time did

you tell John Moss what to say either during the oral statement

or the taped confession?

    A    At no time did I tell John Moss what to say.

    Q    On the trip from Mansfield, Ohio, down to Parkersburg

did John Moss ever have any cigarettes or smoke in the car?

    A    Numerous.

    Q    And who provided those for him?

    A    He had his own.

    Q    And was he allowed to smoke them in the car?

    A    As often and as many as he wanted.

    Q    Do you have any idea approximately how many cigarettes

he smoked from the time you left Mansfield until you got to

Parkersburg?

    A    Probably a dozen.

    Q    Was he smoking during the period of time you were in

the back seat?

    A    Smoking while I was in the back seat and while I was in

the front seat, just at any time.

    MR. STUCKY:  That's all I have, Your Honor.

    THE COURT:  Cross?

    MR. McKITTRICK:  Your Honor, I have cross-examined this

witness for eight hours on most of the matters he has testified

to, so I am going to cut this short, in the evidence we have

Michael Don Smith - Cross                              325

already stipulated in the record.

                            - O -

                                    CROSS-EXAMINATION

BY MR. McKITTRICK:

    Q    Trooper Smith, when you went to Mansfield on

October 28, 1980, with the intention in mind of bringing back

John Moss to the State of West Virginia, did anyone in your

presence explain to John Moss the purpose for which he was to be

returned to the State of West Virginia?

    A    That day?

    MR. STUCKY:  Your Honor --

    Q    That day is the only day you brought him back.

    MR. STUCKY:  I am going to object, Your Honor.  That is

outside the scope of rebuttal.  He is not tendering it for

corroboration evidence.  He is limited to rebutting now what was

testified to on rebuttal evidence.

    THE COURT:  Let me hear the question again.

    (Whereupon, the last question was read by the reporter.)

    THE COURT:  Overruled.  Go ahead.  Answer the question.

    A    I don't recall anybody doing that in my presence.

    Q    When you left Mansfield, West Virginia --

    THE COURT:  Mansfield, West Virginia?

    Q    Mansfield, Ohio, you have testified that you told

John Moss there was a serious crime that you wanted to talk to

Michael Don Smith - Cross                              326

him about; is that correct?

    A    When we left Mansfield, Ohio?

    Q    After, sometime after you left.

    A    Yes.

    Q    How long after you left did you say something the
substance of which was like that statement?

    A    Forty minutes.

    Q    And John's response to you was, "I don't know what
you're talking about", wasn't it, in essence?

    A    That or similar to that.

    Q    And you kept saying to John, "Now, John, you know
something about this serious crime, and we would like you to
talk to us about it"; didn't you?

    A    I wouldn't say I said that exact words, but I am sure
something very similar.

    Q    Was that the substance of it?

    A    Yes, similar to that.

    Q    And John's response again in essence was, "I don't know
anything about a serious crime in the State of West Virginia";
wasn't it?

    A    I would say probably he shook his head no at one time.

    Q    Well, in any event, you concluded by saying, "Jean,
what do you think we came to Ohio for in the month of April,
1980, to get your blood for?"

Michael Don Smith - Cross                         327

    A    It wasn't said like that.

    Q    What was said?

    A    "Why do you think we took your blood", or "Why do you think we obtained your blood?"

    Q    When did you obtain his blood, April of '80?

    A    That would be the one I would be referring to, but you might refer to the one in January.

    Q    But you were referring to the one in April; weren't you?

    A    That is the one I was referring to when I made that statement, yes.

    MR. McKITTRICK;  That's all.

    THE COURT:  Anything further?

    MR. STUCKY:  No, sir.

    THE COURT:  You may step down.

    (Witness Excused.)

    THE COURT:  Any other rebuttal witnesses?

    MR. BROWN:  Yes, sir.

    THE COURT:  All right, call your next witness.

    MR. BROWN:  You are not going to believe it.  Trooper Williams was looking out the window and saw an accident on the street down there.  He went down to tell the officers what he saw, and he is on his way back, so it will be just a minute.

Terry Williams - Direct                                    328

THE COURT:  Trooper Williams, I would remind you, sir, you are still under oath.

- O -

TERRY WILLIAMS,

Having been previously sworn as a witness,

further testified as follows:

DIRECT EXAMINATION

BY MR. BROWN:

Q     You are the same Trooper Terry Williams that testified previously in this matter?

A     Yes.

Q     Let me go to the time in October, 1980, October 28, 1980, specifically, when you and Trooper Smith went to the reformatory and picked up John Moss.  All right?

A     Yes.

Q     When you picked John Moss up at the reformatory did you hear anybody or did you or Trooper Smith or anybody in your presence tell John what you were there for, if you remember?

A     Well, I believe I told him we were there to take him back to West Virginia.

Q     Did you tell him what for or just tell him you were taking him back?

A     I just remember that we were taking him back.

Q     Did he at that time request a lawyer?

Terry Williams - Direct                     329

    A    No.

    Q    From the time you all got with John at the reformatory
during the trip, during the time at the Parkersburg Detachment,
did John ever ask for a lawyer?

    A    No.

    Q    Were his rights ever given to him?

    A    Yes.

    Q    What is the first time they were given to him?

    A    On our way back in the car.

    Q    Who did it?

    A    Trooper Smith.

    Q    How did he do it?

    A    He read his Miranda rights off the back of his I.D.
card.

    Q    When is the next time he was given his rights?

    A    At the Parkersburg Detachment.

    Q    How was it done at that time?

    A    They were read to him off DPS Form 79.

    Q    He signed that form; didn't he?

    A    Yes.

    Q    Were they given to him any other time at the
Parkersburg Detachment?

    A    Yes.

    Q    When was that?

Terry Williams - Direct                          330

    A    Right before the taped confession was taken from him.

    Q    When John Moss was placed in the car, as you bring him out to the car, is he handcuffed?

    A    Yes.

    Q    How was he handcuffed?  Hold your hands up there for the Court to see in what position his hands were.

    A    They were behind his back like that (indicating).

    Q    And you do indicate both hands behind your back?

    A    Yes.

    Q    Were those handcuffs ever changed, sir?

    A    Yes.

    Q    What was the next position of his hand or hands?

    A    When we put him in the car, we switched them to the front.  There was one handcuff around one wrist, and the other handcuff around the headrest.

    Q    All right, did that leave a hand free?

    A    Yes.

    Q    From the time you left the reformatory until you got to the Parkersburg Detachment, were there any stops made?

    A    Yes.

    Q    What stops were made?  Tell the Court what those were.

    A    Well, we made a stop in Mansfield to get gas.  That is before we left Mansfield.  Then we started down the interstate, and we made another stop along the interstate to get gasoline

Terry Williams - Direct                    331

and go to the bathroom.

    Q    Do you remember whether or not John Moss had any
refreshments of any kind from the time he left the reformatory
up until the time you arrived at the Wood County DPS Detachment,
if you remember?

    A    I'm not real sure.  I think we got a coke at the second
stop we made to get gas, but I may be wrong on that.

    Q    Can you tell the Court whether or not Mr. Moss used any
form of tobacco on the way back?

    A    Yes, he did.

    Q    What was that?

    A    He smoked cigarettes.

    Q    Did you provide the cigarettes?

    A    No.

    Q    Did Trooper Smith provide those cigarettes?

    A    No.

    Q    Who had the cigarettes?

    A    John.

    Q    On the way back from the time you left -- Well, after
you have handcuffed John Moss to the headrest with one hand and
the other hand free, what was the purpose of handcuffing him
with just one hand to the headrest?

    A    Well, to make him a little more comfortable and so he
could smoke.

Terry Williams - Direct                           332

Q       Did there come a time when the position of his hand and the handcuffs were changed?

A       Yes.

Q       Approximately when was that timewise, distancewise, any way you want to relate it.

A       I'm not real sure sure, maybe twenty minutes or so, we took the handcuffs off the headrest and both hands were just in front of him.

Q       When you indicate both hands in front of him, both hands were handcuffed together; is that correct?

A       Yes.

Q       Were they attached to anything in the car at that time?

A       No.

Q       What was the purpose of removing the single hand from the headrest and cuffing them both together?

A       With one hand up there the whole trip, it would have been pretty uncomfortable; just to make him more comfortable.

Q       Why did you keep him attached to the car when you first left Ohio?

A       Because we knew we had to stop and get gas, plus the fact of starting and stopping at traffic lights. We didn't want to take the chance when we would be slow moving of him possibly escaping, something like that.

Q       After you put both hands togethe , what road were

Terry Williams - Direct                                333

you on?

    A    It was an interstate.  I'm not sure what interstate it

was.

    Q    Can you tell us whether or not your speed was

increased?

    A    Yes.  It was a four-lane highway.  We had increased the

speed.

    Q    I take it you weren't afraid he would jump out?

    A    No.

    Q    When you leave Ohio, who is sitting in the front seat?

    A    Myself and Trooper Smith.

    Q    Where is John Moss?

    A    In the back seat.

    Q    Does John Moss ever go from the back seat to the front

seat?

    A    No.

    Q    Did you ever go from the front seat to the back seat?

    A    No.

    Q    Did Mike Smith ever go from the front seat to the back

seat?

    A    Yes.

    Q    Approximately when was that, and under what conditions?

    A    I would say it was probably about twenty minutes after

we started down the interstate, he crawled in the back seat.

Terry Williams - Direct                                    334

Q      Mike Smith?

A      Yes.

Q      What did you do?  What was your function the whole
time?

A      I was driving the car.

Q      Were you both in uniform?

A      No.

Q      How were you dressed?

A      Civilian clothes.

Q      After Mike Smith gets in the back seat does he ever get
back in the front seat up until you arrived at the Parkersburg
Detachment?

A      Yes, he gets back in the front seat.  I believe he does.

Q      Did he ever get back in the back seat again, if you
remember?

A      No, just the one time.

Q      About how long was he back there if you remember?

A      Oh, I'm not real sure, maybe about an hour, maybe not
that long.

Q      From the time you all left the Mansfield or the Ohio
area until you arrived in Wood County, West Virginia, did you
ever see anybody hit John Moss?

A      No.

Q      Did you hit John Moss?

Terry Williams - Direct                                335

        A    No.

        Q    Did Mike Smith hit John Moss?

        A    No.

        Q    Did you hear any sounds of impact, one body hitting
another?

        A    No.

        Q    Did you ever hear John Moss complain of being hit?

        A    No.

        Q    Did John Moss ever complain to you of being hit?

        A    No.

        Q    When you arrived at the Wood County Detachment, after
you all three exited the car, yourself, Mike Smith and John
Moss, did you see Mike Smith hit John Moss between the legs?

        A    No.

        Q    Did you hit him between the legs?

        A    No.

        Q    Did anybody in your presence hit him between the legs?

        A    No.

        Q    Did you ever hear him complain of that at any time?

        A    No.

        Q    From the time you picked up John Moss until you arrived
at the Wood County Detachment, did you ever see John Moss with a
Bible?

        A    No.

Terry Williams - Direct                          336

Q    Did he ever tell you that he had a Bible?

A    No.

Q    Did you ever see Mike Smith with a Bible?

A    No.

Q    Do you remember seeing any kind of a small book thrown around in the police car?

A    No.

Q    Do you remember seeing any kind of a small book in the police car?

A    No.

Q    And to be a little more specific, Trooper Williams, a book about the size of the book I hold in my hand, which is Defendant's Exhibit No. 8, a book approximately that size, did you ever see one like this in that car?

A    No.

Q    Did you ever at any time on the trip from Ohio to Wood County ever hear John Moss mention the name James Williams?

A    No.

Q    Did he ever tell you that he had a lawyer named James Williams?

A    No.

Q    On the trip back from Ohio to West Virginia did you hear Mike Smith relate the facts of the Reggettz case to John Moss?

Terry Williams - Direct                           337

A    No.

Q    Did Mike Smith question John Moss about the Reggettz case?

A    No.

Q    And by that I mean going into any detail at all.

A    No.

Q    Did John Moss ever tell you or Mike Smith in your presence that he would talk to you all, by you I mean members of the Department of Public Safety, if his lawyer was there on the way back?

A    No.

Q    Did he ever give, did you ever hear John Moss give Mike Smith the name and telephone number of any lawyer?

A    No.

Q    Did John Moss ever tell you to make Mike Smith quit hitting him and that he would cooperate if you would make Mike Smith quit hitting him?

A    No.

Q    During your travels from Ohio back to the Wood County Detachment in West Virginia did you ever see Mike Smith with any type of black gloves on?

A    No.

Q    Did you see him with any gloves on?

A    No.

Terry Williams - Direct                                    338

    Q    Did anyone ever tell John Moss on this day, October 28,

1980, from the time you were first in his presence in Ohio until

you returned to the Wood County Detachment that he didn't need a

lawyer?

    A    No.

    Q    Did you tell him that?

    A    No.

    Q    Did anybody tell him that?

    A    Not to my knowledge.

    Q    When you and Mike Smith and Chuck Pettry went to Ohio

to retrieve a blood specimen from John Moss, do you remember

that day?

    A    Yes.

    Q    What month was that, sir?

    A    April, 1980.

    Q    When you all went into the clinic portion of the

judicial place or whatever building it was you went to get the

blood, did John Moss ever state to you that he did not want to

give any blood?

    A    No.

    Q    Did he ever tell anyone in your presence that he did

not want to give any blood?

    A    No.

    Q    Did he make a request for a lawyer a. that time to you?

Terry Williams - Direct                            339

A     No.

Q     Did he make a request for a lawyer in your presence to anyone?

A     No.

Q     After you all arrived at the Wood County Detachment, the three of you, Moss, Smith and yourself, there came a time when Mike Smith and John Moss went in a room and John Moss began to or Mike Smith began to question John Moss concerning the Reggettz killings?

A     Yes.

Q     Are you familiar with that?

A     Yes.

Q     Were you present during any of that?

A     Yes.

Q     About how much time were you there?

A     All of it except for about fifteen or twenty minutes.

Q     During the time that you were in there while Mike Smith was taking an oral statement from John Moss concerning the killing of the Reggettz family, did you ever see Mike Smith strike John Moss in any portion of his body?

A     No.

Q     Did you at that time see or hear Mike Smith give John Moss the details of the Reggettz murders and tell him to not mess up?

Terry Williams - Cross                              340

     A    No.

     Q    Did you see or hear Mike Smith give the details of the

Reggettz killings to John Moss?

     A    No.

     MR. BROWN:   That's all I have.

     THE COURT: Cross?

                         - O -

                              CROSS-EXAMINATION

BY MR. McKITTRICK:

     Q    Did I understand your testimony, Trooper Williams, that

on October 28, 1980, when you brought John Moss back to West

Virginia that you told him the purpose for which you were

returning him to West Virginia.   Is that your testimony in this

proceeding?

     A    No.

     Q    Did you tell him?

     A    No.

     Q    Did anyone in your presence tell him?

     A    I don't remember anybody telling him.

     Q    You didn't tell him because you assumed that he already

knew.   Isn't that a fair statement?

     A    I don't know whether it would be fair or not.   I don't

know whether he knew or not.

     Q    My question to you was you didn't tell him, John Moss,

Terry Williams - Cross                                    341

the purpose for returning him to the State of West Virginia was

because you assumed in your mind that he already knew.  Isn't

that a fair statement?

    A    No.

    Q    Do you remember the preliminary hearing that we had in

this case, Trooper Williams?

    A    Yes.

    Q    Do you remember me asking you these questions and you

giving these answers:

        "Q   When you first saw John Moss in the reformatory

    there on October 28, 1980, what, if any, discusions did

    you have with him?

        "A   None at the time.

        "Q   Did you tell him why you were there?

        "A   No.  I assumed he already knew why we were there."

    Now, what is your testimony?  Is that correct, or is your

testimony before His Honor today correct?

    A    Well, I guess that there is correct.  I don't remember

saying it, but evidently maybe that's what I said.

    Q    Now, let me ask you this:  You indicated to Mr. Brown

that you were driving this car that brought John Moss back to

West Virginia; is that correct?

    A    Yes.

    Q    And I take it that you were looking in the rear view

Terry Williams - Cross                                    342

mirror and watching John and Mike Smith in the back seat.  Is

that a fair statement?

    A    Yes.

    Q    And is that the reason that you know John Moss had one

arm hooked to the headrest of the front seat and one arm free?

    A    Because I was looking in the mirror?

    Q    Yes.

    A    No.  I knew before that.

    Q    You knew before that?

    A    Yes.

    Q    When John Moss was put in the car, was he handcuffed in

the front of his body?

    A    We switched the handcuffs to the front and handcuffed

one of the handcuffs to the headrest.

    Q    Are you absolutely positive of that?

    A    Yes.

    Q    What makes you so positive of that, Trooper Williams?

    A    I just remember doing that.

    Q    Are you as positive of that as you are the remainder of

your testimony, where you answered no, no, no, no to every one

of Mr. Brown's questions?

    A    To the best of my knowledge, yes.

    Q    Do you remember the second transfer hearing in this

case?

Terry Williams - Cross                                   343

A      I remember having one.

MR. STUCKY:  What page, Parrish?

Q      Do you remember me asking you these questions and you
giving these answers relating to October 28, 1980 -- Page 325.

"Q  Did you pick John Moss up at that time?

"A  Yes, we did.

"Q  Was he handcuffed?

"A  Not when they brought him down he wasn't.  We were
in a room, and they brought him into the room we were in.
Before we left with him I searched him and handcuffed him.

"Q  Did you handcuff him in the front or in the back?

"A  In the back.

"Q  What did you do next?

"A  Went out to the car and put him in the car.

"Q  Was he still handcuffed in the back?

"A  When we put him in the back of the car you are
referring to, we handcuffed him in the front?

"Q  That's correct."

Does that say that you handcuffed one hand to the headrest
and one hand was free?

A      No.  That said we handcuffed him to the front.

Q      And what did you mean by that?

A      We handcuffed him one hand to the headrest and one hand
to his wrist.

Terry Williams - Cross                              344

MR. McKITTRICK:   Page 434, gentlemen.

Q    Do you remember these questions, and did you give these

answers:

"Q   Do you know the reason why Trooper Smith asked you

to stop the car so he could get in the back seat?

"A   We never stopped.

"Q   He crawled over the seat?

"A   Yes.

"Q   Now, you described the inside of the car.   John was

setting where in the back?

"A   On the passenger's side.

"Q   Now, did you indicate that when John got into the

car at Mansfield just before you were leaving that you

handcuffed him with his hands in front of him?

"A   We switched them from the back to the front.

"Q   All right, did you handcuff his hands to any

portion of the car inside the car?

"A   Not that I can recall.

"Q   Do you know whether Trooper Smith did that?

"A   Well, it has been such a long time, he may have

handcuffed him to the headrest one time, but I'm not real

sure.

"Q   How far into your trip would he have done that?

"A   Done what?

Terry Williams - Cross                                    345

        "Q  Handcuffed him to the headrest.

        "A  Well, it would have been before we left Mansfield.

        "Q  Okay, what is the reason that you handcuffed a

prisoner to the headrest?

        "A  Well, I don't remember if we actually handcuffed

him to the headrest.  We could have."

Was that your answers on that day?

A     Yes.

Q     That is different from your answers today that you are

absolutely positive that you handcuffed him to the headrest?

A     Correct.

MR. McKITTRICK:  That's all the questions I have.

THE COURT:  Any redirect?

MR. BROWN:  We don't have any further questions.

THE COURT:  All right, Trooper, you may step down.

(Witness Excused.)

THE COURT:  Do you have any other rebuttal?

MR. BROWN:  No, Your Honor.

THE COURT:  Any surrebuttal?

MR. McKITTRICK:  No, Your Honor.

THE COURT:  All right, that takes care of the evidence.

Now, you have indicated you want to submit a brief; is that

correct?

MR. McKITTRICK:  Yes, Your Honor.

346

THE COURT:  Do you want any oral argument after the brief?

MR. McKITTRICK;  I don't think it is necessary; but if the Court would request the same --

THE COURT:  No.  I will give you until the 30th day of September to submit a brief.  I'll give the State until the 7th of October and I will rule sometime during the subsequent week. And if you would like, I can rule from the bench, or I can -- That would probably be the simplest way of doing it.  After I read your briefs, let's schedule one morning that week.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

THE COURT:  All right, get with the clerk.  I will schedule it for 9:00 on the 12th of October, that is tentatively set it for the 12th at 9:00.  If that is inconvenient, I will accommodate you on the 13th, or whenever it is convenient.

Does that conclude the suppression hearing?

MR. McKITTRICK:  Yes, it does.

THE COURT:  And all pre-trial matters?

MR. McKITTRICK:  Yes.

MR. BROWN:  Let me put on the record we want to withdraw State's Exhibit No. 1, which is Mike Smith's Department of Public Safety I.D. card and subatitute a Xerox copy, front and back. And there may be some papers you want to do this on.  Do you have any problems with any substitutions on these?

347

MR. McKITTRICK:  No.

THE COURT:  What about Defendant's Exhibit No. 8?

MR. McKITTRICK:  No.

THE COURT:  All right, we will stand in recess on this matter.  Get your briefs in, and I will give you a ruling.

- O -

WHEREUPON, these were all the proceedings had in this matter at this time.

- O -