**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 23**
**(Murphy Deposition, pp. 1 - bn000020)**

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

       Petitioner,

vs.             CIVIL ACTION NO. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

       Respondent.

       The deposition of ROBERT MURPHY was taken on the 17th day of May, 1995, beginning at 10:10 a.m., in the Law Offices of DiTrapano & Jackson, 604 Virginia Street, East, Charleston, Kanawha County, West Virginia, before Penny L. Kerns, Notary Public and Certified Court Reporter, for purposes of discovery and/or to be read as evidence in the above-styled matter which is now pending and undetermined in said Court.

GARRETT REPORTING SERVICE
"PROFESSIONAL STENOMASK FOR THE RECORD"

5208 GLOW DRIVE, CROSS LANES, WEST VIRGINIA 25313 • (304) 776-5303

211

2

APPEARANCES:     On behalf of the Petitioner:

LONNIE C. SIMMONS, ESQUIRE
  DiTrapano & Jackson
  604 Virginia Street, East
  Charleston, West Virginia   25301


On behalf of the Respondent:

MARY BETH KERSHNER, ESQUIRE
  Assistant Prosecuting Attorney
  for Kanawha County
  Judicial Annex
  Charleston, West Virginia   25301


****************************************************

I N D E X

|  | Examination by | |
| Witness | Mr. Simmons | Ms. Kershner |
| Robert Murphy | 3 | 53 |

| Exhibit | Marked |
| --- | --- |
| Deposition Exhibit No. 1 | 16 |
| Deposition Exhibit No. 2 | 24 |

Reporter's Certificate  57, 58

Page 3

1    (Witness sworn)

2  THEREUPON came

3    R O B E R T   M U R P H Y

4  called as a witness herein, who, having been first duly

5  sworn according to law, testified as follows:

6    EXAMINATION

7  BY MR. SIMMONS:

8    Q  Mr. Murphy, my name is Lonnie Simmons. I

9  represent John Moss, III, in a habeas corpus action here in

10  Kanawha County. I guess I've met with you once before.

11  The purpose of this deposition is to create a record in

12  connection with this habeas corpus proceeding. I usually

13  put on the record in these things that in habeas corpus

14  actions clients don't have an absolute right to be present

15  and my client is aware of that fact and so I've talked to

16  him and he knows that I'm doing this today, and my plan is

17  simply to get some information from you so we'll have it on

18  the record and this will become part of the record in a

19  habeas corpus action. Would you state your name for the

20  record, please?

21    A  Robert C. Murphy.

22    Q  Mr. Murphy, where are you currently

23  employed?

Page 4

1    A  CT & E Environmental Services in

2  Charleston.

3    Q  Okay. Now, how long have you been employed

4  by that company?

5    A  A little over seven years.

6    Q  Before we get the rest of your work history

7  with the state police, what's your educational background

8  as far as college and onward?

9    A  Bachelors degree in chemistry from Rutgers

10  University. I also attended the West Virginia University

11  Graduate School of Chemistry and Marshall University

12  Graduate School also in chemistry, a number of short

13  courses put on by professional organizations, the American

14  Academy of Forensic Sciences and the Southern Association

15  of Forensic Science.

16    Q  Okay. When you say you did some post-

17  graduate studies at Marshall and WVU in chemistry, did you

18  obtain any additional degree or were these just additional

19  classes?

20    A  No. It was the equivalent of a masters

21  degree, but I did not receive a masters degree. It was

22  about thirty-some hours.

23    Q  When were you first employed by the

Page 5

1  Department of Public Safety in West Virginia?

2    A  December of 1971.

3    Q  And in what capacity were you first employed

4  by the Department of Public Safety?

5    A  As a chemist. At that time, chemists were

6  considered generalists, which means you worked on anything

7  related to a particular case regardless of whether it was

8  drugs or soils or whatever.

9    Q  Hair? Could you do hair analysis?

10    A  Uh-huh. Whatever was involved in that case.

11    Q  Okay.

12    A  Three or four years later, the mid 70's,

13  started specialization where you would focus on one

14  particular area.

15    Q  What area did you focus on three of four

16  later?

17    A  Serology.

18    Q  So approximately from '74, '75 till when did

19  you focus exclusively on serology?

20    A  Pretty much.

21    Q  When did you leave the state police?

22    A  I left the state police in-- well, I

23  resigned October of '82, but I had been out of serology for

Page 6

1  approximately a year. There had been, let's see, one

2  resignation and one retirement, which left a void in the

3  drug analysis area and I shifted to fill in for that. So

4  it was about a year prior to my leaving.

5    Q  Did there come a time when you were the head

6  of the serology division of the state police?

7    A  Yes, sir.

8    Q  About what year did that happen?

9    A  It was never an official position.

10    Q  Okay.

11    A  I was the senior serologist, so I more or

12  less supervised.

13    Q  Do you know approximately when that would

14  have occurred that you more or less supervised the other

15  serologists?

16    A  Until 1976 when I believe Fred Zain was

17  hired, I was the only serologist, so there was no one to

18  supervise. At the time he was hired, basically I became

19  the supervisor.

20    Q  We'll get into that a little bit more.

21  When you-- What was the reason for leaving in October of

22  '82?

23    A  It was personal.

Page 7

1  Q  Okay. Sometime after '82, did you start
2  working for the company you mentioned in the beginning?
3  A  Well, when I left the state police, I went
4  to work for the Department of Natural Resources as a
5  chemist and I was with them until March of 1988.
6  Q  Okay.
7  A  And then I left there to work for this
8  private commercial testing company.
9  Q  Okay. Well, during the time that you worked
10 for the state police, I take it you testified as an expert
11 in serology in a number of cases?
12 A  Quite a few. Yes, sir.
13 Q  During the time that you were there, you
14 were essentially the main serologist?
15 A  Yes, sir, I was.
16 Q  Okay. I think you mentioned that Fred Zain
17 was hired in 1976. At the time that Fred Zain was hired,
18 were there any other serologists besides yourself in the
19 department?
20 A  There was one other person who was not
21 actively doing it, but had been basically my trainer. That
22 was a Sergeant White, but he was not actively doing the
23 serology work.

Page 8

1  Q  So when Zain was hired in 1976 were the only
2  serologists in the department at that time you and Mr.
3  Zain?
4  A  Yes, sir. Uh-huh.
5  Q  Let's talk about the hiring of Fred Zain.
6  Were you involved in the decision to hire Fred Zain in any
7  way?
8  A  I believe I interviewed him, but that was
9  only to basically obtain my opinion as to whether he was
10 competent to do the work. I had no role in the actual
11 decision. I talked to him, I may have seen a resume, but
12 other than that, I mean, I didn't have a role in his
13 hiring.
14 Q  Do you have any recollection of the
15 interview with Mr. Zain and/or what your impressions were
16 at that time?
17 A  As best as I can remember, I felt he was
18 competent, that he was capable of doing the work. Other
19 than that, I have no details as to the interview.
20 Q  Do you recall making any kind of a
21 recommendation to the other persons involved in the hiring
22 process?
23 A  I probably expressed my opinion that I felt

Page 9

1  he was competent. Other than that, no.
2  Q  Did you have any knowledge at that time
3  about Fred Zain's educational background and his chemistry
4  background in particular?
5  A  No, sir. Like I say, I may have seen a
6  resume, but I didn't pay a whole lot of attention to it. I
7  might mention that the state police basically followed
8  civil service regulations where a person could be
9  classified as a chemist even if their degree were in some
10 other natural science, and for that reason, I didn't pay a
11 whole lot of attention to what his degree was.
12 Q  So beginning in 1976 when Fred Zain was
13 hired, I take it you supervised, generally supervised his
14 work?
15 A  Yes, I did.
16 Q  Do you have any general opinions about the
17 work performed by Fred Zain that you observed yourself?
18 A  My personal experience was, I had no
19 problems with his work. He was competent. He was a good
20 analyst.
21 Q  Okay. During the time that you supervised
22 Fred Zain's work, do you recall having any particular
23 arguments or disputes with him over the analysis in a

Page 10

1  particular case?
2  A  No, sir.
3  Q  Were you ever aware of any cases where Fred
4  Zain said that he saw a marker in a given test and you did
5  not see a marker in that test?
6  A  No, sir.
7  Q  Had you heard any of the stories about the
8  magic wand in the laboratory?
9  A  In the newspapers, but not-- I have no
10 personal knowledge. Just from what I've read.
11 Q  But not at the time you worked in the lab
12 with Mr. Zain, you hadn't heard of the magic wand?
13 A  No.
14 Q  Okay. I'd like to turn to the case that
15 we're dealing with here. I just wonder, sitting here
16 today, do you recall working on what I'll call the
17 investigation of the Reggettz murders?
18 A  Yes, sir.
19 Q  What's the first thing you can remember
20 about this case, your earliest memory of having any
21 involvement in the investigation of those three murders?
22 A  The fact that there had been three murders
23 and someone had to go to the crime scene to collect

Page 11

1  evidence and it was determined that Fred Zain would be the
2  person that actually went to the scene. I might mention
3  the reason I remember this case is, it was an unusual
4  case.
5      Q  Can you recall if there is any particular
6  reason why Fred Zain went to the crime scene versus
7  yourself?
8      A  I can't recall how that decision was made,
9  but he was the one that was sent to the scene.
10     Q  Do you recall being involved in that
11 decision-making process?
12     A  Not really, no.
13     Q  Was it common for a serologist to go to the
14 scene of a crime and actually obtain the samples of
15 evidence to be tested later?
16     A  No, sir, not really.
17     Q  Other than this case, can you recall any
18 other examples of cases where the serologist went to the
19 scene of the crime to obtain the samples?
20     A  Yes, sir. I can recall one case in which I
21 was sent to Martinsburg to obtain samples from a vehicle.
22 There was also a fingerprint examiner that was sent at the
23 same time.

Page 12

1      Q  What was it about the Martinsburg case you
2  just mentioned that someone decided they wanted you to go
3  there in person?
4      A  I really can't say. I mean, it was-- I was
5  told I was going and that was-- I didn't have any say in
6  the matter.
7      Q  Sure. Okay. As a serologist, were you
8  trained in how to obtain evidence from the scene of a
9  crime?
10     A  Not specifically. I was trained on how to
11 basically preserve samples, how they were to be handled,
12 but as far as what samples were to be taken, no.
13     Q  Okay. Are you aware of whether or not Mr.
14 Zain at that time, and this would have been in December of
15 1979, had any training in the procedure for obtaining
16 evidence at the scene of a crime?
17     A  Probably not. I think that at that time
18 period a lot of this was what I would call common sense.
19 You basically chose the samples based on what you perceived
20 to be important and then you took whatever precautions were
21 necessary to make sure that the integrity of those samples
22 was maintained. As far as formal training in collecting
23 evidence, I don't recall any training at all.

Page 13

1      Q  Let me just focus on one thing about the lab
2  at that time, and we're talking about around December of
3  1979. Did the laboratory at that time have any written
4  protocol on laboratory procedures, first of all?
5      A  No, sir.
6      Q  Okay. And how about any written protocol on
7  obtaining evidence at the scene of a crime?
8      A  No, sir.
9      Q  Did they have any written protocol on
10 anything at that time--
11     A  No, sir.
12     Q  December of '79?
13     A  No, sir.
14     Q  So the lab at that time essentially didn't
15 have any written protocol about how serological tests, hair
16 tests, any tests you can think of, there simply was no
17 written protocol?
18     A  No, sir.
19     Q  Okay.
20     A  That was a concept that was coming into
21 place but was not in place. In the early '80s that came
22 into place, but up till that point, the general procedure
23 was, you followed generally accepted procedures, but not

Page 14

1  necessarily anything written down, just what was considered
2  generally accepted in a forensic laboratory, and it was
3  unwritten but well understood among forensic chemists, not
4  necessarily anyone else, but it was pretty much understood
5  among forensic chemists what was acceptable and what was
6  not.
7      Q  Did the laboratory at that time-- and again,
8  this is December of 1979-- did it have any procedure for
9  routinely testing the various materials used in serological
10 testing to make sure that, in other words, sort of a
11 quality control type, quality control/quality assurance
12 kind of a program, was there any kind of program like that
13 in place at that time?
14     A  No, sir.
15     Q  Okay. Do you know if at that time, December
16 of 1979, that the lab did test the materials that were used
17 in serological testing, for example, to ensure the quality
18 and that sort of thing?
19     A  Not the materials themselves. There was
20 indirect testing in that known blood samples, that was from
21 members of the criminal identification bureau donated blood
22 samples and they were tested routinely. They were the
23 standards that were used. If there had been a problem with

Page 15

1   the materials, the chemicals, then it would have shown up
2   in those tests. But as far as separate testing, it was not
3   done.
4       Q  I take it you did not go to the crime scene
5   when Fred Zain went to obtain evidence samples; am I right
6   about that?
7       A  You're correct about that. I did not go.
8       Q  When Fred Zain came back to the lab and this
9   is again, we're talking-- let me make sure I'm right here,
10  around December 13th and 14th of 1979, and let's say he
11  started bringing stuff back to the lab, do you recall any
12  discussions you had with Mr. Zain at that time? I
13  obviously understand a whole heck of a lot of time has
14  passed, but I'm just asking if you recall any conversations
15  you may have had with Mr. Zain when he returned from the
16  crime scene?
17      A  Not specifically, no. I'm sure there was
18  some discussion, but I have no idea what it might have
19  been.
20      Q  Would you have any knowledge as to whether
21  or not Mr. Zain used rubber gloves and things like that
22  when he was at the crime scene obtaining these samples?
23      A  No, sir, and I can't recall what samples he

Page 16

1   may have taken as opposed to the fingerprint examiners and
2   medical examiner. There were quite a few people at the
3   crime scene and I have no idea who collected what.
4       Q  Do you have any knowledge about the
5   procedures that Fred Zain followed when he obtained those
6   samples from the crime scene?
7       A  No, sir.
8       Q  Were you aware of how he packaged those
9   samples at the crime scene?
10      A  No, sir.
11      Q  Let me have an exhibit marked here. I'll
12  tell you what I've done just so you'll understand. I've
13  copied the documents that were produced, that Ted Smith, I
14  guess, got off the microfiche, and I've had them Bates
15  numbered because at some point I'm going to have Mr. Murphy
16  identify which ones he thinks he wrote and which ones he
17  didn't, so I was going to have this marked as Deposition
18  Exhibit 1 and here's your own copy with the Bates number at
19  the bottom.
20          (WHEREUPON, the document referred
21          to was marked for purposes of
22          identification as Deposition Exhibit
23          No. 1 and is attached hereto.)

Page 17

1       BY MR. SIMMONS:
2       Q  For the time being, if you would just maybe
3   kind of glance through that and we'll be more specific as
4   time goes on, but I was actually going to ask you a couple
5   of questions about the report.
6       A  (Witness examines document.)
7       Q  Now, have you had a chance to just generally
8   glance at the report? I know there are some other
9   documents there, but we'll get into more detail here
10  shortly. I had some preliminary questions before I started
11  asking you some specifics about that.
12          Once these items that were collected at the
13  crime scene were brought back to the laboratory, do you
14  recall who was involved in performing serological tests on
15  the various items recovered?
16      A  To the best of my recollection, I was
17  involved in most of the testing.
18      Q  Okay.
19      A  I don't know that I saw-- that I did
20  everything, but I did see all of the results.
21      Q  Who else would have been involved in the
22  testing?
23      A  Fred Zain.

Page 18

1       Q  And maybe-- I think beginning in this
2   Deposition Exhibit No. 1, beginning, it's the Bates number
3   four, is the first sheet of a report dated June 10, 1980.
4   Do you have a general recollection of doing that report
5   yourself?
6       A  To the best of my recollection, I did write
7   the report.
8       Q  I've got a general question about the
9   procedures in the laboratory. What is the significance of
10  the date June 10th, 1980?
11      A  That should have been the date of the
12  report. The date it was issued.
13      Q  Let me ask you this. Would that be the date
14  that someone in the secretarial pool typed it out or would
15  that be the date you actually maybe wrote a handwritten
16  version and then it was typed out?
17      A  I can't remember.
18      Q  You don't know?
19      A  No.
20      Q  Okay. Is it possible there's some sort of
21  delay between when you wrote the report in your own
22  handwriting and it being typed out?
23      A  There is a possibility, yes.

216

John Mosselleys George Trent
Warden of the WV Penitentiary

Case 2:03-cv-02006 Document 17-18 Filed 10/29/10 Page 8 of 35 PageID #: 3179

Multi-Page

Robert Murphy
5/17/95

## Page 19

1    Q   Okay.  On page, and I'm referring to the
2  Bates number, it's page two of the report, Bates number
3  five.
4    A   Uh-huh.
5    Q   It lists items one through seventeen and
6  then it says, "The above items were recovered from the
7  scene by Trooper F.S. Zain 12/13/79."
8    A   Uh-huh.
9    Q   Would that date-- so that's the date it was
10 recovered.  Do you have any knowledge as to when you would
11 have received those in the laboratory or is that just not
12 shown in your report?
13   A   They would have been received in the
14 laboratory the same day.
15   Q   Okay.  Then on down on that same page, this
16 is Bates number page five, page two of the report.
17   A   Uh-huh.
18   Q   It talks about a blood specimen from Vanessa
19 Reggetta and a nightgown.  "The above items were received
20 from Trooper M.D. Smith 12/14/79."  When it says received,
21 does that mean received at the lab?
22   A   Yes.
23   Q   Then down on the same page after listing it

## Page 20

1  looks like a lot of clothing, "The above items were
2  received from Trooper Terry Williams 12/14/79."  So the lab
3  would have had those pieces of clothing on that date?
4    A   That's correct.
5    Q   Then the next one, the blood specimens from
6  Paul Eric Reggetz and Bernadette Reggetz, those were
7  received on 12/17/79?
8    A   That's correct.
9    Q   Turn to the next page.  There are some
10 items, a Christmas package and a flashlight.  It says,
11 "Received on 12/18/79."
12   A   That's correct.
13   Q   That means the lab received it then?
14   A   The chemistry lab.  Corporal Shumate was a
15 fingerprint examiner and he probably collected those items
16 himself.
17   Q   Okay.
18   A   And did his examination and then turned them
19 over to the chemistry lab.
20   Q   By the way, before I pass this by, I guess
21 starting on the first page of the report that was on the
22 microfiche, there's some handwriting on the report and I
23 just wondered if you recognized that handwriting?  Do you

## Page 21

1  see where it says, "VR"?  It's to the left of those item
2  numbers.
3    A   No, sir.
4    Q   Is that your writing?
5    A   No, it isn't.
6    Q   Okay.  Then following-- let me see.  I
7  think we already talked about the flashlight from Shumate.
8  There's a blood specimen from Paul Reggetz, III, that was
9  received on January 2nd of '80?
10   A   Uh-huh.
11   Q   The next items are a doll and table knife
12 and some clothing that was received on January 17th of
13 '80?
14   A   Right.
15   Q   And there's something written above that.
16 Do you recognize that writing?
17   A   No, sir, I don't.
18   Q   Do you know-- can you read that?  I'm not
19 sure I can read that middle word.
20   A   No, sir.
21   Q   It's looks like 1/7/80 and then there's a
22 word and then 3/11/80.  Do you not have any idea what that
23 means?

## Page 22

1    A   No, sir.
2    Q   Okay.  Next there's a list of names and
3  apparently blood samples were obtained from them and
4  received in the lab in January of 1980.  I was wondering
5  what information do you have as to why blood specimens were
6  obtained from those individuals?
7    A   Okay.  Since I talked to you the first time,
8  I've thought about that a great deal.  When the laboratory
9  determined that someone else had been in that house, I hate
10 to put it this way, but basically the state police went on
11 a fishing expedition and rounded up a number of people in
12 that area that were possible suspects and obtained blood
13 samples from them to see if any of their blood specimens
14 matched what was found in the house.  They did not, but I
15 mean, that's the reason for those samples.
16   Q   Do you recall any of the specifics as to why
17 one name was on there versus another?
18   A   No, sir.  They were just submitted to the
19 laboratory as potential suspects and we examined them and
20 ruled them out.
21   Q   Okay.  The next item is stainless flatware
22 that's also from Shumate and that's February 6th of '80.
23 So is it possible that he tried to do fingerprint on that

217

John Moss, et. al. vs. George Trent,
Warden of the WV Penitentiary
Case 2:09-cv-01406 Document 17-18 Filed 10/29/10 Page 9 of 35 PageID #: 3180    5/17/95

Page 23

1  and then he gave it to your lab?

2      A  Yes, sir.

3      Q  Then there are some additional, it looks

4  like clothing items that were received February 7th of '80,

5  and that means the lab received those February 7th of '80?

6      A  That's correct.

7      Q  Okay.  And I think the final items submitted

8  are two tubes of blood from John Moss and that's April 22nd

9  of '80?

10      A  That's correct.

11      Q  Do you recall testifying before the grand

12  jury, which resulted in the indictment of Paul Reggettz,

13  III, I think it is?

14      A  Again, since talking to you, I've thought

15  about that a great deal.  The best of my recollection is, I

16  have only testified before one grand jury and I believe

17  that was for John Moss.  I had nothing in the way of

18  physical evidence to connect Paul Reggettz to this case, so

19  I would not have testified in the grand jury.

20      Q  I understand a lot of time has passed by and

21  I've found something since I met with you that might help

22  refresh your recollection.  I've got a couple of things

23  here.  Let's see.  I would like to have this marked as

Page 24

1  Deposition Exhibit Number 2, please.

2          (WHEREUPON, the document referred

3          to was marked for purposes of

4          identification as Deposition Exhibit

5          No. 2 and is attached hereto.)

6  BY MR. SIMMONS:

7      Q  And ask that you look at that document.

8      A  (Witness examines document.)

9      Q  And particularly note the bottom of the

10  second page.

11      A  As I stated, I had no physical evidence

12  connecting Paul Reggettz with this case.  There was some

13  evidence obviously connecting John Moss.  If I testified

14  before the grand jury, it was in relationship to John Moss

15  not to Paul Reggettz.

16      Q  Okay.  Let me ask you this.  I guess the

17  reason why I'm asking, we have not been able to find the

18  grand jury transcript from the grand jury which indicted

19  Mr. Reggettz and you might also note that on the first page

20  of Deposition Exhibit Number 2, John Moss's name is

21  mentioned in the indictment of Mr. Reggettz, but he's not

22  indicted.  I guess what I'm trying to find out from you, do

23  you have any recollection of testifying before the grand

Page 25

1  jury which indicted Mr. Reggettz?

2      A  It may have been the same grand jury, but I

3  had no testimony related to Mr. Reggettz.

4      Q  Just to make it clear.  I'd like to show

5  you-- you testified-- let me see what the date of this one

6  is-- on September 19th, 1983, and this is in-- this is the

7  suppression hearing in the John Moss case before his first

8  trial, and I would bring your attention to pages I think

9  two fifty-five and two fifty-six, I think you'll see, and

10  just see, if you'll look at that, see if that refreshes

11  your recollection at all.

12      A  (Witness examines documents.)  Well, that

13  was the grand jury.

14      Q  Does that refresh your recollection?

15      A  Again, to me it indicates that my testimony

16  before the grand jury had no relationship to Paul Reggettz.

17  It was related to John Moss.  I don't know if this is on or

18  off the record, but once there was an inconsistency found

19  in the blood sample that indicated someone else had been in

20  the house, the state police were still convinced that Paul

21  Reggettz was involved and they were basically looking for a

22  second party, an accomplice in effect.

23          John Moss met the criteria for an

Page 26

1  accomplice, but that did not exonerate Paul Reggettz.  If

2  the grand jury was looking at both people, as I said, there

3  was no physical evidence connecting Paul Reggettz to the

4  crime.  So when I appeared before the grand jury, I would

5  have had nothing to say regarding Paul Reggettz.  It was

6  only John Moss that I had any physical evidence that

7  connected him.

8      Q  Just so we make it clear, I think you stated

9  that you, during the whole time you worked for the state

10  police, you only testified before a grand jury on one

11  occasion?

12      A  The best as I can remember, yes, sir.

13      Q  And that would be--

14      A  That would be this one.

15      Q  -- this one particular case?

16      A  Uh-huh.  I stated earlier this was an

17  unusual case because the investigating officers, because

18  they had a confession and because Paul Reggettz's behavior

19  was unusual, were convinced that they had the right person

20  and the physical evidence indicated someone else was

21  involved either totally or partially, and there was some

22  resistance on the part of the investigators to pursue that

23  because they would have rather explained it away than

217

John Moss, II vs. George Trent,
Warden of the WV Penitentiary

Case 2:09-cv-01406-JPB Document 17-18 Filed 10/29/10 Page 10 of 35 PageID #: 3181

Multi Page

Robert Murphy
5/17/95

Page 27

1  pursue it because they felt they had the right person.
2      Q  Can you recall the names of these people
3  that you're calling the investigators or the investigating
4  officers?  Can you identify who those people may have
5  been?
6      A  You've handed me some documents that could
7  give me some names.  I don't want to say I recall that.
8  The South Charleston detachment commander was the principal
9  contact, but there were people working under his
10  supervision that were actually doing the investigation.
11      Having the seen the documents, I do recall
12  Terry Williams as being one of the investigators.  Again,
13  the best I can recall, the South Charleston detachment
14  commander was Corporal Cook and there were several Cooks
15  so-- but there was some discussion back and forth about
16  what evidence was and what it meant and what needed to be
17  done and basically, as I said, there was some resistance to
18  pursue this matter because they felt they had the right
19  person.
20      And this puts me in an awkward position
21  because I was a member of the state police.  I'm not
22  putting them down.  They basically were following their
23  instincts that they had the person and the laboratory was

Page 28

1  producing contradictory evidence that said maybe you do and
2  maybe you don't, and they wanted to believe that they were
3  right so--
4      Q  Did they ever-- do you recall any of the
5  people involved in the investigation ever questioning any
6  of your results or did they come up with any other kinds of
7  theories to explain them away?
8      A  Yes.  Again, the detachment commander of
9  South Charleston tried to explain away our results by
10  trying to say that Paul Reggettz had planted blood at the
11  scene to throw us off the track and again, it was well
12  intentioned.  They thought they had the right man and they
13  were trying to explain away the inconsistencies, and I
14  won't say it was a heated discussion, but it was a little
15  agitated, and we tried to say that no, we didn't believe
16  that, someone else was in that house, and we wouldn't buy
17  their trying to explain it away.
18      On the Christmas wrapping paper, in
19  particular, which to this day to me is the key piece of
20  evidence, there was a very distinct drop of blood and it
21  would be difficult to plant that.  I mean, you could smear
22  it, you could do a lot of things, that didn't look like
23  anything other than what it appeared to be.  Someone was

Page 29

1  cut, they bled and a drop of blood fell on that paper, and
2  it would be difficult to plant that so--
3      Q  Let me ask you this.  When the evidence from
4  the crime scene was brought back to the laboratory, are you
5  saying that the lab had the actual items such as the
6  wrapping paper as opposed to having some swatch which had
7  absorbed the blood from the wrapping paper?
8      A  No, we had the actual wrapping paper.
9      Q  Okay.  So when the analysis was performed,
10  you had in the laboratory the actual wrapping paper?  Maybe
11  there was a knife and some of the other items, you had the
12  actual item itself?
13      A  Yes, sir.
14      Q  Well, as far as you can recall, were any of
15  the blood stains obtained at the crime scene placed on
16  swatches as opposed to actually bringing in the item of
17  evidence itself?
18      A  Not that I can recall.  They were the actual
19  items.
20      Q  When-- let me ask you this.  At-- this is
21  again back in December of 1979.  Did the laboratory have
22  any kind of cataloging of types obtained in other cases?
23  In other words, let me try to illustrate that.

Page 30

1      A  A data base?
2      Q  A data base, yeah.  If you got say a PGM 1+
3  and an ABO B, did you have a way of looking through your
4  files and saying, "Well, hey we got this from this case"?
5      A  No.  That was something that was under
6  consideration, but was not in place.
7      Q  So when you received the reference sample of
8  blood from John Moss on April 22nd, 1980, the lab did not
9  previously have any knowledge whatsoever of any of his
10  types from any source?
11      A  As far as I can recall, no.  I mean, we did
12  not have a data base that we could reference.
13      Q  How about if Mr. Moss was incarcerated in
14  another state?  I guess what I'm wondering is whether or
15  not your lab had contacted the other state to find out if
16  they had done any blood testing?  In other words, I'm
17  trying to find out if you had any knowledge of his blood
18  types before you received that reference sample?
19      A  As far as I can recall, the laboratory never
20  contacted any other state and should not have had any
21  reference to what his blood typing was.
22      Q  Okay.  Let's just-- so I can get this part
23  out of the way, let's turn in Deposition Exhibit Number 1

219

John Moss et ux. George Trent    Multi-Page    Robert Murphy
Warden of the WV Penitentiary                              5/17/95
Case 2:09-cv-01406   Document 17-18   Filed 10/29/10   Page 11 of 35 PageID #: 3182

Page 31

1 to it's Bates number ten, and what I'd like to do is have
2 you look at that and determine if you recognize the writing
3 on Bates number page ten?
4     A  That is mine.
5     Q  Okay.  Maybe for purposes of this
6 proceeding, if you would-- I'll give you a pen-- if you
7 would write just "Murphy" at the bottom of that page and
8 that way we'll be able to keep these straight.
9     A  (Witness complies.)
10     Q  Okay.  Now, what would-- the fact that this
11 particular document is in your writing--
12     A  Uh-huh.
13     Q  -- what is the significance of that other
14 than the fact that you wrote it?
15     A  This basically is a compilation of all the
16 parties involved or potentially involved and a summary of
17 all the blood groupings.  Just a tabular way of excluding
18 people or including people.
19     Q  Would this sheet in your handwriting
20 indicate that you had performed all of those tests or does
21 that not indicate that?
22     A  Not necessarily.
23     Q  Okay.

Page 32

1     A  But, as I stated earlier, I would have seen
2 the results.
3     Q  And would you say that-- I think you
4 described this as a compilation.  So this is a compilation
5 sheet as opposed to being the original, what I call the raw
6 data sheet that was filled out when the testing was
7 actually done; would that be correct?
8     A  That is a fuzzy area because the way of
9 keeping notes was in transition.  It is possible that this
10 is the actual bench sheet where things were recorded here,
11 but it's also possible this is a summary sheet and there
12 were other sheets for individual tests.  I can't recall.
13     Q  In the first column across before you have
14 the names listed, in other words, the column that is on top
15 of the column where the names are, it looks like it says
16 "JAN"; is that correct, or does that have any meaning to
17 you?
18     A  Probably just January.
19     Q  And going from left to right, what does that
20 first column-- do you know what that word is?  I know it's
21 very, very hard to see.  I just didn't know if you might
22 recall from doing the sheets what that first column is for.
23     A  No, sir.

Page 33

1     Q  Okay.
2     A  In the initial setup of serology, there were
3 separate tests for determining whether a sample was blood
4 and a second examination to determine if it was human
5 blood.
6     Q  Okay.
7     A  When all of the enzymes and proteins were
8 added, those became pretty much irrelevant, and possibly
9 those first two columns are whether it is blood and whether
10 it is human, but I'm just guessing.
11     Q  Okay.  Let's go ahead and go to Bates number
12 page eleven and I'd ask you to first of all let me know if
13 you-- first of all, is that in your handwriting?
14     A  No, sir, it is not.
15     Q  Okay.  Do you recognize whose handwriting
16 that is?
17     A  No, sir.
18     Q  Would you-- well, let me put it this way.
19 Only you and Fred Zain performed the serological testing in
20 this case; that is correct, isn't it?
21     A  I'm not certain of that.  There were two
22 other serologists and I can't recall when they were hired
23 and whether they were present at the time.  That was Lynn

Page 34

1 Inman and Gale Midkiff, and I'm not sure if they were there
2 at the time or not.  They may have been.
3     Q  Okay.  So--
4     A  But probably on this case the work was done
5 by myself or Fred Zain.
6     Q  Do you have any specific recollection of
7 Inman or Midkiff performing work in this case?
8     A  No, sir.
9     Q  Well, how about on this sheet, simply put
10 "Not Murphy."  That way we'll distinguish between what
11 you're actually able to identify and what you're not.
12     A  (Witness complies.)
13     Q  Okay.  And let's go to Bates number page
14 twelve, and it looks like at the top half of the page
15 there's writing that's different from the bottom half of
16 the page, and I wonder first of all, do you recognize any
17 of the writing on that page as being your writing?
18     A  The bottom half is mine.
19     Q  The one that's in print?
20     A  Uh-huh.
21     Q  And the top half is not yours?
22     A  No, it isn't.
23     Q  And again, you don't have any recollection

220

John Moss, Alloys, George Trent
Warden of the WV Penitentiary
Multi-Page™
Robert Murphy
5/17/95
Case 2:09-cv-01406  Document 17-18  Filed 10/29/10  Page 12 of 35 PageID #: 3183

Page 35

1  as to whether or not this is a compilation based upon raw
2  notes or if this actually is the raw notes?
3      A  No, sir.
4      Q  Let me ask you this.  Since the top half of
5  that page is in someone else's handwriting other than
6  yourself, do you take it from looking at this sheet that
7  somebody else performed the examination of those items
8  listed on the top of that page?
9      A  Probably.
10      Q  Maybe on this sheet, you should put "Bottom
11  Murphy," maybe would be a way to distinguish.
12      A  (Witness complies.)
13      Q  Turning to Bates number thirteen, do you
14  recognize any of that as being your handwriting?
15      A  No, sir.
16      Q  Okay.  Why don't you just write "Not Murphy"
17  on that?
18      A  (Witness complies.)
19      Q  Then on Bates number fourteen, which is a
20  copy of, I think if you'll look at it, it's the back-side
21  of Bates number thirteen.  Do you see the initials "FSZ" on
22  the top of that page?
23      A  Yes, sir, I do.

Page 36

1      Q  And that stands for Fred Salem Zain?
2      A  Right.
3      Q  So obviously this would be a page that you
4  ought to put "Not Murphy" on, I assume; right?
5      A  Uh-huh.
6      Q  Okay.  And it looks like Bates number
7  fifteen, sixteen, seventeen, eighteen.  It looks like it's
8  the handwritten version of the typed report?
9      A  That's correct.
10      Q  And that is your handwriting?
11      A  Yes, sir.
12      Q  So if you wouldn't mind, if you'd write
13  "Murphy" on those particular pages, please?
14      A  (Witness complies.)
15      Q  I think we can skip a few pages.  There are
16  some case submission reports that it looks like Inman
17  received something, so she was there at least in January of
18  '80.
19      A  Okay.  I kind of thought that Inman and
20  Midkiff were there, but--
21      Q  Okay.  Well, let me ask you this.  You
22  mentioned that you reviewed the results.  Do you recall
23  reviewing the results of any serological testing in this

Page 37

1  case performed by any person other than yourself or Fred
2  Zain?
3      A  I can't recall.
4      Q  So you think it's possible that some of the
5  work may have been done by Inman and Midkiff in this case?
6      A  It's possible.
7      Q  Okay.
8      A  Again, to the best of my recollection, I saw
9  the results.
10      Q  But you do specifically recall reviewing
11  some serological testing in this case that was performed by
12  Fred Zain?
13      A  Yes, sir.
14      Q  Let's see.  I think there are some other
15  sheets near the back here that we probably ought to have
16  identified.
17      MS. KERSHNER:  Thirty-five?
18      BY MR. SIMMONS:
19      Q  Yeah, if you would turn to Bates number
20  thirty-five.
21      A  Thirty-five?
22      Q  Yeah.  And I'd ask you, is that your
23  handwriting?

Page 38

1      A  No, sir.
2      Q  Okay.  If you would just write "Not Murphy"
3  on there, please?
4      A  (Witness complies.)
5      Q  And also thirty-six.
6      A  Thirty-six.
7      Q  Would you also say that's not Murphy?
8      A  That's not Murphy.
9      Q  Okay.  The next document, Bates number
10  thirty-seven is some kind of a map.  Were you involved in
11  drawing that diagram?  Not a map, but a diagram.
12      A  No, sir.
13      Q  Do you know who did?
14      A  No, I don't.
15      Q  We won't mark anything on that one.  How
16  about Bates number thirty-eight?  Is that your writing?
17      A  No, sir.
18      Q  Okay.  Why don't you go ahead and write "Not
19  Murphy" on there?
20      A  (Witness complies.)
21      Q  In looking at that sheet, does that have any
22  significance to you?  Can you understand what that person
23  was doing?

281

John Moss II vs. George Trent    Multi-Page    Robert Murphy

Case 2:09-cv-00496   Document 17-18   Filed 10/29/10   Page 13 of 35 PageID #: 3184   5/17/95

Warden of the WV Penitentiary

Page 39

1      A   Not really.

2      Q   Okay. Let's see here. I guess the final

3  group of documents I'd just like to see if you've seen

4  before. Starting with forty-one, forty-two, forty-three,

5  forty-four, forty-five and forty-six, do you recognize

6  those documents at all? Not necessarily the writing, but

7  just those document?

8      A   No, sir, I don't.

9      Q   Does it even look familiar as maybe a way of

10  maintaining the chain of custody, anything like that?

11      A   It appears to be a summary of the custody of

12  evidence, but I don't remember this.

13      Q   Okay. I think we're going to be done with

14  those documents for the time being. Once you obtained the

15  blood types from Vanessa Reggettz, Paul Eric Reggettz and

16  Bernadette Reggettz, isn't it true that you could deduce

17  what the types of Paul Reggettz, III, as the father would

18  be, presuming he's the natural father?

19      A   Not necessarily specifically, but within a

20  certain category, yes, and the conclusion was that there

21  was blood at the crime scene that either Paul Reggettz, Sr.

22  was not the father of those children or someone else was

23  there, and it was the laboratory that requested the sample

Page 40

1  of blood from Paul Reggettz.

2      Q   Was the main purpose for getting the blood

3  sample from Mr. Reggettz to essentially establish that he

4  was in fact the natural father?

5      A   It was more to determine who the unknown

6  blood came from. The assumption was that he was the

7  natural father, but that was not the primary purpose. The

8  primary purpose was to determine-- here we have an unknown

9  blood sample. It doesn't match any of the three victims.

10  It's got to belong to someone, so test Paul Reggettz first.

11  If it matches, okay, and if doesn't, then start looking for

12  someone else.

13      Q   Do you-- well, maybe this will-- let me just

14  ask you a couple of questions here. I think based upon the

15  testing in this case and your report and the various

16  documents, various tables were made of the blood types that

17  were obtained and this has been included in the petition

18  for writ of habeas corpus and let me see if I can find a

19  specific example of-- and it might help you to look at

20  these, but I just wondered if, were there any types-- let

21  me start over again. You mentioned that by knowing the

22  types of the mother and the two children, you can

23  essentially deduce the range of types that the father would

Page 41

1  have to have?

2      A   That's correct.

3      Q   Do you recall if you had found any types at

4  the crime scene that could not have been deposited by the

5  natural father under these facts?

6      A   Right.

7      Q   And I wonder if maybe you know off the top

8  of your head or if you'd like to look through it, if you

9  can point me out an example.

10      A   Well, the Christmas wrapping paper was the

11  one that stood out as not being consistent.

12      Q   Okay.

13      A   And that sample was the one that prompted us

14  to ask for a sample of Paul Reggettz's blood to begin with,

15  because, as I said, either someone else was there or he was

16  not the natural father.

17      Q   Just for purposes of illustration, on page

18  eleven of the petition I've got listed the types that were

19  obtained from the Christmas wrapping paper and then on page

20  eight of the petition, I have the table of the known types

21  from, you know, the various reference samples. I wondered

22  if you could just explain and illustrate what type you

23  found from the Christmas wrapping paper that you knew could

Page 42

1  not have been deposited by the natural father? And I don't

2  know if you can do that or not. but if you would look at

3  those.

4      A   It's been fifteen years.

5      Q   Sure. I understand that.

6      A   (Witness examines document.) In particular

7  the ESD, the esterase. For each of these people to have a

8  one, it means both parents had to be a one, because it's

9  basically one/one. The Christmas wrapping paper was a

10  two/one and known of the members of the Reggettz family had

11  the two to contribute, so the two/one had to come from

12  someone else.

13      Q   Okay.

14      A   Now, there maybe some others, but--

15      Q   That's a good example. I just wanted to

16  illustrate that.

17      A   Okay.

18      (WHEREUPON, a discussion was held

19      off the record.)

20  BY MR. SIMMONS:

21      Q   I'd just like to ask you the final part,

22  just some general questions to make sure I understood what

23  your thought process was in interpreting the samples you

222

**Page 43**

1  obtained and the statistics that you came up with. In this
2  case, what was the purpose for obtaining reference samples
3  from Vanessa Reggettz, Bernadette Reggettz, Paul Eric
4  Reggettz and Paul Reggettz, III?
5       A  There were blood stains at the scene and
6  basically the purpose was to try to account for all of the
7  blood stains there and attribute them to a particular
8  person or group of persons. This was a fairly common
9  procedure at crime scenes and basically you try to
10  reconstruct what happened. In other words, it sounds a
11  little crude, but who bled where, and you can sometimes
12  tell a sequence of events by doing that. So it was a
13  routine practice to try to attribute blood stains in
14  various areas of the crime scene with various people and
15  that, like I say, was routine procedure.
16       Q  Okay. Is one purpose for obtaining
17  reference samples to compare those known types with the
18  types you obtained from the scene where you don't know who
19  deposited the particular blood sample?
20       A  Right.
21       Q  What analysis did you use to account for the
22  possibility-- well, strike that. Let me do it this way.
23  Based upon your training and experience with serological

**Page 44**

1  testing, you were aware of the fact that this kind of
2  serological testing is unable to distinguish between a
3  mixture of blood from two different sources and blood from
4  one source?
5       A  No, sir.
6       Q  You disagree with that?
7       A  I disagree with that.
8       Q  So it's your-- based upon your understanding
9  and expertise, this kind of what I always call it is basic
10  serological testing, is able to distinguish between a
11  mixture of blood from two different samples; is that
12  correct?
13       A  You're biasing the question because there's
14  more involved than just the test itself. You have to look
15  at the source of the sample. In other words, as I stated,
16  on the Christmas wrapping paper, there was a discreet drop
17  of blood. Now, if that had been a smear, then there would
18  have been the possibility that smear was more than
19  one. But a discreet drop is invariably a single source.
20       So taking that into account, along with the
21  test results and again, a mixture would indicate-- well,
22  there would be variability in the test result in that if
23  you had two bloods mixed together, unless they were exactly

**Page 45**

1  fifty/fifty, that the activity demonstrated in the exam
2  would not be equal. So you would see in the pattern
3  exhibited, you would see an inconsistency in the intensity
4  of the bands produced. And that would indicate that you
5  had a mixture. Not proof, but there would be an
6  indication.
7       When I said you're biased, you have to
8  consider not only the test result, but the source of the
9  sample you used and when there is, as I said, a discreet
10  drop of blood, then you're pretty well assured that that is
11  a single source.
12       Q  Let me go back to the question. I
13  understand you have some other theories, or rather
14  explanations or whatever and I'll be glad to get into that,
15  but I just wanted to start with, the first question is,
16  looking at the testing alone and the types that are
17  obtained--
18       A  Huh-uh.
19       Q  -- can basic serological-- will you agree
20  with me that using basic serological testing, you cannot
21  distinguish between a mixture of blood from the source or
22  whether it came from a single source?
23       A  No, sir.

**Page 46**

1       Q  Okay. So you still disagree with that,
2  even without this other explanation that you have, where
3  you have to go beyond that? So you're saying, for example,
4  if I had a tube of blood from you and I had a tube of blood
5  from myself and I put them in a flask and I shook them up
6  and I poured it at a crime scene and you tested it, if you
7  strictly did serological testing, you would be able to
8  separate my blood from your blood?
9       A  I wouldn't say I could distinguish them, but
10  I would recognize that it was not a single source and I'm
11  talking as a very experienced serologist.
12       Q  You would recognize it was not a single
13  source because of the variations in the intensity of the
14  bands?
15       A  Uh-huh.
16       Q  Okay. Using my illustration again-- let's
17  use my illustration again. Let's say you only did ABO
18  testing and let's say that you and I are both ABO O, how
19  would you distinguish between our bloods under that
20  circumstance?
21       A  No way.
22       Q  You wouldn't be able to do that?
23       A  No, sir.

John Moss Plus George Trent   Multi-Page   Robert Murphy
Case 2:09-cv-01406  Document 17-18   Filed 10/29/10   Page 15 of 35 PageID #: 3186  5/17/95
Warden of the WV Penitentiary

Page 47

1  Q  So the only way that you would be able to
2  distinguish using basic serological testing is if the
3  particular typing system you're using, we differ under that
4  system; would that be correct?
5  A  That's correct.
6  Q  Is it your opinion under that illustration I
7  gave you, that there would necessarily be a difference in
8  the intensity of the bands?
9  A  Unless the mixture was exactly
10 proportionate, there would be a difference in the
11 intensity.  So, I'm not ruling out the possibility that it
12 could be deceptive, but I'm saying it would take
13 extraordinary circumstances.
14 Q  Okay.
15 A  Under normal conditions, a mixture which
16 would not be exactly proportionate, you would see a
17 difference in the intensity of the bands.
18 Q  Let's just stick with that illustration.
19 Let's say that you and I, under that illustration, had the
20 same ABO type O, but I'm PGM 1+ and you're PGM 2+.  Under
21 that scenario, if you tested this blood that was mixed
22 together and placed on the carpet, you would anticipate
23 when you did the PGM test seeing a band that demonstrated a

Page 48

1  1+ and a band that demonstrated a 2+; would that be
2  correct?
3  A  Uh-huh.
4  Q  And depending on the amount of the mixture,
5  you would anticipate seeing a variation in the intensity?
6  A  That's correct.
7  Q  Let's say that you see a variation in the
8  intensity of the bands.  How would you report those
9  results?
10 A  I can't recall having experienced that, but
11 it would have to be reported as a two/one, but qualified as
12 being abnormal.
13 Q  So it's possibly you have two/one, it's
14 possibly a 2+ mixed with a 1+?
15 A  Correct.
16 Q  All right.
17 A  As I said, qualified.  In other words, it
18 could be this, it could be this, it could be this.  There's
19 no way to determine it.
20 Q  Okay.  You know, in your explanation you
21 talked about a single blood drop on say the wrapping paper?
22 A  Uh-huh.
23 Q  Let's say there are three separate blood

Page 49

1  drops on the wrapping paper.  Do you assume under that
2  scenario that there was a single source for each separate
3  blood drop?
4  A  No, sir.
5  Q  Okay.
6  A  Each drop would have been examined
7  independently.
8  Q  Okay.  Let's go ahead and turn to the
9  specifics of this case.  Let's say the Christmas wrapping
10 paper, do you recall if this scenario happened at all?
11 Let's say there were two drops on the wrapping paper and
12 let's say you ran ABO, PGM on one drop and GLO and ESD on
13 the other drop.  Would that have happened or go ahead and--
14 A  No.
15 Q  -- maybe you can explain how you did it?
16 A  If that had happened, that would have been
17 reported separately.
18 Q  Okay.  You would not have combined those
19 results?
20 A  No.  No, sir.
21 Q  The lab also at that time, I assume, would
22 not have accumulated samples let's say from the sheet.
23 Let's say there were different drops all over the sheet,

Page 50

1  but one drop wasn't enough to perform the different enzyme
2  testing.  Your lab would not at that time have combined
3  those together and then done the testing?
4  A  No, sir.  Whatever was reported, was
5  reported from a single sample.
6  Q  And you never were aware of Fred Zain at
7  least in the cases you supervised him, ever engaging in
8  that practice of combining--
9  A  No, sir.
10 Q  -- different types together?  Different
11 samples together?
12 A  No, sir.
13 Q  When he would perform the testing in this
14 case, would you necessarily have watched him go through the
15 whole process or would you come in at the end and look at
16 the gel together with him?
17 A  I would primarily look at the final result,
18 not necessarily see every single step.
19 Q  Also I think you stated, but I just wanted
20 to make it clear, you know, you gave your explanation about
21 how serological testing can tell the difference between
22 mixtures and a single source.  I think you mentioned if the
23 blood was smeared, would you at least initially be

John Moss, Il, vs. George Trent,
Warden of the WV Penitentiary

Multi-Page

Robert Murphy
5/17/95

Case 2:09-cv-01406   Document 17-18   Filed 10/29/10   Page 16 of 35 PageID #: 3187

Page 51

1  concerned that that's a mixture if the blood was smeared as
2  opposed to a single drop?
3        A  I would pay a little more attention to the
4  patterns in the results.
5        Q  What is it about a smear that would make you
6  think that it's at least, you know, you need to be a little
7  more concerned about the possibility of a mixture versus a
8  single drop?
9        A  Because a smear is more likely to be a
10  mixture. In other words, you could have a blood stain and
11  smear another blood stain on top of it and there wouldn't
12  be any way to tell that. Whereas, a drop is a distinct
13  pattern and it would be very difficult for a drop to be on
14  top of a drop without it being very obvious. A smear on
15  top of a smear, I mean, there's no indication of what
16  you've got. For a drop to be on top of a drop, there would
17  be something obviously visible.
18        Q  At that time, and again this is December of
19  '79, at least beginning December of '79, did the laboratory
20  have a procedure in place where all of your testing
21  serologically were photographed?
22        A  We had the capability of doing it, but I
23  don't believe it was done on a routine basis. I mean,

Page 52

1  there was some work done in that regard, but as far as
2  every single sample being done, no, I don't believe so.
3        Q  And going back to your analysis of the
4  statistics, in your opinion, then, it is appropriate to,
5  when you're-- let's make it more specific. Let's say you
6  have a blood drop from the crime scene and you find an ABO
7  PGM type and let's say the ABO type is the same as some of
8  the known possible donors of blood at that crime scene, but
9  the PGM is different from any of the known possible donors.
10        Under that set of facts, in your opinion, it
11  is appropriate for statistical purposes to multiply the,
12  you know, the percentage of the population having that
13  particular ABO type times the percentage of the population
14  having that particular PGM type?
15        A  Right.
16        Q  So you would include the ABO type even
17  though it's the same as some of the known possible donors
18  of blood at that crime scene?
19        A  Right, because the probability is a total
20  probability and you take all of the characteristics and
21  include those.
22        Q  Okay. Let me just look at one more thing
23  here and I may be done here. (Examines documents.) Were

Page 53

1  you involved in any way in that whole Zain investigation?
2        A  No, sir.
3        Q  Okay. So no one ever contacted you?
4        A  Well, I was contacted once about two years
5  ago by the Kanawha County Prosecutor's Office in regard to
6  this particular case and that was the only contact I had
7  whatsoever.
8        Q  Okay.
9        A  Until you came into it.
10        Q  Okay. Do you have any recollection about
11  what that was about, that conversation was about?
12        A  Basically, I was asked since I had signed
13  the report, I was asked if I supervised the work and I
14  stated that I had and that I had seen all the results and
15  basically this had-- they didn't see a problem with that
16  and that was the end of it.
17        Q  Okay.
18        A  That was the only contact I had at all.
19        MR. SIMMONS:  Okay.  That's all.
20              EXAMINATION
21  BY MS. KERSHNER:
22        Q  Mr. Murphy, would it be fair to state that--
23  and I believe you did state this more or less, that the

Page 54

1  investigating officers on the Reggettz murders were pretty
2  certain that they had their man when they arrested Mr.
3  Reggettz?
4        A  Yes.
5        Q  Would there have been any advantage to you
6  or to Mr. Zain to have found results that indicated that a
7  person other than Mr. Reggettz or the three victims were at
8  the home at the time of the murders?
9        A  No, actually, that would have been to our
10  disadvantage because finding that kept the investigation
11  open and if we hadn't found that, everything would have
12  been cut and dry. It would have been over.
13        Q  In fact, did you or Mr. Zain experience any
14  difficulties as a result of the results you did find?
15        A  I wouldn't call it difficulties, but we did
16  have to convince the detachment commander, the South
17  Charleston detachment commander, that the investigation was
18  not over, that there was another person and Mr. Reggettz
19  had not planted blood at the scene and that they needed to
20  be looking for someone else, and there was resistance
21  because they felt they had the person responsible.
22        Q  Okay.  Did you take the lead in that
23  persuasion or was Mr. Zain also involved in that?



Page 55

1    A  He was involved.  I took the lead, but Fred
2  Zain was involved in that, too, because he basically backed
3  me up in saying, "Look, you can't sweep this under the
4  carpet.  There is something here that you need to pursue."
5        MS. KERSHNER:  Okay.  I don't have anything
6  further.
7        MR. SIMMONS:  That's all.  You have the
8  right to review this once she types it up.  It's like a
9  deposition, or you can tell her you're willing to waive
10  your signature and, if you'd like, I'd be glad to send you
11  a copy of it when it's done if you want it, but it's up to
12  you.  She needs to hear you say on the record one way or
13  the other.
14        THE WITNESS:  I would like to see a copy.
15        MR. SIMMONS:  Are you willing to waive your
16  signature?
17        THE WITNESS:  Sure.
18        MR. SIMMONS:  Okay.  I'll send you a copy.
19        THE WITNESS:  I want to be cooperative.  I
20  don't have anything to hide and I want to see that things
21  turn out the way they should turn out.
22        MR. SIMMONS:  I appreciate your help here.
23  I just hope this doesn't become a habit.

Page 56

1        (WHEREUPON, the deposition was
2        adjourned at 11:35 a.m.)

Page 57

REPORTER'S CERTIFICATE

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, To-wit:

        I, Penny L. Kerns, a Notary Public within
and for the State of West Virginia, duly commissioned and
qualified, do hereby certify that the foregoing deposition
of ROBERT MURPHY was duly taken by and before me under the
West Virginia Rules of Civil Procedure, at the time and
place and for the purpose specified in the caption thereof,
the said witness having been duly sworn by me to testify
the whole truth and nothing but the truth concerning this
matter in controversy.
        I do further certify that the said
deposition was correctly taken by me by means of the
Stenomask; that the same was transcribed by me or under my
supervision, and that the said transcript is a true and
accurate record of the testimony given by said witness.
        I do further certify that I am not connected
by blood or marriage with any of the parties to this
action, am not a relative or employee or attorney or

Page 58

counsel of any of the parties, nor am I a relative or

employee of such attorney or counsel, or financially

interested in the action, or interested, directly or

indirectly, in the matter in controversy.

        It is stipulated and agreed that the

signature of the witness is hereby expressly waived to the

foregoing deposition.

        Given under my hand this 24th day of May,

1995.

My commission expires June 1, 1998.

                    Penny L. Kerns, CCR
                    Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
PENNY L. KERNS
7 Karon Lane
St. Albans, W.Va. 25177
My Commission Expires June 1, 1998

226

MOSS, JOHN

C-79-2566

SUSPECT: HOMICIDE

EXAM:   SGT. R. C. MURPHY FOR TPR. TERRY
WILLIAMS, SO CHAS.

000003



# CRIMINAL IDENTIFICATION BUREAU

725 Jefferson Road
South Charleston, West Virginia 25309

To:  Trooper Terry Williams
West Virginia State Police
South Charleston, West Virginia

June 10, 1980

This examination has been made with the understanding that the evidence is connected with an official investigation of a criminal matter and that the Laboratory report will be used for official purposes only, related to the investigation or a subsequent criminal prosecution. Authorization cannot be granted for the use of the Laboratory report in connection with a civil proceeding.

RE:  Vanessa Reggettz - VICTIM
Bernadette Reggettz - VICTIM
Paul Eric Reggettz - VICTIM
Paul Reggettz, III - SUSPECT
John Moss - SUSPECT
HOMICIDE 12/12-13/79

YOUR NO.
LAB NO.    C-79-2566

Examination requested by:

Addressee

References:

Examination requested:    Blood determination

Specimens:

/#1:  Piece of knife from bedroom beside bath.
/#2:  Sample from room next to bath where female victim found.
/#3:  Sample from front bedroom carpet.
/#4:  Bedspread from front bedroom.
/#5:  Pillow case from front bedroom.
/#6:  Electrical cord removed from female victim.
/#7:  Curtain from back kitchen door.
/#8:  Sample from sheet on kitchen floor.
/#9:  Sample from outside back door below door handle.
/#10: Sample from kitchen sink.
/#11: Sample from utensil drawer from kitchen.
/#12: Pillow case from bedroom beside bath.

Dedicated Service Bureau to Criminal Justice Agencies

000004

Trooper Terry Williams                    C-79-2546
Page 2
June 10, 1980

ITEMS SUBMITTED ( CONTINUED ):

#13:  Sample from door between bedroom and living room.
#14:  Sample from door between master bedroom and front door.
#15:  Change purse from dresser in master bedroom.
#16:  Medium white t-shirt found under pile of clothes in master bedroom.
#17:  Jockey shorts found under pile of clothes in master bedroom.

     The above items were recovered from the scene by Trooper F. S. Zain
     12/13/79.


One blood specimen from Vanessa Reggettz.
One plastic bag containing a nightgown from Vanessa Reggettz.

     The above items were received from Trooper M. B. Smith 12/14/79.


Two pair brown pants.
One shirt worn from work.
Two pair blue jeans.
One work glove.
One pair brown suede boots.
One blue jean jacket.
One pair white athletic socks.
One pair brown work pants.
Two pair long underwear.
One thermal underwear shirt.
One white t-shirt.
One pair white jockey shorts.
One tan work shirt.
One blue sweat shirt.
One red bandana handkerchief.
One blue toboggan.    (Clothing belonging to Paul Reggettz III).

     The above items were received from Trooper Terry Williams, 12/14/79.


One blood specimen from Paul Eric Reggettz.
One blood specimen from Bernadette Reggettz.

     The above items were received from Trooper Terry Williams 12/17/79.

Trooper Terry Williams                               C-79-2566
Page 3
June 10, 1980

ITEMS SUBMITTED ( CONTINUED ):

One flashlight
Christmas package
Christmas package wrapping

     The above items were received from Corporal D. M. Shumate 12/18/79.


One blood specimen from Paul Reggatts III

     The above item was received from Trooper Terry Williams 1/2/80.


One baby doll (from childrens bedroom).
One table knife.
Bernadettes Clothing                    1-7-80  retu. 3-11-80
     The above items were received from Trooper Terry Williams 1/17/80.


Blood specimens from:

Jack C. Neal, Jr.
Roger L. Province.
William J. Monk.
Ross E. Gillespie.
Marvin D. Smith.
Richard A. Rollins.
Joseph Morehouse.
Nathaniel Brown.
Thomas P. White.

     The above items were received from Trooper Terry Williams and
     Trooper M. D. Smith, January 1980.


One box of stainless flatware.

     The above item was received from Corporal D. M. Shumate 2/6/80.


One blue jacket.
One pair of brown wool and leather gloves.
One tan wool glove.
One brown cloth jersey glove.

     The above items were received from Trooper M. D. Smith 2/7/80.

Trooper Terry Williams                    C-79-2566

Page 4
June 10, 1980

ITEMS SUBMITTED ( CONTINUED ):

Two tubes of blood from John Moss.

    The above item was received from Trooper Terry Williams 4/22/80.

RESULTS OF EXAMINATIONS:

    Stains of human blood, group O, containing the 2-1 variant of
the polymorphic isoenzyme phosphoglucomutase (PGM 2-1), the 1 variant
of the polymorphic isoenzyme adenylate kinase (AK 1), the B variant of
the polymorphic isoenzyme erythrocyte acid phosphatase (EAP ᴮ), the 1
variant of the polymorphic isoenzyme esterase D (EsD 1), the 1 variant
of the polymorphic isoenzyme adenosine deaminase (ADA 1), and the 2 variant
of the polymorphic isoenzyme glyoxalase I (GLO I 2) were identified on
items #1 - 6, #8, and #13 recovered from the scene, on the night gown
of Vanessa Reggettz, and on the doll.

    Human blood, group O, containing PGM 2-1, and EsD 1 was identified
on item #16 from the scene.

    Human blood, group O, containing PGM 2-1 was identified on item #9
from the scene.

    Human blood containing EsD 1 was identified on the table knife.

    No additional blood groupings could be obtained for the above three
items due to the quantity or condition of the blood present.

Trooper Terry Williams
Page 5
June 10, 1980

C-79-2966

RESULTS OF EXAMINATIONS ( CONTINUED ):

Stains of human blood, group O, PGM 1, AK 1, EAP BA, EsD 2-1, ADA 1, and GLO I 2 were identified on items #7, #11, #12, #14, and #15 from the scene, on the Christmas package and wrapping paper, on the flashlight, and on the clothing of Bernadette Reggettz.

In addition, the stains on item #7 from the scene, the stains on the Christmas package wrapping paper, and the stains on the clothing of Bernadette Reggettz were found to contain the 2-1 variant of the polymorphic serum protein haptoglobin (Hp 2-1), the 1 variant of the polymorphic serum protein group specific component (Gc 1), and the PGM 1 was subgrouped and found to be a PGM 1+ 1-.

Blood was identified on items #10 and #17 from the scene but no additional information could be obtained.

The blood specimen of Vanessa Reggettz was of human blood group O, PGM 2+ 1-, AK 1, EAP B, EsD 1, ADA 1, GLO I 2, Hp 1, and Gc 2-1.

The blood specimen of Bernadette Reggettz was of human blood group O, PGM 2+ 2+, AK 1, EAP B, EsD 1, ADA 1, GLO I 2, Hp 2-1, and Gc 2-1.

The blood specimen of Paul Eric Reggettz was of human blood group O, PGM 2+ 1-, AK 1, EAP B, EsD 1, ADA 1, GLO I 2, Hp 2-1, and Gc 2-1.

The blood specimen of Paul Reggettz III was of human blood group O, PGM 2+ 2-, AK 1, EAP BA, EsD 1, ADA 1, GLO I 2, Hp 2, and Gc 2-1.

The blood specimen of John Rose was of human blood group O, PGM 1+ 1-, AK 1, EAP BA, EsD 2-1, ADA 1, GLO I 2, Hp 2-1, and Gc 1.

Trooper Terry Williams                          C-79-2566
Page 6
June 10, 1980

RESULTS OF EXAMINATIONS ( CONTINUED ):

    Of the blood specimens from Neal, Province, Monk, Gillespie,
Smith, Rollins, Morehouse, Brown, and White, none was found to contain
EsD 2-1.

    No blood stains were identified on any of the articles of clothing
submitted other than those previously reported.

    No blood stains were identified on the box of stainless flatware.


CONCLUSION:

    Groupings of the human blood stains identified on Items #1 - 6,
#8, and #13 from the scene, on the night gown of Vanessa Reggettz,
and on the doll were consistent with the groupings of Vanessa Reggettz's
blood and with the groupings of Paul Eric Reggettz's blood.

    Groupings of the human blood stains on Items #9 and #16 from the
scene were consistent with the groupings of Vanessa Reggettz's blood and
Paul Eric Reggettz's blood to the extent that blood groupings could be
determined.

    Groupings of the human blood stains identified on Items #7, #11, #12,
#14, and #15 from the scene, on the Christmas package and wrapping paper,
on the flashlight, and on the clothing of Bernadette Reggettz were
consistent with the groupings of the blood of John Moss and were not
consistent with the groupings of any of the other blood specimens submitted.

    The combination of blood groups O, PGM 1> 1-, AK 1, EAP BA, EsD 2-1,
ADA 1, GLO1 2, Hp 2-1, and Gc 1 occurs in approximately 0.03% of the
population.


                                    Very truly yours,


                                    R. C. MURPHY, FORENSIC
                                    CHEMIST

RCM/edc

000009



Grouping

MURPHY

000010

Grouping

PG. C-7  7566-A

SP Sr. Chee

12-14-79

| Suspect Clothes | | | | | AK | FM | RD | | MP | LC | SH | NS | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| glove | — | | | | | | | | | | | | | | | | |
| B. Jean | — | | | | | | | | | | | | | | | | |
| B. Jean | — | | | | | | | | | | | | | | | | |
| Brown Pants | — | | | | | | | | | | | | | | | | |
| Brown Pants | — | | | | | | | | | | | | | | | | |
| Work Shirt | — | | | | | | | | | | | | | | | | |
| B. J. Jacket | — | | | | | | | | | | | | | | | | |
| T-Shirts | — | | | | | | | | | | | | | | | | |
| Socks | — | | | | | | | | | | | | | | | | |
| Blue Tokup | — | | | | | | | | | | | | | | | | |
| Brown Pants | — | | | | | | | | | | | | | | | | |
| Undershirts | — | | | | | | | | | | | | | | | | |
| Jacket | — | | | | | | | | | | | | | | | | |
| T-Shirt | — | | | | | | | | | | | | | | | | |
| Blue Sweatshirt | — | | | | | | | | | | | | | | | | |
| Handkerchief | — | | | | | | | | | | | | | | | | |
| Workshirt | — | | | | | | | | | | | | | | | | |
| Shoes | | | | | | | | | | | | | | | | | |

NOT MURPHY

000011



BOTTOM    MURPHY



NOT MURPHY

000013

NOT MURPHY

000014

STAINS OF HUMAN BLOOD, GROUP O, CONTAINING THE R-1 VARIANT OF THE POLYMORPHIC ISOENZYME PHOSPHOGLUCOMUTASE (PGM R-1), THE 1 VARIANT OF THE POLYMORPHIC ISOENZYME ADENYLATE KINASE (AK 1), THE B VARIANT OF THE POLYMORPHIC ISOENZYME ERYTHROCYTIC ACID PHOSPHATASE (EAP B), THE 1 VARIANT OF THE POLYMORPHIC ISOENZYME ESTERASE D (EsD 1), THE 1 VARIANT OF THE POLYMORPHIC ISOENZYME ADENOSINE DEAMINASE (ADA 1), AND THE 2 VARIANT OF THE POLYMORPHIC ISOENZYME GLYOXALASE I (GLO I 2) WERE IDENTIFIED ON ITEMS #1-6, #8, AND #13 RECOVERED FROM THE SCENE, ON THE NIGHT GOWN OF VANESSA REGGETH, AND ON THE DOLL.

HUMAN BLOOD, GROUP O, CONTAINING PGM R-1 AND EsD 1 WAS IDENTIFIED ON ITEM #1C FROM THE SCENE.

HUMAN BLOOD, GROUP O, CONTAINING PGM R-1 WAS IDENTIFIED ON ITEM #9 FROM THE SCENE.

HUMAN BLOOD CONTAINING EsD 1 WAS IDENTIFIED ON THE TABLE KNIFE.

NO ADDITIONAL BLOOD GROUPINGS COULD BE OBTAINED FOR THE ABOVE THREE ITEMS DUE TO THEIR QUANTITY OR CONDITION OF THE BLOOD PRESENT.

STAINS OF HUMAN BLOOD, GROUP O, PGM 1, AK 1, EAP BB, EsD 2-1, ADA 1

MURPHY

000015

THE BLOOD SPECIMEN OF PAUL ERIC REGGETTE
WAS OF HUMAN BLOOD GROUP O, PGM 2+1,
AK 1, EAP $^B$, EsD 1, AdA 1, GLO I 2,
Hp 2-1, AND Gc 2-1.

THE BLOOD SPECIMEN OF PAUL REGGETTE III
WAS OF HUMAN BLOOD GROUP O, PGM 2+1-
AK 1, EAP $^{BA}$, EsD 1, AdA 1, GLO I 2,
Hp 2, AND Gc 2-1.

THE BLOOD SPECIMEN OF JOHN MOSS WAS
OF HUMAN BLOOD GROUP O, PGM 1+1-, AS 1
EAP $^{CA}$, EsD 2-1, AdA 1, GLO I 2, Hp 2-1,
AND Gc 1.

OF THE BLOOD SPECIMENS FROM NEAL,
PROVINCE, MONK, GILLESPIE, SMITH, ROLLINS,
MOREHOUSE, BROWN, AND WHITE NONE WAS
FOUND TO CONTAIN EsD 2-1

NO BLOOD STAINS WERE IDENTIFIED ON
ANY OF THE ARTICLES OF CLOTHING
SUBMITTED OTHER THAN THOSE PREVIOUSLY
REPORTED.

NO BLOOD STAINS WERE IDENTIFIED ON
THE BOX OF STAINLESS FLATWARE.

MURPHY

CONCL.

GROUPINGS OF THE HUMAN BLOOD STAINS IDENTIFIED ON ITEMS #1-C, #8, AND #13 FROM THE SCENE, ON THE NIGHT GOWN OF VANESSA REGGETTE, AND ON THE DOLL WERE CONSISTENT WITH$ THE GROUPINGS OF VANESSA REGGETTE'S BLOOD AND WITH THE GROUPINGS OF PAUL ERIC REGGETTE'S BLOOD.

GROUPINGS OF THE HUMAN BLOOD STAINS ON ITEMS #9 AND #10 FROM THE SCENE WERE CONSISTENT WITH THE GROUPINGS OF VANESSA REGGETTE'S BLOOD AND PAUL ERIC REGGETTE'S BLOOD TO THE EXTENT THAT BLOOD GROUPINGS COULD BE DETERMINED.

GROUPINGS OF THE HUMAN BLOOD STAINS IDENTIFIED ON ITEMS #7, #11, #12, #14, AND #15 FROM THE SCENE, ON THE CHRISTMAS PACKAGE AND WRAPPING PAPER, ON THE FLASHLIGHT, AND ON THE CLOTHING OF BERNADETTE REGGETTE WERE CONSISTENT WITH THE GROUPINGS OF JOHN THE BLOOD OF JOHN MOSS AND WERE NOT CONSISTENT WITH THE GROUPINGS OF ANY OF THE OTHER BLOOD SPECIMENS SUBMIT. THE COMBINATION OF BLOOD GROUPS P, PGM 1+1 - AK 1 EAP BA ESD 2-1 ADA 1, GLO I 2 H, 2-1 AND Gm(1) OCCURED IN APPROXIMATELY 1/700 OF THE POPULATION



MURPHY

000017

FROM THE SCENE, ON THE CHRISTMAS PACKAGE
AND WRAPPING PAPER, ON THE FLASHLIGHT,
AND ON THE CLOTHING OF BERNADETTE REGGETTE.

IN ADDITION, THE STAINS ON ITEM #7 FROM
THE SCENE, THE STAINS ON THE CHRISTMAS
PACKAGE WRAPPING PAPER, AND THE STAINS
ON THE CLOTHING OF BERNADETTE REGGETTE
WERE ~~DEMONSTRATED~~ FOUND TO CONTAIN THE 2-1
VARIANT OF THE POLYMORPHIC SERUM PROTEIN
HAPTOGLOBIN (Hp 2-1), THE 1 VARIANT OF
THE SERUM PROTEIN GROUP SPECIFIC POLYMORPHIC
COMPONENT (Gc 1) AND THE PGM 1
WAS SUBGROUPED ~~AS A~~ AND FOUND TO BE A PGM 1+1-.

BLOOD ~~STAINS~~ ~~WERE~~ WAS IDENTIFIED
ON ITEMS #10 AND #17 FROM THE SCENE
BUT NO ADDITIONAL INFORMATION COULD BE
OBTAINED.

THE BLOOD SPECIMEN OF VANESSA REGGETTE
WAS OF HUMAN BLOOD GROUP O, PGM 2+1-,
AK 1, EAP B, EsD 1, ADA 1, GLOI 2,
Hp 1, AND Gc 2-1.

THE BLOOD SPECIMEN OF BERNADETTE REGGETTE
WAS OF HUMAN BLOOD GROUP O, PGM 2+2-, AK 1,
EAP B, EsD 1, ADA 1, GLOI 1, Hp 2-1, AND Gc 2-1.

MURPHY

DEPARTMENT OF PUBLIC SAFETY
(Criminal Identification Bureau)
CASE SUBMISSION REPORT

Your Case No. _____     C.I.B. CASE No. 7 - 7566 9

From: S Police     Location: So. Charleston     Date: 12 / 14 / 19 79
(Organization)                    (city)

Submitted By: M.D. Smith     Rank: Trooper

Subject of Investigation: Murder

Place of Crime: St Albans area     Kanawha
(Town)                    (County)

Date of Crime: 12 / 13 / 79     19 79  Time: _____ A.M. or P.M., E.S.T. or D.S.T.

Name of Victim: Vanessar Riggetts     DOB: _____   Color: W   Sex: M

Address: 7027 Chestnut Ave., St Albans

Suspect or Arrested: Rush Riggetts     DOB: _____   Color: W   Sex: M

Ht. _____ Wt. _____  Criminal History** Unknown     Fingerprinted** Yes

Address: 7027 Chestnut Ave., St Albans

Brief Description of Events Victim was murdered inside her residence
or Comments* by her husband the suspect

List Items Submitted:* (1) one ___ tube of blood blood sample of the
victim

(1) one plastic bag containing nightgown
removed from the victim (various) #

Examination(s) Desired:* Blood comparison and gun powder residue

List Reports Attached: _____

Received at C.I.B. by: Z. S. Zain     Via: Tpr M.D. Smith

Date: 12-14     19 79  Time: _____ A.M. or P.M., E.S.T. or D.S.T.

C.I.B. Disposition of Evidence: _____

Approximate Court Date: _____
**Pertains to Latent Fingerprint Work Only
NOTE: FORWARD THIS REPORT TO THE C.I.B. IN DUPLICATE WITH ITEMS, ONE COPY WILL BE RECEIPTED AND RETURNED
TO SUBMITTER.

000019

Form No. 53 In.P.S.

D. ...RTMENT OF PUBLIC SAFETY
(Criminal Identification Bureau)
CASE SUBMISSION REPORT

C.I.B. CASE NO. 79-2566

Your Case No. _____

From: State Police   Location: So Chas.   Date: 1-2   19 2
(Organization)           (City)

Submitted By: Terry Williams   Rank: Trooper

Subject of Investigation: Murder

Place of Crime: St Albans   Kanawha
(Town)           (County)

Date of Crime: _____ 19 ___ Time: _____ A.M. or P.M., E.S.T. or D.S.T.

Name of Victim: _____ DOB: _____ Color _____ Sex _____

Address: _____

Suspect or Accused: Paul Reggetts III   DOB: _____ Color W   Sex M

Ht. ___ Wt. ___ Criminal History** _____ Fingerprinted** _____

Address: _____

Brief Description of Events
or Comments* _____

List Items Submitted* One CC Tube of blood from Accused

Examination(s) Desired* _____

List Reports Attached: _____

Received at C.I.B. by: _____   Via T. Will...

Date: Jan 2 19 80 Time: 1.00 PM   A.M. or P.M., E.S.T. or D.S.T.

C.I.B. Disposition of Evidence: _____

Approximate Court Date: _____
**Pertains to Latent Fingerprint Work Only

NOTE: FORWARD THIS REPORT TO THE C.I.B. IN DUPLICATE WITH ITEMS, ONE COPY WILL BE ACCEPTED AND RETURNED
TO SUBMITTER.

090020