**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 24**

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

      Petitioner,

v.                          Civil Action No. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

      Respondent.


    The deposition of TED SMITH was taken on the 20th day

of September, 2002, beginning at 9:05 a.m., at the State

Police Headquarters, 725 Jefferson Road, South Charleston,

Kanawha County, West Virginia, before Lisa J. Chambers,

Certified Court Reporter and Notary Public, pursuant to

written agreement for the purposes of discovery and/or to

be read as evidence in the above-styled matter which is

pending and undetermined in said Court.



TED SMITH
MOSS V. GEORGE TRENT                                    CIVIL ACTION NO. 94-MISC-663

---

Page 2

Deposition of Ted Smith                                    Page 2

A P P E A R A N C E S:

On behalf of the Petitioner:

LONNIE C. SIMMONS, ESQUIRE
DiTrapano, Barrett & DiPiero, PLLC
604 Virginia Street, East
Charleston, West Virginia 25301

On behalf of the State of West Virginia:

MICHELE DRUMMOND, ASSISTANT PROSECUTOR
STEVE REVERCOMB, ASSISTANT PROSECUTOR
Kanawha County Prosecuting Attorney's Office
111 Court Street
Charleston, West Virginia 25301

Also appearing:

Trooper Howard Brent Myers

---

Page 4

1          (Witness Sworn.)
2  THEREUPON came
3          TED SMITH,
4  called as a witness herein, after having been first
5  duly sworn to tell the truth, testified as follows:
6          DIRECT EXAMINATION
7  BY MS. DRUMMOND:
8    Q   Please tell us your name.
9    A   Ted Smith.
10   Q   And where are you employed at?
11   A   I'm currently a member of the West
12 Virginia State Police. I'm stationed at the Criminal
13 Identification Bureau. My job assignment is
14 currently laboratory director.
15   Q   And can you just share with us some of
16 your educational background?
17   A   I've been working with the department
18 for about 17 years. During that time frame, my
19 principal responsibilities up until lately have been
20 in the field of forensic biology, so I received and
21 examined physical evidence for the presence of
22 biological materials, and then tested those items to
23 potentially identify the individuals that they could

---

Page 3

Deposition of Ted Smith                                    Page 3

------------------------
        I N D E X
------------------------

Witness                        Examination by

Ted Smith                      Ms. Drummond 4, 80

                               Mr. Simmons 26

Reporter's Certificate.........................89/90

---

Page 5

1  have originated from.
2    Q   And do you have any idea how many times
3  you may have tested such items?
4    A   We've done tens of thousands of tests
5  during the course of my career here.
6    Q   And have you had occasion to testify in
7  courts in various counties in the State?
8    A   Yes, ma'am. I've testified
9  approximately 200 times, and I believe the last count
10 was 38 of the counties of the State, and I've also
11 testified in two other states.
12   Q   And as a part of your employment, do you
13 continue with education on these matters?
14   A   Yes, ma'am. I routinely do training for
15 law enforcement officers and prosecutors and nurses
16 and advocates and all sorts of a variety of people
17 regarding DNA evidence, sexual assault evidence,
18 biological evidence.
19   Q   Do you also undergo any educational
20 training yourself?
21   A   Yes, ma'am. We're required to have
22 yearly continued education, and I participate in that
23 each year.

---

TED SMITH
MOSS V. GEORGE TRENT

Multi-Page

CIVIL ACTION NO. 94-MISC-663

Page 6

1    MS. DRUMMOND: I would at this point
2 move that he be qualified as an expert with regard to
3 forensics I don't know if you have any voir dire.
4    MR. SIMMONS: I don't have any. I agree
5 with that.
6    BY MS. DRUMMOND:
7    Q   Can you tell me the type of forensic
8 testing that you participate in here at the lab?
9    A   Right now, we do principally -- in the
10 biology section, we do DNA analysis, which for us is
11 basically we identify basic body fluids. Once we've
12 identified those fluids or isolated stains -- we
13 don't identify the fluid on all of the stains -- then
14 we do a series of tests that creates a DNA profile.
15    Once the DNA profile is created on the
16 evidence, we compare that evidence to reference
17 samples that were sent, and answer the question
18 whether they could or could not have originated from
19 the reference sample person.
20    Q   And at the request of the Office of
21 Prosecuting Attorney, specifically, myself and Mr.
22 Revercomb, did you review some particular materials
23 in the John Moss matter, specifically, I think, Dr.

Page 7

1 Bing's testimony?
2    A   Yes, ma'am. I looked at the case file,
3 and I was given a copy of a deposition or testimony
4 by Dr. Bing and one by Murphy, who used to work for
5 us.
6    Q   And in reviewing the case file, did you
7 review the typing that had been performed in this
8 particular case?
9    A   Yes, ma'am. There were a variety of
10 samples that were tested and analyzed, and a variety
11 of data that was reported on those samples.
12    Q   And can you share with us what, if any,
13 opinions you formed upon your review of the testing
14 that was done previously?
15    A   To specific items or just in general?
16    Q   Start, if you would, just to speak
17 generally, and then if you can refer to anything
18 specific that would better demonstrate the matter.
19    A   Generally speaking, there were some
20 items of evidence that had genetic markers that could
21 not have originated from the members of the family
22 who were involved in the homicides.  Those genetic
23 markers were consistent with genetic markers that

Page 8

1 could have originated from Mr. Moss.
2    Q   Let me back up a little bit.  In your
3 review of the case file, was there anything in there
4 that would have indicated to you that there was a
5 mixture of blood that was being tested in the matter?
6    A   Can you be more specific in terms of
7 your question? Because, generally, there may have
8 been some that suggest mixture, but not on all of the
9 stains that were identified.
10    Q   Let's consider the -- I think there was
11 Christmas wrapping.
12    A   Yes, yes. I remember that particular
13 item of evidence. And, no, there was nothing in the
14 genetic markers, in and of themselves, that suggested
15 that that was a mixture from more than one
16 individual.
17    Q   Did the data that you examined indicate
18 that there was any type of a mixture with regard to
19 that particular item?
20    A   No, it did not. The data that I looked
21 at was consistent with the type of data that we would
22 expect from a single source, from a blood drop that
23 was identified.

Page 9

1    Q   Returning back now to the specific item
2 in this particular case. We'll start with the
3 Christmas paper, the wrapping, that was examined.
4 Did you review the data with regard to that, and
5 what, if any, opinion did you have of your review?
6    A   The Christmas wrapper gives every
7 appearance of being consistent with a single source,
8 and the genetic markers identified are consistent
9 with markers that could have come from Mr. Moss.
10    Q   And the determination with regard to the
11 number of people that was involved in -- I'm sorry --
12 one out of however many, was that -- do you think
13 that the tabulations were upon your reflection
14 correct in that particular matter?
15    A   Operating from the understanding that it
16 was a single source, yes. Basically, each
17 calculation has -- each of the different systems has
18 a very specific frequency, and the appropriate method
19 to use would be to multiply those frequencies
20 together in order to clearly define the size of the
21 group that those particular characteristics would be
22 found in.
23    Q   And that would be with regard to a

**Page 10**

1  single source?
2      A   Yes, that's correct.
3      Q   If there had been any evidence with
4  regard to a mixture, what would the calculation have
5  been or how would you have performed the calculation?
6      A   The calculations would have,
7  theoretically, been performed the same way. You
8  would have to consider all of the possible types that
9  were present and then multiply them all together. It
10 would change the number that was generated, but the
11 way the calculation was done would be precisely the
12 same. And it would require a different wording in
13 terms of the conclusion if you suspected it was a
14 mixture as opposed to a single source.
15     Q   Okay. And just to clarify, the numbers
16 would remain the same, but the interpretation might
17 change if it were a single --
18     A   Well, for example, let's just take a
19 simple example. If we have a PGM type and the PGM
20 type is a 1+/1-, if we suspect that it was a mixture
21 calculation as opposed to a single source
22 calculation, what you would have to do is you would
23 have to include all of the potential individuals that

**Page 11**

1  were a 1+, and that has a certain frequency.
2          You would have to include all of the
3  potential individuals that were a 1+/1-, which has a
4  certain frequency, and all of the individuals that
5  would be a 1-, which would have a certain frequency.
6          The total of that frequency would be
7  different than the total of the frequency for a
8  1+/1-. The procedure is the same. It just depends
9  on how many factors you include into your
10 calculation.
11     Q   Can you tell me whether or not the
12 review of the testing that you did indicated that
13 these particular tests were performed in the blind,
14 so to speak?
15     A   That's one of characterizing them.
16 During this time frame, in the laboratory, it was
17 common practice to report genetic markers before
18 reference samples were received.
19          So in regard to this particular sample,
20 the genetic markers were identified and reported
21 before they were ever compared to the reference
22 sample that was sent at some later date. That's a
23 fairly good quality control mechanism to make sure

**Page 12**

1  that the calls are legitimate calls and the types are
2  being identified correctly.
3      Q   And you just brought up an issue,
4  quality assurance/quality control. Do you know
5  whether or not there were any quality control or
6  quality assurance mechanisms in place?
7      A   Well, there are always some quality
8  control and quality assurance mechanisms in place.
9  If you run controls on your tests to make sure that
10 your tests are working properly, that's a quality
11 control mechanism.
12          You cannot do the identifications
13 without some quality control present, so you have to
14 have reference samples that you can use in order to
15 identify the types before you even start calling the
16 questioned samples and other things. So there is
17 always some degree of that.
18          Back in -- this was done was in the
19 early '70s -- or the early '80s and the late '70s.
20 The quality control that was in place during that
21 time frame was significantly different than present
22 quality control, but there has always been some
23 degree of quality control in terms of the laboratory

**Page 13**

1  testing here.
2      Q   Do you have any idea what, if any,
3  written protocol was in effect in the '70s?
4      A   I came in '85, so I can simply go by my
5  experience and my discussions with the people who
6  were here in '85 who were also here in '77. The
7  laboratory has always used some form of a written
8  protocol.
9          Whether or not it said that it was the
10 West Virginia State Police protocol or not is a
11 different issue, but it may have been from the FBI
12 laboratory protocols. We used to use the
13 Metropolitan PD's protocol as our protocol. We used
14 to use Culliford's Manual on Electrophoresis as a
15 protocol.
16          And so in some form or fashion, we've
17 always had written protocols that we followed, at
18 least as long as I've been here and as long as the
19 people that I spoke with who were here before me.
20 They basically followed the same pattern.
21     Q   Were you involved with ASCLD and their
22 examination of this particular lab?
23     A   Yes, ma'am. On more than one occasion,

TED SMITH                                                      CIVIL ACTION NO. 94-MISC-663
MOSS V. GEORGE TREN?

**Page 14**

1 I have been involved with ASCLD.
2    Q    And correct me if I'm wrong. It's my
3 understanding that initially they had seven, so to
4 speak, criticisms or concerns?
5    A    No. It depends on which inspection that
6 you're talking about. But involved with the Supreme
7 Court and the original inspection of the Zain issues,
8 yes, they had seven criticisms of the laboratory in
9 regard to things that they thought should be handled
10 differently or improved upon as far as the laboratory
11 was concerned.
12    Q    And can you tell me what participation
13 you played in providing them with information that
14 may have caused them to back off of their initial
15 criticisms?
16    A    Originally, they came in and they made
17 the seven criticisms, and they made certain
18 assumptions that were not quite accurate in regard to
19 those seven criticisms.
20        So as a part of that, with the attorneys
21 that were involved, Alec Ross for the prosecution's
22 side and George Casteel for the defense side, I was
23 asked to provide some additional documentation to

**Page 15**

1 help clarify precisely what was going on in the
2 laboratory and how it was going on. And so as a
3 result of that, we responded to each of those
4 criticisms.
5        And when they did what has
6 affectionately been called "Zain II," they evaluated
7 that additional data and decided that the issues were
8 not as broad as they had originally thought they
9 were, and that the work of the other individuals in
10 the laboratory, although it was not perfect, fell
11 within generally accepted guidelines.
12    Q    Were those issues more a general lack of
13 documentation?
14    A    A lot of it was. And some of them, they
15 had -- the original seven had some criticism of some
16 procedures that we followed, but once we provided
17 them some additional information -- I mean, they --
18 and one of the original seven was that we didn't do
19 proficiency tests, which was -- so we had to give
20 them copies of all of our proficiency tests and
21 demonstrate them.
22        And they suggested that we didn't use
23 known salivas in some of our analysis, which was just

**Page 16**

1 not the case if we had them. So we provided them
2 with that type of documentation.
3        And I don't necessarily need to defend
4 the ASCLD inspectors, but they were given a big task,
5 and they only had a week to do it, and there is bound
6 to be some holes when they're put under that kind of
7 pressure.
8    Q    Would it be fair to say that whatever
9 glitches there might have been at that point did not
10 significantly affect the outcome of the testings?
11    A    Well, that was the opinion that the
12 ASCLD inspectors came to. They said that they
13 basically saw some obvious difficulties in the work
14 of Fred Zain that went beyond the normal kind of
15 glitches that you would expect, but that the
16 remaining individuals in the laboratory seemed to be
17 following generally accepted procedures, and that the
18 lack of records, where records were, and some of the
19 other things didn't necessarily imply that the work
20 that was done was done incorrectly in any way or that
21 the opinions rendered were incorrect in any way.
22    Q    You indicated that you reviewed the
23 earlier deposition of Dr. Bing. With regard to that,

**Page 17**

1 if I recall correctly, in that particular deposition,
2 he comes to some conclusions that perhaps the
3 calculations, even if it were a single source, would
4 be incorrect?
5    A    Yes, ma'am. That's the way I read it,
6 if I'm reading it correctly.
7    Q    Can you tell me whether or not you agree
8 or disagree with the suggested way of Dr. Bing with
9 regard to calculations?
10    A    I think the theory that he talks about
11 is sound in terms of if we're dealing with a mixture.
12 If, in fact, you are dealing with a mixture, then you
13 have to factor additional things in when you're
14 dealing with a set of data.
15        The area that I would personally
16 disagree is that I do not think that all of the data
17 suggests the possibility of a mixture, and the
18 simplest explanation for some of the items data --
19 taking the blood stain on the Christmas packaging,
20 for example -- is that it is a single source.
21        It's consistent with data that we would
22 expect to find from a single source. The testimony
23 of Mr. Murphy suggests that it was a blood -- an

TED SMITH
MOSS V. GEORGE TREN...                              CIVIL ACTION NO. 94-MISC-663

---

**Page 18**

1 obvious blood drop, which would also theoretically be
2 consistent with a single source.
3           And so the total package in that regard
4 of the evidence and how the evidence was packaged --
5 and I'm just going by what was written, you know.  I
6 didn't see it myself.  But it suggests that it would
7 be consistent with a single source.
8           Given that, then the appropriate
9 calculation would be a single source calculation.
10 And the way to do that -- and it's a very simple
11 concept -- is each of the genetic systems have a
12 certain number of characteristics.  You identify the
13 frequency of the characteristic that you have
14 identified, the genotype that you've identified, and
15 then you gradually reduce the size of the group of
16 potential individuals that could contribute to that
17 combination of genetic markers.
18           And the procedure is a relatively simple
19 one.  It's simple multiplication.  The issue comes as
20 to the basic assumptions that you underlie before you
21 make your calculation.
22     Q   If it had been more than one individual,
23 would it be fair to say that a second individual

---

**Page 19**

1 would have had to have been following immediately
2 behind and dropping --
3     A   Personally, I think it would be unusual
4 that we would find what appeared to be a single drop
5 to actually be a drop or a mixture of more than one
6 individual.
7     Q   Would you expect a second outline if
8 someone else had been there?
9     A   Yes.  And like I say, without having
10 seen the drop myself or some of the other samples
11 that were collected.  It's not a necessarily
12 difficult thing to be able to identify that it looks
13 like one blood drop has been spilled on another blood
14 drop or something along those lines.
15           If, in fact, it was a drop that was
16 consistent with the typical standard kind of drop
17 that you would expect, then it would have had a
18 fairly regular pattern that would be consistent with
19 a single drop, which I'm guessing, like I say, not
20 having been there, that that's what Mr. Murphy is
21 suggesting when he says that the drop appeared to be
22 consistent with a single blood drop.
23     Q   There is a discussion about testing of

---

**Page 20**

1 substrates.  Can you kind of define for us what
2 substrates are?
3     A   And, generally, that -- it can apply to
4 the other systems, but generally that only applies to
5 the ABO system.  And this is somewhat a matter of
6 debate.  In the 1970s, late '70s and '80s, I'm sure
7 it was much more of a debate than it is now.
8           But about 19, oh, '92 or '93, ASCLD was
9 basically requiring, if you did ABO testing, that you
10 do substrates under them.  The substrate is an
11 interpretative test that helps you delineate whether
12 or not you may or may not have mixture or an
13 additional body fluid already present on the
14 substrate.
15           So if you have a shirt, for example, if
16 someone sweated in that shirt, since you can pick
17 your ABO types up from other body fluids, sweat or,
18 let's say, seminal fluid or something along those
19 lines could theoretically interfere with the blood
20 type that was present in the blood if there was a
21 mixture of fluids.
22           A substrate control is not going to tell
23 you anything about a mixture of bloods unless there

---

**Page 21**

1 is an -- you would see an obvious blood stain on it
2 that was separate.  A substrate control would tend to
3 tell you something about whether there was an
4 additional body fluid present, whether sweat or
5 something along those lines.
6           So our policy -- and I can only speak
7 from '85 forward -- is that if the type of evidence
8 suggested the possibility that another body fluid
9 could be interfering with the test, then it was the
10 analyst's discretion as to whether or not they would
11 use a substrate control.
12           Like I say, ASCLD later on said they
13 were going to take the discretion away, but that was
14 a gradual process that ultimately ended at that point
15 in time.  In this case, I personally don't think that
16 it's that big of an issue because we're dealing with
17 blood stains.
18           Now, if we were dealing with the
19 possibility of a body fluid mixture, other than
20 something else, then I could see that that might be
21 something that the analyst would have considered.
22 But still then, it would have still been a
23 discretionary thing.

---

TED SMITH
MOSS V. GEORGE TREN.

CIVIL ACTION NO. 94-MISC-663

Page 22

1    MS. DRUMMOND: Lonnie or Mr. Simmons, at
2  this point, I would also move that he be qualified as
3  an expert with regard to serology, which I did fail
4  to do earlier.
5    MR. SIMMONS: That's fine.
6    BY MS. DRUMMOND:
7    Q  In terms of the other items that are
8  listed that were considered in the calculation --
9  we've already talked about the Christmas paper.
10    A  Yes.
11    Q  Among the other items that were of
12  evidence that were considered and tested, were there
13  other items that were consistent with the defendant
14  in this case?
15    A  In the other items, there were genetic
16  markers that were consistent with markers that could
17  have come from Mr. Moss, yes.
18    Q  And do you recall from your review the
19  number of items?
20    A  Well, it's on the original report that
21  was issued, C792566, the third paragraph in the
22  conclusion lists, Item Number 7, 11, 12, 14 and 15
23  from the scene, on the Christmas package and wrapping

Page 23

1  paper and on the flashlight and then on the clothing
2  of Bernadette Reggettz. So those are the items from
3  the original report that were consistent with
4  potentially coming from Mr. Moss.
5    Q  And, again, sort of backing up, I
6  mentioned earlier the Christmas wrapping paper. That
7  in order for there to be a mixture when it appeared,
8  according to prior testimony, to be a single discreet
9  source, a second individual, in essence, would have
10  had to have been following behind, having the same
11  genetic characteristics, and dropping blood on those
12  same areas?
13    A  I guess that would be the theory, yes.
14    Q  In your reflection or your review of
15  everything, do you feel that the testing that was
16  done, that the opinions or the conclusions that were
17  arrived at originally were correct? Obviously,
18  you've not reviewed the items, but you've reviewed
19  the data. Based upon that and --
20    A  I can simply tell you that it is
21  consistent with the type of data that our laboratory
22  generated during this time frame, and that the report
23  is consistent with the type of report that we would

Page 24

1  typically issue during that time frame.
2    The conclusions that were drawn, the
3  only calculation conclusion that was drawn was on the
4  full combination of genetic markers, and there is no
5  reference anywhere that anything other than that
6  combination of markers would have this frequency.
7    Short of some glitch or error in
8  testimony, that seems to be an appropriate way to
9  present the evidence in this regard. So I see
10  nothing out of the ordinary that makes me think that
11  there is any glaring errors or inconsistencies in the
12  reporting of this work.
13    Q  Do you see anything that would indicate
14  to you that the scientific evidence that was
15  presented at the time was overstated in any way?
16    A  Well, the overstatement comes to the
17  actual testimony that was rendered. But based on
18  just the report itself, I believe that if it was
19  testified to correctly, then I think, theoretically,
20  then the testimony should not have been overstated.
21    Q  Do you believe, based upon your review
22  of the items that you've discussed, the serology work
23  in this particular matter was solid?

Page 25

1    A  It appears to be, yeah. It's consistent
2  with the type of data that we would expect. You're
3  not seeing complete profiles on all of the items of
4  evidence, which is real life. That's usually the way
5  that it works.
6    Some items, you would find complete
7  profiles. Some items, you would not. It's reported
8  that there are partial profiles on some of the items,
9  which is not characteristic of the issues that we saw
10  in some of the Zain cases that we looked at.
11    The fact that the genetic marker data
12  was reported prior to, in the blind, in essence, that
13  there are some genetic markers here that are not
14  consistent with any of these people and had to come
15  from another source, for me gives great support to
16  the fact that they did a fairly good job of
17  identifying the genetic markers and accurately
18  reporting them.
19    So, like I say, it seems to be a fair
20  presentation. You know, there are no raw notes
21  anymore, and there are no pictures and all of that.
22  Just going by the face value, it's consistent with
23  what I would expect had they done the protocols in

TED SMITH                                    CIVIL ACTION NO. 94-MISC-663
MOSS V. GEORGE TREN.

Multi-Page

**Page 26**

1 the way that ultimately I was trained to do the
2 protocols.
3     Q   Just one last clarification.  Your
4 review would indicate -- would not indicate that
5 there was any mixture of blood with regard to the
6 items that we've discussed that were consistent with
7 the defendant's?
8     A   The genetic markers or the groupings --
9 they refer to them as groupings -- appear to be
10 consistent with a single source.
11     MS. DRUMMOND:  Okay.
12     MR. SIMMONS:  May I note for the record,
13 as was noted at a previous hearing, the petitioner's
14 objection to the belated -- it's not your fault or
15 anything -- the belated disclosure of you and Trooper
16 Myers as expert witnesses in this habeas, and by
17 going through this process today, I just want to make
18 sure that the record appears that we're still
19 preserving our objection to that.
20         CROSS   EXAMINATION
21 BY MR. SIMMONS:
22     Q   What is your title nowadays?
23     A   Now I'm the director of the laboratory.

**Page 27**

1     Q   And what is your rank?
2     A   I'm now a captain.
3     Q   A captain.  I wanted to be --
4     A   You can call me Ted, though.
5     Q   I can call you Ted, okay.  Okay.  As we
6 sit here today, are you vouching for the accuracy of
7 the testing performed by Fred Zain in this case?
8     A   Well, I'm not exactly sure what testing
9 Fred Zain may or may not have done in this particular
10 case.  But, no, I'm not vouching for the accuracy of
11 his testing.
12         What I've said was is that the data on
13 paper appears to be consistent with the data that I
14 would expect if the tests were done in the proper
15 fashion.
16     Q   And I take it that it is true that in
17 this case in the materials that you reviewed you did
18 not have available to you any photographs of the
19 testing that was performed by either Trooper Zain or
20 Murphy?
21     A   No.  All I looked at was just the actual
22 paper data that was generated, no supporting data in
23 terms of raw data notes or photographs or anything

**Page 28**

1 along those lines.  I'm just taking the data at face
2 value.
3     Q   And in your history with the department,
4 you have had occasion to review Trooper Zain's work;
5 would that be correct?
6     A   Yes, sir, I have, on more than occasion.
7     Q   And I'm sure you're familiar with the
8 West Virginia Supreme Court's opinion, I guess they
9 call it, in the matter of an investigation of the
10 West Virginia State Police laboratory serology
11 division.  I'm referring to the first one that was
12 issued November 10th, 1993.  Are you generally
13 familiar with that?
14     A   Yes, sir.  Basically, they indicated
15 they felt that it was -- his work was inherently
16 invalid.
17     Q   And in that opinion, at the end of the
18 opinion, is attached the recommended  order or report
19 from Special Judge Holliday, and in that special
20 report -- and I will show it to you guys here in a
21 second -- Judge Holliday made certain findings with
22 respect to the review that you had conducted of
23 Zain's work.  I mean, do you generally recall that?

**Page 29**

1     A   Maybe.
2     Q   Let me just read this one part to you.
3 And this is -- let me see if I can figure it out.
4 I suppose it starts on page -- this would be
5 438 Southeast 2nd, and this is on page 513, where
6 Special Judge Holliday is talking about your
7 findings.  And I'm quoting from this.
8         "Despite these problems, Smith testified
9 that he was deeply disturbed when, as a result of a
10 1992 audit, he discovered evidence that Zain had
11 falsely reported results on worksheets that could not
12 be supported by data on the laboratory notes,
13 including falsely reporting that testing had been
14 performed on multiple items when only a few had been
15 tested and falsely reporting that multiple genetic
16 markers had been identified when only a few had been
17 identified."
18         Does that finding by Special Judge
19 Holliday accurately reflect at least part of the
20 conclusions that you reached from your own audit of
21 Trooper Zain's work?
22     A   Yes, sir, it does.
23     Q   It also goes on to say that, "Smith also

Page 30

1 discovered what appeared to be material alterations
2 to laboratory notes by Zain." Is that an accurate
3 finding by Special Judge Holliday?
4    A   Yes, sir.
5    Q   And then, finally, "As with the ASCLD
6 investigation, Smith discovered improprieties in
7 every case he reviewed in which Zain had been
8 involved." And is that finding correct?
9    A   Generally, yes. It's a tad overstated.
10 But, yes, generally.
11    Q   And, of course, the point that Special
12 Holliday made -- and he makes it in that sentence --
13 is that he is making the point that both ASCLD and
14 you concluded that there was at least some
15 impropriety in every case that was reviewed in
16 connection with the special investigation; is that
17 correct?
18    A   That's a fair statement. Yes, sir.
19    Q   So if, in fact, the work performed by
20 Trooper Zain in the Moss case had no improprieties,
21 this case would be the exception to the rule?
22    A   In terms of the cases that were
23 reviewed, yes. There are other cases, earlier cases,

Page 31

1 that did not appear to show improprieties that
2 weren't a part of the ASCLD investigation and a part
3 of the rule. But as a part of that, yes, that would
4 be a correct statement.
5    Q   When were you first contacted by the
6 prosecutor's office to serve as an expert witness in
7 this case?
8    A   A couple of weeks ago. I don't remember
9 exactly when it was.
10    Q   Do you have a letter or anything in
11 front of you from the prosecutor's office or was it
12 by telephone call?
13    A   Telephone call. It actually came
14 through Trooper Myers to me.
15    Q   Had you reviewed any of the work in the
16 -- I'm going to call it the Moss case -- prior to
17 this request being made by the prosecutor's office?
18    A   Yes, I had, to some degree. I generated
19 the data for you in the past. And so when I
20 generated that data, although I didn't do an
21 extensive review of it, I gave it a look-see.
22    Q   Do you have Mr. Murphy's deposition in
23 front of you today?

Page 32

1    A   No, sir, I don't.
2    Q   I take it, you have the -- it looks like
3 you've got a photocopy of the lab notes.
4    A   I just have a copy of the file that I
5 would originally sent you when you did the discovery
6 on this.
7    Q   Are you generally familiar with the way
8 things operated in the laboratory back at the time
9 this case would have been brought in?
10    A   I would have to say yes and no. And the
11 reason that I say that is: Gail Midkiff was still a
12 part of the laboratory when I was hired, and during
13 our tenure there, the impression that I had from her,
14 although there are always changes happening in the
15 laboratory, the practices that they followed under
16 Murphy were generally the same practices that she was
17 following and that we were following at that time.
18        Now, there had been changes in them
19 because we had a new boss at that time, which was
20 Fred Zain. But, basically, the practices and the
21 procedures were generally the same.
22        And that Murphy was her training
23 officer, and so she was following the practices that

Page 33

1 Murphy had put into place when he -- he sort of was
2 the one that kind of started the section.
3    Q   I wonder if you -- let me see if I can
4 -- I take it, your copy is not Bates numbered, right?
5    A   No, sir, it's not.
6    MR. SIMMONS: Okay. I think maybe if
7 you would look -- let me make sure what we're looking
8 at.
9        (Mr. Simmons examines documents.)
10    BY MR. SIMMONS:
11    Q   So yours starts with the typewritten
12 reports. Okay. Then you have a sheet that at the
13 top says, "Grouping," and it has some names down the
14 side, I think, "JAN," and it has, "Jack C. Neal, Jr."
15 Do you see that document?
16    A   Yes, sir, I do.
17    MR. SIMMONS: And do you all see what
18 I'm talking about?
19        (Ms. Drummond and Mr. Revercomb indicate
20 affirmatively.)
21    BY MR. SIMMONS:
22    Q   Through doing these various audits and
23 reviews of Fred Zain's work, have you been able to

TED SMITH
MOSS V. GEORGE TREN.

CIVIL ACTION NO. 94-MISC-663

Page 34

1 develop an idea of what his handwriting looks like?
2     A   Yes, I have.
3     Q   Okay.  And would it be fair to say that
4 as we go through these documents, if the handwriting
5 appears to be Fred Zain's handwriting, that he is the
6 person who performed those particular tests?
7     A   I can say that he is the person that
8 recorded them, positively.  Whether he performed them
9 or not, that's an assumption.  I guess that's a
10 possibility.  But I can say he recorded them.
11     Q   I just wonder -- going back to my
12 question about the practice in the laboratory back
13 when this case was first brought into the lab, is it
14 your understanding that that would have been the
15 practice, that the person doing the test would be the
16 person recording the data?
17     A   Generally, this is the summary sheet.
18 This would have, theoretically, been done by the
19 individual that was recording the data from the raw
20 data sheets.  That's correct.
21         And, like I say, I don't know.  They may
22 have handled it a little differently than we did.  It
23 was usually the responsibility of the analyst that

Page 35

1 did the testing in order to fill out this grouping,
2 this summary.
3         Back in '77, I can't say for sure.  You
4 would have to talk with either Inman or Midkiff to
5 say.  But in our practice, yes, that would be a fair
6 assumption; that if their handwriting was there, they
7 had something to do with the evidence in that regard.
8     Q   I just wonder, for purposes of this
9 record -- and what we will try to do is to identify
10 each sheet, and I may give the Bates number, because
11 we did this with Murphy's, and that may be easier.
12         So the first sheet that you're looking
13 at there in the Murphy deposition is Bates Number 10.
14 I just wonder if you could tell me is that Fred
15 Zain's handwriting or not?
16         MR. REVERCOMB:  What exhibit -- what
17 item is that?
18         MR. SIMMONS:  It's Exhibit 1 to Murphy's
19 deposition.  It was --
20         MR. REVERCOMB:  I don't think I have it.
21         MR. SIMMONS:  I can come over there in
22 between you, because I think these are all in the
23 same order.  Actually, I'll tell you what.  Yeah,

Page 36

1 here it is (indicating).
2         MR. REVERCOMB:  Thank you.
3     BY MR. SIMMONS:
4     Q   So for the document I have that is Bates
5 Number 10, you say that is not Fred Zain's
6 handwriting?
7     A   Well, I can't say one way or the other
8 because that's printed, and I would have to draw the
9 line at whether I can tell if it's his print or
10 not -- but yeah.
11     Q   That's fair.
12     A   It doesn't look like his handwriting.
13 It may be his printing, but I can't say.  I can't
14 say.
15     Q   Now, the next one, which has the word,
16 again, "Grouping," at the top.  It says, "12/14/79."
17 And it looks like the first thing it says something,
18 ". . . clothes."  I can't quite read what that word
19 is.  And it's Bates Number 11 to the Murphy exhibit.
20 Can you identify that handwriting?
21     A   Well, I'm at somewhat of a disadvantage
22 because I don't know what Murphy's handwriting looks
23 like.  Fred's handwriting did not tend to slant to

Page 37

1 the left in that way, so I can't say positively that
2 that is Fred's.  There are instances where I can tell
3 you positively that Fred made the notations.
4     Q   Why don't we do that?  Maybe that would
5 be the easiest thing to do.  And if you will count,
6 maybe I should look to see which ones you're pointing
7 at.
8     A   Here is obvious (indicating).   It's on
9 the back of --
10     Q   It's on the back of what we have as
11 Bates Number 13, which is Bates Number 14.  What are
12 you pointing to?
13     A   It says, "Number 9, Number 10,
14 Number 11, Number 13, Number 14, extracts . . ."
15     Q   I think it says maybe, ". . . used up in
16 analysis"?
17     A   Yes.  And it's called, "F.S. Zain."
18         MR. REVERCOMB:  Where is that?
19         THE WITNESS:  It's on the back.
20         MR. REVERCOMB:  Oh, I see.
21         MR. SIMMONS:  At the top.
22         THE WITNESS:  And Inman's and Fred's
23 handwriting is somewhat similar.  But some of these

TED SMITH  Multi-Page  CIVIL ACTION NO. 94-MISC-663
MOSS V. GEORGE TRENT

---

**Page 38**

1 entries are consistent with the type of entries that
2 I've seen before in Fred's handwriting.
3     MR. SIMMONS: And that would be Bates
4 Number 13 -- well, you don't know that. For the
5 record, I'll say that.
6     THE WITNESS: This page that has 17
7 items listed on it.
8 BY MR. SIMMONS:
9     Q   It starts off -- it has the phrase,
10 "Crime Scene," at the top of the left column; is that
11 correct?
12     A   That's correct.
13     Q   Okay.
14     A   So I could say that, theoretically, he
15 could have entered some of that data. I'm not a
16 handwriting expert.
17     Q   I understand that. Is that really the
18 only one that jumps out at you as you review the
19 file?
20     A   Yes, sir, in terms of the raw data. I
21 mean, it's obvious that you have more than one person
22 entering. This one is a possibility, also
23 (indicating). It's got 792566-C at the top. It's

---

**Page 39**

1 got, "Paul and Bernadette." This is another
2 possibility. But it's obvious that somebody else
3 entered data at the bottom because you have a
4 different type -- a different handwriting.
5     Q   And the document you're referring to is
6 Bates Number 12 where you're saying at the top it has
7 different writing than at the bottom?
8     A   That's correct. But that data is --
9 that handwriting is also consistent with the type of
10 handwriting that I would suspect would be Fred Zain.
11     Q   Do the materials that you were able to
12 find in this case and that you've been looking at --
13 does this include what you call raw data sheets and
14 summary sheets?
15     A   No, sir. As you're well aware, I could
16 not provide to you raw data sheets, because as far as
17 I know they no longer exist.
18     Q   Okay. So the summary sheets that we
19 have in this case would be sheets where somebody took
20 the data from what they had written down when they
21 did the testing, and they just were summarizing on a
22 different sheet of paper?
23     A   That was the procedure that was in place

---

**Page 40**

1 when I came into the laboratory. So, like I say,
2 it's an assumption on my part that it applied back,
3 but that's generally the pattern that was followed.
4     Q   I want to talk a little bit about your
5 discussion on what protocols may have been in place
6 back in -- I guess this is 1979 -- when these
7 materials were brought to the lab. Did you have an
8 opportunity to review Robert Murphy's deposition that
9 was taken May 17, 1995?
10     A   I read it, yes.
11     MR. SIMMONS: I just wanted to clarify
12 something on page 13 of Mr. Murphy's deposition. And
13 let me just have you review it, and I may ask you a
14 question or two about that.
15     (Witness examines document.)
16 BY MR. SIMMONS:
17     Q   Do you remember Mr. Murphy stating that
18 the lab at that time did not have any written
19 protocol?
20     A   Yes, sir.
21     Q   And just so that the record is clear, I
22 think the point you were making is that even if there
23 wasn't a written protocol that said, "West Virginia

---

**Page 41**

1 State Police Laboratory Protocol," you were saying
2 that the lab did follow procedures that may have been
3 written elsewhere?
4     A   Yes, sir. That's my understanding.
5     Q   And your understanding is based upon
6 your discussions with Trooper Midkiff?
7     A   Yes. And my experience when I came in.
8 "Here's the protocols that we've used for a long
9 time. Learn them," et cetera, et cetera.
10     Q   And it wasn't based upon any discussions
11 you had with Trooper Murphy?
12     A   No, sir. Not at all. Yeah. I never
13 met Mr. Murphy.
14     Q   Have you ever had any discussions with
15 Fred Zain regarding this Moss-Reggettz case?
16     A   Actually, yes, sir, I have.
17     Q   Could you just explain that inasmuch as
18 you can recall?
19     A   Generally, the communication that we had
20 is that he considered this one of the best cases that
21 our laboratory had ever done, principally, because
22 the law enforcement officers were firmly convinced
23 that Mr. Reggettz had murdered his family, and there

---

TED SMITH                                                                    Multi-Page
MOSS V. GEORGE TRENT                                          CIVIL ACTION NO. 94-MISC-663

Page 42

1  was intense pressure by law enforcement for that to
2  be the appropriate suspect, and the laboratory
3  personnel stood up and said, "No, there is additional
4  genetic markers here that could not have originated
5  from this family, which suggests that there was
6  another bleeder present at that crime scene." That's
7  the gist of it.
8      Q   And about when would that have occurred?
9      A   Well, it would have had to have occurred
10 -- Fred was here for about three years in my early
11 career, so it would have had to have happened in that
12 time frame.
13     Q   Did you attend the Texas deposition of
14 Zain when Bill Forbes went down there and deposed
15 him? Were you with him on that case?
16     A   No, sir, I wasn't.
17     Q   I thought maybe you had gone to that.
18 Okay. In these discussions with Trooper Zain about
19 this particular case, do you have any recollection
20 that any of the investigating officers had suggested
21 that Mr. Reggettz had planted blood at the scene?
22     A   I know nothing of that, of no
23 discussions in that regard.

Page 43

1      Q   Do you recall Mr. Murphy making any
2  comment about that in his deposition?
3      A   No. I don't remember that in his
4  deposition. I read it quickly, so I may have missed
5  it, but I don't recall that in his deposition.
6      Q   I wanted to go over some of the comments
7  you made about Dr. Bing's opinions. If I understood
8  you right, you were saying, if you assumed that there
9  was a mixture of blood, say, on the wrapping paper,
10 then what Dr. Bing was saying would be accurate,
11 theoretically?
12     A   That's correct.
13     Q   It's just that part of your disagreement
14 is with that premise that you could not find in your
15 review of the materials that you had available to you
16 any evidence of a mixture of blood?
17     A   Yeah. I didn't see anything in the data
18 that suggested a mixture of blood or a mixture of any
19 biological materials.
20     Q   And, again, of course, you did not have
21 available to you photographs of the testing, which I
22 assume may have given some indication that there was
23 a mixture, based upon what you could review?

Page 44

1      A   That's correct.
2      Q   And I take it you're not aware of any
3  eyewitness to the crime or to any blood dripping on
4  the wrapping paper to say that that came from one
5  person?
6      A   No, sir, I'm not.
7      Q   And you seem to suggest that the
8  wrapping paper consisted merely of blood drops. I
9  just wonder what were you basing that comment on?
10     A   I was reading in Mr. Murphy's -- I guess
11 it was his testimony. He talked about it being a
12 single -- appearance of being a single blood drop. I
13 was assuming that he was the individual that was
14 there that actually recovered and participated in the
15 collection of that particular piece of evidence.
16     Q   Maybe we can clarify that, and after
17 it's been clarified see if this changes your opinion
18 any. This was a case that Fred Zain actually went to
19 the crime scene himself to assist in gathering the
20 evidence.
21         And based upon the summary sheets we
22 reviewed -- and this is me talking here, and I don't
23 know if the prosecutor would disagree me or not --

Page 45

1  but the sheet involving what I call the evidence at
2  the scene is the sheet that appears to be in Fred
3  Zain's handwriting. So does that change your opinion
4  in any way?
5      A   Not in terms of the data. I mean, just
6  looking at the data. There is nothing in the data
7  that suggests in any way that there is the appearance
8  of a mixture in that genetic data.
9      Q   If the blood on the wrapping paper had
10 been smeared, as opposed to, I guess, nice, clean
11 blood drops, how would you as a forensic scientist
12 interpret a blood smear on an item?
13     A   That would raise the possibility that
14 you could have more than one source present.
15     Q   So, for example, the perpetrator could
16 have blood on his hands from a victim, as well as
17 cutting himself, and then if it smeared, that would
18 cause a mixture?
19     A   Correct. And my expectation would be,
20 then, in someplace in the genetic data that I would
21 see some data, maybe not a complete profile, that
22 would be consistent with that mixture that was
23 present.

TED SMITH
MOSS V. GEORGE TREN..

Cı vIL ACTION NO. 94-MISC-663

### Page 46

1     Q   But isn't it accurate that the testing
2 available back in 1979 that we're talking about,
3 these various proteins, enzymes, and things like
4 that, could not differentiate between a mixture of
5 bodily fluids?
6     A   Well, no, that's not quite accurate.
7     Q   Okay. If you could explain that,
8 please.
9     A   Well, okay. We could differentiate
10 between a mixture of saliva or seminal fluid and
11 blood. Through not one particular test, but through
12 a series of tests, it was possible. So since I'm
13 considering the whole gamut of testing here -- if
14 there was just one test, then I would have to qualify
15 my opinion somewhat.
16     But since you've got a whole set of
17 genetic markers, then, yes, we could differentiate
18 between seminal fluid, the reason being is the same
19 genetic markers do not occur in seminal fluid as
20 occur in blood that we would routinely test for. The
21 same thing is also true for saliva.
22     If we did an ABO and we suspected an
23 additional body fluid was present, there is a

### Page 47

1 completely other test that we could have done in
2 order to verify that there was, in fact, another body
3 fluid there, and if it was sweat or whether it was
4 seminal fluid or something else, then identify the
5 ABO type that was present in that body fluid.
6     So it just depends. That's why I'm --
7 I'm not being evasive.
8     Q   Right.
9     A   It just depends on the circumstances and
10 the total data. But, generally, with good samples,
11 yes, we could to some degree distinguish between
12 varying body fluids that were present in the stain.
13     Q   How about if you had a mixture of two
14 different -- a mixture of blood from two different
15 sources?
16     A   A mixture of blood from two different
17 sources is also a mixed bag. If they're relatively
18 even in regard to their distribution in the stain,
19 then it would be highly unlikely, if you did a full
20 set of genetic markers, to not identify something
21 that suggested a mixture.
22     So yes and no. If it was a relatively
23 small stain or if there was an imbalance in the stain

### Page 48

1 or something along those lines -- and by "small," it
2 has to be really small -- then there is,
3 theoretically, the possibility that you might have
4 masking present in a blood stain.
5     Q   I wonder if maybe we could use as an
6 example -- I don't know -- you have the actual
7 report. I did a table based upon the data in the
8 reports that I used that I would like to maybe show
9 you. You don't have anything like that in front of
10 you, do you?
11     A   No, sir, I don't.
12     MR. SIMMONS: Steve, do you guys have
13 that?
14     BY MR. SIMMONS:
15     Q   I'm looking at on the table -- I think
16 this is also part of the habeas petition. And
17 Table 2 consists of two pages that is headed,
18 "Unknown Blood Samples." And what these charts are
19 intended to do is to put in bold the types that are
20 the same as one of the four people who lived in the
21 house. So if it's in bold, that's what that
22 indicates, and if it's not, then it's not.
23     So let's look at, on Table 2, "Unknown

### Page 49

1 Blood Samples, Christmas Wrapping Paper." Okay?
2 And, again, I understand that for purposes of these
3 questions you're sort of assuming or accepting that
4 this table I've done is accurate. Would that be all
5 right?
6     A   Yes, sir.
7     Q   Okay. And I think you were saying, if
8 you had a mixture of blood, that the more types you
9 obtain, surely, at some point, you would be able to
10 show whether or not there was a mixture or not?
11     A   That's correct.
12     Q   Okay. So "Christmas Wrapping Paper,
13 ABOO." And that's in bold, so that means that at
14 least somebody else in the house had "O." So that in
15 and of itself, if that was the only item you tested
16 and the only result you got, that wouldn't be very
17 helpful to you, would it?
18     A   That's correct.
19     Q   And the same answer -- and I'm going to
20 jump around here a little bit -- if I'm reading this
21 thing right, that would be true of the ABO type, the
22 AK, the EAP, the ADA, the GLO1, and the Hp, because
23 there is somebody else in that house that has those

---

Page 50

1 blood types? So if there were a mixture, you're not
2 distinguishing -- making any distinction between the
3 sample from Mr. Moss that is being compared to the
4 evidence?
5      A   Well, you have to be careful here, and
6 the reason that you have to be careful is because
7 you're basing your premise on the fact that somebody
8 in the household has that type.
9           In a mixture, you would see consistency.
10 So if, for example, the person that happened to have
11 a 2/1, then the expectation would be they would
12 also have the other things that you would,
13 theoretically, be able to identify in that mixture.
14           So you just can't say, "Because this
15 person has it and this person has it and this person
16 has it." If you're going to make -- then you're
17 saying, "Well, all six people would be involved in
18 the mixture."
19           So you have to look at it from the
20 perspective of, "Okay, is there someone else that
21 would, theoretically, consistently match with a
22 mixture?", if you were making that assumption.
23      Q   Okay. I think I understand what you're

---

Page 51

1 saying.
2      A   Do you see what I'm saying?
3      Q   Right, right.
4      A   So assuming -- let's use your Christmas
5 wrapping sample as an indication. Yes, there are --
6 like this one could have potentially come from
7 someone else in the family. You also have to
8 consider the fact that some of these systems are more
9 stable than other systems are.
10          So my expectation would be is if, in
11 fact -- let's say this BA was actually a mixture that
12 came from someone else in the family that they
13 contributed to it. This system is not as stable as
14 this system (indicating).
15     Q   You're pointing to the EAP system is not
16 as stable as the PGM system?
17     A   Correctly. So my expectation would be,
18 if I'm going to see extra data in the EAP, I would
19 also see that extra data in one of the other systems
20 that were more stable, suggesting.
21     Q   Okay.
22     A   So based on the fact that everybody in
23 that house is a 2/1, then my expectation is, if it

---

Page 52

1 was mixed with a blood from somebody else in that
2 house, someplace in these 1PGM's, I should see some
3 2, faintly, something having to do with a 2.
4           So since I do not see that, and it's one
5 of our most stable systems, then -- and the others,
6 you've got to consider them all in that fashion --
7 then it doesn't suggest to me that I have a mixture
8 with anybody else in that house.
9           Now, you know, I can't say some other
10 two people mixed based on this data, but based on
11 this data, it does not appear to be a mixture with
12 anybody else that was in that house, because I would
13 expect it to show up in this system before I would
14 any of the other systems (indicating).
15     Q   And, again, of course --
16     A   The PGM system.
17     Q   -- you're focusing on the PGM. Again,
18 you didn't have the photograph of that testing
19 available, right?
20     A   That's exactly right.
21     Q   And if, in fact, Trooper Zain is the
22 person who did the testing on the Christmas paper,
23 you have no reason to rely upon the accuracy of that

---

Page 53

1 data?
2      A   I'm just interpreting what's on paper
3 and how it's presented on this piece of paper.
4      Q   And let's focus on the example of a PGM
5 where a result of a 1+/1- shows up. Would it be
6 accurate to say that when you get a PGM 1+/1-, that
7 that could mean that the donor had a -- this is one
8 possibility -- that the donor of that blood had
9 PGM 1+/1-? That's true?
10     A   That's correct.
11     Q   Couldn't it also mean that you have a
12 mixture of either -- let me just use one example --
13 of a 1+ mixed with a 1-? Isn't that theoretically
14 possible?
15     A   That's correct.
16     Q   And I take it, it could also be
17 theoretically possible that it's a mixture of a 1+/1-
18 with a 1-?
19     A   That's correct.
20     Q   Or it could be a mixture of a 1+/1- with
21 a 1+?
22     A   Any of those are a possibility, assuming
23 a mixture.

---

TED SMITH
MOSS V. GEORGE TREN.

CIVIL ACTION NO. 94-MISC-663

---

Page 54

1    Q   It could be a mixture of a 1+/1- with a
2  1+/1-?
3    A   That's correct.
4    Q   And merely by looking at the data, you
5  cannot determine positively that it wasn't a mixture,
6  can you?
7    A   No, sir.  I can simply say that the
8  totality of the data is not consistent with what I
9  would expect a mixture to generate, the reason being
10 is -- let's just use the example.  I think it was
11 .03.  Was that the frequency that was ultimately
12 reported?
13   Q   I believe it was.
14   A   Okay.  So what that's saying is that
15 three in 10,000 individuals would theoretically have
16 that particular combination of genetic markers.  And
17 so what you're asking me to assume is that there is
18 three people in 10,000, so there is theoretically
19 nine people -- 15 people in the greater Charleston
20 area.  Two of those 15 people got together, and they
21 happened to match exactly on these characteristics,
22 and they were the ones that deposited these samples.
23        For me, as a scientist, there is a very

---

Page 55

1  guiding principle that we always follow.  It comes
2  from a medieval philosopher, a guy named Occam.
3  Occam's razor basically tells us that when we're
4  modeling -- and that's what we're doing here, we're
5  modeling -- is that the simplest explanation is
6  usually the best explanation.
7        And so from my perspective as a
8  scientist, the simplest explanation here is that I
9  have a sole source.  Now, I can't say that that's
10 exactly the explanation.  But the simplest
11 explanation, the most logical explanation, consistent
12 with the data as it's presented, is that it's a sole
13 source.
14   Q   Would you agree that if -- and I'm going
15 to make the assumption based upon the record to date
16 that Trooper Zain is the person who performed the
17 testing on the items that you previously identified
18 as being the most significant ones, as far as the
19 Christmas wrapping paper, the flashlight, and the
20 clothing of Bernadette Reggettz.  I'm just going to
21 make that assumption based upon what we have in front
22 of us.
23        Would you agree with me that if Trooper

---

Page 56

1  Zain had obtained, say, the first five types from the
2  wrapping paper, from one sample over here in the
3  wrapping paper, and then he got the other four types
4  from a sample of blood on another piece of wrapping
5  paper, that it would not be proper to then conclude
6  that all of that blood had all of the particular
7  types to be found on the wrapping paper?
8    A   That's correct.  It would not be
9  appropriate to mix data from isolated separate
10 stains?
11   Q   And so when you interpret this data, you
12 have no way of knowing whether, in fact, Trooper Zain
13 did that?
14   A   I have no idea about how the data was
15 created or how it was generated, just simply what it
16 looks like now and how it's being reported now.
17   Q   When you reviewed the materials, did you
18 also get a chance to review the affidavit that was
19 submitted by Dr. Bing before his deposition?
20   A   I believe that was in the packet, but I
21 don't remember reading it.
22   Q   I just wanted to maybe highlight a
23 couple of his statements, and I just wonder if you

---

Page 57

1  can tell me if you agree or disagree.  Okay?  And
2  this was attached to Dr. Bing's deposition as an
3  exhibit.  And in paragraph 18 of the affidavit, he
4  states, "First, where blood samples are discovered in
5  an alleged crime scene, it is important to identify
6  the types of the known possible donors of that
7  blood."  Do you agree or disagree with that
8  statement?
9    A   What's the context?  Now, the reason
10 that I ask that is, generally, yes, it is important
11 to identify the known so that you can identify any
12 foreign genetic markers that may be present, but that
13 doesn't mean that that's necessarily the overriding
14 principle in terms of how you ultimately interpret
15 the data that is generated.  So it depends on the
16 context in which the statement was made.
17   Q   Okay.  He goes on to say -- maybe this
18 will give you the context, and you can tell me if
19 you're agreeing or disagreeing with Bing -- in
20 paragraph 19, "Once the types of the known possible
21 donors of that blood have been determined, those
22 types can be compared with the types obtained from
23 any blood samples found at the alleged crime scene

---

TED SMITH
MOSS V. GEORGE TREN_

CIVIL ACTION NO. 94-MISC-663

Multi-Page

---

**Page 58**

1  where the source is unknown."
2          In Number 20, he says, "The purpose of
3  this comparison is to eliminate any blood type which
4  may have been contributed by a known possible donor."
5  Do you agree with all of those three statements or
6  disagree with them?
7      A  We're doing good until the last one.
8      Q  Okay. So you disagree with Number 20.
9  I want you to explain your disagreement.
10     A  My disagreement is just simply that the
11  implication in that statement is that you have to
12  ignore data that is consistent with victims that may
13  have been at a crime scene. That's not, I guess, a
14  fair premise under which to operate.
15          We're all human beings. For example,
16  like me, I'm an ABOA. I'm a PGM 1+. I think I'm a
17  glyoxalase I. I don't remember exactly. If, if, if,
18  for some reason, my wife was sexually assaulted,
19  let's assume, and the ABO type was an A, PGM 2+/1+
20  and a glyoxalase I, my expectation would not be that
21  I ignore the A and I ignore the glyoxalase simply
22  because they're consistent with me or they would
23  happen to be consistent with somebody else. The data

---

**Page 59**

1  is the data for a particular sample, and so you need
2  to treat the data for that sample.
3          You need to be informed about: Okay.
4  Is there the possibility if there is a mixture? Yes.
5  If there is a possibility if there is a mixture,
6  could it have originated from any of the participants
7  that, unfortunately, were involved in the incident?
8          And then once you consider all of that data,
9  based on your data, then you have to issue an opinion
10  in regard to that. But you don't ignore the data in
11  the sample simply because it's consistent with
12  somebody else that, theoretically, if there was, in
13  fact, a mixture, could have deposited, when you have
14  no suggestion in the data itself -- and, like I say,
15  just going by face value -- that there was, in fact,
16  a mixture.
17          You don't do that. You just don't
18  ignore data in that way. So if that's the
19  implication, then, yeah, I would have to disagree
20  with that statement, because I don't think that is
21  the way that we have been trained or taught to deal
22  with what we consider to be sole source samples.
23      Q  Let me see if I can clarify something.

---

**Page 60**

1  Would you agree with me that prior to the laboratory
2  doing DNA testing, you know, back when they were
3  doing ABO/PGM, in a sexual assault case that it was
4  inappropriate at that time to include in the data
5  that was obtained from the testing, say, from a
6  vaginal swab from a sexual assault case -- it was
7  improper to include types that would be the same as
8  the victim's known types?
9      A  In your calculations, yes, because you
10  have a mixed sample. That's correct.
11     Q  It's well known in a sexual assault case
12  that you would have a mixture of types from the
13  victim and from the assailant?
14     A  Yeah. And then, once again, you've got
15  to give a caveat there. If you're dealing with a
16  neat semen sample, then, no, I don't see a problem
17  with doing your calculation based on just the types,
18  because there is nothing to convince you that you
19  have a mixed sample.
20          And the real issue is whether or not
21  there is a mixed sample. And like I say, just face
22  value, I'm just not convinced that there is a mixed
23  sample there.

---

**Page 61**

1          If there was, in fact, a mixed sample,
2  then I would say, yes, Dr. Bing is correct in his
3  assessment. You have to consider the possibility of
4  all the types. The calculation would have been done
5  on a 1+/1-, let's assume. You would have had to do a
6  1+. You would have had to do a 1+/1-. You would
7  have had to do a 1-. You would have had to have
8  totaled them altogether.
9          An O. You would have had to include
10  non-secreters in the process, so that would have gone
11  up 22 percent on that particular calculation. So the
12  calculation would go up somewhat, he's correct,
13  assuming that there is a mixture present.
14     Q  Okay. Let me see if I can -- I think,
15  based upon your answer, then, in paragraph 22 of the
16  affidavit where he says, "Second, only those types
17  identified from blood found at the alleged crime
18  scene that are different from the types of the known
19  possible donors provide information relevant to a
20  determination as to the source of the blood evidence
21  found at the crime scene," I take it, you disagree
22  with that conclusion?
23     A  Yeah. I would disagree, specifically,

---

TED SMITH
MOSS V. GEORGE TREN...

Multi-Page

CIVIL ACTION NO. 94-MISC-663

---

Page 62

1 because there is nothing in the data that suggests
2 that it was a mixture with somebody else in the crime
3 scene.
4         Now, if there was something in that data
5 that suggests, truly, that it was a mixture from
6 somebody else in the crime scene, then I would say,
7 yeah, you would have to inform.
8         And you would say, "Okay. I've only got
9 a foreign one here, and I've got a foreign one here.
10 He can be any of these things, but he's definitely
11 got to be these two. The others, I can't say
12 positively."
13         And so I see -- we're mixing apples and
14 oranges to some degree. Because, on one hand, you
15 look at the data, and the data says, "Well, I don't
16 see any . . ." Everybody from the crime scene is
17 excluded because there is no PGM data.
18         Okay. So given that, they're
19 non-informative anymore. If we've excluded them,
20 they're non-informative. And if I remember
21 correctly, in his testimony, he says that everybody
22 is excluded from having deposited that material.
23         So based on that assumption, then we go

---

Page 63

1 back to where you are, and we say, "Okay. I've got a
2 stain here." If there is a mixture, then what you
3 would have to suggest is that it is a mixture from
4 somebody who is some kind of a PGM1 and consistent
5 with the other stuff.
6         Now, I positively can't tell you that's
7 not the case. I can simply tell you, based on
8 scientific training and thinking, the way we're
9 taught to think, the simplest explanation is the
10 best. It appears to be consistent with a sole
11 source. It's obviously not consistent with a mixture
12 of the people that ultimately were murdered in this
13 particular crime.
14         So that's why. And you're mixing two
15 things together and you're trying to argue two points
16 at the same time, and it's kind of like apples and
17 oranges in regard to how I'm hearing the argument
18 being made.
19         And I don't disagree with what Dr. Bing
20 says, other than the premise is, if you've excluded
21 them, then I don't see how they can be informed in
22 terms of your subsequent opinion, because you've
23 excluded them. You say, "I don't have to consider

---

Page 64

1 them. They couldn't have given that material."
2         So then I go from there. And that's
3 where I'm coming out and saying, "Okay, yeah. If you
4 want to argue that there is some mixture there from
5 two people that wasn't the people in that crime, I
6 can't say one way or another about that."
7         I can't say that at all. But I can
8 simply tell you it doesn't appear to be, but I can't
9 say positively one way or the other.
10    Q    One thing that we've touched upon --
11 and, of course, you are, for purposes of your review,
12 simply accepting the data as reported, right?
13    A    Yes, sir. That's correct.
14    Q    And I guess I'm trying to see if I can
15 determine the confidence you have in the data that is
16 reported. Are you confident enough in the data
17 reported that you've reviewed that you would testify
18 in a trial as to this data?
19    A    It depends on who did it.
20    Q    Who did what?
21    A    Who did the tests.
22    Q    So if the data --
23    A    The Supreme Court has indicated that if

---

Page 65

1 Fred did it, I can't testify to it, basically,
2 because it's unreliable. So, no, I wouldn't go
3 testify to it if you told me that Fred did it.
4         Now, on face value, no, I don't see
5 anything that suggests any problems with the data.
6 It fits the pattern that I would expect. If I were
7 doing an audit, it fits the pattern that I would
8 expect.
9         But no. If you tell me that Fred did
10 all of these types and all of these testings, then,
11 no, I would not go into court and I would not testify
12 to it, simply because of the Supreme Court's ruling
13 in that regard. They've decided that I can't do
14 that, and so I salute and execute. I don't do that.
15 That's just the bottom line.
16    Q    Paragraph 24 of the affidavit, Dr. Bing
17 says, "Third, where a type from a known possible
18 donor of the blood matched a type found from the
19 blood discovered, it is not appropriate to include
20 that type in calculating the frequency that the blood
21 was deposited by a suspect." And I take it you
22 disagree with that?
23    A    I would for the same reasons that I've

---

TED SMITH
MOSS V. GEORGE TREN_                                                    Cı vIL ACTION NO. 94-MISC-663

Page 66

1 said before.  Once I've excluded them, they're
2 factored out.  And so then I would proceed from
3 there.
4        Q    We looked at the table and the various
5 types from the Christmas wrapping paper, and I
6 believe there were about -- let's see -- nine
7 different types recovered from that particular
8 sample.
9            If there had been a mixture -- and maybe
10 I will come back over there again to ask this
11 question.  I think you're suggesting that, to the
12 extent that there are types that were found from the
13 Christmas wrapping paper that were different from any
14 of the four folks in the house, that had there been a
15 mixture here, that those differences should have
16 shown up, because here you have nine different typing
17 systems?
18       A    That's correct.
19       Q    So you're saying, like in the Gc type,
20 it only shows a 1.  Nobody in the house was a Gc1.
21 So you're saying, if there had been a mixture, you
22 would have expected to see another type in the Gc
23 column?

Page 67

1        A    My expectation would be -- let's exclude
2 the people in the house.
3        Q    Right.
4        A    If two randomly selected individuals --
5 because that's what you're suggesting, is that it's
6 not Mr. Moss, but it could potentially be two other
7 randomly selected individuals.  It would be unlikely
8 that two randomly unselected individuals would match
9 exactly in those -- all nine of those systems.
10           Now, it's theoretically possible.  If
11 you did the calculations, it is possible.  But in
12 practical terms, it would be highly unlikely that we
13 would not see something in there that suggests that
14 I've got an additional person.
15           Now, on face value, I can't say that.
16 Because if, in fact, there were two people and they
17 had this exact mix, I wouldn't know whether there
18 were two people there or not.  Just based on the data
19 alone, it appears to be consistent with a single
20 source.
21       Q    I think the one question I had was:
22 Looking at the Gc result, isn't it theoretically
23 possible that had there been a mixture of blood, that

Page 68

1 you got the Gc -- or that Fred Zain or whomever did
2 it got the Gc sample from one of the blood types and
3 the other one just didn't show up?  That happens,
4 doesn't it?
5        A    Yes.  It depends on the system and like
6 the strength of the system and the stability of the
7 system and all of those sorts of things.
8        Q    So that relates back to the discussion
9 you had previously about which systems are more
10 stable than others?
11       A    That's correct.  And you have to
12 consider those factors when you're trying to decide
13 whether you may or may not have a mixture.  And
14 without looking at the raw data, you know, I'm kind
15 of operating in the dark.  But just based on face
16 value, it appears to be consistent with what I would
17 expect for a single source.
18           MR. SIMMONS:  Let me just -- just to
19 make sure that I've covered everything in here.  Dr.
20 Bing gives an example in his affidavit.  I want to
21 find out if you agree or disagree with it.  I will
22 read it for the record.  I will be happy to let you
23 look at the affidavit.

Page 69

1           In paragraph 25 -- this is after he gave
2 what I've read previously -- he says, "For example,
3 on page 6 of Mr. Murphy's report . . ."  And I think
4 you have that in front of you.  I will wait until you
5 get to that page.
6           (Witness examines document.)
7           THE WITNESS:  Okay.
8           MR. SIMMONS:  ". . . he generally notes
9 that the known types of Mr. Moss were consistent with
10 the blood obtained from some of the evidence and
11 concludes . . ."  And this would be in the report.
12 Quote, ". . . 'The combination of blood groups O,
13 PGM 1+/1-, AK1, EAP BA, EsD 2/-1, ADA1, GLO,'", I
14 guess, "'I-2, Hp 2/-1, and Gc1 occurs in
15 approximately 0.03 percent of the population," quote.
16           In the next part, paragraph 26 to the
17 affidavit, he states, "This conclusion implies that
18 all of the blood typings obtained from the crime
19 scene for these particular items were the same as all
20 of the blood typings obtained from Mr. Moss."
21           Number 27.  "This conclusion is
22 incorrect because there was no PGM subtyping 1- or
23 haptoglobin typing 2/-1 obtained from each

TED SMITH                         CIVIL ACTION NO. 94-MISC-663
MOSS V. GEORGE TRENT

**Page 70**

1 evidentiary sample tested."
2        And then he gives an example of the
3 flashlight, Number 28. "For example, as to the blood
4 obtained from the flashlight, there is no PGM
5 subtyping of 1- obtained, nor is there a haptoglobin
6 typing obtained."
7      BY MR. SIMMONS:
8   Q  So do you agree with at least those
9 comments by Dr. Bing?
10   A  No. I just take it for face value. It
11 says, "This combination of markers." He doesn't say
12 which samples necessarily are covered by that
13 combination of markers. He just says, "This
14 combination of markers."
15      Now, like I say, you have to look at the
16 testimony. Now, if under testimony he implied or
17 stated that that number applied to all of those, then
18 I would think that would be an erroneous statement
19 and that would be false testimony.
20      But if he applied that, "Well, I only
21 found this combination completely on one or two
22 samples," and testified accordingly, then I would
23 think that would be appropriate.

**Page 71**

1      It depends on how it was testified to.
2 Because on face value it's not making a false
3 statement. It's just simply saying this combination
4 of genetic markers occurs this often.
5   Q  I think maybe we're getting near the end
6 of the affidavit points. Twenty-nine, "Fourth, under
7 generally accepted principles, it is only proper to
8 combine the frequencies on types obtained from a
9 blood sample where results in the absence of any
10 other data are consistent with the blood sample
11 coming from a single source."
12   A  Can you read that again?
13   Q  Sure. "Fourth, under generally accepted
14 principles, it is only proper to combine the
15 frequencies on types obtained from a blood sample
16 where results in the absence of any other data are
17 consistent with the blood sample coming from a single
18 source."
19   A  Yes.
20   Q  So you agree with that?
21   A  If I'm hearing it correctly, he's saying
22 that you can't consider them, multiply them together,
23 et cetera, not include the others, unless it's a

**Page 72**

1 single source. If that's what he was saying, then I
2 agree, yes.
3   Q  Okay. And then he goes on in
4 paragraph 30, "One of the inherent deficiencies with
5 basic serologic testing is that such testing cannot
6 distinguish whether the blood sample tested contains
7 a mixture of blood from different sources or not."
8 Do you agree or disagree with that?
9   A  Yes and no. Depending on the
10 combination of genetic markers that would be present
11 in the two sources, then we could tell if there was a
12 mixture. If there was a complete masking of the two
13 sources, then, no, we could not. So it depends on
14 the combination of markers that are included in the
15 two sources that made the mixture. So that's a yes
16 and a no answer.
17   Q  And I think the last of these particular
18 points, paragraph 32 of the affidavit, "Fifth, each
19 of the types found from each individual sample must
20 be treated separately rather than in conjunction with
21 each other because it is not possible scientifically
22 to link together the types found from different blood
23 samples." Do you agree with that?

**Page 73**

1   A  If his assumption is that, in fact, you
2 have a mixture, then I would agree. I would disagree
3 if your opinion is that you're dealing with a sole
4 source.
5   Q  I think maybe this will clarify this,
6 because I think you had a discussion about this
7 previously when I talked about the wrapping paper,
8 and if you had a sample over here and a sample over
9 here.
10      He goes on in paragraph 34, "In this
11 case, various blood stains were found in the Reggettz
12 house in various locations, but there are no data
13 that might identify the source of the blood."
14      And in 35, "In lieu of being able to
15 identify the source of the blood, there is no
16 scientific basis to presume that all of the blood
17 stains are related and came from the same person."
18      So do you agree or disagree with that?
19   A  Read it again for me, would you, please?
20   Q  And I will be happy to hand this to you.
21   A  No. I kind of got it through. I just
22 want to make sure I kind of got it like I think I
23 kind of got it.

TED SMITH
MOSS V. GEORGE TREN.                                    CIVIL ACTION NO. 94-MISC-663

Page 74

1  Q   Okay.  "In this case, various blood
2  stains were found in the Reggettz house in various
3  locations, but there are no data that might identify
4  the source of the blood.
5      "In lieu of being able to identify the
6  source of the blood, there is no scientific basis to
7  presume that all of the blood stains are related and
8  came from the same person."
9  A   I think that is a fair statement.  The
10 evidence presented accurately would not say
11 specifically that it was associated with a particular
12 person.  The proper conclusion would be is that this
13 individual could not be excluded as potentially
14 contributing from this stain, from this stain, from
15 this stain, from this stain.
16      Whether they came from more than one
17 people, from my perspective and from the scientific
18 perspective, is a moot issue.  Our position or our
19 opinion should be:  Are the genetic markers
20 consistent or inconsistent with whatever data was
21 generated for that particular stain?  Not making any
22 assumptions about individuals in that regard.  We
23 just look at data.  This data matches that data.

Page 75

1      We don't care who the data --
2  theoretically, who the data came from.  We just say,
3  "Does it match or does it not match?"  So I think
4  that's a fair statement in the right context.
5      MR. SIMMONS:  Let me just go through my
6  notes here real quick.  I may be near the end.
7      (Mr. Simmons examines documents.)
8  BY MR. SIMMONS:
9  Q   From the materials you reviewed, did you
10 reach some conclusion or understanding  that the
11 reference samples from the people in the Reggettz
12 household were received and tested after the
13 evidentiary stains obtained from the crime scene had
14 been tested, and, if so, can you point me to that?
15 A   No.  I didn't look at it in that great
16 of detail.
17 Q   Let me explain the context of why I'm
18 asking you that.  You had a discussion about, you
19 know, testing being performed in the blind, which the
20 way I understood  you to say, in other words, that the
21 testing of the evidentiary  samples would have been
22 done prior to having the testing from the reference
23 samples of the people in the house.  And I just

Page 76

1  wonder what factual basis do you have --
2  A   No.  My comment there was more in terms
3  of the suspected individual's blood stain rather than
4  the victims' blood stains.  It is my understanding
5  that the suspected individual's stain came somewhat
6  after the analysis was already done and reports had
7  been issued and all of that sort of stuff, not in
8  terms of the victims' stuff.  That would be highly
9  unusual, that the victims' stuff wasn't done at
10 approximately the same time that the evidence was.
11 Q   Now, a question I've had about this
12 case, and I wonder if you could maybe clarify this
13 for me.  They had reference blood samples from the
14 three victims.  And so based upon testing the
15 reference samples, they knew their various types?  If
16 you will generally accept those as being accurate.
17 A   Yes.  Yes, they did.
18 Q   There came a point early on after they
19 had that information that the State Police requested
20 a blood sample from Mr. Reggettz, who was first
21 charged with the crime.  You may or may not be aware
22 of that fact.
23 A   Yeah.  I knew that originally they

Page 77

1  thought it was the father.
2  Q   Okay.  My question is:  Since they had
3  the known types from the wife/mother  and the two
4  children, didn't the State Police already know at
5  least the range of types that Paul Reggettz would
6  have?
7  A   Can I see your chart?
8      MR. SIMMONS:  Yes.
9      (Mr. Simmons tenders document to the
10 witness.)
11      (Witness examines document.)
12      THE WITNESS:  From the known blood
13 specimens of -- assuming parentage --
14      MR. SIMMONS:  Yes.
15      THE WITNESS:  Assuming parentage, no,
16 not on the PGM.  The mother is a 2+/1+.  Both of the
17 children are a 2+/2+.  Both of the children are a 2+
18 and a 1-.  So, theoretically,  they could have gotten
19 the 2+ from the mother, the 1- from the father, and
20 the other allele the father has could,
21 theoretically, be unknown at this point in time.  So
22 he could be a 2+ or he could be a 1+.  You can't say
23 just based on that data.

TED SMITH
MOSS V. GEORGE TREN.

CIVIL ACTION NO. 94-MISC-663

Page 78

1      So, theoretically,  just based on the
2 data, it is possible that Mr. Reggettz was a 1+/1-
3 PGM, I mean, just looking at the PGM. I would have
4 to look at the others.  But that's typically the one
5 that gives you the best discrimination,  and so that's
6 the one that they would tend to have looked at.
7      BY MR. SIMMONS:
8      Q   You made reference to the Zain II or the
9 Laboratory II opinion.  Is there still some
10 investigation going on?  I don't know which one is
11 doing it.  But is there something still going on?
12      A   Well, I guess.  What happened was is
13 there were some additional  cases that they wanted to
14 have looked at.  There were some allegations raised
15 because of a case that Trooper Myers was involved in
16 down in Huntington  that there was some confusion
17 over, and as a result of that, they were wanting to
18 look at some more cases that the laboratory in
19 general had done.
20      But, actually,  what they did is they
21 pulled out a mixture of some more old Zain cases that
22 evidently other people thought may need another look
23 at or another  review and a few more of the cases in

Page 79

1 the laboratory.   And so they're just generally
2 looking at those cases.
3      It's my understanding  that they've not
4 found anything significantly  different than what
5 they've found in the past, that they're basically
6 fitting the same profiles.  Those doesn't mean there
7 may not be issues in them that need to be addressed,
8 but they're basically following  the same general
9 profiles from the original two.
10      Q   Do you have any understanding  as to why
11 this Moss case was not included in any of the special
12 investigations?
13      A   No, sir.  I mean, theoretically,  it
14 should have been on the -- and I would have to check
15 the data to be sure, but my guess is that it was on
16 the list when we provided the Supreme Court with a
17 list of the potential cases. I mean, we didn't
18 discriminate.
19      It may have been prior to.  It may have
20 been outside of the zone that we were looking at.
21 Occasionally,  that happens.  Because it was kind of
22 old compared to the original  investigation range.
23 That would be my only reason.  Because,

Page 80

1 theoretically,  it should have been evaluated  when the
2 others were evaluated  as to whether or not it met
3 Zain criteria.
4      MR. SIMMONS:  That's all the questions I
5 have.  Thanks.
6      REDIRECT   EXAMINATION
7      BY MS. DRUMMOND:
8      Q   Based upon your review, are you able to
9 document who performed  the tests and observed the
10 results in this particular  matter?
11      A   No, I cannot.
12      Q   Were the cases in the time period --
13 from that time period  reviewed?
14      A   Generally,  no, they were not.
15      Q   You've indicated,  I think, you tested
16 tens of thousands of samples.  Of the blood stains
17 that you've tested in your career, do you know how
18 many of those have been mixtures?
19      A   I can't give you a precise.  I can just
20 simply tell you, as a general rule, it's less likely
21 that it's a mixture.  More often than not, a high
22 percentage -- I mean, it would be a small  percentage
23 basically  that were mixtures of blood stains.

Page 81

1      And I can't -- I don't want to give you
2 a figure.  I can just say in my mind it has happened,
3 but it is not a common  occurrence  for us to get blood
4 mixtures, routinely, you know.  And it depends on the
5 case.  It really depends on the case.
6      Q   Would Trooper Murphy have seen the blood
7 drop that's in question with regard to, say, the
8 Christmas wrapping paper?  Would that have been seen
9 in the lab?
10      A   Yes, it would have.
11      Q   And is it true that the more markers
12 that are tested, the greater chance there is of
13 identifying whether or not a mixture exists?
14      A   That's correct.
15      Q   Would you expect -- scientifically and
16 using Occam's razor, would you expect to see two
17 individuals creating a mixture on multiple items?
18      A   Well, assuming that you want to concede
19 that all of the foreign types are consistent with one
20 individual, which is like a big assumption,  then,
21 yes, it would be unlikely that we would see, if, in
22 fact, it was a mixture,  the same two people putting
23 their blood stains in exactly the same location

TED SMITH
MOSS V. GEORGE TREN.
CIVIL ACTION NO. 94-MISC-663

## Page 82

1 across the whole crime scene. I think that would be
2 an unusual occurrence.
3         I would expect to find something in
4 there that was consistent with one and consistent
5 with the other, not always something that would be
6 consistent with both, unless they had identical
7 types.
8     Q    Tell me whether this is accurate or not,
9 in your opinion. You cannot combine results from
10 different stains into one result, but the same
11 profile from different items can be from the same
12 source and have the same frequency?
13    A    That's correct.
14         MS. DRUMMOND: I don't have any other
15 questions.
16         (WHEREUPON, Ms. Drummond and Mr.
17 Revercomb confer off the record.)
18         MS. DRUMMOND: I'm sorry. Mr. Simmons
19 had gone through a number of items in the affidavit,
20 and what I would like to do is hand you a copy of
21 that affidavit -- a number of those were not
22 discussed, starting from Number 39 on -- and ask you
23 to reflect upon those, and then tell me whether or

## Page 83

1 not you agree or disagree with those.
2         (Ms. Drummond tenders document to the
3 witness.)
4         (Witness examines document.)
5         THE WITNESS: Thirty-nine is suggesting
6 that the only blood types of significance are the
7 foreign types. If you're conceding or assuming that,
8 in fact, it was a mixture, then that would be an
9 appropriate statement, in the sense that those would
10 be the only ones that were informative in terms of
11 pure foreign markers.
12         It does not change the fact of how you
13 would do your calculation. It just simply suggests
14 that these would be the only systems that could
15 positively tell you that you had a foreign individual
16 present.
17         Forty, once again, is saying that the
18 remaining types are of no real significance because
19 they're similar to the known donors. I would
20 disagree with that, simply because we've excluded the
21 known donors, and so they should not be a factor.
22         I still think under the assumption of a
23 mixture, though, that would be a true statement, not

## Page 84

1 because it has anything to do with the donors, but
2 simply because under a mixture we would have to
3 potentially not consider the other types that are
4 present.
5         Forty-one is saying that it's
6 inappropriate to include all of the types in your
7 calculation. That's not the case. You would include
8 all of those systems in the calculation if you were
9 doing a mixture calculation.
10         The difference would be is you would
11 have to include all of the potential types that were
12 covered by those genetic markers. So if it was a
13 Gc 2/1, you would have to include the data for a 2, a
14 2/1 and a 1, which would be a hundred percent.
15         So, theoretically, that one would be not
16 informative. But it depends on the mix of the others
17 as to whether they would or they wouldn't be
18 informative. The factor may be one, but they should
19 be factored into the calculation, depending upon what
20 it is.
21         It says, for example -- let's see, 42 is
22 saying that it would be appropriate to compare the Gc
23 sample from the kitchen door to Mr. Moss' in

## Page 85

1 isolation. I don't agree that it would need to be
2 compared in isolation.
3         You have a profile. The issue is: Does
4 Mr. Moss' -- are Mr. Moss' types consistent with the
5 genetic data that was collected from that sample?
6 You have to consider all of the types and all of the
7 profiles. The calculation would be dependent on
8 whether or not you had a mixture or not a mixture.
9 You would have to do it differently depending on that
10 assumption.
11         He said it would not be proper to
12 multiply all of the frequencies. And, like I say,
13 once again, you would multiply all of the frequencies
14 in a mixture just exactly the same way you would do.
15 The only difference is you've got to make sure you
16 add them all in when you're doing a mixture
17 calculation. You've got to make sure that you cover
18 all of the potential types that are there.
19         So your factor may become one for a
20 system because everything is included, but that
21 system should still be factored into the calculation
22 even if its factor is one.
23         Forty-four. I don't see any reason to

TED SMITH
MOSS V. GEORGE TREN.                                          CIVIL ACTION NO. 94-MISC-663

---

**Page 86**

1 disagree with that statement. We can't assume that
2 it comes from a single source. The types are
3 consistent with having come from a single source, but
4 there is nothing to say that they, in fact, came from
5 a single source.
6         And my conclusion would not be
7 necessarily that it came from a single source. It
8 would be just that they were consistent with this
9 person or not consistent with this person.
10         He says, "Only the known blood samples
11 are clearly not mixtures of blood from more than one
12 source." I have to disagree with that. And I'm just
13 going based on the data. It appears that there are
14 some instances where there are a single source.
15         Assuming no mixture, I think the
16 calculations were done correctly. Assuming mixture,
17 then I would agree the calculations have been done
18 incorrectly and they've overstated the position.
19 BY MS. DRUMMOND:
20   Q   Just one last question. If a drop was
21 single, discreet, would it be difficult to mask that?
22   A   I'm not sure if I understand what you're
23 asking.

---

**Page 87**

1   Q   I'm sorry. I guess I'm saying it
2 incorrectly. I suppose the way to say it is: Would
3 it be difficult to mask a mixture of two sources?
4   A   It just simply depends on -- if you're
5 assuming that there is two people, it's also a fair
6 assumption, if you have a significant number of
7 genetic markers identified, that those two people
8 would not be exactly alike on all of those systems.
9 There are calculations that you can do to estimate
10 and guess.
11         So the gist of the matter is: If the
12 observation was, in fact, that it was a single drop,
13 and that is a good observation, the data supports the
14 fact that if that was, in fact, a good observation,
15 that it is, in fact, from a single source.
16         Now, if you cannot trust the
17 observation, then you have other issues. You're
18 talking of 1+ and mixtures. But assuming that it is
19 consistent with what appears to be a discreet drop,
20 then my expectation would be is, if, in fact, it was
21 a mixture, I should at least see something that would
22 suggest over this number of markers that it was, in
23 fact, a mixture.

---

**Page 88**

1         MR. SIMMONS: No questions.
2         MS. DRUMMOND: Nothing else, Lisa.
3 Thank you.
4         (And further the deponent saith not.)
5         (The deposition was concluded at
6 10:55 a.m.)
7         ***************

---

**Page 89**

Deposition of Ted Smith                    Page 89

REPORTER'S CERTIFICATE
STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, to-wit:
      I, Lisa J. Chambers, Notary Public and
Certified Court Reporter, within and for the State of
West Virginia, duly commissioned and qualified, do
hereby certify that the foregoing deposition of
TED SMITH was duly taken by and before me, under the
West Virginia Rules of Civil Procedure, at the time
and place and for the purpose specified in the
caption thereof; the said witness having been duly
sworn by me to testify the whole truth and nothing
but the truth concerning the matter in controversy.
      I do certify that the said deposition was
correctly taken by me, by means of the Stenomask;
that the same was transcribed under my supervision,
and that the said transcript is a true record of the
testimony given by said witness.
      I further certify that I am not connected by
blood or marriage with any of the parties to this
action, am not a relative or employee or attorney or
counsel of any of the parties, nor am I a relative or

---

TED SMITH
MOSS V. GEORGE TREN                                    CIVIL ACTION NO. 94-MISC-663

Page 90

Deposition of Ted Smith                    Page 90

employee of such attorney or counsel, or financially

interested in the action, or interested, directly or

indirectly, in the matter in controversy.

It is hereby said witness did not exercise

the right to read and sign the foregoing deposition.

Given under my hand this 30th day of

September, 2002.

*Lisa J. Chambers*

Lisa J. Chambers, CCR

Notary Public

My commission expires August 16, 2005.



OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
LISA J. CHAMBERS
1 WOODVALE HEIGHTS
HURRICANE, WV 25526
My commission expires August 16, 2005

# MOSS v. BALLARD
# CASE NO. 2:09cv01406

## RESPONDENT'S EXHIBIT 25

**Page 1**

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

        Petitioner,

vs.      CASE NO. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

        Respondent.

The deposition of DAVID H. BING was taken on

the 5th day of June, 1995, beginning at 1:40 o'clock p.m.,
at the Kanawha County Judicial Annex, Judge Paul Zakaib's
Jury Room, 111 Court Street, Charleston, Kanawha County,
West Virginia, before Barbara Harris, Notary Public and
Certified Court Reporter, pursuant to written notice, for
the purposes of discovery and/or to be read as evidence in
the above-styled matter which is now pending and
undetermined in said Court.

**Page 2**

APPEARANCES: On behalf of the Petitioner:

    LONNIE C. SIMMONS, Esquire
    DiTrapano & Jackson
    604 Virginia Street, East
    Charleston, West Virginia 25301

    On behalf of the Respondent:
    MARY BETH KERSHNER, Esquire
    Assistant Prosecuting Attorney
    111 Court Street
    Charleston, West Virginia 25301

### INDEX

Examination by

| Witness | Mr. Simmons | Ms. Kershner |
| --- | --- | --- |
| DAVID H. BING | 4 | 46 |
| Exhibits | | Identified |
| Deposition Exhibit No. 3 | | 3 |
| Deposition Exhibit No. 4 | | 3 |
| Deposition Exhibit No. 5 | | 3 |
| Reporter's Certificate - 51, 52 | | |

**Page 3**

1     (WHEREUPON, documents were marked
2     for identification purposes as
3     Deposition Exhibit Nos. 3, 4, and 5,
4     and are attached hereto.)
5     (Witness Sworn.)
6     MR. SIMMONS: Before we begin, I'd just like
7 to note for the record that we're taking the deposition of
8 Doctor David Bing in connection with the habeas corpus
9 action filed on behalf of John Moss, III. My client has
10 been notified of the deposition. He also has been informed
11 that with habeas corpus actions he does not have an
12 absolute right to be present at all proceedings, and he's
13 aware of that fact. And that the purpose of taking this
14 deposition is to make a record on some of the scientific
15 issues that are set out in the habeas corpus petition and
16 in an affidavit filed by Doctor David Bing.
17     And also I would note for the record that
18 three exhibits have already been marked. Deposition
19 Exhibit 3 is the recent curriculum vitae of Doctor David
20 Bing. Deposition Exhibit 4 is an affidavit executed by
21 Doctor Bing, executed on May 26, 1995, and that's an eight-
22 page document. And then Deposition Exhibit No. 5 are
23 tables that were included in the habeas corpus petition

**Page 4**

1 which summarize the various findings made from the blood
2 testing that was performed in this case.
3 THEREUPON came
4     D A V I D   H.   B I N G,
5 a witness herein, who, after having been first duly sworn
6 to tell the truth, testified as follows:
7     EXAMINATION
8 BY MR. SIMMONS:
9     Q Doctor Bing, first of all, I'd like to ask
10 you to glance at Deposition Exhibit No. 3 and confirm
11 whether or not that's a copy of your most recent curriculum
12 vitae.
13     A (Witness examines document.) Yes, it is.
14     Q You note in the affidavit that you are the
15 Scientific Director of Laboratories of CBR Laboratories in
16 Boston, Massachusetts. Could you generally describe what
17 CBR Laboratories does?
18     A CBR Laboratories is a licensed medical
19 diagnostic testing laboratory. It performs medical
20 testing, diagnostic testing for physicians and primarily
21 the Harvard Medical School hospitals. It does testing in
22 the areas of immunohematology and hematology. About
23 eighty-five percent of its work now is involved in DNA

222

**Page 5**

1  diagnostic testing, but we still maintain a very active

2  profile in the area of blood typing and the analysis of

3  genetic markers in blood based on blood typing and also

4  analysis of serum proteins. It's a part of the work that

5  we do in terms of paternity testing.

6      Q  Okay. Approximately how long have you been

7  the Scientific Director of Laboratories at CBR?

8      A  Well, my current title is Director of

9  Clinical Testing, and I've really been in that position

10  since 1986.

11      Q  Can you also generally describe — Focusing

12  on the forensic testing, could you generally describe the

13  kind of forensic testing that is conducted at CBR?

14      A  The type of forensic testing that is done

15  primarily focuses on DNA typing methods, particularly

16  those — the two principle kinds of DNA typing methods, the

17  RFLP, which is known as Restriction Fragment Length

18  Polymorphism, P-o-l-y-m-o-r-p-h-i-s-m, Polymorphism, and

19  the Polymerase, P-o-l-y-m-e-r-a-s-e, Chain Reaction

20  Methodology.

21      But the laboratory does paternity testing,

22  and in the area of paternity testing we do a full panel red

23  cell antigen typing, serum proteins, genetic typing of

**Page 6**

1  serum proteins, HLA, and when required, we will — We don't

2  do it in our laboratory, but we will send out for analysis

3  of red cell enzymes, such as phospho, gluco, mutase,

4  abbreviated PGM, Esterase D, abbreviated EsD.

5      We do gyloxalase testing in our laboratory.

6  We still do that. That's for glow. But we don't do all

7  the red cell enzymes. But we use them on occasion in our

8  paternity testing results and use the genetic typing

9  information that is in these systems in terms of arriving

10  at a conclusion.

11      And I'm accredited for doing that kind of

12  work because I'm accredited by the American Association of

13  Blood Banks as a technical director for paternity testing,

14  which means I have to be able to use those systems in our

15  work.

16      Q  So prior to the development of DNA testing,

17  did CBR Laboratories and yourself routinely perform, I

18  think what you called the red blood cell typings?

19      A  It did, and it still does. At the point

20  when I took over the laboratory it was still doing this

21  kind of work and still is doing it today.

22      Q  I think you mentioned that the laboratory

23  was generally licensed. I just want it to be clear in the

**Page 7**

1  record. What kinds of licenses are you referring to?

2      A  These are medical diagnostic testing

3  licenses. We are certified in the Commonwealth of

4  Massachusetts. We have a license in the state of

5  Connecticut, the Commonwealth — maybe the state of

6  Maryland, the state of New York. We have a CLIA, that's

7  C-L-I-A, license from the Health and Human Services which

8  allows us to accept blood samplings from other states for

9  clinical testing. And we do paternity testing in almost

10  every state except New York State, so that this is a kind

11  of testing that involves kind red cell genetic — serum

12  protein genetic typings that I've just described.

13      Q  Okay. I'm not sure about this answer or

14  not, so I'll ask you, is your laboratory involved with

15  ASCLD, A-S-C-L-D, or its accreditation program or whatever

16  they refer to it?

17      A  I have petitioned to join ASCLD, which

18  stands for American Society of Crime Lab Directors, and my

19  application is currently undergoing review. I have a

20  letter that I have to respond to. It's laying on my desk

21  right now. And I anticipate that this summer the

22  laboratory will be submitting an application to ASCLD Lab

23  to be accredited. You have to be doing forensic work for

**Page 8**

1  at least five years before you're eligible to apply to

2  ASCLD. We consider that we really started around the

3  middle of 1990, so the middle of 1995 is the time of year

4  eligible to apply.

5      The laboratory adheres to the rules for DNA

6  forensic analysis articulated by the technical working

7  group on DNA analysis methods, and based on what I've seen

8  in the ASCLD accreditation manual, you know, how to do it,

9  the laboratory follows, for the most part, the regulations

10  of ASCLD Lab, because in many, many instances they're

11  identical to the regulations that we follow for our

12  clinical license.

13      Q  What is your involvement in TWGDAM,

14  T-W-G-D-A-M?

15      A  I'm just a member of the committee. There's

16  sixty people on the committee made up of crime lab

17  directors around the country. I'm the representative from

18  the Human Identity Trade Association, which is a collection

19  of private testing laboratories that have representation on

20  this committee.

21      Q  Okay. Can you explain what the significance

22  of TWGDAM is?

23      A  Well, in 1983 — no, not 1983 — 1989 or so

**Page 9**

1  it became imperative for there to be some kind of consensus
2  about how DNA testing should be done for forensic purposes
3  here in the United States. A group of people was assembled
4  at the FBI made up primarily of crime lab directors from
5  public laboratories, and their job was to articulate
6  guidelines for laboratories undertaking DNA analysis
7  methods and guidelines for systems that were to be adopted
8  for DNA analysis methods. And these guidelines really
9  follow, for example, the rules -- or I mean they're very
10  similar to the rules that we use that we have from the
11  American Association of Blood Banks, where we're accredited
12  for paternity testing. They're almost identical in every
13  respect.
14       People have to have the proper training.
15  They have to be in place. There are procedures in the
16  laboratories. Systems that are used for doing the testing
17  have to follow certain scientific principles and obey
18  certain kinds of genetic rules. It's very much the same.
19       Q And I guess the final area of your
20  credentials, you noted in the affidavit that you were
21  qualified as an expert in molecular biology, forensic
22  science, and genetics in the case of Glen Dale Woodall
23  versus Carl Legursky. That was in Cabell County. Is that

**Page 10**

1  correct?
2       A That's correct.
3       Q And you were also qualified as an expert in
4  those particular fields in the case Paul William Ferrell
5  versus William Duncil, which was in Grant County; is that
6  correct?
7       A That's correct.
8       Q And in both the Woodall and Ferrell cases,
9  your expertise involved not only performing DNA testing,
10  but also reviewing the protein and enzyme typing that had
11  been performed by other scientists?
12       A Yes, I was asked to do that, and I testified
13  about that in court.
14       Q Okay.
15       MR. SIMMONS: I'm not exactly sure how you
16  want to do this, Mary Beth, if you wanted to ask him a
17  question, I would now offer him as an expert in molecular
18  biology, forensic science, and genetics in the present
19  case.
20       MS. KERSHNER: I don't have any objection.
21  BY MR. SIMMONS:
22       Q Okay. Turning to the Moss case -- and I'll
23  try to get through some of this preliminary stuff quickly

**Page 11**

1  just by going through the affidavit -- you note that in
2  connection with Moss versus Duncil you reviewed a copy of
3  the autopsy report that's dated December 13, 1979 that was
4  performed by Doctor Irvin Sopher; is that correct?
5       A That's correct.
6       Q Okay. You generally reviewed the Petition
7  for Writ of Habeas Corpus that was filed in this case?
8       A Yes, I did.
9       Q Okay. You reviewed a copy of Fred Zain's
10  testimony from the first and second trials in the Moss
11  case?
12       A Yes, I did.
13       Q Okay. You reviewed a copy of the laboratory
14  notes and other documents that were produced by the State
15  in this Moss case?
16       A Yes, I did.
17       Q And I believe -- Let's see. Yes, I believe
18  that's all the materials you reviewed, other than I think
19  maybe I sent you the -- I may have sent you the deposition
20  of Robert Murphy. Do you recall seeing that?
21       A Let me check my notes. Well, no, I don't
22  have the deposition of Robert Murphy.
23       Q Okay. I may not have sent it to you. I

**Page 12**

1  wasn't sure if I had or not.
2       In the materials you reviewed from the Moss
3  case, you note in your affidavit that there were no
4  photographs of the electrophoretic gels. First of all, I
5  just wondered if you would explain how photographs of those
6  gels would have assisted you in your analysis of the
7  testing?
8       A This type of genetic typing, at least the
9  enzymes, is based on looking at patterns of the proteins
10  that are being tested under conditions where they move in
11  an electric field. And they will move differently in an
12  electric field depending on what genetic type they are
13  reflecting, so that what this -- what these photographs do
14  is allows one to look directly at the results of this
15  testing and correlate that with the actual recorded test
16  results.
17       In our laboratory it's standard practice to
18  make a photograph of every single genetic typing that we
19  do, and that photograph is maintained for as long as keep
20  these files.
21       Q So without being able to review the
22  photographs of the electrophoretic gels that were performed
23  in this case, you have no basis for determining whether or

Page 13

1 not the typings that were determined to have been found are
2 correct or accurate or not?
3     A  I have the -- I gather there's a sworn
4 deposition from Mr. Murphy that attests to the accuracy of
5 these results.  I haven't read it, but I would imagine that
6 it does.  Certainly the notes agree with what the final
7 reports are.  But as in all kinds of testing, what one
8 hopes for is the opportunity to see the results to see if
9 there's any kind of difference in opinion in terms of
10 interpretation of those results, because there can be
11 widely differing interpretations of test results.  So in
12 the absence of being able to do that, it's very difficult
13 to really validate the test results that are recorded in
14 the worksheets that I did have the opportunity to review.
15     Q  You also note in your affidavit that you are
16 generally aware of the special investigation into testing
17 performed by Fred Zain.  I just wonder if you could state
18 generally how many cases involving Fred Zain have you
19 reviewed as an expert?
20     A  Well, there's Woodall -- the Woodall case.
21 Did Zain work on the Ferrell case?
22     Q  No, that was the FBI.
23     A  That was the FBI.  Okay.  The case called

Page 14

1 West Virginia versus Davis, I think Mr. Zain worked on that
2 case.  The case of West Virginia versus Harris, he worked
3 on that case.  I believe there's a case of West Virginia
4 versus Richardson, I think Mr. Zain worked on that case.
5 And also a case of West Virginia versus McClure, I've
6 worked on that case.  And there's a case of West Virginia
7 versus Ward, and I've worked on that case.
8     Q  Okay.
9     A  And there are others that are still pending.
10     Q  Had you previously reviewed any of the
11 documentation that was developed by the special
12 investigation into Fred Zain's work in West Virginia?
13     A  I read the ASCLD summary review.
14     Q  In reviewing the Fred Zain cases, just
15 generally speaking, that you mentioned, have you generally
16 found what, in your opinion, were certain problems with
17 some of his work?
18     A  Each case is different, and the
19 circumstances of each case are different.  But overall one
20 of the difficulties in reviewing these cases is that all
21 that's been available for review has been the summary
22 worksheets on which the results were finally recorded.  And
23 then there's some original worksheets in some of the cases,

Page 15

1 but they're not -- To the best of my recollection, in no
2 case was there a complete set of what I would call raw data
3 that was available for review, although there was partial
4 results.
5     In no case were any photographs available
6 for review, in no case.  It's not the practice of every
7 forensic lab to take photographs.  I would be the first to
8 admit that.  But I think in light of what this is going to
9 be used for, I think it is -- it's not an unreasonable
10 practice to have photographic documentation of test results
11 where the test results are based on interpretation of
12 patterns that are seen and not measured on an instrument or
13 something.
14     Q  You also note in your affidavit that there
15 was no protocol provided, and I believe, even though you're
16 not familiar with Mr. Murphy's deposition, his testimony
17 was that there was no protocol, written protocol, back in
18 1979.  I just wonder if you would explain what is the
19 significance of having a written protocol in a forensic
20 laboratory.
21     A  It essentially is a documentation of how the
22 test was conducted and how -- most protocols usually also
23 have some indication about how the results are interpreted.

Page 16

1 And protocol will document how you set up the test, the
2 agents and things that go into making the test.  It's sort
3 of like a recipe for -- You know, you could sort of draw an
4 analogy.
5     What the scientist is doing in the
6 laboratory is actually baking the cake, and protocol is the
7 recipe for what goes into making that cake.  If the recipe
8 calls for making chocolate cake and you have a lemon cake
9 instead, you could ferret that out by looking at the
10 protocol and say, you know, you didn't get the result that
11 you thought you were going to get based on the protocol
12 that's outlined.
13     Q  Would it be correct to say that a written
14 protocol would help standardize the practice in the
15 laboratory, if, in fact, that written protocol were
16 followed?
17     A  Well, that's one of the requirements by
18 ASCLD Lab now.  ASCLD Lab does other things besides DNA.
19 For example, it accredits laboratories in the area of
20 serology.  And a written protocol is one of their absolute
21 requirements.  Now, ASCLD Lab, this is an evolving
22 organization, and this has really only begun to happen
23 around 1990, '91, '92 that these have begun to evolve, is

231

**Page 17**

1   my understanding.

2    Q   You mean the ASCLD Lab requirements?

3    A   ASCLD Lab was always available for

4   accrediting laboratories, but pretty much prior to 1990 not

5   many laboratories really applied for that accreditation

6   because it wasn't really a very strong organization. That

7   may not be fair to say. It wasn't an organization to which

8   laboratories looked for guidance in terms of establishing

9   standardized protocols in their laboratory.

10    With the need for standardization in the

11   forensic genetic testing field, and serology is part of

12   that field, ASCLD Lab has always been there and has stepped

13   forward and is providing this service to laboratories that

14   allows them to become standardized within the field. So

15   it's always been there. It's just that it's only recently

16   that its importance has become emphasized in forensic

17   laboratories.

18    Q   Would you say that -- And, again, this case

19   dates back to 1979. Do you have any basis for

20   understanding or stating that in 1979 most forensic

21   laboratories would have some written protocol or would that

22   have been unusual?

23    A   No, that wouldn't have been unusual. For

**Page 18**

1   example, I have -- in my collection of protocols I have a

2   protocol from the FBI dated 1974 which outlines all

3   procedures for doing serological analysis of forensic

4   samples. So laboratories were well aware that these

5   protocols existed, and, you know, if you wanted to, you

6   could just adopt the FBI protocol, drop into your

7   laboratory, and say, "This is what we're going to do." It

8   was freely available to all the public testing laboratories

9   and still is.

10    Q   On a different issue -- And, again, I'll

11   represent to you that Mr. Murphy testified that in 1979 the

12   West Virginia laboratory did not have a formalized quality

13   control/quality assurance program, and they did not, for

14   example, test some of the enzymes and other materials used

15   in the testing on a regular basis to make sure that those

16   items were appropriate for use in testing. I wonder if

17   you'd explain the importance of having a quality

18   control/quality assurance program in a forensic laboratory.

19    A   Well, again, quality assurance and quality

20   control is something that has become recognized over the

21   past five or six years as being important in a forensic

22   laboratory. And most laboratories are doing this now.

23   Prior to that time, even if a laboratory didn't have a

**Page 19**

1   quality control/quality assurance program, there still

2   was -- they still could have run positive and negative

3   controls on every single sample that was run so they could

4   internally QC any given run.

5    As near as I could -- There's no evidence in

6   any of the notes that the agents were checked with these

7   controls prior to any of the runs, for example, to make

8   sure that the red cell antigens -- The glutinating agents,

9   called the antisera or antibodies that are used in red cell

10   glutinations, you normally check them before you do a run

11   to make sure they're working, and those are usually

12   recorded in the notes of a run.

13    Controls are usually run of electrophoresis

14   of known samples. PGM, for example, there's a known

15   standard that contains all the known types, and that's

16   always run in parallel with the unknowns just to do a

17   control on that.

18    So those kinds of things could have been

19   done in 1979. It's just a matter of the laboratory

20   director's decision as to whether or not those should be

21   done. But I mean, for example, in our laboratory we were

22   doing -- The CBR Laboratories, even though I wasn't in

23   charge of it, but in 1979 I can show you work pages where

**Page 20**

1   all of the -- and photographs of gels where controls were

2   run on every single run that was done. So it's good

3   laboratory practice and generally acknowledged by people

4   who ran laboratories at that time as being important things

5   to do.

6    Q   In your review of the documentation provided

7   by the State in connection with the testing, you noted in

8   your affidavit that none of the original notes of the work

9   performed were made available to you. What was your basis

10   for making that assertion?

11    A   Well, most of the documentation I received

12   were reports, handwritten summaries that eventually became

13   the reports, summaries of -- I call them worksheet

14   summaries, in other words, all the composite results were

15   listed of the samples tested. Now, there should be a

16   notebook or some kind of backup to that information. It

17   just isn't there.

18    Q   Have you reviewed -- or generally speaking,

19   in your review of the Fred Zain cases that you mentioned,

20   have you seen some cases where the original notes were

21   included?

22    A   There were some where the original notes

23   were available, yes.



Page 21

1    Q  What is it about the original notes that
2  distinguishes them from the summary sheets you described?
3    A  Well, they are — Some of these original
4  notes will have, like, for example, I've seen — I'm
5  trying — I can't remember the case exactly, but there were
6  some PGM results where it was possible to sort of track
7  down through these handwritten notes where the original
8  results were recorded.  And in some instances there would
9  be a place where controls were run, and they, in fact, were
10  run and recorded, and other places where there were
11  controls that were supposed to be run and it was just left
12  blank, so it meant they weren't run or they weren't
13  recorded, one or the other.  I didn't have any of that kind
14  of documentation with this particular case.
15    Q  In the affidavit you've generally summarized
16  that — and this is in number 15 of the affidavit — that
17  these various problems, lack of documentation, no protocol,
18  in your opinion, render the scientific data in this case
19  meaningless.  I just wonder if you could elaborate on that
20  statement.
21    A  Well, by that I mean that the — there is so
22  much data on these stains that weren't analyzed, it would
23  seem to me there should be some extensive notes backing

Page 22

1  that material up.  So that in that — in the context of not
2  being able to look at the backup data, other than the
3  summaries, it becomes, you know, almost impossible for me
4  to either agree or disagree with the final outcome of the
5  results.  And that's what I mean by when I say it's
6  meaningless.  I can't agree, I can't disagree.  All I can
7  say is what was reported.
8    Q  You next generally state that for purposes
9  of your review, that even assuming the accuracy of the
10  typings in this case, the conclusions were flawed for
11  several reasons.  And we'll go through those and maybe, to
12  the extent that you can, illustrate any of these with
13  specific examples, it would be helpful to do so.  And if
14  you want to diagram anything that you feel might help
15  explain something, I'll make my legal pad available for
16  you, and we can make that an exhibit.
17      One of the first general ideas or principles
18  you stated was that where blood samples are discovered at
19  an alleged crime scene, it's important to identify the
20  types of the known possible donors of that blood.  I wonder
21  if you'd explain why that is the case.
22    A  Well, forensic testing is designed to
23  exclude.  That's why this testing is done.  It's designed

Page 23

1  to exclude the person who is false — who is not the true
2  biologic donor of a given sample.  So that to that extent,
3  one tests, and if one has no exclusion, you keep testing
4  and testing and testing until you reach sort of the end of
5  what you're able to test for.  At that point if you have no
6  exclusion, then you can, at that point, make some kind of
7  comment about how often you might expect to find this
8  combination of markers.
9      But in the meantime, if there are people who
10  are potential donors to these samples, scientifically you
11  want to be able to test all the people who might be true
12  biologic — who are candidates to be true biologic donors
13  of these samples.  So if there are other people involved
14  besides the people who were involved in this report, they
15  really should have been — they should be included in the
16  testing panel, if it's possible.  And it's not always
17  possible, and I'd be the first to acknowledge that.
18    Q  Okay.  You state that under the facts of
19  this case that, at a minimum, the persons who lived in the
20  Reggettz house, which would include the three victims,
21  Vanessa Dale Reggettz, Paul Eric Reggettz, and Bernadette
22  Reggettz, and then the father, Paul Reggettz, III, would be
23  known possible donors of blood; is that correct?

Page 24

1    A  That's correct.
2    Q  And as far as you know, based upon your
3  review, you're not aware of any other known possible donors
4  of blood in the Reggettz house?
5    A  No.
6    Q  The second point that you make is that only
7  those types identified from blood found at the alleged
8  crime scene that are different from the types of the known
9  possible donors provide information relevant to a
10  determination as to the source of the blood evidence found
11  at the crime scene.  I wonder if you could explain that,
12  and if you feel that an illustration is appropriate, do
13  that.
14    A  Well, let me try to explain it, and then, if
15  necessary, I can provide an — do a drawing.  The — At a
16  crime scene, when stains are collected, the origin of those
17  stains is unknown, so one always has to make the — one
18  can't make any assumptions about the potential — about who
19  the donors are.  But more important, one cannot make an
20  assumption that any given blood stain collected at a crime
21  scene is from a single source.  So if one wants to
22  distinguish possible sources of that blood and you have a
23  group of people who all have that — all have a given type,

233

1  then that type doesn't really help you distinguish the
2  source of that blood, because you can't assume that it's
3  not a mixture.
4          Think of it another way. Suppose that the
5  distinguishing factor of a blood stain was something that
6  you can actually visualize. Suppose that you could look at
7  this blood stain and you could say unequivocally, "I know
8  that that blood stain came from somebody who has brown
9  hair." Brown hair is a genetic marker. In some ways it's
10 very similar to, say, a blood type antigen because there is
11 a certain -- The color or the reason it's brown is due to
12 certain genetic markers that result in color. So you say I
13 know -- It doesn't make any difference how I know it. I
14 know this blood stain is from somebody who has brown hair.
15 Now, you get your list of possible donors to that and you
16 -- and they all have brown hair. You can't say that any
17 one person is more likely than another to be a donor to
18 that blood stain.
19          Now, let's say if we can do a little bit
20 more. Let's say, "Well, I can" -- "I know that the person
21 who contributed to this blood stain has brown hair and is
22 left-handed." So you now look at your candidates, and you
23 look at them and you say, "Well, three of them are left-

1  handed and say two are right-handed." Well, the two who
2  are right-handed are automatically eliminated, but you
3  still can't distinguish between the other three because
4  left-handedness and brown hair color are the same in all of
5  them.
6          So that if you have a series of markers and
7  they're identical in all the people that are being tested,
8  then you can't really use that to try to distinguish the
9  source of a given blood stain. You can only look to the
10 differences, not to the similarities, because the question
11 that is being asked here, the scientific question that is
12 being asked is who could possibly be a biologic donor to
13 this blood stain.
14         And, secondly, I don't know whether there's
15 a single person or from a bunch of people. As I stated in
16 my affidavit, is it a single source sample or many people
17 are sources of the sample. So you have to look to the
18 differences between individuals who you test rather than to
19 their similarities.
20   Q  Okay. The next general point you have in
21 your affidavit is that where a type from a known possible
22 donor of the blood matched the type from the blood
23 discovered, it is not appropriate to include that type in

1  calculating the frequency that the blood was deposited by a
2  suspect. Now, you may have already gone through that
3  somewhat. You have a specific example. That might be one
4  where going through a specific example from the table or
5  from your affidavit might be helpful to illustrate that
6  point.
7    A  Well, the -- again, the focus here is on the
8  unknown sample, and if there are any similarities there
9  between that blood sample and all of the people that are
10 involved, even -- I mean suppose it's -- suppose it's
11 something really --
12         Let's take another genetic typing you can
13 sort of visualize. Let's suppose that the blood sample
14 that you know came from somebody who has got brown hair, is
15 left-handed, and is an albino, has no pigment color in
16 their skin at all. Albinism is a very rare occurrence in
17 the human population. It's very rare indeed. Now, at that
18 point, the fact that you now have three individuals who are
19 left-handed and have brown hair, but only one of them is an
20 albino. You say that's a very rare event. It could only
21 have been that person.
22         So you can now use that to reason backwards
23 and say, "Alright, albinism is a very rare event, so I know

1  that this blood stain came from an albino." That could
2  only have occurred in one out of a very few number of
3  people who have this inherited genetic trait.
4          That is separate from the question of
5  saying, "How often is the combination of brown hair, left-
6  handism and albinism found in the general population?"
7  That's a separate question. That's how often do I find
8  these together in the general population. You can make
9  that estimate as well. But that's a general question about
10 the population. That is not a question about the sample.
11 The only thing that distinguishes that sample is what is
12 different about that sample than is in the known
13 individuals that you're testing. So you've got a -- Those
14 two things have to be kept separate.
15         And that's what I mean by this, that you
16 can't take a combination of factors that are found in the
17 general population and relate it to a specific sample. All
18 you can say is that if these are present and I now have
19 data to show that are indeed present, this is how often I
20 would expect to find that combination of markers in the
21 general population, providing they are behaving and acting
22 independent of each other, because that's the other issue
23 in terms of being able to do that, they have to be behaving

Page 29

1   independently. They have to be what we say scientifically,
2   they sort independently.
3       Q  I think the specific example that you have
4   in the affidavit, I'd like for you to go ahead and turn to
5   that one, as well.
6       A  Uh-huh.
7       Q  Well, you quoted the report where the
8   statement is made that, quote, "The combination of blood
9   groups O, PGM 1+1-1, AK 1, EAP BA, EsD 2-1, ADA 1,
10  GLO 1 2 , Hp2-1, and Gc 1 occurs in approximately 0.03% of
11  the population." In connection with that statement, you
12  assert that the conclusion implies that all of the blood
13  typings obtained from the crime scene for these particular
14  items were the same as all the blood typings obtained for
15  Mr. Moss. And I wondered if you would give an example of
16  what you mean where you believe that that general
17  conclusion is inaccurate or overstates.
18      A  Well, for example, there's an item called
19  flashlight.
20      Q  Do you have the item number?
21      A  It's item — It doesn't have an item number,
22  it just says flashlight. It's on Table II. It continues
23  the last page of Deposition Exhibit No. 5.

Page 30

1       Q  Okay.
2       A  There — What it is is that there's — It
3   just says PGM 1, so we don't know if it's 1+1- or 1+, 1-.
4   You know, there's three possibilities. It could be 1+, it
5   could be 1-, it could be 1+1-. So we don't know whether or
6   not the 1+1- is there or not. No result was contained
7   in — was obtained Haptoglobin or Gc. That's Hp and Gc.
8   So to take this figure here and apply it to this sample
9   here is not — implies that this combination of factors
10  here would be found in that.
11          Now, in contrast, I mean, if I didn't point
12  it out now, I'm sure someone would point it out to me,
13  there is one result here where there is a complete match
14  between Mr. Moss and a stain found at the crime scene.
15  That's item seven, the kitchen door curtain. And that's
16  also the case reported on the clothing of Bernadette
17  Reggettz, which is the very last line of Table II, and
18  Christmas wrapping paper, which is the next to last — is
19  the third to the last line of Table II.
20          Now, there — The results are here reported
21  to match the types that are reported for Mr. Moss. So at
22  that particular point, if these results are indeed correct,
23  then at that point it is fair to do a calculation and say,

Page 31

1   "I would expect to find these series of markers in a
2   certain percentage in the population." But it relates to
3   the general population, it doesn't relate to the sample.
4   The sample is specific to the forensic situation that's
5   being investigated.
6       Q  So is your point that the conclusions
7   reached should have been based upon the specific types
8   found from each particular item tested, as opposed to using
9   the general population figure and implicitly saying that
10  all those types were obtained from all the evidence?
11      A  If that's — If that was the intent, to
12  implicitly say that this is the type that was found on all
13  of these items, that would be incorrect. On the other
14  hand, those three items it would have been fair to make
15  this conclusion. But it wouldn't have been fair to make
16  that conclusion about the flashlight.
17      Q  I think the next sort of general principle
18  that you talked about in your affidavit is that it is only
19  proper to combine the frequencies on types obtained from a
20  blood sample where results, in the absence of any other
21  data, are consistent with the blood sample coming from a
22  single source. And you follow that up with a statement
23  that — Well, let's start with that statement. Why don't

Page 32

1   you — Those two points, number 29 and 30 of the affidavit,
2   they may sort of relate to each other, but if would just
3   generally explain that idea.
4       A  Well, I think in my previous direct
5   testimony I said that one of the inherent difficulties with
6   serological testing is there's no way to know whether or
7   not a blood sample is a mixture or a single source. The
8   only samples that you really know are truly single source
9   samples are the samples that are taken directly from
10  somebody be they alive or dead. You know where those come
11  from, so that that — And there's no way, to my knowledge,
12  anyway, to, for example, decide whether or not a blood
13  stain is a single source sample. It's very difficult to
14  do.
15          Now, as I'm sure will be pointed out, if you
16  have series of markers, I couldn't say that it wasn't a
17  single source. I mean, for example, take item 7, the
18  kitchen door, I couldn't say that that's not a single
19  source, but I have no way of scientifically sorting that
20  out. It could be a mixture of a whole bunch of people, for
21  all I know. And there's no way to sort that out.
22          So I think that in describing the results of
23  testing, by this, I think that one has to be very cautious

235

Page 33

1  about overstating what the meaning is of these kinds of
2  calculations. They are an accurate calculation. I don't
3  disagree with the 0.03%. My tables are a little different
4  than the ones they us, so it's probably -- I came up with
5  something like 0.05%. That certainly is close enough. As
6  far as I'm concerned, it's the same number.
7      But the -- I don't know that these are
8  single samples. And the other thing that I have to go back
9  to is, is that I have no way of verifying these really very
10  important data as they relate to this case.
11      Q Okay. Let me -- You've mentioned the
12  example of item number 7, the kitchen door curtain, and in
13  that example typings apparently were obtained in the --
14  Let's see. It looks like that's nine different groups that
15  were tested. In the table, the particular types in bold
16  are types that are similar to or identical to known blood
17  types from some of the other -- from some of the known
18  possible donors of blood in the Reggettz home. And I just
19  wanted to make sure I understand when you're talking about
20  calculating the frequency of this particular sample. Are
21  you saying that, for example, since the ABO for the kitchen
22  door curtain was found to be O, but there are known
23  possible donors in the Reggettz house who are O, that you

Page 34

1  should not include that particular typing in calculating
2  the population frequency for item number 7?
3      A Everybody in this case tested as type O
4  blood.
5      Q Yes.
6      A So as far as this is -- this marker is
7  concerned, this does not provide me any information about
8  that particular sample. So if I were doing this
9  calculation, I would not use the fact that approximately
10  forty percent of Caucasians are type O blood --
11      Q Okay.
12      A -- to this sample.
13      Q Right.
14      A I mean, I think I've stated before, I would
15  use it in saying how often would I expect to find this type
16  in combination with all the others in the general
17  population. That's a valid calculation. But with respect
18  to this sample, I would say, "What I'm going to look to is
19  I'm going to look to the differences," and say, "How often
20  would I expect to find that difference?" So, for example,
21  here is -- there's a place where the EAP is -- even there,
22  there still is a person in the Reggettz household who is
23  BA, so I'd have to consider that person as a possible donor

Page 35

1  of the BA on this kitchen door stain, number 7. So that's
2  where they have that in common. The ones where they aren't
3  in common is the 1- is something -- no, the 1+ is the one
4  type that is not seen in anybody.
5      Q Okay. The PGM 1+ --
6      A PGM 1+ is a type not seen in anybody.
7      Q Okay. So you would use that?
8      A That's right.
9      Q And what else in item number 7 would you
10  use? I think it's kind of hard to tell what's bold and
11  what's not. It looks like the --
12      A Gc 1 --
13      Q Okay.
14      A -- because everybody in the Reggettz
15  household is 2-1.
16      Q Okay. So would --
17      A And Esterase D. Everybody in the Reggettz
18  household is a 1, this sample is a 2-1. So I don't know --
19  I can use the 2 as a distinguishing factor, but I can't
20  really use the 1. So the frequencies of each one of these
21  alleles is no. You know, we know how often the 1+ would be
22  found and how often the 2 would be found and how often the
23  1 would be found, and because they occur together, you have

Page 36

1  to look at the frequency of them as they occur together.
2  So you could actually use -- you would actually use the
3  frequency of 1+ or 2-1 and 1 here. But that would allow
4  you to say, "This unique set here is found in a certain
5  portion of the population." And that is specific to this
6  sample.
7      Q Okay. And it's a thing that's a good
8  example. I think the -- maybe the last general statement
9  in the affidavit is that -- and this may, again, repeat
10  something you've already said -- was that each of the types
11  found from each individual sample must be treated
12  separately rather than in conjunction with each other,
13  because it is not possible, scientifically, to link
14  together the types found from different blood samples.
15  Just to make sure I know what you're talking about, would
16  you explain that general idea?
17      A Well, if you have different blood samples,
18  different donors, you can't take the frequency of that
19  person's blood type and link it together with the frequency
20  of a person -- the second person's blood type. What you
21  can do is you can say, "Well, in the general population I
22  might find this combination in, say, three percent of the
23  population or I might find this other combination in, say,

236

Page 37

1  ten percent of the population." So at that particular
2  point you can extrapolate a little bit and say, "Well, that
3  probably represents thirteen percent of the total
4  population might have this combination of factors."
5       But that still isn't specific to the sample
6  in question. The sample in question is -- The
7  distinguishing factors about the sample in question is what
8  distinguishes it from the other -- all the individuals who
9  have been tested, and that's where the focus has to be.
10      Q  Okay. You note in the affidavit that
11 there's no evidence as to when the blood stains were
12 deposited and what caused the blood to be deposited, and I
13 take it you agree that the serological typing is unable to
14 determine when a blood sample was deposited; is that
15 correct?
16      A  I don't know of any method, serological,
17 DNA, that can tell you how old a stain -- a biological
18 stain is.
19      Q  In paragraph 39 of your affidavit you state
20 that the only blood types of significance from any of the
21 samples are PGM, Gc, and EsD, and I wonder if you'd explain
22 why -- what's your basis for making that statement.
23      A  Well, again, going back to Mr. Moss's type

Page 38

1  and to taking item 7 as an example, those are the three
2  systems where that stain could be distinguished from people
3  in the Reggettz house. There's PGM, the 1+1- is not found
4  in any of the people in the Reggettz house. Even though
5  you find somebody with a 1 -- a 1-, you don't find anybody
6  there with a 1+. So the 1+ is what really distinguishes
7  the stain from -- in the PGM system and now you have 1+1-,
8  so you would have to deal with that as a combination. You
9  can't separate that out.
10      Esterase D, everybody in the Reggettz house
11 is a 1, this sample has a 2-1, so that that 2 distinguishes
12 the Esterase D in this stain from everybody in the Reggettz
13 house.
14      The Haptoglobin is -- Well, Gc, I'm sorry,
15 Gc, there's a 1 there. Everybody in the Reggettz house has
16 a 2-1 in the Gc system, so if anybody -- and this, perhaps,
17 illustrates it very well -- if anybody in the Reggettz
18 house had been a source of that stain, you would expect to
19 find a 2 present, as well, and you don't. So, you see,
20 that eliminates anybody in the Reggettz house as a donor of
21 this particular stain. It doesn't tell you who is the
22 donor of that stain, it just eliminates them.
23      Again, it goes back to my previous

Page 39

1  testimony, testing is designed to exclude the person who is
2  not the true biologic donor of the stain.
3       Q  I think that -- Let me see. You've already
4  gone over 41, 42, and 43 in your affidavit, and you've
5  already talked about there's no basis for assuming a single
6  source. Your final conclusion in your affidavit is that
7  based upon the foregoing analysis, the statistical
8  conclusions are overstated in this case. And again, I take
9  it, that relates back to some of the problems you've
10 already discussed, and I don't guess we need to go through
11 that again unless you have something to add to that.
12      A  No, I don't have anything to add. It's -- I
13 think this affidavit may be a little bit repetitious in the
14 sense that I've stated some things several different ways,
15 but I have done that in an effort to clarify my opinion
16 that I have derived based on review of the test results in
17 this case.
18      Q  The final paragraph in the affidavit is that
19 you generally concur with the statements concerning the
20 scientific data that are set out in the habeas corpus
21 petition on pages 29 through 36 without necessarily
22 adopting all the particular language used, that's correct?
23      A  That's correct.

Page 40

1       Q  Maybe just as a final clean-up matter just
2  to make sure that it's clear in the record, when you --
3  when you go through -- when you went through your analysis
4  on, let's go back to item number 7, the kitchen door
5  curtain, and you talked about how you should focus on the
6  types that are different from the known possible donors,
7  and so you looked at the PGM, the EsD, and the Gc. And you
8  stated that you should focus on those differences. I
9  wonder if you'd explain -- and let's see if I can figure
10 out a way of saying this -- what is the -- I guess the
11 scientific problem with simply multiplying all of the
12 samples or all the population frequencies that were found
13 from item number 7 together, as opposed to simply focusing
14 on the differences.
15      A  There's nothing wrong with doing that. All
16 that says is that I would -- when you did that calculation,
17 that would say, "This combination of factors would be
18 expected to be found in a certain portion of the
19 population," in this particular case using the number that
20 was calculated in this case, .03% of the population would
21 have that combination of factors. There's nothing wrong
22 with that.
23      The thing about it is, is before going to

237

Page 41

1  that -- going ahead to make that calculation, one first has
2  to decide what distinguishes this stain from any other
3  stain that's present. And my point is, is that the PGM,
4  the Esterase D, and the Gc types are what distinguish this,
5  and I have to couple that with the scientific fact that I
6  have no way of telling whether or not this is a mixture of
7  a single stain or multiple donors to the stain. And this
8  would be true whether this was DNA testing or serological
9  testing.
10          All one can do is report the data as one
11  sees it and say, "This is how often I would expect to find
12  this combination of markers." It's a unique or it's not --
13  it's a rare combination or it's not very rare at all. It
14  would be like a verbal description of the scientific
15  result. But the -- But beyond that, it's really difficult
16  to say much more.
17          And at that point it's really up to
18  everybody else who is involved in looking at this evidence
19  to come to a decision as to how that stain could have
20  gotten there if, in fact, an individual is the donor of
21  that stain. All we can do is just say, "This is what the
22  scientific data said."
23      Q  Would it be accurate to say that by giving

Page 42

1  what I'll call the general population frequency number on
2  item number 7, that would essentially give you the number
3  that is the most discriminating number versus the
4  calculation you make by multiplying the population
5  frequencies of the types that are different. So in other
6  words, you would be providing the range, one includes
7  everything together, and I think implicitly --
8      A  Yes.
9      Q  -- it says it's a single source --
10      A  Yes.
11      Q  -- and the other is taking into account
12  well, this may be a mixed sample, but here is where these
13  three different types and what the population frequencies
14  would be there?
15      A  And that could still be a very compelling
16  number.
17      Q  Right.
18      A  Even the range can be a very compelling
19  component.
20      Q  And just so I also make it clear, are you
21  saying that the calculation method that you have discussed
22  here is what would have been appropriate, is it what would
23  have been mandatory, or how would you describe the

Page 43

1  additional calculation that you've been talking to where
2  you focused on the differences in each sample?
3      A  There isn't anything really mandatory in
4  doing this. It really is based on understanding how
5  genetic systems work and coupling that with the experience
6  of the forensic scientist who appreciates the nature of the
7  samples that are being studied. Population geneticists
8  never run into this problem. When you get a tube of blood,
9  you know it came from a single person, you do a typing on
10  that and you say, "Oh, this is a rare combination of
11  markers in this individual." There isn't any question
12  about where that sample came from.
13          A stain collected off a disorganized scene,
14  that are frequently what happens in a forensic situation,
15  at that point all we can do is test what is there, say,
16  "This is what I found. Here's a" -- If all of these
17  were -- all of these markers would be expected to be found
18  in a certain combination, these are the markers that
19  distinguish this stain from -- and make this person as a
20  possible donor of that stain.
21          For example, and one of the statements that
22  might be said about this is that -- and then allow the
23  individuals who are going to make decisions about this to

Page 44

1  come to their own conclusions -- one might say that, for
2  example, on the stain on the kitchen door Mr. Moss couldn't
3  be excluded in the PGM, the Gc, and the Esterase D systems.
4  That just says where -- what distinguishes that sample from
5  all the others.
6          And then if you want to know what this
7  combination is, then you could go and say a combination of
8  1+ -- PGM 1+, ESD 2-1, and Gc 1 is a certain number, and
9  the combination of type O blood, PGM 1+2+, AK 1, BA, for
10  EAP 2-1, for EsD, ADA 1, 2 for GLO 1, 2-1 for Haptoglobin,
11  and Gc 1, that's found in three percent of the
12  population -- or .03% of the population.
13          And at that particular point the scientist
14  has done their job, presented you with the best possible
15  data that you can use, and at that point the decision is
16  now up to those people involved in the process who actually
17  have to make the next decision in relationship to what this
18  -- how this data is going to be used in the case being
19  tried.
20      Q  Let me maybe just ask for clarification,
21  then, in the affidavit, just to make sure the record is
22  clear. And I'd ask you to look at paragraph 43 of your
23  affidavit, and maybe if you'd just read that to yourself

238

Page 45

1 and then --
2     A (Witness examines document.) Well, what
3 paragraph 43 says is it addresses the issue about I don't
4 know if these are mixtures or not, and there's no way I can
5 tell that.
6     Q And under --
7     A Under those circumstances, all I can say is
8 what distinguishes it and make a statement to that effect,
9 and then to the extent that that is helpful, the numbers
10 are helpful, one can sort of narrow down the range of
11 people who might be -- have that unique combination of
12 markers not shared by other people. And then beyond that,
13 one can also, accurately and without overstating the facts,
14 find out what a whole series of combination of markers
15 might be expected to be found in the general population.
16 But those are all separate items that have to be taken into
17 account in light of where that sample came from.
18     Q And then in paragraph 41, the way I read
19 that is that where you find the different types, you can
20 state the population frequency for those different types,
21 but you -- for statistical purposes, you should not
22 multiply them together. Just let me make sure I understand
23 here.

Page 46

1     A Not unless you know for sure that it's a
2 single source blood sample.
3     Q Okay. So when you were giving your general
4 example in item number 7, and let's say you found a
5 population frequency for the PGM type and for the Gc type,
6 you're saying that it would be appropriate to state those
7 particular population frequencies, but you should not
8 multiply them together unless you know for a fact that
9 there's a single source?
10     A With respect to that sample, that specific
11 sample, you really don't know. You don't know. I mean you
12 can calculate things, but to -- but to say that I could say
13 with certainty about this sample, that this is a single --
14 that this combination of factors is what's -- this is how
15 often I'm going to find this combination of factors, you
16 have to also be able to state with an equal amount of
17 certainty that it's also a single source sample. And
18 that's the problem with all forensic testing.
19     MR. SIMMONS: I think that's all the
20 questions I have.
21       EXAMINATION
22     BY MS. KERSHNER:
23     Q Doctor Bing, your testimony on direct was

Page 47

1 that it's -- that except where you are certain that you
2 have a single source on a blood sample, such as taking a
3 known blood sample from a suspect, there you know that
4 you've got a single source donor, correct?
5     A (Witness nods affirmatively.)
6     Q But that under other circumstances where
7 evidence is collected like at a crime scene, that you
8 cannot be certain that it's a single source donor; is that
9 correct?
10     A These are -- Yes, these are stains, stains
11 collected at a crime scene, as opposed to something that's
12 taken from an individual, for example, a blood sample, a
13 cell sample, a swab, something like that where you actually
14 know where it came from.
15     Q If a person who has some expertise in
16 serology, however, has collected the stains or examined the
17 stains in some fashion at the crime scene or immediately
18 afterwards, is there any way that, in addition to typing of
19 the blood, the general condition of the stain could
20 indicate whether it's a single source or possibly a
21 multiple source?
22     A Well, I'm not a crime scene investigator,
23 but as I understand it, there are ways to, in terms of

Page 48

1 looking at splatter patterns of blood, for example, if a
2 blood stain is found in and around a victim that's lying on
3 the floor or something like that, people who have spent a
4 lot of time investigating crime scenes would probably
5 testify to the fact that it would be inconsistent with all
6 their experience that this could have come from anything
7 but a single individual. But a stain -- But the whole
8 scene has to be looked at together from that point of view.
9 It literally requires a great deal of experience and
10 expertise. There are people who can do that. There are
11 people who know how to do that.
12     Q Now, where there is a mixture or a suspected
13 mixture of blood, such as at a crime scene, on clothing or
14 other exhibits from a crime scene, would it be normal,
15 where there is a mixture or a suspected mixture, to find a
16 different intensity in the banding? For example, if
17 there's an A, the victim is type A, the suspect is type B,
18 and where -- the area where you're testing shows both A and
19 B, would you then be able to conclude that there was a
20 mixture?
21     A In serological testing that's not of the
22 one -- it's my understanding it's not one of the criteria
23 by which the test is set up. Certainly I would be the last

239

Page 49

1  person to deny that an experienced serologist, if they had
2  had a lot of experience in dealing with mixtures, and they
3  have accumulated experience in that area, they could
4  probably testify to that, based on their experience, this
5  looked to them like a mixture. I would accept that.
6        But, you know, at least to my knowledge, the
7  procedures that describe, for example, how EAP or Esterase
8  D is done, mixtures would be very hard to pick out, would
9  be very hard to pick out. With Haptoglobin and Gc, those
10  are systems with which I'm very familiar. Minor types are
11  not often interpreted as a result of being a mixture,
12  because even in a single source sample, sometimes you will
13  pick up a minor type just because of the nature of these
14  systems.
15     Q  You also testified about the lack of
16  protocol at the laboratory -- lack of written protocol at
17  the West Virginia State Police Serology Laboratory in 1979.
18  But at that time, was it usual for a laboratory of that
19  type, in other words, a state run laboratory, forensic-type
20  laboratory, was it usual for that laboratory to have
21  written protocols?
22     A  I truly have no specific knowledge about
23  forensic testing because I really didn't start doing this

Page 50

1  until around 1989, 1990. And protocols were just something
2  that I always had, so it was a surprise to me to hear from
3  people in the field that this was not an uncommon practice
4  in certain laboratories. But I have no specific knowledge
5  about what was generally practiced in the field at that
6  time. I mean I do have documented the FBI had a written
7  protocol in 1974, and it's actually a very useful protocol
8  because it has a lot of the original development of these
9  systems, which from a scholarly point of view, is a very
10  useful piece of paper.
11     MS. KERSHNER:  I have nothing further.
12     MR. SIMMONS:  Okay. I don't have any
13  follow-up questions. The court reporter needs to hear you
14  waive your signature, if you so desire, or not waive.
15     THE WITNESS:  I waive my signature.
16     (WITNESS STANDS ASIDE.)
17     (WHEREUPON, the deposition was
18     concluded at 3:00 o'clock p.m.)

Page 51

REPORTER'S CERTIFICATE

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:

       I, Barbara Harris, Notary Public within and for
the State of West Virginia, duly commissioned and
qualified, do hereby certify that the foregoing deposition
of DAVID H. BING was duly taken by and before me, under the
West Virginia Rules of Civil Procedure, at the time and
place and for the purpose specified in the caption thereof;
the said witness having been duly sworn by me to testify
the whole truth and nothing but the truth concerning the
matter in controversy.

       I do certify that the said deposition was
correctly taken by me by means of the Stenomask; that the
same was transcribed under my supervision, and that the
said transcript is a true record of the testimony given by
said witness.

       I further certify that I am not connected by
blood or marriage with any of the parties to this action,
am not a relative or employee or attorney or counsel of any
of the parties, nor am I a relative or employee of such
attorney or counsel, or financially interested in the
action, or interested, directly or indirectly, in the
matter in controversy.

Page 52

       It is stipulated and agreed that the signature of

the witness is hereby expressly waived to the foregoing

deposition.

       Given under my hand this 16th day of June, 1995.

                    Barbara Harris, CCR
                    Notary Public

       My commission expires August 30, 2003.

240

DEPOSITION EXHIBIT
4

**AFFIDAVIT**

STATE OF MASSACHUSETTS

COUNTY OF SUFFOLK:

      I, David Bing, having been duly sworn, do hereby depose and say as follows:

### I.

### BACKGROUND

      1.  I am the Scientific Director of Laboratories of CBR Laboratories, a totally owned subsidiary of the Center for Blood Research, a not-for-profit research institute that is a Harvard Medical School affiliate and that is located in Boston, Massachusetts.  CBR Laboratories is a licensed clinical reference laboratory engaged in forensic testing, medical research, and diagnostic testing.

      2.  I have testified in several states, including West Virginia.  I have been qualified based on my education, training, and experience as an expert in molecular biology, forensic DNA testing, and immunology.

      3.  In West Virginia, I was qualified as an expert in molecular biology, forensic science, and genetics in the case styled *Glen Dale Woodall v. Carl Legursky*, Civil Action No. 89-C-1332, in the Circuit Court of Cabell County, West Virginia, and in the case styled *Paul William Ferrell v. William C. Duncil*, Civil Action No. 93-C-24, in the Circuit Court of Grant County, West Virginia.

4.   In the *Woodall* and *Ferrell* cases, I performed DNA testing, reviewed the protein and enzyme typing performed by other scientists, and either provided a written report or testified concerning my criticisms of the protein and enzyme typing performed and the conclusions reached by those other scientists.

5.   The West Virginia Supreme Court approved the CBR Laboratories as one of the laboratories that circuit courts may use in connection with the various habeas corpus actions arising from the investigation into the work performed by former West Virginia serologist Fred Zain.

6.   I have been involved in a number of cases in West Virginia reviewing the testing performed by Fred Zain.

7.   In *Moss v. Duncil*, Civil Action No. 94-MISC-663, I have reviewed the following materials:

(a)   A copy of the autopsy report on Vanessa Dale Reggettz, Paul Eric Reggettz, and Bernadette Reggettz, dated December 13, 1979, by Dr. Irvin M. Sopher.

(b)   The Petition for Writ of Habeas Corpus filed in this case.

(c)   A copy of Fred Zain's testimony from the first and second trials.

(d)   A copy of the laboratory notes and related documents generated from the testing performed in this case.

2

8.   I have reviewed all of the documentation provided by the State in connection with the testing performed.

9.   There were no photographs of the electrophoretic gels and I was unable to evaluate the findings made with regard to the various types found.

10.   Therefore, for purposes of my review, I have no objective basis for determining the accuracy of the typings found.

11.   I am aware of the special investigation conducted into the testing performed by former serologist Fred Zain during the time he was in West Virginia and have reviewed a number of his cases.

12.   Based upon my review of the laboratory notes and related documents provided in this case, there is minimal documentation of the testing performed and no protocol was provided, which is a standard procedure for forensic laboratories.

13.   None of the original notes of the work performed were made available to me.

14.   Based upon the lack of documentation in this case, it is difficult for me to interpret the data reported by Mr. Zain or Mr. Murphy.

15.   These additional deficiencies render the scientific data in this case meaningless.

16.   However, even assuming the accuracy of the typings in this case, the conclusions reached based upon those typings are flawed for several reasons.

3

17.  In this affidavit, I will attempt to set out some general principles which are applicable to this case.

18.  First, where blood samples are discovered at an alleged crime scene, it is important to identify the types of the known possible donors of that blood.

19.  Once the types of the known possible donors of that blood have been determined, those types can be compared with the types obtained from any blood samples found at the alleged crime scene where the source is unknown.

20.  The purpose of this comparison is to eliminate any blood types which may have been contributed by a known possible donor.

21.  For example, under the facts of this case, the known possible donors of blood in the Reggettz house would be, at a minimum, the persons who lived in that house, including Vanessa Dale Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III.

22.  Second, only those types identified from blood found at the alleged crime scene that are different from the types of the known possible donors provide information relevant to a determination as to the source of the blood evidence found at the crime scene.

23.  Where a type from a blood sample found at the alleged crime scene is different from the types obtained from the known possible donors and is consistent with the known types of any suspect leads to the inference that the suspect may have deposited that particular blood sample.

24.   Third, where a type from a known possible donor of the blood matched a type found from the blood discovered, it is not appropriate to include that type in calculating the frequency that the blood was deposited by a suspect.

25.   For example, on page 6 of Mr. Murphy's report, he generally notes that the known types of Mr. Moss were consistent with the blood obtained from some of the evidence and concludes: "The combination of blood groups O, PGM 1+1-, AK 1, EAP BA, EsD 2-1, ADA 1, GLO I 2, Hp2-1, and Gc 1 occurs in approximately 0.03% of the population."

26.   This conclusion implies that all of the blood typings obtained from the crime scene for these particular items were the same as all of the blood typings obtained from Mr. Moss.

27.   This conclusion is incorrect because there was no PGM subtyping 1- or Haptoglobin typing 2-1 obtained from each evidentiary sample tested.

28.   For example, as to the blood obtained from the flashlight, there is no PGM subtyping of 1- obtained nor is there a Haptoblogin typing obtained.

29.   Fourth, under generally accepted principles, it is only proper to combine the frequencies on types obtained from a blood sample where results, in the absence of any other data, are consistent with the blood sample coming from a single source.

30. One of the inherent deficiencies with basic serological testing is that such testing cannot distinguish whether the blood sample tested contains a mixture of blood from different sources or not.

31. Thus, where types from a blood sample are different from the types obtained from the blood of the known possible donors, the frequencies of those different types can be considered individually, but may not be combined for statistical purposes.

32. Fifth, each of the types found from each individual sample must be treated separately, rather than in conjunction with each other, because it is not possible scientifically to link together the types found from different blood samples.

33. I have neither seen nor reviewed testimony or independent evidence identifying the source of the blood found in the Reggettz house, but there are no data identifying the source of the blood other than the blood typing results.

34. In this case, various blood stains were found in the Reggettz house in various locations, but there are no data that might identify the source of the blood.

35. In lieu of being able to identify the source of the blood, there is no scientific basis to presume that all of the blood stains are related and came from the same person.

36. There is no evidence as to when the blood stains were deposited and what caused the blood to be deposited.

37. Serological typing is unable to determine when a particular blood sample was deposited at a crime scene.

6

38. Some of the blood stains found could very well have been deposited by many different people over a long period of time.

39. From the testing performed, the only blood types of significance from any of the samples are PGM, GC, and ESD because Mr. Moss's types at these genetic loci are different from the types of the known possible donors of blood in the Reggettz house.

40. The remaining types obtained are of no real significance due to similarities between those remaining types obtained from known possible donors and from the blood samples found in the Reggettz house.

41. With regard to the PGM, GC, and ESD types obtained from various blood samples, those particular types may be compared individually with the same types of a suspect, but the frequencies of those types may not be multiplied together for statistical purposes.

42. For example, it would be proper to compare the GC 1 type obtained from the blood found on the kitchen door curtain, which is labelled as item 7 in Mr. Murphy's report, to the GC 1 type obtained from John Moss's known blood sample.

43. However, it would not be proper to multiply all of frequencies of the types obtained from the blood found on the kitchen door curtain together for statistical purposes, again based upon the fact that using this testing technique, it is not possible to determine whether the remaining types, which are identical to the types from known possible donors, were deposited by one or more of them rather than from some other unknown single source.

44. Blood was found throughout the Reggettz house and there is no basis for assuming that all of the blood found came from a single source.

45. Only the known blood samples clearly are not mixtures of blood from more than one source.

46. Thus, based upon the principles set out above, the statistical conclusions presented to the jury in this case are overstated.

47. Without repeating each assertion and without adopting all of the particular language used, I generally concur with the criticisms of the scientific data in this case asserted in pages 28 through 36 of the habeas corpus petition, based upon the rationale set out therein and on the general principles stated in this affidavit.

Further this affiant saith naught.

_____
David Bing

Taken, subscribed, and sworn to before me this 26th day of May, 1995.

My commission expires _____ MY COMMISSION EXPIRES JUNE 6, 1997 _____.

_____
Notary Public

(SEAL)

8

# MOSS v. BALLARD
# CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 26

10/24/94

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA


IN RE:   Grand Jury Proceedings, September, 1982
         Term

         STATE OF WEST VIRGINIA

         VS.

         JOHN MOSS, JR., a/k/a
         JOHN MOSS, III


TRANSCRIPT OF PROCEEDINGS had and testimony adduced before the September, 1982, Grand Jury, convened at the Kanawha County Courthouse before the Honorable Robert Harvey, Judge, on the 17th day of September, 1982, commencing at 9:30 a.m.

PRESENT:   JAMES C. STUCKY, Assistant Prosecutor

           TROOPER TERRY WILLIAMS, Witness

           All Members of the Kanawha County
           Grand Jury

           V. Ann Woofter, Court Reporter

*Action Court Reporting*

V. Ann Woofter
879 Chappell Road
Charleston West Virginia 25304
304/925-5588

71-A

2

I N D E X

WITNESS:

TROOPER TERRY WILLIAMS          Page No. 4

Reporter's Certificate          Page No. 61

*turn tape off Pg 10*
*tape still the same Pg 42*
*he confessed on Way back 43*
*at Parkersburg*
*end of tape        Pg 32*
*part of old tape   Pg 33*

MR. STUCKY:  Mr. Foreman, I notice we've got 15 Grand Jurors present, is that correct?

FOREMAN:  Yes, sir.

MR. STUCKY:  Show we have enough to proceed with official Grand Jury business.

Ladies and gentlemen of the Grand Jury, the first case we'd like to present to you today is on page 130.  It's a new case, which papers were passed out this morning.  I think everybody should have a copy. You'll notice that it's entitled, or you'll notice it's an investigation of John Moss, Jr., also known as John Moss, III, states he was 17 at the time of the crime and he's now 20.  That means he was 17 years old and he is now 20 years old.  The victims of the crime, the alleged crime, are Paul Eric Reggettz, Bernadette Reggettz and Vanessa Dale Reggettz.  The alleged offense that is being presented to you is first degree murder.  That means you have three separate cases to be considered and at the end of that you can return one indictment, if you so feel that you should return an indictment, with one, two, or three counts in it.  So you wouldn't necessarily need to return three separate indictments, but could return one indictment with three separate

counts, two separate counts, one separate count, or not a true bill.

The witness that will be presented to you will be Trooper Terry Williams, West Virginia State Trooper from South Charleston, West Virginia.

TROOPER TERRY WILLIAMS, was thereupon called as a witness, and having been first duly sworn by the Clerk, testified as follows:

<u>EXAMINATION</u>

BY MR. STUCKY:

Q    Ladies and gentlemen of the Grand Jury this is Trooper Terry Williams.  Trooper, the Grand Jury is currently investigating John Moss, Jr., also known as John Moss, III, with regards to alleged first degree murders that occurred in December, 1979, the victims being, or the alleged victims being Paul Eric Reggettz, Bernadette Reggettz and Vanessa Dale Reggettz.  Were you the investigating officer with regards to that alleged offense or those alleged offenses?

A    Yes.

Q    How long have you been a state trooper?

A    Almost 11 years.

Q    And where are you stationed at the present

5

time?

    A    South Charleston.

    Q    And where were you stationed in December of 1979?

    A    South Charleston.

    Q    And more particularly, what date did you become involved in this particular investigation?

    A    December 13th, 1979.

    Q    And how did you become involved?  What triggered your involvement?

    A    I received a call on the radio that there was a possible signal 18 on Chesapeake Avenue near St. Albans, which a signal 18 is a murder.

    Q    What did you do when you received that call?

    A    I went to the scene.

    Q    And where was the scene, again?

    A    7027 Chesapeake Avenue.

    Q    And is that in Kanawha County, West Virginia?

    A    Yes, sir.

    Q    Where, more particularily, is that located?

    A    It's located right off Route 60, just east of St. Albans, the city limits of St. Albans.

    Q    And when you got to the scene what did you

find?

    A   I found three bodies.

    Q   Where were the three bodies found?

    A   The older female, Vanessa Reggettz, I found her lying in the floor between what we called the TV room and back bedroom, and I found Paul Eric Reggettz lying on the bed in the back bedroom, and I found Bernadette Reggettz laying on the bed in the front bed-room.

    Q   Were you able to ascertain any relationship between the three victims?

    A   Yes.

    Q   And what was that relationship?

    A   Vanessa Reggettz is the mother of Paul Eric and Bernadette.

    Q   And how old are Paul Eric and Bernadette?

    A   At that time Paul Eric was seven and Bernadette was four.

    Q   Were you able to ascertain whether all three of them were deceased at that time?

    A   Yes, they were.

    Q   Did there come a time when you came into contact with John Moss, Jr., also known as John Moss III,

with regards to this investigation?

    A   Yes.

    Q   And did there come a time when you obtained a statement from John Moss, Jr., also known as John Moss III, with regards to this alleged offense?

    A   Yes.

    Q   And when was that?

    A   October 28th, 1980.

    Q   And at that particular time did he, in fact, give to you a statement with regards to these offenses?

    A   Yes, he did.

    Q   Did you retain or copy down what he told you at that particular time?

    A   Yes, I did.

    Q   And how was that done?

    A   It was on a cassette tape and I taped it.

    Q   Now for the ladies and gentlemen of the Grand Jury, they've heard several different cases and probably are aware of some different investigative techniques, are there several different ways to copy down or take down a statement given by either a witness or an accused in an alleged offense?

    A   Yes.

Q   And what ways do you use, or what ways are used in investigating?

A   Well, normally, we will either write it down in our own handwriting or we will sit there and just take an oral statement.  He'll tell us about it and then later on we'll sit down and write down what he told us, and then we'll use a tape recorder and tape it.

Q   And in this one you used a tape recorder?

A   Yes.

Q   And when you use a tape recorder to take a statement, what do you do, how do you do that?

A   Well, before we take the statement, or in this case, confession from him, the first thing we do is advise him of his constitutional rights.

Q   And did you do that in this case?

A   Yes.

Q   And what proof do you have that you did that?

A   I have a DPS form, A-79, it's a rights form, which we read him his rights and he signed it.

Q   I believe that's a typewritten form that you have, and the first part of it has your rights or some-thing, and it's got your constitutional rights, and then you read that to the person you're taking the statement

9

from, is that right?

    A    That's right.

    Q    And then they sign that piece of paper?

    A    Right.

    Q    And then the second part is a waiver of rights form.  What does that say?  Basically, what does that say?

    A    Basically he waives his right to an attorney. He's willing to give us a statement or talk to us at that time.

    Q    And if he's willing to give you a statement what does he do at that point?

    A    He gives us a statement and he signs it after that.

    Q    And it's witnessed by other people to prevent you from signing his name or saying that he signed it, is that right?

    A    Right.

    Q    And he did that on what, October 28th did you say?

    A    Yes.

    Q    Where was that done?

    A    At the state police office in Parkersburg.

ACR

Q   And did you take that statement yourself?

A   Myself, I took the biggest part of it, and also Sergeant Presson.

Q   Now who's Sergeant Presson?

A   He was the District Sergeant at Parkersburg at that time.

Q   And he didn't ask him many questions with regards to the events, did he, or what did he do?

A   He more or less just asked him if he had been advised of his rights and so on.

Q   When you're actually taking a statement what do you do with the tape recorder and that sort of thing?

A   Well, you put the tape in there and just start it, start running it.

Q   Do you ever turn it off while you're asking questions or getting answers or anything?

A   I believe I turned it off two or three times.

Q   Was that in the middle of a question or answer, or when was that?

A   No, it was at the end of an answer and the reason I done that is I was in the room by myself asking him questions and he was pretty well near the end of the confession, and myself and Trooper Smith were the

A.C.R.

investigators in this case and he was outside the room, and I turned it off and got up and went outside the room to ask Trooper Smith if he could think of anything else that needed to be asked of John.

Q    So when the tape recorder was turned off is it fair to say nothing was going on inside the room?

A    That's a true statement.

Q    So it's your testimony before the Grand Jury that at any time during the statement when anyone was talking, either yourself, Sergeant Presson or John Moss, it's recorded on that tape you had that evening?

A    Yes.

Q    And you have the tape you recorded on the evening of October 28th, 1980?

A    Yes, I do.

Q    And where has that tape been from 1980, until the present time?

A    It's been in my possession, or I have a locker at my office in South Charleston and I have a lock on it and I have the only key to it.

Q    Do you have that here with you today?

A    Yes.

Q    And do you have a tape recorder with you?

A.C.R.

A    Yes.

Q    Would you set up here and we'll play the tapes so the ladies and gentlemen of the Grand Jury can hear that.

(WHEREUPON, an off record discussion was had between the Court Reporter and the Assistant Prosecutor.)

MR. STUCKY:  Ladies and gentlemen of the Grand Jury, the Court Reporter has indicated that for her convenience in checking words that perhaps are unclear on the tape we're about to play, it would perhaps be better for her to have a backup tape recorder to double record this statement that's being played so that she's sure of the accuracy of what she's taking down.  At this point I think it would be appropriate to excuse Trooper Williams until the Court Reporter comes back, perhaps five minutes.

(WHEREUPON a recess was taken.)

MR. STUCKY:  Ladies and gentlemen, we're ready to resume and at this time I'll ask the trooper to return.

BY MR. STUCKY:

Q    Trooper, I believe we were ready to play the tape recording of the statement you took from John Moss, is that

*A.C.R.*

correct?

     A   Yes.

     Q   Would you place that in your tape recorder, and I would ask you that once the first voice appears on the tape to stop it so we can identify who's doing the talking at that time.

     VOICE:   "October 28th."

BY MR. STUCKY:

     Q   Who's that voice?

     A   That's Sergeant Presson.

     Q   And he was, at that time, a Sergeant with the State Police located in Parkersburg, West Virginia, is that correct?

     A   That's correct.

     Q   And what's he doing now?

     A   He's retired.

     Q   All right.   Would you play until you hear the next voice.

     SERGEANT PRESSON:   "At this time, I'm speaking to John Moss at the Parkersburg Detachment office.  John, I'm going to ask you a few questions, but first I want to advise you of your rights.  Have you been advised of your rights prior to your questioning by the State Police Officer?

*A.C.R.*

JOHN MOSS: "Yeah."

BY MR. STUCKY:

Q    I believe we heard a voice come on that said, "Yeah."  Whose voice was that?

A    That was John Moss.

Q    For the next few minutes is the conversation that's going to be on the tape between Sergeant Presson and John Moss?

A    Yes.

Q    All right.  Would you play that until you hear a third voice.

SERGEANT PRESSON:  "Where did this occur at?"

JOHN MOSS:  "Parkersburg."

SERGEANT PRESSON:  "And in whose presence?"

JOHN MOSS:  "Yours, Presson."

SERGEANT PRESSON: "All right.  Sergeant Presson and Trooper Terry who?"

JOHN MOSS:  "Williams."

SERGEANT PRESSON: "All right."

JOHN MOSS: "And Smith."

SERGEANT PRESSON: "Now, on the afternoon of October 28th, were you picked up by these officers at the Mansfield Reformatory in Ohio?"

JOHN MOSS:  "Yes."

A.C.R.

SERGEANT PRESSON: "And after you were picked up there at the reformatory, were you relayed back into West Virginia?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "Did you make any stops on the way back out of Ohio into West Virginia?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "For what reason?"

JOHN MOSS: "To use the bathroom, and gas."

SERGEANT PRESSON:  "And you were later brought into the Parkersburg Detachment Office?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And who was in your presence at that time?"

JOHN MOSS:  "Officer Terry Williams and Officer Mike Smith."

SERGEANT PRESSON:  "And while at the Parkersburg office, were you served your dinner at the detachment office?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And what did you have for dinner, John?"

JOHN MOSS: "I had a ham sandwich."

SERGEANT PRESSON:  "A ham sandwich?"

A.C.R.

16

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And Pepsi-Cola?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And did these officers, at that time, have a sandwich with you?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And while you've been in the custody of these two officers, have you been threatened or made any promises or mistreated in any manner?

JOHN MOSS:  "No."

SERGEANT PRESSON:  "All right.  And while at the Parkersburg Detachment Office, at approximately 9 o'clock, did you talk to myself in regard to an incident in Kanawha County?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And this was in the presence of Trooper Terry Williams?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And prior to discussing the incident in Kanawha County, were you advised of your Constitutional Rights by myself and Trooper Williams?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And this took place in the Parkersburg Detachment Office?"

*ACR.*

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "Were these rights -- were you given a chance to read these rights before you signed it?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And that was along with myself, and initialed later on after you signed the waiver of rights?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "All right.  And after you signed the waiver of rights, were you then questioned in regard to a incident in Kanawha County?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And who was present at that time?"

JOHN MOSS:  "Terry Williams and Mike Smith."

SERGEANT PRESSON:  "And myself."

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "Sergeant Presson?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  At the Parkersburg Detachment?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "And at this time, which was approximately 9:30, did you relate to Trooper Williams

*ACR.*

18

the incident that occurred in Kanawha County in
December of 1979?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "Did you go into detail as
to what happened there at the house?"

JOHN MOSS:  "Yes."

SERGEANT PRESSON:  "Terry, you go ahead and ask
John what you need to ask him there in regard to this
triple murder in Kanawha County."

TROOPER WILLIAMS:  "Okay, John..."

BY MR. STUCKY:

Q    Okay, the new voice on the tape, who is that?

A    That's mine.

Q    For the rest of the tape relating solely to
the statement given by John Moss, will the only voices
we hear be yours and John's?

A    That's correct.

Q    Where did Sergeant Presson go during this
period of time, this period of time coming up?

A    He left the room immediately after he stopped
talking.

Q    During the rest of the tape who is present in
the room, during the rest of this statement?

*A.C.R.*

19

A    Just myself and John Moss.

Q    Would you continue playing the tape.

(WHEREUPON, the Trooper complied.)

TROOPER WILLIAMS:  "What exactly did you do first off that night?"

JOHN MOSS:  "I was at home listening to the radio."

TROOPER WILLIAMS:  "And then what did you do?"

JOHN MOSS:  "Went off down the tracks, down the railroad tracks, and went in Paul's house."

TROOPER WILLIAMS:  "Do you know what Paul's last name is?"

JOHN MOSS:  "No."

TROOPER WILLIAMS: "Is it Reggettz?"

JOHN MOSS:  "I can't remember."

TROOPER WILLIAMS:  "How did you get in the house?"

JOHN MOSS: "I pushed open the door."

TROOPER WILLIAMS:  "What door?  The front door or the back door?"

JOHN MOSS:  "The back door."

TROOPER WILLIAMS:  "And then what happened?"

JOHN MOSS:  "I went in looking around and the

*A.C.R.*

lady woke up."

TROOPER WILLIAMS: "What did you go in there for?"

JOHN MOSS: "Money."

TROOPER WILLIAMS: "Then what happened after the lady woke up?"

JOHN MOSS: "She had a gun and we struggled with it. The gun went off and I took it from her and hit her with it."

TROOPER WILLIAMS: "What room of the house was she in when you were struggling for the gun?"

JOHN MOSS: "The bedroom."

TROOPER WILLIAMS: "Which bedroom, the front bedroom or the bedroom next to the bathroom?"

JOHN MOSS: "The bedroom next to the bathroom."

TROOPER WILLIAMS: "Were the children in bed with her?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "When you were struggling for the gun, you said the gun went off?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "And you took the gun away from her?"

*A.C.R.*

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "And you hit her with the gun?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "How many times did you hit her?"

JOHN MOSS: "About two times."

TROOPER WILLIAMS: "Were you still in that second bedroom or were you in the front bedroom?"

JOHN MOSS: "In the second bedroom."

TROOPER WILLIAMS: "Did you ever go in the front bedroom?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Did you struggle in there with her?"

JOHN MOSS: "No."

TROOPER WILLIAMS: "Did you ever knock her down in that bedroom?"

JOHN MOSS: "The front bedroom?"

TROOPER WILLIAMS: "Yes."

JOHN MOSS: "No."

TROOPER WILLIAMS: "After you hit her and knocked her down, then what did you do?"

JOHN MOSS: "I went running out the house."

TROOPER WILLIAMS: "Which door did you go out?"

JOHN MOSS: "The back door."

TROOPER WILLIAMS: "And after you ran out the back door what did you do?"

JOHN MOSS: "I looked back and I seen her trying to put something against the door."

TROOPER WILLIAMS: "The back door, is that the door at the kitchen?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Were the lights on in the kitchen?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "And you could see her putting something up against the back door?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Do you know what that was?"

JOHN MOSS: "A chair I think."

TROOPER WILLIAMS: "What did you do then?"

JOHN MOSS: "I ran back and knocked the door back open and she grabbed a knife off the sink."

TROOPER WILLIAMS: "Do you know what kind of knife it was?"

*A.C.R.*

JOHN MOSS: "Kitchen knife, steak knife or something."

TROOPER WILLIAMS: "What did she do with that knife?"

JOHN MOSS: "She was swinging it at me. She hit my hand and cut my finger.  I took it from her and I pushed her back in the bedroom and knocked her down and threw the knife down."

TROOPER WILLIAMS: "Do you know what happened after that?  What did you do after that, after you knocked down?  Was she still trying to get up anymore after that?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "What happened?"

JOHN MOSS: "I was hitting her and I tried to choke her."

TROOPER WILLIAMS: "What did you choke her with?"

JOHN MOSS: "First I had my hands, then I had a cord."

TROOPER WILLIAMS: "What were the children doing at this time?"

JOHN MOSS: "Beating on me in the back."

TROOPER WILLIAMS: "Were they hollering or

*A.C.R.*

screaming or anything?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "What were they saying?"

JOHN MOSS:"'Leave my mommy alone,'and I knocked them down."

TROOPER WILLIAMS: "Did you knock both of them down?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "What did you do then?"

JOHN MOSS: "I tied her up."

TROOPER WILLIAMS: "You tied the woman up?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "How did you tie her up?"

JOHN MOSS: "Back through the door."

TROOPER WILLIAMS: "Could you explain that to me? Through what door?"

JOHN MOSS: "There was a door in the bedroom, one of the doors in the bedroom."

TROOPER WILLIAMS: "How did you tie her up?"

JOHN MOSS: "Around the neck."

TROOPER WILLIAMS: "And then what did you do? Was it with a cord did you say?"

JOHN MOSS: "Yes."

ACR.

TROOPER WILLIAMS: "What did you do with the cord after you tied it around her neck?"

JOHN MOSS: "I took the boy."

TROOPER WILLIAMS: "What did you do with the boy?"

JOHN MOSS: "I took him in the bathroom and put him in the tub."

TROOPER WILLIAMS: "Did you do anything to him before you put him in the tub? "

JOHN MOSS: "I tried to strangle him. "

TROOPER WILLIAMS: "How did you try to strangle him?"

JOHN MOSS: "My hands, and then I had a cord around his neck."

TROOPER WILLIAMS: "Do you remember where you got that cord from? "

JOHN MOSS: "No, just off the floor."

TROOPER WILLIAMS: "You say you strangled the boy with the cord? "

JOHN MOSS: "Yeah. "

TROOPER WILLIAMS: "Did you do anything else to him before you put him in the bath tub? "

JOHN MOSS: "I don't think so. "

*A.C.R.*

TROOPER WILLIAMS: "Did you tie him up?"

JOHN MOSS: "Yeah, I think so."

TROOPER WILLIAMS: "How did you tie him up, did you tie his hands together or what?"

JOHN MOSS: "Yeah."

TROOPER WILLIAMS: "How did you do that?"

JOHN MOSS: "I just tied him up."

TROOPER WILLIAMS: "And then what did you do after you tied him up?"

JOHN MOSS: "I put him in the tub."

TROOPER WILLIAMS: "How did you put him in the tub?"

JOHN MOSS: "I don't know, I just put him in the tub."

TROOPER WILLIAMS: "You're talking about the bath tub in the bathroom?"

JOHN MOSS: "Yeah."

TROOPER WILLIAMS: "Was there any water in the bath tub?"

JOHN MOSS: "Yeah."

TROOPER WILLIAMS: "How much water was in it?"

JOHN MOSS: "Probably half a foot."

TROOPER WILLIAMS: "How did you place him in

*A.C.R.*

the bath tub?"

JOHN MOSS: "I don't know."

TROOPER WILLIAMS: "Did you place him in face down or face up?"

JOHN MOSS: "I don't know, I just put him in there."

TROOPER WILLIAMS: "What did you do after that?"

JOHN MOSS: "I went and got the little girl."

TROOPER WILLIAMS: "What did you do with her?"

JOHN MOSS: "I started choking her."

TROOPER WILLIAMS: "Where were you at when you started choking her?"

JOHN MOSS: "In the living room.  I took her out of the room where her mom was."

TROOPER WILLIAMS: "What did you choke her with?"

JOHN MOSS: "A cord."

TROOPER WILLIAMS: "Do you know where that cord come from?"

JOHN MOSS: "It was just on the floor somewhere."

TROOPER WILLIAMS: "What did you do after you choked her?"

JOHN MOSS: " Put her on the door."

TROOPER WILLIAMS: " How did you put her on the door, could you explain that?"

JOHN MOSS: "She was just hanging there on the door."

TROOPER WILLIAMS: "How did you hang her across the door?"

JOHN MOSS: "Put the cord on the door and closed the door."

TROOPER WILLIAMS: "Which door are you speaking of?"

JOHN MOSS: "One of the doors in the front, in the front next to the Christmas tree."

TROOPER WILLIAMS: "Is that the door between the living room and the bedroom?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Which way was she facing on the door?"

JOHN MOSS: "The Christmas tree."

TROOPER WILLIAMS: "Towards the Christmas tree?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Going back to the woman, after you tied her up and put the cord around her neck, was

*A.C.R.*

she laying down or what? "

        JOHN MOSS: "Yeah, she was laying down."

        TROOPER WILLIAMS: "Did you do anything else
to her?"

        JOHN MOSS: "I stabbed her with a knife or
something."

        TROOPER WILLIAMS: "Do you remember what you
stabbed her with?"

        JOHN MOSS: "No, I don't know,  I stabbed
her."

        TROOPER WILLIAMS: "Where did you stab her
at?"

        JOHN MOSS: "In the chest."

        TROOPER WILLIAMS: "What did you do after you
done that?"

        JOHN MOSS: "I went back in looking around to
see if I could find any money."

        TROOPER WILLIAMS: "Did you find any money?

        JOHN MOSS:  Yeah."

        TROOPER WILLIAMS: "Do you know how much
money you found, approximately?"

        JOHN MOSS: "No, a few dollars."

        TROOPER WILLIAMS: "What did you do after you

*A.C.R.*

found the money?"

JOHN MOSS: "I was under the Christmas tree."

TROOPER WILLIAMS: "What did you do under the Christmas tree?"

JOHN MOSS: "I was opening up presents."

TROOPER WILLIAMS: "How many of the presents did you open up?"

JOHN MOSS: "I don't know."

TROOPER WILLIAMS: "Did you take any of those presents?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "How many did you take?"

JOHN MOSS: "One."

TROOPER WILLIAMS: "Do you remember what it was?"

JOHN MOSS: "Some dishes."

TROOPER WILLIAMS: "Did you take anything else out of the house?"

JOHN MOSS: "A gun."

TROOPER WILLIAMS: "What kind of gun was it?"

JOHN MOSS: "A rifle."

TROOPER WILLIAMS: "What kind?"

JOHN MOSS:   A .22.

TROOPER WILLIAMS: "Did it have a scope on it?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Do you remember what kind of rifle it was, whether it was an automatic bolt action, semi-automatic?"

JOHN MOSS: "Bolt action."

TROOPER WILLIAMS: "Did you take anything else?"

JOHN MOSS: "I took the gun."

TROOPER WILLIAMS: "What kind of gun are you speaking of?"

JOHN MOSS: "The little gun she had."

TROOPER WILLIAMS: "A pistol?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "What kind was that?"

JOHN MOSS: "I think it was a .22."

TROOPER WILLIAMS: "What color was it?"

JOHN MOSS: "Silver."

TROOPER WILLIAMS: "What did you do with the pistol?"

JOHN MOSS: "I put it in a bag and took it to school and dumped it into a big green garbage can."

TROOPER WILLIAMS: "At the school?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Which school are you speaking of?"

JOHN MOSS: "High school."

TROOPER WILLIAMS:  "St. Albans High School?"

JOHN MOSS:  "Yes."

TROOPER WILLIAMS:  "What did you do with the rifle?"

JOHN MOSS: "I took it home."

TROOPER WILLIAMS: "What home are you speaking of?'

JOHN MOSS:  "Cleveland."

TROOPER WILLIAMS: "Is that your parents' home?"

JOHN MOSS:  "Yes."

TROOPER WILLIAMS:  "What's that address?"

JOHN MOSS:  "725 (unintelligible)."

TROOPER WILLIAMS:  "Could you speak up a little bit, I couldn't hear you."

BY MR. STUCKY:

Q、 Trooper Williams, is that the end of the first side of the tape?

A    Yes.

Q    Would you now turn it over to the second side, start it at the beginning, and once we hear

*A.C.R.*

33

something, would you stop it then.

VOICE:  "The following call was received October 28th."

BY MR. STUCKY:

Q    What idd we just hear there?

A    That was a conversation that was already on the tape when we started taking the confession of John Moss.  It has something to do with stolen equipment.  It was a telephone conversation between -- I don't even know who was talking.

Q    It has nothing to do with the John Moss investigation, does it?

A    No, it doesn't.

Q    It has nothing to do with the investigation of the alleged murders of Paul Eric Reggettz, Bernadette Reggettz and Vanessa Dale Reggettz, does it?

A    No.

Q    It's apparently, to the best of your knowledge, something to do with the business of the Parkersburg State Police Detachment, is that correct?

A    Yes.

Q    Is that a continuous segment of the tape? There is nothing intertwined with it before you get to

*A.C.R.*

the Moss statement, is there?

    A   No.

    Q   Will you speed the tape up, forward I guess, until the very beginning of the continuation of the Moss Statement.

    A   Okay.  That's the end of that conversation.

    Q   Does everything else on the remainder of the tape pertain to the Moss confession or statement?

    A   Yes.

    Q   Would you continue the playing of that, please.

    TROOPER WILLIAMS:  "This is a continuation of the statement being given by John Moss, being taken by Trooper Terry Williams at the Parkersburg Detachment of the West Virginia State Police.

    "Okay, John, speaking about the items you took out of the house down at St. Albans, specifically talking about the Christmas presents you took, what did you do with that Christmas present?"

    JOHN MOSS:  "Give it to a friend's mother."

    TROOPER WILLIAMS:  "What's that friend's mother's name?  Do you know?"

    JOHN MOSS: "Mrs. Johnson."

    TROOPER WILLIAMS: "What's your **frien**d's name?"

JOHN MOSS:  "Jim."

TROOPER WILLIAMS:  "Do you know where they live?"

JOHN MOSS:  "Yes."

TROOPER WILLIAMS:  "Where do they live?"

JOHN MOSS:  "Town & Country Motel."

TROOPER WILLIAMS:  "Where's that?"

JOHN MOSS:  "Route 60."

TROOPER WILLIAMS:  "Is that in St. Albans?"

JOHN MOSS:  "Yes."

TROOPER WILLIAMS:  "John, going back to when you first went down to the house, you walked down the railroad tracks and went in the back door?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS:  "Was Paul home when you went in the house?"

JOHN MOSS:  "No."

TROOPER WILLIAMS:  "Did you see him anywhere in the house?"

JOHN MOSS: "No."

TROOPER WILLIAMS: "Did you see him outside anywhere?"

JOHN MOSS: "No."

TROOPER WILLIAMS: "Did you see anything outside?"

JOHN MOSS: "No."

TROOPER WILLIAMS: "Did you see Paul's car?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Where was it at?"

JOHN MOSS: "I think it was parked down in front of Mr. Foreston's house."

TROOPER WILLIAMS: "Where does Mr. Foreston live?"

JOHN MOSS: "Next door to Paul."

TROOPER WILLIAMS: "What kind of car does Paul have?"

JOHN MOSS: "A Honda."

TROOPER WILLIAMS: "What color is it?"

JOHN MOSS: "Blue."

TROOPER WILLIAMS: "But you didn't see Paul anywhere in the house?"

JOHN MOSS: "No."

TROOPER WILLIAMS: "Okay, you stated before that

A.C.R.

you took an .22 rifle, a .22 pistol and a Christmas present from under the Christmas tree?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Did you take anything else out of the house?"

JOHN MOSS: "No.  A camera."

TROOPER WILLIAMS: "What kind of a camera was it,do you know?"

JOHN MOSS: "I think it was a Kodak."

TROOPER WILLIAMS: "Was it the kind of camera that developed its own pictures?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Where is that camera at now?"

JOHN MOSS: "At my house in Cleveland."

TROOPER WILLIAMS: "Are you speaking of your parents house?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "At the address you gave me before?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Do you remember something lying in the floor in the kitchen?"

A.C.R.

Case 2:09-cv-01406 Document 17-20 Filed 10/29/10 Page 86 of 116 PageID #: 3320

JOHN MOSS: "No."

TROOPER WILLIAMS: "Or something up on the doorway, hanging on the doorway in the kitchen?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "What color was it?"

JOHN MOSS: "White."

TROOPER WILLIAMS: "Do you remember what happened to it?"

JOHN MOSS: "No."

TROOPER WILLIAMS: "Was it tore down?"

JOHN MOSS: "I just noticed it on the floor."

TROOPER WILLIAMS: "Where at, what floor was it, what room?"

JOHN MOSS: "The kitchen."

TROOPER WILLIAMS: "In the kitchen. After you searched through the house, you say you were looking for money?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "And you took those four items you previously described?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Then what did you do?"

JOHN MOSS: "Ran out of the house."

A.C.R.

TROOPER WILLIAMS: "How did you leave the house?"

JOHN MOSS: "Just ran out the door."

TROOPER WILLIAMS: "The back door?"

JOHN MOSS: "Yes."

TROOPER WILLIAMS: "Then where did you go?"

JOHN MOSS: "Home."

TROOPER WILLIAMS: "What home are you speaking of?"

JOHN MOSS: "To my grandfather's house."

TROOPER WILLIAMS: "Where does he live in relation to this house, Paul's house?"

JOHN MOSS: "What?"

TROOPER WILLIAMS: "Where does he live?"

JOHN MOSS: "West Virginia, St. Albans."

TROOPER WILLIAMS: "How close does he live to this house you ran out of?"

JOHN MOSS: "Right down the railroad tracks."

TROOPER WILLIAMS: "How far is that, approximately?"

JOHN MOSS: "Two hundred, maybe a hundred yards."

TROOPER WILLIAMS: "What did you do after you went back home?"

A.C.R.

JOHN MOSS:  I went to bed.

TROOPER WILLIAMS:  What did you do with the items you took out of the house?

JOHN MOSS:  Hid them on the other side of the bed.

TROOPER WILLIAMS:  Did you take the rifle apart?

JOHN MOSS:  Yes.

TROOPER WILLIAMS:  How did you take it apart?

JOHN MOSS:  Unscrewed the barrel from the handle.

TROOPER WILLIAMS:  What did you do the next day?

JOHN MOSS:  Went to school.

TROOPER WILLIAMS:  Did you take anything with you?

JOHN MOSS:  Yeah.

TROOPER WILLIAMS:  What did you take to school with you?

JOHN MOSS:  The .22.

TROOPER WILLIAMS:  Pistol?

JOHN MOSS:  Yeah.

TROOPER WILLIAMS:  What did you do with that

pistol?"

      JOHN MOSS:  "I threw it in the garbage at the high school."

      TROOPER WILLIAMS:  "Why did you throw the pistol away?"

      JOHN MOSS:  "It wasn't no good; it was broke up."

      TROOPER WILLIAMS:  "How did it get broke?"

      JOHN MOSS:  "I hit the lady with it."

      TROOPER WILLIAMS:  "You're saying it broke when you hit the lady with it?"

      JOHN MOSS:  "Yes."

      TROOPER WILLIAMS:  "How many times did you hit the lady?"

      JOHN MOSS:  "About three times."

      TROOPER WILLIAMS:  "Where did you hit her at?"

      JOHN MOSS:  "In the head."

      TROOPER WILLIAMS:  "What did you do with the rifle and the camera?"

      JOHN MOSS: "I took it back home."

      TROOPER WILLIAMS:  "To Cleveland?"

      JOHN MOSS:  "Yes."

TROOPER WILLIAMS:  "And that rifle and camera are at your mother and father's house in Cleveland?"

JOHN MOSS:  "Yes."

TROOPER WILLIAMS:  "Okay, John, is everything you told me tonight the truth to the best of your knowledge?"

JOHN MOSS: "Yes."

BY MR. STUCKY:

Q    Trooper, is that the conclusiong of the statement taken from John Moss with regards to the alleged murders of Paul Eric Reggettz, Bernadette Reggettz and Vanessa Dale Reggettz?

A    Yes.

Q    And you've just listened to the tape along with the Grand Jurors, is that correct?

A    Yes.

Q    Is the tape exactly the same as it was the night you took it, nothing has been added to it or nothing has been erased from it?

A    That's correct.

MR. STUCKY:  Are there any questions by any of the Grand Jurors of Trooper Williams?

GRAND JUROR:  You say he was in an Ohio

reformatory and was taken to Parkersburg?

     THE WITNESS:  Yes.

     GRAND JUROR:  Why was he in trouble over there?

     MR. STUCKY:  Again, just for the record, this question, like some of the others that have been asked of other witnesses, was not elicited by the State of West Virginia or the attorney or the witness that's been presented.  It is the State's position that this is the Court's Grand Jury and doesn't have the right to interfere with any questions asked by the Grand Jurors.  Trooper, you heard the question, and I'd ask you to answer that.

     GRAND JUROR:  Well, what I was really interested in is that did -- did he tell you he wanted to make a confession in West Virginia or how did you apprehend him and what was the circumstances?

     THE WITNESS:  We, myself and Trooper Smith, had been investigating this since it happened, and we were bringing him back, he was in the Mansfield Reformatory in Mansfield, Ohio, and we were bringing him back on a detainer on another charge, and we had stopped at the Parkersburg Detachment on the way back to eat and get some gasoline, and he confessed to this crime.

*A.C.R.*

GRAND JUROR:  Did he ask you about this crime or did he just come out and tell you?

THE WITNESS:  We asked him about it.

GRAND JUROR:  Up until this time had he been a suspect or were there other --

THE WITNESS:  He was a suspect at this time.

GRAND JUROR:  There were other suspects in addition to Mr. Moss?

THE WITNESS:  Well, the husband of Vanessa Reggettz had been arrested for this crime.

GRAND JUROR:  Does that have a bearing on what we're hearing here?  Do we need to know the circumstances of that or --

MR. STUCKY:  Maybe I can clear it up with a couple of questions.

BY MR. STUCKY:

Q   Trooper Williams, in your investigation you received a confession from Paul Reggettz, the husband of Vanessa Dale Reggettz, is that correct?

A   Yes.

Q   And that was a confession shortly after the discovery of this crime?

A   Yes.

A.C.R.

Q   And, in fact, Paul Reggettz was at a future date indicted by a Grand Jury in Kanawha County, is that correct?

A   Yes.

Q   And to your knowledge, do you know whatever happened to that indictment?

A   Yes.

Q   What happened to that indictment?

A   It was dismissed.

Q   If you know, was the reason it was dismissed the results of further investigations by your department?

A   Yes.

GRAND JUROR:  The confession of Mr. Moss, was that in agreement with the scene as you observed it and would he have had any reason to have known --

THE WITNESS:  There were certain things Mr. Moss told us that no one else knew about or could have known about.  Some of this stuff, in fact, a lot of it was in the newspaper, but there were certain things that were not in the newspaper that he was able to tell us about, and that gave us good reason to believe that he committed the crime, because I mean there were certain things he could tell us that no one else knew about

except the police.

GRAND JUROR:  You don't suspect he was involved
with this Mr. Moss?

THE WITNESS:  Who are you talking about?

GRAND JUROR:  Mr. Reggettz.

THE WITNESS:  No.

GRAND JUROR:  Were they good friends, Moss and
Reggettz?  Did they know each other?

THE WITNESS:  We asked John Moss if he knew
Paul Reggettz.  He said he knew of him because Mr.
Reggettz and his family used to live at some
motel down on Route 60, but he said they were not
friends and throughout investigation we were never able
to link them together in any way.

GRAND JUROR:  He kept saying something about going
to Paul's house.  I just wondered.

GRAND JUROR:  Well, he seemed to know the
neighborhood real well because he knew who the people's
names were that Paul's car was sitting in front of.

THE WITNESS:  Well, he lived with his grand-
father and his grandfather lived within a hundred yards
of where Paul's house was at.  He went around -- Paul
rented off of Mr. Foreston who lived within ten feet

A.C.R.

of Paul, and John was friends with Mr. Foreston's son, so he would be familiar with the area.

GRAND JUROR:  When you were taking his state-ment I believe you said the sergeant left the room. Was there any particular reason for that?  Was that just to make him feel at ease?

THE WITNESS:  There was no particular reason, he just got up and left.

GRAND JUROR:  I understood him to say he left the little girl hanging on the door?

THE WITNESS:  Yes.

GRAND JUROR:  When you first said -- When you first made the statement that the little girl was found in the back bedroom you said she was hanging there, she was hanging on the door in the back bedroom?

THE WITNESS:  Yes.  Well, when I got to the scene she was lying on the bed.

GRAND JUROR:  That's a conflict because the last thing you said was he had her hanging on the door.

THE WITNESS:  Paul told us he took her down when he came home from work.

GRAND JUROR:  You have no suspicions

*A.C.R.*

whatsoever that Paul was involved in it?

THE WITNESS:  No.

GRAND JUROR:  Wonder why he confessed to it?

THE WITNESS:  Well, I can't answer that.

GRAND JUROR:  Well, I just wondered.

THE WITNESS:  I have no idea.

GRAND JUROR:  This is a statement of 10-28-80.
Where has he been during this time?

THE WITNESS:  Up until now?

GRAND JUROR:  Yes, John Moss?

MR. STUCKY:  After that date?

GRAND JUROR:  Isn't this 10-28-80?  Where's
he been since then?

THE WITNESS:  Till the present?

GRAND JUROR:  Yes.

THE WITNESS:  Well, the next day on 10-29 of
'80, of course, myself and Trooper Smith were in
Cleveland, Ohio.  We had John Moss relayed on down here
to the Kanawha County Jail where we were enroute to
in the beginning, but when he gave us the confession
and told us where the guns were at, we went to
Cleveland in an attempt to recover the gun, the rifle
and camera.  We had already recovered what he said was the

dishes. And we had John already relayed down here
and he was taken next to Mansfield the next day and
then another detainer was obtained after we come back
and signed petitions on him for three counts of murder.
Another detainer was obtained and myself and Trooper
Smith went back, and I'm not sure of the exact date,
I think it was in December of '80, and brought him back
down here to Kanawha County Jail and he's been in the
Kanawha County Jail ever since and he's over there
today.

GRAND JUROR: Why was he in the reformatory
in Ohio? I'll ask the question what charge?

THE WITNESS: He was up there -- He shot a
woman and **raped her up there**.

GRAND JUROR: Did you all get the rifle and
camera when you went up there, you did find it?

THE WITNESS: We got the camera. The rifle,
we didn't get the rifle. He told us his brother
possibly had the rifle because his brother knew where
he put it. We talked to his brother, Carlton Moss.
He told us that he cut it in two and threw it away,
and we never did recover the rifle.

GRAND JUROR: Were any of the victims sexually

molested?

      THE WITNESS:   No.

      GRAND JUROR:   The reason you were bring Mr.
Moss back was on another charge?

      THE WITNESS:   Yes.

      GRAND JUROR:   What happened to the other
charge?   You said he was released back to Cleveland.

      THE WITNESS:   As far as I know nothing ever
happened to the other charge.

      MR. STUCKY:   That's a very complex legal
question and Trooper Williams doesn't have the expertise
to answer that question and I don't think -- I probably
shouldn't.   If you want to know about that, Judge
Harvey could explain to you some of the rules and
regulations on the detainers which would probably
answer that question.

      Any other questions?

      GRAND JUROR:   He was 17 at the time of the
crime, he's 20 now?

      THE WITNESS:   Yes.

      GRAND JUROR:   And the statement was made in
1980.   I suppose the question I want to know is why it
takes so long to get here?

MR. STUCKY:  Again, I guess Trooper Williams could answer what he knows of the proceedings that have taken place.  Again, that's a legal question.  Trooper Williams has been involved in a lot of hearings and maybe you can set forth the hearings that you've been into and why it has taken so long, to your knowledge.

THE WITNESS:  We've had -- You know this case has strung out a long time I'll admit.  We've been to several hearings.  We had a transfer hearing not long after he was brought back to West Virginia.  I don't remember the exact date.

GRAND JUROR:  You mean when he was taken back to Ohio?

THE WITNESS:  No, we had a transfer hearing to transfer him from a juvenile to an adult, to try him as an adult because he was 17 at the time the crime was committed.  Even though he was 18 when he gave the confession he still has to be tried as a juvenile because he was 17 at the time.  So we had a transfer hearing and, of course, we were successful in getting him transferred to an adult in Circuit Court and his lawyers, of course, they have the right, like an automatic right to an appeal to the Supreme Court.  That's where

A.C.R.

it's been most of the time. The Supreme Court over-
turned that transfer hearing and we had to have another
one. Most of the time it's been on appeal is the
reason it's taken so long.

GRAND JUROR: At this point is he going to
be tried, do you know, as a juvenile or as an adult?
You said the Supreme Court overruled the --

THE WITNESS: Well, we just recently had
another transfer hearing. In fact, it was just completed
Monday, and we were successful in transferring him, again,
to an adult. Of course, they have another right to
appeal to the Supreme Court. I'm sure they will, but
we don't know if they are or not.

MR. STUCKY: I might interject here that the
case that you are considering is being presented to
you for an indictment as an adult. Now, what the Supreme
Court does with that, we're not in a posture to know
at this time.

GRAND JUROR: As an attorney, I'm sure you'll
know if they do overrule this and try him as a juvenile,
what possible punishment could he get? I know it's
not relevant to our decision here.

MR. STUCKY: If John Moss -- Under the juvenile

statutes John Moss is over the age of juvenile jurisdict-

ion, so I don't believe we could try him as a juvenile,

and if we did the Court wouldn't have any jurisdiction

to impose any punishment.

GRAND JUROR:  The crime he committed in

Cleveland, was that when he was a juvenile or when he

was over 18 as an adult?

THE WITNESS:  He was a juvenile.

GRAND JUROR:  He was a juvenile when he killed

the lady and raped her up there?

THE WITNESS:  He didn't kill her.

GRAND JUROR:  He didn't kill her, he raped

her and shot her?

GRAND JUROR:  How can we indict him as an

adult when he was a juvenile when he committed the

crime?  I don't understand that.

GRAND JUROR:  They had a hearing that said he

was an adult.

GRAND JUROR:  Yeah, but he wasn't an adult.

GRAND JUROR:  Yeah, but he had a hearing.

They ruled -- they transferred him to an adult.  Now

at this point he's an adult until the Supreme Court or

somebody says he's still a juvenile, so we're just

*A.C.R.*

trying to indict him.

MR. STUCKY:  I can read to you the juvenile statute with regards to transfer from Juvenile Court jurisdiction to adult jurisdiction if you want.  That may or may not clear it up.

GRAND JUROR:  That's a legal step we really aren't concerned with.

MR. STUCKY:  You're not concerned with it. You don't have any say so over it, but you might want to know how that type thing was done, if you're interested in it.

GRAND JUROR:  I'd like to know, personally.

MR. STUCKY:  I'll bring the statute over as soon as Trooper Williams leaves and read it to you.  If you want any explanation of it, I think you'll have to ask Judge Harvey.

GRAND JUROR:  When you started taking him statement, did you know this other conversation was on the tape?

THE WITNESS:  Yes.

GRAND JUROR:  I was just wondering why some-thing this serious, you wouldn't have a new tape for it?

THE WITNESS:  It was 9:30 at night.  That

A.C.R.

was the only cassette tape they had at the detachment
and we didn't want to waste a whole lot of time.

MR. STUCKY:  Any other questions of Trooper
Williams?  If not, may he be excused?

FOREMAN:  Yes, sir, and we thank you very
much.

GRAND JUROR:  I have one question.  Is there
a signed confession with this or is this as valid as
a signed confession?

THE WITNESS:  We don't have a signed confession,
no.  We just have the taped confession is all we have.

GRAND JUROR:  Is that because he refused to
sign?

THE WITNESS:  We never asked.  We never wrote
it down to have him sign it.  You know, it would have
taken some time to have that taped confession transcribed
into writing and, of course, there was no secretary
available, and at the time we just didn't think it was
necessary.

GRAND JUROR:  Has he since denied this?

THE WITNESS:  I have no idea if he has or not.
In all the hearings I've been in he's never taken the
stand to deny it.

A.C.R.

GRAND JUROR:  These hearins have been primarily about the adult and the juvenile status thing, and he's never really been indicted or been in any kind of trial about this, it just went to the Supreme Court over this juvenile-adult thing, is that right?

THE WITNESS:  That's correct.

GRAND JUROR:  All the hearings and the delays have been just that?

THE WITNESS:  Yes.  Well, I've had a preliminary hearing before the juvenile referee to determine if there was probable cause that he committed the crime, but other than that it's just been mostly juvenile transfer hearings.

MR. STUCKY:  Thank you, Trooper.

WHEREUPON the witness was excused.

MR. STUCKY:  Ladies and gentlemen, if you'll excuse me for just a second I'll go over and get the law pertaining to the transfer status and be right back.

In attempting to answer the Grand Jury's question I would read from Chapter 49, Article 5, Section 10 of the West Virginia Code, which is entitled "Waiver and Transfer of Jurisdiction".  I would read subsection D in part.  It starts out, "The Court may,

A.C.R.

upon consideration of the child's mental and physical condition, maturity, emotional attitude, home or family environment, school experience and similar personal factors, transfer a juvenile proceeding to criminal jurisdiction if there is probable cause to believe that:

"Subsection One, if the child has committed the crime of treason under Section 1, Article 1, Chapter 61 of this Code; the crime of murder under Sections 1, 2 and 3, Article 2, Chapter 61 of this Code; the crime of robbery involving the use or presenting of firearms or other deadly weapons, under Section 12, Article 2, Chapter 61 of this Code; the crime of kidnapping under Section 14a, Article 2, Chapter 61 of this Code; the crime of first-degree arson under Section 1, Article 3, Chapter 61 of this Code; charging sexual assault in the 1st degree under Section 3, Article 8b, Chapter 61 of this Code; and in such case the existence of such probable cause shall be sufficient grounds for transfer without further inquiry."

That was the statute that was presented in evidence by the Court and that the Circuit Court entered

A.C.R.

an order transferring John Moss's juvenile proceedings to the adult jurisdiction of the Circuit Court.

GRAND JUROR: What was the legal basis that the Supreme Court threw it out on?

MR. STUCKY: There's about a six or seven page opinion on that and I don't think that under the recent guidelines of the Grand Jury that I would be the proper person to answer that. I think --

GRAND JUROR: Is there any reason their decision would be any different this time?

MR. STUCKY: Well, they sent down an opinion and we held a new transfer hearing hoping to correct what they said was done wrong or improperly in the first one.

GRAND JUROR: In other words, what was did wrong in the first one has been corrected in the second transfer?

MR. STUCKY: I can't answer that. The Supreme Court will answer that.

GRAND JUROR: In other words, you think it has?

MR. STUCKY: I don't think one way or the other. I don't think what I think makes any difference

to the Grand Jury and I don't think I ought to express
my opinions on that.

I would like to ask the Grand Jury at this
point to discuss this case and determine whether or not
you are ready to take a vote on this case. And if you
are ready to take a vote, to take that vote and inform
the Prosecuting Attorney's Office of the result of
that vote so we can take proper action.

We would like to return this case out to the
Circuit Court today, one way or the other, whatever your
findings are.

If you need additional witnesses or additional
information, let me know and we'll get that to you,
either immediately or as quickly hereafter as we can.
So I won't present any new witnesses to you until I
hear something back on what you want us to do or what
you all have done on this particular case.

Mr. Foreman, with regards to the investigation
of John Moss, I would instruct you that on the back of
this document, if you have voted a not true bill, that
you will fill in the words, "a not true bill," and sign
your name where it says "Foreman of the Grand Jury."
If you vote a true bill, you will write or you will see,

"a true bill," and you will sign your name right there above "Foreman of the Grand Jury," and return it to James E. Roark, the Prosecutor, who will sign the document also.  If you will review that and see if it's consistent with the feeling of the Grand Jury, I'll excuse myself once again, with the Court Reporter, so that you all can deliberate further on the matter.

FOREMAN:  I know it says blank day of September.  Does this date need to be filled in there?

MR. STUCKY:  No.

(WHEREUPON, Mr. Stucky and the Court Reporter left the Grand Jury room in order that the Jurors might deliberate and vote.)

61

## REPORTER'S CERTIFICATE

I, V. Ann Woofter, Official Court Reporter for the Kanawha County Grand Jury, do hereby certify that the foregoing is a true and correct transcript of the testimony of TROOPER TERRY WILLIAMS, heard on the 30th day of September, 1982, as reported by me by the Stenomask procedures.

Given under my hand this 16th day of November, 1982.

_____
V. Ann Woofter, Certified Reporter

Kanawha County

**OFFICE OF THE PROSECUTING ATTORNEY**

Kanawha County Judicial Building
111 Court Street, Charleston, W. Va. 25301
(304) 357-0300
FAX (304) 357-0342

WILLIAM C. FORBES
Prosecuting Attorney

October 24, 1994

The Honorable Judge A. Andrew MacQueen
111 Court Street, Fifth Floor
Charleston, WV  25301

Re:  **Moss v. Trent**
     94-Misc.663

Dear Judge MacQueen:

I have caused a search to be made of our rather voluminous
files on the trials of John Moss, III.  The transcript of the
grand jury proceeding in which Mr. Moss was indicted is in our
custody, and I am sending a copy of this to Lonnie Simmons on
this date.  I will also place a copy in the Circuit Clerk's file.
However, we have been unable to locate the Paul Reggetz
transcript.

I wanted to inform you as soon as possible that it does not
appear that this office can comply with part of your October 14,
1994 Order.  As you know, the Reggetz indictment is over fourteen
(14) years old, and I do not know where we could locate it if it
is not in our files or in the Court file.

I will await further instructions from your office with
regard to this issue.  Thank you for your attention to this
matter.

Very truly yours,

Mary Beth Kershner
Assistant Prosecuting Attorney

cc:  Lonnie Simmons, Esquire

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

        Petitioner,

v.

                                     Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

        Respondent.

## ORDER

On October 3, 1994, this Court held a hearing on **PETITIONER'S MOTION FOR THE GRAND JURY TRANSCRIPTS THAT RESULTED IN THE INDICTMENT OF PAUL REGGETTZ, III, AND JOHN MOSS, III**. Present at the hearing were Lonnie C. Simmons, counsel for Petitioner, and Mary Beth Kershner, counsel for Respondent.

After considering the pleadings and arguments of counsel, the Court does hereby **ADJUDGE, ORDER,** and **DECREE**:

    1.    **PETITIONER'S MOTION FOR THE GRAND JURY TRANSCRIPTS THAT RESULTED IN THE INDICTMENT OF PAUL REGGETTZ, III, AND JOHN MOSS, III,** is granted; and

    2.    Respondent is ordered to search through its files and produce copies of both grand jury transcripts within twenty days from the date of this hearing.

The objection of the Respondent is noted.



69

The Clerk is directed to mail a certified copy of this **ORDER** to all counsel of record.

ENTERED this __14th__ day of October, 1994.

A. Andrew MacQueen, III Judge

Presented by:

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133
Counsel for Petitioner

Inspected by:

Mary Beth Kershner
Steve Revercomb
Peter C. Brown
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg
111 Court Street
Charleston, West Virginia 25301
(304) 357-0300
Counsel for Respondent



# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

        Petitioner,

v.                                 Civil Action No. 94-MISC-663

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

        Respondent.

## NOTICE OF HEARING

    **PLEASE TAKE NOTICE** that on the 3rd day of October, 1994,

beginning at 2:00 p.m., and continuing from that time until complete, a hearing on

**PETITIONER'S MOTION FOR THE GRAND JURY TRANSCRIPTS THAT

RESULTED IN THE INDICTMENT OF PAUL REGGETTZ, III, AND JOHN

MOSS, III,** will be held before the Honorable A. Andrew MacQueen, III, Judge of the

Circuit Court of Kanawha County, in his courtroom, at which time and place you may

appear to protect your interest.

                                 **JOHN MOSS, III,** Petitioner,
                                 --By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**NOTICE OF HEARING,** was served upon counsel of record on the 14th day of

September, 1994, by the United States Postal Service, postage prepaid.

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300

Lonnie C. Simmons

2

68

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

        Petitioner,

v.

                                    Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

        Respondent.

## ORDER

After considering **PETITIONER'S MOTION TO EXCEED STATUTORY LIMIT ON EXPENSES**, the Court does hereby find, pursuant to W. Va. Code, 53-4A-4, that Petitioner John Moss, III, is an indigent, that he is eligible to have counsel appointed to represent him, and that he is entitled to have the fees and expenses incurred by his expert witnesses and investigator for purposes of post-appeal and habeas corpus proceedings, to be paid by the West Virginia Public Defender Services. The Court further finds that it is material and necessary that the fees incurred on behalf of Petitioner for the services of his expert witnesses and investigator exceed the statutory limit. Therefore, it is **ADJUDGED, ORDERED, AND DECREED** that Petitioner John Moss, III, be permitted to incur expenses for expert witnesses and his investigator in excess of the statutory limit. Upon proper proof of such expenses and in accordance with additional orders of this Court, such expenses shall be paid by the West Virginia Public Defender Services.

65

The Clerk is ordered to mail a certified copy of this **ORDER** to all counsel of record.

**ENTERED** this _15th_ day of September, 1994.

_____
Judge A. Andrew MacQueen, III

Inspected by:

_____
Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

_____
Mary Beth Kershner
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg
111 Court Street
Charleston, West Virginia 25301
(304) 357-0300

RECORDED

2