# MOSS v. BALLARD
# CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 27

IN THE CIRCUIT COURT OF KANAWHA COUNTY

WEST VIRGINIA


JOHN MOSS, III,

      Petitioner

vs.                       Action No. 94-MISC-663

GEORGE TRENT, etc., et als,

      Respondents


BEFORE:   Hon. Louis H. Bloom


Motion for Writ of Habeas Corpus

June 10, 2001


Connie L. Cooke

Official Reporter



2

APPEARANCES


FOR THE STATE:

Michele Drummond
Asst. Prosecuting Attorney
Kanawha County Judicial Bldg.
111 Court Street, 3rd Floor
Charleston, WV   25301


FOR THE DEFENDANT:

Lonnie R. Simmons
Attorney at Law
604 Virginia Street, E.
Charleston, WV   25301

3

1    BE IT REMEMBERED, that on Monday, the 10th

2    day of June, 2002, during the May 2002 Term of said

3    Court, in the matter of JOHN MOSS, III, Petitioner,

4    versus GEORGE TRENT, etc., et als, Respondents, upon

5    Action No. 94-MISC-663, as stated in the caption

6    hereto, upon a habeas corpus proceeding, the following

7    transpired:

8

9    THE COURT:          This is a habeas matter.

10   We have Mr. Simmons and Ms. Drummond present.

11                       Ms. Drummond, you filed a motion?

12   MS. DRUMMOND:       Yes, your Honor.  The

13   motion was very brief.  My request is simply to ask the

14   Court's permission to allow the State to re-open the

15   matter in this Writ of Habeas Corpus.  I have recently

16   been assigned to it.

17                       The matter was handled by two of

18   the assistants in our office, one who is no longer

19   there.

20                       Upon reflection of the file and

21   upon meeting with various members of the West Virginia

22   Department of Public Safety forensics lab, I am

23   personally of the opinion that evidence which should

24   have been brought to the Court's attention and made

4

1    part of the record was not, that there was a failure to

2    do so.

3              I believe that the equities of

4    justice would permit the Court to do this, and I think

5    it is important in this Court coming to the proper

6    opinion in this matter, and allowing the record to

7    blossom a little bit.  There is a Writ, assuming it is

8    not granted here, that will be forwarded on to the

9    Supreme Court.  The Supreme has a better reflection of

10   what the evidence in this matter was.

11             THE COURT:        What additional activity

12   would you seek?

13             MS. DRUMMOND:      My intention would be to

14   call at least two, if not perhaps a third witness.

15   They are Brett Meyers, of the lab in question --

16   specifically, I don't think the record was fully

17   developed, and depositions of Doctor Bing and Trooper

18   Murphy, I believe it was, as to some of the blood

19   evidence.  It's just a general type of inquiry.

20             THE COURT:        And you would do that by

21   way of further depositions?

22             MS. DRUMMOND:      Or calling them into

23   Court, whatever would be best.

24             THE COURT:        Alright.  Mr. Simmons ...

5

1                MR. SIMMONS:         Judge, on behalf of the

2    petitioner, we would object to reopening.  This case

3    has been pending for -- I think it has a '94 number on

4    it.  It's not this Court's fault though, and I don't

5    mean to imply that at all.

6                My client is anxious to get,

7    particularly the Fred Zain issue, up to the Supreme

8    Court.  I think the respondent in the case has had

9    ample opportunity to develop the record.

10               My recollection of what is in the

11    record, all of the lab notes from the testing in the

12    record, Mr. -- Trooper Murphy and Trooper Zain were the

13    ones who performed the testing in the case.  Murphy has

14    been deposed, and Zain has not.

15               We just object.  We think that the

16    respondent has had ample time.  There were deadlines

17    that they could have met.  And we don't believe that

18    the respondent has demonstrated the need to reopen the

19    case.  It has continued this long, and I just believe

20    that it just further prejudices my client with more

21    delay.

22          THE COURT:         Alright.  I am going to

23    -- this case is one that has been around for some time.

24    However, after looking at all of the equities as to

6

1    everybody involved in this matter require that the

2    evidence be fully developed.

3              Ms. Drummond is apparently new to

4    the case and sees some deficiencies.  I want to give

5    her the opportunity, and for the Court to be fully

6    informed of all of the facts upon which a proper and

7    just decision might be made.

8              Ms. Drummond, do you think you can

9    have your evidence concluded in the next sixty (60)

10   days?

11         MS. DRUMMOND:      Yes, your Honor.

12         THE COURT:      Alright.  Thereafter --

13   have both parties briefed this matter fully?

14         MR. SIMMONS:      The petitioner has.

15         MS. DRUMMOND:      No, your Honor.  The

16   opinion that was out, that was developed in the record,

17   I would not be able to brief it from the evidence.

18         THE COURT:      Alright.  Well, why don't

19   we conclude all testimony in this matter by way of

20   deposition within sixty (60) days.  I'll then give you

21   forty-five (45) days thereafter to file your response

22   memorandum, and then I'll give Mr. Simmons fifteen (15)

23   days after that.

24              Does that give you enough time?

7

1          MR. SIMMONS:          That would be fine.

2          MS. DRUMMOND:          That's fine, your Honor.

3          THE COURT:          Alright.  And then, you

4     all could get a date after that, and Sheila will set it

5     down for hearing.

6                    Thank you all very much.

7

8          WHEREUPON, the proceedings were concluded.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

8

1   STATE OF WEST VIRGINIA,

2   COUNTY OF KANAWHA, to-wit:

3

4        I, Connie L. Cooke, Official Reporter for the

5   Circuit Court of Kanawha County, do hereby certify that

6   the foregoing is a true and correct transcript of the

7   proceedings had and reported in the above captioned

8   matter, as reported by me and transcribed into the

9   English language.

10        Given under my hand this _____ day of

11   _____, 2002.

12

13

14

15

16                          _____

17                          Official Reporter

18

19

20

21

22

23

24

# MOSS v. BALLARD
# CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 28

IN THE CIRCUIT COURT OF KANAWHA COUNTY

WEST VIRGINIA

JOHN MOSS, III,

     Petitioner

vs.                          Action No. 94-MISC-663

GEORGE TRENT, etc.,

     Respondent

BEFORE:   Hon. Louis H. Bloom

HABEAS CORPUS

January 17, 2003

Connie L. Cooke

Official Reporter

2

APPEARANCES


Lonnie Simmons
Simmons & Fragale
604 Virginia Street, E.
Charleston, WV   25301
(Counsel for Petitioner)


Mary Beth Kershner
Asst. Prosecuting Attorney
Kanawha County Judicial Bldg.
111 Court Street, 3rd Floor
Charleston, WV   25301
(Counsel for Respondent)

1    BE IT REMEMBERED, that on Friday, the 17th

2 day of January, 2003, during the January 2003 Term of

3 said Court, in the matter of JOHN MOSS, III, Petitioner

4 versus GEORGE TRENT, etc., Respondent, upon Action No.

5 94-MISC-663, as stated in the caption hereto, upon a

6 Habeas Corpus proceeding, the following transpired:

7

8    THE COURT:    This is the matter of State

9 versus John Moss.  Would counsel please note your

10 appearance -- or, I guess it's technically Moss versus

11 Trent.

12    MR. SIMMONS:    Lonnie Simmons on behalf of

13 the Petitioner, John Moss.

14    MS. KERSHNER:  Mary Beth Kershner, Assistant

15 Prosecuting Attorney, for the Respondent.

16    THE COURT:    Alright.  Mr. Simmons, are you

17 ready to proceed?

18    MR. SIMMONS:    Yes, your Honor.

19    We're here today to resolve the

20 final issues that are raised in the Habeas petition.

21 The previous Orders of the Court have already resolved

22 what I call the *Fred Zain* Habeas, or the laboratory

23 decision issues, and that has been fully briefed, and I

24 know the Court has had all of that.

4

1    In the meanwhile, Ted Smith was

2    deposed, and I believe that is of record now.   The

3    arguments are pretty well set out in the briefs.

4    The second issue is the

5    Petitioner's proof that the actual testing and

6    testimony given by Fred Zain was false, misleading, and

7    unscientific.  So what distinguishes the second issue

8    from the issue -- under the laboratory decision, the

9    Court had to presume that the testing and testimony of

10   Fred Zain was false, misleading, and unscientific,

11   whereas on the second issue, the Petitioner has the

12   burden of proving that that is the case.  And in order

13   to do that, we retained Doctor David Bing, B-I-n-g, and

14   he was deposed and his testimony is also of record.  So

15   his testimony was cited both in the previous Orders and

16   in subsequent briefs.

17   Doctor Bing was able to confirm

18   that many of the findings that formed the basis of the

19   laboratory decisions actually do apply to John Moss'

20   case.  One of the things that is a little bit unusual

21   about this case that no one seems to have an answer for

22   is the fact that John Moss's case should have actually

23   been included in the initial special investigation that

24   was conducted by Judge Holiday.  And for whatever

5

1    reason, is wasn't.  But he fit the pattern; he was

2    still incarcerated, obviously, and Fred Zain did

3    testing and testimony in his case.  And for whatever

4    reason, it wasn't.  And I think this case would have

5    been simplified had it been involved in that initial

6    investigation, because the ASCLAB experts found errors

7    in every single case they looked at.

8                    But what Doctor Bing noted

9    initially was that many of the criticisms that were

10   made through the special investigation of these other

11   cases actually apply here, and there are some real

12   basis ones:   There was no written protocol at the lab

13   that was applied, specifically to the testing; there

14   was no -- there are a lot of scientific controls that

15   the ASCLAB expert said needed to be used that were not

16   routinely used.  And the best example of that would be

17   when you are testing, say, a blood sample, and in this

18   case from Christmas paper, what you're supposed to do

19   is to take a sample of what you believe is an unstained

20   part of the Christmas paper or the object upon which

21   the evidence was found, and test it to make sure that

22   you are not getting any readings from that.  And what

23   you are hoping for there is a negative result.  It's

24   just a part of the scientific method.  You want some

6

1  negative results that you know are going to be

2  negative, and some positives.  That wasn't done here.

3              So, several of the criticisms that

4  the special investigation came up with do, in fact,

5  apply to the John Moss case, and Doctor Bing has

6  established that.  And that is really not disputed by

7  anybody.  It's not disputed by Ted Smith.  It's a

8  matter that really can't be disputed, based upon the

9  designation, because they weren't doing things like

10  that back then.

11              The remainder of Doctor Bing's

12  opinion in analyzing the testimony and testing of Fred

13  Zain in this case really has to do with the application

14  of forensic principles, wherein you have a situation

15  where evidence is found at a crime scene, and Doctor

16  Bing, both in his extensive Affidavit, that is in the

17  record, and in his deposition, when he was asked

18  questions both by me and by the Prosecutor's office,

19  went into great detail about a number of accepted

20  forensic principles that you apply when you are

21  interpreting data obtained from a crime scene.

22              What he ultimately concluded, when

23  -- the ultimate conclusion that Doctor Bing reached,

24  when you put all of the pieces together, was that the

1  data generated in this case was meaningless, and that

2  includes both -- I know it's in his deposition, and I

3  think it's also in his Affidavit.  And Doctor Bing is

4  an eminently qualified national expert from Boston, who

5  has testified as an expert in this case and many others

6  about DNA and other forensic areas.  And the lab he

7  worked at was affiliated with the Harvard Medical

8  School, and he has a lot of experience, both

9  forensically, doing DNA testing, and medically, doing

10  DNA testing.

11          When the Court re-opened the

12  discovery to allow the State to have their own expert,

13  and we can introduce the deposition of Ted Smith, who

14  is the current head of the lab here in West Virginia, I

15  think largely he did not disagree with Doctor Bing.

16  And more importantly, Ted Smith testified that he

17  couldn't vouch for the accuracy of anything that Fred

18  Zain did, and that in fact he felt that based upon the

19  Supreme Court decision that he couldn't do that, and

20  that he could never vouch for -- to the extent that we

21  could prove that the testing was done by Fred Zain, he

22  could never vouch for the accuracy.  So, you have a

23  situation where the State's own expert can't talk about

24  the reliability or accuracy of the data that was

8

1   generated.

2              I think when you read the

3   deposition of Robert Murphy and Doctor Bing, and you

4   look at the lab notes, I think the record pretty

5   clearly demonstrates that it was Fred Zain who

6   performed the serological testing on what I call the

7   critical pieces of evidence, which would be the blood

8   on the Christmas wrapping paper, on the door knob, and

9   I think there was a flash light, and I may be getting

10  that confused.  But the ones that Zain at trial

11  testified, where he did multiple typings, and he

12  concluded that some of the typings could not have been

13  deposited by the other people in the house, and that

14  they matched John Moss's type.

15              But I think we've been able to

16  establish, without much contradiction, and the one

17  sheet, in particular, he did find Fred Zain's initials,

18  FSZ.  And that was what Mr. Murphy testified that would

19  tend to indicate that Fred Zain was the one who did

20  that, but Mr. Murphy couldn't really recall, in fact,

21  who did what.  And it was pretty clear that Mr. Murphy

22  had done the serological testing on what I call the

23  control blood samples, which would be the blood samples

24  of the Reggettz family, because he needed to identify

1   their various types to make sure that the blood on the

2   wrapping paper could not possibly have been deposited

3   by them.

4               So, I think that we're pretty much

5   not in dispute scientifically up to that point.  I

6   think the area where Captain Smith was disagreeing with

7   Doctor Bing had to do with some of the assumptions.

8   Can we assume, for example, that the blood on the

9   wrapping paper was deposited by one person, as opposed

10  to potentially being a mixture.  And he did testify

11  that while the blood was smeared on the wrapping paper,

12  that would at least create an argument that it possibly

13  was a mixture, in which case the analysis that Doctor

14  Bing made was essentially that we don't have an eye

15  witness who is alive as to how this blood got

16  deposited, so what you have to do is to say, Well,

17  let's see, who are the potential donors in the house?

18  So you look at the types of the four members of the

19  Reggettz family, and when you compare the types that

20  were found, for the vast majority of the types that

21  were found, one or more members of the Reggettz family

22  could have been donors or depositors of the blood on

23  these critical pieces of evidence.

24               And what Doctor Bing said is that

10

by not analyzing it appropriately, it gave an
exaggerated probability statistic when Fred Zain
testified as to the ultimate results of the testing,
whereas the testing and the testimony should have
focused on those types -- and I believe there are
three, at least there were three different types --
that could not have been deposited by anybody in the
Reggettz family, where the probabilities would have
been substantially lower.  And it was in that area that
Captain Smith had the biggest disagreement with Doctor
Bing.

I don't know how to characterize
the dispute.  Obviously, experts can disagree.  Maybe
some experts are more conservative than others.  It may
be in the nature of that kind of disagreement.  It may
the kind of thing that scientists are free to argue
about.  But I think in light of the history that
ultimately was and has been demonstrated when Fred Zain
was investigated, a conservative approach certainly
makes a lot more sense than one where you kind of --
where you're kind of accepting of the data, you're kind
of saying, Yeah, I'm going to accept what I see here on
the paper that Fred Zain wrote down; I'm going to
accept that as being true and accurate.

11

1          And I know that in the reply brief

2    I pointed out that the Respondent, in his brief, has

3    asked this Court to actually make a finding that what

4    Fred Zain did in this case was correct and reliable.

5    And even though I think it is critical as to the second

6    issue for the Court to make a finding one way or the

7    other, I think the Court is in the position in

8    resolving the second issue --

9          THE COURT:     Well, let me ask you about

10   this issue.  Was this raised on appeal?

11         MR. SIMMONS:    This issue was not raised on

12   appeal.  It was not.

13         THE COURT:     What effect does that have on

14   this issue?

15         MR. SIMMONS:    Well, it has the effect of not

16   having been addressed by the Supreme Court previously;

17   okay, it has that effect.

18              It has the effect of putting the

19   burden on me to prove it as a factual matter in the

20   Habeas.  And it would probably depend on what label you

21   would put it under.  Obviously, the Supreme Court

22   historically, for many years, was affirming convictions

23   and not accepting appeals in cases where Fred Zain's

24   testing and testimony was involved, and they were

1    accepting those results.  And it wasn't until the

2    special investigation was completed that the Supreme

3    Court even had the benefit of knowing what the State

4    lab was doing at that time.

5              So, if you --

6              THE COURT:    So, you're saying that it's

7    your position, under these unique circumstances, that

8    it's not waived?

9              MR. SIMMONS:    Right.  I don't think it's

10   waived.  But in part, because it is a kind of newly

11   discovered evidence, because I don't think that anybody

12   knew.  I think if we'd known about it earlier, we

13   wouldn't have let him testify, you know, and the judges

14   wouldn't have let him testify, and the prosecutors

15   wouldn't have let him testify.  So, once we got all of

16   that evidence compiled, and everybody was on notice, I

17   think that is what led us to say, Well, let's examine

18   what he did.

19              And I also think that even without

20   that, in a Habeas, if you raise an issue that wasn't

21   raised in the appeal, which is often the case, and I'm

22   treating this as a constitutional violation, the fact

23   that it wasn't raised in the appeal, in my view,

24   doesn't cause any waiver issue.  I think there may be a

13

1    stricter standard in the federal system than there is

2    in the state system.  But --

3              THE COURT:    Let me ask you another

4    question about the -- Judge MacQueen, when he reviewed

5    this matter, was of the opinion that there was more

6    than sufficient evidence, assuming that the Zain

7    testimony was, in fact, false.  How is that different

8    than what you are raising today?

9              MR. SIMMONS:   Well, I think what is

10   different, and what I tried to explain in the briefs on

11   these last two issues, under the last opinion, the

12   Court has to assume it was false.  Okay, under this

13   issue, I have to prove that it was false; so that's one

14   distinction.

15                   As I noted --

16             THE COURT:    What is the practical effect

17   though?

18             MR. SIMMONS:   I think I tried to get to

19   that.  What the lab decision ended up saying was, and

20   we can assume that it was false -- what the laboratory

21   decision said was anytime false evidence or false

22   testimony is presented, it's a non-constitutional

23   error; therefore, the harmless error standard for non-

24   prosecutional errors applied.  And that is why the

1 Court came up with that type of three prong test.  You

2 look at it, was there other evidence, and if that is

3 yes, then you go to number two, well, was he

4 prejudiced?  It's a two-part test.

5       In my view, the Supreme Court erred

6 in saying that that was a non-constitutional error.  I

7 think the decision by the U.S. Supreme Court is very

8 clear that when we have false testimony and false

9 evidence, that that is a constitutional error, and the

10 harmless error standard is raised.  So, what I've tried

11 to argue to the Court is that if I can convince you

12 that the evidence was unscientific, misleading, and

13 false here, that is a constitutional error, and the

14 only thing I have to show is the State would have to

15 show that it is harmless beyond a reasonable doubt -- I

16 don't have the exact language, but that is quoted in

17 the brief.  That is the essence of what the rule is.

18       It's kind of a technical

19 distinction, but I think it's a legitimate one.

20    THE COURT:    I see where you're coming

21 from.

22    MR. SIMMONS:   Okay.  So, I think we have a

23 record before the Court now that is extremely

24 supportive of -- this record overlaps a little bit.  I

15

1    think it supports the first issue, but it also supports

2    the second issue.  I think we have pretty solid

3    evidence that what Fred Zain did in this case was

4    false, unscientific, and misleading, and that there was

5    exaggerated evidence.

6              We really don't have a strong

7    dispute on most of the criticisms that Doctor Bing

8    made, and therefore, on that issue, I would ask the

9    Court to find in favor of the Petitioner.  And if you

10   apply the constitutional harmless error standards, I

11   believe the Petitioner has to prevail under that

12   theory, because of the way that standard is applied.

13             Obviously, just so this is not

14   confusing the record, we obviously believe that both

15   standards, the non-constitutional and the

16   constitutional harmless error standards are met in this

17   case.  But we have already argued and briefed that

18   first one, so I won't talk about that one.

19             So, the final issue of the three

20   issues raised is simply the one having to do with the

21   confession.  And this is one of the things that makes

22   this case unique.  I've not seen it.  I've done a lot

23   of research trying to find it; I've not seen a case

24   like this, and I'm sure they exist somewhere and I just

16

1  haven't found them yet, where you have two different

2  people at two different times confessing to the same

3  crime.  And it is a very, very unusual circumstance.

4        And to me, that confession issue

5  definitely influences the other two more scientific

6  issues that have already been argued and discussed

7  before the Court, because when you go through any

8  analysis and you're trying to say, Okay, well, what was

9  the evidence?  Was there enough evidence for a jury to

10  convict this person?  That is a big problem for the

11  State, when you have a completely different person who

12  testified in this trial, who confessed to the same

13  crime.  And so, to me, that created an extra burden for

14  the State, when you do the Habeas analysis, to overcome

15  that confessional issue.

16        I also think that the confession

17  issue, which was obviously raised on appeal, and we're

18  certainly allowed to raise it again in a Habeas, is

19  influenced by this Court's resolution of what I'm going

20  to call the scientific issues.  The whole case has to

21  be looked at as a whole, and that is why these were the

22  issues raised in the Habeas.

23        Some of the previous Orders, not by

24  you, but by your predecessor, seem to indicate, well,

17

you know, obviously the confession from Mr. Reggettz
was beaten out of him.  It's as if there is a
conclusion that that confession was beaten out of him,
and this one, where there was testimony that Mr. Moss,
who was a 17 year old boy at the time, was handcuffed
to the neck wrist, and a State Trooper got in the back
and beat him in the stomach, and the Trooper didn't
deny that he got in the back seat with him.  Of course,
he denied hitting him.  But it seems to me that if the
Court really took the position that Mr. Reggettz'
confession was beaten out of him, and was not knowingly
and intelligently given, despite the specific findings
made by Judge Hey, who was the judge in the Reggettz
part of the case, then you would similarly have to
conclude the same here with respect to Mr. Moss.

But I kind of attached those issues
all together.  I didn't devote a lot of the briefing to
the confession issues, because there's a lot of stuff
in the record already with respect to that.  I just
wanted it to be placed in the context of what was done
here, and so in light of these issues, I would
respectfully ask the Court to grant the Habeas.

THE COURT:   Alright.  Thank you very much,
Mr. Simmons.

18

1       Ms. Kershner ...

2    MS. KERSHNER:  Your Honor, I think it's

3 really important for the Court to be aware of a little

4 bit of background.  Again, as Mr. Simmons said, I think

5 most of it is probably already before the Court and has

6 already been reviewed.

7       But at the time this case arose,

8 which was in December of 1979, at that time, Mr. Zain

9 was not the head of the lab at the State Police

10 Serology lab.  He was working under the supervision of

11 Trooper Murphy, and no questions have been raised about

12 Trooper Murphy's work, and in fact, the case, what is

13 commonly called *Zain II*, the second case involving the

14 investigation of the State Police lab, specifically

15 found that no other troopers were -- that no other

16 employees of the State Police lab's work was

17 questioned, or was under the same scrutiny as Zain.

18       But at that time, Mr. Zain was

19 working under supervision.  So, I think that is an

20 important element.

21       Second --

22    THE COURT:  But Mr. Zain, in fact, did the

23 testing?

24    MS. KERSHNER:  He did do the -- he did

19

1    probably most of the important testing, but he did it

2    under supervision.

3              Second of all, it is a unique case

4    in that the work done by -- the police already had a

5    suspect, and in fact, had already arrested him.  While

6    he was in custody, still in jail, the testing was done

7    and at that point Murphy and Zain are saying to the

8    arresting officers, There is evidence here that someone

9    other than the defendant or any of the victims

10   deposited blood at the scene of the crime.  And in

11   fact, they came under a great deal of pressure because

12   of that result.

13             THE COURT:    Say that again?

14             MS. KERSHNER:  They came under a great deal

15   of pressure because they got a result that obviously

16   the arresting officers didn't want them to get.

17             But in fact, that helped clear Mr.

18   Reggettz, and had the police looking for another

19   suspect.  And the results of that test -- and it

20   primarily centered around this one small spot of blood

21   on Christmas wrapping.  And Judge MacQueen already

22   ruled -- in fact, he already had ruled on the issue as

23   it relates to Doctor Bing's review of the evidence, in

24   his Order of September 10th of 1998.  He dealt with

1    Doctor Bing's testimony, Doctor Bing's deposition, and

2    still found that Doctor Bing's evidence was not

3    sufficient to create a new constitutional issue.

4              Since that time, the only

5    additional evidence that there is, since Judge

6    MacQueen's Order was entered, the only additional

7    evidence there is, is the Ted Smith deposition, and Ted

8    did disagree with Doctor Bing on some fairly key

9    points.  He certainly doesn't strengthen Doctor Bing's

10   testimony or raise any new issues that would create

11   doubt as to the results of the testing.

12             So, we've got Judge MacQueen's

13   ruling, and some additional evidence that tends to

14   support Judge MacQueen's ruling.  There just isn't any

15   more issue here on that point.

16        THE COURT:    But Mr. Simmons suggests that

17   you are asking the Court to make a finding that the

18   testing isn't correct, that the evidence isn't correct.

19        MS. KERSHNER:  Make a finding that he has not

20   met his burden of showing that it was incorrect, which

21   is a little bit different, but that he has not met his

22   burden.

23             With regard to the confession, I'll

24   just say -- or the two confessions that were ruled

1    admissible, there may have -- since *Miranda's*

2    confession, there may not have been a confession more

3    reviewed that these confessions.  They were reviewed as

4    part of a transfer hearing, as part of a trial, as part

5    of a -- two different Supreme Court cases, and another

6    trial, and they have withstood the review of several

7    different courts.

8            THE COURT:    Mr. Simmons suggests to me,

9    however, that you have to look at them in the totality

10   of the circumstances, and suggestion is that you have

11   to question the validity of them, in light of the

12   testing.

13           MS. KERSHNER:  Well, your Honor, obviously

14   that's not the only thing the conviction was standing

15   on.  But when you look at the confessions themselves,

16   there are indicia of reliability within those

17   confessions that have nothing to do with the testing.

18   So, the one that springs to my mind most readily is Mr.

19   Moss indicating that there had been -- well, there had

20   been Christmas presents taken from the scene of the

21   crime in December, and Mr. Moss indicating that he had

22   given one of the gifts he had taken to a friend's

23   mother, I believe it was.  And that woman confirming

24   that she had gotten a gift that matched the description

22

1   of one of the stolen presents.

2                    There are lots of indicia of

3   reliability within the confession that had nothing to

4   do with Zain's work or anything else.  So, I don't

5   think that there is a basis for finding that those

6   confessions were in any way tainted by Fred Zain.

7                    And again, this is kind of a unique

8   case, in that we are dealing with a suspect whose guilt

9   was supported by Zain's work.  We are dealing, first of

10  all, with a suspect who was cleared by Zain's work.

11  And then that same -- those same testing results later

12  implicated another person.  So, it's really, as Judge

13  MacQueen said at more than one point during this case,

14  it's a lot different than your typical Zain case.

15                   So, I think that --

16       THE COURT:     You're suggestion there is

17  that they didn't come up with the results the State

18  Police wanted?

19       MS. KERSHNER:   Right; where typically, I

20  don't know of a case that was reviewed as part of the

21  investigation of the State Police lab, where questions

22  were raised about -- that would indicate that the

23  guilty were set free as a result of Zain's work.

24  Rather, there were questions raised that the innocent

23

1    may have been convicted.  This is just a very different

2    kind of situation than we would expect if Zain were

3    going to falsify work, or do sloppy work, incomplete

4    work, this is not the results we would expect to get.

5            THE COURT:    Mr. Simmons, is there anything

6    further you would like to add?

7            MR. SIMMONS:    I'd just like to respond to a

8    couple of points there.  It seems that the State's main

9    argument to the response to the scientific criticism is

10   largely due to the testimony, I think, of Mr. Murphy,

11   the idea that some of the officers involved in the case

12   didn't like it when some of the test results came out

13   that did not implicate Mr. Reggettz, and therefore, put

14   pressure on them.  But Mr. Murphy also noted, when he

15   was deposed, and that's in the record, is that when

16   they did come up with results that Fred Zain said that

17   it could not have been Mr. Reggettz, the detectives

18   suggested that maybe someone planted the blood there.

19           So, I don't know that the kind of

20   speculation and back room discussions that may have

21   been had in this case would necessarily be what this

22   Court bases a decision on, on the scientific

23   reliability and the testing.  I would trust that that

24   would be based upon the actual testimony of Doctor Bing

24

1    and which Ted Smith testified to, which did not agree

2    with Doctor Bing.

3              On the reference to some findings

4    made in an Order that Judge MacQueen made earlier with

5    respect to Doctor Bing, it is clear in the record that

6    a motion was filed noting specific places in the

7    deposition and in the record that we contended were

8    erroneously noted in the Order by Judge MacQueen.  That

9    has been filed and supplemented, and it is all in the

10   record, and ultimately, that motion was not granted.

11             But I guess the point I'm trying to

12   make is even though there may be findings by Judge

13   MacQueen in his Orders that are contrary to what Doctor

14   Bing testified to, as the Petitioner, we have at least

15   made an effort to correct those findings, by citing to

16   the record, and citing Doctor Bing's testimony, and

17   that is not refuted by anybody.  But the record stands

18   as it stands.

19             I agree that this confession

20   probably has been analyzed a lot, but it has never been

21   analyzed subsequent to the special investigation and

22   all of the findings made with respect to Fred Zain and

23   his history of testifying falsely and making up data.

24             Here, you have a case where John

25

1     was 17 years old, and I don't know how old he would

2     have been when he was convicted the first time and the

3     second time, but it's a life without mercy case.  And

4     we have this case that is just tainted throughout by

5     Fred Zain, and somehow the Court system, I would

6     submit, just needs to deal with that.  We need to

7     remove what I think is the stain and the questions that

8     are on this case because of Fred Zain's involvement,

9     and this Habeas action is really the only effective

10    relief that Mr. Moss has.

11                    And again, I would respectfully ask

12    the Court to grant the Habeas.

13         THE COURT:    Alright; thank you very much.

14    The argument was well done, and very helpful to the

15    Court.  We'll get an Order accomplished in this matter.

16                    Thank you all very much.

17         MR. SIMMONS:    Thank you, Judge.

18

19         WHEREUPON, the proceedings were concluded.

20

21

22

23

24

26

1    STATE OF WEST VIRGINIA,

2    COUNTY OF KANAWHA, to-wit:

3

4            I, Connie L. Cooke, Official Reporter for the

5    Circuit Court of Kanawha County, do hereby certify that

6    the foregoing is a true and correct transcript of the

7    proceedings had and reported by me and transcribed into

8    the English language.

9            Given under my hand this *18th* day of

10   February, 2003.

11

12

13

14

15                          _Connie L. Cooke_

16                          Official Reporter

17

18

19

20

21

22

23

24

650

# MOSS v. BALLARD
# CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 29

FILED

IN THE CIRCUIT COURT OF KANAWHA COUNTY

90 APR 23 PH 12: 07

WEST VIRGINIA

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

STATE OF WEST VIRGINIA,

       Plaintiff,

vs.

                         FELONY NO. CR-AP-82-F-122

JOHN R. MOSS, III,

       Defendant.

BEFORE: HONORABLE HERMAN G. CANADY, JR., Judge,

APPEARANCES:

   FOR THE STATE:  Neva Lusk, Esquire, Assistant
Prosecuting Attorney, Kanawha County, West Virginia.

   FOR THE DEFENDANT:  The defendant in person, and by
Nelson Bickley and Kathy Beckett, Esquires, Attorneys at
Law.

                      Margaret I. Williams, CSR
                      Official Reporter

3/3/89

1      (BE IT REMEMBERED, that heretofore on the 3rd day

2   of March, 1989, upon Felony No. CR-AP-82-F-221, the

3   following transpired:)

4      THE COURT:  CR-AP-82-F-221, State of West Virginia

5   versus John Moss.  Ms. Lusk, Mr. Revercomb, or at least

6   Ms. Lusk, for the State of West Virginia.  Mr. Nelson

7   Bickley, Mr. David Lambert for the defense. Conference

8   to set trial date. Do I have a motion here, Mr. Lambert?

9      MR. LAMBERT:  Yes, Your Honor.  I filed a motion to

10   withdraw based upon my change of employment in the

11   practice of private law.

12      THE COURT:  All right. Where are you going?

13      MR. LAMBERT:  I'm going with the State.  I will be

14   special assistant attorney general and assigned

15   primarily to Public Employees Insurance Agency.

16      THE COURT:  I guess that disqualifies you.  Mr.

17   Bickley, I guess we can go ahead and set a trial date

18   with you here.  Would you prefer the Court Administrator

19   appoint another lawyer to assist you in this matter?

20      MR. BICKLEY:  Yes, I would prefer it, Your Honor.

21   But I'd like to advise the Court that I would not be

22   able to, and I have so advised my client, Mr. Moss, to

23   go to trial at least until the fall because of prior

24   criminal commitment cases that I currently have at the

1  particular time, i.e. two murder cases and one rape.

2  But - - and I think even - -- it will take me that long

3  considering the other cases I have in my practice and to

4  study the transcript on the legal nuances of the

5  particular trial to become familiar with it.  So I'm not

6  asking to be relieved.  I'm just saying that if a speedy

7  trial is the issue, then I have a problem.

8      THE COURT:  Well, Mr. Moss is in custody.  It's a

9  ways off.

10      John Moss, you have a constitutional right to have

11  a speedy trial and to have your case heard under the

12  laws of the State of West Virginia rapidly.  Mr.

13  Bickley, your lawyer, indicates that he can't possibly

14  get this case ready for trial before some time in the

15  fall.  Do you agree or disagree with your lawyer in that

16  regard?

17      THE DEFENDANT:  I agree with him.

18      THE COURT:  All right.  For good cause shown and

19  without objection thereof, I'm going to at least

20  continue this matter until the rise of the May Term,

21  1989.

22      Mr. Thaxton, just give me a trial date some time

23  later in that May Term.

24      MR. THAXTON:  July 31st, Judge, or August 7, or

4

1   August 14.

2       THE COURT:  Well, let's just - - when is your

3   vacation going to be, Mr. Bickley?  Can we tentatively

4   set it down on August 14th, and then we'll just adjourn

5   from there until - -

6       MR. BICKLEY:  Your Honor, I will be on vacation

7   August 14th hopefully.  Small week.

8       THE COURT:  What about July 31st?  Will you be in

9   town?

10      MR. BICKLEY:  Same week, Your Honor.  July 29th I

11  leave for Sunset Beach.

12      MR. THAXTON:  July 28th, Judge, or Tuesday,

13  September the 5th.

14      MR. BICKLEY:  September 5th?

15      THE COURT:  Tuesday, September 5th. Then we'll set

16  it down tentatively for a trial date at 9:30.  We'll

17  call this case at 9:30, September 5, 1989, hoping that

18  you are thinking of Mr. Moss while you're there on

19  Sunset Beach, Mr. Bickley.

20      MR. BICKLEY:  Oh, I'll probably take transcripts

21  down, Your Honor.

22      THE COURT:  At any rate, let's have the Court

23  Administrator designate another lawyer to associate with

24  Mr. Bickley on that matter.

5

1      MR. SLACK:  Mr. Richard Lindsay, Your Honor?  If

2  you will give us one moment, Your Honor.

3      (WHEREUPON, following a brief recess, the following

4  transpired.)

5      THE COURT:  All right, to return to our case, State

6  of West Virginia versus John Moss, CR-AP-82-F-221. Ms.

7  Lusk, Mr. Bickley, John Moss being still present with

8  counsel.  Mr. Bickley has indicated that he prefers to

9  have counsel associated with him on this case. The

10 Court Administrator directed another name of another

11 appointee; is that correct?

12     MR. SLACK:  Kathy Beckett who is with the

13 Department of - -

14     THE COURT:  All right.  That's - -

15     MR. SLACK:  That's Beckett, Your Honor.

16 B-E-C-K-E-T-T.

17     THE COURT:  Let me set up pretrial motion schedules

18 while we're here.  Some of that may have been

19 already resolved in the first trial in this matter.

20 Nevertheless, there may be additional pretrial motions.

21 See if you can file your pretrial motions, Mr. Bickley,

22 by August 15, 1989, and the State respond by August

23 22nd, 1989.

24     MS. LUSK:  Your Honor, the State probably would

1   anticipate filing a motion for discovery itself.

2   Perhaps we can set the deadline for Mr. Bickley to

3   answer that too.

4       MR. BICKLEY:  August the what, the State respond,

5   Your Honor?

6       THE COURT:  August 22nd.  The State is anticipating

7   filing some discovery that will be by way of

8   interrogatories, or do you know?

9       MS. LUSK:  I'm not sure yet, Your Honor.  I'm not

10  sure.

11      THE COURT:  Let's set then, August 1st as the

12  deadline to complete all that discovery anticipated

13  by the State so that - -

14      MS. LUSK:  Judge, generally, our right to ask for

15  reciprocal discovery isn't triggered until we have fully

16  complied and answered Mr. Bickley's motions for

17  discovery.  So perhaps - - maybe I can suggest that Mr.

18  Bickley file his motions by the 1st and we can respond

19  by the 15 which would trigger our right to ask for

20  discovery and he can respond to mine by the 22nd. Use

21  the same date but in a different order.  Is that all

22  right?

23      THE COURT:  All right. So ordered.  Cut an order to

24  that effect.  Is there anything else to take up this

7

1    morning?

2        MR. BICKLEY:  I have nothing further, Your Honor.

3        THE COURT:  All right, I'll remand John Moss back

4    into the custody of the sheriff.

5        (WHEREUPON, the hearing concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:

    I, Margaret I. Williams, Official Reporter of the Circuit Court of Kanawha County, West Virginia, do hereby certify that the foregoing is a true and accurate transcript of the proceedings had in the matter of State of West Virginia versus John R. Moss, CR-AP-82-F-221, held on March 3, 1989, as reported by me in stenotype characters and transcribed into the English language.

    I further certify that the transcript within meets the requirements of the Code of the State of West Virginia, 51-7-4, and all rules pertaining thereto as promulgated by the Supreme Court of Appeals.

    Given under my hand this 23rd of April, 1990.

_____
Margaret I. Williams

~IN THE CIRCUIT COURT OF KANAWHA COUNTY

WEST VIRGINIA

FILED

90 APR 23 PM 12: 07

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

STATE OF WEST VIRGINIA,

       Plaintiff,

vs.

                             FELONY NO. CR-AP-82-F-122

JOHN R. MOSS, III,

       Defendant.

BEFORE: HONORABLE *9/5/89* IADY, JR., Judge,

   FOR THE STATE:  Ne            teve Revercomb,
Esquires, Assistant Pro      rneys, Kanawha
County, West Virginia.

   FOR THE DEFENDANT:  The defendant in person, and by
Nelson Bickley and Kathy Beckett, Esquires, Attorneys at
Law.

Margaret I. Williams, CSR
Official Reporter

780

2

1      (BE IT REMEMBERED, that heretofore on the 5th day

2   of September, 1989, upon Felony No. 82-F-221, the

3   following transpired:)

4      THE COURT:  State of West Virginia versus John R.

5   Moss, III.  Ms. Lusk, Mr. Revercomb, Mr. Bickley.  The

6   matter is set today for - - I thought we had a trial

7   date on over in September.  Is that not correct?

8      MR. BICKLEY:  There is one set for September I

9   believe, Your Honor.  But - -

10      MR. REVERCOMB:  It was set for today, Your Honor,

11   September 5th.

12      MR. BICKLEY:  It was set for today.

13      THE COURT:  I thought it was on over in September.

14   Both parties ready to proceed to trial?

15      MR. BICKLEY:  Your Honor, no.  The defendant - -

16   the defense is not ready and prior to that, Your Honor,

17   a motion is being - - I would like to offer a motion

18   which Mr. Moss and I are in full concurrence, is that

19   myself and Ms. Beckett be relieved as his attorney.  Now

20   I think that's a justifiable motion, Your Honor,

21   considering my schedule.  And I understand Mr. Moss'

22   qualms.  I have not even read all the transcripts. I

23   just found out this morning it was four thousand and

24   some pages of just voir dire. I read the voir dire, but

1  I don't know the number of pages. But just to give you

2  some idea of the amount of work that's involved. At the

3  present time I have for the upcoming months of October

4  and November, two murder trials, one sexual assault and

5  the major case, the Walker case, in December, scheduled

6  for December the 4th.

7      Mr. Moss has questioned the fact that I have not

8  been able to see him on a regular basis or even

9  intermittently as I should have or normally have. I

10  have not been able to read the entire transcript even at

11  this date, and I have been diligently trying to do so.

12  But my work load right now is so tremendous and I think

13  Mr. Moss deserves one who can devote more time to his

14  case. Mr. Moss joins me with this motion, don't you,

15  Mr. Moss?

16      THE DEFENDANT: Yes, I do.

17      MR. BICKLEY: He joins with me with this motion.

18  If fact, he feels so serious about it, if the Court

19  denies this, he wants to go to Supreme Court to get

20  relief, and I think that Mr. Moss, considering the

21  seriousness of his crime that's alleged against him,

22  that he should have someone he can have complete

23  confidence in.

24      THE COURT: Who's on the case with you?

4

1    MR. BICKLEY:  Ms. Beckett, Your Honor.

2    THE COURT:  Well, I received at least two pieces of

3    correspondence from Mr. Moss and I relayed those on to

4    you.  You were appointed to this case last - -

5    MR. BICKLEY:  February.

6    THE COURT:  - - February, and assumed the

7    responsibility of getting the case ready for trial this

8    fall.  If I were to appoint another lawyer to this case,

9    he couldn't get it ready before next February.  And in

10   that regard, I think that, you know, the ends of justice

11   and John Moss' right to a speedy trial would be

12   frustrated.  I believe that you and Ms. Beckett ought to

13   be able to bring this case to trial some time this fall.

14   And you assumed that responsibility. When were the

15   transcripts prepared and read?

16   MR. BICKLEY:  Well, the transcripts have been

17   prepared I guess some time ago, Your Honor.  That

18   came back on appeal.

19   THE COURT:  The transcripts went up on appeal - -

20   MR. BICKLEY:  On appeal, yes, sir.  That's not the

21   matter.  The matter is that I have, you know, there's a

22   difference between - - I have a tremendous case work

23   load now.  As I have said, there are - - Robert Adams

24   trial, which will be going to trial because there's no

1    plea bargaining being offered.  Larry James, two sexual

2    — — first degree sexual assaults.  That will go to

3    trial.  Larry James.  Workman has been settled.  Those

4    two — — both Pennington first degree sexual assaults

5    probably will go to trial.  Now these are pretty much

6    cases that plea bargaining has either been forthcoming

7    or not much of a bargain being offered.  All of those

8    cases are sandwiched in between the Moss case.  That's

9    not the main problem.  The Moss case entails about

10   fifteen volumes of voluminous — — how many transcripts?

11   Do you know?

12       MR. REVERCOMB:  Eighteen.

13       MR. BICKLEY:  Eighteen volumes of transcripts that

14   I have to digest and make some sense of.  It's three

15   volumes just of voir dire.  And as I'm trying to explain

16   to Mr. Moss, that I cannot be discussing the case

17   because I don't know what I'm discussing until I read

18   the transcript and understand the nature of what

19   happened at the trial, what our defense is going to be,

20   et cetera.  Meanwhile, I have to make a living.

21       THE COURT:  I understand.  But someone's got to do

22   it and — —

23       MR. BICKLEY:  But — — yes, sir.

24       THE COURT:  — — it's going to result in

6

1   considerable delay for Mr. Moss.

2       MR. BICKLEY:   I was just informed, Your Honor,

3   that he was over there three years before he went to

4   trial.   That was with Mr. McKittrick.   So he had all the

5   time to work it up, and he was retained.   Now I will do

6   an outstanding job for him when we go to trial.   But we

7   have to have some understanding that there's a mass

8   amount of trial work that went on that I have to digest

9   and comprehend and then come up with a defense.   And Mr.

10  Moss' confidence in me is -- there is no confidence

11  because of what has not transpired in his mind, and all

12  I am saying is that whoever gets it is going to have --

13  whether I do it or whomever -- is going to have to read

14  these transcripts before they can do anything as far as

15  a trial, and that's an awful lot of work to do if the

16  person is doing something else.

17      THE COURT:   John R. Moss, do you understand that

18  the case that was tried in this Court and later reversed

19  by the Supreme Court of this State is a particularly

20  complicated case?

21      THE DEFENDANT:   Yes, I do.

22      THE COURT:   And whomever takes over that case and

23  gets it ready for trial must spend a great deal of time

24  and it's not going to be an easy case for someone else

7

1    to stand in the shoes of your first lawyer, Mr.

2    McKittrick?

3        THE DEFENDANT:  Yes, I do.

4        THE COURT:  And you have written a couple of

5    letters, and I have relayed those on to your attorney,

6    expressing your concern about the fact that your case

7    hasn't moved as rapidly as you had hoped and would like

8    to see it move.  Do you recall those two pieces of

9    correspondence that you wrote?

10        THE DEFENDANT:  Yes.

11        THE COURT:  Now do you understand that if you

12    continually ask - - become disatisfied and

13    ask for new counsel and ask that your counsel be

14    relieved, then your case will remain in limbo

15    indefinitely?  In other words, you're going to have to

16    show some patience with your attorneys and expect that

17    it's going to take some time to read all these

18    transcripts and understand the case and to bring it to

19    trial.  Do you understand that, sir?

20        THE DEFENDANT:  Yes, I do.

21        Last February when I was over here in Court, I was

22    of the understanding that I would be, you know, they

23    would be ready around August, which is today.  And

24    within that time he has done nothing to show me anything

1  whether he, you know, whether he's interested in the

2  case or not. Neither has his assistant. I have talked

3  to his assistant on several occasions and she said that

4  she had constantly tried to get in touch with Mr.

5  Bickley in coming over here to get with me on my case.

6  But, you know, I never seen him. Once he met with any

7  concern of my case.

8      THE COURT: Well, any lawyer that I appoint here is

9  going to be a busy lawyer and is going to have

10  difficulty earning a living. I'm going to decline to

11  grant the joint motions of both the defendant and his

12  counsel just forthwith, and I'll take it under

13  advisement. I'm reluctant to entertain such a motion.

14  The lawyer who takes on the responsibility of becoming a

15  lawyer in a serious case assumes that responsibility

16  and must get the case ready for trial. If the case is

17  not ready for trial today, give me a trial date later in

18  this term, Court Administrator.

19      MR. THAXTON: We can go - - what month are you

20  looking at, Judge? I'm sorry.

21      THE COURT: Either October or November.

22      MR. THAXTON: We can put it on November 27th,

23  or December 11th.

24      MR. BICKLEY: December 11th would be the best date,

9

1    Your Honor.

2         THE COURT:  All right.  Do I take it that you

3    disagree with the urgings of your lawyer there, Mr. Moss?

4         THE DEFENDANT:  Yes, I do.  I have here, Your

5    Honor, a motion I made myself, and I'd like it to be put

6    in the record.

7         THE COURT:  Go ahead and read it in the record.

8    Is it that long?

9         THE DEFENDANT:  Yes.

10        THE COURT:  Do you want to hand it to me and - -

11   have you seen it?

12        MR. BICKLEY:  I have not seen it, Your Honor.

13        THE COURT:  You'd better view it and inspect it,

14   Fifth Amendment considerations.

15        MR. BICKLEY:  (After reading document.)

16   Basically, that's the same thing we've discussed, Your

17   Honor.

18        THE COURT:  All right.  We'll file John Moss'

19   motion and make it a part of the record. I've got the

20   matter under advisement.  In the meantime, I'm going to

21   continue this matter until December 11, 1989, at 9:30.

22        You, Mr. Moss, make what efforts you can to amend

23   those offenses and assist your cousel in bringing this

24   matter to trial.

10

1       Mr. Bickley, peruse those transcripts. The

2    transcripts of the voir dire other than to get the drift

3    of what tactics counsel was utilizing, the responses may

4    not be that material to this case because you will have

5    a new group of jurors who will have new responses and

6    new matters of sensitivity that you will be attempting

7    to detect through that voir dire examination. But at any

8    rate, let's prepare this case and get it ready for trial

9    December 11, 1989.

10       Being nothing further, I'll remand John R. Moss

11    back into the custody of the sheriff.

12       MR. REVERCOMB:  Thank you, Judge.

13       MR. BICKLEY:  Thank you, Your Honor.

14       (WHEREUPON, the hearing concluded.)

15

16

17

18

19

20

21

22

23

24

11

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:

I, Margaret I. Williams, Official Reporter of the Circuit Court of Kanawha County, West Virginia, do hereby certify that the foregoing is a true and accurate transcript of the proceedings had in the matter of State of West Virginia versus John R. Moss, CR-AP-82-F-221, held on September 5, 1989, as reported by me in stenotype characters and transcribed into the English language.

I further certify that the transcript within meets the requirements of the Code of the State of West Virginia, 51-7-4, and all rules pertaining thereto as promulgated by the Supreme Court of Appeals.

Given under my hand this 23rd of April, 1990.

Margaret I. Williams

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:

I, Connie L. Cooke, Official Reporter for the Circuit Court of Kanawha County, do hereby certify that the foregoing is a true and correct transcript of the proceedings had and reported in the matter of the State of West Virginia versus John Moss, Jr., aka John Moss, III, upon action number 82-F-221, as stated in the caption hereto, had on the 26th day of April, 1990, during the May 1990 Term of said Court, as reported by me and transcribed into the English language.

I hereby certify that the transcript within meets the requirements of the Code of the State of West Virginia, 51-7-4, and all rules pertaining thereto as promulgated by the Supreme Court of Appeals.

Given under my hand this 13th day of July, 1990.

_Connie L. Cooke_

Official Reporter