# MOSS v. BALLARD
## CASE NO. 2:09cv01406

## RESPONDENT'S EXHIBIT 30

IN THE CIRCUIT COURT OF KANAWHA COUNTY,

WEST VIRGINIA


STATE OF WEST VIRGINIA

vs.                        Action No. 82-F-221

JOHN MOSS


BEFORE:  Hon. A. Andrew MacQueen


3/19/90

SUPPRESSION HEARING


March 19, 1990


935



Connie L. Cooke

Official Reporter

APPEARANCES

FOR THE STATE OF WEST VIRGINIA:

Stephen Revercomb, Esq.
Ms. Neva Lusk
Assistant Prosecuting Attorneys
Kanawha County Judicial Building
111 Court Street
Charleston, WV    25301

FOR THE DEFENDANT, JOHN MOSS:

Nelson R. Bickley, Esq.
Timothy Huffman, Esq.
Ms. Kathryn Beckett
Bank One Center
Charleston, WV    25301

3

1        BE IT REMEMBERED, that on Monday, the 19th day of

2   March, 1990, during the January 1990 Term of said Court, in

3   the matter of the State of West Virginia versus John Moss,

4   Defendant, upon Action No. 82-F-221, during a Suppression

5   Hearing, the following transpired:

6

7        THE COURT:   I'll admit, unfortunately, that I

8   intended to read the Supreme Court's opinion in this case

9   before I began this hearing, and didn't do it.  I need to

10  know what's at issue.  Have you got a copy?

11       MR. BICKLEY: Yes, I do have, your Honor.  I also

12  have for the Court, which the State has, this is the Code

13  that we'll be arguing from, and this is the case that the

14  Supreme Court made reference to, and here's another case

15  that has some relevance in re. John Moss, Elsworth.

16       THE COURT:  Okay.

17       MR. BICKLEY:  The -- your Honor, we're on our --

18  we are the moving party, and I sort of had -- I guess it --

19  it is propitious for me to begin -- well to begin, we are

20  here on the fact that we want to suppress two of the

21  confessions made by John Moss, for lack of presentment.

22  If I like -- I'd like to do a chronology of the events by

23  John Moss, and I think it will put everything in

24  perspective and the basis for our argument.  I'll use the

4

1    chalkboard.

2                    In January 1980, your Honor, two State

3    Policemen, Scott and Wilson -- I believe it's Scott and

4    Wilson.

5              MR. HUFFMAN:  Williams and Smith.

6              MR. BICKLEY:  Huh?

7              MR. HUFFMAN:  Williams and Smith.

8              MR. BICKLEY:   Williams  and  Smith  went  to

9    Mansfield, Ohio, to take -- to get blood.

10             MR. HUFFMAN:  Cleveland.

11             MS. LUSK:  They went to Cleveland.

12             MR. BICKLEY:  Huh?

13             MR. HUFFMAN:  They went to Cleveland.

14             MS. LUSK:  To Cleveland.

15             MR. BICKLEY:  To Cleveland?

16             MR. HUFFMAN:  I'm sure you're thinking about a

17   different case.

18             MR. BICKLEY:  No, it's the same case.  I thought

19   they went to Mansfield.

20             MS. LUSK:  That was in April.

21             MR. HUFFMAN:  That was in April.

22             MR. BICKLEY:  No, no.  In April they got the

23   legal blood sample.

24             MR. HUFFMAN:  All right.

1          MR. BICKLEY: In January 1980, they got illegal

2  blood samples. That's what I'm talking about. Okay?

3          MS. LUSK: In Cleveland.

4          MR. HUFFMAN: Cleveland.

5          MR. BICKLEY: Where was it, John?

6          MR. MOSS: Cleveland.

7          MR. BICKLEY: Okay. They went to Cleveland, and

8  they got illegal blood sample. That is, they did not talk

9  to an attorney, and they was reported. The attorney

10  suppressed that and made them to send the blood sample back

11  to Cleveland.

12          Then in April, they got a Court Order,

13  the same two Troopers. And --

14          THE COURT: If I recall, just from incidental

15  knowledge, Mr. Moss was in custody in Cleveland at this

16  time on an unrelated charge.

17          MR. BICKLEY: Right, unrelated charge.

18          THE COURT: How old was he then?

19          MR. BICKLEY: He was sixteen or seventeen --

20          MR. HUFFMAN: Seventeen.

21          MR. BICKLEY: -- at the time. Now, in 1980 -- I

22  mean April of '80, they got -- legally they got the blood.

23  They got a Court Order and went up and got the blood.

24          Then in September of '80, they got a

1    detainer on malicious wounding.  Then in October, the 28th

2    specifically -- and this is the two confessions we wish to

3    suppress.  In October of '80, they went to exercise this

4    detainer; that is, they went up and got John Moss.  This is

5    in Mansfield, Ohio.   Mansfield, Ohio, isn't it?

6              MR. HUFFMAN:  Mansfield.

7              MR. BICKLEY:  And from this trip, coming back,

8    the two officers had some conversation, some smattering of

9    conversation, about malicious wounding.  But obviously,

10   their intent was not about the malicious wounding, but

11   about the murder trial, the murder.

12             THE COURT:  Excuse me.  What was the charge of

13   malicious wounding?  I mean, who was the victim of the

14   malicious wounding?

15             MR. BICKLEY:  It was some -- they were

16   investigating a shooting down at the Moose Lodge or some

17   such thing here in Charleston.

18             THE COURT:  Unrelated to the Reggetz case?

19             MR. BICKLEY:  Unrelated to the Reggetz case

20   altogether.  That's what the detainer was on.

21                     In Parkersburg they secured an oral

22   confession and an electronic confession.  This is October

23   the 28th.  They went from Parkersburg, stopped in

24   Parkersburg, delayed in Parkersburg, gave him food and

7

1   what-have-you and secured an oral and electronic

2   confession.

3                    They brought him here to the Kanawha

4   County Jail on the 29th, made no presentment to a

5   Magistrate or a Judge or anything, did not do the same --

6   did not do the same here in Parkersburg.  He stayed

7   overnight in the Kanawha County Jail.

8                    On the 30th of October, on route back

9   to Mansfield, they obtained another oral confession.

10       THE COURT:  Now, in that interim between the 29th

11  and 30th, was he arraigned?

12       MR. BICKLEY:  No; nothing happened.  It is the

13  30th confession with which -- it was the 30th confession,

14  the 30th of October, that the Supreme Court suppressed.  It

15  was -- the Supreme Court stated they were required to make

16  a presentment and they did -- failed to do so, but they did

17  not reach the other two confessions, because there was no

18  presentment objection made in the course of the trial.

19                    And we maintain that, one, it was a

20  subterfuge of the detainer, the malicious wounding

21  detainer, that they went after, to get him to come back to

22  Charleston.  Enroute from Parkersburg, to Parkersburg and

23  in Parkersburg --

24       THE COURT:  Did they stop in Parkersburg on the

8

1   way back from Ohio?

2           MR. BICKLEY:  They stopped in Parkersburg.  They

3   took the oral confession and then they taped it.

4           THE COURT:  Where did they stop?

5           MR. BICKLEY:  At the detachment.

6           MR. REVERCOMB:  State Police detachment.

7           MR. BICKLEY:  State Police Detachment.

8           THE COURT:  Was that a brief stop and then they

9   came on the same day to Charleston?

10          MR. BICKLEY:  Well, it wasn't brief.  It was over

11  several hours.

12          THE COURT:  But, I mean, they didn't spend the

13  night there?

14          MR. BICKLEY:  They did not spend the night there.

15  In fact, these two State Policemen, these are the same

16  fellows who went up and got the blood from him illegally

17  and later legally.

18                        Now, these two officers knew that he

19  had counsel.  Or at least they knew that he had counsel in

20  Mansfield, because they had already ran into him when they

21  took his blood up there in Cleveland.  They failed to make

22  a present-- --

23          THE COURT:  Counsel on the Cleveland charge?

24          MR. BICKLEY:  On the mali-- -- on the Cleveland

9

1  charge.  But that -- that was the same -- they had counsel

2  on the Cleveland charge when they took his blood illegally

3  also.

4       THE COURT:  Now, there's a West Virginia case of

5  that fellow up in Morgantown.

6       MS. LUSK:  Elsworth.

7       THE COURT:  Yeah, and if I recall correctly, it

8  was a related set of circumstances.  He had an abduction in

9  New Jersey.

10      MR. REVERCOMB:  Yes, your Honor.

11      THE COURT:  And he had counsel on that, and they

12  got a statement from our Supreme Court, as I recall, that

13  said that the fact that he had the counsel on an unrelated

14  charge didn't mean that that had anything to do with it,

15  that he had exercised his right to counsel in a different

16  charge than the West Virginia charge.

17      MR. BICKLEY:  Now the Supreme Court never

18  mentioned in remanding the case of --

19      THE COURT:  But I'm talking about in an

20  independent case.

21      MR. BICKLEY:  Oh.

22      THE COURT:  Is that my recollection?

23      MR. REVERCOMB:  That's right.

24      MS. LUSK:  Your Honor, do you want me to add

1    facts as we go through here?

2          THE COURT:  Wait.  Let me hear Mr. Bickley.

3          MR. BICKLEY:  The Supreme Court never mentioned

4    the lack of counsel in reference to when they -- when they

5    suppressed it.

6          THE COURT:  October 29th.

7          MR. BICKLEY:  The -- October 30th.  Nothing

8    happened on October 29th.  Nothing, as far as -- the --

9    October 28th is the two confessions that we wish to

10   suppress based upon --

11         THE COURT:  Based upon what the Supreme Court

12   said?

13         MR. BICKLEY:  Was suppressed.  Our argument that

14   no presentment was made, that there was deliberate

15   delaying, they were using a subterfuge and malicious

16   wounding to get him here -- or to get him in route, they

17   secured a confession delayed in waiting in Parkersburg, had

18   opportunity to present him to a Magistrate or a Judge.

19         THE COURT:  Where?

20         MR. BICKLEY:  In Parkersburg.

21         THE COURT:  How can he answer Kanawha County

22   charges before a Magistrate there?

23         MR. BICKLEY:  I don't know whether the

24   requirement is to answer to the county, but they had to --

1   someone had to tell him what his rights were, that he could

2   have counsel.

3         THE COURT:   I don't understand anybody has any

4   jurisdiction on the Reggetz charge except a Judge or

5   Justice or Magistrate in Kanawha County.

6         MR. BICKLEY:   Well, even if -- that was never

7   satisfied, even in Kanawha County.

8         THE COURT:   I understand.   I understand that's

9   your position.

10        MR. BICKLEY:   Now, here it says "A child in

11  custody must immediately be taken before a Referee or Judge

12  of the Circuit Court, and in no event shall a delay exceed

13  the next succeeding judicial day."

14              Now, in this instance here, he had

15  never been taken before a Magistrate or a Judge in the time

16  frame that we're making reference to; he was never taken.

17  And we feel that all of the circumstances which the 30th of

18  October's suppression, all of them, are the same as here,

19  the oral and electronic confession.

20        THE COURT:   Well, certainly one of them isn't.

21  And by October he's not been presented before a Magistrate.

22  In the first place, he's in Kanawha County --

23        MR. BICKLEY:   Yes, sir.

24        THE COURT:   -- on the 30th or before the 30th.

1    That's number one.  And number two, the 30th is longer than

2    the next judicial day from the time he's taken into custody

3    initially on the 28th.  So you've got two distinctions, it

4    appears to me, anyway.

5           MR. BICKLEY:  Well, that's correct.  That's even

6    better than the 30th.   That is, on the -- he gave a

7    confession on the 28th.  He was overnight here in jail on

8    the 29th.  He went back on the 30th.  They took it -- they

9    suppressed the confession on the way back from there.  We

10   don't next have a succeeding day, which we do on this one.

11          THE COURT:  No.  I'm saying the 30th is beyond

12   the next succeeding day.  It doesn't comply with that

13   requirement of the statute that he must be presented within

14   the next succeeding day, on the 30th.  But that doesn't

15   apply to the 28th confession.  That's within -- that is not

16   without the next succeeding day requirement.

17          MR. BICKLEY:  I don't understand.  It says -- the

18   quote said, "in no case beyond the next succeeding day,"

19   and the next succeeding day is the 29th.

20          THE COURT;  Right, so they got him within the

21   next succeeding day.  They didn't violate that Rule.

22          MR. BICKLEY:  No, no.  He has to go before a

23   Judge or a Magistrate by the next succeeding day.

24          THE COURT;  I understand that.

13

1        MR. BICKLEY:  But he did not.

2        THE COURT:  Right.  I understand that.  If they

3   had taken a statement from him -- they'd take him into

4   custody on the 28th and within ten minutes they got a

5   statement from him, and twenty minutes later, they take him

6   before a Magistrate, that's okay.  Right?

7        MR. BICKLEY:  Twenty minutes later?

8        THE COURT:  Yes.

9        MR. BICKLEY:  Yes.

10       THE COURT:  Now, in this case, they're in route.

11  They've got no ability to take him before a Kanawha County

12  Magistrate, because they're not in Kanawha County, and they

13  have not gone beyond the next succeeding day, on the 28th,

14  have they?

15       MR. BICKLEY:  No.  On the 28th.

16       THE COURT:  That's the distinction that I think

17  might be critical here.

18       MR. BICKLEY:  They went by the next -- the 29th,

19  which is the next succeeding day.

20       THE COURT:  Right.  I understand that.

21       MR. BICKLEY:  And they failed to take him to a

22  Magistrate or a Judge.

23       THE COURT:  Wait a second.  Let me look at

24  something here.

1       MR. BICKLEY: It's our argument, your Honor, that

2   they should not have talked to him at all.  They should

3   have brought him on to Kanawha County, made a presentment

4   before the Magistrate or a Judge, then made their query.

5       THE COURT:  Well, is there some -- certainly the

6   statute doesn't require that.  Is there some holding that

7   they can't talk to a defendant before he's presented to a

8   Magistrate, some Court case to that effect?

9       MR. HUFFMAN:  Judge, if I may, I think the copy

10  that he gave you, the court's ruling in the Elsworth case,

11  says that -- it's cited directly in the opinion --

12      THE COURT:  Right.

13      MR. HUFFMAN:  -- where it says, in Elsworth when

14  it talks about no proper presentment was made at trial,

15  basically.  The Court's basic holding in Elsworth was that

16  there should not be a delay in a juvenile -- in fact, it

17  says here that I'm looking at in Elsworth on page 508, note

18  number 6, "Consequently, we conclude that under West

19  Virginia Code 49.58(d), when a juvenile is taken into

20  custody, he must immediately be taken before a Circuit

21  Judge or a Magistrate.  If there is a failure to do so, any

22  conviction obtained as a result of the delay will be

23  invalid, where it appears the primary purpose of the delay

24  was to obtain a confession from the juvenile."

15

1        THE COURT:  Right.

2        MR. HUFFMAN:  And that's what we contend.

3        THE COURT:  Okay.

4        MR. HUFFMAN:  They made the trip down to

5    Parkersburg, the stopped specifically --

6        THE COURT:  But this doesn't say that no

7    statement taken prior to a presentment to a Magistrate is

8    invalid.

9        MR. HUFFMAN:  No, no.  I think there's a

10   distinction between if they picked him up, he's in the car

11   and they're on their way to do it.  This was not the case

12   here.  They specifically stopped.  And I think if you'll

13   look at it, there is a confession already, from the

14   troopers' notes that was given to us as part of the State's

15   Answer to our Motion to Produce.  Specifically, they

16   discuss putting him in the car and the first thing they

17   talked about was the malicious wounding charge.  And at

18   that point, when they stopped talking to him about that,

19   the troopers determined they wouldn't discuss anything

20   further in the car, that they would go to Parkersburg and

21   stop, and at that point is where the discussions became

22   discussions surrounding the events in this particular case.

23       THE COURT:  I understand that, but why was there

24   a stop in Parkersburg?

16

1         MS. LUSK:   Your Honor, the stop at Parkersburg

2    was so that the confession could be taken in a place that

3    was more comfortable.   They could get a place to eat, they

4    could go to the rest room.

5         THE COURT:  Had he made no oral statement at that

6    point?

7         MR. REVERCOMB:  No, your Honor.

8         MS. LUSK:  No.  He had agreed to talk with them,

9    and Trooper Smith had told him that he thought it was more

10   appropriate that they sit down and talk, get something to

11   eat, go to the rest room, and not discuss such a serious

12   matter in the back seat of a State Police cruiser.

13            And I believe, as I recall the Moss

14   decision, there's a footnote in it that implies that the

15   Court thought that that was good, that they didn't spend

16   their time taking this statement in the back seat of the

17   police cruiser.

18        THE COURT:  Where is it?

19        MS. LUSK:  Footnote 15.  It says the troopers

20   delayed questioning until the group arrived at the State

21   Police Detachment at Parkersburg.  I got the impression

22   there that they thought that was good.

23        MR. REVERCOMB:  Your Honor, they do --

24        THE COURT:  Let me --

1          MR. REVERCOMB:  Pardon me.

2          THE COURT:  -- read that for just a second.

3  Okay.

4          MS. LUSK:  They also distinguish that fact, I

5  believe, from the State versus Mollohan facts, which was

6  another extradition case in which a statement was taken in

7  a police cruiser.  That's where it says the confession was

8  taken entirely, solely within the confines of the patrol

9  car during a two-day journey from New Hampshire to West

10  Virginia.

11                You know, I got the impression between

12  those two things that they thought it was a better idea to

13  stop, go to the rest room and so forth.

14          MR. BICKLEY:  Your Honor, but we think that that

15  was strictly on the voluntariness of the confession.  We

16  concede, and the Court concluded, that it was voluntary.

17  It was the prompt presentment which the 30th was ruled out,

18  and we think that the 28th should have been also.

19          THE COURT:  I understand that.

20          MS. LUSK:  Your Honor, if I could fill in --

21          THE COURT:  I think you're correct in that.  I,

22  frankly, don't think the Supreme Court was hard pressed to

23  find some law specifically on a car.  They're not going to

24  be able to -- the Supreme Court couldn't find something

18

1 inherently bad about obtaining a confession in a car versus

2 the police station. I'm sorry; go ahead.

3      MS. LUSK: If I could fill in a few more facts,

4 Judge, the defendant had been in Ohio during the January

5 and April dates that Mr. Bickley has indicated there. He

6 was in juvenile custody in Cleveland and had been charged

7 up there as a juvenile with rape, attempted robbery,

8 dangerous and deadly weapon, there was an attempted murder

9 and a sexual assault charge, all arising from the same

10 transaction.

11      The troopers testified that when they

12 went to Cleveland in January of 1980, they did not know

13 that John Moss had a lawyer in Ohio, and my recollection is

14 that the person who came and brought to the Court's

15 attention that they had taken the blood sample from Mr.

16 Moss was somebody who worked there in the detention center.

17 And I believe Trooper Smith testified -- I'm not sure this

18 is of any great import -- but he testified that he was not

19 aware that there was a lawyer there.

20      In April, after the Court Order was

21 obtained in Cleveland for the seizure, the blood was seized

22 by West Virginia authorities as well as Cleveland

23 authorities. Both authorities were there at the same time

24 for the drawing of that blood. Cleveland got some of the

19

1    blood and we got some of the blood.

2                    By September -- in May I believe it was

3    -- Mr. Moss was transferred --

4            THE COURT:   What's the purpose of seeking the

5    blood in April?

6            MS. LUSK:   The West Virginia authorities?

7            THE COURT:   Uh-huh.

8            MS. LUSK:   For the Reggetz homicide.

9            THE COURT:   So at least by that point, they had

10   focused their investigation on Mr. Moss?

11           MS. LUSK:   Absolutely, your Honor.   As a matter

12   of fact, I believe in April was when the indictment was

13   returned, and Mr. Moss is named but not indicted in the

14   Reggetz indictment in April.

15           THE COURT:   You mean Mr. Reggetz was indicted in

16   April?

17           MS. LUSK:   Right, and Mr. Moss was named but not

18   indicted in that indictment.   There's no question that

19   there was a focus on him at that time.

20                    By May, Moss was transferred over to

21   adult jurisdiction in Ohio on those charges that he was in

22   a juvenile facility for, and he was convicted as an adult

23   over there of rape and attempted murder.   He was sentenced

24   in Ohio to serve a term of four to twenty-five years.

20

1            In October, after the detainer was

2    filed on the malicious wounding, we would take issue with

3    Mr. Bickley's contention that we just made this all up.

4    And I'm pointing out to the Court that there has been

5    scientific testing done in the malicious wounding charge.

6    They had gone up to Cleveland and gotten the weapon which

7    was used in the Cleveland attempted murder and test fired

8    it against the bullets in the May '79 Moose Club malicious

9    wounding, and they had matched the weapon up.

10            So they had done scientific testing and

11   were in the process of an actual investigation for that May

12   1979 unrelated charge, the one the detainer was filed on.

13            They went up and got him on October the

14   28th, got him at a custody hearing --

15            THE COURT:  Let me interrupt just a second.  I'm

16   not sure I know the interstate or the multi-state statutes

17   on this detainer system.  Was he required to waive

18   extradition in order to --

19            MS. LUSK:  Your Honor, the law was not clear at

20   that time.  It's not the extradition statute that we're

21   dealing with, which was found in Chapter 5.  This is the

22   interstate compact on detainers, which is at 62-14 I think,

23   14.1.

24            THE COURT:  Yes.

1          MS. LUSK:  And it is clear now that he would have

2    been taken before a Judge and confronted with the charges

3    and asked to waive or not.  At that time, that was not

4    clear and it's addressed in the Moss opinion that once we

5    got him here, even though they did that improperly in

6    Mansfield, he doesn't have any attack on that, because like

7    the extradition statute --

8          THE COURT:  I understand that, but my question

9    is:  Is that a point at which he would have had the

10   opportunity to have counsel appointed on this charge?

11         MS. LUSK:  On the malicious wounding charge?

12         THE COURT:  Or the Reggetz -- the killings.

13         MS. LUSK:  Well, he wasn't charged at that point,

14   your Honor.

15         THE COURT:  I understand that.  I understand

16   that.  Is that not a malicious wounding charge?

17         MS. LUSK:  Not a West Virginia lawyer, I don't

18   believe, Judge.

19         THE COURT:  Of coarse not.  A Judge in Mansfield

20   -- no, I'm just -- under ordinary circumstances, then or

21   now, either one, would he have been routinely afforded the

22   opportunity for counsel to resist his removal to the State

23   of West Virginia?

24         MS. LUSK:  I think he would be now, yes, sir.

22

1       THE COURT:   But not at that time?

2       MS. LUSK:   But not at that time, right.

3       THE COURT:   And the Supreme Court says however

4    illegal it was, it's like the old cases where you snatch

5    somebody and bring them back?

6       MS. LUSK:   Right.

7       THE COURT:   All right.

8       MS. LUSK:   And they address that specific point

9    in this Moss opinion.  Once we got him, it was too late for

10   him to argue about what Cleveland should have done on the

11   extradition or the detainer procedures.

12                  Okay, Moss was placed in the car on

13   October the 28th.  Within a half an hour or so, Trooper

14   Smith advised him of his rights from the back of his ID

15   card.  Smith had gotten into the back seat with him,

16   advised him of his rights.

17       THE COURT:   Did he tell him why he was doing

18   that?

19       MS. LUSK:   He told him he wanted to discuss some

20   crimes in West Virginia.  He did not specifically mention

21   the Reggetz murders, and Smith has testified, and so has

22   Williams, that the Reggetz murders, the Reggetz name, was

23   not mentioned in the cruiser at all.

24                  But  Smith  told  him  they  had  some

1    important crimes they wanted to talk to him about, after

2    advising him of his rights.  Moss acknowledged his rights,

3    and this was oral, there was no waiver in the car, no

4    written form.  Trooper Smith asked him --

5              THE COURT:  About where did this occur?

6              MS. LUSK:  About twenty minutes to thirty minutes

7    outside of Mansfield.  This is about a four-hour drive or

8    -- about a four-hour drive.

9              THE COURT:  From Mansfield to Parkersburg?

10             MS. LUSK:  To Charleston.  I don't believe --

11   it's about three hours to Parkersburg.  I'm not sure

12   exactly on that, but it's hours rather than minutes.

13                  Smith advised him of his rights orally

14   from the back of his ID card, his State Police ID card.

15   Moss acknowledged those rights, didn't have any questions,

16   never asked for a lawyer.

17                  Smith asked him about the malicious

18   wounding charge, that incident at the Moose Club in May of

19   1979.  Smith testified within five or ten minutes, he

20   confessed to that unrelated charge.

21                  Smith then told him there was a much

22   more serious crime that he wanted to talk with him about.

23   He didn't think that they should talk about it in the car,

24   though, that it was too serious, that they should stop

24

1  somewhere where they could sit down and talk about it, get

2  something to eat.

3                    Moss at first said he didn't know what

4  he was talking about, and Smith said, "Why do you think we

5  got your blood?" Moss then acknowledged that he knew what

6  they were talking about and also expressed a willingness to

7  talk to the police about the incident.  There was no

8  further discussion in the car.  Smith got back in the front

9  seat.

10                    THE COURT:  Just out of curiosity, this is all

11  represented, I take it, in suppression hearings that have

12  been held before Judge Hay.

13                    MS. LUSK:  Right.

14                    THE COURT:  Did anybody explain why it was too

15  serious to be talked about in the car?

16                    MS. LUSK:  I think he just made that statement,

17  Judge.  I don't recall him saying why he thought so.

18                    MR. REVERCOMB:  Your Honor, I think Mollohan may

19  have had something to do with that.  The State Troopers in

20  that case the Supreme Court had reversed because the

21  confession had been taken in the back of the cruiser, and

22  he just felt that it shouldn't be done like that.

23                    THE COURT:  Did he say that?  Did the officer say

24  that?

1          MR. REVERCOMB:  No, no, the officer didn't say

2   that, but I just was going by some other new cases, a more

3   recent case, again recites disapproval of the fact that on

4   the way back from an extradition, the officers didn't

5   sufficiently interrogate the prisoner in the back of a

6   cruiser.  It's an '88 or '89 case.  They had a belief and

7   at least in the cases I've looked at, the Court doesn't

8   approve of that practice for some reason.

9          MS. LUSK:  They stopped enroute on at least one

10  other occasion and all three of the men went to the rest

11  room I believe at a service station.

12          They stopped then at the State Police

13  Detachment in Parkersburg, went in, told the officer in

14  charge that they would like to have a room to talk to Mr.

15  Moss.  They were accommodated immediately.  They all three

16  went to the rest room again.  They ordered up some food.

17  One of the dispatchers there went out and got some food for

18  them.

19          Trooper Williams advised Moss of his

20  right again, this time from the form 79 that the State

21  Police routinely use.  Moss waived those rights in writing

22  and then the troopers talked with him orally about the

23  Reggetz murders.  Very little time lapsed between the

24  beginning of that conversation and the first inculpatory

1  statement by him. It was just a matter of minutes.

2           THE COURT: On Reggetz?

3           MS. LUSK: On the Reggetz murders, yes, sir. The

4  oral statement lasted approximately two hours. He was

5  advised of his rights at 6:50 p.m. and the waiver was

6  signed at 6:57.

7                Then sometime after 9:00, they looked

8  for a tape recorder and had a great deal of difficulty

9  finding a blank tape. As a matter of fact, they never did

10 find a blank tape there at the detachment. They had to

11 reuse one that had part of a dispatch on it.

12               Again at 9:28 he was read his rights,

13 this time by a Sergeant Crescent, who was the officer in

14 charge there of the detachment at Parkersburg. He waived

15 those rights and then confessed on tape to the Reggetz

16 murders.

17               During these confessions, he told the

18 police that he had taken a camera and a rifle out of the

19 Reggetz home at the time of the murders. These were facts

20 that the State Police didn't know about and Williams and

21 Smith left the detachment there at Parkersburg and went

22 back to Cleveland to search for those items.

23               Sergeant Preston made arrangements to

24 have Moss relayed back down to Charleston to be housed

1    here.

2                    Then  on  the  30th,  the  Prosecutor's

3    Office I believe had made the decision not to pursue the

4    malicious  wounding  charge.    He  was  relayed  back  up  to

5    Mansfield, Ohio, where a new detainer was filed on the

6    murder charges.

7             THE COURT:   Now, with a -- under the Interstate

8    Compact, would the State of West Virginia not have been

9    allowed to detain him on an independent charge?

10            MS. LUSK:  No, sir.

11            THE  COURT:    So he had to actually legally be

12   trucked back there in order to get a --

13            MS. LUSK:  Yes, sir, the way the detainer statute

14   is worded, we are only permitted to prosecute him while we

15   have him on the specific charges that are set forth in the

16   detainer papers.

17            THE COURT:   Now, is there any dispute that Mr.

18   Moss had been informed of the nature of the detainer, the

19   malicious wounding detainer, at the time it was filed with

20   the appropriate authorities in the State of Ohio?

21            MS. LUSK:   I think it's very unclear.   In all

22   likelihood, he had not been.  He says he wasn't and we

23   don't have any facts to refute that.

24            THE COURT:   But he didn't know why there was a

1  detainer?

2          MS. LUSK:  Well, he says he didn't know there was

3  a detainer, period.  He testified in suppression that they

4  called him and told him he was going out to Court, to pack

5  his bag, and that he thought his sentence was going to be

6  reconsidered on his Ohio felonies.

7          THE COURT:  Is there not some standard formal

8  procedure for not only notifying the responding State, but

9  the accused in that responding State?

10         MS. LUSK:  Judge, there definitely is now.  But

11 there is a United States Supreme Court case that came down

12 I believe in '80 or -- I mean I believe in '81 or '82 --

13 which said that the detainees and people who are being

14 transported under the Interstate Compact On Detainer are

15 entitled to the same rights as those transported under the

16 Extradition Agreement and that they have to be taken into

17 Court and have a chance to contest it.  But that wasn't

18 decided in 1980.

19         THE COURT:  Okay.  Now, when is the first time

20 that Mr. Moss is made aware of the fact that he is the

21 subject of detention on the Reggetz case?  When they asked,

22 "Why do you think we got your blood sample?"

23         MS. LUSK:  January.

24         MR. REVERCOMB:  Your Honor, this is important.

29

1   This is -- that in the back seat of the police car in

2   October of 1980.   In January of 1980, both in Trooper

3   Smith's testimony in suppression, as well as the

4   defendant's testimony, Mr. Moss admits that they asked him

5   about the Reggetz murders and used the word "Reggetz" in

6   January of 1980, at the time they took the initial blood in

7   Cleveland.

8              THE COURT:   And is that in the context that he

9   was a suspect?

10             MR. REVERCOMB:   Well, Your Honor, they asked him

11  if he knew anything about it that they wanted some

12  information about it and they wanted to talk to him about

13  it.

14             MS. LUSK:   And then again in April of course,

15  they came and got the blood specifically for the Reggetz

16  case, and those Court papers have the Reggetz name

17  throughout.

18             THE COURT:   Those are Court papers filed in the

19  State of Ohio?

20             MS. LUSK:   Yes, sir.

21             MR. REVERCOMB:   Yes, sir.

22             THE COURT:   Now, is all of this information that

23  both sides have given me reflected in the transcripts of

24  the suppression hearing?

1          MS. LUSK:   Well,  it's  more  than  just  a

2    suppression hearing, your Honor.   There are --

3          THE COURT:   Do you propose to put on evidence

4    today?

5          MS. LUSK:   No.

6          MR. BICKLEY:   We're arguing the law, your Honor.

7          THE COURT:   Okay, I need for you to tell me what

8    -- specifically, what part of prior transcripts I need to

9    read  in  order  to  get  the  details  of  this  factual

10   background.

11         MS. LUSK:   Probably the biggest part of it would

12   be the Moss suppression hearing.   Now I draw a little bit

13   -- because I've read it all, I draw a little bit from his

14   transfer hearings and the trial transcript itself.   But the

15   biggest part of the facts will be contained in the Moss

16   suppression hearing in the testimony of Smith, Williams,

17   and Moss himself.

18         MR. REVERCOMB:   And, your Honor, there are some

19   stipulations made in that suppression hearing referring

20   back to a transfer hearing.

21         THE COURT:   Oh, is that right?   Parts of that

22   testimony of the transfer hearing would be considered for

23   purposes of the suppression hearing?

24         MR. REVERCOMB:   As to some of the facts of the

31

1  suppression hearing.

2          THE COURT:  Okay.  So I need the testimony of

3  who?  Williams?

4          MR. REVERCOMB:  Smith.

5          THE COURT:  Smith?

6          MS. LUSK:  And Moss --

7          THE COURT:  And Moss.

8          MS. LUSK:  -- testified at the suppression

9  hearing.  He didn't testify at trial, but he did testify at

10  the suppression hearing.

11          MR. BICKLEY:  Your Honor --

12          THE COURT:  Yes, sir?

13          MR. BICKLEY:  -- we're making a contention not

14  necessarily about the voluntariness of the confession, but

15  in using the case State v. Elsworth, the copy you have on

16  your desk and also marked on page 507, and I quote --

17          THE COURT:  Hold on.  Let me catch up with you.

18  507 in Elsworth?

19          MR. BICKLEY:  Yes, sir.  In the paragraph just

20  above that where you have colored, "We do so."

21          THE COURT:  Yes.

22          MR. BICKLEY:  "Because we do not believe that

23  this language is intended to sanction any delay in taking

24  a juvenile directly to a judicial officer, but rather, this

1    clause relates to how long a detention hearing may be

2    lawfully delayed when a child is being held in custody,

3    there is a temporal difference between advising the

4    juvenile to his rights and arranging to have a formal

5    detention hearing with the juvenile's counsel being

6    present. It is obvious that advising the juvenile to his

7    constitutional rights can be done immediately on the

8    appearance of the child, whereas a detention hearing

9    requiring the presence of a counsel may take some

10   additional time."

11                  It is our argument, first off, that

12   this detention, the detainer for the malicious wounding was

13   a subterfuge to deal with the Reggetz. They went there

14   specifically for the Reggetz case.

15           THE COURT: Okay, now, let me ask this. How do

16   I -- do I just infer that from the totality of the

17   circumstances, or is there some direct evidence that this

18   is surreptitious here?

19           MR. BICKLEY: There is -- well, the direct

20   evidence would be the statement that Ms. Lusk was making in

21   reference to of the State Police themselves and how they

22   came to the confession.

23                  They made a -- in this statement, which

24   we received on discovery, is the chronology of how the

33

1   State Police came to the confession.  In fact, much of it

2   Neva recited for your purpose, and the first five minutes

3   they discuss something about malicious wounding.

4                    For three days later, that is, from the

5   29th -- from the 28th, the 29th, and 30th, everything was

6   dealt with that had to do with the Reggetz murder.

7                    Now, the Court says that delay in

8   taking the individual from the point of arrest to the Judge

9   is not counted as delay time to the Court.    The

10  transportation is not counted as delay time.   The Court

11  will give her that.  But you see, there's an end to it when

12  he gets to the Magistrate.  It sort of gives up the delay

13  time or non-delay time.

14                    This man never got to a Magistrate or

15  a Judge, at no time.  He was delayed intentionally in

16  Parkersburg in order to take this confession.  But at no

17  time was he taken before a Magistrate or a Judge to be

18  advised, "Are you aware of your constitutional rights," et

19  cetera, et cetera, et cetera.  In fact, he was transported

20  back on the 30th of October and if you look at the Court's

21  ruling, they had another day, the 31st, to take him by the

22  statute and the Supreme Court overruled the 30th of October

23  confession, even without the succeeding day.

24                    We're arguing in our case that it's

1   even better, because on the 28th he gave the confession

2   oral and electronic, brought down here to Kanawha County,

3   kept in jail overnight, asked nothing about the malicious

4   wounding, went back on the 30th, never visited with a

5   lawyer, never visited with a Magistrate or a Judge, and we

6   believe that it fits on all four squares of the remand that

7   was based upon the 30th of October suppression.

8           THE COURT:  Do you think that confessions without

9   counsel are inherently suspect under the constitutional

10  rule?

11          MR. BICKLEY:  Not for an adult, your Honor.  I

12  think that the Court's, the Legislature thinks, that any

13  confession by a juvenile is not as an adult ipso facto

14  voluntary.

15          THE COURT:  That's only for adolescents under

16  sixteen, isn't it?

17          MR. BICKLEY:  Yes, that is, yes.  But in this

18  case, the Court took great -- in the brief and in the

19  remand and in the case that you have that opinion, they

20  indicated that he should have been taken -- it says here

21  again on page 508 of Elsworth, which the Court referred to

22  several times, "Consequently, we conclude that under West

23  Virginia Code 495(a)(d), when a juvenile is taken into

24  custody, he must immediately be taken before a Referee,

35

1    Circuit Judge, or Magistrate.  If there is a failure to do

2    so, any confession obtained as a result of the delay will

3    be invalid for the primary purpose of the delay was to

4    obtain a confession from the juvenile."

5                    Now, they could have cured this I

6    believe very simply on the 29th, had they marched him right

7    over to the Magistrate or a Judge and advised him that he

8    had certain rights and what-have-you, a constitutional

9    right to an attorney, and et cetera.  But they failed to do

10   any of these things.

11              THE COURT:  So you think if they had taken him

12   before somebody after the statement, it would have

13   validated the statement?

14              MR. BICKLEY:  I think they have to question him

15   again then.

16              THE COURT:  And get a new statement?

17              MR. BICKLEY:  New statement.

18              THE COURT:  See, if either of you disagree with

19   me, it doesn't matter with getting statements there, does

20   it?  It's good police work to get a guilty party to confess

21   to a crime.  Is that a fair statement?

22              MR. HUFFMAN:  That's a fair statement.

23              THE COURT:  None of us lawyers likes confessions.

24   Frankly, I asked the question about whether they are

1   suspect because I think generally everybody has some

2   reservations about it.  But it is good police work to get

3   a confession from a guilty party.

4          MR. HUFFMAN:  If you draw the distinction between

5   what's good police work and what's good to support a

6   conviction.

7          THE COURT:  I understand that.  I understand.  No

8   good police officer wants a dirty confession.

9                    Okay, now, do you think if they said --

10  they're coming down the road and they get over to about

11  Marietta and they smell a confession coming, and they say,

12  you know, "This is going to be easy if we could get this on

13  a tape recording," and they specifically figure, "We're

14  going to get us a rock solid confession, and the best way

15  to do it is to delay our trip to Charleston."  Now is that

16  enough to invalidate the confession, that alone, if they

17  intended to stop to get a confession, a delay for that

18  purpose?

19         MR. HUFFMAN:  I think it is under Elsworth.

20         THE COURT:  But that's not what Elsworth says.

21  Elsworth is an affirmation of those facts.  Everything that

22  Elsworth says is suggestive rather than dispositive.

23         MR. HUFFMAN:  In this case, you've got the trip

24  down from Ohio where they left sometime in the afternoon --

1   3:00; I'm not sure -- they stopped in Parkersburg, an hour

2   from Charleston, an hour and ten minutes from Charleston,

3   at 7:00, before seven.   The first statement is taken, he

4   signs a waiver at ten minutes till seven, they talk to him

5   and the second waiver he signs about 10:00 at night.

6           THE COURT:   I've got some questions I want to ask

7   about that, but let's talk about the first confession.   You

8   all don't derive a lot of benefit in terms of the defendant

9   in this case by getting a second confession suppressed, but

10  not the first, do you?

11          MR. HUFFMAN:   I think they both got -- for the

12  same reason, I think they both need to be suppressed.   And

13  I think for the same reason that the third confession was

14  suppressed, the first two should also be suppressed, and

15  the only reason the Court didn't do it whenever it was

16  there the last time, the objection was never preserved as

17  to these two prior to trial, because the Elsworth case took

18  place and was decided after this case was tried.

19          THE COURT:   Now, let me add a little to the

20  formula.   Does it make any difference if the police

21  officers believe that if they take Mr. Moss to a

22  Magistrate, they know that the Magistrate's going to, in

23  the ordinary course of affairs, as every Magistrate does in

24  every county in the State of West Virginia, want a form

1   provided to them by the West Virginia State Supreme Court

2   and he will be given his opportunity for counsel, and he

3   signs a financial affidavit and you know that the Supreme

4   Court says that that's an indication of his desire to have

5   counsel appointed, and from that point on, a law

6   enforcement officer can't talk with him anymore.

7                           Let's assume that these officers think,

8   "If we wait till we get to Charleston, he's going to sign

9   that and then we're in a pickle. We're not going to get

10  this confession that's going to help our case." Does that

11  add anything to the case, do you think?

12          MR. HUFFMAN:   I'm sure all the police officers

13  would think "If he's got a chance to talk to a lawyer,

14  we're not going to get a confession out of him."

15          THE COURT:   That's not always the case.

16          MR. HUFFMAN:   But what's balanced here is the

17  question of whether or not -- what's the statute intended

18  to do? I mean we're talking about a difference between an

19  adult and a juvenile. You know, what we're balancing is

20  whether or not police officers should be able to get a

21  confession before he sees a lawyer versus whether or not

22  the statute requires them to present him before a

23  Magistrate.

24                           I mean that's what we're dealing with,

1   whether or not good police work, in this sense, has got to

2   go by the wayside in favor of what the statute says and

3   whether or not he has a constitutional right to consult

4   with an attorney or with a Magistrate or with his parents

5   or with someone other than a juvenile surrounded by several

6   police officers in a police station.

7                    And for me, the distinction here is

8   it's not that they were on a two-day trip and it was the

9   best time to do it or they should have done it then.  I

10  mean by the time they took the second confession, they

11  could have been in Charleston.  They were an hour and ten

12  minutes, seventy-some miles away.  The purpose for the stop

13  in Parkersburg was to delay in order to get a confession.

14  I don't think there's any question about that.

15                   The question in my mind -- and it's not

16  a question in my mind -- is whether that's in violation of

17  the statute in the Elsworth case, and I think it is.  I

18  mean if they had him down here, they could have -- I mean

19  what do you do with a confession that you can't use?  I

20  don't think it's a question of whether they should have

21  taken the confession and talked with him or not.  It's can

22  it support a conviction or should it be suppressed at his

23  trial, and I think the statute requires that.

24                   THE COURT:  Again, I don't have the benefit of

1    having read these parts of the transcript. Does it appear

2    relatively   clear   that   they've   had   no   substantive

3    discussions in the car about Reggetz?

4         MS. LUSK:  Well, Moss says they did.

5         THE COURT:  That they did?

6         MS. LUSK:  Moss says that they beat him all the

7    way to Parkersburg and that they systematically informed

8    him of the facts of the case and told him that he'd better

9    spit it out when they got to Parkersburg. But the troopers

10   say that that absolutely did not occur.

11              And the Supreme Court upheld the lower

12   Court's finding that the case on the admissibility on the

13   voluntariness that the Court made the right decision on

14   that, that the statements were voluntarily given.

15              Procedurally, your Honor, there's no

16   question that John Moss was a juvenile in October of 1980.

17   But he was, in fact, eighteen years of age.

18              And when we look at the Elsworth case,

19   Judge, you'll see that in Elsworth, even though the

20   statement is made about the purpose of delay being for a

21   confession, in Elsworth, the confession was admitted. It

22   was not suppressed. In the biggest number of cases which

23   cite Elsworth, the confessions are admitted, they're not

24   suppressed.

41

1              In the Elsworth case, the person was

2    taken into the car, admitted he had been lying, then later

3    at the station, he was given his Miranda warnings, gave a

4    seven-page written statement, was taken to a Magistrate

5    approximately two and a half hours later, and they said

6    that was fine, that his confession started within an hour

7    of the beginning of the questioning.  And that's really the

8    focal point that we have to look at, because there are so

9    many things, so many time frames, that if they don't count.

10             The transportation time doesn't count,

11   the booking time doesn't count, the time after the

12   confession being taken for arraignment doesn't count, the

13   time they may take him out -- and there's one case where

14   they take somebody out for four hours, search him for

15   evidence after the confession.  The focal point is the

16   time.

17             THE COURT:  Now you're talking about under this

18   statute or under the juvenile statute?

19             MS. LUSK:  Under both the juvenile and the adult.

20             THE COURT:  Well, you see, I think there's a

21   clear distinction.  The forthwith requirement for the adult

22   statute has been held by our Supreme Court to mean any time

23   within six months technically, but you've got to

24   acknowledge that that statute has been construed very

42

1    liberally in favor of the law enforcement officer.

2              There's a distinction based on the

3    terms.  Non only is there a forthwith requirement here, but

4    there's an immediate requirement also and it seems to me

5    like the Court has made the distinction, number one, based

6    upon that distinction of language that the Court ruled, but

7    also the Legislature made a distinction, because they said

8    no later than the next day.

9         MS. LUSK:  Well, yes, Judge, but the cases cite

10   back and forth too.  Elsworth is cited in the adult cases

11   and vice versa.

12        MR. REVERCOMB:  And Moss is cited in adult cases.

13        MR. BICKLEY:  The distinction here, your Honor,

14   in Elsworth, he was taken before a Magistrate two and one-

15   half hours afterwards.  He was taken to a Magistrate.

16   That's why the confession was upheld.

17        THE COURT:  Let me suggest that I have a serious

18   problem with the argument that the failure to take the

19   defendant promptly before a Magistrate for presentment

20   after he confesses invalidates the confession.  It doesn't

21   make any sense.

22        MR. BICKLEY:  But it wasn't invalidated in

23   Elsworth.  In Elsworth, remember --

24        THE COURT:  Now wait.  But you've got a detour in

43

1  Elsworth.  You don't go straight to the Magistrate.  You go

2  straight to the police station and then to the Magistrate

3  in Elsworth.  That's what you do in this case.  The only

4  difference is, as I understand it, number one, that it's

5  further from Cleveland to Charleston than it was from Mr.

6  Elsworth's place of apprehension to the Magistrate, number

7  one.

8          And number two, there was a greater

9  amount of time both before and after the confession was

10 made in this case than there was in Elsworth.  But that's

11 all.  That's the only distinction.

12         MR. BICKLEY:  They never went to a Magistrate.

13         THE COURT:  In that case, in Elsworth, they went

14 to the police station in order to take down his confession.

15 They didn't go straight to the Magistrate and wait.

16         MR. BICKLEY:  But they did go to the Magistrate,

17 though, in Elsworth.

18         THE COURT:  Afterwards.

19         MR. BICKLEY:  They never went to a Magistrate

20 here.

21         THE COURT:  I don't understand how that makes any

22 difference at all.  The validity of the statement can't

23 depend on the absence of the events that occurred

24 afterwards.

1      MR. BICKLEY:  That's the whole basis for the 30th

2  of October suppression by the Supreme Court.

3      THE  COURT:   But  in  that  case,  you've  got  a

4  judicial day requirement that's past.

5      MR. BICKLEY:  You say what?

6      THE  COURT:   He  was  taken  into  custody  on  the

7  28th.  Anything that happens later than the next judicial

8  day after the 28th is invalid, by virtue of the statute.

9  Absolutely.   That's what the judicial day requirement is

10  all about.  That's what distinguishes the juvenile statute

11  from the adult statute.

12      MR.  REVERCOMB:   But  only  delay  prior  to  his

13  confession can be said to have induced it.

14      THE COURT:  Sure.

15      MR. REVERCOMB:  Not afterward.

16      THE COURT:  I think that Mr. Revercomb's correct.

17  The  conduct  after  the  confession  could  be  egregious  as

18  heck, and I can't imagine under what circumstances that's

19  going to -- it seems to me the key to your case is that, in

20  fact, he wasn't taken straight to the law enforcement

21  officers, that he was diverted in the course of that trip

22  for the purposes of obtaining a confession.

23      MR. BICKLEY:  That's right.

24      MR. HUFFMAN:  That's exactly right.

45

1        THE COURT:  What happened after that doesn't make

2   any difference.

3        MR. HUFFMAN:  In this case, it doesn't.

4        THE COURT:  You're right on that point.  Now

5   distinguish Elsworth for me.  Tell me how Elsworth's

6   different.  There isn't any question in Elsworth, is there,

7   that Mr. Elsworth didn't go straight past go; he went

8   straight to a Police Station before he went straight to a

9   Magistrate.

10       MR. HUFFMAN:  The difference is in this case, the

11  purpose for the stop was to obtain a confession.

12       THE COURT:  Why did they take him to the police

13  station in Elsworth?

14       MR. HUFFMAN:  Because they were taking him for --

15  it was different.  They just apprehended this fellow at the

16  scene of the crime.  We're talking about a guy who's

17  already in jail, who's been under investigation for this

18  particular crime since January of 1980.  The Prosecutor

19  knew what they -- the Prosecutor's office and the State

20  Police officers knew what they were talking to him about.

21  They spent a total of maybe fifteen minutes talking about

22  the crime that he was actually picked up on.

23       THE COURT:  The malicious wounding?

24       MR. HUFFMAN:  Yeah.  He was never charged with

1    that.   Nothing ever happened with that.

2          THE COURT:  If you were a law enforcement officer

3    and you smell blood in a homicide, you're going to push

4    that a little harder than a malicious wounding, aren't you?

5          MR. HUFFMAN:  And I agree.

6          MS. LUSK:  Did you say he was charged with it?

7          MR. HUFFMAN:  Was he?

8          MR. REVERCOMB:  Yes, he was charged.

9          MS. LUSK:  Yeah, there was a pending petition.

10   He was charged with that.

11         MR. REVERCOMB:  That's what they went -- the

12   detainer was based upon juvenile petition for malicious

13   wounding.

14         MR. HUFFMAN:  But nothing ever happened with

15   that.

16         MR. REVERCOMB:  No, because that was held up for

17   prosecution of the homicide.

18         MR. HUFFMAN:  He was here on the 30th.  On

19   November the 2nd was whenever the detainer was issued on

20   the murder charge, and that's what everything has proceeded

21   on since that time.

22         MR. REVERCOMB:  That's right.  Your Honor, I

23   think Elsworth is pretty close to --

24         THE COURT:  Well, that's not inconsistent with

1   the circumstances in this case.   There's an indictment

2   against another fellow who's about ready to go to trial.

3           MR. REVERCOMB:   That's right.

4           MR. HUFFMAN:   And if you're a police officer and

5   you obtain two confessions from a fellow -- I mean at what

6   point do you stop investigating the crime?   I mean

7   obviously, to them, they stop investigating when they don't

8   continue to question him.   What we contend the failure was

9   is that they should have presented him before they

10  questioned him.   And the fact that they didn't -- he should

11  have been presented before a Magistrate prior -- when he

12  was here, and then they could have questioned him all they

13  wanted after that.   And any confessions they obtained after

14  that would have been admissible.

15          THE COURT:   Let me get back to my earlier

16  question.   Distinguish <u>Elsworth</u> in some material way from

17  this case.

18          MR. HUFFMAN:   The time spent and the purpose for

19  the -- the time spent for a trip that took four hours with

20  a fellow who was already in custody, had already been

21  investigated, they knew what they were going to do with him

22  whenever they got him, and the sole purpose for the stop --

23          THE COURT:   Now, was there any question in this

24  case that from Mansfield, Ohio, to Parkersburg, there's no

48

1    delay?  The delay occurred when --

2            MR. HUFFMAN:  That's right.

3            THE COURT:  Okay, now, there's no question in

4    Elsworth that there was no delay between the time Mr.

5    Elsworth was apprehended and the time he got to the police

6    station, and he was diverted at the police station for the

7    purpose of taking his statement from him.

8                        And all the rest of the delays that

9    you've got to complain about occurred after the confessions

10   in this case, with the exception of the second confession.

11   You have a bunch of time in there where he could have very

12   well been presented for whatever reason before a

13   Magistrate.

14           MR. HUFFMAN:  I mean that basically is our

15   argument, that he was not presented.

16           MR. REVERCOMB:  Your Honor, Elsworth is similar

17   in that what happened to Mr. Moss, when they picked him up,

18   after getting new information, I'm sure they took him

19   straight to the police department, told him they had some

20   new evidence.  They didn't take him before a Magistrate.

21   He did confess, and they said, "That's fine."

22           MS. LUSK:  Elsworth, your Honor, is often

23   followed in this -- there's a Mark E. P. case, which is a

24   case out of Mercer County, where a couple of boys tied a

49

1    woman to a bed and poured gasoline on the bed and burned

2    her.  They were jointly transferred to adult status.  And

3    the name of the case is Mark E. P., but with it is John A.

4    L.  And the case was sent back -- reversed and sent back

5    for more suppression hearings in 1985, and then in 1987,

6    the Court suppressed Mark E.P.'s confession, holding that

7    he was in defacto arrest.

8                    But the John A.L. confession, where

9    based upon Mark's confession, they had obtained a petition

10   against John A.L., they had probable cause to arrest him.

11   He was under actual arrest when they picked him up.  They

12   took him to the police station and talked to him and he

13   started confessing in less than an hour and was

14   subsequently taken to a Magistrate.  And they said that

15   that was all right too.

16                    The facts are similar with this John

17   A.L.'s confession, as they are with the Elsworth

18   confession.

19            THE COURT:  Do you have a cite on that case?

20            MS. LUSK:  On rehearing, it's 363 SE 2d 729, and

21   I have a copy of it here, Judge, if you'd like to see it.

22            THE COURT:  Yeah, I would, please.  Let me ask

23   you essentially the same question except from a different

24   perspective.  There isn't any question in this case that

1    the officers Smith and Williams diverted from the direct

2    route to the City of Charleston to get a confession, is

3    there?

4             MS. LUSK:  Your Honor, but the diversion means --

5             THE COURT:  No; wait a minute.  As Judges are

6    known to say on television anyway, a simple yes or no will

7    do, and then you can explain your answer.

8             MS. LUSK:  Well, they stopped.  They did stop.

9             THE COURT:  Well, I thought you just told me a

10   minute ago that the evidence of this case would be that the

11   officer says, "We want to talk to you about some much more

12   serious things --" --

13            MS. LUSK:  Right.

14            THE COURT:  -- "-- and it's a much more fitting

15   place to do that outside of this car in a nice, comfortable

16   police station that's warm" and that sort of stuff.  They

17   had in mind to take him in an attempt to get a confession,

18   right?

19            MS. LUSK:  Right.

20            THE COURT:  So they were delayed in their

21   immediate presentment to get a confession.

22            MS. LUSK:  True.  They didn't change courses,

23   though.  I mean it is in a direct line, the right road, in

24   other words.  I mean they stopped at the first State Police

1  barracks they came to as soon as they crossed the West

2  Virginia line, and they were traveling on the same

3  interstate that they would have continued on to Charleston.

4  I mean they didn't take a route through Roane County or

5  anything.

6          MR. REVERCOMB: It's a lot like the Guthrie case,

7  your Honor.

8          THE COURT:  Right.

9          MS. LUSK:  And Elsworth focuses on the fact that

10  there's no circuitous journey.

11          THE COURT:  I understand that.  I understand

12  that.

13          MS. LUSK:  Judge, this is the Mark E. P. and John

14  A. L. case.  Now, I also have the first one where they

15  remanded it back, but this is the one where the Court

16  actually rules on the confession in 1987.

17          THE COURT:  This is what I need.  Let me ask you

18  this.  I'm not inviting briefs.  I, frankly, would just as

19  well, as soon, not have them.  But if either of you wants

20  to submit something, I'll take it.

21          MR. BICKLEY:  We will submit something.

22          MR. HUFFMAN:  Judge, everybody's talking at my

23  back.  Picking through the Elsworth case, the distinction

24  that is made, and I guess the same distinction on mine is

1   the amount of time involved.  If you'll look on page 509,

2   the Court specifically -- and the Court really doesn't give

3   a lot of reasons in this opinion as to why specifically it

4   didn't invalidate this particular confession.  Actually, if

5   you read the Court's opinion all the way through, it looks

6   like they're ruling just the opposite until it gets to the

7   very end, except that if you look under Headnote 10, what

8   the Court really pegs on here is the amount of time, the

9   overall time that was involved.

10         THE COURT:  I'm sorry.  Are you talking about

11   Elsworth?

12         MR. HUFFMAN:  Elsworth.  Yeah, you were asking me

13   why is this particular situation different than Elsworth.

14   This is why I believe it's different.  On page 509 it says

15   there at Headnote number 10 in the center of the page, the

16   reading starting with the second sentence there, "The

17   written statement was started approximately one hour after

18   the juvenile was first picked up.  The record does not

19   disclose how long it took to transport him nor the exact

20   time period from the oral confession in the police cruiser

21   to the start of the written confession, but the interval is

22   clearly less than one hour."  That's certainly not the case

23   here.  He spent more than an hour in Parkersburg.

24         THE COURT:  But that's only because it's a longer

1   distance.

2          MR. HUFFMAN:  But he --

3          THE COURT:  It has nothing to do with this.

4          MR. HUFFMAN:  But I think that's the reason they

5   didn't invalidate it was because of the short period of

6   time involved.  I think if there had been a longer distance

7   to travel and a longer period of time involved here, the

8   end result would have been different, although the opinion

9   may have been the same thing.

10              But in this particular case, we're

11  talking about a juvenile that's made a four-hour trip that

12  started at 3:00 in the afternoon and his second confession

13  didn't start until 9:30, or 9:22.  I mean they spent more

14  than an hour in Parkersburg taking two confessions from

15  this juvenile.  That, to me, violates what the statute says

16  and what the Elsworth case stands for.

17         THE COURT:  The logic to that is they could never

18  get a valid confession if they drove cross-country.

19         MR. HUFFMAN:  Well, your Honor, they need to take

20  the precaution necessary.

21         THE COURT:  At the speed limit nonstop.

22         MR. HUFFMAN:  But I mean I guess what we're

23  talking about is not what you're able to do as a police

24  officer to obtain a valid confession, although that's

1    obviously part of what the end result is, but what is

2    necessary to protect the rights of a juvenile and what's

3    the statute require.

4              THE COURT:  Okay.  My idea of immediacy is that

5    there be -- that the route be direct and without inordinate

6    or inappropriate delays along the way.  Now, because it

7    took whatever it took, three hours, to get from Cleveland

8    to Parkersburg, does not add any delay that's greater than

9    the Elsworth case, because it's the direct route.  I don't

10   see that as an issue in the case.

11             Frankly, what I see as the issue in

12   this case is that so far as I understand it -- and I, as

13   I've said, have not read the transcript -- is that he was

14   taken to the police station for the purposes of obtaining

15   a confession.

16             MR. HUFFMAN:  That's exactly right.

17             THE COURT:  Okay?  And that created a delay.  So

18   insofar as immediate means, they came straight away, he

19   wasn't taken straight away.  But even though the Court has

20   used that language in Elsworth, the detour in Elsworth was

21   practically identical.  The only difference is Mr. Elsworth

22   was picked up in the immediate vicinity of the offense and

23   the nearest Magistrate, and instead of taking four hours to

24   transport him, it took a matter of minutes.  But the delay

1   is identical.

2          MR. HUFFMAN:  Well, in the sense that a delay is

3   a delay, for however long it takes to go from point A to

4   point B when one happens to be longer than the other, yes.

5   But I think the purpose for the statutory section begins

6   with, you know, what immediately means for a juvenile are

7   different than what it means for an adult.

8          THE COURT:  No question about it.

9          MR. HUFFMAN:  Obviously, it's the result of the

10  circumstances weighing upon a juvenile and the seriousness.

11  In fact, I think there's a specific quote in the statute

12  that says the reasons for it to begin with is because when

13  there is a serious crime involved -- and you can't get more

14  serious than this -- the purpose is to protect the juvenile

15  so they don't give statements unless he's apprised of his

16  rights, and that's the question here.

17         THE COURT:  I was there when the legislation was

18  passed.  The notion is that a juvenile has got less of an

19  ability to make an informed judgment about making a

20  statement.  That's all.  I admit there ought to be a

21  greater protection extended.  I don't think there's any

22  question about that.  I think you're absolutely right.

23              Well, how much time do you want?

24         MR. HUFFMAN:  We're looking at a trial date of

56

1   the 16th of April.

2           THE COURT:  The sooner the better, because you

3   all are going to have to respond.  Either the State is

4   going to have to react to no confession and the defense

5   gets the bonanza, or the defense is going to have to know

6   that you're going to have to defend in the presence of the

7   confession.  So it seems to me the sooner, the better.  I'd

8   like to give you as much lead time as I can.  I intend to

9   give this case deference.

10          MR. BICKLEY:  Monday, your Honor?

11          THE COURT:  Oh, that's plenty.  You can give it

12  to me a little later than that.

13          MR. BICKLEY:  Well --

14          THE COURT:  Okay, Monday's fine.

15          MR. BICKLEY:  We don't want to wait too long.

16  And then we'll have two days to reply?

17          THE COURT:  Let me suggest this.

18          MR. HUFFMAN:  So do you want submission on Monday

19  and then two days to respond?

20          THE COURT:  Yes.

21          MR. BICKLEY:  Do what?

22          MR. HUFFMAN:  He wants submission on Monday and

23  two days to respond.

24          THE COURT:  Is that all right with you?

1          MR. BICKLEY: Yes. Is that all right, Neva?

2          MS. LUSK: Yes.

3          THE COURT: Okay, now, let me suggest this. Make

4   it easy on yourself. I don't think I need a lot of

5   narrative. If you've got a case that you think certain

6   points of the case are relevant, I'd just as soon have

7   that. Don't wear yourself out with a lot of argumentative

8   content. I really would just as soon have clean law and

9   how it applies. Okay. In the meantime, I'm going to ask

10  that the suppression hearing evidence and the transfer

11  hearing evidence be brought to me.

12         MS. LUSK: Judge, that may be a thousand pages

13  when you get down to it. It's a lot. Now, you'll find in

14  the suppression hearing that they were also focusing on

15  lots of other evidence. There is suppression testimony

16  relating to the seizure in Cleveland of the camera. There

17  is suppression evidence of the seizure of the blood, which

18  occurred in April.

19         THE COURT: Incidentally, I think I can read

20  through that. I assume there's a bunch of evidence about

21  the 30th confession too.

22         MS. LUSK: No, there isn't.

23         THE COURT: There isn't?

24         MR. REVERCOMB: No.

58

1          MS. LUSK:  No, that was during voir dire in the

2     trial that that was discovered.

3          MR. REVERCOMB:  We didn't know about the third

4     confession at that time.

5          THE COURT:  It might not be here if it wasn't

6     used.  Okay, is it correct that the same officers who took

7     this statement took the statement from Reggetz?

8          MS. LUSK:  No, Woodrum took the statement from

9     Reggetz.

10          MR. REVERCOMB:  Your Honor, I have some other

11     cases.  Do you want me to wait and submit those?

12          THE COURT:  Yeah, you might as well.

13

14          WHEREUPON, the hearing was adjourned.

15

16

17

18

19

20

21

22

23

24

# MOSS v. BALLARD
## CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 31

IN THE CIRCUIT COURT OF KANAWHA COUNTY,

WEST VIRGINIA

STATE OF WEST VIRGINIA

vs.                                    Action No. 82-F-221

JOHN MOSS, JR.

BEFORE:  Hon. A. Andrew MacQueen

SUPPRESSION HEARING

April 13, 1990

4/13/90

Connie L. Cooke

Official Reporter

933

2

APPEARANCES

FOR THE STATE:

Neva Lusk, Assistant Prosecuting Attorney
Stephen Revercomb, Assistant Prosecuting Attorney
Office of the Prosecuting Attorney
Kanawha County Judicial Building
111 Court Street
Charleston, WV      25301

FOR THE DEFENDANT:

The Defendant, in person

Nelson R. Bickley, Esq.
Bickley, Jacobs & Barkus
823 Charleston National Plaza
Charleston, WV      25301

Kathy Beckett, Esq.
Robinson & McElwee
600 United Center
P. O. Box 1791
Charleston, WV      25326

Timothy E. Huffman, Esq.
Jackson & Kelly
1600 Laidley Tower
P. O. Box 553
Charleston, WV      25322

3

1       BE IT REMEMBERED, that on Friday, the 13th

2   of April, 1990, during the January 1990 Term of

3   said Court, in the matter of the State of West

4   Virginia versus John Moss, III, upon Action No. 82-

5   F-221, as stated in the caption hereto, upon a

6   Suppression Hearing, the following transpired:

7

8       THE COURT:  The first thing I want to take

9   up is this letter that I received from Professor

10  Frank Cleckley at West Virginia University.

11      You've seen this; haven't you?

12      THE DEFENDANT:  Yes.

13      THE COURT:  He -- basically, the letter

14  raises his concern about this case going forward

15  because of some reservations apparently that you

16  have expressed to him about your lawyers in this

17  case.    And he asks that either I postpone this

18  case or that I conduct a hearing to determine that

19  any fears about your counsel are unfounded, and I

20  want to take this up before we go any further,

21  because obviously this is a matter of some

22  substantial concern.

23      Do you -- in fact, are you concerned about

24  the work that your attorneys have done?

4

1      THE DEFENDANT:  When everyone faces this

2  problem, after the conversation between myself and

3  my attorneys here, I talked to them yesterday, I

4  seem to believe that they have been working on my

5  case.  But I was just misinformed about what they

6  were doing.

7      THE COURT:  And you're satisfied that they

8  have adequately prepared to defend this case?

9      THE DEFENDANT:   I  believe  at  the

10 conversation that we had that they are prepared.

11     THE  COURT:  Okay.  Do  you  have  any

12 hesitation about going forward to trial set for

13 Monday, other than the fact that, obviously, nobody

14 looks forward to going to trial on a murder charge?

15     THE DEFENDANT:  Excuse me, sir?

16     THE COURT:  Well, obviously, nobody wants

17 to go to trial on murder charges, but there has to

18 be a trial in this case; are you satisfied that

19 it's all right to go forward on Monday?

20     THE DEFENDANT:  If my counsel's ready,

21 your Honor.  From things they told me yesterday,

22 they have been in touch with witnesses and they've

23 been getting things together.

24     THE  COURT:  Are  you  all  ready  to  go

5

1    forward?

2          MR. BICKLEY:  Yes, your Honor.

3          THE COURT:  Do you have any hesitation

4    about going forward with these lawyers representing

5    you?

6          THE DEFENDANT:  No, I don't.

7          THE COURT:  Well, let's go on then.  What

8    -- let me just ask you all, how do you expect your

9    case to be sequenced?  What are you going to put on

10   in what order, roughly?

11         MS.  LUSK:  Well,  one  of  the  main

12   investigating  officers;  the  medical  examiner;

13   Reggettz --

14         MR. BICKLEY:  The medical examiner -- Dr.

15   Sopher?

16         MS. LUSK:  Right.

17         MR. BICKLEY:  Your Honor, I'd like to file

18   a  motion  in  limine  that  Dr.  Sopher  concerned

19   himself primarily with the death of the victims,

20   and the time of death, and I fear that he may far

21   afield.

22         THE COURT:  Let's take that up in just a

23   second.  Let me this other stuff out of the way

24   first.

6

1          MR. BICKLEY:  All right.

2          THE COURT:  Okay.  Who else?

3          MS. LUSK:  Well, we've got an employee of

4    the A&W where Reggettz came in and asked that they

5    call the law, that his wife had been murdered.

6          We've got a friend of the Defendant's;

7    that friend's mother, whom he had given a Christmas

8    gift to; a fingerprint expert; a firearms expert --

9          MR. REVERCOMB:  A serology expert.

10         MS. LUSK:  A serology expert.

11         THE COURT:  My understanding, by the way,

12   is that because of the degradation in the blood

13   samples, that it was impossible to do DNA testing?

14         MS. LUSK:  Right.

15         There are three short jail house

16   confessions.

17         THE COURT:  Made to other inmates?

18         MS. LUSK:  Yes, sir.

19         THE COURT:  Here?

20         MR. REVERCOMB:  Here and in the

21   penitentiary.

22         THE COURT:  Well, the one in the

23   penitentiary, I take it, then, was not something

24   that was disclosed at the original trial?

7

1          MS. LUSK:  That's right.

2          MR. REVERCOMB:  None of them --

3          MS. LUSK:  None of them were.  There is a

4    State Police diving expert, who dove where Reggettz

5    told them he threw the guns on the way to work.

6          THE COURT:  And he's just going to testify

7    that he didn't find them?

8          MS. LUSK:  Yes; he's testified before.

9          THE COURT:  Well, you're obviously going

10   to put the Officers on who have the confessions;

11   right?

12         MS. LUSK:  Yes.  That's all I can think

13   of, off the top of my head.

14         THE COURT:  If cross-examination is equal

15   in time to direct examination, how long do you

16   think it would take?

17         MS. LUSK:  If it equaled?  Oh, Lord.

18         MR. REVERCOMB:  I'd say we have five

19   anchor witnesses who are going to take a while.

20   The rest of them will be relatively short.  And the

21   long witnesses will be long.  I'd expect that maybe

22   one of them may take a day.

23         MS. LUSK:  Just the direct.

24         MR. REVERCOMB:  Well, it may not be that

8

1  long, but it may be.

2      THE COURT:   So, if you put it all

3  together, what are you looking at?

4      MS. LUSK:  I would say our case would take

5  probably at least four days, with no cross-

6  examination.

7      THE COURT:  With no cross?  Okay.

8      MS. LUSK:  At least four days, with no

9  cross-examination.

10      THE COURT:  Okay.

11      MS. LUSK:  Maybe longer.

12      THE COURT:  Okay; now how has discovery

13  gone?  Do you have, to your knowledge, everything

14  that you need?  Have you been exposed to everything

15  they have?

16      MR. BICKLEY:   They have disclosed

17  everything, your Honor.  They gave us some things

18  this morning that we should know.

19      THE COURT:  Is there any evidence, new

20  evidence, from the time of the first trial, other

21  than those three statements, the jail house

22  confessions?

23      MS. LUSK:  I don't think there are any --

24  that's the only new witness.

1           THE   COURT:    The   reason   I   ask   that

2   question, obviously if Defense counsel have had the

3   opportunity to read the transcript of the first

4   case,   that   is   going   to   provide   substantial

5   discovery.

6           MS. LUSK:  Sure.

7           THE   COURT:    If   there   is   material

8   extraneous to that post-trial, I want to find out

9   if they know it.

10          Is   there   anything   in   there   other   than

11   those statements that you can think of?

12          MR. REVERCOMB:  No, your Honor.  We have

13   not yet received any written answers from them no

14   our discovery.  They say they're going to have an

15   alibi defense, and we've not received anything on

16   that.

17          MR. BICKLEY:  That's my fault, your Honor.

18   We have an alibi defense, which is basically the

19   same defense.  We did inform them, and I'm remiss,

20   we just haven't had an opportunity to -- we're

21   utilizing the same witnesses, and we just decided

22   last night, or the night before last, that we are

23   going to use a psychiatrist, or we're thinking

24   about using a psychiatrist.  We're going to use Dr.

10

1   Massenburg.   At least, I'm going to talk to him

2   this weekend and see if he can help us; if not,

3   then -- but you're on notice that we --

4          THE COURT:  In what kind of defense?

5          MR. BICKLEY:  He is going to evaluate the

6   two confessions for us and give us the benefit of

7   his expertise as to the propensity of one person

8   vis-a-vis another, as to the type of confession.

9          THE COURT:  You say both confessions, your

10  client's and Reggettz's?

11         MR. BICKLEY:  Right.  My client's and Mr.

12  Reggettz's both.

13         THE COURT:  Okay.  This Massenburg, who is

14  he?

15         MR. BICKLEY:  He's with Dr. Smith.

16         THE COURT:  He's a psychiatrist?

17         MR. BICKLEY:   He  is  a  psychiatrist.

18  Psychiatric Group is the name of --

19         THE COURT:  Okay.

20         MR. BICKLEY:  And I will have to get an

21  Order in to you to authorize that so he can be

22  paid.

23         THE  COURT:   Has  he  reviewed  these

24  materials to this point?

11

1      MR. BICKLEY:  He has not.  I'm making a

2  copy -- I called him yesterday to see if he was

3  available in forensic psychiatry, and both he and

4  his partner is.  So, he asked me -- he couldn't

5  give me an answer one way or another until he could

6  find out what the problem is or what I wanted or

7  what could I provide.  And he wouldn't make any

8  statement -- he wouldn't commit himself as to

9  whether or not he could provide me with what I

10  wanted to use in the two confessions, or the

11  confessions of the two individuals.

12      THE COURT:  Okay.  Well, you need to

13  disclose those in case he has an opinion -- if he

14  expresses one.

15      MR. BICKLEY:  I will do that, your Honor.

16  I'll give that to the State as soon as I find out.

17      THE COURT:  But you are going to use an

18  alibi defense?  You're going to use the same

19  witnesses, the same --

20      MR. BICKLEY:  An alibi, yes, and the same

21  witnesses -- that's the same defense they had the

22  last time.

23      MS. LUSK:  Judge, that's really going to

24  be putting us in a position of being an expert

12

1   short, though.  You know, we may find out on

2   Saturday, or Easter Sunday, that they've got an

3   expert to testify in the case when we don't have

4   the opportunity to ask for an expert of our own.

5        THE COURT:  Oh, I think there's got to be

6   a rebuttal witness.

7        MS. LUSK:  You're going to talk about him

8   interviewing your client?

9        MR. BICKLEY:  No.  He's just going to look

10  at the confessions.

11       MR. REVERCOMB:  That's another problem,

12  Judge.  It's one thing to look at a summary

13  confession of Paul Reggettz, just a summary; but on

14  the other hand, you have a taped confession, or

15  what purports to be a taped confession of John

16  Moss.  I mean, that's a different -- I don't

17  understand how a psychiatrist can --

18       MR. BICKLEY:  Well, do you all have

19  another copy of that taped confession?  We have a

20  transcript of it, but --

21       MS. LUSK:  No.

22       MR. REVERCOMB:  The original is stored

23  with the evidence in the previous case downstairs

24  in the Clerk's office.

13

1        MR. HUFFMAN:  I would think there ought to

2   be more than one copy of a tape.

3        MS. LUSK:  Well, see they monkeyed with

4   the tape at the first trial.  Remember?  They took

5   out the word "reformatory" so that the jury

6   wouldn't hear that they had been to the reformatory

7   in Ohio.  So, there is an edited tape that was

8   actually played for the jury that is evidence

9   downstairs, which is different than the original

10  tape.  The original tape was on two sides.  You

11  know, they played one side, finished it up, turned

12  it over -- there was a portion of that tape that

13  had been used in the Parkersburg Detachment, that

14  had some stolen property reports that had been

15  taken over the telephone, and that has nothing to

16  do with this case.  And then the confession was

17  completed on the back side of that tape.

18       For the trial in 1984, they took that tape

19  -- I don't know if it was to the State Police, or

20  where, but they had it copied and had the word

21  "reformatory" omitted from the confession.  It is

22  now contained on one side of a new tape.

23       So, there is two tapes, but they are both

24  downstairs.

14

1        THE COURT:  You mean, downstairs in the

2   Clerk's office?

3        MS. LUSK:  In the Clerk's office.

4        THE COURT:  Okay.

5        MS. LUSK:  But if you're asking if we have

6   one that you can send to Dr. Massenburg; no, we

7   don't.

8        THE COURT:  If you need to copy that, I

9   can make arrangements through the Clerk's office to

10  assist you in getting that.

11       MR. BICKLEY:  All right, your Honor.

12       MS. LUSK:  I had also told you, Tim, that

13  I thought we had that three-quarter inch WSAZ tape.

14  The tape we have is not that tape.  We took --

15       MR. REVERCOMB:  That's an audio tape of

16  his confession.

17       MS. LUSK:  Well, that's true.  But it's a

18  three-quarter inch tape.

19       We had in our file, and of course there is

20  no -- that WSAZ tape is not in evidence.  It is not

21  downstairs; it was never even marked.   It was

22  played for the jury in 1984, but it was not

23  admitted as an exhibit.   It was a twenty-eight

24  second spot of how bad Reggettz looked when he was

15

1    arraigned.  And it was played for the jury; but the

2    tape itself was not admitted.

3           And we found in one of the boxes having to

4    do with this case, a three-quarter inch WSAZ tape.

5    We assumed that that is what that was.

6           MR. REVERCOMB:  In our office.

7           MS. LUSK:  In our office.  And we took it

8    over to WSAZ, and it's not.

9           MR. BICKLEY:  It's not?

10          MS. LUSK:  No.  It's a three-quarter inch

11   -- it's an SAZ tape, but the first twenty-some

12   minutes of it have no picture at all, and it's

13   obviously a tape they just put the camera and

14   turned the visual off, and recorded the confession

15   of John Moss as it was played in the Courtroom, so

16   that they could take it and use a little bit of it

17   and play it on the news.

18          And then there is at the end of that, Arch

19   Moore announcing that he is running for Governor in

20   1984.

21          But anyway, it has nothing to do with

22   anything that transpired in 1979.  So, I don't know

23   --

24          THE COURT:  I take it that that tape was

16

1   something that the State put on?

2           MR. REVERCOMB:  It's not in evidence.

3           MS. LUSK:  No, it wasn't in evidence.  Oh,

4   oh, the Reggettz tape?  No; Parrish put that on.

5           THE COURT:  Why?

6           MR. REVERCOMB:  To show how bad he looked.

7   He had been up for fifty-nine hours, and he looked

8   disheveled and --

9           THE COURT:   What difference would that

10  make?

11          MR. REVERCOMB:  They were trying to make

12  Paul look bad.

13          MS. LUSK:  And he looked bad, evidently,

14  although we haven't seen the tape.

15          THE COURT:  Okay.  Is that something that

16  you want?

17          MR. BICKLEY:  We might want to look at it.

18  I'll --

19          THE COURT:  Do you know where it is?

20          MS. LUSK:  No.  Like I said, I thought we

21  had it.  We just found this three-quarter inch

22  tape, and I assumed that that is what it was.

23          MR. BICKLEY:  We thought it had been put

24  into evidence downstairs, and we looked in the

17

1   exhibit box.

2        MS. LUSK:  It's not admitted.  It's not --

3   it was never even numbered.  I went back and looked

4   at the two witnesses who testified about it.  They

5   were the custodian of the tape, and then they

6   brought in the reporter, I think, who was present

7   when the tape was made, and the tape was never even

8   marked.  It was just played.

9        THE COURT:  Who tried the case with Mike?

10        MS. LUSK:  Pete.

11        MR. BICKLEY:  No, Pete and Stuckey tried

12   that case.

13        MS. LUSK:  It wasn't Pete and Mike.

14        THE COURT:  Have you asked Pete if he

15   knows where it is?

16        MS. LUSK:  Have you asked him, Steve?  I

17   don't think I've asked him.

18        MR. REVERCOMB:  No.

19        MS. LUSK:  I intended to, but I --

20        THE COURT:  Why don't you do that and see

21   if he has any recollection at all.  At least let

22   them look at it.

23        MR. REVERCOMB:  Your Honor, there is one

24   question about a piece of additional evidence.  I

18

1    filed and served on Mr. Bickley yesterday a notice

2    of our intent to use the statement of Carlton Moss.

3    He is on our witness list.

4         THE COURT:  Now, who is Carlton Moss?

5         MR. REVERCOMB:    That  is  John  Moss's

6    brother.

7         THE COURT:  Okay.

8         MR. REVERCOMB:  We've tried to locate him

9    and I have a motion here to use it, and it's sort

10   of a memo of facts to support my motion.  I would

11   like to file this with the Court and give you this

12   copy.

13        THE COURT:  You gave me mine.

14        MR. REVERCOMB:  We intend to call him as

15   a witness if we can find him.  But if we can't find

16   him -- back in '84, we attempted to have him served

17   as an out-of-state witness and he was able to avoid

18   process.

19        THE COURT:  When the case was originally

20   tried?

21        MR. REVERCOMB:  Right.  He gives a very

22   important statement, and we would like to have him

23   here.

24        THE COURT:  Okay.  Was that put in in the

19

1  first case?

2          MS. LUSK: Huh-huh. It wasn't attempted.

3          MR. REVERCOMB: It wasn't attempted, they

4  just simply tip-toed around it somewhat. I guess

5  a hint of it came in.

6          THE COURT: Whose statement do you have?

7          MR. REVERCOMB: It's a fairly long

8  statement and very detailed about the elaborate

9  steps --

10          THE COURT: I mean, to whom was it given?

11          MR. REVERCOMB: It was given to the Police

12  back in 1980, October 30th, 1980.

13          THE COURT: What do you have, a tape-

14  recording of the statement?

15          MR. REVERCOMB: No; it's a signed

16  statement, actually.

17          THE COURT: A written statement?

18          MR. REVERCOMB: Uh-huh.

19          THE COURT: What do you do about the

20  confrontation part of it?

21          MR. REVERCOMB: Well, it's written and

22  signed, and it may have been typed and signed, too.

23  I'm not sure.

24          MR. BICKLEY: I haven't seen the

20

1   statement.  Are you going to show us the statement?

2          MR. REVERCOMB:  Yeah.

3          MR. BICKLEY:  When will we get to see it?

4          MR. REVERCOMB:  Do you want it now?

5          MR. BICKLEY:  Yes, I'd like to have it

6   now.

7          THE COURT:  Here it is; it's signed by

8   Carlton Moss.  It's a typed statement.

9          THE COURT:  Is that another copy?  You say

10  this is the Defendant's uncle?

11         MS. LUSK:  Brother.

12         THE COURT:  How do you get around the

13  confrontation?  Is that something you want to

14  object to?

15         MR. BICKLEY:  Yes, sir.  Very definitely.

16         MR. REVERCOMB:  Well, your Honor, under

17  804(b)5, I'd have to look at that rule, you may

18  want to read my memo, but obviously, you do have a

19  confrontation clause issue.  But I think that's the

20  whole purpose of 804(b)5, is there a submission in

21  any hearsay, any hearsay --

22         THE COURT:  804 just deals with hearsay.

23         MR. REVERCOMB:  It's 803 does too; the

24  basis of all hearsay exceptions is trustworthiness.

1   803 is whether the declarant is available or not.

2   The question is whether it is trustworthy.

3          THE COURT:  I'm not -- the Rules of Civil

4   Procedure don't purport to deal with the issue of

5   confrontation.  It just gives the definition --

6          MR. REVERCOMB:  Yeah, but the Rules of

7   Evidence do.

8          THE COURT:  I understand that.  But the

9   Rules of Evidence don't purport to address any

10  constitutional issues with definitions.

11         MR. REVERCOMB:  There is some case law on

12  that, your Honor.  I'd have to find it, but

13  obviously, the question has come up before.  And

14  the Rules of Evidence and case law hold that you

15  can let in statements under these circumstances.

16  I'm sure those cases discuss the confrontation law.

17         THE COURT:  Yeah; the Fourth Circuit does,

18  but I don't think it's a very reliable case.

19         MR. REVERCOMB:  Well, we have some cases

20  here.

21         THE COURT:  In West Virginia?

22         MR. REVERCOMB:  On 804(b)5.

23         THE COURT:  That would justify putting

24  this confession in?

22

1          MR. REVERCOMB:  Yes.

2          THE COURT:  Well, you ought to bring it to

3     my attention, because I'm not disposed to allow it

4     in at this point.

5          MR. REVERCOMB:  Another thing, your Honor

6     --

7          THE COURT:  Frankly, I think it's an error

8     in the case that you don't need.

9          MR. REVERCOMB:  Well, I don't want to use

10    this; I want to use Carlton Moss's.  They know

11    where he is, probably.  They could find him.

12         My problem is we've been looking to find

13    him, and we've dealt with the Prosecutor up in

14    Cleveland, the Police Department up there.  We've

15    been looking for him for some time.

16         His father and some other members of his

17    family live in Cleveland.  They've come down here

18    to visit.  I don't know if Carlton comes with them,

19    but I know he has another brother that does.  But

20    if they know where Carlton is hid, and if he'll

21    come in and testify, fine.

22         We're trying to serve; we're trying to

23    serve him.

24         THE COURT:  Well, if you've got some case

1   law, bring it in and we'll take that up again, but

2   at this point, I'm --

3           MR. BICKLEY:  Will you share the case law

4   with us, Counselor?

5           MR. REVERCOMB:  I'll be glad to.

6           THE COURT:  What else do you have that you

7   want to take up?

8           MS. LUSK:  Well, we have the --

9           THE COURT:  Let me ask you, do you all

10  have any questions that you want posed to the jury

11  in  voir  dire,  either  as  a  group  or  in  an

12  abbreviated individual voir dire?

13          MS. LUSK:  Judge, I know we will.  We

14  started working on that this morning, and kind of

15  got side-tracked.  We just need to get it all

16  together.  We want to ask if they have children;

17  individually,  we  would  like  to  ask  them  the

18  question whether they could find a verdict of

19  guilty without a recommendation of mercy, if the

20  evidence justified it and the case was proved,

21  knowing that the defendant would spend the rest of

22  his life in jail, in the penitentiary.

23          THE COURT:  Anything else?

24          MS.  LUSK:   And  Steve  was  talking  this

1   morning about perhaps asking them a question about

2   the fact that the case is very brutal, you know, if

3   they could sit on the case knowing that it's a very

4   brutal killing.

5         THE COURT:  Why don't you reduce those to

6   writing and share copies with counsel for the

7   defense and we'll take those up, the specific

8   language of any of those questions.  What I would

9   propose to do is to just take whatever brief

10  questions there are and ask them myself, both the

11  State's and the Defendant's, and then allowing each

12  of you to follow up on any responses you get.

13        An area where I have a particular concern

14  is the pretrial publicity, number one.  And I think

15  if either side would rather ask your own questions,

16  I will allow you to do it.  But frankly, the reason

17  I proposed to ask them myself is because I think

18  you can probably get a frank answer, number one;

19  and number two is, we're not going to identify the

20  source of the question so that if they do sense

21  something sensitive, the jurors are not going to be

22  made any anybody particular.

23        MR. BICKLEY:  We'll reduce ours to writing

24  also, your Honor.

25

1      THE COURT:  And I'm going to ask for those

2  a little later.

3      What else do we have that we need to take

4  up, from the State's point of view, in pretrial?

5      MS. LUSK:  Well, your Honor, we had a

6  couple of questions about in limine, about

7  statements that Vanessa, who is deceased, the wife

8  and mother, made against her husband to relatives

9  of hers, which the husband at the time of the last

10  trial didn't remember, didn't have any knowledge

11  of, and which can't be proven up, obviously.

12      THE COURT:  How did they come in?

13      MS. LUSK:  Cross-examination of Reggettz.

14      THE COURT:  Did it?  And he was asked,

15  Isn't it true that your wife said that you all were

16  having trouble four years ago or eight years ago,

17  or something like that?

18      MS. LUSK:  Right.

19      THE COURT:  And he said he said no?

20      MS. LUSK:  He said -- well, it was

21  questions like, Isn't it true that Vanessa said you

22  have a split personality, that you were evil around

23  her and then in public you were real nice?  And

24  he'd say, I don't know if she ever said that.

26

1        They asked questions, Well, isn't it true

2   that -- let me refer back here -- "Isn't it true

3   that a couple of days before the murders, you ran

4   her and the kids out of the house and told her that

5   if they didn't get out, you were going to kill

6   them?"

7        He says, "I don't remember telling them

8   anything like that."

9        And, "Isn't it true that you told your

10  son, Paul Eric, you wished he was never born?"

11       He says he doesn't remember anything like

12  that.

13       There were remote instances, too, Judge,

14  that -- "Isn't it true that your son, who was

15  almost eight years old at the time of his death,

16  when he was a teeny baby," you know, when he was an

17  infant, so this is seven years earlier, "isn't it

18  true that once he had a real bad rash and he was

19  crying a whole lot and you said he was driving you

20  crazy, and left the house?"

21       You know, it's our position that that just

22  doesn't reflect on anything.  Not to mention the

23  fact that it's remote.  But he said --

24       THE COURT:  But he didn't affirm any of

27

1    that?

2          MS. LUSK:  No.  I mean, there's plenty of

3    things that he did affirm.

4          THE COURT:  Yeah.

5          MS. LUSK:  There's lots of ammunition that

6    he affirmed.

7          THE COURT:  Is that to show that he lied?

8          MR. REVERCOMB:  What's that?

9          THE COURT:  Any of those questions?

10         MR. BICKLEY:  I'm sorry, Judge, I missed

11   that.

12         THE COURT:  All of that stuff Reggettz

13   said he didn't remember saying, things like --

14         MR. HUFFMAN:  Well, I think there's a big

15   difference between asking him those questions, and

16   offering some evidence that at least he said that

17   by another witness.

18         THE COURT:  Oh, yeah, I know.  Yeah.  I

19   think there is a definite difference.

20         MR. HUFFMAN:  I mean, I don't think those

21   were  necessarily  improper  questions  for  cross-

22   examination.

23         MR. REVERCOMB:  Well, if you know he's --

24         THE COURT:  Wait  a  minute.   I  think

28

1   there's a serious problem with asking a question

2   that carries with it some suggestion or implication

3   that you know that he's not going to answer yes to,

4   but you can't prove.

5          MR. HUFFMAN: But they did offer evidence;

6   they did offer somebody --

7          MS. LUSK: No, they didn't.

8          MR. HUFFMAN: You offered -- there were

9   two witnesses who testified that the sister or

10  cousin of the deceased lady --

11         MS. LUSK: Well, they testified to --

12         THE COURT: I have no problems whatsoever

13  with that material if you're going to connect it,

14  but I remember the time Joe Perry was trying --

15         MR. HUFFMAN: Oh, I understand that --

16         THE COURT: -- a case down here that was

17  completely off the wall --

18         MR. HUFFMAN: It gives us license then, in

19  cross.

20         MS. LUSK: There are instances which you

21  can prove up. I mean, there's an incident about a

22  television, which there was a witness to. And if

23  that was denied or he said he didn't remember, you

24  could actually prove that up.

29

1        What I'm talking about are things that

2    Vanessa told people, that there was nobody else

3    present for.

4        MR. HUFFMAN:   Well, right here, she

5    testified about the baby was crying and --

6        MS. LUSK:   Well, she did, but that was

7    eight years earlier.   My objection is that it was

8    remote, that the baby was an infant --

9        MR. HUFFMAN:   Now, it's going to be ten

10   years earlier; I mean, now, everything's going to

11   be earlier.

12       MS. LUSK:   It was eight years before the

13   killing.

14       MR. HUFFMAN:   Right.

15       THE COURT:   I would be inclined to let

16   that in; I think the remoteness goes to weight.

17   But I do have some problems with questions being

18   asked that you can't follow them up with evidence.

19       MR. REVERCOMB:   There are a lot of

20   questions like that, Judge.

21       MS. LUSK:   Because the only person that

22   was present was Vanessa and the children.

23       THE COURT:   Oh, I understand that; I

24   understand that.

1        To the extent that there are questions in

2    there that have some adverse implications to them,

3    and you know that Mr. Reggettz is not going to

4    indicate   knowledge,   don't   ask   any   of   those

5    questions.

6        MS.   LUSK:    Judge,   there   is   also   the

7    question about whether the defense can introduce

8    Moss's prior denials of the killings.

9        THE COURT:  I'm going to look at that.  My

10   inclination is to believe that they are entitled to

11   do  it,  notwithstanding  the  self-serving  nature,

12   because they are inconsistent with the admissions.

13   But they're position has to be that his admissions

14   are  not  credible,  or  that  he  didn't  make  them.

15   Under  either  set  of  circumstances,  it  would  seem

16   that   prior   denials   are   consistent   with   that

17   position.  But I want to take a look at it.

18        MS.   LUSK:   And  in  the  even  that  you

19   permitted them to use them as a prior inconsistent

20   statement, you would give a limiting instruction

21   that they aren't offered for the truth, or --

22        THE COURT:  Now, wait a minute.  The Rule

23   says,  the  party  ...  they  are  not  offered  or

24   received  except  in  the  instance  of  a  bargain.

1  That's not the exact language, but that's close.

2          MR. REVERCOMB:  Where the parties are --

3          THE COURT:  I hardly think it makes any

4  difference in a case of prior denials in this case,

5  because credibility is really what they are talking

6  about.

7          MR. REVERCOMB:  Isn't that where the

8  parties testify about it, subject to cross-

9  examination?

10          THE COURT:  You can't force him to go to

11  the stand.

12          MR. REVERCOMB:  Obviously not.

13          THE COURT:  I don't know how you would get

14  that without him volunteering it.

15          Let me say this, I'm just going to look at

16  the law on that.  I'm going to find out.  I think

17  it will be easy enough for me to look up over the

18  weekend.

19          But you're obviously going to work with

20  those assumptions?

21          MR. BICKLEY:  Yes, yes, without any

22  question.

23          MR. REVERCOMB:  And there also may be a

24  distinction between those statements, self-serving

32

1   statements   made   to   a   Police   Officer   under

2   questioning,   and   those   made   to   a   relative.   I'm

3   sure there's a --

4           THE COURT:   Well, let me look and see.

5           I mean, I don't frankly think that those

6   made to a Police Officer carry any greater or less

7   probative value.

8           MR. REVERCOMB:   Well, it's simply -- you

9   may have a Police officer on the stand and cross-

10  examine him, if you allow it, to the prior denial,

11  and that's different from allowing them to put on

12  a witness, I think, just to elicit a self-serving

13  statement.

14          Do   you   understand   the   distinction   I'm

15  arguing?  They may not be true, but to me, in my

16  mind, there is a difference.

17          They, in their case in chief, can put on

18  a relative to say, yeah, we were playing cards, or

19  something, and --

20          THE COURT:   And in fact, there was some

21  evidence to that effect?

22          MR. REVERCOMB:   Right.

23          THE COURT:   Some casual conversations?

24          MR. REVERCOMB:   Yes.

1        MS. LUSK:  Well, we'll look at it, too,

2   Judge.  I don't understand how --

3        THE COURT:  If you all find anything that

4   I don't --

5        MS. LUSK:  But Judge, though, in any case

6   where there was a confession, the defendant could

7   admit a year's worth of exculpatory statements

8   because there is a confession, something that he

9   couldn't do if there was no confession.

10       THE COURT:  I understand what your

11  position is.  I'm just going to look at it this

12  weekend.

13       MS. LUSK:  Okay.

14       We did receive a phone call, Nelson, from

15  J. R. Smith, who you've evidently had a subpoena

16  served on.  He's not served, though.  They

17  delivered this subpoena to the detachment.  He's

18  retired, but he did call.  He has a trip out of

19  town planned the second week of trial.  His son is

20  graduating from -- I don't think he's graduating

21  from a service academy, I think he's graduating

22  from boot camp, or something, but he's driving to

23  Missouri.  He's scheduled to leave on Tuesday and

24  be back on the weekend, so he would be available

34

1  all of next week and the following Monday, if we

2  can accommodate him.  I might suggest that if you

3  really want to call him, that we would ask

4  permission of the Court to let you call him out of

5  order, you know, if we haven't rested our case,

6  that perhaps we can get him out of the way and let

7  him go see his son graduate.

8        MR. BICKLEY:  Are you going to call him

9  back with what we decide?

10        MS. LUSK:  Yeah.

11        MR. BICKLEY:  Okay.  That would be all

12  right.

13        MS. LUSK:  To call him out of order, if

14  need be?

15        MR. BICKLEY:  Yes.  He's coming back next

16  week; right?  I mean, he'd going next week?

17        MS. LUSK:  No.

18        THE COURT:  He's going to be gone the week

19  after next.

20        MS. LUSK:  He's going to be gone when you

21  need him.

22        MR. BICKLEY:  Okay.

23        MS. LUSK:  He'll be here the first week

24  and the Monday of the second week.

35

1        MR. BICKLEY:   Why don't we call him and

2    tell if we're going to use him, we'll use him next

3    week --

4        MS. LUSK:   Use him out of order?

5        MR. BICKLEY:   -- and that we will get

6    together and decide what is the best time to call

7    him.

8        MS. LUSK:   Or even Monday.   He'd be

9    available Monday for you.

10        MR. BICKLEY:   Let's make it Monday then.

11    That would probably be a good time for me anyway.

12    I can make a commitment on that one.

13        MS. LUSK:   Okay.

14        MR. REVERCOMB:   Something else, Nelson,

15    let me ask you -- Sgt. Woodyard called this

16    morning, and I understand you've subpoenaed him.

17    You've subpoenaed him for Monday, the 16th, and he

18    wanted to know if he has to be here that day?

19        MR. BICKLEY:   No, but just when we

20    subpoenaed him, that's when I thought -- I executed

21    for everybody on the 16th.   But the people in

22    Cleveland, I'm advising them, that unless they just

23    want to come down, that it's not necessary, and I

24    will let them know when I think your case is about

36

1   to wind up for them to come down.

2         MS. LUSK:  Have you got Carlton coming?

3         MR.  REVERCOMB:   Do  you  have  a  list  of

4   witnesses?  Would you give us one?

5         MR. BICKLEY:  Yeah, I'm going to give you

6   a list.  It's the same list, with the exception of

7   Jerome Massenburg, it's the same list that Parrish

8   McKittrick had.

9         MR. REVERCOMB:  Well --

10         I understand that I should have given you

11   a list --

12         MR.  REVERCOMB:  Here  we  are  the  Friday

13   before trial and we don't have any notice --

14         MR. BICKLEY:  I apologize.  You know this

15   is an alibi defense; the same defense there was the

16   last time.

17         MR. REVERCOMB:  We don't know that until

18   we see the list of witnesses you've issued.

19         MR.  BICKLEY:   You  have  our  word,  your

20   Honor, the Court has it in the Court records; it's

21   an alibi defense.

22         MS. LUSK:  Judge, there was also -- if we

23   call Rudy O'Dell, who was the polygraph examiner,

24   obviously, part of the problem with this retrial is

37

1  when the State called O'Dell last time -- he's now

2  retired -- but if he is to testify -- he testified

3  about Reggettz's state before he administered the

4  polygraph examination.

5      Now, the State didn't elicit, and wasn't

6  going to elicit, any evidence regarding the

7  examination or even the fact that they were about

8  to conduct one.  The defense got up and elicited

9  that he was about ready to perform a polygraph

10  examination on Reggettz.

11      MR. REVERCOMB:  To assess that as a

12  polygraph examiner he's seen a lot of people break

13  down and cry when they know they're going to take

14  a polygraph.  And of course, they went on, and they

15  went into the merits, or what actually happened

16  during the polygraph examination.

17      MS. LUSK:  And then the later one, when he

18  was exonerated and released from jail.

19      We'd like to call O'Dell again.  But we

20  obviously don't want to elicit any evidence

21  regarding the polygraph; we didn't want to the

22  first time around, either.  And we just throw this

23  out, I guess, to get some kind of understanding

24  about --

1        THE COURT:  Won't that be self-serving as

2  to him.

3        MR. HUFFMAN:  No, no.  If you're asking

4  with regard to cross?  I mean, that's what he was

5  put on for, to say that Reggettz cried when he --

6        MR. REVERCOMB:  But we're not going to ask

7  him why, if we don't let the polygraph come in.

8        THE COURT:  How is it relevant?

9        MS. LUSK:  Well, I think he would also

10  testify that he was absolutely exhausted, that he

11  was just -- you know, his physical state, as well,

12  right before he confessed.

13        THE COURT:  The day of his confession?

14        MR. REVERCOMB:  Yes, twelve hours after he

15  was taking into custody, after he had gone to the

16  detachment.

17        MS. LUSK:  And like and hour before he

18  confessed at 2:30 in the morning.

19        It's consistent with Reggettz's testimony

20  that he was just beat; he was just absolutely

21  exhausted.  He was going to tell them anything they

22  wanted to hear.

23        THE COURT:  That's all you want to put on?

24  Just as to his physical condition?

39

1          MR. REVERCOMB:  Yeah, that he cried.

2          MS. LUSK:  Yeah, that he was crying and --

3          MR. HUFFMAN:  Are you going to ask him

4    what he does for a living, that he's a polygraph

5    operator, or anything like that?

6          MR. REVERCOMB:  No.

7          MS. LUSK:  He's retired.

8          MR. HUFFMAN:  Are you going to ask him if

9    he's a retired polygraph operator?

10         MS. LUSK:  No.

11         THE COURT:  Nobody wants to start over

12   again and have to call it quits and pull another

13   jury.

14         MR. REVERCOMB:  Oh, I understand that.

15   And Parrish McKittrick argued, and it's not in the

16   record -- I guess he just convinced Judge Hey that

17   it was permissible for him to ask -- or to give the

18   reason that he cried was that he was about ready to

19   take the polygraph examination.

20         MS. LUSK:  Of course, then his next

21   argument was that after you took the polygraph

22   examination, you went to jail?  The obvious

23   implication was that he flunked the polygraph and

24   went on to jail.

1        And then, of course, the State wanted to

2   get in the fact that he took another polygraph

3   examination when he was in much better shape, later

4   in the year, and that after he took that polygraph

5   examination, he got out of jail.

6        MR. REVERCOMB:  And when they threw him in

7   jail that night, he didn't want to run anyway.

8        MS. LUSK:  You know, it was just like a

9   big boulder running down the mountain, and he just

10  lost control of the whole thing.

11       MS. HUFFMAN:  Excuse me, this is in the

12  line of error.

13       THE COURT:  Putting him on in the first

14  place?

15       MR. BICKLEY:  Yes.

16       THE COURT:  Isn't the evidence relevant?

17       MR. BICKLEY:  That he was crying -- but we

18  have the --

19       THE COURT:  That he was -- but that's just

20  part of his general physical condition description;

21  isn't it?

22       MR. REVERCOMB:  We have to explain why,

23  you know, we have to offer some explanation to the

24  jury why he confessed, or how he --

41

1          MS. LUSK:  Well, and it also corroborates

2     him, that he was just absolutely --

3          MR. HUFFMAN:  Well, you can get the

4     polygraph operator to testify that he saw him

5     crying also.

6          MS. LUSK:  No, he's the only one.

7          MR. BICKLEY:  Were the Police in there?

8          MR. REVERCOMB:  No.

9          MS. LUSK:  No; when you take a polygraph,

10    you're alone with the examiner.

11         MR. BICKLEY:  I mean, were they in there

12    before he hooked him up?  He wasn't crying and

13    wired up when they asked him these questions in the

14    questioning; is that what you're saying?

15         MS. LUSK:  No, it was prior to the

16    questioning.

17         We want to get into his physical

18    condition.  We don't want to touch the polygraph.

19         MR. BICKLEY:  I can understand that.

20         MS. LUSK:  And we didn't want to touch it

21    the last time, either, but it just mushroomed.

22         THE COURT:  It sounds to me like it's a

23    legitimate line of inquiry, but the results of a

24    polygraph are not.

42

1        MR. REVERCOMB:  According to what Tim has

2   just said, they should be able to ask, to get into

3   the  reason  he  cried,  that  it  wasn't  possibly

4   because he was going to take a polygraph test.

5        MR. HUFFMAN:   There's  a  difference  in

6   asking him and --

7        MS. LUSK:  I don't believe -- there is no

8   inquiry in the first trial as to what the results

9   of the polygraph were.  It was purely implication,

10  like, after you finished your polygraph you went to

11  jail?  And, after you finished polygraph number

12  two, you got out of jail?

13       I mean, it didn't take a genius -- and THE

14  COURT:  I understand.

15       MS. LUSK:   And they tried to draw a

16  distinction between admission of evidence that a

17  polygraph  was  administered,  and  admission  of

18  evidence that a polygraph -- what the polygraph

19  results were.

20       MR. BICKLEY:   He used it in closing

21  arguments.

22       MR. REVERCOMB:  Yeah, I think he did.

23       MR. BICKLEY:  And he shouldn't have.

24       MR. REVERCOMB:  I agree.

43

1      MS. LUSK:  True.  It shouldn't have come

2  in at all.

3      THE  COURT:  Well, I don't think a

4  polygraph is like insurance, Okay?  Or, at best,

5  it's like putting on evidence of insurance and it's

6  going to invite error, or something like that if it

7  comes in, but we all ought to start with the notion

8  that everybody wants to keep it out.

9      Their problem is, if they get whipsawed --

10  because in all of this there is a grain of evidence

11  for the defense, and that is possibly he was there

12  to take the polygraph and after he took the

13  polygraph, he went to jail.  I frankly don't think

14  that that's -- the inference is that the polygraph

15  is a reliable -- and then he made a factual

16  inculpatory statement.  The Supreme Court says they

17  are not reliable.

18      MS. LUSK:  Of course, he made factual --

19  after he took the polygraph, he confessed.  I mean,

20  they have hours of factually inculpatory statements

21  against him at that point.

22      MR. REVERCOMB:  And what really concerns

23  me is that after it was all said and done, after

24  this whole polygraph thing mushroomed at the trial,

44

1  Mr. McKittrick is the one who mentioned it first,

2  and of course, the Supreme Court did not buy our

3  argument.

4       It was our argument that it was invited

5  error, that he's the one that got into it.

6       THE COURT:  Yeah, I understand that.  I

7  understand that, and I won't let anything in on it.

8  That's one of the easily understood lessons to the

9  Defendant.  But I think you can put on evidence of

10  Reggettz's physical condition.

11       Okay.  What else have you got?  Do you

12  have anything else for the State?

13       MS. LUSK:  No.  I just had a note here to

14  ask Nelson what he worked out about his other

15  trial.

16       MR. BICKLEY:  Huh?

17       MS. LUSK:  What did you work out about

18  your other trial?

19       MR. BICKLEY:  Well, I meant to bring it

20  down here, your Honor.  I need to discuss it with

21  you.

22       I sent Judge Hallanan, oh, I guess a week

23  or so ago or longer, the fact that I had this trial

24  starting, and I asked for her to continue the one

1  of the 19th, which she granted, and the one on the

2  26th which she has denied. I had to go up there to

3  Beckley on Tuesday to argue motions for the one on

4  the 19th and that's when the government got up and

5  said, "Your Honor, I understand what Mr. Bickley's

6  problem is. I am familiar with the Moss trial, and

7  it will at least probably go two weeks, and maybe

8  three weeks."

9         I got up and said that "Judge MacQueen has

10  assured me that he is going to try to keep it

11  within two weeks, but again, if it doesn't

12  encompass three week, two weeks would still

13  encompass the 26th."

14         She says from the bench, "I am familiar

15  with the Moss trial, but this is not why we are

16  here today."

17         Now, this is a drug trial, which has been

18  scheduled to start on the 26th and she has denied

19  to continue it. I think that once the trial goes

20  past a week and she sees that it doesn't fold and

21  I go up and ask for a reconsideration, that she

22  will reconsider. At least, she indicated -- the

23  government agreed whole-heartedly that I should

24  have a continuance; that's the Federal government.

1   And  Judge  Hallanan  indicated  to  me  that  she

2   understands my problem, but that that wasn't -- "We

3   are here on this case, the Davis case," and she has

4   given  me  that  continuance,  and  apparently,  the

5   Pannell case, she didn't want to at that time.

6           THE COURT:   What I'll do is, when we get

7   to about Thursday of next week, I'll take time out

8   and call her.

9           MR. BICKLEY:   Okay.

10          THE COURT:   I'm sure -- you know, I've

11  never had any problem getting one of the Federal

12  Judges to say that they'll accommodate us if we've

13  got one going here.   I'm confident that she will.

14          MR. BICKLEY:   Okay.   Are you through?

15          MS. LUSK:   Yes.

16          MR. BICKLEY:   Now, there are some of the

17  things, I am still certain that the government is

18  aware of, but I think it is incumbent upon me to

19  assure them.   I have a motion in limine on all of

20  his prior convictions, not only the -- understand,

21  we're not talking about -- we're going to try to

22  work this out as far as possible, but --

23          THE COURT:   Let me ask you to do me a

24  favor with your witnesses.   As you are woodshedding

47

1    them, would you just tell them that it's extremely

2    important that they don't blurt out something that

3    relates to the prior trial in this case.   We're

4    going to get into the situation where it may be --

5    any number of witnesses may be impeached by their

6    prior trial testimony.

7              What I would suggest is that you just --

8    with those witnesses that the prefatory questions

9    be asked, like, Now, Mr. Jones, on this case, you

10   have previously testified; have you not?

11             Yes, I have.

12             And did you not testify at that particular

13   case --

14             And that way, it's ambiguous enough so

15   that it doesn't directly lead the jury to the

16   conclusion that there was one.

17             MR. LUSK:  And so, Judge, if we could, we

18   might need to get into dates of the witnesses'

19   testimony that they are making reference to, just

20   so counsel can follow.   Because some of these

21   witnesses, the Police Officers, in particular, some

22   of them testified at Reggettz' preliminary hearing,

23   Reggettz' suppression hearing --

24             THE COURT:  Well, what you need to do is

48

1   go to the transcript and just point out the page

2   number where it shows up --

3        MR. REVERCOMB:   And be sure not to call

4   the trial transcript the "trial transcript."

5        THE COURT:   Right.   These jurors have been

6   -- you know, we've got a panel that's been here

7   about eight weeks.   They are going to have had

8   deposition transcripts and that sort of stuff read

9   to them before.   They don't have any reason to

10  understand that this is from a prior trial.

11       MR. BICKLEY:   Well, we have the Smiths.

12  We have to make certain that they come in from

13  Manville, Ohio, not the reform school.

14       MS. LUSK:   Uh-huh.

15       MR. REVERCOMB:   It wasn't a reform school.

16       MS. LUSK:   It was the Ohio State Reform

17  School.

18       MR. BICKLEY:   Well, just say that they are

19  coming from Manville, Ohio, rather than --

20       THE COURT:   Right; right.

21       MS. LUSK:   They know that.

22       MR. BICKLEY:   And we have a motion in

23  limine that their --

24       THE COURT:   What are you going to do if an

49

1   inmate is from the penitentiary?  We need to

2   address that before you put him on.  We're going to

3   have to do that anyway.

4        MR. REVERCOMB:  Yeah, we do.  Of course,

5   we have inmates from the Kanawha County Jail, but

6   that's never been a problem.  I don't know how you

7   want to handle that, but --

8        THE COURT:  Well, let's -- before you call

9   them, ask me for a recess and I'll get into the

10  details about what they're going to testify and

11  we'll see if we can't not recreate, but sterilize

12  their testimony a little.

13       MS. LUSK:  Well, we might want to lead

14  them a little bit.

15       THE COURT:  Oh, yeah.  Right, right.

16       MS. LUSK:  I don't think any of them will

17  be that long.  They won't be lengthy witnesses.

18       THE COURT:  Okay.

19       MR. BICKLEY:  There is some witness who

20  wanted, prior to Mrs. Reggettz' death, that there

21  was some confrontation on the railroad tracks with

22  a black man.  There is going to be no association

23  with a black man, vis-a-vis John Moss.  We don't

24  think that testimony -- we believe that testimony

50

1    to be prejudicial and not to have any impetus for

2    them.

3              THE COURT:  Who offered, or who gave that

4    testimony?

5              MS. LUSK:  It wasn't offered.  We agreed

6    not to offer it the last time.

7              THE COURT:  And you're not going to put it

8    in this time?

9              MS. LUSK:  No.

10             THE COURT:  All right.

11             MS. LUSK:  We can't connect it up.  Nobody

12   can identify and say it was him.

13             THE COURT:  Okay.  Let me ask you this,

14   what do you have this afternoon?

15             MR. BICKLEY:  I don't have anything.

16             THE COURT:  Can you come back this

17   afternoon at 2:00 o'clock?

18             MR. BICKLEY:  Yes, I can.

19             THE COURT:  Okay.  We'll pick up where we

20   left off then.  Don't forget to renew this motion

21   on Sopher, too.

22             MR. BICKLEY:  Okay.

23

24             WHEREUPON, the Court stood in the noon

51

1   recess.

2            (Back on the Record)

3

4            THE COURT:  Okay, are you all ready?

5            MR. BICKLEY:   Okay.  We want to bring up

6   Dr. Sopher.

7            THE COURT:   Yeah.  Let me just -- you've

8   got -- Sopher is going to testify as to the cause

9   of death and time of death; right?  And you've got

10  no objection to that?

11           MR. BICKLEY:  None at all.

12           THE COURT:  What else -- okay, he's going

13  to testify to some facts --

14           MS. LUSK:  Uh-huh.

15           THE COURT:  -- and make some observations

16  about the physical surroundings.  How long after

17  the bodies were discovered did Sopher get there?

18           MS. LUSK:  An hour.

19           THE COURT:  How many officers are on the

20  spot at any given time?

21           MS. LUSK:  Well, there were several there,

22  Judge, and I can't say off the top of my head how

23  many of them were inside, and how many of them

24  never went inside.  There were a number that were

52

1   outside conducting searches in the immediate area,

2   and so forth and so on.

3           On the premises, though, there was the

4   fingerprint expert, the serology expert, the

5   medical examiner, Roark --

6           THE COURT:  Is the serologist somebody --

7   is he a State cop?

8           MS. LUSK:  Zain.

9           MR. REVERCOMB:  He's no longer a cop.

10          MS. LUSK:  Former.

11          MR. REVERCOMB:  The fingerprint expert had

12  some help.  He may have had one or two people

13  helping him.

14          MS. LUSK:  Well, the medical examiner did

15  too, that I know of.

16          MR. REVERCOMB:  There was a lot of people

17  there.

18          THE COURT:  I see.  So, you're talking

19  about what -- maybe ten, twelve people inside?

20          MS. LUSK:  Probably.

21          THE COURT:  Okay.

22          MS. LUSK:  Well, I don't think they were

23  all inside, though, until after the experts had

24  finished what they were doing.  I mean, the

1  photographer came in and took all of the pictures

2  first, and then the fingerprints and the serology,

3  and the medical examiner did their business, and

4  then the troops came in, I think, and started

5  gathering up and taking out of there.

6       THE COURT:  Okay.  Now, in addition to the

7  facts, what else are you going to have him testify

8  to?  What other opinions will be offered, assuming

9  that he is not given the opportunity in cross-

10 examination to volunteer a lot of stuff?

11      MS. LUSK:  Well, Judge, he had a lot of

12 observations there at the scene, and his opinion

13 about the hanging and the length of time hanging,

14 and I mean, his opinions relate to the condition of

15 the bodies.

16      MR. REVERCOMB:  Time of death -- he'll

17 explain how long strangulation takes, and things

18 like that.

19      THE COURT:  That's cause of death.  One of

20 those things you were talking about this morning --

21 is he going to testify that, for example, if they

22 found blood in a certain location that that meant

23 that the cut was a right to left cut, or something

24 like that?  Is he going to testify about other

54

1  matters, and stuff?

2       MS. LUSK:  No, not really.  I mean, I

3  think what Nelson is talking about was he had an

4  opinion that Vanessa must have been picked up and

5  moved from one location where she bled a great

6  deal, to another location where she bled a great

7  deal.  He didn't observe anything which indicated

8  that she was upright for any length of time,

9  because there were no droplets of blood on the

10 shoulders of her nightgown.

11      THE COURT:  Okay.

12      MR. REVERCOMB:  And of course, Dr. Sopher

13 is an accident reconstructionist with cars.  I've

14 had him in a DUI causing a death case where he --

15 blood splatters were important.

16      THE COURT:  Okay.  I'm just trying to find

17 out, though, what we're talking about so I can

18 identify what they've got an objection to; that's

19 all.  Whether he's got qualifications to make

20 certain observations, I'm not sure that I could

21 rule on today.  I mean, I've heard him in other

22 cases, but obviously the cause of death --

23      MS. LUSK:  There's a pattern of injury on

24 Vanessa, and he took the piece of a gun butt that

55

1   was broken off and remained in the house, and

2   actually compared it with the wound on her head --

3        MR. BICKLEY:   Wait, let me tell you what

4   upsets me.   He identified blood on the Christmas

5   wrapping as foreign blood.   Now, that's not -- he's

6   not a serologist --

7        MR. REVERCOMB:   We're going to use a

8   serologist to do that.

9        MR. BICKLEY:   But, I mean, that's what he

10  did.

11       THE COURT:   So, you're not going to use

12  him for that?

13       MR. REVERCOMB:   No, no.

14       MS. LUSK:   Well, I didn't even realize --

15  I must have skipped right over that.

16       MR. BICKLEY:   I think Parrish may have

17  walked into this, but --

18       MR. REVERCOMB:   Well, as a matter of fact,

19  he does know that it was foreign, but he couldn't

20  have --

21       MR. BICKLEY:   No, because he said that it

22  is unlikely that Mrs. Reggettz would --

23       MS. LUSK:   -- would have opened the

24  presents and left the lid on them; that's kind of

56

1   common sense.

2        MR. BICKLEY:  Yeah, but I don't need him

3   to make that observation.

4        MS. LUSK:  Is there any other observation

5   other than that which you are particularly upset

6   about?

7        MR. BICKLEY:  Well, that was the main

8   concern.  But the other observations that I found

9   distasteful was the jousting back and forth,

10  intellectualizing, which had nothing to do -- they

11  were educating --

12       THE COURT:  But you're not going to give

13  him that opportunity; are you?

14       MR. BICKLEY:  No, I'm definitely not.

15       MS. LUSK:  So, the foreign blood is the

16  only thing that you are particularly offended by?

17       MR. BICKLEY:  The foreign blood and --

18       THE COURT:  If you've got a serologist,

19  tell him not to talk about that.  He's just

20  buttressing, and that's not appropriate.

21       MS. LUSK:  All right.  I'll tell him not

22  to characterize it as foreign blood.

23            Is there anything else that would make you

24  happy?

57

1        MR. BICKLEY:  If he would just give us the

2   time of death and how they died, and I'll have no

3   questions.

4        THE COURT:  Well, some of this stuff is

5   kind of permutations on that, like the length of

6   time of the hanging.  That's something he can

7   obviously talk about.

8        MR. BICKLEY:  Yeah.  I don't see anything

9   wrong with that.  We're not trying to deny that

10  somebody killed these people.

11       MS. LUSK:  But his testimony will be

12  pretty long, will be pretty lengthy.  This is about

13  the most -- he told me the other day this is about

14  the most involved case he'd had since he's been the

15  medical examiner.

16       MR. BICKLEY:  And he'll say that.  He does

17  not need to make that characterization.

18       THE COURT:  You know what somebody's going

19  to do one of these days?  Somebody's going to come

20  back and pay the money to go through the routine

21  files downstairs and get transcripts of his

22  testimony, and say, I'll guarantee you that he's

23  said that before.

24       MR. BICKLEY:  And he doesn't need to say

58

1  that.

2      MS. LUSK:  Well, I'm not going to ask him

3  that, Nelson.  That was just an observation he

4  made.

5      MR. BICKLEY:  Neva, he's absolutely

6  uncontrollable.  He's going to say that this is the

7  most involved, complicated -- and you know what

8  this does, really it directs all of the attention

9  over on your client.  He is uncontrollable unless

10 you really put the harness on him.

11     THE COURT:  If he starts rambling out of

12 hand, I'll take a recess and I'll suggest to him

13 myself that he ought to refrain from volunteering

14 a lot of that.

15     As I've told you, I have immense respect

16 for Sopher's skills and abilities, but he tends

17 from time to time to be a team player.

18     MR. BICKLEY:  He does, your Honor.

19     THE COURT:  And he ordinarily gets away

20 with it.  I mean, he's very good.  I've seen him

21 tear up more lawyers than you can shake a stick at.

22     MR. BICKLEY:  It's the kiss of death to go

23 up there and challenge him.

24     THE COURT:  You can nail him if you get

59

1  something that he doesn't know about, some really

2  curious, esoteric issue.  But other than that --

3  okay, what else?

4          MR. BICKLEY:  Well, I think this is a

5  positive thing -- the site visit.

6          MS. LUSK:  The what?

7          MR. BICKLEY:  The jury view.

8          MS. LUSK:  We probably do want to take a

9  view.

10          THE COURT:  Do you care one way or the

11  other?

12          MR. BICKLEY:  We don't want it.

13          THE COURT:  Okay.

14          MS. LUSK:  The house is changed

15  dramatically.  I mean, there'll have to be some

16  characterization --

17          THE COURT:  Are there people living in it?

18          MS. LUSK:  There are people living in it,

19  and the man -- the husband just had a leg

20  amputated.  But they are expecting him to be back

21  in the hospital undergoing some therapy, so he

22  won't be there, hopefully, when we go.

23          THE COURT:  Okay.  What I'd like to do in

24  a view, is to just completely eliminate any talk

1   other than to give the jury instructions about

2   where to go, "To walk around here; look all around

3   you", that sort of thing.

4         MR. REVERCOMB: Just viewpoint things.

5         THE COURT: And I'll do that in each

6   instance only by agreement of counsel.

7         The problem is that you don't have the

8   ability to transcribe or record the comings and

9   goings of everybody, to recreate that for the

10   record. So, I would like to have the evidence in

11   front of the jury about what they are going to want

12   to see before they go see it.

13         So, what I would suggest that you do is to

14   keep -- are you going to make arrangements with a

15   bus company to do it?

16         MS. LUSK: I guess we need to decide when

17   and then I think Bob Slack is usually pretty good

18   about making those arrangements.

19         THE COURT: Fine. I would suggest, too,

20   that you confer with Defense lawyers during the

21   course of the trial when you think you're getting

22   close to that. And if you've got any objections,

23   let's take that up, but let's sort of keep posted

24   on that view during the course of trial.

61

1      What I will do, also, is I'll tell the

2   jury at the beginning, and if I don't do it

3   somebody needs to remind me of that, but we'll do

4   that before opening statements; tell them to pay

5   close attention to the photographs and drawings and

6   designs that we've got that show the physical

7   environment of where this occurrence was, because

8   we're going to go see it, and we won't offer any

9   testimony at the site about what is what.

10      What are you going to ask the jury; or

11   what do you want me to ask them?

12      MR. BICKLEY:  I'm going to give you some

13   questions on the matter of race and whether or not

14   they think they would have any problems -- do they

15   have any problems with blacks; the basic questions.

16   And also, so you have any parents or relatives who

17   have been the victim of crime by blacks?

18      THE COURT:  Incidentally, what I'm going

19   to do, and I would like for both of you to give me

20   your prospective list and give it to me first thing

21   Monday morning, but I'm going to have something

22   generally.  I will not ask the race question

23   generally, because I think you can get the best

24   answers specifically.  Also, publicity; I'm going

1  to put together some publicity stuff to ask.

2          Now, do you want me to ask the questions

3  or do you want to ask them?

4          MR. BICKLEY:  I don't care whether you ask

5  them or not.

6          THE COURT:  What I propose is that I will

7  ask both sides' questions and then let you follow

8  up if there is some response to particular ones.

9  I'd like to try to keep that to three or four

10  minutes per juror.

11          MR. BICKLEY:  Well, perhaps there are one

12  or two questions that I would like to ask the jury

13  myself because I can identify with the issue of

14  being black.

15          THE COURT:  And it won't be argument.

16          MR. BICKLEY:  No, it won't be argument.

17  And it would just be very brief.

18          THE COURT:  Okay.

19          MS. LUSK:  I'd like to ask that no mercy

20  question, myself.

21          THE COURT:  Okay; that's fine.

22          Bring the ones that you want me to ask in

23  writing, and well, just bring in all of your

24  questions and identify which is which, and before

1  we go into them, I'll sit down and spend ten

2  minutes with them and tell you what I'm going to

3  ask them.  But I'll get into all of that stuff

4  about are any of you related to Police Officers,

5  are any of you victims of crime, and sort of stuff.

6  I just want to see your lists.

7        MR. BICKLEY:  All right.

8        MR. REVERCOMB:  Will we ask the questions

9  in a group first and then we'll go back

10  individually?

11        THE COURT:  Yeah, right.  I'm going to do

12  all of the nuts and bolts stuff out here, just to

13  avoid the necessity of repeating it.

14        MR. BICKLEY:  Where is the jury list?  Did

15  we get one?

16        THE COURT:  You can get one downstairs.

17  It's the same panel -- they are summoning in

18  thirty, no, fifty jurors.  We have two trials to

19  go, a civil and this one.  What I'm going to do is

20  to roll out the first thirty, and from that we'll

21  put twenty-four jurors, which will give us two

22  alternates -- have you all looked at the Rules of

23  Criminal Procedure?  I think it's one and one

24  strike; isn't it?

64

1      MR. REVERCOMB:  Yeah.

2      THE COURT:  Let me look here -- it says,

3  you pull twenty-four names, and with that twenty-

4  four do the questioning, and when you've got

5  twenty-four jurors free of exception, you'll take

6  your six out of the first twenty, you take your two

7  out of the first twenty, and then -- I'm sorry --

8  you take your first two, you take your six, then

9  you take one and out of the remaining four, you

10  take one.  That leaves us with fourteen in the box.

11      Okay?

12      MR. BICKLEY:  Okay.

13      THE COURT:  I don't think you're going to

14  need more alternates than that.

15      What else have you got?

16      MR. HUFFMAN:  What about the confessions?

17      THE COURT:  Yeah, as I've indicated, I'm

18  going to allow those in.  If you -- the two

19  confessions.  I'm going to articulate some detailed

20  basis for that.  I'll do that when we get started.

21  And your objections can be saved for the record.

22      MR. REVERCOMB:  Your Honor, one last

23  thing.  About the statement of Carlton Moss.  I

24  have a list of cases for that that I've got the

65

1    cites on. I'm going to give you a set of cases,

2    first of all, I think the right to confrontation,

3    I think there is -- the distinction ought to be

4    noted that this is his brother. If anyone knows

5    where he is, he does. He's unavailable because we

6    can't find him. We're trying to find him, and I

7    hope we're able to find him, to secure his presence

8    here.

9           But these cases talk about --

10          THE COURT: But he doesn't have to help

11   you find him.

12          MR. REVERCOMB: No, no, I'm not saying

13   that. But I do think that the distinction -- well,

14   these cases generally say -- they talk about the

15   confrontation clause and hearsay. They are really

16   designed to protect the same thing. And they about

17   it at great length.

18          The right to confrontation, they say where

19   we show that he is unavailable, if we show that the

20   statement is reliable and that there is sufficient

21   indicia of reliability and trustworthiness, then it

22   can be admitted over the right to confrontation

23   claims. I'll just hand you these cases. They are

24   West Virginia and United States Supreme Court

66

1    cases.

2         Because on the other hand, 804(b), the

3    statements that would come under that exception

4    would always -- were that if the declarant is

5    unavailable, would always violate his right to

6    confrontation at trial proceedings.

7         THE COURT:  But there is no such right in

8    a civil case?

9         MR. REVERCOMB:  Right.

10        THE COURT:  So 804 is tailored to deal

11   with both?

12        MR. REVERCOMB:  Right.  These cases cite

13   the current law.

14        THE COURT:  Did you all find anything

15   contradictory to this?

16        MR. HUFFMAN:  No, your Honor.

17        THE COURT:  You're not going to call this

18   guy -- you wouldn't propose to put that on in the

19   first couple of days; would you?

20        MR. REVERCOMB:  No.

21        THE COURT:  One of the things -- I'll

22   spend a couple of minutes with security, but one of

23   the things I do want to make sure of is that the

24   jury is excused before Mr. Moss is brought in or

67

1    taken away from the Courtroom.

2         Do you have any arrangements made for

3    street clothes?

4         MR. HUFFMAN:  Yes, your Honor.

5         MS. LUSK:  Probably, before we take the

6    view, too, Judge, we'll have to make a record of

7    what kind of security we want to impose at the

8    view.  We don't want that to be an open arena.  And

9    I guess if the Sheriff wants to handcuff him or

10   shackle him, then it would be in the presence of

11   the jury, and we need something on the record on

12   that.

13        THE COURT:  Yeah, and I expect we'll --

14   I'll sit down with them.  My inclination is to give

15   the Sheriff's office a lot of discretion in the

16   security issues, to the extent that that can be

17   done consistent with the Defendant's rights to as

18   fair as possible a trial.

19        MR. BICKLEY:  I would like it noted that

20   he did not find any gunshot residue on Mrs.

21   Reggettz, and I'm just telling you that this is

22   something that will go on during the course of the

23   trial.

24        THE COURT:  Okay.

68

1      MS. LUSK:  You wanted to raise the speedy

2  trial issue.

3      MR. BICKLEY:  Right.   We want to raise

4  the speedy trial issue.

5      THE COURT:  Okay, go right ahead.

6      MR. BICKLEY:  Well, John never agreed to

7  a continuance.  We came up, I believe, and moved

8  for a continuance and the State moved for a

9  continuance --

10      THE COURT:  Now, are you talking about

11  from the time of arrest to now, or from the time of

12  reversal to now?

13      MR. BICKLEY:  From the time of reversal.

14      THE COURT:  Okay.  When was the reversal

15  effective?

16      MS. LUSK:  It was reversed in December,

17  but an Order of Remand wasn't received until

18  February.

19      THE COURT:  Of this year?

20      MS. LUSK:  Of '89.

21      THE COURT:  February of '89?

22      MR. BICKLEY:  And he came here in '88.

23      MS. LUSK:  No, he came in '89.

24      MR. BICKLEY:  Then, it was reversed in

69

1   '88.

2          MS. LUSK:  We brought him down before the

3   Order of Remand was even received.  Probably, we

4   should have waited until the Order of Remand was

5   received, but I went ahead and did a Transportation

6   Order --

7          THE COURT:  And it was received in

8   January?

9          MS. LUSK:  I was thinking it was February.

10         THE COURT:  Oh, February, okay, of '89?

11         MR. REVERCOMB:  January of '89 Term.

12         THE COURT:  Okay, so we're in -- we're

13  three terms later?

14         MS. LUSK:  Right.  The State has moved for

15  one continuance.

16         MR. REVERCOMB:  And that was in December

17  of '89.

18         MS. LUSK:  To do the DNA testing.

19         MR. REVERCOMB:  That would have been the

20  September '89 Term.

21         THE COURT:  Okay.  How did the case get

22  continued from the January to May terms?

23         MS. LUSK:  Defense motion.

24         MR. REVERCOMB:  And from May to September

70

1   was Defense motion.

2          THE COURT:  Is that correct?

3          MR. BICKLEY:  Yes, sir.

4          THE COURT:  Then what is your argument

5   that since you only asked for two of those that --

6          MR. BICKLEY:  No, we only asked for one.

7          THE COURT:  They said two.

8          MR. BICKLEY:  Right, there were two

9   continuances, one by --

10         MS. LUSK:  Three altogether; two by the

11  Defense and one by the State.

12         MR. BICKLEY:  When was the third one?  I

13  don't recall that one.

14         MS. LUSK:  From --

15         MR. REVERCOMB:  Well, you have the January

16  to May term, and you have the May to September

17  term; that's two.

18         MR. BICKLEY:  The May term --

19         THE COURT:  The third one they asked for

20  that brings us up to this time?

21         MR. REVERCOMB:  Your Honor, I think the

22  record will show that they didn't object to it.  We

23  kind of hemmed and hawed on the record, but you

24  were going to ask for a continuance and then you

71

1   decided not to.

2           MS. LUSK:  And you filed a written motion

3   for continuance, and when we got up there for the

4   hearing and you said your client objected, you

5   withdrew the motion, and then we moved for a

6   continuance because we needed to have the DNA

7   testing.  And he did not object.

8           THE COURT:  Do we have transcripts of any

9   of those motions?

10          The file has in the main text everything

11  up until the Remand Order, and then it's got mixed

12  things in it.  And there are no Orders reflecting

13  that there was a continuances in this.  Well, there

14  are hearings on motions, the question of counsel,

15  and that sort of thing.  So, I'm going to have to

16  go through it.

17          Let's do this:  let's take this up when

18  I've had a chance to go through this and pull out

19  the documents.

20          But you think you've got a continuance in

21  there?

22          MR.  BICKLEY:    I  know  we  have  one

23  continuance in May, I believe.  And we did not want

24  a continuance in the one, and the Defense contests.

72

1  I don't recall the third one, I may have, but I

2  don't recall the third one.

3          THE COURT:   There ought to be three:

4  There ought to be from January to May term, from

5  May to September term, and then from that term to

6  here.

7          MR. BICKLEY:     They got the last

8  continuance, I think.

9          THE COURT:  Well, let me go through the

10  file and find out.  What else?  Is there anything

11  else?

12          MR. REVERCOMB:   The last continuance was

13  because we didn't have the report yet.   They

14  requested it, while it was within the term.  Didn't

15  we have a January trial date or a February trial

16  date?

17          MS. LUSK:   February 5th.   We were moved

18  from February 5th --

19          THE COURT:  Yeah, I did that one.  I did

20  that.  But that's not from term to term.

21          MR. REVERCOMB:  No.

22          THE COURT:  Well, I'll check on that.

23          If there's nothing else, then ...

24          WHEREUPON, the proceedings were concluded.

73

1    STATE OF WEST VIRGINIA

2    COUNTY OF KANAWHA, to-wit:

3

4         I, Connie L. Cooke, Official Reporter for

5    the Circuit Court of Kanawha County, do hereby

6    certify that the foregoing is a true and correct

7    transcript of the proceedings had and reported in

8    the above captioned matter, had on the 13th day of

9    April, 1990, during the January 1990 Term of said

10   Court, as reported by me and transcribed into the

11   English language.

12        Given under my hand this 3rd day of

13   February, 1993.

14

15

16   _____

17                Official Reporter

18

19

20

21

22

23

24

**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 32**

1   IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2

3

4   STATE OF WEST VIRGINIA

5

6   vs.

7

8   JOHN MOSS, JR.

9

10

11      BEFORE:  Hon. A. Andrew MacQueen, Judge

12

13

14

15          APPEARANCES

16

17      For the State:  Neva Lusk and Stephen Revercomb,

18  Assistant Prosecuting Attorneys for Kanawha County.

19

20      For the Defendant:  The defendant, in person, and

21  by Nelson Bickley, Timothy Huffman, and Kathy Beckett,

22  his counsel.

23

24                          Connie L. Cooke

25                          Official Reporter



2

1    BE IT REMEMBERED, that on Monday, the 16th day of

2    April, 1990, during the January 1990 Term of said Court,

3    in the matter of the State of West Virginia versus John

4    Moss, Jr., as aforesaid, a suppression hearing was

5    previously held on the 13th day of April, 1990, and the

6    following ruling of the Judge was entered on the first

7    day of trial:

8

9    THE COURT:  Let's put my ruling on the record

10   right now.

11   Previously, I have told the attorneys in this

12   case my ruling on the question of suppression of the two

13   statements about which I heard argument a couple of weeks

14   ago.  I have ruled that those statements are admissible,

15   and there are two reasons why that -- why I want to

16   articulate the two bases for that ruling.

17   First is, having read the decision on Appeal of

18   this case, I am satisfied that the Supreme Court of

19   Appeals, in that case, held those two statements

20   admissible.  And I believe that they specifically

21   considered, while not on its face very completely, the

22   question of the immediate taking of the defendant before

23   a Magistrate or Referee, because the Court said that.

24   So, I believe that the admissibility of those statements

3

1    is law of the case by the Supreme Court of Appeals.

2        If that were not the case, I would nonetheless

3    authorize the admission of these two statements because

4    I believe that the foray or diversion from the direct

5    route from Ohio to Charleston, West Virginia, the taking

6    of the statement does not violate either specific

7    language or the principles embodied in the juvenile

8    statute requiring an immediate presentment. And for the

9    life of me, I can't remember the name of the other case.

10        MR. REVERCOMB:  Elsworth.

11        THE COURT:  Elsworth.  It is particularly noted

12    in Elsworth that the defendant in that case, while that

13    statement was held admissible, the defendant or

14    respondent was not taken immediately, but in fact was

15    taken to a Police Station later to give a statement.

16        Law Enforcement Officers are entitled to, so long

17    as they follow the rules, take statements. It's an

18    efficient and effective way to solve a crime, although

19    this case raises some question with respect to the

20    infallibility of that taking. But, it's a legitimate

21    technique to take a statement, so long as those

22    statements are verified and are taken under

23    constitutionally permissible conditions. The officers

24    in this case -- we're not talking specifically about this

4

1    case, but we're talking about this by implication --

2    there was another criminal offense, and it was suggested

3    then that they wanted to talk to him about something else

4    and he said he was willing to talk to them.  And they

5    made the circumstances comfortable for him.  I don't find

6    that a violation of the statute, and I will admit the

7    statements.

8         MR. BICKLEY:  Will you note our exceptions, your

9    Honor.

10        THE COURT:  They are taken.

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:

I, Connie L. Cooke, Official Reporter for the Circuit Court of Kanawha County, do hereby certify that the foregoing is a true and correct transcript of the proceedings had and reported in the matter of the STATE OF WEST VIRGINIA versus JOHN MOSS, JR., upon action number   as stated in the caption hereto, had on the 16th day of April, 1990, during the April Term of said Court, as reported by me and transcribed into the English language.

I hereby certify that the transcript within meets the requirements of the Code of the State of West Virginia, 51-7-4, and all rules pertaining thereto as promulgated by the Supreme Court of Appeals.

Given under my hand this 16th day of April, 1990.

*Connie L. Cooke*

Official Reporter

IN THE CIRCUIT COURT OF KANAWHA COUNTY

WEST VIRGINIA

01 AUG 31

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

STATE OF WEST VIRGINIA

vs.                                    Action No. 94-MISC-663

JOHN MOSS, III


BEFORE:   Hon. A. Andrew MacQueen



Reconsideration of Legal Conclusions

December 1, 2000



Connie L. Cooke

Official Reporter

3                          507

2

APPEARANCES


FOR THE STATE:


Jon Blevins, Esq.
Asst. Prosecuting Attorney
Kanawha County Judicial Bldg.
111 Court Street, 3rd Floor
Charleston, WV   25301


FOR THE DEFENDANT:


The Defendant, in person


Lonnie Simmons, Esq.
Attorney at Law
604 Virginia Street, E., Suite 200
Charleston, WV   25301

3

1      BE IT REMEMBERED, that on Friday, the 1st day

2   of December, 2000, during the September 2000 Term of

3   said Court, in the matter of the STATE OF WEST VIRGINIA

4   versus JOHN MOSS, III, upon Action No. 94-MISC-663, as

5   stated in the caption hereto, the following transpired:

6

7      THE COURT:    Alright; go ahead.

8      MR. SIMMONS:    I think the last time I was in

9   here you did issue a ruling from the bench where you

10  addressed the second prong of the laboratory decision,

11  and you concluded, based on the record, that Mr. Moss

12  was not prejudiced by Fred Zain's testimony.  And when

13  I went back and looked at looked at the motion I filed,

14  it just occurred to me, Judge, that the Court will

15  benefit from a development on the record from you as

16  to, number one, your rationale for that legal

17  conclusion.  And then, when I went back to the motion,

18  I did point out various factual things, either that I

19  thought were maybe not exactly correct, and then some

20  things that I thought were omitted.  And I thought just

21  for purposes of the record, it would be helpful to have

22  those addressed.

23      I do think, after I reread my

24  motion, Judge, I do recall that you did state on the

4

1    record, besides that one conclusion, that you realized

2    that that one footnote was wrong, that there hadn't

3    been any DNA testing to consider, or anything.  And

4    just to keep the record clear, I wanted to make sure

5    the record was clear on that.

6              THE COURT:    Right.

7              MR. SIMMONS:   But to me, the most

8    significant thing that I think I need for the record to

9    reflect is your, I guess your legal explanation as to

10   why you concluded that Moss was not prejudiced by Fred

11   Zain's testimony in this case.  And I just -- if you

12   have any way of -- and I think what I was trying to do

13   in my motion, I went back to the laboratory decision

14   and took an advocate position to see what they were

15   talking about, and it seemed to me that the cases that

16   the Supreme Court relied upon in coming up with that

17   two-part test of the laboratory decision, on the second

18   part of the test they were really focusing on

19   eliminating cases where the prejudicial Zain testimony,

20   false testimony, whatever you want to label it, wasn't

21   a significant part of the case, or it wasn't simply a

22   tangential part, and I added that word "tangential".

23   And I think from my reading of the trial transcript

24   that that would not be a fair conclusion to make.  I

5

don't think it would be fair to say that Fred Zain was

a tangential part.

So, I guess the way I could see

this case being resolved, Judge, your initial ruling,

of course, is that the laboratory standard doesn't

apply.  Of course, we disagree with that and we object

to that.  But that was your ruling.

Then what you did, you kind of went

above and beyond the call of duty.  You said, Okay, if

I did apply the standard, on step one, I'm going to

look at it to see what was the evidence to support

conviction without Fred Zain stuff.  And you looked at

his confession, and a couple of other things, the

camera, the silverware, and you said, Well, that would

have been sufficient for a conviction, and you stopped

in your Order there.

Whereas, the laboratory decision,

as a second step, and says, Well, if you conclude that

other evidence is sufficient to support a conviction,

you then have to analyze, Well, was this person

prejudiced by this tainted testimony that is a

violation of due process, and that is what I'm here

trying to get laid out on the record today.

Now, what I can see happening,

6

1    Judge, is you've already made your ruling.  You've

2    already held that the laboratory decision doesn't

3    apply, so you've already made your decision on step

4    one.

5              I can see you concluding, under

6    step two, that he was, in fact, prejudiced by Zain's

7    testimony because it was a big part of the case.  At

8    least in my view, that was the critical evidence that

9    allowed the jury to distinguish the confession given by

10   Reggettz and the confession given by Moss.  I mean,

11   obviously, this is an extremely unusual case.

12             The jury had to choose between

13   conflicting confessions between two separate people.

14   And from our viewpoint, the critical evidence that

15   allowed them to do that was Fred Zain's testing and

16   testimony.  Therefore, I can see the Court finding, as

17   it has already, but then concluding that he was

18   prejudiced by Fred Zain's testimony, and then I could

19   take it up on appeal.  It wouldn't change your result,

20   because what you are actually doing here, Judge, I

21   think, is giving the State Supreme Court the benefit of

22   your analogy, because you've already told the Supreme

23   Court that in your view the laboratory decision doesn't

24   apply.  But if it doesn't apply in step one, the other

7

1    evidence is sufficient.

2                  But then you said, Well, if step

3    two doesn't apply, then he wasn't prejudiced by it,

4    because it was not a tangential part of the case; it

5    was a very significant part.  Then, I would have a nice

6    complete Order to take up to the Supreme Court just on

7    this issue, and they may agree with you on your initial

8    analysis, and at the end of it, if they believe that

9    the laboratory decision applied, then they would have

10   the benefit of your analogy that you would have applied

11   to this case.  So, that is the legal part.  That is the

12   most important thing I need to get brought in.

13                  I think the factual things are --

14   maybe I emphasize facts differently than the way you

15   do.  I guess I would just ask the Court to review that

16   motion again on those factual statements, and you may

17   determine that you don't feel it necessary to say

18   anything else about it, and that's fine.  But there

19   might be a couple of them that you might want to

20   specifically address.

21                  I think we're --

22                  THE COURT:    You mean the independent

23   evidence?

24                  MR. SIMMONS:   I tell you what, the way my

8

1    motion starts, it goes through your factual statement

2    and points out things that I think were either

3    misstated, or however you want to word it.  You know,

4    part of it would be, for example, Doctor Bing's

5    (Phonetic) testimony.  And what I tried to provide for

6    the Court, and I did a supplement to that motion, where

7    I went through the ASCLAD report that was done, and I

8    tried to show how the criticism that was in the ASCLAD

9    report were essentially the things that Doctor Bing was

10   talking about.

11                  For whatever reason, the Moss case

12   was not included in the group of those initial inmates

13   when they had the special investigation.  But what I

14   tried to do was to show specific criticisms that ASCLAD

15   made of the State lab, which ASCLAD concluded had a

16   direct impact on the validity of Zain's testimony, and

17   how those same criticisms were discussed by Doctor Bing

18   and applied here.

19                  There's a line in your Order that I

20   think doesn't completely reflect what Doctor Bing

21   testified to, because in the overall gist of his

22   testimony, he was very critical, pretty much saying

23   that they had no protocol, and that all of these things

24   are very scientific.  Zain did do the same exaggeration

9

of statistics that every expert found he did in the

Woodall case, for example, where you have -- you find

blood evidence at the scene, you're supposed to

eliminate the other possible donors, which would be the

Reggettz family.  And if, to the extent they are tied

to saying that the mother, who was murdered, Vanessa,

you're not supposed to include that when you give your

statistics because you don't know who contributed those

bloods, you don't know at what time.

I guess on the factual things, I

would just ask the Court to just review those again to

see if the Court feels obligated to readdress or make

clarifications of things that were in your Order.  Some

of the things, Judge, and I realize that it may just be

me being kind of picky, and maybe because you didn't go

with the angle I was going on, but I thought some of

the things, particularly with Doctor Bing, I thought

weren't really correct, and didn't correctly pick up on

things that were being testified to, especially when

you tie it in with the ASCLAD report.

But actually, those are really the

main things that I think -- and once we've gotten that

type of Order addressing those things, I think it's in

a good position to take up, and that way the Supreme

10

1    Court will know what your ruling was and the basis for

2    it.

3              MR. BLEVINS:   The Court is familiar with the

4    case, and the facts.  We're satisfied with the Court

5    revisiting that issue.  We have some differences with

6    Mr. Simmons in some of his interpretations, but on the

7    other hand, we're satisfied that the Court will reach

8    the right decision, and that's about all I need to say,

9    Judge.

10             THE COURT:    I'm doing everything I can to

11   get every case I have pending done.  And so I'll just

12   get to this very quickly.

13             MR. SIMMONS:   Thank you, Judge.

14

15             WHEREUPON, the proceedings were concluded.

16

17

18

19

20

21

22

23

24

11

1    STATE OF WEST VIRGINIA,

2    COUNTY OF KANAWHA, to-wit:

3

4        I, Connie L. Cooke, Official Reporter for the

5    Circuit Court of Kanawha County, do hereby certify that

6    the foregoing is a true and correct transcript of the

7    proceedings had and reported in the above captioned

8    matter and transcribed into the English language.

9        Given under my hand this _24th_ day of

10   _August_____, 2001.

11

12

13

14   _Connie L. Cooke_____

15              Official Reporter

16

17

18

19

20

21

22

23

24