**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 33**
**(HABEAS RECORD, 94-MISC-663**
**Appeal Record No 1 - 62)**

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

        Petitioner,

**v.**
                                          Civil Action No. 94-misc-663

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

        Respondent.

## PETITION FOR WRIT OF HABEAS CORPUS

### I.

### INTRODUCTION AND PROCEDURAL HISTORY

Petitioner John Moss, III, respectfully files this **PETITION FOR WRIT OF HABEAS CORPUS** under the West Virginia Post-Conviction Habeas Corpus Act (W. Va. Code, 53-4A-1 through -11), seeking to have his convictions vacated, to be released immediately from prison, and/or to be granted a new trial, based upon the following:

1.     On April 30, 1984, Petitioner was convicted by a jury in the Circuit Court of Kanawha County of three counts of first degree murder, without a recommendation of mercy.

2.     The Honorable Judge John Hey presided over Petitioner's first trial.

3.     For these crimes, Petitioner was ordered to serve three consecutive life with no mercy sentences.

4.     Petitioner's convictions were overturned by the West Virginia Supreme Court in the case styled *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988), and the case was remanded for a new trial.

5.     On April 16, 1990, Petitioner's second trial began, with the Honorable Judge A. Andrew MacQueen, III, presiding.

6.     On April 24, 1990, a jury in the Circuit Court of Kanawha County convicted Petitioner of three counts of first degree murder, without a recommendation of mercy.

7.     Petitioner appealed this second conviction to the West Virginia Supreme Court, which refused to grant the petition on a 3 to 2 vote on March 12, 1991.

8.     Petitioner has not previously sought relief from the convictions arising from his second trial under the West Virginia Post Conviction Habeas Corpus Act.

9.     Petitioner is not presently serving any sentence on a conviction other than the convictions upon which this **PETITION** is based.

10.     The filing of this **PETITION** has been delayed by Petitioner's counsel, who has attempted to familiarize himself with most of the relevant transcripts in Petitioner's two trials and the second juvenile transfer proceeding, which resulted from the West Virginia Supreme Court's opinion styled *In the Interest of John Moss, Jr.*, 170 W.Va. 543, 295 S.E.2d 33 (1982).

11. Furthermore, most of the transcripts from the hearings held in connection with the case styled *State v. Paul Reggettz, III*, Criminal Action No. CR-80-F-121, had not been transcribed previously.

12. The Honorable Judge John Hey also presided over the proceedings in the *Reggettz* case, which, as this Court knows, is factually and legally relevant to Petitioner's case.

13. In light of the detailed confessions given by Paul Reggettz, III, and the more recent indictments in Texas and West Virginia against Trooper Fred Salem Zain, Petitioner and his counsel believed it was essential that virtually all of the hearings held in the *Reggettz* case be transcribed so that the various representations made by the State and others regarding the Reggettz confessions and the findings by Trooper Zain could be noted.

14. After most of the court reporter tapes were located, they were sent to the original court reporter, who now lives in Georgia, for transcription.

15. More recently, an additional court reporter tape from one hearing was sent to the original court reporter in New York, who should have the transcript available in the next few months.

16. The Clerk's office now has transcripts of the hearings held on January 2, May 5, June 11, 18, 19, and 23, 1980, in the *Reggettz* case, some of which will be cited in this **PETITION**.

## II.

## STATEMENT OF THE CASE

### A.

### *REGGETTZ CONFESSES TO THE MURDER OF HIS FAMILY*

17.     The evidence in this case consists largely of conflicting confessions from two different people--Paul Reggettz, III, and Petitioner.

18.     In this **PETITION**, the relevant facts in the proceedings against Paul Reggettz, III, and Petitioner will be noted.

19.     On December 13, 1979, Paul Reggettz, III, testified that he returned from work to his home in St. Albans, West Virginia, and found that his wife, Vanessa Reggettz, his son, Paul Eric Reggettz, and his daughter, Bernadette Lynn Reggettz, were dead.  (SECOND TRIAL, Tr. 684-90).

20.     On that same day and the next day, Paul Reggettz, III, confessed to killing his wife, Vanessa Reggettz, his son, Paul Eric Reggettz, and his daughter, Bernadette Lynn Reggettz.  (SECOND TRIAL, Tr. 599-611, 619, 699-712).

21.     On December 14, 1979, Paul Reggettz, III, returned to his house, accompanied by law enforcement officers, and, through words and actions, demonstrated how he killed his wife, his son, and his daughter.

22.     Based upon his detailed confessions, Paul Reggettz, III, was arrested for these three murders and incarcerated in the Kanawha County Jail.

### B.

### *STATE REQUESTS BLOOD SAMPLE FROM REGGETTZ*

23.     Shortly after his arrest, the State sought to obtain a blood sample from Paul Reggettz, III.

4

24.     On December 20, 1979, a hearing was held in which, apparently, the State made various representations regarding the known blood types of the three victims, and the blood types obtained from the unknown blood samples found in the Reggettz house.

25.     However, to date, a search of the Clerk's office has been unable to find the court reporter tape from this hearing, and consequently, it is not available for review.

26.     On December 31, 1979, counsel for Paul Reggettz, III, filed a motion opposing the request by the State to obtain a blood sample from Reggettz.

27.     According to the memorandum filed on behalf of Reggettz, the basis for the State's request was that, "The State has offered testimony that seven (7) blood smears were taken from the defendant's home and that the State is able to say conclusively that those smears were not of the blood type of the three (3) victims." **(NOTE OF ARGUMENT AND MEMORANDUM OF DEFENDANT IN OPPOSITION TO STATE'S MOTION FOR A COURT ORDER TO REQUIRE AND COMPEL DEFENDANT TO SUBMIT TO WITHDRAWAL OF BLOOD AND BLOOD SAMPLE TESTING** at 1).

28.     In an order dated January 2, 1980, the Honorable Judge John Hey required Paul Reggettz, III, to provide the State with a blood sample.

29.     On January 7, 1980, Paul Reggettz, III, was bound over to the grand jury.

*C.*

## *BLOOD SAMPLE ILLEGALLY OBTAINED FROM PETITIONER*

30.     On January 30, 1980, Trooper Michael Don Smith went to the Juvenile Detention Center in Cleveland, Ohio, to meet with Petitioner and to obtain a blood sample from him.  (SECOND TRIAL, Tr. 912-14).

31.     In the second juvenile transfer hearing, styled *In the Interest of John Moss, Jr., also known as John Moss, III*, Juv-80-775, 776, 777, Trooper Smith explained that he gave Petitioner a sharp metal pin, which Petitioner used to prick his own finger.  Petitioner then bled on a piece of cloth, which Trooper Smith took with him.  (SECOND JUVENILE TRANSFER HEARING, Tr. 195-96).

32.     At the time Trooper Smith obtained this blood sample from Petitioner, Petitioner was represented by counsel and was a juvenile.

33.     After Trooper Smith's actions were brought to the attention of the appropriate authorities, the Cuyahoga Court of Common Pleas determined that this blood sample had been obtained from Petitioner illegally and ordered the sample be destroyed or returned to Petitioner.

34.     Apparently, Trooper Smith returned the blood sample before returning to West Virginia.

35.     On April 22, 1980, after obtaining a search warrant, Trooper Terry Williams and Trooper Smith went to Cleveland, Ohio, to obtain another blood sample from Petitioner.  (SECOND TRIAL, Tr. 505).

### D.

### *REGGETTZ INDICTED FOR MURDERING HIS FAMILY*

36.    On April 24, 1980, in the January, 1980 term of the grand jury, Paul Reggettz, III, was indicted for three counts of murder, based upon the testimony of Trooper Terry Williams and Sergeant Robert C. Murphy.    (SUPPRESSION HEARING PRIOR TO FIRST TRIAL, Tr. 168).

37.    Petitioner's name is also included in this indictment, but the grand jury did not officially indict him on any charges.

38.    On May 5, 1980, Paul Reggettz, III, was arraigned on this indictment and a trial date was scheduled for June 23, 1980. (*REGGETTZ* MAY 5, 1980, Tr. 8).

### E.

### *STATE CONDUCTS SEROLOGICAL TESTING*

39.    In this **PETITION**, a known blood sample refers to a blood sample where the source of the blood is identified while an unknown blood sample refers to a blood sample where the source of the blood is unidentified.

40.    During the course of the investigation, the State obtained known blood samples from various individuals, including Paul Reggettz, III, Petitioner, the three victims, and several other persons.

41.    In searching the Reggettz home, the State also obtained several unknown blood samples from various items discovered therein.

42.    After obtaining these blood samples, the State performed testing on them to compare the blood types determined from the known blood samples with the blood types obtained from the unknown blood samples.

49.     Trooper Zain provided similar testimony with regard to the unknown blood samples obtained from Item No. 11, the utensil drawer, Item No. 14, the door between the master bedroom and the front door, Item No. 12, the pillow case from the bedroom beside the bath, and the flashlight.  (SECOND TRIAL, Tr. 1122).

50.     With regard to Item No. 7, the curtain on the kitchen door, the Christmas wrapping paper, and the clothing of Bernadette Reggettz, Trooper Zain testified that the combination of nine blood types found on these items eliminated 99.97 % of the population, meaning that three persons in ten thousand would have those nine blood types, and that Petitioner was included in the population with that particular combination of nine blood types.  (SECOND TRIAL, Tr. 1122-25).

*F.*

### *REGGETTZ'S CONFESSIONS FOUND BY COURT TO BE VOLUNTARY AND ADMISSIBLE*

51.     On October 20 and 21, 1980, a suppression hearing was held on the voluntariness and admissibility of the confessions given by Paul Reggettz, III.

52.     The State filed a brief in opposition to the motion to suppress and concluded:

> "In summary, it is the State's contention that Paul Reggettz, III, gave a voluntary and informed consent to waive his rights to remain silent and his right to counsel, and ultimately confessed to Trooper H. F. Woodyard on December 14, 1980.  It is submitted that the record in this case is devoid of any evidence to support defendant's theory that the confession was the result of physical force, threats, psychological coercion, or some other fraud, deceit or trickery.  Rather, it is submitted that during the time he was being questioned Paul Reggettz' various and sundry constitutional rights were assiduously protected, and he was

12

treated in an orderly and civilized fashion. To hold otherwise, would give credence to the defendant's obviously self-serving testimony and to completely disregard the testimony of several members of the West Virginia Department of Public Safety and the Prosecuting Attorney of Kanawha County. **Defendant's contention that his confession was involuntarily and unintelligently given flies in the face of reason, considering the detailed nature of the confession and in considering that the crime itself was re-enacted by the accused."** (Emphasis added). (**MEMORANDUM OF LAW ON BEHALF OF THE STATE OF WEST VIRGINIA IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS** at 8-9).

53.  On October 28, 1980, the Honorable Judge John Hey agreed with the State's arguments and made extensive findings of fact and conclusions of law on the record, holding that the confessions were voluntary and admissible.

54.  Specifically, Judge Hey held:

"Thus, a reading of the cases submitted for the Court's consideration and a totality of the facts surrounding this matter, leaves this Court to conclude in fact and in law that the defendant Reggettz was of normal intelligence and that the State has proven its case by a preponderance of the evidence that it was made voluntarily.

"There was testimony from a number of State's witnesses that Reggettz was alert and that he did not ask to go to sleep when asked if he was tired. He was given food and drink and cigarettes and he was permitted to go outside unaccompanied, although Reggettz disputes that.

"Given a totality of the circumstances of this case, which involved three counts of murder in the first degree, the Court finds that the confession was made knowingly, intelligently, voluntarily, and that the State, by a preponderance of the evidence, has sustained its burden of proof." (*REGGETTZ* OCTOBER 28, 1980, Tr. 35-36).

*G.*

*PETITIONER ALLEGEDLY CONFESSES TO THE THREE MURDERS*

55.     On October 28, 1980, the same day the Circuit Court of Kanawha County found the confessions given by Paul Reggettz, III, to have been given voluntarily and in accordance with his constitutional rights, Petitioner, who was then seventeen years old, allegedly confessed to killing Vanessa Reggettz, Paul Eric Reggettz, and Bernadette Lynn Reggettz. (SECOND TRIAL, Tr. 505-78).

56.     In the suppression hearing held before the first trial, Petitioner testified that he confessed to these crimes only after being subjected to repeated physical abuse by Trooper Smith, who crawled into the back seat beside Petitioner while both of Petitioner's hands were handcuffed to the headrest. (FIRST TRIAL PRETRIAL SUPPRESSION HEARING, Tr. 303-05).

57.     Trooper Williams and Trooper Smith confirmed the fact that Petitioner was handcuffed to the front seat head rest and that Trooper Smith did crawl into the back seat with Petitioner to begin the questioning. (SECOND TRIAL, Tr. 509, 937).

58.     Even though Trooper Williams and Trooper Smith denied the beating allegations, both admitted that Petitioner's "willingness" to discuss the Reggettz murders was triggered when Trooper Smith said to Petitioner, "'Why do you think we got your blood?'" (SECOND TRIAL, Tr. 511-14, 944-45).

59.     The alleged confessions were obtained from Petitioner after they arrived in Parkersburg, West Virginia, at the State Police barracks.

60.    Based upon these alleged confessions, Petitioner was arrested for these three murders and incarcerated in the Kanawha County Jail.

61.    Subsequent to Petitioner's arrest, Paul Reggettz, III, was released from jail.

H.

### *FRED SALEM ZAIN'S SEROLOGICAL TESTING AND TESTIMONY CRITICAL TO THE STATE'S CASE*

62.    Although the State presented some additional circumstantial evidence in an effort to bolster or corroborate the alleged confessions given by Petitioner, it cannot be disputed that the most significant evidence presented at both trials was the testimony of Trooper Fred Salem Zain, who is the former head of the serology division of the West Virginia Department of Public Safety.

63.    Since Petitioner anticipates that the State, at this time, may attempt to deny that Trooper Zain was involved in the testing in this case, the following discussion notes the various transcripts in which Trooper Zain either admits, under oath, conducting the testing, or in which the State attributes the blood testing to Trooper Zain.

64.    The importance of Trooper Zain's testimony and the blood typing results to the State's case was emphasized numerous times throughout both trials.

65.    In the first trial, the State explained to the jury in its opening statement what some of the evidence would be:

> "On April 22, 1980, police officers, state police officers and
> a member of the prosecutor's office, acting on a tip, went to
> Ohio to obtain a blood specimen from a young man that they

15

found out lived within two to three hundred yards of the
Reggettz house during the time of these murders. And that
young man was John Moss, Jr.

"A blood specimen was obtained. It was analyzed, and
that blood specimen, you will hear, matched the blood
characteristics of John Moss, Jr.

"**The technician will tell you that that blood is
found -- three in every ten thousand people have that
kind of blood.** They will also tell you that they no longer
break down blood the way you and I may be familiar with it,
the old A-B-O. They can break blood down into nine
separate factors now, each one independent of the others.
But they will tell you about that." (Emphasis added).
(FIRST TRIAL, Tr. 2236).

66.    In the first trial, Petitioner's counsel raised a question about who

performed the serological testing, Trooper Zain or Sergeant Robert C. Murphy:

"The defendant, John Moss, moves the Court to prohibit
Sergeant Zain from testifying as a serologist in this case on
the basis that upon discovery the defendant discussed and
was given blood analysis reports from the State of West
Virginia. Those blood analysis reports reflected that a
Sergeant Murphy did the blood analysis.

"In a subsequent suppression hearing a Sergeant Murphy
testified under oath that he was the one that did those
analyses of the blood. Relying on discovery, relying on what
the State afforded the defendant, and relying on the
evidence in the suppression hearing, the defendant
interviewed Sergeant Murphy, and now is advised that
Sergeant Zain did the analyses. We object on that basis."
(FIRST TRIAL, Tr. 3450-51).

67.    Actually, in the suppression hearing held before the first trial,

Sergeant Robert C. Murphy testified that all of the blood tests were completed by April

26, 1980, and that he testified before the grand jury which indicted Paul Reggettz, III.

(FIRST TRIAL PRETRIAL SUPPRESSION HEARING, Tr. 255-56).

16

68.    Sergeant Murphy was never asked whether he performed all of the tests by himself or whether Trooper Zain had any involvement in the testing process.

69.    Furthermore, Sergeant Murphy did not testify before the jury in either the first or second trials, leaving Trooper Zain to provide the jury with all of the evidence regarding the blood typing.

70.    The State opposed the objection and explained:

"Sergeant Zain took scrapings, and he will testify that he did the analyses, as did Murphy.  I have seen Zain's notes.  He does have a lot of notes.  I don't know if he has them with him here, but he has them.  In any event, what he did do he can testify he did.  I think he can testify." (FIRST TRIAL, Tr. 3451).

71.    Thus, the State represented to the Court that it had actually reviewed laboratory notes generated by Trooper Zain during the testing process and that these notes helped to establish the fact that Trooper Zain did some of the serological testing.

72.    Based upon these representations and arguments, the trial court overruled the objection and permitted Trooper Zain to testify.  (FIRST TRIAL, Tr. 3452).

73.    In the first trial, Trooper Zain testified how he obtained the various blood samples from the scene and further stated:

"Q  Did you do testing on all these various items?

"A  Yes, sir, I did.

"Q  Do you have any charts here with you today to explain what testing procedures you used and what results you had?

17

"A   I have some charts to show the results of the tests which were performed on the majority of the items which I received and which were submitted at a later time for display purposes." (FIRST TRIAL, Tr. 3465).

74.   In the State's closing argument in the first trial, some emphasis is placed on the blood evidence obtained by Trooper Zain:

"April 22, 1980, the investigation went on, continued. They went and obtained John Moss' blood. They had no idea what kind of blood John Moss had at that time. They went and got a sample of it. They obtained the results. You heard testimony that right here (indicating) is John Moss' blood type. When compared with the blood found at the scene, there is a remarkable fact: The blood was the same, was consistent, no differences. One difference, and it throws it out. There was no differences.

"And what else did we learn about that blood from the testimony? **We learned that that blood is found in the population of North America in three persons in every ten thousand, three people. We know that half of that three are women**." (Emphasis added). (FIRST TRIAL, Tr. 4086-87).

75.   Later in the closing argument, the State further emphasized the blood evidence:

"What is the evidence that indicates beyond a reasonable doubt that John Moss is the killer of Vanessa, Paul Eric and Bernadette? **What is the probability of being able to select out of ten thousand people, when only three of them have that type of blood, being able to randomly select one of those three people, as if we had a jar of jelly beans, 10,000 jelly beans, and 9,997 of them are white jelly beans and 3 of them are red jelly beans. Now, it would be fairly easy to reach in with your eyes open and pull out one of the red jelly beans. But you don't know what type blood is in a person until you draw it.** So you put a blindfold on that individual and now what is the probability of reaching in there and pulling out a red jelly bean?   What is the probability?

**"John's blood matched.  I submit to you that it matched because John Moss' blood was in the house on December 13, 1979.**  And I submit to you it was in there because he was in there, because he did exactly what he told you he did in his taped confession.  They got his blood.  And then you take a person, as improbable as it is that you would pick that jelly bean or that person out, and then he confesses and his confession is accurate.  What is the probability of that?" (Emphasis added). (FIRST TRIAL, Tr. 4100-01).

76.    In the State's final closing argument, the blood is again emphasized:

"And then there is the blood.  Mr. McKittrick says that Trooper Zain said that three in ten thousand is not very rare.  What he got him to say was that they had found that the rarest blood is one in one hundred million.  You all go count.  Do you think three in ten thousand is rare?  He said the rarest is one in one hundred million.

**"Do you think that electrophoresis light that the chemist was talking about, did that lie about John Moss' blood?  No."** (Emphasis added). (FIRST TRIAL, Tr. 4207).

77.    In the second trial, the State's reliance on the blood testing conducted by Trooper Zain was even greater than in the first trial.

78.    In the State's opening statement in the second trial, the jury was told at length about the testimony anticipated from Trooper Zain:

"Now, the case begins to unravel soon after that, because at the scene that day on December 13th, when the Troopers showed up and the Lab people showed up, the photographer showed up, a person from the Serology Lab, a person who is a forensic serologist, showed up along with a fingerprint man.  The serologist, a man by the name of **Fred Zain,** the chief forensic serologist for the State -- he'll tell you that there was a lot of blood at the scene.
"Vanessa Reggettz had an injury.  We all know how a head injury is.  For example, **Fred Zain** will tell you that he took his samples of blood from every blood stain in that house.

19

He will tell you that he took those samples from this house, then he went back to the lab where he analyzed them. Of course, in the meantime, he had the known blood samples of the victim, the mother. He got a known blood sample of Paul Reggettz shortly thereafter.

"He will tell you that the blood samples that he took from a drawer in the kitchen and from a flashlight in the TV room, from a Christmas package, some Christmas wrapping paper, blood samples from the door between the living room and the front bed room. He took blood samples from that door, a change purse from the chest of drawers in the front bed room, a pillow case from the back bed room, a curtain on the back door, even the little pajama top that Bernadette Reggettz was wearing when she was murdered.

"He will tell you that when he took that samples, he analyzed them in the lab. He found samples of blood taken from all of these people that I've just listed, that did not match any member of the Reggettz family. The blood didn't belong to Vanessa, from the head wound. It didn't belong to Paul Eric. It didn't belong to Bernadette. And it didn't belong to Paul Reggettz.

"So, the Police continued their investigation. On April 22, 1980, they traveled to Cleveland, Ohio, to take a blood sample from a young man. During the course of their investigation, at the time of these murders, this man was living with his grandfather, some one hundred to two hundred yards straight down the road from the Reggettz home. And shortly after the murders, after about a week, that young man returned to Cleveland. That young man, ladies and gentlemen, is sitting right here (Indicating), John Moss, the defendant. His blood was taken that day in April and brought back to **Fred Zain**, the serologist, and his blood was found to match the blood found in the house.

"Now, we all know about some bloodwork. Everyone has an ABO type; either O, A, or AB, or B. **Trooper Zain** -- or **Lieutenant Zain** will tell you that the bloodwork at the time, was broken down scientifically and forensically, and can be broken down to a number of samples, to nine genetic markers or enzymes, all independent of each other, which is important. Some of the blood samples that were taken from the house were taken from the curtains on the back door, from Bernadette's pajama top, from Christmas wrapping paper, I believe the Christmas package. **And those blood samples were able to be broken down by Fred Zain**

20



**into those nine genetic markers.** And one at a time -- that blood exactly matched John Moss's -- the genetic markers, those nine genetic markers, in the sample of blood.

"**And Fred Zain will further tell you that the combination of those nine genetic markers found in the defendant's known blood and on those exhibits, the exhibits that I just listed, occur in three of every ten thousand people, point zero three percent of the population in this State.   Three in every ten thousand. Fred Zain will further tell you that some of the other samples, the other ones I listed, for lack of sufficient sample or whatever reason, he was able to break it down into seven of the nine genetic markers. And again, he'll tell you that those seven genetic markers found on those exhibits matched right down the line to the defendant's known blood.**

"**Fred Zain will tell you that combination of those seven genetic markers occurs in one of every thousand, twenty-one percent.**"      (Emphasis added)(SECOND TRIAL, Tr. 406-09).

79.    In an *in camera* hearing held prior to Trooper Zain's testimony, the

State raised a question about who was responsible for doing the testing in this case, to

which the following was stated:

"Q  I see a Sergeant Murphy's signature on this report, dated June 10th of 1980.  Is it your testimony that you performed these analyses, too?

"A   Yes, sir.  Sergeant Murphy, at the time, was in charge of a section, and we both countersigned reports.   And I processed all of the evidence that was submitted to me at the serology section at the time.

"The reports were either issued by himself or myself after conferring as to what should be issued in a report.

"**Q   But it is your testimony that you performed the analysis?**

"**A   Yes, that's correct.**"  (Emphasis added). (SECOND TRIAL, Tr. 1049-50).

80.    During this same hearing, Trooper Zain reiterated the fact that he performed the testing in this case:

> "Q  Mr. Zain, you testified that you actually did the analysis that was presented here in this particular case; is that correct?
> "A  Yes, sir, that is correct.
> "Q  So, how long after these scrapings were obtained was the analysis performed?
> "A  Within the next day or so.
> "Q  So, the fact that the report is dated in June, that doesn't indicate that's how long it was before the actual analyses were done; is that correct?
> "A  That's correct."    (Emphasis added).    (SECOND TRIAL, Tr. 1053).

81.    One of the unique features about this case is that not only did Trooper Zain perform the testing, but he also obtained the unknown blood samples from the scene of the crime himself.  (SECOND TRIAL, Tr. 1074).

82.    In the closing argument of the second trial, the State emphasized the significance of the testing performed by Trooper Zain:

> "We know that Paul Reggettz's confession is not true. How do we know that?  We know that from the evidence. **The blood found on the Christmas presents and wrapping paper is not Paul Reggettz's blood. Remember what Trooper Zain said yesterday?  He said one inconsistent marker excludes people one hundred percent.  The blood found at the scene wasn't Vanessa's.   It was consistent with the defendant's.**   It can be Paul's.   A hundred percent." (Emphasis added)(SECOND TRIAL, Tr. 1326).

83.    Throughout the State's initial closing argument in the second trial, numerous references are made to the serological testing performed by Trooper Zain.

22



84. Following the closing argument by Petitioner's counsel, the State once again focused on the significance of Trooper Zain's serological analysis. (SECOND TRIAL, Tr. 1370).

85. In the deposition Trooper Zain gave in Texas on May 24, 1993, he reconfirmed the fact that he was the person who did the testing in this case and, in fact, stated that during the testing process, he had excluded at least 27 other suspects:

> "[W]hen you talk about blood cases, I will tell you one that would mean more to you-all than anything else and that's in Paul Reggetz'. There we went through 27 suspects, I believe it was, to try to match up not only by A.B.O. typing but enzyme typing and we went through 27 exonerations, for example.
>
> Q. Were you the analyst that identified the blood in the Reggetz investigation that did not fit the theory of the case that the investigating officers were working on at the time?
>
> A. I did the protein enzyme work as well as Sergeant Murphy who also ran samples in the case, which is a matter of documentation.
>
> Q. And that ultimately led to the conviction of Mr. Moss (spelled phonetically) on that case?
>
> A. That's correct." (May 24, 1993 Deposition, Tr. 47).

86. Based upon the foregoing extensive record, Petitioner respectfully submits that the State cannot at this time deny the fact that at least some of the serological testing in this case was conducted by Trooper Zain, with Sergeant Robert C. Murphy also performing some of the tests.

23

*I.*

## IF THE STATE NOW CLAIMS THAT TROOPER ZAIN DID NO TESTING, THEN JUDGMENT OF ACQUITTAL SHOULD BE ENTERED DUE TO PROSECUTORIAL MISCONDUCT IN PRESENTING PERJURED TESTIMONY TO JURY

87.   In this case, it cannot be disputed that Trooper Zain:

(A)   personally obtained most of the unknown blood samples from the crime scene;

(B)   testified before the jury in both trials regarding the serological testing he conducted; and

(C)   performed DNA testing prior to the second trial.

88.   Moreover, the State represented to the Court in the first trial that the State had reviewed laboratory notes generated by Trooper Zain during the testing process, and that these notes clearly established the fact that Trooper Zain conducted some of the serological testing.

89.   Despite all of the evidence in the record to the contrary, it is possible that the State may now claim that Trooper Zain did not perform any serological testing, which would mean that Trooper Zain committed several additional acts of perjury in this case.

90.   In the unlikely event that the State would adopt such an untenable position, then Petitioner would be forced to amend this **PETITION** and further assert that the State engaged in prosecutorial misconduct by presenting to the jury in both trials perjured testimony from Trooper Zain.

24

91.    Discovery would then have to be taken to uncover when the State knew that Trooper Zain did not perform any serological testing and whether the State knowingly permitted Trooper Zain to perjure himself.

92.    Under these circumstances, it is possible, if these facts are established, that a new trial would be barred and a judgment of acquittal would have to be entered under either double jeopardy or due process principles.  *See generally Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *State v. Pennington*, 179 W.Va. 139, 365 S.E.2d 803 (1987); *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979); *State ex rel. Knotts v. Watt*, 186 W.Va. 518, 413 S.E.2d 173 (1991); *State v. Bonham*, 184 W.Va. 555, 401 S.E. 2d 901 (1990); *State ex rel. Pinson v. Maynard*, 181 W.Va. 662, 383 S.E.2d 844 (1989).

93.    However, for purposes of this **PETITION**, Petitioner will assume that the State will acknowledge, as established by the record, that Trooper Zain was involved in the serological testing in this case.

*J.*

### TROOPER ZAIN COMMITTED PERJURY BY LYING ABOUT HIS QUALIFICATIONS

94.    For purposes of this **PETITION**, as established by the West Virginia Supreme Court and as discussed below, this Court is to assume that any testimony or testing performed by Trooper Zain is invalid, unreliable, inadmissible, and false.

25

95. Even though all of his testimony and testing, under this analysis, is presumptively invalid, unreliable, inadmissible, and false, Petitioner respectfully submits that parts of Trooper Zain's testimony are, in fact, false and the statistical conclusions presented based upon the blood typing results are overstated.

96. During his tenure as the head of the serology laboratory for the West Virginia Department of Public Safety, Trooper Zain routinely lied under oath about his credentials.

97. For example, in an *in camera* hearing held in the second trial, Trooper Zain testified as follows:

> "Q And what training had you received at that time in performing -- to perform such analysis?
>
> "A My formal education was a degree in biology, with a minor in chemistry.
>
> "I also received an Associate Degree in Police Sciences, and specialized training at the FBI academy at Quantico, Virginia, relating to the specific field of forensic science, and more particularly, serology, or tests and methods utilized in the identification of blood and body fluids.
>
> "Both basic and advanced courses were obtained by me from the FBI Academy and other specialized training sessions that I had attended, as well as scientific organizations which I belong to, such as the Southern Association of Forensic Scientists, and other peer groups." (SECOND TRIAL, Tr. 1050).

98. Virtually the same testimony about his credentials was presented to the jury shortly thereafter. (SECOND TRIAL, Tr. 1066-67).

99. Trooper Zain was indicted for perjury on July 22, 1994, for giving approximately the same answer in the case styled *State v. Paul Walker*, Felony No. 91-F-62.

100.   As was discovered during the special investigation headed by Special Judge James O. Holliday, Trooper Zain never obtained a minor in chemistry, which was not even offered at that time by the college he attended.

101.   Furthermore, as for Zain's FBI training, he either flunked or failed to complete at least two FBI training sessions he attended.

102.   Moreover, if Trooper Zain's history of fabricating evidence, as discovered during the special investigation, had been known at the time of Petitioner's first trial, his testimony and test results would have been given little or no weight by the jury and may have been found too unreliable to be admitted into evidence.

103.   In *People v. Cornille*, 95 Ill.2d 497, 69 Ill.Dec. 945, 448 N.E.2d 857 (1983), a case cited by the West Virginia Supreme Court in *In the Matter of Investigation of the West Virginia State Police Crime Laboratory*, 190 W.Va. 321, 438 S.E.2d 501 (1993), the Illinois Supreme Court was presented with a situation where an arson expert lied about his education and other credentials.

104.   The facts in *Cornille* are remarkably similar to the present facts in that by the time the defendant in *Cornille* had filed his habeas corpus action, the alleged arson expert had already been indicted for perjury for lying about his education and credentials.

105.   The Illinois Supreme Court held that there was a reasonable likelihood that the jury's decision may have been affected by this expert's false testimony, which made him appear to be more credible.

27

106.   Consequently, the defendant in *Cornille* was granted a new trial on this basis alone.

107.   Petitioner respectfully submits that a similar holding is required in the present case, where there can be no doubt that even without the presumption of falsity in Trooper Zain's testimony and blood typing, there is a reasonable likelihood that the jury's decision was affected by Trooper Zain's false testimony concerning his education and credentials.

108.   Moreover, in light of the revelations made about Trooper Zain and his proclivity to fabricate evidence in an effort to obtain a conviction, a jury would have the right to disregard anything he said.

*K.*

*TROOPER ZAIN OVERSTATED THE STATISTICS*
*IN CONNECTION WITH THE BLOOD TYPING*

109.   In addition to his perjured testimony and history of fabricating evidence, Trooper Zain, as he often did, overstated the statistical conclusions that could be legitimately drawn from the blood typing performed.

110.   The scientific analysis in this part of the **PETITION** is based, in part, upon the scientific criticism of Trooper Zain's serological testing in *State v. Glen Dale Woodall*, as noted in the written reports of Dr. Edward Blake, Professor Alec Jeffreys, Dr. George Sensabaugh, Dr. David Bing, Dr. Henry Erlich, and Dr. Robert Shaler.

111.   This scientific criticism as applied to the present case would be subject to further refinement once all of the documentation generated in connection with the serological testing is reviewed by an expert.

112.   Petitioner respectfully submits that under the accepted view of most reputable forensic scientists, Trooper Zain overstated the population frequency statistics in comparing the unknown blood samples with Petitioner's known blood samples.

113.   It is important to note that for each blood type found, a properly trained forensic scientist is able to refer to sources which provide what percentage of the population have that particular blood type.

114.   Where multiple blood types are found from one sample, these population frequency statistics for each type are multiplied together, resulting in a smaller and smaller statistical percentage with each blood type.

115.   Thus, one of the goals of any forensic scientist is to identify as many blood types as possible in order to obtain a more probative population frequency percentage.

116.   In other words, where the blood types obtained from an unknown blood sample from the crime scene are found to be similar to the blood types obtained from an accused's blood sample, the smaller the percentage of the population with the same combination of blood types, the greater the likelihood that the two different blood samples came from the same person.

117.   Forensic science has developed rules to ensure that these blood type population statistics are not overstated or misstated.

29

29

118.   Whenever blood is discovered at a crime scene, forensic scientists have to be concerned about whether it is possible that the blood of a victim was mixed with the blood of an assailant.

119.   If there is a mixture of the blood of the victim with the blood of the assailant, ordinary serological testing is unable to make a determination as to the source of the blood tested.

120.   A basic tenet of forensic biology is that in a situation where the evidence establishes that a victim and an assailant or other person possibly bled at the crime scene, only those blood types obtained from an unknown blood sample that are foreign to the known blood types of any known possible donors of the blood may be included in the population frequency statistics calculated from the unknown blood sample.

121.   This rule concerning the possibility of a mixture of types is particularly true in sexual assault cases, where the swabs taken from the victim often contain a mixture of bodily fluids from the victim and the assailant.

122.   The rule recognized by forensic scientists to account for this mixture in a sexual assault case is stated as follows:

> "In forensic specimens such as vaginal swabs, which are known to contain a mixture of both semen and vaginal fluid, one should only make use of those markers present in the forensic stain but <u>absent</u> from the victim in any biostatistical estimation of the frequency of individuals in the population who could have contributed the semen."--Professor Alec Jeffreys, November 9, 1990 Report in *State v. Glen Dale Woodall*.

30

"Semen stain evidence in sexual assault cases must be presumed to contain a mixture of semen and fluids from the victim unless there is microscopic or chemical evidence to the contrary. In this case, no such evidence is suggested in either the reports or the testimony; hence the presumption of mixture applies. Accordingly, the only meaningful genetic typings on the evidence samples are those that show a type foreign to the victim."--Dr. George Sensabaugh, December 9, 1990 Report in *State v. Glen Dale Woodall*.

"I agree with Dr. Blake's criticism of the statistical interpretation given for the conventional serological genetic marker testing in this case. Since the sperm and epithelial cells were not separated from each other, only those genetic markers found in the semen stain and absent in the victims' reference sample can be used to estimate the probability of a random match."--Dr. Henry Erlich, December 21, 1990 Report in *State v. Glen Dale Woodall*.

123.  Even though this possibility of mixture rule clearly applies in sexual assault cases, the underlying principle also applies where multiple blood samples are discovered at a crime scene.

124.  A forensic scientist, in calculating the percentage of the population having the particular blood types obtained from an unknown blood sample found at a crime scene, can only include those blood types that are different from any of the known blood types of persons who are known possible donors of blood in that particular location.

125.  If the known blood types of the victim are not excluded from the blood types obtained from the unknown blood sample, then the resulting probability statistic is overstated and is misleading because the impression given to the jury is that the unknown blood sample came from one person when, in fact, there may be a mixture of blood within that sample.

126.   The only scientifically acceptable method of addressing this problem is to exclude any blood types obtained from the unknown blood sample which either are identical to the victim's blood types or which cannot be excluded from the victim's blood types.

127.   In the present case, at a minimum, it cannot be disputed that Vanessa Reggettz is a known possible donor of blood in the Reggettz home, since she was stabbed with a pair of scissors.

128.   Arguably, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III, are additional known possible donors of blood in the Reggettz home because they lived there and may have deposited blood in the home at some point.

129.   However, for purposes of this **PETITION**, Vanessa Reggettz will be treated as a known possible donor of blood in the Reggettz home.

130.   According to the June 10, 1980 report, Vanessa Reggettz has the following blood types: **ABO O**, PGM 2+1-, **AK 1**, EAP B, EsD 1, **ADA 1**, **GLO I 2**, Hp 1, and Gc 2-1.

131.   According to the June 10, 1980 report, **ABO O**, **AK 1**, **ADA 1**, and **GLO I 2** blood types were obtained from several of the unknown blood samples.

132.   Thus, in analyzing the unknown blood samples obtained from the crime scene, a forensic scientist would not be able to include the ABO, AK, ADA, and GLO I blood types because Vanessa Reggettz has the same blood types as the types determined from the unknown blood samples using these particular tests.

133.   If the known blood types of Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III, are included as known possible donors of blood in the Reggettz home, then, in addition to the blood types listed above, the EAP and Hp blood types would also be eliminated.

134.   Moreover, several additional blood types may also have to be eliminated where it is impossible to distinguish the blood types of Vanessa Reggettz from the blood types obtained from the unknown blood samples.

135.   For example, according to the June 10, 1988 report, Vanessa Reggettz has EsD type 1 and several of the unknown blood samples have EsD type 2-1.

136.   Any unknown blood sample with EsD 2-1 could possibly result from a mixture of blood with EsD type 1 and EsD type 2.

137.   Therefore, the EsD type cannot be included in the statistical conclusions drawn from the types obtained from the unknown blood samples or, at least, a forensic scientist would have to recognize this additional possibility.

138.   However, in reaching his statistical conclusions regarding the unknown blood types found, Trooper Zain committed the error of including blood types that either matched or could not be excluded from being deposited by Vanessa Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III.

139.   Even though the June 10, 1980 report does not clearly state how Trooper Zain's statistics were calculated, it is apparent from his testimony that he did include blood types that either matched or could not be excluded from the known blood types of Vanessa Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III.

140. The inclusion of these additional blood types gave the unknown blood typing much greater statistical significance than it merited if the proper and accepted procedure had been followed.

*L.*

*TROOPER ZAIN POSSIBLY OVERSTATED*
*THE STATISTICS BY COMBINING TYPES*
*FROM SEPARATE UNKNOWN BLOOD SAMPLES*

141. Another area where it is very possible, if not probable, that Trooper Zain overstated the statistics from the unknown blood samples is the combining of blood types from different blood stains found on the same item.

142. The only reason for qualifying this criticism is that the record does not specifically demonstrate which blood stains from a particular item provided the blood types obtained by Trooper Zain.

143. For example, consider the unknown blood samples obtained from the Christmas wrapping paper that was found removed from various packages.

144. A forensic scientist cannot assume that the blood found on the Christmas wrapping paper from different packages came from the same person because there is no factual basis for making such an assumption.

145. Furthermore, the only probative information to be obtained from these unknown blood samples are the blood types that are foreign to the blood types of any known possible donors of blood.

146.  Assume that when Trooper Zain examined the Christmas wrapping paper, there were five separate drops or smears of blood on the different pieces of paper, as opposed to one single pool of blood.

147.  When he performed the serological testing, further assume that he obtained the ABO and PGM blood types from the first drop or smear, the AK and EAP blood types from the second drop or smear, the EsD and ADA blood types from the third drop or smear, the GLO I and Hp types from the fourth drop or smear, and the Gc blood type from the fifth drop or smear.

148.  Under these assumed facts, Trooper Zain can only combine the particular blood types obtained from the particular drop or smear of blood tested.

149.  Thus, from the first drop or smear, Trooper Zain would only be able to combine the population frequencies for the ABO and PGM blood types obtained.

150.  Since neither the ABO nor the PGM test was performed on any of the other drops or smears of blood, it is possible that a different ABO or PGM type would have been obtained from these other samples.

151.  Therefore, it would be scientifically unacceptable to combine the blood types obtained from the separate drops or smears of blood obtained from the Christmas wrapping paper.

152.  The problem with the possible mixture of different blood samples still applies under this hypothetical scenario, which would further eliminate the blood types that can be included in the statistics based upon a comparison of Vanessa Reggettz's known blood types with the blood types obtained from the unknown blood samples.

153.   If, in fact, the hypothetical scenario stated above occurred, then the statistics in this case were grossly overstated in a manner contrary to accepted scientific principles.

*M.*

### RELIABILITY OF ANY EVIDENCE OBTAINED BY TROOPER ZAIN IS QUESTIONABLE

154.   As noted earlier, one unique feature about this case is the fact that most of the critical unknown blood samples were obtained by Trooper Zain.

155.   In the report issued by Special Judge Holliday, which is quoted in *Matter of West Virginia State Police Crime Laboratory*, 190 W.Va. at ___, 438 S.E.2d at 503, the following litany of false evidence presented by Trooper Zain under oath is noted:

> "'The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results.'"

156.   The possibility that Trooper Zain fabricated what types were obtained from the unknown blood samples by simply matching them to Petitioner's known blood types is not too far fetched and, in fact, would be consistent with Trooper Zain's demonstrated history.

157.    Thus, in light of Zain's perjury, his overstatement of the blood type results, and his history of fabricating evidence, Petitioner respectfully submits that this habeas corpus action should not be determined based upon any evidence obtained by Trooper Zain.

158.    Petitioner should be granted a new trial where a jury is asked to decide Petitioner's guilt or innocence based solely on the confessions of Paul Reggettz, III, and the alleged confessions of Petitioner, if such alleged confessions are found to be voluntary and admissible.

## III.

## LEGAL STANDARD TO BE APPLIED
## IN THIS *ZAIN* HABEAS CORPUS ACTION

### A.

### *JURY MATERIALLY AFFECTED BY ZAIN'S TESTIMONY*

159.    Special Judge Holliday concluded in his report, that was adopted and quoted by the West Virginia Supreme Court in *Matter of Investigation of State Police Crime Laboratory*, 190 W.Va. at ___, 438 S.E.2d at 506:

> "'It is believed that, as a matter of law, **any testimonial or documentary evidence offered by Zain** at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding.'" (Emphasis added).

160.    This special habeas corpus standard of review established in *Matter of Investigation of State Police Crime Laboratory* applies to all cases in which Trooper Zain testified or had any involvement with the testing process.

37

*37*

161.   Thus, in this habeas corpus action, all of the blood testing testified to by Trooper Zain and all of his testimony must be deemed invalid, unreliable, inadmissible, and false.

162.   In Syllabus Point 2 of *Matter of Investigation of State Police Crime Laboratory*, the West Virginia Supreme Court established what a habeas corpus petitioner must demonstrate where invalid, unreliable, inadmissible, and false evidence was presented against him at trial:

> "Although it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict."

163.   In the present case, as noted repeatedly by the State throughout both trials, the deciding factor in this case was the testimony of Trooper Zain.

164.   Without Trooper Zain's testimony, a jury would have to decide the guilt or innocence of Petitioner based upon whether they believed Petitioner's alleged confessions or the confessions given by Paul Reggettz, III.

165.   Clearly, Petitioner has met the standard set out in Syllabus Point 2, justifying this Court in setting aside his conviction and awarding him a new trial.

166.   Petitioner respectfully submits that the West Virginia Supreme Court erred in applying the harmless error standard for **nonconstitutional** error under these facts.

38

167.   Since the West Virginia Supreme Court recognized in Syllabus Point 2 that a conviction obtained upon false testimony is a **constitutional** error, the harmless error standard for constitutional errors should be applied.

168.   This standard is set out in Syllabus Point 5 of *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975):

> "Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt."

*See also* Syllabus Point 3, *State v. Barrow*, 178 W.Va. 406, 359 S.E.2d 844 (1987); Syllabus Point 1, *Maxey v. Bordenkircher*, 175 W.Va. 49, 330 S.E.2d 859 (1985); *United States v. Hasting*, 461 U.S. 499, 510-11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96,107 (1983); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

169.   Petitioner respectfully submits that under this more appropriate standard, the State would never be able to establish that the admission of Trooper Zain's invalid, unreliable, inadmissible, and false testimony and test results was "harmless beyond a reasonable doubt."

170.   However, for purposes of this **PETITION**, even if the West Virginia Supreme Court adopted an inappropriate harmless error standard to these facts, Petitioner respectfully submits that he is entitled to a new trial even under the nonconstitutional harmless error standard adopted.

171.   In Syllabus Point 3, the West Virginia Supreme Court held that the following harmless error test should be applied under these facts:

> "'Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible

39

39

evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.' Syllabus Point 2, *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980)."

172.   Whether, after disregarding Trooper Zain's testimony and the blood typing conclusions, the remaining evidence in the present case is sufficient to convince impartial minds that Petitioner is guilty beyond a reasonable doubt is a difficult question to answer.

173.   Under this scenario, these impartial minds would be presented with several detailed confessions to these three murders from two different people--Paul Reggettz, III, and Petitioner, if in fact Petitioner's confessions are found to be voluntary and admissible.

174.   Theoretically, the detailed confessions given by Paul Reggettz, III, may constitute reasonable doubt as a matter of law.

175.   However, for purposes of this argument, even if the remaining evidence is sufficient to sustain a guilty verdict against Petitioner, the question then becomes whether Trooper Zain's testimony had a prejudicial effect on the jury.

176.   As the State told the jury repeatedly in both trials, the critical evidence shifting the balance between the conflicting confessions given by Paul Reggettz, III, and Petitioner, was Trooper Zain's testimony and serological testing.

40

177.   This case is not one where Trooper Zain's testimony and testing were merely collateral to the main evidence, but rather, Trooper Zain's evidence was the deciding factor in the case.

178.   Thus, regardless of whether or not the remaining evidence, after eliminating Trooper Zain's testimony, is sufficient to support Petitioner's conviction, clearly Petitioner was prejudiced by the admission of Trooper Zain's false and overstated testimony.

179.   Consequently, even under the legal analysis adopted by the West Virginia Supreme Court, Petitioner respectfully submits that his convictions should be set aside and he should be granted a new trial.

*B.*

*DNA TESTING APPROPRIATE AFTER NEW TRIAL AWARDED*

180.   Another issue that will need to be addressed in this habeas corpus action is whether DNA testing should be performed and when such testing should take place.

181.   In dicta, the West Virginia Supreme Court held in *Matter of Investigation of State Police Crime Laboratory*, 190 W.Va. at ___, 438 S.E.2d at 507, held:

> "In order to resolve these matters, we will direct the Clerk of this Court to prepare and cause to be distributed to the Division of Corrections an appropriate post-conviction habeas corpus form. This form will be designed to identify those individuals who desire to seek habeas relief on a Zain issue. As a condition for obtaining such relief, the form will require the relator to consent to a DNA test. The right of the State to obtain similar tests has been sanctioned by the United States Supreme Court in *Schmerber v. California*,

41

384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). *See also State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991). This Court will then determine an appropriate independent laboratory to conduct the DNA test at the State's expense."

182.   This procedure was adopted by the West Virginia Supreme Court as a method of establishing an orderly procedure in these cases, where it was anticipated that the legal system would be flooded by *pro se* habeas corpus petitions filed by numerous inmates, many of whom had already exhausted their habeas corpus remedies.

183.   Under this administrative procedure, those petitioners who chose to follow this administrative route filled out this form and filed it with the West Virginia Supreme Court, which would then determine if a hearing was justified.

184.   The case would then be remanded to the original trial judge, who would either appoint the original lawyer assigned to the case at trial or would appoint new counsel.

185.   The present case differs from the multitude of petitions filed in accordance with this procedure in three respects.

186.   First, Petitioner has never previously sought habeas corpus relief arising from his second conviction.

187.   Under *Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981), a prisoner is entitled to an omnibus habeas corpus hearing in which all issues can be raised.

42

188.   Second, as noted earlier, this case presents this Court with a situation where Trooper Zain was the person who actually obtained the unknown blood samples from the crime scene.

189.   Trooper Zain's involvement in the actual obtaining of the critical evidence as well as with the testing of this evidence raises a serious question about the reliability of *any* results that may be obtained.

190.   Neither Petitioner nor the State should have any confidence with the reliability or validity of any evidence touched by Trooper Zain.

191.   One of the prosecuting attorneys involved in Petitioner's first trial engaged in some speculation concerning the revelations made about Trooper Zain and its possible impact on Petitioner's case:

> "Stucky says there may be nothing wrong with the blood. But, then again, maybe there is. 'They [the state police] were combing the hillsides looking for someone with the rare blood type,' Stucky said. 'Does the blood really match John, or did Zain fabricate it?'" (The Charleston Gazette, November 13, 1993, at 17A).

192.   Obviously, if the above quote is accurate, Mr. Stucky was simply engaging in pure speculation based upon the revelations about Trooper Zain.

193.   However, it is precisely that kind of legitimate questioning and speculation that a jury would have to consider in evaluating any evidence handled by Trooper Zain.

194.   Even if Trooper Zain did act honestly and in accordance with accepted scientific principles in this case, there is no way of proving one way or the other that he did.

43

195.   For example, if the State were able to obtain DNA from the three victims, Petitioner, and some of the unknown blood samples, and Petitioner's DNA was found to match the DNA from some of the unknown blood samples, it would not be proper to deny Petitioner a new trial based upon this DNA match due to the serious questions concerning the integrity of the evidence.

196.   Under those circumstances, a jury would have to consider the results of any DNA testing along with the substantial evidence that Trooper Zain committed perjury, overstated his test results, and had a history of fabricating evidence against an accused.

197.   Thus, the weight of any DNA testing would be seriously affected by Trooper Zain's demonstrated history.

198.   Finally, DNA testing has already been performed in this case.

199.   Prior to the second trial, Trooper Zain conducted DNA testing on several unknown blood samples obtained from the crime scene, but was unable to develop any banding patterns, apparently because only low molecular weight DNA was obtained.  (SECOND TRIAL, Tr. 1092).

200.   Whether there is any evidence available for additional DNA testing is unknown at this time.

201.   Furthermore, in order to perform additional DNA testing properly and in accordance with accepted protocol, the DNA from the known possible donors of the blood in the Reggettz home would have to be tested as well.

44

202.   Trooper Zain testified in the second trial that after his attempt at DNA testing failed, all of the known blood samples of the three victims were destroyed, in accordance with normal protocol.  (SECOND TRIAL, Tr. 1094).

203.   As a practical matter, it may be impossible at this time for any DNA testing to be performed that would have the likelihood of providing any real meaningful result.

204.   Thus, even though Petitioner generally has no objection to DNA testing, under the unique facts of this case, Petitioner respectfully submits that he should be granted a new trial, regardless of any DNA testing that may or may not be conducted.

205.   Stated simply, Petitioner does not believe that whether or not he receives a new trial should be dependent upon the outcome of any DNA testing, but rather is mandated under the facts of this case, regardless of any possible DNA test results.

206.   Petitioner respectfully submits that under both the United States and West Virginia Constitutions, his constitutional rights have been violated, requiring his convictions to be set aside and entitling him to a new trial at this time.

## GROUNDS FOR RELIEF

In support of this Petition, Petitioner asserts that his incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10, and 14 of the West Virginia Constitution, based upon the following, to-wit:

45

1.    The admission of testimony and test results performed by Trooper Fred Salem Zain, whose credentials, credibility, and test results have all been found by the West Virginia Supreme Court of Appeals to be inherently unreliable and a violation of a criminal defendant's constitutional rights.

2.    The presentation by the State of incorrect, false, misleading, overstated, and unscientific evidence.

3.    The admission of the alleged confessions given by Petitioner, which resulted from a violation of his constitutional rights.  Although the issues regarding the confessions have been extensively litigated in many hearings, Petitioner reserves the right to develop new information and new arguments with regard to the alleged confessions that were previously unavailable.

For the foregoing reasons, Petitioner John Moss, III, respectfully asks this Honorable Court, pursuant to W. Va. Code, 53-4A-1 through -11, to grant the writ of habeas corpus, to vacate all of his convictions arising from the underlying criminal case, to release Petitioner from prison immediately, and to enter a judgment of acquittal. Alternatively, Petitioner John Moss, III, respectfully asks this Honorable Court, pursuant to W. Va. Code, 53-4A-1 through -11, to grant the writ of habeas corpus, to vacate all of his convictions arising from the underlying criminal case, to release Petitioner from prison immediately, and to order a new trial.

Petitioner respectfully reserves the right to pursue any additional grounds that may arise during the habeas corpus hearing.

JOHN MOSS, III, Petitioner,

--By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

47

## CERTIFICATE OF SERVICE

9h AUG 18 PM 1: 23

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**PETITION FOR WRIT OF HABEAS CORPUS** was served upon counsel of record

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

on the \[th\] day of August, 1994, by the United States Postal Service, postage prepaid.

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300

Lonnie C. Simmons

48

48

*MAC*

# DiTRAPANO & JACKSON
### ATTORNEYS AT LAW
#### 604 VIRGINIA STREET, EAST
### CHARLESTON, WEST VIRGINIA  25301

94 AUG 18  PM 1: 23

RUDOLPH L. DiTRAPANO
P. RODNEY JACKSON
J. TIMOTHY DiPIERO
FRANKLIN S. FRAGALE, JR.

TELEPHONE 304-342-0133
FAX. NO. 304-342-4605

CATHY S. GATSON
KANAWHA COUNTY CIRCUIT

JOSHUA I. BARRETT
LONNIE C. SIMMONS
DEBRA L. HAMILTON
SUZANNE M. WEISE

August 18, 1994

Cathy S. Gatson
Circuit Clerk of Kanawha County
Judicial Annex
111 Court Street
Charleston, West Virginia 25301

Re:  *John Moss, III v. George Trent*

94-misc-663

Dear Ms. Gatson:

Please find enclosed herewith for filing in the above-captioned civil action **PETITIONER'S MOTION FOR ALL DOCUMENTS RELATING TO ANY TESTING PERFORMED IN CONNECTION WITH THIS CASE OR IN CONNECTION WITH PAUL REGGETTZ, III; PETITIONER'S MOTION FOR THE GRAND JURY TRANSCRIPTS THAT RESULTED IN THE INDICTMENT OF PAUL REGGETTZ, III, AND JOHN MOSS, III; PETITIONER'S MOTION TO EXCEED STATUTORY LIMIT ON EXPENSES**; and **PETITION FOR WRIT OF HABEAS CORPUS**, copies of each have been hand delivered to all counsel of record.

Thank you for your cooperation in this matter.

Very truly yours,

Lonnie C. Simmons

LCS/jb

Enclosures

cc:  Mary Beth Kershner
Steve Revercomb
Peter C. Brown

49

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

    Petitioner,

v.               Civil Action No. 94-misc-6663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

    Respondent.


### PETITIONER'S MOTION FOR ALL DOCUMENTS
### RELATING TO ANY TESTING PERFORMED
### IN CONNECTION WITH THIS CASE
### OR IN CONNECTION WITH PAUL REGGETTZ, III

  Petitioner John Moss, III, respectfully moves this Court to order the State to produce all documents relating to any testing performed in connection with this case or in connection with Paul Reggettz, III, for the following reasons:

  1.  During the investigation into the homicides of Vanessa Reggettz, Paul Eric Reggettz, and Bernadette Lynn Reggettz, various serological and other tests were conducted on the evidence found at the scene of the crime.

  2.  Of particular interest is the serological testing performed on certain blood samples found at the scene of the crime.

  3.  These blood samples were obtained by Fred Salem Zain, who also conducted the testing, along with Sergeant Robert C. Murphy.

  4.  As noted in the **PETITION**, Petitioner has raised several issues regarding the overstatement of the statistics which can only be determined by an examination of all documentation generated in connection with the testing.

5.    Furthermore, since Petitioner anticipates that the State may attempt to argue that Trooper Zain was not involved in the testing, despite all of the testimony and evidence to the contrary, this documentation will help address that issue.

6.    An examination of this documentation may very well provide additional exculpatory evidence.

7.    In order for Petitioner's expert to complete his analysis, it is necessary for him to review all of the following items:

(a)    All reports, laboratory notes, bench notes, memoranda, slides, photographs, autorads, and other documentation related to the serological and DNA testing performed in this case.

(b)    All of the population and other data used in connection with the serological and DNA testing.

(c)    All of the quality assurance records maintained in connection with the serological and DNA testing, including but not limited to, the temperature logs, solution logs, quality assurance sheets, quality assurance manuals, protocol manuals, and the documentation establishing that the typings were interpreted and confirmed by a second analyst.

(d)    All documents and records of any testing performed to ensure that the controls used gave the expected results.

(e)    All documents and records relating to proficiency testing performed in connection with the serological testing, either internally or externally by an outside agency.

(f)    All documents and records relating to blind trials performed to determine the accuracy of the serological testing.

8.    Included in the material produced should be any and all documentation related to the testing of at least 27 other persons allegedly tested by Trooper Zain.

2

51

For the foregoing reasons, Petitioner John Moss, III, respectfully moves this Court to order the State to produce all documents relating to any testing performed in connection with this case or in connection with Paul Reggettz, III

**JOHN MOSS, III**, Petitioner,

--By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

3

52

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **PETITIONER'S MOTION FOR ALL DOCUMENTS RELATING TO ANY TESTING PERFORMED IN CONNECTION WITH THIS CASE OR IN CONNECTION WITH PAUL REGGETTZ, III**, was served upon counsel of record on the 18 day of August, 1994, by the United States Postal Service, postage prepaid.

Mary Beth Kershner
Steve Revercomb
Peter C. Brown
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg
111 Court Street
Charleston, West Virginia 25301
(304) 357-0300


Lonnie C. Simmons

4

53

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

           Petitioner,

v.

                                       Civil Action No. 94-misc-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

              Respondent.

### PETITIONER'S MOTION TO EXCEED
### STATUTORY LIMIT ON EXPENSES

        Petitioner John Moss, III, by counsel, respectfully moves this Court for an order approving Petitioner's incurring expenses for an investigator and for expert witnesses in this habeas corpus action in excess of the statutory limits.

        As grounds for this motion, Petitioner states that he is an indigent, as reflected by the pauper's affidavit filed prior to his first criminal trial. Based upon this affidavit, the Circuit Court of Kanawha County appointed counsel for Petitioner for his criminal trial. Petitioner's family has retained counsel to represent Petitioner in this habeas corpus action.

        In the habeas corpus proceedings, Petitioner anticipates the need for expert witnesses in connection with the serological testing as well as the need for investigative services. As far as exceeding the statutory limit on these fees and expenses, Petitioner asserts that this order is material and necessary, that Petitioner's right to adequate representation would be impaired if this motion is not granted, and that Petitioner cannot properly and adequately proceed to develop a proper record in

this habeas corpus action without these additional expert witness fees and expenses and will be deprived of his constitutional rights, including his right to the effective assistance of counsel, due process of law and equal protection of the law without such order.

W. Va. Code, 53-4A-4(b), specifically provides that where the court determines that the petitioner in a habeas corpus action is an indigent, "all necessary costs and expenses incident to proceedings hereunder, originally, or on appeal pursuant to section nine [53-4A-9] of this article, or both, including, but not limited to, all court costs, and the cost of furnishing transcripts, shall, upon certification by the court to the state auditor, be paid our of the treasury of the State from the appropriation for criminal charges." Petitioner respectfully submits that the costs and expenses incurred in connection with expert witnesses and an investigator in this case will be necessary and should be paid pursuant to the procedure set out in this statute.

The right of a criminal defendant to have evidence presented against him independently tested has been recognized and approved by the West Virginia Supreme Court. For example, the West Virginia Supreme Court has recognized that a person accused of a criminal offense involving controlled substances has a right to have the substances independently tested. In Syllabus Point 4 of *State v. Harr*, 156 W. Va. 492, 194 S.E.2d 652 (1973), the Supreme Court held:

> "'A person charged with possession of an illegal drug should be permitted to examine the alleged illegal drug under proper supervision and control.' Syl. pt. 3, *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972)."

2



*See also State v. Adkins*, 167 W. Va. 626, 280 S.E.2d 293 (1981); *State v. McArdle*, 156 W. Va. 409, 194 S.E.2d 174 (1973).

In *McArdle*, the defendant charged with possession and sale of marijuana, sought to have his own independent tests done on the substances seized because his defense was that he did not possess the illegal parts of the plants. The trial court refused to allow this testing. In reversing the trial court's ruling on this matter, this Court stated the defendant "should have been permitted to have his expert make laboratory tests and **whatever chemical tests he deemed necessary**." (Emphasis added). 194 S.E.2d at 178.

The West Virginia Supreme Court found that the denial of this test was in violation of the fundamental principles discussed by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and quoted the following passage from *Brady*:

> "'Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. * * * A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant.' *See Mooney v. Holohan*, 294 U.S. 103, 55 S. Ct. 340, 79 L.Ed.2d 791, 98 A.L.R. 406.
>
> "Applying these principles to this issue we find that the failure to permit the defendant an opportunity to adequately examine and test the substance does not comport with the basic standard of fairness to which an accused is entitled." 194 S.E.2d at 179.

3



Furthermore, courts have been particularly sensitive to the problems encountered by criminal defendants who are indigent and who must rely on the resources of the State to pay the fees necessary to obtain expert witnesses. A number of courts have held that an indigent criminal defendant has a constitutional due process right to have independent tests performed by experts so that he can adequately prepare and present his defense. *See Hintz v. Beto*, 379 F.2d 937 (5th Cir. 1967); *United States ex rel. Robinson v. Pate*, 345 F.2d 691 (7th Cir. 1965); *United States v. Decoster*, 199 App.D.C. 359, 624 F.2d 196 (1976); *People v. Worthy*, 109 Cal.App.3d 514, 167 Cal.Rptr. 402 (1980); *People v. Watson*, 36 Ill.2d 228, 221 N.E.2d 645 (1966); *State v. Taylor*, 202 Kan. 202, 447 P.2d 806 (1968); *State v. Horton*, 34 N.J. 518, 170 A.2d 1 (1961); *see also Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); Annot., 34 A.L.R.3d 1256 (1970). In light of these decisions, Petitioner respectfully asserts that he is entitled to have his expert review the serological testing in this case.

The fact that Petitioner's family retained counsel for Petitioner does not alter the fact that Petitioner is an indigent entitled to have these expert witnesses paid for by the State. The West Virginia Supreme Court has recognized that where a criminal defendant is an indigent, he is entitled to have his transcript paid for by the State, even where his family has retained counsel. *Mayle v. Ferguson*, ___ W.Va. ___, 327 S.E.2d 409 (1985); *State v. Moore*, ___ W.Va. ___, 273 S.E.2d 821 (1980); *Johnson v. Stevens*, ___ W.Va. ___, 265 S.E.2d 764 (1980); *State ex rel. Kennedy v. Boles*, 150 W.Va. 504, 147 S.E.2d 391 (1966); *State ex rel. Legg v. Boles*, 148 W.Va. 354, 135 S.E.2d 257 (1964); *State ex rel. Banach v. Boles*, 147 W.Va. 850, 131 S.E.2d 722 (1963); *State*

4

*v. Bosworth*, 143 W.Va. 57, 99 S.E.2d 740 (1957); *Boles v. Kershner*, 320 F.2d 284 (4th Cir. 1963).

For the foregoing reasons, Petitioner John Moss, III, respectfully moves this Court for an order approving Petitioner's incurring expenses in excess of the statutory limits.

**JOHN MOSS, III**, Petitioner,

--By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

58

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**PETITIONER'S MOTION TO EXCEED STATUTORY LIMIT ON EXPENSES,**

was served upon counsel of record on the 3rd day of August, 1994, by the United States

Postal Service, postage prepaid.

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300

*Lonnie C. Simmons*
Lonnie C. Simmons

6

59

**IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA**

**JOHN MOSS, III,**

Petitioner,

v.                                                                Civil Action No. 94-misc-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

Respondent.

### PETITIONER'S MOTION FOR THE GRAND JURY
### TRANSCRIPTS THAT RESULTED IN THE INDICTMENT
### OF PAUL REGGETTZ, III, AND JOHN MOSS, III

Petitioner John Moss, III, respectfully moves this Court to order the State to produce a copy of the grand jury transcripts that resulted in the indictment of Paul Reggettz, III, and Petitioner, for the following reasons:

1.     Paul Reggettz, III, was indicted on three counts of murder by the January, 1980 grand jury.

2.     Petitioner was indicted by the September, 1982 grand jury.

3.     In connection with both trials of Petitioner, orders have been entered permitting Petitioner access to both grand jury transcripts.

4.     However, Petitioner's present counsel has been unable to find either transcript in any of the files he has reviewed.

5.     Petitioner respectfully submits that any evidence that indicates another person may have committed the crime for which a defendant has been charged is exculpatory and therefore required to be produced.

4

6.     These transcripts may shed further light on some of the issues presently raised regarding the blood typing and the confessions allegedly given by Petitioner.

For the foregoing reasons, Petitioner John Moss, III, respectfully moves this Court to order the State to produce a copy of the grand jury transcripts that resulted in the indictment of Paul Reggettz, III, and Petitioner.

**JOHN MOSS, III**, Petitioner,

--By Counsel--


_____
Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

2

61

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**PETITIONER'S MOTION FOR THE GRAND JURY TRANSCRIPTS THAT**

**RESULTED IN THE INDICTMENT OF PAUL REGGETTZ, III, AND JOHN**

**MOSS, III,** was served upon counsel of record on the 19th day of August, 1994, by the

United States Postal Service, postage prepaid.

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300

Lonnie C. Simmons

3

62