**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 33**
**(Continuation, appendix [bn000040 to 77])**

## RECEIPT FOR RETURN OF EVIDENCE

The following exhibits in the case number $\underline{\text{C-79-- 2566}}$ were given

C-79-- 2566-A
C-79-2566

to ___Trooper T. Williams___ on ___03/31/80___

by ___Trooper F. S. Cain___

1. ___Exhibits to above case___

2. ___Flstucce___

3. _____

4. _____

5. _____

6. _____

_T. Willi_

Signature of Officer Receiving Exhibits

_Trp. Fred S. Cain_

Signature of Chemist

Prepare In Duplicate.

000040

| ① | ② | ③ | ④ | |
|---|---|---|---|---|
| Piece of Knife ? | Piece of electrical #110 B Short cord from Vanessa ? | Cieldia from back door ? | Scissors ? | Green Sh |
| Zain 12-13-79 | Zain 12-13-79 | Zain 12-13-79 | Zain 12-13-79 | Zain |
| Williams 3-31-80 | Williams 3-31-80 | Williams 3-31-80 | Shumate 12-13-79 1-23-80 | Williams |
| | | | Williams 3-3-80 | |

| ⑥ | ⑦ | ⑧ | ⑨ | |
|---|---|---|---|---|
| Eureka Vacuum Cleaner ? | Clock Radio ? | Childrens dish set ? | Pots + Pan Set ? | Cloth. Sopt. Willi |
| Shumate 12-13-79 1-23-80 | Shumate 12-13-79 1-27-80 | Shumate 12-13-79 1-23-80 | Shumate 12-13-79 1-23-80 | Zain |
| Williams 3-6-80 | Williams 3-31-80 | Williams 3-3-80 | Williams 3-3-80 | Will |

| ④ | ⑤ | |
|---|---|---|
| ? | ? | ← |
| back door | Scissors | glassware |
| 2-13-79 | Zain 12-13-79 | Green hand lantern |
| 3-31-80 | Shamate 12-13-79 | Shamate 12-13-79 |
| | 1-23.80 | Zain 12-18-79 |
| | Williams 1-23-80 | stDilliams 3-31-80 |

| ⑨ | ⑩ | |
|---|---|---|
| ? | ? | ? |
| h set | Pots + Pan Set | Clothing f P. Reggots |
| 12-13-79 | Shamate 12-13-79 | Sopher 12-13-79 |
| 23-80 | 1-23-80 | Williams 12-14-79 |
| | Williams | Zain 12-14-79 |
| | | Williams 3-31-80 |

| ⑭ | ⑮ | |
|---|---|---|
| ? | Blood ? | Clothing ? |
| Watts | Bernadette Reggette | Bernadette Reggette |
| 12-14-79 | Sopher 12-13-79 | Sopher 12-13-79 |
| 12-17-79 | Williams 12-17-79 | Williams 12-17-79 |
| 7-79 | Zain 12-17-79 | Zain 1-7-80 |
| | | Williams T3 80 |
| | | 3/31/80 |

| | ⑲ | ⑳ |
|---|---|---|
| ? bullet | ? N | ? Electrical Cord Paul Ezie Reggette |
| - the scene | Time Card of P. Reggette | |
| 12-13-79 | David W. Milburn 12-13-79 | Sopher 12/13/79 |
| -14-79 | Rinehart - 12-13-79 | Williams 12/12/79 |
| | Williams 12-13-79 | |

000043

| (21) Electrical Cords -? (white + brown) VANESSA Reppetts #110 A Sopher 12/13/79 Williams 32/12/79 | (22) ? Electrical Cord (brown) Near Feet VANESSA Reppetts Korek 12/13/79 Williams 12/22/79 | (23) ? Electrical Cord (white) (Piece of cord) cut from VANESSA Reppetts ZAIN 12/13/79 Williams 3/31/30 | (5.) Chair Dresser _Z^ Will. |
|---|---|---|---|
| (26) ? (1) KodAK CAmeRA (From MR. Moss) John Moss JR. | (27) ? FiReARms TRansAction Records forms (HELts) | (28) ? (2) tubes blood John Moss | (Z Knif |
| John Moss JR 10/29/80 (Father) SmitH + Williams 10/29/80 | Ella Light Smith + Williams | DR. KapleR 4-22-80 Williams 4-22-80 ZAIN 4-22-80 | Sh... Will. |

00001?

| (23) ? | (24) ? | (25) ? | Wrapping Paper |
|---|---|---|---|
| Electrical Cord (white) Piece of cord) cut from VANESSA Reggetts | Change Purse DRESSER master Bedroom | (2) Polaroid Cameras (1) Kodak Camera (Search) | |
| ZAIN 12/13/79 Williams 8/31/80 | ZAIN 12/13/79 Williams 3/31/80 | SmitH Williams 3/31/80 | 3/31/80 |

| (28) ? | (29) ? | (30) | (30) |
|---|---|---|---|
| 2) tubes blood John Moss | Knife Handle | Reggette Blood | Guns |
| Kepler 4-22-80 Williams 4-22-80 VN 4-22-80 | Shamate 12-13-79 Williams 12-13-79 | Wanda Wells 1-2-80 Williams 1-2-80 Inman -1-2-80 | 30 1-24-89 |

600046

State of West Virginia, Kanawha County, ss:

IN THE ~~INTERMEDIATE~~ CIRCUIT COURT OF SAID COUNTY:

The Grand Jurors of the State of West Virginia, in and for the body of the County of Kanawha, and now attending the said Court, upon their oaths present, that PAUL REGGETTZ, III and John Moss, Jr., on the _____ day of December, 1979, and prior to the date of the finding of this indictment, in the said County of Kanawha, feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder one Vanessa Dale Reggettz against the peace and dignity of the State.

SECOND COUNT: And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present, that PAUL REGGETTZ, III and John Moss, Jr., on the_____ day of December, 1979, and prior to the date of the finding of this indictment, in the said County of Kanawha, feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder one Paul Eric Reggettz against the peace and dignity of the State.

THIRD COUNT: And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present, that PAUL REGGETTZ, III and John Moss, Jr., on the _____ day of December, 1979, and prior to the date of the finding of this indictment, in the said County of Kanawha, feloniously, wilfully, maliciously, deliberately, premeditatedly and


DEPOSITION EXHIBIT
No. 2

| ⑪ | ⑫ | ⑬ | ⑭ |
|---|---|---|---|
| Blood Specimen | Nightgown of | Blood | Blo |
| Vanessa Reggette | Vanessa Reggette | Paul E. Reggette | Bernade |
| Sophar 12-14-79 | Sopher 12-14-79 | Sopher 12-14-79 | Sopher |
| Smith 12-14-79 | Smith 12-14-79 | Williams 12-17-79 | Williams |
| Zain 12-14-79 | Zain 12-14-79 | Zain 12-17-79 | Zain |
| | Williams 3-31-80 | | |

| ⑯ | ⑰ | ⑱ | ⑲ |
|---|---|---|---|
| | | .22 calibar bullet recovered at the scene | Time Card |
| Flatware | Pieces of gun | | David W |
| Mrs Johnson 2-6-80 | Williams 12-13-79 | Williams 12-13-79 | Rinehart |
| Smith 2-6-80 | | Lane 12-14-79 | Williams |
| Williams 2-6-80 | | | |
| Shumate 2-6-80 | | | |
| Zain 2-6-80 | | | |
| Williams 3-31-80 | | | |

00001

Page 3

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

    Petitioner,

vs.    CASE NO. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

    Respondent.

The deposition of DAVID H. BING was taken on

the 5th day of June, 1995, beginning at 1:40 o'clock p.m.,
at the Kanawha County Judicial Annex, Judge Paul Zakaib's
Jury Room, 111 Court Street, Charleston, Kanawha County,
West Virginia, before Barbara Harris, Notary Public and
Certified Court Reporter, pursuant to written notice, for
the purposes of discovery and/or to be read as evidence in
the above-styled matter which is now pending and
undetermined in said Court.

---

Page 3

1    (WHEREUPON, documents were marked
2    for identification purposes as
3    Deposition Exhibit Nos. 3, 4, and 5,
4    and are attached hereto.)
5    (Witness Sworn.)
6    MR. SIMMONS: Before we begin, I'd just like
7  to note for the record that we're taking the deposition of
8  Doctor David Bing in connection with the habeas corpus
9  action filed on behalf of John Moss, III. My client has
10  been notified of the deposition. He also has been informed
11  that with habeas corpus actions he does not have an
12  absolute right to be present at all proceedings, and he's
13  aware of that fact. And that the purpose of taking this
14  deposition is to make a record on some of the scientific
15  issues that are set out in the habeas corpus petition and
16  in an affidavit filed by Doctor David Bing.
17    And also I would note for the record that
18  three exhibits have already been marked. Deposition
19  Exhibit 3 is the recent curriculum vitae of Doctor David
20  Bing. Deposition Exhibit 4 is an affidavit executed by
21  Doctor Bing, executed on May 26, 1995, and that's an eight-
22  page document. And then Deposition Exhibit No. 5 are
23  tables that were included in the habeas corpus petition

---

Page 2

APPEARANCES: On behalf of the Petitioner:

    LONNIE C. SIMMONS, Esquire
    DiTrapano & Jackson
    604 Virginia Street, East
    Charleston, West Virginia 25301

    On behalf of the Respondent:

    MARY BETH KERSHNER, Esquire
    Assistant Prosecuting Attorney
    111 Court Street
    Charleston, West Virginia 25301

    ----------

    I N D E X

    ----------

Examination by

Witness        Mr. Simmons  Ms. Kershner
DAVID H. BING     4     46
Exhibits        Identified
Deposition Exhibit No. 3    3
Deposition Exhibit No. 4    3
Deposition Exhibit No. 5    3
Reporter's Certificate - 51, 52

---

Page 4

1  which summarize the various findings made from the blood
2  testing that was performed in this case.
3  THEREUPON came
4    D A V I D   H .   B I N G ,
5  a witness herein, who, after having been first duly sworn
6  to tell the truth, testified as follows:
7    EXAMINATION
8  BY MR. SIMMONS:
9    Q Doctor Bing, first of all, I'd like to ask
10  you to glance at Deposition Exhibit No. 3 and confirm
11  whether or not that's a copy of your most recent curriculum
12  vitae.
13    A (Witness examines document.) Yes, it is.
14    Q You note in the affidavit that you are the
15  Scientific Director of Laboratories of CBR Laboratories in
16  Boston, Massachusetts. Could you generally describe what
17  CBR Laboratories does?
18    A CBR Laboratories is a licensed medical
19  diagnostic testing laboratory. It performs medical
20  testing, diagnostic testing for physicians and primarily
21  the Harvard Medical School hospitals. It does testing in
22  the areas of immunohematology and hematology. About
23  eighty-five percent of its work now is involved in DNA

Page 5

1 diagnostic testing, but we still maintain a very active
2 profile in the area of blood typing and the analysis of
3 genetic markers in blood based on blood typing and also
4 analysis of serum proteins. It's a part of the work that
5 we do in terms of paternity testing.
6     Q  Okay.  Approximately how long have you been
7 the Scientific Director of Laboratories at CBR?
8     A  Well, my current title is Director of
9 Clinical Testing, and I've really been in that position
10 since 1986.
11     Q  Can you also generally describe -- Focusing
12 on the forensic testing, could you generally describe the
13 kind of forensic testing that is conducted at CBR?
14     A  The type of forensic testing that is done
15 primarily focuses on DNA typing methods, particularly
16 those -- the two principle kinds of DNA typing methods, the
17 RFLP, which is known as Restriction Fragment Length
18 Polymorphism, P-o-l-y-m-o-r-p-h-i-s-m, Polymorphism, and
19 the Polymerase, P-o-l-y-m-e-r-a-s-e, Chain Reaction
20 Methodology.
21     But the laboratory does paternity testing,
22 and in the area of paternity testing we do a full panel red
23 cell antigen typing, serum proteins, genetic typing of

Page 6

1 serum proteins, HLA, and when required, we will -- We don't
2 do it in our laboratory, but we will send out for analysis
3 of red cell enzymes, such as phospho, gluco, mutase,
4 abbreviated PGM, Esterase D, abbreviated EsD.
5     We do glyoxalase testing in our laboratory.
6 We still do that. That's for glow. But we don't do all
7 the red cell enzymes. But we use them on occasion in our
8 paternity testing results and use the genetic typing
9 information that is in these systems in terms of arriving
10 at a conclusion.
11     And I'm accredited for doing that kind of
12 work because I'm accredited by the American Association of
13 Blood Banks as a technical director for paternity testing,
14 which means I have to be able to use those systems in our
15 work.
16     Q  So prior to the development of DNA testing,
17 did CBR Laboratories and yourself routinely perform, I
18 think what you called the red blood cell typings?
19     A  It did, and it still does. At the point
20 when I took over the laboratory it was still doing this
21 kind of work and still is doing it today.
22     Q  I think you mentioned that the laboratory
23 was generally licensed. I just want it to be clear in the

Page 7

1 record. What kinds of licenses are you referring to?
2     A  These are medical diagnostic testing
3 licenses. We are certified in the Commonwealth of
4 Massachusetts. We have a license in the state of
5 Connecticut, the Commonwealth -- maybe the state of
6 Maryland, the state of New York. We have a CLIA, that's
7 C-L-I-A, license from the Health and Human Services which
8 allows us to accept blood samplings from other states for
9 clinical testing. And we do paternity testing in almost
10 every state except New York State, so that this is a kind
11 of testing that involves kind red cell genetic -- serum
12 protein genetic typings that I've just described.
13     Q  Okay.  I'm not sure about this answer or
14 not, so I'll ask you, is your laboratory involved with
15 ASCLD, A-S-C-L-D, or its accreditation program or whatever
16 they refer to it?
17     A  I have petitioned to join ASCLD, which
18 stands for American Society of Crime Lab Directors, and my
19 application is currently undergoing review. I have a
20 letter that I have to respond to. It's laying on my desk
21 right now. And I anticipate that this summer the
22 laboratory will be submitting an application to ASCLD Lab
23 to be accredited. You have to be doing forensic work for

Page 8

1 at least five years before you're eligible to apply to
2 ASCLD. We consider that we really started around the
3 middle of 1990, so the middle of 1995 is the time of year
4 eligible to apply.
5     The laboratory adheres to the rules for DNA
6 forensic analysis articulated by the technical working
7 group on DNA analysis methods, and based on what I've seen
8 in the ASCLD accreditation manual, you know, how to do it,
9 the laboratory follows, for the most part, the regulations
10 of ASCLD Lab, because in many, many instances they're
11 identical to the regulations that we follow for our
12 clinical license.
13     Q  What is your involvement in TWGDAM,
14 T-W-G-D-A-M?
15     A  I'm just a member of the committee. There's
16 sixty people on the committee made up of crime lab
17 directors around the country. I'm the representative from
18 the Human Identity Trade Association, which is a collection
19 of private testing laboratories that have representation on
20 this committee.
21     Q  Okay.  Can you explain what the significance
22 of TWGDAM is?
23     A  Well, in 1983 -- no, not 1983 -- 1989 or so

Page 9

1 it became imperative for there to be some kind of consensus
2 about how DNA testing should be done for forensic purposes
3 here in the United States. A group of people was assembled
4 at the FBI made up primarily of crime lab directors from
5 public laboratories, and their job was to articulate
6 guidelines for laboratories undertaking DNA analysis
7 methods and guidelines for systems that were to be adopted
8 for DNA analysis methods. And these guidelines really
9 follow, for example, the rules -- or I mean they're very
10 similar to the rules that we use that we have from the
11 American Association of Blood Banks, where we're accredited
12 for paternity testing. They're almost identical in every
13 respect.
14          People have to have the proper training.
15 They have to be in place. There are procedures in the
16 laboratories. Systems that are used for doing the testing
17 have to follow certain scientific principles and obey
18 certain kinds of genetic rules. It's very much the same.
19     Q And I guess the final area of your
20 credentials, you noted in the affidavit that you were
21 qualified as an expert in molecular biology, forensic
22 science, and genetics in the case of Glen Dale Woodall
23 versus Carl Legursky. That was in Cabell County. Is that

Page 10

1 correct?
2     A That's correct.
3     Q And you were also qualified as an expert in
4 those particular fields in the case Paul William Ferrell
5 versus William Duncil, which was in Grant County; is that
6 correct?
7     A That's correct.
8     Q And in both the Woodall and Ferrell cases,
9 your expertise involved not only performing DNA testing,
10 but also reviewing the protein and enzyme typing that had
11 been performed by other scientists?
12     A Yes, I was asked to do that, and I testified
13 about that in court.
14     Q Okay.
15     MR. SIMMONS: I'm not exactly sure how you
16 want to do this, Mary Beth, if you wanted to ask him a
17 question, I would now offer him as an expert in molecular
18 biology, forensic science, and genetics in the present
19 case.
20     MS. KERSHNER: I don't have any objection.
21     BY MR. SIMMONS:
22     Q Okay. Turning to the Moss case -- and I'll
23 try to get through some of this preliminary stuff quickly

Page 11

1 just by going through the affidavit -- you note that in
2 connection with Moss versus Duncil you reviewed a copy of
3 the autopsy report that's dated December 13, 1979 that was
4 performed by Doctor Irvin Sopher; is that correct?
5     A That's correct.
6     Q Okay. You generally reviewed the Petition
7 for Writ of Habeas Corpus that was filed in this case?
8     A Yes, I did.
9     Q Okay. You reviewed a copy of Fred Zain's
10 testimony from the first and second trials in the Moss
11 case?
12     A Yes, I did.
13     Q Okay. You reviewed a copy of the laboratory
14 notes and other documents that were produced by the State
15 in this Moss case?
16     A Yes, I did.
17     Q And I believe -- Let's see. Yes, I believe
18 that's all the materials you reviewed, other than I think
19 maybe I sent you the -- I may have sent you the deposition
20 of Robert Murphy. Do you recall seeing that?
21     A Let me check my notes. Well, no, I don't
22 have the deposition of Robert Murphy.
23     Q Okay. I may not have sent it to you. I

Page 12

1 wasn't sure if I had or not.
2          In the materials you reviewed from the Moss
3 case, you note in your affidavit that there were no
4 photographs of the electrophoretic gels. First of all, I
5 just wondered if you would explain how photographs of those
6 gels would have assisted you in your analysis of the
7 testing?
8     A This type of genetic typing, at least the
9 enzymes, is based on looking at patterns of the proteins
10 that are being tested under conditions where they move in
11 an electric field. And they will move differently in an
12 electric field depending on what genetic type they are
13 reflecting, so that what this -- what these photographs do
14 is allows one to look directly at the results of this
15 testing and correlate that with the actual recorded test
16 results.
17          In our laboratory it's standard practice to
18 make a photograph of every single genetic typing that we
19 do, and that photograph is maintained for as long as keep
20 these files.
21     Q So without being able to review the
22 photographs of the electrophoretic gels that were performed
23 in this case, you have no basis for determining whether or

Page 13

1  not the typings that were determined to have been found are
2  correct or accurate or not?
3      A  I have the -- I gather there's a sworn
4  deposition from Mr. Murphy that attests to the accuracy of
5  these results. I haven't read it, but I would imagine that
6  it does. Certainly the notes agree with what the final
7  reports are. But as in all kinds of testing, what one
8  hopes for is the opportunity to see the results to see if
9  there's any kind of difference in opinion in terms of
10  interpretation of those results, because there can be
11  widely differing interpretations of test results. So in
12  the absence of being able to do that, it's very difficult
13  to really validate the test results that are recorded in
14  the worksheets that I did have the opportunity to review.
15      Q  You also note in your affidavit that you are
16  generally aware of the special investigation into testing
17  performed by Fred Zain. I just wonder if you could state
18  generally how many cases involving Fred Zain have you
19  reviewed as an expert?
20      A  Well, there's Woodall -- the Woodall case.
21  Did Zain work on the Ferrell case?
22      Q  No, that was the FBI.
23      A  That was the FBI. Okay. The case called

Page 14

1  West Virginia versus Davis, I think Mr. Zain worked on that
2  case. The case of West Virginia versus Harris, he worked
3  on that case. I believe there's a case of West Virginia
4  versus Richardson, I think Mr. Zain worked on that case.
5  And also a case of West Virginia versus McClure, I've
6  worked on that case. And there's a case of West Virginia
7  versus Ward, and I've worked on that case.
8      Q  Okay.
9      A  And there are others that are still pending.
10      Q  Had you previously reviewed any of the
11  documentation that was developed by the special
12  investigation into Fred Zain's work in West Virginia?
13      A  I read the ASCLD summary review.
14      Q  In reviewing the Fred Zain cases, just
15  generally speaking, that you mentioned, have you generally
16  found what, in your opinion, were certain problems with
17  some of his work?
18      A  Each case is different, and the
19  circumstances of each case are different. But overall one
20  of the difficulties in reviewing these cases is that all
21  that's been available for review has been the summary
22  worksheets on which the results were finally recorded. And
23  then there's some original worksheets in some of the cases,

Page 15

1  but they're not -- To the best of my recollection, in no
2  case was there a complete set of what I would call raw data
3  that was available for review, although there was partial
4  results.
5      In no case were any photographs available
6  for review, in no case. It's not the practice of every
7  forensic lab to take photographs. I would be the first to
8  admit that. But I think in light of what this is going to
9  be used for, I think it is -- it's not an unreasonable
10  practice to have photographic documentation of test results
11  where the test results are based on interpretation of
12  patterns that are seen and not measured on an instrument or
13  something.
14      Q  You also note in your affidavit that there
15  was no protocol provided, and I believe, even though you're
16  not familiar with Mr. Murphy's deposition, his testimony
17  was that there was no protocol, written protocol, back in
18  1979. I just wonder if you would explain what is the
19  significance of having a written protocol in a forensic
20  laboratory.
21      A  It essentially is a documentation of how the
22  test was conducted and how -- most protocols usually also
23  have some indication about how the results are interpreted.

Page 16

1  And protocol will document how you set up the test, what
2  agents and things that go into making the test. It's sort
3  of like a recipe for -- You know, you could sort of draw an
4  analogy.
5      What the scientist is doing in the
6  laboratory is actually baking the cake, and protocol is the
7  recipe for what goes into making that cake. If the recipe
8  calls for making chocolate cake and you have a lemon cake
9  instead, you could ferret that out by looking at the
10  protocol and say, you know, you didn't get the result that
11  you thought you were going to get based on the protocol
12  that's outlined.
13      Q  Would it be correct to say that a written
14  protocol would help standardize the practice in the
15  laboratory, if, in fact, that written protocol were
16  followed?
17      A  Well, that's one of the requirements by
18  ASCLD Lab now. ASCLD Lab does other things besides DNA.
19  For example, it accredits laboratories in the area of
20  serology. And a written protocol is one of their absolute
21  requirements. Now, ASCLD Lab, this is an evolving
22  organization, and this has really only begun to happen
23  around 1990, '91, '92 that these have begun to evolve, is

**Page 17**

1  my understanding.
2      Q  You mean the ASCLD Lab requirements?
3      A  ASCLD Lab was always available for
4  accrediting laboratories, but pretty much prior to 1990 not
5  many laboratories really applied for that accreditation
6  because it wasn't really a very strong organization.  That
7  may not be fair to say.  It wasn't an organization to which
8  laboratories looked for guidance in terms of establishing
9  standardized protocols in their laboratory.
10     With the need for standardization in the
11  forensic genetic testing field, and serology is part of
12  that field, ASCLD Lab has always been there and has stepped
13  forward and is providing this service to laboratories that
14  allows them to become standardized within the field.  So
15  it's always been there.  It's just that it's only recently
16  that its importance has become emphasized in forensic
17  laboratories.
18     Q  Would you say that — And, again, this case
19  dates back to 1979.  Do you have any basis for
20  understanding or stating that in 1979 most forensic
21  laboratories would have some written protocol or would that
22  have been unusual?
23     A  No, that wouldn't have been unusual.  For

**Page 18**

1  example, I have — in my collection of protocols I have a
2  protocol from the FBI dated 1974 which outlines all
3  procedures for doing serological analysis of forensic
4  samples.  So laboratories were well aware that these
5  protocols existed, and, you know, if you wanted to, you
6  could just adopt the FBI protocol, drop into your
7  laboratory, and say, "This is what we're going to do."  It
8  was freely available to all the public testing laboratories
9  and still is.
10     Q  On a different issue — And, again, I'll
11  represent to you that Mr. Murphy testified that in 1979 the
12  West Virginia laboratory did not have a formalized quality
13  control/quality assurance program, and they did not, for
14  example, test some of the enzymes and other materials used
15  in the testing on a regular basis to make sure that those
16  items were appropriate for use in testing.  I wonder if
17  you'd explain the importance of having a quality
18  control/quality assurance program in a forensic laboratory.
19     A  Well, again, quality assurance and quality
20  control is something that has become recognized over the
21  past five or six years as being important in a forensic
22  laboratory.  And most laboratories are doing this now.
23  Prior to that time, even if a laboratory didn't have a

**Page 19**

1  quality control/quality assurance program, there still
2  was — they still could have run positive and negative
3  controls on every single sample that was run so they could
4  internally QC any given run.
5     As near as I could — There's no evidence in
6  any of the notes that the agents were checked with these
7  controls prior to any of the runs, for example, to make
8  sure that the red cell antigens — The glutinating agents,
9  called the antisera or antibodies that are used in red cell
10  glutinations, you normally check them before you do a run
11  to make sure they're working, and those are usually
12  recorded in the notes of a run.
13     Controls are usually run of electrophoresis
14  of known samples.  PGM, for example, there's a known
15  standard that contains all the known types, and that's
16  always run in parallel with the unknowns just to do a
17  control on that.
18     So those kinds of things could have been
19  done in 1979.  It's just a matter of the laboratory
20  director's decision as to whether or not those should be
21  done.  But I mean, for example, in our laboratory we were
22  doing — The CBR Laboratories, even though I wasn't in
23  charge of it, but in 1979 I can show you work pages where

**Page 20**

1  all of the — and photographs of gels where controls were
2  run on every single run that was done.  So it's good
3  laboratory practice and generally acknowledged by people
4  who ran laboratories at that time as being important things
5  to do.
6     Q  In your review of the documentation provided
7  by the State in connection with the testing, you noted in
8  your affidavit that none of the original notes of the work
9  performed were made available to you.  What was your basis
10  for making that assertion?
11     A  Well, most of the documentation I received
12  were reports, handwritten summaries that eventually became
13  the reports, summaries of — I call them worksheet
14  summaries, in other words, all the composite results were
15  listed of the samples tested.  Now, there should be a
16  notebook or some kind of backup to that information.  It
17  just isn't there.
18     Q  Have you reviewed — or generally speaking,
19  in your review of the Fred Zain cases that you mentioned,
20  have you seen some cases where the original notes were
21  included?
22     A  There were some where the original notes
23  were available, yes.

Page 21

1  Q  What is it about the original notes that
2  distinguishes them from the summary sheets you described?
3  A  Well, they are — Some of these original
4  notes will have, like, for example, I've seen — I'm
5  trying — I can't remember the case exactly, but there were
6  some PGM results where it was possible to sort of track
7  down through these handwritten notes where the original
8  results were recorded.  And in some instances there would
9  be a place where controls were run, and they, in fact, were
10  run and recorded, and other places where there were
11  controls that were supposed to be run and it was just left
12  blank, so it meant they weren't run or they weren't
13  recorded, one or the other.  I didn't have any of that kind
14  of documentation with this particular case.
15  Q  In the affidavit you've generally summarized
16  that — and this is in number 15 of the affidavit — that
17  these various problems, lack of documentation, no protocol,
18  in your opinion, render the scientific data in this case
19  meaningless.  I just wonder if you could elaborate on that
20  statement.
21  A  Well, by that I mean that the — there is so
22  much data on these stains that weren't analyzed, it would
23  seem to me there should be some extensive notes backing

Page 22

1  that material up.  So that in that — in the context of not
2  being able to look at the backup data, other than the
3  summaries, it becomes, you know, almost impossible for me
4  to either agree or disagree with the final outcome of the
5  results.  And that's what I mean by when I say it's
6  meaningless.  I can't agree, I can't disagree.  All I can
7  say is what was reported.
8  Q  You next generally state that for purposes
9  of your review, that even assuming the accuracy of the
10  typings in this case, the conclusions were flawed for
11  several reasons.  And we'll go through those and maybe, to
12  the extent that you can, illustrate any of these with
13  specific examples, it would be helpful to do so.  And if
14  you want to diagram anything that you feel might help
15  explain something, I'll make my legal pad available for
16  you, and we can make that an exhibit.
17  One of the first general ideas or principles
18  you stated was that where blood samples are discovered at
19  an alleged crime scene, it's important to identify the
20  types of the known possible donors of that blood.  I wonder
21  if you'd explain why that is the case.
22  A  Well, forensic testing is designed to
23  exclude.  That's why this testing is done.  It's designed

Page 23

1  to exclude the person who is false — who is not the true
2  biologic donor of a given sample.  So that to that extent,
3  one tests, and if one has no exclusion, you keep testing
4  and testing and testing until you reach sort of the end of
5  what you're able to test for.  At that point if you have no
6  exclusion, then you can, at that point, make some kind of
7  comment about how often you might expect to find this
8  combination of markers.
9  But in the meantime, if there are people who
10  are potential donors to these samples, scientifically you
11  want to be able to test all the people who might be true
12  biologic — who are candidates to be true biologic donors
13  of these samples.  So if there are other people involved
14  besides the people who were involved in this report, they
15  really should have been — they should be included in the
16  testing panel, if it's possible.  And it's not always
17  possible, and I'd be the first to acknowledge that.
18  Q  Okay.  You state that under the facts of
19  this case that, at a minimum, the persons who lived in the
20  Reggettz house, which would include the three victims,
21  Vanessa Dale Reggettz, Paul Eric Reggettz, and Bernadette
22  Reggettz, and then the father, Paul Reggettz, III, would be
23  known possible donors of blood; is that correct?

Page 24

1  A  That's correct.
2  Q  And as far as you know, based upon your
3  review, you're not aware of any other known possible donors
4  of blood in the Reggettz house?
5  A  No.
6  Q  The second point that you make is that only
7  those types identified from blood found at the alleged
8  crime scene that are different from the types of the known
9  possible donors provide information relevant to a
10  determination as to the source of the blood evidence found
11  at the crime scene.  I wonder if you could explain that,
12  and if you feel that an illustration is appropriate, do
13  that.
14  A  Well, let me try to explain it, and then, if
15  necessary, I can provide an — do a drawing.  The — At a
16  crime scene, when stains are collected, the origin of those
17  stains is unknown, so one always has to make the — one
18  can't have any assumptions about the potential — about who
19  the donors are.  But more important, one cannot make an
20  assumption that any given blood stain collected at a crime
21  scene is from a single source.  So if one wants to
22  distinguish possible sources of that blood and you have a
23  group of people who all have that — all have a given type,

1  then that type doesn't really help you distinguish the
2  source of that blood, because you can't assume that it's
3  not a mixture.
4        Think of it another way. Suppose that the
5  distinguishing factor of a blood stain was something that
6  you can actually visualize. Suppose that you could look at
7  this blood stain and you could say unequivocally, "I know
8  that that blood stain came from somebody who has brown
9  hair." Brown hair is a genetic marker. In some ways it's
10 very similar to, say, a blood type antigen because there is
11 a certain -- The color or the reason it's brown is due to
12 certain genetic markers that result in color. So you say I
13 know -- It doesn't make any difference how I know it. I
14 know this blood stain is from somebody who has brown hair.
15 Now, you get your list of possible donors to that and you
16 -- and they all have brown hair. You can't say that any
17 one person is more likely than another to be a donor to
18 that blood stain.
19       Now, let's say if we can do a little bit
20 more. Let's say, "Well, I can" -- "I know that the person
21 who contributed to this blood stain has brown hair and is
22 left-handed." So you now look at your candidates, and you
23 look at them and you say, "Well, three of them are left-

1  handed and say two are right-handed." Well, the two who
2  are right-handed are automatically eliminated, but you
3  still can't distinguish between the other three because
4  left-handedness and brown hair color are the same in all of
5  them.
6        So that if you have a series of markers and
7  they're identical in all the people that are being tested,
8  then you can't really use that to try to distinguish the
9  source of a given blood stain. You can only look to the
10 differences, not to the similarities, because the question
11 that is being asked here, the scientific question that is
12 being asked is who could possibly be a biologic donor to
13 this blood stain.
14       And, secondly, I don't know whether there's
15 a single person or from a bunch of people. As I stated in
16 my affidavit, is it a single source sample or many people
17 are sources of the sample. So you have to look to the
18 differences between individuals who you test rather than to
19 their similarities.
20   Q  Okay. The next general point you have in
21 your affidavit is that where a type from a known possible
22 donor of the blood matched the type from the blood
23 discovered, it is not appropriate to include that type in

1  calculating the frequency that the blood was deposited by a
2  suspect. Now, you may have already gone through that
3  somewhat. You have a specific example. That might be one
4  where going through a specific example from the table or
5  from your affidavit might be helpful to illustrate that
6  point.
7    A  Well, the -- again, the focus here is on the
8  unknown sample, and if there are any similarities there
9  between that blood sample and all of the people that are
10 involved, even -- I mean suppose it's -- suppose it's
11 something really --
12       Let's take another genetic typing you can
13 sort of visualize. Let's suppose that the blood sample
14 that you know came from somebody who has got brown hair, is
15 left-handed, and is an albino, has no pigment color in
16 their skin at all. Albinism is a very rare occurrence in
17 the human population. It's very rare indeed. Now, at that
18 point, the fact that you now have three individuals who are
19 left-handed and have brown hair, but only one of them is an
20 albino. You say that's a very rare event. It could only
21 have been that person.
22       So you can now use that to reason backwards
23 and say, "Alright, albinism is a very rare event, so I know

1  that this blood stain came from an albino." That could
2  only have occurred in one out of a very few number of
3  people who have this inherited genetic trait.
4        That is separate from the question of
5  saying, "How often is the combination of brown hair, left-
6  handism and albinism found in the general population?"
7  That's a separate question. That's how often do I find
8  these together in the general population. You can make
9  that estimate as well. But that's a general question about
10 the population. That is not a question about the sample.
11 The only thing that distinguishes that sample is what is
12 different about that sample than is in the known
13 individuals that you're testing. So you've got a -- Those
14 two things have to be kept separate.
15       And that's what I mean by this, that you
16 can't take a combination of factors that are found in the
17 general population and relate it to a specific sample. All
18 you can say is that if these are present and I now have
19 data to show that are indeed present, this is how often I
20 would expect to find that combination of markers in the
21 general population, providing they are behaving and acting
22 independent of each other, because that's the other issue
23 in terms of being able to do that, they have to be behaving

Moss vs. Trent    Case 2:09-cv-01406   Document 17-26   Filed 10/29/10   Page 17 of 41 PageID #: 3724    David Bing

Multi-Page™

Page 29

1   independently. They have to be what we say scientifically,
2   they sort independently.
3      Q I think the specific example that you have
4   in the affidavit, I'd like for you to go ahead and turn to
5   that one, as well.
6      A Uh-huh.
7      Q Well, you quoted the report where the
8   statement is made that, quote, "The combination of blood
9   groups O, PGM 1+1-1, AK 1, EAP BA, EsD 2-1, ADA 1,
10   GLO 1 2 , Hp2-1, and Gc 1 occurs in approximately 0.03% of
11   the population." In connection with that statement, you
12   assert that the conclusion implies that all of the blood
13   typings obtained from the crime scene for these particular
14   items were the same as all the blood typings obtained from
15   Mr. Moss. And I wondered if you would give an example of
16   what you mean where you believe that that general
17   conclusion is inaccurate or overstates.
18      A Well, for example, there's an item called
19   flashlight.
20      Q Do you have the item number?
21      A It's item — It doesn't have an item number,
22   it just says flashlight. It's on Table II. It continues
23   the last page of Deposition Exhibit No. 5.

Page 30

1      Q Okay.
2      A There — What it is that there's — It
3   just says PGM 1, so we don't know if it's 1+1- or 1+, 1-.
4   You know, there's three possibilities. It could be 1+, it
5   could be 1-, it could be 1+1-. So we don't know whether or
6   not the 1+1- is there or not. No result was contained
7   in — was obtained Haptoglobin or Gc. That's Hp and Gc.
8   So to take this figure here and apply it to this sample
9   here is not — implies that this combination of factors
10   here would be found in that.
11      Now, in contrast, I mean, if I didn't point
12   it out now, I'm sure someone would point it out to me,
13   there is one result here where there is a complete match
14   between Mr. Moss and a stain found at the crime scene.
15   That's item seven, the kitchen door curtain. And that's
16   also the case reported on the clothing of Bernadette
17   Reggettz, which is the very last line of Table II, and
18   Christmas wrapping paper, which is the next to last — is
19   the third to the last line of Table II.
20      Now, there — The results are here reported
21   to match the types that are reported for Mr. Moss. So at
22   that particular point, if these results are indeed correct,
23   then at that point it is fair to do a calculation and say,

Page 31

1   "I would expect to find these series of markers in a
2   certain percentage in the population." But it relates to
3   the general population, it doesn't relate to the sample.
4   The sample is specific to the forensic situation that's
5   being investigated.
6      Q So is your point that the conclusions
7   reached should have been based upon the specific types
8   found from each particular item tested, as opposed to using
9   the general population figure and implicitly saying that
10   all those types were obtained from all the evidence?
11      A If that's — If that was the intent, to
12   implicitly say that this is the type that was found on all
13   of these items, that would be incorrect. On the other
14   hand, those three items it would have been fair to make
15   this conclusion. But it wouldn't have been fair to make
16   that conclusion about the flashlight.
17      Q I think the next sort of general principle
18   that you talked about in your affidavit is that it is only
19   proper to combine the frequencies on types obtained from a
20   blood sample where results, in the absence of any other
21   data, are consistent with the blood sample coming from a
22   single source. And you follow that up with a statement
23   that — Well, let's start with that statement. Why don't

Page 32

1   you — Those two points, number 29 and 30 of the affidavit,
2   they may sort of relate to each other, but if would just
3   generally explain that idea.
4      A Well, I think in my previous direct
5   testimony I said that one of the inherent difficulties with
6   serological testing is there's no way to know whether or
7   not a blood sample is a mixture or a single source. The
8   only samples that you really know are truly single source
9   samples are the samples that are taken directly from
10   somebody be they alive or dead. You know where those come
11   from, so that that — And there's no way, to my knowledge,
12   anyway, to, for example, decide whether or not a blood
13   stain is a single source sample. It's very difficult to
14   do.
15      Now, as I'm sure will be pointed out, if you
16   have series of markers, I couldn't say that it wasn't a
17   single source. I mean, for example, take item 7, the
18   kitchen door, I couldn't say that that's not a single
19   source, but I have no way of scientifically sorting that
20   out. It could be a mixture of a whole bunch of people, for
21   all I know. And there's no way to sort that out.
22      So I think that in describing the results of
23   testing, by this, I think that one has to be very cautious

Page 33

1  about overstating what the meaning is of these kinds of
2  calculations. They are an accurate calculation. I don't
3  disagree with the 0.03%. My tables are a little different
4  than the ones they us, so it's probably -- I came up with
5  something like 0.05%. That certainly is close enough. As
6  far as I'm concerned, it's the same number.
7      But the -- I don't know that these are
8  single samples. And the other thing that I have to go back
9  to is, is that I have no way of verifying these really very
10  important data as they relate to this case.
11      Q  Okay. Let me -- You've mentioned the
12  example of item number 7, the kitchen door curtain, and in
13  that example typings apparently were obtained in the --
14  Let's see. It looks like that's nine different groups that
15  were tested. In the table, the particular types in bold
16  are types that are similar to or identical to known blood
17  types from some of the other -- from some of the known
18  possible donors of blood in the Reggettz home. And I just
19  wanted to make sure I understand when you're talking about
20  calculating the frequency of this particular sample. Are
21  you saying that, for example, since the ABO for the kitchen
22  door curtain was found to be O, but there are known
23  possible donors in the Reggettz house who are O, that you

Page 34

1  should not include that particular typing in calculating
2  the population frequency for item number 7?
3      A  Everybody in this case tested as type O
4  blood.
5      Q  Yes.
6      A  So as far as this is -- this marker is
7  concerned, this does not provide me any information about
8  that particular sample. So if I were doing this
9  calculation, I would not use the fact that approximately
10  forty percent of Caucasians are type O blood --
11      Q  Okay.
12      A  -- to this sample.
13      Q  Right.
14      A  I mean, I think I've stated before, I would
15  use it in saying how often would I expect to find this type
16  in combination with all the others in the general
17  population. That's a valid calculation. But with respect
18  to this sample, I would say, "What I'm going to look to is
19  I'm going to look to the differences," and say, "How often
20  would I expect to find that difference?" So, for example,
21  here is -- there's a place where the EAP is -- even there,
22  there still is a person in the Reggettz household who is
23  BA, so I'd have to consider that person as a possible donor

Page 35

1  of the BA on this kitchen door stain, number 7. So that's
2  where they have that in common. The ones where they aren't
3  in common is the 1- is something -- no, the 1+ is the one
4  type that is not seen in anybody.
5      Q  Okay. The PGM 1+ --
6      A  PGM 1+ is a type not seen in anybody.
7      Q  Okay. So you would use that?
8      A  That's right.
9      Q  And what else in item number 7 would you
10  use? I think it's kind of hard to tell what's bold and
11  what's not. It looks like the --
12      A  Gc 1 --
13      Q  Okay.
14      A  -- because everybody in the Reggettz
15  household is 2-1.
16      Q  Okay. So would --
17      A  And Esterase D. Everybody in the Reggettz
18  household is a 1, this sample is a 2-1. So I don't know --
19  I can use the 2 as a distinguishing factor, but I can't
20  really use the 1. So the frequencies of each one of these
21  alleles is no. You know, we know how often the 1+ would be
22  found and how often the 2 would be found and how often the
23  1 would be found, and because they occur together, you have

Page 36

1  to look at the frequency of them as they occur together.
2  So you could actually use -- you would actually use the
3  frequency of 1+ or 2-1 and 1 here. But that would allow
4  you to say, "This unique set here is found in a certain
5  portion of the population." And that is specific to this
6  sample.
7      Q  Okay. And it's a thing that's a good
8  example. I think the -- maybe the last general statement
9  in the affidavit is that -- and this may, again, repeat
10  something you've already said -- was that each of the types
11  found from each individual sample must be treated
12  separately rather than in conjunction with each other,
13  because it is not possible, scientifically, to link
14  together the types found from different blood samples.
15  Just to make sure I know what you're talking about, would
16  you explain that general idea?
17      A  Well, if you have different blood samples,
18  different donors, you can't take the frequency of that
19  person's blood type and link it together with the frequency
20  of a person -- the second person's blood type. What you
21  can do is you can say, "Well, in the general population I
22  might find this combination in, say, three percent of the
23  population or I might find this other combination in, say,

Page 37

1 ten percent of the population." So at that particular
2 point you can extrapolate a little bit and say, "Well, that
3 probably represents thirteen percent of the total
4 population might have this combination of factors."
5       But that still isn't specific to the sample
6 in question. The sample in question is -- The
7 distinguishing factors about the sample in question is what
8 distinguishes it from the other -- all the individuals who
9 have been tested, and that's where the focus has to be.
10      Q Okay. You note in the affidavit that
11 there's no evidence as to when the blood stains were
12 deposited and what caused the blood to be deposited, and I
13 take it you agree that the serological typing is unable to
14 determine when a blood sample was deposited; is that
15 correct?
16      A I don't know of any method, serological,
17 DNA, that can tell you how old a stain -- a biological
18 stain is.
19      Q In paragraph 39 of your affidavit you state
20 that the only blood types of significance from any of the
21 samples are PGM, Gc, and EsD, and I wonder if you'd explain
22 why -- what's your basis for making that statement.
23      A Well, again, going back to Mr. Moss's type

Page 38

1 and to taking item 7 as an example, those are the three
2 systems where that stain could be distinguished from people
3 in the Reggettz house. There's PGM, the 1+1- is not found
4 in any of the people in the Reggettz house. Even though
5 you find somebody with a 1 -- a 1-, you don't find anybody
6 there with a 1+. So the 1+ is what really distinguishes
7 the stain from -- in the PGM system and now you have 1+1-,
8 so you would have to deal with that as a combination. You
9 can't separate that out.
10      Esterase D, everybody in the Reggettz house
11 is a 1, this sample has a 2-1, so that that 2 distinguishes
12 the Esterase D in this stain from everybody in the Reggettz
13 house.
14      The Haptoglobin is -- Well, Gc, I'm sorry,
15 Gc, there's a 1 there. Everybody in the Reggettz house has
16 a 2-1 in the Gc system, so if anybody -- and this, perhaps,
17 illustrates it very well -- if anybody in the Reggettz
18 house had been a source of that stain, you would expect to
19 find a 2 present, as well, and you don't. So, you see,
20 that eliminates anybody in the Reggettz house as a donor of
21 this particular stain. It doesn't tell you who is the
22 donor of that stain, it just eliminates them.
23      Again, it goes back to my previous

Page 39

1 testimony, testing is designed to exclude the person who is
2 not the true biologic donor of the stain.
3      Q I think that -- Let me see. You've already
4 gone over 41, 42, and 43 in your affidavit, and you've
5 already talked about there's no basis for assuming a single
6 source. Your final conclusion in your affidavit is that
7 based upon the foregoing analysis, the statistical
8 conclusions are overstated in this case. And again, I take
9 it, that relates back to some of the problems you've
10 already discussed, and I don't guess we need to go through
11 that again unless you have something to add to that.
12      A No, I don't have anything to add. It's -- I
13 think this affidavit may be a little bit repetitious in the
14 sense that I've stated some things several different ways,
15 but I have done that in an effort to clarify my opinion
16 that I have derived based on review of the test results in
17 this case.
18      Q The final paragraph in the affidavit is that
19 you generally concur with the statements concerning the
20 scientific data that are set out in the habeas corpus
21 petition on pages 29 through 36 without necessarily
22 adopting all the particular language used, that's correct?
23      A That's correct.

Page 40

1      Q Maybe just as a final clean-up matter just
2 to make sure that it's clear in the record, when you --
3 when you go through -- when you went through your analysis
4 on, let's go back to item number 7, the kitchen door
5 curtain, and you talked about how you should focus on the
6 types that are different from the known possible donors,
7 and so you looked at the PGM, the EsD, and the Gc. And you
8 stated that you should focus on those differences. I
9 wonder if you'd explain -- and let's see if I can figure
10 out a way of saying this -- what is the -- I guess the
11 scientific problem with simply multiplying all of the
12 samples or all the population frequencies that were found
13 from item number 7 together, as opposed to simply focusing
14 on the differences.
15      A There's nothing wrong with doing that. All
16 that says is that I would -- when you did that calculation,
17 that would say, "This combination of factors would be
18 expected to be found in a certain portion of the
19 population," in this particular case using the number that
20 was calculated in this case, .03% of the population would
21 have that combination of factors. There's nothing wrong
22 with that.
23      The thing about it is, is before going to

1  that -- going ahead to make that calculation, one first has
2  to decide what distinguishes this stain from any other
3  stain that's present.  And my point is, is that the PGM,
4  the Esterase D, and the Gc types are what distinguish this,
5  and I have to couple that with the scientific fact that I
6  have no way of telling whether or not this is a mixture of
7  a single stain or multiple donors to the stain.  And this
8  would be true whether this was DNA testing or serological
9  testing.
10        All one can do is report the data as one
11  sees it and say, "This is how often I would expect to find
12  this combination of markers."  It's a unique or it's not --
13  it's a rare combination or it's not very rare at all.  It
14  would be like a verbal description of the scientific
15  result.  But the -- But beyond that, it's really difficult
16  to say much more.
17        And at that point it's really up to
18  everybody else who is involved in looking at this evidence
19  to come to a decision as to how that stain could have
20  gotten there if, in fact, an individual is the donor of
21  that stain.  All we can do is just say, "This is what the
22  scientific data said."
23     Q  Would it be accurate to say that by giving

1  what I'll call the general population frequency number on
2  item number 7, that would essentially give you the number
3  that is the most discriminating number versus the
4  calculation you make by multiplying the population
5  frequencies of the types that are different.  So in other
6  words, you would be providing the range, one includes
7  everything together, and I think implicitly --
8     A  Yes.
9     Q  -- it says it's a single source --
10    A  Yes.
11    Q  -- and the other is taking into account
12  well, this may be a mixed sample, but here is where these
13  three different types and what the population frequencies
14  would be there?
15    A  And that could still be a very compelling
16  number.
17    Q  Right.
18    A  Even the range can be a very compelling
19  component.
20    Q  And just so I also make it clear, are you
21  saying that the calculation method that you have discussed
22  here is what would have been appropriate, is it what would
23  have been mandatory, or how would you describe the

1  additional calculation that you've been talking to where
2  you focused on the differences in each sample?
3     A  There isn't anything really mandatory in
4  doing this.  It really is based on understanding how
5  genetic systems work and coupling that with the experience
6  of the forensic scientist who appreciates the nature of the
7  samples that are being studied.  Population geneticists
8  never run into this problem.  When you get a tube of blood,
9  you know that it came from a single person, you do a typing on
10  that and you say, "Oh, this is a rare combination of
11  markers in this individual."  There isn't any question
12  about where that sample came from.
13        A stain collected off a disorganized scene,
14  that are frequently what happens in a forensic situation,
15  at that point all we can do is test what is there, say,
16  "This is what I found.  Here's a" -- If all of these
17  were -- all of these markers would be expected to be found
18  in a certain combination, these are the markers that
19  distinguish this stain from -- and make this person as a
20  possible donor of that stain.
21        For example, and one of the statements that
22  might be said about this is that -- and then allow the
23  individuals who are going to make decisions about this to

1  come to their own conclusions -- one might say that, for
2  example, on the stain on the kitchen door Mr. Moss couldn't
3  be excluded in the PGM, the Gc, and the Esterase D systems.
4  That just says where -- what distinguishes that sample from
5  all the others.
6        And then if you want to know what this
7  combination is, then you could go and say a combination of
8  1+ -- PGM 1+, EsD 2-1, and Gc 1 is a certain number, and
9  the combination of type O blood, PGM 1+2+, AK 1, BA, for
10  EAP 2-1, for EsD, ADA 1, 2 for GLO I, 2-1 for Haptoglobin,
11  and Gc 1, that's found in three percent of the
12  population -- or .03% of the population.
13        And at that particular point the scientist
14  has done their job, presented you with the best possible
15  data that you can use, and at that point the decision is
16  now up to those people involved in the process who actually
17  have to make the next decision in relationship to what this
18  -- how this data is going to be used in the case being
19  tried.
20     Q  Let me maybe just ask for clarification,
21  then, in the affidavit, just to make sure the record is
22  clear.  And I'd ask you to look at paragraph 43 of your
23  affidavit, and maybe if you'd just read that to yourself

1 and then --

2     A (Witness examines document.) Well, what

3 paragraph 43 says is it addresses the issue about I don't

4 know if these are mixtures or not, and there's no way I can

5 tell that.

6     Q And under --

7     A Under those circumstances, all I can say is

8 what distinguishes it and make a statement to that effect,

9 and then to the extent that that is helpful, the numbers

10 are helpful, one can sort of narrow down the range of

11 people who might be -- have that unique combination of

12 markers not shared by other people. And then beyond that,

13 one can also, accurately and without overstating the facts,

14 find out what a whole series of combination of markers

15 might be expected to be found in the general population.

16 But these are all separate items that have to be taken into

17 account in light of where that sample came from.

18     Q And then in paragraph 41, the way I read

19 that is that where you find the different types, you can

20 state the population frequency for those different types,

21 but you -- for statistical purposes, you should not

22 multiply them together. Just let me make sure I understand

23 here.

1     A Not unless you know for sure that it's a

2 single source blood sample.

3     Q Okay. So when you were giving your general

4 example in item number 7, and let's say you found a

5 population frequency for the PGM type and for the Gc type,

6 you're saying that it would be appropriate to state those

7 particular population frequencies, but you should not

8 multiply them together unless you know for a fact that

9 there's a single source?

10     A With respect to that sample, that specific

11 sample, you really don't know. You don't know. I mean you

12 can calculate things, but to -- but to say that I could say

13 with certainty about this sample, that this is a single --

14 that this combination of factors is what's -- this is how

15 often I'm going to find this combination of factors, you

16 have to also be able to state with an equal amount of

17 certainty that it's also a single source sample. And

18 that's the problem with all forensic testing.

19     MR. SIMMONS: I think that's all the

20 questions I have.

21         EXAMINATION

22 BY MS. KERSHNER:

23     Q Doctor Bing, your testimony on direct was

1 that it's -- that except where you are certain that you

2 have a single source on a blood sample, such as taking a

3 known blood sample from a suspect, there you know that

4 you've got a single source donor, correct?

5     A (Witness nods affirmatively.)

6     Q But that under other circumstances where

7 evidence is collected like at a crime scene, that you

8 cannot be certain that it's a single source donor; is that

9 correct?

10     A These are -- Yes, these are stains, stains

11 collected at a crime scene, as opposed to something that's

12 taken from an individual, for example, a blood sample, a

13 cell sample, a swab, something like that where you actually

14 know where it came from.

15     Q If a person who has some expertise in

16 serology, however, has collected the stains or examined the

17 stains in some fashion at the crime scene or immediately

18 afterwards, is there any way that, in addition to typing of

19 the blood, the general condition of the stain could

20 indicate whether it's a single source or possibly a

21 multiple source?

22     A Well, I'm not a crime scene investigator,

23 but as I understand it, there are ways to, in terms of

1 looking at splatter patterns of blood, for example, if a

2 blood stain is found in and around a victim that's lying on

3 the floor or something like that, people who have spent a

4 lot of time investigating crime scenes would probably

5 testify to the fact that it would be inconsistent with all

6 their experience that this could have come from anything

7 but a single individual. But a stain -- But the whole

8 scene has to be looked at together from that point of view.

9 It literally requires a great deal of experience and

10 expertise. There are people who can do that. There are

11 people who know how to do that.

12     Q Now, where there is a mixture or a suspected

13 mixture of blood, such as at a crime scene, on clothing or

14 other exhibits from a crime scene, would it be normal,

15 where there is a mixture or a suspected mixture, to find a

16 different intensity in the banding? For example, if

17 there's an A, the victim is type A, the suspect is type B,

18 and where -- the area where you're testing shows both A and

19 B, would you then be able to conclude that there was a

20 mixture?

21     A In serological testing that's not of the

22 one -- it's my understanding it's not one of the criteria

23 by which the test is set up. Certainly I would be the last

Page 49

1 person to deny that an experienced serologist, if they had
2 had a lot of experience in dealing with mixtures, and they
3 have accumulated experience in that area, they could
4 probably testify to that, based on their experience, this
5 looked to them like a mixture. I would accept that.
6     But, you know, at least to my knowledge, the
7 procedures that describe, for example, how EAP or Esterase
8 D is done, mixtures would be very hard to pick out, would
9 be very hard to pick out. With Haptoglobin and Gc, those
10 are systems with which I'm very familiar. Minor types are
11 not often interpreted as a result of being a mixture,
12 because even in a single source sample, sometimes you will
13 pick up a minor type just because of the nature of these
14 systems.
15     Q You also testified about the lack of
16 protocol at the laboratory -- lack of written protocol at
17 the West Virginia State Police Serology Laboratory in 1979.
18 But at that time, was it usual for a laboratory of that
19 type, in other words, a state run laboratory, forensic-type
20 laboratory, was it usual for that laboratory to have
21 written protocols?
22     A I truly have no specific knowledge about
23 forensic testing because I really didn't start doing this

Page 50

1 until around 1989, 1990. And protocols were just something
2 that I always had, so it was a surprise to me to hear from
3 people in the field that this was not an uncommon practice
4 in certain laboratories. But I have no specific knowledge
5 about what was generally practiced in the field at that
6 time. I mean I do have documented the FBI had a written
7 protocol in 1974, and it's actually a very useful protocol
8 because it has a lot of the original development of these
9 systems, which from a scholarly point of view, is a very
10 useful piece of paper.
11     MS. KERSHNER: I have nothing further.
12     MR. SIMMONS: Okay. I don't have any
13 follow-up questions. The court reporter needs to hear you
14 waive your signature, if you so desire, or not waive.
15     THE WITNESS: I waive my signature.
16     (WITNESS STANDS ASIDE.)
17     (WHEREUPON, the deposition was
18     concluded at 3:00 o'clock p.m.)

Page 51

REPOR   , CERTIFICATE

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to-wit:

    I, Barbara Harris, Notary Public within and for
the State of West Virginia, duly commissioned and
qualified, do hereby certify that the foregoing deposition
of DAVID H. BING was duly taken by and before me, under the
West Virginia Rules of Civil Procedure, at the time and
place and for the purpose specified in the caption thereof;
the said witness having been duly sworn by me to testify
the whole truth and nothing but the truth concerning the
matter in controversy.

    I do certify that the said deposition was
correctly taken by me by means of the Stenomask; that the
same was transcribed under my supervision, and that the
said transcript is a true record of the testimony given by
said witness.

    I further certify that I am not connected by
blood or marriage with any of the parties to this action,
am not a relative or employee or attorney or counsel of any
of the parties, nor am I a relative or employee of such
attorney or counsel, or financially interested in the
action, or interested, directly or indirectly, in the
matter in controversy.

Page 52

    It is stipulated and agreed that the signature of

the witness is hereby expressly waived to the foregoing

deposition.

    Given under my hand this 16th day of June, 1995.

    Barbara Harris, CCR
    Notary Public

    My commission expires August 30, 2003.

DEPOSITION
EXHIBIT
5

## TABLE I*

## KNOWN BLOOD SAMPLES

| PERSON | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|--------|-----|-----|----|----|-----|-----|-------|----|----|
| Vanessa Reggettz | O | 2+1- | 1 | B | 1 | 1 | 2 | 1 | 2-1 |
| Bernadette Reggettz | O | 2+2+ | 1 | B | 1 | 1 | 2 | 2-1 | 2-1 |
| Paul Eric Reggettz | O | 2+1- | 1 | B | 1 | 1 | 2 | 2-1 | 2-1 |
| Paul Reggettz III | O | 2+2- | 1 | BA | 1 | 1 | 2 | 2 | 2-1 |
| John Moss, III | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |

*The shared blood attributes between Petitioner's known blood types and the blood types of the Reggettz family are highlighted in Table I to emphasize the similarities and differences in the known blood types.

*TABLE I**

## KNOWN BLOOD SAMPLES (CONTINUED)

| PERSON | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|--------|-----|-----|----|----|-----|-----|-------|----|----|
| Jack C. Neal, Jr. | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Roger L. Province | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| William J. Monk | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Ross E. Gillespie | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Marvin D. Smith | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Richard A. Rollins | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Joseph Morehouse | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Nathaniel Brown | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Thomas F. White | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |

*Petitioner has been unable to find any explanation as to why the blood of Jack C. Neal, Jr., Roger L. Province, William J. Monk, Ross E. Gillespie, Marvin D. Smith, Richard A. Rollins, Joseph Morehouse, Nathaniel Brown, and Thomas F. White was tested.

### TABLE II*

## UNKNOWN BLOOD SAMPLES

| ITEM | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|---|---|---|---|---|---|---|---|---|---|
| 1. Knife pieces | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 2. Room next to bath | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 3. Front bedroom carpet | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 4. Bedspread front bedroom | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 5. Pillow case front bedroom | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 6. Electrical cord | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 7. Kitchen door curtain | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |
| 8. Sheet kitchen floor | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 9. Back door handle | O | 2-1 | ? | ? | ? | ? | ? | ? | ? |
| 10. Kitchen sink | ? | ? | ? | ? | ? | ? | ? | ? | ? |
| 11. Utensil drawer | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 12. Pillow case bedroom beside bath | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 13. Door between bedroom and living room | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 14. Door between bedroom and front door | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 15. Change purse | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 16. Medium t-shirt | O | 2-1 | ? | ? | 1 | ? | ? | ? | ? |
| 17. Jockey shorts | ? | ? | ? | ? | ? | ? | ? | ? | ? |
| 18. Vanessa Reggettz's nightgown | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 19. Doll | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |

*The blood types obtained from the unknown blood samples that are identical to the known blood types obtained from Vanessa Reggettz, Paul Eric Reggettz, Bernadette Reggettz, or Paul Reggettz, III, are highlighted in Table II.

*TABLE II*

## UNKNOWN BLOOD SAMPLES (CONTINUED)

| ITEM | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|------|-----|-----|-----|-----|-----|-----|-------|-----|-----|
| Table knife | ? | ? | ? | ? | *1* | ? | ? | ? | ? |
| Christmas wrapping paper | *O* | 1+*1*- | *1* | *BA* | *2-1* | *1* | *2* | *2-1* | 1 |
| Flashlight | *O* | 1 | *1* | *BA* | *2-1* | *1* | *2* | ? | ? |
| Clothing of Bernadette Reggettz | *O* | 1+*1*- | *1* | *BA* | *2-1* | *1* | *2* | *2-1* | 1 |

DEPOSITION
EXHIBIT
3
PENGAD-Bayonne, N. J.

## CURRICULUM VITAE

**NAME:**  David Howard Bing

**ADDRESS:**  CBR Laboratories
800 Huntington Avenue, Boston, MA 02115
Phone #: (617) 278-3450

**HOME ADDRESS:**  27 Waverly Street, Brookline, MA 02146

**DATE OF BIRTH:**  August 3, 1938

**PLACE OF BIRTH:**  E. Cleveland, Ohio

**EDUCATION:**
| | | |
|---|---|---|
| 1960 | B.A. | Wesleyan University, Middletown, CT (Distinction in Biology) |
| 1966 | Ph.D. | Western Reserve University, Cleveland, OH (Microbiology and Biochemistry) |

**POSTDOCTORAL TRAINING:**
1966-1968    University of California, Berkeley, CA
(Bacteriology and Immunology)

**RESEARCH FELLOWSHIPS:**
1960-1966    NIH Predoctoral Fellow
1966-1968    American Cancer Society Postdoctoral Fellow
1970-1971    Cercheur Etranger of INSERM, Hopital Necker, Clinique Nephrologique, Paris, France
1972-1973    Research Career Development Awardee, NIH
1976-1981    Established Investigator, American Heart Association
1982-1983    NIH Senior Fellowship, Dept. Cell Biology, Children's Hospital, Harvard Medical School, Boston, MA

**LICENSURE AND CERTIFICATION:**
1987    Certified Technical Director of Clinical Reference Laboratory in Commonwealth of Massachusetts
1988    Certified Technical Director for Paternity Testing by American Association of Blood Banks
1989    Certified Technical Director of Clinical Reference Laboratory in New York, Maryland, and Connecticut
1995    Certified Laboratory Director of Diagnostic Immunology, Immuno-hematology, and Paternity/Identity Testing in the State of New York

**ACADEMIC APPOINTMENTS:**
1968-1971    Assistant Professor, Dept. of Microbiology and Public Health, Michigan State University, E. Lansing, MI
1971-1973    Associate Professor (Tenure), Depts. of Microbiology and Public Health and Human Development, Michigan State University, E. Lansing, MI
1973-1978    Principle Research Associate, Dept. Biological Chemistry, Harvard Medical School
1978-1983    Instructor, Dept. Biological Chemistry, Harvard Medical School
1992-Present    Principal Associate in Pediatrics, Department of Medicine, Harvard Medical School, Boston, MA

BING, David H.

## NON-ACADEMIC APPOINTMENT:

| | |
|---|---|
| 1983-1986 | Associate Director of Biological Sciences, Cambridge Research Laboratories, Ortho Diagnostics Systems Inc., Cambridge, MA |
| 1992-Present | Adjunct Faculty, College of Pharmacology and Allied Health Sciences, Northeastern University, Boston, MA |

## HOSPITAL APPOINTMENTS:

| | |
|---|---|
| 1973- | Senior Investigator, The Center for Blood Research, Boston, MA |
| 1973- | Research Associate in Immunology, Children's Hospital, Boston, MA |
| 1980-1983 | Associate in Medicine, New England Deaconess Hospital, Boston, MA |
| 1983- | Sr. Research Associate in Medicine, Beth Israel Hospital, Boston, MA |
| 1986-1994 | Vice President and Scientific Director, CBR Laboratories, Inc. (A subsidary of The Center for Blood Research) |
| 1988- | Director of Laboratories, The Center for Blood Research, Boston, MA |
| 1994- | Director of Clinical Research Testing, CBR Laboratories, Inc., Boston, MA |

## MAJOR COMMITTEE ASSIGNMENTS:

| | |
|---|---|
| 1969-1973 | Chairman of Graduate Committee (Admissions and Thesis Defense Committee) Dept. Microbiology and Public Health, Michigan State University |
| 1975-1983 | Ad Hoc Reviewer for National Cancer Institute Program Project Grants, NIH |
| 1975-1983 | Ad Hoc Reviewer for National Heart, Lung, and Blood Institute, NIH |
| 1979 | NHLBI Committee which Prepared 10-year Summary of Research in the Area of Blood Resources |
| 1980- | Ad Hoc Reviewer Allergy and Infectious Disease Study Section, NIH |
| 1980- | Ad Hoc Reviewer, National Science Foundation |
| 1980-1983 | Plasma Derivatives Review Group, American Red Cross, Washington, DC |
| 1986- | Reviewer Special Study Section for Small Business Innovative Research, NIH |

## EDITORIAL BOARDS:

| | |
|---|---|
| 1979- | Associate Editor Molecular Immunology |
| 1980-1984 | Associate Editor, Journal of Immunology |
| 1980- | Ad Hoc Reviewer, Biochemistry |
| 1984- | Ad Hoc Reviewer, Journal of Immunology |

## MEMBERSHIPS IN PROFESSIONAL SOCIETIES:

| | |
|---|---|
| 1966 | Sigma Xi |
| 1969- | American Association of Immunology |
| 1969-1987,1992- | American Chemical Society |
| 1969- | American Association for Advancement of Science |
| 1983- | American Association of Clinical Chemistry |
| 1989- | International Society for Forensic Haemogenetics |
| 1990 | American Academy of Forensic Sciences |
| 1990- | Association of Northeast Forensic Scientist |

## MAJOR RESEARCH INTERESTS:

1. Therapeutic Plasma Protein Derivatives
2. Immunodiagnostics for the Blood Bank
3. DNA Probe Diagnostics for the Blood Bank and Genetic Testing
4. DNA Forensic Testing

BING, David H.

## TEACHING EXPERIENCE:

| | |
|---|---|
| 1960-1966 | Teaching Assistant, Dept. Microbiology, Western Reserve University, Cleveland, OH |
| 1968-1973 | Graduate Course in Immunochemistry, Dept. Microbiology Public Health, Michigan State University |
| 1968-1973 | Seminar Chairman, Dept. of Microbiology and Public Health, Michigan State University |
| 1968-1970 | Seminars in Immunology, Dept. Biochemistry, Michigan State University |
| 1972 | Video Course in Basic Immunology for medical students, veterinary students, medical technologists, nurses, undergraduates, Dept. Microbiology and Public Health, Michigan State University |
| 1973-1976 | Advanced Biochemistry, Dept. Biological Chemistry, Harvard Medical School |
| 1973-1980 | Seminar Chairman at The Center for Blood Research |
| 1992 | Foundations of Forensic Sciences, Northeastern University, Boston, MA |

## CONTINUING EDUCATION:

| | |
|---|---|
| 1985 | Gordon Conference of Cancer |
| 1985 | Federation of American Society for Experimental Biology and Medicine - American Association of Immunologists |
| 1986 | Federation of American Society for Experimental Biology and Medicine - American Association of Immunologists |
| 1987 | American Association of Blood Banks. |
| 1988 | American Association of Clinical Chemistry |
| 1989 | American Association of Clinical Chemistry |
| 1989 | 13th Congress for the Society of Forensic Haemogenetics |
| 1989 | American Association of Blood Banks |
| 1989 | UCLA Symposia on Molecular and Cell Biology - Defense Molecules |
| 1989 | Promega International Symposium on Human Identification |
| 1990 | American Academy of Forensic Sciences |
| 1990 | American Association of Clinical Chemistry |
| 1991 | Second Promega International Symposium on Human Identification |
| 1991 | American Academy of Forensic Sciences |
| 1992 | American Academy of Forensic Sciences |
| 1992 | Third Promega International Symposium of Human Identification |
| 1993 | American Academy of Forensic Sciences |
| 1993 | Jackson Laboratory Short Course on Advance Human and Mammalian Genetics |
| 1993 | Fourth Promega International Symposium of Human Identification |

## PATENTS:

1. Richard Laura and David Bing:  Amidinophenylmethanesulfonylfluoride.  4.303.592.  December 1, 1981.
2. David H. Bing:  Means and Method for Purifying Clq, Clr and Cls.  4,374,061.  February 15, 1984.
3. Patrea L. Pabst and David Bing:  Electrodialysis preparation of purified AHF concentrate.  4,435.318.  March 6, 1984.

## ORIGINAL REPORTS:

1. Bing DH, Stavitsky AB.  Hemagglutination with aldehyde fixed erythrocytes for assay of antigens and antibodies.  Proc Soc Exp Biol Med  124:1166-70, 1967.
2. Wofsy L, Kimura J, Bing DH, Parker D.  Affinity labeling of rabbit antisaccharide antibodies.  Biochemistry  6:1981-6, 1967.
3. Bing DH, Stavitsky AB.  Isolation and characterization of two quantigenically active peptides from bovine beta-lactoglobulin A.  Immunology  15:305-17, 1968.

BING, David H.

4.   Bing DH.  The nature of the active site of a subunit of the first component of human complement.  Biochemistry 8:4503-9, 1969.

5.   Bing DH.  Inhibition of guinea pig complement by aromatic amidine and guanidine compounds.  J Immunol 105:1289-91, 1970.

6.   Knudson KC, Bing DH, Kater LA.  Quantitative measurement of guinea pig complement with liposomes.  J Immunol 106:258-65, 1971.

7.   Bing DH.  Purification of human C1s by affinity chromatography.  Immunochemistry 8:539-50, 1971.

8.   Bing DH.  Purification of the first component of human complement by affinity chromatography on human immunoglobulin linked to Sepharose.  J Immunol 107:1243-7, 1971.

9.   Rosenhaft ME, Bing DH, Knudson AC.  A vacuum assisted apparatus for blood sampling in guinea pigs.  Lab Animal Care 21:598-9, 1971.

10.  Somack RL, Bing DH, Costilow RN.  Preparation and characterization of 2,4-diaminovaleric acid, an intermediate in the anaerobic oxidation of ornithine.  Anal Biochem 41:132-7, 1971.

11.  Knudson KC, Bing DH.  A simplified method for centrifugation of liposomes.  Immunochemistry 9:587-89, 1972.

12.  Bing DH, Mernitz JL, Spurlock SE.  Inactivation of the first component of human complement by $m$-[$o$-(2-chloro-5-fluorosulfonyl-phenylureido)phenoxybutoxy]-benzamidine.  Biochemistry 11:4263-8, 1972.

13.  Sledge CR, Bing DH.  Binding properties of the human complement protein C1q.  J Biol Chem 248:2818-23, 1973.

14.  Sledge CR, Bing DH.  Purification of human complement protein C1q by affinity chromatography.  J Immunol 111:661-6, 1973.

15.  Bing DH, Cory M, Doll M.  Inactivation of human C1 by benzamidine and pyrioinium sulfonyl fluorides.  J Immunol 113:584-90, 1974.

16.  Assimen SN, Bing DH, Painter RH.  A simple method for isolation of the subcomponent of the first component of complement by affinity chromatography.  J Immunol 113:225-34, 1974.

17.  Spurlock SE, Hunt SM, Bing DH.  Cryopreservation of sheep erythrocyte intermediates EA and EAC4 and utilization of the thawed cells in complement assays.  J Immunol Methods 6:53-59, 1974.

18.  Smith CW, Hollers JC, Bing DH, Patrick RA.  Effects of human C1 inhibitor on complement mediated human leukocyte chemotaxis.  J Immunol 114:216-20, 1975.

19.  Bing DH, Spurlock SE, Bern MM.  Synthesis of the first component of complement by primary cultures of human tumors and comparable normal tissue.  Clin Immunol Immunopathol 4:341-51, 1975.

20.  Bing DH, Andrews JM, Suddath FL, Spencer R.  Affinity chromatography of the subunits of human C1.  In: Protides of Biological Fluids, Peeters H. ed, New York: Pergamon Press 23:551-7, 1975.

21.  Andrews JM, Rosen FS, Silverberg SJ, Cory M, Schneeberger E, Bing DH.  Inhibition of C1s-induced vascular leakage in guinea pigs by substituted benzamidine and pyridinium compounds.  J Immunol 118:466-71, 1977.

22.  Taylor PA, Fink S, Bing DH, Painter RH.  Further studies on the identification of the subcomponents of the first component of complement after affinity chromatography of human serum on IgG-Sepharose.  J Immunol 118:1722-7, 1977.

23.  Bing DH, Cory M, Fenton JW II.  Exo-site affinity labeling of human thrombins.  Similar labeling on the A chain and B chain fragments of clotting and nonclotting thrombins.  J Biol Chem 252:8027-34, 1977.

24.  Donaldson VH, Rosen FS, Bing DH.  Role of the second component of complement (C2) and plasmin in kinin release in hereditary angioneurotic edema (H.A.N.E.) plasma.  Transactions of the Association of American Physicians XC:174-83, 1977.

25.  Morris KM, Colten HR, Bing DH.  The first component of complement C1: A quantitative comparison of its biosynthesis in culture by human epithelial and mesenchymal cells.  J Exp Med 148:1007-19, 1978.

BING, David H.

26. Feldman RJ, Bing DH, Furie BC, Furie B. Interactive computer surface graphics approach to study of the active site of bovine trypsin. Proc Natl Acad Sci 75:409-12, 1978.

27. Andrews JM, Roman DP Jr, Bing DH, Cory M. Inhibition of four human serine proteases by substituted benzamidines. J Med Chem 21:1202-7, 1978.

28. Bing DH, Laura R, Andrews JM, Cory M. Exo-site affinity labeling of C1s, a subcomponent of the first component of complement by m-[o-(2-chloro-5-fluorosulfonylphenylureido)phenoxybutoxy]benz-amidine. Biochemistry 17:5713-8, 1978.

29. Robison DJ, Furie B, Furie BC, Bing DH. Active site of bovine factor Xa; characterization using substituted benzamidines as competitive inhibitors and affinity labeling reagents. J Biol Chem 255:2014-21, 1980.

30. Bing DH, Andrews JM, Morris KM, Cole E, Irish V. Purification of subcomponents C1q, C1r and C1s of the first component of complement from Cohn Fraction I by affinity chromatography. Prep Biochem 10:269-98, 1980.

31. Laura R, Robison DJ, Bing DH. p-Amicinophenylmethanesulfonyl-fluoride, an irreversible inhibitor of serine proteases. Biochemistry 19:4859-64, 1980.

32. Herzlinger GA, Bing DH, Stein R, Cumming D. Quantitative measurement of C3 activation at polymer surfaces. Blood 57:764-70, 1981.

33. Wehler C, Andrews JM, Bing DH. The use of solid phase C1q and horseradish peroxidase conjugated goat anti-IgG for the detection of immune complexes in human serum. Mol Immunol 18:157-62, 1981.

34. Almeda A, Bing DH, Laura R, Friedman PA. Photoaffinity inhibition of rat liver NAD(P)H dehydrogenase by 3-(acetonyl-p-azidobenzyl)-4-hydroxycoumarin. Biochemistry 20:3731-37, 1981.

35. Bing DH, Laura R. A computer-generated 3-dimensional model of the B chain of bovine thrombin. Ann NY Acad Sci 370:496-510, 1981.

36. Warrell DA, Perine PL, Krause DW, Bing DH, MacCougal SJ. Pathophysiology and immunology of the Jarisch-Herxheimer-like reaction in louse-borne relapsing fever: Comparison of tetracycline and slow-release penicillin. J Inf Dis 147:898-909, 1981.

37. Furie B, Bing DH, Feldmann RJ, Robison DJ, Burnier JP, Furie BC. Computer generated models of blood coagulation factor Xa, Factor IXa and thrombin based upon structural homology with other serine proteases. J Biol Chem 257:3875-82, 1982.

38. Isliker H, Bing DH, Hynes RO. Fibronectin interacts with C1q, a subcomponent of the first component of complement. Immunol Letters 4:39-43, 1982.

39. Bing DH, Almeda S, Isliker H, Lahav J, Hynes RO. Fibronectin binds to the C1q component of complement. Proc Natl Acad Sci 79:4198-4201, 1982.

40. Almeda S, Rosenberg RD, Bing DH. The binding properties of human complement component C19; interaction with mucopolysaccharides. J Biol Chem 158:785-791, 1983.

41. Bing DH. The interaction of immune serum globulin and intravenous immune globulin with complement. Mol Immunol 20:893-900, 1983.

42. Bing DH. Complement activating and binding properties of ISG and IGIV. BOB Workshop on Methods for Evaluating Plasma Derivatives; 1983.

43. Donaldson VH, Harrison RA, Rosen FS, Bing DH, Kindness G, Canar J, Wagner C, Awad S. Variability in purified dysfunctional C1-inhibitor proteins from patients with hereditary angioneurotic edema. J Clin Invest 75:124-32, 1985.

44. Bing DH. Complement interaction with immune serum globulin and immune globulin intravenous. Amer J Med 76(3A):19-25, 1985.

45. Feldmann RJ, Bing DH, Potter M, Mainhart C, Furie B, Furie BC, Caporale LH. On the construction of computer models of proteins by the extension of crystallographic structures. Ann NY Acad Sci 439:12-43, 1985.

BING, David H.

46.  Bing DH, Feldmann, RJ, Fenton, JW II.  Structure-function relationships of thrombin based on the computer generated three dimensional model of the B chain of bovine thrombin.  NY Acad Sci,  485:104-120, 1986.

47.  Donaldson VH, Wagner CJ, Tsuei B, Kindness G, Bing DH, Harrison RA, and Rosen FS.  Interactions of plasma kallikrein and C1s with normal and dysfunctional C1 inhibitor proteins from patients with hereditary angioneurotic edema.  Analytical gel studies.  Blood 69:1096-1101, 1987.

48.  Goldberger G, Bing DH, Sipe, JD, Rits M, and Colten HR.  Transcriptional regulation of genes encoding the acute phase proteins CRP, SAA and C3.  J. Immunol. 138:3967-3971, 1987.

49.  Jennette JC, Tidwell RR, Geratz JD, Bing DH, and Falk RJ.  Amelioration of immune complex mediated glomerulonephritis by synthetic protease inhibitors.  Amer J Pathol  127:499-505, 1987.

50.  Lopez-Trascasa M, Bing DH, Riomel M, and Nicholson-Weller A.  Factor J isolation and characterization of a new polypeptide inhibitor of complement C1.  J Biol Chem.  264:16214-16221, 1989.

51.  Pantazis P, Kalyanaraman VS, and Bing DH.  Synthesis of the third component of complement (C3) by lectin-activated and HTLV-infected human T-cells.  Mol Immunol.  27:283-289, 1990.

52.  Laclette JP, Shoemaker CH, Richter D, Arcos L, Pante N, Cohen C, Bing D, and Nicholson-Weller A.  Paramyosin inhibits complement C1.  J Immunol.  148:124-128, 1992.

53.  Yunis J, Delgado M, Lewandrowski E, Yunis EJ, and Bing DH.  Rapid identification of HLA-DRw53 positive samples by a generic DRB-PCR amplification without further analysis.  Tissue Antigens.  40:41-44, 1992.

54.  Salazar M, Yunis J, Delgado M, Bing DH, and Yunis EJ.  HLA-DQB1 allele typing by a new PCR-RFLP: Correlation with PCR-SSO method.  Tissue Antigens.  40:116-123, 1992.

55.  Yunis JJ, Salazar M, Delgado MB, Alper CA, Bing DH, and Yunis EJ.  HLA-DQA1, DQB1, and DPB1 alleles on HLA-DQw2, and DQw9 carrying extended haplotypes.  Tissue Antigen.  41:37-41, 1993.

56.  Deulofeut H, Iglesias A, Mikael N, Bing DH, Awdeh Z, Yunis J, Bagley DM, Kruskall MS, Alper CA, and Yunis EJ.  Cellular recognition and HLA restriction of a midsequence HBsAG peptide in Hepatitis B vaccinated individuals.  Mol Immunol. 30:941-948, 1993.

57.  Salazar M, Deulofeut H, Yunis JJ, Bing DH, and Yunis EJ.  A fast PCR-SSP method for HLA-DQ generic typing.  Tissue Antigens  41:102-106, 1993.

58.  Mandle R, Baron C, Sundel R, Gelfand J, Davis AE, III, Rosen FS, and Bing DH.  Acquired C1 inhibitor deficiency due to an autoantibody to the reactive center region of C1 inhibitor.  J Immunol. 152:4680-4695, 1994.

59.  Salazar M, Williamson, JM, and Bing, DH.  Genetic typing of DQA1*4 alleles by restriction enyzme digestion of the PCR product obtained with two DQ alpha Amplitype™ kit.  J. Forensic Sci.  39:518,525, 1994.

60.  Yunis, JJ, Delgado, MB, Williamson, JM, Yunis, EJ, and Bing, DH.  Generic HLA DRB1 allele typing by PCR-SSO in forensic cases.  An approach to resolve identity in samples with uniformative HLA-DQα typings.  J. Forensic Sci.  Submitted for Review.

61.  Alper CA, Marcus-Bagley, D, Awdeh, Z, Kruskall MS, Eisenbarth, GS, Brink, SJ, Katz, AJ, Bing, DH, Yunis EJ, and Schur, PH.  Many individuals who carry the [HLA-B8, SCO1, DR3] conserved extended haplotype have immunoglobulin deficiencies.  J. Exp. Med.  Submitted for Review.

62.  Yunis JJ, Ossa H, Salazar M, Deulofeut R, Delattoz A, Delgado MB, Bing DH, Yunis EJ, and Yunis JJ.  Major histocompatibility complex class II alleles and haplotypes and blood groups of four Amerindian tribes of Northern Columbia.  Human Immunol.  Submitted, 1994.

63.  Wengler G, Gorlin JB, Williamson JM, Rosen FS, and Bing DH.  Non-random inactivation of the X-chromosome in early lineage hematopoietic cells in carriers of Wiskott-Aldrich syndrome.  Blood, in press, 1994.

BING, David H.

REVIEWS, CHAPTERS IN BOOKS:

1.  Bing DH.  Purification of the first component of human complement and its subunit Cl esterase.  In: Jakoby WB, Wilchek M, eds. Methods in Enzymology. Affinity Methods Enzyme Purification Part B.  NY: Academic Press, 731-46, 1974.

2.  Bing DH.  Purification of the human complement protein Cls by affinity chromatography.  In:  Resolution, Properties, and Genetic Aspects of Complement, NY: MSS Information Corp.  I:45-57, 1974.

3.  Cory M, Andrews JM, Bing DH.  Design of exo-affinity labeling reagents.  In: Jakoby WB, Wilchek M, eds. Methods in Enzymology XLVI.  Affinity Labeling.  NY: Academic Press, 115-30, 1977.

4.  Bing DH, Andrews JM, Cory M.  Affinity labeling of thrombin and other serine proteases with an extended reagent.  In: Lundblad RL, Fenton JW II, Mann KG, eds.  Chemistry and Biology of Thrombin.  Michigan: Ann Arbor Science Publishers, 159-77, 1977.

5.  Fenton JW II, Landis BW, Walz DA, Bing DH, Feinman RD, Zabinski MP, Sonder SA, Berliner LJ, Finlayson JS.  Human thrombin: Preparative evaluation, structural properties and enzyme specification. In: Bing DH, ed. The Chemistry and Physiology of the Human Plasma Proteins.  NY: Pergamon Press, 151-85, 1979.

6.  Cory M, Andrews JM, Bing DH.  Affinity labeling of serine proteases with an active site-directed irreversible inhibitor.  In: Kalman TI, ed.  Drug Action and Design: Mechanism Based Enzyme Inhibition.  NY: Elsevier, 259-69, 1980.

7.  Isliker H, Bing DH, Hynes RO.  Interaction of fibronectin with Clq, a subcomponent of the first component of complement.  In: Steinberg CM, Lefkovitz I, eds.  The Immune System. Basel: S. Karger.  2:231-238, 1981.

8.  Donaldson V, Rosen FS, Bing DH.  Kinin generation in hereditary angioneurotic edema (H.A.N.E.).  Plasma Bayer Conference on Kinins, 1982.

9.  Bing DH.  Biochemical specificity of complement protein Clq.  In: Schumaker V, Calada F, Sercarz E, eds. Protein Conformation Changes as a Signal.  NY: Plenum Publishing, 119-130, 1983.

10.  Bing DH.  Chemical precipitation and removal of IgG and immune complexes.  In: Pineda AA, ed. Selective Removal of Plasma Components.  NY: Futura Publishing Co, 139-168, 1984.

11.  Bing DH, DiDonno AC, Regan M, Strang C.  Blood plasma processing by electrodialysis.  In: Membrane Separations in Biotechnology.  R. McGregor, ed. Marcel Dekker; 135-160, 1985.

12.  Bar-Shavit R, Bing DH, Kahn AJ, Wilner GD.  Thrombin mediated mononuclear cell chemotaxis:  Relationship of ligand structure to biological activity.  In: Membrane receptor and cellular regulation.  329-338, 1985.

13.  Fenton JW II, Bing DH.  Thrombin Active Site Regions.  In: Seminars, Thrombosis and Hemostasis, 12:200-208, 1986.

14.  Bing DH, Di Donno AC, Regan M, Strang C.  Blood plasma processing by electrodialysis.  In: Membrane Separations in Biotechnology.  McGregor R, ed. Marcel Dekker, 131:1573-1582, 1986.

15.  Nicholson-Weller A, Rivard M, Lopez-Trascasa M, and Bing DH.  Regulation of the classical complement pathway by heparin.  In:  Marchalonis JJ, and Reinisch CL, Eds.  Defense Molecules.  Alan R. Liss, Inc.  UCLA Symposium on Molecular and Cellular Biology, 121:201-212, 1990.

16.  Bing, DH.  Plasma Proteins.  In: Hematology Basic Principles and Practice. Hoffman R, Benz, EJ, Jr., Shattil, SJ, Furie, B, and Cohen, HJ, Eds.  Churchill Livingstone, 1573-1582, 1991.

17.  Bing DH, Yunis EJ, and Yunis E.  The use of genetic markers in the analysis of anthropological origins of South Amerindians.  Proc Pan American Conference on HLA, 1992.

18.  Bing DH, Williamson J, Lewandrowski EL, Yunis JJ, Delgado MB, Yunis EJ, Ramos O, and Yunis TE.  Analysis of blood groups and VNTR markers in two Colombian Indian tribes.  Proceedings Third International Symposium on Human Identification, pp. 231-243, 1992.

BING, David H.

19. Bing DH, and Alper CA.  Complement in Health and Disease.  In: Colvin, RB, Bhan AK, and McCluskey R. Eds.  Diagnostic Immunopathology, Raven Press.  In press, 1994.

20. Bing DH.  Development of DNA typing methods for forensic analysis.  Gerber, SM, and Saferstein, R., Eds.  Chemistry in Crime II.  American Chemical Society.  In press, 1994.

20. Bing DH, and Alper CA.  Biochemistry of Plasma Proteins.  In: Anderson, K., and Ness, P.M., Eds.  Scientific basis of transfusion medicine: Implications for clinical practice.  Saunders Press, 1994.

22. Mandle R, and Bing, DH.  Immunoglobulins structure, function and uses.  *In:* Hoffman R, Benz JR EJ, Shattil SJ, Furie B, Cohen JH, Silberstein LE, Eds.  Hematology:  Basic Principles and Practice.  2nd edition.  New York: Churchill, Livingstone 1994:109-118.


BOOKS:

1. Bing DH, ed.  The Chemistry and Physiology of the Human Plasma Proteins.  Proceedings of a conference held by The Center for Blood Research, November 21-33, 1978 in Boston, MA.  NY: Pergamon Press, 1979.

2. Feldman RJ, Bing DH.  TAMS - Teaching Aids for Macromolecular Structure, 1980.

3. Bing DH, Rosenbaum RA, eds.  Plasma and Cellular Modulatory Proteins.  Proceedings of a conference held by The Center for Blood Research, November 22,84, 1980 in Boston, MA.  Boston: The Center for Blood Research, 1981.


ABSTRACTS OF WORK NOT PUBLISHED AS FULL ARTICLES:

1. Bing DH, Gusdon Jr, Stavitsky AB.  The antigenic determinants of bovine B-lactoglobulin A.  Fed Proc  25:2382, 1967.

2. Bing DH, Burr B, Wofsy L.  Azo-hemocyanin conjugates as immunoadsorbents.  Fed Proc  28:381, 1969.

3. Kater LA, Bing DH.  Purification and characterization of a subunit of the first component of human complement (Cls) isolated from ileal mucosa.  Gastroenterology, 1971.

4. Rosenhaft ME, Bing DH.  Serum complement levels in guinea pigs during induction of immunity.  Fed Proc  30:924, 1971.

5. Smith CW, Hollers J, Bing DH, Mernitz JL.  Enhancement of neutrophil chemotaxis by Cl inhibitor.  Presented at Reticulo-Endothelial Society Meeting, Dec. 1972.

6. Tavella BA, Miller HC, Bing DH, Ghannam RD, Dougherty GD.  Quantitative lymphocyte response to Candida albicans measured by viral plaque assay.  Fed Proc  32:356, 1973.

7. Patrick RA, Mernitz JL, Bing DH.  Purification of C4 by affinity chromatography.  J Immunol  111:296, 1973.

8. Roman DP Jr, Bing DH, Cory M.  Benzamidine inhibitors of human Cls, a subunit of the first component of complement: Correlation of partition coefficients with inhibition constants.  Fed Proc  34:1777, 1975.

9. Spurlock SE, Bing DH.  Synthesis of the first component of complement by primary cultures of columnar and transitional cell carcinomas.  Fed Proc  34:4220, 1975.

10. Bing DH, Spurlock SE, Bern MM.  Separation of a population of Cl synthesizing cells by affinity chromatography.  Fed. Proc  35:853, 1976.

11. Andrews JM, Bing DH, Cory M.  Chemical basis for the specificity of thrombin, plasmin, Cls, Clr and trypsin.  Circulation 54:200, 1978.

12. Morris KM, Bing DH, Andrews JM, Silverstein LJ, Attisano CA, Borin PS.  Biosynthesis of the subcomponents of Cl by twelve human established cell lines.  J Immunol  120:1786, 1978.

13. Davis AE III, Rosenberg RD, Fenton JW II, Bing DH, Rosen FS, Alper CA.  Is factor D of the alternative pathway a fragment of thrombin?  J Immunol  120:1771, 1978.

BING, David H.

14. Landis BH, Zabinski MP, LaFleur GJM, Bing DH, Fenton JW II.  Human alpha thrombin: differential inhibition with hirudin.  Fed Proc 37:1969, 1978.

15. Caporale LH, Woods D, Gagnon J, Christie DL, Bing DH.  A computer generated 3-dimensional model of the serine proteinase domain of human complement Factor B.  Immunobiology, 164, 220, 1983.

16. Caporale LH, Arlaud GJ, Gagnon J, Bing DH.  A computer generated 3-dimensional model of serine proteinase subunit of Clr, a subcomponent of the first component of complement.  Immunobiology, 164, 221, 1983.

17. Sofen N, Kalmyer JB, Bing DH.  Specificity of a monoclonal antibody to the heparin binding site of Clq.  Fed Proc 44, 3391, 1985.

18. Alper CA, Marcus D, Truesddon L, Awdeh Z, Yunis EJ, and Bing DH.  C4 null alleles and immunologic function in normal individuals.  Complement 4, 125, 1987.

19. Bing DH, Donaldson DH, and Rosen FS.  Heparin enhance enzymatic cleavage of Cl inhibitor by plasma but not Cls.  Complement 4, 136, 1987.

20. Bing DH.  Przysiecki CT, and Freidman PA.  Identification and quantitation of $\beta$-hydroxy asparagine in Clr and Cls.  Complement 4, 136, 1987.

21. Williamson J, and Bing DH.  The use of murine monoclonal antibodies to blood group related antigens for the immunofluorescent assays.  Clin Chem 35:680, 1989.

22. Williamson J, Mozill D, and Bing DH.  The use of DNA profile analysis to resolve two cases of disputed parentage unresolvable by conventional serological analysis.  Second Intl. Symp. on Human Identification, 1989.

23. Bogdan SI, Pinkus JL, Brody DL, Williamson JM, and Bing DH.  DNA profile data: Use in a serial rape case and in a paternity assessment; non-use in a rape case.  Northeastern Forensic Society.  October, 1990.

24. Williamson J, Mitchel S, Mozill DR, and Bing DH.  Modified method for the extraction of high molecular genomic DNA from hemolyzed blood.  Amer Acad of Forensic Sci., 1990.

3/21/95

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

     Petitioner,

v.            Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

     Respondent.

## PETITIONER'S MOTION FOR PRODUCTION
## OF RECORDS RELATING TO TROOPERS MICHAEL DON SMITH
## AND TERRY WILLIAMS

    Petitioner John Moss, III, respectfully moves the Court for an order

requiring Respondent to produce, under the seal of this Court, all personnel records

maintained by the Department of Public Safety on Troopers Michael Don Smith and

Terry Williams, including, but not limited to, their complete personnel files, all

documentation relating to any hearings held in connection with any disciplinary

actions, and all documentation relating to any formal or informal investigation relating

to Petitioner's case, for the following reasons:

    1.  Trooper Michael Don Smith and Trooper Terry Williams were the

main law enforcement officers involved in the investigation of the Reggettz murders

and the confessions given by Paul Reggettz, III, and Petitioner.

    2.  In the habeas corpus petition, Petitioner has raised the issue of

whether his confessions were obtained in violation of his constitutional rights.

73





Kanawha County
## OFFICE OF THE PROSECUTING ATTORNEY
Kanawha County Judicial Building
111 Court Street, Charleston, W. Va. 25301
(304) 357-0300
FAX (304) 357-0342

WILLIAM C. FORBES
Prosecuting Attorney

November 22, 1994

Lonnie Simmons, Esquire
DiTrapano and Jackson
604 Virginia Street East
Charleston, WV 25301


RE:  <u>Moss v. Trent</u>
     94-MISC-663


Dear Mr. Simmons:


    Enclosed please find a copy of the serological records from
the West Virginia State Police int he above-referenced case.
This is the raw data that Judge MacQueen directed be delivered to
you.

    I am also submitting copies of this data to Judge MacQueen
and to the Circuit Clerk to enclose in the case file.  Thank you
for your attention to this matter.

                              Very truly yours,

                              Mary Beth Kershner
                              Assistant Prosecuting Attorney


cc:  Hon. A. Andrew MacQueen, Circuit Judge
     Hon. Cathy Gatson, Circuit Clerk


72

3.     Petitioner's intention in raising this constitutional issue, which was raised in both of his trials and in the hearings held during the juvenile transfer proceedings, was to develop new evidence relevant to the issue.

4.     Petitioner has information that an informal investigation may have been conducted by the Department of Public Safety into certain allegations made against Troopers Michael Don Smith and Terry Williams directly related to the underlying facts of this case.

5.     If such an investigation had been conducted, clearly any documentation related to such investigation is relevant to Petitioner's habeas corpus action.

6.     If no such investigation had ever been conducted, then Petitioner needs to develop this fact on the record, with a member of the Department of Public Safety testifying under oath after making a thorough search of the records.

7.     Presumably, if such an investigation occurred, there may be some documentation in the personnel files of these two troopers relating to the investigation.

8.     Requests for the production of documents and other discovery in a habeas corpus action was discussed by the West Virginia Supreme Court in *Gibson v. Dale*, ___ W.Va. ___, 319 S.E.2d 806 (1984), which held in Syllabus Point 5:

> "A habeas corpus petitioner is entitled to careful consideration of his grounds for relief, and the court before which the writ is made returnable has a duty to provide whatever facilities and procedures are necessary to afford the petitioner an adequate opportunity to demonstrate his entitlement to relief."

2

74

9.    As to the right of a habeas corpus petitioner to discovery, the West

Virginia Supreme Court stated:

> "The right to access to relevant evidence in the possession
> of the State is a component of the right to full consideration
> of one's claims.  Certainly, the habeas petitioner, by virtue
> of his status as a prisoner, is almost always at a
> disadvantage in developing the evidence necessary to
> support his allegations.  The court to which a motion for
> production of documents or records is addressed in a habeas
> proceeding should exercise flexibility in ruling on the
> motion.    Where the petitioner can demonstrate that
> materials in the possession of the State contain relevant
> evidence which would enable him to prove specific
> allegations entitling him to relief, the court should grant the
> motion." ___ W.Va. at ___, 319 S.E.2d at 814.

10.    Petitioner respectfully submits that all of this documentation,

including all documents in the personnel files maintained on Troopers Michael Don

Smith and Terry Williams, are relevant and critical to the final determination of the

issues raised in the habeas corpus petition.

11.    Any concerns Respondent may have regarding the privacy of the

officers involved will be protected by having their complete personnel files produced

under seal for review by this Court, which can determine whether any of the

information contained in the files is relevant to Petitioner's habeas corpus action.

12.    Without this documentation, the issues raised in connection with

the confessions cannot be resolved.

For the foregoing reasons, Petitioner John Moss, III, respectfully moves

the Court for an order requiring Respondent to produce, under the seal of this court,

all personnel records maintained by the Department of Public Safety on Troopers

75

Michael Don Smith and Terry Williams, including, but not limited to, their entire personnel files, all documentation relating to any hearings held in connection with any disciplinary actions and all documentation relating to any formal or informal investigations relating to Petitioner's case.

**JOHN MOSS, III**, Petitioner,

--By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

4

76

**CERTIFICATE OF SERVICE**

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **PETITIONER'S MOTION FOR PRODUCTION OF RECORDS RELATING TO TROOPERS MICHAEL DON SMITH AND TERRY WILLIAMS** was served upon counsel of record on the 11th day of April, 1995, by the United States Postal Service, postage prepaid.

> Mary Beth Kershner
> Steve Revercomb
> Assistant Prosecuting Attorneys
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-2323
> Counsel for Respondent George Trent
>
> Bradford Deel
> Assistant Attorney General
> 725 Jefferson Road
> South Charleston, West Virginia 25309
> (304) 746-2222
> Counsel for West Virginia Department of Public Safety

Lonnie C. Simmons