# MOSS v. BALLARD
# CASE NO. 2:09cv01406

# RESPONDENT'S EXHIBIT 33
## (Continuation, pp. 78 - 171)

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

        Petitioner,

v.

                                             Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

        Respondent.

## NOTICE OF HEARING

    **PLEASE TAKE NOTICE** that on the 19th day of April, 1995, beginning

at 1:30 p.m., and continuing from that time until complete, a hearing on

**PETITIONER'S MOTION FOR PRODUCTION OF RECORDS RELATING TO**

**TROOPERS MICHAEL DON SMITH AND TERRY WILLIAMS** will be held before

the Honorable A. Andrew MacQueen, III, Judge of the Circuit Court of Kanawha

County, in his courtroom, at which time and place you may appear to protect your

interest.

                                   **JOHN MOSS, III**, Petitioner,
                                        --By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **NOTICE OF HEARING**, was served upon counsel of record on the 11th day of April, 1995, by the United States Postal Service, postage prepaid.

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300
> Counsel for Respondent George Trent
>
> Bradford Deel
> Assistant Attorney General
> 725 Jefferson Road
> South Charleston, West Virginia 25309
> (304) 746-2222
> Counsel for West Virginia Department of Public Safety

_____
Lonnie C. Simmons

2

79

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

         Petitioner,

v.                              Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

         Respondent.

## NOTICE OF DEPOSITION

**PLEASE TAKE NOTICE** that Petitioner John Moss, III, by counsel, will

conduct the deposition of **Dr. David Bing** on the 6th day of June, 1995, at 1:30 p.m.,

and continuing from that time until complete, at a room in the Kanawha County

Courthouse, to be designated prior to the deposition, at which time and place you may

appear to protect your interests.

        The deposition shall be by oral examination, with a written record made

thereof, before a notary public or before some other officer authorized by law to

administer oaths. The purpose of this evidentiary deposition is to provide testimony

in this habeas corpus proceeding to be made a part of the record herein for evaluation

by the trial court in connection with the various arguments raised in the petition.

                                    **JOHN MOSS, III**, Petitioner,
                                      --By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133



## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**NOTICE OF DEPOSITION**, was served upon counsel of record on the 28th day of

April, 1995, by the United States Postal Service, postage prepaid.

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300

Lonnie C. Simmons

2

# DiTRAPANO & JACKSON
### ATTORNEYS AT LAW
604 VIRGINIA STREET, EAST
CHARLESTON, WEST VIRGINIA  25301

RUDOLPH L. DiTRAPANO
P. RODNEY JACKSON
J. TIMOTHY DiPIERO
FRANKLIN S. FRAGALE, JR.
JOSHUA I. BARRETT

TELEPHONE 304-342-0133
FAX. NO. 304-342-4605

LONNIE C. SIMMONS
DEBRA L. HAMILTON
SUZANNE M. WEISE
L. DANTE' di TRAPANO

April 28, 1995

Mary Beth Kershner
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Building
111 Court Street
Charleston, West Virginia 25301



Re:   *John Moss, III v. George Trent*
      Civil Action No. 94-MISC-663

Dear Mary Beth:

        After the hearing, we discussed the possibility of taking Dr. David Bing's deposition while he was in town for the *Davis* trial. I checked with Dr. Bing and he will be available for deposition on June 6, 1995. Enclosed is a notice of deposition for June 6, 1995, beginning at 1:30 p.m. It was my understanding from our discussion that you were available at that time. Please let me know if this date and time conflicts with your schedule. I plan to have his deposition taken in a jury room in the court house.

        Also, after the hearing, I discussed with you the conclusions reached by Dr. Bing. As I stated, generally he concurred with the scientific problems I noted in the petition. However, if you want me to obtain some additional report or affidavit from Dr. Bing prior to his deposition, please let me know immediately and I will ask him to provide one.

        Prior to deposing Dr. Bing, I plan to take the deposition of Robert Murphy. I would like to take his deposition during the week of May 15, 1995. Please let me know by Tuesday of next week if you have any conflicts the following week. I need to have Murphy noticed and subpoenaed as soon as possible.





Mary Beth Kershner
April 28, 1995
Page 2


       Neither of these depositions should be very long.  Once they are completed,
I do not anticipate developing any further testimonial evidence in this habeas corpus
proceeding, unless something develops in connection with the documents to be produced
regarding the possible internal investigation.

                    Very truly yours,


                    Lonnie C. Simmons


LCS/jb

Enclosure

cc:   John Moss III

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

        Petitioner,

v.

        Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

        Respondent.



### ORDER

On the 19th day of April, 1995, this Court considered **PETITIONER'S MOTION FOR PRODUCTION OF RECORDS RELATING TO TROOPERS MICHAEL DON SMITH AND TERRY WILLIAMS**. Present at the hearing were Lonnie C. Simmons, counsel for Petitioner John Moss III, Mary Beth Kershner, Assistant Prosecuting Attorney for Respondent George Trent, and Bradford Deel, counsel for the West Virginia Department of Public Safety.

Based upon the pleadings and arguments of counsel, the Court does hereby ADJUDGE, ORDER, and DECREE that:

    1.    **PETITIONER'S MOTION FOR PRODUCTION OF RECORDS RELATING TO TROOPERS MICHAEL DON SMITH AND TERRY WILLIAMS** is granted.



2.     Respondent and the West Virginia Department of Public Safety shall conduct a search of their records to determine whether or not a formal or informal internal affairs investigation was conducted into the conduct of Troopers Michael Don Smith and Terry Williams relevant to Petitioner's case.

3.     If any documentation relating to any formal or informal internal affairs investigation is discovered, copies of such documentation shall be provided to Petitioner and Respondent.

4.     The complete personnel files of Troopers Michael Don Smith and Terry Williams shall be reviewed by a responsible person in the West Virginia Department of Public Safety and any documents or entries relating to Petitioner's case, such as in connection with obtaining blood samples from Petitioner or obtaining a confession from Petitioner, shall be produced to this Court for its review.  After the Court has reviewed the materials provided, the Court will determine whether the documentation provided is relevant and should be provided to the parties in this case.

5.     In the event that the person reviewing the complete personnel files of Troopers Michael Don Smith and Terry Williams discovers no documents or entries relating to Petitioner's case, then that person shall execute an affidavit to that effect and file the affidavit with this Court.  In the affidavit, the person shall explain what procedures were followed in attempting to locate the information requested.

To all of which Respondent George Trent objects and excepts.  Counsel for the West Virginia Department of Public Safety stated on the record that the Department takes no position in this matter, other than a general concern to protect the privacy rights of the troopers involved.

The Clerk is directed to mail certified copies of this **ORDER** to all counsel of record.

ENTERED: ___5/2/95___

A. Andrew MacQueen, Judge

Presented by:

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

3





Approved by:


Mary Beth Kershner
Steve Revercomb
Assistant Prosecuting Attorneys
Kanawha County Judicial Court Annex Bldg
111 Court Street
Charleston, West Virginia 25301
(304) 357-2323
Counsel for Respondent George Trent


Bradford Deel
Assistant Attorney General
725 Jefferson Road
South Charleston, West Virginia 25309
(304) 746-~~2222~~ 2113 ~~~
Counsel for West Virginia Department of Public Safety

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

        Petitioner,

v.

                                  Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

        Respondent.

## CERTIFICATE OF SERVICE

      I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**AMENDED NOTICE OF DEPOSITION** of Dr. David Bing, was served upon counsel

of record on the 3rd day of May, 1995, by the United States Postal Service, postage

prepaid, addressed as follows:

        Mary Beth Kershner
        Steve Revercomb
        Peter C. Brown
        Assistant Prosecuting Attorney
        Kanawha County Judicial Court Annex Bldg
        111 Court Street
        Charleston, West Virginia 25301
        (304) 357-0300

                                   Lonnie C. Simmons

**IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA**

JOHN MOSS, III,

     Petitioner,

v.              Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

     Respondent.

### CERTIFICATE OF SERVICE

     I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**NOTICE OF DEPOSITION** of Robert Murphy, was served upon counsel of record on

the 3rd day of May, 1995, by the United States Postal Service, postage prepaid,

addressed as follows:

       Mary Beth Kershner
       Steve Revercomb
       Peter C. Brown
       Assistant Prosecuting Attorney
       Kanawha County Judicial Court Annex Bldg
       111 Court Street
       Charleston, West Virginia 25301
       (304) 357-0300

           Lonnie C. Simmons

KANAWHA COUNTY CIRCUIT COURT

CIVIL ACTION NO: _94-misc-663_

John Moss, III _____PLAINTIFF,

RETURN DATE: _____

TIME: _____

v.

COURTROOM: _____

George Trent _____DEFENDANT.

WITNESS FOR: ____P____

/ Robert Murphy

Lonnie Simmons _____, ATTY

SUBP & ____/____COPIES ISSUED _____

# DEPOSITION SUBPOENA TO TESTIFY

*FILED*
*95 MAY 12  AM 8 3~*
*CATHY S. GATSON CLERK*
*KANAWHA COUNTY CIRCUIT COURT*

## THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

---

**JOHN MOSS, III,**

    Petitioner,

v.             Civil Action No. 94-MISC-663

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

    Respondent.


**In The Name of The State of West Virginia:**

    Robert Murphy
    Commercial Testing & Engineering Company
    1529 Greenbrier Street
    Charleston, WV   25311


You are hereby summoned to appear at the offices of Di Trapano and Jackson, 604 Virginia Street,

East, Charleston, West Virginia, on the 17th day of May, 1995, at 10:00 o'clock a.m., to testify and

tell the truth in a certain matter of controversy before our said Court, and have then there this writ,

at the taking of a deposition in the above entitled action pending in the Circuit Court of Kanawha

County, West Virginia.


Dated: May 3, 1995    *Cathy S Gatson* Clerk



IN THE CIRCUIT COURT OF KANAWHA COUNTY,
WEST VIRGINIA

JOHN MOSS, III,

       Petitioner,

v.                     Civil Action No. 94-MISC-663

GEORGE TRENT, Warden
West Virginia State Penitentiary,

       Respondent.

## AFFIDAVIT

I, Marsha Beasley, Director, Personnel Section, West Virginia State Police, do hereby swear or affirm that I have searched the personnel files of Troopers Michael Don Smith and Terry Williams and discovered no documentation as to any formal or informal internal affairs investigation relating to the above troopers relevant to petitioner's case.

Marsha Beasley
Director, Personnel Section,
West Virginia State Police

Taken, sworn, and subscribed before me this _6th_ day of _July_____, 1995.

Notary Public

My commission expires _6-24-2002_____.





IN THE CIRCUIT COURT OF KANAWHA COUNTY, FILED
WEST VIRGINIA

95 JUL -7 AM 11:43

JOHN MOSS, III,

      Petitioner,

v.                          Civil Action No. 94-MISC-663

GEORGE TRENT, Warden,
West Virginia State Penitentiary,

      Respondent.

## AFFIDAVIT

I, Tara M. Davis, Secretary, Professional Standards Unit,
West Virginia State Police, do hereby swear or affirm that I
conducted a search of all files maintained by the West Virginia
State Police Professional Standards Unit and discovered no
documentation relating to an internal affairs investigation
conducted into the conduct of Troopers Michael Don Smith and
Terry Williams relevant to petitioner's case.

*Tara M. Davis*
Tara M. Davis, Secretary,
Professional Standards Unit,
West Virginia State Police

Taken, sworn, and subscribed before me this _6th_ day of
_July_____, 1995.

*Delores J. Pettry*
Notary Public

My commission expires ___6-24-2002_____.



OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
DELORES J. PETTRY
WV STATE POLICE
725 JEFFERSON ROAD
SO. CHARLESTON, WV 25309
My Commission Expires June 24, 2002

IN THE CIRCUIT COURT OF KANAWHA COUNTY,
WEST VIRGINIA

JOHN MOSS, III,

      Petitioner,

v.                      Civil Action No. 94-MISC-663

GEORGE TRENT, Warden,
West Virginia State Penitentiary,

      Respondent.


## CERTIFICATE OF SERVICE

    I, Bradford W. Deel, counsel for the West Virginia State Police, do hereby certify that a true and exact copy of the foregoing AFFIDAVITS by Marsha Beasley and Tara Davis were served on the following on the 6th day of July, 1995, by placing a copy thereof in the United States Mail, first class postage pre-paid, and addressed as follows:

1.    Mary Beth Kershner
      Steve Revercomb
      Assistant Prosecuting Attorneys
      Kanawha County Judicial Court Annex Bldg.
      111 Court Street
      Charleston, WV 25301

2.    Lonnie C. Simmons
      Attorney at Law
      DiTrapano & Jackson
      604 Virginia Street, East
      Charleston, WV 25301


BRADFORD W. DEEL
Assistant Attorney General
725 Jefferson Road
South Charleston, WV 25309
(304) 746-2113



### Division of Public Safety

(West Virginia State Police)
725 Jefferson Road
South Charleston, West Virginia 25309-1698

**Gaston Caperton**
Governor

**Colonel Thomas L. Kirk**
Superintendent

November 9, 1994

Mary Beth Kershner
Kanawha County PA Office
111 Court Street
Charleston, WV  25301

Dear Ms. Kershner:

Enclosed you will find the material requested regarding the
John Moss, III case: reference number C-79-2566.

The enclosed documents are photocopies of the microfilm
file.  The enclosed documents represent the complete microfilm
file.

Sincerely,

T. A. Smith, Supervisor
Biochemistry Section

TAS/daj
Enclosure

MOSS, JOHN

C-79-2566

SUSPECT: HOMICIDE

EXAM:  SGT.  R.  C.  MURPHY  FOR  TPR.  TERRY
WILLIAMS,  SO  CHAS.

**IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA**

**JOHN MOSS, III,**

        Petitioner,

v.                            Civil Action No. 94-MISC-663

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

        Respondent.

## NOTICE OF HEARING

      **PLEASE TAKE NOTICE** that on the 19th day of September, 1995,

beginning at 9:00 a.m., and continuing from that time until complete, a hearing on the

Fred Zain issue will be held before the Honorable A. Andrew MacQueen, III, Judge of

the Circuit Court of Kanawha County, in his courtroom, at which time and place you

may appear to protect your interest.

                      **JOHN MOSS, III**, Petitioner,
                      --By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**NOTICE OF HEARING**, was served upon counsel of record on the 11th day of

September, 1995, by the United States Postal Service, postage prepaid.

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300
> Counsel for Respondent George Trent

_____
Lonnie C. Simmons

2

103

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

    Petitioner,

v.               Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

    Respondent.

### ORDER APPROVING PAYMENT OF DIRECT EXPENSES

On a former date, John Moss filed in this Court an affidavit reciting financial inability to employ experts for representation in connection with certain proceedings before this Court, and the Court being of the opinion the eligibility requirements of West Virginia Code 29-21-1, et seq, were satisfied.

Counsel informs this Court that in order to provide representation it was necessary to retain Garrett Reporting Service, to provide the court reporting service for the deposition of Robert Murphy.

The Court has considered these matters and being of the opinion the request is appropriate, approves this request. Accordingly is it **HEREBY ORDERED:**

That Public Defender Services issue a check payable to Garrett Reporting Service in the amount of $226.25 as payment for the services described in the Direct Expense Payment form and accompanying invoice.

The Clerk is directed to mail two certified copies of this Order to Lonnie C. Simmons and one certified copy of this Order to Mary Beth Kershner.

**ENTER** this 17ᵗ day of July, 1995.

_____
A. Andrew MacQueen, III, Judge

2



GARRETT REPORTING SERVICE
"PROFESSIONAL STENOMASK FOR THE RECORD"

5208 GLOW DRIVE, CROSS LANES, WEST VIRGINIA 25313 • (304) 776-5303

Lonnie Simmons
DiTrapano & Jackson
604 Virginia Street, East
Charleston, WV 25301-0000

INVOICE NO. :  401240
INVOICE DATE: 5/29/95
REPORTER:
Penny Kerns

John Moss, III vs. George Trent, Warden
of the State of WV Penitentiary
Deposition of Robert Murphy

Fed ID#:55-061-2306

| Date | Description | Amount |
|------|-------------|--------|
| 5/17/95 | Original and One Copy | 174.00 |
| | Reporting Fee | 40.00 |
| | Exhibits | 12.25 |

| | |
|---|---|
| Subtotal | 226.25 |
| Paid | 0.00 |
| Balance Due | 226.25 |

Please return one copy with remittance.

101

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

Petitioner,

v.

Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

Respondent.

## ORDER APPROVING PAYMENT OF DIRECT EXPENSES

On a former date, John Moss filed in this Court an affidavit reciting financial

inability to employ experts for representation in connection with certain proceedings

before this Court, and the Court being of the opinion the eligibility requirements of

West Virginia Code 29-21-1, et seq, were satisfied.

Counsel informs this Court that in order to provide representation it was

necessary to retain Garrett Reporting Service, to provide the court reporting service for

the deposition of Dr. David Bing.

The Court has considered these matters and being of the opinion the request is

appropriate, approves this request. Accordingly is it **HEREBY ORDERED:**

That Public Defender Services issue a check payable to Garrett Reporting Service

in the amount of $196.00 as payment for the services described in the Direct Expense

Payment form and accompanying invoice.

96

The Clerk is directed to mail two certified copies of this Order to Lonnie C. Simmons and one certified copy of this Order to Mary Beth Kershner.

**ENTER** this 17 day of July, 1995.

_A. Andrew MacQueen, III, Judge_

2





## GARRETT REPORTING SERVICE
"PROFESSIONAL STENOMASK FOR THE RECORD"

5208 GLOW DRIVE, CROSS LANES, WEST VIRGINIA 25313 • (304) 776-5303

Lonnie Simmons
DiTrapano & Jackson
604 Virginia Street, East
Charleston, WV 25301-0000

INVOICE NO. : 301785
INVOICE DATE: 6/21/95
REPORTER:
Barbara Harris

John Moss, III vs George Trent, Warden
of the W. Va. State Penitentiary
Deposition of David Bing

Fed ID#:55-061-2306

| Date | Description | Amount |
|------|-------------|--------|
| 6/05/95 | Original and One Copy | 156.00 |
| | Reporting Fee | 40.00 |

| | |
|---|---|
| Subtotal | 196.00 |
| Paid | 0.00 |
| Balance Due | 196.00 |

Please return one copy with remittance.

98

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

            Petitioner,

v.                                    Civil Action No. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

            Respondent.

## PETITIONER'S SUPPLEMENTAL BRIEF
## ON ISSUES RAISED IN HABEAS CORPUS PETITION

In the **PETITION FOR WRIT OF HABEAS CORPUS** filed by Petitioner John Moss, III, on August 18, 1994, Petitioner sought either a judgment of acquittal or a new trial based upon his contention that his incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10, and 14 of the West Virginia Constitution, on the following grounds:

    1.   The admission of testimony and test results performed by Trooper Fred Salem Zain, whose credentials, credibility, and test results have all been found by the West Virginia Supreme Court of Appeals to be inherently unreliable and a violation of a criminal defendant's constitutional rights.

    2.   The presentation by the State of incorrect, false, misleading, overstated, and unscientific evidence.



     3.   The admission of the alleged confessions given by Petitioner, which resulted from a violation of his constitutional rights. Although the issues regarding the confessions have been extensively litigated in many hearings, Petitioner reserves the right to develop new information and new arguments with regard to the alleged confessions that were previously unavailable.*

In the **PETITION**, Petitioner included all of the applicable law entitling him to relief. The purpose of this brief is to supplement the law set out in the **PETITION** and to add to the factual discussion included therein, based upon the discovery developed in this case.

Before discussing the facts, it should be noted that to date, Respondent has not filed any written response admitting or denying the allegations set out in detail in the **PETITION**. Under West Virginia law, Petitioner respectfully submits that the failure of Respondent to admit or deny each allegation in the **PETITION** allows this Court to deem all allegations as being admitted. *See, e.g.*, Syllabus Point 1, *Staton v. Hrko*, ___ W.Va. ___, 379 S.E.2d 159 (1989)(Failure to admit or deny allegations in a mandamus petition permits a court to deem all allegations in the petition as admitted). Presumably, in light of this law, Respondent will file a written response to the **PETITION** prior to any hearing held in connection with the Zain issue raised.

---

*In the hearing to be held on this SUPPLEMENTAL BRIEF, Petitioner will focus only on the issue surrounding the involvement of Fred Zain. Petitioner specifically reserves his right to raise any new evidence or arguments in connection with the confession obtained against him at a later time, in the event this Court determines that the Zain issue is not dispositive. Obviously, if a new trial is granted, Petitioner will raise these issues relating to the confession prior to the new trial. Consequently, Petitioner wants to make it very clear that he is not waiving any challenge he may have to the validity of the confession obtained by the State from him.

The main argument presented by Petitioner is that under the standards set out in *In the Matter of Investigation of the West Virginia State Police Crime Laboratory*, 190 W.Va. 321, 438 S.E.2d 501 (1993), Petitioner is entitled to a judgment of acquittal or a new trial.  The Court should note that Petitioner has made an additional argument that the West Virginia Supreme Court in the *Laboratory* decision erred in applying the harmless error test for nonconstitutional errors, rather than the harmless error test for constitutional errors, but that under either test, Petitioner is entitled to a judgment of acquittal or a new trial.

Petitioner respectfully submits that he has presented a compelling case for vacating his convictions based upon the analysis set out in *Laboratory*.  Clearly in this case, the testing and testimony of Fred Zain was a critical factor, which was emphasized again and again by the State, as noted in the citations to the trial transcript included in the **PETITION**.  If Zain's testing and testimony are removed, as required under the *Laboratory* decision, the jury is left with two conflicting confessions by two different individuals.  Thus, the key fact differentiating between the confessions given by Paul Reggettz, III, and by Petitioner was the testing and testimony by Zain.

Petitioner is at the point in this habeas corpus action where he can either spend a great deal of time extensively developing other relevant issues or he can seek a ruling on his strongest argument, leaving the development of other issues to another day.  Consequently, Petitioner and his counsel have determined that the record at this time is sufficiently developed to allow this Court to rule on the Zain issue.

3

All of the laboratory documentation that could be found by the State has been produced. However, the State was not able to locate any photographs of any of the testing performed, the autorads and notes from the DNA testing performed by Zain, and the original raw laboratory notes. The grand jury transcript resulting in the indictment of Petitioner was produced, pursuant to the order of this Court, but the grand jury transcript resulting in the indictment of Reggettz was never found. An independent expert, Dr. David Bing, has reviewed Zain's testimony and the underlying documentation, and the person who assisted Zain in the testing, Robert Murphy, was deposed. With this background, Petitioner respectfully believes that the Zain issue in this case is ripe for decision. However, in the event this Court determines that this issue alone does not justify a judgment of acquittal or a new trial, Petitioner reserves the right to pursue additional issues in the context of this habeas corpus action.

The deposition of Robert Murphy was taken on May 17, 1995. (A copy of his deposition is attached under Tab 1). As the Court may recall, Mr. Murphy is the person who issued the report dated June 10, 1980, summarizing the blood typing tests performed in this case. Mr. Murphy acted as a serologist for the West Virginia Department of Public Safety approximately from 1974 to 1982. (Murphy Dep. at 6). Once Fred Zain was hired, Mr. Murphy supervised him in the serology laboratory. (Murphy Dep. at 6).

Mr. Murphy testified that it was unusual for a serologist to go to the scene of a crime to collect evidence samples, as Zain did in the present case. In fact, he could only recall one case when he (Mr. Murphy) was ordered to obtain evidence samples at the scene of a crime. (Murphy Dep. at 11).

4

As of December, 1979, the laboratory had no written protocols on laboratory procedure, the collection of evidence, or any of their testing procedures. (Murphy Dep. at 13). He also explained that at that time, the laboratory did not have any quality control, quality assurance program. (Murphy Dep. at 14).

With regard to the testing conducted in this case, Mr. Murphy explained:

"A. To the best of my recollection, I was involved in most of the testing.

"Q. Okay.

"A. I don't know that I saw-- that I did everything, but I did see all of the results.

"Q. Who else would have been involved in the testing?

"A. Fred Zain."   (Murphy Dep. at 17).

In his deposition, Mr. Murphy reviewed the laboratory documents produced, and marked "Murphy" on documents written by him and "Not Murphy" on documents written by some other person in the laboratory. As a general rule, if the writing was in Murphy's handwriting, he performed those tests. These documents were attached as a group exhibit to Mr. Murphy's deposition. Of particular interest in the documentation is one sheet, marked with Bates Number 000013, which records the results of tests performed on most of the evidence items obtained by Zain. The back of this sheet has the initials "FSZ" and Petitioner respectfully submits that Zain is the person who recorded this information, which indicates he is the person who performed these particular tests. Thus, the most critical testing in this case was performed by Zain.

5

The deposition of Dr. David H. Bing was taken on June 5, 1995. (A copy of his deposition is attached under Tab 2). Dr. Bing had reviewed all of the trial testimony of Fred Zain from the first and second trials, all of the laboratory documentation produced by the State, the autopsy report, and the **PETITION FOR WRIT OF HABEAS CORPUS** filed by Petitioner. Dr. Bing initially noted that the lack of any photographs recording the results of electrophoretic typing made it impossible for him to evaluate the accuracy of the results reported. (Dr. Bing Dep. at 12-13). Due to this lack of preserving the test results, for purposes of his analysis, Dr. Bing had to assume the typings were correct. (Dr. Bing Dep. at 13).

Dr. Bing explained the importance of having a written protocol in the laboratory and a quality control, quality assurance program. (Dr. Bing Dep. at 18-19). In explaining why he believed the data generated in this case was meaningless, Dr. Bing stated:

> "Well, by that I mean that the -- there is so much data on these stains that weren't analyzed, it would seem to me there should be some extensive notes backing that material up. So that in that -- in the context of not being able to look at the backup data, other than the summaries, it becomes, you know, almost impossible for me to either agree or disagree with the final outcome of the results. And that's what I mean by when I say it's meaningless. I can't agree, I can't disagree. All I can say is what was reported." (Dr. Bing Dep. at 21-22).

After commenting on the lack of any written protocols, quality control, quality assurance programs, original laboratory notes and photographs of the testing performed, Dr. Bing went through a series of general scientific principles applicable to the serological testing performed in this case. The purpose of this analysis was to demonstrate the flaws in the conclusions reached based upon the data and the overstating of the significance of this testing at trial.

First, he noted that it is important to obtain the known blood types of all potential donors of blood at the scene of the crime. In this case, the potential donors of blood were Vanessa Dale Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III. (Dr. Bing Dep. at 22-23).

Second, at a crime scene, where the origin of all evidentiary stains is unknown, it cannot be assumed that the stains originated from a single source. (Dr. Bing Dep. at 24). Third, only those types obtained from the evidence that are different from any of the types obtained from known possible donors provides relevant and meaningful information to the forensic scientist. Dr. Bing gave the following hypothetical to illustrate this general principle:

> "Think of it another way. Suppose that the distinguishing factor of a blood stain was something that you can actually visualize. Suppose that you could look at this blood stain and you could say unequivocally, 'I know that that blood stain came from somebody who has brown hair.' Brown hair is a genetic marker. In some ways it's very similar to, say, a blood type antigen because there is a certain -- The color or the reason it's brown is due to certain genetic markers that result in color. So you say I know -- It doesn't make any difference how I know it. I know this blood stain is from somebody who has brown hair. Now, you get your list of possible donors to that and you -- and they all have brown hair. You can't say that any one person is more likely than another to be a donor to that blood stain.
>
> "Now, let's say if we can do a little bit more. Let's say, 'Well, I can' -- 'I know that the person who contributed to this blood stain has brown hair and is left-handed.' So you now look at your candidates, and you look at them and you say, 'Well, three of them are left-handed and say two are right-handed.' Well, the two who are right-handed are automatically eliminated, but you still can't distinguish between the other three because left-handedness and brown hair color are the same in all of them.

7

"So that if you have a series of markers and they're identical in all the people that are being tested, then you can't really use that to try to distinguish the source of a given blood stain. You can only look to the differences, not to the similarities, because the question that is being asked here, the scientific question that is being asked is who could possibly be a biologic donor to this blood stain.

"And, secondly, I don't know whether there's a single person or from a bunch of people. As I stated in my affidavit, is it a single source sample or many people are sources of the sample. So you have to look to the differences between individuals who you test rather than to their similarities." (Dr. Bing Dep. at 25-26).

Fourth, as a general rule, where a type from a known possible donor of a blood stain matches a type from the blood discovered, it is not appropriate to include that type in calculating the frequency that the blood was deposited by a particular suspect. Dr. Bing illustrated this general principle as follows:

"Let's take another genetic typing you can sort of visualize. Let's suppose that the blood sample that you know came from somebody who has brown hair, is left-handed, and is an albino, has no pigment color in their skin at all. Albinism is a very rare occurrence in the human population. It's very rare indeed. Now, at that point, the fact that you now have three individuals who are left-handed and have brown hair, but only one of them is an albino. You say that's a very rare event. It could only have been that person.

"So you can use that to reason backwards and say, 'Alright, albinism is a very rare event, so I know that this blood stain came from an albino.' That could only have occurred in one out of a very few number of people who have this inherited genetic trait.

"That is separate from the question of saying, "How often is the combination of brown hair, left-handism and albinism found in the general population?' That's a separate question. That's how often do I find these together in the

8

general population.  You can make that estimate as well. But that's a general question about the population. That is not a question about the sample.  The only thing that distinguishes that sample is what is different about that sample than is in the known individuals that you're testing. So you've got a -- Those two things have to be kept separate.

"And that's what I mean by this, that you can't take a combination of factors that are found in the general population and relate it to a specific sample. All you can say is that if these are present and I now have data to show that are indeed present, this is how often I would expect to find that combination of markers in the general population, providing they are behaving and acting independent of each other, because that's the other issue in terms of being able to do that, they have to be behaving independently.  They have to be what we say scientifically, they sort independently." (Dr. Bing Dep. at 28-29).

Finally, Dr. Bing noted that serological typing is unable to determine when a particular evidentiary stain was deposited.  (Dr. Bing Dep. at 37).  Thus, from a scientific point of view, there is no objective basis for a scientist to conclude that a particular stain actually resulted from the criminal episode or may have been deposited at some time earlier.

The remainder of Dr. Bing's deposition applies these general principles to the facts.  He concludes that the only blood types of significance are PGM, Gc, and EsD. The remaining types obtained from the blood stains found at the crime scene do not provide significant information because the remaining types obtained from the evidence were identical to the types obtained from at least one or more of the known possible donors.  (Dr. Bing Dep. at 38).  Dr. Bing further testified that he agreed with the scientific analysis of the evidence set out in the **PETITION**.  (Dr. Bing Dep. at 39).

9

In addition to the Zain issue, another issue relating to the blood testing performed is the failure of the State to preserve the evidence and the results of the testing for review by Petitioner. The West Virginia Supreme Court has long held that the State has an obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), to disclose exculpatory evidence to the accused.

Related to this obligation is the requirement that the State preserve evidence which may provide exculpatory evidence. For example, in Syllabus Point 4 of *State v. Harr*, 156 W. Va. 492, 194 S.E.2d 652 (1973), the West Virginia Supreme Court held:

> "'A person charged with possession of an illegal drug should be permitted to examine the alleged illegal drug under proper supervision and control.' Syl. pt. 3, *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972)."

*See also State v. Adkins*, 167 W.Va. 626, 280 S.E.2d 293 (1981); *State v. McArdle*, 156 W.Va. 409, 194 S.E.2d 174 (1973).

In *McArdle*, the defendant charged with possession and sale of marijuana, sought to have his own independent tests done on the substances seized because his defense was that he did not possess the illegal parts of the plants. The trial court refused to allow this testing. In reversing the trial court's ruling on this matter, the West Virginia Supreme Court stated the defendant "should have been permitted to have his expert make laboratory tests and whatever chemical tests he deemed necessary." 156 W.Va. at ___, 194 S.E.2d at 178. The West Virginia Supreme Court found that the denial of this test was in violation of the fundamental principles discussed by the United States Supreme Court in *Brady*, and quoted the following passage from *Brady*:

10

"'Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. * * * A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant.' *See Mooney v. Holohan*, 294 U.S. 103, 55 S. Ct. 340, 79 L.Ed.2d 791, 98 A.L.R. 406.

"Applying these principles to this issue we find that the failure to permit the defendant an opportunity to adequately examine and test the substance does not comport with the basic standard of fairness to which an accused is entitled." 156 W.Va. at ___, 194 S.E.2d at 179.

In these cases involving controlled substances, the most critical fact is the identity of the substances confiscated by the police. Similarly, in the present case, one of the critical issues to be determined was the identity of the person or persons whose blood drops were found in the Reggettz home. Thus, even under the law existing at the time Petitioner's case was tried, Petitioner's constitutional rights were violated by the State's failure either to preserve some of the blood samples for testing or to photograph the electrophoretic gels so that another expert could examine the types determined.

The only remedy for the State's admitted failure to preserve this critical evidence is for the State's blood typing results to be inadmissible. The remedy suggested has been adopted by the West Virginia Supreme Court in Syllabus Point 4 of *State v. Thomas*, 187 W.Va. 686, 421 S.E.2d 227 (1992):

"When the government performs a complicated test on evidence that is important to the determination of guilt, and in so doing destroys the possibility of an independent

11

> replication of the test, the government must preserve as much documentation of the test as is reasonably possible to allow for a full and fair examination of the results by a defendant and his experts."

In *Thomas*, who was convicted on September 30, 1987, the FBI performed blood typing on three small drops of blood found in the defendant's car. The testing of these samples consumed all of the blood. As a result, there were no blood samples available for the defendant's experts to test. Furthermore, the FBI has a policy of not photographing their electrophoresis gels, which makes it impossible for another expert to review the same results and evaluate the accuracy of the typings.

Under these facts, the West Virginia Supreme Court held that absent photographs of the test results, the State was prohibited from admitting into evidence any of the genetic typings because this failure to preserve such evidence was contrary to a defendant's constitutional right to a fair trial, to full and fair cross-examination, and contrary to the State's constitutional obligation to reveal all potentially exculpatory evidence.

The West Virginia Supreme Court has never held whether or not the decision in *Thomas* is to be applied prospectively only or retroactively. Petitioner respectfully submits that the rule announced in *Thomas* was not new and was consistent with the *Brady* obligation already recognized in *Harr*, *Adkins*, and *McArdle*. Furthermore, under the analysis set out in *Bowman v. Leverette*, ___ W.Va. ___, 289 S.E.2d 435 (1982), Petitioner respectfully submits that the West Virginia Supreme Court will accord retroactive application to *Thomas*. The State's failure to preserve potentially exculpatory evidence goes to the very heart of the truth-finding process and

12

raises serious questions about the validity of guilty verdicts obtained without such evidence.

Under the foregoing analysis, the State's blood typing evidence should have been inadmissible. Moreover, a retroactive application of *Thomas*, which Petitioner respectfully submits would be appropriate, clearly renders the State's blood typing evidence inadmissible as evidence for any purpose. Thus, this Court is presented with two reasons rendering the blood testing performed in this case inadmissible.

First, the testing was performed by Fred Zain, whose work has been wholly discredited and rendered untrustworthy by the *Laboratory* decision. In the report issued by Special Judge Holliday, which is quoted in *Laboratory*, 190 W.Va. at ___, 438 S.E.2d at 503, the following litany of false evidence presented by Zain under oath is noted:

> "'The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results.'"

13

Consequently, Zain's involvement alone in this case and the critical importance of his testimony and testing is sufficient for this Court to reverse Petitioner's convictions and to grant a judgment of acquittal or a new trial.

Second, the failure of the State to preserve the test results through photographs rendered it impossible for Petitioner to exercise his constitutional right to cross-examine Zain fully and intelligently. Furthermore, by failing to preserve the results of this testing, all of the serological testing allegedly performed is rendered inadmissible because the State failed to maintain photographs of the electrophoretic gels.

The facts set out in the **PETITION** and this analysis of the blood testing summarized in this **SUPPLEMENTAL BRIEF** establishes the following facts which compel the vacating of Petitioner's conviction and awarding a judgment of acquittal or a new trial:

1.   Fred Zain personally gathered most of the evidentiary blood stains tested in this case;

2.   Fred Zain personally performed the blood typing on most of the evidentiary blood stains tested in this case;

3.   Fred Zain testified in Petitioner's first and second trials, and was the only witness in both trials testifying on the serological testing performed by the State;

4.   The State, in opening and closing arguments, placed great emphasis on the testing and testimony of Fred Zain;

5.   Fred Zain's testing and testimony was the strongest evidence presented against Petitioner and was the critical evidence shifting the balance between the confession given by Paul Reggetz, III, and the confession allegedly given by Petitioner;

14

6.     Based upon the analysis of Dr. David Bing, Fred Zain's testing and testimony in this case was virtually meaningless because he overstated the significance of some of the data, assumed a single source for each of the stains, failed to take into account the possibility that some types obtained could have been deposited by known possible donors, was done at a time when the laboratory had no written protocol, no quality control, quality assurance program, no policy of preserving test results with photographs, and no policy of maintaining original laboratory notes;

7.     Furthermore, the problems set out in the previous paragraph violates Petitioner's constitutional right to fully and fairly cross-examine Fred Zain, when the underlying data relating to the testing performed is unavailable to Petitioner;

8.     Fred Zain performed DNA testing prior to Petitioner's second trial, but was unable to detect sufficient DNA to make any comparison to Petitioner's DNA; and

9.     Fred Zain threw out the reference blood samples obtained from Vanessa Reggettz, Paul Eric Reggettz, and Bernadette Lynn Reggettz.

Petitioner respectfully submits that even though he has had two trials, he has not yet received the fair trial guaranteed to him by either the United States Constitution or the West Virginia Constitution. The *Laboratory* decision and the underlying special investigation into the gross misconduct of Fred Zain clearly establish the need to grant Petitioner a new trial. For the foregoing reasons, and for the reasons set out in more detail in the **PETITION**, Petitioner John Moss, III, respectfully asks this Court to grant his writ of habeas corpus, to vacate his convictions, and either to grant a judgment of acquittal or grant a new trial.

**JOHN MOSS, III**, Petitioner,
--By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

15

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**PETITIONER'S SUPPLEMENTAL BRIEF ON ISSUES RAISED IN HABEAS**

**CORPUS PETITION** was served upon counsel of record on the 14th day of August,

1995, by the United States Postal Service, postage prepaid, addressed as follows:

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300

Lonnie C. Simmons

**IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA**

**JOHN MOSS, III,**

                    Petitioner,

v.                                                    Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

                    Respondent.


### ORDER

        A hearing in the above-styled case will be held on September 19, 1995, at

9:00 a.m., in the courtroom of the Honorable A. Andrew MacQueen, III.  It is deemed

necessary that Petitioner John Moss, III, be present for that hearing.  This court does

hereby **ORDER** that the appropriate agents of the Division of Corrections transport

Petitioner John Moss, III, from the Mount Olive Correctional Center to the courtroom

of the Honorable A. Andrew MacQueen, III, so that he can be present for the hearing

to be held on September 19, 1995, at 9:00 a.m.

        The Clerk is directed to mail a certified copy of this Order to all counsel

of record.

        **ENTER** this ____ day of September, 1995.

                                        A. Andrew MacQueen, III, Judge

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS III,

Petitioner,

v.                                                       No. 94-MISC-663

GEORGE TRENT, Warden, West
Virginia Penitentiary,

Respondent.

## ANSWER OF THE RESPONDENT TO ISSUES
## RAISED IN PETITIONER'S SUPPLEMENTAL BRIEF

Comes now the Respondent, George Trent, by counsel, William C. Forbes, Prosecuting Attorney in and for Kanawha County, West Virginia, and Mary Beth Kershner, Assistant Prosecuting Attorney, and for answer to the Petitioner's Supplemental Brief on Issues Raised in the Habeas Corpus Petition, says as follows:

A.     The Petitioner seeks habeas corpus relief in this matter pursuant to In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division, 190 W.Va. 321, 438 S.E.2d 501 (1993) (hereinafter, "*Zain I*"). That case requires any of the so-called "Zain" petitioners to consent to DNA testing as a prerequisite to the merits of their petition being heard.

105

B.    The Petitioner herein has not submitted a consent to DNA testing with this Court or with the West Virginia Supreme Court of Appeals.

C.    The Petitioner has not asked for DNA testing in order to provide this Court with information relating to his guilt or innocence.

D.    The Petitioner has implied that any DNA testing would be futile, since Fred Zain apparently disposed of the known samples of the victims' blood; however, a sample of the Petitioner's blood could still be compared through DNA testing with blood from certain of the Exhibits which are in the possession of the Kanawha County Circuit Clerk and such testing might have some probative value, despite the absence of samples of the victims' blood.

E.    The Petitioner has argued that the serological testimony of Fred Zain was critical to the State's case. This argument ignores the admission at trial of Petitioner's three (3) confessions to the crimes committed, which have been held to be admissible by two (2) different Circuit Judges in this circuit as well as by the West Virginia Supreme Court of Appeals. State v. Moss, 376 S.E.2d 569 (W.Va. 1988). Because of the admission of these confessions, this Court cannot find that the serology testimony was crucial to the State's case. (The Petitioner has indicated his intent to once again challenge the confessions on the issue of voluntariness; however, in the absence of new evidence on this issue and in light of the numerous prior findings that these confessions were made voluntarily, it would be inappropriate for this Court to

again review this issue.)

The Petitioner's request for Habeas Corpus relief based upon *Zain i* is, at best, premature, due to the Petitioner's opposition to DNA testing in this matter.  Therefore, the Respondent prays that this Court will deny the relief sought and dismiss the Petition for Writ of Habeas Corpus presently pending before this Court; or in the alternative, Order that DNA testing for a comparison between the Petitioner's DNA and that found on certain of the State's Exhibits be Ordered.


GEORGE TRENT,

Respondent,

By Counsel


WILLIAM C. FORBES
Prosecuting Attorney for Kanawha
County

MARY BETH KERSHNER
Assistant Prosecuting Attorney

107

## CERTIFICATE OF SERVICE

I, Mary Beth Kershner, Assistant Prosecuting Attorney for Kanawha County in and for Kanawha County, West Virginia, do hereby certify that service of an Answer of the Respondent to Issues Raised in Petitioner's Supplemental Brief was made by mailing in the United States mail, postage prepaid this 14th day of September, 1995 to

Lonnie Simmons
Attorney At Law
604 Virginia Street E
Charleston, WV

Mary Beth Kershner/jcu

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

       Petitioner,

v.

       Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

       Respondent.

## ORDER APPROVING PAYMENT OF DIRECT EXPENSES

On a former date, John Moss filed in this Court an affidavit reciting financial inability to employ experts for representation in connection with certain proceedings before this Court, and the Court being of the opinion the eligibility requirements of West Virginia Code 29-21-1, <u>et seq</u>, were satisfied.

Counsel informs this Court that in order to provide representation it was necessary to retain Garrett Reporting Service, to provide the court reporting service for the depositions of Robert Murphy and Dr. David Bing.

The Court has considered these matters and being of the opinion the request is appropriate, approves this request. Accordingly is it **HEREBY ORDERED:**

That Public Defender Services issue a check payable to Garrett Reporting Service in the amount of $422.25 as payment for the services described in the Direct Expense Payment form and accompanying invoice.

The Clerk is directed to mail two certified copies of this Order to Lonnie C. Simmons and one certified copy of this Order to Mary Beth Kershner.

**ENTER** this _23_ day of October, 1995.

A. Andrew MacQueen, III, Judge

110

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

Petitioner,

v.                                                    Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

Respondent.

## ORDER APPROVING PAYMENT OF DIRECT EXPENSES

On a former date, John Moss filed in this Court an affidavit reciting financial

inability to employ experts for representation in connection with certain proceedings

before this Court, and the Court being of the opinion the eligibility requirements of

West Virginia Code 29-21-1, et seq, were satisfied.

Counsel informs this Court that in order to provide representation it was

necessary to retain Dr. David Bing of CBR Laboratories, Inc., as an expert witness for

Petitioner John Moss.

The Court has considered these matters and being of the opinion the request is

appropriate, approves this request. Accordingly is it **HEREBY ORDERED:**

That Public Defender Services issue a check payable to CBR Laboratories, Inc.,

in the amount of $6,812.17 as payment for the services described in the Direct Expense

Payment form and accompanying invoice.

The Clerk is directed to mail two certified copies of this Order to Lonnie C. Simmons and one certified copy of this Order to Mary Beth Kershner.

**ENTERED** this _8th_ day of December, 1995.

A. Andrew MacQueen, III, Judge

RECORDED

# STATEMENT

PLEASE MAKE CHECKS PAYABLE TO:

## CBR LABORATORIES, INC.

800 HUNTINGTON AVE.
BOSTON, MA. 02115
(617) 731-6470

| 3381 | 10/31/95 | 1 |
|------|----------|---|
| ACCOUNT NO | STATEMENT DATE | PAGE |

BILL TO: OFFICE OF THE PUBLIC DEFENDER
KANAWHA COUNTY
PO BOX 2827
CHARLESTON, WV 25330-2827

PLEASE DETACH AND RETURN THIS PORTION WITH YOUR REMITTANCE

**CBR LABORATORIES, INC.** · 800 HUNTINGTON AVE. · BOSTON, MA. 02115 · (617) 731-6470

| INV NO | DATE | CODE | AMOUNT | DATE | AMOUNT | BALANCE |
|--------|------|------|--------|------|--------|---------|
| 2086 | 6/28/95 | 3110 | 400.00 | | | |
| | 6/28/95 | 3140 | 3,250.00 | | | 3,650.00 |
| 2089 | 6/28/95 | 1230 | 362.17 | | | |
| | 6/28/95 | 3110 | 800.00 | | | |
| | 6/28/95 | 3140 | 800.00 | | | |
| | 6/28/95 | 3150 | 400.00 | | | 2,362.17 |
| 2216 | 11/09/95 | 3110 | 400.00 | | | |
| | 11/09/95 | 3110 | 400.00 | | | 800.00 |
| SERVICE CHARGE | | | | | | 360.73 |

UNPAID BALANCES OVER 30 DAYS OLD ARE SUBJECT TO A SERVICE CHARGE OF 1 1/2% MONTHLY, 18% ANNUALLY

| CURRENT | 30-60 DAYS | 60-90 DAYS | 90-120 DAYS | OVER 120 DAYS | TOTAL DUE |
|---------|-----------|-----------|-------------|---------------|-----------|
| 1,160.73 | | | | 6,012.17 | 7,172.90 |

CODES:
| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0010 | PREPAYMENT | 3010 | SERUM PROTEIN ANALYSIS | 3070 | IVEEGAM SALES | 3170 | IDENTITICK LAB |
| 1230 | MISCELLANEOUS | 3020 | IMMUNODIAGNOSTICS LAB | 3100 | CONTRACT RESEARCH | 3180 | DNA PATERNITY LAB |
| 2010 | MISCELLANEOUS | 3030 | IMMUNOHEMATOLOGY LAB | 3110 | CONSULTING | 4360 | TRANSPORTATION |
| 2200 | CONTRACT RESEARCH | 3050 | PRODUCTS LAB | 3120 | LYME DISEASE LAB | 4410 | TRAVEL |
| 3000 | HLA PATERNITY LAB | 3060 | MVP TESTING LAB | 3140 | FORENSIC LAB | | |

113

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

        Petitioner,

v.                                   Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

        Respondent.



## ORDER APPROVING PAYMENT OF DIRECT EXPENSES

On a former date, John Moss filed in this Court an affidavit reciting financial inability to employ experts for representation in connection with certain proceedings before this Court, and the Court being of the opinion the eligibility requirements of West Virginia Code 29-21-1, et seq, were satisfied.

Counsel informs this Court that in order to provide representation it was necessary to retain Dr. David Bing of CBR Laboratories, Inc., as an expert witness for Petitioner John Moss.

The Court has considered these matters and being of the opinion the request is appropriate, approves this request. Accordingly is it **HEREBY ORDERED:**

On August 8, 1995, an Order was entered by this Court granting payment of expenses to CBR Laboratories, Inc., in the amount of $6,812.17. That amount was not correct. Therefore, the correct amount the Public Defender Services should issue to CBR Laboratories, Inc., as payment for the services described in the Direct Expense Payment form and accompanying invoice is $2,362.17.



The Clerk is directed to mail two certified copies of this Order to Lonnie C. Simmons and one certified copy of this Order to Mary Beth Kershner.

**ENTERED** this ___13___ day of December, 1995.

A. Andrew MacQueen, III, Judge

115

RECORDED

Kanawha County

# OFFICE OF THE PROSECUTING ATTORNEY

Kanawha County Judicial Building
111 Court Street, Charleston, W. Va. 25301
(304) 357-0300
FAX (304) 357-0342

WILLIAM C. FORBES
Prosecuting Attorney

June 4, 1996

The Honorable A. Andrew MacQueen
Circuit Court of Kanawha County
111 Court Street
Charleston, WV 25301

RE: State ex rel. John Moss III v. George Trent
    No. 94-MISC-663

Dear Judge MacQueen:

    I am in receipt of a copy of the order in the above case proposed by Lonnie Simmons. Having reviewed this order, I have some objections to it of which you should be aware.

    First, the order refers to the fact that the Respondent has filed no answer to the petition, and that the Court can therefore deem the petition as admitted. However, W.Va. Code §53-4A-6 specifies that: "[w]ithin such time as may be specified in the writ or as the court may fix, the State shall file its return. No other or further pleadings shall be filed except as the court may order." In this case, there has never been an order entered requiring any answer to the petition. Additionally, the Respondent has been represented at every proceeding and has argued against granting this Petition. Therefore, the allegations therein cannot be deemed to have been admitted.

    Second, Mr. Simmons states in the proposed order that the standard for review of this case is found in Syllabus Point 2 of *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 438 S.E.2d 501 (W.Va. 1993). However, the standard in fact is found in Syllabus Point 3 of that case, and states:

        "Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince

116

impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury. " Syllabus Point 2, State v. Atkins, 163 W.Va. 502, 261 S.E.2d 55 (1979), cert. denied, 445 U.S. 904, 100 S. Ct. 1081, 63 L. Ed. 2d 320 (1980).

Since in this case, "the remaining evidence" includes three (3) confessions which were plainly admissible, certainly the State has met the first part of this test.  The only question remaining, assuming that the Petitioner is not obligated to obtain DNA testing, is whether the testimony of Fred Zain may have prejudiced the jury.

Finally, the issue of DNA testing is not a closed one.  Mr. Simmons states that the serological evidence was tested by Fred Zain previously and did not yield results.  Here, we must remember that *all* of Zain's work is suspect at best, and this does not mean that additional testing would yield the same results.  I don't believe that the Supreme Court wanted petitioners to be able to rely on some of Zain's work and exclude the rest.  Further, DNA testing using the PCR method, which can often yield results with smaller samples and/or older samples was not developed until approximately 1987, and did not gain acceptance until about 1989.  I telephoned the Bexar County, Texas Forensic Sciences Laboratory and spoke to Tim Fallon, Chief of Physical Evidence.  He informed me that until last year, the only DNA testing performed in that laboratory was the old RFLP method.  This method often is unsuccessful when PCR testing shows results.  Therefore, even assuming that Zain's DNA results were valid, this does not mean that results could not be obtained now.  Finally, the fact that some of the blood samples are missing does not eliminate the possibility that results which would be helpful to this Court could not be obtained by a comparison of the DNA of the unknown person at the Reggetz residence with the DNA of Mr. Moss.

As you can see, there are a lot of issues which are not nearly so cut and dried as Mr. Simmons' order would indicate.  Therefore, the Respondent objects to the entry of this order, which would be contrary to both the applicable law and to the facts of this case.

Very truly yours,

Mary Beth Kershner
Assistant Prosecuting Attorney

cc: Lonnie Simmons, Esquire

**IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA**

**JOHN MOSS, III,**

           Petitioner,

v.                                          Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

           Respondent.



## NOTICE OF STATUS CONFERENCE

    PLEASE TAKE NOTICE that a status conference in the above-styled case will be held at 9:00 a.m. on August 20, 1996. The last hearing in this case was held on September 19, 1995. At that time, Petitioner argued that this case was ripe for decision on the issue of whether Petitioner is entitled to a new trial under the standards set out in *In the Matter of Investigation of the West Virginia State Police Crime Laboratory*, 190 W.Va. 321, 438 S.E.2d 501 (1993). Because the Fred Zain issue is dispositive, Petitioner has refrained from developing the other issues raised in his **PETITION**.

    Since that hearing, no order has been issued by this Court. Petitioner has provided this Court with a proposed **ORDER** and counsel have engaged in correspondence with the Court. Despite these efforts and the passage of almost a year, the case is still pending without a final ruling from this Court.

    As this Court knows, habeas corpus matters must be accorded constitutional priority over all other cases. Petitioner recognizes the magnitude of the issue pending before the Court, however, Petitioner respectfully submits that he is

118

entitled to a new trial based upon Fred Zain's extensive involvement in this case.  In fact, when Fred Zain was deposed in Texas by Prosecuting Attorney Bill Forbes, he spoke with some pride concerning his involvement in this case, as quoted in the original habeas corpus **PETITION**.

It is Petitioner's sincere hope that the need for this status conference will be mooted by this Court issuing a ruling prior to August 20, 1996.

**JOHN MOSS, III**, Petitioner
By Counsel

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
342-0133

2

119

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **NOTICE OF STATUS CONFERENCE**, was served upon counsel of record on the 14th day of June, 1996.

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300
> Counsel for Respondent George Trent

Lonnie C. Simmons

3

120

**IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA**

**JOHN MOSS, III,**

        Petitioner,

v.

                                   Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

        Respondent.

### PETITIONER'S MOTION FOR PRODUCTION OF ALL STATEMENTS, NOTES, REPORTS, MEMORANDA, AND DOCUMENTS IN THE POSSESSION OF THE STATE OR ANY LAW ENFORCEMENT AGENCY RELATING TO THIS CASE

        Petitioner John Moss, III, respectfully moves this Court, pursuant to this Court's broad authority to provide discovery in a habeas corpus action, to order Respondent George Trent to produce to Petitioner all statements, notes, reports, memoranda, and documents in the possession of the State or any law enforcement agency relating to this case, for the following reasons:

        1.    The last hearing in this case was held on September 19, 1995.

        2.    At that time, Petitioner moved this Court to reverse his convictions and either to enter a judgment of acquittal or order a new trial, based upon the principles established in *In the Matter of Investigation of the West Virginia State Police Crime Laboratory*, 190 W.Va. 321, 438 S.E.2d 501 (1993).

        3.    To date, this Court has not issued a final ruling on this critical issue.



4.     Since that hearing, the parties have not engaged in any further discovery because this Court's ruling on the application of the *Laboratory* decision should be dispositive.

5.     In light of the delay, Petitioner feels obligated to begin discovery in this case once again.

6.     Petitioner wants to emphasize that his request for additional documents from Respondent Trent should not have any effect on this Court's decision on the application of the *Laboratory* decision to this case.

7.     In other words, Petitioner is not trying to further delay this Court's decision, but rather is trying to complete the record while the parties wait for a final ruling in this case.

8.     In *Gibson v. Dale*, ___ W.Va. ___, 319 S.E.2d 806 (1984), the West Virginia Supreme Court recognized that trial courts have broad discretion in authorizing discovery in habeas corpus actions.

9.     In *Gibson*, the West Virginia Supreme Court emphasized the fact that a habeas corpus petitioner is always at a disadvantage, in connection with discovery, because his incarceration limits his ability to conduct discovery.

10.     Consequently, trial courts should ensure that all of the issues raised by a habeas corpus petitioner are discovery fully so that the resolution of the issues raised is based upon appropriate facts and every opportunity to develop the facts has been exhausted.

122

11.    The experience in the "Fred Zain" habeas corpus proceedings has been that further investigation into the documents in the possession of the State not only has revealed material relevant to the scientific issues, but also has resulted in the discovery of exculpatory material.

12.    For example, in the William Harris civil action, it was discovered that the victim, who had identified Mr. Harris at trial as her assailant, specifically had eliminated Mr. Harris as her assailant in the first photo lineup given to her.

13.    This initial elimination of Mr. Harris was never disclosed to Mr. Harris or his trial counsel.

14.    In *State ex rel. James Richardson, Jr. v. Trent*, Civil Action No. 93-W-53, the trial court ordered the State to provide documents in its possession to Mr. Richardson.

15.    After reviewing the documents, it was discovered that several exculpatory statements had been made by the victim's daughter that had never been turned over to Mr. Richardson or his trial counsel.

16.    In light of the history of these cases, Petitioner feels obligated to seek a similar order from this Court to make sure not only that all of the information relating to the scientific issues is revealed, but also to eliminate the possibility that exculpatory evidence has been withheld.

17.    This motion is particularly critical in this case, where the State's initial theory was that Paul Reggettz, III, was the person who committed these crimes.

3

123

18.   Petitioner believes it is critical to the development of the facts of this case to review all of the documentation relied upon by the State to support its view that Mr. Reggettz, not Petitioner, committed these horrible crimes.

19.   Clearly, any documentation supporting the State's theory that Mr. Reggettz murdered his own family is exculpatory to Petitioner and extremely relevant to the issues raised in this case.

For the foregoing reasons, Petitioner John Moss, III, respectfully moves this Court, pursuant to this Court's broad authority to provide discovery in a habeas corpus action, to order Respondent George Trent to produce to Petitioner all statements, notes, reports, memoranda, and documents in the possession of the State or any law enforcement agency relating to this case.

**JOHN MOSS, III**, Petitioner,

--By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

4

124

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**PETITIONER'S MOTION FOR PRODUCTION OF ALL STATEMENTS,**

**NOTES, REPORTS, MEMORANDA, AND DOCUMENTS IN THE POSSESSION**

**OF THE STATE OR ANY LAW ENFORCEMENT AGENCY RELATING TO**

**THIS CASE,** was hand-delivered to counsel of record on the 24th day of June, 1996,

at the following address:

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300
> Counsel for Respondent George Trent

Lonnie C. Simmons

5

125

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

Petitioner,

v.                                                          Civil Action No. 94-MISC-663

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

Respondent.


## AMENDED NOTICE OF STATUS CONFERENCE
## AND NOTICE OF HEARING

PLEASE TAKE NOTICE that a status conference and a hearing on

**PETITIONER'S MOTION FOR PRODUCTION OF ALL STATEMENTS,**

**NOTES, REPORTS, MEMORANDA, AND DOCUMENTS IN THE POSSESSION**

**OF THE STATE OR ANY LAW ENFORCEMENT AGENCY RELATING TO**

**THIS CASE** in the above-styled case will be held at 11:00 a.m. on July 26, 1996.  You

may be present to protect your interests.


                                        **JOHN MOSS, III,** Petitioner
                                        By Counsel


Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
342-0133

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**AMENDED NOTICE OF STATUS CONFERENCE AND NOTICE OF HEARING,**

was served upon counsel of record on the 24th day of June, 1996.

> Mary Beth Kershner
> Steve Revercomb
> Peter C. Brown
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300
> Counsel for Respondent George Trent

Lonnie C. Simmons

2

127

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

            Petitioner,

v.

                                      Civil Action No. 94-MISC-663

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

            Respondent.

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

## ORDER APPROVING PAYMENT OF DIRECT EXPENSES

On a former date, JOHN MOSS filed in this Court an affidavit reciting financial inability to employ expert witnesses and an investigator for representation in connection with certain proceedings before this Court, and the Court being of the opinion the eligibility requirements of West Virginia Code 29-21-1, et seq, were satisfied.

Counsel informs this Court that in order to provide representation it was necessary to retain Lesa R. Smith, dba Mid Atlantic Investigative Services, Inc., to provide the following services to the Petitioner: Investigative services.

The Court has considered these matters and being of the opinion the request is appropriate, approves this request. Accordingly is it **HEREBY ORDERED:**

That Public Defender Services issue a check payable to Lesa R. Smith dba Mid Atlantic Investigative Services, Inc. FEIN NUMBER: 55-0723283 in the amount of $1402.84 as payment for the services described in the Direct Expense Payment form and accompanying invoice.

**ENTER** this 23rd day of July, 1996.

                                Judge Andrew McQueen



IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

_John Moss, IV_ ,
                            Plaintiff,

v.                                    CIVIL ACTION NO. _94-misc 663_

                                      CRIMINAL ACTION NO. _____

_George Trent, Warden of the_
_West Virginia Penitentiary_  Defendant.


# - NOTATION OF DELIVERY -


A (certified) copy of the following:

_Order: Approving Payment of Trent Expenses_

(1ccd) was hand delivered to: _Mary Beth Kushner_

(2cfd) was mailed to:

_Loanie C. Simmons_     _604 Virginia St, E, Charleston, WV 25301_

_____     _____     _____

_____     _____     _____

on this _14_ day of _December_ , 1995.


                            _Lacey Edwards_
                            (signature) - Deputy Clerk

                                                    36

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

*John Moss III* ,

Plaintiff,

v.

CIVIL ACTION NO. *94-MISC-663*

CRIMINAL ACTION NO. _____

*George Trent* ,

Defendant.

## - NOTATION OF DELIVERY -

A (certified) copy of the following:

*O    12/8* _____

_____

( ✓ ) was hand delivered to:

( ✓ ) was mailed to:

*Lonnie Simmons*   *Mary Beth Kesner*

*W.Va. St. E*

*Chas, WV 25301*

on this *13* day of *Dec* , 1995.

*C. Edens*

(signature) - Deputy Clerk

33-34

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

*John Moss, III*,

Plaintiff,

v.

CIVIL ACTION NO. *94-Miss-663*

CRIMINAL ACTION NO. _____

*George Trent, etc*,

Defendant.

# - NOTATION OF DELIVERY -

A (certified) copy of the following:

*order dated 9/12/95*

( X ) was hand delivered to:

(   ) was mailed to:

(2 ccd) *Lonnie Simmons*
(1 ccd) *Ronnie Simmons for Mary B. Kershner*

on this *13th* day of *Sept*_____, 1995.

_____
(signature) - Deputy Clerk



DEPOSITION
EXHIBIT
4

## AFFIDAVIT

STATE OF MASSACHUSETTS

COUNTY OF SUFFOLK:

I, David Bing, having been duly sworn, do hereby depose and say as follows:

### I.

### BACKGROUND

1. I am the Scientific Director of Laboratories of CBR Laboratories, a totally owned subsidiary of the Center for Blood Research, a not-for-profit research institute that is a Harvard Medical School affiliate and that is located in Boston, Massachusetts. CBR Laboratories is a licensed clinical reference laboratory engaged in forensic testing, medical research, and diagnostic testing.

2. I have testified in several states, including West Virginia. I have been qualified based on my education, training, and experience as an expert in molecular biology, forensic DNA testing, and immunology.

3. In West Virginia, I was qualified as an expert in molecular biology, forensic science, and genetics in the case styled *Glen Dale Woodall v. Carl Legursky*, Civil Action No. 89-C-1332, in the Circuit Court of Cabell County, West Virginia, and in the case styled *Paul William Ferrell v. William C. Duncil*, Civil Action No. 93-C-24, in the Circuit Court of Grant County, West Virginia.

4.   In the *Woodall* and *Ferrell* cases, I performed DNA testing, reviewed the protein and enzyme typing performed by other scientists, and either provided a written report or testified concerning my criticisms of the protein and enzyme typing performed and the conclusions reached by those other scientists.

5.   The West Virginia Supreme Court approved the CBR Laboratories as one of the laboratories that circuit courts may use in connection with the various habeas corpus actions arising from the investigation into the work performed by former West Virginia serologist Fred Zain.

6.   I have been involved in a number of cases in West Virginia reviewing the testing performed by Fred Zain.

7.   In *Moss v. Duncil*, Civil Action No. 94-MISC-663, I have reviewed the following materials:

(a)   A copy of the autopsy report on Vanessa Dale Reggettz, Paul Eric Reggettz, and Bernadette Reggettz, dated December 13, 1979, by Dr. Irvin M. Sopher.

(b)   The Petition for Writ of Habeas Corpus filed in this case.

(c)   A copy of Fred Zain's testimony from the first and second trials.

(d)   A copy of the laboratory notes and related documents generated from the testing performed in this case.

2

8. I have reviewed all of the documentation provided by the State in connection with the testing performed.

9. There were no photographs of the electrophoretic gels and I was unable to evaluate the findings made with regard to the various types found.

10. Therefore, for purposes of my review, I have no objective basis for determining the accuracy of the typings found.

11. I am aware of the special investigation conducted into the testing performed by former serologist Fred Zain during the time he was in West Virginia and have reviewed a number of his cases.

12. Based upon my review of the laboratory notes and related documents provided in this case, there is minimal documentation of the testing performed and no protocol was provided, which is a standard procedure for forensic laboratories.

13. None of the original notes of the work performed were made available to me.

14. Based upon the lack of documentation in this case, it is difficult for me to interpret the data reported by Mr. Zain or Mr. Murphy.

15. These additional deficiencies render the scientific data in this case meaningless.

16. However, even assuming the accuracy of the typings in this case, the conclusions reached based upon those typings are flawed for several reasons.

3

17. In this affidavit, I will attempt to set out some general principles which are applicable to this case.

18. First, where blood samples are discovered at an alleged crime scene, it is important to identify the types of the known possible donors of that blood.

19. Once the types of the known possible donors of that blood have been determined, those types can be compared with the types obtained from any blood samples found at the alleged crime scene where the source is unknown.

20. The purpose of this comparison is to eliminate any blood types which may have been contributed by a known possible donor.

21. For example, under the facts of this case, the known possible donors of blood in the Reggettz house would be, at a minimum, the persons who lived in that house, including Vanessa Dale Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III.

22. Second, only those types identified from blood found at the alleged crime scene that are different from the types of the known possible donors provide information relevant to a determination as to the source of the blood evidence found at the crime scene.

23. Where a type from a blood sample found at the alleged crime scene is different from the types obtained from the known possible donors and is consistent with the known types of any suspect leads to the inference that the suspect may have deposited that particular blood sample.

4

24.   Third, where a type from a known possible donor of the blood matched a type found from the blood discovered, it is not appropriate to include that type in calculating the frequency that the blood was deposited by a suspect.

25.   For example, on page 6 of Mr. Murphy's report, he generally notes that the known types of Mr. Moss were consistent with the blood obtained from some of the evidence and concludes: "The combination of blood groups O, PGM 1+1-, AK 1, EAP BA, EsD 2-1, ADA 1, GLO I 2, Hp2-1, and Gc 1 occurs in approximately 0.03% of the population."

26.   This conclusion implies that all of the blood typings obtained from the crime scene for these particular items were the same as all of the blood typings obtained from Mr. Moss.

27.   This conclusion is incorrect because there was no PGM subtyping 1- or Haptoglobin typing 2-1 obtained from each evidentiary sample tested.

28.   For example, as to the blood obtained from the flashlight, there is no PGM subtyping of 1- obtained nor is there a Haptoblogin typing obtained.

29.   Fourth, under generally accepted principles, it is only proper to combine the frequencies on types obtained from a blood sample where results, in the absence of any other data, are consistent with the blood sample coming from a single source.

5

30. One of the inherent deficiencies with basic serological testing is that such testing cannot distinguish whether the blood sample tested contains a mixture of blood from different sources or not.

31. Thus, where types from a blood sample are different from the types obtained from the blood of the known possible donors, the frequencies of those different types can be considered individually, but may not be combined for statistical purposes.

32. Fifth, each of the types found from each individual sample must be treated separately, rather than in conjunction with each other, because it is not possible scientifically to link together the types found from different blood samples.

33. I have neither seen nor reviewed testimony or independent evidence identifying the source of the blood found in the Reggettz house, but there are no data identifying the source of the blood other than the blood typing results.

34. In this case, various blood stains were found in the Reggettz house in various locations, but there are no data that might identify the source of the blood.

35. In lieu of being able to identify the source of the blood, there is no scientific basis to presume that all of the blood stains are related and came from the same person.

36. There is no evidence as to when the blood stains were deposited and what caused the blood to be deposited.

37. Serological typing is unable to determine when a particular blood sample was deposited at a crime scene.

6

38. Some of the blood stains found could very well have been deposited by many different people over a long period of time.

39. From the testing performed, the only blood types of significance from any of the samples are PGM, GC, and ESD because Mr. Moss's types at these genetic loci are different from the types of the known possible donors of blood in the Reggettz house.

40. The remaining types obtained are of no real significance due to similarities between those remaining types obtained from known possible donors and from the blood samples found in the Reggettz house.

41. With regard to the PGM, GC, and ESD types obtained from various blood samples, those particular types may be compared individually with the same types of a suspect, but the frequencies of those types may not be multiplied together for statistical purposes.

42. For example, it would be proper to compare the GC 1 type obtained from the blood found on the kitchen door curtain, which is labelled as item 7 in Mr. Murphy's report, to the GC 1 type obtained from John Moss's known blood sample.

43. However, it would not be proper to multiply all of frequencies of the types obtained from the blood found on the kitchen door curtain together for statistical purposes, again based upon the fact that using this testing technique, it is not possible to determine whether the remaining types, which are identical to the types from known possible donors, were deposited by one or more of them rather than from some other unknown single source.

7

44. Blood was found throughout the Reggettz house and there is no basis for assuming that all of the blood found came from a single source.

45. Only the known blood samples clearly are not mixtures of blood from more than one source.

46. Thus, based upon the principles set out above, the statistical conclusions presented to the jury in this case are overstated.

47. Without repeating each assertion and without adopting all of the particular language used, I generally concur with the criticisms of the scientific data in this case asserted in pages 28 through 36 of the habeas corpus petition, based upon the rationale set out therein and on the general principles stated in this affidavit.

Further this affiant saith naught.

David Bing

Taken, subscribed, and sworn to before me this 26 th day of May, 1995.

My commission expires _____ MY COMMISSION EXPIRES JUNE 6, 1997 _____

Notary Public

(SEAL)

8

DEPOSITION
EXHIBIT
5

*TABLE I**

### KNOWN BLOOD SAMPLES

| PERSON | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|--------|-----|-----|-----|-----|-----|-----|-------|-----|-----|
| Vanessa Reggettz | O | 2+1- | 1 | B | 1 | 1 | 2 | 1 | 2-1 |
| Bernadette Reggettz | O | 2+2+ | 1 | B | 1 | 1 | 2 | 2-1 | 2-1 |
| Paul Eric Reggettz | O | 2+1- | 1 | B | 1 | 1 | 2 | 2-1 | 2-1 |
| Paul Reggettz III | O | 2+2- | 1 | BA | 1 | 1 | 2 | 2 | 2-1 |
| John Moss, III | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |

*The shared blood attributes between Petitioner's known blood types and the blood types of the Reggettz family are highlighted in Table I to emphasize the similarities and differences in the known blood types.

*TABLE I\**

## KNOWN BLOOD SAMPLES (CONTINUED)

| PERSON | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|--------|-----|-----|-----|-----|-----|-----|-------|-----|-----|
| Jack C. Neal, Jr. | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Roger L. Province | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| William J. Monk | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Ross E. Gillespie | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Marvin D. Smith | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Richard A. Rollins | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Joseph Morehouse | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Nathaniel Brown | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |
| Thomas F. White | ? | ? | ? | ? | Not 2-1 | ? | ? | ? | ? |

\*Petitioner has been unable to find any explanation as to why the blood of Jack C. Neal, Jr., Roger L. Province, William J. Monk, Ross E. Gillespie, Marvin D. Smith, Richard A. Rollins, Joseph Morehouse, Nathaniel Brown, and Thomas F. White was tested.

*TABLE II**

## UNKNOWN BLOOD SAMPLES

| ITEM | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|------|-----|-----|-----|-----|-----|-----|-------|-----|-----|
| 1. Knife pieces | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 2. Room next to bath | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 3. Front bedroom carpet | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 4. Bedspread front bedroom | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 5. Pillow case front bedroom | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 6. Electrical cord | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 7. Kitchen door curtain | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |
| 8. Sheet kitchen floor | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 9. Back door handle | O | 2-1 | ? | ? | ? | ? | ? | ? | ? |
| 10. Kitchen sink | ? | ? | ? | ? | ? | ? | ? | ? | ? |
| 11. Utensil drawer | OB | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 12. Pillow case bedroom beside bath | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 13. Door between bedroom and living room | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 14. Door between bedroom and front door | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 15. Change purse | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| 16. Medium t-shirt | O | 2-1 | ? | ? | 1 | ? | ? | ? | ? |
| 17. Jockey shorts | ? | ? | ? | ? | ? | ? | ? | ? | ? |
| 18. Vanessa Reggettz's nightgown | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |
| 19. Doll | O | 2-1 | 1 | B | 1 | 1 | 2 | ? | ? |

*The blood types obtained from the unknown blood samples that are identical to the known blood types obtained from Vanessa Reggettz, Paul Eric Reggettz, Bernadette Reggettz, or Paul Reggettz, III, are highlighted in Table II.

*TABLE II*

## UNKNOWN BLOOD SAMPLES (CONTINUED)

| ITEM | ABO | PGM | AK | EAP | EsD | ADA | GLO I | Hp | Gc |
|------|-----|-----|-----|-----|-----|-----|-------|-----|-----|
| Table knife | ? | ? | ? | ? | 1 | ? | ? | ? | ? |
| Christmas wrapping paper | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |
| Flashlight | O | 1 | 1 | BA | 2-1 | 1 | 2 | ? | ? |
| Clothing of Bernadette Reggettz | O | 1+1- | 1 | BA | 2-1 | 1 | 2 | 2-1 | 1 |

# CURRICULUM VITAE

DEPOSITION
EXHIBIT
3

NAME:          David Howard Bing

ADDRESS:       CBR Laboratories
               800 Huntington Avenue, Boston, MA 02115
               Phone #: (617) 278-3450

HOME ADDRESS:  27 Waverly Street, Brookline, MA 02146

DATE OF BIRTH: August 3, 1938

PLACE OF BIRTH: E. Cleveland, Ohio

## EDUCATION:
1960  B.A.    Wesleyan University, Middletown, CT
              (Distinction in Biology)
1966  Ph.D.   Western Reserve University, Cleveland, OH
              (Microbiology and Biochemistry)

## POSTDOCTORAL TRAINING:
1966-1968     University of California, Berkeley, CA
              (Bacteriology and Immunology)

## RESEARCH FELLOWSHIPS:
1960-1966     NIH Predoctoral Fellow
1966-1968     American Cancer Society Postdoctoral Fellow
1970-1971     Cercheur Etranger of INSERM, Hopital Necker, Clinique Nephrologique,
              Paris, France
1972-1973     Research Career Development Awardee, NIH
1976-1981     Established Investigator, American Heart Association
1982-1983     NIH Senior Fellowship, Dept. Cell Biology, Children's Hospital,
              Harvard Medical School, Boston, MA

## LICENSURE AND CERTIFICATION:
1987          Certified Technical Director of Clinical Reference
              Laboratory in Commonwealth of Massachusetts
1988          Certified Technical Director for Paternity Testing by American
              Association of Blood Banks
1989          Certified Technical Director of Clinical Reference Laboratory in New
              York, Maryland, and Connecticut
1995          Certified Laboratory Director of Diagnostic Immunology, Immuno-
              hematology, and Paternity/Identity Testing in the State of New York

## ACADEMIC APPOINTMENTS:
1968-1971     Assistant Professor, Dept. of Microbiology and Public Health,
              Michigan State University, E. Lansing, MI
1971-1973     Associate Professor (Tenure), Depts. of Microbiology and Public
              Health and Human Development, Michigan State University,
              E. Lansing, MI
1973-1978     Principle Research Associate, Dept. Biological
              Chemistry, Harvard Medical School
1978-1983     Instructor, Dept. Biological Chemistry, Harvard Medical School
1992-Present  Principal Associate in Pediatrics, Department of Medicine, Harvard
              Medical School, Boston, MA

BING, David H.

## NON-ACADEMIC APPOINTMENT:

1983-1986    Associate Director of Biological Sciences, Cambridge Research
             Laboratories, Ortho Diagnostics Systems Inc., Cambridge, MA
1992-Present  Adjunct Faculty, College of Pharmacology and Allied Health Sciences,
             Northeastern University, Boston, MA

## HOSPITAL APPOINTMENTS:

1973-        Senior Investigator, The Center for Blood Research, Boston, MA
1973-        Research Associate in Immunology, Children's Hospital, Boston, MA
1980-1983    Associate in Medicine, New England Deaconess Hospital, Boston, MA
1983-        Sr. Research Associate in Medicine, Beth Israel Hospital, Boston, MA
1986-1994    Vice President and Scientific Director, CBR Laboratories, Inc.
             (A subsidary of The Center for Blood Research)
1988-        Director of Laboratories, The Center for Blood Research, Boston, MA
1994-        Director of Clinical Research Testing, CBR Laboratories, Inc.,
             Boston, MA

## MAJOR COMMITTEE ASSIGNMENTS:

1969-1973    Chairman of Graduate Committee (Admissions and Thesis
             Defense Committee) Dept. Microbiology and Public Health, Michigan
             State University
1975-1983    Ad Hoc Reviewer for National Cancer Institute Program Project
             Grants, NIH
1975-1983    Ad Hoc Reviewer for National Heart, Lung, and Blood Institute, NIH
1979         NHLBI Committee which Prepared 10-year Summary of Research in the
             Area of Blood Resources
1980-        Ad Hoc Reviewer Allergy and Infectious Disease Study Section, NIH
1980-        Ad Hoc Reviewer, National Science Foundation
1980-1983    Plasma Derivatives Review Group, American Red Cross, Washington, DC
1986-        Reviewer Special Study Section for Small Business Innovative
             Research, NIH

## EDITORIAL BOARDS:

1979-        Associate Editor Molecular Immunology
1980-1984    Associate Editor, Journal of Immunology
1980-        Ad Hoc Reviewer, Biochemistry
1984-        Ad Hoc Reviewer, Journal of Immunology

## MEMBERSHIPS IN PROFESSIONAL SOCIETIES:

1966             Sigma Xi
1969-            American Association of Immunology
1969-1987,1992-  American Chemical Society
1969-            American Association for Advancement of Science
1983-            American Association of Clinical Chemistry
1989-            International Society for Forensic Haemogenetics
1990             American Academy of Forensic Sciences
1990-            Association of Northeast Forensic Scientist

## MAJOR RESEARCH INTERESTS:

1. Therapeutic Plasma Protein Derivatives
2. Immunodiagnostics for the Blood Bank
3. DNA Probe Diagnostics for the Blood Bank and Genetic Testing
4. DNA Forensic Testing

BING, David H.

## TEACHING EXPERIENCE:

| | |
|---|---|
| 1960-1966 | Teaching Assistant, Dept. Microbiology, Western Reserve University, Cleveland, OH |
| 1968-1973 | Graduate Course in Immunochemistry, Dept. Microbiology Public Health, Michigan State University |
| 1968-1973 | Seminar Chairman, Dept. of Microbiology and Public Health, Michigan State University |
| 1968-1970 | Seminars in Immunology, Dept. Biochemistry, Michigan State University |
| 1972 | Video Course in Basic Immunology for medical students, veterinary students, medical technologists, nurses, undergraduates, Dept. Microbiology and Public Health, Michigan State University |
| 1973-1976 | Advanced Biochemistry, Dept. Biological Chemistry, Harvard Medical School |
| 1973-1980 | Seminar Chairman at The Center for Blood Research |
| 1992 | Foundations of Forensic Sciences, Northeastern University, Boston, MA |

## CONTINUING EDUCATION:

| | |
|---|---|
| 1985 | Gordon Conference of Cancer |
| 1985 | Federation of American Society for Experimental Biology and Medicine - American Association of Immunologists |
| 1986 | Federation of American Society for Experimental Biology and Medicine - American Association of Immunologists |
| 1987 | American Association of Blood Banks. |
| 1988 | American Association of Clinical Chemistry |
| 1989 | American Association of Clinical Chemistry |
| 1989 | 13th Congress for the Society of Forensic Haemogenetics |
| 1989 | American Association of Blood Banks |
| 1989 | UCLA Symposia on Molecular and Cell Biology - Defense Molecules |
| 1989 | Promega International Symposium on Human Identification |
| 1990 | American Academy of Forensic Sciences |
| 1990 | American Association of Clinical Chemistry |
| 1991 | Second Promega International Symposium on Human Identification |
| 1991 | American Academy of Forensic Sciences |
| 1992 | American Academy of Forensic Sciences |
| 1992 | Third Promega International Symposium of Human Identification |
| 1993 | American Academy of Forensic Sciences |
| 1993 | Jackson Laboratory Short Course on Advance Human and Mammalian Genetics |
| 1993 | Fourth Promega International Symposium of Human Identification |

## PATENTS:
1. Richard Laura and David Bing: Amidinophenylmethanesulfonylfluoride. 4.303.592. December 1, 1981.
2. David H. Bing: Means and Method for Purifying Clq, Clr and Cls. 4,374,061. February 15, 1984.
3. Patrea L. Pabst and David Bing: Electrodialysis preparation of purified AHF concentrate. 4,435.318. March 6, 1984.

## ORIGINAL REPORTS:
1. Bing DH, Stavitsky AB. Hemagglutination with aldehyde fixed erythrocytes for assay of antigens and antibodies. Proc Soc Exp Biol Med 124:1166-70, 1967.
2. Wofsy L, Kimura J, Bing DH, Parker D. Affinity labeling of rabbit antisaccharide antibodies. Biochemistry 6:1981-6, 1967.
3. Bing DH, Stavitsky AB. Isolation and characterization of two quantigenically active peptides from bovine beta-lactoglobulin A. Immunology 15:305-17, 1968.

BING, David H.

4.  Bing DH. The nature of the active site of a subunit of the first component of human complement. Biochemistry 8:4503-9, 1969.

5.  Bing DH. Inhibition of guinea pig complement by aromatic amidine and guanidine compounds. J Immunol 105:1289-91, 1970.

6.  Knudson KC, Bing DH, Kater LA. Quantitative measurement of guinea pig complement with liposomes. J Immunol 106:258-65, 1971.

7.  Bing DH. Purification of human C1s by affinity chromatography. Immunochemistry 8:539-50, 1971.

8.  Bing DH. Purification of the first component of human complement by affinity chromatography on human immunoglobulin linked to Sepharose. J Immunol 107:1243-7, 1971.

9.  Rosenhaft ME, Bing DH, Knudson KC. A vacuum assisted apparatus for blood sampling in guinea pigs. Lab Animal Care 21:598-9, 1971.

10. Somack RL, Bing DH, Costilow RN. Preparation and characterization of 2,4-diaminovaleric acid, an intermediate in the anaerobic oxidation of ornithine. Anal Biochem 41:132-7, 1971.

11. Knudson KC, Bing DH. A simplified method for centrifugation of liposomes. Immunochemistry 9:587-89, 1972.

12. Bing DH, Mernitz JL, Spurlock SE. Inactivation of the first component of human complement by m-[o-(2-chloro-5-fluorosulfonyl-phenylureido)phenoxybutoxy]-benzamidine. Biochemistry 11:4263-8, 1972.

13. Sledge CR, Bing DH. Binding properties of the human complement protein C1q. J Biol Chem 248:2818-23, 1973.

14. Sledge CR, Bing DH. Purification of human complement protein C1q by affinity chromatography. J Immunol 111:661-6, 1973.

15. Bing DH, Cory M, Doll M. Inactivation of human C1 by benzamidine and pyrioinium sulfonyl fluorides. J Immunol 113:584-90, 1974.

16. Assimen SN, Bing DH, Painter RH. A simple method for isolation of the subcomponent of the first component of complement by affinity chromatography. J Immunol 113:225-34, 1974.

17. Spurlock SE, Hunt SM, Bing DH. Cryopreservation of sheep erythrocyte intermediates EA and EAC4 and utilization of the thawed cells in complement assays. J Immunol Methods 6:53-59, 1974.

18. Smith CW, Hollers JC, Bing DH, Patrick RA. Effects of human C1 inhibitor on complement mediated human leukocyte chemotaxis. J Immunol 114:216-20, 1975.

19. Bing DH, Spurlock SE, Bern MM. Synthesis of the first component of complement by primary cultures of human tumors and comparable normal tissue. Clin Immunol Immunopathol 4:341-51, 1975.

20. Bing DH, Andrews JM, Suddath FL, Spencer R. Affinity chromatography of the subunits of human C1. In: Protides of Biological Fluids, Peeters H. ed, New York: Pergamon Press 23:551-7, 1975.

21. Andrews JM, Rosen FS, Silverberg SJ, Cory M, Schneeberger E, Bing DH. Inhibition of C1s-induced vascular leakage in guinea pigs by substituted benzamidine and pyridinium compounds. J Immunol 118:466-71, 1977.

22. Taylor PA, Fink S, Bing DH, Painter RH. Further studies on the identification of the subcomponents of the first component of complement after affinity chromatography of human serum on IgG-Sepharose. J Immunol 118:1722-7, 1977.

23. Bing DH, Cory M, Fenton JW II. Exo-site affinity labeling of human thrombins. Similar labeling on the A chain and B chain fragments of clotting and nonclotting thrombins. J Biol Chem 252:8027-34, 1977.

24. Donaldson VH, Rosen FS, Bing DH. Role of the second component of complement (C2) and plasmin in kinin release in hereditary angioneurotic edema (H.A.N.E.) plasma. Transactions of the Association of American Physicians XC:174-83, 1977.

25. Morris KM, Colten HR, Bing DH. The first component of complement C1: A quantitative comparison of its biosynthesis in culture by human epithelial and mesenchymal cells. J Exp Med 148:1007-19, 1978.

BING, David H.

26.  Feldman RJ, Bing DH, Furie BC, Furie B.  Interactive computer surface graphics approach to study of the active site of bovine trypsin.  Proc Natl Acad Sci 75:409-12, 1978.

27.  Andrews JM, Roman DP Jr, Bing DH, Cory M.  Inhibition of four human serine proteases by substituted benzamidines.  J Med Chem 21:1202-7, 1978.

28.  Bing DH, Laura R, Andrews JM, Cory M.  Exo-site affinity labeling of Cls, a subcomponent of the first component of complement by m-[o-(2-chloro-5-fluorosulfonylphenylureido)phenoxybutoxy]benz-amidine.  Biochemistry 17:5713-8, 1978.

29.  Robison DJ, Furie B, Furie BC, Bing DH.  Active site of bovine factor Xa; characterization using substituted benzamidines as competitive inhibitors and affinity labeling reagents.  J Biol Chem 255:2014-21, 1980.

30.  Bing DH, Andrews JM, Morris KM, Cole E, Irish V.  Purification of subcomponents Clq, Clr and Cls of the first component of complement from Cohn Fraction I by affinity chromatography.  Prep Biochem 10:269-98, 1980.

31.  Laura R, Robison DJ, Bing DH.  p-Amicinophenylmethanesulfonyl-fluoride, an irreversible inhibitor of serine proteases.  Biochemistry 19:4859-64, 1980.

32.  Herzlinger GA, Bing DH, Stein R, Cumming D.  Quantitative measurement of C3 activation at polymer surfaces.  Blood 57:764-70, 1981.

33.  Wehler C, Andrews JM, Bing DH.  The use of solid phase Clq and horseradish peroxidase conjugated goat anti-IgG for the detection of immune complexes in human serum.  Mol Immunol 18:157-62, 1981.

34.  Almeda A, Bing DH, Laura R, Friedman PA.  Photoaffinity inhibition of rat liver NAD(P)H dehydrogenase by 3-(acetonyl-p-azidobenzyl)-4-hydroxycoumarin.  Biochemistry 20:3731-37, 1981.

35.  Bing DH, Laura R.  A computer-generated 3-dimensional model of the B chain of bovine thrombin.  Ann NY Acad Sci 370:496-510, 1981.

36.  Warrell DA, Perine PL, Krause DW, Bing DH, MacCougal SJ.  Pathophysiology and immunology of the Jarisch-Herxheimer-like reaction in louse-borne relapsing fever: Comparison of tetracycline and slow-release penicillin.  J Inf Dis 147:898-909, 1981.

37.  Furie B, Bing DH, Feldmann RJ, Robison DJ, Burnier JP, Furie BC.  Computer generated models of blood coagulation factor Xa, Factor IXa and thrombin based upon structural homology with other serine proteases.  J Biol Chem 257:3875-82, 1982.

38.  Isliker H, Bing DH, Hynes RO.  Fibronectin interacts with Clq, a subcomponent of the first component of complement.  Immunol Letters 4:39-43, 1982.

39.  Bing DH, Almeda S, Isliker H, Lahav J, Hynes RO.  Fibronectin binds to the Clq component of complement.  Proc Natl Acad Sci 79:4198-4201, 1982.

40.  Almeda S, Rosenberg RD, Bing DH.  The binding properties of human complement component C19; interaction with mucopolysaccharides.  J Biol Chem 158:785-791, 1983.

41.  Bing DH.  The interaction of immune serum globulin and intravenous immune globulin with complement.  Mol Immunol 20:893-900, 1983.

42.  Bing DH.  Complement activating and binding properties of ISG and IGIV.  BOB Workshop on Methods for Evaluating Plasma Derivatives; 1983.

43.  Donaldson VH, Harrison RA, Rosen FS, Bing DH, Kindness G, Canar J, Wagner C, Awad S.  Variability in purified dysfunctional Cl-inhibitor proteins from patients with hereditary angioneurotic edema.  J Clin Invest 75:124-32, 1985.

44.  Bing DH.  Complement interaction with immune serum globulin and immune globulin intravenous.  Amer J Med 76(3A):19-25, 1985.

45.  Feldmann RJ, Bing DH, Potter M, Mainhart C, Furie B, Furie BC, Caporale LH.  On the construction of computer models of proteins by the extension of crystallographic structures.  Ann NY Acad Sci 439:12-43, 1985.

BING, David H.

46.   Bing DH, Feldmann, RJ, Fenton, JW II.  Structure-function relationships of thrombin based on the computer generated three dimensional model of the B chain of bovine thrombin.  NY Acad Sci, 485:104-120, 1986.

47.   Donaldson VH, Wagner CJ, Tsuei B, Kindness G, Bing DH, Harrison RA, and Rosen FS.  Interactions of plasma kallikrein and C1s with normal and dysfunctional C1 inhibitor proteins from patients with hereditary angioneurotic edema.  Analytical gel studies.  Blood 69:1096-1101, 1987.

48.   Goldberger G, Bing DH, Sipe, JD, Rits M, and Colten HR.  Transcriptional regulation of genes encoding the acute phase proteins CRP, SAA and C3.  J. Immunol. 138:3967-3971, 1987.

49.   Jennette JC, Tidwell RR, Geratz JD, Bing DH, and Falk RJ.  Amelioration of immune complex mediated glomerulonephritis by synthetic protease inhibitors.  Amer J Pathol  127:499-505, 1987.

50.   Lopez-Trascasa M, Bing DH, Riomel M, and Nicholson-Weller A.  Factor J isolation and characterization of a new polypeptide inhibitor of complement C1.  J Biol Chem.  264:16214-16221, 1989.

51.   Pantazis P, Kalyanaraman VS, and Bing DH.  Synthesis of the third component of complement (C3) by lectin-activated and HTLV-infected human T-cells.  Mol Immunol.  27:283-289, 1990.

52.   Laclette JP, Shoemaker CH, Richter D, Arcos L, Pante N, Cohen C, Bing D, and Nicholson-Weller A.  Paramyosin inhibits complement C1.  J Immunol.  148:124-128, 1992.

53.   Yunis J, Delgado M, Lewandrowski E, Yunis EJ, and Bing DH.  Rapid identification of HLA-DRw53 positive samples by a generic DRB-PCR amplification without further analysis.  Tissue Antigens.  40:41-44, 1992.

54.   Salazar M, Yunis J, Delgado M, Bing DH, and Yunis EJ.  HLA-DQB1 allele typing by a new PCR-RFLP: Correlation with PCR-SSO method.  Tissue Antigens.  40:116-123, 1992.

55.   Yunis JJ, Salazar M, Delgado MB, Alper CA, Bing DH, and Yunis EJ.  HLA-DQA1, DQB1, and DPB1 alleles on HLA-DQw2, and DQw9 carrying extended haplotypes.  Tissue Antigen.  41:37-41, 1993.

56.   Deulofeut H, Iglesias A, Mikael N, Bing DH, Awdeh Z, Yunis J, Bagley DM, Kruskall MS, Alper CA, and Yunis EJ.  Cellular recognition and HLA restriction of a midsequence HBsAG peptide in Hepatitis B vaccinated individuals.  Mol Immunol. 30:941-948, 1993.

57.   Salazar M, Deulofeut H, Yunis JJ, Bing DH, and Yunis EJ.  A fast PCR-SSP method for HLA-DQ generic typing.  Tissue Antigens  41:102-106, 1993.

58.   Mandle R, Baron C, Sundel R, Gelfand J, Davis AE, III, Rosen FS, and Bing DH.  Acquired C1 inhibitor deficiency due to an autoantibody to the reactive center region of C1 inhibitor.  J Immunol. 152:4680-4695, 1994.

59.   Salazar M, Williamson, JM, and Bing, DH.  Genetic typing of DQA1*4 alleles by restriction enyzme digestion of the PCR product obtained with two DQ alpha Amplitype[TM] kit.  J. Forensic Sci.  39:518,525, 1994.

60.   Yunis, JJ, Delgado, MB, Williamson, JM, Yunis, EJ, and Bing, DH.  Generic HLA DRB1 allele typing by PCR-SSO in forensic cases.  An approach to resolve identity in samples with uniformative HLA-DQα typings.  J. Forensic Sci.  Submitted for Review.

61.   Alper CA, Marcus-Bagley, D, Awdeh, Z, Kruskall MS, Eisenbarth, GS, Brink, SJ, Katz, AJ, Bing, DH, Yunis EJ, and Schur, PH.  Many-individuals who carry the [HLA-B8, SC01, DR3] conserved extended haplotype have immunoglobulin deficiencies.  J. Exp. Med.  Submitted for Review.

62.   Yunis JJ, Ossa H, Salazar M, Deulofeut R, Delattoz A, Delgado MB, Bing DH, Yunis EJ, and Yunis JJ.  Major histocompatibility complex class II alleles and haplotypes and blood groups of four Amerindian tribes of Northern Columbia.  Human Immunol.  Submitted, 1994.

63.   Wengler G, Gorlin JB, Williamson JM, Rosen FS, and Bing DH.  Non-random inactivation of the X-chromosome in early lineage hematopoietic cells in carriers of Wiskott-Aldrich syndrome.  Blood, in press, 1994.

BING, David H.

REVIEWS, CHAPTERS IN BOOKS:

1. Bing DH. Purification of the first component of human complement and its subunit C1 esterase. In: Jakoby WB, Wilchek M, eds. Methods in Enzymology. Affinity Methods Enzyme Purification Part B. NY: Academic Press, 731-46, 1974.

2. Bing DH. Purification of the human complement protein C1s by affinity chromatography. In: Resolution, Properties, and Genetic Aspects of Complement, NY: MSS Information Corp. I:45-57, 1974.

3. Cory M, Andrews JM, Bing DH. Design of exo-affinity labeling reagents. In: Jakoby WB, Wilchek M, eds. Methods in Enzymology XLVI. Affinity Labeling. NY: Academic Press, 115-30, 1977.

4. Bing DH, Andrews JM, Cory M. Affinity labeling of thrombin and other serine proteases with an extended reagent. In: Lundblad RL, Fenton JW II, Mann KG, eds. Chemistry and Biology of Thrombin. Michigan: Ann Arbor Science Publishers, 159-77, 1977.

5. Fenton JW II, Landis BW, Walz DA, Bing DH, Feinman RD, Zabinski MP, Sonder SA, Berliner LJ, Finlayson JS. Human thrombin: Preparative evaluation, structural properties and enzyme specification. In: Bing DH, ed. The Chemistry and Physiology of the Human Plasma Proteins. NY: Pergamon Press, 151-85, 1979.

6. Cory M, Andrews JM, Bing DH. Affinity labeling of serine proteases with an active site-directed irreversible inhibitor. In: Kalman TI, ed. Drug Action and Design: Mechanism Based Enzyme Inhibition. NY: Elsevier, 259-69, 1980.

7. Isliker H, Bing DH, Hynes RO. Interaction of fibronectin with C1q, a subcomponent of the first component of complement. In: Steinberg CM, Lefkovitz I, eds. The Immune System. Basel: S. Karger. 2:231-238, 1981.

8. Donaldson V, Rosen FS, Bing DH. Kinin generation in hereditary angioneurotic edema (H.A.N.E.). Plasma Bayer Conference on Kinins, 1982.

9. Bing DH. Biochemical specificity of complement protein C1q. In: Schumaker V, Calada F, Sercarz E, eds. Protein Conformation Changes as a Signal. NY: Plenum Publishing, 119-130, 1983.

10. Bing DH. Chemical precipitation and removal of IgG and immune complexes. In: Pineda AA, ed. Selective Removal of Plasma Components. NY: Futura Publishing Co, 139-168, 1984.

11. Bing DH, DiDonno AC, Regan M, Strang C. Blood plasma processing by electrodialysis. In: Membrane Separations in Biotechnology. R. McGregor, ed. Marcel Dekker; 135-160, 1985.

12. Bar-Shavit R, Bing DH, Kahn AJ, Wilner GD. Thrombin mediated mononuclear cell chemotaxis: Relationship of ligand structure to biological activity. In: Membrane receptor and cellular regulation. 329-338, 1985.

13. Fenton JW II, Bing DH. Thrombin Active Site Regions. In: Seminars, Thrombosis and Hemostasis, 12:200-208, 1986.

14. Bing DH, Di Donno AC, Regan M, Strang C. Blood plasma processing by electrodialysis. In: Membrane Separations in Biotechnology. McGregor R, ed. Marcel Dekker, 131:1573-1582, 1986.

15. Nicholson-Weller A, Rivard M, Lopez-Trascasa M, and Bing DH. Regulation of the classical complement pathway by heparin. In: Marchalonis JJ, and Reinisch CL, Eds. Defense Molecules. Alan R. Liss, Inc. UCLA Symposium on Molecular and Cellular Biology, 121:201-212, 1990.

16. Bing, DH. Plasma Proteins. In: Hematology Basic Principles and Practice. Hoffman R, Benz, EJ, Jr., Shattil, SJ, Furie, B, and Cohen, HJ, Eds. Churchill Livingstone, 1573-1582, 1991.

17. Bing DH, Yunis EJ, and Yunis E. The use of genetic markers in the analysis of anthropological origins of South Amerindians. Proc Pan American Conference on HLA, 1992.

18. Bing DH, Williamson J, Lewandrowski EL, Yunis JJ, Delgado MB, Yunis EJ, Ramos O, and Yunis TE. Analysis of blood groups and VNTR markers in two Colombian Indian tribes. Proceedings Third International Symposium on Human Identification, pp. 231-243, 1992.

BING, David H.

19.  Bing DH, and Alper CA.  Complement in Health and Disease.  In: Colvin, RB, Bhan AK, and McCluskey R. Eds.  Diagnostic Immunopathology, Raven Press.  In press, 1994.

20.  Bing DH.  Development of DNA typing methods for forensic analysis.  Gerber, SM, and Saferstein, R., Eds.  Chemistry in Crime II.  American Chemical Society.  In press, 1994.

20.  Bing DH, and Alper CA.  Biochemistry of Plasma Proteins.  In: Anderson, K., and Ness, P.M., Eds.  Scientific basis of transfusion medicine: Implications for clinical practice.  Saunders Press, 1994.

22.  Mandle R, and Bing, DH.  Immunoglobulins structure, function and uses. *In:* Hoffman R, Benz JR EJ, Shattil SJ, Furie B, Cohen JH, Silberstein LE, Eds.  Hematology:  Basic Principles and Practice.  2nd edition.  New York: Churchill, Livingstone 1994:109-118.

BOOKS:

1.  Bing DH, ed.  The Chemistry and Physiology of the Human Plasma Proteins.  Proceedings of a conference held by The Center for Blood Research, November 21-33, 1978 in Boston, MA.  NY: Pergamon Press, 1979.

2.  Feldman RJ, Bing DH.  TAMS - Teaching Aids for Macromolecular Structure, 1980.

3.  Bing DH, Rosenbaum RA, eds.  Plasma and Cellular Modulatory Proteins.  Proceedings of a conference held by The Center for Blood Research, November 22,84, 1980 in Boston, MA.  Boston: The Center for Blood Research, 1981.

ABSTRACTS OF WORK NOT PUBLISHED AS FULL ARTICLES:

1.  Bing DH, Gusdon Jr, Stavitsky AB.  The antigenic determinants of bovine B-lactoglobulin A.  Fed Proc  25:2382, 1967.

2.  Bing DH, Burr B, Wofsy L.  Azo-hemocyanin conjugates as immunoadsorbents.  Fed Proc  28:381, 1969.

3.  Kater LA, Bing DH.  Purification and characterization of a subunit of the first component of human complement (C1s) isolated from ileal mucosa.  Gastroenterology, 1971.

4.  Rosenhaft ME, Bing DH.  Serum complement levels in guinea pigs during induction of immunity.  Fed Proc  30:924, 1971.

5.  Smith CW, Hollers J, Bing DH, Mernitz JL.  Enhancement of neutrophil chemotaxis by C1 inhibitor.  Presented at Reticulo-Endothelial Society Meeting, Dec. 1972.

6.  Tavella BA, Miller HC, Bing DH, Ghannam RD, Dougherty GD.  Quantitative lymphocyte response to Candida albicans measured by viral plaque assay.  Fed Proc  32:356, 1973.

7.  Patrick RA, Mernitz JL, Bing DH.  Purification of C4 by affinity chromatography.  J Immunol  111:296, 1973.

8.  Roman DP Jr, Bing DH, Cory M.  Benzamidine inhibitors of human C1s, a subunit of the first component of complement: Correlation of partition coefficients with inhibition constants.  Fed Proc  34:1777, 1975.

9.  Spurlock SE, Bing DH.  Synthesis of the first component of complement by primary cultures of columnar and transitional cell carcinomas.  Fed Proc  34:4220, 1975.

10.  Bing DH, Spurlock SE, Bern MM.  Separation of a population of C1 synthesizing cells by affinity chromatography.  Fed. Proc  35:853, 1976.

11.  Andrews JM, Bing DH, Cory M.  Chemical basis for the specificity of thrombin, plasmin, C1s, C1r and trypsin.  Circulation 54:200, 1978.

12.  Morris KM, Bing DH, Andrews JM, Silverstein LJ, Attisano CA, Borin PS.  Biosynthesis of the subcomponents of C1 by twelve human established cell lines.  J Immunol  120:1786, 1978.

13.  Davis AE III, Rosenberg RD, Fenton JW II, Bing DH, Rosen FS, Alper CA.  Is factor D of the alternative pathway a fragment of thrombin?  J Immunol  120:1771, 1978.

BING, David H.

14. Landis BH, Zabinski MP, LaFleur GJM, Bing DH, Fenton JW II.  Human alpha thrombin: differential inhibition with hirudin.  Fed Proc 37:1969, 1978.

5. Caporale LH, Woods D, Gagnon J, Christie DL, Bing DH.  A computer generated 3-dimensional model of the serine proteinase domain of human complement Factor B.  Immunobiology, 164, 220, 1983.

16. Caporale LH, Arlaud GJ, Gagnon J, Bing DH.  A computer generated 3-dimensional model of serine proteinase subunit of C1r, a subcomponent of the first component of complement.  Immunobiology, 164, 221, 1983.

17. Sofen N, Kalmyer JB, Bing DH.  Specificity of a monoclonal antibody to the heparin binding site of C1q.  Fed Proc 44, 3391, 1985.

18. Alper CA, Marcus D, Truessdon L, Awdeh Z, Yunis EJ, and Bing DH.  C4 null alleles and immunologic function in normal individuals.  Complement 4, 125, 1987.

19. Bing DH, Donaldson DH, and Rosen FS.  Heparin enhance enzymatic cleavage of C1 inhibitor by plasma but not C1s.  Complement 4, 136, 1987.

20. Bing DH.  Przysiecki CT, and Freidman PA.  Identification and quantitation of $\beta$-hydroxy asparagine in C1r and C1s.  Complement 4, 136, 1987.

21. Williamson J, and Bing DH.  The use of murine monoclonal antibodies to blood group related antigens for the immunofluorescent assays.  Clin Chem 35:680, 1989.

22. Williamson J, Mozill D, and Bing DH.  The use of DNA profile analysis to resolve two cases of disputed parentage unresolvable by conventional serological analysis.  Second Intl. Symp. on Human Identification, 1989.

23. Bogdan SI, Pinkus JL, Brody DL, Williamson JM, and Bing DH.  DNA profile data:  Use in a serial rape case and in a paternity assessment; non-use in a rape case.  Northeastern Forensic Society.  October, 1990.

24. Williamson J, Mitchel S, Mozill DR, and Bing DH.  Modified method for the extraction of high molecular genomic DNA from hemolyzed blood.  Amer Acad of Forensic Sci., 1990.

3/21/95

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA, ex rel.
JOHN MOSS, III,

Petitioner,

v.                                          No. 94-MISC-663

GEORGE TRENT, Warden, West
Virginia Penitentiary,

Respondent.


## MEMORANDUM IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS


### I. INTRODUCTION


On April 24, 1990, Petitioner was convicted of three (3) counts of first degree murder in the Circuit Court of Kanawha County. The jury did not recommend mercy. No. 82-F-221, Circuit Court of Kanawha County.

This was Petitioner's second trial relating to the murders of Vanessa, Paul Eric, and Bernadette Reggetz. The result of the first trial was the same; however, the West Virginia

129

Supreme Court of Appeals had reversed the first conviction in State v. Moss, 180 W.Va. 363, 376 S.E.2d 569 (1988).

The present petition is based upon the ruling of the West Virginia Supreme Court of Appeals in In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division, 438 S.E.2d 510 (1993).  This case allows for habeas corpus review of all cases in which Fred Zain, formerly of the West Virginia State Police Serology Laboratory, performed testing and/or testified at trial.

## II. STATEMENT OF FACTS[1]

On December 13, 1979 at approximately 11:30 a.m., Paul Reggettz finished his shift at United Parcel Service in Rand, West Virginia.  (R. 679).  He drove towards his home on Chesapeake Avenue in St. Albans, West Virginia.  (R. 681).  The previous evening he and his wife, Vanessa, had agreed to meet after Paul got off work to go shopping at the St. Albans K-Mart.  (R. 670).  Paul was scheduled to meet his wife and daughter Bernadette across from Route 60 in St. Albans.  (Id.).  Paul did not find his wife and daughter waiting for him, however, and he continued home to find out why they had not met him as planned.  (R. 681).

---

[1]The initial statement of facts deliberately omits any reference to the testimony of Fred Zain.  This is so that the Court will be able to have a view of the weight of the evidence at trial against Petitioner which is completely independent of the Zain testimony.

/30

Paul arrived home and knocked several times on the front door of his home. (R. 683). After receiving no answer, he went around to the back door of his house and pushed the door open. (R. 684). He found his wife sprawled across the living room with two cords wrapped around her neck and a pair of scissors sticking out of her chest. (R. 685 and 688). The cause of Vanessa's death was later determined to be strangulation. (R. 838). As Paul was starting back out of his home to seek help, he saw his daughter hanging from a door by a cord wrapped around her neck. (R. 686). The cause of Bernadette's death was later determined to be strangulation. (R. 860-61). Paul lifted his four-year-old daughter down from the noose and placed her on the floor before leaving to find help. (R. 687).

Paul ran to a near-by business, the A&W Root Beer Stand, and asked an employee to call the police. (Id.). Paul left the A&W and returned to his house. (R. 688). As he re-entered his home, he found his seven-year-old son, Paul Eric, bound in a "hog-tie" position, face down in the bathtub (R. 689-91). The cause of Paul Eric's death was later determined to be drowning. (R. 844). Paul then returned to his daughter's room, picked her up and laid her on the bed because he "couldn't stand the thought of her laying in the floor." (R. 688). The police arrived and found the house ransacked. (R. 462). The Christmas presents the Reggettz's had wrapped had been ripped open, and some of the presents were missing. (R. 459). Among the missing presents was a set of silverware. (R. 734) Other items, such as a camera, were taken from the house.

Initially, Paul Reggetz confessed to the killings. He was arrested and indicted, and

3

) 3 }

remained in the Kanawha County Jail for approximately eleven (11) months.  However, it became apparent that someone else was involved in the killing of the victims.

The Petitioner became a suspect in the crime.  Two West Virginia State Troopers, Trooper Terry Williams and Trooper Mike Smith, traveled to Mansfield, Ohio, where the Petitioner was being held on an unrelated charge.  They interviewed Petitioner, who initially denied any involvement in the crime.  However, in response to a question as to whether the Petitioner considered Vanessa Reggetz to be pretty, he replied that he did not because her face had bumps.  Vanessa's picture which had been shown to Petitioner showed a smooth-skinned woman.  However, at the time of her death, her face was blemished.  (R. 727, 972)

John Moss, Jr. was brought back to Parkersburg, West Virginia for questioning on October 28, 1980. (Id.).  Moss was Mirandized and signed a waiver of his rights.  (R. 519,20).[2]

Petitioner confessed to the crimes, first during the trip to Parkersburg, and later during a more formal interview.  He told the troopers he went to the house to steal money.  (R. 556).  Moss stated that he struggled with Vanessa when he first entered he home, and struck her with the butt of a gun he found at the house.  (R.528, 559,60).  The gun butt was found beside of Vanessa's body, and her autopsy revealed lacerations of the scalp which could have been caused by the butt of the gun.  The gun butt found at the scene was identified by Paul Reggetz

---

[2]Petitioner's confession has been ruled admissible on several occasions: at his transfer hearing, at his first trial, and at his trial before this Court.

132

as one that he owned. (R. 450, 722, 832)  Petitioner stated that the gun broke when he was hitting Vanessa with it, and he disposed of the remainder of the gun after he left the Reggetz home. (R. 965)  Petitioner also stated that he left the house briefly because he was frightened; however, he then decided to return.  When he went back, he found Vanessa with a knife in her hand.  They struggled for the knife, and Petitioner took it away from her.  Again, a knife was found beside of Vanessa'a body.  (R. 528)  Moss stated that he put a cord around Vanessa's neck and choked her.  (R. 560).

Moss then recounted choking Paul Eric with a cord, tieing him up and putting him in a half-full bath tub.  (R. 561-62).  Moss also described choking Bernadette with a cord and hanging her on the door.  (R. 563).  After hanging Bernadette, Moss told the troopers he stabbed Vanessa in the chest with a "knife or something."  (R. 564).

After killing the Reggettz family, Moss stated that he searched the house for money and opened the Christmas presents. (R. 565).  Moss described a camera he stole from the Reggettz home and told the troopers the camera was at his parents home in Cleveland, Ohio.  (R. 569).  This camera was recovered Moss' father's car the following day, and was identified at trial by Paul Reggetz as his. (R. 725)

Moss also admitted taking one of the Christmas presents that he described as "some dishes." (R. 565).  Moss told the troopers he took the Christmas present he stole and gave it as a Christmas gift to his best friend's mother, Ms. Arbutus Johnson, of St. Albans.  (R. 567).

5

133

A set of silverware was recovered from Ms. Johnson. (R. 902). Ms. Johnson told the troopers that Moss had given the silverware to her as a Christmas present the night before he returned to Cleveland, Ohio in December, 1979. (R. 901). Ms. Johnson also stated she saw some scratches and a Band-aid on Moss' face. (R. 900).

## III. ARGUMENT

**The evidence of Petitioner's guilt as presented at trial was of such weight that he is not entitled to a new trial based upon the involvement of Fred Zain in his trial.**

The West Virginia Supreme Court of Appeals has required the habeas corpus review in all cases in which Fred Zain, formerly a serologist at the West Virginia State Police Serology Laboratory, testified and/or performed serological testing.  In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division, 438 S.E.2d 510 (W.Va. 1993) (Hereinafter, "Zain I")  There is no argument here that Petitioner is not entitled to such review.  The question for this Court, then, is whether Zain's involvement was such that the Petitioner is entitled to a new trial.

The standard for review of the so-called "Zain" cases was enunciated by the Court in Zain I, *supra*.  That standard is as follows:

> "'Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.'"

438 S.E.2d at . (Citations omitted).

7

135

This Court must therefore first make a finding as to whether the evidence presented by the State at trial was sufficient to sustain the State's burden of proving guilt beyond a reasonable doubt, even without Zain's testimony.  If this Court finds that the evidence is sufficient, then this Court must determine whether the testimony in question had a "prejudicial effect" upon the jury.[3]

**1. The evidence at trial, absent Zain's testimony, was sufficient to sustain the jury's verdict.**

The Petitioner confessed to committing the three (3) murders of which he was convicted.  His confession was ruled admissible and was heard by the jury.  However, a confession is not sufficient by itself to convict a person of a crime.

> "[a] conviction in a criminal case is not warranted by the extrajudicial confession of the accused, alone. The confession must be corroborated in a material and substantial manner by evidence aliunde of the corpus delicti  . The corroborating evidence, however, need not of itself be conclusive; it is sufficient if[,] when taken in connection with the confession, the crime is established beyond reasonable doubt."

State v. Garrett, 466 S.E.2d 481 (W.Va. 1995), citing Syl. pt. 1, State v. Blackwell, 102 W.Va. 421, 135 S.E. 393 (1926).

---

[3]In his Petition, Petitioner discusses matters occuring in his first trial and in the suppression hearing.  However, the West Virginia Supreme Court of Appeals has made it clear that the Circuit Court is to review "Zain" cases based upon the evidence heard by the jury.  Therefore, the Respondent will discuss only the matters which are relevant to this case.

136

Therefore, the State must produce evidence in addition to a confession which corroborates the confession, even though that evidence in itself need not be sufficient to prove the State's case absent the confession.

In this case, the State presented a substantial amount of evidence to the jury which corroborated the confession. Petitioner informed the officers as to the location of the camera he had stolen from the Reggetz home. The officers found the camera where Petitioner said that they would, and Paul Reggetz identified it at trial. Paul Reggetz had also reported that the set of silverware he had purchased for his wife was missing from the house after the murders. Mrs. Johnson testified that Petitioner had given her a set of silverware for a Christmas present that year, and the set she received was of the same description as that missing from the Reggetz home, although, after the passage of so many years, Paul Reggetz was not able to identify it as the same set.   However, in his confession, Petitioner admitted to having taken "some dishes" and giving them to Mrs. Johnson. Mrs. Johnson also reported seeing scratches and a bandage on Petitioner's face when he gave her the present, which would be consistent with his statement in his confession that he and Vanessa had struggled before he killed her. The State had received the silverware from Mrs. Johnson prior to any confession by the Petitioner.

Vanessa Reggetz's autopsy revealed that she had suffered from scalp lacerations which were consistent with being struck with the butt of the gun which was found beside her body, and identified as belonging to Paul Reggetz. Petitioner's confession indicated that he had

137

struggled for a gun with Vanessa, and struck her with the butt of the gun. His confession also revealed his knowledge that the gun was broken, and showed that the gun became broken as a result of Petitioner beating Vanessa with it.

Before he admitted to any involvement in the crime, Petitioner stated that Vanessa's face was "bumpy". This was inconsistent with the pictures of Vanessa which were shown to Petitioner, but was consistent with Vanessa's appearance at the time of her death.

Petitioner also admitted to having struggled with Vanessa for a knife. A knife was found beside of Vanessa at the time of her death.

Petitioner raised the issue again of the voluntariness of his confession in this proceeding. However, at least three (3) different reviews of the voluntariness issue have been conducted – in Petitioner's first trial, in Petitioner's appeal, and again at Petitioner's second trial. In all cases, the confession was held to be voluntary and admissible. *See* State v. Moss, *supra*. This issue is now beyond the scope of permissible review here. Petitioner may attempt in this proceeding to assert that his confession stemmed from his being confronted with the results of the blood test. However, his earlier position was that he was beaten into confessing. He can hardly take the position now that his sworn testimony would have been different had he known that the results of the serological testing would later be suspect.

10

138

Based upon the Record of the trial, it is plain that the State presented more than adequate evidence of Petitioner's guilt to sustain the guilty verdict, even without the testimony of Fred Zain.  Therefore, this Court must now examine the testimony of Fred Zain in order to determine whether this testimony prejudiced the jury.

## B. The testimony of Fred Zain could not have prejudiced the jury in Petitioner's trial.

The trial testimony of Fred Zain is found at R. Pp. 1048-1139.  Zain was one of eighteen (18) witnesses for the State in this trial.  He testified that he went to the crime scene on December 13, 1979, to collect evidence for serological testing.  (R. 1073-4) He removed pieces of a broken knife, a blood sample from the pool of blood where Vanessa Reggetz had lain, a piece of bloody carpet from a second pool of blood, the electrical cord from Vanessa's neck, a pillow case, and a curtain from the bedroom where Vanessa was found.  (R. 1076-7) He also removed blood samples from a sheet,  doors, the sink, a utensil drawer, bedspread, and a change purse, and removed jockey shorts and a pillowcase.  (R. 1977-9, 1089) All of the items  removed appeared to have blood stains on them.  He removed a pair of scissors from the body of Vanessa, under the supervision of Dr. Sopher, the Medical Examiner. (R. 1091) He received clothing belonging to Paul Reggetz, along with a known blood sample from Vanessa Reggetz and the nightgown she was wearing when she died,  from Trooper Williams on December 14, 1979.  (R. 1093).  On December 17, 1979, Zain received blood samples from the two children.  On December 18, 1979, Zain received a flashlight, a Christmas package, and some Christmas wrapping paper. (R. 1094) He also received a glass

11

139

bowl at that time. (R. 1096) The known blood sample of Paul Reggetz was given to Zain on January 2, 1980. (R. 1100)

After testing the items mentioned above, Zain requested blood samples from anyone who may have had access to the Reggetz home. This was because he had found blood stains from some of the items tested which did not belong to any of the four (4) persons for whom he had known samples. These unidentified stains were fresh, and could not have been on the scene for very long prior to the murders. (R. 1100-1101)

All of the family members were ABO type O, and ESD type 1. Some of the stains from the crime scene were ABO type O, ESD type 2-1. (R. 1104) No blood was found on Paul Reggetz's clothing. (R. 1110) Zain found no blood stains at the scene except ones that were consistent with either Vanessa or the Petitioner. (R. 1110)

Petitioner's blood sample was given to Zain on April 22, 1980. (R. 1110) Several items had blood stains on them which were consistent with Petitioner's blood. These included the change purse, the kitchen utensil drawer, the door to the bedroom, the pillowcase from the bedroom, the flashlight, and the Christmas wrapping. (R. 1113) The blood stains on these items and Petitioner's blood type were said to represent one tenth of one percent of the general population. (R. 1119-1122) The only exceptions were the curtain, Bernadette's nightgown, and the wrapping paper, which were tested successfully in nine (9) different categories. This was a match to three out of ten thousand people, and were also consistent

12

with the Petitioner's blood. (R. 1123-4)  All of the other items which contained blood stains which showed test results revealed blood types identical to Vanessa's.

Zain was cross-examined based upon the number of people in Kanawha County alone who could have deposited blood matching Petitioner's.  This number ranged from sixty eight to two hundred twenty nine.

Zain was the final witness for the State.  He testified after the State had already presented the extensive case outlined in Argument A, above.  This included the confession, and the evidence relating to the camera, the gun, and the silverware.  The jury had already heard enough evidence by this time to believe beyond a reasonable doubt that Petitioner was guilty of the triple murder.

Under the totality of the circumstances, there is no real possibility that the testimony of Fred Zain "prejudiced" the jury.  Petitioner did not testify concerning his confession or the gift he gave to Mrs. Johnson, or present any other evidence on these issues.  Therefore, it was not a case where the defendant was able to "explain" all of the evidence besides the serology evidence. Had the Petitioner and his trial counsel been able to present a plausible explanation for why he confessed despite his "innocence", and the origin of the gift to Mrs. Johnson, then there might be the possibility that he was indeed "prejudiced" by Zain's testimony.  However, his trial defense left too many pieces of the State's evidence unanswered for this to be the case here.

13

141

Therefore, Zain's testimony, considering the totality of the evidence at trial, could not have prejudiced the jury.

142

**C. The Petitioner's case presents a situation to this Court which was not anticipated by the West Virginia Supreme Court of Appeals when that Court provided for habeas corpus review of the "Zain" cases.**

The West Virginia Supreme Court of Appeals in Zain I, *supra*, addressed the possibility that innocent persons had been convicted due to the unreliable or false testimony of Fred Zain. That Court did not address some of the situations which are before this Court: namely, where the serological work performed by the West Virginia State Police served to *exculpate* the sole initial suspect, and where the work performed involved another serologist as well as Zain.

> " Serology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Fred S. Zain, are not subject to the invalidation and other strictures contained in In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division... "

Syllabus Point 3, In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division, 445 S.E.2d 165, 191 W.Va. 224 (1994) (Hereinafter, "Zain II").

During most of the time in which Fred Zain was employed by the West Virginia State Police, he was the supervisor of the Serology Division, and he effectively had no supervision. However, at the time the testing was performed in Petitioner's case, Zain was working under the supervision of Robert Murphy, who was the first serologist working for the State Police. (Deposition of Robert Murphy {hereinafter, "Murphy"} p. 6) Murphy testified

15

143

before the grand jury which first indicted Petitioner and Paul Reggetz, relating solely to the involvement of Petitioner, since Murphy "had no physical evidence connecting Paul Reggetz with this case" (Murphy, p. 24)  Murphy and Zain both performed testing in this case. (Murphy pp. 33-4)  Since Murphy was involved in the testing process, this Court must assume that some of the testing produced true and accurate results. Zain II, *supra*.

Further, both Murphy and Zain were under considerable pressure at the time to find evidence pointing to Paul Reggetz as the murderer.  The investigating officers were convinced that Reggetz was the killer.  The laboratory, however, produced evidence that pointed to some other person.  Murphy recounted in his deposition that this resulted in some conflicts in which he was forced to vigorously defend his findings. (Murphy, pp. 26-29) Murphy also stated the obvious – that there was no motive on the part of either Murphy or Zain to falsify the results to exculpate Reggetz, and no reason to inculpate the Petitioner.  (Murphy, p. 54)

It is also noteworthy that the serological results which pointed to someone other than Reggetz as the perpetrator were obtained before Petitioner's blood was submitted for analysis. The results of the then-unknown person could not have been manipulated to conform with the then-unknown blood type of the Petitioner.  Therefore, it is safe to assume that the blood type found to not match any of the Reggetz family was correctly reported from the beginning, and this result was not changed once Petitioner's blood sample was analysed.  Similarly, it appears from a review of Murphy's deposition that Murphy performed the testing of all of the known blood samples – including that of the Petitioner.  Therefore, Murphy determined that

16

/44

Petitioner was a match for the unknown specimens found by Zain during testing of the crime scene exhibits, and Zain had no opportunity to falsely make Petitioner a match for the unknown blood depositor at the scene.

Thus, this Court is presented with a variation on the usual "Zain" case. Zain had some motivation to lie about the test results in order to inculpate Reggetz, but did not do so. Zain was not working on his own, but was working under the supervision of Robert Murphy. Finally, Murphy was involved with the testing along with Zain. Therefore, the serological results here are entitled to receive more credibility than is normal in such a case.

## IV. CONCLUSION

The evidence presented by the State at trial was more than sufficient to support the jury's verdict even after exclusion of the serological testimony of Fred Zain. The testimony of Fred Zain, when examined in light of the testimony which preceded it, could not have prejudiced the jury. Finally, there are indicia of reliability attached to the serological testimony in this case which are not normally present in the typical "Zain" case.

145

For all of these reasons, this Court should dismiss the Writ of Habeas Corpus in this matter.

GEORGE TRENT

Respondent

By Counsel

Mary Beth Kershner
Assistant Prosecuting Attorney

146

STATE OF WEST VIRGINIA, ex. rel.
JOHN MOSS III,
           Petitioner,



v.                         94-MISC-663



GEORGE TRENT, Warden,
    West Virginia Penitentiary,
        Respondent.

<u>SUPPLEMENTAL ARGUMENT IN OPPOSITION TO</u>

<u>PETITION FOR WRIT OF HABEAS CORPUS</u>

This Petitioner's case is unique and should not be decided or analyzed under the <u>Zain</u> case guidelines. There is no question that discredited former State Police Serologist Fred Salem Zain was intimately involved in the testing and analysis of evidence in Petitioner's case. However, in this case, unlike the classic Zain case, there are independent indicia of reliability of Zain's testing.

On December 13, 1979, Zain went to the scene of the crime, the Reggetz house, and secured blood scrapings and other items of evidence for analysis. Thereafter, the investigating officers in the case submitted additional exhibits for testing including, but not limited to, the known blood samples of the victims, Vanessa, Paul and Bernadette Reggetz. Bernadette Reggetz's pajama top was submitted by Trooper Terry Williams in early January of 1980. Additionally, known blood samples of a host of other males who had possible access to the house were submitted to the State Police Lab.

As Petitioner knows, Sgt. R. C. Murphy was Zain's supervisor in the Serology Section and was also intimately involved in the testing and analysis of the exhibits of this case. Zain and Murphy knew early on that someone other than members of the Reggetz family had been in the house at the time of or immediately prior to the murders, and that there very likely was someone other than a member of the family involved in the murders. They knew this from the analysis of

the blood found on the Christmas wrapping paper which had been torn from some of the presents under the Reggetz's Christmas tree. Analysis of a droplet of blood found on some of the paper showed an ESD genetic marker of 2-1. Because the Reggetz's victims, mother and children, all had an ESD of 1, they knew that unless Paul Reggetz was not the biological father of Bernadette and Paul, then someone else's blood was on the wrapping paper. On January 2, 1980, the lab received a known blood sample of Paul Reggetz and analysis of said sample showed his ESD genetic marker as a 1, thus excluding him from being the donor of the blood found on the wrapping paper..

This revelation of Zain and Murphy brought a great deal of pressure upon them as the investigating officers thought they had their man, Paul Reggetz. Reggetz had given a sensational confession albeit after 17 to 22 hours of interrogation. Needless to say the State Police brass was not happy with the Zain/Murphy revelation. Accordingly, the State Police began scouring the countryside for blood samples of anyone who was known to have had access to the Reggetz house.

Crucial to this case is the fact that the Serology Section had unknown blood samples from the murder scene which had genetic markers that did not match the suspect, Paul Reggetz or the victims. Zain and Murphy knew what the markers were in these unknown blood samples and had found a combination of nine enzymes or genetic markers on three of the exhibits including Bernadette Reggetz's pajama top, the Christmas wrapping paper discussed above and a curtain from the back door of the Reggetz home. Zain had found a combination of seven genetic markers which differed from the Reggetz family and Paul Reggetz on the flashlight, blood sample taken from the utensil drawer, a pillowcase from behind the bath, a sample from the door between the master bedroom and the front door and a change purse. Most important of all, Zain and Murphy

149

had identified and knew the genetic markers of the unknown blood samples long before obtaining a known sample of the Petitioner's blood on April 22, 1980. Accordingly, they could not have known the genetic makeup of the Petitioner's blood at the time they analyzed the unknown blood samples.

As mentioned above Sgt. Murphy was also involved in the testing and analysis in this case. From his deposition, he testified under oath that he saw all the results and was involved in most of the testing in this case (Pg. 17). In Petitioner's supplemental brief filed with this court on August 14, 1995, he states that as a general rule in reviewing the laboratory documents produced in this case if the writing was in Sgt. Murphy's handwriting, he performed those tests. In looking at those submitted documents it appears that Sgt. Murphy did the testing and analysis of all the known blood samples of the victims, Paul Reggetz and the Petitioner's. More importantly in looking at page 12 of the laboratory documents, Sgt. Murphy appears to have done the testing of Bernadette Reggetz's clothing or pajama top, which had a blood stain containing the nine genetic markers consistent with the Petitioner's. Moreover, Murphy's results from Bernadette Reggetz's clothing match perfectly with the genetic markers that Zain had found on the curtain, the Christmas wrapping paper and the other exhibits which contain blood consistent with the Petitioner's.

Thus, there are independent indicia of reliability supporting the serology work done in this case. Zain and Murphy already knew the genetic makeup of the unknown blood samples. They knew that there was someone else involved in this case. Sgt. Murphy tested the Petitioner's known blood sample in April of 1980. Sgt. Murphy, and not Zain, tested the little pajama top of Bernadette Reggetz, and finally, Murphy's test results overlap and confirm Zain's results. All of these factors make this case uniquely an exception to the other "Zain" cases.

For the aforestated reasons, Petitioner's case should not be analyzed under the <u>Zain</u> guidelines, and Petitioner's Writ of Habeas Corpus should not be granted on that basis.

RESPECTFULLY SUBMITTED,

STEPHEN B. REVERCOMB, ASSISTANT
PROSECUTING ATTORNEY

## CERTIFICATE OF SERVICE

I, Stephen B. Revercomb, Assistant Prosecuting Attorney for Kanawha County in and for Kanawha County, West Virginia, do hereby certify that service of a true copy of the foregoing Supplemental Argument in Opposition to Petition for Writ of Habeas Corpus, was made by delivery in the United States mail, postage pre-paid, this 27th day of September, 1996, addressed as follows:

Mr. Lonnie Simmons
Attorney at Law
604 Virginia Street, East
Charleston, WV 25301

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**John Moss, III**

v.                                    Civil Action No.: **94-MISC-663**

**George Trent, Warden WV State Penitentiary**

| INDEX | |
|---|---|

| DESCRIPTION | LINE |
|---|---|
| Petition  For Writ Of Habeas Corpus | 1 |
| Letter dated 8/18/94 | 49 |
| Petitioner's motion for all documents relating to testing | 50 |
| Petitioners motion to exceed statutory limit on exspenses | 54 |
| Petitioner's motion for Grand Jury Transcipts | 60 |
| Order dated September 15, 1994 | 63 |
| Order September 15, 1994 | 65 |
| Not of Hearing | 67 |
| Order Dated October 14th, 1994 | 69 |
| Letter dated 10/24/94 | 71 |
| Transcript of Grand Jury Hearing September 17th, 1982 | 71-A |
| Letter dated 11/22/94 regarding serological records from WV State Police | 72 |
| Petitioner's Motion for Production of records | 73 |
| Notice of Hearing | 78 |
| Notice of Deposition | 80 |
| Letter dated 4/28/95 | 82 |
| Order dated May 2, 1995 | 84 |
| Certificate of service amended notice of deposition | 88 |
| Precipe issuing subpoena & one copy | 90 |
| Deposition Subpoena as to Robert Murphy | 92 |
| Affidavit | 92 |
| Petitioner's Supplemental Brief | 95 |
| Order datedAugust 17th , 1995 | 96 |

FILED

MAR - 5 2007

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

1

| | |
|---|---|
| Order dated August 17th ,1995 | 99 |
| Notice of hearing | 102 |
| Order dated | 104 |
| Answer of Respondent | 105 |
| Order dated  October 23, 1995 | 109 |
| Order dated  December 8, 1995 | 111 |
| Order dated  December 13, 1995 | 114 |
| Leter dated 6/4/1996 | 116 |
| Notice of Status Conference | 118 |
| Petitioner's Motion for production | 121 |
| Amened notice of status conference | 126 |
| Order dated July 23rd , 1996 | 128 |
| Memorandum in opposition to Petition for Writ of Habeas Corpus | 129 |
| Supplemental argument | 148 |
| Petitioner's response to Memorandum in Opposition | 153 |
| Notice of Status Conference | 172 |
| Petitioner's responde to Memorandum in Opposition to petition for Writ | 174 |
| Petitioner's response to Memorandum in Oppsoition to  petition for Writ | 175 |
| Petitioner's Supplemental Brief | 194 |
| Petitioner's motion for access to Fred Zain Special Grand Jury Transcript | 241 |
| Memorandum Order dated September 10th , 1998 | 243 |
| Notice of Hearing | 251 |
| Petitioner's Motion to alter or amend | 253 |
| Order dated October 21, 1998 | 267 |
| Notation of Delivery | 268 |
| Notice of change of address | 269 |
| Petitioner's Supplemental to Rule 59 | 271 |
| Order dated January 12th ,1999 | 278 |
| Notice of Status Conference | 279 |
| Petitioner's Supplemental Motion to Alter or Amend Order | 281 |
| Letter dated December 1, 1999 | 310 |
| Motion for leave to file Petitioner's additional Supplement | 311 |
| Petitioner's Additional Supplement to Rule 59 | 312 |

| | |
|---|---|
| Notice | 480 |
| Notice of Status Conference | 482 |
| Notice of Hearing | 484 |
| Notice of hearing | 492 |
| Case Information Sheet | 494 |
| Appellate Transcript Request | 505 |
| Transcript of Status Conference held July 7,200 | 506 |
| Transcript of Hearing held December 1, 2000 | 507 |
| Indigent Petitioner's Motion for Appointment of Publicly funded Co-Counsel | 508 |
| Motion to Proceed in Form Pauperis | 519 |
| Leter dated October 1,2001 | 523 |
| Petitioner's Second Motion for entry of Order | 554 |
| Amended Memorandum Order Denying Habeas Relief | 556 |
| Petitioner's Rule 59(e) Motion to alter Judgment | 560 |
| Petitioner's Motion to have Present Counsel Appointed for Appeal | 567 |
| Order Reinstating Action to the Docket And Setting Briefing Schedule | 575 |
| Petitioner's Motion for relief | 577 |
| Transcript of Hearing June 10, 2001 | 597 |
| Order Approving Payment of Direct Exspenses | 598 |
| Notice Of Change of Address | 599 |
| Notice Of Hearing | 600 |
| Memorandum of Respondent in Opposition to Petitioner's Motion | 603 |
| Petitioner's Reply Brief | 609 |
| Transportation Order | 642 |
| Final Order Denying Habeas Relief | 643 |
| Petitioner's Renewed Motion | 646 |
| Transcript of Hearing Held January 17th , 2003 | 649 |
| Order Dated March 3, 2003 | 651 |
| Memorandum | 652 |
| Receipt of Appeal | 653 |
| Letter dated July 16, 2003 | 654 |
| Petitioner's Motion to have Portions of record | 655 |
| Order dated July 28, 2003 | 659 |

**Order dated August 11, 2003**       **660**

**Receipt of file from WVSCA**       **666**

**Order from WVSCA**       **664**

**Opinion From WVSCA**       **667**

**Order from WVSCA**       **683**

**Order from WVSCA**       **684**

**Letter dated June 18, 2003**       **685**

**Order from WVSCA**       **686**

**Reciept of Record**       **687**

**Clerk's Certificate**

# WEST VIRGINIA SUPREME COURT
# OF APPEALS

To:        **Kanawha County Circuit Clerk**

Date:      **July 16, 2007**

Style:     **John Moss, III**

           **vs.)  No. 070678**

           **Thomas McBride**

> This receipt is for delivery of record
> only.  Record will be checked for the
> return of designated pleadings and
> colored receipt will be forwarded to the
> WVSCA

Received of Rory L. Perry, II, Clerk, Supreme Court of Appeals of West

Virginia, a copy of the **Court's Order and Original Record** in the above-

styled action.  Dated at _____Charleston_____, West

Virginia, this the ___20___ day of ___July___, 2007.

_____Nina Stephenson_____
Deputy  Circuit Clerk

Please return to the West Virginia Supreme Court of Appeals, Clerk's
Office, State Capitol Complex, Building 1, Rm. E-317, Charleston,
WV 25305 Attn: Angie Wilkinson. If you have any questions please
call 340-2326.

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

           Petitioner,

v.

                                        Civil Action No. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

           Respondent.

## PETITIONER'S RESPONSE TO MEMORANDUM IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

### I.

### INTRODUCTION

In his initial **PETITION FOR WRIT OF HABEAS CORPUS** and subsequent **PETITIONER'S SUPPLEMENTAL BRIEF ON ISSUES RAISED IN HABEAS CORPUS PETITION**, Petitioner John Moss, III, stated in great detail the basis for his argument that he is entitled to a judgment of acquittal or a new trial. Petitioner based his claim for habeas corpus relief, in part, upon the West Virginia Supreme Court's decision in *In the Matter of Investigation of the West Virginia State Police Crime Laboratory*, 190 W.Va. 321, 438 S.E.2d 501 (1993). Stated simply, in a case where Paul Reggettz, III, and Petitioner allegedly confessed to being solely responsible for the murders of Vanessa Reggettz, Paul Eric Reggettz, and Bernadette Lynn Reggettz, the testimony of Fred Zain was the most compelling independent evidence presented to the jury that incriminated Petitioner and exonerated Mr.

153

*Reggettz.* Since Zain's testing and testimony has been discredited and cannot be deemed reliable, Petitioner is entitled to a reversal of his convictions and either a judgment of acquittal or a new trial.

Recently, Respondent George Trent filed a brief opposing Petitioner's request for habeas corpus relief and followed that brief with a supplemental argument. In applying the *Laboratory* decision, Respondent contends that after excluding Zain's testimony, the remaining evidence at Petitioner's trial was sufficient to sustain his conviction. Further, after reaching that conclusion, Respondent then asserts that Fred Zain's testimony could not have prejudiced the jury because at trial, Petitioner did not take the stand or otherwise "explain" the alleged other incriminating evidence. Finally, Respondent argues in his original brief and in the supplemental argument that this case is not a "Zain" case, as contemplated by the West Virginia Supreme Court, because Zain was working under the supervision of Robert Murphy and because Zain had an opportunity to incriminate Paul Reggettz, III, but did not do so.

A closer review of Respondent's arguments merely confirms the fact that he is entitled to a judgment of acquittal or a new trial under the *Laboratory* decision. In this brief, Petitioner will respond to the arguments presented. However, for purposes of this critical decision, Petitioner also relies upon the extensive arguments already stated in the original **PETITION** and in **PETITIONER'S SUPPLEMENTAL BRIEF**. Consequently, based upon all of the arguments set out in the **PETITION**, **PETITIONER'S SUPPLEMENTAL BRIEF**, and in this brief, Petitioner respectfully moves this Court to set aside his convictions and either to enter a judgment of acquittal or a new trial.

2   154

## II.

## PARTIES GENERALLY AGREE ON APPLICABLE LEGAL STANDARD

Before addressing the merits of Respondent's arguments, the Court should note the areas where Petitioner and Respondent are in agreement.  First, Respondent does not dispute that this issue is ripe for decision at this time.  The parties have endeavored to develop a complete record relevant to the serological testing by and testimony of Fred Zain.

For the Court's convenience and reference, Petitioner has filed with this brief a notebook containing the portions of the record relevant to the Fred Zain issue. Although the habeas corpus record in this case includes the first trial transcript, the second trial transcript, and the *State v. Paul Reggettz, III* hearing transcripts, the proceedings and documents included in the notebook should be sufficient for this Court in ruling on this issue.  In this notebook are the following:

Tab 1:   The complete deposition of Robert Murphy, with attached exhibits;

Tab 2:   The complete deposition of Dr. David Bing, with attached exhibits;

Tab 3:   The opening statement by the State, which included multiple references to Fred Zain;

Tab 4:   The testimony of Fred Zain;

Tab 5:   The tables created by Petitioner's counsel summarizing the serological testing in this case; and

Tab 6:   The closing statements by the State, which included multiple references to Fred Zain.

155

Second, Petitioner and Respondent agree that this Court's decision is controlled by Syllabus Point 3 of the *Laboratory* decision, which provides:

> "'Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury. Syllabus Point 2, *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980)."

As noted in the original **PETITION**, Petitioner contends that the West Virginia Supreme Court mistakenly applied the harmless error standard for **nonconstitutional** violations to a situation where **constitutional** violations are demonstrated. Syllabus Point 2 of the *Laboratory* decision clearly states that a conviction based upon false evidence is a **constitutional** violation. The harmless error standard for constitutional violations is set out in Syllabus Point 5 of *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975):

> "Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt."

*See also* Syllabus Point 3, *State v. Barrow*, 178 W.Va. 406, 359 S.E.2d 844 (1987); Syllabus Point 1, *Maxey v. Bordenkircher*, 175 W.Va. 49, 330 S.E.2d 859 (1985); *United States v. Hasting*, 461 U.S. 499, 510-11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96, 107 (1983); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

4

156

Petitioner respectfully submits that under this more appropriate standard, the State would never be able to establish that the admission of Zain's invalid, unreliable, inadmissible, and false testimony and test results was "harmless beyond a reasonable doubt." Nevertheless, although Petitioner has preserved this issue and seeks a ruling from this Court on this point, as a practical matter, the same result obtains regardless of which harmless error standard is applied. The only difference is that for a constitutional violation, Respondent must demonstrate that the error is harmless beyond a reasonable doubt, while for a nonconstitutional error, where the remaining evidence is sufficient to sustain the conviction, Petitioner must demonstrate a prejudicial effect on the jury.

Third, Respondent acknowledges that the West Virginia Supreme Court has mandated habeas corpus review of all cases involving Zain and further asserts that "[t]here is no argument here that Petitioner is not entitled to such review." Thus, Respondent concedes that Petitioner is entitled to this review of his case, based upon the law discussed in the *Laboratory* decision.

Fourth, Respondent does not dispute the summary of Fred Zain's extensive involvement in this case, outlined in great detail in the original **PETITION** and summarized in **PETITIONER'S SUPPLEMENTAL BRIEF**. In fact, Respondent provides his own summary of Zain's involvement in this case, which supports Petitioner's assertion that Zain was the single most critical witness who provided independent evidence incriminating Petitioner. In the supplemental argument, Respondent concedes that "There is no question that discredited former State Police

5

Serologist Fred Salem Zain was intimately involved in the testing and analysis of evidence in Petitioner's case."

Finally, even though Petitioner has raised an issue regarding the State's failure to preserve the evidence, citing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *State v. Thomas*, 187 W.Va. 686, 421 S.E.2d 227 (1992), *State v. Harr*, 156 W. Va. 492, 194 S.E.2d 652 (1973), *State v. Adkins*, 167 W.Va. 626, 280 S.E.2d 293 (1981), and *State v. McArdle*, 156 W.Va. 409, 194 S.E.2d 174 (1973), the Court need not address this issue at this time. Since the Zain issue is dispositive, any other legal issues relating to the State's failure to preserve any evidence for testing can be litigated either prior to a new trial or in the rest of this habeas corpus action, in the event no new trial is awarded.

### III.

### WITHOUT ZAIN'S TESTIMONY,
### EVIDENCE INSUFFICIENT TO SUPPORT CONVICTION

Under the first prong of the analysis stated in Syllabus Point 3, this Court first must examine the evidence, excluding all of the testing and testimony of Fred Zain, and determine whether the remaining evidence is sufficient "to convince impartial minds of the defendant's guilt beyond a reasonable doubt." In arguing this point, Respondent relies mainly on the confessions allegedly given by Petitioner. Since a conviction cannot be sustained based upon an uncorroborated confession, Respondent relies upon the following evidence in concluding that Petitioner's confession is sufficiently corroborated:

6

1.   The finding of a camera in Petitioner's home, which corroborated the confession;

2.   Evidence that Petitioner gave flatware to a Mrs. Johnson, which was similar to flatware missing from the Reggettz home;

3.   Mrs. Johnson's testimony that Petitioner had scratches and a bandage on his face, which could have been inflicted during a struggle with Vanessa Reggettz;

4.   Petitioner's statement that Vanessa Reggettz had a bumpy face, which was inconsistent with live pictures of her, but consistent with her appearance at death;

5.   The broken gun found at the scene of the crime, which corroborated Petitioner's confession that he had hit Vanessa Reggettz with the gun; and

6.   A knife found beside Vanessa Reggettz at the crime scene, which was consistent with Petitioner's confession.

These alleged corroborative facts are easily dismissed.  There was no evidence identifying either the camera or the flatware as being **the** camera and flatware belonging to the Reggettz family.  Scratches and bandages on Petitioner's face could have been the result of a number of things unrelated to the murders.  The attempt to relate an innocuous comment allegedly made by Petitioner regarding the facial complexion of Vanessa Reggettz and her condition after death is very speculative, at best, and irrelevant, at worst.

Finally, the fact that a broken gun and a knife were found at the crime scene was already known by the officers who obtained the confession from Petitioner. If this same standard were applied to the confession given by Mr. Reggettz, the Court would find that the facts discovered at the crime scene are reported more accurately in the confessions given by Mr. Reggettz than in the confessions allegedly given by

159

Petitioner. In fact, Mr. Reggettz confessed that he and Vanessa Reggettz struggled over the gun, which he threw in the bedroom. (SECOND TRIAL Tr. 599-600). Furthermore, Respondent ignores the inconsistencies in the alleged confessions given by Petitioner, such as Petitioner's alleged reference to stabbing Vanessa Reggettz with a knife, rather than the scissors found at the scene. (SECOND TRIAL Tr. 531-32).

Petitioner respectfully submits that Respondent's analysis fails to give appropriate weight to the unique facts of this case, where two different people, Paul Reggettz, III, and Petitioner, allegedly confessed to being solely responsible for all three murders. Respondent's position might be correct if this Court were presented with a case where only Petitioner had confessed to the crime and there were facts corroborating that confession. However, this Court cannot ignore the evidence of Mr. Reggettz's confessions, because they establish a major reasonable doubt that the State has to overcome before prevailing against Petitioner. In other words, it is not appropriate under these facts for this Court merely to review the evidence against Petitioner when the record is replete with evidence indicative of Mr. Reggettz's guilt.

If a conviction against Petitioner could be sustained based upon his alleged confessions and other corroborative facts, then the same could be said regarding Mr. Reggettz. There were more corroborative facts supporting Mr. Reggettz's confessions, particularly in light of the fact that he reenacted the murders and was the initial person on the scene. Where the evidence is sufficient to sustain a conviction against two different people, both of whom confessed to being the sole person responsible for the crime, Petitioner respectfully submits that absent compelling physical or other

8

160

evidence directly linking one of the confessors to the crime, neither person can be convicted because the other person's confession and corroborative evidence renders it impossible for the remaining evidence to be sufficient "to convince impartial minds of the defendant's guilt beyond a reasonable doubt." This assertion is particularly true where, as in the present case, trial courts analyzing the totality of the circumstances of the two different confessions have held they were intelligently and voluntarily given.

If it is assumed, as found by the respective trial courts involved, that both confessions were given intelligently and voluntarily by Mr. Reggettz and Petitioner, then what basis did the jury have to reject the confessions given by Mr. Reggettz? Clearly, when weighing the evidence against Mr. Reggettz and Petitioner, the deciding evidence was the testimony of Fred Zain. Zain's testimony appeared to be scientifically reliable and based upon objective physical evidence found at the crime scene. Since, according to Zain, some of the unknown blood found could not have been deposited by Mr. Reggettz, and some of the stains were consistent with Petitioner's blood types, the testing, if valid, incriminated Petitioner and exonerated Mr. Reggettz. Thus, no matter how hard Respondent tries to rely upon tangential facts to support the conviction, clearly the evidence in the record is insufficient to convince impartial minds of Petitioner's guilt beyond a reasonable doubt, without Zain's testing and testimony.

Having established that without Zain's testing and testimony, Petitioner's conviction cannot be sustained on the remaining evidence, Petitioner respectfully submits that the analysis should stop here. The second prong in this analysis provides that "if the remaining evidence is found to be insufficient, the error is not harmless."

Thus, based upon this review of the evidence, Petitioner is entitled either to a judgment of acquittal or a new trial.

### IV.

### EVEN IF EVIDENCE SUFFICIENT TO SUSTAIN CONVICTION, ZAIN'S TESTIMONY CLEARLY HAD PREJUDICIAL EFFECT ON THE JURY

In the event this Court finds that without Zain's testimony, the remaining evidence is sufficient to sustain Petitioner's conviction, the Court then is required to determine "whether the error had any prejudicial effect on the jury." In the context of the *Laboratory* decision, the "error" referred to is the admission of Fred Zain's testing and testimony. Petitioner respectfully submits that the prejudicial effect on the jury in this case was monumental and the deciding factor in his conviction.

Interestingly, in addressing this issue, Respondent acknowledges the considerable involvement of Fred Zain in this trial. Petitioner provided this Court with a very detailed summary of Zain's involvement in this case in his **PETITION** and **PETITIONER'S SUPPLEMENTAL BRIEF**. Again, rather than repeating those same facts, Petitioner refers this Court to those pleadings, which include quotes and the relevant citations to the record.

Any juror having any reasonable doubts about Petitioner's guilt, based upon the detailed confessions given by Mr. Reggettz, must have been quite impressed with Zain's ability to make the physical evidence point the finger of guilt toward Petitioner. Since most people would like to believe that physical evidence does not lie, Zain's testimony must have been very persuasive. Of course, what the jurors did not

10

162

know at that time was Zain's history of making up data, falsifying records, lying or exaggerating about his credentials, overstating statistical frequencies, and waiving his "magic wand," all designed to make a suspect appear to be guilty allegedly based upon an analysis of the physical evidence.

The impact of Zain's testimony on the jury must be analyzed within the context of the trial. When Zain entered the court room, he had the aura of a person entrusted by law enforcement to perform this very specialized task. He wanted the jury to believe him and rely on his expert opinions, so he detailed his education and work history. He summarized the number of times other courts throughout the state had acknowledged that he was an expert in his field. He was cloaked with the label "expert witness" by this Court, which found him to be qualified, based upon his testimony. (SECOND TRIAL Tr. 1072). He rattled off terms of art common in his field of expertise, but foreign to most if not all jurors. Particularly in an area as complex as serological testing, jurors are at the mercy of the expert witness and must accept the expert opinions stated as true because most jurors lack the educational background to analyze critically and scientifically the opinions presented.

Placed in this context, how could the jury not have been prejudiced by hearing Zain testify that the seven types obtained from the unknown blood samples found on Item No. 15 (the change purse), Item No. 11 (the utensil drawer), Item No. 14 (the door between the master bedroom and the front door), Item No. 12 (the pillow case from the bedroom beside the bath), and the flashlight, eliminated 99.9 % of the population, meaning that **one person in one thousand** would have those seven blood

11

163

types, and that Petitioner was included in the population with that particular combination of seven blood types? (SECOND TRIAL, Tr. 1120). How could the jury not have been prejudiced by hearing Zain testify that the nine types obtained from the unknown blood samples found on Item No. 7 (the curtain on the kitchen door), the Christmas wrapping paper, and the clothing of Bernadette Reggettz eliminated 99.97 % of the population, meaning that **three persons in ten thousand** would have those nine blood types, and that Petitioner was included in the population with that particular combination of nine blood types? (SECOND TRIAL, Tr. 1122-25). Regardless of any assertions made by Respondent to the contrary, the obvious answer to both rhetorical questions is that it is impossible for any person to suggest that the jury was not prejudiced by Zain's testimony.

It is not surprising that at this point, the State is attempting to minimize the importance of Zain's testimony, when before the jury, the State referred again and again to Zain's test results and testimony. What is surprising is the following comment included on page 13 of Respondent's brief:

> "Under the totality of the circumstances, there is no real possibility that the testimony of Fred Zain 'prejudiced' the jury. **Petitioner did not testify concerning his confession or the gift he gave to Mrs. Johnson, or present any other evidence on these issues. Therefore, it was not a case where the defendant was able to 'explain' all of the evidence besides the serology evidence. Had the Petitioner and his trial counsel been able to present a plausible explanation for why he confessed despite his 'innocence', and the origin of the gift to Mrs. Johnson, then there might be the possibility that he was indeed 'prejudiced' by Zain's testimony. However, his trial defense left too many pieces of the State's evidence unanswered for this to be the case here.**" (Emphasis added).

164

Petitioner disputes Respondent's assertion that the weaknesses in the other evidence relied upon by the State were not challenged by Petitioner at trial. However, more importantly, Petitioner has a constitutional right not to testify at trial, is not obligated to refute any evidence presented by the State, and is not required to provide an explanation for every minor fact deemed by the State to be indicative of guilt. The burden is upon the State to prove Petitioner's guilt beyond a reasonable doubt. In this case, the State prevailed against Petitioner only because it relied upon the invalid, unreliable, inadmissible, and false testimony of Fred Zain.

This attempt by Respondent to shift the burden of proof to Petitioner was necessitated by the fact that Respondent in reality has no legitimate argument that Zain did not have a prejudicial effect on the jury. Although Respondent seeks to diminish Zain's involvement at this time, clearly this effort is refuted by the record in the second trial. In the jury's eyes, based upon the State's arguments, Zain must have appeared to be a brilliant scientist whose analysis provided the jury with the independent evidence needed to shift the weight of the evidence toward Petitioner and away from Mr. Reggettz. Although Respondent has made an attempt to argue that Zain had no prejudicial effect on the jury, Petitioner respectfully submits that the effort is wholly unconvincing and unsupported by the record. Consequently, Petitioner respectfully submits that it cannot be disputed that Zain had a prejudicial effect on the jury, requiring a reversal of Petitioner's convictions and the entry of a judgment of acquittal or an order requiring a new trial.

13

165

## V.

## PETITIONER'S CASE IS GOVERNED
## BY THE *LABORATORY* DECISION

After going through the analysis dictated by the *Laboratory* decision, Respondent curiously finishes his brief by asserting that this case should not be governed by that decision.  This same assertion is reiterated in the supplemental argument.  Respondent's theory is that despite Zain's record of deceit, this Court should accept his test results and testimony as valid and reliable in this case.

Respondent argues that since some of the testing was conducted by Robert Murphy and the testing performed by Zain was reviewed by Mr. Murphy, this Court should accept the test results.  According to Mr. Murphy's deposition and the exhibits attached thereto, Mr. Murphy only conducted the testing of nine potential suspects, including control samples from the victims (Bates Number 000010), and four items listed at the bottom of Bates Number 000012, including clothing from Bernadette Reggettz.  **ALL** of the remaining items, including all other items from the crime scene and control samples from the victims, were tested by Zain (Bates Numbers 000011, 000012, 000013, 000014).

In the supplemental argument, Respondent places great significance on the fact that Mr. Murphy analyzed a blood stain on Bernadette Reggettz's clothing and obtained an EsD result consistent with Petitioner, but inconsistent with any member of the Reggettz family.  This argument ignores the fact that this result was not preserved for other analysis (the *Thomas* problem discussed above) and the undisputed fact that the laboratory at that time lacked written protocol and a quality control,

14

quality assurance program to ensure the accuracy of the results. Dr. Bing testified that without these indicia of reliability, which would permit another expert to review the results to determine their accuracy, the testing conducted in this case was virtually "meaningless." Finally, Dr. Bing explained that even if the EsD type is accepted as accurate and reliable, it should be considered by itself in comparison with Petitioner's EsD type, rather than by multiplying the EsD frequency by the frequencies of all of the types obtained from a particular sample. The rationale for this opinion is that since all of the other types obtained from, in this instance, the blood found on Bernadette Reggettz's clothing, could have been deposited by other members of the Reggettz family, it is not proper to include those other frequencies.

Petitioner agrees with Respondent that in many respects, this case is unique. Besides the unusual fact that two different people allegedly confessed to being the sole perpetrator of the murders, this case also is unique in that Zain obtained most if not all of the blood samples from the crime scene himself. Mr. Murphy acknowledged that it was very unusual for a serologist to go to a crime scene and obtain the samples himself. Zain's extensive involvement in this case not only raises serious questions regarding the reliability of any of his test results, but also creates reasonable doubts regarding the integrity of the evidence itself.

The fact that Mr. Murphy testified to reviewing most if not all of Zain's work should be of little comfort to Respondent. Throughout his tenure with the Department of Public Safety, Zain's work was reviewed by others in the serology laboratory, and yet he continued to falsify data consistently in case after case. When

169

Zain's work was analyzed by qualified experts, in connection with the investigation headed by Special Judge Holliday, these experts found that Zain had falsified data or otherwise acted contrary to well established scientific principles **IN EVERY CASE EXAMINED, WITHOUT ANY EXCEPTIONS!!!**   With this well documented condemnation of Fred Zain and the fraud he committed on courts throughout West Virginia and elsewhere, it is unimaginable that any person at this time would even suggest that this Court or any other court should place any reliance whatsoever in anything Fred Zain ever did in a laboratory.

Respondent further asserts that Mr. Murphy and Zain were under considerable pressure to prove that Mr. Reggettz was the actual killer, but they refused to bow down to that pressure.  This argument suggests that since Mr. Murphy and Zain did not falsify their results to incriminate Mr. Reggettz, then this Court should accept Zain's analysis in this one case as being fully reliable and accurate.  This argument not only is absurd on its face because it accepts the fact that Zain has a history of falsifying data to incriminate a suspect, but ignores all of the scientific deficiencies noted by Dr. Bing in his analysis of the serological testing.

The problem with any case involving Zain is that it is virtually impossible to know when he was making things up or when he conducted testing in accordance with well accepted scientific principles.  Where there is evidence remaining to be tested, DNA testing may provide scientific evidence that is valid and reliable, thus avoiding the

16

168

problems inherent in any testing performed by Zain. However, in this case, even if evidence is available for DNA testing and the problems with having no controls from the victims is overcome, Zain has tainted the reliability of the evidence because he was the person who obtained it from the crime scene.

Even if the State could overcome the significant scientific problems with the testing conducted in this case, as outlined in Dr. David Bing's deposition, at the most, Respondent merely has identified additional evidence this Court could consider in applying the first prong of Syllabus Point 3. In other words, if this Court were to find this one ESD result obtained by Mr. Murphy combined with Petitioner's alleged confessions and the alleged other corroborative facts to be sufficient to sustain the conviction, the real question is whether the jury was prejudiced by Zain's testing and testimony. Clearly, as discussed above, even with this new argument, the result is the same.

Thus, despite Respondent's assertion to the contrary, the serological testing performed by Zain as well as his testimony are entitled to less than zero weight in this case. While this case does present this Court with certain unique facts, there is nothing about this case supporting Respondent's final assertion that this case is not controlled by the *Laboratory* decision.

17

169

## VI.

## CONCLUSION

For the foregoing reasons, and for the reasons set out in his **PETITION** and **PETITIONER'S SUPPLEMENTAL BRIEF**, Petitioner John Moss, III, respectfully moves this Court to set aside his convictions and to enter a judgment of acquittal or to order a new trial.

**JOHN MOSS, III**, Petitioner,
--By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

170

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **PETITIONER'S RESPONSE TO MEMORANDUM IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS** was hand-delivered to counsel of record on the 2nd day of October, 1996:

        Steve Revercomb
        Jon Blevins
        Assistant Prosecuting Attorney
        Kanawha County Judicial Court Annex Bldg
        111 Court Street
        Charleston, West Virginia 25301
        (304) 357-0300

Lonnie C. Simmons

19