**MOSS v. BALLARD
CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 33
(Continuation, pp. 172 - 344)**

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

        Petitioner,

v.

        Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

        Respondent.

## NOTICE OF STATUS CONFERENCE

**PLEASE TAKE NOTICE** that on the 31st day of January, 1997, at 3:00

o'clock p.m., a status conference will be held regarding the above-styled case before the

Honorable A. Andrew MacQueen, III, Judge of the Circuit Court of Kanawha County,

in his courtroom, at which time and place you may appear to protect your interests.

        **JOHN MOSS, III**, Petitioner,
        --By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133
Counsel for Petitioner John Moss, III

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **NOTICE OF STATUS CONFERENCE**, was served upon counsel of record on the 6th day of January, 1997, by the United States Postal Service, postage prepaid.

Steve Revercomb
Peter C. Brown
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg
111 Court Street
Charleston, West Virginia 25301
(304) 357-0300
Counsel for Respondent George Trent

Lonnie C. Simmons

2

173

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

        Petitioner,

v.

                                  Civil Action No. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

        Respondent.

## PETITIONER'S RESPONSE TO MEMORANDUM IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

### I.

### INTRODUCTION

In his initial **PETITION FOR WRIT OF HABEAS CORPUS** and subsequent **PETITIONER'S SUPPLEMENTAL BRIEF ON ISSUES RAISED IN HABEAS CORPUS PETITION**, Petitioner John Moss, III, stated in great detail the basis for his argument that he is entitled to a judgment of acquittal or a new trial. Petitioner based his claim for habeas corpus relief, in part, upon the West Virginia Supreme Court's decision in *In the Matter of Investigation of the West Virginia State Police Crime Laboratory*, 190 W.Va. 321, 438 S.E.2d 501 (1993). Stated simply, in a case where Paul Reggettz, III, and Petitioner allegedly confessed to being solely responsible for the murders of Vanessa Reggettz, Paul Eric Reggettz, and Bernadette Lynn Reggettz, the testimony of Fred Zain was the most compelling independent evidence presented to the jury that incriminated Petitioner and exonerated Mr.

175.

Reggettz. Since Zain's testing and testimony has been discredited and cannot be deemed reliable, Petitioner is entitled to a reversal of his convictions and either a judgment of acquittal or a new trial.

Recently, Respondent George Trent filed a brief opposing Petitioner's request for habeas corpus relief and followed that brief with a supplemental argument. In applying the *Laboratory* decision, Respondent contends that after excluding Zain's testimony, the remaining evidence at Petitioner's trial was sufficient to sustain his conviction. Further, after reaching that conclusion, Respondent then asserts that Fred Zain's testimony could not have prejudiced the jury because at trial, Petitioner did not take the stand or otherwise "explain" the alleged other incriminating evidence. Finally, Respondent argues in his original brief and in the supplemental argument that this case is not a "Zain" case, as contemplated by the West Virginia Supreme Court, because Zain was working under the supervision of Robert Murphy and because Zain had an opportunity to incriminate Paul Reggettz, III, but did not do so.

A closer review of Respondent's arguments merely confirms the fact that he is entitled to a judgment of acquittal or a new trial under the *Laboratory* decision. In this brief, Petitioner will respond to the arguments presented. However, for purposes of this critical decision, Petitioner also relies upon the extensive arguments already stated in the original **PETITION** and in **PETITIONER'S SUPPLEMENTAL BRIEF**. Consequently, based upon all of the arguments set out in the **PETITION**, **PETITIONER'S SUPPLEMENTAL BRIEF**, and in this brief, Petitioner respectfully moves this Court to set aside his convictions and either to enter a judgment of acquittal or a new trial.

## II.

## PARTIES GENERALLY AGREE ON APPLICABLE LEGAL STANDARD

Before addressing the merits of Respondent's arguments, the Court should note the areas where Petitioner and Respondent are in agreement. First, Respondent does not dispute that this issue is ripe for decision at this time. The parties have endeavored to develop a complete record relevant to the serological testing by and testimony of Fred Zain.

For the Court's convenience and reference, Petitioner has filed with this brief a notebook containing the portions of the record relevant to the Fred Zain issue. Although the habeas corpus record in this case includes the first trial transcript, the second trial transcript, and the *State v. Paul Reggettz, III* hearing transcripts, the proceedings and documents included in the notebook should be sufficient for this Court in ruling on this issue. In this notebook are the following:

Tab 1: The complete deposition of Robert Murphy, with attached exhibits;

Tab 2: The complete deposition of Dr. David Bing, with attached exhibits;

Tab 3: The opening statement by the State, which included multiple references to Fred Zain;

Tab 4: The testimony of Fred Zain;

Tab 5: The tables created by Petitioner's counsel summarizing the serological testing in this case; and

Tab 6: The closing statements by the State, which included multiple references to Fred Zain.

3

Second, Petitioner and Respondent agree that this Court's decision is controlled by Syllabus Point 3 of the *Laboratory* decision, which provides:

> "'Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury. Syllabus Point 2, *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980)."

As noted in the original **PETITION**, Petitioner contends that the West Virginia Supreme Court mistakenly applied the harmless error standard for **nonconstitutional** violations to a situation where **constitutional** violations are demonstrated. Syllabus Point 2 of the *Laboratory* decision clearly states that a conviction based upon false evidence is a **constitutional** violation. The harmless error standard for constitutional violations is set out in Syllabus Point 5 of *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975):

> "Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt."

*See also* Syllabus Point 3, *State v. Barrow*, 178 W.Va. 406, 359 S.E.2d 844 (1987); Syllabus Point 1, *Maxey v. Bordenkircher*, 175 W.Va. 49, 330 S.E.2d 859 (1985); *United States v. Hasting*, 461 U.S. 499, 510-11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96,107 (1983); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

4

*178*

Petitioner respectfully submits that under this more appropriate standard, the State would never be able to establish that the admission of Zain's invalid, unreliable, inadmissible, and false testimony and test results was "harmless beyond a reasonable doubt." Nevertheless, although Petitioner has preserved this issue and seeks a ruling from this Court on this point, as a practical matter, the same result obtains regardless of which harmless error standard is applied. The only difference is that for a constitutional violation, Respondent must demonstrate that the error is harmless beyond a reasonable doubt, while for a nonconstitutional error, where the remaining evidence is sufficient to sustain the conviction, Petitioner must demonstrate a prejudicial effect on the jury.

Third, Respondent acknowledges that the West Virginia Supreme Court has mandated habeas corpus review of all cases involving Zain and further asserts that "[t]here is no argument here that Petitioner is not entitled to such review." Thus, Respondent concedes that Petitioner is entitled to this review of his case, based upon the law discussed in the *Laboratory* decision.

Fourth, Respondent does not dispute the summary of Fred Zain's extensive involvement in this case, outlined in great detail in the original **PETITION** and summarized in **PETITIONER'S SUPPLEMENTAL BRIEF**. In fact, Respondent provides his own summary of Zain's involvement in this case, which supports Petitioner's assertion that Zain was the single most critical witness who provided independent evidence incriminating Petitioner. In the supplemental argument, Respondent concedes that "There is no question that discredited former State Police

5

*179*

Serologist Fred Salem Zain was intimately involved in the testing and analysis of evidence in Petitioner's case."

Finally, even though Petitioner has raised an issue regarding the State's failure to preserve the evidence, citing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *State v. Thomas*, 187 W.Va. 686, 421 S.E.2d 227 (1992), *State v. Harr*, 156 W. Va. 492, 194 S.E.2d 652 (1973), *State v. Adkins*, 167 W.Va. 626, 280 S.E.2d 293 (1981), and *State v. McArdle*, 156 W.Va. 409, 194 S.E.2d 174 (1973), the Court need not address this issue at this time. Since the Zain issue is dispositive, any other legal issues relating to the State's failure to preserve any evidence for testing can be litigated either prior to a new trial or in the rest of this habeas corpus action, in the event no new trial is awarded.

### III.

### WITHOUT ZAIN'S TESTIMONY,
### EVIDENCE INSUFFICIENT TO SUPPORT CONVICTION

Under the first prong of the analysis stated in Syllabus Point 3, this Court first must examine the evidence, excluding all of the testing and testimony of Fred Zain, and determine whether the remaining evidence is sufficient "to convince impartial minds of the defendant's guilt beyond a reasonable doubt." In arguing this point, Respondent relies mainly on the confessions allegedly given by Petitioner. Since a conviction cannot be sustained based upon an uncorroborated confession, Respondent relies upon the following evidence in concluding that Petitioner's confession is sufficiently corroborated:

6

180

1.  The finding of a camera in Petitioner's home, which corroborated the confession;

2.  Evidence that Petitioner gave flatware to a Mrs. Johnson, which was similar to flatware missing from the Reggettz home;

3.  Mrs. Johnson's testimony that Petitioner had scratches and a bandage on his face, which could have been inflicted during a struggle with Vanessa Reggettz;

4.  Petitioner's statement that Vanessa Reggettz had a bumpy face, which was inconsistent with live pictures of her, but consistent with her appearance at death;

5.  The broken gun found at the scene of the crime, which corroborated Petitioner's confession that he had hit Vanessa Reggettz with the gun; and

6.  A knife found beside Vanessa Reggettz at the crime scene, which was consistent with Petitioner's confession.

These alleged corroborative facts are easily dismissed.  There was no evidence identifying either the camera or the flatware as being **the** camera and flatware belonging to the Reggettz family.  Scratches and bandages on Petitioner's face could have been the result of a number of things unrelated to the murders.  The attempt to relate an innocuous comment allegedly made by Petitioner regarding the facial complexion of Vanessa Reggettz and her condition after death is very speculative, at best, and irrelevant, at worst.

Finally, the fact that a broken gun and a knife were found at the crime scene was already known by the officers who obtained the confession from Petitioner. If this same standard were applied to the confession given by Mr. Reggettz, the Court would find that the facts discovered at the crime scene are reported more accurately in the confessions given by Mr. Reggettz than in the confessions allegedly given by

18)

Petitioner. In fact, Mr. Reggettz confessed that he and Vanessa Reggettz struggled over the gun, which he threw in the bedroom.     (SECOND TRIAL Tr. 599-600). Furthermore, Respondent ignores the inconsistencies in the alleged confessions given by Petitioner, such as Petitioner's alleged reference to stabbing Vanessa Reggettz with a knife, rather than the scissors found at the scene. (SECOND TRIAL Tr. 531-32).

Petitioner respectfully submits that Respondent's analysis fails to give appropriate weight to the unique facts of this case, where two different people, Paul Reggettz, III, and Petitioner, allegedly confessed to being solely responsible for all three murders.  Respondent's position might be correct if this Court were presented with a case where only Petitioner had confessed to the crime and there were facts corroborating that confession.  However, this Court cannot ignore the evidence of Mr. Reggettz's confessions, because they establish a major reasonable doubt that the State has to overcome before prevailing against Petitioner.  In other words, it is not appropriate under these facts for this Court merely to review the evidence against Petitioner when the record is replete with evidence indicative of Mr. Reggettz's guilt.

If a conviction against Petitioner could be sustained based upon his alleged confessions and other corroborative facts, then the same could be said regarding Mr. Reggettz. There were more corroborative facts supporting Mr. Reggettz's confessions, particularly in light of the fact that he reenacted the murders and was the initial person on the scene.  Where the evidence is sufficient to sustain a conviction against two different people, both of whom confessed to being the sole person responsible for the crime, Petitioner respectfully submits that absent compelling physical or other

8

evidence directly linking one of the confessors to the crime, neither person can be convicted because the other person's confession and corroborative evidence renders it impossible for the remaining evidence to be sufficient "to convince impartial minds of the defendant's guilt beyond a reasonable doubt." This assertion is particularly true where, as in the present case, trial courts analyzing the totality of the circumstances of the two different confessions have held they were intelligently and voluntarily given.

If it is assumed, as found by the respective trial courts involved, that both confessions were given intelligently and voluntarily by Mr. Reggettz and Petitioner, then what basis did the jury have to reject the confessions given by Mr. Reggettz? Clearly, when weighing the evidence against Mr. Reggettz and Petitioner, the deciding evidence was the testimony of Fred Zain. Zain's testimony appeared to be scientifically reliable and based upon objective physical evidence found at the crime scene. Since, according to Zain, some of the unknown blood found could not have been deposited by Mr. Reggettz, and some of the stains were consistent with Petitioner's blood types, the testing, if valid, incriminated Petitioner and exonerated Mr. Reggettz. Thus, no matter how hard Respondent tries to rely upon tangential facts to support the conviction, clearly the evidence in the record is insufficient to convince impartial minds of Petitioner's guilt beyond a reasonable doubt, without Zain's testing and testimony.

Having established that without Zain's testing and testimony, Petitioner's conviction cannot be sustained on the remaining evidence, Petitioner respectfully submits that the analysis should stop here. The second prong in this analysis provides that "if the remaining evidence is found to be insufficient, the error is not harmless."

9

183

Thus, based upon this review of the evidence, Petitioner is entitled either to a judgment of acquittal or a new trial.

## IV.

### EVEN IF EVIDENCE SUFFICIENT TO SUSTAIN CONVICTION, ZAIN'S TESTIMONY CLEARLY HAD PREJUDICIAL EFFECT ON THE JURY

In the event this Court finds that without Zain's testimony, the remaining evidence is sufficient to sustain Petitioner's conviction, the Court then is required to determine "whether the error had any prejudicial effect on the jury." In the context of the *Laboratory* decision, the "error" referred to is the admission of Fred Zain's testing and testimony. Petitioner respectfully submits that the prejudicial effect on the jury in this case was monumental and the deciding factor in his conviction.

Interestingly, in addressing this issue, Respondent acknowledges the considerable involvement of Fred Zain in this trial. Petitioner provided this Court with a very detailed summary of Zain's involvement in this case in his **PETITION** and **PETITIONER'S SUPPLEMENTAL BRIEF**. Again, rather than repeating those same facts, Petitioner refers this Court to those pleadings, which include quotes and the relevant citations to the record.

Any juror having any reasonable doubts about Petitioner's guilt, based upon the detailed confessions given by Mr. Reggettz, must have been quite impressed with Zain's ability to make the physical evidence point the finger of guilt toward Petitioner. Since most people would like to believe that physical evidence does not lie, Zain's testimony must have been very persuasive. Of course, what the jurors did not

10

184

know at that time was Zain's history of making up data, falsifying records, lying or exaggerating about his credentials, overstating statistical frequencies, and waiving his "magic wand," all designed to make a suspect appear to be guilty allegedly based upon an analysis of the physical evidence.

The impact of Zain's testimony on the jury must be analyzed within the context of the trial. When Zain entered the court room, he had the aura of a person entrusted by law enforcement to perform this very specialized task. He wanted the jury to believe him and rely on his expert opinions, so he detailed his education and work history. He summarized the number of times other courts throughout the state had acknowledged that he was an expert in his field. He was cloaked with the label "expert witness" by this Court, which found him to be qualified, based upon his testimony. (SECOND TRIAL Tr. 1072). He rattled off terms of art common in his field of expertise, but foreign to most if not all jurors. Particularly in an area as complex as serological testing, jurors are at the mercy of the expert witness and must accept the expert opinions stated as true because most jurors lack the educational background to analyze critically and scientifically the opinions presented.

Placed in this context, how could the jury not have been prejudiced by hearing Zain testify that the seven types obtained from the unknown blood samples found on Item No. 15 (the change purse), Item No. 11 (the utensil drawer), Item No. 14 (the door between the master bedroom and the front door), Item No. 12 (the pillow case from the bedroom beside the bath), and the flashlight, eliminated 99.9 % of the population, meaning that **one person in one thousand** would have those seven blood

185

types, and that Petitioner was included in the population with that particular combination of seven blood types? (SECOND TRIAL, Tr. 1120). How could the jury not have been prejudiced by hearing Zain testify that the nine types obtained from the unknown blood samples found on Item No. 7 (the curtain on the kitchen door), the Christmas wrapping paper, and the clothing of Bernadette Reggettz eliminated 99.97 % of the population, meaning that **three persons in ten thousand** would have those nine blood types, and that Petitioner was included in the population with that particular combination of nine blood types?   (SECOND TRIAL, Tr. 1122-25). Regardless of any assertions made by Respondent to the contrary, the obvious answer to both rhetorical questions is that it is impossible for any person to suggest that the jury was not prejudiced by Zain's testimony.

It is not surprising that at this point, the State is attempting to minimize the importance of Zain's testimony, when before the jury, the State referred again and again to Zain's test results and testimony. What is surprising is the following comment included on page 13 of Respondent's brief:

> "Under the totality of the circumstances, there is no real possibility that the testimony of Fred Zain 'prejudiced' the jury. **Petitioner did not testify concerning his confession or the gift he gave to Mrs. Johnson, or present any other evidence on these issues. Therefore, it was not a case where the defendant was able to 'explain' all of the evidence besides the serology evidence. Had the Petitioner and his trial counsel been able to present a plausible explanation for why he confessed despite his 'innocence', and the origin of the gift to Mrs. Johnson, then there might be the possibility that he was indeed 'prejudiced' by Zain's testimony. However, his trial defense left too many pieces of the State's evidence unanswered for this to be the case here."** (Emphasis added).

12

186

Petitioner disputes Respondent's assertion that the weaknesses in the other evidence relied upon by the State were not challenged by Petitioner at trial. However, more importantly, Petitioner has a constitutional right not to testify at trial, is not obligated to refute any evidence presented by the State, and is not required to provide an explanation for every minor fact deemed by the State to be indicative of guilt. The burden is upon the State to prove Petitioner's guilt beyond a reasonable doubt. In this case, the State prevailed against Petitioner only because it relied upon the invalid, unreliable, inadmissible, and false testimony of Fred Zain.

This attempt by Respondent to shift the burden of proof to Petitioner was necessitated by the fact that Respondent in reality has no legitimate argument that Zain did not have a prejudicial effect on the jury. Although Respondent seeks to diminish Zain's involvement at this time, clearly this effort is refuted by the record in the second trial. In the jury's eyes, based upon the State's arguments, Zain must have appeared to be a brilliant scientist whose analysis provided the jury with the independent evidence needed to shift the weight of the evidence toward Petitioner and away from Mr. Reggettz. Although Respondent has made an attempt to argue that Zain had no prejudicial effect on the jury, Petitioner respectfully submits that the effort is wholly unconvincing and unsupported by the record. Consequently, Petitioner respectfully submits that it cannot be disputed that Zain had a prejudicial effect on the jury, requiring a reversal of Petitioner's convictions and the entry of a judgment of acquittal or an order requiring a new trial.

187

## V.

## PETITIONER'S CASE IS GOVERNED
## BY THE *LABORATORY* DECISION

After going through the analysis dictated by the *Laboratory* decision, Respondent curiously finishes his brief by asserting that this case should not be governed by that decision. This same assertion is reiterated in the supplemental argument. Respondent's theory is that despite Zain's record of deceit, this Court should accept his test results and testimony as valid and reliable in this case.

Respondent argues that since some of the testing was conducted by Robert Murphy and the testing performed by Zain was reviewed by Mr. Murphy, this Court should accept the test results. According to Mr. Murphy's deposition and the exhibits attached thereto, Mr. Murphy only conducted the testing of nine potential suspects, including control samples from the victims (Bates Number 000010), and four items listed at the bottom of Bates Number 000012, including clothing from Bernadette Reggettz. **ALL** of the remaining items, including all other items from the crime scene and control samples from the victims, were tested by Zain (Bates Numbers 000011, 000012, 000013, 000014).

In the supplemental argument, Respondent places great significance on the fact that Mr. Murphy analyzed a blood stain on Bernadette Reggettz's clothing and obtained an EsD result consistent with Petitioner, but inconsistent with any member of the Reggettz family. This argument ignores the fact that this result was not preserved for other analysis (the *Thomas* problem discussed above) and the undisputed fact that the laboratory at that time lacked written protocol and a quality control,

14

*188*

quality assurance program to ensure the accuracy of the results. Dr. Bing testified that without these indicia of reliability, which would permit another expert to review the results to determine their accuracy, the testing conducted in this case was virtually "meaningless." Finally, Dr. Bing explained that even if the EsD type is accepted as accurate and reliable, it should be considered by itself in comparison with Petitioner's EsD type, rather than by multiplying the EsD frequency by the frequencies of all of the types obtained from a particular sample. The rationale for this opinion is that since all of the other types obtained from, in this instance, the blood found on Bernadette Reggettz's clothing, could have been deposited by other members of the Reggettz family, it is not proper to include those other frequencies.

Petitioner agrees with Respondent that in many respects, this case is unique. Besides the unusual fact that two different people allegedly confessed to being the sole perpetrator of the murders, this case also is unique in that Zain obtained most if not all of the blood samples from the crime scene himself. Mr. Murphy acknowledged that it was very unusual for a serologist to go to a crime scene and obtain the samples himself. Zain's extensive involvement in this case not only raises serious questions regarding the reliability of any of his test results, but also creates reasonable doubts regarding the integrity of the evidence itself.

The fact that Mr. Murphy testified to reviewing most if not all of Zain's work should be of little comfort to Respondent. Throughout his tenure with the Department of Public Safety, Zain's work was reviewed by others in the serology laboratory, and yet he continued to falsify data consistently in case after case. When

189

Zain's work was analyzed by qualified experts, in connection with the investigation headed by Special Judge Holliday, these experts found that Zain had falsified data or otherwise acted contrary to well established scientific principles **IN EVERY CASE EXAMINED, WITHOUT ANY EXCEPTIONS!!!**   With this well documented condemnation of Fred Zain and the fraud he committed on courts throughout West Virginia and elsewhere, it is unimaginable that any person at this time would even suggest that this Court or any other court should place any reliance whatsoever in anything Fred Zain ever did in a laboratory.

Respondent further asserts that Mr. Murphy and Zain were under considerable pressure to prove that Mr. Reggettz was the actual killer, but they refused to bow down to that pressure.  This argument suggests that since Mr. Murphy and Zain did not falsify their results to incriminate Mr. Reggettz, then this Court should accept Zain's analysis in this one case as being fully reliable and accurate.  This argument not only is absurd on its face because it accepts the fact that Zain has a history of falsifying data to incriminate a suspect, but ignores all of the scientific deficiencies noted by Dr. Bing in his analysis of the serological testing.

The problem with any case involving Zain is that it is virtually impossible to know when he was making things up or when he conducted testing in accordance with well accepted scientific principles.  Where there is evidence remaining to be tested, DNA testing may provide scientific evidence that is valid and reliable, thus avoiding the

16

190

problems inherent in any testing performed by Zain. However, in this case, even if evidence is available for DNA testing and the problems with having no controls from the victims is overcome, Zain has tainted the reliability of the evidence because he was the person who obtained it from the crime scene.

Even if the State could overcome the significant scientific problems with the testing conducted in this case, as outlined in Dr. David Bing's deposition, at the most, Respondent merely has identified additional evidence this Court could consider in applying the first prong of Syllabus Point 3. In other words, if this Court were to find this one ESD result obtained by Mr. Murphy combined with Petitioner's alleged confessions and the alleged other corroborative facts to be sufficient to sustain the conviction, the real question is whether the jury was prejudiced by Zain's testing and testimony. Clearly, as discussed above, even with this new argument, the result is the same.

Thus, despite Respondent's assertion to the contrary, the serological testing performed by Zain as well as his testimony are entitled to less than zero weight in this case. While this case does present this Court with certain unique facts, there is nothing about this case supporting Respondent's final assertion that this case is not controlled by the *Laboratory* decision.

191

## VI.

## CONCLUSION

For the foregoing reasons, and for the reasons set out in his **PETITION** and **PETITIONER'S SUPPLEMENTAL BRIEF**, Petitioner John Moss, III, respectfully moves this Court to set aside his convictions and to enter a judgment of acquittal or to order a new trial.

**JOHN MOSS, III**, Petitioner,
--By Counsel--

*Lonnie C. Simmons*

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

192

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**PETITIONER'S RESPONSE TO MEMORANDUM IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS** was hand-delivered to counsel of record on the 2nd day of October, 1996:

> Steve Revercomb
> Jon Blevins
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300

Lonnie C. Simmons

19

193

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

        Petitioner,

v.

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

        Respondent.

Civil Action No. 94-MISC-663

## PETITIONER'S SUPPLEMENTAL BRIEF ON ISSUES RAISED IN HABEAS CORPUS PETITION

In the **PETITION FOR WRIT OF HABEAS CORPUS** filed by Petitioner John Moss, III, on August 18, 1994, Petitioner sought either a judgment of acquittal or a new trial based upon his contention that his incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10, and 14 of the West Virginia Constitution, on the following grounds:

    1.   The admission of testimony and test results performed by Trooper Fred Salem Zain, whose credentials, credibility, and test results have all been found by the West Virginia Supreme Court of Appeals to be inherently unreliable and a violation of a criminal defendant's constitutional rights.

    2.   The presentation by the State of incorrect, false, misleading, overstated, and unscientific evidence.



104

      3.   The admission of the alleged confessions given by Petitioner, which resulted from a violation of his constitutional rights.  Although the issues regarding the confessions have been extensively litigated in many hearings, Petitioner reserves the right to develop new information and new arguments with regard to the alleged confessions that were previously unavailable.[*]

In the **PETITION**, Petitioner included all of the applicable law entitling him to relief.   The purpose of this brief is to supplement the law set out in the **PETITION** and to add to the factual discussion included therein, based upon the discovery developed in this case.

Before discussing the facts, it should be noted that to date, Respondent has not filed any written response admitting or denying the allegations set out in detail in the **PETITION**.   Under West Virginia law, Petitioner respectfully submits that the failure of Respondent to admit or deny each allegation in the **PETITION** allows this Court to deem all allegations as being admitted.   *See, e.g.*, Syllabus Point 1, *Staton v. Hrko*, ___ W.Va. ___, 379 S.E.2d 159 (1989)(Failure to admit or deny allegations in a mandamus petition permits a court to deem all allegations in the petition as admitted).   Presumably, in light of this law, Respondent will file a written response to the **PETITION** prior to any hearing held in connection with the Zain issue raised.

---

[*]In the hearing to be held on this SUPPLEMENTAL BRIEF, Petitioner will focus only on the issue surrounding the involvement of Fred Zain.  Petitioner specifically reserves his right to raise any new evidence or arguments in connection with the confession obtained against him at a later time, in the event this Court determines that the Zain issue is not dispositive.  Obviously, if a new trial is granted, Petitioner will raise these issues relating to the confession prior to the new trial.  Consequently, Petitioner wants to make it very clear that he is not waiving any challenge he may have to the validity of the confession obtained by the State from him.

195

The main argument presented by Petitioner is that under the standards set out in *In the Matter of Investigation of the West Virginia State Police Crime Laboratory*, 190 W.Va. 321, 438 S.E.2d 501 (1993), Petitioner is entitled to a judgment of acquittal or a new trial. The Court should note that Petitioner has made an additional argument that the West Virginia Supreme Court in the *Laboratory* decision erred in applying the harmless error test for nonconstitutional errors, rather than the harmless error test for constitutional errors, but that under either test, Petitioner is entitled to a judgment of acquittal or a new trial.

Petitioner respectfully submits that he has presented a compelling case for vacating his convictions based upon the analysis set out in *Laboratory*. Clearly in this case, the testing and testimony of Fred Zain was a critical factor, which was emphasized again and again by the State, as noted in the citations to the trial transcript included in the **PETITION**. If Zain's testing and testimony are removed, as required under the *Laboratory* decision, the jury is left with two conflicting confessions by two different individuals. Thus, the key fact differentiating between the confessions given by Paul Reggettz, III, and by Petitioner was the testing and testimony by Zain.

Petitioner is at the point in this habeas corpus action where he can either spend a great deal of time extensively developing other relevant issues or he can seek a ruling on his strongest argument, leaving the development of other issues to another day. Consequently, Petitioner and his counsel have determined that the record at this time is sufficiently developed to allow this Court to rule on the Zain issue.

3

196

All of the laboratory documentation that could be found by the State has been produced. However, the State was not able to locate any photographs of any of the testing performed, the autorads and notes from the DNA testing performed by Zain, and the original raw laboratory notes. The grand jury transcript resulting in the indictment of Petitioner was produced, pursuant to the order of this Court, but the grand jury transcript resulting in the indictment of Reggettz was never found. An independent expert, Dr. David Bing, has reviewed Zain's testimony and the underlying documentation, and the person who assisted Zain in the testing, Robert Murphy, was deposed. With this background, Petitioner respectfully believes that the Zain issue in this case is ripe for decision. However, in the event this Court determines that this issue alone does not justify a judgment of acquittal or a new trial, Petitioner reserves the right to pursue additional issues in the context of this habeas corpus action.

The deposition of Robert Murphy was taken on May 17, 1995. (A copy of his deposition is attached under Tab 1). As the Court may recall, Mr. Murphy is the person who issued the report dated June 10, 1980, summarizing the blood typing tests performed in this case. Mr. Murphy acted as a serologist for the West Virginia Department of Public Safety approximately from 1974 to 1982. (Murphy Dep. at 6). Once Fred Zain was hired, Mr. Murphy supervised him in the serology laboratory. (Murphy Dep. at 6).

Mr. Murphy testified that it was unusual for a serologist to go to the scene of a crime to collect evidence samples, as Zain did in the present case. In fact, he could only recall one case when he (Mr. Murphy) was ordered to obtain evidence samples at the scene of a crime. (Murphy Dep. at 11).

4

As of December, 1979, the laboratory had no written protocols on laboratory procedure, the collection of evidence, or any of their testing procedures. (Murphy Dep. at 13). He also explained that at that time, the laboratory did not have any quality control, quality assurance program. (Murphy Dep. at 14).

With regard to the testing conducted in this case, Mr. Murphy explained:

"A.  To the best of my recollection, I was involved in most of the testing.

"Q.  Okay.

"A.  I don't know that I saw-- that I did everything, but I did see all of the results.

"Q.  Who else would have been involved in the testing?

"A.  Fred Zain."   (Murphy Dep. at 17).

In his deposition, Mr. Murphy reviewed the laboratory documents produced, and marked "Murphy" on documents written by him and "Not Murphy" on documents written by some other person in the laboratory. As a general rule, if the writing was in Murphy's handwriting, he performed those tests. These documents were attached as a group exhibit to Mr. Murphy's deposition. Of particular interest in the documentation is one sheet, marked with Bates Number 000013, which records the results of tests performed on most of the evidence items obtained by Zain. The back of this sheet has the initials "FSZ" and Petitioner respectfully submits that Zain is the person who recorded this information, which indicates he is the person who performed these particular tests. Thus, the most critical testing in this case was performed by Zain.

5

198

The deposition of Dr. David H. Bing was taken on June 5, 1995. (A copy of his deposition is attached under Tab 2). Dr. Bing had reviewed all of the trial testimony of Fred Zain from the first and second trials, all of the laboratory documentation produced by the State, the autopsy report, and the **PETITION FOR WRIT OF HABEAS CORPUS** filed by Petitioner. Dr. Bing initially noted that the lack of any photographs recording the results of electrophoretic typing made it impossible for him to evaluate the accuracy of the results reported. (Dr. Bing Dep. at 12-13). Due to this lack of preserving the test results, for purposes of his analysis, Dr. Bing had to assume the typings were correct. (Dr. Bing Dep. at 13).

Dr. Bing explained the importance of having a written protocol in the laboratory and a quality control, quality assurance program. (Dr. Bing Dep. at 18-19). In explaining why he believed the data generated in this case was meaningless, Dr. Bing stated:

> "Well, by that I mean that the -- there is so much data on these stains that weren't analyzed, it would seem to me there should be some extensive notes backing that material up. So that in that -- in the context of not being able to look at the backup data, other than the summaries, it becomes, you know, almost impossible for me to either agree or disagree with the final outcome of the results. And that's what I mean by when I say it's meaningless. I can't agree, I can't disagree. All I can say is what was reported." (Dr. Bing Dep. at 21-22).

After commenting on the lack of any written protocols, quality control, quality assurance programs, original laboratory notes and photographs of the testing performed, Dr. Bing went through a series of general scientific principles applicable to the serological testing performed in this case. The purpose of this analysis was to demonstrate the flaws in the conclusions reached based upon the data and the overstating of the significance of this testing at trial.

First, he noted that it is important to obtain the known blood types of all potential donors of blood at the scene of the crime. In this case, the potential donors of blood were Vanessa Dale Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III. (Dr. Bing Dep. at 22-23).

Second, at a crime scene, where the origin of all evidentiary stains is unknown, it cannot be assumed that the stains originated from a single source. (Dr. Bing Dep. at 24). Third, only those types obtained from the evidence that are different from any of the types obtained from known possible donors provides relevant and meaningful information to the forensic scientist. Dr. Bing gave the following hypothetical to illustrate this general principle:

> "Think of it another way. Suppose that the distinguishing factor of a blood stain was something that you can actually visualize. Suppose that you could look at this blood stain and you could say unequivocally, 'I know that that blood stain came from somebody who has brown hair.' Brown hair is a genetic marker. In some ways it's very similar to, say, a blood type antigen because there is a certain -- The color or the reason it's brown is due to certain genetic markers that result in color. So you say I know -- It doesn't make any difference how I know it. I know this blood stain is from somebody who has brown hair. Now, you get your list of possible donors to that and you -- and they all have brown hair. You can't say that any one person is more likely than another to be a donor to that blood stain.

> "Now, let's say if we can do a little bit more. Let's say, 'Well, I can' -- 'I know that the person who contributed to this blood stain has brown hair and is left-handed.' So you now look at your candidates, and you look at them and you say, 'Well, three of them are left-handed and say two are right-handed.' Well, the two who are right-handed are automatically eliminated, but you still can't distinguish between the other three because left-handedness and brown hair color are the same in all of them.

"So that if you have a series of markers and they're identical in all the people that are being tested, then you can't really use that to try to distinguish the source of a given blood stain. You can only look to the differences, not to the similarities, because the question that is being asked here, the scientific question that is being asked is who could possibly be a biologic donor to this blood stain.

"And, secondly, I don't know whether there's a single person or from a bunch of people. As I stated in my affidavit, is it a single source sample or many people are sources of the sample. So you have to look to the differences between individuals who you test rather than to their similarities." (Dr. Bing Dep. at 25-26).

Fourth, as a general rule, where a type from a known possible donor of a blood stain matches a type from the blood discovered, it is not appropriate to include that type in calculating the frequency that the blood was deposited by a particular suspect. Dr. Bing illustrated this general principle as follows:

"Let's take another genetic typing you can sort of visualize. Let's suppose that the blood sample that you know came from somebody who has brown hair, is left-handed, and is an albino, has no pigment color in their skin at all. Albinism is a very rare occurrence in the human population. It's very rare indeed. Now, at that point, the fact that you now have three individuals who are left-handed and have brown hair, but only one of them is an albino. You say that's a very rare event. It could only have been that person.

"So you can use that to reason backwards and say, 'Alright, albinism is a very rare event, so I know that this blood stain came from an albino.' That could only have occurred in one out of a very few number of people who have this inherited genetic trait.

"That is separate from the question of saying, "How often is the combination of brown hair, left-handism and albinism found in the general population?' That's a separate question. That's how often do I find these together in the

8

general population.  You can make that estimate as well. But that's a general question about the population.  That is not a question about the sample.  The only thing that distinguishes that sample is what is different about that sample than is in the known individuals that you're testing. So you've got a -- Those two things have to be kept separate.

"And that's what I mean by this, that you can't take a combination of factors that are found in the general population and relate it to a specific sample. All you can say is that if these are present and I now have data to show that are indeed present, this is how often I would expect to find that combination of markers in the general population, providing they are behaving and acting independent of each other, because that's the other issue in terms of being able to do that, they have to be behaving independently.  They have to be what we say scientifically, they sort independently." (Dr. Bing Dep. at 28-29).

Finally, Dr. Bing noted that serological typing is unable to determine when a particular evidentiary stain was deposited.  (Dr. Bing Dep. at 37).  Thus, from a scientific point of view, there is no objective basis for a scientist to conclude that a particular stain actually resulted from the criminal episode or may have been deposited at some time earlier.

The remainder of Dr. Bing's deposition applies these general principles to the facts.  He concludes that the only blood types of significance are PGM, Gc, and EsD. The remaining types obtained from the blood stains found at the crime scene do not provide significant information because the remaining types obtained from the evidence were identical to the types obtained from at least one or more of the known possible donors.  (Dr. Bing Dep. at 38).  Dr. Bing further testified that he agreed with the scientific analysis of the evidence set out in the **PETITION**.  (Dr. Bing Dep. at 39).

9

In addition to the Zain issue, another issue relating to the blood testing performed is the failure of the State to preserve the evidence and the results of the testing for review by Petitioner.  The West Virginia Supreme Court has long held that the State has an obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), to disclose exculpatory evidence to the accused.

Related to this obligation is the requirement that the State preserve evidence which may provide exculpatory evidence.  For example, in Syllabus Point 4 of *State v. Harr*, 156 W. Va. 492, 194 S.E.2d 652 (1973), the West Virginia Supreme Court held:

> "'A person charged with possession of an illegal drug should be permitted to examine the alleged illegal drug under proper supervision and control.' Syl. pt. 3, *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972)."

*See also State v. Adkins*, 167 W.Va. 626, 280 S.E.2d 293 (1981); *State v. McArdle*, 156 W.Va. 409, 194 S.E.2d 174 (1973).

In *McArdle*, the defendant charged with possession and sale of marijuana, sought to have his own independent tests done on the substances seized because his defense was that he did not possess the illegal parts of the plants.  The trial court refused to allow this testing.  In reversing the trial court's ruling on this matter, the West Virginia Supreme Court stated the defendant "should have been permitted to have his expert make laboratory tests and whatever chemical tests he deemed necessary." 156 W.Va. at ___, 194 S.E.2d at 178.  The West Virginia Supreme Court found that the denial of this test was in violation of the fundamental principles discussed by the United States Supreme Court in *Brady*, and quoted the following passage from *Brady*:

10

203

> "'Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. * * * A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant.' *See Mooney v. Holohan*, 294 U.S. 103, 55 S. Ct. 340, 79 L.Ed.2d 791, 98 A.L.R. 406.

> "Applying these principles to this issue we find that the failure to permit the defendant an opportunity to adequately examine and test the substance does not comport with the basic standard of fairness to which an accused is entitled." 156 W.Va. at ___, 194 S.E.2d at 179.

In these cases involving controlled substances, the most critical fact is the identity of the substances confiscated by the police. Similarly, in the present case, one of the critical issues to be determined was the identity of the person or persons whose blood drops were found in the Reggettz home. Thus, even under the law existing at the time Petitioner's case was tried, Petitioner's constitutional rights were violated by the State's failure either to preserve some of the blood samples for testing or to photograph the electrophoretic gels so that another expert could examine the types determined.

The only remedy for the State's admitted failure to preserve this critical evidence is for the State's blood typing results to be inadmissible. The remedy suggested has been adopted by the West Virginia Supreme Court in Syllabus Point 4 of *State v. Thomas*, 187 W.Va. 686, 421 S.E.2d 227 (1992):

> "When the government performs a complicated test on evidence that is important to the determination of guilt, and in so doing destroys the possibility of an independent

11

204

replication of the test, the government must preserve as much documentation of the test as is reasonably possible to allow for a full and fair examination of the results by a defendant and his experts."

In *Thomas*, who was convicted on September 30, 1987, the FBI performed blood typing on three small drops of blood found in the defendant's car. The testing of these samples consumed all of the blood. As a result, there were no blood samples available for the defendant's experts to test. Furthermore, the FBI has a policy of not photographing their electrophoresis gels, which makes it impossible for another expert to review the same results and evaluate the accuracy of the typings.

Under these facts, the West Virginia Supreme Court held that absent photographs of the test results, the State was prohibited from admitting into evidence any of the genetic typings because this failure to preserve such evidence was contrary to a defendant's constitutional right to a fair trial, to full and fair cross-examination, and contrary to the State's constitutional obligation to reveal all potentially exculpatory evidence.

The West Virginia Supreme Court has never held whether or not the decision in *Thomas* is to be applied prospectively only or retroactively. Petitioner respectfully submits that the rule announced in *Thomas* was not new and was consistent with the *Brady* obligation already recognized in *Harr*, *Adkins*, and *McArdle*. Furthermore, under the analysis set out in *Bowman v. Leverette*, ___ W.Va. ___, 289 S.E.2d 435 (1982), Petitioner respectfully submits that the West Virginia Supreme Court will accord retroactive application to *Thomas*. The State's failure to preserve potentially exculpatory evidence goes to the very heart of the truth-finding process and

12

raises serious questions about the validity of guilty verdicts obtained without such evidence.

Under the foregoing analysis, the State's blood typing evidence should have been inadmissible. Moreover, a retroactive application of *Thomas*, which Petitioner respectfully submits would be appropriate, clearly renders the State's blood typing evidence inadmissible as evidence for any purpose. Thus, this Court is presented with two reasons rendering the blood testing performed in this case inadmissible.

First, the testing was performed by Fred Zain, whose work has been wholly discredited and rendered untrustworthy by the *Laboratory* decision. In the report issued by Special Judge Holliday, which is quoted in *Laboratory*, 190 W.Va. at ___, 438 S.E.2d at 503, the following litany of false evidence presented by Zain under oath is noted:

> "'The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results.'"

13

*206*

Consequently, Zain's involvement alone in this case and the critical importance of his testimony and testing is sufficient for this Court to reverse Petitioner's convictions and to grant a judgment of acquittal or a new trial.

Second, the failure of the State to preserve the test results through photographs rendered it impossible for Petitioner to exercise his constitutional right to cross-examine Zain fully and intelligently. Furthermore, by failing to preserve the results of this testing, all of the serological testing allegedly performed is rendered inadmissible because the State failed to maintain photographs of the electrophoretic gels.

The facts set out in the **PETITION** and this analysis of the blood testing summarized in this **SUPPLEMENTAL BRIEF** establishes the following facts which compel the vacating of Petitioner's conviction and awarding a judgment of acquittal or a new trial:

1. Fred Zain personally gathered most of the evidentiary blood stains tested in this case;

2. Fred Zain personally performed the blood typing on most of the evidentiary blood stains tested in this case;

3. Fred Zain testified in Petitioner's first and second trials, and was the only witness in both trials testifying on the serological testing performed by the State;

4. The State, in opening and closing arguments, placed great emphasis on the testing and testimony of Fred Zain;

5. Fred Zain's testing and testimony was the strongest evidence presented against Petitioner and was the critical evidence shifting the balance between the confession given by Paul Reggettz, III, and the confession allegedly given by Petitioner;

14

6.      Based upon the analysis of Dr. David Bing, Fred Zain's testing and testimony in this case was virtually meaningless because he overstated the significance of some of the data, assumed a single source for each of the stains, failed to take into account the possibility that some types obtained could have been deposited by known possible donors, was done at a time when the laboratory had no written protocol, no quality control, quality assurance program, no policy of preserving test results with photographs, and no policy of maintaining original laboratory notes;

7.      Furthermore, the problems set out in the previous paragraph violates Petitioner's constitutional right to fully and fairly cross-examine Fred Zain, when the underlying data relating to the testing performed is unavailable to Petitioner;

8.      Fred Zain performed DNA testing prior to Petitioner's second trial, but was unable to detect sufficient DNA to make any comparison to Petitioner's DNA; and

9.      Fred Zain threw out the reference blood samples obtained from Vanessa Reggettz, Paul Eric Reggettz, and Bernadette Lynn Reggettz.

Petitioner respectfully submits that even though he has had two trials, he has not yet received the fair trial guaranteed to him by either the United States Constitution or the West Virginia Constitution. The *Laboratory* decision and the underlying special investigation into the gross misconduct of Fred Zain clearly establish the need to grant Petitioner a new trial. For the foregoing reasons, and for the reasons set out in more detail in the **PETITION**, Petitioner John Moss, III, respectfully asks this Court to grant his writ of habeas corpus, to vacate his convictions, and either to grant a judgment of acquittal or grant a new trial.

**JOHN MOSS, III**, Petitioner,
--By Counsel--

Lonnie C. Simmons
DI TRAPANO & JACKSON
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133

15

208

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**PETITIONER'S SUPPLEMENTAL BRIEF ON ISSUES RAISED IN HABEAS**

**CORPUS PETITION** was served upon counsel of record on the 14th day of August,

1995, by the United States Postal Service, postage prepaid, addressed as follows:

Mary Beth Kershner
Steve Revercomb
Peter C. Brown
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg
111 Court Street
Charleston, West Virginia 25301
(304) 357-0300


Lonnie C. Simmons

209

# DiTRAPANO & JACKSON
### ATTORNEYS AT LAW
604 VIRGINIA STREET, EAST
CHARLESTON, WEST VIRGINIA 25301

RUDOLPH L. DiTRAPANO
P. RODNEY JACKSON
J. TIMOTHY DiPIERO
FRANKLIN S. FRAGALE, JR.
JOSHUA I. BARRETT

TELEPHONE 304-342-0133
FAX. NO. 304-342-4605

LONNIE C. SIMMONS
DEBRA L. HAMILTON
SUZANNE M. WEISE
L. DANTE' di TRAPANO*

*Also admitted in Georgia

August 18, 1995

**HAND DELIVERY**

Honorable A. Andrew MacQueen
Chief Judge
13th Judicial Circuit
Kanawha County Judicial Annex
111 Court Street
Charleston, West Virginia 25301

Re:    *John Moss, III v. George Trent*
       Civil Action No. 94-MISC-663

Dear Judge MacQueen:

Enclosed for your review is a copy of **PETITIONER'S SUPPLEMENTAL BRIEF ON ISSUES RAISED IN HABEAS CORPUS PETITION.** Attached to the Supplemental Brief are copies of the depositions of Robert Murphy and David Bing. I would like to schedule a hearing on the Zain issue no later than September, 1995. Please let me know when you are available for a hearing. I understand that even though you are involved in another asbestos trial, you may be willing to schedule some hearings after 4:00 p.m.

Respectfully yours,

Lonnie C. Simmons

LCS/jb

Enclosure

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

      Petitioner,

v.

                              CIVIL ACTION NO. 94-MISC-663

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

      Respondent.



## PETITIONER'S MOTION FOR
## ACCESS TO FRED ZAIN SPECIAL GRAND JURY TRANSCRIPT AND REPORT

      Petitioner John Moss, III, respectfully moves this Court to allow him to have access to the Fred Zain Special Grand Jury Transcript and Report. Petitioner incorporates by reference all of the arguments made by the other petitioners seeking the same information. It is Petitioner's understanding that this matter was heard before this Court earlier this week and that a ruling is expected sometime next week. In light of the fact that Petitioner's habeas corpus proceeding is still pending before this Court, Petitioner respectfully asks that he be included in any ruling issued by this Court with respect to the disclosure of any of the Fred Zain Special Grand Jury Transcript and Report.

                                      **JOHN MOSS, III,** Petitioner
                                        By Counsel

Lonnie C. Simmons
West Virginia State Bar I.D. No. 3406
*Law Office of*
**P. RODNEY JACKSON**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-4616

241

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, counsel for Petitioner John Moss, III, do hereby certify that true copies of **PETITIONER'S MOTION FOR ACCESS TO FRED ZAIN SPECIAL GRAND JURY TRANSCRIPT AND REPORT** were served upon counsel of record through the regular course of the United States mail, on the 29th day of May, 1998, addressed as follows:

> James B. Lees, Jr.
> 7 Players Club Drive
> P. O. Box 2506
> Charleston, West Virginia 25329-2506
>
> Arthur Ciccarello
> CICCARELLO, DEL GUIDICE & LAFON
> 1219 Virginia Street, East
> Suite 100
> Charleston, West Virginia 25301

and by hand delivery, addressed to:

> Steve Revercomb
> Kanawha County Prosecutor's Office
> Kanawha County Judicial Court Annex Building
> 111 Court Street
> Charleston, West Virginia 25301
>
> Honorable A. Andrew MacQueen
> 13th Judicial Circuit
> Kanawha County Judicial Annex
> 111 Court Street
> Charleston, West Virginia 25301

Lonnie C. Simmons

2

242

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

    Petitioner,

v.                Civil Action No. 94-MISC-663

**GEORGE TRENT,** Warden of the
West Virginia State Penitentiary,

    Respondent.

### NOTICE OF HEARING

  **PLEASE TAKE NOTICE** that on the 27th day of October, 1998, beginning at 11:00

a.m., and continuing from that time until complete, a hearing on **PETITIONER'S MOTION TO**

**ALTER OR AMEND ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO**

**RECONSIDER LEGAL CONCLUSIONS,** regarding the above-styled case will be held before

the Honorable A. Andrew MacQueen, Judge of the Circuit Court of Kanawha County, in his

courtroom, at which time and place you may appear to protect your interests.

            **JOHN MOSS, III,** Petitioner,
            --By Counsel--

Lonnie C. Simmons
West Virginia State Bar No. 3406
*Law Office of*
**P. RODNEY JACKSON**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-4616

251

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **NOTICE OF HEARING** was hand-delivered to counsel of record on the 21st day of September, 1998, addressed as follows:

> Steve Revercomb
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300

_Lonnie C. Simmons_

Lonnie C. Simmons

2

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

        Petitioner,

v.

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

        Respondent.

Civil Action No. 94-MISC-663



### PETITIONER'S MOTION TO ALTER OR AMEND ORDER,
### TO CORRECT FACTUAL AND LEGAL ERRORS, AND
### TO RECONSIDER LEGAL CONCLUSIONS

Petitioner John Moss, III, pursuant to Rules 59 and 60 of the West Virginia Rules of

Civil Procedure, respectfully moves this Court to alter and amend its September 10, 1998 **ORDER**,

to correct factual and legal errors in that **ORDER**, and to reconsider the legal conclusions reached

in that **ORDER**, for the following reasons:

       1.    On September 10, 1998, this Court entered an **ORDER** addressing Petitioner's

claim that he is entitled to a new trial under the standard established by the West Virginia Supreme

Court in *In the Matter of Investigation of the West Virginia State Police Crime Laboratory*, 190

W.Va. 321, 438 S.E.2d 501 (1993).

       2.    In this **MOTION**, Petitioner respectfully will note some of the factual and

legal errors committed by the Court.

       3.    This **MOTION** may be supplemented prior to the hearing to ensure that the

record on this issue is complete.

253

4.  The **ORDER** contains the following factual errors

a.  *The Court notes on page 3 of the* ***ORDER*** *that "the record in this proceeding does not contain sufficient detail to identify exactly which of the State Police serologists performed the testing of all of the specific blood samples."* In the deposition of Robert Murphy, and the exhibits attached thereto, Mr. Murphy identified the test results that were in his writing and those that were not. Since only Mr. Murphy and Fred Zain performed any of the testing in this case, those notes that were not in Mr. Murphy's handwriting necessarily were written by Zain. Through this process, there really is no question that Zain is the person who conducted the critical serological testing on the blood samples obtained from the crime scene. Of particular interest in the documentation attached to Murphy's deposition is one sheet, marked with Bates Number 000013, which records the results of tests performed on most of the evidence items obtained by Zain. The back of this sheet has the initials "FSZ" and Petitioner respectfully submits that Zain is the person who recorded this information, which indicates he is the person who performed these particular tests. Thus, the most critical testing in this case was performed by Zain. Murphy is the serologist who performed the testing on the known blood samples.

b.  *The Court notes on page 4 of the* ***ORDER*** *that Murphy "performed much of the laboratory testing and prepared the forensic report."* As noted above, Zain is the serologist who conducted the critical testing on the evidence samples, while Murphy only did the testing to determine the types from known blood samples. Murphy is in fact the person who signed the report, but Murphy never testified in either of Petitioner's trials. Zain is the only serologist who presented the State's evidence in this area.

c.  *The Court states on page 4 of the* ***ORDER*** *that "Zain and Murphy had discovered genetic markers in blood samples from the Reggettz residence that excluded Paul Reggettz and would ultimately incriminate John Moss, long before a sample of Moss's blood was obtained and analyzed."* Even though earlier in the **ORDER**, the Court notes that a sample of Petitioner's blood had been obtained illegally when he was incarcerated in Ohio, the Court ignores the possibility that the officer involved saved a portion of that sample. Furthermore, the Court ignores the unrefuted opinion given by Dr. David Bing, who notes that most of the types obtained could have been deposited by members of the Reggettz family, that there was no independent evidence establishing that each blood stain came from

2

254

the same person, and that the only types of scientific significance are those types that differ from the known types of the Reggettz family.

d.    *The Court notes in footnote 4 of the **ORDER** that "the parties have agreed to submit the blood evidence that remains to an independent laboratory for analysis, evidently in an attempt to ascertain if new technology may yield some results."*  The parties have never submitted any of the evidence in this case for additional testing. Petitioner argued that he did not oppose any DNA testing, but such testing would require that the three victims be exhumed and whether or not Petitioner obtained a new trial should not be determined based upon such testing.  Although the State made noises that DNA testing would be helpful, the State never requested any such testing.  Counsel for Petitioner and Respondent have reviewed all of the physical evidence remaining and were not able to see any visible blood stains left to be tested.

e.    *The Court's overall characterization of the testimony of Dr. David Bing is that he did not determine that the testing by Zain was false, inaccurate, or invalid.  The Court even makes the assertion that Dr. Bing "confirmed the scientific validity of the conclusions."  These conclusions are wholly inaccurate.*  In making that statement, the Court seems to be criticizing Dr. Bing, when it was the State which failed to preserve any photographs of the electrophoretic gels, which Dr. Bing could have analyzed for their accuracy.  The only items Dr. Bing could analyze were the report and the laboratory notes.  Dr. Bing explained the importance of having a written protocol in the laboratory and a quality control, quality assurance program.  (Dr. Bing Dep. at 18-19).  In explaining why he believed the data generated in this case was meaningless, Dr. Bing stated:

> "Well, by that I mean that the -- there is so much data on these stains that weren't analyzed, it would seem to me there should be some extensive notes backing that material up. **So that in that -- in the context of not being able to look at the backup data, other than the summaries, it becomes, you know, almost impossible for me to either agree or disagree with the final outcome of the results.  And that's what I mean by when I say it's meaningless.  I can't agree, I can't disagree.  All I can say is what was reported.**"  (Emphasis added).  (Dr. Bing Dep. at 21-22).

3

2SS

After commenting on the lack of any written protocols, quality control, quality assurance programs, original laboratory notes and photographs of the testing performed, Dr. Bing went through a series of general scientific principles applicable to the serological testing performed in this case.   The purpose of this analysis was to demonstrate the flaws in the conclusions reached based upon the data and the overstating of the significance of this testing at trial.

First, he noted that it is important to obtain the known blood types of all potential donors of blood at the scene of the crime.  In this case, the potential donors of blood were Vanessa Dale Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III. (Dr. Bing Dep. at 22-23).

Second, at a crime scene, where the origin of all evidentiary stains is unknown, it cannot be assumed that the stains originated from a single source.  (Dr. Bing Dep. at 24).   Third, only those types obtained from the evidence that are different from any of the types obtained from known possible donors provides relevant and meaningful information to the forensic scientist.  Dr. Bing gave the following hypothetical to illustrate this general principle:

> "Think of it another way.  Suppose that the distinguishing factor of a blood stain was something that you can actually visualize. Suppose that you could look at this blood stain and you could say unequivocally, 'I know that that blood stain came from somebody who has brown hair.' Brown hair is a genetic marker.  In some ways it's very similar to, say, a blood type antigen because there is a certain -- The color or the reason it's brown is due to certain genetic markers that result in color.  So you say I know -- It doesn't make any difference how I know it.  I know this blood stain is from somebody who has brown hair.  Now, you get your list of possible donors to that and you -- and they all have brown hair.  You can't say that any one person is more likely than another to be a donor to that blood stain.

4

256

"Now, let's say if we can do a little bit more. Let's say, `Well, I can' -- `I know that the person who contributed to this blood stain has brown hair and is left-handed.' So you now look at your candidates, and you look at them and you say, `Well, three of them are left-handed and say two are right-handed.' Well, the two who are right-handed are automatically eliminated, but you still can't distinguish between the other three because left-handedness and brown hair color are the same in all of them.

"So that if you have a series of markers and they're identical in all the people that are being tested, then you can't really use that to try to distinguish the source of a given blood stain. You can only look to the differences, not to the similarities, because the question that is being asked here, the scientific question that is being asked is who could possibly be a biologic donor to this blood stain.

"And, secondly, I don't know whether there's a single person or from a bunch of people. As I stated in my affidavit, is it a single source sample or many people are sources of the sample. So you have to look to the differences between individuals who you test rather than to their similarities." (Dr. Bing Dep. at 25-26).

Fourth, as a general rule, where a type from a known possible donor of a blood stain matches a type from the blood discovered, it is not appropriate to include that type in calculating the frequency that the blood was deposited by a particular suspect. Dr. Bing illustrated this general principle as follows:

"Let's take another genetic typing you can sort of visualize. Let's suppose that the blood sample that you know came from somebody

who has brown hair, is left-handed, and is an albino, has no pigment color in their skin at all. Albinism is a very rare occurrence in the human population.  It's very rare indeed. Now, at that point, the fact that you now have three individuals who are left-handed and have brown hair, but only one of them is an albino.  You say that's a very rare event.  It could only have been that person.

"So you can use that to reason backwards and say, `Alright, albinism is a very rare event, so I know that this blood stain came from an albino.'  That could only have occurred in one out of a very few number of people who have this inherited genetic trait.

"That is separate from the question of saying, "How often is the combination of brown hair, left-handism and albinism found in the general population?' That's a separate question.  That's how often do I find these together in the general population.  You can make that estimate as well.  But that's a general question about the population. That is not a question about the sample.  The only thing that distinguishes that sample is what is different about that sample than is in the known individuals that you're testing.  So you've got a -- Those two things have to be kept separate.

"And that's what I mean by this, that you can't take a combination of factors that are found in the general population and relate it to a specific sample.  All you can say is that if these are present and I now have data to show that are indeed present, this is how often I would expect to find that combination of markers in the general population, providing they are behaving and acting independent of each other, because that's the other issue in terms of being able to do that, they have to be

6

258

behaving independently. They have to be what we say scientifically, they sort independently." (Dr. Bing Dep. at 28-29).

Finally, Dr. Bing noted that serological typing is unable to determine when a particular evidentiary stain was deposited. (Dr. Bing Dep. at 37). Thus, from a scientific point of view, there is no objective basis for a scientist to conclude that a particular stain actually resulted from the criminal episode or may have been deposited at some time earlier.

The remainder of Dr. Bing's deposition applies these general principles to the facts. He concludes that the only blood types of significance are PGM, Gc, and EsD. The remaining types obtained from the blood stains found at the crime scene do not provide significant information because the remaining types obtained from the evidence were identical to the types obtained from at least one or more of the known possible donors. (Dr. Bing Dep. at 38). Dr. Bing further testified that he agreed with the scientific analysis of the evidence set out in the **PETITION**. (Dr. Bing Dep. at 39).

5. This **ORDER** omits the following significant facts:

a. *The Court notes on page 2 of the* **ORDER** *that "Reggettz confessed to the killings" and in footnote 2, the Court implies that his confessions were involuntary.* The Court fails to note that on October 28, 1980, the Honorable Judge John Hey agreed with the State's arguments and made extensive findings of fact and conclusions of law on the record, holding that the multiple confessions given by Reggettz, including the confession he gave the following day when he graphically and physically reenacted the murders, were voluntary and admissible. That ruling was never challenged or overturned by any higher court.

b. *The Court notes on page 2 of the* **ORDER** *that blood samples were obtained from several other persons, "including policemen who had been present at the Reggettz home."* Petitioner has no way of knowing the accuracy of this assertion because there is nothing in the record supporting this claim. If the Court is referring to the known

7

259

blood samples contained in Table I of Petitioner's **PETITION FOR WRIT OF HABEAS CORPUS**, Petitioner respectfully asks the Court to identify those persons who were officers and those who were simply the usual suspects.

c.   *The Court notes on page 3 of the **ORDER** that after first illegally obtaining blood from Petitioner and then legally obtaining such a sample, "petitioner gave officers a detailed confession which was consistent with the physical evidence in significant respects."* Despite the Court's willingness to accept the Reggettz testimony with respect to the involuntariness of his confessions, the Court ignores Petitioner's testimony that he confessed to these crimes only after being subjected to repeated physical abuse by Trooper Michael Don Smith, who crawled into the back seat beside Petitioner while both of Petitioner's hands were handcuffed to the headrest. (FIRST TRIAL PRETRIAL SUPPRESSION HEARING, Tr. 303-05). Trooper Terry Williams and Trooper Smith confirmed the fact that Petitioner was handcuffed to the front seat head rest and that Trooper Smith did crawl into the back seat with Petitioner to begin the questioning. (SECOND TRIAL, Tr. 509, 937). Even though Trooper Williams and Trooper Smith denied the beating allegations, both admitted that Petitioner's "willingness" to discuss the Reggettz murders was triggered when Trooper Smith said to Petitioner, "'Why do you think we got your blood?'" (SECOND TRIAL, Tr. 511-14, 944-45).

6.   As for the legal analysis, Petitioner respectfully submits that this Court erred in failing to apply Syllabus Point 3 of the *Laboratory* decision to the facts of this case. The West Virginia Supreme Court made it clear that in light of the substantial record of lying and deceit committed by Zain, inmates in a habeas corpus proceeding are entitled to pursue relief on the ground that Zain's testimony and testing are false, invalid, and inaccurate.

Rather than accept that finding by the West Virginia Supreme Court, this Court seems to assume that Petitioner had the burden of proving that Zain's testimony and testing in this particular case was false, invalid, and inaccurate. The problem with adopting that approach is that Zain did not preserve the results of his testing through photographing the electrophoretic gels. As a result,

260

the Court has established an impossible burden for Petitioner because Zain failed to preserve his test results in a way that another expert could review them for accuracy, and the testing used up all of the evidence. In light of Zain's repeated history of faking data, matching evidence to the suspect's types, misreporting types, overstating the strength of results, overstating the frequency of genetic matches, misreporting the frequency of genetic matches on multiple pieces of evidence, reporting that multiple items had been tested, when only a single item had been tested, reporting inconclusive results as conclusive, repeatedly altering laboratory records, grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested, implying a match with a suspect when testing only supported a match with the victim, and reporting scientifically impossible or improbable results, it is very difficult for Petitioner to understand how this Court can place any weight at all in Zain's testimony and test results. *Laboratory*, 190 W.Va. at 323, 438 S.E.2d at 503.

Since the special investigation conducted by Special Judge James O. Holliday revealed that in **every case examined, the experts found that Zain had committed one or more of the offenses stated above**, no court, no lawyer, and no jury should ever give any weight whatsoever to anything Zain ever said or did. What if Zain, in the present case, simply matched the items of evidence to the known types of Moss which were different from any of the types from the Reggettz family? What if Zain combined the types from one blood drop with the types obtained from a separate blood drop? At this point, no person has any way of determining whether any of the testing, including the testing of the known blood types from the victims, is accurate.

9

261

Petitioner, through the testimony of Dr. Bing, has established the fact that Zain overstated the significance of his data. Furthermore, Dr. Bing established, without any rebuttal, that Zain's testing and testimony were virtually meaningless scientifically because there was nothing to back up the data allegedly generated.

The Court compounded this error by failing to apply the complete test required by Syllabus Point 3. First, the Court has to separate Zain's testimony and testing from the evidence, and then determine whether the remaining evidence was sufficient "to convince impartial minds of the defendant's guilt beyond a reasonable doubt." In performing that analysis, this Court concludes that Petitioner's confession along with evidence of a camera and silverware, were sufficient to meet this test. However, in performing this analysis, the Court completely ignores the fact that in this case, another person, Paul Reggettz, was the first person to confess to these murders. Thus, in analyzing whether a jury of impartial minds could be convinced of Petitioner's guilt beyond a reasonable doubt, the Court should have considered the fact that there was another very detailed confession by another person to this same crime. Under these unique facts, Petitioner respectfully submits that without Zain's testing and testimony, the remaining evidence, including the two conflicting confessions by two different people, clearly was insufficient "to convince impartial minds of the defendant's guilt beyond a reasonable doubt." Thus, the Court erred in failing to address the impact of Reggettz's confessions in analyzing this evidence.

Even if the Court were correct in concluding that Petitioner's confession along with other evidence was sufficient to prove his guilt, the analysis does not stop there. As noted in Syllabus Point 3, "if the remaining evidence is sufficient to support the conviction, an analysis must

10

then be made to determine whether the error had any prejudicial effect on the jury." In the **ORDER**, the Court completely ignored this critical part of the analysis in this case.

Did the admission of Zain's false, invalid, and inaccurate testimony have any prejudicial effect on the jury in Petitioner's case? As noted, it was Zain's evidence that shifted the balance of the evidence away from Reggettz and toward Petitioner. How can this Court or any person argue that the jury was not prejudiced under the facts of this case?

Petitioner respectfully submits that the *Laboratory* is not simply an "arbitrary" decision designed to apply a "prophylactic" rule, but rather is a decision consistent with prior case law and with decisions by the United States Supreme Court. The West Virginia Supreme Court recognizes in the *Laboratory* decision that in many cases, it may not be possible to demonstrate conclusively that Zain lied or falsified data because he also destroyed records, failed to preserve his test results in a manner which would allow another expert to review them, and failed to maintain good records. Thus, all the *Laboratory* decision did was to eliminate the need for an inmate in a habeas corpus action to reinvent the wheel by proving that Zain is an inveterate liar and allowing such inmates to pursue claims, based upon the substantial and unprecedented record of Zain's history of deceit.

Having established that fact, the remedy provided is mandated by prior case law and cases decided by the United States Supreme Court. The presentation of false evidence in a criminal trial is a due process violation to which the State is held accountable, even if the State did not have actual knowledge that the evidence was false. Once it is established that false evidence was presented to the jury, the prejudicial effect of that evidence must be evaluated. In the context of the present case, Zain's testing and testimony was not merely a minor issue in this case, but, in fact, was

11

the main distinguishing evidence allegedly exonerating Reggettz and implicating Petitioner. Based upon the analysis required by the West Virginia Supreme Court in Syllabus Point 3, there really can be no doubt that Petitioner is entitled to a new trial.

Petitioner recognizes the fact that for some reason, the Court decided to apply a different standard to this case than has been applied in every other habeas corpus action in which this *Laboratory* standard has been applied. Obviously, Petitioner respectfully questions the standard applied by this Court and asserts that this error goes to the heart of the **ORDER**. However, for purposes of making a complete record, Petitioner believes it would be helpful to the West Virginia Supreme Court for this Court to actually apply Syllabus Point 3 of the *Laboratory* decision, in case that Court disagrees with the unprecedented and novel standard applied in the present case. In other words, Petitioner respectfully asks this Court to go through the complete Syllabus Point 3 analysis so that the record in this case will be complete.

For the foregoing reasons, Petitioner John Moss, III, pursuant to Rules 59 and 60 of the West Virginia Rules of Civil Procedure, respectfully moves this Court to alter and amend its September 10, 1998 **ORDER**, to correct factual and legal errors in that **ORDER**, and to reconsider

the legal conclusions reached in that **ORDER**.  Further, Petitioner seeks such other relief as this

Court deems appropriate.

**JOHN MOSS, III**, Petitioner,

--By Counsel--

Lonnie C. Simmons
West Virginia State Bar No. 3406
*Law Office of*
**P. RODNEY JACKSON**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-4616

13

265

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing

**PETITIONER'S MOTION TO ALTER, AMEND ORDER, TO CORRECT FACTUAL AND**

**LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS** was hand-delivered to

counsel of record on the 21st day of September, 1998, addressed as follows:

> Steve Revercomb
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300

Lonnie C. Simmons

14

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

        Petitioner,

v.

                                          Civil Action No. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

        Respondent.

## ORDER

On October 27th, 1998, at 11:00 a.m., a hearing will be held on **PETITIONER'S MOTION TO ALTER OR AMEND ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS**. The Court has determined that Petitioner should be present for this hearing. Therefore, it is hereby ADJUDGED, ORDERED, and DECREED that the appropriate law enforcement officials transport Petitioner John Moss III, from the Mount Olive Correctional Center to this Courtroom on October 27th, 1998, so that he may be present for the hearing scheduled for 11:00 a.m.

The Clerk is ORDERED to mail certified copies of this ORDER to all counsel of record.

ENTERED this 21st day of October, 1998.

_____
Honorable A. Andrew MacQueen
for A. Andrew MacQueen

Prepared by:


Lonnie C. Simmons
West Virginia State Bar No. 3406
*Law Office of*
**P. RODNEY JACKSON**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-4616


Inspected and approved by:


Jon Blevins
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg
111 Court Street
Charleston, West Virginia 25301
(304) 357-0300

2

IN THE CIRCUIT COURT OF KANAWHA COUNTY, VIRGINIA

_Moss_____, Plaintiff,

CIVIL ACTION NO. _94 MISC 663_

v.

CRIMINAL ACTION NO. _____

_Trent_____, Defendant

# NOTATION OF DELIVERY

A (certified) copy of the following: _Order 10-21-98_

_____

( ✓ ) was hand delivered to: Capt. Long - Grg
                              L. Simmons
                              by cm

( ✓ ) faxed: SCRJ / Mt. Olive

( ) was mailed to:

( ✓ ) placed in folder: APA
                        SCRJ

on this _26_ day of _October_, 1998

_Jane A. Thaxton_
(signature) - Deputy Clerk

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

Petitioner,

v.

Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

Respondent.

## NOTICE OF CHANGE OF ADDRESS

Counsel for Petitioner John Moss, III,  respectfully advises the Court, counsel, and the parties in this action that all future pleadings, correspondence, and documents should be forwarded to Lonnie C. Simmons at the following address:

> Lonnie C. Simmons
> *Law Office of*
> **P. RODNEY JACKSON**
> 410 Washington Street, East - Suite 307
> Post Office Box 3785
> Charleston, West Virginia 25337.

**JOHN MOSS, III**, Petitioner,
--By Counsel--

Lonnie C. Simmons
West Virginia State Bar I.D. No. 3406
*Law Office of*
**P. RODNEY JACKSON**
410 Washington Street, East - Suite 307
P.O. Box 3785
Charleston, West Virginia 25337
(304) 342-4616

59

269

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing **NOTICE OF CHANGE OF ADDRESS**, was served upon counsel of record on the 5th day of November, 1998, by the United States Postal Service, postage prepaid:

>Jon Blevins
>Assistant Prosecuting Attorney
>Kanawha County Judicial Court Annex Bldg
>111 Court Street
>Charleston, West Virginia 25301
>(304) 357-0300
>Counsel for Respondent George Trent

Lonnie C. Simmons

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

       Petitioner,

v.

       Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

       Respondent.

### PETITIONER'S SUPPLEMENT TO RULE 59 MOTION TO ALTER, AMEND ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS

Following the hearing held on **PETITIONER'S RULE 59 MOTION**

**PETITIONER'S MOTION TO ALTER, AMEND ORDER, TO CORRECT FACTUAL**

**AND LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS,** Petitioner

John Moss, III, asked this Court for an opportunity to file this brief supplemental memorandum.

At the hearing, the Court acknowledged that Syllabus Point 3 of *In the Matter of Investigation of*

*the West Virginia State Police Crime Laboratory*, 190 W.Va. 321, 438 S.E.2d 501 (1993),

required the Court to conduct a two-part analysis and that the Court's September 10, 1998 order

failed to address the second issue. Thus, at a minimum, it appeared to Petitioner that this Court

at least will be issuing an order addressing whether or not Zain's testimony had a "prejudicial

effect on the jury." If the Court concludes, as Petitioner asserts, that he was prejudiced by Zain's

testimony, then Petitioner is entitled to a new trial.

       At the hearing and in the order, the Court has placed the burden on Petitioner to

prove that the testing performed by Fred Zain was false or incorrect and so far has refused to

allow Petitioner to benefit from the factual presumption that all of Zain's testing and testimony must be presumed to be false, as mandated by the *Laboratory* decision. As noted by Petitioner, this ruling places an impossible burden on Petitioner because Zain did not preserve the results through photographs and by consuming the evidence in the testing, there is nothing left for Petitioner to test. Thus, it is physically and scientifically impossible for Petitioner to present this Court with the results of electrophoretic testing that contradicts the results allegedly obtained by Zain.

However, Petitioner is able to demonstrate that certain parts of Zain's evidence were false, misleading, exaggerated, and scientifically unsound. The August 6, 1993 report by the experts from the American Society of Crime Laboratory Directors (ASCLD) examined a number of cases analyzed in the State Police Crime Laboratory 1986 through 1989. While the cases examined occurred after the initial testing performed in this case, there is no evidence and no reason to believe that any of the practices found by the ASCLD experts to be deficient or just plain wrong were any different earlier. Thus, based upon this report, the Court may conclude that at the time the testing was performed in the State Police Crime Laboratory in this case, there was no quality assurance program, no procedures manual, and no use of controls or standards.

Of particular importance to this Court's consideration is the failure of Zain to use any controls or standards in the testing he performed in this case. Petitioner can demonstrate that Zain failed to use controls or standards in this case by referring the Court to the laboratory documents provided. The ASCLD criticism was that any time blood or other evidence is found on some object, a sample from the unstained areas of that object, sometimes referred to as the substrate, should be taken "to ensure that the material itself (substrate) was not rendering a false

2

positive interference. The use of such controls is imperative." ASCLD report at 5. In reviewing Zain's documentation, there is no reference to any substrate samples being tested on any of the items where blood allegedly was found. Thus, Petitioner has demonstrated that Zain's testing in this particular case was in fact performed consistent with ASCLD's criticism of the State Police Crime Laboratory.

In reviewing the ASCLD report, the Court should note that with respect to several of the cases reviewed, there was a severe lack of documentation and preservation of the test results, as in the present case, rendering it impossible for these experts to complete their analysis. The problem with overstating the statistical matches found with several of the cases examined was repeated in the present case. For example, in the ASCLD report, in connection with the examination of the data from the Robert Wallace case, the experts noted that Zain had included a marker in calculating the percentage of the population who might be the semen donor that matched the victim's known marker. By committing that error, Zain was able to testify that only 6.8% of the population would have the same markers as those found from the evidence, when, in fact, the number should have been 28%. This same error of exaggerating the statistical significance of the data was committed by Zain in this case. Petitioner respectfully refers the Court to the extensive analysis of the typings included in his original petition.

In its conclusion, the ASCLD experts stated:

"Irregularities were found in most of the cases reviewed in this investigation, and one, therefore, believed to have been the result of systematic practice rather than an occasional inadvertent error. The majority of the irregularities were in the incompleteness of records or appeared to affect the weight given to a genetic match of evidence samples to possible donors."

3

Thus, based upon the conclusions reached by these ASCLD experts regarding the lack of

documentation and exaggeration of results, the West Virginia Supreme Court ordered that all

inmates have the right to pursue a habeas corpus action in which the trial court is to assume that

all of Zain's testing and testimony is false.

There is no question that if the ASCLD experts had reviewed the data in this case,

as did Dr. David Bing, they similarly would have concluded that the data was "meaningless" due

to the lack of documentation and the overstatement of the statistics generated.  This fact is

particularly true in the present case where Respondent was unable to provide any expert to refute

Dr. Bing's conclusions.

Furthermore, as noted in the ASCLD report and in the habeas corpus petition filed

in this case, Zain repeatedly and consistently lied about his credentials.  In this case, in an *in*

*camera* hearing held in the second trial, Zain testified as follows:

> "Q    And what training had you received at that time in
> performing -- to perform such analysis?
>
> "A    My formal education was a degree in biology, with a minor
> in chemistry.
>
> "I also received an Associate Degree in Police Sciences, and
> specialized training at the FBI academy at Quantico, Virginia,
> relating to the specific field of forensic science, and more
> particularly, serology, or tests and methods utilized in the
> identification of blood and body fluids.
>
> "Both basic and advanced courses were obtained by me from the
> FBI Academy and other specialized training sessions that I had
> attended, as well as scientific organizations which I belong to, such
> as the Southern Association of Forensic Scientists, and other peer
> groups."  (SECOND TRIAL, Tr. 1050).

Virtually the same testimony about his credentials was presented to the jury

shortly thereafter. (SECOND TRIAL, Tr. 1066-67). Trooper Zain was indicted for perjury on July 22, 1994, for giving approximately the same answer in the case styled *State v. Paul Walker*, Felony No. 91-F-62. As was discovered during the special investigation headed by Special Judge James O. Holliday, Zain never obtained a minor in chemistry, which was not even offered at that time by the college he attended. Furthermore, as for Zain's FBI training, he either flunked or failed to complete at least two FBI training sessions he attended. Moreover, if Zain's history of fabricating evidence, as discovered during the special investigation, had been known at the time of Petitioner's first trial, his testimony and test results would have been given little or no weight by the jury and may have been found too unreliable to be admitted into evidence.

When an expert lies about his credentials, his intention is to convince the jury to give his opinions greater weight, based upon his asserted expertise. Thus, it is a very serious due process violation where an expert witness lies about his credentials. In *People v. Cornille*, 95 Ill.2d 497, 69 Ill.Dec. 945, 448 N.E.2d 857 (1983), a case cited by the West Virginia Supreme Court in *In the Matter of Investigation of the West Virginia State Police Crime Laboratory*, 190 W.Va. 321, 438 S.E.2d 501 (1993), the Illinois Supreme Court was presented with a situation where an arson expert lied about his education and other credentials. The facts in *Cornille* are remarkably similar to the present facts in that by the time the defendant in *Cornille* had filed his habeas corpus action, the alleged arson expert had already been indicted for perjury for lying about his education and credentials. The Illinois Supreme Court held that there was a reasonable likelihood that the jury's decision may have been affected by this expert's false testimony, which made him appear to be more credible. Consequently, the defendant in *Cornille* was granted a new trial on this basis alone.

5

275

Finally, it cannot be emphasized enough that the rule developed in the *Laboratory* decision is based upon a number of cases decided by the United States Supreme Court where false evidence was presented to the jury. *Napue v. Illinois*, 360 U.S. 264 (1959); *Giglio v. United States*, 405 U.S. 150 (1972); *Miller v. Pate*, 386 U.S. 1 (1967). The United States Supreme Court found that it is a due process violation for a person to be convicted, in part, upon false testimony.

Consequently, based upon the foregoing analysis, and the materials and briefs provided previously, it cannot be disputed that Petitioner's conviction was obtained, in part, upon the false, misleading, exaggerated, and scientifically unsound testimony of Fred Zain. Therefore, Petitioner respectfully that under the standards mandated by these United States Supreme Court decisions, as recognized in the *Laboratory* decision, and under the facts of this case, Petitioner is entitled to a new trial.

**JOHN MOSS, III**, Petitioner,

--By Counsel--

Lonnie C. Simmons
West Virginia State Bar No. 3406
*Law Office of*
**P. RODNEY JACKSON**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-4616

276

**CERTIFICATE OF SERVICE**

I, Lonnie C. Simmons, do hereby certify that a copy of the foregoing
**PETITIONER'S SUPPLEMENT TO RULE 59 MOTION TO ALTER, AMEND ORDER,
TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO RECONSIDER LEGAL
CONCLUSIONS** was mailed to counsel of record on the 25th day of November, 1998,
addressed as follows:

> Jon Blevins
> Assistant Prosecuting Attorney
> Kanawha County Judicial Court Annex Bldg
> 111 Court Street
> Charleston, West Virginia 25301
> (304) 357-0300

Lonnie C. Simmons

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

           99 JAN 12 PM 2:56

      Petitioner,

           CATHY S. GATSON, CLERK
           KANAWHA CIRCUIT COURT

v.                                          Civil Action No. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

      Respondent.

### ORDER

      On January 12, 1999, counsel for Plaintiff, Lonnie C. Simmons, informed this Court that in order to provide representation for JOHN MOSS, III, in his habeas corpus civil case, it was necessary to retain the Serological Research Institute to perform a laboratory analysis and prepare a report of findings.

      This Court having considered these matters and being of the opinion that this request is appropriate, approves this request.  Accordingly, it is HEREBY ORDERED :

      That Public Defender services issue a check payable to the Serological Research Institute, Taxpayer Identification Number 94-2520402, in the amount of $881.00, as payment for the services described in the Direct Expense form and accompanying invoice.

      ENTERED this 12th day of January, 1999.

                                       Honorable A. Andrew MacQueen, Judge

Presented by:

Lonnie C. Simmons
West Virginia State Bar No. 3406
*Law Office of*
**P. RODNEY JACKSON**
410 Washington Street, East - Suite 307
P. O. Box 3785
Charleston, West Virginia 25337
(304) 342-4616

278

RECORDED

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

Petitioner,

v.                                                          Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the
West Virginia State Penitentiary,

Respondent.

## NOTICE OF STATUS CONFERENCE

**PLEASE TAKE NOTICE** that on the 18th day of March, 1999, beginning at 1:30 p.m., and continuing from that time until complete, a status conference regarding the above-styled case will be held before the Honorable A. Andrew MacQueen, Judge of the Circuit Court of Kanawha County, in his courtroom, at which time and place you may appear to protect your interests.

John Moss, III, Petitioner
By Counsel

Lonnie C. Simmons
West Virginia State Bar No. 3406
*Law Office of*
**P. RODNEY JACKSON**
410 Washington Street, East - Suite 307
P. O. Box 3785
Charleston, West Virginia 25337
(304) 342-4616



## CERTIFICATE OF SERVICE FILED

99 FEB 24  AM 8: 57

I, Lonnie C. Simmons, do hereby certify that a true copy of this **NOTICE OF STATUS CONFERENCE** was served upon counsel for Respondent, through the regular course of the United States mail, postage prepaid, this 23rd day of February, 1999, addressed as follows:

CATHY S. GATSON, CLERK

>        Jon Blevins
>        Assistant Prosecuting Attorney
>        Judicial Annex Building
>        111 Court Street
>        Charleston, West Virginia 25301

Lonnie C. Simmons, WV State Bar ID No. 3406



IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

          Petitioner,

v.

                                         Civil Action No. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

          Respondent.

## PETITIONER'S SUPPLEMENT TO
## MOTION TO ALTER OR AMEND ORDER,
## TO CORRECT FACTUAL AND LEGAL ERRORS,
## AND TO RECONSIDER LEGAL CONCLUSIONS

        Petitioner John Moss, III, respectfully files this supplement in support of his **MOTION TO ALTER OR AMEND ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS**. As the Court will note, a hearing was held on this motion on October 27, 1998. This motion was triggered by the Memorandum Order issued by this Court on September 10, 1998.

        In the Memorandum Order, the Court placed some reliance on the *Zain II* decision and noted that under that decision, "serology reports prepared by employees of the Serology Division of the State Police Crime Lab other than Trooper Zain, are not subject to the invalidation and other strictures contained in *Zain I*." (Memorandum Opinion 3-4). Based in part upon this *Zain II* decision, this Court noted that Trooper Robert Murphy performed some of the testing in this case and that Trooper Murphy supervised some of Zain's testing. Thus, based upon the *Zain II* decision, which issued a blanket approval of all work performed by other employees in the laboratory besides Zain, this Court provided Petitioner no relief in this initial Memorandum Order.

        Since the hearing held on October 27, 1998, additional events have occurred that need to be brought to the Court's attention. First, in *Wilbert Thomas v. George Trent, et al.*, Civil Action No. 2:98-0912, United States Magistrate Jerry D. Hogg issued a 16-page **REPORT-**

**RECOMMENDATION** in a federal habeas corpus action filed by Mr. Thomas. A copy of this **REPORT-RECOMMENDATION** is attached under Tab 1. One of the issues raised in Mr. Thomas' habeas corpus action is the testing and testimony of persons in the laboratory other than Zain. Specifically, it was developed in Mr. Thomas' State habeas corpus proceeding that the State Laboratory did not perform Lewis typing prior to 1990. However, despite that fact, the Laboratory had adopted a policy, pursuant to instructions by Zain, to report secretor status by stating a Lewis type, even though no Lewis typing had been performed. In this thorough **REPORT-RECOMMENDATION**, Magistrate Hogg deemed the evidence of questionable scientific procedures and false testimony to be sufficient, along with two other grounds, to reverse Mr. Thomas' convictions.

Most recently, based upon the *Thomas* case, and a petition filed by Prosecuting Attorney William C. Forbes, the West Virginia Supreme Court issued an order entered June 10, 1999, authorizing a second special investigation into the practices of the State Laboratory. A copy of this Order is attached under Tab 2. Although Petitioner has not seen a copy of the Prosecutor's Petition, presumably, he was concerned about the reliability and validity of evidence given by other employees of the Laboratory besides Zain. Since Petitioner's case involves not only testing and testimony performed by Zain, but also testing performed by Trooper Murphy, it would appear that the Prosecutor's action in bringing this issue to the Supreme Court was prompted by cases similar to Petitioner's.

This second special investigation raises serious questions regarding the correctness of the conclusion reached by the Supreme Court in the *Zain II* decision. While there were no Lewis typing results reported in the present case, Petitioner does not believe that this second investigation necessarily will be limited simply to that issue. Thus, the significance of the *Thomas* **REPORT-RECOMMENDATION** and the Supreme Court's reopening of the Laboratory investigation may not be fully appreciated for some time.

Petitioner respectfully submits that the record in this habeas corpus proceeding is sufficient to justify this Court in reversing his convictions and granting him a new trial. These most recent events only provide the Court with additional evidence supporting Petitioner's claim that he was denied a fair trial and that his constitutional rights were violated. A final ruling in this matter should be of the highest priority so that this injustice can be corrected without any further delay.

John Moss, III, Petitioner
By Counsel

Lonnie C. Simmons
West Virginia State Bar No. 3406
*Law Office of*
**P. RODNEY JACKSON**
410 Washington Street, East - Suite 307
P. O. Box 3785
Charleston, West Virginia 25337
(304) 342-4616

283

## CERTIFICATE OF SERVICE

I, Lonnie C. Simmons, do hereby certify that a true copy of **PETITIONER'S SUPPLEMENT TO MOTION TO ALTER OR AMEND ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS** was served upon counsel for Respondent, through the regular course of the United States mail, postage prepaid, this 13th day of July, 1999, addressed as follows:

> Jon Blevins
> Assistant Prosecuting Attorney
> Judicial Annex Building
> 111 Court Street
> Charleston, West Virginia 25301

Lonnie C. Simmons, WV State Bar ID No. 3406

284

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON

**WILBERT THOMAS,**

       **Petitioner,**

v.                                    **Civil Action No. 2:98-0912**

**GEORGE TRENT, WARDEN,**
 **Mount Olive Correctional Complex,**
**HOWARD PAINTER,**
**ACTING WARDEN,**
 **Mount Olive Correctional Complex,**

       **Respondents.**



FILED

APR 2 8 1999

SAMUEL L. KAY, CLERK
U. S. District & Bankruptcy Courts
Southern District of West Virginia

## REPORT-RECOMMENDATION

**JERRY D. HOGG, UNITED STATES MAGISTRATE JUDGE**       **APRIL 28, 1999**

On September 16, 1998, petitioner, by counsel, filed this petition pursuant to 28 U.S.C. § 2254 seeking release from state custody.

The motion was referred to the undersigned magistrate judge to make proposed findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (B)(3).

On January 4, 1999, the respondents filed a consolidated answer and motion for summary judgment with supporting memorandum. On February 1, 1999, petitioner filed a response to respondents' answer and motion for summary judgment. On February 10, 1999, respondents filed a reply to petitioner's response. This matter is now in a

posture for review.

According to the pleadings and evidence of record filed by both parties, in October 1988, petitioner was tried for burglary and sexual assault.   The State presented testimony by the victim, Ms. Judy Francisco, who described the attack, but could not identify Mr. Thomas as her assailant and who testified that she was not dating anyone at the time of the attack.  Petitioner did not take the stand, but his wife testified that on the night of the attack, he was at home.

After deliberating, the jury was unable to render a verdict on the sexual assault charge, [Exh. 1 to Petitioner, Trial I, Tr. 362], and the judge asked whether the jury found that Mr. Thomas had broken into Ms. Francisco's apartment, but that he "in fact, did not commit sexual assault." Id., TR. 363.  The jury foreperson responded: "Yes, your Honor, I believe that was the sense and finding of the jury at that time.  It may very well be the sense and finding now, that's why I need one minute to ask a question." Id. The judge made sure all jurors understood his query and allowed the jury to retire.  Id., Tr. 362-363.  When they returned, the judge asked "Can you respond to my question?" and the foreperson responded in full: "Yes, your honor, that was the perception of each and all the jurors.  We understood that that was our perception." Id., Tr. 363.  Rather than accept that decision and enter an acquittal, the trial judge declared a mistrial on the charge of sexual assault and accepted the jury's verdict on the burglary charge.

The judge later ordered a new trial on both charges and Mr. Thomas was retried v 1989. [Ex. 2 to Petition, Trial II, Tr. 406, 410].  This time, the judge accepted the ·dict regarding the burglary, but declared a mistrial on the sexual assault

2

charge. Id., Tr. 410-11.

On February 14, 15, and 16, 1990, petitioner was tried a third time on the sexual assault charge and convicted. As in the previous trials, the victim could not identify Mr. Thomas as her attacker and vaguely described the assailant as a "black man." [Exh. 3 to Petition, Trial III, Tr. 73, 75]. Again, she testified that no one else witnessed the crime. Id., Tr. 72-77.

Throughout each trial, Mr. Thomas maintained that he was at home with his family the entire night of March 21-22, 1987. His wife testified at each trial that Mr. Thomas was home at all times during that night. [Exh. 3, Trial III, Tr. 454-60; Exh. 2, Trial II, Tr. 316-20]; [Exh. 1, Trial I, Tr. 246-50] That night, Mr. Thomas and his wife slept in the same bed along with their baby boys. [Exh. 3, Trial III, Tr. 398]

During the third trial, as he had at the first two trials, Mr. Thomas followed the advice of counsel and exercised his Fifth Amendment right not to testify. Id., Tr. 328. After the prosecution rested, however, the judge spoke directly to Mr. Thomas on the subject of testifying. The judge asked Mr. Thomas if he understood his right to testify and whether he willingly chose not to and warned him that it was unusual for someone relying on an alibi defense not to testify and suggested that Mr. Thomas should reconsider his decision not to take the stand. Id., Tr. 328-33, 347. Mr. Thomas asserts that the judge placed undue pressure on him to testify. The following day, Mr. Thomas informed his attorney that he wanted to testify and was put on the stand that same morning without any preparation. Id. Tr. 348

3

Following his conviction, Mr. Thomas filed a direct appeal to the West Virginia Supreme Court.  On appeal, he raised claims relating to 1) violation of his federal constitutional and state law rights to a speedy trial; 2) violation of the federal and state constitutional prohibitions against double jeopardy; 3) violation of federal and state constitutional due process rights by failing to exclude certain evidence of and by not holding a suppression hearing; 4) violation of federal and state constitutional due process rights because Mr. Thomas was convicted under an overly vague statute; 5) erroneous and prejudicial admission of certain evidence; and 6) insufficiency of evidence to support verdict.  The court denied the appeal. [Exh. 9 to Petition, Order, State v. Thomas, No. 901404, Mar. 19, 1991]

In 1991, petitioner pursued post-conviction relief by filing, *pro se*, a petition for writ of habeas corpus in Cabell County Circuit Court raising claims relating to (1) violation of federal constitutional rights through illegally seized evidence and pretextual arrest on a disorderly conduct charge; (2) violation of his federal and state constitutional rights to counsel on the same disorderly conduct arrest; (3) violation of his federal constitutional and state rights to a speedy trial; (4) violation of his federal and state constitutional rights against self-incrimination; (5) violation of the federal and state prohibitions against double jeopardy; (6) violation of federal and state due process rights by judicial interference with jury deliberations; and (7) violation of federal and state due process rights by failure to instruct the jury on a lesser offense.  Judge Egnor denied the petition four years later. [Exh. 10 to Petition, Order, State ex rel. Thomas v. Trent, Civ. A. No. 91-C-1431, Jan. 27, 1995]  Asserting the same claims, Mr. Thomas

4

289

appealed the denial of relief to the Supreme Court of West Virginia.  The court refused the appeal. [Exh. 11 to Petition, Order, <u>State ex rel. Thomas v. Trent</u>, No. 950253, April 12, 1995]

More than a year before Judge Egnor denied his petition for post-conviction relief, Mr. Thomas filed a habeas corpus petition in the West Virginia Supreme Court. The court issued the writ, returnable to the Cabell County Circuit Court for further proceedings, pursuant to its opinion in <u>Zain I</u>.[1] [Exh. 12 to Petition, Order, <u>State ex rel. Thomas v. Trent</u>, No. 931806, Dec. 8, 1993]

Judge Egnor then ordered the required DNA testing. [Exh. 13 to Petition, Order, <u>State ex rel. Thomas v. Trent</u>, No. 91-C-1431 and 94-C-21]  Following an evidentiary hearing, Judge Egnor denied Mr. Thomas relief on April 17, 1996. [Exh. 14 to Petition, Order, <u>State ex rel. Thomas v. Trent</u>, Civ. A. No. 93-C-1206, Apr. 17, 1997]

On November 10, 1997, the West Virginia Supreme Court refused an appeal. [Exh. 15 to Petition, Order, No. 971408, <u>State ex rel. Thomas v. Trent</u>]

---

[1]In <u>In re an Investigation of the West Virginia State Police Crime Laboratory, Serology Division</u>, 438 S.E.2d 501 (W.Va. 1993)("<u>Zain I</u>") and <u>In re an Investigation of the West Virginia State Police Crime Laboratory, Serology Division</u>, 445 S.E.2d 165 (W.Va. 1994)("<u>Zain II</u>"), the West Virginia Supreme Court found that Trooper Zain had systematically falsified evidence to support criminal prosecutions in West Virginia, and ordered additional testing to identify cases in which the state wrongly obtained convictions.  Since then, Glen Dale Woodall, Dewey Clyde Davis, Gerald Wayne Davis, Gilbert Alejandro, William O'Dell Harris, and Jack Davis--all convicted of charges stemming from a sexual assault--have successfully asserted Zain-related claims and have been released from prison. <u>See</u> <u>State v. Woodall</u>, 385 S.E.2d 253 (W.Va. 1989).

It appears that all state court remedies have been fully exhausted by presentation to the West Virginia state courts either on direct appeal or in subsequent post-conviction proceedings. The issues raised in the instant petition have never been decided on the merits by a federal court.

The petition now before the court raises four grounds for relief. First, petitioner asserts that newly-discovered DNA evidence, not available at the time of trial, proves that he did not commit the crime for which he was convicted. Second, misconduct by state police serologists and other officers denied petitioner a fair trial in violation of the Due Process Clause. Third, petitioner challenges his conviction on the grounds of double jeopardy asserting that he was acquitted of sexual assault at the end of his first trial when the jury foreman reported to the trial judge that the finding of "each and all the jurors" was that petitioner "did not commit sexual assault." The trial court's decision to give the State a second and third try at convicting petitioner, therefore, constituted a violation of the Double Jeopardy Clause. Finally, petitioner asserts that the trial judge violated his Fifth Amendment rights by pressuring him to testify at the third trial and thereby exposing himself to cross-examination, which he chose not to do in his previous trials and at which the jury acquitted and hung.

Based on a careful review of the record, the undersigned magistrate judge finds that there is merit to the instant petition. The record establishes that the State's key witness, Trooper Howard Myers, a West Virginia State Police officer, falsely testified about non-existent serology test results supposedly linking petitioner to the crime at issue. It seeks to blame defense counsel for failing to uncover this deception, even

6

while conceding that the state police concealed documents from the defense that would have revealed the truth.  In addition, the State has offered nothing to rebut the DNA evidence developed at the behest of its own Supreme Court following the Fred Zain problems resulting from tampered evidence which shows with scientific certainty that Mr. Thomas was not the source of genetic material left by the assailant.   Further, the State has offered no support for the state trial court's decision to allow retrial after the first jury announced in open court that all agreed Mr. Thomas was not guilty of the sexual assault charge in clear violation of the Double Jeopardy Clause.  Thus, for reasons stated more fully below, relief pursuant to 28 U.S.C. § 2254 should be granted.

First, the undersigned magistrate judge finds that newly-discovered DNA evidence demonstrates that petitioner was not the victim's assailant.  As noted above, pursuant to the writ issued by the West Virginia Supreme Court directing further proceedings, Judge Egnor ordered the required DNA testing. [Exh. 13 to Petition, Order, State ex rel. Thomas v. Trent, No. 91-C-1431 and 94-C-21]  LabCorp conducted sensitive testing of the vaginal samples and found that both the sperm and nonsperm "fractions" or parts of the sample contained genetic material, presumably from sperm, but also possibly from skin or other body cells. [Exh. 17 to Petition, LabCorp Report, p. 2]  DNA testing on these samples establishes that the genetic material found did not come from Mr. Thomas.  Id.  The amount of material was small, but the DNA testing met accepted scientific standards. [Exhibit 4 to Petition, p. 73]   Significantly, Trooper Ted Smith-- Fred Zain's replacement as head of the Serology Divison--agreed that Mr. Thomas could not have been the source of the genetic material found on the vaginal

7



swabs. Id., p. 148, 194.

The only serological evidence the State relied on at trial was a dried semen stain found on the victim's nightgown.  However, this evidence could not be retested because Fred Zain altered the sample prior to the first trial, which required additionally testing and ultimately consumed the stain.  Therefore, LabCorp could not obtain a sufficient quantity of DNA from the nightgown to meet reporting standards. [Exh. 17 to Petition, p. 2]  In any event, "any sample taken directly from [inside] the victim['s vagina] is preferable for testing purposes to a sample extracted from a stain [on the victim's clothing.]" State v. Hammond, 604 A.2d 793, 806 (Conn. 1992).

The State claims that there is sufficient evidence to sustain the conviction pursuant to Jackson v. Virginia, 443 U.S. 307 (1979).  Under Jackson, the court is required to determine whether "there is sufficient evidence which, if credited, could support the conviction." Schlup v. Delo, 513 U.S. 298, 330 (1995).  The State contends that under Jackson, the review is limited to "record evidence," id. at 318, and a federal habeas court may not extend Jackson review to nonrecord evidence, including newly discovered evidence. Herrera v. Collins, 506 U.S. 390 (1993).  However, as the petitioner notes, the evidence at issue has been part of the record since the beginning of this case.  Soon after the assault, rape kit samples were taken from the victim's body.  Those samples have been preserved ever since the attack at issue.  Although initial tests did not reveal any DNA, the West Virginia Supreme Court ruled that existing samples must be retested in light of the proven history of fraudulent conduct and perjured testimony by the State's serology laboratory. [See Exh. 12 to Petition]  The re-

test showed that the rape kit sample contained DNA that matched neither Mr. Thomas nor the victim. By requiring DNA tests as a precondition for Mr. Thomas to proceed with his Zain claims, the West Virginia Supreme Court recognized that the DNA evidence is relevant to Mr. Thomas's case. The State lacks any basis to complain about consideration of DNA evidence that its own highest court ordered be developed to assure justice in cases like this one affected by the wrongdoing of Trooper Zain.

Significantly, the State offers no factual rebuttal to the DNA testing done by the State of West Virginia. Instead, it claims that the new DNA test results do not entitle the petitioner to relief as a free standing claim of innocence because it is not cognizable in federal habeas corpus, citing Herrera v. Collins, 506 U.S. 390 (1993) But unlike the petitioner in Herrera, Mr. Thomas also alleges numerous constitutional violations that occurred during his trial. Specifically, as noted above, petitioner alleges that his due process rights, his Fifth Amendment rights, and his double jeopardy rights were violated during his criminal trials.

Moreover, on the basis of the fact that petitioner's conviction rests on knowingly false testimony by the state's serology witness, Mr. Thomas was denied a fair trial. The record establishes that petitioner was convicted based on testimony by Trooper Myers of the Serology Division--testimony that Myers has now admitted was false when given. Trooper Myers identified two genetic markers in the semen found on the victim's nightgown. According to Trooper Myers, one of these markers, PGM, was of a type (denoted "2+1+") that is shared by 25% of the population. Trooper Myers testified that a blood sample from Mr. Thomas also had this same 2+1+ marker. [Exh. 3 to Petition,

9

Trial III, Tr. 279-80]  Trooper Myers then testified that he was able to dramatically narrow the probabilities of a match by conducting a Lewis factor test. Id., Tr. 279, 282.

That testimony was false.  Trooper Myers admitted at the evidentiary hearing on the habeas petition in state court that, as a matter of policy established by Fred Zain, the Serology Division reported Lewis results even when they had not done Lewis testing.  [Exh. 4 to Petition, Habeas Hg., Tr. 130-31]  Instead, the lab conducted ABO inhibition tests which, unlike Lewis tests, do not distinguish between kinds of "nonsecretor."  (A nonsecretor is an individual, such as Mr. Thomas, whose semen, saliva, or other non-blood bodily fluid does not reveal his blood type.)  Not only did the State present testimony that its witness knew to be false, but it also had a deliberate policy of refusing to produce the underlying test data that might have permitted defense counsel to uncover the falsehood. [Exh. 4 to Petition, Habeas Hg., Tr. 138, 174]

Trooper Myers has admitted that his testimony at petitioner's third trial was false.  Trooper Myers stated at Mr. Thomas's third trial (1) that he had identified a Lewis marker and (2) that he "could not eliminate [Mr. Thomas] through any scientific test as a suspect in this crime." [Exh. 4 to Response at 495]; [Exh. 3 to Petition at 295]  The State has conceded that such statements were false, but defends the conviction by claiming that "the 'fabrication' of evidence concerning the Lewis factor did not intentionally occur" and claiming that this finding is "entitled to a presumption of correctness" under § 2254(e)(1).  See Resp. Br. at 12, 15.   The undersigned magistrate judge finds such assertion incredulous in light of the fact that Trooper Myers explained that he testified the way he did because accurately reporting the "secretor

10

status" might have created "confusion" and so "it was decided that secretor status would be reported as a Lewis type." [Exh. 4 to Petition at 130]  In addition, he admitted that falsifying Lewis results was consistent with the general practice of the serology laboratory during the time Zain directed the reporting of Lewis results even though no Lewis test was actually performed. Id. At 131-32; see id. at 182 (Trooper Smith confirms that practice was initiated by Trooper Zain.)

The United States Supreme Court has held unequivocally that "a conviction obtained through use of false evidence, known to be such by representatives of the State must fall under the Fourteenth Amendment." Nape v. Illinois, 360 U.S. 264, 269 (1959) Inasmuch as Trooper Myers has admitted that he never conducted the Lewis test he described to the jury and that he knew he had not done so when he testified, and the jury never heard the truth, petitioner was denied due process. See Nape, 360 U.S. at 269 (1959)

Respondents further attempt to avoid responsibility for the presentation of false testimony by asserting that the defense should somehow have discovered Trooper Myers' misrepresentations.  Trooper Smith, the head of the State's serology lab, conceded that the State Police denied the existence of bench notes that would have revealed the truth and that, if the notes had not been concealed from the defense in this way, he could have produced them. [Resp. Br. at 14; Habeas Hg., Tr. 174-75] Disclosure of the notes was the State's obligation and by failing to disclose them, it precluded defense counsel from pursuing the issue.  Mr. Thomas cannot be denied relief simply because his counsel were unaware of documents that the police denied

11



existed.

The undersigned magistrate judge further finds that because the first jury acquitted petitioner on the sexual assault charge, the second and third trials on this charge violated double jeopardy rights. Following the petitioner's first trial, the jury initially returned a verdict on the burglary charge, but stated that it was having difficulty reaching a verdict on the sexual assault charge. [Exh. 1 to Petition, Trial 1, Tr. 338] The judge averred that he was "particularly concerned" about the jury's failure to reach a verdict on the second charge because there might be a second trial on that charge; he ordered them to continue to deliberate. Id., Tr. 339. The jury then submitted a question to the judge on one of the elements of first-degree sexual assault. The judge then instructed the jurors to apply their "common sense" and reread some of his instructions. Id., Tr. 346. The jury foreperson then informed the judge that the jury was deadlocked. The judge requested the foreperson to give him the vote count and sent the jury back in to determine if they should deliberate further. The jury then stated that they would like to deliberate further and asked for transcripts of some of the trial testimony.

At this point, the judge questioned the jury about their verdict and concluded that their finding indicated their conviction on the burglary charge, but not on the sexual assault charge. He asked them to clarify their verdict. Once the jury retired to deliberate, both counsel objected to the judge's comments. The judge stated that he was going to declare a mistrial unless the jury could explain the verdict. Id., Tr. 356. At this point, defense counsel stated, "Your Honor, I'll withdraw my objection," and the

12

297

prosecutor told the judge that "you've made some comments that were inappropriate. . . I think it's appropriate that you declare a mistrial." Id., Tr. 358.

When the jury came back in, the judge opined "[I]t is my presumption, in view of your failure to return a verdict on the charge of sexual assault, that your jury must have found that he did, in fact, break and enter and that in addition to that, he possessed the intent to commit sexual assault, but, in fact, did not commit sexual assault, and my question to you was, was that your jury's sense and finding in your support of the burglary defense?" Id., Tr. 363. The foreman responded: "Yes, Your Honor, I believe that was the sense and finding of the jury at that time. It may well be the sense and finding now, that's why I need one minute to ask a question." Id. After the jury briefly retired, the judge asked, "Can you respond to my question?" and the foreman replied, "Yes, Your Honor. That was the perception of each and all the jurors. . . ." Id., Tr. 364. However, even though the jury unanimously found that Mr. Thomas "did not commit sexual assault," the judge declared a mistrial on the sexual assault charge and accepted the burglary conviction. Subsequently, the judge declared a mistrial on the burglary conviction.[2]

Given the fact that the jury rendered a verdict convicting petitioner on the burglary charge and acquitting him of sexual assault, Mr. Thomas should not have been

---

[2]The jury in the second trial rendered a similar verdict to that initially returned by the first jury. The second jury found Mr. Thomas guilty of burglary and deadlocked on the sexual assault count. Exh. 2, Trial II, Tr. 406. The judge instructed the jury to deliberate further but it remained hung. Id. This time, the judge accepted the burglary verdict but declared a mistrial with regard to the sexual assault count. Id., Tr. 410-11.

13

298

subjected to a second and third trial.  As the Supreme Court has ruled, "[I]t is, of course, well settled that an acquittal can not be reviewed, on error or otherwise, without putting the defendant twice in jeopardy, and thereby violating the constitution.  In this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense."  United States v. Sisson, 399 U.S. 267, 289-90 (1970) (citation, internal quotation marks, parentheses, and asterisks omitted).  Indeed, this is "[p]erhaps the most fundamental rule in the history of double jeopardy jurisprudence. . . ."  United States v. Martin Linen Supply Co., 430 U.S. 564, 571 (1977).  The second and third trials, then, clearly violated the prohibition against double jeopardy set forth in the Fifth Amendment.

Therefore, it is the recommendation of the undersigned magistrate judge that the instant petition for relief be granted and that Mr. Thomas' burglary and sexual assault convictions be overturned.

The undersigned magistrate judge has reviewed petitioner's claim that the trial judge improperly pressured him to testify at the third trial in violation of his right against self incrimination and finds that such claim is without merit.  The cases cited by petitioner in support of such argument are not directly pertinent to such argument.  It is undisputed that official coercion of testimony and self-accusation is prohibited by United States v. Washington, 431 U.S. 181, 1887 (1977).  However, the nature of the coercion must be defined.  For example, in Webb v. Texas, 409 U.S. 95 (1972), the Court found a trial judge's comments to a defendant's sole witness impermissible.  Such comments, however, demonstrated the judge's expectation that the witness would

14

lie and that if he lied he would be subject to criminal perjury charges, possible conviction, and additional incarceration. Id. at 97.   Similarly, in Anderson v. Warden, 696 F.2d 296, 298-99 (4th Cir. 1982), a trial judge intimidated defense witnesses by reference to their alleged perjury.  Thus, the coercion attendant in Webb and Anderson, was coercion attendant to imposition of criminal punishment and the application of the punitive force of the State in response to offered testimony.  Perhaps inappropriate, but the trial judge's comments to the petitioner in the instant case clearly do not rise to the level of threatening officially sanctioned punishment in response to testimony.

Accordingly, for the reasons stated above, it is

**RECOMMENDED** that the respondents' motion for summary judgment be denied; the petition of Wilbert Thomas for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be granted; the petitioner's request that his conviction on sexual assault be overturned; and that he be released from confinement.

Petitioner and respondents are hereby notified that a copy of this **REPORT-RECOMMENDATION** will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge, and that, in accordance with the provisions of the parties may, within 13 days of the date of filing of this **REPORT-RECOMMENDATION** serve and file written objections with the Clerk of this court, identifying the portions of the **REPORT-RECOMMENDATION** to which objection is made and the basis for such objections.  The Judge will make a *de novo* determination of those portions of the **REPORT-RECOMMENDATION** to which objection is made in accordance with the provisions of 28 U.S.C. § 636(b) and the parties are advised that failure to file timely

15



objections will result in a waiver of their right to appeal from a judgment of the district court based on such **REPORT-RECOMMENDATION**.  Copies of objections shall be served on all parties with copies of the same to Judge Copenhaver and this magistrate judge.

The Clerk is directed to file this **REPORT-RECOMMENDATION** and mail a copy of the same to all counsel of record.

DATED:   April 28, 1999.


JERRY D. HOGG
UNITED STATES MAGISTRATE JUDGE

16

301

# ADMINISTRATIVE ORDER

## SUPREME COURT OF APPEALS OF WEST VIRGINIA

## RE: RECALL OF THE HONORABLE JAMES O. HOLLIDAY, RETIRED JUDGE OF THE TWENTY-NINTH JUDICIAL CIRCUIT, TO ACTIVE SERVICE TO PRESIDE IN KANAWHA COUNTY, THIRTEENTH JUDICIAL CIRCUIT, IN THE MATTER OF AN INVESTIGATION OF THE WEST VIRGINIA STATE POLICE CRIME LABORATORY, SEROLOGY DIVISION

**WHEREAS,** on June 2, 1993, a petition was filed with this Court by William C. Forbes, Prosecuting Attorney for Kanawha County, requesting the appointment of a circuit judge to conduct an investigation into whether habeas corpus relief should be granted to prisoners whose convictions were obtained through the willful false testimony of Trooper Fred S. Zain, a former serologist with the West Virginia Division of Public Safety. On June 3, 1993, in response to the petition, the Court entered an Order appointing the Honorable James O. Holliday , a retired circuit judge, to supervise an investigation of the Serology Division at the West Virginia State Police Crime Laboratory.

**WHEREAS,** on November 4, 1993, after an extensive investigation, Judge Holliday filed his report with the Court. The report chronicled the history of allegations of misconduct on the part of Trooper Zain. The report summarized the findings of serologists selected by the American Society of Crime Laboratory Directors (ASCLD) to conduct an analysis of the policies, practices, procedures and records of the serology division during Trooper Zain's tenure. The ASCLD report and the testimony of fellow officers during Trooper Zain's tenure supported the findings by Judge Holliday regarding Trooper Zain's long history of falsifying evidence in criminal prosecutions. The ASCLD report stated as follows:

> The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that

1

303

multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results.

**WHEREAS,** the ASCLD report also included criticisms regarding the procedural deficiencies of the Serology Division including the following:

(1) no written documentation of testing methodology; (2) no written quality assurance program; (3) no written internal or external auditing procedures; (4) no routine proficiency testing of laboratory technicians; (5) no technical review of work product; (6) no written documentation of instrument maintenance and calibration; (7) no written testing procedures manual; (8) failure to follow generally-accepted scientific testing standards with respect to certain tests; (9) inadequate record keeping; and (10) failure to conduct collateral testing.

**WHEREAS,** this Court adopted Judge Holliday's report and recommendations in In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division, 190 W.Va. 321, 438 S.E.2d 501 (1993) (Zain I). The Court stated that "[w]e agree with Judge Holliday's recommendation that in any habeas corpus hearing involving Zain evidence, the only issue is whether the evidence presented at trial, independent of the forensic evidence presented by Trooper Zain, would have been sufficient to support the verdict...once the use of false evidence is established as here, such use constitutes a violation of due process. The only inquiry that remains is to analyze the other evidence in the case under the Atkins [State v. Atkins, 163 W.Va. 502, 261 S.E.2d 55 (1979), cert. denied, 445 U.S. 904 (1980)] rule to determine if there is sufficient evidence to uphold the conviction."

2

3

**WHEREAS**, this Court determined that the Zain matters were "shocking and represent egregious violations of the right of a defendant to a fair trial. They stain our judicial system and mock the ideal of justice under law." This Court in <u>Zain I</u> directed Prosecutor Forbes to pursue any violations of criminal law committed by Trooper Zain and urged that he consult with the United States District Attorney for the Southern District of West Virginia. The Court also noted that the "corruption of our legal system would not have occurred had there been adequate controls and procedures in the serology division." The Court observed that Judge Holliday 's report was replete with the deficiencies and derelictions that existed in the serology lab. In an effort to ensure that the horrible situation would not recur, the Court directed the Superintendent of the Division of Public Safety to take steps to obtain certification of the State Police Forensic Laboratory by the ASCLD.

**WHEREAS**, Judge Holliday as directed by this Court continued to investigate the policies, procedures and records of the West Virginia State Police Crime Laboratory, Serology Division and issued a report on February 24, 1994. Judge Holliday reported that an analysis of the work of other officers who worked with Zain was undertaken by the ASCLD team to determine whether any of those officers had engaged in misconduct similar to Trooper Zain's. The ASCLD team reviewed 22 case files for 5 officers. In addition to serology records, the ASCLD team reviewed a transcript of court testimony for at least one of the cases for each serologist.

**WHEREAS**, the ASCLD team concluded in a report dated February 10, 1994 as follows:

> Occasional errors were noted in reporting of analytical findings, and some of the results recorded on the worksheets were not confirmed to be present in the submitted data sheets. At least some of these apparent discrepancies may be due to missing data sheets, especially with the earlier cases; the use of cryptic nomenclature, making it difficult to associate a data sheet entry with corresponding evidence items; or poor copy quality, rendering some entries illegible.

WHEREAS, the ASCLD team indicated that these were minor problems that did not compromise the integrity of the prosecutions and that the defects in the case files of the 5 officers differed in character from those reviewed in the case files of Trooper Zain in that the defects were sporadic, did not have a discernable pattern and did not appear to have adversely impacted the defendants.

WHEREAS, based upon the ASCLD report, Judge Holliday found that "there is not a scintilla of evidence of intentional misconduct on the part of other serologists who worked with Fred Zain."

WHEREAS, in In the Matter of an Investigation of the West Virginia State Police Crime Laboratory Serology Division, 191 W.Va. 224, 445 S.E.2d 165 (1994) (Zain II) this Court adopted the report of Judge Holliday and concluded that there was no evidence of a pattern or practice of intentional misconduct on the part of serologists other than Fred S. Zain which would warrant systematic review of those cases in which persons were convicted upon the evidence of the other officers.

WHEREAS, this Court in Zain II found as follows:

> We agree with Judge Holliday's conclusion that there is no indication that the occasional errors of relative insignificance committed by these officers affected, to any discernable degree, the prosecutions of the cases in which they gave evidence. Consequently, the most important element of the factors required for the award of a new trial is not present here.
>
> We also concur with Judge Holliday's findings and conclusions with regard to Trooper Zain's fellow serologists. Consequently, we conclude that serology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Zain, are not subject to the invalidation and other strictures contained in Zain I.
>
> Our adoption of Judge Holliday's report does not preclude prisoners against whom these serologists offered evidence

4

306

from seeking review of their convictions under the post-conviction habeas corpus statute, W.Va. Code, 53-4A-1, et seq. We hold only that evidence from such other employees of the Serology Division does not warrant the presumption of invalidity and the systematic review awarded in those cases in which Trooper Zain himself presented evidence. A prisoner who wishes to challenge his or her conviction will have to prove that in his or her case the other serologist offered false evidence, in addition to proving the 5 factors set-out in Syllabus point 1 of Zain I.

**WHEREAS**, on April 28, 1999, Jerry D. Hogg, United States Magistrate Judge, United States District Court for the Southern District of West Virginia, issued a report recommendation regarding a habeas petition filed by Wilbert Thomas. Wilbert Thomas was indicted in May 1987 upon charges of first degree sexual assault and burglary. Thomas' third trial, held in February 1990, resulted in a verdict of guilty on the first degree sexual assault charge. The Serology Division of the West Virginia Crime Laboratory conducted serology testing and Trooper Howard Myers testified at Thomas' third trial. Magistrate Hogg found that there was merit to Thomas' petition. Specifically, Magistrate Hogg stated in his report that "the record establishes that the State's key witness, Trooper Howard Myers, a West Virginia State Police Officer, falsely testified about nonexistent serology test results supposedly linking [Thomas] to the crime at issue." Magistrate Hogg determined that Thomas' conviction rested on knowingly false testimony by Trooper Myers.

**WHEREAS**, the testimony identified by Magistrate Hogg involved whether Lewis testing was done on a stain on the victim's nightgown. Trooper Myers both reported a Lewis test result in the Thomas case and testified at Thomas' third trial regarding the results of the Lewis test. It has since come to light that the Serology Division did not conduct Lewis tests prior to 1990.

**WHEREAS**, Magistrate Hogg relied on evidence submitted by expert witness Mark D. Stolorow, the Director of Operations for Cellmark Diagnostic, who reported the following:

307

The Lewis genetic marker testing on the secretion stains on the nightgown described in the laboratory report and testimony in this case were fabricated. The ABO genetic marker testing marker conducted on the secretion stain on the nightgown in this case were misrepresented in the laboratory report of H. B. Myers and correspondence of F. S. Zain and in the testimony of H. B. Myers as Lewis genetic marker test results. In fact, no Lewis typing was ever conducted on the gown. The fabrication of serological testing results in the Lewis genetic marker system is improper and scientifically unethical.

WHEREAS, it appears from a limited review of testimony in the Thomas habeas corpus proceeding that the Serology Division did not conduct Lewis blood group testing on evidence stains at least prior to 1990. Rather, it appears that for some period of time, the officers in the Serology Division inferred the Lewis type from the results of ABO testing of secretion stain evidence. According to Stolorow, there are critical flaws with the practice of inferring secretor/nonsecretor status from the presence of ABO factors in secretion stains. The most serious flaw may be the possibility of failing to eliminate an innocent defendant.

WHEREAS, the issues regarding testimony by troopers about results in allegedly nonexistent serology testing have cast a renewed shadow of doubt on the State Police Laboratory Serology Division. Whether there was a practice of reporting a result for a test that was not performed and whether the newly-raised questions represent another systematic procedural deficiency at the Serology Division is unknown. It is plain, however, that information now available regarding the Lewis test raises concerns about convictions where Lewis test evidence was reported and raises concerns as to whether there were problems at the Serology Division that were not previously identified in the process of review resulting in the opinions in Zain I and Zain II. These concerns mandate a reopening of the investigation of the Serology Division.

WHEREAS, IT IS THEREFORE ORDERED, that the Honorable James O. Holliday, retired judge of the 29th Judicial Circuit, be and he hereby is, recalled for temporary assignment to the Circuit Court of Kanawha County in the 13th Judicial Circuit under the provisions of Article VIII, sections 3 and 8 of the Constitution of West Virginia and Va. Code § 51-9-10 for the purpose of presiding in a renewed investigation of the West Virginia State Police Crime Laboratory, Serology Division.

**IT IS FURTHER ORDERED** that the Honorable James O. Holliday , Retired Judge of the 29th Judicial Circuit, be and he hereby is, authorized: (1) to appoint with the prior approval of the Administrative Director of the Courts as to compensation an independent forensics expert to conduct a thorough review of the policies, procedures, and records of the West Virginia State Police Crime Laboratory, Serology Division; (2) to appoint, if he deems necessary and proper, a special prosecutor to serve as representative of the State of West Virginia in any proceedings arising from this appointment; (3) to appoint, if he deems necessary and proper, a public defender to serve as representative of prisoners whose convictions were obtained, in part, through evidence secured from the West Virginia State Police Crime Laboratory, Serology Division; (4) to conduct such proceedings as he may deem necessary and proper in furtherance of the investigation; (5) if it is concluded that nonexistent serology testing was reported, to investigate why the ASCLD team review and resulting report of February 10, 1994 did not identify this matter; and (6) to render a written report to the Supreme Court of Appeals containing findings of fact, conclusions of law and recommendations regarding actions to be taken in light of the results of the investigation.

**IT IS FINALLY ORDERED** that the Circuit Clerk of Kanawha County record this Order in the office of said Clerk and that proceedings be held in the manner provided by law and by this Order.

Chief Justice Starcher would reopen the investigation but would appoint a different judge.

Enter June _10_, 1999

LARRY V. STARCHER
Chief Justice

309

John Moss III
P.O. Box 241
1 Mountainside Way
Mt. Olive, WV 25185

December 1, 1999

FILED

99 DEC -2 PM 1:58

CATHY S. GATSCH CLERK
KANAWHA COUNTY CIRCUIT COURT

Cathy Gatson
Clerk of the Circuit Court
13th. Judicial Circuit
Kanawha County Judicial Annex
111 Court Street
Charleston, WV 25301

RE:  Moss  v.  Trent
Civil Action No. 94-MISC-663
(Jugde Andrew MacQueen)

Dear Ms. Gatson,

Enclosed are the original and two copies of my "Motion For Leave To File: Petitioner's Additional Supplement To Rule 59(e) Motion To Alter Or Amend Order, To Correct Factual And Legal Errors, And To Reconsider Legal Conclusions", and Petitioner's to be filed for this Courts' consideration. As demonstrated by the certificate of Service herein, all parties have been served with a true copy of the above.  Please present this matter to the Court for it's consideration.

Thank you for your assistance on this matter.

Sincerely,

John Moss III

* copy sent to Judge MacQueen / 12-2-99 / CM

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED

99 DEC -2 PM 1:58

JOHN MOSS III

       Petitioner,

v.

       Civil Action No. 94-MISC-403

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

       Respondent

**MOTION FOR LEAVE TO FILE: PETITIONER'S ADDITIONAL
SUPPLEMENT TO RULE 59(e) MOTION TO ALTER OR AMEND
ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO
RECONSIDER LEGAL CONCLUSIONS**

    Petitioner, John Moss, III, seeks Leave of the Court to file his pro-se

Supplemental Correction to a Factual issue before this Court as the Court's

consideration of a factual error as evidence is adversely effecting this

Court's determination of the facts. To permit this error to go uncorrected

will result in a manifest injustice to Petitioner, and deny this Court the

proper foundation to make a constitutionally sound determination of the facts

prior to its final decision.

    For this the Petitioner shall ever Pray.

               Respectfully submitted,

               John Moss III,
               Petitioner, pro-se.

311

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED

JOHN MOSS III,

      Petitioner,

99 DEC -2 PM 1: 58

v.

Civil Action No. 94-MISC-663

CATHY S. GATSON CLERK
KANAWHA COUNTY CIRCUIT COURT

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

      Respondent,

### PETITIONER'S ADDITIONAL SUPPLEMENT TO RULE 59 (e) MOTION TO ALTER OR AMEND ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS

Petitioner John Moss III, has sought leave of the Court to file an Additional Supplement as he believes the Petition contains a mistake which credits Sgt. Murphy with having been the serologist who performed blood stain testing on the shirt of Bernadette Reggettz. Petitioner seeks to correct this mistake under his "Rule 59 (e) Motion" as this matter relates back to correcting factual errors so this Court may reconsider its' legal conclusions based upon accurate information.

### THE MISTAKE

On August 14, 1995 counsel for petitioner filed a supplemental brief which improperly states "As a general rule, if the writing was in Murphy's handwriting, he performed those tests" (See page 5).

On September 17, 1996 Respondent's filed its <u>Answer</u> and Memorandum in support to its Answer. Respondent properly submits Sgt. Murphy tested known blood samples and that Trp. Zain tested the crime scene exhibits. (See pages 16-17)

On September 27, 1996 the Respondent filed a "Supplemental Argument in Opposition to Petition For Writ Of Habeas Corpus" contending that it appears Sgt. Murphy "tested the little pajama top of Bernadette Reggettz", not Zain. (See page 3). The only foundation for this contention is counsel for Petitioner's "general rule" statement contained in the August 14,1995 brief. Somehow, the "general rule" statement became an authoritative rule that when Sgt. Murphy recorded the Bernadette clothing (shirt) on a case worksheet that Murphy and not Zain conducted the testing on this crucial piece of evidence.

On October 2, 1996 counsel for Petitioner filed a response to the Respondent's Memorandum in Opposition where he again improperly implies that Sgt. Murphy tested the clothing from Bernadette Reggettz. (See page 14). Counsel furthermore argues that Sgt. Murphy identified an EsD genetic marker consistent with Petitioner, but inconsistent with any member of the Reggettz family. This representation is mistaken and totally belied by the record.

## CORRECTING THE MISTAKE

Upon review of the record, Sgt. Murphy testified in Petitioners first trial (1984) that his testimony before the Grand Jury was limited to results of known blood samples he had tested. (See Appendix 1). The Respondent has offered no: statement; affidavit; or declaration of any type from Sgt. Murphy that he in fact tested any piece of crime scene evidence, including the Bernadette clothing item.

On May 17, 1995 the deposition of Former State Trooper, Sgt. Robert Murphy was taken. Upon questioning by counsel for Petitioner, Lonnie Simmons, Esq., relating to different handwriting on "case worksheets" disclosed in discovery during this habeas action, the following transpired:

> A. This basically is a compilation of all the parties involved and a summary of all the blood grouping. Just a tabular way of excluding people or including people.

313

Q. Would this sheet in your handwriting indicate that you had performed all of those tests or does that not indicate that?

A. Not Necessarily.

(See Murphy deposition -- here on out known as 'Murphy', at page 31) (Provided here as Appendix 2)

The record evidence of this case clearly shows former Trooper Sgt. Murphy did not contend that if he recorded results on a worksheet that he performed the test. On page 32 and 35 of Murphy it was disclosed the "case worksheets" could be original records or test results that were transcribed from sheets for individual tests. Understandable, after fifteen (15) years, Sgt. Murphy could not possibly recall who tested what evidence, but to the best of his recollection -- he saw the results. Sgt. Murphy added that all the work was probably done by Zain and himself (See page 34 of Murphy)

## MURPHY AS SUPERVISOR

Great weight has been given to the fact that Murphy was Zain's supervisor and saw results of tests as they were performed. When Sgt. Murphy was questioned about what was different about the blood evidence from the crime scene that showed someone other than a Reggettz family member had bled, after refreshing his memory through the use of a genetic characteristics chart of crime scene evidence, Sgt. Murphy selected that the esterase (EsD) was different. (See page 42 of Murphy) The genetic characteristic EsD 2 is recorded throughout this case as being the crucial genetic marker obtained from the crime scene evidence used to exclude 27 other possible donors as the foreign blood source. This is supported by the June 10, 1980 forensic report authored by Sgt. Murphy. (Provided here as Appendix 3) On page 6 of this report at paragraph 1, nine (9) possible donors to the foreign blood type identified from the crime scene were excluded as "none was found to contain EsD 2-1".

It is important to note that none of the known blood comparison samples recorded were an EsD 2.  Petitioner's expert Dr. David Bing established that it is improper to include genetic characteristics that are common to the victim on samples of crime scene evidence.  Only genetic characteristics foreign to the victim(s) should be considered as the sample could be a mixture of blood from a victim and the perpetrator.  The State refuted the mixture concept alleging the Christmas package wrapping paper was clearly a drop of blood, as was the Bernadette clothing item.  The State alleged the perpetrator wore gloves which would have permitted the glove to absorb a victims blood, mix with the perpetrator's blood and "drop" as a mixed sample.  Therefore, only the EsD 2 factor would be proper to compare as a foreign factor if the Respondent could establish someone other than Zain tested crime scene evidence, which they have not.

This is further supported by the summary case worksheet (Bates number 12-- provided here as Appendix 4A) where Sgt. Murphy only recorded the EsD type for a "table knife" catalogued as a "case knife". Clearly Sgt. Murphy was only interested in the EsD genetic marker which draws one to the inescapable conclusion that the EsD genetic marker is the only credible foreign blood type identified and recorded as a comparison factor.

Base upon the record of Sgt. Murphy having viewed the results of tests, and performed serological testing on known blood samples which resulted in excluding numerous possible sources as being the donor of foreign blood identified at the Reggettz home, only the genetic marker EsD 2, should be considered.  Sgt. Murphy compared known blood samples to foreign blood based upon the EsD 2 as the foreign genetic type.  Petitioner has no reason to doubt this fact or that Sgt. Murphy has testified honorably to the best of his recollection, however, at no time did Sgt. Murphy exclude any other

(4)

315

suspect and/or possible source of foreign blood through the use of any genetic characteristic other than the EsD 2-1.

The case worksheets produced as the underlying data to the June 10, 1980 Report cannot be the original record of results catalogued as the tests were recorded. On page 4 of the June 10, 1980 report seven (7) genetic characteristics are reported for the "doll" submitted for testing. The case worksheet (Appendix 4-A) only records one (1) genetic characteristic for the "doll". Either there are individual data sheets for the items submitted, or the report authored by Sgt. Murphy is false.

Another example is found on page 5 of the June 10, 1980 Report in paragraph 2 where a number of items were reported to have the subgroup PGM 1+, 1- identified. The case worksheets provided are for group one test results which do not identify the subgroup of PGM factors. PGM subgrouping is conducted in a second test commonly called "group two tests". Again, either the additional factors had to have been obtained from individual data sheets or the report is false. (See Appendix 4-A).

One of the most compelling factors that establishes the worksheets are summaries of other data sheets submitted to Sgt. Murphy to prepare a final report, is Bates number 10 -- Appendix 4-B here. The genetic characteristics of Petitioner are catalogued on a worksheet dated simply as "Jan". It was established by Sgt. Murphy that "Jan" represented January. (See Murphy page 32). The illegally obtained blood sample of Petitioner was taken on January 30, 1980, but the state contends the sample was returned in its entirety without being tested. If the results recorded on the disclosed worksheets are to be taken as correctly catalogued in accordance with the dates represented, the January date recording Petitioner's blood types must also be considered as being correct. Under these circumstances, all blood evidence,

316

including the EsD 2-1, would have been obtained illegally and Petitioner's conviction must be reversed.

The Respondent has represented that the characteristics recorded by Zain predates Sgt. Murphy's testing Petitioner's known blood sample obtained on April 22, 1980. There is no worksheet dating Petitioner's blood type other than the January worksheet. The Respondent cannot pick and choose which worksheets it wants the dates to be credible on. Either all dated work is credible or none of it is.

One of the most disturbing features of the recorded data on the Appendix 4-A worksheet is two different sets of results for the same piece of evidence, the clothing (shirt) of Bernadette Reggettz. A careful review of the entire record has shown that only one item of clothing was submitted for testing that belonged to the child Bernadette Reggettz. In the handwriting only identified as being "not Murphy", the last item listed is "Burnadette Clothing". The genetic characteristics attributed to this item perfectly match the known blood sample of Burnadette Reggettz. Trial testimony described one blood drop from Bernadette's shirt/clothing as having been tested.

Just below the "not Murphy" Bernadette Clothing entry is an entry in Sgt. Murphy's handwriting of "Clothing Bern.". This time the genetic characteristics recorded are aligned to those of the Petitioner. As shown above, this worksheet cannot be the original results obtained data sheet, because the June 10, 1980 report lists more genetic markers than what appears on the data worksheet for three (3) different items. Relying upon the record in this de novo review Sgt. Murphy only tested known blood samples. Knowing that Sgt. Murphy had no personal recollection of anyone other than Zain testing the crime scene evidence, it becomes clear that the second Bernadette

(6)

317

clothing entry is a transcription from a data sheet provided to Sgt. Murphy by Zain.

The entries by Sgt. Murphy on Appendix 4-A are not dated, but would appear that they were transcribed to the worksheet in June of 1980 when Sgt. Murphy was preparing his final report. It is not mere speculation that Zain would have altered his original case worksheet(s) or totally rewrote the documents to include Petitioner in the gene pool of the population that could have deposited the blood foreign to the Reggettz family. The West Virginia Supreme Court of Appeals in Zain I, S.E.2d 501 at 506 found the evidence is overwhelming that Zain did falsify his reports to falsely include defendants.

Sgt. Murphy's supervision of Zain's original testing enunciates: the genetic marker EsD 2 is foreign to the Reggettz family; documentation repeatedly reflects Sgt. Murphy relied upon the EsD results obtained; and that six (6) months after having seen Zain's original test results, Sgt. Murphy accepted Zain's worksheets as being accurate relating to genetic markers obtained from crime scene samples. At no time has Sgt. Murphy alleged he recalls every result he witnessed on Zain's test gel plates. Petitioner has no doubt that Zain deceived Sgt. Murphy after the original tests were conducted by providing false results to Sgt. Murphy after Petitioner's blood type was made known.

All testimony and evidence points to the fact the West Virginia State Police, Serology Division was being pressed to identify a blood type that would match blood obtained from the crime scene foreign to the Reggettz family. Petitioner was the first and only person identified to have an EsD 2 genetic factor. Based upon Zain's history of falsifying evidence and the opinion issued in Zain I, even the most liberal review of the evidence, in a light most favorable to the State, only the EsD 2 could possibly be considered credible through Sgt. Murphy's record of events.

There are only three (3) possible EsD genetic types. The EsD 2 and 2-1 types would likely occur in well over 65% of the population. When considering the prejudicial effect the false blood evidence had on the jury — — it cannot be ignored that comparing Petitioner to foreign blood at the crime scene which includes Petitioner in a gene pool of 65% of the nations population, verses the trial testimony by Zain that only .03% would be included in the gene pool, the prejudicial effect upon the jury's verdict is undeniable.

## THE EVIDENCE CORROBORATING CONFESSION

Should this habeas action have to be further developed on other matters beyond the false serology issue, Petitioner would cast a long shadow of doubt upon evidence this Court has not yet been made aware of. For example, this Court found Petitioner's confession was largely consistent with the physical evidence citing a camera identified by Paul Reggettz as belonging to him, and silverware Reggettz alleged he had purchased. Due to ineffective assistance of trial counsel, this Court has been denied convincing evidence that Paul Reggettz identification of these items were false and completely self-serving to draw attention away from his own (admissible) confession to the murders of his family.

### The Silverware

Paul Reggettz identified a set of silverware at trial as being the silverware he purchased as a christmas gift for his wife in 1979 at the local K-mart store. Police obtained the silverware from the mother of one of Petitioner's friends, Mrs. Arbutus Johnson Pomrory. Petitioner had given the silverware to Mrs. Pomroy as a christmas gift.

319

In the first trial of this case (1984), defense called the K-mart merchandising and ordering manager as a witness, Ms. Edith Lilly. Ms Lilly testified that K-mart has never sold the brand of silverware that Paul Reggettz identified as being the item he purchased for his wife at K-mart. (See Appendix 5) Defense counsel at Petitioner's second trial did not call Ms. Lilly as a witness despite requests to call her. As a result, this Court has been deprived crucial information in determining what degree of credibility should be afforded to Paul Reggettz' identification of the silverware attributed to Petitioner. Based upon Reggettz' testimony of purchasing silverware at K-mart, alleged to be missing from his home after the murder of his family, the silverware relied upon at trial could not be the property allegedly stolen from the Reggettz home.

**The Camera**

Originally no camera was alleged to have been missing from the Reggettz home. Once again the only evidence offered that a camera obtained from Petitioner's father's car was taken from the Reggettz home, was the self-serving identification of the camera by Paul Reggettz. The state offered no corroborating evidence that Paul Reggettz owned a camera, such as: demonstrating that Reggettz owned film that would fit this model of camera; or a picture alleged to have been taken with the camera. The Reggettz Family had been residents of Kanawha County West Virginia for some time, yet no witness alleging to have ever seen any member of the Reggettz family with a camera of any kind was called to corroborate Paul Reggettz theory of a missing camera.

On the other hand, both Petitioner's parents (John and Marzee Moss, Jr) were called as witnesses in the first trial in 1984, who did substantiate that Petitioner did own a camera like the one identified by Paul Reggettz as

being his camera. (See Appendix 6 and 7) It was furthermore established that both Petitioner and his sister had owned cameras and that Petitioner had his camera during the summer of 1979 prior to the December 1979 murders of the Reggettz family. Petitioner's mother passed away prior to the second trial and Petitioner's father was not called by trial counsel even though it was reqested by Petitioner.

In light of Paul Reggettz' false identification of the silverware and the lack of any corroboration to his identification of the camera being his, Petitioner seeks this Court's reconsideration of the credibility of the physical evidence considered as corroborating Petitioner's coerced confession. The Zain issue being considered independant of other issues yet to be developed has denied this Court a full consideration of the facts.

## Reliability of Petitioner's Confession

The Respondent has contended Petitioner's confession is reliable citing consistencies to crime scene evidence, motive and other identified factors. The Respondent has overlooked the fact that Circuit Court Judge John Hey found Paul Reggettz' confession to murdering his family credible and admissible. When the confession of Paul Reggettz is compared to the crime scene evidence and forensic evidence that couldn't be known to persons who only viewed the scene after the fact, Reggettz' confession is the only credible account of the murders consistent to unseen forensic evidence.

When Petitioner's confession is compared to all the physical and admissible forensic evidence, it becomes clear that his confession is consistent to having been told what to say by investigating officers who had viewed the crime scene, but could not have known the underlying forensic evidence. Petitioner has developed a pro-se comparison between the reliability of his confession and that of Paul Reggettz. (See Appendix 8).

This information will be fully developed in additional grounds through Habeas Corpus, if this action is not resolved on the Zain issue now pending. Petitioner believes it's only fair to this Court to provide this information as the Court must rely upon factors other than the serology evidence in determining the sufficiency of evidence and the prejudicial effect Zain's testimony had on the jury.

## CONCLUSION

This is not the massive case envisioned by the Respondent with overwhelming evidence of guilt. As this Court has recognized in its September 10, 1998 Order, the Court considered "both the confession and the serological evidence to be equally important". The sole intent of this motion is to correct the mistake that credited former State Trooper Sgt. Robert Murphy with having tested any crime scene evidence, including the clothing of Bernadette Reggettz.

The additional factors casting new light on the reliability of Paul Reggettz' identification of the silverware and camera are meant to enlighten this Court on other issues that would be further developed under additional grounds should this action have to advance further. Petitioner has presented this Court with factors that warrant further consideration of the sufficiency of evidence to sustain this conviction. Petitioner also demonstrates that he was clearly prejudiced by Zain's testimony, which undoubtedly effected the judgement of the jury, when considered in conjunction with the additional factors provided herein that Sgt. Murphy only tested known blood samples, and only recalls the foreign blood EsD gene type as being different than the Reggettz family members blood type.

This correction of facts casts the serology results into a whole new light that demonstrates confidence in the jury's verdict, based upon false

evidence, is undermine and this Court's consideration of mistaken information resulted in Petitioner suffering an adverse Order where the Court had to rely upon the record presented. Petitioner is entitled to have his Habeas Corpus considered on the merits of the record, and this Court is entitled to base its finding of fact with conclusions of law on information that is not found upon mistaken representations.

Based upon the foregoing analysis, correction to the record, the attachments and briefs provided previously; it cannot be disputed that Petitioner's conviction was obtained, in part, upon the false, misleading, exaggerated, and scientifically unsound testimony of Fred Zain. Therefore, Petitioner respectfully represents that under the standards mandated by the United States Court decisions, as recognized in the Zain I decision, and under the facts of this case; Petitioner is entitled to a new trial.

Respectfully submitted,

John Moss III,
Petitioner, pro-se.

cc: file

## CERTIFICATE OF SERVICE

I, John Moss III, Petitioner pro-se, certify that on this day of December 1, 1999 a true copy of the "Motion For Leave To File Petitioner's Additional Supplement To Rule 59(e) Motion To Alter Or Amend Order, To Correct Factual And Legal Errors, And To Reconsider Legal Conclusions" and Petitioner's Additional Supplement To Rule 59(e) Motion To Alter Or Amend Order, To Correct Factual And Legal Errors, And To Reconsider Legal Conclusions" were mailed, first class postage prepaid, to counsel of Respondent, and Petitioner's counsel of record at the addresses listed below:

Jon Blevins
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg.
111 Court Street
Charleston, WV 25301

Lonnie C. Simmons, Esq.
410 Washington Street East-Suit 307
P.O. Box 3785
Charleston, WV 25337

John Moss III

324

# APPENDIX #1

Robert C. Murphy - Direct                    254

and Mr. Brown, Assistant Prosecuting Attorney for Kanawha

County.

    All right, where are we, gentlemen?

    MR. McKITTRICK:  The defense calls Mr. Murphy as a witness.

    THE COURT:  Come forward to be sworn.

- 0 -

ROBERT C. MURPHY,

    Being thereupon called as a witness, after

    being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

    Q    State your name please.

    A    Robert C. Murphy.

    Q    Bob, are you presently employed?

    A    Yes, sir.

    Q    Where are you employed?

    A    I am employed as a chemist at the Department of Natural

Resources Organics Laboratory at Guthrie.

    Q    Were you formerly employed as a chemist by the

West Virginia Department of Public Safety?

    A    Yes, sir, I was.

    Q    When were you so employed?

    A    September of '71 until October of '82.

    Q    Let me direct your attention to April, 1980.  Did you

Robert C. Murphy - Direct                         256

1979, were consistent with the blood that you analyzed of John

Moss, III?

    A    Yes, sir.

    Q    And did you so testify before the January Term of the

grand jury on the 28th day of April, 1980?

    A    Yes, sir, I did.

    Q    Other than testifying to your analysis of John Moss,

III's blood before the January Term of the grand jury of Kanawha

County, West Virginia, did you testify to anything else

concerning the investigation of the Reggettz murders?

    A    My testimony was limited exclusively to the blood

samples.

    MR. McKITTRICK:  That is all the questions I have.

    THE COURT:  Cross?

    MR. STUCKY:  None.

    THE COURT:  All right, thank you, Mr. Murphy.  You may step

down.

    (Witness Excused.)

    MR. McKITTRICK:  At this time, Your Honor, the defense would

ask permission to approach the bench.

    THE COURT:  All right.

    THE COURT:  And would lodge with the Court a petition which

requests the Court's approval, confirmation and permission to

use or to have certain information disclosed from what has been

**APPENDIX #2**

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

      Petitioner,

vs.           CIVIL ACTION NO. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

      Respondent.



      The deposition of ROBERT MURPHY was taken on the 17th day of May, 1995, beginning at 10:10 a.m., in the Law Offices of DiTrapano & Jackson, 604 Virginia Street, East, Charleston, Kanawha County, West Virginia, before Penny L. Kerns, Notary Public and Certified Court Reporter, for purposes of discovery and/or to be read as evidence in the above-styled matter which is now pending and undetermined in said Court.

GARRETT REPORTING SERVICE
"PROFESSIONAL STENOMASK FOR THE RECORD"

5208 GLOW DRIVE, CROSS LANES, WEST VIRGINIA 25313 • (304) 776-5303

2

APPEARANCES:       On behalf of the Petitioner:

LONNIE C. SIMMONS, ESQUIRE
  DiTrapano & Jackson
  604 Virginia Street, East
  Charleston, West Virginia   25301


On behalf of the Respondent:

MARY BETH KERSHNER, ESQUIRE
  Assistant Prosecuting Attorney
  for Kanawha County
  Judicial Annex
  Charleston, West Virginia   25301


*******************************************************

I N D E X

|  | Examination by | |
| Witness | Mr. Simmons | Ms. Kershner |
| Robert Murphy | 3 | 53 |

| Exhibit | Marked |
| Deposition Exhibit No. 1 | 16 |
| Deposition Exhibit No. 2 | 24 |

Reporter's Certificate  57, 58

Case 2:09-cv-01406  Document 17-28  Filed 10/29/10  Page 121 of 134 PageID #: 4009

John Moss, III vs. George Trent,
Warden of the WV Penitentia

Multi-Page™

Robert Murphy
5/17/95

Page 3

1    (Witness sworn)
2    THEREUPON came
3        R O B E R T   M U R P H Y
4    called as a witness herein, who, having been first duly
5    sworn according to law, testified as follows:
6        EXAMINATION
7    BY MR. SIMMONS:
8        Q  Mr. Murphy, my name is Lonnie Simmons.  I
9    represent John Moss, III, in a habeas corpus action here in
10   Kanawha County.  I guess I've met with you once before.
11   The purpose of this deposition is to create a record in
12   connection with this habeas corpus proceeding.  I usually
13   put on the record in these things that in habeas corpus
14   actions clients don't have an absolute right to be present
15   and my client is aware of that fact and so I've talked to
16   him and he knows that I'm doing this today, and my plan is
17   simply to get some information from you so we'll have it on
18   the record and this will become part of the record in a
19   habeas corpus action.  Would you state your name for the
20   record, please?
21       A  Robert C. Murphy.
22       Q  Mr. Murphy, where are you currently
23   employed?

Page 4

1        A  CT & E Environmental Services in
2    Charleston.
3        Q  Okay.  Now, how long have you been employed
4    by that company?
5        A  A little over seven years.
6        Q  Before we get the rest of your work history
7    with the state police, what's your educational background
8    as far as college and onward?
9        A  Bachelors degree in chemistry from Rutgers
10   University.  I also attended the West Virginia University
11   Graduate School of Chemistry and Marshall University
12   Graduate School also in chemistry, a number of short
13   courses put on by professional organizations, the American
14   Academy of Forensic Sciences and the Southern Association
15   of Forensic Science.
16       Q  Okay.  When you say you did some post-
17   graduate studies at Marshall and WVU in chemistry, did you
18   obtain any additional degree or were these just additional
19   classes?
20       A  No.  It was the equivalent of a masters
21   degree, but I did not receive a masters degree.  It was
22   about thirty-some hours.
23       Q  When were you first employed by the

Page 5

1    Department of Public Safety in West Virginia?
2        A  December of 1971.
3        Q  And in what capacity were you first employed
4    by the Department of Public Safety?
5        A  As a chemist.  At that time, chemists were
6    considered generalists, which means you worked on anything
7    related to a particular case regardless of whether it was
8    drugs or soils or whatever.
9        Q  Hair?  Could you do hair analysis?
10       A  Uh-huh.  Whatever was involved in that case.
11       Q  Okay.
12       A  Three or four years later, the mid 70's,
13   started specialization where you would focus on one
14   particular area.
15       Q  What area did you focus on three of four
16   later?
17       A  Serology.
18       Q  So approximately from '74, '75 till when did
19   you focus exclusively on serology?
20       A  Pretty much.
21       Q  When did you leave the state police?
22       A  I left the state police in-- well, I
23   resigned October of '82, but I had been out of serology for

Page 6

1    approximately a year.  There had been, let's see, one
2    resignation and one retirement, which left a void in the
3    drug analysis area and I shifted to fill in for that.  So
4    it was about a year prior to my leaving.
5        Q  Did there come a time when you were the head
6    of the serology division of the state police?
7        A  Yes, sir.
8        Q  About what year did that happen?
9        A  It was never an official position.
10       Q  Okay.
11       A  I was the senior serologist, so I more or
12   less supervised.
13       Q  Do you know approximately when that would
14   have occurred that you more or less supervised the other
15   serologists?
16       A  Until 1976 when I believe Fred Zain was
17   hired, I was the only serologist, so there was no one to
18   supervise.  At the time he was hired, basically I became
19   the supervisor.
20       Q  We'll get into that a little bit more.
21   When you-- What was the reason for leaving in October of
22   '82?
23       A  It was personal.

331

Case 2:09-cv-01406   Document 17-28   Filed 10/29/10   Page 122 of 134 PageID #: 4010

John Moss, III vs. George Tren~
Warden of the WV Penitentiar~

Multi-Page™

Robert Murphy
5/17/95

Page 7

1    Q  Okay.  Sometime after '82, did you start
2  working for the company you mentioned in the beginning?
3    A  Well, when I left the state police, I went
4  to work for the Department of Natural Resources as a
5  chemist and I was with them until March of 1988.
6    Q  Okay.
7    A  And then I left there to work for this
8  private commercial testing company.
9    Q  Okay.  Well, during the time that you worked
10  for the state police, I take it you testified as an expert
11  in serology in a number of cases?
12    A  Quite a few.  Yes, sir.
13    Q  During the time that you were there, you
14  were essentially the main serologist?
15    A  Yes, sir, I was.
16    Q  Okay.  I think you mentioned that Fred Zain
17  was hired in 1976.  At the time that Fred Zain was hired,
18  were there any other serologists besides yourself in the
19  department?
20    A  There was one other person who was not
21  actively doing it, but had been basically my trainer.  That
22  was a Sergeant White, but he was not actively doing the
23  serology work.

Page 8

1    Q  So when Zain was hired in 1976 were the only
2  serologists in the department at that time you and Mr.
3  Zain?
4    A  Yes, sir.  Uh-huh.
5    Q  Let's talk about the hiring of Fred Zain.
6  Were you involved in the decision to hire Fred Zain in any
7  way?
8    A  I believe I interviewed him, but that was
9  only to basically obtain my opinion as to whether he was
10  competent to do the work.  I had no role in the actual
11  decision.  I talked to him, I may have seen a resume, but
12  other than that, I mean, I didn't have a role in his
13  hiring.
14    Q  Do you have any recollection of the
15  interview with Mr. Zain and/or what your impressions were
16  at that time?
17    A  As best as I can remember, I felt he was
18  competent, that he was capable of doing the work.  Other
19  than that, I have no details as to the interview.
20    Q  Do you recall making any kind of a
21  recommendation to the other persons involved in the hiring
22  process?
23    A  I probably expressed my opinion that I felt

Page 9

1  he was competent.  Other than that, no.
2    Q  Did you have any knowledge at that time
3  about Fred Zain's educational background and his chemistry
4  background in particular?
5    A  No, sir.  Like I say, I may have seen a
6  resume, but I didn't pay a whole lot of attention to it.  I
7  might mention that the state police basically followed
8  civil service regulations where a person could be
9  classified as a chemist even if their degree were in some
10  other natural science, and for that reason, I didn't pay a
11  whole lot of attention to what his degree was.
12    Q  So beginning in 1976 when Fred Zain was
13  hired, I take it you supervised, generally supervised his
14  work?
15    A  Yes, I did.
16    Q  Do you have any general opinions about the
17  work performed by Fred Zain that you observed yourself?
18    A  My personal experience was, I had no
19  problems with his work.  He was competent.  He was a good
20  analyst.
21    Q  Okay.  During the time that you supervised
22  Fred Zain's work, do you recall having any particular
23  arguments or disputes with him over the analysis in a

Page 10

1  particular case?
2    A  No, sir.
3    Q  Were you ever aware of any cases where Fred
4  Zain said that he saw a marker in a given test and you did
5  not see a marker in that test?
6    A  No, sir.
7    Q  Had you heard any of the stories about the
8  magic wand in the laboratory?
9    A  In the newspapers, but not-- I have no
10  personal knowledge.  Just from what I've read.
11    Q  But not at the time you worked in the lab
12  with Mr. Zain, you hadn't heard of the magic wand?
13    A  No.
14    Q  Okay.  I'd like to turn to the case that
15  we're dealing with here.  I just wonder, sitting here
16  today, do you recall working on what I'll call the
17  investigation of the Reggettz murders?
18    A  Yes, sir.
19    Q  What's the first thing you can remember
20  about this case, your earliest memory of having any
21  involvement in the investigation of those three murders?
22    A  The fact that there had been three murders
23  and someone had to go to the crime scene to collect

Case 2:09-cv-01406 Document 17-28 Filed 10/29/10 Page 123 of 134 PageID #: 4011

John Moss, III vs. George Trent
Warden of the WV Penitentia

Multi-Page

Robert Murphy
5/17/95

## Page 11

1  evidence and it was determined that Fred Zain would be the
2  person that went actually to the scene. I might mention
3  the reason I remember this case is, it was an unusual
4  case.
5      Q  Can you recall if there is any particular
6  reason why Fred Zain went to the crime scene versus
7  yourself?
8      A  I can't recall how that decision was made,
9  but he was the one that was sent to the scene.
10     Q  Do you recall being involved in that
11 decision-making process?
12     A  Not really, no.
13     Q  Was it common for a serologist to go to the
14 scene of a crime and actually obtain the samples of
15 evidence to be tested later?
16     A  No, sir, not really.
17     Q  Other than this case, can you recall any
18 other examples of cases where the serologist went to the
19 scene of the crime to obtain the samples?
20     A  Yes, sir. I can recall one case in which I
21 was sent to Martinsburg to obtain samples from a vehicle.
22 There was also a fingerprint examiner that was sent at the
23 same time.

## Page 12

1      Q  What was it about the Martinsburg case you
2  just mentioned that someone decided they wanted you to go
3  there in person?
4      A  I really can't say. I mean, it was-- I was
5  told I was going and that was-- I didn't have any say in
6  the matter.
7      Q  Sure. Okay. As a serologist, were you
8  trained in how to obtain evidence from the scene of a
9  crime?
10     A  Not specifically. I was trained on how to
11 basically preserve samples, how they were to be handled,
12 but as far as what samples were to be taken, no.
13     Q  Okay. Are you aware of whether or not Mr.
14 Zain at that time, and this would have been in December of
15 1979, had any training in the procedure for obtaining
16 evidence at the scene of a crime?
17     A  Probably not. I think that at that time
18 period a lot of this was what I would call common sense.
19 You basically chose the samples based on what you perceived
20 to be important and then you took whatever precautions were
21 necessary to make sure that the integrity of those samples
22 was maintained. As far as formal training in collecting
23 evidence, I don't recall any training at all.

## Page 13

1      Q  Let me just focus on one thing about the lab
2  at that time, and we're talking about around December of
3  1979. Did the laboratory at that time have any written
4  protocol on laboratory procedures, first of all?
5      A  No, sir.
6      Q  Okay. And how about any written protocol on
7  obtaining evidence at the scene of a crime?
8      A  No, sir.
9      Q  Did they have any written protocol on
10 anything at that time--
11     A  No, sir.
12     Q  December of '79?
13     A  No, sir.
14     Q  So the lab at that time essentially didn't
15 have any written protocol about how serological tests, hair
16 tests, any tests you can think of, there simply was no
17 written protocol?
18     A  No, sir.
19     Q  Okay.
20     A  That was a concept that was coming into
21 place but was not in place. In the early '80s that came
22 into place, but up till that point, the general procedure
23 was, you followed generally accepted procedures, but not

## Page 14

1  necessarily anything written down, just what was considered
2  generally accepted in a forensic laboratory, and it was
3  unwritten but well understood among forensic chemists, not
4  necessarily anyone else, but it was pretty much understood
5  among forensic chemists what was acceptable and what was
6  not.
7      Q  Did the laboratory at that time-- and again,
8  this is December of 1979-- did it have any procedure for
9  routinely testing the various materials used in serological
10 testing to make sure that, in other words, sort of a
11 quality control type, quality control/quality assurance
12 kind of a program, was there any kind of program like that
13 in place at that time?
14     A  No, sir.
15     Q  Okay. Do you know if at that time, December
16 of 1979, that the lab did test the materials that were used
17 in serological testing, for example, to ensure the quality
18 and that sort of thing?
19     A  Not the materials themselves. There was
20 indirect testing in that known blood samples, that was from
21 members of the criminal identification bureau donated blood
22 samples and they were tested routinely. They were the
23 standards that were used. If there had been a problem with

Page 15

1  the materials, the chemicals, then it would have shown up
2  in those tests.  But as far as separate testing, it was not
3  done.
4      Q  I take it you did not go to the crime scene
5  when Fred Zain went to obtain evidence samples; am I right
6  about that?
7      A  You're correct about that.  I did not go.
8      Q  When Fred Zain came back to the lab and this
9  is again, we're talking-- let me make sure I'm right here,
10  around December 13th and 14th of 1979, and let's say he
11  started bringing stuff back to the lab, do you recall any
12  discussions you had with Mr. Zain at that time?  I
13  obviously understand a whole heck of a lot of time has
14  passed, but I'm just asking if you recall any conversations
15  you may have had with Mr. Zain when he returned from the
16  crime scene?
17      .  A  Not specifically, no.  I'm sure there was
18  some discussion, but I have no idea what it might have
19  been.
20      Q  Would you have any knowledge as to whether
21  or not Mr. Zain used rubber gloves and things like that
22  when he was at the crime scene obtaining these samples?
23      A  No, sir, and I can't recall what samples he

Page 16

1  may have taken as opposed to the fingerprint examiners and
2  medical examiner.  There were quite a few people at the
3  crime scene and I have no idea who collected what.
4      Q  Do you have any knowledge about the
5  procedures that Fred Zain followed when he obtained those
6  samples from the crime scene?
7      A  No, sir.
8      Q  Were you aware of how he packaged those
9  samples at the crime scene?
10      A  No, sir.
11      Q  Let me have an exhibit marked here.  I'll
12  tell you what I've done just so you'll understand.  I've
13  copied the documents that were produced, that Ted Smith, I
14  guess, got off the microfiche, and I've had them Bates
15  numbered because at some point I'm going to have Mr. Murphy
16  identify which ones he thinks he wrote and which ones he
17  didn't, so I was going to have this marked as Deposition
18  Exhibit 1 and here's your own copy with the Bates number at
19  the bottom.
20          (WHEREUPON, the document referred
21          to was marked for purposes of
22          identification as Deposition Exhibit
23          No. 1 and is attached hereto.)

Page 17

BY MR. SIMMONS:
1
2      Q  For the time being, if you would just maybe
3  kind of glance through that and we'll be more specific as
4  time goes on, but I was actually going to ask you a couple
5  of questions about the report.
6      A  (Witness examines document.)
7      Q  Now, have you had a chance to just generally
8  glance at the report?  I know there are some other
9  documents there, but we'll get into more detail here
10  shortly.  I had some preliminary questions before I started
11  asking you some specifics about that.
12          Once these items that were collected at the
13  crime scene were brought back to the laboratory, do you
14  recall who was involved in performing serological tests on
15  the various items recovered?
16      A  To the best of my recollection, I was
17  involved in most of the testing.
18      Q  Okay.
19      A  I don't know that I saw-- that I did
20  everything, but I did see all of the results.
21      Q  Who else would have been involved in the
22  testing?
23      A  Fred Zain.

Page 18

1      Q  And maybe-- I think beginning in this
2  Deposition Exhibit No. 1, beginning, it's the Bates number
3  four, is the first sheet of a report dated June 10, 1980.
4  Do you have a general recollection of doing that report
5  yourself?
6      A  To the best of my recollection, I did write
7  the report.
8      Q  I've got a general question about the
9  procedures in the laboratory.  What is the significance of
10  the date June 10th, 1980?
11      A  That should have been the date of the
12  report.  The date it was issued.
13      Q  Let me ask you this.  Would that be the date
14  that someone in the secretarial pool typed it out or would
15  that be the date you actually maybe wrote a handwritten
16  version and then it was typed out?
17      A  I can't remember.
18      Q  You don't know?
19      A  No.
20      Q  Okay.  Is it possible there's some sort of
21  delay between when you wrote the report in your own
22  handwriting and it being typed out?
23      A  There is a possibility, yes.

334

## Page 19

1　Q Okay. On page, and I'm referring to the
2　Bates number, it's page two of the report, Bates number
3　five.
4　A Uh-huh.
5　Q It lists items one through seventeen and
6　then it says, "The above items were recovered from the
7　scene by Trooper F.S. Zain 12/13/79."
8　A Uh-huh.
9　Q Would that date-- so that's the date it was
10　recovered. Do you have any knowledge as to when you would
11　have received those in the laboratory or is that just not
12　shown in your report?
13　A They would have been received in the
14　laboratory the same day.
15　Q Okay. Then on down on that same page, this
16　is Bates number page five, page two of the report.
17　A Uh-huh.
18　Q It talks about a blood specimen from Vanessa
19　Reggettz and a nightgown. "The above items were received
20　from Trooper M.D. Smith 12/14/79." When it says received,
21　does that mean received at the lab?
22　A Yes.
23　Q Then down on the same page after listing it

## Page 20

1　looks like a lot of clothing, "The above items were
2　received from Trooper Terry Williams 12/14/79." So the lab
3　would have had those pieces of clothing on that date?
4　A That's correct.
5　Q Then the next one, the blood specimens from
6　Paul Eric Reggettz and Bernadette Reggettz, those were
7　received on 12/17/79?
8　A That's correct.
9　Q Turn to the next page. There are some
10　items, a Christmas package and a flashlight. It says,
11　"Received on 12/18/79."
12　A That's correct.
13　Q That means the lab received it then?
14　A The chemistry lab. Corporal Shumate was a
15　fingerprint examiner and he probably collected those items
16　himself.
17　Q Okay.
18　A And did his examination and then turned them
19　over to the chemistry lab.
20　Q By the way, before I pass this by, I guess
21　starting on the first page of the report that was on the
22　microfiche, there's some handwriting on the report and I
23　just wondered if you recognized that handwriting? Do you

## Page 21

1　see where it says, "VR"? It's to the left of those item
2　numbers.
3　A No, sir.
4　Q Is that your writing?
5　A No, it isn't.
6　Q Okay. Then following-- let me see. I
7　think we already talked about the flashlight from Shumate.
8　There's a blood specimen from Paul Reggettz, III, that was
9　received on January 2nd of '80?
10　A Uh-huh.
11　Q The next items are a doll and table knife
12　and some clothing that was received on January 17th of
13　'80?
14　A Right.
15　Q And there's something written above that.
16　Do you recognize that writing?
17　A No, sir, I don't.
18　Q Do you know-- can you read that? I'm not
19　sure I can read that middle word.
20　A No, sir.
21　Q It's looks like 1/7/80 and then there's a
22　word and then 3/11/80. Do you not have any idea what that
23　means?

## Page 22

1　A No, sir.
2　Q Okay. Next there's a list of names and
3　apparently blood samples were obtained from them and
4　received in the lab in January of 1980. I was wondering
5　what information do you have as to why blood specimens were
6　obtained from those individuals?
7　A Okay. Since I talked to you the first time,
8　I've thought about it a great deal. When the laboratory
9　determined that someone else had been in that house, I hate
10　to put it this way, but basically the state police went on
11　a fishing expedition and rounded up a number of people in
12　that area that were possible suspects and obtained blood
13　samples from them to see if any of their blood specimens
14　matched what was found in the house. They did not, but I
15　mean, that's the reason for those samples.
16　Q Do you recall any of the specifics as to why
17　one name was on there versus another?
18　A No, sir. They were just submitted to the
19　laboratory as potential suspects and we examined them and
20　ruled them out.
21　Q Okay. The next item is stainless flatware
22　that's also from Shumate and that's February 6th of '80.
23　So is it possible that he tried to do fingerprint on that

Case 2:09-cv-01406  Document 17-28  Filed 10/29/10  Page 126 of 134 PageID #: 4014

John Moss, III vs. George Trent,                     Multi-Page                     Robert Murphy
Warden of the WV Penitentia                                                          5/17/95

Page 23

1  and then he gave it to your lab?

2  A  Yes, sir.

3  Q  Then there are some additional, it looks

4  like clothing items that were received February 7th of '80,

5  and that means the lab received those February 7th of '80?

6  A  That's correct.

7  Q  Okay.  And I think the final items submitted

8  are two tubes of blood from John Moss and that's April 22nd

9  of '80?

10  A  That's correct.

11  Q  Do you recall testifying before the grand

12  jury, which resulted in the indictment of Paul Reggettz,

13  III, I think it is?

14  A  Again, since talking to you, I've thought

15  about that a great deal.  The best of my recollection is, I

16  have only testified before one grand jury and I believe

17  that was for John Moss.  I had nothing in the way of

18  physical evidence to connect Paul Reggettz to this case, so

19  I would not have testified in the grand jury.

20  Q  I understand a lot of time has passed by and

21  I've found something since I met with you that might help

22  refresh your recollection.  I've got a couple of things

23  here.  Let's see.  I would like to have this marked as

Page 24

1  Deposition Exhibit Number 2, please.

2  (WHEREUPON, the document referred

3  to was marked for purposes of

4  identification as Deposition Exhibit

5  No. 2 and is attached hereto.)

6  BY MR. SIMMONS:

7  Q  And ask that you look at that document.

8  A  (Witness examines document.)

9  Q  And particularly note the bottom of the

10  second page.

11  A  As I stated, I had no physical evidence

12  connecting Paul Reggettz with this case.  There was some

13  evidence obviously connecting John Moss.  If I testified

14  before the grand jury, it was in relationship to John Moss

15  not to Paul Reggettz.

16  Q  Okay.  Let me ask you this.  I guess the

17  reason why I'm asking, we have not been able to find the

18  grand jury transcript from the grand jury which indicted

19  Mr. Reggettz and you might also note that on the first page

20  of Deposition Exhibit Number 2, John Moss's name is

21  mentioned in the indictment of Mr. Reggettz, but he's not

22  indicted.  I guess what I'm trying to find out from you, do

23  you have any recollection of testifying before the grand

Page 25

1  jury which indicted Mr. Reggettz?

2  A  It may have been the same grand jury, but I

3  had no testimony related to Mr. Reggettz.

4  Q  Just to make it clear.  I'd like to show

5  you-- you testified-- let me see what the date of this one

6  is-- on September 19th, 1983, and this is in-- this is the

7  suppression hearing in the John Moss case before his first

8  trial, and I would bring your attention to pages I think

9  two fifty-five and two fifty-six, I think you'll see, and

10  just see, if you'll look at that, see if that refreshes

11  your recollection at all.

12  A  (Witness examines documents.)  Well, that

13  was the grand jury.

14  Q  Does that refresh your recollection?

15  A  Again, to me it indicates that my testimony

16  before the grand jury had no relationship to Paul Reggettz.

17  It was related to John Moss.  I don't know if this is on or

18  off the record, but once there was an inconsistency found

19  in the blood sample that indicated someone else had been in

20  the house, the state police were still convinced that Paul

21  Reggettz was involved and they were basically looking for a

22  second party, an accomplice in effect.

23  John Moss met the criteria for an

Page 26

1  accomplice, but that did not exonerate Paul Reggettz.  If

2  the grand jury was looking at both people, as I said, there

3  was no physical evidence connecting Paul Reggettz to the

4  crime.  So when I appeared before the grand jury, I would

5  have had nothing to say regarding Paul Reggettz.  It was

6  only John Moss that I had any physical evidence that

7  connected him.

8  Q  Just so we make it clear, I think you stated

9  that you, during the whole time you worked for the state

10  police, you only testified before a grand jury on one

11  occasion?

12  A  The best as I can remember, yes, sir.

13  Q  And that would be--

14  A  That would be this one.

15  Q  -- this one particular case?

16  A  Uh-huh.  I stated earlier this was an

17  unusual case because the investigating officers, because

18  they had a confession and because Paul Reggettz's behavior

19  was unusual, were convinced that they had the right person

20  and the physical evidence indicated someone else was

21  involved either totally or partially, and there was some

22  resistance on the part of the investigators to pursue that

23  because they would have rather explained it away than

336

Case 2:09-cv-01406   Document 17-28   Filed 10/29/10   Page 127 of 134 PageID #: 4015

John Moss, III vs. George Trent
Warden of the WV Penitentia

Multi-Page

Robert Murphy
5/17/95

**Page 27**

1 pursue it because they felt they had the right person.
2     Q  Can you recall the names of these people
3 that you're calling the investigators or the investigating
4 officers?  Can you identify who those people may have
5 been?
6     A  You've handed me some documents that could
7 give me some names.  I don't want to say I recall that.
8 The South Charleston detachment commander was the principal
9 contact, but there were people working under his
10 supervision that were actually doing the investigation.
11     Having the seen the documents, I do recall
12 Terry Williams as being one of the investigators.  Again,
13 the best I can recall, the South Charleston detachment
14 commander was Corporal Cook and there were several Cooks
15 so-- but there was some discussion back and forth about
16 what evidence was and what it meant and what needed to be
17 done and basically, as I said, there was some resistance to
18 pursue this matter because they felt they had the right
19 person.
20     And this puts me in an awkward position
21 because I was a member of the state police.  I'm not
22 putting them down.  They basically were following their
23 instincts that they had the person and the laboratory was

**Page 28**

1 producing contradictory evidence that said maybe you do and
2 maybe you don't, and they wanted to believe that they were
3 right so--
4     Q  Did they ever-- do you recall any of the
5 people involved in the investigation ever questioning any
6 of your results or did they come up with any other kinds of
7 theories to explain them away?
8     A  Yes.  Again, the detachment commander of
9 South Charleston tried to explain away our results by
10 trying to say that Paul Reggettz had planted blood at the
11 scene to throw us off the track and again, it was well
12 intentioned.  They thought they had the right man and they
13 were trying to explain away the inconsistencies, and I
14 won't say it was a heated discussion, but it was a little
15 agitated, and we tried to say that no, we didn't believe
16 that, someone else was in that house, and we wouldn't buy
17 their trying to explain it away.
18     On the Christmas wrapping paper, in
19 particular, which to this day to me is the key piece of
20 evidence, there was a very distinct drop of blood and it
21 would be difficult to plant that.  I mean, you could smear
22 it, you could do a lot of things, that didn't look like
23 anything other than what it appeared to be.  Someone was

**Page 29**

1 cut, they bled and a drop of blood fell on that paper, and
2 it would be difficult to plant that so--
3     Q  Let me ask you this.  When the evidence from
4 the crime scene was brought back to the laboratory, are you
5 saying that the lab had the actual items such as the
6 wrapping paper as opposed to having some swatch which had
7 absorbed the blood from the wrapping paper?
8     A  No, we had the actual wrapping paper.
9     Q  Okay.  So when the analysis was performed,
10 you had in the laboratory the actual wrapping paper?  Maybe
11 there was a knife and some of the other items, you had the
12 actual item itself?
13     A  Yes, sir.
14     Q  Well, as far as you can recall, were any of
15 the blood stains obtained at the crime scene placed on
16 swatches as opposed to actually bringing in the item of
17 evidence itself?
18     A  Not that I can recall.  They were the actual
19 items.
20     Q  When-- let me ask you this.  At-- this is
21 again back in December of 1979.  Did the laboratory have
22 any kind of cataloging of types obtained in other cases?
23 In other words, let me try to illustrate that.

**Page 30**

1     A  A data base?
2     Q  A data base, yeah.  If you got say a PGM 1+
3 and an ABO B, did you have a way of looking through your
4 files and saying, "Well, hey we got this from this case"?
5     A  No.  That was something that was under
6 consideration, but was not in place.
7     Q  So when you received the reference sample of
8 blood from John Moss on April 22nd, 1980, the lab did not
9 previously have any knowledge whatsoever of any of his
10 types from any source?
11     A  As far as I can recall, no.  I mean, we did
12 not have a data base that we could reference.
13     Q  How about if Mr. Moss was incarcerated in
14 another state?  I guess what I'm wondering is whether or
15 not your lab had contacted the other state to find out if
16 they had done any blood testing?  In other words, I'm
17 trying to find out if you had any knowledge of his blood
18 types before you received that reference sample?
19     A  As far as I can recall, the laboratory never
20 contacted any other state and should not have had any
21 reference to what his blood typing was.
22     Q  Okay.  Let's just-- so I can get this part
23 out of the way, let's turn in Deposition Exhibit Number 1

330

Case 2:09-cv-01406  Document 17-28  Filed 10/29/10  Page 128 of 134 PageID #: 4016
John Moss, III vs. George Tre~*        Multi-Page™                    Robert Murphy
Warden of the WV Penitentia~                                          5/17/95

### Page 31

1  to it's Bates number ten, and what I'd like to do is have
2  you look at that and determine if you recognize the writing
3  on Bates number page ten?
4       A  That is mine.
5       Q  Okay.  Maybe for purposes of this
6  proceeding, if you would-- I'll give you a pen-- if you
7  would write just "Murphy" at the bottom of that page and
8  that way we'll be able to keep these straight.
9       A  (Witness complies.)
10      Q  Okay.  Now, what would-- the fact that this
11 particular document is in your writing--
12      A  Uh-huh.
13      Q  -- what is the significance of that other
14 than the fact that you wrote it?
15      A  This basically is a compilation of all the
16 parties involved or potentially involved and a summary of
17 all the blood groupings.  Just a tabular way of excluding
18 people or including people.
19      Q  Would this sheet in your handwriting
20 indicate that you had performed all of those tests or does
21 that not indicate that?
22      A  Not necessarily.
23      Q  Okay.

### Page 32

1       A  But, as I stated earlier, I would have seen
2  the results.
3       Q  And would you say that-- I think you
4  described this as a compilation.  So this is a compilation
5  sheet as opposed to being the original, what I call the raw
6  data sheet that was filled out when the testing was
7  actually done; would that be correct?
8       A  That is a fuzzy area because the way of
9  keeping notes was in transition.  It is possible that this
10 is the actual bench sheet where things were recorded here,
11 but it's also possible this is a summary sheet and there
12 were other sheets for individual tests.  I can't recall.
13      Q  In the first column across before you have
14 the names listed, in other words, the column that is on top
15 of the column where the names are, it looks like it says
16 "JAN;" is that correct, or does that have any meaning to
17 you?
18      A  Probably just January.
19      Q  And going from left to right, what does that
20 first column-- do you know what that word is?  I know it's
21 very, very hard to see.  I just didn't know if you might
22 recall from doing the sheets what that first column is for.
23      A  No, sir.

### Page 33

1       Q  Okay.
2       A  In the initial setup of serology, there were
3  separate tests for determining whether a sample was blood
4  and a second examination to determine if it was human
5  blood.
6       Q  Okay.
7       A  When all of the enzymes and proteins were
8  added, those became pretty much irrelevant, and possibly
9  those first two columns are whether it is blood and whether
10 it is human, but I'm just guessing.
11      Q  Okay.  Let's go ahead and go to Bates number
12 page eleven and I'd ask you to first of all let me know if
13 you-- first of all, is that in your handwriting?
14      A  No, sir, it is not.
15      Q  Okay.  Do you recognize whose handwriting
16 that is?
17      A  No, sir.
18      Q  Would you-- well, let me put it this way.
19 Only you and Fred Zain performed the serological testing in
20 this case; that is correct, isn't it?
21      A  I'm not certain of that.  There were two
22 other serologists and I can't recall when they were hired
23 and whether they were present at the time.  That was Lynn

### Page 34

1  Inman and Gale Midkiff, and I'm not sure if they were there
2  at the time or not.  They may have been.
3       Q  Okay.  So--
4       A  But probably on this case the work was done
5  by myself or Fred Zain.
6       Q  Do you have any specific recollection of
7  Inman or Midkiff performing work in this case?
8       A  No, sir.
9       Q  Well, how about on this sheet, simply put
10 "Not Murphy."  That way we'll distinguish between what
11 you're actually able to identify and what you're not.
12      A  (Witness complies.)
13      Q  Okay.  And let's go to Bates number page
14 twelve, and it looks like at the top half of the page
15 there's writing that's different from the bottom half of
16 the page, and I wonder first of all, do you recognize any
17 of the writing on that page as being your writing?
18      A  The bottom half is mine.
19      Q  The one that's in print?
20      A  Uh-huh.
21      Q  And the top half is not yours?
22      A  No, it isn't.
23      Q  And again, you don't have any recollection

Case 2:09-cv-01406  Document 17-28  Filed 10/29/10  Page 129 of 134 PageID #: 4017

John Moss, III vs. George Trent,
Warden of the WV Penitentiary

Multi-Page™

Robert Murphy
5/17/95

### Page 35

1  as to whether or not this is a compilation based upon raw
2  notes or if this actually is the raw notes?
3      A  No, sir.
4      Q  Let me ask you this.  Since the top half of
5  that page is in someone else's handwriting other than
6  yourself, do you take it from looking at this sheet that
7  somebody else performed the examination of those items
8  listed on the top of that page?
9      A  Probably.
10      Q  Maybe on this sheet, you should put "Bottom
11  Murphy," maybe would be a way to distinguish.
12      A  (Witness complies.)
13      Q  Turning to Bates number thirteen, do you
14  recognize any of that as being your handwriting?
15      A  No, sir.
16      Q  Okay.  Why don't you just write "Not Murphy"
17  on that?
18      A  (Witness complies.)
19      Q  Then on Bates number fourteen, which is a
20  copy of, I think if you'll look at it, it's the back-side
21  of Bates number thirteen.  Do you see the initials "FSZ" on
22  the top of that page?
23      A  Yes, sir, I do.

### Page 36

1      Q  And that stands for Fred Salem Zain?
2      A  Right.
3      Q  So obviously this would be a page that you
4  ought to put "Not Murphy" on, I assume; right?
5      A  Uh-huh.
6      Q  Okay.  And it looks like Bates number
7  fifteen, sixteen, seventeen, eighteen.  It looks like it's
8  the handwritten version of the typed report?
9      A  That's correct.
10      Q  And that is your handwriting?
11      A  Yes, sir.
12      Q  So if you wouldn't mind, if you'd write
13  "Murphy" on those particular pages, please?
14      A  (Witness complies.)
15      Q  I think we can skip a few pages.  There are
16  some case submission reports that it looks like Inman
17  received something, so she was there at least in January of
18  '80.
19      A  Okay.  I kind of thought that Inman and
20  Midkiff were there, but--
21      Q  Okay.  Well, let me ask you this.  You
22  mentioned that you reviewed the results.  Do you recall
23  reviewing the results of any serological testing in this

### Page 37

1  case performed by any person other than yourself or Fred
2  Zain?
3      A  I can't recall.
4      Q  So you think it's possible that some of the
5  work may have been done by Inman and Midkiff in this case?
6      A  It's possible.
7      Q  Okay.
8      A  Again, to the best of my recollection, I saw
9  the results.
10      Q  But you do specifically recall reviewing
11  some serological testing in this case that was performed by
12  Fred Zain?
13      A  Yes, sir.
14      Q  Let's see.  I think there are some other
15  sheets near the back here that we probably ought to have
16  identified.
17      MS. KERSHNER:  Thirty-five?
18      BY MR. SIMMONS:
19      Q  Yeah, if you would turn to Bates number
20  thirty-five.
21      A  Thirty-five?
22      Q  Yeah.  And I'd ask you, is that your
23  handwriting?

### Page 38

1      A  No, sir.
2      Q  Okay.  If you would just write "Not Murphy"
3  on there, please?
4      A  (Witness complies.)
5      Q  And also thirty-six.
6      A  Thirty-six.
7      Q  Would you also say that's not Murphy?
8      A  That's not Murphy.
9      Q  Okay.  The next document, Bates number
10  thirty-seven is some kind of a map.  Were you involved in
11  drawing that diagram?  Not a map, but a diagram.
12      A  No, sir.
13      Q  Do you know who did?
14      A  No, I don't.
15      Q  We won't mark anything on that one.  How
16  about Bates number thirty-eight?  Is that your writing?
17      A  No, sir.
18      Q  Okay.  Why don't you go ahead and write "Not
19  Murphy" on there?
20      A  (Witness complies.)
21      Q  In looking at that sheet, does that have any
22  significance to you?  Can you understand what that person
23  was doing?

John Moss, III vs. George Tre~~t~~.
Warden of the WV Penitentia
Multi-Page™
Robert Murphy
5/17/95

## Page 39

1   A  Not really.

2   Q  Okay.  Let's see here.  I guess the final
3  group of documents I'd just like to see if you've seen
4  before.  Starting with forty-one, forty-two, forty-three,
5  forty-four, forty-five and forty-six, do you recognize
6  those documents at all?  Not necessarily the writing, but
7  just those document?

8   A  No, sir, I don't.

9   Q  Does it even look familiar as maybe a way of
10  maintaining the chain of custody, anything like that?

11   A  It appears to be a summary of the custody of
12  evidence, but I don't remember this.

13   Q  Okay.  I think we're going to be done with
14  those documents for the time being.  Once you obtained the
15  blood types from Vanessa Reggettz, Paul Eric Reggettz and
16  Bernadette Reggettz, isn't it true that you could deduce
17  what the types of Paul Reggettz, III, as the father would
18  be, presuming he's the natural father?

19   A  Not necessarily specifically, but within a
20  certain category, yes, and the conclusion was that there
21  was blood at the crime scene that either Paul Reggettz, Sr.
22  was not the father of those children or someone else was
23  there, and it was the laboratory that requested the sample

## Page 40

1  of blood from Paul Reggettz.

2   Q  Was the main purpose for getting the blood
3  sample from Mr. Reggettz to essentially establish that he
4  was in fact the natural father?

5   A  It was more to determine who the unknown
6  blood came from.  The assumption was that he was the
7  natural father, but that was not the primary purpose.  The
8  primary purpose was to determine-- here we have an unknown
9  blood sample.  It doesn't match any of the three victims.
10  It's got to belong to someone, so test Paul Reggettz first.
11  If it matches, okay, and if it doesn't, then start looking for
12  someone else.

13   Q  Do you-- well, maybe this will-- let me just
14  ask you a couple of questions here.  I think based upon the
15  testing in this case and your report and the various
16  documents, various tables were made of the blood types that
17  were obtained and this has been included in the petition
18  for writ of habeas corpus and let me see if I can find a
19  specific example of-- and it might help you to look at
20  these, but I just wondered if, were there any types-- let
21  me start over again.  You mentioned that by knowing the
22  types of the mother and the two children, you can
23  essentially deduce the range of types that the father would

## Page 41

1  have to have?

2   A  That's correct.

3   Q  Do you recall if you had found any types at
4  the crime scene that could not have been deposited by the
5  natural father under these facts?

6   A  Right.

7   Q  And I wonder if maybe you know off the top
8  of your head or if you'd like to look through it, if you
9  can point me out an example.

10   A  Well, the Christmas wrapping paper was the
11  one that stood out as not being consistent.

12   Q  Okay.

13   A  And that sample was the one that prompted us
14  to ask for a sample of Paul Reggettz's blood to begin with,
15  because, as I said, either someone else was there or he was
16  not the natural father.

17   Q  Just for purposes of illustration, on page
18  eleven of the petition I've got listed the types that were
19  obtained from the Christmas wrapping paper and then on page
20  eight of the petition, I have the table of the known types
21  from, you know, the various reference samples.  I wondered
22  if you could just explain and illustrate what type you
23  found from the Christmas wrapping paper that you knew could

## Page 42

1  not have been deposited by the natural father?  And I don't
2  know if you can do that or not. but if you would look at
3  those.

4   A  It's been fifteen years.

5   Q  Sure.  I understand that.

6   A  (Witness examines document.)  In particular
7  the ESD. the esterase.  For each of these people to have a
8  one, it means both parents had to be a one, because it's
9  basically one/one.  The Christmas wrapping paper was a
10  two/one and known of the members of the Reggettz family had
11  the two to contribute, so the two/one had to come from
12  someone else.

13   Q  Okay.

14   A  Now, there maybe some others, but--

15   Q  That's a good example.  I just wanted to
16  illustrate that.

17   A  Okay.

18       (WHEREUPON, a discussion was held
19       off the record.)

20  BY MR. SIMMONS:

21   Q  I'd just like to ask you the final part,
22  just some general questions to make sure I understood what
23  your thought process was in interpreting the samples you

340

Case 2:09-cv-01406  Document 17-28  Filed 10/29/10  Page 131 of 134 PageID #: 4019

John Moss, III vs. George Trent,
Warden of the WV Peniten'  y

Multi-Page

Robert Murphy
5/17/95

Page 43

1 obtained and the statistics that you came up with. In this
2 case, what was the purpose for obtaining reference samples
3 from Vanessa Reggettz, Bernadette Reggettz, Paul Eric
4 Reggettz and Paul Reggettz, III?
5     A  There were blood stains at the scene and
6 basically the purpose was to try to account for all of the
7 blood stains there and attribute them to a particular
8 person or group of persons. This was a fairly common
9 procedure at crime scenes and basically you try to
10 reconstruct what happened. In other words, it sounds a
11 little crude, but who bled where, and you can sometimes
12 tell a sequence of events by doing that. So it was a
13 routine practice to try to attribute blood stains in
14 various areas of the crime scene with various people and
15 that, like I say, was routine procedure.
16     Q  Okay. Is one purpose for obtaining
17 reference samples to compare those known types with the
18 types you obtained from the scene where you don't know who
19 deposited the particular blood sample?
20     A  Right.
21     Q  What analysis did you use to account for the
22 possibility-- well, strike that. Let me do it this way.
23 Based upon your training and experience with serological

Page 44

1 testing, you were aware of the fact that this kind of
2 serological testing is unable to distinguish between a
3 mixture of blood from two different sources and blood from
4 one source?
5     A  No, sir.
6     Q  You disagree with that?
7     A  I disagree with that.
8     Q  So it's your-- based upon your understanding
9 and expertise, this kind of what I always call it is basic
10 serological testing, is able to distinguish between a
11 mixture of blood from two different samples; is that
12 correct?
13     A  You're biasing the question because there's
14 more involved than just the test itself. You have to look
15 at the source of the sample. In other words, as I stated,
16 on the Christmas wrapping paper, there was a discreet drop
17 of blood. Now, if that had been a smear, then there would
18 have been the possibility that that smear was more than
19 one. But a discreet drop is invariably a single source.
20     So taking that into account, along with the
21 test results and again, a mixture would indicate-- well,
22 there would be variability in the test result in that if
23 you had two bloods mixed together, unless they were exactly

Page 45

1 fifty/fifty, that the activity demonstrated in the exam
2 would not be equal. So you would see in the pattern
3 exhibited, you would see an inconsistency in the intensity
4 of the bands produced. And that would indicate that you
5 had a mixture. Not proof, but there would be an
6 indication.
7     When I said you're biased, you have to
8 consider not only the test result, but the source of the
9 sample you used and when there is, as I said, a discreet
10 drop of blood, then you're pretty well assured that that is
11 a single source.
12     Q  Let me go back to the question. I
13 understand you have some other theorics, or rather
14 explanations or whatever and I'll be glad to get into that,
15 but I just wanted to start with, the first question is,
16 looking at the testing alone and the types that are
17 obtained--
18     A  Huh-uh.
19     Q  -- can basic serological-- will you agree
20 with me that using basic serological testing, you cannot
21 distinguish between a mixture of blood from the source or
22 whether it came from a single source?
23     A  No, sir.

Page 46

1     Q  Okay. So you still disagree with that,
2 even without this other explanation that you have, where
3 you have to go beyond that? So you're saying, for example,
4 if I had a tube of blood from you and I had a tube of blood
5 from myself and I put them in a flask and I shook them up
6 and I poured it at a crime scene and you tested it, if you
7 strictly did serological testing, you would be able to
8 separate my blood from your blood?
9     A  I wouldn't say I could distinguish them, but
10 I would recognize that it was not a single source and I'm
11 talking as a very experienced serologist.
12     Q  You would recognize it was not a single
13 source because of the variations in the intensity of the
14 bands?
15     A  Uh-huh.
16     Q  Okay. Using my illustration again-- let's
17 use my illustration again. Let's say you only did ABO
18 testing and let's say that you and I are both ABO O, how
19 would you distinguish between our bloods under that
20 circumstance?
21     A  No way.
22     Q  You wouldn't be able to do that?
23     A  No, sir.

John Moss, III vs. George Trent,
Warden of the WV Peniteti

Multi-Page™

Robert Murphy
5/17/95

Page 47

1    Q  So the only way that you would be able to
2  distinguish using basic serological testing is if the
3  particular typing system you're using, we differ under that
4  system; would that be correct?
5    A  That's correct.
6    Q  Is it your opinion under that illustration I
7  gave you, that there would necessarily be a difference in
8  the intensity of the bands?
9    A  Unless the mixture was exactly
10  proportionate, there would be a difference in the
11  intensity.  So, I'm not ruling out the possibility that it
12  could be deceptive, but I'm saying it would take
13  extraordinary circumstances.
14    Q  Okay.
15    A  Under normal conditions, a mixture which
16  would not be exactly proportionate, you would see a
17  difference in the intensity of the bands.
18    Q  Let's just stick with that illustration.
19  Let's say that you and I, under that illustration, had the
20  same ABO type O, but I'm PGM 1+ and you're PGM 2+.  Under
21  that scenario, if you tested this blood that was mixed
22  together and placed on the carpet, you would anticipate
23  when you did the PGM test seeing a band that demonstrated a

Page 48

1  1+ and a band that demonstrated a 2+; would that be
2  correct?
3    A  Uh-huh.
4    Q  And depending on the amount of the mixture,
5  you would anticipate seeing a variation in the intensity?
6    A  That's correct.
7    Q  Let's say that you see a variation in the
8  intensity of the bands.  How would you report those
9  results?
10    A  I can't recall having experienced that, but
11  it would have to be reported as a two/one, but qualified as
12  being abnormal.
13    Q  So it's possibly you have two/one, it's
14  possibly a 2+ mixed with a 1+?
15    A  Correct.
16    Q  All right.
17    A  As I said, qualified.  In other words, it
18  could be this, it could be this, it could be this.  There's
19  no way to determine it.
20    Q  Okay.  You know, in your explanation you
21  talked about a single blood drop on say the wrapping paper?
22    A  Uh-huh.
23    Q  Let's say there are three separate blood

Page 49

1  drops on the wrapping paper.  Do you assume under that
2  scenario that there was a single source for each separate
3  blood drop?
4    A  No, sir.
5    Q  Okay.
6    A  Each drop would have been examined
7  independently.
8    Q  Okay.  Let's go ahead and turn to the
9  specifics of this case.  Let's say the Christmas wrapping
10  paper, do you recall if this scenario happened at all?
11  Let's say there were two drops on the wrapping paper and
12  let's say you ran ABO, PGM on one drop and GLO and ESD on
13  the other drop.  Would that have happened or go ahead and--
14    A  No.
15    Q  -- maybe you can explain how you did it?
16    A  If that had happened, that would have been
17  reported separately.
18    Q  Okay.  You would not have combined those
19  results?
20    A  No.  No, sir.
21    Q  The lab also at that time, I assume, would
22  not have accumulated samples let's say from the sheet.
23  Let's say there were different drops all over the sheet,

Page 50

1  but one drop wasn't enough to perform the different enzyme
2  testing.  Your lab would not at that time have combined
3  those together and then done the testing?
4    A  No, sir.  Whatever was reported, was
5  reported from a single sample.
6    Q  And you never were aware of Fred Zain at
7  least in the cases you supervised him, ever engaging in
8  that practice of combining--
9    A  No, sir.
10    Q  -- different types together?  Different
11  samples together?
12    A  No, sir.
13    Q  When he would perform the testing in this
14  case, would you necessarily have watched him go through the
15  whole process or would you come in at the end and look at
16  the gel together with him?
17    A  I would primarily look at the final result,
18  not necessarily see every single step.
19    Q  Also I think you stated, but I just wanted
20  to make it clear, you know, you gave your explanation about
21  how serological testing can tell the difference between
22  mixtures and a single source.  I think you mentioned if the
23  blood was smeared, would you at least initially be

342

Page 51

1  concerned that that's a mixture if the blood was smeared as
2  opposed to a single drop?
3        A  I would pay a little more attention to the
4  patterns in the results.
5        Q  What is it about a smear that would make you
6  think that it's at least, you know, you need to be a little
7  more concerned about the possibility of a mixture versus a
8  single drop?
9        A  Because a smear is more likely to be a
10  mixture. In other words, you could have a blood stain and
11  smear another blood stain on top of it and there wouldn't
12  be any way to tell that. Whereas, a drop is a distinct
13  pattern and it would be very difficult for a drop to be on
14  top of a drop without it being very obvious. A smear on
15  top of a smear, I mean, there's no indication of what
16  you've got. For a drop to be on top of a drop, there would
17  be something obviously visible.
18        Q  At that time, and again this is December of
19  '79, at least beginning December of '79, did the laboratory
20  have a procedure in place where all of your testing
21  serologically were photographed?
22        A  We had the capability of doing it, but I
23  don't believe it was done on a routine basis. I mean,

Page 52

1  there was some work done in that regard, but as far as
2  every single sample being done, no, I don't believe so.
3        Q  And going back to your analysis of the
4  statistics, in your opinion, then, it is appropriate to,
5  when you're-- let's make it more specific. Let's say you
6  have a blood drop from the crime scene and you find an ABO
7  PGM type and let's say the ABO type is the same as some of
8  the known possible donors of blood at that crime scene, but
9  the PGM is different from any of the known possible donors.
10        Under that set of facts, in your opinion, it
11  is appropriate for statistical purposes to multiply the,
12  you know, the percentage of the population having that
13  particular ABO type times the percentage of the population
14  having that particular PGM type?
15        A  Right.
16        Q  So you would include the ABO type even
17  though it's the same as some of the known possible donors
18  of blood at that crime scene?
19        A  Right, because the probability is a total
20  probability and you take all of the characteristics and
21  include those.
22        Q  Okay. Let me just look at one more thing
23  here and I may be done here. (Examines documents.) Were

Page 53

1  you involved in any way in that whole Zain investigation?
2        A  No, sir.
3        Q  Okay. So no one ever contacted you?
4        A  Well, I was contacted once about two years
5  ago by the Kanawha County Prosecutor's Office in regard to
6  this particular case and that was the only contact I had
7  whatsoever.
8        Q  Okay.
9        A  Until you came into it.
10        Q  Okay. Do you have any recollection about
11  what that was about, that conversation was about?
12        A  Basically, I was asked since I had signed
13  the report, I was asked if I supervised the work and I
14  stated that I had and that I had seen all the results and
15  basically this had-- they didn't see a problem with that
16  and that was the end of it.
17        Q  Okay.
18        A  That was the only contact I had at all.
19        MR. SIMMONS: Okay. That's all.
20              EXAMINATION
21  BY MS. KERSHNER:
22        Q  Mr. Murphy, would it be fair to state that--
23  and I believe you did state this more or less, that the

Page 54

1  investigating officers on the Reggettz murders were pretty
2  certain that they had their man when they arrested Mr.
3  Reggettz?
4        A  Yes.
5        Q  Would there have been any advantage to you
6  or to Mr. Zain to have found results that indicated that a
7  person other than Mr. Reggettz or the three victims were at
8  the home at the time of the murders?
9        A  No, actually, that would have been to our
10  disadvantage because finding that kept the investigation
11  open and if we hadn't found that, everything would have
12  been cut and dry. It would have been over.
13        Q  In fact, did you or Mr. Zain experience any
14  difficulties as a result of the results you did find?
15        A  I wouldn't call it difficulties, but we did
16  have to convince the detachment commander, the South
17  Charleston detachment commander, that the investigation was
18  not over, that there was another person and Mr. Reggettz
19  had not planted blood at the scene and that they needed to
20  be looking for someone else, and there was resistance
21  because they felt they had the person responsible.
22        Q  Okay. Did you take the lead in that
23  persuasion or was Mr. Zain also involved in that?

343

Case 2:09-cv-01406 Document 17-28 Filed 10/29/10 Page 134 of 134 PageID #: 4022

John Moss, III vs. George Trent,
Warden of the WV Penitenti

Multi-Page

Robert Murphy
5/17/95

Page 55

1     A  He was involved. I took the lead, but Fred
2 Zain was involved in that, too, because he basically backed
3 me up in saying, "Look, you can't sweep this under the
4 carpet. There is something here that you need to pursue."
5     MS. KERSHNER: Okay. I don't have anything
6 further.
7     MR. SIMMONS: That's all. You have the
8 right to review this once she types it up. It's like a
9 deposition, or you can tell her you're willing to waive
10 your signature and, if you'd like, I'd be glad to send you
11 a copy of it when it's done if you want it, but it's up to
12 you. She needs to hear you say on the record one way or
13 the other.
14     THE WITNESS: I would like to see a copy.
15     MR. SIMMONS: Are you willing to waive your
16 signature?
17     THE WITNESS: Sure.
18     MR. SIMMONS: Okay. I'll send you a copy.
19     THE WITNESS: I want to be cooperative. I
20 don't have anything to hide and I want to see that things
21 turn out the way they should turn out.
22     MR. SIMMONS: I appreciate your help here.
23 I just hope this doesn't become a habit.

Page 56

1     (WHEREUPON, the deposition was
2     adjourned at 11:35 a.m.)

Page 57

REPORTER'S CERTIFICATE

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, To-wit:

    I, Penny L. Kerns, a Notary Public within
and for the State of West Virginia, duly commissioned and
qualified, do hereby certify that the foregoing deposition
of ROBERT MURPHY was duly taken by and before me under the
West Virginia Rules of Civil Procedure, at the time and
place and for the purpose specified in the caption thereof,
the said witness having been duly sworn by me to testify
the whole truth and nothing but the truth concerning this
matter in controversy.
    I do further certify that the said
deposition was correctly taken by me by means of the
Stenomask; that the same was transcribed by me or under my
supervision, and that the said transcript is a true and
accurate record of the testimony given by said witness.
    I do further certify that I am not connected
by blood or marriage with any of the parties to this
action, am not a relative or employee or attorney or

Page 58

counsel of any of the parties, nor am I a relative or

employee of such attorney or counsel, or financially

interested in the action, or interested, directly or

indirectly, in the matter in controversy.

    It is stipulated and agreed that the

signature of the witness is hereby expressly waived to the

foregoing deposition.

    Given under my hand this 24th day of May,

1995.

My commission expires June 1, 1998.

Penny L. Kerns, CCR
Notary Public