**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 33**
**(Continuation, pp. 345 - 477)**

# APPENDIX #3

# APPENDIX #4-A

Grouping

| Spouses | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IAN | | | | | | | | | | | | | | | |
| JACK C. NEAL JR | | O | | | | 1 | | | 2 | | | | | | |
| ROGER L. PROVINCE | | O | 2 | | | 1 | | | 2-1 | | | | | | |
| WILLIAM + HOWE | | O | 1 | | B | 1 | | | | | | | | | |
| ROSS E. GILLESPIE | | A | 1 | 1 | B | 1 | 1 | | 2-1 | | | | | | |
| MARVIN D. SMITH | | | 1 | 1 | A | 1 | 1 | | 2-1 | | | | | | |
| RICHARD A. ROLLINS | | A | 1 | 1 | CB | 1 | | | | | | | | | |
| JOSEPH MOOREHOUSE | | | 1 | | | 1 | | | | | | | | | |
| NATHANIEL BROWN | | | 1 | | | 1 | | | | | | | | | |
| THOMAS R WHITE | | 2-1 | | | 1 | 1 | | | 2-1 | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| MOSS | | O | 4 | 1 | BA | 2-1 | 1 | 2-1 | 1 | 2 | | | | | |
| | | | | | | | | | | | | | | | |
| VANESSA | | O | 2-1 | 1 | B | 1 | 1 | | 2-1 | 2 | | | | | |
| PAUL JR | | O | 2-1 | 1 | B | 1 | 1 | 2-1 | 2-1 | 2 | | | | | |
| BERNADETTE | | O | 2-1 | 1 | B | 1 | 1 | 2-1 | 2-1 | 2 | | | | | |
| | | | | | | | | | | | | | | | |
| PAUL SR | | O | | | | | | | | | | | | | |

353

# APPENDIX #4-B

354

1 Grouping

Contributor: S P S. Ch
Date: 12-17-79

| Specimens | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paul 17" | + | T | O | 24 | 1 | B | 1 | 1 | 21 | | 2 | | | | | | | |
| Beaulita 44" | + | + | O | 2 | 1 | B | 1 | | 2-1 | | 2 | | | | | | | |
| (Sheath) 12-17-79 | | | | | | | | | | | | | | | | | | |
| Christine Plg. | + | T | O | 1 | 1 | BA 24 | | 1 | | | | | | | | | | |
| Plg. Wayne | + | T | O | 1 | 1 | BA | 21 | 1 | 2-1 | | | | | | | | | |
| Eladloff | + | + | O | 1 | 1 | BA 2-1 | | 1 | | | | | | | | | | |
| Bernt M Cloty | 0 | 0 | O | 2 | 1 | B | 1 | 1 | 4 M | | 2 | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| DOLL | | | O | | | | | | | | | | | | | | | |
| CASE KNIFE | | | | | 1 | | | | | | | | | | | | | |
| CLOTHING BERN | 2 | | O | 1-1 | 1 | BA | 2-1 | 1 | 2-1 | 1 | 2 | | | | | | | |
| PKG SET OF TABLE ATE | | | | | | | | | | | | | | | | | | |

# APPENDIX #5

356

3997

questions were about.  I think the jury has a right to see that and do a little counting for themselves.

THE COURT:  Let me see it.

(Document examined by  the Court.)

MR. McKITTRICK:  I am going to withdraw my objection.

THE COURT:  All right.

(Whereupon, counsel and the defendant resumed their seats at counsel table where the following proceedings were had in open court and in the hearing of the jury:)

THE COURT:  All right, State's Exhibit 150 will be admitted into evidence, properly marked, without objection by the defendant.

MR. BROWN:  That's all we have.

MR. McKITTRICK:  That's all.

THE COURT:  Is he excused from his subpoena?

MR. McKITTRICK:  Yes, sir.

THE COURT:  All right, Corporal, you are excused.  Thank you.

(Witness excused.)

THE COURT:  It is anticipated that the next witness should be short, so hopefully we will get out of here close to the noon hour anyway.

Call your next witness.

- 0 -

Edith Lilly - Direct                                          3999

    Q    Did you order all the merchandise?

    A    Yes, sir.

    Q    Have you at the request of my office checked your records for the year 1979 to determine whether or not you sold a silverware pattern from International called Radiant Rose?

    A    Yes, sir. When Mr. Murray came down there -- I knew we didn't carry Radiant Rose, but to make sure, I went back and checked the records.

    Q    And what do your records disclose?

    A    We do not carry a Radiant Rose. We carry a Jewel Rose.

    Q    Let me hand you what has been marked and introduced into evidence as State's Exhibit 107, and I will ask you to look that over carefully. And I will ask you during your tenure as head of housewares at K-Mart in St. Albans you ever sold that pattern?

    A    No, sir, not Radiant Rose.

    MR. McKITTRICK:  That's all the questions I have.

    THE COURT:  Any cross?

    MR. BROWN:  Yes, sir.

    THE COURT:  All right.

                - O -

Edith Lilly - Cross                              4001

Q    Do you sell State's Exhibit 153 now?

A    Yeah.  We carry Oneida, but it comes in a clear -- It
is in a clear wrapper.  It is not boxed like this, but we may
have some that is old stock still on hand.

Q    Do you all sell State's Exhibit 151?

A    No, sir.

MR. BROWN:  Okay, thank you, ma'am.  That's all.

MR. McKITTRICK:  That's all, Your Honor.

THE COURT:  All right, Mrs. Lilly, you may step down.

(Witness excused.)

MR. McKITTRICK:  The defense rests, Your Honor.

THE COURT:  All right, sir.

Let the record reflect the defense rests at 11:44 am.,
April 18, 1984.

Come to the bench.

Ladies and gentlemen, we are going to stand in informal
recess for about five minutes.  Just stay in your chairs, and
even though it is informal, nonetheless, at the expense of
repeating myself, I would admonish you and each of you not to
discuss this case among yourselves.  Neither should you permit
anyone to discuss it in your presence.  Neither should you read
any newspaper accounts, watch any television accounts or listen
to any radio accounts of this trial or of any of the
personalities connected herewith.

# APPENDIX #6

360

John Moss, Jr. - Direct                              3714

                          JOHN MOSS, JR.,

          Being thereupon called as a witness on behalf

          of the Defendant, after being first duly sworn,

          testified as follows:

                                      DIRECT EXAMINATION

BY MR. McKITTRICK:

     Q    State your name please.

     A    John Moss, Jr.

     Q    Are you the father of the John Moss now on trial?

     A    Yes, I am.

     Q    Where do you live at, John?

     A    Cleveland, Ohio.

     Q    Are you married?

     A    Yes, I am.

     Q    To whom are you married?

     A    Marzee Moss.

     Q    Are you employed?

     A    Yes.

     Q    Where are you employed, John?

     A    Cleveland Building and Supply Company.

     Q    How long have you been employed?

     A    Sixteen years with that company.

     Q    Your wife is employed?

     A    Yes, she is.

John Moss, Jr. - Direct                        3716

    Q    Was that around Christmas of 1979 or thereabouts?

    A    Yes.

    Q    Let me ask you this, John:  Have you ever seen -- I am going to hand you what has been marked as State's's Exhibit 119 and notice on that camera it has a name on it?

    A    Yes.

    Q    What is the name?

    A    Detrius Moss.

    Q    Do you know a person by the name of Detrius Moss?

    A    Yes, I do.

    Q    Who is that?

    A    That is my daughter.

    Q    Now, I know you probably can't say that this is that exact camera, but does Detrius have a camera like that?

    A    Yes, she does.

    Q    Have you ever seen a camera that your son owned that looked like that camera?

    A    Yes, I have.

    Q    And did you see that before December of 1979?

    A    Yes, I did.

    Q    Let me hand you what has been marked for identification purposes as State's Exhibit 102, John.  Was there a camera that looked like this, that looked like the one that had "Detrius Moss" on it?

John Moss, Jr. - Cross                                    3718

    A     I would say it is more like his mother's voice.

    MR. McKITTRICK:  That's all the questions I have.

    THE COURT: Cross?

    MR. BROWN:  Yes, sir.

                 - 0 -

                        CROSS-EXAMINATION

BY MR. BROWN:

    Q     When did John come back to your home, Mr. Moss at

Christmastime; about what time was it; what date; before

Christmas?

    A     Yes, sir, it was before Christmas.

    Q     What did he come back for, sir?

    A     What did he come back for?

    Q     Did he come back to live with you?

    A     Yes.

    Q     How long did he live with you there at the house?

    MR. McKITTRICK:  Your Honor, may I approach the bench

please?

    THE COURT:  Yes, sir.

    (Whereupon, counsel and the defendant approached the bench

where the following proceedings were had out of the hearing of

the jury:)

    THE COURT:  Be very, very careful.  Now, don't try playing

games, Mr. Brown, after several weeks in this trial.

John Moss, Jr. - Cross                          3720

     Q     And you can tell which one belonga to Detrius, can't
you?

     A     Yes.

     Q     And that is because written across the top is the name,
"Detrius L. Moss", is that correct?

     A     That ia what it aays.

     Q     All right, sir, and that is not the camera that you
gave the state police up there, ia it, the one with Detriua'
name on it?  Ia that correct?

     A     No, it ia not the camera.

     Q     You gave them a camera that looked juat like it, didn't
you?

     A     Yea.

     Q     And you couldn't identify -- There is nothing special
that identifiea thia camera, is there?  Thee ia no name on this
camera, ia that correct?

     A     There ia no name on it.

     Q     But you did give a camera aimilar to the state police
up there, didn't you?

     A     Not that camera.

     Q     It waa not thia camera?

     A     That I can remember.  No.

     Q     Well, how do you know it wasn't thia camera then, sir?
You look it over.  You can't be sure, can you, air?



John Moss, Jr. - Cross                                3722

prison, Your Honor.

     THE COURT:  He can ask questions about anything in the --

     MR. McKITTRICK:  If it has prison identification or alludes

to the penitentiary, it has absolutely no relevance.  Before he

starts to ask him questions about it, it has no relevance to the

Bible or it being in evidence.  It would do nothing but

prejudice the defendant.  That is the reason the Court ruled the

way it did on the tape.  That is the reason I came up to the

bench before he started talking about it.

     MR. BROWN:  You mean if there is a confession in here we

can't use it?  You put it in, Buddy.

     THE COURT:  My ruling is, I don't know what is in there, but

it has been introduced into evidence, number one, in its

totality.  Whatever is contained in that exhibit is allowable,

admissible evidence.  The defense put it in.  I don't know what

is in it.

     MR. McKITTRICK:  What I'm saying is, Judge, I don't disagree

with that ruling unless it is something that is irrelevant to

this proceeding.  And it would be irrelevant to the proceeding

with regards to his prison status.  Do you know of anything that

is in there, Pete?

     MR. BROWN:  What?

     MR. McKITTRICK:  Do you know of anything that is relevant to

his prison status?

John Moss, Jr. - Cross                              3724

    A     I don't remember what he brought back because I didn't

see what he brought back.

    Q     You didn't see what he brought back?

    A     No.  I know he had a camera though.

    Q     And what was the brand name of the camera he had?

    A     Uh, that was an instamatic camera.  I think it was a

Kodak.

    Q     And he had that before Christmas?

    A     Yes.

    Q     But these four cameras that are here were all removed

from your house, weren't they, sir?

    A     I think so.

    Q     And you don't know if John brought three of those back

or not?

    A     No.

    Q     You do know that one of them belongs to your daughter,

Detrius?

    A     Yes.  I had a camera also myself there, and John had a

camera of his own.

    MR. BROWN:  All right, sir.  That's all the questions I have

of this witness.

    MR. McKITTRICK:  I have no further questions.

    THE COURT:  All right, Mr. Moss, you may step down.  You may

remain in the courtroom or leave, whichever you wish to do.  Is

APPENDIX #7

3119

Thank you.

(Whereupon, the jury exited the courtroom.)

THE COURT:  Now, it is my understanding you are going to call Mrs. Moss next.

MR. BROWN:  Yes, sir.

THE COURT:  How long do you expect her to be on?

MR. BROWN:  Not too long.

THE COURT:  All right, we will stand in recess until 1:15.

- O -

(Whereupon, a recess was had in the proceedings.)

- O -


AFTERNOON SESSION

Whereupon, the proceedings in the Matter of State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, were resumed with all parties present as before noted, including the defendant and his counsel, and in the presence of the jury.

THE COURT:  Show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts.  The defendant is present in person and by counsel, Mr. McKittrick, the State of West Virginia by her Prosecuting

3119

Marzee Moss - Direct                                    3121

    MR. BROWN:  I'm just trying to relax the lady, Your Honor.
That gentleman right there is the Judge, the gentleman there in
the robe.  Just so you will know who is who.  And the man that
made the objection is the lawyer defending your son.

    Q    Where do you live, Mrs. Moss?

    A    Cleveland, Ohio.

    Q    In 1979 where did you live?

    A    Cleveland, Ohio.

    Q    You have lived there from 1979 up until today, is that
correct?

    A    That's correct.

    Q    Do you have a son named John Moss, ma'am?

    A    Yes, I do.

    Q    Is he here in the courtroom today?

    A    Yes, he is.

    Q    Would you point him out?

    A    Setting right there (indicating).

    Q    What does he have on?

    A    Tweed like jacket, blue striped tie, white shirt, beige
pants and black shoes.

    MR. BROWN:  Let the record show the witness has indicated
the defendant, John Moss.

    THE COURT:  The record will so reflect.

    Q    On Christmas Day of 1979, do you remember whether John

Marzee Moss - Direct                                    3123

live with you when some police officers came to your house with

a search warrant?

     A     Yes.

     Q     And they asked you about, they wanted to see some

things in your house; they wanted to search your house for some

items.  Do you remember that, ma'am?

     A     Yes.

     Q     And do you remember what it was they were looking for?

     A     They was looking for a camera.

     Q     A camera?

     A     Yes.

     Q     Would you tell these folks what they asked you and what

they did.

     A     Well, when they come to my house, I wasn't at home.  I

was at work.  There was a neighbor of mine called and told me

that there was some police there going to break into my house.

So I rushed home.  When I got home, they was in my house, and

they had been all upstairs, and they had ransacked upstairs

looking for the item.  So they called back and -- Well, when

they come in, they said they was friends of John, all they

needed was the camera, and things was looking good for John.  So

they went upstairs and was looking for it.  So they called back

here --

     Q     Wait a minute before you get to the call back here.

Marzee Moss - Direct                                    3125

A      No.

Q      And you went downtown with them, didn't you, ma'am?

A      Yes.

Q      And they had you give them a little statement; they typed something out, and you signed it, didn't you?

A      Yes.

Q      And then the officers came back later on and recovered the camera later on that evening, didn't they?

A      Yes.

Q      Do you remember telling them that the camera was in your husband's car?

A      Yes, the camera was in my husband's car because when -- During the summer when he would come home, he had a camera, but when he come home around Christmas time, I don't know -- He had this camera during the summer when he would come home.

Q      This is young John, your son?

A      Yes.  It was a camera just like my daughter had, Detriua.

Q      Okay, ma'am, when you were down at the police station, those police officers called Charleston, West Virginia, didn't they?

A      When they were down where?

Q      When you went to the place, do you remember, where they typed something up for you to sign, they talked on the telephone

Marzee Moss - Direct                                    3127

but I think she is confused.

THE COURT:  Do you have any objection, Mr. McKittrick, to

Mr. Brown leading her?

MR. McKITTRICK:  I'm not going to give him a blanket lead,

but if he wants to get into the things he and I discussed --

THE COURT:  All right, if you have any objections, just let

me know.

MR. McKITTRICK:  All right, I will come to the side bar.

(Whereupon, counsel and the defendant resumed their seats at

counsel table where the following proceedings were had in open

court and in the hearing of the jury:)

Q    Maybe I wasn't real clear there, Mrs. Moss.  Do you

remember the police officers called Charleston, and you talked

to John on the telephone.  Do you remember that?

A    Yes.

Q    All I want you to do is just tell the folks what you

and John talked about on the telephone.  Not any other time,

just when he was talking to you on the telephone; and you know

John's voice, don't you?

A    Yes.

Q    And that was John.  Now, tell them just about the phone

conversation when the police were there that time.

A    All we talked about, he told me to go upstairs and get

a camera and take a picture of the baby.

Marzee Moss - Direct                                    3129

is in my husband's car.  It is the same camera that John, Jr.

brought with him from West Virginia when he came home at

Christmas time and left in his room."  Is that what that says,

ma'am?

    A    That's what it says, but I don't call him John, Jr.

    Q    But that is what it says, is that correct, ma'am?

    A    Yeah, that's what it says.

    Q    All right, now, did the police officers ask you if

there was a gun in the house, ma'am?

    A    Yes.

    Q    And did you help them look for a gun, ma'am?

    A    No.

    Q    Did John tell you there was a gun in the house?

    A    I don't remember.

    Q    When you talked on the telephone?

    A    I don't remember.

    Q    To the best of your memory -- Well, let me just show

you one other thing, ma'am.  You talk about John asked you to

get a picture.  When you and John talked about taking a picture,

that wasn't in this phone conversation, was it, ma'am?

    A    No.

    Q    So now to go back to the phone conversation that you

and John had -- You are in Cleveland, and John is in Charleston,

and --

Marzee Moss - Direct                                    3131

     A    No, I don't remember anything else about the gun.

     Q    So you all talked about the gun and the camera, is that
correct?

     A    Yes.

     Q    And that is all?

     A    That's all.

     Q    And he said, "If you can't find the gun, ask Carlton
about it"?

     A    Yes.

     Q    And that is all you talked about?

     A    Yes.

     Q    How long did that conversation last?

     A    Just for a few minutes.

     Q    One or two minutes, about that?

     A    About five.

     Q    So you talked about the gun for five minutes?

     A    No, not the gun, the gun and the camera.

     Q    What else did he say?

     A    Nothing.

     Q    Anything else about the camera?

     A    No.

     Q    Did you all have a camera there in your house, ma'am?

     A    Yes.

     Q    That was your very own?

Marzee Moss - Direct                                    3133

Q     Is that your daughter?

A     Yes, it is.

Q     State's Exhibit No. 117 is a Polaroid camera.  Does this camera especially mean anything to you?  Do you recognize it?

A     Like I said, all the cameras in her room, I don't know.  All of them look alike.  But I know my son had one, and my daughter had cameras alike because one day he had the camera, and he said, "This is a camera just like my sister's."

Q     And he brought that camera back to Cleveland right before Christmas, didn't he?

A     I don't know what he brought back.

Q     Well, he brought a camera back though, didn't he; and he left it on the dresser in the second floor room, didn't he, ma'am?  That's what your statement says?

A     Well --

Q     State's Exhibit No. 118 is a Polaroid color pack camera.  Does this camera especially mean anything to you one way or the other?  You can take them and look at them all you want.

A     Like I say, I don't know.  I don't remember.

Q     Now, when the officers, when you got to the house and the officers were there with the search warrant, after a little while they left, right?

Marzee Moss - Direct                                    3135

MR. BROWN:  I'm going to withdraw that.

MR. McKITTRICK:  You're going to withdraw the question?

MR. BROWN:  Yes, withdraw the question.

Q     All right, Mrs. Moss, he said to you that there was a

gun there, and Carlton might know where it was, not a rifle; he

said a gun, didn't he, ma'am?

A     Yes.

Q     But you don't remember him saying anything about a .22

rifle?

A     No.

Q     You don't remember him saying that the .22 rifle might

be in the closet in the bedroom?

A     No, I don't.

Q     And you don't remember saying the .22 rifle might be

under the bed?

A     No, I don't.

Q     And you don't remember him saying anything about the

.22 rifle had a scope on it?

A     No, I don't.

Q     I know it has been a long time, ma'am, since that phone

call.  I want you to think the best you can what all you and

your son talked about on the telephone, just cameras and the

gun, right?

A     That's all.

Marzee Moss- Cross                                      3137

- O -


                                    CROSS-EXAMINATION

BY MR. McKITTRICK:

     Q     Mrs. Moss, the State of West Virginia brought you to

Charleston, West Virginia, is that correct?

     A     Yes, they did.

     Q     Now, since you have been here, I have not discussed any

of your testimony with you, have I?

     A     No, you haven't.

     Q     The statement that Mr. Brown was talking to you about

says nothing about a .22 rifle, does it?

     A     No, it doesn't.

     Q     It says nothing about the gun, a .22 rifle, being under

a bed?

     A     No, it didn't.

     Q     It says nothing about a rifle with a scope on it?

     A     No, it didn't.

     Q     It says nothing about a rifle in a closet, does it?

     A     No, it didn't.

     Q     You told the ladies and gentlemen that you don't call

John "John, Jr."  What do you call him?

     A     What do I call him?

     Q     Yes.



Marzee Moss- Cross                                    3139

marked as State's Exhibit 102.  Is that camera like the camera

which is marked as State's Exhibit 119?

    A    Yes.

    Q    All right now, I thought I heard you say that your son,

John, had a camera like your daughter's, Detrius.

    A    Yes.

    Q    Is this the camera that you are talking about when you

compare it with Detrius' camera, that being State's Exhibit No.

119?

    A    Yes.  I can see now.  He was bringing them one at a

time, and it has been so long that I just don't really remember.

    Q    All right now, when John was staying in West Virginia

with his grandparents, did he visit at home?

    A    Yes, he did.

    Q    And was that before he came home at around Christmas in

1979?

    A    Yes, it was.

    Q    And did you ever see John with this camera that you say

was similar to Detrius' camera?

    A    Yes, I did because he used to take pictures of his

little nephew.

    Q    With the camera?

    A    With the camera.

    Q    Now, I guess you can't testify that it was this camera,

Marzee Moss - Redirect                                3141

MR. BROWN:  We don't want to be ungracious about it, but no,

we don't want to do it.  *what happened to truthfulness* !!

THE COURT:  Okay.

(Whereupon, counsel and the defendant resumed their seats at

counsel table where the following proceedings were had in open

court and in the hearing of the jury:)

MR. McKITTRICK:  That's all the questions I have.

THE COURT:  Any redirect?

MR. BROWN:  Yes, sir.

- o -

REDIRECT EXAMINATION

BY MR. BROWN:

Q     Mrs. Moss, in your statement you said, speaking of

John, "He brought the cameras with him."  You said that, didn't

you?  Let me show you.  "Just before last Christmas, 1979, John

came home, and he brought the cameras", see the little "s",

"with him".

A     Yes.

Q     You said that, didn't you?

A     I don't remember saying that.

Q     And you went on to say right after that, "I only saw

one at the time".  Do you remember saying that?  And you went on

to say, "The camera was a Kodak instant camera.  John left the

camera on the second floor on his dresser, and no one else

379                    3141

Marzee Moss - Reccross                          3143

come home during the summer.

    MR. McKITTRICK:  That's all the questions I have.

    MR. BROWN:  Would the court reporter read back the last

answer.

    MR. McKITTRICK:  For what reason?

    MR. BROWN:  I want to make sure she said what I think she

said.

    MR. McKITTRICK:  Why don't you go up and ask her?

    MR. BROWN:  I just want to hear what she said.  Why

shouldn't it be in open court?

    THE COURT:  Read back the last answer.

    (Whereupon, the last answer was read by the reporter.)

    MR. BROWN:  He had what?

    THE REPORTER:  Cameras.

    MR. McKITTRICK:  I would like to move at this time to make

this witness my witness for two short questions.

    THE COURT:  That has already been ruled on at the bench. If

you wish to bring her back, you may bring her back.  That matter

has already been settled at the bench.

    MR. McKITTRICK:  I know it has.

    THE COURT:  Yes, it has.

    MR. McKITTRICK:  I said I know it has.

    THE COURT:  All right, you may step down.  You are released

from the State's subpoena.

3145

that they are interested in.

THE COURT: Who is this guy? Where did this guy come from? What is the basis for your wanting to put him on?

MR. BROWN: John tells him two or three weeks beforehand, as they are walking down the railroad tracks, "I would like to break in that house. There are a bunch of guns, shotguns and rifles there." It shows system, motive and intent. I have a whole bunch of cases --

THE COURT: Let me read this.

"I heard that it was", I'm not sure that is proper, these last two questions and answers, "I heard this is where . . ."

MR. BROWN: I don't know that he is going to say that. The only thing he is going to say, he tells me --

THE COURT: Are you going to question him directly from that statement?

MR. BROWN: No. There is too much nasty stuff in here.

THE COURT: He is entitled to question him on any inculpatory statements the defendant might have made.

MR. McKITTRICK: Your Honor, the defendant's statement is not inculpatory.

MR. BROWN: What are you looking for?

MR. McKITTRICK: The statement is not inculpatory because it says, Your Honor, right here that he could not do it because the people had been killed. He couldn't go in there, that they were

# APPENDIX #8

## APPENDIX # 8

In the case of John Moss III, both Moss and Paul Reggettz confessed to killing the Reggettz family. Each confession was independent of the other, neither including the presence of or the aid of the other. Both confessions were later recanted, both men asserted their confession was forced by investigating officers, but only John said police told him what to say in confessing.

Vanessa Reggettz was a mother of 2 children, 26 years old, 5 feet tall, and weighed 94 pounds. Bernadette Reggettz was 4 years old, 40 inches tall and weighed 29 pounds. Paul Eric Reggettz was 7 years old, 44 inches tall, and weighed 39 pounds.

Blood evidence from the crime scene that did not match Paul Reggettz or any of the victims caused a problem with prosecuting Paul Reggettz based upon his confession of being the sole actor of committing the murders. A warrentless search of trying to match a blood type to potential suspects ensued in the community to no avail. The state police were under a great deal of pressure to match the unknown blood to a suspect. Investigating officers were convinced they had the right killer, Paul Reggettz, due to his detailed confession.

The Reggettz murders received a great deal of press coverage due to the bazaar murders of the children. The police investigating the case needed to solve the case to restore faith in the community, that the police force was providing adequate protection to those who employed them. It was a former Deputy Sheriff officer who provided information that led officers to develop John as a suspect. That deputy is John's own uncle.

(1)

383

John was tried and convicted on Zain's testimony, shifting the balance of the evidence presented. The trial was essentially a contest between the Reggettz confession, which he recanted and John's confession, which he recanted. To Reggettz, the defense had attributed the motive of hatred fueled by an economically stretched and emotional strained home. To John, the state had attributed robbery as the motive, implying the desire to purchase drugs.

Without the focus being shifted from the creditability of the confessions due to discredited serology evidence, the real question for a jury is who's confession fits the evidence of the crime scene?

### The Reggettz Confession

Paul Reggettz offered his confession in great detail within 24 hours of the murders being reported. Reggettz offered exactly how he murdered his wife, his son and daughter. Reggettz detailed confession was offered prior to any known results of the autopsy performed by Dr. Irving Sopher, the State's Chief Medical Examiner.

Reggettz told officers he had hit his wife with a handgun, she fell to the floor and was moaning but not moving. This account is entirely consistent with the medical examiners theory that because of the severity of the head wound suffered by Vanessa Reggettz, along with the blood loss, she would have been unable to move from where she had fallen. (1st. Tr. 3365-66)

He then picked her up and carried her to the children's bedroom where he dropped her on the floor near the TV room. Dr. Sopher was of the opinion Vanessa had been struck in the head with the pistol and had fallen to the floor in the front bedroom, where he found a large pool of blood. He also believed, because of the absence of pattern dripping of

blood on her clothes or anywhere else in the house, that she stayed down when struck and was carried to where her body was found. (1st. Tr. 3301-02, 3365-66)

When Reggetts thought he saw his wife start to move, he grabbed an extension cord lying by the door in the TV room. (1st. Tr. 2456) He wrapped the extension cord around his wife's neck and pulled until movement stopped. Afraid she might come to and continue to fight, he tied her to the door of the TV room.

Reggetts recounted to officers details totally consistent to what children would do and say given the attack on their mother. Reggetts said his son tried to run but he grabbed him. He remembered him pleading "Daddy don't". He had yanked a radio cord out of an outlet and wrapped it around his son's neck, pulling it until the screaming stopped.(1st. Tr. 2458) He then placed his son face down in the remains of bath water in the tub. Reggetts explained his little boy liked to swim and "it looked like he was swimming". (1st. Tr. 2466)

The boys' neck showed a scraping and bruising pattern that did not completely surround the neck, but rather extended roughly ear-lobe to ear-lobe consistent to the fathers' confession of holding his knee on he boys buttocks and legs while he pulled on the cord. Reggetts reported tying the childs hands and feet before putting him in the bathtub face down, "it looked like he was swimming". The autopsy showed that he had been alive when immersed in water and that the actual cause of death was drowning.(1st. Tr. 3308)

There is nothing from the crime scene that officers could adduce to provide Paul Reggetts with such detailed information such as the cord being pulled around the boys neck to kill the him. Certainly nothing

could have informed the police that the child's last moment of life was spent struggling with the cord that bound his little hands and feet attempting to free himself, and that the actual cause of death was drowning.

Dr. Irving Sopher placed the time of death between midnight and no later than 6:00am. (1st. Tr. 3339) Dr. Sopher testified that after a body has been immersed in water for approximately 3 or 4 hours a wrinkling of the skin on the hands and feet occur, and depending upon the environmental temperature, the process takes up to 10 to 12 hours to reverse. That wrinkling condition was not found on the body of the son. (1st. Tr. 3389-92) Paul Reggettz had reported to trooper Williams he had removed the boys body from the water around noon just 2 hours prior to Dr. Sopher coming to the crime scene to examine the body. By this account, assuming the murderer killed Paul Eric on his way out the door at 6:00am. the body would have spent no less then 6 hours in the water. Once again Paul Reggettz confession shows he knew to many details and his original report that someone other than him committed the murders just does not fit the forensic evidence.

The little girl was only 4 years old . Paul Reggettz told trooper Woodyard that when he returned from the bathroom after drowning his son he discovered his little girl at her mother's side begging her to wake up, saying "Get up Mommy; wake up". Reggettz said he then grabbed his daughter and carried her to the front bedroom where he took an electrical cord from the sweeper and wrapped it around her neck, pulling it tight until she stopped moving. He said he then looped the cord over the top of the door and let her body hang against the door. (1st. Tr.2459) He said he hung his daughter because she like to swing. "Hung her up so she could". (1st. Tr. 2466)

Again Reggettz just knew too much information about how the murders were committed, not to have done it. For instant, who knew what cord went where and how they where tied, Reggettz. Nobody knew besides the medical examiner and the killer, that Vanessa Reggettz was hit in the head with a gun and carried into another room.

The image of Bernadette's 4 foot body hanging from a door and Paul Eric laying face down in a tub of water, is more than just shocking. The mental/emotional disturbance of seeing your own children in such a condition would cause any loving parent to be left emotionally disturbed. Little Bernadette was hung by her own father's words, because she liked to swing. Little Paul Eric was drowned by his own father's words because he liked to swim. Seeing such a terrible image of children would cause an emotional/reaction to anyone, yet not the father, Paul Reggettz.

Trooper Williams testified that Paul Reggettz showed no emotion over the death of his family. (1st. Tr. 2777) Other officials also took note of this puzzling circumstance. In fact, Reggettz told Trooper Woodyard he had "felt relieved", just like he had been set free, "relieved at no longer having any responsibility". (1st. Tr. 2462) At trial prosecution put on testimony from trooper O'Dell to show at one point Paul Reggettz "sobbed for a few seconds". (1st. Tr. 3211-12) However, defense counsel on cross examination established that trooper O'Dell was a polygraph examiner and Paul Reggettz didn't show emotion until he "was about to take a lie detector test when he cried". (1st. Tr. 3215) The only emotion shown was self-serving as grief for what could be his own loss of freedom.

(5)

Again, Paul confession gave the actual cause of death of both children prior to the autopsy report being prepared. This could only have been given by the real killer. Other events that would require someone else to have committed the crimes just isn't supported by crime scene evidence such as the lack of wrinkling condition on the boy. This is all information that can not be disputed by a creditable State Expert witness.

Paul Reggettz told trooper Woodyard he feared his wife might still be alive so he returned to her body and using both hands, pushed a pair of scissors into her chest. (1st. Tr. 2460)

## The Moss Confession

The troopers who obtain the alleged confession of John Moss had basic information from the crime scene to tell John what to say. They had already obtained the flatware now alleged to have been taken from the Reggettz home. One can only speculate what information John's uncle provided on the flatware that was given as a gift to his friends mother. Receipts of evidence show troopers received the flatware on February 6, 1980. It has now been shown the flatware/silverware used at trial could not be the silverware Paul Reggettz purchased at K-Mart.

Prior to the alleged confession of John, there was never any mention of a camera missing nor did the state offer any pictures at trial alleged to have been taken by this camera as proof the Reggettz owned a camera. The only evidence offered was from Paul Reggettz' self-serving identification of the camera as being his.

The only thing consistent about John's confession is that, it is inconsistent to the theory, troopers told John what to say. The State Troopers who beat John into submission could have had him confess to

(6)

388

murdering J.F.K..  John's confession is consistent to being provided basic information investigating officers would know.

What the officers didn't know was Forensic Evidence obtained through the autopsy and personal observation of Dr. Irving Sopher. By human error, they got some evidence wrong, such as the location of the gun being fired. This is all exhibited by John's allege confession not being consistent to the evidence. The troopers had already obtained a illegal blood sample from John to tie him to the crime scene so they were not concerned with details of the confession.

In the alleged confession given by John authorities would have you to believe John fought with Vanessa for the handgun in the back bedroom were the gun went off. Trooper Williams recovered the bullet which went through the bed and into the floor, in the front bedroom. Paul Reggettz pointed out the bullet hole in his confession in it's proper location.

Next authorities would have you to believe through John's alleged confession that he hit Vanessa in the head with the gun with such force to break the guns grips and then run from the house. Next you would have to totally discount Dr. Sopher's expert opinion and the lack of blood drippings on Vanessa attempting to block the backdoor.

The officers who told John what to say didn't know the severity of the head wound suffered by Vanessa, along with the blood loss shown by the blood pool where she fell in the bedroom would have made any altercation at the backdoor impossible. The officers knew they had blood evidence, mostly collected near the backdoor to explain. Therefore they invented an altercation to provide an injury to John at that location in the house.

(7)

389

State Troopers prior to formulating this theory of a backdoor altercation examined the hands of John and found a scar on his left little finger. This would become the foundation for the theory of Vanessa fighting off an intruder at the backdoor, grabbing a knife and cutting him, thus resulting in blood found at the crime scene consistent to John. At trial however, defense established the cut to John on his left little finger received medical attention in October of 1974. (1st. Tr. 3778) Defense also provided expert testimony by a plastic surgeon that the age and description of the scar fit emergency room records of having treated the cut in 1974. (1st. Tr. 3789)

Troopers providing information in a coerced confession could not know medical evidence would prove Vanessa could not have had this altercation nor that defense could establish a medical history for the scar on John's little finger.

Further attempts of troopers to formulate a believable attack on the Reggettz family by an intruder would also prove to be discredited. To believe John's alleged confession, one would have to believe he first choked Vanessa and Paul Eric with his hands to subdue them. Dr. Sopher testified to a reasonable degree of medical certainty, "they were not manually strangled". (1st. Tr. 3384)

Within 24 hours of the murders Paul Reggettz had given a detailed confession including facts only Forensic Experts could later discover. Paul Reggettz confession stands the test of time and forensic testing. Reggettz was indicted for the murders of his wife and 2 children but was released due to blood evidence that did not match him. It was easier for the State to frame John Moss by falsely reporting his blood type as being that obtained from the crime scene, than to have to explain why

such a detailed confession as Paul Reggettz failed to include a second party.

Too many question remain unanswered. Why would a young black man only open part of the Christmas gifts and then only take a set of silverware? If a perpetrator was seeking items to purchase drugs, why would he/she take silverware but leave 2 civil war rifles valued at $300.00? The evidence does not point to an outsider.

Also, John knew of this family as they lived in his uncles Motel. He knew the family didn't have anything of value. Why pick one of the poorest families in the neighborhood to rob. Again, the evidence does not point to an outsider.

No fingerprints were found so troopers had John confess to wearing gloves and put on expert testimony that "glove prints" were found at the crime scene. Where is the bloody glove print if this is true? Again the autopsy of Vanessa shows numerous signs of scratches, scrapes, and abrasions consistent to fingernail scratches occurring in a struggle. (1st. Tr. 3296-97) This is totally inconsistent with the State's theory that John wore gloves during the attack. (1st. Tr. 3246-50)

The true blood type of the original crime scene will never be known now due to former Trooper Fred S. Zain's involvement in collection, testing, recording of results, and testimony thereof. The State Police illegally obtained a sample of John's blood prior to any recorded court document disclosing the type of blood collected at the crime scene, forever casts doubt on the creditability of any reported results offered by Zain. Additional testing is not an option as the State of West Virginia turned to Zain again in 1990 for DNA testing permitting him to destroy any remaining evidence.

Original reports of blood not matching Paul Reggettz at the crime scene does not exclude him from committing the murders. It only means his confession left out a second party he sought to protect, perhaps a lady friend. A set of silverware taken is more consistent to a female taking the item, than a drug crazed murderer. It is remarkable how uncritical authorities were of Paul Reggettz receiving regular visits from a lady friend after confessing to killing his family during the year he spent in the county jail. It is equally remarkable how it went unquestioned that Paul Reggettz married this lady shortly after his release and received an undisclosed amount of money from the State. It is also note worthy that not one females blood was submitted for serological testing to compared to the foreign blood type identified at the crime scene.

It is much more likely the blood unidentified as not belonging to the Reggettz family, scratches on Vanessa's body and "backdoor altercation" involved 2 females. What did Paul originally say Vanessa said during an alleged domestic altercation? "I'm going to get a gun". Get a gun to deal with a fight with her husband or get a gun to run off her husbands lover? The whole attack on Vanessa clearly took time, the blood pool in the bedroom didn't form in a matter of seconds, it took time. Paul Eric didn't run back until after Reggettz hung his wife from a door or couldn't run because he was held by a second party? None of the theories offered at either trial by the State fits a single killer not employing the aid of a second party.

## CONCLUSION

Justice has not been served for the memory of Vanessa, Paul Eric,

or Bernadette Reggettz. The image of a mother fighting for her family is forever recorded in the evidence. The monster who confessed to choking Paul Eric, tying his hands and feet and then drowning him in a tub of water "he looked like he was swimming", was freed. The most outrageous image that forever haunts anyone who hears of this case is the 29 pound body of little Bernadette hung from a door facing the Christmas tree. Only Paul Reggettz knew this child was hung from the door when he gave his confession because he moved her lifeless body to her bed before police came. Likewise, Paul Reggetttz moved the body of little Paul Eric from the bathtub, but as shown above, if Reggettz original story was true of coming home to find his family murdered, Paul Eric would have shown signs of having been in the water for at least 6 hours. There was no such evidence.

The evidence in this case is clear. Paul Reggettz murdered his family in cold blood, moved his children bodies out of guilt, confessed out of guilt, and walked free due to Zain. It is equally clear the confession of John Moss III was coerced and was convicted on the weight of Zain's testimony.

394

John Moss III
P.O. Box 241
1 Mountainside Way
Mt. Olive, WV 25185

December 1, 1999

Cathy Gatson
Clerk of the Circuit Court
13th. Judicial Circuit
Kanawha County Judicial Annex
111 Court Street
Charleston, WV 25301

RE:  Moss  v.  Trent
     Civil Action No. 94-MISC-663
     (Jugde Andrew MacQueen)

Dear Ms. Gatson,

Enclosed are the original and two copies of my "Motion For Leave To File: Petitioner's Additional Supplement To Rule 59(e) Motion To Alter Or Amend Order, To Correct Factual And Legal Errors, And To Reconsider Legal Conclusions", and Petitioner's to be filed for this Courts' consideration. As demonstrated by the certificate of Service herein, all parties have been served with a true copy of the above. Please present this matter to the Court for it's consideration.

Thank you for your assistance on this matter.

Sincerely,

John Moss III

395

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS III

        Petitioner,

v.                            Civil Action No. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

        Respondent

**MOTION FOR LEAVE TO FILE: PETITIONER'S ADDITIONAL SUPPLEMENT TO RULE 59(e) MOTION TO ALTER OR AMEND ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS**

Petitioner, John Moss, III, seeks Leave of the Court to file his pro-se Supplemental Correction to a Factual issue before this Court as the Court's consideration of a factual error as evidence is adversely effecting this Court's determination of the facts. To permit this error to go uncorrected will result in a manifest injustice to Petitioner, and deny this Court the proper foundation to make a constitutionally sound determination of the facts prior to its final decision.

For this the Petitioner shall ever Pray.

                                  Respectfully submitted,

                                  John Moss III,
                                  Petitioner, pro-se.

396

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS III,

        Petitioner,

v.                                    Civil Action No. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

        Respondent,

## PETITIONER'S ADDITIONAL SUPPLEMENT TO RULE 59 (e) MOTION TO ALTER OR AMEND ORDER, TO CORRECT FACTUAL AND LEGAL ERRORS, AND TO RECONSIDER LEGAL CONCLUSIONS

Petitioner John Moss III, has sought leave of the Court to file an Additional Supplement as he believes the Petition contains a mistake which credits Sgt. Murphy with having been the serologist who performed blood stain testing on the shirt of Bernadette Reggettz. Petitioner seeks to correct this mistake under his "Rule 59 (e) Motion" as this matter relates back to correcting factual errors so this Court may reconsider its' legal conclusions based upon accurate information.

### THE MISTAKE

On August 14, 1995 counsel for petitioner filed a supplemental brief which improperly states "As a general rule, if the writing was in Murphy's handwriting, he performed those tests" (See page 5).

On September 17, 1996 Respondent's filed its <u>Answer</u> and Memorandum in support to its Answer. Respondent properly submits Sgt. Murphy tested known blood samples and that Trp. Zain tested the crime scene exhibits. (See pages 16-17)

On September 27, 1996 the Respondent filed a "Supplemental Argument in Opposition to Petition For Writ Of Habeas Corpus" contending that it appears Sgt. Murphy "tested the little pajama top of Bernadette Reggettz", not Zain. (See page 3). The only foundation for this contention is counsel for Petitioner's "general rule" statement contained in the August 14,1995 brief. Somehow, the "general rule" statement became an authoritative rule that when Sgt. Murphy recorded the Bernadette clothing (shirt) on a case worksheet that Murphy and not Zain conducted the testing on this crucial piece of evidence.

On October 2, 1996 counsel for Petitioner filed a response to the Respondent's Memorandum in Opposition where he again improperly implies that Sgt. Murphy tested the clothing from Bernadette Reggettz. (See page 14). Counsel furthermore argues that Sgt. Murphy identified an EsD genetic marker consistent with Petitioner, but inconsistent with any member of the Reggettz family. This representation is mistaken and totally belied by the record.

### CORRECTING THE MISTAKE

Upon review of the record, Sgt. Murphy testified in Petitioners first trial (1984) that his testimony before the Grand Jury was limited to results of known blood samples he had tested. (See Appendix 1). The Respondent has offered no: statement; affidavit; or declaration of any type from Sgt. Murphy that he in fact tested any piece of crime scene evidence, including the Bernadette clothing item.

On May 17, 1995 the deposition of Former State Trooper, Sgt. Robert Murphy was taken. Upon questioning by counsel for Petitioner, Lonnie Simmons, Esq., relating to different handwriting on "case worksheets" disclosed in discovery during this habeas action, the following transpired:

> A.   This basically is a compilation of all the parties involved and a summary of all the blood grouping. Just a tabular way of excluding people or including people.

> Q.  Would this sheet in your handwriting indicate that you had performed all of those tests or does that not indicate that?
>
> A.  Not Necessarily.
>
> (See Murphy deposition -- here on out known as 'Murphy', at page 31) (Provided here as Appendix 2)

The record evidence of this case clearly shows former Trooper Sgt. Murphy did not contend that if he recorded results on a worksheet that he performed the test. On page 32 and 35 of Murphy it was disclosed the "case worksheets" could be original records or test results that were transcribed from sheets for individual tests. Understandable, after fifteen (15) years, Sgt. Murphy could not possibly recall who tested what evidence, but to the best of his recollection -- he saw the results. Sgt. Murphy added that all the work was probably done by Zain and himself (See page 34 of Murphy)

## MURPHY AS SUPERVISOR

Great weight has been given to the fact that Murphy was Zain's supervisor and saw results of tests as they were performed. When Sgt. Murphy was questioned about what was different about the blood evidence from the crime scene that showed someone other than a Reggettz family member had bled, after refreshing his memory through the use of a genetic characteristics chart of crime scene evidence, Sgt. Murphy selected that the esterase (EsD) was different. (See page 42 of Murphy) The genetic characteristic EsD 2 is recorded throughout this case as being the crucial genetic marker obtained from the crime scene evidence used to exclude 27 other possible donors as the foreign blood source. This is supported by the June 10, 1980 forensic report authored by Sgt. Murphy. (Provided here as Appendix 3) On page 6 of this report at paragraph 1, nine (9) possible donors to the foreign blood type identified from the crime scene were excluded as "none was found to contain EsD 2-1".

It is important to note that none of the known blood comparison samples recorded were an EsD 2. Petitioner's expert Dr. David Bing established that it is improper to include genetic characteristics that are common to the victim on samples of crime scene evidence. Only genetic characteristics foreign to the victim(s) should be considered as the sample could be a mixture of blood from a victim and the perpetrator. The State refuted the mixture concept alleging the Christmas package wrapping paper was clearly a drop of blood, as was the Bernadette clothing item. The State alleged the perpetrator wore gloves which would have permitted the glove to absorb a victims blood, mix with the perpetrator's blood and "drop" as a mixed sample. Therefore, only the EsD 2 factor would be proper to compare as a foreign factor if the Respondent could establish someone other than Zain tested crime scene evidence, which they have not.

This is further supported by the summary case worksheet (Bates number 12-- provided here as Appendix 4A) where Sgt. Murphy only recorded the EsD type for a "table knife" catalogued as a "case knife". Clearly Sgt. Murphy was only interested in the EsD genetic marker which draws one to the inescapable conclusion that the EsD genetic marker is the only credible foreign blood type identified and recorded as a comparison factor.

Base upon the record of Sgt. Murphy having viewed the results of tests, and performed serological testing on known blood samples which resulted in excluding numerous possible sources as being the donor of foreign blood identified at the Reggettz home, only the genetic marker EsD 2, should be considered. Sgt. Murphy compared known blood samples to foreign blood based upon the EsD 2 as the foreign genetic type. Petitioner has no reason to doubt this fact or that Sgt. Murphy has testified honorably to the best of his recollection, however, at no time did Sgt. Murphy exclude any other

400

suspect and/or possible source of foreign blood through the use of any
genetic characteristic other than the EsD 2-1.

The case worksheets produced as the underlying data to the June 10, 1980
Report cannot be the original record of results catalogued as the tests were
recorded.  On page 4 of the June 10, 1980 report seven (7) genetic charact-
eristics are reported for the "doll" submitted for testing.  The case
worksheet (Appendix 4-A) only records one (1) genetic characteristic for the
"doll".  Either there are individual data sheets for the items submitted, or
the report authored by Sgt. Murphy is false.

Another example is found on page 5 of the June 10, 1980 Report in
paragraph 2 where a number of items were reported to have the subgroup PGM
1+, 1- identified.  The case worksheets provided are for group one test
results which do not identify the subgroup of PGM factors.  PGM subgrouping
is conducted in a second test commonly called "group two tests". Again,
either the additional factors had to have been obtained from individual data
sheets or the report is false.  (See Appendix 4-A).

One of the most compelling factors that establishes the worksheets are
summaries of other data sheets submitted to Sgt. Murphy to prepare a final
report, is Bates number 10 -- Appendix 4-B here.  The genetic characteristics
of Petitioner are catalogued on a worksheet dated simply as "Jan".  It was
established by Sgt. Murphy that "Jan" represented January.  (See Murphy page
32).  The illegally obtained blood sample of Petitioner was taken on January
30, 1980, but the state contends the sample was returned in its entirety
without being tested.  If the results recorded on the disclosed worksheets
are to be taken as correctly catalogued in accordance with the dates
represented, the January date recording Petitioner's blood types must also be
considered as being correct.  Under these circumstances, all blood evidence,

401

including the EsD 2-1, would have been obtained illegally and Petitioner's conviction must be reversed.

The Respondent has represented that the characteristics recorded by Zain predates Sgt. Murphy's testing Petitioner's known blood sample obtained on April 22, 1980. There is no worksheet dating Petitioner's blood type other than the January worksheet. The Respondent cannot pick and choose which worksheets it wants the dates to be credible on. Either all dated work is credible or none of it is.

One of the most disturbing features of the recorded data on the Appendix 4-A worksheet is two different sets of results for the same piece of evidence, the clothing (shirt) of Bernadette Reggettz. A careful review of the entire record has shown that only one item of clothing was submitted for testing that belonged to the child Bernadette Reggettz. In the handwriting only identified as being "not Murphy", the last item listed is "Burnadette Clothing". The genetic characteristics attributed to this item perfectly match the known blood sample of Burnadette Reggettz. Trial testimony described one blood drop from Bernadette's shirt/clothing as having been tested.

Just below the "not Murphy" Bernadette Clothing entry is an entry in Sgt. Murphy's handwriting of "Clothing Bern.". This time the genetic characteristics recorded are aligned to those of the Petitioner. As shown above, this worksheet cannot be the original results obtained data sheet, because the June 10, 1980 report lists more genetic markers than what appears on the data worksheet for three (3) different items. Relying upon the record in this de novo review Sgt. Murphy only tested known blood samples. Knowing that Sgt. Murphy had no personal recollection of anyone other than Zain testing the crime scene evidence, it becomes clear that the second Bernadette

402

clothing entry is a transcription from a data sheet provided to Sgt. Murphy by Zain.

The entries by Sgt. Murphy on Appendix 4-A are not dated, but would appear that they were transcribed to the worksheet in June of 1980 when Sgt. Murphy was preparing his final report. It is not mere speculation that Zain would have altered his original case worksheet(s) or totally rewrote the documents to include Petitioner in the gene pool of the population that could have deposited the blood foreign to the Reggettz family. The West Virginia Supreme Court of Appeals in Zain I, S.E.2d 501 at 506 found the evidence is overwhelming that Zain did falsify his reports to falsely include defendants.

Sgt. Murphy's supervision of Zain's original testing enunciates: the genetic marker EsD 2 is foreign to the Reggettz family; documentation repeatedly reflects Sgt. Murphy relied upon the EsD results obtained; and that six (6) months after having seen Zain's original test results, Sgt. Murphy accepted Zain's worksheets as being accurate relating to genetic markers obtained from crime scene samples. At no time has Sgt. Murphy alleged he recalls every result he witnessed on Zain's test gel plates. Petitioner has no doubt that Zain deceived Sgt. Murphy after the original tests were conducted by providing false results to Sgt. Murphy after Petitioner's blood type was made known.

All testimony and evidence points to the fact the West Virginia State Police, Serology Division was being pressed to identify a blood type that would match blood obtained from .the crime scene foreign to the Reggettz family. Petitioner was the first and only person identified to have an EsD 2 genetic factor. Based upon Zain's history of falsifying evidence and the opinion issued in Zain I, even the most liberal review of the evidence, in a light most favorable to the State, only the EsD 2 could possibly be considered credible through Sgt. Murphy's record of events.

There are only three (3) possible EsD genetic types. The EsD 2 and 2-1 types would likely occur in well over 65% of the population. When considering the prejudicial effect the false blood evidence had on the jury -- it cannot be ignored that comparing Petitioner to foreign blood at the crime scene which includes Petitioner in a gene pool of 65% of the nations population, verses the trial testimony by Zain that only .03% would be included in the gene pool, the prejudicial effect upon the jury's verdict is undeniable.

## THE EVIDENCE CORROBORATING CONFESSION

Should this habeas action have to be further developed on other matters beyond the false serology issue, Petitioner would cast a long shadow of doubt upon evidence this Court has not yet been made aware of. For example, this Court found Petitioner's confession was largely consistent with the physical evidence citing a camera identified by Paul Reggettz as belonging to him, and silverware Reggettz alleged he had purchased. Due to ineffective assistance of trial counsel, this Court has been denied convincing evidence that Paul Reggettz identification of these items were false and completely self-serving to draw attention away from his own (admissible) confession to the murders of his family.

### The Silverware

Paul Reggettz identified a set of silverware at trial as being the silverware he purchased as a christmas gift for his wife in 1979 at the local K-mart store. Police obtained the silverware from the mother of one of Petitioner's friends, Mrs. Arbutus Johnson Pomroy. Petitioner had given the silverware to Mrs. Pomroy as a christmas gift.

(8)

404

In the first trial of this case (1984), defense called the K-mart merchandising and ordering manager as a witness, Ms. Edith Lilly. Ms Lilly testified that K-mart has never sold the brand of silverware that Paul Reggettz identified as being the item he purchased for his wife at K-mart. (See Appendix 5) Defense counsel at Petitioner's second trial did not call Ms. Lilly as a witness despite requests to call her. As a result, this Court has been deprived crucial information in determining what degree of credibility should be afforded to Paul Reggettz' identification of the silverware attributed to Petitioner. Based upon Reggettz' testimony of purchasing silverware at K-mart, alleged to be missing from his home after the murder of his family, the silverware relied upon at trial could not be the property allegedly stolen from the Reggettz home.

**The Camera**

Originally no camera was alleged to have been missing from the Reggettz home. Once again the only evidence offered that a camera obtained from Petitioner's father's car was taken from the Reggettz home, was the self-serving identification of the camera by Paul Reggettz. The state offered no corroborating evidence that Paul Reggettz owned a camera, such as: demonstrating that Reggettz owned film that would fit this model of camera; or a picture alleged to have been taken with the camera. The Reggettz Family had been residents of Kanawha County West Virginia for some time, yet no witness alleging to have ever seen any member of the Reggettz family with a camera of any kind was called to corroborate Paul Reggettz theory of a missing camera.

On the other hand, both Petitioner's parents (John and Marzee Moss, Jr) were called as witnesses in the first trial in 1984, who did substantiate that Petitioner did own a camera like the one identified by Paul Reggettz as

405

being his camera. (See Appendix 6 and 7) It was furthermore established that both Petitioner and his sister had owned cameras and that Petitioner had his camera during the summer of 1979 prior to the December 1979 murders of the Reggettz family. Petitioner's mother passed away prior to the second trial and Petitioner's father was not called by trial counsel even though it was reqested by Petitioner.

In light of Paul Reggettz' false identification of the silverware and the lack of any corroboration to his identification of the camera being his, Petitioner seeks this Court's reconsideration of the credibility of the physical evidence considered as corroborating Petitioner's coerced confession. The Zain issue being considered independant of other issues yet to be developed has denied this Court a full consideration of the facts.

## Reliability of Petitioner's Confession

The Respondent has contended Petitioner's confession is reliable citing consistencies to crime scene evidence, motive and other identified factors. The Respondent has overlooked the fact that Circuit Court Judge John Hey found Paul Reggettz' confession to murdering his family credible and admissible. When the confession of Paul Reggettz is compared to the crime scene evidence and forensic evidence that couldn't be known to persons who only viewed the scene after the fact, Reggettz' confession is the only credible account of the murders consistent to unseen forensic evidence.

When Petitioner's confession is compared to all the physical and admissible forensic evidence, it becomes clear that his confession is consistent to having been told what to say by investigating officers who had viewed the crime scene, but could not have known the underlying forensic evidence. Petitioner has developed a pro-se comparison between the reliability of his confession and that of Paul Reggettz. (See Appendix 8).

406

This information will be fully developed in additional grounds through Habeas Corpus, if this action is not resolved on the Zain issue now pending. Petitioner believes it's only fair to this Court to provide this information as the Court must rely upon factors other than the serology evidence in determining the sufficiency of evidence and the prejudicial effect Zain's testimony had on the jury.

## CONCLUSION

This is not the massive case envisioned by the Respondent with overwhelming evidence of guilt. As this Court has recognized in its September 10, 1998 Order, the Court considered "both the confession and the serological evidence to be equally important". The sole intent of this motion is to correct the mistake that credited former State Trooper Sgt. Robert Murphy with having tested any crime scene evidence, including the clothing of Bernadette Reggettz.

The additional factors casting new light on the reliability of Paul Reggettz' identification of the silverware and camera are meant to enlighten this Court on other issues that would be further developed under additional grounds should this action have to advance further. Petitioner has presented this Court with factors that warrant further consideration of the sufficiency of evidence to sustain this conviction. Petitioner also demonstrates that he was clearly prejudiced by Zain's testimony, which undoubtedly effected the judgement of the jury, when considered in conjunction with the additional factors provided herein that Sgt. Murphy only tested known blood samples, and only recalls the foreign blood EsD gene type as being different than the Reggettz family members blood type.

This correction of facts casts the serology results into a whole new light that demonstrates confidence in the jury's verdict, based upon false

evidence, is undermine and this Court's consideration of mistaken information resulted in Petitioner suffering an adverse Order where the Court had to rely upon the record presented. Petitioner is entitled to have his Habeas Corpus considered on the merits of the record, and this Court is entitled to base its finding of fact with conclusions of law on information that is not found upon mistaken representations.

Based upon the foregoing analysis, correction to the record, the attachments and briefs provided previously; it cannot be disputed that Petitioner's conviction was obtained, in part, upon the false, misleading, exaggerated, and scientifically unsound testimony of Fred Zain. Therefore, Petitioner respectfully represents that under the standards mandated by the United States Court decisions, as recognized in the Zain I decision, and under the facts of this case; Petitioner is entitled to a new trial.

Respectfully submitted,

John Moss III,
Petitioner, pro-se.

cc: file

(12)   408

## CERTIFICATE OF SERVICE

I, John Moss III, Petitioner pro-se, certify that on this day of December 1, 1999 a true copy of the "Motion For Leave To File: Petitioner's Additional Supplement To Rule 59(e) Motion To Alter Or Amend Order, To Correct Factual And Legal Errors, And To Reconsider Legal Conclusions" and Petitioner's Additional Supplement To Rule 59(e) Motion To Alter Or Amend Order, To Correct Factual And Legal Errors, And To Reconsider Legal Conclusions" were mailed, first class postage prepaid, to counsel of Respondent, and Petitioner's counsel of record at the addresses listed below:

Jon Blevins
Assistant Prosecuting Attorney
Kanawha County Judicial Court Annex Bldg.
111 Court Street
Charleston, WV 25301

Lonnie C. Simmons, Esq.
410 Washington Street East-Suit 307
P.O. Box 3785
Charleston, WV 25337

John Moss III

409

# APPENDIX #1

410

Robert C. Murphy - Direct                         254

and Mr. Brown, Assistant Prosecuting Attorney for Kanawha

County.

    All right, where are we, gentlemen?

    MR. McKITTRICK:  The defense calls Mr. Murphy as a witness.

    THE COURT:  Come forward to be sworn.

- O -

ROBERT C. MURPHY,

      Being thereupon called as a witness, after

      being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

    Q    State your name please.

    A    Robert C. Murphy.

    Q    Bob, are you presently employed?

    A    Yes, sir.

    Q    Where are you employed?

    A    I am employed as a chemist at the Department of Natural

Resources Organics Laboratory at Guthrie.

    Q    Were you formerly employed as a chemist by the

West Virginia Department of Public Safety?

    A    Yes, sir, I was.

    Q    When were you so employed?

    A    September of '71 until October of '82.

    Q    Let me direct your attention to April, 1980.  Did you

Robert C. Murphy - Direct                                    256

1979, were consistent with the blood that you analyzed of John

Moss, III?

    A    Yes, sir.

    Q    And did you so testify before the January Term of the

grand jury on the 28th day of April, 1980?

    A    Yes, sir, I did.

    Q    Other than testifying to your analysis of John Moss,

III's blood before the January Term of the grand jury of Kanawha

County, West Virginia, did you testify to anything else

concerning the investigation of the Reggettz murders?

    A    My testimony was limited exclusively to the blood

samples.

    MR. McKITTRICK:  That is all the questions I have.

    THE COURT:  Cross?

    MR. STUCKY:  None.

    THE COURT:  All right, thank you, Mr. Murphy.  You may step

down.

    (Witness Excused.)

    MR. McKITTRICK:  At this time, Your Honor, the defense would

ask permission to approach the bench.

    THE COURT:  All right.

    THE COURT:  And would lodge with the Court a petition which

requests the Court's approval, confirmation and permission to

use or to have certain information disclosed from what has been

# APPENDIX #2

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

       Petitioner,

vs.             CIVIL ACTION NO. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,



       Respondent.

        The deposition of ROBERT MURPHY was taken on

the 17th day of May, 1995, beginning at 10:10 a.m., in the

Law Offices of DiTrapano & Jackson, 604 Virginia Street,

East, Charleston, Kanawha County, West Virginia, before

Penny L. Kerns, Notary Public and Certified Court Reporter,

for purposes of discovery and/or to be read as evidence in

the above-styled matter which is now pending and

undetermined in said Court.

GARRETT REPORTING SERVICE
"PROFESSIONAL STENOMASK FOR THE RECORD"

5208 GLOW DRIVE, CROSS LANES, WEST VIRGINIA 25313 • (304) 776-5303

414

2

APPEARANCES:     On behalf of the Petitioner:

LONNIE C. SIMMONS, ESQUIRE
  DiTrapano & Jackson
  604 Virginia Street, East
  Charleston, West Virginia  25301


On behalf of the Respondent:

MARY BETH KERSHNER, ESQUIRE
  Assistant Prosecuting Attorney
  for Kanawha County
  Judicial Annex
  Charleston, West Virginia  25301


*****************************************************


I N D E X

|                              | Examination by |              |
| Witness                      | Mr. Simmons    | Ms. Kershner |
| Robert Murphy                | 3              | 53           |

| Exhibit                      | Marked |
| Deposition Exhibit No. 1     | 16     |
| Deposition Exhibit No. 2     | 24     |

Reporter's Certificate  57, 58

John C. Moss, III vs. George Trent, Document 17-29   Filed 03/29/10   Page 67 of 117 PageID #: 4022
Warden of the WV Penitenti                                                    Robert Murphy
                                                                                    5/17/95

| Page 3 | Page 5 |
|---|---|

**Page 3**

1  (Witness sworn)
2  THEREUPON came
3  R O B E R T   M U R P H Y
4  called as a witness herein, who, having been first duly
5  sworn according to law, testified as follows:
6  EXAMINATION
7  BY MR. SIMMONS:
8  Q  Mr. Murphy, my name is Lonnie Simmons. I
9  represent John Moss, III. in a habeas corpus action here in
10  Kanawha County. I guess I've met with you once before.
11  The purpose of this deposition is to create a record in
12  connection with this habeas corpus proceeding. I usually
13  put on the record in these things that in habeas corpus
14  actions clients don't have an absolute right to be present
15  and my client is aware of that fact and so I've talked to
16  him and he knows that I'm doing this today, and my plan is
17  simply to get some information from you so we'll have it on
18  the record and this will become part of the record in a
19  habeas corpus action. Would you state your name for the
20  record, please?
21  A  Robert C. Murphy.
22  Q  Mr. Murphy, where are you currently
23  employed?

**Page 4**

1  A  CT & E Environmental Services in
2  Charleston.
3  Q  Okay. Now, how long have you been employed
4  by that company?
5  A  A little over seven years.
6  Q  Before we get the rest of your work history
7  with the state police, what's your educational background
8  as far as college and onward?
9  A  Bachelors degree in chemistry from Rutgers
10  University. I also attended the West Virginia University
11  Graduate School of Chemistry and Marshall University
12  Graduate School also in chemistry, a number of short
13  courses put on by professional organizations, the American
14  Academy of Forensic Sciences and the Southern Association
15  of Forensic Science.
16  Q  Okay. When you say you did some post-
17  graduate studies at Marshall and WVU in chemistry, did you
18  obtain any additional degree or were these just additional
19  classes?
20  A  No. It was the equivalent of a masters
21  degree, but I did not receive a masters degree. It was
22  about thirty-some hours.
23  Q  When were you first employed by the

**Page 5**

1  Department of Public Safety in West Virginia?
2  A  December of 1971.
3  Q  And in what capacity were you first employed
4  by the Department of Public Safety?
5  A  As a chemist. At that time, chemists were
6  considered generalists, which means you worked on anything
7  related to a particular case regardless of whether it was
8  drugs or soils or whatever.
9  Q  Hair? Could you do hair analysis?
10  A  Uh-huh. Whatever was involved in that case.
11  Q  Okay.
12  A  Three or four years later, the mid 70's,
13  started specialization where you would focus on one
14  particular area.
15  Q  What area did you focus on three of four
16  later?
17  A  Serology.
18  Q  So approximately from '74, '75 till when did
19  you focus exclusively on serology?
20  A  Pretty much.
21  Q  When did you leave the state police?
22  A  I left the state police in-- well, I
23  resigned October of '82, but I had been out of serology for

**Page 6**

1  approximately a year. There had been, let's see, one
2  resignation and one retirement, which left a void in the
3  drug analysis area and I shifted to fill in for that. So
4  it was about a year prior to my leaving.
5  Q  Did there come a time when you were the head
6  of the serology division of the state police?
7  A  Yes, sir.
8  Q  About what year did that happen?
9  A  It was never an official position.
10  Q  Okay.
11  A  I was the senior serologist, so I more or
12  less supervised.
13  Q  Do you know approximately when that would
14  have occurred that you more or less supervised the other
15  serologists?
16  A  Until 1976 when I believe Fred Zain was
17  hired, I was the only serologist, so there was no one to
18  supervise. At the time he was hired, basically I became
19  the supervisor.
20  Q  We'll get into that a little bit more.
21  When you-- What was the reason for leaving in October of
22  '82?
23  A  It was personal.

John Moss, III vs. George Trent,
Warden of the WV Penitentiary

Case 2:09-cv-01406  Document 17-29  Filed 10/29/10  Page 68 of 117 PageID #: 4090

Robert Murphy
5/17/95

Page 7

1    Q  Okay. Sometime after '82, did you start
2  working for the company you mentioned in the beginning?
3    A  Well, when I left the state police, I went
4  to work for the Department of Natural Resources as a
5  chemist and I was with them until March of 1988.
6    Q  Okay.
7    A  And then I left there to work for this
8  private commercial testing company.
9    Q  Okay. Well, during the time that you worked
10  for the state police, I take it you testified as an expert
11  in serology in a number of cases?
12    A  Quite a few. Yes, sir.
13    Q  During the time that you were there, you
14  were essentially the main serologist?
15    A  Yes, sir, I was.
16    Q  Okay. I think you mentioned that Fred Zain
17  was hired in 1976. At the time that Fred Zain was hired,
18  were there any other serologists besides yourself in the
19  department?
20    A  There was one other person who was not
21  actively doing it, but had been basically my trainer. That
22  was a Sergeant White, but he was not actively doing the
23  serology work.

Page 8

1    Q  So when Zain was hired in 1976 were the only
2  serologists in the department at that time you and Mr.
3  Zain?
4    A  Yes, sir. Uh-huh.
5    Q  Let's talk about the hiring of Fred Zain.
6  Were you involved in the decision to hire Fred Zain in any
7  way?
8    A  I believe I interviewed him, but that was
9  only to basically obtain my opinion as to whether he was
10  competent to do the work. I had no role in the actual
11  decision. I talked to him, I may have seen a resume, but
12  other than that, I mean, I didn't have a role in his
13  hiring.
14    Q  Do you have any recollection of the
15  interview with Mr. Zain and/or what your impressions were
16  at that time?
17    A  As best as I can remember, I felt he was
18  competent, that he was capable of doing the work. Other
19  than that, I have no details as to the interview.
20    Q  Do you recall making any kind of a
21  recommendation to the other persons involved in the hiring
22  process?
23    A  I probably expressed my opinion that I felt

Page 9

1  he was competent. Other than that, no.
2    Q  Did you have any knowledge at that time
3  about Fred Zain's educational background and his chemistry
4  background in particular?
5    A  No, sir. Like I say, I may have seen a
6  resume, but I didn't pay a whole lot of attention to it. I
7  might mention that the state police basically followed
8  civil service regulations where a person could be
9  classified as a chemist even if their degree were in some
10  other natural science, and for that reason, I didn't pay a
11  whole lot of attention to what his degree was.
12    Q  So beginning in 1976 when Fred Zain was
13  hired, I take it you supervised, generally supervised his
14  work?
15    A  Yes, I did.
16    Q  Do you have any general opinions about the
17  work performed by Fred Zain that you observed yourself?
18    A  My personal experience was, I had no
19  problems with his work. He was competent. He was a good
20  analyst.
21    Q  Okay. During the time that you supervised
22  Fred Zain's work, do you recall having any particular
23  arguments or disputes with him over the analysis in a

Page 10

1  particular case?
2    A  No, sir.
3    Q  Were you ever aware of any cases where Fred
4  Zain said that he saw a marker in a given test and you did
5  not see a marker in that test?
6    A  No, sir.
7    Q  Had you heard any of the stories about the
8  magic wand in the laboratory?
9    A  In the newspapers, but not-- I have no
10  personal knowledge. Just from what I've read.
11    Q  But not at the time you worked in the lab
12  with Mr. Zain, you hadn't heard of the magic wand?
13    A  No.
14    Q  Okay. I'd like to turn to the case that
15  we're dealing with here. I just wonder, sitting here
16  today, do you recall working on what I'll call the
17  investigation of the Reggettz murders?
18    A  Yes, sir.
19    Q  What's the first thing you can remember
20  about this case, your earliest memory of having any
21  involvement in the investigation of those three murders?
22    A  The fact that there had been three murders
23  and someone had to go to the crime scene to collect

417

John Moss, III vs. George Trent,
Warden of the WV Penitenti
Case 2:09-cv-01406 Document 17-29 Filed 10/29/10 Page 69 of 117 PageID #: 4991
Robert Murphy
5/17/95

## Page 11

1  evidence and it was determined that Fred Zain would be the
2  person that went actually to the scene. I might mention
3  the reason I remember this case is, it was an unusual
4  case.
5      Q  Can you recall if there is any particular
6  reason why Fred Zain went to the crime scene versus
7  yourself?
8      A  I can't recall how that decision was made,
9  but he was the one that was sent to the scene.
10     Q  Do you recall being involved in that
11 decision-making process?
12     A  Not really, no.
13     Q  Was it common for a serologist to go to the
14 scene of a crime and actually obtain the samples of
15 evidence to be tested later?
16     A  No, sir, not really.
17     Q  Other than this case, can you recall any
18 other examples of cases where the serologist went to the
19 scene of the crime to obtain the samples?
20     A  Yes, sir. I can recall one case in which I
21 was sent to Martinsburg to obtain samples from a vehicle.
22 There was also a fingerprint examiner that was sent at the
23 same time.

## Page 12

1      Q  What was it about the Martinsburg case you
2  just mentioned that someone decided they wanted you to go
3  there in person?
4      A  I really can't say. I mean, it was-- I was
5  told I was going and that was-- I didn't have any say in
6  the matter.
7      Q  Sure. Okay. As a serologist, were you
8  trained in how to obtain evidence from the scene of a
9  crime?
10     A  Not specifically. I was trained on how to
11 basically preserve samples, how they were to be handled,
12 but as far as what samples were to be taken, no.
13     Q  Okay. Are you aware of whether or not Mr.
14 Zain at that time, and this would have been in December of
15 1979, had had any training in the procedure for obtaining
16 evidence at the scene of a crime?
17     A  Probably not. I think that at that time
18 period a lot of this was what I would call common sense.
19 You basically chose the samples based on what you perceived
20 to be important and then you took whatever precautions were
21 necessary to make sure that the integrity of those samples
22 was maintained. As far as formal training in collecting
23 evidence, I don't recall any training at all.

## Page 13

1      Q  Let me just focus on one thing about the lab
2  at that time, and we're talking about around December of
3  1979. Did the laboratory at that time have any written
4  protocol on laboratory procedures, first of all?
5      A  No, sir.
6      Q  Okay. And how about any written protocol on
7  obtaining evidence at the scene of a crime?
8      A  No, sir.
9      Q  Did they have any written protocol on
10 anything at that time--
11     A  No, sir.
12     Q  December of '79?
13     A  No, sir.
14     Q  So the lab at that time essentially didn't
15 have any written protocol about how serological tests, hair
16 tests, any tests you can think of, there simply was no
17 written protocol?
18     A  No, sir.
19     Q  Okay.
20     A  That was a concept that was coming into
21 place but was not in place. In the early '80s that came
22 into place, but up till that point, the general procedure
23 was, you followed generally accepted procedures, but not

## Page 14

1  necessarily anything written down, just what was considered
2  generally accepted in a forensic laboratory, and it was
3  unwritten but well understood among forensic chemists, not
4  necessarily anyone else, but it was pretty much understood
5  among forensic chemists what was acceptable and what was
6  not.
7      Q  Did the laboratory at that time-- and again,
8  this is December of 1979-- did it have any procedure for
9  routinely testing the various materials used in serological
10 testing to make sure that, in other words, sort of a
11 quality control type, quality control/quality assurance
12 kind of a program, was there any kind of program like that
13 in place at that time?
14     A  No, sir.
15     Q  Okay. Do you know if at that time, December
16 of 1979, that the lab did test the materials that were used
17 in serological testing, for example, to ensure the quality
18 and that sort of thing?
19     A  Not the materials themselves. There was
20 indirect testing in that known blood samples, that was from
21 members of the criminal identification bureau donated blood
22 samples and they were tested routinely. They were the
23 standards that were used. If there had been a problem with

418

John Moss, III vs. George Trent,
Warden of the WV Penitenti

Multi-Page

Robert Murphy
5/17/95

Page 15

1 the materials, the chemicals, then it would have shown up
2 in those tests. But as far as separate testing, it was not
3 done.
4     Q  I take it you did not go to the crime scene
5 when Fred Zain went to obtain evidence samples; am I right
6 about that?
7     A  You're correct about that.  I did not go.
8     Q  When Fred Zain came back to the lab and this
9 is again, we're talking-- let me make sure I'm right here,
10 around December 13th and 14th of 1979, and let's say he
11 started bringing stuff back to the lab, do you recall any
12 discussions you had with Mr. Zain at that time?  I
13 obviously understand a whole heck of a lot of time has
14 passed, but I'm just asking if you recall any conversations
15 you may have had with Mr. Zain when he returned from the
16 crime scene?
17     A  Not specifically, no.  I'm sure there was
18 some discussion, but I have no idea what it might have
19 been.
20     Q  Would you have any knowledge as to whether
21 or not Mr. Zain used rubber gloves and things like that
22 when he was at the crime scene obtaining these samples?
23     A  No, sir, and I can't recall what samples he

Page 16

1 may have taken as opposed to the fingerprint examiners and
2 medical examiner.  There were quite a few people at the
3 crime scene and I have no idea who collected what.
4     Q  Do you have any knowledge about the
5 procedures that Fred Zain followed when he obtained those
6 samples from the crime scene?
7     A  No, sir.
8     Q  Were you aware of how he packaged those
9 samples at the crime scene?
10     A  No, sir.
11     Q  Let me have an exhibit marked here.  I'll
12 tell you what I've done just so you'll understand.  I've
13 copied the documents that were produced, that Ted Smith, I
14 guess, got off the microfiche, and I've had them Bates
15 numbered because at some point I'm going to have Mr. Murphy
16 identify which ones he thinks he wrote and which ones he
17 didn't, so I was going to have this marked as Deposition
18 Exhibit 1 and here's your own copy with the Bates number at
19 the bottom.
20         (WHEREUPON, the document referred
21         to was marked for purposes of
22         identification as Deposition Exhibit
23         No. 1 and is attached hereto.)

Page 17

1 BY MR. SIMMONS:
2     Q  For the time being, if you would just maybe
3 kind of glance through that and we'll be more specific as
4 time goes on, but I was actually going to ask you a couple
5 of questions about the report.
6     A  (Witness examines document.)
7     Q  Now, have you had a chance to just generally
8 glance at the report?  I know there are some other
9 documents there, but we'll get into more detail here
10 shortly.  I had some preliminary questions before I started
11 asking you some specifics about that.
12         Once these items that were collected at the
13 crime scene were brought back to the laboratory, do you
14 recall who was involved in performing serological tests on
15 the various items recovered?
16     A  To the best of my recollection, I was
17 involved in most of the testing.
18     Q  Okay.
19     A  I don't know that I saw-- that I did
20 everything, but I did see all of the results.
21     Q  Who else would have been involved in the
22 testing?
23     A  Fred Zain.

Page 18

1     Q  And maybe-- I think beginning in this
2 Deposition Exhibit No. 1, beginning, it's the Bates number
3 four, is the first sheet of a report dated June 10, 1980.
4 Do you have a general recollection of doing that report
5 yourself?
6     A  To the best of my recollection, I did write
7 the report.
8     Q  I've got a general question about the
9 procedures in the laboratory.  What is the significance of
10 the date June 10th, 1980?
11     A  That should have been the date of the
12 report.  The date it was issued.
13     Q  Let me ask you this.  Would that be the date
14 that someone in the secretarial pool typed it out or would
15 that be the date you actually maybe wrote a handwritten
16 version and then it was typed out?
17     A  I can't remember.
18     Q  You don't know?
19     A  No.
20     Q  Okay.  Is it possible there's some sort of
21 delay between when you wrote the report in your own
22 handwriting and it being typed out?
23     A  There is a possibility, yes.

John Morris, Asst. Warden of the WV Penitentiary

Case 2:09-cv-01406 Document 17-29 Filed 08/29/10 Page 71 of 117 PageID #: 5683

State vs. George Treacy

Medical Murphy

5/17/95

## Page 19

1   Q Okay. On page, and I'm referring to the
2 Bates number, it's page two of the report, Bates number
3 five.
4   A Uh-huh.
5   Q It lists items one through seventeen and
6 then it says, "The above items were recovered from the
7 scene by Trooper F.S. Zain 12/13/79."
8   A Uh-huh.
9   Q Would that date-- so that's the date it was
10 recovered. Do you have any knowledge as to when you would
11 have received those in the laboratory or is that just not
12 shown in your report?
13   A They would have been received in the
14 laboratory the same day.
15   Q Okay. Then on down on that same page, this
16 is Bates number page five, page two of the report.
17   A Uh-huh.
18   Q It talks about a blood specimen from Vanessa
19 Reggettz and a nightgown. "The above items were received
20 from Trooper M.D. Smith 12/14/79." When it says received,
21 does that mean received at the lab?
22   A Yes.
23   Q Then down on the same page after listing it

## Page 20

1 looks like a lot of clothing, "The above items were
2 received from Trooper Terry Williams 12/14/79." So the lab
3 would have had those pieces of clothing on that date?
4   A That's correct.
5   Q Then the next one, the blood specimens from
6 Paul Eric Reggettz and Bernadette Reggettz, those were
7 received on 12/17/79?
8   A That's correct.
9   Q Turn to the next page. There are some
10 items, a Christmas package and a flashlight. It says,
11 "Received on 12/18/79."
12   A That's correct.
13   Q That means the lab received it then?
14   A The chemistry lab. Corporal Shumate was a
15 fingerprint examiner and he probably collected those items
16 himself.
17   Q Okay.
18   A And did his examination and then turned them
19 over to the chemistry lab.
20   Q By the way, before I pass this by, I guess
21 starting on the first page of the report that was on the
22 microfiche, there's some handwriting on the report and I
23 just wondered if you recognized that handwriting? Do you

## Page 21

1 see where it says, "VR"? It's to the left of those item
2 numbers.
3   A No, sir.
4   Q Is that your writing?
5   A No, it isn't.
6   Q Okay. Then following-- let me see. I
7 think we already talked about the flashlight from Shumate.
8 There's a blood specimen from Paul Reggettz, III, that was
9 received on January 2nd of '80?
10   A Uh-huh.
11   Q The next items are a doll and table knife
12 and some clothing that was received on January 17th of
13 '80?
14   A Right.
15   Q And there's something written above that.
16 Do you recognize that writing?
17   A No, sir, I don't.
18   Q Do you know-- can you read that? I'm not
19 sure I can read that middle word.
20   A No, sir.
21   Q It's looks like 1/7/80 and then there's a
22 word and then 3/11/80. Do you not have any idea what that
23 means?

## Page 22

1   A No, sir.
2   Q Okay. Next there's a list of names and
3 apparently blood samples were obtained from them and
4 received in the lab in January of 1980. I was wondering
5 what information do you have as to why blood specimens were
6 obtained from those individuals?
7   A Okay. Since I talked to you the first time,
8 I've thought about that a great deal. When the laboratory
9 determined that someone else had been in that house, I hate
10 to put it this way, but basically the state police went on
11 a fishing expedition and rounded up a number of people in
12 that area that were possible suspects and obtained blood
13 samples from them to see if any of their blood specimens
14 matched what was found in the house. They did not, but I
15 mean, that's the reason for those samples.
16   Q Do you recall any of the specifics as to why
17 one name was on there versus another?
18   A No, sir. They were just submitted to the
19 laboratory as potential suspects and we examined them and
20 ruled them out.
21   Q Okay. The next item is stainless flatware
22 that's also from Shumate and that's February 6th of '80.
23 So is it possible that he tried to do fingerprint on that

420

John Moss, III vs. George Trent, Warden of the WV Penitenti

Case 2:09-cv-01406   Document 17-29   Filed 10/29/10   Page 72 of 117 PageID #: 4094

Robert Murphy
5/17/95

Page 23

1  and then he gave it to your lab?

2      A  Yes, sir.

3      Q  Then there are some additional, it looks
4  like clothing items that were received February 7th of '80,
5  and that means the lab received those February 7th of '80?

6      A  That's correct.

7      Q  Okay.  And I think the final items submitted
8  are two tubes of blood from John Moss and that's April 22nd
9  of '80?

10     A  That's correct.

11     Q  Do you recall testifying before the grand
12 jury, which resulted in the indictment of Paul Reggettz,
13 III, I think it is?

14     A  Again, since talking to you, I've thought
15 about that a great deal.  The best of my recollection is, I
16 have only testified before one grand jury and I believe
17 that was for John Moss.  I had nothing in the way of
18 physical evidence to connect Paul Reggettz to this case, so
19 I would not have testified in the grand jury.

20     Q  I understand a lot of time has passed by and
21 I've found something since I met with you that might help
22 refresh your recollection.  I've got a couple of things
23 here.  Let's see.  I would like to have this marked as

Page 24

1  Deposition Exhibit Number 2, please.

2          (WHEREUPON, the document referred
3          to was marked for purposes of
4          identification as Deposition Exhibit
5          No. 2 and is attached hereto.)

6  BY MR. SIMMONS:

7      Q  And ask that you look at that document.

8      A  (Witness examines document.)

9      Q  And particularly note the bottom of the
10 second page.

11     A  As I stated, I had no physical evidence
12 connecting Paul Reggettz with this case.  There was some
13 evidence obviously connecting John Moss.  If I testified
14 before the grand jury, it was in relationship to John Moss
15 not to Paul Reggettz.

16     Q  Okay.  Let me ask you this.  I guess the
17 reason why I'm asking, we have not been able to find the
18 grand jury transcript from the grand jury which indicted
19 Mr. Reggettz and you might also note that on the first page
20 of Deposition Exhibit Number 2, John Moss's name is
21 mentioned in the indictment of Mr. Reggettz, but he's not
22 indicted.  I guess what I'm trying to find out from you, do
23 you have any recollection of testifying before the grand

Page 25

1  jury which indicted Mr. Reggettz?

2      A  It may have been the same grand jury, but I
3  had no testimony related to Mr. Reggettz.

4      Q  Just to make it clear.  I'd like to show
5  you-- you testified-- let me see what the date of this one
6  is-- on September 19th, 1983, and this is in-- this is the
7  suppression hearing in the John Moss case before his first
8  trial, and I would bring your attention to pages I think
9  two fifty-five and two fifty-six, I think you'll see, and
10 just see, if you'll look at that, see if that refreshes
11 your recollection at all.

12     A  (Witness examines documents.)  Well, that
13 was the grand jury.

14     Q  Does that refresh your recollection?

15     A  Again, to me it indicates that my testimony
16 before the grand jury had no relationship to Paul Reggettz.
17 It was related to John Moss.  I don't know if this is on or
18 off the record, but once there was an inconsistency found
19 in the blood sample that indicated someone else had been in
20 the house, the state police were still convinced that Paul
21 Reggettz was involved and they were basically looking for a
22 second party, an accomplice in effect.

23         John Moss met the criteria for an

Page 26

1  accomplice, but that did not exonerate Paul Reggettz.  If
2  the grand jury was looking at both people, as I said, there
3  was no physical evidence connecting Paul Reggettz to the
4  crime.  So when I appeared before the grand jury, I would
5  have had nothing to say regarding Paul Reggettz.  It was
6  only John Moss that I had any physical evidence that
7  connected him.

8      Q  Just so we make it clear, I think you stated
9  that you, during the whole time you worked for the state
10 police, you only testified before a grand jury on one
11 occasion?

12     A  The best as I can remember, yes, sir.

13     Q  And that would be--

14     A  That would be this one.

15     Q  -- this one particular case?

16     A  Uh-huh.  I stated earlier this was an
17 unusual case because the investigating officers, because
18 they had a confession and because Paul Reggettz's behavior
19 was unusual, were convinced that they had the right person
20 and the physical evidence indicated someone else was
21 involved either totally or partially, and there was some
22 resistance on the part of the investigators to pursue that
23 because they would have rather explained it away than

Page 27

1  pursue it because they felt they had the right person.

2  Q  Can you recall the names of these people

3  that you're calling the investigators or the investigating

4  officers?  Can you identify who those people may have

5  been?

6  A  You've handed me some documents that could

7  give me some names.  I don't want to say I recall that.

8  The South Charleston detachment commander was the principal

9  contact, but there were people working under his

10  supervision that were actually doing the investigation.

11  Having the seen the documents, I do recall

12  Terry Williams as being one of the investigators.  Again,

13  the best I can recall, the South Charleston detachment

14  commander was Corporal Cook and there were several Cooks

15  so-- but there was some discussion back and forth about

16  what evidence was and what it meant and what needed to be

17  done and basically, as I said, there was some resistance to

18  pursue this matter because they felt they had the right

19  person.

20  And this puts me in an awkward position

21  because I was a member of the state police.  I'm not

22  putting them down.  They basically were following their

23  instincts that they had the person and the laboratory was

Page 28

1  producing contradictory evidence that said maybe you do and

2  maybe you don't, and they wanted to believe that they were

3  right so--

4  Q  Did they ever-- do you recall any of the

5  people involved in the investigation ever questioning any

6  of your results or did they come up with any other kinds of

7  theories to explain them away?

8  A  Yes.  Again, the detachment commander of

9  South Charleston tried to explain away our results by

10  trying to say that Paul Reggettz had planted blood at the

11  scene to throw us off the track and again, it was well

12  intentioned.  They thought they had the right man and they

13  were trying to explain away the inconsistencies, and I

14  won't say it was a heated discussion, but it was a little

15  agitated, and we tried to say that no, we didn't believe

16  that, someone else was in that house, and we wouldn't buy

17  their trying to explain it away.

18  On the Christmas wrapping paper, in

19  particular, which to this day to me is the key piece of

20  evidence, there was a very distinct drop of blood and it

21  would be difficult to plant that.  I mean, you could smear

22  it, you could do a lot of things, that didn't look like

23  anything other than what it appeared to be.  Someone was

Page 29

1  cut, they bled and a drop of blood fell on that paper, and

2  it would be difficult to plant that so--

3  Q  Let me ask you this.  When the evidence from

4  the crime scene was brought back to the laboratory, are you

5  saying that the lab had the actual items such as the

6  wrapping paper as opposed to having some swatch which had

7  absorbed the blood from the wrapping paper?

8  A  No, we had the actual wrapping paper.

9  Q  Okay.  So when the analysis was performed,

10  you had in the laboratory the actual wrapping paper?  Maybe

11  there was a knife and some of the other items, you had the

12  actual item itself?

13  A  Yes, sir.

14  Q  Well, as far as you can recall, were any of

15  the blood stains obtained at the crime scene placed on

16  swatches as opposed to actually bringing in the item of

17  evidence itself?

18  A  Not that I can recall.  They were the actual

19  items.

20  Q  When-- let me ask you this.  At-- this is

21  again back in December of 1979.  Did the laboratory have

22  any kind of cataloging of types obtained in other cases?

23  In other words, let me try to illustrate that.

Page 30

1  A  A data base?

2  Q  A data base, yeah.  If you got say a PGM 1+

3  and an ABO B, did you have a way of looking through your

4  files and saying, "Well, hey we got this from this case"?

5  A  No.  That was something that was under

6  consideration, but was not in place.

7  Q  So when you received the reference sample of

8  blood from John Moss on April 22nd, 1980, the lab did not

9  previously have any knowledge whatsoever of any of his

10  types from any source?

11  A  As far as I can recall, no.  I mean, we did

12  not have a data base that we could reference.

13  Q  How about if Mr. Moss was incarcerated in

14  another state?  I guess what I'm wondering is whether or

15  not your lab had contacted the other state to find out if

16  they had done any blood testing?  In other words, I'm

17  trying to find out if you had any knowledge of his blood

18  types before you received that reference sample?

19  A  As far as I can recall, the laboratory never

20  contacted any other state and should not have had any

21  reference to what his blood typing was.

22  Q  Okay.  Let's just-- so I can get this part

23  out of the way, let's turn in Deposition Exhibit Number 1

John Moss, III vs. George Trent, Warden of the WV Penitentiary

Case 2:09-cv-01406 Document 17-29 Filed 10/29/10 Page 74 of 117 PageID #: 4096

Multi-Page

Robert Murphy
5/17/95

Page 31

1  to it's Bates number ten, and what I'd like to do is have
2  you look at that and determine if you recognize the writing
3  on Bates number page ten?
4      A That is mine.
5      Q Okay. Maybe for purposes of this
6  proceeding, if you would-- I'll give you a pen-- if you
7  would write just "Murphy" at the bottom of that page and
8  that way we'll be able to keep these straight.
9      A (Witness complies.)
10     Q Okay. Now, what would-- the fact that this
11 particular document is in your writing--
12     A Uh-huh.
13     Q -- what is the significance of that other
14 than the fact that you wrote it?
15     A This basically is a compilation of all the
16 parties involved or potentially involved and a summary of
17 all the blood groupings. Just a tabular way of excluding
18 people or including people.
19     Q Would this sheet in your handwriting
20 indicate that you had performed all of those tests or does
21 that not indicate that?
22     A Not necessarily.
23     Q Okay.

Page 32

1      A But, as I stated earlier, I would have seen
2  the results.
3      Q And would you say that-- I think you
4  described this as a compilation. So this is a compilation
5  sheet as opposed to being the original, what I call the raw
6  data sheet that was filled out when the testing was
7  actually done; would that be correct?
8      A That is a fuzzy area because the way of
9  keeping notes was in transition. It is possible that this
10 is the actual bench sheet where things were recorded here,
11 but it's also possible this is a summary sheet and there
12 were other sheets for individual tests. I can't recall.
13     Q In the first column across before you have
14 the names listed, in other words, the column that is on top
15 of the column where the names are, it looks like it says
16 "JAN"; is that correct, or does that have any meaning to
17 you?
18     A Probably just January.
19     Q And going from left to right, what does that
20 first column-- do you know what that word is? I know it's
21 very, very hard to see. I just didn't know if you might
22 recall from the sheets what that first column is for.
23     A No, sir.

Page 33

1      Q Okay.
2      A In the initial setup of serology, there were
3  separate tests for determining whether a sample was blood
4  and a second examination to determine if it was human
5  blood.
6      Q Okay.
7      A When all of the enzymes and proteins were
8  added, those became pretty much irrelevant, and possibly
9  those two columns are whether it is blood and whether
10 it is human, but I'm just guessing.
11     Q Okay. Let's go ahead and go to Bates number
12 page eleven and I'd ask you to first of all let me know if
13 you-- first of all, is that in your handwriting?
14     A No, sir, it is not.
15     Q Do you recognize whose handwriting
16 that is?
17     A No, sir.
18     Q Would you-- well, let me put it this way.
19 Only you and Fred Zain performed the serological testing in
20 this case; that is correct, isn't it?
21     A I'm not certain of that. There were two
22 other serologists and I can't recall when they were hired
23 and whether they were present at the time. That was Lynn

Page 34

1  Inman and Gale Midkiff, and I'm not sure if they were there
2  at the time or not. They may have been.
3      Q Okay. So--
4      A But probably on this case the work was done
5  by myself or Fred Zain.
6      Q Do you have any specific recollection of
7  Inman or Midkiff performing work in this case?
8      A No, sir.
9      Q Well, how about on this sheet, simply put
10 "Not Murphy." That way we'll distinguish between what
11 you're actually able to identify and what you're not.
12     A (Witness complies.)
13     Q Okay. And let's go to Bates number page
14 twelve, and it looks like at the top half of the page
15 there's writing that's different from the bottom half of
16 the page, and I wonder first of all, do you recognize any
17 of the writing on that page as being your writing?
18     A The bottom half is mine.
19     Q The one that's in print?
20     A Uh-huh.
21     Q And the top half is not yours?
22     A No, it isn't.
23     Q And again, you don't have any recollection

423

John Moss, III vs. George Trent, Warden of the WV Penitent...    Multi-Page™    Robert Murphy
5/17/95

Case 2:09-cv-01406   Document 17-29   Filed 10/29/10   Page 75 of 117 PageID #: 4097

Page 35

1 as to whether or not this is a compilation based upon raw
2 notes or if this actually is the raw notes?
3    A  No, sir.
4    Q  Let me ask you this. Since the top half of
5 that page is in someone else's handwriting other than
6 yourself, do you take it from looking at this sheet that
7 somebody else performed the examination of those items
8 listed on the top of that page?
9    A  Probably.
10    Q  Maybe on this sheet, you should put "Bottom
11 Murphy," maybe would be a way to distinguish.
12    A  (Witness complies.)
13    Q  Turning to Bates number thirteen, do you
14 recognize any of that as being your handwriting?
15    A  No, sir.
16    Q  Okay. Why don't you just write "Not Murphy"
17 on that?
18    A  (Witness complies.)
19    Q  Then on Bates number fourteen, which is a
20 copy of, I think if you'll look at it, it's the back-side
21 of Bates number thirteen. Do you see the initials "FSZ" on
22 the top of that page?
23    A  Yes, sir, I do.

Page 36

1    Q  And that stands for Fred Salem Zain?
2    A  Right.
3    Q  So obviously this would be a page that you
4 ought to put "Not Murphy" on, I assume; right?
5    A  Uh-huh.
6    Q  Okay. And it looks like Bates number
7 fifteen, sixteen, seventeen, eighteen. It looks like it's
8 the handwritten version of the typed report?
9    A  That's correct.
10    Q  And that is your handwriting?
11    A  Yes, sir.
12    Q  So if you wouldn't mind, if you'd write
13 "Murphy" on those particular pages, please?
14    A  (Witness complies.)
15    Q  I think we can skip a few pages. There are
16 some case submission reports that it looks like Inman
17 received something, so she was there at least in January of
18 '80.
19    A  Okay. I kind of thought that Inman and
20 Midkiff were there, but--
21    Q  Okay. Well, let me ask you this. You
22 mentioned that you reviewed the results. Do you recall
23 reviewing the results of any serological testing in this

Page 37

1 case performed by any person other than yourself or Fred
2 Zain?
3    A  I can't recall.
4    Q  So you think it's possible that some of the
5 work may have been done by Inman and Midkiff in this case?
6    A  It's possible.
7    Q  Okay.
8    A  Again, to the best of my recollection, I saw
9 the results.
10    Q  But you do specifically recall reviewing
11 some serological testing in this case that was performed by
12 Fred Zain?
13    A  Yes, sir.
14    Q  Let's see. I think there are some other
15 sheets near the back here that we probably ought to have
16 identified.
17        MS. KERSHNER:  Thirty-five?
18    BY MR. SIMMONS:
19    Q  Yeah, if you would turn to Bates number
20 thirty-five.
21    A  Thirty-five?
22    Q  Yeah. And I'd ask you, is that your
23 handwriting?

Page 38

1    A  No, sir.
2    Q  Okay. If you would just write "Not Murphy"
3 on there, please?
4    A  (Witness complies.)
5    Q  And also thirty-six.
6    A  Thirty-six.
7    Q  Would you also say that's not Murphy?
8    A  That's not Murphy.
9    Q  Okay. The next document, Bates number
10 thirty-seven is some kind of a map. Were you involved in
11 drawing that diagram? Not a map, but a diagram.
12    A  No, sir.
13    Q  Do you know who did?
14    A  No, I don't.
15    Q  We won't mark anything on that one. How
16 about Bates number thirty-eight? Is that your writing?
17    A  No, sir.
18    Q  Okay. Why don't you go ahead and write "Not
19 Murphy" on there?
20    A  (Witness complies.)
21    Q  In looking at that sheet, does that have any
22 significance to you? Can you understand what that person
23 was doing?

424

John Moss, Jr. vs. George Trent, Warden of the WV Penitenti

Case 2:09-cv-01406 Document 17-29 Filed 10/29/10 Page 76 of 117 PageID #: 4098

Multi-Page

Robert Murphy
5/17/95

Page 39

1    A Not really.
2    Q Okay. Let's see here. I guess the final
3 group of documents I'd just like to see if you've seen
4 before. Starting with forty-one, forty-two, forty-three,
5 forty-four, forty-five and forty-six, do you recognize
6 those documents at all? Not necessarily the writing, but
7 just those document?
8    A No, sir, I don't.
9    Q Does it even look familiar as maybe a way of
10 maintaining the chain of custody, anything like that?
11    A It appears to be a summary of the custody of
12 evidence, but I don't remember this.
13    Q Okay. I think we're going to be done with
14 those documents for the time being. Once you obtained the
15 blood types from Vanessa Reggetz, Paul Eric Reggetz and
16 Bernadette Reggetz, isn't it true that you could deduce
17 what the types of Paul Reggetz, III, as the father would
18 be, presuming he's the natural father?
19    A Not necessarily specifically, but within a
20 certain category, yes, and the conclusion was that there
21 was blood at the crime scene that either Paul Reggetz, Sr.
22 was not the father of those children or someone else was
23 there, and it was the laboratory that requested the sample

Page 40

1 of blood from Paul Reggettz.
2    Q Was the main purpose for getting the blood
3 sample from Mr. Reggettz to essentially establish that he
4 was in fact the natural father?
5    A It was more to determine who the unknown
6 blood came from. The assumption was that he was the
7 natural father, but that was not the primary purpose. The
8 primary purpose was to determine-- here we have an unknown
9 blood sample. It doesn't match any of the three victims.
10 It's got to belong to someone, so test Paul Reggettz first.
11 If it matches, okay, and if doesn't, then start looking for
12 someone else.
13    Q Do you-- well, maybe this will-- let me just
14 ask you a couple of questions here. I think based upon the
15 testing in this case and your report and the various
16 documents, various tables were made of the blood types that
17 were obtained and this has been included in the petition
18 for writ of habeas corpus and let me see if I can find a
19 specific example of-- and it might help you to look at
20 these, but I just wondered if, were there any types-- let
21 me start over again. You mentioned that by knowing the
22 types of the mother and the two children, you can
23 essentially deduce the range of types that the father would

Page 41

1 have to have?
2    A That's correct.
3    Q Do you recall if you had found any types at
4 the crime scene that could not have been deposited by the
5 natural father under these facts?
6    A Right.
7    Q And I wonder if maybe you know off the top
8 of your head or if you'd like to look through it, if you
9 can point me out an example.
10    A Well, the Christmas wrapping paper was the
11 one that stood out as not being consistent.
12    Q Okay.
13    A And that sample was the one that prompted us
14 to ask for a sample of Paul Reggettz's blood to begin with,
15 because, as I said, either someone else was there or he was
16 not the natural father.
17    Q Just for purposes of illustration, on page
18 eleven of the petition I've got listed the types that were
19 obtained from the Christmas wrapping paper and then on page
20 eight of the petition, I have the table of the known types
21 from, you know, the various reference samples. I wondered
22 if you could just explain and illustrate what type you
23 found from the Christmas wrapping paper that you knew could

Page 42

1 not have been deposited by the natural father? And I don't
2 know if you can do that or not. but if you would look at
3 those.
4    A It's been fifteen years.
5    Q Sure. I understand that.
6    A (Witness examines document.) In particular
7 the ESD, the esterase. For each of these people to have a
8 one, it means both parents had to be a one, because it's
9 basically one/one. The Christmas wrapping paper was a
10 two/one and known of the members of the Reggettz family had
11 the two to contribute, so the two/one had to come from
12 someone else.
13    Q Okay.
14    A Now, there maybe some others, but--
15    Q That's a good example. I just wanted to
16 illustrate that.
17    A Okay.
18    (WHEREUPON, a discussion was held
19    off the record.)
20    BY MR. SIMMONS:
21    Q I'd just like to ask you the final part,
22 just some general questions to make sure I understood what
23 your thought process was in interpreting the samples you

425

John Moss v. George Trent Robert Murphy
Warden of the WV Penitent' 5/17/95
Case 2:09-cv-01406 Document 17-29 Filed 10/28/10 Page 77 of 117 PageID #: 4099

**Page 43**

1 obtained and the statistics that you came up with. In this
2 case, what was the purpose for obtaining reference samples
3 from Vanessa Reggettz, Bernadette Reggettz, Paul Eric
4 Reggettz and Paul Reggettz, III?
5     A There were blood stains at the scene and
6 basically the purpose was to try to account for all of the
7 blood stains there and attribute them to a particular
8 person or group of persons. This was a fairly common
9 procedure at crime scenes and basically you try to
10 reconstruct what happened. In other words, it sounds a
11 little crude, but who bled where, and you can sometimes
12 tell a sequence of events by doing that. So it was a
13 routine practice to try to attribute blood stains in
14 various areas of the crime scene with various people and
15 that, like I say, was routine procedure.
16     Q Okay. Is one purpose for obtaining
17 reference samples to compare those known types with the
18 types you obtained from the scene where you don't know who
19 deposited the particular blood sample?
20     A Right.
21     Q What analysis did you use to account for the
22 possibility-- well, strike that. Let me do it this way.
23 Based upon your training and experience with serological

**Page 44**

1 testing, you were aware of the fact that this kind of
2 serological testing is unable to distinguish between a
3 mixture of blood from two different sources and blood from
4 one source?
5     A No, sir.
6     Q You disagree with that?
7     A I disagree with that.
8     Q So it's your-- based upon your understanding
9 and expertise, this kind of what I always call it is basic
10 serological testing, is able to distinguish between a
11 mixture of blood from two different samples; is that
12 correct?
13     A You're biasing the question because there's
14 more involved than just the test itself. You have to look
15 at the source of the sample. In other words, as I stated,
16 on the Christmas wrapping paper, there was a discreet drop
17 of blood. Now, if that had been a smear, then there would
18 have been the possibility that that smear was more than
19 one. But a discreet drop is invariably a single source.
20     So taking that into account, along with the
21 test results and again, a mixture would indicate-- well,
22 there would be variability in the test result in that if
23 you had two bloods mixed together, unless they were exactly

**Page 45**

1 fifty/fifty, that the activity demonstrated in the exam
2 would not be equal. So you would see in the pattern
3 exhibited, you would see an inconsistency in the intensity
4 of the bands produced. And that would indicate that you
5 had a mixture. Not proof, but there would be an
6 indication.
7     When I said you're biased, you have to
8 consider not only the test result, but the source of the
9 sample you used and when there is, as I said, a discreet
10 drop of blood, then you're pretty well assured that that is
11 a single source.
12     Q Let me go back to the question. I
13 understand you have some other theories, or rather
14 explanations or whatever and I'll be glad to get into that,
15 but I just wanted to start with, the first question is,
16 looking at the testing alone and the types that are
17 obtained--
18     A Huh-uh.
19     Q -- can basic serological-- will you agree
20 with me that using basic serological testing, you cannot
21 distinguish between a mixture of blood from the source or
22 whether it came from a single source?
23     A No, sir.

**Page 46**

1     Q Okay. So you still disagree with that,
2 even without this other explanation that you have, where
3 you have to go beyond that? So you're saying, for example,
4 if I had a tube of blood from you and I had a tube of blood
5 from myself and I put them in a flask and I shook them up
6 and I poured it at a crime scene and you tested it, if you
7 strictly did serological testing, you would be able to
8 separate my blood from your blood?
9     A I wouldn't say I could distinguish them, but
10 I would recognize that it was not a single source and I'm
11 talking as a very experienced serologist.
12     Q You would recognize it was not a single
13 source because of the variations in the intensity of the
14 bands?
15     A Uh-huh.
16     Q Okay. Using my illustration again-- let's
17 use my illustration again. Let's say you only did ABO
18 testing and let's say that you and I are both ABO O, how
19 would you distinguish between our bloods under that
20 circumstance?
21     A No way.
22     Q You wouldn't be able to do that?
23     A No, sir.

426

Case 2:09-cv-01406  Document 17-29  Filed 10/29/10  Page 78 of 117 PageID #: 4100
John Moss, III vs. George Trent,
Warden of the WV Penitentiary

Multi-Page

Robert Murphy
5/17/95

Page 47

1 Q So the only way that you would be able to
2 distinguish using basic serological testing is if the
3 particular typing system you're using, we differ under that
4 system; would that be correct?
5 A That's correct.
6 Q Is it your opinion under that illustration I
7 gave you, that there would necessarily be a difference in
8 the intensity of the bands?
9 A Unless the mixture was exactly
10 proportionate, there would be a difference in the
11 intensity. So, I'm not ruling out the possibility that it
12 could be deceptive, but I'm saying it would take
13 extraordinary circumstances.
14 Q Okay.
15 A Under normal conditions, a mixture which
16 would not be exactly proportionate, you would see a
17 difference in the intensity of the bands.
18 Q Let's just stick with that illustration.
19 Let's say that you and I, under that illustration, had the
20 same ABO type O, but I'm PGM 1+ and you're PGM 2+. Under
21 that scenario, if you tested this blood that was mixed
22 together and placed on the carpet, you would anticipate
23 when you did the PGM test seeing a band that demonstrated a

Page 48

1 1+ and a band that demonstrated a 2+; would that be
2 correct?
3 A Uh-huh.
4 Q And depending on the amount of the mixture,
5 you would anticipate seeing a variation in the intensity?
6 A That's correct.
7 Q Let's say that you see a variation in the
8 intensity of the bands. How would you report those
9 results?
10 A I can't recall having experienced that, but
11 it would have to be reported as a two/one, but qualified as
12 being abnormal.
13 Q So it's possibly you have two/one, it's
14 possibly a 2+ mixed with a 1+?
15 A Correct.
16 Q All right.
17 A As I said, qualified. In other words, it
18 could be this, it could be this, it could be this. There's
19 no way to determine it.
20 Q Okay. You know, in your explanation you
21 talked about a single blood drop on say the wrapping paper?
22 A Uh-huh.
23 Q Let's say there are three separate blood

Page 49

1 drops on the wrapping paper. Do you assume under that
2 scenario that there was a single source for each separate
3 blood drop?
4 A No, sir.
5 Q Okay.
6 A Each drop would have been examined
7 independently.
8 Q Okay. Let's go ahead and turn to the
9 specifics of this case. Let's say the Christmas wrapping
10 paper, do you recall if this scenario happened at all?
11 Let's say there were two drops on the wrapping paper and
12 let's say you ran ABO, PGM on one drop and GLO and ESD on
13 the other drop. Would that have happened or go ahead and--
14 A No.
15 Q -- maybe you can explain how you did it?
16 A If that had happened, that would have been
17 reported separately.
18 Q Okay. You would not have combined those
19 results?
20 A No. No, sir.
21 Q The lab also at that time, I assume, would
22 not have accumulated samples let's say from the sheet.
23 Let's say there were different drops all over the sheet,

Page 50

1 but one drop wasn't enough to perform the different enzyme
2 testing. Your lab would not at that time have combined
3 those together and then done the testing?
4 A No, sir. Whatever was reported, was
5 reported from a single sample.
6 Q And you never were aware of Fred Zain at
7 least in the cases you supervised him, ever engaging in
8 that practice of combining--
9 A No, sir.
10 Q -- different types together? Different
11 samples together?
12 A No, sir.
13 Q When he would perform the testing in this
14 case, would you necessarily have watched him go through the
15 whole process or would you come in at the end and look at
16 the gel together with him?
17 A I would primarily look at the final result,
18 not necessarily see every single step.
19 Q Also I think you stated, but I just wanted
20 to make it clear, you know, you gave your explanation about
21 how serological testing can tell the difference between
22 mixtures and a single source. I think you mentioned if the
23 blood was smeared, would you at least initially be

4 27

Case 2:09-cv-01406  Document 17-29  Filed 10/29/10  Page 79 of 117 PageID #: 4101

John Moss, III vs. George Trent,
Warden of the WV Penitenti-

Multi-Page

Robert Murphy
5/17/95

Page 51

1 concerned that that's a mixture if the blood was smeared as
2 opposed to a single drop?
3     A  I would pay a little more attention to the
4 patterns in the results.
5     Q  What is it about a smear that would make you
6 think that it's at least, you know, you need to be a little
7 more concerned about the possibility of a mixture versus a
8 single drop?
9     A  Because a smear is more likely to be a
10 mixture. In other words, you could have a blood stain and
11 smear another blood stain on top of it and there wouldn't
12 be any way to tell that. Whereas, a drop is a distinct
13 pattern and it would be very difficult for a drop to be on
14 top of a drop without it being very obvious. A smear on
15 top of a smear, I mean, there's no indication of what
16 you've got. For a drop to be on top of a drop, there would
17 be something obviously visible.
18     Q  At that time, and again this is December of
19 '79, at least beginning December of '79, did the laboratory
20 have a procedure in place where all of your testing
21 serologically were photographed?
22     A  We had the capability of doing it, but I
23 don't believe it was done on a routine basis. I mean,

Page 52

1 there was some work done in that regard, but as far as
2 every single sample being done, no, I don't believe so.
3     Q  And going back to your analysis of the
4 statistics, in your opinion, then, it is appropriate to,
5 when you're-- let's make it more specific. Let's say you
6 have a blood drop from the crime scene and you find an ABO
7 PGM type and let's say the ABO type is the same as some of
8 the known possible donors of blood at that crime scene, but
9 the PGM is different from any of the known possible donors.
10     Under that set of facts, in your opinion, it
11 is appropriate for statistical purposes to multiply the,
12 you know, the percentage of the population having that
13 particular ABO type times the percentage of the population
14 having that particular PGM type?
15     A  Right.
16     Q  So you would include the ABO type even
17 though it's the same as some of the known possible donors
18 of blood at that crime scene?
19     A  Right, because the probability is a total
20 probability and you take all of the characteristics and
21 include those.
22     Q  Okay. Let me just look at one more thing
23 here and I may be done here. (Examines documents.) Were

Page 53

1 you involved in any way in that whole Zain investigation?
2     A  No, sir.
3     Q  Okay. So no one ever contacted you?
4     A  Well, I was contacted once about two years
5 ago by the Kanawha County Prosecutor's Office in regard to
6 this particular case and that was the only contact I had
7 whatsoever.
8     Q  Okay.
9     A  Until you came into it.
10     Q  Okay. Do you have any recollection about
11 what that was about, that conversation was about?
12     A  Basically, I was asked since I had signed
13 the report, I was asked if I supervised the work and I
14 stated that I had and that I had seen all the results and
15 basically this had-- they didn't see a problem with that
16 and that was the end of it.
17     Q  Okay.
18     A  That was the only contact I had at all.
19         MR. SIMMONS: Okay. That's all.
20             EXAMINATION
21 BY MS. KERSHNER:
22     Q  Mr. Murphy, would it be fair to state that--
23 and I believe you did state this more or less, that the

Page 54

1 investigating officers on the Reggettz murders were pretty
2 certain that they had their man when they arrested Mr.
3 Reggettz?
4     A  Yes.
5     Q  Would there have been any advantage to you
6 or to Mr. Zain to have found results that indicated that a
7 person other than Mr. Reggettz or the three victims were at
8 the home at the time of the murders?
9     A  No, actually, that would have been to our
10 disadvantage because finding that kept the investigation
11 open and if we hadn't found that, everything would have
12 been cut and dry. It would have been over.
13     Q  In fact, did you or Mr. Zain experience any
14 difficulties as a result of the results you did find?
15     A  I wouldn't call it difficulties, but we did
16 have to convince the detachment commander, the South
17 Charleston detachment commander, that the investigation was
18 not over, that there was another person and Mr. Reggettz
19 had not planted blood at the scene and that they needed to
20 be looking for someone else, and there was resistance
21 because they felt they had the person responsible.
22     Q  Okay. Did you take the lead in that
23 persuasion or was Mr. Zain also involved in that?

428

John Gress, III vs. George Trent Document 17-29 Filed 10/20/10 Page 80 of 117 PageID #: 6102 Robert Murphy
Warden of the WV Penitenti·
5/17/95

Page 55

1     A  He was involved. I took the lead, but Fred
2 Zain was involved in that, too, because he basically backed
3 me up in saying, "Look, you can't sweep this under the
4 carpet. There is something here that you need to pursue."
5     MS. KERSHNER: Okay. I don't have anything
6 further.
7     MR. SIMMONS: That's all. You have the
8 right to review this once she types it up. It's like a
9 deposition, or you can tell her you're willing to waive
10 your signature and, if you'd like, I'd be glad to send you
11 a copy of it when it's done if you want it, but it's up to
12 you. She needs to hear you say on the record one way or
13 the other.
14     THE WITNESS: I would like to see a copy.
15     MR. SIMMONS: Are you willing to waive your
16 signature?
17     THE WITNESS: Sure.
18     MR. SIMMONS: Okay. I'll send you a copy.
19     THE WITNESS: I want to be cooperative. I
20 don't have anything to hide and I want to see that things
21 turn out the way they should turn out.
22     MR. SIMMONS: I appreciate your help here.
23 I just hope this doesn't become a habit.

Page 56

1     (WHEREUPON, the deposition was
2     adjourned at 11:35 a.m.)



Page 57

REPORTER'S CERTIFICATE

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, To-wit:

    I, Penny L. Kerns, a Notary Public within
and for the State of West Virginia, duly commissioned and
qualified, do hereby certify that the foregoing deposition
of ROBERT MURPHY was duly taken by and before me under the
West Virginia Rules of Civil Procedure, at the time and
place and for the purpose specified in the caption thereof,
the said witness having been duly sworn by me to testify
the whole truth and nothing but the truth concerning this
matter in controversy.

    I do further certify that the said
deposition was correctly taken by me by means of the
Stenomask; that the same was transcribed by me or under my
supervision, and that the said transcript is a true and
accurate record of the testimony given by said witness.

    I do further certify that I am not connected
by blood or marriage with any of the parties to this
action, am not a relative or employee or attorney or

Page 58

counsel of any of the parties, nor am I a relative or

employee of such attorney or counsel, or financially

interested in the action, or interested, directly or

indirectly, in the matter in controversy.

    It is stipulated and agreed that the

signature of the witness is hereby expressly waived to the

foregoing deposition.

    Given under my hand this 24th day of May,

1995.

My commission expires June 1, 1998.

Penny L. Kerns, CCR
Notary Public

429

# APPENDIX #3

430

# APPENDIX #5

442

3997

questions were about.  I think the jury has a right to see that
and do a little counting for themselves.

    THE COURT:  Let me see it.

    (Document examined by  the Court.)

    MR. McKITTRICK:  I am going to withdraw my objection.

    THE COURT:  All right.

    (Whereupon, counsel and the defendant resumed their seats at
counsel table where the following proceedings were had in open
court and in the hearing of the jury:)

    THE COURT:  All right, State's Exhibit 150 will be admitted
into evidence, properly marked, without objection by the
defendant.

    MR. BROWN:  That's all we have.

    MR. McKITTRICK:  That's all.

    THE COURT:  Is he excused from his subpoena?

    MR. McKITTRICK:  Yes, sir.

    THE COURT:  All right, Corporal, you are excused.  Thank
you.

    (Witness excused.)

    THE COURT:  It is anticipated that the next witness should
be short, so hopefully we will get out of here close to the noon
hour anyway.

    Call your next witness.

- O -

Edith Lilly - Direct                                        3999

    Q    Did you order all the merchandise?

    A    Yes, sir.

    Q    Have you at the request of my office checked
your records for the year 1979 to determine whether or not you
sold a silverware pattern from International called Radiant
Rose?

    A    Yes, sir.  When Mr. Murray came down there -- I knew we
didn't carry Radiant Rose, but to make sure, I went back and
checked the records.

    Q    And what do your records disclose?

    A    We do not carry a Radiant Rose.  We carry a Jewel Rose.

    Q    Let me hand you what has been marked and introduced
into evidence as State's Exhibit 107, and I will ask you to look
that over carefully.  And I will ask you during your tenure as
head of housewares at K-Mart in St. Albans you ever sold that
pattern?

    A    No, sir, not Radiant Rose.

    MR. McKITTRICK:  That's all the questions I have.

    THE COURT:  Any cross?

    MR. BROWN:  Yes, sir.

    THE COURT:  All right.

                   - O -

Edith Lilly - Cross                                          4001

Q    Do you sell State's Exhibit 153 now?

A    Yeah.  We carry Oneida, but it comes in a clear -- It is in a clear wrapper.  It is not boxed like this, but we may have some that is old stock still on hand.

Q    Do you all sell State's Exhibit 151?

A    No, sir.

MR. BROWN:  Okay, thank you, ma'am.  That's all.

MR. McKITTRICK:  That's all, Your Honor.

THE COURT:  All right, Mrs. Lilly, you may step down.

(Witness excused.)

MR. McKITTRICK:  The defense rests, Your Honor.

THE COURT:  All right, sir.

Let the record reflect the defense rests at 11:44 am., April 18, 1984.

Come to the bench.

Ladies and gentlemen, we are going to stand in informal recess for about five minutes.  Just stay in your chairs, and even though it is informal, nonetheless, at the expense of repeating myself, I would admonish you and each of you not to discuss this case among yourselves.  Neither should you permit anyone to discuss it in your presence.  Neither should you read any newspaper accounts, watch any television accounts or listen to any radio accounts of this trial or of any of the personalities connected herewith.

445                                          4001

# APPENDIX #6

446

John Moss, Jr. - Direct                          3714

                    JOHN MOSS, JR.,

          Being thereupon called as a witness on behalf

          of the Defendant, after being first duly sworn,

          testified as follows:

                                        DIRECT EXAMINATION

BY MR. McKITTRICK:

     Q    State your name please.

     A    John Moss, Jr.

     Q    Are you the father of the John Moss now on trial?

     A    Yes, I am.

     Q    Where do you live at, John?

     A    Cleveland, Ohio.

     Q    Are you married?

     A    Yes, I am.

     Q    To whom are you married?

     A    Marzee Moss.

     Q    Are you employed?

     A    Yes.

     Q    Where are you employed, John?

     A    Cleveland Building and Supply Company.

     Q    How long have you been employed?

     A    Sixteen years with that company.

     Q    Your wife is employed?

     A    Yes, she is.

John Moss, Jr. - Direct                                      3716

    Q    Was that around Christmas of 1979 or thereabouts?

    A    Yes.

    Q    Let me ask you this, John:  Have you ever seen -- I am going to hand you what has been marked as State's's Exhibit 119 and notice on that camera it has a name on it?

    A    Yes.

    Q    What is the name?

    A    Detrius Moss.

    Q    Do you know a person by the name of Detrius Moss?

    A    Yes, I do.

    Q    Who is that?

    A    That is my daughter.

    Q    Now, I know you probably can't say that this is that exact camera, but does Detrius have a camera like that?

    A    Yes, she does.

    Q    Have you ever seen a camera that your son owned that looked like that camera?

    A    Yes, I have.

    Q    And did you see that before December of 1979?

    A    Yes, I did.

    Q    Let me hand you what has been marked for identification purposes as State's Exhibit 102, John.  Was there a camera that looked like this, that looked like the one that had "Detrius Moss" on it?

448                                      3716

John Moss, Jr. - Cross                          3718

    A    I would say it is more like his mother's voice.

    MR. McKITTRICK:  That's all the questions I have.

    THE COURT: Cross?

    MR. BROWN:  Yes, sir.

- 0 -

CROSS-EXAMINATION

BY MR. BROWN:

    Q    When did John come back to your home, Mr. Moss at

Christmastime; about what time was it; what date; before

Christmas?

    A    Yes, sir, it was before Christmas.

    Q    What did he come back for, sir?

    A    What did he come back for?

    Q    Did he come back to live with you?

    A    Yes.

    Q    How long did he live with you there at the house?

    MR. McKITTRICK:  Your Honor, may I approach the bench

please?

    THE COURT:  Yes, sir.

    (Whereupon, counsel and the defendant approached the bench

where the following proceedings were had out of the hearing of

the jury:)

    THE COURT:  Be very, very careful.  Now, don't try playing

games, Mr. Brown, after several weeks in this trial.

449

John Moss, Jr. - Cross                          3720

Q    And you can tell which one belongs to Detrius, can't you?

A    Yes.

Q    And that is because written across the top is the name, "Detrius L. Moss", is that correct?

A    That is what it says.

Q    All right, sir, and that is not the camera that you gave the state police up there, is it, the one with Detrius' name on it?  Is that correct?

A    No, it is not the camera.

Q    You gave them a camera that looked just like it, didn't you?

A    Yes.

Q    And you couldn't identify -- There is nothing special that identifies this camera, is there?  Thee is no name on this camera, is that correct?

A    There is no name on it.

Q    But you did give a camera similar to the state police up there, didn't you?

A    Not that camera.

Q    It was not this camera?

A    That I can remember.  No.

Q    Well, how do you know it wasn't this camera then, sir? You look it over.  You can't be sure, can you, sir?

John Moss, Jr. - Cross                                    3722

prison, Your Honor.

    THE COURT:  He can ask questions about anything in the --

    MR. McKITTRICK:  If it has prison identification or alludes

to the penitentiary, it has absolutely no relevance.  Before he

starts to ask him questions about it, it has no relevance to the

Bible or it being in evidence.  It would do nothing but

prejudice the defendant.  That is the reason the Court ruled the

way it did on the tape.  That is the reason I came up to the

bench before he started talking about it.

    MR. BROWN:  You mean if there is a confession in here we

can't use it?  You put it in, Buddy.

    THE COURT:  My ruling is, I don't know what is in there, but

it has been introduced into evidence, number one, in its

totality.  Whatever is contained in that exhibit is allowable,

admissible evidence.  The defense put it in.  I don't know what

is in it.

    MR. McKITTRICK:  What I'm saying is, Judge, I don't disagree

with that ruling unless it is something that is irrelevant to

this proceeding.  And it would be irrelevant to the proceeding

with regards to his prison status.  Do you know of anything that

is in there, Pete?

    MR. BROWN:  What?

    MR. McKITTRICK:  Do you know of anything that is relevant to

his prison status?

John Moss, Jr. - Cross                           3724

    A    I don't remember what he brought back because I didn't see what he brought back.

    Q    You didn't see what he brought back?

    A    No.  I know he had a camera though.

    Q    And what was the brand name of the camera he had?

    A    Uh, that was an instamatic camera.  I think it was a Kodak.

    Q    And he had that before Christmas?

    A    Yes.

    Q    But these four cameras that are here were all removed from your house, weren't they, sir?

    A    I think so.

    Q    And you don't know if John brought three of those back or not?

    A    No.

    Q    You do know that one of them belongs to your daughter, Detrius?

    A    Yes.  I had a camera also myself there, and John had a camera of his own.

    MR. BROWN:  All right, sir.  That's all the questions I have of this witness.

    MR. McKITTRICK:  I have no further questions.

    THE COURT:  All right, Mr. Moss, you may step down.  You may remain in the courtroom or leave, whichever you wish to do.  Is

452

# APPENDIX #7

453

3119

Thank you.

(Whereupon, the jury exited the courtroom.)

THE COURT:  Now, it is my understanding you are going to call Mrs. Moss next.

MR. BROWN:  Yes, sir.

THE COURT:  How long do you expect her to be on?

MR. BROWN:  Not too long.

THE COURT:  All right, we will stand in recess until 1:15.

- O -

(Whereupon, a recess was had in the proceedings.)

- O -

AFTERNOON SESSION

Whereupon, the proceedings in the Matter of State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, were resumed with all parties present as before noted, including the defendant and his counsel, and in the presence of the jury.

THE COURT:  Show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts.  The defendant is present in person and by counsel, Mr. McKittrick, the State of West Virginia by her Prosecuting

Marzee Moss - Direct                                    3121

MR. BROWN:  I'm just trying to relax the lady, Your Honor. That gentleman right there is the Judge, the gentleman there in the robe.  Just so you will know who is who.  And the man that made the objection is the lawyer defending your son.

Q      Where do you live, Mrs. Moss?

A      Cleveland, Ohio.

Q      In 1979 where did you live?

A      Cleveland, Ohio.

Q      You have lived there from 1979 up until today, is that correct?

A      That's correct.

Q      Do you have a son named John Moss, ma'am?

A      Yes, I do.

Q      Is he here in the courtroom today?

A      Yes, he is.

Q      Would you point him out?

A      Setting right there (indicating).

Q      What does he have on?

A      Tweed like jacket, blue striped tie, white shirt, beige pants and black shoes.

MR. BROWN:  Let the record show the witness has indicated the defendant, John Moss.

THE COURT:  The record will so reflect.

Q      On Christmas Day of 1979, do you remember whether John

Marzee Moss - Direct                                              3123

live with you when some police officers came to your house with

a search warrant?

    A    Yes.

    Q    And they asked you about, they wanted to see some

things in your house; they wanted to search your house for some

items.  Do you remember that, ma'am?

    A    Yes.

    Q    And do you remember what it was they were looking for?

    A    They was looking for a camera.

    Q    A camera?

    A    Yes.

    Q    Would you tell these folks what they asked you and what

they did.

    A    Well, when they come to my house, I wasn't at home.  I

was at work.  There was a neighbor of mine called and told me

that there was some police there going to break into my house.

So I rushed home.  When I got home, they was in my house, and

they had been all upstairs, and they had ransacked upstairs

looking for the item.  So they called back and -- Well, when

they come in, they said they was friends of John, all they

needed was the camera, and things was looking good for John.  So

they went upstairs and was looking for it.  So they called back

here --

    Q    Wait a minute before you get to the call back here.

Marzee Moss - Direct                                3125

A     No.

Q     And you went downtown with them, didn't you, ma'am?

A     Yes.

Q     And they had you give them a little statement; they
typed something out, and you signed it, didn't you?

A     Yes.

Q     And then the officers came back later on and recovered
the camera later on that evening, didn't they?

A     Yes.

Q     Do you remember telling them that the camera was in
your husband's car?

A     Yes, the camera was in my husband's car because when --
During the summer when he would come home, he had a camera, but
when he come home around Christmas time, I don't know -- He had
this camera during the summer when he would come home.

Q     This is young John, your son?

A     Yes.  It was a camera just like my daughter had,
Detrius.

Q     Okay, ma'am, when you were down at the police station,
those police officers called Charleston, West Virginia, didn't
they?

A     When they were down where?

Q     When you went to the place, do you remember, where they
typed something up for you to sign, they talked on the telephone

457                      3125

Marzee Moss - Direct                                3127

but I think she is confused.

    THE COURT:  Do you have any objection, Mr. McKittrick, to

Mr. Brown leading her?

    MR. McKITTRICK:  I'm not going to give him a blanket lead,

but if he wants to get into the things he and I discussed --

    THE COURT:  All right, if you have any objections, just let

me know.

    MR. McKITTRICK:  All right, I will come to the side bar.

    (Whereupon, counsel and the defendant resumed their seats at

counsel table where the following proceedings were had in open

court and in the hearing of the jury:)

    Q    Maybe I wasn't real clear there, Mrs. Moss.  Do you

remember the police officers called Charleston, and you talked

to John on the telephone.  Do you remember that?

    A    Yes.

    Q    All I want you to do is just tell the folks what you

and John talked about on the telephone.  Not any other time,

just when he was talking to you on the telephone; and you know

John's voice, don't you?

    A    Yes.

    Q    And that was John.  Now, tell them just about the phone

conversation when the police were there that time.

    A    All we talked about, he told me to go upstairs and get

a camera and take a picture of the baby.

Marzee Moss - Direct                          3129

is in my husband's car.  It is the same camera that John, Jr.

brought with him from West Virginia when he came home at

Christmas time and left in his room."  Is that what that says,

ma'am?

    A   That's what it says, but I don't call him John, Jr.

    Q   But that is what it says, is that correct, ma'am?

    A   Yeah, that's what it says.

    Q   All right, now, did the police officers ask you if

there was a gun in the house, ma'am?

    A   Yes.

    Q   And did you help them look for a gun, ma'am?

    A   No.

    Q   Did John tell you there was a gun in the house?

    A   I don't remember.

    Q   When you talked on the telephone?

    A   I don't remember.

    Q   To the best of your memory -- Well, let me just show

you one other thing, ma'am.  You talk about John asked you to

get a picture.  When you and John talked about taking a picture,

that wasn't in this phone conversation, was it, ma'am?

    A   No.

    Q   So now to go back to the phone conversation that you

and John had -- You are in Cleveland, and John is in Charleston,

and --

Marzee Moss - Direct                                    3131

    A    No, I don't remember anything else about the gun.

    Q    So you all talked about the gun and the camera, is that correct?

    A    Yes.

    Q    And that is all?

    A    That's all.

    Q    And he said, "If you can't find the gun, ask Carlton about it"?

    A    Yes.

    Q    And that is all you talked about?

    A    Yes.

    Q    How long did that conversation last?

    A    Just for a few minutes.

    Q    One or two minutes, about that?

    A    About five.

    Q    So you talked about the gun for five minutes?

    A    No, not the gun, the gun and the camera.

    Q    What else did he say?

    A    Nothing.

    Q    Anything else about the camera?

    A    No.

    Q    Did you all have a camera there in your house, ma'am?

    A    Yes.

    Q    That was your very own?

460                                                     3131

Marzee Moss - Direct                                    3133

Q    Is that your daughter?

A    Yes, it is.

Q    State's Exhibit No. 117 is a Polaroid camera.  Does
this camera especially mean anything to you?  Do you recognize
it?

A    Like I said, all the cameras in her room, I don't know.
All of them look alike.  But I know my son had one, and my
daughter had cameras alike because one day he had the camera,
and he said, "This is a camera just like my sister's."

Q    And he brought that camera back to Cleveland right
before Christmas, didn't he?

A    I don't know what he brought back.

Q    Well, he brought a camera back though, didn't he; and
he left it on the dresser in the second floor room, didn't he,
ma'am?  That's what your statement says?

A    Well --

Q    State's Exhibit No. 118 is a Polaroid color pack
camera.  Does this camera especially mean anything to you one
way or the other?  You can take them and look at them all you
want.

A    Like I say, I don't know.  I don't remember.

Q    Now, when the officers, when you got to the house and
the officers were there with the search warrant, after a little
while they left, right?

Marzee Moss - Direct                              3135

MR. BROWN:  I'm going to withdraw that.

MR. McKITTRICK:  You're going to withdraw the question?

MR. BROWN:  Yes, withdraw the question.

Q    All right, Mrs. Moss, he said to you that there was a gun there, and Carlton might know where it was, not a rifle; he said a gun, didn't he, ma'am?

A    Yes.

Q    But you don't remember him saying anything about a .22 rifle?

A    No.

Q    You don't remember him saying that the .22 rifle might be in the closet in the bedroom?

A    No, I don't.

Q    And you don't remember saying the .22 rifle might be under the bed?

A    No, I don't.

Q    And you don't remember him saying anything about the .22 rifle had a scope on it?

A    No, I don't.

Q    I know it has been a long time, ma'am, since that phone call.  I want you to think the best you can what all you and your son talked about on the telephone, just cameras and the gun, right?

A    That's all.

Marzee Moss- Cross                                          3137

- O -

CROSS-EXAMINATION

BY MR. McKITTRICK:

    Q    Mrs. Moss, the State of West Virginia brought you to

Charleston, West Virginia, is that correct?

    A    Yes, they did.

    Q    Now, since you have been here, I have not discussed any

of your testimony with you, have I?

    A    No, you haven't.

    Q    The statement that Mr. Brown was talking to you about

says nothing about a .22 rifle, does it?

    A    No, it doesn't.

    Q    It says nothing about the gun, a .22 rifle, being under

a bed?

    A    No, it didn't.

    Q    It says nothing about a rifle with a scope on it?

    A    No, it didn't.

    Q    It says nothing about a rifle in a closet, does it?

    A    No, it didn't.

    Q    You told the ladies and gentlemen that you don't call

John "John, Jr."  What do you call him?

    A    What do I call him?

    Q    Yes.

Marzee Moss- Cross                                    3139

marked as State's Exhibit 102. Is that camera like the camera

which is marked as State's Exhibit 119?

    A    Yes.

    Q    All right now, I thought I heard you say that your son,

John, had a camera like your daughter's, Detrius.

    A    Yes.

    Q    Is this the camera that you are talking about when you

compare it with Detrius' camera, that being State's Exhibit No.

119?

    A    Yes. I can see now. He was bringing them one at a

time, and it has been so long that I just don't really remember.

    Q    All right now, when John was staying in West Virginia

with his grandparents, did he visit at home?

    A    Yes, he did.

    Q    And was that before he came home at around Christmas in

1979?

    A    Yes, it was.

    Q    And did you ever see John with this camera that you say

was similar to Detrius' camera?

    A    Yes, I did because he used to take pictures of his

little nephew.

    Q    With the camera?

    A    With the camera.

    Q    Now, I guess you can't testify that it was this camera,

Marzee Moss - Redirect                                3141

MR. BROWN: We don't want to be ungracious about it, but no, we don't want to do it. *what happened to truthfulness*

THE COURT: Okay.

(Whereupon, counsel and the defendant resumed their seats at counsel table where the following proceedings were had in open court and in the hearing of the jury:)

MR. McKITTRICK: That's all the questions I have.

THE COURT: Any redirect?

MR. BROWN: Yes, sir.

- O -

REDIRECT EXAMINATION

BY MR. BROWN:

Q    Mrs. Moss, in your statement you said, speaking of John, "He brought the cameras with him." You said that, didn't you? Let me show you. "Just before last Christmas, 1979, John came home, and he brought the cameras", see the little "s", "with him".

A    Yes.

Q    You said that, didn't you?

A    I don't remember saying that.

Q    And you went on to say right after that, "I only saw one at the time". Do you remember saying that? And you went on to say, "The camera was a Kodak instant camera. John left the camera on the second floor on his dresser, and no one else

Marzee Moss - Reccross                          3143

come home during the summer.

    MR. McKITTRICK:  That's all the questions I have.

    MR. BROWN:  Would the court reporter read back the last

answer.

    MR. McKITTRICK:  For what reason?

    MR. BROWN:  I want to make sure she said what I think she

said.

    MR. McKITTRICK:  Why don't you go up and ask her?

    MR. BROWN:  I just want to hear what she said.  Why

shouldn't it be in open court?

    THE COURT:  Read back the last answer.

    (Whereupon, the last answer was read by the reporter.)

    MR. BROWN:  He had what?

    THE REPORTER:  Cameras.

    MR. McKITTRICK:  I would like to move at this time to make

this witness my witness for two short questions.

    THE COURT:  That has already been ruled on at the bench. If

you wish to bring her back, you may bring her back.  That matter

has already been settled at the bench.

    MR. McKITTRICK:  I know it has.

    THE COURT:  Yes, it has.

    MR. McKITTRICK:  I said I know it has.

    THE COURT:  All right, you may step down.  You are released

from the State's subpoena.

466                    3143

3145

that they are interested in.

THE COURT: Who is this guy? Where did this guy come from? What is the basis for your wanting to put him on?

MR. BROWN: John tells him two or three weeks beforehand, as they are walking down the railroad tracks, "I would like to break in that house. There are a bunch of guns, shotguns and rifles there." It shows system, motive and intent. I have a whole bunch of cases --

THE COURT: Let me read this.

"I heard that it was", I'm not sure that is proper, these last two questions and answers, "I heard this is where . . ."

MR. BROWN: I don't know that he is going to say that. The only thing he is going to say, he tells me --

THE COURT: Are you going to question him directly from that statement?

MR. BROWN: No. There is too much nasty stuff in here.

THE COURT: He is entitled to question him on any inculpatory statements the defendant might have made.

MR. McKITTRICK: Your Honor, the defendant's statement is not inculpatory.

MR. BROWN: What are you looking for?

MR. McKITTRICK: The statement is not inculpatory because it says, Your Honor, right here that he could not do it because the people had been killed. He couldn't go in there, that they were

**APPENDIX #8**

## APPENDIX # 8

In the case of John Moss III, both Moss and Paul Reggettz confessed to killing the Reggettz family. Each confession was independent of the other, neither including the presence of or the aid of the other. Both confessions were later recanted, both men asserted their confession was forced by investigating officers, but only John said police told him what to say in confessing.

Vanessa Reggettz was a mother of 2 children, 26 years old, 5 feet tall, and weighed 94 pounds. Bernadette Reggettz was 4 years old, 40 inches tall and weighed 29 pounds. Paul Eric Reggettz was 7 years old, 44 inches tall, and weighed 39 pounds.

Blood evidence from the crime scene that did not match Paul Reggettz or any of the victims caused a problem with prosecuting Paul Reggettz based upon his confession of being the sole actor of committing the murders. A warrentless search of trying to match a blood type to potential suspects ensued in the community to no avail. The state police were under a great deal of pressure to match the unknown blood to a suspect. Investigating officers were convinced they had the right killer, Paul Reggettz, due to his detailed confession.

The Reggettz murders received a great deal of press coverage due to the bazaar murders of the children. The police investigating the case needed to solve the case to restore faith in the community, that the police force was providing adequate protection to those who employed them. It was a former Deputy Sheriff officer who provided information that led officers to develop John as a suspect. That deputy is John's own uncle.

(1)

469

John was tried and convicted on Zain's testimony, shifting the balance of the evidence presented. The trial was essentially a contest between the Reggettz confession, which he recanted and John's confession, which he recanted. To Reggettz, the defense had attributed the motive of hatred fueled by an economically stretched and emotional strained home. To John, the state had attributed robbery as the motive, implying the desire to purchase drugs.

Without the focus being shifted from the creditability of the confessions due to discredited serology evidence, the real question for a jury is who's confession fits the evidence of the crime scene?

### The Reggettz Confession

Paul Reggettz offered his confession in great detail within 24 hours of the murders being reported. Reggettz offered exactly how he murdered his wife, his son and daughter. Reggettz detailed confession was offered prior to any known results of the autopsy performed by Dr. Irving Sopher, the State's Chief Medical Examiner.

Reggettz told officers he had hit his wife with a handgun, she fell to the floor and was moaning but not moving. This account is entirely consistent with the medical examiners theory that because of the severity of the head wound suffered by Vanessa Reggettz, along with the blood loss, she would have been unable to move from where she had fallen. (1st. Tr. 3365-66)

He then picked her up and carried her to the children's bedroom where he dropped her on the floor near the TV room. Dr. Sopher was of the opinion Vanessa had been struck in the head with the pistol and had fallen to the floor in the front bedroom, where he found a large pool of blood. He also believed, because of the absence of pattern dripping of

(2)

blood on her clothes or anywhere else in the house, that she stayed down when struck and was carried to where her body was found. (1st. Tr. 3301-02, 3365-66)

When Reggetts thought he saw his wife start to move, he grabbed an extension cord lying by the door in the TV room. (1st. Tr. 2456) He wrapped the extension cord around his wife's neck and pulled until movement stopped. Afraid she might come to and continue to fight, he tied her to the door of the TV room.

Reggetts recounted to officers details totally consistent to what children would do and say given the attack on their mother. Reggetts said his son tried to run but he grabbed him. He remembered him pleading "Daddy don't". He had yanked a radio cord out of an outlet and wrapped it around his son's neck, pulling it until the screaming stopped.(1st. Tr. 2458) He then placed his son face down in the remains of bath water in the tub. Reggetts explained his little boy liked to swim and "it looked like he was swimming". (1st. Tr. 2466)

The boys' neck showed a scraping and bruising pattern that did not completely surround the neck, but rather extended roughly ear-lobe to ear-lobe consistent to the fathers' confession of holding his knee on he boys buttocks and legs while he pulled on the cord. Reggetts reported tying the childs hands and feet before putting him in the bathtub face down, "it looked like he was swimming". The autopsy showed that he had been alive when immersed in water and that the actual cause of death was drowning.(1st. Tr. 3308)

There is nothing from the crime scene that officers could adduce to provide Paul Reggetts with such detailed information such as the cord being pulled around the boys neck to kill the him. Certainly nothing

(3)

could have informed the police that the child's last moment of life was spent struggling with the cord that bound his little hands and feet attempting to free himself, and that the actual cause of death was drowning.

Dr. Irving Sopher placed the time of death between midnight and no later than 6:00am. (1st. Tr. 3339) Dr. Sopher testified that after a body has been immersed in water for approximately 3 or 4 hours a wrinkling of the skin on the hands and feet occur, and depending upon the environmental temperature, the process takes up to 10 to 12 hours to reverse. That wrinkling condition was not found on the body of the son. (1st. Tr. 3389-92) Paul Reggettz had reported to trooper Williams he had removed the boys body from the water around noon just 2 hours prior to Dr. Sopher coming to the crime scene to examine the body. By this account, assuming the murderer killed Paul Eric on his way out the door at 6:00am. the body would have spent no less then 6 hours in the water. Once again Paul Reggettz confession shows he knew to many details and his original report that someone other than him committed the murders just does not fit the forensic evidence.

The little girl was only 4 years old . Paul Reggettz told trooper Woodyard that when he returned from the bathroom after drowning his son he discovered his little girl at her mother's side begging her to wake up, saying "Get up Mommy; wake up". Reggettz said he then grabbed his daughter and carried her to the front bedroom where he took an electrical cord from the sweeper and wrapped it around her neck, pulling it tight until she stopped moving. He said he then looped the cord over the top of the door and let her body hang against the door. (1st. Tr.2459) He said he hung his daughter because she like to swing. "Hung her up so she could". (1st. Tr. 2466)

(4)                          472

Again Reggettz just knew too much information about how the murders were committed, not to have done it. For instant, who knew what cord went where and how they where tied, Reggettz. Nobody knew besides the medical examiner and the killer, that Vanessa Reggettz was hit in the head with a gun and carried into another room.

The image of Bernadette's 4 foot body hanging from a door and Paul Eric laying face down in a tub of water, is more than just shocking. The mental/emotional disturbance of seeing your own children in such a condition would cause any loving parent to be left emotionally disturbed. Little Bernadette was hung by her own father's words, because she liked to swing. Little Paul Eric was drowned by his own father's words because he liked to swim. Seeing such a terrible image of children would cause an emotional/reaction to anyone, yet not the father, Paul Reggettz.

Trooper Williams testified that Paul Reggettz showed no emotion over the death of his family. (1st. Tr. 2777) Other officials also took note of this puzzling circumstance. In fact, Reggettz told Trooper Woodyard he had "felt relieved", just like he had been set free, "relieved at no longer having any responsibility". (1st. Tr. 2462) At trial prosecution put on testimony from trooper O'Dell to show at one point Paul Reggettz "sobbed for a few seconds". (1st. Tr. 3211-12) However, defense counsel on cross examination established that trooper O'Dell was a polygraph examiner and Paul Reggettz didn't show emotion until he "was about to take a lie detector test when he cried". (1st. Tr. 3215) The only emotion shown was self-serving as grief for what could be his own loss of freedom.

(5)

473

Again, Paul confession gave the actual cause of death of both children prior to the autopsy report being prepared. This could only have been given by the real killer. Other events that would require someone else to have committed the crimes just isn't supported by crime scene evidence such as the lack of wrinkling condition on the boy. This is all information that can not be disputed by a creditable State Expert witness.

Paul Reggettz told trooper Woodyard he feared his wife might still be alive so he returned to her body and using both hands, pushed a pair of scissors into her chest. (1st. Tr. 2460)

### The Moss Confession

The troopers who obtain the alleged confession of John Moss had basic information from the crime scene to tell John what to say. They had already obtained the flatware now alleged to have been taken from the Reggettz home. One can only speculate what information John's uncle provided on the flatware that was given as a gift to his friends mother. Receipts of evidence show troopers received the flatware on February 6, 1980. It has now been shown the flatware/silverware used at trial could not be the silverware Paul Reggettz purchased at K-Mart.

Prior to the alleged confession of John, there was never any mention of a camera missing nor did the state offer any pictures at trial alleged to have been taken by this camera as proof the Reggettz owned a camera. The only evidence offered was from Paul Reggettz' self-serving identification of the camera as being his.

The only thing consistent about John's confession is that, it is inconsistent to the theory, troopers told John what to say. The State Troopers who beat John into submission could have had him confess to

(6)      474

murdering J.F.K.. John's confession is consistent to being provided basic information investigating officers would know.

What the officers didn't know was Forensic Evidence obtained through the autopsy and personal observation of Dr. Irving Sopher. By human error, they got some evidence wrong, such as the location of the gun being fired. This is all exhibited by John's allege confession not being consistent to the evidence. The troopers had already obtained a illegal blood sample from John to tie him to the crime scene so they were not concerned with details of the confession.

In the alleged confession given by John authorities would have you to believe John fought with Vanessa for the handgun in the back bedroom were the gun went off. Trooper Williams recovered the bullet which went through the bed and into the floor, in the front bedroom. Paul Reggettz pointed out the bullet hole in his confession in it's proper location.

Next authorities would have you to believe through John's alleged confession that he hit Vanessa in the head with the gun with such force to break the guns grips and then run from the house. Next you would have to totally discount Dr. Sopher's expert opinion and the lack of blood drippings on Vanessa attempting to block the backdoor.

The officers who told John what to say didn't know the severity of the head wound suffered by Vanessa, along with the blood loss shown by the blood pool where she fell in the bedroom would have made any altercation at the backdoor impossible. The officers knew they had blood evidence, mostly collected near the backdoor to explain. Therefore they invented an altercation to provide an injury to John at that location in the house.

(7)

47S

State Troopers prior to formulating this theory of a backdoor altercation examined the hands of John and found a scar on his left little finger. This would become the foundation for the theory of Vanessa fighting off an intruder at the backdoor, grabbing a knife and cutting him, thus resulting in blood found at the crime scene consistent to John. At trial however, defense established the cut to John on his left little finger received medical attention in October of 1974. (1st. Tr. 3778) Defense also provided expert testimony by a plastic surgeon that the age and description of the scar fit emergency room records of having treated the cut in 1974. (1st. Tr. 3789)

Troopers providing information in a coerced confession could not know medical evidence would prove Vanessa could not have had this altercation nor that defense could establish a medical history for the scar on John's little finger.

Further attempts of troopers to formulate a believable attack on the Reggettz family by an intruder would also prove to be discredited. To believe John's alleged confession, one would have to believe he first choked Vanessa and Paul Eric with his hands to subdue them. Dr. Sopher testified to a reasonable degree of medical certainty, "they were not manually strangled". (1st. Tr. 3384)

Within 24 hours of the murders Paul Reggettz had given a detailed confession including facts only Forensic Experts could later discover. Paul Reggettz confession stands the test of time and forensic testing. Reggettz was indicted for the murders of his wife and 2 children but was released due to blood evidence that did not match him. It was easier for the State to frame John Moss by falsely reporting his blood type as being that obtained from the crime scene, than to have to explain why

476

such a detailed confession as Paul Reggettz failed to include a second party.

Too many question remain unanswered. Why would a young black man only open part of the Christmas gifts and then only take a set of silverware? If a perpetrator was seeking items to purchase drugs, why would he/she take silverware but leave 2 civil war rifles valued at $300.00? The evidence does not point to an outsider.

Also, John knew of this family as they lived in his uncles Motel. He knew the family didn't have anything of value. Why pick one of the poorest families in the neighborhood to rob. Again, the evidence does not point to an outsider.

No fingerprints were found so troopers had John confess to wearing gloves and put on expert testimony that "glove prints" were found at the crime scene. Where is the bloody glove print if this is true? Again the autopsy of Vanessa shows numerous signs of scratches, scrapes, and abrasions consistent to fingernail scratches occurring in a struggle. (1st. Tr. 3296-97) This is totally inconsistent with the State's theory that John wore gloves during the attack. (1st. Tr. 3246-50)

The true blood type of the original crime scene will never be known now due to former Trooper Fred S. Zain's involvement in collection, testing, recording of results, and testimony thereof. The State Police illegally obtained a sample of John's blood prior to any recorded court document disclosing the type of blood collected at the crime scene, forever casts doubt on the creditability of any reported results offered by Zain. Additional testing is not an option as the State of West Virginia turned to Zain again in 1990 for DNA testing permitting him to destroy any remaining evidence.

(9)

477