**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 33**
**(Continuation, pp. 685 to end)**



Lodge

**Cathy S. Gatson, Clerk**
Kanawha County Circuit Court
111 Court St., Charleston, WV 25301

Telephone: (304) 357-0440
Facsimile: (304) 357-0473

13TH JUDICIAL CIRCUIT
WEST VIRGINIA

TO: CLERK OF SUPREME COURT

FROM: CATHY S. GATSON

DATE: JUNE 18, 2003

RE: JOHN MOSS, III

v.

GEORGE TRENT, Warden, etc.
RESPONDANT APPEAL NO. 94-MISC-663

The entire record has been designated in the above referenced case. If the appeal is accepted, please retain the original file. No additional paperwork has been filed in this record. Please attach this with the record for appeal purposes.

If you have any questions regarding this matter, please do not hesitate to contact Mary Ann Billings.

FILED
JUL 16 2003
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA

At a Regular Term of the Supreme Court of Appeals continued and held at Charleston, Kanawha County, on the 9th day of September 2004, the following order was made and entered:

FILED
2004 OCT -7 PM 2:32
CATHY S. GATSON CLERK
KANAWHA CO. CIRCUIT COURT

John Moss, III, Petitioner Below, Appellant

vs.) No. 31646

George Trent, Warden of the West Virginia State Penitentiary, Respondent Below, Appellee

The Court, having maturely considered the record and the oral argument and the briefs of counsel thereon, is of the opinion for reasons stated in writing and filed with the record that there is no error in the ruling of the Circuit Court of Kanawha County, rendered on the 30th day of January, 2003. It is therefore considered and ordered by the Court that said ruling be, and it hereby is, affirmed; all of which is ordered to be certified to the Circuit Court of Kanawha County.

The syllabus of points adjudicated, prefixed to the written opinion aforesaid prepared Per Curiam, was concurred in by Chief Justice Maynard and Justices Davis, Starcher, McGraw and Albright.

A True Copy

Attest: Rory L. Perry II.
Clerk, Supreme Court of Appeals

RECORDED

135

686

FILED
2007 MAR -2 AM 9:29

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

STATE OF WV, EX REL JOHN MOSS, JR
Vs
THOMAS L MCBRIDE, WARDEN
MOUNT OLIVE CORRECTIONAL COMPLEX

06-MISC-245
06-MISC-298
94-MISC-663
CR-82-F-221

Received the above appeal action on the ________________, **2007.**

136

Rory L. Perry II

**CLERK**
**SUPREME COURT OF APPEAL**
**OF WEST VIRGINIA**

FILED
MAR - 2 2007
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

04-MISC-663

STATE OF WEST VIRGINIA
IN THE SUPREME COURT OF APPEALS
IN VACATION

John Moss, III, Petitioner Below, Petitioner

vs.) No. 070678

Thomas McBride, Warden, Mount Olive Correctional Complex, Respondent Below, Respondent

FILED
2007 JUL 23 PM 2:09
CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

On a former day, to-wit, March 5, 2007, came the petitioner, John Moss, III, pro se, and presented to the Court his petition praying for an appeal from a judgment of the Circuit Court of Kanawha County, rendered on the 16 th day of October, 2006, with the record accompanying the petition.

Upon consideration whereof, the Court is of opinion to and doth hereby refuse said petition for appeal. Justice Albright would grant.

DONE IN VACATION of the Supreme Court of Appeals, this 9th day of July, 2007.

Honorable Robin Jean Davis, Chief Justice

Honorable Larry V. Starcher

Honorable Elliott E. Maynard

Honorable Joseph P. Albright,

Honorable Brent D. Benjamin

Received the foregoing order this 9th day of July, 2007, and entered the same in Order Book No. 159.

A True Copy RECORDED

Attest: Rory L. Perry II.
Clerk, Supreme Court of Appeals

137

DiTRAPANO & JACKSON
ATTORNEYS AT LAW
604 VIRGINIA STREET, EAST
CHARLESTON, WEST VIRGINIA 25301

TELEPHONE 304-342-0133
FAX. NO. 304-342-4605

RUDOLPH L. DiTRAPANO
P. RODNEY JACKSON
J. TIMOTHY DiPIERO
FRANKLIN S. FRAGALE, JR.
JOSHUA I. BARRETT

LONNIE C. SIMMONS
DEBRA L. HAMILTON
SEAN McGINLEY
L. DANTE' di TRAPANO*

*Also admitted in Georgia

October 2, 1996

**HAND DELIVERY**

FILE COPY

Honorable A. Andrew MacQueen
Chief Judge
13th Judicial Circuit
Kanawha County Judicial Annex
111 Court Street
Charleston, West Virginia 25301

Re: ***John Moss, III v. George Trent***
**Civil Action No. 94-MISC-663**

Dear Judge MacQueen:

Enclosed for your review is **PETITIONER'S RESPONSE TO MEMORANDUM IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS**. I have also filed with you a notebook of exhibits relevant to the Fred Zain issue. The notebook I have given you is the original.

It is my understanding that the issue is now ripe for decision by the Court. On behalf of my client, I respectfully ask this Court to issue a ruling as soon as possible so that this matter may be resolved one way or the other without any further delay. Obviously, these pleadings raise very serious issues and I do not mean to place undue or improper pressure on the Court to render a prompt decision. However, my client has been incarcerated for approximately seventeen years and would very much appreciate bringing this matter to an end.



Honorable A. Andrew MacQueen
October 2, 1996
Page 2


       If after reviewing the pleadings and exhibits, the Court believes an additional hearing is required, I would be happy to comply with any requests.

Respectfully yours,

Lonnie C. Simmons

LCS/jb

Enclosure

cc:    Steve Revercomb
       Jon Blevins

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**JOHN MOSS, III,**

Petitioner,

v.

Civil Action No. 94-MISC-663

**GEORGE TRENT**, Warden of the West Virginia State Penitentiary,

Respondent.

# EXHIBITS RELEVANT TO THE FRED ZAIN ISSUE



IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JOHN MOSS, III,

        Petitioner,

vs.             CIVIL ACTION NO. 94-MISC-663

GEORGE TRENT, Warden of the
West Virginia State Penitentiary,

        Respondent.

COPY

        The deposition of ROBERT MURPHY was taken on the 17th day of May, 1995, beginning at 10:10 a.m., in the Law Offices of DiTrapano & Jackson, 604 Virginia Street, East, Charleston, Kanawha County, West Virginia, before Penny L. Kerns, Notary Public and Certified Court Reporter, for purposes of discovery and/or to be read as evidence in the above-styled matter which is now pending and undetermined in said Court.

APPEARANCES: On behalf of the Petitioner:

LONNIE C. SIMMONS, ESQUIRE
DiTrapano & Jackson
604 Virginia Street, East
Charleston, West Virginia 25301

On behalf of the Respondent:

MARY BETH KERSHNER, ESQUIRE
Assistant Prosecuting Attorney
for Kanawha County
Judicial Annex
Charleston, West Virginia 25301

******************************************************

I N D E X

| Witness | Examination by Mr. Simmons | Examination by Ms. Kershner |
| --- | --- | --- |
| Robert Murphy | 3 | 53 |

| Exhibit | Marked |
| --- | --- |
| Deposition Exhibit No. 1 | 16 |
| Deposition Exhibit No. 2 | 24 |

Reporter's Certificate 57, 58

(Witness sworn)

THEREUPON came

ROBERT MURPHY

called as a witness herein, who, having been first duly sworn according to law, testified as follows:

EXAMINATION

BY MR. SIMMONS:

Q Mr. Murphy, my name is Lonnie Simmons. I represent John Moss, III, in a habeas corpus action here in Kanawha County. I guess I've met with you once before. The purpose of this deposition is to create a record in connection with this habeas corpus proceeding. I usually put on the record in these things that in habeas corpus actions clients don't have an absolute right to be present and my client is aware of that fact and so I've talked to him and he knows that I'm doing this today, and my plan is simply to get some information from you so we'll have it on the record and this will become part of the record in a habeas corpus action. Would you state your name for the record, please?

A Robert C. Murphy.

Q Mr. Murphy, where are you currently employed?

A CT & E Environmental Services in Charleston.

Q Okay. Now, how long have you been employed by that company?

A A little over seven years.

Q Before we get the rest of your work history with the state police, what's your educational background as far as college and onward?

A Bachelors degree in chemistry from Rutgers University. I also attended the West Virginia University Graduate School of Chemistry and Marshall University Graduate School also in chemistry, a number of short courses put on by professional organizations, the American Academy of Forensic Sciences and the Southern Association of Forensic Science.

Q Okay. When you say you did some post-graduate studies at Marshall and WVU in chemistry, did you obtain any additional degree or were these just additional classes?

A No. It was the equivalent of a masters degree, but I did not receive a masters degree. It was about thirty-some hours.

Q When were you first employed by the

Department of Public Safety in West Virginia?

A December of 1971.

Q And in what capacity were you first employed by the Department of Public Safety?

A As a chemist. At that time, chemists were considered generalists, which means you worked on anything related to a particular case regardless of whether it was drugs or soils or whatever.

Q Hair? Could you do hair analysis?

A Uh-huh. Whatever was involved in that case.

Q Okay.

A Three or four years later, the mid 70's, started specialization where you would focus on one particular area.

Q What area did you focus on three of four later?

A Serology.

Q So approximately from '74, '75 till when did you focus exclusively on serology?

A Pretty much.

Q When did you leave the state police?

A I left the state police in-- well, I resigned October of '82, but I had been out of serology for

approximately a year. There had been, let's see, one resignation and one retirement, which left a void in the drug analysis area and I shifted to fill in for that. So it was about a year prior to my leaving.

Q Did there come a time when you were the head of the serology division of the state police?

A Yes, sir.

Q About what year did that happen?

A It was never an official position.

Q Okay.

A I was the senior serologist, so I more or less supervised.

Q Do you know approximately when that would have occurred that you more or less supervised the other serologists?

A. Until 1976 when I believe Fred Zain was hired, I was the only serologist, so there was no one to supervise. At the time he was hired, basically I became the supervisor.

Q We'll get into that a little bit more. When you-- What was the reason for leaving in October of '82?

A It was personal.

Q Okay. Sometime after '82, did you start working for the company you mentioned in the beginning?
A Well, when I left the state police, I went to work for the Department of Natural Resources as a chemist and I was with them until March of 1988.
Q Okay.
A And then I left there to work for this private commercial testing company.
Q Okay. Well, during the time that you worked for the state police, I take it you testified as an expert in serology in a number of cases?
A Quite a few. Yes, sir.
Q During the time that you were there, you were essentially the main serologist?
A Yes, sir, I was.
Q Okay. I think you mentioned that Fred Zain was hired in 1976. At the time that Fred Zain was hired, were there any other serologists besides yourself in the department?
A There was one other person who was not actively doing it, but had been basically my trainer. That was a Sergeant White, but he was not actively doing the serology work.

Q So when Zain was hired in 1976 were the only serologists in the department at that time you and Mr. Zain?
A Yes, sir. Uh-huh.
Q Let's talk about the hiring of Fred Zain. Were you involved in the decision to hire Fred Zain in any way?
A I believe I interviewed him, but that was only to basically obtain my opinion as to whether he was competent to do the work. I had no role in the actual decision. I talked to him, I may have seen a resume, but other than that, I mean, I didn't have a role in his hiring.
Q Do you have any recollection of the interview with Mr. Zain and/or what your impressions were at that time?
A As best as I can remember, I felt he was competent, that he was capable of doing the work. Other than that, I have no details as to the interview.
Q Do you recall making any kind of a recommendation to the other persons involved in the hiring process?
A I probably expressed my opinion that I felt

he was competent. Other than that, no.
Q Did you have any knowledge at that time about Fred Zain's educational background and his chemistry background in particular?
A No, sir. Like I say, I may have seen a resume, but I didn't pay a whole lot of attention to it. I might mention that the state police basically followed civil service regulations where a person could be classified as a chemist even if their degree were in some other natural science, and for that reason, I didn't pay a whole lot of attention to what his degree was.
Q So beginning in 1976 when Fred Zain was hired, I take it you supervised, generally supervised his work?
A Yes, I did.
Q Do you have any general opinions about the work performed by Fred Zain that you observed yourself?
A My personal experience was, I had no problems with his work. He was competent. He was a good analyst.
Q Okay. During the time that you supervised Fred Zain's work, do you recall having any particular arguments or disputes with him over the analysis in a

particular case?
A No, sir.
Q Were you ever aware of any cases where Fred Zain said that he saw a marker in a given test and you did not see a marker in that test?
A No, sir.
Q Had you heard any of the stories about the magic wand in the laboratory?
A In the newspapers, but not-- I have no personal knowledge. Just from what I've read.
Q But not at the time you worked in the lab with Mr. Zain, you hadn't heard of the magic wand?
A No.
Q Okay. I'd like to turn to the case that we're dealing with here. I just wonder, sitting here today, do you recall working on what I'll call the investigation of the Reggettz murders?
A Yes, sir.
Q What's the first thing you can remember about this case, your earliest memory of having any involvement in the investigation of those three murders?
A The fact that there had been three murders and someone had to go to the crime scene to collect

Page 11

evidence and it was determined that Fred Zain would be the person that went actually to the scene. I might mention the reason I remember this case is, it was an unusual case.

Q Can you recall if there is any particular reason why Fred Zain went to the crime scene versus yourself?

A I can't recall how that decision was made, but he was the one that was sent to the scene.

Q Do you recall being involved in that decision-making process?

A Not really, no.

Q Was it common for a serologist to go to the scene of a crime and actually obtain the samples of evidence to be tested later?

A No, sir, not really.

Q Other than this case, can you recall any other examples of cases where the serologist went to the scene of the crime to obtain the samples?

A Yes, sir. I can recall one case in which I was sent to Martinsburg to obtain samples from a vehicle. There was also a fingerprint examiner that was sent at the same time.

Page 12

Q What was it about the Martinsburg case you just mentioned that someone decided they wanted you to go there in person?

A I really can't say. I mean, it was-- I was told I was going and that was-- I didn't have any say in the matter.

Q Sure. Okay. As a serologist, were you trained in how to obtain evidence from the scene of a crime?

A Not specifically. I was trained on how to basically preserve samples, how they were to be handled, but as far as what samples were to be taken, no.

Q Okay. Are you aware of whether or not Mr. Zain at that time, and this would have been in December of 1979, had had any training in the procedure for obtaining evidence at the scene of a crime?

A Probably not. I think that at that time period a lot of this was what I would call common sense. You basically chose the samples based on what you perceived to be important and then you took whatever precautions were necessary to make sure that the integrity of those samples was maintained. As far as formal training in collecting evidence, I don't recall any training at all.

Page 13

Q Let me just focus on one thing about the lab at that time, and we're talking about around December of 1979. Did the laboratory at that time have any written protocol on laboratory procedures, first of all?

A No, sir.

Q Okay. And how about any written protocol on obtaining evidence at the scene of a crime?

A No, sir.

Q Did they have any written protocol on anything at that time--

A No, sir.

Q December of '79?

A No, sir.

Q So the lab at that time essentially didn't have any written protocol about how serological tests, hair tests, any tests you can think of, there simply was no written protocol?

A No, sir.

Q Okay.

A That was a concept that was coming into place but was not in place. In the early '80s that came into place, but up till that point, the general procedure was, you followed generally accepted procedures, but not

Page 14

necessarily anything written down, just what was considered generally accepted in a forensic laboratory, and it was unwritten but well understood among forensic chemists, not necessarily anyone else, but it was pretty much understood among forensic chemists what was acceptable and what was not.

Q Did the laboratory at that time-- and again, this is December of 1979-- did it have any procedure for routinely testing the various materials used in serological testing to make sure that, in other words, sort of a quality control type, quality control/quality assurance kind of a program, was there any kind of program like that in place at that time?

A No, sir.

Q Okay. Do you know if at that time, December of 1979, that the lab did test the materials that were used in serological testing, for example, to ensure the quality and that sort of thing?

A Not the materials themselves. There was indirect testing in that known blood samples, that was from members of the criminal identification bureau donated blood samples and they were tested routinely. They were the standards that were used. If there had been a problem with

Page 15

the materials, the chemicals, then it would have shown up in those tests. But as far as separate testing, it was not done.

Q I take it you did not go to the crime scene when Fred Zain went to obtain evidence samples; am I right about that?

A You're correct about that. I did not go.

Q When Fred Zain came back to the lab and this is again, we're talking-- let me make sure I'm right here, around December 13th and 14th of 1979, and let's say he started bringing stuff back to the lab, do you recall any discussions you had with Mr. Zain at that time? I obviously understand a whole heck of a lot of time has passed, but I'm just asking if you recall any conversations you may have had with Mr. Zain when he returned from the crime scene?

A Not specifically, no. I'm sure there was some discussion, but I have no idea what it might have been.

Q Would you have any knowledge as to whether or not Mr. Zain used rubber gloves and things like that when he was at the crime scene obtaining these samples?

A No, sir, and I can't recall what samples he

Page 16

may have taken as opposed to the fingerprint examiners and medical examiner. There were quite a few people at the crime scene and I have no idea who collected what.

Q Do you have any knowledge about the procedures that Fred Zain followed when he obtained those samples from the crime scene?

A No, sir.

Q Were you aware of how he packaged those samples at the crime scene?

A No, sir.

Q Let me have an exhibit marked here. I'll tell you what I've done just so you'll understand. I've copied the documents that were produced, that Ted Smith, I guess, got off the microfiche, and I've had them Bates numbered because at some point I'm going to have Mr. Murphy identify which ones he thinks he wrote and which ones he didn't, so I was going to have this marked as Deposition Exhibit 1 and here's your own copy with the Bates number at the bottom.

(WHEREUPON, the document referred to was marked for purposes of identification as Deposition Exhibit No. 1 and is attached hereto.)

Page 17

BY MR. SIMMONS:

Q For the time being, if you would just maybe kind of glance through that and we'll be more specific as time goes on, but I was actually going to ask you a couple of questions about the report.

A (Witness examines document.)

Q Now, have you had a chance to just generally glance at the report? I know there are some other documents there, but we'll get into more detail here shortly. I had some preliminary questions before I started asking you some specifics about that.

Once these items that were collected at the crime scene were brought back to the laboratory, do you recall who was involved in performing serological tests on the various items recovered?

A To the best of my recollection, I was involved in most of the testing.

Q Okay.

A I don't know that I saw-- that I did everything, but I did see all of the results.

Q Who else would have been involved in the testing?

A Fred Zain.

Page 18

Q And maybe-- I think beginning in this Deposition Exhibit No. 1, beginning, it's the Bates number four, is the first sheet of a report dated June 10, 1980. Do you have a general recollection of doing that report yourself?

A To the best of my recollection, I did write the report.

Q I've got a general question about the procedures in the laboratory. What is the significance of the date June 10th, 1980?

A That should have been the date of the report. The date it was issued.

Q Let me ask you this. Would that be the date that someone in the secretarial pool typed it out or would that be the date you actually maybe wrote a handwritten version and then it was typed out?

A I can't remember.

Q You don't know?

A No.

Q Okay. Is it possible there's some sort of delay between when you wrote the report in your own handwriting and it being typed out?

A There is a possibility, yes.

Page 19

Q Okay. On page, and I'm referring to the Bates number, it's page two of the report, Bates number five.
A Uh-huh.
Q It lists items one through seventeen and then it says, "The above items were recovered from the scene by Trooper F.S. Zain 12/13/79."
A Uh-huh.
Q Would that date-- so that's the date it was recovered. Do you have any knowledge as to when you would have received those in the laboratory or is that just not shown in your report?
A They would have been received in the laboratory the same day.
Q Okay. Then on down on that same page, this is Bates number page five, page two of the report.
A Uh-huh.
Q It talks about a blood specimen from Vanessa Reggettz and a nightgown. "The above items were received from Trooper M.D. Smith 12/14/79." When it says received, does that mean received at the lab?
A Yes.
Q Then down on the same page after listing it

Page 20

looks like a lot of clothing, "The above items were received from Trooper Terry Williams 12/14/79." So the lab would have had those pieces of clothing on that date?
A That's correct.
Q Then the next one, the blood specimens from Paul Eric Reggettz and Bernadette Reggettz, those were received on 12/17/79?
A That's correct.
Q Turn to the next page. There are some items, a Christmas package and a flashlight. It says, "Received on 12/18/79."
A That's correct.
Q That means the lab received it then?
A The chemistry lab. Corporal Shumate was a fingerprint examiner and he probably collected those items himself.
Q Okay.
A And did his examination and then turned them over to the chemistry lab.
Q By the way, before I pass this by, I guess starting on the first page of the report that was on the microfiche, there's some handwriting on the report and I just wondered if you recognized that handwriting? Do you

Page 21

see where it says, "VR"? It's to the left of those item numbers.
A No, sir.
Q Is that your writing?
A No, it isn't.
Q Okay. Then following-- let me see. I think we already talked about the flashlight from Shumate. There's a blood specimen from Paul Reggettz, III. that was received on January 2nd of '80?
A Uh-huh.
Q The next items are a doll and table knife and some clothing that was received on January 17th of '80?
A Right.
Q And there's something written above that. Do you recognize that writing?
A No, sir, I don't.
Q Do you know-- can you read that? I'm not sure I can read that middle word.
A No, sir.
Q It's looks like 1/7/80 and then there's a word and then 3/11/80. Do you not have any idea what that means?

Page 22

A No, sir.
Q Okay. Next there's a list of names and apparently blood samples were obtained from them and received in the lab in January of 1980. I was wondering what information do you have as to why blood specimens were obtained from those individuals?
A Okay. Since I talked to you the first time, I've thought about that a great deal. When the laboratory determined that someone else had been in that house, I hate to put it this way, but basically the state police went on a fishing expedition and rounded up a number of people in that area that were possible suspects and obtained blood samples from them to see if any of their blood specimens matched what was found in the house. They did not, but I mean, that's the reason for those samples.
Q Do you recall any of the specifics as to why one name was on there versus another?
A No, sir. They were just submitted to the laboratory as potential suspects and we examined them and ruled them out.
Q Okay. The next item is stainless flatware that's also from Shumate and that's February 6th of '80. So is it possible that he tried to do fingerprint on that

Page 23

and then he gave it to your lab?
A Yes, sir.
Q Then there are some additional, it looks like clothing items that were received February 7th of '80, and that means the lab received those February 7th of '80?
A That's correct.
Q Okay. And I think the final items submitted are two tubes of blood from John Moss and that's April 22nd of '80?
A That's correct.
Q Do you recall testifying before the grand jury, which resulted in the indictment of Paul Reggettz, III, I think it is?
A Again, since talking to you, I've thought about that a great deal. The best of my recollection is, I have only testified before one grand jury and I believe that was for John Moss. I had nothing in the way of physical evidence to connect Paul Reggettz to this case, so I would not have testified in the grand jury.
Q I understand a lot of time has passed by and I've found something since I met with you that might help refresh your recollection. I've got a couple of things here. Let's see. I would like to have this marked as

Page 24

Deposition Exhibit Number 2, please.
(WHEREUPON, the document referred to was marked for purposes of identification as Deposition Exhibit No. 2 and is attached hereto.)
BY MR. SIMMONS:
Q And ask that you look at that document.
A (Witness examines document.)
Q And particularly note the bottom of the second page.
A As I stated, I had no physical evidence connecting Paul Reggettz with this case. There was some evidence obviously connecting John Moss. If I testified before the grand jury, it was in relationship to John Moss not to Paul Reggettz.
Q Okay. Let me ask you this. I guess the reason why I'm asking, we have not been able to find the grand jury transcript from the grand jury which indicted Mr. Reggettz and you might also note that on the first page of Deposition Exhibit Number 2, John Moss's name is mentioned in the indictment of Mr. Reggettz, but he's not indicted. I guess what I'm trying to find out from you, do you have any recollection of testifying before the grand

Page 25

jury which indicted Mr. Reggettz?
A It may have been the same grand jury, but I had no testimony related to Mr. Reggettz.
Q Just to make it clear. I'd like to show you-- you testified-- let me see what the date of this one is-- on September 19th, 1983, and this is in-- this is the suppression hearing in the John Moss case before his first trial, and I would bring your attention to pages I think two fifty-five and two fifty-six, I think you'll see, and just see, if you'll look at that, see if that refreshes your recollection at all.
A (Witness examines documents.) Well, that was the grand jury.
Q Does that refresh your recollection?
A Again, to me it indicates that my testimony before the grand jury had no relationship to Paul Reggettz. It was related to John Moss. I don't know if this is on or off the record, but once there was an inconsistency found in the blood sample that indicated someone else had been in the house, the state police were still convinced that Paul Reggettz was involved and they were basically looking for a second party, an accomplice in effect.
John Moss met the criteria for an

Page 26

accomplice, but that did not exonerate Paul Reggettz. If the grand jury was looking at both people, as I said, there was no physical evidence connecting Paul Reggettz to the crime. So when I appeared before the grand jury, I would have had nothing to say regarding Paul Reggettz. It was only John Moss that I had any physical evidence that connected him.
Q Just so we make it clear, I think you stated that you, during the whole time you worked for the state police, you only testified before a grand jury on one occasion?
A The best as I can remember, yes, sir.
Q And that would be--
A That would be this one.
Q -- this one particular case?
A Uh-huh. I stated earlier this was an unusual case because the investigating officers, because they had a confession and because Paul Reggettz's behavior was unusual, were convinced that they had the right person and the physical evidence indicated someone else was involved either totally or partially, and there was some resistance on the part of the investigators to pursue that because they would have rather explained it away than

Page 27

pursue it because they felt they had the right person.

Q Can you recall the names of these people that you're calling the investigators or the investigating officers? Can you identify who those people may have been?

A You've handed me some documents that could give me some names. I don't want to say I recall that. The South Charleston detachment commander was the principal contact, but there were people working under his supervision that were actually doing the investigation.

Having the seen the documents, I do recall Terry Williams as being one of the investigators. Again, the best I can recall, the South Charleston detachment commander was Corporal Cook and there were several Cooks so-- but there was some discussion back and forth about what evidence was and what it meant and what needed to be done and basically, as I said, there was some resistance to pursue this matter because they felt they had the right person.

And this puts me in an awkward position because I was a member of the state police. I'm not putting them down. They basically were following their instincts that they had the person and the laboratory was

Page 28

producing contradictory evidence that said maybe you do and maybe you don't, and they wanted to believe that they were right so--

Q Did they ever-- do you recall any of the people involved in the investigation ever questioning any of your results or did they come up with any other kinds of theories to explain them away?

A Yes. Again, the detachment commander of South Charleston tried to explain away our results by trying to say that Paul Reggettz had planted blood at the scene to throw us off the track and again, it was well intentioned. They thought they had the right man and they were trying to explain away the inconsistencies, and I won't say it was a heated discussion, but it was a little agitated, and we tried to say that no, we didn't believe that, someone else was in that house, and we wouldn't buy their trying to explain it away.

On the Christmas wrapping paper, in particular, which to this day to me is the key piece of evidence, there was a very distinct drop of blood and it would be difficult to plant that. I mean, you could smear it, you could do a lot of things, that didn't look like anything other than what it appeared to be. Someone was

Page 29

cut, they bled and a drop of blood fell on that paper, and it would be difficult to plant that so--

Q Let me ask you this. When the evidence from the crime scene was brought back to the laboratory, are you saying that the lab had the actual items such as the wrapping paper as opposed to having some swatch which had absorbed the blood from the wrapping paper?

A No, we had the actual wrapping paper.

Q Okay. So when the analysis was performed, you had in the laboratory the actual wrapping paper? Maybe there was a knife and some of the other items, you had the actual item itself?

A Yes, sir.

Q Well, as far as you can recall, were any of the blood stains obtained at the crime scene placed on swatches as opposed to actually bringing in the item of evidence itself?

A Not that I can recall. They were the actual items.

Q When-- let me ask you this. At-- this is again back in December of 1979. Did the laboratory have any kind of cataloging of types obtained in other cases? In other words, let me try to illustrate that.

Page 30

A A data base?

Q A data base, yeah. If you got say a PGM 1+ and an ABO B, did you have a way of looking through your files and saying, "Well, hey we got this from this case"?

A No. That was something that was under consideration, but was not in place.

Q So when you received the reference sample of blood from John Moss on April 22nd, 1980, the lab did not previously have any knowledge whatsoever of any of his types from any source?

A As far as I can recall, no. I mean, we did not have a data base that we could reference.

Q How about if Mr. Moss was incarcerated in another state? I guess what I'm wondering is whether or not your lab had contacted the other state to find out if they had done any blood testing? In other words, I'm trying to find out if you had any knowledge of his blood types before you received that reference sample?

A As far as I can recall, the laboratory never contacted any other state and should not have had any reference to what his blood typing was.

Q Okay. Let's just-- so I can get this part out of the way, let's turn in Deposition Exhibit Number 1

John Moss, III vs. George Trent Warden of the WV Penitentiary
Multi-Page™
Robert Murphy 5/17/95

Page 31

to it's Bates number ten, and what I'd like to do is have you look at that and determine if you recognize the writing on Bates number page ten?

A That is mine.

Q Okay. Maybe for purposes of this proceeding, if you would-- I'll give you a pen-- if you would write just "Murphy" at the bottom of that page and that way we'll be able to keep these straight.

A (Witness complies.)

Q Okay. Now, what would-- the fact that this particular document is in your writing--

A Uh-huh.

Q -- what is the significance of that other than the fact that you wrote it?

A This basically is a compilation of all the parties involved or potentially involved and a summary of all the blood groupings. Just a tabular way of excluding people or including people.

Q Would this sheet in your handwriting indicate that you had performed all of those tests or does that not indicate that?

A Not necessarily.

Q Okay.

Page 32

A But, as I stated earlier, I would have seen the results.

Q And would you say that-- I think you described this as a compilation. So this is a compilation sheet as opposed to being the original, what I call the raw data sheet that was filled out when the testing was actually done; would that be correct?

A That is a fuzzy area because the way of keeping notes was in transition. It is possible that this is the actual bench sheet where things were recorded here, but it's also possible this is a summary sheet and there were other sheets for individual tests. I can't recall.

Q In the first column across before you have the names listed, in other words, the column that is on top of the column where the names are, it looks like it says "JAN"; is that correct, or does that have any meaning to you?

A Probably just January.

Q And going from left to right, what does that first column-- do you know what that word is? I know it's very, very hard to see. I just didn't know if you might recall from doing the sheets what that first column is for.

A No, sir.

Page 33

Q Okay.

A In the initial setup of serology, there were separate tests for determining whether a sample was blood and a second examination to determine if it was human blood.

Q Okay.

A When all of the enzymes and proteins were added, those became pretty much irrelevant, and possibly those first two columns are whether it is blood and whether it is human, but I'm just guessing.

Q Okay. Let's go ahead and go to Bates number page eleven and I'd ask you to first of all let me know if you-- first of all, is that in your handwriting?

A No, sir, it is not.

Q Okay. Do you recognize whose handwriting that is?

A No, sir.

Q Would you-- well, let me put it this way. Only you and Fred Zain performed the serological testing in this case; that is correct, isn't it?

A I'm not certain of that. There were two other serologists and I can't recall when they were hired and whether they were present at the time. That was Lynn

Page 34

Inman and Gale Midkiff, and I'm not sure if they were there at the time or not. They may have been.

Q Okay. So--

A But probably on this case the work was done by myself or Fred Zain.

Q Do you have any specific recollection of Inman or Midkiff performing work in this case?

A No, sir.

Q Well, how about on this sheet, simply put "Not Murphy." That way we'll distinguish between what you're actually able to identify and what you're not.

A (Witness complies.)

Q Okay. And let's go to Bates number page twelve, and it looks like at the top half of the page there's writing that's different from the bottom half of the page, and I wonder first of all, do you recognize any of the writing on that page as being your writing?

A The bottom half is mine.

Q The one that's in print?

A Uh-huh.

Q And the top half is not yours?

A No, it isn't.

Q And again, you don't have any recollection

Garrett Reporting Service (304) 776-5303
Penny L. Kerns, CCR
Page 31 - Page 34

John Moss, III vs. George Trent, Warden of the WV Penitentiar
Multi-Page
Robert Murphy 5/17/95

Page 35

as to whether or not this is a compilation based upon raw notes or if this actually is the raw notes?

A No, sir.

Q Let me ask you this. Since the top half of that page is in someone else's handwriting other than yourself, do you take it from looking at this sheet that somebody else performed the examination of those items listed on the top of that page?

A Probably.

Q Maybe on this sheet, you should put "Bottom Murphy," maybe would be a way to distinguish.

A (Witness complies.)

Q Turning to Bates number thirteen, do you recognize any of that as being your handwriting?

A No, sir.

Q Okay. Why don't you just write "Not Murphy" on that?

A (Witness complies.)

Q Then on Bates number fourteen, which is a copy of, I think if you'll look at it, it's the back-side of Bates number thirteen. Do you see the initials "FSZ" on the top of that page?

A Yes, sir, I do.

Page 36

Q And that stands for Fred Salem Zain?

A Right.

Q So obviously this would be a page that you ought to put "Not Murphy" on, I assume; right?

A Uh-huh.

Q Okay. And it looks like Bates number fifteen, sixteen, seventeen, eighteen. It looks like it's the handwritten version of the typed report?

A That's correct.

Q And that is your handwriting?

A Yes, sir.

Q So if you wouldn't mind, if you'd write "Murphy" on those particular pages, please?

A (Witness complies.)

Q I think we can skip a few pages. There are some case submission reports that it looks like Inman received something, so she was there at least in January of '80.

A Okay. I kind of thought that Inman and Midkiff were there, but--

Q Okay. Well, let me ask you this. You mentioned that you reviewed the results. Do you recall reviewing the results of any serological testing in this

Page 37

case performed by any person other than yourself or Fred Zain?

A I can't recall.

Q So you think it's possible that some of the work may have been done by Inman and Midkiff in this case?

A It's possible.

Q Okay.

A Again, to the best of my recollection, I saw the results.

Q But you do specifically recall reviewing some serological testing in this case that was performed by Fred Zain?

A Yes, sir.

Q Let's see. I think there are some other sheets near the back here that we probably ought to have identified.

MS. KERSHNER: Thirty-five?

BY MR. SIMMONS:

Q Yeah, if you would turn to Bates number thirty-five.

A Thirty-five?

Q Yeah. And I'd ask you, is that your handwriting?

Page 38

A No, sir.

Q Okay. If you would just write "Not Murphy" on there, please?

A (Witness complies.)

Q And also thirty-six.

A Thirty-six.

Q Would you also say that's not Murphy?

A That's not Murphy.

Q Okay. The next document, Bates number thirty-seven is some kind of a map. Were you involved in drawing that diagram? Not a map, but a diagram.

A No, sir.

Q Do you know who did?

A No, I don't.

Q We won't mark anything on that one. How about Bates number thirty-eight? Is that your writing?

A No, sir.

Q Okay. Why don't you go ahead and write "Not Murphy" on there?

A (Witness complies.)

Q In looking at that sheet, does that have any significance to you? Can you understand what that person was doing?

Garrett Reporting Service (304) 776-5303
Penny L. Kerns, CCR
Page 35 - Page 38

Page 39

A Not really.

Q Okay. Let's see here. I guess the final group of documents I'd just like to see if you've seen before. Starting with forty-one, forty-two, forty-three, forty-four, forty-five and forty-six, do you recognize those documents at all? Not necessarily the writing, but just those document?

A No, sir, I don't.

Q Does it even look familiar as maybe a way of maintaining the chain of custody, anything like that?

A It appears to be a summary of the custody of evidence, but I don't remember this.

Q Okay. I think we're going to be done with those documents for the time being. Once you obtained the blood types from Vanessa Reggettz, Paul Eric Reggettz and Bernadette Reggettz, isn't it true that you could deduce what the types of Paul Reggettz, III, as the father would be, presuming he's the natural father?

A Not necessarily specifically, but within a certain category, yes, and the conclusion was that there was blood at the crime scene that either Paul Reggettz, Sr. was not the father of those children or someone else was there, and it was the laboratory that requested the sample

Page 40

of blood from Paul Reggettz.

Q Was the main purpose for getting the blood sample from Mr. Reggettz to essentially establish that he was in fact the natural father?

A It was more to determine who the unknown blood came from. The assumption was that he was the natural father, but that was not the primary purpose. The primary purpose was to determine-- here we have an unknown blood sample. It doesn't match any of the three victims. It's got to belong to someone, so test Paul Reggettz first. If it matches, okay, and if doesn't, then start looking for someone else.

Q Do you-- well, maybe this will-- let me just ask you a couple of questions here. I think based upon the testing in this case and your report and the various documents, various tables were made of the blood types that were obtained and this has been included in the petition for writ of habeas corpus and let me see if I can find a specific example of-- and it might help you to look at these, but I just wondered if, were there any types-- let me start over again. You mentioned that by knowing the types of the mother and the two children, you can essentially deduce the range of types that the father would

Page 41

have to have?

A That's correct.

Q Do you recall if you had found any types at the crime scene that could not have been deposited by the natural father under these facts?

A Right.

Q And I wonder if maybe you know off the top of your head or if you'd like to look through it, if you can point me out an example.

A Well, the Christmas wrapping paper was the one that stood out as not being consistent.

Q Okay.

A And that sample was the one that prompted us to ask for a sample of Paul Reggettz's blood to begin with, because, as I said, either someone else was there or he was not the natural father.

Q Just for purposes of illustration, on page eleven of the petition I've got listed the types that were obtained from the Christmas wrapping paper and then on page eight of the petition, I have the table of the known types from, you know, the various reference samples. I wondered if you could just explain and illustrate what type you found from the Christmas wrapping paper that you knew could

Page 42

not have been deposited by the natural father? And I don't know if you can do that or not, but if you would look at those.

A It's been fifteen years.

Q Sure. I understand that.

A (Witness examines document.) In particular the ESD, the esterase. For each of these people to have a one, it means both parents had to be a one, because it's basically one/one. The Christmas wrapping paper was a two/one and known of the members of the Reggettz family had the two to contribute, so the two/one had to come from someone else.

Q Okay.

A Now, there maybe some others, but--

Q That's a good example. I just wanted to illustrate that.

A Okay.

(WHEREUPON, a discussion was held off the record.)

BY MR. SIMMONS:

Q I'd just like to ask you the final part, just some general questions to make sure I understood what your thought process was in interpreting the samples you

Page 43

obtained and the statistics that you came up with. In this case, what was the purpose for obtaining reference samples from Vanessa Reggettz, Bernadette Reggettz, Paul Eric Reggettz and Paul Reggettz, III?

A There were blood stains at the scene and basically the purpose was to try to account for all of the blood stains there and attribute them to a particular person or group of persons. This was a fairly common procedure at crime scenes and basically you try to reconstruct what happened. In other words, it sounds a little crude, but who bled where, and you can sometimes tell a sequence of events by doing that. So it was a routine practice to try to attribute blood stains in various areas of the crime scene with various people and that, like I say, was routine procedure.

Q Okay. Is one purpose for obtaining reference samples to compare those known types with the types you obtained from the scene where you don't know who deposited the particular blood sample?

A Right.

Q What analysis did you use to account for the possibility-- well, strike that. Let me do it this way. Based upon your training and experience with serological

Page 44

testing, you were aware of the fact that this kind of serological testing is unable to distinguish between a mixture of blood from two different sources and blood from one source?

A No, sir.

Q You disagree with that?

A I disagree with that.

Q So it's your-- based upon your understanding and expertise, this kind of what I always call it is basic serological testing, is able to distinguish between a mixture of blood from two different samples; is that correct?

A You're biasing the question because there's more involved than just the test itself. You have to look at the source of the sample. In other words, as I stated, on the Christmas wrapping paper, there was a discreet drop of blood. Now, if that had been a smear, then there would have been the possibility that that smear was more than one. But a discreet drop is invariably a single source.

So taking that into account, along with the test results and again, a mixture would indicate-- well, there would be variability in the test result in that if you had two bloods mixed together, unless they were exactly

Page 45

fifty/fifty, that the activity demonstrated in the exam would not be equal. So you would see in the pattern exhibited, you would see an inconsistency in the intensity of the bands produced. And that would indicate that you had a mixture. Not proof, but there would be an indication.

When I said you're biased, you have to consider not only the test result, but the source of the sample you used and when there is, as I said, a discreet drop of blood, then you're pretty well assured that that is a single source.

Q Let me go back to the question. I understand you have some other theories, or rather explanations or whatever and I'll be glad to get into that, but I just wanted to start with, the first question is, looking at the testing alone and the types that are obtained--

A Huh-uh.

Q -- can basic serological-- will you agree with me that using basic serological testing, you cannot distinguish between a mixture of blood from the source or whether it came from a single source?

A No, sir.

Page 46

Q Okay. So you still disagree with that, even without this other explanation that you have, where you have to go beyond that? So you're saying, for example, if I had a tube of blood from you and I had a tube of blood from myself and I put them in a flask and I shook them up and I poured it at a crime scene and you tested it, if you strictly did serological testing, you would be able to separate my blood from your blood?

A I wouldn't say I could distinguish them, but I would recognize that it was not a single source and I'm talking as a very experienced serologist.

Q You would recognize it was not a single source because of the variations in the intensity of the bands?

A Uh-huh.

Q Okay. Using my illustration again-- let's use my illustration again. Let's say you only did ABO testing and let's say that you and I are both ABO O, how would you distinguish between our bloods under that circumstance?

A No way.

Q You wouldn't be able to do that?

A No, sir.

Page 47

Q So the only way that you would be able to distinguish using basic serological testing is if the particular typing system you're using, we differ under that system; would that be correct?
A That's correct.
Q Is it your opinion under that illustration I gave you, that there would necessarily be a difference in the intensity of the bands?
A Unless the mixture was exactly proportionate, there would be a difference in the intensity. So, I'm not ruling out the possibility that it could be deceptive, but I'm saying it would take extraordinary circumstances.
Q Okay.
A Under normal conditions, a mixture which would not be exactly proportionate, you would see a difference in the intensity of the bands.
Q Let's just stick with that illustration. Let's say that you and I, under that illustration, had the same ABO type O, but I'm PGM 1+ and you're PGM 2+. Under that scenario, if you tested this blood that was mixed together and placed on the carpet, you would anticipate when you did the PGM test seeing a band that demonstrated a

Page 48

1+ and a band that demonstrated a 2+; would that be correct?
A Uh-huh.
Q And depending on the amount of the mixture, you would anticipate seeing a variation in the intensity?
A That's correct.
Q Let's say that you see a variation in the intensity of the bands. How would you report those results?
A I can't recall having experienced that, but it would have to be reported as a two/one, but qualified as being abnormal.
Q So it's possibly you have two/one, it's possibly a 2+ mixed with a 1+?
A Correct.
Q All right.
A As I said, qualified. In other words, it could be this, it could be this, it could be this. There's no way to determine it.
Q Okay. You know, in your explanation you talked about a single blood drop on say the wrapping paper?
A Uh-huh.
Q Let's say there are three separate blood

Page 49

drops on the wrapping paper. Do you assume under that scenario that there was a single source for each separate blood drop?
A No, sir.
Q Okay.
A Each drop would have been examined independently.
Q Okay. Let's go ahead and turn to the specifics of this case. Let's say the Christmas wrapping paper, do you recall if this scenario happened at all? Let's say there were two drops on the wrapping paper and let's say you ran ABO, PGM on one drop and GLO and ESD on the other drop. Would that have happened or go ahead and--
A No.
Q -- maybe you can explain how you did it?
A If that had happened, that would have been reported separately.
Q Okay. You would not have combined those results?
A No. No, sir.
Q The lab also at that time, I assume, would not have accumulated samples let's say from the sheet. Let's say there were different drops all over the sheet,

Page 50

but one drop wasn't enough to perform the different enzyme testing. Your lab would not at that time have combined those together and then done the testing?
A No, sir. Whatever was reported, was reported from a single sample.
Q And you never were aware of Fred Zain at least in the cases you supervised him, ever engaging in that practice of combining--
A No, sir.
Q -- different types together? Different samples together?
A No, sir.
Q When he would perform the testing in this case, would you necessarily have watched him go through the whole process or would you come in at the end and look at the gel together with him?
A I would primarily look at the final result, not necessarily see every single step.
Q Also I think you stated, but I just wanted to make it clear, you know, you gave your explanation about how serological testing can tell the difference between mixtures and a single source. I think you mentioned if the blood was smeared, would you at least initially be

Page 51

concerned that that's a mixture if the blood was smeared as opposed to a single drop?

A I would pay a little more attention to the patterns in the results.

Q What is it about a smear that would make you think that it's at least, you know, you need to be a little more concerned about the possibility of a mixture versus a single drop?

A Because a smear is more likely to be a mixture. In other words, you could have a blood stain and smear another blood stain on top of it and there wouldn't be any way to tell that. Whereas, a drop is a distinct pattern and it would be very difficult for a drop to be on top of a drop without it being very obvious. A smear on top of a smear, I mean, there's no indication of what you've got. For a drop to be on top of a drop, there would be something obviously visible.

Q At that time, and again this is December of '79, at least beginning December of '79, did the laboratory have a procedure in place where all of your testing serologically were photographed?

A We had the capability of doing it, but I don't believe it was done on a routine basis. I mean,

Page 52

there was some work done in that regard, but as far as every single sample being done, no, I don't believe so.

Q And going back to your analysis of the statistics, in your opinion, then, it is appropriate to, when you're-- let's make it more specific. Let's say you have a blood drop from the crime scene and you find an ABO PGM type and let's say the ABO type is the same as some of the known possible donors of blood at that crime scene, but the PGM is different from any of the known possible donors.

Under that set of facts, in your opinion, it is appropriate for statistical purposes to multiply the, you know, the percentage of the population having that particular ABO type times the percentage of the population having that particular PGM type?

A Right.

Q So you would include the ABO type even though it's the same as some of the known possible donors of blood at that crime scene?

A Right, because the probability is a total probability and you take all of the characteristics and include those.

Q Okay. Let me just look at one more thing here and I may be done here. (Examines documents.) Were

Page 53

you involved in any way in that whole Zain investigation?

A No, sir.

Q Okay. So no one ever contacted you?

A Well, I was contacted once about two years ago by the Kanawha County Prosector's Office in regard to this particular case and that was the only contact I had whatsoever.

Q Okay.

A Until you came into it.

Q Okay. Do you have any recollection about what that was about, that conversation was about?

A Basically, I was asked since I had signed the report, I was asked if I supervised the work and I stated that I had and that I had seen all the results and basically this had-- they didn't see a problem with that and that was the end of it.

Q Okay.

A That was the only contact I had at all.

MR. SIMMONS: Okay. That's all.

EXAMINATION

BY MS. KERSHNER:

Q Mr. Murphy, would it be fair to state that-- and I believe you did state this more or less, that the

Page 54

investigating officers on the Reggettz murders were pretty certain that they had their man when they arrested Mr. Reggettz?

A Yes.

Q Would there have been any advantage to you or to Mr. Zain to have found results that indicated that a person other than Mr. Reggettz or the three victims were at the home at the time of the murders?

A No, actually, that would have been to our disadvantage because finding that kept the investigation open and if we hadn't found that, everything would have been cut and dry. It would have been over.

Q In fact, did you or Mr. Zain experience any difficulties as a result of the results you did find?

A I wouldn't call it difficulties, but we did have to convince the detachment commander, the South Charleston detachment commander, that the investigation was not over, that there was another person and Mr. Reggettz had not planted blood at the scene and that they needed to be looking for someone else, and there was resistance because they felt they had the person responsible.

Q Okay. Did you take the lead in that persuasion or was Mr. Zain also involved in that?

1.

No. CR. 80-F-121

THE CIRCUIT COURT

of Kanawha County

JANUARY Term, 19 80

**STATE OF WEST VIRGINIA**

VS.

PAUL REGGETTZ, III

Indictment for

FELONY - MURDER

A True Bill:

Sally B. Sullivan

Foreman of the Grand Jury

Attest: James E. Roark

JAMES E. ROARK

~~XXXXXXXXXXXXXXXXX~~

Prosecuting Attorney

Kanawha County, West Virginia





Kanawha County
OFFICE OF THE PROSECUTING ATTORNEY
Kanawha County Judicial Building
111 Court Street, Charleston, W. Va. 25301
(304) 357-0300
FAX (304) 357-0342

WILLIAM C. FORBES
Prosecuting Attorney

November 22, 1994

Lonnie Simmons, Esquire
DiTrapano and Jackson
604 Virginia Street East
Charleston, WV 25301

RE: Moss v. Trent
94-MISC-663

Dear Mr. Simmons:

Enclosed please find a copy of the serological records from the West Virginia State Police int he above-referenced case. This is the raw data that Judge MacQueen directed be delivered to you.

I am also submitting copies of this data to Judge MacQueen and to the Circuit Clerk to enclose in the case file. Thank you for your attention to this matter.

Very truly yours,

Mary Beth Kershner
Assistant Prosecuting Attorney

cc: Hon. A. Andrew MacQueen, Circuit Judge
Hon. Cathy Gatson, Circuit Clerk

Page 55

A He was involved. I took the lead, but Fred Zain was involved in that, too, because he basically backed me up in saying, "Look, you can't sweep this under the carpet. There is something here that you need to pursue."

MS. KERSHNER: Okay. I don't have anything further.

MR. SIMMONS: That's all. You have the right to review this once she types it up. It's like a deposition, or you can tell her you're willing to waive your signature and, if you'd like, I'd be glad to send you a copy of it when it's done if you want it, but it's up to you. She needs to hear you say on the record one way or the other.

THE WITNESS: I would like to see a copy.

MR. SIMMONS: Are you willing to waive your signature?

THE WITNESS: Sure.

MR. SIMMONS: Okay. I'll send you a copy.

THE WITNESS: I want to be cooperative. I don't have anything to hide and I want to see that things turn out the way they should turn out.

MR. SIMMONS: I appreciate your help here. I just hope this doesn't become a habit.

Page 56

(WHEREUPON, the deposition was adjourned at 11:35 a.m.)

Page 57

REPORTER'S CERTIFICATE

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, To-wit:

I, Penny L. Kerns, a Notary Public within and for the State of West Virginia, duly commissioned and qualified, do hereby certify that the foregoing deposition of ROBERT MURPHY was duly taken by and before me under the West Virginia Rules of Civil Procedure, at the time and place and for the purpose specified in the caption thereof, the said witness having been duly sworn by me to testify the whole truth and nothing but the truth concerning this matter in controversy.

I do further certify that the said deposition was correctly taken by me by means of the Stenomask; that the same was transcribed by me or under my supervision, and that the said transcript is a true and accurate record of the testimony given by said witness.

I do further certify that I am not connected by blood or marriage with any of the parties to this action, am not a relative or employee or attorney or

Page 58

counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, or financially interested in the action, or interested, directly or indirectly, in the matter in controversy.

It is stipulated and agreed that the signature of the witness is hereby expressly waived to the foregoing deposition.

Given under my hand this 24th day of May, 1995.

My commission expires June 1, 1998.

Penny L. Kerns, CCR
Notary Public



Division of Public Safety
(West Virginia State Police)
725 Jefferson Road
South Charleston, West Virginia 25309-1698

Gaston Caperton
Governor

Colonel Thomas L. Kirk
Superintendent

November 9, 1994

Mary Beth Kershner
Kanawha County PA Office
111 Court Street
Charleston, WV 25301

Dear Ms. Kershner:

Enclosed you will find the material requested regarding the John Moss, III case: reference number C-79-2566.

The enclosed documents are photocopies of the microfilm file. The enclosed documents represent the complete microfilm file.

Sincerely,

T. A. Smith, Supervisor
Biochemistry Section

TAS/daj
Enclosure



MOSS, JOHN C-79-2566

SUSPECT: HOMICIDE

EXAM: SGT. R. C. MURPHY FOR TPR. TERRY WILLIAMS, SO CHAS.

according to the way the attorneys have attempted to develop that evidence. And I've told you that they would attempt to develop that evidence. So, that is why I'm going to turn the case over to counsel for the making of opening statements.

OPENING STATEMENTS

(For the State)

By Mr. Revercomb:

May it please the Court. Ladies and gentlemen of the jury, on December 13, 1979, this man, the defendant, entered the home of the Paul Reggettz family down in St. Albans. Paul Reggettz was at work. His wife, Vanessa, and two children, Paul Eric and Bernadette Lynn, were in the back bed room of that house that day.

This is perhaps the most horrifying crime that was ever committed in this State. John Moss brutally murdered Vanessa Reggettz, Paul Eric Reggettz, and Bernadette Reggettz. He did it all for a .22 rifle and a .22 pistol, a camera, a set of flatware, and a few dollars.

As introduced before, my name is Steve Revercomb and I'm an Assistant Prosecuting Attorney, and along with Ms. Lusk, we'll be representing the State of West Virginia and the people of this County in this case. I'll also introduce to you Mr. Nelson Bickley, Tim Huffman, and Kathy Beckett, the defense counsel for the defendant, John Moss, who is also here present.

Now, you jurors have been summoned here for an important duty. I'm here to represent the good people of this County, the citizens of this County, and you are to determine whether John Moss is guilty or innocent of three counts of murder in the first degree. Your duty is to apply the facts. You are the jurors and judges of the facts that come from the witness stand, and to apply the law that Judge MacQueen will tell you about. He'll instruct you on the law. But you are the judges of the law and you are sworn to follow that law. You jurors are the judges of the facts.

Now, the charges that come to you through the Kanawha County Grand Jury --- the Grand Jury meets and they decide whether to indict people.

I'll tell you right up front that the fact that they have indicted John Moss, or anyone else for that matter, is not to be considered evidence of their guilt.

I am telling you that now, and I'm sure Mr. Bickley and the other defense counsel will tell you that. I'm sure the Judge will read to you an instruction on that point of law. The fact that one is indicted is not to be considered by you all as evidence of guilt. An indictment is a formal instrument setting a person for trial by a jury of his peers.

At this time, I'll read the Indictment, so please bear with me.

"The State of West Virginia, Kanawha County, in the Circuit Court of the aforesaid County, the Grand Jury of West Virginia, in and for the County of Kanawha, now attending said Court, upon their oaths present that John Moss, Jr., also known as John Moss, III, on the blank day of December, 1979, and in the said County of Kanawha, did feloniously, maliciously, willfully, deliberately, premeditatedly and unlawfully slay, kill and murder one Paul Eric Reggettz in violation of Chapter 61, Article 2, Section 1 of the West Virginia Code, 1931, as amended, against the peace and dignity of the State.

"Count 2: The Grand Jurors aforesaid, upon their oaths aforesaid, further present that John Moss, Jr., also known as John Moss, III, on the blank day of December, 1979, and prior to the date of the filing of

Case 2:09-cv-01406 Document 17-32 Filed 10/29/10 Page 32 of 183 PageID #: 4402

this Indictment in the said County of Kanawha, did feloniously, maliciously, willfully, deliberately, premeditatedly and unlawfully slay, kill and murder one Bernadette Reggettz, in violation of Chapter 61, Article 2, Section 1 of the West Virginia Code, 1931, as amended, against the peace and dignity of the State.

"Count 3: The Grand Jurors aforesaid, upon their oaths aforesaid, further present that John Moss, Jr., also known as John Moss, III, on the blank day of December, 1979, and prior to the date of the filing of this Indictment in the said County of Kanawha, did feloniously, maliciously, willfully, deliberately, premeditatedly and unlawfully slay, kill and murder one Vanessa Gail Reggettz, in violation of Chapter 61, Article 2, Section 1 of the West Virginia Code, 1931, as amended, against the peace and dignity of the State.

"Found during the September Term of Court.

"Trooper Terry Williams of the West Virginia Department of Public Safety at South Charleston, West Virginia, who came before the Court to give evidence before that body, signed James E. Roark, Prosecuting Attorney."

Now, the burden of proof in a criminal case, you've already been told about this, and the burden of

proof is on the State in every criminal case. We accept our burden. The burden of proof is on the State to prove each and every element of a crime, beyond a reasonable doubt. The burden is one of reasonable doubt. The burden is not one of all doubt. We don't have to prove this case against this man against all doubt or beyond all possible doubt. We have to prove his built beyond a reasonable doubt, and a reasonable doubt is one based upon reason.

I ask you to keep in mind, as you listen to the evidence, what the word reasonable means because the only tools you have to determine what the truth is in this case is your common sense, your life experiences, and your sense of what is reasonable and what is not reasonable.

You have also been told, I believe, that briefly, there will be some circumstantial evidence in this case. And what circumstantial evidence is, it's one fact or one set of facts, or you can infer another set of facts, for instance I believe that Judge MacQueen used the example, if you are in the Jury Room looking out the window, you can see it raining. You can see the dark clouds come rolling in and puddles forming on the ground. That is direct evidence. You can see it raining.

However, if you've been in this Courtroom for two house and it was sunny when you came in here and someone comes to the door and comes in with a raincoat on and an umbrella with water dripping off of it, you can infer that it's raining outside. And that's a reasonable inference. That is circumstantial evidence.

But I would also ask you to pay attention in this case. Pay attention, because this is a very serious charge, the most serious charge that a jury can decide. This is not TV, ladies and gentlemen, this is real. What happened on December 13, 1979 is real. Remember that. A four year old girl is dead, a seven year old boy is dead, and their twenty-six year old mother is dead. I ask you to pay attention, because it's not like the case will unfold. We may call witnesses out of turn. There are bits and pieces of evidence that will arise.

The Judge has said that you're not allowed to take notes, so please pay attention to what is said. Listen to the testimony, whether you believe it or not, or how much of it you believe.

Some of the parts of this trial will be rather tedious; some exhibits and the photographs, certain witnesses will take maybe a whole day. Certain witnesses will be short. You will get tired, like everyone else

will, but I still ask you to please pay attention.

On December 13, 1979, Paul Reggettz got up at approximately 1:00 a.m. to go to work. He worked the night shift at UPS in Rand. He lived in St. Albans, at 7027 Chesapeake Avenue. He worked the shift from 2:30 a.m. until 11:30 a.m. in the morning.

At about 1:00 in the morning, he got up, got dressed, and talked to his wife Vanessa. They had some coffee together. About a quarter until two, it was time to leave. He kissed his wife goodbye and left. He went to work. He worked all morning and got off at 11:30 a.m. He then went home, shortly after noon, or at about noon. He was expecting to meet his wife and daughter, Bernadette, at the intersection of Route 60 and Fourth Avenue in St. Albans, or near St. Albans. He expected to meet them there and they were going on together to K-Mart to look for a watch that he had seen advertised, for a Christmas present.

When he gets to the intersection though, they are not there. But it has been raining off and on, so he thinks maybe they are at the house because of the rain. So, he turns down Fourth Avenue and he goes to the house. He parks in the driveway between his house and his landlord's house, Mr. Fortson. He goes to the front door

and he knocks, but there is no answer. He walks around the back and looks at the back door. He goes to it and realizes that it is not shut all the way. He pushed it open. Immediately, he sees, some ten feet away from him -- the door is open to the kitchen, but he could see his wife's legs sticking out of the doorway between the back bed room and the TV room which is off the kitchen.

He rushes to his wife. She is lying in the doorway, a cord around her neck, one cord -- two cords around her neck. One cord extends up through a hold in the door where a door knob had once been. They didn't have a door knob on it that day. He also notices some scissors in her chest.

Ladies and gentlemen, his worst nightmare was just beginning. The nightmare would get worse -- much worse. He wondered immediately where his little girl was. He found his little girl hanging on the door separating the front bed room from the living room. He took her down from that door.

Paul Reggettz found his son, Paul Eric Reggettz, in the bathtub, face down, hands tightly bound behind him, with a cord coming up around his neck. All three were dead, just as surely as his wife was to meet him at noon on December 13, 1979.

Paul then left the house and had someone call the Police. Fourteen hours later, at approximately 2:30 a.m. down at the State Police Detachment in South Charleston, Paul Reggettz confessed to killing them. He gave a very colorful and very graphic description of what he had done. He went so far as to say that he had put his little girl on the door because she liked to swing; he put his little boy in the bathtub because he liked to swim.

Also, later that morning, on December 14th, he returned to his home on Chesapeake Avenue, where Law Enforcement Officers demonstrated how he had murdered his family. There was only thing left out. Paul Reggettz didn't kill his family. He didn't kill his wife and little boy or his little girl. The Police, at that time, had his confession. They'll tell you that as soon as the Police arrived that day, he didn't show much remorse. He wasn't hysterical.

You'll hear the time of death, established by the Medical Examiner. He'll say that the time of death is in the range, it's not exact, that it could have been between 12:00 midnight or five, six, or seven in the morning. Paul will tell you that he didn't leave for work until a quarter till two. The Police were sure they

had the killer.

Now, the case begins to unravel soon after that, because at the scene that day on December 13th, when the Troopers showed up and the Lab people showed up, the photographer showed up, a person from the Serology Lab, a person who is a forensic serologist, showed up along with a fingerprint man. The serologist, a man by the name of Fred Zain, the chief forensic serologist for the State -- he'll tell you that there was a lot of blood at the scene.

Vanessa Reggettz had an injury. We all know how a head injury is. For example, Fred Zain will tell you that he took his samples of blood from every blood stain in that house. He will tell you that he took those samples from this house, then he went back to the lab where he analyzed them. Of course, in the meantime, he had the known blood samples of the victim, the mother. He got a known blood sample of Paul Reggettz shortly thereafter.

He will tell you that the blood samples that he took from a drawer in the kitchen and from a flashlight in the TV room, from a Christmas package, some Christmas wrapping paper, blood samples from the door between the living room and the front bed room. He took blood

samples from that door, a change purse from the chest of drawers in the front bed room, a pillow case from the back bed room, a curtain on the back door, even the little pajama top that Bernadette reggettz was wearing when she was murdered.

He will tell you that when he took that samples, he analyzed them in the lab. He found samples of blood taken from all of these people that I've just listed, that did not match any member of the Reggettz family. The blood didn't belong to Vanessa, from the head wound. It didn't belong to Paul Eric. It didn't belong to Bernadette. And it didn't belong to Paul Reggettz.

So, the Police continued their investigation. On April 22, 1980, they traveled to Cleveland, Ohio, to take a blood sample from a young man. During the course of their investigation, at the time of these murders, this man was living with his grandfather, some one hundred to two hundred yards straight down the road from the Reggettz home. And shortly after the murders, after about a week, that young man returned to Cleveland. That young man, ladies and gentlemen, is sitting right here (Indicating), John Moss, the defendant. His blood was taken that day in April and brought back to Fred Zain, the serologist, and his blood was found to match the

blood found in the house.

Now, we all know about some bloodwork. Everyone has an ABO type; either O, A, or AB, or B. Trooper Zain -- or Lieutenant Zain will tell you that the bloodwork at the time, was broken down scientifically and forensically, and can be broken down to a number of samples, to nine genetic markers or enzymes, all independent of each other, which is important. Some of the blood samples that were taken from the house were taken from the curtains on the back door, from Bernadette's pajama top, from Christmas wrapping paper, I believe the Christmas package. And those blood samples were able to be broken down by Fred Zain into those nine genetic markers. And one at a time -- that blood exactly matched John Moss's -- the genetic markers, those nine genetic markers, in the sample of blood.

And Fred Zain will further tell you that the combination of those nine genetic markers found in the defendant's known blood and on those exhibits, the exhibits that I just listed, occur in three of every ten thousand people, point zero three percent of the population in this State. Three in every ten thousand. Fred Zain will further tell you that some of the other samples, the other ones I listed, for lack of sufficient

sample or whatever reason, he was able to break it down into seven of the nine genetic markers. And again, he'll tell you that those seven genetic markers found on those exhibits matched right down the line to the defendant's known blood.

Fred Zain will tell you that that combination of those seven genetic markers occurs in one of every thousand, twenty-one percent.

On October 28, 1980, Trooper Williams and Trooper Smith, two investigating officers in this case -- they traveled to Mansfield, Ohio, where they picked up John Moss to bring him back here to West Virginia. Along the way, they stopped at the Parkersburg Detachment of the State Police Detachment. On October 28, 1990, John Moss confessed to murdering Vanessa Reggettz, confessed to murdering Paul Eric Reggettz, and confessed to murdering Bernadette Reggettz. And while his confession was not as colorful, perhaps, as Paul Reggettz, it was more detailed.

There are some important details in his confession that aren't in Paul Reggettz'. One of them was a camera. John Moss says he stole a camera from the Reggettz household. The Police didn't even know that a camera had been stolen until John Moss told them about

it. He also told them about some flatware and some dishes -- actually, in his confession he said he stole some dishes from the residence. He said he murdered the family; went to the Christmas tree and opened the packages; and said he took one gift -- it was a set of dishes -- and he gave it to his best friend's mother for a Christmas gift. He took it home, rewrapped it, and gave it away.

The State will put on a witness and she'll tell you that she received the Christmas gift, which was one set of dishes and one set of flatware. There are a couple of details that are in John Moss's confession that were not in Paul Reggettz' confession.

The defendant confessed twice. He confessed orally, and you'll hear about that. He also confessed on tape, and you'll get to hear his confession. In his confession, one thing he said, is that Vanessa Reggettz cut him with a knife, and you'll hear about that.

More importantly, he says in his confession, he went into the Reggettz home that night to steal, commit burglary. The reason that's important, ladies and gentlemen, we have in this State what is called felony murder. It's a rule of law that if a person commits a murder in the course of committing or attempting to

commit either a rape, a robbery, an arson or a burglary, then that person is automatically guilty of first degree murder. The State doesn't have to prove that there was any malice or premeditation or deliberation. The State has to prove that the underlying offense, in this case a burglary, was committed. Burglary is the breaking and entering of a dwelling, or entering without breaking of a dwelling, with the intent to steal. Along with the murder, that is a felony.

The State's evidence in this case will show that John Moss entered the Reggettz home that night in the middle of the night with the intent to commit a larceny. We can prove that by his confession. He had already stolen two guns, some money, the flatware and the camera.

Once again, the felony murder rule is that if someone kills somebody, murders somebody in the attempt or in the commission of either rape, robbery, arson or burglary, they are automatically guilty of first degree murder.

What the jury is to decide is, if you find him guilty, is whether or not he gets mercy, whether or not he is entitled to mercy.

After the Moss confession, Paul Reggettz was let out of jail and the charges against him were dismissed.

I also note that on discovery, we received the report that has been filed with the Court. It appears that Randy Murphy -- and I think that's Randy Murphy's signature as opposed to Zain's -- I think in this particular case that he -- it's not necessary for the Prosecution to allow us to show what part he played in the analyses that were taking place, and what procedures were done in compliance with -- specifically, the procedures that were involved in the examination.

THE COURT: Yes.

MR. REVERCOMB: That's fine.

THE COURT: I think that's appropriate.

WHEREUPON, the bench conference was concluded.

(Back on the Record)

THE COURT: Folks, we're going to give you about fifteen minutes. You've got plenty of time to go get a cup of coffee.

(On the Record with the Jury Not Present)

WHEREUPON, Fred S. Zain was duly sworn, and on

his oath, deposed as follows:

DIRECT EXAMINATION

BY MR. REVERCOMB:

Q Would you state your name, sir?

A Fred Salem Zain.

Q Where are you currently employed?

A I am currently employed as the Chief of Physical Evidence of the Bayer County Crime Laboratory in San Antonio, Texas.

Q In 1979 and 1980, where were you employed?

A I was employed by the West Virginia Department of Public Safety, stationed in Criminal Identification Bureau at South Charleston, and was in charge of one of the identification units that handled physical evidence pertaining to the blood and body fluids and hair samples.

Q Is that called serology?

A Yes, that's correct.

Q You say that you were in charge -- what was your rank?

Case 2:09-cv-01406 Document 17-32 Filed 10/29/10 Page 46 of 183 PageID #: 4416

A Lieutenant.

Q Were you involved in an investigation of the Reggettz murders back in December of 1979?

A Yes, sir, I was. I was called in to process the crime scene at the particular residence of the Reggettz family.

Q And did you collect samples at that scene?

A Yes, sir, I did.

Q And were some exhibits submitted to you?

A Yes, they were.

Q Who performed the analysis on those exhibits?

A I did.

Q I see a Sergeant Murphy's signature on this report, dated June 10th of 1980. Is it your testimony that you performed these analyses, too?

A Yes, sir. Sergeant Murphy, at the time, was in charge of a section, and we both counter-signed reports. And I processed all of the evidence that was submitted to me at the serology section at the time. The reports were either issued by himself or myself after conferring as to what should be issued in

a report.

Q But it is your testimony that you performed the analysis?

A Yes, that's correct.

Q And what training had you received at that time in performing -- to perform such analysis?

A My formal education was a degree in biology, with a minor in chemistry.

I also received an Associate Degree in Police Sciences, and specialized training at the FBI academy at Quantico, Virginia, relating to the specific field of forensic science, and more particularly, serology, or tests and methods utilized in the identification of blood and body fluids.

Both basic and advanced courses were obtained by me from the FBI Academy and other specialized training sessions that I had attended, as well as scientific organizations which I belong to, such as the Southern Association of Forensic Scientists, and other peer groups.

Q At the time, in 1979, how long had you been a forensic serologist?

A I transferred from the Department of Natural Resources in 1976, where I was a chemist and a

conservation specialist.

With a background still relating to the different types of analysis, I received specific training and designation at the CIB in the capacity which I spoke of. I was hired specifically to develop and implement forensic serology techniques for the State Police.

Q You examined the blood in this case by in 1979 for scientific testing procedures -- or testing was done?

A The methodologies were: One, I would take a staining that would identify ABO type on the stain, which was called the Howard-Martin Absorption Elution technique.

Secondly, to identify electrophoretic protein enzymes from blood staining by a method of electrophoresis. Those were, and still are, the routine blood typing techniques which are used, as well as scientific ways.

Q At the time of this murder, did you obtain any serology samples for your department?

A Well, what was utilized was a PGM subtyping system, which was utilized at the time, as well as other cases in this time frame, and additional blood blocking tests were made routinely, also, such as

haptoglobin and gesc-typetesting, that were used during this time period also.

Q You, yourself, have used these methods?

A With the methodology and techniques were used, it not only was refined for these particular blood-typing systems, but there was evolutions occurring in the scientific arena where a variety of blood-typing tests were being utilized that never had been before.

For example, the primary blood-typing systems that were utilized in 1976 was one ABO blood-typing, which was used for years. And secondly, a protein enzyme type typing called biregular PGM, or phosphoglucomutase; and also another method of EAP, or erythrocyte acid phosphatase, was used. These are abbreviations for blood-typing systems.

So, any additional blood-typings other than those were not routinely used or developed at the State Police lab until after I was hired.

Q And you implemented those prior to your testing in this case?

A Yes, that's correct.

MR. REVERCOMB: May I have a moment, please, your Honor?

THE COURT: Sure.

MR. REVERCOMB: I have nothing further at this time, your Honor.

CROSS-EXAMINATION

BY MR. HUFFMAN:

Q Mr. Zain, you testified that you actually did the analysis that was presented here in this particular case; is that correct?

A Yes, sir, that is correct.

Q So, how long after these scrapings were obtained was the analysis performed?

A Within the next day or so.

Q So, the fact that the report is dated in June, that doesn't indicate that's how long it was before the actual analyses were done; is that correct?

A That's correct.

Q At the time, whenever you performed these analyses, which would have been in late 1979, or in early 1980, it was a multi-system of electrophoresis used by the State Police?

A Yes, sir.

Q Was that the particular method that was

utilized in this case?

A These systems were run singularly and multi.

Q Did you utilize the four-and-one method, which was a derivative of the multi-system approach?

A No.

Q You didn't use that method?

A No, sir. The PGM subtyping system was utilized as a singular system, and that is how it was originally introduced by the people that developed the technique.

Q Was the multi-system technique, utilizing that system, which I believe you -- that Drexall had done studies on?

MR. REVERCOMB: Your Honor, I'm going to object to this. This should be done in front of a jury. It's like discovery, and it ought to be done in front of a jury. I don't see the purpose of it.

MR. HUFFMAN: Judge, the purpose of it is, in 1979, the testimony has been that there was a fairly -- even though Mr. Zain hasn't said it yet, this method of typing blood was well accepted within the scientific community. I don't know that that's particularly the

case.

In fact, I have a decision from 1988 from the State of New York, as well as one from the State of Michigan, in which it was decided in 1989, which questions this particular method of typing blood. There was some question raised in both of those particular cases as to whether or not there was particular reliability in that.

In fact, one of the fellows who apparently is an expert in the field, testified that there was some question as to this method of the typing of blood. In both the New York case and the Michigan case, that formed the basis of a reversal, because there was some question as to whether or not a specific scientific foundation under the Frye case a bit later, established by the Prosecution. I don't think they've identified ---

THE COURT: I'll let him testify.

BY MR. HUFFMAN:

Q What laboratory controls were utilized whenever you actually did this analysis?

A Internal and external quality control standards were used in all testing.

In reference to the multi-systems, the two points that you raised are, there was a controversy as to time and place, which was totally nullified as to the people, or qualified people, who were actually running the analysis.

The particular systems and the qualifications of the systems have been upheld and have no longer been in controversy in any manner.

Q How late do you recall the controversy to be? When was it you recall the controversy within the scientific community was resolved?

A In the beginning, or at the inception of the technique, that was simply due to the nonfamiliarity of the new system. And also, the main point is that these systems were run individually and separately. The multi-system was used simply in conjunction with, and not as a sole source. So, therefore, the analysis that was reported was done on independent, singular systems which have nothing to do with the multi-system technique.

Q So, what you're telling me is that all of the items you identified were done on the singular system?

A That's correct.

Q Were all of the tests repeated by someone else?

A The tests were read and looked at by both people working in the area at the time. The scientific method was followed completely.

Q Were photographs made of the actual plates?

A No. We did not have photographic capabilities in-house at that time.

Q So, at this point in time, there is no way to actually review the results of the typing that was done; is that correct?

A Other than the report itself, that is correct.

Q And the report itself, you think is conclusory as to what was specifically obtained; is that correct?

A The results of the tests were reported as they were done, and confirmed.

Q And that is the report that was signed off on by Sergeant Murphy; is that correct?

A That's correct.

Q Were there any documents that were available or were there any kept in 1979 relating to the

maintenance of the machine that was utilized in the testing?

A Maintenance, as far as equipment used in electrophoresis, consisted of a tank and power supply. It either works or it doesn't work.

Q What you are telling me is that there were no records kept as to either of the machines that were utilized; is that correct?

A What I'm telling you is that it's not really a machine on which records need to be kept. The power supply either works a hundred percent, or it doesn't work at all. The results are either positive or negative. There is no gray tone of interpretation.

The PH buffers are commercially bought and standardized by lot number, and everything is standardized and maintained to the specificity of the manufacturer.

Q But you all didn't manufacture the machine; is that correct?

A No, sir, we did not make the electrophoresis machines.

Q And you didn't work on them, either, at that time?

A An electrophoresis tank is a plastic

tank that you put some buffer solutions in, and you place a jello-type slab of substance on it, and put some blood stains in it, and it shoots the power through it to separate out the blood into some specific components. The interpretation of what those components are is reported, and those are compared to standards that are used in every comparison that is made.

Q Were there any controls utilized to account for the effects of the crime scene contaminants?

A Crime scene contamination on bloods are primarily such that would affect ABO typing, but therefore, controls aren't used at the crime scene, and are utilized on each analysis of ABO typing.

Q ABO typing is different than what we're talking about, electrophoresis, is that correct?

A That's the only time contamination would interfere in any way, shape or form because of the sensitivity.

Q Then you would agree with the Supreme Court opinion from Michigan where they reversed the Court in the case because there weren't sufficient controls for contamination of the crime scene; is that correct?

A No, sir. What I'm saying here, was that on protein enzyme analysis, what they are referring

to is controls which are really standards that are used on every plate for an exact comparison of what you are tying to identify. You do not try to identify unknowns by not having known standards, and I believe what they mentioned is controls as referred to as standards. And those were used on every protein enzyme that was identified.

Q Is it not possible that certain enzymes are affected by contaminants, and could cause a false-positive reading?

A A false-positive -- there could be an interpretation made, for instance, if sodium chloride is viewed on whole blood which was not found at the crime scene, there could be alterations that would totally destroy or denature a blood typing that may be interpreted incorrectly by a non-experienced individual, whereby the protocol and the proficiency that we used at the State Police crime lab in the mid-'70s through the '80s including now, are of the highest proficiency. And that is why there were proficiency tests that were done in-house, as well as out of State.

So, the quality control would be maintained in such instances as criminal cases because of the importance of the standards, the scientific methods, and

the closest scrutinization of quality control was utilized at the bureau, and still is today.

Q And that was based upon your recollection, and not based upon any independent ---

A It was based upon what I worked at and what I was in charge of. The protocols that I set forth as the standards to be used, based on what was accepted across the United States in over three hundred sixty-five crime laboratories, as of which now I am in charge of one, they used the same protocols and standards that are accepted, not only by law peer groups, but in the Court systems in the United States.

Q Do you recognize Dr. Benjamin Grunbaum as an expert in electrical phoresis?

A No, not in the field of electrophoresis.

Q What would you recognize him as an expert in?

A He was an expert witness for Beckman Industries Instruments.

Q He didn't -- Dr. Grunbaum is not the author of a book, of a handbook, for the individualization or analysis for the individualization of blood stains?

A Professor Grunbaum is in a precarious, and has been, in a situation working for a private company in projecting that company's image and the instrumentation that they sell, which is the way his interpretations assert methodologies and techniques, because they are different than what could be utilized in a particular situation.

Q Professor Grunbaum happens to disagree with you and most other lab technicians on the type of electrophoretic testing; doesn't he?

A I'm not a lab technician. Secondly, I'm not ---

Q I'm not addressing you as a lab technician.

A You stated lab technician. I'm just simply saying that Dr. Grunbaum has been perjured on the stand, because of the unreliability of his testimony.

Q That's your opinion?

A That's my opinion.

MR. HUFFMAN: Judge, I have no further questions.

THE COURT: So, you're objecting to his being offered?

MR. HUFFMAN: I don't question per se, Mr. Zain's qualifications. I don't think that the State has

complied with our own evidentiary requirements to perform a foundation.

I don't think, as an expert, that he, himself -- I'm not even sure he says that he is. I'm sure that he will say that he's been accepted in the scientific community, but it requires some independent testimony other than him as to an expert to testify in this case.

MR. REVERCOMB: Judge, that's simply not true. He cites two opinions from other states. They are States in which the Supreme Court has upheld blood testing in several cases.

MR. HUFFMAN: Judge, I might point out that there is a difference between blood testing and ABO typing and blood testing for the purpose of excluding an individual in a paternity case, and attempting to use certain types of blood testing to put an individual in a category in a criminal case.

THE COURT: I understand. I'm not sure that I'm grasping -- you're suggesting that he's got to lay a wide foundation for the process itself?

MR. HUFFMAN: I think he does. I think the record is that it is required. I think the State, in order to lay the proper foundation, has got to supply evidence other than the expert who is going to testify

and say that it is acceptable in scientific communities, this method of doing precisely what they're offering evidence for.

THE COURT: So, the expert himself can't testify to that?

Is there some law to that effect? The last case we had to that effect was that bite mark case that Dr. Sopher did, in which he identified -- he testified about that field of forensic examination and laid a foundation himself.

MR. HUFFMAN: I don't know if that was objected to, your Honor.

THE COURT: No, as a matter of fact, I don't think it was.

MR. HUFFMAN: But that wasn't the precise -- the Michigan case that I referred to is People v. Young, decided in 1985.

MS. LUSK: Judge, I know we've got a drug case in West Virginia where the lab, the chemistry expert from the lab, testified to the reliability of the methods which he used in identifying, I believe it was, marijuana. There wasn't any independent expert called in to state that this particular method of identifying controlled substances was reliable in the community. She

testified to it herself.

THE COURT: What other cases do you have?

MR. HUFFMAN: Judge, just note my objection.

THE COURT: I'm going to allow it.

Do you all want to take a five minute break yourselves?

WHEREUPON, the Court stood in a recess in the hearing of this case.

(Back on the Record with the Jury Present)

THE COURT: Go right ahead.

(To the Jurors) He's already been sworn.

DIRECT EXAMINATION

BY MR. REVERCOMB:

Q Would you please state your name, sir?

A Fred Salem Zain.

Q Mr. Zain, where are you currently employed?

A I am employed as the Chief of Physical

Evidence with the Bayer County Crime Lab in the Court Examiner's Office in San Antonio, Texas.

Q Previous to that, where were you employed?

A I was employed as a member of the Department of Public Safety here in West Virginia. I was stationed at the Criminal Identification Bureau in South Charleston, and was the Lieutenant in charge of the identification unit which received and examined physical evidence, such as blood, body fluids, hair samples, and such for examination.

Q Is that called the serology section?

A That's correct.

Q In what capacity were you employed there?

A I was the Lieutenant in charge of a particular unit, in charge of training and development of that particular unit, from the time I came into the Department of Public Safety until the time I left.

Q And how long were you a State Trooper?

A For over thirteen years.

Q Would you tell the jury and the Court your qualifications?

A My formal education is, I have a

Bachelor of Science degree in Biology, and a minor in Chemistry.

I have an Associate Degree in Applied Sciences from Marshall University. Also, I've got a Master's Degree in Biological Sciences from Marshall University.

I've done graduate work involved in the field of sciences, both biological and social sciences. I'm also an Associate Professor at the University of Texas, where I teach criminalistics. I'm also a guest lecturer and I continually lecture at a variety of colleges in the San Antonio area, as well as the State of West Virginia.

I have spoken at the West Virginia University Medical College routinely, as well as -- I have performed at the inception and development of legal investigation seminars, which are developed by the legal examiner system in the State of West Virginia.

Q Go ahead.

A My peer group associations -- I am a member of the Southern Association of Forensic Scientists. I am a member of the Canadian Society of Forensic Scientists. I am a member of the American Academy of Forensic Scientists.

Also, I hold memberships and work with the International Society of Electrophoresis, the

International Society of Hemogenetis, the Academy of Criminal Justice Scientists, and the American Society of Blood Banking. I'm also a Certified Peace Officer with the State of Texas, and I'm an advanced instructor for law enforcement in the State of Texas, and am in charge of two training programs, one with the Sheriff's Department in the County in which I am employed, as well as the San Antonio Police Department.

I'm also -- have made application for and acceptance to the International Association of Identification and am also a member of the American Association of Crime Laboratory Directors. I think that covers the peer groups.

As far as publications, I've published papers specifically regarding electrophoresis analysis and blood typings and genetic marker identification, using multi-systems and single systems in the State of West Virginia for six years, which was a survey of not only case studies, but whole bloods. And I was published with the American Academy, Journal of Sciences.

I have written other papers with regard to methodology and techniques used in forensic serology and personal lectures which have been given as far as the collection of evidence at the crime scene and surveys of

crime scene processing, and even presently I am continuing to give lectures pertaining to physical evidence.

I have also been in charge of training programs which were developed with the West Virginia State Police and include the people that are now presently employed, in doing the work and serological techniques at the Police Criminal Identification Bureau.

Primarily, that generally sums up my qualifications.

Q Have you been trained in the field of DNA testing?

A Yes, sir, I've had specific training at the Canadian Society of Forensic Sciences Center in Toronto, Canada. I have also had specialized training with the Connecticut State Police at Westhaven University in New Haven, Connecticut. I also have specific training and instruction with the Analytical and Genetic Testing Center out in Colorado, where I helped put on a DNA workshop for criminal litigators for DNA testing, and for paternity testing, as well as, our crime laboratory does DNA testing and processes criminal and civil cases independently.

Q Have you ever testified as an expert in

the field of forensic serology before?

A Yes, sir, I have testified in approximately forty-eight counties in the State of West Virginia and surrounding states, including Florida and Texas, regarding any and all serological techniques, be they basic serology or advanced techniques involving DNA analysis.

Q You have testified an expert in DNA analysis?

A Yes, sir, I have.

Q What are the tests that you use in processing cases in your work as a forensic serologist?

A The primary tests are examinations used in serology that are either visual tests and exams or chemical tests. Chemical tests give you an idea of whether something is positive or negative, and you can continue on with that process as far as -- you obtain as much information as possible.

For example, all of the methods and techniques that are utilized in forensic today are accepted, not only in forensic scientific community, but in the general scientific community as it relates to forensic evidence or clinical evidence. The development of processes, even as of today, have been developed from clinical

processing.

A lot of the origin of electrophoretic techniques were developed in Europe in the 1940s and '50s, that pertain to paternity testing, that have to do with the biological father of a child, for example. These techniques were utilized and implemented into the forensic community and standardized across the United States. The same thing, right now, is being done.

The primary two areas are one, abuse of a microscope for determining an ABO type, because you can visually see it through a microscope, whether it is positive or negative, and whether you are an A, a B, an AB, or an O, from a stain.

And second, is to use a method of electrophoresis, which is a long name. It means a very simple process. Electrophoresis, very simply, is a jello-type substance is put on the last plate. You put a portion of the stained item on that jello, then you pass through the jello a current which separates out the particular blood stain or body fluid.

Q Like an electrical current?

A Yes. That would sort out the blood stain into some components that you can add some coloring agents to and receive the patterns. If you see any

banding patterns, they may match up or they may not. If they match up, then it's a positive identification. And if it doesn't match up, it's different, and that's exactly how it's reported.

For example, if you get three drops of a person's blood and then you add three specific substances, one will react to an A blood type, and one will react to a B blood type, and one will react to an O blood type. The same thing is the method of electrophoresis. You use standards. You use quality control so that you don't misinterpret anything that may be available. And when the results are issued, they are either positive or negative as far as the conclusion of whether they match or not.

Q Are these tests accepted within scientific communities?

A Yes, sir, they are.

MR. REVERCOMB: Your Honor, at this time, I would ask that Mr. Zain be qualified as an expert forensic serologist.

THE COURT: Subject to the defendant's -- noting the defendant's objection, he may be permitted to testify at this point.

MR. REVERCOMB: Thank you, Judge.

BY MR. REVERCOMB:

Q Now, Mr. Zain, I want to call your attention to December 13, 1979, and ask you if you recall being at the scene of a triple murder?

A Yes, sir. At that time, I was stationed at headquarters, and as I mentioned previously, I was directed through the Company B to go to a particular residence to process a crime scene.

Q Do you remember where that location was?

A It was in the St. Albans area. I forget the exact location, but it was a residence of the Reggettz family.

Q At what time, approximately, did you arrive?

A To the best of my recollection, it was after noon, probably around 1:00 o'clock, or so. I know that once I got there, the processing of the crime scene went on through the evening until about dark.

Q For what purpose were you called there?

A Specifically, I was designated to go to the crime scene, one, to collect any physical evidence that may be available at the scene for testing and

analysis.

Q And in general terms, what do you look for at the crime scene?

A My specific job capacity would have been to look for hairs, fibers, and blood stains. And seeing how it was all at the crime scene, the primary physical evidence around and through the house which I inspected was a majority and variety of blood staining.

Q Did you find that blood stain at the Reggettz home that day?

A Yes, sir. There was blood staining in the majority of the rooms of the residence, as well as on the outside of the residence.

Q Did you take samples of the blood stains and objects that had blood on them from the scene that day?

A Yes, sir. I collected, I believe, seventeen items from the crime scene, myself, personally, as well as I received other items of evidence that were submitted for analysis at the time, from Trooper Smith and Trooper Williams. And also I received other items internally from other people in reference to this particular case.

Q Do you have a list of all of the items

which you took from the scene in 1979?

A Yes, sir. I've got a copy of my report that was issued, that you gave me, as well as the items that I reported.

MR. REVERCOMB: Your Honor, I would like permission to request Trooper Zain to step down and point on the chart where he took these items and samples.

THE COURT: Fine.

MR. REVERCOMB: Your Honor, I'm referring Lieutenant Zain to Exhibit 147.

BY MR. REVERCOMB:

Q First of all, Mr. Zain, does this Exhibit 147 accurately depict the layout of the house as you found it on December 13, 1979?

A Yes, sir, I did a -- it looks like a pretty accurate drawing, or a non-scale drawing which I made at the time, of the crime scene, which would more or less give me a quick orientation of the samples I made. I've got the same format here, where the items are marked, are pretty evident.

You've got item number one which is right here (Indicating). It was in this one bedroom area, where

there were pieces of a knife, a broken knife, laying around this area, is number one.

Number two was a sample that I removed from the pool of blood where Vanessa Reggettz was lying, or where she was when I came into the residence.

Example number three was a portion of bloody carpet which I removed from this area, which I didn't assume anything at the time, but it was the second larger pool of blood in the home.

Q What room was that in?

A That was in the front bedroom which is close to the -- right next to the living room.

Q And it also was Reggettz' blood?

A Number four was blood from a bed in the front bedroom, this area (Indicating), where the little girl was lying, where she was placed.

Number five was a pillow case, also from the front bedroom.

Number six was the electrical cord which was removed from around Vanessa Reggettz' neck. She was hung up on the door right here (Indicating).

Number seven was a curtain that was on the back door. The curtain had slight blood staining present on it.

Number eight was a sample from the sheet in the kitchen floor. Number eight was right here (Indicating).

Number nine was a sample from outside the back door, below the door handle, on this same door, on the outside, below the door handle, there was some blood staining smears. They weren't drops or splatters; it was like somebody had shoved the door. If you have a cut finger, it would leave a smear as you are going out or coming in, one or the other.

Number ten -- there was a blood smear on the edge of the sink, which I removed a portion of it.

Number eleven is the same, only from the utensil drawer in the kitchen.

Number twelve is a pillow case from the bedroom situated right here (Indicating), where the son was.

Number thirteen is a sample from the door which was right in this area (Indicating).

Number fourteen was a sample of blood from the door area, right here (Indicating).

Number fifteen was from a change purse that was on a dresser.

Number sixteen was from an item that was located here (Indicating) in the stack of clothes that was piled up right in this area near the closet and the doorway.

And number seventeen was also in that same locale.

Those were the majority of items that I either physically removed the item if it was moveable, or extracted it or took a portion of blood stain that may have been present on any of the items there. There were other items that were blood-stained which I can identify later, but these were the items that I personally removed, taking into my care and custody through the analyses, until the work was done on them.

Some of the items, because they were extracted, say, for example, from an item there wasn't a blood stain on, something that could be tangibly removed, I just removed a small portion for use during the analysis. And it's like having a blood stain on a piece of thread. We'd use the thread for analysis and then there isn't any thread left.

But some of the items were returned to the investigating officer and some of them were not.

Q Okay, you may take your seat now.

Before we go on Trooper, or excuse me, Mr. Zain, item seventeen, the jockey shorts -- is that correct?

A Yes.

Q Where was that found in regard to the

bodies?

A It was underneath the pile of clothes, and I designated that as such in the report. I specifically stated jockey shorts found under pile of clothes in the master bedroom.

Q Mr. Zain, I want to now hand you what has been marked for identification purposes as State's Exhibit 108, and ask you if that corresponds to any of the exhibits which you removed from the house on December 13, 1979?

A Yes, sir. This is the first item which I mentioned. On the outside, it's -- I'll hold it so it won't come through the plastic. On the outside of the bag, the normal procedure is to mark the item, but more specifically, to designate a case number. That way we specifically know where and when the item was picked up, because that's how all items are submitted to the bureau, whether I did the investigation at the crime scene or someone else did.

And then, below that is the initials of the person that analyzes the evidence or collects it. And the FSZ is, of course, my initials. The case number for this State's Exhibit 108, which will remain consistent through all of the items, except for supplemental, which

was 79-2566. That's the official case number that was given to these particular items at the bureau.

Q I refer your attention more closely to the piece of knife blade there. Please describe its condition as it appears today.

A Except for the coloration since the last time I saw this item of evidence, it remains and appears to be in similar condition as it was the last time I saw it. You can see, actually, on the blood stain, the total mass of blood stains present. There are two little clear places. It might be a little rough for you to see, but right here and right here (Indicating), there's a clear space where there isn't any blood. That's because those are the areas of the knife that I actually removed some of the blood stain from for testing purposes.

Q And once you were through with the processing of this, who did you return it to?

A Like the majority of the items, they remained in my sole care and custody, and I returned them to Trooper Williams, who was one of the major investigating officers.

Q Do you recall when that was?

A I believe it was on March 31, 1979, the

Case 2:09-cv-01406 Document 17-32 Filed 10/29/10 Page 78 of 183 PageID #: 4448

majority of the items were turned over to him.

Q March of '79 or March of '80, Mr. Zain?

A I'd say March of '80.

Q I want to hand you what's been marked for identification purposes as State's Exhibit 35, and ask you if that photograph depicts where that knife was found?

A Yes, sir, that's the specific area by photo representation that I pointed out on the crime scene sketch there. The larger portion of the knife is right at the edge of the blood stain, and there are other scattered pieces of the knife which are also around the piece, yes, sir.

Q All right. Thank you. I now want to hand you what has been marked for identification purposes as State's Exhibit 110-B.

Would you examine that and tell us what it is?

A It's a portion of cut cord that I examined, Exhibit 110-B, and my initials are on the cord as to when I received it, and it would have been in another bag with whatever -- other than just being loose. But it also was removed and appears to be in similar condition since the last time I saw it.

Q Does that comport with item number six

on your chart?

A Yes, it does.

Q This was in your care, custody and control while you were examining it?

A Yes, sir.

Q Who did you return it to?

A I also returned it to Trooper Williams.

Q Now, I want to hand you what has been marked for identification purposes as State's Exhibit 115 and ask you to look inside that envelope and tell us what that consists of?

A It's State's Exhibit 115. It corresponds with my marked item number up here in the corner with the case number C-79-2566, and my initials. The marks are still on the item, the change purse, inside. You can see right in this particular area there is -- you may not be able to see it too good, but that's a hole right there (Indicating), and that's where I removed some of the blood stain that was present.

And it appears to be a small drop of blood or so on the change purse, but it appears to be in similar condition which the last time I saw it.

Q And do you recall where that was recovered?

A I believe that was on the dresser in the front bedroom. It also remained in my care and custody until I returned it to Trooper Williams.

Q I now hand you what has been marked as State's Exhibit Number 79, and ask you to look at that photograph and see if you can identify the change purse?

A Yes, sir. On the dresser, on the left side, right about in this area (Indicating) there appears to be the purse that we're looking at.

Q I will now hand you what has been marked for identification purposes as State's Exhibit 109 and ask you to take that out, and tell the jury what that is?

A First of all, State's Exhibit 109, it was referred to in my report as item number seven, and that was a curtain from the back kitchen door which I spoke of earlier. On the outside of this envelope, you have got the case number which was originally issued.

Also, I want to point out so that it won't be confusing, there is another number on there that says FD 89-445, also with my initials, and the date, 12/15/89. That was when I had looked at this when the crime occurred and rechecked some of the blood staining for additional technical analysis that was not available ten

years ago.

On the curtain itself, you have a large cutting that was taken in this area right here (Indicating), where there was some blood staining and some smears. This was done specifically for DNA analysis, but there was additional blood testing done here (Indicating) originally, which was reported in this report.

Also on the curtain, is the same case number and there were some other cuttings from, like right through here, which I'll stick my finger through to show you. There was blood staining in this area, and also in this area (Indicating).

And when I originally pointed out that it appears to be similar in condition to which I recently last saw it, and the original cuttings that were made on it were made by me, even though it was ten years later. And it originally looks to be the same as when I removed it from the residence.

Q After your initial examination of this item in 1979, who did you return it to?

A It also -- after I was finished and the evidence was picked up, it was picked up by Trooper Williams at the same time as was originally designated, on the 31st of March, 1980.

Q You say you later received it back; who did you receive it from?

A Also Trooper Williams. He sent it to the crime laboratory in Texas, because there was not the availability to do the type of testing in this State. He sent it to us and we tried to do DNA testing on it. There was DNA material present in the blood stain, but the grade or the condition was such that we were unable to get any additional information. It had just been too long since the occurrence, plus it would have probably preserved the evidence in a frozen condition. That would have been the best way to keep it from ten years ago.

The technology on DNA testing wasn't even heard of, much less being tried on forensic evidence then. We still thought we would try and see if we could possibly gain some additional information.

Q I don't know if I asked you this, but State's Exhibit 115, the change purse, did you also return that to Trooper Williams?

A Yes, sir.

Q State's Exhibit 63 is a photograph. I would ask you if that depicts the curtain which you just testified to?

A Yes, sir. It shows the same areas of

blood stains, which I stuck my finger through that one place, which is in this area here (Indicating), on the curtain. And that's a pretty good photo-likeness of the item at the house.

Q That's the item that was found?

A Yes.

Q Prior to your processing it?

A Yes, that's correct.

Q Now, I want to hand you what has been marked for identification purposes as State's Exhibit 41, and ask you what this photograph depicts?

A State's Exhibit 41 is the blood staining smear on the door. This is the door between the back bedroom and, I think they call it a family room, if I'm not mistaken. And that would be the sample or item number thirteen which I believe I referred to in my notes. It was a large blood stain which you can see from the photo, near where Mrs. Reggettz was found.

Q I now hand you what has been marked for identification purposes as State's Exhibits 54 and 55, and ask you to tell the jury what these photographs depict.

A Those particular two photographs are the same door area; one is just a little larger than the

other, but there is blood stains and smears on it, that appears on the edge of this doorway.

And if my memory serves me correctly, that would be -- I removed a blood stain from that particular area which was referenced as a sample from the door between the -- what I call the master bedroom and the front door, or the front door area, if I'm not mistaken.

That would have been item number fourteen, which I referred to in the picture up there.

Q Is that the master bedroom, the front bedroom?

A That's correct.

Q I now hand you what has been marked for identification purposes as State's Exhibit 46, and ask you what this photograph depicts?

A This is the photo, State's Exhibit 46, which is a sample from the kitchen sink area. You can see that there is a reddish color blood stain present on the edge, as well as water staining. This blood stain has been moist or it has been possibly some detergent or whatever may have been intermingled with it, but it's diluted. It isn't just a blood smear, straight-out. And I believe we weren't able to identify it, other than being blood, although it looks to be a whole there.

That's the sample I removed from the kitchen sink. I believe that was listed as item number ten.

I might say that the sample, like I was explaining earlier, the samples that were removed, such as from that particular area, a small portion of it was removed and that was used during the analysis, and the remainder of the blood stain, of course, remained on the scene or whatever the blood was deposited on originally.

Q State's Exhibit 51?

A This is the drawer in the kitchen that I made reference to. Item number eleven is a sample from the utensil drawer in the kitchen. It's right here in this area. You can see the reddish color stain, and that's on State's Exhibit 51, of that particular item.

I also removed a small portion of that stain and it was used during analysis.

Q State's Exhibit 57, for identification purposes?

A This is the sheet that was lying in the middle, or lying in the walk-through area of the kitchen. It pretty much depicts the accurate position of where the sheet was. There was a couple of things that were strewn about, some spoons or some utensils lying on the sheet. I identified some blood staining which you can actually

see. You might be able to see a small portion of the blood stain on the sheet right about in this area right here (Indicating).

But on State's Exhibit 57, it's what I made reference to as example number, or item number eight.

Q State's Exhibit 73?

A State's Exhibit 73 is the sample which I removed from the bed spread in this area (Indicating). It was on the bed where one of the children was lying, and that was item number four in my report.

Q Is there any other blood visible in this photograph?

A Yes, sir.

Q What I made reference to was example or item number three in my report, a sample from the carpet area, right in this area (Indicating). That is what I was talking about earlier. That's also on the board up there.

Q Finally, I'll refer you to the upper right corner. It's hard to see in the photograph. See if there is any other blood in that photograph.

A There is. You can see it by shadow of the pillow on the far side away from the child, in this area right here, there is a blood stain on the pillow,

and that also, was referred to as a pillow case from the front bedroom, or item number five.

Q I now hand you what has been marked for identification purposes as State's Exhibit 5. What does this photograph depict, if you know?

A This is an enlargement of Exhibit No. 5, which shows the outside back door. The blood staining which I made reference to primarily in the report, is this small portion of the blood which I removed below the handle, right there (Indicating). That's on the outside of the house. When I made reference that I collected it, that was inside and outside of the house, this is what I was referring to. But that's the item which I marked.

Item number nine, which I specifically stated was a sample from the outside of the back door, is below the door handle.

Q Now, Mr. Zain, I want to hand you what has been marked for identification purposes as State's Exhibit 158, and ask you if you've seen this exhibit before?

A Yes, sir, unfortunately. This has got my initials on the outside, with a ballpoint pen. You can hardly see it here (Indicating).

These particular items, a pair of scissors, is

what I removed -- personally removed from Vanessa Reggettz's chest at the crime scene, by direction of Dr. Sopher.

Q Who did you give this exhibit to at that time?

A Well, that exhibit remained in my direct care until I removed a blood sample from the scissors myself, and then it was turned over for printing to the latent print section.

Q Do you remember what date that was?

A No, sir, not specifically. The blood sample was removed probably that day or the next, and immediately turned over and handled as a latent print item. But because I had removed it from the victim personally, then I just went ahead and retained it to get the blood sample, the biological sample, off the item before it might have been denatured.

Q Who did you give it to?

A It was given to Corporal Shumate, with the latent department.

Q Who is now a Lieutenant?

A That's correct.

Q I believe you've already testified that you received some items back and that you tried to do

some DNA testing?

A There were several items that were submitted to the crime laboratory, which is an independent crime laboratory in San Antonio, Texas. They were submitted to possibly obtain additional information pertaining to this case that was not available to be done by any crime laboratory ten years ago.

What we did was check the blood staining that was available on the items that were submitted. The blood staining was extracted to determine if DNA banding patterns could be identified. There was material present, but it's what was called "low molecular weight" size, which was inappropriate for identification purposes. That material had degraded to the point where no further analysis could be performed on it.

Q So, your results of the DNA testing were what?

A The results of our banding patterns were negative, or inconclusive. None were obtained.

Q I want to call your attention to December 14, 1979. Did you have occasion to see the clothing identified as belonging to Paul Reggettz?

A Yes, sir, I received a -- on December 14, 1979, quite a variety of clothing that I received

from Trooper Williams. It consisted of -- it would be easier to go down the list here: Two pairs of brown pants, one shirt worn from work -- I'm going to read to you specifically what was submitted -- two pairs of blue jeans, one work glove, one pair of brown suede boots, one blue jean jacket, one pair of white athletic socks, one pair of brown work pants, two pairs of long underwear, one thermal underwear shirt, one white T-shirt, one pair of white jockey shorts, one tan workshirt, one blue sweatshirt, one red bandanna handkerchief, and one blue toboggan.

All of these items were submitted as belonging to Paul Reggettz, III.

Q I also ask you, on that occasion, December 14, 1979, did you receive any other items from Trooper Smith?

A Yes, sir. On that same day, I received from Trooper Smith, M. D. Smith, one blood specimen that was from Vanessa Reggettz, and also a plastic bag containing the nightgown of Vanessa Reggettz, which she had been wearing at the time of the particular incident.

Q I call your attention now to December 17, 1979 and ask you what evidence pertaining to this case you received at that time?

A On December 17, 1979, I received a known blood specimen of Paul Eric Reggettz, the son, the little boy, and a blood sample of Bernadette Reggettz, the little girl. I received both of these items from Terry -- Trooper Williams, on December 17, 1979.

Q Of all of the blood work which you received in this case, did you ever return it to the investigating officer?

A No, sir. The whole bloods were utilized during analysis and kept for quite a long period of time in refrigeration until they were disposed of, as is normal protocol.

Q Mr. Zain, I also want to ask you, or call your attention to December 18, 1979, and ask you if you had occasion to receive any evidence or exhibits in this case from Corporal Shumate?

A Yes, sir. On December 18, 1979, I received some items that were also at the crime scene when I was there, that I did not process or physically take them in hand at the time, but we did take caution of the biological presence that was on them. It consisted of a flashlight, a Christmas package that was under the Christmas tree, and also some Christmas package wrappings, which were also around the Christmas tree.

These items I received from Dave Shumate, of the latent print section.

Q Lieutenant Zain, I want to hand you what has been marked for identification purposes as State's Exhibit 155, and ask you if you have seen this exhibit before?

A Yes, sir, that's the particular item -- that's Exhibit 55 that was submitted to me by Trooper Williams as being the nightgown of Vanessa Reggettz.

Q That was submitted by Trooper Williams or Trooper Smith?

A It was submitted by Trooper Smith, I'm sorry.

Q Who did you return it to?

A It also was returned to Trooper Williams on March 31, 1980.

Q And did you conduct tests on this item?

A Yes, sir. A variety of blood stains on the item were checked, and blood staining origin as to who it was originally from was identified.

Q And I want to hand you what has been marked for identification purposes as State's Exhibit 107. I'd like you to look at that.

A This, also -- I've got it marked on

Case 2:09-cv-01406 Document 17-32 Filed 10/29/10 Page 93 of 183 PageID #: 4463

here, the case number is in this area (Indicating), and my initials. This box had a glass bowl in it.

Q . Who did you receive this item from?

A That was also received from Dave Shumate at the bureau for identification.

Q And who was it returned to?

A It was also returned to Trooper Williams.

Q And did you conduct tests on that?

A Yes, sir. There was a blood stain on the bottom part of the box, that I checked out, and reported.

Q State's Exhibit 106?

A This is a flashlight that was lying on a chair in the house that Shumate picked up. It's got my initials on the outside rim of the front part here (Indicating), which I marked at the time. That also was returned to Trooper Williams after I received it and tested it for blood staining.

Q I now hand you what has been marked for identification purposes as State's Exhibit 114?

A There, again, as I pointed out earlier, there is some double numbers here and initials. That's due to it being resubmitted to me for examination. It

should just contain a variety of what we call Christmas package wrappings, with a variety of holes cut in here. Where the holes are cut, are primarily where the blood staining was identified. You can see there is still some apparent blood staining in this area right here.

And also, in this area here, these areas were tested the first time, where I gained the original information. And then also, I utilized the same areas of the blood staining where we tried to do the DNA testing. This is just one of the pieces of paper.

Q Are there also blood stains on this piece, too?

A Yes, sir. These, like I say, they're getting sort of worn out, but there is blood staining apparent, visible blood staining, in these areas here. You can see the cuttings, the holes in the paper that are small cuttings. That is where blood staining was identified.

We got some anhydrant spray from the latent print section. And these all remained in my care, custody and were returned to Williams the first time, then just recently received and returned back to him again.

Q Did you receive these from Corporal Shumate?

A I received them from Shumate, from internal, and then for re-exam. I received them from Trooper Williams and then returned them to him after I was done with them.

Q Now, I hand you what has been marked for identification purposes as State's Exhibit 116, and ask you to examine that.

A 116-A, which you can tell is a child's item here, that I examined twice. The markings that are made on here now and labeled were areas that I marked in the photos for DNA analysis. But these items and the cuttings from this were made by me for testing purposes. It takes a little bit more blood staining, especially when it gets old, to try to identify DNA patterns. There is a variety of blood stains on this item.

Q Was this item also tested in 1979 by you?

A Yes, sir, it was.

Q And in 1980, who did you receive this from?

A I received that January 7, 1980 from Trooper Williams, and I also returned it to him on the same day that I returned the other items.

Q On March 31st?

A March 31, 1980.

Q I would hand you what has been marked for identification purposes as State's Exhibit 100, and ask you if you have seen this exhibit before?

A Yes, sir, I've got it marked on this piece of plastic here. The case number, my initials, and when we received it. This was one of the items that was examined, the flatware, or kitchenware, a box of stainless flatware. I received this from Shumate on February 6, 1980, and also returned it to Trooper Williams along with the other items on March 31, 1980.

Q I would like at this time to hand you what has been marked for identification purposes as State's Exhibit 63, I believe, and ask you to tell us what this -- oh, excuse me, number 64, and tell us what that photograph depicts?

A State's Exhibit 64 is a blood staining which, I believe that I was showing you on the paper there a while ago, the larger blood stain that was present at the time we were at the crime scene. That's the way it appeared to us as we were going through the house, looking at particular items, and that is one of the blood stains that was analyzed and reported.

Q That was done before you did your

testing?

A That's correct.

Q Mr. Zain, I want to ask you if you had occasion on January 2, 1980, to receive the known blood of Paul Reggettz, III, the father and husband?

A Yes, sir. I received that blood specimen from Mr. Reggettz, because I received it from Trooper Williams.

I requested that a known blood specimen be obtained from the father, number one, because of the ongoing investigation, and number two, because the samples from the scene that I had removed showed that the blood staining did not originate from anybody at the house at that time, which left the question, because of the freshness of the blood staining throughout the home, and because it would be assumed that because there was only one person bleeding, and that would have been Vanessa Reggettz, that when I identified the blood staining on a variety of the items throughout that house, and on the outside of the house, it did not originate from her.

Then I suggested that we start obtaining blood samples from any and all people that would have had access to the house, or could possibly have been involved

in this particular crime, at which time Trooper Williams and Trooper Smith, being the primary investigators in the case, obtained the blood specimen of Mr. Reggettz, and testing was done on his blood, which also excluded it from being his blood in the house.

Q What are you saying -- that after you received Mr. Reggettz's blood, you still had a variety of blood samples that didn't match anybody in the Reggettz family?

A What I'm saying is, there were a variety of blood stains that I had removed from the house, or identified on items from the crime scene, that could not have originated from Mrs. Reggettz or either of the two children. So I requested a blood sample from the father, seeing as how he was the fourth person who had ready access to the house at any time.

The blood staining was not identified as being his. He was totally excluded, and there ensued obtaining or trying to find out where the blood came from, because the blood staining was fresh. It was on stuff that hadn't been there that long or could not have lasted that long on items that the blood was deposited on, and it indicated in the investigation that there had been blood staining deposited by another person, other than the

people that we already knew about.

Q Do you have charts for selecting blood characteristics of the family members?

A No, sir, I don't. I've just got the report.

Q Do you ever make charts?

A Sure.

Q I'm going to hand you what's been marked State's Exhibits 143, 144, 145, and 146, and ask you to compare the blood on the members of the Reggettz family. Would you do that for us? Show the jury?

A I can; it's not problem. It might be easier, instead of using a whole lot of these numbers and letters, if I could just put it on the board there.

Q That would be fine.

A It would be easier for everybody, and simpler, and I won't write anything contrary to what's on this. I just won't write as many things, to make it easier.

What I'll do is simply this: I'll mark it, using initials. There might be a conflict of initials, so I'll put mother, father, son, daughter, and use initials from there on.

You've got the primary victim from the standpoint

of a person bleeding, known as the mother. You've got the daughter, designated as "D", and the son as the little boy, and on here, the father, Mr. Reggettz -- I originally was going to do this so that you could relate to what I'm talking to you about today.

Everybody can associate with an ABO blood type. All of the people in the family were blood type O. One of the other blood typings -- all blood typings are separate and independent of each other -- in other words, the blood type O does not make -- anything else that I talk about is not necessary for any of these other blood typings nor any of the other blood typings necessary because of this particular one here. So, I'm just going to use one blood type.

I'm going to show you all why I requested a known blood specimen from Mr. Reggettz and why I requested a known blood specimen, even after I analyzed his blood.

Another blood characteristic, which is called ESD, that's an abbreviation for extra-esteration-D blood type. They don't change. Everybody in here has got one; they don't change. They are not altered, they are genetically engineered, and they are inherited by what's Mendelian's Laws. You have three basic types of esterates. You have a 1, a 2, and a 2-1; that's how

they're designated. Just like the blood types in an ABO are A, B, AB, and O.

The mother is blood type 1; the daughter, type 1; the son, type 1; and Mr. Reggettz was type 1. The majority of the samples from the scene -- for example, the stain on the curtain, the sample from the kitchen drawer, the sample from the Christmas packages -- this is right at Christmastime -- the samples that were taken throughout the house, the doorframes and such, so, we're just going to call them questionable samples. We don't know where they came from. We're just picking them up.

Say, two were ABO type O, and they were of the Esterase-D type 2-1. Now, any way you cut it, that blood did not come from any of the people in the house. So, I recommended to the investigators that there was somebody else bleeding at approximately the same time that all of the other blood was being distributed in the house, and they needed to find out who it came from. That's where I left it.

From that point on, is when we ensued additional blood samples from a variety of different people that could possibly have been in the house and deposited blood there, or maybe not, I don't know. But that is the simplest form of even showing you that you can -- whoever

deposited this blood excluded this whole family of leaving the blood in the house. One individual's blood type if very different from another individual's, and can be one hundred percent exclusive that that blood is coming from another individual. The more you try to exclude somebody as depositing blood somewhere, the more you include them as couldn't possibly contributing blood in a certain place.

In other words, the harder I tried to say that this blood didn't come from you, the more tests I run to show that it didn't come from you, if it doesn't exclude you, it makes it even that much more apparent that it probably did come from you.

That's all the purpose of forensics. It's not to try to catch somebody because you're trying to get all of the blood types. It's really in reverse of trying to exclude somebody as being the possible depositor of the blood stains, no matter what kind of forensics it is. But on these charts, you've got an ABO type, you've got an Esterase-D type, all of these other designations or additional blood characteristics that everybody has. They don't change. They're not altered, and they're not hard to identify. And these typings were not identified in Mr. Reggettz blood, and from Bernadette's, the little

daughter's, from the father, and from the son.

You get a percentage of the population, that these people that the blood typings occur in, not how many people really have it, but they're not based on statistics, they're based on gene frequencies.

On a paper that I published in West Virginia, over six to eight years of work was based on a variety of blood samples; fresh blood samples, forensic blood samples -- they always were exactly compared to each other. If I analyze a very small sample size -- in other words, a very small blood stain on that back door that I showed you all, if I can only get one or two or three or four of these blood characteristics, it doesn't mean that blood's different, than if I get all nine of them. What it tells me is, if I only get half this many, I can only say that the blood stain still has some blood types identified on these. I just can't scientifically say that it is as good, because like I say, the more blood typings you get to try to exclude somebody as depositing blood, then you can narrow down the number of people that actually have that whole total amount of blood typings.

It's like, of course, to use as an example -- approximately forty-five percent of the population are blood type O. Well, that's a pretty good large amount

of people, but only three percent of the population are AB. So, if you've got somebody who's a type AB, then you've already excluded ninety-seven percent of the population, because that's just how the curve falls. It's genetically inherited, so you get all of these blood types together and you get a certain percentage. And I'm pretty sure they're going to have me testify to what the total combination of all of these blood types are.

But the key is that if the blood typings identified from the crime scene would have matched up with Mr. Reggettz or the daughter or the son or the mother, it still wouldn't mean that it specifically, one hundred percent, came from that person. But it would say that it would be very highly likely that it did. But because there was not only just one blood type, which is all you need to say that it didn't come from anybody there, there were several blood typings that were different than what is found in the whole family scenario.

So, as soon as I identified the one blood typing, it was readily apparent to me that the investigation needed to occur, no matter what may appear on the surface at the time, to find out who was bleeding in the house.

It's a part of our job as being a State

Policeman, to be investigators and to use investigative tools to try to find out as much information about a crime as possible, and this is what warranted us to continue the investigations at a more rapid pace. The longer time goes on after a crime, the more chances there are of losing physical evidence. That's exactly what our department did.

Q Mr. Zain, before we leave this subject, I see Paul Reggettz's chart there. He's got nine blood typings?

A Yes, sir.

Q I guess the importance of all of this is that all of those are separate and independent from the others?

A That's correct. In other words, I could do a blood typing on you, and I could just type your blood for, say, what's designated at the bottom there, as GC, that stands for group specific component blood type, it's a big word for just blood type. I can identify what your GC is and it doesn't matter what that is compared to what your ABO type is, or any of these others that are on that board. And it's just as important as getting an ABO type. About the only time you work that in is because if you're A positive or B

negative, or you worry about having kids because of your RH factor, and stuff like that.

Well, these other blood typings are not clinically important. In other words, if you have a transfusion or give somebody blood, these other blood typings aren't going to interfere. They're not going to be of any relevant importance from the standpoint clinically, but they are genetically important to forensic applications, and they are genetically important to population studies. They are sort of an added plus to find out an internal characterization of an individual. It's just like having brown hair or blue eyes, or long arms or short fingers, and things along this line. That gives you a physical makeup of what an individual looks like.

For blood characteristics, when used, and the way they're used forensically, and in population studies by anthropologists, give you an internal makeup of individuals of a certain area, and the study I did was on a thousand people and a thousand cases in the State of West Virginia. It shows that the population was primarily ninety-six percent caucasian and three percent black. And it confirmed the national gene frequencies that were being used scientifically in forensics and

otherwise, of what was used in the crime laboratory at the time, and is now, the gene frequencies to give us an idea of what type of population or how many people, say, should have a certain set of blood typings are right in sync with what is across the United States.

Q Before going any further, was any blood found in the house that was consistent with the blood of Paul Reggettz, III, the father?

A There was no blood stain in the residence or on any item that identified -- or that I tested that had any blood staining the same as Mr. Reggettz's or anybody else, other than Mrs. Reggettz, and the blood samples that I took from Mr. Moss.

Q And you've also testified that you had clothing submitted by Trooper Williams in December of 1979 that was identified as belonging to Paul Reggettz. Was any blood found on any of those items?

A No, sir, there was no blood that could be identified visually or chemically.

Q I want to call your attention to April 22, 1980, and ask you if you had occasion on that date to see the known blood of the defendant, John Moss?

A Yes, sir.

Q Who did you receive that from?

A I received a known blood sample of Mr. Moss's blood from Terry Williams on April 22, 1980.

Q And you compared his blood to the blood of the Reggettz family?

A It was tested, just like the other blood samples and stains that I had done. The blood typings which were identified were the same blood typings which I supplied from the samples from the scene.

Q One thing I think you testified about, one inconclusive marking can exclude a person?

A That's correct. If I were to check Mr. Moss's blood or that of anybody else and find that he is a blood type B, then there is no way he could have deposited the blood at the scene.

If he was an esterase type 1, there is no way that the blood could have come from him.

If he was any other blood typing than what I identified or what he is, it would have excluded him from being the depositor of the blood stain, at that place or anywhere else. But it didn't.

Q Was the blood identified consistent with Vanessa Reggettz's blood found anywhere at the scene?

A Yes, sir. I can tell you very quickly,

I hope, on the items that I removed from the scene. Personally, all of the items -- I'll just go through these by item numbers, because there are right there on that board and you've talked about them several times already.

But items one through five, which is from the pieces of the knife, samples from the doorways, the carpet, the bedspread, and the pillowcase ---

Q Which pillowcase is that?

A That's the pillowcase from the front bedroom.

Also, number six, the electrical cord which was removed from around her neck. The sample from the sheet on the kitchen floor, which had a couple drops of blood. A sample from outside the back door, below the door handle, which is sort of unusual.

Q That was consistent with Vanessa Reggettz's blood?

A That's right. I'm going to include everything that was on my sample that was hers.

There was a sample from the door between the bedrooms, and the living room.

Q The living room or the TV room?

A The TV room.

Q Is that the door at which Vanessa was found?

A That's correct. And also, the medium white T-shirt was found under a pile of clothes in the master bedroom, and was the same as her blood.

Q It was underneath some clothes?

A Right. And then, of course, the known blood sample on her nightgown, which we've already talked about. All of those samples that I referred to had blood staining on them and the blood types which were identified were the same as hers.

The other items where there was human blood identified, and the identified characteristics -- or they were identified as being the same as Mr. Moss's, and that was from the sample from the door between the master bedroom, or what I called the master bedroom, the front bedroom, and the front door.

The change purse, a sample from the utensil drawer in the kitchen, the pillowcase from the bedroom beside the bath, the curtain from the back door, and you've got the flashlight, the Christmas package wrapping -- those items, if I'm not mistaken there might have been another one, but all of those, for sure, had blood staining on them of the blood type the same as Mr. Moss,

and nobody else in the family.

Q Mr. Zain, what is meant by the term "consistent with blood samples consistent with a member of the family?" Does that mean that it is his blood?

A Consistent or not consistent is a way of reporting where you're not scientifically, at least at that time, you could not say the blood specifically one hundred percent came from an individual, unless you were there at the time the blood was deposited, or at least with a certainty that the type of blood, and the number of times you eliminated the vast majority of people -- the policy was, which I set forth, was to assure that reports were consistent or not consistent.

Q What does not consistent mean?

A Not consistent means that you one hundred percent exclude someone as being the possible depositor of blood or other body fluids.

Consistent means that all of the blood typings, whether you have one or whether you have nine, are consistent with what you are comparing to, and the person cannot be eliminated at all from the positive, depositing the blood or body fluids, if the same genetic markers are identified from item to the next, which make it consistent with each other.

Q I have a hypothetical for you, Mr. Zain.

Suppose an item, possibly a small amount of blood of person "X" and a large amount of person "Y", you found in a pool consistent with person "Y", in your testimony of what you would expect to find?

A I think I've used in this Court the analogy -- if you take a cup of water and throw it in the ocean, you are not going to be able to identify the cup of water. That's about as simple as you can say it, because you've got such a small portion of blood in a large portion of another blood, then you're not going to be able to identify it.

Q I want to again refer your attention to State's Exhibit 108, and I'll ask you to look at the biggest piece of the knife blade. I believe you've identified that as being a blood stain?

A Yes, sir.

Q Whose blood was that consistent with?

A That's the same blood type as Mr. and Mrs. Reggettz.

Q If she had cut someone with that knife, would you expect to find the other person's blood on it?

A Well, it depends upon a variety of

situations, but it's not really that complicated.

If you have one, you just cut somebody or you just cut at somebody and even though you may cut them, you're not going to have blood on that item which you cut them with. You have to have repeated exposure to an item, at least more than once, before you can have blood left on an item, particularly with a knife.

When you have a knife and it's just a cut through, it's primarily cutting through a variety of tissues, and the skin -- the skin is pretty tough. But when you cut through the first time, you've got to cause some bleeding to occur before blood can be left on something.

If you stab yourself when you're cutting an apple or something like that with a pocket knife, or when you're working in the kitchen, and you cut your hand, you cut your hand, but after you know that you've cut yourself is when you start bleeding, because there is no blood on the item that you cut yourself with.

Now, if you lay a knife down where you've got someone bleeding on it, then of course you're going to have blood deposited on it.

Q I believe you've already testified that the largest piece of that knife was found in a pool

consistent with Vanessa Reggettz's blood?

A Yes, that's true. And it is showed by the photograph. But even if, for example, this was used to cut somebody; with the amount of blood that is present on here, and from the area that I assembled from, you're only going to identify one set or combination of blood typings. And even if you had a fifty-fifty mixture, just keeping it real simple, adding one person's blood to another person's blood and you mix them up, you put them on something, then by running the variety of blood typings which were run, we'd be able to differentiate as to the blood typings that were identified, no doubt.

Q Mr. Zain, I'm going to have you what has been marked as State's Exhibit 152 for identification, and ask you to tell us what that is?

A It's a card that just simply says the blood typings or blood characteristics that were identified from Mr. Moss's blood sample, which is depicted -- his blood type is O. I'll put that on the board.

These other characteristics are abbreviated. They are protein enzyme-type blood characteristics. The PGM is 1-plus, 1-minus. There are ten blood characteristics in a PGM blood typing system, just like

there is four in the ABO blood typing system. ESD was 2-1, GLO-1 was type 2. The EAP type was a BA. The AK type was a 1. ADA type was a 1. The HP type was 2-1, and the GC type was a 1. These are the blood typings which I identified from the known blood sample. These typings were compared to the blood typings which were identified from the stains present at the crime scene which I mentioned earlier.

A variety of the stains, I was able to identify a majority of the blood characteristics. All of them, for comparison purposes, but on some of them, I was only able to identify -- which is quite a vast amount in itself -- let's say, seven out of nine. That's simply because for these two particular blood typing systems that are run individually and separately, you need a fairly large portion of the blood stain. And I think you all have seen what I tried to show you all on a variety of the items, either by a picture or by the items themselves.

A lot of samples that were present at the crime scene, there wasn't a whole heck of a lot of blood -- just a smear of blood here, a drop of blood there. And you have to have a certain amount of blood, even when it is in the best condition, to be able to identify any

information from it at all.

So, it doesn't make them different from each other; it just makes them -- we got more information from some blood stains than we did from others.

But the bottom line is, they still could not exclude Mr. Moss as being the possible contributor of the blood stains. And on the other hand it definitely excluded anyone else in that family from having deposited the blood at the crime scene.

Q Mr. Zain, I want to go through each of these items one-by-one, starting first with the change purse. That's State's Exhibit 115.

A Yes, sir.

Q How many genetic markers were you able to identify in your analysis of that exhibit?

A This is going to take a little time, going down through these, from the items per se.

Q How about this: Only on what's been marked for identification purposes, as State's Exhibit 134?

A Okay. These are my item numbers from the case, correct?

Q Yes.

A Okay.

Q You identified it on the change purse; is that correct?

A Right.

Q Item No. 15, the change purse from the dresser -- I identified seven blood characteristics from the blood staining I showed you. The blood staining identified on there eliminated ninety-nine percent of the population.

Q Is that what is meant by one person in a thousand?

A It's ninety-nine point nine percent of the population, so say, one in a thousand people could have a combination of blood types that are identified here.

Q Does John Moss have that combination?

A Yes, sir, he does.

Q I hand you now what has been marked for identification purposes as State's Exhibit 136. I believe that represents the stain that you took from the utensil drawer?

A Yes, sir. There, again, the same seven blood characteristics were identified. And I want to point out from the door, there was a smear of a blood stain; there wasn't a whole lot. And we utilized -- I

tested to get the information that I could readily obtain from the stain without destroying it.

These seven blood characteristics were identified as the same ones as before that had occurred, and it eliminated ninety-nine point nine percent of the general population.

Q And John Moss has those same blood characteristics?

A Yes, sir, that's correct.

Q Now, I hand you what has been marked for identification purposes as State's Exhibit 136, and ask you what that corresponds to?

A The same blood characteristics, again, were identified, which eliminated ninety-nine point nine percent of the population.

Item No. 14 is what I designated as between the front bedroom, or master bedroom as I've been calling it, and the front door, that was the entrance to the home, into the bedroom. But it did also have the same blood type as John Moss.

Q You removed that blood stain sample from that door?

A Yes.

Q Now, I hand you what has been marked

for identification purposes as State's Exhibit 139.

A 139 also, as Item No. 12 in my report, is the pillowcase from the bedroom beside the bath. It has the same blood typings as Mr. Moss. It occurs in one person in a thousand. That eliminates ninety-nine point nine percent of the blood typings, as report earlier.

Q Although you don't have a chart for it, I believe you also found blood on the flashlight?

A Correct.

Q Is that State's 106?

A Right. The blood typings and smears that were on the flashlight were identified as being the same blood type as on these previous items, and it occurs in approximately the same percentage, ninety-nine point nine, and due to the amount of the sample that was present on the particular item.

Q Now, I hand you what has been marked for identification purposes as State's Exhibit 137.

A I mentioned earlier about the curtain from the back door. You all have seen it. I have showed you where the blood staining was present on the curtain. You can see that there was a fairly large amount of blood staining present at the time that it was removed from the crime scene, and it was readily available to see the

amount of staining still present on it.

I was able to obtain nine blood characteristics. The combination of these blood types occurs probably in about three people in ten thousand, who would have the same combination of blood characteristics as that which are identified. These are the same blood typings that Mr. Moss has.

Q That's three in ten thousand people?

A Yes.

Q What percentage of the population does that exclude?

A Because of the gene frequency in occurrence, it eliminates ninety-nine point ninety-nine -- seven percent of the population.

Q Ninety-nine point ninety-seven percent of the population?

A That's correct.

Q I will now hand you what has been marked as State's Exhibit 135.

A This is also -- we had a large amount of stain, which I have shown you. We've talked about it previously -- the Christmas package.

Also, the same number and types of characteristics were identified, as I just stated, from

the curtain. The same package -- percentage and the same blood typings as Mr. Moss, and that occurred -- ninety-nine point ninety-seven percent had been eliminated as being possible contributors of the blood.

Q And that's the bowl box exhibit that you identified?

A That's correct.

Q And State's Exhibit 140 ---

A The wrapping paper which I showed you earlier -- there is still some blood staining present on the paper. It's the same blood characteristics which have been identified, the same ones as Mr. Moss's, which occur in the same percentage, and eliminated ninety-nine point ninety-seven percent of the general population.

Q Now, I hand you what has been marked as State's Exhibit 141.

A Okay. On the clothing of Bernadette, the daughter, you've got nine blood characteristics identified, the same blood typings as Mr. Moss's, and it eliminated ninety-nine point ninety-seven percent of the population, the same blood typing we previously talked about.

Q Does that chart represent what you found on Exhibit 189?

A Yes, sir, that's correct.

MR. REVERCOMB: May I have a moment, your Honor?

THE COURT: Yes.

(Back on the Record)

MR. REVERCOMB: I believe that's all I have.

CROSS-EXAMINATION

BY MR. HUFFMAN:

Q Mr. Zain, I think you've already testified on direct examination as to why you use the term consistent with; is that correct?

A Yes, sir. I believe so.

Q That's because, based on this type of testing which was done in 1979, you were unable to specifically say that this specific sample which you reviewed came from a particular person; is that correct?

A Yes, sir, it is.

Q And I think that you've already indicated that these tests were actually tests of exclusion; that's what they are generally referred to.

Is that correct?

A Yes, sir.

Q Now, the statistics that you used here for purposes of your analysis, three in ten thousand, one in one thousand -- where did those come from?

A First of all, they are not statistics. They are gene frequencies.

Q Oh, okay. Where did they come from?

A Gene frequencies are what can be genetically inherited in a given population. The population statistics, that you are calling statistics, are gene frequencies that are used here, are what is being used in a cross-section of national gene frequencies at this time and place.

Q Who compiled those statistics, or the gene frequency numbers, which you used?

A The primary information was done through the FBI facilities, the major crime laboratory, in the United States.

Also, there was work done by Dr. George Sensabaugh at the University of California in Berkeley. And also there were anthropological studies done on a wide variety of populations, which are available, as well as the major gene frequencies which were used at the time

of this report, was from the -- is from Scotland Yard.

The Metropolitan Police Department of Scotland Yard, which is pretty much a closed pattern of what types of population we have in West Virginia.

Q Are you familiar with the West Virginia Blue Book?

A Yes, sir.

Q In fact, I think your name is in here; isn't it?

A Probably in a couple of them.

Q Let me let you take a look at the Blue Book that I've got and we'll note -- we'll let you tell us for the record what that represents.

A This was issued in 1979, probably for 1978.

Q I've got a couple of tabs marked there beside -- the first one, you don't need to worry about, but if you will turn to this tab right there (Indicating).

MR. REVERCOMB: Your Honor, may we see that book before he shows it?

THE COURT: All right.

WHEREUPON, Mr. Revercomb was shown the reference.

BY MR. HUFFMAN:

Q Let me hand you this Blue Book back, Mr. Zain. Where I've got the tab marked, I believe, has information in there about Kanawha County; is that correct?

A Yes, sir, that's correct.

Q Does it show there on the page, close to where my tab is, what the population was reported to be in Kanawha County at that time?

A Yes, sir, it's got population, 1970, 229195.

Q All right. Let me turn to the other tab and you tell me what county this is for? Can you tell where I've got the tab there?

A Let's see. Are you referring to Putnam County?

Q Putnam. What's the population shown in the Blue Book for Putnam County that year?

A Population, time period 1970, twenty-seven thousand six hundred twenty-five.

Q Okay. Now, if you were to take the three in ten thousand figure that is on the report here and were to figure that into utilizing the population in

Case 2:09-cv-01406 Document 17-32 Filed 10/29/10 Page 126 of 183 PageID #: 4496

Kanawha County, according to the Blue Book, do you know what figure that would give us, based on a population in Kanawha County as reported, in terms of the number of people that you expect to see who would fall into this category?

A I think the map would probably call for what -- three hundred thousand. I mean, I want you to use which ever ---

Q Let me tell you what I came up with and you tell me if that sounds right.

A Okay.

Q I think this is right, because I did it on my calculator. Based upon a population in Kanawha County of two hundred twenty-nine five-oh-five, I came up with a figure for the three in ten thousand formula of three six five; is that right?

A Yes.

Q So, if, then, we were to assume that these characteristics would occur in three in ten thousand people, could we then assume that there were approximately sixty-eight point eight-five people in Kanawha County who had these genetic markers for any particular period; would that be right?

A As far as possible, or probable,

individuals that could have the same blood typings, that is correct.

Q And on the one and one thousand figures, if we were to do that same type of calculation, and again my calculator tells me, assuming it's correct, that the number for Kanawha County, again, based on the same population, would be six hundred ninety-four point two-four. Does that sound about right?

A That sounds correct.

Q So, we're talking about six hundred and ninety-four point two-four people that would apply to?

A Correct; who could possibly have the combination of blood types.

Q Would you come down for a minute. I want to ask you some questions about the crime scene here.

Item 1, which Mr. Revercomb asked you about, is the change purse. Where on there, on the change purse, does it appear?

A Which item?

Q Item No. 1, the change purse.

A That's the piece of a knife, right here.

Q No, I'm sorry. I'm going through the

last list of things that Mr. Revercomb gave you, not specifically the item.

Let me ask about the specific item, or this change purse.

A The change purse was my numbered item 15. It was found on the dresser.

Q And that's the one in one thousand. Let's point out a mistake my calculator made. Let's start again.

One in one thousand would not be six hundred ninety-four people, but would be two hundred twenty-nine people; is that correct?

A It's your calculator. You've got to remember, I was agreeing with your calculator.

Q I'm going to agree with her calculations; two-twenty-nine.

The change purse has characteristics which would put it in the one in one thousand category; is that correct?

A Yes, sir, that's the item on the dresser.

Q So, we're talking about two hundred and twenty-nine people; is that correct?

A Yes, sir.

Q Would you stick that on there where the change purse was?

A All right.

Q The next item was the utensil drawer. Would you show us where that is?

A That's the drawer in the kitchen, which would be right here (Indicating).

Q That's also in the one in one thousand category; is that correct?

A Yes.

Q So, I'll give you a two-twenty-nine to put on there.

The next item is the door between the master bedroom and the living room. Would you show the jury where that is?

A This is Item No. 14.

Q I've got it marked also as the one in one thousand category; is that correct?

A Yes, sir.

Q Let me give you a sticker for that.

Okay. The next item I have is a pillowcase from the front bedroom -- I'm sorry, it would have been the other pillow case.

And that item also was in the one in one thousand

category; is that correct?

A I believe so.

Q Let me give you a sticker for that one.

Now, the next item I have is the flashlight which was in the chair, I believe, in the TV room; is that correct?

A Yes, sir.

Q That was also in the one in one thousand category, which was two hundred twenty-nine people; is that correct?

A Right.

Q And now the next item which was removed from the back door -- since my figure was sixty-eight point eight-five, I could round off to sixty-nine, but I'll say sixty-eight. That item was in the three in ten thousand category; right?

A Yes.

Q Now, the Christmas package and wrapping paper was put in the same area; is that correct?

A Yes.

Q And the paper appears to be paper that came from that same package, which was also tested; is that correct?

A That's correct.

Q And that's also in the three in ten thousand category, which would give us sixty-eight people; is that correct?

A That's correct.

Q And the final item that was tested was clothing of Bernadette, and it's also in the three in ten thousand category. Where was it located?

A The bedroom of the daughter.

Q And that would be sixty-eight; is that correct?

A Correct.

Q Where -- let me ask you this. There is a pool of blood located in the front bedroom by the bed; is that correct?

A It's number 3 on my crime report.

Q That blood was consistent with the blood of Vanessa Reggettz?

A That's right.

Q As was the blood that was found on the bedspread there in that bedroom; is that correct?

A Yes.

Q Right on the corner, there; wasn't it?

A Yes, it's designated as number 4 on the report.

Q And the blood -- was it consistent with Vanessa's blood which was also found on the pillow case; is that correct?

A Yes, sir, that's correct. The blood stain was found on the pillow, to the right of the child.

Q You may take your seat again.

MR. HUFFMAN: I don't have any further questions.

REDIRECT EXAMINATION

BY MR. REVERCOMB:

Q Mr. Zain, Mr. Huffman asked you about a number of items that were removed from the scene there and were submitted to you later as being -- they fell in the one in ten thousand or the three in ten thousand group. Are all of those blood samples taken from those various items, are they all consistent with each other?

A Yes, sir.

Q They could all have originated from the same person?

A It's very likely that they did; yes sir.

Q What percentage -- three in ten

thousand people have the blood characteristics of the defendant, John Moss -- what percentage of that would be ---

A The normal populations which are taken into consideration -- gene pools are usually fifty-two to fifty-four percent of the population in female, and forty-eight -- forty-six to forty-eight in males, normally.

Q So, assuming a man committed this crime, it would cut these numbers in half?

A It could. But, depending on a given population, in a general sense, yes.

Q And once again, the blood characteristics of John Moss and the blood characteristics found on several of these items, the little girl's pajama top, the curtain on the back door, and the Christmas wrapping paper would exclude ninety-nine point nine percent of the population?

A So far as being the possible contributors that would have that combination of blood types, yes.

Q They don't exclude the defendant; do they?

A That's correct.

MR. REVERCOMB: That's all I have.

RECROSS-EXAMINATION

BY MR. HUFFMAN:

Q I've got one question, Mr. Zain. The blood you tested from the scene, you can't determine from those tests whether it came from a man or a woman; can you? Based on the sample that you used, you can't tell -- based on what you saw?

A At the time and place at that analysis time, it was unavailable to me. It can be done, is why I'm hesitating. But it was not available to be done at the time.

Q And DNA testing is what you do now; is that correct?

A Yes, sir.

Q And in this particular case, the DNA testing that was done most recently by you was inconclusive; is that correct?

A Yes, sir.

MR. HUFFMAN: No further questions.

RE-REDIRECT EXAMINATION

BY MR. REVERCOMB:

Q DNA testing wasn't available in 1979; was it?

A That's correct.

MR. REVERCOMB: No further questions.

THE COURT: Folks, we're going to recess until 1:30.

WHEREUPON, the jury was excused for the noon recess.

THE COURT: Steve, do you have anything else?

MR. REVERCOMB: We need to move these into evidence. We need to talk about the possibility of maybe calling another witness, probably an hour.

THE COURT: Okay.

Do you all have some witnesses?

MR. BICKLEY: We have two, that I've seen, your Honor. We have two others that I've not seen, but they were to be here at 1:00 o'clock, anyway.

THE COURT: Okay.

Mr. Zain, thank you. You may step down.

WHEREUPON, the Court stood in a recess in the hearing of this case.

(Back on the Record after Noon Recess)

THE COURT: Sally, tell the jury that we're going to deal with exhibits, and it will be about ten more minutes.

Okay. You want to do some house cleaning now, I take it?

MS. LUSK: Yes. The first matter is -- we would simply ask the Court to poll the jury this morning and ask if they have seen that crazy question that Channel 13 reporter had asked him out at the scene, when she put a microphone up to his face. We had forgotten to do that. If it's not too late, I would still like to know if any of the jury members saw that.

THE COURT: Why don't we bring them in and just ask it?

MS. LUSK: I would like to ask them one-by-one, if that would be okay with the Court.

CLOSING ARGUMENTS

(For the State)

BY MR. REVERCOMB:

MR. REVERCOMB: May it please the Court.

Good morning, ladies and gentlemen. At this time, I would like to take the time to thank you all on behalf of everyone. You have paid close attention this past week, this past seven days, and sometimes it has been hard to stay awake. It has been hot in here, and there has been some tedious evidence. But I've watched you. It is obvious that you have paid close attention to all of the evidence, and I am sure that I speak on behalf of everyone in thanking you.

I've also noticed that you have taken this case very seriously, as it is. Your duty is important. Ms. Lusk and I, we take our jobs very seriously, as do Mr. Bickley, Mr. Huffman, and Ms. Beckett.

At this time, I would submit to you that the State has met its burden of proof. We have proved the defendant, John Moss, guilty beyond a reasonable doubt of the first degree murder of Bernadette Reggettz,

Vanessa Reggettz, and Paul Eric Reggettz. I say that because we have proven each and every element of felony murder, beyond a reasonable doubt.

We proved that the defendant entered -- broke and entered the Reggettz home on December 13, 1979, in the early morning hours, with the intent to commit a larceny therein. His confession says that, "I went in there to steal," and he did steal. He took some flatware, the camera -- and in the course of doing that, in committing that felony burglary, he murdered three people, ladies and gentlemen. He murdered a little girl, a seven year old boy, and their mother.

The defense in this case has been Paul Reggettz's confession. I want to stress that fact. Mr. Reggettz -- you saw him on the stand. He told you -- and the evidence shows -- that he was at the State Police Detachment for fourteen and a half hours. That's that day, on December 13, 1979, before he confessed. He had had four to six hours' sleep in the past two days. He had worked the night shift at UPS. He had gone to Company B down there with Trooper -- Sergeant Woodyard, to try to help them solve this crime. That day, he came home and found that his family had been murdered.

You heard from Scott Leasure, the man who worked

at the A&W. What did he tell you about Paul Reggettz? He told you that he came in there and that it was obvious that something dramatic had happened to him. He was shook up, he didn't know what he was doing, he didn't even know how to ask for anything. He didn't know what to do. So, what did he do? That day, he was shook up. He threw a dollar down on the counter and says, "Call the Police. Someone has killed my wife." And then he ran back toward the house to see if there was anything else he could do to help the situation.

Then, when Trooper Williams arrived, Trooper Williams represented help. He wanted help. Trooper Williams was there to give it to him. He said he told Trooper Williams what he had found. Paul doesn't even remember going back into the house that day. He doesn't remember that.

You heard what Trooper Williams told you, that he went back into the house twice, and Paul told him exactly what he had found. Paul doesn't remember that. Trooper Williams said he didn't show much emotion or no emotion, that he had a blank look. Paul told you that something inside of him died. You heard him say it. He said, "I've got to tell this Trooper what I found."

You heard from Chuck Pettry Friday. What did he

say about Paul Reggettz when he saw him at Company B that afternoon? He said he was distraught, upset.

Paul Reggettz told you that later on that evening he realized that the Troopers, Dr. Sopher, and Law Enforcement -- he realized that they suspected him of doing it, and he just couldn't understand that. He couldn't believe it. He told you how they fired questions at him; one person asking a question and before he got it answered, somebody else would ask him a question. That went on for hours. The same questions over and over again.

Sergeant Woodyard testified yesterday that that could be true. There were times when there were three or four people asking him questions at the same time, for fourteen and a half hours.

You heard what Paul said about Dr. Sopher. He said he was insinuating things -- "You did this, you did it like that, didn't you?"

Dr. Sopher admitted that he made him take his clothes off and he didn't find any cuts on Paul Reggettz. He checked Paul Reggettz's boots for blood, for blood splatters. I think I remember Trooper Williams testified that there was no blood on any of Paul Reggettz's clothes or boots.

The final straw came at 2:30 a.m. Two men came downstairs. He didn't know who they were. They said, "Let us have him. We'll take care of him." A couple of minutes later, another man came and said, "They want blood. I don't want any part of this." He said that at that point, that was it -- "I had to tell them something to make them quit asking me questions and leave me alone." Paul said, "I'll tell you what you want, if you don't let them hurt me."

You heard Sergeant Woodyard yesterday. He said that Paul Reggettz said that to him. He admitted that, that he had said, "If I tell you what you want, will you make them leave me alone?" Sergeant Woodyard said he didn't know who he meant, but he was afraid of something.

Paul was also tired. He wanted the questioning to stop. Paul's confession, his first confession, was simply, "Okay, I killed my wife and kids." Later on, he went on into detail.

You heard Sergeant Woodyard yesterday in cross-examination. His every response to the question, "What did you kill your wife over?" His answer was, "We got into a pushing match over the kids playing." When he said, "Don't, daddy," every response he gave was to a specific question.

Now, one thing he couldn't have fabricated, ladies and gentlemen, he had seen it. He had seen everything. He came home and found his little girl hanging on the door; he found his wife tied to another door; he found his little boy in the tub. When he said he put his little girl on the door because she liked to swing, this was in response to a question. When he said he put his little boy in the tub, that was a response to a direct question.

Paul told you that he just couldn't take it. He wanted to be left alone. He was scared. Consider this: Where did Paul have to go? Who did he have to go home to? No one.

We know that Paul Reggettz's confession is not true. How do we know that? We know that from the evidence. The blood found on the Christmas presents and wrapping paper is not Paul Reggettz's blood. Remember what Trooper Zain said yesterday? He said one inconsistent marker excludes people one hundred percent. The blood found at the scene wasn't Vanessa's. It was consistent with the defendant's. It can be Paul's. A hundred percent.

Paul's confession, or the so-called confession, he never mentioned any Christmas gifts. I doubt if he

knew it. After all, his little girl was hanging on the door there.

Whose confession is it consistent with? That man right there (Indicating). Whose blood is it consistent with? John Moss's.

John Moss told you about opening those gifts -- not Paul. The blood found on the curtain at the back door was not Paul Reggettz's blood. Again, he is excluded a hundred percent. Vanessa Reggettz's blood is on the outside of that door, you could see that in Exhibit 5. The curtains were partially torn down on that back door. Whose confession is that consistent with? Whose blood is it consistent with on that curtain? John Moss's.

Paul Reggettz -- in his confession, there was never a struggle at the back door. They weren't even in the kitchen.

Alex and Paul Fortson both testified that you had to lift that back door to shut it, that it didn't fit the door frame very well. Whose confession is that consistent with, ladies and gentlemen? Who said he saw Vanessa at the back door after he ran out of the house, trying, in his words, "to put something against it, a chair or something"? What she was trying to do was to

lift that door and shut it.

The blood found on little Bernadette´s pajama top -- blood on the side where she was man-handled when the cord was wrapped around her neck. Blood here (Indicating), when she was picked up and hung on that door. Whose blood is that? It´s not Paul Reggettz´s. It´s consistent with that man right there (Indicating). It´s consistent with his confession.

Paul Reggettz -- according to Sergeant Woodyard, it was never explained to him how he hung that little girl on the door. Why? Because he didn´t do it.

The fact that the defendant´s blood, or consistent with his blood, on that shirt, shows two things. First of all, it excludes ninety-nine point nine percent of the population -- ninety-nine point nine-seven percent. That´s nine hundred and ninety-seven -- actually, it´s nine thousand nine hundred ninety-seven people out of ten thousand, excuse me. But it does more than that. Paul Reggettz is excluded a hundred percent as the depositor of that blood. It shows that he didn´t hand his girl on that door.

The defense would have you believe that Paul Reggettz cut his family, then went out and got someone else´s blood and sprinkled it around the scene. Is that

reasonable?

They would further have you believe that it happened to be another person's blood they got. It just happened to be that man's right there (Indicating). Is that believable? That's absurd. Paul Reggettz just happened to find some blood that excluded ninety-nine point nine-seven percent of the population? That's just not reasonable.

Paul's confession -- his so-called confession -- is just not true, ladies and gentlemen. Little Bernadette's body tells us that. The livor mortis is the color of death. You heard Dr. Sopher's testimony. She had livor mortis in her feet, consistent with being hung, suspended completely. That's in John Moss's confession, and Paul Reggettz saw that when he took her down. What did Dr. Sopher say about it? He said it wasn't intense enough for her to have hung for twelve hours, but it was too intense for her to have hung for two hours. What that does -- that excludes both of Paul Reggettz's confessions, when he first told Sergeant Woodyard that he took the little girl down before he had gone off to work. We know that's not true, from the color of death. She had not hung on that door for twelve hours.

Later, at the scene, he said he took a nap before

he went to work. We know that's not true either, because when they found her lying on the bed, she had not been lying on that bed for twelve hours. The livor mortis would have been in the back of her legs, her back, her torso. There wouldn't be the mottled effect on the front of her legs, which is consistent with the color all around her legs. So, she didn't hang for twelve hours and she didn't lie for twelve hours. So, whose confession is that consistent with?

Finally, we've got to use logic and common sense. What effect did Paul Reggettz's confession have on John Moss? None whatsoever.

Paul Reggettz's confession, and any evidence against John Moss, is completely separate and independent.

How does the Reggettz confession change the evidence, the blood evidence? How does that change the evidence against John Moss? How does it change John Moss's confession? How does it change the other evidence, the flatware that he took, the glove prints? It doesn't change any of the tangible evidence. You can leave Paul Reggettz's confession in or you can take it out; it doesn't affect the evidence against this man.

You saw Paul Reggettz on the stand. He told you

that -- he admitted things that he didn't have to about the initial relief that was placed on him. He was just being honest, ladies and gentlemen. He admitted things that would hurt him, and he didn't remember things that would help him. He said, "Oh, yeah, I remember going back in with Trooper Williams," but he didn't remember those things before.

I want you to ask defense counsel -- again, ask them to explain how Paul Reggettz's confession changes any of the evidence against John Moss. See if they can explain it.

Some other facts -- Paul didn't know that the camera was missing or the flatware. He had never had a chance to do an inventory. He knew the guns were missing. And speaking of guns, he explanation was, he took those guns and threw them away because he didn't want the Police to think that he was dangerous. Well, that's absurd too. I mean, he's got three bodies right there. Someone obviously dangerous had been there. And he gave the explanation that he left because he was upset. That didn't make sense either. It's not reasonable, it's not consistent. The rifle wasn't where he said he threw it. He couldn't tell them anything about the pistol.

This man (Indicating) told about the pistol, didn't he? He told them it was broken and it wasn't any good, so he put it in a bag and dumped it in the St. Albans High School trash. Did the Police make that up? Did he make that confession up? Is that reasonable? Did they put that fact in there that he threw it away at the high school?

John Moss told them about the rifle, too. He said that he took it. And Chuck Pettry, on October 29, 1980 -- you heard the defendant on the stand tell his mother where to look for that rifle. If she didn't find it, then ask Carlton.

Is that reason to believe that Paul Reggettz stopped in the middle of a quarrel with his wife? Incidentally, if the quarrel was over her attempts to discipline the kids, then would he kill the three of them? Does that make sense? Is it reasonable to believe that he stopped in the middle of that quarrel to kill them?

And once again, on the wrapping paper, on State's Exhibit 114, two pieces of wrapping paper with blood on them. There was a glove print on one of them. You can see it clearly in the blood. That blood could not be Paul Reggettz's blood.

Again, I think I've already mentioned, there is no blood mentioned on any of the clothing submitted by Paul Reggettz. Plus, he had no blood or cuts, according to Dr. Sopher. There was no rifle, according to Sergeant Custer. There was no prints, from Mr. Shumate. There was no blood on his clothes, according to Trooper Zain. There was no bruising found on little Paul Eric's buttocks, which the father said he did.

Paul Reggettz's confession is not true. He didn't kill that family.

Now, we come to John Moss and the evidence against him. His confession, ladies and gentlemen, you will have to chance to play this tape over back there. All you do is hit this play button, and listen to his taped confession, and listen to his voice. Listen to the tape.

In his confession, he is corroborated by what -- by the blood. And once again, John Moss said this several times. You can consider this evidence. And lots of times you can consider it together. It's not just his blood. It's his confession, his blood, and everything else.

His confession, in the first place, is corroborated by his blood. You've got it on the

Christmas paper, the wrapping paper, the utensil drawer, the curtain in the back, on the back door in the kitchen, the change purse on top of the chest of drawers, the rifle is gone, the door that little Bernadette was hanged on, the pillow case in the back bedroom, the flashlight in the TV room, used to help him search the house in the dark, and the little pajama top of Bernadette -- blood consistent with his blood found in every room in that house except the bathroom. Blood was found on those items in that house consistent with his, which excludes ninety-nine point nine-seven percent of the population. It excludes Paul Reggettz and every member of his family and it excludes nine thousand nine hundred ninety-seven out of every ten thousand people.

The burden of proof, ladies and gentlemen, is beyond a reasonable doubt, not beyond all doubt or all possible doubt. It is beyond a reasonable. Evidence against the defendant is overwhelming. The blood alone excludes ninety-nine point nine-seven percent of the population.

The population of St. Albans -- Mr. Huffman made a big deal about Putnam County or Kanawha County. The population of St. Albans is ten thousand to twelve thousand people. How many of those people were excluded

statistically?

There is more than that, ladies and gentlemen. And I ask you to consider it all, not just the blood, not just the confession, not just the glove prints.

What did they find? They found the scissors in Vanessa Reggettz's chest; they found the knife handle; they found blood on the handkerchief box and the door that Vanessa was tied to; on the wrapping paper and the flatware box. And then John testified that he gave it to another lady.

Moss's confession that he didn't remember whether he wore gloves or not -- I would say he did. He was in a frenzy, ladies and gentlemen. His blood was rushing. That's what he told you.

Exhibit 114, ladies and gentlemen, I submit to you, is his signature, right there (Indicating). This blood that is consistent with his. That bloody glove print is consistent in shape and size to the glove print found on the scissors shoved in Vanessa Reggettz's chest. Look at these exhibits. They are not pleasant, but they are important to look at. That's not Paul Reggettz's blood, it is John Moss's blood. It corroborates his confession -- Moss's confession.

After murdering three people, the little girl,

the little boy, and their mother, he went to their Christmas gifts under the Christmas tree, opening their gifts, just looking -- those were his words. Listen to the tape. Just looking, with the little girl hanging behind him on the door.

Again, this glove print here is consistent with the one found on the scissors. In his confession, he says he stabbed her with a knife or something. He doesn't know if it was a knife or what. And again, you have got to consider all of the evidence.

So far, we have the blood; the glove prints; the wrapping paper; and the scissors. What else? This man, in his confession, said that Vanessa Reggettz cut him when he came back in that door after leaving. We'll get to that.

He said she cut him with a knife on his hand. What did he say? He says, "I took the knife away from her and threw it down." The glove print consistent with the one on the scissors and the one on that wrapping paper -- even his blood was found on this knife. Evidently, he just threw it down.

Paul Reggettz never mentioned a knife, ladies and gentlemen.

The door to which Vanessa Reggettz was tied --

the glove print with one impression on one side and two on the other, a thumb and two fingers. According to Lieutenant Shumate, what were those glove prints doing there? They were put there when John Moss tied Vanessa to that door.

The handkerchief box under the tree, you can see that exhibit, too. He was at the tree, just looking through the gifts. The flatware -- he gave the flatware box to Arbutus Johnson. I want you to look at that, too, the silverware. It had the same glove print on it. A thumb print, consistent with the shape and design of the one found on the blood on the scissors sticking into Vanessa's chest; and on the wrapping paper. The flatware that Arbutus Johnson has identified in this Courtroom, the flatware that Paul Reggettz identified in this Courtroom, Paul Reggettz -- that it came from under his Christmas tree.

Arbutus Johnson said that man gave it to her. She also said he has scratches on his face when he came gave it to her. Vanessa must have put up a fight.

John Moss's confession says, "dishes". I submit to you that he is confused, ladies and gentlemen, because he didn't know what this is (Indicating). He saw this gift under the tree when he opened it.

We have the cameras. The first time the Police had ever heard about the cameras was October 28, 1980, when John Moss told them that he took the cameras home. The Police went to Cleveland and searched the house once. It wasn't there. They get a phone call -- John told his mom where to look for it -- "On a dresser in my bedroom." She looked and found it in his father's car. So, they went back that evening and got State's Exhibit 102 from Mr. Moss's father. That camera has been identified by Paul Reggettz as being his, and we have entered photographs which were made with that camera.

The defendant's father testified yesterday. Mr. Bickley asked him to pick up John Moss's camera. Which camera belonged to John? He picked up the State's Exhibit 117, not 102, not Paul Reggettz's camera.

The defense asked Mr. Fortson yesterday, some questions about how the house had been entered after he was brought into custody, insinuating that those cameras were stolen then. I don't know. But if that were true, why did John Moss tell the Police about it? Why did he confess to taking the camera? He told them that himself. Paul Reggettz didn't even know the camera was missing.

And again, this phone call, when John Moss talked to Mike Smith, two hundred fifty miles away in Cleveland.

He talked to his mother and told his mother where to look for the camera, where it had been, on his dresser. The rifle was in the closet, or if it's not there, ask Carlton about it.

Chuck Pettry overheard the things he was saying. He told his mother he was okay. He told her where the camera and where the rifle were.

We've got the time of John Moss's confession. They asked, "Do you know what time it was, John?" and he said, "No, I don't. It must have been late, because it was almost daylight when I got home." Almost daylight when I got home.

State's Exhibit 127, ladies and gentlemen, is a clock radio. What time did it stop? When the cord was snapped -- 6:15. The rest of this cord was used to kill Paul Eric Reggettz. It's consistent with John Moss's confession, corroborating his confession. The confession about the time -- that's the clock the Reggettz family went by.

You heard Paul testify that Vanessa would wake him up for work. She would holler, "It's 1:00 o'clock, Paul, time to get up for work." The only other clock in the house, you heard testimony too, is a wind-up clock in the front bedroom. Paul says it wasn't used except

on weekends when he wanted to get up early.

You can tell in this photo of the clock that it was taken some time in the afternoon, 1:00, 2:00, 3:00 o'clock in the afternoon, by Lieutenant Fulks. This photo shows a clock with a reading of 9:30, approximately.

You've got to consider all of this evidence together, ladies and gentlemen, the blood; the glove prints; John Moss's confession; the clock; the time. John Moss's confession was live. You heard it on tape. The troopers didn't give him that information; they didn't feed it to him.

In his confession, he says he stabbed Vanessa Reggettz with a knife or something. Later on, he says a knife or a fork. Ladies and gentlemen, if he had been told what to say, he would have gotten it right; he would have said scissors. They would have made sure that John Moss got that right. But he wasn't told what to say.

The camera -- the Police didn't know about that. If there were making up that confession, are they going to drive to Cleveland, go all of that way from Charleston? I don't believe so.

If the Troopers are making up John Moss's confession, what about the flatware, the silverware? If

they were leading Moss and telling him what to say, they would have said, "Who put the little boy face-down in the tub?" Reggettz said, "I don't remember. I just put him in the tub." Remember, that's what he told you. Listen to the confession.

Vanessa and the children were in bed together. That's how they slept because Paul worked at night. In Moss's confession, there was no one else there. Paul wasn't there. Paul didn't ask him to do this. Do you think the Police want to admit that they were wrong about Paul Reggettz, that they made a mistake?

That piece of evidence about Paul's car -- John Moss knew they lived in the neighborhood. The Reggettz family had lived in his aunt and uncle's motel. He knew that they drove a little blue Honda. He knew that Paul Reggettz worked the night shift. It's in his confession.

When asked, "Was the blue Honda there?" he said, "Yeah." He knew that people would be in that house -- Vanessa and the two children. Vanessa weighed eighty-seven pounds. If the Police were making this up, they wouldn't have thrown in loose ends about the car.

What did Mr. Fortson tell you about Paul's car that day when he got home? That it wasn't parked in its usual spot in front of the Fortson home; it was parked

in the driveway by his house. Is that consistent with Paul Reggettz's confession? His confession is consistent with his testimony that he was going to K-Mart and he had come to see about his wife and little girl. He told you that he was supposed to pick them up out on Route 60, but because it had been raining off and on he figured they were at the house. So, he pulled up to the house and left the engine running in the driveway. He went in to get his little girl and his wife and go to K-Mart, but that's not what happened.

In John Moss's confession, he says he went in the house initially, had a confrontation, struck Vanessa with the gun and knocked her down, then he went out of the house. He said he looked back and saw her at the door. He went back and forced his way back in. Is that reasonable to believe that the Troopers made up that?

You've got to consider this thing. Listen to that tape. You are going to be asked to decide whether or not to recommend mercy or not to recommend mercy for John Moss. I want you to listen to that tape -- how this man's own voice talks when he talks about what he did to those people -- when he knocked Vanessa down and tied her up with the cord and strangled her, put scissors in her chest, tied her to the door.

And little Paul Eric -- he hog-tied him and put him in a tub, and then he tied the little girl to the door with a cord around her neck and strangled her, then hanged her on the door.

Listen to him tell it with his own voice and consider the horror they went through. The children watch this man kill their mommy -- the mother not knowing what's going to happen to her babies.

Look at the photographs, ladies and gentlemen. They are not pleasant, but they are real.

I submit to you that it is all or nothing in this case. If you believe beyond a reasonable doubt that the evidence is overwhelming that John Moss murdered the Reggettz family, that he murdered little Bernadette, Paul Eric, and Vanessa -- there is no room for mercy. He should spend the rest of his life in the penitentiary. His father could visit him in the penitentiary. Paul Reggettz will never have visitation day.

Consider what mercy John Moss showed the Reggettz family. After the initial confrontation, he left the house. They were all alive, ladies and gentlemen. He went back in when he saw Vanessa at the door for one reason -- his blood was rushing and he went back in that house to kill them. And that's exactly what he did.

What mercy did he show them? None.

I'm asking you to find that John Moss is guilty of first degree murder of Paul Eric Reggettz as set out in Count One, and show him no mercy. I'm asking you to find that he is guilty of the first degree murder of Bernadette Reggettz, in Count Two, no mercy. I'm going to ask you to find him guilty of the murder of Vanessa Reggettz -- no mercy. He should spend the rest of his life in the penitentiary for what he did.

Thank you.

THE COURT: Mr. Huffman, I tell you what let's do, let's let this jury have about ten minutes.

MR. HUFFMAN: Fine.

THE COURT: Folks, we'll take a brief recess.

WHEREUPON, the Court stood in a recess in the hearing of this case.

(Back on the Record)

THE COURT: Go right ahead Mr. Huffman.

MR. HUFFMAN: Thank you, your Honor.

(Back on the Record)

CLOSING ARGUMENT

(For the State)

BY MS. LUSK:

Did you notice, ladies and gentlemen, that they didn't talk about the blood? Did you notice that there is no explanation for this blood that's consistent with John Moss's being in this house?

They are arguing out of both sides of their mouths. If you believe that Paul Reggettz committed this crime, then where did this blood come from that doesn't belong to any member of his family? Do you think somebody came into the house and burglarized the house after these people were already dead? That they went through the house, cut themselves shaving, and bled all over the house?

Where did the blood come from? These people were already dead. There is certainly no struggle that ensued. There is no one to struggle with, so where did the blood come from? The blood came from the murderer,

and that was John Moss. The blood came from the person who struggled with Vanessa Reggettz at the back door.

We know that there was a struggle at the back door. There is blood on the back door. There is blood on the curtains. Vanessa's blood is on the outside of the back door where she tried to close the door. The curtain is partially torn down. The murderer's blood is on the utensil drawer over where the knives are, because there is a struggle.

The knife that was taken away from Vanessa Reggettz had a glove print on it. It's like Mr. Revercomb said, do you think Paul Reggettz took the time to put gloves on?

Every room in the house is consistent with John Moss. There is a flashlight in the family room that has got his blood on it. He used it to go through the house and look for stuff to steal. But he didn't need the flashlight, because all the lights in the house were on.

We know that there are two coffee cups in that family room, just like Paul Reggettz said. He sat up and watched TV with his wife.

There is the K-Mart ad, where he was going to go buy himself a Christmas present. Vanessa was going to buy it for him the next day.

There is the struggle with Mrs. Reggettz. She is hit in the head with a gun. Dr. Sopher compared the gun with the wound on her head. The gun butt -- just like John Moss said. His blood was rushing. He snatched a cord. He didn't know where he got the cord from, he was frenzied. His blood was rushing. He took the cord and tied these victims up.

Mr. Huffman started talking to you about the time of death. I want to talk to you a little bit more about that. We know that there is a preliminary time of death range given by the Medical Examiner. We know that that preliminary time of death is given at about 2:00 o'clock in the afternoon, because it caused the State Police to read Paul Reggettz his rights.

Let's look at the objective factors. At 2:00 o'clock in the afternoon, you have the preliminary time of death stated. Then we know that at 3:30, there is actually an on-the-scene check done by the Medical Examiner. He testified that at 3:30, he checked the rigor mortis of the victims and he took their temperatures. After looking at his findings, his objective findings, at 3:30 in the afternoon, first, rigor mortis of Vanessa was not yet fixed. It was marked in her neck and jaws, moderate in part, of her body, and

mild in part of her body.

What did the Medical Examiner tell us about the rigor? It generally fixes in eight, ten, twelve hours. From the time he was checking it at 3:30 in the afternoon, what does that back you up to? 3:30 a.m. to 7:30 a.m. Who is that consistent with? John Moss -- not Paul Reggettz, he was at work.

The second rigor mortis check was of Paul Eric Reggettz, with the same results. Rigor mortis is not fixed throughout his body. Back it up, eight, ten, twelve hours -- 3:30 a.m. to 7:30 a.m. -- John Moss.

The third victim -- look at that rigor mortis of Bernadette Reggettz. The same results. Her rigor is not fixed either. 3:30 a.m. to 7:30 a.m. -- John Moss.

Look at the temperature of Vanessa Reggettz. Now, we know that the body temperature of the children doesn't tell us a whole lot. There are no studies on that. Vanessa's temperature was eighty-two degrees. The Medical Examiner said you take that and subtract it from a hundred, though, because we are telling what the rectal temperature was. You subtract a degree and a half per hour -- that backs you up twelve hours from the time he is checking -- 3:30 a.m. But what did he say about Vanessa, though? She is a teeny-tiny woman. She is

going to cool faster than the average adult. That tells us, doesn't it, after 3:30 -- John Moss. Paul Reggettz was at work.

Fifth, let's look at the livor mortis on Bernadette. It is intense in the soles of her feet, from the hanging. We know that she was totally suspended, because there is no blanching on the bottom of her feet, no area of pressure where her feet were resting on the floor and the blood vessels would have been pinched, so that they couldn't fill with blood. That didn't happen. She was totally suspended. Intense livor of her soles of her feet.

What did the doctor say about that? She wasn't up there twelve hours. It wasn't intense enough. That was Reggettz's first statement; wasn't it -- that she hung there all night. And consistent with that, tells us -- John Moss.

The next that we'll look at is the livor of Bernadette, which is not intense enough for just two hours. If Reggettz hung her up there, then took her back down before he went to work, it would have been more intense. What does that tell you? Is it consistent with Reggettz? No, it must have been John Moss.

Dr. Sopher also in looking at the livor of

Bernadette, said she didn't lie on that bed for twelve hours, for two reasons: That you know that Reggettz did not put her up for only a couple of hours, it was not intense enough. He didn't lie her on the bed for twelve hours, because the livor was totally around her legs. If she had been on the bed all night long, the liver would have drifted to the back of her legs. That's not the finding. You can see the mottling in the photograph, ladies and gentlemen. Not Paul Reggettz -- John Moss.

Next, let's look at the clock. What does the time on the clock say? 6:17. Look at it. 6:17, ladies and gentlemen. This is all consistent with John Moss; not Paul Reggettz.

Let's look at another feature on this clock radio. You can see that the alarm is set for 7:00 o'clock in the morning, that's about when mom would get up her son to go to school. Vanessa set the alarm because she went to bed that night expecting to get her son up for school the next day. The alarm is set at 7:00 o'clock; and you can look at something else on this alarm.

When it was smashed into the floor when the cord was removed, it broke in the position in which it was found. It is on -- the alarm is set for 7:00 o'clock and

is in the "on" position, wake to music. And that is because Mrs. Reggettz sent her husband off to work, set her alarm clock to get her son up, and was killed. The alarm is on. Everything about this clock radio, all three factors, tell you Moss -- Moss -- Moss.

What else do we know about the time of this crime? John Moss's confession. What time does he say it happened? It was almost daylight. So, what did he say is the truth? Is that consistent with the bodies? Is it consistent with the clock? It's all consistent; and the reason for that is, he told the truth. John Moss.

There is not a single thing about these bodies -- not a single objective factor that you can look at which points to Paul Reggettz. Every single one has this defendant's name right on it. The reason for that is simple; he did it. He committed the crime. He bled in the house. He went in there, he said, looking for money. Mr. Bickley said, "Well, he should have known that they didn't have any." He knew Vanessa Reggettz was there by herself with her two children, didn't he? He knew that her husband worked at night. He didn't necessarily tell the whole story. Perhaps that's why Vanessa Reggettz's panties are on the bed -- not on her body. Why her

sanitary napkin was on the floor -- a homemade sanitary napkin, not a store-bought one, something that has no pins to secure it, no tape to secure it, no belt to secure it. It was secured in place by her underwear, but her underwear is off of her body and her sanitary napkin is on the floor.

He did leave out a struggle in the front bedroom, and he left out taking off her underwear. But what he did tell you in his confession, that is corroborated.

We know that he took certain items from the house, and we know that he took exactly what he said. He was telling the truth.

He told the Police who his parents were. He told the Police where his parents lived. He told the truth.

He told the Police that there was a struggle at the back door. That's corroborated by all of the evidence; that he was cut, of course he was cut. There was a struggle with a knife, and there is a broken knife. There is blood. He rifled through the house with a flashlight.

Why did he kill Vanessa Reggettz? He doesn't say, but he does say that he put the scissors in her chest. He wanted to make sure she was dead. He wanted to make sure she was dead.

The Police asked him why he put that boy in the bathtub after he had already strangled that child, and what did he say? "I wanted to make sure he was dead." Cold.

"What did you do next, Mr. Moss?"

"I got the girl and I killed her." He did what he intended to do. He killed her. He took her little body, strangled her and put her up on the back of the door facing her Christmas tree, where he opened her presents, all of the gifts that her mom and dad had bought her for Christmas. John Moss opened them. He bled on that door as he hung her up, and he bled on her shirt. You can look at her shirt. You can see where the Police cut out the blood from her shirt.

When you hold this shirt up, to hang the child on the back of the door, what do you find? A bloody thumbprint right where the murderer hung her. Whose blood is that? It's John Moss's blood. This shirt proves that the murderer in this case hung this child, bleeding. Right here, the thumbprint, that is not Paul Reggettz's blood; it is John Moss's. And the reason for that is that Paul Reggettz didn't hang this child. The murderer hung this child, and the proof is right there. He bled on the door where this child was. He left

thumbprints, fingerprints, and glove marks on the door where he hung Mrs. Reggettz -- two on one side of the door and one on the other side of the door. You know, like you would hold a door while you are struggling to get a cord through a hole.

The person who struggled to get that cord through that hole was wearing gloves. He left glove prints on the front and the back, just like you were holding that door.

The person who plunged those scissors into Mrs. Reggettz's chest was wearing the gloves. Do you think that the father is going to stop and put on a pair of gloves in the heat of this passion? A murderer is going to wear gloves. John Moss wore gloves.

The person who opened those Christmas gifts wore gloves, bled right into the glove, and left a print of the glove in the blood. It's not Paul Reggettz's blood; it's John Moss's blood.

The person who rifled through the house, bled on the flashlight, as I've said. Does it make sense to you, ladies and gentlemen, that a man, the father, would kill his family, then spend the whole night thinking about it? What is he going to do when he gets home? And what he does is tamper with the scene. "Gosh, I've been thinking

about this all night, but I'm going to have to go into the house and take the little girl down. I'm going to try to get my wife down, then I'm going to run frenzied to the A&W to call the Police, then I'm going to run back to the house and take the little boy out of the bathtub." Those are the actions of a man who was not expecting -- who had not idea of what he was going to find when he came home.

Of a father -- is a father going to leave his child hanging on the back of a door if he had killed her? He knew she was there. He wouldn't have moved her. And he did the same thing with his son. He took him out of the water.

Look at John Moss's confession. You look at the oral confession, because you are going to have the tape in there. You can listen to it. John Moss told the Police that he thought Vanessa Reggettz had bumps on her face.

Now, you're going to have the opportunity, ladies and gentlemen, to look at the photographs in this case. This is very important; you are going to see it. There is a photograph, a Polaroid photograph, of Vanessa Reggettz as she appeared in life. The photograph is dated November 5, 1979. You'll see by the flash on the

camera that her forehead and cheeks are shiny and clear. She had a clear complexion. In life she had a beautiful complexion. The Medical Examiner described to you that the suffusion, the suffocation, caused blood to collect in her head, which discolored her face and made it look darker. And also, that that caused little pinpoint hemorrhages on her face.

Trooper Smith told you that he viewed a part of the autopsy and it appeared that those hemorrhages could have been bumps, acne. There is a photograph that you can look at yourself. You can look at her chin, and you can see that she looks like she does have pimples on her chin. Only the murderer would know that. Only John Moss saw her in a state in which she appeared to have acne. Only the murderer.

He motioned to Trooper Smith, "I thought she had bumps on her face." The last time he saw her, she did look like it, didn't she? That's exactly the way she appeared the last time he viewed her, in death.

What else did he tell the Police? The Police asked him, "Why do you think we got your blood?" He became wide-eyed, but he sat down. He'd been caught and he knew it. He knew that he had bled all over the Reggettz residence. What did he tell them? "Well, I was

scared. When I'm scared, my blood rushes. And I was scared. I got scared at the back door. I was scared before it happened, and after, my blood was rushing."

He knew she was in there. Yes, she and the kids. He said he had gone in there to get some money and that he couldn't find any. Well, we know that his blood is on the changepurse. It sure is, right there on the dresser. You can look at that exhibit on the changepurse. It is photographed also, in the master bedroom.

He said that it was almost daylight when he got home -- we know that was true. He said that he walked directly from his house to their house, walked there by walking down the railroad tracks -- that's true too, isn't it? His grandfather lived right up the railroad tracks. He said she was there at the bed with a gun -- she sure was, wasn't she? Right there with the broken gun, where he had broke it on her head. She and the kids, right there in bed together.

He knocked her to the floor, struck her with the gun. We know that's true. We know she was in the floor, certainly, because there is a large pool of blood there. He said the gun went off.

"How many times did the gun go off?"

"Once." That´s true, isn´t it?

"Was anyone shot?"

"No, I don´t think so." That´s true, too.

He says he went to the back door, he ran out. You´ll hear in the confession, the taped confession, where he says, "It was a curtain or a sheet in the kitchen." You´ll see that every other room, all the other doorways, where there isn´t an actual wooden door there is a bedspread or a sheet hanging to close off the rooms for heat, save the kitchen. The reason for that is that it was torn down in the struggle with John Moss. We know that because he said it was a curtain or a sheet. He knew its former position; he knew where it had been before it got to the floor. You see the curtain rod underneath Vanessa Reggettz´s body.

We also know that Vanessa Reggettz bled on that sheet, drops of blood, drops of blood that could only occur when she was alive.

Paul Reggettz said that he put that sheet on the floor after his family was already dead to make it look like a burglary. If it was hanging -- now, these aren´t smears or smudges -- Vanessa Reggettz could not have dropped the blood upon it. That had to have occurred while she was still walking around, still having a

struggle at the back door, still looking for a knife, still swinging a knife at John Moss. The sheet in the kitchen tells you that John Moss is the murderer. He said he tied her up and he placed the scissors in her to make sure that she was dead. The same for the boy, making sure he was dead.

He killed each of them twice. He killed them each twice. He was making sure they were dead. He did make sure they were dead. He was successful. He strangled Vanessa Reggettz with a cord, and he stabbed her with the scissors. He took the boy and strangled him with a cord, and he drowned him. He took the girl and strangled her with a cord, and then he hung her. He killed them each twice. He was successful.

What else did he tell the Police? Well, he took the little gun because it was broken. We know that to be true. He took a .22 rifle, and he described it accurately. "Well, it was a bolt action, it was a .22. It had a screw underneath the stock where it all came apart." That was all true. He knew how to describe that rifle, because he had it. He had taken it apart. He took it to Cleveland. He said, "Check with my brother, Carlton."

He said that he took a Christmas gift; we know

that's true. He took flatware from underneath that tree, and he called it dishes. Of course, as you've seen, he saw dishes beneath that tree. He said he only took one gift and he gave it to his best friend's mother, Mrs. Johnson. She kind of left it on the dresser; didn't she? Why didn't she open it? Why did she just leave it sitting? But he only took one gift, and that, he gave to Mrs. Johnson. Mrs. Johnson told you, "Right there it is, the flatware." That's what John Moss gave her; that's what John Moss stole from under the Reggettz new Christmas tree.

What about the camera? He took a handle camera -- Paul Reggettz's handle camera. We knew that Paul Reggettz had a Polaroid camera with a handle. We've got some of the photographs that he took of battle scenes; the Civil War was his hobby.

We also knew that John Moss's sister had a handle camera. This is a camera that he was familiar with. Her name is on it, but it's broken. She needed a new one; he saw the opportunity. Right there it was for her, a new handle camera that works. The Police didn't even know that was gone, and they didn't know that the flatware belonged in the house because they couldn't talk to Paul Reggettz about it.

Well, we know it was. John Moss told us it was. And now Paul Reggettz says -- he's able to testify and he can say, "Yes, I bought my wife that flatware. I remember the rose pattern." John Moss says he took it from the house and gave it to Mrs. Johnson, where he left his glove print, the same as the one that is in the house. He said he wrapped it back up and gave it to her.

It's all the way it happened; all of it. Look at the blood; look at the reliability of the blood, ladies and gentlemen.

We're in a situation where the Police have a man in jail for murdering his family. The serologist and the chemist start examining this blood and say, "There's a problem here, folks." There is a problem here. There is some blood in this house that doesn't belong to these Reggettz family members. This crime didn't occur the way Paul Reggettz said it occurred. They don't know what happened. They didn't know how it happened at this point. All they know is that it didn't happen like Paul Reggettz said it did. So, they talked to John Moss. They want to know if Paul Reggettz was there.

They asked him, "Was he with you? Was he helping you? Was he an accessory?"

"No, he was not. He wasn't there."

"Was Paul Reggettz in the house?" He said, "No."

"Well, had you talked to him about Vanessa?" He said, "No. I did it all by myself."

And that's the truth. He did do it all by himself. He certainly did. Look at the circumstances of taking his confession. Trooper Smith and Trooper Williams both told you he was very cooperative, very cooperative. Trooper Smith talked with him for maybe five minutes about this serious crime. He didn't want to describe the triple homicide case in the back of a patrol car where he didn't have the rights forms. He didn't have a tape recorder. He didn't have any of the proper equipment that is good police work. So, they stopped at the first State Police Detachment they came to when they hit the West Virginia border.

John Moss was so cooperative. He was advised of his rights on three separate occasions. When he came in there, he made no complaints of any mistreatment in the car. The reason for that was, there was none. He made no complaints to Williams about his treatment.

The following day, he is at the Kanawha County Jail and Chuck Pettry talks to him. Pettry is not a Police Officer, he is not wearing a uniform. He isn't

armed. He isn't a threatening figure. Pettry says, "We'd like for you to talk to Trooper Smith, okay?" And he says, "Okay, I'll talk to Trooper Smith."

They're having a little trouble finding your camera and they want to make sure they are looking in the right closet. They want to check on that, okay? He didn't complain any to Chuck Pettry. These Troopers are two hundred fifty miles away, they are up in Cleveland. And he talked to his mom, and did he say to his mom, "Well, gee, whiz, these guys are really mean. You'd better watch yourself there. You're alone with those Troopers"? Heck, no. He said, "I'm fine," because he was. He didn't say, "Gosh, they're mistreating me down here, mom." He said, "I'm fine. I'm okay." And he continued to be just as cooperative with them as he had been the day before, the same attitude, the same voice, the same level of cooperation. He wanted to help them find the rifle at the time.

He gave them a truthful statement, ladies and gentlemen, and all of the evidence bears that out.

Mr. Huffman wants you to look at these figures on this blood. We didn't talk about it that much, but let's look at the circumstances surrounding the blood.

Did anybody else in the Kanawha Valley who has

this blood confess? Nope.

Did anybody else in the Kanawha Valley who has this blood -- do we have any evidence of anybody else who lived up the tracks? John Moss did.

Did anybody else enter the house, knowing that Vanessa was there alone with her children? Nope.

Did anybody else have a camera taken from the Reggettz house? No.

Did anybody else have flatware taken from the Reggettz house? No.

Did anybody else take a small broken pistol and throw it away at St. Albans High School? No.

Did anybody else take a rifle out of the house and take it home to Ohio? No.

Did anyone else kill the Reggettz family? No.

You look at this case, ladies and gentlemen, and you look at the reasonableness. You look at reasonable hypotheses. Sometimes there are two hypotheses which are reasonable in a case, given a set of circumstances.

Say, you're back in your deliberation room and you're looking down on Virginia Street and you see a car coming east, one car. The windshield wipers are on. You can't see any rain, so you say, gee, I guess it could be raining; or perhaps a person is just cleaning their

windshield. Those things are both very reasonable under that circumstance. Very reasonable. But then, the light up at Clendenin Street turns green, and three or four or five more cars come down Virginia Street, all of them have on their windshield wipers. What does that tell you? It is no longer reasonable that the windshield wipers are on cleaning the windshield. Six cars coming down Virginia Street with the windshield wipers on tells you that it's raining. One reasonable; now one unreasonable.

You have the same thing in this case. One thing, and one confession. Just the confessions. You don't know, do you? That's why you have to look at everything else. You have to look at the blood. You have to look at the flatware. You have to look at the camera, at the rifle, at the opportunity, at the knowledge, the money -- he took change, he took Christmas presents. Everything he said is the way it happened. And he said more than the Police knew.

Look at it all, and when you look at it all, you will find that there is only one reasonable hypothesis. There are other hypotheses, sure. But they are absurd. There is one reasonable hypothesis, and that is that John Moss killed the three members of the Reggettz family.

At this time, I want to ask you to think about the evidence. Think closely about what happened to these three people in St. Albans in December of 1979. Think about the brutality. Think about the children, who watched their mother die. The children, who were hung by a man so cold that he could open their Christmas presents with a dead baby hanging over his shoulder looking at him.

I ask you to go back in your Jury Deliberation Room and find John Moss guilty of all three counts in this indictment.

MR. BICKLEY: May we approach the bench, your Honor?

THE COURT: Yes.

WHEREUPON, a bench conference was held, and the following transpired:

THE COURT: I know you're going to register an objection. Number one, is it something that you think you want a curative instruction on, or is it instructional?

MR. BICKLEY: I don't know.

94-MJSC-663

# WEST VIRGINIA SUPREME COURT OF APPEALS

FILED
2004 OCT -7 PM 2:32
CATHY S. GATSON, CLERK
KANAWHA CTY. CIRCUIT COURT

To: Kanawha County Circuit Clerk

Date: September 14, 2004

Re: Moss v. Trent
No. 31646

Received of Rory L. Perry II, Clerk, Supreme Court of Appeals of West Virginia, a copy of the **mandate and record** in the above-styled action.

Dated at Charleston, West Virginia, this 7th day of October, 2004.

Cathy S. Gatson /mB
Circuit Clerk

RETURN TO:

SUPREME COURT OF APPEALS OF WV
STATE CAPITOL COMPLEX
BLDG. 1, ROOM E-317
CHARLESTON, WV 25305
**ATTENTION: MEGAN BERRY**

17