IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JOHN MOSS, III,

       *Petitioner*,

v.                                       Civil Action No. 2:09-cv-01406

DAVID BALLARD,  Warden,
Mount Olive Correctional Complex,

       *Respondent*.

---

**RESPONDENT'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

## I.

## INTRODUCTION

John Moss, III ("Petitioner"), filed a petition under 28 U.S.C. § 2254 for a federal Writ of Habeas Corpus on December 15, 2009. By order entered January 6, 2010, Magistrate Judge Mary E. Stanley ordered Respondent to answer Petitioner's petition on the sole issues of timeliness and exhaustion. (Doc. No. 6.) Respondent filed its answer conceding that Petitioner's petition is timely and that Petitioner's claims are exhausted (albeit some grounds for relief are barred from review by this Court as previously argued). (Doc. No. 8.) By order entered June 22, 2010, Magistrate Judge Stanley ordered the Respondent to answer the grounds for relief alleged in the Petitioner's petition. (Doc. No. 12.)

Respondent, by counsel, now moves this Court to dismiss the present federal petition on the grounds that Petitioner has failed to prove that there are any material issues of fact in this case, and Respondent is entitled to judgment as a matter of law.

## II.

## PROCEDURAL HISTORY

Respondent incorporates by reference the procedural history set forth in the previously filed Answer and includes the following overview.

Petitioner was convicted on April 24, 1990, of three counts of first degree murder in the Circuit Court of Kanawha County, for the killing of Vanessa Reggettz, age 26, and her two small children--Paul Eric, age seven, and Bernadette, age four.  The jury did not recommend mercy.  (Case No. 82-F-221.)[1]  Originally,  Paul Reggettz the respective husband and father of the  victims  was charged with the crimes following what turned out to be a false confession.

This was Appellant's second trial and conviction for the murders. The result of the first trial was the same; however, the West Virginia Supreme Court of Appeals (sometimes "WVSCA" hereinafter), (McGraw, J.), reversed the first conviction on issues arising from prosecutorial misconduct resulting in a possibly tainted jury pool, improper remarks in closing, and also the improper admission at trial of polygraph testing of witness Paul Reggettz. *See State v. Moss*, 376 S.E.2d 569 (W. Va. 1988).  The court also found that one of Petitioner's three confessions was admitted in violation of the state prompt presentment rules but was otherwise voluntarily given and Petitioner's other two confession were admissible.  *See id.* at 580-81.

_____

[1]Petitioner's court records have all been filed under this original felony number.

The decision in *State v. Moss*, overturning Petitioner's first conviction, was the second opinion released by the WVSCA regarding Petitioner's trial court proceedings. The first of three state supreme court opinions issued on this case was *In the Interest of John Moss, Jr.*, 295 S.E.2d 33 (W. Va. 1982), wherein the court reversed an order of the Kanawha County Circuit Court transferring Petitioner from the state trial court's juvenile jurisdiction to its adult jurisdiction and remanding the case with directions on several points, some of which form the foundation of claims raised herein.

The second opinion on this case, *State v. Moss*, 376 S.E.2d 569 (W. Va. 1988), overturned Petitioner's first conviction: Petitioner was re-tried and re-convicted. The WVSCA denied Petitioner's appeal of his second conviction. (Resp't Ex. 3.)

Petitioner then launched an assault in state court, filing no less than four petitions for post-conviction relief in Kanawha County Circuit Court.[2] The WVSCA granted Petitioner's appeal of the state habeas court's order of September 10, 1998 (94-MISC-663), denying relief and confirmed the findings of the state court in the opinion, *Moss v. Trent*, 603 S.E.2d 656 (W. Va. 2004). (Resp't Ex. 19.) In *Moss. v. Trent* the court extensively re-examined the blood evidence introduced at trial under the so-called "*Zain*" line of cases and also, again, examined the circumstances surrounding Petitioner's confession.[3]

---

[2]Counsel for the Respondent has filed herewith the complete record in Case No. 94-MISC-663 that resulted in *Moss v. Trent, supra*. The orders denying relief on the Petitioner's subsequent state petitions for writ of habeas corpus have been previously filed. (Resp't Exs. 5, 10, 13, 16.) Any of Petitioner's state habeas petitions filed after the 94-MISC-663 will be provided upon request.

[35]Three cases emerged from the WVSCA as a result of the actions of Trooper Fred Zain in falsifying serology evidence that was relied on in numerous prosecutions in West Virginia. (*See In the Matter of an Investigation of the West Virginia State Police Crime Laboratory*, 438 S.E.2d 501

In the instant federal petition, Petitioner challenges the voluntariness of his confession and the reliability of the blood evidence introduced at trial, along with other issues previously addressed in either at least one, or all, of the state court proceedings including all three opinions issued by the WVSCA. Petitioner also raises claims procedurally barred from review but exhausted because he has no further available state court remedies. The claims pertaining to Petitioner's confession and the blood evidence introduced at trial will not be reargued extensively herein. Rather Respondent will rely on the reams of previous analysis of these issues provided by the state court and the West Virginia Supreme Court.

Respondent re-asserts Petitioner's federal claims for relief as follows:

1.    The lower courts' ruling that Petitioner's confessions were voluntary is clearly against the weight of the evidence presented and an unreasonable application of the clearly established federal law as announced by the United States Supreme Court.

2.    Petitioner's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution were violated and the lower court's ruling was contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court and/or an unreasonable determination of the facts of the case.

    (a)    The confessions were obtained through exploitation of custody obtained through a statutorily defective transfer pursuant to the Interstate Agreement on Detainers.

---

(W. Va. 1993) ("*Zain I*"); *In the Matter of An Investigation of the West Virginia State Police Crime Laboratory*, 445 S.E.2d 165 (W. Va. 1994) ("*Zain II*"); and *In the Matter of Renewed Investigation of the State Police Crime Laboratory*, 633 S.E.2d 762 (W. Va. 2006) ("*Zain III*").) Although convictions in so-called *Zain* cases are entitled to additional review pursuant to the *Zain* line of cases, whether Petitioner is entitled to further review in state court thereunder is not a matter for federal habeas corpus or for the federal courts. An allegation that the State violated one of its own statutes or rules does not state a claim cognizable in federal habeas corpus. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine *state-cou*rt determinations on state-law questions.").

4

(b)     The confessions were obtained as the result of the Police's intentional failure to comply with the juvenile prompt presentment statute, W. Va. Code 49-5-8-(d).

(c)     The confessions were obtained through coerced waivers of Petitioner's constitutional rights.

(d)     The West Virginia Supreme Court of Appeals Erroneously Ruled that no objections were entered at petitioner's first trial on two of Petitioner's three confessions.

(e)     The second trial court ruled that the two confessions in question were admissible under the law of the case doctrine.

(f)     The lower court admitted Petitioners' confessions to the Reggettz murders into evidence at trial.

3.     Petitioner did not receive a full and fair hearing on his motion and memorandum to suppress samples of blood, confession, and other physical evidence seized due to the improper tactics of Fred S. Zain and the West Virginia State Police Troopers and crime laboratory and Petitioner's due process rights were violated.  The lower court's rulings were contrary to and/or an  unreasonable application of clearly established federal law as announced by the United States Supreme Court, or an unreasonable determination of the facts as set forth in the record.

4.     Petitioner's Sixth Amendment right to a fair trial and impartial jury was contravened when the State knew or should have known, of the false or misleading testimony and evidence presented by a State witness and the lower courts' rulings were contrary to or an unreasonable application of clearly established federal law as announced by the United States supreme court and/or was an unreasonable determination of the facts as set forth in the record.

5.     The admission of Petitioner's blood samples, confessions and all evidence incident thereto violated Petitioner's right to a fair trial when the samples of blood were obtained in violation of federal constitutional rights and the rulings of the lower courts are contrary to or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, and/or an unreasonable determination of the facts as set forth in the record.

6.     Improper closing arguments by the prosecution denied Petitioner his federal constitutional rights to a fair trial and due process of law, the lower courts'

5

rulings are contrary to or an unreasonable determination of the clearly established federal law as announced by the United States Supreme Court, and/or an unreasonable determination of the facts as set forth in the record.

7.      Petitioner's guarantee to equal protection and the due process of law were violated when the lower courts failed to provide him with the appointment of counsel and a full habeas corpus evidentiary hearing, inasmuch, the circuit court failed to abide by the West Virginia Supreme Court's mandate, and the West Virginia Supreme Court of Appeal failed to honor its own mandate thereby the lower court's ruling is contrary to or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, or an unreasonable determination of the facts as set forth in the record.

8.      Petitioner's incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitutions respectively and the lower courts ruling is contrary to ro an unreasonable application of clearly established federal law as announced by the United States Supreme Court, or an unreasonable determination of the facts as set forth in the record.

9       Petitioner was denied his right to effective assistance of counsel guaranteed to him through the Sixth and Fourteenth Amendments to the United States Constitution, and the court's rulings below were contrary to or an unreasonable application of clearly established law as announced by the United States Supreme Court and/or an unreasonable determination of the facts as set forth in the record.

        A.      Counsel failed to bring to the trial and appellate court's attention the fact that the two October 28, 1980, confessions were the subject of an extensive  motion and memorandum hearing and testimony and was, in fact, objected to by counsel prior to the first trial, based on, inter alia, W. Va. Code § 49-5-8(d).

        B.      If trial counsel, at the first trial, failed to object to the West Virginia authorities' failure to promptly present the juvenile defendant to a neutral judicial officer prior to taking Petitioner's alleged confessions.

        C.      Trial counsel failed to conduct adequate investigation into the facts and law of the case prior to Petitioners' second trial.

D.     Appellate counsel failed to conduct adequate investigation and research prior to perfecting and filing a petition for appeal from Petitioner's second trial.

10.     Petitioner's due process rights were violated by the State's withholding of exculpatory and/or impeachment evidence and the lower courts' rulings were contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, and/or an unreasonable determination of the facts as set forth in the record.

## III.

## THE STANDARDS OF REVIEW

**A.     MOTION FOR SUMMARY JUDGMENT.**

The Supreme Court of the United States has recognized the appropriateness of Rule 56 summary judgment motions in habeas cases. *See Blackledge v. Allison*, 431 U.S. 63, 80 (1977). So too has the Fourth Circuit Court of Appeals.

From the text of the Federal Rules of Civil Procedure, it is clear that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Maynard v. Dixon*, 943 F.2d 407 (4th Cir. 1991).

Motions for summary judgment impose a difficult standard on the moving party; for, it must be obvious that no rational trier of fact could find for the nonmoving party. *Miller v. Federal Deposit Ins. Corp.*, 906 F.2d 972, 974 (4th Cir. 1990).

However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a

7

"fair-minded jury could return a verdict for the [party]." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they create fair doubt rather than encourage mere speculation. *See Anderson*, 477 U.S. at 248. And it is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Notwithstanding the standards which govern the granting of a motion for summary judgment, the provisions of 28 U.S.C. § 2254 must be examined to determine whether habeas relief is proper.

## B.   TITLE 28 U.S.C. § 2254.

Title 28 U.S.C. § 2254 requires a district court to entertain a petition for habeas corpus relief from a prisoner in State custody, "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Sargent v. Waters*, 71 F.3d 158, 160 (4th Cir. 1995). Moreover, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b). However, the federal court may not grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the State court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Fourth Circuit Court of Appeals has determined that "the phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." *Thomas v. Taylor*, 170 F.3d 466, 475 (4th Cir. 2000). When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently examines the record and clearly established Supreme Court law. *Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000) (citing *Bacon v. Lee*, 225 F.3d 470, 478 (4th Cir. 2000)). However, the court must still "'confine [its] review to whether the court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."'" *Bell*, 236 F.3d at 158 (quoting *Bacon*, 225 F.3d at 478).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal habeas court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A federal habeas court may grant relief under the "unreasonable application" clause of § 2254(d)(1) if the state court identified the appropriate Supreme Court precedent but unreasonably applied the governing principles to the facts of the petitioner's case. *Id.*

In determining whether the state court's decision was contrary to, or was an unreasonable application of, Supreme Court precedent, all factual determinations by the state court are entitled

9

to a presumption of correctness, and the Petitioner has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).[4]

Petitioner's exhausted claims have been "adjudicated on the merits in State court proceedings," and are therefore subject to this heightened standard of review.

## IV.

## STATEMENT OF FACTS

A.    INTRODUCTION.

As previously discussed in Respondent's Answer and above, Petitioner has been attacking his conviction since *before* his first trial and original conviction in 1984 for the crimes committed in the year 1979.   Petitioner's conviction for the murders of Vanessa Reggettz and her two small children, Bernadette and Paul Eric. Petitioner's has become one the most, if not *the* most litigated, reviewed and analyzed convictions in the annals of West Virginia criminal jurisprudence. At the time of Petitioner's 2004 habeas appeal, it was widely considered to be the last of the so-called "*Zain*" cases.

This protracted legal odyssey has been perpetuated owing in no small part to the myriad of sensational circumstances surrounding this crime.  Petitioner became a suspect only after the case against Paul Reggettz, began to fall apart. Paul Reggettz had originally admitted killing his family

_____

[4]Title 28, U.S.C. Section 2254(e)(1) provides:

   In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

in what he later claimed was a coerced confession. Blood evidence gathered at the scene showed the presence of a third person, not Paul Reggettz at the scene. Petitioner's own uncle alerted authorities that Petitioner was a possible suspect because he lived near the family at the time of the murders and had committed other violent acts around the same time. At trial, Reggettz explained his confession by stating he was weak and cowardly and was afraid for his life after being threatened and intimidated by interrogators. Serologist Fred Zain of the West Virginia State Troopers, one of the most infamous figures in the annals of police misconduct in American law enforcement, testified in this case. As is well known in this jurisdiction, it came to light that after years of offering expert testimony in numerous criminal convictions, it was discovered that Fred Zain, had been falsifying blood test results to implicate defendants and achieve guilty verdicts. Every case wherein Fred Zain offered testimony, or where testing he performed was used to obtain a conviction, was given additional review under the *Zain* series of West Virginia Supreme Court opinions.

Also, at the time of the crimes, Petitioner was only 17 years old. When Petitioner became a suspect in the murders, he was incarcerated in Ohio for a disturbingly savage but unrelated crime. Petitioner was also suspected in another unrelated but extremely violent crime in West Virginia committed around May of that same year as the Reggettz murders. To make this case even more sensational, a series of improper procedures by West Virginia officials in securing Petitioner from Ohio custody (for questioning in West Virginia) and in obtaining blood samples from him, resulted in two West Virginia Supreme Court opinions reversing Petitioner's juvenile transfer proceedings and his first conviction. Not least of all, the Reggettz murders were particularly brutal, sadistic and heart wrenching having involved two tiny children who suffered what can only be described as a

11

monster story come true, only days before Christmas.  The facts of this case were further muddied by Paul Reggettz's  rather bizarre and questionable character.   Paul Reggettz had a reputation as being abusive towards his family and he told interrogators that when he found his family murdered, he was relieved and felt as if a great responsibility had been lifted from him. Testimony and evidence at trial suggested that the Reggettz family lived in dire want even though Paul Reggettz made a fairly decedent living and was funneling the family's financial resources into paying for a new car he'd bought.  Paul Reggettz had gone so far as to keep his family in a hotel for several months while paying down his car.  He was not a sympathetic character.

This case received widespread local news coverage and national attention as did Petitioner's subsequent challenges to his conviction. Petitioner's first trial was sensational and ridded with errors including inflammatory and theatrical comments and actions by the prosecutor.  The fact that Paul Reggettz's confession turned out to be false  cast a bad light on investigators and resulted in a shadow that hangs over the case to this day.

Petitioner has indeed had more than his fair share of facially legitimate grounds to challenge his conviction and this case has haunted the West Virginia judicial system for thirty years. Because of the circumstances surrounding Petitioner's case it has been doubly important that he receive the utmost of propriety in his trial and conviction as well as thoughtful post conviction review and he has most surely received just that.  Through more than thirty years, two trials, four state habeas proceedings, and three State Supreme Court opinions, countless hours of effort have

gone into ensuring that Petitioner's conviction complied with the notions of due process and the constitutional guarantee of a fair trial.  But now, it's time to stop.[5]

\* \* \* \* \*

**Overview of record evidence used in the conviction.**[6]

The evidence admitted at trial against Petitioner included blood  tying him to the scene. Blood evidence recovered from a small pajama top belonging to Bernadette Reggettz  was tested. Nine enzyme types were found which were consistent with the enzyme types of Petitioner, occurring in about 3 out of every 10,000 persons.  The jury at the Petitioner's trial heard this evidence.  It is pivotal to this case to strongly emphasize that neither this blood spot nor the reference samples were collected by nor tested by nor reported by Fred Zain.

Further,  Petitioner confessed to these murders:

> On September 26, 1980, while the appellant was serving a term of four to twenty-five years at the Ohio State Reformatory for felony convictions in Ohio, the Kanawha County prosecutor's office lodged a detainer and sought custody of the appellant . . . .  The purpose of the detainer was to obtain a determination by the Circuit Court of Kanawha County of whether the appellant was a delinquent child . . . .  The delinquency petition and detainer were based on a malicious wounding charge, unrelated to the instant homicides, pending against the appellant in

_____

[5]Respondent will rely heavily on previous decisions issued in this case by the state habeas courts, the trial courts, and the West Virginia Supreme Court.  Given this case's endless use of resources, Respondent feels that the extensive analysis of this case by the West Virginia Supreme Court and the state courts does not need to be re-argued, re-litigated or reexamined and can stand on its own merits for both the sake of judicial economy and finality. Respondent has further adopted heavily  from prior pleadings drafted by several parties representing the State of West Virginia over the years as Petitioner wound through the systems, including Stephen B. Revercomb and Mary Beth Kershner, Assistant Kanawha County Prosecuting Attorneys; and the late Jon R. Blevins,  Assistant Attorney General, who represented the State of West Virginia in Petitioner's 2004 habeas appeal before the West Virginia Supreme Court.

[6]Citation to the record to support the assertions in this overview of facts will be set forth below in more detail.

> Kanawha County.  On October 28, 1980, two [troopers] . . . traveled to Ohio, took the appellant into custody, and returned with him to West Virginia. . . . The appellant subsequently made three inculpatory statements regarding the murders to the West Virginia authorities.  One of the statements was tape recorded. . . .

*State v. Moss*,  376 S.E.2d at 576.

The West Virginia Supreme Court ruled that all three confessions were voluntary, but excluded one of them because of a violation of the prompt presentment rule.  *Id.*

The jury heard John Moss confess, and this admissible confession was extensively corroborated by the Petitioner's description of details at the crime scene and the manner of each of the killings, the location and condition of the weapons, the wounds on his person, the post-mortem appearance of Vanessa, as well as the identification of property he admitted taking from the crime scene which was later recovered consistent with his statements.  Mrs. Arbutus Pomeroy, who received some of the merchandise stolen from the scene as a Christmas present from Petitioner, testified that Petitioner's face was scratched up pretty badly.  Petitioner also had a scar on his little finger consistent with where he said he'd been cut during the struggle over the knife with Vanessa.

Paul Reggettz, the husband and father of the victims, testified at Petitioner's trial, and he repudiated his earlier confession which he made after about 14 hours of interrogation and over 24 hours with no sleep.  Further, both the circumstances surrounding the giving of the confession as well as the post-mortem condition of the victims support the repudiation..

**B.      TRIAL EVIDENCE.**

As evidenced by his timecard on December 13, 1979, at approximately 11:30 a.m., Paul Reggettz finished his 2:30 a.m. to 11:30 a.m. night shift at United Parcel Service in Rand, West Virginia.  (Respondent's Exhibit 20 [hereinafter "Resp't Ex. ___"]at 676 & 679.)   On that night, his co-workers did not notice any unusual or different behavior or mood.  (*Id.* at 635-49.) He drove towards his home on Chesapeake Avenue in St. Albans, West Virginia.  (*Id*. at 681.) After his family had dinner at about 7:30 on the previous evening, he and his wife, Vanessa, had agreed to meet after Paul got off work to go shopping at the St. Albans K-Mart.  (*Id*. at 670.)  Paul Reggettz was scheduled to meet his wife and daughter, Bernadette, across from Route 60 in St. Albans.  (*Id*.)  Paul Reggettz did not find his wife and daughter waiting for him, and he continued home to find out why they had not met him as planned.  (*Id*. at 681.)

Paul Reggettz arrived home and knocked on the front door of his home with his foot because his hands were full. (Resp't Ex. 20  at  683.) After receiving no answer, he went to the back door of his house and pushed the door open with his foot. *(Id*. at 683-84.)  He found his wife sprawled across the living room with cords wrapped around her neck and scissors sticking out of her chest. (*Id.* at 685 & 688.)   The cause of Vanessa's death was later determined to be strangulation. (*Id.* at 838.) As Paul Reggettz was starting back out of his home to seek help, he saw his four-year-old daughter hanging from a door by a cord wrapped around her neck.  (*Id.* at 686.) The cause of Bernadette's death was later determined to be strangulation.  (*Id.* at 860-61.)  Paul Reggettz lifted his daughter down from the noose and placed her on the floor before leaving to find help.  (*Id.* at 687.)

Reggettz ran to an A&W Root Beer stand, and as he testified to at trial, "Well, I walked into the A&W and I just stood there--I couldn't say anything. I just stood there in front of those people and couldn't say a word." (Resp't Ex. 20 at 687.)  Eventually he asked an employee to call the police.  (*Id.*)  An employee of  A&W described Reggettz as "disorganized"  and asking for help. (*Id.* at 627.)  Reggettz left the A&W and returned to his house.  ( *Id.* at 688.)  As he re-entered his home, he found his seven-year-old son, Paul Eric, bound in a "hog-tie" position, face down in the bathtub.  (*Id.* at 689-91.)  Asked about lifting his son, Mr. Reggettz told the jury, "I remember he was stiff-like, like he was tense." (*Id*. at 690.)  The cause of Paul Eric's death was later determined to be drowning.  (*Id.* at 844.)  Paul Reggettz then returned to his daughter's room, picked her up and laid her on the bed because he "couldn't stand the thought of her laying in the floor."  (*Id.* at 688.)

The police arrived and described  Mr. Reggettz's demeanor: "He just had a sort of blank look," and he did not say that he had killed his family. (*Id.* at 433.)  Thereafter, the police found the house ransacked.  (*Id.*  at  462.)  The Christmas presents the Reggettz's had wrapped had been ripped open, and some of the presents were missing.  (*Id.* at 459.)  Among the missing presents was a set of silverware. (*Id.* at 734.)  A camera and a .22 rifle were also taken from the house. (*Id.* at 569.)

After extensive interrogations, Paul Reggettz confessed to the killings.  He was arrested and indicted, and remained in Kanawha County jail for approximately 11 months.  However, because of some blood discovered at the scene, it became apparent that someone else was involved in the killing of the victims.

16

The Petitioner first became a suspect in the crimes on January 29, 1980, when his uncle, Arthur Moss, gave the West Virginia State Police a newspaper clipping reflecting that the Petitioner had attempted to strangle and rape a woman in Cleveland, and his uncle told the officer that Petitioner had been living with his grandfather near the Reggettz home at the time of the crime and left for Ohio shortly thereafter.  (Resp't Ex. 21 at 166-79, 190; Resp't Ex. 22 at 91-94 & 119-22; State v. Moss, 376 S.E.2d at 576).  At that time, Petitioner was already the suspect in a malicious assault which occurred in St. Albans in May of 1979, and the similarity of the strangulation *modus operandi* alerted the officers.  (*Id.*)

In January 1980, two West Virginia State Troopers, Terry Williams and  Mike Smith, traveled to Mansfield, Ohio, where Petitioner was being held on the Ohio charge.  They interviewed Petitioner, who initially denied any involvement in the crime.  However, in response to a question as to whether the Petitioner considered Vanessa Reggettz to be pretty, he replied that he did not because her face had "bumps."  Vanessa's picture which had been shown to the Petitioner showed a smooth-skinned woman.  However, at the time of her death, her face was blemished.  (Resp't Ex. 20 at 727, 972.).  A blood sample was taken, when, at the authorities' request, Petitioner pricked his finger and dribbled blood on a cloth provided for this purpose. What followed was addressed in Petitioner's first opinion issued by the West Virginia Supreme Court:

> At the time of this interrogation, the appellant was seventeen years of age. The blood sample was taken without a court order, and without the knowledge or consent of the appellant's parents.  The authorities were aware that the appellant was a juvenile.  They made no effort to contact the appellant's Ohio lawyer.  The appellant was advised of his rights prior to questioning, but did not sign a waiver of rights form.
>
> When the appellant's counsel learned of the blood sample taken by the West Virginia authorities, he objected, and an Ohio court ordered that the cloth on which the blood sample was deposited be returned to the appellant.  This apparently was

17

done.  Subsequently, in April 1980, the investigating authorities again travelled to Cleveland to obtain a blood sample from the appellant, pursuant to an order issued by an Ohio court.  A doctor performed the sampling.  Analysis of the blood sample strengthened the investigating authorities' suspicions concerning the appellant's involvement in the murders.

On September 26, 1980, the State filed a detainer against the appellant, pursuant to W. Va. Code § 62-14-1 et seq.  (1977 Replacement Vol.), based on a malicious wounding charge, unrelated to the homicides.  The appellant at this time was serving a term of four to twenty-five years at the Ohio State Reformatory on charges of rape and attempted murder.

*In the Interest of John Moss, Jr.*, 295 S.E.2d at 36-37.

On October 28, 1980, two West Virginia State Troopers traveled to Ohio to return Petitioner to West Virginia for questioning.

When Petitioner began to make incriminating statements during the trip back, officers sought out a State Police detachment in Parkersburg to conduct more formal questioning.  Petitioner confessed to the crimes first during the trip, and later during the interview in Parkersburg after being *Mirandized* and signing a waiver of rights statement.  The confession in Parkersburg, which was tape recorded, was played for the jury at trial.  (Resp't Ex. 20 at 519-20, 551.)  On that tape, Petitioner conceded that he has not been threatened or mistreated and that he had a ham sandwich and a coke for dinner with the officers.  (*Id.* at 553.)

The Petitioner told the troopers he went to the house to steal money.  (Resp't Ex. 20  at 556.)  Moss stated that when he entered the house, Vanessa was pointing a gun at him. A struggled ensued and Petitioner wrested the gun from Vanessa and struck her in the head with the butt.  (*Id.* at 559-60.)  The gun butt was found beside Vanessa's body, and her autopsy revealed lacerations of the scalp which could have been caused by the butt of the gun. (*Id.* at 813-14.)  The gun butt found at the scene was identified by Paul Reggettz as one that he owned.  (*Id.* at 450, 722.)

18

Petitioner stated that the gun broke when he was hitting Vanessa with it, and he disposed of the remainder of the gun after he left the Reggettz home.  (*Id.* at 965.)  The Petitioner also stated that he left the house briefly because he was frightened; however, he then decided to return.  When he went back, he found Vanessa with a knife in her hand.[7]  They struggled for the knife, but he took it away from her, and it was found beside Vanessa's body.  (*Id.* at 528.)  The Petitioner said that he was cut on the finger by the knife during the struggle.  (*Id.* at 559.)  The Petitioner stated that he put a cord around Vanessa's neck and choked her.  (*Id.* at 560.)

When asked on tape what the two children were doing as the Petitioner was choking their mother, the following excerpt of the tape recording was heard by the jury:

A.  Beating on me in the back.

Q.  Were they hollering or screaming or anything?

A.  Yes.

Q.  What were they, what were they saying?

A.  Leave their mommy alone and I knocked them down.

Q.  Did you knock both of them down?

A.  Yes.

(Resp't Ex. 20 at 559-60.)  Bernadette Reggettz weighed 29 pounds and was 3' 4" tall.  (*Id.* at 859.)

The Petitioner then recounted choking Paul Eric with a cord, tying him up, and putting him in a half-full bathtub. (Resp't Ex. 20 at 561-62.)  Petitioner also described choking Bernadette with a cord and hanging her on the door.  (*Id.* at 563.)  After hanging Bernadette, Petitioner told the troopers he stabbed Vanessa in the neck with a "knife or something."  (*Id.* at 564.)

---

[7]There was no phone at the Reggettz home.

After killing the Reggettz family, Petitioner stated that he searched the house for money and opened the Christmas presents. (*Id.* at 565.)  He described a camera he stole from the Reggettz home and told the troopers the camera was at his parents' home in Cleveland, Ohio. (*Id.* at 569.) This camera was recovered in Petitioner's father's car the following day.  It was identified at trial by Paul Reggettz as his camera. (*Id.* at 725.)  Petitioner also admitted taking one of the Christmas presents that he described as "some dishes." (*Id.* at 565.)  Petitioner told the troopers he took the present he stole and gave it as a Christmas gift to his best friend's mother, Ms. Arbutus Johnson Pomeroy of St. Albans. (*Id.* at 567.)  A set of silverware was recovered from Ms. Pomeroy prior to Petitioner's October 1980 confession specifically in February 1980. (*Id.* at 591-95, 902.)  Ms. Pomeroy told the troopers that Petitioner had given the silverware to her as a Christmas present the night before he returned to Cleveland, Ohio, in December 1979. (*Id.* at 901.)  Ms. Pomeroy also stated that she saw some scratches and a Band-Aid on Petitioner's face. (*Id.* at 900.)  Furthermore, Petitioner admitted that he had also taken a .22 rifle from the Reggettz home and later told Trooper Smith that the gun was in an upstairs closet in his parents' home, but if Smith could not find it there, to ask Petitioner's brother, Carlton, where it was. (*Id.* at 565-67 & 1001-03.)

Petitioner told the troopers that after he murdered the family it was almost daylight when he got to his home which was about 100 to 200 yards from the Reggettz home. (*Id.* at 526-27.)

The State also had admitted a clock radio which had been located in the back bedroom from which the cord had been torn.  The clock had stopped at 6:17 a.m. ( *Id.* at 456-57 & 503-05.)  Also, Trooper Shumate testified that he examined the knife handle,  the scissors, the handkerchief box, the wrapping paper, and the door that Vanessa Reggettz was tied to and found fabric marks

consistent with a design that were similar to each other and what appeared to be glove marks.  (*Id.* at 1039.)

## C.        FACTS OF THE SEROLOGY TESTING.

On December 13, 1979, Trooper Fred Zain went to the scene of the crime, the Reggettz house, and secured blood scrapings and other items of evidence for analysis.  (Resp't Ex. 23 at 10-11.) Thereafter, the investigating officers in the case submitted additional exhibits for testing including, but not limited to, the known blood samples of the victims, Vanessa, Paul Eric, and Bernadette Reggettz. (Resp't Ex 23 at Exhibit Bates Number 4-9 [hereinafter Ex. 23 B.N.__"].) Bernadette Reggettz's pajama top was submitted by Trooper Terry Williams in early January 1980. (*Id.*)  Additionally, known blood samples of a host of other  males who had possible access to the house were submitted to the State Police Laboratory during January 1980.  (*Id.*)

State Police Sergeant. R.C. Murphy was Zain's supervisor in the Serology Section at the time and was involved in the testing of most of the exhibits of this case and saw all of the test results. (Resp't Ex.23  at 17.)  Zain and Murphy knew early on that someone other than members of the Reggettz family had been in the house at the time of or immediately prior to the murders, and that there very likely was someone other than a member of the family involved in the murders. They knew this from the analysis of the blood found on the Christmas wrapping paper which had been torn from some of the presents under the Reggettz's Christmas tree.   Analysis on December 17, 1979, of a droplet of blood found on some of the paper showed an EsD enzyme type of 2-1.  (Resp't Ex. 23 at 25-29 & Ex. 23 at B.N. 12.)  Because the Reggettz's victims, mother and children, all had an EsD of 1, they knew that unless Paul Reggettz was not the biological father of Bernadette and Paul, then someone else's blood was on the wrapping paper.  On January 2, 1980,

21

the lab received a known blood sample of Paul Reggettz and analysis of that sample showed his EsD enzyme type as a 1, thus excluding him from being the donor of the blood found on the wrapping paper. (Ex. 23 at B.N. 10.)

This revelation brought a great deal of pressure upon them as the investigating officers felt that they had their man, Paul Reggettz. The State Police brass was not happy with the Zain/Murphy revelation. (Resp't Ex. 23 at 25-29.) Accordingly, the State Police began scouring the countryside for blood samples of anyone who was known to have had access to the Reggettz house. (*Id.* at 22.)

Crucial to this case is the fact that by early January 1980, the Serology Section had unknown blood samples from the murder scene which had enzyme types that did not match the suspect, Paul Reggettz, or the victims. (*Id.*) Zain and Murphy knew what the types were in these unknown blood samples and had found a combination of enzymes on three of the exhibits including Bernadette Reggettz's pajama top, the Christmas wrapping paper discussed above, and a curtain from the back door of the Reggettz home. Zain had found enzyme types which differed from the Reggettz family and Paul Reggettz in blood on the flashlight, taken from the utensil drawer, a pillowcase from behind the bath, from the door between the master bedroom and the front door, and a change purse. (Ex.23 at B.N. 10-14.)

Most importantly, in looking at B.N. 12 of the laboratory document exhibits, Sgt. Murphy did the testing of Bernadette Reggettz's pajama top, which had a bloodstain containing the nine enzyme types consistent with the Petitioner's, occurring in about 3 out of every 10,000 persons. Moreover, Murphy's results from Bernadette Reggettz's clothing matched perfectly with the enzyme types that Zain had found on the curtain, the Christmas wrapping paper, and the other

exhibits which contain blood consistent with the Petitioner's. (Ex. 23 at B.N. 4-14.)  Finally, all of the testing that was done was reported by Sgt. Murphy.  (*Id*. at B.N.  4-9.)

## D.    FACTS AND CIRCUMSTANCES OF THE PAUL REGGETTZ CONFESSION.

Three witnesses testified at Petitioner's trial about the facts and circumstances directly relating to the verity of Paul Reggettz's confession: Paul Reggettz, himself; Trooper Howard F. Woodyard, to whom Mr. Reggettz initially confessed; and Dr. Irvin Sopher, the Chief Medical Examiner, about whether forensic science supported the details in Reggettz's confession.

When Paul Reggettz testified, he admitted that he confessed to killing his family, but he told the jury that he confessed because he was afraid of implied threats by the police, culminating with him saying to Trooper Woodyard, "Just don't let those people [referring to other troopers] hurt me. I'll do whatever you want."[8]  (Resp't Ex. 20 at 702-03.)  Thereafter he said he "confessed to killing my family." (*Id*. at 703-04.)  However, Mr. Reggettz then testified in detail, repudiating each of the incriminating statements he had given Trooper Woodyard.  (*Id*. at 704-17.)  He admitted making the incriminating statements to the police on cross-examination, including that he had kneeled on his son's buttocks, that he had hung his daughter from the door, and that after he had done these things he slept for a while, getting up for work at about 1:00 a.m.  (*Id*. at 735-61, 750, 752 & 753.)

On cross-examination, Petitioner's counsel made repeated reference to Mr. Reggettz's statement that he felt relieved after his family was killed or words to that effect. *(Id.)*  But, in response to a question, Reggettz had told the jury about those feelings:

Ma'am, I want to tell you something.  I want to tell you one thing that did happen down there.  After they died that morning, and I realized they had died, I felt

---

[8]As noted above, this occurred after nearly 14 hours of interrogation.

like a great weight had been took off of me, in a responsible way, responsibility is
what I mean.

Now, that thought--it's not what had happened, it's just a thought that came
into my mind, that a great responsibility had been come off of me.  And that feeling
passed.  Then, the worst feeling I've ever felt in my life came over me, of a great
loss.  I had a thought of the free -- you're talking about the feeling of free -- the
sudden weight went off of me, and as it went off, the thought of it, I felt a great
dread, the most horrible feeling I felt inside of me that I have ever felt in my life.
I've never felt anything like it before or since.

. . . .

As I ran back out of the house to go up at the A&W the first time that I went
out there.  The thought came into my mind, "I'm free.  The responsibility is gone."
And as that passed out of sight, something inside me died.

I felt like I'd died.  I felt like I died inside.

(Resp't Ex. 20 at 712-13.)  (The employee of A&W described Reggettz as "disorganized."  *(Id.* at

627.)

Finally, Reggettz twice told the jury that he did not kill Vanessa, Paul Eric nor Bernadette

Reggettz.  (*Id.* at 735 & 764.)

\* \* \* \* \*

Trooper Howard Woodyard testified about the circumstances of the formal confession he

obtained from Paul Reggettz on the day after the crimes were discovered.  He testified that the

Petitioner arrived at the South Charleston detachment at about 1:00 p.m. on December 13, 1979,

and signed a Waiver of Rights at 2:10 p.m.  (Resp't Ex. 20. at 1223-24.)  Thereafter, he was

interrogated by as many as three or four troopers at a time until almost 14 hours after his arrival,

specifically at about 2:30 am., when he made his first inculpatory statement.  (*Id.* at 1224-25.)  In

this regard, the trooper was asked by the assistant prosecuting attorney:

Q.     And isn't it true that when he made his first inculpatory statement, he said, "If I tell you what you want, then you won't let them hurt me?"

A.     Yes, he did.

Q.     Did you ever ascertain who "they" were?

A.     No, I did not.

Q.     That is all that Mr. Reggettz said at that time?

A.     Yes, sir.

Q.     He was looking up to you; wasn't he?

A.     Yes, sir.

Q.     For protection?

A.     Yes, sir.

Q.     You played up to that; didn't you?

A.     Yes, sir, I did.

Q.     At that time, you made the simple statement that you wouldn't let anyone hurt him - - but, "Okay, I killed my wife and two children"?

A.     Yes.

(*Id.* at 1225.)

     The trooper then explained that he went into a detailed statement that took several hours, being completed around 6:00 a.m.  (Resp't Ex. 20 at 1226.)  The trooper conceded that Mr. Reggettz had not had any sleep, having had only four to six hours of sleep in the past two days; that all of the details in Reggettz's statements were in response to a question from the trooper; and, finally, that when Reggettz had entered and re-entered his home before the police arrived, he was able to observe the crime scene and the details he was admitting.  (*Id.* at 1226-27.)  Trooper

25

Woodyard was then asked about Reggettz's explanation of what he had done with his daughter's body:

> Q.   Were you ever able to understand his explanation?
>
> A.   No, sir, I never could.  He was never able to make me understand with respect to what he had done, in that respect.

(*Id.* at 1227.)

Woodyard then testified that he went to a demonstration the next day, some 20 hours after Reggettz had "gone through tragedy," and Reggettz had had no sleep.  (*Id.* at 1228.)  The trooper told the jury that he did not simply walk in to the demonstration and ask Reggettz to demonstrate what he did; rather, he was asked to demonstrate some specific things:  how he picked up his wife's body and carried it and how he stabbed her with the scissors.  Woodyard stated that Reggettz did not just volunteer to go from one place to the next, he was instructed to by the authorities, and, at the scene, when he said what the kids were saying,  it was a response to "What were the kids doing, what were the kids saying?"  (*Id.* at 1228-30.)   Also, the following exchange occurred:

> Q.   When he said that he felt that a great weight had been taken off of him that was in response to you asking him how he felt; wasn't it?
>
> A.   Yes.
>
> . . . .
>
> Q.   The first statement you took from Paul Reggettz was early in the afternoon; is that correct.
>
> A.   Yes, it was.
>
> Q.   And in that statement, he didn't say anything about killing him [sic] family; did he?
>
> A.   No, sir.

(*Id*. at 1229-30.)  In addition, Reggettz told Woodyard that he had taken his .22 rifle from the house and thrown it in the Kanawha River.  (*Id.* at 1217.)  And finally, Trooper Woodyard conceded that Reggettz did not confess until after he asked, "You won't let them hurt me, if I tell you what you want?" (*Id.* at 1233.)

\* \* \* \* \*

Dr. Irvin Sopher, the Chief Medical Examiner, testified that he did not observe a bruise on the buttocks of Paul Eric Reggettz and that the boy's stomach contents were consistent with his having eaten at 7:30 p.m. the prior evening and been drowned at about 6:00 a.m. the next day. (Resp't Ex. 20 at 846-47.)   The doctor also testified that the livor mortis pattern evident with Bernadette Reggettz was inconsistent with her having been hung from the door on the prior night and then been taken down the next day.  (*Id*. at 851-56.)  Further, this pattern was consistent with this child having been hung at about 6:00 a.m. (*Id*. at 856-57.) Additionally, Bernadette's stomach contents were consistent with her having eaten at dinner the prior evening and been hung at about 6:00 a.m. the next day. (*Id*.)  Dr. Sopher also testified that it was his opinion that 9:00 p.m. on the night of December 12 was too early a time frame, given the condition of the victims, and that there was no evidence of injury to or blood on Paul Reggettz.  (*Id*. at 862-63.)

## V.

## ARGUMENT

### A.    INTRODUCTION TO ARGUMENT.

Because of the extensive history of this case, the grounds will be combined for purposes of judicial economy and clarity.  The claims as argued by Petitioner combine sometimes three issues at a time and consistently "incorporate" facts set forth in any, all and any combination of claims

argued before and after each ground is raised.  Petitioner has set forth his claims as a quilt of challenges to proceedings in both trials and all the state habeas proceedings (often mixed on one claim) as well as the state courts' interpretations and applications of the holdings in not only the *Zain* line of cases, but the WVSCA's holdings in Petitioner's decisions as well (including the West Virginia Supreme Court's interpretation of it's own holdings). Therefore,  Respondent will rely almost exclusively on previously issued state court determinations.

Although Petitioner asserts several claims challenging both his confession and the blood evidence, it is only necessary to address the issues once each on the underlying premise given that Petitioner's claims in each regard are so repetitious they incorporate each and every other claim because they are, in Petitioner's words, "interwoven." While "interwoven" is correct, it is nonetheless misleading.  Rather, each claim rests on two disproved presumptions already  settled by the West Virginia Supreme Court; to-wit, that 1) Petitioner's confession was inadmissible and false (either as coerced or in violation of other constitutional or  procedural safeguards); and 2) the testimony of Fred Zain rendered Petitioner's trial presumptively unfair and also rendered Trooper Murphy's testimony false,  irrespective of whether the testimony was indeed false or whether it was prejudicial in light of the overwhelming remaining evidence of guilt.  Moreover, Petitioner consistently maintains (in support of repeated attacks on the admissibility of his confession) that he was improperly extradited and questioned in violation of the Interstate Agreement on Detainers Act. This exact issue  was addressed and settled by the West Virginia Supreme Court prior to Petitioner's second trial and conviction.

Regarding Petitioner's claims challenging the admission of blood evidence, there is indeed no question that Fred Zain testified at Petitioner's trial about significant blood evidence implicating

Petitioner.  However, unlike the classic *Zain* case, there are profound independent indicia of reliability of  Zain's testing and pivotal evidence was tested by and reported by State Police Serologist Robert Murphy. It's not even necessary to perform the traditional Zain, analysis by presuming that Zains's testimony was false, then proceeding to determine whether the testimony was harmless or prejudicial.  This has been firmly established by the state courts, the facts, the record and corroborated by other evidence introduced at trial.  However, as will be more fully set forth below, even though the state courts, including the West Virginia Supreme Court, determined that Zain did not perform the testing of the pivotal blood evidence (Bernadette's pajama top), they still determined there was sufficient remaining evidence to sustain the conviction sufficient to satisfy the analysis in *Zain I*.

Most important of all, unlike the typical *Zain* case, Zain and Murphy's initial testing *eliminated* who they thought to be  a confessed murderer already in custody and resulted in an independently identified enzyme long before Petitioner submitted a blood sample.  Zain and Murphy *did not* have a sample of Petitioner's blood when they isolated the enzymes type of the unknown sample.   They knew that there was someone else involved in this case before they even obtained  Petitioner's  known blood sample in April of 1980.  Sergeant Murphy, and not Zain, tested the little pajama top of Bernadette Reggettz and, finally, Murphy's test results overlap and confirm Zain's results.  All of these factors make this case unique and an exception to the other "*Zain*" cases.

29

However, even if this Court were to presume that the blood evidence testimony by Trooper Murphy was falsified by association (and the reams of state court findings on this point are wrong as a matter of law) the blood evidence still, nonetheless, was not sufficient to prejudice Petitioner's trial in light of Petitioner's confession and the corroborating evidence recovered as a result.

Because of the unmatched quality and the extensive nature of the review of this case by West Virginia's highest court as well as the diligent review by the state habeas courts, Respondent will present an in-depth overview of the circumstances surrounding each of those issues and the findings of the State court in regard to each. All arguments raised by Petitioner in relationship to both major issues are defeated by a clarification of the record, the facts and the legal standards surrounding each issue.

**B.    THE BLOOD EVIDENCE ISSUES.**

**1.    The "*Zain*" Standard.**

As previously noted the West Virginia Supreme Court, through a series of opinions, has required that every conviction involving Trooper Fred Zain in any capacity, is entitled to review. (*See Zain I.*)  There is no argument that Petitioner was not entitled to such review or that he received that review.  The issue here is not to re-analyze the evidence or retry this case under state law, but whether or not the state courts applied the proper federal standards to the facts of Petitioner's case--not just once but countless times over numerous appeals and state habeas petitions, not to mention all the review conducted during the trial court proceedings.

The West Virginia Supreme Court enunciated its standards of review on this issue in *Zain I*:

> Newly discovered evidence is not the only ground on which habeas relief can be afforded.  It has long been recognized by the United States Supreme Court that it

is a violation of due process for the State to convict a defendant based on false evidence. Chief Justice Warren, writing for a unanimous court in *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959), summarized this principle:

> "First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment....  The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  (Emphasis in original; citations omitted).

In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), a unanimous Court again concluded that the Government was responsible for false testimony on the part of one of its witnesses even though the prosecutor was unaware of its falsity.  In *Giglio*, a Government witness was promised immunity if he would testify against the defendant.  This promise was made by an assistant district attorney who was not involved in the *Giglio* trial.  The trial prosecutor was unaware of the promise.  On cross-examination, the witness denied that he received any promise of immunity.  The Supreme Court in *Giglio* began by *reaffirming Napue's* principle:

> "In  Napue ..., we said, '[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'  [360 U.S.] at 269, [79 S.Ct. at 1177], 3 L.Ed.2d at 1221.  Thereafter *Brady v. Maryland*, 373 U.S. [83], at 87, 10 L.Ed.2d [215] at 218, 83 S.Ct. 1194 [at 1196] (1963), held that suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecutor.' "

 405 U.S. at 153-54, 92 S.Ct. at 766, 31 L.Ed.2d at 108.  (Citations omitted).

It then made this observation as to responsibility of the prosecutor's office: "Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor.  The prosecutor's office is an entity and as such it is the spokesman for the Government." 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 109.

     Thus, in this case, it matters not whether a prosecutor using Trooper Zain as his expert ever knew that Trooper Zain was falsifying the State's evidence.  The State must bear the responsibility for the false evidence.  The law forbids the State from obtaining a conviction based on false evidence.

It is also recognized that, although it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict.  As explained in *United States ex rel. Wilson v. Warden Cannon*, 538 F.2d 1272, 1277 (1976), citing *Giglio*, 405 U.S. at 153-54, 92 S.Ct. at 766, 31 L.Ed.2d at 108:

> " 'A finding of materiality of the evidence is required *under Brady [v. Maryland*, 373 U.S. 83] at 87, [83 S.Ct. 1194 at 1196, 10 L.Ed.2d 215 at 218-19 (1963) ].  A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ...."  *Napue* [*v. Illinois*, 360 U.S. 264] at 271, [79 S.Ct. 1173, at 1178, 3 L.Ed.2d 1217, at 1222 (1959) ]."

There is some divergence of view among the federal courts of appeals as to the test to be used in determining what impact false testimony will have on the ultimate question of whether a criminal conviction should be set aside.  For example, in *United States v. Langston*, 970 F.2d 692, 700 (10th Cir.), cert. denied sub nom., *Francis v. United States*, 506 U.S. 965, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992), the court made this statement with regard to ascertaining the impact of false testimony:

> "The test for materiality is the same as the test for harmless constitutional error. *United States v. Bagley*, 473 U.S. 667, 679 n. 9, 680, 105 S.Ct. 3375, 3382 & n. 9, 87 L.Ed.2d 481 [492 n. 9] (1985).  The test for harmless constitutional error is 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." '  *Yates v. Evatt*, 500 U.S. 391, [403, ] 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 [448] (1991) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 [710] (1967).  'To say that an error did not contribute to the verdict is, rather to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.' *Yates*, [500 U.S. at 403 ] 111 S.Ct. at 1893 [114 L.Ed.2d at 449].  *Yates* thus instructs us 'to make a judgment about the significance' of the tainted evidence relative to the remaining evidence."

*Zain I*, 438 S.E.2d at 504-06.

The West Virginia Supreme Court in *Zain I* recognized that under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972), that it is a violation of due

process for the State to convict a defendant based on false evidence, whether or not the prosecutor

is aware of its falsity--the proper federal standard. However, under these decisions, a new trial is

not automatically required when false evidence has been shown to have been introduced at trial.

The evidence must be found to be material to guilt or innocence, and a new trial is required only

if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the

jury." *Napue* at 271; *see also Giglio* at 154. Therefore, the WVSCA held that "although it is a

violation of due process for the State to convict a defendant based on false evidence, such

conviction will not be set aside unless it is shown that the false evidence had a material effect on

the jury verdict." *Zain I*, 438 S.E.2d at 505. This standard is consistent with the harmless error

standard enunciated in *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993) (In habeas proceedings,

an error is harmful only if it "'had substantial and injurious effect or influence in determining the

jury's verdict.'") (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)). *See also Sherman*

*v. Smith*, 89 F.3d 1134 (4th Cir. 1996).

     The resulting standard for review in the *Zain* line of cases was enunciated as follows:

> Where improper evidence of a nonconstitutional nature is introduced by the
> State in a criminal trial, the test to determine if the error is harmless is: (1) the
> inadmissible evidence must be removed from the State's case and a determination
> made as to whether the remaining evidence is sufficient to convince impartial minds
> of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence
> is found to be insufficient, the error is not harmless; (3) if the remaining evidence
> is sufficient to support the conviction, an analysis must then be made to determine
> whether the error had any prejudicial effect on the jury.

*Zain I*, 438 S.E.2d at 506 (quoting Syl. Pt. 2, *State v. Atkins*, 261 S.E.2d 55 (W. Va. 1955)). Thus,

if the circuit court determined that this analysis applied, it was required to make findings according

to this standard.

The WVSCA found that any evidence offered by Zain in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in a subsequent habeas corpus proceeding. The Court also held that

> in any habeas corpus hearing involving *Zain* evidence, the only issue is whether the evidence presented at trial, independent of the forensic evidence presented by Trooper Zain, would have been sufficient to support the verdict. As we have earlier stated, once the use of false evidence is established, as here, such use constitutes a violation of due process. The only inquiry that remains is to analyze the other evidence in the case under the *Atkins* rule to determine if there is sufficient evidence to uphold the conviction.

*Zain I*, 438 S.E.2d at 506.

The WVSCA, in *Zain I*, properly recognized that a conviction obtained on the basis of false evidence need be set aside only if it is shown that the false evidence had a *material* effect on the jury verdict. After examining several materiality tests, this Court finally settled on the three-part test for reviewing courts to employ in analyzing the *materiality* of *Zain I* challenges.

Petitioner maintains that the blood evidence introduced at his trial was gathered and tested by Trooper Fred Zain. However, a pivotal piece of evidence in this case is the analysis of the blood spot from the pajama top of Bernadette Reggettz. This evidence was not collected by Zain, tested by Zain, nor reported by Zain. Fred Zain effectively *read Trooper Murphy's report to the jury* relative to this piece of evidence. The statistical assertions, as well as the results of the testing, were the product of Murphy's work, which the WVSCA addressed in Syllabus Point 3 of *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory*, 445 S.E.2d 165 (W. Va. 1994) [hereinafter "*Zain II*"].

34

C.      DISCUSSION OF ASSIGNMENTS OF ERROR.

    1.      <u>The West Virginia Supreme Court's Findings on the Blood<br>Evidence Issue Are Correct as a Matter of Federal Law.</u>

On this issue, Petitioner appealed from the state habeas arguing that the state court's determination that *Zain I* did not apply was clearly erroneous.

As previously noted the WVSCA, in *Zain I,* addressed the possibility that innocent persons had been convicted due to the unreliable or false evidence of Fred Zain.  However *Zain I* did not address some of the situations which were before the circuit court and the WVSCA in this case; namely, where the serological work performed by the West Virginia State Police served to exculpate the sole initial suspect, and where pivotal work was performed by another serologist, as well as Zain, and Zain's results were examined by the other serologist.

The WVSCA in *Zain II* stated:

> Serology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Fred S. Zain, are not subject to the invalidation and other strictures contained in *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division,* 190 W.Va. 321, 438 S.E.2d 501 (1993).

Syl. Pt. 3, *Zain II.*

The serology report in this case was prepared by and signed by Sergeant Robert Murphy of the State Police. (Ex.23 at  B.N. 4-9.)  Furthermore, Murphy was involved in the testing and analysis of the exhibits of this case and examined all of the test results. (Resp't Ex. 23 at 17.)

During most of the time in which Fred Zain was employed by the West Virginia State Police, he was the supervisor of the Serology Division, and he effectively had no supervision.  *(See Zain I, supra.)*  However, at the time the testing was performed in Petitioner's case, Zain was working under the supervision of Sergeant Robert Murphy, who was the first serologist working

35

for the State Police.  (Resp't Ex. 23 at 6.)  Murphy testified before the grand jury which first indicted Petitioner relating solely to the involvement of Petitioner, since Murphy "had no physical evidence connecting Paul Reggettz with this case."  (*Id.* at 24.)

Further, both Murphy and Zain were under considerable pressure at the time to find evidence pointing to Paul Reggettz as the murderer.  The investigation officers were convinced that Reggettz was the killer.  The laboratory, however, produced evidence that pointed to some other person.  Murphy recounted in his deposition that this resulted in some conflicts in which he was forced to vigorously defend his findings.  (Resp't Ex. 23 at 26-29.)  Murphy also stated the obvious--that there was no motive on the part of either Murphy or Zain to falsify the results to exculpate Reggettz, and no reason to inculpate the Petitioner.  (*Id.* at 54.)

It is also noteworthy that the serological results which pointed to someone other than Reggettz as the perpetrator were obtained before the Petitioner's blood was submitted for analysis. The results of the then-unknown person could not have been manipulated to conform with the then-unknown blood type of the Petitioner.  Therefore, it is safe to assume that the blood type found not to match any of the Reggettz family was correctly reported from the beginning, and this result was not changed once Petitioner's blood sample was analyzed.  Similarly, a review of Murphy's deposition reveals that Murphy performed the testing of all of the known blood samples--including that of the Petitioner.  Therefore, Murphy determined that the Petitioner was a match for the unknown specimens found by Zain during testing of the crime scene exhibits, and Zain had no opportunity to falsely make the Petitioner a match for the unknown blood depositor at the scene.

Most importantly, Ex. 23 at B.N. 12 reflects Sergeant Murphy did the testing of Bernadette Reggettz's clothing or pajama top, which had a bloodstain containing the nine enzyme types

consistent with the Petitioner, occurring in about 3 out of every 10,000 persons, and when Zain testified at trial about this item of clothing, this was precisely what he told the jury.  (Resp't Ex. 20 at 1124.)  Moreover, Murphy's results from Bernadette Reggettz's clothing matched perfectly with the enzyme types that Zain had found on the curtain, the Christmas wrapping paper, and the other exhibits which contain blood consistent with the Petitioner's. (Ex. 23 at B.N. 4-14.)

Murphy denied that Zain ever combined samples to obtain a desired result. (Resp't Ex. 23 at 50.) Nor did the investigation into Zain's conduct report that Zain planted evidence:

> "The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results."  (Footnote omitted).

*Zain I,* 438 S.E.2d at 503.

Thus, the state courts were again presented with a twist on the usual "*Zain*" case under the set of facts present in Petitioner's case.  In this case, given Zain's later established *modus operandi* Zain would have been motivated to manufacture evidence inculpating Reggettz, but he did not do so.  Zain was not working on his own, but was working under the supervision of Robert Murphy.

Aside from the independent indicia of reliability of the challenged evidence, there was sufficient evidence remaining to sustain the conviction in this case.  The state habeas court

(MacQueen, J) issued a Memorandum Order on September 10, 1998, denying the requested relief.[9]

(Resp't Ex. 5 as attached "Memorandum Order).  In that order, the court provided a thoughtful and

cogent analysis of the facts and detailed findings relating to Petitioner's expert in the state habeas

proceedings (94-MISC-663) Dr. Bing.  (Resp't Ex. 5 at 4-7.)  Based upon all the evidence, Judge

MacQueen made the following findings:

> In addition to the fact that Trooper Robert Murphy performed much of the laboratory testing and prepared the forensic report for the Department, other facts distinguish this case from the prototypical *Zain* case envisioned by the Court in *Zain I and II*.  Perhaps the most striking aspect of the record is the fact that Zain and Murphy had discovered genetic markers in blood samples from the Reggettz residence that excluded Paul Reggettz and would ultimately incriminate John Moss, long before a sample of Moss's blood was obtained and analyzed.  This stands in start contrast with the image Zain developed in other cases, as an expert witness who was willing to adjust his opinions to fit the theories developed by other investigators.  In addition, Zain was not the chief serologist, but was subordinate to and supervised by Murphy.  Under these particular circumstances, it is inappropriate to resolve the petitioner's claims by the application of an arbitrary rule.

> The Petitioner offered the expert opinion of Dr. David H. Bing, a nationally recognized authority in the fields of molecular biology, forensic DNA testing and immunology, to support his challenge to the evidentiary sufficiency of the testimony of Fred Zain.  Dr. Bing was unable to conduct independent testing of the blood evidence, apparently because samples were consumed in the original testing, were discarded or were treated in a manner that prevents contemporary DNA analysis. . . .

> [Here the Court provides a detailed analysis of the scientific evidence] . . . .

> It can hardly be said that Dr. Bing characterized Murphy and Zain's scientific conclusions and Zain's testimony as false, inaccurate or invalid.  To the contrary, based on the information available to him, he confirmed the scientific validity of the conclusions.  At best, it seems that Dr. Bing suggested that Zain should have explained to the jury that only a limited number of genetic markers

---

[9]The circuit court (Bloom, J) issued an Amended Memorandum Order Denying Habeas Relief on February 15, 2002, adopting and incorporating Judge MacQueen's earlier Order. (Resp't Ex. 5.)

distinguished the petitioner's blood from that of the victims.  From the evidence presented at trial, the jury could not have failed to appreciate this fact.

Based on the record as it has been developed, this court is of the opinion: (1) That the prophylactic rule announced in *Zain I* and *II should not operate to nullify the serology evidence* offered during the petitioner's trial; and (2) That in the absence of specific evidence that the blood test results were falsified or were substantially incorrect, there is no basis to set aside the verdicts against the petitioner.

Resp't Ex. 5 at Memorandum Order  4-7; emphasis added.

The WVSCA found:

Upon consideration of these distinguishing factors and the record as developed, Judge MacQueen concluded that the rule  announced in *Zain I* and *II* "should not operate to nullify the serology evidence offered during the petitioner's trial" and "[t]hat in the absence of specific evidence that the blood test results were falsified or were substantially incorrect, there is no basis to set aside the verdicts against the petitioner."  After making this ruling, the trial court proceeded to the third-prong of the analysis suggested by Judge Holliday to consider whether "even if the serological evidence is completely disregarded, there remains sufficient evidence to sustain the conviction." Following his summary of the evidence presented at trial against Appellant, Judge MacQueen ruled that "petitioner's incriminating statements, the statement's harmony with the physical evidence and related corroboration were certainly sufficiently persuasive to convince twelve reasonable persons [of] his guilt beyond a reasonable doubt."

Notwithstanding Judge MacQueen's denial of relief to Appellant in September 1998, his counsel ultimately convinced the trial court to examine the additional issue of whether the introduction of Mr. Zain's testimony had a prejudicial effect on the jury under this Court's holdings in syllabus points two and three of *Zain I*. In syllabus point two, we held that "[a]lthough it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict."  190 W. Va. at 322, 438 S.E.2d at 502.  Upon a demonstration of false evidence used to sustain a conviction, we reasoned: "The only inquiry that remains is to analyze the other evidence in the case under the *Atkins* rule  to determine if there is sufficient evidence to uphold the conviction." *Id*. at 326, 438 S.E.2d at 506 (footnote added).  Accordingly, in syllabus point three of *Zain I* we restated the test for evidentiary error:

" 'Where improper evidence of a non-constitutional nature is introduced by the State in a criminal trial, the test to determine if the

error is harmless is:  (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt;  (2) if the remaining evidence is found to be insufficient, the error is not harmless;  (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.'  Syllabus Point 2, *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), cert. denied,  445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980)."

190 W. Va. at 322, 438 S.E.2d at 502.

The crux of Appellant's appeal is that the trial court, in applying the *Atkins* test, wrongly concluded that Mr. Zain's testimony did not have a prejudicial effect on the jury.  Emphasizing the personal and extensive involvement of Mr. Zain in his prosecution, Appellant states that Mr. Zain collected blood samples at the scene; performed testing on critical pieces of evidence;  testified in both of Appellant's trials; and presented key evidence that enabled the jury to decide which of two confessions to believe.  Downplaying the significance of Mr. Murphy's involvement in the case, Appellant argues that Mr. Zain's testimony was the key testimony based upon which the jury made its decision regarding which of the two confessions was credible.

In response to these arguments, the State identifies a number of inaccurate statements made by Appellant.  As opposed to the scenario described by Appellant with Mr. Zain improperly and overzealously going to the Reggettz's home to collect blood samples, Mr. Zain only went to the scene of the crimes to collect those samples upon being called by Trooper Williams for that express purpose.  Moreover, at least one critical piece of evidence--the pajama top of Bernadette Reggettz--was collected by Trooper Williams and submitted for testing at a later date in time.  The testing on this top, which Dr. Bing testified to as constituting a complete match with the blood typing of Appellant,  was performed by Trooper Murphy.  Mr. Zain's only involvement with this critical piece of evidence was his reading of the report with the blood typing results to the jury.

While Appellant strenuously argues that absent the testimony of Mr. Zain the jury had no basis from which to choose between the two confessions, the State explains why this contention is specious.  In making his argument, Appellant chose to ignore various items of evidentiary significance that the jury was presented with that may have affected their decision regarding the truthfulness of the two confessions.  Mr. Reggettz testified at trial and explained the circumstances surrounding the giving of his confession AND FULLY REPUDIATED that confession. Dr. Irving Sopher, the Chief Medical Examiner, testified both to specific

40

marks on the victims' bodies and the contents of their stomachs with regard to the time of their last meal. The details of Dr. Sopher's testimony suggested the veracity of Appellant's confession, as opposed to that given by Mr. Reggettz.

Perhaps the most convincing corroborative evidence that the jury heard on the issue of confessions, however, was testimony describing the recovery of various items taken from the Reggettz' home. During his confession, Appellant related that he had taken a camera and what he described as "some dishes" from the Reggettz' home. He further indicated that he had given the camera to his father and the dishes to a Ms. Arbutus Pomeroy, his best friend's mother. The camera that was taken from the Reggettz' home was discovered in Appellant's father's car in Cleveland, Ohio, and Ms. Arbutus Pomeroy testified that Appellant had given her silverware, which was identified as having been taken from the Reggettz' home, as a Christmas present, shortly after the time when the murders occurred.

Setting aside the *Zain* evidence, the confession given by Appellant was powerfully incriminating evidence, as Judge Bloom recognized in ruling on the habeas corpus petition:

Moss's own confession is a key piece of evidence that stands independently of any *Zain*-related evidence. Further, the confession is corroborated in a number of significant ways, which the Court has described as "indices of reliability." In focusing on Zain, Moss ignores the power of his own well-corroborated confession.

The State convincingly argues that there was sufficient testimony offered through individuals other than Mr. Zain from which the jury could have based its decision to believe Appellant's confession. Given the abundance of evidence that the jury was presented with that supported Appellant's confession to having committed the subject murders, we simply cannot accept Appellant's argument that Mr. Zain's testimony was per se prejudicial. Accordingly, we find no error with the trial court's conclusion that the introduction of testimony or evidence by Mr. Zain did not have a prejudicial effect on the jury. *See* Syl. Pt. 2, *Atkins*, 163 W. Va. 502, 261 S.E.2d 55 (1979).

*Moss v. Trent*, 603 S.E.2d at 659-62.

The WVSCA did not go so far as to exempt Petitioner's case from Zain review expressly.

It did, nonetheless, affirm Judge McQueens's findings. Moreover, although the state habeas court

found that the circumstances surrounding Zain's testimony did not require that it be nullified, it still

performed an analysis for prejudice and found there was none under the federal standards enunciated

41

in *Zain I*. Most importantly, it has never been held in this jurisdiction that the West Virginia Supreme Court applied the wrong federal standards in its analysis for error or prejudice in the *Zain* series of decisions. Therefore, all claims related to the admission of Zain's testimony on this point raised by Petitioner fail to rebut the presumption that the history of state court rulings on this point is correct as a matter of federal law.

> **2.      The Circuit Court's Finding That the Evidence Presented by the State at Trial Was Sufficient to Convince Impartial Minds of the Petitioner's Guilt Beyond a Reasonable Doubt Even after Exclusion of the Serological Evidence of Fred Zain Is Correct as a Matter of Federal Law.**

The holdings of both the state habeas court and the WVSCA are correct as a matter of federal law on this issue.  Given the substance of Petitioner's confession and its corroboration by the evidence, the confession alone was sufficient to sustain the conviction.

The Petitioner confessed to committing the three murders of which he was convicted.  His confession was ruled admissible and was heard by the jury on tape. Petitioner is also taped claiming that he had been properly taken care of by interrogators. Petitioner stated he had eaten well and had not been injured.  But irrespective of Petitioner's claims that his confession was coerced, he fails to explain how it was that every single aspect of his confession was corroborated by the evidence, right down to the recovery of the Christmas present from Mrs. Pomeroy and the camera found at his father's house.

In this case, the State presented a substantial amount of evidence to the jury which corroborated Petitioner's confession. Vanessa Reggettz's autopsy revealed that she had suffered from scalp lacerations which were consistent with being struck with the butt of the gun which was found beside her body, and identified as belonging to Paul Reggettz.  Petitioner's confession

indicated that he had struggled for a gun with Vanessa, and struck her with the butt of the gun. His confession also revealed his knowledge that the gun was broken, and showed that the gun became broken as a result of his beating Vanessa with it. Before he admitted to any involvement in the crime, Petitioner stated that Vanessa's face was "bumpy." This was inconsistent with the pictures of Vanessa which were shown to Petitioner, but was consistent with Vanessa's appearance at the time of her death. Petitioner also admitted to having struggled with Vanessa for a knife, and a knife was found beside Vanessa's body. The Petitioner said that he was cut on the finger by the knife during the struggle. The Petitioner then recounted choking Paul Eric with a cord, tying him up, and putting him in a half-full bathtub. He also described choking Bernadette with a cord and hanging her on the door. After hanging Bernadette, Petitioner told the troopers he stabbed Vanessa in the neck with a "knife or something."

After killing the Reggettz family, Petitioner stated that he searched the house for money and opened the Christmas presents. He told the troopers he stole a camera and it was at his parents' home in Cleveland where it was recovered in the Petitioner's father's car and identified at trial by Paul Reggettz as his camera. The Petitioner also admitted taking "some dishes," and telling the troopers he gave it to his best friend's mother, Ms. Arbutus Pomeroy, and a set of silverware was recovered from Ms. Pomeroy, who told the troopers that the Petitioner had given the silverware to her as a Christmas present the night before he returned to Cleveland in December 1979. Ms. Pomeroy also stated that she saw some scratches and a Band-Aid on the Petitioner's face. The Petitioner also admitted that he had taken a .22 rifle from the Reggettz home, the existence of which could only have been known by the person who took it.

The Petitioner told the troopers that after he murdered the family it was almost daylight when he got to his home which was about 100 to 200 yards from the Reggettz home, which is consistent with the early morning hour and the time the clock radio stopped 6:17 when the cord was ripped off to "hog-tie" Paul Eric.  It is also consistent with Dr. Sopher's testimony about the likely time of death of the children. Also, Petitioner's own family member alerted police after Petitioner was charged with another brutal crime in Ohio. Petitioner left town almost immediately after the murders for Ohio.

Paul Reggettz repudiated his confession before the jury--detail by detail. As is set forth above, Reggettz confessed and was led to demonstrate his acts after a protracted interrogation and after he had been without sleep for more than 24 hours. Reggettz told Trooper Woodyard that he had thrown his .22 rifle in the Kanawha River, but denied before the jury that he had done so; however, the Petitioner told the troopers that he had taken the rifle and precisely where to find it. Further, the details Reggettz provided to the police are inconsistent with the forensic evidence provided by Dr. Sopher relating to the time of death, the *livor mortis* pattern in his daughter, as well as the lack of a bruise on the buttocks of his son.  For Reggettz's confession to be true, he would have had to have killed his family at about 9:00 or 10:00 p.m., and Dr. Sopher effectively dismisses the possibility of that as too early a time frame, given the condition of the victims.  Sopher also noted that there was no evidence of injury to or blood on Paul Reggettz.  The likely time of death, about 6:00 a.m., is consistent with the time shown on the clock radio, and Reggettz was-- unquestionably--at work at that time.  Given all of the foregoing, there was ample reason for the jury to believe that Reggettz's confession was false and the Petitioner's confession was true--independent of any serological evidence.

44

In fact, in order to believe Paul Reggettz's repudiated confession was true, a juror would have to believe that in a heat of passion stemming from an episode of domestic violence he had the presence of mind to don gloves, set the clock radio for the next morning, plant the Petitioner's blood, give the Petitioner the property which was recovered in Cleveland, arrange for the blood in his daughter's body to defy the laws of gravity, remove a bruise from his son's buttocks, take a nap, and then fool his co-workers during his shift.

The Petitioner essentially argues throughout his attacks on his confession that the jury could not have found him guilty without Zain's testimony because there were two dueling confessions by two different persons. Petitioner then premises his claims on the mere existence of Mr. Reggettz's confession separate and apart from the fact that his own confession supported the crime scene and physical evidence but Reggettz's did not. However, the mere existence of Reggettz's confession has no effect on the validity of Petitioner's confession or the evidence that corroborated it, especially given that Reggettz's confession not only lacked corroboration but was actually repudiated by the chain of events surrounding the crime.

With regard to the voluntariness of Petitioner's confession, Petitioner premises his entire argument challenging the validity of his confession purely on the existence of Paul Reggettz's confession without considering any of the evidence corroborating his own. Even were it established factually that the Reggettz confession was coerced, that does not render Petitioner's confession coerced nor does is explain Petitioner's statements to the contrary taped while he was having lunch with the officer. Although the trial court did indeed originally determined that Reggettz's

45

confession was given voluntarily, it made no determination of its validity but instead left that to the jury.[10]  The jury chose to believe Petitioner's confession.

While the voluntariness of Petitioner's confession ultimately amounted to a credibility determination between himself and the investigators and only those parties will ever know what really happened, the fact remains that Petitioner's confession was extensively corroborated by the facts and details set forth above.  Although whether a confession is coerced cannot be determined solely on whether or not the confession is true (a true confession can be coerced the same as a false confession and there is no due process exception for the voluntariness of confessions based on guilt or innocence) interrogators could not under any analysis have adjusted the physical and direct evidence to support a false confession from Petitioner. Moreover, such a false confession would have required investigators to manufacture the testimony of and the evidence recovered from Mrs. Pomeroy who received the silverware Petitioner stole from the scene for a Christmas present.

With regards to the sufficiency of Petitioner's confession to sustain the conviction, although, strictly speaking, this is not a sufficiency claim, the analysis and standards promulgated in sufficiency cases are helpful in the evaluating this claim under state law applying federal standards:

> An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. As we have cautioned

---

[10]Absent physical evidence, witnesses, or a video or tape recording, whether interrogators coerced a confession comes down to the word of the accused against law enforcement officers.  It's safe to say that historically speaking, trial courts come down on the side of law enforcement and no one can argue that coerced confessions aren't, in fact, a bane of the justice system.  However, unless and until, reviewing courts come up with a crystal ball from which to view an interrogation, the courts can do little besides conduct a credibility determination between the confessor and interrogators on what evidence is available.

> before, appellate review is not a device for this Court to replace a jury's finding with our own conclusion. On review, we will not weigh evidence or determine credibility. Credibility determinations are for a jury and not an appellate court.  On appeal, we will not disturb a verdict in a criminal case unless we find that reasonable minds could not have reached the same conclusion. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. . . .

*State v. Guthrie*, 461 S.E.2d 163, 175-76 (W. Va. 1995) (footnote omitted).

"Given the abundance of evidence that the jury was presented with that supported Appellant's confession to having committed the subject murders, we simply cannot accept Appellant's argument that Mr. Zain's testimony was per se prejudicial." *Moss v. Trent,* 603 S.E.2d at 661, citing *Atkins, supra*.

And a jury is free to believe the uncorroborated testimony of a single witness and this will be sufficient evidence.  *See United States v. Wilson*, 115 F.3d 1185, 1190 (4th Cir. 1997).

Based upon the record of the trial, it is plain the state habeas court's determination, confirmed by the West Virginia Supreme Court, finding that sufficient evidence supported the conviction without the *Zain* evidence,  was correct as a matter of federal law as set forth in *Zain I*.

3.    **The State Courts' Holdings that the Evidence of Fred Zain Did Not Prejudice the Jury in Petitioner's Trial Was Correct as a Matter of Federal Law.**

Not only did the state courts determine that there was sufficient evidence to sustain the conviction, with or without the *Zain* evidence, they also determined that there was no prejudicial effect flowing from the *Zain* evidence - even treating it as traditional *Zain* evidence for purposes of the analysis..

In making a determination of prejudice, this Court must start from the premise that a conviction need  be reversed only if "there is any reasonable likelihood that the false testimony

47

could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103 (1976)  The United States Supreme Court further refined this standard in *Kyles v. Whitley,* 514 U.S. 419 (1995), explaining that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434.

In this case, while the serology evidence was no doubt compelling,  this Court will note that the above-detailed evidence presents a clear picture of guilt beyond a reasonable doubt, and that there is no reasonable likelihood that the jury would have acquitted had it received the trial evidence without the *Zain* evidence.  *See Agurs,* 427 U.S. at 103. The addition of the serology evidence served only to remove all doubt from the issue, a burden that the state need not carry to convict.

Petitioner consistently argues that the *Zain* evidence was essentially the linchpin of the State's case.  However, Petitioner fails to address the compelling nature of the remaining evidence of guilt presented at trial.  Petitioner has not accounted for the lack of evidence presented in the instant petition or any previous attacks on his conviction accounting for the stunning level of detail and evidence corroborating his confession. Petitioner fails to explain how stolen goods from the scene ended up in the hands of family and friends just like he told investigators. Petitioner does not explain how his movements before, during  and following the time of the murder matched the circumstances of the crime.  Petitioner does not account for why Zain did not manufacture a case against Paul Reggettz, the  imprisoned "confessed' killer instead of inconveniently exculpating him and perhaps allowing a killer to go free.  Zain's *modus operandi* was to implicate the accused, not exonerate them--particularly a confessed killer. This in light of the disapproval of investigators (Zain's most sought after audience after jurors and court personnel)  who had to have known how

it would look to admit they had held the wrong man for over a year, not to mention how it would reflect on them to have evidence support Paul Reggettz's claim he'd been brutalized by investigators.

Had the defense been able to present a plausible explanation for why the Petitioner confessed despite his "innocence," and to attack the copious details in his confession, then there might be the possibility that he was indeed prejudiced by Zain's evidence.  However, his trial defense left the State's powerfully incriminating evidence essentially unanswered.  Therefore, Zain's evidence, considering the totality of the evidence at trial, could not have prejudiced the jury.

Additionally, the evidence at trial, given to the jury, was that  Sergeant Murphy did the significant testing and analysis of the key evidence. The fact is, if Fred Zain had not simply shown up at trial and read Murphy's report, we would not be here.

The West Virginia Supreme Court  has previously held that a comparable fact may be taken into consideration in assessing the prejudicial effect of Zain's evidence:

> The Petitioner also contends that the circuit court erred by considering the post-trial DNA test results because they were not introduced at trial. Upon review of the final order, we find that the circuit court simply followed the procedure set forth in Syllabus Point 3 of *Zain I, supra.*  The circuit court disregarded the testimony adduced by Mr. Zain and considered the remaining evidence for its sufficiency to sustain the convictions.  The post-trial DNA testing did not form the basis for the decision to deny the Petitioner a new trial on counts four through nine.  Instead, the test results merely confirmed that the Zain evidence had no prejudicial effect on the jury. Therefore, we find no merit to this assignment of error.

*State ex rel. McLaurin v. Trent*, 506 S.E.2d 322, 327 (W. Va. 1998). Accordingly, Murphy's evidence may be taken to confirm the fact that "the Zain evidence had no prejudicial effect on the jury." (*Id.*)  Additionally and parenthetically, it seems to torture the notion of the quest for truth to

posit that where a discredited person accurately reads the true statement of another person, prejudice results.

According to all of the foregoing, the habeas court's and the West Virginia Supreme Court's finding that the evidence of Fred Zain did not prejudice the jury in Petitioner's trial was not wrong as a matter of federal law as required to overcome the presumption that the state court's findings are correct.

### 4. The State Court Determined Thirty Years Ago that Petitioner's Confession Was Voluntary and Admissible.

Petitioner raises several claims arguing that his confession was improperly admitted for a number of reasons. This issue has been flogged by the State courts for thirty years and no new evidence has revealed itself since this issue was first addressed by the courts in 1980. At least four different reviews of the voluntariness issue have been conducted--in the Petitioner's transfer hearing, in the Petitioner's first trial, in the Petitioner's appeal, and again at the Petitioner's second trial--all of which are included herein for the Court's review. The West Virginia Supreme Court then again took it up in *Moss v. Trent.* In all cases, the admitted confession was held to be voluntary and admissible. *See State v. Moss,* and *Moss v. Trent, supra.* The Petitioner gave two oral confessions on October 28, 1980, the day that he was returned to the custody of the West Virginia authorities, one of which was tape recorded. A third oral confession given by the Petitioner on October 30, 1980, the day that he was transported back to Ohio to await the filing of a second detainer based on the first degree murder charges, and the West Virginia Supreme Court later ruled that "[a]fter considering the testimony at the suppression hearings, the trial court admitted the Petitioner's inculpatory statements into evidence. We find no error in the trial court's voluntariness determination." *State v. Moss, supra*, at 376 S.E.2d at 577-78.

50

The only factual development that occurred after the state court's initial determination on the voluntariness of Petitioner's confession was the Fred Zain debacle.  However, the fact that Fred Zain was discredited after Petitioner's conviction can have no effect on the determination of the voluntariness of the Petitioner's confession. As Justice O'Connor wrote in a different, but analogous, context:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. . . .  No doubt the additional information would have been useful to respondent;  perhaps even it might have affected his decision to confess.   But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self- interest in deciding whether to speak or stand by his rights. *See, e.g., Oregon v. Elstad*; *United States v. Washington.*   Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law. . . .

*Moran v. Burbine*, 475 U.S. 412, 422-23 (1986) (citations and footnote omitted.).  Additionally, the West Virginia Supreme Court applied this standard with approval:

> The Supreme Court explained that "events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." [*Moran*] at 422, 106 S.Ct. 1135. The police officers' failure to inform the defendant of an attorney's telephone call had no bearing on the validity of the waiver, and the officers' state of mind was determined to be irrelevant to the question of the waiver.  *Id.*

*State v. Hager*, 511 S.E.2d 139, 149 (W. Va. 1998).  Thus, any information outside that considered by the state courts over the years has no bearing on the initial determination by the state courts and the West Virginia Supreme Court on the determination of the voluntariness of his confession.

Additionally, the West Virginia Supreme Court noted when considering whether the supposed tainted *Zain* evidence impacted the voluntariness of Petitioner's confession:

In April of 1980 the investigating authorities had obtained a blood sample from the Petitioner, pursuant to an order by an Ohio court. This one factor does not convince us to conclude that the waivers and confessions in the present case were coerced, given the preponderance of the evidence to the contrary.

*State v. Moss*, 376 S.E.2d at 579 n.13 (citations omitted).

Based upon all the evidence, Judge Bloom made the following findings:

Moss failed to present any new evidence on the voluntariness of his confession. Rather, he seems to argue that the fact that Mr. Reggettz had, at one point, given a confession somehow invalidates Moss's own confession. The existence of the Reggettz confession does not have the devastating effect that Moss desires because the Reggettz confession does not impugn the voluntariness of Moss's confession. At most, it provided fodder for defense theories at trial.

The question before the Court is whether Moss was able to establish that his confession was constitutionally flawed. He was not. Therefore, the admission of his confession at trial does not provide a predicate for issuance of the requested writ.

(Resp't Ex. 5, Final Order at. 2-3.)

In upholding the state court's determination that Petitioner's confession was admissible, but reversing on other grounds, the West Virginia Supreme Court, in *State v. Moss*, held:

The appellant claims that the statements he made while in custody in West Virginia were involuntary under the totality of the circumstances, which he contends included unlawful coercion and prolonged interrogation in an unduly restrictive custodial setting, and that these statements should have been excluded from the evidence at trial. In accordance with the mandatory duty to determine voluntariness set out in Syllabus Point 1 of *State v. Fortner*, 150 W. Va. 571, 148 S.E.2d 669 (1966), overruled in part, *State ex rel. White v. Mohn*, 168 W. Va. 211, 283 S.E.2d 914 (1981), the trial court held in camera suppression hearings to consider evidence of the voluntariness of the appellant's waiver of his constitutional rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and of the resulting confessions. After considering the testimony at the suppression hearings, the trial court admitted the appellant's inculpatory statements into evidence. We find no error in the trial court's voluntariness determination.

Because the appellant was over the age of sixteen years of age when his extrajudicial statements were made to the police, the voluntariness of those statements are tested by the totality of the circumstances under which they were taken. Syl. Pt. 1 and Syl. Pt. 2, *Matter of Mark E.P.*, 175 W. Va. 83, 331 S.E.2d 813

(1985); see W. Va. Code § 49-5-1(d). "The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case." Syl. Pt. 5, *State v. Starr*, 158 W. Va. 905, 216 S.E.2d 242 (1975).  In Syllabus Point 7 of *State v. Plantz*, 155 W. Va. 24, 180 S.E.2d 614 (1971), we emphasized that the prosecution must also demonstrate that the accused has knowingly and intelligently relinquished his *Miranda* rights:

> A statement freely and voluntarily made by an accused while in custody or deprived of his freedom by the authorities and subjected to questioning is admissible in evidence against him if it clearly appears that such statement was freely and voluntarily made after the accused had been advised of his constitutional right to remain silent and that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney and if he can not afford an attorney one will be appointed for him, and that, after he has been so advised, he knowingly and intelligently waives such rights.

*See also Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981); *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

In support of his contention that he did not voluntarily waive his rights, the appellant cites *State v. Mollohan*, 166 W.Va. 60, 272 S.E.2d 454 (1980).  The totality of the circumstances in the present case, however, are distinguishable from the circumstances of *Mollohan*.  The *Mollohan* confession was taken in its entirety solely within the confines of a patrol car, during a two-day journey from New Hampshire to West Virginia.  In *Mollohan*, the accused had a defective level of intelligence and was deeply religious, characteristics which the investigating officers played upon in securing a waiver and confession from the accused.  We concluded from the totality of these circumstances that the waiver in *Mollohan* was coerced.  *Id.* 166 W.Va. at 64, 272 S.E.2d at 457.  The totality of the circumstances in the present case lead us to a different conclusion.

The two officers who took the appellant into custody at the Ohio State Reformatory on October 28, 1980, testified at the pretrial suppression hearing. Trooper Smith testified that on the return trip to Kanawha County, prior to discussing the appellant's involvement in any crimes committed in West Virginia, he advised the appellant of his constitutional rights by reading the standard  Miranda warnings, and that the appellant acknowledged that he understood his rights.  Trooper Smith testified that he then inquired as to whether the appellant would agree to talk about the "serious" crime in West Virginia.  The appellant at first suggested that he did not know anything about the crime, but after being asked by Trooper Smith, "Why do

53

you think we took your blood?", the appellant indicated his willingness to talk. Trooper Smith testified that he then told the appellant that they should wait until they arrived at the state police detachment in Parkersburg before discussing the matter. Trooper Williams corroborated Trooper Smith's testimony that the appellant was advised of and indicated that he understood his rights prior to the discussion in the police car.

Both troopers testified that the appellant at no time requested a lawyer or conditioned his willingness to talk on the presence of a lawyer, and that the appellant voluntarily signed two separate *Miranda* waiver forms at the Parkersburg state police detachment. The *Miranda* warnings printed on the first form was read to the appellant by Trooper Williams beginning at 6:50 p.m. The appellant affixed his signature to the form in the presence of both troopers at 6:57 p.m. ) A question and answer interrogation, lasting about two hours, followed, during which the appellant confessed to the murders. At 9:22 p.m. the appellant signed another waiver of rights form in the presence of Trooper Williams and another officer from the Parkersburg detachment. Subsequent to the signing of this waiver of his rights, the appellant made a tape recorded confession, which lasted until about 11:00 p.m.

The appellant was then transported to Kanawha County, where he remained until October 30, 1980, when he was returned to the Ohio State Reformatory by two other members of the Department of Public Safety, Troopers Woodyard and Allen. At a second in camera suppression hearing Trooper Allen testified that during the return trip he advised the appellant of his *Miranda* rights; that the appellant indicated he understood those rights; and that the appellant indicated his willingness to talk about the murders without the presence of an attorney. Trooper Woodyard testified that he overheard the exchange between the appellant and Trooper Allen, and vouched for the accuracy of Trooper Allen's testimony. The troopers testified that they questioned the appellant about the murders for about forty-five minutes to an hour, and that the appellant's inculpatory responses included the statement that he wore gloves while at the scene of the murders. The trial court thereupon ruled that a third oral confession had been voluntarily made by the appellant during the return trip to Ohio after a knowing and intelligent waiver of the appellant's constitutional rights.

Upon consideration of the relevant testimony adduced at the suppression hearings, we conclude that, under the totality of the circumstances, there was sufficient evidence to support the trial court's determination that the three confessions now in question were voluntarily made after knowing and intelligent waivers by the appellant of his constitutional rights. The appellant was eighteen years of age when he waived his rights and gave the confessions, and there is no evidence that he had a defective level of intelligence. The evidence also shows that the appellant was given *Miranda* warnings prior to each discussion with the police, and that he signed two written waivers of his rights at the Parkersburg detachment.

54

The officers involved testified that he never requested the presence of an attorney, and they adequately refuted his claims that unlawful coercion was involved in obtaining the confessions.

Based on all of the foregoing, we find that there was a sufficient showing of voluntariness to support the trial court's rulings. It is well established that "[a] trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syl. Pt. 3, *State v. Vance*, 162 W. Va. 467, 250 S.E.2d 146 (1978).

*State v. Moss*, 376 S.E.2d at 580.

The West Virginia Supreme Court held in *Moss v. Trent*:

Although Appellant sought to raise, according to the State for the fourth time, the issue of the voluntariness of his confession, the trial court found that he "failed to present any new evidence on the voluntariness of his confession." The trial court further opined:

. . . [H]e seems to argue that the fact that Mr. Reggettz had, at one point, given a confession somehow invalidates Moss's own confession. The existence of the Reggettz confession does not have the devastating effect that Moss desires because the Reggettz confession does not impugn the voluntariness of Moss's confession. At most, it provided fodder for defense theories at trial.

As the State correctly posits, events that took place outside the presence of Appellant's confession (i.e., any malfeasance committed by Mr. Zain) have no bearing on the determination of the voluntariness of that confession. *See State v. Hager*, 204 W. Va. 28, 38, 511 S.E.2d 139, 149 (1998) (citing *Moran v. Burbine*, 475 U.S. 412, 422, 106 S. Ct. 1135, 89 L.Ed.2d 410 (1986)).

Having closely examined the arguments presented against the record of this case, we find no merit in the assignments of error raised by Appellant. Accordingly, the order of the Circuit Court of Kanawha County is hereby affirmed.

Affirmed.

603 S.E.2d at 661.

Petitioner has presented no evidence to overcome the findings of the West Virginia Supreme Court, the trial court and the habeas court on this issue. Therefore, Respondent relies on the years

of determinations by State courts in absence of any authority presented by Petitioner demonstrating that the state court's determinations incorrectly applied controlling federal precedent on this issue.

With regard to Petitioner's challenges to his confession as a violation of West Virginia's prompt presentment rules, this issue too has been litigated to within an inch of its life.

The final issue which we address concerns the appellant's contention on appeal that all three of his confessions should be ruled inadmissible because his rights under West Virginia Code § 49-5-8(d) (1986 Replacement Vol.) were violated. This statute directs that a juvenile be taken immediately before a neutral judicial officer upon being taken into custody. In Syllabus Point 3 of *State v. Ellsworth J.R.*, 175 W.Va. 64, 331 S.E.2d 503 (1985), we addressed the consequences of noncompliance with the provisions of Code § 49-5-8(d):

Under W.Va.Code, 49-5-8(d), when a juvenile is taken into custody, he must immediately be taken before a referee, circuit judge, or magistrate. If there is a failure to do so, any confession obtained as a result of the delay will be invalid where it appears that the primary purpose of the delay was to obtain a confession from the juvenile.

In reaching this decision, we concluded that the juvenile prompt presentment requirement is more stringent than the provision requiring the initial presentment of an adult before a magistrate under West Virginia Code§ 62-1-5 (1984 Replacement Vol.); see W.Va.R.Crim.P. 5(a). Unlike a violation of the adult prompt presentment requirement, which is analyzed for admissibility as part of the totality of the circumstances making a confession involuntary and hence inadmissible, Syl.Pt. 6, *State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1982), as amended, Syl.Pt. 1, *State v. Guthrie*, 173 W.Va. 292, 315 S.E.2d 397 (1984), noncompliance with the juvenile prompt presentment requirement results in inadmissibility if the violation occurred for the primary purpose of obtaining a confession from the juvenile, *Ellsworth J.R.*, 175 W.Va. at ----, 331 S.E.2d at 508, and may operate to exclude confessions even where *Miranda* rights have [180 W.Va. 375] been given and waived. *Guthrie*, 173 W.Va. at ----, 315 S.E.2d at 399. To view preceding link please click here. Thus, compliance with the juvenile prompt presentment requirement is examined separately from the determination of voluntariness.

Like the rule stated in Syllabus Point 6 of *Persinger*, however, the exclusionary rule established in Syllabus Point 3 of Ellsworth J.R. "is not to be applied retroactively to a confession which was obtained prior to the date of that decision where no prompt presentment objection was made at trial." Syl. Pt. 4, in part, *State v. Hickman*, 175 W.Va. 709, 338 S.E.2d 188 (1985) (emphasis added); see also Syl.Pt. 3, *State v. Gangwer*, 168 W.Va. 190, 283 S.E.2d 839 (1981). In the

56

present case, it is uncontroverted that the appellant was not presented to a referee, circuit judge, or magistrate, even after he had given three confessions to the murders. The three confessions were obtained prior to our holding in *Ellsworth J.R.*, however, and our review of the record reveals that a prompt presentment objection was preserved before the trial court only with respect to the third confession.  Since the issue was not preserved on the first two confessions, the decision in *Ellsworth J.R.* will not be applied retroactively to exclude those confessions, but will only be applied retroactively to exclude the third confession obtained from the appellant on October 30, 1980.   Accordingly, the appellant's third confession is hereby declared invalid and inadmissible.

*Moss v. Trent*, 603 S.E.2d at 581.

Petitioner has presented no federal standard misapplied by the state courts on this issue. It has been long settled and it is not the duty of the federal courts to re-litigate a thirty year old confession in the absence of demonstrable failure of the state courts to apply the proper federal standards on this issue.

### 5.        The Prosecutor's Closing Argument was Not Prejudicial.

In ground six, Petitioner claims that the prosecutor made inflammatory statements in closing arguments.  Petitioner isolates several comments apart from context and claims the prosecutor's remarks were prejudicial.  Petitioner claims that  statements made by the prosecutor in closing were veiled comments on Petitioner's failure to testify. Petitioner also challenges the prosecutor's comments noting that the victim was found without her panties, arguing that the comments inferred to the jury that Petitioner had sexually assaulted the victim even though there was no evidence of such.

The habeas court found in habeas Case No. 05-MISC-298:

Mr. Moss claims that the State implicitly stated that Mr. Moss, an African-American man, had sex with the victim, a Caucasian woman, during her menstrual cycles.  Mr. Moss avers that there was no direct evidence of sexual relations and that such statement unduly prejudiced him.

> The victim's husband, Mr. Reggettz, testified at the trial that his wife was menstruating at the time of her death and that she used homemade sanitary napkins. (Trial Transcript, pp. 730-731). The Chief Medical Examiner for the State of West Virginia testified that Ms. Reggettz was wearing a nightgown, but no other clothing at the time he examined the body. (Trial Transcript, pp. 829-830).

(Resp't Ex. 10 at 9-10.)

> Mr. Moss's seventh and final ground for relief relates to he prosecutor's statements during closing arguments about the adult victim's panties and sanitary napkin. The Court concludes that this ground must be summarily denied and dismissed as Mr. Moss has failed to provide this court with probable cause to believe that he may be entitled to relief. The trial transcript reveals that there was testimony at trial about Ms. Reggettz's use of homemade sanitary napkins and the fact that she was not wearing underwear when her body was found. Specifically, the Court concludes that the prosecutor's comments were not unduly prejudicial and did not infect the trial with unfairness resulting in a denial of due process. *See Donnelly v. DeChristofora,* 416 U.S. 637, 94 S. Ct. 1868, 40 L.E.2d 431 (1974).

(*Id*. at 13.)

Habeas relief is only warranted if the prosecutor's remarks rendered the Petitioner's trial fundamentally unfair. The Fourth Circuit has established a two-part test for determining when a prosecutor's comments deny a defendant due process. First, the prosecutor's comments must actually have been improper. Second, the prosecutor's comments must have been so prejudicial that the criminal defendant was denied a fair trial. *See United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988), *overruled on other grounds by Bailey v. United States*, 516 U.S. 137 (1995).

A prosecutor's improper comments during closing arguments may "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Wilson*, 135 F.3d 291, 297 (4th Cir.), *cert. denied,* 523 U.S. 1143 (1998) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Unless the alleged errors deprived a criminal defendant of the fundamental concepts of a fair trial, however, due process is not violated. *United States v. Morsley*, 64 F.3d 907, 913 (4th Cir. 1991).

Even if a prosecutor's conduct was improper, "reversal is not warranted unless the defendant has been unfairly prejudiced by the comment." *Brockington*, 849 F.2d at 875. Factors to be considered in determining whether improper comments substantially prejudiced were so damaging to a defendant's trial as to require reversal include: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. *United States v. Mitchell*, 1 F.3d 235, 241 (4th Cir. 1993) (internal citations omitted); *see also United States v. Harrison*, 716 F.2d 1050 (4th Cir. 1983).

The statements of the prosecutor that Petitioner claims were comments on his failure to testify, referred only to the contents of the confession as Petitioner's version of events. The prosecutor was simply noting Petitioner's lack of explanation in his confession for certain events surrounding the crimes. Clearly, the jury was able to distinguish from a taped confession and the fact that Petitioner did not testify at trial. Moreover, Petitioner isolate the comments of the prosecutor from the context of the statements when read in their entirety, make clear the prosecutor was speaking of the contents of Petitioner's confession. With regard to the prosecutor's statements regarding the location of Vanessa Reggettz's underwear and sanitary napkin, the challenged statements simply commented on evidence introduced at trial from both Irwin Sopher and Paul Reggettz as noted in the habeas court's order. Arguably the comments may have had questionable evidentiary value but as set forth in controlling federal precedent on this issue, a prosecutor's closing may rise to the level of being "universally condemned" but unless statements were offered that

59

rendered the trial fundamentally unfair there is no due process violation. *Darden, supra.* Any such analysis is made on the evidence as a whole and not isolated from the record. *Mitchell, supra.*

In light of Petitioner's confession and the direct evidence corroborating that confession, it cannot be said that comments on evidence introduced at trial of questionable evidentiary value, were significant enough to support the jury's verdict irrespective of the remaining evidence of guilt. Petitioner admitted to killing the Reggettz family. There is no more compelling evidence of guilt than an admission by the accused.  The jury had sufficient evidence before it to support a finding of guilt and the statements of the prosecutor viewed in light of Petitioner's admission were not sufficiently material to rise to the level of a due process violation.

Petitioner has presented no evidence that will overcome the presumption that the findings of the habeas court were correct as a matter of federal law.

### 6.   <u>Ineffective Assistance of Counsel.</u>

In ground nine, Petitioner claims trial counsel was ineffective for a number of reasons. Petitioner argues that trial counsel  failed to challenge Petitioner's confessions based on testimony and hearings conducted in the first trial.  Petitioner claims that trial counsel failed to investigate and appellate counsel failed to adequately investigate.[11]

The state habeas court in Case No. 05-MISC-298 held:

> The Court finds that these grounds relate to the admissibility of Mr. Moss's confessions, which has been previously raised, considered and denied, on the merits, by the Supreme Court of Appeals and this Court in Mr. Moss's prior habeas petition and appeal.

(Resp't Ex. 10 at 7.)

---

[11]Petitioner's claims of ineffective assistance stemming from the first trial proceedings will not be addressed herein.

The Court finds that the issue of ineffective assistance of counsel has been alleged by Moss in two of his prior habeas petitions. In his second petition, the Court ultimately found the admissibility of confessions had been previously raised, considered and denied on the merits by both the Supreme Court of Appeals and the Circuit court of Kanawha County. In his third habeas petition, the Court ultimately held that he issue was moot because there remained sufficient evidence on the record to sustain the conviction.

(Resp't Ex. 16 at 8-9; Petitioner's fourth habeas.)

The fourth habeas court then summarily denied Petitioner's Ineffective Assistance of Counsel as previously adjudicated by Judge Bloom in two of his prior state habeas petitions. (Resp't Ex.16 at 12.)

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court articulated the test to determine if a counsel's performance was ineffective under the Sixth Amendment:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.

Under *Strickland*, the Petitioner must show that (1) his trial counsel's representation fell below an objective standard of reasonableness, 466 U.S. at 687-91; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In reviewing a trial counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance, *id*. at 689, and

the burden is on the Petitioner to show prejudice. *Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983), *cert. denied*, 464 U.S. 1065 (1984).

A petitioner may not merely speculate about potential prejudice but must "affirmatively prove," that the result of the proceedings would have been different but for the deficient performance of trial counsel. *See Strickland*, 466 U.S. at 693.

Petitioner's claims rest on issues previously adjudicated and settled by the state courts as noted in Judge Blooms findings.  It cannot be said that trial counsel failed to investigate issues surrounding Petitioner's confession when the courts ruled thirty years ago Petitioner's confessions were voluntarily given and admissible unless there was new evidence that would effect the issue and Petitioner has presented no such evidence. Nor can Petitioner challenge trial court's actions stemming from events that occurred during the first trial.  Petitioner's challenges to trial counsel's actions do not contemplate the fact that trial counsel could not challenge issues after they had been addressed and settled by the West Virginia Supreme Court. As noted by the habeas courts, the WVSCA settled all issues surrounding Petitioner's confession and his juvenile transfer hearing. Therefore, any actions by trial counsel relating to both issues cannot form the basis of a claim of ineffective assistance of counsel.  "[T]here can be no claim of ineffective assistance where, as here, counsel is alleged to have failed to raise a meritless argument."  *Moore v. United States*, 934 F. Supp. 724, 731 (E.D. Va. 19 96).  *See also United States v. Kilmer*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); *Ludwig v. United States*, 162 F.3d 456, 459 (6th Cir. 1998) ("Counsel was not required to raise meritless arguments to avoid a charge of ineffective

assistance of counsel."); *Thomas v. United States*, 951 F.2d 902, 903 (8th Cir. 1991) (per curiam) (semble).  Trial counsel was not required to perform futile investigations on previously settled issues without evidence to support additional investigation.  Any decision by trial counsel not to plow old ground cannot be viewed as breach of duty to investigate.  "An attorney need not fully investigate every potential avenue if he or she has reasonable grounds for not doing so."  *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996).

With regard to Petitioner's claims of ineffective assistance of counsel on appeal or in post conviction proceedings, such grounds cannot form the basis for federal relief.  See  28 U.S.C.A. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under  section 2254.").  Because there is no federal right to appellate review for a state prisoner, there can be no claim of ineffective assistance of appellate counsel.

> We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, see *Johnson v. Avery,* 393 U.S. 483, 488, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969), and we decline to so hold today. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.  Thus, we have rejected suggestions that we establish a right to counsel on discretionary appeals. *Wainwright v. Torna*, 455 U.S. 586, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982); *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974).  We think that since a defendant has no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction, a fortiori, he has no such right when attacking a conviction that has long since become final upon exhaustion of the appellate process.

*Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).[12]

---

[12]As of the filing of this pleading, West Virginia has no first appeal of right.  The federal courts have never held that West Virginia's discretionary review is a violation of due process. *Billotti v. Legursky*, 975 F.2d 113, 115 (4th Cir.1992).

Petitioner has not demonstrated that the state court's misapplied the proper legal standard to this claim. Therefore, it fails.

7.   **Petitioner's Challenges to Post-Conviction Proceedings Cannot Form the Basis for Habeas Relief.**

In grounds seven and eight, Petitioner challenges his post-conviction proceedings including the failure of the habeas court to appoint counsel in all of Petitioner's post-conviction *Zain* challenges. Petitioner also claims that he was denied review under the West Virginia Supreme Court's rulings under all the *Zain* cases as was his right under the holdings in those case.

Both grounds challenge state court post conviction proceedings and as such, cannot form the basis for relief in federal habeas. Although Petitioner does also argue that he was denied review as mandated by the West Virginia Supreme Court in subsequent *Zain* decisions, this still amounts to a challenge to post conviction review.  Because there is no constitutional right to post conviction review under the *Zain* line of cases, any such claim amounts to a challenge to post conviction proceedings since the *Zain* cases specifically apply to post conviction review.   Because there is no federally guaranteed constitutional right to review under *Zain* line of cases and *Zain* remedies  are a purely prophylactic state court post conviction remedy, this claim cannot form the foundation of federal habeas relief.  A federal court may only grant habeas relief "on the ground[s] that [the Petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  There is no constitutional right requiring the States to provide any avenue for State post-conviction collateral relief:

> A state prisoner has no federal constitutional right to post-conviction proceedings in state court. *Lackawanna County Dist. Att'y v. Coss*, 532 U.S. 394, 402 (2001) (noting that "each State has created mechanisms for both direct appeal and state post-conviction review, even though there is no constitutional mandate that they do so" (internal citations omitted)); *Pennsylvania v. Finley*, 481 U.S. 551, 557,

107 S.Ct. 1990, 95 L.Ed.2d 539 (1987).   Thus, even where there is some error in state post-conviction proceedings, a petitioner is not entitled to federal habeas relief because the assignment of error relating to those *post-conviction proceedings represents an attack on a proceeding collateral to detention and not to the detention itself.  Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir.1988)  ("[C]laims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal habeas corpus relief."); *see also Bell-Bey v. Roper*, 499 F.3d 752, 756 (8th Cir. 2007) ("Because the Constitution does not guarantee the existence of state post-conviction proceedings, an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas application.")  (internal citations, quotation marks, and alteration omitted); *United States v. Dago*, 441 F.3d 1238, 1248 (10th Cir.2006) ("[D]ue process challenges to post-conviction procedures fail to state constitutional claims cognizable in a federal habeas proceeding.").

*Lawrence v. Branker*, 517 F.3d 700, 717 (4th Cir. 2008) (emphasis added).

"The Due Process Clause of the Fifth Amendment . . . *certainly* does not establish any right to collaterally attack a final judgment of conviction." *United States v. MacCollom*, 426 U.S. 317, 323 (1976) (plurality opinion of Rehnquist, J.) (emphasis added).

As with Petitioner's claims regarding the denial of *Zain* review, Petitioner's claims of ineffective assistance of appellate counsel implicate no federal constitutional right.  A right to effective assistance of counsel only exists where a right to counsel exists in the first place.  *See Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982).  Moreover, the right to appellate counsel only extends to a first appeal of right and West Virginia has no such right. *Evitts v. Lucey*, 469 U.S. 387, 394 (1985).  *See Chalk v. Kuhlmann*, 311 F.3d 525, 529 (2d Cir.2002) (holding that there can be no deprivation of effective assistance of counsel trial counsel failed to file for discretionary appeal because the defendant's right to counsel did not extend to a discretionary appeal).

Therefore, even though Petitioner complains that he was not given review under subsequent *Zain* decisions, this claim still amounts to an attack on post conviction remedies. Moreover, as

evidenced by the West Virginia Supreme Court's opinion in *Moss v. Trent, supra*, Petitioner was indeed given proper review under *Zain* post conviction remedy.

### 8.   <u>Petitioner's *Brady* Claim Is Procedurally Barred From Review</u>.

Petitioner next argues that the State withheld exculpatory and/or impeachment evidence thus violating his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1968).

Section 2254(b) of Title 28 of the United States Code states that a petition for a writ of habeas corpus filed in a federal district court by a prisoner in state custody shall not be granted, unless it appears that the applicant has exhausted the remedies available in the state courts, or if the state has waived the exhaustion requirement.  28 U.S.C. § 2254(b)(1)(A), (b)(3).

Although Petitioner has relentlessly challenged his conviction for thirty years while exercising his constitutional rights to due process, and during that time raised every possible argument that could be wrung from the circumstances of his case, Petitioner did not present the state courts with a claim under *Brady v. Maryland*. Nowhere did the state courts, in any habeas proceedings or Petitioner's appeals or three state supreme court opinions, review any claim that the State intentionally withheld exculpatory evidence either as a *Brady* claim or a state law claim.

Rather Petitioner now churns the circumstances surrounding the blood evidence and the post conviction proceedings which resulted in renewed analysis of that blood evidence, into a claim that the State withheld exculpatory evidence from the defense.  Although not fully articulated, it appears Petitioner is citing to evidence developed during the *Zain* habeas proceedings as exculpatory.

Petitioner does not cite to what exculpatory evidence was withheld nor did Petitioner argue before the state courts how any such alleged evidence was withheld in violation of the federal standards of *Brady v. Maryland* as required to properly exhaust the substance of this claim before

the state courts. All claims regarding how the State divulged testing results were examined as evidentiary issues by the State courts and not as claims that exculpatory evidence was withheld in violation of *Brady v. Maryland* as required to develop the substance of a federal claim reviewable in federal habeas corpus.   No hearing was conducted during any of the Petitioner's post-conviction proceedings on whether the State withheld exculpatory evidence nor were any of Petitioner's claims analyzed by the State courts under *Brady v. Maryland*.   Nor has Petitioner successfully cited to evidence developed at the *Zain* hearing that would constitute newly discovered evidence that would raise the specter of a Brady claim.   No evidence was ever developed during the *Zain* habeas that was exculpatory or could have been exculpatory or even beneficial to he defense at trial.

Therefore, because Petitioner did not develop a claim that exculpatory evidence was intentionally withheld in violation of *Brady*, before the state courts sufficient to alert the state courts to a violation of *Brady v. Maryland*.

In West Virginia, prisoners may exhaust their available State court remedies either by stating cognizable Federal constitutional claims in a direct appeal, or by stating such claims in a petition for a writ of habeas corpus in a State circuit court pursuant to West Virginia Code § 53-4A-1, followed by an appeal from any adverse ruling to the West Virginia Supreme Court of Appeals. *Moore v. Kirby*, 879 F. Supp. 592, 593 (S.D. W. Va. 1995); *McDaniel v. Holland*, 631 F. Supp. 1544, 1545 (S.D. W. Va. 1986).   A petition for a writ of habeas corpus filed under the original jurisdiction of the Supreme Court of Appeals that is denied with prejudice following a determination on the merits will also exhaust the prisoner's State court remedies.   *See Moore*, 897 F. Supp. at 593; *McDaniel*, 631 F. Supp. at 1546; *see also Meadows v. Legursky*, 904 F.2d 903, 908-09 (4th Cir. 1990) (*abrogated on other grounds*, *Trest v. Cain*, 522 U.S. 87 (1997).

67

Additionally, Petitioner must show that the claims he raised in State proceedings are the same as the claims he now seeks to raise in his Federal habeas proceeding. *See Pitchess v. Davis*, 421 U.S. 482, 487 (1975); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). The claims in both courts must "fairly present" the "substance" of the claim, based upon the same factual grounds, and must allege that the same federal constitutional right was violated. *Anderson v. Harless*, 459 U.S. 4, 6 (1982).

Because Petitioner did not exhaust this claim and he has no further state court remedies available, this claim is barred from review by this Court. As noted numerous times, Petitioner has not only had full review in State court, he has probably had the most extensive review of any case in the history of West Virginia criminal jurisprudence. Sending Petitioner, or even allowing Petitioner, back to State court would be counterproductive.

The exhaustion requirement does not require the prisoner to return to state court if the claims are procedurally barred in state court. *Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Bassette v. Thompson*, 915 F.2d 932, 937 (4th Cir. 1990). Instead, claims not presented to the highest state court, and which are procedurally defaulted, will be deemed exhausted. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996). "However, the procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the Petitioner can show cause and prejudice for the default." *Id.* at 161. *See also Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). The Petitioner should be required to show cause and prejudice for not raising these issues in the West Virginia state judicial system.

The failure to appeal issues to the state's highest court from a denial of relief on those issues in a state trial court habeas corpus procedurally defaults the unappealed claims. *See Whitley v. Bair*, 802 F.2d 1487, 1500 (4th Cir. 1986). The Petitioner has failed to exhaust ground ten because he did not properly develop this claim within a federal context before the state court. Now Petitioner has no available state remedies. Therefore, this Court cannot grant relief on a claim that the state withheld exculpatory evidence in violation of *Brady v. Maryland*. *See, e.g.*, *Gray*, 518 U.S. at 162

Consequently, this ground is procedurally defaulted, and should be dismissed.

## VI.

## CONCLUSION

For the foregoing reasons, this Court should enter an order dismissing the "Petition Under 28 U.S.C. § 2254 For Writ Of Habeas Corpus By A Person In State Custody."

> *Respectfully submitted*,
>
> DAVID BALLARD, Warden,
> Mount Olive Correctional Complex,
> *Respondent*,
>
> > *By counsel*,

DARRELL V. McGRAW, JR.
ATTORNEY GENERAL

/s/ *Robert D. Goldberg*
Robert D. Goldberg, Bar No. 7370
Assistant Attorney General
Attorney for Respondent
Office of the Attorney General
State Capitol Complex
Building 1, Room E-26
Charleston, West Virginia 25305-0220
Telephone:     (304) 558-2021
Fax:             (304) 558-0140
E-mil:  robert.goldberg@wvago.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 29, 2010, I electronically filed the foregoing "Respondent's Memorandum in Support of Motion for Summary Judgment" with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have mailed, by United States Postal Service, the aforesaid document(s) to the following non-CM/ECF participant:

> John Moss, III, DOC # 13734
> Mt. Olive Correctional Complex
> One Mountainside Way
> Mt. Olive,  WV 25185

/s/ *Robert D. Goldberg*
Robert D. Goldberg, Bar No. 7370
Assistant Attorney General
Attorney for Respondent
Office of the Attorney General
State Capitol Complex
Building 1, Room E-26
Charleston, West Virginia 25305-0220
Telephone:    (304) 558-2021
Fax:             (304) 558-0140
E-mil:  robert.goldberg@wvago.gov