IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

FILED

FEB 24 2011

TERES⋯           ⋯LERK
Southern District ⋯ ⋯⋯

JOHN MOSS, III,

        Petitioner,

v.                                     Civil Action No: 2:09-cv-01406
                                     (Magistrate Judge Mary E. Stanley)

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

        Respondent.

## PETITIONER'S RESPONSE TO RESPONDENT'S ANSWER, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF LAW IN SUPPORT THEREOF

       COMES NOW, John Moss, III, (hereinafter "Petitioner") and submits his Response to Respondent's Answer and/or Motion(s). In support thereof, Petitioner asserts as follows:

1.      Petitioner filed his petition under 28 U.S.C. § 2254 for a writ of habeas corpus on December 15, 2009. By Order entered January 6, 2010, the Honorable Mary E. Stanley, United States Magistrate Judge, ordered Respondent to file an answer solely on the issues of timeliness of the petition and exhaustion of available state court remedies on or before February, 15, 2010. Respondent answered as directed, conceding the petition was timely filed and that Petitioner had exhausted available state remedies on all but one claim. By Order entered June 22, 2010, Magistrate Judge Stanley ordered Respondent to answer the merits of Petitioner's claims on or before September 17, 2010. (No. 12.) By motion filed September 13, 2010, Respondent moved the Court for an extension of time within which to file his answer. (No. 13.) Respondent was granted an extension which allowed him to submit his answer on or before November 1, 2010. (No. 14.) Respondent electronically filed his answer to Petitioner's claims on October 29, 2010, via Respondent's Answer, Motion For Summary Judgment, and Memorandum In Support of Motion For Summary Judgment.

2.     Petitioner's motion setting a time for Petitioner to file a response was entered on November 17, 2010.

3.     An Order, pursuant to Rule 5(e), Rules Governing Section 2254 Cases, was entered on December 23, 2010, directing Petitioner he has until February 25, 2011, to file a response to Respondent's filings. The Order also informed Respondent any reply thereto would be due March 11, 2011. This, therefore, is Petitioner's response:

### Respondent's Answer

"In federal civil procedure, an issue is a single, certain, and material point arising out of the allegations and contentions of the parties; it is a matter affirmed on one side and denied on the other, and when a fact is alleged in the complaint and denied in the answer, the matter is then put in issue between the parties." *See generally*, 35A C.J.S. *Federal Civil Procedure* §357, at 541. (1960).

Rule 5 of the Rules Governing § 2254 Cases requires that an Answer be specific and intended to ensure a responsive pleading. Respondent's *Answer* herein was overly broad and nonspecific. Respondent was left no option, however, because he has a duty to; (1) make sure that denials of factual allegations are warranted by the evidence or are reasonably based on a lack of information and belief; (2) to refrain from denying an allegation he knows to be true; and, (3) to withdraw a prior denial when further investigation or discovery reveals that a denial is no longer warranted. Respondent's answer consisted only of an assertion for further pleadings should the Court determine that this matter is not ripe for summary dismissal, and leaves Petitioner in no position to meaningfully respond. Petitioner, therefore, respectfully reserves the right to file a responsive pleading to Respondent's answer on the merits of Petitioner's claim should the Court deny Respondent's motion for summary judgment.

Respondent also implicitly asserted in his cursory Answer the necessity for an evidentiary hearing when he stated; "Should this Court determine that this matter is not ripe for summary dismissal, Respondent reserves the right to **present further evidence** and argument in opposition to the Petitioner's claims...." (Emphasis added.) Petitioner agrees with Respondent's wish to conduct further fact development should the Court deny Respondent's summary judgment motion, and that an evidentiary hearing be held at such time and place as the Court may direct.

Respondent did not file any affidavits or depositions with his Answer or in support of his motion and memorandum for summary judgment.

### Respondent's Statement Regarding Timeliness

Petitioner joins with Respondent's concession that his §2254 Petition was timely filed.

### Respondent's Statement Regarding Exhaustion

Petitioner agrees with Respondent's concession that all of Petitioner's state remedies have been colorably exhausted. Petitioner disagrees, however, with Respondent's characterization of the claims raised in the § 2254 Petition as only attacking the admission of confessions and blood evidence. As the Court will determine if it decides summary dismissal is not proper, once Respondent is required to answer on the merits, Petitioner's claims go far above the simplified characterization offered by Respondent.

Petitioner also objects to Respondent's assertion that Petitioner "...has received four full rounds of [state] habeas review[.]" In fact, under West Virginia state law, Petitioner has not received any full, normal, state habeas review. He has only received the special "Zain" habeas review.[1] An omnibus habeas corpus hearing, as contemplated by *W.Va. Code* § 53-4A-1 *et seq.*, was never held; no *Losh* checklist of grounds was signed and entered by Petitioner.[2] Therefore, issues of waiver do not pertain. Retained counsel presented only issues directed by the West Virginia Supreme Court of Appeals, (hereinafter "WVSCA") in its decision in *Zain I*. Once Petitioner's money to retain counsel ran out, so, apparently, did Petitioner's Due Process in West Virginia. The other three petitions for state post-conviction relief were filed by Petitioner *pro se*. The state court summarily denied and dismissed each one without appointing counsel even though the *pro se* petitions raised many colorable grounds, other than the *Zain* issues, for habeas corpus relief. Petitioner, therefore, has never had even one full round of state habeas review for any claims except for those under *Zain I*.[3]

---

1.      See, *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory*, 438 S.E.2d 501 (W.Va. 1993). The first of three cases as result of the improper tactics of State Police Trooper Fred S. Zain, when he falsified evidence and committed perjury on the stand in numerous cases, including Petitioner's.

2.      See *Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981), wherein the West Virginia Supreme Court of Appeals suggested, for purposes of finality, a petitioner for state post-conviction relief be required to submit a list of possible claims for habeas corpus.

3.      Respondent informs the Court Petitioner's *pro se* applications for state post-conviction relief will be provided upon request. (No. 17, p.3 n. 2.) Petitioner asserts he does not have the financial means to provide the Court with the *pro se* applications for state post-conviction relief and respectfully requests Respondent provides the Court with the same. "The obligation to come forward with the state court record is squarely upon the respondent, not upon the petitioner." *Advisory Committee Note to Rule 5 of the Rules Governing § 2254 Cases*.

### Respondent's Motion And Memorandum For Summary Judgment

Respondent claims in his motion and memorandum that Petitioner has failed to rebut the presumption that the state court findings on his claims are correct as a matter of federal law. That is not the correct standard under a motion for summary judgment. Especially on Petitioner's claim of receiving ineffective assistance of counsel, which claims raise both factual and legal issues. The West Virginia state courts have never ruled on Petitioner's claims of ineffective assistance of counsel.

In *Blackledge v. Allison*, 431 U.S. 63 (1977), the Supreme Court held that "the critical question" which must be answered affirmatively to justify summary dismissal is whether the "allegations, when viewed against the record [available to the court are] so 'palpably incredible,' so 'patently frivolous or false,' as to warrant summary dismissal." In opposing a motion for summary judgment, the nonmoving party's allegations in the petition must be taken as true. Unless patently false, the facts alleged in the petition must be presumed to be true for summary dismissal purposes. If the facts alleged point to a real possibility of constitutional errors, summary dismissal is not appropriate. A district court is entitled to dismiss the petition summarily only if it plainly appears from the face of the petition that the petitioner is not entitled to relief.

A non-moving party must establish the existence of a genuine issue of material fact by presenting evidence on which a jury could reasonably find in his favor. In the law of summary judgments, a genuine issue of material fact is a triable, substantial, or real question of fact supported by substantial evidence. A fact in issue is a fact the petitioner alleges and that the defendant controverts – a fact to be determined by a fact-trier. An issue of this kind precludes entry of summary judgment. Motions for summary judgment impose a difficult standard on the moving party, for it must be obvious that no rational trier of fact could find for the non-moving party.

The mere existence of a scintilla of evidence favoring the non-moving party will not prevent entry of summary judgment. To withstand such a motion, the non-moving party must offer evidence from which a fair minded jury could return a verdict for the party. Such evidence must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they create fair doubt rather than encourage mere speculation. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. The district court is obliged to credit the factual asseveration's contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable.

Affidavits or depositions filed in support of summary judgment motions are used to determine whether issues of fact exist and not decide issues themselves. Summary judgment may be granted only when non-movant's evidence fails to put material fact(s) in dispute or is not significantly probative. Thus, when resolution of issue of fact depends upon credibility determination, summary judgment is not appropriate.

The non-moving party may rely on the verified complaint, when allegations therein are based on personal knowledge, as a response to a motion for summary judgment. *Williams v. Griffen*, 952 F.2d 820, 823 (4TH Cir. 1991).

Petitions filed *pro se* will be held to less stringent standards than formal pleadings drafted by lawyers.

Petitioner's case presents many multifaceted claims, contentions, and arguments. There are only a few key points, however. The only thing Respondent is not in dispute with Petitioner on is that Petitioner has been asserting his innocence and fighting for justice for over thirty years now, and the state has been fighting just as vigorously, though not on a level playing field, just as strenuously to support a conviction obtained solely on a coerced confession and improper tactics by state actors.

One key point in Petitioner's case is the January, 1980, Blood Grouping Table evidencing the West Virginia State Police Crime Laboratory, Serology Division, Fred S. Zain and Robert Murphy, had a known sample of Petitioner's blood in January, 1980, and conducted analysis on the same prior to April, 1980, when it is alleged authorities obtained a "legal" sample.

The significance of this disputed fact is that, even though the Blood Grouping Table was presented at Petitioner's special *Zain* habeas corpus proceeding, no specific ruling has ever been entered by any state court confirming or controverting authorities had in their possession a known sample of Petitioner's blood in January, 1980, and the resulting effect of the illegally obtained sample on the evidence recovered and testimony obtained. The lower courts merely grouped the January, 1980, Blood Grouping Table in with the tainted *Zain* evidence, removed it from consideration, and conducted an analysis of the remaining evidence under the improper non-constitutional standard announced in *Zain I*. The state courts have failed to conduct an analysis of the illegally obtained blood sample under the federal constitutional standards Petitioner raises, such as the fruits of the poisonous tree doctrine. This cannot be determined as harmless because virtually none of the remaining evidence would have been available at trial which the WVSCA used to announce that after removing the tainted Zain testimony the remaining evidence is strong enough to convict.

Another key point of the § 2254 petition is Petitioner's claim(s) of ineffective assistance of trial counsel, which are mixed questions of law and fact. The state has never been required to answer the merits of Petitioner's claims, and none of the state courts have articulated the standards of review for such claims, nor made findings of facts on Petitioner's assertions.

For example, the state courts have never ruled whether, notwithstanding Petitioner's claims the WVSCA's determination that no objections were entered prior to trial on the state authorities' failure to present Petitioner before a neutral judicial officer prior to obtaining a confession were clearly erroneous, did trial counsel fail to object and, if so, did that constitute deficient performance? If it does, was Petitioner's case prejudiced by a reasonable probability that, but for counsel's deficient performance, would the outcome of the proceedings been different? Were the second trial attorneys

ineffective for failing to bring the WVSCA's clearly erroneous determination that no objections were entered prior to the first trial to the attention of the Court via a Writ of Prohibition? Were the second trial attorneys ineffective for failing to file a Writ of Prohibition, etc., with the WVSCA when the second trial court ruled that under a law of the case doctrine it had no choice but to allow two of Petitioner's three confessions when, in fact, under the law of the case doctrine,[4] because trial counsel at the second trial did object to the introduction of the two remaining confessions for failing to immediately present Petitioner to a neutral judicial officer prior to obtaining his confessions, those confessions should have been, like the third, disallowed at the second trial.

Also, though not announced as an analysis of an ineffective assistance of counsel claim, the WVSCA placed great emphasis on the testimony of Arbutus Johnson concerning flatware Petitioner gave her as a Christmas present and the fact, as they articulated, the flatware came from the Reggettz home. Petitioner asserts the WVSCA relies on the transcript records of only the second trial in reaching their erroneous determination. Petitioner also claims that the second trial counsel were ineffective for failing to call the same type witness at the second trial that testified at the first trial that K Mart had never carried a pattern such as was entered into evidence. This is key because it was left unchallenged at the second trial whereas at the first trial it was irrefutably demonstrated that, contrary to Reggettz's testimony at the second trial, the flatware given by Petitioner could not possibly have come from the Reggettz home. Due to counsel's deficiency, this fact was not brought before the WVSCA.

The state apparently alleges that because West Virginia State Police Sergeant, Robert Murphy, tested a key piece of evidence and not Fred S. Zain, then it should be considered in an analysis of the prejudice caused to Petitioner in any and/or all of his claims. Respondent's assertions are flawed for several reasons: (1) They are contrary to the actual fact that Zain, not Murphy, tested all the gathered evidence, other than that of known blood samples; (2) It is undisputed that Zain had possession of the subject evidence as part of the documented chain of evidence; (3) the entire body of work which Zain had anything to do with, including possession thereof, was determined to be unreliable by the WVSCA and cannot now be considered under any standard that requires it to be considered otherwise; and, (4) Because the improper tactics and testimony of the West Virginia State Police Crime Laboratory, Serology Division, and any serologist employed by the Division between the

---

4.    The WVSCA ruled, in *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569, (1988), that only one confession, out of three, will be declared invalid and inadmissible at the first trial because no prompt presentment objections were entered in respect to the two remaining confessions. The court did not enter a mandate declaring no objections could be entered at a subsequent trial on the two remaining confessions.

years 1979 and 1989, other than Fred S. Zain, was called into question by the WVSCA in *Zain III*.[5] Contrary to the mandate announced in *Zain III*, the state failed to afford Petitioner a full habeas proceeding. Petitioner has made allegations of improper tactics against a serologist, other than Zain, specifically, Robert Murphy, upon whom Respondent asks this Court to consider as being reliable. Robert Murphy worked at the crime laboratory between the stated years. The state court(s), however, failed to allow Petitioner to develop his factual claims. They did so by using an erroneous legal analysis. The WVSCA announced incertitude over Robert Murphy's body of work and mandated an evidentiary hearing should be held, even if the Petitioner was previously given full *Zain* habeas proceedings, including a prior evidentiary hearing, to resolve any allegations against the serologist. The state courts failed to afford Petitioner that opportunity and summarily denied and dismissed his claims. Based on the WVSCA's ruling that reliability of *all* serologist's work is questionable, this Court cannot rely upon Murphy's testimony or alleged evidence before having proper factual development and should, therefore, appoint counsel to investigate, order process allowed under the Rules of Discovery and, *inter alia*, hold an evidentiary hearing to resolve the dispute.

On August 14, 1995, counsel for Petitioner filed a Supplemental Brief, in Kanawha County Case No. 94-MISC-663, which erroneously states Murphy performed tests on crime scene exhibits. (See p. 5 of Resp't. Exh. 33A, herein.) On September 17, 1996, Respondent filed his Answer and Memorandum in support thereof. Respondent properly submits Sgt. Murphy tested known blood samples and that Trp. Zain tested the crime scene exhibits. (See pp. 16-17 of Resp't. Exh. 33A.)

Sgt. Murphy testified in Petitioner's first trial (1984), that his testimony before the Grand Jury was limited to results of known blood samples he had tested. (First Trial Trans., Resp't. Exh. 22, pp. 254-56.) Respondent has offered no statement, affidavit, deposition, or declaration of any type evidencing Murphy tested any piece of crime scene evidence, including the subject clothing item.

On May 17, 1995, the deposition of Sgt. Murphy was conducted. The record evidence of this case clearly shows Sgt. Murphy did not contend that if he recorded results on a worksheet that he performed the test. Sgt. Murphy testified that, after fifteen years, he could not possibly recall who tested what evidence, but to the best of his recollection...he saw the results.

---

5.   See, *In the Matter of Renewed Investigation of the State Police Crime Laboratory, Serology Division*, 633 S.E.2d 762 (W.Va. 2006).

It is significant to note Fred S. Zain testified before the jury that he collected and conducted all the analysis of evidence, including Bernadette's nightgown/T-shirt.  (See pp. 3462-63, 3465, 3474-75, First Trial Trans., Resp't Exh. 22)

Q.    Directing your attention to the report from the serology lab, Items 1 through 17, would you read those and tell me who recovered those?
A.    Items marked and numbered 1 through 17 were all taken from the scene by myself on the 13th of December.

(Page 3462.)

A.    No. 16, medium white T-shirt found under a pile of clothes in the master bedroom.

(Page 3463.)

Q.    Did you do testing on all these various items?
A.    Yes, sir, I did.

(Page 3465.)

Q.    All right, sir, before you go to your next item, I hand you now, sir, State's Exhibit No. 116-A [Bernadette's nightgown/T-shirt] and ask you if you recognize that, sir.
A.    Yes.  This is the T-shirt, what I call it, sort of like a gown of Bernadette Reggettz which has blood stains or smears on the front and on the side.
Q.    Did you make any alterations in that garment, sir?
A.    That portion of the blood stain on the T-shirt was removed by me on the left.
Q.    How is that indicated on the T-shirt, sir?
A.    There is a cutting, what we call a cutting, removal, where the stain would be, and that portion of the stain is used for mountings.
Q.    Is that the cutting you have used in indicating the next chart of Bernadette Reggettz?
A.    Yes, sir, it is.

(Pages 3474-75, First Trial Trans.)

Q.    And did you collect samples at that scene?
A.    Yes, sir, I did.
Q.    And were some exhibits submitted to you?
A.    Yes, they were.
Q.    Who performed the analysis on those exhibits?
A.    I did.
Q.    I see a Sergeant Murphy's signature on this report, dated June 10th of 1980.  Is it your testimony that you performed these analyses, too?
A.    Yes, sir.  Sergeant Murphy, at the time, was in charge of a section, and we both countersigned reports.  And I processed all of the evidence that was submitted to me at the serology section at the time.
The reports were either issued by himself or myself after conferring as to what should be issued in a report.
Q.    But it is your testimony that you performed the analysis?
A.    Yes, that's correct.

(Pages 1049-50, Second Trial Trans.)

- 8 -

Great weight has been given to the fact Murphy was Zain's supervisor and saw results of tests as they were performed. When Sgt. Murphy was questioned about what was different about the blood evidence from the crime scene that showed someone other than a Reggettz family member had bled, after refreshing his memory through the use of a genetic characteristics chart of crime scene evidence, Sgt. Murphy selected that the esterase (EsD) was different. (See page 42 of Resp't. Exh. 23 & 33, herein.) The genetic characteristic EsD 2 is recorded throughout this case as being the crucial genetic marker obtained from the crime scene evidence used to exclude 27 other possible donors as the foreign blood source. This is supported by the June 10, 1980, forensic report authored by Sgt. Murphy. (Resp't. Exh. 23, herein.)

On page 6 of the report at ¶1, nine possible donors to the foreign blood type identified from the crime scene were excluded as "...none was found to contain EsD 2-1." It is important to note that none of the known blood comparison samples recorded were an EsD 2. Petitioner's expert in Kanawha County No. 94-MISC-663, Dr. David Bing, established that it is improper to include genetic characteristics that are common to the victim on samples of crime scene evidence. Only genetic characteristics foreign to the victim(s) should be considered as the sample could be a mixture of blood from a victim and the perpetrator. The state refuted the mixture concept alleging the Christmas package wrapping paper was clearly a drop of blood, as was the Bernadette clothing item. The state alleged the perpetrator wore gloves which would have permitted the glove to absorb a victim's blood, mix with the perpetrator's blood, and "drop" as a mixed sample. Therefore, only the EsD 2 factor would be proper to compare as a foreign factor if the Respondent could establish someone other than Zain tested crime scene evidence, which they have not.

This is further supported by the summary case worksheet (Bates Number 12, Resp't. Exh. 23.) where Sgt. Murphy only recorded the EsD type for a "table knife" catalogued as a "case knife." Clearly, Sgt. Murphy was only interested in the EsD genetic marker which draws one to the inescapable conclusion that the EsD genetic marker is the only credible foreign blood type identified and recorded as a comparison factor.

Based upon the record of Sgt. Murphy having viewed the results of tests, and performed serological testing on known blood samples only, which resulted in excluding numerous possible sources as being the donor of foreign blood identified at the Reggettz home, only the genetic marker EsD 2 should be considered. Sgt. Murphy compared known blood samples foreign to blood based upon EsD 2 as the foreign genetic type. At no time did Sgt. Murphy exclude any other suspect and/or possible source of foreign blood through the use of any genetic characteristic other than the EsD 2-1. At the time Murphy's deposition was taken, there was no reason to doubt Murphy testified honorably to the best of his recollection. Due to the additional information obtained which resulted in the renewed investigation of the West Virginia State Police Crime Lab, *Zain III* (n. 5, *infra*) this is no longer true.

- 9 -

The case worksheets produced as the underlying data to the June 10, 1980, Report cannot be the original record of results catalogued as the tests were recorded. On page 4 of the June 10, 1980 report, seven genetic characteristics are reported for the "doll" submitted for testing. The case worksheet only records one genetic characteristic for the "doll." Either there are individual data sheets for the items submitted, or the report authored by Sgt. Murphy is false.

Another example is found on page 5 of the June 10, 1980, Report, in paragraph 2, where a number of items were reported to have the subgroup PGM 1+, 1- identified. The case worksheets provided are for Group One test results which do not identify the subgroup of PGM factors. PGM subgrouping is conducted in a second test commonly called "Group Two Tests." Again, either the additional factors had to have been obtained from individual data sheets or the report is false.

A compelling factor establishing the worksheets are summaries of other data sheets submitted to Sgt. Murphy to prepare a final report on is Bates Number 10 (Resp't. Exh. 23). The genetic characteristics of Petitioner are catalogued on a worksheet dated simply as "Jan." It was established by Sgt. Murphy that "Jan" represented January, 1980. (Resp't. Exh. 23 & 33, page 32.) The illegally obtained blood sample of Petitioner was taken on January 30, 1980. The state contends the sample was returned in its entirety without being tested. If the results recorded on the disclosed worksheets are to be taken as correctly catalogued in accordance with the dates represented, the January date recording Petitioner's blood types must also be considered as being correct. Under these circumstances, all blood evidence, including the EsD 2-1, would have been illegally obtained.

The recorded data on the case worksheet (Resp't. Exh. 23), is two different sets of results for the same piece of evidence, the clothing (T-shirt/nightgown) of Bernadette Reggettz. A careful review of the entire record reveals only one item of clothing was submitted for testing that belonged to the child, Bernadette. In the handwriting identified only as being "not Murphy," the last item listed is "Bernadette Clothing." The genetic characteristics attributed to this item perfectly match the known blood sample of Bernadette Reggettz. Trial testimony described one blood drop from Bernadette's shirt/clothing as having been tested. Why are there two separate results?

Just below the "not Murphy" Bernadette Clothing entry is an entry in Sgt. Murphy's handwriting of "Clothing Bern." This time the genetic characteristics recorded are aligned to those of Petitioner. As shown above, this worksheet cannot be the original results obtained data sheet, because the June 10, 1980, report lists more genetic markers than what appears on the data worksheet for three different items.

At the time of Petitioner's special Zain habeas proceedings, there was no reason to doubt the veracity of Sgt. Murphy's work and/or reports, and it was suspected he had been duped by Fred S. Zain just as much as anybody. Now it seems he may have been in collusion with Zain, among the possibility of various others. In 2006, aspersions were cast by the WVSCA on Sgt. Murphy's involvement in testing, preparing reports, and/or testifying in criminal cases. The state now asks this

Court to consider Sgt. Murphy's involvement in Petitioner's case without Petitioner having an opportunity, as the WVSCA said he should, of developing his allegations of wrongdoing on Murphy's part in obtaining Petitioner's conviction of three amazingly brutal and heinous homicides. It is vital that, due to Murphy's involvement in this extremely key point, and the subsequent federal constitutional violations it touches on, this Court should afford Petitioner an opportunity for factual development.

#### Petitioner's *Brady* Claim(s)

Whether a federal constitutional issue was presented before a state's highest court is, itself, a federal question. Petitioner asserts the *Brady* claim, Respondent complains is unexhausted and not proper for this Court's review, **was** presented below. Petitioner pointed to where in the record it was in his 17 February, 2010, *pro se* request to respond to Respondent's answer on the limited issue of timeliness of the petition and exhaustion of available state court remedies. (No. 09, ¶16.)

"...Petitioner placed the [*Brady*] issue before the West Virginia Supreme Court of Appeals, in at least one instance, when Petitioner asserted, 'This information which was known, or should have been known, by the prosecutor, [false and/or misleading evidence or testimony by a state serologist...] was withheld from Appellant, as well as the blood grouping data sheet... .' (*See* Resp't. Exhibit 11, p. 32, Ground 4; *see also* p. 33, Ground 5.)"

Petitioner received review of only *Zain* claims. No state court has ever considered Petitioner's claims other than under the state court standard announced in *Zain I*. For example, the state court orders dismissing Petitioner's *pro se* petitions never made factual determinations on Petitioner's claims of ineffective assistance of counsel, nor of whether the West Virginia State Police Crime Laboratory, Serology Division, had a sample of Petitioner's blood in January, 1980. Petitioner has submitted evidence that they did have a sample of Petitioner's blood then. In denying Petitioner's claims, the state courts merely reiterated its findings from the *Zain I* proceedings. The court never considered Petitioner's factual allegations under the constitutional violations claims made by Petitioner.

The state courts have never made factual determinations, and the resulting legal conclusions, whether the trial attorneys from the first trial objected to the admission of two of Petitioner's confessions. Neither have they made a factual determination, and the resultant legal conclusions, whether the trial attorneys at the second trial objected to the introduction of the two confessions and whether the two confessions should be precluded, notwithstanding the WVSCA's *obiter dictum* that the two confessions were admissible at the first trial. The second trial court simply ruled that the two confessions were admissible under the law of the case doctrine when, in fact, under the said doctrine, the two confessions should have been precluded at the second trial because, Petitioner asserts, objections to the two confessions were made at the first trial.

Under West Virginia law, decisions by the WVSCA is considered *res judicata* in future proceedings, unless those decisions are clearly wrong. Petitioner asserts the WVSCA's factual determination that no objections were entered prior to trial on two of the three confessions is clearly wrong. No state court has ever ruled on Petitioner's asseveration.

Similarly, no state court has ever ruled on Petitioner's claims that he had a right anew to object to the introduction of the two confessions at the second trial, and the impact on the jury when the trial court erroneously allowed the introduction of the same at trial.

## CONCLUSION

Respondent is impressively eloquent in his writing. Petitioner is uneducated, inarticulate and woefully mismatched when compared with the educational level and unlimited resources of the Attorney General's Office and his entire support staff. Petitioner does not wish, however, to waste the Court's time or insult the Court with superfluous pleadings, so he would like to simplify, as much as possible, the key points on his contentions for habeas corpus relief, the facts of which are set forth in his *pro se* § 2254 petition. Petitioner relies on the verified factual allegations contained therein in lieu of an affidavit.

1.  Petitioner asserts that the January, 1980, illegally obtained blood sample was either not returned, or the West Virginia State Police Crime Laboratory, Serology Division, contrary to what was testified to, retained a partial sample and conducted analysis on Petitioner's blood in January, 1980,[6] and, for whatever reason–who knows what motivates persons like Fred S. Zain and/or Robert Murphy to lie and formulate false reports of testing, etc.–decided to match Petitioner's blood with alleged unknown blood samples taken at the crime scene. That illegally obtained blood sample led to the discovery of virtually all the other "corroborative evidence" the WVSCA relied on to affirm the circuit court's denial of Petitioner's special *Zain* habeas proceeding,[7] and the subsequent denials of Petitioner's *pro se* state applications for post-conviction relief. Petitioner did not receive, *inter alia*, a full and fair opportunity to litigate his Fourth Amendment violations claims due to the improper and illegal tactics of the West Virginia State Police, and the withholding of the evidence discovered subsequent thereto–during the special *Zain* habeas proceedings–of wrongdoing by the state.

_____

6.  *See Moss v. Trent*, 2004 W.Va. LEXIS 121, (W.Va. July 1, 2004). "Another significant distinction with regard to this case was 'the fact Zain and Murphy had discovered genetic markers in blood samples from the Reggettz [victims'] residence that excluded Paul Reggettz [original suspect] and would ultimately incriminate John Moss, long before a sample of Moss's blood was obtained and analyzed.'"

7.  *Moss v. Trent*, 2004 W.Va. LEXIS 121, (W.Va. July 1, 2004). *See*, however, Petitioner's Exhibit 1, a November 13, 1993, Charleston Gazette article interviewing Petitioner's first trial lead counsel, Parrish McKittrick.

2.   Under a "totality of the circumstances" analysis, the WVSCA's determination that Petitioner's confessions were voluntarily given and not coerced, is clearly erroneous and the said confessions should have been excluded.

3.   Petitioner received ineffective assistance of trial counsel. This is a mixed question of law and fact Petitioner presented to the lower courts, who have refused to conduct the proper legal analysis on.

4.   Petitioner's trial was so infused with unfairness that it violated Due Process guarantees.

Respondent does not explicitly dispute many of Petitioner's factual allegations, thus creating a genuine issue as to material facts. Petitioner has provided the Court herein cites to portions of the record, as well as alleged extraneous facts, which Respondent implicitly disputes, that allows the Court to answer, in the negative, the question whether Petitioner's allegations, when viewed against the record available to the Court, are so palpably incredible, so patently frivolous or false, as to warrant summary dismissal. Under the applicable legal standards, dismissal is appropriate only when the petition presents obviously untenable arguments that further factual development, legal explication, or the assistance of counsel cannot make tenable. No matter how inartfully raised, an incarcerated *pro se* petitioner's pleadings should be liberally construed to state a claim upon which habeas relief may be granted. Petitioner should survive Respondent's motion for summary judgment. Petitioner reserves the right to submit a responsive pleading to Respondent's answer on the merits of Petitioner's claims, should this Court determine summary judgment is not proper.

Finally, Petitioner asserts that for reasons beyond his control, the factual claims raised by Petitioner were not previously the subject of a full and fair hearing in the state courts or, if a full and fair hearing was held, it did not result in state court factfindings that resolve all the controlling factual issues in this case.

Respectfully submitted by:

John Moss, III
Mount Olive Correctional Complex
One Mountainside Way
Mt. Olive, WV 25185

This, the 23rd day of February, 2011.

Petitioner proceeding *pro se*.

- 13 -

Most file

Petitioner's Exhibit 1

★ The Charleston Gazette, Saturday, November 13, 1993    17A

# Crucial evidence now questioned

By Jack McCarthy
STAFF WRITER

Parrish McKittrick couldn't account for the blood.

McKittrick's client, John Moss, was convicted on April 26, 1984, of the bloody murders of a St. Albans-area woman and her two children. As the courtroom emptied out that day, McKittrick gathered up his papers and reflected on the verdict.

"I had everything covered," he said. "But I couldn't get around the blood."

Blood samples used as evidence in the Moss trial, along with blood samples in scores of other trials, have been called into question this week by the revelation of possible evidence tampering in the state police crime laboratory.

The state Supreme Court ruled Wednesday that former state police chemist Fred Zain had fabricated and misrepresented evidence as head of the state police serology unit, which tests blood, semen and hair samples in criminal cases. Moss' case was specifically mentioned as a cause of concern.

Blood was one of the most important pieces of evidence used against Moss at his trial.

Moss was accused of the 1979 strangulation and knifing deaths of Vanessa Reggettz, her daughter, Bernadette, 4, and her son, Paul Jr., 8. Police first arrested Paul Reggettz, Vanessa's husband.

Holding Reggettz at state police headquarters for hours without a lawyer, they obtained a detailed confession of the killings from him.

Police found blood splattered throughout the Reggettz house. Most of the blood was a normal type consistent with the Reggettz family. But a small quantity of extremely rare blood was also found. No one in the Reggettz family had it.

State police found the blood of Moss matched the rare blood type.

State police released Reggettz and admitted they forced Reggettz, through physical and mental intimidation, to give a false confession.

Moss, who was serving a prison sentence in Ohio for assaulting a woman, was brought back to stand trial.

For three weeks, McKittrick battled former Kanawha County prosecutor Jim Stucky and assistant prosecutor Pete Brown in one of the longest and most dramatic murder trials in Kanawha County.

Zain testified about the blood findings confidently and expertly, as he did in scores of trials in Kanawha County.

Other pieces of evidence were brought forward, including plates allegedly taken by Moss from the Reggettz household and given to his parents.

But McKittrick believed he fought to a draw with the prosecutors.

"I felt the only issue I had trouble dealing with was the blood," McKittrick said Friday. "I ran into the jury foreman after the trial and he told me I had refuted everything in the case except the blood."

Stucky said he believes Moss would have been convicted without the blood as evidence.

"I have to admit I was surprised by the news [of Zain's actions]," Stucky said. "He was the leader in his field throughout the state. There was no reason to question him."

Zain would have seemed to have little motive for implicating Moss. The state police were forced to drop charges against Reggettz and opened themselves up for criticism by admitting to coercing his confession.

"Who knows?" McKittrick said. "Zain could have taken the blood from somewhere and said he got it from Moss. The guy [Zain] is crazy."

Stucky says there may be nothing wrong with the blood. But, then again, maybe there is. "They [the state police] were combing the hillsides looking for someone with the rare blood type," Stucky said. "Does the blood really match John, or did Zain fabricate it?"

Petitioner's Exhibit 1