**MOSS v. BALLARD
CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 34
(Habeas Petition, pp. 1 - 74)**

PETITION UNDER W.VA. CODE § 53-4A-1 FOR WRIT OF HABEAS CORPUS

## STATE OF WEST VIRGINIA

| Name    John Moss, III | County   Kanawha | FILED |
|---|---|---|

Place of Confinement

Prisoner No.   13734

2005 JUL -7  AM 9:23   Case No. 05-MISC-298

Mount Olive Correctional Complex
One Mountainside Way
Mt. Olive, WV 25185

CATHY S. GATSON CLERK
KANAWHA CO. CIRCUIT COURT

Bloom

Name of Petitioner (include name under which convicted)     Name of Respondent (authorized person having custody of petitioner)

John Moss, III

v.

Thomas L. McBride, Warden

## PETITION

1. Name and location of court which entered the judgment of conviction under attack Kanawha County Circuit Court, Charleston, WV

2. Date of judgment of conviction First Trial -- 26 April, 1984; Second Trial -- 26 April, 1990

3. Length of sentence Life without possibility of parole -- Three Counts

4. Nature of offense involved (all counts) First degree murder -- Three Counts

5. What was your plea? (Check one)
   (a)   Not guilty   X
   (b)   Guilty   ☐
   (c)   Nolo Contendere ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   N/A

6. If you pleaded not guilty, what kind of trial did you have?   (Check one)
   (a)   Jury   X
   (b)   Judge only   ☐

7. Did you testify at the trial?
   Yes ☐   No X

8. Did you file a direct appeal from the judgment of conviction in the Supreme Court of Appeals?
   Yes X   No ☐

ICC - Judge
& Petitioner

9.    If you did appeal, answer the following:

(a)    Date of filing   14 January, 1991; 23 February, 1991

(b)    Grounds raised   See Memorandum

(c)    Was the petition granted ☐   or refused   X ?

(d)    If refused, what was date of refusal?   12 March, 1991

(e)    If granted, give date and type of result and citation if known.

10.   Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes   X      No   ☐

11.   If your answer to 10 was "yes," give the following information:

(a)    (1)    Name of court   Kanawha County Circuit Court -- United States Supreme Court

(2)    Nature of proceeding   "Special Zain" Habeas -- Writ of *Certiorari* on denial of collateral
appeal

(3)    Grounds raised   False or misleading evidence presented by state's witness

(4)    Did you receive an evidentiary hearing on your petition, application or motion?
Yes   ☐      No   ☐      Not a full and fair hearing.

(5)    Result   Denied and dismissed

(6)    Date of result   31 July, 2003

(b)    As to any second petition, application or motion give the same information:

(1)    Name of court   N/A

(2)    Nature of proceeding   N/A



(3)    Grounds raised   N/A _____

_____

_____

_____

_____

(4)    Did you receive an evidentiary hearing on your petition, application or motion?

       Yes  ☐     No  ☐

(5)    Result _____

(6)    Date of result   N/A _____

(c)    Did you appeal to the highest court having jurisdiction the result of action taken on any petition, application or motion?

    (1)    First petition, etc.    Yes  **X**    No  ☐

    (2)    Second petition, etc.    Yes  ☐    No  ☐

(d)    If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

   N/A _____

_____

_____

12.    State *concisely* every ground on which you claim that you are being held unlawfully.  Summarize *briefly* the *facts* supporting each ground.  If necessary, you may attach pages stating additional grounds and *facts* supporting same.

**CAUTION:**      **In order to proceed in the circuit court, you must state grounds that have NOT been previously and finally adjudicated or waived.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.**

      For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief.  You may raise any grounds which you may have other than those listed.  However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.
      Do not check any of these listed grounds.  If you select one or more of these grounds for relief, you must allege facts.  The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.
(a)    Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b)    Conviction obtained by use of coerced confession.
(c)    Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d)    Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e)    Conviction obtained by a violation of the privilege against self-incrimination.
(f)    Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g)    Conviction obtained by a violation of the protection against double jeopardy.
(h)    Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(I)    Denial of effective assistance of counsel.
(j)    Denial of right of appeal.

A.   Ground one:   __See Facts And Memorandum In Support of Petition  (Included herewith.)__

_____

Supporting FACTS (state *briefly* without citing cases or law)   __See Memorandum__

_____

_____

_____

_____

_____

B.   Ground two:   _____

_____

Supporting FACTS (state *briefly* without citing cases or law)   _____

_____

_____

_____

_____

_____

C.   Ground three:   _____

_____

Supporting FACTS (state *briefly* without citing cases or law)   _____

_____

_____

_____

_____

_____

D.   Ground four:   _____

_____

_____

_____

Supporting FACTS (state *briefly* without citing cases or law) _____

_____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:   See Memorandum

_____

_____

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes ☐   No X

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment herein:

(a)   At preliminary hearing   Parrish McKittrick; 45 Second St., St. Albans, WV 25177;

(b)   At arraignment and plea   Same as above

(c)   At trial   First Trial - Same as above -- Second Trial -- Nelson R. Bickley; Charleston, WV;

Timothy Huffman; Charleston, WV; Kathy G. Beckett; Charleston, WV

(d)   At sentencing   Same as above

(e)   On appeal   Same as above

(f)   In any post-conviction proceeding   Lonnie C. Simmons; Charleston, WV:  For "Special Zain" Habeas

(g)   On appeal from any adverse ruling in a post-conviction proceeding   Same as above



16. Have you, or an attorney representing you, obtained a transcript of the criminal proceedings which resulted in the conviction under attack?

Yes  **X**    No  ☐

17. If your answer to 16 was "no," have you submitted an Appellate Transcript Request form for transcripts to the circuit court, a court reporter, or any other tribunal or individual?

Yes  ☐    No  ☐

18. If your answer to 17 was "yes," attach a copy, if available, of the Appellate Transcript Request form and provide the name of the court or person to whom it was submitted and the date of submission.

(a)  Copy of request is attached  ☐

(b)  Date  ☐

(c)  Name  _____

19. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes  **X**    No  ☐

20. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes  ☐    No  **X**

If so, give name and location of court which imposed sentence to be served in the future:  __N/A__

_____

(b)  Give date and length of the above sentence:  _____

_____

(c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes  ☐    No  ☐

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  __June 29, 2005__ _____.
                                    (date)

_____
Signature of Petitioner

# APPENDIX B

## POST-CONVICTION HABEAS CORPUS FORM
## APPLICATION TO PROCEED IN FORMA PAUPERIS
## AND AFFIDAVIT

FILED

2005 JUL -7  AM 9: 23

CATHY S. GATSON, CLERK
KANAWHA CO. CIRCUIT COURT

### STATE OF WEST VIRGINIA

| County  Kanawha | |
|---|---|
| Name  John Moss, III | Prisoner No. 13734 | Case No. |

| Place of Confinement |
|---|
| **Mount Olive Correctional Complex**<br>**One Mountainside Way**<br>**Mt. Olive, WV 25185** |

Name of Petitioner (include name under which convicted)     Name of Respondent (authorized person having custody of petitioner)

John Moss, III                    v.                    Thomas McBride, Warden

NOTICE:    This form is only to be used by incarcerated persons seeking post-conviction habeas corpus relief pursuant to W.Va. Code § 53-4A-1, *et seq.*

❖ ❖ ❖

I, __John Moss, III_____, declare that I am the petitioner in the above-entitled proceeding; that in support of my request to proceed without prepayment of fees or costs, I declare that I am unable to pay the costs of these proceedings and that I am entitled to the relief sought in the petition.

In support of this application, I answer the following questions under penalty of perjury:

1.    State the place of your incarceration __Mount Olive Correctional Complex_____.

Are you employed at the institution? __No_____    Do you receive any payment from the institution? __No_____

Have the institution fill out the Certificate portion of this application and attach a ledger sheet from the institution(s) of your incarceration showing at least the past six months' transactions.

2.    In the past twelve months have you received any money from any of the following sources?

| | | | |
|---|---|---|---|
| a. | Business, profession or other self-employment | Yes X | No ☐ |
| b. | Rent payments, interest or dividends | Yes ☐ | No X |
| c. | Pensions, annuities or life insurance payments | Yes ☐ | No X |
| d. | Disability or workers compensation payments | Yes ☐ | No X |
| e. | Gifts or inheritances | Yes X | No ☐ |
| f. | Any other sources | Yes ☐ | No X |

If the answer to any of the above is "Yes" describe each source of money and state the amount received and what you expect you will continue to receive.

I have an arts & crafts shop at the facility from which I receive minimal funds.  I also receive small gifts of money from family members.

3. Other than any institutional accounts, do you have **any** cash, checking or savings accounts?  ☐ Yes  ☒ No

If "Yes" state the total amount _____.

4. Do you own any real estate, stocks, bonds, securities, other financial instruments, automobiles or other valuable property?

☐ Yes   ☒ No

If "Yes" describe the property and state its value.

_____

_____

5. List the persons who are dependent on you for support, state your relationship to each person and indicate how much you contribute to their support.

N/A _____

_____

_____

I declare under penalty of perjury that the above information is true and correct.

June 29, 2005
DATE

_____
SIGNATURE OF APPLICANT

CATHY S. GATSON, CLERK
KANAWHA CIRCUIT COURT
2005 JUL -7 AM 9:23

## CERTIFICATE

### (To be completed by the institution of incarceration)

I certify that the applicant named herein has the sum of $ .83¢ in a trustee spending account to his/her credit at (name of institution) **Mount Olive Correctional Complex**. I further certify that during the past six months the applicant's average balance was $ 18.72, and the average of monthly deposits was $258.37.

27 June 2005
DATE

_____
SIGNATURE OF AUTHORIZED OFFICER

```
06/27/2005 14:25           DEPARTMENT OF CORRECTIONS           Page    1 Of    8

AMBER                   MOUNT OLIVE CORRECTIONAL COMPLEX                OTRTASTA
                    T R U S T   A C C O U N T   S T A T E M E N T
```

DOC#  : 0000013734     Name:  MOSS, JOHN JR.                    BKG#      1998520

LOCATION:   MOCC-ELM

ACCOUNT BALANCES  TOTAL :          6.35   CURRENT:        6.35   HOLD:       0.00

                                12/01/2004      06/27/2005

| SUB ACCOUNT | START BALANCE | END BALANCE |
|---|---|---|
| DRAWING ACCOUNT | 10.38 | 0.83 |
| VOLUNTARY SAVINGS | 0.00 | 0.00 |
| MEMO CONTROL | 0.00 | 0.00 |
| MANDATORY CONTROL | 5.52 | 5.52 |

### DEBTS AND OBLIGATIONS

| WRITE OFF | TYPE | PAYABLE | INFO NUMBER | AMOUNT OWING | AMOUNT PAID |
|---|---|---|---|---|---|

#### TRANSACTION DESCRIPTIONS --   MANDATORY CONTROL  SUB-ACCOUNT

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|---|---|---|---|---|
| 01/26/2005 | Interest Distribution | | 0.00 | 5.52 |
| 02  '2005 | Interest Distribution | | 0.00 | 5.52 |
| 02, _/2005 | Interest Distribution | | 0.00 | 5.52 |
| 03/14/2005 | Interest Distribution | | 0.00 | 5.52 |
| 03/14/2005 | Interest Distribution | | 0.00 | 5.52 |
| 03/16/2005 | Interest Distribution | | 0.00 | 5.52 |
| 03/23/2005 | Interest Distribution | | 0.00 | 5.52 |
| 03/30/2005 | Interest Distribution | | 0.00 | 5.52 |
| 04/16/2005 | Interest Distribution | | 0.00 | 5.52 |
| 05/11/2005 | Interest Distribution | | 0.00 | 5.52 |

#### TRANSACTION DESCRIPTIONS --   DRAWING ACCOUNT  SUB-ACCOUNT

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|---|---|---|---|---|
| 12/01/2004 | CRS SAL ORD #700795 | | ( 7.86) | 2.52 |
| 12/02/2004 | CRS SAL ORD #701143 | | ( 0.75) | 1.77 |
| 12/04/2004 | CRS SAL ORD #701897 | | ( 1.44) | 0.33 |
| 12/08/2004 | I TO I | | 153.00 | 153.33 |
| 12/08/2004 | SS | | ( 100.00) | 53.33 |
| 12  2004 | Postage Draw 12/06/2004 | | ( 3.95) | 49.38 |
| 12/08/2004 | CRS SAL ORD #703056 | | ( 16.75) | 32.63 |
| 12/08/2004 | CRS SAL ORD #703066 | | ( 8.98) | 23.65 |
| 12/09/2004 | CRS SAL ORD #703354 | | ( 19.28) | 4.37 |
| 12/11/2004 | CRS SAL ORD #704134 | | ( 3.65) | 0.72 |

06/27/2005 14:25

DEPARTMENT OF CORRECTIONS                                    Page    2 Of   8

AMBER

MOUNT OLIVE CORRECTIONAL COMPLEX                             OTRTASTA

T R U S T   A C C O U N T   S T A T E M E N T

DOC#  : 0000013734      Name: MOSS, JOHN JR.                 BKG#      1998520

LOCATION:  MOCC-ELM

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|------|-------------------------|-----------|-----------------|---------|
| 12/13/2004 | Postal Receipt  J EDDENS | | 20.00 | 20.72 |
| 12/13/2004 | CRS SAL ORD #704719 | | ( 15.80) | 4.92 |
| 12/15/2004 | CEC SAL ORD #700795 | | 0.96 | 5.88 |
| 12/16/2004 | CRS SAL ORD #705178 | | ( 3.70) | 2.18 |
| 12/16/2004 | I TO I | | 22.50 | 24.68 |
| 12/16/2004 | I TO I | | 31.50 | 56.18 |
| 12/16/2004 | I TO I | | 27.00 | 83.18 |
| 12/16/2004 | I TO I | | 31.50 | 114.68 |
| 12/16/2004 | SS | | ( 22.00) | 92.68 |
| 12/16/2004 | CRS SAL ORD #705452 | | ( 7.55) | 85.13 |
| 12/16/2004 | CRS SAL ORD #705468 | | ( 22.90) | 62.23 |
| 12/16/2004 | CRS SAL ORD #705495 | | ( 11.96) | 50.27 |
| 12/16/2004 | CRS SAL ORD #705496 | | ( 3.70) | 46.57 |
| 12/19/2004 | CRS SAL ORD #706219 | | ( 20.73) | 25.84 |
| 12/19/2004 | CRS SAL ORD #706322 | | ( 21.10) | 4.74 |
| 12/19/2004 | CRS SAL ORD #706509 | | ( 2.62) | 2.12 |
| 12/22/2004 | CRS SAL ORD #707618 | | ( 0.66) | 1.46 |
| 12/23/2004 | Postal Receipt  D MASON 034424 | | 100.00 | 101.46 |
| 12/23/2004 | CRS SAL ORD #708107 | | ( 14.09) | 87.37 |
| 12/26/2004 | CRS SAL ORD #708541 | | ( 11.19) | 76.18 |
| 12/26/2004 | CRS SAL ORD #708550 | | ( 2.34) | 73.84 |
| 12/26/2004 | CRS SAL ORD #708596 | | ( 0.66) | 73.18 |
| 12/27/2004 | Postal Receipt  W GARRETT 134542 | | 10.00 | 83.18 |
| 12/27/2004 | Postal Receipt  C GALLOWAY 134620 | | 25.00 | 108.18 |
| 12/27/2004 | CRS SAL ORD #709016 | | ( 14.97) | 93.21 |
| 12/28/2004 | CRS SAL ORD #709365 | | ( 8.12) | 85.09 |
| 12/29/2004 | CRS SAL ORD #709797 | | ( 11.77) | 73.32 |
| 12/30/2004 | CRS SAL ORD #710126 | | ( 23.27) | 50.05 |
| 01/02/2005 | CRS SAL ORD #711201 | | ( 6.47) | 43.58 |
| 01/02/2005 | KLOCK IT | | ( 14.45) | 29.13 |
| 01/02/2005 | CRS SAL ORD #711844 | | ( 2.21) | 26.92 |
| 01/05/2005 | CRS SAL ORD #711994 | | ( 12.84) | 14.08 |
| 01/06/2005 | I TO I | | 31.50 | 45.58 |
| 01/06/2005 | CRS SAL ORD #712221 | | ( 5.43) | 40.15 |

06/27/2005 14:25                  DEPARTMENT OF CORRECTIONS                  Page    3 Of   8

AMBER                        MOUNT OLIVE CORRECTIONAL COMPLEX                          OTRTASTA

                    T R U S T    A C C O U N T    S T A T E M E N T

DOC#  : 0000013734     Name: MOSS, JOHN JR.                    BKG#      1998520

LOCATION:  MOCC-ELM

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|------|------------------------|-----------|-----------------|---------|
| 01/06/2005 | CRS SAL ORD #712519 | | ( 4.51) | 35.64 |
| 01/08/2005 | CRS SAL ORD #712995 | | ( 11.62) | 24.02 |
| 01/08/2005 | CRS SAL ORD #713243 | | ( 2.96) | 21.06 |
| 01/09/2005 | CRS SAL ORD #713640 | | ( 4.03) | 17.03 |
| 01/09/2005 | CRS SAL ORD #713641 | | ( 0.69) | 16.34 |
| 01/10/2005 | CRS SAL ORD #713830 | | ( 2.51) | 13.83 |
| 01/11/2005 | CRS SAL ORD #714163 | | ( 9.12) | 4.71 |
| 01/11/2005 | CRS SAL ORD #714187 | | ( 3.05) | 1.66 |
| 01/12/2005 | CRS SAL ORD #714335 | | ( 1.63) | 0.03 |
| 01/18/2005 | Postal Receipt ?   30 | | 15.00 | 15.03 |
| 01/18/2005 | CRS SAL ORD #716662 | | ( 12.39) | 2.64 |
| 01/18/2005 | CRS SAL ORD #716668 | | ( 2.15) | 0.49 |
| 01/18/2005 | CRS SAL ORD #716669 | | ( 0.28) | 0.21 |
| 01/20/2005 | Other Receipt SS | | 21.15 | 21.36 |
| 0:    '2005 | Other Receipt SS | | 64.80 | 86.16 |
| 01/20/2005 | ELSWICK LUMBER | | ( 84.95) | 1.21 |
| 01/25/2005 | Other Receipt STAFF SALES | | 2.70 | 3.91 |
| 01/26/2005 | CRS SAL ORD #719314 | | ( 3.34) | 0.57 |
| 01/26/2005 | CRS SAL ORD #719330 | | ( 0.43) | 0.14 |
| 02/03/2005 | Other Receipt STAFF SALES | | 16.98 | 17.12 |
| 02/03/2005 | Other Receipt STAFF SALES | | 25.20 | 42.32 |
| 02/03/2005 | SS | | ( 25.00) | 17.32 |
| 02/03/2005 | CRS SAL ORD #721799 | | ( 16.96) | 0.36 |
| 02/07/2005 | Postal Receipt  C.GALLOWAY 661 | | 30.00 | 30.36 |
| 02/08/2005 | Other Receipt STAFF SALES | | 2.74 | 33.10 |
| 02/09/2005 | CRS SAL ORD #723573 | | ( 17.29) | 15.81 |
| 02/09/2005 | CRS SAL ORD #723579 | | ( 4.14) | 11.67 |
| 02/10/2005 | Other Receipt STAFF SALES | | 13.50 | 25.17 |
| 02/10/2005 | SS | | ( 10.00) | 15.17 |
| 02/  /2005 | CRS SAL ORD #723840 | | ( 13.57) | 1.60 |
| 02    2005 | CRS SAL ORD #724645 | | ( 1.52) | 0.08 |
| 02/16/2005 | I TO I | | 31.50 | 31.58 |
| 02/16/2005 | CRS SAL ORD #725622 | | ( 8.99) | 22.59 |
| 02/16/2005 | CRS SAL ORD #725652 | | ( 6.75) | 15.84 |

06/27/2005 14:25          DEPARTMENT OF CORRECTIONS          Page    4  Of   8

AMBER                 MOUNT OLIVE CORRECTIONAL COMPLEX                    OTRTASTA

                T R U S T   A C C O U N T   S T A T E M E N T

DOC#  : 0000013734     Name: MOSS, JOHN JR.                 BKG#      1998520

LOCATION:   MOCC-ELM

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|------|------------------------|-----------|-----------------|---------|
| 02/17/2005 | Other Receipt STAFF SALES | | 31.50 | 47.34 |
| 02/17/2005 | I TO I | | 31.50 | 78.84 |
| 02/17/2005 | SS | | ( 20.00) | 58.84 |
| 02/18/2005 | Postal Receipt C,GALLOWAY   1244 | | 30.00 | 88.84 |
| 02/19/2005 | CRS SAL ORD #726388 | | ( 3.71) | 85.13 |
| 02/19/2005 | CRS SAL ORD #726395 | | ( 34.96) | 50.17 |
| 02/19/2005 | CRS SAL ORD #726480 | | ( 19.31) | 30.86 |
| 02/19/2005 | CRS SAL ORD #726500 | | ( 1.81) | 29.05 |
| 02/19/2005 | CRS SAL ORD #726661 | | ( 2.41) | 26.64 |
| 02/21/2005 | CRS SAL ORD #727340 | | ( 7.77) | 18.87 |
| 02/22/2005 | Postal Receipt J.EDDENS   1300 | | 15.00 | 33.87 |
| 02/22/2005 | Other Receipt STAFF SALES | | 18.00 | 51.87 |
| 02/22/2005 | I TO I | | 54.00 | 105.87 |
| 02/23/2005 | CRS SAL ORD #727982 | | ( 4.18) | 101.69 |
| 0:    2005 | CRS SAL ORD #728067 | | ( 6.19) | 95.50 |
| 02/24/2005 | SS | | ( 45.00) | 50.50 |
| 02/24/2005 | CRS SAL ORD #728225 | | ( 9.64) | 40.86 |
| 02/24/2005 | CRS SAL ORD #728227 | | ( 5.46) | 35.40 |
| 02/24/2005 | CRS SAL ORD #728251 | | ( 4.51) | 30.89 |
| 02/24/2005 | CRS SAL ORD #728420 | | ( 8.04) | 22.85 |
| 02/27/2005 | CRS SAL ORD #729501 | | ( 3.16) | 19.69 |
| 03/01/2005 | CRS SAL ORD #730001 | | ( 3.85) | 15.84 |
| 03/01/2005 | CRS SAL ORD #730004 | | ( 1.13) | 14.71 |
| 03/02/2005 | CRS SAL ORD #730210 | | ( 8.98) | 5.73 |
| 03/03/2005 | Other Receipt STAFF SALES | | 27.00 | 32.73 |
| 03/03/2005 | CRS SAL ORD #730514 | | ( 8.02) | 24.71 |
| 03/03/2005 | CRS SAL ORD #730686 | | ( 11.59) | 13.12 |
| 03/03/2005 | CRS SAL ORD #730714 | | ( 1.86) | 11.26 |
| 03/07/2005 | Postal Receipt C.GALLOWAY  1812 | | 100.00 | 111.26 |
| 03/08/2005 | CRS SAL ORD #731901 | | ( 17.06) | 94.20 |
| 03    2005 | CEC SAL ORD #731901 | | 2.73 | 96.93 |
| 03/09/2005 | SS | | ( 15.00) | 81.93 |
| 03/09/2005 | SS | | ( 5.18) | 76.75 |
| 03/09/2005 | ARMOR CRAFTS | | ( 7.90) | 68.85 |
| 03/09/2005 | CRS SAL ORD #732210 | | ( 14.03) | 54.82 |



06/27/2005 14:25      DEPARTMENT OF CORRECTIONS      Page   5   Of   8

AMBER         MOUNT OLIVE CORRECTIONAL COMPLEX         OTRTASTA

T R U S T    A C C O U N T    S T A T E M E N T

DOC# : 0000013734     Name: MOSS, JOHN JR.        BKG#     1998520

LOCATION:   MOCC-ELM

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|---|---|---|---|---|
| 03/09/2005 | CEC SAL ORD #732210 | | 1.32 | 56.14 |
| 03/10/2005 | I TO I | | ( 9.00) | 47.14 |
| 03/10/2005 | 10% A&C | | ( 1.00) | 46.14 |
| 03/10/2005 | SALES TAX | | ( 0.60) | 45.54 |
| 03/10/2005 | CRS SAL ORD #732509 | | ( 7.58) | 37.96 |
| 03/10/2005 | CRS SAL ORD #732512 | | ( 1.61) | 36.35 |
| 03/10/2005 | CRS SAL ORD #732707 | | ( 4.17) | 32.18 |
| 03/12/2005 | CRS SAL ORD #733151 | | ( 7.83) | 24.35 |
| 03/13/2005 | CRS SAL ORD #733586 | | ( 5.54) | 18.81 |
| 03/14/2005 | CRS SAL ORD #733883 | | ( 3.81) | 15.00 |
| 03/15/2005 | Postal Receipt J EDDENS 2196 | | 15.00 | 30.00 |
| 03/15/2005 | Other Receipt STAFF SALES | | 27.00 | 57.00 |
| 03/15/2005 | SS | | ( 33.98) | 23.02 |
| 03/17/2005 | CRS SAL ORD #734634 | | ( 19.68) | 3.34 |
| 0:  /2005 | CRS SAL ORD #735736 | | ( 2.88) | 0.46 |
| 03/22/2005 | Other Receipt STAFF SALES | | 9.00 | 9.46 |
| 03/22/2005 | CRS SAL ORD #736346 | | ( 4.64) | 4.82 |
| 03/22/2005 | I TO I | | 31.50 | 36.32 |
| 03/22/2005 | CRS SAL ORD #736432 | | ( 9.55) | 26.77 |
| 03/22/2005 | CRS SAL ORD #736447 | | ( 8.56) | 18.21 |
| 03/23/2005 | Postal Receipt C GALLOWAY 2522 | | 40.00 | 58.21 |
| 03/23/2005 | CRS SAL ORD #736523 | | ( 5.99) | 52.22 |
| 03/23/2005 | CRS SAL ORD #736529 | | ( 2.22) | 50.00 |
| 03/24/2005 | CRS SAL ORD #737026 | | ( 11.10) | 38.90 |
| 03/24/2005 | Postage Draw 3/24/2005 | | ( 0.05) | 38.85 |
| 03/24/2005 | CRS SAL ORD #737111 | | ( 17.38) | 21.47 |
| 03/24/2005 | CRS SAL ORD #737249 | | ( 2.58) | 18.89 |
| 03/24/2005 | CRS SAL ORD #737253 | | ( 2.70) | 16.19 |
| 03/26/2005 | CRS SAL ORD #737752 | | ( 8.30) | 7.89 |
| 03/28/2005 | Postage Draw 3/28/2005 | | ( 0.23) | 7.66 |
| 0:  /2005 | CRS SAL ORD #738265 | | ( 6.43) | 1.23 |
| 03/28/2005 | CRS SAL ORD #738332 | | ( 0.66) | 0.57 |
| 03/29/2005 | Postal Receipt D MASON 2679 | | 50.00 | 50.57 |
| 03/29/2005 | CRS SAL ORD #738605 | | ( 5.01) | 45.56 |
| 03/29/2005 | CRS SAL ORD #738607 | | ( 1.12) | 44.44 |

06/27/2005 14:25                     DEPARTMENT OF CORRECTIONS                        Page    6   of   8

AMBER                            MOUNT OLIVE CORRECTIONAL COMPLEX                         OTRTASTA

                          T R U S T    A C C O U N T    S T A T E M E N T


DOC#  : 0000013734        Name:  MOSS, JOHN JR.                      BKG#       1998520
LOCATION:   MOCC-ELM


| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|---|---|---|---|---|
| 03/29/2005 | CRS SAL ORD #738667 | | ( 3.05) | 41.39 |
| 03/30/2005 | CRS SAL ORD #738921 | | ( 2.77) | 38.62 |
| 03/30/2005 | CRS SAL ORD #738995 | | ( 2.65) | 35.97 |
| 03/31/2005 | CRS SAL ORD #739348 | | ( 9.16) | 26.81 |
| 03/31/2005 | CRS SAL ORD #739491 | | ( 5.02) | 21.79 |
| 04/01/2005 | Other Receipt  STAFF SALES | | 30.00 | 51.79 |
| 04/02/2005 | CRS SAL ORD #740122 | | ( 14.97) | 36.82 |
| 04/05/2005 | Postal Receipt A,GIBSON  2940 | | 20.00 | 56.82 |
| 04/05/2005 | SS | | ( 10.00) | 46.82 |
| 04/05/2005 | I TO I | | 36.00 | 82.82 |
| 04/05/2005 | REV GL#983370 INCORRECT AMOUNT | | ( 30.00) | 52.82 |
| 04/05/2005 | Other Rept. STAFF SALES 4/1/05 CORRECTED | | 27.00 | 79.82 |
| 04/05/2005 | CRS SAL ORD #740689 | | ( 5.18) | 74.64 |
| 04/  /2005 | CRS SAL ORD #742864 | | ( 10.75) | 63.89 |
| 04.   2005 | CRS SAL ORD #743040 | | ( 8.45) | 55.44 |
| 04/11/2005 | CRS SAL ORD #743043 | | ( 7.32) | 48.12 |
| 04/12/2005 | Postal Receipt ?  3310 | | 15.00 | 63.12 |
| 04/12/2005 | Other Receipt  STAFF SALES | | 10.80 | 73.92 |
| 04/12/2005 | SS | | ( 10.00) | 63.92 |
| 04/12/2005 | CRS SAL ORD #743371 | | ( 10.28) | 53.64 |
| 04/13/2005 | CRS SAL ORD #743630 | | ( 12.42) | 41.22 |
| 04/13/2005 | CRS SAL ORD #743635 | | ( 0.96) | 40.26 |
| 04/14/2005 | CRS SAL ORD #743938 | | ( 7.98) | 32.28 |
| 04/15/2005 | Other Receipt STAFF SALES | | 34.20 | 66.48 |
| 04/16/2005 | CRS SAL ORD #744852 | | ( 8.07) | 58.41 |
| 04/16/2005 | CRS SAL ORD #744894 | | ( 5.00) | 53.41 |
| 04/18/2005 | CRS SAL ORD #745645 | | ( 7.25) | 46.16 |
| 04/18/2005 | CRS SAL ORD #745650 | | ( 6.21) | 39.95 |
| 04/18/2005 | CRS SAL ORD #745827 | | ( 8.43) | 31.52 |
| 04/  /2005 | SS | | ( 5.18) | 26.34 |
| 04.   2005 | CRS SAL ORD #746670 | | ( 7.20) | 19.14 |
| 04/21/2005 | CRS SAL ORD #746972 | | ( 9.75) | 9.39 |
| 04/24/2005 | CRS SAL ORD #748023 | | ( 4.50) | 4.89 |
| 04/25/2005 | CRS SAL ORD #748491 | | ( 3.96) | 0.93 |

```
06/27/2005 14:25          DEPARTMENT OF CORRECTIONS          Page     7  of  8
AMBER              MOUNT OLIVE CORRECTIONAL COMPLEX              OTRTASTA
              T R U S T   A C C O U N T   S T A T E M E N T

DOC# : 0000013734    Name: MOSS, JOHN JR.              BKG#      1998520
LOCATION:  MOCC-ELM
```

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|---|---|---|---|---|
| 04/28/2005 | CRS SAL ORD #749431 | | ( 0.52) | 0.41 |
| 04/29/2005 | Postal Receipt C GALLOWAY 3911 | | 50.00 | 50.41 |
| 04/30/2005 | CRS SAL ORD #749928 | | ( 30.42) | 19.99 |
| 04/30/2005 | CRS SAL ORD #749934 | | ( 0.16) | 19.83 |
| 05/01/2005 | CRS SAL ORD #750508 | | ( 2.20) | 17.63 |
| 05/03/2005 | CRS SAL ORD #750828 | | ( 3.28) | 14.35 |
| 05/04/2005 | CRS SAL ORD #751200 | | ( 8.64) | 5.71 |
| 05/05/2005 | CRS SAL ORD #751590 | | ( 4.02) | 1.69 |
| 05/09/2005 | CRS SAL ORD #753133 | | ( 0.90) | 0.79 |
| 05/10/2005 | Other Receipt S STAFF SALES | | 4.95 | 5.74 |
| 05/10/2005 | I TO I | | 9.00 | 14.74 |
| 05/10/2005 | I TO I | | 31.50 | 46.24 |
| 05/10/2005 | I TO I | | 31.50 | 77.74 |
| 05/10/2005 | SS | | ( 15.00) | 62.74 |
| 05   2005 | MEISEL HARDWARE | | ( 7.59) | 55.15 |
| 05/10/2005 | GRIZZLY INDUSTRILS | | ( 16.45) | 38.70 |
| 05/10/2005 | MLCS LIMITED | | ( 9.50) | 29.20 |
| 05/10/2005 | CRS SAL ORD #753544 | | ( 15.77) | 13.43 |
| 05/11/2005 | CRS SAL ORD #753836 | | ( 3.57) | 9.86 |
| 05/12/2005 | CRS SAL ORD #754209 | | ( 4.66) | 5.20 |
| 05/12/2005 | CRS SAL ORD #754221 | | ( 4.47) | 0.73 |
| 05/16/2005 | I TO I | | 31.50 | 32.23 |
| 05/16/2005 | I TO I | | ( 10.80) | 21.43 |
| 05/16/2005 | 10%A&C | | ( 1.20) | 20.23 |
| 05/16/2005 | SALES TAX | | ( 0.72) | 19.51 |
| 05/17/2005 | Postal Receipt J EDDENS 2769 | | 15.00 | 34.51 |
| 05/18/2005 | CRS SAL ORD #756069 | | ( 10.39) | 24.12 |
| 05/18/2005 | CRS SAL ORD #756381 | | ( 5.97) | 18.15 |
| 05/18/2005 | CRS SAL ORD #756387 | | ( 2.44) | 15.71 |
| 05/19/2005 | Postage Draw5/19/2005 | | ( 7.77) | 7.94 |
| 05   2005 | CRS SAL ORD #757288 | | ( 7.53) | 0.41 |
| 05/23/2005 | Other Receipt STAFF SALES | | 31.50 | 31.91 |
| 05/23/2005 | Other Receipt STAFF SALES | | 18.00 | 49.91 |
| 05/23/2005 | CRS SAL ORD #758322 | | ( 5.52) | 44.39 |
| 05/24/2005 | CRS SAL ORD #758493 | | ( 0.52) | 43.87 |

15

06/27/2005 14:25

DEPARTMENT OF CORRECTIONS

Page 8 of 8

MOUNT OLIVE CORRECTIONAL COMPLEX

OTRTASTA

NUMBER

T R U S T   A C C O U N T   S T A T E M E N T

DOC#  : 0000013734     Name: MOSS, JOHN JR.

BKG#      1998520

LOCATION:  MOCC-ELM

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|------|------------------------|-----------|-----------------|---------|
| 05/24/2005 | CRS SAL ORD #758690 | | ( 4.71) | 39.16 |
| 05/24/2005 | CRS SAL ORD #758695 | | ( 0.91) | 38.25 |
| 05/24/2005 | CRS SAL ORD #758777 | | ( 3.10) | 35.15 |
| 05/24/2005 | CRS SAL ORD #758779 | | ( 2.71) | 32.44 |
| 05/25/2005 | CRS SAL ORD #759047 | | ( 9.41) | 23.03 |
| 05/26/2005 | CRS SAL ORD #759431 | | ( 5.24) | 17.79 |
| 05/26/2005 | CRS SAL ORD #759737 | | ( 6.13) | 11.66 |
| 05/28/2005 | CRS SAL ORD #760251 | | ( 4.68) | 6.98 |
| 05/28/2005 | CRS SAL ORD #760261 | | ( 4.66) | 2.32 |
| 05/31/2005 | CRS SAL ORD #761240 | | ( 1.47) | 0.85 |
| | | | 30.00 | 30.85 |
| 06/03/2005 | Postal Receipt C.GALLOWAY   3311 | | | 21.23 |
| 06/04/2005 | CRS SAL ORD #762488 | | ( 9.62) | 18.36 |
| 06/04/2005 | CRS SAL ORD #762489 | | ( 2.87) | 14.71 |
| 06/ /2005 | CRS SAL ORD #762568 | | ( 3.65) | 9.44 |
| 06 /2005 | CRS SAL ORD #763241 | | ( 5.27) | 3.15 |
| 06/07/2005 | CRS SAL ORD #763831 | | ( 6.29) | 0.00 |
| 06/08/2005 | CRS SAL ORD #764111 | | ( 3.15) | 25.00 |
| 06/14/2005 | Postal Receipt C.GALLOWAY   4054 | | 25.00 | 45.00 |
| 06/14/2005 | Postal Receipt J.EDDENS   4084 | | 20.00 | 19.27 |
| 06/14/2005 | CRS SAL ORD #766341 | | ( 25.73) | 12.61 |
| 06/14/2005 | CRS SAL ORD #766372 | | ( 6.66) | 9.63 |
| 06/14/2005 | CRS SAL ORD #766384 | | ( 2.98) | 8.97 |
| 06/14/2005 | CRS SAL ORD #766387 | | ( 0.66) | 40.47 |
| 06/15/2005 | I TO I | | 31.50 | 37.47 |
| 06/15/2005 | Media Lab PHOTOS | | ( 3.00) | 46.47 |
| 06/17/2005 | I TO I | | 9.00 | 35.50 |
| 06/19/2005 | CRS SAL ORD #767811 | | ( 10.97) | 31.75 |
| 06/19/2005 | CRS SAL ORD #767959 | | ( 3.75) | 23.47 |
| 06/19/2005 | CRS SAL ORD #767961 | | ( 8.28) | 22.56 |
| 06/ 9/2005 | CRS SAL ORD #767962 | | ( 0.91) | 21.18 |
| 0 /2005 | CRS SAL ORD #768760 | | ( 1.38) | 0.83 |
| 06/23/2005 | SUPPLY ORDER ELSWICK LUMBER | | ( 20.35) | |

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED

2005 JUL -7  AM 9: 24

CATHY S. GATSON, CLERK
KANAWHA CO. CIRCUIT COURT

STATE OF WEST VIRGINIA, EX REL.
JOHN MOSS, III,

       Petitioner,

vs.

       Civil Action No. 05-MISC-298
       Underlying Proceedings CR-82-F-221

THOMAS McBRIDE, Warden,
Mount Olive Correctional Complex,

       Respondent.

---

## FACTS AND MEMORANDUM IN SUPPORT OF PETITION UNDER § 53-4A-1 FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM

Respectfully submitted:

John Moss, III
Mount Olive Correctional Complex
One Mountainside Way
Mt. Olive, WV  25185
MOCC Telephone: 304.442.7213

On this, the 29th day of June, 2005.

Petitioner proceeding *pro se*.

# INDEX

ITEM                                                                                                    PAGE

I.      INTRODUCTION AND JURISDICTION                                                                     1

II.     STATEMENT OF THE CASE                                                                             2

III.    CONTENTIONS PRESENTED                                                                            9

        a.      THE TRIAL COURT ABUSED ITS DISCRETION AND
                COMMITTED REVERSIBLE ERROR IN RULING THAT THE
                FIRST TWO CONFESSIONS WERE ADMISSIBLE UNDER
                THE "LAW OF THE CASE DOCTRINE."                                                          10

        b.      THE FACTUAL DETERMINATION BY THE WEST VIRGINIA
                SUPREME COURT OF APPEALS THAT NO PROMPT
                PRESENTMENT OBJECTIONS WERE ENTERED ON THE
                FIRST TWO ALLEGED CONFESSIONS IS CLEARLY
                ERRONEOUS AND WORKS MANIFEST INJUSTICE.                                                  17

        c.      PETITIONER WAS DEPRIVED OF THE SIXTH
                AMENDMENT'S GUARANTEE OF THE EFFECTIVE
                ASSISTANCE OF COUNSEL:                                                                   19

        d.      PETITIONER DID NOT RECEIVE A FULL AND FAIR
                HEARING ON HIS MOTION AND MEMORANDUM TO
                SUPPRESS SAMPLES OF BLOOD, CONFESSION, AND
                OTHER PHYSICAL EVIDENCE SEIZED DUE TO THE
                IMPROPER TACTICS OF FRED S. ZAIN AND THE WEST
                VIRGINIA STATE POLICE TROOPERS AND CRIME
                LABORATORY.                                                                              23

        e.      PETITIONER'S SIXTH AMENDMENT RIGHT TO A FAIR
                TRIAL AND IMPARTIAL JURY WAS CONTRAVENED
                WHEN THE STATE KNEW, OR SHOULD HAVE KNOWN,
                OF THE FALSE OR MISLEADING TESTIMONY AND
                EVIDENCE PRESENTED BY A STATE WITNESS.                                                   25

        f.      THE TRIAL COURT ABUSED ITS DISCRETION AND
                COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED
                PETITIONER'S CONFESSIONS OF THE REGGETTZ
                MURDERS INTO EVIDENCE.                                                                   25

        g.      IMPROPER CLOSING ARGUMENTS BY THE
                PROSECUTION DENIED THE PETITIONER A FAIR TRIAL.                                          30

IV.     CONCLUSION                                                                                       33

V.      PRAYER FOR RELIEF                                                                                33

VI.     VERIFICATION                                                                                     34

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2005 JUL -7 AM 9: 24

CATHY S. GATSON, CLERK
KANAWHA CO. CIRCUIT COURT

STATE OF WEST VIRGINIA, EX REL.
JOHN MOSS, III,

Petitioner,

vs.

Civil Action No. 05-MISC-298
Underlying Proceedings CR-82-F-221

THOMAS McBRIDE, Warden,
Mount Olive Correctional Complex,

Respondent.

FACTS AND MEMORANDUM IN SUPPORT OF PETITION UNDER
§ 53-4A-1 FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM

I. INTRODUCTION AND JURISDICTION

Comes now the petitioner, John Moss, III, *pro se*, and moves this Honorable Court to issue an order that sets aside and voids Petitioner's three life sentences without mercy for three counts of first degree murder as they are in violation of the rights secured to this petitioner through the Constitutions of the United States and the State of West Virginia. Other than a "Special Zain" habeas, this is Petitioner's first state application for post conviction relief. This Court has jurisdiction to rule upon this Petition for Writ of Habeas Corpus Ad-Subjiciendum pursuant to *West Virginia Code*, Chapter 53, Article 4A, Section 1, *et seq.*, and the *Rules Governing Post-Conviction Habeas Corpus Proceedings In West Virginia*. Moreover, a habeas petitioner is entitled to careful consideration of his grounds for relief, and the court before which the writ is made returnable has a duty to provide whatever facilities and procedures are necessary to afford the petitioner an adequate opportunity to demonstrate his entitlement to relief. Syllabus Point 5, *Gibson v. Dale*, 173 W.Va. 681, 391 S.E.2d 806 (1984).

Additionally, the West Virginia Supreme Court of Appeals (hereinafter WVSCA) refused to review several of Petitioner's contentions herein that were previously presented on appeal in his 14 January, 1991, petition on appeal, as well as his 23 February, 1991, supplemental petition. Those contentions can be reiterated in this petition for writ of habeas corpus ad subjiciendum, whereas the refusal by the WVSCA to review Petitioner's contentions of error on appeal was not effectively an adjudication on the merits of said

- 1 -

contentions.  Therefore, the court should not utilize the doctrine of *res judicata* to summarily dismiss the contentions as being previously and finally adjudicated.

The WVSCA opined the following in *Smith v. Hedrick*, 181 W.Va. 394, 382 S.E.2d 588 (1989):

> This Court's rejection of a petition for appeal is not a decision on the merits precluding all future consideration of the issues raised therein, unless, as stated in Rule 7 of the West Virginia Rules of Appellate Procedure, such petition is rejected because the lower court's judgment or order is plainly right, in which case no other petition for appeal shall be permitted.

Petitioner avers his 1991 petitions on appeal were not rejected by the WVSCA because the lower court's judgment was plainly right and, therefore, this court should give careful consideration to his contentions including writing clear and detailed findings of facts and conclusions of law on each contention raised and stating whether a state or federal constitutional issue was raised. *W.Va. Code* § 53-4A-7; *Losh v. McKenzie*, 277 S.E.2d 606 (W.Va. 1984).

## II. STATEMENT OF THE CASE

In December, 1979, a woman and her two children were found dead in their St. Albans, West Virginia home.  Soon afterward, the deceased woman's husband, Paul Reggettz, III, became a suspect in the triple murders and actually confessed to the crimes. He was subsequently indicted by the January, 1980, term of the Kanawha County, West Virginia Grand Jury.  The body of the indictment also named John Moss.  The husband was held in custody for approximately eleven months, during which time his confession was ruled admissible into evidence as voluntarily given.  Mr. Reggettz's trial was set for November 12, 1980.

Petitioner became involved in the case when Petitioner's uncle, who was in law enforcement at one time, offered his opinion that his nephew may know something about the crimes due to living in the neighborhood.  As a result of the information offered by the uncle, in January, 1980, investigating authorities traveled to Cleveland, Ohio, to question Petitioner about the murders.  At that time, Petitioner was housed in a juvenile detention center on an unrelated charge.  Petitioner denied committing the murders or having any knowledge of them.  However, the two law enforcement personnel demanded that Petitioner provide them a blood sample, even though they had no warrant, no court order and had not discussed it with Petitioner's parents or Ohio court appointed counsel.  The troopers directed him to prick his own finger and dribble blood on a cloth provided by the officers for that purpose.  Petitioner complied and gave the Troopers what they demanded because he "had nothing to hide."



At the time of this first interrogation and relinquishment of physical evidence, Petitioner was only seventeen years old, a fact the two troopers were not uncognizant of. When Petitioner's Ohio counsel learned of the blood sample taken by the West Virginia authorities, he objected and petitioned an Ohio court for an order that the cloth on which the blood sample was deposited be returned to Petitioner. The Ohio court granted counsel's request and ordered that the blood soaked cloth be returned. However, it was never returned to Petitioner and authorities cannot affirmatively demonstrate what became of the cloth or the blood samples smeared on it. Nor did they demonstrate that, if something was returned, was only part of it returned, what was on whatever was returned, i.e., no testing was conducted to determine if, whatever it was the two troopers avowed was returned, it contained Petitioner's blood sample he relinquished, animal blood, ink, or some other substance resembling blood.

In an opinion written by the West Virginia Supreme Court on an appeal taken pretrial by Petitioner from a final order of the Circuit Court, Kanawha County, West Virginia, John Hey, C.J., transferring the juvenile Petitioner to adult jurisdiction, the Court stated that the blood soaked cloth was "apparently" [returned]; *In the Interest of John Moss, Jr.*, 295 S.E.2d 33, 36 (W.Va. 1982). However, it is unclear how the court reached this conclusion as the record does not support it (6/29/81 Juvenile Transfer Hearing Transcript). Nevertheless, in spite of Petitioner's assertions that the cloth was never returned to him and contrary to Petitioner's wishes, counsel adopted the state supreme court's erroneous postulation and failed to develop this erroneous fact in the lower proceedings. It is also noteworthy here that Judge Hey, who presided over the juvenile transfer proceedings and first trial, was forced to resign his position in disgrace when it was demonstrated that he was routinely inebriated while sitting on the bench.

In April 1980, the investigating authorities again traveled to Cleveland to obtain a blood sample from Petitioner pursuant to an order issued by an Ohio court. Based on the alleged analysis by West Virginia State Police Crime Laboratory Serologist, Fred Salem Zain, on 26 September, 1980, West Virginia filed a detainer against Petitioner, pursuant to W.Va. Code § 62-14-1 *et seq.,* requesting that a juvenile be held, based on a malicious wounding charge unrelated to the murders. Petitioner at this time was serving a term imposed by Ohio on unrelated charges.

On 28 October, 1980, ostensibly while being transported to West Virginia by members of the Department of Public Safety to answer the malicious wounding charge although they were the chief investigating authorities in the Reggettz murders, a confession was coerced out of the seventeen-year-old boy. On that same date, a tape recorded confession was then made after Petitioner signed a Miranda waiver. (First and second confessions.) However, Petitioner was not brought before a juvenile referee, magistrate or judicial officer at that time to

have the waiver explained to him.  It is interesting to note that the adult suspect, Paul Reggettz, Sr., *was* promptly presented to a magistrate by the same troopers who traveled to Ohio to illegally extract Petitioner's blood and then on 28 October, 1980, wherein they obtained his "confessions."  This is an indication that the actions by the West Virginia authorities were intentionally designed to intimidate and coerce the juvenile.

On 30 October, 1980, Petitioner was returned to Ohio by two different members of the West Virginia State Police, Troopers Woodyard and Allen.  These two troopers also asserted Petitioner just all of a sudden wished to discuss further details of the crime which he had not previously told authorities.  (Third confession.)  It is clear from the evidence presented in this case that seldom, if ever, are investigations afforded such a reflective and considerate suspect as the four troopers, who transported the forlorn juvenile, encountered with Petitioner. Perhaps it was the two scenic car rides the troopers so graciously presented him with that induced him to make their jobs so easy as to voluntarily provide them with so much vital information.  It has always been a subject of contemplation why it was only during these car rides did any authority allege Petitioner wished to "confess."  For example, of all the authorities Petitioner came into contact with; his Ohio attorney, the Ohio juvenile facility staff, Kanawha County Jail personnel, etc., he chose to confess only to the troopers who transported him. Perhaps it was the solitary surroundings the young suspect encountered with the burly troopers.

Be that as it may, on 2 November, 1980, a second detainer was filed by West Virginia against Petitioner, again requesting that a juvenile be held, based on a charge of three counts of first degree murder.  On 18 December, 1980, Petitioner was again transported from the Ohio State Reformatory to the Kanawha County Jail.  A preliminary hearing was set for 24 December, 1980, but as a result of motions for continuance made by the defense, the hearing was not held until 12 January, 1981, at which time probable cause was found by the juvenile referee who then referred Petitioner to the juvenile jurisdiction of the Circuit Court.

On 20 January, 1981, West Virginia filed a motion to have Petitioner transferred to the criminal jurisdiction of the circuit court and tried as an adult.  Continuances were granted on defense's several motions to allow for psychological and psychiatric evaluation, etc., and a transfer hearing was held on 29 June, 1981.  After protracted litigation, at a 6 August, 1981 hearing, the court issued from the bench its decision to transfer Petitioner to adult status.  On 13 August, 1981, West Virginia presented its case against Petitioner to the grand jury, which returned an indictment charging him with three counts of murder in the first degree.

Prior to trial, defense counsel filed a *Motion To Suppress* Petitioner's alleged confessions and a hearing was held on Petitioner's motion.  After another prolonged period of time within which issues pertaining to the state's transfer proceedings were litigated, another

indictment was returned, on or about 30 September, 1982, again charging Petitioner with three counts of first degree murder. Trial was commenced on 21 March, 1984, wherein Petitioner was convicted of three counts of first degree murder without receiving a recommendation of mercy.

After considering and denying defense post trial motions, a petition for appeal was filed on Petitioner's behalf with the West Virginia Supreme Court of Appeals. In *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988), the West Virginia Supreme Court reversed Petitioner's convictions because; (1) [T]he trial judge committed reversible error when he refused to poll the jurors; (2) [M]anifest injustice resulted from the prosecutor's remarks; and, (3) [T]he introduction of the husband's polygraph test results in this instance was so prejudicial that the trial court's instruction not to consider such evidence was insufficient to cure the error... .

Though not adjudicative of the WVSCA's decision to reverse Petitioner's first convictions, they nonetheless wrote on the issue on appeal of the West Virginia authorities' failure to promptly present the juvenile defendant to a neutral judicial officer upon being taken into custody. The Court ruled that had objections been made on the first two confessions the decision in *Ellsworth J.R.*, 331 S.E.2d 503 (W.Va. 1985) would have been retroactively applied and they, like the third confession, would have been inadmissible.

After various pretrial proceedings, including a hearing on defense counsel's motion for the suppression of Petitioner's alleged confessions on the basis of authorities' failure to promptly present Petitioner--who, at the time, was under juvenile jurisdiction--to a neutral judicial officer, on 26 April, 1990, Petitioner was again convicted of three counts of first degree murder without a recommendation of mercy. Petitioner's counsel then filed, on 14 January, 1991, a petition for appeal, and Petitioner, *pro se*, filed, on 23 February, 1991, a supplemental petition for appeal. The court, however, refused to review the petitions without comment.

On or about 18 August, 1994, Petitioner then filed a Petition For Writ of Habeas Corpus (Special "Zain" Habeas) in the Kanawha County Circuit Court, pursuant to the West Virginia Supreme Court of Appeals' prophylactic remedy for persons convicted in cases involving the false and/or misleading testimony or evidence presented by Fred S. Zain. After protracted proceedings the circuit court denied Petitioner's prayer for relief and dismissed the petition. Petitioner appealed that denial and the WVSCA, in a written *per curiam* opinion, cited as *Moss v. Trent*, 2004 W.Va. Lexis 121, No. 31646, July 1, 2004, upheld the circuit court's denial. Petitioner then timely filed his *Petition For Rehearing*, and the appellate court refused to consider it.

Petitioner then filed his petition for writ of *certiorari* in the United States Supreme Court. By Order entered 24 January, 2005, the Court refused *cert*. Therefore, Petitioner now files his *Petition For Writ Of Habeas Corpus Ad Subjiciendum Under W.Va. Code § 53-4A-1*, for his



remaining contentions of the constitutional and procedural violations which result in Petitioner's continued unlawful incarceration.

For convenience, the essential chronology of events follows:

1. December 13, 1979 -- Paul Reggettz, III, allegedly returned home and found his family, wife Vanessa Reggettz (26 years old), son Paul Eric Reggettz (7 years old), and daughter Bernadette Lynn Reggettz (4 years old), all dead. (Second Trial, Tr. 397). After several hours of questioning, Reggettz confessed, in detail, that he had murdered his family. (Second Trial, Tr. 599-611, 684-90, 699-712). At Petitioner's second trial, Reggettz admitted that he had said that he wished his wife were dead and further admitted saying that he "wished he (Paul Eric Reggettz) had never been born." (Second Trial, Tr. 742). Reggettz also acknowledged that he belonged to a motorcycle gang called *The Sons of Satan* and that on one occasion, he and his fellow gang members unsuccessfully tried to "conjure up Satan." (Second Trial, Tr. 728, 740). Finally, Reggettz testified that after seeing his wife dead, he stated, "I felt free." (Second Trial, Tr. 744, 764-65).

2. December 13, 1979 -- Zain was dispatched to the Reggettz home where he took several samples of the many blood stains and spatters at the scene for serological testing. (September 10, 1998 Order, at p. 2). By that time, Trooper Zain had been employed at the West Virginia State Police Laboratory "for about three years and was supervised by another serologist, Trooper Robert Murphy." (September 10, 1998 Order at p. 2).

3. December 14, 1979 -- Reggettz returned to the scene of the crime, with law enforcement officers, and demonstrated how he had plunged the scissors in his wife's chest. Reggettz went over to where she had been tied up to the door and said he got the scissors and kind of bent down and pushed them in her chest. Reggettz testified that in his confession, he told the police that he drowned his son because his son liked swimming, and he hanged his daughter with the electrical cord draped over a door, because she liked swinging. (Second Trial, Tr. 611, 758).

4. January 30, 1980 -- Trooper Michael Don Smith went to the juvenile detention center in Cleveland, Ohio, to meet with Petitioner and to obtain a blood sample. Trooper Smith asked Petitioner to prick his finger and bleed onto a cloth, which Trooper Smith kept. (Second Trial, Tr. 912; Second Juvenile Transfer Hearing, Tr. 195-96). It is not clear in any of the records or transcripts what happened to this blood sample that was obtained illegally. As the West Virginia Supreme Court noted in *In the Interest of John Moss, Jr.*, 170 W.Va. at 545, 295 S.E.2d at 36: "When the appellant's counsel learned of the blood sample, taken by the West Virginia authorities, he objected, and an Ohio court ordered that the cloth on which the blood sample was deposited be returned to the appellant. **This apparently was done.**" (emphasis added). Petitioner denies that this illegally obtained blood sample was ever returned to him or his counsel. Further, Petitioner alleges the illegally obtained blood is the sole means by which Zain typed Petitioner's blood type with the blood type "discovered" at the crime scene.

5. April 22, 1980 -- Trooper Williams went to Cleveland, Ohio, pursuant to an Ohio court order to obtain another blood sample from Petitioner. (Second Trial, Tr. 505). Allegedly, later that same day, Trooper Zain received Petitioner's blood sample from Trooper Williams. (Second Trial, Tr. 1110). Petitioner, however, asserts Zain already had a sample of his blood, via the illegally obtained sample and the only way West Virginia's serologist was able to even type Petitioner's blood samples allegedly gathered at the crime scene was through the blood soaked cloth.



6.  April 24, 1980 -- Reggettz, who was jailed soon after he confessed to the murders, was indicted by a grand jury in Kanawha County for these murders. (Suppression Hearing Prior To First Trial, Tr. 169). Petitioner's name is also included in this indictment.

7.  June 10, 1980 -- Date of report containing results of blood types obtained from the three victims, Reggettz, Petitioner, and various blood stains found at the crime scene. According to Trooper Robert Murphy, who then was the head of the West Virginia State Police Crime Laboratory, he only conducted the testing of nine potential suspects, including control samples from the victims. All of the remaining items, including all other items from the crime scene, were tested by Trooper Zain.

8.  October 24, 1980 -- State files *Memorandum Of Law On Behalf Of The State Of West Virginia In Opposition To Defendant's Motion To Suppress*, in Paul Reggettz's case. In the motion, the state asserts, "In the early morning hours of December 14, 1979, Paul Reggettz contradicted his earlier denials and confessed, **in detail**, to Trooper Woodyard that he had, in fact, committed the murders. This was done in the presence of Trooper Woodyard alone. It should be noted that before such confession Reggettz had executed two (2) Waiver of Rights forms, which had been admitted into evidence and which Trooper Woodyard testified were read to and apparently understood by Reggettz. Subsequently, Reggettz returned to his home and again explained **in detail** that he had committed the murders and the manner and sequence of his actions. This confession was given in the presence of Troopers Woodyard, McGowan and Williams, and James E. Roark, Prosecuting Attorney for Kanawha County." (Respondent's Brief, p. 2). "Defendant's contention that his confession was involuntarily and unintelligently given flies in the face of reason, considering the detailed nature of the confession and in considering that the crime itself was reenacted by the accused." (Respondent's Brief, p. 9).

9.  October 28, 1980 -- After considering the briefs, testimony, and arguments, Judge John Hey found that Reggettz's confessions were admissible and concluded, "Given a totality of the circumstances of this case, which involved three counts of murder in the first degree, the Court finds that the confession was made knowingly, intelligently, voluntarily, and that the State, by a preponderance of the evidence, has sustained its burden of proof." (Reggettz October 28, 1980, Tr. 35-36).

10. October 28, 1980 -- Troopers Williams and Smith went to Mansfield, Ohio, to bring Petitioner back to Charleston. (Second Trial, Tr. 506). As noted by the West Virginia Supreme Court in *In the Interest of John Moss Jr., Id.* at 36-37, the purpose of this trip was to return Petitioner to West Virginia to answer an unrelated malicious wounding charge. During this trip, Petitioner allegedly confessed to these murders. (Second Trial, Tr. 505-78). In the suppression hearing held before the first trial, Petitioner testified that he confessed to these crimes only after being subjected to repeated physical abuse by Trooper Smith, who crawled into the back seat beside Petitioner while both of Petitioner's hands were handcuffed to the headrest. (September, 1983, First Trial Pretrial Suppression Hearing, Tr. 303-05). Trooper Williams and Trooper Smith confirmed the fact that Petitioner was handcuffed to the front seat headrest and that Trooper Smith did crawl into the back seat with Petitioner to begin the questioning. (Second Trial, Tr. 509-937). Even though Trooper Williams and Trooper Smith denied the beating allegations, both admitted that Petitioner's "willingness" to discuss the Reggettz murders was triggered when Trooper Smith said to Petitioner, "Why do you think we got your blood?" (Second Trial, Tr. 511-14, 944-45). These essential facts were noted by the West Virginia Supreme Court in *State v. Moss*, 180 W.Va. at 372-73, 376 S.E.2d at 578-79.

11. February 27, 1981 -- Judge John Hey entered an order granting the State's motion to *nolle prosequi* the charges against Reggettz.

12. September 30, 1982 -- Indictment returned by the Kanawha County Grand Jury charging Petitioner with three counts of first degree murder.

13. September 19, 20, 21, & 22, 1983 -- Hearing on Petitioner's motion to suppress evidence. The court ruled briefs be filed at a later date and the court will make its ruling thereafter.  (Transcript attached hereto as Petitioner's Exhibit #1.)

14. October 3, 1983 -- Petitioner's memorandum of law in support of [Petitioner's] motion to suppress samples of blood, confessions and other physical evidence seized from John Moss by employees of West Virginia filed.  (Copy attached hereto as Petitioner's Exhibit #2.)

15. October 17, 1983 -- State's Memorandum In Opposition To Defendant's Motion To Suppress served upon defense counsel.

16. April 26, 1984 -- Petitioner was convicted by a jury in the Circuit Court of Kanawha County of three counts of first degree murder, without a recommendation of mercy.

17. December 19, 1988 -- In *State v. Moss*, the WVSCA reversed Petitioner's convictions and remanded for a new trial.

18. February 20, 1990 -- Petitioner's Motion to Suppress Evidence filed.

19. March 19, 1990 -- Suppression hearing held on Petitioner's motion to suppress evidence the two 28 October, 1980, alleged confessions.

20. March 26, 1990 -- Petitioner's memorandum of law in support of motion to suppress evidence filed.

21. April 24, 1990 -- A jury in the Circuit Court of Kanawha County convicted Petitioner of three counts of first degree murder, without a recommendation of mercy.

22. January 14 & February 23, 1991 -- Petitioner appealed second conviction to the WVSCA.  On March 12, 1991, the Court, with a 3 to 2 vote, refused to review the petition.

23. August 18, 1994 -- Petitioner's Petition for Writ of Habeas Corpus was filed raising the special Zain issues.

24. June 10, 1999 -- The West Virginia Supreme Court reopens the investigation into the West Virginia Crime Lab.

25. January 30, 2003 -- After protracted and arduous proceedings, Judge Bloom's Final Order Denying "Zain" Habeas Relief.

26. May 30, 2003 -- Petition For Collateral Appeal filed.

27. December 4, 2003 -- WVSCA voted 4 to 1 to hear Petitioner's Appeal.



28.   December 30, 2003 -- Petitioner's Appeal Brief

29.   March 30, 2004 -- Appellee's Brief filed.

30.   April 28, 2004 -- Petitioner's Reply Brief.

31.   June 8, 2004 -- Oral arguments before the WVSCA.

32.   July 1, 2004 -- WVSCA delivered *per curiam* opinion denying collateral appeal.

33.   August 2, 2004 -- Petitioner's Petition for Rehearing filed.

34.   September 2, 2004 -- WVSCA Order refusing *Petition For Rehearing*.

35.   September 9, 2004 -- WVSCA final mandate order affirming Judge Bloom's January 30, 2003, Order denying Habeas Relief.

36.   December 6, 2004 -- Petition for writ of *certiorari* filed in the United States Supreme Court.

37.   January 24, 2005 -- Order denying *cert*.

38.   June 29, 2005 -- Petitioner's *pro se* petition for writ of habeas corpus and memorandum submitted to prison officials for mailing.

## III. CONTENTIONS PRESENTED

a.   THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR IN RULING THAT THE FIRST TWO CONFESSIONS WERE ADMISSIBLE UNDER THE "LAW OF THE CASE DOCTRINE."

b.   THE FACTUAL DETERMINATION BY THE WEST VIRGINIA SUPREME COURT OF APPEALS THAT NO PROMPT PRESENTMENT OBJECTIONS WERE ENTERED ON THE FIRST TWO ALLEGED CONFESSIONS IS CLEARLY ERRONEOUS AND WORKS A MANIFEST INJUSTICE.

c.   PETITIONER WAS DEPRIVED OF THE SIXTH AMENDMENT'S GUARANTEE OF THE EFFECTIVE ASSISTANCE OF COUNSEL:

   (1).   Counsel Failed To Bring To The Trial And Appellate Court's Attention The Fact That The Two October 28, 1980, Confessions Were The Subject Of An Extensive Motion And Memorandum, Hearing, And Testimony And Was, In Fact, Objected To By Counsel Prior To The First Trial, Based On, *Inter Alia, W.Va. Code* § 49-5-8(d).

   (2).   If Trial Counsel, At The First Trial, Failed To Object To The West Virginia Authorities' Failure To Promptly Present The Juvenile Defendant To A Neutral Judicial Officer Prior To Taking Petitioner's Alleged Confessions.



d.  PETITIONER DID NOT RECEIVE A FULL AND FAIR HEARING ON HIS MOTION AND MEMORANDUM TO SUPPRESS SAMPLES OF BLOOD, CONFESSION, AND OTHER PHYSICAL EVIDENCE SEIZED DUE TO THE IMPROPER TACTICS OF FRED S. ZAIN AND THE WEST VIRGINIA STATE POLICE TROOPERS AND CRIME LABORATORY.

e.  PETITIONER'S SIXTH AMENDMENT RIGHT TO A FAIR AND IMPARTIAL JURY WAS CONTRAVENED WHEN THE STATE KNEW, OR SHOULD HAVE KNOWN, OF THE FALSE OR MISLEADING TESTIMONY AND EVIDENCE PRESENTED BY A STATE WITNESS.

f.  THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED PETITIONER'S BLOOD SAMPLES, CONFESSIONS AND ALL EVIDENCE INCIDENT THERETO INTO EVIDENCE, WHEN THE SAMPLES OF BLOOD WERE OBTAINED IN VIOLATION OF FEDERAL AND STATE CONSTITUTIONAL RIGHTS.

g.  IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION DENIED THE PETITIONER A FAIR TRIAL.

## 1. FACTS AND DISCUSSION ON CONTENTIONS RAISED

a.  THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR IN RULING THAT THE FIRST TWO CONFESSIONS WERE ADMISSIBLE UNDER THE "LAW OF THE CASE DOCTRINE."

The opinion of the West Virginia Supreme Court of Appeals in *Moss II* clearly implied that, had objections been made--during the first trial--the first two confessions, like the third, would also have been inadmissible under the prompt presentment exclusionary rule announced in *State v. Ellsworth, J.R.,* 331 S.E.2d 503 (W.Va. 1985), because it was uncontested that Petitioner had not been taken before a neutral judicial officer even after giving all three confessions.  The second trial court, however, felt it was compelled--under the law of the case doctrine--not to make an independent and/or *de novo* review--because of the WVSCA decision in *Moss II*, i.e., that the holding in *Ellsworth J.R.* would not be applied retroactively because of the lack of objections--of Petitioner's motion to suppress the alleged confessions based on the failure to promptly present Petitioner to a neutral judicial officer, and subsequent objections to the denial of Petitioner's motion.

In West Virginia, at least in the context *sub judice*, the law of the case doctrine has never before been expounded on by the WVSCA, but other courts have explained it thus:

> In the absence of statute the phrase "law of the case" merely expresses the practice of courts generally to refuse to reopen what has been decided; it is not a limit to their power. *Messenger v. Anderson,* 225 U.S. 436, 444, 56 L.Ed. 1152, 32 S.Ct. 739 (1912) (Holmes, J.).



Unlike the more precise requirements of *res judicata* and *collateral estoppel*, law of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides on a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. See, *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16, 100 L.Ed.2d 811, 108 S.Ct. 2166 (1988); *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318, 333 (1983) (dictum).

Observations, commentary, or mere dicta touching upon issues not formally before the Court do not constitute binding determinations, and are not, therefore, law of the case. *See, e.g., Quern v. Jordan*, 440 U.S. 332, 347 n.18, 99 S.Ct. 1139, 1148 n.18, 59 L.Ed.2d 358 (1979). *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 533.

The doctrine is a self-imposed prudential limitation of the court's power. IB Moore's Federal Practice 0.404[10] at 573 (2d ed. 1980). It is not an immutable rule, but rather a way to foreclose continued appeals for reconsideration of prior rulings of law. *Southern Railway Co. v. Clift*, 260 U.S. 316, 319, 43 S.Ct. 126, 127, 67 L.Ed. 283 (1922).

When an appellate court issues a specific mandate it is not subject to interpretation, the district court has an obligation to carry out the order. A different result would encourage and invite district courts to **engage in** *ad hoc* **analysis of the propriety of appellate court rulings**. Post mandate maneuvering in the district courts would undermine the authority of appellate courts and create a great deal of uncertainty {825 F.2d 1512} in the judicial process. It would also eliminate any semblance of finality.

There are three general exceptions to the law of the case doctrine. It should not be applied when: [1] the evidence on a subsequent trial is substantially different, [2] controlling authority has since made a contrary decision of the law applicable to such issues, or [3] the decision was clearly erroneous and would work a manifest injustice. *Sejman v. Warner-Lambert Co.*, 885 F.2d 66, 69 (4th Cir. 1988); *E.E.O.C. v. International Longshoremen's Association*, 623 F.2d 1054, 1058 (5th Cir. 1980).

Most importantly, the law of the case rule should not be applied to any issues which were **not necessary to the decision** on the first appeal. *People v. Medina*, 6 Cal.3d 484, 491, 99 Cal.Rptr. 630, 492 P.2d 686 (1972). And above all, the rule should never be made the instrument of injustice. *Gore v. Bingaman*, 20 Cal.2d 118, 122-123, 124 P.2d 17, 20 (1942).

The WVSCA considered the confession issues in *Moss II* "[b]ecause the admissibility of the . . . three confessions . . . [would] again be of concern on remand . . . ." *State v. Moss*, 376 S.E.2d 569, 575. The holding, therefore, was not necessary to the decision itself; the Court had already decided that "[e]ach of [the first three] errors require[d] reversal." Id. at 572. Had the WVSCA foregone consideration of the confession issues altogether, the conviction of the Petitioner would still have been reversed, and all Petitioner's rights reinstated. *See United States v. Watson*, 146 F.Supp 258, 259 (D.C. 1956) (After a conviction is reversed and a

case is remanded for a new trial, all rights a defendant originally had are reinstated and he is not precluded from filing a motion to suppress evidence prior to his retrial. Nor is he precluded from urging in support thereof legal grounds not previously raised.) *Cf. United States v. Romano*, 241 F.Supp 933 (S.D.Me. 1965); *United States v. Paroutian*, 319 F.2d 661 (2d Cir. 1963), cert. denied, 375 U.S. 981, 84 S.Ct. 494, 11 L.Ed.2d 426 (1964); *Booth v. United States*, 154 F. 836, 837 (2d Cir. 1907).

Assuming arguendo, however, that the law of the case was applicable to the WVSCA's former determination regarding the admissibility of the petitioner's confessions, still there would be exceptions to its application. For example, if the evidence upon remand was substantially different, or if an intervening decision had altered the applicable rule of law, it is clear that the law of the case would not govern. *See Naples v. United States*, 359 F.2d 276 (C.A.D.C. 1966); *People v. Medesto*, 427 P.2d 788 (Cal. (1967). The Petitioner's case is undoubtedly exceptional. Not only was the evidence different on remand, but the intervening decision of *State v. Ellsworth, J.R.*, 331 S.E.2d 503 (W.Va. 1985), had altered the applicable rule of law. Moreover, insofar as the decision of the WVSCA in *Moss II* would foreclose the Petitioner from objecting anew, that decision was clearly erroneous and works a manifest injustice.

In *United States v. Coward*, 669 F.2d 180 (4th Cir. 1982), the defendant's first conviction had been overruled; he was retried and once again convicted. At his first trial, evidence was "erroneously" suppressed by the trial court, but the Government did not appeal on this ground. At the second trial, this same evidence was introduced after a new suppression hearing where the Government was permitted to clarify the error of the first suppression hearing. On appeal, the Fourth Circuit stated that "[r]emand of the case for a new trial effectively **cleansed the slate**; the District Court properly corrected as many errors of the first trial as was possible." *Id.* at 184. (Emphasis added).

Likewise, in *State v. Darwin*, 161 Conn. 413, 288 A.2d 422 (1971), the defendant had been convicted and appealed to the Connecticut Supreme Court. That court affirmed, holding that "[t]he . . . claims [concerning attacks on the validity of the search warrant] now come too late. The [trial] court was never asked to rule on the claims, and under settled Connecticut practice they cannot now be considered." *State v. Darwin*, 155 Conn. 124, 142, 230 A.2d 573, 582. Darwin petitioned the United States Supreme Court for *certiorari*, and the case was reversed on the unrelated issue of the voluntariness of Darwin's confession, *Darwin v. Connecticut*, 391 U.S. 346, 20 L.Ed.2d 630, 88 S.Ct. 1488 (1968). At his second trial, Darwin filed a motion to suppress certain evidence obtained as a result of an insufficient search warrant; this issue formed the basis for his second appeal. Conceding the validity of this claim, the State argued three reasons against it, "(1) that by not attacking it before or during

the first trial the defect was waived, (2) that the defendant had no standing to challenge the search of his wife's car and (3) that by reversing on the ground of an inadmissible confession, and by not mentioning the search warrant, the validity of which the defendant had raised before it, the United States Supreme Court implied . . . the warrant was valid. Rejecting the State's argument altogether, the Connecticut Supreme Court reversed, holding this:

> The first trial ended in a verdict of guilty and a judgment was rendered. That judgment was appealed, first to this court then to the United States Supreme Court. The end result was a reversal and the ordering of a new trial. The purpose of a new trial is to have an error-free trial. The trial is "new" in every sense. It is as if no trial had ever taken place. *Darwin, supra,* citing *State v. Adjimi,* 170 So. 2d 340 (Fla.App.); *Cichos v. State,* 246 Ind. 680, 208 N.E.2d 685; *People v. Corbo,* 17 A.D.2d 351, 234 N.Y.S.2d 662. An invalid search, therefore, which was not contested on the first trial may be contested by a motion to suppress prior to the second trial. *United States v. Romano,* 241 F. Supp. 933 (D.Me.); *United States v. Watson,* 146 F.Supp. 258 (D.D.C.). By the same token, **evidence which was not objected to at the first trial may be contested at the second.** It would not be compatible with the theory of a new trial to tie the hands of counsel so that any errors waived in the first trial are forever waived. Thus, the defendant did have a right to raise the issue of a defective search warrant; that right had not been waived. *Id.* 288 A.2d 425. (Emphasis added).

The law of the case doctrine was designed to stop the needless repetition of meritless arguments already fairly adjudicated; it was not intended to be used as an instrument of injustice to blindly preclude consideration of legitimate issues never before decided. The Petitioner's first argument was never fairly considered by the WVSCA because that Court declared a procedural default. "* * * [T]rial error not raised in the trial court will not be addressed on appeal." *See State v. Humphrey,* 351 S.E.2d 613 (W.Va. 1986). Petitioner herein was granted a "new" trial, however, and this **cleansed the slate** of "**all**" errors at his first trial, including those made by his first trial attorney. Petitioner was given new lawyers, and they objected in a timely fashion with sufficient specificity. This is not a case where the same facts which were previously decided not to warrant a positive outcome are again sought to be considered without a substantial change in the evidence; the obvious futility the law of the case doctrine was designed to avert.

The ultimate responsibility of the courts, at all levels, is to reach the correct judgment under law. Though that obligation may be tempered at times by concerns of finality and judicial economy, nowhere is it greater and more unflagging than in the context of subject matter jurisdiction issues, which calls into question the very legitimacy of a court's adjudicatory authority. These questions are of such overriding import that the United States Supreme Court has, in other contexts, carved out special exceptions for them to the general rules of procedure.

So, for example, a party can challenge subject matter jurisdiction for the first time on appeal even though, in most contexts, issues not raised below are considered waived. *See, e.g., Wisconsin Dept. Of Correction v. Schacht*, 524 U.S. 381, 389, 141 L.Ed.2d 364, 118 S.Ct. 2047 (1998) "No party can waive the [subject matter jurisdiction] defect or consent to jurisdiction"). Thus, the U.S. Supreme Court itself has decided that the value of correctness in the subject matter jurisdiction context overrides at least some of the procedural bars in place to protect the values of finality and judicial economy. See 18B Wright, Miller & Cooper, Federal Practice and Procedure § 4478 (2d ed. 2002) (Even after the first final judgment, the nature of some issues may encourage reconsideration; the most obvious illustration is provided by the rule that federal subject-matter jurisdiction remains open until there is not more opportunity to continue the proceeding by appeal.")

Law of the case does not and cannot limit the power of a court to reconsider an earlier ruling. The force of law of the case doctrine is affected by the nature of the first ruling and by the nature of the issues involved. If the ruling is avowedly tentative or the issues especially important, it may be said that ("law of the case" principles do not apply). See 18B Wright, Miller & Cooper, Federal Practice and Procedure § 4478.5. This being the case, the first part of the trial court's order, holding the confessions admissible under the law of the case doctrine, was an abuse of discretion and reversible error.

Additionally, the second part of the trial court's order, dealing with the "foray or diversion" of the police in stopping at the Parkersburg State Police detachment, though logically incongruous with the W.Va. Supreme Court's *Moss II* opinion, but is incorrect both as to findings of facts and legal conclusions. As previously discussed, the admissibility of the three confessions obtained from Petitioner by the police between October 28 - 30, 1980, is an issue which the WVSCA reviewed in *Moss II*. The Court there held that the third confession, the one given by Petitioner on October 30, 1980, should not have been admitted into evidence because it was obtained in violation of the prompt presentment provisions of *W.Va. Code* § 49-5-8(d), and the WVSCA ruling in *State v. Ellsworth J.R.*, 31 S.E.2d 503 (W.Va. 1985). With regard to the two confessions obtained from Petitioner on October 28, 1980, at the Parkersburg State Police Detachment, the exclusionary rule of *Ellsworth J.R.* was deemed inapplicable because a timely prompt presentment objection had not been made.

The second trial court, however, ruled that "the taking of the statement [did] not violate either specific language or the principles embodied in the juvenile statute requiring an immediate presentment." (Tr. 20). In *Moss II*, the Court found that the facts clearly established that the [Petitioner] had not been presented to a referee, circuit judge, or magistrate, even after he had given three confessions to the murders. *State v. Moss*, 376 S.E.2d at 581. If noncompliance with the juvenile prompt presentment requirement occurred

for the primary purpose of obtaining a confession from the juvenile, then such noncompliance renders the confessions inadmissible into evidence. *Ellsworth*, 331 S.E.2d at 508.

The stop in Parkersburg was initiated by the police to obtain a confession from the juvenile Petitioner. To allow the intimidation of juveniles through the tactic of delay is unconscionable. The juvenile prompt presentment statute exists for the purpose of assuring that juveniles who are frightened and overwhelmed by the circumstances involving the accusation of committing a serious crime are taken before a neutral party who can explain the types of options that are available to him. A juvenile is to be afforded the same rights as available to adults and in order to do so, he must be told what those rights are and be made aware that exercising those rights is perfectly legal, acceptable to the police officers around him, and actually recommended for his own defense.

Of particular interest here is, not only was Petitioner not taken to a neutral judicial officer after allegedly confessing to the murders, but he was never taken to a magistrate. The state has never offered an explanation as to what obstacles intervened to preclude experienced State Police Troopers from following the law. The adult suspect, Paul Reggettz, III, was promptly presented. Why wasn't the young Petitioner herein? When applying the *Ellsworth* rule to the situation presented in the instant case, it is obvious that the trial court should have denied admission of the two confessions obtained on October 28, 1980, into evidence.

The WVSCA's interpretation of the prompt presentment statute in *Ellsworth* was two-pronged. First, the Court looked to the language of the statute, which provides that a juvenile must be presented before a neutral judicial officer. The Court stated:

> [this provision was] designed to ensure that if a juvenile referee or judge is not available, a child in custody must be *immediately* brought before a magistrate. In placing this construction on the statute, we have restricted the import of the proceeding language that indicates a delay may not "exceed the next succeeding judicial day."
>
> We do so because we do not believe that this language was intended to sanction *any delay* in taking a juvenile directly to a judicial officer. Rather, this clause relates to how long a detention hearing may lawfully be delayed while a child is held in custody. [(emphasis added) *Ellsworth*, 331 S.E.2d at 507.]

The *Ellsworth* Court continued its reasoning by stating that, "It is obvious that advising the juvenile as to his constitutional rights can be done immediately upon the appearance of the child." *Id.* The interpretation of the juvenile prompt presentment statute therefore dictates that Petitioner should have been taken before a neutral judicial officer immediately. This interpretation does not even allow the "next judicial day" time frame.

- 15 -

33

The second principle the Court addresses is the issue of delay when traveling to appear before a judicial officer. The facts of the *Ellsworth* case indicate that Ellsworth confessed to the murder in question while riding in the police car which presumably was traveling to the offices of the neutral judicial officer. The police stopped en route in order to reduce to writing the oral confession offered in the car. Delay as a result of the need to reduce to writing the oral confession is "designed to insure that what the defendant desires to relate is accurately recorded." *Ellsworth*, 331 S.E.2d at 509. In *Ellsworth*, the Court assumed that the stop to record a statement was for the purpose of recording a confession already given and that had the defendant not volunteered to confess he would have been promptly presented.

In order to arrive at the prompt presentment exception recognized in *Ellsworth*, the Court posed three questions: (1) Was the juvenile taken before a magistrate? (2) was the confession obtained as a result of delay? and, (3) was the primary purpose of the delay to obtain a confession? It is clear that Petitioner was not taken before a magistrate; that the confessions were obtained as a result of the troopers' decision to stop in Parkersburg not as a result of the Petitioner's offering of a confession; and that the primary purpose of the delay was to obtain a confession.

Trooper Smith, one of the officers traveling with Petitioner, provided the following statement describing the applicable facts:

> "It was then said to the effect, that we needed to get it straightened out but that something of that importance needed to be discussed some place other than the back seat of the car in which we were riding. Going on to say it needed to be discussed in a place where you could sit down, have a cup of coffee and could look each other in the face."

Moreover, it is to be noted, however, that the delay was not for the purpose of recording a confession which had already been offered as in *Ellsworth*. The statement of Trooper Smith indicates that there was no clear or specific understanding between Petitioner and the troopers that he was prepared to discuss the Reggettz murders at that moment while traveling or at any other time. The nod of his head as described by Trooper Smith is not tantamount to an expression of the desire to offer a confession. The entire conversation was conceived and prompted by the trooper, not Petitioner. In a September, 1983 Suppression Hearing (hereinafter [1983 Supp.Hrg.Tr. p. ___, Petitioner's Exh. #1]), Trooper Smith states:

> "...I said something to the effect of, now John, we both know what I am talking about and it is important we get it straightened out. *He did not at that time acknowledge that he did know what we were talking about.* After expressing a couple of more times to John that it was extremely important that the matter needed to be straightened out, it was told to John or asked of him something to the effect of, John why do you think we got a sample of your blood. After mentioning the blood, John was again told something to the effect of, now John, we both know what I am talking about, *he agreed shaking his head yes.*"

- 16 -

The delay in Petitioner's case does not qualify as the statutory prompt presentment requirement because Petitioner had not confessed nor suggested that he wished to confess prior to the stop in Parkersburg. In *Ellsworth*, the purpose for the delay in presenting the juvenile to a judicial officer was to accurately record the accused's statement. Therefore, the confession was inadmissible.

Because Petitioner's prompt presentment objections were timely raised prior to, not only his second trial but also his first trial, Petitioner's conviction should be reversed and his confessions thrown out as they were obtained in violation of the prompt presentment requirement. The second trial court's ruling not to apply the exclusionary rule, because of the law of the case doctrine, was an abuse of discretion and reversible error.

b.  THE FACTUAL DETERMINATION BY THE WEST VIRGINIA SUPREME COURT OF APPEALS THAT NO PROMPT PRESENTMENT OBJECTIONS WERE ENTERED ON THE FIRST TWO ALLEGED CONFESSIONS IS CLEARLY ERRONEOUS AND WORKS A MANIFEST INJUSTICE.

The WVSCA reversed Petitioner's first conviction on the 19th of December 1988. See *State v. Moss*, 376 S.E.2d 569 (W.Va. 1988) ("Moss II"). That opinion clearly implied that, had an objection been made, with the [f]irst two confessions, like the [t]hird, they would also have been inadmissible under the prompt presentment exclusionary rule because it was uncontested that the Petitioner had not been taken before a magistrate even after giving all three confessions. Petitioner contests the WVSCA's determination that objections to the first two "confessions" were not made.

In the September, 1983 Suppression Hearing, Petitioner was extensively examined on and testified to, *inter alia*, the West Virginia Troopers' failure to take him before a neutral judicial officer. At the conclusion of the hearing the trial court set a briefing schedule for counsel on both sides to brief issues raised at the hearing and also set a date of October 12, 1983, at 9:00 a.m. to render a ruling from the bench on the admissibility of the confessions (1983 Supp.Hrg. pp. 345-46; Petitioner's Exh. #1).

In his 3 October, 1983, *Memorandum In Support Of Defendant's Motion To Suppress Samples Of Blood, Confession, And Other Physical Evidence Seized From John Moss By Employees Of The State Of West Virginia*, (hereinafter [1983 Memo at __; Petitioner's Exh. #2]) trial counsel wrote with great fervor on the rights of Petitioner, as a juvenile, under *W.Va. Code*, § 49-5-1, *et seq.*, that were violated. Trial counsel specifically quoted § 49-5-8(d) and the only available West Virginia decision on the issue available at the time, i.e., *State ex rel. J.M. v. Taylor*, 276 S.E.2d 199 (W.Va. 1981), and complained Petitioner was questioned in a lonely and hostile environment without first being taken before an interested and friendly adult such as a juvenile referee or magistrate (1983 Memo at 61-64; Petitioner's Exh. #2). Trial

counsel posited that the totality of the circumstances dictated that all three confessions should be suppressed:

> "Because of the nature of the events and circumstances, the taking of the confessions from John Moss constituted a communicative contact between the defendant while he was still technically within the juvenile jurisdiction of this Court and had all of the appearances of a situation impacted with duress and coercion by governmental agents... ." (1983 Memo at 64; Petitioner's Exh. #2.)

Additionally, when writing on the voluntariness of the confessions, trial counsel made numerous mention of the confession*s* (plural) in the Memo:

4.   The Taking of the Confessions, (1983 Memo at 58);

Later, John Moss gave certain confessions concerning his involvement... . (1983 Memo at 60);

This abuse which (sic) was continual and systematic overborne (sic) the will of John Moss that resulted in the confessions in question. (1983 Memo at 60);

As defendant discussed at considerable length in the preceding sections of this Memorandum, *the confessions obtained from John Moss on the 28th day of October, 1980*, were taken while under the juvenile jurisdiction of this Court. (1983 Memo at 62)(emphasis added);

In the present case, John Moss was not permitted his right to have an attorney present either at or before his confessions were taken (1983 Memo at 62-63);

[T]he taking of the confessions from John Moss constituted communicative contact between the defendant... . (1983 Memo at 64);

In the absence of such constitutional rights, the results of the confessions should be suppressed and declared inadmissible. (1983 Memo at 64);

[T]he evidence clearly indicates the confessions taken from John Moss to be unlawfully taken. (1983 Memo at 65);

Thus, the facts indicate that as a result of information contained in John Moss's confession shortly after the confessions were taken from John Moss o[n] October 28, 1980, Troopers Williams and Smith went to John Moss's home in Cleveland, Ohio... . (1983 Memo at 65);

Therefore, assuming the confessions to have been illegally obtained from John Moss... . (1983 Memo at 65);

The record herein unequivocally demonstrates trial counsel objected to the two 28 October, 1980, confessions due to Petitioner not being taken before an interested or friendly adult such as a juvenile referee or magistrate. Additionally, on 30 December, 1983, the state filed its *Memorandum In Opposition To Defendant's Motion To Suppress*, wherein it argues against counsel's assertion that Petitioner was not taken before a neutral judicial officer even



after giving the two alleged confessions, the oral one then the recorded one. The WVSCA's contrary determination, in 1988, and the resulting constitutional violations, therefore, works a manifest injustice. In light of the WVSCA's holdings, i.e., that, although all the blood work conducted by Fred S. Zain and the W.Va. State Police Crime Laboratory was unreliable at Petitioner's two trials, Petitioner's claim the Zain evidence was prejudicial was unfounded because of Petitioner's confessions and the other evidence introduced, if a correct factual determination had been made, i.e., that objections *were* made on the two 28 October, 1980, confessions, the rulings in *Ellsworth J. R.* would--as the third confession given on 30 October, 1980--also have been retroactively applied to those two confessions and they too would have been excluded at the second trial. The fact the two 28 October, 1980, confessions should have been suppressed but were not cannot be considered harmless because, coupled with the fact the Zain evidence was later excluded, no substantive evidence with which to convict Petitioner would have existed upon which the court could rule that, even with excluding the Zain false and misleading evidence, the results of the proceedings would not have changed because of the confessions and evidence resulting therefrom.

c.   PETITIONER WAS DEPRIVED OF THE SIXTH AMENDMENT'S GUARANTEE OF THE EFFECTIVE ASSISTANCE OF COUNSEL:

   (1).   Second Trial Counsel Failed To Bring To The Trial And Appellate Court's Attention The Fact That The Two October 28, 1980, Confessions Were The Subject Of An Extensive Motion And Memorandum, Hearing, And Testimony And Was, In Fact, Objected To By Counsel Prior To The First Trial, Based On, *Inter Alia*, *W.Va. Code* § 49-5-8(d).

   (2).   If Trial Counsel, At The First Trial, Failed To Object To The West Virginia Authorities' Failure To Promptly Present The Juvenile Defendant To A Neutral Judicial Officer Prior To Taking Petitioner's Alleged Confessions.

Petitioner incorporates herein, by reference thereto, the facts as previously asserted in this Memo. In a September 19, 20, 21 & 22, 1983 Suppression Hearing, Petitioner extensively testified, *inter alia*, on the West Virginia Troopers' failure to take him before a neutral judicial officer. The focus of that hearing was the two "confessions" of 28 October, 1980. The state failed to divulge their intention to use, and the existence of, the third "confession" until the first day of jury voir dire. At the conclusion of the September, 1983, hearing, the trial court set a briefing as well as a date of October 12, 1983, at 9:00 a.m. to render a ruling from the bench on the admissibility of the two 10/28/80 "confessions" (1983 Supp.Hrg. pp. 345-46; Petitioner's Exh. #1). It is not clear, due to the passage of time, whether any hearing was held on that date and Petitioner has been unable to obtain a

transcript of the court's ruling or entered Order. It is undisputed, however, that the first two "confessions" were used at trial.

Additionally, once the state, on the eve of trial, informed trial counsel of the existence and its intention of using the third "confession" of 30 October, 1980, trial counsel objected to it but the court allowed it, also. The WVSCA, of course, later stated the third "confession" should have been excluded and reversed Petitioner's conviction based, in part, on it not being excluded. In their opinion they implied that had objections been made to the first two "confessions," those, like the third, should also have been excluded.

Petitioner's counsel at his second trial were ineffective for failing to bring the court's attention to, or otherwise asserting and failing to enter into the record, Petitioner's *Motion To Suppress Samples Of Blood, Confession, And Other Physical Evidence Seized From John Moss By Employees Of The State Of West Virginia*, and *Memorandum In Support* thereof, as well as the transcript of the suppression hearings held on 19, 20, 21 & 22 September, 1983. Those documents and transcripts unequivocally demonstrate that counsel at the first trial did indeed object to the failure of state authorities to promptly present Petitioner to a neutral judicial office in violation of *W.Va. Code* § 49-5-8(d) and the holdings, made retroactive to Petitioner's case on the third confession, in *State v. Ellsworth J.R.*, 175 W.Va. 64, 331 S.E.2d 503 (1985), and that the factual determination to the contrary by the WVSCA, i.e., that "[A] prompt presentment objection was preserved before the trial court only with respect to the third confession" is clearly erroneous. The results of the second trial court's ruling, therefore, would certainly have been different and the two confessions of 28 October, 1980, would have been excluded, as well as the evidence resulting therefrom. Coupled with Reggettz's confession, without the three confessions and the "poisoned" evidence resulting therefrom, the results of Petitioner's trial would be an acquittal. Indeed, a trial probably would not have occurred, because the state would have no evidence to present.

The United States Supreme Court, in *Wiggans v. Smith*, 123 S.Ct. 2527 (2003), **reaffirmed** the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The Court, through their infinite wisdom, also went on to paint, in broad strokes, a clear picture of the complex, as well as the multifaceted, legal obligations every defense counsel should undertake in order to provide a criminal defendant with the constitutionally mandated effective assistance of counsel. The Court also explicitly made clear that there are a plethora of complicated tasks involving the adequate representation of a capital-charge criminal defendant. Furthermore, they are virtually unlimited and the multitask demands placed on counsel are often onerous and time consuming.

It has been well established in this state that, in reviewing claims of ineffective assistance of counsel, the standards delineated in *Strickland v. Washington, supra*, govern.

In the West Virginia Courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) counsel's performance was deficient under an objective standard of reasonableness; (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. (Syllabus Point 5 of *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995)).

In reviewing counsel's performance a court must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight, or second guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. (Syllabus Point 6, *State v. Miller*, *supra*).

Petitioner avers that he is entitled to a hearing in order for him to have a fair and adequate opportunity to litigate his claims of ineffective assistance of counsel and to develop a record to support his allegations that are not discernible from the existing record. "Lacking an adequate record, [a]...court simply is unable to determine the egregiousness of many of the claimed deficiencies." *State v. Miller*, 459 S.E.2d 114, 126 (W.Va. 1995). "In cases involving ineffective assistance...intelligent review is rendered impossible because the most significant witness, the trial attorney, has not been given the opportunity to explain the motive and reason behind his or her trial behavior." *Id.* at 125-26.

In *SER Watson v. Hill*, 200 W.Va. 201, 488 S.E.2d 476 (1997), the trial court dismissed a habeas corpus petition alleging ineffective assistance of counsel without conducting an evidentiary hearing. On appeal, the WVSCA directed the lower court to hold an evidentiary hearing on the ineffective assistance of counsel claims. The opinion of the Court is sound in that the rationale of *Miller* is to force the litigation of ineffective assistance of counsel claims in habeas actions and not on direct appeal. If the lower court fails to allow record development to take place at this time, then an important thrust of the *Miller* decision is wasted. *See*, *SER Nazelrod v. Hun*, 199 W.Va. 582, 486 S.E.2d 322 (1997)(*per curiam*) [(where the WVSCA] found that a trial court's denial of a habeas claim for ineffective assistance of counsel without a hearing may require remand for a hearing **if the claim is one that has the appearance of being cognizable**). In *Nazelrod*, the WVSCA remanded for a hearing and, in doing so, opined the following:

An examination of the ineffective assistance of counsel claims **requires an examination of facts not developed in the appellant's trial transcript.** For instance, the advice that trial counsel gave, or failed to give the appellant, is not given in the trial transcript. Similarly, why counsel failed to object to evidence, or what his specific trial strategy was, does not appear in the record.

The constitutional guarantee of effective assistance of counsel at trial applies to every criminal prosecution, without regard to whether counsel is retained or appointed. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Cuyler v. Sullivan*, 444 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). Similarly, the WVSCA in *Tucker v. Holland*, 327 S.E.2d 388 (W.Va. 1985), observed that the constitutional right to qualitatively sufficient representation is not diminished because retained rather than appointed counsel is involved.

The Court in *Strickland* made it clear that rarely can there be a successful claim of ineffectiveness in cases where there had been adequate investigation as to both law and facts. In this context, the Court stated:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonably professional judgments support the limitations on investigation. In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

It is clear that representation involves more than the courtroom conduct of the advocate. The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case. When a petitioner claims that the trial attorney failed to investigate, the petitioner must show that the claim has some merit. It is simply not enough for a petitioner to allege there might have been deficiency in some aspect of trial. *Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992).

The WVSCA reversed Petitioner's first conviction on the 19th of December 1988. *See State v. Moss*, 376 S.E.2d 569 (W.Va. 1988) ("Moss II"). That opinion clearly implied that, had an objection been made, with the [f]irst two confessions, like the [t]hird, they would also have been inadmissible under the prompt presentment exclusionary rule because it was uncontested that the Petitioner had not been taken before a magistrate even after giving all three confessions. Although Petitioner contests the WVSCA determination that objections to the first two confessions were not made (see Contention "b" *supra*) he maintains that, even if by some improbable stretch that determination is not found to be erroneous and that objections were *not* entered on the first two alleged confessions, then trial counsel were ineffective for failing to do so.

Petitioner's second trial attorneys failed to bring the trial court's attention to the fact that objections were entered on the first two confessions. In furtherance of that ineffectiveness, appellate counsel failed to also inform the Court of its serious erroneous determination of the

facts. Appellate counsel also failed to include other, stronger, meritorious issues in their petition for appeal when they actually prepared the petition prior to the second trial itself, but, most tellingly, prior to the second trial court's "law of the case" ruling. The petition on appeal did not respond to the first part of the trial court's two-part ruling on the admissibility of Petitioner's confessions because it was already written when that decision issued. This is flagrant ineffectiveness. Because appellate counsel's strategy or tactics for not raising the stronger issues on appeal does not appear anywhere in the record, Petitioner is entitled, at the very least, to appointment of counsel to develop the reason or reasons why counsel was so woefully ineffective and to thereafter demonstrate his entitlement to relief by reinstatement of his right to appeal his convictions.

d.   PETITIONER DID NOT RECEIVE A FULL AND FAIR HEARING ON HIS MOTION AND MEMORANDUM TO SUPPRESS SAMPLES OF BLOOD, CONFESSION, AND OTHER PHYSICAL EVIDENCE SEIZED DUE TO THE IMPROPER TACTICS OF FRED S. ZAIN AND THE WEST VIRGINIA STATE POLICE TROOPERS AND CRIME LABORATORY.

The two samples of blood obtained from Petitioner were derived from him on two separate trips by West Virginia State Police Troopers to Ohio where Petitioner was being held. On the first occasion, 30 January, 1980, the Troopers did not have a court order, warrant, or permission from Petitioner's counsel or parents. On the second occasion, 28 April, 1980, however, an Ohio court order was obtained to allow West Virginia authorities to extract a blood sample. On neither occasion was counsel present with Petitioner, even though the assistant prosecuting attorney for West Virginia was present at the second, forced, extraction. It was only after the first blood sample was obtained that Petitioner became a suspect in the homicides of the Reggettz family. It was alleged by West Virginia authorities that the cloth containing the first sample was returned to Petitioner. Petitioner, however, unequivocally avers the cloth, or all of it, was not returned but was taken to Fred S. Zain on 30 January, 1980, by Zain's fellow troopers, Williams and Smith. It was only after Zain had a known sample of Petitioner's blood, with which he falsely stated had been gathered at the crime scene, that Petitioner became a serious point of focus in the investigation of Petitioner's alleged involvement in the murders of the Reggettz family.

The fact Zain had a known sample of Petitioner's blood in January, 1980, is borne out by the copy of Zain's January, 1980, lab table listing blood groupings from fourteen (14) individuals, including Petitioner. (*See* copy of January, 1980, blood groupings table, attached hereto as Petitioner's Exhibit #3.) As is apparent from Zain's table, a known sample of Petitioner's blood grouping was in his possession in January, 1980, and he listed it in his table. The only possible way for Zain to have a *known* sample of Petitioner's blood in January, 1980,

was to have received at least a portion of the illegally gotten sample obtained by Troopers Williams and Smith from Petitioner on 30 January, 1980.

In essence, the illegally retrieved blood sample and constitutionally prohibited questioning of the, at the time, juvenile Petitioner ostensibly provided West Virginia authorities with probable cause evidence to obtain an Ohio court order to allow authorities to take another blood sample from Petitioner. This allowed Zain to perpetuate his fraudulent representations in the probable cause process by alleging the sample of blood taken from Petitioner on 22 April, 1980, matched unknown blood samples gathered at the crime scene. In fact, the sample taken from Petitioner on 22 April, 1980, did not match any unknown sample gathered by Zain at the Reggettz crime scene, later allegedly determined, by Zain, to be that of Petitioner. It matched only the known sample illegally obtained from Petitioner on 30 January, 1980. Zain fraudulently manipulated blood sampling evidence, with total disregard for the truth, to reflect Petitioner to be a prime suspect in the murders of the Reggettz family. This information which was known, or should have been known, by the prosecutor was withheld from Petitioner and did not become known to him until the investigation of Zain and the West Virginia Police Crime Laboratory in which Petitioner received the noted blood grouping table dated January, 1980. Trial counsel was diligent in seeking all evidence in possession of the state, but due to the late divulgence of the table by the state, Petitioner did not have a full and fair opportunity to litigate his Fourth, Fifth, Sixth and Fourteenth Amendment claims at the 19, 20, 21, & 22 September, 1983 suppression hearing prior to the first trial, or the 26 February, 1990, suppression hearing prior to the second trial.

In *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 903 (1966), the Court indicated that all compelled blood tests are seizures subject to the reasonableness requirement of the Fourth Amendment to the United States Constitution. Since the holding in *Schmerber*, the courts of this land have concertedly held the Fourth Amendment rules on search and seizure should guide the courts when law enforcement seek blood from internal body cavities.

In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court held that neither state nor federal prisoners could collaterally attack state convictions on grounds that illegal evidence was admitted at trial where the "[S]tate has provided an opportunity for full and fair litigation of a Fourth Amendment claim." 428 U.S. at 494. The Supreme Court reaffirmed its decision in *Stone v. Powell, supra*, and held that habeas relief could not be granted to a state prisoner on the ground that the custodial statements made by him were obtained in violation of the Fourth Amendment. *Cardwell v. Taylor*, 461 U.S. 571, 103 S.Ct. 2015, 76 L.Ed.2d 333 (1983). The Court in *Cardwell* held that relief could be granted if statements were involuntary and therefore obtained in violation of the Fifth Amendment.

42

The Petitioner carries both burdens of pleading and proving the facts and the reasons why he did not receive an opportunity for full and fair litigation. *Doleman v. Muncy*, 579 F.2d 1258 (4th Cir. 1978).

In sum, Petitioner was denied a full and fair opportunity to litigate his Fourth Amendment claim prior to trial due to the improper actions of the state through its prosecutor and investigative body. A hearing on the matter in these habeas corpus proceedings, therefore, is mandatory and vital to afford Petitioner a full and fair opportunity to demonstrate his entitlement to relief.

e.      PETITIONER'S SIXTH AMENDMENT RIGHT TO A FAIR AND IMPARTIAL JURY WAS CONTRAVENED WHEN THE STATE KNEW, OR SHOULD HAVE KNOWN, OF THE FALSE OR MISLEADING TESTIMONY AND EVIDENCE PRESENTED BY A STATE WITNESS.

Petitioner incorporates herein, by reference thereto, the facts as previously stated in this Memo. An investigative trooper is an agent of the state and under the supervision of the prosecutor. In the case *sub judice*, Zain was a trooper in the West Virginia State Police Crime Laboratory and under the control or supervision of the Kanawha County Prosecuting Attorneys' Office. The prosecutor knew, or should have known, of the false and/or misleading information and testimony provided in Petitioner's case by Zain. Because Zain's false or misleading testimony was presented to the jury, Petitioner did not receive his constitutional right to a fair and impartial jury. In all criminal prosecutions, state and federal, "the accused shall enjoy the right to trial by an impartial jury." U.S. Const. Amdt. 6; *Duncan v. Louisiana*, 391 U.S. 145, 20 L.Ed.2d 491, 88 S.Ct. 1444 (1968).

Additionally, the West Virginia Supreme Court's prophylactic remedial device of forcing prisoners who had Zain test evidence and/or testify at their trials file and litigate only claims related to Zain and to thereafter make a determination if, absent Zain evidence, the remaining evidence is enough to convict, is inadequate in Petitioner's case due to the overall circumstances of Zain participating in the probable cause process and the fact Petitioner was precluded from litigating all the issues in the "Special Zain" habeas proceedings.

f.      THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED PETITIONER'S BLOOD SAMPLES, CONFESSIONS AND ALL EVIDENCE INCIDENT THERETO INTO EVIDENCE, WHEN THE SAMPLES OF BLOOD WERE OBTAINED IN VIOLATION OF FEDERAL AND STATE CONSTITUTIONAL RIGHTS.

Petitioner incorporates herein, by reference thereto, the facts as previously stated in this Memo. The samples of blood obtained from Petitioner were derived from him on two separate occasions. On the first occasion, the police did not have a court order, warrant, or

permission from Petitioner's parents or counsel, but on the second occasion, a court order was issued by an Ohio court. On neither occasion was counsel present with Petitioner and it was only after the blood samples were obtained that Petitioner became a suspect in the homicides of the Reggettz family. In essence, the results of the blood tests provided the authorities in West Virginia with the probable cause evidence which they had previously lacked. Also, Troopers Williams' and Smith's discussion with Petitioner on 30 January, 1980, created investigative leads which they pursued upon their return to West Virginia. Thereafter, these troopers obtained physical and testimonial evidence from Arbutus and William Johnson in the form of silverware which was presented at trial and which the West Virginia Supreme Court relied upon for affirming the denial of Petitioner's Special "Zain" Habeas Corpus petition for relief. Both courts, however, failed to recognize the fact that unequivocal and conclusive evidence was presented by the defense demonstrating that there was no way the silverware given came from the Reggettz home.

The United States Supreme Court, in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 903 (1966), indicated that all compelled blood tests are seizures subject to the reasonableness requirement of the Fourth Amendment to the United States Constitution. The facts of Petitioner's case clearly demonstrate that Petitioner was required to give the authorities probable cause evidence which effectively incriminated him before there was probable cause evidence to believe Petitioner committed the homicides, making the compelled taking of Petitioner's blood unreasonable.

The evidence is clear from the testimony of police authorities testifying at all hearings held that there was a complete lack of probable cause on 22 April, 1980, the date of the second extraction, pursuant to an Ohio court order, of Petitioner's blood. Even though that order directed Petitioner to give blood it is undebatable that Trooper Smith's and Prosecuting Attorney Mike Roark's affidavit appended to the petition for the Ohio court order does not state probable cause. First, the affidavit is written in conclusory language and, second, Trooper Smith testified in the suppression hearing that blood was not an issue in the felonious shooting case at the Moose Club in St. Albans, West Virginia, thereby negating the felonious assault allegation in the affidavit. Finally, there are no other facts stated which even remotely constitute a factual foundation reflecting probable cause on 22 April, 1980, as every investigating officer who has testified has conceded.

Trooper Smith attempted but failed miserably in his suppression hearing testimony to state reasons for having probable cause to extract Petitioner's blood on the 22nd day of April, 1980. Trooper Smith stated three reasons to believe there was reasonable grounds to believe Petitioner committed the Reggettz homicides:

(1)     Petitioner lived in close proximity to the Reggettz home;

(2)     Trooper Smith had a newspaper article that indicated Petitioner had used a .25 caliber revolver in a crime in Ohio and that a .25 caliber revolver was used in the Moose Club shooting;

(3)     Petitioner indicated to a friend he desired to burglarize the Reggettz home.

At the same time, Trooper Smith testified he had knowledge of 1 and 2 above before 30 January, 1980, when he unlawfully extracted blood from Petitioner. More importantly, Trooper Smith testified that on 30 January, 1980, he did not have reasonable grounds to believe Petitioner committed the Reggettz murders. All evidence indicates no facts were added to the state police investigation which would enhance probable cause between 30 January and 22 April, 1980, when the second blood was taken from Petitioner.

Consent is not an issue in the taking of Petitioner's blood on 22 April, 1980, because assistant prosecuting attorney, Chuck Pettry, who accompanied the troopers to Ohio to extract the blood, testified in the suppression hearing that he did not attempt to secure Petitioner's consent because he, Pettry, did not consider the taking of Petitioner's blood a search and seizure under the Fourth Amendment to the United States Constitution.

In *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed.2d 183 (1952), the Supreme Court stated that due process of law precludes convictions brought about by methods which offend a sense of justice. "It would be a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order to convict a man the police cannot extract by force what is in his mind but can extract what is in his [body]."

On the facts of Petitioner's case, a parallel can be drawn with *Rochin* and its progeny in that West Virginia law enforcement officers cannot establish probable cause evidence from seizing Petitioner's blood without pursuing a search warrant based on independently stated factual probable cause. There was no probable cause evidence until *after* the blood samples were obtained. Additionally, there was no danger that the evidence (blood) would disappear.

In obtaining samples of Petitioner's blood under forced circumstances (which strain of blood was, according to Zain, consistent with that found at the scene of the homicides of the Reggetz family; (*See* Contention (d.), *supra*)) the blood samples resulted in incriminating evidence prejudicial to Petitioner and, for all intent and purposes, produced a confession of a circumstantial variety.

The United States Supreme Court has indicated where there is probable cause to believe one has committed a crime, scientific tests and intrusions of the body are constitutionally permissible. In *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900

45

(1975), the Court held that when the defendant voluntarily appeared at the police station for questioning on the strangulation of his wife, the warrantless taking of scrapings from the defendant's fingernails was permissible because of independent existing probable cause. Probable cause must first exist because the guidelines and standards relating to search and seizure under the Fourth Amendment applies.

The touchstone of the Fourth Amendment is the protection of privacy, and to that end, it prohibits unreasonable invasions without a warrant. Facts are the proper basis upon which probable cause for the issuance of a search warrant is to be ascertained. Petitioner submits that his blood samples at issue were not taken incident to a lawful arrest, nor, as admitted to by all officers in this case, was there a reasonable belief or probable cause to believe Petitioner had committed the homicides of the Reggettz family.

Concerted court precedent indicates that, since Petitioner's rights were violated when a sample of his blood was obtained, the blood sample and the results thereof should be excluded from evidence in a trial on the merits of guilt. Physical by products of illegally obtained statements are inadmissible during a trial of the defendant as "poisonous fruit" of illegal statements. Such physical evidence is protected by the Fourth Amendment, and the exclusionary sanction applies to any fruits of a constitutional violation -- whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention. The exclusionary rule has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial. *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal trial against the victim of the illegal search and seizure. The rule's prohibition applies to such direct evidence as well as to "fruit of the poisonous tree" -- secondary evidence derived from the illegally seized evidence itself. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

It is not debated that on 30 January, 1980, troopers of the West Virginia Department of Public Safety violated Petitioner's rights by extracting a blood sample from him while he was incarcerated in the state of Ohio. More importantly, during that meeting, certain information was secured which was used at trial. Petitioner supplied the troopers with the names of his friends. After leaving Ohio, the troopers contacted William Johnson and took a written statement which tended to incriminate Petitioner.

Also, Trooper Williams testified that after the 22 April, 1980, meeting with Petitioner, where blood was again extracted, upon a court order, but without probable cause, that "[W]e

obtained [another] written statement from William Johnson[.]" That statement alleged that Petitioner had indicated he desired to burglarize the Reggettz home and that Petitioner had given Arbutus Johnson flatware that came from the Reggettz home. The trooper admits this statement was not taken until after the blood laboratory results on Petitioner were disclosed and after the trooper came to the conclusion Petitioner was a suspect. Thereafter, written statements were taken from Arbutus Johnson concerning the flatware allegedly stolen from the Reggettz residence as well as the flatware being secured.

Decisions on this issue indicate that where an illegal search confrontation has provided the prosecution with the names and later testimony of witnesses it might not have otherwise acquired such are inadmissible as the fruits of an illegal search. The blood sample taken from Petitioner without probable cause constituted illegally obtained evidence which should have been suppressed, just as all fruits of the search and seizure, i.e., flatware, statements of William and Arbutus Johnson, and alleged confessions should have been.

If it had not been for the totality of the circumstances, i.e., unlawful extraction of Petitioner's blood on 30 January, 1980, which resulted in statements being taken from William and Arbutus Johnson and which resulted in securing the flatware against Petitioner, and the unlawful extraction of Petitioner's blood on 22 April, 1980, which resulted in a second statement from William and Arbutus Johnson, Petitioner would not have even been a suspect in the murders of the Reggettz family, thus negating the possibility of securing inculpatory statements from Petitioner by Troopers Williams and Smith on 28 October, 1980, and by Troopers Woodyard and Allen on 30 October, 1980.

The confessions are a direct result of the illegal search and seizures of Petitioner's blood carried out by representatives of West Virginia on 30 January, and 22 April, 1980, and should have been excluded from trial. The trial court abused its discretion and committed reversible error when it ruled contrary thereto.

It is submitted at the outset that to have required Petitioner to submit to the withdrawal of his blood for testing against his will and without his consent and over his objection is violative of his Fifth Amendment privilege against self-incrimination and is a denial of his right to due process of law as being fundamentally unfair.

The case of *Schmerber v. California, supra*, involved the implied consent to submit to blood sample testing by an operator of a motor vehicle. The United States Supreme Court ruled that the accused's privilege against self-incrimination had not been violated, reasoning that since the blood test evidence, although an incriminating product of compulsion, was neither Schmerber's testimony nor evidence relating to some communicative act or writing by him. Therefore, it was not inadmissible on privilege grounds. That position has been followed in a plethora of cases involving driving under the influence and implied consent matters.

Because the "implied consent" statute was at issue in *Schmerber*, the defendant there could reasonably expect and anticipate that the alcoholic content of his blood was directly in issue.

In the present case, the blood alcohol content of Petitioner is not directly an issue. The results of any testing of blood taken from Petitioner against his will, without his consent, and over his objection upon the invocation of his privilege against self-incrimination can only be used collaterally to confirm or corroborate the compatibility of Petitioner's blood type with the blood type of blood smears found at the residence where the alleged homicides occurred. Such evidence is merely circumstantial at best. Petitioner should not be required to submit to a process involving the intrusive violation of his very person against his will, without his consent, over his objection and after his assertion of his privilege against self-incrimination when there is no reasonable causal relationship of the test sought to be administered on the body of Petitioner and the crime in question.

If the extraction from Petitioner and the use of the results of such tests at trial against him is some communication or testimony from inside the person of the Petitioner, contrary to *Schmerber*, then the Petitioner was entitled to the constitutionally afforded privilege against self-incrimination if he desires that no such communication from him be given to state officials for use against him. If, in fact, the extraction of Petitioner's blood, for the purpose of using the results of such tests of Petitioner's blood, was taken involuntarily, without his consent, and over his objection, must then be inadmissible hearsay which, if desired to be used by the state, can only be prejudicial to Petitioner and, hence, reversible error.

To allow the state to use the results of the tests performed upon the blood samples taken from Petitioner who was required and compelled to submit to the extraction of his own blood for purposes of using the same against him at trial and which would materially assist the state in obtaining evidence to be used against Petitioner in a criminal trial could only constitute prejudicial and reversible error.

Although the blood samples taken from Petitioner were taken after an order was obtained from an Ohio court, the tests on Petitioner's blood samples must be admissible under West Virginia law, and there was no express authority for the admissions of such tests or analyses into evidence before a West Virginia court. Instead, a determination of probable cause seems more reasonable before such blood samples can be obtained, and yet the police officers did not have probable cause against Petitioner until after the blood samples were obtained. The blood samples taken against his will and without his consent give the state the probable cause evidence it needed. In other words, the probable cause evidence against Petitioner was obtained in violation of his Fifth Amendment right against self-incrimination.

The taking of Petitioner's blood constituted a communication from inside Petitioner's body much like a verbal confession, and as such is protected by the Fifth Amendment to the United States Constitution.  The extraction of the blood itself is protected by the protection against unlawful search and seizures forbidden by the Fourth Amendment to the United States Constitution as made applicable to the states through the Fourteenth Amendment.  To have permitted such tests or analyses to go into evidence in Petitioner's trial constituted prejudicial and reversible error.  Importantly, all "fruits" of the blood sample, i.e., statements of William and Arbutus Johnson, flatware, and the confessions later obtained from Petitioner should have  been excluded from the evidence.  The trial court's ruling in opposition thereto was an abuse of discretion and reversible error.

g.      IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION DENIED THE PETITIONER A FAIR TRIAL.

When all was said and done, the trial of this case came down to the simple matter of which confessor the jury was willing to believe.  Both the Petitioner and Paul Reggettz had confessed to the murders.  Both had unsuccessfully attacked their confessions as being unconstitutionally coerced.  Paul Reggettz testified for the state.  He told the jury of the pressures and tactics the police used to illegally extract his confession.  The jury saw him testify; they heard his version of the story.  The petitioner, on the other hand, invoked his constitutional right not to testify.  The jury had only his confession to go by.  The significance of this fact was not lost on the prosecution in its summation.  Repeated references were made in relation to Mr. Reggettz such as:

> [Y]ou saw him on the stand.  He told you... (Tr. 1322);  Paul told you... .  You heard him say it.  (Tr. 1323);  Paul Reggettz told you [about the interrogation]; He told you how they fired questions at him;  You heard what Paul said [about the interrogation].  (Tr. 1324);  Paul told you that he just couldn't take it [the interrogation].  (Tr. 1326);  You saw Paul Reggettz on the stand.  He told you... (Tr. 1330);  And now Paul Reggettz says -- he's able to testify and he can say... (Tr. 1386).

References were also made with regard to the petitioner:

> John Moss told you about opening those gifts... (Tr. 1327);  [Y]ou heard the defendant on the stand... (Tr. 1332);  And then John testified that he gave it to another lady... (1335)  That's what he told you... (Tr. 1335).

Contrary to the state's argument, however, Petitioner did not testify.  He was never on the stand before the jury.  He told the jury nothing.  The jury was aware of that fact and they were made even more aware of it by the state's improper remarks that Petitioner had taken the stand, that he had testified.  This ploy was designed with one purpose in mind.  To draw

I want you to ask defense counsel -- again, ask them to explain how Paul Reggettz's confession changes any of the evidence against John Moss. See if they can explain it. (Tr. 1331).

Did you notice...they didn't talk about the blood? Did you notice that there is no explanation... . (Tr. 1370).

He didn't necessarily tell the whole story. (Tr. 1376).

Why did he kill [her]? He doesn't say... . (Tr. 1377).

Those comments also drew the attention of the jury to the possibility of special facts known by the prosecutor that they, the jurors, were not privy to; it attacked opposing counsel's strategy and/or presentation of his case; and was a comment on Petitioner's, or his witnesses' credibility.

Taken as a whole, the state's remarks in closing amounted to improper comments on the failure of Petitioner to testify and infused the entire trial process with so a fundamental unfairness as to deprive Petitioner the guarantees of a fair trial. *State v. Starcher*, 282 S.E.2d 877 (W.Va. 1981); *State v. Nuckolls*, 273 S.E.2d (W.Va. 1980); *State v. Noe*, 230 S.E.2d 826 (W.Va. 1976).

The state also made the following comments:

He knew Vanessa Reggettz was there by herself with her two children, didn't he? He knew that her husband worked at night. He didn't necessarily tell the whole story. **Perhaps that's why Vanessa Reggettz's panties are on the bed -- not on her body. Why her sanitary napkin was on the floor -- a homemade sanitary napkin, not a store bought one, something has no pins to secure it, no tape to secure it, no belt to secure it. It was secured in place by her underwear, but her underwear is off her body and her sanitary napkin is on the floor.**

**He did leave out a struggle in the front bedroom and he left out taking off her underwear.** [(Emphasis added.) (Tr. 1376 and 1377)].

At the conclusion of the State's argument, defendant's counsel asked to approach the bench. The court, *sua sponte*, said, "I know you are going to raise an objection. [I]s it something that you think you want a curative instruction on or is it instructional?" (Tr. 1391). Defendant's counsel replied, "I don't know." (Tr. 1391). The court continued: "The reason I ask is this, if you don't think it's something that can be taken care of by a curative instruction..." (Tr. 1391). "You made the timely request to object. I take it you object to the inference drawn from the panties and such?" (Tr. 1392). Defendant's counsel replied; "[Y]es." (Tr. 1392).

Defendant's counsel moved for a motion for mistrial. (Tr. 1395). The court stated; "I overruled the motion for mistrial, and I will deny the request for a curative instruction." (Tr.

1396).

To justify the granting of a mistrial or new trial, the misconduct of the prosecutor must be so egregious as to render ineffectual the type of curative measure employed. *United States v. Weatherless*, 734 F.2d 179, 182, (4th Cir. 1984). The court immediately recognized the egregious nature of the state's inflammatory remarks, and understood that a curative instruction would not nullify the prejudicial inferences to the defendant. The court, therefore, should have granted the mistrial.

There was absolutely no basis for the state to make an argument that the defendant had sex with the victim, Vanessa Reggettz. No evidence was put forth during the course of the trial that remotely indicated that sex played any part in the crime.

The type of conduct engaged in by the state in Petitioner's case was interdicted by the West Virginia Supreme Court: "The crime of which this defendant is accused is so revolting that it is difficult for the average jury to give the one accused the benefit of a reasonable doubt. Its very nature should have prompted the prosecuting attorney to exercise the highest degree of decorum in the conduct of the trial." *State v. Boyd*, 233 S.E.2d 710, 717 (W.Va. 1977).

Instead of exercising discretion, the state graphically and deliberately drew a mental image of a homemade sanitary napkin. What possible relevance does the fact the victim's sanitary napkin is homemade, has no pins, no tape and no belt to secure it have?  None. Such conduct is not in consonance with the expectation that the prosecution will exercise the highest degree of decorum in the conduct of a trial.  The only possible inference that one can make from the aforementioned argument is that the prosecutor was conscious of the fact she was talking to a white jury panel, the majority of whom were women, about a black defendant. It would have been damning if it had been a white defendant, but the implication of a black man having sex with a white woman, during her menstruation, is greater.

The litany of the sanitary napkin and its particulars were deliberately designed only to inflame the jury.  The impact of a prosecutor's remarks is to be determined by considering the tendency of such remarks to mislead the jury, whether the remarks are isolated or extensive, and whether the remarks were deliberate or accidental.  The remarks made by the state here were deliberate and without basis in fact. "A prosecuting attorney has a duty not to make statements concerning facts not in evidence or not inferable from the evidence." *State v. Critzer*, 280 S.E.2d 288 (W.Va. 1981).

The United States Supreme Court sets forth the following guidance to prosecutors: "He may prosecute with earnestness and vigor -- indeed he should do so.  But while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much her duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 633, 74

L.Ed.2d 1314 (1935).

The state waited until its closing rebuttal argument to convey the aforementioned sex allegations, knowing that defendant's counsel would be unable to mitigate the prejudicial harm her inflammatory remarks would make. As has been noted, curative instructions would not be able to erase the mental image of the defendant, a black man, having sex with a white victim, Vanessa Reggettz, during her menstrual period, a taboo that most people find less than pleasant. Only a new trial could cure the misconduct of the prosecutor.

## IV. CONCLUSION

Petitioner herein has made a *prima facie* showing that, if the facts set forth in this petition and memorandum are true, he has colorable grounds for habeas corpus relief. However, Petitioner requires the appointment of counsel to review the record, etc., (*see* Motion for Appointment of Counsel, filed contemporaneously herewith) and to thereafter advise Petitioner of all the grounds available to him and that if not raised in these habeas proceedings, he will forever be precluded from raising them in any subsequent proceedings.

## V. PRAYER FOR RELIEF

WHEREFORE, Petitioner prays now and forevermore that the court issue his petition for writ of habeas corpus and direct the respondent warden to show cause, if any he can, why Petitioner's convictions and sentences on three counts of first degree murder should not hereafter be set aside as the same are void as a matter of constitutional law, and for any further relief as the court deems just and necessary.


Respectfully submitted by:

John Moss, III
One Mountainside Way
Mt. Olive, WV 25185
MOCC Telephone: 304.442.7213

On this, the 29th day of June, 2005.

Petitioner proceeding *pro se*.

- 34 -

## VI.  VERIFICATION

I, John Moss, III, by my signature below, do hereby verify that I have read, or have had read to me, the foregoing petition and memorandum for writ of habeas corpus.  That the facts and allegations contained therein are true and correct to the best of my knowledge, except as to those facts and allegations found to be upon information and belief, and, as to those, I believe them to be true.

John Moss, III - *pro se* Petitioner

Subscribed and sworn to before me this __27__ day of June, 2005.

My commission expires: ___April 17, 2013___

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
R. MARK CRAWFORD
MOUNT OLIVE CORRECTIONAL COMPLEX
1 MOUNTAINSIDE WAY
MT. OLIVE, WV 25185
My commission expires April 17, 2013

NOTARY PUBLIC

- 35 -

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINA

FILED

2005 JUL -7 AM 9: 25

STATE OF WEST VIRGINA EX REL.,
JOHN MOSS, III,

CATHY S. GATSON CLERK
KANAWHA CO CIRCUIT COURT

　　　　　　　Petitioner,

vs.

Civil Action No. _05-MISC-298_
Underlying Felony No. _CR-82-F-221_

THOMAS McBRIDE, Warden,
Mount Olive Correctional Complex,

　　　　　　　Respondent.

## MOTION FOR APPOINTMENT OF COUNSEL

　　　　John Moss, III, the petitioner herein, believes that he has grounds for relief under the West Virginia Post-Conviction Habeas Corpus Act (*W.Va. Code* § 53-4A-1, et seq.).  More specifically, he believes that errors occurred in the underlying proceedings which, upon proper presentation and review, will show that, *inter alia*, he was denied due process.

　　　　Due to the intricate complexities of the case and Petitioner's inability to investigate certain facts, interview witnesses, secure affidavits and file material not in his possession, he is unable to properly demonstrate his entitlement to relief without the appointment of counsel.

　　　　Petitioner hereby applies to have an attorney appointed to represent him and to take whatever action necessary to assure due process, including filing a collateral appeal in the West Virginia Supreme Court of Appeals in the event his petition herein is denied.  Petitioner makes this request pursuant to the applicable provisions of *W.Va. Code* §§ 29-21-1 and 53-4A-1, *et seq*.  Petitioner does not own any property or have any money to retain an attorney of his choice to assist him with the proceedings herein.

Respectfully submitted by:

John Moss, III
One Mountainside Way
Mt. Olive, West Virginia
MOCC Telephone: 304.442.7213
On this, the 29th day of June, 2005.

Petitioner proceeding *pro se*

54

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINA

FILED

2005 JUL -7  AM 9: 25

CATHY S. GATSON, CLERK
KANAWHA CO. CIRCUIT COURT

STATE OF WEST VIRGINA EX REL.,
JOHN MOSS, III,

        Petitioner,

vs.

        Civil Action No. _05-MISC-298_
        Underlying Felony No. _CR-82-F-221_

THOMAS McBRIDE, Warden,
Mount Olive Correctional Complex,

        Respondent.

## MOTION TO PROCEED IN FORMA PAUPERIS

        Comes now the petitioner, John Moss, III, *pro se*, and makes known to the Court that he is an indigent prisoner without the necessary funds in which to pay the required court costs and filing fees associated with this action.

        THEREFORE, your Petitioner hereby requests this Court GRANT him permission to proceed in this action *In Forma Pauperis*.

Respectfully submitted by:

John Moss, III
One Mountainside Way
Mt. Olive, West Virginia
MOCC Telephone: 304.442.7213

On this, the 29th day of June, 2005.

Petitioner proceeding *pro se*

55

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2005 JUL -7  AM 9: 25

CATHY S. _____ SOIL CLERK
KANAWHA CO. CIRCUIT COURT

STATE OF WEST VIRGINA EX REL.,
JOHN MOSS, III,

         Petitioner,

                                         Civil Action No. 05-MISC-298

vs.                                  Underlying Felony No. CR-82-F-221

THOMAS McBRIDE, Warden,
Mount Olive Correctional Complex,

         Respondent.

## CERTIFICATE OF SERVICE

    I, John Moss, III, the undersigned *pro se* petitioner, do hereby certify that I served the foregoing *pro se* Petition Under West Virginia Code § 53-4A-1 For Writ of Habeas Corpus, Memorandum of Facts and Law In Support of Petition For Writ of Habeas Corpus Ad Subjiciendum, Motion For Appointment of Counsel, Motion To Proceed In Forma Pauperis, and Post-Conviction Habeas Corpus Form Application To Proceed In Forma Pauperis And Affidavit, with *certificate*, upon counsel for the respondent by handing true copies thereof to prison officials for mailing in the regular course of the United States mail, postage prepaid, on this the 29th day of June, 2005, in a correctly addressed and stamped envelope, addressed as follows:

        Prosecuting Attorney
        Kanawha County Circuit Court
        111 Court Street
        Charleston, WV  25301

                                     John Moss, III
                       John Moss, III, *pro se* Petitioner

56

PETITIONER'S EXHIBIT #1

September 19, 20, 21 & 22, 1983, Suppression Hearing Transcripts

PETITIONER'S EXHIBIT #1



9-19-83

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

Pictorial FILED

DEC 17 1985

STATE OF WEST VIRGINIA

9/20/83

vs.                    CR-82-F-221

CLERK OF THE
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

FILED
In Kanawha Circuit Court
Clerk's Office

JOHN MOSS, JR.,
also known as
John Moss, III

JAN 18 1983

Phyllis Jean Cole
CLERK

BEFORE:   HONORABLE JOHN HEY, Judge

APPEARANCES

FOR THE STATE:  James C. Stucky, Prosecuting Attorney,
and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha
County.

FOR THE DEFENDANT:  The Defendant, John Moss, Jr., also
known as John Moss, III, in person, and by Parriah McKittrick
and William Murray, his counsel.

A TRUE COPY
TESTE _____
CLERK COURT KANAWHA COUNTY, W. VA.

Patty Lou Frame
Official Reporter

T.P 92-74

---

INDEX

2

BEFORE THE COURT:

FOR THE STATE:

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael Don Smith | 48 | 79 | 118 | 124 |
| Charles Pettry | 130 | 145 | 171 | 178 |
| Terry Williams | 186 | 218 | | |

FOR THE DEFENDANT:

| | | | |
|---|---|---|---|
| Ernestine Whitlock | 235 | 240 | 240 |
| Beverly Selby | 242 | | |
| (Recalled) | 258 | | |
| Terry Williams | 245 | | |
| Michael Don Smith | 250 | | |
| Robert C. Murphy | 254 | | |
| Phyllis E. Griffith | 267 | | |
| James E. Williams | 272 | | |
| John Moss, III | 281 | | |

FOR THE STATE (Rebuttal):

| | | |
|---|---|---|
| Michael Don Smith | 311 | 325 |
| Terry Williams | 328 | 340 |

---

INDEX                    2-A

EXHIBITS

FOR THE STATE:

| NO. | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 1 | - I.D. Card | 60 | 235 |
| 2 | - DPS Form 79 | 64 | 235 |
| 3 | - Affidavit | 133 | 235 |
| 4-A | - Search Warrant | 190 | 235 |
| 4-B | - Affidavit | 201 | 235 |
| 4-C | - Return | 197 | 235 |
| 4-D | - Receipt | 197 | 235 |
| 5 | - Statement of John Moss, Jr. | 208 | 235 |

FOR THE DEFENDANT:

| NO. | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 1 | - Ohio Statute | 75 | 75 |
| 2 | - Affidavit | 103 | 105 |
| 3 | - Affidavit | 153 | 154 |
| 4 | - Xerox copy of Indictment | 238 | 239 |
| 5 | - Detainer | 260 | 265 |
| 6 | - Detainer | 265 | 266 |
| 7 | - Clerk's Notes | 269 | 270 |
| 8 | - Bible | 300 | |

---

3

BE IT REMEMBERED, That on Monday, the 19th day of
September, 1983, in the September, 1983 Term of the Circuit
Court of Kanawha County, West Virginia, in the Matter of STATE
OF WEST VIRGINIA vs. JOHN MOSS, JR., also known as
John Moss, III, CR-82-F-221, the following transpired:

THE COURT:  We are here in the Matter of State of
West Virginia vs. John Moss, Jr., also known as John Moss, III,
CR-82-F-221, murder in the first degree, three counts.  The
defendant is present in person and by Mr. McKittrick and
Mr. Murray, heretofore employed on behalf of the defendant; the
State of West Virginia by Mr. Stucky, Prosecuting Attorney, and
Mr. Brown, Assistant Prosecuting Attorney for Kanawha County.

We come upon defendant's motion for argument of pre-trial
motions.  The first thing I want to do logistically is for you
to tell me which actions you wish to argue and in what order,
and the clerk will pull them from the file as we read them off.
I know it is a voluminous file but --

MR. McKITTRICK:  Yes, Judge, but I think I have it in pretty
good order here.  But at times I know it is going to be
difficult.

Firstly, there would be the motion for grand jury minutes.

MR. BROWN:  Is that one or two actions?  Two separate
actions, Reggettz and Moss?

MR. McKITTRICK:  Right.

3

8

MR. STUCKY:  No, sir.

THE COURT:  Go ahead, Mr. McKittrick.

MR. McKITTRICK:  Your Honor, for purposes of the record, so that I might clarify something we discussed in our last meeting before this Court, as the Court is aware, John Moss has requested, pursuant to motions to produce, certain materials from the State; and the State has made an effort to get those materials, belatedly.  We received them finally I believe it was on the 9th day of September, 1983.  We immediately, Your Honor, sent those to our experts.

I can see the possibility, after talking with our experts, that they are not going to have time to analyze the materials that we have sent them and comply with the Court's trial date.  Now, I don't know that to be true at this time.  I have asked them to make an expeditious analyzation of the materials we have sent them because I know the State of West Virginia and John Moss want to get this matter over with.

We have worked very hard in preparing to do just that, but I just wanted to tell the Court, so that I don't surprise you at a later date.

THE COURT:  Well, just so I don't surprise you, let me state for the record they have had them since September 9, and this matter is not scheduled to go to trial until October 17, which is some month and a half.  And it seems to this Court that that

9

is a reasonable period of time for them to get their work completed.  As far as I am concerned, the matter is scheduled for trial on that date; but if need be, I will hear any motions in this regard, should it arise.  Right now it is premature.

MR. McKITTRICK:  Secondly, Your Honor, one of the things the defendant had asked production of was pictures.  Mr. Brown gave us several pictures, two sets of pictures, and indicated to me when he gave them to me that he thought that was all the pictures, but that he would check for us to see if there were any other pictures.  I would like to make a record on that and determine whether or not he has ascertained whether there are any other pictures.

MR. BROWN:  I think the pictures Mr. McKittrick really is concerned with are autopsy photographs.  We provided Mr. McKittrick with ten autopsy photographs.  I have been unable to determine if there are any others, but I did provide him with ten autopsy photographs taken at the office of the State Medical Examiner.  At this time those are all the ones I know of, but I am going to double check with Dr. Sopher to be sure because we did have a little problem with some slides Mr. McKittrick wanted.  So I am going to double check.  But we do have at least ten autopsy photographs.

THE COURT:  You will provide whatever copies are available to Mr. McKittrick?

10

MR. BROWN:  Yes, sir.  We provided ten autopsy photographs and ninety-one crime scene photographs.

THE COURT:  You have already provided those?

MR. BROWN:  Yes, sir.

THE COURT:  Does that take care of that, Mr. McKittrick?

MR. McKITTRICK:  Yes, for now, Your Honor.  But I would like for the Court to make sure they comply as quickly as possible, because again if there are some available, we have to get them to our expert.

THE COURT:  Well, the State has indicated a moment ago, and I thought it was clear enough, they will provide them to you as soon as they have them in their hands.  Sometimes you can't get these things overnight.  I call your attention to the writ of prohibition in State of West Virginia vs. Timothy Lee Bess which was just denied by the Supreme Court in which the defendant sought prohibition of his trial because it required two and a half years for the state police, because of understaffing or whatever, to complete analyses of chemicals alleged to be drugs.  And the Supreme Court denied the writ of prohibition.

The State has indicated and represented, and I accept their representation, that they will turn over to you, Mr. McKittrick, these photographs just as soon as they become available.  I would urge the Prosecutor to urge the authorities in whose custody they are to try to expedite these matters.

11

MR. BROWN:  If they in fact exist.

THE COURT:  If they exist.

MR. McKITTRICK:  The next motion is a motion to dismiss.  It has to do with West Virginia Code Section 49-5-10.

THE COURT:  Is that the juvenile transfer?

MR. McKITTRICK:  Yes, Your Honor.  That motion has been made before this Court before.  The Court has addressed that motion before.  The motion simply indicates that Mr. Moss was transferred on the 28th day of September, 1982.  And the defendant feels that he was prematurely indicted before the ten day appeal time, as set forth in 49-5-10, had run.

The Court heretofore has ruled that he was not prematurely indicted.  The defendant by this motion asks for a dismissal of the indictment because of the prematureness of the indictment.

THE COURT:  Motion denied.  The Court finds the motion is without any foundation of law.  This matter has been argued a number of times -- I can't count the number of times -- before this Court and the West Virginia Supreme Court.

For the reasons aforesaid in the record, this Court reaffirms its prior rulings and denies the motion to dismiss on the grounds alleged by counsel.

MR. McKITTRICK:  Your Honor, the next two motions to dismiss relate to the question of whether or not the time of 120 days has passed on the detainer statute.  Now, there are two motions

16

too much wrong with the search on that, although Mr. Reggettz can say he had a .22 rifle with a scope in his house. A scope was recovered from John Moss' parents' home in Cleveland. That is not the same scope. So that scope is out. That will take care of that right now.

MR. McKITTRICK: You will not use the scope?

MR. BROWN: We will not use the scope, although there will be testimony that there was a scope on the .22 rifle that was taken. But we are satisfied that is not the same scope. We will not introduce that scope.

As to the camera, the camera was also recovered from the home in Cleveland. Mr. Reggettz will identify that camera as being the same camera. He will not say positively that is the exact same camera. He will say he had a camera just like that.

As to the blood, Your Honor, there is a motion in limine that the blood of John Moss does not have sufficient characteristics, not enough common characteristics between the blood at the scene and the actual blood of John Moss. I think the chemist reduced that, Your Honor, so that point three ten-thousandths of the people have that, in other words, 60 people in the Kanawha Valley would have that same kind of blood. Out of 200,000 people, 60 of them in this valley would be likely statisticswise to have that kind of blood. Now, Your Honor, I would argue that that is enough common characteristics of the

17

blood at the scene and the actual blood of John Moss. And in any event, I think that is a jury question, Your Honor. I think they can give that any kind of weight they want to.

Your Honor, Mr. McKittrick has discussed and asked that we not bring up the fact that prior to the death of Vanessa Reggettz she had had a confrontation with a black man on or near the railroad tracks in the vicinity of her home because there is no evidence to link that black man with John Moss; and that is true. We can't link John Moss with that man, and we have no intention of even trying to do it.

THE COURT: That takes care of that, doesn't it, Mr. McKittrick?

MR. McKITTRICK: Yes, it does, Your Honor.

MR. BROWN: Your Honor, there was a motion in limine on the flatware and also a motion to suppress on the flatware; and Your Honor, the motion to suppress, we feel is not founded since there is no standing by the defendant to object to any search or any procedure by which that flatware was taken from Arbutus Johnson.

MR. STUCKY: Your Honor, the only thing left that hasn't been addressed by Mr. Brown is the motion to suppress the confession.

THE COURT: You are getting into a number of items. Let's take the ones we have discussed. Do you have any responses to

18

those?

MR. McKITTRICK: Yes, I do, Your Honor.

Mr. Brown talks about the silverware. Your Honor, the evidence undisputably in this case is simply this: The only time John Moss has ever been talked to was the confession taken on the 28th day of October, 1980. The essence of that confession is that John Moss took dishes from the home of Reggettz. It is the only gift as he calls it, characterizes it, that he took from the home, dishes. Now, I went into, on a previous hearing, cross-examination very thoroughly on this matter, and both troopers, specifically Terry Williams, indicated that the flatware are knives and spoons, and that he cannot say that they came from the Reggettz home.

Let's assume that they could say, Your Honor, that they came from the Reggettz home. That does not link John Moss with the silverware. But from my cross-examination of the trooper in this matter, he said no one has identified the flatware as coming from the home firstly, and secondly, he is aware of the fact that after John Moss was questioned, after some seven hours about this matter, that he always only referred to dishes.

There is absolutely no link whatsoever between the silverware and Paul Reggettz' house. I don't care who has them. And there cannot be any in this case.

Now, with regard to the camera, Your Honor --

19

THE COURT: Let's take one thing at a time. Do you have any response?

MR. BROWN: Arbutus Johnson will say she received the dishes or flatware, whatever you want to call them, from John Moss. And Mr. Reggettz will say that he had flatware under that Christmas tree.

THE COURT: I think the flatware or dishes, whatever you prefer to characterize them, goes to their weight, not admissibility. Motion denied.

Secondly, the defense has demonstrated no standing by this defendant in connection with these items and that he has any standing to move for suppression. I am going to deny the motion to suppress.

MR. McKITTRICK: Well, Your Honor, just assuming for the moment we don't have standing, we also filed a motion in limine on the basis there is no independent connection to the Reggettz home. Arbutus Johnson received a gift. She does not know where it came from.

THE COURT: I understand that. That is why I have overruled your motion and your motion in limine. It goes to weight, not to admissibility. You can argue that in your closing argument, or on your cross-examination.

MR. McKITTRICK: Secondly, Your Honor, Mr. Brown talked about the camera. The camera was taken from the residence

24

Maybe the trooper will take the stand and maybe he will
start alluding to these things and implying to the jury there is
some connection when in fact there is absolutely none. And
Mr. Brown at that time concludes "I'm not going to put Reggettz
on" -- All I'm asking from the Court, if Mr. Brown is
representing to the Court that Mr. Reggettz is the only one who
can independently link those physical items to his home, that if
he doesn't do so, and I'm not asking him at this point to respond
whether he will or not, but if he doesn't use him that those
matters cannot be alluded to by the State's witnesses prior to
them being identified.

THE COURT: Is that it?

MR. BROWN: Yes, sir.

THE COURT: Motion denied as being premature. It might very
well be during the course of this proceeding, if the State
attempts to introduce those items I will grant a motion,
depending on argument at that time. But at this point this is a
motion in limine and I am treating it as a motion in limine, and
I think it is premature.

For that reason it is denied.

MR. McKITTRICK: As I understand what Mr. Brown has said
with regard to this rifle, it is the same thing he said with
regard to the scope; and that is that there will be testimony
from someone that a rifle and a scope was taken from the

24

---

25

Reggettz residence, but there will be no other evidence
connecting John Moss with the rifle because the rifle cannot be
identified as the rifle that John Moss may have taken, if in
fact he did. Correct, Pete?

MR. BROWN: I think there is somebody who will testify that
they saw John with a .22 rifle at his parents' home in
Cleveland, and that it had a scope on it, and also that a .22
rifle with a scope was taken from the home of Paul Reggettz and
Moss was seen with one at the home in Cleveland. I think
somebody else also can put a .22 rifle in his hand. I believe
that John Moss' brother indicated he took a .22 rifle and got
rid of it, that he knew John had; and that somebody else --

MR. McKITTRICK: I don't mean to cut you off, but there is
nobody else. That is the reason for the motion. What happened
was the officers went to Cleveland, and they talked to Carlton
Moss, who is John's brother. And they found the scope in
Carlton's room, not John's room. That is the scope they said
doesn't even link up, and they are not going to use it.

The same thing happened with regard to the rifle, Judge.
There is no one who can say that the rifle, if there was a rifle
in Cleveland, Ohio, was the rifle that came out of the Reggettz
home. The implication that will be left in the jury's mind is
that that is the same .22 rifle that came out of St. Albans,
when nobody can prove it, not one that came out of St. Albans,

25

---

26

came out of the Reggettz home. And there is no one who can say
that.

Your Honor, we don't object to the police saying that a
rifle and scope were taken. I don't know how they are going to
say that because they weren't there when the alleged crimes
occurred. But we have no objection to somebody who knew they
were there saying they were taken. I assume that would be
Mr. Reggettz, if he testifies. But we do have an objection to
any evidence being presented that someone saw John Moss with a
rifle and a scope in Cleveland, Ohio.

MR. BROWN: Judge, I think Mr. Moss told the officers where
the gun was. He told them he took it and where the gun was.

MR. McKITTRICK: He told them where the gun was, Judge; and
when they went there, it wasn't there.

THE COURT: I think the motion in limine on that matter is
premature. Denied. And again I want to emphasize I am treating
it as, and in this context only, as a motion in limine and am
denying it at this time.

MR. McKITTRICK: Your Honor, our motion with regard to the
blood, other than the extraction of the blood on April 22, 1980,
has to do with the blood report itself. The survey of the blood
report indicates there are certain variances of blood samples
found at the scene that are consistent with the blood of John
Moss. But they don't have all the variances, Your Honor. In

26

---

27

other words, there may be ten variances in blood or twelve
variances in blood; and the officer has indicated there may be
three variances in a particular sample that is consistent with
John. That is the blood we are moving that should not be used.

MR. BROWN: Judge, all blood is broken down into nine parts,
all of it is. And starting with either the O, A, B or the AB we
are familiar with. Those are the cellular breakdowns of blood.
The other eight breakdowns deal with enzymes and proteins.
There are some letter designations that I won't bore the Court
with, but all people have these, besides the letters, O, A, B or
AB, they all have the other eight designations, which are, for
instance, PGM, AK, that type of thing, ESD. But each one of the
enzymes or proteins can be broken down into a sub group. And
each one of those enzymes or proteins are just as distinctive to
a chemist as the O or the A or the B or the AB.

And the chemist will say positively that any one of the
three distinctions that he makes here in that blood, in the nine
distinctions that he makes in that blood, three of them are
different and go specifically to John Moss' blood. And he will
say that any one of those three is sufficient to go particularly
to a person with that type blood. Any one of those three would
single out and differentiate that from any of the other blood
specimens taken, that of the three victims and that of Paul
Reggettz, the father and husband. Those three items will

27

32

in this matter, and I will present some evidence on that.

THE COURT: I have no problem. Why would you went to take it up last? If I grant it, that is going to obviate the necessity of any other proceedings in this matter. I am going to do it, but I just wanted to know why you want to take it up last.

MR. McKITTRICK: Quite frankly, I have talked with my client in detail on it, but I haven't had time this morning to talk with him about it.

THE COURT: Fair enough. We will take it last then.

MR. McKITTRICK: Your Honor, I believe the only motions left to address are the motions to suppress, which is a motion to suppress the flatware, the camera, the scope and the gun, the blood and the confession.

THE COURT: The scope and the gun I thought had been disposed of. Am I incorrect?

MR. BROWN: You can't suppress the gun, Your Honor. We don't have it. And the scope, we are not going to use the scope.

MR. McKITTRICK: The camera, the blood and the confession.

THE COURT: All right.

MR. STUCKY: Your Honor, if we might take those, or at least the beginning part in backwards order there, as far as the confession, it is the State's position that on September 24,

33

1982, the Court had a transfer hearing in which the Court heard lengthy testimony as to the voluntariness and admissibility of the confession of John Moss. And on page 465 of that transcript the Court began making its ruling, and carried over on page 469, and the Court finds that Moss was advised of his Miranda warnings not once but at least twice, that he was fed, given an opportunity to go to the restroom, permitted to smoke, provided food and drink, that he never asked that the questioning be stopped, never asked for a lawyer, that he knowingly, intelligently and voluntarily signed a waiver of rights, and the Court finds in fact and concludes in law that the taped confession was valid and given voluntarily, knowingly and intelligently by this defendant after a full explanation of his Miranda rights and the signing of the waiver of those rights.

The Court, therefore, concluded that the taped confession was indeed a valid confession, given voluntarily, and intelligently after an explanation to him not once but twice of his Miranda rights, and that he knowingly and intelligently waived the same. Therefore, the Court concludes that the taped confession was given knowingly and intelligently and is a valid confession.

And the Court went on to make the same findings as to the oral statements that were given.

It would be the State's position that the Court has already

34

heard suppression evidence and that was the sole purpose in the transfer hearing, to have a suppression hearing of the statement before the Court heard the statement as part of the transfer hearing. The State's position is that the admissibility of the statement in the hearing of a suppression hearing at the transfer hearing is the exact same standard. The Court made the exact same findings, the exact same evidence produced by the State, and the State would rest on Volumes 1, 2 and 3 of the transfer hearing as far as the suppressability in a suppression hearing of this statement and would ask the Court to find that in fact the statement is admissible in this proceeding.

MR. McKITTRICK: I really can't believe the State would make such a motion in a case like this, but I will respond to it. Obviously there is a difference in finding whether a person voluntarily gives a statement and whether or not his constitutional rights have been violated either prior to the statement being taken or during the statement being taken. There was never any evidence whatsoever gone into by the defendant. There was never a motion to suppress filed in the juvenile case with regard to many, many violations of John Moss' constitutional rights, which we would contend are obviously apparent, not only factually but legally in this case.

For example, let's just assume for example that this Court would suppress the extraction of blood on April 22, 1980.

35

It is inherent, and I believe that there are innumerable grounds to suppress that blood. And I say to Your Honor that there would be obviously a poisonous tree argument if the blood was suppressed by this Court. Your Honor, this Court has never thoroughly in detail examined the evidence pursuant to a motion to suppress, and that is completely different from this Court finding the defendant has voluntarily given a statement.

THE COURT: I agree, Mr. McKittrick. If you are not willing to accept the State's position without argument, then I am certainly not going to permit the State to enter that confession without a full blown hearing. This is a trial de novo. The confession issue raised in the juvenile proceeding was for the purpose of the juvenile transfer hearing and not as to the admissibility at trial in this matter, wherein the defendant was transferred to adult status. This is a trial de novo, gentlemen for the State. So if you have evidence to put on as to the confession, put it on.

I agree it would be a lot easier to adopt your position, but I am not going to do it in a trial of this magnitude when there is an objection by defense counsel.

MR. BROWN: Your Honor, we will have evidence and witnesses to put on. They will be here just shortly. Whether or not a motion to suppress was filed in the matter, we felt we still had the burden of proving that the confession was taken voluntarily

40

wants to call him, then you can cross-examine him. But the Court is not going to call Mr. Reggettz as its own witness.

MR. McKITTRICK: Your Honor, the issue in the State of West Virginia that gives us some anxiety, and I know that legal commentators and the Supreme Court have worn it, the "voucher rule" as most trial lawyers call it -- The rule is you are not supposed to impeach your own witness, have worn that rule down. And in fact the federal rules have dissipated the rule, and the rule has been thrown out. There is no such thing.

In this case, Your Honor, if we would call Mr. Reggettz as our own witness, I am sure the Court is familiar with the Supreme Court cases that indicate that it would be a violation of due process for the voucher rule to be invoked to prevent us from cross-examining this witness. In other words, obviously from prior hearings the Court realizes that Paul Reggettz has taken the stand before Your Honor and has admitted that he confessed to these murders but then said he did not do it.

Now, upon that happening, Your Honor, I am sure that the State would object and say, "Well, these people now are trying to cross-examine their own witness, and they can't impeach their own witness." The reason we make this motion is that we don't want to vouch for the credibility of Paul Reggettz. His confession and the facts contained in the confession are so unquestionably consistent with the murders in this case that we

40

41

could not put him on and vouch for his credibility.

What I say to the Court is that with the uniqueness of this case as it has been characterized by the Supreme Court of the United States in the only case that has come before it, and it is almost on all fours with this case, that the defendant's due process rights would be served by the Court calling Mr. Reggettz so that he could be cross-examined not only by the State but also by the defense. And we wouldn't get into the voucher rule controversy, and whether or not the Supreme Court case applies or it doesn't apply.

Also, Your Honor, as the Court is aware, the case of State vs. Williams in the State of West Virginia now gives us an exception to the hearsay rule in the admission against penal interests. I remember in the transfer hearings some objections by the State was sustained by the Court on the basis that it was hearsay when other witnesses tried to testify to what Paul Reggettz said when he indicated in detail how he murdered his family. Under the Williams case, Your Honor, that would be an exception to the hearsay rule.

We wouldn't have to get into that kind of controversy in the trial of this case if Reggettz was called as a Court's witness so that both sides could cross-examine him. That is the reason for the motion, Your Honor.

THE COURT: Is that it?

41

42

MR. McKITTRICK: Yes.

MR. BROWN: Your Honor, if the Court were to call Mr. Reggettz, it would put the Court in the unusual position of the Court vouching for the witness' credibility. And of course, the Court is not supposed to comment on any evidence or the testimony of any witness. In some respects it would almost be like the Court saying, "This is my witness. Pay special attention." I think it would be improper.

Every criminal case, Your Honor, is fraught with a certain kind of peril as to what witnesses you call or don't call. I know Mr. McKittrick has a problem with calling Mr. Reggettz. That may be a problem that I may have. That is just a problem that we are going to have to face, both sides, as to whether it is called or not called. I just think it would cause a special kind of problem for the Court to call this witness as its own witness.

The common law cases that are brought up where the court calls its own witnesses are generally cases where the court has called some kind of almost a neutral expert to explain the value of land or to shed a little light on some kind of a particular situation, or a witnesses that doesn't hurt either side, or a witness that is somewhat neutral.

But in this particular case, I don't have to beat you down on that. You know that this particular witness is a very

42

43

crucial witness, his testimony will be very crucial, his credibility will be really screened by the jurors. And I think it would just cause all sorts of problems for the Court to in effect have vouched for the credibility of this person.

MR. McKITTRICK: Well, Your Honor, Mr. Brown's statement as to "He may have a problem" or "I may have a problem" is not what we are trying to get to in this case. We are trying to get a full disclosure to this jury so that it can hear the facts. This isn't a game of chance, and that is what the Supreme Court said in Chambers vs. Mississippi. It said under the cases with this kind of facts, it so unique that you violate the due process rights of the defendant when you adhere to these anachronistic rules like the voucher rule and you can't bring in third persons to testify that another person said, "I committed that crime", because it is hearsay. It is an admissions against penal interests. And the reason for this motion, Your Honor, is to do away with some kind of a crap game and a courtroom where jurors don't hear something because of anachronistic rules. And that is what -- I'm quoting the Supreme Court. That is not my argument, Your Honor.

THE COURT: Which Supreme Court, the West Virginia Supreme Court of Appeals or the United States Supreme Court?

MR. McKITTRICK: The United States Supreme Court, Your Honor, the United States Supreme Court. And the case,

43

Michael Don Smith - Direct      48

MICHAEL DON SMITH,

Being thereupon called as a witness, after

being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. STUCKY:

Q    Would you state your full name please.

A    Michael Don Smith.

Q    Where are you employed?

A    Department of Public Safety, State Police.

Q    In what capacity are you employed by the West Virginia State Police?

A    Trooper.

Q    How long have you been a trooper with the West Virginia State Police?

A    Approximately twelve years and three months.

Q    Where are you currently stationed?

A    Winfield, Putnam County.

Q    How long have you been stationed in Winfield?

A    A little over three years.

Q    In October, 1980 where were you stationed?

A    Winfield.

Q    And did there come a time when you were assigned an investigation of three murders that occurred in St. Albans, Kanawha County, West Virginia?

---

Michael Don Smith - Direct      49

A    Would you repeat the question.

Q    Were you assigned to an investigation of three murders that occurred in Kanawha County, West Virginia, and specifically in St. Albans, West Virginia, in October, 1980, or before that?

A    Yes.

Q    Who was assisting you, or who were you assisting in that investigation?

A    Trooper Terry Williams.

Q    Did there come a time in October, 1980 when, during the course of your investigation you left the Kanawha County area and went to the State of Ohio?

A    Yes.

Q    And do you know particularly when that was?

A    It was October 28, 1980.

Q    And what was the purpose of going to Ohio at that time?

A    To go to the State Reformatory in Mansfield, Ohio, and bring back a subject.

THE COURT: Now, you understood my rulings this morning. I realize we are here now in suppression without a jury. But you heard my rulings this morning about any mention of any penitentiary or reformatory in the State of Ohio. I don't have a problem right now because we are in suppression.

MR. STUCKY: Your Honor, also the ruling, as I recall it, we are not to bring up any prior convictions or prior criminal

---

Michael Don Smith - Direct      50

record. I don't think we can manufacture evidence as to the fact that they had to go to the reformatory to pick this guy up.

THE COURT: I'm not going to permit it. Now, they can say they want to go to the State of Ohio to pick Moss up, but I am not going to permit any reference to any penitentiary or penal institution.

MR. STUCKY: All right.

Q    When you arrived in Mansfield, Ohio, did you --

MR. McKITTRICK: I don't mean to interrupt, but as I understood, you said you had no problem with it now because of legal problems?

THE COURT: I have no problem with it now because there is no jury here. We are not at trial. This is a suppression hearing before the Court.

Q    When you got to Mansfield, did you meet the subject you went up there after or went up there for?

A    Yes.

Q    Who was that?

A    John Moss.

THE COURT: Let me say this for clarification: If you open it up during the trial, it is fair game for the State.

MR. McKITTRICK: I understand.

THE COURT: All right.

Q    For purposes of the record, would you look around the

---

Michael Don Smith - Direct      51

courtroom to see whether or not the person you went and retrieved from the State of Ohio on October 28, 1980, is present in the courtroom?

A    Yes, he is.

Q    Would you identify him please.

A    He is sitting at the end of the large table in front of me in red coveralls.

MR. STUCKY: May the record reflect he has pointed to the defendant, John Moss, III or John Moss, Jr.?

THE COURT: The record will so reflect.

Q    Who went with you to Mansfield, Ohio?

A    Trooper Terry Williams.

Q    How did you get there, what mode of transportation?

A    Department of Public Safety vehicle.

Q    Was it a marked vehicle or unmarked vehicle?

A    It was an unmarked vehicle.

Q    Would you describe what type automobile it was and what it looked like?

A    Full size car, four door, front and back seats. The front seats were bucket type seats with a bench in the middle. It was carpeted and has cloth type upholstery.

Q    Were there any weapons or restraining devices in the interior?

A    No.

Michael Don Smith - Direct                36

A    Yes.

Q    When was that along the trip, if you can remember?

A    I would say it was around twenty minutes or so after getting out of Mansfield, and after having some casual talk about how, as I said earlier, how things were going for him, his weight gain.

What I told him, before he started anything about any type of crime, his involvement in West Virginia, I told him I wanted to advise him of his constitutional rights and make him aware of them.

Q    Did you in fact advise him of his rights?

A    Yes, I did.

Q    How did you do that?

A    From the back of my I.D. card, Department I.D. card.

Q    Do you have with you this afternoon the I.D. card which you read to John Moss on October 28, 1980?

A    Yes, I do.

Q    Would you produce that for me please.

A    Yes.

MR. STUCKY:  Your Honor, I would ask that this be marked for identification purposes only as State's Exhibit No. 1.

THE COURT:  All right, it will be so marked.

(Whereupon, the document referred to was marked by the reporter as State's Exhibit No. 1.)

---

Michael Don Smith - Direct                37

Q    Trooper Smith, I'll show you what has been marked for identification as State's Exhibit No. 1 and ask you to identify that for the record.  Can you identify that?

A    Okay, this is my Department of Public Safety identification card.

Q    Where do you get that?

A    It is issued to us by our department.

Q    And on the front of it it has what kind of information?

A    It has "The West Virginia State Police," who I am, my height, weight, unit number and date of birth.

Q    And on the reverse side of that, what information is contained?

A    It is a Miranda warning.

Q    What is the purpose of that being on the back of the card, if you know?

A    So that we will have it available any time we want to advise a suspect or accused of his rights.

Q    In your training to perform your duties as a West Virginia State Policeman, are you instructed on the necessity of advising people of their rights before asking them any questions in an investigation?

A    Yes, we are.

Q    And are you trained further in how to advise people of their rights?

---

Michael Don Smith - Direct                58

A    Yes.

Q    What instructions are you given as to the use or when or how to use that particular card?

A    Well, I think it is, for the most part it would be when they become at an accusatory stage is when I have always been told you should advise them of their rights.

Q    Are you told how to advise them of their rights?

A    You can either use your card, or we also have forms at the office.

Q    On this particular occasion, on October 28, 1980, how did you advise John Moss of his Miranda rights?

A    While in the patrol car that particular day I advised him of his rights from the back of this card I have here.

Q    You read them to him?

A    Yes, I did.  I read them off the card.

Q    All right, would you read them to us in the same fashion you did coming back in the car from Mansfield, Ohio, on October 28, 1980.

A    Okay, the card states that "You have the right to remain silent and refuse to answer questions.  Anything you do say may be used against you in a court of law.  You have the right to consult with an attorney before speaking to the police and to have an attorney present during any questioning now or in the future.  If you cannot afford an attorney, one will be provided

---

Michael Don Smith - Direct                59

for you without cost.  If you do not have an attorney available, you have the right to remain silent until you have an opportunity to consult with one.  Now that you have been advised of your rights, are you willing to answer questions without an attorney present?"

Q    Were you able to observe John Moss during the period of time that you were reading that card?

A    Yes.

Q    Did he appear to be listening to you?

A    Yes, he did.

Q    When you read the Miranda warnings, was it done in such a fashion that John Moss could easily understand you and hear what you were saying?

MR. McKITTRICK:  Objection.  He cannot testify as to what John Moss could understand.

THE COURT:  That is true.  I will sustain it on that basis.  You can rephrase.

Q    Was it done in such a fashion that John Moss could easily hear what you were saying to him?

A    I felt that I did it in such a fashion that John was listening and that I read them in such a fashion that if he had had any questions or wanted to say anything, he would have had an opportunity to say so at the time I was reading the rights.

Q    Did you say anything with regard to his rights other

---

A    I believe it is in this report right here.

MR. STUCKY:  Your Honor, I would ask that this DPS Form 79,
dated 10/28/80 be marked as State's Exhibit No. 2 for
identification purposes for this hearing.

THE COURT:  It will be so marked.

(Whereupon, the document referred to was marked by the
reporter as State's Exhibit No. 2.)

MR. STUCKY:  For the record I probably should show it was
marked on September 24, 1982, as State's Exhibit No. 4 in the
transfer hearing and is in fact the same document.

Q    I show you what has been marked as State's Exhibit No.
2 and ask you to identify that please.

A    Yes.  This is the form that we gave to John, and I
witnessed at the Parkersburg Detachment.

Q    At the top of it it has a date, place and time, and
those are filled in with ink; is that right?

A    Yes.

Q    Do you know who filled that in?

A    Trooper Williams.

Q    Did you watch him fill that in?

A    Yes, I did.

Q    Would you read to us what that says.

A    "Parkersburg State Police Detachment, 10/28/80, 6:50
p.m., Eastern Standard time."

---

Q    And there is a subtitle there "Your Rights" which goes
down six different paragraphs, and then there is another
subtitle there "Waiver of Rights", and it says "Signed" and
there is a signature there; is that right?

A    Yes, there is.

Q    Whose signature is that?

A    John Moss, III.

Q    Do you know who put that signature there?

A    John Moss, III did.

Q    Did you watch him put that signature there?

A    Yes, I did.

Q    That is the gentleman you previously pointed out in the
red coveralls?

A    Yes.

Q    And then there is a place for witnesses to sign, and it
is signed by two individuals.  Who are they?

A    Myself and Trooper Williams.

Q    Is there a time on there?

A    Out from Trooper Williams' name it says 6:57 p.m.

Q    Which would indicate it took some seven minutes to
complete reading that particular form and for John Moss, III to
sign it; is that correct?

A    Yes.

Q    Once that document was completed, what, if anything,

---

took place?

A    Oh, numerous questions and answers, questions that I
asked and answers that John gave.

Q    Were those questions and answers recorded in any
fashion?

A    Not at that time, no.

Q    More of a conversation between you and John?

A    What was taking place between John and I at that time,
yes, sir.

Q    You didn't have any tape recorders or secretaries
writing things down?

A    Not at that time, no.

Q    You weren't writing things down as the answers were
being given?

A    No, sir.

Q    At any time prior to this question and answer session,
did you or anyone in your presence make any threats or promises
to John Moss?

A    No.

Q    Did, at any time prior to your questioning, John Moss
request an attorney?

A    No.

Q    Did he at any time indicate he didn't want to talk to
you?

---

A    No, he didn't.

Q    At any time during the questioning did he indicate he
wanted to stop and didn't want to talk to you any more?

A    No.

Q    At any time prior to this questioning did you try to
trick John into giving you a statement or threaten him or do
anything to make him give you a statement?

A    No, sir.

Q    Do you recall what the conversation you and John Moss
had contained?

A    After the rights form?

Q    Correct.

A    Yes.  I asked him if he would give us some answers,
that I felt he could give us some answers to the very serious
thing that had occurred here in West Virginia, that I couldn't
explain how serious, but that it was something very serious and
we needed some answers, and I felt like he could give us some
answers and help us get the issue straightened up and why.

Q    You say you didn't record the answers at that
particular session.  Did there come a time later on you wrote
down what John Moss told you?

A    Yes.

Q    When did you do that?

A    After returning from Ohio, which was not the next day

Michael Don Smith - Direct                72

memory back on some of it. Some things were more detailed.
Like he went into the fact that there was water in the bathtub.
He placed him, the little boy, in the bathtub with his hands
tied. He did that to make sure he was dead. And he stabbed the
woman to make sure she was dead or wouldn't give him any
more problems.

Q    I don't want to drag this thing out a lot, but I would
like for you to continue going through your notes and see if
there is anything else you haven't told the Court that John Moss
told you that evening at the Parkersburg State Police Detachment
in the oral conversation between yourself and John Moss.

THE COURT: All right, we will take a five minute recess
while you complete your study of the notes.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

THE COURT: Show the resumption of these proceedings in
State of West Virginia vs. John Moss, Jr., also known as John
Moss, III, with all parties present heretofore present here
again, including the defendant and his counsel; the State of
West Virginia by her Prosecuting Attorney and Assistant
Prosecuting Attorney.

Have the State and the defense agreed on any stipulations?
Where are we?

MR. McKITTRICK: Yes, we have, Judge. And I think we can

---

73

save the Court at least a couple of days of evidence the way we
are going to propose to do this. What we would like to do is
stipulate into the record the second transfer hearing. There
are, as I remember, three volumes of that hearing.

THE COURT: Just give us the dates please, if you could.

MR. McKITTRICK: September 24, 1982. It goes on to around
the 27th. It is the 24th, 25th and 27th, Your Honor.

THE COURT: Of 1982?

MR. McKITTRICK: Of 1982.

THE COURT: And you want to make those a part of the record?

MR. McKITTRICK: Yes, we want to make those a part of the
record for the purpose of addressing the suppression hearing on
the blood and the confession and the camera, subject to ay
cross-examination of some of the State's witnesses. And it will
be abbreviated, Your Honor. And subject to the State, if it
wishes, to bring on evidence that may rebut some cross-examination
that I may have.

THE COURT: Is that a correct representation, Mr. Stucky?

MR. STUCKY: I think that is correct, Your Honor.
Basically, as I understand it, Mr. McKittrick is going to go
into some issues or may go into some issues that weren't covered
by this particular hearing. This was basically a Miranda type
situation, voluntariness, informed consent, that sort of thing.
I think Mr. McKittrick is going to basically be delving into an

---

74

area of a fruit of a poisonous tree type thing at this time that
really wasn't covered -- It was covered briefly but not
extensively in this hearing; and we have agreed to allow this to
stand, for him to put on evidence and for us to come back with
evidence rebutting or refuting the testimony he has regarding
the fruit of a poisonous tree situation.

THE COURT: As I understand it, at the appropriate time, at
trial you are going to move to have these transcripts made a
part of the record?

MR. STUCKY: No, just for suppression, Your Honor.

THE COURT: Oh, just for suppression. All right.

MR. McKITTRICK: First, Your Honor, we would like for the
Court to take judicial notice -- if I may approach the bench --
of an Ohio statute regarding the taking of blood tests on the
22nd day of April, 1980. I have shown a copy of that statute to
Mr. Stucky and Mr. Brown, and they have no objection to the
Court taking judicial notice of that statute.

MR. BROWN: That is correct, Your Honor.

MR. McKITTRICK: At a later time, Your Honor, so that the
Court knows what we are doing, we intend to introduce into
evidence a court order, pursuant to a petition of the Ohio
authorities and West Virginia authorities to take blood,
requesting from the Ohio court an order directing John Moss to
give blood and saliva, which was done. We will introduce those

---

75

documents by Chuck Pettry, who was an Assistant Prosecuting
Attorney at that time.

THE COURT: But you want the Court to take judicial notice
of Ohio Statute 2317.47 relating to blood tests; is that
correct?

MR. McKITTRICK: Yes. And we would like to have that marked
and moved into evidence at this time.

THE COURT: I understand the State has no objection?

MR. BROWN: That is correct, Your Honor.

THE COURT: All right, the Court will allow the exhibit and
will take judicial notice of Ohio Statute 2317.47 relating to
blood tests.

(Whereupon, the document referred to was marked by the
reporter as Defendant's Exhibit No. 1.)

THE COURT: I assume you have finished your direct?

MR. BROWN: That's correct.

THE COURT: How long is your cross going to take?

MR. McKITTRICK: I don't know. I don't think more than
twenty minutes, Your Honor.

THE COURT: It is getting late.

MR. McKITTRICK: Does the Court recess at 4:00?

THE COURT: Normally. You have cross; they say have some
redirect --

MR. McKITTRICK: We can do it tomorrow.

Michael Don Smith - Cross                80

A    And other proof.

Q    At the time that you went -- Where did you go in Ohio at that time?

A    You mean where John was at?

Q    To extract the blood from John.

A    We went mainly to talk with John, not to extract blood. That was only if, you know, if we would be able to or he would voluntarily give that, and that was at a detention center.

Q    And I believe you have already indicated to His Honor in a previous hearing that you talked to John about the Reggettz cases, and you talked to John about a felonious assault case; is that correct?

A    Yes, briefly.

Q    And it is a fair statement to say when you talked to John about the Reggettz murder cases he denied firstly that he knew who committed those murders and denied that he committed them. I think that is your previous testimony.

A    He denied any knowledge of who or whether he or anybody could have committed them. He said he had knowledge that it had occurred.

Q    When did it first enter your mind at that time to extract blood from John Moss?

A    Well, I couldn't say exactly when it first entered my mind. I just, you know, simply asked him if he would volunteer

80

---

Michael Don Smith - Cross                81

to give it.

Q    You are not telling His Honor here you went to Ohio without the intention of extracting blood from John Moss on the 30th day of January, 1980 --

A    I went with the intentions that possibly I could not get the blood, yes.

Q    Excuse me.

A    I went with the intentions I possibly would not obtain the blood, yes.

Q    But it is a fair statement you went to Ohio on the 30th day of January, 1980, prepared to extract blood from John Moss. Isn't that a fair statement?

A    If he was willing to give it, yes.

Q    What did you take with you at the time you went to extract the blood?

A    We have a little tiny package which contains a little metal stick type pin sort of thing that you prick your finger with.

Q    When you went to Ohio on the 30th day of January, 1980, you knew John Moss was charged with a crime in the State of Ohio at that time?

A    Yes.

Q    And in fact you even talked to the law enforcement authorities in the State of Ohio about those charges?

81

---

Michael Don Smith - Cross                82

A    Yes.

Q    And you knew that John Moss was being held in the juvenile center on the 30th day of January, 1980 for the purpose of awaiting disposition on the charges that were against him in the State of Ohio. Isn't that a fair statement?

A    Some sort of, some type of disposition I am sure, yes.

Q    He hadn't been tried, and he hadn't pled guilty at that time?

A    No, sir.

Q    Did you, before you went to the State of Ohio on the 30th day of January, 1980, contact John Moss' lawyer?

A    No. It was my belief that he didn't have a lawyer.

Q    You talked with the Ohio authorities, and you knew he was charged with very serious felonies in the State of Ohio; but it was your conclusion he didn't have a lawyer?

A    I was told that.

Q    And you didn't look any further than somebody telling you that?

A    No, sir.

Q    Do you know when these felonies occurred in the State of Ohio that John was charged with before you went up there on the 30th day of January, 1980?

A    Not an exact date, no.

Q    Can you approximate it for His Honor?

82

---

Michael Don Smith - Cross                83

A    I would think sometime within a two week period, but probably much closer than that.

Q    Now, you did extract blood from John on the 30th day of January, 1980, Isn't that a fair --

A    I let John do it.

Q    Blood was extracted from John Moss?

A    I obtained blood that John gave me, yes.

Q    And later an Ohio Common Pleas Court suppressed that blood and made you and Trooper Williams give it back?

A    I was ordered by a judge there to turn the sample over to a detective we were with at that time.

Q    And the conclusion was you had violated John's constitutional rights at that time, and that is why you had to give it back?

A    Well, I don't know whether I would call it that.

Q    That is what the judge called it; you know that; don't you?

A    The judge simply ordered me to give the officer the sample.

Q    Now, after you took the blood, and when you went through this proceeding where the judge ordered the return of the blood so that you couldn't use the same for any purpose, John Moss was represented by counsel; wasn't he?

A    Would you repeat that again.



83

Michael Don Smith - Cross                                          88

Q    Excuse me.

A    Information, or maybe you might want to call it probable cause to believe --

Q    You had more information?

A    Yes.

Q    What other information did you have?

A    Well, you kind of have to put your information together. I mean I can't give you a simple yes, you know.

Q    I want to --

A    Do you want the information?

Q    Yes. I want to know what other information you had.

A    The information, we put it together with the fact that we had the newspaper clipping.

Q    You had the what?

A    The newspaper clipping.

Q    From Cleveland?

A    Yes.

Q    Concerning the murder?

A    Explaining the murder there and also the information to the police department, the fact that this did occur. No, not the murder, the attempted murder.

Q    Let's go over this carefully now. You are telling the Court you had a newspaper advertisement or a newspaper article that indicated John Moss was charged with a crime in the State

---

Michael Don Smith - Cross                                          89

of Ohio?

A    Along with information from the police department up there.

Q    Along with information from the police department up where?

A    Cleveland, Ohio.

Q    Concerning what?

A    Concerning crimes John had been involved in up there.

Q    What did that have to do with the Reggettz murders?

A    Well, the fact that he had attempted murder by strangulation, and we had strangulation murders concerning the Reggettz; the fact that John was close to where he resided; he was now a suspect, and almost considered an accused, in an attempted robbery and felonious shooting, wounding, at the Moose Club, which is also close to the Reggettz residence.

Q    What did that have to do with the Reggettz murders?

A    Well, like I said, you know, you would have to think it is very probable that a person who could be involved in what I just explained to you could very possibly be involved in the Reggettz murders.

Q    Would you have been willing to go before a magistrate and get an arrest warrant for John Moss based on the fact that there was a felonious shooting at a Moose Club, based on the fact that you had an article that a crime had occurred in Ohio,

---

Michael Don Smith - Cross                                          90

and John Moss was a suspect and was charged with a crime in Ohio? Is that what you are telling His Honor?

A    No, I certainly am not.

Q    In other words, you wouldn't have done that?

A    No, I wouldn't have gone and got an arrest warrant.

Q    You are a trained police officer, correct, in investigations with regard to the facts and probable cause; aren't you?

A    I think we had probable cause there with the information. There is a lot of difference, fluctuation between an arrest warrant and search warrant.

Q    You do agree that probable cause means reasonable grounds to believe that someone committed a crime. Isn't that a fair statement of what it means?

A    You can use it in that case.

Q    I am asking you --

A    I am speaking of information for a type of search warrant.

Q    Are you telling His Honor that between January 30, 1980, and April 22, 1980, that you concluded that you had probable cause to believe John Moss committed the Reggettz murders because a felonious assault had occurred near the Reggettz home and that you had an article from an Ohio newspaper where a crime had been committed and John Moss had been charged

---

Michael Don Smith - Cross                                          91

with a crime? Is that a fair statement?

A    I am telling you I had information I felt was good enough to sign an affidavit to try to obtain the blood. That is what I am telling you.

Q    And the information is the information I just enumerated?

A    That is the information I just told you.

Q    And there is no other information that you had between January 30, 1980, and April 22, 1980, other than those two things, that is the article in the Cleveland newspaper and the felonious assault; is that correct?

A    There are some other things, I mean, that goes along with what I'm telling you.

Q    Well, what are they?

A    Well, you have -- I explained the fact that John lived close to where the Reggettz residence was at. We had good reason to believe he was involved in a crime at the Moose Club, which is either as close as his residence to their residence or closer, the fact that you had the strangulation, attempted strangulation in Cleveland, and that you had the strangulation at the Reggettz'.

Q    Is there anything else?

A    Not that I can recall right now. There may be.

Q    When did the Moose Club crime occur?

Michael Don Smith - Cross                                96

know that -- I am sure it was probably discussed.  As to exactly

what was said, I couldn't tell you.

     Q    Do you remember that Mr. Pettry was formulating some

papers so that you could go back to Ohio and extract some blood

from John Moss on April 22, 1980?

     A    I'm aware that was being prepared by somebody.

     Q    When is the first time you were advised that those

papers were prepared and that you could go to the State of Ohio

and get this blood that you needed?

     A    I couldn't honestly tell you.

     Q    Do you know how long before you went it was in days or

weeks?

     A    The only thing I could tell you, I was maybe made aware

of it the week before that we were going up on such and such a

date or just told the day before that.

     Q    All right, what preparations did you make to go to

Cleveland, Ohio, on the 22nd day of April, 1980?

     A    Myself, I really didn't make any preparations as far

as, you know, I went up and met with the Prosecutor's office and

did whatever I was supposed to do as far as signing the

affidavit.  Then we would have left.

     Q    Now, did you come to the conclusion in your own mind

that because -- Strike that -- Were you aware that John Moss was

still charged with the crimes in the State of Ohio when you went

---

Michael Don Smith - Cross                                97

there on the 22nd day of April, 1980?

     A    I am not sure.  I couldn't say what -- I'm not sure

what John's status was as far as -- He was still either charged

or had been convicted.

     Q    Did you not think that was relevant?

     A    He was still in custody.  That is all I can tell you.

     Q    Well, did you not even consider the fact that John may

still have been charged and have a lawyer representing him?

     A    Are we talking about the 22nd --

     Q    The 22nd of April, 1980, did you not think in your own

mind that it was important to consider whether John Moss was

still charged with crimes in the State of Ohio and had a lawyer

representing him on those crimes before you went up to

Cleveland, Ohio, on the 22nd day of April, 1980?

     A    I probably wasn't considering such on it because I

was figuring the Prosecutor's office was handling the paper work

and whatever had to be done, so I really wasn't thinking that

much about it one way or the other.

     Q    I guess you figured in your own mind that the

Prosecutor's office would take care of those matters?

     A    I did.

     Q    Now, when you traveled to Ohio to extract John's blood

on April 22, 1980, were you accompanied by Chuck Pettry and

Trooper Williams?

---

Michael Don Smith - Cross                                98

     A    Yes.

     Q    Tell us what happened when you got to Cleveland, Ohio.

     THE COURT:  What was that date, Parrish?

     MR. McKITTRICK:  The 22nd of April, 1980.

     THE COURT:  Thank you.

     Q    Tell us what happened when you got to the City of

Cleveland, Ohio.  What did you do?

     A    Okay, we went to an office and met with, it was either

-- It was someone out of the Prosecutor's office, you know,

there in Cleveland.

     Q    You went to the Prosecutor's office in Cleveland?

     A    We went somewhere.  It was connected with the detention

center or justice center in Cleveland, and met with whoever we

needed to meet with about the paperwork the Prosecutor's office

had sent up.

     Q    Were you present at the meeting?

     A    I am sure I was.  I was with Mr. Pettry and Trooper

Williams.

     Q    Who did you meet with?

     A    I couldn't tell you.

     Q    What was the purpose of the meeting?

     A    Concerning the paperwork that was prepared or had been

prepared to get the blood.

     Q    Do you know anything about that?

---

Michael Don Smith - Cross                                99

     A    Not other than the fact that I signed an affidavit and

the Prosecutor's office handled the rest of it.

     Q    Now, had you had conversations with Mike Roark

concerning the extraction of John Moss' blood on the 22nd day of

April, 1980?

     A    Did I have a conversation with Mike Roark on the 22nd

day of April --

     Q    And any time prior to the 22nd day of April.

     A    I am sure I probably did.

     Q    Do you remember them specifically?

     A    It seems to me like, you know, I think I made, I can't

say.  I don't know whether I touched base with Mr. Pettry or

Mr. Roark after coming back on January 30.

     Q    Between January 30, 1980, and April 22, 1980, do you

remember specifically as you sit here today having any

conversations or meetings with Mike Roark, the Prosecuting

Attorney of Kanawha County, concerning the extraction of

John Moss' blood on April 22, 1980?

     A    No.  I can't say that definitely, no.

     Q    Now, after you met with whoever you met with concerning

the papers that you don't know anything about, where did you go

next?

     A    Okay, I said I didn't know anything about the papers.

I do know of the affidavit, which I am sure would have been part

Michael Don Smith - Cross                104

Q    I didn't say it; you said it a little while ago,
Trooper.  You said the affidavit you signed was the reasons for
which you needed John Moss' --

A    I didn't say reasons.  I said information.  I stated
that information, and I think that contains it.

Q    Contains the information?

A    Yes.  For the most part, yes.

Q    What kind of information?

A    What I repeated to you earlier.  The fact that where he
resided, what had occurred, and what occurred in Cleveland,
what other information we found out, his friend, what his friend
had told us, the fact that he was here when it happened, the
fact that he left shortly after that;

Q    Where does it say anything in this Defendant's Exhibit
2 about John Moss' friend?

A    Well, I think if you will read this whole thing it
states --

MR. BROWN:  Excuse me, Your Honor.  Has that document been
introduced into evidence?

THE COURT:  I don't think so.

MR. McKITTRICK:  Not yet.

MR. BROWN:  I don't think it is proper to cross-examine from
a document --

MR. McKITTRICK:  I move the introduction of Defendant's

---

Michael Don Smith - Cross                105

Exhibit No. 2 into evidence.

MR. BROWN:  Objection.

THE COURT:  Overruled.

MR. BROWN:  Your Honor, may I explain something to the
Court?  The Court didn't get to see all of the --

THE COURT:  The Court didn't get to see anything at this
point.

MR. BROWN:  May I approach the bench?

THE COURT:  Certainly.  You guys have been passing back and
forth --

MR. McKITTRICK:  Your Honor, I'm sorry.  My apologies.

MR. BROWN:  You will notice at the bottom of Defendant's
Exhibit 2 a volume number and a page number.

THE COURT:  I can't even read it frankly.  Is it 387 at 894?

MR. McKITTRICK:  The only reason we have introduced it is
for the sole purpose he identified it.  I am not even into this
yet.  That is not saying I won't get into it.

THE COURT:  I don't even have this.  The only thing I have is
the trooper's affidavit.

MR. BROWN:  If you will notice, this is all one sheaf of
papers with the same volume which indicates apparently it is all
one document.  The items all run together.  See the page
numbers, 799, 800, and they just go along with this affidavit --

THE COURT:  The affidavit is part of that?

---

Michael Don Smith - Cross                106

MR. McKITTRICK:  No.

MR. BROWN:  Yes, Your Honor, that is our feeling, that the
affidavit is part of all the orders concerning this blood
extraction --

THE COURT:  I overruled the objection by the State.  If you
want to move it later, Pete, you can go ahead and move it.  Note
the objection of the State.  The objection is overruled.

Q    The fact is that there is nothing in Defendant's
Exhibit No. 2 that says anything about John Moss' friend
indicating to the state police that John Moss told his friend
that he wanted to burglarize the Reggettz home; does it?  Does
it?

A    Exactly what you said, the way you said it, as to your
words, that is not there.

Q    It says nothing about John Moss' friend, doesn't
characterize John Moss' friend in there, doesn't call him by
name or even say that John Moss had a friend; does it?

A    No, it doesn't.

Q    In fact, it doesn't say that you got an article from
Ohio; does it?

A    No, well, maybe I had better look at it again.

Q    Do you want to look it over again?

A    Yes.

(Document examined by witness.)

---

Michael Don Smith - Cross                107

A    No, it doesn't say I have an article or that we have an
article from Ohio.

Q    But it does say that John Moss was a suspect in a
felonious assault in West Virginia; doesn't it?

A    Suspect in a certain armed robbery which occurred in
Kanawha County, West Virginia.

Q    That is the felonious assault at the Moose Club they
are talking about; isn't it?

A    Yes, I am sure it is.

Q    Now, based on the fact that John Moss was a suspect in
the felonious -- Do you know of any other armed robberies?

A    No, sir.

Q    Based on the fact that John Moss was a suspect in the
felonious assault at the Moose Club, that would not give you
reasonable grounds to get a warrant for the murders of the
Reggettz family, would it, against John Moss?

A    No, sir.

Q    And it doesn't say, does it, that John Moss lived in
any close proximity to the Reggettz house; does it?

A    If you say it doesn't --

Q    Do you want to look at it again?

A    Yes, sir.

(Document examined by witness)

A    It says he lived in St. Albans, Kanawha County, at the

Michael Don Smith - Cross                    113

Q    All right now, when you were in the presence of
John Moss, who was present there?

A    I remember Trooper Williams and Mr. Pettry.

Q    Who else?

A    And as far as any names, it seems like there was a lady
there.  She may have been a nurse or a nurse's assistant or
something like that, and either a doctor or whoever, a type
person that was qualified to take the blood; and I believe a
detective was there also.

Q    Were you present when the blood was taken from John?

A    I remember seeing them take blood from John.

Q    How was the blood taken from John?  Tell His Honor --

A    As far as I remember, it was taken out of his arm.

Q    How much blood was taken, approximately?

A    Three or four tubes maybe.  I'm not sure.  I know we
got two.

Q    You got two tubes?

A    Two small tubes, containers.

Q    Did anyone else take any tubes?

A    I can't recall.  I don't remember for sure

Q    In other words, what I'm asking you is this:  When they
took the blood out of John, they put the blood in tubes, and
they gave it to Trooper Williams immediately.  Is that a fair
statement?

---

Michael Don Smith - Cross                    114

A    We received some in tubes.

Q    Did you receive them at the place where the blood was
taken?

A    Yes, right there in the room.

Q    Did you see any blood given to anyone else besides
Trooper Williams?

A    No.

Q    What did Trooper Williams do with that blood?

A    He marked it.

Q    Okay.

A    And kept it until we got back to South Charleston.

Q    Did he put it on his person?

A    Well, I am sure he kept it somewhere on him.  I don't
know whether he put it in a pocket, held it in his hand, or
where he kept it.  But he kept it.

Q    And when you brought the blood back to Charleston,
West Virginia, you did bring it back to Charleston,
West Virginia; didn't you?

A    Trooper Williams did.

Q    When did he bring it back; do you know?

A    We came back the same day.

Q    The same day.  And did you then give it to the lab?

A    I am sure he submitted it to the lab as soon as we got
back.

---

Michael Don Smith - Cross                    115

Q    Do you remember who extracted the blood from John Moss?

A    No.

MR. McKITTRICK:  That is all the questions I have, Your
Honor.

MR. BROWN:  Could we have about five minutes?

THE COURT:  Sure.  We will take a five minute recess.
Trooper Smith, I admonish you not to discuss your testimony
with anyone during the recess.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

THE COURT:  Show the resumption of these proceedings in
State of West Virginia vs. John Moss, Jr., also known as John
Moss, III, with all parties present heretofore present here
again, including the defendant and his counsel.

I thought you had finished your cross.

MR. McKITTRICK:  I just have a couple of questions,
Your Honor.

THE COURT:  Omitted questions?

MR. McKITTRICK:  Yes.

THE COURT:  Go ahead.

MR. McKITTRICK CONT:

Q    On the 22nd day of April, 1980, when the blood was
extracted from John Moss, how long in time were you in John
Moss' presence?

---

Michael Don Smith - Cross                    116

A    Twenty or thirty minutes maybe.

Q    Were you in the presence of Mr. Pettry and Mr. Williams
from the time that you entered the institution where John Moss
was incarcerated until the time that you left the institution?

A    I stayed with Trooper Williams and Mr. Pettry the whole
time.

Q    Now, during this twenty or thirty minutes that you were
in John Moss' presence, tell His Honor what occurred.

A    Well, I'm going to tell you just what I told you a
little bit ago.  I only remember being up there, standing around
waiting, you know, until they got their preparations, whatever
they had to do to draw the blood from John.  Like I'm telling
you, it seemed like it was like twenty or thirty minutes.  It
could have been fifteen minutes.

Q    Let me ask you this:  During that twenty, thirty or
fifteen minutes you were in John's presence at all times because
Trooper Williams and Pettry were there.  Is that a fair
statement?

A    There is a room, a small room.  It seems like one room
connected to another.  So I could have stepped in or they could
have stepped into this room, like ten feet or eight feet apart,
and you could have been, you know, out of sight from the other.

Q    Well, were you?

A    I don't know.  I am just saying we were all up there

Michael Don Smith - Redirect          121

    THE COURT:  Now, I'm going to let that in for the

suppression hearing; but I wouldn't let anything like that in

front of a jury.

    MR. STUCKY:  I understand.

    MR. McKITTRICK:  Objection based on hearsay.

    THE COURT:  Well, this is a suppression hearing, and I'm

going to let it in for the reasons aforesaid.  But of course, I

would not let something like that in before a jury.

    MR. STUCKY:  Again not going to the truth of the matter, but

he had information given to him.

    THE COURT:  I have let it in for purposes of this

suppression hearing, Mr. Stucky; but if it were before a jury, I

doubt seriously that I would.

    Q    Did you receive information as to when and how John Moss

left the St. Albans area?

    MR. McKITTRICK:  Show my objection to the hearsay.

    THE COURT:  Overruled.

    MR. STUCKY:  There is no hearsay there.  I said did you

receive information.

    MR. McKITTRICK:  It requests an answer based on hearsay, did

you receive information.

    THE COURT:  Again I want to emphasize, since all of you are

so good at making records, this is for the suppression hearing

only, and hearsay would not be admitted before a jury at trial.

Michael Don Smith - Redirect          122

Overruled on the grounds it is being admitted for suppression

only and not for the guilt or innocence of this accused.

    A    I received information that he had went back to

Cleveland to his parents' home by transportation with some of

his relatives here in the St. Albans area and that he had left

shortly after the Reggettz murders, just right before Christmas,

and hadn't returned and was making no plans on returning as far

as anyone knew.

    Q    And I believe you testified, not to Mr. McKittrick but

on prior occasions, that you learned that some flatware was

given to a lady by John Moss as a Christmas present; is that

correct?

    A    Yes.  We obtained some flatware from a lady and found

out it had been given to her by John Moss.

    Q    And you had some information some flatware had been

stolen from the Reggettz residence at the time of the murders?

    A    No, I can't say that we had information that flatware

had been taken.

    Q    What information did you have at that time?

    A    As far as the flatware goes?

    Q    Yes.

    A    Nothing other than the fact that it had been given to a

lady as a Christmas gift by John.

    Q    When did you learn anything had been taken from the

Michael Don Smith - Redirect          123

Reggettz residence?

    A    Within the same day or a day or two after the crime

occurred we knew of some articles missing.

    Q    What articles did you know were missing?

    A    Two weapons were missing.

    Q    Anything else?

    A    No, not at that time.

    Q    You testified that you learned or that a camera and

flatware were taken from the Reggettz residence.  When did you

learn that?

    MR. McKITTRICK:  Objection.  That is leading.

    THE COURT:  Sustained.

    MR. McKITTRICK:  He has already asked the question, and he

answered it.

    THE COURT:  I will sustain it as to leading.  You can

rephrase it.

    MR. STUCKY:  Your Honor, when -- That is not a yes or no --

    THE COURT:  Let the court reporter read it back, and you

tell me whether or not it is leading.

    (Whereupon, the last question was read by the reporter.)

    MR. STUCKY:  When is not a yes or no --

    THE COURT:  I stand corrected.  Overruled.  The question

was properly phrased.  Go ahead.

    A    I would say my first knowledge of that was after

Michael Don Smith - Redirect          124

speaking to John.

    Q    At which time speaking to John?

    A    At which time?

    Q    When you took the confession or statement that is in

issue in this suppression hearing --

    A    The interview confession that was taken at Parkersburg.

    Q    So prior to that you didn't know that a camera

or flatware, dishes, had been taken from the Reggettz residence?

    A    We knew that there were two guns missing, but we didn't

know at that time that there was a camera and flatware.

    MR. STUCKY:  That's all I have, Your Honor.

    - o -

RECROSS-EXAMINATION

BY MR. McKITTRICK:

    Q    What was the date that you talked to Art Moss?

    A    The date?

    Q    The date.  Look on your activity if you don't know.

    A    The 29th.

    Q    Of what?

    A    As far as the clipping goes, the 29th.

    Q    The 29th of January, 1980?

    A    The 29th of January, 1980.

    Q    Is that your answer?

    A    Yes.

Michael Don Smith - Recross                129

    Q    All right, did the officers tell you that they came to

that conclusion as a result of interviewing Paul Reggettz?

    A    They didn't tell me in those words, you know --

    Q    Well, the essence of those words.

    A    They told me based on what they had discussed

with Mr. Reggettz we were looking for some guns that should have

been at the house.  Then like I told you, we went and did some

checking and found out --

    MR. McKITTRICK:  That's all the questions I have.

    MR. STUCKY:  Nothing further.

    THE COURT:  Thank you.  You may step down.

    (Witness Excused)

    (Whereupon, a discussion was had off the record and then

resumed back on the record as follows:)

    THE COURT:  All right, we will stand in recess until 1:15.

                      - o -

    (Whereupon, a recess was had in the proceedings.)

                      - o -

                                                   129

---

Charles Pettry - Direct                    130

                  AFTERNOON SESSION

    WHEREUPON, the proceedings in this matter were resumed

at 1:30 p.m. with all parties present as before noted, including

the defendant and his counsel, and the State of West Virginia by

James C. Stucky, Prosecuting Attorney, and Peter C. Brown,

Assistant Prosecuting Attorney.

    THE COURT:  Show the resumption of these proceedings in the

matter of State of West Virginia vs. John Moss, Jr., also known

as John Moss, III, CR-82-F-221, murder in the first degree,

three counts.  The defendant is present in person and by

counsel; the State of West Virginia by Mr. Stucky, Prosecuting

Attorney, and Mr. Brown, Assistant Prosecuting Attorney for

Kanawha County.

    Call your next witness.

    MR. BROWN:  Chuck Pettry.

                      - o -

                              DIRECT EXAMINATION

BY MR. BROWN:

    Q    State your name please.

    A    Charles Pettry.

    Q    And your occupation, sir?

    A    I am an attorney.

    Q    By whom were you employed in April of 1980?

    A    By Kanawha County.  I was an Assistant Prosecuting

                                                   130

---

Charles Pettry - Direct                    131

Attorney.

    Q    And on April 22, 1980, were you so employed?

    A    Yes, I was.

    Q    You are no longer with the Prosecuting Attorney's

office?

    A    That is correct.

    Q    On April 22, 1980, did you have an occasion to go to

the City of Cleveland in Ohio?

    A    Yes, I did.

    Q    What was your purpose in going there, sir?

    A    I had been requested to accompany Troopers Mike Smith

and Terry Williams to Cleveland.  The basic reason was to obtain

a blood sample.

    Q    Prior to April 22, 1980, or prior to leaving for

Cleveland, had you done anything in preparation to receiving

this blood specimen or the taking of this blood specimen?

    A    Yes, sir, I had.

    Q    Would you tell the Court please what you did.

    A    Basically as a result of information I received from

Troopers Williams and Smith we knew the defendant was in custody

in Cleveland, Ohio.  Initially by way of telephone conversations

with a member of the Prosecuting Attorney's office in Cleveland

we had made arrangements to get a blood sample because it had

become important as part of this investigation.

                                                   131

---

Charles Pettry - Direct                    132

    After the phone calls I followed it up with an affidavit

that I had prepared, and I forwarded it to I believe the

fellow's name was Pato.  John Pato, I think was the Assistant

Prosecutor in Cleveland I dealt with.

    MR. BROWN:  I would like to have this marked.

    (Whereupon, the document referred to was marked by the

reporter as State's Exhibit No. 3.)

    Q    I hand you now what has been marked for identification

purposes as State's Exhibit No. 3, which consists of several

pages marked Volume 387, Page 799 through Volume 387, Page 204;

is that correct, sir?

    A    804.

    Q    804, yes, sir, I'm sorry.

    A    Yes, sir, that is correct.  I might observe I believe

they start on Page 797.

    Q    All right, sir, I stand corrected.  Directing your

attention, sir, to an affidavit contained in that exhibit that

appears on Page 803 --

    A    Yes, sir.

    Q    Do you have that, sir?

    A    Yes, I do.

    Q    How many pages is that exhibit?

    A    I have two pages.

    Q    Would you tell the Court what you did in relation to