**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 34**
**(Continuation, pp. 75 to end)**

Charles Pettry - Direct                137

West Virginia State Troopers, myself and the detective from
Cleveland.

Q    All right, sir, tell the Court please what happened,
after you got to the clinic area.

A    As I recall, when we got to the clinic area itself, we
had to enter through some locked doors and got into a treating
area, you know, medical clinic area.  My recollection is Mr. Moss
was not there when we arrived.  They called up or down for him,
and he arrived within minutes of our arrival.

Q    All right, sir.

A    There was a doctor there and a nurse, technician maybe,
assistant, whatever, as well.  When Mr. Moss arrived, the doctor
as I recall was getting ready to do his blood withdrawal.

Q    Let me interrupt you just for a second.  At the time
the blood is actually taken, when the doctor begins to take the
blood, who all is present in the room?

A    Okay, the same bunch of people, myself, Troopers
Williams and Smith, the fellow from the Cleveland Police
Department, the doctor and the nurse.  I am assuming she is a
nurse.  She looked like one.

Q    Did the doctor look like a doctor?

A    Yes, sir, he did.

Q    What makes you think he looked like a doctor?

A    He had on your basic doctor coat.  He had on a lab coat

137

---

Charles Pettry - Direct                138

with a name plate on it.

Q    Do you by any chance remember, or did you learn that
person's name?

A    I learned his name because I expected at some point it
would become important, and I asked Mike Smith or Terry Williams
to please make a note of that doctor's name.  I even, after
everything was finished, talked very briefly and got the details
on where his office was, because I had already learned at that
point his jail duty was part time on a contract basis, and that
he had a private office, private practice somewhere in the
Cleveland area.  I got that information from one of the
troopers.

     THE COURT:  Hold on just one second please.

     (Whereupon, a recess was had in the proceedings.)

     (After recess.)

     THE COURT:  All right, proceed.

Q    All right, to pick up, you have all your papers and all
of you, the people that you have already named proceed over to
the holding area or the clinic area --

A    Clinic area, yes, sir.

Q    Where Mr. Moss is.  Would you go ahead and relate to
the Court what happened.

A    When Moss was brought in, as I recall, by a uniformed
deputy or policeman, I, as I have testified, had the papers with

138

---

Charles Pettry - Direct                139

me.  I went over to Mr. Moss and told him who I was.

Q    Which Mr. Moss did you go over to, sir?  What was his
first name?

A    John Moss.

Q    The person you went to with these papers, is he in the
courtroom today?

A    Yes, sir, he is.

Q    Would you point him out to us please.

A    He is seated by Mr. McKittrick, on Mr. McKittrick's
left.

Q    Would you continue, sir.

A    As I said, I went over and explained to him who I was,
who the troopers were, who everybody else was for that matter.
Told him what we were there for, what was going to happen in the
next few minutes, and told him I had a court order with me
signed by the judge, I guess, of the Common Pleas Court in
Cuyahoga County.

Q    Did you present him with these papers?

A    Yes, I did.  Well, I offered.  I said, "Here is the
Court order.  Here is the affidavit", all that.  "You can look
at them if you want to.  It is going to happen anyway."  That is
basically what I told him.  I obviously can't remember what he
said, but he didn't have any interest in reading the papers.

Q    All right, sir, then what happened?

139

---

Charles Pettry - Direct                140

A    Having completed that, basically I got out of the way.
I didn't leave the room.  I just stepped back because the doctor
at that point was ready to proceed with the withdrawal of the
blood specimen, which he did.

Q    Tell us what you remember about the drawing of the
blood specimen, what you observed, and what your recollection
was of the drawing of the blood specimen.

A    As best I remember, we were all in the room, kind of
standing around.  It pretty well filled this room because there
were a lot of people in there at this point.  Mr. Moss had on a
jumpsuit kind of like he has on today.  As I recall, they
pushed his sleeve up.  I honestly can't tell you which arm we
are talking about here.  I think it was the left arm, but I
don't know that.  He was either seated in a chair or on an
examining table.  As I recall, they had an examining table
there, and they may have asked him to sit on that.  As I recall,
the next thing they did the nurse put a tourniquet on his upper
arm.  The doctor inserted a syringe in his upper arm, just above
his elbow and began drawing the blood specimen from the left
arm.

Q    Was blood retrieved from his arm?

A    Yes, it was.

Q    What did the doctor do with the blood he got the first
time from the arm of Mr. Moss?

140

Charles Pettry - Cross                          145

CROSS-EXAMINATION

BY MR. McKITTRICK:

Q   Mr. Pettry, when did you become involved in the Reggettz murder case?

A   The day it happened.

Q   You had an opportunity, I believe, to even go to the scene; didn't you

A   Yes, sir.

Q   And did you work with law enforcement officers the day of the 13th of December, '79, after the bodies were found?

A   Did I what? I heard the rest of it.

Q   Work with them?

A   Yes, sir, to a certain extent.

Q   And you, I take it, generally became familiar with the scene and the facts surrounding the murders?

A   Generally.  I was not -- I did not have an official capacity there as far as an evidence gatherer.  I was there as an Assistant Prosecutor.

Q   But I take it one of the reasons you as an Assistant Prosecuting Attorney of Kanawha County, West Virginia, were assigned to this case at a later time was because you were somewhat intimately familiar with the facts surrounding the murders as they were investigated.  Isn't that a fair statement?

A   That is a fair statement.  I don't know if  agree with

145

Charles Pettry - Cross                          146

intimately acquainted, but basically that is a fair statement.

Q   And from time to time, I take it, pursuant to your duties, the officers who were investigating the Reggettz murders consulted you.

A   Yes, sir.

Q   And they consulted you for things which included, but were not limited to, the blood samples that are in question here; isn't that correct?

A   Yes, sir, that is correct.

Q   And as a result of their consultations with you, and as the days and weeks went by, I take it that you became very familiar with the details of that murder case?

A   Yes, sir.

Q   Now, you have already indicated, I believe, to His Honor that part of the allegation in the affidavit that is appended to the request or petition to the court for a direction from the court to extract John Moss' blood was incorrect?

A   Yes, sir.  The date that I, the handwritten date on the front page of that.

Q   What was the reason for the filing of your affidavit where you have already pointed out to the Court one of the allegations was incorrect?

A   I didn't say the allegation was incorrect.  I said the date was incorrect.  You said the allegation was incorrect.

146

Charles Pettry - Cross                          147

Q   Well, when you say that John Moss was a suspect in an armed robbery case which occurred in Kanawha County, West Virginia, in the month of September, 1978, and in fact, it did not occur until May, 1979, isn't that an incorrect allegation?

A   As to the date, yea.

Q   Because the crime didn't occur on that date.  Isn't that a fair statement?

A   That is a perfectly fair statement.

Q   Now, what was the reason that the State of West Virginia filed an affidavit to be appended to this petition to extract John Moss' blood?  What was the reason it was necessary?

A   To -- Why did we went the blood, or why did we send the affidavit?

Q   Why did you send the affidavit?

A   The affidavit was so we could be part of the proceedings in Cleveland.  We obviously needed to have some judicial process to do what we wanted to accomplish.

Q   What is the reason for the affidavit though?  Why is it necessary for you, as a lawyer representing the Kanawha County Prosecuting Attorney's office, to prepare an affidavit and append it to this petition that goes to the court?  Why is that necessary?

A   Well, one reason it was necessary, the Assistant Prosecutor in Cleveland asked me for it; and another reason is,

147

Charles Pettry - Cross                          148

my recollection is and my feeling at the time was without us indicating some reason why we wanted it we didn't have any standing to go to Cleveland for anything.

Q   So in other words, this affidavit that was appended was supposed to give the court in Ohio probable cause to make a direction that John Moss' blood be extracted, just like any affidavit that is appended to any petition to the court.  Is that a fair statement?

A   That is a reasonably fair statement.  They could have gone on without us.

Q   When you say "They could have gone on" --

A   The Cleveland people didn't need us.

Q   When you say "They could have gone on", what you mean is the State of Ohio didn't need the State of West Virginia for Ohio to get their blood?

A   I don't think so.  That is a conclusion on my part.

Q   You don't know that?

A   That's right.

Q   You assume that?

A   Yes.

Q   But in order for the State of West Virginia to get their blood, the State of West Virginia's blood from John Moss, it was necessary for you to file an affidavit setting forth probable cause for that court to direct John Moss' blood to be

148

Charles Pettry - Cross                          153

A    Yes, that's right.

Q    What is the purpose of that?

A    The purpose for it?

Q    Yes.

A    I don't think there is any purpose for it.

Q    Does an affidavit, pursuant to notary rules and regulations, have to be notarized?

A    Yes, sir.

Q    And does the date on which the person signs that affidavit have to be filled in in order for the notary to be correct and to comply with the provisions of the law?

A    I suspect so.  I don't know.

Q    But this doesn't do that?

A    It doesn't have the day of the month filled in.

MR. McKITTRICK:  I would like to have this marked.

(Whereupon, the document referred to was marked by the reporter as Defendant's Exhibit No. 3.)

Q    Let me hand you what has been marked for identification as Defendant's Exhibit No. 3.  We have been talking about State's Exhibit No. 3; isn't that correct?

A    Yes, sir.

Q    I want to ask you if you have ever seen that affidavit before?

A    I am sure I have.  I notarized it.

153

---

Charles Pettry - Cross                          154

Q    Is that the same affidavit, with the same typing, and I think it is pretty clear, as the affidavit that is appended to State's Exhibit 3.

A    It looks like it, just glancing at it; it certainly does.

Q    Does it look like the same type?

A    Sure does.  One obviously is a reduction copy.  It is a little smaller.  It is set up the same.  The words track the same.

Q    But the typing looks different, doesn't it?

A    As I said, it is a reduction copy.  The type is smaller.

Q    A reduction copy?

A    That is what it appears to be, Parrish.  I mean, I'm no Xerox man, but one looks like a Xerox copy of the other.  You know what I'm talking about.  It's a reduction copy.

Q    And in paragraph 4 on Defendant's Exhibit 3, is that filled in?

A    No, no.  That is just blank.

Q    That is different from State's Exhibit 3?

A    Yes, sir, on State's 3 the blank is filled in.

MR. McKITTRICK:  We would move the introduction of Defendant's Exhibit 3 into evidence.

THE COURT:  Any objection?

154

---

Charles Pettry - Cross                          155

MR. BROWN:  No objection.

THE COURT:  All right, it will be admitted into evidence and marked as Defendant's Exhibit No. 3 without objection by the State.

Q    Were you, as part of your duties as an Assistant Prosecuting Attorney, familiar with the facts surrounding the allegation in paragraph 4 of this affidavit appended to Exhibit No. 3?

A    Yes, sir, in a secondhand way.

Q    What do you mean by that?

A    I didn't -- I was not the Prosecutor assigned to that case and didn't really have any direct involvement with it when it happened.

Q    Well, you filed an affidavit and that was one of the allegations in the affidavit.  Did you not determine whether there were facts surrounding that case?

A    I'm not trying to joust with you, Parrish.  That is not my affidavit.  I prepared it in the sense of typing it.  I am not the affiant on it.  I am playing transcriber on that affidavit.  You understand that.

Q    I see.  I see.  So you didn't feel that as the Assistant Prosecuting Attorney of Kanawha County who was corresponding with Ohio authorities who requested that you file an affidavit, you didn't feel it your obligation to determine the

155

---

Charles Pettry - Cross                          156

facts stated in that affidavit were true and correct; is that correct?

A    No, that is not correct.  That is really not what I said.

Q    Did you determine whether the facts in this affidavit appended to State's Exhibit 3 were true and correct?

A    Insofar as I know, yes.  But Parrish, what you are trying to get me to say I am not going to do.  I wasn't there.  I didn't know about that case like I knew about other cases I prosecuted.  I am not the affiant there.

Q    Did you state basically the facts of the case?

A    Basically, yes.

Q    Generally speaking what were the facts of that case?

A    As I recall the facts of that case, a lady who was a witness, whose name I can't remember, who worked at the Moose Club in St. Albans, I think, was robbed, and as I recall, shot; and that is --

Q    It is fair to say, as other officers have already stated to His Honor, that blood was not in issue in that case that you have just told us about, which is the substance of allegation four in the affidavit appended to Exhibit 3.  Isn' that a fair statement?

A    That blood was not an issue?  I think that is fair, yes.

156

Charles Pettry - Cross                                    161

I remember in prosecuting other criminal cases that when that

issue came up that is the case we went to for guidelines, if you

will.

    Q    And did you feel that Schmerber vs. California applied

to the factual situation in John Moss' case?

    A    I don't remember. I'm not so sure what difference it

makes what I thought. I don't remember.

    Q    Well, what I have done is I have just asked you

whether you believed it was a search and seizure, and you have

indicated to me you didn't then and you don't now.

    A    That's right.

    Q    And the reason is you relied on Schmerber vs.

California. What I am asking is do you believe that case

applies to the factual situation of John Moss, that is as it was

when you extracted the blood on the 22nd day of April, 1980?

    A    Do I believe -- Did I believe it then?

    Q    Then, yes.

    A    I can't remember. I probably did. But that is -- You

know, you are asking me to look back a long time on something I

hadn't thought about.

    Q    Now, Mr. Pettry, were you familiar with the fact that

Trooper Williams and Trooper Smith traveled to Ohio on the 30th

day of January, 1980, to extract blood from John Moss?

    A    I knew they had been up there before. I didn't know

161

---

Charles Pettry - Cross                                    162

the date. You said January 30. That's fine. I don't know what

date it was.

    Q    Now, they have testified in this proceeding and other

proceedings that they, to the best of their memory, did not

contact you before they went up there on January 30, 1980.

Would you say that is a fair statement?

    A    That is a fair statement. I don't know. I don't

remember it.

    Q    Did you send them up there specifically on the 30th day

of January, 1980?

    A    No, sir. I didn't have any the authority to send them

anywhere.

    Q    Did you request that they go up there?

    A    I don't think so, but I don't know that.

    Q    In any event, after Troopers Williams and Smith --

Well, let me ask you this: Was it brought to your attention an

Ohio Court made Trooper Smith and Trooper Williams return the

blood sample that they extracted on January 30, 1980?

    A    I think so. But the problem, you are asking me did I

know that before April 22?

    Q    That is exactly right.

    A    I think so, but I can't tell you with any real

certainty because obviously I now know it. But I don't know

when I learned it. I know that is not much of an answer, but it

162

---

Charles Pettry - Cross                                    163

is the best I can give you.

    Q    Well, are you telling this Court when you had

conversations with Trooper Williams and Trooper Smith and they

indicated to you they needed a blood sample from John Moss on

April 22, 1980, you didn't discuss that they had gone up there

on January 30, 1980?

    A    No. That is not at all what I said just now. If I

did, I have made a mistake and misled you.

    Q    Let me ask you this: Did you have knowledge before you

prepared the affidavit that Trooper Smith and Trooper Williams

had gone to Ohio on the 30th day of January and had gotten a

blood specimen and had then been ordered to give it back by an

Ohio Court?

    A    I expect I did, but I don't remember somebody bursting

into my office and telling me that on a certain day. I am

qualifying my answer in that regard.

    Q    I'm asking if you had knowledge.

    A    I probably did. I can't say for sure, you know --

    Q    When approximately did you come to the conclusion it

might be necessary for you to accompany Trooper Smith and

Trooper Williams to Cleveland, Ohio, on April 22, 1980, to

extract blood from John Moss?

    A    When?

    Q    Approximately when? How long before you went?

163

---

Charles Pettry - Cross                                    164

    A    I can't answer that. I just flat don't know.

    Q    Would it have been a month?

    A    It could have been a month; it could have been a week.

I know how that looks to you, but I just don't know.

    Q    How long did you negotiate with Assistant Prosecuting

Attorney Pato from Cleveland, Ohio, before you went up there?

    A    A week, maybe two weeks. Again, that is the best I can

do for you.

    Q    What led you to the conclusion that you should go to

Cleveland, Ohio, on April 22, 1980, to extract blood from

John Moss?

    A    Why was it important for me to go?

    Q    Why was it important for law enforcement to go,

Mr. Pettry?

    A    Why did I think I should go, or why did I think Mike

and Terry should?

    Q    Why did you think it was important for law enforcement

to go?

    A    To get the blood sample.

    Q    For what purpose?

    A    As part of the investigation.

    Q    The investigation of what?

    A    Well, there was a joint investigation.

    Q    Of what?

164

Charles Pettry - Cross                        169

who did the blood analysis appeared before that January, 1980,

Grand Jury?

    A   No, I don't remember that.

    Q   You weren't in the grand jury at that time?

    A   I can't even tell you that, Parrish. I ran and worked

in ten or twelve grand juries while I was there, you know; and

as unfortunate as it may sound, there were plenty of murder

cases; and I don't know if I was in there that day or not, or

who was there.

    THE COURT:  Let's take a ten minute recess.

    (Whereupon, a recess was had in the proceedings.)

    (After recess.)

    THE COURT:  All right, show the resumption of these

proceedings with all parties present heretofore present here

again, including the defendant and his counsel.

MR. McKITTRICK CONT:

    Q   Mr. Pettry, you do remember, do you not, that John Moss

was returned to the State of West Virginia in October, 1980?

    A   I don't remember that specifically. I am sure it

happened some time.

    Q   Did you participate in preparing detainers for John Moss

to come back to West Virginia pursuant to a felonious assault

charge?

    A   I may have, Parrish.  I don't have any specific

169

---

Charles Pettry - Cross                        170

recollection of that.

    Q   Do you have any specific recollection as to whether or

not Troopers Williams and Smith went to Ohio to bring John Moss

back on the 28th day of October, 1980?

    A   Yes.

    Q   All right now, what do you remember about that?

    A   Well, I don't remember anything about them going, them

leaving, in that sense. As I recall, on the way back they

called me at home. It was in the evening, night or in the

middle of the night or something and indicated that they were in

Parkersburg or the Parkersburg Detachment or something like

that.

    Q   But you didn't know anything about them going up there?

    A   I don't remember anything about that. I am sure I knew

it at the time that they were going up. If you are asking me do I

now remember it, no, but I am certain I knew it at the time.

    MR. McKITTRICK:  That's all the questions I have.

    THE COURT:  Any redirect?

    MR. BROWN:  Yes, sir.

             - O -

170

---

Charles Pettry - Redirect                     171

            REDIRECT EXAMINATION

BY MR. BROWN:

    Q   On April 22, 1980, Mr. Pettry, what lawyer represented

John Moss on the Reggettz case while John Moss was in Ohio?

    A   No one.

    Q   He didn't have a lawyer; did he?

    A   He wasn't charged.

    MR. McKITTRICK:  Objection to the leading.

    THE WITNESS:  I was getting ready to say it anyway.

    THE COURT:  Sustained. Ask your next question.

    Q   Did he have a lawyer?

    A   No, sir.

    Q   As regards the Reggettz case?

    A   No, sir. He wasn't charged with a crime.

    Q   I hand you now State's Exhibit No. 3 and on Page 799,

what is that, Mr. Pettry?

    A   That is a court order from Cuyahoga County Common

Pleas Court Criminal Division.

    Q   Is it signed?

    A   Yes, sir, it is.

    Q   Is it signed by a judge?

    A   Yes, sir.

    Q   What does the judge order?

    A   Orders that John Moss submit to the withdrawal of a

171

---

Charles Pettry - Redirect                     172

blood specimen and the taking of a saliva sample.

    THE COURT:  What is the date of that order?

    THE WITNESS:  I believe the order is dated April 15, 1980.

It is indicated as being dated April 15, 1980.

    Q   The judge did order that it be taken?

    A   Yes, sir.

    Q   There are two affidavits to that particular exhibit;

correct?

    A   Yes, sir.

    Q   One of the affidavits is from what state?

    A   West Virginia.

    Q   What is the other state?

    A   Ohio.

    Q   Would it be fair to say that the judge was satisfied --

    MR. McKITTRICK:  Objection.

    A   He appeared to be.

    MR. McKITTRICK:  Objection and move to strike.

    THE COURT:  Sustained. Strike. Ask your next question.

    Q   Are you familiar with the juvenile law in the State of

Ohio?

    A   No, sir.

    Q   You answered one of Mr. McKittrick's questions, sir, in

regards to getting the results of some blood back the next week

after April 22. When you say you got the results back, what do

172

Charles Pettry - Redirect                 177

A    Yes, sir, it is the same size.

MR. McKITTRICK: Objection and move to strike, Your Honor. That is a conclusion, and it is non-responsive. He said compare it. He didn't say what does it say, what does it look like. He said compare it. The witness editorialized and said yes.

THE COURT: Objection sustained. Do you have another question?

Q    Would you compare it please. Have you made that comparison, sir?

A    Yes, sir.

Q    Do you see any comparison with the printing on your affidavit as to the rest of the mechanical printing there?

MR. McKITTRICK: Objection.

THE COURT: Overruled.

Q    Do you see any?

A    Yes, sir.

Q    Would you tell us what it is?

A    They are the same color.

Q    All right, do you see any similarities?

A    They are the same size.

MR. BROWN: That's all.

MR. McKITTRICK: My objection still stands, Your Honor.

THE COURT: You have your objection, and it is overruled for the record.

-77

---

Charles Pettry - Recross                 178

- o -

RECROSS-EXAMINATION

BY MR. McKITTRICK:

Q    As I understand it, Mr. Pettry, you or no other representative of the State of West Virginia went through a hearing and presented evidence to the court in Ohio.

MR. BROWN: Objection, beyond the scope of redirect.

MR. McKITTRICK: No, it isn't. You asked him about --

THE COURT: We have been through that at great length. We have already been through that at great length earlier in this proceeding in which you asked if they had a hearing. He said no, he had a court order. And the transcript will speak for itself. I am going to sustain the objection.

Q    Okay, since Mr. Brown asked you to allude to the documents in State's Exhibit 3, and you included among your answers that there was a brief appended to it, would you look at that brief please.

A    Do you want me to read it?

Q    Yes, I want you to read it, not out loud but to yourself. Or you can read it out loud if you want to, but you don't have to.

A    Do you want me to set here and read the whole thing?

Q    Yes. It is only about two pages.

MR. BROWN: I'm sorry, I don't have a copy of it. Could he

178

---

Charles Pettry - Recross                 179

read it out loud please.

THE COURT: Do you want the court reporter to have to take this whole thing down as he reads it.

MR. McKITTRICK: I'm not asking him to, and I have the witness on cross-examination.

MR. BROWN: I don't have a copy, Judge.

THE COURT: Go on behind the witness --

MR. BROWN: Is that all right with the Court?

THE COURT: That's fine.

(Document examined by witness.)

Q    Are you finished reading?

A    Yes, sir, I am.

Q    Do you or did you agree with the statements and conclusions in that memorandum as it applied to the extraction of John Moss' blood on April 22, 1980?

MR. BROWN: Objection.

MR. STUCKY: That is not material or relevant.

MR. McKITTRICK: This is important. He has testified he was the Assistant Prosecutor representing the State of West Virginia, and the other gentleman was the Assistant Prosecutor representing the State of Ohio. I understand in their dual capacities they both brought this petition. I think it is a fair question.

THE COURT: Well, I'm not going to let you ask if he agrees

179

---

Charles Pettry - Recross                 180

with the conclusions of law, the law in the State of Ohio.

MR. McKITTRICK: They are not the law, Judge.

THE COURT: I don't know what they are. I haven't seen the memoranda. You all have been handing it back and forth. I haven't seen it.

(Document examined by the Court.)

THE COURT: All right, repeat the last question of counsel.

(Whereupon, the last question was read by the reporter.)

THE COURT: And again I will let him answer as to his legal conclusion as to the United States federal law -- Now, just a moment. That memoranda also incorporates several references to Ohio law. I don't know whether Mr. Pettry is a licensed attorney in the State of Ohio.

MR. McKITTRICK: Let me amend my question.

THE COURT: All right, amend your question.

Q    Do you and did you agree with the statements and conclusions of the federal law as it applied to the extraction of John Moss' blood on April 22, 1980, as stated in the memorandum contained in State's Exhibit 3?

MR. BROWN: Objection, Your Honor.

THE COURT: Overruled.

A    There are two questions there. Did I and do I?

Q    That is correct.

A    Did I then?

180

185

the prosecution when we find out what their names are.  We are
still trying to find out what their names.  We don't know who we are
going to subpoena, Your Honor, with regard to small matters.

Secondly, I had indicated to the Court when we started the
motions, the last motion I wanted to take up had to do with John
Moss' rights when he was returned on the detainer.  I take it,
Your Honor, since we have accumulated all this evidence together
that some of my cross-examination will and has gone to that
matter.

THE COURT:  I think that matter has been gone into rather
extensively, as reflected in the earlier transcript of these
proceedings.

MR. McKITTRICK:  That is correct, Your Honor.

THE COURT:  If you want to open it up again, we will open it
up again.  But I think it has been ruled on, not only by this
Court but by the West Virginia Supreme Court as well.

MR. McKITTRICK:  Well, I think as far as the legal basis
that we will raise and argue to the Court, it is a different
legal basis than has ever been raised in this matter.

THE COURT:  All right

MR. McKITTRICK:  But I think, as you said, the evidence has
been gone into before in the other transcript.

THE COURT:  However you want to proceed on it, I will permit
you to do so.  But I just want the record to reflect we do have

185

---

Terry Williams - Direct                                    186

transcripts of prior proceedings in which that issue was raised
and ruled on, not only by this Court but, as I said, the  West
Virginia Supreme Court of Appeals.

(Whereupon, a discussion was had off the record and then
resumed back on the record as follows:)

THE COURT:  All right, call your next witness.

MR. BROWN:  Terry Williams.

- o -

TERRY WILLIAMS,

Being thereupon called as a witness, after

being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BROWN:

Q    Would you state your name please.

A    Terry Williams.

Q    And your occupation, sir?

A    I am a trooper with the Department of Public Safety

A    Trooper Williams, there was a time when you were in Wood
County, West Virginia, with John Moss.  Do you remember that?

A    Yes.

Q    And at that time John Moss gave you certain information
concerning some items.  Do you remember that?

A    Yes.

Q    Did he also tell you where he lived at the  time?  Did

186

---

Terry Williams - Direct                                    187

he give you an address where he lived?

A    Yes.

Q    Where was that address?

A    7025 Zoerter Avenue, Cleveland, Ohio.

Q    After John Moss provided you with the information as to
where he lived, what items did he specifically give you some
information about?

A    A camera and a .22 rifle, bolt action.

Q    After he gave you that information, did you leave the
Wood County area?

A    Yes.

Q    Who went with you, if anyone?

A    Trooper Smith.

Q    Where did you and Trooper Smith go to?

A    Cleveland, Ohio.

Q    About what day and what year did you arrive in
Cleveland, Ohio?

A    We got back in Cleveland on the 29th of October.  I
don't remember what day that was.

Q    Well, the date.  I don't care about the day.

A    The 29th of October, 1980.

Q    About what time did you arrive in Cleveland?

A    It was around 3:00 in the morning, a.m.

Q    Did you ultimately contact any office there in the

---

Terry Williams - Direct                                    188

Cleveland area in relation to law enforcement?

A    Yes, we did.

Q    Where was that?

A    We went to, I believe it was called a justice center.  We
went to the Cleveland Police Department.

Q    What was your purpose in going to the Cleveland justice
building?

A    Well, we wanted to get with a police officer and have
his take us to the Prosecutor's office in reference to getting
a search warrant.

Q    Were you taken to the Prosecutor's office?

A    Yes.

Q    Was a warrant prepared for you at the Prosecutor's
office, portions of it?  Was an affidavit prepared there?

A    Yes.

Q    Did you take the items you had, or after you got the
affidavit, where did you go?

A    I went before a judge.

Q    What county was that in, what city?

A    In Cleveland.  I believe it was Cuyahoga County.

Q    Who actually went before the judge?

A    I did.

Q    Were you sworn in by the judge?

A    Yes.

Terry Williams - Direct                    193

show up?

   A    Yes.

   Q    Who showed up?

   A    John Moss' mother.

   Q    Okay, and do you remember what her name was?

   A    Yes.

   Q    What was it?

   A    Marzee Moss.

   Q    Do you know how to spell that, sir?

   A    M-a-r-z-e-e.

   Q    And was the warrant executed there or served on
Mrs. Moss?

   A    Yes.

   Q    After the warrant was served on Mrs. Moss -- Who served
the warrant?

   A    I did.

   Q    After the warrant was served on Mrs. Moss, what
happened? Just tell the Court there what you did and the best
that you can recall what the other people did that you saw.

   A    Well, we sort of like split up in teams, myself and one
of the detectives and one of the uniformed officers went
upstairs; and Trooper Smith and the other detective and the
other uniformed officer took the downstairs.  And we searched
through the house for the items specified in the warrant.

193

Terry Williams - Direct                    194

   Q    Okay, that was you and a detective and a uniformed
officer upstairs?

   A    Yes.

   Q    And Mike Smith, a uniformed officer and a detective
downstairs?

   A    Right.

   Q    Do you remember what the upstairs was like?  Can you
recall that at this time?

   A    Pretty much so.  You go to the top of the stairs, and
there is a bedroom and then I believe that there is a doorway in
that bedroom and you go straight through and there is another
bedroom.  And I believe there is another room off to the left.
It was pretty messy, pretty bad shape.

   Q    Was there any certain room you had in mind or any
certain place you had in mind to search for any particular
object?

   A    Yes.

   Q    Where was that you were going to search and what were
you searching for?

   A    It was John Moss' bedroom right at the top of the
stairs, and there was supposed to be a camera on his chest of
drawers, and the rifle was supposed to have been in the closet.
That is where we went first.

   Q    Was that the closet in his bedroom?

194

Terry Williams - Direct                    195

   A    Yes.

   Q    Did you find a rifle in that closet?

   A    No.

   Q    Did you find a rifle in that room?

   A    No.

   Q    Did you find a rifle in that house?

   A    Yes.

   Q    Did you seize that rifle?

   A    No.

   Q    Why not?  Tell the Judge why you didn't seize that
rifle.

   A    Because it wasn't the rifle that was specified on the
warrant.  It had the wrong serial number on it.

   Q    The rifle that you were looking for, sir, could you
tell the Court what exactly you expected to find.

   A    It was a Glenfield bolt action .22 rifle with the
serial number 27526931, and it had a scope on it.

   Q    All right, you expected to find a .22 rifle with a
scope?

   A    Yes.

   Q    You did not find a rifle; is that correct?  I mean, you
didn't find that particular rifle?

   A    No.

   Q    Did you find a scope?

Terry Williams - Direct                    196

   A    Yes.

   Q    Where did you find a scope?

   A    It was in a drawer in Kenneth Moss' bedroom.

   Q    Did you seize the scope?

   A    Yes.

   Q    Did you find a camera on that dresser?

   A    No.

   Q    Did you find a camera in that bedroom?

   A    No,

   Q    Did you find the particular camera you expected to find
in that house?

   A    No.

   Q    Did you find any cameras in that house?

   A    Yes.

   Q    Did you find those cameras or did someone else find
those cameras?

   A    Someone else did.

   Q    Tell us about those other cameras as best you can, sir,
how many there were and where they were found, if you received
that information from the other officer.

   A    I'm not -- I don't know which rooms they were found in.
They were found downstairs.  There was three cameras, and after
they were gathered up they were turned over to me.

   Q    Those cameras then were seized through this search



Terry Williams - Direct                    201

Q    Did she indicate any unwillingness to let you in the
house?

A    No.

Q    I hand you now, sir, what has been marked for
identification purposes as State's Exhibit 4-C and ask you if
you can identify that.

A    Yes.

Q    What is that?

A    This is the search warrant return.

Q    Trooper Williams, on your search warrant return what
date does it indicate you received the search warrant?

A    The 29th of October, 1980.

Q    And of course, what date was the search warrant
actually executed?

A    The 29th of October, 1980.

Q    And the receipt given?

A    The 29th of October, 1980.

Q    And the return made, sir?

A    The 29th of October, 1980.

Q    And about a third of the way down on State's Exhibit,
on the return, whatever it is, in capital letters it says, "We
left attached Schedule B".  Is that the receipt?

A    Yes.

Q    And what State's exhibit number is also Exhibit B?

201

---

Terry Williams - Direct                    202

A    Exhibit 4-D.

Q    Who all was home or who all was in the Moss house when
you finally left?  Did there ever come a time when anybody else
came in the house during this time that you served the warrant
besides the six police officers and Mrs. Moss?

A    I can't remember anybody else being there besides us.

Q    No other members of the family that you can remember
being there?

A    Not that I can remember.

Q    As these items were seized, who were they given to?

A    Me.

Q    And did you take them into your custody and possession?

A    Yes, I did.

Q    And did you keep them in your custody and possession?

A    Yes, I did.

Q    Until you returned to West Virginia?

A    Yes.

Q    Trooper Williams, I do want to call your attention to
paragraph 6 of the affidavit.  It is the second page of your
affidavit.  Would you read that, sir.

A    "Affiant states that he and other members of the West
Virginia Department of Public Safety went to the Mansfield
Reformatory in Mansfield, Ohio, and interviewed Mr. John Moss,
III.  Affiant states that Mr. Moss, III was fully advised of his

202

---

Terry Williams - Direct                    203

constitutional rights, and after being so advised admitted to
the affiant that he killed the three members of the Reggettz
family while he was burglarizing their home.  Mr. Moss, III
admitted to the affiant that he stole from the home a camera and
a Glenfield bolt action .22 caliber rifle."

Q    Did you hand write or prepare this affidavit?

A    No.

Q    How was this affidavit prepared?  Explain that to the
Court.

A    Well, I explained to the Prosecutor the circumstances
for the affidavit, and he filled it out.

Q    All right, in looking at paragraph 6, is that a
complete statement of what happened as to how you obtained these
facts?

A    No.

Q    What does that paragraph -- How do you interpret that
paragraph now, sir?

A    That we obtained the confession from John Moss at
the Mansfield Reformatory.

Q    Is that what happened?

A    No.

Q    It is an incomplete paragraph; is that correct, sir?

MR. McKITTRICK:  Objection.

THE COURT:  Quit leading.

---

Terry Williams - Direct                    204

Q    Are all the facts in that paragraph.

MR McKITTRICK:  Objection.  It speaks for itself, compared
to the facts in the case.

THE COURT:  Overruled.

Q    Are all the facts as to how you obtained this
information contained in that particular paragraph, sir?

A    No.

Q    At the top of that warrant, who all is it directed to?

A    The Chief of Police of the Cleveland Police Department,
and/or any member of said department, and/or West Virginia
Department of Public Safety, and/or any member of said
department.

Q    Did you serve the warrant, sir?

A    Yes, I did.

Q    And made the search?

A    Yes.

Q    Was it daytime when you made the search?

A    Yes.

Q    Did you find any property there that you seized?

A    Pardon me.

Q    Did you find any property there that you wanted to
seize?  Did you find any property in that house?

A    Yes, we did.

Q    Did you seize it?

Terry Williams - Direct                209

specifically on the basis of hearsay.  And I would move at this
time to strike the testimony.

THE COURT:  Well, not until he has completed his examination
of the witness on that document.

Q   The person that you investigated that this hearing is
about, is that person in the courtroom here today?

A   Yes.

Q   Would you point him out to us please.

A   Setting at the table in a red jumpsuit.

Q   What is that person's name?

A   John Moss, III.

Q   And what signature appears on State's Exhibit No. 5?

A   John Moss, Jr.

Q   Was the person that signed that statement, State's
Exhibit No. 5, the same person as you have pointed out here in
the courtroom?

A   No.

Q   Who did you know that John Moss in Cleveland to be?

A   John Moss, III's father.

Q   All right, sir, tell the Judge -- Well, first of all
State's Exhibit No. 5, does it indicate about what time you were
at the Moss home?

MR. McKITTRICK:  Objection.  It speaks for itself.

THE COURT:  Overruled.

209

---

Terry Williams - Direct                210

A   Yes, it does.

Q   About what time was that, sir?

MR. McKITTRICK:  Your Honor, it has not been introduced into
evidence and the witness is testifying as to its contents.

MR. BROWN:  He can throw it out later if it is not
satisfactory to the Court.  I think I have a right to lay a
foundation.

THE COURT:  I think you do too.  The objection is overruled.

Q   What time does that show, sir?

A   6:00 p.m.

Q   Now, sir, would you tell the Court exactly what you
did, how you came to get that document, what you all did when
you went back to the Moss home, who all went back, all you can
remember.

A   There was myself, Trooper Smith and the two detectives
from the Cleveland Police Department.

Q   All right, sir.

A   We went back to the house and Mr. and Mrs. Moss were
both there, and Mr. Moss gave us the camera.

Q   All right now, when you get to the Moss home, is it a
house or is it an apartment type of building, or how would you
describe that?

A   A house.

Q   Does it front right on the street, or is  here a little

210

---

Terry Williams - Direct                211

walk up to the house?

A   I believe there is a little walk up to the house.

Q   Does it have a porch?

A   I don't think it did.

Q   When you got up to the house, what happened?  How did
you gain entrance to the house?  Did you knock, ring the bell?
Was the door opened?  Tell the Court how it happened.

A   I am thinking there was a door on the side of the house
that leads into the kitchen.  I believe we went in that door.

Q   How did you get in; just walk in?

A   We knocked on the door.

Q   Do you remember who opened the door?

A   No, I don't.

Q   What happened when you went in?  How far in the house
did you get at that time?

A   We were invited in.  We went into the kitchen.  I
believe that is where we stayed, in the kitchen.

Q   When you went into the door, what room did you walk
into?

A   I believe it is the kitchen, but I may be wrong.

Q   Did you leave that kitchen to go into any other area of
the house that evening?

A   Not that I can recall.  If we did, we would have went
in the living room.

---

Terry Williams - Direct                212

Q   When you went in the house, what happened?  When you
got in the kitchen, what happened?

A   Well, Mr. Moss gave us the camera.

Q   Did you say anything; did you say anything to him?

MR. McKITTRICK:  Objection.

THE COURT:  Rephrase the question.  Sustained.

Q   Was anything said by yourself to Mr. Moss to indicate
you wanted the camera?

MR. McKITTRICK:  Objection.

THE COURT:  Overruled.

A   I didn't say anything.

Q   Did anybody demand the camera from him?

MR. McKITTRICK:  Objection.  That's leading.  Your Honor,
this is a crucial part of the case, what was done there.

THE COURT:  I'll sustain the objection.  Just rephrase the
question.

MR. BROWN:  Your Honor, the case of State vs. Damron, a 1982
case, says the Court can listen to leading questions.  Now,
there is no jury here.  I am sure this Court can separate the
wheat from the chaff.  All I want to do is get this information
for your benefit, not for the jury's benefit.  I would like for
you to hear this.

THE COURT:  Well the Court can hear it.  And you are a
competent, qualified and experienced trial lawyer, and you can

Terry Williams - Direct                    217

evening ever identified?

    A    Yes.

    Q    Was it identified -- Who was it identified by?

    Paul Reggettz.

    Q    How did he identify it?  Did he identify it as a camera coming from his home?

    A    Yes.

    THE COURT:  So the record is clear, let it be shown that Mr. McKittrick had a continuing objection to that entire line of questioning which the Court overruled.

    THE COURT:  I think he objected generally to the questioning of this witness upon that document; didn't you, Parrish?

    A    Yes.

    THE COURT:  All right, and I overruled the same for the reasons aforesaid in the record.

    MR. McKITTRICK:  That document still hasn't been moved.

    THE COURT:  I know it.  Have you finished your direct?

    MR. BROWN:  Yes.

    THE COURT:  All right, Mr. McKittrick, cross-examination?

    MR. McKITTRICK:  Yes, sir.

    - 0 -

217

---

Terry Williams - Cross                    218

CROSS-EXAMINATION

BY MR. McKITTRICK:

    Q    You have already identified State's Exhibit 4-B as the affidavit for the search warrant you signed; is that correct, sir?

    A    Yes.

    Q    And the information, as I understand it, that you received to put in your affidavit for the search warrant came from John Moss, III; is that correct?

    A    No.  The information --

    Q    Well, the information with regard to the physical objects that you wanted to seize came from John Moss, III; is that correct?

    A    Yes.

    Q    When was that information given to you?

    A    On the 28th of October, 1980.

    Q    Where were you when it was given to you?

    A    At the state police office in Parkersburg.

    Q    Are you telling His Honor that John Moss told you that there was a Glenfield bolt action .22 rifle, Serial No. 27526931, at his home?

    A    He didn't tell us exactly that.

    Q    Then you are saying he didn't give you all the information up here concerning the physical objects you attempted

218

---

Terry Williams - Cross                    219

to seize.  Is that a fair statement?

    A    Well, I'm not sure I know what you mean.  I don't know whether that is a fair statement.

    Q    He didn't give you all the information?

    A    He didn't give us the aerial number.

    Q    Where did you get the aerial number?

    A    At Heck's in St. Albans.

    Q    Heck's in St. Albans.  You, as I understand it, being one of the primary investigating officers of the Reggettz murders went to the home and was the first officer that found the Reggettz family murdered; is that correct?

    A    Yes.

    Q    Now, the first time that you ever saw John Moss, as I understand it, was on the 30th day of January, 1980; is that correct?

    A    Yes.

    Q    Did you discuss anything about a rifle on that occasion with John Moss?

    A    No.

    Q    The second time that you saw John Moss was on the 22nd day of April, 1980; is that correct?

    A    Yes.

    Q    Did you discuss anything with John Moss about a rifle?

    A    No.

---

Terry Williams - Cross                    220

    Q    Did you know on the 30th day of January, 1980, that a rifle was missing from the Reggettz home?

    A    Yes.

    Q    How did you know that?

    A    Because Paul Reggettz told us.

    Q    Is that when he confessed to the crimes?

    A    When he confessed to the crimes?

    Q    Yes.

    A    Yes.

    Q    Now, did Paul Reggettz tell you that it was a Glenfield rifle?

    A    Yes.

    Q    Would you please search your activity and show the Court, if you will, where you find that Paul Reggettz told you that a Glenfield rifle was missing from the home.

    A    I couldn't find it because I don't have it wrote down anywhere.

    Q    In other words, you just remember --

    A    It was oral.

    Q    It was oral?

    A    Yes.

    Q    But you didn't think it was that important?

    A    Yes, we thought it was important.

    Q    But you didn't put it in your activity report?

Terry Williams - Cross                    225

Q    Have you returned those cameras to the Mosses?

A    No.

Q    Are you willing to do that?

MR. BROWN:   Objection, Your Honor.

THE COURT:   Sustained.

Q    Now, tell us what happened in this meeting where Paul
Reggettz identified this camera, this Kodak camera.

MR. BROWN:   Objection.  This is a suppression hearing going
to the constitutionality of the search.  He is now going into
whether or not we can identify certain items.  Now, Your Honor,
that is not at all what a suppression hearing is for.  We will
have to identify that camera when we bring it before this Court.

THE COURT:   I agree.  This is a suppression hearing to
determine whether or not the items seized were seized in a
constitutional and lawful manner.  Now, at trial you have a
right, depending upon how the Court rules, then to bring in
evidence on how they were seized.

MR. McKITTRICK:   Your Honor, I say this respectfully, but I
assume, and I am sure from the testimony that this camera was
contraband.  Now, if I can prove it wasn't contraband, that it
wasn't the camera missing out of the Reggettz home, then
obviously it should be suppressed.

THE COURT:   I agree with you.

MR. McKITTRICK:   hat is what I am trying to do.

225

---

Terry Williams - Cross                    226

THE COURT:   But the point is that seems to me to be an issue
for cross-examination.  The purpose of suppression is to
determine whether or not this particular object was seized in a
lawful manner.  Now as to whether that object has any connection
with the underlying issue in this trial it seems to me is
properly brought out on cross-examination, should they attempt
to introduce the camera.

MR. McKITTRICK:   Well, Your Honor, let's say hypothetically
this trooper had not had Paul Reggettz look at this one camera.
He had four cameras.  Now, I'm asking you to suppress them all
in this hearing.  If he can't identify them, is the Court saying
I can't cross-examine to determine whether or not they were the
cameras that came out of the Reggettz home?  Just because he
went and seized them someplace don't make them the camera.  I
should be able to in this hearing pursuant to a motion to
suppress because one of the allegations in our motion is that he
can't identify it as coming from the Reggettz home, and that is
what I'm trying to cross-examine him on.

THE COURT:   That who can't identify it as coming from the
Reggettz home?

MR. McKITTRICK:   This trooper or anybody from law
enforcement because that has been the previous testimony up
until this time, Your Honor.

MR. BROWN:   Your Honor, these are matters to be brought out

226

---

Terry Williams - Cross                    227

at a later hearing, but right now, the purpose of this hearing,
the reason this trooper is on the stand, is to determine whether
or not the search procedures were proper.  It makes no
difference if we seized eighty-five items and the Court throws
them all out later on because none of them can be identified.
That is not the point, Your Honor.  The point is did he use the
proper procedures to safeguard this man's constitutional rights
to an unlawful search of the home.  That's all.  Now, you can go
into this other stuff later on and have a hearing --

THE COURT:   I'm not going to go into it later on and have
another hearing.  We can go into it now.  Objection overruled.
Proceed.  Get it out of the way now once and for all.

MR. BROWN:   Excuse me, Your Honor.  Does this mean he can't
go into it later on?

THE COURT:   What do you mean?

MR. BROWN:   If we're going to have a hearing on it now, does
this mean Mr. McKittrick cannot have another in limine hearing
on this matter, on this camera?

THE COURT:   In limine hearing?

MR. BROWN:   Or another hearing about the identification of
this camera.  How many hearings do you get?

MR. McKITTRICK:   I assume at the trial, Your Honor, we are
going to be able to voir dire this matter before it is
introduced to the jury.  I can't -- If Pete Brown comes in here

227

---

Terry Williams - Cross                    228

and introduces that camera before the jury and then you find it
is not properly linked up, I can't take it from the jury's mind
I assume I have a right to voir dire it on a motion in limine.

MR. BROWN:   Well, Your Honor, we're going to have hearing on
hearing.

THE COURT:   Well, you can have hearing on hearing on
hearing.  That's fine; then we'll have hearing on hearing on
hearing.

MR. BROWN:   I say it is not proper at this time, Your Honor
and our witnesses were not advised of this.  We don't have
enough witnesses here, don't have the cameras here.  That wasn't
our purpose.  Our purpose was to study the scope of the
constitutional safeguards against unconstitutional searches.

MR. McKITTRICK:   I think the motion speaks for itself,
Your Honor.

THE COURT:   Proceed.  Would you read the last question.

(Whereupon, the last question was read by the reporter.)

MR. BROWN:   I object to that, Your Honor.  If he wants to
ask him if he identified that camera, that's fine.  But what I
did in there with Mr. Reggettz as any pre-trial preparation for
trial, I think that's --

THE COURT:   I agree with that, Mr. Brown.  I will sustain
that.  You can ask him whether or not Reggettz identified it,
but I'm not going to let you get into what else went on down

Terry Williams - Cross                    233

Q    What was the name?

A    Moss.  I don't remember the first name.  Something
Moss.

Q    But the camera he did pick out, are there any other
individualistics on that camera that looked like they were
imposed or put on there after its manufacture or after its sale?

A    No.

Q    When you, Trooper Williams, brought those four cameras
back to Charleston, West Virginia, did you know which one of
those cameras, after you had seized them at the Moss residence,
which one of those cameras may have been the camera that came
from the Reggetts residence on the 13th day of December, 1979?

A    Yes.

Q    What camera did you believe came from the residence?

A    The one that John Moss, III's father gave us.

Q    How come you arrived at that conclusion?

A    By what John told us in his confession.

Q    And what did he tell you that made you arrive at the
conclusion that that specific camera had come from the Reggettz
home?

A    John told me that the camera he took from Paul
Reggettz' home was on his chest in his bedroom.  When we went to
his house in Cleveland, his mother and father's house with the
search warrant, the camera was not there; and his mother told us

                               233

---

Terry Williams - Cross                    234

that that camera, that she had taken it and used it and put it
in his father's car, and that is where it was.

Q    The camera that was on his chest?

A    Yes.

THE COURT:  I hate to be picky, but for the sake of the
record, by "chest", what are you referring to?

THE WITNESS:  Chest of drawers.

MR. McKittrick;  That's all the questions I have, Your
Honor.

THE COURT:  Any redirect?

MR. BROWN:  No, Your Honor.

THE COURT:  Okay, Trooper, you may step down.

(Witness Excused.)

MR. BROWN:  At this time the State would move into evidence
all of the exhibits it has had marked, which would be State's
Exhibits 1 through 5, including 4-A, B, C and D.

THE COURT:  All right.

MR. McKITTRICK:  Defendant objects to State's Exhibit No. 5
on the basis that it is a hearsay writing of another individual

THE COURT:  Would you gentlemen mind telling me what these
exhibits are.

(Whereupon, a discussion was had off the record and then
resumed back on the record as follows:)

THE COURT:  State's Exhibits 1 through 4-A, B, C and D will

                               234

---

Ernestine Whitlock - Direct               235

be admitted into evidence without objection by the defense.
State's Exhibit 5 will be admitted into evidence over the
objection of the defense.

All right, who is your next witness?

MR. BROWN:  That's all we have, Your Honor, on these
matters, which as I understand are the search, the blood, the
confession and the detainer; and of course, we feel that
Mr. McKittrick will have the burden on the detainer.

THE COURT:  Mr. McKittrick indicated he has five witnesses
he wishes to call on these issues.

MR. McKITTRICK:  I may be able to get a couple of witnesses
on here real quick.

THE COURT:  That's fine.  Call you first witness then,
Mr. McKittrick.

MR. McKITTRICK:  Ernestine Whitlock.

                    - O -

               ERNESTINE WHITLOCK,

     Being thereupon called as a witness, after

     being first duly sworn, testified as follows:

                         DIRECT EXAMINATION

BY MR. McKITTRICK:

Q    State your name please.

A    Ernestine Whitlock.

Q    Ernestine, are you employed?

---

Ernestine Whitlock - Direct               236

A    Yes, I am.

Q    Where are you employed?

A    In the Circuit Clerk's office of Kanawha County,
West Virginia.

Q    What are your duties there?

A    All of them?

Q    What are your duties there relative to criminal matters
in the Circuit Court?

A    I am presently serving as courtroom clerk to the
Honorable John Hey, one of the seven circuit judges.

Q    Were you employed on January 1, 1980, by the Circuit
Clerk's office of Kanawha County, West Virginia.

A    Yes, sir.

Q    Were your duties relative to criminal matters in the
Circuit Court of Kanawha County any different at that time than
they are today?

A    No.  They are about the same routine.

Q    Did you have an opportunity in January of 1980 to do
anything with regard to the grand jury in Kanawha County,
West Virginia?

A    Yes, sir.

Q    Do you as part of your duties keep the official
indictments returned by the Kanawha County grand jury?

A    Yes, sir.

Ernestine Whitlock - Cross - Redirect     241

A   I have a routine, when we open court the Judge calls for grand jury witnesses to be sworn.  If the person is here, I write a red or blue or green, or what have you, in the left side of the page the date that they appear to be sworn to go before the grand jury; and the swearing is done in open court.

Q   And have you looked at your documents, and do they reflect that the witnesses you have enumerated, that is Mr. Williams and Mr. Murphy, were sworn to testify before the grand jury on the dates that you have enumerated for the Court?

A   Yes, sir.

MR. McKITTRICK:  That's all.

THE COURT:  Any recross?

MR. BROWN:  No, Your Honor.

THE COURT:  All right, thank you, Mrs. Whitlock.  You may step down.

(Witness Excused.)

THE COURT:  Call your next witness.

MR. McKITTRICK:  Beverly Selby.

- o -

241

---

Beverly Selby - Direct     242

BEVERLY SELBY,

Being thereupon called as a witness, after being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q   Would you state your name please.

A   Beverly Selby.

Q   Beverly, are you employed?

A   Yes, I am.

Q   Where are you employed?

A   At the Prosecuting Attorney's office here in Kanawha County, West Virginia.

Q   What are you employed as at the Prosecuting Attorney's office?

A   Assistant Prosecuting Attorney.

Q   And when were you so employed?

A   Around the first of January, 1981.

Q   Are you assigned to the juvenile division of the Prosecuting Attorney's office of Kanawha County?

A   No, but I was.

Q   Did you have occasion to handle juvenile matters?

A   Not any more.

Q   Did you?

A   Yes.

242

---

Beverly Selby - Direct     243

Q   Were you acquainted with the case of State of West Virginia vs. John Moss as it related to an alleged felonious assault shooting at the Moose Club in St. Albans, West Virginia?

A   Yes.

Q   Do you have that file with you?

A   It is back there.  The deputy has it.

Q   Would you like for me to retrieve that for you?

A   Yes.

MR. STUCKY:  Your Honor, at this time, pursuant to the confidentiality laws of West Virginia, as the Court is well aware, it is a misdemeanor offense to release any juvenile records to any person for any reason without a court order.  And to prevent one of my assistants from committing a criminal offense in West Virginia, I would ask that none of the records either from my office or the circuit clerk's office regarding John Moss as a juvenile be released without a court order ordering that those be released for whatever purpose.  There are specific purposes set forth in the statute, and I don't believe this falls within one of those purposes.

MR. McKITTRICK:  I believe it does, Your Honor, but one of the easiest ways to remedy that, 'f there is no objection by the State, is to get a court order, if you feel it is necessary.

THE COURT:  Oh, I feel it is necessary, because it occurs to

---

Beverly Selby - Direct     244

me that only recently a circuit judge was chastised by the Supreme Court for releasing certain juvenile information in the southern part of this State.

I am going to sustain the objection at this time.

MR. McKITTRICK:  I will file a petition for an order if you want me to.

THE COURT:  It is not a question of what I want.  They have raised an objection, and I have sustained the objection.  File your petition, and I'll act on it.  Why don't we take a two minute informal recess and sit right here, and counsel for the State and counsel for the defendant might be able to work this thing out.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

MR. McKITTRICK:  Your Honor, I am going to withdraw this witness for the time being; and we are going to remedy this problem during noon.

THE COURT:  All right, Beverly, step down and be available around 1:00.

THE WITNESS:  Yes, sir.

(Witness stands aside.)

MR. McKITTRICK:  My next witness is Trooper Williams.

- o -

THE CLERK:  You are still under oath.

Michael Don Smith - Direct                 250

(Whereupon, the last question was read by the reporter.)

A    No, I did not.

MR. McKITTRICK:  That's all the questions I have.

THE COURT:  Any cross?

MR. BROWN:  No, Your Honor.

THE COURT:  Thank you, Trooper Williams.  Is he on standby

or is he excused?

MR. BROWN:  Your Honor, we would like to keep him here until

this afternoon.

THE COURT:  All right, be here at 1:30.  Anything further?

(Witness stands aside.)

MR. McKITTRICK:  Your Honor, I might be able to get one more

witness on.

THE COURT:  Fine.  Call him or her, whoever.

MR. McKITTRICK:  The defense calls Trooper Smith.

THE COURT:  All right, Trooper Smith, take the stand.  You

are still under oath.

- o -

MICHAEL DON SMITH,

Having been previously sworn as a witness,

further testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q    You are the same Trooper Smith that has testified

250

---

Michael Don Smith - Direct                 251

heretofore in these proceedings?

A    Yes.

Q    Trooper Smith, you assisted in interrogating John Moss

concerning the Reggettz murders; is that correct, sir?

A    Yes.

Q    And during your interrogation did John Moss indicate to

you that he had been cut during the scuffle that led to the

Reggettz murders?

A    Yes.

Q    Now, what else did John Moss tell you about that, that

cut?

A    That he received a cut on his left little finger.

Q    And you have indicated that he showed that to you; is

that correct?

A    A small scar.

Q    On his left little finger?

A    Yes.

Q    I am going to ask Mr. Moss to approach you and show you

his left little finger; and if you would, for purposes of this

record, would you point out where the scar is, sir?

A    Well, there is a scar right here, right at the bottom.

Q    Is that where he showed you?

A    I just remember him showing me a scar on his left

little finger.

251

---

Michael Don Smith - Direct                 252

Q    Well, do you see any other scars on his left little

finger other than the one that appears there?

A    No.  That is all I can see.

Q    And the scar that we are talking about is on the

outside of the left little finger under the knuckle; is that

correct?

A    Well, it is at the bottom.

Q    It is under the knuckle where you make a fist?

A    Yes.

MR. McKITTRICK:  That's all the questions I have.

THE COURT:  Let the Prosecutor see the scar to which you

were referring.

(Scar examined by Prosecutors.)

THE COURT:  Any cross?

MR. BROWN:  No, I don't have any.

THE COURT:  No cross?

MR. BROWN:  No.

THE COURT:  Thank you, Trooper Smith.  You may step down.

Do you want him on call also?

MR. BROWN:  Yes, Your Honor, just until Mr. McKittrick

finishes.  We may have some redirect.  It could be possible, but

I don't anticipate it at all.

(Witness stands aside.)

MR. McKITTRICK:  Judge, I think that is all I am going to be

---

253

able to get on at this time.

THE COURT:  All right, if you gentlemen can work out the

problem with Mrs. Selby's testimony, fine.  If not, we will take

that up as the first order of business.   Let's try to get back

here around 1:15 or 1:20.

MR. BROWN:  Yes, sir.

MR. McKITTRICK:  All right.

- o -

(Whereupon, a recess was had in the proceedings.)

- o -

AFTERNOON SESSION

WHEREUPON, the proceedings in the Matter of STATE OF

WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III,

CR-82-F-221, were resumed with all parties present as before

noted, including the defendant and his counsel, and the State of

West Virginia by James C. Stucky, Prosecuting Attorney, and

Peter C. Brown, Assistant Prosecuting Attorney for Kanawha

County.

THE COURT:  Show the resumption of these proceedings in

State of West Virginia vs. John Moss, Jr., also known as John

Moss, III, CR-82-F-221, murder in the first degree, three

counts.  The defendant is present in person and by his counsel;

the State of West Virginia by Mr. Stucky, Prosecuting Attorney,

Beverly Selby - Direct                               258

- o -

BEVERLY SELBY,

Having been previously sworn as a witness,

further testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q    Mrs. Selby, you indicated to me that you are familier

with the file in question and that you had it in your

possession; is that correct?

A    That's right.

Q    Now, does the file reflect to you the nature of the

charge against John Moss?

A    On the malicious wounding?

Q    Yes.

A    Yes, on the malicious wounding.

Q    What was the nature of the charge, and when did it

occur?

A    A malicious wounding against one Montina Diggert on May

1, 1979, sworn to before Norma Todd, June 6, 1980, and filed

September 9, 1980.

Q    Were the charges against one John Moss, III, who is

seated at counsel table with the red jumpsuit on?

A    Yes, sir.

Q    Were you assigned to handle this case for the

---

Beverly Selby - Direct                               259

Prosecuting Attorney's office for Kanawha County, West Virginia?

A    I was assigned to handle the juvenile proceedings on

the homicide case, and then I just assumed that I was also to

handle the other case on John Moss.

Q    And then I take it, pursuant to your duties as

Assistant Prosecuting Attorney of Kanawha County, that you

started to handle the malicious wounding case?

A    That's right.

Q    When did this file, to the best of your knowledge, come

into your possession?

A    Probably around the first of March of '81 because it

first came up for a preliminary hearing on March 5, 1981, and I

generally get the file for a preliminary hearing about a week

before, something like that.

Q    As a result of your handling this file, you were aware

that John Moss, III, on the 28th day of October, 1980, was

brought back to West Virginia pursuant to a detainer?

A    That wasn't in the file.

Q    Are you familiar with that as a result of your duties

in the Prosecuting Attorney's office?

A    Of what, the detainer?

Q    Yes.

A    Yes.  I have seen the detainer since then, of course.

MR. McKITTRICK:  I would like to have this marked as

---

Beverly Selby - Direct                               260

Defendant's Exhibit 5.

(Whereupon, the document referred to was marked by the

reporter as Defendant's Exhibit No. 5.)

Q    Now, I take it you were familiar with the detainer

which John Moss was brought back on after he was brought back;

is that correct?

A    I wasn't there when he was brought back.

Q    I take it you were familiar with the detainer that John

Moss was brought back on to West Virginia.

A    At one point, yes.

Q    And that was after he was brought back?

A    Yes.

Q    To the State of West Virginia --

MR. STUCKY:  He is starting to lead his own witness.

MR. McKITTRICK:  I am just trying to hurry this proceeding.

THE COURT:  I agree, Mr. McKittrick.  Overruled.

Q    And of course, the detainer has a great deal of

relevance to the case itself and how much time you have to

prosecute it; does it not?

A    Right.

Q    And in what regard does it?

A    Well, that's when I became aware of the detainer was,

let's see, it was after the motions for the psychiatric

examination on the murder charges, and some time started lapsing

---

Beverly Selby - Direct                               261

and it occurred to me, "Don't you have just so many days on a

detainer."  And it was at that point that I went to look at the

detainer and the date and the statute and all that.  That was

after all this business on the malicious wounding charge.

Q    And the detainer that you familiarized yourself with I

believe is the detainer that has been marked as Defendant's

Exhibit 5.  Would you look that over carefully and tell us if

that is true.

A    Do you also have the detainer on the homicide charge?

Q    No.  Is that not it?

A    No, because --

Q    The only one I am asking you about now is the felonious

assault charge.

A    I don't know if I have ever seen this one or not.  I

have seen one detainer.  If I could compare this one with the

other one, I could tell you if this is the one I saw before.

Q    What I have asked you so far, you have testified that

you handled the felonious assault case?

A    Yes.

Q    And that you familiarized yourself with the detainer

because it had some relevance in the felonious assault case

because you have to prosecute the defendant in a certain amount

of time, and you said yes.  Is that a fair statement?

A    I wasn't clear on which detainer you were talking

Beverly Selby - Direct                266

THE COURT: All right, it will be admitted into evidence as Defendant's Exhibit No. 6, properly marked, without objection by the State.

Q   Now, you are familiar, are you not, as a result of being in this case and handling the felonious assault case that John Moss was returned to the State of Ohio after being brought to the State of West Virginia pursuant to the felonious assault and brought back to West Virginia on the homicide detainer?  Is that a fair statement?

A   Yes.

MR. McKITTRICK: That is all the questions I have, Your Honor.

THE COURT: Any cross?

MR. McKITTRICK: No, Your Honor.

THE COURT: All right, thank you, Mrs. Selby.  You may step down.

(Witness Excused.)

MR. BROWN: We probably ought to open those doors again.

THE COURT: Yes.  Mangus, would you unlock the doors now and open them.

Call your next witness.

MR. McKITTRICK: Peggy Griffith.

- o -

266

---

Phyllia E. Griffith - Direct                267

PHYLLIS E. GRIFFITH,

Being thereupon called as a witness, after being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q   State your name please.

A   Phyllia E. Griffith.

Q   Are you employed?

A   Yes, sir.

Q   Where are you employed?

A   At the office of the Prosecuting Attorney.

Q   When were you so employed?

A   October 1, 1965.

Q   Were you employed during the course of the time that the January, 1980 grand jury was setting?

A   Yes, sir.

Q   And as part of your duties in the Prosecuting Attorney's office of Kanawha County, West Virginia, do you have occasion to keep the grand jury notes on each case presented to the grand jury?

A   Yes, sir.

Q   And have you at the request of your present Prosecuting Attorney, James Stucky, pursuant to a court order, supplied me with a copy of the grand jury minutes relative to State of

267

---

Phyllia E. Griffith - Direct                268

West Virginia vs. Paul Reggettz?

A   Yes, sir.

THE COURT: Let the record reflect that the proceedings are now open to the public.  All right.

Q   Was the case of State of West Virginia vs. Paul Reggettz presented to the January, 1980 grand jury?

A   Yes, sir.

Q   And what do you do with regard to your duties in presenting or having or assisting in having presented a case to the grand jury?

A   I type up the docket sheets, and then I schedule the investigating officer or the witness that is to testify before the grand jury.

Q   Did you work at that time in combination with Ernestine Whitlock?

A   Yes.

Q   Have you brought to the courtroom a copy of the minutes of the grand jury relative to the State of West Virginia's case against Paul Reggettz?

A   Yes, sir.

Q   Would you hand that to me please.

A   Yes.

MR. McKITTRICK: I would like to have this marked as Defendant's Exhibit 7.

268

---

Phyllia E. Griffith - Direct                269

(Whereupon, the document referred to was marked by the reporter as Defendant's Exhibit No. 7)

Q   Let me hand you now what has been marked for identification purposes as Defendant's Exhibit No. 7 and ask you what that is.

A   This is a copy of the clerk's sheet out of the docket book for the grand jury.

Q   Who is the clerk of the grand jury?  Is that the person that takes the minutes of the grand jury?

A   Yes.

MR. McKITTRICK: We move the introduction of Defendant's Exhibit 7.

THE COURT: Any objection?

MR. STUCKY: Your Honor, the State would object simply because what that appears to be is handwritten notes of a clerk in the grand jury, what she may or may not have heard witnesses testify to in the grand jury.  It is not a transcript.  It is not represented to be complete.  The person who is testifying is not even the clerk who wrote those notes.  I think it is purely a document that contains partial or hearsay of a partial nature of what the person heard, handwritten notes of bits and pieces of information that was presented to the grand jury.  And I don't know what purpose it serves here.  I don't think it is proper in this hearing nor certainly in front of a jury on

269

James Williams - Direct                274

A    Yes.  There has been no disposition made of that case.

Q    Jim, where are the grand larceny charges pending; in Kanawha County, West Virginia?

A    In Kanawha County, West Virginia, in the juvenile court.

MR. McKITTRICK:  That's all the questions I have.

THE COURT:  Any cross?

MR. STUCKY:  None.

THE COURT:  Thank you, Jim.  You may step down.

(Witness Excused.)

THE COURT:  Do you have any other witnesses other than Mr. Moss?

MR. McKITTRICK:  That's it.

THE COURT:  Do you want to start at 1:15 tomorrow?

MR. McKITTRICK:  Yes, sir.

THE COURT:  Without trying to box you in, I'm not trying to box anybody in, but can you give me some idea of how many more witnesses you are going to have, Mr. McKittrick?  Let me put it another way.  Do you think we can conclude it in another half day?

MR. McKITTRICK:  Oh, yeah, I do.

MR. BROWN:  Judge, we were just wondering -- How many divorces -- If the Court maybe had some divorces, the only thing that is holding us up here is that Mr. Moss needs to get over to

274

---

275

the jail and pick up these items; and we just thought there might be a possibility if these divorces were done by say 3:30 or 4:00 -- We're not having much cross on this thing --

THE COURT:  No.  I'm not continuing it after 4:00.  Now, let me say this to you:  It may be that I can get rid of these divorces by 3:00.  So if you want to try and --

MR. McKITTRICK:  But you are not going to go past 4:00?

THE COURT:  No, I am not.  I have other matters.

MR. McKITTRICK:  Judge, I think we probably ought to do it tomorrow then.

THE COURT:  Okay.

MR. McKITTRICK:  If I could ask you this while I remember it, during the trial of this case, is it your plan to adjourn at approximately 4:00 each day most of the time?  I think you said before we wouldn't try it on Friday because of your motion day.

THE COURT:  You can't pin me to this.  In fact, I am seriously considering -- You have filed a motion for individual voir dire; haven't you?

MR. McKITTRICK:  Yes, I have.

THE COURT:  I am considering, in light of what you told me the other day about your experts having certain evidence in their possession, and it may not be here by the 17th, I'm giving some thought to postponing this until the 24th.  That will give them another week -- I'm considering it.  That will give them another

275

---

276

week to complete their analysis of the evidence they have in their possession.  And if we are going to have individual voir dire, I suspect that will take maybe, if we run into complications, maybe two days, maybe not.

Let me give you the ground rules as I understand them now to be, subject to amendment by the Court.  I anticipate going to trial Monday through Thursday, quitting at 4:00 or thereabouts.  Now obviously, we may go over some days; some days we may have to quit early because of the absence of witnesses, whatever.  Normally I would expect 4:00.

If it becomes necessary, and I do not know that it ever will, but if it becomes necessary, I'll hold court on Saturday; but usually, and I anticipate at this time, the holding of the trial Monday through Thursday from 9:30 or 9:00 until 4:00 or thereabouts.  If we have to go over, we'll go over.

Secondly, on the motion for individual voir dire, I don't know whether I have spelled this out before or not.  I think I did, but if I haven't, I will spell it out again.  I'm going to grant the motion for individual voir dire.  However, I will expect you to submit your questions to me, both sides, in writing in advance.  I will ask the questions.  If as a result of my questions and the answers elicited from the prospective jurors, you develop further questions, I'll permit them.  Just write them out and hand them to me when I have concluded your

76

---

277

first set.  If as a result of questions propounded by the State you think of further questions you want me to ask, Mr. McKittrick, write them out, and I will probably ask most of those, unless there is a real reason not to.  But I intend to conduct the voir dire.  I am very, very generous in the amount of questions I permit to be asked, and very seldom do I ever refuse a question of counsel for the defendant.  But I intend to proceed with the actual questioning, subject to those written questions you submit.  And as I said, as a result of the answers I get, if you have more questions, write them out and hand them to me.  Then when the State questions them, if they do, and there are answers elicited which evoke more questions in your mind, Mr. McKittrick, submit them to me; and I'll ask them.

MR. McKITTRICK:  Of course, I haven't communicated with my experts, Your Honor, because as of yesterday they still hadn't received our evidence.  We sent it to them --

THE COURT:  On the 9th of September I believe you told me.

MR. McKITTRICK:  We got it on the 9th.  That was on Friday, I believe; and we sent it on Monday or Tuesday, as quickly as we could get it prepared to go; and they hadn't received it today, well yesterday.  I assume they got it today, hopefully.

When, subject to my talking to them, would we know about the 24th maybe?

THE COURT:  If there is no objection from either side, I'll

277

John Moss, III - Direct                 282

Q    One of the officers at the detention home come down and told me I had a visitor.

Q    Did you meet with Officers Williams and Smith?

A    Yes.

Q    Where did you meet with the men?

A    Where the attorneys talk to their clients.

Q    Is it a small room or sorts?

A    It is about the size of this courtroom here.

Q    Was there anyone with Officers Smith and Williams?

A    No.

Q    In other words, they were by themselves when they met with you?

A    Yes.

Q    And what did they indicate to you occasioned their visit?

A    They wanted to talk to me about a family being killed down here.

Q    And did they tell you the name of that family?

A    Yes.

Q    And what did they tell you the name was?

A    The Reggettz family.

Q    Did they indicate or ask you whether you knew anything about the Reggettz family?

A    Yes.

282

---

John Moss, III - Direct                 283

Q    Did they ask you if you knew anything about the Reggettz homicides or murders?

A    Yes, they asked me about them.

Q    What did you tell them?

A    I said I didn't know nothing about it.

Q    Did they ask you whether you committed those murders?

A    Yes.

Q    What did you tell them?

A    No.

Q    Did they ask you how you found out about those murders?

A    I seen it on the news the next day.

Q    And then what did they do?

A    They asked me was I willing to talk to them about the Reggettz murders.

Q    What did you tell them?

A    I told them I didn't have nothing to tell them because I didn't know nothing about it.

Q    Did you indicate to them at that time that you had a lawyer?

A    Yes, I told them I had a lawyer for the charges over in Ohio.

Q    Did you tell them that you wanted to see your lawyer at that time?

A    Yes.

283

---

John Moss, III - Direct                 284

Q    What did they say?

A    They told me they had talked to my lawyer already, and he would be over later.

Q    Then what did they do?

A    They asked me if I would give them a sample of blood. I told them, "Yeah, I'll give it to you; I don't have nothing to hide."

Q    Did they take a sample of blood from you?

A    Yes.

Q    And then what occurred?

A    When they took the blood from me?

Q    Yes. How did they take that blood, John?

A    They had this little metal like a stick pin. They stuck me in my index finger. They squeezed it and a little bit of blood come out on a cotton pad.

Q    Then what happened after they took your blood?

A    They put it in some kind of container.

Q    Then what happened?

A    Then they kept asking if I was willing to talk to them about the Reggettz murders.

Q    Then what did you say?

A    I told them I didn't have nothing to say.

Q    Then what happened?

A    Well, they asked me about a few friends of mine down

284

---

John Moss, III - Direct                 285

here in West Virginia.

Q    Then did a lady lawyer there intervene in your conversation?

A    Yes.

Q    What was the purpose for her intervention?

A    She seen that they was taking blood from me and my lawyer wasn't there, because she had seen me there before and she knew who my lawyer was. She come over to the table and asked me had they talked to my lawyer. They said my lawyer was in court, and she advised them to come back later when he was in my presence, my lawyer was in my presence.

Q    Did they leave?

A    Yes.

Q    Did they come back later?

A    No.

Q    Did you later talk with your lawyer in Ohio about this matter?

A    Yes. He come back about fifteen minutes later.

Q    Now, did your lawyer do something with regard to that blood sample?

A    Yeah. At first he had told me what they had did, what they had come down here for. He asked me what they had did. I told him they had come here down to ask me about some murders in West Virginia. And he asked me what I said, and I told him I

285

John Moss, III - Direct                290

setting on the table or something, and you know, they told me to

stick out my arm so they can withdraw the blood from it.

   Q   And did they take blood from you?

   A   Yes.

   Q   How much blood did they take?

   A   I think about two or three tubes.

   Q   What did they put it in?

   A   Tubes, glass tubes.

   Q   And did they hand that blood to Trooper Williams?

   A   Yes.

   Q   Then what occurred?

   A   Williams, he marked something --

   Q   On the blood?

   A   On the bottles, yeah.

   Q   Then what happened?

   A   After a while they left, and they took me back

downstairs.

   Q   John, let me direct your attention to the 28th day of

October, 1980.  Did you have occasion to see Troopers Terry

Williams and Mike Smith on that date?

   A   Yes.

   Q   Where were you at that time?

   A   When I met them?

   Q   Excuse me.

---

John Moss, III - Direct                291

   A   When I met them?

   Q   Yes.

   A   We was in a place where you call a holding cell.

   Q   Where was that located?

   A   In Mansfield.

   Q   In Mansfield, Ohio?

   A   Yes.

   Q   Was it at an institution?

   A   Yes.

   Q   A penal institution?

   A   Yes.

   Q   How did it come to your attention that Troopers Smith

and Williams were there to see you?

   A   I was at work in the kitchen.  I had a job there in the

kitchen, and they called me over the intercom and told me I was

going AWOL.

   Q   What does that mean?

   A   It means you are going back to court on a

reconsideration for your sentence or you are going back for

other charges.  So I assumed I was going back to get a time cut

because I wasn't thinking West Virginia was coming down there to

get me.

   Q   Okay.

   A   So they called me down to the office to go to the

---

John Moss, III - Direct                292

bullpen.  I get the pass to go to the bullpen, and they told me

to go pack my stuff, I was going AWOL.

   Q   Who told you to go pack your stuff?

   A   One of the officers at the bullpen.  So I go pack my

stuff, and I come back down and turn in my mattress and

everything.

   Q   At the time, John, did you know you were going back to

the State of West Virginia?

   A   No.

   Q   Then what happened?

   A   I come back down to the bullpen where the officer was.

He signed my pass and took my pass.  He sat me in the holding

cell until they was ready to call me up.

   Q   Then what happened?

   A   I sat there in the holding cell about half an hour.

Then he called me out there where Trooper Smith and Williams

was.  They asked -- Smith said, "I told you we would be back."

He asked me was I ready, and I asked him ready for what.  He

said, "I told you we was coming back down here to get you."  I

asked him, "Coming to get me on what?"  And he said, "On the

Reggettz murders", and I said --

   Q   All right now, did they ever say anything to you, they

being Trooper Williams and Trooper Smith, about a felonious

assault at that time at the Moose Club?

---

John Moss, III - Direct                293

   A   No.

   Q   And then what happened?

   A   Well, he asked was I ready.  I said, "Ready for

what?  I told you all I didn't know nothing about no murders

down there.'

   Q   Did you have a conversation with Trooper Smith and

Trooper Williams at that time about a lawyer?

   A   Yeah.  They was packing up my things, and I told them I

wanted to talk to my lawyer first.

   Q   What lawyer are you talking about?

   A   A lawyer down here in West Virginia.

   Q   All right now, did they say that you didn't have a

right to a lawyer?

   A   He said I didn't need no lawyer, that I can talk to a

lawyer whenever I get there in West Virginia.

   Q   All right now, did you have a discussion with them

concerning what you call extradition at that time?

   A   I told them that I wanted to fight it.

   Q   Fight what, John?

   A   Extradition or whatever they call it, you know,

bringing me back down here.

   Q   You wanted to fight coming back to West Virginia from

Ohio.  Is that what you are saying?

   A   Yes.

John Mosa, III - Direct                298

Q    What did he do; what did Trooper Smith do?

A    He uncuffed one hand, one wrist, and cuffed them together behind the headrest of the front seat.

Q    At that time, John, were you handcuffed in the front of your body?

A    Yes.

Q    Are you saying Trooper Smith handcuffed the handcuffs to the headrest of the front seat?

A    Yes.

Q    Then what happened?

A    Well, after a while, after I was handcuffed, he asked me am I ready to talk about the Reggettz family. I said, "I told you before, and I'm telling you again, I don't know nothing about no Reggettz family. All I know, the people got killed by the father or the husband down there."

Q    And then what occurred? What did he say; what did he do?

A    He said I know more than what I'm saying.

Q    Are you saying Trooper Smith said, "You, John Mosa, know more than you are saying"?

A    Yes.

Q    All right, then what happened?

A    I -- He said something about Bill, a friend of mine named Bill.

298

---

John Mosa, III - Direct                299

Q    Bill Johnson?

A    Yes. He said Bill said I knowed something about them.

Q    About what?

A    The Reggettz murders.

Q    All right.

A    I told him, "I don't know nothing. If you want to talk to me, you talk to my lawyer."

Q    Did you tell Trooper Smith at that time who your lawyer was?

A    Yes.

Q    Who did you tell him your lawyer was? Who did you tell Trooper Smith your lawyer was?

A    I told him Lawyer James Williams.

Q    Now, James Williams is a lawyer in the State of West Virginia; is that correct?

A    Yes.

Q    Was James Williams representing you at that time?

A    Yes.

Q    And what was James Williams representing you for? Was it a grand larceny charge in Kanawha County, West Virginia?

A    Yeah, grand larceny.

Q    Had you had an opportunity in the month of March, 1980, to see, meet with and talk with James Williams in the State of Ohio concerning that charge in West Virginia?

299

---

John Mosa, III - Direct                300

A    Yeah.

Q    Now, did you indicate to Officer Smith that you would be glad to talk to him about the Reggettz murders in the presence of your lawyer; is that correct?

A    I told him I would talk to him if my lawyer was here.

Q    Okay, did you then give Trooper Smith something so he could get hold of your lawyer?

A    I told him I had my lawyer's name and number written down in my Bible in my pocket.

Q    Now, did you have your Bible with you?

A    Yeah. It was in my back pocket.

Q    Do you have your Bible with you today?

A    Yes.

Q    Is it the same Bible that you had at that time?

A    Yes.

Q    Would you please produce that for me.

(Bible produced.)

MR. McKITTRICK:  I would like to have this marked.

(Whereupon, the item referred to was marked by the reporter as Defendant's Exhibit No. 8.)

Q    All right now, did Trooper Smith reach and get your Bible?

A    He took it out of my back pocket. I couldn't get it.

Q    Did you tell him where your lawyer's name and number

300

---

John Mosa, III - Direct                301

was?

A    Yes.

Q    Where is it in the Bible?

A    On the inside front page.

Q    John, let me hand you what has been marked as Defendant's Exhibit 8 and ask you if that is the Bible you are talking about.

A    Yes.

MR. BROWN:  Judge, we want a few minutes to look through this.

THE COURT:  All right.

(Exhibit examined.)

Q    John, on the inside cover of Defendant's Exhibit No. 8, what does it say with regard to your lawyer in West Virginia?

A    James Williams' home and office telephone numbers.

Q    And it has the name and then the phone numbers?

A    Yes.

MR. McKITTRICK:  We move the introduction of Defendant's Exhibit 8 into evidence.

MR. BROWN :  No objection.

THE COURT:  All right, Defendant's Exhibit No. 8 will be introduced into evidence for purposes of this hearing without objection by the State.

Q    John, when you handed Defendant's Exhibit 8, which is

301

John Moss, III - Direct                306

Q    Now, did they then take you into the detachment at Parkersburg?

A    Yes.

Q    What happened there?

A    Well, I seen a sergeant setting in the bed on one side of me.  They took me in this little room.  He came out.  After a while Smith, he comes in the room with me.

Q    Is this the sergeant that the troopers have called Preston?

A    Yeah.

Q    Was he introduced to you?

A    Yes.

Q    Go ahead, John.  What happened then?

A    He goes up front of the station, I guess, and Smith, he is in the room with me.  And Williams, he is out talking to Preston.  And Smith, he is going over how things is supposed to have happened with the killings, and I told him okay.

Q    Did Smith indicate to you at that time that he was going to tape a statement from you?

A    Yes.

Q    Now, what time, approximately, John, did you arrive at Parkersburg?

A    About 6:30 or twenty after, somewhere around in there.

Q    Thereafter did Trooper Smith start this where he went

306

---

John Moss, III - Direct                307

over the facts with you, preparing you for this tape recording?

A    Yes.

Q    And when approximately did you start taping the confession?  Do you remember?

A    It was about nine something.

Q    There is an exhibit in evidence in this case where you signed -- The troopers indicate that it was approximately 9:30 when they started taking this.  Would that be approximately right?

A    Yes.

Q    Now, how long after you got to the Parkersburg Detachment did Trooper Smith start this going over the facts of these murders again with you?

A    How long was it?

Q    Yeah.

A    How long was I there?

Q    No.  How long after you arrived inside the Parkersburg Detachment and you indicated that you are willing to cooperate did Trooper Smith start going over these facts again with you?

A    About a half an hour.

Q    So he started what, quarter of seven or thereabouts?

A    Yeah.  It was a little bit -- It was going on 7:00, you know.

Q    All right now, did Trooper Smith continue this up to or

307

---

John Moss, III - Direct                308

almost up to the time that they taped this confession?

A    Yes.

Q    And what did he do during that period of time?

A    He was writing everything down; and when I messed up, he slapped me in my head.  Then we go over it again.  Then he starts writing some more.

Q    Was he telling you what to say?

A    Yes.

Q    Was he going over the facts of the crime as he knew them and telling them to you?

A    Yes.

Q    Now, John, you signed some forms.  Do you remember doing that?

A    Yes.

Q    Do you know what those forms were?

A    No.

Q    Tell His Honor what happened when you signed those forms?

A    I just signed them.

Q    Who asked you to sign them?

A    Smith.

Q    And was Trooper Williams there when you signed the second one?

A    The second form?

308

---

John Moss, III - Direct                309

Q    Yes, Trooper Williams and Trooper Preston or Sergeant Preston.

A    Was they both in the room there?

A    Yes.

A    Yes.

Q    Now, John, do you remember them taking your confession?

A    Yes.

Q    Do you remember in the confession on the tape where they said they had advised you of your rights?

A    Yes.

MR. McKITTRICK:  That's all the questions I have.

THE COURT:  We will take a ten minute break before we begin cross-examination to give Mr. Moss a chance to go back and use the restroom, smoke a cigarette, whatever.  We will take a ten minute break.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

THE COURT:  Show the resumption of these proceedings with all parties present heretofore present here again, including the defendant and his counsel; the State by her Prosecuting Attorney and Assistant Prosecuting Attorney.

Any omitted questions, Mr. McKittrick?

MR. McKITTRICK:  Yes, Your Honor.

Q    John, when you were at the Parkersburg Detachment of

309

Michael Don Smith - Direct                314

Q    More specifically, did you ask him about a William

Johnson?

A    Not that I recall.  I don't remember asking him any

questions about any friends.

Q    Was there any questions prior to taking the blood about

the Reggettz murders with John Moss?

A    None.

Q    Once again on October 28, 1980, did you have occasion

to go to Ohio?

A    Yes

Q    What was the purpose of that?

A    To bring John Moss back to West Virginia.

Q    Where did you go when you got to Ohio?

A    Mansfield.

Q    Where in Mansfield did you go?

A    The state reformatory.

Q    Was John Moss an inmate there at the Mansfield

reformatory at that time?

A    Yes, he was.

Q    Do you know what he was there for?

A    He had been convicted of some charges in the State of

Ohio and was serving his sentence.

Q    Was John Moss then turned over to your custody at the

Mansfield reformatory?

314

Michael Don Smith - Direct                315

A    Yes.

Q    Was that pursuant to some legal papers or orders that

you had?

A    Yes, that we transferred to the reformatory.

Q    What kind of papers were those, if you know?

A    A detainer.

Q    Once he was turned over to your custody, what, if

anything, did you do with John Moss?

A    We placed him in our patrol car, and on our way out of

town we stopped for gas.

Q    Did you at any time in the reformatory tell him you

were back to get him for the Reggettz murders?

A    No.  It was never mentioned.

Q    Did you handcuff him on the way out of the reformatory?

A    Yes, we did.

Q    In what fashion was he handcuffed?

A    Handcuffed behind, with his hands behind his back.

Q    When you got to the car, was that changed?

A    Yes, it was.

Q    How was he placed in the car?

A    He was handcuffed to the front, placed in the car, and

either his left or right hand, I believe it was his left hand,

with the other cuff placed on the headrest, to a bar on the

headrest to the passenger's seat.

315

Michael Don Smith - Direct                316

Q    To explain that, one hand was free and one hand was in

a handcuff?

A    The right hand would have been free, and the left hand

would have been up in a handcuff.

Q    What did you do then?

A    Well, as I said, we just started leaving the

reformatory and drove down to a gas station somewhere there in

town, gassed up, and we had a little bit of trouble getting out

of town because we weren't familiar with the town.

Q    At any time at the reformatory did John Moss say to you

that he wanted to see any lawyer?

A    There was never any lawyer mentioned in any

conversation with John as far as him having one or wanting one.

Q    Did he ever tell you he had a lawyer in West Virginia?

A    No.

Q    Did you ever tell him, "You don't need a lawyer.  You

can talk to one when you get to West Virginia"?

A    No, sir.

Q    Did he ever tell you he wanted to fight extradition,

that he didn't want to come back on the detainer?

A    It was never mentioned.

Q    Now, I believe you stated that you went to a gas station

and got some gas?

A    Yes.

Michael Don Smith - Direct                317

Q    And then what did you do after you got gas?

A    We just drove, started driving out of town.

Q    Did John Moss continue to stay handcuffed one hand to

the headrest?

A    Well, while we were in town, and you know, like we had

to stop for a red light or anything, when we were in kind of slow

traffic, yes.  But once we got out of town on the interstate,

four lanes, where the car was moving on and we didn't have to

make any stops, I unhandcuffed him from the headrest and placed

the other hand, which left him cuffed both hands to the front

which made it more comfortable for him to smoke.  We either also

we had gotten him a coke as we were there at the gas station.

Q    So he was free then to move in the back seat, but

handcuffed two hands together; is that correct?

A    Yes.

Q    Where were you located in the car at that time?

A    In the front, the passenger's seat.

Q    And Trooper Williams?

A    I was still in the front seat, and Trooper Williams was

too.

Q    Did there come a time when you left the front seat?

A    Yes.

Q    And when was that?

A    It was, we had been talking casually probably maybe

Michael Don Smith - Direct                 322

A    No.

Q    Did you ever strike him in any fashion while taking him
out of the car?

A    Never.

Q    Or at any other time that day?

A    At no time that day.

Q    When you went inside the state police detachment in
Parkersburg, West Virginia, did you then tell John Moss the
facts of the Reggettz murders?

MR. McKITTRICK:  Objection, Your Honor.

THE COURT:  On what grounds?

MR. McKITTRICK:  I understand this is rebuttal, but these
questions are leading questions not relating to rebuttal.  I
object on that basis.

MR. STUCKY:  Your Honor, the testimony was that Smith and
Preason got in there from approximately seven until almost nine
thirty and told Mr. Moss exactly what to say and how the
Reggettz murders occurred.

THE COURT:  I believe he did, Mr. McKittrick.  Overruled.
The record will speak to whether he did or didn't.  I recall
that he did.  Go ahead, Mr. Stucky.

Q    Did you from approximately seven until nine-thirty tell
John Moss how the Reggettz murders occurred?

A    No, I did not.

322

---

Michael Don Smith - Direct                 323

Q    Did you tell him what to say as you were writing down
notes at the Parkersburg Detachment?

A    At no time that day did I tell him what to say.

Q    And if John Moss didn't say what you told him to say,
did you smack him in the head?

A    No, sir.

Q    I believe you witnessed a waiver of rights form; is
that correct?

A    Yes.

Q    Prior to your signing the waiver of rights form, what
took place concerning that particular form?

A    Well, it was filled out by Trooper Williams at the top.
It was explained to John by Trooper Williams.  It was read to
him, and they were read in such a manner if he had any questions
concerning the reading he had plenty of time and an opportunity
to state so, if he did have a question.  And John appeared to me
he was listening, was paying attention.  And after it was done,
he agreed to sign it, which he did.  Trooper Williams witnessed
it; I witnessed it.

Q    We have heard testimony from you and others about John
Moss telling you orally what occurred in December of 1979 with
regards to the death of Mrs. Reggettz and her two children, and
we have heard testimony that John Moss gave a tape recorded
statement as to his involvement and what occurred during the

323

---

Michael Don Smith - Direct                 324

murders of Mrs. Reggettz and her two children.  At any time did
you tell John Moss what to say either during the oral statement
or the taped confession?

A    At no time did I tell John Moss what to say.

Q    On the trip from Mansfield, Ohio, down to Parkersburg
did John Moss ever have any cigarettes or smoke in the car?

A    Numerous.

Q    And who provided those for him?

A    He had his own.

Q    And was he allowed to smoke them in the car?

A    As often and as many as he wanted.

Q    Do you have any idea approximately how many cigarettes
he smoked from the time you left Mansfield until you got to
Parkersburg?

A    Probably a dozen.

Q    Was he smoking during the period of time you were in
the back seat?

A    Smoking while I was in the back seat and while I was in
the front seat, just at any time.

MR. STUCKY:  That's all I have, Your Honor.

THE COURT:  Cross?

MR. McKITTRICK:  Your Honor, I have cross-examined this
witness for eight hours on most of the matters he has testified
to, so I am going to cut this short, in the evidence we have

---

Michael Don Smith - Cross                 325

already stipulated in the record.

- 0 -

CROSS-EXAMINATION

BY MR. McKITTRICK:

Q    Trooper Smith, when you went to Mansfield on
October 28, 1980, with the intention in mind of bringing back
John Moss to the State of West Virginia, did anyone in your
presence explain to John Moss the purpose for which he was to be
returned to the State of West Virginia?

A    That day?

MR. STUCKY:  Your Honor --

Q    That day is the only day you brought him back.

MR. STUCKY:  I am going to object, Your Honor.  That is
outside the scope of rebuttal.  He is not tendering it for
corroboration evidence.  He is limited to rebutting now what was
testified to on rebuttal evidence.

THE COURT:  Let me hear the question again.

(Whereupon, the last question was read by the reporter.)

THE COURT:  Overruled.  Go ahead.  Answer the question.

A    I don't recall anybody doing that in my presence.

Q    When you left Mansfield, West Virginia --

THE COURT:  Mansfield, West Virginia?

Q    Mansfield, Ohio, you have testified that you told
John Moss there was a serious crime that you wanted to talk to

Terry Williams - Direct                    330

A    Right before the taped confession was taken from him.

Q    When John Moss was placed in the car, as you bring him out to the car, is he handcuffed?

A    Yes.

Q    How was he handcuffed? Hold your hands up there for the Court to see in what position his hands were.

A    They were behind his back like that (indicating).

Q    And you do indicate both hands behind your back?

A    Yes.

Q    Were those handcuffs ever changed, sir?

A    Yes.

Q    What was the next position of his hand or hands?

A    When we put him in the car, we switched them to the front. There was one handcuff around one wrist, and the other handcuff around the headrest.

Q    All right, did that leave a hand free?

A    Yes.

Q    From the time you left the reformatory until you got to the Parkersburg Detachment, were there any stops made?

A    Yes.

Q    What stops were made? Tell the Court what those were.

A    Well, we made a stop in Mansfield to get gas. That is before we left Mansfield. Then we started down the interstate, and we made another stop along the interstate to get gasoline

330

---

Terry Williams - Direct                    331

and go to the bathroom.

Q    Do you remember whether or not John Moss had any refreshments of any kind from the time he left the reformatory up until the time you arrived at the Wood County DPS Detachment, if you remember?

A    I'm not real sure. I think we got a coke at the second atop we made to get gas, but I may be wrong on that.

Q    Can you tell the Court whether or not Mr. Moss used any form of tobacco on the way back?

A    Yes, he did.

Q    What was that?

A    He smoked cigarettes.

Q    Did you provide the cigarettes?

A    No.

Q    Did Trooper Smith provide those cigarettes?

A    No.

Q    Who had the cigarettes?

A    John.

Q    On the way back from the time you left -- Well, after you have handcuffed John Moss to the headrest with one hand and the other hand free, what was the purpose of handcuffing him with just one hand to the headrest?

A    Well, to make him a little more comfortable and so he could smoke.

331

---

Terry Williams - Direct                    332

Q    Did there come a time when the position of his hand and the handcuffs were changed?

A    Yes.

Q    Approximately when was that timewise, distancewise, any way you want to relate it.

A    I'm not real sure sure, maybe twenty minutes or so, we took the handcuffs off the headrest and both hands were just in front of him.

Q    When you indicate both hands in front of him, both hands were handcuffed together; is that correct?

A    Yes.

Q    Were they attached to anything in the car at that time?

A    No.

Q    What was the purpose of removing the single hand from the headrest and cuffing them both together?

A    With one hand up there the whole trip, it would have been pretty uncomfortable; just to make him more comfortable.

Q    Why did you keep him attached to the car when you first left Ohio?

A    Because we knew we had to stop and get gas, plus the fact of starting and stopping at traffic lights. We didn't want to take the chance when we would be slow moving of him possibly escaping, something like that.

Q    After you put both hands togethe , what road were

332

---

Terry Williams - Direct                    333

you on?

A    It was an interstate. I'm not sure what interstate it was.

Q    Can you tell us whether or not your speed was increased?

A    Yes. It was a four-lane highway. We had increased the speed.

Q    I take it you weren't afraid he would jump out?

A    No.

Q    When you leave Ohio, who is sitting in the front seat?

A    Myself and Trooper Smith.

Q    Where is John Moss?

A    In the back seat.

Q    Does John Moss ever go from the back seat to the front seat?

A    No.

Q    Did you ever go from the front seat to the back seat?

A    No.

Q    Did Mike Smith ever go from the front seat to the back seat?

A    Yes.

Q    Approximately when was that, and under what conditions?

A    I would say it was probably about twenty minutes after we started down the interstate, he crawled in the back seat.

Terry Williams - Direct                    338

Q    Did anyone ever tell John Moss on this day, October 28,
1980, from the time you were first in his presence in Ohio until
you returned to the Wood County Detachment that he didn't need a
lawyer?

A    No.

Q    Did you tell him that?

A    No.

Q    Did anybody tell him that?

A    Not to my knowledge.

Q    When you and Mike Smith and Chuck Pettry went to Ohio
to retrieve a blood specimen from John Moss, do you remember
that day?

A    Yes.

Q    What month was that, sir?

A    April, 1980.

Q    When you all went into the clinic portion of the
judicial place or whatever building it was you went to get the
blood, did John Moss ever state to you that he did not want to
give any blood?

A    No.

Q    Did he ever tell anyone in your presence that he did
not want to give any blood?

A    No.

Q    Did he make a request for a lawyer a  that time to you?

---

Terry Williams - Direct                    339

A    No.

Q    Did he make a request for a lawyer in your presence to
anyone?

A    No.

Q    After you all arrived at the Wood County Detachment,
the three of you, Moss, Smith and yourself, there came a time
when Mike Smith and John Moss went in a room and John Moss began
to or Mike Smith began to question John Moss concerning the
Reggettz killings?

A    Yes.

Q    Are you familiar with that?

A    Yes.

Q    Were you present during any of that?

A    Yes.

Q    About how much time were you there?

A    All of it except for about fifteen or twenty minutes.

Q    During the time that you were in there while Mike Smith
was taking an oral statement from John Moss concerning the
killing of the Reggettz family, did you ever see Mike Smith
strike John Moss in any portion of his body?

A    No.

Q    Did you at that time see or hear Mike Smith give John
Moss the details of the Reggettz murders and tell him to not
mess up?

---

Terry Williams - Cross                    340

A    No.

Q    Did you see or hear Mike Smith give the details of the
Reggettz killings to John Moss?

A    No.

MR. BROWN:  That's all I have.

THE COURT:  Cross?

- 0 -

CROSS-EXAMINATION

BY MR. McKITTRICK:

Q    Did I understand your testimony, Trooper Williams, that
on October 28, 1980, when you brought John Moss back to West
Virginia that you told him the purpose for which you were
returning him to West Virginia.  Is that your testimony in this
proceeding?

A    No.

Q    Did you tell him?

A    No.

Q    Did anyone in your presence tell him?

A    I don't remember anybody telling him.

Q    You didn't tell him because you assumed that he already
knew.  Isn't that a fair statement?

A    I don't know whether it would be fair or not.  I don't
know whether he knew or not.

Q    My question to you was you didn't tell him, John Moss,

---

Terry Williams - Cross                    341

the purpose for returning him to the State of West Virginia was
because you assumed in your mind that he already knew.  Isn't
that a fair statement?

A    No.

Q    Do you remember the preliminary hearing that we had in
this case, Trooper Williams?

A    Yes.

Q    Do you remember me asking you these questions and you
giving these answers:

"Q  When you first saw John Moss in the reformatory
there on October 28, 1980, what, if any, discussions did
you have with him?

"A  None at the time.

"Q  Did you tell him why you were there?

"A  No.  I assumed he already knew why we were there."

Now, what is your testimony?  Is that correct, or is your
testimony before His Honor today correct?

A    Well, I guess that there is correct.  I don't remember
saying it, but evidently maybe that's what I said.

Q    Now, let me ask you this:  You indicated to Mr. Brown
that you were driving this car that brought John Moss back to
West Virginia; is that correct?

A    Yes.

Q    And I take it that you were looking in the rear view

346

THE COURT:  Do you want any oral argument after the brief?

MR. McKITTRICK:  I don't think it is necessary; but if the Court would request the same --

THE COURT:  No.  I will give you until the 30th day of September to submit a brief.  I'll give the State until the 7th of October and I will rule sometime during the subsequent week. And if you would like, I can rule from the bench, or I can -- That would probably be the simplest way of doing it.  After I read your briefs, let's schedule one morning that week.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

THE COURT:  All right, get with the clerk.  I will schedule it for 9:00 on the 12th of October, that is tentatively set it for the 12th at 9:00.  If that is inconvenient, I will accommodate you on the 13th, or whenever it is convenient.

Does that conclude the suppression hearing?

MR. McKITTRICK:  Yes, it does.

THE COURT:  And all pre-trial matters?

MR. McKITTRICK:  Yes.

MR. BROWN:  Let me put on the record we want to withdraw State's Exhibit No. 1, which is Mike Smith's Department of Public Safety I.D. card and substitute a Xerox copy, front and back. And there may be some papers you want to do this on.  Do you have any problem with any substitutions on these?

346

347

MR. McKITTRICK:  No.

THE COURT:  What about Defendant's Exhibit No. 8?

MR. McKITTRICK:  No.

THE COURT:  All right, we will stand in recess on this matter.  Get your briefs in, and I will give you a ruling.

- O -

WHEREUPON, these were all the proceedings had in this matter at this time.

- O -

347

PETITIONER'S EXHIBIT #2

3 October, 1983, Memorandum In Support Of Defendant's Motion To Suppress...

PETITIONER'S EXHIBIT #2

02

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**F I L E D**
In Kanawha Circuit Court
Clerk's Office

OCT - 3 1983

*Phyllis Jean Cole.*
CLERK

STATE OF WEST VIRGINIA,

      Plaintiff,

V.

JOHN MOSS, JR., a/k/a
JOHN MOSS, III,

      Defendant.

CR-82-F-221
(JUDGE HEY)

---

### MEMORANDUM IN SUPPORT OF
### DEFENDANT'S MOTION TO SUPPRESS
### SAMPLES OF BLOOD, CONFESSION, AND OTHER
### PHYSICAL EVIDENCE SEIZED FROM JOHN MOSS
### BY EMPLOYEES OF THE STATE OF WEST VIRGINIA

McKITTRICK & MURRAY
P. O. Box 4088
St. Albans, West Virginia   25177

BY: _____
        PARRISH McKITTRICK

I.

<u>NATURE OF PROCEEDINGS</u>

This Memorandum is submitted in support of the defendant's motion to suppress blood samples, the defendant's, John Moss, confession, and certain seized physical evidence due to a denial of defendant's state and federal constitutional rights.  In his Motion to Suppress Blood Samples, the defendant alleges that the samples of defendant's blood taken from John Moss and placed into the custody of representatives, agents and/or employees of the West Virginia department of Public Safety were obtained in violation of defendant's constitutional rights; that the blood samples were obtained at a point in time when the homicide investigation had not become accusatory so that the defendant herein was not a suspect in the homicides of the Reggettz family; that the blood samples were a product of coercion; that the blood samples were obtained while the defendant was still within the juvenile jurisdiction of the Court; that the blood samples were obtained without the presence of counsel or a responsible adult being present; that the samples of blood were obtained in violation of defendant's due process and fourth amendment rights; that the blood samples were obtained before there was probable cause to believe the defendant had committed the homicides of the Reggettz family; and that the blood samples were obtained without proper notice of same having been given to defendant's parents.



-2-

the defendant's Constitutional rights which render the defendant's alleged confession inadmissible.

Since defendant's alleged confession was obtained in violation of this significant constitutional right, and in violation of other constitutional rights to which he is entitled, defendant's alleged confession was obtained neither legally, voluntarily, intelligently, or knowingly. Therefore, defendant moves this Court for an Order declaring the defendant's alleged confession to be inadmissible.

## II.

### STATEMENT OF FACTS

On the 13th day of December, 1979, Bernadette Reggettz, Vanessa Reggettz, and Paul Eric Reggettz were found dead in their home on Chesapeake Avenue in St. Albans, Kanawha County, West Virginia. A short time thereafter, in response to police interrogation, Paul Reggettz, the husband and father, confessed to the homicides of his wife and two children. A short time after his confession, Paul Reggettz went with state police back to his home and re-enacted in detail for the benefit of police how he committed the homicides.

Subsequently, Paul Reggettz was indicted by the January, 1980, Kanawha County, West Virginia, Grand Jury for the homicides of his wife and two children. Counsels for Paul Reggettz filed a Motion to Suppress the Reggettz confession, and hearings were held



-4-

January 30, 1980, there was a complete absence of reasonable grounds to believe John Moss committed the Reggettz murders thereby excluding John Moss as a suspect in the slayings until after his blood was tested from the samples of blood eventually obtained on April 22, 1980.  Furthermore, during this initial interview when John Moss's blood sample was taken, the defendant's attorney was not present nor was a responsible adult, such as either of John Moss's parents, actually present.  At this time, there was not probable cause to believe John Moss had committed the homicides of the Reggettz family.

Troopers Terry Williams and Mike Smith and Assistant Prosecuting Attorney, Chuck Pettry, again returned to Ohio on April 22, 1980, in order to obtain another sample of John Moss's blood. On this occasion, a court order had been obtained from an Ohio judge allowing the State of Ohio and the West Virginia authorities to obtain a blood sample from defendant.  On April 22, 1980, John Moss was incarcerated in the Ohio penal institution located at Mansfield, Ohio.  The blood sample was obtained from John Moss at the penitentiary on April 22, 1980, and turned over to Trooper Williams of the West Virginia Department of Public Safety.  The blood sample was taken from John Moss on April 22, 1980, and returned to West Virginia State Police Laboratory for testing the same day.  Blood Technician Sergeant Robert Murphy started testing John Moss's blood on April 23rd, and concluded April 26, 1980, concluding the sample

for Kanawha County, West Virginia, Chuck Pettry, who accompanied Troopers Williams and Smith to take the blood sample indicated in his suppression hearing testimony that there was no need for John Moss's consent because the procedure for obtaining John Moss's blood was not a search and seizure under the fourth amendment to the United States Constitution. As this Court is also aware, the defendant heren was returned from the State of Ohio and dealt with in the juvenile jurisdiction of this Court before being transferred to the criminal jurisdiction of this Court for purposes of trial. Therefore, due to the age of John Moss at the time of the homicides of the Reggettz family, John Moss was still a juvenile under the laws of the State of West Virginia on April 22, 1980.

On October 28, 1980, Troopers Terry Williams and Michael Don Smith of the West Virginia Department of Public Safety went to Mansfield, Ohio, in order to return John Moss to West Virginia on a malicious wounding charge stemming from an incident at the Moose Lodge in St. Albans, West Virginia, pursuant to Article IV of the Interstate Agreement on Detainers. (W.Va. Code 62-14-1). Prior to the trip to West Virginia, defendant was not fully advised of the reason he was to return to West Virginia nor was he afforded his right to a pre-transfer hearing when an attorney would have been appointed for him. It was during the trip from Ohio to West Virginia that defendant herein allegedly confessed to the homicides of the Reggettz family. The troopers left Mansfield, Ohio, with John Moss at approximately 2:00 p.m. Shortly thereafter, Trooper

John Moss's confession, Troopers Williams and Smith obtained a
search warrant that ultimately led to the recovery of a Kodak
"Handle" camera which John Moss confessed taking from the Reggettz
house on the night of December 13, 1979, after the defendant
allegedly murdered the Reggettz family.  While in Cleveland, the
troopers also secured written statements from John, Carlton, and
Marzee Moss concerning the camera and rifle.

On November 5, 1980, the Prosecuting Attorney of Kanawha
County, West Virginia, requested temporary custody of John Moss,
pursuant to the Interstate Agreement on Detainers for the
prosecution of the Reggettz homicides.  The request for temporary
custody was received at the Ohio State Reformatory and was then
forwarded to the Governor of Ohio.  John Moss was formally
incarcerated in the Kanawha County jail for the Reggettz homicides
on December 17, 1980.

All of the foregoing transpired while Paul Reggettz
remained indicted for the homicides of his wife and two children and
while defendant herein was named in the body of the Reggettz
indictment.  All of the foregoing also transpired while John Moss
was regarded as a juvenile under the laws of the State of West
Virginia.

On the 12th day of January, 1981, a preliminary hearing in
the case of John Moss was held before Edgar L. Moss, Juvenile
Referee for Kanawha County, West Virginia, for events charged in
Juvenile Petitions 80-775, 80-776, and 80-777, which alleged murder



-10-



the West Virginia Supreme Court of Appeals, the defendant's transfer
was reversed and remanded to this Court.   IN THE INTEREST OF JOHN
MOSS, No. 15490 (July 15, 1982).

Prior to the transfer hearing held on September 24, 1982,
the State neither scheduled another preliminary hearing nor did it
file a written Motion for Transfer.  The transfer hearing proceeded
as scheduled on September 24, 1982, continued through Saturday,
September 25, 1982, and concluded at about 9:00 P.M. on Monday,
September 27, 1982.

During the hearing, the State presented its evidence
against John Moss in the form of the alleged confession.  The only
evidence the State presented was the alleged confession of John
Moss.  The state's witnesses admitted that at the time of their
testimony the State had not one piece of physical evidence
implicating John Moss in the murders.  As the transcript points out,
Paul Reggettz appeared at the hearing and admitted making at least
four confessions in December of 1979, after the homicides of his
family, wherein he implicated himself in the murders of his wife and
two children.  furthermore, the Court below took judicial notice
that at a prior hearing, the alleged confessions of Paul Reggettz
were determined by the same Judge to have been voluntarily given.
Moss Transcript of Proceedings, pp. 488-499.  This Court then
ordered John Moss to be transferred to the criminal jurisdiction of
this Court, and in so doing, issued Findings of Fact and Conclusions

obtained.  On neither occasion was counsel present with defendant,
and it was only after the blood sample was obtained that John Moss
became a suspect in the homicides of the Reggettz family.  In
essence, the results of the blood tests provided the authorities in
West Virginia with the probable cause evidence which they had
previously lacked.  Also, Troopers Williams' and Smith's discussions
with John Moss on January 30, 1980, created new investigative leads
which they pursued upon their return to West Virginia.  Thereafter,
these troopers obtained physical evidence and testimonial evidence
from Arbutus and William Johnson in the form of silverware which,
the State of West Virginia has represented to this Honorable Court,
will be used on a trial on the merits concerning the innocence or
guilt of John Moss.

1.      Search and Seizure

        In the now-classic case of Schmerber v. California, 384
U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 903 (1966), the United States
Supreme Court ruled that the extraction of blood from Schmerber
under the circumstances of the case did not offend the sense of
justice relating to due process rights of which the Court had spoken
in Breithaupt v. Abram, 352 U.S. 432, 77 S. Ct. 408, 1 L. Ed. 2d 448
(1957) and Rochin v. State of California, 342 U.S. 165, 72 S. Ct.
205, 25 A.L.R. 2d 1396 (1952).  The defendant, Schmerber, was
involved in an automobile accident and had been taken to a hospital
for treatment.  At the direction of an officer and over the
objection of the defendant, a blood sample was taken which was
introduced in evidence at his trial.

-14-

230

The Supreme Court of the United States based its holding on the fact there was probable cause at the time to believe the defendant was driving his vehicle while under the influence of alcohol due to the manner in which the arresting officer observed the defendant to be driving his vehicle upon the highways. In other words, the government agent had sufficient evidence to believe that a crime was being committed. Furthermore, due to the gradual diminishment of the level of alcohol in one's blood, there was reasonable cause to believe the necessary evidence would disappear quickly, thus presenting an emergency or exigent circumstance. Therefore, no warrant needed to be obtained.

But what about the facts in the present case? Officers testifying at all hearings held in this matter have consistently stated that the defendant became a suspect in the Reggettz homicides only after the blood sample was taken and tested. Therefore, under the facts of the present case, John Moss was required to give the authorities probable cause evidence which effectively incriminated him before there was probable cause evidence to believe the defendant committed the homicides.

The evidence is clear there was a complete lack of probable cause on April 22, 1980, as reflected in the preliminary hearing cross-examination of Trooper Terry Williams

Page 94 Transcript:

Q - Now, when you went to Cleveland on January 30, 1980, for what reason did you need a blood sample?

Pages 92-93

Page 131 - Trooper Williams testified that when he received the blood
results from the laboratory on John Moss in April, 1980,
that John Moss then became a suspect in the Reggettz
murders.

Pages 132-133 - Trooper Williams testified that after he came to the
conclusion in April, 1980 (because of laboratory report on
John Moss's blood) that John Moss was a suspect that he,
Trooper Williams, talked to and took a statement from
William Johnson who indicated that John Moss had given
Arbutus Johnson flatware and that John Moss had in the past
indicated a desire to burglarize the Reggettz home.

Page 134 - Trooper Williams testified "so then when I traveled to
Mansfield, Ohio, on the 28th day of October, 1980, the only
incriminating evidence that I had in hand suggesting John
Moss was a suspect in the Reggettz homicides were:

> (1) blood found at the scene of the homicides con-
> sistent with John Moss's blood;
>
> (2) statement by William Johnson indicating John Moss
> had given his mother flatware; and
>
> (3) that John Moss had indicated to Johnson he was
> thinking about burglarizing the Reggettz home.

Even at that time, the flatware could not have been evidence against
John Moss constituting probable cause because Trooper Williams



-18-

234

(1)   John Moss lived in close proximity to the Reggettz
      home;

(2)   Trooper Smith had a newspaper article that indi-
      cated John Moss had used a 25 caliber revolver in
      a crime in Ohio and that a 25 caliber revolver was
      used in the Moose Club shooting;

(3)   John Moss indicated to a friend he desired to
      burglarize the Reggettz home

At the same, time Trooper Smith testified he had knowledge
of 1 and 2 above before the 30th day of January, 1980, when he
attempted to unlawfully extract blood from John Moss.  More
importantly, Trooper Smith testified that on the 30th day of
January, 1980, he did not have reasonable grounds to believe John
Moss committed the Reggettz murders.  All evidence indicates no
facts were added to the state police investigation which would
enhance probable cause between January 30 and April 22, 1980, when
the second blood was taken from John Moss.

Consent is not an issue in the taking of John Moss's blood
on April 22, 1980, because assistant Prosecuting Attorney, Chuck
Pettry, who accompanied the troopers to Ohio to extract the blood,
testified in the suppression hearing that he did not attempt to
secure John Moss's consent because he, Pettry, did not consider the
taking of John Moss's blood a search and seizure under the fourth
amendment to the United States Constitution.

In essence, the Supreme Court was saying that the forced extraction of the capsules from the defendant's stomach resulted in a coerced confession not admissible into evidence against the accused.   The capsules which were forcibly taken from the defendant against his will without a warrant having been obtained to enter the accused's house provided the evidence which the police needed.   The recovery of the capsules of narcotics was self-incriminating as having come from the defendant himself, and was, in essence, an admission of involvement with narcotics.   Rochin v. California, supra.   On the facts of the present case, the facts parallel Rochin and its progeny in that West Virginia law enforcement officers cannot establish probable cause evidence from seizing John Moss's blood without pursuing a search warrant based on independently stated factual probable cause, State v. Stone, supra.   In Schmerber, there was probable cause evidence before the blood sample was taken and there was the danger that the blood-alcohol content would decrease while in the case of John Moss, there was no probable cause evidence until the blood sample was obtained and tested.   And in the present case, can we say that there was danger that the evidence would disappear?   Not likely!   In obtaining a sample of the defendant's blood under such forced circumstances (which strain of blood was consistent with that found at the scene of the homicides of the Reggettz family) , the blood sample resulted in incriminating

result of no probable cause under circumstances more akin to the facts of the present case in the case of United States v. Allen, 337 F. Supp. 1041 (E.D. Pa. 1972). In this case, the Court held that a search warrant was required for subjecting the defendants, not then in custody for the crime charged, the taking of a blood sample to determine blood type. It is submitted that a different result would have been reached in Allen if the defendant had been in custody and the government had had probable cause evidence. The facts of the Allen case are closer to those in the present case because John Moss was not, at the time of the blood sample, in custody for the Reggettz homicides nor was there probable cause until after the search and seizure was made to believe that he committed the homicides of the Reggettz family.

The touchstone of the Fourth Amendment is the protection of privacy, and to that end, it prohibits unreasonable invasions without a warrant. United States v. Gerhart, 275 F. Supp. 443 (S.D. W.Va. 1967). Facts are the proper basis upon which probable cause for the issuance of a search warrant is to be ascertained. State v. Stone, W.Va., United States v. Gerhart, 275 F. Supp. at 445. Citing the case of Schmerber v. California, supra, as authority, the Court in People v. Superior Court of Kern County, 493 P. 2d 1145, 1147 (Calif. 1972) stated that the Fourth Amendment to the United States Constitution does not bar a compulsory seizure, without a warrant, of a person's blood for the purposes of a blood alcohol test to determine intoxication, "provided the taking of the sample is done



applied to rectal probes in <u>Rivas v. United States</u>, 368 F. 2d 703,

710 (9th Cir. 1966), cert. denied 386 U.S. 945, 87 S. Ct. 980, 17 L.

Ed. 2d 875 (1967).

With the exception of the situation or circumstances of

probable cause as set forth in <u>Schmerber</u>, bodily intrusions or

extractions are as protected as other areas of privacy so that a

search warrant rather than a court order is necessary.  At the time

of the court order that was obtained for permission to sample John

Moss' blood, West Virginia police did not have probable cause to

believe John Moss was involved in the Reggettz homicides.

Therefore, they could not have obtained a warrant.  Therefore, the

defendant submits the State violated John Moss' rights in obtaining

a sample of blood.


2.        <u>Fruits of an Illegal Search</u>

A. Flatware and statements of William and Arbutus Johnson.

Concerted court precedent indicates since John Moss's

rights were violated when a sample of his blood was obtained, the

blood sample and the results thereof should be excluded from

evidence in a trial on the merits of guilt.  Physical by-products of

illegally obtained statements are inadmissible during a trial of the

defendant as "poisonous fruit" of illegal statements.  <u>People v.</u>

<u>Superior Court for County of Santa Clara</u>, 83 Cal. Rptr. 771, 3 Cal.

App. 3d 476 (1970).  Such physical evidence is protected by the

Fourth Amendment.  Furthermore, the exclusionary sanction applies to



-26-



States, 344 F. 2d 454 (D.C. Cir. 1965); <u>United States v. Bayer</u>, 331
U.S. 532, 67 S. Ct. 1394, 91 L. Ed. 1654 (1947); <u>Killough v. United
States</u>, 114 U.S. App. D.C. 305, 315 F. 2d 241 (1962).

      Thus, it is not debated that on January 30, 1980, troopers
of the West Virginia Department of Public Safety violated John
Moss's rights by extracting a blood sample from him while he was
incarcerated in the State of Ohio.  More importantly, during that
unlawful meeting between Troopers Williams and Smith and John Moss,
certain incriminating information was secured which the State of
West Virginia now intends to use against John Moss at trial.  The
troopers discussed with John Moss the names of his friend.  John
Moss not realizing the intention of the officers provided the name
of William Johnson.  After leaving Ohio on January 30, 1980, the
troopers contacted William Johnson and took a written statement
which incriminated John Moss.

      Also, Trooper Williams testified at Page 132-133 of the
preliminary hearing transcript, that after the April 22, 1980
meeting with John Moss where blood again was extracted without the
benefit of probable cause, that "we obtained [another] written
statement from William Johnson" who indicated firstly, that John
Moss had indicated he desired to burglarize the Reggettz home and
secondly, that John Moss had given Arbutus Johnson flatware that
came from the Reggettz home.  The trooper admits this statement was
not taken until after the blood laboratory results on John Moss were



Tex. – <u>Nicholas v. State</u> (1973, Tex Crim) 502 SW2d 169

Based upon the foregoing, the blood sample taken from defendant without probable cause constituted illegally obtained evidence which should be suppressed just as all fruits of the search and seizure, i.e., flatware, statements of William and Arbutus Johnson, should be.  As importantly, all "fruits" of the illegally seized blood sample, such as the confession must also be excluded from evidence by being suppressed.

  B.  Confession.

  If it had not been for the series of events, i.e., unlawful extraction of John Moss's blood on January 30, 1980, which resulted in statements being taken from William Johnson and Arbutus Johnson and which resulted in securing the flatware against John Moss, and the unlawful extraction of John Moss's blood on April 22, 1980, which resulted in a second statement from William Johnson and Arbutus Johnson, John Moss would not have even been a suspect in the murders of the Reggettz family thus negating the possibility of securing inculpatory statements from John Moss by Troopers Williams and Smith on October 28, 1980.

  Pursuant to precedent above cited and set forth herein concerning "fruit of the poisonous tree", the confessions are a direct result of the illegal search and seizures of John Moss's blood carried out by representatives of the State of West Virginia on January 30, 1980, and April 22, 1980, and should be excludable from the evidence in the instant case.

similarity to certain blood stains found at the scene of the homicides of the Reggettz family in the home at 7027 Chesapeake Avenue in St. Albans.  For all intent and purposes, due to the rarity of the defendant's strain of blood, the results of the tests made on defendant's blood sample constituted a confession.

In this regard, it has been held that a juvenile is not capable of knowingly waiving his Fifth Amendment privilege against self-incrimination.  State ex rel. J.M. v. Taylor, 276 S.E. 2d 199 (W.Va. 1981).  Instead of knowingly being able to waive his Fifth Amendment privilege against self-incrimination, the juvenile must always have an attorney or a responsible adult present when he is being interrogated by government officials.  Since a juvenile cannot knowingly waive his right against self-incrimination, the juvenile must be advised by an attorney or have a responsible adult present, such as a parent, before he can knowingly and intelligently waive his Fifth Amendment right against self-incrimination.  State ex rel. J.M. v. Taylor, supra.

In the present case, John Moss was not permitted his right to have an attorney present either at or before the sample of his blood was taken, nor was he accorded his right to have a responsible adult present.  In addition, his parents were not given any notice of the blood sample being taken.  In no manner or particular was John Moss allowed the rights to which he was entitled under State ex rel. J.M. v. Taylor, supra.

that of an adult.  See, Code, 56-4-10; Code, 56-4-9; Code 54-2-4; Code, 41-5-5; Code, 37-1-3; Code, 37-1-4; Code, 37-1-12; Code 36-2-5; Code, 57-4-7; Code, 39-3-7; Code, 49-6-2.  Consequently, in State ex rel. J.M. v. Taylor, our State's High Court held that a juvenile may waive his right to counsel, but only upon the advice of counsel because only then can there be a knowing waiver.  State ex rel. J.M. v. Taylor, 276 S.E. 2d at 204.

Because of the nature of the events and circumstances, the taking of the blood sample from John Moss constituted a communicative contact between the defendant while he was still technically within the juvenile jurisdiction of this Court and had all of the appearances of a situation impacted with duress and coercion by governmental agents against the defendant, John Moss. It was a situation wherein the defendant's rights as set forth in State ex rel. J.M. v. Taylor should have been applicable, but were not.  In the absence of such constitutional rights, the results of the blood samples should be suppressed and declared inadmissible.

4.      Denial of Due Process Rights

It is submitted at the outset that to have required the defendant herein to submit to the withdrawal of his blood for testing against his will and without his consent and over his objection is violative of his Fifth Amendment privilege against self-incrimination, and further, is a denial of his right to due process of law as being fundamentally unfair.

-34-

"implied consent" statute was at issue in <u>Schmerber</u>, the defendant could reasonably expect and anticipate that the alcoholic content of his blood was <u>directly</u> (underlined for emphasis) in issue.

In the present case, the blood alcohol content of the defendant is not directly an issue. The results of any testing of blood taken from the defendant against his will, without his consent, and over his objection upon the invocation of his privilege against self-incrimination can only be used collaterally to confirm or corroborate the compatibility of the defendant's blood type with the blood type of blood smears found at the residence where the alleged homicides occurred. Such evidence is merely circumstantial at best. The defendant should not be required to submit to a process involving the intrusive violation of his very person against his will, without his consent, over his objection, and after his assertion of his privilege against self-incrimination when there is no reasonable causal relationship of the test sought to be administered on the body of the defendant and the crime in question.

In two (2) cases involving the offense of driving under the influence and one (1) case in which the results of a polygraph test was held inadmissible, the West Virginia Supreme Court of Appeals has commented on <u>Schmerber</u>.

In <u>Jordan v. Roberts</u>, 246 S.E. 2d 259 (W.Va. 1978), the Supreme Court of Appeals was concerned with the administrative proceeding for the suspension of a driver's license under the implied consent law and upheld the suspension. The Supreme Court of



252

petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not admissible on privilege grounds. Schmerber, 384 U.S. at 765, 86 S. Ct. at 1833.

In Adams, our State's High Court stated the following:

> Schmerber differs from our case in that the California law does not expressly provide the right to refuse these (blood) tests as does ours; and blood tests are expressly exempt from refusal consequences here. We commend our legislature's wisdom, exempting blood tests from the license suspension penalty of the implied Consent Law, having grave doubts about Schmerber's correctness on the point that blood taken from a person and used against him, does not violate his Fifth and Fourteenth Amendment rights when it is taken without his consent. State v. Adams, 247 S.E. 2d 475, 476 and 477, Footnote 4.

To order and sanction the extraction of blood from the defendant against his will, without his consent, over his objection and subsequent to his invocation of his privilege against self-incrimination for the purpose of using and admitting into evidence the results of such blood tests against the defendant on the grounds that such tests are not "communication" or "testimony" of the defendant is a perverted ruse and is contrary to the reality that but for the results of defendant's blood taken from him as an act of compulsion of his express desire to invoke his constitutional privilege against self-incrimination, this defendant may not be convicted.

It is submitted there is little real difference between the Court authorizing the State to obtain evidence against the defendant by compelling the accused against his will, without his consent, over his objection and contrary to the advice of his counsel to an

122

-38-

254

State, and counsel for the defendant cited Schmerber as implying that the Miranda warnings may apply to the defendant's taking a polygraph test and that the privilege against self-incrimination might also be claimed because of the testimonial nature of the polygraph test:

> To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment.  State v. Frazier, 252 S.E. 2d at 49, Footnote 14.

5.    Lack of Authority

With the exception of specific statutes and rules authorizing the Court to order physical and mental examinations of the defendant, such as in determining the competency of the defendant to stand trial, or as an aid to the Court in sentencing or in carrying out a sentencing of a convicted criminal defendant, or when the defendant by an affirmative defense has put his own state of mind at the time of the commission of the alleged crime in direct issue, this writer can find no specific statutory authority or general statutory authority which would authorize the Court to sanction or compel the defendant to have complied with the State's order to require him to submit to the extraction of his blood for use against him in a criminal proceeding.  It it true that there are other areas of the law wherein out legislature has specifically established the guidelines, standards, and status of the administration and use of blood tests, such as in bastardy



-40-

obtaining for use the evidence the State needs in proving its case against the defendant. To allow the State to use the test results on his own blood against the defendant in a criminal trail which was taken against his will and without his consent would be a fundamentally unfair violation of the defendant's right of due process and right of privacy as guaranteed by both Federal and State Constitutions.

There is authority for the proposition that although the taking of defendant's hair samples and blood samples would not violate the Fifth Amendmant privilege against self-incrimination and would not violate due process or constitute unreasonable search and seizure if the Government obtained the blood samples through lawful procedures, the Government must make the showing of probable cause before a magistrate rather than requesting the Court's permission to obtain samples. United States v. Allen, 337 F. Supp. 1041 (D.C. Pa. 1972).

Although the blood samples taken from the defendant were taken after an order was obtained from an Ohio court, the tests on the defendant's blood samples must be admissible under West Virginia law, and there is no express authority for the admission of such tests or analyses into evidence before a West Virginia Court. Instead, a determination of probable cause seems more reasonable before such blood samples can be obtained, and yet the police officers did not have probable cause against the defendant until after the blood samples were obtained. The blood samples taken



-42-

258

III.

ISSUES

A.   IS THE ALLEGED CONFESSION OF JOHN MOSS ADMISSIBLE

INTO EVIDENCE AS HAVING BEEN OBTAINED LEGALLY,

VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY, AND

WITH DUE REGARD FOR THE DEFENDANT'S CONSTITUTIONAL

RIGHTS?

The alleged confession of defendant herein should be ruled

inadmissible and not admitted into evidence in any trial of this

matter since it was obtained from defendant illegally,

involuntarily, and unintelligently when his will had been overborne

without the presence of counsel and was the product of an illegal

detainment after defendant had been denied his right to a

pre-transfer hearing and because the confession was obtained while

defendant was being returned to West Virginia on a detainer for an

unrelated charge over which the State of West Virginia lost

jurisdiction and before the State had probable cause to believe John

Moss committed the homicides.   There was no independent act to break

the chain of events and rid the defendant's confession of its

primary taint, thereby rendering defendant's confession as the fruit

of the poisonous tree, and therefore, inadmissible into evidence.



While the case was on appeal to the United States Court of Appeals for the Third Circuit, a Pennsylvania appellate court held in an unrelated case that state prisoners transferred pursuant to Article IV of the Detainer Agreement have no right to a pre-transfer hearing. Commonwealth ex rel. Coleman v. Cuyler, 261 Pa. Super. Ct. 274, 396 A. 2d 394 (1978). The Third Circuit, however, concluded that the Detainer Agreement is subject to federal, rather than state, construction and that it was not bound by the Pennsylvania court's decision. The Third Circuit held that as a matter of statutory construction, a prisoner has a right to a pre-transfer hearing. Adams v. Cuyler, 592 F. 2d 720 (3d Cir. 1979), aff'd, 101 S.Ct. 703 (1981). The Third Circuit concluded that the Detainer Agreement preserves those rights granted to inmates under the Extradition Act; therefore, because the Extradition Act provides for a pre-transfer hearing, a pre-transfer hearing is available under the Detainer Agreement.

On appeal to the United States Supreme Court, our Nation's High Court affirmed the Third Circuit's holding. Because Congress consented to the Detainer Agreement, federal law governs the interpretation of such interstate compact. Adams v. Cuyler, 101 S.Ct. 703, 708-709 (1981). The United States Supreme Court also affirmed the Third Circuit's holding that the Detainer Agreement incorporated the procedural safeguards provided by the Extradition Act, and that therefore a prisoner has a right to a pre-transfer hearing. Adams v. Cuyler, 101 S.Ct. at 709-712.



its language, and its legislative history, we conclude as a matter of federal law that prisoners transferred pursuant to the provisions of the Agreement are not required to forfeit any pre-existing rights they may have under state or federal law to challenge their transfer to the receiving state.  Respondent Adams has therefore stated a claim for relief under 42 U.S.C. 1983 for the asserted violation by state officials of the terms of the Detainer Agreement . . . <u>Adams v. Cuyler</u>, 101 S.Ct. at 712.

<u>Adams v. Cuyler</u> guarantees the prisoner being transferred pursuant to the Agreement on Detainers the full panoply of rights to which a person being extradited is entitled, including the pre-transfer hearing at which the indigent prisoner would be entitled to legal counsel.  The case of <u>Adams v. Cuyler</u> is of enormous constitutional significance in this area and is of particular significance herein since the defense herein submits that defendant herein was never afforded his right to a pre-transfer hearing before being returned from Ohio on either occasion.

The holding in <u>Adams v. Cuyler</u> has been consistently upheld by the courts of this land.  In the only other action to date by the United States Supreme Court involving <u>Adams v. Cuyler</u>, our Nation's High Court granted a petition for a writ of certiorari from the United States Court of Appeals for the Second Circuit and then vacated the judgment and remanded the case to the United States Court of Appeals for the Second Circuit "for further consideration in light of <u>Adams v. Cuyler</u>, 449 U.S. _____, 101 S.Ct. 703, 66 L. Ed. 2d 641 (1981)."  <u>Peyton v. David Harris</u>, 101 S.Ct. 2040 (1981).

The issue was considered in the case of <u>Pfaff v. Wells</u>, 648 F. 2d 689 (10th Cir. 1981) wherein the Court of Appeals dealt with



protections of that Act, including the right to a pre-transfer hearing, before being transferred to another jurisdiction pursuant to Article IV of the Detainer Agreement and then held that the prisoner sufficiently alleged the failure to provide a hearing prior to his involuntary removal to Pennsylvania from California.

In Wilson v. Fenton, 684 F. 2d 249 (3 Cir. 1982), the Court held that Adams v. Cuyler applied only to those cases in which transfer occurs pursuant to the Interstate Agreement on Detainers and not when a prisoner is transferred pursuant to writs of habeas corpus ad prosequendum which, as was noted in United States v. Mauro, 436 U.S. 340, 98 S.Ct. 1834, 56 L. Ed. 2d 329 (1978), do not trigger the detainer agreement. Nevertheless, the Court upheld the letter and the spirit of the decision of Adams v. Cuyler.

The chief question involved in Sassoon v. Stynchombe, 654 F. 2d 371 (5th Cir. 1981) was whether federal law required release for a violation of section IV(e) of the Agreement on Detainers. Although the Court of Appeals found nothing wrong with a brief removal of a prisoner to the receiving jurisdiction and his prompt return to the sending jurisdiction after arraignment and prior to trial, the Court held that federal law does require a release of the prisoner for a violation of Section IV(e) of the Detainer Agreement if the prisoner is harmed by the violation or where the "legitimate interest" of the prisoner is defeated by the violation. Sassoon v. Stynchombe, 654 F. 2d at 374. The Court cited Adams v. Cuyler for



the hearing is not provided, or in the alternative, introduces a coercive factor into the analysis of whether the transfer between states for purposes of trial is current, legal, and proper.  The Interstate Agreement on Detainers requires strict construction, and all procedural requirements must be met or the prisoner is entitled to the relief set forth in the Detainer Agreement itself.  Stroble v. Anderson, 587 F. 2d 830 (6th Cir. 1978); Stroble v. Egeler, 408 F. Supp. 630 (E.D. Mich. 1976); United States v. Mauro, 436 U.S. 340 (1978); United States v. Ford, 550 F. 2d 732 (2d Cir. 1977).

The failure on the part of the State of Ohio to provide defendant herein with a pre-transfer hearing and the resultant legal advice renders the transfer process returning defendant to West Virginia illegal.

The Interstate Agreement on Detainers (to which both the State of West Virginia and State of Ohio are signatory) establishes two procedures under which the prisoner against whom a detainer has been lodged may be transferred to the temporary custody of the receiving State.  One of these procedures may be invoked by the prisoner; the other may be invoked by the prosecuting attorney of the receiving State.  (Code, 62-14-1, et. seq.).

Article III of the Agreement provides the prisoner-initiated procedure.  It requires the Warden to notify the prisoner of all outstanding detainers and then inform him of his right to request final disposition of the criminal charges underlying these detainers.  If the prisoner initiates the transfer



268

transfer, this would render defendant's alleged confession illegally obtained and inadmissible into evidence as invalidly obtained.

In this regard, it has been held that an illegal arrest and detainment does not prejudice a conviction if (underlined for emphasis) evidence used in the trial does not flow from the detainment.  Collins v. Swenson, 443 F. 2d 329 (8th Cir. 1971).  In the present case, the alleged confession does (underlined for emphasis) flow from the detainment itself, and counsel for defendant herein submits that since the alleged confession is the only incriminating evidence against defendant, its admissibility into evidence does prejudice him.

It is an illegal detention and not an illegal arrest which invalidates a confession.  Jefferson v. State of Texas, 503 S.W. 2d 779 (Tex. Ct. Crim. App. 1974); Hughes v. State of Texas, 409 S.W. 2d 416 (Tex. Ct. Crim. App. 1966); State v. Hunt, 193 N.W. 2d 858 (Wisc. 1972); Liphford v. State, 168 N.W. 2d 549 (Wis. 1969); District of Columbia v. Jordan, 232 A. 2d 298 (D.C. Ct. App. 1967); United States v. Rose, 526 F. 2d 745 (8th Cir. 1976).  It is not the fact of illegal detention itself with which the rule is concerned but evidence obtained as a result of it.  Lamotha v. Robbins, 199 F. Supp. 855 (S.D. Me. 1961), aff'd per curiam 303 F. 2d 831 (1st Cir. 1962).  There must be a causal connection between the illegal arrest or detainment and the subsequent confession or admission.  Commonwealth v. Bishop, 228 A. 2d 661 (Pa. 1967).



his alleged statement grew out of, was a product of, and was the fruit of this illegal detainment.

3.        Loss of Jurisdiction

Other than John Moss's being refused his due process rights by failing to accord him a pre-transfer hearing, he was detained illegally as a result of the loss of jurisdiction to prosecute him on the charges contained in the detainer upon which he was returned to West Virginia on October 28, 1980.  The record of all proceedings held in the instant matter to date will show, John Moss was originally returned to West Virginia from Ohio on a detainer pertaining to a malicious wounding charge stemming from an incident at the Moose Lodge in St. Albans.  It was during this trip that John Moss allegedly gave his statement.  After John Moss gave his statement concerning the Reggettz homicides, he was returned to Ohio and then brought back to West Virginia in December of 1980 on a detainer relating to the Reggettz homicides.  Consequently, the State of West Virginia lost jurisdiction to try or prosecute John Moss on the malicious wounding charge.  See Moore v. Whyte, 266 S.E. 2d 137 (W.Va. 1980).

Indeed, a detainer on which the receiving State losses jurisdiction would render defendant's detainment upon return even more illegal and would taint his alleged statement as the fruit or product of the illegal detainment.  In the case of John Moss, the result is a detainer issued pursuant to Article IV of the Detainer



1978); <u>Hughes v. District Court of Denver</u>, 593 P. 2d 702 (Colo. 1979); <u>State v. Keener</u>, 224 Kan. 100, 577 P. 2d 1182 (1978); <u>People v. Beamon</u>, 83 Mich. App. 121, 268 N.W. 2d 310 (1978); <u>Commonwealth v. Merlo</u>, 242 Pa. Super. 517, 364 A. 2d 391 (1976).   The foregoing cases are supported in the State of West Virginia by the case of <u>Moore v. Whyte</u>, 266 S.E. 2d 137 (W.Va. 1980).   This case stands for the proposition that a State loses jurisdiction to try a prisoner returned under a detainer when the prisoner is returned to the sending jurisdiction without a trial.   If the prisoner is returned to the receiving jurisdiction, the receiving State loses jurisdiction to try the prisoner.

Therefore, it does not matter how many rights forms John Moss signed, if the detainment was illegal, which it was, the confessions given by the defendant should be suppressed in the instant case.   Thus, both the refusal of a pre-transfer hearing and the failure to prosecute John Moss on the felonious assault detainer and subsequent loss of jurisdiction so to do renders inadmissible the confessions given by John Moss.

4.      The Taking of the Confessions

The Supreme Court of the United States and all state courts exclude from evidence confessions illegally obtained.   Where courts find that confessions are involuntary or coerced they exclude those confessions and appellate courts have reversed convictions which have been based on involuntary or coerced confessions.



Further, John Moss indicated that he would cooperate with Trooper Smith as long as Mr. Williams was present during any questioning.  At that time, John Moss gave Trooper Smith a Bible which contained the name, home and office telephone numbers of lawyer Jim Williams.  Trooper Smith rejected such right on the part of John Moss by throwing the Bible against the front seat saying "you don't need a lawyer".  Later, John Moss gave certain confessions concerning his involvement in the Reggettz murders.

The West Virginia Supreme Court in State v. McNeal, 251 S.E. 2d 484 (1978) invoked the standard that once a suspect in custody has expressed his clear, unequivocal desire to be represented by counsel, the police must deal with him as if he is thus represented.  Thereafter, it is improper for the police to initiate any communication with the suspect other than through his legal representative, even for the limited purpose of seeking to persuade him to reconsider his decision on the presence of counsel.

C.  Coerced Confession

Thereafter, John Moss's testimony in the suppression hearing focused on the physical abuse of Trooper Smith toward John Moss.  This abuse whch was continual and systematic overborne the will of John Moss that resulted in the confessions in question.

Where there is physical abuse during interrogation, there is a lack of voluntariness which warrants the exclusion of all confessions resulting from the abuse.  The United States Supreme Court has also expressed in clear language that the lack of



33

276

Agreement on Detainers (<u>Code</u>, 62-14-1, <u>et. seq</u>.), was dealt with
under the juvenile provisions of the Code, was accorded a
preliminary hearing, and was transferred to the adult criminal
jurisdiction of this Court for purposes of trial as an adult.  For
purposes of this proceeding, the defendant was a juvenile until
transferred to the adult section of this Court, pursuant to official
Order of this Court.

   As defendant discussed at considerable length in the
preceding sections of this Memorandum, the confessions obtained from
John Moss on the 28th day of October, 1980, were taken while under
the juvenile jurisdiction of this Court.

   In this regard, it has been held that a juvenile is not
capable of knowingly waiving his fifth amendment privilege against
self-incrimination.  <u>State ex rel J.M. v. Taylor</u>, 276 S.E. 2d 199
(W.Va. 1981).  Instead of knowingly being able to waive his fifth
amendment privilege against self-incrimination, the juvenile must
always have an attorney or a responsible adult present when he is
being interrogated by government officials.  Since a juvenile cannot
knowingly waive his right against self-incrimination, the juvenile
must be advised by an attorney or have a responsible adult present,
such as a parent, before he can knowingly and intelligently waive
his fifth amendment right against self-incrimination.  <u>State ex rel.
J.M. v. Taylor</u>, supra.

   In the present case, John Moss was not permitted his right
to have an attorney present either at or before his confessions were



-62-

West Virginia Code prevents interrogation of juveniles without the presence of a parent or counsel. Code, 49-5-8(d). Therefore, our own Code reflects a legislative judgment that a juvenile is not capable of knowingly waiving his fifth amendment privilege against self-incrimination. No juvenile legal status is treated in the same as that of an adult. See Code, 56-4-10; Code, 56-4-0; Code 54-2-4; Code, 41-5-5; Code, 37-1-3; Code, 37-1-4; Code, 37-1-12; Code 36-2-5; Code 57-4-7; Code, 39-3-7; Code 49-6-2. Consequently, in State ex rel J.M. v. Taylor, our State's High Court held that a juvenile may waive his right to counsel, but only upon the advice of counsel because only then can there be a knowing waiver. State ex rel. J.M. v. Taylor, 276 S.E. 2d at 204.

Because of the nature of the events and circumstances, the taking of the confessions from John Moss constituted a communicative contact between the defendant while he was still technically within the juvenile jurisdiction of this Court and had all of the appearances of a situation impacted with duress and coercion by governmental agents against the defendant, John Moss. It was a situation wherein the defendant's rights as set forth in State ex rel. J.M. v. Taylor should have been applicable, but were not. In the absence of such constitutional rights, the results of the confessions should be suppressed and declared inadmissible.

5.      Fruit of the Poisoned Tree.

As a result of John Moss's constitutional rights being

Virginia, the indictment on Paul Reggettz was still pending.  As the
Exhibit introduced in the suppression hearing illustrates, John Moss
was named in the body of the Reggettz indictment.  However, John
Moss was returned to the State
of Ohio without being tried on the malicious wounding charge without
his relationship to the Reggettz indictment being resolved.  This
renders John Moss' alleged confession even more tainted as the fruit
and product of an illegal detention.

In Massiah v. United States, 377 U.S. 201 (1964), the
defendant, while under a federal indictment, talked with a person
who was an unknown government informer.  The informer was "wired for
sound", and the defendant's statements were recorded by federal
authorities.  Testimony about Massiah's incriminating statements was
held inadmissible on the ground that no indicted person can be
interrogated under any circumstances in the absence of his attorney
without having his sixth amendment right to counsel impaired.
Clearly, the Massiah doctrine was held applicable to the states in
McLeod v. Ohio, 381 U.S. 356 (1965).  In McLeod, the defendant had
been indicted for first degree murder but had not yet been
arraigned; he had not retained or been appointed counsel.  While he
was riding around in the sheriff's automobile accompanied by a
deputy sheriff and an assistant prosecuting attorney in search of a
gun used in the commission of the murder, he "voluntarily" made an
oral confession, testimony about which was later admitted into
evidence against him.  The United States Supreme Court held that



On appeal, the petitioner charged that the incriminating
statements were obtained in violation of petitioner's rights under
the fourth amendment, so that said evidence was inadmissible at
trial. Also on appeal, petitioner alleged a violation of fifth and
sixth amendment rights which were violated by the use of
incriminating statements deliberately elicited in the absence of
counsel. In its opinion, the Supreme Court side-stepped the fourth
amendment issue, but in essence held that no indicted person can be
interrogated under any circumstances in the absence of his attorney
without having his sixth amendment right to counsel impaired. An
accused has a clear right to the presence of an attorney in all
post-indictment matters, and most particularly, in all
confrontations with agents of the Government.

Although the Supreme Court's opinion in <u>Massiah</u> did not
reach the fourth amendment issues of unlawful search and seizure as
is all very often involved in cases of bodily extractions or the
taking of blood samples, the Supreme Court clearly spoke to the
rights of those involved in a post-indictment situation. A copy of
the Paul Reggettz indictment was introduced into evidence at the
suppression hearing and it shows that the defendant, John Moss, was
named in the body of this indictment. The defendant submits he is
entitled to the same formal rights as those formally named and
accused in an indictment.

The Massiah doctrine was held to be clearly applicable to
the States in the case of <u>McLeod v. Ohio</u>, 381 U.S. 356 (1965). In

the body of the Paul Reggettz indictment, he was entitled to certain rights when confronted by government agents, which rights included the presence of an attorney who would be responsible for protecting his fourth amendment rights. Clearly, during post-indictment confrontations with government agents where incriminating matters are, or could be, elicited, the right of counsel attaches.

The United States Supreme Court has in numerous other instances scrutinized post-indictment confrontations between government agents and the accused in order to determine whether they are "critical stages" of the prosecution at which time the sixth amedment right to the assistance of counsel attaches. See, e.g., United States v. Ash, 413 U.S. 300 (1973); United States v. Wade, 388 U.S. 218 (1967).

In the case of the United States v. Henry, 447 U.S. 264 (1980), the defendant was indicted for the armed robbery of the Janaf Branch of the United Virginia Bank/Seaboard National in Norfolk, Virginia, in August of 1972. No witnesses were able to identify the defendant Henry as one of the participants. While Henry was in jail awaiting trial on the indictments, Government agents contacted an informant who was then an inmate confined in the same cellblock with Henry. A government agent instructed the defendant to be alert to any statements made by federal prisoners but not to initiate conversation with or question the respondent regarding the charges against him. After the informant was released from jail, he reported to the agent that he and Henry had engaged in

*138*

-70-

statements without the assistance of counsel, the Government violated Henry's sixth amendment right to counsel. <u>United States v. Henry</u>, 447 U.S. at 274. When the blood samples were obtained from John Moss, he was in an institutional environment on each occasion. Since the defendant was so incarcerated on each occasion, the State may argue that the defendant had no protection or rights since he was an inmate confined to a penal institution. Indeed, there is a body of law which holds that prisoners receive almost no fourth amendment protection and that such prisoners have diminished expectations of privacy. <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979); <u>Olsen v. Klecker</u>, 642 F. 2d 1115 (8th Cir. 1981); <u>United States v. Stumes</u>, 549 F. 2d 831 (8th Cir. 1977). However, the cases in this area deal with cell-search situations and the expectation of privacy which each inmate in an institutional setting would have, which is, at best, minimal due to the security interests of the institution. Further, such cases do not concern themselves with inmates incarcerated in an institution and who are charged with other crimes for which they are not incarcerated and the inmate's rights with regard to crimes for which they are suspected but not incarcerated. The case of <u>United States v. Henry</u> seems to indicate that those who are in an incarcerated status may even have greater rights as long as they are indicted or suspected of criminal activity.

Furthermore, it is of significance that the first sample of blood taken from the defendant was obtained without the presence of the defendant's attorney and without a court order and the Ohio



In the case of United States v. Kenny, 645 F. 2d 1323 (9th Cir. 1981), the Court held that there was no custodial interrogation of the defendant to warrant his right to counsel inasmuch as the right to counsel only attaches at the initiation of adversary judicial proceedings.  The imputation or implication from the Kenny decision is that if the government is aware that the accused is represented by counsel, there cannot be any questioning of the defendant outside the presence of said counsel.  United States v. Kenny, 645 F. 2d at 1338.  When the blood sample was obtained from John Moss at the Ohio penitentiary in Mansfield, Ohio, the defendant was, at that time, beginning to serve a sentence for a charge on which he had been represented by an attorney in the State of Ohio. This attorney was not given notice that the blood sample was going to be taken from John Moss on either occasion.

The Massiah doctrine regulates very carefully post-indictment confrontations with government officials.  Such confrontations must be in the presence of the accused's attorney, and without counsel, incriminating evidence obtained as a result must be suppressed.  When John Moss's name appeared in the Paul Reggettz indictment as one who participated in the murders in question such was eqvalent to an indictment, thus placing law enforcement on notice that the dictates of Massiah applied to post-indictment confrontations.

Respectfully submitted,

PARRISH McKITTRICK
COUNSEL FOR DEFENDANT

-74-

PETITIONER'S EXHIBIT #3

West Virginia State Police Crime Laboratory January, 1980, Blood Grouping Table

PETITIONER'S EXHIBIT #3

Grouping

| PC. | |
|---|---|
| [ ] | |
| Date | |

| NAME | | | | | AX | EAX | FAD | | H2 | 6c | 64J | N3 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JACK C NEAL JR | | O | | | | 1 | | | | 2 | | | | | | | |
| ROGER L PROWSE | | O | 2 | | | 1 | | | | 2-1 | | | | | | | |
| WILLIAM J MOUE | | O | 1 | 1 | B | 1 | 1 | | | 1 | | | | | | | |
| ROSS F GILLESPIE | | A | 1 | 1 | B | 1 | 1 | | | 2-1 | | | | | | | |
| MARVIN D SMITH | | | 1 | 1 | A | 1 | 1 | | | 2-1 | | | | | | | |
| RICHARD A ROLLINS | | A | 1 | 1 | CB | 1 | 1 | | | | | | | | | | |
| JOSEPH MOREHOUSE | | | 1 | | | 1 | | | | 1 | | | | | | | |
| NATHANIEL BROWN | | | 1 | | | 1 | | | | | 1 | | | | | | |
| THOMAS E WHITE | | | 2-1 | | | 1 | | | | 2-1 | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| ROSS | | O | 4L | 1 | 5A | 2-1 | 1 | 2-1 | 1 | 2 | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| VANESSA | | O | 2-L | 1 | B | 1 | 1 | 2-1 | 2 | | | | | | | | |
| PAUL JR | | O | 2-L | 1 | B | 1 | 1 | 2-1 | 2-1 | 2 | | | | | | | |
| BERNADETTE | | O | 2-2-1 | 1 | B | 1 | 1 | 2-1 | 2-1 | 2 | | | | | | | |
| PAUL SR | | O | 2-2-1 | 1 | B | 1 | 1 | 2-1 | 2-1 | 2 | | | | | | | |

142