# MOSS v. BALLARD
## CASE NO. 2:09cv01406

## RESPONDENT'S EXHIBIT 35

*Occ-MISC-245*
*Bloom*

## PETITION UNDER W.VA. CODE § 53-4A-1 FOR WRIT OF HABEAS CORPUS

| STATE OF WEST VIRGINIA | County   Kanawha | |
|---|---|---|
| Name   John Moss, III | Prisoner No. 13734 | Case No.  82-F-221 |

**Place of Confinement**

Mount Olive Correctional Complex
One Mountainside Way
Mt. Olive, WV 25185

Name of Petitioner (include name under which convicted)      Name of Respondent (authorized person having custody of petitioner)

John Moss, III            v.            Thomas L. McBride, Warden

## PETITION

1. Name and location of court which entered the judgment of conviction under attack  Kanawha County Circuit  Court, Charleston, WV

2. Date of judgment of conviction  First Trial -- 24 April, 1984;  Second Trial -- 26 April, 1990

3. Length of sentence  Life without possibility of parole -- Three Counts

4. Nature of offense involved (all counts)  First degree murder -- Three Counts

5. What was your plea? (Check one)
   (a)    Not guilty        X
   (b)    Guilty            ☐
   (c)    Nolo Contendere   ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:
   N/A

6. If you pleaded not guilty, what kind of trial did you have?  (Check one)
   (a)    Jury        X
   (b)    Judge only  ☐

7. Did you testify at the trial?
   Yes  ☐    No  X

8. Did you file a direct appeal from the judgment of conviction in the Supreme Court of Appeals?
   Yes  X    No  ☐

*1-3*

*Pauper's afd.*
*100 m to Pet*
*100 to Judge*
*Motions Attached*

*1*

9.   If you did appeal, answer the following:

   (a)   Date of filing    14 January, 1991;  23 February, 1991

   (b)   Grounds raised    See attached additional sheet, page no. 3a.

   (c)   Was the petition granted   ☐   or refused   **X** ?

   (d)   If refused, what was date of refusal?    12 March, 1991

   (e)   If granted, give date and type of result and citation if known.

10.   Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

   Yes   **X**   No   ☐

11.   If your answer to 10 was "yes," give the following information:

   (a)   (1)   Name of court    Kanawha County Circuit Court -- U.S. & W.V. Supreme Courts

      (2)   Nature of proceeding    "Special Zain" Habeas -- Writ of *Certiorari* on denial of collateral appeal; Application for state post-conviction relief -- Petition for appeal.

      (3)   Grounds raised    False or misleading evidence presented by state's witness; The admission of Trooper Zain's testimony and test results violated Mr. Moss's Constitutional rights;  The admission of Mr. Moss's confessions violated his Constituitional rights

      (4)   Did you receive an evidentiary hearing on your petition, application or motion?

        Yes   ☐   No   ☐   Not a full and fair hearing.

      (5)   Result    Denied and dismissed

      (6)   Date of result    31 July, 2003

   (b)   As to any second petition, application or motion give the same information:

      (1)   Name of court    Same

      (2)   Nature of proceeding    Habeas corpus

2

Attached Additional Sheet 3a

### Counsel's Petition

Improper closing argument by the prosecutor denied the defendant a fair trial.

The trial court committed reversible error when it admitted into evidence John Moss' confessions to the Reggettz murders.

The improper admission of serology test results into evidence denied the defendant a fair trial.

    1.    The State failed to establish that the electrophoresis multi-system technique is generally accepted within the scientific community.

    2.    The State failed to establish a proper foundation for the introduction of electrophoresis multi-system blood stain and test results into evidence.

### Pro Se Supplemental Petition

The trial court committed reversible error when it admitted Petitioner's confessions of the Reggettz murders into evidence.

Improper closing arguments by the prosecution denied the Petitioner a fair trial.

The improper admission of serology test results denied the Petitioner a fair trial.

Petitioner was deprived of effective assistance of counsel and equal protection of the law.

(3)     Grounds raised     _See attached additional sheet, page no. 4a._

(4)     Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐     No  X

(5)     Result     _Denied and dismissed_

(6)     Date of result     _7 February, 2006_

(c)   Did you appeal to the highest court having jurisdiction the result of action taken on any petition, application or motion?

(1)     First petition, etc.          Yes  X      No ☐

(2)     Second petition, etc.      Yes  X      No ☐

(d)   If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_N/A_

12.   State *concisely* every ground on which you claim that you are being held unlawfully.  Summarize *briefly* the *facts* supporting each ground.  If necessary, you may attach pages stating additional grounds and *facts* supporting same.


**CAUTION:**          In order to proceed in the circuit court, you must state grounds that have NOT been previously and finally adjudicated or waived.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.


For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings.  Each statement preceded by a letter constitutes a separate ground for possible relief.  You may raise any grounds which you may have other than those listed.  However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds.  If you select one or more of these grounds for relief, you must allege facts.  The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)     Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b)     Conviction obtained by use of coerced confession.
(c)     Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d)     Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e)     Conviction obtained by a violation of the privilege against self-incrimination.
(f)     Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g)     Conviction obtained by a violation of the protection against double jeopardy.
(h)     Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(i)     Denial of effective assistance of counsel.
(j)     Denial of right of appeal.

## Attached Additional Sheet 4a

The trial court abused its discretion and committed reversible error in ruling that the first two confessions were admissible under the "Law of the Case Doctrine."

The factual determination by the West Virginia Supreme Court of Appeals that no prompt presentment objections were entered on the first two alleged confessions is clearly erroneous and works a manifest injustice.

Petitioner was deprived of the Sixth Amendment's guarantee of the effective assistance of counsel.

Petitioner did not receive a full and fair hearing on his motion and memorandum to suppress samples of blood, confession, and other physical evidence seized due to the improper tactics of Fred S. Zain and the West Virginia State Police Troopers and Crime Laboratory.

Petitioner's Sixth Amendment right to a fair and impartial jury was contravened when the state knew, or should have known, of the false or misleading testimony and evidence presented by a state witness.

The trial court abused its discretion and committed reversible error when it admitted Petitioner's blood samples, confessions, and all evidence incident thereto into evidence, when the samples of blood were obtained in violation of federal and state constitutional rights.

Improper closing arguments by the prosecution denied Petitioner a fair trial.

A.    Ground one:    Blood test results and reports  of offered serology evidence were falsified or were

substantially incorrect.  *See* Syllabus Point 6, (see attached additional sheet, page no. 5a.

Supporting FACTS (state *briefly* without citing cases or law)     The W.Va. State Police Crime Laboratory

Serology Division and Troopers and/or Serologists Robert Murphy, Ted Smith, Lynn Inman and

Gale Midkiff falsified blood test results reports.

B.    Ground two:    Ineffective assistance of trial counsel

Supporting FACTS (state *briefly* without citing cases or law)     Trial counsel failed to conduct adequate

investigation.

C.    Ground three:

Supporting FACTS (state *briefly* without citing cases or law)

D.    Ground four:

- 5 -

## Attached Additional Sheet 5a

*In The Matter Of: Renewed Investigation Of The State Police Crime Laboratory, Serology Division*, West Virginia Supreme Court No. 32885, 16 June, 2006.

Supporting FACTS (state *briefly* without citing cases or law)

_____

_____

_____

_____

_____

_____

13.  If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:  ___N/A___

_____

_____

_____

14.  Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes  **X**      No  ☐

15.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment herein:

(a)  At preliminary hearing  Parrish McKittrick; 45 Second St., St. Albans, WV 25177:

_____

(b)  At arraignment and plea  Same as above

_____

(c)  At trial  First Trial - Same as above -- Second Trial -- Nelson R. Bickley; Charleston, WV:

Timothy Huffman; Charleston, WV; Kathy G. Beckett; Charleston, WV

(d)  At sentencing  Same as above

_____

(e)  On appeal  Same as above

_____

(f)  In any post-conviction proceeding  Lonnie C. Simmons; Charleston, WV; For "Special Zain" Habeas

*pro se*

(g)  On appeal from any adverse ruling in a post-conviction proceeding  Same as above

_____

_____

- 6 -

16. Have you, or an attorney representing you, obtained a transcript of the criminal proceedings which resulted in the conviction under attack?

Yes ☐   No  X   Not all transcripts listed in court's file docketing sheet.

17. If your answer to 16 was "no," have you submitted an Appellate Transcript Request form for transcripts to the circuit court, a court reporter, or any other tribunal or individual?

Yes ☐   No  X

18. If your answer to 17 was "yes," attach a copy, if available, of the Appellate Transcript Request form and provide the name of the court or person to whom it was submitted and the date of submission.

   (a)   Copy of request is attached    ☐

   (b)   Date    ☐

   (c)   Name    _____

19. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes  X   No ☐

20. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes ☐   No  X

If so, give name and location of court which imposed sentence to be served in the future:    N/A

   (b)   Give date and length of the above sentence: _____

   (c)   Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

   Yes ☐   No ☐

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  June 21, 2006 _____.
                     (date)

_____
Signature of Petitioner

- 7 -

# APPENDIX B

## POST-CONVICTION HABEAS CORPUS FORM
## APPLICATION TO PROCEED IN FORMA PAUPERIS
## AND AFFIDAVIT

STATE OF WEST VIRGINIA

County Kanawha

Name  John Moss, III

Prisoner No.  13734

Case No.  82-F-221

Place of Confinement

Mount Olive Correctional Complex
One Mountainside Way
Mt. Olive, WV 25185

| Name of Petitioner (include name under which convicted) | | Name of Respondent (authorized person having custody of petitioner) |
|---|---|---|
| John Moss, III | v. | Thomas McBride, Warden |

NOTICE:      This form is only to be used by incarcerated persons seeking post-conviction habeas corpus relief pursuant to W.Va. Code § 53-4A-1, *et seq.*

❖ ❖ ❖

I,  John Moss, III                            , declare that I am the petitioner in the above-entitled proceeding; that in support of my request to proceed without prepayment of fees or costs, I declare that I am unable to pay the costs of these proceedings and that I am entitled to the relief sought in the petition.

In support of this application, I answer the following questions under penalty of perjury:

1.   State the place of your incarceration  Mount Olive Correctional Complex                    .

Are you employed at the institution?  No              Do you receive any payment from the institution?  No

Have the institution fill out the Certificate portion of this application and attach a ledger sheet from the institution(s) of your incarceration showing at least the past six months' transactions.

2.   In the past twelve months have you received any money from any of the following sources?

|     |     |     |     |
|---|---|---|---|
| a. | Business, profession or other self-employment | Yes X | No ☐ |
| b. | Rent payments, interest or dividends | Yes ☐ | No X |
| c. | Pensions, annuities or life insurance payments | Yes ☐ | No X |
| d. | Disability or workers compensation payments | Yes ☐ | No X |
| e. | Gifts or inheritances | Yes X | No ☐ |
| f. | Any other sources | Yes ☐ | No X |

If the answer to any of the above is "Yes" describe each source of money and state the amount received and what you expect you will continue to receive.

3. Other than any institutional accounts, do you have **any** cash, checking or savings accounts? ☐ Yes  ☒ No

If "Yes" state the total amount _____

4. Do you own any real estate, stocks, bonds, securities, other financial instruments, automobiles or other valuable property?

☐ Yes      ☒ No

If "Yes" describe the property and state its value.

_____

_____

5. List the persons who are dependent on you for support, state your relationship to each person and indicate how much you contribute to their support.

   N/A _____

_____

_____

I declare under penalty of perjury that the above information is true and correct.

_____June 21, 2006_____          _John Moss III_____
DATE                              SIGNATURE OF APPLICANT

# CERTIFICATE

## (To be completed by the institution of incarceration)

I certify that the applicant named herein has the sum of $ __19.26__ in a trustee spending account to his/her credit

at (name of institution) __Mount Olive Correctional Complex__. I further certify that during the past

six months the applicant's average balance was $ __13.45__, and the average of monthly deposits was

$ __158.77__.

_21 June 2006_____          _Amber Weathers_____
DATE                         SIGNATURE OF AUTHORIZED OFFICER

9

**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 36**

07-MISC-403
Walker

## PETITION UNDER W.VA. CODE § 53-4A-1 FOR WRIT OF HABEAS CORPUS

| STATE OF WEST VIRGINIA | County   Kanawha | |
|---|---|---|
| Name   John Moss, III | Prisoner No. 13734 | Case No.   82-F-221 |

**Place of Confinement**

Mount Olive Correctional Complex
One Mountainside Way
Mt. Olive, WV 25185

Name of Petitioner (include name under which convicted)     Name of Respondent (authorized person having custody of petitioner)

John Moss, III          v.          David Ballard, Warden

## PETITION

1.  Name and location of court which entered the judgment of conviction under attack  Kanawha County Circuit Court, Charleston, WV

2.  Date of judgment of conviction  First Trial -- 24 April, 1984;  Second Trial -- 26 April, 1990

3.  Length of sentence  Life without possibility of parole -- Three Counts

4.  Nature of offense involved (all counts)   First degree murder -- Three Counts

5.  What was your plea? (Check one)
    (a)     Not guilty          X
    (b)     Guilty              ☐
    (c)     Nolo Contendere ☐
    If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:
    N/A

6.  If you pleaded not guilty, what kind of trial did you have?   (Check one)
    (a)     Jury                X
    (b)     Judge only      ☐

7.  Did you testify at the trial?
    Yes  ☐     No   X

8.  Did you file a direct appeal from the judgment of conviction in the Supreme Court of Appeals?
    Yes   X     No   ☐

68

9.  If you did appeal, answer the following:

    (a)   Date of filing  First Trial - Unknown; Second Trial - 14 January, 1991;  23 February, 1991

    (b)   Grounds raised   See attached additional pages 3a-3c

    (c)   Was the petition granted  X   or refused   X? First trial was reversed; Second trial refused.

    (d)   If refused, what was date of refusal?   12 March, 1991

    (e)   If granted, give date and type of result and citation if known.   First appeal; *State v. Moss*, 180 W.Va. 363

       376 S.E.2d 569 (1988)

10.  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

    Yes  X   No  ☐

11.  If your answer to 10 was "yes," give the following information:

    (a)   (1)   Name of court   Kanawha County Circuit Court -- U.S. & W.V. Supreme Courts

          (2)   Nature of proceeding   "Special Zain" Habeas -- Writ of *Certiorari* on denial of collateral

               appeal; Application for state post-conviction relief -- See attached pages 3a-3c

          (3)   Grounds raised   Petitioner's incarceration is illegal and in violation of his constitutional

               rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

               Constitution and Article III, Sections 1, 5, 10 and 14 of the West Virginia Constitution,

               based upon the following, To-Wit:  1. The admission of testimony and test results

               performed by Trooper Fred Salem Zain, See attached additional pages 3a-3c

          (4)   Did you receive an evidentiary hearing on your petition, application or motion?
               Yes  ☐   No  X   Not a full and fair hearing.

          (5)   Result   Denied and dismissed

          (6)   Date of result   31 July, 2003

    (b)   As to any second petition, application or motion give the same information:

          (1)   Name of court   Same

          (2)   Nature of proceeding   Habeas corpus

- 3 -

6<sup>9</sup>

Attached Additional Page 3a

(Answer to Question 9(b))  (First Appeal)

A.   THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED INTO EVIDENCE JOHN MOSS'S CONFESSIONS TO THE REGGETTZ MURDERS.

    1.   The Confessions Were Obtained Through Exploitation Of Custody Obtained Through A Statutorily Defective Transfer Pursuant To The Interstate Agreement On Detainers.

    2.   The Confessions Were Obtained As The Result Of The Police's Intentional Failure To Comply With The Juvenile Prompt Presentment Statute, *W.Va. Code*, 49-5-8(d).

    3.   The Confessions Were Obtained Through Coerced Waiver Of Constitutional Rights.

B.   THE DEFENDANT WAS DENIED A FAIR TRIAL BY THE STATE'S INTRODUCTION INTO THE TRIAL OF THE RESULTS OF POLYGRAPH EXAMINATIONS GIVEN TO A WITNESS, PAUL REGGETTZ.

C.   THE DEFENDANT WAS DENIED A FAIR TRIAL BY THE REFUSAL OF THE TRIAL COURT TO POLL THE JURY AS TO POSSIBLE PREJUDICE CAUSED BY PUBLIC RADIO BROADCAST DURING WHICH THE PROSECUTOR EXPRESSED HIS PERSONAL OPINION OF THE GUILT OF JOHN MOSS.

D.   IMPROPER CLOSING ARGUMENT BY THE PROSECUTOR, UNCORRECTED BY THE TRIAL COURT, DENIED THE DEFENDANT A FAIR TRIAL.

    1.   Appeals To The Passions And Prejudices Of The Jury.

    2.   Expressions Of Personal Opinion And Beliefs.

    3.   Misstatement Of The Evidence.

    4.   Argument Concerning Consequences Of Jury Verdict.

    5.   Elevated Standard Of Fairness And Impartiality.

    6.   Contemporaneous Objection Requirement.

    7.   Responsibility Of Trial Court.

(Second appeal.)  (Counsel's submitted petition.)

A.   THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO GRANT DEFENDANT'S MOTION FOR A MISTRIAL DUE TO THE PROSECUTRIX'S PREJUDICIAL AND INFLAMMATORY STATEMENT DURING HER CLOSING ARGUMENT.

Attached Additional Page 3b

B.   THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO RENDER INADMISSIBLE THE TWO CONFESSIONS OF THE JUVENILE DEFENDANT, JOHN MOSS, WHICH WERE OBTAINED AS A RESULT OF UNJUSTIFIED DELAY AND WERE OBTAINED PRIOR TO PRESENTMENT TO A NEUTRAL JUDICIAL OFFICER.

C(1).   THE TRIAL COURT ERRED IN RULING THAT THE STATE HAD MET THE BURDEN OF PROOF IMPOSED UPON IT TO ESTABLISH THAT THE ELECTROPHORESIS MULTI-SYSTEM TECHNIQUE ENJOYS GENERAL ACCEPTANCE IN THE SCIENTIFIC COMMUNITY.

C(2).   THE TRIAL COURT ERRED IN RULING THAT THE STATE HAD ESTABLISHED A PROPER FOUNDATION FOR THE INTRODUCTION OF ELECTROPHORESIS MULTI-SYSTEM BLOOD STAIN TEST RESULTS, THEREBY RENDERING THESE RESULTS INADMISSIBLE AS A MATTER OF LAW.

(Supplemental *pro se* petition.)

1.   THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED PETITIONER'S CONFESSIONS OF THE REGGETTZ MURDERS INTO EVIDENCE.

2.   IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION DENIED THE PETITIONER A FAIR TRIAL.

3.   THE IMPROPER ADMISSION OF SEROLOGY TEST RESULTS DENIED THE PETITIONER A FAIR TRIAL.

4.   PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AND EQUAL PROTECTION OF THE LAW.

(Answer to Question 11(a)(2)) (cont.)

Collateral appeal of the denial of habeas relief; Renewed Investigation (Zain III) petition for writ of habeas corpus; Collateral appeal of the denial of habeas relief on Renewed Investigation (Zain III) petition; Original Jurisdiction Petition for Writ of Habeas Corpus Ad Subjiciendum to the West Virginia Supreme Court of Appeals.

(Response to question 11(a)(3)) (cont.)

Whose Credentials, Credibility, And Test Results Have All Been Found By The West Virginia Supreme Court Of Appeals To Be Inherently Unreliable And A Violation Of A Criminal Defendant's Constitutional Rights.

2.   The Presentation By The State Of Incorrect, False, Misleading, Overstated, And Unscientific Evidence.

Attached Additional Page 3c

3.     The Admission Of The Alleged Confessions Given By Petitioner, Which Resulted From A Violation Of His Constitutional Rights. Although The Issues Regarding The Confessions Have Been Extensively Litigated In Many Hearings, Petitioner Reserves The Right To Develop New Information And New Arguments With Regard To The Alleged Confessions That Were Previously Unavailable.

(Counsel's supplemental habeas corpus brief.)

The State Failed To Preserve Evidence And The Results Of Testing Of Evidence.

Serologists, Other Than Fred S. Zain Offered Evidence That Was Substantially False And/Or Misleading And Which Led To The Conviction Of The Petitioner.

(*See* previously stated issues.)

(3)  Grounds raised   See attached additional page no. 4a.

_____

_____

_____

_____

(4)  Did you receive an evidentiary hearing on your petition, application or motion?

Yes  ☐   No   X

(5)  Result   Summarily  denied and dismissed

(6)  Date of result   7 February, 2006

(c)  Did you appeal to the highest court having jurisdiction the result of action taken on any petition, application or motion?

(1)  First petition, etc.      Yes  X    No  ☐

(2)  Second petition, etc.    Yes  X    No  ☐

(d)  If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

N/A

_____

_____

12.  State *concisely* every ground on which you claim that you are being held unlawfully.  Summarize *briefly* the *facts* supporting each ground.  If necessary, you may attach pages stating additional grounds and *facts* supporting same.

**CAUTION:**      In order to proceed in the circuit court, you must state grounds that have NOT been previously and finally adjudicated or waived.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings.  Each statement preceded by a letter constitutes a separate ground for possible relief.  You may raise any grounds which you may have other than those listed.  However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds.  If you select one or more of these grounds for relief, you must allege facts.  The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)  Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b)  Conviction obtained by use of coerced confession.

(c)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e)  Conviction obtained by a violation of the privilege against self-incrimination.

(f)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g)  Conviction obtained by a violation of the protection against double jeopardy.

(h)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(I)  Denial of effective assistance of counsel.

(j)  Denial of right of appeal.

- 4 -

(Answer to Question 11(b)(3)):

a.     THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE
       ERROR IN RULING THAT THE FIRST TWO CONFESSIONS WERE ADMISSIBLE
       UNDER THE "LAW OF THE CASE DOCTRINE."

b.     THE FACTUAL DETERMINATION BY THE WEST VIRGINIA SUPREME COURT
       OF APPEALS THAT NO PROMPT PRESENTMENT OBJECTIONS WERE
       ENTERED ON THE FIRST TWO ALLEGED CONFESSIONS IS CLEARLY
       ERRONEOUS AND WORKS A MANIFEST INJUSTICE.

c.     PETITIONER WAS DEPRIVED OF THE SIXTH AMENDMENT'S GUARANTEE OF
       THE EFFECTIVE ASSISTANCE OF COUNSEL:

       (1).    Counsel Failed To Bring To The Trial And Appellant Court's Attention The Fact
               That The Two October 28, 1980, Confessions Were The Subject Of An
               Extensive Motion And Memorandum, Hearing, And Testimony And Was, In
               Fact, Objected To By Counsel Prior To The First Trial, Based On, *Inter Alia*,
               *W.Va. Code* § 49-5-8(d).

       (2).    If Trial Counsel, At The First Trial, Failed To Object To The West Virginia
               Authorities' Failure To Promptly Present The Juvenile Defendant To A Neutral
               Judicial Officer Prior To Taking Petitioner's Alleged Confessions.

d.     PETITIONER DID NOT RECEIVE A FULL AND FAIR HEARING ON HIS MOTION
       AND MEMORANDUM TO SUPPRESS SAMPLES OF BLOOD, CONFESSION,
       AND OTHER PHYSICAL EVIDENCE SEIZED DUE TO THE IMPROPER TACTICS
       OF FRED S. ZAIN AND THE WEST VIRGINIA STATE POLICE TROOPERS AND
       CRIME LABORATORY.

e.     PETITIONER'S SIXTH AMENDMENT RIGHT TO A FAIR AND IMPARTIAL JURY
       WAS CONTRAVENED WHEN THE STATE KNEW, OR SHOULD HAVE KNOWN,
       OF THE FALSE OR MISLEADING TESTIMONY AND EVIDENCE PRESENTED BY
       A STATE WITNESS.

f.     THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE
       ERROR WHEN IT ADMITTED PETITIONER'S BLOOD SAMPLES, CONFESSIONS
       AND ALL EVIDENCE INCIDENT THERETO INTO EVIDENCE, WHEN THE
       SAMPLES OF BLOOD WERE OBTAINED IN VIOLATION OF FEDERAL AND
       STATE CONSTITUTIONAL RIGHTS.

g.     IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION DENIED THE
       PETITIONER A FAIR TRIAL.

A.   Ground one:   See attached additional pages 5a-5c

Supporting FACTS (state *briefly* without citing cases or law)   See attached additional pages 5a-5c

B.   Ground two:   N/A

Supporting FACTS (state *briefly* without citing cases or law)   N/A

C.   Ground three:   N/A

Supporting FACTS (state *briefly* without citing cases or law)

D.   Ground four:

- 5 -

75

PETITIONER RECEIVED THE INEFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE CONSTITUTIONS OF WEST VIRGINIA AND THE UNITED STATES.

## The Silverware

The Kanawha County Circuit Court and the West Virginia Supreme Court of Appeals (hereinafter "WVSCA") found that Petitioner's confessions were largely consistent with the physical evidence, citing a camera identified by Paul Reggettz as belonging to him, and silverware Reggettz alleged he had purchased. Due to ineffective assistance of trial counsel, at the second trial, the jury, as well as both courts as stated above, were all denied evidence which would provide a basis that Paul Reggettz's identification of these items were false and completely self-serving and were offered to draw attention away from his own (admissible) confession and culpability in the murders of his family.

Paul Reggettz identified a set of silverware at trial as being the silverware he purchased as a Christmas gift for his wife in 1979 at the local K-Mart store. Police obtained the silverware presented at trial from the mother of one of Petitioner's friends, Mrs. Arbutus Johnson Pomeroy. Petitioner had given the silverware to Mrs. Pomeroy as a Christmas gift.

In the first trial of this case, (1984), defense called the K-Mart merchandising and ordering manager as a witness, Ms. Edith Lilly. Ms. Lilly testified that K-Mart has never sold the brand of silverware that Paul Reggettz identified as being the item he purchased for his wife at K-Mart. Defense counsel at Petitioner's second trial did not call Ms. Lilly as a witness despite requests to call her. As a result, Petitioner was deprived of putting crucial information before the jury, this Court, and the WVSCA in determining the weight of evidence to be afforded in Paul Reggettz's testimony of purchasing the flatware at K-Mart. Based upon Reggettz's testimony of purchasing silverware at K-Mart, alleged to be missing from his home after the murder of his family, the silverware relied upon at trial could not be the property allegedly stolen from the Reggettz home. Absent the false, misleading and/or substantially incorrect evidence and testimony offered by employees of the West Virginia State Police and Crime Laboratory, Serology Division, the absolute testimony by Ms. Lilly was such as would create reasonable doubt.

Additionally, the Kanawha County Circuit Court and/or WVSCA rulings that evidence of the silverware was, absent the false, misleading and/or substantially incorrect evidence and testimony by members of the West Virginia State Police and Crime Laboratory, Serology Division, were strong enough to sustain a conviction, would certainly not have been the same, if not for the deficient performance of trial counsel.

76

### The Camera

Originally, no camera was alleged to have been missing from the Reggettz home. Once again the only evidence offered that a camera obtained from Petitioner's father's car was taken from the Reggettz home was self-serving identification by Paul Reggettz. The state offered no corroborating evidence that Paul Reggettz owned a camera, such as demonstrating that Reggettz owned film that would fit this model of camera, or a picture alleged to have been taken with the camera. The Reggettz family had been residents of Kanawha County for some time, yet no witness alleging to have ever seen any member of the Reggettz family with a camera of any kind was called to corroborate Paul Reggettz's story of a missing camera.

On the other hand, both Petitioner's parents (John and Marzee Moss) were called as witnesses in the first trial in 1984. Both witnesses substantiated the fact Petitioner owned a camera like the one identified by Paul Reggettz as being his camera. It was further established that both Petitioner and his sister had owned cameras and that Petitioner had his camera during the summer of 1979 prior to the December 1979 murders of the Reggettz family. Petitioner's mother passed away prior to the second trial and Petitioner's father was not called by trial counsel to testify at the second trial even though Petitioner requested the same.

The Kanawha County Circuit Court and/or WVSCA rulings that evidence of the silverware was, absent the false, misleading and/or substantially incorrect evidence and testimony by members of the West Virginia State Police and Crime Laboratory, Serology Division, were strong enough to sustain a conviction, if not for the deficient performance of trial counsel, would certainly not have been the same.


### Reliability of Petitioner's Confession

The Kanawha County Circuit Court and the WVSCA has ruled that Petitioner's confessions were reliable citing consistencies to crime scene evidence, motive and other identified factors. However, when the confession of Paul Reggettz is compared to the crime scene evidence and forensic evidence that couldn't be known to persons who only viewed the scene after the fact, Reggettz's confession is the only credible account of the murders consistent to unseen forensic evidence.

When Petitioner's confessions are compared to all the physical and admissible forensic evidence, it becomes clear that his confessions were consistent to having been told, for over 5 hours, what to say by the investigating officers who had viewed the crime scene, but who could not have known the underlying forensic evidence.

The deficient performance by the second trial counsel in putting on witnesses whose testimony dispels the self-serving testimony of Paul Reggettz concerning the alleged items removed from the Reggettz home during the murders of his family, or, at the least, creates a reasonable doubt as to the veracity of Reggettz's testimony concerning the same, prejudiced Petitioner three-fold. First, the jurors at the second trial did not hear the compelling testimony of the omitted witnesses testifying from the stand; the Kanawha County Circuit Court was not afforded to consider the testimony in its decision to deny Petitioner relief in all his habeas corpus petitions, and, third, the WVSCA didn't have the benefit of the witness's testimony in considering all of Petitioner's appeals of all the circuit court's denials of his petitions for writ of habeas corpus. If any one of the above-named entities had had the available testimony to consider, the results of these proceedings certainly would be different.

Supporting FACTS (state *briefly* without citing cases or law)   N/A

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:   N/A

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes ☐   No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment herein:

(a) At preliminary hearing   Parrish McKittrick; 45 Second St., St. Albans, WV 25177:

(b) At arraignment and plea   Same as above

(c) At trial   First Trial - Same as above -- Second Trial -- Nelson R. Bickley; Charleston, WV:

Timothy Huffman; Charleston, WV: Kathy G. Beckett; Charleston, WV

(d) At sentencing   Same as above

(e) On appeal   Same as above

(f) In any post-conviction proceeding   Lonnie C. Simmons; Charleston, WV:  For "Special Zain" Habeas

(g) On appeal from any adverse ruling in a post-conviction proceeding   Same as above

79

16. Have you, or an attorney representing you, obtained a transcript of the criminal proceedings which resulted in the conviction under attack?

Yes **X**   No ☐

17. If your answer to 16 was "no," have you submitted an Appellate Transcript Request form for transcripts to the circuit court, a court reporter, or any other tribunal or individual?

Yes ☐   No ☐

18. If your answer to 17 was "yes," attach a copy, if available, of the Appellate Transcript Request form and provide the name of the court or person to whom it was submitted and the date of submission.

(a)   Copy of request is attached   ☐

(b)   Date   ☐

(c)   Name   _____

19. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes **X**   No ☐

20. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes ☐   No **X**

If so, give name and location of court which imposed sentence to be served in the future:   **N/A** _____

_____

(b)   Give date and length of the above sentence:   _____

_____

(c)   Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes ☐   No ☐

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  September 22, 2007 _____.
                        (date)

_____
Signature of Petitioner

80

# APPENDIX B

## POST-CONVICTION HABEAS CORPUS FORM
## APPLICATION TO PROCEED IN FORMA PAUPERIS
## AND AFFIDAVIT

| STATE OF WEST VIRGINIA | County Kanawha | |
|---|---|---|
| Name  John Moss. III | Prisoner No.   13734 | Case No.   82-F-221 |

Place of Confinement

Mount Olive Correctional Complex
One Mountainside Way
Mt. Olive, WV  25185

Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner)

John Moss, III　　　　　v.　　　　　David Ballard, Warden

NOTICE:　　This form is only to be used by incarcerated persons seeking post-conviction habeas corpus relief pursuant to W.Va. Code § 53-4A-1, *et seq.*

❖  ❖  ❖

I,  John Moss, III _____, declare that I am the petitioner in the above-entitled proceeding; that in support of my request to proceed without prepayment of fees or costs, I declare that I am unable to pay the costs of these proceedings and that I am entitled to the relief sought in the petition.

In support of this application, I answer the following questions under penalty of perjury:

1.　State the place of your incarceration  Mount Olive Correctional Complex _____.

Are you employed at the institution?  No _____　　Do you receive any payment from the institution?  No _____

Have the institution fill out the Certificate portion of this application and attach a ledger sheet from the institution(s) of your incarceration showing at least the past six months' transactions.

2.　In the past twelve months have you received any money from any of the following sources?

| | | | |
|---|---|---|---|
| a. | Business, profession or other self-employment | Yes X | No ☐ |
| b. | Rent payments, interest or dividends | Yes ☐ | No X |
| c. | Pensions, annuities or life insurance payments | Yes ☐ | No X |
| d. | Disability or workers compensation payments | Yes ☐ | No X |
| e. | Gifts or inheritances | Yes X | No ☐ |
| f. | Any other sources | Yes ☐ | No X |

If the answer to any of the above is "Yes" describe each source of money and state the amount received and what you expect you will continue to receive. I make a small amount from my arts and crafts shop.  I someimes receive small gifts from friends and family. $100.00 - $100.00

81

3. Other than any institutional accounts, do you have **any** cash, checking or savings accounts?  ☐ Yes  ☒ No

If "Yes" state the total amount _____.

4. Do you own any real estate, stocks, bonds, securities, other financial instruments, automobiles or other valuable property?

☐ Yes  ☒ No

If "Yes" describe the property and state its value.

_____
_____

5. List the persons who are dependent on you for support, state your relationship to each person and indicate how much you contribute to their support.

N/A
_____
_____

I declare under penalty of perjury that the above information is true and correct.

September 22, 2007
DATE

_____
SIGNATURE OF APPLICANT   13734

## CERTIFICATE

## (To be completed by the institution of incarceration)

I certify that the applicant named herein has the sum of $ 0.14 in a trustee spending account to his/her credit at (name of institution) __Mount Olive Correctional Complex__. I further certify that during the past six months the applicant's average balance was $ 11.18, and the average of monthly deposits was $ 320.55.

24 Sep 2007
DATE

_____
SIGNATURE OF AUTHORIZED OFFICER

- 2 -

82

```
IXKI                     MOUNT OLIVE CORRECTIONAL COMPLEX                    OTRTASTA
                   T R U S T   A C C O U N T   S T A T E M E N T

DOC#  : 0000013734     Name:  MOSS, JOHN JR.                     BKG#      1998520
LOCATION:    MOCC-ELM

ACCOUNT BALANCES  TOTAL :          5.72   CURRENT:          5.72  HOLD:       0.00
                                02/01/2007        09/24/2007
                              START BALANCE     END BALANCE
SUB ACCOUNT

DRAWING ACCOUNT                     0.07             0.14
VOLUNTARY SAVINGS                   0.00             0.00
MEMO CONTROL                        0.00             0.00
MANDATORY CONTROL                   5.57             5.58

                      DEBTS AND OBLIGATIONS
WRITE
OFF    TYPE     PAYABLE                 INFO NUMBER      AMOUNT OWING    AMOUNT PAID


         TRANSACTION DESCRIPTIONS --           MANDATORY CONTROL  SUB-ACCOUNT
DATE             TRANSACTION DESCRIPTION     RECEIPT #    TRANSACTION AMT       BALANCE
04/27/2007   Interest Distribution                          0.00          5.57
04/27/2007   Interest Distribution                          0.00          5.57
04/.  :007   Interest Distribution                          0.00          5.57
05/01/2007   Interest Distribution                          0.00          5.57
05/04/2007   Interest Distribution                          0.00          5.57
05/11/2007   Interest Distribution                          0.00          5.57
05/11/2007   Interest Distribution                          0.00          5.57
05/11/2007   Interest Distribution                          0.00          5.57
05/22/2007   Interest Distribution                          0.00          5.57
06/01/2007   Interest Distribution                          0.00          5.57
07/27/2007   Interest Distribution                          0.01          5.58
         TRANSACTION DESCRIPTIONS --           DRAWING ACCOUNT   SUB-ACCOUNT
DATE             TRANSACTION DESCRIPTION     RECEIPT #    TRANSACTION AMT       BALANCE
02/06/2007   Postal Receipt J EDDENS 267405                 5.00          5.07
02/06/2007   Other Receipt STAFF SALES                      1.70          6.77
02/06/2007   I TO I                                        27.00         33.77
02/06/2007   SS                                    (        2.91)        30.86
02/0  :007   CRS SAL ORD #964538                   (       21.72)         9.14
02/06/2007   CRS SAL ORD #964548                   (        3.27)         5.87
02/07/2007   CRS SAL ORD #964762                   (        0.58)         5.29
02/07/2007   CRS SAL ORD #964840                   (        2.22)         3.07
02/08/2007   CRS SAL ORD #965215                   (        2.66)         0.41
```

9/24/2007 10:10

MOUNT OLIVE CORRECTIONAL COMPLEX

IKKI

OTRTASTA

T R U S T   A C C O U N T   S T A T E M E N T

DOC# : 0000013734      Name: MOSS, JOHN JR.

BKG#      1998520

LOCATION:   MOCC-ELM

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|------|------------------------|-----------|-----------------|---------|
| 03/22/2007 | I TO I | | ( 6.30) | 3.32 |
| 03/22/2007 | AC 10% | | ( 0.70) | 2.62 |
| 03/22/2007 | TAX | | ( 0.42) | 2.20 |
| 03/22/2007 | Postage Draw 03/22/07 | | ( 2.19) | 0.01 |
| 03/27/2007 | Other Receipt STAFF SALES | | 195.97 | 195.98 |
| 03/27/2007 | PENN STATE INDUSTRIES | | ( 162.70) | 33.28 |
| 03/28/2007 | CRS SAL ORD #981595 | | ( 4.77) | 28.51 |
| 03/28/2007 | CRS SAL ORD #981894 | | ( 17.51) | 11.00 |
| 03/28/2007 | CRS SAL ORD #982053 | | ( 2.32) | 8.68 |
| 03/28/2007 | CRS SAL ORD #982054 | | ( 0.68) | 8.00 |
| 03/28/2007 | CRS SAL ORD #982055 | | ( 4.40) | 3.60 |
| 03/31/2007 | CRS SAL ORD #982975 | | ( 2.10) | 1.50 |
| 03/31/2007 | CRS SAL ORD #982977 | | ( 1.42) | 0.08 |
| 04/10/2007 | Postal Receipt C GALLOWAY 381190 | | 40.00 | 40.08 |
| 04/ 2007 | Other Receipt STAFF SALES | | 18.00 | 58.08 |
| 04/10/2007 | Other Receipt STAFF SALES | | 4.50 | 62.58 |
| 04/10/2007 | CRS SAL ORD #986559 | | ( 16.85) | 45.73 |
| 04/11/2007 | Postage Draw 04/11/07 | | ( 1.11) | 44.62 |
| 04/11/2007 | Postage Draw 04/11/07 | | ( 6.08) | 38.54 |
| 04/11/2007 | CRS SAL ORD #986801 | | ( 34.19) | 4.35 |
| 04/12/2007 | CRS SAL ORD #987248 | | ( 2.87) | 1.48 |
| 04/19/2007 | I TO I | | 9.00 | 10.48 |
| 04/19/2007 | CRS SAL ORD #989775 | | ( 4.06) | 6.42 |
| 04/19/2007 | CRS SAL ORD #989780 | | ( 4.26) | 2.16 |
| 04/22/2007 | CRS SAL ORD #990649 | | ( 1.46) | 0.70 |
| 04/24/2007 | CRS SAL ORD #991781 | | ( 0.68) | 0.02 |
| 04/25/2007 | Other Receipt STAFF SALES | | 40.50 | 40.52 |
| 04/25/2007 | CRS SAL ORD #992026 | | ( 4.58) | 35.94 |
| 04/25/2007 | CRS SAL ORD #992330 | | ( 17.89) | 18.05 |
| 04/25/2007 | CRS SAL ORD #992337 | | ( 3.37) | 14.68 |
| 04/ 2007 | CRS SAL ORD #992633 | | ( 4.44) | 10.24 |
| 04/27/2007 | Postage Draw 4/27/07 | | ( 7.65) | 2.59 |
| 04/29/2007 | CRS SAL ORD #993644 | | ( 2.11) | 0.48 |
| 04/30/2007 | Postal Receipt M WOMACK 414941 | | 25.00 | 25.48 |
| 04/30/2007 | CRS SAL ORD #994137 | | ( 9.20) | 16.28 |

IKKI         MOUNT OLIVE CORRECTIONAL COMPLEX        OTRTASTA

T R U S T    A C C O U N T    S T A T E M E N T

DOC# : 0000013734     Name: MOSS, JOHN JR.            BKG#      1998520

LOCATION:    MOCC-ELM

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|------|------------------------|-----------|-----------------|---------|
| 05/21/2007 | CRS SAL ORD #1002386 | | ( 8.50) | 31.33 |
| 05/22/2007 | CRS SAL ORD #1002793 | | ( 3.06) | 28.27 |
| 05/23/2007 | Postage Draw 05/23/07 | | ( 8.37) | 19.90 |
| 05/23/2007 | Other Receipt STAFF SALES | | 90.00 | 109.90 |
| 05/24/2007 | CRS SAL ORD #1003123 | | ( 1.05) | 108.85 |
| 05/24/2007 | CRS SAL ORD #1003519 | | ( 9.16) | 99.69 |
| 05/24/2007 | CRS SAL ORD #1003521 | | ( 5.08) | 94.61 |
| 05/24/2007 | CRS SAL ORD #1003736 | | ( 11.41) | 83.20 |
| 05/27/2007 | CRS SAL ORD #1004637 | | ( 15.97) | 67.23 |
| 05/27/2007 | CRS SAL ORD #1004644 | | ( 1.42) | 65.81 |
| 05/29/2007 | CRS SAL ORD #1004920 | | ( 1.69) | 64.12 |
| 05/29/2007 | Sub-Account Transfer | | ( 60.00) | 4.12 |
| 05/29/2007 | CRS SAL ORD #1005130 | | ( 3.15) | 0.97 |
| 05/31/2007 | CRS SAL ORD #1006062 | | ( 0.78) | 0.19 |
| 06/'  2007 | Sub-Account Transfer | | 60.00 | 60.19 |
| 06/0./2007 | CRS SAL ORD #1007794 | | ( 8.95) | 51.24 |
| 06/05/2007 | CRS SAL ORD #1007795 | | ( 0.42) | 50.82 |
| 06/06/2007 | CRS SAL ORD #1008050 | | ( 2.68) | 48.14 |
| 06/07/2007 | GRIZZLY INDUSTRIAL | | ( 25.90) | 22.24 |
| 06/07/2007 | CRS SAL ORD #1008518 | | ( 5.30) | 16.94 |
| 06/07/2007 | CRS SAL ORD #1008839 | | ( 6.36) | 10.58 |
| 06/07/2007 | CRS SAL ORD #1008857 | | ( 1.42) | 9.16 |
| 06/07/2007 | CRS SAL ORD #1008859 | | ( 2.57) | 6.59 |
| 06/09/2007 | CRS SAL ORD #1009233 | | ( 3.42) | 3.17 |
| 06/10/2007 | CRS SAL ORD #1009574 | | ( 2.62) | 0.55 |
| 06/13/2007 | Other Receipt STAFF SALES | | 54.00 | 54.55 |
| 06/13/2007 | ARMOR CRAFT | | ( 17.40) | 37.15 |
| 06/13/2007 | CRS SAL ORD #1010794 | | ( 3.25) | 33.90 |
| 06/13/2007 | CRS SAL ORD #1011008 | | ( 2.66) | 31.24 |
| 06/13/2007 | CRS SAL ORD #1011009 | | ( 11.08) | 20.16 |
| 06/'  2007 | Regular Payroll Receipt | | 40.00 | 60.16 |
| 06/1./2007 | I TO I | | 42.30 | 102.46 |
| 06/18/2007 | CRS SAL ORD #1012387 | | ( 18.49) | 83.97 |
| 06/19/2007 | PENN STATE INDUSTRIES | | ( 73.75) | 10.22 |
| 06/20/2007 | CRS SAL ORD #1013483 | | ( 7.95) | 2.27 |

85

MOUNT OLIVE CORRECTIONAL COMPLEX                      OTRTASTA

T R U S T   A C C O U N T   S T A T E M E N T

DOC# : 0000013734      Name: MOSS, JOHN JR.                BKG#      1998520
LOCATION:   MOCC-ELM

| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|------|------------------------|-----------|-----------------|---------|
| 07/11/2007 | CRS SAL ORD #1021309 | | ( 4.40) | 37.26 |
| 07/12/2007 | Other Receipt STAFF SALES | | 45.00 | 82.26 |
| 07/12/2007 | SS | | ( 40.00) | 42.26 |
| 07/12/2007 | CRS SAL ORD #1021676 | | ( 1.78) | 40.48 |
| 07/12/2007 | CRS SAL ORD #1021811 | | ( 2.54) | 37.94 |
| 07/14/2007 | CRS SAL ORD #1022345 | | ( 2.62) | 35.32 |
| 07/15/2007 | CRS SAL ORD #1022588 | | ( 7.74) | 27.58 |
| 07/16/2007 | Postal Receipt L EDDENS 781317 | | 20.00 | 47.58 |
| 07/16/2007 | AA PIZZA | | ( 25.40) | 22.18 |
| 07/18/2007 | Sub-Account Transfer | | ( 20.00) | 2.18 |
| 07/18/2007 | CRS SAL ORD #1023624 | | ( 1.61) | 0.57 |
| 07/19/2007 | Other Receipt STAFF SALES | | 13.50 | 14.07 |
| 07/19/2007 | Other Receipt STAFF SALES | | 16.20 | 30.27 |
| 07/19/2007 | Other Receipt STAFF SALES | | 13.50 | 43.77 |
| 07/ '2007 | CRS SAL ORD #1024772 | | ( 12.05) | 31.72 |
| 07/.. 2007 | Sub-Account Transfer | | ( 30.00) | 1.72 |
| 07/24/2007 | Other Receipt STAFF SALES | | 27.00 | 28.72 |
| 07/24/2007 | Other Receipt STAFF SALES | | 16.20 | 44.92 |
| 07/24/2007 | I TO I | | 32.40 | 77.32 |
| 07/24/2007 | I TO I | | 27.90 | 105.22 |
| 07/25/2007 | CRS SAL ORD #1026476 | | ( 7.87) | 97.35 |
| 07/25/2007 | CRS SAL ORD #1026483 | | ( 6.74) | 90.61 |
| 07/25/2007 | CRS SAL ORD #1026709 | | ( 4.69) | 85.92 |
| 07/26/2007 | Other Receipt STAFF SALES | | 19.80 | 105.72 |
| 07/26/2007 | Other Receipt STAFF SALES | | 29.70 | 135.42 |
| 07/26/2007 | SS | | ( 50.00) | 85.42 |
| 07/26/2007 | S STAX | | 0.00 | 85.42 |
| 07/27/2007 | Sub-Account Transfer | | ( 30.00) | 55.42 |
| 07/29/2007 | CRS SAL ORD #1027448 | | ( 12.61) | 42.81 |
| 07/29/2007 | CRS SAL ORD #1027474 | | ( 2.49) | 40.32 |
| 07/ '2007 | Postage Draw 07/30/07 | | ( 7.52) | 32.80 |
| 07/.. 2007 | CRS SAL ORD #1028267 | | ( 7.53) | 25.27 |
| 08/01/2007 | Other Receipt STAFF SALES | | 16.20 | 41.47 |
| 08/01/2007 | Other Receipt STAFF SALES | | 36.00 | 77.47 |
| 08/01/2007 | CRS SAL ORD #1028509 | | ( 3.26) | 74.21 |

47KKI                    MOUNT OLIVE CORRECTIONAL COMPLEX                    OTRTASTA

                       T R U S T   A C C O U N T   S T A T E M E N T


DOC# : 0000013734      Name: MOSS, JOHN JR.                        BKG#       1998520

LOCATION:  MOCC-ELM


| DATE | TRANSACTION DESCRIPTION | RECEIPT # | TRANSACTION AMT | BALANCE |
|------|------------------------|-----------|-----------------|---------|
| 08/23/2007 | Other Receipt STAFF SALES | | 22.50 | 42.39 |
| 08/23/2007 | CRS SAL ORD #1036842 | | ( 3.19) | 39.20 |
| 08/23/2007 | CRS SAL ORD #1036891 | | ( 2.18) | 37.02 |
| 08/23/2007 | CRS SAL ORD #1037077 | | ( 5.96) | 31.06 |
| 08/25/2007 | CRS SAL ORD #1037730 | | ( 6.11) | 24.95 |
| 08/25/2007 | CRS SAL ORD #1037777 | | ( 4.78) | 20.17 |
| 08/27/2007 | CRS SAL ORD #1038362 | | ( 8.67) | 11.50 |
| 08/27/2007 | CRS SAL ORD #1038369 | | ( 6.98) | 4.52 |
| 08/27/2007 | CRS SAL ORD #1038508 | | ( 3.63) | 0.89 |
| 08/28/2007 | Other Receipt STAFF SALES | | 32.40 | 33.29 |
| 08/28/2007 | Other Receipt STAFF SALES | | 19.80 | 53.09 |
| 08/28/2007 | CRS SAL ORD #1038839 | | ( 0.54) | 52.55 |
| 08/29/2007 | Sub-Account Transfer | | 150.00 | 202.55 |
| 08/29/2007 | Misc. Draw MRS. AUDREY R GIBSON | | ( 200.00) | 2.55 |
| 08/?? /2007 | CRS SAL ORD #1039224 | | ( 0.90) | 1.65 |
| 08/. 2007 | CRS SAL ORD #1039722 | | ( 0.90) | 0.75 |
| 09/06/2007 | Other Receipt STAFF SALES | | 63.00 | 63.75 |
| 09/06/2007 | Other Receipt STAFF SALES | | 13.50 | 77.25 |
| 09/06/2007 | CRS SAL ORD #1041981 | | ( 12.13) | 65.12 |
| 09/06/2007 | CRS SAL ORD #1042252 | | ( 25.32) | 39.80 |
| 09/08/2007 | CRS SAL ORD #1042724 | | ( 7.53) | 32.27 |
| 09/08/2007 | CRS SAL ORD #1042802 | | ( 3.50) | 28.77 |
| 09/08/2007 | CRS SAL ORD #1042804 | | ( 8.32) | 20.45 |
| 09/09/2007 | CRS SAL ORD #1043073 | | ( 4.63) | 15.82 |
| 09/10/2007 | CRS SAL ORD #1043418 | | ( 6.82) | 9.00 |
| 09/10/2007 | CRS SAL ORD #1043423 | | ( 2.12) | 6.88 |
| 09/11/2007 | Other Receipt STAFF SALES | | 13.50 | 20.38 |
| 09/11/2007 | Other Receipt STAFF SALES | | 16.20 | 36.58 |
| 09/11/2007 | Other Receipt STAFF SALES | | 22.50 | 59.08 |
| 09/11/2007 | I TO I | | 22.50 | 81.58 |
| 09/?? /2007 | I TO I | | 9.00 | 90.58 |
| 09/. 2007 | CRS SAL ORD #1043854 | | ( 6.21) | 84.37 |
| 09/11/2007 | CRS SAL ORD #1043969 | | ( 6.61) | 77.76 |
| 09/12/2007 | CRS SAL ORD #1044245 | | ( 4.65) | 73.11 |
| 09/12/2007 | CRS SAL ORD #1044324 | | ( 5.76) | 67.35 |

**MOSS v. BALLARD
CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 37**

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**F I L E D**
In Kanawha Circuit Court
Clerk's Office

OCT — ? 1983

*Phyllis Jean Cole*  CLERK

STATE OF WEST VIRGINIA,

        Plaintiff,

V.

JOHN MOSS, JR., a/k/a
JOHN MOSS, III,

        Defendant.

CR-82-F-221
(JUDGE HEY)

---

MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS
SAMPLES OF BLOOD, CONFESSION, AND OTHER
PHYSICAL EVIDENCE SEIZED FROM JOHN MOSS
BY EMPLOYEES OF THE STATE OF WEST VIRGINIA

---

McKITTRICK & MURRAY
P. O. Box 4088
St. Albans, West Virginia  25177

BY: _____
        PARRISH McKITTRICK

216

26

3

TABLE OF CONTENTS

Page

I.     NATURE OF PROCEEDINGS. . . . . . . . . . . . .1

II.    STATEMENT OF FACTS . . . . . . . . . . . . .4

III.   ASSIGNMENT OF ERRORS . . . . . . . . . . 13

IV.    ARGUMENT AND AUTHORITIES . . . . . . . . . 13

I.

## NATURE OF PROCEEDINGS

This Memorandum is submitted in support of the defendant's motion to suppress blood samples, the defendant's, John Moss, confession, and certain seized physical evidence due to a denial of defendant's state and federal constitutional rights.  In his Motion to Suppress Blood Samples, the defendant alleges that the samples of defendant's blood taken from John Moss and placed into the custody of representatives, agents and/or employees of the West Virginia department of Public Safety were obtained in volation of defendant's constitutional rights; that the blood samples were obtained at a point in time when the homicide investigation had not become accusatory so that the defendant herein was not a suspect in the homicides of the Reggettz family; that the blood samples were a product of coercion; that the blood samples were obtained while the defendant was still within the juvenile jurisdiction of the Court; that the blood samples were obtained without the presence of counsel or a responsible adult being present; that the samples of blood were obtained in violation of defendant's due process and fourth amendment rights; that the blood samples were obtained before there was probable cause to believe the defendant had committed the homicides of the Reggettz family; and that the blood samples were obtained without proper notice of same having been given to defendant's parents.

-2-

Because of the matters alleged, the facts to be elicited, and the applicable law, defendant calls upon this Court to suppress the samples of blood taken from the defendant and placed into the possession of employees of the West Virginia Department of Public Safety for purposes of testing.

This Memorandum is also submitted in support of the Motion to Suppress Confession filed on behalf of the defendant. Defendant, John Moss, submits that the alleged confessions of defendant at issue was obtained in violation of defendant's constitutional rights. For the reasons to be set forth herein, defendant submits to this Honorable Court that the alleged confession of John Moss was obtained from him contrary to certain procedural and due process of law rights to which defendant is entitled. Furthermore, the confession, certain physical evidence secured by the State of West Virginia, i.e., flatware, statements of William and Arbutus Johnson, a Kodak camera, and statements by John, Carlton, and Marzee Moss are "fruits" of the illegally obtained blood and confessions and should be excluded from the evidence in the instant case.

More specifically, defendant asserts that he was returned to the State of West Virginia from Ohio under Article IV of the Interstate Agreement on Detainers for purposes of trial. Prior to this return from the State of Ohio, defendant was not afforded his right to a pre-transfer hearing at which he would have been afforded counsel at his request. The failure of the Government to accord the defendant a pre-trial hearing was one in a series of violations of

-3-

the defendant's Constitutional rights which render the defendant's alleged confession inadmissible.

Since defendant's alleged confession was obtained in violation of this significant constitutional right, and in violation of other constitutional rights to which he is entitled, defendant's alleged confession was obtained neither legally, voluntarily, intelligently, or knowingly.  Therefore, defendant moves this Court for an Order declaring the defendant's alleged confession to be inadmissible.

II.

STATEMENT OF FACTS

On the 13th day of December, 1979, Bernadette Reggettz, Vanessa Reggettz, and Paul Eric Reggettz were found dead in their home on Chesapeake Avenue in St. Albans, Kanawha County, West Virginia.  A short time thereafter, in response to police interrogation, Paul Reggettz, the husband and father, confessed to the homicides of his wife and two children.  A short time after his confession, Paul Reggettz went with state police back to his home and re-enacted in detail for the benefit of police how he committed the homicides.

Subsequently, Paul Reggettz was indicted by the January, 1980, Kanawha County, West Virginia, Grand Jury for the homicides of his wife and two children.  Counsels for Paul Reggettz filed a Motion to Suppress the Reggettz confession, and hearings were held

-4-

on October 20, 1980; October 21, 1980; October 22, 1980; and October 28, 1980.  During the last hearing on October 28, 1980, before the Circuit Court of Kanawha County, West Virginia, the Honorable John Hey ruled the Reggettz confessions to be admissible into evidence as being voluntarily given.  The case was then scheduled for trial on November 12, 1980.  During this time, Paul Reggettz spent approximately eleven months in jail awaiting his trial.

On or about January 30, 1980, Troopers Terry Williams and Mike Smith of the West Virginia Department of Public Safety went to the Cleveland, Ohio, police in order to take a blood sample from defendant, who, at that time, was in police custody, represented by counsel, and awaiting trial on Ohio criminal charges.  The purpose in obtaining this blood sample was to ascertain if John Moss's blood was consistent and comparable to a blood type found at the scene of the Reggettz homicides.  At this time, West Virginia authorities clearly knew of the presence and whereabouts of John Moss.  On this occasion, Troopers Smith and Williams questioned John Moss about the Reggettz murders.  John Moss denied committing the murders or knowing who had.  Thereafter, Troopers Smith and Williams obtained a sample of John Moss's blood.  Shortly thereafter, defendant's Court appointed lawyer appeared before an Ohio court concerning the extraction of the blood from John Moss, and the Ohio Court ordered the sample returned.

The testimony of police officers in previous hearings and the suppression hearing held in this matter clearly reflects that on

January 30, 1980, there was a complete absence of reasonable grounds to believe John Moss committed the Reggettz murders thereby excluding John Moss as a suspect in the slayings until after his blood was tested from the samples of blood eventually obtained on April 22, 1980.  Furthermore, during this initial interview when John Moss's blood sample was taken, the defendant's attorney was not present nor was a responsible adult, such as either of John Moss's parents, actually present.  At this time, there was not probable cause to believe John Moss had committed the homicides of the Reggettz family.

Troopers Terry Williams and Mike Smith and Assistant Prosecuting Attorney, Chuck Pettry, again returned to Ohio on April 22, 1980, in order to obtain another sample of John Moss's blood. On this occasion, a court order had been obtained from an Ohio judge allowing the State of Ohio and the West Virginia authorities to obtain a blood sample from defendant.  On April 22, 1980, John Moss was incarcerated in the Ohio penal institution located at Mansfield, Ohio.  The blood sample was obtained from John Moss at the penitentiary on April 22, 1980, and turned over to Trooper Williams of the West Virginia Department of Public Safety.  The blood sample was taken from John Moss on April 22, 1980, and returned to West Virginia State Police Laboratory for testing the same day.  Blood Technician Sergeant Robert Murphy started testing John Moss's blood on April 23rd, and concluded April 26, 1980, concluding the sample

taken from John Moss was consistent with blood found at the murder scene.

As noted above, the State of West Virginia presented evidence against Paul Reggettz to a January, 1980, Grand Jury. Trooper Terry Williams appeared on behalf of West Virginia before the Grand Jury on January 15, 1980.  Sergeant Robert Murphy appeared on behalf of West Virginia before the Grand Jury on April 28, 1980. Sergeant Murphy's testimony in the suppression hearing which was confirmed by the January, 1980, Grand Jury minutes indicated he testified against John Moss testifying that blood found at the Reggettz murder scene was consistent with that of John Moss.  The Kanawha County Grand Jury indicted Paul Reggettz on April 29, 1980. John Moss's name was stated in the indictment as participating in the murders but not as being formally indicted.

At the time that the defendant's second blood sample was taken and returned to West Virginia, there was not an attorney present representing John Moss nor was there a responsible adult present, such as the defendant's parents nor was John Moss's Ohio attorney or parents ever contacted for such purpose.  Furthermore, since the troopers testified that John Moss was not a suspect in the homicides of the Reggettz family until after his blood was tested, there was not probable cause to believe that the defendant had committed the slayings of the Reggettz family.  The second blood sample was obtained under the auspices of an Ohio court order without the consent of John Moss.  Assistant Prosecuting Attorney



for Kanawha County, West Virginia, Chuck Pettry, who accompanied Troopers Williams and Smith to take the blood sample indicated in his suppression hearing testimony that there was no need for John Moss's consent because the procedure for obtaining John Moss's blood was not a search and seizure under the fourth amendment to the United States Constitution. As this Court is also aware, the defendant heren was returned from the State of Ohio and dealt with in the juvenile jurisdiction of this Court before being transferred to the criminal jurisdiction of this Court for purposes of trial. Therefore, due to the age of John Moss at the time of the homicides of the Reggettz family, John Moss was still a juvenile under the laws of the State of West Virginia on April 22, 1980.

On October 28, 1980, Troopers Terry Williams and Michael Don Smith of the West Virginia Department of Public Safety went to Mansfield, Ohio, in order to return John Moss to West Virginia on a malicious wounding charge stemming from an incident at the Moose Lodge in St. Albans, West Virginia, pursuant to Article IV of the Interstate Agreement on Detainers. (W.Va. Code 62-14-1). Prior to the trip to West Virginia, defendant was not fully advised of the reason he was to return to West Virginia nor was he afforded his right to a pre-transfer hearing when an attorney would have been appointed for him. It was during the trip from Ohio to West Virginia that defendant herein allegedly confessed to the homicides of the Reggettz family. The troopers left Mansfield, Ohio, with John Moss at approximately 2:00 p.m. Shortly thereafter, Trooper

Smith started to question John Moss about the Reggettz murders. John Moss again denied he murdered the Reggettz family and denied he knew who had. Trooper Smith insisted on questioning the defendant. John Moss advised Trooper Smith he wanted his lawyer and would talk to Smith in his lawyer's presence. The defendant told Trooper Smith who his lawyer was and showed Smith a bible with his lawyer's name, home and office phone number on it. Trooper Smith refused to cease questioning and in fact started to interrogate and physically abuse John Moss in an attempt to get John Moss to confess. After approximately three and a half hours of mental intimidation and physical abuse by Trooper Smith, John Moss indicated a willingness to talk.

After John Moss gave his alleged confession, he was brought to the Kanawha County jail and then was sent back to the Reformatory at Mansfield without being tried on the malicious wounding charge. To date, the malicious wounding charge has not been dismissed, and is barred under the detainer statute, not only by the loss of jurisdiction because John Moss was returned to Ohio after October 28, 1980, but before he was tried on the malicious wounding detainer but also by the expiration of 120 days in which the detainer statute requires the State of West Virginia to try John Moss for the malicious wounding.

Troopers Williams and Smith traveled to the home of John Moss in Cleveland, Ohio while John Moss was being returned to Charleston, West Virginia. In Cleveland, pursuant to the taking of

John Moss's confession, Troopers Williams and Smith obtained a search warrant that ultimately led to the recovery of a Kodak "Handle" camera which John Moss confessed taking from the Reggettz house on the night of December 13, 1979, after the defendant allegedly murdered the Reggettz family.  While in Cleveland, the troopers also secured written statements from John, Carlton, and Marzee Moss concerning the camera and rifle.

On November 5, 1980, the Prosecuting Attorney of Kanawha County, West Virginia, requested temporary custody of John Moss, pursuant to the Interstate Agreement on Detainers for the prosecution of the Reggettz homicides.  The request for temporary custody was received at the Ohio State Reformatory and was then forwarded to the Governor of Ohio.  John Moss was formally incarcerated in the Kanawha County jail for the Reggettz homicides on December 17, 1980.

All of the foregoing transpired while Paul Reggettz remained indicted for the homicides of his wife and two children and while defendant herein was named in the body of the Reggettz indictment.  All of the foregoing also transpired while John Moss was regarded as a juvenile under the laws of the State of West Virginia.

On the 12th day of January, 1981, a preliminary hearing in the case of John Moss was held before Edgar L. Moss, Juvenile Referee for Kanawha County, West Virginia, for events charged in Juvenile Petitions 80-775, 80-776, and 80-777, which alleged murder



charges for the homicides of Bernadette Reggettz, Vanessa Reggettz, and Paul Eric Reggettz on the 13th day of December, 1979, in Kanawha County, West Virginia.   After the presentation of evidence, the Juvenile Referee found probable cause to believe the homicides were committed and probable cause to believe John Moss committed the homicides.

On the 20th day of January, 1981, the Prosecuting Attorney of Kanawha County, West Virginia, presented to the Court a written Motion to transfer John Moss from the juvenile jurisdiction of such Court to a criminal proceeding.   The first such transfer hearing was held on June 29, 1981, at which time this Court took the issue of transfer under advisement after hearing the evidence presented by the State and counsel for John Moss.   Thereafter, the State presented a Motion to Re-Open the Transfer Hearing, and during a hearing on this Motion held on August 6, 1981, this Court heard and considered evidence in the form of a recorded confession allegedly given by defendant herein.   The Court ruled from the Bench, issuing Findings of Fact and Conclusions of Law transferring John Moss to the criminal adult jurisdiction of this Court.   The Order of transfer was entered on the 11th day of August, 1981.

On the 13th day of August, 1981, the Prosecuting Attorney of Kanawha County, West Virginia, presented the case of John Moss to a Kanawha County Grand Jury which resulted in first degree murder indictments against John Moss for the charges alleged.   After briefing and oral argument on defendant's petition for appeal before



the West Virginia Supreme Court of Appeals, the defendant's transfer was reversed and remanded to this Court.  IN THE INTEREST OF JOHN MOSS, No. 15490 (July 15, 1982).

Prior to the transfer hearing held on September 24, 1982, the State neither scheduled another preliminary hearing nor did it file a written Motion for Transfer.  The transfer hearing proceeded as scheduled on September 24, 1982, continued through Saturday, September 25, 1982, and concluded at about 9:00 P.M. on Monday, September 27, 1982.

During the hearing, the State presented its evidence against John Moss in the form of the alleged confession.  The only evidence the State presented was the alleged confession of John Moss.  The state's witnesses admitted that at the time of their testimony the State had not one piece of physical evidence implicating John Moss in the murders.  As the transcript points out, Paul Reggettz appeared at the hearing and admitted making at least four confessions in December of 1979, after the homicides of his family, wherein he implicated himself in the murders of his wife and two children.  furthermore, the Court below took judicial notice that at a prior hearing, the alleged confessions of Paul Reggettz were determined by the same Judge to have been voluntarily given.  Moss Transcript of Proceedings, pp. 488-499.  This Court then ordered John Moss to be transferred to the criminal jurisdiction of this Court, and in so doing, issued Findings of Fact and Conclusions



of Law.  On September 28, 1982, Judge Hey signed the Order of
Transfer

On September 30, 1982, the Office of the Prosecuting
Attorney of Kanawha County, James E. Roark, presented the case of
John Moss to a Kanawha County Grand Jury which resulted in
indictments being returned by the said Grand Jury against John Moss
for the charges alleged.  On October 1, 1982, John Moss and his
counsels appeared before Judge Hey to set a trial date.

Thereafter, the West Virginia Supreme Court of Appeals
affirmed the transfer of defendant herein to the criminal
jurisdiction of this Court.


III.

ASSIGNMENT OF ERRORS

SHOULD THE SAMPLES OF BLOOD OBTAINED FROM
JOHN MOSS BE SUPPRESSED AS HAVING BEEN OBTAINED
IN VIOLATION OF FEDERAL AND STATE CONSTITUTIONAL
RIGHTS AND FUNDAMENTAL RIGHTS AS GUARANTEED
DEFENDANT HEREIN?


IV.

ARGUMENT AND AUTHORITIES

The samples of blood obtained from defendant, John Moss,
were derived from him on two (2) separate trips, one of which was to
Cleveland, Ohio, and the other to the Ohio State Penitentiary at
Mansfield, Ohio.  On the first occasion, the police did not have a
court order, but on the second occasion, such a court order was

-13-



obtained.  On neither occasion was counsel present with defendant,
and it was only after the blood sample was obtained that John Moss
became a suspect in the homicides of the Reggettz family.   In
essence, the results of the blood tests provided the authorities in
West Virginia with the probable cause evidence which they had
previously lacked.  Also, Troopers Williams' and Smith's discussions
with John Moss on January 30, 1980, created new investigative leads
which they pursued upon their return to West Virginia.   Thereafter,
these troopers obtained physical evidence and testimonial evidence
from Arbutus and William Johnson in the form of silverware which,
the State of West Virginia has represented to this Honorable Court,
will be used on a trial on the merits concerning the innocence or
guilt of John Moss.

1.        Search and Seizure

          In the now-classic case of Schmerber v. California, 384
U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 903 (1966), the United States
Supreme Court ruled that the extraction of blood from Schmerber
under the circumstances of the case did not offend the sense of
justice relating to due process rights of which the Court had spoken
in Breithaupt v. Abram, 352 U.S. 432, 77 S. Ct. 408, 1 L. Ed. 2d 448
(1957) and Rochin v. State of California, 342 U.S. 165, 72 S. Ct.
205, 25 A.L.R. 2d 1396 (1952).  The defendant, Schmerber, was
involved in an automobile accident and had been taken to a hospital
for treatment.  At the direction of an officer and over the
objection of the defendant, a blood sample was taken which was
introduced in evidence at his trial.

230

However, the Court in Schmerber indicated that all compelled blood tests are seizures subject to the reasonableness requirement of the fourth amendment to the United States Constitution.  Justice Brennan, writing for the majority in Schmerber, at 767 U.S. and at 1834 S. Ct. clearly indicated its resolve in this regard;

> "[i]t could not be reasonably argued. . .that the administration of the blood test in this case was free of the constraints of the Fourth Amendment."

Since the holding in Schmerber the courts of this land have without debate concertedly held the Fourth Amendment rules on search and seizure should guide the courts when law enforcement seek blood from internal body cavities.  State v. Oevering, 268 N.W. 2d 68 (1978); State v. Smith, 557 S.W. 2d 299 (1977; People v. Williams, 557 P. 2d 399 (1976); Layland v. State, 535 P. 2d 1043 (1975); Mills v. State, 345 A. 2d 127 (1975).

In Schmerber, the Supreme Court held that the protection against unreasonable search and seizure which was binding on the states was satisfied because there was probable cause at the time to arrest and charge the petitioner and to suggest the required relevance and likely success of a test of petitioner's blood for alcohol, because the arresting officer might reasonable have believed he was confronted with an emergency, (exigent circumstance exception) in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence, and because the test chosen to measure Schmerber's blood-alcohol level was a reasonable one performed in a reasonable manner.

23

The Supreme Court of the United States based its holding on the fact there was probable cause at the time to believe the defendant was driving his vehicle while under the influence of alcohol due to the manner in which the arresting officer observed the defendant to be driving his vehicle upon the highways.  In other words, the government agent had sufficient evidence to believe that a crime was being committed.  Furthermore, due to the gradual diminishment of the level of alcohol in one's blood, there was reasonable cause to believe the necessary evidence would disappear quickly, thus presenting an emergency or exigent circumstance.  Therefore, no warrant needed to be obtained.

But what about the facts in the present case?  Officers testifying at all hearings held in this matter have consistently stated that the defendant became a suspect in the Reggettz homicides only after the blood sample was taken and tested.  Therefore, under the facts of the present case, John Moss was required to give the authorities probable cause evidence which effectively incriminated him before there was probable cause evidence to believe the defendant committed the homicides.

The evidence is clear there was a complete lack of probable cause on April 22, 1980, as reflected in the preliminary hearing cross-examination of Trooper Terry Williams

Page 94 Transcript:

Q - Now, when you went to Cleveland on January 30, 1980, for what reason did you need a blood sample?

-16-

A - To see if maybe he [John Moss] was involved in the
Reggettz case.

Pages 95 and 96 - Trooper Williams testified he knew John Moss was 17
years old, a juvenile, and incarcerated in Ohio on criminal
charges.

Page 111 - Trooper Williams testified "I also asked him if he killed
them or if he knew who killed them.  He denied that.  He
said he didn't know who killed them and I didn't kill them."
"And then I took a blood sample of him."

Pages 118 to 121 - Trooper Williams testified he had no testimonial
evidence which remotely indicated John Moss was a suspect
in the Reggettz murders.

Page 121 - Trooper Williams testified "that up to including the 21st
day of April, 1980, I had no physical evidence that would
make John Moss, III, a suspect in the Reggettz homicides."

Page 122 - Trooper Williams testified "the only reason for which I
went to Cleveland on the 22nd day of April, 1980, was to
obtain or secure a blood sample from John Moss, III."

Pages 122-123 - Trooper Williams testified that he still knew John
Moss was a juvenile but he didn't contact his parents.

Pages 129-130 - Trooper Williams testified blood sample taken from
John Moss was consistent to that found at Reggettz murder
scene.

Page 131 - Trooper Williams testified he received blood results from
laboratory shortly after April 22, 1980.

233

Pages 92-93

Page 131 -- Trooper Williams testified that when he received the blood
results from the laboratory on John Moss in April, 1980,
that John Moss then became a suspect in the Reggettz
murders.

Pages 132-133 - Trooper Williams testified that after he came to the
conclusion in April, 1980 (because of laboratory report on
John Moss's blood) that John Moss was a suspect that he,
Trooper Williams, talked to and took a statement from
William Johnson who indicated that John Moss had given
Arbutus Johnson flatware and that John Moss had in the past
indicated a desire to burglarize the Reggettz home.

Page 134 - Trooper Williams testified "so then when I traveled to
Mansfield, Ohio, on the 28th day of October, 1980, the only
incriminating evidence that I had in hand suggesting John
Moss was a suspect in the Reggettz homicides were:

> (1) blood found at the scene of the homicides con-
> sistent with John Moss's blood;
>
> (2) statement by William Johnson indicating John Moss
> had given his mother flatware; and
>
> (3) that John Moss had indicated to Johnson he was
> thinking about burglarizing the Reggettz home.

Even at that time, the flatware could not have been evidence against
John Moss constituting probable cause because Trooper Williams

-18-

234

testified at Pages 83 and 453 of the second transfer hearing transcripts that he didn't know if the flatware came from Reggettz home and that no one had identified it as coming out of the Reggettz home.

Further, even though an Ohio court order directed John Moss to give blood it is undebatable that Trooper Smith's and Prosecuting Attorney Mike Roark's affidavit appended to the petition for the Ohio court order does not state probable cause:  firstly, the affidavit is written in conclusory language contrary to State v. Stone's, 268 S.E. 2d 50 (1980) requirement that "to constitute probable cause for the issuance of a search warrant, the affiant must set forth facts indicating the existence of criminal activities which would justify a search"; secondly, Trooper Smith testified in the suppression hearing that blood was not an issue in the felonious shooting case at the Moose Club in St. Albans, West Virginia, thereby negating the felonious assault allegation in the affidavit; and thirdly, there are no other facts stated which even remotely constitute a factual foundation reflecting probable cause on April 22, 1980, as every investigating officer who has testified has already conceded.

Trooper Smith attempted but failed miserably in his suppression hearing testimony to state reasons for having probable cause to extract John Moss's blood on the 22nd day of April, 1980. Trooper Smith stated three reasons to believe there was reasonable grounds to believe John Moss committed the Reggettz homicides:

-19-

235

(1)   John Moss lived in close proximity to the Reggettz home;

(2)   Trooper Smith had a newspaper article that indicated John Moss had used a 25 caliber revolver in a crime in Ohio and that a 25 caliber revolver was used in the Moose Club shooting;

(3)   John Moss indicated to a friend he desired to burglarize the Reggettz home

At the same, time Trooper Smith testified he had knowledge of 1 and 2 above before the 30th day of January, 1980, when he attempted to unlawfully extract blood from John Moss.  More importantly, Trooper Smith testified that on the 30th day of January, 1980, he did not have reasonable grounds to believe John Moss committed the Reggettz murders.  All evidence indicates no facts were added to the state police investigation which would enhance probable cause between January 30 and April 22, 1980, when the second blood was taken from John Moss.

Consent is not an issue in the taking of John Moss's blood on April 22, 1980, because assistant Prosecuting Attorney, Chuck Pettry, who accompanied the troopers to Ohio to extract the blood, testified in the suppression hearing that he did not attempt to secure John Moss's consent because he, Pettry, did not consider the taking of John Moss's blood a search and seizure under the fourth amendment to the United States Constitution.

John Moss submits the lack of probable cause was in violation of the defendant's rights and therefore clearly distinguishes this case from the application of Schmerber.

In the case of Rochin v. State of California, supra, police officers, having information that the defendant was selling narcotics, illegally entered his dwelling whereupon Rochin swollowed two capsules containing morphine, despite the attempts of the officers to extract the capsules by force.  Rochin was handcuffed and taken to a hospital, where, at the direction of one of the officers, a doctor forced an emetic solution through a tube against Rochin's will into his stomach.  Primarily upon the evidence of the capsules so obtained, Rochin was convicted of the illegal possession of morphine.

The Supreme Court began its analysis by stating that due process of law precludes convictions brought about by methods which offend "a sense of justice."  "It would be a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order to convict a man the police cannot extract by force what is in his mind but can extract what is in his stomach."  Rochin v. California, 25 A.L.R. 2d at 1403. Coerced confessions are inadmissible under the due process of law clause as constitutionally obnoxious even though the statements contained in them may be independently established as true.  The Supreme Court held that on the facts of the case, the conviction of Rochin was obtained by methods which offended the due process clause.  Rochin v. California, 25 S.L.R. at 1404.

-21-



In essence, the Supreme Court was saying that the forced extraction of the capsules from the defendant's stomach resulted in a coerced confession not admissible into evidence against the accused.  The capsules which were forcibly taken from the defendant against his will without a warrant having been obtained to enter the accused's house provided the evidence which the police needed.  The recovery of the capsules of narcotics was self-incriminating as having come from the defendant himself, and was, in essence, an admission of involvement with narcotics.  Rochin v. California, supra.  On the facts of the present case, the facts parallel Rochin and its progeny in that West Virginia law enforcement officers cannot establish probable cause evidence from seizing John Moss's blood without pursuing a search warrant based on independently stated factual probable cause, State v. Stone, supra.  In Schmerber, there was probable cause evidence before the blood sample was taken and there was the danger that the blood-alcohol content would decrease while in the case of John Moss, there was no probable cause evidence until the blood sample was obtained and tested.  And in the present case, can we say that there was danger that the evidence would disappear?  Not likely!  In obtaining a sample of the defendant's blood under such forced circumstances (which strain of blood was consistent with that found at the scene of the homicides of the Reggettz family) , the blood sample resulted in incriminating

-22-



evidence prejudicial to the defendant, and for all intent and purposes, produced a confession of a circumstantial variety.

The United States Supreme Court has indicated where there is probable cause to believe one has committed a crime, scientific tests and intrusions of the body are constitutionally permissible. In Cupp v. Murphy, 412 U.S. 291, 93 S. Ct. 2000, 36 L. Ed. 2d 900 (1975), the Supreme Court held that when the defendant voluntarily appeared at the police station for questioning on the strangulation of his wife, the warrantless taking of scrapings from the defendant's fingers was permissible because of independent existing probable cause. In United States v. Smith, 470 F. 2d 377 (D.C. Cir. 1972), the Court held that following the defendant's arrest for assault with intent to rape, a warrantless benzidine test to determine the presence of blood on the penis was proper because the test was incident to an arrest. In United States v. Millen, 338 F. Supp. 747 (E.D. Wis. 1972), the Court held that after the defendant's arrest for a narcotics offense, a warrantless placing of his hands under a fluorescent light, incident to the arrest, to see if he had handled narcotics dusted with flourescent powder was proper. Probable cause must first exist because the guidelines and standards relating to search and seizure under the Fourth Amendment to the United States Constitution applies. The import of the three foregoing cases is that there was, at the time of the test, probable cause to believe the defendant had committed the offense for which the accused was in custody. A different result was reached as a

-23-

result of no probable cause under circumstances more akin to the facts of the present case in the case of <u>United States v. Allen</u>, 337 F. Supp. 1041 (E.D. Pa. 1972). In this case, the Court held that a search warrant was required for subjecting the defendants, not then in custody for the crime charged, the taking of a blood sample to determine blood type. It is submitted that a different result would have been reached in <u>Allen</u> if the defendant had been in custody and the government had had probable cause evidence. The facts of the <u>Allen</u> case are closer to those in the present case because John Moss was not, at the time of the blood sample, in custody for the Reggettz homicides nor was there probable cause until after the search and seizure was made to believe that he committed the homicides of the Reggettz family.

The touchstone of the Fourth Amendment is the protection of privacy, and to that end, it prohibits unreasonable invasions without a warrant. <u>United States v. Gerhart</u>, 275 F. Supp. 443 (S.D. W.Va. 1967). Facts are the proper basis upon which probable cause for the issuance of a search warrant is to be ascertained. <u>State v. Stone</u>, W.Va., <u>United States v. Gerhart</u>, 275 F. Supp. at 445. Citing the case of <u>Schmerber v. California</u>, supra, as authority, the Court in <u>People v. Superior Court of Kern County</u>, 493 P. 2d 1145, 1147 (Calif. 1972) stated that the Fourth Amendment to the United States Constitution does not bar a compulsory seizure, without a warrant, of a person's blood for the purposes of a blood alcohol test to determine intoxication, "provided the taking of the sample is done

-24-



in a medically approved manner, is incident to a lawful arrest, and is based upon the reasonable belief that the person is intoxicated."  In People v. Superior Court of Kern County, 493 P. 2d at 1147, the Court stated as follows:

> Contrary to the People's claim, Schmerber's approval of the compulsory seizure of blood is clearly founded on the premise that it is incident to a lawful arrest.

Defendant, John Moss, submits that his blood sample at issue herein was not taken incident to a lawful arrest nor, as admitted to by all officers previously in this case, was there a reasonable belief or probable cause to believe the defendant had committed the homicides of the Reggettz family.

In the heretofore cited case of United States v. Allen, supra, the Court stated as follows:

> . . . The opinion of the Court in Schmerber, supra, at 767-770, 86 S. Ct. 1826, 16 L. Ed. 2d 908 leads to the conclusion that blood, hair and other bodily components are objects to be seized only through the warrant process or one of the recognized exceptions thereto . . .  United States v. Allen, 337 F. Supp. at 1043.

In another statement, the Court in Allen had a statement not inapplicable to the present case:

> . . . Indeed the Government does not contend that it can properly take the samples and x-rays sua sponte, but has applied to this Court for an order.  The Government should have applied for a warrant under Rule 41. . .

Because the integrity of an individual's person is a cherished value of our society, an intrusion into an individual's body requires a clear indication that desired evidence will be found.  United States v. Summersfield, 421 F. 2d 685 (9th Cir. 1970).  This standard was

24

applied to rectal probes in <u>Rivas v. United States</u>, 368 F. 2d 703,
710 (9th Cir. 1966), cert. denied 386 U.S. 945, 87 S. Ct. 980, 17 L.
Ed. 2d 875 (1967).

With the exception of the situation or circumstances of
probable cause as set forth in <u>Schmerber</u>, bodily intrusions or
extractions are as protected as other areas of privacy so that a
search warrant rather than a court order is necessary.  At the time
of the court order that was obtained for permission to sample John
Moss' blood, West Virginia police did not have probable cause to
believe John Moss was involved in the Reggettz homicides.
Therefore, they could not have obtained a warrant.  Therefore, the
defendant submits the State violated John Moss' rights in obtaining
a sample of blood.


2.      <u>Fruits of an Illegal Search</u>

A. Flatware and statements of William and Arbutus Johnson.

Concerted court precedent indicates since John Moss's
rights were violated when a sample of his blood was obtained, the
blood sample and the results thereof should be excluded from
evidence in a trial on the merits of guilt.  Physical by-products of
illegally obtained statements are inadmissible during a trial of the
defendant as "poisonous fruit" of illegal statements.  <u>People v.
Superior Court for County of Santa Clara</u>, 83 Cal. Rptr. 771, 3 Cal.
App. 3d 476 (1970).  Such physical evidence is protected by the
Fourth Amendment.  Furthermore, the exclusionary sanction applies to



any fruits of a constitutional violation - whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention. United States v. Crews, 445 U.S. 463, 470 (1980). The exclusionary rule has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial. United States v. Caceres, 440 U.S. 741,754 (1979). Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal trial against the victim of the illegal search and seizure. The rule's prohibition applies to such direct evidence as well as to "fruit of the poisonous tree" - secondary evidence derived from the illegally seized evidence itseld. United States v. Houltin, 566 F. 2d 1027, 1030 (5th Cir.), cert. denied, 439 U.S. 826 (1978), Stone v. Stone, 268 S.E. 2d 50 (1980)..

There are a multiple number of cases which have held evidence which was the fruit of the poisonous tree to be inadmissible. Wong Sunc v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); Hale v. Henderson, 485 F. 2d 266 (6th Cir. 1973); Harrison v. United States, 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 1047 (1968); People v. Johnson, 70 Cal. 2d 541, 75 Cal. Rptr. 401, 450 P. 2d 865 (1969); Smith and Anderson v. United



243

States, 344 F. 2d 454 (D.C. Cir. 1965); <u>United States v. Bayer</u>, 331
U.S. 532, 67 S. Ct. 1394, 91 L. Ed. 1654 (1947); <u>Killough v. United
States</u>, 114 U.S. App. D.C. 305, 315 F. 2d 241 (1962).

Thus, it is not debated that on January 30, 1980, troopers
of the West Virginia Department of Public Safety violated John
Moss's rights by extracting a blood sample from him while he was
incarcerated in the State of Ohio.  More importantly, during the
unlawful meeting between Troopers Williams and Smith and John Moss,
certain incriminating information was secured which the State of
West Virginia now intends to use against John Moss at trial.  The
troopers discussed with John Moss the names of his friend.  John
Moss not realizing the intention of the officers provided the name
of William Johnson.  After leaving Ohio on January 30, 1980, the
troopers contacted William Johnson and took a written statement
which incriminated John Moss.

Also, Trooper Williams testified at Page 132-133 of the
preliminary hearing transcript, that after the April 22, 1980
meeting with John Moss where blood again was extracted without the
benefit of probable cause, that "we obtained [another] written
statement from William Johnson" who indicated firstly, that John
Moss had indicated he desired to burglarize the Reggettz home and
secondly, that John Moss had given Arbutus Johnson flatware that
came from the Reggettz home.  The trooper admits this statement was
not taken until after the blood laboratory results on John Moss were

-28-

disclosed and after the trooper came to the conclusion John Moss was a suspect.  Thereafter, written statements were taken from Arbutus Johnson concerning the flatware allegedly stolen from the Reggettz residence on the night of December 13, 1979.  The flatware was also secured from Arbutus Johnson by state police officers.

Decisions on this issue indicate that where an illegal search confrontation has provided the prosecution with the names and later testimony of witnesses it might not have otherwise acquired such are inadmissible as the fruits of an illegal search.

Second Circuit - United States v. Tawe (1964, CA 2 NY) 329 F2d 848.

United States v. Schipani (1968, DC NY) 289 F Supp 43.

Fifth Circuit - Williams v. United States (1967, CA5 Tex) 382 F2d 48.

Dist Col Circuit - United States v. Alston (1970, DC Dist Col) 311 F Supp 296 (noting that Supreme Court has not considered question).

Cal. - Lockridge v. Superior Court of Los Angeles County (1970) 3 Cal

3d 166, 474 P2d 683, 89 Cal Rpte 731.

Ind. - Pirtle v. State (1975, Ind) 323 NE2d 634

Or. - State v. Armstrong (1976) 24 Or App 785, 547 P2d 170 ("Inevitable Discovery" rule is available to permit testimony).

Pa. - Commonwealth v. Cephas (1972, Pa) 291 A2d 106.




Tex. – <u>Nicholas v. State</u> (1973, Tex Crim) 502 SW2d 169

Based upon the foregoing, the blood sample taken from defendant without probable cause constituted illegally obtained evidence which should be suppressed just as all fruits of the search and seizure, i.e., flatware, statements of William and Arbutus Johnson, should be.  As importantly, all "fruits" of the illegally seized blood sample, such as the confession must also be excluded from evidence by being suppressed.

B.  Confession.

If it had not been for the series of events, i.e., unlawful extraction of John Moss's blood on January 30, 1980, which resulted in statements being taken from William Johnson and Arbutus Johnson and which resulted in securing the flatware against John Moss, and the unlawful extraction of John Moss's blood on April 22, 1980, which resulted in a second statement from William Johnson and Arbutus Johnson, John Moss would not have even been a suspect in the murders of the Reggettz family thus negating the possibility of securing inculpatory statements from John Moss by Troopers Williams and Smith on October 28, 1980.

Pursuant to precedent above cited and set forth herein concerning "fruit of the poisonous tree", the confessions are a direct result of the illegal search and seizures of John Moss's blood carried out by representatives of the State of West Virginia on January 30, 1980, and April 22, 1980, and should be excludable from the evidence in the instant case.

-30-



3.     Juvenile Rights

Chapter 49, Article 5, Section 1 of the West Virginia Code

provides as follows:

> . . . If during a criminal proceeding against a person in
> any court, it shall be ascertained or shall appear that the
> person is under the age of nineteen years and was under the
> age of eighteen years at the time of the alleged offense,
> the matter shall be immediately certified to the juvenile
> jurisdiction of the circuit court, and the circuit court
> shall assume jurisdiction of the case in the same manner as
> cases originally instituted in the circuit court by
> petition . . .

The record of the proceedings held in this matter to date will show

that the defendant herein was under the age of eighteen years at the

time of the homicides of the Reggettz family, and upon his return

from the State of Ohio under the provisions of the Interstate

Agreement on Detainers (Code, 62-14-1, et.seq.), was dealt with

under the juvenile provisions of the Code, was accorded a

preliminary hearing, and was transferred to the adult criminal

jurisdiction of this Court for purposes of trial as an adult.   For

purposes of this proceeding, the defendant was a juvenile until

transferred to the adult section of this Court, pursuant to official

Order of this Court.

As defendant discussed at considerable length in the

preceeding section of this Memorandum, the blood sample which was

taken from defendant herein was incriminating due to the nature of

the strain of blood which John Moss was found to have and its

-31-

similarity to certain blood stains found at the scene of the homicides of the Reggettz family in the home at 7027 Chesapeake Avenue in St. Albans. For all intent and purposes, due to the rarity of the defendant's strain of blood, the results of the tests made on defendant's blood sample constituted a confession.

In this regard, it has been held that a juvenile is not capable of knowingly waiving his Fifth Amendment privilege against self-incrimination. State ex rel. J.M. v. Taylor, 276 S.E. 2d 199 (W.Va. 1981). Instead of knowingly being able to waive his Fifth Amendment privilege against self-incrimination, the juvenile must always have an attorney or a responsible adult present when he is being interrogated by government officials. Since a juvenile cannot knowingly waive his right against self-incrimination, the juvenile must be advised by an attorney or have a responsible adult present, such as a parent, before he can knowingly and intelligently waive his Fifth Amendment right against self-incrimination. State ex rel. J.M. v. Taylor, supra.

In the present case, John Moss was not permitted his right to have an attorney present either at or before the sample of his blood was taken, nor was he accorded his right to have a responsible adult present. In addition, his parents were not given any notice of the blood sample being taken. In no manner or particular was John Moss allowed the rights to which he was entitled under State ex rel. J.M. v. Taylor, supra.

-32-



A waiver of constitutional rights can only be in situations where it is clear that the accused has full knowledge of all facts and of his rights and a full appreciation of the effects of his voluntary relinquishment. Holland v. Boles, 225 F. Supp. 863 (N.D. W.Va. 1963). By declaration and conduct, an accused may waive a fundamental right protected by the Constitution, but it must be demonstrated that the waiver was made knowingly and intelligently. State v. Eden, 256 S.E. 2d 868, 873 (W.Va. 1979). A more objective and workable standard invalidates juvenile waivers not secured with counsel, guardian, parent, or interested adult present. State ex rel. J.M. v. Taylor, 276 S.E. 2d at 202. It is regarded that an interested and friendly adult is supposed to protect an infant from governmental pressure and coercion and to allow someone capable of understanding the nature and consequences of the waiver to help in the decision and to protect the child from inaccurate accounts of his statements at proceedings in which waiver is made.

Some states have legislatively mandated that an adult be present when a juvenile waives. Colo. Rev. Stat. Ann. Sec. 19-2-102(3)(c)(I); Okl. Stat. Ann tit. 10 Sec. 1109(a)(Supp. 1975-76); Texas Family Code, Sec. 5610 (1973). Furthermore, the West Virginia Code prevents interrogation of juveniles without the presence of a parent or counsel. Code, 49-5-8(d). Therefore, our own Code reflects a legislative judgment that a juvenile is not capable of knowingly waiving his Fifth Amendment privilege against self-incrimination. No juvenile legal status is treated the same as



-33-

that of an adult.  See, <u>Code</u>, 56-4-10; <u>Code</u>, 56-4-9; <u>Code</u> 54-2-4;
<u>Code</u>, 41-5-5; <u>Code</u>, 37-1-3; <u>Code</u>, 37-1-4; <u>Code</u>, 37-1-12; <u>Code</u>
36-2-5; <u>Code</u>, 57-4-7; <u>Code</u>, 39-3-7; <u>Code</u>, 49-6-2.  Consequently, in
<u>State ex rel. J.M. v. Taylor</u>, our State's High Court held that a
juvenile may waive his right to counsel, but only upon the advice of
counsel because only then can there be a knowing waiver.  <u>State ex</u>
<u>rel. J.M. v. Taylor</u>, 276 S.E. 2d at 204.

Because of the nature of the events and circumstances, the
taking of the blood sample from John Moss constituted a
communicative contact between the defendant while he was still
technically within the juvenile jurisdiction of this Court and had
all of the appearances of a situation impacted with duress and
coercion by governmental agents against the defendant, John Moss.
It was a situation wherein the defendant's rights as set forth in
<u>State ex rel. J.M. v. Taylor</u> should have been applicable, but were
not.  In the absence of such constitutional rights, the results of
the blood samples should be suppressed and declared inadmissible.

4.    <u>Denial of Due Process Rights</u>

It is submitted at the outset that to have required the
defendant herein to submit to the withdrawal of his blood for
testing against his will and without his consent and over his
objection is violative of his Fifth Amendment privilege against
self-incrimination, and further, is a denial of his right to due
process of law as being fundamentally unfair.



Most of the case law involving the compulsory extraction of blood and the use of the results of blood testing therefrom has been in regard to driving under the influence of intoxicants and related motor vehicle crime, as well as in bastardy proceedings. Even the aforementioned classic case of Schmerber v. United States, 384 U.S. 757, 86 S. Ct. 1826, 15 L. Ed. 908 (1966) involved the implied consent to submit to blood sample testing by an operator of a motor vehicle in the State of California. In Schmerber, the United States Supreme Court ruled that the accused's privilege against self-incrimination had not been violated, reasoning that since the blood test evidence, although an incriminating product of compulsion, was neither the petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner. Therefore, it was not inadmissible on privilege grounds. This is the position which has been followed in cases involving driving under the influence and implied consent matters. Wharton's Criminal Evidence, 13th Ed.; Examinations, Tests, and Real Evidence, Sections 624 and 631; Kemp v. Canal Zone, 167 F. 2d 938 (5th Cir.). No West Virginia authorities on point have been found in this regard.

It is well to set forth that the only United States Supreme Court case dealing with the issue of compelling the defendant to submit to testing of his own blood and later ruling admissible the results therefrom involve the particular and peculiar set of circumstances of an operator of a motor vehicle charged with the offense of driving under the influence of intoxicants. Because the

"implied consent" statute was at issue in Schmerber, the defendant could reasonably expect and anticipate that the alcoholic content of his blood was directly (underlined for emphasis) in issue.

In the present case, the blood alcohol content of the defendant is not directly an issue. The results of any testing of blood taken from the defendant against his will, without his consent, and over his objection upon the invocation of his privilege against self-incrimination can only be used collaterally to confirm or corroborate the compatibility of the defendant's blood type with the blood type of blood smears found at the residence where the alleged homicides occurred. Such evidence is merely circumstantial at best. The defendant should not be required to submit to a process involving the intrusive violation of his very person against his will, without his consent, over his objection, and after his assertion of his privilege against self-incrimination when there is no reasonable causal relationship of the test sought to be administered on the body of the defendant and the crime in question.

In two (2) cases involving the offense of driving under the influence and one (1) case in which the results of a polygraph test was held inadmissible, the West Virginia Supreme Court of Appeals has commented on Schmerber.

In Jordan v. Roberts, 246 S.E. 2d 259 (W.Va. 1978), the Supreme Court of Appeals was concerned with the administrative proceeding for the suspension of a driver's license under the implied consent law and upheld the suspension. The Supreme Court of

-36-



Appeals upheld the suspension.  The Supreme Court of Appeals held
that the West Virginia implied consent statute, unlike some such
statutes as in Schmerber, precludes the forcible administration of
the blood test against the will of the driver.  Code, 17C-5-A-3;
Schmerber, supra.  In Jordan, the Court rejected the defendant's
contention that his constitutional privilege against compulsory
self-incrimination was violated on the grounds that Jordan involved
an administrative issue on the charge of license suspension and not
the criminal issue on a charge of driving under the influence.

In State v. Adams, 247 S.E. 2d 475 (W.Va. 1978), the Court
held, inter alia, that a criminal defendant's refusal to take tests
to determine his state of intoxication pursuant to the implied
consent statute could not be commented upon or introduced into
evidence by the State.  In Adams, the Court noted that Schmerber did
not reach the question of the admissibility of the defendant's
useless protest against the test because the evidence thereof was
not objected to at his trial.  In Adams, the Court further cited
Schmerber's holding:

> . . . that the privilege (against incriminating one's self)
> protects an accused only from being compelled to testify
> against himself, or otherwise provide the State with
> evidence of a testimonial or communicative nature,
> (Footnote omitted) and that the withdrawal of blood and use
> of the analysis in question in this case did not involve
> compulsion to these ends.  Schmerber, 384 U.S. at 761, 86
> S. Ct. at 1830.

The Court further cited Schmerber's holding:

> . . . since the blood test evidence although an
> incriminating product of compulsion, was neither

-37-

253

petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not admissible on privilege grounds. Schmerber, 384 U.S. at 765, 86 S. Ct. at 1833.

In Adams, our State's High Court stated the following:

> Schmerber differs from our case in that the California law does not expressly provide the right to refuse these (blood) tests as does ours; and blood tests are expressly exempt from refusal consequences here. We commend our legislature's wisdom, exempting blood tests from the license suspension penalty of the implied Consent Law, having grave doubts about Schmerber's correctness on the point that blood taken from a person and used against him, does not violate his Fifth and Fourteenth Amendment rights when it is taken without his consent. State v. Adams, 247 S.E. 2d 475, 476 and 477, Footnote 4.

To order and sanction the extraction of blood from the defendant against his will, without his consent, over his objection and subsequent to his invocation of his privilege against self-incrimination for the purpose of using and admitting into evidence the results of such blood tests against the defendant on the grounds that such tests are not "communication" or "testimony" of the defendant is a perverted ruse and is contrary to the reality that but for the results of defendant's blood taken from him as an act of compulsion of his express desire to invoke his constitutional privilege against self-incrimination, this defendant may not be convicted.

It is submitted there is little real difference between the Court authorizing the State to obtain evidence against the defendant by compelling the accused against his will, without his consent, over his objection and contrary to the advice of his counsel to an

254

intrusion into his own body and the extraction of his own blood, the tests thereof to be used against the accused at trial, and allowing an official of the State to "twist an accused's arm" or to subject him to other means of physical coercion and compulsion for the purpose of extracting a verbal statement from him which may or may not implicate him in a crime or may or may not serve to identify his presence at the scene of the crime. In neither case would this defendant have consented to such an act of force or compulsion. In neither case would counsel for this defendant have advised him to consent to the same.

If this extraction from the defendant and the use of the results of such tests at trial against him is some communication or testimony from inside the person of the defendant, contrary to Schmerber, then the defendant is entitled to the constitutionally afforded privilege against self-incrimination if he desires that no such communication from him be given to state officials for use against him. See, State v. Adams, supra. If in fact the extraction of the defendant's blood for the purpose of using the results of such tests of the defendant's blood taken involuntarily, without his consent, and over his objection must then be inadmissible hearsay, which if desired to be used by the State can only be prejudicial to the defendant, and hence, reversible error.

In State v. Frazier, supra, the West Virginia Supreme Court of Appeals held inadmissible the results of a polygraph examination despite pretrial stipulations as to their admissibility by the

-39-



State, and counsel for the defendant cited Schmerber as implying that the Miranda warnings may apply to the defendant's taking a polygraph test and that the privilege against self-incrimination might also be claimed because of the testimonial nature of the polygraph test:

> To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment. State v. Frazier, 252 S.E. 2d at 49, Footnote 14.

5.     Lack of Authority

With the exception of specific statutes and rules authorizing the Court to order physical and mental examinations of the defendant, such as in determining the competency of the defendant to stand trial, or as an aid to the Court in sentencing or in carrying out a sentencing of a convicted criminal defendant, or when the defendant by an affirmative defense has put his own state of mind at the time of the commission of the alleged crime in direct issue, this writer can find no specific statutory authority or general statutory authority which would authorize the Court to sanction or compel the defendant to have complied with the State's order to require him to submit to the extraction of his blood for use against him in a criminal proceeding. It it true that there are other areas of the law wherein out legislature has specifically established the guidelines, standards, and status of the administration and use of blood tests, such as in bastardy




proceedings and in a prenatal examination serologic test, as well as the implied consent chemical blood test for intoxication pursuant to the operation of a motor vehicle in the State of West Virginia.  In a case involving the offense of driving under the influence of intoxicants, as we have ascertained, the accused does have the right to refuse to take such a blood test, and he may not be compelled to do so.  Code, 17C-5-1, et.seq.  The West Virginia Rules of Civil Procedure authorize mental and physical examinations, but the Rules do not address themselves to the admissibility of such tests in a criminal proceeding.

To allow the State to use the results of the tests performed upon the blood samples taken from the defendant who was required and compelled to submit to the extraction of his own blood for purposes of using the same against him at trial and which would materially assist the State in obtaining evidence to be used against the defendant in a criminal trial could only constitute prejudicial and reversible error to this Court.  Furthermore, if this Court were to allow to be admitted into evidence in a trial of this matter the results of the tests performed on the blood samples taken from the defendant pursuant to the order of the Ohio court would, in essence, mean that the defendant's conviction would be enhanced by evidence which was obtained through the assistance of a Court.  It is not the function of a Court to assist the State in the preparation of its case.  If this Court were to rule such blood test results admissible, this Court would also be assisting the State in

obtaining for use the evidence the State needs in proving its case against the defendant.  To allow the State to use the test results on his own blood against the defendant in a criminal trail which was taken against his will and without his consent would be a fundamentally unfair violation of the defendant's right of due process and right of privacy as guaranteed by both Federal and State Constitutions.

There is authority for the proposition that although the taking of defendant's hair samples and blood samples would not violate the Fifth Amendmant privilege against self-incrimination and would not violate due process or constitute unreasonable search and seizure if the Government obtained the blood samples through lawful procedures, the Government must make the showing of probable cause before a magistrate rather than requesting the Court's permission to obtain samples.  <u>United States v. Allen</u>, 337 F. Supp. 1041 (D.C. Pa. 1972).

Although the blood samples taken from the defendant were taken after an order was obtained from an Ohio court, the tests on the defendant's blood samples must be admissible under West Virginia law, and there is no express authority for the admission of such tests or analyses into evidence before a West Virginia Court. Instead, a determination of probable cause seems more reasonable before such blood samples can be obtained, and yet the police officers did not have probable cause against the defendant until after the blood samples were obtained.  The blood samples taken



against his will and without his consent give the State the probable cause evidence it needed.  In other words, the probable cause evidence against the defendant was obtained in violation of the defendant's fifth amendment rights.

For the foregoing reasons, either individually or in combination, the defendant herein moves this Court to suppress the results of the tests performed upon the samples of blood taken from the defendant.  The taking of the defendant's blood constituted a communication from inside the defendant's body much like a verbal confession, and as such is protected by the fifth amendment to the United States Constitution. The extraction of the blood itself is protected by the protection against unlawful search and seizures forbidden by the fourth amendment to the United States Constitution as applicable to the States through the fourteenth amendment.  To permit such tests or analyses to come into evidence in a trial of this matter would constitute reversible and prejudicial error.  As importantly, all "fruits" of the blood sample, i.e., the statements of William and Arbutus Johnson, the flatware obtained from Arbutus Johnson and the confession later obtained from John Moss on October 28, 1980, must be excluded from the evidence.

III.

ISSUES

A.    IS THE ALLEGED CONFESSION OF JOHN MOSS ADMISSIBLE

INTO EVIDENCE AS HAVING BEEN OBTAINED LEGALLY,

VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY, AND

WITH DUE REGARD FOR THE DEFENDANT'S CONSTITUTIONAL

RIGHTS?

The alleged confession of defendant herein should be ruled inadmissible and not admitted into evidence in any trial of this matter since it was obtained from defendant illegally, involuntarily, and unintelligently when his will had been overborne without the presence of counsel and was the product of an illegal detainment after defendant had been denied his right to a pre-transfer hearing and because the confession was obtained while defendant was being returned to West Virginia on a detainer for an unrelated charge over which the State of West Virginia lost jurisdiction and before the State had probable cause to believe John Moss committed the homicides.  There was no independent act to break the chain of events and rid the defendant's confession of its primary taint, thereby rendering defendant's confession as the fruit of the poisonous tree, and therefore, inadmissible into evidence.

IV.

ARGUMENT AND AUTHORITIES

A.   IS THE ALLEGED CONFESSION OF JOHN MOSS ADMISSIBLE

INTO EVIDENCE AS HAVING BEEN OBTAINED LEGALLY,

VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY, AND

WITH DUE REGARD FOR THE DEFENDANT'S

CONSTITUTIONAL RIGHTS?

1.   Pre-Transfer Hearing

In May, 1977, a New Jersey prosecutor's office requested
custody of a Pennsylvania prisoner wanted for trial in New Jersey.
As in the case of defendant herein, the request for custody was
filed pursuant to Article IV of the Interstate Agreement on
Detainers Adams v. Cuyler, 101 S.Ct. 703 (1981).  In an effort to
prevent his transfer to the New Jersey authorities, the prisoner,
Adams, filed suit alleging that Pennsylvania correctional
authorities had violated his due process and equal protection rights
by failing to give him the pre-transfer hearing that would have been
available had the request for custody been pursuant to the
Extradition Act.  Adams v. Cuyler, 101 S.Ct. at 706.  The United
States District Court for the Eastern District of Pennsylvania
dismissed the prisoner's complaint for failure to state a claim upon
which relief could be granted.  Adams v. Cuyler, 441 F. Supp. 556
(E.D.Pa. 1977), vacated and remanded, 592 F. 2d 720 (3d Cir. 1979),
aff'd, 101 S.Ct. 703 (1981).

While the case was on appeal to the United States Court of Appeals for the Third Circuit, a Pennsylvania appellate court held in an unrelated case that state prisoners transferred pursuant to Article IV of the Detainer Agreement have no right to a pre-transfer hearing. Commonwealth ex rel. Coleman v. Cuyler, 261 Pa. Super. Ct. 274, 396 A. 2d 394 (1978). The Third Circuit, however, concluded that the Detainer Agreement is subject to federal, rather than state, construction and that it was not bound by the Pennsylvania court's decision. The Third Circuit held that as a matter of statutory construction, a prisoner has a right to a pre-transfer hearing. Adams v. Cuyler, 592 F. 2d 720 (3d Cir. 1979), aff'd, 101 S.Ct. 703 (1981). The Third Circuit concluded that the Detainer Agreement preserves those rights granted to inmates under the Extradition Act; therefore, because the Extradition Act provides for a pre-transfer hearing, a pre-transfer hearing is available under the Detainer Agreement.

On appeal to the United States Supreme Court, our Nation's High Court affirmed the Third Circuit's holding. Because Congress consented to the Detainer Agreement, federal law governs the interpretation of such interstate compact. Adams v. Cuyler, 101 S.Ct. 703, 708-709 (1981). The United States Supreme Court also affirmed the Third Circuit's holding that the Detainer Agreement incorporated the procedural safeguards provided by the Extradition Act, and that therefore a prisoner has a right to a pre-transfer hearing. Adams v. Cuyler, 101 S.Ct. at 709-712.

Although nothing in the Detainer Agreement explicitly provided for a pre-transfer hearing, the Supreme Court found certain language in Articles III and IV of the Agreement which tended to support the proposition that a prisoner's extradition rights are meant to be preserved when the receiving State seeks disposition of an outstanding detainer. Article IV(d) provides as follows:

> Nothing contained in this Article shall be construed to deprive any prisoner of any right which he may have to contest the legality of his delivery as provided in paragraph (a) hereof, but such delivery may not be opposed or denied on the ground that the executive authority of the sending state has not affirmatively consented to or ordered such delivery.

Furthermore, the Supreme Court cited certain provisions of the legislative history of the Agreement on Detainers for the proposition that a prisoner transferred against his will under Article IV should be entitled to whatever "safeguards of the extradition process" he might otherwise have enjoyed, and these safeguards include the procedural protections of the Extradition Act (in those states that have adopted it) as well as any other procedural protections the sending state guarantees persons being extradited from within its borders. Adams v. Cuyler, 101 S.Ct. at 711-712.

In the final part of the majority opinion, the Court set forth the following:

> . . . The remedial purpose of the Agreement supports an interpretation that gives prisoners the right to a judicial hearing for a limited challenge to the receiving State's custody request. In light of the purpose of the Detainer Agreement, as reflected in the structure of the Agreement,



263

its language, and its legislative history, we conclude as a matter of federal law that prisoners transferred pursuant to the provisions of the Agreement are not required to forfeit any pre-existing rights they may have under state or federal law to challenge their transfer to the receiving state. Respondent Adams has therefore stated a claim for relief under 42 U.S.C. 1983 for the asserted violation by state officials of the terms of the Detainer Agreement . . . Adams v. Cuyler, 101 S.Ct. at 712.

Adams v. Cuyler guarantees the prisoner being transferred pursuant to the Agreement on Detainers the full panoply of rights to which a person being extradited is entitled, including the pre-transfer hearing at which the indigent prisoner would be entitled to legal counsel. The case of Adams v. Cuyler is of enormous constitutional significance in this area and is of particular significance herein since the defense herein submits that defendant herein was never afforded his right to a pre-transfer hearing before being returned from Ohio on either occasion.

The holding in Adams v. Cuyler has been consistently upheld by the courts of this land. In the only other action to date by the United States Supreme Court involving Adams v. Cuyler, our Nation's High Court granted a petition for a writ of certiorari from the United States Court of Appeals for the Second Circuit and then vacated the judgment and remanded the case to the United States Court of Appeals for the Second Circuit "for further consideration in light of Adams v. Cuyler, 449 U.S. _____, 101 S.Ct. 703, 66 L. Ed. 2d 641 (1981)." Peyton v. David Harris, 101 S.Ct. 2040 (1981).

The issue was considered in the case of Pfaff v. Wells, 648 F. 2d 689 (10th Cir. 1981) wherein the Court of Appeals dealt with

264

the supposed narrow range of issues which may be dealt with in a
habeas corpus action resisting extradition.  Citing Michigan v.
Doran, 439 U.S. 282, 99 S.Ct. 530, 58 L. Ed. 2d 521 (1978); Adams v.
Cuyler; Pacileo v. Walker, 101 S. Ct. 308 (1981); and Brown v.
Nutsch, 619 F. 2d 758 (8th Cir. 1980), the Court noted the narrow
range of issues which may be considered in a challenge to
extradition by habeas proceedings in the asylum state.  However, in
Pfaff v. Wells, the petitioner was claiming that extradition would
infringe federal constitutional rights.  Pfaff v. Wells, 648 F. 2d
at 692.  The value of legal counsel appointed at such a hearing to
raise legal issues and to provide legal advice raises the importance
of the appointment of counsel at a pre-transfer hearing prior to
transfer between states under the Agreement on Detainers.  If
counsel had been so appointed in the case of defendant herein in a
pre-transfer hearing before being returned to West Virginia from
Ohio, such legal counsel would surely have had an opportunity to
advise John Moss about his Fifth Amendment rights during the trip to
West Virginia.  More importantly, that advice may not have been
necessary if John Moss had successfully defended his return to West
Virginia as it was his right to do pursuant to a pre-transfer
hearing under the detainer statute.

In Ricks v. Sumner, 647 F. 2d 76 (9th Cir. 1981), the Court
cited Adams v. Cuyler, 101 S. Ct. 703 (1981) for the proposition
that a prisoner incarcerated in a jurisdiction that has adopted the
Uniform Criminal Extradition Act is entitled to the procedural

265

protections of that Act, including the right to a pre-transfer
hearing, before being transferred to another jurisdiction pursuant
to Article IV of the Detainer Agreement and then held that the
prisoner sufficiently alleged the failure to provide a hearing prior
to his involuntary removal to Pennsylvania from California.

In Wilson v. Fenton, 684 F. 2d 249 (3 Cir. 1982), the Court
held that Adams v. Cuyler applied only to those cases in which
transfer occurs pursuant to the Interstate Agreement on Detainers
and not when a prisoner is transferred pursuant to writs of habeas
corpus ad prosequendum which, as was noted in United States v.
Mauro, 436 U.S. 340, 98 S.Ct. 1834, 56 L. Ed. 2d 329 (1978), do not
trigger the detainer agreement.  Nevertheless, the Court upheld the
letter and the spirit of the decision of Adams v. Cuyler.

The chief question involved in Sassoon v. Stynchombe, 654
F. 2d 371 (5th Cir. 1981) was whether federal law required release
for a violation of section IV(e) of the Agreement on Detainers.
Although the Court of Appeals found nothing wrong with a brief
removal of a prisoner to the receiving jurisdiction and his prompt
return to the sending jurisdiction after arraignment and prior to
trial, the Court held that federal law does require a release of the
prisoner for a violation of Section IV(e) of the Detainer Agreement
if the prisoner is harmed by the violation or where the "legitimate
interest" of the prisoner is defeated by the violation.  Sassoon v.
Stynchombe, 654 F. 2d at 374.  The Court cited Adams v. Cuyler for

the proposition that the Interstate Agreement is federal law so that federal law governs.  Id.

In the case of Bush v. Muncy, 659 F. 2d 402 (4th Cir. 1981), the Circuit Court held that the Interstate Agreement on Detainers is federal law binding upon the party states and their officials by virtue of the compact clause.  Therefore, its provisions, interpreted as federal law, must prevail over any existing or subsequently created provisions of state law in direct conflict.  With regard to interpreting its provisions, the federal courts have the final word without regard to any prior decisions by courts of the party state purporting to interpret or apply the provisions in question.  Bush v. Muncy, 659 F. 2d at 411.  The Court cited Adams v. Cuyler for the proposition again that the Interstate Agreement is federal law so that federal law governs.

The clear import of Adams v. Cuyler and its progeny is that a prisoner transferred from one jurisdiction to another for purposes of trial is entitled to a pre-transfer hearing at which counsel could be appointed and that the rationale is contained in Article IV of the Detainer Agreement which provides that the Agreement does not cause the prisoner to forfeit any transfer rights to which he is entitled.  In essence, Adams v. Cuyler specifically and directly sets forth a procedural right which the Detainer Agreement itself only sets forth impliedly.  Thus, according to all the cases, the pre-transfer hearing is a substantial due process right under the Detainer Agreement for which dismissal of the charges is mandated if

the hearing is not provided, or in the alternative, introduces a coercive factor into the analysis of whether the transfer between states for purposes of trial is current, legal, and proper.   The Interstate Agreement on Detainers requires strict construction, and all procedural requirements must be met or the prisoner is entitled to the relief set forth in the Detainer Agreement itself.  Stroble v. Anderson, 587 F. 2d 830 (6th Cir. 1978); Stroble v. Egeler, 408 F. Supp. 630 (E.D. Mich. 1976); United States v. Mauro, 436 U.S. 340 (1978); United States v. Ford, 550 F. 2d 732 (2d Cir. 1977).

The failure on the part of the State of Ohio to provide defendant herein with a pre-transfer hearing and the resultant legal advice renders the transfer process returning defendant to West Virginia illegal.

The Interstate Agreement on Detainers (to which both the State of West Virginia and State of Ohio are signatory) establishes two procedures under which the prisoner against whom a detainer has been lodged may be transferred to the temporary custody of the receiving State.  One of these procedures may be invoked by the prisoner; the other may be invoked by the prosecuting attorney of the receiving State.  (Code, 62-14-1, et. seq.).

Article III of the Agreement provides the prisoner-initiated procedure.  It requires the Warden to notify the prisoner of all outstanding detainers and then inform him of his right to request final disposition of the criminal charges underlying these detainers.  If the prisoner initiates the transfer



268

by demanding disposition (which under the Detainer Agreement automatically extends to all pending charges in the receiving State), the authorities in the receiving State must bring him to trial within 180 days or the charges will be dismissed with prejudice absent good cause shown (Code, 62-14-1, Article III).

Article IV of the Detainer Agreement provides the procedure by which the prosecutor in the receiving State may initiate the transfer.  First, the prosecutor must file with the authorities in the sending State written notice of the custody request, approved by a court having jurisdiction to hear the underlying charges.  For the next 30 days, the prisoner and prosecutor must wait while the Governor of the sending State on his own Motion or that of the prisoner, decides whether to disapprove the request.  If the Governor does not disapprove the request, the prisoner is transferred to the temporary custody of the receiving State where he must be brought to trial on the charges underlying the detainer within 120 days of his arrival.  If the prisoner is not brought to trial within the time period, the charges will be dismissed with prejudice, absent good cause shown (Code, 62-14-1, Article IV). Article IV procedures now require the pre-transfer hearing as set forth in Adams v. Cuyler.  John Moss was brought back to West Virginia under Article IV of the Detainer Agreement on October 28, 1980.

2.      Illegal Detainment

If the detainer under which defendant herein was brought to West Virginia was invalid because defendant was denied a pre-trial



transfer, this would render defendant's alleged confession illegally obtained and inadmissible into evidence as invalidly obtained.

In this regard, it has been held that an illegal arrest and detainment does not prejudice a conviction _if_ (underlined for emphasis) evidence used in the trial does not flow from the detainment. Collins v. Swenson, 443 F. 2d 329 (8th Cir. 1971). In the present case, the alleged confession _does_ (underlined for emphasis) flow from the detainment itself, and counsel for defendant herein submits that since the alleged confession is the only incriminating evidence against defendant, its admissibility into evidence does prejudice him.

It is an illegal detention and not an illegal arrest which invalidates a confession. Jefferson v. State of Texas, 503 S.W. 2d 779 (Tex. Ct. Crim. App. 1974); Hughes v. State of Texas, 409 S.W. 2d 416 (Tex. Ct. Crim. App. 1966); State v. Hunt, 193 N.W. 2d 858 (Wisc. 1972); Liphford v. State, 168 N.W. 2d 549 (Wis. 1969); District of Columbia v. Jordan, 232 A. 2d 298 (D.C. Ct. App. 1967); United States v. Rose, 526 F. 2d 745 (8th Cir. 1976). It is not the fact of illegal detention itself with which the rule is concerned but evidence obtained as a result of it. Lamotha v. Robbins, 199 F. Supp. 855 (S.D. Me. 1961), aff'd per curiam 303 F. 2d 831 (1st Cir. 1962). There must be a causal connection between the illegal arrest or detainment and the subsequent confession or admission. Commonwealth v. Bishop, 228 A. 2d 661 (Pa. 1967).

In the aforementioned case of Adams v. Cuyler, the United States Supreme Court, in affirming the Circuit Court of Appeals, held that a prisoner incarcerated in a jurisdication that has adopted the Uniform Criminal Extradition Act is entitled to the procedural protections of that Act, particularly the right to a pre-transfer hearing before being transferred to another jurisdiction pursuant to Article IV of the Interstate Agreement on Detainers. Adams v. Cuyler, 101 S.Ct. at 712. The denial of this right gave basis for relief under 42 U.S.C. Section 1983. The State of Ohio's extradition statute is located in Title 29 of its Page's Ohio Revised Code Annotated. Section 2963.09 of this statute provides for a mandatory pre-transfer hearing, as discussed in Adams v. Cuyler. The defendant, John Moss, submits that he was not accorded his right to a pre-transfer hearing before being returned to West Virginia from Ohio pursuant to the Detainer Agreement. In the absence of such a pre-transfer hearing, where John Moss would have been accorded his right to counsel, John Moss' due process rights would have been violated, and his detainment on route to West Virginia when he allegedly confessed would be unlawful.

A confession is excludable subsequent to an illegal arrest if it is the fruit of the arrest or because the arrest caused the confession. Wong Sun v. United States, 371 U.S. 471, 484-488, 491, 83 S.Ct. 407, 9 L. Ed. 2d 441 (1963). Applying this rationale to the case at bar, if John Moss' detainment at the time he allegedly confessed was illegal, his purported confession was tainted since

his alleged statement grew out of, was a product of, and was the
fruit of this illegal detainment.

3.       Loss of Jurisdiction

      Other than John Moss's being refused his due process rights
by failing to accord him a pre-transfer hearing, he was detained
illegally as a result of the loss of jurisdiction to prosecute him
on the charges contained in the detainer upon which he was returned
to West Virginia on October 28, 1980.  The record of all proceedings
held in the instant matter to date will show, John Moss was
originally returned to West Virginia from Ohio on a detainer
pertaining to a malicious wounding charge stemming from an incident
at the Moose Lodge in St. Albans.  It was during this trip that John
Moss allegedly gave his statement.  After John Moss gave his
statement concerning the Reggettz homicides, he was returned to Ohio
and then brought back to West Virginia in December of 1980 on a
detainer relating to the Reggettz homicides.  Consequently, the
State of West Virginia lost jurisdiction to try or prosecute John
Moss on the malicious wounding charge.  See Moore v. Whyte, 266 S.E.
2d 137 (W.Va. 1980).

      Indeed, a detainer on which the receiving State losses
jurisdiction would render defendant's detainment upon return even
more illegal and would taint his alleged statement as the fruit or
product of the illegal detainment.  In the case of John Moss, the
result is a detainer issued pursuant to Article IV of the Detainer

Agreement wherein defendant was denied his right to a pre-transfer hearing and then the receiving State lost jurisdiction over the detainer.  The net effect is to render the defendant's alleged confession tainted and suppressable.

Whenever prosecuting authorities in the jurisdiction in which charges are pending against a prisoner who is incarcerated in another state obtain his temporary custody pursuant to the procedures prescribed by Article IV of Detainer Agreement, Article IV(e) requires dismissal of the charges if the prisoner is returned to his original place of imprisonment without trial being held in the charging jurisdiction.  In the following cases in which prisoners who had not been tried in the charging jurisdiction were returned to custody in the states in which they were incarcerated, the courts held that a violation of their Article IV(e) right to a speedy trial was established.  United States ex rel. Esola v. Grooms, 520 F. 2d 830 (3d Cir. 1975); United States v. Scallion, 548 F. 2d 1168 (5th Cir. 1977); United States v. Sorrell, 562 F. 2d 227 (3d Cir. 1977); United States v. Mauro, 436 U.S. 340, 56 L. Ed. 2d 329, 98 S.Ct. 1834 (1978); Ridgeway v. United States, 558 F. 2d 357 (6th Cir. 1977); United States v. Cyphers, 556 F. 2d 630 (2d Cir. 1977); United States v. Thompson, 562 F. 2d 232 (3d Cir. 1977); United States v. Palmer, 574 F. 2d 164 (3d Cir. 1978); United States v. Eaddy, 595 F. 2d 341 (6th Cir. 1979); Enright v. United States, 434 F. Supp. 1056 (S.D.N.Y. 1977); Gray v. Benson, 443 F. Supp. 1284 (D.C. Kan. 1978); Mars v. United States, 463 F. Supp. 87 (E.D. Mich.

1978); <u>Hughes v. District Court of Denver</u>, 593 P. 2d 702 (Colo. 1979); <u>State v. Keener</u>, 224 Kan. 100, 577 P. 2d 1182 (1978); <u>People v. Beamon</u>, 83 Mich. App. 121, 268 N.W. 2d 310 (1978); <u>Commonwealth v. Merlo</u>, 242 Pa. Super. 517, 364 A. 2d 391 (1976).  The foregoing cases are supported in the State of West Virginia by the case of <u>Moore v. Whyte</u>, 266 S.E. 2d 137 (W.Va. 1980).  This case stands for the proposition that a State loses jurisdiction to try a prisoner returned under a detainer when the prisoner is returned to the sending jurisdiction without a trial.  If the prisoner is returned to the receiving jurisdiction, the receiving State loses jurisdiction to try the prisoner.

Therefore, it does not matter how many rights forms John Moss signed, if the detainment was illegal, which it was, the confessions given by the defendant should be suppressed in the instant case.  Thus, both the refusal of a pre-transfer hearing and the failure to prosecute John Moss on the felonious assault detainer and subsequent loss of jurisdiction so to do renders inadmissible the confessions given by John Moss.

4.     <u>The Taking of the Confessions</u>

The Supreme Court of the United States and all state courts exclude from evidence confessions illegally obtained.  Where courts find that confessions are involuntary or coerced they exclude those confessions and appellate courts have reversed convictions which have been based on involuntary or coerced confessions.

A.   The Right to Remain Silent.

The facts in the instant case reflect Troopers Williams and Smith left Mansfield, Ohio, enroute to Charleston, West Virginia, with John Moss in their vehicle.   Shortly into the trip, Trooper Smith jumped over the front seat into the back seat.   John Moss's hands were handcuffed to the headrest on the back of the front seat.   Thereafter, Trooper Smith started to interrogate John Moss about the Reggettz murder cases.   Firstly, John Moss indicated that he had nothing to say to Trooper Smith about the Reggettz murders because he did not know anything about the homicides.   Trooper Smith persisted.   John Moss indicated he had nothing to say.   John Moss chose to invoke his right to remain silent.   Trooper Smith persisted and eventually received incupatory statements from John.   The West Virginia Supreme Court's position on this matter is clear that once a person under interrogation has exercised the right to remain silent guaranteed by West Virginia Constitution, Article III, Section 5, and by the fifth amendment to the United States Constitution, the police must scrupulously honor that privilege. The failure to do so renders subsequent statements inadmissible at trial.   State v. Rissler, 270 S.E. 2d 778 (1980)

B.   Right to be represented by counsel.

Testimony indicates that Trooper Smith persisted in his efforts to interrogate John Moss about the Reggettz murders.   John Moss then advised Trooper Smith that he wanted to talk with his lawyer, Jim Williams, in West Virginia.

275

Further, John Moss indicated that he would cooperate with Trooper Smith as long as Mr. Williams was present during any questioning. At that time, John Moss gave Trooper Smith a Bible which contained the name, home and office telephone numbers of lawyer Jim Williams. Trooper Smith rejected such right on the part of John Moss by throwing the Bible against the front seat saying "you don't need a lawyer". Later, John Moss gave certain confessions concerning his involvement in the Reggettz murders.

The West Virginia Supreme Court in State v. McNeal, 251 S.E. 2d 484 (1978) invoked the standard that once a suspect in custody has expressed his clear, unequivocal desire to be represented by counsel, the police must deal with him as if he is thus represented. Thereafter, it is improper for the police to initiate any communication with the suspect other than through his legal representative, even for the limited purpose of seeking to persuade him to reconsider his decision on the presence of counsel.

C. Coerced Confession

Thereafter, John Moss's testimony in the suppression hearing focused on the physical abuse of Trooper Smith toward John Moss. This abuse whch was continual and systematic overborne the will of John Moss that resulted in the confessions in question.

Where there is physical abuse during interrogation, there is a lack of voluntariness which warrants the exclusion of all confessions resulting from the abuse. The United States Supreme Court has also expressed in clear language that the lack of

276

voluntariness warrants the exclusion of confessions obtained as a result of such abuse.

> "To be sure, confessions cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy.  But the constitutional principle of excluding confessions that are not voluntary does not rest on this consideration.  Indeed, in many of the cases in which the command of the due process plause has compelled us to reverse state convictions involving the use of confessions obtained by impermissible methods, independent corroborating evidence left little doubt of the truth of what the defendant had confessed.  Despite such verification, confessions were found to be the product of constitutionally impermissible methods in their inducement.  Since a defendant had been subjected to pressures to which, under our accusatorial system, an accused should not be subjected, we were constrained to find that the procedures leading to his conviction had failed to afford him that due process of law which the 14th amendment guarantees.  Blackburn v. Alabama, 361 U.S., 199; 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960)4.

4.      Juvenile Rights

Chapter 49, Article 5, Section 1 of the West Virginia Code provides as follows:

> . . .If during a criminal proceeding against a person in any court, it shall be ascertained or shall appear that the person is under the age of nineteen years and was under the age of eighteen years at the time of the alleged offense, the matter shall be immediately certified to the juvenile jurisdiction of the circuit court, and the circuit court shall assume jurisdiction of the case in the same manner as cases originally instituted in the circuit court by petition. . .

The record of the proceedings held in this matter to date will show that the defendant herein was under the age of eighteen years at the time of the homicides of the Reggettz family, and upon his return from the State of Ohio under the provisions of the Interstate

-61-

27

Agreement on Detainers (Code, 62-14-1, et. seq.), was dealt with under the juvenile provisions of the Code, was accorded a preliminary hearing, and was transferred to the adult criminal jurisdiction of this Court for purposes of trial as an adult.  For purposes of this proceeding, the defendant was a juvenile until transferred to the adult section of this Court, pursuant to official Order of this Court.

As defendant discussed at considerable length in the preceding sections of this Memorandum, the confessions obtained from John Moss on the 28th day of October, 1980, were taken while under the juvenile jurisdiction of this Court.

In this regard, it has been held that a juvenile is not capable of knowingly waiving his fifth amendment privilege against self-incrimination.  State ex rel J.M. v. Taylor, 276 S.E. 2d 199 (W.Va. 1981).  Instead of knowingly being able to waive his fifth amendment privilege against self-incrimination, the juvenile must always have an attorney or a responsible adult present when he is being interrogated by government officials.  Since a juvenile cannot knowingly waive his right against self-incrimination, the juvenile must be advised by an attorney or have a responsible adult present, such as a parent, before he can knowingly and intelligently waive his fifth amendment right against self-incrimination.  State ex rel. J.M. v. Taylor, supra.

In the present case, John Moss was not permitted his right to have an attorney present either at or before his confessions were

taken, nor was he accorded his right to have a responsible adult present.  In addition, his parents were not given any notice of the confessions being taken.  In no manner or particular was John Moss allowed the right to which he was entitled under State ex rel. J.M. v. Taylor, supra.

A waiver of constitutional rights can only be in situations where it is clear that the accused has full knowledge of all facts and of his rights and a full appreciation of the effects of his voluntary relinquishment.  Holland v. Boles, 225 F. Supp. 863 (N.D. W.Va. 1963).  By declaration and conduct, an accused may waive a fundamental right protected by the Constitution, but it must be demonstrated that the waiver was made knowingly and intelligently. State v. Eden, 256 S.E. 2d 868, 873 (W.Va. 1979).  A more objective and workable standard invalidates juvenile waivers not secured with counsel, guardian, parent, or interested adult present.  State ex rel J.M. v. Taylor, 276 S.E. 2d at 202.  It is regarded that an interested and friendly adult is supposed to protect an infant from governmental pressure and coercion and to allow someone capable of understanding the nature and consequences of the waiver to help in the decision and to protect the child from inacurate accounts of his statements at proceedings in which waiver is made.

Some states have legislatively mandated that an adult be present when a juvenile waives.  Col. Rev. Stat. Ann. Sec. 19-2-102(3)(c)(I); Okl. Stat. Ann tit. 10 Sec. 1109 (a)(Supp. 1976-76); Texas Family Code, Sec. 5610 (1973).  Furthermore, the

West Virginia Code prevents interrogation of juveniles without the presence of a parent or counsel. Code, 49-5-8(d). Therefore, our own Code reflects a legislative judgment that a juvenile is not capable of knowingly waiving his fifth amendment privilege against self-incrimination. No juvenile legal status is treated in the same as that of an adult. See Code, 56-4-10; Code, 56-4-0; Code 54-2-4; Code, 41-5-5; Code, 37-1-3; Code, 37-1-4; Code, 37-1-12; Code 36-2-5; Code 57-4-7; Code, 39-3-7; Code 49-6-2. Consequently, in State ex rel J.M. v. Taylor, our State's High Court held that a juvenile may waive his right to counsel, but only upon the advice of counsel because only then can there be a knowing waiver. State ex rel. J.M. v. Taylor, 276 S.E. 2d at 204.

Because of the nature of the events and circumstances, the taking of the confessions from John Moss constituted a communicative contact between the defendant while he was still technically within the juvenile jurisdiction of this Court and had all of the appearances of a situation impacted with duress and coercion by governmental agents against the defendant, John Moss. It was a situation wherein the defendant's rights as set forth in State ex rel. J.M. v. Taylor should have been applicable, but were not. In the absence of such constitutional rights, the results of the confessions should be suppressed and declared inadmissible.

5.      Fruit of the Poisoned Tree.

As a result of John Moss's constitutional rights being

deprived as a result of a violation of his fifth amendment, right of silence, his sixth amendment, right to counsel, and/or his fourteenth amendment, rights to due process, the evidence clearly indicates the confessions taken from John Moss to be unlawfully taken.

Thus, the facts indicate that as a result of information contained in John Moss's confession shortly after the confessions were taken from John Moss or October 28, 1980, Troopers Williams and Smith went to John Moss's home in Cleveland, Ohio, and secured a Kodak camera.  Also, the officers secured written statements from John, Carlton, and Marzee Moss concerning a 22 caliber rifle and the camera.

The law relating to "fruit of the poisonous tree" has been analyzed in a prior section but safe to say the analogy to the search and seizure language of the "fruit of the poisonous tree" doctrine also applies to the illegal obtaining of a confession and "fruits" therefrom.  Wong Sun v. United States, supra, Harrison v. Unites States, 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 1047 (1968).

Therefore, assuming the confessions to have been illegally obtained from John Moss, the camera, the 22 caliber rifle, and the statements from John, Carlton, and Marzee Moss are fruits of the original illegality and should be excluded in the evidence of this case.

6.    Paul Reggettz Indictment

Furthermore, at the time John Moss was returned to West

Virginia, the indictment on Paul Reggettz was still pending.  As the

Exhibit introduced in the suppression hearing illustrates, John Moss

was named in the body of the Reggettz indictment.  However, John

Moss was returned to the State

of Ohio without being tried on the malicious wounding charge without

his relationship to the Reggettz indictment being resolved.  This

renders John Moss' alleged confession even more tainted as the fruit

and product of an illegal detention.

In Massiah v. United States, 377 U.S. 201 (1964), the

defendant, while under a federal indictment, talked with a person

who was an unknown government informer.  The informer was "wired for

sound", and the defendant's statements were recorded by federal

authorities.  Testimony about Massiah's incriminating statements was

held inadmissible on the ground that no indicted person can be

interrogated under any circumstances in the absence of his attorney

without having his sixth amendment right to counsel impaired.

Clearly, the Massiah doctrine was held applicable to the states in

McLeod v. Ohio, 381 U.S. 356 (1965).  In McLeod, the defendant had

been indicted for first degree murder but had not yet been

arraigned; he had not retained or been appointed counsel.  While he

was riding around in the sheriff's automobile accompanied by a

deputy sheriff and an assistant prosecuting attorney in search of a

gun used in the commission of the murder, he "voluntarily" made an

oral confession, testimony about which was later admitted into

evidence against him.  The United States Supreme Court held that



<u>Massiah</u> precluded the admissibility of this evidence.  Applying this rationale to the present case, since John Moss was named in the Paul Reggettz indictment, he should not have been interrogated about the Reggettz homicides under any circumstances without counsel present.

6.    Sixth Amendment:  <u>Right to Counsel</u>

The United States Supreme Court has scrutinized post-indictment confrontations between Government agents and the accused to determine whether they are "critical stages" at which the sixth amendment right to the assistance of counsel attaches.  The defendant, John Moss, was named in the body of the Paul Reggettz indictment, which was returned in the Januray, 1980, term of the Kanawha County Circuit Court.

Our Nation's High Court dealt specifically with such a post-indictment confrontation in the case of <u>Massiah v. United States</u>, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).  The petitioner was a merchant seaman who was arrested, arraigned, and indicted for possession of narcotics aboard a United States vessel, along with conspiracy to possess narcotics aboard a United States vessel with one Colson.  Massiah retained a lawyer, pleaded not guilty, and was released on bail.  With the help of Colson, who was "wired for sound," several incriminating remarks were made by the petitioner in the course of a conversation between Colson and Massiah, who was subsequently convicted of several drug-related charges.



283

On appeal, the petitioner charged that the incriminating statements were obtained in violation of petitioner's rights under the fourth amendment, so that said evidence was inadmissible at trial.  Also on appeal, petitioner alleged a violation of fifth and sixth amendment rights which were violated by the use of incriminating statements deliberately elicited in the absence of counsel.  In its opinion, the Supreme Court side-stepped the fourth amendment issue, but in essence held that no indicted person can be interrogated under any circumstances in the absence of his attorney without having his sixth amendment right to counsel impaired.  An accused has a clear right to the presence of an attorney in all post-indictment matters, and most particularly, in all confrontations with agents of the Government.

Although the Supreme Court's opinion in Massiah did not reach the fourth amendment issues of unlawful search and seizure as is all very often involved in cases of bodily extractions or the taking of blood samples, the Supreme Court clearly spoke to the rights of those involved in a post-indictment situation.  A copy of the Paul Reggettz indictment was introduced into evidence at the suppression hearing and it shows that the defendant, John Moss, was named in the body of this indictment.  The defendant submits he is entitled to the same formal rights as those formally named and accused in an indictment.

The Massiah doctrine was held to be clearly applicable to the States in the case of McLeod v. Ohio, 381 U.S. 356 (1965).  In

McLeod, the defendant had been indicted for first degree murder but had not yet been arraigned, and similar to the situation of the defendant herein at the time the blood samples were taken, he had not retained or been appointed counsel. While he was riding around in the sheriff's automobile accompanied by a deputy sheriff and an assistant prosecuting attorney in search of a gun used in the commission of the murder, he "voluntarily" made an oral confession which was later admitted into evidence against him at trial. In its decision, the United States Supreme Court held that the Massiah opinion precluded the admissiblilty of this evidence. Applying this rationale to the present case, since the blood samples obtained from John Moss were incriminating and resulted in the defendant herein becoming a suspect while he was named in the body of the Reggettz indictment, the defendant herein should have had counsel present to represent his interests in any proceedings which resulted in the court order being obtained and in any subsequent matters. The failure to so accord the defendant such rights resulted in a violation of the defendant's fifth and sixth amendment rights.

The reluctance or failure of the United States Supreme Court to concern itself with fourth amendment intrusions of a post-indictment nature does not deprive us of the ability to apply this case and its progeny to the present situation. Post-indictment confrontations are now regarded as a "critical stage" with the accord of even greater rights than would normally be accorded at other phases of the criminal process. Since John Moss was named in



-69-

the body of the Paul Reggettz indictment, he was entitled to certain
rights when confronted by government agents, which rights included
the presence of an attorney who would be responsible for protecting
his fourth amendment rights.  Clearly, during post-indictment
confrontations with government agents where incriminating matters
are, or could be, elicited, the right of counsel attaches.

The United States Supreme Court has in numerous other
instances scrutinized post-indictment confrontations between
government agents and the accused in order to determine whether they
are "critical stages" of the prosecution at which time the sixth
amedment right to the assistance of counsel attaches.  See, e.g.,
United States v. Ash, 413 U.S. 300 (1973);  United States v. Wade,
388 U.S. 218 (1967).

In the case of the United States v. Henry, 447 U.S. 264
(1980), the defendant was indicted for the armed robbery of the
Janaf Branch of the United Virginia Bank/Seaboard National in
Norfolk, Virginia, in August of 1972.  No witnesses were able to
identify the defendant Henry as one of the participants.  While
Henry was in jail awaiting trial on the indictments, Government
agents contacted an informant who was then an inmate confined in the
same cellblock with Henry.  A government agent instructed the
defendant to be alert to any statements made by federal prisoners
but not to initiate conversation with or question the respondent
regarding the charges against him.  After the informant was released
from jail, he reported to the agent that he and Henry had engaged in



-70-

conversation and that the defendant made incriminating statements about the robbery.  The informant was paid for furnishing the information.  At the defendant's trial, which resulted in a conviction, the informant testified about the incriminating statements that the defendant had made to him.  United States v. Henry, 447 U.S. at 265-270.

The question presented to the Court under the facts of the case was whether a government agent "deliberately elicited" incriminating statements from Henry within the meaning of Massiah. The Supreme Court stated it was a different matter when the Government used undercover agents to obtain incriminating statements from persons not in custody but suspected of criminal activity prior to the time charges are filed.  United States v. Henry, 447 U.S. at 272.  However, since Henry was in custody and under indictment, and the facts of the situation showed the incriminating statements had been "deliberately elicited", as in Massiah.  United States v. Henry, 447 U.S. at 271-73.

The Supreme Court noted another relevant factor in Henry to be Henry's incarceration at the time he was engaged in conversation with the government informer.  The Supreme Court had noted in Miranda v. Arizona, 384 U.S. 436, 467 (1966), the psychological inducements to reach for aid when a person is in confinement since the mere fact of custody imposes pressures on the accused which make him susceptible to the ploys of undercover agents.  By intentionally creating a situation likely to induce Henry to make incriminating

statements without the assistance of counsel, the Government violated Henry's sixth amendment right to counsel. <u>United States v. Henry</u>, 447 U.S. at 274. When the blood samples were obtained from John Moss, he was in an institutional environment on each occasion. Since the defendant was so incarcerated on each occasion, the State may argue that the defendant had no protection or rights since he was an inmate confined to a penal institution. Indeed, there is a body of law which holds that prisoners receive almost no fourth amendment protection and that such prisoners have diminished expectations of privacy. <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979); <u>Olsen v. Klecker</u>, 642 F. 2d 1115 (8th Cir. 1981); <u>United States v. Stumes</u>, 549 F. 2d 831 (8th Cir. 1977). However, the cases in this area deal with cell-search situations and the expectation of privacy which each inmate in an institutional setting would have, which is, at best, minimal due to the security interests of the institution. Further, such cases do not concern themselves with inmates incarcerated in an institution and who are charged with other crimes for which they are not incarcerated and the inmate's rights with regard to crimes for which they are suspected but not incarcerated. The case of <u>United States v. Henry</u> seems to indicate that those who are in an incarcerated status may even have greater rights as long as they are indicted or suspected of criminal activity.

Furthermore, it is of significance that the first sample of blood taken from the defendant was obtained without the presence of the defendant's attorney and without a court order and the Ohio



court ordered the blood sample to be returned while the second sample of blood was obtained after a court order was obtained but without the presence of an attorney.  At that particular time, the defendant was incarcerated on one charge and named in the body of the Reggettz indictment and was forced to give evidence which incriminated him and gave authorities the probable cause evidence which they needed.  Due to his incarcerated status, the defendant was not in a position to be able to resist giving the blood sample. He was without the means to resist or the protection which would be accorded by the representation of counsel.  In such a situation, his rights were totally denied, and in the face of government authority with no recourse, the evidence was taken from John Moss which incriminated him.

In the case of United States v. Bagley, 641 F. 2d 1235 (9th Cir. 1981), the Court applied the doctrine of United States v. Massiah and United States v. Henry to a situation where the government used an informant to elicit information from the defendant while the informant and defendant shared a cell.  Although the Bagley court concluded that the informant did not produce evidence prejudicial to the defendant at trial, the Court still reiterated the principles of Massiah and Henry.  In Bagley, the Court was saying that the evidence should be prejudicial or incriminating before the principles of Massiah and Henry are controlling.  In the present case, the blood sample which was obtained from John Moss resulted in incriminating evidence which was certainly prejudicial.



In the case of <u>United States v. Kenny</u>, 645 F. 2d 1323 (9th Cir. 1981), the Court held that there was no custodial interrogation of the defendant to warrant his right to counsel inasmuch as the right to counsel only attaches at the initiation of adversary judicial proceedings.  The imputation or implication from the Kenny decision is that if the government is aware that the accused is represented by counsel, there cannot be any questioning of the defendant outside the presence of said counsel.  <u>United States v. Kenny</u>, 645 F. 2d at 1338.  When the blood sample was obtained from John Moss at the Ohio penitentiary in Mansfield, Ohio, the defendant was, at that time, beginning to serve a sentence for a charge on which he had been represented by an attorney in the State of Ohio. This attorney was not given notice that the blood sample was going to be taken from John Moss on either occasion.

The <u>Massiah</u> doctrine regulates very carefully post-indictment confrontations with government officials.  Such confrontations must be in the presence of the accused's attorney, and without counsel, incriminating evidence obtained as a result must be suppressed.  When John Moss's name appeared in the Paul Reggettz indictment as one who participated in the murders in question such was equvalent to an indictment, thus placing law enforcement on notice that the dictates of <u>Massiah</u> applied to post-indictment confrontations.

Respectfully submitted,

PARRISH McKITTRICK
COUNSEL FOR DEFENDANT