**MOSS v. BALLARD**
**CASE NO. 2:09cv01406**

**RESPONDENT'S EXHIBIT 38**
**(Trial Transcript, pp. 1- 125)**

VOLUME 1 OF 18

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA

vs.                                        CR-82-F-22

JOHN MOSS, JR.,
also known as
John Moss, III

FILED

JAN 13 1986

CLERK OF THE
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

BEFORE:   HONORABLE JOHN HEY, Judge,
          and a Jury,

APPEARANCES

        FOR THE STATE:  James C. Stucky, Prosecuting Attorney,
and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha
County.

        FOR THE DEFENDANT:  The Defendant, John Moss, Jr., also
known as John Moss, III, in person, and by Parrish McKittrick,
his counsel.

                                        Patty Lou Frame
                                        Official Reporter

# I N D E X

BEFORE THE COURT:
FOR THE STATE

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Randall Allen | 1945 | 1959 | 1976 | 1980 |
| Howard Woodyard | 1983 | 1999 | 2019 | |
| Michael Don Smith | 2020 | 2025 | 2041 | |

FOR THE DEFENDANT

| | DIRECT | | | |
|---|---|---|---|---|
| Terry Williams | 2043 | | | |
| John Moss | 2051 | | | |

| EXHIBITS | IDENTIFIED | ADMITTED |
|---|---|---|
| State's No. 1 - Miranda Card | 1981 | 1982 |

BEFORE THE JURY:

| | | | | |
|---|---|---|---|---|
| Opening Statements | | | | |
| State | | | | 2228 |
| Defense | | | | 2240 |

FOR THE STATE

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael Don Smith | 2267 | 2301 | | |
| Robert L. Presson | 2363 | 2379 | | |
| John Fulks | 2395 | 2397 | 2401 | 2401 |
| Clarence Ralph Lane | 2760 | 2764 | | |
| Terry Williams | 2769 | 2964 | 3097 | 3111 |
| | | | 3117 | |
| (Recalled) | 3582 | 3585 | 3586 | 3586 |
| | | | 3589 | 3590 |
| Marzee Moss | 3120 | 3137 | 3141 | 3142 |
| William Johnson | 3147 | 3157 | 3160 | |
| Arbutus Johnson | 3161 | 3166 | | |
| R. R. Custer | 3180 | 3190 | 3208 | 3209 |
| R. E. O'Dell | 3211 | 3212 | 3220 | 3224 |
| | | | 3225 | 3225 |
| David H. Shumate | 3232 | 3252 | 3274 | 3277 |
| Irvin M. Sopher | 3281 | 3341 | 3423 | 3435 |
| Fred Salem Zain | 3455 | 3480 | | |
| Randall Allen | 3509 | 3525 | | |
| Charles Pettry | 3539 | 3550 | 3573 | 3575 |
| | | | 3577 | 3577 |
| Joe Thomas | 3591 | 3600 | | |

FOR THE COURT

| Paul Reggettz, III | | | | |
|---|---|---|---|---|
| (State) | | 2442 | | 1721 |
| | | | | 2754 |
| (Defense) | | 2588 | | 2741 |
| | | | | 1756 |

2-A

I N D E X

FOR THE DEFENDANT

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Marzee Moss | 3173 | 3176 | | |
| Terry Williams | 3626 | | | |
| Belinda Gregg | 3628 | | | |
| (Avowal) | 3638 | | | |
| (Continuing) | 3642 | 3642 | 3643 | |
| Bonnie Hull | 3644 | 3649 | | |
| Faith Moss | 3649 | | | |
| John Wideman | 3656 | 3672 | | |
| (Recalled) | 3935 | 3941 | 3943 | |
| William James Moss | 3688 | 3699 | 3707 | |
| J. R. Smith | 3709 | 3711 | 3713 | |
| John Moss, Jr. | 3714 | 3718 | | |
| Alexander Fortson | 3725 | 3735 | 3741 | |
| James E. (Mike) Roark | 3744 | 3750 | 3762 | 3768 |
| | | | 3771 | |
| Karen Glass | 3775 | | | |
| Jacques Charbonniez | 3779 | | | |
| Betty Ann Fortson | 3790 | 3797 | | |
| Roger Lyons | 3807 | | | |
| Lauren Tobia | 3807 | | | |
| Michael Don Smith | 3812 | 3835 | 3874 | 3904 |
| | | | 3906 | 3918 |
| | | | 3919 | |
| | | | 3933 | |
| Reese Otts | 3923 | 3930 | | |
| Howard Woodyard | 3947 | 3972 | 3991 | |
| Edith Lilly | 3998 | 4000 | | |

INSTRUCTIONS
    State      4006
    Defense      4016

CLOSING ARGUMENTS
    State (Opening)      4069
    Defense      4104
    State (Closing)      4194

JURY VERDICT      4258

DISPOSITION      4264

2-B

I N D E X

| EXHIBITS | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| FOR THE STATE | | | |
| No. | 1 - Photograph | 2396 | 2568 |
| No. | 2 - Photograph | 2396 | 2568 |
| No. | 3 - Photograph | 2396 | 2527 |
| No. | 4 - Photograph | 2396 | 2814 |
| No. | 5 - Photograph | 2396 | |
| No. | 6 - Photograph | 2396 | 2812 |
| No. | 7 - Photograph | 2396 | |
| No. | 8 - Photograph | 2396 | 3032 |
| No. | 9 - Photograph | 2396 | 2558 |
| No. | 10 - Photograph | 2396 | 2710 |
| No. | 11 - Photograph | 2396 | |
| No. | 12 - Photograph | 2396 | 2530 |
| No. | 13 - Photograph | 2396 | |
| No. | 14 - Photograph | 2396 | 3032 |
| No. | 15 - Photograph | 2396 | 2811 |
| No. | 16 - Photograph | 2396 | 2791 |
| No. | 17 - Photograph | 2396 | 2549 |
| No. | 18 - Photogoraph | 2396 | 3032 |
| No. | 19 - Photograph | 2396 | |
| No. | 20 - Photograph | 2396 | 2813 |
| No. | 21 - Photograph | 2396 | 2709 |
| No. | 22 - Photograph | 2396 | 3022 |
| No. | 23 - Photograph | 2396 | 2557 |
| No. | 24 - Photograph | 2396 | |
| No. | 25 - Photograph | 2396 | |
| No. | 26 - Photograph | 2396 | 3032 |
| No. | 27 - Photograph | 2396 | |
| No. | 28 - Photograph | 2396 | 2537 |
| No. | 29 - Photograph | 2396 | 2538 |
| No. | 30 - Photograph | 2396 | 2787 |
| No. | 31 - Photograph | 2396 | 3032 |
| No. | 32 - Photograph | 2396 | 2796 |
| No. | 33 - Photograph | 2396 | |
| No. | 34 - Photograph | 2396 | |
| No. | 35 - Photograph | 2396 | |
| No. | 36 - Photograph | 2396 | |
| No. | 37 - Photograph | 2396 | 2712 |
| No. | 38 - Photograph | 2396 | 2796 |
| No. | 39 - Photograph | 2396 | 3115 |
| No. | 40 - Photograph | 2396 | 3115 |
| No. | 41 - Photograph | 2396 | 2792 |
| No. | 42 - Photograph | 2396 | |
| No. | 43 - Photograph | 2396 | 3032 |
| No. | 44 - Photograph | 2396 | 2788 |
| No. | 45 - Photograph | 2396 | |
| No. | 46 - Photograph | 2396 | 2794 |
| No. | 47 - Photograph | 2396 | 2713 |
| No. | 48 - Photograph | 2396 | 2712 |
| No. | 49 - Photograph | 2396 | |
| No. | 50 - Photograph | 2396 | 2713 |
| No. | 51 - Photograph | 2396 | 2711 |
| No. | 52 - Photograph | 2396 | 27-4 |
| No. | 53 - Photograph | 2396 | 3011 |

I N D E X

| EXHIBITS | IDENTIFIED | ADMITTED |
|---|---|---|
| FOR THE STATE | | |
| No.  54 - Photograph | 2396 | 2819 |
| No.  55 - Photograph | 2396 | 3032 |
| No.  56 - Photograph | 2396 | 2554 |
| No.  57 - Photograph | 2396 | 2534 |
| No.  58 - Photograph | 2396 | 3019 |
| No.  59 - Photograph | 2396 | |
| No.  60 - Photograph | 2396 | 2555 |
| No.  61 - Photograph | 2396 | 3032 |
| No.  62 - Photograph | 2396 | 2714 |
| No.  63 - Photograph | 2396 | 2559 |
| No.  64 - Photograph | 2396 | 2810 |
| No.  65 - Photograph | 2396 | 2534 |
| No.  66 - Photograph | 2396 | 2555 |
| No.  67 - Photograph | 2396 | |
| No.  68 - Photograph | 2396 | |
| No.  69 - Photograph | 2396 | 3032 |
| No.  70 - Photograph | 2396 | |
| No.  71 - Photograph | 2396 | |
| No.  72 - Photograph | 2396 | 2739 |
| No.  73 - Photograph | 2396 | |
| No.  74 - Photograph | 2396 | 2540 |
| No.  75 - Photograph | 2396 | 2994 |
| No.  76 - Photogrph | 2396 | |
| No.  77 - Photograph | 2396 | 3032 |
| No.  78 - Photograph | 2396 | |
| No.  79 - Photograph | 2396 | 2544 |
| No.  80 - Photograph | 2396 | 2993 |
| No.  81 - Photograph | 2396 | 2711 |
| No.  82 - Photograph | 2396 | 2559 |
| No.  83 - Photograph | 2396 | 3032 |
| No.  84 - Photograph | 2396 | 2835 |
| No.  85 - Photograph | 2396 | |
| No.  86 - Photograph | 2396 | 2518 |
| No.  87 - Photograph | 2396 | 2528 |
| No.  88 - Photograph | 2396 | 3021 |
| No.  89 - Photograph | 2396 | 2529 |
| No.  90 - Photograph | 2396 | |
| No.  91 - I. D. Card | 2278 | 2300 |
| No.  92 - Waiver of Rights Form | 2286 | 2300 |
| No.  93 - Waiver of Rights Form | 2295 | 2379 |
| No.  94 - Photograph | 2396 | 3055 |
| No.  95 - Photograph | 2396 | 3369 |
| No.  96 - Photograph | 2396 | 3369 |
| No.  97 - Photograph | 2396 | 3602 |
| No.  98 - Time Card | 2520 | 2522 |
| No.  99 - Dishes | 2570 | 3602 |
| No. 100 - Silverware | 2572 | 3602 |
| No. 101 - Knife Handle | 2574 | 3602 |
| No. 102 - Camera | 2575 | 2911 |
| No. 103 - Parts of Gun | 2581 | 2825 |
| No. 104 - Bullet and Card | 1761 | 2822 |
| No. 105 - Vacuum Cleaner | 2817 | 3602 |

I N D E X

| EXHIBITS | IDENTIFIED | ADMITTED |
|---|---|---|
| FOR THE STATE | | |
| No. 106 - Lantern | 2829 | 3602 |
| No. 107 - Christmas Gift | 2836 | 3602 |
| No. 108 - Bag with contents | 2837 | 3602 |
| No. 109 - Envelope with contents | 2838 | 3602 |
| No. 110-A - Cord | 2840 | 3602 |
| No. 110-B - Cord | 2840 | 3602 |
| No. 111 - Cord | 2843 | 3602 |
| No. 112 - Cord | 2845 | 3602 |
| No. 113 - Cord | 2847 | 3602 |
| No. 114 - Wrapping Paper | 2848 | 3602 |
| No. 115 - Change Purse | 2850 | 3602 |
| No. 116 - Bag | 2851 | |
| No. 116-A - Clothing | 2851 | 3602 |
| No. 117 - Camera | 2905 | 2911 |
| No. 118 - Camera | 2905 | 2911 |
| No. 119 - Camera | 2905 | 2911 |
| No. 120-A - Tape | 2936 | 2937 |
| No. 120-B - Tape | 2936 | 2937 |
| No. 121 - Fingerprint Picture | 3244 | 3246 |
| No. 122 - Fingerprint Picture | 3244 | 3246 |
| No. 123 - Fingerprint Picture | 3245 | 3246 |
| No. 124 - Fingerprint Picture | 3245 | 3246 |
| No. 125 - Fingerprint Picture | 3245 | 3246 |
| No. 126 - Fingerprint Picture | 3248 | 3251 |
| No. 127 - Clock Radio | 3275 | 3602 |
| No. 128 - Photograph | 3288 | 3369 |
| No. 129 - Photograph | 3288 | 3369 |
| No. 130 - Photograph | 3292 | 3369 |
| No. 131 - Photograph | 3295 | 3369 |
| No. 132 - Photograph | 3297 | 3369 |
| No. 133 - Photograph | 3313 | 3369 |
| No. 134 - Blood Work Chart | 3479 | 3602 |
| No. 135 - Blood Work Chart | 3479 | 3602 |
| No. 136 - Blood Work Chart | 3479 | 3602 |
| No. 137 - Blood Work Chart | 3479 | 3602 |
| No. 138 - Blood Work Chart | 3479 | 3602 |
| No. 139 - Blood Work Chart | 3479 | 3602 |
| No. 140 - Blood Work Chart | 3479 | 3602 |
| No. 141 - Blood Work Chart | 3479 | 3602 |
| No. 142 - Blood Work Chart | 3479 | 3602 |
| No. 143 - Blood Work Chart | 3479 | 3602 |
| No. 144 - Blood Work Chart | 3479 | 3602 |
| No. 145 - Blood Work Chart | 3479 | 3602 |
| No. 146 - Blood Work Chart | 3479 | 3602 |
| No. 147 - Blood Work Chart | 3479 | 3602 |
| No. 148 - I. D. Card | 3513 | 3514 |
| No. 149 - D.N.R. Regulations | 3933 | 3933 |
| No. 150 - Oral Statement | 3996 | 3997 |
| No. 151 - Flatware | 4000 | |
| No. 152 - Flatware | 4000 | |
| No. 153 - Flatware | 4000 | |

2-E

I N D E X

| EXHIBITS | IDENTIFIED | ADMITTED |
|----------|------------|----------|
| FOR THE DEFENDANT | | |
| No.  1 - Bible | 2337 | 2338 |
| No.  2 - Photograph | 2592 | 2593 |
| No.  3 - Photograph | 2592 | 2593 |
| No.  4 - Scissors | 2670 | 3602 |
| No.  5 - Diagram | 3405 | 3603 |
| No.  6 - Photograph | 3627 | 3627 |
| No.  7 - Photograph | 3659 | 3667 |
| No.  8 - Photograph | 3659 | 3667 |
| No.  9 - Photograph | 3659 | 3667 |
| No. 10 - Photograph | 3659 | 3667 |
| No. 11 - Photograph | 3659 | 3667 |
| No. 12 - Photograph | 3659 | 3667 |
| No. 13 - Photograph | 3659 | 3667 |
| No. 14 - Photograph | 3659 | 3667 |
| No. 15 - Photograph | 3659 | 3667 |
| No. 16 - Photograph | 3659 | 3667 |
| No. 17 - Photograph | 3659 | 3667 |
| No. 18 - Photograph | 3659 | 3667 |
| No. 19 - Medical Records | 3776 | 3778 |
| No. 20 - Tape(Sealed by Order of the Court) | 3870 | 3870 |
| No. 21 - Chart | 3924 | 3925 |
| No. 22 - Chart | 3924 | 3927 |
| No. 23 - Chart | 3943 | 3944 |
| No. 24 - Chart | 3944 | 3945 |
| No. 25 - Rights Form | 3953 | 3953 |

3

BE IT REMEMBERED, That on Tuesday, the 21st day of February, 1984, in the January, 1984 Term of the Circuit Court of Kanawha County, West Virginia, in the Matter of STATE OF WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III, CR-82-F-221, the following transpired:

THE COURT:  State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts.  The defendant is present in person and by counsel, Mr. McKittrick, heretofore employed on behalf of the defendant, the State of West Virginia by her Prosecuting Attorney, James Stucky, and her Assistant Prosecuting Attorney, Peter Brown.

All right, Mr. McKittrick.

MR. McKITTRICK:  May I approach the bench with the State, Your Honor?

THE COURT:  All right.

(Whereupon, counsel and the defendant approached the bench where the following proceedings were had:)

MR. McKITTRICK:  I have just been handed this motion by the State to restrain John during trial.  The motion itself has many prejudicial statements in it.  I think at the beginning of this trial that this late motion has been filed to prejudice the defendant's rights in the following manner:

First, as the Court can see in the courtroom are several

4

reporters; and if this motion is placed on the record in open court prior to this trial beginning, it spreads before the Court some of John's background, some allegations that have never been proven that are very prejudicial to this defendant.

The motion is made on the date the trial is set; and therefore, the defendant does not have proper time to defend, get witnesses; and therefore, I would request the Court that this motion be stricken and not be heard by the Court at this time.

In the alternative I would request the Court that this motion be filed and heard in camera so that the press does not obtain the same so as to prejudice the rights of this defendant.

MR. BROWN: Our only response to that, Your Honor, is, of course, it was not filed in order to prejudice this defendant. It was filed today because today is the day of the trial. However the Court wants to dispose of this matter or wherever the Court wants to dispose of the matter is fine with us -- in camera, in this courtroom, I don't care. If Mr. McKittrick would like until tomorrow to get whatever cases he can on this, that's fine. We are not planning on having a trial today. We are just concerned for the safety of the people in the courtroom. It is not a big deal.

THE COURT: Under State vs. Brewster it is a proper motion and properly filed. And I believe the State is entitled to be

5

heard on it. I am not ready to entertain it at this time, but I will entertain it in camera.

MR. McKITTRICK: Thank you, Your Honor.

(Whereupon, counsel and the defendant resumed their seats at counsel table where the following proceedings were had:)

THE COURT: Is the State ready for trial?

MR. STUCKY: The State is ready, Your Honor.

THE COURT: Is the defense ready for trial?

MR. McKITTRICK: The defense is ready, Your Honor.

THE COURT: Bring your client to the bar.

I am going to read the indictment in its entirety.

"State of West Virginia, Kanawha County, SS:

"In the Circuit Court of said County.

"The Grand Jurors of the State of West Virginia, in and for the body of the County of Kanawha, now attending the said Court, upon their oaths present that John Moss, Jr., also known as John Moss, III, on the blank day of December, 1979, and prior to the date of the finding of this indictment, in the said County of Kanawha, feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder one Paul Eric Reggettz in violation of Chapter 61, Article 2, Section 1, West Virginia Code 1931, as amended, against the peace and dignity of the State.

"Count II: And the Grand Jurors aforesaid, upon their oaths

6

aforesaid, do further present that John Moss, Jr., also known as
John Moss, III, on the blank day of December, 1979, and prior to
the date of the finding of this indictment, in the said County
of Kanawha, feloniously, wilfully, maliciously, deliberately,
premeditatedly and unlawfully did slay, kill and murder one
Bernadette Reggettz in violation of Chapter 61, Article 2,
Section 1, West Virginia Code 1931, as amended, against the
peace and dignity of the State.

"Count III:  And the Grand Jurors aforesaid, upon their
oaths aforesaid, do further present that John Moss, Jr., also
known as John Moss, III, on the blank day of December, 1979, and
prior to the date of the finding of this indictment, in the said
County of Kanawha, feloniously, wilfully, maliciously,
deliberately, premeditatedly and unlawfully did slay, kill and
murder one Vanessa Dale Reggettz in violation of Chapter 61,
Article 2, Section 1, West Virginia Code 1931, as amended,
against the peace and dignity of the State.

"Found at the September Term of said Court, 1982, upon the
information of Trooper Terry Williams, Department of Public
Safety, Charleston, West Virginia, sworn in open court and sent
before the Grand Jury to give evidence to that body.

"James E. Roark, Prosecuting Attorney.

"No. CR-82-F-221.

"In the Circuit Court, Kanawha County, September Term, 1982.

7

"State of West Virginia vs. John Moss, Jr., also known as John Moss, III.  Indictment for Murder, Felony, West Virginia Code 61-2-1.  A True Bill

"Paul Emory, Foreman of the Grand Jury.

"Attest:  James E. Roark, Prosecuting Attorney, Kanawha County, West Virginia."

Mr. McKittrick, have you received a copy of the indictment?

MR. McKITTRICK:  Yes, I have, Your Honor.

THE COURT:  Have you explained the charges of the indictment to your client?

MR. McKITTRICK:  Yes, I have.

THE COURT:  Do you feel he understands your explanation?

MR. McKITTRICK:  Fully, Your Honor.

THE COURT:  Mr. Moss, you are charged in the indictment with three counts of murder in the first degree, that is three counts of murder in the first degree.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Very well, as to Count I charging you with murder in the first degree upon one Paul Eric Reggettz.  How do you plead, guilty or not guilty?

THE DEFENDANT:  Not guilty.

THE COURT: In Count II you are charged with murder in the first degree upon one Bernadette Reggettz.  How do you plead, guilty or not guilty?

8

THE DEFENDANT:  Not guilty.

THE COURT: In Count III you are charged with murder in the first degree upon one Vanessa Dale Reggettz.  How do you plead, guilty or not guilty?

THE DEFENDANT:  Not guilty.

THE COURT:  Very well, have a seat at counsel table.

I am going to delay ruling on the motion that we took up at the bench earlier.  I think it is a little premature.  We are not quite ready for it.

Does the State have any other motions?

MR. BROWN:  Yes, Your Honor.  Before we start striking the jury the State would request the use of a juror questionnaire in this case.  The State has prepared a stack of questionnaires for the jurors, and we would request that the jurors fill the questionnaires out so that both sides and the Court can review the questionnaires prior to any voir dire taking place.

THE COURT:  All right.  On a prior date I granted defense counsel's motion for individual voir dire.  As I told you then, the ground rules are that each side will submit to the Court in advance upon the completion of these questionnaires -- Let me back up a moment if I may.  The next thing I am going to do is have the questionnaires distributed among the jury panel.  I believe there are some hundred and forty people down there on the fifth floor.  This courtroom simply isn't big enough to hold

them.  And as I understand it, the roof is falling in across the street so we can't use Courtroom 4.  So out of necessity, I have put the panel down in the main jury room on the fifth floor; and I have made arrangements with Judge MacQueen that we will switch courtrooms when we get to the point of actually impaneling a jury until that impaneling has been completed.  Then we will come back up here.  The reason for that being they are being kept in the jury lounge in close proximity so that I can have it guarded by deputies to insure the integrity of the jury as they move from the jury room to Courtroom 5.  Do you have any objection to that, Mr. McKittrick?

     MR. McKITTRICK:  No, I don't, Your Honor.

     THE COURT:  Does the State?

     MR. BROWN:  No, Your Honor.

     THE COURT:  Upon completion of the questionnaires, I am going to send the panel home for the day, the reason being you have to Xerox two copies of all those questionnaires and put them together.  Counsel for both sides, I am sure, will want an opportunity to read them over the evening break.

     Now, on voir dire -- And of course, today we will also take up that other motion you brought up at the bench.

     On voir dire I want both sides to submit written questions to the Court.  I care not whose questions I ask first, whether it be the defense or the State.  If there is any objection, I

will go along with the defense's posture on that, however they

want to do it.  If as a result of answers elicited by me of the

potential jurors either side thinks any additional questions

should be asked, feel free at the conclusion of my examination,

my voir dire, to submit any additional questions.

MR. BROWN:  Would you like that in writing also?

THE COURT:  I want them in writing.  You can write them down

as I am questioning the panel.  That is what we did in the

Miller case.  Mr. McKittrick, I will give the defense great

latitude in their questioning.  I will not give you carte

blanche at this point, but I will attempt to let you have any

questions you ask, anything within reason.  I will be a little

more restrictive probably with the State.  I will determine that

as we go along and as I review your questions.

Is there any question about how we are going to proceed on

voir dire?

MR. BROWN:  No, Your Honor.  I think we need the balance of

the day after the jury has filled out the questionnaire -- It is

a seven page questionnaire.  And by the time we have read

approximately a hundred and thirty or a hundred and forty of

those, we will need that much time.

THE COURT:  Oh, I have no doubt about it.  I am going to

excuse the jury after we get the completed questionnaires back.

Will the rest of this day and well into the night be sufficient

11

time for you to go over these questionnaires and start voir dire tomorrow?

MR. BROWN:  I hope so.

THE COURT:  Mr. McKittrick?

MR. McKITTRICK:  Assuming they can be run off and we can be given copies.

THE COURT:  They will be in your hands I would hope within several hours after they are completed.

Now, Mr. Hickman, sir, you and Mr. Slack, if you would, split those up and take those questionnaires to the jury lounge fifth floor and help him distribute them.  Make sure there are enough pencils for approximately one hundred forty people.

Distribute them, and Gene, instruct them to begin filling them out.  Tell them to get started.  As soon as they have all completed the questionnaires, they are to let you know; and then you will bring them up to me.

I want you to stay down there.  I don't want you having any contact with them as they are filling them out.  But I want you to stay there to make sure no one goes in the jury room.  And I don't think there are any trials going.  But just in case, I don't want any other judge trying to impanel from that jury because they are here now once those questionnaires are distributed.

Now, there is one other thing that comes to mind.

12

Mr. McKittrick, I just wonder whether out of an abundance of caution the Court should go down and admonish them not to discuss the case among themselves and not to permit others to discuss it with them after they fill out the questionnaire. I will go down and admonish them again before I recess them; but I just wonder if I should go down and do it in advance.

MR. McKITTRICK: Yes, Your Honor, I was going to request the Court to address the jury for that purpose because I am sure there is going to be attendant to this trial some publicity. I think it is going to be necessary, especially in view of some of the things that have happened already.

THE COURT: All right, I think we ought to have Mr. Moss, and you and the court reporter there.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

THE COURT: I propose now to adjourn to the fifth floor jury lounge and admonish them that they are to fill out the questionnaires and that they are not to discuss this case among themselves, and once they have filled out the questionnaires, I will then go down and recess them for the day and further admonish them not to discuss the case among themselves or with others, not to listen to any radio accounts or watch any television accounts or read any newspapers accounts.

MR. BROWN: Your Honor, I believe both sides would like to

request of the Court some information so could we come back to this courtroom after you finish admonishing the jury, and could we just leave our papers here?

THE COURT: That is what I intended to do.

All right, let's go down to the fifth floor now.

(Whereupon, the Court, counsel for the State, counsel for the defendant, the defendant in person, and the court reporter exited the courtroom and entered the jury lounge where the following proceedings were had:)

THE COURT: Show the resumption of these proceedings in the jury lounge with all parties present heretofore present here again, including the defendant and his counsel, and in the presence of the prospective panel.

Ladies and gentlemen, may I have your attention please. We are about to impanel a jury in the case of the State of West Virginia vs. John Moss, Jr., also known as John Moss, III, who is charged with three counts of murder in the first degree.

There has been a request by counsel that you fill out individually a seven page questionnaire. Mr. Hickman, our civilian bailiff, will distribute the questionnaire to each and every one of you. I cannot impress upon you too strongly the seriousness of this matter.

When you have completed the questionnaires, let me suggest that we clean this table off, and as you complete your

14

questionnaire, bring it up and put it on this table.  When the last questionnaire has been completed, advise Mr. Hickman, who will then bring the questionnaires up to me upstairs.

Now, unfortunately in this building we asked for one large courtroom.  We didn't get it.  There is no courtroom in the building large enough to hold all of you, so we are going to have to play musical chairs.  Today you are down here.  Tomorrow I will be down here.  I am upstairs today.  But when we get started impaneling a jury, we will impanel the jury in the courtroom on the fifth floor, this floor, inasmuch as the jury lounge is in close proximity to the courtroom.

While we are going through all of this, ladies and gentlemen, I admonish you and each of you in the strongest terms, I do not want you discussing this case among yourselves, nor do I want you to discuss it with anyone.  We will get into individual questions on this later, but I cannot stress to you strongly enough the seriousness of this matter.  But I am telling you I do not want you discussing it with anyone while in this lounge and while you are filling out your questionnaires.

If there are any newspapers in this room, I want no one reading any newspaper accounts.  I don't see any television sets in here right now; but I want to impress upon you, I don't want you reading the newspaper accounts involving this trial; I don't want you watching anything on television involving this trial,

15

nor do I want you listening to anything on the radio involving

this trial.

In a few moments they will be passing out the

questionnaires. We have to read them, so please print legibly.

I don't know whether any of you went to medical school, but

please remember we have to read these.

(Whereupon, the Court, counsel for the State, counsel for

the defendant, the defendant in person and the court reporter

exited the jury lounge and returned to Courtroom F where the

following proceedings were had:)

THE COURT: Have you had an opportunity to read Brewster,

Mr. McKittrick?

MR. McKITTRICK: Yes, Your Honor.

THE COURT: All right now, one other matter before we take

that up. I propose to impanel a jury of twelve plus four

alternates. It is apparent that this proceeding may go on for

some number of weeks. We have no way of knowing, of course; but

I think we can safely assume if it follows its natural course it

will indeed take six to eight weeks. And out of an abundance of

caution, I don't want to have to go through four, five or six

weeks and not have a sufficient number of jurors in the box. So

if there is no objection, I am going to have the first twenty

pulled. Then I am going to have the clerk pull eight more. You

will get your six strikes from the first twenty, Mr. McKittrick,

and the State will get its two strikes from the first twenty.

Then you will each then get two strikes apiece from the

prospective alternates, thus reducing it to twelve jurors and

four alternates.

Does the State have any objection to that?

MR. STUCKY:  No, Your Honor.

THE COURT:  Does the defense have any objection to that?

MR. McKITTRICK:  No, Your Honor.

THE COURT:  All right, let's go in chambers and take up that

motion.  It shouldn't take more than five minutes, if that long.

(Whereupon, the Court, counsel for the State, counsel for the

defendant, the defendant in person and the court reporter

entered the Court's chambers where the following proceedings

were had:)

THE COURT:  Let the record show we are in chambers.  The

defendant is present in person and is accompanied by counsel,

Mr. McKittrick, and that the State is represented by her

Prosecutor, Mr. Stucky, and Assistant Prosecutor, Mr. Brown, no

other persons being present except authorized court personnel.

All right, State's motion to restrain.

MR. McKITTRICK:  I made a record in the courtroom, and one

thing I want to point out on the record is that as a result of

the late filing of this motion the defendant has not had

adequate time to not only properly defend the motion but

properly raise objections as to the motion itself because there was not due notice given.

I assume that this case coming on for trial now for a couple of years now, after the transfer from the juvenile jurisdiction of this Court, that the State of West Virginia could anticipate filing this motion and could have given the defendant not only previous notice of this motion so that the defendant could secure witnesses, could properly do research to prepare for the defense of this hearing.

And I also feel strongly that since this Court convenienced counsel on the side of the State and the defense by taking up the motions in this case some many months prior to this time that that was the appropriate time for the State to file this motion.

On those grounds I will renew the motions that I have already made before the Court to strike this motion, it being untimely filed.

Secondly, Your Honor, I believe that pursuant to <u>Brewster</u> and the guidelines set forth in <u>State of West Virginia vs. David Harvey Brewster</u> and also a West Virginia Supreme Court case, that this motion is deficient and defective on its face because, taking the motion as it is stated or the allegations as they are stated in the motion, there are not sufficient grounds in this motion on its face for this Court to grant the motion, pursuant

to the guidelines set forth in <u>Brewster</u>, as far as a criteria is concerned for this Court to determine whether or not the defendant should be restrained.

Some of the guidelines that I specifically allude to, Your Honor, are the guidelines that were apparently adopted in Note 7 of the <u>McManus</u> case, which adopted the ABA Advisory Committee on Criminal Trials findings relative to this question, and it sets forth on page seven of the opinions that have been given to us today, a copy of which I would like to make a part of this record, and there are twelve different categories or twelve different criterion that the Court can consider in determining whether or not there is manifest and pressing necessity for the defendant to be placed in restraints.

This motion does not come close to setting forth allegations that should be considered by this Court; and in fact, the whole thing is prejudicial to this defendant, because it opens this motion to adverse publicity of this defendant. The allegations made in this motion are conclusionary in nature. They are not factual.

THE COURT: Let me stop you for a moment. I want to make it clear, I share your concern for publicity; and that is the reason I am at your request holding this hearing in camera, out of the presence of the press.

MR. McKITTRICK: Your Honor, the thing that bothers me about

19

this motion is that the Court will remember clearly that the

press requested and obtained a copy of the confession of Mr.

Moss which had been entered into evidence during the juvenile

transfer hearing.  Now, the only way the press could have

obtained that information was from either the State's attorney's

office or someone that knew that the confession of John Moss

had been filed.

The press went to the circuit clerk's office and got hold of

that confession prior to the Court's ruling on the motion to

suppress by the defendant, and one of the daily newspapers

published the confession almost in its entirety, which caused

this Court to on a previous occasion continue this case.

Now, this motion and its language, conclusionary language,

some of which had nothing to do with the guidelines set forth in

Brewster is nothing but prejudicial to this defendant and may

affect his right to a fair trial in this case.

What I'm saying, and I'm not being very articulate because I

just got the motion --

THE COURT:  I understand what you are saying.

MR. McKITTRICK:  Your Honor, what I'm saying is this motion,

I am asking the Court to not even consider granting the motion,

but it does set forth conclusionary language that is prejudicial

to this defendant.  And I would ask that this motion be stricken

because otherwise this motion will be placed on record open to

the press.

THE COURT: Mr. Brown.

MR. BROWN: Well, of course, Your Honor, the State's lawyers are only human. We just thought of this motion because it occurred to us that since the defendant has been shackled through all the other hearings, it just occurred to us as the trial date approached he may not be shackled at the trial.

THE COURT: I take issue with that. I don't think he has been shackled at all the other hearings before this Court. Has he?

MR. McKITTRICK: I don't believe he has.

THE COURT: I don't believe he has either. That is not my memory. He certainly has been sometimes, and there is reason for that when he has to be brought across the street, but he may not have been earlier.

MR. BROWN: Let me say every time I have seen him he has been shackled, and I'm sorry all these things didn't occur to us in time, but they didn't.

The whole purpose of this is to determine whether or not this man is dangerous or whether there may be a danger for defense lawyers, the court reporter or anybody in that courtroom. There is no specific way set out to handle a thing like this. We made a motion. We made the motion in good faith. I don't think there is any particular standard for this type

21

of thing.

In any event, we have a motion before the Court. We believe we could have done it orally, but we wrote it up.

Now, the factors that are listed in Brewster are not exclusive factors. They are factors to be considered. There is nothing that says all twelve factors have to be met. I think the Court should have a hearing, listen to the arguments of both sides and make a decision, and not on some kind of real technical point.

I think the Court has to use good common sense. I think it has to keep the defendant's interest in mind, and it also has to keep the interests of the people in mind. There is nothing tricky about it.

THE COURT: Number one, I am denying the motion to strike the motion. I find it was timely filed. A careful reading of the Brewster case sets forth no time period in which it has to be filed. On the other hand, as to whether the State has sufficiently convinced the Court that the prisoner should be restrained is another matter.

MR. BROWN: Your Honor, I hate to interrupt. One other matter, Mr. McKittrick says he was not given time to prepare. We have no objection if he has more time to prepare, if that is what he says he needs.

THE COURT: Well, I am prepared to rule on it. I presided

22

in a trial not too long ago equal in seriousness to this one.
It was two counts of murder in the first degree of two on-duty
police officers.  The prosecutor asked that he be restrained,
and we had an in camera hearing.  And I elicited from the
defendant in that case his word that he would not be shackled
unless I had one iota of trouble from the defendant, then I
would order him shackled after giving him the proper evidentiary
hearing.

Now, Moss has always conducted himself with decorum in this
Court.  How he conducts himself in the jail, I don't know, but
always with decorum in this Court.  Now, if I do not order him
shackled, I want his assurance that he will conduct himself
properly in the courtroom.  And if he does not, at the first
sign of any problem, the deputies have their instructions.  I
don't want to order him shackled, but on the other hand, I don't
want to take a chance with anyone being hurt.

Now, if I have that assurance, I will deny the motion.

MR. McKITTRICK:  You have my assurance.

THE COURT:  I want to hear it from Mr. Moss.

THE DEFENDANT:  Yes, you have my assurance.

THE COURT:  You understand, Mr. Moss, with one incident the
deputies have their instructions?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right, with that assurance I will deny the

motion at this time.

MR. BROWN: The chief deputy in the jail, Chief Porterfield, has a record of the time Mr. Moss has spent in deadlock. He says he is extremely subject to stress, that if things go wrong and don't go his way, that he is very dangerous. I think the chief deputy will say that. He says he has no doubt he is dangerous. He also said he hasn't had any trouble with him in the last seven or eight months. He is outside if the Court wants to hear him.

THE COURT: No, I don't think it is necessary. I have asked the sheriff to send another deputy up so that we will have at least two deputies in the courtroom at all times. Whatever he does in the jail has not been observed by this Court. As I said, he has always conducted himself with decorum in this Court. I think he understands, and I know Mr. McKittrick does.

I am denying your motion, and it behooves him to conduct himself with the proper decorum throughout these proceedings.

MR. McKITTRICK: He will, Your Honor.

MR. BROWN: Could we have that deputy sit behind the defendant?

THE COURT: I am not interfering with court security. That is the responsibility of the deputy sheriff assigned to this courtroom. And if the deputy feels it is all right, he can stand across the courtroom. If the deputy feels he should, he

24

can stand behind him.  I am not going to interfere with it.

MR. McKITTRICK:  As an officer of this Court I want to place on the record John Moss has been coming before this Court almost three and a half years.  During that time I have talked to numerous deputies who have been in that jail and in this courtroom, and every one of them have assured me that they have no problems with Mr. Moss.

In fact, your Ralph Porterfield represented to me, and I am an officer of this Court under a daily oath, that John Moss has --

THE COURT:  On the record, I have just spoken with Sheriff Carl Withrow.  There will be another deputy assigned to this courtroom during this trial.  So we will have two full time deputies in the courtroom.  That, in my judgment, obviates any necessity of restraint.

MR. McKITTRICK:  There are a couple of other things we ought to take up at this time.

THE COURT:  Let's go back out in the courtroom.

(Whereupon, the Court, counsel for the State, counsel for the defendant, the defendant in person and the court reporter entered the courtroom where the following proceedings were had in open court:)

THE COURT:  Are there any other motions counsel wishes to take up?

MR. McKITTRICK:  Your Honor, the State said they had several motions.

THE COURT:  All right.

MR. BROWN:  Yes, Your Honor.  The State has made a motion for discovery, and we would again ask the defense if he has any hospital records, scientific studies and any reports from any hospitals, specifically Cleveland Clinic; any records, reports, either oral or written, from Dr. Cyril Wecht, of Pittsburgh, Pennsylvania; and any meteorological reports from the National Weather Service, either oral or written.

MR. McKITTRICK:  Your Honor, I think before the Court rules on that the Court would have to rule that firstly the Rules of Criminal Procedure apply to this case.  This case has been under the jurisdiction of this Court for three and a half years, and I think the first thing the Court would have to do is make a determination as to whether or not the Rules of Criminal Procedure apply to the case.

THE COURT:  Let the record be clear, it has been in the Court three and a half years partially because of defense counsel's motions to protect his client's interests.  That is one of the reasons it has been in the court so long.  I want that on the record.

Number two, I believe you are correct, Mr. McKittrick, that in fact this matter is bring tried under the rules of

26

Criminal Procedure.

MR. McKITTRICK:  We take the position it is not.

THE COURT:  You take the position it is not?

MR. McKITTRICK:  Yes.

THE COURT:  I am sorry, sir.  I take issue with you on that and overrule that motion  This matter most certainly is being tried under the Rules of Criminal Procedure.

MR. McKITTRICK:  The second is that the defendant would have to make a motion under 16(a)(1)(c) or (d) for materials afforded to it by the prosecution so that there is reciprocal discovery.

THE COURT:  What is it, 16 what?

MR. BROWN:  Your Honor, the defendant through his counsel filed --

THE COURT: What rule did you refer to, 16 what?

MR. McKITTRICK:   Rule 16(a)(1)(c) and (d) I think it is.

MR. BROWN:  The defendant through his counsel filed twenty-seven different motions, and we were heard on a prior date on those matters.  That particular rule deals with documents and tangible objects and reports, examinations and tests of state witnesses.  Well, just (c) and (d), I'm sorry.

In any event, Your Honor, I know I personally went down with Mr. McKittrick to state police headquarters in South Charleston while he examined all of the evidence in this case, all the evidence that I'm aware of.  I think it is contained in

approximately eight different cardboard boxes down there.

Any tests that we have, I can think of the autopsy reports from the medical examiner on the three bodies of Vanessa, Eric and Bernadette.   Mr. McKittrick has those.   We have photographs.   He has copies of those.   We had fingerprint tests. He has copies of those.   Blood tests.   He has copies of those. Firearms identification had some tests.   He has copies of those.

If there is anything he is aware of, I would turn it over, but I just can't think of it.

THE COURT:   Pardon me, I'm lost somewhere.   You made a motion that you wanted additional documents from him.

MR. BROWN:   Yes, sir, and he is saying he wanted the same rules to apply to him.   I'm just saying that I don't know what it is that --

THE COURT:   I have ruled on a prior date I expect the State to turn over all exculpatory documents and materials to the defendant.   Do you have any additional documents that haven't been supplied to him?

MR. STUCKY:   No, Your Honor.

MR. McKITTRICK:   I can take that up at the proper time.   The issue I have posed to the Court is whether or not what the State has afforded us falls within 16(a)(1)(c) and (d).

THE COURT:   Well, the State has a copy of the rule in front of it.   Have you complied with it?

MR. STUCKY: What Mr. McKittrick is saying is whether or not he requested the information under (c) and (d), that being tangible objects, documents, reports, examinations and tests.

I would refer the Court to a motion made by Mr. McKittrick in this matter called "Motion to Produce and Compel Disclosure of Evidence" wherein they asked for pathology reports pertaining to the deaths of all three of the victims, photographs, other photographs, any cords, items taken, scissors, any and all other photographs, any and all items recovered by the representatives, agents, employees believed to have been taken from the home of Paul Reggettz, all slides and tissue used by pathologist, etc.

That certainly is what Rule 16(a)(1)(c) and (d) talks about. All that has been presented to defense counsel; and once that was done, the State filed its motion for discovery asking under 16(c) for the reciprocal discovery; and we have not been afforded any of that.

Mr. McKittrick, we believe, has in his possession certain documents from hospitals, certain reports, either oral or written from Cyril Wecht, from the National Weather Service and other witnesses which he has given us on his witness list, and which we believe he has reports from them or those people certainly wouldn't be on his witness list to be provided as witnesses in this case if he didn't and we believe we are entitled to the reciprocal discovery since apparently the Rules

29

of Criminal Procedure have taken away from the defendant the right to trial by ambush as they previously had.

THE COURT: I have already ruled that the Rules of Criminal Procedure apply in this matter, and I am in fact going to order the defense to turn over under the rules any such documents requested heretofore by the State.

MR. McKITTRICK: Your Honor, we have -- Mr. Brown and I have had several conversations, and I have advised him that we were trying to secure certain documents, and we have received those. We have not received the documents from the Weather Bureau. We may be able to get those for you. We don't have them in our possession.

We have absolutely no written materials from Cyril Wecht, none whatsoever.

THE COURT: All right, but I am ordering you that you are to turn over to them those documents that they have asked for under the Rules; and further, you are to make available to them any documents which come into your possession at a future time, any documents heretofore requested under the rules by the State.

MR. BROWN: Your Honor, it is getting a little late in the game for us to see those reports. Could we have some kind of a deadline?

MR. McKITTRICK: I would be glad to walk down to the Prosecutor's office with them and let them run a copy of the

records we have just received from the Cleveland Clinic.   I

don't have the records from the Weather Bureau.

THE COURT:  At the next recess Xerox and turn over to them

those records which you now have in your possession that they

requested under the rules and to which they are entitled.

What else?

MR. STUCKY:  Your Honor, just along those same lines, we

made a request for notice of alibi as required by Rule 12.1 --

THE COURT:  A member of the jury pool just showed up.  Do

you want her in there or not?

MR. McKITTRICK:  No, considering your admonishment to the

jury.

THE COURT:  All right, tell her to go home.   She will be

called when she is needed.

MR. STUCKY:  Could we have that juror's name too?

THE COURT:  Yes, get the name for the record too please.

THE COURT:  All right, I'm sorry.  Continue.

MR. STUCKY:  We made a motion under Rule 12.1, that being

notice of alibi, and since that date have not received any

response as to the defendant's intention of using the alibi or

list of witnesses and information of those witnesses as required

by the rules and by lack of getting that, I would assume, but

maybe incorrectly, that the defendant is not going to use the

defense of alibi.  I would like that cleared up, that if they

31

are going to use an alibi they need to comply with Rule 12.1.

    THE COURT:  Rule 12.1(a), right?

    MR. McKITTRICK:  I know that they have asked for that, and under the facts of this case that is a difficult matter to address.  And the reason I say that is we are not going to present witnesses that John Moss was in California on the date that these murders supposedly occurred.  But you remember the evidence from the other hearings held in this matter.  John Moss was not contacted concerning these matters until months after they happened.  And John Moss doesn't have an alibi as to where he was because you can't remember one day from the other obviously in this case.  And that is why we haven't afforded them an alibi defense, because although John Moss was not present when the murders occurred -- there is no question about that, and the evidence will clearly show that -- we can't say where he was.  I assume if witnesses testified in his behalf he would have been in the same place he always is -- He lived in his home and was in school.  But that is not an alibi in my opinion.

    THE COURT:  Well, the rule is clear, and I will read it for the record.

    "Rule 12.1, Subsection (a).  Notice by Defendant.

    "Upon written demand of the attorney for the State, stating the time, date and place at which the alleged offense was committed, the defendant shall serve, or at such different time

as the Court may direct, upon the attorney for the State, a written notice of his intention to offer a defense of alibi.

"Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi."

That is clear to this Court. And if the defendant intends to advance the proposition, you can call it by any name you want, but a rose by any other name still smells the same. And if he is going to offer an alibi, then I expect you to submit and comply with Rule 12.1 as to the date of the alleged offenses and as to where he maintains he was at that particular date. The rule is clear. Whatever you call it, it still boils down to the same thing. And I am ordering you to provide the State with a statement as to where he claims to have been on the date of the alleged offense as required under 12.1.

That juror's name, gentlemen, was Natalie Toliver; and upon your request, Mr. Mckittrick, I have excused her, No. 71.

Now, does the State have any other pre-trial motions?

MR. STUCKY:  I think that is it, Your Honor.

MR. McKITTRICK:  For the record, so that there is no problem with the last motion made by the State, I am going to state for the record that the night these murders occurred, although it cannot be specifically remembered by Mr. Moss, if he was

anywhere, he was at home. I am going to tell them on the record. I hope that is a sufficient answer. And if they want it any other way, tell me now.

MR. BROWN: All we want to know is if he is going to call any other witnesses other than John Moss to state where he was.

MR. McKITTRICK: We are not.

THE COURT: I understand, and he has stated on the record that he does not intend to call any other witnesses, solely for the purpose, and correct me if I am wrong, Mr. McKittrick, of buttressing an alibi. Now, that is what he just represented on the record, and that should be satisfactory to the State. Is that a correct representation, Mr. McKittrick? Read it back to him.

(Whereupon, the last statement of the Court was read by the reporter.)

MR. McKITTRICK: That is a correct representation.

THE COURT: All right, that should satisfy the State's motion in that regard.

MR. BROWN: Yes, Your Honor.

THE COURT: Does the State have any other pre-trial motions?

MR. STUCKY: No, Your Honor.

THE COURT: Mr. McKittrick, do you have anything further?

MR. McKITTRICK: Yes, Your Honor.

We made a motion for exculpatory material, and the State was

good enough to afford us part of that material. The State afforded us one statement from a witness by the name of Bonnie Hull, and one statement or part of a statement from a witness by the name of Violet Spradling, statements which indicated that Paul Reggettz did not want his family, that they were a pressure and a responsibility to him that he couldn't deal with, that he wanted to get rid of them, that he wanted to get away from them, and numerous other allegations along those lines, that he never wanted his children, that his children made him upset, made him nervous, that he couldn't sleep at night.

We feel, considering the confession of Paul Reggettz, all of those statements are exculpatory to the defendant, and the State has afforded us part of these statements before. But in going over the State's file again about two and a half weeks ago, I personally found there were several statements in there of the same nature in essence from several witnesses which were not afforded to us by the State.

At that time I requested of Mr. Brown that he afford me copies of those statements. He said he would take it up with Mr. Stucky. And I was told I think Sunday finally that Mr. Stucky and Mr. Brown had considered that those statements, part of which they had already afforded me pursuant to that motion for exculpatory material, were not exculpatory now and that I was told at that time that the Court would have to make that

decision before they would afford me those statements.

I think those statements are very important, Your Honor. Those are the statements of the following witnesses: Nora Bucklen, Bonnie Hull, Violet Spradling, Belinda Gregg, Betty Gaynor and David Terry. And in David Terry's statement, Your Honor, was the statement where he told the state police in the statement that they took from him that Violet Spradling, a very good friend of Paul Reggettz, said that Paul Reggettz called her from the jail and apologized to her for killing Vanessa and the children, which is obviously exculpatory material to John Moss.

THE COURT:  Any response?

MR. BROWN:  Yes, Your Honor.  As I understand, he wants the statements of Betty Gaynor, David Terry --

THE COURT:  Wait a minute.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

MR. BROWN:  Your Honor, as I understand, he wants the statements of Betty Gaynor, David Terry, Bonnie Hull, Belinda Gregg, Okey Graley, Violet Spradling and Nora Bucklen.  Your Honor, it seems to me that Mr. McKittrick is already familiar with those statements, so if there is any exculpatory material, he knows of it already.  I don't think he is entitled to the statements, but in any event, to save that trouble, we would be glad to provide to the Court a copy of those statements, and let

36

the Court make its own decision whether or not these statements

are exculpatory.  And if the Court would like to hear argument

on it, we will be glad to do so.

THE COURT:  I think that is a reasonable response.

MR. McKITTRICK:  So that the Court will understand the

foundation for the motion, we had those people subpoenaed as

witnesses, and it is absolutely necessary in the defense of this

case to present some of the defenses that we would present to

use those people possibly, and we cannot prepare our case unless

we have those people's statements.

THE COURT:  All right, I will direct the State to supply to

me -- How many do you have?

MR. BROWN:  Seven, Your Honor.

THE COURT:  Get them to me at noon, and I will review them

and make a determination as to each individual statement,

whether or not they are exculpatory and whether or not Mr.

McKittrick is entitled to them.

Does that satisfy that for the time being?

MR. McKITTRICK:  Yes, Your Honor.

THE COURT:  Any other motions?

MR. McKITTRICK:  Your Honor, we had made several motions in

limine that the Court indicated were premature and that we would

be allowed to voir dire certain of the evidence that the State

intended to submit to the Court and indicated to the Court it

would call for the evidence, that being a camera and certain silverware.  I think the Court has ruled on some of the other motions in limine, which I will bring to the Court's attention prior to the time that we put on witnesses in this case; and also the State has indicated that it would not offer some of the evidence also which the defendant will take up before the Court before we present witnesses in the case.

THE COURT:  It seems to me in going through the file there was some sort of motion somebody filed on hearsay.

MR. STUCKY:  Mr. McKittrick filed that.  It was just a notice.

THE COURT:  All right.

MR. McKITTRICK:  So, Your Honor, I think it is probably necessary while the jury is gone that we have those motions heard before the Court.

THE COURT:  I agree one hundred percent.  I want to hear whatever else you have to say.  I want to take everybody down, including the defendant, and recess them until tomorrow morning at 9:30.  Then we will devote the afternoon to disposing of any other pre-trial motions of either side, including motions in limine that either side would want to bring up, so that hopefully by tomorrow morning the questionnaires will have been Xeroxed, you will have read them, and we will be able to start impaneling a jury.

38

Is that agreeable?

MR. STUCKY:  Yes, sir.

THE COURT:  Mr. McKittrick?

MR. McKITTRICK:  Yes, sir.

THE COURT:  Do you have anything?

MR. McKITTRICK:  No, sir.

THE COURT:  Pete?

MR. BROWN:  No, sir.

THE COURT:  Mr. Stucky?

MR. STUCKY:  No, sir.

THE COURT:  All right, let's go downstairs, and remain outside the jury lounge until I come down.

MR. McKITTRICK:  The State and the defense counsel both agree that what we will do is wait until we put the jurors in the box, and then we will go over the questionnaires at that time.  In other words, instead of reading all one hundred forty of them, we will just read those selected.

THE COURT:  Is that agreeable to both sides?

MR. McKITTRICK:  Yes.

MR. STUCKY:  Yes, sir.

THE COURT:  All right.  Now, let's go downstairs.

(Whereupon, the Court, counsel for the State and the defendant, the defendant in person, and the court reporter exited the courtroom and entered the jury lounge where the

following proceedings were had:)

THE COURT: Ladies and gentlemen, could I have your attention please. I now have your completed questionnaires, and I appreciate the speed with which you did them. It is going to obviously take some several hours to Xerox them and make sufficient copies. Rather than have you all sit around all afternoon, for your purposes, not mine, but for yours, we are going to quit for the day. I want you all to be in the jury lounge here tomorrow morning, in this room, at 9:15; and hopefully, although we have no way of knowing, hopefully we will start the jury selection process at 9:30 tomorrow morning or as shortly thereafter as we can.

Let me also tell you I propose to impanel a jury of twelve plus four alternates which from a potential panel we will draw twenty-eight and then reduce it to twelve and four.

Now, in the strongest terms I can impress upon you, I admonish you and each of you please do not read anything about this trial in the newspapers. Do not listen to anything on the radio. Do not watch anything on television about it. Nor are you to discuss among yourselves or with your families or with anyone this trial or any of the personalities connected herewith.

Now, does anyone have any questions? If not, for your purposes -- and please give us a minute to get out before you

40

trample us -- but for your purposes we will stand in recess.

(Whereupon, the Court, counsel for the State, counsel for
the defendant, the defendant in person and the court reporter
exited the jury room and re-entered the courtroom where the
following proceedings were had:)

THE COURT:  All right, show the resumption of these
proceedings back in the courtroom, the defendant being present
in person and accompanied by counsel, Mr. McKittrick, the State
by her Prosecutor, Mr. Stucky, and her Assistant Prosecutor,
Mr. Brown.

The questionnaires, some one hundred twenty-three of them,
have been completed.  I want two copies Xeroxed, one for the
State, one for Mr. McKittrick, and the Court will want the
originals given back to the Court.

Now, I don't care where they are done.  If the clerk can do
them, fine.  If the clerk can't do them, then the State will do
them.  But I would like, Mr. Stucky, for you to assign whomever
you need to do it, and I want them done as rapidly as possible.

The Court will in a moment stand in recess until 1:30, and
we will then take up all other pre-trial motions, including any
motions in limine which may not have been ruled upon as yet.

Now, you don't have to have those things Xeroxed an hour
ago.  It is going to take most of the afternoon, inasmuch as we
agreed you are not going to review all hundred forty of them;

41

but we will take them up as the prospective jurors are selected.
I think Mr. McKittrick's suggestion is a rational one.  So
therefore, if you can get your people to have them run off by
4:00, Mr. Stucky, I would appreciate it.

Did you have a question about his being fed?  Is there a
problem with that?

MR. McKITTRICK:  No.  Donna had indicated to me they wanted
to feed him, and I didn't know what your motion schedule was
going to be.

THE COURT:  Well, they feed over there at noon, don't they?

THE DEPUTY:  Yes, sir.

THE COURT:  So he is fine.  It's 11:30.  Oh, don't worry.
I'll make sure, if we have to have special meals prepared for
him, we will do it.  Absolutely he will be fed.  You can count
on that.  If it comes to a point where our schedule does
interfere, let me know; and we will arrange for him to be fed.

Is there anything else?  If not, we will stand in recess
until 1:30.

- O -

(Whereupon, a recess was had in the proceedings.)

- O -

(After recess.)

42

AFTERNOON SESSION

Whereupon, the proceedings in the Matter of State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, were resumed with all parties present as before noted, including the defendant and his counsel.

THE COURT: Let the record show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221. The defendant is present in person and by counsel, Mr. McKittrick, and the State of West Virginia by her Prosecuting Attorney, Mr. Stucky, and her Assistant Prosecuting Attorney, Mr. Brown, in chambers, with no other persons being present except authorized personnel.

This morning you will recall Juror No. 71, Natalie Toliver arrived some hour and a half late, and Mr. McKittrick moved that she be excused at the time, and the Court granted that. I have received a request for two more excuses, and I want counsel for both sides to know it now. And if there is any objection, I won't excuse them. One of them is Darrell Brown, No. 99. I have received the following letter. It was sent to Judge MacQueen, who properly sent it up to me, from Spilman, Thomas, Battle & Klostermeyer, which reads as follows:

"Dear Judge MacQueen:

"This firm represents Charleston Area Medical Center, Inc., the employer of Darrell Brown.

43

"Mr. Brown has been summoned to serve as a petit juror for the January, 1984 term of the Circuit Court of Kanawha County, West Virginia.  Mr. Brown's immediate supervisor, through the undersigned, is requesting that he be excused from petit jury duty at this time.

"Mr. Brown is employed as a respiratory therapy assistant. As you may know, the medical services provided through the Respiratory Therapy Department involves the scheduling of particular patients for particular treatments on given dates. It is the feeling of Mr. Brown's supervisor that his absence from the department will create problems with respect to the provision of medical services rendered by that department since only minimal staff is employed therein.  In addition, the department is unable to schedule patients in advance due to the fact that Mr. Brown's availability for employment is unknown on a daily basis because of his required jury duty.

"In view of the foregoing, we would appreciate your consideration in excusing Mr. Brown from petit jury duty.  I would be happy to furnish you with further information in connection with this request if the same is necessary.

"Thank you very much for your assistance in connection with the aforesaid request.

"Very truly yours,

"George G. Guthrie."

44

I have no feelings one way or the other, but I will excuse him if counsel does not object.

MR. McKITTRICK:  I have no objection.

MR. BROWN:  I have no objection.

THE COURT:  The second one is Connie Ellis, No. 19.  Mrs. Ellis is a clerk in the Eq. Division -- Equipment Division of the Department of Highways.  They have asked that she be excused.

MR. McKITTRICK:  I have no objection.

MR. BROWN:  How many do we have, Judge?

THE COURT:  About a hundred and twenty.

MR. BROWN:  We have no objection.

THE COURT:  All right, so the record is clear, I am going to excuse Darrell Brown, Juror No. 99, without objection by the defense or the State.  I am further going to excuse Connie Ellis, Juror No. 19, without objection by the defense or the State.  Okay, that is all I wanted.

Now, I want to read these statements; and I want to read them in chambers, without interference.  If I try to go out there and read them on the bench, I will be distracted.

MR. McKITTRICK:  We would like to make one other motion, and that is to have that motion sealed.

THE COURT:  Which motion?

MR. McKITTRICK:  That being the motion requesting the Court

to restrain the defendant during the trial.

THE COURT: Any problems with that?

MR. BROWN: Sealed?

THE COURT: Sealed and made a part of the record.

MR. BROWN: I don't see anything unusual about it. The Court granted the extra security. It is still our feeling the man is dangerous.

THE COURT: The motion is granted, over the objection of the State. The motion requesting that the motion to restrain be sealed is granted, and I will so advise the clerk and order it made a part of the court file. And it is not to be opened without order of the Court.

Anything else?

MR. McKITTRICK: Not here, Your Honor.

THE COURT: All right, we will take about a ten or fifteen minute recess while I read these statements.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

THE COURT: Show the resumption of these proceedings in chambers, with the defendant being present in person and by his attorney, and the State of West Virginia by her Prosecuting Attorney and Assistant Prosecuting Attorney for Kanawha County.

A few moments ago, Mr. McKittrick, you made a motion that the motion by the State to restrain the defendant be sealed; and

46

I granted it. I have just been advised by one of the reporters

for the afternoon paper it is already in the paper. She did not

get it from me. And that was the purpose for holding the

hearing in chambers earlier. Where she got it, I don't know.

But she is concerned she may have violated a court order, which

she did not since I just granted your motion ten minutes ago. I

just wanted you to be aware of the fact that it is going to be

in the evening paper, but it is not a violation of the Court's

order because the Court only made that ruling --

    MR. McKITTRICK: We would ask for a hearing by the Court to

determine from whom the reporter got the motion. To follow up

on our objection to the motion initially, we feel the motion was

filed to prejudice the defendant's rights to a fair trial

attendant to previous adverse publicity in this case.

    THE COURT: I don't think I quite follow you. I'll tell you

what she said, that she garnered the information in your

presence this morning.

    MR. McKITTRICK: I told her they filed a motion this

morning. I did not go into details.

    THE COURT: I don't know how she got it then. But no one

was under any restraint not to. It was held in camera. I'm not

so sure about the propriety of doing it. If I had admonished

counsel --

    MR. McKITTRICK: How can the reporter get a motion that has

not been filed with the clerk yet?

THE COURT:  Beats me.  She didn't get it from me.  How do you think she got it?  You can ask her.

MR. McKITTRICK:  I don't think she will tell me.  I think she will claim confidentiality.  She will say that is confidential.

THE COURT:  If you want to lay a subpoena on her, lay a subpoena on her.

MR. McKITTRICK:  She is right out there.  Why don't we bring her in here and ask her?

MR. BROWN:  Fine.

THE COURT:  Go out and ask Kay Michaels to come in, Bill.

MR. McKITTRICK:  I have another matter we want to take up either now or after you finish reading the statements.  We want to place the plea bargain on the record, Your Honor.

THE COURT:  Not now.  Let's wait until after Miss Michaels comes in.

THE DEPUTY:  She has already gone.

THE COURT:  She has already left. She said she got it in your presence.

MR. McKITTRICK:  She said, "Did the State file a motion to have the defendant restrained during trial?"  I said, "Yes, and the Court overruled it", something to the essence of that.

THE COURT:  That is it; that is how she got it.

48

MR. McKITTRICK:  She has the essence of the allegations in the motion, which I think are prejudicial to this defendant.

THE COURT:  If you want to lay a subpoena on her, lay a subpoena on her.  We will take evidence in the morning if you want to.  But number one, I have admonished the jurors not to discuss the case and not to read anything in the newspapers. And I don't think under our case law and state law I am required to do anything further.

Even if something is in there, they have been admonished not to read anything about this case.  Why don't you read it this evening; and if you want to make a motion, fine.

MR. BROWN:  There is going to be something in the paper every day.

THE COURT:  That's right.  And again we have a conflict in the First and Sixth Amendment rights.

MR. BROWN:  Aren't they entitled to come back on selection of individual jurors?

THE COURT:  There is a case out of the Supreme Court, a California case, last month.  I have it right here.  I was prepared for this.  The Supreme Court came out with a decision last month, and it is here on my desk somewhere.  I suggest you might want to read this.  It came out of the Criminal Law Reporter.  It is the text of the Opinion No. 82-556 entitled Press -- Enterprise Company vs. Superior Court of

49

<u>California, Riverside, California, Writ of Certiorari to the</u>

<u>Court of Appeal of California, Fourth Appellate District</u>, which

says:

"Voir dire proceedings in criminal trials are presumptively

open to the public and can be closed only if the trial court

determines that the presumption of openness has been overcome by

an overriding interest, based upon the trial court's specific

and articulated findings that closure is essential to serve

higher values, that the closure order is narrowly tailored, and

that alternatives to closure have been considered."

They are talking about voir dire.  The difference is here

though it seems to me that this case is not germane to the one

at hand because here it says in the syllabus, "Before the voir

dire examination of prospective jurors began at a trial in

California Superior Court for the rape and murder of a teenage

girl, petitioner moved that the voir dire be open to the public

and the press.  The State opposed the motion."

So I don't see any problem here if the defendant opposes it.

It seems to me it would be open if the defendant objects.  Here

the defendant wants the individual voir dire.  I don't see any

problem.  In other words, I see the problem if the defendant

wants it open to the public rather than the State.

MR. BROWN:  We don't care, Judge.

THE COURT:  If there is any problem, we will face it

tomorrow morning.  At least the reporter is honest enough to come in and tell me, "This is going to be in the paper this afternoon, and I just found out that you just ordered it sealed", which I did.  I don't know how you control those things.  They are not in violation of any court order.  I haven't issued any.

MR. McKITTRICK:  We will just wait until tomorrow morning.

THE COURT:  All right.  What is your plea bargaining you want to put on the record?

MR. BROWN:  At this time, on the chance the defendant is convicted in this Court for the murders that he is charged with, the three murders he is charged with, I would like the Court to be aware of the fact that the State made a tentative plea bargaining offer to the defendant, through his counsel, Mr. McKittrick.  And as the Court is aware, sometimes if defendants are convicted, at some later date they file a motion claiming that they weren't aware of the offer, that their counsel did not make them aware of that offer, that they didn't realize all the various aspects of the offer, and they ask the Supreme Court to relieve them.  So at this time, we would like to place on the record that the State, without regard to whether or not this Court itself would accept the plea bargain, because we never got that far, but we did tentatively offer the defense three concurrent, or three pleas to murder in the first degree.  The

51

State would recommend mercy.  The sentences were to be served

concurrently, the three murder sentences.  Those three sentences

were to run consecutively to the sentence that the defendant is

now serving in the State of Ohio, which I believe is something

like four to twenty or four to twenty-five years.  Mr.

McKittrick may correct me on that.  But it was to run

consecutive to that.

     And we were going to make the recommendations of mercy as

binding as we could make them, and with credit for time spent,

Your Honor, which I think this defendant has been in jail since

somewhere around --

     MR. McKITTRICK:  October 28, 1980.

     MR. BROWN:  On these charges, Your Honor.

     MR. McKITTRICK:  You are familiar with that plea tendered

from the State to us, aren't you, John?

     THE DEFENDANT:  Yes.

     MR. McKITTRICK:  And you have consulted with me on that plea

tendered to us?

     THE DEFENDANT:  Yes, you told me.

     MR. McKITTRICK:  And also your father and your uncle?

     THE DEFENDANT:  Yes.

     THE COURT:  And I take it that the defense rejected the

plea?

     MR. McKITTRICK:  And you have rejected the plea, is

52

that correct?

THE DEFENDANT: Yes, I did.

THE COURT: I want to make sure, just for the record now --
all they do is read words -- you are addressing the question to
the defendant, Mr. Moss?

MR. McKITTRICK: Yes, Your Honor.

THE COURT: Is that correct, you have rejected the plea
bargaining?

THE DEFENDANT: Yes, I do.

THE COURT: And you have had an opportunity to consult with
your attorney?

THE DEFENDANT: Yes.

MR. McKITTRICK: And it was your decision to refuse the
offered plea bargaining?

THE DEFENDANT: Yes.

THE COURT: Let me also make clear for the record, I did not
participate in any plea bargaining and was not aware of any plea
bargaining.

Anything else on that?

MR. McKITTRICK: No, sir.

THE COURT: All right, let me finish these statements.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

THE COURT: Show the resumption of these proceedings in open

53

court, and show the presence of the defendant in person and by
counsel, the State of West Virginia by her Prosecutor and
Assistant Prosecutor.

First let me put on the record juror Connie Ellis called.
She did not want to be excused.  That was something her boss
wanted for her.  She did not want to be excused, so I told her
to report again in the morning.

Is that satisfactory with the defense, Mr. McKittrick?

MR. McKITTRICK:  Yes, sir, that's fine.

THE COURT:  And the State?

MR. BROWN:  Yes, sir.  She didn't miss any of your
admonitions or anything, did she?

THE COURT:  No, no, absolutely not.  He called sometime
after I dismissed the jury this morning; and apparently he is
the one that wanted her excused.  She called and said she didn't
ask to be excused.

MR. BROWN:  She is No. 19?

THE COURT:  Pardon?

MR. BROWN:  She is No. 19?

THE COURT:  I don't know.  You tell me.

MR. McKITTRICK:  Did she want to be excused as a result of
her employment, or did her boss want her to be excused as a
result of employment?

THE COURT:  Yes.  It is one of those bureaucratic positions

up at the statehouse.  I suppose he didn't want to be burdened

in the slightest.  And she apparently -- Well, it is one of

those matters where she called and said, "I didn't ask to be

excused."  So without any objection I am going to put her back

in the pool tomorrow morning.

     Is that agreeable, Mr. McKittrick?

     MR. McKITTRICK:  That's fine, Your Honor.

     THE COURT:  Mr. Stucky?

     MR. STUCKY:  Yes, sir.

     THE COURT:  All right, now, I have spent approximately

almost two hours in chambers reading these statements.  Prior to

adjournment a motion was made by Mr. McKittrick to require the

State to turn these statements over to the defense, in that Mr.

McKittrick represented they contained exculpatory materials.  I

shall treat them one at a time.

     As to the statement of Nora Lynn Bucklen, I find nothing

whatever exculpatory.  It is nothing but the rankest hearsay and

second hearsay at best.

     "Question, Did you see any of it personally?

     "Answer, No."

     It is replete with "he said, she said, they said".  I find

nothing but the rankest of hearsay, and I'm not going to require

the State to turn it over.

     There are two statements by her.  The second one, without

55

going into the contents of the statement, "Vanessa said" he would

do thus and so, "My aunt told me" of an incident.  "Vanessa

said.  Vanessa said."

    There is no first hand knowledge of anything.  This is rank

hearsay.

    The statements of Nora L. Bucklen will not be required by

the State to be turned over to the defense.  There is nothing

whatever exculpatory.

    The statement of Violet L. Spradling, "Yes, she told me.

Did she say why?  No, she just said that he said to her.  Well,

from what I assumed, he seemed to be."

    That is the statement of Violet Spradling.  I knew he did

thus and so and heard he did other things.

    The statements of Violet Spradling contain nothing

exculpatory and are nothing but rank hearsay.  They will not be

required to be turned over to the defense.

    MR. McKITTRICK:  Are you talking about the statement taken

on December 17, 1979?

    THE COURT:  Well, if I failed to cross a "T" or dot an "I",

I'll do so.  Let me say the first one I referred to was the

statement of Nora Lynn Bucklen taken December 18 at

approximately 3:00 p.m.  The statement of Nora Lynn Bucklen

taken at approximately 2:15 p.m. on December 14.  The statement

of Violet Spradling taken on December 17 at 6:30 p.m.  The

56

statement of Violet Spradling taken at her residence on December

14 at 3:30 p.m.  The statement of Violet Spradling taken at 6:30

p.m. on December 17, 1979.

The next one I refer to is the statement of Okey R. Graley,

Jr., taken at his residence --

MR. McKITTRICK:  Judge, if I could interject myself with

regard to Violet Spradling's statement taken on December 17,

1979, I think in that statement Violet Spradling indicated that

Paul Reggettz himself threatened to leave her many times,

Vanessa, that he was going to leave her in a couple of weeks.

On page twelve of that statement --

THE COURT:  Page twelve?

MR. McKITTRICK:  Page twelve.

MR. BROWN:  Your Honor, your numbers may appear to be

starting with 103, 104.

THE COURT:  I have F-1, F-2 and F-3.

MR. BROWN:  There are two statements given on December 17,

Your Honor.  Do you not have two statements?

THE COURT:  Oh, I have got at least three statements.

apparently my numbers are different from yours.

(Whereupon, a discussion was had off the record and then

resumed back on the record as follows:)

MR. McKITTRICK:  Maybe I can find it and point it out to the

Court.

57

THE COURT:  That's fine.

MR. McKITTRICK:  That's it right there.

THE COURT:  All right, what are you referring to, page 114?

MR. McKITTRICK:  Right.  On 114 where she says that they had problems, they had marital problems.

THE COURT:  Wait a minute.

MR. McKITTRICK:  Are you on 114?

THE COURT:  I'm on 114, next to the last answer.

MR. McKITTRICK:  Yes.  This is from her observations that she is making that conclusion.

Then, let's see, on page 104 in the middle of the page, where it said:

"Did his job make him nervous?"

The answer was, "Yes.

"Did he tell you this?

"Yes.

" Was he taking pills?

" Answer, I knew that at one time he was taking nerve pills, a light sedative.

"How did you know this?

"I have been at his home while he was taking them."

All right, now on page 106 it goes on here and says, it is talking about money and who controlled the money and whether or not he was tight.  We have witnesses, Your Honor, that will

testify that this was a source of confrontation in that

household, a continuing source of argument and oral

confrontation between these parties.  And some of the things

that happened on the night the murders occurred, pursuant to

Paul Reggettz' own confession, are similar to and parallel to

the statements that are made by these witnesses as to the

children getting on his nerves, his not being able to sleep -- I

think his testimony was, during the hearing before this Court,

that he had certain sleep habits that he had as a result of his

work, and that these witnesses will testify that he told them,

and they were present when he was unable to sleep that he became

furious about that, how he beat the children, how he became

nervous about that, how he told witnesses that he was unable to

sleep, that they made him nervous, that he was taking nerve

pills as a result of that.

    On 106 it goes on talking about the money difficulties that

they were having.  On 107 it goes on and tells about how he

would get so upset he would curse a lot and he would use God's

name in vain.

    All these things parallel the facts as he stated them in his

confession, the facts that led up to the climax where Paul

Reggettz took the lives of his children and his wife.  They are

the same kinds of facts, and they are exculpatory to Mr. Moss if

there are other people that can attest to the things he said

that were similar to what happened on the night he murdered his family and then confessed why it happened.  Those facts are exculpatory as to Mr. Moss.

Now, there is testimony from not only this witness but other witnesses in these statements that this man had several confrontations with Vanessa, that he wanted to get away from them because they were a burden and a responsibility to him that he couldn't deal with, that he wanted the divorce, but because of the tightness of money that he had, where he wouldn't share with his family, he had indicated to witnesses he didn't want to pay alimony or child support, but he still wanted to get rid of his family; and in fact, there is one witness that will testify that he even went to work one night all packed up ready to leave.  He constantly talked about leaving his family and going to Virginia; and in fact, told several of these witnesses in these statements that after the holidays were over he was packing and he was going.

Any strained relationship between Paul Reggettz and Vanessa and/or his children are exculpatory as to Mr. Moss in this case. And these statements are replete, not in themselves, but they are replete with people that had personal knowledge of Paul Reggettz, either by relations, by kin or blood, that can testify as to these things.

I could point out several other things that are in the

statements if you want me to.

THE COURT:  I have read the statements, Mr. McKittrick.  I spent the last two hours reading them.

MR. McKITTRICK:  On page 9 it says he didn't want his children, didn't want them because he felt he was not financially able, he felt they were a burden to him, he didn't want the responsibility of his children, he wasn't capable of dealing with them.  I think that is exculpatory in this case.

THE COURT:  I am waiting until you are finished.

MR. McKITTRICK:  I am finished with that particular statement, Judge.

MR. BROWN: Is this your copy or ours?

THE COURT:  I don't know.  Yours, I guess.

I have read each and every one of these statements, and I am going to go through them all.  The motion is denied as to the statement of Violet Spradling taken at 6:30 p.m. on December 17, 1979.

Now, as to the statement of Okey Graley, Jr. taken on December 16, 1979, at 12:00 p.m., there is nothing in here exculpatory.  These are self-serving statements; and in one of these statements it is contained from one of the affiants, "He hates our family.  He doesn't like our family."  These are all self-serving statements.  In this Court's judgement there is not one scintilla of exculpatory evidence.  They are nothing but

61

hearsay upon hearsay.

MR. McKITTRICK:  I take it that the Court's ruling is to overrule the motion as to each and every one of these statements?

THE COURT:  That is correct.

MR. McKITTRICK:  May I ask the Court, since the Court has in its possession the statements, to make --

THE COURT:  There are just a few more statements.  Let's get it in the record.

The next one I am going to deny is Betty J. Gaynor, given December 19, 1979, at approximately 3:40 p.m.  On page 172:

"Did he ever say that he wished he had never had his children because of the money part in it?

"Answer, No, not actually that, no.

"Did he say, or I believe he said he was going to leave his family, is that right?

"Yes, I think he even said he was separated."

It is "Yes, I think; yes, I assume; he said to she".  That is all these things contain.

The next one is Belinda M. Gregg, taken December 18, 1979, at approximately 7:00 p.m., at page 146:

"Well, I don't remember how he said it right then, what words he said, but he told me he got up" and on and on.

MR. McKITTRICK:  Judge, I know you are reading from those

62

statements, but you are also leaving a lot of things out.

THE COURT: Just a minute. Let me finish, and then I will

hear what you have got to say.

The next statement was Bonnie C. Hull, December 18, 1979, at

11:00 a.m.:

"How did you find this out?

"His wife told me."

The next one is David Terry, taken December 19, 1979, at

3:20 p.m.:

"And she said that I should keep my nose out of it, that

Paul called her and said he was sorry about killing Vanessa and

the kids."

"He said, she said".

And farther on down:

"Do you remember what his exact words were when he told her

he was sorry?

"She said that he said . . ."

There is nothing in any of these statements that the Court

finds exculpatory. It is not going to require the State to turn

any of them over to defense counsel.

Now, you represented a moment ago I left a lot out. Yes, I

left a lot out because it would take two hours to read them from

the bench. However, if you like, Mr. McKittrick, I shall seal

them and make them a part of the record.

63

MR. McKITTRICK:  That was my next request.

THE COURT:  Yes, sir, granted.

Does the State have any objection?

MR. BROWN:  No, Your Honor.

THE COURT:  These will be sealed and not to be opened except by court order, and they will be a part of the record in the event that this matter ever reaches an appellant body.

MR. McKITTRICK:  Your Honor, this statement of Bonnie Hull that I consider to have a lot of exculpatory material in it, I don't know whether you have the same statement or not.  May I take a look at it?

THE COURT:  Surely.

(Documents examined by Mr. McKittrick.)

THE COURT:  I have every one that was handed to me.  I am going to order all of those made a part of the record, put them in an envelope to be sealed and opened only by a court order.

Now, did you get all of the questionnaires Xeroxed?

MR. BROWN:  Yes, sir.  I believe we have a stack and Mr. McKittrick has a stack.

THE COURT:  Have they been supplied to you, Mr. McKittrick?

MR. McKITTRICK:  Yes, sir.

THE COURT:  All right, now, in the morning when Donna gets here tell her I want my copies of the questionnaires put in alphabetical order.  And I assume you gentlemen will do the

64

same.  That way when we call a juror we will be able to find it without any trouble.

Are there any other matters this afternoon?

MR. STUCKY:  Your Honor, we had a motion this morning about getting a medical records copy.  Mr. McKittrick gave us one.  Unfortunately it is not legible.  We can't read it, and I don't know whether he has had any contact with the hospital up there and was able to decipher any of the information himself or not.  If he has, I think the essence of the rules is that they give us one that we can read.

THE COURT:  I agree.  Is it a bad Xerox copy?  Is that what you are saying?

MR. STUCKY:  Yes, Your Honor.

MR. McKITTRICK:  I have given Mr. Stucky exactly what I have.  I have not had any contact with them personally.  I haven't talked with them about the record itself.  I have given them what I just got from them.  Mine is as illegible as theirs.

THE COURT:  The only obligation you are under, Mr. McKittrick, is to provide them with like copies that you possess; and you have just represented that is what you have done.

MR. McKITTRICK:  Now, Your Honor, there were two items we wanted a motion in limine on, two items of physical evidence, one being silverware and the other being a camera.

THE COURT:  All right.

MR. McKITTRICK:  Of course, our contention in the motion before the Court prior to this time in argument was that the State had never linked those articles up as coming from the Reggettz household.  I think the State had represented to the Court and the Court ruled at that time the motion was premature and would be taken up right before trial; and the State said at that time they would produce witnesses to link the evidence up.

MR. STUCKY:  Your Honor, I don't believe a motion in limine is to determine whether or not the State can link up evidence. That is something that is done at trial.

We aren't in a position -- In this particular case we have already had a partial trial on the juvenile level, partial trial twice on the transfer level, a partial trial in the suppression hearing which, of course, took three or four days.  Mr. McKittrick now wants a partial trial on our chain of custody of certain evidence.

Mr. McKittrick is well aware that if the link is not properly before the Court, then the Court is not going to admit the evidence before the jury.  The chain of custody is to be taken up during the trial and not a motion in limine.  If he has got some claim that it is illegal or improper, then he can make those allegations.  And if he can sustain that burden, that can be done in a motion in limine.  But merely to say that the State

66

hasn't shown a chain of custody, the State doesn't have to until the trial.

MR. McKITTRICK:  Your Honor, I realize there have been eight assistant prosecutors in this case and Mr. Stucky has not been here in all the hearings.  But I know before this Court the evidence in the chain of custody, the evidence heretofore before this Court, was that there wasn't any way to prove that evidence came out of the Reggettz household.

The State represented to the Court in late '83 in the suppression hearing that they now thought they had a witness that could tell this Court that that evidence came out of the Reggettz household.  The Court ruled at that time that the purpose of the motion in limine was to voir dire the evidence to determine whether or not it could be linked up.  It has nothing to do with the chain of custody.

We were told at the last suppression hearing we would have a right to have a hearing voir diring that particular evidence.

THE COURT:  Well, I'll tell you very candidly, this thing has gone on now for so long and we have had so many hearings, from this Court to the Supreme Court and back to this Court, I have no independent recollection of that, and the record will have to speak for itself.

MR. BROWN:  Your Honor, if I might, I believe we told Mr. McKittrick that we had a telescope that we were not going to

introduce into evidence.  I believe we have already covered

that.

As to the rifle, we don't have the rifle.  I think we explained

that to the Court.

As to the camera, Your Honor, John Moss' statement:

"Did you take anything else out of the house?

"No.  A camera.

"What kind of a camera was it, do you know?

"I think it was a Kodak.

"Was it the kind of camera that develops its own pictures?

"Yes."

We think, Your Honor, without putting on a whole chain of

evidence here, that that camera is important, and the defendant

himself has identified a Kodak camera as coming out of that

house.  That is what we have, a Kodak camera.

"Where is the camera now?

"At my house in Cleveland."

And, of course, Your Honor, you have already heard in the

suppression of those items.  The officers testified how they

went to Cleveland and recovered a camera like that.

Flatware or silverware -- On the flatware, the defendant

says:

"What did you do with the Christmas present?"

Now, he identified it, Your Honor -- Give me just a minute

68

here.  I want to be fair.

"Did you take any presents from under the tree?

"Yes.

"How many did you take?

"One.

"Do you remember what it was?

"It was some dishes.

"What did you do with that Christmas present?

"Gave it to some friend's mother.

"What was the friend's mother's name, do you know?

"Mrs. Johnson.

"What is your friend's name?

"Bill."

Your Honor, we have witnesses who will come forward and say,

although she did not receive dishes, she in fact received

flatware or silverware.  This is the only gift this defendant

says he took out from under the tree.  This witness will say she

received not dishes but silverware.  It was Christmas wrapped.

It was the only gift that this man, the defendant, ever gave to

this lady in his lifetime or her lifetime.

We feel we can connect that up also, Your Honor.  We think

that it is proper evidence.  And we think it is capable of being

linked to this defendant.

Further, Your Honor, the defendant says that he wants no

69

reference to certain physical evidence.  Your Honor, we will

make reference to the .22 rifle, although we don't have the

rifle, because the defendant, John Moss, in his statement where

he admits killing the Reggettz family, Vanessa, Bernadette and

Eric, the question in that statement:

    "You stated that you took the rifle, the .22 rifle, and a

Christmas present from under the Christmas tree."

    Once again there, Your Honor, he makes those statements.   We

believe that we can get in evidence about the .22 rifle.

    You remember the officers went to Cleveland.  John said

later in his statement:

    "What did you do with those items?

    "I hid them beside my bed.

    "Did you take the rifle apart?

    "Yes.

    "How did you take it apart?

    "I unscrewed the barrel from the handle."

    Then he talks about taking the rifle, putting it in a

suitcase and taking it to Cleveland.  We feel these items are

important.

    "What did you do with the rifle and the camera?

    "Took it back home.

    "To Cleveland?

    "Yeah."

70

Your Honor, we feel that these items are material. Granted, there are still a lot of hurdles for us to overcome to getting these items into evidence; but as far as a motion in limine that they are not conclusively linked, Your Honor, everything doesn't have to be conclusively linked.

I quote from State vs. Bail, 140 W.Va. 680, "Upon an inquiry as to the admissibility of evidence, its weight or probative value is not the criteria or test. If it tends, even slightly, to prove a fact relevant to any issue in the case and is material and forceful in the determination thereof, it is admissible." And they cite State vs. McKinney, 88 W.Va. 400.

State vs. McKinney, Your Honor, "Upon an inquiry as to the admissibility of evidence, its weight or probative value is not the criteria or test. If it tends, even slightly, to prove a fact relevant to any issue in the case and is material and forceful in the determination thereof, it is admissible."

In the fourth Circuit case, Your Honor, of Meredith vs. United States, 238 F.2d 535, Judge Sobeloff, "Modern tendency in the law of evidence is to give the triers of fact all the light they can have, especially in complicated technical situations." Once again, "However, the weight or probative value is not the criteria or test."

This is from State vs. Morgan, "If it tends even slightly to prove a fact relevant to any issue in the case and is material

and forceful in the determination thereof, it is admissible.
The criteria of relevancy is whether or not the evidence tends
to cast any light upon the subject of the inquiry.  There are
instances where the circumstances are such that the act in
question, while perhaps somewhat remote, is not sufficiently
irrelevant to render it inadmissible as a matter of law; and it
may have such probative value and legal relevancy, that the
inferences that may be drawn therefrom are clearly proper for
the jury.  Evidence which tends in an appreciable degree to
sustain a material issue of fact is admissible; and the safer
and more satisfactory rule is for the Court to admit whatever is
relevant and leave the question of weight to the jury.  It is
not necessary that the relevancy of the evidence should appear
at the time it is offered."

     Your Honor, we feel these matters speak for themselves.  And
we feel that the State should be allowed to proceed with these
matters until the Court rules otherwise.

     MR. McKITTRICK:  Judge, that's why we are making these
motions.  Mr. Brown says that he has a statement from Mr. Moss
and he says that he took a camera, so Mr. Brown's state
policemen go to Cleveland, and they know what camera it is.
That's why they took four cameras in Cleveland, Ohio, bring them
back here; and in every hearing we have had before this Court
they say, "Nobody can link up any of these four cameras as

72

coming out of the Reggettz household."

Now, in the suppression hearing they finally come to the Court and they say, "Well, we have finally got a witness. Our witness is Paul Reggettz. We have finally gone to him at the end of 1983 and said, "Gees, this trial is upon us. We need somebody to identify a camera. Will you come in here and identify the camera." So we make a motion in limine to determine whether or not that evidence that for three years had not been identified can be introduced before the jury. That is the purpose of a motion in limine. That is why a motion in limine is filed.

Once that camera is taken before the jury, even if I prove it is not the proper camera, I can't take it out of the jury's mind. That is why I filed a motion in limine.

Now, as to the confession of John Moss to the taking of a present, which he characterizes as dishes, has absolutely nothing to do with the flatware that these troopers have secured. And they have indicated in every trooper's testimony that they cannot identify it as coming out of the Reggettz house. So we properly filed a motion in limine to determine, prior to the time it is flashed to the jury, whether this evidence can be presented to the jury. And we were told in this proceeding a long time ago that we would have a hearing on that. And that is all we want, pursuant to our motion in limine.

Now, with regard to these guns that Mr. Brown talks about, Paul Reggettz has also confessed in his confession that after he murdered his family, before he left for work, that he remembered "Oh, there are some guns in the house. I'm going to take those so the state police don't think I'm a dangerous person."

Mr. Brown is the one that represented to this Court that he was not going to use the guns because he has never recovered the guns. That is not in issue. The only motion we have filed that we are seeking a hearing on has to do with the camera and has to do with the silverware, nothing else.

MR. BROWN: John Moss' own mother identified the camera that we have, one of those cameras, as the one he brought from West Virginia. He says he took a camera. We recovered a camera that his own mother said was the camera he brought from West Virginia.

THE COURT: The motion in limine is denied. Whether or not the Court will permit the introduction into evidence of the items in question remains to see whether or not the State sustains its burden to permit them to go to the jury. But I'm not going to permit the motion in limine.

The motion in limine is denied. Note the objection and exception of counsel.

Anything else?

MR. BROWN: Where are we supposed to be tomorrow morning, on

74

the fifth floor or up here?

THE COURT:  No, I want you up here because given my some seven and a half years on the bench, I am sure that overnight there will be some more motions that will be thought of by either side, and properly so, and I would like to get all of those argued and out of the way before we bring the jury in.

I have one disposition in the morning.  I am trying to get hold of the attorney to get him in here at 9:00.  But if I can't, I will take the disposition at 9:30.  It shouldn't take more than ten minutes.

Anything further from the State of West Virginia?

MR. STUCKY:  Not from the State, Your Honor.

THE COURT:  Anything further from the defense?

MR. McKITTRICK:  No, sir.

THE COURT:  This Court stands in recess until 9:30 a.m.

- O -

(Whereupon, a recess was had in the matter.)

- O -

75

PROCEEDINGS HAD ON

WEDNESDAY, FEBRUARY 22, 1984

WHEREUPON, the proceedings in the Matter of STATE OF
WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III,
were resumed on Wednesday, the 22nd day of February, 1984, with
all parties present as before noted, including the defendant and
his counsel.

THE COURT:  We are here in the Matter of State of
West Virginia vs. John Moss, Jr., also known as John Moss, III,
CR-82-F-221, murder in the first degree, three counts.  The
defendant is present in person and by counsel, Mr. McKittrick,
the State of West Virginia by her Prosecuting Attorney, Mr.
Stucky, and her Assistant Prosecuting Attorney, Mr. Brown, out
of the presence of the jury panel, no other persons being
present except authorized court personnel.

You had a matter you wanted to put on the record?

MR. McKITTRICK:  Yes, Your Honor.  Before we left yesterday
the Court ruled on the motions in limine where the defendant
requested a hearing on the camera and the silverware.  The Court
denied those motions.  I don't know whether the Court was
denying the defendant the right to have a hearing or denying the
motion itself.

THE COURT:  We have had a suppression hearing in this
matter.  And what I am denying, I think it is just a matter of

76

syntax, but if it will assist you in the record, I am denying

the motion; and I am denying your hearing in limine. That does

not mean I am going to permit the introduction of these items

into evidence. The State will have to sustain the burden at

that time, but at this stage, I am denying the motion in limine

for the grounds aforesaid in the record, including but not

limited to, in this Court's judgement, all matters requiring a

suppression hearing. We have had a suppression hearing in this

matter.

All right, let's go down to the fifth floor. Take Moss down

to the courtroom. Go into the courtroom. We are going to

conduct the jury voir dire.

(Whereupon, all parties, including the defendant in person

and by his counsel, exited the chambers and entered the

courtroom on the fifth floor where the following proceedings

were had:)

THE COURT: All right, now, let me ask you this: As I

understand, we are plowing new ground. Unfortunately, in their

infinite wisdom the county commission didn't see fit to let us

have a courtroom which would accommodate matters of this

magnitude. Judge MacQueen and I have exchanged courtrooms

because of the space, the jury lounge being the only room big

enough to hold all of the potential panel without going into the

grand jury room. And we wouldn't want to do that. That is on

77

the third floor. So that leaves one room available large enough
to hold this jury panel.

So the only way I can see to impanel the jury is the clerk
will pull the pill and read the name, and I will ask Mr.
Hickman, the bailiff, to go to the jury lounge and call out the
name and bring the person in.

Is there any objection to that?

MR. McKITTRICK:  I have no objection to that except I would
like the person brought through this door here and walk to the
jury box.

THE COURT:  That's fine, but how do you do that.

LIEUTENANT BURDETTE:  We can go down the hall and around the
corner and back up.

THE COURT:  That's fine.  But if you want, I will bring all
one hundred twenty in here, clear the courtroom and line the
walls.

MR. McKITTRICK:  I know what the Court is pointing out to
me.  I realize that I probably could make a record on this, but
I think that would be ludicrous to do.  I am not going to object
to them being pulled and then brought into the courtroom as you
have suggested.

THE COURT:  Now, as I understand it, you want the
prospective jurors brought in through the front entrance rather
than the side entrance?

MR. McKITTRICK:  Yes.

THE COURT:  I have no problem with that.  All right, if there is no objection, the clerk will call the name, the bailiff will go to the jury lounge, call out the prospective juror's name, and then bring the prospective juror in through the main door of the courtroom.

MR. McKITTRICK:  I have no objection.

THE COURT:  Does the State?

MR. STUCKY:  No, Your Honor.

THE COURT:  All right, that is what we will do.

Now, as I understand it, the State is ready to begin impaneling a jury?

MR. BROWN:  Yes, it is, Your Honor.

THE COURT:  Is the defense ready to begin impaneling a jury?

MR. McKITTRICK:  Yes, it is.

THE COURT:  All right, the clerk will put a jury in the box. Now, you understand, both sides, that you will take your two strikes from the first twenty, you take your six strikes from the first twenty, then you will have two strikes each from the proposed alternates.

MR. STUCKY:  Do we alternate, Judge?

THE COURT:  I don't care.  You can work it out.

MR. McKITTRICK:  We can alternate.

THE COURT:  All right, is the State ready to begin

79

impaneling a jury?

MR. STUCKY:  Yes, Your Honor.

THE COURT:  Is the defense ready to begin impaneling a jury?

MR. McKITTRICK:  Yes, it is.

THE COURT:  The clerk will put a jury in the box.

Is there any objection to her drawing five names at a time, or do you want it one at a time?

MR. McKITTRICK:  I think it should be one at a time.

THE COURT:  Okay.

(Whereupon, the clerk proceeded to call the names of the prospective jurors who were then sworn to truly answer all questions asked of them.)

THE COURT:  Ladies and gentlemen, we will stand in unofficial recess.  Everyone please remain in your seats.  I don't want you discussing this case among yourselves, nor permitting anyone to discuss it with you.  Neither should you read any newspaper accounts, listen to any radio accounts or watch any television accounts of this trial or of any of the personalities connected herewith.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

THE COURT:  Ladies and gentlemen, we are about to impanel a jury for the purpose of trying the case of the State of West Virginia vs. one John Moss, Jr., also known as John Moss, III.

80

He is charged in this indictment with three counts of murder in

the first degree, said offenses, in Count I, alleged to have

occurred, murder in the first degree upon one Paul Eric Reggettz

on the blank day of December, 1979; Count II, murder in the

first degree upon one Bernadette Reggettz, said to have occurred

during the month of December, 1971; and Count III, murder in the

first degree upon one Vanessa Dale Reggettz in the month of

December, 1979, murder in the first degree.

Are any of you ladies and gentlemen kin, either by blood or

marriage, to the accused, John Moss, Jr., also known as John

Moss, III?

Have any of you made up your mind or expressed any opinion

concerning the guilt or innocence of the accused?

Are any of you sensible of any prejudice or bias as would

prevent you from receiving both the evidence of the State of

West Virginia on the one hand and the evidence of the accused

and from returning a true and impartial verdict therefrom?

Do each of you feel that you can stand freely and

impartially between the State of West Virginia on the one hand

and the accused, John Moss, Jr. on the other, and that you could

return a verdict from the evidence as presented here at the bar

of this Court?

Ladies and gentlemen, this indictment was returned by the

September, 1982 Term of the Grand Jury of the Circuit Court of

81

Kanawha County of which Mr. Paul Emory was foreman.  Were any of

you ladies or gentlemen members of the Grand Jury that returned

this indictment?

Exclusive of this term of court, have any of you ladies and

gentlemen served on a petit jury within the last two years.

JUROR NO. 19:  I have.

THE COURT:  Within the last two years exclusive of this

term?

JUROR NO. 19:  I'm not sure of the date.  I think it was in

'81 maybe.

THE COURT:  Check the card.

JUROR NO. 19:  On my card I filled out, I don't remember

what I may have put on it.  It may have been over two years.

THE COURT:  Is there any reason why we can't proceed,

counsel, before we get that information?

MR. McKITTRICK:  I have no objection.

THE COURT:  Ladies and gentlemen, it is absolutely vital

that you be straightforward and unreserved in your replies.  I

appreciate your bringing that to our attention.  It is vitally

important.  Do not hesitate to answer any of these questions.

It is vitally important to both sides.

When I call your name, counsel, please stand.

Are any of you ladies and gentlemen clients now, or have you

ever been clients, of Mr. James Stucky, Prosecuting Attorney of

82

Kanawha County?

Or of Mr. Peter C. Brown, Deputy Prosecuting Attorney?

Or of Mr. Parrish McKittrick, counsel for the accused?

Yes, sir?

JUROR NO. 15:  He represented my brother-in-law in a divorce case, and later there was a civil suit.

THE COURT:  Would that in any way affect your ability to sit on this panel in a true and impartial manner?

JUROR NO. 15:  No, sir.

THE COURT:  Are any of you now or have you ever been clients of Mr. William Murray?

Are any of you ladies and gentlemen acquainted with or are you kin, either by blood or marriage, to either Paul Eric Reggettz, Bernadette Reggettz or Vanessa Dale Reggettz or Paul Reggettz?

Are any of you ladies and gentlemen kin, either by blood or marriage, or are you acquainted with Trooper Terry Williams of the Department of Public Safety?

Ladies and gentlemen, I can't impress upon you too strongly that you are the triers of the facts.  I am the trier of the law.  It is my duty to determine what evidence you can or cannot hear.

There will be times when we have conferences out of your presence up here at the bench.  We are not trying to hide

anything from you, but these are matters of law that must be discussed between the Court and opposing counsel; and they are not of your concern.

You as triers of the facts are to determine the issues in this case based solely on the evidence, the arguments of counsel and the instructions of law that I will read to you. Is there anyone who cannot do that? Is there anyone who will not follow my instructions even though you personally may disagree with them?

If I instruct you that the law is thus and so, and you personally disagree with that, is there anyone here who cannot or will not follow my instructions? If I tell you that the law is such and such, even though you disagree, will you and each of you follow my instructions and apply that law?

Is there anyone who cannot?

You are not to concern yourself with the number of objections from the lawyers on either side. You are not to concern yourself with how I rule on those objections. It is not of your concern.

You are not to read anything into the inflection of my voice. I tell you quite honestly and sincerely I couldn't care less how this matter comes out. That is not my function. That is yours.

So you are not to read anything whatever in my voice, or

84

anything in my voice as I address either side, the attorneys for either side.

You are only to consider the evidence, the arguments of counsel and the instructions of the law. That is all you are to consider in your deliberations and attempt to reach a true and impartial verdict therefrom.

I have just been advised that you have not served since prior to 1980.

JUROR NO. 19: I should have looked. I had it down at home.

THE COURT: Is that satisfactory to counsel?

MR. McKITTRICK: Yes, it is.

MR. STUCKY: Yes, it is.

THE COURT: I appreciate your bringing that to our attention.

As I told you during orientation the other day, you are not to take notes from the jury box. You must remember the testimony as it is presented from the witness stand.

Twelve of you folks from the box there and six here, unless you are stricken for some other reason, but twelve in the box are the people that will compose the jury. The eight folks out front, four of you possibly will be selected as alternates in this matter. That means you will be required to listen to all of the testimony just as if you were sitting back there in that box. And if it becomes necessary to replace some of the

85

original twelve, some of you, starting with number one, will move up. It may be none of you are needed, but you will have to sit through these proceedings, listen to the evidence, and after the evidence has been concluded, counsel has completed its arguments and the Court has read the law, it may very well be that you will then be discharged and take no further part in the deliberations.

Now, notwithstanding individual voir dire, does counsel for the State have any general questions?

MR. BROWN: I have a question I would like for the Court to ask.

THE COURT: All right, come to the bench.

(Whereupon, counsel and the defendant approached the bench where the following proceedings were had out of the hearing of the prospective jury panel:)

THE COURT: Show the presence of the defendant at all times.

MR. BROWN: Judge, you may get some of them off there. Mr. McKittrick covers it in his voir dire, and I do too, but maybe you can ask is there anybody that has a medical appointment coming up --

THE COURT: Do you understand if they answer yes you can excuse them for one day for the medical appointment unless you want them excused for cause?

MR. BROWN: Yes.

86

THE COURT:  Do you want me to ask the question: This may take six weeks or more.  Does anyone have a problem with that, and if anybody does, they may be excused for cause, depending upon --

MR. BROWN:  Then we can pin them down later.

MR. McKITTRICK:  I would like to know the name of that juror's brother-in-law.

THE COURT:(Addressing juror)  Sir, what was your brother-in-law's name?

JUROR NO. 15:  Lyle Lawrence.

THE COURT:  When did this action take place?

JUROR NO. 15:  It was '79 or '80.

THE COURT:  Do you recall it?

MR. McKITTRICK:  I sure do.

(Whereupon, counsel and the defendant resumed their seats at counsel table where the following proceedings were had in open court and in the hearing of the prospective jury panel:)

THE COURT:  Ladies and gentlemen, we have no way of knowing how long this trial is going to last.  Ladies and gentlemen, it is conceivable, we have no way of knowing, but it is conceivable this trial could last six to eight weeks.  I try cases Monday through Thursday.  I don't hold trials on Fridays.  Those are the days I set aside for domestic relations, divorces, things of that nature.

Is there anyone here who has a conflicting appointment who would find it difficult to serve on this jury because of that appointment?

JUROR:  I have a business appointment on the first of March.

JUROR:  I am scheduled to have my tonsils out on the 5th of March.

JUROR:  My company is getting ready to transfer me to Parkersburg in two or three weeks.

JUROR:  Doctor's appointment on the 29th, but I can change it.

JUROR:  I have a business conference in Atlantic City the 5th, 6th and 7th.  It is not mandatory, but it is pre-scheduled.

THE COURT:  Of March?

JUROR:  Yes, of March.

THE COURT:  Come to the bench.

(Whereupon, counsel and the defendant approached the bench where the following proceedings were had out of the hearing of the prospective jury panel:)

MR. BROWN:  The young lady with the tonsil problem has to go, I think.

MR. McKITTRICK;  Yes.

THE COURT:  Do you want to challenge her for cause?

MR. McKITTRICK:  No.  Let's just let her go.

88

THE COURT:  Does the State have any objection to just letting her go?

MR. BROWN:  No.

THE COURT:  Does the defense?

MR. McKITTRICK:  No.

THE COURT:  I have a business engagement I set some time ago out of State.  We will not be holding trial March 1, which is a Thursday.  I have got to be out of town March 1, 2, 3 and 4. The only day affecting us would be March 1.  So without objection from either side, we will excuse Miss Bell.

MR. McKITTRICK:  You might want to ask them if as a result of these appointments they feel it would be absolutely necessary to be excused.

MR. BROWN:  This guy is going to be transferred.

MR. McKITTRICK:  He is an alternate.

MR. BROWN:  I don't care if he is.

THE COURT:  Bell is the only one I am going to excuse right now.

(Whereupon, counsel and the defendant resumed their seats at counsel table where the following proceedings were had in open court and in the hearing of the prospective jury panel:)

THE COURT:  When was your business appointment?

JUROR:  The 1st of March.

THE COURT:  I don't expect to be holding court that day

89

because I have a business appointment out of state that day too.

Miss Bell, we are going to excuse you.  Good luck with your tonsils.  I had mine out forty-three years ago.

The clerk will put another juror in the box.

(Whereupon, Juror Rose was called.)

THE COURT:  Mr. Holbrook, you say you are to be transferred in three weeks?

JUROR HOLBROOK:  Yeah, two to three weeks.  We are just waiting for the final word.

THE COURT:  All right, you are excused.  Good luck in Parkersburg.

The clerk will call another alternate.

(Whereupon, Juror Bradley was called, and Jurors Rose and Bradley were sworn to truly answer all questions asked of them.)

Now, I am going to address myself to only Mrs. Rose and Miss Bradley.

We are about to impanel a jury for the purpose of trying the case of the State of West Virginia vs. John Moss, Jr., also known as John Moss, III, who is charged in a three count indictment with three counts of murder in the first degree. These incidents are alleged to have occurred during the month of December, 1979.

In Count I the accused is charged with murder in the first degree upon one Paul Eric Reggettz.  In Count II, the accused is

90

charged with murder in the first degree upon one Bernadette

Reggettz.   And in Count III the accused is charged with murder

in the first degree upon one Vanessa Dale Reggettz.

Are either of you ladies kin, either by blood or marriage,

to the accused, John Moss, Jr.?

Or to one Trooper Terry Williams?

Do you know Trooper Terry Williams?

Do either of you know, or did you know Paul Eric Reggettz,

Bernadette Reggettz, or Vanessa Dale Reggettz, or Paul Reggettz?

Have you, either of you made up your mind or expressed any

opinion concerning the guilt or innocence of the accused?

Are either of you sensible of any bias or prejudice as would

prevent you from receiving both the evidence of the State of

West Virginia on the one hand and the accused on the other, and

from returning a true and impartial verdict therefrom?

Do each of you feel that you could stand freely and

impartially between the State of West Virginia on the one hand

and the accused, John Moss, on the other, and that you could

return a verdict from the evidence as presented here at the bar

of this Court?

Ladies, this indictment was returned by the September, 1982

Term of the Grand Jury of the Circuit Court of Kanawha County of

which Mr. Paul Emory was foreman.  Were either of you ladies

members of that Grand Jury that returned this indictment?

91

Have either of you ladies, exclusive of this term of court,

sat on a petit jury within the past two years?

Stand up when I call your name.

Are either of you ladies now, or have you ever been, clients

of Mr. Jim Stucky, Prosecuting Attorney?

Or of Mr. Peter Brown, Deputy Prosecuting Attorney?

Or of Mr. Parrish McKittrick, counsel for the accused?

Ladies, if you are selected for this proceeding, you, Miss

Bradley, if you are selected, would be selected as an alternate.

And you, Mrs. Rose, if you are selected, would be selected on

the main panel.  Your function is to listen to the evidence, the

arguments of counsel and the instructions of the Court.  If I

tell you that thus and so is the law, even if you disagree with

that law, will you follow my instructions and apply it to this

case?  Do either of you feel you cannot or will not do that, if

I tell you it is the law and and you disagree with it?

You are not to concern yourself with the number of

objections or the lack of objections made by the lawyers for

either side.  That is their function.  You are not to concern

yourself with how I rule on those objections, whether I rule for

one side or the other.  That is not your concern.  You are the

triers of the facts.  I am the trier of the law.  I determine

which evidence it is proper for you to hear and consider.

There may be times when we approach the side bar over here

92

out of your hearing.  We are not trying to keep anything from you.  But that is not part of your function.  That is mine and the lawyers.

You are not, and I emphasize you are not, to read anything into the inflection of my voice.  I couldn't care less how this proceeding comes out.  You are the triers of the facts, not me. I am the trier of the law.

This proceeding may take, and we have no way of knowing at this point, this proceeding may take six weeks.  Do either of you have any conflicts during that period of time that are unavoidable?

All right, anything else?

MR. McKITTRICK:  Not at this time, Your Honor.

THE COURT:  I want to see counsel at the side bar.

(Whereupon, counsel and the defendant approached the bench where the following proceedings were had out of the hearing of the prospective jury panel:)

THE COURT:  I am going to recess for lunch and begin the individual voir dire at 1:30.  Now, what I propose to do, unless there is an objection, is have them come back this afternoon and go back into the jury room with the rest of the panel.  I will advise them to be back here at 1:20, and those in the jury room to go to the jury room and these folks to come here to this courtroom, with the usual admonition not to discuss the case,

93

read any newspapers, watch any television and so on.

MR. McKITTRICK:  Do you want us to go over the questionnaires now and then go over them --

THE COURT:  I'm going to start individual voir dire at 1:30. You know who I am going to start with first. I want you to go over these in advance so that you will know what we are doing as we bring these twenty-eight in.

MR. BROWN:  Could we start at 2:00?

THE COURT:  I'm hoping to get started and get as many done today as we can. If you want to go until 2:00, okay, but --

MR. McKITTRICK:  Why don't we get back at 1:30?

MR. BROWN:  Okay. Do you want us to go to the jury room or in here.

THE COURT: In here.

MR. BROWN:  Would you caution them against discussing anything on voir dire that you are going to ask them.

MR. STUCKY:  There was one other question that might be general enough to ask out here, whether or not any members of their families or themselves are law enforcement officers.

THE COURT:  Yes.

(Whereupon, counsel and the defendant resumed their seats at counsel table where the following proceedings were had in open court and in the hearing of the prospective jury panel:)

THE COURT:  Ladies and gentlemen, are any of you kin, either

by blood or marriage, to any law enforcement officer?  And by

that I mean city, county, state police, Federal Bureau of

Investigation?  Or are any of you kin, either by blood or

marriage, to anyone who is a prosecuting attorney, assistant

prosecuting attorney, attorney general, assistant attorney

general, United States attorney or assistant United States

attorney, or any member of the Justice Department of the

United States.

     JUROR:  I have a first cousin that is a city cop.

     THE COURT:  Where?

     JUROR:  Here in Charleston.

     THE COURT:  How close are you to him?

     JUROR:  He is my sister's boy.

     THE COURT:  Well, do you spend a lot of time together?

     JUROR:  Oh, no.  I never see him.

     THE COURT:  That is your first cousin?

     JUROR:  Yes.

     JUROR:  My cousin's son is with the deputy sheriffs,

Mark McMillian.

     THE COURT: What is that?

     JUROR:  My first cousin's son.

     THE COURT:  Are you very close to him personally?

     JUROR:  Not really.

     THE COURT:  Does he spend much time in your home?

JUROR:  I haven't seen him for eight or ten years.

THE COURT:  All right, thank you.

JUROR:  My wife's sister is married to a county deputy.

THE COURT:  Are you close to him socially?

JUROR:  No, not really.

THE COURT:  Do you spend a great deal of time socializing with him?

JUROR:  No.

THE COURT:  Would that have any bearing on your ability to sit in judgment of this case in a true and impartial manner?

JUROR:  No.

THE COURT:  How about you, ma'am?

JUROR:  No.  He has never been to my house.

THE COURT:  All right, come to the bench.

(Whereupon, counsel and the defendant approached the bench where the following proceedings were had out of the hearing of the prospective jury panel:)

Mr. McKITTRICK:  The only thing I can think of is McMillian.

THE COURT:  Yeah, that bothers me too.  It is his sister's husband.

MR. STUCKY:  There may be testimony about Mark in this trial also.

THE COURT:  Mark McMillian?

MR. STUCKY:  Yes.

96

THE COURT:  Do you want to challenge him for cause?

MR. McKITTRICK:  Yes.

THE COURT:  Any objection?

MR. BROWN:  No.

THE COURT: (Addressing jury panel)  Now, who is it that has a wife whose sister has a husband that --

JUROR:  It is my cousin's son.

THE COURT:  I thought somebody had a sister whose --

JUROR:  My wife's sister is married to Jim Akers.

THE COURT:  Your wife's sister is married to a Kanawha County Deputy Sheriff?

JUROR:  Right.

THE COURT:  You are excused.

MR. STUCKY:  That is the wrong one.

THE COURT:  Oh, sit back down.

(Addressing counsel)  If he has a sister whose husband is a deputy sheriff, that concerns me.  I haven't read that case in some weeks.

MR. BROWN:  I think they have to be in there fairly close.

MR. McKITTRICK:  That case has been struck down recently.

THE COURT:  Do you have any problem with him sitting on here?

MR. BROWN:  With 21 I do.

THE COURT:  What about the other juror?

97

MR. McKITTRICK:  No, I have no problem.

THE COURT:  All right, 21 you want stricken, who is related to McMillian?

MR. BROWN:  Yes.

THE COURT:  All right.

(Whereupon, counsel and the defendant resumed their seats at counsel table where the following proceedings were had in open court and in the hearing of the prospective jury panel:)

THE COURT:  You are excused.  Just go back and have a seat in the jury lounge.

MR. McKITTRICK:  Your Honor --

THE COURT:  Come on back up.

(Whereupon, counsel and the defendant approached the bench where the following proceedings were had out of the hearing of the prospective jury panel:)

MR. McKITTRICK:  John indicates to me that he has had some --

THE COURT:  Some problems with someone.  Who?

MR. McKITTRICK:  Akers, in the jail, so I think you were right when you did that.

THE COURT:  All right, if you want him excused --

MR. McKITTRICK:  Yes, sir.

(Whereupon, counsel and the defendant resumed their seats at counsel table where the following proceedings were had in open

98

court and in the hearing of the prospective jury panel:)

THE COURT: All right, you are excused. Go back to the jury

room please.

How do you want this drawn? Does it make any difference?

MR. McKITTRICK: No, it doesn't to me.

THE COURT: All right, pull the main panel first then. The

next juror pulled will replace No. 8, Mr. Stowers on the main

panel and the second will be the alternate.

(Whereupon, Teresa Taylor and Michael Milam were called and

sworn to truly answer all questions asked of them.)

THE COURT: Now, I am going to address myself only to you,

Mr. Milam, and you, Mrs. Taylor.

We are about to impanel a jury for the purpose of trying the

case of the State of West Virginia vs. one John Moss, Jr., also

known as John Moss, III, who is charged in a three count

indictment with three counts of murder in the first degree. In

Count I he is charged with murder in the first degree upon one

Paul Eric Reggettz; Count II he is charged with murder in the

first degree upon one Bernadette Reggettz; and in Count III he

is charged with murder in the first degree upon one Vanessa Dale

Reggettz. These incidents are alleged to have occurred during

the month of December, 1979.

Are either of you kin, either by blood or marriage, to the

accused, John Moss?

Or to Trooper Terry Williams, Department of Public Safety, West Virginia State Police?

Have either of you made up your mind or expressed any opinion concerning the guilt or innocence of the accused?

Are either of you sensible of any prejudice or bias that would prevent you from receiving both the evidence of the State of West Virginia and of the accused and returning a true and impartial verdict therefrom?

Do each of you feel you can stand freely and impartially between the State of West Virginia on the one hand and the accused, John Moss, Jr., on the other and that you can return a verdict from the evidence as presented here at the bar of this Court.

This indictment was returned by the September, 1982 Grand Jury of the Circuit Court of Kanawha County of which Mr. Paul Emory was foreman. Were either of you members of that Grand Jury that returned this indictment?

Exclusive of this term of court, have either of you sat on a petit jury within the past two years.

As I call your name please stand.

Are either of you now, or have you ever been, clients of Mr. Jim Stucky, Prosecuting Attorney?

Or of Mr. Peter Brown, Deputy Prosecuting Attorney of Kanawha County?

Or of Mr. Parrish McKittrick, counsel for the accused?

Now, you, if you are selected, Mr. Milam, will be selected for the main panel of twelve.  You, Mrs. Taylor, if you are selected, would be an alternate, which means that you might be required to sit through these proceedings, hear all the evidence, and if there is no need for you to replace a member of the original panel, you would be excused without participating in the deliberations.

Do either of you have any kin, either by blood or marriage, to any law enforcement officer, city, county, state police, FBI or prosecuting attorney or assistant prosecuting attorney, assistant United States attorney or United States attorney, attorney general or assistant attorney general or an employee of the Department of Justice?

This proceeding may take six weeks.  We have no way of knowing.  Do either of you have any severe conflict that can't be avoided during that period?

Let me explain to you that I am the trier of the law; you are the triers of the facts.  I have absolutely no interest whatever in the outcome of this proceeding.  I couldn't care less.

You are not to read anything into the inflection of my voice.  You are not to concern yourself with the number of objections or the lack of objections that either side or their

lawyers make. You are not to concern yourself with whether I
rule in favor of one side on an objection or whether I rule in
favor of the other. That is not your concern.

You are only to concern yourself with the evidence that you
hear; and as the trier of the law, I determine what evidence
that is, and the arguments of the lawyers, and the instructions
of the Court as to the law.

Now, if I tell you that I am about to read to you the
instructions of the law, even if you personally disagree with
the law as I read it to you, will you follow my instructions and
apply that law?

Now, ladies and gentlemen, I want you in a moment to go with
Lieutenant Burdette back into the jury lounge. I will give my
general admonition at that time to all of you. When we return
-- And I'll announce the time and so forth back there -- But
when we return, those of you here, you twenty-eight, at the
appointed hour I want you here in this courtroom in those seats.
The rest of the jury panel that is back there in the lounge now
will report back to the lounge. But you folks, I would
appreciate your being here in these seats.

One thing, I do not want you or any of you discussing the
proceedings that took place here this morning, including my voir
dire, my questions to you. Or I don't want that discussed with
any other member of that panel back there. So I will go back

there now.

(Whereupon, the prospective jury panel exited the

courtroom.)

THE COURT: All right, let's please, counsel and the

defendant, go back to the jury lounge.

(Whereupon, the parties exited the courtroom and entered the

jury lounge where the following proceedings were had:)

THE COURT: Ladies and gentlemen, we are going to recess for

lunch. There are some matters that counsel and the Court have

to take up. You folks, the twenty-eight of you in the courtroom

in the box, I want you back in those seats at five minutes to

2:00. The rest of you ladies and gentlemen who have not yet

been called, I want you back here in this lounge at five minutes

to 2:00.

During that time I admonish you and each of you not to

discuss this case among yourselves, nor should you permit others

to discuss it with you. Neither should you read any newspaper

accounts, watch any television accounts or listen to any radio

accounts of this trial or of any of the personalities connected

herewith.

Let me say, as a former four-pack a day smoker, I can

appreciate how those of you who smoke feel. As a reformed

smoker, I can also appreciate how the non-smokers feel. So if

you can do it voluntarily, let's put the smokers on one side of

the room and the non-smokers on the other.

Thank you very much. Give us a minute to get out, and then we will stand in recess.

- O -

(Whereupon, a recess was had in the proceedings.)

- O -

(After recess.)

AFTERNOON SESSION

WHEREUPON, the proceedings in the matter of State of West Virginia vs. John Moss, Jr., also known as John Moss, III, were resumed with all parties present as before noted, including the defendant and his counsel, out of the presence of the jury panel.

THE COURT:  Show the resumption of the proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts.  The defendant is present in person and by his counsel, Mr. McKittrick, the State of West Virginia by her Prosecuting Attorney, Jim Stucky, and her Assistant Prosecuting Attorney, Pete Brown, no other persons being present except authorized court personnel, and out of the presence of the jury.

Did you have something you wanted to put on the record?

MR. McKITTRICK:  Right.  Juror No. 13, Bobby Burgraff,

represented to the Court that I represented his brother-in-law in a divorce that later turned into a civil suit.  At lunch time I contacted my office.  I remembered the case, but I wanted to find out the particulars of it.  It was a very hotly contested divorce case that may or may not have ended up in divorce, but the case itself concluded with my client taking his life, committing suicide as a result of the separation of the parties.

Thereafter there was a will contest, and there was a lot of family confrontation over the will that was involved; and there was a lot of bad blood between the lawyers and the clients.

Approximately six months into the case I had to get out of the case because I had a conflict in the case.  But I would like to challenge him for cause because I know there was a lot of bad blood between the family members, and there were a lot of threats back and forth.  So I would like to challenge him for cause.

THE COURT:  Any objection?

MR. STUCKY: No.

THE COURT:  All right, he will be excused.

Now, the State had a motion?

MR. STUCKY:  Yes, Your Honor.  Juror No. 1, Frankie Holstein, during the selection of the jury appeared very familiar to me; and at the noon hour I researched our files and the files of the adult probation office and determined from the

questionnaire that he gave, which in fact he states to question

No. 19, "Has any member of your family been charged with a

crime? Yes. Specify date. Unknown. Court. Unknown. Crime.

Unknown"

That triggered me to do some research, and I determined that

he in fact is the brother of Ralph Holstein, who was tried

before this Court and before this Judge, and was found guilty by

a petit jury, and was in fact sentenced by this Court to the

penitentiary.

THE COURT: There were two Holstein brothers, Ralph and

David. David was "Wild Man". I did not sentence him to the

penitentiary at first. At first I put him on probation. Then

one day, during a conversation with his probation officer he

said words to the effect, "I'll beat that fat little son-of-a-

bitch's ass if he sends me to the penitentiary."

I recall I told him that I wasn't afraid of him or his

family, that if he wanted to try it, come on, but he would

probably be stopped by several deputies.

I didn't hold that against him, and I still granted him

probation. I also told him I didn't take umbrage with what he

wanted to call me, but if my little seventy-five year old mother

was here she would probably punch him in the mouth. I think the

transcript will reflect that. I gave him probation, but I think

he subsequently went to the pen. His brother went to the

106

penitentiary.  I'm not sure about him.  One of them was up in the office just the other day.  He wanted a transcript.  And I'm going to instruct the court reporter not to prepare it.  He is already out.  He is just wasting the taxpayers' money.

But at any rate, I do recall the Holstein family.  What is your motion?

MR. STUCKY:  My motion is to strike him for cause.

MR. McKITTRICK:  How do you know he is the brother?

THE COURT:  That is my next statement.  I intend to bring him in and ask him.

MR. STUCKY:  The information I obtained is he lives in Brounland and works in Charleston, and the probation report indicated one of them was employed at Pressure Products Company.  And the answer to question No. 7 on the questionnaire about employment, "Machinist, Pressure Products Company, Charleston."  And then with his answers that some family member has been convicted, I think if the Court needs further inquiry, that is fine; but that is the information.

MR. McKITTRICK:  How do you know though, even if he is the brother, he wouldn't be a fair and impartial juror without asking him those questions?

MR. BROWN:  The same way we figure your guy --

THE COURT:  This is going to be a long, protracted proceeding, fellows.  Now, the first thing we will do is

determine whether or not he is the brother, then go from there.

If you want to bring him in right now, we will put it on the

record, or if you want me to inquire of him on the record out

of your presence and then read the record back, however you want

to proceed.

MR. McKITTRICK:  I would like to remain here.

THE COURT:  All right.  No one is to say anything to him.

The Court will ask the questions.

Bring Mr. Holstein in.

(Whereupon, Juror Frankie Holstein entered.)

THE COURT:  You are Frankie Holstein?

JUROR HOLSTEIN:  Yes, sir.

THE COURT:  You live in Brounland?

JUROR HOLSTEIN:  Yes, sir.

THE COURT:  Do you have any brothers and sisters?

JUROR HOLSTEIN:  Yes, sir, I have three brothers and two

sisters.

THE COURT:  Ralph?

JUROR HOLSTEIN:  Yes, sir.

THE COURT:  David?

JUROR HOLSTEIN:  Yes, sir.

THE COURT:  Does David go by any other name, such as "Wild

Man"?

JUROR HOLSTEIN:  Yes, sir.

108

THE COURT:  Did he not serve some time in the penitentiary?

JUROR HOLSTEIN:  Yes, sir.

THE COURT:  Were you in the courtroom at the sentencing proceeding?

JUROR HOLSTEIN:  Yes, sir.

THE COURT:  Your father was I believe?

JUROR HOLSTEIN:  Yes, sir.

THE COURT:  I believe I sentenced two of your brothers?

JUROR HOLSTEIN:  I don't know what for, but I think you are the judge that done it.

THE COURT:  The first one involved a stereo in a car, and I put him on probation.

JUROR HOLSTEIN:  I don't know what they involved.  I know you put him on probation.

THE COURT:  But you also know I sentenced both of them to the penitentiary eventually?

JUROR HOLSTEIN:  Yes, sir, I do know that.

THE COURT:  All right, Mr. Holstein, thank you very much.  Just take you seat back out there.

(Whereupon, the juror exited.)

MR. BROWN:  We challenge for cause.

MR. McKITTRICK:  Objection.

THE COURT:  Over the objection of defense counsel, I'm going to grant the motion for cause.

I sentenced not only one of his brothers but two of his brothers to the penitentiary, one of whom, as I have said, without burdening the record with profanity, had threatened me with profanity, and hurled several epithets. I still granted him probation. Nonetheless, he violated it.

I think since this Court has granted defense counsel's challenge for cause of Mr. Burgraff because there may be some hard feelings as a result of some representation of some of Mr. Burgraff's relatives years ago and the State did not object, I think it only fair to grant the State's motion to exclude Holstein. And given the criminal involvement of not one but at least two of his brothers, I don't think that this man could sit objectively on a proceeding before this Judge who sentenced both of them to the penitentiary.

I'll note the objection and exception of Mr. McKittrick, but I will grant the State's motion and excuse him for cause.

Now, we have to go back out there and put two more jurors in the box.

(Whereupon, all parties entered the courtroom where the following proceedings were had in open court and in the presence of the prospective jury panel:)

THE COURT: Juror No. 13, Mr. Burgraff, you are excused. You may go home, but you are to check with the circuit clerk's office to see when you might be needed again. You are not

excused from the panel.  You are simply excused from this trial.

JUROR BURGRAFF:  Thank you.

THE COURT:  Okay, thank you very much.

Juror No. 1, Mr. Holstein, you are excused likewise.  You may go home, but call the clerk's office to see if you are needed on another panel.  You are only excused from this panel.

JUROR HOLSTEIN:  All right, thank you.

THE COURT:  You're welcome.

Now, just rest easy for just a minute.  Do not discuss this case among yourselves nor permit others to discuss it with you.  Neither should you read any newspaper accounts, watch any television accounts or listen to any radio accounts of this trial or of any of the personalities connected herewith.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

THE COURT:  The clerk will put two more jurors in the box.

(Whereupon, Harvey Hunley and Suzie Meadows were called and sworn to truly answer all questions asked of them.)

THE COURT:  All right, my questions are addressed only to Mr. Hunley and Mrs. Meadows.

Mr. Hunley and Mrs. Meadows, we are about to impanel a jury for the purpose of trying the case of the State of West Virginia against one John Moss, Jr., also known as John Moss, III, who is charged in a three count indictment with three counts of murder

in the first degree. These incidents are alleged to have occurred during the month of December, 1979.

In Count I he is charged with murder in the first degree upon one Paul Eric Reggettz. In Count II he is charged with murder in the first degree upon one Bernadette Reggettz. And in Count III he is charged with murder in the first degree upon one Vanessa Dale Reggettz.

This indictment was returned by the Grand Jury of the Circuit Court of Kanawha County during the September, 1982 Term, of which Mr. Paul Emory was foreman.

Are either of you kin either by blood or marriage to the accused, John Moss?

JUROR No. 13: I didn't understand.

THE COURT: Are you related by blood or marriage to the defendant?

Do either of you know anything, or have you made up your mind or expressed any opinion concerning the guilt or innocence of the accused?

Are either of you sensible of any bias or prejudice that would prevent you from receiving both the evidence of the State of West Virginia and the evidence of the accused, and from returning a true and impartial verdict therefrom?

Do you, both of you, feel you can stand freely and impartially between the State of West Virginia on the one hand

and John Moss on the other and that you can return a verdict

from the evidence as presented here at the bar of this Court?

JUROR NO. 13:  I'm not sure.

THE COURT:  What is your problem?

JUROR NO. 13:  I'll certainly try.

THE COURT:  Well, have you made up your mind?  Have you

formed an opinion?

JUROR NO. 13:  No, I haven't formed an opinion.

THE COURT:  Come to the bench.

(Whereupon, counsel and the defendant approached the bench

where the following proceedings were had out of the hearing of

the prospective jury panel:)

MR. McKITTRICK:  Your Honor, if you are going to voir dire

this juror, I think it should be done out of the presence of the

others.

MR. BROWN:  She might blurt something out.

THE COURT:  If you want to move to excuse her, I'll excuse

her.

MR. McKITTRICK:  All right.

(Whereupon, counsel and the defendant resumed their seats at

counsel table where the following proceedings were had in open

court and in the hearing of the jury panel:)

THE COURT:  All right, Mrs. Meadows, you are excused.  You

may be needed on another matter.

113

JUROR MEADOWS; Thank you.

THE COURT: The clerk will put another juror in the box.

(Whereupon, Donald Tackett was called and sworn to truly answer all questions asked of him.)

THE COURT: It takes a while, ladies and gentlemen, but it is vitally important that you be totally candid and forthright. That is the purpose of these questions. It is vitally important to both sides that you be fair and impartial.

Mr. Tackett, these questions I am about to ask are addressed solely to you and Mr. Hunley. The first two or three I have already asked of Mr. Hunley.

Mr. Tackett, we are about to impanel a jury in the case of the State of West Virginia vs. John Moss, Jr., also known as John Moss, III, who is charged in a three count indictment with three counts of murder in the first degree. These incidents were alleged to have taken place during the month of December 1979.

In Count I he is charged with murder in the first degree upon one Paul Eric Reggettz. In Count II he is charged with murder in the first degree upon one Bernadette Reggettz. In Count III he is charged with murder in the first degree upon one Vanessa Dale Reggettz.

Are you related or kin, either by blood or marriage, you or Mr. Hunley, to any of those people I have named, the Reggettz

114

people I have just named?

Or to one Paul Reggettz?

Are you kin, either by blood or marriage, to the accused, Mr. John Moss?

Mr. Tackett, do you know, or are you acquainted with, you or Mr. Hunley, to one Trooper Terry Williams of the state police?

Have either of you made up your mind or expressed any opinion concerning the guilt or innocence of the accused?

Are either of you sensible of any bias or prejudice that would prevent you from receiving both the evidence of the State of West Virginia on the one hand and the accused, John Moss, on the other and returning a true and impartial verdict therefrom?

Do both of you feel, and each of you feel, that you can stand freely and impartially between the State of West Virginia on the one hand and the accused, John Moss, on the other, and that you could return a verdict from the evidence as presented here at the bar of this Court?

Gentlemen, this indictment was returned by the September, 1982 Term of the Grand Jury of the Circuit Court of Kanawha County, of which Mr. Paul Emory was foreman.

Were either of you gentlemen members of that Grand Jury that returned this indictment?

Have either of you, exclusive of this term of court, served on a petit jury within the last two years?

Are either of you gentlemen now, or have you ever been clients of Mr. James Stucky, Prosecuting Attorney?

Or Mr. Peter Brown, Deputy Prosecuting Attorney?

Or Mr. Parrish McKittrick, counsel for the accused?

Gentlemen, you will be triers of the fact, if you are selected. I am the trier of the law. I decide what evidence is to be heard. There will be times when we have bench conferences over here at the side out of your hearing. We are not trying to keep anything from you. These are matters of law to be discussed by the Court and counsel and not for your consideration.

Do you both feel you can attempt to return a true and impartial verdict based solely on the evidence, the arguments of counsel and the instructions of the Court?

If I read to you the instructions of the Court and I say to you, "This is the law. You must apply this law in your deliberations," even if you may personally disagree with the law as I read it to you, will you follow my instructions and apply the law as I give it to you?

You are not to read anything into the inflection of my voice. I couldn't care less how this turns out. That is not my function; that's yours. You are the triers of the facts.

You are not to concern yourself with the number of objections or the lack of objections made by either side. You

are not to concern yourself with how I rule on those objections. You are to concern yourself solely with the evidence you hear, the instructions of the law given by me, by the Court, and the arguments of counsel. Do you both feel that you can do that?

Do either of you have any relatives, either by blood or marriage, who are law enforcement officers, either city, county, state police, FBI, Department of Justice, or prosecuting attorney, assistant prosecuting attorney, attorney general for the state, assistant attorney general, United States attorney or assistant United States attorney? Do either of you have any kin?

This trial may, may, take six weeks. Do either of you have any conflicts that can't be avoided for that period of time?

JUROR NO. 1:  What about vacation?

THE COURT:  When is the vacation schedule?

JUROR NO. 1:  The 16th of April for two weeks.

THE COURT:  Have you already made reservations?

JUROR NO. 1:  Yes.

THE COURT:  To go somewhere?

JUROR NO. 1:  Yes.

THE COURT:  Come to the bench.

(Whereupon, counsel and the defendant approached the bench where the following proceedings were had out of the hearing of the prospective jury panel:)

117

MR. McKITTRICK:  Judge, that is the reason we have alternates.

THE COURT:  All right, I'm not going to excuse him.  We can put an alternate in.

(Whereupon, counsel and the defendant resumed their seats at counsel table where the following proceedings were had in open court and in the hearing of the prospective jury panel:)

THE COURT:  Any other conflicts?

All right, Mr. McKittrick, if you and your client and the Prosecutor and his assistant will go back to the jury room please.

MR. McKITTRICK:  Your Honor, since we put a new juror in as Juror No. 1, could we have about five or ten minutes to go over that questionnaire as we did the other one?

THE COURT:  Yes.  Ladies and gentlemen, there is no doubt in my mind this is going to go on the rest of the afternoon.  I don't know how many of you we are going to get to.  Should you need to use the restroom facilities, please ask Lieutenant Burdette.  If it is one of the ladies, the clerk will go with you.  Lieutenant Burdette will take the men to the restroom facilities, there and straight back.  And if you ladies have to avail yourselves of the facilities, the clerk will walk you to the door and walk you back, and no conversation in the hallways.

All right, let's retire to the jury room, and you can go

over it there, Mr. McKittrick.

(Whereupon, the Court, counsel for the State, counsel for the defendant, the defendant in person and the court reporter entered the jury room, where the following proceedings were had:)

THE COURT:  All right, show the resumption of these proceedings with all parties present heretofore present here again, including the defendant and his counsel, out of the presence of the jury.

I'm not going to give some of these.  You are trying to get in the back door what you can't through the front door.

MR. BROWN:  Your Honor, could we have a little bit to look over these questions?

THE COURT:  I have already asked some of these.

MR. McKITTRICK:  Yes.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

MR. BROWN:  Your Honor, I would move you go ahead and let the jury go so we can properly consider these on both sides.

THE COURT:  All right, let's let them go.  There is no point in keeping that jury setting out there.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

THE COURT:  All right, is it agreeable that I let them go

119

until 1:30 tomorrow afternoon?

MR. McKITTRICK:  Yes.

MR. BROWN:  Yes.

(Whereupon, all parties entered the courtroom where the following proceedings were had in open court and in the hearing of the prospective jury panel:)

THE COURT:  Ladies and gentlemen, would you now please go into the jury lounge, and I will be in there in just a moment and explain the rest of today's proceedings.

MR. BROWN:  Is there any kind of stickers that those folks can put on?  I would not recognize most of the people if I saw them in a half an hour.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

THE COURT:  Let's let the jury go back there, and then we'll go.

(Whereupon, the jury exited the courtroom and entered the jury lounge, followed by the Court, counsel for the State, counsel for the defendant, the defendant in person, and the court reporter, where the following proceedings were had:)

THE COURT:  Ladies and gentlemen, may I have your attention for just a moment please.  The attorneys and the Court have some legal matters to take up, and I know it will take more than the rest of this afternoon and most of tomorrow morning.  And I

don't want you sitting around here any more than is necessary.

We are going to stand in recess until 1:30 tomorrow. I want you back here at 1:20 tomorrow in this room, all of you, including the twenty-eight setting in the box now.

Now, I know you are going to get tired of hearing it, but I am required by law to admonish you at every recess. I, therefore, admonish you and each of you not to discuss this case among yourselves nor permit others to discuss it with you. Neither should you read any newspaper accounts, listen to any radio accounts or watch any television accounts of this trial or of any of the personalities connected herewith.

With that, please be back here at 20 minutes after 1:00 tomorrow afternoon, and I thank you for your patience.

(Whereupon, the jury exited the room.)

THE COURT: Okay, let's go back upstairs.

(Whereupon, the Court, counsel for the State, counsel for the defendant, the defendant in person and the court reporter entered the jury room on the seventh floor where the following proceedings were had:)

THE COURT: Show the resumption of these proceedings with all parties present heretofore present here again, including the defendant and his counsel, out of the presence of the jury.

I have just dismissed the jury until 1:30 tomorrow afternoon. Mr. McKittrick has presented his voir dire

121

questions, which contain some thirty-two pages, typewritten,

double spaced.   The State has presented its voir dire questions

which are unnumbered.

    MR. BROWN:   There are sixty-two questions, Your Honor.

    THE COURT:   Some sixty-two questions, typed, by the State.

In addition to which, I would suggest, gentlemen, that you take

your time between now and tomorrow morning to also go over

perhaps the first twelve seven-page questionnaires prepared by

the jurors.   We are not going to get through twelve a day.   We

will be lucky to get through six or eight, but you should have

at least six of them read and be ready to go.

    MR. STUCKY:   I have a question on voir dire.   I have pages

one through twenty-nine, and then it skips to thirty-three and

thirty-four.   I don't know whether there are a thirty, thirty-

one and thirty-two.

    MR. McKITTRICK:   This is out of order.

    THE COURT:   I want you to go over at least six of these

questionnaires tomorrow, because I'm not going to ask every

question on these questionnaires.

    (Whereupon, a discussion was had off the record and then

resumed back on the record as follows:)

    THE COURT:   Just go through those and see if there is

anything in there you might want me to inquire about.

    Anything else?

122

MR. McKITTRICK:  Yes, Judge.  There has been discussion in this case concerning evidence and how it would be adduced and whether it would be adduced, and that evidence has to do with Paul Reggettz' confession.  There has been some discussion between the Prosecutor, and the Court and defense counsel.

There has been objections in prior hearings, and the Court has made certain rulings and today made a statement when we tried to adduce before the jury a statement of the facts concerning Paul Reggettz' confession that the Court would not allow us to get in the back door what we couldn't get in the front door.

Now, it is the position of the defendant in this case, pursuant to Chambers vs. Mississippi, and I have a copy of that which I would like to give to the Court for the Court's perusal, the essence of that case, Your Honor, is on all fours with this case before the Court.

In that case the State of Mississippi had a voucher rule, as we do, although I understand ours has just been vitiated by a recent Supreme Court ruling, in that a party now don't vouch for the credibility of the witness we put on the stand.  I haven't seen that, but I understand it just came out.

In any event, the holding in Chambers vs. Mississippi was that when the defendant is trying to defend himself the rules of evidence do not go out the window but the old anachronistic

123

rules of hearsay with regard to the voucher rule do not apply to
this kind of case or its unique facts and that the defendant has
a right to cross-examine thoroughly and in detail the declarant,
the out of court declarant on cross-examination if he is put on
by the State, and if he is put on by the defendant he has the
same right.

Also that case holds that the defendant has the right to
bring third parties in to attest to statements made by the
declarant outside the courtroom, which in this case would be the
confession.

I think the case is very important to the evidence in this
particular case.  And I would like to adduce it to the Court and
allow the Court to read that case thoroughly because I know
those evidentiary issues are going to arise.  And I am sure you
will want the guidelines of that case.  It is a United States
Supreme Court case.

THE COURT:  Do you have a copy with you?

MR. McKITTRICK:  I have it with me.

(Whereupon, a discussion was had off the record and then
resumed back on the record as follows:)

THE COURT:  Now, read this overnight and let me see if you
have any objection to it.

MR. BROWN:  We will have objection.  We just feel this is
not the time to get into that thing.

124

THE COURT:  We will argue that tomorrow.

Now, here is what I want to take up tomorrow.  I want you to read as many of these as you have to.  You read the State's voir dire, and you read his voir dire.  Anything that is stipulated to, I'll ask.  Then be prepared to argue your motion on the Chambers case.  So be here by 10:00 in the morning.  That will give you enough time to go over all these things.  I would like to get all these things argued tomorrow morning.

- O -

(Whereupon, a recess was had in the proceedings.)

- O -

PROCEEDINGS HAD ON

THURSDAY, FEBRUARY 23, 1984

WHEREUPON, the proceedings in the Matter of State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, were resumed on Thursday, the 21st day of February, 1984, with all parties present as before noted, including the defendant and his counsel, out of the presence of the jury.

THE COURT: Show the resumption of these proceedings in chambers, the defendant being present in person and accompanied by counsel, the State of West Virginia by her Prosecutor and Assistant Prosecutor, no other persons being present except authorized court personnel.

We are here for the purpose of going over the voir dire questions submitted in writing by both sides.

All right, let's take up the defense's voir dire first.

(Whereupon, the defense presented the following questions for the Court's consideration:)

ONE

1.  Can you follow the instructions of the law given to you by me, whether or not you like those laws? Even if you disagree with those laws?

2.  Regardless of what the law is, assuming you are willing to follow my instructions of law in this case, do you agree to follow those instructions completely and in detail no matter to