**RESPONDENT'S EXHIBIT 39**

VOLUME 2 OF 18

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA

vs.                              CR-82-F-221

**FILED**

JAN 1 3 1986

CLERK OF THE
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

JOHN MOSS, JR.,
also known as
John Moss, III

BEFORE:   HONORABLE JOHN HEY, Judge,
          and a Jury.

APPEARANCES

        FOR THE STATE:  James C. Stucky, Prosecuting Attorney,
and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha
County.

        FOR THE DEFENDANT:  The Defendant, John Moss, Jr., also
known as John Moss, III, in person, and by Parrish McKittrick,
his counsel.

                              Betty Lou Frame
                              Official Reporter

arrives this afternoon with the rest of the jurors, I call her

into chambers, the Court and the court reporter, and have the

court reporter transcribe her conversation and then make it

available to the defense and the State?

MR. McKITTRICK:  No, I have no objection.

THE COURT:  Does the State?

MR. STUCKY:  No, Your Honor.

THE COURT:  Also, I received a call this morning from Juror

No. 16, Dorothy Shaw.  Mrs. Shaw has a small child, a boy, who

suffers from bronchitis.  She was afraid he may have a touch of

pneumonia.  She was taking him to the hospital.  I advised her

if she could be here at 1:30 to be here.  If she could not, to

let my secretary know.  And if she is not here at 1:30,

gentlemen, we will take up the possibility of her status at that

time.  Is that agreeable?

MR. McKITTRICK:  That's fine, Judge.

MR. STUCKY:  That's fine.

THE COURT:  Now, having said that, what about this last voir

dire; any objection?

MR. STUCKY:  Yes, Your Honor.  As the Court reads voir dire,

section 25 there, it is worded in such a manner as being a

court's instruction to a juror of a law rather than a question

of a voir dire type, that being what they will do or what they

understand the law to be, is not a proper voir dire question.

It is an instruction of the Court. "This is the law. Do you

understand that". And that is not the purpose of voir dire,

instructing jurors on the law. It is to find out whether or not

they have any prejudices either for or against the defendant or

for or against the State that would not make them an impartial

or fair juror. And that question does not meet those

requirements.

    MR. McKITTRICK: Judge, I drafted the thing exactly as you

dictated it.

    THE COURT: I agree with you. I know it is an instruction

of the law. I have got to give McKittrick credit. He just

wears you out after awhile. I'm going to give it.

    That takes care of the defendant's voir dire. Now, let us

proceed to the State's. Do you have any order in which you want

me to give these, that is to say, do you want me to give the

State's first or the defense's?

    MR. McKITTRICK: It doesn't matter to me.

    THE COURT: I might as well start off then with the State's,

if you don't have any objection, with that first question

because that is the one that is going to take the most time,

have you read anything in the newspapers or heard anything on

television or radio about this case involving the murders of the

Reggettz people.

    MR. McKITTRICK: I have no objection to 1, 2 --

THE COURT:  I think I am going to give the State's first because that is going to be a very important question.  All right, 1, 2 --

MR. McKITTRICK:  I have no objection to 3.  I have no objection to 4.  I have no objection to 5.  I have no objection to 6 or 7.

MR. BROWN:  No. 7, Your Honor, excuse me, is an alternate. You might bracket 7.  Just kind of put a bracket around it.

THE COURT:  Okay.

MR. BROWN:  And also 8 I think is an alternate type question.

MR. McKITTRICK:  I do object to No. 9 for the following reasons:  I think No. 9 firstly tries to imply that John's lawyer is hired instead of appointed.

THE COURT:  Wait a minute, "Have you contributed or have you been asked to contribute any money, aid, or time to the defendant?"  What possible place does a question have --

MR. BROWN:  Let me ask you this:  If there is somebody on that jury that gave money, time or aid to the defendant in this case, do you think that would prejudice the State, Your Honor?

THE COURT:  I don't think that is a proper question.  You are asking them to be excused right now.

MR. BROWN:  Wait a minute now.  Time out, Your Honor.  What if somebody gave time or helped in doing investigation in this

233

case for John Moss?

MR. McKITTRICK:  I'm telling you they didn't.  I'm an officer of this Court.  I'm saying they didn't, and this is a prejudicial question to the jury that someone out there has been contributing to John's assistance other than his lawyer.

MR. STUCKY:  Your Honor, Mr. McKittrick was not in this case initially.  He had court appointed --

THE COURT:  Do you have any reason to believe that someone on this panel may have contributed money to Moss?

MR. STUCKY:  Or could have worked as an investigator or a part time secretary for whoever his court appointed lawyers were.

MR. McKITTRICK:  Your Honor, that's wrong.  Those lawyers that came into this case never represented Moss -- What happened, the situation was simply this:  There was a hiatus for a couple of days while the Mosses firmed up their hiring me. Those lawyers did nothing for Mr. Moss.

MR. STUCKY:  They went on the record and continued several preliminary hearings --

MR. McKITTRICK:  That's all.

THE COURT:  What happened?  Would you mind filling me in?

MR. McKITTRICK:  Four years ago, when this case began, when John Moss was brought back from the State of Ohio to the State of West Virginia on the 28th day of October, 1980, he was

234

appointed counsel, two counsel.

    THE COURT: Who?

    MR. McKITTRICK: John Krivonyak and Steve Max. At that time both counsel contacted me. They were told by John his parents were going to hire me. Some weeks went by. The lawyers did not look into the facts of the case, did nothing with regard to the case, and at my behest continued the preliminary proceedings until I could be in the case.

    MR. BROWN: What if they gave money to Jim Williams?

    MR. McKITTRICK: Who?

    MR. BROWN: Jim Williams.

    MR. McKITTRICK: Jim Williams?

    MR. STUCKY: The guy who testified he was hired in this case.

    MR. McKITTRICK: Jim Williams wasn't in this case.

    THE COURT: Well, he said he was.

    MR. McKITTRICK: That was in another case.

    THE COURT: Yes, but Moss implied that if Williams was in the other case he had a lawyer, and he had a lawyer to govern the situation coming from Ohio back to West Virginia.

    MR. McKITTRICK: Judge, that question is prejudicial. I'm telling you that this would be error if you ask this question.

    THE COURT: I understand that. We'll get to that in a minute. But I'm telling you for the record he did indicate he

had a lawyer and that lawyer was Jim Williams. Whether he had

Williams or not is another matter. I ruled, I believe, that he

didn't have.

MR. McKITTRICK: It says John Moss in this case.

MR. STUCKY: Your Honor, this is no more prejudicial than

asking whether or not any of the jurors work for the State of

West Virginia or work for any police agency. This is to see

whether or not they are associated with John Moss.

THE COURT: I'm not giving it.

No. 10. Well, I'm not going to sequester them. I'm not

ruling on this yet. Don't get excited. The Supreme Court has

discouraged sequestration. And I think I would call McHugh

first if somebody is going to move that they be sequestered. I

have no problem with that, but I would have to call McHugh first

to see if they are going to approve it.

MR. McKITTRICK: Quite frankly I was thinking seriously of

doing it in this case, Judge.

THE COURT: Oh, I don't have any problem giving it, Jimmy --

MR. STUCKY: I was just going to say you gave a similar one

of Mr. McKittrick's where he asked if they were going to be

locked up away from their family --

MR. BROWN: For instance, Your Honor, let's suppose we asked

this question: If you ladies and gentlemen of the jury were to

buy a car, would you ladies and gentlemen buy it based on style

or on performance?  It seems to have nothing to do with the

case, but it does, Your Honor.  Whether or not they are locked

up, how they answer that tells me how nervous they are about

staying in on this case.  I don't care if they are locked up or

not.  The impression I want to get is when somebody starts

whining on that question, that tells me that they are not too

happy about really having to pay that much attention to this

case.

MR. McKITTRICK:  Why don't you ask that question then

instead of asking them a question that don't apply to this case?

MR. BROWN:  Because I think this is a little slicker.  I

don't have to ask a direct question.

THE COURT:  You just finished saying, Mr. McKittrick, you

may ask for sequestration.

MR. BROWN:  That's the whole purpose of voir dire.

THE COURT:  Well, I'm going to give it.  Whether they are

sequestered or not is going to depend upon whether the Supreme

Court approves it.

MR. McKITTRICK:  Show my objection on the basis it doesn't

apply to this case on the basis there hasn't been a motion for

sequestration.

THE COURT:  It doesn't need a motion for sequestration.  If

you will read the question, I think it says, quote, If you were

selected and you were required. . ."  I don't know whether they

will be or not.  But I can understand Mr. Brown's argument that

if they start, and to use his words "weasle around a little" or

whatever he said, it appears that he is concerned about their

ability to give attention to the case.  I suspect when I ask

that question we are going to have about ten of them that want

off right then and there.

MR. STUCKY:  Your Honor, for the record I would like to show

that Mr. McKittrick asked basically the same question on section

Fifteen, page 20, Question No. 8, "Would the inconvenience of

having to spend the night or more nights away from home prevent

you from sticking to your guns and refusing to change your

verdict if you still have the same reasonable doubt about the

guilt of John?"  Just so the Supreme Court might know that he

asked the same question and not have to go through all the --

MR. McKITTRICK:  I think that is a completely separate

question.

THE COURT:  I think they are both in the same context, Mr.

McKittrick.  I am giving one for the defense.  I will give one

for the State.

MR. McKITTRICK:  Show my objection and exception.

On No. 11, Judge, I really don't have any objection to it,

but I think it has been asked.

THE COURT:  I think it has too, but I'll ask it.

MR. BROWN:  Judge, the reason some of these have been asked

238

relating to personal things, health, whatever, obviously it is
not going to hurt to repeat these things ad nauseum since you
have already done it to them -- We have already had I think at
least four pop up and now after a weekend or sometime last week
they say, "Well, now that you mention it, I do have to go to a
croquet tournament", or whatever it is they have come up with.

THE COURT:  I agree.  No. 11 is all right; what about 12?

MR. McKITTRICK:  I object to 12 on the basis that I don't
understand what the question is.  I don't know what an
unfortunate experience is.  I think it is unclear.

MR. BROWN:  Let them determine that.  Let them raise their
hand and let me find out about it.  It's a counter to your
question.

MR. McKITTRICK:  Show my objection.

MR. BROWN:  It is a perfectly legitimate question, Your
Honor.  I think that --

THE COURT:  What about rephrasing it, "Have you had any
experience with law enforcement officers or courts that would
prejudice you against the prosecution in this case?

MR. BROWN:  All right, strike out unfortunate, so that it
will read thusly, "Have you had any experience with law
enforcement officers or courts that would prejudice you against
the prosecution in this case?"  Do you object to that?

MR. McKITTRICK:  I object to the words "or courts".

239

THE COURT: Well, I'm giving it. I think it is proper.

All right, No. 13.

MR. McKITTRICK: I have no objection to 13 although I think it has been asked.

THE COURT: No. 14.

MR. McKITTRICK: I have no objection to 14 although I think it has been asked.

THE COURT: No. 15.

MR. McKITTRICK: I have no objection to 15 or 16.

THE COURT: No. 17.

MR. McKITTRICK: I have no objection to 17.

THE COURT: What about 18?

MR. McKITTRICK: I have no objection to 18.

THE COURT: No. 19. You need the word "a" on the last line between the words "require" and "heavier", "require a heavier burden".

MR. McKITTRICK: I object to 19 as an instruction by the Court of the law, and this is an incorrect proposition of law. There is no heavier burden in the law than to prove a case beyond a reasonable doubt, and this implies that there is.

THE COURT: Given. Note the objection and exception of counsel. I have already given a half dozen of yours that are instructions of the law, and I'm not sure all of those are correct.

240

No. 20.

MR. McKITTRICK:  Again I object to that as being a comment on what the law is.

THE COURT:  Given.  Note the objection.  When I say given, just for the purpose of this record which undoubtedly is going to be extremely voluminous by the time we are finished, when I say given, I mean in this case I am permitting the State to ask this as a voir dire question.  The defense objects to my permitting the State to ask it through the Court.

All right, 21.

MR. McKITTRICK:  I have no objection.

MR. BROWN:  Your Honor, on 21, I think it would be better, "Would you give more weight and credibility to the testimony of a police officer" and the same thing on 22, Your Honor.

THE COURT:  Okay.  No. 23.

MR. McKITTRICK:  I object to 23 because there is not only circumstantial evidence in this case.

THE COURT:  I'm not going to give it.  You can offer it as an instruction as to circumstantial evidence alone or coupled with other evidence, etc.

MR. McKITTRICK:  I have no objection to 24 and no objection to 25.

THE COURT:  You need the word "the" in there in front of the word "trier".

241

MR. BROWN:  All right.

THE COURT:  No. 26.

MR. McKITTRICK:  I have no objection to that.

THE COURT:  All right, 27.

MR. BROWN:  Your Honor, on 27 that should be, "Is there anybody here who would not return a guilty verdict of murder in the first degree without a recommendation of mercy if the facts and the law called for it".

THE COURT:  I think you need a predicate laid first.  I think it has to be explained to them that among the possible verdicts available --

MR. STUCKY:  That's in 31, Your Honor.

THE COURT:  Well, I think you are putting the cart before the horse.

MR. BROWN:  All right, let me put 31 as No. 27, and let me withdraw the old 31 that you have --

THE COURT:  Do you want to make that 27?

MR. BROWN:  Yes, sir.

THE COURT:  And make 27 as 31?

MR. BROWN:  Yes, sir.

THE COURT:  Now, how do you want that 27 --

MR. BROWN:  I'm just taking the existing 27 at the top of the page out.

THE COURT:  Okay, and substituting 31.  All right, I will

242

take out the existing 27.  Do you have that, Parrish?

MR. McKITTRICK:  As I understand, they are going to substitute 31 for 27?

THE COURT:  Yes.  Strike 27 and renumber 31.  I don't think it is still complete though.  I think if you are going to complete it --  This one is all right.  "Do you understand a verdict without a recommendation of mercy means that he is going to spend the rest of his life in the penitentiary without hope of parole.  Knowing this could you still return a verdict if the State proved its case beyond a reasonable doubt and the facts called for it?  A verdict of murder in the first degree with a recommendation of mercy . . ."  Well, I'm going to give that in the instructions anyway.

MR. BROWN:  I just want to see how they feel about mercy; can they do it.

THE COURT:  They'll get that in the instructions.  Now, this is the one case which is an exception on argument of penalties. I am going to permit counsel for the defendant to argue penalties if it reaches that stage.  In other words, you can argue to them a recommendation of mercy means he would be eligible for parole in ten years, but absent a recommendation of mercy he must spend the rest of his natural life in the penitentiary without hope of parole.  This is the one case I make an exception to, and I think you are absolutely entitled to

243

argue that, Mr. McKittrick.

MR. McKITTRICK:  Judge, I object to the question on the

basis that it is not complete, it is a comment on the law, but

it is not a complete comment for it leaves out what a

recommendation of mercy means.

MR. BROWN:  Well, Your Honor, our reply to that is these are

not instructions, they are not intended to be instructions.

This gives me a chance to plumb that jury's mind on whether or

not they can withhold mercy if --

THE COURT:  I think it is a proper question.  If we had

capital punishment in this state, I think it is just as proper

to ask the jury, "Is there anyone here who could not return a

verdict of guilty" if they knew that the punishment provided for

capital punishment.  I think it is proper.  I will note your

objection.  I'll permit it to be asked.

MR. McKITTRICK:  I have no objection to 28, 29 and 30

although I think they have been given.

THE COURT:  I think so too, by you several times, so we will

give one for them.

MR. McKITTRICK:  I have no objection to 32.

I object to 33 on the basis it is a comment on the law.

THE COURT:  You want to object to 33?  All right.

MR. BROWN:  I think he has already given something like

that, and we want it in.  I think it is proper.

244

THE COURT: I'm going to strike it.

MR. BROWN: Does that mean he can't ask it at all in any of his questions?

THE COURT: I have just struck it in yours. No. 34.

MR. McKITTRICK: I have no objection to 34 and 35.

THE COURT: How about 36?

MR. BROWN:: Your Honor, this is to cover, should it come out in the case, should it come out at all -- I don't see it coming out at all, but this was prepared, should it come out --

MR. McKITTRICK: I object to 36. Every voir dire question that I tried to ask that started out with "The Judge will instruct you", there was an objection from the State and the Court sustained it

THE COURT: I agree. However, it might be asked if I rephrase it, "Do you understand"?

MR. BROWN: All right, do you understand.

MR. McKITTRICK: And further, I object to it on the basis it has already been covered.

THE COURT: All right, I am going to change "The Judge will instruct you" to "Do you understand". I'm going to permit it to be asked. Note the objection of the defense counsel.

I might say, Parrish, I'm writing on the originals at the side of every question which I am refusing and to which you object, I'm writing that on the originals.

245

MR. STUCKY:  Judge, I would like to go back to 33, which you struck.  On Defendant's section Six, page 9, question No 4, so that you don't have to go back, I have got it right there.  The only difference is that his is specific to John, and ours is --

THE COURT:  I understand, but I think I have just permitted you to cover it in 36.

MR. BROWN:  All right, that's fine.

THE COURT:  Read it; 36 covers it.

MR. McKITTRICK:  Since the Court has ruled as it has on 33 and 34, and realizing the Court does not want to get error in this case, I would ask the court to look at section Six of the defendant's questions, which the Prosecutor has just pointed out to the Court; and the Court on every question that the defendant asked on Section Six refused to give the same kind of voir dire that has just been given for the State.

THE COURT:  What are you talking about?  Which one are we on?

MR. McKITTRICK:  Section Six, page 9.

MR. BROWN:  He is going back to his?

THE COURT:  I know that.  Section Six, page 9?

MR. McKITTRICK:  Page 9, Section Six.  You refused to give 1, 3, 4, 5 and 6 on that page.

THE COURT:  I don't think that is error.  These are voir dire questions, and I don't think it makes any difference

246

whether I give it in your context or their context because the

ones that I refused by you are now covered in 36, which says,

"Do you understand where any person comes into a court of law

accused of a crime the fact that he had been arrested or the

fact that he has been indicted is absolutely no evidence of

guilt?" I'm giving that. They don't know whether it is the

State's question or your question, and it covers every one of

those that you are indicating I refused on page 9. These are

not instructions. I can't emphasize that too strongly. These

are voir dire questions. And every one of these is an

instruction. "John has been arrested on these charges. What do

you think that means as far as proof he is guilty?" No. 3,

"I'll tell you John's arrest is absolutely no indication of

guilt." No. 4, "Do you understand an indictment is nothing

more", etcetera and so on. I have covered every one of yours

in --

      MR. McKITTRICK: Except that mine are personalized, Judge,

the way we wanted to ask them.

      THE COURT: I think it is covered. Let me ask you a

question. I'm confused here. No. 2, "John has been arrested on

these --

      MR. STUCKY: You are going to give that, Judge.

      THE COURT: "John Moss has been arrested. . ." I don't know

how personalized you want them, but I am totally unpersonalized;

I am totally detached from any personalization for either the
State of West Virginia or the defendant. I think it has been
covered in 36. They are the Court's questions; and that covers
it regarding indictment, arrest, the preasumption of innocence,
the whole ball of wax. So I see no error in refusing to give
your questions. Again at the expense of belaboring this record,
these are not instructions of the law; they are voir dire
questions. And I believe I have given every question up to this
point which I deem proper. If the Supreme Court, should it
reach them, thinks otherwise, they can reverse. That doesn't
bother me. That is what they are there for, to reverse or
affirm.

No. 37.

MR. McKITTRICK:  No objection.

THE COURT:  And 38.

MR. McKITTRICK:  No objection.

THE COURT:  No. 39.

MR. McKITTRICK:  No objection.

THE COURT:  No. 40.

MR. McKITTRICK:  I think that has been asked.

THE COURT:  Do you want to object to it?  I'm going to give
it.

MR. McKITTRICK:  No, I don't want to object.

THE COURT:  No. 41.

248

MR. McKITTRICK:  I think that has been asked, and I do object.

MR. BROWN:  That has been, Your Honor, and we will withdraw it.

THE COURT:  All right, 41 is withdrawn.

MR. BROWN:  We will withdraw 42.

MR. McKITTRICK:  I object to this, because he refused mine.

MR. BROWN:  No, I don't believe he did.

THE COURT:  Show me where I refused his, if I did.  This is the old hung jury instruction which I am going to give if we ever reach that point.  I'm going to give at least one of those.

MR. McKITTRICK:  These are completely different, Judge.

MR. STUCKY:  It's on page 22, section Fifteen, question 7, and it was given.

MR. McKITTRICK:  Okay, I have no objection to it.

THE COURT:  Okay, what page?

MR. STUCKY:  Page 22, question 7.

MR. McKITTRICK:  I have no objection, Judge, in view of that.

THE COURT:  In view of the fact that your memory is slightly faulty along those lines because I did give yours.  You have no objection then to 43?

MR. McKITTRICK:  No.

THE COURT:  All right, 44.

MR. STUCKY: Your Honor, that was given in No. 8 on page 22, and it is also similar --

MR. BROWN: What it does is go from not guilty to guilty, Your Honor. We just shadowed his right along. The Court has already given it with not guilty. We are just shadowing it with guilty.

MR. McKITTRICK: He is not shadowing because he didn't have my questions before he prepared his. But in any event the Prosecutors represented to the Court that the reason that they wanted to give No. 10 was because I gave this voir dire question. Now, they can't have it both ways, Judge.

THE COURT: I'm not giving this.

MR. BROWN: Wait a minute, Judge. Seriously, look at this. This is his.

(Document examined by the Court.)

MR. McKITTRICK: Why don't you give this one and withdraw 10?

MR. BROWN: Now, you read mine, Your Honor. This is the defendant's: "Would the inconvenience of having to spend the night or more nights away from home prevent you from sticking to your guns and refusing to change your verdict even if you still had a reasonable doubt about the guilt of John?"

THE COURT: Then why don't you just put a period after the word "verdict", and that will cover both of them? "Would the

250

inconvenience of having to spend the night or more nights away from home prevent you from sticking to your guns and refusing to change your verdict?"

MR. STUCKY: Your Honor, it doesn't change the context because you have about twelve questions before that all talking about not guilty verdicts. All of his questions refer to --

THE COURT: Read his back that I gave.

MR. STUCKY: Well, first you have got to get back, the whole section of Fifteen talks about finding a verdict of not guilty.

THE COURT: I understand that. Just read me his that I gave.

MR. BROWN: "Would the inconvenience of having to spend the night or more nights away from home prevent you from sticking to your guns and refusing to change your verdict?"

THE COURT: And that relates back to the not guilty verdict?

MR. BROWN: "If you still have a reasonable doubt about the guilt of John."

THE COURT: I'm going to give it.

MR. McKITTRICK: Judge, listen to my objection please.

THE COURT: I thought I had, but go ahead.

MR. McKITTRICK: No. 10 of their voir dire questions, you will remember it, had to do with sequestration. They represented to the Court that because I gave this voir dire that is the reason they were giving that, and that is why you gave

No. 10. Now, they come back and give the same voir dire
question I give.

THE COURT: No. It is a different question entirely. I am
going to give it. Note the objection of the defendant. I think
if the Supreme Court, if it ever reaches them, reads your
question Ten and their 44 in pari materia, they will find they
are entirely different questions.

No. 45.

MR. McKITTRICK: Your Honor, as I remember it --

MR. BROWN: Let me read, Your Honor, the defense instruction
on page 23. You watch mine, Your Honor, please.

THE COURT: Do you mind if I see what his is first? I know
you are going to read it, but which number?

MR. BROWN: His on page 23, No. 1.

MR. McKITTRICK: I have no objection to 45.

THE COURT: All right, that takes care of that.

No. 46.

MR. McKITTRICK: I have no objection to that.

THE COURT: All right, 47.

MR. McKITTRICK: That is covered in 45, and I do object.

MR. BROWN: He has the same --

THE COURT: That is pretty well covered, Pete. No. 45 goes
to, "Would it bother you with members of your church or with
any social group to which you belong"; and then down in 47 you

say the same thing, "Would it cause you any embarrassment in

clubs or fraternal or social groups". I think it is covered in

45.

    MR. BROWN: We will withdraw that.

    THE COURT: You want to withdraw what, 47?

    MR. BROWN: Yes.

    THE COURT: All right, 48.

    MR. McKITTRICK: I don't understand that. "Regardless of

what the law is, are you willing to follow --

    MR. BROWN: I'm not sure I understand that either.

    THE COURT: I suggest you look at that one.

    MR. BROWN: Let me make a little confession here, Your

Honor. We are able to do this because all of these came from

the Stanley Preiser book. He has one, and I have got one. And

I don't know whether I have miscopied it or what, but I sort of

have to agree with him.

    THE COURT: If you strike the first few words and start

with, "Are you willing to follow, accept and abide by the

Judge's . . ."

    MR. BROWN: That's what I want, just are you willing to do

that. Just strike "Regardless of what the law is."

    MR. McKITTRICK: I have no objection to that.

    THE COURT: All right, 49.

    MR. McKITTRICK: I object to this one for the same reason I

253

objected to the last one.

THE COURT:  I'm not giving 49.  It is an instruction of the law which I will give at the appropriate time.

No. 50.

MR. BROWN:  Now, Your Honor, we are going to stick to our guns on this one.  He has reasonable doubt in here at least fifty-five times.  I think we are entitled to have these people know something about it.  He has just about instructed them on reasonable doubt all the way through this thing.

MR. McKITTRICK:  I wanted to, but he wouldn't allow me to.

THE COURT:  Do you have any objection to 50?

MR. McKITTRICK:  Yes, I do.

THE COURT:  What is your objection?

MR. STUCKY:  Your Honor, his section Five is nothing but reasonable doubt, all of it.

MR. McKITTRICK:  It is not section Five; it is section Nineteen and all were refused.

MR. STUCKY:  Section Five, "If you have a reasonable doubt. If you have a reasonable doubt.  If you found that there was a reasonable doubt."

MR. McKITTRICK:  Section Five, Jim?

MR. STUCKY:  Yeah, section Five on pages 6 and 7.

MR. BROWN:  Right here, "If they cannot prove his guilt to the degree of moral certainty which amounts to proof beyond a

254

reasonable doubt --

    THE COURT:  Where are you?

    MR. STUCKY:  Page 7.

    THE COURT:  I gave 11 --

    MR. McKITTRICK:  No --

    THE COURT:  No, you withdrew 11.

    MR. McKITTRICK:  I tried to put it back in, and you wouldn't

let me.

    MR. STUCKY:  That is because 11 through 15 are nothing but

reasonable doubt questions.  And the Court ruled at that point

that he would allow them even though they were instructions.

    THE COURT:  Gentlemen, even the State is getting into

instructions.  That is an instruction.  You know it is an

instruction, and I know it is an instruction.  "Do you

understand proof beyond a reasonable doubt does not necessarily

. . ."  I will give that in an instruction, not voir dire.

    MR. STUCKY:  Your Honor, you allowed the defendant to have

one, two, three, four, five, six instructions on reasonable

doubt on pages 7 and 8.

    MR. BROWN:  And page 18.

    THE COURT:  Wait a minute, 7 and 8 or 18?

    MR. STUCKY:  Here is 7 and 8 and again on page 18.  You have

six on 7 and 8 and --

    THE COURT:  On 18 where?  I've got page 18.  Now you show me

255

where it is. Page 18 has nothing to do with reasonable doubt.

MR. STUCKY: Your Honor, here is the one. That is off that old one. We are going to have to find the right page on it. It is on page 20 of the new one, question 12.

MR. BROWN: And No. 11 above it.

THE COURT: I'm going to give it. I think I have given the same thing for the defense so I will give the same thing for the State. Note the objection of counsel. I want you to know neither side is fooling me. We are getting into instructions.

MR. McKITTRICK: Judge, No. 51 you have covered pretty well.

THE COURT: I won't give it the way it is written. But I think it would be more proper, "During the trial the attorneys will make objections to testimony."

MR. McKITTRICK: You have already gone over that, Judge. You went over that with them out there, the whole panel.

THE COURT: I pretty well did cover that when I said, "You are not to consider the number of objections or lack of objections nor how I rule".

MR. BROWN: Okay, as long as Parrish --

THE COURT: No. 51 is withdrawn.

MR. McKITTRICK: I withdrew mine because it was covered out there.

THE COURT: Withdrawn.

No. 52. I covered that out there.

256

MR. BROWN: But he --

THE COURT: Well, if he has got one, I'll ask yours pro forma, but I told them out there from the bench, "You are not to consider the number of objections, the lack of objections, how I rule on the objections."

MR. STUCKY: His section Eighteen on page 25 -- What we have to counteract, Your Honor, is the prejudicial effect of his questions in this voir dire that the Court has already allowed in.

THE COURT: Oh, yes, Parrish, I did give that. Jimmy is right.

MR. STUCKY: And that is the same thing as 51 that we withdrew.

MR. McKITTRICK: I have no objection to that. I thought we were on 51. I withdrew that because he had covered it.

MR. STUCKY: Look here. It is not withdrawn.

(Document examined by the Court.)

THE COURT: Yes, I did give it. I gave one for you --

MR. McKITTRICK: I will either withdraw it or we can leave it in.

MR. STUCKY: I think we ought to leave it in.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

THE COURT: All right, I'm giving 51 and 52.

All right, how about 53?

Parrish, I have just been advised by the deputy clerk that several of the judges have picked juries from the panel, so I told him to have those that were excused by other judges to be back here at 1:30.   Rather than wait until we go through the whole twenty-eight, let's grab them today if we need replacements today.

MR. McKITTRICK:  I had already made a record on Thursday of last week where I objected on the record --

THE COURT:  Oh, if you don't want the pool, that's fine.

MR. McKITTRICK:  No, you may remember that my objection was that the determination under the statute as to what is accessible to the defendant is made at the time the jurors are pulled.

THE COURT:  You made your record on that.  I'm just asking if you want me -- For example, Casey and somebody else, Harvey, I guess, picked a jury this morning.  A number of potential panelists, of course, weren't selected; and they were put back in the pool.  Your objection is preserved.  Do you want them available this afternoon to replace anybody we might --

MR. McKITTRICK:  Oh, yeah, I think we should have them available.

THE COURT:  All right, that's what I'm saying.  You are entitled under the law to everyone available, and they

are available.

No. 53.

MR. McKITTRICK: I object to 53 adamantly, Judge, on the basis that it implies --

MR. BROWN: We will withdraw it.

THE COURT: All right, they have withdrawn it.

No. 54.

MR. McKITTRICK: I think you have already covered that.

THE COURT: I pretty well covered that from the bench.

MR. BROWN: If you don't want it in, that's all right; but it is not going to hurt anything.

THE COURT: It's not, but do you realize we are talking over a hundred and some questions.

MR. BROWN: I understand, but --

THE COURT: I covered this from the bench. I told them not to concern themselves with any inflection in my voice. Do you object to it?

MR. McKITTRICK: I object to it.

THE COURT: I'm not going to --

MR. BROWN: Your Honor, just one thing before you go on. You and I and Mr. McKittrick have been in cases for a long time and so has Mr. Stucky. And you cannot repeat to these hardheaded people too many times these kinds of things. You can tell them in a thirty day trial not to read newspapers, and on

259

the twenty-eighth day you will have some guy there that has

looked at a newspaper.  Something like this that doesn't hurt

anybody -- I don't care.  I just think  --

    THE COURT:  What is your objection?

    MR. McKITTRICK:  I think if we continue putting questions in

here that you have gone over, we're going to be here forever.

    THE COURT:  I understand that.

    MR. BROWN:  Just take it out.  I withdraw it.

    THE COURT:  Might I say, I have given a number of your

questions which I think are repetitious, Mr. McKittrick; but

okay, it has been withdrawn.  I agree with Mr. Brown; but on the

other hand, you have to understand I can only tell them so many

times; and if they don't listen, I can't control their minds..

    No. 55.

    MR. BROWN:  I think here you are giving them one last

chance.

    MR. McKITTRICK:  I have no objection to that.

    THE COURT:  Okay, given.

    No. 56.

    MR. McKITTRICK:  I object to 56 on the basis that it is

always improper --

    MR. BROWN:  The Golden Rule does not apply --

    MR. McKITTRICK:  I have no objection.  I think I have one

like that.

THE COURT:  All right, I am going to give it.

All right, 57.

MR. McKITTRICK::  Judge, I don't like this question.  This is akin to objections made by the State on the basis of --

MR. BROWN:  I will withdraw it, Your Honor.

THE COURT:  All right, withdrawn.  Now, let's go back for just a minute to the State's 49, 50, 51 and 52.  I refused 49.

MR. McKITTRICK:  Right.  You were going to give 50.

THE COURT:  I am going to give 50 over your objection.  And I'm giving 51 and 52 without objection, inasmuch as we determined I had already given them for you.

MR. McKITTRICK:  Right.  I object to 58 on the same basis.

MR. BROWN:  Your Honor, on 58 not only would I like you to give 58, I would like you to read the same question again as 58-A --

THE COURT:  Wait a minute.  Well, first of all the jury is not imposing any sentence at all.  The Court imposes any sentence.

MR. BROWN:  Assuming we get past that --

MR. STUCKY:  The sentence is automatic.

THE COURT:  But the jury does not impose a sentence.  "Do you have any feelings or beliefs about the life without mercy sentence which would cause you to automatically reject the imposition of a sentence of life without mercy and automatically

vote for the life with mercy sentence . . ." Where does the

impose come in?

MR. BROWN: Assuming I can clean that up about who gives the

sentence?

THE COURT: "Do you have any feelings or beliefs about the

life without mercy sentence which would cause you to

automatically reject the imposition of a sentence of life

without mercy. . ." I don't like the language of it.

MR. BROWN: But you see what I'm getting at, don't you? I

would like for you to read 58 and then reverse it and see if

they are more inclined to give life --

THE COURT: That is 58.

MR. BROWN: Yes, sir, but if I clean it up there a little

bit, I would like 58 and I would also like a 58-A with their

feelings reversed, "Are you more inclined to give life without

mercy? Would you automatically give life without mercy?" to

show that they also would consider -- Some of these folks might

say, "Well, if we're going to give it to him, let's give him

life without mercy. Let's say reverse it and give it both ways.

THE COURT: Let's pass it for a minute and go on to 59.

MR. BROWN: Okay.

MR. McKITTRICK: I'm going to put my objections on the

record.

THE COURT: Okay, I'm going to come back to it.

262

What about 59?

MR. McKITTRICK:  I object to that.  It has absolutely no relevance to this case whatsoever.

MR. BROWN:  Your Honor, I think we are entitled to know the background of these people.  We asked their age, their health, where they work, if they are retired.  Mr. McKittrick even wanted tax returns for these people.

MR. McKITTRICK:  When did I want tax returns?

MR. STUCKY:  It is in your motion.

MR. BROWN:  I think I have a right to know if these people have ever associated with any criminal.  I think I have a right to know the background of these people, Your Honor.

THE COURT:  I'm going to ask it.  Note the objection of the defendant.

All right, No. 60.

MR. BROWN:  That's the kind of thing where somebody says to one of the jurors, "Hey, do you know I saw you on TV last night. Did you know you were on the 6:00 news and you'll be on the 11:00".  And the juror says, "Yeah, I can't stand it.  I have got to see myself on that TV set."  I think that is a good fair question.

MR. McKITTRICK:  I have no objection.

THE COURT:  All right, 61.

MR. McKITTRICK;  I do object to this on the basis that in a

263

former hearing the Court had ruled it would not allow the

State's witnesses to allude to reformatory or penitentiary or

whatever incarceration John had been in. That's it with regard

to this. I have a motion with regard to the confession too to

delete that, but --

THE COURT: Let's take up one at a time. Go to 61.

MR. BROWN: The word "reformatory" appears very briefly in

the first part of that confession, Your Honor. The confession

is a taped confession.

THE COURT: Who uses the word?

MR. BROWN: Sergeant Presson. He says, "Now, John -- He is

setting the stage. He says, "You are here with the state police

at Parkersburg. You have just been returned from the Mansfield

Reformatory." That's all he says. He doesn't say what it

means. If he doesn't want this in here, it doesn't hurt me. I

guess what I'm trying to do is caution you. I have no intention

of using the word reformatory if I can get out of. The only

thing I'm thinking of, Parrish, if it comes up, we could at

least say, "You are not to consider it as any indication of

anything."

MR. McKITTRICK: Well, I'm going to move to delete it from

the tape and the transcribed tape. It has no purpose in those

tapes, and it should be deleted.

MR. STUCKY: You have the problems with the testimony coming

264

in -- As the Court is well aware, the blood was obtained from
John Moss while he was incarcerated in the reformatory.  And we
have got to work around that.  What I'm talking about, we have
got people, witnesses, who may or may not at our questions or
the Court's own questions or Mr. McKittrick's own questions
say --

THE COURT:  Well, I think you are asking for error.  And I
don't intend to preside over these proceedings for "X" number of
weeks -- Now, I am going to strongly tell the State right now
you had better instruct your witnesses not to mention
reformatory.  As to excluding that word from the confession, I
want to re-hear the taped confession; and I will rule on it at
that time.

Now, if the defense invites the word reformatory, it is fair
game.  But it is absolutely in my judgment grounds for reversal
if the State brings it out.  And I'm cautioning you to caution
your witnesses.  They don't have to say they were at the
reformatory.  They were in Ohio.

MR. BROWN:  We agree with you, Judge, a hundred percent.
I'm just saying that if it pops out --

THE COURT:  Then you are taking a chance on reversal.  And
both of you, Mr. Stucky and Mr. Brown, are extremely experienced
prosecutors.  And my warning to you should be sufficient that
when you tune up your witnesses -- and that is exactly what you

265

do even if you call it by any other name and the defense tunes

his witnesses -- you had better get it in their heads not to

mention reformatory. If Mr. McKittrick elicits it, then it is

fair game.

I'm not giving 61.

How about 62?

MR. BROWN: Judge, I think you have probably covered this.

THE COURT: I think I did. But I'll give it if there is no

objection.

MR. BROWN: I would like it given one more time.

MR. STUCKY: The Court covered blood and marriage and

professional. I'm not sure that the Court covered social

relationships.

THE COURT: All right, I'm going to give it. I don't think

it will cause any harm.

All right, back to 58. He has objected to 58.

MR. McKITTRICK: I object to 58 on the basis it implies the

jury will find a verdict of first degree murder, and the only

question before the jury is with or without mercy.

THE COURT: Well, they only have three verdicts, guilty of

murder in the first degree, guilty of murder in the first degree

with a recommendation of mercy and not guilty.

MR. McKITTRICK: I agree, but this question is not whole.

It does not allude to the burden of proof; it does not allude to

the burden of proof being beyond a reasonable doubt; it does not allude to the alternative verdict of not guilty.

THE COURT: I'm going to refuse it. If you want to type up another 58 and 58-A and give it to me after lunch, I'll consider it. But I'm going to refuse it as given. I think he is right. I think you have to put in there and make it clear that "if you return a verdict of guilty", because they have every right to return a verdict of not guilty.

MR. BROWN: But, of course, you understand my point. Let's just assume -- This is a felony murder case. But if this was not a felony murder case, and it could all be reduced to murder in the second degree, I don't believe I would have to propound a question that would include murder in the second degree.

THE COURT: You don't in this trial.

MR. BROWN: But my point is, this is a voir dire question. I don't think I would have to give them all their verdicts. My point on this question is if you are going to come back with a verdict of guilty, are you so hard clad that you are just every time going to vote life without mercy or life with mercy? That's all.

THE COURT: I'm going to let you retype it and submit it to me after lunch. But I'm going to refuse it as offered.

All right, what else do we have? Is that it?

I want you all back here at 1:30. Go through these and put

267

them in proper order.

MR. McKITTRICK: Wait a second. We needed to give you a copy of our witnesses. My witnesses will be the same witnesses that they have plus these witnesses right here.

MR. BROWN: Here is an all inclusive list.

THE COURT: All right, you guys get together and get the list the way you want it. I'm trying to get him over there so he can get a hot lunch.

Right after lunch, as I understand, we have your 58 and 58-A to go over, and then we can start voir diring the prospective jurors hopefully in chambers.

All right, we will stand in recess until 1:30.

                            - O -

        (Whereupon, a recess was had in the proceedings.)

                            - O -


        (After recess)


                    AFTERNOON SESSION

        (Whereupon, the proceedings in the Matter of State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, were resumed with all parties present as before noted including the defendant and his counsel, out of the presence of the prospective jury panel.

THE COURT: All right, show the resumption of these proceedings with all parties present heretofore present here again, including the defendant and his counsel, out of the presence of the prospective jury panel.

All right, let's take up State's proposed questions 58 and 58-A. Those are the only two left as I understand it. All right, the State has just offered question 58, which reads:

"If the facts of this case support a verdict of guilty of murder in the first degree, do you have any feelings or beliefs that would cause you to automatically reject the returning of a verdict of life without mercy and vote for life with mercy?"

What is your objection to that?

MR. McKITTRICK: The question doesn't include an allegation to burden of proof and reasonable doubt. The question implicitly says the only verdicts in the case are murder with mercy and murder without mercy.

THE COURT: Is that your objection?

MR. McKITTRICK: Yes.

THE COURT: I am going to give it. I will note your objection. I believe they have cured that. It says, "If the facts of this case support the verdict of murder in the first degree". I think that properly clarifies it. I think it is a proper question to ask, and I am going to ask it.

MR. McKITTRICK: It says nothing about a not guilty verdict.

269

THE COURT:  I have ruled that the question covers that and
so do many of the other questions I have asked for both sides.
This question says, "If the facts of this case support a verdict
of guilty of murder in the first degree".  I think that covers
it.  I will let the record speak for itself.  There are any
number of questions that speak for burden of proof and so forth
throughout.  I have let both sides get into instructions.  I
just want you to realize it is not improper --

MR. STUCKY:  That is a new 58 and 58-A.  We have withdrawn
the initial one.

MR. McKITTRICK:  My objections are to both of those.

THE COURT:  All right, I have been advised that all twenty-
eight panel members are here, Mr. McKittrick, including Mrs.
Shaw.  What I would propose to do, without objection, is we will
go to the courtroom, open proceedings, and I will advise them we
are about to begin individual questioning but before we do there
are a couple of matters I must take up first.  I will call Mrs.
Shaw into chambers with the court reporter and myself to find
out whether or not she has a problem with her ill son which we
discussed this morning.

Do you have any objection to that?

MR. McKITTRICK:  I have none.

THE COURT:  All right, upon questioning her I will call you
in and let you know what the situation is.

MR. BROWN: She is here?

THE COURT: Right, but I want to find out if she can continue. You don't want anybody with a sick kid, do you?

MR. BROWN: No, sir.

THE COURT: All right, I want you all to go out in the courtroom, and I will have Mr. Hickman --

MR. McKITTRICK: Let me renew my objection, Your Honor, with regard to only twenty-eight jurors that we have access to at this time.

THE COURT: Now wait a minute. We are building a record. What do you mean you only have access to twenty-eight?

MR. McKITTRICK: When the jurors were called, there were one hundred twenty-three jurors called. Pursuant to previous objections to be considered with our objection, we feel we should have access to all one hundred twenty-three, plus or minus those jurors that have been struck for cause at this time, and minus those jurors we have already placed in the box as twenty and eight alternates.

THE COURT: Just so the record is clear, the Court is not unmindful of the importance of records. You have available not only those twenty-eight, but all those available in the pool. The twenty-eight up here now have already been called. Judge Harvey and Judge Smith, I believe, have drawn some members from the original one hundred twenty-three for trials which they

began this morning; but you do have available more than twenty-eight.

MR. McKITTRICK: I'm sorry, I meant the jurors available to the defendant, John Moss, minus those jurors that have been taken from the pool this morning and impaneled as jurors in other cases in other courts. I'm sorry, I didn't mean to say only the twenty-eight.

THE COURT: I understand, but if this record reaches the Supreme Court, I want it to be clear. As I said, I am not unmindful of the importance of the record, as I am sure counsel for the defense is not unmindful.

MR. McKITTRICK: Yes, sir.

THE COURT: All right, let's go out in the courtroom.

(Whereupon, the Court, counsel for the State, counsel for the defendant, the defendant in person and the court reporter entered the courtroom where the following proceedings were had:)

THE COURT: Show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts. The defendant is present in person and by counsel, Mr. McKittrick, the State of West Virginia by her Prosecuting Attorney, Mr. Stucky, and her Assistant Prosecuting Attorney, Mr. Brown, and in the presence of the prospective jury panel.

Ladies and gentlemen, in just a few moments, but not quite

272

yet, we are going to begin individual questioning; and we are
going to do this in the jury room in the rear of this floor,
which is the seventh floor. I want to admonish you and each of
you that upon completion of your individual questioning you are
not to discuss with any other member of this panel the questions
that were asked of you or the answers that you gave. That
conversation rests solely between the Court, counsel, the
accused and court personnel.

You are not to discuss with any other member of this jury or
with anyone at home or with anyone questions that we ask you
individually. And the reason that we are proceeding this way is
we don't want anyone to be embarrassed by some of the questions
that may be asked, nor do we want you to have a reticence in
being perfectly candid and forthright in the answers you give.

However, before we do that, there are two jurors that I need
to talk with privately. After I complete my discussions with
them, then we will begin the individual voir dire.

I want you to stay in the courtroom, Mr. Hickman, with the
panel. I don't want anyone leaving their seats. If there is an
absolute necessity to use the restroom or whatever, Mrs.
Whitlock will escort you ladies, and Mr. Hickman will escort the
gentlemen. I don't want them having any conversation with
anyone in the hallways.

MR. BROWN: Judge, may we approach the bench?

273

THE COURT:  Yes.

(Whereupon, counsel and the defendant approached the bench where the following proceedings were had out of the hearing of the jury:)

THE COURT:  Show the defendant's presence at all times at these bench conferences.

MR. BROWN:  I would like the clerk to make absolutely sure that all these people are in the proper seats.

THE COURT:  Okay.

(Whereupon, a discussion was had off the record and then resumed back on the record as follows:)

THE COURT:  Anything else?

MR. BROWN:  No, sir.

(Whereupon, counsel and the defendant resumed their seats at counsel table where the following proceedings were had in open court and in the presence of the prospective jury panel:)

THE COURT:  All right, ladies and gentlemen, if you would, remain in your seats please.

Gentlemen, let's go to the jury room on the seventh floor, please.

(Whereupon, the Court, counsel for the State and the defendant, the defendant in person and the court reporter exited the courtroom and entered the jury room on the seventh floor where the following proceedings were had:)

274

THE COURT:  All right, show the resumption of these proceedings in the jury room on the seventh floor, out of the presence of the jury.

MR. McKITTRICK:  I know this is a small thing possibly to the Court, but considering other things I understand, and I am sure the Court understands, I would object to the Prosecutor sitting so close to the jurors when they come in here on voir dire.  I think counsel should sit away from them.

THE COURT:  Fine.  We will have her sit right over here against the wall.  Let the record show there are some three feet between her and the nearest person.

Ask Mrs. Shaw to come in.

(Whereupon, Juror Dorothy Shaw entered the room.)

THE COURT:  This is Juror No. 16, Dorothy Shaw.

Mrs. Shaw, you recall this morning having a conversation with me on the telephone in which you advised your boy, I believe --

JUROR SHAW:  Yes.

THE COURT:  How old is he?

JUROR SHAW:  Eleven.

THE COURT:  I believe you said he had bronchitis and perhaps a touch of pneumonia and you were taking him to the hospital.

JUROR SHAW:  Yes.

THE COURT:  And I told you he was obviously going to be your

first concern, but if it was so you could get here by 1:30 to be here; and obviously you are here.  What is his physical status?

JUROR SHAW:  He is breathing better.  They gave him a shot and took a chest x-ray.

THE COURT:  In view of his health is it going to cause you to be distracted if you are selected for this proceeding for a time which may last up to six weeks?  Is his health going to distract you from giving your full and complete attention to the proceedings?

JUROR SHAW:  I don't think.  He hasn't had a whole lot of trouble in the last year.

THE COURT:  Do you think then that you would like to go on, and if you are picked for this proceeding, do you feel you can give it your full attention?

JUROR SHAW:  I don't see any reason why I couldn't.

THE COURT:  Let me ask you this:  Do you recall my admonition the other day not to discuss this case with anyone?

JUROR SHAW:  Right.

THE COURT:  Have you discussed this case with anyone?

JUROR SHAW:  No.

THE COURT:  And you don't feel your son's present health would in any way interfere with your ability to sit on this proceeding if you are selected?

JUROR SHAW:  I don't think so.

276

THE COURT:  All right, why don't you go back and have a seat out there.  Thank you very much.

(Whereupon, Juror Shaw exited the room.)

THE COURT:  Do you have any questions?

MR. McKITTRICK:  I don't have any.

MR. BROWN:  I can think of some.  I would like to know what his past track record was and what the prognosis is for his being okay in the future.  Apparently the kid is still in the hospital.

THE COURT:  She said she could sit on the case; and if the defense has no motion to excuse her for cause, I'm not going to excuse her.  As far as I am concerned, it is status quo.

All right, bring in Miss Bradley.

(Whereupon, Juror Martha Bradley entered the room.)

THE COURT:  Just have a seat over there, Miss Bradley.

We have prospective Alternate 25, Martha Bradley.  Miss Bradley, you phoned me Friday, I believe?

JUROR BRADLEY:  Right.

THE COURT:  And indicated to me that you didn't think you wanted to sit on this proceeding; and I told you at that time I would not discuss it with you over the telephone, that you had to report as instructed today; and you have.  And I said I would discuss it with you then.

Now, I think what I'm going to do here in a moment is ask

you to come into chambers with me and the court reporter, and we
will put your reasons on the record; and then I will advise you
appropriately.

All right, Miss Bradley, do you want to come with me.

JUROR BRADLEY:  All right.

(Whereupon, the Court, Juror Martha Bradley and the court
reporter entered the Court's chambers where a conversation was
had between the Court and the prospective juror, which
conversation was reported by the court reporter but has not
been transcribed as a part of this official record by order of
the Court.  Following the conversation, the Court excused
Juror Martha Bradley from further service.  The Court and the
court reporter then re-entered the jury room where a
conversation was had among the Court, counsel for the State
and counsel for the defendant, which conversation was reported
by the court reporter but was not transcribed as a part of
this official record by order of the Court.)

All right, Mr. McKittrick, do you have something you want to
put on the record regarding this?

MR. McKITTRICK:  No, sir.

THE COURT:  Mr. Stucky?

MR. STUCKY:  No, sir.

THE COURT:  All right, I'll hear any motion.

MR. BROWN:  The State moves to strike her for cause.

278

THE COURT:  Any objection to striking Miss Bradley for cause?

MR. McKITTRICK:  I have no objection.

THE COURT:  All right, upon motion of the State, without objection by the defendant, Juror Martha Bradley will be struck for cause.

All right, Mr. McKittrick, do you have something you want to put on the record?

MR. McKITTRICK:  My office received a telephone call from a woman who knows one of the jurors by the name of Glenna Withrow.

MR. STUCKY:  The juror is Evelyn Withrow?

THE COURT:  Juror No. 11.  Her master number is 80 on the master sheet, Evelyn Withrow.  Her name is Glenna E. Withrow, 2203 Main Drive, St. Albans.

MR. McKITTRICK:  She apparently has discussed this case with people before and indicated her opinion that since they found blood that was consistent with John's -- I can tell you her words -- "Since they found his blood in there and they found Vanessa's camera --

THE COURT:  Now wait a minute.  Did these alleged discussions take place after my admonition?

MR. McKITTRICK:   This occurred prior to the admonition. Since the admonition this woman is supposed to have spoken to two neighbors and indicated what her opinion was.

279

A person called this woman and advised this woman that this Mrs. Withrow was talking with people in the neighborhood about the case.

THE COURT:  After --

MR. McKITTRICK:  Yes.

THE COURT:  -- she had been selected as a prospective juror?

MR. McKITTRICK:  Yes, after.

THE COURT:  All right, let's get her in here and see what she has to say.  And then I think probably -- It depends on what she says.  If she denies it, she denies it.  Then I am going to ask the Prosecutor to investigate when this thing is over whether or not there were any such conversations.  I don't know how else to proceed with this.

MR. STUCKY:  Well, she has a right --

MR. BROWN:  What is the name of the lady who made the phone calls?

MR. McKITTRICK:  To my office?

THE COURT:  This woman has the right to defend herself.

MR. STUCKY:  I would like to hear what she has to say.

MR. McKITTRICK:  The woman that has made the phone calls to my office is an individual who has given a statement in this case before, and her name is Belinda Gregg.

MR. STUCKY:  She may be an interested party in this case if she thinks --

280

MR. McKITTRICK:  I'm just telling you what I know.

THE COURT:  You tell me the allegations, and I'll inquire of her.  The allegations are that --

MR. McKITTRICK:  She had conversations about this case prior to the admonitions by the Court, and she had formed an opinion that John Moss, the defendant, must have been at the scene of the murders.  She has talked to family members about the case. Belinda Gregg, is she a relative?

MR. BROWN:  She is a relative of one of the deceased parties.

MR. McKITTRICK:  And that this woman has discussed the case after the Court's admonitions.  That is what I am told.

THE COURT:  I also asked during voir dire if there was any reason they knew why they could not reach a true and impartial verdict, and she never said a word.

MR. McKITTRICK:  Let me see the questionnaire.  What did she say in her questionnaire?

MR. STUCKY:  Here, I've got it right here.  She says she has read accounts in the Daily Mail, period.  She says she hasn't had any contact with John, not acquainted with Paul. "Do you have any dealings with him or any member of his family?  No."

MR. BROWN:  That's close, buddy.  She is a sister-in-law.

MR. STUCKY:  No, no, not this lady.

THE COURT: Is there a question in there about have you ever discussed this case with others? Is that in there?

MR. STUCKY: No, it is not in here.

THE COURT: Is there anything in the questionnaire?

MR. STUCKY: No, sir.

THE COURT: All right, how do you want to handle it? Do you want to bring her in and see what she says?

MR. McKITTRICK: I think you might start with "Do you know anybody that was related to any of the deceased?" Let's see if she is telling the truth.

MR. BROWN: Do you know what the neighbors names are.

MR. STUCKY: She might not know Belinda Gregg is related.

MR. McKITTRICK: She used to live near Belinda Gregg, according to Belinda Gregg.

THE COURT: Who is Belinda Gregg?

MR. McKITTRICK: She is a relative --

THE COURT: Of Reggettz?

MR. McKITTRICK: Of Vanessa.

MR. STUCKY: She may not know that though.

THE COURT: Well, I understand that. I'm going to ask her this: "Do you know anything about the facts of this case? Have you ever discussed this case with anyone prior to coming to the courthouse last week when you were brought in here for jury duty; and have you discussed it with anybody after my

admonition?"

MR. BROWN:   This could just be a supplemental question, "Do you know Belinda Gregg?"

THE COURT:   Is that it?

MR. McKITTRICK:   Yes, sir, that is it.

THE COURT:   All right, ask her to come in.

(Whereupon, Juror Evelyn Withrow entered the room.)

THE COURT:   All right, we have here Evelyn Withrow, Juror No. 11, No. 80 on the master list.

You live in St. Albans, Mrs. Withrow?

JUROR WITHROW:   Uh-huh.

THE COURT:   I asked you a few questions out there the other day.   I would like to ask you a few more in here.   Do you know anything about the facts of this case, or have you heard it discussed by others?

JUROR WITHROW:   No, sir.

THE COURT:   Have you at any time had any discussions regarding this case with anyone?

JUROR WITHROW:   By anyone do you mean around here or at home?

THE COURT:   Well, let's take it one step at a time.   From the time of the alleged incidents in 1979, have you had occasion to discuss this case with anyone?

JUROR WITHROW:   No, sir, huh-uh.

THE COURT:  Prior to being picked and called for jury duty?

JUROR WITHROW:  No, sir, huh-uh.

THE COURT:  Have you had any discussions -- Do you remember the other day, the last time you were here when I admonished the entire jury not to discuss this case among themselves nor permit others to discuss it with them?

JUROR WITHROW:  Right.

THE COURT:  Did you after that, between the time I gave you that admonition and today, have you discussed it --

JUROR WITHROW:  No, sir.  I have been quiet, even at home, not even to my family, huh-uh.

THE COURT:  Are you acquainted with or do you know anyone that is kin, either by blood or marriage, to any of the alleged victims?

JUROR WITHROW:  No, sir, huh-uh.

THE COURT:  Do you know a Belinda Gregg?

JUROR WITHROW:  Oh, yes, sir, I know her.  She used to be my neighbor.  But sir, I did not know that this was her sister.

THE COURT:  When did you find out?

JUROR WITHROW:  After I was picked, because me and Mrs. Gregg wasn't very -- You know, I didn't associate with Mrs. Gregg.

THE COURT:  Now, I want to make it clear so we all understand each other.  You are telling me then that you have

never had a conversation about this case prior to your being

picked for jury duty with anyone?

    JUROR WITHROW:  No, sir.

    THE COURT:  You have not discussed this case with anyone

since you have been here on jury duty?

    JUROR WITHROW:  No, huh-uh.

    THE COURT:  Did you at any time discuss this case with

Belinda Gregg?

    JUROR WITHROW:  Oh, Lord, no.  That lady I didn't speak to.

    THE COURT:  I see.

    JUROR WITHROW:  And when this happened, sir, she didn't live

next door to me.  She had moved away.

    THE COURT:  She doesn't live there now?

    JUROR WITHROW:  Oh, no, no, no.  She wasn't -- She didn't

get along with nobody.

    THE COURT:  Well, by virtue of the fact that you now know

she was the sister of one of the deceased, would that cause you

any problems either for or against either side?

    JUROR WITHROW:  Oh, lordy, no, sir.  Huh-uh, no, sir.

    THE COURT:  Have you ever overheard this case discussed by

anyone?

    JUROR WITHROW:  No, sir, huh-uh.

    THE COURT:  Whereabouts is Mrs. Gregg now?

    JUROR WITHROW:  Oh, she lives out at Riverlake, along out

that way?

THE COURT:  Where is that?

JUROR WITHROW:  Out in St. Albans, but I have no idea.  It's out there somewhere.

THE COURT:  I notice your name is Withrow.  Is that your married name?

JUROR WITHROW:  Yes, sir.

THE COURT:  Is there any kin to the sheriff?

JUROR WITHROW:  No, sir.  My husband's name is Donald.

THE COURT:  I know, but it could be Sam.  Are you any relation?

JUROR WITHROW:  No, we are no relation, huh-uh.

THE COURT:  Do you know of any reason whatever, whatever -- It is very important that you be perfectly candid with us.  Do you know of any reason at this stage why you could not sit on this jury with an open, a completely open and fair mind, and attempt to reach a verdict based solely on the evidence, the arguments of counsel and the instructions of the law?  Do you know of any reason you could not be absolutely fair to both sides?

JUROR WITHROW:  No.

THE COURT:  And you have never discussed this case with anyone?

JUROR WITHROW:  No.

286

THE COURT:  You have never overheard it discussed?

JUROR WITHROW:  No.

THE COURT:  When did you tell me you found out Belinda Gregg was the sister of one of the victims?

JUROR WITHROW:  With the man that I rode with.

THE COURT:  Rode where?

JUROR WITHROW:  Up here.

THE COURT:  You learned this after you were picked for jury duty?

JUROR WITHROW:  Yes.

THE COURT:  Did this man discuss this case with you?

JUROR WITHROW:  No.  He just told me he remembered, you know, that it was her sister.  And we wasn't neighbors, you know.  She was --

THE COURT:  Did this man that rode you here, is he on jury duty too?

JUROR WITHROW:  Yeah, but he isn't on ours.  The only thing he said was, you know; and I said, "No, I did not know that", because Mrs. Gregg did not tell me a thing about any of her relatives. you know.

THE COURT:  How did the conversation come up, Mrs. Withrow?

JUROR WITHROW:  Well, sir, you know, I don't -- Well, we was just talking.  This was before I ever got picked on this one. He said he heard that the trial was coming up, and he said it

287

was Belinda Gregg's sister, and I said that I did not know that.

And I was her next door neighbor, and I did not know that.

THE COURT: Did you ever visit her home?

JUROR WITHROW: Oh, no, huh-uh.

THE COURT: Let's back up just a minute. How long did she

live next to you?

JUROR WITHROW: She has been gone now almost five years.

THE COURT: Well, by your attitude I take it you weren't

close friends?

JUROR WITHROW: Nope.

THE COURT: Well, what about the day she first moved in?

You didn't know anything about her, did you?

JUROR WITHROW: Nope.

THE COURT: When did this lack of friendship, if you will,

develop?

JUROR WITHROW: We didn't have a friendship.

THE COURT: Well, I understand that. There had to be a

reason for that. What was the reason?

JUROR WITHROW: That's what I would like to know. She

wasn't friendly with any of her neighbors.

THE COURT: Did you ever have words with her?

JUROR WITHROW: Oh, words, yes, sir. She caused problems

for my husband and I too.

THE COURT: I see, okay.

288

JUROR WITHROW:  That's true.  You can talk to him and ask him.

THE COURT:  That's all right, I want to ask you.  Did you ever get into fisticuffs with her or anything?

JUROR WITHROW:  No, but I sure would have liked to sometimes.  Now this is the truth, my fifteen year old -- She was fifteen at the time -- Listen, that lady called us some very filthy names, and we don't know why.  Now, this is the truth because I'm under oath or I'm sworn in --

THE COURT:  Yes, you are.

JUROR WITHROW:  Okay, and we don't know what made that lady pick on, you know -- She didn't only pick on me and my daughter; she picked on the whole neighborhood just about.

THE COURT:  When did this start after she moved there?

JUROR WITHROW:  Right after she moved in.  And see, when she moved in, I wasn't even home.  We were gone on vacation.  I wasn't even home when the lady moved in.

THE COURT:  Oh, I see.  How long has she been gone?

JUROR WITHROW:  It has been almost five years.  I could take you out there and let you talk to the neighbors.  They could tell you the same thing I -- She wasn't, you know --

THE COURT:  Well, thank you, Mrs. Withrow, but I don't have time --

JUROR WITHROW:  I know you don't, but I just wanted to

289

tell you.

     THE COURT:  I have my own neighbors that I talk to.

     JUROR WITHROW:  Yeah.  Oh, I have nice neighbors too now,

you know.

     THE COURT:  I take it then that you don't ride in your own

car here to the courthouse?

     JUROR WITHROW:  Oh, no, sir.

     THE COURT:  Do you ride with the same people every day?

     JUROR WITHROW:  Yes.

     THE COURT:  What are their names?

     JUROR WITHROW:  My son brought me this morning, but first I

rode with Theodore Eads.

     THE COURT:  Theodore Eads?

     JUROR WITHROW:  Uh-huh, until I got picked in the twenty-

eight.  And then my next door neighbor, Albert Brady --

     THE COURT:  Is he on this jury?

     JUROR WITHROW:  Not on this with me.

     THE COURT:  He is just on the jury panel?

     JUROR WITHROW:  Yeah, uh-huh, and he just lives right above

me.  He asked me if I would like to ride.  I said sure.

     THE COURT:  Oh, sure.  It saves gas.  Who was the juror you

rode with the morning this Gregg woman's name came up?

     JUROR WITHROW:  That was, I'm sure it was Mr. Brady because

I don't think Mr. Eads knows the lady.  No, I know he doesn't.

THE COURT: All right, would you mind going outside the door and staying a couple of feet down there for just a couple of minutes.

JUROR WITHROW: I'd be glad to.

(Whereupon, the juror exited the room.)

THE COURT: Gentlemen, what's your pleasure, if any?

MR. BROWN: What I'm thinking, Judge, we are probably going to have to let this lady go. What does concern me is putting the witnesses in this case in a position where they designate who we pick and who we don't pick.

THE COURT: I agree, but I don't think that is the problem you have here.

MR. BROWN: Oh, no. She wouldn't believe this lady if this lady had slides; she just wouldn't believe Belinda Gregg.

THE COURT: You heard the one aside about not only causing problems for her but her husband.

MR. BROWN: Yes.

THE COURT: Yes. I know where you are coming from, and I will treat that as we get to it. But is there any motion as to Mrs. Withrow?

MR. McKITTRICK: We challenge for cause.

THE COURT: Does the State have any objection?

MR. BROWN: No, sir.

THE COURT: All right, I'm going to call her in here and

tell her she is excused from this case and to call the clerk's

office to see when she is needed again.

    All right, bring her back in.

    (Whereupon, the juror re-entered the room.)

    THE COURT:  Mrs. Withrow, I don't want you discussing with

anyone, and by anyone I mean your husband, your daughter, your

son or whatever, anyone, anything that has been said or that has

happened while you have been down here.  Now, you are excused

from this trial.  You are not excused from jury duty.  You can

go to the fifth floor, get your belongings and go home for the

day, but call the clerk's office to see whether or not they will

need you tomorrow morning.  You are not excused from jury duty,

just from the Moss trial.

    JUROR WITHROW:  Right, okay.

    THE COURT:  I don't want you discussing your appearance in

front of us here today --

    JUROR WITHROW:  I haven't, sir, honestly.

    THE COURT:  I believe you, Mrs. Withrow.  I accept what you

are saying.  But I want to impress upon you as strongly as I

can, if anybody mentions the Moss trial, you say, "I cannot

discuss it.  I am under a court order from the Judge"; okay?

    JUROR WITHROW:  Uh-huh.

    THE COURT:  Now, you check with the clerk's office.  And

when you go downstairs to get your hat and coat, say nothing;

292

just get it and go.

JUROR WITHROW:  All right.

THE COURT:  And call the clerk's office tonight -- You know the number I guess.

JUROR WITHROW:  Yes.

THE COURT:  Call tonight and see when they need you.  They might need you on another panel, but you are excused from this one; okay?

JUROR WITHROW:  All right.  Thank you.

THE COURT:  Thank you very much.

(Whereupon, the juror exited the room and a discussion was had off the record.)

THE COURT:  All right, let's go recess the jury for a while.

(Whereupon, the Court, counsel for the State, counsel for the defendant, the defendant in person and the court reporter entered the courtroom where the following proceedings were had in open court and in the presence of the prospective jury panel:)

THE COURT:  Ladies and gentlemen, in a moment I am going to give you a recess.  You have been here now for over an hour, and I don't know how much longer this is going to take before we even get to you.

What I would like you to do is, Mr. Hickman, I want you to escort them downstairs to the jury lounge and stay there.  You

293

can go down to the jury lounge on the fifth floor and stay there
until I send for you, in the event you want to smoke a cigarette
or whatever.

I know you get tired of hearing this, but it is important.
I can't impress upon you too strongly, I don't want you
discussing this case with anyone nor are you to permit anyone to
discuss it with you or in your presence. While you are in the
jury lounge, you are not to discuss it among yourselves. You
are not to read any newspaper accounts, watch any television
accounts or listen to any radio accounts of this trial or of any
of the personalities connected herewith.

So with that, we will now stand in recess. You may adjourn
to the lounge and stay there until I send for you.

JUROR NO. 10: I need to tell you something.

THE COURT: Well, just come over here and tell me.

(Whereupon, the following proceedings were had between the
Court and Juror No. 10:)

THE COURT: Let's see, you are Marsha Booker, Juror No. 10?

JUROR BOOKER: Yes, sir.

THE COURT: Okay, what is it?

JUROR BOOKER: It is nothing really, but I thought maybe I
should tell you. Friday there was this trooper on television,
and my husband mentioned he went to school with him. At the
time you were questioning us about Terry Williams, I didn't know

294

it.  He went through DuPont.  I don't know him.  Maybe I have

seen him, you know, at a basketball game or something.  I only

remember him because he has a twin brother.

THE COURT:  You don't know him personally?

JUROR BOOKER:  No.

THE COURT:  Does the fact that your husband went to school

with Williams, would that cause you, if he is called as a

witness, to give his testimony any greater or less weight than

any other witness?

JUROR BOOKER:  No.

THE COURT:  All right, thank you.

(Whereupon, the juror resumed her seat and the following

proceedings were had in open court and in the presence of the

prospective jury panel:)

THE COURT:  All right, take the jury down to the lounge.

(Whereupon, the jury exited the courtroom.)

THE COURT: Okay, let's go into chambers, and I'll tell you

what she had to say.

(Whereupon, the Court, counsel for the State, counsel for

the defendant, the defendant in person and the court reporter

entered the Court's chambers where the following proceedings

were had out of the hearing of the prospective jury panel:)

THE COURT:  All right, read back what she had to say.

(Whereupon, the colloquy between the Court and Juror Booker

295

was read by the court reporter.)

THE COURT: Do you have any problem with that, Mr. McKittrick?

MR. McKITTRICK: I just want to voir dire her further at the proper time.

THE COURT: Okay, at the proper time.

Does the State have any problem?

MR. BROWN: We don't have any problem.

THE COURT: All right. Let's take a break.

(Whereupon, a recess was had in the proceedings.)

(After recess.)

THE COURT: Show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221. All right, let me suggest this to you: I'm going to send for the jury and bring them all up, since we can fit them all in the courtroom. We are going to replace Juror No. 11 first and then No. 25.

Bring the jury up, and tell the original twenty-eight -- Everybody in the jury room, we want them upstairs. I want the twenty-eight that have already been picked to take their seats, and the rest to sit in the courtroom.

MR. McKITTRICK: That's fine.

(Whereupon, the jury entered the courtroom.)

THE COURT: Show the resumption again of these proceedings

296

in State of West Virginia vs. John Moss, Jr., also known as John

Moss, III, CR-82-F-221. The defendant is present in person and

by his counsel, Mr. McKittrick, the State of West Virginia by

her Prosecuting Attorney and Assistant Prosecuting Attorney.

The clerk will draw a juror to replace Juror No. 11. The

next juror called will be seated in seat number eleven on the

main panel.

(Whereupon, Juror Rex Hayes was called.)

THE COURT: The clerk will pull another pill, and this will

be Juror No. 25.

(Whereupon, Juror Barbara Mason was called and then Juror

Hayes and Juror Mason were duly sworn to answer all questions

asked of them.)

THE COURT: These questions I am about to ask will be

addressed to Mr. Hayes and Miss Mason.

We are about, lady and gentleman, to impanel a jury for the

purpose of trying the case of the State of West Virginia vs.

John Moss, Jr., also known as John Moss, III, who is charged in

a three count indictment with three counts of murder in the

first degree. These incidents are alleged to have occurred

during the month of December, 1979.

In Count I Mr. Moss is accused of murder in the first degree

upon one Paul Eric Reggettz. In Count II he is charged with

murder in the first degree upon one Bernadette Reggettz. In

297

Count III he is charged with murder in the first degree upon one Vanessa Dale Reggettz.

Are either of you kin, either by blood or marriage, to the accused, John Moss, Jr., also known as John Moss, III?

Or to Paul Eric Reggettz, Bernadette Reggettz or Vanessa Dale Reggettz?

Or to Paul Reggettz?

Are you kin, either by blood or marriage, to, or do you know Terry Williams, a member of the West Virginia Department of Public Safety, commonly known as the state police.

Do either of you have any members of your immediate family who are members of any police department, sheriff's department, FBI or any law enforcement agency, city, county, state or federal?

Do you, or either of you, have any relatives who are either United States Attorneys, with the Department of Justice, the Attorney General's office, or the Prosecuting Attorney's office of this county or of any other county?

Have either of you made up your mind or expressed any opinion concerning the guilt or the innocence of the accused?

Are either of you sensible of any bias or prejudice as would prevent you from receiving the evidence of the State of West Virginia on the one hand and the accused on the other and from returning a true and impartial verdict therefrom?

298

Do each of you feel you can stand freely and impartially between the State of West Virginia on the one hand and the accused, John Moss, Jr. on the other, and return a verdict from the evidence presented here at the bar of this Court.

Mr. Hayes and Miss Mason, this indictment was returned by the September, 1982 Term of the Grand Jury of the Circuit Court of Kanawha County of which Mr. Paul Emory was foreman. Were either of you members of that grand jury that returned this indictment?

Exclusive of this term of court, have either of you served on a petit jury within the past two years?

Are either of you now, or have you ever been clients of Mr. James Stucky, Prosecuting Attorney for Kanawha County?

Or of Mr. Peter Brown, Deputy Prosecuting Attorney for Kanawha County?

Or of Mr. Parrish McKittrick, counsel for the accused?

During the course of this proceeding I must tell you first, if you are selected, you will be the triers of the facts. In your case, Miss Mason, if you are selected, you would be selected as an alternate, which means you might sit throughout these proceedings; and unless there is need for you to be replaced in the main panel, you could sit here for six weeks, hear all the evidence and then be discharged without participating in the deliberations. Do you understand that?

299

JUROR MASON: Yes.

THE COURT: Do either of you know why, if this matter does take six weeks -- and it may take that or more. I have no way of knowing. Do either of you know of any reason why you could not serve on this jury?

Now, you will be triers of the facts if you are selected. I am the trier of the law. You determine the facts. You listen to the evidence. You give it what weight you think it is worth. I determine, as trier of the law, I determine what evidence you may hear. Some you may; some you may not. That is my role as trier of the law.

There will be times counsel and the Court will go to the side bar. When we do that, we are not trying to hide anything from you; we are discussing matters of law that are not of your concern.

You are not to concern yourselves with the number of objections or lack of objections made by counsel for either side. You are not to concern yourselves with how I rule on those objections, whether I rule in favor of one side or the other. That is not your concern.

You are not to read anything into the inflection in my voice. I couldn't care less how this matter comes out. That is not my function. That is your function as triers of the facts.

And I will add another one. I have no doubt at times my

voice will get testy between me and the lawyers for both sides as this matter progresses. Don't read anything into that fact.

Do either of you have any vacations or anything of a personal nature planned or any medical problems that if you are required to sit for six weeks would cause you any problems?

Anything further?

MR. McKITTRICK: Nothing for the defendant.

THE COURT: All right, everyone just remain seated in the courtroom. Let's go back here to the jury deliberation room.

(Whereupon, the Court, counsel for the State, counsel for the defendant, the defendant in person and the court reporter entered the jury room on the seventh floor where the following proceedings were had out of the hearing of the jury panel:)

THE COURT: All right, let the record show that Mr. McKittrick's request was granted in that the juror's chair has been moved as far back against the wall as it can be.

All right, bring in Juror No. 1.

(Whereupon, Juror Harvey B. Hunley entered the room.)

THE COURT: All right, we have here Harvey B. Hunley. If you don't mind, Mr. Hunley, I would like to ask you a few questions. Can you hear me all right?

JUROR HUNLEY: Yes, sir.

THE COURT: Mr. Hunley, have you read anything in the newspapers or heard anything on television or the radio about

301

this case involving the murders of Vanessa Reggettz, Bernadette

Reggettz and Paul Eric Reggettz?

JUROR HUNLEY:  Yes, sir.

THE COURT:  And when was the last time you read something

regarding this?

JUROR HUNLEY:  Here recently when it was in the paper.

THE COURT:  And do you recall the contents of that story

that you read?

JUROR HUNLEY:  Not offhand, no.

THE COURT:  Do you recall which paper you read it in?

JUROR HUNLEY:  The Daily Mail.  That is the one I get.

THE COURT:  Where do you live, Mr. Hunley?

JUROR HUNLEY:  Campbell's Creek.

THE COURT:  Where on Campbell's Creek?  I am familiar with

it.

JUROR HUNLEY:  375 1/2, about three doors above the Fas-

Chek.

THE COURT:  Oh, okay.

JUROR HUNLEY:  About three doors above it.

Let me clear one thing.  When this was taking place, I was

running a bread route in St. Albans at the time.  I am retired

now, but during those years that this happened, I was running a

bread route in St. Albans.  And you asked here maybe a question

before, everyone -- I was familiar with the surroundings down

there.  When you are a bread man, you go from one place to

another, and you hear all kinds of comments.

As I remember this right, there was another guy confessed

first.  Is that right?  And then something else happened to this

fellow.  I don't know anything about it particularly, but it was

discussed in my presence.  And you know how people are.  They

form opinions of what they should do.  I'm going to be honest

with you.

THE COURT:  I want you to be.

JUROR HUNLEY:  I'm going to be.

THE COURT:  Well, has anything you have heard about the case

or anything you have read --

JUROR HUNLEY:  Well, let me ask this fellow, are you any

kin to that fellow Moss that was a cop down in St. Albans?

THE COURT:  No, you have to ask me.

JUROR HUNLEY:  I knew that Moss.  I don't know whether it

was the same man or not, but I knew of him.

THE COURT:  Well, let me ask you this:  Has anything you

have read or heard -- Well, you have heard things.  People have

expressed opinions?

JUROR HUNLEY:  Yeah.

THE COURT:  Has anything you have read or heard caused you

to form an opinion either for or against either side?  Have you

formed an opinion in this case?

303

JUROR HUNLEY:  Yes, I have.

THE COURT:  You have.

JUROR HUNLEY:  I am going to be honest with you.

THE COURT:  I want you to be honest with us.

JUROR HUNLEY:  I am being honest with you.  I just don't think I could rightly sit there and judge this case according to my convictions.  Do you understand?

You might not understand what I'm trying to say.

THE COURT:  I understand exactly what you are trying to say; and I'll say this to you, that we all -- You remind me of the typical West Virginia Mountaineer -- we all appreciate your candor.  It might save us all a lot of time.

JUROR HUNLEY:  I don't want you all to get into this thing and then have to say, "Hey, wait a minute; I just can't do that."

THE COURT:  You are absolutely right, and we appreciate it.

JUROR HUNLEY:  I'm going to tell you something else.  I've laid awake since 3:00 of a morning studying because I'm on this thing.  I don't want on it.  I'll tell you the truth about it. I don't want on it.  You've got me here, and I don't want to be here.

THE COURT:  I can appreciate what you are saying, Mr. Hunley, but I'm going to tell you something.  If people aren't willing to serve, we don't have a court system.

304

JUROR HUNLEY:  I know that.

THE COURT:  We don't have a democracy.

JUROR HUNLEY:  I understand that.  But I think you have got the wrong man, honestly.  Now, this tears me up.  I don't care what you say.  You can convince me maybe, but it tears me up.

THE COURT:  I'm not trying to convince you.  What I'm trying to say to you is I can appreciate what you are saying regarding this particular matter.  But what I'm trying to tell you is if people aren't willing -- Forget this for a minute.  Forget what we are here for.  If people aren't willing to serve on jury duty in general, you don't have a court system.

JUROR HUNLEY:  I understand that.

THE COURT:  And then you don't have a democracy.

JUROR HUNLEY:  I understand that.

THE COURT:  Why don't you just step outside the door there for just a minute, would you please.

(Whereupon, the juror exited the room.)

THE COURT:  Well, gentlemen --

MR. McKITTRICK:  I think you ought to ask him, Judge, what his reservations are and where they are at.

MR. STUCKY:  He doesn't say reservations.  He said he has an opinion.

MR. BROWN:  He said he has an opinion.

MR. McKITTRICK:  I think we ought to ask him what he bases

305

his opinion on and --

THE COURT:  He already said he -- All right, Parrish, we'll do it your way.  We'll be here until Christmas.  Bring him in.

MR. STUCKY:  What he bases his opinion on is not relevant.

THE COURT:  Just bring him back in.

MR. McKITTRICK:  And you can ask him if he has talked with any of the other jurors.

(Whereupon, Juror Hunley re-entered the room.)

THE COURT:  Mr. Hunley, you have already told us you have heard a lot about the case earlier, that you had a bread route or something in St. Albans.

JUROR HUNLEY:  Yeah.

THE COURT:  Have you heard anybody talking about it since you have been here at the courthouse on this jury?

JUROR HUNLEY:  Yes, sir.

THE COURT:  Have you heard any of the other jurors talking about it?

JUROR HUNLEY:  No.

THE COURT:  You said you have formed an opinion?

JUROR HUNLEY:  Yes.

THE COURT:  What caused you to form an opinion?

JUROR HUNLEY:  Reading it in the newspapers and talking among people.

THE COURT:  In other words, you have read quite a bit about

306

this matter?

JUROR HUNLEY: Yes, I have.

THE COURT: And you have heard it discussed and talked about it with people?

JUROR HUNLEY: Yes.

THE COURT: And you had a bread route in St. Albans at the time of these offenses?

JUROR HUNLEY: Yes.

THE COURT: Do I take it then you heard a lot of people discuss it in St. Albans?

JUROR HUNLEY: Yes.

THE COURT: Well, let me ask you: You have already indicated you have formed an opinion. Is there any way of your blocking that opinion from your mind?

JUROR HUNLEY: Well, again, I wouldn't lie to you, Judge, for nothing.

THE COURT: I know that.

JUROR HUNLEY: I'm going to be honest with you. For a fender bender, or somebody beating his wife or leaving his wife, I could set on a jury. But where it is pertaining to a man's life at stake maybe, I just can't do it. Honestly, I wouldn't do it.

THE COURT: There is no way you feel you could sit out there with a clean mind --

307

JUROR HUNLEY: No, sir.

THE COURT: And attempt to reach a true and impartial verdict?

JUROR HUNLEY: No, sir.

THE COURT: We appreciate your honesty. That is what it is all about.

JUROR HUNLEY: And I'm wasting your time and my time by even pretending I can do that. I can't do it honestly. That's all there is to it.

THE COURT: You are not wasting my time. I have got to be here anyway.

JUROR HUNLEY: Well, you're getting paid for it, and that's all right. But I don't care nothing about the pay. We are just among friends here. If it came down to this man over here, and they had a six to five vote up there in the jury room, and my vote decided to put this man away maybe for the rest of his life or something, I just couldn't do it. There ain't no way I could do it. I couldn't live with myself for the rest of my life if it depended upon me, and a lot of this is going to depend upon me. And I just couldn't do it. That's all there is to it. So there is no point in me wasting your time.

THE COURT: All right, just step outside the door, Mr. Hunley. We will get to you in a moment.

(Whereupon, the Juror Hunley left the room.)

308

MR. BROWN: Challenge for cause, Your Honor.

THE COURT: Any objection?

MR. McKITTRICK: No objection.

THE COURT: Do you want him replaced now?

MR. McKITTRICK: Yeah.

THE COURT: Rather than go on to the next one?

MR. STUCKY: Might as well while we have those people here.

THE COURT: All right, I don't think we will have any voir dire this afternoon, but at least we can get a jury in there.

Tell Mr. Hunley to come back in here.

(Whereupon, Juror Hunley re-entered the room.)

THE COURT: Mr. Hunley, don't sit down. Don't get yourself comfortable. You are not going to be here that long. I want you to know we all appreciate your candor in this matter. I will excuse you. You can go on back home today. Now, you are not excused from jury duty, but you are excused from the Moss trial.

I don't want you discussing whatever we have discussed in here. I don't want you discussing the Moss trial with anyone. But I want you to know we do appreciate your candor. Just call the clerk's office to see when you will be needed again.

(Whereupon, Juror Hunley left the room.)

THE COURT: All right, let's go back out there and put another juror in the box.

309

(Whereupon, the Court, counsel for the State, counsel for the defendant, the defendant in person and the court reporter entered the courtroom where the following proceedings were had:)

THE COURT: The clerk will put another jury in the box in seat number one.

(Whereupon, Juror William Woodson was called and duly sworn to answer all questions asked of him.)

THE COURT: Mr. Woodson, these questions are directed to you, sir, and you alone.

We are about to impanel a jury for the purpose of trying the case of the State of West Virginia against one John Moss, Jr., also known as John Moss, III, who is charged in a three count indictment with three counts of murder in the first degree. These incidents are alleged to have occurred during the month of December, 1979.

In Count I he is charged with murder in the first degree upon one Paul Eric Reggettz. In Count II he is charged with murder in the first degree upon one Bernadette Reggettz, and in Count III he is charged with murder in the first degree upon one Vanessa Dale Reggettz.

Are you kin, either by blood or marriage, to any of those three people?

JUROR WOODSON: No, sir.

THE COURT: Or to one Paul Reggettz?

310

JUROR WOODSON:  No, sir.

THE COURT:  Or to one Terry Williams of the West Virginia State Police?

JUROR WOODSON:  No.

THE COURT:  Do you know Mr. Williams?

JUROR WOODSON:  No, sir.

THE COURT:  Do you know Mr. Paul Reggettz?

JUROR WOODSON:  No, sir.

THE COURT:  Are you kin, either by blood or marriage, to John Moss?

JUROR WOODSON:  No, sir.

THE COURT:  Do you know John Moss?

JUROR WOODSON:  No, sir.

THE COURT:  Have you made up your mind or expressed any opinion concerning the guilt or innocence of the accused?

JUROR WOODSON:  No, I have not.

THE COURT:  Are you sensible of any bias or prejudice that would prevent you from receiving the evidence of the State of West Virginia on the one hand and the evidence of the accused on the other and from returning a true and impartial verdict therefrom?

JUROR WOODSON:  No.

THE COURT:  Do you feel you can stand freely and impartially between the State of West Virginia on the one hand and the

311

accused, John Moss, on the other, and that you can return a fair and impartial verdict based on the evidence as presented here at the bar of this Court?

JUROR WOODSON:  Yes, sir.

THE COURT:  Mr. Woodson, this indictment was returned by the September, 1982, Term of the Grand Jury of the Circuit Court of Kanawha County of which Mr. Paul Emory was foreman.  Were you a member of the grand jury that returned this indictment?

JUROR WOODSON:  No, sir.

THE COURT:  Exclusive of this term of court, have you sat on a petit jury within the last two years?

JUROR WOODSON:  No, sir.

THE COURT:  Are you now, or have you ever been, a client of Mr. James Stucky, Prosecuting Attorney of Kanawha County?

Or of Mr. Peter Brown, Deputy Prosecuting Attorney of Kanawha County?

Or of Mr. Parrish McKittrick, counsel for the accused?

JUROR WOODSON:  No, sir.

THE COURT:  Mr. Woodson, if you are selected, you, as a juror, will be a trier of the facts.  I as a judge will be the trier of the law.  That is to say, I determine what evidence you are to hear.  You then give that evidence whatever weight you care to give it as trier of the facts.

There will be times we have bench conferences at the side

312

over here away from your hearing. We are not trying to keep
anything from you. But these are matters of law, and you are
not to concern yourself with it.

You are not to concern yourself with the number of
objections or lack of objections made by the lawyers for either
side. Nor are you to concern yourself with how I rule on those
objections, whether I rule favorably for one side or the other.

You are not to concern yourself with any inflection in my
voice. I couldn't care less how this proceeding comes out.
That is not my function. That is yours as trier of the facts.

Do you know of any reason why you could not sit as a juror
on this case and attempt to reach a verdict based solely on the
evidence, the arguments of counsel and the instructions of the
law?

If at the end of the proceeding, when I read to you the
instructions of the law, even if you disagree with the law --
Let's say I gave you laws A, B, C and D, and you didn't like B,
will you still follow the law as I give it to you? Do you know
of any reason you will be unable or unwilling to do that?

JUROR WOODSON: No.

THE COURT: Do you have any members of your immediate family
who are members of any police department, city, county, state,
federal, Prosecuting Attorney's office, Justice Department, FBI,
United States Attorney or Attorney General?

313

JUROR WOODSON:  No, sir.

THE COURT:  Would you tend to give a police officer's testimony any greater or any less weight than that of any other witness?

JUROR WOODSON:  No, sir.

THE COURT:  This trial may last for six weeks.  You have heard me say it before.  I'll say it again.  We don't know how long it is going to last.  Do you have any medical problems or any vacations scheduled or anything of a personal nature that would prevent you from sitting over that period of time?

JUROR WOODSON:  Not at the time.

THE COURT:  Well, as you heard me say earlier, let's take it a day at a time.

Okay, let's go.

(Whereupon, the Court, counsel for the State, counsel for the defendant, the defendant in person and the court reporter entered the jury room where the following proceedings were had:)

THE COURT:  All right, bring in Juror No. 1, Mr. Woodson.

(Whereupon, Juror Woodson entered the room.)

THE COURT:  Have a seat over there please.  Let's see, you are William B. Woodson?

JUROR WOODSON:  Yes, sir.

THE COURT:  Okay, Mr. Woodson, I would like to ask you some questions.

314

Have you read anything in the newspapers or heard anything on the television or radio about this case involving the murders of Vanessa Reggettz, Bernadette Reggettz and Paul Eric Reggettz on December 13, 1979?

JUROR WOODSON: I might have read it in the Gazette when it came up, one of the papers when it came up; but I didn't really pay it any mind.

THE COURT: Have you read anything about it lately?

JUROR WOODSON: No, I haven't.

THE COURT: Have you heard it discussed, or have you discussed it?

JUROR WOODSON: No, I haven't.

THE COURT: Has anything you have read, even though it may have been some four years ago, has anything you have read, seen or heard caused you to form an opinion either for or against the defendant, John Moss?

JUROR WOODSON: None whatsoever.

THE COURT: Has anything you may have read, seen or heard caused you to form an opinion either for or against the State of West Virginia?

JUROR WOODSON: No, sir.

THE COURT: Mr. Woodson, have you formed any fixed opinion as to the guilt of John Moss?

JUROR WOODSON: I haven't thought about it.

THE COURT:  Have you formed any fixed opinion as to the innocence of John Moss?

JUROR WOODSON:  No, I haven't.

THE COURT:  Have you formed any opinion as to the guilt or innocence of any other person in this case?

JUROR WOODSON:  None whatsoever.

THE COURT:  If you were selected on this jury and you were required to remain each night in a hotel or motel until the conclusion of this trial, would this cause you to be unable to give your full attention to the testimony given in court because of any personal, family or business problems?

JUROR WOODSON:  No, not really.

THE COURT:  Would being selected to this jury cause you any serious personal problems if the trial required several weeks, say six weeks?

JUROR WOODSON:  No.

THE COURT:  Have you ever had any experience with law enforcement officers or courts that would prejudice you against the prosecution in this case?

JUROR WOODSON:  No.

THE COURT:  Any member of your family, immediate family, that you know of that have had contact with the courts?

JUROR WOODSON:  You know, when you say immediate family, what does that cover, Judge?

316

THE COURT: Well, who do you have in mind?

JUROR WOODSON: Well, see, I have been wondering about this. See, my mother was divorced from my father when i was one year old. My father got married again. I have a couple of half brothers, and every time you look around, they stay in trouble.

THE COURT: Who are they?

JUROR WOODSON: Charles Woodson, and I can't think of the other name.

THE COURT: If you can't think of the other name, you are not very close, are you?

JUROR WOODSON: No, that's right. We're not very close.

THE COURT: Well, would their problems with the courts cause you to be prejudiced for or against either side?

JUROR WOODSON: No.

THE COURT: Are you any relation to Gwendolyn Woodson?

JUROR WOODSON: Yes.

THE COURT: What is she to you?

JUROR WOODSON: She is an ex-sister-in-law.

THE COURT: Ex-sister-in-law. And she has had difficulty with the courts I believe?

JUROR WOODSON: Yes.

THE COURT: Would that cause you to have any prejudice for or against either side?

JUROR WOODSON: None whatsoever.

317

THE COURT:  How old are you, Mr. Woodson?

JUROR WOODSON:  I will be forty-five in March.

THE COURT:  Would being forty-five, your age, prevent you from giving complete attention to the testimony and other proceedings in this case if you were selected as a juror?

JUROR WOODSON:  I don't think so.

THE COURT:  Do you have any health problems that you know of, hearing, eyesight, that would prevent you from giving your complete attention to these proceedings?

JUROR WOODSON:  No.

THE COURT:  Do you know of any reason about which you have not been asked why you could not be completely fair and impartial to both sides in this case if you are selected as a juror?

JUROR WOODSON:  Not that I can recall, to be honest.

THE COURT:  That's what I want you to be.  Do you think that the oath to well and truly try this case according to the law and evidence is a mere formality?

JUROR WOODSON:  No.

THE COURT:  You take great stock in the oath then?

JUROR WOODSON:  Yes.

THE COURT:  The State of West Virginia, Mr. Woodson, must prove the defendant guilty beyond a reasonable doubt; but the law does not require any heavier burden.  Would you as a juror

318

require a heavier burden?

    JUROR WOODSON:  No.

    THE COURT:  Let me tell you right up front, we are not looking for any yes or no answers.  Just answer to the best of your ability.  Some folks think we are looking for yes and no. We are not.

    JUROR WOODSON:  I understand.

    THE COURT:  Do you believe that beyond a reasonable doubt means beyond all doubt?

    JUROR WOODSON:  Yes.

    THE COURT:  You do?

    JUROR WOODSON:  Run that by me again.

    THE COURT:  Do you think that the phrase "beyond a reasonable doubt" means the same as "beyond all doubt"?

    JUROR WOODSON:  No; no, sir.

    THE COURT:  Would you tend to give more weight and credibility or less weight and credibility to the testimony of a police officer just because he is a police officer?

    JUROR WOODSON:  No.

    THE COURT:  Do you understand that sympathy is not a part of your verdict?

    JUROR WOODSON:  Sure.

    THE COURT:  And as I explained out there, do you further understand you are only the trier of the facts; I am the trier

319

of the law?

JUROR WOODSON:  Yes.

THE COURT:  Do you have any personal philosophy that would not allow you to return a verdict of guilty?

JUROR WOODSON:  No.

THE COURT:  A verdict, Mr. Woodson, a verdict of murder in the first degree without a recommendation of mercy --

MR. McKITTRICK:  Judge, I think you struck that one.

THE COURT:  No, I didn't, if you will read my note at the side.

Mr. Woodson, a verdict of murder in the first degree without a recommendation of mercy means the defendant would spend the rest of his natural life in the penitentiary without hope of parole.  Knowing that, could you still return such a verdict if the State proved its case beyond a reasonable doubt and the facts called for it?

JUROR WOODSON:  Yes.

THE COURT:  Any question in your mind about that?

JUROR WOODSON:  No.

THE COURT:  And you are a resident of Kanawha County?

JUROR WOODSON:  Yes.

THE COURT:  That's an easy one.

JUROR WOODSON:  Yeah.

THE COURT:  And you are a citizen of the United States?

JUROR WOODSON:  Right.

THE COURT:  That's two easy ones in a row.  Is there any reason you can think of why you would not or could not follow my instructions, even though you did not agree with the law as I instructed you?  In other words, if I say, "Mr. Woodson, this is the law", even if you disagree with that law, would you follow my instructions?

JUROR WOODSON:  The law is the law.

THE COURT:  Now, if during the testimony -- and you can't take paper and pencil in the jury box; you cannot take notes -- But if during the testimony something triggers your memory about something you have read or heard about this case, would you be able to put that completely out of your mind?

JUROR WOODSON:  I am sure that I would.  I am being honest now, and if something would come to my attention, you know, if it would trigger something, I'm being honest, no, it wouldn't.

THE COURT:  You would be able to put it out of your mind?

JUROR WOODSON:  Yes.

THE COURT:  Would you be able to decide this case solely on the evidence and testimony presented in this courtroom, keeping in mind that what you read or heard might not have been accurate, that it wasn't given under oath, and that it wasn't subject to cross examination?

JUROR WOODSON:  Yes.

321

THE COURT:  Do you understand that an indictment is nothing more than the way charges are filed against a person in order to bring a case into court for consideration by a jury?  Do you understand that an indictment is no evidence?  Do you understand that?

JUROR WOODSON:  Uh-huh.

THE COURT:  Do you understand that the grand jury system whereby indictments are returned is provided for by the United States Constitution and the West Virginia State Constitution? Do you understand that the grand jury is provided for by the Constitutions of the United States and West Virginia?

JUROR WOODSON:  Okay.

THE COURT:  Do you understand that where any person comes into the court accused of a crime the fact that he had been arrested or the fact that he had been charged by formal court papers such as an indictment is absolutely no evidence of his guilt?

JUROR WOODSON:  Yes.

THE COURT:  There is a reason for all these questions now.

JUROR WOODSON:  Okay.

THE COURT:  Have you or any member of your family or close personal friends ever been a member of the National Weather Service?

JUROR WOODSON:  No.

322

THE COURT: Have you or any member of your family or close personal friends ever been a member or employee of a law firm?

JUROR WOODSON: Okay, one more thing. Now, I have another -- I have a lot of half brothers, and I think I have a half brother on my stepfather's side that is taking law at WVU, but I don't really know. That shows you how close I am with them. That is Fred Sims.

THE COURT: Did he used to work for the city?

JUROR WOODSON: Yes, he did.

THE COURT: Would that influence you one way or the other?

JUROR WOODSON: No.

THE COURT: Do you know a Samuel Siders?

JUROR WOODSON: No, not by name.

THE COURT: Have you or any member of your family or close personal friends ever worked for a private detective agency?

JUROR WOODSON: Not that I know of.

THE COURT: Well, I asked, and you have already told us a little bit; but I am going to ask you anyway. Have you or any member of your family ever been involved in a criminal case, either as the defendant, a witness for the defense or in any other capacity other than what you have told us about your half brothers and ex-sister-in-law?

JUROR WOODSON: No.

THE COURT: I take it you are not close to any of

323

those people?

JUROR WOODSON: Not too close.

THE COURT: Well, has their experiences with the court in any way caused you to form opinions about the court system, favorably or not favorably?

JUROR WOODSON: No. That is the way they are.

THE COURT: If you believe beyond a reasonable doubt that the defendant is guilty, and after listening to the arguments of your fellow jurors when you retire to consider the case you still have that belief beyond a reasonable doubt that the defendant is guilty, will you stick to your guns and refuse to change your verdict, even though it is an unpopular one and one which might result in a hung jury?

JUROR WOODSON: That is my right.

THE COURT: On the other hand, will you be willing to listen to the arguments of the other jurors, even if they differ from your own?

JUROR WOODSON: Oh, yes, sir.

THE COURT: Would the inconvenience of having to spend the night or more nights away from home prevent you from sticking to your guns and refusing to change your verdict, if you still believe beyond a reasonable doubt that the defendant is guilty?

JUROR WOODSON: No.

THE COURT: Conversely, if you felt he was not guilty, would

324

you still stick to your guns?

JUROR WOODSON:  Yes.

THE COURT:  Do you think a verdict of guilty in this or any criminal case would be unpopular with members of your family, or with your neighbors or friends, or with members of your church, or with members of any social group or fraternal group to which you belong?

JUROR WOODSON:  No.

THE COURT:  Let's assume for a moment that you are picked as a juror in this case and you brought in a verdict of guilty, would you find it embarrassing in the neighborhood or area in which you live?

JUROR WOODSON:  No.

THE COURT:  Are you willing to follow, accept and abide by my directives, orders and instructions?  Do you agree to follow, accept and abide by those directives, orders and instructions all the way, no matter where they lead you and to return your verdict based upon the law and the evidence, even if you believe the verdict will be an unpopular one?  Will you stick by your convictions and follow my directives and orders?

JUROR WOODSON:  I'll stick by my convictions.

THE COURT:  Will you follow my directives and orders as pertaining to the law?

JUROR WOODSON:  As pertaining to the law.

325

THE COURT:  Do you understand that proof beyond a reasonable doubt does not necessarily mean proof without contradictions, or without conflict, but if after considering all the evidence and circumstances produced in the case you can say that you have an abiding conviction of the truth of the charges contained in the indictment, then you are satisfied beyond a reasonable doubt and may find the defendant guilty?  Do you follow that?

JUROR WOODSON:  Yes.

THE COURT:  Now, during the trial, the attorneys for the State will make objections to testimony or evidence offered by the defense.  Do you understand that it is the State's job to preserve the record by doing this?

JUROR WOODSON:  Uh-huh.

MR. McKITTRICK:  Judge, I think maybe you struck that.

MR. BROWN:  No, it is in.

THE COURT:  I have got it in.  If I did, so be it.  We will take care of it later.

If you are offended by the State's objections, will you hold that against the State in your deliberations?

JUROR WOODSON:  (Juror shakes head.)

THE COURT:  You understand this is a record, this lady is taking down.

JUROR WOODSON:  Yes.

THE COURT:  Do you realize you should not give any more

326

weight, or any less weight, to the arguments of the defense
lawyers than to the State's attorneys?  You treat them both
equally.

JUROR WOODSON:  Yeah, equal.

THE COURT:  Mr. Woodson, is there any reason which I have
not covered which would make you feel that you could not
approach this case with a completely open mind, or that you
feel might embarrass you in your consideration of this case?

JUROR WOODSON:  At the moment, no.

THE COURT:  Okay, you mean you think there is something in
the back of your mind.

JUROR WOODSON:  I don't know -- No, no.

THE COURT:  As of right now, this moment.

JUROR WOODSON:  No.

THE COURT:  There is nothing in the back of your mind?

JUROR WOODSON:  Nothing whatsoever.

THE COURT:  All right now, assuming that you or some loved
one of yours was standing in place of the relatives of the
deceased victims in this crime, would you be satisfied to have
you or your loved one represented by twelve jurors having the
same frame of mind as you have?

JUROR WOODSON:  Yeah.

THE COURT:  Would you be happy with yourself as a juror in
your frame of mind if you were the defendant?

327

JUROR WOODSON:  Yes.

THE COURT:  This next one may be obvious to you in light of your other answers to me, but have you or any member of your family ever posted bond for anyone in a criminal matter?

JUROR WOODSON:  I never posted bond for them.

THE COURT:  You never have personally?

JUROR WOODSON:  No, not personally.

THE COURT:  How about any member of your immediate family, like your wife?

JUROR WOODSON:  No, not my wife.

THE COURT:  Now, from time to time there may be television coverage of portions of this trial.  Would that cause you to want to watch television news coverage of this trial in order to see yourself on television?

JUROR WOODSON:  Lord no.

I have got one more thing.  Last year or year before last, a couple of years back, I got called as a witness to a case; and I don't even really know the name; but it was an accident that happened.  No, it was a shooting that happened up in Rand.  I was coming home from bowling, and I saw this woman fall over. They called me about a year later and I talked to them about it, but I never did go.  I want to be honest.

THE COURT:  We want you to.  It is important that you be absolutely candid with us, both sides.

328

Would that in and of itself or coupled with anything cause you to be unable to sit on this matter with an impartial and open mind?

JUROR WOODSON:  No, but I just want to set the record straight.

THE COURT:  Sure.  I'm glad you did.  I appreciate that.

How long ago was this?

JUROR WOODSON:  Maybe two years ago.

THE COURT:  Do you remember the names of the people involved?

JUROR WOODSON:  I can't think of the people involved.  I knew you were going to ask me that.  I don't know why I brought it up.

THE COURT:  But you never came to court?

JUROR WOODSON:  No, I never came to court.

THE COURT:  Do you know any of these lawyers personally?

JUROR WOODSON:  No.

THE COURT:  Have you ever had any professional or social contact with them?

JUROR WOODSON:  No.

THE COURT:  Have any of them ever acted as your lawyer or any members of your immediate family?

JUROR WOODSON:  No.

THE COURT:  If the facts of this case support a verdict of

guilty of murder in the first degree, do you have any feelings

or beliefs that would cause you to automatically reject the

returning of a verdict of life without mercy and vote for life

with mercy?

JUROR WOODSON:  No.

THE COURT:  If the facts of this case support a verdict of

guilty of murder in the first degree, do you have any feeling or

beliefs that would cause you to automatically reject the

returning of a verdict of life with mercy and vote for life

without mercy?

JUROR WOODSON:  No.

THE COURT:  I know I have asked you before and it may be

repetitious, but we always have a reason for doing things, and

it is important.  Even if you personally disagree with the law

as I give it to you, will you follow my instructions of the law

and apply that law in your deliberations?

JUROR WOODSON:  It is the law.

THE COURT:  If I tell you it is the law, will you accept

that?

JUROR WOODSON:  Yes.

THE COURT:  Even if you personally disagree with it?

JUROR WOODSON:  Yes.

THE COURT:  Now, I'm going to ask you if you know any of the

following lawyers who have at one time or another worked in the

330

office of the Prosecuting Attorney of Kanawha County:

    Fran McCoy?

    JUROR WOODSON:  No.

    THE COURT:  Beverly Selby?

    JUROR WOODSON:  No.

    THE COURT:  James Roark?

    JUROR WOODSON:  No.

    THE COURT:  Peter Brown?

    JUROR WOODSON:  No.

    THE COURT:  James Stucky?

    JUROR WOODSON:  No.

    THE COURT:  Neva Lusk?

    JUROR WOODSON:  No.

    THE COURT:  Charles Pettry?

    JUROR WOODSON:  No.

    THE COURT:  Cheryl Fuller?

    JUROR WOODSON:  No.

    THE COURT:  Are you acquainted with, or do you have any
relationship with a man by the name of Paul Reggettz?

    JUROR WOODSON:  No.

    THE COURT:  Does any member of your family to your
knowledge?

    JUROR WOODSON:  To my knowledge, no.

    THE COURT:  Have you ever had any contact with one

331

Paul Reggettz, you personally?

    JUROR WOODSON:  Not that I can remember.

    THE COURT:  All right, have you heard of or do you know any

of the following persons:

    Trooper Terry Williams?

    JUROR WOODSON:  No, sir.

    THE COURT:  Trooper Michael Don Smith?

    JUROR WOODSON:  No.

    THE COURT:  Trooper F. S. Zain?

    JUROR WOODSON:  No.

    THE COURT:  Trooper R. R. Custer?

    JUROR WOODSON:  No, sir.

    THE COURT:  Trooper D. R. Rinehart?

    JUROR WOODSON:  No, sir.

    THE COURT:  Trooper D. Egnor?

    JUROR WOODSON:  No.

    THE COURT:  R. C. Murphy, a former state trooper?

    JUROR WOODSON:  No, sir.

    THE COURT:  Trooper H. Woodyard?

    JUROR WOODSON:  No.

    THE COURT:  Trooper D. L. Williams?

    JUROR WOODSON:  No, sir.

    THE COURT:  Trooper G. L. Clark?

    JUROR WOODSON:  No, sir.

332

THE COURT:  Trooper L. C. Inman?

JUROR WOODSON:  No.

THE COURT:  Trooper L. L. Farley?

JUROR WOODSON:  No.

THE COURT:  Trooper D. R. Searls?

JUROR WOODSON:  No.

THE COURT:  Steve McGowan, former state trooper?

JUROR WOODSON:  No.

THE COURT:  Trooper R. L. Seacrist?

JUROR WOODSON:  No.

THE COURT:  Dr. Irvin Sopher?

JUROR WOODSON:  No, sir.

THE COURT:  The State Medical Examiner?

JUROR WOODSON:  No, sir.

THE COURT:  Sergeant C. R. Lane?

JUROR WOODSON:  No.

THE COURT:  Lieutenant John Fulks?

JUROR WOODSON:  No.

THE COURT:  Corporal R. E. O'Dell?

JUROR WOODSON:  No.

THE COURT:  Arbutus Johnson?

JUROR WOODSON:  No.

THE COURT:  William Johnson?

JUROR WOODSON:  No.

333

THE COURT:  James E. Roark?

JUROR WOODSON:  No.

THE COURT:  Betty Gainer?

JUROR WOODSON:  Not that I recall.

THE COURT:  Joseph Mendleson?

JUROR WOODSON:  No.

THE COURT:  Dr. Cyril Wecht of Pittsburgh?

JUROR WOODSON:  No.

THE COURT:  David Terry?

JUROR WOODSON:  No, sir.

THE COURT:  Bonnie Hull?

JUROR WOODSON:  No.

THE COURT:  William Estep?

JUROR WOODSON:  William Estep?

THE COURT:  William Estep, Charleston, West Virginia?

JUROR WOODSON:  No.  I am thinking of Epps.

THE COURT:  Belinda Gregg?

JUROR WOODSON:  No.

THE COURT:  Okey Graley?

JUROR WOODSON:  No.

THE COURT:  Connie Taylor?

JUROR WOODSON:  No.

THE COURT:  Paul Dicker?

JUROR WOODSON:  Not that I recall.

334

THE COURT:  James Williams?

JUROR WOODSON:  No.

THE COURT:  Violet Spradling?

JUROR WOODSON:  No.

THE COURT:  John Wideman?

JUROR WOODSON:  No.

THE COURT:  Nora Bucklen?

JUROR WOODSON:  No, sir.

THE COURT:  Kevin McDowell, state police?

JUROR WOODSON:  No.

THE COURT:  Marzee Moss?

JUROR WOODSON:  No.

THE COURT:  Carlton Moss?

JUROR WOODSON:  I know a Moss.  I bowl with a Moss.  I never can think of his first name.

MR. BROWN:  This particular Moss lives in Cleveland, Ohio.

THE COURT:  In other words, the Moss you know you bowl with?

JUROR WOODSON:  Yeah, I used to, a couple of years ago.

THE COURT:  This man now lives in Cleveland, Ohio.  Do you think it would be the same one?

JUROR WOODSON:  No, I don't think so.  He used to live here?

MR. BROWN:  No.

THE COURT:  Arthur Moss?

JUROR WOODSON:  No.

335

THE COURT:  Will Moss?

JUROR WOODSON:  No.

THE COURT:  Dennis Vaughn?

JUROR WOODSON:  No.

THE COURT:  Donald Ferris?

JUROR WOODSON:  No.

THE COURT:  A man by the name of Minton, Detective Minton?

JUROR WOODSON:  No.

THE COURT:  Dr. Kepler?

JUROR WOODSON:  No.

THE COURT:  William Johnson?

JUROR WOODSON:  No.

THE COURT:  Arbutus Johnson?

JUROR WOODSON:  No.

THE COURT:  Nora Bucklen?

JUROR WOODSON:  No.

THE COURT:  Paul Fortson?

JUROR WOODSON:  No.

THE COURT:  Paul Reggettz?

JUROR WOODSON:  No.

THE COURT:  Charles Pettry?

JUROR WOODSON:  No.

THE COURT:  Scott Lasure?

JUROR WOODSON:  No.

336

THE COURT:  Ronnie Champe?

 JUROR WOODSON:  No.

 THE COURT:  Trooper Terry Williams?

 JUROR WOODSON:  No.

 THE COURT:  Trooper Michael Smith?

 JUROR WOODSON:  No.

 THE COURT:  Trooper F. S. Zain?

 JUROR WOODSON:  No.

 THE COURT:  Sergeant C. R. Lane?

 JUROR WOODSON:  No.

 THE COURT:  Corporal R. R. Custer?

 JUROR WOODSON:  No.

 THE COURT:  Trooper Rinehart?

 JUROR WOODSON:  No.

 THE COURT:  Dr. Irvin Sopher?

 JUROR WOODSON:  No.

 THE COURT:  Lieutenant John Fulks?

 JUROR WOODSON:  No.

 THE COURT:  Are we going over the same list?

 JUROR WOODSON:  That's what I think we are doing.

 THE COURT:  Sergeant Shumate?

 JUROR WOODSON:  No.

 THE COURT:  Sergeant Dan Egnor?

 JUROR WOODSON:  No.

337

THE COURT: R. C. Murphy?

JUROR WOODSON: No.

THE COURT: Trooper L. C. Inman?

JUROR WOODSON: No.

THE COURT: Lieutenant R. F. Langley?

JUROR WOODSON: No.

THE COURT: Trooper Woodyard?

JUROR WOODSON: No.

THE COURT: Trooper D. L. Williams?

JUROR WOODSON: No.

THE COURT: Sergeant J. R. Smith?

JUROR WOODSON: No.

THE COURT: Trooper G. L. Clark?

JUROR WOODSON: No.

THE COURT: Trooper L. L. Farley?

JUROR WOODSON: No.

THE COURT: Trooper D. R. Searls?

JUROR WOODSON: No.

THE COURT: Steve McGowen?

JUROR WOODSON: No.

THE COURT: Sergeant C. N. Cook?

JUROR WOODSON: No.

THE COURT: Trooper D. R. Martin?

JUROR WOODSON: No.

338

THE COURT:  Trooper R. L. Seacrist?

JUROR WOODSON:  No.

THE COURT:  Deputy Mark McMillian?

JUROR WOODSON:  No.

THE COURT:  Bill Moss?

JUROR WOODSON:  No.

THE COURT:  Jebb Moss?

JUROR WOODSON:  No.

THE COURT:  Calvin Moss?

JUROR WOODSON:  No.

THE COURT:  Diane Hawkins?

JUROR WOODSON:  No.

THE COURT:  Reese Otts?

JUROR WOODSON:  No.  I have heard of that Otts, but I don't
think --

THE COURT:  Supposing I tell you this fellow works for the
National Weather Service?

JUROR WOODSON:  No.

THE COURT:  Sergeant Presson?

JUROR WOODSON:  No.

THE COURT:  Mr. Woodson, is it hard for you to get started
in the morning?  I am particularly interested in this question
if you live a long way from the courthouse and will have to get
up especially early in the morning in order to be here and ready

339

to go to work at 9:30.

JUROR WOODSON:  Oh, no, I'm just a slow starter in the
mornings; but as long as I have my coffee I am okay.

THE COURT:  You can have that at home.  Do you often take a
nap during the day?

JUROR WOODSON:  No.

THE COURT:  Do you think you can function here without
taking a nap?

JUROR WOODSON:  Oh, yes.

THE COURT:  Do you get tired easily?

JUROR WOODSON:  No.

THE COURT:  Do you suffer from headaches or from any physical
pain which would result from non-activity, or from being
required to sit quite still for quite a bit of time?

JUROR WOODSON:  No.

THE COURT:  Will your legs bother you when you are required
to sit still for long periods of time?

JUROR WOODSON:  No.

THE COURT:  Do you have any physical problems which would
make it uncomfortable for you to sit in this case?

JUROR WOODSON:  Not really.

THE COURT:  Now, this case may take a fairly long time to
try.  Do you suffer from any illness which might disturb you
during this period such as ulcers, earaches, headaches, or any

340

other illness, even of a minor kind?

JUROR WOODSON: No.

THE COURT: Do you understand that our law requires and our constitution guarantees an impartial trial by an unbiased jury, no matter what the charges are against a defendant?

JUROR WOODSON: Yes.

THE COURT: Again these are repetitious, but they are important.

If during the testimony something triggers your memory about something you have read or heard about this case, would you be able to put that completely out of your mind?

JUROR WOODSON: Yes.

THE COURT: Would you be able to decide the case solely on the evidence and testimony presented in this courtroom, keeping in mind that what you read or heard might not have been accurate, that it wasn't given under oath, and that it wasn't subject to cross-examination by John Moss' lawyer?

JUROR WOODSON: Sure.

THE COURT: Is there anything about the charges in this case which creates some strong emotion in you, or would cause you any difficulty in being a fair and impartial juror?

JUROR WOODSON: I don't know that much about it, so no.

THE COURT: You will find from the evidence in this case that Paul Reggettz --

MR. BROWN:  Your Honor, all of Four-A was struck.

MR. McKITTRICK:  I think what we were going to do with Four-A was after you read <u>Chambers</u> --

THE COURT:  Right.  That was not to be taken up at this time.

Apart from any discussions you have heard or participated in, have you read or heard anything about this case other than what you have heard here today?

JUROR WOODSON:  Just like I said, the newspapers a couple of years ago, whenever it was, and that is it.

THE COURT:  Well, you have read something about it in the newspapers?

JUROR WOODSON:  I didn't really read about it in the newspapers.  I just glanced at it.

THE COURT:  That was several years ago?

JUROR WOODSON:  Yeah.

THE COURT:  You don't recall anything that you read?

JUROR WOODSON:  No.

THE COURT:  Have you seen anything about this case while you were watching one of the local television stations, or heard anything while you were listening to one of the local radio stations?

JUROR WOODSON:  Maybe TV stations, but that was quite a while ago.  And when I say quite a while ago, I mean a year or

342

whenever this took place.  I'm a TV freak, so I go from channel

to channel.  I very seldom watch the news.

    THE COURT:  Do you remember anything you saw on TV about

this case, even if it was several years ago?

    JUROR WOODSON:  No, I don't; to be honest, I don't.

    THE COURT:  Do you understand that the reports which you

have read or seen or heard may not be accurate, that the

information you heard was not testimony given under oath and

that John Moss' attorney did not have the opportunity to cross-

examine on his behalf?

    JUROR WOODSON:  Yes.

    THE COURT:  When you saw or read or heard these, quote,

facts, unquote, whenever you saw them, did you believe them to

be true at that time?

    JUROR WOODSON:  No.  You never believe what the Daily Mail

or the Gazette writes.

    THE COURT:  Since you have come to the courthouse, have you

heard any discussion about this case by any other jurors, or by

the court personnel or deputies, or by anyone else?

    JUROR WOODSON:  No.

    THE COURT:  Will you agree, Mr. Woodson, to judge this case

based only on what you see and hear during the trial in this

courtroom, the evidence and testimony presented from the witness

stand?

343

JUROR WOODSON:  Yes.

THE COURT:  Would you consider this case differently from a case which had not been in the public attention?

JUROR WOODSON:  No.

THE COURT:  Have you formed any opinion whatsoever as to the guilt or innocence of John Moss?

JUROR WOODSON:  None whatsoever.

THE COURT:  There again some of these are repetitious.  Just bear with me.

Knowing what you do about this case, would you be entirely satisfied to be tried by a jury in your present frame of mind if you were the person charged with this crime?

JUROR WOODSON:  I would.

THE COURT:  Would you render a verdict in this case according to the law and the evidence, and if there is a reasonable doubt, would you return a verdict of not guilty by reason of the fact that the prosecutor failed to carry his burden and not allow the fear of any criticism from any source to influence your verdict?

JUROR WOODSON:  Yes.

THE COURT:  If you found that there was a reasonable doubt in this case and the prosecutor had not carried his burden and you entered a not guilty verdict, would you be uncomfortable around your neighbors or fellow workers after you voted for an

344

acquittal in this case?

JUROR WOODSON:  No.

THE COURT:  If you have a reasonable doubt about John Moss'
guilt in this case and feel that the prosecutor has not carried
the burden, that there is substantial questions after the
evidence has been introduced and after you have listened to the
arguments of your fellow jurors, you still have that reasonable
doubt or doubts in your mind, will you stand by your belief and
refuse to change your verdict even though it might result in a
mistrial in this case?

JUROR WOODSON:  Yeah.

THE COURT:  You realize, of course, that there is such a
thing as the complete jury cannot reach a unanimous verdict and
that the Court will call a mistrial in such a case?  In other
words, in order to have a verdict, it must be unanimous?

JUROR WOODSON:  Yeah.

THE COURT:  You understand that?

JUROR WOODSON:  Yes.

THE COURT:  In other words, would you give John Moss the
benefit of your individual opinion and vote for a verdict of not
guilty as long as you have a reasonable doubt of his guilt, even
though the other eleven jurors voted the other way?

JUROR WOODSON:  Yes, if I still have got my belief.

THE COURT:  Do you know of any reason you could not serve in

345

this case as a fair and impartial juror?

JUROR WOODSON: I really don't think so.

THE COURT: Now, John Moss has been arrested on this charge. Now, what do you think that means as far as proof that he is guilty or not guilty?

JUROR WOODSON: Nothing. He has just been arrested.

THE COURT: Have you or any member of your family or have any of your close personal friends, ever been a member of a law enforcement agency either in civilian or military life?

JUROR WOODSON: No.

THE COURT: If any of the witnesses in this case are employed by any law enforcement agency, do you understand that you may not give their testimony any more weight or credibility than you give to the testimony of any other witnesses, solely for the reason that they are police officers or law enforcement people?

JUROR WOODSON: Yes.

THE COURT: Do you feel you could follow this requirement of the law?

JUROR WOODSON: Yes.

THE COURT: Have you or any member of your family ever been employed by the State of West Virginia or by the United States government, or any of their agencies?

JUROR WOODSON: Just -- Well, no, just in city.

THE COURT:  No member of your family has ever been employed by the state or federal government?

JUROR WOODSON:  Not that I know of.

THE COURT:  Are you or any member of your family acquainted with anyone who works in the prosecutor's office or anyone who has worked there?

JUROR WOODSON:  No.

THE COURT:  Are you acquainted with any city, state or county police officers?

JUROR WOODSON:  I know an ex police officer.

THE COURT:  An ex police officer?  He is retired?

JUROR WOODSON:  Yes.

THE COURT: Who would that be?

JUROR WOODSON:  Clark, Ed Clark.

THE COURT:  He is in security down at State now?

JUROR WOODSON:  Yeah.  I go down there and drink coffee with the C.B. buddies.  That is where I met him.

THE COURT:  If a police officer and another witness, who is not in law enforcement, were to testify about facts in contradiction to one another, would you tend to believe the police officer just because he or she is a police officer?

JUROR WOODSON:  No.

THE COURT:  Do you understand that you may not automatically believe the testimony of a police officer over the testimony of

347

another witness?

    JUROR WOODSON:  I understand that.

    THE COURT:  Do you understand you must weigh and evaluate the testimony of all witnesses, including police officers, by the same standards?

    JUROR WOODSON:  True.

    THE COURT:  You understand, don't you, that police officers are human like you and I?

    JUROR WOODSON:  Yes.

    THE COURT:  They are subject to the same human frailties as you and I?

    JUROR WOODSON:  Yes, I understand that.

    THE COURT:  Do you accept the fact that police officers may make a mistake or mistakes just as you or I could make?

    JUROR WOODSON:  True.

    THE COURT:  Now, do you feel under certain circumstances they may make a casual error just as you and I make?

    JUROR WOODSON:  Sure.  They're human.

    THE COURT:  If the testimony revealed that the police had erred or used improper judgment, how would you react to such testimony?

    JUROR WOODSON:  Well, it would be just like any other person if it wasn't a police officer.  It would be the same reaction. I would have the same reaction.  I wouldn't say just because he

348

is a police officer, "Boy, oh boy, he should have known."

THE COURT:  You don't feel that way?

JUROR WOODSON:  No.

THE COURT:  Do you feel that under certain circumstances
police officers, just like other people, may be overly
aggressive in trying to accomplish their job?

JUROR WOODSON:  Sure.

THE COURT:  Have you ever appeared, except for the one time
you told us about in the shooting incident, have you ever
appeared as a witness and testified in jury proceedings?

JUROR WOODSON:  No.

THE COURT:  Have you ever had your statement taken by a
lawyer in preparation for trial?

JUROR WOODSON:  No.

THE COURT:  Have you ever had your deposition taken?

JUROR WOODSON:  No.

THE COURT:  That means to testify in a private proceeding
with a court reporter.

JUROR WOODSON:  No.

THE COURT:  Do you think that a confession necessarily
reflects something that --

That was struck.  Just disregard that last question
completely and put it out of your mind.

Is there anything about the way John Moss looks, or anything

about his appearance which makes you feel that he is either innocent or guilty?

JUROR WOODSON: Who is John Moss?

THE COURT: Over there (indicating). Is there anything about his appearance that causes you to have some hard feelings about him?

JUROR WOODSON: None whatsoever.

THE COURT: All right now, John Moss is a black man. I am certain we all feel that when a man's life and liberty are at stake there is no room for prejudice. And I am satisfied that consciously none of you would be prejudiced one way or the other, or that you would convict a man because of his coloring, whatever that coloring may be. What I want from you is your assurance that you will not tolerate any prejudice. Do I have that assurance?

JUROR WOODSON: I won't.

THE COURT: Of course, you know that a person is presumed innocent until and unless he is proven guilty beyond a reasonable doubt.

JUROR WOODSON: Yes.

THE COURT: You also realize, don't you, that you must give John Moss the benefit of this presumption of innocence without any mental reservations whatsoever?

JUROR WOODSON: Yes.

THE COURT: And that you are to consider this presumption of innocence as actual proof of innocence until and unless the prosecution proves otherwise to you beyond a reasonable doubt?

JUROR WOODSON: Right.

THE COURT: Can you accept the concept that John Moss is presumed innocent as he sits here today?

JUROR WOODSON: Yes.

THE COURT: If you were to vote right now, before any evidence is presented and before any testimony is heard, how would you have to vote?

JUROR WOODSON: Well, I would have to put not guilty. They haven't proved nothing.

THE COURT: Do you understand that the presumption of innocence is a substantial part of the law of our country and is not to be lightly disregarded or given mere lip service?

JUROR WOODSON: Right.

THE COURT: Do you understand, for example, that if you had to vote right now you would have to find John Moss not guilty, because he is presumed innocent and you've heard no evidence against him? Could you do that?

JUROR WOODSON: Yes.

THE COURT: Now, I am going to instruct you at the appropriate time, Mr. Woodson, that unless the State proves beyond a reasonable doubt that John Moss is guilty of the crimes

here charged against him you must vote not guilty. Would you be able to follow that instruction and vote not guilty, even though you might believe that John Moss violated some other state law?

JUROR WOODSON: I would go along with that.

THE COURT: If the prosecution fails to prove the guilt of John Moss, who is seated here in the room with you -- if they cannot prove his guilt to the degree of moral certainty which amounts to proof beyond a reasonable doubt -- then you realize that you must vote not guilty if you are going to carry out your oath as a juror. Do you understand that?

JUROR WOODSON: Yeah, I understand.

THE COURT: If you are chosen as a juror, will you stand by your opinion based on the evidence that comes before you during the trial, and only that evidence?

JUROR WOODSON: True.

THE COURT: If you are chosen as a juror, will you stand by your own individual analysis of the evidence and not be swayed by the emotions of any other jurors?

JUROR WOODSON: True.

THE COURT: You should be swayed by the facts, but will you stand on your own individual judgment if you are chosen as a trial juror, and not let the emotions of others persuade you?

JUROR WOODSON: Yes.

THE COURT: Do you find it difficult to make up your mind as

to who is right and who is wrong in a family dispute or in a
problem at work?

JUROR WOODSON: No.

THE COURT: When faced with a difficult decision, would you
rather leave it to someone else so that you won't be blamed if
the wrong decision is made?

JUROR WOODSON: No.

THE COURT: I will instruct you at the end of the case that
each juror must decide the case on his or her own, and that you
cannot surrender your conscientious convictions if you are not
satisfied that the State has proven John Moss guilty beyond a
reasonable doubt. You may not surrender your convictions just
for the purpose of joining in a verdict; even though the other
eleven jurors may be of a different opinion, you should not
surrender your convictions for that reason. Will you be able to
stick to your own opinion, if you are not satisfied of proof
beyond a reasonable doubt?

JUROR WOODSON: Yes.

THE COURT: Do you feel that you are a strong enough person
not to surrender simply because the others are of a different
opinion?

JUROR WOODSON: That's right.

THE COURT: If you do have a reasonable doubt about John
Moss' guilt, and after listening to the arguments of your fellow

jurors when you retire to consider the case and you still have that reasonable doubt, will you stick to your guns and refuse to change your verdict, even though it is an unpopular one and one which might result in a hung jury?

JUROR WOODSON: Right is right.

THE COURT: Would the inconvenience of having to spend the night or more nights away from home prevent you from sticking to your guns and refusing to change your verdict, if you still have that reasonable doubt about the guilt of John Moss?

JUROR WOODSON: No.

THE COURT: Do you think that a verdict of not guilty in this or any criminal case would be unpopular or embarrassing with members of your family or with your neighbors and friends, or with members of your church, or with members of any social or fraternal group to which you belong, or maybe with the people with whom you work?

JUROR WOODSON: No.

THE COURT: Could you bring in an unpopular verdict if you were required to do so by the law and the evidence in this case?

JUROR WOODSON: I could.

THE COURT: Would it be embarrassing to you or your spouse if you sat on a jury in a long case and then found John Moss not guilty?

JUROR WOODSON: No, it wouldn't.

354

THE COURT: Would it be embarrassing to you or your spouse, at work or at home, or in discussions with your friends or neighbors?

JUROR WOODSON: No.

THE COURT: Regardless of what the law is, assuming you are willing to follow my instructions, do you agree to follow those instructions all the way, no matter where they lead you, and to return your verdict based upon the law and the evidence even if you believe the verdict will be an unpopular one?

JUROR WOODSON: Based on the law.

THE COURT: Where are you employed, Mr. Woodson?

JUROR WOODSON: St. Francis Hospital.

THE COURT: What are your duties there?

JUROR WOODSON: Director of Central Receiving, seventeen years.

THE COURT: Central Receiving? What does that entail.

JUROR WOODSON: Receive all goods and supplies that come into the hospital and distribute them.

THE COURT: And you have been doing this seventeen years?

JUROR WOODSON: Seventeen years.

THE COURT: Did you have any special training before you started working in your occupation, or have you received any special training from your employer while you have been working at your job?

355

JUROR WOODSON:  Yes.

THE COURT:  Do you supervise any employees?

JUROR WOODSON:  I am the director.

THE COURT:  How many employees do you supervise?

JUROR WOODSON:  Five.

THE COURT:  Well, seventeen years is a long time ago.  Did you have any other jobs before that that lasted over six months?

JUROR WOODSON:  Not that I can recall.

THE COURT:  Supposing for some reason, and let's hope it doesn't come up, but supposing for some reason you are laid off. Are you trained or could you work in any other field?

JUROR WOODSON:  Even when I started there, I started in housekeeping.  I started at the bottom, and I worked my way up to the top.  I have a few more skills I can go back on.

THE COURT:  What are they?

JUROR WOODSON:  Housekeeping, Class B welder --

THE COURT:  All right, during the course of your employment are you required to make decisions during the course of the day?

JUROR WOODSON:  Oh, lord, yes.

THE COURT:  What kind of decisions are those?

JUROR WOODSON:  Well, say for instance, the boss tells me like today our breezeway connecting the hospital was tore town today.  We have got to deliver another way.  What are we going to do about it.  Decisions about that.  I have to put people on

night shift, on overtime.

THE COURT: And you are the director of that?

JUROR WOODSON: I am the director.

THE COURT: And does your wife work?

JUROR WOODSON: She works at St. Francis Hospital too.

THE COURT: What does she do?

JUROR WOODSON: She is an O. R. Tech.

THE COURT: Operating room technician?

JUROR WOODSON: Yes. She has been there about maybe seven years or so.

THE COURT: Do you understand, Mr. Woodson, that all of the lawyers in this case, on both sides, are to be treated equally, and you should not treat the State's lawyers any differently than you do the defense lawyers?

JUROR WOODSON: I understand.

THE COURT: During the trial, Mr. McKittrick, the attorney for John Moss, will make objections to testimony or evidence offered by the State. Do you understand that it is his job to preserve the record by doing this?

JUROR WOODSON: Yes.

THE COURT: If you are offended by his objections, will you hold that against John Moss in your deliberations?

JUROR WOODSON: No.

THE COURT: And do you realize that the prosecuting

357

attorneys and the defense lawyer are all equals, all equal in

the eyes of the law, each doing his best to represent his

client?

    JUROR WOODSON:  I understand that.

    THE COURT:  Do you realize you should not give any more

weight to the arguments of the prosecutors than to the defense

attorneys, merely because they bear the title Prosecuting

Attorney or Deputy Prosecuting Attorney?

    JUROR WOODSON:  I understand.

    THE COURT:  You realize, don't you, that the State and the

Prosecutors have the burden of proof in this case?

    JUROR WOODSON:  Yes.

    THE COURT:  Now, do you also understand, Mr. Woodson, that

while in a civil case, like in an automobile accident case, the

party who is seeking relief need only prove his case by a mere

preponderance of the evidence.  That is, where there is an even

scale, just the slightest tipping would be a preponderance of

the evidence (indicating).

    JUROR WOODSON:  Okay.

    THE COURT:  But in a criminal case, as in this case, it is

necessary for the prosecution to prove the defendant guilty

beyond a reasonable doubt that is to a moral certainty?  They

tip a lot more (indicating).  Do you understand that?

    JUROR WOODSON:  I understand that.

358

THE COURT: Do you think that is asking too much of them that they should have to do that, that is to say, they have the burden of proof in this case, and do you think that is asking them to take on more of a burden than they should have to?

JUROR WOODSON: No.

THE COURT: Do you think that John Moss has to prove he is innocent?

JUROR WOODSON: No. He is innocent until proven guilty.

THE COURT: Do you think he has to prove he is innocent? Do you think he must prove anything?

JUROR WOODSON: No.

THE COURT: Do you understand the State must prove his guilt beyond a reasonable doubt?

JUROR WOODSON: Yes.

THE COURT: Mr. Woodson, I have asked you many questions. At certain points you may feel I was trying to invade your privacy. Do the questions I have asked you anger you or trouble you in such a way that you couldn't be a fair and impartial juror?

JUROR WOODSON: No.

THE COURT: Do you understand why I am asking these questions and why it is necessary for me to ask these questions?

JUROR WOODSON: I understand.

THE COURT: Is there anything else you want to tell me that

will help me discover whether you have any prejudgment in this case or any questions in your own mind that may affect your decision making process?

JUROR WOODSON:  Not right at the moment, Judge.

THE COURT:  Have the questions which I asked you triggered anything within your mind that you want to volunteer?

JUROR WOODSON:  No.

THE COURT:  Is there anything about this case that bothers you in any way?

JUROR WOODSON:  Not at all.

THE COURT:  If you are chosen to be a juror in this case, do you know of any reason why you could not sit as a fair and impartial juror?  Is there anything I have said about John Moss or about the facts of this case which creates a doubt in your own mind about your ability to be a fair and impartial juror?

JUROR WOODSON:  No.

THE COURT:  Is there anything that you have felt or seen or heard since you came here which would lead you to believe that you might have a tendency to accept one view of the case, either that of the prosecution or the defense, more than the other view?

JUROR WOODSON:  No.

THE COURT:  Is there any reason which I have not covered which would make you feel that you could not approach this case

360

with a completely open mind, or that you feel might embarrass you in your consideration of the case?

JUROR WOODSON: No, not really. Well, this is my first time as a juror. That is different, but other than that, no.

THE COURT: Would it embarrass you, just being a juror serving on this case?

JUROR WOODSON: No.

THE COURT: I think I have asked you, but I will ask you again, if you or one of your loved ones were in the place of John Moss, standing trial for the same crime, would you be satisfied to have you or your loved one tried by twelve jurors having the same frame of mind as your present frame of mind setting in judgment of you?

JUROR WOODSON: I would be satisfied.

THE COURT: Do you understand you cannot find John Moss guilty because you think he might be guilty; you can't find John Moss guilty because you think he most likely is guilty; you can't find John Moss guilty because you think he is probably guilty; you can't find John Moss guilty because he is possibly guilty; and you can't convict John Moss on a suspicion of guilt. But instead do you understand in order for you to find John Moss guilty the State must prove his guilt beyond a reasonable doubt that is to a moral certainty? Do you understand that?

JUROR WOODSON: I understand that.

THE COURT:  Do you have anything else?

MR. McKITTRICK:  Just these (indicating).

THE COURT:  Do you have any special training as a typist or any type of special training?

JUROR WOODSON:  No.

THE COURT:  You said you were a welder at one time?

JUROR WOODSON:  Yeah.

MR. McKITTRICK:  In his present job I think he said he had some special training.

THE COURT:  You said you had special training for your present job.  What special training have you had for your job?

JUROR WOODSON:  I have been to seminars for management, you know, Management I and Management II, in Richmond, Virginia, and Erie, Pennsylvania.  We go to seminars every year.  Right now we are getting into computers, and I have to go to a thing on computers later on in the year here.

THE COURT:  Do you have any others, Parrish?

MR. McKITTRICK:  No.

THE COURT:  You remember that shooting that you thought you might be called on, do you remember who the state trooper was that investigated it?

JUROR WOODSON:  It wasn't a state trooper; it was a sheriff, but I can't remember.

THE COURT:  Do you remember whether you were called by the

362

defense or the state for that matter? I know you were never

called to testify.

JUROR WOODSON: I got a summons in the mail. I had to call

someone. I called someone down here, you know. I told them

they were backing a weak horse because it was dark and

everything.

THE COURT: All right, Mr. Woodson, that's all. I don't

want you discussing this matter, Mr. Woodson, any of the

questions that were asked or the answers that were given back

and forth here today; all right?

JUROR WOODSON: All right.

THE COURT: All right, just go back out and take your seat.

(Whereupon, Juror Woodson left the room.)

THE COURT: I'm going to go out and recess the jury until

tomorrow. Now, I want you fellows to go through these and try

to straighten them out. You have a lot of repetition in these.

(Whereupon, the Court, counsel for the State, counsel for

the defendant, the defendant in person and the court reporter

entered the courtroom where the following proceedings were had:)

THE COURT: Ladies and gentlemen, we are going to recess for

the night, and my remarks are now addressed to everyone. I

would like you back in the jury lounge on the fifth floor

tomorrow at 10:00. I would much prefer being here earlier, but

unfortunately my dentist wants to see me in the morning. I

363

would rather be here with you, believe me.  So be down in the

lounge at 10:00.  And during the overnight recess I admonish you

and each of you not to discuss this case among yourselves nor

permit others to discuss it with you.  Neither should you read

any newspaper accounts, watch any television accounts or listen

to any radio accounts of this trial or of any of the

personalities connected herewith.

    We will stand in recess.  Be in the lounge for roll call at

10:00, and I do thank each of you for your patience.

    Good night.

    (Whereupon, the jury exited the courtroom.)

    THE COURT:  All right, we will stand in recess until 10:00

tomorrow morning.

                          - 0 -

    (Whereupon, a recess was had in the proceedings.)

                          - 0 -