VOLUME 4 OF 18

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**FILED**
In Kanawha Circuit Court
Clerk's Office

JUN 10 1985

STATE OF WEST VIRGINIA

vs.                          CR-82-F-221

JOHN MOSS, JR.,
also known as
John Moss, III

BEFORE:   HONORABLE JOHN HEY, Judge,
          and a Jury,

APPEARANCES

   FOR THE STATE:  James C. Stucky, Prosecuting Attorney, and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha County.

   FOR THE DEFENDANT:  The Defendant, John Moss, Jr., also known as John Moss, III, in person, and by Parrish McKittrick, his counsel.

Patty Lou Frame
Official Reporter

678

PROCEEDINGS HAD ON

MONDAY, MARCH 5, 1984

WHEREUPON, the proceedings in the Matter of State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, were resumed on Monday, March 5, 1984.

THE COURT: Show the resumption of these proceedings in chambers. We have in chambers Juror Terry McNeely, who has not yet been selected for the prospective panel, but he is in the general pool of jurors. There is no one present except the Court, the prospective juror, the court reporter and the bailiff.

All right, Mr. McNeely, what is your problem?

JUROR McNEELY: First, my grandmother had a massive coronary last night.

THE COURT: I'm sorry to hear that. How old is your grandmother, Mr. McNeely?

JUROR McNEELY: She is seventy-five.

THE COURT: I'm sorry to hear that. What is your second problem, if that is not enough?

JUROR McNEELY: We need to find another place to live. We are having severe financial problems, and we have got to move.

THE COURT: Where do you work?

JUROR McNEELY: South Hills Floral. Me and my wife own South Hills Floral.

679

THE COURT: Oh, up at the little mall up there?

JUROR McNEELY: Yes.

THE COURT: I'm really very sorry to hear that business is bad. I spend enough on flowers. I live up in that area, but I have always done business with John Burton. For the past number of years he has supplied me free -- I give a rose to all my adoptive mothers, and he has always supplied me with a free rose, so I buy all my flowers there.

JUROR McNEELY: I don't blame you. He has been in business a long time and knows a lot of people.

THE COURT: Is your grandmother in the hospital?

JUROR McNEELY: She is in Kanawha Valley in intensive care.

THE COURT: What is your grandmother's name?

JUROR McNEELY: Nora Selby.

THE COURT: Is she any relation to the Selbys at Morgantown?

JUROR McNEELY: I don't know. I don't think so.

THE COURT: All right, Mr. McNeely, just go back out there and have a seat for a minute.

JUROR McNEELY: Thank you, sir.

(Whereupon, the juror left the Court's chambers, and counsel for the State, counsel for the defendant and the defendant in person entered, and the following proceedings were had:)

THE COURT: Let the record show the presence of the defendant in person and by counsel, and the State by her

680

Prosecuting Attorney and Assistant Prosecuting Attorney.

We just had a conversation with Mr. McNeely in chambers, that is Terry McNeely, who has not yet been selected on the twenty-eight but is in the general pool. Read the conversation to them.

(Whereupon, the conversation was read by the reporter.)

MR. McKITTRICK: I have no objection to his being excused.

MR. BROWN: We have no objection.

THE COURT: All right, that is No. 136, Terry McNeely.

All right, let's go back in the jury lounge and get started.

(Whereupon, the Court, counsel for the State, counsel for the defendant, the defendant in person and the court reporter entered the jury room on the seventh floor where the following proceedings were had:)

MR. McKITTRICK: Your Honor, before we start on this, I have something I want to put on the record.

THE COURT: All right.

MR. McKITTRICK: On Friday, March 2, I had received a phone call at my office from Assistant Prosecuting Attorney Peter Brown. I returned that call and was advised by Mr. Brown that the State had belatedly, after some three and one-half years, found another confession from the defendant, John Moss.

Mr. Brown apologized to me that he had not been familiar with the so-called confession or statement from Mr. Moss that

was described as not in writing, not in the police investigative report, hadn't been brought to the attention of the Prosecutor's office by any of the investigators in this case, especially the two chief investigators in this case from its inception, Trooper Terry Williams and Trooper Mike Smith, who have been cross-examined in various proceedings, including, but not limited to at least two preliminary hearings, two transfer hearings, a four day suppression hearing, etc., etc.

The cross-examination included, but was not limited to questions the essence of which was, "Do you know if any other officers have ever talked to John Moss"; and the answers was "No, they hadn't." The substance of the answers were, "If they had, we would have known. We were the chief investigating officers, and it has never been reported to us."

Now I understand there is some kind of oral confession that has been conjured up by somebody somewhere from some previous time. That's all I know about it.

THE COURT: Well, let me hear what the State has got to say.

MR. BROWN: Your Honor, we had made arrangements, or I had made arrangements to have some witnesses in the office Thursday. We had Presson, Woodyard and the two state police officers, some civilian witnesses; and as the Court probably knows, I'm about the sixth or seventh Assistant Prosecutor to be in this case.

I was talking to Woodyard, who is now a corporal in Boone

682

County; and Woodyard was the officer who originally took the statement from Paul Reggettz. It came up somehow that Woodyard took Moss back to Ohio. When I say back to Ohio, I was familiar with the fact that he had been brought out of Ohio to Parkersburg where the taped confession was made, and then on down to the Kanawha County Jail. I did not realize Moss had then been returned back to Ohio. I didn't realize that, but that came up. And during the course of that conversation it was revealed to me Moss had talked to Woodyard and Trooper Allen, Randy Allen on the way back to Ohio. As soon as I heard that, I asked the officers to contact Allen.

THE COURT: Is he no longer with the Department of Public Safety?

MR. BROWN: Allen is no longer with the Department of Public Safety, and in fact lives in Ohio at this time, works for an insurance company. Although he lives in Ohio, the officers tracked him down to a meeting at the Marriott Hotel. This was late in the afternoon. I asked them to go over and get him, to get Allen. Allen got away from them, or left just ahead of them; and they had to stop him with their blue lights, had to run him down in a state police car, and didn't catch him until Dunbar. He was on his way to another meeting, insurance company meeting, business meeting, in Huntington. They brought him back here.

Allen then related to me the story that Woodyard had related. Naturally I asked myself, why did this thing come up so late. The officers tell me that they, Woodyard and Allen tell me that when they took Moss back to Ohio they asked basically out of curiosity why, what had happened, and the statement was given to them.

They tell me when they came back from Ohio that they relayed this information to Williams and Mike Smith, Trooper Williams and Trooper Smith. Smith then gave the information, Smith or Williams then gave the information to Chuck Pettry. They made no notes, took no tape, nothing. It was just an oral statement. And asked what they should do with it. And it was indicated to them that since the statement was basically the same there was no need to preserve it. It was not exculpatory in any way and would have been of no aid to the defendant. They did not preserve it.

I know it doesn't look real good. I have got to admit it. I would be the first to admit it. But I would also be the first to tell the Court that Randy Allen, when he was brought into my office, didn't talk to Woodyard because Woodyard was in my office all day, and we just called him. He related basically the same story.

I know it doesn't look real good, but that is the way it happened. That is the way it has been given to me, and I don't

684

plan to let go of it just because it came in late, Your Honor. Of course, that is going to be up to the Court ultimately; but that is in fact what happened.

MR. McKITTRICK: Judge, Mr. Pettry has testified in this case concerning inculpatory evidence against John Moss, including, but not limited to, his confession and/or confessions. I personally can represent to this Court, as an officer of this Court, that I have interviewed Trooper or Corporal Woodyard no less than three times and talked to him in detail about this case. And never was it ever represented to me Trooper Woodyard ever came close to taking a statement from John Moss.

Now, it is not important whether Mr. Brown belatedly got in this case or not. I think Brady vs. Maryland and cases concertedly discussed that issue and held that any knowledge of one law enforcement officer is knowledge to all law enforcement officers. That is irrelevant.

If the State, as Mr. Brown has indicated, intends to use this confession, I would like to make a few motions, one of which would be for a mistrial, and a motion in the alternative to exclude the confession on Sixth Amendment grounds and on Fourteenth Amendment grounds; and I would like to assign my reasons.

This is the most incredible story I have heard in almost

sixteen years of practice in criminal law in almost every state in the east, that there is a triple murder case, two state police officers take a confession and do not even mention it or say they mention it to the chief investigators of the case, and they don't even make mention of it in any investigative report, either as to John Moss or to Paul Reggettz, who was the defendant previously charged in these cases and whose cases were also investigated by Trooper Williams and Trooper Smith.

It is the most incredible story I have ever heard in my life. And it reeks of Fourteenth Amendment unfairness for various reasons which I'll put in this record when the time comes.

THE COURT: Is that it?

MR. McKITTRICK: Yes.

THE COURT: This is going to require a suppression hearing in order for the Court to determine whether or not it will be let in. I don't propose to do that, however, until after we get a panel selected, which I suspect at this rate is going to take another two or three weeks. Once we get a panel sworn, gentlemen, then I'll expect a full suppression hearing because I must agree, Mr. Brown, it doesn't look the greatest at this point.

I don't know how I am going to rule until I hear the evidence. But some three years have elapsed, so I very

definitely want a full suppression on that issue. Now, it is probably going to be two weeks before we get to it, so it will give you a little time, both sides.

MR. McKITTRICK: Judge, I don't know what the essence of the statement is. As I understand it from Mr. Brown, there was never a waiver taken. There was never anything indicating that Miranda rights were given. It was never reduced to writing. What we're asking officers to do is after four years or three and a half years to now come before this Court and testify as to what these officers remember.

THE COURT: That goes to the suppression hearing, and I'm certainly going to give you full opportunity to make your argument at that time. We will have a suppression hearing; but as I indicated, I want to put a jury in first. Then you can make whatever motion you wish to make at that time, depending on my ruling.

Are you making a motion for a mistrial at this time?

MR. McKITTRICK: If they are intending to use it, I'm making a motion for a mistrial at this time, without the necessity of a suppression hearing. I am making a motion for a mistrial or in the alternative to exclude this confession on due process grounds on the basis that this defendant is now in trial, and this Court has ordered the State to allow the defendant to inspect any confessions in this case.

The defendant, as this Court knows, has been offered a plea bargain, which is on the record, and has been requested by this Court to make a plea before inspection after it was ordered by the Court, firstly.

Secondly, it violates my effective assistance of counsel in that we have been preparing this case now for three years. We have never, even though the Court has ordered production of confessions, had an opportunity to cross-examine nor prepare for trial; and we are in the midst of trial.

THE COURT: Just so the record is clear, I don't know that we are in the midst of anything. We have sat here for two weeks and voir dired five prospective jurors. That's how far we have gotten. There are twenty-three more to go.

MR. McKITTRICK: Thirdly, the State has already answered over a year ago what evidence it was their intention to use in the trial of this case; and of course, the Court knows that this confession is not enumerated.

THE COURT: The motion for a mistrial is denied at this time. The Court will have a suppression hearing at the appropriate time, and this is not it, if the State intends to use this so-called purported oral confession. However, I am going to order the State to forthwith, during the next recess, provide to Mr. McKittrick the essence of the oral statement that you allege that you now have, and as I understand it, you just

688

received knowledge of this.

MR. BROWN: Judge, I received it Thursday afternoon. I called Mr. McKittrick that afternoon. He had already gone home. I left word for him to call me in the morning, which he did.

THE COURT: My point is you, as the Prosecutor, or Mr. Stucky just now became aware of it?

MR. BROWN: Yes, sir

THE COURT: So the record is clear, I think you are about the sixth Prosecutor on this thing. This goes back over about three years. We had a transfer hearing. I think Beverly Selby handled one of them. Pettry was involved. He has since left your office. The record will state who was on this thing; but just so it is clear, you are about the sixth one.

We had two transfer hearings. The first one was reversed by the Supreme Court. We went into a lengthy second transfer hearing. That was upheld. I think, Parrish, you may have even filed a writ of prohibition on grounds of the interstate compact time had run. They turned you down on that. So for various and sundry legal maneuvering, proper legal maneuvering, because Mr. McKittrick's first duty is to protect the interests of his client; and I think he has done an excellent job up to this point of doing that. And that is one of the reasons that this matter has taken so many years. And in the interim, because of the ridiculously low salaries paid to these people,

689

there is a large turnover down in that Prosecutor's office. You can only starve so long, and that is why they have left. So that is the reason there have been so many prosecutors in this case, one of the reasons.

But at any rate, we will have a suppression hearing at the appropriate time; and I don't think now is the time. I want to finish voir diring this panel in the hopes of getting a jury, because each day it takes us to do this, somebody becomes ill -- The record will show that one woman's son had to go to the hospital, another one's grandmother had a heart attack. The sooner we get this jury impaneled, the better off we will all be.

If a mistrial motion is appropriate down the line, I will rule on it at that time. But I'm denying it now for the reasons aforesaid in the record.

MR. BROWN: Judge, just one other thing. I'll have Corporal Woodyard available just about any time it is convenient for Mr. McKittrick to talk to him. He can just talk to him on the side. He is already here.

THE COURT: All right, I'm serving notice I want the State to provide Woodyard's presence to Mr. McKittrick so that he can talk to him face to face so that he can see what the purported tenor of the so-called or alleged confession is. We will get into the merits of suppression at a suppression hearing.

Are there any other matters?

690

MR. BROWN: No, sir.

MR. McKITTRICK: No, sir.

THE COURT: All right, let's get Juror Clyde Miller, Clyde Austin Miller, in here.

(Whereupon, Juror Clyde Miller entered the room.)

THE COURT: Mr. Miller, I'm sorry it took so long. I know you all are sitting down there thinking we are sitting up here sleeping, but we really are not. We have had matters that we had to take up.

We have Juror No. 6, Prospective Juror No. 6, Clyde Austin Miller, for individual voir dire in chambers.

Mr. Miller, I would like to ask you a few questions if you don't mind.

Have you, Mr. Miller, read anything in the newspapers or heard anything on television or the radio about this case involving the murders of Vanessa Reggettz, Bernadette Reggettz and Paul Eric Reggettz on December 13, 1979?

JUROR CLYDE MILLER: Yes, when it happened. I read something about it then.

THE COURT: Would that have been '79 or '80 you read about it?

JUROR CLYDE MILLER: Yes.

THE COURT: Have you read anything since then or heard anything since then?