VOLUME 9 OF 18


IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

F I L E D
In Kanawha Circuit Court
Clerk's Office

STATE OF WEST VIRGINIA

JUN 10 1985


vs.                           CR-82-F-221



JOHN MOSS, JR.,
also known as
John Moss, III



BEFORE:   HONORABLE JOHN HEY, Judge,
          and a Jury,




APPEARANCES

        FOR THE STATE:  James C. Stucky, Prosecuting Attorney,
and Peter C. Brown, Assistant Prosecuting Attorney for Kanawha
County.

        FOR THE DEFENDANT:  The Defendant, John Moss, Jr., also
known as John Moss, III, in person, and by Parrish McKittrick,
his counsel.



                              Patty Lou Frame
                              Official Reporter

1944

PROCEEDINGS HAD ON

MONDAY, MARCH 19, 1984

WHEREUPON, the proceedings in the Matter of STATE OF

WEST VIRGINIA vs. JOHN MOSS, JR., also known as John Moss, III,

CR-82-F-221, were resumed on Monday, March 19, 1984, with all

parties present as before noted, including the defendant and his

counsel, out of the presence of the prospective jury panel.

THE COURT:  State of West Virginia vs. John Moss, Jr., also

known as John Moss, III, CR-82-F-221, murder in the first

degree, three counts.  The defendant is present in person and by

counsel, Mr. McKittrick, the State of West Virginia by Mr.

Brown, Assistant Prosecuting Attorney for Kanawha County.

This matter is being heard in chambers, in camera, the

motion brought on to suppress a purported oral confession made

by the defendant.

All right, Mr. Brown, it is your motion.

MR. BROWN:  The State will call Randy Allen, Your Honor, in

support of our motion to have the confession ruled admissible.

THE COURT:  All right.

Randall Allen - Direct                           1945

                        RANDALL ALLEN,

        Being thereupon called as a witness on behalf

        of the State, after being first duly sworn,

        testified as follows:

                                    DIRECT EXAMINATION

BY MR. BROWN:

     Q     Would you state your name for the Court please.

     A     Randall Allen.

     Q     And on October 30, 1979, you were a member of the

West Virginia Department of Public Safety, is that true?

     A     Yes, I was.

     Q     You are no longer a member, is that correct?

     A     That is correct.

     Q     When did you leave the department?

     A     It would have been December, 1982.

     Q     How much time did you spend with the Department of

Public Safety?

     A     Approximately seven and a half years.

     Q     On October 30, 1979, did you and Howard Woodyard have

an occasion to take one John Moss to the State of Ohio?

     A     I believe it was October 30, 1980.

     Q     I'm sorry --

     THE COURT:  That is twice you have referred to '79.  What

year is it?

Randall Allen - Direct                              1946

MR. BROWN:  I'm sorry, it is '80.

Q    How did you come to be chosen to go to Ohio, sir?

A    I was called by then my corporal, Mark Kilburn, and told I would be transporting a prisoner to Mansfield, Ohio.

Q    Did you get together with Woodyard to do this?

A    On the morning that we transported the prisoner to Mansfield, yes.

Q    Where did you pick the prisoner up?

A    Kanawha County Jail.

Q    Do you remember what his name was?

A    It was John Moss.

Q    Is John Moss in the courtroom here today?

A    Yes, he is.

Q    Would you point him out please?

A    He would be sitting at the table to my right.

MR. BROWN:  Would the record show he pointed to the defendant, John Moss.

THE COURT:  The record will so reflect.

Q    Tell the Court how you were dressed.  How were you and Woodyard dressed?

A    Trooper Woodyard and myself were both in the standard Department of Public Safety uniforms, the green uniforms.

Q    All right, and what type of vehicle were you in?

A    We had an unmarked cruiser.  It would be either a Dodge

Randall Allen - Direct                              1947

or Plymouth.

    Q    Do you remember which one of you signed Moss out of the

jail?

    A    As I recall, I believe it was Trooper Woodyard that

signed him out.

    Q    On October 30, 1980, up until that time, had you done

any work or any investigation work in the case involving the

killing of three members of the Reggettz family in St. Albans?

    A    No, I had not.

    Q    You were in no way involved in that investigation?

    A    No.

    Q    At either the time Paul Reggettz was a defendant or

John Moss was a defendant?

    A    At neither time was I involved in it.

    Q    Approximately what time did you leave the jail and

start your trip to Ohio?

    A    As I recall, it was probably 9:00, or in that vicinity,

in the morning.  We waited until after we had had breakfast and

that they would have normally served breakfast in the jail

before we left.

    Q    Where did you go, and what was your destination?

    A    Our destination was a reformatory in Mansfield, Ohio.

    Q    Approximately how long did it take you to get to

Mansfield?

Randall Allen - Direct                              1948

A    Anywhere between four and five hours.

Q    Once you left the jail, did you make any stops between the jail and the actual reformatory?

A    To the best of my knowledge we stopped, I believe, at an Exxon station somewhere in the area of Cambridge, Ohio, to get gas.

Q    Who drove the vehicle?

A    Trooper Woodyard drove the vehicle to Mansfield, and then I drove the vehicle back to Charleston.

Q    Did you return the same day?

A    Yes.

Q    When Trooper Woodyard drove obviously he was behind the steering wheel?

A    Yes.

Q    Where were you seated in the vehicle?

A    I was in the passenger's side front of the vehicle.

Q    Was it a standard four-door vehicle?

A    Yes.

Q    Where was John Moss?

A    He would have been in the passenger's side rear of the vehicle.

Q    Had you and Woodyard had any discussions prior to picking John Moss up about questioning John Moss?

A    No.

                                                    1948

Randall Allen - Direct                          1949

    Q    Had you prepared yourself in any way to question John

Moss?

    A    No.

    Q    What route did you take or what road did you get on to

go to Mansfield?

    A    We took I-77 north through Parkersburg to Cambridge,

and then took I-70, I believe it was, east to north of Columbus,

and then took I-71 north from Columbus to Mansfield.

    Q    Did you get on I-77 here in Charleston?

    A    Yes.

    Q    You indicated a little while ago that you stopped in

the Cambridge area for gasoline.  Did anybody get anything to

eat or drink if you remember?

    A    I don't recall anybody getting anything to eat or

drink, but I know I went to the restroom.  And we asked John

Moss if he needed to go to the restroom.  He indicated he did

not, and Trooper Woodyard, I believe, got the gas.

    Q    After you got on I-77 and you started towards

Parkersburg, did you and Woodyard engage in any conversation?

    A    Yes, we did.

    Q    What was the type of conversation?

    A    We were talking to each other about different events

within the department, promotions, transfers; and we were

talking to John Moss general conversation, where he went to

Randall Allen - Direct                          1950

school, where he was from, where he lived in Cleveland because I

have relatives in Cleveland, that sort of conversation.

    Q    Just small talk?

    A    Right.

    Q    Would John from time to time join in the conversation?

    A    Yes.

    Q    Did this sort of conversation among the three of you

continue to the Parkersburg area?

    A    Yes.

    Q    Did there come a time during your travels and during

the conversations between the three of you when the conversation

turned towards the killings that John Moss was accused of?

    A    Yes, it did.

    Q    Would you tell the Judge please, the best you remember,

about how the conversations, how the turn of the conversations

turned and what happened at that time.

    A    It was probably in the vicinity of Parkersburg-

Marietta.  We had been traveling approximately an hour to two

hours.  Trooper Woodyard, who had worked on the murder case,

asked John if he would mind talking about it.  And at that time

I advised John I wanted to read his Miranda rights to him.

    Q    Now, when Woodyard asked John Moss if he minded talking

about it, did John make any reply?

    A    He said he didn't care, he would talk about it.

Randall Allen - Direct                          1951

Q     Trooper Woodyard was still driving?

A     Yes.

Q     You are still in the passenger's side?

A     Yes.

Q     The vehicle is moving?

A     Yes.

Q     John Moss is still in the back seat passenger's side?

A     Yes.

Q     At the point where John Moss indicated he was willing to talk or discuss the matter with you all, what, if anything, did you do?

A     At that point I took out my Miranda card I carried in my uniform shirt pocket.  It is a white card.  I have a close facsimile to it here today.  It is not the same card because when I left the department I turned all the equipment in, but it is essentially identical to the one I used then.

Q     The card you read from, was that a Department of Public Safety card?

A     It was issued by the department.  Our photo section made them up and laminated them.

Q     All right, and the card you have in your hand, is that a Department of Public Safety card also?

A     Yes.

Q     Would you read that card to the court please.

Randall Allen - Direct                              1952

MR. McKITTRICK:  Objection.

THE COURT:  On what grounds?

MR. McKITTRICK:  It is not the same card.  He has already admitted that.

THE COURT:  He has also testified it was essentially identical.  Is that a DPS card you have in your hand?

THE WITNESS:  Yes, sir.

THE COURT:  Overruled.

Q     Would you read that card please.

A     Yes.  At the top it has entitled "Miranda Warnings".

"No. 1, You have the right to remain silent and refuse to answer questions.

"No. 2, Anything you do say may be used against you in a court of law.

"No. 3, You have the right to consult an attorney before speaking to the police and have an attorney present during any questioning now or in the future.

"No. 4, If you cannot afford an attorney, one will be provided for you without cost.

"No. 5, If you do not have an attorney available, you have the right to remain silent until you have had an opportunity to consult with one.

"No. 6, Now that you have been advised of your rights, are you willing to answer questions without an attorney present?"

Randall Allen - Direct                    1953

    Q    All right, when you read number six, what, if anything, did John Moss say?

    A    He then said yes or yeah, and nodded his head in an affirmative fashion.

    Q    Did you ask Mr. Moss whether or not he understood his rights?

    A    Yes.

    Q    Could you see John Moss?  What was your position in the seat or the position of your body when you read the rights to John Moss?  Explain that to the Judge.

    A    As I was in the passenger's side front of the car, I turned sideways so that I could look at John behind me, see his face, as I read the card to him, so that I could see any expression, see if he appeared to understand what I was telling him; and when he responded, I could visually see him nod his head in the affirmative, yes.

    Q    When you asked him if he understood, did he nod his head?

    A    Yes.

    Q    Did he make any formal or verbal indication that he understood?

    A    He said, "Yeah".

    Q    And he did indicate that he was willing to go ahead?

    A    Yes.

Randall Allen - Direct                          1954

Q    Did you and Trooper Woodyard then proceed to question John Moss about the charges?

A    Well, after I got through reading the rights to John, Trooper Woodyard then asked him if he was still willing to talk to us about the murders; and he said, "Yeah".

Q    Did you then proceed to question him?

A    Yes.

Q    Approximately how long did the questioning last?

A    Travel time, while in the vehicle probably thirty to forty-five minutes driving time.  The type of questions, they weren't back-to-back in any means or fashion, would have lasted anywhere from five to ten minutes actual questions.  They weren't back-to-back.

Q    Who asked the bulk of the questions?

A    Trooper Woodyard.

Q    Does the Department of Public Safety have a form entitled DPS 79 form, which is a Miranda Waiver form?

A    Yes, they do.

Q    Are you familiar with that form?

A    Yes, I am.

Q    Had you ever had anybody sign that in the past or during the course of any of your investigations?

A    Many times.

Q    Did you have that form there with you in the vehicle

Randall Allen - Direct                              1955

that day?

    A    No, we didn't.

    Q    Did you ask any questions of John Moss as you all

proceeded along your way?

    A    I did more or less as a follow-up to questions that

Trooper Woodyard might ask because I really didn't have any

specific knowledge of the crime.

    Q    Were you aware at the time you picked John Moss up at

the jail, were you aware of the fact that he had made a

confession of some type?

    A    Yes, I was.

    Q    Did you know in what manner the confession was taken,

whether it was oral, written or taped?

    A    No.  I had heard that a confession had been given.

    Q    Was that just general talk?

    A    Right.

    Q    After you arrived at the reformatory, did you turn John

Moss over to the officials there?

    A    Yes, we did.

    Q    Did there come a time at the end of the questioning by

you and Woodyard when the questioning ceased about this subject?

    A    Yes.  After talking to him for, like I say, I think it

was thirty to forty-five minutes traveling time, Trooper

Woodyard asked John if he just didn't care to talk about it any

Randall Allen - Direct                                 1956

more or didn't want to talk about it.  At that time, John said

he would rather not go on.

    Q    Were there any more questions asked at that time?

    A    No.

    Q    What made Woodyard ask that question of John Moss, if

he didn't want to talk about it any more, do you know?

    A    I can only --

    MR. McKITTRICK:  Objection.  How can he testify --

    MR. BROWN:  That's fine.  I'll withdraw the question.

    THE COURT:  That's fine.  I was just waiting for him to get

his answer finished, and I was going to sustain you.

    MR. BROWN:  I'll withdraw the question.

    THE COURT:  All right.

    Q    When did you return to Charleston, about what time?

    A    It was getting dusk.  I would suspect it was probably

around seven.  It was already getting dark.

    Q    And you were driving coming back, is that correct?

    A    Yes.

    Q    Did you and Woodyard have any discussion about what to

do about this statement that you had obtained from John Moss?

    A    As I recall, Trooper Woodyard, since he had been

involved in the investigation, said he was going to talk to

Trooper Mike Smith, who had also been an investigating officer,

and Trooper Terry Williams.

Randall Allen - Direct                               1957

Q     Did you and Woodyard leave each other then there that evening?

A     Yes.

Q     When you separated, was it left up to Woodyard to report the confession?

A     Yes.

Q     Did you ever report the confession to anybody in the prosecutor's office?

A     No.

Q     Or to anybody who was an investigating officer in the Moss/Reggettz case?

A     No.

Q     Did Woodyard ever get back to you, or did you ever have any further discussions with Woodyard about what, if anything, would be done about the confession after you all separated that day?

A     It was really assumed on my part that Woodyard would talk to Trooper Smith and Trooper Williams, and they would discuss the merits of the confession, since it was my understanding they had taken another one, for comparative purposes.

Q     Then that evening of October 30, 1980, when you returned to Charleston, that was your last contact with the case or discussion with anybody who would be involved in the case.

Randall Allen - Direct                                    1958

Is that essentially correct, sir?

    A    Yes.

    Q    Can you remember, the best you can, the questions you
asked John Mosa during the course of the questioning about these
charges?

    A    Most of my questions, as I stated earlier, was that if
Trooper Woodyard would ask a question regarding the crime.  I
would ask a follow-up, something that would come into my mind,
such as what he had taken from the house; and his response at
that point was a rifle; and I would ask, "What did you do with
the rifle?"  And John Mosa said that he had taken it back to
Cleveland.  And I asked him what did he do with it there in
Cleveland.  He said he didn't remember.

    Q    Nobody from the prosecutor's office ever contacted you
about this statement that you took from John Mosa, did they?

    A    No.

    Q    And no other officers from the Department of Public
Safety ever contacted you any further about it?

    A    No.

    Q    Have you, up until today, ever seen a transcript of
John Mosa' taped confession?

    A    No, never have.

    Q    Have you ever heard the confession?

    A    No.

Randall Allen - Cross                                    1959

Q       Do you have any knowledge of the contents of that
confession by reading it, seeing it, hearing it?

A       No.

MR. BROWN:  That's all the questions I have.

THE COURT:  Cross?

- O -

CROSS-EXAMINATION

BY MR. McKITTRICK:

Q       Randy, you indicated to the Court that you took John
Moss back to Mansfield, Ohio, correct?

A       Yes.

Q       When did you take him back to Mansfield, Ohio?

A       It was October 30, 1980.  We had departed Charleston at
approximately 9:00 a.m..

Q       What did you do on October 26, 1980?

A       I could not tell you.

Q       How do you remember -- Strike that, Patty -- As I
understand it, there was absolutely no activity made on what you
and Trooper Woodyard did relative to taking John Moss back to
Mansfield, Ohio, is that correct?

A       When you say "activity", what do you refer to?

Q       What I mean is a submission report by you as a state
trooper that could be used in the investigation report either
as to the Paul Reggettz case or the John Moss case.  Is that a

Randall Allen - Cross                                    1960

fair statement?

    A    The only correction I would make is a daily activity

log is maintained on each detachment as to a trooper's activity

that day.  It would have been noted on those logs that Trooper

Woodyard and I transported a prisoner to Mansfield.

    Q    All right then, I take it before you came here this

morning and were placed under oath you went to the Department of

Public Safety and you checked those logs to see if it was

October 30, 1980, that you took John back to Mansfield?

    A    I personally didn't, no.

    Q    I see.  How did you find that out?

    A    From Trooper Woodyard.

    Q    Trooper Woodyard told you it was October 30, 1979?

    A    '80.

    Q    And you took his word for it?

    A    Yes.

    Q    Now, Randy Allen, three and one-half years ago, be fair

to this Court, you could not tell this Court any conversations

that you had with any troopers on the 24th, 23rd, 22nd or 21st

of October, 1980, could you?

    A    I could if it was involving a murder case.

    Q    I see.  Were you, as a part of your duties as a

trooper, investigating crime in October, 1980?

    A    Yes.

Randall Allen - Cross                                    1961

Q    And I take it that you remember the exact cases that
you investigated in October, 1980?

A    No, I don't.

Q    But if you had an activity report before you this
morning, you could look at that to refresh your recollection,
couldn't you?

A    Surely.

Q    And it would tell you among other things what you said
and did concerning that investigation?

A    Not entirely.

Q    Not entirely?

A    No.

Q    Are you telling the Court that it would tell you the
relative things that you did?

A    An activity report would, yes.

Q    Okay.  And that in your activity report you put the
most important things with regard to your activity in that
investigation?

A    Yes.

Q    Do you have anything like that to refresh your
recollection here this morning?

A    No.

Q    So what you are saying to the Court is you can't tell
the Court from your independent recollection that you took

Randall Allen - Cross                                    1962

John Moss back to Mansfield, Ohio, on the 30th day of October,
1980.  Is that a fair statement?

    A    No.

    Q    You could not?

    A    I could tell the Court that I had taken John Moss back
to Mansfield, Ohio.  As to the specific date, I would have to
refer to some other source.

    Q    Which you do not have?

    A    No.

    Q    And when you say you picked up John Moss at
approximately 9:00 am., you got that from Trooper Woodyard too?

    A    No.

    Q    You didn't get that from Trooper Woodyard?

    A    No.

    Q    Did you talk to Trooper Woodyard about your testimony
here this morning?

    A    We had met last week.

    Q    And in fact, did you go over a statement that I took
from Trooper Woodyard and Trooper Woodyard had initialed?

    A    Trooper Woodyard had some notes, but I didn't have
access to those.

    Q    Did he talk to you concerning those notes?

    A    We had talked about what transpired, yes.

    Q    Did Trooper Woodyard use those notes to refresh his

Randall Allen - Cross                                    1963

recollection when he talked to you?

    A    Yes.

    Q    Now, they are notes that I prepared last week, three

and a half years after this incident occurred, that Trooper

Woodyard initialed, aren't they?

    A    I don't know.

    Q    And they are the same notes that Mr. Brown was using in

this courtroom this morning to ask you questions from, weren't

they?

    A    I don't know what notes Mr. Brown had.

    Q    You say you talked to Trooper Woodyard about your

testimony and his testimony last week, is that correct?

    A    Yes.

    Q    When was that last week?

    A    I believe it was last Friday.

    Q    Where was that?

    A    Here at the Prosecuting Attorney's office.

    Q    Is that the first time that you had discussed this case

with the Prosecuting Attorney?

    A    No.  I think it was approximately two weeks prior to

that, the particular date I don't recall, that I was

summoned to the Prosecuting Attorney's office that morning.

    Q    This Friday?  Are you talking about this past Friday?

    A    The past Friday.

Randall Allen - Cross                                    1964

    Q    The Court was not in session picking a jury or doing
anything with regard to the proceedings in this case now on
trial?

    A    I'm not aware of what proceedings were going on.

    Q    Who did you meet with in the Prosecuting Attorney's
office?

    A    Mr. Brown, Trooper Woodyard and I believe Mike Smith
was in the room.

    Q    Okay, and then at that time you all went over your
testimony that you would testify here to today?

    A    Mr. Brown asked me questions at that point.

    Q    And that is when Mr. Brown had access to the notes, the
same notes, that Trooper Woodyard had access to, that I
prepared, in taking a statement from Trooper Woodyard.  Isn't
that a fair statement?

    A    I would assume, but I don't know what notes they were
in fact.

    Q    Well, you saw notes that Woodyard had, correct?

    A    Yes.

    Q    And they were Xeroxed notes?

    A    Yes.

    Q    So without question, without insulting anybody in this
courtroom, when you all met there on Friday, what you did was
coordinate your testimony as to what happened three and a half

Randall Allen - Cross                                    1965

years ago.  Is that correct?

    A    No.

    Q    You didn't do that?

    A    I was asked the questions by Mr. Brown as to what I remembered.

    Q    And you remembered everything, correct?

    A    No, not everything.

    Q    In other words, you had to be told some things from those notes that Trooper Woodyard had?

    A    No.  What I did was relay the information that I recalled personally.

    Q    Well, you didn't recall everything, did you?  You don't recall every question that was asked and every answer given in October, 1980, do you?

    A    No.

    Q    And you don't remember that because there was no activity of it?

    A    Exactly.

    Q    If there was an activity of it, you could look at it like you do in every case that you prosecute for the State of West Virginia when you go on trial and refresh your recollection, couldn't you?

    A    The activity logs don't state every, every, piece of information, every question I have ever asked a suspect or

Randall Allen - Cross                                    1966

everyone.  They do recall some of the highlights.

Q    How many murder cases have you worked on, Mr. Allen?

A    I assisted or have been involved in probably three.

Q    And in any of those murder cases are you telling this Court that confessions of an accused were not reduced to writing?

A    They were.

Q    They all were, weren't they?

A    Yes.

Q    And in fact, it is department policy, and you are taught from the first course that you have called "Criminal Investigations" at the academy to reduce confessions to writing. Isn't that a fair statement?

A    To record them, yes.

Q    Either by writing them down or recording them on tape?

A    Yes.

Q    That was not done in this case?

A    No.

Q    You didn't know, according to your responses to Mr. Brown, that this was a triple murder case, is that correct?

A    I was aware that there had been a triple murder and Mr. Mosa was a suspect of it.

Q    How many triple murder cases have you heard of in the State of West Virginia in the last fifty years?

Vol. 3

Randall Allen - Cross                                    1967

FILED

     A     Probably that is the only one.

     Q     Pretty important crime in this state, wasn't it?

     A     Yes.                              APR - 3 1986

     Q     You had a confession from the accused, what you

considered to be a confession?

CLERK OF THE
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

     A     I had a conversation with the accused, yea?

     Q     Did you consider it to be a confession?

     A     Yes.

     Q     You knew that the accused had already confessed?

     A     I was aware that there was some sort of confession

before.

     Q     And at the time you took this statement that you have

characterized as a confession from the accused, did you feel

that the accused had confessed and had already been arrested?

     A     I was aware he had confessed in some fashion.  As to

the charges, I did not know.

     Q     How many people do you know of, in all the time that

you have been working in investigations, that have confessed to

a murder that have not been arrested?

     A     I didn't know what other evidence other than the

confession had been established.

     Q     When you heard what you considered to be a statement or

confession from John Mosa on the date that you and Woodyard

supposedly took this, did you consider in your mind that there

Randall Allen - Cross                                    1968

was enough in that statement, if it were true, to charge the

defendant, John Moss?

    A    Yes.

    Q    Charge him with the crimes of murder?

    A    Yes.

    Q    Now, what is the reason that one gives somebody the

Miranda rights?

    A    You are asking me what the reason is?

    Q    That's right.

    A    Well, the reason is so they will be advised of their

constitutional rights, right to an attorney and the right not to

speak to law enforcement officials.

    Q    Did you know anything about John Moss, him personally?

    A    No.

    Q    Did you know when it was -- Strike that -- Did you know

-- You have indicated to us that Trooper Woodyard said he would

talk to Trooper Smith and Trooper Williams about this

confession, correct?

    A    Yes.

    Q    Why would Trooper Woodyard go and talk to Smith and

Williams about this confession?

    A    It was my understanding they were the primary

investigating officers of the case.

    Q    Well, you knew that, I take it, as a result of being

Randall Allen - Cross                                    1969

there at the South Charleston Department barracks, and this case

had been going on for three and a half or four years, is that

correct?

     A    I was at Cross Lanes, and the crime had occurred in

Kanawha County, so I was aware that there was a murder

investigation ongoing.

     Q    And you were familiar with the fact that the two chief

investigators on that investigation were Trooper Smith and

Trooper Williams?

     A    Yes.

     Q    And I take it that you were familiar with the fact

that confessions that John Moss had allegedly given were to

Trooper Smith and Trooper Williams?

     A    Yes.

     Q    Did you understand that they were given the day before

you took John Moss back to Mansfield, Ohio?

     A    I was not aware of the date of the confessions.

     Q    How was it that you found out confessions were given?

     A    Through conversations with other troopers at South

Charleston.

     Q    Wasn't one of the topics of conversation when these

confessions were given?

     A    No, there was no -- No one stated a specific date they

had obtained a confession from John Moss.

Randall Allen - Cross                                    1970

    Q    In the past, I'm talking about some years ago while you were a trooper -- Let me ask you this:  When did DPS Form 79 come into existence?

    A    Prior to my enlistment with the department.

    Q    Are you familiar with the fact that one of the reasons that that form came into existence is because when you get into the trial of a case and a trooper would testify that he gave somebody their Miranda rights, that individual would testify, "No, you didn't give me that right"?  Are you aware that that is one of the reasons those forms came into existence?

    A    The exact reason for the form's existence, I could not attest to.

    Q    Well, in fact, you can tell His Honor here that one of the reasons you are instructed to use the form is so that the accused can sign it so there is no question that he got his rights?

    A    That's correct.

    Q    And you are instructed as an investigating officer of the State Police to have those forms with you or in the car at all times.

    A    No.

    Q    That is not a regulation of your department?

    A    No.

    Q    When do you usually have those forms with you?

Randall Allen - Cross                                    1971

    A    They are kept on the detachment level, and they are

used whenever you are going to question a suspect or anticipate

questioning a suspect.  You then produce a form and go over it

with them.

    Q    What happens, Mr. Allen, when you are out in the field

and you are doing a murder investigation and you go, "Geea, I

can take a confession here but I left those Forms 79 back at the

detachment?"  You have real problems, don't you?

    A    Possibly, but you can take the person you are going to

question to the office.

    Q    That assumes the person you are questioning still wants

to cooperate with you?

    A    Yes.

    Q    And if you are up some hollow in Cabin Creek an hour

away from the detachment, you lose an hour as an investigating

officer.  Is that what you are telling the Court?

    A    No.  You could read the Miranda warnings to him from

your card.

    Q    And then it would be your word against his word?

    A    Yes.

    Q    Can you tell us in factual sequence the questions that

were asked to John Moss and the answers that he gave that day,

remembering three and a half years ago?

    A    I could tell you the questions that I recall being

Randall Allen - Cross                                        1972

asked of John Moss.  As to their actual sequence or the order or

the number of questions, no.

    Q    And you can recall those questions being asked of John

Moss because you went over that testimony pursuant to Woodyard's

notes?

    A    No.

    Q    So what you are telling this Court is that three and a

half years ago you can remember the questions asked of John

Moss?

    A    I generally don't have conversations regarding triple

murders.  That sticks out in my mind.

    Q    You think that is important because it was a triple

murder case?

    A    Yes.

    Q    But it was not important enough for you to follow it up

with a superior or to make an activity report.  Is that what you

are telling the Judge?

    A    That was left to the senior trooper, Trooper Woodyard,

who had been investigating the case.

    Q    And you felt you had no obligation to the people of the

State of West Virginia to follow it up?

    A    It was being followed up by a partner?

    Q    Was it followed up in fact?  Is that the reason we are

here in this suppression hearing?

Randall Allen - Cross                               1973

    A    I can make that assumption that it was.

    Q    That it was followed up?

    A    Yes.

    Q    Do you know whether there is any notation whatsoever in the John Moss investigative file concerning this confession?

    A    I have never seen the John Moss file.

    Q    You have talked to Mr. Brown, and you have talked to Mr. Woodyard again, Trooper Woodyard, that senior officer; and they have indicated to you that nobody knew about it until two weeks ago.  Isn't that a fair statement?

    A    Yes, that's a fair statement.

    Q    Let me ask you this:  Since you have indicated to His Honor that this was a triple murder case and that this confession was so important, are you also telling the Court you didn't even have a pencil or a pen where you could have written down the responses to the questions by John Moss?

    A    I had two pens in my uniform pocket.

    Q    Did you take the questions and the answers down on a piece of paper?

    A    No, I didn't.

    Q    Did you even think about that?

    A    The thought crossed my mind, yes.

    Q    You were in the passenger's seat.  You weren't driving; you weren't doing anything, were you?

Randall Allen - Cross                              1974

A    No.

Q    You didn't have to have that senior officer's authorization to do something like that on a triple murder case, did you?

A    No.

Q    But you didn't do it?

A .  No.

Q    And you thought that this confession was so important, because this was a triple murder case, that after you left Woodyard and he said he would get hold of Smith and Williams, you never followed up one time?

A    No.

Q    Never talked to Trooper Williams about it?

A    Probably in the course of passing with Trooper Smith and Trooper Williams that John Moss had talked about the statements.

Q    Now, you said to His Honor "probably" and "may". Now, do you know that you did or you didn't, or are you just guessing again?

A    I'm just guessing.  They were aware that we had taken John Moss back to Mansfield, Ohio.  And they were aware that we had talked to John Moss.

Q    Are you telling His Honor that Trooper Smith and Trooper Williams, to your best indication and knowledge, were

Randall Allen - Cross                                    1975

aware that you all had taken a statement, oral statement, from

John Moss?

    A    Yes.

    Q    Is that your statement to this Court?

    A    Yes.

    Q    And I take it that is your statement to this Court

because you remember independently, as you sit here today, that

you talked to Williams and Smith about this statement in some

respect?

    A    I recall that Trooper Woodyard had said he was going to

talk to Trooper Williams and Trooper Smith about the statement.

    Q    My question to you is, do you base your conclusion that

Trooper Smith and Trooper Williams had knowledge that you took

this statement on the fact that you know from your personal

knowledge that they did?

    A    I personally did not go over any conversations with

Trooper Smith and Trooper Williams.

    Q    So you don't know, other than what Woodyard tells you

again?

    A    Exactly.

    Q    Mr. Allen, did you ever take the notes that Woodyard

had, that I prepared, and read over them with Woodyard?

    A    Yes.

    Q    And did you in reading over those, did you read them

Randall Allen - Redirect                                      1976

or did Woodyard read them?

    A    I read them.

    Q    And contained in those notes was the actual questions

an the answers that Woodyard asked of John Moss, and the answers

that were given to him by John Moss, isn't that correct?

    A    Yes.

    Q    How many times did you go over them?

    A    Once.

    Q    One time?

    A    Yes.

    MR. McKITTRICK:  That's all the questions I have.

    THE COURT:  Redirect?

                - O -

                            REDIRECT EXAMINATION

BY MR. BROWN:

    Q    Are you prepared to make an activity report regarding

this matter if you were requested, sir?

    A    Yes.

    Q    Do you remember about two or two and a half weeks ago,

when you were first contacted about coming into the prosecutor's

office and going over this statement, do you remember where you

were when you were contacted?

    A    I was at the Marriott Hotel at a computer seminar for

my company.

Randall Allen - Redirect                              1977

    Q    Where did you first come in contact with the officers?

Where exactly were you?

    A    I was on I-64 near Dunbar when they pulled me over.

    Q    Who pulled you over?

    A    Trooper Smith and Trooper Williams.

    Q    How did they pull you over?

    A    Turned on their lights and siren.

    Q    Up until that time had you talked to anybody; had you

been called about this case?

    A    No.

    Q    Nobody had talked to you about it, had they?

    A    No.

    Q    As soon as they got you, what did they ask you to do?

    A    They asked me if I had time to come back up to the

prosecutor's office and talk to them regarding when we, when

Woodyard and I had transported John Moss to Mansfield and what

he had said to us in the car.

    Q    About what time did you leave the Marriott Hotel?

    A    I would venture to say around 3:30.

    Q    What were you in town for?

    A    We had had a computer seminar there at the hotel, our

company.

    Q    Had that been scheduled ahead of time?

    A    Yes.

Randall Allen - Redirect                                    1978

    Q      Where do you now live?

    A      South Point, Ohio.

    Q      Had you been contacted by anybody prior to being
stopped on the interstate?

    A      No.

    Q      When they notified you what they wanted you to do,
where did you go?

    A      We first took my car down to the -- We have a Dunbar
office, and Troopers Smith and Williams brought me up to the
courthouse here.

    Q      When you say "we", do you mean we, the state police, or
we, the company you now work for?

    A      The state police.

    Q      Did you come back to the courthouse?

    A      Yes.

    Q      About what time did you get to the courthouse?

    A      Probably around 4:15.

    Q      Was I here at that time?

    A      Yes.

    Q      And I talked to you as soon as you got here, didn't I?

    A      Yes.

    Q      And I questioned you --

    MR. McKITTRICK:  Objection.

    Q      About your knowledge --

Randall Allen - Redirect                                    1979

MR. McKITTRICK:  Objection.

THE COURT:  What is the objection?

MR. McKITTRICK:  He is trying to ask him questions as to what he said.  He is asking for responses --

THE COURT:  You are saying he is leading?  Is that what you are saying?

MR. McKITTRICK:  Yes.

THE COURT:  Sustained.

Q    Were you questioned?

A    Yes.

Q    Who questioned you?

A    You did.

Q    What about?

A    The statements made by John Moss when Trooper Woodyard and I had transported him back to Mansfield, Ohio.

Q    And you told me what you remembered?

A    Yes.

MR. McKITTRICK:  Objection.

THE COURT: He is not going into what he told him.  He said, "Do you remember what you told me?"  I think that is a fair question and answer.  Overruled.

Q    Was that prior to seeing any written statement made by Mr. McKittrick?

A    Yes, it was.

Randall Allen - Recross                                    1980

Q    Then can you tell the Court whether or not there came a
time when you and I discussed this again?

A    Yes.  It would have been last Friday.

Q    And can you tell the Court whether or not in
preparation for this hearing you, myself and Corporal Woodyard
got together and discussed this matter?

A    Yes.

Q    Can you tell the Court whether or not you have ever
done that in any other case you have been involved in?

A    Practically any case that is going before the circuit
court.

MR. BROWN:  That's all the questions I have.

THE COURT:  Any recross?

MR. McKITTRICK:  Yes, sir.

- o -

RECROSS-EXAMINATION

BY MR. McKITTRICK:

Q    How many other cases where you have testified before
the circuit court did you take a statement from the accused and
make no activity and three and a half years later were called on
by the prosecuting attorney to recollect what happened in that
statement that took five or ten minutes to take?

A    None.

MR. McKITTRICK:  That's all.

1981

MR. BROWN: That's all we have of this witness.

THE COURT: All right, Mr. Allen, you may return to South Point. Is he under subpoena?

MR. BROWN: Well, he is not for this particular hearing.

THE COURT: Well, whatever.

MR. BROWN: Before you leave there, let me have your little card please.

(Card tendered to Mr. Brown.)

MR. BROWN: Would you mark this as State's Exhibit No. 1?

(Whereupon, the document referred to was marked by the reporter as State's Exhibit No. 1.)

MR. McKITTRICK: Show our objection on the grounds he has testified that is not the card he used that day.

THE COURT: Objection overruled. He has testified this is a similar card. It is a DPS card entitled "Miranda Warning", which is similar to the one that he used in 1980. I don't think anyone logically could expect him to still have the same card he used in 1980 now in 1984. He further testified that the original was turned back in to the Department of Public Safety when he resigned from the force.

For the aforesaid reasons the motion is overruled.

MR. BROWN: At this time we would move the admission into evidence for purposes of this hearing of State's Exhibit No. 1, which is the Miranda card that Trooper Allen testified to.

1982

THE COURT:  It will be so admitted into evidence over the objection of defense counsel.

Now, is there anything else before we recess for lunch?

MR. McKITTRICK:  No, sir.

MR. BROWN:  No, sir.

THE COURT:  Have your next witness here and ready to go at 1:30.

- O -

(Whereupon, a recess was had in the proceedings.)

- O -


AFTERNOON SESSION

Whereupon, the proceedings in the Matter of State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, were resumed with all parties present as before noted, including the defendant and his counsel.

THE COURT:  Show the resumption of these proceedings in State of West Virginia vs. John Moss, Jr., also known as John Moss, III, CR-82-F-221, murder in the first degree, three counts.  The defendant is present in person and by counsel, Mr. McKittrick, the State of West Virginia by her Assistant Prosecuting Attorney, in camera, in chambers.

Call your next witness.

MR. BROWN:  Corporal Woodyard.

Howard F. Woodyard - Direct                    1983

- o -

HOWARD F. WOODYARD,

Being thereupon called as a witness in behalf

of the State, after being first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. BROWN:

Q     Would you state your name for the Court please.

A     Howard F. Woodyard.

Q     You are a member of the West Virginia Department of

Public Safety?

A     Yes, sir.

Q     How long have you been so employed, sir?

A     Thirteen years.

Q     And you were so employed on October 30, 1980, is that

correct?

A     Yes, sir.

Q     And where were you stationed in October of 1980?

A     At that time I was stationed at the South Charleston

Detachment.

Q     Were you a corporal at that time?

A     No, sir, I was not.

Q     Where are you stationed now?

A     Madison.

Howard F. Woodyard - Direct                           1984

THE COURT:  Just for the record, in case it reaches the appellate stage, there may be some members of the Supreme Court that don't know where Madison is.  You may want to inquire as to what county that is in.

Q     What county is that in, sir?

A     That's in Boone County, West Virginia.

THE COURT:  Thank you.

Q     On October 30, 1980, did you have an occasion together with then Trooper Randy Allen to take one John Moss to the State of Ohio?

A     Yes, sir, I did.

Q     Is John Moss in the courtroom here today?

A     Yes, sir, he is.

Q     Would you point him out please.

A     He is setting right over there (indicating).

MR. BROWN:  Let the record show he has indicated the defendant in this case, John Moss?

THE COURT:  The record will so reflect.

Q     Can you tell us whether you were in uniform or not?

A     Yes, sir, I was.

Q     Was Allen in uniform?

A     Yes, sir.

Q     What kind of car did you all take to Ohio?

A     We were driving an unmarked cruiser.

Howard F. Woodyard - Direct                    1985

Q    Around what time did you pick John up?

A    About 9:00.

Q    And where did you pick him up?

A    Kanawha County Jail.

THE COURT:  Excuse me.  Was that nine in the morning or nine at night?

MR. BROWN:  Nine in the morning.

Q    Who drove to Ohio?

A    I did.

Q    Did you drive continuously from the time you all left the jail until you got to Ohio?

A    Yes, sir.

Q    How many stops, if any, did you make between the jail and Mansfield, Ohio?

A    Two.

Q    What was your ultimate destination in Mansfield?

A    It was the youth facility there.

Q    What stops did you make, sir?

A    We stopped for gas on one occasion and stopped to ask directions on the other.

Q    Where were you when you stopped to ask for directions?

A    We were near Mansfield, right outside Mansfield.

Q    When you stopped to ask for directions, did you get out of the car, did you stop the car, or how did that happen?

Howard F. Woodyard - Direct                    1986

        A    I stopped the car and was approached by a highway

patrolman.

        Q    Did he give you directions?

        A    He led us there.

        Q    Where did Trooper Allen sit in the vehicle?

        A    Front seat passenger's side.

        Q    Where did John Moss sit in the vehicle?

        A    Rear seat on the right side.

        Q    Approximately how long did it take you all to reach

Mansfield?

        A    As I remember, it was four or five hours.

        Q    Did you come back the same day?

        A    Yes, sir, we did.

        Q    Of course, you left John Moss there?

        A    Yes, sir.

        Q    How did you personally come to drive John Moss to Ohio?

        A    I was available that particular day, and I was just

directed to return him to the facility.

        Q    Do you remember who directed you to do that?

        A    Yes, sir.

        Q    Who was it?

        A    Captain Lemon.

        Q    Prior to October 30, 1980, had you been involved in any

way in the investigation of the murder of the Reggettz family?

Howard F. Woodyard - Direct                        1987

    A    Yes, sir, to some extent.

    Q    Prior to October 30, 1980, were you aware or can you

tell the Court whether or not you were aware that John Moss had

given a statement to other members of the Department of Public

Safety?

    A    Yes, sir, I was aware of that.

    Q    Do you know in what manner that statement was taken?

    A    I had heard that there was a taped statement.

    Q    Do you know who it was given to, or did you know at

that time?

    A    Yes, sir.

    Q    Who was that, sir?

    A    Trooper Smith and Trooper Williams.

    Q    Had you heard the tape or seen a transcript of the tape

before you took John Moss to Ohio?

    A    No, sir, I had not.

    Q    As you left, when you left Charleston, did you drive,

or did you go by way of I-77 to start out of Charleston?

    A    Yes, sir, we did.

    Q    When you left town and you began your journey to

Mansfield, was there any discussion or any talk between yourself

and Trooper Allen and John Moss?

    A    Yes, sir.

    Q    What did that concern, if you remember?

Howard F. Woodyard - Direct                    1988

    A    More or less just general conversation.

    Q    At this time were there any questions directed to John
Moss concerning the investigation of the Reggettz killings?

    A    No, sir.

    Q    Did this general conversation continue for a while?

    A    Yes, sir, it did.

    Q    At some time during your journey to Mansfield, did the
conversation switch to the investigation or did the conversation
switch to the Reggettz investigation?

    A    Yes, sir, it did.

    Q    Approximately where were you, either in time or
location, when this conversation took place?

    A    As I remember, we were near Marietta, Ohio.

    Q    Would you tell the Judge please what happened, how the
conversation turned and what took place.

    A    Well, at that particular point I asked John, I told
John, "There are some questions we would like to ask you."  I
said, "There are some things I would like to ask you.  It
pertains to this Reggettz investigation."  I said, "I have some
questions I would like to ask you."  And I said, "If you
wouldn't mind talking about it," I said, "I would like to ask
you some questions about it."  I also informed him that before
I did that we would advise him of his constitutional rights.

    Q    When you asked him if he would talk to you, what did he

Howard F. Woodyard - Direct                              1989

say, if anything?

    A    He said it was all right.

    Q    Did anybody give John Moss his constitutional rights?

    A    Yes, sir.  Trooper Allen at that time read him his constitutional rights.

    Q    In what manner were the rights given to John Moss?

    A    They were read by Trooper Allen from a card he was carrying in his pocket at that time.

    Q    Did John Moss read them, or were they read to him?

    A    They were read to him by Trooper Allen.

    Q    Did John Moss indicate whether or not he understood his constitutional rights?

    A    Yes, sir, he did.

    Q    Did he indicate whether or not he was willing to go ahead and discuss this with you?

    A    Yes, sir, he did.

    Q    At that point did you begin to ask questions of John Moss concerning the Reggettz murders?

    A    Yes, sir.

    Q    Approximately how long did this questioning last, or how long did it take place?

    A    In that particular fashion of it?

    Q    Yes, sir.

    A    Approximately an hour or so.

Howard F. Woodyard - Direct                          1990

Q     About how long did it take to ask all these questions
if they were asked one after another?

A     Rapid fire?

Q     Yes, sir.

A     In rapid fire sequence?

Q     Yes, sir.

Q     In rapid fire sequence it would have taken a very short
time.  I would say no more than fifteen minutes.

Q     Were you in any manner familiar with -- Well, strike
that -- You have indicated you had participated in the
investigations of the Reggettz murders, is that correct?

A     Yes, sir.

Q     Prior to picking up John Moss at the jail on October
30, 1980, had you and Trooper Allen discussed questioning John
Moss?

A     No, sir.

Q     Did you or Trooper Allen have with you Form 79 of the
Department of Public Safety, the Miranda form?

A     No, sir, we did not.

Q     Why did you not have that form with you, sir?

A     At that particular time we had no use for that form.
At that time I had no intentions, I had made no prior plans to
talk with John.

Q     During the questioning of John Moss, who asked the

Howard F. Woodyard - Direct                                1991

majority of the questions?

    A   I did.

    Q   Did Trooper Allen ask any questions?

    A   Yes, sir.

    Q   Did you write anything down as to what John Moss said?

    A   No, sir.

    Q   Did Trooper Allen write anything down?

    A   No, sir.

    Q   At the conclusion of the -- Well, strike that -- There came a time when you concluded your interview with John Moss. Would you tell the Court how that interview came to an end.

    A   I just asked John, I said, "John, would you prefer not to answer any more questions about this"; and he indicated he would prefer not to answer any more.  I said, "Would you rather not talk about this?"; and he said, "Yes".

    Q   Were any questions asked after that?

    A   No, sir.

    Q   Had he indicated in any way from the time he said he would talk until that time that he did not want to talk?

    A   No, sir.

MR. McKITTRICK:  Objection.  Leading.

THE COURT:  Sustained.  Quit leading.

    Q   After you returned to Charleston did you write up an activity report on the statement that John Moss made?

Howard F. Woodyard - Direct                    1992

    A    No, sir.

    Q    Can you tell the Court whether or not on the way back from Mansfield you and Trooper Allen discussed whether or not there should be an activity or what should be done?

    A    I may have told him that I would bring it to the investigating officers' attention.

    Q    Did you know at that time who the investigating officers were?

    A    Yes, sir.

    Q    Who were they?

    A    Trooper Smith and Trooper Williams.

    Q    Did you bring it to the attention of the investigating officers?

    A    Yes, sir.

    Q    Which officer are you speaking of?

    A    Trooper Smith.

    Q    About what time did you get back in to Charleston, if you remember?

    A    As I remember, it was between 6:00 and 7:00.

    Q    When did you next get hold of Trooper Smith?

    A    It was the following Monday or Tuesday.

    Q    Do you remember what day it was you returned?

    A    Yes, sir.

    Q    What day was it?

Howard F. Woodyard - Direct                    1993

    A    It was a Thursday.

    Q    Was there anything that stuck out in your mind about October 30?

    A    That particular day?

    Q    Yes.

    A    As to why I remember that day?

    Q    Yes, sir.

    A    Yes, sir.

    Q    What was it?

    A    That was trick or treat in the area where I live, and my kids wanted me to take them that night.

    Q    Was it Halloween?

    A    Yes, sir.

    Q    So that was Thursday, and you notified Smith Monday?

    A    Monday or Tuesday, yes, sir.

    Q    Or Tuesday.  What, if anything -- Did you relate to him the contents or the essentials of what John Moss had told you?

    A    Yes, sir, I summarized about what John had told me.

    Q    All right, and how did you leave it with Trooper Smith?

    A    I asked him if he would bring it to the attention of the Prosecuting Attorney's office.  He informed me that he would.

    Q    Did you ever hear back from Trooper Smith?

    A    Yes, sir.

Howard F. Woodyard - Direct                           1994

Q     How long was it that you heard back from him?

A     It was a few days following that that I approached him
about it.

Q     What, if anything, did he say to you concerning that?

A     He said that he had talked to the Prosecuting
Attorney's office, and that they didn't feel it was necessary,
that it was pretty much the same thing that they already had.

Q     Would you tell the Court please, were you prepared to
make an activity at that time?

A     Yes, sir.

Q     If requested?

A     Yes, sir.

Q     Would you tell the Judge please the substance or the
contents of the statement, the questions and answers that were
given by you and John Moss in your trip to Mansfield.

A     Yes, sir.  The first question that I asked was whether
or not he knew John, excuse me, Paul Reggettz.  He responded no,
that he didn't know him.  I said, "Well, do you know who Paul
Reggettz is?", to which he responded, "Yes."  I said, "How well
do you know him?"  He said to see him or to say hello or hi
to.  I said, "Are you familiar with the Reggettz family, a woman
and a little boy and a little girl?", to which he responded he
knew who they were.

I asked him if he knew where the Reggettz house was located,

                                                         1994

Howard F. Woodyard - Direct                    1995

and he said, "Yes."  I asked him if he lived near that
particular house, and he responded that he did.  I asked him how
far away, and he said, "Not far."  I asked him if he had ever
been in that house.  He said he had been.  He responded yes to
it.  I asked him when that was.  He stated it was before
Christmas.  I asked him if he could remember the day of the week
he was in the house, and he stated no, he couldn't remember the
day of the week.  I asked him if it was daylight or dark when he
went in.  He stated it was night.

I asked him why he went into the house.  He stated he went
in to steal.  I asked him what happened when he went in.  He
told me he got scared and left but that he came back in the
house.  I asked what happened when he came back in the second
time.  He stated the woman was there.  I asked him what happened
then.  He told me that the woman attempted to fight him.  I
asked him what happened then.  He stated he did not remember.  I
said, "Did you kill the woman?"  He stated yeah, that he had.
I asked him how he killed her.  He told me he didn't remember.
I said, "Did you stab the woman?"  He responded he didn't
remember.  I asked him if he had stabbed her with a knife.  He
said he didn't remember.  I asked him if he recalled a pair of
scissors being in the house, to which he responded, "Yeah".  I
asked him if he stabbed her with those scissors, and he stated
he didn't remember.

Howard F. Woodyard - Direct                    1996

     I asked him, "At this time where were the children?"  He

said, "They were there."  I said, "Did you kill the children?"

He said, "Yes."  I asked him how he killed the little boy, to

which he responded he didn't remember.  I asked him how he

killed the little girl.  He responded that he didn't remember.

     I asked him what he had done with the little girl after she

was dead.  He responded that he had put her on the door.  I

asked him what he had done with the little boy's body.  He said

he had put him in a bathtub.  I asked him if the bathtub was

empty, and he stated, "There was water in it." I asked him if he

saw anyone else in the house at that time.  He said, "No."  I

asked him if Paul Reggettz was there at that time.  He said no,

he didn't think so.

     I asked him if he had taken anything from the house, if he

had stolen anything from the house.  He responded, "Yes, a

rifle."  I asked what kind.  He said he didn't know.  I asked

him what he had done with the rifle that he took from the house.

He said he had taken it home.  I said, "Did you do anything with

it after that, after you had taken it home?"  He said he had

taken it to Cleveland.  I asked him what he had done with it in

Cleveland, to which he responded he didn't remember.  I asked

him if he sold it in Cleveland.  He said he didn't remember.  I

asked him if he gave it to someone in Cleveland.  He didn't

remember.  I asked him if he knew where the gun was at that

                                              1996

Howard F. Woodyard - Direct                    1997

time.  He said, "No."  I asked him if he had taken anything else

from the house.  He hesitated and responded, "No, I don't think

so."  I asked him again.  He said yes, but he didn't remember

what.

     I asked if when he entered the house he was wearing gloves,

to which he responded, "Yeah."  I asked him if he knew where the

gloves were or what he had done with the gloves or where they

were at that time.  He responded he didn't know.

     I asked him if he was familiar with Paul Reggettz' work

schedule.  He responded that Paul Reggettz was gone that night.

I asked him if he was familiar, or in what respect he was

familiar with it.  He was not familiar with it in that he didn't

know where Paul worked or what shift he worked.

     I asked him if he could remember what time he left the

house, if he remembered how long he was in there or what time he

went.  He said he didn't know.  I asked him if it was still dark

when he left.  He responded he thought it was.  I asked him why

he put the little girl on the door, to which he responded he

didn't know.  He was also asked why he put the little boy in the

bathtub, to which he responded the same answer, that he didn't

know.

     I think generally that is about the questions that we asked

or that were asked by me.

     Q    Can you tell us whether or not you remember him saying,

Howard F. Woodyard - Direct                               1998

when you asked him what time he went there, he said, "After

midnight"?

    A    Yes, sir, he did.

    MR. McKITTRICK:  Objection and move to strike on the basis

the prosecutor has already told the witness the answer.

    THE COURT:  Sustained.

    MR. BROWN:  I asked if he remembered.

    THE COURT:  You were leading.  Sustained.

    Q    Do you remember that particular answer from your own

memory?

    A    Yes, sir, I do.

    Q    And you related this same answer to Mr. McKittrick just

this week, didn't you, or last week?

    A    Yes, sir, I did.

    Q    In written form, didn't you?

    A    Yes, sir.

    MR. McKITTRICK:  I object to the leading of the witness by

the prosecutor.

    MR. BROWN:  He said --

    MR. McKITTRICK:  I'm objecting --

    MR. BROWN:  Let me finish my question.

    MR. McKITTRICK:  And I'm objecting to the question before,

Mr. Brown, if you don't mind if I put my objection on the

record.

Howard F. Woodyard - Direct                          1999

Q     Do you remember that of your own memory?

A     Yes, I do.

THE COURT:  He testified he had an independent recollection
of it.  Overruled.

Q     Now, did you ever talk with anybody in the prosecutor's
office about this statement you had taken from John Moss in
1980, at the time you took it?

A     No, sir, I didn't.

Q     When was the first time that you brought this to
anybody's attention in the prosecutor's office?

A     It was about two weeks ago when I spoke with you.

MR. BROWN:  Excuse me, Your Honor, I had another item here;
but I can't seem to locate it.

THE COURT:  Take your time.

MR. McKITTRICK:  If you find it, Pete, do you want to do it
on redirect?

MR. BROWN:  Okay.

MR. McKITTRICK:  That's fine with me.

- O -

CROSS-EXAMINATION

BY MR. McKITTRICK:

Q     At the time that this happened, Corporal, were you a
trooper?

A     Yes, sir.

Q How long had you been a trooper at that time?

A In 1979?

Q Yes.

A About eight years, eight and a half years or so.

Q Trooper Allen was also a trooper at that time, is that correct?

A Yes, sir, he was.

Q Were you considered a senior officer to Trooper Allen, to tell him what to do; or were you on the same level?

A We were on the same level rank wise. I had the seniority department wise.

Q Does that mean you could tell him what to do?

A No, sir.

Q You wouldn't be characterized as a senior officer then?

A As his senior officer?

Q Yes.

Q No, sir.

Q This cruiser that you used to go to Mansfield, Ohio, you indicated to the Court that it was unmarked, is that correct?

A Yes, sir.

Q How is it that the department has unmarked cruisers for you to use?

A You mean how was it, how did I happen to be using that

Howard F. Woodyard - Cross                              2001

particular vehicle?

    A    Yes.

    Q    It was loaned to me by one of the detachment corporals

or a sergeant; I am not sure which.

    Q    I guess what I'm asking you is does the department have

these kinds of vehicles in stock?

    A    What is the purpose of those vehicles?

    Q    Yes.

    A    Those vehicles are used for criminal investigations and

road patrol.

    Q    For --

    A    Road patrol.

    Q    Okay now, in these vehicles, I'm interested to know,

are they made internally like the regular cruisers?

    A    Yes, sir, they are.

    Q    Do they have a locking system that is locked in the

front of the car?

    A    Yes, sir.

    Q    Do you know of any exceptions of these particular kinds

of cars where there isn't a locking system in the front of the

car?

    A    For that particular type vehicle?

    Q    Yes.

    A    For that particular type of vehicle, no.  However,

Howard F. Woodyard - Cross                           2002

there are, the department does have cars that do not have

automatic locks.

Q     Okay, are they used for taking people like John Moss

back to Ohio?

A     No, sir.

Q     You always use one that has a locking system on it?

A     Yes, sir.

Q     Now, you indicated to His Honor that you were familiar

with the fact that John Moss had already given a confession to

Trooper Smith and Trooper Williams?

A     Yes, sir.

Q     How did that come to your attention?

A     I don't know if I heard it just in passing or if it was

told to me by one of them, that they had received a confession

from him.

Q     You can't remember which it was?

A     Which of those two?

Q     Yes.

A     No, sir.

Q     How long had you known that John Moss had given a

confession before you picked him up at approximately 9:00 at the

Kanawha County jail?

A     I may have heard about it the previous day or the

previous evening.

Howard F. Woodyard - Cross                          2003

     Q     Assuming that you are right in remembering four years
ago that Halloween was on the 30th of October and that is what
motivates your memory in this proceeding, I take it then that
the confession that John Moss would have given Trooper Smith and
Trooper Williams would have been given either on the 28th of
October or before that time, is that correct, sir?

     A     I don't know.

     Q     Could it have been given on the 22nd of October as far
as you are personally concerned?

     A     I do not know when they obtained the confession.

     Q     So in other words, when you had John Moss in the car
that day, taking him back to Mansfield, you knew Trooper Smith
and Trooper Williams had brought him back to West Virginia from
the State of Ohio?

     A     Yes, sir.

     Q     But you didn't know when it was that they did that?

     A     No, sir.

     Q     It could have been a week before that, is that correct?

     A     Could have been.  I don't know.

     Q     And I guess one of the reasons that you told His Honor
that you weren't prepared to take a confession from John Moss
was because you didn't know those things, and those things
raise certain legal questions in your mind when you take a
confession, isn't that correct?

Howard F. Woodyard - Cross                          2004

A      Sir, all I knew was that they had obtained a confession.

Q      But try to answer what I just asked you.

A      Would you repeat it for me please.

MR. McKITTRICK:  Sure.  Would you read it back for him please.

(Whereupon, the last question was read by the reporter.)

A      As I interpret the question there, was I concerned with talking with John because it might raise a legal question.

Q      Well, let's assume for a moment that John Moss had given a confession to Trooper Smith and Trooper Williams two days before you picked him up to take him back to Ohio.  Would there be certain legal questions raised in your mind about your taking a confession from him at that time?

A      As I recall, I didn't; there were none raised in my mind at that time.

Q      Let's look at it right now, I'm asking you.

A      Do I think there was something to prevent me from taking a confession from John Moss?

Q      Are there certain considerations that you would have raised before you took a confession from John Moss that might raise legal questions as to the legal acceptability of that confession?

MR. BROWN:  Your Honor, could that question be a little

Howard F. Woodyard - Cross                                    2005

more specific?

    MR. McKITTRICK:  I'm going to make it so, but he is a
trained police officer.

    Q    You have taken confessions on many occasions before
that; and it would be an insult to your intelligence to say you
haven't, wouldn't it?

    A    I have taken other statements, yes, sir.

    Q    All right, can you answer that question now.

    A    There are always legal considerations that have to be
considered.

    Q    What legal considerations would have to be considered
if a man had been brought back to West Virginia from another
state two days before and had given a confession then.

    A    And had given a confession then?

    Q    Yes.

    A    I'm not sure I understand what you are saying; but if
you mean should I have advised him of his rights --

    Q    Let me ask you this:  Did you make an inquiry as to
whether John Moss had a lawyer?

    A    Did I ask John if he had a lawyer at that time?

    Q    Yes.

    A    As I recall, I did not.

    Q    How about if he would have come back here, and as his
right to do, and you know this, for him to be taken before a

Howard F. Woodyard - Cross                              2006

neutral judicial official to have a lawyer appointed for him if
he could not afford one; how about if he had a lawyer appointed?

    A    If he had had a lawyer appointed at that time?

    Q    Yes.  Would that have been something you would want to
consider before taking a confession from him?

    A    I would consider it.

    Q    In what respect?

    A    In whether or not, I would consider that in respect to
whether or not he understood the rights that were read to him,
and how he interpreted those rights, and if he wanted to consult
a lawyer.

    Q    Was John Moss ever taken before a judicial official, as
was his right to do?

    A    By me?

    Q    Yes.

    A    No, sir.

    Q    Was he by any other police officer to your knowledge?

    A    I do not know.

    Q    Did you make that determination before you took the
statement?

    A    Did I inquire of any other police officers whether he
had a lawyer appointed for him?

    Q    No, whether he had been taken before a neutral judicial
official and advised -- Do you know what an accused has a right

Howard F. Woodyard - Cross                    2007

to have a neutral judicial official such as a magistrate or

judge, advise him of after he is charged with a crime?

    A    He has a right to an attorney and one will be appointed

for him.

    Q    What else?

    A    Well, just the general Miranda warnings?  I'm sorry,

sir, I'm --

    Q    I'm asking you does he have those rights or not in the

State of West Virginia, and did he have them at that time?

    A    He has his constitutional rights wherever he is.

    Q    Now, was he taken, as is his right, without unnecessary

delay, before a judicial official?

    A    Not by me.

    Q    Did you make that determination before you took the

confession from him?

    A    We asked if he had had his rights explained to him

before.

    Q    All right --

    A    To which he replied yes.

    Q    You gave me a statement as to what transpired there in

the car, is that correct?

    A    Yes, sir, it is.

    Q    Do you have that in that statement?

    A    Do I have what in that statement?

Howard F. Woodyard - Cross                              2008

    Q    That you asked him if he had been given his rights
before.

    A    I think I told you that.

    Q    Is it in the statement?

    A    I do not know.

    Q    Would you look at the statement please.

    A    It is not in your notes.

    Q    Okay, and I asked you after that statement, "Now,
Howard, is there anything else that you want to tell me about
this case", at least three times.  And you said, "There is
nothing else that I can remember that was said."  Isn't that a
fair statement?

    A    That would be a fair statement that I told you that I
didn't remember anything else at that time.

    Q    But you remember that now?

    A    Pardon me?

    Q    You remember that now?

    A    That you asked me that?

    Q    No, that you told me that or that you asked John Moss
that in the car that day.

    A    Trooper Allen --

    Q    You remember now, but you didn't tell me when I took
the statement that you asked John Moss in the car on the 30th
day of October, 1980, "Have you had your rights given to you

Howard F. Woodyard - Cross                              2009

before?"  You do remember that now?

    A    I remember Trooper Allen asking him that, yes, sir.

    Q    But we don't have it in the statement you gave me as to everything that transpired in the car, correct?

    A    Is everything that transpired in the car in this statement that you wrote down?

    Q    Howard, you gave me a statement, did you not, sir?

    A    Yes, sir, I did.

    Q    And I wrote it down?

    A    Yes, sir.

    Q    And I asked you whether or not that was everything you could remember that transpired; and you said yes, is that correct?

    A    You asked me if there was anything else that I felt you should know, as I recall.

    Q    All right, or anything else that transpired that you could remember; and you said no, isn't that correct?

    A    I remember you asked me if there was anything else that I felt you should know or whatever about this, and I said no.

    Q    And you initialed the statement?

    A    Yes, sir, I did.

    Q    Now, I want to take you back to December of 1979.  You answered one of Mr. Brown's questions that you had investigated to some extent the allegations concerning the murders of the

Howard F. Woodyard - Cross                            2010

Reggettz family, is that correct?

     A     Yes, sir.

     Q     In fact, you were the state trooper that took two confessions from Paul Reggettz and then accompanied Paul Reggettz to the scene of the murders where he showed and demonstrated in detail how he committed the murders of his family, is that correct?

     A     Yes, sir.

     Q     So it is a fair statement to tell His Honor that you knew intimately the details surrounding the murders of the Reggettz family?

     A     I knew what Paul Reggettz told me in his confession, yes, sir.

     Q     What he told you in his confession was exactly consistent with the facts surrounding those murders, weren't they?

     A     I don't know whether I could answer that accurately or not.

     Q     Have you had an opportunity in the last three and a half years, since you took those confessions from Paul Reggettz and accompanied him to the scene of the murders, to read over the investigation report of either Paul Reggettz or John Mosa?

     A     Have I read the statements of John Mosa or Paul Reggettz?  I have read the --

Howard F. Woodyard - Cross                              2011

Q     That's not what I asked you, Howard.  Now, listen to
me.  Have you had an opportunity, in the last three and a half
years or so, since you took the confessions of Paul Reggettz and
accompanied him to the murder scene, to read the investigation
report concerning the allegations of murder against Paul
Reggettz and/or John Moss?

A     No, sir, I haven't.

Q     And I take it since that time you have had an
opportunity to investigate many crimes and do activities or
investigation reports yourself?

A     I have investigated some, yes, sir.

Q     How many?

A     In the last -- Since 1980?

Q     No, since December 13, 1979.

A     In 1979, 1980 and 1981 I was public information officer
and did not investigate crimes.

Q     What did you do as public information officer?

A     Public information officer -- Was your question what
did I do in that regard?

Q     Yes.

A     I did traffic safety talks, just about any type of talk
that the community or civic group wanted.

Q     Now, how many murder cases have you had the opportunity
to work in your tenure as a state policeman?

Howard F. Woodyard - Cross                                    2012

    A    How many have I been a part of?

    Q    Yes, sir.

    A    Eight or nine I think.

    Q    And you have been taught since the time you started as a state trooper that you are to reduce, either to writing or tape, confessions taken in any murder case or any other criminal case for that matter?

    A    That is the general procedure.

    Q    And did you, as you were driving the car to Mansfield, Ohio, say to Trooper Randy Allen, "Take your pencil out or your pen and get a piece of paper and write down these questions and answers"?

    A    No, sir, I didn't.

    Q    Did you after you returned -- Strike that -- When you returned to South Charleston it is my understanding that you did not talk to Trooper Smith and/or Trooper Williams for a couple of days after your return, is that correct?  In fact, it was the next week?

    A    As I remember it, that is correct.

    Q    You returned on a --

    A    Thursday.

    Q    Thursday.  So you didn't talk to them until Monday or Tuesday, is that correct?

    A    As I remember it, no.

Howard F. Woodyard - Cross                              2013

     Q    Now, at that time I take it you were investigating
crimes?

     A    At that time, I was -- Pardon me.  You mean in that
particular respect?

     Q    Yes.  Were you involved in the investigation of
criminal activities?

     A    At that particular time?

     Q    Yes.

     A    As a particular function of my job?

     Q    Yes, sir.

     A    No, sir.

     Q    But as the time went on, were you not fearful of the
fact that these things would not be vivid in your mind?

     A    Yes, sir.

     Q    Did you prepare an activity pursuant to that fear?

     A    No, sir.  I was told it wasn't necessary.

     Q    Who told you it wasn't necessary?

     A    Mike Smith, after talking with the Prosecuting
Attorney's office.

     Q    Did he also tell you that the Prosecuting Attorney's
office had made the decision that the evidence you had secured
was not necessary to be used?

     A    That was my understanding.

     Q    And then you forgot it right there?

Howard F. Woodyard - Cross                              2014

    A    No, sir, I didn't forget it.

    Q    Did you do anything about it?

    A    Pardon me?

    Q    Did you do anything about what you had taken from John
Moss?  Did you go to a superior and talk to him?

    A    No, sir.

    Q    Did you feel as a trained police officer in a triple
murder case that it was advisable for the Prosecuting Attorney
to turn down a confession?

    A    Did I feel that way?

    Q    Yes.

    A    No, sir, I didn't.

    Q    You didn't feel it was advisable?

    A    No, sir.  I think any time you have information it is
advisable to at least be aware of it.

    Q    Coming to that conclusion, Howard, what did you do?

    A    I took it through Trooper Smith to the chief law
enforcement official of the county and was told it wasn't
necessary.

    Q    Did you talk to Chuck Pettry?

    A    No, sir, I didn't.

    Q    Chuck Pettry is the individual Trooper Smith told you
he talked to?

    A    I don't remember who he said he talked to.

Howard F. Woodyard - Cross                           2015

     Q    All right now, when you talked to Trooper Smith, you

yourself talked to him, where did you see Trooper Smith?

     A    At the South Charleston Detachment.

     Q    Was Trooper Williams with him?

     A    I don't remember.

     Q    What did you tell Trooper Smith, "We got a confession

from John Moss.  Go see the prosecutor and see if he wants it"?

     A    Yes.  And I also basically told him what we talked to

him about, that his responses were mainly yes or no or he didn't

remember.

     Q    Did you go over with Trooper Smith in detail what you

told His Honor today?

     A    No, sir.

     Q    In other words, you said to him, "John Moss told us he

killed the Reggettz family", basically?

     A    Basically, with some of the questions we had asked him,

what type of questions we had asked.

     Q    What questions did you tell Trooper Smith that you had

asked, do you remember?

     A    Uh --

     Q    Now, honestly, Howard, can you remember three and a

half years ago?  You didn't tell him all of them, but can you

remember some of them?

     A    Yeah.  I remember telling him we asked him if he had

Howard F. Woodyard - Cross                           2016

killed the wife and children, how he had done it and why he had

done it, and that sort of thing.

    Q    Did you tell all the questions to Trooper Smith?

    A    I may have or I may not have.

    Q    You don't remember?

    A    I don't remember.

    Q    But today when you come in this courtroom three and a

half years later, you remember in sequential order what John

Moss told you, correct?

    A    I never said this was sequential order, no, sir.

    Q    So as I understand it, to get your testimony right, you

can't remember how many questions that you related to Trooper

Smith that you asked John Moss and there were answers from John

Moss.  But you remember you told him something, is that correct?

    A    I gave him a summary of what we had talked about.

    Q    Now, how long after that time was it that Trooper Smith

got back to you and said, "The prosecutor's office perfunctorily

rejects this for use as evidence in the John Moss triple murder

case?

    A    Within a few days after I talked with him, I saw him at

South Charleston and asked him if he had relayed that

information to the Prosecuting Attorney's office; and he advised

me he had.

    Q    And he was awaiting an answer or what?

Howard F. Woodyard - Cross                              2017

     A    Pardon?

     Q    He was awaiting an answer?

     A    No, sir.  He went on to say they felt it was pretty
much the same as the confession John had already given and they
didn't feel it was necessary.

     Q    All right now, did you take it upon yourself at that
time, feeling as you did, to go to a superior and say, "Look,
through everything I have been trained to do, this isn't right
This is a triple murder case."  Did you do that?

     A    No, sir.

     Q    Did you, as a result of your fear that you might forget
some of the evidence, did you say, "I don't care what they say.
I feel it is important.  At least I'm going to write it down so
I don't forget it."  Did you do that?

     A    No.

     Q    When you talked to Trooper Smith, was Trooper Williams
present?

     A    I don't remember.

     Q    You indicated to His Honor that you knew that Trooper
Smith and Trooper Williams were the chief investigating officers
on the allegations of murder against John Moss, is that correct?

     A    Yes, sir.

     Q    Did you ever, after that day, taking into consideration
how you personally felt about this evidence not being used, did

Howard F. Woodyard - Cross                              2018

you go to Trooper Williams or Trooper Smith and say anything the

essence of which was, "Do you think I ought to go see Chuck

Pettry", or "Don't you think this evidence ought to be used"?

Did you ever do that?

    A    No, sir.

    Q    Did you ever discuss the alleged confession that you

took from John Moss at any time in the future with either

Trooper Smith and/or Trooper Williams?

    A    No, sir.

    Q    Now, you have related to His Honor the things that John

Moss told you that day in the car on what you say was October 30

1980, is that correct?

    A    Yes, sir, as I remember it.

    Q    Are you absolutely positive that the responses that John

Moss gave you are the responses that you have given His Honor?

    A    As to the negative and affirmative, yes, sir.

    Q    How about as to not negative and affirmative?

    A    It depends on what you mean by that.

    Q    Any other answer that he gave you, are you sure that

was his answer?

    A    The ones that he responded to?

    Q    Yes.

    A    Yes, sir.

    MR. McKITTRICK:  That's all.

Howard F. Woodyard - Redirect                          2019

     THE COURT:  Any redirect?

     MR. BROWN:  Yes, sir.

                        - O -

                                    REDIRECT EXAMINATION

BY MR. BROWN:

     Q     Do you remember whether or not John Moss told you how

he killed the little boy and the little girl?

     A     I asked the question, "Did you kill the little boy and

the little girl", to which he responded yes, he had.

     Q     Do you remember if he told you how he killed them?

     A     He didn't go into any detail other than to say he

choked them.

     MR. BROWN:  All right's that all the questions I have.

     THE COURT:  Any recross?

     MR. McKITTRICK:  No, sir.

     THE COURT:  All right, Corporal, you may step down.

     (Witness excused.)

     THE COURT: All right, we'll take a ten minute break, and

then have Smith ready to go.

     (Whereupon, a recess was had in the proceedings.)

     (After recess.)

     THE COURT:  Show the resumption of these proceedings with

all parties present heretofore present here again, including the

defendant and his counsel, out of the presence of the

Michael Don Smith - Direct                                    2020

prospective jury panel.

    Call your next witness.

    MR. BROWN:  Trooper Smith.

                        - 0 -

                  MICHAEL DON SMITH

    Being thereupon called as a witness in behalf

of the State, after being first duly sworn,

testified  as follows:

                        DIRECT EXAMINATION

BY MR. BROWN:

    Q    Your name is Michael Smith?

    A    Michael Don Smith.

    Q    And you are a member of the Department of Public

Safety?

    A    Yes.

    Q    And you were so employed in October, 1980?

    A    Yes.

    Q    And during 1979 and 1980 you were involved as an

investigating officer in the case of the Reggettz family

murders, is that correct?

    A    That is correct.

    Q    On October 28, 1980, you and Trooper Terry Williams

took a statement from John Moss, is that correct?

    A    Correct.

Michael Don Smith - Direct                              2021

Q       After October 28, 1980, did you have, sometime after

that, did you have an occasion to have a conversation with

Trooper Howard Woodyard?

A       Yes.

Q       When was that, if you can remember?

A       It would have been the first part of the next week

after the 28th, like Monday or Tuesday.

Q       Do you remember what day the 28th was?

A       I want to say Wednesday, but I am not positive about

that.

Q       This conversation that you had with Trooper Woodyard,

was it face-to-face or by telephone?

A       Face-to-face.

Q       Where did the conversation take place?

A       In the corporal's office at the South Charleston

Detachment.

Q       Who was the corporal at that time?

A       C. N. Cook.

Q       Can you tell the Court please what the gist of the

conversation was?

A       Okay.  It was concerning the fact that John Moss had

made a statement or confession to Trooper Woodyard en route from

Charleston to Mansfield, Ohio.

Q       Did Trooper Woodyard indicate to you whether or not

Michael Don Smith - Direct                                    2022

anybody was with him at the time this statement was made, any

other trooper?

    A    Randy Allen.

    Q    All right, at that time can you tell the Court whether

or not Trooper Woodyard related to you any portion of what John

Moss had told him, or the best you can remember?

    A    Trooper Woodyard -- It was just a simple matter that he

did confess.  And he advised me at that time there wasn't a lot

of detail.  I remember he told me he had asked some questions

about Paul Reggettz, as to his involvement, and that John had

advised him Paul had no involvement in the murders, and that

John advised that he did murder the mother, Vanessa, and the two

children, Paul Eric and Bernadette.

    Q    About how long did this conversation take place on this

subject?

    A    I would say ten minutes took care of it.

    Q    Had you met there in the corporal's office to talk

about this, or how did that come about, as well as you remember?

    A    As well as I remember, it was in the morning, and we

had just run into each other, and that is part of what the

conversation was about.

    Q    What, if anything, did you tell Woodyard you would do?

    A    Well, Woodyard asked me if they would be interested in

that in the prosecutor's office; and I advised him I would check

Michael Don Smith - Direct                                    2023

and get back to him.

     Q    Did you check?

     A    Yes, I did.

     Q    Do you remember whether or not you checked that day?

     A    I am wanting to say it was a day or maybe two days later.

     Q    Who did you check with at the prosecutor's office?

     A    Chuck Pettry.

     Q    Can you tell the Court whether or not Chuck Pettry had been involved in any portion of the case up to this point in time?

     A    Chuck Pettry, as far as I know, was the assistant as far as that case went; and that is who we communicated with, you know, if Mr. Roark wasn't there present.  And a lot of times, if Mr. Roark was there, we would communicate with him.

     Q    Who was the other trooper who worked with you in investigating this case?

     A    Trooper Williams, Terry Williams.

     Q    Was Terry Williams present with you in the corporal's office?

     A    Yes, he was.

     Q    Was Terry Williams present when this statement was made?

     A    By?

     Q    By Trooper Woodyard?

     A    Yes.

     Q    How did you contact Chuck Pettry.

Michael Don Smith - Direct                                    2024

    Q    Well, we were just there.  I was there at the prosecutor's office and spoke with him face-to-face at the prosecutor's office.

    Q    All right, and did you relate to Pettry any of the details or anything that Woodyard had told you?

    A    I related to Pettry that Woodyard had come back and advised me about obtaining the statement, the confession, on the way back, that there wasn't a lot of detail, just the fact that Mr. Reggettz was not involved and that he admitted to murdering the mother and her two children, and also that the statement ended up, at the end of Woodyard's conversation, was that he really didn't want to talk to him about it any more at the end, or preferred not to.

    Q    Was any other trooper present when you talked to Chuck Pettry?

    A    Trooper Williams.

    Q    Was anybody else present with Chuck Pettry, any other member of the prosecutor's office?

    A    Not that I can recall, no.

    Q    Do you remember whether or not Pettry gave you an answer at that time?

    A    Yes, he did.

    Q    Tell the Court what he said.

    A    That it wasn't needed or it wasn't necessary.

Michael Don Smith - Direct                                    2025

Q    All right, did you make any response to that?

A    Just that I would let Woodyard know.  That is all it
was about, I was letting him know what Woodyard told, what it
was all about, whether or not they wanted it or would be needed.
And like I said, it was just repetitious and wasn't necessary or
needed at that time, as far as he was concerned.

Q    Did you leave after that?

A    I couldn't tell you whether I left right then or not.

Q    After that conversation with Mr. Pettry, did anybody
from the prosecutor's office ever get back to you or to Terry
Williams, if you know, concerning this statement?

A    Not that I am aware of.

MR. BROWN:  That's all the questions I have.

THE COURT:  Cross?

                                        CROSS-EXAMINATION

BY MR. McKITTRICK:

Q    As I understand it, Pettry said, "Well, this is
repetitious, not very much detail", and he told you he didn't
want it, is that right?

A    That was the understanding I had, that it was just the
same or repetitious, there wasn't very much detail involved in
it, that it wasn't needed or it wasn't necessary.

Q    All right now, tell His Honor what did you tell Pettry?

A    I remember telling Pettry that Woodyard came back and

Michael Don Smith - Cross                                    2026

told me that on the way back from Charleston to Mansfield, Ohio,

that they spoke with John concerning the Reggettz murders, and

that he had been advised of his rights at the time this was

being done, and that questions were asked if there was any

involvement as far as Paul Reggettz, and that John had advised

them no, that questions was asked, "Did you murder them" or,

"Did you murder the lady" or the mother.  "Yes."  "Did you

murder the child?"  "Yes", naming the boy.  "Did you murder the

girl?"  "Yes".  That he admitted to murdering all three, and that

it ended up that they had talked to him and there wasn't a lot

of detail overtop of what was already there, and that it was

ended by saying, "Would you prefer not to talk about this any

more", or "Do you not want to talk about this any more".

    Q     That is what you told Pettry?

    A     That is what I remember telling Pettry, yes.

    Q     Is that the essence of what you remember Woodyard told

you?

    A     Yes.

    Q     Same thing?

    A     Yes.

    Q     Was there any difference?  Do you remember anything

different from what Woodyard told you as to what you told

Pettry?

    A     Well, I tried to relate to Pettry as much as I could

Michael Don Smith - Cross                                    2027

remember exactly what Woodyard told me.

    Q    So it was probably the same or the essence was the same?

    A    Yes.

    Q    Did you think it was necessary for you to have Trooper

Woodyard draft an activity of exactly what was said between he

and John Moss so that Pettry could go over that activity report?

    A    No, I didn't.

    Q    Let me ask you this:  When you were at the academy you

had a course called "Criminal Investigations", is that correct?

    A    Yes.

    Q    Who was your teacher?

    A    I couldn't tell you.

    Q    Do you remember the nature of the book that you had?

    A    I don't think we had a book.

    Q    You didn't have a book?

    A    No.  We could have had more than one instructor as far

as that goes.

    Q    Let me ask you this:  Is this the book you had when you

were at the academy?

    A    I don't think we had a book.

    Q    Did you ever see this book?

    A    If I did, I don't remember it.

    Q    You never used it?

    A    No, sir.

Michael Don Smith - Cross                          2028

Q    Do you want to look through it to make sure now?

A    I don't need to look at the book because I'm sure I have never had the book as far as studying it or having it in class.

Q    When you were at the academy and you had "Criminal Investigations", you were taught how to prepare a report, is that correct, investigation reports?

A    Yes.

Q    An investigation report?

A    Yes.

Q    In the allegations of murder against John Moss and Paul Reggettz, you and Trooper Williams participated in writing the investigation report, as you have told us in previous hearings, is that correct?

A    Yes.

Q    Now, Mike, one of the things that you learned at the academy and you learned as a trooper in preparing a report is that the report should be accurate and should contain anything that is relevant to proof or non-proof in the case. Isn't that a fair statement?

A    I can't say I have ever heard it worded exactly like that. I can't recall that.

Q    Have you ever been told that everything you do as far as an activity is concerned where proof might be used in the case should be placed in your activity report?

Michael Don Smith - Cross                    2029

A       If you think it is going to be used in that case, yes.

Q       Are you saying that because you were told by Pettry that
this evidence should be rejected, "We are not going to use it",
that you took it upon yourself not to put it in your report?

A       That probably swayed my decision.

Q       Did you agree with that, with Pettry?

A       At that time?

A       Yes.

Q       Probably; I feel like I did.

Q       Did you discuss with Trooper Williams the decision that
Pettry made?

A       I can't recall whether we discussed Pettry's decision
or not when we left.   No, it was accepted as far as I was
concerned.

Q       Well, you did tell His Honor that Trooper Williams was
present at the corporal's office when Woodyard told you about
taking this confession from John Moss, isn't that correct?

A       Yes.

Q       And that Williams was present in Pettry's office, the
prosecutor's office, when you discussed whether or not that
evidence would be used, isn't that correct?

A       Yes.

Q       Now, did you and Williams ever discuss this confession
that Woodyard took from John Moss, other than in the presence of

Michael Don Smith - Cross                          2030

Woodyard, when he told you in the corporal's office, and in the

presence of Pettry when you talked to him in the prosecutor's

office?

    A    If I did, I don't remember doing it.

    Q    Do you remember that you and Trooper Williams were of

the same mind not to place this confession or a note that the

confession was taken in the investigation report?

    A    I'll say that was my decision as far as I go.  I

can't speak for Trooper Williams, how he felt about it.

    Q    He was one of the two chief investigating officers?

    A    Yes, sir.

    Q    Did he disagree with it?

    A    As far as I remember, once we talked with Mr. Pettry,

that was the end of it.

    Q    It was just forgotten?

    A    It was forgotten by me, and I don't remember discussing

it any further other than letting Woodyard know what his answer

was.

    Q    You have already testified in the suppression hearing

here concerning the confession, haven't you, in this Court,

concerning the John Moss case?

    A    Which confession?  You are not talking about

Woodyard's, are you?

    Q    You have already testified in a suppression hearing

Michael Don Smith - Cross                                    2031

before His Honor in the John Moss case concerning the

confessions of John Moss, haven't you?

    A    Yes, concerning confessions, yes, sir.

    Q    You never mentioned one time knowing that Trooper

Williams had taken a confession of John Moss subsequent to the

one you took on the 28th day of October, 1980, did you?

    A    No, I didn't.

    THE COURT:  Now, I want to make sure that I understand.  In

other words, you knew of the existence of this purported oral

confession back in 1980; you discussed it with Woodyard or

Woodyard discussed it with you?

    THE WITNESS:  Yes, sir.

    THE COURT:  And then you went to Pettry's office.  Pettry

said it wasn't needed, it was redundant and superfluous.  Is

that correct up to that point?

    THE WITNESS:  Yes, sir.

    THE COURT:  But you knew about it three years ago?

    THE WITNESS:  Yes, sir.

    Q   Now, you have worked in this case since its inception,

isn't that correct, because you were the chief investigating

officer and were assigned by Dave Lemon on the first day that it

happened to start investigating the Paul Reggettz murder case,

which subsequently turned into the John Moss murder case?  Isn't

that a fair statement?

Michael Don Smith - Cross                              2032

    A     Yes, but I would say Trooper Williams and myself were
equal --

    Q     Okay, that's fine.  But you have been in this case
since its inception?

    A     Yes, sir.

    Q     And since that time you have been through various
proceedings in this case concerning the allegations of murder
against John Moss, haven't you?

    A     Yes, sir.

    Q     And in every proceeding the confession of John Moss was
introduced, is that correct?

    THE COURT:  Be fair to him.  Are you talking about the one
on tape?

    Q     Both of them, the one on tape and the oral confession
before the tape.

    A     I think.  To the best of my knowledge they were all
introduced.

    Q     And that included but was not limited to two transfer
hearings and a suppression hearing and a preliminary hearing,
correct?

    A     Okay, I only remember testifying in one suppression
hearing and one transfer hearing.

    Q     That's correct.  You testified in one suppression
hearing and one transfer hearing, is that correct?

Michael Don Smith - Cross                                    2033

A     Yes.

Q     And in neither of those did you mention this confession
taken by Woodyard?

A     No, sir.

Q     Now, as I understand it, the only persons that know
about this confession are Woodyard, Pettry, Williams and
yourself and Randy Allen?

A     That is the only ones that I know of.  It is my
understanding that other people are aware of it now, but up
until now --

Q     I'm talking about before.

A     That's all I am aware of.

Q     And over the three and a half years that this case has
been litigated and gone through various proceedings, there have
been no less than eight assistant prosecutors or prosecutors
handling this case, has there?

A     I don't know how many there are.  I know it has been
numerous.

Q     And you didn't mention this confession to any
prosecutor except Pettry?

A     That's right.

Q     Now, Mike, let me ask you this question:  On the 28th of
October, 1980, you and Terry Williams went to Mansfield, Ohio,
picked up John, took him back to Parkersburg, West Virginia, and

Michael Don Smith - Cross                              2034

there secured a confession from him or two confessions, however

you want to read it.  Isn't that a fair statement?

    A    There was an interview, question and answer period, and

then there was a taped confession, yes.

    Q    Those confessions were to the murders of three people.

Isn't that a fair statement?

    A    Concerning three murders, yes.

    Q    Those confessions admitted the murdering of three

people.  Isn't that a fair statement?

    A    Yes.

    Q    Now, did you consider at that time, after you had the

confession of John Moss to three murders, that John Moss was

under arrest for those murders?

    A    Did I consider that?

    Q    Yeah.

    A    I can't say that I considered, you know, hey, he was

under arrest, because I was going to advise the prosecutor's

office of what we had and leave that decision up to them as to

what they wanted to do and how they wanted to do it.

    Q    Are you telling His Honor that you didn't think that

you had probable cause to believe a crime had been committed

after you had been the chief investigator for eleven months

in three murder cases when you got a confession from John Moss?

    A    Certainly.

Michael Don Smith - Cross                              2035

Q    Did you believe you had probable cause to believe that
John Moss committed those crimes?

A    I felt that way.

Q    If John Moss had not been in custody as a result of you
bringing him back from Mansfield, Ohio, and you were up in Cabin
Creek, West Virginia, and you picked John Moss up and he
confessed, would you have arrested him, or would you have left
him go?

A    I don't think I would have let him, go, but I would
have checked with the prosecutor's office and made them aware of
what we had.  I think at that time there was a big change, like
Mr. Roark was in, and he wanted to keep on top of pretty much
everything, what was happening in the more important cases as to
what you had, what was going on.

Q    I thought you couldn't get hold of the prosecutor's
office at night; it was 1:00 at night and you couldn't get hold
of anybody?

A    We never had any problems getting hold of somebody.

Q    Let's assume you couldn't.  Just hypothetically, what
would you do, let that suspect of three murders go?

A    I would have gotten hold of somebody.

Q    I said assume hypothetically you couldn't.

A    I would probably in a case like that detain him until I
could get hold of somebody.

                                                      2035

Michael Don Smith - Cross                                    2036

    Q     When you detain somebody, they are under arrest.  Isn't
that what the law says?

    A     I am not so sure that is a fair statement the way you
say it like that.

    Q     Can you just pick somebody up in West Virginia on
suspicion?

    A     No, sir.

    Q     So what you are telling His Honor is that you felt you
had probable cause to believe that a crime had occurred and
probable cause to believe that John Moss had committed those
crimes once you secured those confessions?

    A     I felt that way, yes, sir.

    Q     Now, what time did John Moss leave Parkersburg,
West Virginia, for Charleston, West Virginia?

    A     It was sometime between 10:30 and 11:30.

    Q     How long after the confessions were finished did he
come back?

    A     You mean did they leave Parkersburg?

    Q     Yes.

    A     I would say 10:30 would have been the end of the tape,
summed everything up as far as the confessions went.  I would
say within an hour he would have left.

    Q     Do you know whether or not it was arranged to take John
Moss before a magistrate or other judicial official at that

Michael Don Smith - Cross                                    2037

time?

    A    I couldn't answer.

    Q    Do you know that the law in West Virginia requires that a person who is charged with crime be taken before a magistrate without undue delay?

    A    It has always been my opinion you take them and process them as soon as available or as soon as possible.

    Q    Was there anything that prevented these officers, to the best of your knowledge, from taking John Moss before a magistrate between the time he arrived back in Kanawha County, West Virginia, which would have probably been 12:30 or 1:00 on the morning of October 29 and 9:00 on the morning of October 30, when he was taken back to Mansfield, Ohio?

    A    I couldn't honestly answer that because those type of papers that they had I am not that familiar with, and I don't know whether they call it taking him before a magistrate, or you know, when they are incarcerated, taking them before a circuit judge.

    Q    Are you saying that because a person confesses to a triple murder in the State of West Virginia, because he has been brought back here on a detainer, he has no less rights than a person who is charged with murder in this state?  Is that what you're telling His Honor?

    A    You've got me a little confused now.  Are you talking

Michael Don Smith - Cross                          2038

about what he was originally brought back on?

    Q    That has nothing to do with it.  You took two

confessions from a man that said he committed a triple murder.

I'm asking you if in your mind that man, pursuant to West

Virginia law, had the right to be taken before a neutral

judicial magistrate or judicial official without unnecessary

delay.

    A    If you were going to charge him with that, yeah, at

that point.

    Q    I see.  That's why my question hypothetically is very

important in this case.  Do you understand my question now about

the man in Cabin Creek where you couldn't get hold of the

prosecutors?

    A    I'm saying if you charge someone, yes, you need to take

him before a magistrate.

    Q    Are you telling His Honor that John Moss was not

charged with murder?

    A    At that time?

    Q    Yes.

    A    No, not by me.

    Q    How do you charge a person?

    A    Normally you would end up telling him that he is under

arrest or you would go get a warrant.

    Q    Do you have to tell a person he is under arrest in

Michael Don Smith - Cross                                    2039

order for him to be arrested?

    A    Well, I think you would tell someone if that is what

your intentions are.

    Q    Do you think that is necessary for a person to be

arrested?

    A    You can arrest without a warrant, so I would think that

if you are going to arrest someone you would tell them that,

yes, you are under arrest.

    Q    But you are telling the Judge that John Moss was not

charged with murder?

    A    That night?

    Q    Yes.

    A    Not by me.

    Q    When was he charged?

    A    I would have to look back and see the warrant.  I'm not

sure.

    Q    All right, let me ask you this then:  When in your

opinion, pursuant to West Virginia law, where the accused has

the right to be taken before a neutral judicial official

without unnecessary delay should John Moss have been charged

with murder?

    A    Should he have been?

    Q    When should he have been?

    MR. BROWN:  Objection, Your Honor.  There isn't any good

Michael Don Smith - Cross                                    2040

answer to that.  You don't have to make an arrest just because

you have probable cause.  You can have probable cause today and

not arrest for a year.  There is no good answer to that question.

   MR. McKITTRICK:  I didn't ask for a good answer.  This man

is a trained police officer.  He took the confessions.  I'm

asking for his answer.

   THE COURT:  I think you are going a hundred miles afield.  I

wish you would get back to the issue we are here on.  I will

overrule the objection one time.  Let's go.

   Q    Can you answer that question?

   A    Would you restate the question again.

   THE COURT:  The court reporter will read back the question.

   MR. BROWN:  Renew my objection.

   THE COURT:  If he can answer it, he can answer it.  If he

can't answer it, just state that he can't answer it, although I

have no idea what this has to do with the suppression hearing we

are here for.

   MR. McKITTRICK:  Judge, that is what I'm going to tell you

after this is over.

   A    I'm not sure, but I believe there is maybe a couple --

I'm not sure how to answer that, because I think the way you are

wording the questions, number one, you are saying "When should

he be" like before, and then you are saying "Should I have

arrested him".

Michael Don Smith - Redirect                               2041

    Q    That's what I'm asking you, when should --

    A    You take him before a magistrate after you arrest him, but I'm telling you I did not arrest him that night.

    Q    I'm asking you was he ever arrested when he was in the State of West Virginia.

    A    I'm telling you I really can't answer that because I really don't know.

    Q    Who did arrest him, Mr. Smith?

    A    I really don't know.

MR. McKITTRICK:  That's all.

THE COURT:  Do you have any redirect?

MR. BROWN:  Yes, sir.

- o -

REDIRECT EXAMINATION

BY MR. BROWN:

    Q    Do you know whether or not Mr. Pettry ever communicated anything to Mr. Roark about this statement, if you know or if you heard?

    A    No.

    Q    No, you did not know?

    A    No, I wasn't told.

MR. BROWN:  That's all the questions I have.

MR. McKITTRICK:  I have no others.

THE COURT:  All right, Trooper Smith, you are excused.

2042

(Witness excused.)

- O -

THE COURT:  Are you going to call Williams?

MR. BROWN:  No, I don't think so.  I just want the Court to take judicial notice of the prior Miranda warnings and statements that were introduced before this Court concerning the October 28 suppression.

MR. McKITTRICK:  I assume this is a continuation of the suppression hearing we have already had.

THE COURT:  I was under the impression that the suppression hearing today was for the purpose of ruling on the purported oral confession taken on October 30, 1980.  I have ruled on all the other confessions.

MR. McKITTRICK:  I'm not talking about that, Judge.  What I'm saying is that there is continuity in the evidence, that the evidence used in that suppression hearing has already been heard by the Court and can be used in this.  I have no objection to that if that is what Pete is saying.

MR. BROWN:  Just the fact that he was given his rights on three other times.

THE COURT:  All right, I'll take judicial notice that he has been given his Miranda warnings on at least three other occasions.

Now, do you want Williams?

Terry Williams - Direct                                    2043

    MR. McKITTRICK:  Yes, Your Honor.

    THE COURT:  Are you finished with your case?

    MR. BROWN:  Yes, Your Honor.

<div align="center">- 0 -</div>

<div align="center">TERRY WILLIAMS</div>

    Being thereupon called as a witness in behalf

of the Defendant after being duly sworn

testified as follows:

<div align="right">DIRECT EXAMINATION</div>

BY MR. McKITTRICK:

    Q    State your name please.

    A    Terry Williams.

    Q    Mr. Williams, are you employed?

    A    Yes.

    Q    Where are you employed, sir?

    A    Department of Public Safety.

    Q    And how long have you been employed there, sir?

    A    Twelve years and three months.

    Q    Let me direct your attention to the 28th day of

October, 1980.  Do you remember that day?

    A    Yes.

    Q    On that day I believe you and Trooper Mike Smith went

to the State of Ohio and brought John Moss back to Parkersburg,

West Virginia where you secured an oral and a taped confession.

Terry Williams - Direct                                    2044

Is that a fair statement?

    A    Yes.

    Q    All right now, after you secured those confessions, it is my understanding that you and Trooper Smith went to the State of Ohio?

    A    Yes.

    Q    After you returned to West Virginia from the State of Ohio, I take it that you worked in the ordinary course of your employment, is that correct?

    A    Yes.

    Q    Where were you assigned at that time?

    A    South Charleston.

    Q    Were you present in Corporal Cook's office at the South Charleston Detachment when a conversation took place with Trooper Woodyard concerning a confession secured from John Moss when John Moss was returned to Mansfield, Ohio?

    A    Yes.

    Q    Tell us when that occurred.

    A    I don't know the exact date.  It was about a week or so, maybe less.

    Q    Who was present at that conversation?

    A    Myself, Trooper Smith and Trooper Woodyard.

    Q    Now, how was it that that conversation took place? Did you all agree to meet there or what?

Terry Williams - Direct                                    2045

    A    I don't know that we all agreed to meet there.  We were

all stationed -- Wait a minute.  I don't know whether Mike was

still stationed there or not.  I don't know how we come to meet

there.

    Q    Did you all have a conversation?

    A    Yes.

    Q    What was the substance of the conversation?

    A    Trooper Woodyard was telling Trooper Smith and myself

about John Moss confessing to him and Trooper Allen.

    Q    Was there anyone else present there?

    A    Not that I can recall.

    Q    What did Woodyard tell you?

    A    I don't remember him going into any kind of detail

other than I remember him saying John confessed to killing

Vanessa and the kids, and basically that is about all I remember

other than, you know, near the end he said after he questioned

him for a while he asked John if he would rather not talk about

it any more, and John said no, he would rather not talk about

it; and Woodyard didn't ask him any more after that.

    THE COURT:  What date was this on that Woodyard told you

about Moss' confession?

    THE WITNESS:  I don't remember the exact date.  It was about

a week or so after, maybe less.

    THE COURT:  After the 28th?

Terry Williams - Direct                                    2046

THE WITNESS:  After the 30th.

THE COURT:  Oh, okay.

Q     Now, did that piece of evidence, that confession of John Moss, where Woodyard and Allen had talked to John Moss, after the 28th of October interest you as one of the two investigating officers of the John Moss case?

A     Well, I thought it was interesting at that time, yeah.

Q     Now, as I understand it, the conversation was left that you and Smith would go and talk to the prosecutor about what they wanted to do about this confession?

A     We told Woodyard that we would tell the prosecutor about it.

Q     Did you do so?

A     Trooper Smith did.

Q     Were you present?

A     Yes.

Q     All right, how long after your conversation with Woodyard did that take place?

A     I'm thinking it was two or three days later, maybe the next day.  I don't remember exactly the day.

Q     Where did you meet Pettry?

A     I am sure it was here in the prosecutor's office.

Q     You are sure of that?

A     I'm pretty sure, yes.

Terry Williams - Direct                                    2047

Q    What was the essence of that conversation?

A    Trooper Smith told Pettry what Woodyard had told us.

Q    What did he tell Pettry?

A    He told him John Moss had confessed to Trooper Woodyard and Trooper Allen.

Q    What did you say to Pettry?

A    I didn't say anything.

Q    You just listened?

A    Yes.

Q    Let me ask you this then, Trooper Williams:  What you are telling this Court then is that you, as one of the two chief investigating officers, was familiar with the fact that other officers had talked to John Moss and secured a confession from him after October 28, 1980.  Is that true?

A    Yes.

Q    Have you ever given an inconsistent statement at any time?

A    What do you mean by inconsistent statement?

Q    Have you ever said you had no knowledge of anybody talking to John Moss about the Reggettz murders?

A    I don't remember if I have or not.

Q    Let me ask you this:  Do you remember a preliminary hearing in the John Moss case on January 12, 1981, some two months after you took confessions from John Moss?

Terry Williams - Direct                                    2048

    A    I remember having preliminary hearings.  I don't know

the dates.

    Q    Would you say to His Honor sitting on this bench that

your memory was better two months after you took confessions

than it is today?

    A    It probably is.

    Q    Do you remember being asked these questions and giving

these answers on that date --

    MR. BROWN:  Is he impeaching his own witness, Your Honor?

    THE COURT:  Apparently he is trying to.

    MR. McKITTRICK:  State vs. Cofer that just came down this

week says that --

    THE COURT:  Oh, just came down this week.  May I have the

benefit of seeing it please.

    MR. McKITTRICK:  If I have it with me.

    (Whereupon, a discussion was had off the record and then

resumed back on the record as follows:)

    THE COURT:  I will accept your representation as an officer

of the Court.  What does it hold?

    MR. McKITTRICK:  It holds that there is no such thing as

calling your own witnesses in a criminal case and vouching for

their credibility any more.  And not only that, that is

consistent with State vs. Seth and State vs. Spadafore in this

state.

Terry Williams - Direct                                    2049

THE COURT:  I must confess with the rapid changes in the law
which come down from our Supreme Court, I'm really not sure
whether at this point you may be right or may not be right.  The
case came down this week, so it may not be the case last week
and may not be the case next week.  Go ahead.

MR. McKITTRICK CONT:

Q   Let me ask if you were asked this question and if you
gave this answer:

"Q   To your knowledge did any other personnel of any other
police agency talk to John Moss after you left Parkersburg for
Cleveland on the 28th day of October, 1980, about the Reggettz
homicides?

"A   Well, that's hard to say.  There was two took him back
to Ohio the next day as I understand.  I don't know whether they
talked to him or not.  To my knowledge they didn't.

"Q   In other words they didn't come to you and report it to
you so you could put it in your activity that he made any
incriminating statements?

"A   No.

"Q   And they would have done so, normally speaking, in the
ordinary procedures?

"A   I'd hope."

Do you remember giving those answers?

A   If you say I did.

Terry Williams - Direct                                    2050

    Q    And at page 178 of the same transcript do you remember

being asked this question and giving this answer:

    "Q    Now, other than this conversation on the 29th of

October, 1980, that Trooper Smith had with John Moss on the

phone, to your knowledge did anyone associated with any police

agency after that time have any conversation with John Moss

about the Reggettz homicides?

    "A    Not to my knowledge."

    Now, Trooper Williams, which one of those stories are

correct, the one you gave His Honor in the courtroom today or

the one in that transcript?

    A    Today.

    Q    Even though you have already indicated to His Honor

that your memory was better two months after you took the

confession?

    A    I said it would probably have been better back at that

time, but evidently I didn't remember.

    MR. McKITTRICK:  That's all the questions I have.

    MR. BROWN:  I don't have any questions.

    THE COURT:  All right, Trooper Williams, you are excused for

now.

    (Witness excused.)

    THE COURT:  Who is your next witness?

    MR. McKITTRICK:  John Moss.

John Moss - Direct                                    2051

- o -

JOHN MOSS,

Being thereupon called as a witness in his

own behalf, after being first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. McKITTRICK:

Q    Your name is John Moss?

A    Yes.

Q    You are the accused in this proceeding?

A    Yes.

Q    You have already testified?

A    Yes.

Q    John, I want to direct your attention to the 28th day

of October, 1980, when you were brought back to Charleston,

West Virginia, from Mansfield, Ohio.  On the morning of the 28th

of October what time did you awake?

A    About 4:00 a.m.

Q    Why did you awake so early?

A    I had to work.

Q    Where did you work at that time, John?

A    I worked in the kitchen in Ohio there at the

reformatory.

Q    What did you do in the kitchen?

John Moss - Direct                                    2052

    A   I worked at the ateam table.

    Q   Did you arise every morning at that time?

    A   Yes.

    Q   Now, John, there has already been testimony here that you were picked up by Trooper Smith and Trooper Williams and brought back to Parkersburg, West Virginia, and then returned to Charleston, West Virginia, is that correct?

    A   Yes.

    Q   And you have already testified as to the facts that occurred in that interim period, is that correct?

    A   Yes.

    Q   Now, when you -- What time approximately, to the best of your memory, did you get to bed that night after being booked at the Kanawha County Jail?

    A   It was real early in the morning.

    Q   Do you know what time approximately?

    A   I would say about 2:00 or 2:30.

    Q   Did you sleep that night, John?

    A   No.

    Q   What was the reason that you didn't sleep that night?

    A   Well, I was sore from what I went through on the way down here to Charleaton.

    Q   You have already testified about that to His Honor?

    A   Yes.

John Moss - Direct                                                2053

    Q    Did you sleep any that night?

    A    I just laid down, tried to lay down.  I didn't sleep
any.

    Q    Now, the next day, did you have occasion to sleep the
next day?

    A    No.

    Q    Did you see Mr. Pettry the next day?

    A    Yes.

    Q    All right now, the next night, did you sleep the next
night?

    A    I kind of dozed off, but I wasn't asleep.

    Q    Why not?

    A    I was sore from what I went through on the 28th.

    Q    Was there any other reason?

    A    What day was you talking about?

    Q    This is the day after or the night after that you were
brought back.

    A    The 29th?

    Q    Yes.

    A    No, I wasn't asleep.

    Q    All right now, the next morning is when these troopers
came and took you to Mansfield, Ohio, is that correct?

    A    What about it now?

    Q    The morning of the 29th or the morning of the 30th of

John Moss - Direct                                    2054

October, 1980, is when these two troopers came and picked you up

and took you back to Mansfield, Ohio, is that correct?

    A    Yes.

    Q    All right now, while you were in the car with these

troopers, did you have any conversation with them concerning the

Reggettz murders?

    A    No.

    Q    Did they have any discussions with you whatsoever?

    A    About these murders?

    Q    About anything.

    A    They asked me did I know anything about a case similar

to this one that happened in Columbus.  I told them I didn't

know nothing about it; I had never been to Columbus.

    Q    Other than that, did you have any discussions with

them?

    A    They asked me did I want a milkshake.

    Q    Did they stop and get you a milkshake?

    A    Yeah.

    Q    Other than that --

    A    They asked me was I willing to talk to them.  I said I

wasn't, I didn't have nothing to say to them.

    Q    What did you do most of the time from the time you left

Charleston until you got to Mansfield?

    A    Tried to sleep.

John Moss - Direct                                    2055

     Q    Did you sleep?

     A    Off and on.

     Q    When they asked you would you talk to them, what were they asking you to talk about?

     A    They asked me -- Woodyard, the last one that testified here, he asked me did I really confess to it, did I really do it. I told him I didn't have nothing to say about it.

    MR. McKITTRICK:  That's all the questions I have.

    MR. BROWN:  I don't have any questions.

    THE COURT:  All right, you may step down.

    (Witness stands aside.)

    THE COURT:  Any other witnesses?

    MR. McKITTRICK:  No, sir.

    THE COURT:  Any argument?

    MR. McKITTRICK:  Yes, Your Honor.

    The State has the burden in this matter.

    MR. BROWN: Not the burden of going forward, Your Honor, but I'll take it.

    Well, Your Honor, this defendant was given his rights, I think the record will show, approximately three times on October 28 in connection with the taped confession.  I am sure you have heard those plenty of times.

    He arrives at the jail, and he says he goes to bed about 2:30 on the morning of the 29th.  The next morning he goes back

2056

to, not the morning of the 29th, but the next morning, which is
the 30th, he goes back to Ohio again.  And as I understand it,
he was to be sent back to Ohio to be set up on formal charges,
to get the proper papers to bring him back on charges of murder.
He was given his rights again.  This defendant received his
rights at least four times, Your Honor.

The case of State of West Virginia vs. Rob Wilcox, a
January 19, 1982 case, says that a waiver need not be in writing
although I believe there are already two waivers that this
defendant had received within forty-eight hours that were in
writing.  We are speaking now for our purposes as to the second
confession and to the waiver that was given in the car.

In the Wilcox case the trooper testified that the defendant
had made an oral statement after he had been advised of his
constitutional rights.  He indicated he understood them and
agreed to answer questions.  There was no other officer present,
and the defendant did not sign a written waiver of his Miranda
rights.  The Court held that, "It is not invariably necessary
that a person under investigation make an explicit oral or
written statement of the waiver in order that it may be properly
concluded as a matter of law that the person has waived their
right to counsel as guaranteed by the West Virginia Constitution
and the United States Constitution."

The two troopers testified that they did in fact give him

2057

his rights.  Trooper Allen said he read him his rights from a card; he had surrendered the card.  He went to the trouble to seek a duplicate card, Your Honor.  He said he had turned in the previous old styled Miranda card, and he had gone to the trouble to get one here for the Court.

I think Trooper Allen also indicated to the Court he had been on pretty short notice by the time he got to our office as to what we wanted him to do, that we wanted him to relate his statement as he remembered it.  He said he remembered it.  He said it was a triple murder.  He remembered it.  At no point did any of the officers indicate that this defendant wanted to exercise his rights, but only towards the end of the statement he indicated, or they felt he didn't want to talk any more; and they asked him if he didn't.  He said he didn't; and at that point they quit going ahead with taking the statement.

They also indicated, Your Honor, that they came back and reported it to the investigating officers.  The investigating officers reported it to the prosecutor's office.  The prosecutor's office indicated at that time they didn't need it or didn't want it.  It was not exculpatory, Your Honor.

I believe that the law is it must be exculpatory.  I would cite to the Court State vs. Trolly Hatfield, a January 26, 1982 case, "When the trial court grants pre-trial discovery motion requiring the prosecution to disclose evidence in its

2058

possession, non-disclosure by the prosecution is fatal where it is prejudicial."  There is no exculpatory evidence contained in that statement, Your Honor.  And the Court in Hatfield cites United States vs. Agurs, 427 U.S. 97:

". . . necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.  This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt, whether or not there is additional evidence to consider, there is no justification for a new trial."

They also cite State vs. McFarland.  In that case the prosecution withheld some evidence of a gun that they brought in on rebuttal.  The case was affirmed, Your Honor.

There is no indication anywhere in here that this defendant was denied his constitutional rights as pertains to Miranda for the purposes of this hearing.

MR. McKITTRICK:  Your Honor, firstly I think what we are talking about is fundamental fairness of the due process clause and the Fourteenth Amendment here and has very little to do with the Miranda rights, although the burden is on them to prove they gave the Miranda rights.  And even if they did, it is up to the Court to make that factual distinction.

Pursuant to the McNabb-Mallory Rule, which has been handed

2059

down since 1943 to the present date, the Supreme Court in
Mallory, after a defendant, who was accused of rape, was
interrogated for two hours before being taken to a magistrate,
without any allegation by the defendant that there was any
physical abuse or psychological abuse, the Court threw it out
because it said that when you consider the totality of the
circumstances, that he had an absolute right to be taken before
a neutral magistrate without unnecessary delay --

Now, here is a defendant that confesses to a triple murder
case at approximately 9:30 on the 28th day of October, 1980.
He is kept in the county jail for a day.  He is picked up by
troopers, and they still interrogate him without him being taken
before a neutral magistrate, where he is to be given not only
his rights, but if he could not afford it, then he would be
appointed counsel.  And therefore, there could be no discussions
with the defendant if he had counsel.

Now, there is no question in this case that initially in the
case John Moss has signed a pauper's affidavit.  That is part of
the record, and I would ask the Court to take judicial notice of
that fact; and was appointed two lawyers as a pauper.

Therefore, we contend, Your Honor, that his Fourteenth
Amendment rights have been violated.

Secondly, this Court has got to test what happened under
these circumstances as to whether or not it happened, to

2060

determine whether there is fundamental fairness here in the totality of the circumstances.

Here we have one officer who says he relied on the senior officer; and that officer takes the stand and says, "I wasn't the senior officer.  I was on the same level as him.  He could use his independent judgment merely to take out a pencil or a pen and write down this so-called confession."

. The question becomes whether or not the confession itself is credible after three and a half years.  We have got a state trooper that comes in here and testifies under oath that he was present at two meetings when this confession was discussed.  And when he testified two months after the confessions were taken from John Moss that no other officer, no other representative of a police agency had ever indicated that they had taken a confession or even discussed the Reggettz murders with John Moss.

Therefore, Your Honor, under the totality of the circumstances the evidence itself is not credible.

The Court has got to ask itself what legitimate means can the State use to try to convict the defendant.  That is a violation firstly, Your Honor, of this defendant's Fourteenth Amendment rights and also his Sixth Amendment rights.

We would also say that the cases Mr. Brown has cited for the Court had to do with rebuttal evidence.  This Court realizes

2061

what the rule in this State is with regard to rebuttal evidence.
This Court made a ruling that the State of West Virginia,
pursuant to Rule 16, would furnish the defendant with all
confessions.  The State did not do that.

    This Court has the discretion, Rule 16(2)(d)(2), to refuse
to allow the State now to present this evidence before the
Court.  And one of the things that the Court has to again take
into consideration in making that decision is the totality of
the circumstances that determine whether or not the evidence
itself is safe, whether it is acceptable.  And Your Honor, under
the evidence by these troopers and the conflicts and
inconsistencies in their own testimony and their lack of
remembering exactly what happened, the totality of the
circumstances indicate that to allow this evidence to go before
this jury would be a violation of this defendant's Fourteenth
Amendment rights and also a violation of his Sixth Amendment
rights, because this Court has already told the prosecution to
furnish to us, over a year ago, the confessions in this case.

    The Court well knows that these confessions were only
disclosed to us two weeks ago.

    THE COURT:  Any reply?

    MR. BROWN:  Yes, sir.

    This Hatfield case, Your Honor, State vs. Hatfield, in that
case, which the Court affirmed, it is when the State fails to

2062

disclose in advance of trial -- We are not in trial yet.  But the big thing is it has to be exculpatory, and this is not exculpatory evidence, Your Honor.  This is inculpatory; inculpatory, Your Honor.  That is the big thing about this confession.  Whether or not it is credible is a jury question.

The troopers, I think both of them said after the prosecutors said, "We don't need it", they just forgot about it. That might be a problem for a jury as to credibility or weight; but I don't think it is a problem for this Court.

Now, whether or not Mr. Moss was taken before a magistrate in the middle of the night, Your Honor, as you may remember, at that time Moss was a juvenile.  We don't take a juvenile before a magistrate.  They don't go before a J.P.  They went before referees as we call them.  And the juvenile referee is not available at 2:30 or 2:00, whenever.  He is available through the day.

In any event he was taken back to Ohio the next day, the 30th, to set up to bring back with the proper charges against him, Your Honor.

We feel that the confession meets the Miranda standards; it is not exculpatory; there is no surprise.  Although there was surprise when it came out, there is no surprise about what is in there.  Mr. McKittrick has heard about this.  He is well aware of what his client has said, and it is not going to hamper him

2063

in any manner, Your Honor.

THE COURT:  The Court makes the following findings of fact
and conclusions of law:

I think Mr. McKittrick was right that you have to look at
the totality of the circumstances; and should this ever reach an
appellate body, I suspect it is going to end up with about ten or
twelve volumes; so I am not going to burden it any more except
to say the record speaks for itself as to some of the issues
raised.

The State of West Virginia, the testimony I think is clear
from the record, only discovered this purported confession two
weeks ago, and advised counsel for defense promptly upon their
discovery.

Now, when I say the State of West Virginia discovered, that
is Mr. Brown and Mr. Stucky, because this matter has been in the
courts for some three years or more and there has been, for
whatever reason, I am sure at least six Assistant Prosecuting
Attorneys and at least two Prosecuting Attorneys.  And while
Pettry may not have decided that he wanted to use it, he never
told anybody else, the point being that Mr. Brown, who is now
assigned the case -- Again, for whatever reason, we have been
through as I say at least two prosecutors and six assistants --
As soon as Brown found out about it, he decided he did want to
use it.  And he only found out two weeks ago and promptly

2064

advised the defense.

There is testimony from Allen that Miranda was given. Allen testified he was on the department seven and one-half years, and I think it would be folly to conclude that he had not given Miranda hundreds of times. It would be sheer folly not to conclude otherwise. So the fact that he came in here with a duplicate card is of no moment. He testified he turned in the original to the Department of Public Safety when he left.

As you pointed out, these matters are discretionary with the court as to admissibility. I find and conclude that the confession is admissible and goes to its weight and not its admissibility, and that the defense would be entitled to an instruction at the conclusion of the trial on coercion of the confession if that is their position.

We have sat here for four weeks selecting a jury, and we have voir dired them individually. And after asking some forty prospective jurors these questions -- I haven't sat down and counted, but I know the State has fifty-six questions and the defense has thirty-three pages of questions. We have been here for a long time. And there is such a series of questions, I might add, on how the prospective jurors would see the testimony of a police officer. Several of the voir dire questions submitted by the defense included, but are not limited to, "Do you believe police officers are human? Do you believe they are

2065

sometimes over zealous in trying to accomplish their job?"  We
asked all those questions.

My point being finally that you can argue in your closing
argument that they are to give it that weight that the jury
feels it is entitled to.  You can further argue, and you are
very eloquent at it and good at it, you can certainly argue
about their faulty memory some three years later.

I find, therefore, that the confession is admissible and it
goes to its weight and not to its admissibility, and that you
can at the appropriate time offer an instruction as to coercion,
and you can argue as to their faulty memories.

For the aforesaid reasons, the motion to suppress is denied.
The confession will be admitted.  Note the objection and
exception of defense counsel.

(Whereupon, a discussion was had off the record and then
resumed back on the record as follows:)

THE COURT:  All right, let's recess for now and come back
tomorrow.

- 0 -

(Whereupon, a recess was had in the proceedings.)

- 0 -

STATE OF WEST VIRGINIA
**THIRTEENTH JUDICIAL CIRCUIT**
Judicial Annex
**CHARLESTON, WEST VIRGINIA 25301**
357-0361

JOHN HEY
JUDGE

December 29, 1983

F I L E D
In Kanawha Circuit Court
Clerk's Office

DEC 30 1983

Phyllis Jean Cole.
CLERK

Parrish McKittrick, Esq.
McKittrick & Murray
P. O. Box 4088
St. Albans, West Virginia    25177

Neva  G. Lusk, Assistant
   Prosecuting Attorney for Kanawha County
3d Floor, Judicial Annex Building
111 Court Street
Charleston, West Virginia    25301

                    Re:  State of West Virginia vs. John
                         Moss, Jr., a/k/a John Moss, III
                         CR-82-F-221

Dear Sir and Madam:

        This letter will serve as the Court's ruling on defendant's
motion to suppress blood samples, confession and other physical
evidence seized from the defendant, John Moss, Jr., a/k/a John
Moss, III.

        Counsel for the defendant submitted to the Court a rather
lengthy memorandum of law, including some 74 pages, in support of
defendant's motion to suppress.  The State replied by her Assistant
Prosecuting Attorney in a 19-page memorandum.  The Court, after
reading briefs of counsel, finds that the motion to suppress the
above-described items is without merit and doth deny the same.

        This Court, without attempting to write a long, detailed
opinion for the purpose of explaining its ruling, and for the sake
of brevity, advises counsel that many of the matters raised by
defendant's brief have previously been raised ad infinitum in
this Court and the West Virginia Supreme Court of Appeals.  With
respect to the motion to suppress the blood sample taken from the
defendant suffice it to say that the first blood sample taken was
ordered returned by the appropriate court in the State of Ohio;
that Court finding that the blood was taken not in accordance with
the appropriate Ohio statutes.  Subsequently, on April 22, 1980, a
second blood sample was taken from the defendant under an appro-
priate Court order from the Common Pleas Court of Cuyahoga County,

Parrish McKittrick, Esq.
        and
Neva G. Lusk, Assistant PA, Kanawha County
December 29, 1983
Page 2
_____

Ohio.  It is this second blood sample that defendant seeks to
suppress.  This Court finds that the Ohio court properly ordered
the blood sample taken from the defendant and to raise the de-
fense that, among other things, a responsible adult, such as the
defendant's parents, was not present is ludicrous at best given
the surrounding circumstances, i.e., defendant at that time had
obtained the age of eighteen and was incarcerated in an adult
penal institution in the State of Ohio serving a sentence for
rape/robbery/attempted murder of a Cleveland bus driver.  With
respect to counsel's argument that his lawyer was not present,
this Court, from a clear review of the record, finds that he had
no lawyer appointed for him on this particular charge, but, rather,
had a lawyer on a previous felony offense and said lawyer had no
standing in the issue of taking a blood sample from the defendant
pertaining to the instant case  (See cases cited in State's
Memorandum in Opposition to Defendant's Motion to Suppress).

        For the foregoing reasons and from a clear review of the
record in its entirety, the motion to suppress all matters
raised in defendant's brief is denied.

                        Very truly yours,


                        JOHN HEY
                        Judge


JH:dg

cc: Court file

243