IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JOHN MOSS, III,

      Petitioner,

v.                                    Case No. 2:09-cv-01406

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

On December 15, 2009, Petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 2). This matter is assigned to the Honorable Joseph R. Goodwin, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court is Respondent's Motion for Summary Judgment (ECF No. 17).

## PROCEDURAL HISTORY

**A.    Petitioner's criminal proceedings.**

On April 24, 1990, Petitioner was convicted of three counts of first degree murder in the Circuit Court of Kanawha County, for the murders of Vanessa Reggettz, age 26, and her two children, Paul Eric, age seven, and Bernadette, age four. The jury did not recommend mercy. (Case No. 82-F-221). Initially, Paul Reggettz,

the husband and father of the victims, confessed to committing the murders, and was charged with the crimes. However, as will be discussed below, blood evidence collected at the scene did not match either Mr. Reggettz or any of the victims. Reggettz later recanted his confessions.

This action concerns Petitioner's second trial and conviction for these murders. After being convicted in his first trial, the Supreme Court of Appeals of West Virginia (the "WVSCA") reversed the conviction on issues concerning a possibly tainted jury pool, improper remarks by the prosecution during closing arguments, and the improper admission at trial of evidence concerning a polygraph examination of Paul Reggettz. See State v. Moss, 376 S.E.2d 569 (W. Va. 1988)("Moss II").

In the WVSCA's opinion, the court also found that one of Petitioner's three alleged confessions was admitted in violation of the state's juvenile prompt presentment rule, but was otherwise voluntarily given. The court found that Petitioner's other two confessions were also voluntarily given, and were admissible because Petitioner had not objected to them on the prompt presentment basis. Id. at 580-81. These findings will be discussed in greater detail infra.

The decision in State v. Moss, overturning Petitioner's first conviction, was the second opinion issued by the WVSCA regarding Petitioner's criminal proceedings. In the first opinion, In the

Interest of John Moss, Jr., 295 S.E.2d 33 (W. Va. 1982)("Moss I"), the court reversed an order of the Kanawha County Circuit Court transferring Petitioner to adult status to be tried in the Circuit Court, with directions on several points, some of which form the foundation of claims raised herein and will also be discussed in greater detail infra.

After Petitioner was re-tried and convicted, he filed a Petition for Appeal in the WVSCA. (ECF No. 8, Ex. 3). Petitioner raised the following claims of error in his direct appeal:

1. The trial court committed reversible error when it failed to grant defendant's motion for a mistrial due to the prosecutrix's prejudicial and inflammatory statement during her closing argument.

2. The trial court committed reversible error when it failed to render inadmissible the two confessions of the juvenile defendant John Moss, Jr., which were obtained as a result of unjustified delay and were obtained prior to presentment to a neutral judicial officer.

3. The trial court erred in ruling that the State had met the burden of proof imposed upon it to establish that the electrophoresis multi-system technique enjoys general acceptance in the scientific community.

4. The trial court erred in ruling that the State had established a proper foundation for the introduction of electrophoresis multi-system blood stain test results, thereby rendering these results inadmissible as a matter of law.

(Id.) According to Petitioner's section 2254 petition, Petitioner, acting pro se, filed a supplemental petition, which contained the following grounds for relief:

3

1.    The trial court committed reversible error when it admitted Petitioner's confessions of the Reggettz murders into evidence.

2.    Improper closing arguments by the prosecution denied Petitioner a fair trial.

3.    The improper admission of serology test results denied Petitioner a fair trial.

4.    Petitioner was deprived of effective assistance of counsel and equal protection of the law.

(ECF No. 2 at 4).   On March 12, 1991, the WVSCA refused the Petition for Appeal.  (ECF No. 8, Ex. 3).

**B.    The investigations of the State Serology Lab.**

On June 2, 1993, the Prosecuting Attorney for Kanawha County, William Forbes, filed a petition with the WVSCA requesting the appointment of a circuit judge to conduct an investigation into the policies, procedures and records of the West Virginia State Police Crime Lab's Serology Division, to determine whether habeas corpus relief should be granted to prisoners whose convictions were obtained through the willfully false testimony of Fred Zain.[1]  The Honorable James O. Holliday, a retired circuit judge, was appointed to supervise the investigation.

---

[1]    This request was made following the 1992 reversal of defendant Glen Dale Woodall's conviction by the WVSCA, after DNA testing had conclusively established that he was not the perpetrator of his crime of conviction.  Zain had offered inculpatory evidence at Woodall's trial.  Woodall subsequently filed a civil suit against the State of West Virginia.  Thereafter, an internal audit of Zain's work was conducted by the State Police, which identified certain improprieties.  This investigation was then ordered by the WVSCA.

On November 4, 1993, following a five-month investigation, Judge Holliday filed his report with the WVSCA.  Judge Holliday made the following findings of fact:

> The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results. Moreover, the [American Society of Crime Laboratory Directors/Laboratory Accreditation Board [ASCLD]] concluded that this misconduct was "the result of systematic practice rather than an occasional inadvertent error." [Footnote omitted].
>
> * * *
>
> The overwhelming evidence of a pattern and practice of misconduct by Zain completely undermines the validity and reliability of any forensic work he performed or reported during his tenure in the serology department of the state police crime laboratory.  If the information which is now available concerning the pattern and practice of misconduct by Zain had been available during the prosecution of cases in which he was involved, the evidence regarding the results of serological testing would have been deemed inadmissible.

In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division, 438 S.E.2d 501, 516, 518 (W. Va. 1993)("Zain I").  Judge Holliday concluded that the findings of fact made in his report constituted newly discovered evidence, and

recommended that "as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding." Id. at 520.

Zain I opinion

On November 10, 1993, the WVSCA issued its opinion in Zain I. The WVSCA found that "Trooper Zain's pattern and practice of misconduct completely undermined the validity and reliability of any forensic work he performed or reported, and thus constitutes newly discovered evidence." Id. at 506.   The opinion then sets forth the appropriate standards of review for granting a new trial based on newly discovered evidence, and for granting habeas relief based on the use of falsified evidence.   Id. at 504-505.

The WVSCA agreed with Judge Holliday's recommendation that:

> in any habeas corpus hearing involving Zain evidence, the only issue is whether the evidence presented at trial, independent of the forensic evidence presented by Trooper Zain, would have been sufficient to support the verdict. As we earlier stated, once the use of false evidence is established, as here, such use constitutes a violation of due process.  The only inquiry that remains is to analyze the other evidence in the case under the [State v.] Atkins, [261 S.E.2d 55 (W. Va. 1979)] rule to determine if there is sufficient evidence to uphold the conviction.

Id.   The WVSCA applied the Atkins rule in its review of claims concerning falsification of evidence by Zain, stating:

> Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the

inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must be made to determine whether the error had any prejudicial effect on the jury.

Id.

### Zain II opinion

On May 20, 1994, before Petitioner had filed his first habeas corpus petition in the Circuit Court, the WVSCA issued its opinion in In re: An Investigation of West Virginia State Police Crime Lab Serology Division, 445 S.E.2d 165 (W. Va. 1994) ("Zain II"). In that proceeding, Judge Holliday was asked to investigate and report on whether other serologists at the State Police Crime Lab had committed acts similar to Zain. Judge Holliday found some evidence of errors by other serologists, but concluded that they were "relatively minor," "occasional" and "not the result of an intentional and systematic subversion of the criminal justice system." Id. at 167. Furthermore, the errors found "did not appear to have 'significantly compromised the prosecutions of the cases in which these other serologists were involved.'" Id. The ASCLD team that conducted the investigation noted that "No instance was found in which an error or omission was likely to have had a significant impact on the conclusion, nor the weight given to the conclusion, on an apparently probative item of evidence." Id. at

7

167 n.2.   On the basis of this report, the WVSCA held that
"serology reports prepared by employees of the Serology Division of
the West Virginia State Police Crime Laboratory, other than Trooper
Zain, are not subject to the invalidation and other strictures
contained in Zain I."   Id. at 168.

Zain III opinion

On June 16, 2006, the WVSCA issued its opinion in In re:
Renewed Investigation of the State Police Crime Laboratory,
Serology Division, 633 S.E.2d 762 (W. Va. 2006) ("Zain III").   In
that decision, the Court again addressed whether serologists in the
State Police Crime Lab, other than Fred Zain, falsified evidence in
criminal prosecutions.   In the course of this third investigation,
two expert witnesses, Mark Stolorow, Executive Director of Orchid
Cellmark Laboratories, and Ronald Linhart, an inspector with the
ASCLD, authored a joint report that was filed on December 2, 2004.
(hereinafter the "Stolorow/Linhart report").   Id. at 765.   The
Stolorow/Linhart report concluded:

> The errors found by this investigation were frequent,
> recurring and multifaceted, spanning the spectrum of
> examiners. However, it must be stressed that in only one
> instance does it appear that erroneous procedures,
> documentation, reporting or testimony led to a false, but
> non-probative, association between a defendant and the
> biological evidence (State v. Gray and Finney) . . . The
> authors of this report do not ascribe any particular
> motive, intent or design to the scientists in regard to
> the errors made . . .

> Finally, there is a significant qualitative difference
> between the errors discovered during this investigative
> review and the shocking and egregious misconduct

8

> documented in Zain I.   The intentional and willful
> malfeasance and reckless disregard of both truth and good
> scientific practice exhibited by Fred Zain were not found
> to exist in these cases among the remaining serologists
> in the laboratory.

Id. at 766.   The report described the work product of the other

serologists as "potentially unreliable."   Id.

Following receipt of a report from the Honorable Thomas A.

Bedell, who succeeded Judge Holliday as special judge assigned to

these matters, the WVSCA issued its decision, which held:

> After careful review of the Stolorow/Linhart findings,
> the special judge's report, and the briefs of the
> prisoners and the State, this Court concludes that there
> is insufficient evidence of intentional misconduct to
> justify invalidating the work of serologists other than
> Zain.

Id. at 767.   However:

> because of the significant number, frequency, and types
> of errors which Stolorow discovered in the work of the
> Crime Lab serologists, this Court finds it necessary to
> enact additional safeguards to ensure that prisoners
> against whom serologists offered evidence receive a
> thorough, timely and full review of their challenges to
> the serology evidence.

Id. at 769.   Thus, the WVSCA set up a special habeas corpus

procedure to be utilized by those prisoners against whom

serologists, other than Zain, had offered evidence.

Accordingly, in habeas corpus cases involving serologists

other than Zain, "a prisoner who challenges his or her conviction

must prove that the serologist offered false evidence in his or her

prosecution."   Also the prisoner must satisfy the following

standards indicating that a new trial is warranted: (1) The

9

evidence must appear to have been discovered since trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained; (2) It must appear from facts stated in his affidavit that the defendant was diligent in discovering the new evidence, and that it could not have been discovered with due diligence before the trial; (3) Such evidence must be new and material, and not merely cumulative; (4) The evidence must be such that it ought to produce an opposite result at a new trial on the merits; and (5) A new trial will generally be refused if the sole object of the new evidence is to discredit or impeach an opposing witness. Id. at 769 (citing State v. Frazier, 253 S.E.2d 534 (W. Va. 1979)).

Concerning the special procedures, the WVSCA further held that a prisoner against whom a serologist other than Zain offered evidence is to be granted a full habeas corpus hearing on the issue of the serology evidence, with counsel appointed to represent him or her. The Court further held that the Circuit Courts must review the serology evidence "with searching and painstaking scrutiny" and must write "a comprehensive order" which includes "detailed findings as to the truth or falsity of the serology evidence." If the Circuit Court finds that the evidence was false, then the Circuit Court must determine whether the prisoner has shown the necessity of a new trial based on the five Frazier factors. Id. Finally, the WVSCA held that such proceedings must be conducted in

as reasonably timely a manner as possible, and that such proceedings are not subject to the res judicata limitations normally applied to state habeas corpus proceedings. Id.

The WVSCA further specifically held:

> In order to guarantee that the serology evidence offered in each prisoner's prosecution will be subject to searching and painstaking scrutiny, this Court now holds that a prisoner who was convicted between 1979 and 1999 [footnote omitted] and against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence despite the fact that the prisoner brought a prior habeas corpus challenge to the same serology evidence and the challenge was finally adjudicated.

Id. at 770.

As will be discussed further below, when the Zain III decision was issued, Petitioner's Zain I habeas proceedings (Case No. 94-MISC-663), in which he had been represented by counsel, had long since been concluded, and his second Circuit Court habeas corpus petition (Case No. 05-MISC-298) had been denied. On June 22, 2006, within a week after the Zain III decision, Petitioner simultaneously filed an appeal from the denial of his second Circuit Court habeas petition, and a third habeas corpus petition in the Circuit Court (Case No. 06-MISC-245), in which he raised only a Zain III type claim.

## C.  Petitioner's post-conviction proceedings.

Petitioner has filed four petitions for post-conviction relief in the Circuit Court of Kanawha County, and appeals therefrom, as

11

well as a petition for a writ of habeas corpus under the original jurisdiction of the WVSCA, all of which have been denied.

The first petition was filed on August 18, 1994, in Case No. 94-MISC-663, by counsel, Lonnie C. Simmons.  That petition raised the following claims for relief:

> Petitioner's incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10 and 14 of the West Virginia Constitution, based on the following, to-whit [sic; to-wit]:
>
> 1.   The admission of testimony and test results performed by Trooper Fred Salem Zain, whose credentials, credibility, and test results have all been found by the West Virginia Supreme Court of Appeals to be inherently unreliable and a violation of a criminal defendant's constitutional rights.
>
> 2.   The presentation by the State of incorrect, false, misleading, overstated, and unscientific evidence.
>
> 3.   The admission of the alleged confessions given by Petitioner, which resulted from a violation of his constitutional rights.    Although the issues regarding the confessions have been extensively litigated in many hearings, Petitioner reserves the right to develop new information and new arguments with regard to the alleged confessions that were previously unavailable.

(ECF No. 33 at 45-46).  According to Petitioner's section 2254 petition, and the documents Respondent has produced from Petitioner's first habeas proceedings, his counsel raised the following issue in a supplemental brief:

> 4.   The State failed to preserve evidence and the results of testing of evidence.

(ECF No. 2 at 6; ECF No. 33).  A hearing on Petitioner's habeas

corpus petition, at least as it concerned the Zain issues, was held on September 19, 1995. This court is not in possession of any transcript from that hearing, but it is believed that only argument of counsel was entertained during that hearing, and that no evidence was taken. However, prior to that hearing, depositions were taken of Sergeant Robert Murphy and Captain Ted Smith, both of whom were employed by the West Virginia State Police Crime Lab, as well as Dr. David Bing, Scientific Director of Laboratories for CBR Laboratories in Boston, Massachusetts, an expert witness for Petitioner. The testimony of these individuals was considered by the circuit court, as further addressed below.

On September 10, 1998, the Honorable Andrew A. MacQueen, Circuit Judge of Kanawha County, issued a Memorandum Order denying Petitioner's habeas corpus petition. (ECF No. 8, Ex. 5). Judge MacQueen's Memorandum Order found in pertinent part, as follows:

> Since it will be unnecessary to reach any of the other grounds asserted in the petition if the petitioner is correct in his assertion concerning Zain, this issue is being addressed preliminary to and independent of any other issues.
>
> * * *
>
> It is important to note that even if the serological evidence is completely disregarded, there remains sufficient evidence to sustain the conviction. The petitioner gave statements in which he confessed to the killings and provided detail that gave particular credence to the confession. Lawyers and judges alike know that a confession is a profoundly convincing piece of evidence and that it is uncommon for any defendant who has confessed to avoid conviction. [footnote omitted]. However, in the trial of the present case, the confession

13

and the evidence derived from it provided particular
indices of reliability beyond the fact of a confession
alone.  For example, petitioner's confession was largely
consistent with the physical evidence.  He said that he
went to the Reggettz residence to steal money and that he
had taken a camera and what he recalled were dishes.  He
told investigators that he had taken the camera to his
parents['] home in Cleveland, Ohio, and that he had given
the dishes to a Ms. Arbutus Johnson.  A camera was
obtained from the petitioner's father's car and was
subsequently identified by Paul Reggettz during the
trial.  Mrs. Johnson said that Moss had given her a set
of silverware as a Christmas gift sometime during
December, 1979.  Mrs. Johnson also stated that Moss was
scratched when she saw him.  Significantly, before he
returned to his home in Cleveland, the petitioner lived
with his grandfather at his grandfather's home which was
immediately behind the Reggettz residence.  The State has
identified other, similar portions of the petitioner's
confession which reinforced its reliability.

As was noted earlier, to the extent that opening
statements and closing arguments reflect the degree to
which the State relied on various components of the
evidence, it is plain that it considered both the
confession and the serological evidence to be equally
important.  Nevertheless, the appropriate inquiry is
whether the evidence, exclusive of the serological
evidence, was sufficient to "convince impartial minds of
the defendant['s] guilt beyond a reasonable doubt."
Here, the petitioner's incriminating statements, the
statement's harmony with the physical evidence and
related corroboration were certainly sufficiently
persuasive to convince twelve reasonable persons [of] his
guilt beyond a reasonable doubt.

For the reasons articulated above, it is hereby
ORDERED that the request of the petitioner for a new
trial, based on the fact that Fred S. Zain conducted
forensic serology and gave testimony in the trial that
resulted in his conviction, is denied.

(ECF No. 5, "Memorandum Order" at 2, 7-8).

Judge MacQueen's Memorandum Order did not address the issue of

whether the admission of the serology evidence "had any prejudicial

14

effect on the jury." Thus, on September 21, 1998, Mr. Simmons filed a "Motion to Alter or Amend Order, to Correct Factual and Legal Errors, and to Reconsider Legal Conclusions." (ECF No. 33 at 253-266). Mr. Simmons filed two Supplements to the Motion to Alter or Amend on November 27, 1998, and July 15, 1999. (Id. at 271-277; 281-284). Petitioner filed a pro se supplement to the Motion to Alter or Amend on December 2, 1999. (Id. at 311-393). All of these documents asserted that there were specific factual errors made in the court's initial September 10, 1998 order. However, the alleged errors cited by Petitioner in the motion largely concern the court's findings about who conducted the serology testing (Trooper Zain or Sergeant Murphy), and whether certain conclusions concerning the serology results were accurate. Given the mandate to treat all testimony and evidence presented by Zain as false, and to exclude it, these asserted errors are irrelevant to this court's analysis, and will not be further addressed.

A hearing on the motions to alter or amend was held on July 7, 2000. (ECF No. 17, Ex. 33 at 506). During that hearing, the only issue addressed was Mr. Simmons' assertion that the Circuit Court had not addressed whether Petitioner had been prejudiced by Zain's testimony. At the conclusion of the hearing, Judge MacQueen requested that counsel for Respondent draft an appropriate order. On October 13, 2000, no order having been presented or entered, Mr. Simmons filed a Motion for Entry of Order with Detailed Findings of

Fact and Conclusions of Law. (ECF No. 33 at 485-491). On October 9, 2001, Mr. Simmons filed a Second Motion for Entry of Order with Detailed Findings of Fact and Conclusions of Law. (ECF No. 524-532).

On February 15, 2002, the Honorable Louis H. Bloom, Kanawha County Circuit Judge, issued an Amended Memorandum Order Denying Habeas Relief. (ECF No. 15).[2] The Amended Order found in pertinent part:

> Moss argues that "Zain's evidence . . . shifted the balance of the evidence away from Reggettz and toward Petitioner [Moss]." The Memorandum Order contains a discussion of the evidence, which will not be duplicated herein. As noted in that discussion, Moss's own confession is a key piece of evidence that stands independently of any Zain-related evidence. Further, the confession is corroborated in a number of significant ways, which the Court has described as "indices of reliability." In focusing on Zain, Moss ignores the power of his own well-corroborated confession.
>
> In light of the external indicia that Moss's confession was legitimate, the Court must conclude that the introduction of Zain-related evidence and testimony was not prejudicial within the meaning of Syllabus point 3 of [Zain I].

(Id.)

Then, on February 2, 2002, the Zain issues having been resolved in favor of the Respondent, Mr. Simmons filed another Motion to Alter or Amend Judgment under Rule 59(e), objecting to the court's refusal to address the alleged factual errors in its

---

[2] By this time, Judge MacQueen had retired, and Judge Bloom took over responsibility for Petitioner's habeas corpus matter.

previous orders, and asserting that the court's legal conclusions were also erroneous.  Mr. Simmons requested that the court enter a "final judgment" on the "Fred Zain" issue, so that he might appeal that issue, but allow for the remainder of the claims that Petitioner had raised in his first Kanawha County habeas corpus petition to be addressed by the court.  (ECF No. 33 at 560-566).

On March 28, 2002, Judge Bloom entered an Order reinstating Case No. 94-MISC-663 to the docket, in order to address the remaining claims raised in that petition.  (Id. at 575-576).  On April 15, 2002, Mr. Simmons filed a "Motion for Relief on the Two Remaining Issues Raised in the Habeas Corpus Petition."  (Id. at 577-596).

After the Respondent filed a Response in Opposition (id. at 603-608), and Petitioner filed a Reply (id. at 609-617), a hearing was held on January 17, 2003, during which Petitioner argued the following issues:

1.   That his conviction was defective because the scientific evidence introduced by the State was so flawed that he was deprived of his constitutional right to a fair trial.

2.   That his confession was involuntary and should not have been admitted at trial.

On January 30, 2003, Judge Bloom issued a "Final Order Denying Habeas Relief."  (ECF No. 8, Ex. 5).

Petitioner essentially argued that the court should have determined whether the use by the State of flawed serology evidence

17

at trial constituted an error of constitutional dimension and that
the admission thereof must be found to be reversible error unless
it can be shown to be harmless beyond a reasonable doubt.  Judge
Bloom's "Final Order" found that:

> The Court need not determine whether the admission of the
> serological testimony and evidence was an error of
> constitutional magnitude because, even if it were, it
> would still be harmless beyond a reasonable doubt.  As
> the Court has noted in its earlier orders, Moss's
> confession was well-corroborated and consistent with
> details of the crime scene.  Therefore, even if the Court
> were to adopt all of Moss's arguments as to the flaws in
> the State's scientific evidence, Moss still would not be
> entitled to the requested writ.

(Id. at 2).  Concerning Petitioner's argument that his confession
was involuntary, Judge Bloom found that the voluntariness issue had
been thoroughly litigated and that Petitioner had failed to present
any new evidence on that issue.  The "Final Order" further states:

> Rather, he seems to argue the fact that Mr. Reggettz had,
> at one point, given a confession somehow invalidates
> Moss's own confession.  The existence of the Reggettz
> confession does not have the devastating effect that Moss
> desires because the Reggettz confession does not impugn
> the voluntariness of Moss's confession.  At most, it
> provided fodder for defense theories at trial.
>
> The question before the Court is whether Moss was
> able to establish that his confession was
> constitutionally flawed.  He was not.  Therefore, the
> admission of his confession at trial does not provide a
> predicate for issuance of the requested writ.

(Id. at 2-3).

Petitioner filed an appeal from the final denial of his first
habeas petition on July 16, 2003.  (ECF No. 8, Ex. 6).  The WVSCA
granted the petition for appeal (id.), but ultimately affirmed the

18

findings of the Circuit Court in an opinion in <u>Moss v. Trent</u>, 603 S.E.2d 656 (W. Va. 2004)("<u>Moss III</u>") (ECF No. 8, Ex. 7).  In <u>Moss III</u>, which was decided on July 1, 2004, the court extensively re-examined the blood evidence introduced at trial under <u>Zain I</u>, as well as the circumstances surrounding Petitioner's confessions. This opinion will be discussed in greater detail <u>infra</u>.

On January 24, 2005, the Supreme Court of the United States denied Petitioner's petition for a writ of certiorari concerning the denial of his habeas corpus petition.  (ECF No. 8, Ex. 8).

On July 7, 2005, Petitioner filed a second habeas petition in the Circuit Court of Kanawha County, Case No. 05-MISC-298, raising the following claims:

  a.   The trial court abused its discretion and committed reversible error in ruling that the first two confessions were admissible under the "law of the case doctrine."

  b.   The factual determination by the West Virginia Supreme Court of Appeals that no prompt presentment objections were entered on the first two alleged confessions is clearly erroneous and works a manifest injustice.

  c.   Petitioner was deprived of the Sixth Amendment's guarantee of the effective assistance of counsel:

      (1)  Counsel failed to bring to the trial and appellate court's attention the fact that the two October 28, 1980, confessions were the subject of an extensive motion and memorandum, hearing and testimony and was, in fact, objected to by counsel prior to the first trial, based on, <u>inter alia</u>, West Virginia Code § 49-5-8(d).

19

> > (2) If trial counsel, at the first trial,
> > failed to object to the West Virginia
> > authorities' failure to promptly present
> > the juvenile defendant to a neutral
> > judicial officer prior to taking
> > Petitioner's alleged confessions.

> d. Petitioner did not receive a full and fair hearing
> on his motion and memorandum to suppress samples of
> blood, confession, and other physical evidence
> seized due to the improper tactics of Fred S. Zain
> and the West Virginia State Police troopers and
> crime laboratory.

> e. Petitioner's Sixth Amendment right to a fair and
> impartial jury was contravened when the State knew,
> or should have known, of the false or misleading
> testimony and evidence presented by a state
> witness.

> f. The trial court abused its discretion and committed
> reversible error when it admitted Petitioner's
> blood samples, confessions, and all evidence
> incident thereto into evidence, when the samples of
> blood were obtained in violation of federal and
> state constitutional rights.

> g. Improper closing arguments by the prosecution
> denied the Petitioner a fair trial.

(ECF No. 35, Ex. 34). On February 7, 2006, Judge Bloom denied

Petitioner's second habeas corpus petition. (ECF No. 8, Ex. 10).

On June 22, 2006, Petitioner filed a Petition for Appeal from

the denial of his second circuit court habeas petition, raising

identical grounds for relief. On December 6, 2006, the WVSCA

refused the Petition for Appeal. (ECF No. 8, Ex. 11).

On June 22, 2006, immediately after the WVSCA's decision in

Zain III, Petitioner also filed his third habeas petition in the

Circuit Court of Kanawha County, Case No. 06-MISC-245, raising the

20

following claims:

1.  Blood test results and reports of offered serology
    evidence were falsified or were substantially
    incorrect. See Syllabus Point 6 [of In the Matter
    Of: Renewed Investigation of the State Police Crime
    Laboratory, Serology Division, 633 S.E.2d 762 (W.
    Va. 2006)(Zain III)] The West Virginia State Police
    Crime Laboratory Serology Division and/or
    Serologists Robert Murphy, Ted Smith, Lynn Inman
    and Gale Midkiff falsified blood test results
    reports.

2.  Ineffective assistance of counsel. Trial counsel
    failed to conduct adequate investigation.

(ECF No. 35, Ex. 35 at 5-5a). On October 16, 2006, Judge Bloom

denied Petitioner's third habeas corpus petition, making findings

of how each claim had previously been ruled upon in Petitioner's

prior habeas corpus petitions. (ECF No. 8, Ex. 13).

On March 5, 2007, Petitioner filed a Petition for Appeal from

the denial of his third circuit court habeas petition. (ECF No. 8,

Ex. 14). Petitioner challenged Judge Bloom's failure to follow the

directives of the WVSCA in Zain III with regard to appointing

Petitioner counsel, conducting a full review of the serology

evidence, and issuing a comprehensive order with detailed findings

as to the truth or falsity of the serology evidence. (Id.) On

July 9, 2007, the WVSCA refused the Petition for Appeal. (Id.)

On July 31, 2007, Petitioner filed a Petition for a Writ of

Habeas Corpus in the WVSCA which raised the following grounds for

relief:

1.  The trial court abused its discretion and committed
    reversible error in ruling that the first two

21

confessions were admissible under the "law of the case doctrine."

2.   The factual determination by the West Virginia Supreme Court of Appeals that no prompt presentment objections were entered on the first two alleged confessions is clearly erroneous and works a manifest injustice.

3.   Petitioner was deprived of the Sixth Amendment's guarantee of the effective assistance of counsel:

   a.   Counsel failed to bring to the trial and appellate court's attention the fact that the two October 28, 1980, confessions were the subject of an extensive motion and memorandum, hearing and testimony and was, in fact, objected to by counsel prior to the first trial, based on, inter alia, West Virginia Code § 49-5-8(d).

   b.   If trial counsel, at the first trial, failed to object to the West Virginia authorities' failure to promptly present the juvenile defendant to a neutral judicial officer prior to taking Petitioner's alleged confessions.

4.   Petitioner did not receive a full and fair hearing on his motion and memorandum to suppress samples of blood, confession, and other physical evidence seized due to the improper tactics of Fred S. Zain and the West Virginia State Police troopers and crime laboratory.

5.   Petitioner's Sixth Amendment right to a fair and impartial jury was contravened when the State knew, or should have known, of the false or misleading testimony and evidence presented by a state witness.

6.   The trial court abused its discretion and committed reversible error when it admitted Petitioner's blood samples, confessions, and all evidence incident thereto into evidence, when the samples of blood were obtained in violation of federal and state constitutional rights.

7.    Improper closing arguments by the prosecution denied the Petitioner a fair trial.

8.    Blood test results and reports of offered serology evidence were falsified or were substantially incorrect.

9.    Ineffective assistance of counsel.

(ECF NO. 8, Ex. 18).  Treating the petition as being filed under the court's original jurisdiction, the WVSCA summarily refused the petition on September 13, 2007.  (Id.)

On September 28, 2007, Petitioner filed his fourth habeas petition in the Circuit Court of Kanawha County, Case No. 07-MISC-403, raising the following ground for relief:

Petitioner received the ineffective assistance of counsel as guaranteed by the constitutions of West Virginia and the United States.

(ECF No. 35, Ex. 36 at 5a-5c).  Petitioner's claims of ineffective assistance of counsel raised in this petition concerned his second trial counsel's failure to challenge the admission of the testimony concerning two items of evidence; specifically, the silverware that had allegedly been taken from the Reggettz home by Petitioner and given to Arbutus Johnson, and a camera that had allegedly been taken from the Reggettz home by Petitioner and taken to his parents' home in Cleveland.  Petitioner further asserted that his counsel was deficient in failing to call witnesses whose testimony would have created reasonable doubt as to whether these items were removed from the Reggettz home, and would have called into question the indicia of reliability attributed to Petitioner's confession.

23

(Id.)  On March 30, 2009, the Honorable Jennifer F. Bailey, Kanawha County Circuit Judge, denied Petitioner's fourth habeas corpus petition.  (ECF No. 8, Ex. 16).

On August 6, 2009, Petitioner filed a Petition for Appeal from the denial of his fourth circuit court habeas petition.  (ECF No. 8, Ex. 17).  On November 30, 2009, the WVSCA refused the Petition for Appeal.  (Id.)

<u>Petitioner's section 2254 petition</u>

In the instant federal petition, Petitioner raises the following claims for relief:

1.  The lower court's ruling that Petitioner's confessions were voluntary is clearly against the weight of the evidence presented and an unreasonable application of the clearly established federal law as announced by the United States Supreme Court.

2.  Petitioner's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution were violated and the lower court's ruling was contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court and/or an unreasonable determination of the facts of the case.

    (a)  The confessions were obtained through exploitation of custody obtained through a statutorily defective transfer pursuant to the Interstate Agreement on Detainers.

    (b)  The confessions were obtained as the result of the Police's intentional failure to comply with the juvenile prompt presentment statute, W. Va. Code 49-5-8(d).

24

(c)   The confessions were obtained through coerced waivers of Petitioner's constitutional rights.

(d)   The West Virginia Supreme Court of Appeals erroneously ruled that no objections were entered at Petitioner's first trial on two of Petitioner's three confessions.

(e)   The second trial court ruled that the two confessions in question were admissible under the law of the case doctrine.

(f)   The lower court admitted Petitioner's confessions to the Reggettz murders into evidence at trial.

3.   Petitioner did not receive a full and fair hearing on his motion and memorandum to suppress samples of blood, confession, and other physical evidence seized due to the improper tactics of Fred S. Zain and the West Virginia State Troopers and crime laboratory and Petitioner's due process rights were violated.  The lower court's rulings were contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, or an unreasonable determination of the facts as set forth in the record.

4.   Petitioner's Sixth Amendment right to a fair trial and impartial jury was contravened when the State knew or should have known of the false or misleading testimony and evidence presented by a State witness and the lower courts' rulings were contrary to an or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, or an unreasonable determination of the facts as set forth in the record.

5.   The admission of Petitioner's blood samples, confessions and all evidence incident thereto violated Petitioner's right to a fair trial when the samples of blood were obtained in violation of federal constitutional rights and the rulings of the lower courts are contrary to or an unreasonable

25

application of clearly established federal law as announced by the United States Supreme Court, and/or an unreasonable determination of the facts as set forth in the record.

6. Improper closing arguments by the prosecution denied Petitioner his federal constitutional rights to a fair trial and due process of law, the lower courts' rulings are contrary to or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, and/or an unreasonable determination of the facts as set forth in the record.

7. Petitioner's guarantee to equal protection and the due process of law were violated when the lower courts failed to provide him with the appointment of counsel and a full habeas corpus evidentiary hearing, inasmuch, the Circuit Court failed to abide by the West Virginia Supreme Court's mandate, and the West Virginia Supreme Court of Appeals failed to honor its own mandate thereby the lower court's ruling is contrary to or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, or an unreasonable determination of the facts as set forth in the record.

8. Petitioner's incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution respectively and the lower court's ruling is contrary to or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, or an unreasonable determination of the facts as set forth in the record.

9. Petitioner was denied his right to effective assistance of counsel guaranteed to him through the Sixth and Fourteenth Amendments to the United States Constitution, and the court's rulings below were contrary to or an unreasonable application of clearly established law as announced by the United States Supreme Court and/or unreasonable determination of the facts as set forth in the record.

A.   Counsel failed to bring to the trial and appellate court's attention the fact that the two October 28, 1980, confessions were the subject of an extensive motion and memorandum hearing and testimony and was, in fact, objected to by counsel prior to the first trial, based on, <u>inter alia</u>, W. Va. Code § 49-5-8(d).

B.   If trial counsel, at the first trial, failed to object to the West Virginia authorities' failure to promptly present the juvenile defendant to a neutral judicial officer prior to taking Petitioner's alleged confessions.

C.   Trial counsel failed to conduct adequate investigation into the facts and law of the case prior to Petitioner's second trial.

D.   Appellate counsel failed to conduct adequate investigation and research prior to perfecting and filing a petition for appeal from Petitioner's second trial.

10.   Petitioner's due process rights were violated by the State's withholding of exculpatory and/or impeachment evidence and the lower courts' rulings were contrary to and/or an unreasonable application of clearly established federal law as announced by the United States Supreme Court, and/or an unreasonable determination of the facts as set forth in the record.

(ECF No. 2).

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that

27

was adjudicated on the merits in State court proceedings
unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly
established Federal Law, as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the
Supreme Court held that under the "contrary to" clause, a federal
court may grant a writ of habeas corpus with respect to claims
adjudicated on the merits in state court only if (1) the state
court arrives at a conclusion opposite to that reached by the
Supreme Court on a question of law, or (2) if the state court
decides a case differently from the Supreme Court on a set of
materially indistinguishable facts.  The Court further held that
under the "unreasonable application" test, a federal court may
grant a writ of habeas corpus with respect to a claim adjudicated
on the merits in state court only if the state court identifies the
correct governing principle from the Supreme Court's decision, but
unreasonably applies that principle to the facts of the prisoner's
case.  Id. at 413.

Moreover, the AEDPA contains a presumption that a state
court's factual findings are correct:

In a proceeding instituted by an application for a writ
of habeas corpus by a person in custody pursuant to the

28

judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.   The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.  <u>See</u>, *e.g.*, <u>Blackledge v. Allison</u>, 431 U.S. 63, 81 (1977); <u>Maynard v. Dixon</u>, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## <u>STATEMENT OF FACTS AND RELEVANT TESTIMONY</u>

This statement of relevant facts and testimony is a summary of the trial testimony based upon the undersigned's exhaustive review of the trial transcript and other records produced in this court:

On December 13, 1979, at approximately 11:30 a.m., Paul Reggettz finished his 2:30 a.m. to 11:30 a.m. night shift at United Parcel Service in Rand, West Virginia.  (ECF No. 17, Ex. 20 at 676, 679).  On that night, his co-workers did not notice any unusual or different behavior by Mr. Reggettz.  (<u>Id.</u> at 635-49).  After he left work, Mr. Reggettz drove towards his home in St. Albans, West Virginia.  Mr. Reggettz testified that he was supposed to meet his wife, Vanessa, and his daughter, Bernadette, at a location across

29

from Route 60 in St. Albans to go Christmas shopping. (<u>Id.</u> at 670, 681). However, when he arrived, his wife and daughter were not there, so he continued on to their home on Chesapeake Avenue. (<u>Id.</u> at 681).

Mr. Reggettz further testified that, upon arriving at the house, he knocked on the front door with his foot because his hands were full. (<u>Id.</u> at 683). Getting no answer, he went around to the back door of the house and pushed the already ajar door open with his foot. (<u>Id.</u> at 683-84). When he entered the house, he found his wife laying dead on the floor between the living room and a bedroom. (<u>Id.</u> at 685). The cause of Vanessa's death was later determined to be strangulation. (<u>Id.</u> at 838).

Mr. Reggettz stated that he also discovered his daughter, Bernadette, hanging by a cord from a door in between the living room and a bedroom. (<u>Id.</u> at 686). The cause of Bernadette's death was also determined to be strangulation. (<u>Id.</u> at 860-61). Mr. Reggettz testified that, before he went to get help, he lifted his daughter out of the noose and placed her body on the floor. (<u>Id.</u> at 686-687).

Reggettz ran to a nearby A&W Root Beer restaurant. He testified that he walked into the A&W and "I just stood there -- I couldn't say anything. I just stood there in front of those people and I couldn't say a word." (<u>Id.</u> at 687). He further testified that, eventually, he asked an A&W employee to call the police

because "somebody had murdered my wife." (Id.)

Reggettz returned to his house.  He testified that he went back inside, and he moved his daughter's body from the floor onto a bed "because he couldn't stand the thought of her laying on the floor." (Id. at 688).  He further stated that it was at that time that he saw the cord around his wife's neck and the scissors protruding from her chest.  (Id.)

Reggettz stated that, upon his return to the house, he also found his son laying face down in the bath tub.  (Id. at 689).  He stated that he did not remember his son being wet or cold, but that he was "stiff-like, like he was tense." (Id. at 690).  Reggettz stated that there was a cord tied around his wrists and, which were around his back.  (Id.)  Reggettz testified that he moved his son's body onto the bed in the room where his wife's body was located. (Id.)  Reggettz further testified that he unsuccessfully tried to loosen the cords on both his wife and son.  (Id. at 691).  Reggettz said he also pushed on his son's back because he did not know CPR, but thought that his son might still be alive because his eyes were partially open.  (Id. at 691-692).

When the police arrived at the house, Mr. Reggettz was standing outside.  The responding officer, State Trooper Terry Williams, described Mr. Reggettz's demeanor, stating, "He just had a sort of blank look," and said "someone killed my family." (Id. at 428, 433).  The police found the house ransacked.  (Id. at 462).

31

The Christmas presents that the Reggettz family had wrapped and placed under the Christmas tree were ripped open and some of the presents were missing. (Id. at 459). Mr. Reggettz later told the police that, among the items missing from the house, was a set of silverware that was a gift for his wife, a camera, and a .22 caliber rifle. (Id. at 569).

### A.   Facts surrounding Paul Reggettz's confessions.

At Petitioner's second trial, four witnesses testified about the facts and circumstances surrounding the confessions made by Paul Reggettz: Paul Reggettz, Trooper Howard Woodyard, to whom Reggettz initially confessed, Trooper Terry Williams, who was also present for the Reggettz confession and who was the first responder to the crime scene, and Dr. Irvin Sopher, the Chief Medical Examiner, who testified about whether the forensic evidence could support the details given by Reggettz in his confessions.

Trooper Howard Woodyard, who was called as a defense witness at the second trial, testified that Reggettz arrived at the South Charleston detachment at about 1:00 p.m. on December 13, 1979, after working all night, and that he signed a waiver of rights form at 2:10 p.m. Reggettz was then questioned for almost 14 hours, until about 2:30 a.m., when he made his first inculpatory statement. (Id. at 1224-25). Trooper Woodyard testified that Reggettz did state "If I tell you what you want, then you won't let them hurt me?" (Id. at 1225). Reggettz then stated, "Okay I

32

killed my wife and two children." (Id.)

Trooper Woodyard further testified that Reggettz gave a detailed statement that took several hours and was not completed until about 6:00 a.m. By that time, Reggettz was tired, having had only 4-6 hours of sleep in the previous two days. Trooper Woodyard further stated that Reggettz's statements were all in response to questions from the troopers, and pointed out that Reggettz had been able to observe the crime scene when he entered the home initially and upon re-entry with the investigating officer. (Id. at 1226-27).

Specifically, Reggettz told Woodyard that he and his wife got into an argument because she was yelling at the children, who were acting up. (Id. at 1211). Reggettz stated that the argument continued into a bedroom, where Vanessa Reggettz picked up Paul Reggettz's pistol. Reggettz further stated that they struggled over the gun, but he took it away from her. He stated that he recalled hitting something as he swung the gun around, but did not recall what it was. (Id. at 1212).

Reggettz further stated that Vanessa was knocked to the ground, and he then took an electrical cord and strangled her with it. Reggettz further stated that he moved Vanessa's body from the bedroom where they were arguing into the second bedroom. (Id. at 1213). Then he took the extension cord and put it around her neck and attempted to tie her up to the door. (Id.) During this time,

the children were yelling and screaming and "causing his head to pound." (Id.)  According to Woodyard, Reggettz said "things were happening in a haze to him."  (Id.)

Reggettz further stated that, after trying with difficulty to secure his wife to the door, he grabbed his son and "threw him in the floor and strangled him with a cord."  (Id. at 1213-1214). According to Woodyard, Reggettz said he "placed his knee across the boy's buttocks and lower legs and put him face down on the floor." (Id. at 1214).  Woodyard acknowledged that Reggettz told him he pulled the cord tight around the child's neck and then tied his hands behind his back with the same cord, and then placed the boy face down in the remainder of some bath water in the bath tub. (Id. at 1214-1215).  Woodyard further stated that Reggettz said his son was saying "Don't, daddy, don't" while this was happening. (Id. at 1215).

Reggettz told Woodyard he then grabbed his daughter from her mother's side and carried her into another room and placed a cord around her neck, too.  (Id. at 1215-1216).  He said his daughter was saying, "get up, mommy, get up." (Id. at 1216).  After pulling the cord tight until she stopped moving, Reggettz said he hung his daughter over the door.  (Id.)  Then, he said he got some scissors from the bathroom and stabbed his wife in the chest. (Id. at 1216-1217).

34

Woodyard further testified that Reggettz then said he went to sleep for a little while, and got up around 1:00 a.m. to get dressed and go to work.  (Id. at 1217).  Reggettz told Woodyard that, on his way to work, he took a .22 rifle out of the house and threw it off the Interstate bridge into the Kanawha River.  (Id.) Reggettz further stated that, before he left the house, he pulled a sheet down and put it on the kitchen floor and put some spoons or some kitchen utensils on it.  (Id. at 1217-1218).  Woodyard further testified that Reggettz told him that he felt like a "heavy weight had been taken off of him."  (Id. at 1218).

The following day, the investigating officers, including Trooper Woodyard, took Reggettz back to the house for a demonstration.  He still had not slept at that time.  Trooper Woodyard testified that Reggettz was asked to demonstrate specific things he did.  Reggettz's statement and demonstration was largely repetitive of his statement from the previous day.  (Id. at 1219-1222).

On cross-examination by the State, Trooper Woodyard confirmed that Reggettz had been questioned for almost fourteen hours, without sleep, when he made his first inculpatory statement, and that he said, "If I tell you what you want, then you won't let them hurt me?"  (Id. at 1224-1225).  Woodyard stated that he never ascertained who "they" were, but played up to Reggettz's quest for protection.  (Id. at 1225).

35

Woodyard also stated that Reggettz was asked to demonstrate things, and did not volunteer any of the information without prompting. (Id. at 1228-1229). Woodyard also acknowledged that Reggettz had seen where the bodies were located and had also moved them before the police had arrived. (Id. at 1226-1227). Woodyard stated he never could understand why Reggettz would have taken his daughter's body down from the door. (Id. at 1227).

Trooper Terry Williams also testified about Reggettz's confession. Trooper Williams acknowledged that Reggettz told him he had moved the bodies of his children, and that the only confirmation that Bernadette had been hung from a door and that Paul Eric had been in the bathtub was Paul Reggettz's own word and the fact that Paul Eric's body was wet. Despite allegedly moving his son's body, however, Paul Reggettz did not appear to be wet. Trooper Williams stated that he didn't really think about that at the time. (Id. at 596-598).

Trooper Williams also confirmed that, during the demonstration on December 14, 1979, Paul Reggettz re-enacted the actions he had confessed to the day before. (Id. at 599-601). Trooper Williams also testified that, when asked why he put his son in the bath tub, Reggettz stated that "he liked to swim." Furthermore, when asked why he hung his daughter, Reggettz stated "because she liked to swing." (Id. at 601-602).

36

Dr. Irvin Sopher, the Chief Medical Examiner, testified that he did not observe a bruise on Paul Eric's buttocks that would have been consistent with his father's statement that he knelt on top of his son before choking him. Dr. Sopher further testified that the contents of the boy's stomach were consistent with him having eaten at 7:30 p.m. the night before, and having been drowned at approximately 6:00 a.m. (Id. at 846-47).

Dr. Sopher also testified that the *livor mortis* pattern evident on Bernadette Reggettz's body was inconsistent with her having been hung from the door on the prior night and then taken down the following morning. (Id. at 851-56). Rather, it was consistent with her having been hung at about 6:00 a.m. (Id. at 856-57). Additionally, Bernadette's stomach contents were consistent with her having eaten dinner the prior evening and been hung about 6:00 a.m. the following morning. (Id.)

Dr. Sopher gave his opinion that 9:00 p.m. on the night of December 12, 1979 was too early a time frame for the murders, given the condition of the victims. Thus, the murders had to have occurred while Paul Reggettz was at work. There was also no evidence of injury to Paul Reggettz. (Id. at 862).

Paul Reggettz testified that he did confess to killing his family, but stated that, after approximately 14 hours of interrogation, he had been coerced into confessing because he was afraid of implied threats by the police. Reggettz said he told

37

Trooper Woodyard, "Just don't let those people hurt me.  I'll do whatever you want." (ECF No. 17, Ex. 20 at 702-03).  At the trial, Reggettz repudiated each of the incriminating statements he had previously made. (Id. at 705-717, 734-735).  Petitioner's counsel vigorously cross-examined Reggettz about the detailed confessions he had given, and made repeated reference to Reggettz's statement that he felt relieved after his family was killed. (Id. at 735-761).

>    **B.   Facts surrounding the taking of Moss's blood samples.**

At the time of the crimes, Petitioner, who was from Cleveland, Ohio, was living with his grandparents down the road from the Reggettz house, but he returned to Cleveland shortly thereafter. Petitioner first became a suspect in the crimes on or about January 29, 1980, when his uncle, Arthur Moss, gave the West Virginia State Police a newspaper clipping reflecting that Petitioner had attempted to strangle and rape a woman in Cleveland.  Petitioner was also already a suspect in a malicious assault which occurred at the Moose Lodge in St. Albans, West Virginia, in May of 1979. Petitioner was seventeen years of age at the time of all of these crimes.

On January 30, 1980, two West Virginia State Troopers, Terry Williams and Mike Smith, traveled to Cleveland, Ohio, where Petitioner, who was still seventeen at that time, was being held in a juvenile facility on the Ohio charge.  They interviewed

Petitioner, who initially denied any involvement in the Reggettz murders.   However, in response to a question about whether Petitioner considered Vanessa Reggettz to be pretty, Petitioner replied that he did not, because her face had "bumps."   A picture of Vanessa that had been shown to Petitioner at that time showed a smooth-skinned woman.   However, at the time of her death, Vanessa's face was blemished.   (Id. at 727, 972).

While at the juvenile facility, Troopers Williams and Smith took a blood sample from Petitioner by having him prick his finger and bleed onto a cloth.   The following summary from the WVSCA's first opinion described what happened subsequently with this blood sample:

> At the time of this interrogation, the appellant was seventeen years of age.   The blood sample was taken without a court order, and without the knowledge or consent of the appellant's parents.   The authorities were aware that the appellant was a juvenile.   They made no effort to contact the appellant's Ohio lawyer.   The appellant was advised of his rights prior to questioning, but did not sign a waiver of rights form.
>
> When the appellant's counsel learned of the blood sample taken by the West Virginia authorities, he objected, and an Ohio court ordered that the cloth on which the blood sample was deposited be returned to the appellant.   This apparently was done.   Subsequently, in April 1980, the investigating authorities again traveled to Cleveland to obtain a blood sample from the appellant, pursuant to an order issued by an Ohio court.   A doctor performed the sampling.   Analysis of the blood sample strengthened the investigating authorities' suspicions concerning the appellant's involvement in the murders.
>
> On September 26, 1980, the State filed a detainer against the appellant, pursuant to W. Va. Code § 62-14-1 et seq.   (1977 Replacement Vol.), based on a malicious

wounding charge unrelated to the homicides. The appellant at this time was serving a term of four to twenty-five years at the Ohio State Reformatory on charges of rape and attempted murder.

In the Interest of John Moss, Jr., 295 S.E.2d at 36-37 ("Moss I").

As noted in the excerpt above, on April 22, 1980, Troopers Williams and Smith returned to Cleveland to obtain a court ordered blood sample from Petitioner. Examination of that blood sample revealed that Petitioner's blood and blood on some of the items collected from the scene of the Reggettz murders were consistent, containing identical blood enzymes.

**C. Facts surrounding Petitioner's confessions.**

On May 5, 1980, Petitioner turned 18 years of age. As noted above, on September 26, 1980, a detainer was lodged against Petitioner on the St. Albans malicious wounding charge, unrelated to the murders. On October 28, 1980, Troopers Williams and Smith traveled to Mansfield, Ohio, where Petitioner was in custody, having been transferred to adult status and convicted of the Ohio charges. Respondent's brief states that Petitioner was being returned to West Virginia for questioning. However, the testimony of the transporting officers and others was that Petitioner was being brought to West Virginia to answer the unrelated malicious wounding charges. There is no indication that Petitioner ever made an appearance before a neutral judicial officer concerning any charges in West Virginia during this trip.

During the trip, Trooper Michael Don Smith asked Petitioner if he would be willing to speak to them about "a crime which occurred in West Virginia." (ECF No. 17, Ex. 20 at 941). According to the troopers, Petitioner allegedly stated that he would be willing to speak to them, so they pulled off the interstate and went to a State Police Detachment in Parkersburg, West Virginia to question Petitioner.   The law enforcement officers who were present testified that Petitioner was read his <u>Miranda</u> rights and that he signed a waiver of rights statement.   They further stated that Petitioner did not ask to speak to an attorney, and that no threats or promises were made to him.   (<u>Id.</u> at 516-521, 950-951).

Petitioner confessed to killing all three of the Reggettz victims.   After answering some verbal questions, Petitioner gave a tape-recorded confession.   On the tape, Petitioner confirmed that he had not been threatened, mistreated, or coerced into making the confession, and that he had been given food and a drink by the officers.   (<u>Id.</u> at 519-20, 551, 553).   Petitioner, however, testified in a pre-trial suppression hearing that he had been beaten in the car by Trooper Smith and that he confessed because he felt threatened.   (ECF No. 17, Ex. 22 at 297-310).

The following is a summary of the testimony of Troopers Williams and Smith concerning the oral confessions given by Petitioner.   Petitioner's taped confession was also played for the jury, and the text of the taped confession is included in the trial

41

transcript at pages 551-573.  Some of the citations to Petitioner's statements are directly from the taped confession and some are from the troopers' testimony concerning the same:

Petitioner told the troopers that he went to the Reggettz house to steal money.  (ECF No. 17, Ex. 20 at 525, 556, 955).  Petitioner stated that, when he entered the house, Vanessa Reggettz was pointing a gun at him.  Petitioner struggled with Vanessa, and the gun went off, but he wrestled the gun from her and struck her in the head with the butt of the gun.  (Id. at 528, 559-60, 957-958).  Petitioner stated that the gun broke when he struck Vanessa and that he later disposed of the remainder of the gun after he left the Reggettz home, leaving the gun butt there.  (Id. 535, 566, 964-965).  The butt of the gun was found next to Vanessa's body, and her autopsy revealed scalp lacerations which could have been caused by being struck with the gun butt.  (Id. at 813-14).  Paul Reggettz testified that the gun butt found at the scene belonged to his gun.  (Id. at 450, 722).

Petitioner stated that he ran out of the Reggettz house because he was frightened.  (Id. at 528, 958).  He further stated that he looked back towards the house and saw Vanessa trying to put something up against the door, so he ran back and forced his way inside.  (Id. at 528, 958).  He found Vanessa with a knife in her hand.  Petitioner stated that they struggled for the knife, and he got a cut on his left little finger.  (Id. at 528, 958-959).

42

Trooper Smith testified that Petitioner showed him a scar on his left little finger during his confession.  (Id. at 959).

Petitioner further stated that he grabbed a cord and placed it around Vanessa's neck and choked her.  (Id. at 528, 559-560, 959). Petitioner stated that, while he was struggling with Vanessa, the two children were beating on him and yelling to leave their mommy alone.  He stated that he pushed them both away.  (Id. at 529, 959).

Petitioner stated that he then grabbed Paul Eric Reggettz and choked him with a cord, tied his hands behind his back, and placed him face down in the bathtub, which was half-filled with water. (Id. 530, 561-62, 960).  Petitioner also described choking Bernadette Reggettz with his hands and a cord and then hanging her on the door in the living room, facing the Christmas tree.  (Id. at 530-531, 563, 961).  Petitioner further stated that, after hanging Bernadette, he stabbed Vanessa with a "knife or something" to make sure she was dead.  (Id. at 530-531, 564, 960).

Before leaving the Reggettz house, Petitioner stated that he searched the house for money and he opened their Christmas presents and took a few things.  (Id. at 565, 966).  He described a Kodak instant camera he stole from the Reggettz house and told the troopers that the camera was at his parents' home in Cleveland. (Id. at 534, 569).  A camera matching the description given by Petitioner was located in his father's car the following day, along

43

with three other similar cameras found in their home.

Petitioner also admitted to taking "some dishes" from the Reggettz Christmas gifts. Petitioner told the troopers that he gave the "dishes" to his best friend's mother, Arbutus Johnson, for Christmas. (Id. at 534, 565, 966, 970-971). Ms. Johnson and her son lived in St. Albans. (Id. at 534-535, 567). A set of silverware was recovered from Ms. Johnson on February 6, 1980, prior to Petitioner's confession. (Id. at 591-92, 902, 934-935). Ms. Johnson told the investigators that Petitioner had given her the silverware as a Christmas present the night before he returned to Cleveland in December of 1979. (Id. at 901). Ms. Johnson stated that Petitioner had some scratches and a Band-aid on his face at that time. (Id. at 900).

Petitioner also admitted that he took a .22 rifle from the Reggettz home, which he said he took back to Cleveland and placed in an upstairs closet in his parents' home. However, the rifle was never recovered. (Id. at 534-536, 565-67, 969-970, 976-978).

Petitioner told the troopers that it was almost daylight when he left the Reggettz home. A clock radio, from which a cord had been torn, was located in the back bedroom of the house. The time on the clock stated 6:17 a.m. (Id. at 456-57, 503-05).

Petitioner did not remember whether he was wearing gloves at the time of the crime. However, fabric marks were located on several pieces of evidence which had a consistent design and

44

appeared to be glove marks.  (Id. at 1039).

**C.   Facts regarding serology evidence collection and testing.**

On December 13, 1979, Trooper Fred Zain went to the Reggettz home, where he secured blood scrapings and other items of evidence for analysis.  (ECF No. 17, Ex. 23 at 10-11).  The investigating officers later submitted additional exhibits for testing, including known blood samples from the victims, a pajama top that had been worn by Bernadette Reggettz at the time of the crimes, and known blood samples from a number of other males who had possible access to the Reggettz house.  (ECF No. 17, Ex. 23, B.N. 000006).  All of these items were submitted in January 1980.

State Police Sergeant Robert C. Murphy, Zain's supervisor in the Serology Section of the State Police Crime Laboratory, participated in the testing of some of the evidence, saw the test results, and issued a report on all of the evidence on June 10, 1980.  (ECF No. 17, Ex. 23 at 15-16 and B.N. 000004-000009). Murphy and Zain determined that some of the blood enzymes on the evidence collected at the Reggettz home following the murders was inconsistent with all of the members of the Reggettz family, including Paul Reggettz.  Thus, they believed that someone other than Paul Reggettz was involved in the murders.

In particular, there was a piece of wrapping paper that had blood on it that was not consistent with any of the Reggettz family members.  Analysis on the drop of blood from the wrapping paper

indicated an EsD enzyme type of 2-1.  (ECF No. 17, Ex. 23 at 25-29 and B.N. 000012).  All of the Reggettz victims had an EsD of 1.  A known blood sample of Paul Reggettz also showed an EsD enzyme type of 1.  Thus, unless Paul Reggettz was not the biological father of the children, someone else's blood had to be on the wrapping paper.

Other crucial pieces of evidence that contained enzyme types that did not match the victims or Paul Reggettz included Bernadette's pajama top, a curtain from the back door of the house, a flashlight, taken from a utensil drawer in the kitchen, a pillowcase from behind the bath, a blood spot on the door between the master bedroom and the front door, and a change purse found in the front bedroom.  (Id. at B.N. 000010-000014).

Because Paul Reggettz had been the main suspect in these crimes, the State Police began to search for blood samples from anyone who was known to have access to the Reggettz home around the time of the murders.  Sometime in January of 1980, they tested a number of people in the area to see if their samples matched the unknown blood.  (Id. at 21-22 and B.N. 000006).

As previously noted, on or about January 29, 1980, Petitioner's uncle, Arthur Moss, indicated to the investigators that he believed his nephew might have been involved in the crimes, and gave them a copy of an article concerning Petitioner's arrest on rape and attempted murder charges in Cleveland.  Strangulation was the mode of the attempted murder in that crime.  Thus, the

investigators added Petitioner as a suspect in the Reggettz investigation.   In the months that followed, Petitioner was questioned and his blood samples taken as described previously herein.

According to the June 10, 1980 laboratory report, Bernadette's pajama top had a bloodstain containing nine enzyme types consistent with Petitioner's blood sample, which occurs in approximately 3 out of 10,000 persons.  The results on the pajama top matched perfectly with the enzyme types on the curtain, the wrapping paper, the flashlight, the spot in the doorway and the change purse.  (ECF No. 17, Ex. 23 at B.N. 000009).

<u>**ANALYSIS**</u>

**A.   Ground One - Challenging the rulings that Petitioner's confessions were voluntary and that the admission thereof did not violate his due process rights.**

In Ground One of his section 2254 petition, Petitioner contends that the state courts' findings that the confessions he gave on October 28, 1980 were voluntary are against the weight of the evidence and an unreasonable application of clearly established federal law.  (ECF No. 2 at 12-13).  The supporting facts offered by Petitioner in support of Ground One of his petition are as follows:

1.   On October 28, 1980, ostensibly while being transported to West Virginia by members of the West Virginia Department of Public Safety to answer an unconnected malicious wounding charge, although the two troopers were the chief investigating

47

authorities in the Reggettz murders, a confession was beaten and/or coerced out of the young, eighteen-year-old defendant.

2.   Petitioner was yanked out of the Ohio State Reformatory without a chance to resist being transported to West Virginia by having his counsel file a habeas due to violations of the Interstate Agreement on Detainers.

3.   Petitioner was then placed into the troopers' car by having both hands cuffed to the passenger's side front head rest.

4.   After stopping for fuel, the trio were underway on some lonely Ohio highway when Trooper Smith crawled over the front seat and started punching Petitioner in the midsection asking him about the Reggettz murders.

5.   Petitioner told the troopers he would be glad to talk to them with the presence of his attorney and requested that he be allowed to contact attorney Jim Williams.  Trooper Smith, however, told Petitioner he did not need an attorney.  Trooper Smith intermittently continued beating Petitioner until they arrived at a Parkersburg, West Virginia State Police Detachment at around 6:30 p.m.

6.   Once there, the troopers removed Petitioner from the vehicle.  Trooper Smith then hit Petitioner in the groin and told him they were there to take a taped confession.

7.   For over five hours Petitioner was held at the state police detachment and coached about what he would confess to on tape concerning the Reggettz murders.  When Petitioner did not get it right, Trooper Williams would send Trooper Smith in and he would slap Petitioner around until he got it correct.

8.   Finally, at about 9:22 p.m., Petitioner signed a second waiver of rights form and a tape recorded "confession" was conducted by Troopers Williams and Preston [sic; Presson].

48

9.    The West Virginia Supreme Court (hereinafter
      "WVSCA"), however, found that Petitioner never
      requested the presence of an attorney and that the
      troopers adequately refuted his claims that
      unlawful coercion was involved in obtaining
      Petitioner's confessions.  State v. Moss, 180 W.
      Va. 363, 376 S.E.2d 569, 579 (1988), and,
      therefore, under a totality of the circumstances,
      Petitioner's confessions were voluntary.

10.   The WVSCA made that determination even though it
      was admitted by Trooper Smith that Petitioner was
      handcuffed to the front seat head rest, and that he
      (Smith) crawled over the seat to sit beside
      Petitioner and that he (Smith) asked Petitioner why
      he thought they took his blood.  Petitioner took
      that to mean they took his blood in order to frame
      him for the Reggettz murders.

11.   From a totality of the circumstances, Petitioner's
      free will was overborne by the two burly troopers,
      both on the deserted, lonely highway, and later at
      the Parkersburg State Police detachment.

(ECF No. 2 at 12-13).

Respondent's Memorandum of Law in support of his Motion for

Summary Judgment collectively addresses the various claims

concerning the admissibility of Petitioner's confessions as

follows:

Petitioner raises several claims arguing that his
confession was improperly admitted for a number of
reasons.  This issue has been flogged by the State courts
for thirty years and no new evidence has revealed itself
since this issue was first addressed by the courts in
1980.    At least four different reviews of the
voluntariness issue have been conducted -- in the
Petitioner's transfer hearing, in the Petitioner's first
trial, in the Petitioner's appeal, and again at the
Petitioner's second trial -- all of which are included
herein for the Court's review.  The West Virginia Supreme
Court then again took it up in Moss v. Trent.  In all
cases, the admitted confession was held to be voluntary
and admissible.  See State v. Moss, and Moss v. Trent,

<u>supra.</u>   The Petitioner gave two oral confessions on October 28, 1980, the day he was returned to the custody of the West Virginia authorities, one of which was tape recorded.   A third oral confession [was] given by the Petitioner on October 30, 1980, the day he was transported back to Ohio to await the filing of a second detainer based on the first degree murder charges, and the West Virginia Supreme Court later ruled that "[a]fter considering the testimony at the suppression hearings, the trial court admitted the Petitioner's inculpatory statements into evidence.   We find no error in the trial court's voluntariness determination."   <u>State v. Moss</u>, <u>supra</u>, at 376 S.E.2d at 577-78.

(ECF No. 18 at 50).

Respondent emphasizes that the only factual development that occurred after the state court's initial determination that Petitioner's confessions were voluntary was the discrediting of Fred Zain.   Citing to <u>Moran v. Burbine</u>, 475 U.S. 412 (1986), Respondent asserts that "the fact that Fred Zain was discredited after Petitioner's conviction can have no effect on the determination of the voluntariness of the Petitioner's confession." (<u>Id.</u> at 51).   The <u>Moran</u> Court held that:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right . . .   No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess.   But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.   <u>See</u>, e.g., <u>Oregon v. Elstad</u>; <u>United States v. Washington</u>.   Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis

50

is complete and the waiver is valid as a matter of law .
. . .

475 U.S. at 422-23.  The WVSCA applied the reasoning of the <u>Moran</u>
holding in the context of a police officer's failure to inform a
suspect of a telephone call by an attorney in <u>State v. Hager</u>, 511
S.E.2d 139, 149 (W. Va. 1998).

Thus, Respondent asserts that "any information outside that
considered by the state courts over the years has no bearing on the
initial determination by the state courts and the [WVSCA] on the
determination of the voluntariness of his confession."  (<u>Id.</u> at
51).  The WVSCA noted as much in its consideration of the voluntary
nature of Petitioner's confession, holding:

> In April of 1980 the investigating authorities had
> obtained a blood sample from the Petitioner, pursuant to
> an order by an Ohio court.  This one factor does not
> convince us to conclude that the waivers and confessions
> in the present case were coerced, given the preponderance
> of the evidence to the contrary.

<u>State v. Moss</u> [<u>Moss II</u>], 376 S.E.2d at 579 n.13 (other citations
omitted).

In upholding the first trial court's determination that
Petitioner's confession was admissible, but reversing the first
conviction on other grounds, the WVSCA held:

> The appellant claims that the statements he made
> while in custody in West Virginia were involuntary under
> the totality of the circumstances, which he contends
> included unlawful coercion and prolonged in an unduly
> restrictive custodial setting, and that these statements
> should have been excluded from the evidence at trial.  In
> accordance with the mandatory duty to determine
> voluntariness set out in Syllabus Point 1 of <u>State v.</u>

51

Farmer, 150 W. Va. 571, 148 S.E.2d 669 (1966), overruled
in part, State ex rel. White v. Mohn, 168 W. Va. 211, 283
S.E.2d 914 (1981), the trial court held in camera
suppression hearings to consider evidence of the
voluntariness of the appellant's waiver of his
constitutional rights under Miranda v. Arizona, 384 U.S.
436, 86 S. Ct. 1602, 16 L. Ed.2d 694 (1966), and of the
resulting confessions. After considering the testimony
at the suppression hearings, the trial court admitted the
appellant's inculpatory statements into evidence. We
find no error in the trial court's voluntariness
determination.

Because the appellant was over the age of sixteen
years of age when his extrajudicial statements were made
to the police, the voluntariness of those statements are
tested by the totality of the circumstances under which
they were taken. Syl. Pt. 1 and Syl. Pt. 2, Matter of
Mark E.P., 175 W. Va. 83, 331 S.E.2d 813 (1985); see W.
Va. Code § 49-5-1(d). "The State must prove, at least by
a preponderance of the evidence, that confessions or
statements of an accused which amount to admissions of a
part or all of an offense were voluntary before such may
be admitted into the evidence of a criminal case." Syl.
Pt. 5, State v. Starr, 158 W. Va. 905, 216 S.E.2d 242
(1975). In Syllabus Point 7 of State v. Plantz, 155 W.
Va. 24, 180 S.E.2d 614 (1971), we emphasized that the
prosecution must also demonstrate that the accused has
knowingly and intelligently relinquished his Miranda
rights:

A statement freely and voluntarily made
by an accused while in custody or deprived of
his freedom by the authorities and subjected
to questioning is admissible in evidence
against him if it clearly appears that such
statement was freely and voluntarily made
after the accused had been advised of his
constitutional right to remain silent and that
anything he says can be used against him in a
court of law, that he has the right to the
presence of an attorney and if he can not
afford an attorney one will be appointed for
him, and that, after he has been so advised,
he knowingly and intelligently waives such
rights.

See also Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1883, 68 L. Ed.2d 378 (1981); Johnson v. Zerbst, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed.2d 1461 (1938).

In support of his contention that he did not voluntarily waive his rights, the appellant cites State v. Mollohan, 166 W. Va. 60, 272 S.E.2d 454 (1980). The totality of the circumstances in the present case, however, are distinguishable from the circumstances of Mollohan. The Mollohan confession was taken in its entirety solely within the confines of a patrol car, during a two-day journey from New Hampshire to West Virginia. In Mollohan, the accused had a defective level of intelligence and was deeply religious, characteristics which the investigating officers played upon in securing a waiver and confession from the accused. We concluded from the totality of these circumstances that the waiver in Mollohan was coerced. Id. 166 W. Va. at 64, 272 S.E.2d at 457. The totality of the circumstances in the present case lead us to a different conclusion.

The two officers who took the appellant into custody at the Ohio State Reformatory on October 28, 1980, testified at the pretrial suppression hearing. Trooper Smith testified that on the return trip to Kanawha County, prior to discussing the appellant's involvement in any crimes committed in West Virginia, he advised the appellant of his constitutional rights by reading the standard Miranda warnings, and that the appellant acknowledged that he understood his rights. Trooper Smith testified that he then inquired as to whether the appellant would agree to talk about the "serious" crime in West Virginia. The appellant at first suggested that he did not know anything about the crime, but after being asked by Trooper Smith, "Why do you think we took your blood?" the appellant indicated his willingness to talk. Trooper Smith testified that he then told the appellant that they should wait until they arrived at the state police detachment in Parkersburg before discussing the matter. Trooper Williams corroborated Trooper Smith's testimony that the appellant was advised of and indicated that he understood his rights prior to the discussion in the police car.

Both troopers testified that the appellant at no time requested a lawyer or conditioned his willingness to talk on the presence of a lawyer, and that the appellant

53

voluntarily signed two separate Miranda waiver forms at the Parkersburg state police detachment.   The Miranda warnings printed on the first form was [sic; were] read to the appellant by Trooper Williams beginning at 6:50 p.m.   The appellant affixed his signature to the form in the presence of both troopers at 6:57 p.m.   A question and answer interrogation, lasting about two hours, followed, during which the appellant confessed to the murders.   At 9:22 p.m. the appellant signed another waiver of rights form in the presence of Trooper Williams and another officer from the Parkersburg detachment. Subsequent to the signing of this waiver of his rights, the appellant made a tape recorded confession, which lasted until about 11:00 p.m.

The appellant was then transported to Kanawha County, where he remained until October 30, 1980, when he was returned to the Ohio State Reformatory by two other members of the Department of Public Safety, Troopers Woodyard and Allen.   At a second in camera suppression hearing Trooper Allen testified that during the return trip he advised the appellant of his Miranda rights; that the appellant indicated that he understood those rights; and that the appellant indicated his willingness to talk about the murders without the presence of an attorney. Trooper Woodyard testified that he overheard the exchange between the appellant and Trooper Allen, and vouched for the accuracy of Trooper Allen's testimony.   The troopers testified that they questioned the appellant about the murders for about forty-five minutes to an hour, and that the appellant's inculpatory responses included the statement that he wore gloves while at the scene of the murders.   The trial court thereupon ruled that a third oral confession had been voluntarily made by the appellant during the return trip to Ohio after a knowing and intelligent waiver of the appellant's constitutional rights.

Upon consideration of the relevant testimony adduced at the suppression hearings, we conclude that, under the totality of the circumstances, there was sufficient evidence to support the trial court's determination that the three confessions now in question were voluntarily made after knowing and intelligent waivers by the appellant of his constitutional rights.   The appellant was eighteen years of age when he waived his rights and gave the confessions, and there is no evidence that he had a defective level of intelligence.   The evidence also

shows that the appellant was given <u>Miranda</u> warnings prior to each discussion with the police, and that he signed two written waivers of his rights at the Parkersburg detachment.   The officers involved testified that he never requested the presence of an attorney, and they adequately refuted his claims that unlawful coercion was involved in obtaining the confessions.

Based on all of the foregoing, we find that there was a sufficient showing of voluntariness to support the trial court's rulings.  It is well established that "[a] trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syl. Pt. 3, <u>State v. Vance</u>, 162 W. Va. 467, 250 S.E.2d 146 (1978).

<u>State v. Moss</u> [<u>Moss II</u>], 376 S.E.2d at 577-580.  (ECF No. 8, Ex. 1).

Respondent next cites to the Final Order entered in Petitioner's first state habeas corpus proceeding (Case No. 94-MISC-663), in which Judge Bloom made the following findings:

Moss failed to present any new evidence on the voluntariness of his confession.  Rather, he seems to argue that the fact that Mr. Reggettz had, at one point, given a confession somehow invalidates Moss's own confession.   The existence of the Reggettz confession does not have the devastating effect that Moss desires because the Reggettz confession does not impugn the voluntariness of Moss's confession.  At most, it provided fodder for defense theories at trial.

The question before the Court is whether Moss was able to establish that his confession was constitutionally flawed.   He was not.   Therefore, the admission of his confession at trial does not provide a predicate for issuance of the requested writ.

(ECF No. 8, Ex. 5, Final Order, at 2-3).

The voluntariness of Petitioner's confessions was addressed for the fourth time in Petitioner's first habeas appeal, <u>Moss v.</u>

55

Trent [Moss III], 603 S.E.2d 656 (W. Va. 2004).  There, the WVSCA held:

> Although Appellant sought to raise, according to the State for the fourth time, the issue of the voluntariness of his confession, the trial court found that he "failed to present any new evidence on the voluntariness of his confession." * * * Having closely examined the arguments presented against the record of this case, we find no merit in the assignments of error raised by the Appellant.  Accordingly, the order of the Circuit Court of Kanawha County is hereby affirmed.

Id. at 661.  (ECF No. 8, Ex. 7).  Respondent asserts that Petitioner has still not presented any evidence to overcome the findings of the WVSCA, the trial court and the state habeas court on this issue.  (ECF No. 18 at 55).

Petitioner's Response to Respondent's Motion for Summary Judgment focuses on other issues and does not specifically address the voluntariness of his confessions.  (ECF No. 23).  Likewise, Respondent's Reply does not specifically re-address this issue.  (ECF No. 26).

The trial court held suppression hearings during which testimony was taken from Petitioner and the officers who transported him and took his confessions at the Parkersburg State Police Detachment.  Petitioner testified about the alleged coercion and use of force against him by Trooper Smith; however, the trial court found that the weight of the evidence fell with the testimony of the law enforcement officials, who claimed no such force was used.  (ECF No. 17, Ex. 22 at 48-72, 290-345).

Petitioner has not demonstrated, by clear and convincing evidence, that the state courts' factual determinations were incorrect or unreasonable.  Nor has Petitioner demonstrated that the state courts' decisions concerning the voluntariness of his confessions were contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and that Respondent is entitled to judgment as a matter of law on Ground One of Petitioner's section 2254 petition.

**B.  Ground Two - Challenges to the admission of Petitioner's confessions on other grounds.**

In Ground Two of his section 2254 petition, Petitioner asserts that his confessions should have been ruled inadmissible because they were obtained through the State's violations of procedures under the Interstate Agreement on Detainers and the West Virginia juvenile prompt presentment rule.  (ECF No. 2 at 15).  Petitioner further reiterates that the confessions were obtained through coerced waivers of his rights.  (Id.)  Finally, Petitioner contends that the state courts' rulings that his October 28, 1980 confessions were admissible at his second trial under the "law of the case" doctrine were based on an unreasonable determination of the facts of the case and were contrary or an unreasonable application of clearly established federal law.  (Id.)

Although Petitioner refers to the Interstate Agreement on Detainers, and the alleged coerced waiver of his constitutional rights (which was addressed in the analysis of Ground One), Petitioner's focus in Ground Two is largely on the admission of the two confessions made on October 28, 1980, in light of the juvenile prompt presentment rule and the law of the case doctrine.   The undersigned will address each of Petitioner's contentions in turn.

<u>Denial of pretransfer hearing under IAD</u>

Petitioner has alleged that his confessions were obtained through a statutorily defective transfer under the Interstate Agreement on Detainers (the "IAD").   Respondent did not specifically address this issue in his briefing.

The WVSCA addressed that issue as follows in the appeal following Petitioner's first trial:

> On September 26, 1980, while the appellant was serving a term of four to twenty-five years at the Ohio State Reformatory for felony convictions in Ohio, the Kanawha County prosecutor's office lodged a detainer and sought custody of the appellant, pursuant to Article IV of the Detainer Agreement. [FN 6] The purpose of the detainer was to obtain a determination by the Circuit Court of Kanawha County of whether the appellant was a delinquent child within the provisions of § 49-1-4(1) (1986 Replacement Vol.).   The delinquency petition and detainer were based on a malicious wounding charge, unrelated to the instant homicides, pending against the appellant in Kanawha County.   On October 28, 1980, two officers from the West Virginia Department of Public Safety travelled to Ohio, took the appellant into custody, and returned with him to West Virginia.   The appellant was not granted a pretransfer hearing.   The appellant subsequently made three inculpatory statements regarding the murders to the West Virginia authorities. One of the statements was tape recorded.   All three were

admitted into evidence at trial.

[FN 6 - An involuntary transfer under Article IV is initiated when the prosecuting attorney in the state seeking temporary custody sends a written request to the asylum state to have the prisoner made available for prosecution of the charges pending against him.]

In Cuyler v. Adams, 449 U.S. 433, 101 S. Ct. 703, 66 L. Ed.2d 641 (1981), the United States Supreme Court held that a prisoner incarcerated in a jurisdiction that has adopted the Uniform Criminal Extradition Act (Extradition Act) [FN 7] is entitled to a hearing before being transferred to another jurisdiction pursuant to Article IV of the Detainer Agreement. [FN 8] Before trial, the appellant moved to suppress the inculpatory statements arguing, inter alia, that the denial of the pretransfer hearing rendered his detention unlawful, and that the inculpatory statements he gave while unlawfully detained should be excluded from evidence.   The trial court rejected this argument and denied the appellant's motion to suppress.  In support of this same position on appeal, the appellant argues by analogy that his transfer under the Detainer Agreement without a pretransfer hearing should be equated with an illegal arrest under the Fourth Amendment, thereby vitiating his confessions.   Citing Syllabus Point 2 of State v. Stanley, 168 W. Va. 294, 284 S.E.2d 367 (1981) and Wong Sun v. United States, 371 U.S. 471, 478-88, 83 S. Ct. 407, 412-418, 9 L. Ed.2d 441 (1963), the appellant contends that his detention by West Virginia authorities without a pretransfer hearing is sufficiently analogous to an illegal arrest to cause application of the exclusionary rule.  We disagree.

[FN 7 - The Extradition Act, which has been adopted in 48 states, Puerto Rico, and the Virgin Islands, provides procedures to transfer from one state to another persons against whom criminal charges are pending.   While the Detainer Agreement applies only to persons incarcerated, the Extradition Act applies to persons at liberty as well as to persons incarcerated.   The Extradition Act is codified in Ohio, Ohio Rev. Code Ann. §§ 2963.01 to 2963.29 (Page's 1987), and in West Virginia, West Virginia Code § 5-1-7 to 5-1-13 (1987 Replacement Vol.).]

[FN 8 - A person transferred pursuant to the Extradition Act is explicitly granted a right to a pretransfer "hearing." Cuyler v. Adams, 449 U.S. 433, 443, 101 S.

Ct. 703. 66 L. Ed.2d 641 (1981). Although the Detainer Agreement does not explicitly provide a pretransfer hearing right, Id. at 443, 101 S. Ct. at 709, the United States Supreme Court held in Cuyler that, as a matter of federal law, the Detainer Agreement and the Extradition Act must be construed together, Id. at 445-450, 101 S. Ct. at 710-713, and that a prisoner transferred pursuant to Article IV of the Detainer Agreement is entitled to the pretransfer hearing guaranteed to prisoners under the Extradition Act.   Id.; see Ohio Rev. Code Ann. § 2963.09.]

While a prisoner denied a pretransfer hearing is entitled to seek habeas relief in the asylum state in order to prevent his transfer without a hearing, Cavallaro v. Wyrick, 701 F.2d 1273 (8th Cir. 1983), cert. denied, 462 U.S. 1135, 103 S. Ct. 3120, 77 L. Ed.2d 1372 (1983), a prisoner who has been denied a pretransfer hearing is not [180 W. Va. 371] entitled to have his convictions overturned after notice and a fair trial in the demanding state.   Shack v. Attorney General of the State of Pennsylvania, 776 F.2d 1170, 1172-74 (3d Cir. 1985)[], cert. denied, 475 U.S. 1030, 106 S. Ct. 1234, 89 L. Ed.2d 342 (1986); see Frisbie v. Collins, 342 U.S. 519, 77 S. Ct. 509, 96 L. Ed. 541 (1952); Ker v. Illinois, 119 U.S. 436, 7 S. Ct. 225, 30 L. Ed. 421 (1886).  In Syllabus Point 4 of State v. Flint, 171 W. Va. 676, 301 S.E.2d 765 (1983), where a defendant sought dismissal of the murder charge against him because he had been extradited to West Virginia without benefit of counsel, this Court held that "[o]nce a fugitive has been brought within the jurisdiction of West Virginia, as the demanding state, the propriety of the extradition proceedings which occurred in the asylum state may not be challenged.   The extradition proceedings may be challenged only in the asylum state." Thus, the general rule denies collateral attacks upon convictions imposed after notice and a fair trial.

The appellant attempts to distinguish between challenging the detainer proceeding itself and challenging the admissibility of evidence obtained after the appellant's transfer without a pretransfer hearing. His argument is founded on the allegation that he was illegally detained. As we have said in prior cases, however, "[w]e are unable to perceive a Fourth Amendment violation where the defendant is already in lawful custody on another unrelated charge." [State v. Grubbs,

178 W. Va. 811, 814-815 n.8, 364 S.E.2d 824, 828 n.8 (1987)] (citing State v. Clawson, 165 W. Va. 588, 600-04, 270 S.E.2d 659, 668-69 (1980)).  When the detainer was lodged against the appellant, he was in lawful custody in the Ohio State Reformatory on unrelated Ohio convictions. Thus, his transfer to West Virginia without a pretransfer hearing did not violate his rights under the Fourth Amendment, [FN 9] even though it did deny him the opportunity to test the legality of the detainer lodged against him. [FN 10]

[FN 9 - We note that there are sanctions other than the exclusionary rule for violation of the pretransfer hearing requirement.  A prisoner who had been denied a pretransfer hearing has a claim for relief under 42 U.S.C. § 1983 (1982).  Cuyler, 449 U.S. at 450, 101 S. Ct. at 712-713.]

[FN 10 - In this regard, however, we find it significant that the appellant has not raised at trial or on appeal a challenge to any of the factors which would have been scrutinized had the appellant been taken before a judge in Ohio and given the opportunity to test the legality of the detainer.  See Michigan v. Doran, 439 U.S. 282, 99 S. Ct. 530, 58 L. Ed.2d 521 (1978); Syl. Pt. 1, State ex rel. Gonzales v. Wilt, 163 W. Va. 270, 256 S.E.2d 15, 17 (1979)(citing Syl Pt. 2, State ex rel. Mitchell v. Allen, 155 W. Va. 530, 185 S.E.2d 355 (1971)).]

State v. Moss [Moss II], 376 S.E.2d at 576-577 (ECF No. 8, Ex. 1).

The undersigned first notes that Cuyler was decided by the Supreme Court after the date of Petitioner's transfer to West Virginia; thus, it was not clearly-established law at that time. In the pre-trial suppression hearing on March 18, 1990, prior to Petitioner's second trial, Assistant Prosecuting Attorney Neva Lusk noted that the law concerning a pre-transfer hearing under the IAD was not clear at the time of Petitioner's transfer.  The following colloquy occurred:

THE COURT:      Let me interrupt just a second.  I'm not
                sure I know the interstate or the multi-
                state statutes on this detainer system.
                Was he required to waive extradition in
                order to --

MS. LUSK:       Your Honor, the law was not clear at that
                time.  It's not the extradition statute
                that we're dealing with, which is found
                in Chapter 5.  This is the interstate
                compact on detainers, which is at 62-13 I
                think.  14.1.

THE COURT:      Yes.

MS. LUSK:       And it is clear now that he would have
                been taken before a Judge and confronted
                with the charges and asked to waive or
                not.  At that time, that was not clear
                and it's addressed in the _Moss_ opinion
                that once we got him here, even though
                they did that improperly in Mansfield, he
                doesn't have any attack on that, because
                like the extradition statute - -

THE COURT:      I understand that, but my question is:
                Is that a point at which he would have
                had the opportunity to have counsel
                appointed on this charge?

                            * * *

MS. LUSK:       Well, he wasn't charged at that point,
                Your Honor.

                            * * *

THE COURT:      And the Supreme Court says however
                illegal it was, it's like the old cases
                where you snatch somebody and bring them
                back?

MS. LUSK:       Right.  * * *  And they address that
                specific point in the _Moss_ opinion.  Once
                we got him, it was too late for him to
                argue about what Cleveland should have
                done on the extradition or the detainer
                procedures.

                              62

(ECF No. 17, Ex. 30 at 20-22).

Petitioner has not demonstrated that the admission of his confessions made after his transfer to the custody of West Virginia authorities without the benefit of a pretransfer hearing resulted in a violation of his constitutional rights. As noted by the WVSCA, federal courts have held that the denial of a pretransfer hearing does not entitle a prisoner to have his convictions overturned after notice and a fair trial in the demanding state. The WVSCA further found that Petitioner's attempt to paint the denial of a transfer hearing as an illegal detention subject to Fourth Amendment protection failed.

The undersigned proposes that the presiding District Judge **FIND** that the state courts' denial of habeas corpus relief on this basis is neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim for relief as pled in Ground Two of Petitioner's section 2254 petition.

<u>Prompt presentment issue</u>

Petitioner's section 2254 petition also claims that his confessions were obtained through the transporting officers' intentional failure to comply with West Virginia's juvenile prompt presentment statute, contained, at that time, in W. Va. Code § 49-5-8(d), which stated in pertinent part:

> A child in custody must immediately be taken before a
> referee or judge of the circuit court and in no event

63

> shall a delay exceed the next succeeding judicial day:
> *Provided*, That if there be no judge or referee then
> present in the county, then such child shall be taken
> immediately before any magistrate in the county for the
> sole purpose of holding a detention hearing.  The judge
> or referee shall inform the child of his right to remain
> silent, that any statement may be used against him, and
> of his right to counsel, and no interrogation shall be
> made without the presence of a parent or counsel.

W. Va. Code § 49-5-8(d) (1978).

It must first be noted that Petitioner was a 17 year old juvenile at the time of the crimes at issue herein.  However, at the time that Petitioner gave his confessions he was 18 years old. At the time of these crimes and Petitioner's confessions, West Virginia Code § 49-5-1(a) provided as follows:

> If during a criminal proceeding against a person in any
> court, it shall be ascertained or shall appear that the
> person is under the age of nineteen years and was under
> the age of eighteen years at the time of the alleged
> offense, the matter shall be immediately certified to the
> juvenile jurisdiction of the circuit court, and the
> circuit court shall assume jurisdiction of the case in
> the same manner as cases originally instituted in the
> circuit court by petition . . . .

W. Va. Code § 49-5-1(a) (1978).  Because Petitioner was a juvenile at the time of the alleged crimes, and was under the age of nineteen at the time he was brought to West Virginia and made incriminating statements, juvenile procedures, including the juvenile prompt presentment rule arguably would apply to Petitioner.

At the time the West Virginia authorities questioned Petitioner, W. Va. Code § 49-5-1(d) provided in pertinent part:

> Extra-judicial statements other than *res gestae* statements by a child under sixteen years of age, made to law enforcement officials while the child is in custody and outside the presence of the child's counsel shall not be admissible.

W. Va. Code § 49-5-1(d)(1978).  The statute, however, was silent as to statements taken from juveniles over the age of sixteen. Subsequently, it was clarified that the validity of a juvenile's confession, outside of the enumerated age-based statutory restrictions, is determined by the totality of the circumstances. See State v. Howerton, 329 S.E.2d 874 (W. Va. 1985); State v. Manns, 329 S.E.2d 865 (W. Va. 1985).  Petitioner's confessions fell outside those restrictions.

In 1985, after Petitioner's first trial, but prior to the second trial, the WVSCA also decided the case of State v. Ellsworth J.R., 331 S.E.2d 503 (W. Va. 1985), in which the court ruled that any confession obtained as a result of the delay in taking a juvenile before a neutral judicial officer would be excluded, if it appeared that the primary purpose of the delay was to obtain a confession.  The WVSCA later stated that the holding in Ellsworth J.R. would not be applied retroactively, unless a proper objection to the confession on that basis had been preserved.  State v. Moss [Moss II], 376 S.E.2d at 581 and n.18.

However, the Ellsworth J.R. opinion states that "all of this was designed to bring a detached judicial officer into the process once an arrest has been made to furnish meaningful protection for

a defendant's constitutional rights." 331 S.E.2d at 507 (emphasis added). At the time Petitioner made his damaging statements, he was in custody in Ohio, having been convicted of other crimes in that state, and he was allegedly being brought to West Virginia to answer to a malicious wounding charge that was unrelated to the subject murders, and on which a detainer had been lodged. As it turns out, after Petitioner confessed to the murders, the State of West Virginia opted not to pursue the malicious wounding charge and, thus, Petitioner did not appear before any judicial officer while he was in West Virginia. Rather, on October 30, 1980, Petitioner was returned to Ohio, so that a new detainer could be lodged against him on the murder charges. Thus, as noted by the WVSCA, it is undisputed that Petitioner was not taken before a neutral judicial officer between October 28-30, 1980.

Petitioner offers the following in support of his argument that his first two confessions should have been excluded on the prompt presentment basis, and that the state courts' findings that the confessions were admissible as the law of the case were erroneous:

1.  The admissibility of the three confessions obtained from Petitioner by the state troopers between October 28-30, 1980, is an issue which the WVSCA reviewed in State v. Moss, 376 S.E.2d 569 (1988).

2.  In Moss, *supra*, the WVSCA held that the third confession, the one on October 30, 1980, should not have been admitted into evidence because it was obtained in violation of the prompt presentment provisions of W. Va. Code § 49-5-8(d), and the

court's ruling in <u>State v. Ellsworth J.R.</u>, 331 S.E,2d 503 (1985).

3. With regard to the two confessions obtained from Petitioner on October 28, 1980, at the Parkersburg State Police Detachment, the court's ruling was deemed inapplicable because a timely prompt presentment objection had not been made.

4. However, in the second trial a prompt presentment objection was specifically and timely raised as to the two confessions. (Tr. pg. 19-21).

5. The trial court, however, interpreted the <u>Moss</u> decision as requiring a finding that the two statements in issue [were] admissible evidence. (Tr. pg. 19). The court ruled that "the taking of the statement did not violate either specific language or the principles embodied in the juvenile statute requiring an immediate presentment. (Tr. pg. 20).

6. In <u>State v. Moss</u>, the Court found that the facts clearly established that the Petitioner had not been presented to a referee, circuit court judge or magistrate, even after he had given three confessions to the murders. <u>Id.</u> at 376 S.E.2d at 508.

7. The stop in Parkersburg was solely a calculated tactic of delay to allow the intimidation of a frightened juvenile who was overwhelmed by the circumstances involving the accusation of being accused of committing a serious crime.

8. The integrity of the state troopers is immediately under scrutiny when such abuses take place.

9. Trooper Smith, one of the troopers traveling with Petitioner, provided the following statement describing the applicable facts:

> It was then said to the effect, that we needed to get it straightened out but that something of the importance needed to be discussed some [sic; somewhere] other than the back seat of a car in which we were riding.

> Going on to say it needed to be
> discussed in a place where you could
> sit down, have a cup of coffee and
> could look each other in the eye.

10. The facts clearly indicate that Petitioner was never taken in front of a magistrate; that the confession was obtained not as a result of the troopers' decision to stop in Parkersburg or not as a result of Petitioner's offering of a confession; and that the primary purpose of the delay was to obtain a confession; and not that the delay was for the recording of said confession which had already been offered.

11. Trooper Smith's statement clearly indicates that there was no clear or specific understanding between Petitioner and the troopers that he was prepared to discuss the Reggettz murders at that moment or any other time. The nod of his head described by Trooper Smith is certainly not tantamount to an expression of the desire to offer a confession. The entire conversation was conceived by and prompted by the trooper, not Petitioner:

> . . . I said something to the effect
> of, now John, we both know what I am
> talking about and it is important we
> get it straightened out. He did not
> acknowledge that he did know what we
> were talking about. After
> expressing a couple of more times to
> John that it was extremely important
> that the matter needed to be
> straightened out, it was told to
> John or asked of him something of
> the effect of, John why do you think
> we got that sample of blood. After
> mentioning the blood, John was again
> told something to the effect of, now
> John, we both know what I'm talking
> about, he agreed shaking his head
> yes.

12. Therefore, because Petitioner's prompt presentments were timely raised at the second trial, the confessions should have been excluded

from evidence.  Based upon the particular set of facts in the instant case, Petitioner should be entitled to a new trial.

13. Prior to Petitioner's first trial, counsel filed a motion to suppress two of the alleged confessions of Petitioner, as well as the results of blood tests.  The court held two *in camera* suppression hearings.

14. One was held prior to the first trial, and one was held after individual *voir dire* of the jury had begun.  At the conclusion of the September, 1983, hearing the trial court set a briefing schedule as well as a date of October 12, 1983, at 9:00 a.m. to render a ruling from the bench on the admissibility of the two 10/28/80 "confessions."  It is not clear to Petitioner, due to the passage of time, whether any hearing was held on that date and Petitioner has been unable to obtain a transcript of the court's ruling or any entered Order.

15. Counsel filed his Memorandum in Support of Motion to Suppress, on or about 3 October, 1983.  A bench ruling that the two confessions would be admissible was issued in a December 29, 1983, 2-page letter type document.

16. The defense was not informed of the state's intention of introducing Petitioner's third confession, so that confession was not a subject of the motion, September, 1983, hearing, memorandum or ruling.  Counsel also filed a motion *in limine* on the two confessions.

17. Though not dispositive of the reversal by the WVSCA of Petitioner's first trial, the court nonetheless considered Petitioner's issue on direct appeal that the three confessions were improperly admitted at trial, due to, they felt, "[b]ecause the admissibility of the...three...confessions [would] again be of concern on remand..."  See State v. Moss, 180 W. Va. 363, 376 S.E.2d 569, 575 (1988).

18. The court ruled than, unlike the first two confessions, the third confession is inadmissible due to the lack of prompt presentment to a neutral judicial officer.  State v. Moss, 376 S.E.2d at

576.  The court ruled that had prompt presentment
objections been preserved on the first two
confessions, as in the third confession, they, too,
would have been inadmissible.  <u>Id.</u> at 581.
Appellate counsel failed to file a petition on
rehearing to call the court's attention to their
mistake.

19.  Prior to Petitioner's second trial, counsel filed a
motion to suppress the two remaining confessions
based on authorities' failure to promptly present
Petitioner to a neutral judicial officer, and
subsequently objected to the second trial court's
adverse ruling.  The second trial court ruled that
the WVSCA, in <u>State v. Moss</u>, had held the two
confessions to be admissible, and that ruling was,
therefore, "law of the case" on remand; and if that
were not the case, the foray or diversion from the
direct route from Ohio to Charleston would not
violate the juvenile prompt presentment statute or
the WVSCA mandate in <u>Ellsworth, J.R.</u> (<u>State v.
Ellsworth, J.R.</u>, 331 S.E.2d 503 (W. Va. 1985).

20.  The two confessions were quite probably the
decisive factor for the jury to convict Petitioner
as the remaining evidence were [sic] was] easily
dispelled as not being strong enough to convince
impartial minds, beyond a reasonable doubt, of
Petitioner's guilt.  Neither the WVSCA or Kanawha
County Circuit Court followed the state's own
procedural and decisional law in allowing the two
confessions before the jury.

(ECF No. 2 at 15-18).

Respondent asserts that Petitioner has not presented any
federal authority that has been misapplied by the state courts.
Respondent cites to the WVSCA's opinion affirming the denial of
Petitioner's first state habeas petition, which states:

The final issue which we address concerns the
appellant's contention on appeal that all three of his
confessions should be ruled inadmissible because his
rights under West Virginia Code § 49-5-8(d) (1986
Replacement Vol.) were violated.  This statute directs

70

that a juvenile be taken immediately before a neutral judicial officer upon being taken into custody.  In Syllabus Point 3 of State v. Ellsworth J.R., 175 W. Va. 64, 331 S.E.2d 503 (1985), we addressed the consequences of noncompliance with the provisions of Code § 49-5-8(d):

Under W. Va. Code § 49-5-8(d), when a juvenile is taken into custody, he must immediately be taken before a referee, circuit judge, or magistrate.  If there is a failure to do so, any confession obtained as a result of the delay will be invalid where it appears that the primary purpose of the delay was to obtain a confession from the juvenile.

In reaching this decision, we concluded that the juvenile prompt presentment requirement is more stringent than the provision requiring the initial presentment of an adult before a magistrate under West Virginia Code § 62-1-5 (1984 Replacement Vol.); see W. Va. R. Crim. P. 5(a).  Unlike a violation of the adult prompt presentment requirement, which is analyzed for admissibility as a part of the totality of the circumstances making a confession involuntary and hence inadmissible, Syl. Pt. 6, State v. Persinger, 169 W. Va. 121, 286 S.E.2d 261 (1982), as amended, Syl. Pt. 1, State v. Guthrie, 173 W. Va. 292, 315 S.E.2d 397 (1984), noncompliance with the juvenile prompt presentment requirement results in inadmissibility if the violation occurred for the primary purpose of obtaining a confession from the juvenile, Ellsworth v. J.R., 175 W. Va. at ----, 331 S.E.2d at 508, and may operate to exclude confessions even where Miranda rights have [180 W. Va. 375] been given and waived.  Guthrie 173 W. Va. ----, 315 S.E.2d at 399. [text omitted].  Thus, compliance with the juvenile prompt presentment requirement is examined separately from the determination of voluntariness.

Like the rule stated in Syllabus Point 6 of Persinger, however, the exclusionary rule established in Syllabus Point 3 of Ellsworth J.R. "is not to be applied retroactively to a confession which was obtained prior to the date of that decision where no prompt presentment objection was made at trial." Syl. Pt. 4, in part, State v. Hickman, 175 W. Va. 709, 338 S.E.2d 188 (1985)(emphasis added); see also Syl. Pt. 3, State v. Gangwer, 168 W. Va. 190, 283 S.E.2d 839 (1981).  In the present case, it is uncontroverted that the appellant was not presented to a referee, circuit judge, or magistrate,

> even after he had given three confessions to the murders.
> The three confessions were obtained prior to our holding
> in Ellsworth J.R., however, and our review of the record
> reveals that a prompt presentment objection was preserved
> before the trial court only with respect to the
> third confession.  Since the issue was not preserved on the
> first two confessions, the decision in Ellsworth J.R.
> will not be applied retroactively to exclude those
> confessions, but will only be applied retroactively to
> exclude the third confession obtained from the appellant
> on October 30, 1980.  Accordingly, the appellant's third
> confession is hereby declared invalid and inadmissible.

Moss v. Trent [Moss III], 603 S.E.2d at 580-581.  (ECF No. 8, Ex.
1 at 12).

Neither Petitioner's Response (ECF No. 23) nor Respondent's
Reply (ECF No. 26) address the prompt presentment issue.  On May
17, 2011, however, Petitioner submitted his own Affidavit stating
that he recalled that Judge Hey made a verbal ruling from the
bench, on or about October 12, 1983, in which "Judge Hey did
mention and deny the Motion [to suppress confessions] by ruling on
issues pertaining to the West Virginia juvenile prompt presentment
rule" and that "defendant's counsel, Parrish McKittrick, did object
to the court's ruling, and the court acknowledged the said verbal
objections." (ECF No. 36, Attach. 1).  There is no indication on
Petitioner's criminal docket sheet that any such proceeding took
place on the record on or around October 12, 1983.  (ECF No. 8, Ex.
2).

Based upon a thorough review of all records from Petitioner's
state court proceedings that have been provided to this court, the
following facts have been established:

Petitioner's first trial counsel filed several Motions to Suppress on March 23, 1983. One motion was a specific Motion to Suppress Confession which challenged the admissibility of Petitioner's confessions on a number of grounds. Although the motion states that Petitioner "was brought back to West Virginia and initially dealt with as a juvenile," the motion makes absolutely no mention of the juvenile prompt presentment rule or the fact that Petitioner was not taken before a neutral judicial officer. Rather, it only asserts that the statement was obtained without a parent or responsible adult being present" and "no notice of any such transfer was given" to Petitioner's parents or a responsible adult. (ECF No. 36, Attach. 3 at 9-12). Petitioner also filed Motions to Suppress concerning his blood samples and physical evidence seized from his parents' house. (Id. at 1-8).

For some reason, a supporting Memorandum concerning these motions was not filed until October 3, 1983. (ECF No. 35, Ex. 37). By that time, a hearing on Petitioner's various motions to suppress had already been held on September 19, 1983. (ECF No. 17, Ex. 22). During the hearing, no specific argument concerning the juvenile prompt presentment rule was made. Rather, the arguments and testimony centered on the voluntariness of Petitioner's confessions, the propriety of the extraction of Petitioner's two blood samples and the admissibility of physical evidence collected thereafter. (Id. at 32-346). At the conclusion of the hearing,

73

Petitioner's counsel was granted permission to file the brief in support of his motion to suppress mentioned above. (Id. at 345).

On October 3, 1983, Petitioner's counsel filed a Memorandum in Support of Defendant's Motion to Suppress Samples of Blood, Confession, and Other Physical Evidence Seized from Defendant (ECF No. 35, Ex. 37). In that brief, Petitioner's counsel argued that, as a juvenile, Petitioner was unable to properly waive his Fifth Amendment rights without an attorney or a responsible adult being present. The brief made no argument about the West Virginia juvenile prompt presentment rule. (Id.)

On December 29, 1983, Judge John Hey issued a letter-form ruling on the Motion to Suppress Blood Samples, Confession and Other Physical Evidence Seized from the Defendant. Concerning the confessions, the letter-form ruling states:

> The Court, after reading briefs of counsel, finds that the motion to suppress the above-described items is without merit and doth deny the same.
>
> This Court, without attempting to write a long, detailed opinion for the purpose of explaining its ruling, and for the sake of brevity, advises counsel that many of the matters raised by defendant's brief have previously been raised ad infinitum in this Court and the West Virginia Supreme Court of Appeals.

(ECF No. 36, Attach. 5 at 125-126). The remainder of the letter-form ruling focuses on the motion to suppress the blood sample taken from Petitioner in April 1980, which will be addressed separately herein. (Id.)

Thus, the letter-form ruling resulted in a finding that the Petitioner's first two confessions, made on October 28, 1980, were admissible at his first trial.

Then, on March 2, 1984, just before the start of Petitioner's first trial, the State disclosed to the defense, for the first time, the fact that Petitioner had made a third confession to Troopers Howard F. Woodyard and Randall Allen on October 30, 1980, as he was being returned to the correctional facility in Ohio. (ECF No. 36-2 at 4-7). Thus, an in camera hearing was held on March 19, 1984, during which time Petitioner's counsel moved to suppress the third confession. During that hearing, Petitioner's counsel did state the following:

> Now, here is a defendant that confesses to a triple murder case at approximately 9:30 on the 28th day of October, 1980. He is kept in the county jail for a day. He is picked up by troopers, and they still interrogate him without him being taken before a neutral magistrate, where he is to be given not only his rights, but if he could not afford it, then he would be appointed counsel. And, therefore there could be no discussions with the defendant if he had counsel.

> \* \* \*

> Therefore, we contend, Your Honor, that his Fourteenth Amendment rights have been violated.

(ECF No. 36, Attach. 5 at 2059). The prosecutor then argued in rebuttal:

> Now, whether or not Mr. Moss was taken before a magistrate in the middle of the night, Your Honor, as you may remember, at that time, Mr. Moss was a juvenile. We don't take a juvenile before a magistrate. They don't go before a J.P. They went before referees as we call them.

75

> And the juvenile referee is not available at 2:30 or 2:00, whenever.  He is available through the day.
>
> In any event he was taken back to Ohio the next day, the 30th, to set up to bring back with the proper charges against him, Your Honor.

(Id. at 2062).  These are the only arguments concerning juvenile prompt presentment that were made before Petitioner's first trial. The trial court then ruled as follows:

> The Court makes the following findings of fact and conclusions of law:
>
> I think Mr. McKittrick was right that you have to look at the totality of the circumstances, and should this ever reach an appellate body, I suspect it is going to end up with about ten or twelve volumes; so I am not going to burden it any more except than to say the record speaks for itself as to some of the issues raised.
>
> * * *
>
> As you pointed out, these matters are discretionary with the court as to admissibility.  I find and conclude that the confession is admissible and goes to its weight and not its admissibility, and that the defense would be entitled to an instruction at the conclusion of the trial on the coercion of the confession if that is their position.

(ECF No. 36, Attach. 5, at 2063-2064).  The court did not specifically address the juvenile prompt presentment issue.

Prior to this in camera proceeding, Petitioner's counsel had not formally lodged any objection to the admission of any of Petitioner's confessions specifically on the basis of the juvenile prompt presentment rule and, to the extent that this exchange by Petitioner's counsel and the prosecution constituted an objection, which is how the WVSCA apparently construed it, such objection was

further construed by the WVSCA to apply only to the third confession, as the other two confessions had previously been ruled admissible.

Thus, when the WVSCA held that only the third confession would be inadmissible under the ruling in Ellsworth J.R. because an objection under the juvenile prompt presentment rule had only been raised with regard to the third confession, that finding was based upon a reasonable determination of what was argued in the proceedings prior to Petitioner's first trial. Petitioner's second trial counsel admitted as much during the pre-trial suppression hearing on March 19, 1990:

> MR. HUFFMAN: I think they both got -- for the same reason, I think they both need to be suppressed. And I think for the same reason that the third confession was suppressed, the first two should also be suppressed, and the only reason the Court didn't do it whenever it was there the last time, the objection was never preserved as to these two prior to trial, because the Elsworth case took place and was decided after this case was tried.

(ECF No. 17, Ex. 30 at 37).

Therefore, the undersigned proposes that the presiding District Judge **FIND** that the state courts' rulings were not based upon an unreasonable determination of the facts in light of the evidence presented in the state proceedings.

Furthermore, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not established that the admission of his first two confessions at his second trial, based upon the Circuit Court's finding that the WVSCA's ruling that those

77

confessions were admissible was the "law of the case," resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law.  The prompt presentment rule's potential impact on the admissibility of Petitioner's confessions is a matter of state law, and Petitioner has not demonstrated that such a decision implicated his federal constitutional rights. Petitioner has not demonstrated that he was unduly prejudiced by the proper admission of his confessions under West Virginia law.

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim as stated in Ground Two of Petitioner's section 2254 petition.

### C.   Grounds Three, Five and Ten - Fourth Amendment claim and Brady claim.

In Ground Three of his section 2254 petition, Petitioner asserts that he did not receive a full and fair hearing on his Motion to Suppress Samples of Blood, Confession, and Other Physical Evidence Seized, due to the improper tactics of Trooper Fred Zain and the West Virginia State Police Crime Lab.  Petitioner asserts that his due process rights were violated and that the state courts' rulings were contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent, or an unreasonable determination of the facts as set forth in the record.  (ECF No. 2 at 21).  Petitioner's petition further asserts:

78

1.   Two samples of blood obtained from Petitioner were
     derived from him on two separate trips by West
     Virginia State Police troopers to Ohio where
     Petitioner was being held.

2.   On the first occasion, 30 January 1980, the
     troopers did not have a court order, warrant or
     permission from Petitioner's counsel or parents.
     On the second occasion, 28 April 1980, however, an
     Ohio court order was obtained by West Virginia
     authorities to extract a blood sample.

3.   On neither occasion was counsel present with
     Petitioner, even though the assistant prosecuting
     attorney for Kanawha County, West Virginia, was
     present at the second, forced extraction.

4.   It was only after the first blood sample was
     obtained that Petitioner became a serious focal
     point in the homicides of the Reggettz family.

5.   It was alleged by West Virginia authorities that
     the cloth containing the first sample was returned
     to Petitioner.  However, Petitioner unequivocally
     avers the cloth, or all of it, was not returned but
     was taken to Fred S. Zain on 30 January, 1980, by
     Zain's fellow troopers, Williams and Smith.  That
     fact has never been disputed by the government.

6.   It was only after Zain had a known sample of
     Petitioner's blood, with which he falsely reported
     had been gathered at the crime scene, that
     Petitioner became a serious focal point in the
     investigation of Petitioner's involvement in the
     murders of the Reggettz family.

7.   The fact Zain had a known sample of Petitioner's
     blood is borne out by the copy of a January, 1980,
     lab table listing blood groupings from fourteen
     (14) individuals, including Petitioner.  Contrary
     to testimony, a known blood sample of Petitioner's
     blood was in Zain's possession in January 1980.

8.   The illegally obtained blood sample forcefully
     extracted from the then 17-year-old, and
     constitutionally prohibited questioning of the
     young defendant, who had, subsequently, just turned
     18, provided West Virginia authorities with the

probable cause to obtain an Ohio court order to obtain another, ostensibly, legal blood sample from Petitioner, for the probable cause to transport Petitioner from Ohio to West Virginia, and to issue search warrants of Petitioner's parents' home and automobile.  It is also what the two troopers who beat a confession from Petitioner used to inform him that they were pinning the murders of the Reggettz family on him.

9. The trial court held two _in_ _camera_ suppression hearings on counsel's motion to suppress Petitioner's blood test results, confessions, and all physical evidence seized from Petitioner's parents' home and automobile, which were also the subject of counsel's motions _in_ _limine_.

10. One hearing was held prior to trial and one was held after individual _voir dire_ of the jury had commenced.

11. Counsel had filed motions for particulars (discovery) requesting the state turn over all reports, statements, test results, etc., that was in the possession of the state.

12. The state responded that it had provided defense counsel with all the requested material.

13. However, the blood grouping table was not divulged by the state until Petitioner's habeas corpus counsel[,] Lonnie G. Simmons, discovered it during Petitioner's first special Zain habeas proceeding.

14. Trial counsel was precluded from fully and fairly litigating Petitioner's Fourth Amendment issues prior to or during trial because of the state's nondisclosure of, _inter alia_, the blood grouping table.

(ECF No. 2 at 21-22).

Petitioner contends that this first blood sample, though ordered to be returned, either was not returned, or at least some of it was retained and used to manufacture evidence implicating

Petitioner in the Reggettz murders. Petitioner claims that the fact that Zain had a known sample of Petitioner's blood is demonstrated by a Blood Grouping Table that was not divulged by the State until Petitioner's <u>Zain I</u> habeas proceeding. Because Petitioner did not elaborate on this claim in his section 2254 petition, the following is an excerpt from the argument concerning this claim as it was raised in Petitioner's second Circuit Court habeas proceeding (Case No. 05-MISC-298):

> The fact Zain had a known sample of Petitioner's blood in January, 1980, is borne out by the copy of Zain's January, 1980 lab table listing blood groupings from fourteen (14) individuals, including Petitioner. (See copy of January, 1980 blood groupings table, attached hereto as Petitioner's Ex. #3.) As is apparent from Zain's table a known sample of Petitioner's blood grouping was in his possession in January, 1980, and he is listed in his table. The only possible way for Zain to have a known sample of Petitioner's blood in January, 1980, was to have received at least a portion of the illegally gotten sample obtained by Troopers Williams and Smith from Petitioner on 30 January, 1980.
>
> In essence, the illegally retrieved blood sample and constitutionally prohibited questioning of the, at the time, juvenile Petitioner ostensibly provided West Virginia authorities with probable cause evidence to obtain an Ohio court order to allow authorities to take another blood sample from Petitioner. This allowed Zain to perpetrate his fraudulent representations in the probable cause process by alleging the sample of blood taken from Petitioner on 22 April, 1980, matched unknown blood samples gathered at the crime scene. In fact, the sample taken from Petitioner on 22 April, 1980, did not match any unknown sample gathered by Zain at the Reggettz crime scene, later allegedly determined by Zain, to be that of Petitioner. It matched only the known sample illegally obtained from Petitioner on 30 January, 1980. Zain fraudulently manipulated blood sampling evidence, with total disregard for the truth, to reflect Petitioner to be a prime suspect in the murders of the Reggettz

81

family.  This information which was known, or should have
been known, by the prosecutor was withheld from
Petitioner and did not become known to him until the
investigation of Zain and the West Virginia Police Crime
Laboratory in which Petitioner received the noted blood
grouping table dated January, 1980.  Trial counsel was
diligent in seeking all evidence in possession of the
state, but due to the late divulgence of the table by the
state, Petitioner did not have a full and fair
opportunity to litigate his Fourth, Fifth, Sixth and
Fourteenth Amendment claims at the 19, 20, 21 & 22
September, 1983 suppression hearing prior to the first
trial, or the 26 February, 1990, suppression hearing
prior to the second trial.

In Schmerber v. California, 384 U.S. 757, 86 S. Ct.
1826, 16 L. Ed.2d 903 (1966), the Court indicated that
all compelled blood tests are seizures subject to the
reasonableness requirement of the Fourth Amendment to the
United States Constitution.  Since the holding in
Schmerber, the courts of this land have concertedly held
the Fourth Amendment rules on search and seizure should
guide the courts when law enforcement seek blood from
internal body cavities.

In Stone v. Powell, 428 U.S. 465, 96 S. Ct. 3037, 49
L. Ed.2d 1067 (1976), the Supreme Court held that neither
state nor federal prisoners could collaterally attack
state convictions on grounds that illegal evidence was
admitted at trial where the "[S]tate has provided an
opportunity for full and fair litigation of a Fourth
Amendment claim."  428 U.S. at 494.  The Supreme Court
reaffirmed its decision in Stone v. Powell, supra, and
held that habeas relief could not be granted to a state
prisoner on the ground that custodial statements made by
him were obtained in violation of the Fourth Amendment.
Cardwell v. Taylor, 461 U.S. 571, 103 S. Ct. 2015, 76 L.
Ed.2d 333 (1983).  The Court in Caldwell held that relief
could be granted if statements were involuntary and
therefore obtained in violation of the Fifth Amendment.

The Petitioner carries both burdens of pleading and
proving the facts and the reasons why he did not receive
an opportunity for full and fair litigation.  Doleman v.
Muncy, 579 F.2d 1258 (4th Cir. 1978).

In sum, Petitioner was denied a full and fair
opportunity to litigate his Fourth Amendment claim prior

82

> to trial due to the improper actions of the state through
> its prosecutor and investigative body.  A hearing on the
> matter in these habeas corpus proceedings, therefore, is
> mandatory and vital to afford Petitioner a full and fair
> opportunity to demonstrate his entitlement to relief.

(ECF No. 35, Ex. 34 at 23-25).

Petitioner continues his Fourth Amendment argument in Ground Five of his section 2254 petition.  Petitioner repeats his claims that he was denied a fair trial and due process of law because of the taking of both of his blood samples, which he alleges led to the discovery of other evidence that led to his conviction. Petitioner claims that this other evidence should have been excluded as fruit of the poisonous tree.  (ECF No. 2 at 24). Petitioner's section 2254 petition incorporates by reference the facts set forth in support of his other grounds for relief therein, and does not elaborate on this claim.  Thus, the undersigned again turns to the arguments made in Petitioner's second Circuit Court habeas corpus petition (Case No. 05-MISC-298), where Petitioner first raised this claim:

> The samples of blood obtained from Petitioner were
> derived from him on two separate occasions.  On the first
> occasion, the police did not have a court order, warrant,
> or permission from Petitioner's parents or counsel.  On
> the second occasion, a court order was issued by an Ohio
> court.   On neither occasion was counsel present with
> Petitioner, and it was only after the blood samples were
> obtained that Petitioner became a suspect in the
> homicides of the Reggettz family.   In essence, the
> results of the blood tests provided the authorities in
> West Virginia with the probable cause evidence which they
> had previously lacked.  Also, Trooper Williams' and
> Smith's discussion with Petitioner on 30 January, 1980,
> created investigative leads which they pursued upon their

return to West Virginia.   Thereafter, these troopers obtained physical and testimonial evidence from Arbutus and William Johnson in the form of silverware which was presented at trial and which the West Virginia Supreme Court relied upon for affirming the denial of Petitioner's Special "Zain" Habeas Corpus petition for relief.   Both courts, however, failed to recognize the fact that unequivocal and conclusive evidence was presented by the defense demonstrating that there was no way the silverware came from the Reggettz home.

* * *

The evidence is clear from the testimony of police authorities at all the hearings held that there was a complete lack of probable cause on 22 April, 1980, the date of the second extraction, pursuant to an Ohio court order, of Petitioner's blood.   Even though that order directed Petitioner to give blood it is undebatable that Trooper Smith's and Prosecuting Attorney Mike Roark's affidavit appended to the petition for the Ohio court order does not state probable cause.   First, the affidavit is written in conclusory language and, second, Trooper Smith testified in the suppression hearing that blood was not an issue in the felonious shooting case at the Moose Club in St. Albans, West Virginia, thereby negating the felonious assault allegation in the affidavit.   Finally, there are no other facts stated which even remotely constitute a factual foundation reflecting probable cause on 22 April, 1980, as every investigating officer who has testified has conceded.

Trooper Smith attempted but failed miserably in his suppression hearing testimony to state reasons for having probable cause to extract Petitioner's blood on the 22nd day of April, 1980.   Trooper Smith stated three reasons to believe there was [sic; were] reasonable grounds to believe Petitioner committed the Reggettz homicides:

(1)   Petitioner lived in close proximity to the Reggettz home;

(2)   Trooper Smith had a newspaper article that indicated Petitioner had used a .25 caliber revolver in a crime in Ohio and that the .25 caliber revolver was used in the Moose Club shooting;

(3) Petitioner indicated to a friend he
    desired to burglarize the Reggettz home.

At the same time, Trooper Smith testified he had
knowledge of 1 and 2 above before 30 January, 1980, when
he unlawfully extracted blood from Petitioner. More
importantly, Trooper Smith testified that on 30 January,
1980, he did not have reasonable grounds to believe
Petitioner committed the Reggettz murders. All evidence
indicates no facts were added to the state police
investigation which would enhance probable cause between
30 January and 22 April, 1980, when the second blood was
taken from Petitioner.

(ECF No. 35, Ex. 34 Memorandum at 25-27). The previous petition

further asserts:

In obtaining samples of Petitioner's blood under
forced circumstances (which strain of blood was,
according to Zain, consistent with that found at the
scene of the homicides of the Reggettz family; * * * the
blood samples resulted in incriminating evidence
prejudicial to Petitioner and, for all intent[s] and
purposes, produced a confession of a circumstantial
variety.

* * *

It is not debated that on 30 January, 1980, troopers
of the West Virginia Department of Public Safety violated
Petitioner's rights by extracting a blood sample from him
while he was incarcerated in the state of Ohio. More
importantly, during that meeting, certain information was
secured that was used at trial. Petitioner supplied the
troopers with the names of his friends. After leaving
Ohio, the troopers contacted William Johnson and took a
written statement which tended to incriminate Petitioner.

Also, Trooper Williams testified that after the 22
April, 1980 meeting with Petitioner, where blood was
again extracted, upon a court order, but without probable
cause, that "[W]e obtained [another] written statement
from William Johnson[.]" That statement alleged that
Petitioner had indicated he desired to burglarize the
Reggettz home and that Petitioner had given Arbutus
Johnson flatware that came from the Reggettz home. The
trooper admits this statement was not taken until after

85

the blood laboratory results on Petitioner were disclosed
and after the trooper came to the conclusion Petitioner
was a suspect.  Thereafter, written statements were taken
from Arbutus Johnson concerning the flatware allegedly
stolen from the Reggettz residence as well as the
flatware being secured.

Decisions on this issue indicate that where an
illegal search confrontation has provided the prosecution
with the names and later testimony of witnesses it might
not have otherwise acquired such are inadmissible as the
fruit of the illegal search.  The blood sample taken from
Petitioner without probable cause constituted illegally
obtained evidence which should have been suppressed, just
as all fruits of the search and seizure, i.e. flatware,
statements of William and Arbutus Johnson, and alleged
confessions should have been.

If it had not been for the totality of the
circumstances, i.e., unlawful extraction of Petitioner's
blood on 30 January, 1980, which resulted in statements
being taken from William and Arbutus Johnson and which
resulted in securing the flatware against Petitioner, and
the unlawful extraction of Petitioner's blood on 22
April, 1980, which resulted in a second statement from
William and Arbutus Johnson, Petitioner would not have
even been a suspect in the murders of the Reggettz
family, thus negating the possibility of securing
inculpatory statements from Petitioner by Troopers
Williams and Smith on 28 October, 1980, and by Troopers
Woodyard and Allen on 30 October, 1980.

The confessions are a direct result of the illegal
search and seizures of Petitioner's blood carried out by
representatives of West Virginia on 30 January, and 22
April 1980, and should have been excluded from trial.
The trial court abused its discretion and committed
reversible error when it ruled contrary thereto.

(Id. at 27-29).  Petitioner also emphasizes that the State's

conduct violated his Fifth Amendment right against self-

incrimination, denied him due process, and was fundamentally

unfair.  (Id. at 29-31).

Because of the way Respondent addressed Petitioner's claims in a grouped fashion, Respondent did not specifically address Petitioner's Fourth Amendment claims in his Memorandum of Law. (ECF No. 18). However, Petitioner's Response to the Motion for Summary Judgment, re-addressed his assertion that the State was in possession of his known blood sample in January of 1980, as a result of the first illegal extraction (ECF No. 23 at 5, 10). The Conclusion section of Petitioner's Response states:

> Petitioner asserts that the January, 1980, illegally obtained blood sample was either not returned, or the West Virginia State Police Crime Laboratory, Serology Division, contrary to what was testified to, retained a partial sample and conducted analysis on Petitioner's blood in January, 1980 [footnote omitted] and, for whatever reason – who knows what motivates persons like Fred S. Zain and/or Robert Murphy to lie and formulate false reports of testing, etc. – decided to match Petitioner's blood with alleged unknown blood samples taken at the crime scene. That illegally obtained blood sample led to the discovery of virtually all the other "corroborative evidence" the WVSCA relied on to affirm the circuit court's denial of Petitioner's special <u>Zain</u> habeas proceeding [footnote omitted] and the subsequent denials of Petitioner's <u>pro se</u> state applications for post-conviction relief. Petitioner did not receive, <u>inter alia</u>, a full and fair opportunity to litigate his Fourth Amendment violations claims due to the improper and illegal tactics of the West Virginia State Police, and the withholding of the evidence discovered subsequent thereto – during the special <u>Zain</u> habeas proceedings – of wrongdoing by the state.

(<u>Id.</u> at 12).

Petitioner has also tied a claim under the Supreme Court's decision in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) to his Fourth Amendment and false evidence claims. Ground Ten of Petitioner's

section 2254 petition asserts that Petitioner's due process rights were violated by the State's withholding of exculpatory and/or impeachment evidence.  Petitioner's section 2254 petition does not elaborate on this claim and, once again, incorporates by reference the facts supporting his other grounds for relief.  (ECF No. 2 at 59).

As noted by Respondent in his Reply brief, "The Supreme Court in Brady v. Maryland, 373 U.S. 83 (1963), held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment.'  Brady has been interpreted by the courts to include not only the suppression of favorable evidence but the knowing use of false evidence by the prosecution."  (ECF No. 23 at 12 n.1).

In his initial Memorandum of Law, Respondent asserts that Petitioner did not present a Brady claim in the state courts and, thus, such claim is unexhausted and procedurally barred from consideration by this federal court.  (ECF NO. 18 at 66). Respondent's Memorandum of Law further states:

> Although Petitioner has relentlessly challenged his conviction for thirty years while exercising his constitutional right to due process, and during that time raised every possible argument that could be wrung from the circumstances of his case, Petitioner did not present the state courts with a claim under Brady v. Maryland. Nowhere did the state courts, in any habeas proceedings or Petitioner's appeals or three state supreme court opinions, review any claim that the State intentionally withheld exculpatory evidence either as a Brady claim or

as a state law claim.

Rather Petitioner now churns the circumstances surrounding the blood evidence and the post conviction proceedings which resulted in renewed analysis of that blood evidence, into a claim that the State withheld exculpatory evidence from the defense. Although not fully articulated, it appears Petitioner is citing to evidence developed during the Zain habeas proceedings as exculpatory.

Petitioner does not cite to what exculpatory evidence was withheld in violation of the federal standards of Brady v. Maryland as required to properly exhaust the substance of this claim before the state courts. All claims regarding how the State divulged testing results were examined as evidentiary issues by the State courts and not as claims that exculpatory evidence was withheld in violation of Brady v. Maryland as required to develop the substance of a federal claim reviewable in federal habeas corpus. No hearing was conducted during any of Petitioner's post-conviction proceedings on whether the State withheld exculpatory evidence nor were any of Petitioner's claims analyzed by the State courts under Brady v. Maryland. Nor has Petitioner successfully cited to evidence developed at the Zain hearing that would constitute newly discovered evidence that would raise the specter of a Brady claim. No evidence was ever developed during the Zain habeas that was exculpatory or could have been exculpatory or even beneficial to [t]he defense at trial.

(Id. at 66-67).

Petitioner's Response contends that he did raise his Brady

claim in the state courts. He asserts:

Petitioner pointed to where in the record it was in his 17 February, 2010 pro se request to respond to Respondent's answer on the limited issue of timeliness of the petition and exhaustion of available state court remedies. (No. 09, ¶6.)

"...Petitioner placed the [Brady] issue before the West Virginia Supreme Court of Appeals in at least one instance, when Petitioner asserted, 'This information which was known,

> or should have been known, by the prosecutor,
> [false and/or misleading evidence or testimony
> by a state serologist...] was withheld from
> Appellant, as well as the blood grouping data
> sheet...' (<u>See</u> Resp't, Exhibit 11, p. 32,
> Ground 4; <u>see also</u> p. 33, Ground 5.)"

Petitioner received review of only <u>Zain</u> claims.  No state
court has ever considered Petitioner's claims other than
under the state court standard announced in <u>Zain I</u>.  For
example, the state court orders dismissing Petitioner's
<u>pro se</u> petitions never made factual determinations on
Petitioner's claims of ineffective assistance of counsel,
nor of whether the West Virginia State Police Crime
Laboratory, Serology Division, had a sample of
Petitioner's blood in January, 1980.  Petitioner has
submitted evidence that they did have a sample of
Petitioner's blood then.  In denying Petitioner's claims,
the state courts merely reiterated its findings from the
<u>Zain I</u> proceedings.  The court never considered
Petitioner's factual allegations under the constitutional
violations claims made by Petitioner.

(ECF No. 23 at 11).

Respondent's Reply states that Petitioner is asserting that

there is a genuine issue of material fact in dispute:

> because the state courts did not fully review his
> challenges to certain blood evidence under the Fourth
> Amendment and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).
> [footnote omitted]  Petitioner claims that the state
> courts erred by only conducting an analysis of the
> challenged blood evidence under <u>Zain I</u> and <u>II</u> as set
> forth in <u>Moss v. Trent</u>, 603 S.E.2d 656 (W. Va. 2004)."
> (ECF No. 26 at 2-3).

Respondent's Reply further states:

> In support of this claim, Petitioner appears to
> argue that it was the falsification of the January 1980
> sample by Fred Zain that triggered the investigation and
> led to his ultimate conviction.  Petitioner argues that
> on the strength of the falsified testing of an illegally
> obtained blood sample, investigators coerced a confession
> from him that not only formed the linchpin of the State's
> evidence of guilt at trial but gave the state courts

90

enough evidence to uphold his conviction on appeal under
the <u>Zain I</u> standards.  Petitioner claims that because all
evidence[] flowed from the falsification of the illegally
obtained sample, it should all have been excluded as
fruit of the poisonous tree, including his confession.

Therefore, Petitioner argues, because all evidence[]
flowed from the falsification of illegally obtained
evidence, the state courts should have reviewed
Petitioner's claim regarding the illegal sample under the
Fourth Amendment and <u>Brady</u> instead of <u>Zain I</u> and <u>II</u>.
Petitioner argues that because the state courts did not
review the claim as argued within the context of the
Fourth Amendment and <u>Brady</u>, there remains a genuine issue
of material fact sufficient to defeat summary judgment
o[n] his petition.  Respondent previously argued in
support of the motion for summary judgment that
Petitioner did not properly raise the substance of a
claim under <u>Brady v. Maryland</u> before the state courts
sufficiently [sic; sufficient] to properly exhaust this
claim.

(<u>Id.</u> at 4).

Respondent further states that, even if the court finds that

Petitioner did exhaust his <u>Brady</u> and Fourth Amendment claims in his

state habeas corpus proceedings, his claims still fail as a matter

of law.  Respondent states:

First of all, the state courts were not required to
review this claim at all because the challenged evidence
was excluded long before Petitioner was convicted and was
never made a part of the record.  Therefore, any such
review under Petitioner's theory was impossible.

Even had the state courts taken this issue up as a
Fourth Amendment claim, it is not reviewable in a § 2254.
In <u>Stone v. Powell</u>, 428 U.S. 465 (1976), the Supreme
Court narrowly delineated the scope of review of Fourth
Amendment claims in 28 U.S.C. § 2254 by holding:

[W]here the state has provided an opportunity
for full and fair litigation of a Fourth
Amendment claim, a state prisoner may not be
granted federal habeas corpus relief on the

91

        ground   that   evidence   obtained   in   an
        unconstitutional   search   or   seizure   was
        introduced at his trial.

<u>Stone v. Powell</u>, 428 U.S. at 494.

        But even applying <u>Stone v. Powell</u> to this claim is too generous since the challenged evidence was ruled illegally obtained and excluded before trial even started. Although Petitioner argues in his Response that the habeas court "grouped the January 1980 Blood Grouping Table in with the tainted Zain evidence . . . [,]" the test results of testing performed on the January 1980 sample were never introduced at trial or made a part of the record. (Petition at 5.) According to <u>In re Moss</u>, the sample was returned to Petitioner or his lawyer. Petitioner previously argued in state court proceedings that the sample was never returned. (<u>See</u> Resp't Ex. 14 at 5.) No matter what happened to the excluded sample, nothing on the record explains what happened to it. As far as the reviewing courts were concerned, that sample never existed. Therefore, the state courts had no duty to examine the constitutional effect of the January 1980 sample on Petitioner's conviction because there was none.

        This entire claim rests entirely on pure conjecture, speculation and self-serving conclusory assertions that have even included Petitioner's theory that investigators used the blood sample to smear it on evidence found at the scene of the crimes. (Resp't Ex. 14 at 24.) But what this theory does not include is the simple fact that it was Petitioner's uncle who triggered the investigation when he went to police with his suspicions about Petitioner's involvement. That is what sparked the investigation and led investigators to seek the January 1980 sample. But that is neither here nor there under a legal analysis because that sample was excluded and never developed on the record of this case.

        As far as <u>Brady</u> is concerned, and at the risk of further descending into this legal quicksand of a claim, no test results were ever made a part of the record that *excluded* Petitioner as a source of the blood evidence. Although Petitioner's expert at the habeas hearing, Dr. Bing, challenged Zain and Murphy's conclusions and methodology, no testing was ever produced that excluded Petitioner as a source of the pivotal blood evidence. Simply because the blood evidence was presumed to be

falsified under the <u>Zain I</u> and <u>II</u> analysis does not automatically render it exculpatory within the meaning of <u>Brady</u> without a *showing* under <u>Brady</u>, which Petitioner never did.   Moreover, the <u>Zain</u> analysis is nearly the same as the <u>Brady</u> analysis in that a petitioner, under <u>Zain</u>, must show presumptively falsified evidence was material to guilt or innocence and prejudiced the defense.

        A <u>Brady</u> violation has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."   <u>Stricker v. Greene</u>, 527 U.S. 263, 281-82 (1999).   The West Virginia Supreme Court analyzed the blood serology evidence presented at Petitioner's trial for both materiality and prejudice under the <u>Zain</u> standard and all available lab results were provided to Petitioner in the state habeas proceedings.   Whether any evidence was falsified or not, there is no more of it available.   Therefore, no further factual development is available for purpose of summary judgment on this issue or within the meaning of <u>Brady v. Maryland</u>.

        What this claim amounts to is an elaborate theory on how the investigation unfolded premised on a determination that Petitioner's confession was coerced solely because Fred Zain implicated Petitioner by falsifying evidence.   This claim is fatally flawed in many regards but again, the state courts' consistent determination that Petitioner's confession was voluntary puts any dispute on the underlying facts at rest. [Footnote omitted].

        Therefore, this claim fails as either a challenge under <u>Brady v. Maryland</u>, a challenge to the legality of the admission of Petitioner's confessions (as fruit of the poisonous tree as Petitioner argues) or as sufficient to raise a material issue of genuine fact in dispute for purposes of summary judgment. [Footnote omitted].

(<u>Id.</u> at 4-7).   Respondent reiterates his assertion that Petitioner

has not exhausted his <u>Brady</u> claim, and that this argument goes only

to rebut Petitioner's theory that there is a genuine issue of

material fact sufficient to defeat summary judgment.  (Id. at 7 n.3).

The Circuit Court's Order denying Petitioner's second habeas corpus petition (Case No. 05-MISC-298) made the following findings of fact concerning these claims:

> 21.  The Court finds as fact that the sixth ground raises issues regarding blood samples and confessions that were obtained from Mr. Moss while he was in custody.  To the extent that Mr. Moss argues that his confessions were obtained in violation of his Constitutional rights, the Court finds as fact that such issue was previously raised, considered, and denied by this Court and the Supreme Court of Appeals of West Virginia.  To the extent that Mr. Moss's sixth ground for relief relates to the admissibility of his blood sample, the Court finds that such ground does not appear to have been raised in prior appeals or habeas matters.

> 22.  Mr. Moss alleges that two samples of blood were obtained from him while he was in Ohio.  He claims that the blood was extracted and seized in violation of his Fourth Amendment rights.  The Court finds as fact that the first blood sample was allegedly taken in January of 1980, without a court order, and was subsequently determined, by an Ohio Court, to have been in violation of Mr. Moss's Constitutional rights.  The Ohio Court ordered that sample returned to Mr. Moss.  The second sample, which was allegedly obtained in April of 1980, was pursuant to an Ohio Court Order.  Mr. Moss claims that the order was granted, even though no probable cause existed at that time.

> 23.  Trooper Michael Smith testified at a suppression hearing prior to the first trial that in April of 1980, he had the following evidence that led him to believe that Mr. Moss may have committed the murders:  (1) A newspaper article from Ohio indicating that Mr. Moss was suspected of attempted murder by strangulation in Ohio; (2) The fact that Mr. Moss lived in close proximity to the victim's

home; (3) The fact that Mr. Moss was suspected of being involved in a crime at a Moose Club that was close to the victims' home; (4) Information from a "friend" of Mr. Moss who claims that Mr. Moss stated, prior to the murders, that he wanted to burglarize the victims' home. (Transcript, September 19, 1983).

24. Trooper Terry Williams testified at the second trial that the blood sample obtained in April of 1980 was taken by a doctor. (Trial Transcript, p. 505).

25. In the 2004 decision which upheld this Court's denial of Mr. Moss's prior habeas petition, the Supreme Court repeated Judge MacQueen's findings that the Troopers "discovered genetic markers in blood samples from the [victims'] residence that excluded [the other suspect] and would ultimately incriminate [Mr. Moss], long before a sample of Moss's blood was obtained and analyzed." Moss v. Trent, 216 W. Va. 192, 194, 603 S.E.2d 656, 658.

ECF No. 8, Ex. 10 at 7-9). The Circuit Court also made the following conclusion of law on this claim:

5. The Court concludes that Mr. Moss's sixth ground for relief must be SUMMARILY DENIED and DISMISSED as it fails to provide this Court with probable cause that Mr. Moss may be entitled to relief. While the United States Supreme Court has determined that compulsory blood testing implicates Fourth Amendment issues, the questions is whether the "intrusion" is justified and reasonable. See Schmerber v. California, 384 U.S. 757, 86 S. Ct. 1826 (1966). In Schmerber, the Court found that extraction of blood samples in a hospital environment, and according to accepted medical practice, was reasonable. Schmerber, 384 U.S. 757, 771, 86 S. Ct. 1826, 1836.

6. The Court concludes that based on the testimony provided at the earlier suppression hearing, law enforcement officers completed an affidavit which included a substantial basis for determining that probable cause existed in April of 1980. Further, the Court concludes that the withdraw[al] of the

> blood sample in April of 1980, where law
> enforcement officers submitted an affidavit to a
> neutral and detached judicial officer, who granted
> them permission to withdraw the blood, and where
> sample was obtained by medical personnel, was
> reasonable and Constitutional. Id.

(Id. at 12).

There is no dispute that the first extraction of blood from Petitioner was found to be improper under the circumstances, and that an Ohio judge ordered that the sample, consisting of drops of blood on a cloth, be returned to Petitioner or destroyed.[3] However, Petitioner claims that the entire sample was not returned and, in fact, was used to implicate him in the Reggettz crimes. Petitioner's claims for habeas corpus relief rely largely on this contention and Petitioner's assertion that the rest of the evidence against him was only discovered as a result of the illegal seizure of his blood and, thus, should have been excluded as fruit of the poisonous tree.

The undersigned has conducted an exhaustive review of all of the pre-trial and trial materials produced in this matter.  First, Petitioner's counsel raised all of the arguments concerning Petitioner's Fourth Amendment claim, including the alleged lack of probable cause, and his assertion that the other discovered evidence was fruit of the poisonous tree, in his Motions to

---

[3]  The Order directing that the first blood sample be returned is not a part of the record before this court.  The Order by the Ohio court directing that the second blood sample be drawn is also not a part of the record herein.

96

Suppress Blood Samples, Confessions and Other Physical Evidence, and the Memorandum of Law in support thereof, and evidence regarding these issues was presented in a pre-trial suppression hearing.

<u>The first blood sample and the blood grouping table</u>

In the pre-trial suppression hearing conducted on September 19, 1983, prior to Petitioner's first trial, Trooper Michael Don Smith testified that he was one of the two officers who questioned Petitioner and collected his blood sample in Ohio, on January 30, 1980. Trooper Smith's testimony on cross-examination reflects the following:

> Q.   Now, you did extract blood from John on the 30th day of January, 1980.  Isn't that a fair --
>
> A.   I let John do it.
>
> Q.   Blood was extracted from John Moss?
>
> A.   I obtained blood that John gave me, yes.
>
> Q.   And later an Ohio Common Pleas Court suppressed that blood and made you and Trooper Williams give it back?
>
> A.   I was ordered by a judge there to turn the sample over to a detective we were with at that time.
>
>                 * * *
>
> A.   The judge simply ordered me to give the officer the sample.

(ECF No. 17, Ex. 22 at 83).  On re-direct, Trooper Smith repeated that he gave the blood sample to an officer in Ohio, and further clarified that no information in the investigation was obtained

97

from that blood sample.  (Id. at 118).

The undersigned further notes that Petitioner was asked about the first blood sample during the suppression hearing before his first trial.  Petitioner stated that his Ohio attorney asked him if he gave the West Virginia authorities a blood sample.  (ECF No. 17, Ex. 22 at 285-286).  The following colloquy then occurred:

    Q.  Did he have to go to court concerning that blood?

    A.  Yes.  He said he was going to the courthouse about it.

    Q.  And what was the result of that?

    A.  He told me he got the blood stopped or something.

    Q.  He got the blood sample back?

    A.  Yeah.

(Id. at 286).

Thus, evidence exists supporting a finding that Trooper Smith returned the cloth with Petitioner's blood sample before they returned to West Virginia, and there is no evidence to substantiate Petitioner's assertion that Fred Zain had a known sample of Petitioner's blood in January 1980, other than Petitioner's contention that the "Blood Grouping Table" with Petitioner's results on it states "JAN" at the top, which is also the sole basis for Petitioner's Brady claim.  A copy of the Blood Grouping Table can be viewed at ECF No. 17, Ex. 33 at 353.

Former State Crime Lab serologist Robert Murphy gave a deposition during Petitioner's Zain I habeas proceedings.  Murphy

98

testified that the subject blood grouping table was in his handwriting.  Murphy further testified:

> A.  This basically is a compilation of all of the parties involved or potentially involved and a summary of all the blood groupings.  Just a tabular way of excluding people or including people.

(ECF No. 17, Ex. 23 at 31).  The following exchange between Murphy and Petitioner's counsel, Mr. Simmons, also occurred:

> Q.  And would you say that -- I think you described this as a compilation.  So this is a compilation sheet as opposed to being the original, what I call the raw data sheet that was filled out when the testing was actually done; would that be correct?

> A.  That is a fuzzy area because the way of keeping notes was in transition.  It is possible that this is the actual bench sheet where things were recorded here, but it is also possible this is a summary sheet and there were other sheets for individual tests.  I can't recall.

(Id. at 32).  Murphy was also asked if, when they received Petitioner's blood sample taken on April 22, 1980, they had any knowledge whatsoever of Petitioner's blood types from any other sources.  Murphy stated "as far as I can recall, no . . . ." (Id. at 30).

Petitioner's claim that his blood types were known as early as January of 1980 simply because his name and results appear on the blood grouping table that contains the word "JAN" is speculative at best.  As noted by Sergeant Murphy, the blood grouping table could have been a summary compilation of all of the results that had been obtained prior to the drafting of the report in June of 1980, and

99

the "JAN" could be directed to the other results on the table which were obtained in January of 1980.   Petitioner's name is in a different location on the table than the other people who were tested in January.   At any rate, the state courts found that it appeared that the first blood sample had been immediately returned, and Petitioner has not demonstrated by clear and convincing evidence that the state courts' findings are incorrect.

<u>Fourth Amendment claim</u>

Petitioner further maintains that there was no probable cause to take either of his blood samples, and that the other evidence derived from the questioning of Petitioner when they took his first blood sample, up through his confessions on October 28 and 30, 1980, should be excluded as fruit of the poisonous tree.

As noted above, Petitioner raised these issues in his Motion to Suppress Blood Samples, Confessions and Other Physical Evidence, and the Memorandum of Law in support thereof.   Furthermore, in the pre-trial suppression hearing on September 19, 1983, Troopers Smith and Williams and Assistant Prosecuting Attorney Charles Pettry, who assisted in preparing the application and affidavit for the court ordered blood extraction in April of 1980, all testified about the information available to them at that time.   Ultimately, the trial court denied the Motion to Suppress in a letter-form order, which states:

> Counsel for the defendant submitted to the Court a rather lengthy memorandum of law, including some 74

100

pages, in support of defendant's motion to suppress.  The
State replied by her Assistant Prosecuting Attorney in a
19-page memorandum.  The Court, after reading briefs of
counsel, finds that the motion to suppress the above-
described items is without merit and doth deny the same.

This Court, without attempting to write a long,
detailed opinion for the purpose of explaining its
ruling, and for the sake of brevity, advises counsel that
many of the matters raised by defendant's brief have
previously been raised ad infinitum in this Court and the
West Virginia Supreme Court of Appeals.  With respect to
the motion to suppress the blood sample taken from the
defendant suffice it to say that the first blood sample
taken was ordered returned by the appropriate court in
the State of Ohio; that Court finding that the blood was
taken not in accordance with the appropriate Ohio
statutes.  Subsequently, on April 22, 1980, a second
blood sample was taken from the defendant under an
appropriate Court order from the Common Pleas Court of
Cuyahoga County, Ohio.  It is this second blood sample
that defendant seeks to suppress.  This Court finds that
the Ohio court properly ordered the blood sample taken
from the defendant and to raise the defense that, among
other things, a responsible adult, such as the
defendant's parents, was not present is ludicrous at best
given the surrounding circumstances, i.e., defendant at
that time had obtained the age of eighteen and was
incarcerated in an adult penal institution in the State
of Ohio serving a sentence for rape/robbery/attempted
murder of a Cleveland bus driver.  With respect to
counsel's argument that his lawyer was not present, this
Court, from a clear review of the record, finds that he
had no lawyer appointed for him on this particular
charge, but, rather, had a lawyer on a previous felony
offense and said lawyer had no standing in the issue of
taking a blood sample from the defendant pertaining to
the instant case (See cases cited in State's Memorandum
in Opposition to Defendant's Motion to Suppress).

For the foregoing reasons and from a clear review of
the record in its entirety, the motion to suppress all
matters raised in defendant's brief is denied.

(ECF No. 36-5 at 125-126).

Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner had a full and fair opportunity to challenge the probable cause determination prior to his trial and to litigate his Fourth Amendment claim.  Accordingly, under Stone v. Powell, supra, Petitioner is prohibited from re-litigating that issue in this collateral proceeding.

<u>Brady claim</u>

Based upon a review of all of the Petitioner's post-conviction filings, the undersigned proposes that the presiding District Judge **FIND** that Petitioner did not fairly present the substance of a <u>Brady</u> claim in his state court proceedings sufficient to satisfy the exhaustion requirements under section 2254.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Ground Ten of Petitioner's section 2254 petition is unexhausted and procedurally barred from review by this court.

Notwithstanding the failure to exhaust this claim, section 2254(b)(2) permits a court to deny a petition on the merits. Petitioner has not demonstrated that the State withheld any evidence that it knew or should have known was exculpatory.  The Zain investigation commenced in 1993, after both of Petitioner's trials and appeals.

Based upon the evidence presented during all of Petitioner's state habeas corpus proceedings, the undersigned proposes that the presiding District Judge **FIND** that the prosecution did not have any

102

forewarning that Fred Zain's work was unreliable and that Petitioner has not satisfactorily demonstrated that the State knowingly withheld or failed to disclose exculpatory or impeachment evidence.  Moreover, even if the State failed to disclose any favorable evidence, or evidence that could have been used to impeach Zain's testimony, such evidence was not reasonably likely to have affected the judgment of the jury, as none of the evidence was exculpatory.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief were neither contrary to, nor an unreasonable application of, clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Petitioner's Fourth Amendment and <u>Brady</u> claims.

> **D.   Grounds Three, Four, Five and Eight - Grounds concerning admission of serology evidence and its effect on the jury verdict.**

In Ground Four of his section 2254 petition, Petitioner asserts that his rights to a fair trial and an impartial jury were contravened when the State knew or should have known of the false or misleading testimony and evidence presented by a state witness (Fred Zain), and repeats that the lower courts' rulings were

contrary to or an unreasonable application of clearly established federal law, and/or an unreasonable determination of the facts in the record.   Petitioner does not elaborate on this claim, but incorporates by reference the facts as stated throughout his petition in support of other claims.   (Id. at 24).

In Ground Eight of his section 2254 petition, Petitioner largely repeats his other allegations, asserting that his "incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments." In support of this blanket claim, Petitioner states:

1.  The admission of testimony and test results performed by Trooper Fred Zain, whose credentials, credibility, and test results have all been found by the West Virginia Supreme Court of Appeals to be inherently unreliable and a violation of a criminal defendant's constitutional rights.   (See *PETITION FOR WRIT OF HABEAS CORPUS*, (Civil Action No. 94-MISC-663, pg. 45).

2.  The presentation by the State of incorrect, false, misleading, overstated, and unscientific evidence. (See *PETITION FOR WRIT OF HABEAS CORPUS*, (Civil Action No. 94-MISC-663, pg. 45).

3.  The admission of the alleged confessions given by the Petitioner, which resulted from the violation of his constitutional rights.   Although the issues regarding the confessions has been extensively litigated in many hearings, petitioner reserves the right to develop new information and new arguments with regard to the alleged confessions that were previously unavailable.   (See *PETITION FOR A WRIT OF HABEAS CORPUS*, (Civil Action No. 94-MISC-663, pg. 45).

4.  The West Virginia Supreme Court in the Laboratory Decision erred in applying the harmless error test for nonconstitutional errors, rather than the

104

harmless error test for constitutional errors.
(See *PETITIONER'S SUPPLEMENTAL BRIEF ON ISSUES
RAISED IN HABEAS CORPUS PETITION*, pg. 3).

5.   The State failed to preserve the evidence and the
results of testing for review by Petitioner. (See
*PETITIONER'S SUPPLEMENTAL BRIEF ON ISSUES RAISED IN
HABEAS CORPUS PETITION*, pg. 10).

(ECF No. 2 at 29). Petitioner's section 2254 petition then
contains 23 pages of facts and argument in support of these five
sub-parts which the undersigned will summarily address as
necessary.

The undersigned notes that, in sup-part 3 of Ground Eight,
Petitioner again asserts that the admission of his confessions
resulted in the violation of his constitutional rights. Petitioner
further "reserves the right to develop new information and new
arguments" with regard to his confessions.  It is apparent that
Petitioner copied this language from his previous state court
habeas corpus petitions.  This federal court is limited to a review
of the record that was before the state court.  See Cullen v.
Pinholster, 563 U.S. ___, 131 S. Ct. 1388 (2011).  Accordingly,
Petitioner may not present any new information or new arguments
before this court.  Furthermore, because the undersigned has
already addressed the Petitioner's claims for relief concerning the
admission of his confessions, such analysis will not be repeated.

Grounds Three, Four, Five and Eight address issues related to
the serology evidence that was collected and about which Fred Zain
testified at Petitioner's second trial.  Petitioner spends a great

deal of time in his briefs arguing about whether Fred Zain or Robert Murphy tested specific pieces of evidence and cites to testimony given at pre-trial proceedings, at Petitioner's first trial, and in the Paul Reggetz matter.[4]  However, for the purpose of this federal habeas proceeding, all evidence and testimony related to the serology testing in this case has been determined to be unreliable and has been removed from consideration in accordance with the <u>Zain I</u> opinion.  Thus, the undersigned will not spend a great deal of time addressing the specific test results or testimony, but will focus on the state courts' determinations that (1) excluding the serology evidence, there was sufficient remaining evidence upon which to convict Petitioner of the murders, and (2) that the serology evidence did not have a prejudicial effect on the jury's verdict.

<u>Proper standard of review</u>

It is a violation of due process for the State to convict a defendant based upon false evidence.  <u>Napue v. Illinois</u>, 360 U.S. 264 (1959).  Furthermore, the State is responsible for false

---

[4]  Petitioner's arguments about who tested what evidence were in response to Respondent's assertions in Petitioner's state habeas proceedings that most of the crucial evidence was tested by Sergeant Murphy.  Respondent also asserted that Petitioner's case did not fit into Zain's typical *modus operandi* of characterizing evidence in order to inculpate the target suspect.  Rather, in Petitioner's case, the test results actually exculpated the initial suspect, Paul Reggetz.  Thus, a great deal of the briefing in the state habeas proceedings focused on whether the <u>Zain I</u> standard should even be applied in Petitioner's case.

testimony even if the prosecutor is unaware of the falsity.  Giglio v. United States, 405 U.S. 150 (1972); Miller v. Pate, 386 U.S. 1 (1967).  However, a conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict.  A new trial will only be granted if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."  Napue, 360 U.S. at 271; Giglio, 405 U.S. at 154.

The WVSCA applied an analogous standard in its Zain I opinion, holding:

> Where improper evidence of a nonconstitutional nature is
> introduced by the State in a criminal trial, the test to
> determine if the error is harmless is: (1) the
> inadmissible evidence must be removed from the State's
> case and a determination made as to whether the remaining
> evidence is sufficient to convince impartial minds of the
> defendant's guilt beyond a reasonable doubt; (2) if the
> remaining evidence is found to be insufficient, the error
> is not harmless; (3) if the remaining evidence is
> sufficient to support the conviction, an analysis must be
> made to determine whether the error had any prejudicial
> effect on the jury.

438 S.E.2d at 506.

There has been a great deal of confusion, however, concerning the WVSCA's use of the word "nonconstitutional" in its standard of review.  Upon further review of the Zain I opinion and the other authority discussed therein, the undersigned has derived the following explanation.

In Zain I, the Court, relying upon the Supreme Court's decisions in Napue and Giglio, supra, confirmed the principle that, whether or not the State knew about it, the presentation of false

evidence at a trial results in a due process violation.  However, the conviction will not be set aside as a result of the due process violation, unless it is shown that the admission of the false evidence had a material effect on the jury verdict.  438 S.E.2d at 505.  The Court further stated that a "material effect" means that "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . ." Id. (citing Napue, 360 U.S. at 271).

The court then noted that there is a divergence in the federal courts concerning how to determine "what impact false testimony will have on the ultimate question of whether a criminal conviction should be set aside."  Id.  For example, the Tenth Circuit has stated:

> "The test for materiality is the same as the test for harmless constitutional error.  United States v. Bagley, 473 U.S. 667, 679 n.9, 680, 105 S. Ct. 3375, 3382 & n.9, 87 L. Ed.2d 481 [492 n.9] (1985).  The test for harmless constitutional error is 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."' Yates v. Evatt, 500 U.S. 391, [403,] 111 S. Ct. 1884, 1892, 114 L. Ed.2d 432 [448] (1991)(quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed.2d 705 [710] (1967). 'To say that an error did not contribute to the verdict is, rather to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.' Yates, [500 U.S. at 403] 111 S. Ct. at 1893 [114 L. Ed.2d at 449].  Yates thus instructs us 'to make a judgment about the significance' of the tainted evidence relative to the remaining evidence."

United States v. Langston, 970 F.2d 692, 700 (10th Cir.), cert. denied sub nom, Francis v. United States, 506 U.S. 965, 113 S. Ct.

439, 121 L. Ed.2d 358 (1992).  The Zain I court then stated:

> Where evidentiary error is concerned, however, the
> ultimate question is the impact on the verdict.  Our test
> for evidentiary error is contained in Syllabus Point 2 of
> State v. Atkins, 163 W. Va. 502, 261 S.E.2d 55 (1979),
> cert. denied, 445 U.S. 904, 100 S. Ct. 1081, 63 L. Ed.2d
> 320 (1980) [quotation omitted]. . . .

Id. at 506.

In Atkins, the WVSCA discussed the distinction between
"constitutional" and "nonconstitutional" error, as recognized by
the Supreme Court in Chapman v. California, 386 U.S. 18 (1967) and
Cooper v. California, 386 U.S. 58 (1967).  In Chapman, the Supreme
Court determined a harmless error standard of review for a federal
constitutional error on direct review by holding that "the court
must be able to determine a belief that [the error] was harmless
beyond a reasonable doubt."  386 U.S. at 24.  In Cooper, the Court
stated that, where no constitutional error was found, "the State is
free, without review by us, to apply its own state harmless-error
rule to such errors of state law."  386 U.S. at 62.  This appears
to be where the Atkins court derived the use of the term
"nonconstitutional" in its description of the standard of review
for evidentiary error in state criminal proceedings.

In sub-part 4 of Ground Eighth of his section 2254 petition,
Petitioner contends that the WVSCA applied an improper standard of
review in Zain I, considering that the court had determined that
the use of Zain's testimony and evidence in any criminal case was
a violation of the defendant's due process rights and was, thus,

"constitutional" error.  Petitioner appears to be contending that the WVSCA should have used the harmless error test set forth in Chapman, supra, which would have required the court to determine if the error was harmless beyond a reasonable doubt before it could disregard it and deny habeas corpus relief.

In Brecht v. Abrahamson, 507 U.S. 619 (1992), the Supreme Court determined that in habeas corpus proceedings, the standard for determining whether trial errors, including constitutional errors, are harmless, is to determine whether the error "had a substantial and injurious effect or influence in determining the jury's verdict." (citing Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  More recently, in Fry v. Pliler, 127 S. Ct. 2321, 2328 (2007), the court clarified that, in Brecht, it "rejected the Chapman standard in favor of the more forgiving standard of review applied to nonconstitutional errors on direct appeal from federal convictions."  The Fry Court further stated:

> We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed.2d 353, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in Chapman, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed.2d 705.

Thus, the standard of review in Zain I and Atkins is essentially the same as the federal standard in Brecht.  Since the WVSCA had already determined that there was constitutional error involved in

the use of Zain's evidence, the only question for the state habeas courts and this federal court to determine is whether the error "had a substantial and injurious effect on the jury's verdict."

The undersigned proposes that the presiding District Judge **FIND** that, based upon the clearly established Supreme Court precedent discussed above, the standard of review applied by the WVSCA to Petitioner's <u>Zain I</u> petition was appropriate to address Petitioner's false evidence claims.  <u>See</u> <u>Ward v. Trent</u>, 188 F.3d 505 (Table), 1999 WL 638606, at ** 5 (4th Cir. (W. Va.) 1999)(unpublished) ("We conclude that the West Virginia Supreme Court of Appeals set forth the proper standards to be applied in reviewing Zain/serology claims.")

<u>Alleged false evidence</u>

It is well-established that two samples of blood were obtained from Petitioner before he was charged with the Reggettz murders. As noted previously, the first blood sample was taken on January 30, 1980, without a court order or warrant and without the knowledge of Petitioner's parents or his counsel in Ohio.  Although that blood sample was immediately ordered to be returned or destroyed, Petitioner asserts that the cloth which contained the blood sample, or at least a portion of it, was not returned and was taken to Fred Zain.[5]  (ECF No. 2 at 21, Ground Three, ¶ 5).

---

[5]   The undersigned previously addressed this assertion with regard to Petitioner's claims in Grounds Three and Five and proposed that the presiding District Judge find that Petitioner has not

As previously discussed in addressing Grounds Three and Five of Petitioner's section 2254 petition, Petitioner asserts that Zain used this known blood sample to manufacture evidence and report that blood consistent with Petitioner's had been found at the crime scene.  Petitioner claims that it was only after this blood sample was obtained that he became the focal point of the investigation of the Reggettz murders.  (<u>Id.</u>, ¶¶ 3, 5).  Ground Three of the section 2254 petition further states:

> 7.   The fact Zain had a known blood sample of Petitioner's blood is borne out by the copy of a January, 1980 lab table listing blood groupings from fourteen (14) individuals, including Petitioner.  Contrary to testimony, a known sample of Petitioner's blood was in Zain's possession in January 1980.

(<u>Id.</u> at 23, ¶ 7).

Petitioner further asserts that all of the evidence cited by Respondent and the state courts as being sufficient to support his convictions, including his confessions, was derived as the result of the State obtaining the first illegal blood sample and, therefore, such evidence is fruit of the poisonous tree and should have been excluded.  Without such evidence, Petitioner argues that there would be insufficient evidence to tie him to the crimes, and that the jury verdict would have been different.

---

demonstrated by clear and convincing evidence that the first blood sample was not returned.  The undersigned repeats these allegations here in order for the presiding District Judge to fully understand and conduct a full and fair review of all of Petitioner's claims.

Petitioner also asserts that Zain falsified his credentials (<u>id.</u> at 42-43, ¶¶ 70-78), and overstated the statistics in connection with the blood typing on the evidence collected in the Reggettz home (<u>id.</u> at 43-47, ¶¶ 79-109). Petitioner asserts that Zain overstated the population frequency statistics in comparing the unknown blood samples from the evidence collected with Petitioner's known blood sample, because his statistical calculations were based upon a determination that the unknown blood samples were droplets of blood from a single source, rather than the possibility that the blood samples were a mixture of blood from more than one source. Petitioner provided expert testimony on this issue during his state habeas proceeding.

The WVSCA aptly summarized the forensic evidence that was presented at Petitioner second trial as follows:

> The forensic evidence presented against the petitioner [Appellant] at trial consisted of two essential conclusions. First, blood stains sampled at the scene contained genetic markers that were not donated by any of the victims or Paul Reggettz, but matched the known blood sample from John Moss. Second, the combination of markers in the samples from the scene that matched the petitioner's blood occurred in one-tenth of one percent (.1%) and three-hundredths of one percent (.03%) of the general population.

603 S.E.2d at 659.

In Ground Eight of Petitioner's section 2254 petition, Petitioner argues:

> 93. A forensic scientist, in calculating the percentage of the population having the particular blood type obtained from an unknown blood sample found at a

crime scene can only include those blood types that are different from the any of the known blood types of persons who are known possible donors of blood in that particular location.

94. Furthermore, if the known blood types of the victim are not excluded from the blood types obtained from the unknown sample, then the resulting probability statistic is overstated and is misleading because the impression is given to the jury is that the unknown blood sample came from one person when, in fact, there may be a mixture of blood within that sample.

* * *

107. However, in reaching this statistical conclusion regarding the unknown blood types found, Zain committed the error of including blood types that either matched or could not be excluded from being deposited by Vanessa Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III.

108. Even though the June 10, 1980 report does not clearly state how Zain's statistics were calculated, it is apparent that he did include blood types that either matched or could not be excluded from being deposited by Vanessa Reggettz, Paul Eric Reggettz, Bernadette Reggettz, and Paul Reggettz, III.

109. The inclusion of these additional blood types gave the unknown blood typing much greater statistical significance than it merited if the proper and accepted procedure had been followed.

(Id. at 45, 47, ¶¶ 93-94, 107-109).  Elsewhere in the section 2254

petition, Petitioner states:

112. The possibility that Zain fabricated what types were obtained from the unknown blood samples by simply matching them to Petitioner's known blood types is not too far fetched and, in fact, would be consistent with Zain's demonstrated history.

113. Thus, in light of the overwhelming evidence of Zain's perjury, his overstatement of the blood type

114

> results, and his history of fabricating evidence,
> Petitioner avers that this § 2254 petition should
> not be based upon any evidence obtained by Zain.

(Id. at 48, ¶¶ 112-113).

The crux of Petitioner's argument is that the evidence in this case consists largely of conflicting confessions from Reggettz and Petitioner and that the deciding factor on who the jury believed was the testimony of Fred Zain.  His section 2254 petition states:

45. Although the State presented some additional evidence in an effort to bolster or corroborate the alleged confessions given by Petitioner, it cannot be disputed that the most significant evidence presented at both trials was the testimony of Zain, who is the former head of the Serology Division of the West Virginia Department of Public Safety.

* * *

60. In the second trial, the State's reliance on the blood testing conducted by Trooper Zain was even greater than in the first trial.

61. In the State's opening statement in the second trial, the jury was told at length about the testimony anticipated from Trooper Zain:

> "Now the case begins to unravel after that, because at the scene that day on December 13th, when the Troopers showed up and the Lab people showed up, the photographer showed up, a person from the Serology Lab, a person who is a forensic serologist, showed up along with a fingerprint man.  The serologist, a man by the name of Fred Zain, the chief serologist for the State -- he'll tell you that there was a lot of blood at the scene."

"Vanessa Reggettz had an injury.  We all know how a head injury is.  For example, Fred Zain will tell you that he took samples of blood from every stain in that house.  He will tell you that he took these samples from the house, then he took them back to the lab where he analyzed them.  Of course, in the meantime, he had the known blood samples of the victim, the mother.  He got a known blood sample of Paul Reggettz shortly thereafter."

"He will tell you that when he took the samples, he analyzed them in the lab.  He found samples of blood taken from all of these people I've just listed, that did not match any member of the Reggettz family.  The blood didn't belong to Vanessa from the head wound.  It didn't belong to Paul Eric.  It didn't belong to Bernadette.  And it didn't belong to Paul Reggettz."

"So the Police continue their investigation.  On April 22, 1980, they traveled to Cleveland, Ohio, to take a blood sample from a young man.  During the course of their investigation, at the time of the murders, this man was living with the grandfather, some one hundred to two hundred yards down the road from the Reggettz home.  And shortly after the murders, after about a week, that young man returned to Cleveland.  That young man, ladies and gentlemen, is sitting right there (Indicating), John Moss, that defendant.  His blood was taken that day in April and brought back to Fred Zain, the serologist, and his blood was found to match the blood found in the house."

116

"Now we all know about the blood work.   Everyone has an ABO type: either O, A, or AB, or B.   Trooper Zain - or Lieutenant Zain will tell you that the blood work at the time was broken down scientifically and forensically, and can be broken down to a number of samples, to nine genetic markers or enzymes, all independent of each other, which is important.   Some of the blood samples that were taken from the house were taken from the curtains on the back door, from Bernadette's pajama top, from Christmas wrapping paper, I believe the Christmas package.   And those blood samples were able to be broken down by Fred Zain into nine genetic markers.   And one at [a] time -- that blood exactly matched John Moss' -- the genetic markers, those nine genetic markers, in the sample of the blood."

"And Fred Zain will further tell you that the combination of those genetic markers found in the defendant's known blood and on those exhibits, the exhibits I just listed, occur in three of every ten thousand people, point zero three percent of the population of this State.   Three in every ten thousand. Fred Zain will further tell you that some of the other samples, the other ones I listed, for lack of sufficient sample or whatever reason, he was able to break down into seven of the nine genetic markers.   And again, he'll tell you that those seven genetic markers found on those exhibits matched right down the line to defendant's known blood."

"Fred Zain will tell you that combination of those seven genetic

117

markers occurs in one of every thousand, twenty-one percent." (SECOND TRIAL, Tr. 406-409).

* * *

65. In the closing argument of the second trial, the State emphasized the significance of the testing performed by Zain:

"We know that Paul Reggettz's confession is not true, How do we know that? We know that from the evidence. The blood found on the Christmas presents and wrapping paper is not Paul Reggettz's blood. Remember what Trooper Zain said yesterday? He said an inconsistent marker excludes people one hundred percent. The blood found at the scene wasn't Vanessa's. It wasn't consistent with the defendant's [sic; Paul Reggettz?] It can't be Paul's. A hundred percent." (SECOND TRIAL, Tr. 1326).

66. Throughout the State's initial closing argument in the second trial, numerous references are made to the serological testing performed by Zain.

67. Following the closing argument by Petitioner's counsel, the State once again focused on the significance of Zain's serological analysis. (SECOND TRIAL, Tr. 1370).

(Id. at 36, 39-41, ¶¶ 45, 60-61,65-67).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment first argues why the Zain I standard of review should not be applied in Petitioner's case. Respondent asserts that certain pieces of crucial evidence were tested by Sergeant Murphy, not Zain. Murphy also wrote the June 10, 1980 report concerning all of the serological findings in the case; however,

118

Zain testified about that report at Petitioner's trial.  Respondent further asserts that this case does not fit the typical *modus operandi* of the other Zain cases, in which the serological findings were characterized to inculpate the initial suspect, rather than exculpate that suspect, as occurred with Paul Reggettz.  (ECF No. 18 at 35).  Respondent's Memorandum of Law further states:

> Further, both Murphy and Zain were under considerable pressure at the time to find evidence pointing to Paul Reggettz as the murderer.  The investigation officers were convinced that Reggettz was the killer.  The laboratory, however, produced evidence that pointed to some other person.  Murphy recounted in his deposition that this resulted in some conflicts in which he was forced to vigorously defend his findings. (Resp't Ex. 23 at 26-29).  Murphy also stated the obvious -- that there was no motive on the part of either Murphy or Zain to falsify the results to exculpate Reggettz and no reason to inculpate the Petitioner.  (Id. at 54.)
>
> It is also noteworthy that the serological results which pointed to someone other than Reggettz as the perpetrator were obtained before the Petitioner's blood was submitted for analysis.  The results of the then-unknown person could not have been manipulated to conform with the then-unknown type of the Petitioner.  Therefore, it is safe to assume that the blood type found not to match any of the Reggettz family was correctly reported from the beginning, and this result was not changed once Petitioner's blood sample was analyzed.  Similarly, a review of Murphy's deposition reveals that Murphy performed the testing of all of the known blood samples -- including that of the Petitioner.  Therefore, Murphy determined that the Petitioner was a match for the unknown specimens found by Zain during testing of the crime scene exhibits, and Zain had no opportunity to falsely make the Petitioner a match for the unknown blood depositor at the scene.
>
> Most importantly, Ex. 23 at B.N. 12 reflects Sergeant Murphy did the testing of Bernadette Reggettz's clothing or pajama top, which had a bloodstain containing the nine enzyme types consistent with the Petitioner,

occuring in about 3 out of every 10,000 persons, and when
Zain testified at trial about this item of clothing, this
was precisely what he told the jury. (Resp't Ex. 20 at
1124.)   Moreover, Murphy's results from Bernadette
Reggettz's clothing matched perfectly with the enzyme
types that Zain had found on the curtain, the Christmas
wrapping paper, and the other exhibits which contain
blood consistent with the Petitioner's. (Ex. 23 at B..N.
4-14).

(Id. at 36-37).

As previously discussed, however, in light of the three Zain

decisions, the undersigned will presume all of the serology

evidence presented at Petitioner's trial to be unreliable and will

remove it from consideration.

Respondent then addresses the sufficiency of the remaining

evidence in the case as follows:

The holdings of both the state habeas court and the
WVSCA are correct as a matter of law on this issue.
Given the substance of Petitioner's confession and its
corroboration by the evidence, the confession alone was
sufficient to sustain the conviction.

The Petitioner confessed to committing the three
murders of which he was convicted.  His confession was
ruled admissible and was heard by the jury on tape.
Petitioner is also taped claiming that he had been
properly taken care of by interrogators.  Petitioner
stated that he had eaten well and had not been injured.
But irrespective of Petitioner's claims that his
confession was coerced, he fails to explain how it was
that every single aspect of his confession was
corroborated by the evidence, right down to the recovery
of the Christmas present from Mrs. Pomeroy[6] and the
camera found at his father's house.

---

[6] By the time of Petitioner's second trial, Arbutus Johnson's
name had changed to Arbutus Pomeroy.

120

In this case, the State presented a substantial amount of evidence to the jury which corroborated Petitioner's confession.  Vanessa Reggettz's autopsy revealed that she had suffered from scalp lacerations which were consistent with being struck with the butt of a gun which was found beside her body, and identified as belonging to Paul Reggettz.  Petitioner's confession indicated that he had struggled for a gun with Vanessa, and struck her with the butt of the gun.  His confession also revealed his knowledge that the gun was broken, and showed that the gun became broken as a result of his beating Vanessa with it.  Before he admitted to any involvement in the crime, Petitioner stated that Vanessa's face was "bumpy."  This was inconsistent with the pictures of Vanessa which were shown to Petitioner, but was consistent with Vanessa's appearance at the time of her death.  Petitioner also admitted to having struggled with Vanessa for a knife, and a knife was found beside Vanessa's body.  The Petitioner said that he was cut on the finger by the knife during the struggle.  The Petitioner then recounted choking Paul Eric with a cord, tying him up, and putting him in a half-full bathtub.  He also described choking Bernadette with a cord and hanging her on the door.  After hanging Bernadette, Petitioner told the troopers he stabbed Vanessa in the neck with a "knife or something."

After killing the Reggettz family, Petitioner stated that he searched the house for money and opened the Christmas presents.  He told the troopers that he stole a camera and it was at his parents' home in Cleveland where it was recovered in the Petitioner's father's car and identified at trial by Paul Reggettz as his camera.  The Petitioner also admitted taking "some dishes," and telling the troopers he gave it to his best friend's mother, Ms. Arbutus Pomeroy, and a set of silverware was recovered from Ms. Pomeroy, who told troopers that the Petitioner had given the silverware to her as a Christmas present the night before he returned to Cleveland in December 1979.  Ms. Pomeroy also stated that she saw some scratches and a Band-Aid on the Petitioner's face.  The Petitioner also admitted that he had taken a .22 rifle from the Reggettz home, the existence of which could only have been known by the person who took it.

The Petitioner told the troopers that after he murdered the family it was almost daylight when he got to his home which is about 100 to 200 yards from the

121

Reggettz home, which is consistent with the early morning
hour and the time the clock radio stopped [at] 6:17 when
the cord was ripped off to "hog-tie" Paul Eric.  It is
also consistent with Dr. Sopher's testimony about the
likely time of death of the children.  Also, Petitioner's
own family member alerted police after Petitioner was
charged with another brutal crime in Ohio.  Petitioner
left town almost immediately after the murders for Ohio.

Paul Reggettz repudiated his confession before the
jury -- detail by detail.  As is set forth above,
Reggettz confessed and was led to demonstrate his acts
after a protracted interrogation and after he had been
without sleep for more than 24 hours.  Reggettz told
Trooper Woodyard that he had thrown his .22 rifle in the
Kanawha River, but denied before the jury that he had
done so; however, the Petitioner told the troopers that
he had taken the rifle and precisely where to find it.
Further, the details Reggettz provided to the police are
inconsistent with the forensic evidence provided by Dr.
Sopher relating to the time of death, the *livor mortis*
pattern in his daughter, as well as the lack of a bruise
on the buttocks of his son.  For Reggettz's confession to
be true, he would have had to have killed his family at
about 9:00 or 10:00 p.m., and Dr. Sopher effectively
dismisses the possibility of that as too early a time
frame, given the conditions of the victims.  Sopher also
noted that there was no evidence of injury or blood on
Paul Reggettz.  The likely time of death, about 6:00
a.m., is consistent with the time shown on the clock
radio, and Reggettz was -- unquestionably -- at work at
that time.  Given all of the foregoing, there was ample
reason for the jury to believe that Reggettz's confession
was false and that the Petitioner's confession was true -
- independent of any serological evidence.

(ECF No. 18 at 42-44).  Respondent's Memorandum adds:

The Petitioner essentially argues throughout his
attacks on his confession that the jury could not have
found him guilty without Zain's testimony because there
were two dueling confessions by two different persons.
Petitioner then premises his claims on the mere existence
of Mr. Reggettz's confession separate and apart from the
fact that his own confession supported the crime scene
and physical evidence but Reggettz's did not.  However,
the mere existence of Reggettz's confession has no effect
on the validity of Petitioner's confession or the

122

evidence that corroborated it, especially given that Reggettz's confession not only lacked corroboration but was actually repudiated by the chain of events surrounding the crime.

(Id. at 45).

Respondent's Memorandum of Law then addresses the prejudice

prong of the Zain I analysis as applied in Petitioner's case:

Not only did the state courts determine that there was sufficient evidence to sustain the conviction, with or without the Zain evidence, they also determined that there was no prejudicial effect flowing from the Zain evidence – even treating it as traditional Zain evidence for purposes of the analysis.

In making a determination of prejudice, this Court must start from the premise that a conviction need be reversed only if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). The United States Supreme Court further refined this standard in Kyles v. Whitley, 514 U.S. 419 (1995), explaining that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 434.

In this case, while the serology evidence was no doubt compelling, this Court will note that the above-detailed evidence presents a clear picture of guilt beyond a reasonable doubt, and that there is no reasonable likelihood that the jury would have acquitted had it received the trial evidence without the Zain evidence. See Agurs, 427 U.S. at 103. The addition of the serology evidence served only to remove all doubt from the issue, a burden that the state need not carry to convict.

Petitioner consistently argues that the Zain evidence was essentially the linchpin of the State's case. However, Petitioner fails to address the compelling nature of the remaining evidence of guilt presented at trial. Petitioner has not accounted for the

123

lack of evidence presented in the instant petition or any previous attacks on his conviction accounting for the stunning level of detail and evidence corroborating his confession. Petitioner fails to explain how stolen goods from the scene ended up in the hands of family and friends just like he told investigators. Petitioner does not explain how his movements before, during and following the time of the murder matched the circumstances of the crime. Petitioner does not account for why Zain did not manufacture a case against Paul Reggettz, the imprisoned, "confessed" killer, instead of inconveniently exculpating him and perhaps allowing a killer to go free. Zain's *modus operandi* was to implicate the accused, not exonerate them -- particularly a confessed killer. This in light of the disapproval of investigators (Zain's most sought after audience after jurors and court personnel) who had to have known how it would look to admit they had held the wrong man for over a year, not to mention how it would reflect on them to have evidence support Paul Reggettz's claim he'd been brutalized by investigators.

Had the defense been able to present a plausible explanation for why the Petitioner confessed despite his "innocence," and to attack the copious details in his confession, then there might be the possibility that he was indeed prejudiced by Zain's evidence. However, his trial defense left the State's powerfully incriminating evidence essentially unanswered. Therefore, Zain's evidence, considering the totality of the evidence at trial, could not have prejudiced the jury.

(Id. at 47-49).

Petitioner's Response and Respondent's Reply address issues concerning blood evidence in the context of claims raised by Petitioner under the Fourth Amendment and Brady v. Maryland, and not under the Zain I and Napue/Giglio false evidence line of cases. The undersigned has already addressed the other claims herein.

Petitioner's Response reiterates his contention that the blood grouping table containing his serology results, which was produced

for the first time in his _Zain I_ proceeding, was generated as a
result of testing done on his blood sample that was illegally
obtained in January of 1980, and not from the sample taken in April
of 1980 pursuant to a court order.  As previously mentioned,
Petitioner relies upon this blood grouping table to assert that
Fred Zain knew the results of Petitioner's blood sample in January
1980 and used it to frame him for the Reggettz murders by stating
that the blood on the various pieces of evidence collected at the
crime scene was consistent with his.  Petitioner's Response states:

> The significance of this disputed fact is that, even
> though the Blood Grouping Table was presented at
> Petitioner's special _Zain_ habeas corpus proceeding, no
> specific ruling has ever been entered by any state court
> confirming or controverting authorities had in their
> possession a known sample of Petitioner's blood in
> January, 1980, and the resulting effect of the illegally
> obtained sample on the evidence recovered and testimony
> obtained.  The lower courts merely grouped the January,
> 1980, Blood Grouping Table in with the tainted _Zain_
> evidence, removed it from consideration, and conducted an
> analysis of the remaining evidence under the improper
> non-constitutional standard announced in _Zain I_.  The
> state courts have failed to conduct an analysis of the
> illegally obtained blood sample under the federal
> constitutional standards Petitioner raises, such as the
> fruits of the poisonous tree doctrine.  This cannot be
> determined as harmless because virtually none of the
> remaining evidence would have been available at trial
> which the WVSCA used to announce that after removing the
> tainted Zain testimony, the remaining evidence is strong
> enough to convict.

(ECF No. 23 at 5).  Petitioner's Response also states:

> The state apparently alleges that because West
> Virginia State Police Sergeant Robert Murphy tested a key
> piece of evidence and not Fred S. Zain, then it should be
> considered in an analysis of the prejudice caused to
> Petitioner in any and/or all of his claims.  Respondent's

125

assertions are flawed for several reasons: (1) They are contrary to the actual fact that Zain, not Murphy, tested all the gathered evidence, other than the known blood samples; (2) It is undisputed that Zain had possession of the subject evidence as part of the documented chain of evidence; (3) the entire body of work which Zain had anything to do with, including possession thereof, was determined to be unreliable by the WVSCA and cannot now be considered under any standard that requires it to be considered otherwise; and (4) Because the improper tactics and testimony of the West Virginia State Police Crime Laboratory, Serology Division, and any serologist employed by the Division between the years 1979 and 1999, other than Fred S. Zain, was called into question by the WVSCA in <u>Zain III</u> [footnote omitted].   Contrary to the mandate announced in <u>Zain III</u>, the state failed to afford Petitioner a full habeas proceeding.

(<u>Id.</u> at 6-7).

Despite Respondent's contentions that any testing actually performed by Sergeant Murphy should not be excluded, and should be considered in determining the sufficiency of the evidence to support Petitioner's convictions under the <u>Zain I</u> analysis, it was Zain who presented all of the evidence at Petitioner's trial.   The <u>Zain I</u> decision states that "as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding." 438 S.E.2d at 520.   Thus, all of the evidence presented by Zain at trial, whether tested by him or not, must be excluded.   Moreover, in light of the <u>Zain III</u> ruling, it is more appropriate to exclude all of the serology evidence and conduct the appropriate analysis under <u>Napue</u>, <u>Giglio</u>, and <u>Brecht</u>,

supra, to determine whether Petitioner has been denied due process and a fair trial as a result of the serology evidence presented.

Concerning the sufficiency of the remaining evidence, after exclusion of the serology evidence, and whether the serology evidence had a material effect on the jury's verdict, the WVSCA found:

> Following his summary of the evidence presented at trial against Appellant, Judge MacQueen ruled that "petitioner's incriminating statements, the statement's harmony with the physical evidence and related corroboration were certainly sufficiently persuasive to convince twelve reasonable persons [of] his guilt beyond a reasonable doubt."
>
> Notwithstanding Judge MacQueen's denial of relief to Appellant in September 1998, his counsel ultimately convinced the trial court to examine the additional issue of whether the introduction of Mr. Zain's testimony had a prejudicial effect on the jury under this Court's holdings in syllabus point two and three of Zain I.
>
> * * *
>
> The crux of Appellant's appeal is that the trial court, in applying the Atkins test, wrongly concluded that Mr. Zain's testimony did not have a prejudicial effect on the jury. Emphasizing the personal and extensive involvement of Mr. Zain in his prosecution, Appellant states that Mr. Zain collected blood samples at the scene; performed testing on critical pieces of evidence; testified in both of Appellant's trials; and presented key evidence that enabled the jury to decide which of two confessions to believe. Downplaying the significance of Mr. Murphy's involvement in the case, Appellant argues that Mr. Zain's testimony was the key testimony based upon which the jury made its decision regarding which of the two confessions was credible.
>
> * * *
>
> While Appellant strenuously argues that absent the testimony of Mr. Zain the jury had no basis from which to

127

choose between the two confessions, the State explains why this contention is specious.  In making his argument, Appellant chose to ignore various items of evidentiary significance that the jury was presented with that may have affected their decision regarding the truthfulness of the two confessions.  Mr. Reggettz testified at trial and explained the circumstances surrounding the giving of his confession and FULLY REPUDIATED that confession.  Dr. Irving Sopher, the Chief Medical Examiner, testified both to specific marks on the victims' bodies and the contents of their stomachs with regard to the time of their last meal.  The details of Dr. Sopher's testimony suggested the veracity of Appellant's confession, as opposed to that given by Mr. Reggettz.

Perhaps the most convincing corroborative evidence that the jury heard on the issue of confessions, however, was testimony describing the recovery of various items taken from the Reggettz'[s] home. During his confession, Appellant related that he had taken a camera and what he described as "some dishes" from the Reggettz'[s] home. He further indicated that he had given the camera to his father and the dishes to a Ms. Arbutus Pomeroy, his best friend's mother.  The camera that was taken from the Reggettz'[s] home was discovered in Appellant's father's car in Cleveland, Ohio, and Ms. Arbutus Pomeroy testified that Appellant had given her silverware, which was identified as having been taken from the Reggettz'[s] home as a Christmas present, shortly after the time when the murders occurred.

Setting aside the Zain evidence, the confession given by Appellant was powerfully incriminating evidence, as Judge Bloom recognized in ruling on the habeas corpus petition:

> Moss's own confession is a key piece of evidence that stands independently of any Zain-related evidence.  Further, the confession is corroborated in a number of significant ways, which the Court has described as "indices of reliability."  In focusing on Zain, Moss ignores the power of his own well-corroborated confession.

The State convincingly argues that there was sufficient testimony offered through individuals other than Mr. Zain from which the jury could have based its

128

decision to believe Appellant's confession.  Given the abundance of evidence that the jury was presented with that supported Appellant's confession to having committed the subject murders, we simply cannot accept Appellant's argument that Mr. Zain's testimony was per se prejudicial.  Accordingly, we find no error with the trial court's conclusion that the introduction of testimony or evidence by Mr. Zain did not have a prejudicial effect on the jury.  See Syl. Pt. 2, Atkins, 163 W. Va. 502, 261 S.E.2d 55 (1979).

Moss v. Trent [Moss III], 603 S.E.2d at 659-661.  (ECF No. 8, Ex. 7 at 4-6).

The undersigned proposes that the presiding District Judge **FIND** that, absent the serology evidence, there was sufficient evidence to support Petitioner's convictions for the Reggettz murders, and that the admission of the serology evidence at Petitioner's trial did not have a "substantial and injurious effect or influence in determining the jury's verdict."  Petitioner has not sufficiently established evidence to the contrary.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions concerning Petitioner's false evidence claims were neither contrary to, nor an unreasonable application of, clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Petitioner's false evidence claims as stated in Grounds Three, Four, Five and Eight of Petitioner's section 2254

petition.

**E.   Ground Six - Petitioner claims that he was denied a fair trial and due process of law because of an improper closing argument by the prosecutor.**

In Ground Six of his section 2254 petition, Petitioner contends that the prosecutor improperly pointed out that Petitioner did not testify at trial and further improperly implied that Petitioner may have sexually assaulted Vanessa Reggettz on the night of the crimes because her underwear and a homemade sanitary pad were found in the room away from her body. Petitioner alleges that these facts were not presented as evidence to the jury. (ECF No. 2 at 25-27). Petitioner's petition further states:

1.   The trial of this case came down to the simple matter of which confessor the jury would chose to believe.

2.   Both had unsuccessfully attacked their confessions as being unconstitutionally coerced.

3.   Paul Reggettz testified for the state. He told the jury of the pressures and tactics the police employed in illegally extracting his confession. The jury saw him testify, they heard his version of the story.

4.   The petitioner, on the other hand, invoked his constitutional right not to testify. The jury had his confession to consider.

5.   The significance of this fact was not lost on the prosecution in its summation. Repeated references were made in relation to Mr. Reggettz such as:

> [Y]ou saw him on the stand. He told you... (Tr. 1322); Paul told you... You heard him say it. (Tr. 1323); Paul Reggettz told you [about the interrogation]; He told you how they

fired questions at him; You heard what Paul said [about] the interrogation. (Tr. 1324); Paul told you that he just couldn't take it [the interrogation]; (Tr. 1326). You saw Paul Reggettz on the stand. He told you... (Tr. 1330); And how Paul Reggettz says - - he's able to testify and he can say... (Tr. 1386).

References were also made with regard to the petitioner:

John Moss told you about those gifts... (Tr. 1327); [Y]ou heard the defendant on the stand... (Tr. 1332); And then John testified he gave it to another lady... He told you... (Tr. 1335).

6.  Contrary to the state's argument, Petitioner did not testify. He was never on the stand before the jury. He told the jury nothing. The jury was aware of that fact and they were made even more aware of it by the state's improper implication that Petitioner's confession was akin to him having taken the stand, and that he had testified.

7.  The prosecutor deliberately made comments that drew attention to the jury, special facts known only to the prosecutor that they, the jury, were not privy to; it attacked opposing counsel's strategy and/or presentation of Petitioner's case; and was a comment on Petitioner's, or his witness' credibility.

I want to ask defense counsel -- again, ask them to explain how Paul Reggettz's confession changes any of the evidence against John Moss. See if they can explain it. (Tr. 1331).

Did you notice... they didn't talk about blood? Did you notice that there is no explanation..." (Tr. 1370).

131

He didn't necessarily tell you the
whole story.  (Tr. 1376).

Why did he kill [her].  He doesn't
say..."  (Tr. 1377).

8.  Taken as a whole, the state's remarks in closing
amounted to improper comments on the failure of
petitioner to testify and infused the entire trial
process with so a fundamental unfairness as to
deprive petitioner the guarantees of a fair trial.

9.  The state also made the following statement:

He knew Vanessa Reggettz was there
by herself with her two children,
didn't he? He knew that her husband
worked at night.   He didn't
necessarily tell the whole story.
Perhaps, Vanessa Reggettz's panties
are on the bed -- not on her body.
Why her sanitary napkin was on the
floor -- a homemade sanitary napkin,
not store bought one, something has
no pins to secure it, no tape to
secure it no belt to secure it.  It
was secured in place by her
underwear, but her underwear is off
her body and her sanitary napkin is
on the floor.

He did leave out a struggle in the
front bedroom and left out taking
off her underwear.  (Tr. 1376 &
1377).

10.  At the conclusion of the State's argument,
Petitioner's counsel asked to approach the bench.
The court, <u>sua</u> <u>sponte</u>, said, "I know you are going
to raise an objection. [I]s it something that you
think you want a curative instruction on or is it
instructional?  (Tr. 1391).  Petitioner's counsel
replied, "I don't know."  (Tr. 1391).  The court
continued: "The reason I ask is this, if you don't
think it's something that can be taken care of by a
curative instruction. . ."  (Tr. 1391).  ["]You've
made a timely request to object.  I take it you
object to the inference drawn for the panties and

such?"  (Tr. 1392).  Petitioner's counsel replied
"[Y]es."  (Tr. 1391).

11. Petitioner's counsel moved for a mistrial.  (Tr.
1395).  The court stated: "I overruled the motion
for mistrial, and I will deny the request for a
curative instruction."  (Tr. 1396.)

12. There was absolutely no factual basis for the state
to make an argument that the Petitioner had sex
with the victim.  The litany of the sanitary napkin
and its particulars were deliberately designed only
to inflame the jury, and was most certainly highly
prejudicial to the Petitioner at his trial.

(ECF No. 2 at 25-27).

Respondent's Memorandum in Support of his Motion for Summary

Judgment asserts:

Petitioner isolates several comments apart from context
and claims the prosecutor's remarks were prejudicial.
Petitioner claims that statements made by the prosecutor
in closing were veiled comments on Petitioner's failure
to testify.  Petitioner also challenges the prosecutors
comments noting that the victim was found without her
panties, arguing that the comments inferred to the jury
that Petitioner had sexually assaulted the victim even
though there was no evidence of such.

(ECF No. 18 at 57).  Respondent then cites to the state habeas

court's ruling in Case No. 05-MISC-298, which stated:

Mr. Moss claims that the State implicitly stated
that Mr. Moss, an African-American man, had sex with the
victim, a Caucasian woman, during her menstrual cycles.
Mr. Moss avers that there was no direct evidence of
sexual relations and that such statements unduly
prejudiced him.

The victim's husband, Mr. Reggettz, testified at the
trial that his wife was menstruating at the time of her
death and that she used homemade sanitary napkins.
(Trial Transcript, pp. 730-731).  The Chief Medical
Examiner for the State of West Virginia testified that
Ms. Reggettz was wearing a nightgown, but no other

133

> clothing at the time he examined her body.  (Trial
> Transcript, pp.829-830).

(ECF No. 8 Ex. 10 at 9-10).

> Mr. Moss's seventh and final ground for relief
> relates to [t]he prosecutor's statements during the
> closing arguments about the adult victim's panties and
> sanitary napkin.  The Court concludes that this ground
> must be summarily denied and dismissed as Mr. Moss has
> failed to provide this court with probable cause to
> believe that he may be entitled to relief.  The trial
> transcript reveals that there was testimony at trial
> about Ms. Reggettz's use of homemade sanitary napkins and
> the fact that she was not wearing underwear when her body
> was found.  Specifically, the Court concludes that the
> prosecutor's comments were not unduly prejudicial and did
> not infect the trial with unfairness resulting in a
> denial of due process.  See Donnelly v. DeChristofora,
> 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed.2d 431 (1974).

(Id. at 13). (ECF No. 18 at 57-58).

As noted by Respondent, habeas relief is only warranted if a
prosecutor's remarks rendered the trial fundamentally unfair. (ECF
No. 18 at 58).  The United States Supreme Court has held that "a
criminal conviction is not to be lightly overturned on the basis of
a prosecutor's comments standing alone, for the statements or
conduct must be viewed in context; only by so doing can it be
determined whether prosecutor's conduct affected fairness of the
trial." United States v. Young, 470 U.S. 1, 11 (1985).  In fact,
courts have applied what has come to be known as the "invited
response" or "invited reply" rule, whereby courts look at the
remarks within the context of the entire trial to determine whether
the prosecutor's behavior amounted to prejudicial error.  Id. at
12.

134

"Prosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation." <u>Caldwell v. Russell</u>, 181 F.3d 731, 736 (6th Cir. 1999)(citations omitted), <u>abrogated on other grounds</u>, <u>Mackey v. Dutton</u>, 217 F.3d 399, 406 (6th Cir. 2000); <u>see also</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986)("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)).

Respondent's memorandum adds:

> Even if a prosecutor's conduct was improper, "reversal is not warranted unless the defendant has been unfairly prejudiced by the comment." <u>[United States v.] Brockington</u>, 849 F.2d [872] at 875 [(4th Cir. 1988)]. Factors to be considered in determining whether improper comments [] were so damaging to a defendant's trial as to require reversal include: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. <u>United States v. Mitchell</u>, 1 F.3d 235, 241 (4th Cir. 1993) (internal citations omitted); <u>see also</u> <u>United States v. Harrison</u>, 716 F.2d 1050 (4th Cir. 1983).

(ECF No. 18 at 59).

In the instant case, the prosecutor contends that the prosecutor's comments on Petitioner's failure to testify were

135

simply comments concerning Petitioner's lack of explanation of certain events surrounding the crimes in his confession, and that, clearly, the jury could distinguish between a taped confession and the fact that Petitioner did not testify at trial. (Id.) Respondent further asserts that the prosecutor's statements regarding the location of Vanessa Reggettz's underwear and sanitary napkin simply commented on evidence introduced at trial from both Irwin Sopher and Paul Reggettz as noted in the habeas court's order. (Id.) Respondent adds, "[a]rguably the comments may have had questionable evidentiary value, but as set forth in controlling federal precedent on this issue, a prosecutor's closing may rise to the level of being "universally condemned" but unless statements were offered that rendered the trial fundamentally unfair there is no due process violation. Darden, supra." (Id. at 59-60).

Respondent's Memorandum concludes as follows:

In light of Petitioner's confession and the direct evidence corroborating that confession, it cannot be said that comments on evidence introduced at trial of questionable evidentiary value, were significant enough to support the jury's verdict irrespective of the remaining evidence of guilt. Petitioner admitted to killing the Reggettz family. There is no more compelling evidence of guilt than an admission by the accused. The jury had sufficient evidence before it to support a finding of guilt and the statements of the prosecutor viewed in light of Petitioner's admission were not sufficiently material to rise to the level of a due process violation.

Petitioner has presented no evidence that will overcome the presumption that the findings of the habeas court were correct as a matter of law.

136

(Id. at 60).

Petitioner did not address this particular claim in his Response. (ECF No. 23). Likewise, Respondent did not revisit this claim in his Reply. (ECF No. 26)

As has been sufficiently established herein, based upon the Petitioner's confessions and the corroborating physical evidence, there was ample evidence upon which to find Petitioner guilty of these murders beyond a reasonable doubt. Furthermore, the implications made by the prosecutor in closing arguments were supported by the evidence at the crime scene. Given that the evidence was sufficient to find Petitioner guilty of the crimes with which he was charged and viewing the argument in the context of the entire proceedings, such comments did not infect the trial with unfairness or deny Petitioner due process. See Buell v. Mitchell, 274 F.3d 337, 364-65 (6th Cir. 2001); Kinder v. Bowersox, 272 F.3d 532 (8th Cir. 2001); Sublett v. Dormire, 217 F.3d 598 (8th Cir. 2000); United States v. Sanchez-Sotelo, 8 F.3d 202, 211 (5th Cir. 1993); Simmons v. Bowersox, 235 F.3d 1124, 1136-37 (8th Cir. 2001).

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that Petitioner's rights to due process and a fair trial were not violated by the prosecutor's comments in closing argument. The court further proposes that the presiding District Judge **FIND** that the state courts' decisions were not

contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, or based upon an unreasonable determination of the facts as set forth in the record, and that Respondent is entitled to judgment as a matter of law on Ground Six of Petitioner's section 2254 petition.

**F.   Ground Seven - Denial of full and fair habeas corpus evidentiary hearing and appointment of counsel.**

In Ground Seven of his section 2254 petition, Petitioner asserts that his rights to equal protection and due process of law were violated because the state courts failed to provide him with appointment of counsel and a full and fair evidentiary hearing, following the WVSCA's decision in Zain III. (ECF No. 2 at 27). In support of this claim, Petitioner states:

1.   On June 16, 2006, the West Virginia Supreme Court of Appeals filed its opinion styled In the matter of: Renewed Investigation of the State Police Crime Laboratory, Serology Division, 2006 W. VA. LEXIS 512006, W.VA. LEXIS 51, NO. 32885 [633 S.E.2d 762 (W. Va. 2006)]. The Supreme Court enunciated the following directive:

A prisoner against whom a West Virginia State Police Crime Laboratory serologist other than Fred Zain offered evidence and who challenges his or her conviction based on serology evidence is to be granted a full habeas corpus hearing on the issue of the serology evidence. The prisoner is to be represented by counsel unless he or she knowingly and intelligently waives that right. The circuit court is to review the serology evidence presented by the prisoner

138

with painstaking scrutiny. At the close of the evidence, the circuit court is to draft a comprehensive order which includes detailed findings as to the truth or falsity, whether the prisoner has shown the necessity of a new trial based on the five factors set forth in <u>State v. Frazier</u>, 162 W. Va. 935, 253 S.E.2d 534 (1979). Syllabus Point 4.

A prisoner who was convicted between 1979 and 1999 and against whom a serologist, other than Fred Zain, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence despite the fact that the prisoner brought a prior habeas corpus challenge to the same serology evidence, and the challenge was finally adjudicated. Syllabus Point 6.

2. In announcing these new syllabus points, the WVSCA adopted the reports of findings submitted by the Honorable Thomas A. Bedell, Special Judge, but with modifications thereto. Those modifications included the additional findings that, though insufficient evidence exists to rule Zain's assistant serologists engaged in misconduct, errors did occur in the proceedings below. Justice Maynard opined:

"[B]ecause of the frequent and recurring errors identified in the work of Zain's assistant serologists we deem it necessary to enact a special habeas corpus procedure . . . to be utilized by those prisoners against whom serologists other than Zain, offered evidence."

3. On or about June 21, 2006, Petitioner filed his Special Habeas Corpus with the Kanawha County Circuit Court pursuant to the WVSCA madate, alleging that serologists other than Fred Zain

139

offered evidence at his 1990 trial that was
falsified and/or substantially incorrect.

4.   On October 16, 2006, the Honorable Judge Louis H.
Bloom, entered an Order summarily denying
Petitioner's Writ of Habeas Corpus, in direct
contravention of the Supreme Court's Mandate that
counsel be appointed and a full hearing be held in
the matter.

5.   On or about January 31, 2007, Petitioner filed his
pro se petition with the WVSCA appealing the
circuit court's Order summarily dismissing
Petitioner's petition.

6.   On or about June 9, 2007, the WVSCA refused said
appeal, in direct violation of their express
mandate in their previous ruling, and not in
accordance with the State of West Virginia
constitutional directive as contained in Article
VIII, Section 4, which states:

> A writ of error, supersedeas or
> appeal shall be allowed by the
> supreme court of appeals, or justice
> thereof, only upon a petition
> assigning error in the judgment or
> proceedings of a court and then only
> after the court, or justice thereof,
> shall have considered the record and
> is satisfied that there is probably
> error in the record, or that it
> presents a point proper for the
> consideration of the court.

(ECF No. 2 at 27-29).

Respondent's Memorandum of Law asserts that this claim is not

cognizable in federal habeas corpus.   (ECF No. 18 at 64).

Respondent's Memorandum states:

> In grounds seven and eight, Petitioner challenges
> his post-conviction proceedings including the failure of
> the habeas court to appoint counsel in all of
> Petitioner's post-conviction Zain challenges. Petitioner
> also claims that he was denied review under the West

140

Virginia Supreme Court's rulings under all of the Zain
cases as was his right under the holdings in those
case[s].

Both grounds challenge state court post-conviction
proceedings and as such, cannot form the basis of relief
in federal habeas.  Although Petitioner does also argue
that he was denied review as mandated by the West
Virginia Supreme Court in subsequent Zain decisions, this
still amounts to a challenge to post-conviction review.
Because there is no constitutional right to post
conviction review under the Zain line of cases, any such
claim amounts to a challenge to post-conviction
proceedings since the Zain cases specifically apply to
post conviction review.  Because there is no federally
guaranteed constitutional right to review under [the]
Zain line of cases and Zain remedies are a purely
prophylactic state court post conviction remedy, this
claim cannot form the foundation of federal habeas
relief.  A federal court may only grant habeas relief "on
the ground[s] that [the Petitioner] is in custody in
violation of the Constitution or laws or treaties of the
United States.  28 U.S.C. § 2254(a).  There is no
constitutional right requiring the States to provide any
avenue for State post-conviction collateral relief:

> A state prisoner has no federal
> constitutional right to post-conviction
> proceedings in state court. Lackawanna County
> Dist. Att'y v. Cross, 532 U.S. 394, 402
> (2001)(noting that "each State has created
> mechanisms for both direct appeal and state
> post-conviction review, even though there is
> no constitutional mandate that they do so"
> (internal citations omitted)); Pennsylvania v.
> Finley, 481 U.S. 551, 557, 107 S. Ct. 1990, 95
> L. Ed.2d 539 (1987).  Thus, even where there
> is some error in state post-conviction
> proceedings, a petitioner is not entitled to
> federal habeas relief because the assignment
> of error relating to those post-conviction
> proceedings represents an attack on a
> proceedings collateral to detention and not to
> the detention itself. Bryant v. Maryland, 848
> F.2d 492, 493 (4th Cir. 1988)("[C]laims of
> error occurring in a state post-conviction
> proceeding cannot serve as a basis for federal
> habeas corpus relief."); see also Bell-Bey v.

141

Roper, 499 F.3d 752, 756 (8th Cir. 2007)

(ECF No. 18 at 64-65).

Petitioner's Response repeats his assertion that the state failed to afford him a full habeas proceeding under the mandate of Zain III.  His Response further states:

> Petitioner made allegations of improper tactics against a serologist, other than Zain, specifically Robert Murphy, upon whom Respondent asks this Court to consider as being reliable.  Robert Murphy worked at the crime laboratory between the stated years.  The state court(s), however, failed to allow Petitioner to develop his factual claims.  They did so by using an erroneous legal analysis.  The WVSCA announced incertitude over Robert Murphy's body of work and mandated an evidentiary hearing should be held, even if the Petitioner was previously given full Zain habeas proceedings including a prior evidentiary hearing, to resolve any allegations against the serologist.  The state courts failed to afford Petitioner that opportunity and summarily denied and dismissed his claims.  Based on the WVSCA's ruling that the reliability of **all** serologists work is questionable, this Court cannot rely upon Murphy's testimony or alleged evidence before having proper factual development and should, therefore, appoint counsel to investigate, order process allowed under the Rules of Discovery and, inter alia, hold an evidentiary hearing to resolve the dispute.

(ECF No. 23 at 7).

Petitioner's Response then identifies inconsistencies or errors in the record concerning Murphy's grand jury and deposition testimony and test results found in the June 10, 1980 report versus some of the underlying data produced during Petitioner's Zain I habeas proceeding.  (Id. at 7-11).  Respondent did not re-address this claim in his Reply.  (ECF No. 26).

142

As aptly noted by Respondent, this claim is not cognizable in federal habeas corpus. <u>Bryant v. Maryland</u>, 848 F.2d 492 (4th Cir. 1988) (infirmities in state post-conviction proceedings cannot serve as a basis for federal habeas corpus relief). Generally, a federal court cannot grant habeas relief based on errors occurring during state collateral review proceedings. <u>See</u> <u>Wright v. Angelone</u>, 151 F.3d 151, 159 (4th Cir. 1998). Furthermore, Petitioner does not have a constitutional right to counsel in a state court habeas corpus proceeding. <u>See</u> <u>Murray v. Giarratano</u>, 492 U.S.1 (1989); <u>Pennsylvania v. Finley</u>, 481 U.S. 551 (1987). To the extent that Petitioner is asserting that the failure to appoint counsel and conduct a full review of the serology evidence under the WVSCA's decision in <u>Zain III</u> was a fundamental miscarriage of justice that denied him due process of law, his claim lacks merit.

In light of the <u>Zain I</u> decision, all of the serology evidence was removed from consideration, and a determination of the sufficiency of evidence to support Petitioner's convictions was made. Even after a full review of Murphy's conduct in deriving the serological test results, if such results were determined to be false, the result would be the same. Moreover, Petitioner appealed the summary denial of his "<u>Zain III</u>" habeas petition to the WVSCA, which refused his petition for appeal. If the court that issued the <u>Zain III</u> decision thought that Petitioner had been improperly denied review, it could have taken action to remand the case to the

Circuit Court; but it did not.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner's claim in Ground Seven of his section 2254 petition is not cognizable in federal habeas corpus, and that Respondent is entitled to judgment as a matter of law on that claim.

### G.  Ground Nine - Ineffective assistance of counsel claims.

In Ground Nine of his section 2254 petition, Petitioner asserts four claims of ineffective assistance of counsel by the various attorneys who represented him through his two trials and his direct appeals.  The four claims state as follows:

> A.  Counsel [at Petitioner's second trial] failed to bring to the trial and appellate court's attention the fact that the two October 28, 1980, confessions were the subject of an extensive Motion and Memorandum, Hearing, and testimony and was, in fact, objected to by counsel prior to the first trial, based on, inter alia, W. Va. Code § 49-5-8(d).

> B.  If trial counsel, at the first trial, failed to object to the West Virginia authorities' failure to promptly present the juvenile defendant to a neutral Judicial Officer prior to taking Petitioner's alleged confessions.

> C.  Trial counsel failed to conduct adequate investigation into the facts and law of the case prior to Petitioner's second trial.

> D.  Appellate counsel failed to conduct adequate investigation and research prior to perfecting and filing a petition for appeal from Petitioner's second trial.

(ECF No. 2 at 53).

In Strickland v. Washington, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel. A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 687-91. Moreover, "judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard." Holman v. Gilmore, 126 F.3d 876, 881 (7th Cir. 1997). Using this standard, and based upon all of the evidence of record, the court will address the merit of each of the allegations concerning ineffective assistance of counsel in the order they were presented by Petitioner.

### Failure to challenge admission of confessions

As was laid out extensively in addressing Grounds One and Two above, the record demonstrates that Petitioner's first trial counsel did not lodge a specific objection to the admission of Petitioner's two October 28, 1980 confessions on the basis that he was not taken before a neutral judicial officer, pursuant to W. Va. Code § 49-5-8(d); whereas in the in camera hearing, which dealt exclusively with the admissibility of Petitioner's third confession

made on October 30, 1980, his counsel did make the argument that
Petitioner was not taken before a neutral judicial officer.  Thus,
when the WVSCA reviewed the matter under the Court's ruling in
Ellsworth J.R., which was not retroactively applicable, unless an
objection had been lodged on that basis, the Court found that only
the third confession had been objected to on that basis and, thus,
should have been inadmissible.

> Petitioner asserts that:

> The results of the second trial court's ruling,
> therefore, would certainly have been different and the
> two confessions of 28 October, 1980, would have been
> excluded as well as the evidence resulting therefrom.
> Coupled with Reggettz's confession, without the three
> confessions and the "poisoned" evidence resulting
> therefrom, the results of Petitioner's trial would have
> been an acquittal.  Indeed, a trial probably would not
> have occurred, because the state would have had no
> evidence to present.

(Id. at 54).

Petitioner further asserts that his second trial attorneys
failed to bring to the trial court's attention that such objections
were entered on the first two confessions, or to formulate any
argument against the second trial court's determination that the
finding that the first two confessions were admissible was the "law
of the case."  Petitioner further asserts that his counsel failed
to object to the court's erroneous determination that taking
Petitioner to the Parkersburg State Police Detachment did not
violate the West Virginia juvenile prompt presentment rule.  (Id.
at 55).  Finally, Petitioner asserts that his appellate counsel did

146

not raise a claim concerning such error in his appeal following the second trial. (Id.)

Respondent's Memorandum of Law in support of his Motion for Summary Judgment couches Petitioner's ineffective assistance of counsel claims as follows: "Petitioner argues that trial counsel failed to challenge Petitioner's confessions based on testimony and hearings conducted in the first trial. Petitioner claims that trial counsel failed to investigate and appellate counsel failed to adequately investigate." (ECF No. 18 at 60). Respondent's brief also refuses to address Petitioner's claims of ineffective assistance of counsel stemming from his first trial. (Id. n.11). Respondent's Memorandum further states:

> Petitioner's claims rest on issues previously adjudicated and settled by the state courts as noted in Judge Bloom's findings. It cannot be said that trial counsel failed to investigate issues surrounding Petitioner's confession when the courts ruled thirty years ago Petitioner's confessions were voluntarily given and admissible unless there was new evidence that would effect the issue and Petitioner has presented no such evidence. Nor can Petitioner challenge trial court's actions stemming from events that occurred during the first trial. Petitioner's challenges to trial counsel's actions do not contemplate the fact that trial counsel could not challenge issues after they had been addressed and settled by the West Virginia Supreme Court. As noted by the habeas courts, the WVSCA settled all issues surrounding Petitioner's confession and his juvenile transfer hearing. Therefore any actions by trial counsel relating to both issues cannot form the basis of a claim of ineffective assistance of counsel.

(Id. at 62). Respondent also quotes the decisions in Petitioner's second (Case No. 05-MISC-298) and fourth (Case No. 07-MISC-403)

147

Circuit Court habeas petitions, in which Petitioner raised his ineffective assistance of counsel claims. (<u>Id.</u> at 60-61).

Addressing Ground 3 of Petitioner's habeas corpus petition in Case No. 05-MISC-298, the Circuit Court held:

> 19.  The Court finds as fact that the third ground raised in Mr. Moss's petition is based on the following two averments: (1) Mr. Moss's trial counsel failed to bring the trial court's attention to the fact that two of the confessions were the subject of an extensive motion and memorandum; and (2) Mr. Moss's trial counsel failed to object to the admission of his confessions based on the failure to promptly present Mr. Moss to a neutral judicial officer.  The Court finds that these grounds relate to the admissibility of Mr. Moss's confessions, which has been previously raised, considered and denied, on the merits, by the Supreme Court of Appeals and this Court in Mr. Moss's prior habeas petition and appeal.
>
> * * *
>
> 3.  The Court concludes that Mr. Moss's third ground for relief must be SUMMARILY DENIED AND DISMISSED as it relates to the admissibility of his confessions, which was previously raised, considered, and denied, on the merits, by this Court and the Supreme Court of Appeals of West Virginia.

(ECF No. 7, 11-12).  The Order further states that Petitioner had previously raised his ineffective assistance of counsel claims in two other petitions, and that the issues were fully and finally adjudicated.  (<u>Id.</u> at 8-9, 12).

This federal court is not charged with reviewing the conduct of Petitioner's counsel at his first trial, where his convictions were ultimately vacated.  As noted previously herein, Petitioner's

148

second trial counsel did object and move to suppress Petitioner's first two confessions on the basis of the failure of the state to comply with the juvenile prompt presentment rule. However, because no prior objection on that basis had been articulated in Petitioner's first trial proceedings (a fact that has been affirmatively established from the undersigned's review of the entire record), the WVSCA had already ruled that the two confessions were admissible on those grounds and the Circuit Court found that to be the law of the case. Petitioner's second trial counsel had no factual or legal basis to challenge this ruling.

Likewise, Petitioner's appellate counsel had no basis to challenge the admission of his first two confessions on the basis of the juvenile prompt presentment rule or the Circuit Court's "law of the case" finding concerning the same. Concerning the alleged ineffective assistance of his appellate counsel, Petitioner's section 2254 petition merely states: "Appellate counsel's failure to investigate these facts as well as the law in regard to this case constituted ineffective assistance of counsel at the appellate level." (ECF No. 2 at 58). Petitioner has not identified any other specific facts or law he believes his appellate counsel failed to investigate prior to filing his petition for appeal.

<u>Failure to call witnesses</u>

Turning to the issue of the failure to call witnesses, in Case No. 07-MISC-403, Petitioner raised additional claims of ineffective

assistance of counsel, specifically, that his second trial counsel failed to call witnesses which would have disproved Paul Reggettz's testimony that the silverware given to Arbutus (Johnson) Pomeroy and the camera seized from Petitioner's father's car had actually been taken from the Reggettz home. (ECF No. 35, Ex. 36 at 5a-5c). Petitioner further asserts that this additional witness testimony would have called into doubt the reliability of Petitioner's confession, and that the jury's verdict would have been different. (Id. at 5b-5c).

Paul Reggettz testified, inter alia, that he owned a Kodak instant camera. He was shown two Kodak instant cameras that had been seized from the Moss home in Cleveland. (ECF No. 17, Ex, 20 at 723-724). Upon being asked if he could tell the difference between the two Kodak cameras he was shown, Reggettz stated:

> A. Mine was in excellent condition. For one thing, the handle on mine was there, and that one's gone. That one has a name on it. The only name mine had on it was not a name, it was on this part here -- there are three little slots that you put your initials and I had put VET there on the back. There's nothing on this one, but the one I had put VET on it. Mine was in excellent condition. It was a new camera. I hadn't had it that long.

(Id.) Reggettz further testified that one of the cameras had a rough spot on the location where the initials "VET" had been (as though the initials had been scraped off) and the other camera had the name "Moss" on it. (Id. at 725). Reggettz stated that he didn't immediately tell the police about the camera because he

didn't know it was missing.  (Id. at 727).

Paul Reggettz further testified as follows concerning the
silverware that was among the Christmas gifts he had purchased for
his wife and children:

> Q.   Let me hand you Exhibit 100 [the silverware
> obtained from Arbutus Johnson], and ask you to
> examine those.  Can you identify that?
>
> A.   Oh, it's like a set that I had got my wife that
> year.
>
> Q.   Do you recall where you bought it?
>
> A.   Well, I thought I had got it at K-Mart, from what I
> remember; but I can't say for sure.  I thought I
> bought it at K-Mart.  One reason is because I told
> her to go ahead and get it; it was on sale -- I
> remember that.  But I thought it was at the K-Mart
> we shopped at in St. Albans.
>
> Q.   Were you with her when it was purchased?
>
> A.   Yes, ma'am.
>
> Q.   What do you remember about the silverware?
>
> A.   It had flowers on it.  I called them roses.

(Id. at 733-734).

At Petitioner's first trial, his counsel called Edith Lilly,
a K-Mart merchandising and ordering manager, as a witness.  Ms.
Lilly testified that K-mart never sold the brand of silverware that
had been turned over by Arbutus (Johnson) Pomeroy.  (ECF No. 2 at
56).  Petitioner states that, despite his requests to recall Ms.
Lilly, his second trial counsel failed to do so.  Petitioner claims
that Ms. Lilly's testimony was crucial, and would have created

reasonable doubt as to whether the silverware was actually taken from the Reggettz home by Petitioner on the night of the murders. (Id.)

Petitioner further asserts that, originally, no camera was alleged to have been missing from the Reggettz home. Petitioner states that the only evidence offered that a camera that was seized from Petitioner's father's car was taken from the Reggettz home was Paul Reggettz's self-serving testimony, and that the State offered no corroborating evidence that Paul Reggettz owned a camera that went missing after the murders. (Id. at 57). Petitioner's section 2254 petition adds:

> 16. On the other hand, both Petitioner's parents (John and Marzee Moss) were called as witnesses at the first trial in 1984. Both witnesses substantiated the fact Petitioner owned a camera like the one identified by Paul Reggettz as being his camera. It was further established that both Petitioner and his sister had owned cameras and that Petitioner had his camera during the summer of 1979 prior to the December 1979 murders of the Reggettz family. Petitioner's mother passed away prior to the second trial and Petitioner's father was not called by trial counsel to testify at the second trial even though Petitioner requested the same.

(Id.)

Concerning his second trial counsel's failure to call these witnesses about the silverware and the camera, Ground Nine of Petitioner's section 2254 petition further asserts:

> 20. The deficient performance by the second trial counsel in failing to put on witnesses whose testimony dispels the self-serving testimony of Paul Reggettz concerning the alleged items removed

152

from the Reggettz home during the murders of his family, or, at the least, creates a reasonable doubt as [to] the veracity of Reggettz's testimony concerning the same, prejudiced Petitioner three-fold. First, the jurors at the second trial did not hear the compelling testimony of the omitted witnesses testifying from the stand; the Kanawha County Circuit Court was not afforded the opportunity to consider the testimony in its decision to deny Petitioner relief in all of his habeas corpus petitions, and third, the WVSCA didn't have the benefit of the witness's testimony in considering all of Petitioner's appeals of all the circuit court's denials of his petitions for writ of habeas corpus. If any one of the above-named entities had had the available testimony to consider, the results of these proceedings certainly would be different.

(Id. at 58).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment does not specifically address this claim of ineffective assistance of counsel. (ECF No. 8).

However, Petitioner re-addressed this claim in his Response, stating:

Although not announced as an analysis of an ineffective assistance of counsel claim, the WVSCA placed great emphasis on the testimony of Arbutus Johnson concerning flatware Petitioner gave her as a Christmas present and the fact, as they articulated, the flatware came from the Reggettz home. Petitioner asserts the WVSCA relies on the transcript records of only the second trial in reaching their erroneous determination. Petitioner also claims that the second trial counsel were ineffective for failing to call the same type witness at the second trial that testified at the first trial that K Mart had never carried a pattern such as was entered into evidence. This is key because it was left unchallenged at the second trial whereas at the first trial it was irrefutably demonstrated that, contrary to Reggettz's testimony at the second trial, the flatware given by Petitioner could not possibly have come from the

153

Reggettz home.   Due to counsel's deficiency, this fact was not brought before the WVSCA.

(ECF No. 23 at 6).

Respondent did address this ineffective assistance of counsel claim in his Reply:

Specifically, Petitioner claims that trial counsel from the second trial did not call a witness from the first trial who testified that the flatware recovered from Mrs. Arbutus Johnson was not sold by K-Mart. Petitioner claims the state courts never performed findings on this claim and, as such, it is grounds to deny summary judgment because it constitutes another issue of material fact in dispute.

(ECF No. 26 at 8).

Concerning these claims of ineffective assistance of counsel, the Circuit Court found as follows:

27. The Court finds as fact that the assertion tendered by Moss in his current petition relates to physical evidence and the reliability of his confession. Specifically, Moss asserts that his counsel failed to present testimony regarding silverware and a camera allegedly stolen from the victim's home. Moss asserts if such testimony had been provided and his counsel had not acted deficiently, there would not have been evidence sufficient to sustain his conviction. Moss further questions the reliability of his confession and his attorneys presentment of testimony in relation thereto.

(ECF No. 8, Ex. 16 at 8). The Circuit Court then summarily denied Petitioner's claims as either having already been adjudicated or as having been waived because they were not raised in prior proceedings. (Id. at 12).

The undersigned first notes that Petitioner's father was called as a witness at his second trial and he testified about the

cameras that were taken from their house in Cleveland.  (ECF. No. 17, Ex. 20 at 1196-1201).  Thus, there is no merit to Petitioner's claim concerning this witness.

Ms. Lilly, on the other hand, was not called as a witness at Petitioner's second trial.  As noted above, Petitioner claims that Ms. Lilly's testimony that the silverware that was Petitioner gave to Arbutus (Johnson) Pomeroy for Christmas in 1979 was not sold at K-Mart, would have demonstrated that the silverware was not taken from the Reggettz home.  This entire theory is premised on Reggettz's testimony that he thought that he and his wife purchased the silverware at the K-Mart in St. Albans.  However, earlier in Reggettz's testimony, he stated that they also frequently shopped at a Heck's in Huntington.  (ECF No. 17, Ex. 20 at 671-672).

Thus, it is reasonable to believe that Reggettz could have purchased the silverware from somewhere other than K-Mart.  The most that Ms. Lilly's testimony would have demonstrated was that, several years after the brutal murder of his family, Reggettz was incorrect about where he purchased the silverware.

Petitioner claims that Ms. Lilly's testimony would have called into doubt Paul Reggettz's testimony and would have altered the jury's guilty verdicts.  However, the jury in Petitioner's first trial heard this evidence and still found Petitioner guilty. Moreover, Petitioner overlooks the crucial fact that he confessed to taking a set of "dishes" from the Reggettz house and further

confessed that he gave them to Arbutus (Johnson) Pomeroy, and the jury heard that fact in his taped confession.

Ineffective assistance of counsel is not shown where a witness who is not called to testify would not have helped the defense. See Jones v. Taylor, 547 F.2d 808, 810 (4th Cir. 1977). Furthermore, the decision of whether to call these witnesses was a matter of trial strategy. The United States Court of Appeals for the Fourth Circuit has held that ineffective assistance of counsel may not be established by questioning counsel's choice of strategy. See Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991). The decision not to call these witnesses did not prejudice Petitioner's defense.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has failed to demonstrate that his trial counsels' conduct fell below an objective standard of reasonableness. Petitioner merely speculates that testimony of the named witnesses that were not called by his counsel as defense witnesses would have changed the outcome of his trial. Based upon a review of the entire record, the undersigned proposes that the presiding District Judge **FIND** that the decision of Petitioner's counsel not to call certain witnesses at trial was a matter of trial strategy, and that the decision was objectively reasonable under the totality of the circumstances.

It is also well-settled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." <u>Strickland</u>, 466 U.S. at 690.  Petitioner has not shown that his counsels' choices were anything other than trial strategy; nor has he demonstrated that either his trial counsels' or his appellate counsel's conduct fell below an objective standard of reasonableness.

Moreover, Petitioner has not shown that there is a reasonable probability that, but for his counsels' alleged unprofessional errors, the result of the proceeding would have been different. Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not made a sufficient showing of ineffective assistance of counsel based upon these grounds.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state habeas courts' decisions denying Petitioner habeas corpus relief on the basis of ineffective assistance of counsel were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on each of Petitioner's claims of ineffective assistance of counsel as raised in Ground Nine of his section 2254 petition.

## <u>RECOMMENDATION</u>

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for

157

Summary Judgment (ECF No. 17), and dismiss this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(C), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of this Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on the opposing party and Chief Judge Goodwin.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and to transmit a copy to counsel of record.

___July 26, 2011___                    *Mary E. Stanley*
          Date                              Mary E. Stanley
                                    United States Magistrate Judge

159